| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| Ronald K. Brown, Jr., Esq. SBN 102012<br>Ronald K. Brown, Jr., APC<br>901 Dove Street, #120<br>Newport Beach, CA 92660<br>ron@rkbrownlaw.com | |

☐ *Individual appearing without attorney*
☒ *Attorney for:* SDCO Tustin Executive Center, Inc.

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION**

| In re:<br><br>The Litigation Practice Group P.C., a California corporation | CASE NO.: 8:23-bk-10571<br>CHAPTER: 11 |
|---|---|
| | **NOTICE OF MOTION AND MOTION FOR RELIEF FROM THE AUTOMATIC STAY OR FOR ORDER CONFIRMING THAT THE AUTOMATIC STAY DOES NOT APPLY UNDER 11 U.S.C. § 362(l) (with supporting declarations) (UNLAWFUL DETAINER)** |
| Debtor(s). | DATE: 05/03/2023<br>TIME: 1:30 pm<br>COURTROOM: 5C |

**Movant:** SDCO Tustin Executive Center, Inc., a Delaware corporation

1. **Hearing Location**:
   - ☐ 255 East Temple Street, Los Angeles, CA 90012    ☒ 411 West Fourth Street, Santa Ana, CA 92701
   - ☐ 21041 Burbank Boulevard, Woodland Hills, CA 91367    ☐ 1415 State Street, Santa Barbara, CA 93101
   - ☐ 3420 Twelfth Street, Riverside, CA 92501

2. Notice is given to the Debtor and trustee (*if any*)(Responding Parties), their attorneys (*if any*), and other interested parties that on the date and time and in the courtroom stated above, Movant will request that this court enter an order granting relief from the automatic stay as to Debtor and Debtor's bankruptcy estate on the grounds set forth in the attached Motion.

3. To file a response to the motion, you may obtain an approved court form at www.cacb.uscourts.gov/forms for use in preparing your response (optional LBR form F 4001-1.RFS.RESPONSE), or you may prepare your response using the format required by LBR 9004-1 and the Court Manual.

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

4. When serving a response to the motion, serve a copy of it upon the Movant's attorney (or upon Movant, if the motion was filed by an unrepresented individual) at the address set forth above.

5. If you fail to timely file and serve a written response to the motion, or fail to appear at the hearing, the court may deem such failure as consent to granting of the motion.

6. ☒ This motion is being heard on REGULAR NOTICE pursuant to LBR 9013-1(d). If you wish to oppose this motion, you must file and serve a written response to this motion no later than 14 days before the hearing and appear at the hearing.

7. ☐ This motion is being heard on SHORTENED NOTICE pursuant to LBR 9075-1(b). If you wish to oppose this motion, you must file and serve a response no later than (date) _____ and (time) _____ and you may appear at the hearing.

a. ☐ An application for order setting hearing on shortened notice was not required (according to the calendaring procedures of the assigned judge).

b. ☐ An application for order setting hearing on shortened notice was filed and was granted by the court and such motion and order have been or are being served upon the Debtor and upon the trustee (if any).

c. ☐ An application for order setting hearing on shortened notice was filed and remains pending. After the court rules on that application, you will be served with another notice or an order that specifies the date, time and place of the hearing on the attached motion and the deadline for filing and serving a written opposition to the motion.

Date: 3/28/2023

Ronald K. Brown, Jr. APC
_____
Printed name of law firm (if applicable)

Ronald K. Brown, Jr.
_____
Printed name of individual Movant or attorney for Movant

_____
Signature of individual Movant or attorney for Movant

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

June 2014                                    Page 2                              F 4001-1.RFS.UD.MOTION

## MOTION FOR RELIEF FROM THE AUTOMATIC STAY OR FOR ORDER CONFIRMING THAT THE AUTOMATIC STAY DOES NOT APPLY
### (Unlawful Detainer)

1. **Movant is the:**

   a. ☐ Owner of the Property
   b. ☒ Authorized Agent of the owner of the Property
   c. ☐ Other (specify):

2. **The Property at Issue (Property):**

   Type of Property: ☐ Residential ☒ Nonresidential

   *Street Address:* 17542 E. 17th Street
   *Unit/Suite Number:* Suites 100, 105, 250 & 330
   *City, State, Zip Code:* Tustin, CA 92780 (Orange County)

3. **Bankruptcy Case History:**

   a. ☒ A voluntary ☐ An involuntary petition under chapter ☐ 7 ☒ 11 ☐ 12 ☐ 13 was filed on (date): 03/20/2023

   b. ☐ An order to convert this case to chapter ☐ 7 ☐ 11 ☐ 12 ☐ 13 was entered on (date):

   c. ☐ A plan was confirmed on (date):

4. **Pursuant to 11 U.S.C. § 362(b)(22) and (23) there is no stay because (check all that apply):**

   a. ☐ Movant commenced an eviction, unlawful detainer action or similar proceeding against the Debtor involving residential property in which the Debtor resides and:

      (1) ☐ The Debtor has not filed and served on Movant the certification required under 11 U.S.C. § 362(l)(1).

      (2) ☐ The Debtor or adult dependent of the Debtor has not deposited with the clerk any rent that would become due during the 30-day period after the filing of the petition.

      (3) ☐ The Debtor or adult dependent of the Debtor has not filed and served on Movant the further certification required under 11 U.S.C. § 362(l)(2) that the entire monetary default that gave rise to the judgment has been cured.

      (4) ☐ Movant filed and served an objection to the Debtor's certification. A copy of the objection is attached as Exhibit _____. A hearing on this objection is set for (date) _____.

5. **Grounds for Relief from Stay: (check all that apply)**

   a. ☒ Pursuant to 11 U.S.C. § 362(d)(1), cause exists because, as of the bankruptcy petition date, the Debtor had no right to continued occupancy of the premises, as follows:

      (1) ☒ Movant caused a notice to quit to be served on the Debtor.

      (2) ☒ An unlawful detainer proceeding was commenced on (date) 03/08/2023

      (3) ☐ An unlawful detainer judgment was entered on (date) _____

---

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

June 2014                                      Page 3                          F 4001-1.RFS.UD.MOTION

(4) ☐ Movant acquired title to the Property by foreclosure sale before the bankruptcy petition was filed and recorded the deed within the period provided by state law for perfection.

(5) ☐ Movant acquired title to the Property by foreclosure sale after the bankruptcy petition was filed and recorded the deed within the period provided by state law for perfection.

b. ☒ Pursuant to 11 U.S.C. § 362(d)(1) the Debtor's right to possession should be terminated because (*check all that apply*):

(1) ☐ The lease or other right of occupancy expired by its terms on (*date*) _____.

(2) ☐ The lease has matured, been rejected or deemed rejected by operation of law on (*date*) _____.

(3) ☒ Lease payments have not been made after the filing of the bankruptcy petition.

(4) ☐ An unlawful detainer action was filed to obtain possession of the Property on grounds of endangerment of the Property or because of illegal use of controlled substances on the Property and Movant filed and served upon the Debtor a certification that ☐ such an action was filed or ☐ that within the 30 days preceding the certification, the Debtor has endangered the subject Property or illegally allowed the use of controlled substances on the Property. A copy of Movant's certification is attached as Exhibit _____. The Debtor ☐ has ☐ has not filed an objection to Movant's certification. A copy of the Debtor's objection, if any, is attached as Exhibit _____. A hearing on this objection is set for (*date*) _____.

(5) ☐ The bankruptcy case was filed in bad faith:

(A) ☐ Movant is the only creditor or one of few creditors listed in the Debtor's case commencement documents.

(B) ☐ Other bankruptcy cases have been filed in which an interest in the Property was asserted.

(C) ☐ The Debtor filed only a few case commencement documents. No schedules or statement of financial affairs (or chapter 13 plan, if appropriate) has been filed.

(D) ☐ There was a recent transfer of all or part ownership of, or other interest in the Property without the consent of the Movant or court approval.

c. ☒ Pursuant to 11 U.S.C. § 362(d)(2)(A), the Debtor has no equity in the Property; and pursuant to 11 U.S.C § 362(d)(2)(B), the Property is not necessary to an effective reorganization.

6. **Grounds for Annulment of the Stay.** Movant took postpetition actions against the Property or the Debtor:

a. ☐ These actions were taken before Movant knew the bankruptcy petition was filed, and Movant would have been entitled to relief from stay to proceed with these actions.

b. ☐ Movant knew the bankruptcy case had been filed, but Movant previously obtained relief from stay to proceed with these enforcement actions in prior bankruptcy cases affecting the Property as set forth in Exhibit _____.

c. ☐ Other:

---

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

June 2014                              Page 4                              F 4001-1.RFS.UD.MOTION

7. **Evidence in Support of Motion:** *(Important Note: Declaration(s) in support of the Motion MUST be signed under penalty of perjury and attached to this motion.)*

    a.  The UNLAWFUL DETAINER DECLARATION on page 7.

    b.  ☐ Supplemental declaration(s).

    c.  ☐ Other *(specify)*:

**Movant requests the following relief.**

1. Relief from stay pursuant to:  ☒ 11 U.S.C. § 362(d)(1)  ☒ 11 U.S.C. § 362(d)(2)

2. ☒ Movant (and any successors or assigns) may proceed under applicable nonbankruptcy law to enforce its remedies to obtain possession of the Property.

3. ☐ Confirmation that there is no stay in effect.

4. ☐ The stay is annulled retroactive to the bankruptcy petition date. Any postpetition acts taken by Movant to enforce its remedies regarding the Property shall not constitute a violation of the stay.

5. ☐ The co-debtor stay of 11 U.S.C. § 1201(a) or § 1301(a) is terminated, modified or annulled as to the co-debtor, on the same terms and conditions as to the Debtor.

6. ☒ The 14-day stay prescribed by FRBP 4001(a)(3) is waived.

7. ☐ A designated law enforcement officer may evict the Debtor and any other occupant from the Property regardless of any future bankruptcy filing concerning the Property for a period of 180 days from the hearing of this motion.
    ☐ without further notice.
    ☐ upon recording of a copy of the order or giving appropriate notice of its entry in compliance with applicable nonbankruptcy law.

8. ☐ Relief from stay is granted under 11 U.S.C. § 362(d)(4), if the order granting this motion is recorded in compliance with state laws governing notices of interest or liens in real property, the order is binding in any other case under this title purporting to affect the Property filed not later than two years after the date of entry of such order, except that a debtor in a subsequent case under this title may move for relief from the order based upon changed circumstances or for good cause shown, after notice and a hearing.

9. ☐ The order is binding and effective in any bankruptcy case commenced by or against any debtor who claims any interest in the Property for a period of 180 days from the hearing of this Motion:
    ☐ without further notice.
    ☐ upon recording of a copy of this order or giving appropriate notice of its entry in compliance with applicable nonbankruptcy law.

10. ☐ The order is binding in any other bankruptcy case purporting to affect the Property filed not later than 2 years after the date of entry of such order, except that a debtor in a subsequent case may move for relief from the order based upon changed circumstances or for good cause shown, after notice and hearing.

11. ☒ The order is binding and effective in any bankruptcy case commenced by or against the Debtor for a period of 180 days, so that no further automatic stay shall arise in that case as to the Property.

---

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

June 2014                                    Page 5                          F 4001-1.RFS.UD.MOTION

12. ☒ If relief from stay is not granted with respect to the Property because the Property is the subject of a lease that may be assumable;

    a. ☒ Establishment of a deadline for assumption or rejection of the lease.

    b. ☒ Adequate protection in the form of regular payments at the lease rate from petition date until assumption or rejection of the lease.

13. ☒ **Other relief requested,** namely, for relief from stay to dispose of any personal property in the premises in accordance with California Civil Code Sections 1993, et seq. and that the relief from stay order remain in effect notwithstanding any conversion of this case to another chapter of the Bankruptcy Code.

Date: 3/28/2023

    Ronald K. Brown, Jr., APC
    _____
    Print name of law firm (*if applicable*)

    Ronald K. Brown, Jr.
    _____
    Print name of individual Movant or attorney for Movant (*if applicable*)

    _____
    Signature of individual Movant or attorney for Movant

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*June 2014*                                Page 6                                **F 4001-1.RFS.UD.MOTION**

## UNLAWFUL DETAINER DECLARATION

I, (name of declarant) ___Christopher Cussen_____, declare as follows:

1.  I have personal knowledge of the matters set forth in this declaration and, if called upon to testify, I could and would competently testify thereto.  I am over 18 years of age.  I have knowledge regarding Movant's interest in the Property because (specify):

    a.  ☐  I am the Movant and owner of the Property.

    b.  ☒  I manage the Property as the authorized agent for the Movant.

    c.  ☐  I am employed by Movant as (title and capacity):

    d.  ☐  Other (specify):

2.  a.  ☒  I am one of the custodians of the books, records and files of Movant as to those books, records and files that pertain to the rental of this Property.  I have personally worked on books, records and files, and as to the following facts, I know them to be true of my own knowledge or I have gained knowledge of them from the business records of Movant on behalf of Movant, which were made at or about the time of the events recorded, and which are maintained in the ordinary course of Movant's business at or near the time of the acts, conditions or events to which they relate.  Any such document was prepared in the ordinary course of business of Movant by a person who had personal knowledge of the event being recorded and had or has a business duty to record accurately such event.  The business records are available for inspection and copies can be submitted to the court if required.

    b.  ☐  Other (see attached):

3.  The Property is:

    ☐ Residential   ☒ Nonresidential

    *Street Address*: 17542 E, 17th Street
    *Unit/Suite Number*: Suites 100, 105, 250 & 330
    *City, State, Zip Code*: Tustin, CA 92780 (Orange County)

4.  Movant is the  ☒ legal owner of the Property, or  ☐ the owner's legally authorized agent.  A true and correct copy of the trustee's deed upon sale, lease, rental agreement, or other document evidencing Movant's interest in the Property is attached as Exhibit __"A"___.  A true and correct copy of the applicable document establishing Movant's authority as agent for the owner is attached as Exhibit _____.

5.  The Debtor asserts a possessory interest in the Property based upon:

    (1) ☐  a month-to-month tenancy

    (2) ☒  a lease that is in default

    (3) ☐  after a foreclosure sale that was held on (date): _____

    (4) ☐  other (specify):

6.  The Debtor failed to pay:

    a.  ☒  The monthly rent of $ 61,103.14_____ beginning on (date): 02/01/2023_____

---

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

b. ☒ Other obligations including:

   (1) ☒ Common area maintenance charges

   (2) ☒ Property taxes

   (3) ☒ Other obligations (*specify*):
An accounting showing all amounts due from Debtor to Movant in the sum of $131,758.16 is attached hereto as Exhibit "B" and made a part hereof. Debtor has failed to pay Movant any post-petition rent.

7. Procedural status

a. ☐ The lease matured or was rejected on (*date*) _____.

   (1) ☐ by operation of law.

   (2) ☐ by order of the court.

b. ☒ Movant caused a notice to quit to be served upon the Debtor on (*date*) 02/27/2023    and a true and correct copy is attached as Exhibit "C" .

c. ☒ Before the bankruptcy petition was filed:

   (1) ☒ Movant filed a complaint for unlawful detainer against the Debtor on (*date*) 03/08/2023 , and a true and correct copy is attached as Exhibit "D" .

   (2) ☐ Trial was held on (*date*) _____.

   (3) ☐ Trial was continued to (*date*) _____.

   (4) ☐ An unlawful detainer judgment against the Debtor was entered on the complaint for unlawful detainer on (*date*) _____, and a true and correct copy is attached as Exhibit _____.

   (5) ☐ A writ of possession for the Property was issued on (*date*) _____, and a true and correct copy is attached as Exhibit _____.

d. After the bankruptcy petition was filed:

   (1) ☐ The Debtor has not filed and served on the Movant the certification required under 11 U.S.C. § 362(l)(1).

   (2) ☐ The Debtor or adult dependent of the Debtor has not deposited with the clerk any rent that would become due during the 30-day period after the filing of the bankruptcy petition.

   (3) ☐ The Debtor or adult dependent of the Debtor has not filed and served on the Movant the further certification required under 11 U.S.C. § 362(l)(2) that the entire monetary default that gave rise to the judgment has been cured.

   (4) ☐ The Debtor filed and served on the Movant the certification required under 11 U.S.C. § 362(d)(1).

      (A) ☐ Movant filed and served an objection a copy of which is attached as Exhibit _____. A hearing on this objection is set for (*date*) _____.

      (B) ☐ Movant has not filed and served an objection.

---

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*June 2014*                              Page 8                              **F 4001-1.RFS.UD.MOTION**

(5) ☐ An unlawful detainer action was filed to obtain possession of the Property on grounds of endangerment of the Property or because of illegal use of controlled substances on the Property and Movant has filed a certification that ☐ such action was filed or ☐ that the Debtor has endangered the Property within 30 days preceding the certification or allowed the illegal use of controlled substances on the Property. A copy of Movant's certification is attached hereto as Exhibit _____.  The Debtor ☐ has ☐ has not filed an objection to Movant's certification.  A copy of the Debtor's objection, if filed, is attached as Exhibit ____.  A hearing on this objection is set for: _____.

(6) ☒ Regular lease payments have not been made after the bankruptcy petition was filed.

8.  ☐ The Debtor does not have an interest in the Property that could be assumed or assigned under 11 U.S.C. § 365.

9.  ☒ The Property is not necessary to an effective reorganization because it is:

a.  ☐ Residential, and is not producing income for the Debtor.

b.  ☒ Commercial, but no reorganization is reasonably in prospect.

c.  ☐ No longer property of the estate.

d.  ☒ Other (specify):
Debtor has failed to pay Movant any post-petition rent.

10.  ☐ The bankruptcy case was filed in bad faith:

a.  ☐ Movant is the only creditor or one of few creditors listed in the Debtor's case commencement documents.

b.  ☐ Other bankruptcy cases have been filed in which an interest in the Property was asserted.

c.  ☐ The Debtor filed only a few case commencement documents.  Schedules and a statement of financial affairs (or chapter 13 plan, if appropriate) have not been filed.

d.  ☐ Other (specify):

11.  ☐ The filing of the bankruptcy petition was part of a scheme to delay, hinder or defraud creditors that involved:

a.  ☐ The transfer of all or part ownership of, or other interest in, the Property without the consent of Movant or court approval.  See attached continuation page of facts establishing the scheme.

b.  ☐ Multiple bankruptcy cases affecting the Property include:

(1) Case name: _____
Chapter: _____    Case number: _____
Date filed: _____    Date discharged: _____    Date dismissed: _____
Relief from stay regarding the Property ☐ was  ☐ was not  granted.

(2) Case name: _____
Chapter: _____    Case number: _____
Date filed: _____    Date discharged: _____    Date dismissed: _____
Relief from stay regarding the Property ☐ was  ☐ was not  granted.

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California

June 2014                                Page 9                                F 4001-1.RFS.UD.MOTION

(3) Case name: _____

Chapter: _____   Case number: _____

Date filed: _____   Date discharged: _____   Date dismissed: _____

Relief from stay regarding the Property ☐ was ☐ was not granted.

☐ See attached continuation page for information about other bankruptcy cases affecting the Property.

☐ See attached continuation page for additional facts establishing that the multiple bankruptcy cases were part of a scheme to delay, hinder, or defraud creditors.

12. ☐ Enforcement actions taken after the bankruptcy petition was filed are specified in the attached supplemental declaration(s).

   a. ☐ These actions were taken before Movant knew the bankruptcy petition was filed, and Movant would have been entitled to relief from stay to proceed with these actions.

   b. ☐ Movant knew the bankruptcy case had been filed, but Movant previously obtained relief from stay to proceed with these enforcement actions in prior bankruptcy cases affecting the Property as set forth in Exhibit _____.

   c. ☐ For other facts justifying annulment, see attached continuation page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

3/27/23
_____
Date

Christopher Cussen
_____
Printed Name

_____
Signature

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

June 2014                                    Page 10                        F 4001-1.RFS.UD.MOTION

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

901 Dove Street, Suite 120
Newport Beach, California 92660

A true and correct copy of the foregoing document entitled: **NOTICE OF MOTION AND MOTION FOR RELIEF FROM THE AUTOMATIC STAY OR FOR ORDER CONFIRMING THAT THE AUTOMATIC STAY DOES NOT APPLY UNDER 11 U.S.C. § 362(l) (with supporting declarations) (UNLAWFUL DETAINER)** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) __3/29/2023__, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Joon M. Khang-joon@khanglaw.com
United States Trustee (SA) -ustpregion16.sa.ecf@usdoj.gov
Queenie K Ng -queenie.k.ng@usdoj.gov

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) __3/29/2023__, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

The Litigation Practice Group P.C.
17542 17th St, Suite 100, Tustin, CA 92780
DEBTOR

☒ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) __3/29/2023__, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

Honorable Scott C. Clarkson
United States Bankruptcy Court -Central District of California
411 West Fourth Street, Suite 5130 / Courtroom 5C, Santa Ana, CA 92701-4593
VIA FEDERAL EXPRESS

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| __3/29/2023__ | __LESLEY ALDAMA__ | *signature* |
| Date | Printed Name | Signature |

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

### SERVICE LIST

Collaboration Advisors
400 Dorla Court,
Zephyr Cove, NV 89448

Anthem Blue Cross
PO Box 511300,
Los Angeles, CA
90051-7855

Azevedo Solutions Groups,
Inc
420 Adobe Canyon Rd,
Kenwood, CA 95452

Debt Pay Pro
1900 E Golf Road, Suite 550
Schaumburg, IL 60173

Sharp Business Systems
8670 Argent St
Santee, CA 92071

Tustin Executive Center
1630 S Sunkist Steet, Ste A
Anaheim, CA 92806

Exela Enterprise Solutions
2701 E. Grauwyler Road
Irving, TX 75061

Netsuite-Oracle
2300 Oracle Way
Austin, TX 78741

Credit Reporting Service Inc
548 Market St, Suite 72907
San Francisco, CA
94104-5401

Document Fulfillment
Services
2930 Ramona Ave #100
Sacramento, CA 95826

Executive Center LLC
5960 South Jones Blvd
Las Vegas, NV 89118

LexisNexus
15500 B Rockfield Blvd,
Irvine, CA 92618

Debt Validation Fund II, LLC
5075 Lower Valley Road,
Atglen, PA 19310

MC DVI Fund 1, LLC; MC
DVI Fund 2, LLC
598 Cottonwood Dr.,
Glenview, IL 60026

Validation Partners LLC
1300 Sawgrass Pkwy, Ste
110
Sunrise, FL 33323

Marich Bein LLC
99 Wall Street, Ste 2669,
New York, NY 10005

Business Centers of America
1100 Sir Francis Drake Blvd,
Ste 1, Kentfield, CA 94904

JP Morgan Chase
3 Park Plaza, Ste 900,
Irvine, CA 92614

CA Franchise Tax Board
PO Box 942857,
Sacramento, CA 94257-0511

Outsource Accelerator Ltd
City Marque Limited, Unit
8801-2 Bldg 244-248 Des
Voeux Rd Central Hong
Kong

Exhibit "A"

0013

DocuSign Envelope ID: BCEE388C-9D0F-448E-9550-...

# LEASE

**SDCO TUSTIN EXECUTIVE CENTER, INC.,**
a Delaware corporation,

Landlord,

and

**THE LITIGATION PRACTICE GROUP PC,**
a California corporation,

Tenant

DocuSign Envelope ID: BCEE388C-9D0F-448E-955D-43A4C90CUM

## TABLE OF CONTENTS

page

| | | |
|---|---|---|
| 1. | USE AND RESTRICTIONS ON USE | 1 |
| 2. | TERM | 2 |
| 3. | RENT | 3 |
| 4. | RENT ADJUSTMENTS | 3 |
| 5. | SECURITY DEPOSIT | 5 |
| 6. | ALTERATIONS | 5 |
| 7. | REPAIR | 6 |
| 8. | LIENS | 6 |
| 9. | ASSIGNMENT AND SUBLETTING | 7 |
| 10. | INDEMNIFICATION | 8 |
| 11. | INSURANCE | 8 |
| 12. | WAIVER OF SUBROGATION | 9 |
| 13. | SERVICES AND UTILITIES | 9 |
| 14. | HOLDING OVER | 10 |
| 15. | SUBORDINATION | 10 |
| 16. | RULES AND REGULATIONS | 10 |
| 17. | REENTRY BY LANDLORD | 10 |
| 18. | DEFAULT | 11 |
| 19. | REMEDIES | 12 |
| 20. | TENANT'S BANKRUPTCY OR INSOLVENCY | 13 |
| 21. | QUIET ENJOYMENT | 14 |
| 22. | CASUALTY | 14 |
| 23. | EMINENT DOMAIN | 15 |
| 24. | SALE BY LANDLORD | 15 |
| 25. | ESTOPPEL CERTIFICATES | 15 |
| 26. | SURRENDER OF PREMISES | 16 |
| 27. | NOTICES | 16 |
| 28. | TAXES PAYABLE BY TENANT | 16 |
| 29. | RELOCATION OF TENANT | 17 |
| 30. | PARKING | 17 |
| 31. | DEFINED TERMS AND HEADINGS | 18 |
| 32. | TENANT'S AUTHORITY | 18 |
| 33. | FINANCIAL STATEMENTS AND CREDIT REPORTS | 19 |
| 34. | COMMISSIONS | 19 |
| 35. | TIME AND APPLICABLE LAW | 19 |
| 36. | SUCCESSORS AND ASSIGNS | 19 |
| 37. | ENTIRE AGREEMENT | 19 |
| 38. | EXAMINATION NOT OPTION | 19 |

10/31/01 CA SOG (BY)-INS
Revised 9/09/05
{2011-11850/01043006;3}

i

DocuSign Envelope ID: BCEE388C-9D0F-448E-955...

## TABLE OF CONTENTS
(continued)

|     |                                 | page |
|-----|---------------------------------|------|
| 39. | **RECORDATION** | 19 |
| 40. | **COUNTERPARTS** | 19 |
| 41. | **SIGNAGE.** | 19 |
| 42. | **OPTION TO EXTEND** | 19 |
| 43. | **EXPANSION OPTION** | 20 |
| 44. | **ELECTRONIC SIGNATURES** | 21 |
| 45. | **LIMITATION OF LANDLORD'S LIABILITY** | 22 |

EXHIBIT A – FLOOR PLAN DEPICTING THE PREMISES

EXHIBIT A-1 – SITE PLAN

EXHIBIT B – INITIAL ALTERATIONS

EXHIBIT C – COMMENCEMENT DATE MEMORANDUM

EXHIBIT D – RULES AND REGULATIONS

EXHIBIT E – FORM OF EARLY POSSESSION AGREEMENT

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

## GROSS (BY) OFFICE LEASE

### REFERENCE PAGES

BUILDING:

Tustin Executive Center
17542 East 17th Street
Tustin, California

LANDLORD:

**SDCO TUSTIN EXECUTIVE CENTER, INC.,
a Delaware corporation**

LANDLORD'S ADDRESS:

SDCO Tustin Executive Center, Inc.
535 Anton Boulevard, Suite 200
Costa Mesa, California 92626

With a copy to:

SDCO Tustin Executive Center, Inc.
c/o Transwestern
1630 South Sunkist, Suite A
Anaheim, California 92806

And a copy to:

SDCO Tustin Executive Center, Inc.
601 S. Figueroa Street, Suite 3650
Los Angeles, California 90017
Attn: David W. Rock

WIRE INSTRUCTIONS AND/OR ADDRESS FOR
RENT PAYMENT:

SDCO Tustin Executive Center, Inc.
P.O. Box 6234
Hicksville, New York 11802

LEASE REFERENCE DATE:

November 5, 2020

TENANT:

**THE LITIGATION PRACTICE GROUP PC,
a California corporation**

TENANT'S NOTICE ADDRESS:

   (a)  As of beginning of Term:

The Premises

   (b)  Prior to beginning of Term (if different):

100 Spectrum Center Drive, Suite 900
Irvine, California 92618

PREMISES ADDRESS:

17542 East 17th Street, Suite 100
Tustin, California 92780

PREMISES RENTABLE AREA:

Approximately **3,567** sq. ft. (for outline of Premises see
<u>Exhibit A</u>)

SCHEDULED COMMENCEMENT DATE:

November 15, 2020

TERM OF LEASE:

Approximately thirty-nine (39) months and sixteen (16)
days beginning on the Commencement Date and ending
on the Termination Date.    The period from the
Commencement Date to the last day of the same month
is the "Commencement Month."

.10/31/01 CA SOG (BY)-INS
Revised 9/09/05
{2011-11850/01043006;3}

iii



Initials

DocuSign Envelope ID: BCEE388C-9D0F-448E-955...

| TERMINATION DATE: | The last day of the thirty-ninth (39th) full calendar month after (if the Commencement Month is not a full calendar month), or from and including (if the Commencement Month is a full calendar month), the Commencement Month, which is estimated to be February 29, 2024. |
|---|---|

ANNUAL RENT and MONTHLY INSTALLMENT OF RENT (Article 3):

| Period | | Rentable Square Footage | Annual Rent Per Square Foot | Annual Rent | Monthly Installment of Rent |
|---|---|---|---|---|---|
| from | through | | | | |
| Month 1 | Month 12 | 3,567 | $30.60 | $109,150.20 | $9,095.85* |
| Month 13 | Month 24 | 3,567 | $31.52 | $112,431.84 | $9,369.32 |
| Month 25 | Month 36 | 3,567 | $32.47 | $115,820.49 | $9,651.71 |
| Month 37 | Month 39 | 3,567 | $33.44 | $119,280.48 | $9,940.04 |

*Monthly Installment of Rent for the second (2nd) through fourth (4th) full calendar months of the initial Term is subject to abatement pursuant to Section 3.3 of this Lease.

| BASE YEAR (EXPENSES): | 2020 |
|---|---|
| BASE YEAR (TAXES): | 2020 |
| BASE YEAR (INSURANCE): | 2020 |
| TENANT'S PROPORTIONATE SHARE: | 3.92% |
| SECURITY DEPOSIT: | $10,934.04 |
| ASSIGNMENT/SUBLETTING FEE: | $2,000.00 |
| AFTER-HOURS HVAC COST: | $65.00 per hour, subject to change at any time |
| PARKING: | Fourteen (14) passes at no monthly parking charge; provided that Tenant may elect to use one (1) of such passes for reserved parking spaces at a monthly charge of $90.00 per month (See Article on Parking) |
| REAL ESTATE BROKER: | Cushman & Wakefield of California, Inc., representing Landlord, and Legacy Realty & Funding, representing Tenant |
| TENANT'S NAICS CODE: | 541110 |
| BUILDING BUSINESS HOURS: | Monday through Friday, 8:00 a.m. to 6:00 p.m. (except national and legal holidays), and Saturday 9:00 a.m. to 1:00 p.m. |
| AMORTIZATION RATE: | N/A |

The Reference Pages information is incorporated into and made a part of the Lease. In the event of any conflict between any Reference Pages information and the Lease, the Lease shall control. The Lease includes Exhibits A through E, all of which are made a part of the Lease.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**



DocuSign Envelope ID: BCEE388C-9D0F-448E-9550-

LEASE

    By this Lease Landlord leases to Tenant and Tenant leases from Landlord the Premises in the Building as set forth and described on the Reference Pages. The Premises are depicted on the floor plan attached hereto as <u>Exhibit A</u>, and the Building is depicted on the site plan attached hereto as <u>Exhibit A-1</u>. The Reference Pages, including all terms defined thereon, are incorporated as part of this Lease.

1.    **USE AND RESTRICTIONS ON USE.**

    1.1    The Premises are to be used solely for general office purposes for a law firm. Tenant shall not do or permit anything to be done in or about the Premises which will in any way obstruct or interfere with the rights of other tenants or occupants of the Building or injure, annoy, or disturb them, or allow the Premises to be used for any improper, immoral, unlawful, or objectionable purpose, or commit any waste. Tenant shall not do, permit or suffer in, on, or about the Premises the sale of any alcoholic liquor without the written consent of Landlord first obtained. Tenant shall comply with all federal, state and city laws, codes, ordinances, rules and regulations (collectively, "Regulations") applicable to the use of the Premises and its occupancy and shall promptly comply with all governmental orders and directions for the correction, prevention and abatement of any violations in the Building or appurtenant land, caused or permitted by, or resulting from the specific use by, Tenant, or in or upon, or in connection with, the Premises, all at Tenant's sole expense. Tenant shall not do or permit anything to be done on or about the Premises or bring or keep anything into the Premises which will in any way increase the rate of, invalidate or prevent the procuring of any insurance protecting against loss or damage to the Building or any of its contents by fire or other casualty or against liability for damage to property or injury to persons in or about the Building or any part thereof. Tenant shall not bring upon the Premises or any portion of the Building or use the Premises or permit the Premises or any portion thereof to be used for the growing, manufacturing, administration, distribution (including without limitation, any retail sales), possession, use or consumption of any cannabis, marijuana or cannabinoid product or compound, regardless of the legality or illegality of the same.

    1.2    Tenant shall not, and shall not direct, suffer or permit any of its agents, contractors, employees, licensees or invitees (collectively, the "Tenant Entities") to at any time handle, use, manufacture, store or dispose of in or about the Premises or the Building any (collectively, "Hazardous Materials") flammables, explosives, radioactive materials, hazardous wastes or materials, toxic wastes or materials, or other similar substances, petroleum products or derivatives or any substance subject to regulation by or under any federal, state and local laws and ordinances relating to the protection of the environment or the keeping, use or disposition of environmentally hazardous materials, substances, or wastes, presently in effect or hereafter adopted, all amendments to any of them, and all rules and regulations issued pursuant to any of such laws or ordinances (collectively, "Environmental Laws"), nor shall Tenant suffer or permit any Hazardous Materials to be used in any manner not fully in compliance with all Environmental Laws, in the Premises or the Building and appurtenant land or allow the environment to become contaminated with any Hazardous Materials. Notwithstanding the foregoing, Tenant may handle, store, use or dispose of products containing small quantities of Hazardous Materials (such as aerosol cans containing insecticides, toner for copiers, paints, paint remover and the like) to the extent customary and necessary for the use of the Premises for general office purposes; provided that Tenant shall always handle, store, use, and dispose of any such Hazardous Materials in a safe and lawful manner and never allow such Hazardous Materials to contaminate the Premises, Building and appurtenant land or the environment. Tenant shall protect, defend, indemnify and hold each and all of the Landlord Entities (as defined in Article 31) harmless from and against any and all loss, claims, liability or costs (including court costs and attorney's fees) incurred by reason of any actual or asserted failure of Tenant to fully comply with all applicable Environmental Laws, or the presence, handling, use or disposition in or from the Premises of any Hazardous Materials by Tenant or any Tenant Entity (even though permissible under all applicable Environmental Laws or the provisions of this Lease), or by reason of any actual or asserted failure of Tenant to keep, observe, or perform any provision of this Section 1.2.

    1.3    Tenant and the Tenant Entities will be entitled to the non-exclusive use of the common areas of the Building as they exist from time to time during the Term, including the parking facilities, subject to Landlord's rules and regulations regarding such use. However, in no event will Tenant or the Tenant Entities park more vehicles in the parking facilities than Tenant's Proportionate Share of the total parking spaces available for common use. The foregoing shall not be deemed to provide Tenant with an exclusive right to any parking spaces or any guaranty of the availability of any particular parking spaces or any specific number of parking spaces. Pursuant to California Civil Code Section 1938, Landlord hereby notifies Tenant that as of the date of this Lease, the Premises has not undergone inspection by a "Certified Access Specialist" ("CASp") to determine whether the Premises meet all applicable construction-related accessibility standards under California Civil Code Section 55.53. Landlord hereby discloses pursuant to California Civil Code Section 1938 as follows: "A Certified Access Specialist (CASp) can inspect the subject premises and determine whether the subject premises comply with all of the applicable construction-related accessibility standards under state law. Although state law does not require a CASp inspection

of the subject premises, the commercial property owner or lessor may not prohibit the lessee or tenant from obtaining a CASp inspection of the subject premises for the occupancy or potential occupancy of the lessee or tenant, if requested by the lessee or tenant. The parties shall mutually agree on the arrangements for the time and manner of the CASp inspection, the payment of the fee for the CASp inspection, and the cost of making any repairs necessary to correct violations of construction-related accessibility standards within the premises." Landlord and Tenant hereby acknowledge and agree that in the event that Tenant elects to perform a CASp inspection of the Premises hereunder, such CASp inspection shall be performed at Tenant's sole cost and expense and Tenant shall be solely responsible for the cost of any repairs, upgrades, alterations and/or modifications to the Premises or the Building necessary to correct any such violations of construction-related accessibility standards identified by such CASp inspection as required by Regulation, which repairs, upgrades, alterations and/or modifications may, at Landlord's option, be performed by Landlord at Tenant's expense, payable as additional rent within ten (10) days following Landlord's demand.

2.    **TERM.**

2.1    The Term of this Lease shall begin on the date ("Commencement Date") that Landlord shall tender possession of the Premises to Tenant, and shall terminate on the date as shown on the Reference Pages as the Termination Date based on the actual Commencement Date ("Termination Date"), unless sooner terminated by the provisions of this Lease. Landlord shall tender possession of the Premises with all the work, if any, to be performed by Landlord pursuant to Exhibit B to this Lease substantially completed, subject to any Tenant Delays (defined below). Tenant shall deliver a punch list of items not completed within thirty (30) days after Tenant Landlord tenders possession of the Premises and Landlord agrees to proceed with due diligence to perform its obligations regarding such items. Tenant shall, at Landlord's request, execute and deliver a memorandum agreement provided by Landlord in the form of Exhibit C attached hereto, setting forth the actual Commencement Date, Termination Date and, if necessary, a revised rent schedule. Should Tenant fail to do so within thirty (30) days after Landlord's request, the information set forth in such memorandum provided by Landlord shall be conclusively presumed to be agreed and correct.

2.2    Tenant agrees that in the event of the inability of Landlord to deliver possession of the Premises on the Scheduled Commencement Date set forth on the Reference Pages for any reason, Landlord shall not be liable for any damage resulting from such inability, but except to the extent such delay is the result of a Tenant Delay, Tenant shall not be liable for any rent until the time when Landlord delivers possession of the Premises to Tenant. No such failure to give possession on the Scheduled Commencement Date shall affect the other obligations of Tenant under this Lease, except that the actual Commencement Date shall be postponed until the date that Landlord delivers possession of the Premises to Tenant, except to the extent that such delay is arising from or related to the acts or omissions of Tenant or any Tenant Entities, including, without limitation as a result of: (a) Tenant's failure to agree to plans and specifications and/or construction cost estimates or bids; (b) Tenant's request for materials, finishes or installations other than Landlord's standard except those, if any, that Landlord shall have expressly agreed to furnish without extension of time agreed by Landlord; (c) Tenant's change in any plans or specifications; or, (d) performance or completion by a party employed by Tenant (each of the foregoing, a "Tenant Delay"). If any delay is the result of a Tenant Delay, the Commencement Date and the payment of rent under this Lease shall be accelerated by the number of days of such Tenant Delay.

2.3    Subject to the terms of this Section 2.3 and provided that this Lease and the Early Possession Agreement (as defined below) have been fully executed by all parties and Tenant has delivered all prepaid rental, the Security Deposit, and insurance certificates required hereunder and the Initial Alterations (as defined in Exhibit B attached hereto) have been completed, Landlord grants Tenant the right to enter the Premises up to two (2) weeks prior to the Commencement Date, as reasonably estimated by Landlord, at Tenant's sole risk, solely for the purpose of installing telecommunications and data cabling, equipment, furnishings and other personalty. Such possession prior to the Commencement Date shall be subject to all of the terms and conditions of this Lease, except that Tenant shall not be required to pay Monthly Installment of Rent with respect to the period of time prior to the Commencement Date during which Tenant occupies the Premises solely for such purposes. However, Tenant shall be liable for any utilities or special services provided to Tenant during such period. Notwithstanding the foregoing, if Tenant takes possession of the Premises before the Commencement Date for any purpose other than as expressly provided in this Section, such possession shall be subject to the terms and conditions of this Lease and Tenant shall pay Monthly Installment of Rent and any other charges payable hereunder to Landlord for each day of possession before the Commencement Date. Said early possession shall not advance the Termination Date. As a condition to any early entry by Tenant pursuant to this Section 2.3, Tenant shall execute and deliver to Landlord an early possession agreement (the "Early Possession Agreement") in the form attached hereto as Exhibit E, provided by Landlord, setting forth the actual date for early possession and the date for the commencement of payment of Monthly Installment of Rent.

DocuSign Envelope ID: BCEE388C-9D0F-448E-955[...]

3.    **RENT.**

    3.1    Tenant agrees to pay to Landlord the Annual Rent in effect from time to time by paying the Monthly Installment of Rent then in effect on or before the first day of each full calendar month during the Term, except that the first full month's rent shall be paid upon the execution of this Lease. The Monthly Installment of Rent in effect at any time shall be one-twelfth (1/12) of the Annual Rent in effect at such time. Rent for any period during the Term which is less than a full month shall be a prorated portion of the Monthly Installment of Rent based upon the number of days in such month. Said rent shall be paid to Landlord, without deduction or offset and without notice or demand, at the Rent Payment Address, as set forth on the Reference Pages, or to such other person or at such other place as Landlord may from time to time designate in writing. Notwithstanding anything to the contrary, Landlord may, in its sole discretion, allocate any rent or monies Tenant pays to Landlord to any sums then due and payable hereunder. If an Event of Default occurs, Landlord may require by notice to Tenant that all subsequent rent payments be made by an automatic payment from Tenant's bank account to Landlord's account, without cost to Landlord. Tenant must implement such automatic payment system prior to the next scheduled rent payment or within ten (10) days after Landlord's notice, whichever is later. Unless specified in this Lease to the contrary, all amounts and sums payable by Tenant to Landlord pursuant to this Lease shall be deemed additional rent.

    3.2    Tenant recognizes that late payment of any rent or other sum due under this Lease will result in administrative expense to Landlord, the extent of which additional expense is extremely difficult and economically impractical to ascertain. Tenant therefore agrees that if rent or any other sum is not paid when due and payable pursuant to this Lease, a late charge shall be imposed in an amount equal to the greater of: (a) Fifty Dollars ($50.00), or (b) six percent (6%) of the unpaid rent or other payment. The amount of the late charge to be paid by Tenant shall be reassessed and added to Tenant's obligation for each successive month until paid. The provisions of this Section 3.2 in no way relieve Tenant of the obligation to pay rent or other payments on or before the date on which they are due, nor do the terms of this Section 3.2 in any way affect Landlord's remedies pursuant to Article 19 of this Lease in the event said rent or other payment is unpaid after date due.

    3.3    Notwithstanding anything in this Lease to the contrary, so long as Tenant is not in default under this Lease, Tenant shall be entitled to an abatement of Monthly Installment of Rent with respect to the Premises, as originally described in this Lease, in the amount of $9,095.85 per month for the second (2nd) through fourth (4th) full calendar months of the initial Term (the "Rent Abatement Period"). The maximum total amount of Monthly Installment of Rent abated with respect to the Premises in accordance with the foregoing shall equal $27,287.55 (the "Abated Monthly Installment of Rent"). If Tenant defaults under this Lease at any time during the Term (as the same may be further extended) and fails to cure such default within any applicable cure period under this Lease, then all Abated Monthly Installment of Rent shall immediately become due and payable. Only Monthly Installment of Rent shall be abated during the Rent Abatement Period pursuant to this Section, as more particularly described herein, and all other rent and other costs and charges specified in this Lease shall remain as due and payable pursuant to the provisions of this Lease.

4.    **RENT ADJUSTMENTS.**

    4.1    For the purpose of this Article 4, the following terms are defined as follows:

        4.1.1    **Lease Year:** Each fiscal year (as determined by Landlord from time to time) falling partly or wholly within the Term.

        4.1.2    **Expenses:** All costs of operation, maintenance, repair, replacement and management of the Building (including the amount of any credits which Landlord may grant to particular tenants of the Building in lieu of providing any standard services or paying any standard costs described in this Section 4.1.2 for similar tenants), as determined in accordance with generally accepted accounting principles, including the following costs by way of illustration, but not limitation: water and sewer charges; utility costs, including, but not limited to, the cost of heat, light, power, steam, gas and energy for the Building; waste disposal; recycling costs; the cost of janitorial services; the cost of security and alarm services (including any central station signaling system); costs of cleaning, repairing, replacing and maintaining the common areas, including parking and landscaping, window cleaning costs; labor costs; costs and expenses of managing the Building including management and/or administrative fees; air conditioning maintenance costs; elevator maintenance fees and supplies; material costs; equipment costs including the cost of maintenance, repair and service agreements and rental and leasing costs; purchase costs of equipment; current rental and leasing costs of items which would be capital items if purchased; tool costs; licenses, permits and inspection fees; wages and salaries; employee benefits and payroll taxes; accounting and legal fees; any sales, use or service taxes incurred in connection therewith. In addition, Landlord shall be entitled to recover, as additional rent (which, along with any other capital expenditures constituting Expenses, Landlord may either include in Expenses or cause to be billed to Tenant along with Expenses and Taxes but as a separate item), Tenant's

Proportionate Share of: (i) an allocable portion of the cost of capital improvement items which are reasonably calculated to reduce operating expenses; (ii) the cost of fire sprinklers and suppression systems and other life safety systems or enhance the environmental sustainability of the Property's operations; and (iii) other capital expenses which are required under any Regulations which were not applicable to the Building at the time it was constructed; but the costs described in this sentence shall be amortized over the reasonable life of such expenditures in accordance with such reasonable life and amortization schedules as shall be determined by Landlord in accordance with generally accepted accounting principles, with interest on the unamortized amount at one percent (1%) in excess of the Wall Street Journal prime lending rate announced from time to time. Expenses shall not include Taxes, Insurance Costs, depreciation or amortization of the Building or equipment in the Building except as provided herein, loan principal payments, costs of alterations of tenants' premises, leasing commissions, interest expenses on long-term borrowings or advertising costs.

4.1.3   **Taxes:**  Real estate taxes and any other taxes, charges and assessments which are levied with respect to the Building or the land appurtenant to the Building, or with respect to any improvements, fixtures and equipment or other property of Landlord, real or personal, located in the Building and used in connection with the operation of the Building and said land, including without limitation, gross receipts taxes, any payments to any ground lessor in reimbursement of tax payments made by such lessor; and all fees, expenses and costs incurred by Landlord in contesting, protesting, contesting or in any way seeking to reduce or avoid increase in any assessments, levies or the tax rate pertaining to any Taxes to be paid by Landlord in any Lease Year.  Taxes shall be determined without regard to any "green building" credit and shall not include any corporate franchise, or estate, inheritance or net income tax, or documentary transfer tax imposed upon any transfer by Landlord of its interest in this Lease or any taxes to be paid by Tenant pursuant to Article 28.

4.1.4   **Insurance Costs:**  Any and all insurance charges of or relating to all insurance policies and endorsements deemed by Landlord to be reasonably necessary or desirable and relating in any manner to the protection, preservation, or operation of the Building or any part thereof.

4.2   If in any Lease Year, (i) Expenses paid or incurred shall exceed Expenses paid or incurred in the Base Year (Expenses) and/or (ii) Taxes paid or incurred by Landlord in any Lease Year shall exceed the amount of such Taxes which became due and payable in the Base Year (Taxes), and/or (iii) Insurance Costs paid or incurred by Landlord in any Lease Year shall exceed the amount of such Insurance Costs which became due and payable in the Base Year (Insurance), Tenant shall pay as additional rent for such Lease Year Tenant's Proportionate Share of each such excess amount. Expenses for the Base Year shall not include market-wide cost increases (including utility rate increases) due to extraordinary circumstances, including, but not limited to, Force Majeure, strikes, conservation surcharges, or amortized costs of capital items.

4.3   The annual determination of Expenses and Insurance Costs shall be made by Landlord and shall be binding upon Landlord and Tenant, subject to the provisions of this Section 4.3.  Landlord may deliver such annual determination to Tenant via regular U.S. mail.  During the Term, Tenant may review, at Tenant's sole cost and expense, the books and records supporting such determination in an office of Landlord, or Landlord's agent, during normal business hours, upon giving Landlord five (5) days advance written notice within sixty (60) days after receipt of such determination, but in no event more often than once in any one (1) year period, subject to execution of a confidentiality agreement acceptable to Landlord, and provided that if Tenant utilizes an independent accountant to perform such review it shall be one of national standing which is reasonably acceptable to Landlord, is not compensated on a contingency basis and is also subject to such confidentiality agreement.  If Tenant fails to object to Landlord's determination of Expenses and Insurance Costs within ninety (90) days after receipt, or if any such objection fails to state with specificity the reason for the objection, Tenant shall be deemed to have approved such determination and shall have no further right to object to or contest such determination. In the event that during all or any portion of any Lease Year or Base Year, the Building is not fully rented and occupied Landlord shall make an appropriate adjustment in occupancy-related Expenses for such year for the purpose of avoiding distortion of the amount of such Expenses to be attributed to Tenant by reason of variation in total occupancy of the Building, by employing consistent and sound accounting and management principles to determine Expenses that would have been paid or incurred by Landlord had the Building been at least ninety-five percent (95%) rented and occupied, and the amount so determined shall be deemed to have been Expenses for such Lease Year.

4.4   Prior to the actual determination thereof for a Lease Year, Landlord may from time to time estimate Tenant's liability for Expenses, Insurance Costs and/or Taxes under Section 4.2, Article 6 and Article 28 for the Lease Year or portion thereof.  Landlord will give Tenant written notification of the amount of such estimate and Tenant agrees that it will pay, by increase of its Monthly Installments of Rent due in such Lease Year, additional rent in the amount of such estimate.  Any such increased rate of Monthly Installments of Rent pursuant to this Section 4.4 shall remain in effect until further written notification to Tenant pursuant hereto.

DocuSign Envelope ID: BCEE388C-9D0F-448E-955...

4.5    When the above mentioned actual determination of Tenant's liability for Expenses, Insurance Costs and/or Taxes is made for any Lease Year and when Tenant is so notified in writing, then:

4.5.1    If the total additional rent Tenant actually paid pursuant to Section 4.3 on account of Expenses, Insurance Costs and/or Taxes for the Lease Year is less than Tenant's liability for Expenses, Insurance Costs and/or Taxes, then Tenant shall pay such deficiency to Landlord as additional rent in one lump sum within thirty (30) days of receipt of Landlord's bill therefor; and

4.5.2    If the total additional rent Tenant actually paid pursuant to Section 4.3 on account of Expenses, Insurance Costs and/or Taxes for the Lease Year is more than Tenant's liability for Expenses, Insurance Costs and/or Taxes, then Landlord shall credit the difference against the then due payments to be made by Tenant under this Article 4, or, if this Lease has terminated, refund the difference in cash. Tenant shall not be entitled to a credit by reason of actual Expenses and/or Taxes and/or Insurance Costs in any Lease Year being less than Expenses and/or Taxes and/or Insurance Costs in the Base Year (Expenses and/or Taxes and/or Insurance).

4.6    If the Commencement Date is other than January 1 or if the Termination Date is other than December 31, Tenant's liability for Expenses, Insurance Costs and Taxes for the Lease Year in which said Date occurs shall be prorated based upon a three hundred sixty-five (365) day year.

5.    **SECURITY DEPOSIT.** Tenant shall deposit the Security Deposit with Landlord upon the execution of this Lease. Said sum shall be held by Landlord as security for the faithful performance by Tenant of all the terms, covenants and conditions of this Lease to be kept and performed by Tenant and not as an advance rental deposit or as a measure of Landlord's damage in case of Tenant's default. If Tenant defaults with respect to any provision of this Lease, Landlord may use any part of the Security Deposit for the payment of any rent or any other sum in default, or for the payment of any amount which Landlord may spend or become obligated to spend by reason of Tenant's default, or to compensate Landlord for any other loss or damage which Landlord may suffer by reason of Tenant's default. If any portion is so used, Tenant shall within five (5) days after written demand therefor, deposit with Landlord an amount sufficient to restore the Security Deposit to its original amount and Tenant's failure to do so shall be a material breach of this Lease. Except to such extent, if any, as shall be required by law, Landlord shall not be required to keep the Security Deposit separate from its general funds, and Tenant shall not be entitled to interest on such deposit. If Tenant shall fully and faithfully perform every provision of this Lease to be performed by it, the Security Deposit or any balance thereof shall be returned to Tenant at such time after termination of this Lease when Landlord shall have determined that all of Tenant's obligations under this Lease have been fulfilled. Notwithstanding anything to the contrary contained herein or in Article 23 hereof, Tenant hereby waives the provisions of Section 1950.7 of the California Civil Code, or any similar or successor Regulations or other laws now or hereinafter in effect.

6.    **ALTERATIONS.**

6.1    Tenant shall not make or suffer to be made any alterations, additions, or improvements, including, but not limited to, the attachment of any fixtures or equipment in, on, or to the Premises or any part thereof or the making of any improvements as required by Article 7, without the prior written consent of Landlord. When applying for such consent, Tenant shall, if requested by Landlord, furnish complete plans and specifications for such alterations, additions and improvements. Landlord's consent shall not be unreasonably withheld with respect to alterations which (i) are not structural in nature, (ii) are not visible from the exterior of the Building, (iii) do not affect or require modification of the Building's electrical, mechanical, plumbing, HVAC or other systems, and (iv) in aggregate do not cost more than $5.00 per rentable square foot of that portion of the Premises affected by the alterations in question.

6.2    In the event Landlord consents to the making of any such alteration, addition or improvement by Tenant, the same shall be made by using either Landlord's contractor or a contractor reasonably approved by Landlord, in either event at Tenant's sole cost and expense. If Tenant shall employ any contractor other than Landlord's contractor and such other contractor or any subcontractor of such other contractor shall employ any non-union labor or supplier, Tenant shall be responsible for and hold Landlord harmless from any and all delays, damages and extra costs suffered by Landlord as a result of any dispute with any labor unions concerning the wage, hours, terms or conditions of the employment of any such labor. In any event Landlord may charge Tenant a construction management fee not to exceed five percent (5%) of the cost of such work to cover its overhead as it relates to such proposed work, plus third-party costs actually incurred by Landlord in connection with the proposed work and the design thereof, with all such amounts being due five (5) days after Landlord's demand.

6.3     All alterations, additions or improvements proposed by Tenant shall be constructed in accordance with all Regulations, and with Landlord's Building construction standards (if any) from time to time to the extent applicable (which standards shall be made available to Tenant by Landlord's Building manager upon request. Tenant shall use Building standard materials where applicable, and Tenant shall, prior to construction, provide the additional insurance required under Article 11 in such case, and also all such assurances to Landlord as Landlord shall reasonably require to assure payment of the costs thereof, including but not limited to, notices of non-responsibility, waivers of lien, surety company performance bonds and funded construction escrows and to protect Landlord and the Building and appurtenant land against any loss from any mechanic's, materialmen's or other liens. Tenant shall pay in addition to any sums due pursuant to Article 4, any increase in real estate taxes attributable to any such alteration, addition or improvement for so long, during the Term, as such increase is ascertainable; at Landlord's election said sums shall be paid in the same way as sums due under Article 4. Landlord may, as a condition to its consent to any particular alterations or improvements, require Tenant to deposit with Landlord the amount reasonably estimated by Landlord as sufficient to cover the cost of removing such alterations or improvements and restoring the Premises, to the extent required under Section 26.2.

7.     **REPAIR.**

7.1     Landlord shall have no obligation to alter, remodel, improve, repair, decorate or paint the Premises, except as specified in Exhibit B if attached to this Lease and except that Landlord shall repair and maintain the structural portions of the Building, including the basic plumbing, air conditioning, heating and electrical systems installed or furnished by Landlord. By taking possession of the Premises, Tenant accepts them as being in good order, condition and repair and in the condition in which Landlord is obligated to deliver them, except as set forth in the punch list to be delivered pursuant to Section 2.1. However, notwithstanding the foregoing, Landlord agrees that the base Building electrical, heating, ventilation and air conditioning and plumbing systems located in the Premises shall be in good working order as of the date Landlord delivers possession of the Premises to Tenant. Except to the extent caused by the acts or omissions of Tenant or any Tenant Entities or by any alterations or improvements performed by or on behalf of Tenant, if such systems are not in good working order as of the date possession of the Premises is delivered to Tenant and Tenant provides Landlord with notice of the same within thirty (30) days following the date Landlord delivers possession of the Premises to Tenant, Landlord shall be responsible for repairing or restoring the same. It is hereby understood and agreed that no representations respecting the condition of the Premises or the Building have been made by Landlord to Tenant, except as specifically set forth in this Lease.

7.2     Tenant shall, at all times during the Term, keep the Premises in good condition and repair excepting damage by fire, or other casualty, and in compliance with all applicable governmental laws, ordinances and regulations, promptly complying with all governmental orders and directives for the correction, prevention and abatement of any violations or nuisances in or upon, or connected with, the Premises, all at Tenant's sole expense. Tenant shall at all times keep and maintain the Premises in a clean, safe and sanitary condition and shall at its sole cost and expense, immediately upon notice from Landlord, sanitize the Premises if Landlord reasonably determines the same is necessary utilizing such methods as reasonably determined by Landlord. Repair and maintenance work shall be undertaken in compliance with Landlord's Building construction standards (if any) from time to time to the extent applicable (which standards shall be made available to Tenant by Landlord's Building manager upon request).

7.3     Landlord shall not be liable for any failure to make any repairs or to perform any maintenance unless such failure shall persist for an unreasonable time after written notice of the need of such repairs or maintenance is given to Landlord by Tenant.

7.4     Except as provided in Article 22, there shall be no abatement of rent and no liability of Landlord by reason of any injury to or interference with Tenant's business arising from the making of any repairs, alterations or improvements in or to any portion of the Building or the Premises or to fixtures, appurtenances and equipment in the Building. Tenant hereby waives any and all rights under and benefits of subsection 1 of Section 1932 and Sections 1941 and 1942 of the California Civil Code, or any similar or successor Regulations or other laws now or hereinafter in effect.

8.     **LIENS.** Tenant shall keep the Premises, the Building and appurtenant land and Tenant's leasehold interest in the Premises free from any liens arising out of any services, work or materials performed, furnished, or contracted for by Tenant, or obligations incurred by Tenant. In the event that Tenant fails, within ten (10) days following the imposition of any such lien, to either cause the same to be released of record or provide Landlord with insurance against the same issued by a major title insurance company or such other protection against the same as Landlord shall accept (such failure to constitute an Event of Default), Landlord shall have the right to cause the same to be released by such means as it shall deem proper, including payment of the claim giving rise to such lien. All such sums paid by Landlord and all expenses incurred by it in connection therewith shall be payable to it by Tenant within five (5) days of Landlord's demand.

10/31/01 CA SOG (BY)-INS                6
Revised 9/09/05
{2011-11850/01043006;3}

DocuSign Envelope ID: BCEE388C-9D0F-448E-955...

9.     ASSIGNMENT AND SUBLETTING.

9.1     Tenant shall not have the right to assign or pledge this Lease or to sublet the whole or any part of the Premises whether voluntarily or by operation of law, or permit the use or occupancy of the Premises by anyone other than Tenant, and shall not make, suffer or permit such assignment, subleasing or occupancy without the prior written consent of Landlord, such consent not to be unreasonably withheld, and said restrictions shall be binding upon any and all assignees of this Lease and subtenants of the Premises. In the event Tenant desires to sublet, or permit such occupancy of, the Premises, or any portion thereof, or assign this Lease, Tenant shall give written notice thereof to Landlord at least sixty (60) days but no more than one hundred twenty (120) days prior to the proposed commencement date of such subletting or assignment, which notice shall set forth the name of the proposed subtenant or assignee, the relevant terms of any sublease or assignment and copies of financial reports and other relevant financial information of the proposed subtenant or assignee.

9.2     Notwithstanding any assignment or subletting, permitted or otherwise, Tenant shall at all times remain directly, primarily and fully responsible and liable for the payment of the rent specified in this Lease and for compliance with all of its other obligations under the terms, provisions and covenants of this Lease. Upon the occurrence of an Event of Default, if the Premises or any part of them are then assigned or sublet, Landlord, in addition to any other remedies provided in this Lease or provided by law, may, at its option, collect directly from such assignee or subtenant all rents due and becoming due to Tenant under such assignment or sublease and apply such rent against any sums due to Landlord from Tenant under this Lease, and no such collection shall be construed to constitute a novation or release of Tenant from the further performance of Tenant's obligations under this Lease.

9.3     In addition to Landlord's right to approve of any subtenant or assignee, Landlord shall have the option, in its sole discretion, in the event of any proposed subletting or assignment, to terminate this Lease, or in the case of a proposed subletting of less than the entire Premises, to recapture the portion of the Premises to be sublet, as of the date the subletting or assignment is to be effective. The option shall be exercised, if at all, by Landlord giving Tenant written notice given by Landlord to Tenant within thirty (30) days following Landlord's receipt of Tenant's written notice as required above. However, if Tenant notifies Landlord, within five (5) days after receipt of Landlord's termination notice, that Tenant is rescinding its proposed assignment or sublease, the termination notice shall be void and this Lease shall continue in full force and effect. If this Lease shall be terminated with respect to the entire Premises pursuant to this Section, the Term of this Lease shall end on the date stated in Tenant's notice as the effective date of the sublease or assignment as if that date had been originally fixed in this Lease for the expiration of the Term. If Landlord recaptures under this Section only a portion of the Premises, the rent to be paid from time to time during the unexpired Term shall abate proportionately based on the proportion by which the approximate square footage of the remaining portion of the Premises shall be less than that of the Premises as of the date immediately prior to such recapture. Tenant shall, at Tenant's own cost and expense, discharge in full any outstanding commission obligation which may be due and owing as a result of any proposed assignment or subletting, whether or not the Premises are recaptured pursuant to this Section 9.3 and rented by Landlord to the proposed tenant or any other tenant.

9.4     In the event that Tenant sells, sublets, assigns or transfers this Lease, Tenant shall pay to Landlord as additional rent an amount equal to fifty percent (50%) of any Increased Rent (as defined below), less the Costs Component (as defined below), when and as such Increased Rent is received by Tenant. As used in this Section, "Increased Rent" shall mean the excess of (i) all rent and other consideration which Tenant is entitled to receive by reason of any sale, sublease, assignment or other transfer of this Lease, over (ii) the rent otherwise payable by Tenant under this Lease at such time. For purposes of the foregoing, any consideration received by Tenant in form other than cash shall be valued at its fair market value as determined by Landlord in good faith. The "Costs Component" is that amount which, if paid monthly, would fully amortize on a straight-line basis, over the entire period for which Tenant is to receive Increased Rent, the reasonable costs incurred by Tenant for leasing commissions and tenant improvements in connection with such sublease, assignment or other transfer.

9.5     Notwithstanding any other provision hereof, it shall be considered reasonable for Landlord to withhold its consent to any assignment of this Lease or sublease of any portion of the Premises if at the time of either Tenant's notice of the proposed assignment or sublease or the proposed commencement date thereof, there shall exist any uncured default of Tenant or matter which would become a default of Tenant with passage of time unless cured, or if the proposed assignee or sublessee is an entity: (a) with which Landlord is already in negotiation; (b) is already an occupant of the Building unless Landlord is unable to provide the amount of space required by such occupant; (c) is a governmental agency; (d) is incompatible with the character of occupancy of the Building; (e) with which the payment for the sublease or assignment is determined in whole or in part based upon its net income or profits; or (f) would subject the Premises to a use which would: (i) involve increased personnel or wear upon the Building; (ii) violate any exclusive right granted to another tenant of the Building; (iii) require any addition to or modification of the Premises or the Building in order to comply with building code

DocuSign Envelope ID: BCEE388C-9D0F-448E-955

or other governmental requirements; or, (iv) involve a violation of Section 1.2. Tenant expressly agrees that for the purposes of any statutory or other requirement of reasonableness on the part of Landlord, Landlord's refusal to consent to any assignment or sublease for any of the reasons described in this Section 9.5, shall be conclusively deemed to be reasonable.

9.6    Upon any request to assign or sublet, Tenant will pay to Landlord the Assignment/Subletting Fee plus, on demand, a sum equal to all of Landlord's costs, including reasonable attorney's fees, incurred in investigating and considering any proposed or purported assignment or pledge of this Lease or sublease of any of the Premises, regardless of whether Landlord shall consent to, refuse consent, or determine that Landlord's consent is not required for, such assignment, pledge or sublease. Any purported sale, assignment, mortgage, transfer of this Lease or subletting which does not comply with the provisions of this Article 9 shall be void.

9.7    If Tenant is a corporation, limited liability company, partnership or trust, any transfer or transfers of or change or changes within any twelve (12) month period in the number of the outstanding voting shares of the corporation or limited liability company, the general partnership interests in the partnership or the identity of the persons or entities controlling the activities of such partnership or trust resulting in the persons or entities owning or controlling a majority of such shares, partnership interests or activities of such partnership or trust at the beginning of such period no longer having such ownership or control shall be regarded as equivalent to an assignment of this Lease to the persons or entities acquiring such ownership or control and shall be subject to all the provisions of this Article 9 to the same extent and for all intents and purposes as though such an assignment.

10.    **INDEMNIFICATION.**  None of the Landlord Entities shall be liable and Tenant hereby waives all claims against them for any damage to any property or any injury to any person in or about the Premises or the Building by or from any cause whatsoever (including without limiting the foregoing, rain or water leakage of any character from the roof, windows, walls, basement, pipes, plumbing works or appliances, the Building not being in good condition or repair, gas, fire, oil, electricity or theft). Tenant shall protect, indemnify and hold the Landlord Entities harmless from and against any and all loss, claims, liability or costs (including court costs and attorney's fees) incurred by reason of (a) any damage to any property (including but not limited to property of any Landlord Entity) or any injury (including but not limited to death) to any person occurring in, on or about the Premises or the Building to the extent that such injury or damage shall be caused by or arise from any actual or alleged act, neglect, fault, or omission by or of Tenant or any Tenant Entity to meet any standards imposed by any duty with respect to the injury or damage; (b) the conduct or management of any work or thing whatsoever done by the Tenant in or about the Premises or from transactions of the Tenant concerning the Premises; (c) Tenant's actual or asserted failure to comply with any and all Regulations applicable to the condition or use of the Premises or its occupancy; or (d) any breach or default on the part of Tenant in the performance of any covenant or agreement on the part of the Tenant to be performed pursuant to this Lease. The provisions of this Article shall survive the termination of this Lease with respect to any claims or liability accruing prior to such termination.

11.    **INSURANCE.**

11.1    Tenant shall keep in force throughout the Term: (a) a Commercial General Liability insurance policy or policies to protect the Landlord Entities against any liability to the public or to any invitee of Tenant or a Landlord Entity incidental to the use of or resulting from any accident occurring in or upon the Premises with a limit of not less than $1,000,000 per occurrence and not less than $2,000,000 in the annual aggregate, or such larger amount as Landlord may prudently require from time to time, covering bodily injury and property damage liability and $1,000,000 products/completed operations aggregate; (b) Business Auto Liability covering owned, non-owned and hired vehicles with a limit of not less than $1,000,000 per accident; (c) Worker's Compensation Insurance with limits as required by statute with Employers Liability and limits of $500,000 each accident, $500,000 disease policy limit, $500,000 disease--each employee; (d) All Risk or Special Form coverage protecting Tenant against loss of or damage to Tenant's alterations, additions, improvements, carpeting, floor coverings, panelings, decorations, fixtures, inventory and other business personal property situated in or about the Premises to the full replacement value of the property so insured; and, (e) Business Interruption Insurance with limit of liability representing loss of at least approximately six (6) months of income.

11.2    The aforesaid policies shall (a) be provided at Tenant's expense; (b) name the Landlord Entities as additional insureds (General Liability) and loss payee (Property—Special Form); (c) be issued by an insurance company with a minimum Best's rating of "A-:VII" during the Term; and (d) provide that said insurance shall not be canceled unless thirty (30) days prior written notice (ten days for non-payment of premium) shall have been given to Landlord; a certificate of Liability insurance on ACORD Form 25 and a certificate of Property insurance on ACORD Form 28 shall be delivered to Landlord by Tenant upon the Commencement Date and at least thirty (30) days prior to each renewal of said insurance.

DocuSign Envelope ID: BCEE388C-9D0F-448E-9550...

11.3    Whenever Tenant shall undertake any alterations, additions or improvements in, to or about the Premises ("Work") the aforesaid insurance protection must extend to and include injuries to persons and damage to property arising in connection with such Work, without limitation including liability under any applicable structural work act; and such other insurance as Landlord shall require; and the policies of or certificates evidencing such insurance must be delivered to Landlord prior to the commencement of any such Work.

12.    **WAIVER OF SUBROGATION.**  Tenant and Landlord hereby mutually waive their respective rights of recovery against each other for any loss insured (or required to be insured pursuant to this Lease) by fire, extended coverage, All Risks or other insurance now or hereafter existing for the benefit of the respective party but only to the extent of the net insurance proceeds payable under such policies.  Each party shall obtain any special endorsements required by their insurer to evidence compliance with the aforementioned waiver.

13.    **SERVICES AND UTILITIES.**

13.1    Provided Tenant shall not be in default under this Lease, and subject to the other provisions of this Lease, Landlord agrees to furnish to the Premises during Building Business Hours (specified on the Reference Pages) on generally recognized business days (but exclusive in any event of Sundays and national and local legal holidays), the following services and utilities subject to the rules and regulations of the Building prescribed from time to time:  (a) water suitable for normal office use of the Premises; (b) heat and air conditioning required in Landlord's judgment for the use and occupation of the Premises during Building Business Hours; (c) cleaning and janitorial service; (d) elevator service by nonattended automatic elevators, if applicable; and, (e) equipment to bring to the Premises electricity for lighting, convenience outlets and other normal office use.  To the extent that Tenant is not billed directly by a public utility, Tenant shall pay, within five (5) days of Landlord's demand, for all electricity used by Tenant in the Premises.  The charge shall be at the rates charged for such services by the local public utility.  Alternatively, Landlord may elect to include electricity costs in Expenses.  In the absence of Landlord's gross negligence or willful misconduct, Landlord shall not be liable for, and Tenant shall not be entitled to, any abatement or reduction of rental by reason of Landlord's failure to furnish any of the foregoing, unless such failure shall persist for an unreasonable time after written notice of such failure is given to Landlord by Tenant and provided further that Landlord shall not be liable when such failure is caused by accident, breakage, repairs, labor disputes of any character, energy usage restrictions or by any other cause, similar or dissimilar, beyond the reasonable control of Landlord. Landlord shall use reasonable efforts to remedy any interruption in the furnishing of services and utilities.

13.2    Should Tenant require any additional work or service, as described above, including services furnished outside ordinary business hours specified above, Landlord may, on terms to be agreed, upon reasonable advance notice by Tenant, furnish such additional service and Tenant agrees to pay Landlord such charges as may be agreed upon, including any tax imposed thereon, but in no event at a charge less than Landlord's actual cost plus overhead for such additional service and, where appropriate, a reasonable allowance for depreciation of any systems being used to provide such service.  The current charge for after-hours HVAC service, which is subject to change at any time, is specified on the Reference Pages.

13.3    Wherever heat-generating machines or equipment are used by Tenant in the Premises which affect the temperature otherwise maintained by the air conditioning system or Tenant allows occupancy of the Premises by more persons than the heating and air conditioning system is designed to accommodate, in either event whether with or without Landlord's approval, Landlord reserves the right to install supplementary heating and/or air conditioning units in or for the benefit of the Premises and the cost thereof, including the cost of installation and the cost of operations and maintenance, shall be paid by Tenant to Landlord within five (5) days of Landlord's demand.  In addition, Landlord may install and shall have access to the Premises to monitor a separate meter (or submeter) to determine the actual use of any utility in the Premises or any shared common area and may make available and share actual whole-project energy and water usage data as necessary to maintain the Building's "green building" certification, if any.  If there is no meter or submeter in the Premises or if Tenant is billed directly by a public utility, then, upon request, Tenant shall provide monthly utility usage to Landlord in electronic or paper format or provide permission for Landlord to request information regarding Tenant's utility usage directly from the utility company.

13.4    Tenant will not, without the written consent of Landlord, use any apparatus or device in the Premises, including but not limited to, electronic data processing machines and machines using current in excess of 2000 watts and/or 20 amps or 120 volts, which will in any way increase the amount of electricity or water usually furnished or supplied for use of the Premises for normal office use, nor connect with electric current, except through existing electrical outlets in the Premises, or water pipes, any apparatus or device for the purposes of using electrical current or water.  If Tenant shall require water or electric current in excess of that usually furnished or supplied for use of the Premises as normal office use, Tenant shall procure the prior written consent of Landlord for the use thereof, which Landlord may refuse, and if Landlord does consent, Landlord may cause a water meter or electric current meter to be installed so as to measure the amount of such

excess water and electric current. The cost of any such meters shall be paid for by Tenant. Tenant agrees to pay to Landlord within five (5) days of Landlord's demand , the cost of all such excess water and electric current consumed (as shown by said meters, if any, or, if none, as reasonably estimated by Landlord) at the rates charged for such services by the local public utility or agency, as the case may be, furnishing the same, plus any additional expense incurred in keeping account of the water and electric current so consumed.

13.5    Tenant will not, without the written consent of Landlord, contract with a utility provider to service the Premises with any utility, including, but not limited to, telecommunications, electricity, water, sewer or gas, which is not previously providing such service to other tenants in the Building. Subject to Landlord's reasonable rules and regulations and the provisions of Articles 6 and 26, Tenant shall be entitled to the use of wiring ("Communications Wiring") from the existing telecommunications nexus in the Building to the Premises, sufficient for normal general office use of the Premises. Tenant shall not install any additional Communications Wiring, nor remove any Communications Wiring, without in each instance obtaining the prior written consent of Landlord, which consent may be withheld in Landlord's sole and absolute discretion. Landlord shall in no event be liable for disruption in any service obtained by Tenant pursuant to this paragraph. If Tenant is billed directly by a public utility with respect to Tenant's electrical usage at the Premises, then, upon request, Tenant shall provide monthly electrical utility usage for the Premises to Landlord for the period of time requested by Landlord (in electronic or paper format) or, at Landlord's option, provide any written authorization or other documentation required for Landlord to request information regarding Tenant's electricity usage with respect to the Premises directly from the applicable utility company.

13.6    Tenant shall have access to the Building and the Premises for Tenant and its employees 24 hours per day/7 days per week, subject to the terms of this Lease and such security or monitoring systems as Landlord may reasonably impose, including, without limitation, sign-in procedures and/or presentation of identification cards to the extent applicable.

14.    **HOLDING OVER.** Tenant shall pay Landlord for each day Tenant retains possession of the Premises or part of them after termination of this Lease by lapse of time or otherwise at the rate ("Holdover Rate") which shall be Two Hundred Percent (200%) of the greater of (a) the amount of the Annual Rent for the last period prior to the date of such termination plus Tenant's Proportionate Share of Expenses, Taxes and Insurance Costs under Article 4; and (b) the then market rental value of the Premises as determined by Landlord assuming a new lease of the Premises of the then usual duration and other terms, in either case, prorated on a daily basis, and also pay all damages sustained by Landlord by reason of such retention. If Landlord gives notice to Tenant of Landlord's election to such effect, such holding over shall constitute renewal of this Lease for a period from month to month or one (1) year, whichever shall be specified in such notice, in either case at the Holdover Rate, but if the Landlord does not so elect, no such renewal shall result notwithstanding acceptance by Landlord of any sums due hereunder after such termination; and instead, a tenancy at sufferance at the Holdover Rate shall be deemed to have been created. In any event, no provision of this Article 14 shall be deemed to waive Landlord's right of reentry or any other right under this Lease or at law.

15.    **SUBORDINATION.** Without the necessity of any additional document being executed by Tenant for the purpose of effecting a subordination, this Lease shall be subject and subordinate at all times to ground or underlying leases and to the lien of any mortgages or deeds of trust now or hereafter placed on, against or affecting the Building, Landlord's interest or estate in the Building, or any ground or underlying lease; provided, however, that if the lessor, mortgagee, trustee, or holder of any such mortgage or deed of trust elects to have Tenant's interest in this Lease be superior to any such instrument, then, by notice to Tenant, this Lease shall be deemed superior, whether this Lease was executed before or after said instrument. Notwithstanding the foregoing, Tenant covenants and agrees to execute and deliver within ten (10) days of Landlord's request such further instruments evidencing such subordination or superiority of this Lease as may be required by Landlord.

16.    **RULES AND REGULATIONS.** Tenant shall faithfully observe and comply with all the rules and regulations as set forth in Exhibit D to this Lease and all reasonable and non-discriminatory modifications of and additions to them from time to time put into effect by Landlord. Landlord shall not be responsible to Tenant for the non-performance by any other tenant or occupant of the Building of any such rules and regulations.

17.    **REENTRY BY LANDLORD.**

17.1    Landlord reserves and shall at all times have the right to re-enter the Premises to inspect the same, to supply janitor service and any other service to be provided by Landlord to Tenant under this Lease, to show said Premises to prospective purchasers, mortgagees or tenants, and to alter, improve or repair the Premises and any portion of the Building, without abatement of rent, and may for that purpose erect, use and maintain scaffolding, pipes, conduits and other necessary structures and open any wall, ceiling or floor in and through the Building and Premises where reasonably required by the character of the work to be performed, provided entrance to the Premises shall not be blocked thereby, and further provided

DocuSign Envelope ID: BCEE388C-9D0F-448E-9550-...

that except in the case of an emergency, Landlord shall make commercially reasonable efforts to minimize any interference with the business of Tenant in the Premises. Landlord shall have the right at any time to change the arrangement and/or locations of entrances, or passageways, doors and doorways, and corridors, windows, elevators, stairs, toilets or other public parts of the Building and to change the name, number or designation by which the Building is commonly known. In the event that Landlord damages any portion of any wall or wall covering, ceiling, or floor or floor covering within the Premises. Landlord shall repair or replace the damaged portion to match the original as nearly as commercially reasonable but shall not be required to repair or replace more than the portion actually damaged. Tenant hereby waives any claim for damages for any injury or inconvenience to or interference with Tenant's business, any loss of occupancy or quiet enjoyment of the Premises. and any other loss occasioned by any action of Landlord authorized by this Article 17.

17.2    For each of the aforesaid purposes, Landlord shall at all times have and retain a key with which to unlock all of the doors in the Premises, excluding Tenant's vaults and safes or special security areas (designated in advance), and Landlord shall have the right to use any and all means which Landlord may deem proper to open said doors in an emergency to obtain entry to any portion of the Premises. As to any portion to which access cannot be had by means of a key or keys in Landlord's possession, Landlord is authorized to gain access by such means as Landlord shall elect and the cost of repairing any damage occurring in doing so shall be borne by Tenant and paid to Landlord within five (5) days of Landlord's demand.

18.    DEFAULT.

18.1    Except as otherwise provided in Article 20, the following events shall be deemed to be Events of Default under this Lease:

18.1.1    Tenant shall fail to pay when due any sum of money becoming due to be paid to Landlord under this Lease, whether such sum be any installment of the rent reserved by this Lease, any other amount treated as additional rent under this Lease, or any other payment or reimbursement to Landlord required by this Lease, whether or not treated as additional rent under this Lease, and such failure shall continue for a period of five (5) days after written notice that such payment was not made when due, but if any such notice shall be given, for the twelve (12) month period commencing with the date of such notice, the failure to pay within five (5) days after due any additional sum of money becoming due to be paid to Landlord under this Lease during such period shall be an Event of Default, without notice. The notice required pursuant to this Section 18.1.1 shall replace rather than supplement any statutory notice required under California Code of Civil Procedure Section 1161 or any similar or successor statute.

18.1.2    Tenant shall fail to comply with any term, provision or covenant of this Lease which is not provided for in another Section of this Article and shall not cure such failure within twenty (20) days (forthwith, if the failure involves a hazardous condition) after written notice of such failure to Tenant provided, however, that such failure shall not be an event of default if such failure could not reasonably be cured during such twenty (20) day period, Tenant has commenced the cure within such twenty (20) day period and thereafter is diligently pursuing such cure to completion, but the total aggregate cure period shall not exceed ninety (90) days.

18.1.3    Tenant shall fail to vacate the Premises immediately upon termination of this Lease, by lapse of time or otherwise, or upon termination of Tenant's right to possession only.

18.1.4    Tenant shall become insolvent, admit in writing its inability to pay its debts generally as they become due, file a petition in bankruptcy or a petition to take advantage of any insolvency statute, make an assignment for the benefit of creditors, make a transfer in fraud of creditors, apply for or consent to the appointment of a receiver of itself or of the whole or any substantial part of its property, or file a petition or answer seeking reorganization or arrangement under the federal bankruptcy laws, as now in effect or hereafter amended, or any other applicable law or statute of the United States or any state thereof.

18.1.5    A court of competent jurisdiction shall enter an order, judgment or decree adjudicating Tenant bankrupt, or appointing a receiver of Tenant, or of the whole or any substantial part of its property, without the consent of Tenant, or approving a petition filed against Tenant seeking reorganization or arrangement of Tenant under the bankruptcy laws of the United States, as now in effect or hereafter amended, or any state thereof, and such order, judgment or decree shall not be vacated or set aside or stayed within sixty (60) days from the date of entry thereof.

DocuSign Envelope ID: BCEE388C-9D0F-448E-955D-...4...

19.    **REMEDIES.**

19.1    Upon the occurrence of any Event or Events of Default under this Lease, whether enumerated in Article 18 or not, Landlord shall have the option to pursue any one or more of the following remedies without any notice (except as expressly prescribed herein) or demand whatsoever (and without limiting the generality of the foregoing. Tenant hereby specifically waives notice and demand for payment of rent or other obligations and waives any and all other notices or demand requirements imposed by applicable law):

19.1.1    Terminate this Lease and Tenant's right to possession of the Premises and recover from Tenant an award of damages equal to the sum of the following:

19.1.1.1    The Worth at the Time of Award of the unpaid rent which had been earned at the time of termination;

19.1.1.2    The Worth at the Time of Award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rent loss that Tenant affirmatively proves could have been reasonably avoided;

19.1.1.3    The Worth at the Time of Award of the amount by which the unpaid rent for the balance of the Term after the time of award exceeds the amount of such rent loss that Tenant affirmatively proves could be reasonably avoided;

19.1.1.4    Any other amount necessary to compensate Landlord for all the detriment either proximately caused by Tenant's failure to perform Tenant's obligations under this Lease or which in the ordinary course of things would be likely to result therefrom; and

19.1.1.5    All such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time under applicable law.

The "Worth at the Time of Award" of the amounts referred to in parts 19.1.1.1 and 19.1.1.2 above, shall be computed by allowing interest at the lesser of a per annum rate equal to: (i) the greatest per annum rate of interest permitted from time to time under applicable law, or (ii) the Prime Rate plus 5%. For purposes hereof, the "Prime Rate" shall be the per annum interest rate publicly announced as its prime or base rate by a federally insured bank selected by Landlord in the State of California. The "Worth at the Time of Award" of the amount referred to in part 19.1.1.3, above, shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus 1%.

19.1.2    Employ the remedy described in California Civil Code § 1951.4 (Landlord may continue this Lease in effect after Tenant's breach and abandonment and recover rent as it becomes due, if Tenant has the right to sublet or assign, subject only to reasonable limitations); or

19.1.3    Notwithstanding Landlord's exercise of the remedy described in California Civil Code § 1951.4 in respect of an Event or Events of Default, at such time thereafter as Landlord may elect in writing, to terminate this Lease and Tenant's right to possession of the Premises and recover an award of damages as provided above in Section 19.1.1.

19.2    The subsequent acceptance of rent hereunder by Landlord shall not be deemed to be a waiver of any preceding breach by Tenant of any term, covenant or condition of this Lease, other than the failure of Tenant to pay the particular rent so accepted, regardless of Landlord's knowledge of such preceding breach at the time of acceptance of such rent. No waiver by Landlord of any breach hereof shall be effective unless such waiver is in writing and signed by Landlord.

19.3    **TENANT HEREBY WAIVES ANY AND ALL RIGHTS CONFERRED BY SECTION 3275 OF THE CIVIL CODE OF CALIFORNIA AND BY SECTIONS 1174 (c) AND 1179 OF THE CODE OF CIVIL PROCEDURE OF CALIFORNIA AND ANY AND ALL OTHER REGULATIONS AND RULES OF LAW FROM TIME TO TIME IN EFFECT DURING THE TERM PROVIDING THAT TENANT SHALL HAVE ANY RIGHT TO REDEEM, REINSTATE OR RESTORE THIS LEASE FOLLOWING ITS TERMINATION BY REASON OF TENANT'S BREACH. TENANT ALSO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY LITIGATION ARISING OUT OF OR RELATING TO THIS LEASE.**

DocuSign Envelope ID: BCEE388C-9D0F-448E-955A-5A14DCE...

19.4    No right or remedy herein conferred upon or reserved to Landlord is intended to be exclusive of any other right or remedy, and each and every right and remedy shall be cumulative and in addition to any other right or remedy given hereunder or now or hereafter existing by agreement, applicable law or in equity. In addition to other remedies provided in this Lease, Landlord shall be entitled, to the extent permitted by applicable law, to injunctive relief, or to a decree compelling performance of any of the covenants, agreements, conditions or provisions of this Lease, or to any other remedy allowed to Landlord at law or in equity. Forbearance by Landlord to enforce one or more of the remedies herein provided upon a default shall not be deemed or construed to constitute a waiver of such default.

19.5    This Article 19 shall be enforceable to the maximum extent such enforcement is not prohibited by applicable law, and the unenforceability of any portion thereof shall not thereby render unenforceable any other portion.

19.6    If more than one (1) Event of Default occurs during the Term or any renewal thereof, Tenant's renewal options, expansion options, purchase options and rights of first offer and/or refusal, if any are provided for in this Lease, shall be null and void.

19.7    If, on account of any breach or default by Tenant in Tenant's obligations under the terms and conditions of this Lease, it shall become necessary or appropriate for Landlord to employ or consult with an attorney or collection agency concerning or to enforce or defend any of Landlord's rights or remedies arising under this Lease or to collect any sums due from Tenant, Tenant agrees to pay all costs and fees so incurred by Landlord, including, without limitation, reasonable attorneys' fees and costs. **TENANT EXPRESSLY WAIVES ANY RIGHT TO: (A) TRIAL BY JURY; AND (B) SERVICE OF ANY NOTICE REQUIRED BY ANY PRESENT OR FUTURE LAW OR ORDINANCE APPLICABLE TO LANDLORDS OR TENANTS BUT NOT REQUIRED BY THE TERMS OF THIS LEASE.** Tenant hereby waives and agrees not to pursue or claim any excuse or offset to Tenant's obligations under this Lease based on the doctrines of impossibility, impracticality, frustration of contract, frustration of purpose, or other similar legal principals.

19.8    Upon the occurrence of a breach or default by Tenant, Landlord may (but shall not be obligated to) cure such default at Tenant's sole expense. Without limiting the generality of the foregoing, Landlord may, at Landlord's option, enter into and upon the Premises if Landlord determines in its sole discretion that Tenant is not acting within a commercially reasonable time given the circumstances (which, in the event of an emergency, may in Landlord's sole discretion, be immediate entrance without notice) to maintain, repair or replace anything for which Tenant is responsible under this Lease or to otherwise effect compliance with its obligations under this Lease and correct the same, without being deemed in any manner guilty of trespass, eviction or forcible entry and detainer and without incurring any liability for any damage or interruption of Tenant's business resulting therefrom and Tenant agrees to reimburse Landlord within five (5) days of Landlord's demand as additional rent, for any expenses which Landlord may incur in thus effecting compliance with Tenant's obligations under this Lease, plus interest from the date of expenditure by Landlord at a rate of ten percent (10%) per annum but in no event in excess of the maximum rate permitted by law.

20.    **TENANT'S BANKRUPTCY OR INSOLVENCY.**

20.1    If at any time and for so long as Tenant shall be subjected to the provisions of the United States Bankruptcy Code or other law of the United States or any state thereof for the protection of debtors as in effect at such time (each a "Debtor's Law"):

20.1.1    Tenant, Tenant as debtor-in-possession, and any trustee or receiver of Tenant's assets (each a "Tenant's Representative") shall have no greater right to assume or assign this Lease or any interest in this Lease, or to sublease any of the Premises than accorded to Tenant in Article 9, except to the extent Landlord shall be required to permit such assumption, assignment or sublease by the provisions of such Debtor's Law. Without limitation of the generality of the foregoing, any right of any Tenant's Representative to assume or assign this Lease or to sublease any of the Premises shall be subject to the conditions that:

20.1.1.1    Such Debtor's Law shall provide to Tenant's Representative a right of assumption of this Lease which Tenant's Representative shall have timely exercised and Tenant's Representative shall have fully cured any default of Tenant under this Lease.

20.1.1.2    Tenant's Representative or the proposed assignee, as the case shall be, shall have deposited with Landlord as security for the timely payment of rent an amount equal to the larger of: (a) three (3) months' rent and other monetary charges accruing under this Lease; and (b) any sum specified in Article 5; and shall have provided Landlord with adequate other assurance of the future performance of the obligations of the Tenant under this Lease. Without

limitation, such assurances shall include, at least, in the case of assumption of this Lease, demonstration to the satisfaction of the Landlord that Tenant's Representative has and will continue to have sufficient unencumbered assets after the payment of all secured obligations and administrative expenses to assure Landlord that Tenant's Representative will have sufficient funds to fulfill the obligations of Tenant under this Lease; and, in the case of assignment, submission of current financial statements of the proposed assignee, audited by an independent certified public accountant reasonably acceptable to Landlord and showing a net worth and working capital in amounts determined by Landlord to be sufficient to assure the future performance by such assignee of all of the Tenant's obligations under this Lease.

20.1.1.3    The assumption or any contemplated assignment of this Lease or subleasing any part of the Premises, as shall be the case, will not breach any provision in any other lease, mortgage, financing agreement or other agreement by which Landlord is bound.

20.1.1.4    Landlord shall have, or would have had absent the Debtor's Law, no right under Article 9 to refuse consent to the proposed assignment or sublease by reason of the identity or nature of the proposed assignee or sublessee or the proposed use of the Premises concerned.

21.    **QUIET ENJOYMENT.** Landlord represents and warrants that it has full right and authority to enter into this Lease and that Tenant, while paying the rental and performing its other covenants and agreements contained in this Lease, shall peaceably and quietly have, hold and enjoy the Premises for the Term without hindrance or molestation from Landlord subject to the terms and provisions of this Lease. Landlord shall not be liable for any interference or disturbance by other tenants or third persons, nor shall Tenant be released from any of the obligations of this Lease because of such interference or disturbance.

22.    **CASUALTY.**

22.1    In the event the Premises or the Building are damaged by fire or other cause and in Landlord's reasonable estimation such damage can be materially restored within one hundred eighty (180) days following the commencement of restoration, Landlord shall forthwith repair the same and this Lease shall remain in full force and effect, except that Tenant shall be entitled to a proportionate abatement in rent from the date of such damage. Such abatement of rent shall be made pro rata in accordance with the extent to which the damage and the making of such repairs shall interfere with the use and occupancy by Tenant of the Premises from time to time. Within forty-five (45) days from the date of such damage, Landlord shall notify Tenant, in writing, of Landlord's reasonable estimation of the length of time within which material restoration can be made, and Landlord's determination shall be binding on Tenant. For purposes of this Lease, the Building or Premises shall be deemed "materially restored" if they are in such condition as would not prevent or materially interfere with Tenant's use of the Premises for the purpose for which it was being used immediately before such damage.

22.2    If such repairs cannot, in Landlord's reasonable estimation, be made within one hundred eighty (180) days following the commencement of restoration, Landlord and Tenant shall each have the option of giving the other, at any time within thirty (30) days after Landlord's notice of estimated restoration time, notice terminating this Lease as of the date of such damage. In the event of the giving of such notice, this Lease shall expire and all interest of the Tenant in the Premises shall terminate as of the date of such damage as if such date had been originally fixed in this Lease for the expiration of the Term. In the event that neither Landlord nor Tenant exercises its option to terminate this Lease, then Landlord shall repair or restore such damage, this Lease continuing in full force and effect, and the rent hereunder shall be proportionately abated as provided in Section 22.1.

22.3    Landlord shall not be required to repair or replace any damage or loss by or from fire or other cause to any panelings, decorations, partitions, additions, railings, ceilings, floor coverings, office fixtures or any other property or improvements installed on the Premises by, or belonging to, Tenant. Any insurance which may be carried by Landlord or Tenant against loss or damage to the Building or Premises shall be for the sole benefit of the party carrying such insurance and under its sole control.

22.4    In the event that Landlord should fail to complete such repairs and material restoration within sixty (60) days after the date estimated by Landlord therefor as extended by this Section 22.4, Tenant may at its option and as its sole remedy terminate this Lease by delivering written notice to Landlord, within fifteen (15) days after the expiration of said period of time, whereupon this Lease shall end on the date of such notice or such later date fixed in such notice as if the date of such notice was the date originally fixed in this Lease for the expiration of the Term; provided, however, that if construction is delayed because of changes, deletions or additions in construction requested by Tenant, strikes, lockouts, casualties, Acts of God, war, material or labor shortages, government regulation or control or other causes beyond the

DocuSign Envelope ID: BCEE388C-9D0F-448E-955...

reasonable control of Landlord, the period for restoration, repair or rebuilding shall be extended for the amount of time Landlord is so delayed.

22.5    Notwithstanding anything to the contrary contained in this Article: (a) Landlord shall not have any obligation whatsoever to repair, reconstruct, or restore the Premises when the damages resulting from any casualty covered by the provisions of this Article 22 occur during the last twelve (12) months of the Term or any extension thereof, or for which sufficient insurance proceeds to fully cover the repair and restoration are not received by Landlord, but if Landlord determines not to repair such damages Landlord shall notify Tenant and if such damages shall render any material portion of the Premises untenantable Tenant shall have the right to terminate this Lease by notice to Landlord within fifteen (15) days after receipt of Landlord's notice; and (b) in the event the holder of any indebtedness secured by a mortgage or deed of trust covering the Premises or Building requires that any insurance proceeds be applied to such indebtedness, then Landlord shall have the right to terminate this Lease by delivering written notice of termination to Tenant within fifteen (15) days after such requirement is made by any such holder, whereupon this Lease shall end on the date of such damage as if the date of such damage were the date originally fixed in this Lease for the expiration of the Term.

22.6    In the event of any damage or destruction to the Building or Premises by any peril covered by the provisions of this Article 22, it shall be Tenant's responsibility to properly secure the Premises and upon notice from Landlord to remove forthwith, at its sole cost and expense, such portion of all of the property belonging to Tenant or its licensees from such portion or all of the Building or Premises as Landlord shall request.

22.7    Tenant hereby waives any and all rights under and benefits of Sections 1932(2) and 1933(4) of the California Civil Code, or any similar or successor Regulations or other laws now or hereinafter in effect.

23.    **EMINENT DOMAIN.** If all or any substantial part of the Premises shall be taken or appropriated by any public or quasi-public authority under the power of eminent domain, or conveyance in lieu of such appropriation, either party to this Lease shall have the right, at its option, of giving the other, at any time within thirty (30) days after such taking, notice terminating this Lease, except that Tenant may only terminate this Lease by reason of taking or appropriation, if such taking or appropriation shall be so substantial as to materially interfere with Tenant's use and occupancy of the Premises; provided, however, that a regulatory action, ordinance or Regulation limiting or temporarily prohibiting Tenant's right to enter or use the Premises or the Building shall not be construed as a taking or appropriation hereunder and Tenant shall have no right to rent abatement or termination right as a result thereof. If neither party to this Lease shall so elect to terminate this Lease, the rental thereafter to be paid shall be adjusted on a fair and equitable basis under the circumstances. In addition to the rights of Landlord above, if any substantial part of the Building shall be taken or appropriated by any public or quasi-public authority under the power of eminent domain or conveyance in lieu thereof, and regardless of whether the Premises or any part thereof are so taken or appropriated, Landlord shall have the right, at its sole option, to terminate this Lease. Landlord shall be entitled to any and all income, rent, award, or any interest whatsoever in or upon any such sum, which may be paid or made in connection with any such public or quasi-public use or purpose, and Tenant hereby assigns to Landlord any interest it may have in or claim to all or any part of such sums, other than any separate award which may be made with respect to Tenant's trade fixtures and moving expenses; Tenant shall make no claim for the value of any unexpired Term. Tenant hereby waives any and all rights under and benefits of Section 1265.130 of the California Code of Civil Procedure, or any similar or successor Regulations or other laws now or hereinafter in effect.

24.    **SALE BY LANDLORD.** In event of a sale or conveyance by Landlord of the Building, the same shall operate to release Landlord from any future liability upon any of the covenants or conditions, expressed or implied, contained in this Lease in favor of Tenant, and in such event Tenant agrees to look solely to the responsibility of the successor in interest of Landlord in and to this Lease. Except as set forth in this Article 24, this Lease shall not be affected by any such sale and Tenant agrees to attorn to the purchaser or assignee. If any security has been given by Tenant to secure the faithful performance of any of the covenants of this Lease, Landlord may transfer or deliver said security, as such, to Landlord's successor in interest and thereupon Landlord shall be discharged from any further liability with regard to said security.

25.    **ESTOPPEL CERTIFICATES.** Within ten (10) days following any written request which Landlord may make from time to time, Tenant shall execute and deliver to Landlord or mortgagee or prospective mortgagee a sworn statement certifying: (a) the date of commencement of this Lease; (b) the fact that this Lease is unmodified and in full force and effect (or, if there have been modifications to this Lease, that this Lease is in full force and effect, as modified, and stating the date and nature of such modifications); (c) the date to which the rent and other sums payable under this Lease have been paid; (d) the fact that there are no current defaults under this Lease by either Landlord or Tenant except as specified in Tenant's statement; and (e) such other matters as may be requested by Landlord. Landlord and Tenant intend that any statement delivered pursuant to this Article 25 may be relied upon by any mortgagee, beneficiary or purchaser, and Tenant shall be liable for all loss, cost or expense resulting from the failure of any sale or funding of any loan caused by any material

DocuSign Envelope ID: BCEE388C-9D0F-448E-9551-

misstatement contained in such estoppel certificate.  Tenant irrevocably agrees that if Tenant fails to execute and deliver such certificate within such ten (10) day period Landlord or Landlord's beneficiary or agent may execute and deliver such certificate on Tenant's behalf, and that such certificate shall be fully binding on Tenant.

26.     **SURRENDER OF PREMISES.**

26.1     Tenant shall arrange to meet Landlord for two (2) joint inspections of the Premises, the first to occur at least thirty (30) days (but no more than sixty (60) days) before the last day of the Term, and the second to occur not later than forty-eight (48) hours after Tenant has vacated the Premises.  In the event of Tenant's failure to arrange such joint inspections and/or participate in either such inspection, Landlord's inspection at or after Tenant's vacating the Premises shall be conclusively deemed correct for purposes of determining Tenant's responsibility for repairs and restoration.

26.2     All alterations, additions, and improvements in, on, or to the Premises made or installed by or for Tenant, including, without limitation, carpeting (collectively, "Alterations"), shall be and remain the property of Tenant during the Term.  Upon the expiration or sooner termination of the Term, all Alterations shall become a part of the realty and shall belong to Landlord without compensation, and title shall pass to Landlord under this Lease as by a bill of sale.  At the end of the Term or any renewal of the Term or other sooner termination of this Lease, Tenant will peaceably deliver up to Landlord possession of the Premises, together with all Alterations by whomsoever made, in the same conditions received or first installed, broom clean and free of all debris, excepting only ordinary wear and tear and damage by fire or other casualty.  Notwithstanding the foregoing, if Landlord elects by notice given to Tenant at least ten (10) days prior to expiration of the Term, Tenant shall, at Tenant's sole cost, remove any Alterations, including carpeting, so designated by Landlord's notice, and repair any damage caused by such removal, provided that Tenant shall not be required to remove any portion of the Initial Alterations described on the Work List as of the date of this Lease, as such terms are defined in Exhibit B hereto.  Tenant must, at Tenant's sole cost, remove upon termination of this Lease, any and all of Tenant's furniture, furnishings, equipment, movable partitions of less than full height from floor to ceiling and other trade fixtures and personal property, as well as all data/telecommunications cabling and wiring installed by or on behalf of Tenant, whether inside walls, under any raised floor or above any ceiling (collectively, "Personalty").  Personalty not so removed shall be deemed abandoned by the Tenant and title to the same shall thereupon pass to Landlord under this Lease as by a bill of sale, but Tenant shall remain responsible for the cost of removal and disposal of such Personalty, as well as any damage caused by such removal.  In lieu of requiring Tenant to remove Alterations and Personalty and repair the Premises as aforesaid, Landlord may, by written notice to Tenant delivered at least thirty (30) days before the Termination Date, require Tenant to pay to Landlord, as additional rent hereunder, the cost of such removal and repair in an amount reasonably estimated by Landlord.

26.3     All obligations of Tenant under this Lease not fully performed as of the expiration or earlier termination of the Term shall survive the expiration or earlier termination of the Term.  Upon the expiration or earlier termination of the Term, Tenant shall pay to Landlord the amount, as estimated by Landlord, necessary to repair and restore the Premises as provided in this Lease and/or to discharge Tenant's obligation for unpaid amounts due or to become due to Landlord.  All such amounts shall be used and held by Landlord for payment of such obligations of Tenant, with Tenant being liable for any additional costs upon demand by Landlord, or with any excess to be returned to Tenant after all such obligations have been determined and satisfied.  Any otherwise unused Security Deposit shall be credited against the amount payable by Tenant under this Lease.

27.     **NOTICES.**  Any notice or document required or permitted to be delivered under this Lease shall be addressed to the intended recipient, by fully prepaid registered or certified United States Mail return receipt requested, or by reputable independent contract delivery service furnishing a written record of attempted or actual delivery, and shall be deemed to be delivered when tendered for delivery to the addressee at its address set forth on the Reference Pages, or at such other address as it has then last specified by written notice delivered in accordance with this Article 27, or if to Tenant at either its aforesaid address or its last known registered office or home of a general partner or individual owner, whether or not actually accepted or received by the addressee.  Any such notice or document may also be personally delivered if a receipt is signed by and received from, the individual, if any, named in Tenant's Notice Address.

28.     **TAXES PAYABLE BY TENANT.**  In addition to rent and other charges to be paid by Tenant under this Lease, Tenant shall reimburse to Landlord, upon demand, any and all taxes payable by Landlord (other than net income taxes) whether or not now customary or within the contemplation of the parties to this Lease: (a) upon, allocable to, or measured by or on the gross or net rent payable under this Lease, including without limitation any gross income tax or excise tax levied by the State, any political subdivision thereof, or the Federal Government with respect to the receipt of such rent; (b) upon or with respect to the possession, leasing, operation, management, maintenance, alteration, repair, use or occupancy of the Premises or any portion thereof, including any sales, use or service tax imposed as a result thereof; (c) upon or measured by the Tenant's gross receipts or payroll or the value of Tenant's equipment, furniture, fixtures and other personal property of

10/31/01 CA SOG (BY)-INS                16
Revised 9/09/05
{2011-11850/01043006;3}

0034

Tenant or leasehold improvements, alterations or additions located in the Premises; or (d) upon this transaction or any document to which Tenant is a party creating or transferring any interest of Tenant in this Lease or the Premises. In addition to the foregoing, Tenant agrees to pay, before delinquency, any and all taxes levied or assessed against Tenant and which become payable during the term hereof upon Tenant's equipment, furniture, fixtures and other personal property of Tenant located in the Premises.

29.    **RELOCATION OF TENANT.**  Landlord, at its sole expense, on at least sixty (60) days prior written notice, may require Tenant to move from the Premises to other space of comparable size and decor in order to permit Landlord to consolidate the space leased to Tenant with other adjoining space leased or to be leased to another tenant. In the event of any such relocation, Landlord will pay all expenses of preparing and decorating the new premises so that they will be substantially similar to the Premises from which Tenant is moving, and Landlord will also pay the expense of moving Tenant's furniture and equipment to the relocated premises. In such event this Lease and each and all of the terms and covenants and conditions hereof shall remain in full force and effect and thereupon be deemed applicable to such new space except that revised Reference Pages and a revised <u>Exhibit A</u> shall become part of this Lease and shall reflect the location of the new premises.

30.    **PARKING.**

     30.1    During the initial Term of this Lease, Tenant agrees to lease from Landlord and Landlord agrees to lease to Tenant, the number and type of parking passes as set forth on the Reference Page of this Lease. This right to park in the Building's parking facilities (the "Parking Facility") shall be on an unreserved, nonexclusive, first come, first served basis, for passenger-size automobiles and is subject to the following terms and conditions:

     30.1.1    Tenant shall pay to Landlord, or Landlord's designated parking operator, the Building's prevailing monthly parking charges, without deduction or offset, on the first day of each month during the Term of this Lease. Landlord will notify Tenant upon not less than thirty (30) days' notice of any increases in the monthly parking charges prior to billing Tenant any increases. No deductions from the monthly charge shall be made for days on which the Parking Facility is not used by Tenant.

     30.1.2    Tenant shall at all times abide by and shall cause each of Tenant's employees, agents, customers, visitors, invitees, licensees, contractors, assignees and subtenants (collectively, "Tenant's Parties") to abide by any rules and regulations ("Rules") for use of the Parking Facility that Landlord or Landlord's garage operator reasonably establishes from time to time, and otherwise agrees to use the Parking Facility in a safe and lawful manner. Landlord reserves the right to adopt, modify and enforce the Rules governing the use of the Parking Facility from time to time including any key-card, sticker or other identification or entrance system and hours of operation. Landlord may refuse to permit any person who violates such Rules to park in the Parking Facility, and any violation of the Rules shall subject the car to removal from the Parking Facility.

     30.1.3    Unless specified to the contrary above, the parking spaces hereunder shall be provided on a non-designated "first-come, first-served" basis. Landlord reserves the right to assign specific spaces, and to reserve spaces for visitors, small cars, disabled persons or for other tenants or guests, and Tenant shall not park and shall not allow Tenant's Parties to park in any such assigned or reserved spaces. Tenant may validate visitor parking by such method as Landlord may approve, at the validation rate from time to time generally applicable to visitor parking. Tenant acknowledges that the Parking Facility may be closed entirely or in part in order to make repairs or perform maintenance services, or to alter, modify, re-stripe or renovate the Parking Facility, or if required by casualty, strike, condemnation, act of God, governmental law or requirement or other reason beyond the operator's reasonable control.

     30.1.4    Tenant acknowledges that to the fullest extent permitted by law, Landlord shall have no liability for any damage to property or other items located in the parking areas of the Building (including without limitation, any loss or damage to tenant's automobile or the contents thereof due to theft, vandalism or accident), nor for any personal injuries or death arising out of the use of the Parking Facility by Tenant or any Tenant's Parties, whether or not such loss or damage results from Landlord's active negligence or negligent omission. The limitation on Landlord's liability under the preceding sentence shall not apply however to loss or damage arising directly from Landlord's willful misconduct. Without limiting the foregoing, if Landlord arranges for the parking areas to be operated by an independent contractor not affiliated with Landlord, Tenant acknowledges that Landlord shall have no liability for claims arising through acts or omissions of such independent contractor. Tenant and Tenant's Parties each hereby voluntarily releases, discharges, waives and relinquishes any and all actions or causes of action for personal injury or property damage occurring to Tenant or any of Tenant's Parties arising as a result of parking in the Parking Facility, or any activities incidental thereto, wherever or however the same may occur, and further agrees that Tenant will not prosecute any claim for personal injury or property damage against Landlord or

10/31/01 CA SOG (BY)-INS                    17
Revised 9/09/05
{2011-11850/01043006;3}

any of its officers, agents, servants or employees for any said causes of action and in all events, Tenant agrees to look first to its insurance carrier and to require that Tenant's Parties look first to their respective insurance carriers for payment of any losses sustained in connection with any use of the Parking Facility. Tenant hereby waives on behalf of its insurance carriers all rights of subrogation against Landlord or any Landlord Entities.

30.1.5    Tenant's right to park as described in this Article and this Lease is exclusive to Tenant and shall not pass to any assignee or sublessee without the express written consent of Landlord. Such consent is at the sole discretion of the Landlord.

30.1.6    In the event any surcharge or regulatory fee is at any time imposed by any governmental authority with reference to parking, Tenant shall (commencing after two (2) weeks' notice to Tenant) pay, per parking pass, such surcharge or regulatory fee to Landlord in advance on the first day of each calendar month concurrently with the month installment of rent due under this Lease. Landlord will enforce any surcharge or fee in an equitable manner amongst the Building tenants.

30.2    If Tenant violates any of the terms and conditions of this Article, the operator of the Parking Facility shall have the right to remove from the Parking Facility any vehicles hereunder which shall have been involved or shall have been owned or driven by parties involved in causing such violation, without liability therefor whatsoever. In addition, Landlord shall have the right to cancel Tenant's right to use the Parking Facility pursuant to this Article upon ten (10) days' written notice, unless within such ten (10) day period, Tenant cures such default. Such cancellation right shall be cumulative and in addition to any other rights or remedies available to Landlord at law or equity, or provided under this Lease.

31.    **DEFINED TERMS AND HEADINGS.** The Article headings shown in this Lease are for convenience of reference and shall in no way define, increase, limit or describe the scope or intent of any provision of this Lease. Any indemnification or insurance of Landlord shall apply to and inure to the benefit of all the following "Landlord Entities", being Landlord, Landlord's investment manager, and the trustees, boards of directors, officers, general partners, beneficiaries, stockholders, employees and agents of each of them. Any option granted to Landlord shall also include or be exercisable by Landlord's trustee, beneficiary, agents and employees, as the case may be. In any case where this Lease is signed by more than one person, the obligations under this Lease shall be joint and several. The terms "Tenant" and "Landlord" or any pronoun used in place thereof shall indicate and include the masculine or feminine, the singular or plural number, individuals, firms or corporations, and their and each of their respective successors, executors, administrators and permitted assigns, according to the context hereof. The term "rentable area" shall mean the rentable area of the Premises or the Building as calculated by the Landlord on the basis of the plans and specifications of the Building including a proportionate share of any common areas. Tenant hereby accepts and agrees to be bound by the figures for the rentable square footage of the Premises and Tenant's Proportionate Share shown on the Reference Pages; however, Landlord may adjust either or both figures if there is manifest error, addition or subtraction to the Building or any business park or complex of which the Building is a part. remeasurement or other circumstance reasonably justifying adjustment. The term "Building" refers to the structure in which the Premises are located and the common areas (parking lots, sidewalks, landscaping, etc.) appurtenant thereto. If the Building is part of a larger complex of structures, the term "Building" may include the entire complex, where appropriate (such as shared Expenses, Insurance Costs or Taxes) and subject to Landlord's reasonable discretion.

32.    **TENANT'S AUTHORITY.**

32.1    If Tenant signs as a corporation, partnership, trust or other legal entity each of the persons executing this Lease on behalf of Tenant represents and warrants that Tenant has been and is qualified to do business in the state in which the Building is located, that the entity has full right and authority to enter into this Lease, and that all persons signing on behalf of the entity were authorized to do so by appropriate actions. Tenant agrees to deliver to Landlord, simultaneously with the delivery of this Lease, a corporate resolution, proof of due authorization by partners, opinion of counsel or other appropriate documentation reasonably acceptable to Landlord evidencing the due authorization of Tenant to enter into this Lease.

32.2    Tenant hereby represents and warrants that neither Tenant, nor any persons or entities holding any legal or beneficial interest whatsoever in Tenant, are (i) the target of any sanctions program that is established by Executive Order of the President or published by the Office of Foreign Assets Control, U.S. Department of the Treasury ("OFAC"); (ii) designated by the President or OFAC pursuant to the Trading with the Enemy Act, 50 U.S.C. App. § 5, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-06, the Patriot Act, Public Law 107-56, Executive Order 13224 (September 23, 2001) or any Executive Order of the President issued pursuant to such statutes; or (iii) named on the following list that is published by OFAC: "List of Specially Designated Nationals and Blocked Persons." If the foregoing

representation is untrue at any time during the Term, an Event of Default will be deemed to have occurred, without the necessity of notice to Tenant.

33.    **FINANCIAL STATEMENTS AND CREDIT REPORTS.** At Landlord's request, Tenant shall deliver to Landlord a copy, certified by an officer of Tenant as being a true and correct copy, of Tenant's most recent audited financial statement, or, if unaudited, certified by Tenant's chief financial officer as being true, complete and correct in all material respects. Tenant hereby authorizes Landlord to obtain one or more credit reports on Tenant at any time, and shall execute such further authorizations as Landlord may reasonably require in order to obtain a credit report.

34.    **COMMISSIONS.** Each of the parties represents and warrants to the other that it has not dealt with any broker or finder in connection with this Lease, except as described on the Reference Pages.

35.    **TIME AND APPLICABLE LAW.** Time is of the essence of this Lease and all of its provisions. This Lease shall in all respects be governed by the laws of the state in which the Building is located. Whenever a period of time is prescribed for the taking of an action by Landlord, the period of time for the performance of such action shall be extended by the number of days that the performance is actually delayed due to strikes, acts of God, shortages of labor or materials, war, terrorist acts, pandemics, civil disturbances and other causes beyond the reasonable control of Landlord.

36.    **SUCCESSORS AND ASSIGNS.** Subject to the provisions of Article 9, the terms, covenants and conditions contained in this Lease shall be binding upon and inure to the benefit of the heirs, successors, executors, administrators and assigns of the parties to this Lease.

37.    **ENTIRE AGREEMENT.** This Lease, together with its exhibits, contains all agreements of the parties to this Lease and supersedes any previous negotiations. There have been no representations made by the Landlord or any of its representatives or understandings made between the parties other than those set forth in this Lease and its exhibits. This Lease may not be modified except by a written instrument duly executed by the parties to this Lease.

38.    **EXAMINATION NOT OPTION.** Submission of this Lease shall not be deemed to be a reservation of the Premises. Landlord shall not be bound by this Lease until it has received a copy of this Lease duly executed by Tenant and has delivered to Tenant a copy of this Lease duly executed by Landlord, and until such delivery Landlord reserves the right to exhibit and lease the Premises to other prospective tenants. Notwithstanding anything contained in this Lease to the contrary, Landlord may withhold delivery of possession of the Premises from Tenant until such time as Tenant has paid to Landlord any security deposit required by Article 5, the first month's rent as set forth in Article 3 and any sum owed pursuant to this Lease.

39.    **RECORDATION.** Tenant shall not record or register this Lease or a short form memorandum hereof without the prior written consent of Landlord, and then shall pay all charges and taxes incident such recording or registration.

40.    **COUNTERPARTS.** This Lease may be executed in any number of counterparts, each of which shall be deemed an original, but all of which, together, shall constitute one and the same Lease. In order to expedite the transaction contemplated herein, telecopied signatures or signatures transmitted by electronic mail in so-called "pdf" format may be used in place of original signatures on this Lease. Landlord and Tenant intend to be bound by the signatures on the telecopied or e-mailed document, are aware that the other party will rely on the telecopied or e-mailed signatures, and hereby waive any defenses to the enforcement of the terms of this Lease based on such telecopied or e-mailed signatures. Promptly following transmission of the telecopied or e-mailed signatures, Tenant shall promptly deliver to Landlord's property manager the original signatures of this Lease.

41.    **SIGNAGE.** Landlord shall provide and install, at Landlord's sole cost and expense, the initial signage for Tenant in the Building directory and at the entry to the Premises. Such signage (and any replacement or modification thereof) shall consist of Building standard materials and shall comply with Landlord's then current Building specifications. Any required maintenance, repair or changes (which changes shall be subject to Landlord's prior written approval) to such signage shall be performed by Landlord at Tenant's sole cost and expense, which costs shall paid to Landlord within five (5) days of Landlord's demand. At Landlord's option, upon the expiration or earlier termination of this Lease, Tenant shall, at Tenant's sole cost and expense, remove any such signage and repair any damage to the Building caused by such signage.

42.    **OPTION TO EXTEND.** Provided (i) this Lease is in full force and effect, (ii) Tenant is not in default under any of the other terms and conditions of this Lease at the time of notification or commencement, (iii) Tenant, at the time of exercise and at the time the term is extended, is conducting regular, active, ongoing business in, and is in occupancy (and occupancy

10/31/01 CA SOG (BY)-INS                    19
Revised 9/09/05
{2011-11850/01043006;3}

by a subtenant, licensee or other party permitted or suffered by Tenant shall not satisfy such condition) of the entire Premises, (iv) Tenant has timely paid all rent due under this Lease during the twelve (12) month period immediately preceding the time of exercise or at any time thereafter until the beginning of such extension of the Term, and (v) Landlord reasonably determines that there has been no material adverse change in Tenant's financial position from such position as of the date of execution of this Lease, as certified by Landlord's third party credit auditor (Tenant shall tender copies of Tenant's certified financial statements as further described below, the "Financial Statements") to Landlord with Tenant's written notice exercising its right hereunder) (the "Financial Condition Adverse Change"), then Tenant shall have one (1) option to extend (the "Extension Option") this Lease for a term of three (3) years (the "Extension Term"), for the portion of the Premises being leased by Tenant as of the date the Extension Term is to commence, on the same terms and conditions set forth in this Lease, except as modified by the terms, covenants and conditions as set forth below:

42.1    If Tenant elects to exercise the Extension Option, then Tenant shall provide Landlord with written notice no earlier than the date which is three hundred sixty five (365) days prior to the expiration of the Term of this Lease but no later than the date which is two hundred seventy (270) days prior to the expiration of the Term of this Lease. If Tenant fails to provide such notice, Tenant shall have no further or additional right to extend or extend the Term of this Lease.

42.2    The Annual Rent and Monthly Installment of Rent in effect at the expiration of the Term of this Lease shall be increased to reflect the Prevailing Market (defined below) rate. Landlord shall advise Tenant of the new Annual Rent and Monthly Installment of Rent for the Premises no later than thirty (30) days after receipt of Tenant's written request therefor. Said request shall be made no earlier than thirty (30) days prior to the first date on which Tenant may exercise its Extension Option under this Article 43. Said notification of the new Annual Rent and Monthly Installment of Rent may include a provision for its escalation to provide for a change in the Prevailing Market rate between the time of notification and the commencement of the Extension Term. Notwithstanding anything to the contrary set forth herein, in no event shall the Annual Rent and Monthly Installment of Rent for the Extension Term be less than the Annual Rent and Monthly Installment of Rent in the preceding period.

42.3    This Extension Option is not transferable; the parties hereto acknowledge and agree that they intend that the Extension Option shall be "personal" to Tenant as set forth above and to a Permitted Transferee following an assignment of this Lease and that in no event will any assignee or sublessee have any rights to exercise the Extension Option.

42.4    If the Extension Option is validly exercised or if Tenant fails to validly exercise the Extension Option, Tenant shall have no further right to extend the Term of this Lease.

42.5    For purposes of this Extension Option, "Prevailing Market" shall mean the arms length fair market annual rental rate per rentable square foot under extension leases and amendments entered into on or about the date on which the Prevailing Market is being determined hereunder for space comparable to the Premises in the Building and Class A buildings comparable to the Building in the Central Orange County submarket area as of the date the Extension Term is to commence, taking into account the specific provisions of this Lease which will remain constant. The determination of Prevailing Market shall take into account any material economic differences between the terms of this Lease and any comparison lease or amendment, such as rent abatements, construction costs and other concessions and the manner, if any, in which the landlord under any such lease is reimbursed for operating expenses and taxes. The determination of Prevailing Market shall also take into consideration any reasonably anticipated changes in the Prevailing Market rate from the time such Prevailing Market rate is being determined and the time such Prevailing Market rate will become effective under this Lease.

42.6    Notwithstanding anything herein to the contrary, the Extension Option is subject and subordinate to the expansion rights (whether such rights are designated as a right of first offer, right of first refusal, expansion option or otherwise) of any tenant of the Building existing on the date hereof.

42.7    In any event, the Financial Statements tendered to Landlord as set forth above shall be Tenant's most recent statements (and in any event applicable to Tenant immediately preceding fiscal year) certified by Tenant's Chief Financial Officer or Controller or other officer of Tenant with appropriate financial responsibility as being true complete and correct. In the event there is a Financial Condition Adverse Change and accordingly Tenant is not qualified to exercise the Extension Option, Landlord, in its sole discretion, may elect to permit Tenant to provide an additional security enhancement (as determined by Landlord in its sole discretion) and, in such event, if Tenant so provides such additional security enhancement to Landlord, Landlord shall then waive such Financial Condition Adverse Change and Tenant shall be entitled to exercise the Extension Option.

43.    **EXPANSION OPTION.**

43.1    Tenant shall have the option (the "Expansion Option") to lease the space known as Suite 105 of the Building containing approximately 3,590 square feet of rentable area which is located adjacent to the Premises (the "Expansion Space") if: (i) Landlord receives written notice (the "Expansion Notice") from Tenant of the exercise of its Expansion Option on or before the earlier to occur of December 1, 2020 and the date which is three (3) business following Landlord's delivery of written notice to Tenant that Landlord has received a bona fide proposal to lease the Expansion Space to a third party; and (ii) Tenant is not in default under this Lease beyond any applicable cure periods at the time that Landlord receives the Expansion Notice; and (iii) no part of the Premises is sublet at the time Landlord receives the Expansion Notice; and (iv) this Lease has not been assigned prior to the date that Landlord receives the Expansion Notice; and (v) the Expansion Space is intended for the exclusive use of Tenant only during the Term; and (vi) Tenant has not vacated or abandoned the Premises at the time Landlord receives the Expansion Notice.

43.2    Terms for Expansion Space.

43.2.1    The schedule of Annual Rent and Monthly Installment of Rent set forth in the Reference Pages of this Lease shall be revised to include the Expansion Space as part Premises and the rental rate for the Expansion Space during the remainder of the initial Term of this Lease shall be at the same rate as set forth herein for the Premises and Monthly Installment of Rent applicable to the Expansion Space during any remaining portion of the Rent Abatement Period shall be abated in accordance with Section 3.3 above.

43.2.2    Tenant shall pay Tenant's Proportionate Share of Expenses, Taxes and Insurance Costs for the Expansion Space on the same terms and conditions set forth in Article 4 of this Lease, including the same Base Year that is applicable to the initial Premises, and Tenant's Proportionate Share shall increase appropriately to account for the addition of the Expansion Space.

43.2.3    The Expansion Space (including improvements and personalty, if any) shall be accepted by Tenant in its "as-built" condition and configuration existing on the earlier of the date Tenant takes possession of the Expansion Space or as of the date the term for the Expansion Space commences; provided, however, that Landlord shall, at its sole cost and expense, (i) paint the existing exposed painted walls in the Expansion Space, (ii) replace the existing carpeting in the Expansion Space with Building standard carpeting, and (iii) replace the existing flooring in the Expansion Space with Building standard flooring (collectively, the "Expansion Space Improvements").

43.2.4    The term for the Expansion Space shall commence on the date that Landlord shall tender possession of the Expansion Space with the Expansion Space Improvements substantially completed (which date is estimated to occur in January, 2021), subject to any Tenant Delays, and shall end, unless sooner terminated pursuant to the terms of this Lease, on the Termination Date of this Lease, it being the intention of the parties hereto that the term for the Expansion Space and the Term for the initial Premises shall be coterminous. If Landlord is delayed delivering possession of the Expansion Space due to the holdover or unlawful possession of such space by any party, Landlord shall use reasonable efforts to obtain possession of the space, and the commencement of the term for the Expansion Space shall be postponed until the date Landlord delivers possession of the Expansion Space to Tenant free from occupancy by any party.

43.2.5    The Expansion Space shall be considered part of the Premises, subject to all the terms and conditions of this Lease, except that no allowances, credits, abatements or other concessions (if any) set forth in the Lease for the initial Premises shall apply to the Expansion Space, except as may be specifically provided otherwise in this Expansion Option provision.

43.3    If Tenant is entitled to and properly exercises the Expansion Option, Landlord shall prepare an amendment (the "Expansion Amendment") to reflect the commencement date of the term for the subject Expansion Space and the changes in Monthly Installment of Rent, rentable square footage of the Premises, Tenant's Proportionate Share and other appropriate terms. A copy of the Expansion Amendment shall be sent to Tenant within a reasonable time after Landlord's receipt of the Expansion Notice, and Tenant shall execute and return the Expansion Amendment to Landlord within 15 days thereafter, but an otherwise valid exercise of the Expansion Option shall be fully effective whether or not the Expansion Amendment is executed.

44.    **ELECTRONIC SIGNATURES. THE PARTIES HERETO CONSENT AND AGREE THAT THIS LEASE MAY BE SIGNED USING ELECTRONIC SIGNATURE TECHNOLOGY (E.G., VIA DOCUSIGN OR SIMILAR ELECTRONIC SIGNATURE TECHNOLOGY), AND THAT SUCH SIGNED ELECTRONIC RECORD SHALL BE VALID AND AS EFFECTIVE TO BIND THE PARTY SO SIGNING AS A PAPER COPY BEARING SUCH PARTY'S HAND-WRITTEN SIGNATURE.**

45.    **LIMITATION OF LANDLORD'S LIABILITY.** Redress for any claim against Landlord under this Lease shall be limited to and enforceable only against and to the extent of Landlord's interest in the Building in which the Premises is located. The obligations of Landlord under this Lease are not intended to be and shall not be personally binding on, nor shall any resort be had to the private properties of, any of its or its investment manager's trustees, directors, officers, partners, beneficiaries, members, stockholders, employees, or agents, and in no case shall Landlord be liable to Tenant hereunder for any lost profits, damage to business, or any form of special, indirect or consequential damages.

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease as of the Lease Reference Date set forth in the Reference Pages of this Lease.

LANDLORD:                                          TENANT:

SDCO TUSTIN EXECUTIVE CENTER, INC.,                THE LITIGATION PRACTICE GROUP PC,
a Delaware corporation                             a California corporation

By:  *Kara Burkhart*                               By:  *Daniel S. March*

Name: Kara Burkhart                                Name:  Daniel S. March

Title:  Vice President                             Title:  President
Dated:  11/6/2020                                  Dated:  11/6/2020

By:  *John Casasante*                              By:  *Daniel S. March*

Name: John Casasante                               Name:  Daniel S. March

Title:  Vice President                             Title:  Treasurer and Member of Board of Directors
Dated:  11/6/2020                                  Dated:  11/6/2020

DocuSign Envelope ID: BCEE388C-9D0F-448E-9551-4A6FA09E3A38

## EXHIBIT A – FLOOR PLAN DEPICTING THE PREMISES

attached to and made a part of the Lease bearing the
Lease Reference Date of November 5, 2020 between
**SDCO TUSTIN EXECUTIVE CENTER, INC., a Delaware corporation, as Landlord and
THE LITIGATION PRACTICE GROUP PC, a California corporation, as Tenant**

Exhibit A is intended only to show the general layout of the Premises as of the beginning of the Term of the Lease. It does not in any way supersede any of Landlord's rights set forth in Article 17 of the Lease with respect to arrangements and/or locations of public parts of the Building and changes in such arrangements and/or locations. It is not to be scaled; any measurements or distances shown should be taken as approximate.



DocuSign Envelope ID: BCEE388C-9D0F-448E-9556...

## EXHIBIT A-1 – SITE PLAN

**attached to and made a part of the Lease bearing the
Lease Reference Date of November 5, 2020 between
SDCO TUSTIN EXECUTIVE CENTER, INC., a Delaware corporation, as Landlord and
THE LITIGATION PRACTICE GROUP PC, a California corporation, as Tenant**

Exhibit A-1 is intended only to show the general location of the Building and/or the project of which the Building is a part as of the beginning of the Term of the Lease. It does not in any way supersede any of Landlord's rights set forth in Article 17 of the Lease with respect to arrangements and/or locations of public parts of the Building and changes in such arrangements and/or locations. It is not to be scaled; any measurements or distances shown should be taken as approximate.



## EXHIBIT B – INITIAL ALTERATIONS

attached to and made a part of the Lease bearing the
Lease Reference Date of November 5, 2020 between
**SDCO TUSTIN EXECUTIVE CENTER, INC.**, a Delaware corporation, as Landlord and
**THE LITIGATION PRACTICE GROUP PC**, a California corporation, as Tenant

1. Landlord shall perform improvements to the Premises in accordance with the following work list (the "Work List") using Building standard methods, materials and finishes. The improvements to be performed in accordance with the Work List are hereinafter referred to as the "Initial Alterations". Landlord and Tenant agree that Landlord's obligation to pay for the cost of Initial Alterations (inclusive of the cost of preparing any necessary plans, obtaining permits, a construction management fee equal to five percent (5%) of the total construction costs, and other related costs) shall be limited to $71,340.00 (i.e., $20.00 per rentable square foot of the Premises (the "Maximum Amount") and that Tenant shall be responsible for the cost of Initial Alterations, plus any applicable state sales or use tax, if any, to the extent that it exceeds the Maximum Amount. Landlord shall enter into a direct contract for the Initial Alterations with a general contractor selected by Landlord. In addition, Landlord shall have the right to select and/or approve of any subcontractors used in connection with the Initial Alterations and Section 2 below.

### WORK LIST

A. Close an opening in the back office and create opening from break area to rear office of the Premises as shown on Schedule 1 attached hereto.
B. Paint the existing, exposed painted walls.
C. Replace the existing carpeting.
D. Replace the existing flooring, including the removal of the existing ceramic tile, with LVT flooring as shown on Schedule 1 attached hereto.
E. Remove two cabinets in rear area of Premises as shown on Schedule 1 attached hereto.
F. Install one (1) deadbolt lock on each of the five (5) exterior offices.
G. Install one (1) power outlet in rear office area for cubicle power as shown on Schedule 1 attached hereto.

2. All other work and upgrades, subject to Landlord's approval, shall be at Tenant's sole cost and expense, plus any applicable state sales or use tax thereon, payable upon demand as additional rent. Tenant shall be responsible for any Tenant Delay in completion of the Initial Alterations resulting from any such other work and upgrades requested or performed by Tenant.

3. Landlord's supervision or performance of any work for or on behalf of Tenant shall not be deemed to be a representation by Landlord that such work complies with applicable insurance requirements, building codes, ordinances, laws or regulations or that the improvements constructed will be adequate for Tenant's use.

4. If Landlord's estimate and/or the actual cost of the Initial Alterations shall exceed the Maximum Amount, Landlord, prior to commencing any Initial Alterations, shall submit to Tenant a written estimate setting forth the anticipated cost of the Initial Alterations, including but not limited to labor and materials, contractor's fees and permit fees. Within three (3) business days thereafter, Tenant shall either notify Landlord in writing of its approval of the cost estimate, or specify its objections thereto and any desired changes to the proposed Initial Alterations. If Tenant notifies Landlord of such objections and desired changes, Tenant shall work with Landlord to reach a mutually acceptable alternative cost estimate.

5. If Landlord's estimate and/or the actual cost of construction shall exceed the Maximum Amount (such amounts exceeding the Maximum Amount being herein referred to as the "Excess Costs"), Tenant shall pay to Landlord such Excess Costs, plus any applicable state sales or use tax thereon, upon demand. The statements of costs submitted to Landlord by Landlord's contractors shall be conclusive for purposes of determining the actual cost of the items described therein. The amounts payable by Tenant hereunder constitute rent payable pursuant to the Lease, and the failure to timely pay same constitutes an event of default under the Lease.

6. Any portion of the Maximum Amount which exceeds the cost of the Initial Alterations or is otherwise remaining after substantial completion of the Initial Alterations shall accrue to the sole benefit of Landlord, it being agreed that Tenant shall not be entitled to any credit, offset, abatement or payment with respect thereto.

DocuSign Envelope ID: BCEE388C-9D0F-448E-9556-BФ4400B8ELF

7.      This Exhibit shall not be deemed applicable to any additional space added to the Premises at any time or from time to time, whether by any options under the Lease or otherwise, or to any portion of the original Premises or any additions to the Premises in the event of a renewal or extension of the original Term of the Lease, whether by any options under the Lease or otherwise, unless expressly so provided in the Lease or any amendment or supplement to the Lease.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

DocuSign Envelope ID: BCEE388C-9D0F-448E-955...

Schedule 1



DocuSign Envelope ID: BCEE388C-9D0F-448E-955...

### EXHIBIT C – COMMENCEMENT DATE MEMORANDUM

attached to and made a part of the Lease bearing the
Lease Reference Date of November 5, 2020 between
**SDCO TUSTIN EXECUTIVE CENTER, INC.**, a Delaware corporation, as Landlord and
**THE LITIGATION PRACTICE GROUP PC**, a California corporation, as Tenant

### COMMENCEMENT DATE MEMORANDUM

THIS MEMORANDUM, made as of _____, 20___, by and between **SDCO TUSTIN EXECUTIVE CENTER, INC.**, a Delaware corporation ("Landlord") and **THE LITIGATION PRACTICE GROUP PC**, a California corporation ("Tenant").

Recitals:

    A.    Landlord and Tenant are parties to that certain Lease, dated for reference _____, 2020 (the "Lease") for certain premises (the "Premises") consisting of approximately **3,567** square feet at the building located at 17542 East 17th Street, Tustin, California.

    B.    Tenant is in possession of the Premises and the Term of the Lease has commenced.

    C.    Landlord and Tenant desire to enter into this Memorandum confirming the Commencement Date, the Termination Date and other matters under the Lease.

NOW, THEREFORE, Landlord and Tenant agree as follows:

    1.    The actual Commencement Date is _____.

    2.    The actual Termination Date is _____.

    3.    The schedule of the Annual Rent and the Monthly Installment of Rent set forth on the Reference Pages is deleted in its entirety, and the following is substituted therefor:

*[insert rent schedule]*

    4.    Capitalized terms not defined herein shall have the same meaning as set forth in the Lease.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date and year first above written.

LANDLORD:                                              TENANT:

**SDCO TUSTIN EXECUTIVE CENTER, INC.,**          **THE LITIGATION PRACTICE GROUP PC,**
a Delaware corporation                              a California corporation


By:   DO NOT SIGN                                   By:   DO NOT SIGN

Name: _____                              Name: _____

Title: _____                             Title: _____

Dated: _____                             Dated: _____


10/31/01 CA SOG (BY)-INS                    C-1
Revised 9/09/05
{2011-11850/01043006;3}

## EXHIBIT D – RULES AND REGULATIONS

**attached to and made a part of the Lease bearing the**
**Lease Reference Date of November 5, 2020 between**
**SDCO TUSTIN EXECUTIVE CENTER, INC., a Delaware corporation, as Landlord and**
**THE LITIGATION PRACTICE GROUP PC, a California corporation, as Tenant**

1. No sign, placard, picture, advertisement, name or notice shall be installed or displayed on any part of the outside or inside of the Building without the prior written consent of the Landlord. Landlord shall have the right to remove, at Tenant's expense and without notice, any sign installed or displayed in violation of this rule. All approved signs or lettering on doors and walls shall be printed, painted, affixed or inscribed at Tenant's expense by a vendor designated or approved by Landlord. In addition, Landlord reserves the right to change from time to time the format of the signs or lettering and to require previously approved signs or lettering to be appropriately altered.

2. If Landlord objects in writing to any curtains, blinds, shades or screens attached to or hung in or used in connection with any window or door of the Premises, Tenant shall immediately discontinue such use. No awning shall be permitted on any part of the Premises. Tenant shall not place anything or allow anything to be placed against or near any glass partitions or doors or windows which may appear unsightly, in the opinion of Landlord, from outside the Premises.

3. Tenant shall not obstruct any sidewalks, halls, passages, exits, entrances, elevators, or stairways of the Building. No tenant and no employee or invitee of any tenant shall go upon the roof of the Building.

4. Any directory of the Building, if provided, will be exclusively for the display of the name and location of tenants only and Landlord reserves the right to exclude any other names. Landlord reserves the right to charge for Tenant's directory listing.

5. All cleaning and janitorial services for the Building and the Premises shall be provided exclusively through Landlord. Tenant shall not cause any unnecessary labor by carelessness or indifference to the good order and cleanliness of the Premises. Landlord shall not in any way be responsible to any Tenant for any loss of property on the Premises, however occurring, or for any damage to any Tenant's property by the janitor or any other employee or any other person.

6. The toilet rooms, toilets, urinals, wash bowls and other apparatus shall not be used for any purpose other than that for which they were constructed. No foreign substance of any kind whatsoever shall be thrown into any of them; and the expense of any breakage, stoppage or damage resulting from the violation of this rule shall be borne by the Tenant who, or whose employees or invitees, shall have caused it.

7. Tenant shall store all its trash and garbage within its Premises. Tenant shall not place in any trash box or receptacle any material which cannot be disposed of in the ordinary and customary manner of trash and garbage disposal. All garbage and refuse disposal shall be made in accordance with directions issued from time to time by Landlord. Tenant will comply with any and all recycling procedures designated by Landlord.

8. Landlord will furnish Tenant two (2) keys free of charge to each door in the Premises that has a passage way lock. Landlord may charge Tenant a reasonable amount for any additional keys, and Tenant shall not make or have made additional keys on its own. Tenant shall not alter any lock or install a new or additional lock or bolt on any door of its Premises. Tenant, upon the termination of its tenancy, shall deliver to Landlord the keys of all doors which have been furnished to Tenant, and in the event of loss of any keys so furnished, shall pay Landlord therefor.

9. If Tenant requires telephone, data, burglar alarm or similar service, the cost of purchasing, installing and maintaining such service shall be borne solely by Tenant. No boring or cutting for wires will be allowed without the prior written consent of Landlord.

10. No equipment, materials, furniture, packages, bulk supplies, merchandise or other property will be received in the Building or carried in the elevators except between such hours and in such elevators as may be designated by Landlord. The persons employed to move such equipment or materials in or out of the Building must be acceptable to Landlord.

11. Tenant shall not place a load upon any floor which exceeds the load per square foot which such floor was designed to carry and which is allowed by law. Heavy objects shall stand on such platforms as determined by Landlord to be necessary to properly distribute the weight. Business machines and mechanical equipment belonging to Tenant which cause

DocuSign Envelope ID: BCEE388C-9D0F-448E-955...

noise or vibration that may be transmitted to the structure of the Building or to any space in the Building to such a degree as to be objectionable to Landlord or to any tenants shall be placed and maintained by Tenant, at Tenant's expense, on vibration eliminators or other devices sufficient to eliminate the noise or vibration. Landlord will not be responsible for loss of or damage to any such equipment or other property from any cause, and all damage done to the Building by maintaining or moving such equipment or other property shall be repaired at the expense of Tenant.

12.     Landlord shall in all cases retain the right to control and prevent access to the Building of all persons whose presence in the judgment of Landlord would be prejudicial to the safety, character, reputation or interests of the Building and its tenants, provided that nothing contained in this rule shall be construed to prevent such access to persons with whom any tenant normally deals in the ordinary course of its business, unless such persons are engaged in illegal activities. Landlord reserves the right to exclude from the Building between the hours of 6 p.m. and 7 a.m. the following day, or such other hours as may be established from time to time by Landlord, and on Sundays and legal holidays, any person unless that person is known to the person or employee in charge of the Building and has a pass or is properly identified. Tenant shall be responsible for all persons for whom it requests passes and shall be liable to Landlord for all acts of such persons. Landlord shall not be liable for damages for any error with regard to the admission to or exclusion from the Building of any person.

13.     Tenant shall not use any method of heating or air conditioning other than that supplied or approved in writing by Landlord. Tenant shall not use space heaters in the Premises.

14.     Tenant shall not waste electricity, water or air conditioning. Tenant shall keep corridor doors closed. Tenant shall close and lock the doors of its Premises and entirely shut off all water faucets or other water apparatus and electricity, gas or air outlets before Tenant and its employees leave the Premises. Tenant shall be responsible for any damage or injuries sustained by other tenants or occupants of the Building or by Landlord for noncompliance with this rule.

15.     Tenant shall not install any radio or television antenna, satellite dish, loudspeaker or other device on the roof or exterior walls of the Building without Landlord's prior written consent, which consent may be withheld in Landlord's sole discretion, and which consent may in any event be conditioned upon Tenant's execution of Landlord's standard form of license agreement. Tenant shall be responsible for any interference caused by such installation.

16.     Tenant shall not mark, drive nails, screw or drill into the partitions, woodwork, plaster, or drywall (except for pictures, tackboards and similar office uses) or in any way deface the Premises. Tenant shall not cut or bore holes for wires. Tenant shall not affix any floor covering to the floor of the Premises in any manner except as approved by Landlord. Tenant shall repair any damage resulting from noncompliance with this rule.

17.     Tenant shall not install, maintain or operate upon the Premises any vending machine without Landlord's prior written consent, except that Tenant may install food and drink vending machines solely for the convenience of its employees.

18.     No cooking shall be done or permitted by any tenant on the Premises, except that Underwriters' Laboratory approved microwave ovens or equipment for brewing coffee, tea, hot chocolate and similar beverages shall be permitted provided that such equipment and use is in accordance with all applicable Regulations.

19.     Tenant shall not use in any space or in the public halls of the Building any hand trucks except those equipped with the rubber tires and side guards or such other material-handling equipment as Landlord may approve. Tenant shall not bring any other vehicles of any kind into the Building.

20.     Tenant shall not permit any motor vehicles to be washed or mechanical work or maintenance of motor vehicles to be performed in any parking lot.

21.     Tenant shall not use the name of the Building or any photograph or likeness of the Building in connection with or in promoting or advertising Tenant's business, except that Tenant may include the Building name in Tenant's address. Landlord shall have the right, exercisable without notice and without liability to any tenant, to change the name and address of the Building.

22.     Tenant requests for services must be submitted to the Building office by an authorized individual. Employees of Landlord shall not perform any work or do anything outside of their regular duties unless under special instruction from Landlord, and no employee of Landlord will admit any person (Tenant or otherwise) to any office without specific instructions from Landlord.

10/31/01 CA SOG (BY)-INS          D-2
Revised 9/09/05
{2011-11850/01043006;3}                                          0048

DocuSign Envelope ID: BCEE388C-9D0F-448E-955...

23.    Tenant shall not permit smoking or carrying of lighted cigarettes or cigars other than in areas designated by Landlord as smoking areas.

24.    Canvassing, soliciting, distribution of handbills or any other written material in the Building is prohibited and each tenant shall cooperate to prevent the same. No tenant shall solicit business from other tenants or permit the sale of any good or merchandise in the Building without the written consent of Landlord.

25.    Tenant shall reasonably comply with Landlord's recycle policy for the Building, including, without limitation. Tenant shall sort and separate its trash into separate recycling containers as required by law or which may be furnished by Landlord and located in the Premises. Tenant shall comply with all Regulations regarding the collection, sorting, separation, and recycling of garbage, waste products, trash and other refuse at the Building. Landlord reserves the right to refuse to collect or accept from Tenant any trash that is not separated and sorted as required by law or pursuant to Landlord's recycling policy, and to require Tenant to arrange for such collection at Tenant's cost, utilizing a contractor reasonably satisfactory to Landlord.

26.    Tenant acknowledges that the Building, at Landlord's option, may be operated in accordance with standards for the certification of environmentally sustainable, high performance buildings or aspects of their performance, including the U.S. EPA's Energy Star® rating and, U.S. Green Building Council's Leadership in Energy and Environmental Design program's standards, as the same are amended or replaced from time to time and similar "green building" standards (hereinafter collectively referred to as "Green Building Standards"). To support Landlord's sustainability practices, Tenant is encouraged to use reasonable efforts to use proven energy, water carbon reduction, and other sustainable measures, such as for example using energy efficient bulbs in task lighting, installing lighting controls, such as automatic sensors; turning off lights at the end of the work day; and utilizing water filtration systems to avoid the use of bottled water.

27.    Tenant shall not permit any animals (including birds and other fowl), reptiles, amphibians or fish (including fish tanks), other than service animals, e.g. seeing-eye dogs, to be brought or kept in or about the Premises or any common area of the Building.

28.    These Rules and Regulations are in addition to, and shall not be construed to in any way modify or amend, in whole or in part, the terms, covenants, agreements and conditions of any lease of any premises in the Building. Landlord may waive any one or more of these Rules and Regulations for the benefit of any particular tenant or tenants, but no such waiver by Landlord shall be construed as a waiver of such Rules and Regulations in favor of any other tenant or tenants, nor prevent Landlord from thereafter enforcing any such Rules and Regulations against any or all of the tenants of the Building.

29.    Landlord reserves the right to make such other and reasonable rules and regulations as in its judgment may from time to time be needed for safety and security, for care and cleanliness of the Building, and for the preservation of good order in and about the Building. Tenant agrees to abide by all such rules and regulations herein stated and any additional rules and regulations which are adopted. Tenant shall be responsible for the observance of all of the foregoing rules by Tenant's employees, agents, clients, customers, invitees and guests.

30.    During the continuance of any invasion, mob, riot, public excitement, "shelter in place" or similar governmental order, or other circumstance rendering such action advisable in Landlord's opinion or as required by Regulations, Landlord reserves the right (but shall not be obligated) to prevent or limit access to the Building during the continuance of that event by any means it considers appropriate for the safety of tenants and protection of the Building, property in the Building or otherwise as required by Regulations and in no event shall the same render Landlord liable to Tenant, constitute a constructive eviction, or excuse Tenant from any obligation under the Lease.

31.    Tenant shall not fly or operate or permit its employees to fly or operate drones on the property for recreational or any other purposes.

## [REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## EXHIBIT E – FORM OF EARLY POSSESSION AGREEMENT

attached to and made a part of the Lease bearing the
Lease Reference Date of November 5, 2020 between
**SDCO TUSTIN EXECUTIVE CENTER, INC.**, a Delaware corporation, as Landlord and
**THE LITIGATION PRACTICE GROUP PC**, a California corporation, as Tenant

### EARLY POSSESSION AGREEMENT

Reference is made to that certain lease dated _____, 2020, between **SDCO TUSTIN EXECUTIVE CENTER, INC.**, a Delaware corporation ("Landlord") and **THE LITIGATION PRACTICE GROUP PC**, a California corporation ("Tenant"), for the premises located at 17542 E. 17th Street, Suite 100, Tustin, California 92780.

It is hereby agreed that, notwithstanding anything to the contrary contained in the Lease but subject to the terms of Section 2.3 of the Lease, Tenant may occupy the Premises on _____. The first Monthly Installment of Rent is due on _____.

Landlord and Tenant agree that all the terms and conditions of the above referenced Lease are in full force and effect as of the date of Tenant's possession of the Premises prior to the Commencement Date pursuant to Section 2.3 other than the payment of rent.

**LANDLORD:**

**SDCO TUSTIN EXECUTIVE CENTER, INC.**,
a Delaware corporation

By: ____DO NOT SIGN_____
Name: _____
Title: _____
Dated: _____

**TENANT:**

**THE LITIGATION PRACTICE GROUP PC,**
a California corporation

By: ____DO NOT SIGN_____
Name: _____
Title: _____
Dated: _____

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

DocuSign Envelope ID: 34D59F4A-6DE0-4824-B238-

## FIRST AMENDMENT

**THIS FIRST AMENDMENT** (the "**Amendment**") is made and entered into as of November 30, 2020, by and between **SDCO TUSTIN EXECUTIVE CENTER, INC., a Delaware corporation** ("**Landlord**"), and **THE LITIGATION PRACTICE GROUP PC, a California corporation** ("**Tenant**").

## RECITALS

A.    Landlord and Tenant are parties to that certain Lease dated November 5, 2020 (the "**Lease**"). Pursuant to the Lease, Landlord has leased to Tenant space currently containing approximately **3,567** rentable square feet (the "**Original Premises**") described as Suite 100 of the building located at 17542 East 17th Street, Tustin, California 92780 (the "**Building**").

B.    Tenant has requested that additional space containing approximately 3,590 rentable square feet described as Suite 105 of the Building shown on **Exhibit A** hereto (the "**Expansion Space**") be added to the Original Premises and that the Lease be appropriately amended and Landlord is willing to do the same on the following terms and conditions.

**NOW, THEREFORE,** in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree as follows:

1.    **Expansion.** Effective as of the Expansion Effective Date (defined below), the Premises, as defined in the Lease, is increased from approximately 3,567 rentable square feet in the Building to approximately **7,157** rentable square feet in the Building by the addition of the Expansion Space, and from and after the Expansion Effective Date, the Original Premises and the Expansion Space, collectively, shall be deemed the "Premises", as defined in the Lease and as used herein. The Term for the Expansion Space shall commence on the Expansion Effective Date and end on the Termination Date (as defined in the Lease). The Expansion Space is subject to all the terms and conditions of the Lease except as expressly modified herein and except that Tenant shall not be entitled to receive any allowances, abatements or other financial concessions granted with respect to the Original Premises unless such concessions are expressly provided for herein with respect to the Expansion Space.

1.1    The "**Expansion Effective Date**" shall be the date upon which the Tenant Alterations (as defined in **Exhibit B** attached hereto) in the Expansion Space have been substantially completed, which is estimated to be January 15, 2021 ("**Target Expansion Effective Date**"); provided, however, that if Landlord shall be delayed in substantially completing the Tenant Alterations in the Expansion Space as a result of the occurrence of a Tenant Delay (defined below), then, for purposes of determining the Expansion Effective Date, the date of substantial completion shall be deemed to be the day that said Tenant Alterations would have been substantially completed absent any such Tenant Delay(s). A "**Tenant Delay**" means any act or omission of Tenant or its agents, employees, vendors or contractors that actually delays substantial completion of the Tenant Alterations, including, without limitation, the following:

DocuSign Envelope ID: 34D59F4A-6DE0-4824-B23E-9BCE4F7B0DAA

1.1.1    Tenant's failure to furnish information or approvals within any time period specified in the Lease or this Amendment, including the failure to prepare or approve preliminary or final plans by any applicable due date;

1.1.2    Tenant's selection of equipment or materials that have long lead times after first being informed by Landlord that the selection may result in a delay;

1.1.3    Changes requested or made by Tenant to previously approved plans and specifications;

1.1.4    The performance of work in the Expansion Space by Tenant or Tenant's contractor(s) during the performance of the Tenant Alterations; or

1.1.5    If the performance of any portion of the Tenant Alterations depends on the prior or simultaneous performance of work by Tenant, a delay by Tenant or Tenant's contractor(s) in the completion of such work.

The Expansion Space shall be deemed to be substantially completed on the date that Landlord reasonably determines that all Tenant Alterations have been performed (or would have been performed absent any Tenant Delays), other than any details of construction, mechanical adjustment or any other matter, the noncompletion of which does not materially interfere with Tenant's use of the Expansion Space. The adjustment of the Expansion Effective Date and, accordingly, the postponement of Tenant's obligation to pay rent on the Expansion Space shall be Tenant's sole remedy and shall constitute full settlement of all claims that Tenant might otherwise have against Landlord by reason of the Expansion Space not being ready for occupancy by Tenant on the Target Expansion Effective Date.

1.2    In addition to the postponement, if any, of the Expansion Effective Date as a result of the applicability of subsection 1.1 of this Amendment, the Expansion Effective Date shall be delayed to the extent that Landlord fails to deliver possession of the Expansion Space for any other reason (other than Tenant Delays by Tenant), including but not limited to, holding over by prior occupants. Any such delay in the Expansion Effective Date shall not subject Landlord to any liability for any loss or damage resulting therefrom. If the Expansion Effective Date is delayed, the Termination Date shall not be similarly extended.

2.    **Tenant's Proportionate Share.**  For the period commencing with the Expansion Effective Date and ending on the Termination Date, Tenant's Proportionate Share for the Expansion Space is 3.95% of the Building. Tenant's Proportionate Share for the Expansion Space and the Original Premises is, collectively, 7.87% of the Building.

3.    **Annual Rent and Monthly Installment of Rent.**  In addition to Tenant's obligation to pay Annual Rent and Monthly Installment of Rent for the Original Premises, Tenant shall pay Landlord Annual Rent and Monthly Installment of Rent for the Expansion Space as follows:

| Months of Term or Period | Rentable Square Footage | Annual Rent Per Square Foot | Annual Rent | Monthly Installment of Rent |
|---|---|---|---|---|
| 1/15/21 – 11/30/21 | 3,590 | $30.60 | $109,854.00 | $9,154.50 |
| 12/1/21 – 11/30/22 | 3,590 | $31.52 | $113,156.80 | $9,429.73 |
| 12/1/22 – 11/30/23 | 3,590 | $32.47 | $116,567.30 | $9,713.94 |
| 12/1/23 – 2/29/24 | 3,590 | $33.44 | $120,049.60 | $10,004.13 |

All such Monthly Installment of Rent and Annual Rent shall be payable by Tenant in accordance with the terms of the Lease, as amended hereby. Notwithstanding anything in the Lease, as amended hereby, to the contrary, so long as Tenant is not in default under the Lease, as amended hereby, Tenant shall be entitled to an abatement of Monthly Installment of Rent with respect to the Expansion Space in the amount of $9,154.50 per month for the first three (3) full calendar months following the Expansion Effective Date (the "**Expansion Space Rent Abatement Period**"). The maximum total amount of Monthly Installment of Rent abated with respect to the Expansion Space in accordance with the foregoing shall equal $27,463.50 (the "**Expansion Space Abated Monthly Installment of Rent**"). If Tenant defaults under the Lease, as amended hereby, at any time during the Term (as the same may be further extended) and fails to cure such default within any applicable cure period under the Lease, as amended hereby, then all Expansion Space Abated Monthly Installment of Rent shall immediately become due and payable. Only Expansion Space Monthly Installment of Rent shall be abated during the Expansion Space Rent Abatement Period pursuant to this Section, as more particularly described herein, and all other rent and other costs and charges specified in the Lease, as amended hereby, shall remain as due and payable pursuant to the provisions of the Lease, as amended hereby.

Landlord and Tenant acknowledge that the foregoing schedule is based on the assumption that the Expansion Effective Date is the Target Expansion Effective Date. If the Expansion Effective Date is other than the Target Expansion Effective Date, the schedule set forth above with respect to the payment of any installment(s) of Annual Rent and Monthly Installment of Rent for the Expansion Space shall be appropriately adjusted on a per diem basis to reflect the actual Expansion Effective Date, and the actual Expansion Effective Date shall be set forth in a confirmation letter to be prepared by Landlord. However, the effective date of any increases or decreases in the Annual Rent and Monthly Installment of Rent rate shall not be postponed as a result of an adjustment of the Expansion Effective Date as provided above.

4.    **Additional Security Deposit.**  Upon Tenant's execution hereof, Tenant shall pay Landlord the sum of **$11,004.54** which is added to and becomes part of the Security Deposit, if any, held by Landlord as provided under Section 5 of the Lease as security for payment of Rent and the performance of the other terms and conditions of the Lease by Tenant. Accordingly, simultaneous with the execution hereof, the Security Deposit is increased from $10,934.04 to **$21,938.58**.

5.    **Additional Rent.**  For the period commencing with the Expansion Effective Date and ending on the Termination Date, Tenant shall pay all additional rent payable under the Lease, including Tenant's Proportionate Share of Expenses, Taxes and Insurance Costs applicable to the Expansion Space, in accordance with the terms of the Lease, as amended hereby.

6.    **Improvements to Expansion Space.**

DocuSign Envelope ID: 34D59F4A-6DE0-4824-B23B-

6.1     **Condition of Expansion Space.**  Tenant has inspected the Expansion Space and agrees to accept the same "as is" without any agreements, representations, understandings or obligations on the part of Landlord to perform any alterations, repairs or improvements, except as may be expressly provided otherwise in this Amendment.

6.2     **Responsibility for Improvements to Expansion Space.**  Landlord shall perform improvements to the Expansion Space in accordance with the terms of **Exhibit B** attached hereto.

7.     **Early Access to Expansion Space.**  During any period that Tenant shall be permitted to enter the Expansion Space prior to the Expansion Effective Date (e.g., to perform alterations or improvements), Tenant shall comply with all terms and provisions of the Lease, except those provisions requiring payment of Annual Rent and Monthly Installment of Rent as to the Expansion Space. If Tenant takes possession of the Expansion Space prior to the Expansion Effective Date for any reason whatsoever (other than the performance of work in the Expansion Space with Landlord's prior approval), such possession shall be subject to all the terms and conditions of the Lease and this Amendment, and Tenant shall pay Annual Rent and Monthly Installment of Rent as applicable to the Expansion Space to Landlord on a per diem basis for each day of occupancy prior to the Expansion Effective Date.

8.     **Deletion.**  Landlord and Tenant agree that, effective as of the date of this Amendment, the Lease shall be amended in the following additional respects:

8.1     **Deletion.**  Article 43 of the Lease (Expansion Option) is hereby deleted in its entirety and of no further force and effect.

8.2     **Insurance.**  Tenant's insurance required under Article 11 of the Lease ("**Tenant's Insurance**") shall include the Expansion Space.  Tenant shall provide Landlord with a certificate of insurance, in form and substance satisfactory to Landlord and otherwise in compliance with Article 11 of the Lease, evidencing that Tenant's Insurance covers the Original Premises and the Expansion Space, upon delivery of this Amendment, executed by Tenant, to Landlord, and thereafter as necessary to assure that Landlord always has current certificates evidencing Tenant's Insurance.

8.3     **Parking.**  The number of parking passes available to Tenant set forth in the Reference Pages of the Lease is hereby amended from 14 to "28".

9.     **Miscellaneous.**

9.1     This Amendment, including **Exhibit A** (Outline and Location of Expansion Space) and **Exhibit B** (Tenant Alterations) attached hereto, sets forth the entire agreement between the parties with respect to the matters set forth herein.  There have been no additional oral or written representations or agreements.  Under no circumstances shall Tenant be entitled to any Rent abatement, improvement allowance, leasehold improvements, or other work to the Premises, or any similar economic incentives that may have been provided Tenant in connection with entering into the Lease, unless specifically set forth in this Amendment.

DocuSign Envelope ID: 34D59F4A-6DE0-4824-B23E-...

9.2    Except as herein modified or amended, the provisions, conditions and terms of the Lease shall remain unchanged and in full force and effect. In the case of any inconsistency between the provisions of the Lease and this Amendment, the provisions of this Amendment shall govern and control. The capitalized terms used in this Amendment shall have the same definitions as set forth in the Lease to the extent that such capitalized terms are defined therein and not redefined in this Amendment.

9.3    Tenant shall reasonably comply with Landlord's recycling policy for the Building, including, without limitation, Tenant shall sort and separate its trash into separate recycling containers as required by law or which may be furnished by Landlord and located in the Premises. Tenant shall comply with all laws regarding the collection, sorting, separation, and recycling of garbage, waste products, trash and other refuse at the Building. Landlord reserves the right to refuse to collect or accept from Tenant any trash that is not separated and sorted as required by law or pursuant to Landlord's recycling policy, and to require Tenant to arrange for such collection at Tenant's cost, utilizing a contractor reasonably satisfactory to Landlord.

9.4    Submission of this Amendment by Landlord is not an offer to enter into this Amendment but rather is a solicitation for such an offer by Tenant. Landlord shall not be bound by this Amendment until Landlord has executed and delivered the same to Tenant.

9.5    Tenant hereby represents to Landlord that Tenant has dealt with no broker in connection with this Amendment, other than Legacy Realty and Funding. Tenant agrees to indemnify and hold Landlord and the Landlord Entities harmless from all claims of any other brokers claiming to have represented Tenant in connection with this Amendment.

9.6    Each signatory of this Amendment represents hereby that he or she has the authority to execute and deliver the same on behalf of the party hereto for which such signatory is acting. Tenant hereby represents and warrants that neither Tenant, nor any persons or entities holding any legal or beneficial interest whatsoever in Tenant, are (i) the target of any sanctions program that is established by Executive Order of the President or published by the Office of Foreign Assets Control, U.S. Department of the Treasury ("**OFAC**"); (ii) designated by the President or OFAC pursuant to the Trading with the Enemy Act, 50 U.S.C. App. § 5, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-06, the Patriot Act, Public Law 107-56, Executive Order 13224 (September 23, 2001) or any Executive Order of the President issued pursuant to such statutes; or (iii) named on the following list that is published by OFAC: "List of Specially Designated Nationals and Blocked Persons." If the foregoing representation is untrue at any time during the Term, an Event of Default under the Lease will be deemed to have occurred, without the necessity of notice to Tenant.

9.7    Tenant shall not bring upon the Premises or any portion of the Building or use the Premises or permit the Premises or any portion thereof to be used for the growing, manufacturing, administration, distribution (including without limitation, any retail sales), possession, use or consumption of any cannabis, marijuana or cannabinoid product or compound, regardless of the legality or illegality of the same.

9.8    Signatures to this Amendment transmitted by telecopy or electronic signatures shall be valid and effective to bind the party so signing. This Amendment may be executed in

two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and same agreement.

9.9     If Tenant (or any party claiming by, through or under Tenant) pays directly to the provider for any energy consumed at the Building, Tenant, promptly upon request, shall deliver to Landlord (or, at Landlord's option, execute and deliver to Landlord an instrument enabling Landlord to obtain from such provider) any data about such consumption that Landlord, in its reasonable judgment, is required to disclose to a prospective buyer, tenant or mortgage lender under California Public Resources Code § 25402.10 or any similar law.

9.10    Pursuant to California Civil Code Section 1938, Landlord hereby notifies Tenant that as of the date of this Amendment, the Premises have not undergone inspection by a "Certified Access Specialist" ("CASp") to determine whether the Premises meet all applicable construction-related accessibility standards under California Civil Code Section 55.53. Landlord hereby discloses pursuant to California Civil Code Section 1938 as follows: "A Certified Access Specialist (CASp) can inspect the subject premises and determine whether the subject premises comply with all of the applicable construction-related accessibility standards under state law. Although state law does not require a CASp inspection of the subject premises, the commercial property owner or lessor may not prohibit the lessee or tenant from obtaining a CASp inspection of the subject premises for the occupancy or potential occupancy of the lessee or tenant, if requested by the lessee or tenant. The parties shall mutually agree on the arrangements for the time and manner of the CASp inspection, the payment of the fee for the CASp inspection, and the cost of making any repairs necessary to correct violations of construction-related accessibility standards within the premises." Landlord and Tenant hereby acknowledge and agree that in the event that Tenant elects to perform a CASp inspection of the Premises hereunder (the "**Inspection**"), such Inspection shall be (a) performed at Tenant's sole cost and expense, (b) limited to the Premises and (c) performed by a CASp who has been approved or designated by Landlord prior to the Inspection. Any Inspection must be performed in a manner which minimizes the disruption of business activities in the Building, and at a time reasonably approved by Landlord. Landlord reserves the right to be present during the Inspection. Tenant agrees to: (i) promptly provide to Landlord a copy of the report or certification prepared by the CASp inspector upon request (the "**Report**"), (ii) keep the information contained in the Report confidential, except to the extent required by Regulations, or to the extent disclosure is needed in order to complete any necessary modifications or improvements required to comply with all applicable accessibility standards under state or federal Regulations, as well as any other repairs, upgrades, improvements, modifications or alterations required by the Report or that may be otherwise required to comply with applicable Regulations or accessibility requirements (the "**Access Improvements**"). Tenant shall be solely responsible for the cost of Access Improvements to the Premises or the Building necessary to correct any such violations of construction-related accessibility standards identified by such Inspection as required by Regulations, which Access Improvements may, at Landlord's option, be performed in whole or in part by Landlord at Tenant's expense, payable as additional rent within ten (10) days following Landlord's demand.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

DocuSign Envelope ID: 34D59F4A-6DE0-4824-B23E-03897A0FCD0F

9.11    Redress for any claim against Landlord under the Lease and this Amendment shall be limited to and enforceable only against and to the extent of Landlord's interest in the Building. The obligations of Landlord under the Lease are not intended to and shall not be personally binding on, nor shall any resort be had to the private properties of, any of its trustees or board of directors and officers, as the case may be, its investment manager, the general partners thereof, or any beneficiaries, stockholders, employees, or agents of Landlord or the investment manager, and in no case shall Landlord be liable to Tenant hereunder for any lost profits, damage to business, or any form of special, indirect or consequential damages.

**IN WITNESS WHEREOF**, Landlord and Tenant have duly executed this Amendment as of the day and year first above written.

LANDLORD:                                          TENANT:

**SDCO TUSTIN EXECUTIVE CENTER, INC.,**            **THE LITIGATION PRACTICE GROUP PC,**
a Delaware corporation                             a California corporation

By: _Kara Burkhart_                                By: _Daniel S. March_
Name: Kara Burkhart                                Name: Daniel S. March
Title: Vice President                              Title: President
Dated: 12/1/2020                                   Dated: 12/1/2020

By: _John Casasante_                               By: _Daniel S. March_
Name: John Casasante                               Name: Daniel S. March
Title: Vice President                              Title: Treasurer and Member of Board of
Dated: 12/1/2020                                          Directors
                                                   Dated: 12/1/2020

DocuSign Envelope ID: 34D59F4A-6DE0-4824-B23E...7

## EXHIBIT A - OUTLINE AND LOCATION OF EXPANSION SPACE

### attached to and made a part of the Amendment dated as of November 30, 2020, between SDCO TUSTIN EXECUTIVE CENTER, INC., a Delaware corporation, as Landlord and THE LITIGATION PRACTICE GROUP PC, a California corporation, as Tenant

**Exhibit A** is intended only to show the general layout of the Expansion Space as of the beginning of Expansion Effective Date. It does not in any way supersede any of Landlord's rights set forth in the Lease with respect to arrangements and/or locations of public parts of the Building and changes in such arrangements and/or locations. It is not to be scaled; any measurements or distances shown should be taken as approximate.



{2011-11897/01048382:3}                                A-1

## EXHIBIT B - TENANT ALTERATIONS

**attached to and made a part of the Amendment dated as of November 30, 2020, between
SDCO TUSTIN EXECUTIVE CENTER, INC., a Delaware corporation, as Landlord and
THE LITIGATION PRACTICE GROUP PC, a California corporation, as Tenant**

1.  Landlord, at its sole cost and expense (subject to the terms and provisions of Section 2 below) shall perform improvements to the Expansion Space in accordance with the following work list (the "**Work List**") using Building standard methods, materials and finishes. The improvements to be performed in accordance with the Work List are hereinafter referred to as the "**Tenant Alterations**". Landlord shall enter into a direct contract for the Tenant Alterations with a general contractor selected by Landlord. In addition, Landlord shall have the right to select and/or approve of any subcontractors used in connection with the Tenant Alterations.

## WORK LIST

A.  Paint the existing exposed painted walls in the Expansion Space.
B.  Replace the existing carpeting in the Expansion Space with Building standard carpeting.
C.  Replace the existing flooring in the Expansion Space with Building standard flooring.

2.  All other work and upgrades, subject to Landlord's approval, shall be at Tenant's sole cost and expense, plus any applicable state sales or use tax thereon, payable upon demand as additional rent. Tenant shall be responsible for any Tenant Delay in completion of the Tenant Alterations resulting from any such other work and upgrades requested or performed by Tenant.

3.  Landlord's supervision or performance of any work for or on behalf of Tenant shall not be deemed to be a representation by Landlord that such work complies with applicable insurance requirements, building codes, ordinances, laws or regulations or that the improvements constructed will be adequate for Tenant's use.

4.  This **Exhibit B** shall not be deemed applicable to any additional space added to the Premises at any time or from time to time, whether by any options under the Lease or otherwise, or to any portion of the original Premises or any additions to the Premises in the event of a renewal or extension of the original Term of the Lease, whether by any options under the Lease or otherwise, unless expressly so provided in the Lease or any amendment or supplement to the Lease.

### [REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

{2011-11897/01048382;3}                                B-1

0059

DocuSign Envelope ID: 9A6A69C7-1A48-48BC-9904-

# SECOND AMENDMENT

**THIS SECOND AMENDMENT** (this "**Amendment**") is made and entered into as of May 14, 2021, by and between **SDCO TUSTIN EXECUTIVE CENTER, INC., a Delaware corporation** ("**Landlord**"), and **THE LITIGATION PRACTICE GROUP PC, a California corporation** ("**Tenant**").

## RECITALS

A.    Landlord and Tenant are parties to that certain lease dated November 5, 2020 (the "**Original Lease**"), which Original Lease has been previously amended by that certain First Amendment (the "**First Amendment**") dated as of November 30, 2020 (collectively, the "**Lease**"). Pursuant to the Lease, Landlord has leased to Tenant space currently containing approximately **7,157** rentable square feet (the "**Original Premises**") described as Suites 100 and 105 of the building located at 17542 East 17th Street, Tustin, California 92780 (the "**Building**").

B.    Tenant has requested that additional space containing approximately **9,287** rentable square feet described as Suite 250 of the Building, as shown on **Exhibit A** attached hereto (the "**Expansion Space**"), be added to the Original Premises and that the Lease be appropriately amended and Landlord is willing to do the same on the following terms and conditions.

C.    The Lease by its terms shall expire on February 29, 2024 ("**Prior Termination Date**"), and the parties desire to extend the Term of the Lease, all on the following terms and conditions.

**NOW, THEREFORE,** in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree as follows:

1.    **Expansion.** Effective as of the Expansion Effective Date (defined below), the Premises, as defined in the Lease, is increased from approximately 7,157 rentable square feet in the Building to approximately **16,444** rentable square feet in the Building by the addition of the Expansion Space, and from and after the Expansion Effective Date, the Original Premises and the Expansion Space, collectively, shall be deemed the "Premises", as defined in the Lease and as used herein. The Term for the Expansion Space shall commence on the Expansion Effective Date and end on the Extended Termination Date (defined below). The Expansion Space is subject to all the terms and conditions of the Lease except as expressly modified herein and except that Tenant shall not be entitled to receive any allowances, abatements or other financial concessions granted with respect to the Original Premises unless such concessions are expressly provided for herein with respect to the Expansion Space.

    1.1    The "**Expansion Effective Date**" shall be the date upon which the Tenant Alterations (as defined in **Exhibit B** attached hereto) in the Expansion Space have been substantially completed, which is estimated to be June 1, 2021 ("**Target Expansion Effective Date**"); provided, however, that if Landlord shall be delayed in substantially completing the Tenant Alterations in the Expansion Space as a result of the occurrence of a Tenant Delay (defined below), then, for purposes of determining the Expansion Effective Date, the date of substantial completion shall be deemed to be the day that said Tenant Alterations would

DocuSign Envelope ID: 9A6A69C7-1A48-48BC-9904...

have been substantially completed absent any such Tenant Delay(s). A "**Tenant Delay**" means any act or omission of Tenant or its agents, employees, vendors or contractors that actually delays substantial completion of the Tenant Alterations, including, without limitation, the following:

1.1.1   Tenant's failure to furnish information or approvals within any time period specified in the Lease or this Amendment, including the failure to prepare or approve preliminary or final plans by any applicable due date;

1.1.2   Tenant's selection of equipment or materials that have long lead times after first being informed by Landlord that the selection may result in a delay;

1.1.3   Changes requested or made by Tenant to previously approved plans and specifications;

1.1.4   The performance of work in the Expansion Space by Tenant or Tenant's contractor(s) during the performance of the Tenant Alterations; or

1.1.5   If the performance of any portion of the Tenant Alterations depends on the prior or simultaneous performance of work by Tenant, a delay by Tenant or Tenant's contractor(s) in the completion of such work.

The Expansion Space shall be deemed to be substantially completed on the date that Landlord reasonably determines that all Tenant Alterations have been performed (or would have been performed absent any Tenant Delays), other than any details of construction, mechanical adjustment or any other matter, the noncompletion of which does not materially interfere with Tenant's use of the Expansion Space. The adjustment of the Expansion Effective Date and, accordingly, the postponement of Tenant's obligation to pay rent on the Expansion Space shall be Tenant's sole remedy and shall constitute full settlement of all claims that Tenant might otherwise have against Landlord by reason of the Expansion Space not being ready for occupancy by Tenant on the Target Expansion Effective Date.

1.2   In addition to the postponement, if any, of the Expansion Effective Date as a result of the applicability of Section 1.1 of this Amendment, the Expansion Effective Date shall be delayed to the extent that Landlord fails to deliver possession of the Expansion Space for any other reason (other than Tenant Delays), including but not limited to, holding over by prior occupants. Any such delay in the Expansion Effective Date shall not subject Landlord to any liability for any loss or damage resulting therefrom. If the Expansion Effective Date is delayed, the Extended Termination Date shall not be similarly extended.

2.   **Extension.** The Term of the Lease is hereby extended for a period of eighteen (18) months and shall expire on August 31, 2025 ("**Extended Termination Date**"), unless sooner terminated in accordance with the terms of the Lease. That portion of the Term commencing the day immediately following the Prior Termination Date ("**Extension Date**") and ending on the Extended Termination Date shall be referred to herein as the "**Extended Term**".

3.   **Monthly Installment of Rent.**

DocuSign Envelope ID: 9A6A69C7-1A48-48BC-9904-...

3.1    **Original Premises Through Prior Termination Date.**  The Monthly Installment of Rent, Tenant's Proportionate Share of Expenses and Taxes and all other charges under the Lease shall be payable as provided therein with respect to the Original Premises through and including the Prior Termination Date.

3.2    **Original Premises From and After Extension Date.**  As of the Extension Date, the schedule of Monthly Installment of Rent and Annual Rent payable with respect to the Original Premises during the Extended Term is the following:

| Period | Rentable Square Footage | Annual Rate Per Square Foot | Annual Rent | Monthly Installment of Rent |
|---|---|---|---|---|
| 3/1/24 – 11/30/24 | 7,157 | $33.44 | $239,330.04 | $19,944.17 |
| 12/1/24 – 8/31/25 | 7,157 | $34.44 | $246,487.08 | $20,540.59 |

All such Monthly Installment of Rent and Annual Rent shall be payable by Tenant in accordance with the terms of the Lease, as amended hereby.

3.3    **Expansion Space From Expansion Effective Date Through Extended Termination Date.**  As of the Expansion Effective Date, the schedule of Monthly Installment of Rent and Annual Rent payable with respect to the Expansion Space for the balance of the original Term and the Extended Term is the following:

| Period | Rentable Square Footage | Annual Rate Per Square Foot | Annual Rent | Monthly Installment of Rent |
|---|---|---|---|---|
| 6/1/21 – 11/30/21 | 9,287 | $30.60 | $284,182.20 | $23,681.85 |
| 12/1/21 – 11/30/22 | 9,287 | $31.52 | $292,726.24 | $24,393.85 |
| 12/1/22 – 11/30/23 | 9,287 | $32.47 | $301,548.89 | $25,129.08 |
| 12/1/23 – 11/30/24 | 9,287 | $33.44 | $310,557.28 | $25,879.77 |
| 12/1/24 – 8/31/25 | 9,287 | $34.44 | $319,844.28 | $26,653.69 |

Notwithstanding anything to the contrary contained in the Lease, effective as of the date of this Amendment, all rent amounts shall be paid in lawful money of the United States of America and shall be paid to Lessor by Electronic Funds Transfer ("**EFT**"), Automated Clearing House ("**ACH**") or wire transfer to the bank account specified by Lessor, or to such other person or at such other place and/or by such other methods as Lessor may from time to time designate in writing and otherwise in accordance with the terms of the Lease, as amended hereby. Upon execution of this Amendment, Lessee agrees to cooperate with Lessor to complete all necessary forms in order to accomplish such method of payment. If Lessor agrees to accept payment of rent by means other than EFT, ACH or wire transfer, and if a default occurs during the Term (as the same may be further extended), Lessor may require by notice to Lessee that all subsequent rent payments be made by EFT, ACH or wire transfer. Lessee must implement such automatic payment system prior to the next scheduled rent payment or within ten (10) days after Lessor's notice, whichever is later. Notwithstanding anything to the contrary, Lessor may, in its sole discretion, allocate any rent or monies Lessee pays to Lessor to any sums then due and payable hereunder and in any order or priority including first to the most delinquent sums then due and payable hereunder.

DocuSign Envelope ID: 9A6A69C7-1A48-48BC-9904-...

Notwithstanding anything in the Lease, as amended hereby, to the contrary, so long as Tenant is not in default under the Lease, as amended hereby, Tenant shall be entitled to an abatement of Monthly Installment of Rent solely with respect to the Expansion Space in the amount of $23,681.85 per month for each of the second (2nd), third (3rd) and fourth (4th) full calendar months following the Expansion Effective Date (the "**Expansion Space Rent Abatement Period**"). The maximum total amount of Monthly Installment of Rent abated with respect to the Expansion Space in accordance with the foregoing shall equal $71,045.55 (the "**Expansion Space Abated Monthly Installment of Rent**"). If Tenant defaults under the Lease, as amended hereby, at any time during the balance of the current Term or the Extended Term (as the same may be further extended) and fails to cure such default within any applicable cure period under the Lease, as amended hereby, then all Expansion Space Abated Monthly Installment of Rent shall immediately become due and payable. Only Expansion Space Monthly Installment of Rent shall be abated during the Expansion Space Rent Abatement Period pursuant to this Section, as more particularly described herein, and all other rent and other costs and charges specified in the Lease, as amended hereby, shall remain as due and payable pursuant to the provisions of the Lease, as amended hereby.

Landlord and Tenant acknowledge that the foregoing schedule is based on the assumption that the Expansion Effective Date is the Target Expansion Effective Date. If the Expansion Effective Date is other than the Target Expansion Effective Date, the schedule set forth above with respect to the payment of any installment(s) of Monthly Installment of Rent for the Expansion Space shall be appropriately adjusted on a per diem basis to reflect the actual Expansion Effective Date, and the actual Expansion Effective Date shall be set forth in a confirmation letter to be prepared by Landlord. However, the effective date of any increases or decreases in the Monthly Installment of Rent rate shall not be postponed as a result of an adjustment of the Expansion Effective Date as provided above.

4.  **Additional Security Deposit.** Upon Tenant's execution hereof, Tenant shall pay Landlord the sum of **$29,975.13** which is added to and becomes part of the Security Deposit, if any, held by Landlord as provided under Article 5 of the Original Lease as security for payment of rent and the performance of the other terms and conditions of the Lease by Tenant. Accordingly, simultaneous with the execution hereof, the Security Deposit is increased from $21,938.58 to **$51,913.71**.

5.  **Tenant's Proportionate Share.** For the period commencing with the Expansion Effective Date and ending on the Extended Termination Date, Tenant's Proportionate Share for the Expansion Space is **10.21%** of the Building. Tenant's Proportionate Share for the Expansion Space and the Original Premises is, collectively, **18.08%** of the Building.

6.  **Additional Rent.**

    6.1    **Original Premises for the Extended Term.** For the period commencing with the Extension Date and ending on the Extended Termination Date, Tenant shall pay all additional rent payable under the Lease, including Tenant's Proportionate Share of Expenses, Taxes and Insurance Costs applicable to the Original Premises, in accordance with the terms of the Lease, as amended hereby.

DocuSign Envelope ID: 9A6A69C7-1A48-48BC-9904-...

6.2 **Expansion Space From Expansion Effective Date Through Extended Termination Date.** For the period commencing with the Expansion Effective Date and ending on the Extended Termination Date, Tenant shall pay for Tenant's Proportionate Share of Expenses and Taxes applicable to the Expansion Space in accordance with the terms of the Lease, provided, however, during such period, the Base Year for the computation of Tenant's Proportionate Share of Expenses, Taxes and Insurance Costs solely with respect to the Expansion Space is calendar year 2021.

7. **Improvements to Expansion Space.**

7.1 **Condition of Expansion Space.** Tenant has inspected the Expansion Space and agrees to accept the same "as is" without any agreements, representations, understandings or obligations on the part of Landlord to perform any alterations, repairs or improvements, except as may be expressly provided otherwise in this Amendment.

7.2 **Responsibility for Improvements to Expansion Space.** Landlord shall perform improvements to the Expansion Space in accordance with the terms of **Exhibit B** attached hereto.

8. **Early Access to Expansion Space.** During any period that Tenant shall be permitted to enter the Expansion Space prior to the Expansion Effective Date (e.g., to perform alterations or improvements), Tenant shall comply with all terms and provisions of the Lease, except those provisions requiring payment of Monthly Installment of Rent or Tenant's Proportionate Share of Expenses, Taxes and Insurance Costs as to the Expansion Space. If Tenant takes possession of the Expansion Space prior to the Expansion Effective Date for any reason whatsoever (other than the performance of work in the Expansion Space with Landlord's prior approval), such possession shall be subject to all the terms and conditions of the Lease and this Amendment, and Tenant shall pay Monthly Installment of Rent and Tenant's Proportionate  Share of Expenses and Taxes as applicable to the Expansion Space to Landlord on a per diem basis for each day of occupancy prior to the Expansion Effective Date.

9. **Other Pertinent Provisions.** Landlord and Tenant agree that, effective as of the date of this Amendment (unless different effective date(s) is/are specifically referenced in this Section), the Lease shall be amended in the following additional respects:

9.1 **Rules and Regulations.** The Rules and Regulations set forth in Exhibit D attached to the Original Lease are hereby amended by adding the following at the end thereof:

"32. Regarding all water supply lines that are used to provide a supplementary water source to Tenant fixtures (toilet and sinks) and equipment, such as and not limited to, coffee makers, water filters, refrigerators, etc., such supplementary supply lines and connections shall consist of either flex copper or stainless steel braided lines. Polyethylene tubing (usually white) is not permitted to be used on the property. All wall angle stops shall solely consist of quarter turn valves. Water heaters shall incorporate a Smitty Pan that is plumbed per code (appropriate drainage for the Smitty Pan). All Tenant equipment requiring connection to water shall require Landlord's prior written approval."

DocuSign Envelope ID: 9A6A69C7-1A48-48BC-9904-...

9.2    **Insurance.** Tenant's insurance required under Article 11 of the Original Lease ("**Tenant's Insurance**") shall include the Expansion Space. Tenant shall provide Landlord with a certificate of insurance, in form and substance satisfactory to Landlord and otherwise in compliance with Article 11 of the Original Lease, evidencing that Tenant's Insurance covers the Original Premises and the Expansion Space, upon delivery of this Amendment, executed by Tenant, to Landlord, and thereafter as necessary to assure that Landlord always has current certificates evidencing Tenant's Insurance.

9.3    **Option to Extend.** Article 42 of the Original Lease shall remain in full force and effect during the Extended Term, provided, however, that (i) all references therein to "Term of this Lease" are hereby amended to mean and refer to the Extended Term.

9.4    **Parking.** The number of parking passes available to Tenant set forth in the Reference Pages of the Original Lease, as amended by Section 8.3 of the First Amendment, is hereby amended from 28 to "65".

10.    **Miscellaneous.**

10.1    This Amendment, including **Exhibit A** (Outline and Location of Expansion Space) and **Exhibit B** (Tenant Alterations) attached hereto, sets forth the entire agreement between the parties with respect to the matters set forth herein. There have been no additional oral or written representations or agreements. Under no circumstances shall Tenant be entitled to any Rent abatement, improvement allowance, leasehold improvements, or other work to the Premises, or any similar economic incentives that may have been provided Tenant in connection with entering into the Lease, unless specifically set forth in this Amendment.

10.2    Except as herein modified or amended, the provisions, conditions and terms of the Lease shall remain unchanged and in full force and effect. In the case of any inconsistency between the provisions of the Lease and this Amendment, the provisions of this Amendment shall govern and control. The capitalized terms used in this Amendment shall have the same definitions as set forth in the Lease to the extent that such capitalized terms are defined therein and not redefined in this Amendment.

10.3    Tenant shall reasonably comply with Landlord's recycling policy for the Building, including, without limitation, Tenant shall sort and separate its trash into separate recycling containers as required by law or which may be furnished by Landlord and located in the Premises. Tenant shall comply with all laws regarding the collection, sorting, separation, and recycling of garbage, waste products, trash and other refuse at the Building. Landlord reserves the right to refuse to collect or accept from Tenant any trash that is not separated and sorted as required by law or pursuant to Landlord's recycling policy, and to require Tenant to arrange for such collection at Tenant's cost, utilizing a contractor reasonably satisfactory to Landlord.

10.4    Submission of this Amendment by Landlord is not an offer to enter into this Amendment but rather is a solicitation for such an offer by Tenant. Landlord shall not be bound by this Amendment until Landlord has executed and delivered the same to Tenant.

0065

DocuSign Envelope ID: 9A6A69C7-1A48-48BC-9904-...

10.5    Tenant hereby represents to Landlord that Tenant has dealt with no broker in connection with this Amendment, other than Legacy Realty & Funding. Tenant agrees to indemnify and hold Landlord and the Landlord Entities harmless from all claims of any other brokers claiming to have represented Tenant in connection with this Amendment.

10.6    Each signatory of this Amendment represents hereby that he or she has the authority to execute and deliver the same on behalf of the party hereto for which such signatory is acting. Tenant hereby represents and warrants that neither Tenant, nor any persons or entities holding any legal or beneficial interest whatsoever in Tenant, are (i) the target of any sanctions program that is established by Executive Order of the President or published by the Office of Foreign Assets Control, U.S. Department of the Treasury ("**OFAC**"); (ii) designated by the President or OFAC pursuant to the Trading with the Enemy Act, 50 U.S.C. App. § 5, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-06, the Patriot Act, Public Law 107-56, Executive Order 13224 (September 23, 2001) or any Executive Order of the President issued pursuant to such statutes; or (iii) named on the following list that is published by OFAC: "List of Specially Designated Nationals and Blocked Persons." If the foregoing representation is untrue at any time during the balance of the current Term of the Extended Term, an Event of Default under the Lease will be deemed to have occurred, without the necessity of notice to Tenant.

10.7    Tenant shall not bring upon the Premises or any portion of the Building or use the Premises or permit the Premises or any portion thereof to be used for the growing, manufacturing, administration, distribution (including without limitation, any retail sales), possession, use or consumption of any cannabis, marijuana or cannabinoid product or compound, regardless of the legality or illegality of the same.

10.8    Signatures to this Amendment transmitted by telecopy or electronic signatures shall be valid and effective to bind the party so signing. This Amendment may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and same agreement. **THE PARTIES HERETO CONSENT AND AGREE THAT THIS AMENDMENT MAY BE SIGNED USING ELECTRONIC SIGNATURE TECHNOLOGY (E.G., VIA DOCUSIGN OR SIMILAR ELECTRONIC SIGNATURE TECHNOLOGY), AND THAT SUCH SIGNED ELECTRONIC RECORD SHALL BE VALID AND AS EFFECTIVE TO BIND THE PARTY SO SIGNING AS A PAPER COPY BEARING SUCH PARTY'S HAND-WRITTEN SIGNATURE.**

10.9    If Tenant (or any party claiming by, through or under Tenant) pays directly to the provider for any energy consumed at the Building, Tenant, promptly upon request, shall deliver to Landlord (or, at Landlord's option, execute and deliver to Landlord an instrument enabling Landlord to obtain from such provider) any data about such consumption that Landlord, in its reasonable judgment, is required to disclose to a prospective buyer, tenant or mortgage lender under California Public Resources Code § 25402.10 or any similar law.

10.10    Pursuant to California Civil Code Section 1938, Landlord hereby notifies Tenant that as of the date of this Amendment, the Premises have not undergone inspection by a "Certified Access Specialist" ("**CASp**") to determine whether the Premises meet all applicable

construction-related accessibility standards under California Civil Code Section 55.53. Landlord hereby discloses pursuant to California Civil Code Section 1938 as follows: "A Certified Access Specialist (CASp) can inspect the subject premises and determine whether the subject premises comply with all of the applicable construction-related accessibility standards under state law. Although state law does not require a CASp inspection of the subject premises, the commercial property owner or lessor may not prohibit the lessee or tenant from obtaining a CASp inspection of the subject premises for the occupancy or potential occupancy of the lessee or tenant, if requested by the lessee or tenant. The parties shall mutually agree on the arrangements for the time and manner of the CASp inspection, the payment of the fee for the CASp inspection, and the cost of making any repairs necessary to correct violations of construction-related accessibility standards within the premises." Landlord and Tenant hereby acknowledge and agree that in the event that Tenant elects to perform a CASp inspection of the Premises hereunder (the "**Inspection**"), such Inspection shall be (a) performed at Tenant's sole cost and expense, (b) limited to the Premises and (c) performed by a CASp who has been approved or designated by Landlord prior to the Inspection. Any Inspection must be performed in a manner which minimizes the disruption of business activities in the Building, and at a time reasonably approved by Landlord. Landlord reserves the right to be present during the Inspection. Tenant agrees to: (i) promptly provide to Landlord a copy of the report or certification prepared by the CASp inspector upon request (the "**Report**"), (ii) keep the information contained in the Report confidential, except to the extent required by Regulations, or to the extent disclosure is needed in order to complete any necessary modifications or improvements required to comply with all applicable accessibility standards under state or federal Regulations, as well as any other repairs, upgrades, improvements, modifications or alterations required by the Report or that may be otherwise required to comply with applicable Regulations or accessibility requirements (the "**Access Improvements**"). Tenant shall be solely responsible for the cost of Access Improvements to the Premises or the Building necessary to correct any such violations of construction-related accessibility standards identified by such Inspection as required by Regulations, which Access Improvements may, at Landlord's option, be performed in whole or in part by Landlord at Tenant's expense, payable as additional rent within ten (10) days following Landlord's demand.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

DocuSign Envelope ID: 9A6A69C7-1A48-48BC-9904-...

10.11   Redress for any claim against Landlord under the Lease and this Amendment shall be limited to and enforceable only against and to the extent of Landlord's interest in the Building. The obligations of Landlord under the Lease are not intended to and shall not be personally binding on, nor shall any resort be had to the private properties of, any of its trustees or board of directors and officers, as the case may be, its investment manager, the general partners thereof, or any beneficiaries, stockholders, employees, or agents of Landlord or the investment manager, and in no case shall Landlord be liable to Tenant hereunder for any lost profits, damage to business, or any form of special, indirect or consequential damages.

**IN WITNESS WHEREOF**, Landlord and Tenant have entered into and executed this Amendment as of the date first written above.

LANDLORD:                                        TENANT:

**SDCO TUSTIN EXECUTIVE CENTER, INC.,**          **THE LITIGATION PRACTICE GROUP PC.**
a Delaware corporation:                          a California corporation

By: _Kara Burkhart_                              By: _Daniel S. March_
Name: Kara Burkhart                              Name: Daniel S. March
Title: Vice President                            Title: President
Dated: 5/17/2021                                 Dated: 5/14/2021

By: _John Casasante_                             By: _Daniel S. March_
Name: John Casasante                             Name: Daniel S. March
Title: Vice President                            Title: Treasurer and Member of Board of
Dated: 5/17/2021                                        Directors
                                                 Dated: 5/14/2021

0068

## EXHIBIT A – OUTLINE AND LOCATION OF EXPANSION SPACE

**attached to and made a part of the Amendment dated as of May 13, 2021, between
SDCO TUSTIN EXECUTIVE CENTER, INC., a Delaware corporation, as Landlord and
THE LITIGATION PRACTICE GROUP PC, a California corporation, as Tenant**

**Exhibit A** is intended only to show the general layout of the Expansion Space as of the beginning of Expansion Effective Date. It does not in any way supersede any of Landlord's rights set forth in the Lease with respect to arrangements and/or locations of public parts of the Building and changes in such arrangements and/or locations. It is not to be scaled; any measurements or distances shown should be taken as approximate.



BRANDSOURCE
STE 250
8,076 USF
9,287 RSF (LEASE)

## EXHIBIT B – TENANT ALTERATIONS

**attached to and made a part of the Amendment dated as of May 13, 2021, between
SDCO TUSTIN EXECUTIVE CENTER, INC., a Delaware corporation, as Landlord and
THE LITIGATION PRACTICE GROUP PC, a California corporation, as Tenant**

1.    Landlord, at its sole cost and expense (subject to the terms and provisions of Section 2 below) shall perform improvements to the Expansion Space in accordance with the following work list (the "**Work List**") using Building standard methods, materials and finishes. The improvements to be performed in accordance with the Work List are hereinafter referred to as the "**Tenant Alterations**". Landlord shall enter into a direct contract for the Tenant Alterations with a general contractor selected by Landlord. In addition, Landlord shall have the right to select and/or approve of any subcontractors used in connection with the Tenant Alterations.

### WORK LIST

A.    Paint the existing exposed painted walls in the Expansion Space with a Building standard color selected by Tenant.

B.    Replace the existing carpeting in the Expansion Space with Building standard carpeting in a Building standard color selected by Tenant.

C.    Replace the existing flooring in the Expansion Space with Building standard flooring in a Building standard color selected by Tenant.

D.    Replace any damaged ceiling tiles and electrical faceplates in the Expansion Space.

E.    Install up to an additional ten (10) electrical outlets in the Expansion Space in locations mutually agreeable to Landlord and Tenant.

2.    All other work and upgrades, subject to Landlord's approval, shall be at Tenant's sole cost and expense, plus any applicable state sales or use tax thereon, payable upon demand as additional rent. Tenant shall be responsible for any Tenant Delay in completion of the Tenant Alterations resulting from any such other work and upgrades requested or performed by Tenant.

3.    Landlord's supervision or performance of any work for or on behalf of Tenant shall not be deemed to be a representation by Landlord that such work complies with applicable insurance requirements, building codes, ordinances, laws or regulations or that the improvements constructed will be adequate for Tenant's use.

4.    This **Exhibit B** shall not be deemed applicable to any additional space added to the Premises at any time or from time to time, whether by any options under the Lease or otherwise, or to any portion of the original Premises or any additions to the Premises in the event of a renewal or extension of the original Term of the Lease, whether by any options under the Lease or otherwise, unless expressly so provided in the Lease or any amendment or supplement to the Lease.

### [REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**THIRD AMENDMENT**

  **THIS THIRD AMENDMENT** (this "**Amendment**") is made and entered into as of June 7, 2021, by and between **SDCO TUSTIN EXECUTIVE CENTER, INC.**, a Delaware corporation ("**Landlord**"), and **THE LITIGATION PRACTICE GROUP PC**, a California corporation ("**Tenant**").

**RECITALS**

A.  Landlord and Tenant are parties to that certain lease dated November 5, 2020 (the "**Original Lease**"), which Original Lease has been previously amended by that certain First Amendment (the "**First Amendment**") dated as of November 30, 2020 and that certain Second Amendment (the "**Second Amendment**") dated as of May 14, 2021 (collectively, the "**Lease**"). Pursuant to the Lease, Landlord has leased to Tenant space currently containing approximately **16,444** rentable square feet (the "**Original Premises**") described as Suites 100, 105 and 250 (the "**Suite 250 Premises**") of the building located at 17542 East 17th Street, Tustin, California 92780 (the "**Building**").

B.  Tenant has requested that additional space containing approximately **6,138** rentable square feet described as Suite 330 of the Building, as shown on **Exhibit A** attached hereto (the "**Third Expansion Space**"), be added to the Original Premises and that the Lease be appropriately amended and Landlord is willing to do the same on the following terms and conditions.

  **NOW, THEREFORE,** in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree as follows:

1.  **Expansion.** Effective as of the Third Expansion Effective Date (defined below), the Premises, as defined in the Lease, is increased from approximately 16,444 rentable square feet in the Building to approximately **22,582** rentable square feet in the Building by the addition of the Third Expansion Space, and from and after the Third Expansion Effective Date, the Original Premises and the Third Expansion Space, collectively, shall be deemed the "Premises", as defined in the Lease and as used herein. The Term for the Third Expansion Space shall commence on the Third Expansion Effective Date and end on the Extended Termination Date (as defined in the Second Amendment). The Third Expansion Space is subject to all the terms and conditions of the Lease except as expressly modified herein and except that Tenant shall not be entitled to receive any allowances, abatements or other financial concessions granted with respect to the Original Premises unless such concessions are expressly provided for herein with respect to the Third Expansion Space.

  1.1.  The "**Third Expansion Effective Date**" shall be the date upon which the Tenant Alterations (as defined in **Exhibit B** attached hereto) in the Third Expansion Space have been substantially completed, which is estimated to be July 1, 2021 ("**Target Third Expansion Effective Date**"); provided, however, that if Landlord shall be delayed in substantially completing the Tenant Alterations in the Third Expansion Space as a result of the occurrence of a Tenant Delay (defined below), then, for purposes of determining the Third Expansion Effective Date, the date of substantial completion shall be deemed to be the day that said Tenant Alterations would have been substantially completed absent any such Tenant Delay(s). A "**Tenant Delay**" means any act or omission of Tenant or its

{2011-12136/01095813;}      1

0071

agents, employees, vendors or contractors that actually delays substantial completion of the Tenant Alterations, including, without limitation, the following:

1.1.1    Tenant's failure to furnish information or approvals within any time period specified in the Lease or this Amendment, including the failure to prepare or approve preliminary or final plans by any applicable due date;

1.1.2    Tenant's selection of equipment or materials that have long lead times after first being informed by Landlord that the selection may result in a delay;

1.1.3    Changes requested or made by Tenant to previously approved plans and specifications;

1.1.4    The performance of work in the Third Expansion Space by Tenant or Tenant's contractor(s) during the performance of the Tenant Alterations; or

1.1.5    If the performance of any portion of the Tenant Alterations depends on the prior or simultaneous performance of work by Tenant, a delay by Tenant or Tenant's contractor(s) in the completion of such work.

The Third Expansion Space shall be deemed to be substantially completed on the date that Landlord reasonably determines that all Tenant Alterations have been performed (or would have been performed absent any Tenant Delays), other than any details of construction, mechanical adjustment or any other matter, the noncompletion of which does not materially interfere with Tenant's use of the Third Expansion Space. The adjustment of the Third Expansion Effective Date and, accordingly, the postponement of Tenant's obligation to pay rent on the Third Expansion Space shall be Tenant's sole remedy and shall constitute full settlement of all claims that Tenant might otherwise have against Landlord by reason of the Third Expansion Space not being ready for occupancy by Tenant on the Target Third Expansion Effective Date.

1.2.    In addition to the postponement, if any, of the Third Expansion Effective Date as a result of the applicability of Section 1.1 of this Amendment, the Third Expansion Effective Date shall be delayed to the extent that Landlord fails to deliver possession of the Third Expansion Space for any other reason (other than Tenant Delays), including but not limited to, holding over by prior occupants. Any such delay in the Third Expansion Effective Date shall not subject Landlord to any liability for any loss or damage resulting therefrom. If the Third Expansion Effective Date is delayed, the Extended Termination Date shall not be similarly extended.

2.    **Tenant's Proportionate Share.**  For the period commencing with the Third Expansion Effective Date and ending on the Extended Termination Date, Tenant's Proportionate Share for the Third Expansion Space is **6.75%** of the Building. Tenant's Proportionate Share for the Third Expansion Space and the Original Premises is, collectively, **24.83%** of the Building.

3.    **Annual Rent and Monthly Installment of Rent.**  In addition to Tenant's obligation to pay Annual Rent and Monthly Installment of Rent for the Original Premises, Tenant shall pay Landlord Annual Rent and Monthly Installment of Rent for the Third Expansion Space as follows:

{2011-12136/01095813;}    2

| Period | Rentable Square Footage | Annual Rate Per Square Foot | Annual Rent | Monthly Installment of Rent |
|---|---|---|---|---|
| 7/1/21 – 11/30/21 | 6,138 | $30.60 | $187,822.80 | $15,651.90 |
| 12/1/21 – 11/30/22 | 6,138 | $31.52 | $193,469.76 | $16,122.48 |
| 12/1/22 – 11/30/23 | 6,138 | $32.47 | $199,300.92 | $16,608.41 |
| 12/1/23 – 11/30/24 | 6,138 | $33.44 | $205,254.72 | $17,104.56 |
| 12/1/24 – 8/31/25 | 6,138 | $34.44 | $211,392.72 | $17,616.06 |

All such Monthly Installment of Rent and Annual Rent shall be payable by Tenant in accordance with the terms of the Lease, as amended hereby, including, without limitation, Section 3.3 of the Second Amendment.

Notwithstanding anything in the Lease, as amended hereby, to the contrary, so long as Tenant is not in default under the Lease, as amended hereby, Tenant shall be entitled to an abatement of Monthly Installment of Rent solely with respect to the Third Expansion Space in the amount of $15,651.90 per month for each of the second (2nd), third (3rd) and fourth (4th) full calendar months following the Third Expansion Effective Date (the "**Third Expansion Space Rent Abatement Period**"). The maximum total amount of Monthly Installment of Rent abated with respect to the Third Expansion Space in accordance with the foregoing shall equal $46,955.70 (the "**Third Expansion Space Abated Monthly Installment of Rent**"). If Tenant defaults under the Lease, as amended hereby, at any time during the balance of the current Term or the Extended Term (as the same may be further extended) and fails to cure such default within any applicable cure period under the Lease, as amended hereby, then all Third Expansion Space Abated Monthly Installment of Rent shall immediately become due and payable. Only Monthly Installment of Rent applicable to the Third Expansion Space shall be abated during the Third Expansion Space Rent Abatement Period pursuant to this Section, as more particularly described herein, and all other rent and other costs and charges specified in the Lease, as amended hereby, shall remain as due and payable pursuant to the provisions of the Lease, as amended hereby.

Landlord and Tenant acknowledge that the foregoing schedule is based on the assumption that the Third Expansion Effective Date is the Target Third Expansion Effective Date. If the Third Expansion Effective Date is other than the Target Third Expansion Effective Date, the schedule set forth above with respect to the payment of any installment(s) of Monthly Installment of Rent for the Third Expansion Space shall be appropriately adjusted on a per diem basis to reflect the actual Third Expansion Effective Date, and the actual Third Expansion Effective Date shall be set forth in a confirmation letter to be prepared by Landlord. However, the effective date of any increases or decreases in the Monthly Installment of Rent rate shall not be postponed as a result of an adjustment of the Third Expansion Effective Date as provided above.

4.    **Additional Security Deposit.** Upon Tenant's execution hereof, Tenant shall pay Landlord the sum of **$19,377.66** which is added to and becomes part of the Security Deposit, if any, held by Landlord as provided under Article 5 of the Original Lease as security for payment of rent and the performance of the other terms and conditions of the Lease by Tenant. Accordingly, simultaneous with the execution hereof, the Security Deposit is increased from $51,913.71 to **$71,291.37**.

DocuSign Envelope ID: 1D6640FB-A609-4AE6-8E54-

5.     **Additional Rent.** For the period commencing with the Third Expansion Effective Date and ending on the Extended Termination Date, Tenant shall pay all additional rent payable under the Lease, including Tenant's Proportionate Share of Expenses, Taxes and Insurance Costs applicable to the Third Expansion Space, in accordance with the terms of the Lease, as amended hereby; provided, however, during such period, the Base Year for the computation of Tenant's Proportionate Share of Expenses, Taxes and Insurance Costs solely with respect to the Third Expansion Space is calendar year 2021.

6.     **Improvements to Third Expansion Space.**

6.1.    **Condition of Third Expansion Space.** Tenant has inspected the Third Expansion Space and agrees to accept the same "as is" without any agreements, representations, understandings or obligations on the part of Landlord to perform any alterations, repairs or improvements, except as may be expressly provided otherwise in this Amendment.

6.2.    **Responsibility for Improvements to Third Expansion Space.** Landlord shall perform improvements to the Third Expansion Space in accordance with the terms of **Exhibit B** attached hereto.

7.     **Early Access to Third Expansion Space.** During any period that Tenant shall be permitted to enter the Third Expansion Space prior to the Third Expansion Effective Date (e.g., to perform alterations or improvements), Tenant shall comply with all terms and provisions of the Lease, except those provisions requiring payment of Monthly Installment of Rent or Tenant's Proportionate Share of Expenses, Taxes and Insurance Costs as to the Third Expansion Space. If Tenant takes possession of the Third Expansion Space prior to the Third Expansion Effective Date for any reason whatsoever (other than the performance of work in the Third Expansion Space with Landlord's prior approval), such possession shall be subject to all the terms and conditions of the Lease and this Amendment, and Tenant shall pay Monthly Installment of Rent and Tenant's Proportionate Share of Expenses and Taxes as applicable to the Third Expansion Space to Landlord on a per diem basis for each day of occupancy prior to the Third Expansion Effective Date.

8.     **Other Pertinent Provisions.** Landlord and Tenant agree that, effective as of the date of this Amendment (unless different effective date(s) is/are specifically referenced in this Section), the Lease shall be amended in the following additional respects:

8.1.    **Insurance.** Tenant's insurance required under Article 11 of the Original Lease ("**Tenant's Insurance**") shall include the Third Expansion Space. Tenant shall provide Landlord with a certificate of insurance, in form and substance satisfactory to Landlord and otherwise in compliance with Article 11 of the Original Lease, evidencing that Tenant's Insurance covers the Original Premises and the Third Expansion Space, upon delivery of this Amendment, executed by Tenant, to Landlord, and thereafter as necessary to assure that Landlord always has current certificates evidencing Tenant's Insurance.

8.2.    **Parking.** The number of parking passes available to Tenant set forth in the Reference Pages of the Original Lease, as amended by Section 8.3 of the First Amendment and Section 9.4 of the Second Amendment, is hereby amended from 65 to "90".

8.3.    **Maximum Occupancy Density.** Notwithstanding anything to the contrary contained in the Lease, the occupancy density within the Third Expansion Space as a whole shall at no time exceed more than thirty-five (35) people. In addition, the occupancy density within the Suite 250 Premises as a whole shall at no time exceed more than fifty (50) people.

9.    **Miscellaneous.**

9.1.    This Amendment, including **Exhibit A** (Outline and Location of Third Expansion Space) and **Exhibit B** (Tenant Alterations) attached hereto, sets forth the entire agreement between the parties with respect to the matters set forth herein. There have been no additional oral or written representations or agreements. Under no circumstances shall Tenant be entitled to any Rent abatement, improvement allowance, leasehold improvements, or other work to the Premises, or any similar economic incentives that may have been provided Tenant in connection with entering into the Lease, unless specifically set forth in this Amendment.

9.2.    Except as herein modified or amended, the provisions, conditions and terms of the Lease shall remain unchanged and in full force and effect. In the case of any inconsistency between the provisions of the Lease and this Amendment, the provisions of this Amendment shall govern and control. The capitalized terms used in this Amendment shall have the same definitions as set forth in the Lease to the extent that such capitalized terms are defined therein and not redefined in this Amendment.

9.3.    Tenant shall reasonably comply with Landlord's recycling policy for the Building, including, without limitation, Tenant shall sort and separate its trash into separate recycling containers as required by law or which may be furnished by Landlord and located in the Premises. Tenant shall comply with all laws regarding the collection, sorting, separation, and recycling of garbage, waste products, trash and other refuse at the Building. Landlord reserves the right to refuse to collect or accept from Tenant any trash that is not separated and sorted as required by law or pursuant to Landlord's recycling policy, and to require Tenant to arrange for such collection at Tenant's cost, utilizing a contractor reasonably satisfactory to Landlord.

9.4.    Submission of this Amendment by Landlord is not an offer to enter into this Amendment but rather is a solicitation for such an offer by Tenant. Landlord shall not be bound by this Amendment until Landlord has executed and delivered the same to Tenant.

9.5.    Tenant hereby represents to Landlord that Tenant has dealt with no broker in connection with this Amendment, other than Legacy Realty & Funding. Tenant agrees to indemnify and hold Landlord and the Landlord Entities harmless from all claims of any other brokers claiming to have represented Tenant in connection with this Amendment.

9.6.    Each signatory of this Amendment represents hereby that he or she has the authority to execute and deliver the same on behalf of the party hereto for which such signatory is acting. Tenant hereby represents and warrants that neither Tenant, nor any persons or entities holding any legal or beneficial interest whatsoever in Tenant, are (i) the target of any sanctions program that is established by Executive Order of the President or published by the Office of Foreign Assets Control, U.S. Department of the Treasury ("**OFAC**"); (ii) designated by the President or OFAC pursuant to the Trading with the

Enemy Act, 50 U.S.C. App. § 5, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-06, the Patriot Act, Public Law 107-56, Executive Order 13224 (September 23, 2001) or any Executive Order of the President issued pursuant to such statutes; or (iii) named on the following list that is published by OFAC: "List of Specially Designated Nationals and Blocked Persons." If the foregoing representation is untrue at any time during the balance of the current Term of the Extended Term, an Event of Default under the Lease will be deemed to have occurred, without the necessity of notice to Tenant.

9.7.    Tenant shall not bring upon the Premises or any portion of the Building or use the Premises or permit the Premises or any portion thereof to be used for the growing, manufacturing, administration, distribution (including without limitation, any retail sales), possession, use or consumption of any cannabis, marijuana or cannabinoid product or compound, regardless of the legality or illegality of the same.

9.8.    Signatures to this Amendment transmitted by telecopy or electronic signatures shall be valid and effective to bind the party so signing. This Amendment may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and same agreement. **THE PARTIES HERETO CONSENT AND AGREE THAT THIS AMENDMENT MAY BE SIGNED USING ELECTRONIC SIGNATURE TECHNOLOGY (E.G., VIA DOCUSIGN OR SIMILAR ELECTRONIC SIGNATURE TECHNOLOGY), AND THAT SUCH SIGNED ELECTRONIC RECORD SHALL BE VALID AND AS EFFECTIVE TO BIND THE PARTY SO SIGNING AS A PAPER COPY BEARING SUCH PARTY'S HAND-WRITTEN SIGNATURE.**

9.9.    If Tenant (or any party claiming by, through or under Tenant) pays directly to the provider for any energy consumed at the Building, Tenant, promptly upon request, shall deliver to Landlord (or, at Landlord's option, execute and deliver to Landlord an instrument enabling Landlord to obtain from such provider) any data about such consumption that Landlord, in its reasonable judgment, is required to disclose to a prospective buyer, tenant or mortgage lender under California Public Resources Code § 25402.10 or any similar law.

9.10.    Pursuant to California Civil Code Section 1938, Landlord hereby notifies Tenant that as of the date of this Amendment, the Premises have not undergone inspection by a "Certified Access Specialist" ("**CASp**") to determine whether the Premises meet all applicable construction-related accessibility standards under California Civil Code Section 55.53. Landlord hereby discloses pursuant to California Civil Code Section 1938 as follows: "A Certified Access Specialist (CASp) can inspect the subject premises and determine whether the subject premises comply with all of the applicable construction-related accessibility standards under state law. Although state law does not require a CASp inspection of the subject premises, the commercial property owner or lessor may not prohibit the lessee or tenant from obtaining a CASp inspection of the subject premises for the occupancy or potential occupancy of the lessee or tenant, if requested by the lessee or tenant. The parties shall mutually agree on the arrangements for the time and manner of the CASp inspection, the payment of the fee for the CASp inspection, and the cost of making any repairs necessary to correct violations of construction-related accessibility standards within the premises." Landlord and Tenant hereby acknowledge and agree that in the event that

Tenant elects to perform a CASp inspection of the Premises hereunder (the "**Inspection**"). such Inspection shall be (a) performed at Tenant's sole cost and expense, (b) limited to the Premises and (c) performed by a CASp who has been approved or designated by Landlord prior to the Inspection. Any Inspection must be performed in a manner which minimizes the disruption of business activities in the Building, and at a time reasonably approved by Landlord. Landlord reserves the right to be present during the Inspection. Tenant agrees to: (i) promptly provide to Landlord a copy of the report or certification prepared by the CASp inspector upon request (the "**Report**"), (ii) keep the information contained in the Report confidential, except to the extent required by Regulations, or to the extent disclosure is needed in order to complete any necessary modifications or improvements required to comply with all applicable accessibility standards under state or federal Regulations, as well as any other repairs, upgrades, improvements, modifications or alterations required by the Report or that may be otherwise required to comply with applicable Regulations or accessibility requirements (the "**Access Improvements**"). Tenant shall be solely responsible for the cost of Access Improvements to the Premises or the Building necessary to correct any such violations of construction-related accessibility standards identified by such Inspection as required by Regulations, which Access Improvements may, at Landlord's option, be performed in whole or in part by Landlord at Tenant's expense, payable as additional rent within ten (10) days following Landlord's demand.

### [REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

DocuSign Envelope ID: 1D6640FB-A609-4AE6-8E54-...

9.11.    Redress for any claim against Landlord under the Lease and this Amendment shall be limited to and enforceable only against and to the extent of Landlord's interest in the Building. The obligations of Landlord under the Lease are not intended to and shall not be personally binding on, nor shall any resort be had to the private properties of, any of its trustees or board of directors and officers, as the case may be, its investment manager, the general partners thereof, or any beneficiaries, stockholders, employees, or agents of Landlord or the investment manager, and in no case shall Landlord be liable to Tenant hereunder for any lost profits, damage to business, or any form of special, indirect or consequential damages.

**IN WITNESS WHEREOF**, Landlord and Tenant have entered into and executed this Amendment as of the date first written above.

LANDLORD:                                    TENANT:

**SDCO TUSTIN EXECUTIVE CENTER, INC.,**      **THE LITIGATION PRACTICE GROUP PC,**
**a Delaware corporation**                   **a California corporation**

By: _Kara Burkhart_                          By: _Daniel S. March_
Name: Kara Burkhart                          Name: Daniel S. March
Title: Vice President                        Title: President
Dated: 6/9/2021                              Dated: 6/9/2021

By: _John Casasante_                         By: _Daniel S. March_
Name: John Casasante                         Name: Daniel S. March
Title: Vice President                        Title: Treasurer and Member of Board of
Dated: 6/9/2021                                     Directors
                                             Dated: 6/9/2021

DocuSign Envelope ID: 1D6640FB-A609-4AE6-8E54-...

## EXHIBIT A – OUTLINE AND LOCATION OF THIRD EXPANSION SPACE

**attached to and made a part of the Amendment dated as of June 7, 2021, between
SDCO TUSTIN EXECUTIVE CENTER, INC., a Delaware corporation, as Landlord and
THE LITIGATION PRACTICE GROUP PC, a California corporation, as Tenant**

**Exhibit A** is intended only to show the general layout of the Third Expansion Space as of the Third Expansion Effective Date. It does not in any way supersede any of Landlord's rights set forth in the Lease with respect to arrangements and/or locations of public parts of the Building and changes in such arrangements and/or locations. It is not to be scaled; any measurements or distances shown should be taken as approximate.



☐ VACANT   ☐ AVAILABLE SOON

0079

## EXHIBIT B – TENANT ALTERATIONS

**attached to and made a part of the Amendment dated as of June 7, 2021, between
SDCO TUSTIN EXECUTIVE CENTER, INC., a Delaware corporation, as Landlord and
THE LITIGATION PRACTICE GROUP PC, a California corporation, as Tenant**

1.   Landlord, at its sole cost and expense (subject to the terms and provisions of Section 2 below) shall perform improvements to the Third Expansion Space in accordance with the following work list (the "**Work List**") using Building standard methods, materials and finishes.  The improvements to be performed in accordance with the Work List are hereinafter referred to as the "**Tenant Alterations**".   Landlord shall enter into a direct contract for the Tenant Alterations with a general contractor selected by Landlord.  In addition, Landlord shall have the right to select and/or approve of any subcontractors used in connection with the Tenant Alterations.

### WORK LIST

A.   Paint the existing exposed painted walls in the Third Expansion Space with a Building standard color selected by Tenant.
B.   Install Building standard flooring selected by Tenant in the Third Expansion Space.
C.   Replace any damaged ceiling tiles and electrical faceplates in the Third Expansion Space.
D.   Install up to an additional seven (7) electrical outlets in the Third Expansion Space in locations mutually agreeable to Landlord and Tenant.

2.   All other work and upgrades, subject to Landlord's approval, shall be at Tenant's sole cost and expense, plus any applicable state sales or use tax thereon, payable upon demand as additional rent. Tenant shall be responsible for any Tenant Delay in completion of the Tenant Alterations resulting from any such other work and upgrades requested or performed by Tenant.

3.   Landlord's supervision or performance of any work for or on behalf of Tenant shall not be deemed to be a representation by Landlord that such work complies with applicable insurance requirements, building codes, ordinances, laws or regulations or that the improvements constructed will be adequate for Tenant's use.

4.   This **Exhibit B** shall not be deemed applicable to any additional space added to the Premises at any time or from time to time, whether by any options under the Lease or otherwise, or to any portion of the original Premises or any additions to the Premises in the event of a renewal or extension of the original Term of the Lease, whether by any options under the Lease or otherwise, unless expressly so provided in the Lease or any amendment or supplement to the Lease.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

Exhibit "B"

3/28/2023 10:56 AM

## International Lease Ledger

Date: 03/28/2023

Property: pco53001

Tenant: t0188672 THE LITIGATION PRACTICE GROUP PC

From Date: 11/22/2020  To Date: 08/31/2025

Move In Date: 11/22/2020

Unit(S): 0100, 0105, 0250, 0330

Base Currency: usd

| Trans Date | Post Month | Description | Balance |
|---|---|---|---|
| **Currency : USD** | | | |
| 2/1/2023 | 2/2023 | ehvac January 2023 Ste 330 HVAC - AFTERHOURS | 1,560.00 |
| 2/1/2023 | 2/2023 | ehvac January 2023 Ste 100/105/250 HVAC - AFTERHOURS | 1,560.00 |
| 2/1/2023 | 2/2023 | abasemt base rent | 9,651.71 |
| 2/1/2023 | 2/2023 | abasemt base rent | 9,713.94 |
| 2/1/2023 | 2/2023 | abasemt base rent | 25,129.08 |
| 2/1/2023 | 2/2023 | abasemt base rent | 16,608.41 |
| 2/1/2023 | 2/2023 | eopex operating expense  current year | 163.76 |
| 2/1/2023 | 2/2023 | eopex operating expense  current year | 164.66 |
| 2/1/2023 | 2/2023 | eopex operating expense  current year | 799.27 |
| 2/1/2023 | 2/2023 | eopex operating expense  current year | 528.25 |
| 3/1/2023 | 3/2023 | ehvac February 2023 Ste 330 HVAC - AFTERHOURS | 1,560.00 |
| 3/1/2023 | 3/2023 | ehvac February 2023 Ste 100/105/250 HVAC -AFTERHOURS | 1,560.00 |
| 3/1/2023 | 3/2023 | abasemt base rent | 9,651.71 |
| 3/1/2023 | 3/2023 | abasemt base rent | 9,713.94 |
| 3/1/2023 | 3/2023 | abasemt base rent | 25,129.08 |
| 3/1/2023 | 3/2023 | abasemt base rent | 16,608.41 |
| 3/1/2023 | 3/2023 | eopex operating expense  current year | 163.76 |
| 3/1/2023 | 3/2023 | eopex operating expense  current year | 164.66 |
| 3/1/2023 | 3/2023 | eopex operating expense  current year | 799.27 |
| 3/1/2023 | 3/2023 | eopex operating expense  current year | 528.25 |
| **Total : USD** | | | **131,758.16** |

0082

Exhibit "C"

0083

## NOTICE TO PAY RENT OR QUIT

TO:    THE LITIGATION PRACTICE GROUP PC, a California corporation; and all others in possession or claiming a right to possession of the premises:

YOU ARE HEREBY REQUIRED within five (5) business days after this notice is served upon you either:

a.  To Pay the following amounts:

| Date | Amount: | Representing: |
|------|---------|---------------|
| 1/1/23 | $ 1,560.00 | Additional Rent (After Hours HVAC) |
| 2/1/23 | $61,103.14 | Base Rent |
| 2/1/23 | $ 1,655.94 | Additional Rent (Operating Expense) |
| 2/1/23 | $ 1,560.00 | Additional Rent (After Hours HVAC) |

TOTAL:    $65,879.08

OR

b.  To surrender and deliver up possession of said premises to the undersigned.   If you fail to do so, legal proceedings will be commenced against you to recover possession of said premises with such other damages as may be allowed by law.

THE UNDERSIGNED HEREBY DECLARES AND GIVES NOTICE that if said rent is not paid within five (5) business days from the date of service of this notice, the Landlord HEREBY ELECTS TO DECLARE A FORFEITURE of the agreement under which you hold possession of said premises and will proceed to commence legal action for recovery of possession of said premises and for all monies due and owing under the terms of said lease agreement and will hold you responsible for all expenses incurred in connection therewith.

Landlord has reasonably estimated the amounts set forth above to be the amounts now due and owing.  The ground upon which your eviction from said premises will be sought is non-payment

of rent.

Landlord reserves the right to accept partial payments and to proceed, if payment in full is not made within the notice period, with an unlawful detainer action.

Said premises are known and described as 17542 E. 17th Street, Suites 100, 105, 250 and 330, Tustin, CA 92780.

Payment pursuant to this notice shall be made payable to "SDCO Tustin Executive Center, Inc." and shall be delivered to Chris Cussen, or any other person employed by Transwestern, the property management company for the landlord, at the following address: 1630 S. Sunkist Street, Suite A, Anaheim, California 92806; Tel No. 714-202-2941. Payment may be made in person. The usual days and hours of business for delivery of payment in person are Mondays through Fridays (holidays excluded), 9:00 a.m. to 5:00 p.m.

Dated: February 24, 2023

Chris Cussen
Vice President/Property Manager

0085

Exhibit "D"

Electronically Filed by Superior Court of California, County of Orange, 03/08/2023 03:23:33 PM.
30-2023-01312735-CU-UD-CJC - ROA # 5 - DAVID H. YAMASAKI, Clerk of the Court By A. Van Arkel, Deputy Clerk.

# SUMMONS—EVICTION
## *(CITACIÓN JUDICIAL—DESALOJO)*

### UNLAWFUL DETAINER / FORCIBLE DETAINER / FORCIBLE ENTRY
*(RETENCIÓN ILÍCITA DE UN INMUEBLE / RETENCIÓN FORZOSA / ENTRADA FORZOSA)*

**SUM-130**

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
THE LITIGATION PRACTICE GROUP PC, a California corporation; and
DOES 1 to 10, Inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
SDCO TUSTIN EXECUTIVE CENTER, INC., a Delaware corporation

| | |
|---|---|
| NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 5 days. You have 5 DAYS, not counting Saturdays and Sundays and other judicial holidays, after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. | *¡AVISO! Usted ha sido demandado. Si no responde dentro de 5 días, el tribunal puede emitir un fallo en su contra sin una audiencia. Una vez que le entreguen esta citación y papeles legales, solo tiene 5 DÍAS, sin contar sábado y domingo y otros días feriados del tribunal, para presentar una respuesta por escrito en este tribunal y hacer que se entregue una copia al demandante.* |
| A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courts.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court. | *Una carta o una llamada telefónica no lo protege. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no presenta su respuesta a tiempo, puede perder el caso por falta de comparecencia y se le podrá quitar su sueldo, dinero y bienes sin más advertencia.* |
| There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services website (www.lawhelpca.org), the California Courts Online Self-Help Center (www.courts.ca.gov/selfhelp), or by contacting your local court or county bar association. | *Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados local.* |
| **FEE WAIVER:** If you cannot pay the filing fee, ask the clerk for a fee waiver form. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case. | *EXENCIÓN DE CUOTAS: Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos con un gravamen sobre cualquier cantidad de $10,000 ó más recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desestimar el caso.* |

1. The name and address of the court is:
*(El nombre y dirección de la corte es):*

ORANGE COUNTY SUPERIOR COURT
700 Civic Center Drive West
Santa Ana, CA 92701

CASE NUMBER *(número del caso):*
30-2023-01312735-CU-UD-CJC

Assigned for All Purposes to: Commissioner Robert Kohler

2. The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: *(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Richard L. Seide CSB: 94677          RICHARD L. SEIDE, APC     TWTE-007
901 Dove Street, Suite 120          (949) 474-8000
Newport Beach, CA 92660

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
SUM-130 [Rev. January 1, 2023]

**SUMMONS—EVICTION**
**(Unlawful Detainer / Forcible Detainer / Forcible Entry)**

Code of Civil Procedure, §§ 412.20, 415.45, 1167
www.courts.ca.gov

CEB | Essential
ceb.com | Forms

0087

SUM-130

| | |
|---|---|
| PLAINTIFF (Name): SDCO TUSTIN EXECUTIVE CENTER, INC., a Delaware corporation | CASE NUMBER |
| DEFENDANT (Name): THE LITIGATION PRACTICE GROUP PC, a California corporation; and DOES 1 to 10, Inclusive | 30-2023-01312735-CU-UD-CJC |

3. (Must be answered in all cases) An **unlawful detainer assistant** (Bus. & Prof. Code, §§ 6400-6415)  ☒ did not  ☐ did
   for compensation give advice or assistance with this form. (If plaintiff has received **any** help or advice for pay from an unlawful
   detainer assistant, complete item 4 below.)

4. Unlawful detainer assistant (complete if plaintiff has received any help or advice for pay from an unlawful detainer assistant):
   a.  Assistant's name:
   b.  Telephone no.:
   c.  Street address, city, and zip:


   d.  County of registration:
   e.  Registration no.:
   f.  Registration expires on (date):

                    DAVID H. YAMASAKI, Clerk of the Court

Date:        03/08/2023                        Clerk, by          [signature]                                    , Deputy
(Fecha)                                        (Secretario)                      A. Van Arkel                    (Adjunto)

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons (form POS-010).)

[SEAL]

5. **NOTICE TO THE PERSON SERVED:** You are served
   a. ☐ as an individual defendant.
   b. ☐ as the person sued under the fictitious name of (specify):
   c. ☐ as an occupant.
   d. ☐ on behalf of (specify):
        under: ☐ CCP 416.10 (corporation).            ☐ CCP 416.60 (minor).
               ☐ CCP 416.20 (defunct corporation).    ☐ CCP 416.70 (conservatee).
               ☐ CCP 416.40 (association or partnership). ☐ CCP 416.90 (authorized person).
               ☐ CCP 415.46 (occupant).               ☐ other (specify):
   e. ☐ by personal delivery on (date):

SUM-130 [Rev. January 1, 2023]                    **SUMMONS—EVICTION**                        Page 2 of 2
                              (Unlawful Detainer / Forcible Detainer / Forcible Entry)

CEB Essential
ceb.com Forms

0088

Electronically Filed by Superior Court of California, County of Orange, 03/08/2023 03:23:33 PM.
30-2023-01312735-CU-UD-CJC - ROA # 2 - DAVID H. YAMASAKI, Clerk of the Court By A. Van Arkel, Deputy Clerk.

UD-100

| ATTORNEY OR PARTY WITHOUT ATTORNEY | STATE BAR NUMBER: | FOR COURT USE ONLY |
|---|---|---|

NAME: Richard L. Seide CSB: 94677
FIRM NAME: RICHARD L. SEIDE, APC        TWTE-007
STREET ADDRESS: 901 Dove Street, Suite 120
CITY: Newport Beach        STATE: CA  ZIP CODE: 92660
TELEPHONE NO.: (949) 474-8000        FAX NO.: (949) 474-8030
EMAIL ADDRESS: rseide@seidelaw.com
ATTORNEY FOR (name): Plaintiff, SDCO TUSTIN EXECUTIVE CENTER

SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE
STREET ADDRESS: 700 Civic Center Drive West
MAILING ADDRESS: Same
CITY AND ZIP CODE: Santa Ana, CA 92701
BRANCH NAME: Central Justice Center

PLAINTIFF: SDCO TUSTIN EXECUTIVE CENTER, INC., a Delaware corporation
DEFENDANT: THE LITIGATION PRACTICE GROUP PC, a California corporation; and
[X] DOES 1 TO    10, Inclusive

30-2023-01312735-CU-UD-CJC

| COMPLAINT — UNLAWFUL DETAINER* | CASE NUMBER Assigned for All Purposes to: |
|---|---|
| [X] COMPLAINT    [ ] AMENDED COMPLAINT (Amendment Number): | Commissioner Robert Kohler |

Jurisdiction (check all that apply):
[ ] ACTION IS A LIMITED CIVIL CASE
Amount demanded    [ ] does not exceed $10,000.
                   [ ] exceeds $10,000 but does not exceed $25,000.
[X] ACTION IS AN UNLIMITED CIVIL CASE (amount demanded exceeds $25,000)
[ ] ACTION IS RECLASSIFIED by this amended complaint or cross-complaint (check all that apply):
    [ ] from unlawful detainer to general unlimited civil (possession not in issue).    [ ] from limited to unlimited.
    [ ] from unlawful detainer to general limited civil (possession not in issue).    [ ] from unlimited to limited.

1. PLAINTIFF (name each):
   SDCO TUSTIN EXECUTIVE CENTER, INC., a Delaware corporation

   alleges causes of action against DEFENDANT (name each):
   THE LITIGATION PRACTICE GROUP PC, a California corporation

2. a. Plaintiff is    (1) [ ] an individual over the age of 18 years.    (4) [ ] a partnership.
                       (2) [ ] a public agency.                          (5) [ ] a corporation.
                       (3) [X] other (specify):  a Delaware corporation

   b. [ ] Plaintiff has complied with the fictitious business name laws and is doing business under the fictitious name of (specify):

3. a. The venue is the court named above because defendant named above is in possession of the premises located at (street
      address, apt. no., city, zip code, and county):
      17542 E. 17th Street, Suites 100, 105, 250 & 330, Tustin, CA 92780 (Orange County)

   b. The premises in 3a are (check one)
      (1) [X] within the city limits of (name of city):  Tustin
      (2) [ ] within the unincorporated area of (name of county):

   c. The premises in 3a were constructed in (approximate year):  1984

4. Plaintiff's interest in the premises is    [X] as owner    [ ] other (specify):

5. The true names and capacities of defendants sued as Does are unknown to plaintiff.

*NOTE: Do not use this form for evictions after sale (Code Civ. Proc., § 1161a).

Page 1 of 4

| Form Approved for Optional Use | COMPLAINT — UNLAWFUL DETAINER | Civil Code, § 1940 et seq. |
|---|---|---|
| Judicial Council of California | | Code of Civil Procedure, §§ 425.12, 1166 |
| UD-100 [Rev. September 1, 2020] | | www.courts.ca.gov |

CEB® Essential Forms®
ceb.com

0089

UD-100

| PLAINTIFF: SDCO TUSTIN EXECUTIVE CENTER, INC., a Delaware corporation | CASE NUMBER: |
|---|---|
| DEFENDANT: THE LITIGATION PRACTICE GROUP PC, a California corporation; and DOES 1 to 10, Inclusive | |

6. a. On or about *(date):* SEE ATTACHMENT 6
   *defendant (name each):*
   THE LITIGATION PRACTICE GROUP PC, a California corporation

   (1) agreed to rent the premises as a ☐ month-to-month tenancy ☐ other tenancy *(specify).*
   (2) agreed to pay rent of $ _____ payable ☐ monthly ☐ other *(specify frequency):*
   (3) agreed to pay rent on the ☐ first of the month ☐ other day *(specify):*
   b. This ☐ written ☐ oral agreement was made with
   (1) ☐ plaintiff. (3) ☐ plaintiff's predecessor in interest.
   (2) ☐ plaintiff's agent. (4) ☐ Other *(specify):*
   c. ☐ The defendants not named in item 6a are
   (1) ☐ subtenants.
   (2) ☐ assignees.
   (3) ☐ Other *(specify):*
   d. ☐ The agreement was later changed as follows *(specify):*

   e. ☐ A copy of the written agreement, including any addenda or attachments that form the basis of this complaint, is attached
      and labeled Exhibit 1. *(Required for residential property, unless item 6f is checked. See Code Civ. Proc., § 1166.)*
   f. ☐ *(For residential property)* A copy of the written agreement is **not** attached because *(specify reason):*
   (1) ☐ the written agreement is not in the possession of the landlord or the landlord's employees or agents.
   (2) ☐ this action is solely for nonpayment of rent (Code Civ. Proc., § 1161(2)).

7. The tenancy described in 6 *(complete (a) or (b))*

   a. ☒ is **not** subject to the Tenant Protection Act of 2019 (Civil Code, § 1946.2). The specific subpart supporting why tenancy
      is exempt is *(specify):* This pertains to a Commerical tenancy NOT a Residential tenancy.
   b. ☐ is subject to the Tenant Protection Act of 2019.

8. *(Complete only if item 7b is checked. Check all applicable boxes.)*

   a. ☐ The tenancy was terminated for at-fault just cause (Civil Code, § 1946.2(b)(1)).

   b. ☐ The tenancy was terminated for no-fault just cause (Civil Code, § 1946.2(b)(2)) and the plaintiff *(check one)*

   (1) ☐ waived the payment of rent for the final month of the tenancy, before the rent came due, under
         section 1946.2(d)(2), in the amount of $
   (2) ☐ provided a direct payment of one month's rent under section 1946.2(d)(3), equaling $
       **to** *(name each defendant and amount given to each):*

   c. ☐ Because defendant failed to vacate, plaintiff is seeking to recover the total amount in 8b as damages in this action.

9. a. ☒ Defendant *(name each):* THE LITIGATION PRACTICE GROUP PC, a California corporation

   was served the following notice on the same date and in the same manner:

   (1) ☐ 3-day notice to pay rent or quit        (5) ☐ 3-day notice to perform covenants or quit
   (2) ☐ 30-day notice to quit                       *(not applicable if item 7b checked)*
   (3) ☐ 60-day notice to quit                    (6) ☐ 3-day notice to quit under Civil Code, § 1946.2(c)
   (4) ☐ 3-day notice to quit                          Prior required notice to perform covenants served *(date):*
                                                  (7) ☒ Other *(specify):* 5-business day notice to pay rent or quit

CEB Essential
ceb.com Forms

0090

UD-100

| | |
|---|---|
| PLAINTIFF: SDCO TUSTIN EXECUTIVE CENTER, INC., a Delaware corporation | CASE NUMBER: |
| DEFENDANT: THE LITIGATION PRACTICE GROUP PC, a California corporation; and DOES 1 to 10, Inclusive | |

9.  b. (1) On (date): 3/6/2023                                       the period stated in the notice checked in 9a expired at the end of the day
       (2) Defendants failed to comply with the requirements of the notice by that date.
    c. All facts stated in the notice are true.
    d. [X] The notice included an election of forfeiture.
    e. [X] A copy of the notice is attached and labeled Exhibit 2. **A** *(Required for residential property. See Code Civ. Proc., § 1166. When Civil Code, § 1946.2(c), applies and two notices are required, provide copies of both.)*
    f. [ ] One or more defendants were served (1) with the prior required notice under Civil Code, § 1946.2(c), (2) with a different notice, (3) on a different date, or (4) in a different manner, as stated in Attachment 10c. *(Check item 10c and attach a statement providing the information required by items 9a–e and 10 for each defendant and notice.)*

10. a. [X] The notice in item 9a was served on the defendant named in item 9a as follows:
       (1) [ ] By personally handing a copy to defendant on (date):
       (2) [ ] By leaving a copy with (name or description):
           a person of suitable age and discretion, on (date):                                    at defendant's
           [ ] residence   [ ] business   AND mailing a copy to defendant at defendant's place of residence
           on (date):                        because defendant cannot be found at defendant's residence or usual place of business.
       (3) [X] By posting a copy on the premises on (date): 2/27/2023
           [X] AND ~~giving a copy to a person found residing at the premises AND~~ mailing a copy to defendant at the premises
           on (date): 2/27/2023
           (a) [ ] because defendant's residence and usual place of business cannot be ascertained OR
           (b) [X] because no person of suitable age or discretion can be found there.
       (4) [ ] *(Not for 3-day notice; see Civil Code, § 1946, before using)* By sending a copy by certified or registered mail
           addressed to defendant on (date):
       (5) [ ] *(Not for residential tenancies; see Civil Code, § 1953, before using)* In the manner specified in a written
           commercial lease between the parties
    b. [ ] (Name):
       was served on behalf of all defendants who signed a joint written rental agreement.
    c. [ ] *Information about service of notice on the defendants alleged in item 9f is stated in Attachment 10c.*
    d. [X] *Proof of service of the notice in item 9a is attached and labeled Exhibit 3.* **B**

11. [ ] *Plaintiff demands possession from each defendant because of expiration of a fixed-term lease.*
                                5-business
12. [X] *At the time the ~~3-~~day notice to pay rent or quit was served, the amount of* **rent due** *was $* See Attachment 12

13. [X] *The fair rental value of the premises is $*              2,091.97 *per day.*

14. [ ] *Defendant's continued possession is malicious, and plaintiff is entitled to statutory damages under Code of Civil Procedure section 1174(b). (State specific facts supporting a claim up to $600 in Attachment 14.)*

15. [X] *A written agreement between the parties provides for attorney fees.*

16. [ ] *Defendant's tenancy is subject to the local rent control or eviction control ordinance of (city or county, title of ordinance, and date of passage):*

    Plaintiff has met all applicable requirements of the ordinances.

17. [X] *Other allegations are stated in Attachment 17.*

18. Plaintiff accepts the jurisdictional limit, if any, of the court.



0091

UD-100

| PLAINTIFF: SDCO TUSTIN EXECUTIVE CENTER, INC., a Delaware corporation | CASE NUMBER: |
|---|---|
| DEFENDANT: THE LITIGATION PRACTICE GROUP PC, a California corporation; and DOES 1 to 10, Inclusive | |

## 19. PLAINTIFF REQUESTS

a. possession of the premises.
b. costs incurred in this proceeding:
c. ☒ past-due rent of $ See Attachment 12
d. ☒ reasonable attorney fees.
e. ☒ forfeiture of the agreement.

f. ☐ damages in the amount of waived rent or relocation assistance as stated in item 8: $
g. ☒ damages at the rate stated in item 13 from *(date):* 3/1/2023
   for each day that defendants remain in possession through entry of judgment
h. ☐ statutory damages up to $600 for the conduct alleged in item 14.
i. ☐ other *(specify):*

20. ☒ Number of pages attached *(specify):* 9

### UNLAWFUL DETAINER ASSISTANT (Bus. & Prof. Code, §§ 6400–6415)

21. ☒ *(Complete in all cases.)* An unlawful detainer assistant    ☒ did not    ☐ did
for compensation give advice or assistance with this form. *(If declarant has received **any** help or advice for pay from an unlawful detainer assistant, complete a–f.)*

a. Assistant's name:
b. Street address, city, and zip code:

c. Telephone no.:
d. County of registration:
e. Registration no.:
f. Expires on *(date):*

Date: March 7, 2023

RICHARD L. SEIDE                                    *Richard L. Seide*
_____                            _____
(TYPE OR PRINT NAME)                               (SIGNATURE OF PLAINTIFF OR ATTORNEY)

### VERIFICATION

*(Use a different verification form if the verification is by an attorney or for a corporation or partnership.)*

I am the plaintiff in this proceeding and have read this complaint. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

SEE ATTACHED VERIFICATION                          _____
_____
(TYPE OR PRINT NAME)                               (SIGNATURE OF PLAINTIFF)

## ATTACHMENT 6

Plaintiff, as landlord, and defendant The Litigation Practice Group PC, as tenant, entered into a written lease agreement dated November 5, 2020 (the "Lease") for Suite 100 located at 17542 E. 17th Street, Tustin, CA, for a term of 39 months, 16 days.  The Lease has been amended three (3) times in writing.  The amendments expanded the premises and extended the term of the Lease. Defendant now occupies 17542 E. 17th Street, Suites 100, 105, 250 and 330, Tustin, CA 92780 and the term of the Lease has been extended through August 31, 2025.   Defendant pays base rent and additional rent (Operating Expenses), both due on the first of the month.  Current monthly base rent is the sum of $61,103.14 and current monthly additional rent is the sum of $1,655.94. Defendant also pays for after hours HVAC  as additional rent.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>ATTACHMENT 12</u>

Defendant owes base rent and additional rent in the sum of $65,870.08 for the period January 1, 2023 through February 28, 2023, as set forth in the notice to pay rent or quit, a copy of which is attached as an exhibit to this complaint.

1

2                                      ATTACHMENT 17

3              The above entitled Court is the proper Court for the commencement of this action as the real

4     property is in fact located in the County of Orange, State of California, within the jurisdiction of the

5     above entitled Court.  This action is not subject to the provisions of Section 1812.10 or 2984.4 of

6     the Civil Code of California.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT "A"

NOTICE TO PAY RENT OR QUIT

TO:    THE LITIGATION PRACTICE GROUP PC, a California corporation; and all others in
possession or claiming a right to possession of the premises:

YOU ARE HEREBY REQUIRED within five (5) business days after this notice is served

upon you either:

a.  To Pay the following amounts:

| Date | Amount: | Representing: |
|------|---------|---------------|
| 1/1/23 | $ 1,560.00 | Additional Rent (After Hours HVAC) |
| 2/1/23 | $61,103.14 | Base Rent |
| 2/1/23 | $ 1,655.94 | Additional Rent (Operating Expense) |
| 2/1/23 | $ 1,560.00 | Additional Rent (After Hours HVAC) |

TOTAL:        $65,879.08

OR

b.  To surrender and deliver up possession of said premises to the

undersigned.  If you fail to do so, legal proceedings will be

commenced against you to recover possession of said premises with

such other damages as may be allowed by law.

THE UNDERSIGNED HEREBY DECLARES AND GIVES NOTICE that if said

rent is not paid within five (5) business days from the date of service of this notice, the Landlord

HEREBY ELECTS TO DECLARE A FORFEITURE of the agreement under which you hold

possession of said premises and will proceed to commence legal action for recovery of possession

of said premises and for all monies due and owing under the terms of said lease agreement and will

hold you responsible for all expenses incurred in connection therewith.

Landlord has reasonably estimated the amounts set forth above to be the amounts now due

and owing.  The ground upon which your eviction from said premises will be sought is non-payment

of rent.

Landlord reserves the right to accept partial payments and to proceed, if payment in full is not made within the notice period, with an unlawful detainer action.

Said premises are known and described as 17542 E. 17th Street, Suites 100, 105, 250 and 330, Tustin, CA 92780.

Payment pursuant to this notice shall be made payable to "SDCO Tustin Executive Center, Inc." and shall be delivered to Chris Cussen, or any other person employed by Transwestern, the property management company for the landlord, at the following address: 1630 S. Sunkist Street, Suite A, Anaheim, California 92806; Tel No. 714-202-2941. Payment may be made in person. The usual days and hours of business for delivery of payment in person are Mondays through Fridays (holidays excluded), 9:00 a.m. to 5:00 p.m.

Dated: February 24, 2023

_____
Chris Cussen
Vice President/Property Manager

0098

# EXHIBIT "B"

**AAA Attorney Service II, Inc.**　　　　**DECLARATION OF**
**4122 E. Chapman Ave. Ste. 24.**　　　　**SERVICE OF NOTICE**
**Orange, CA 92869**　　　　　　　　　　**TWTE-007**
**Phone: 714-633-4167**

　　　I declare that I am over the age of eighteen (18) and not a party to this action and that I served the following notice:

| | |
|---|---|
| _____ Notice to Pay Rent or Quit (3 Days) | _____ Notice to Pay Rent or Quit (10 Days) |
| __X__ Notice to Pay Rent or Quit (5 Business Days) | _____ Notice to Pay Rent or Quit (15 Days) |
| _____ Notice to Pay Rent or Quit (5 Days) | _____ Notice to Pay Late Fees & Legal Fees/Costs or Quit |
| _____ Notice to Pay Rent or Quit (5 Business Days) | _____ Notice to Quit (3 DAYS) |
| _____ Notice of Termination of Tenancy (30 Days) | __X__ Other: Notice to Cure Covenant or Quit (30 Days) |

　　　I effected service on the named tenant by:

_____    **PERSONAL SERVICE:**
By personally handing the Notice to ___ on ___. A copy of the notice was mailed to each tenant(s) at the premises address by first class mail with postage fully prepaid on ___ from ___ORANGE___, CA.

____    **SUBSTITUTE SERVICE AND MAIL:**
By leaving a copy of the Notice for each tenant(s) with ___ a person of suitable age and discretion at the place of business because the named tenant was absent on_____. Thereafter, a copy of the notice was mailed to each tenant(s) at the premises address, by first class mail with postage fully prepaid on _____ at __ORANGE__, CA.

__X_    **POST AND MAIL:**
By posting a copy of the Notice for each tenant(s) in a conspicuous place on the property on _2-27-23 @ 1:15-1:25PM___, there being no person of suitable age or discretion with whom to leave the Notice. Thereafter, a copy of the notice was mailed to each tenant(s) at the premises address, by first class mail on__ **2-27-23** __ from _ORANGE_, CA.

*THE LITIGATION PRACTICE GROUP PC, a California corporation; ALL OTHER OCCUPANTS IN POSSESSION OR CLAIMING A RIGHT TO POSSESSION; 17542 E. 17th Street, Suites 100, 105, 250 and 330, Tustin, CA 92780*

　　　I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on ___2-28-23___ at __ORANGE___, CA.

**Fee: $65.00**
**(LEON GALLIANO)**_____(signature)

## VERIFICATION

**STATE OF CALIFORNIA, COUNTY OF ORANGE**

I have read the foregoing  Complaint - Unlawful Detainer
and know its contents.

### CHECK APPLICABLE PARAGRAPHS

[  ] I am a party to this action.  The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters, I believe them to be true.

[ X ] I am   [  ] an Officer   [  ] a partner [ X ] the Vice President & Property Manager for  SDCO
   Tustin Executive Center, Inc., a Delaware corporation                                              ,
the plaintiff in this action.  I have personal knowledge of the facts set forth in the complaint; am one of the custodians of the books, records and files of plaintiff as those books, records and files pertain to the rental of the subject property; have personally worked on those books, records and files, which are business records of plaintiff and prepared and maintained in the ordinary course of plaintiff's business; am more familiar with the terms and conditions of the lease and defendants' non-performance of such terms and conditions than the property owner; and am authorized by plaintiff to make this verification for and on behalf of plaintiff.  I make this verification for that reason.  [  ] I am informed and believe and on that ground allege that the matters stated in the foregoing document are true. [ X ] The matters stated in the foregoing document are true of my own knowledge, except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

[  ] I am one of the attorneys for _____ , a party
to this action.  Such party is absent from the aforesaid county where such attorneys have their offices, and I make this verification for and on behalf of that party for that reason.  I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.

Executed on   3/7/2023                , at Anaheim                              , California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Christopher Cussen                                   _____
Type or Print Name                                   Signature