Christopher B. Ghio (State Bar No. 259094)
Christopher Celentino (State Bar No. 131688)
Jeremy B. Freedman (State Bar No. 308752)
**DINSMORE & SHOHL LLP**
655 West Broadway, Suite 800
San Diego, CA 92101
Telephone:  619.400.0500
Facsimile:  619.400.0501
christopher.ghio@dinsmore.com
christopher.celentino@dinsmore.com
jeremy.freedman@dinsmore.com

Proposed Special Counsel to Richard A. Marshack

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION

| | |
|---|---|
| In re: | Case No.: 8:23-bk-10571-SC |
| THE LITIGATION PRACTICE GROUP P.C., | Chapter 11 |
| Debtor. | **DECLARATION OF RICHARD A. MARSHACK IN SUPPORT OF MOTION OF TRUSTEE RICHARD A. MARSHACK FOR ENTRY OF AN ORDER (A) APPROVING SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS PURSUANT TO 11 U.S.C. § 363(b) AND (B) APPROVING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND OTHER AGREEMENTS** |
| | Date:  [To be set]<br>Time:  [To be set]<br>Judge:  Hon. Scott C. Clarkson<br>Place:  Courtroom 5C<br>411 W. Fourth Street<br>Santa Ana, CA  92701 |

# DECLARATION OF RICHARD A. MARSHACK

I, Richard A. Marshack, declare as follows:

1.      I am the duly appointed Chapter 11 Trustee in the above captioned matter. I am an equity partner at Marshack Hays, LLP, and I am duly admitted to practice before all of the Courts in the State of California, United States District Court for the State of California and the United States Bankruptcy Courts for the State of California.

2.      I have personal knowledge of the matters set forth herein. If called as a witness in this matter, I could and would testify competently thereto.

3.      Pursuant to Docket No. 65, I was duly appointed as the Chapter 11 Trustee in this matter on May 8, 2023.

4.      I make this Declaration in support of *Motion of Trustee Richard A. Marshack for Entry of an Order (A) Approving Sale of Assets Free and Clear of All Liens, Claims, Encumbrances and Interests Pursuant to 11 U.S.C. § 363(b) and (B) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and Other Agreements*.

5.      True and correct experts of the Transcript from Debtor's 341(a) hearing on April 24, 2023 is attached hereto as **Exhibit 1**.

6.      A true and correct copy of the proposed Asset Purchase Agreement with Consumer Legal Group, P.C. ("CLG") is attached hereto as **Exhibit 2**.

7.      I and my attorneys have spoken with two parties that were interested in purchasing the debtor's assets, but we did not consider to be viable offers.  I have a meeting with a third interested party on the afternoon of July 7, 2023.  I have received another offer from Morning Law, whom is revising it so that it can provide its "best offer", and I will provide it to the Court in a supplemental declaration.

8.      From the outset and upon the Court granting emergency relief for turnover of assets, among other relief, the United States Trustee's office ("UST") has prohibited the use of any and all ACH client payments received by the Trustee. Such funds represent the only assets Trustee has recovered to date.  Appreciating the UST's position and concern for consumer clients and creditors,

1

none of the funds recovered and/or received to date have been used and remain in my control. These financial constraints have effectively turned Debtor's estate into a no asset estate.

9.    Despite the foregoing financial limitations placed on Debtor's estate, I continue to work diligently with a team to gather, review, analyze and coordinate efforts for the Benefit of the Estate. Such efforts require funding. As such, I negotiated and this Court approved terms of interim financing up to $800,000. As of the date of this declaration all funds under the interim financing order have been drawn. Based on my best business judgment and estimate, these funds are set to run out on or before July 14, 2023. A true and accurate copy of the Debtor's current budget is attached hereto as **Exhibit 3**.  Based on my continued discussions regard further financing, options remain limited, if any exist at all. As such, exigent circumstances exist for the Court to hear the instant Sale motion on an order shortening time and without a normal auction process.

10.    Based on my review of the documents received to date, discussions with and declarations of attorneys handling consumer client files and others involved and assisting the Estate, it is my belief based on those declarations that most consumers seeking the services of an attorney in the consumer debt space have a legitimate legal question, issue or need for such legal services by an attorney to combat lawsuits.

11.    To that end, I carefully thought through additional layers of consumer protections and reformation of LPG's Legal Services Contract in order to evaluate the viability and benefits of the proposed sale to the consumer client. I discussed this plan of action with investors, attorneys in the consumer debt space and those that provide such services to this day. All of whom have expressed support for a sale of LPG's executory contracts for the benefit of the consumer clients and the Estate.

12.    I required additional consumer protections to be built into any proposed bid and proposed Asset Purchase Agreement.  Moreover, prior compliance and experience in handling consumer legal services was also a major factor in considering any potential bidder. With consumer protections in place and a reformed Legal Services Agreement intended to cure any potential violations or concerns over consumer protection laws, I sought potential bidders. In the short amount of time afforded in this matter, as discussed above, I received two bids.

13.     I determined that the bid from CLG was the highest and best bid based not only on the consideration proposed, but also on CLG's history, experience, and prior compliance with applicable law.   In my business judgment, the CLG offer strikes the correct balance between maximizing consumer client protections and return for the benefit of the Estate and its creditors. As such, the proposed sale is not only proposed in good faith, but was structured to identify a good faith purchaser who was willing and able to comply with extraordinary consumer protections contained in the proposed APA. Given that the Debtor's financial condition and the unique consumer protection concerns prevented a more fulsome sale process, I believe, in my business judgment, that a sale to CLG pursuant to the proposed APA is in the best interest of all parties in interest.

14.     It is my view that winding down LPG's business and forcing approximately 22,000 consumer clients out on the street to seek new representation or assistance will cause more harm than the proposed sale. First and foremost, it stands to potentially subject the consumer clients to predatory practices of other substandard debt relief companies, illegal marketing ploys, and bad actors, including but not limited to Tony Diab and his entourage of alter egos. While the Trustee has not received evidence that Mr. Diab and his alter egos do not have a copy of LPG consumer client information, such a probability has not been ruled out. Second, consumer clients who are in or threatened with litigation need and require attorneys that CLG can provide. Finally, forcing such consumer clients out into the market without representation or assistance will potentially subject them to unfair, deceptive and manipulative practices as they seek to replace the services that they paid the Debtor to provide.   In my best judgment, the only way to avoid additional harm for the Debtor's consumer clients from this bankruptcy is the proposed sale to CLG giving the consumer 90 days to consent to or opt out of the transfer of their file to CLG.

15.     Further, based on my site inspection, I have personally witnessed the 70+ employees who have been nothing but hardworking and committed to the consumer files. These employees, upon mutual agreement by purchaser and employee, will have the opportunity to transition.

16.     A true and correct copy of the proposed Modified Legal Services Agreement is attached hereto as **Exhibit 4**.

/ / /

17.    A true and correct copy of their curriculum vitae of Nancy Rapoport, JD and Matthew Bouslog is attached the Marshack Declaration as **Exhibits 5 and 6,** respectively.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed on this 7 day of July, 2023 at Los Angeles, California.

_____
Richard Marshack

**EXHIBIT 1**

EXHIBIT 1

Page 5

```
 1              OFFICE OF THE UNITED STATES TRUSTEE

 2                      SANTA ANA DIVISION

 3

 4  In Re:                    )  Case No. 8:23-bk-10571-SC
                              )
 5  THE LITIGATION PRACTICE   )  Chapter 11
    GROUP, PC,                )
 6                            )
            Debtor.           )
 7  _____)

 8                       341(a) MEETING

 9                  QUEENIE NG, Presiding

10                       --oOo--

11              Monday, April 24, 2023

12                411 West Fourth Street
               Santa Ana, California 92701
13

14  APPEARANCES:

15  For the Debtor:           JOON M. KHANG, ESQ.
                              Khang & Khang, LLP
16                            4000 Barranca Parkway
                              Suite 250
17                            Irvine, California 92604
                              (949) 419-3834
18

19  For the United States     QUEENIE K. NG, ESQ.
      Trustee:                MARILYN SORENSEN, ANALYST
20                            CAM MISKINS, ESQ.
                              Office of the United States
21                                Trustee
                              411 West Fourth Street
22                            Suite 7160
                              Santa Ana, California 92701
23                            (714) 338-3403

24

25  Proceedings recorded by electronic sound recording;
    transcript produced by transcription service.
```

ii

1  APPEARANCES:  (cont'd.)

2  For All Service Financial:     ALAN I. NAHMIAS, ESQ.
                                  Mirman, Bubman & Nahmias, LLP
3                                 21860 Burbank Boulevard
                                  Suite 360
4                                 Woodland Hills, California
                                      91367
5                                 (818) 995-2555

6  For SDCO Tustin Executive      RONALD BROWN, ESQ.
     Center:
7

8  For DVF 2, MCDVI 1, MCDVI 2:   DAVID CUSIO, ESQ.
                                  MATTHEW STOCKHOLD, ESQ.
9                                 MICHAEL BRELJE, ESQ.

10 For Maverick Bank Card,        FRANK WHITE, ESQ.
     Inc.:
11

12 For Carolyn Beach:             DANIEL EDELMAN, ESQ.

13 For the Commonwealth of        AMY SCHULMAN, ESQ.
     Pennsylvania:
14

15 For Validation Fund 2:         DAVE ZUCK, ESQ.

16 Transcriber:                   Briggs Reporting Company, Inc.
                                  9711 Cactus Street
17                                Suite B
                                  Lakeside, California 92040
18                                (310) 410-4151

19

20

21

22

23

24

25

*Briggs Reporting Company, Inc.*

EXHIBIT 1

Page 7

iii

# I N D E X

WITNESSES:                                              EXAMINATION

DANIEL MARCH                                                 5

TONY DIAB                                                    6

1

1     SANTA ANA, CALIFORNIA MONDAY, APRIL 24, 2023  11:00 AM

2                          --oOo--

3          TRUSTEE NG:  Good morning, everyone.  My name is

4     Queenie Ng.  I'm the trial attorney for the United States

5     Trustee's Office, and the Assistant U.S. Trustee, Cam

6     Miskins (phonetic), is also attending today.

7          This is the 341(a) meeting of In Re The Litigation

8     Practice Group, PC, Case Number 8:23-bk-10751-SC.  This

9     Chapter 11 case was filed on March 20th, '23, and the

10    initial 341(a) was set for April 24th, '23 and was continued

11    to today, May 2nd, '23, at 9:30 pursuant to the Debtor's

12    request.

13         I note there are a lot of people on the phone

14    right now.  I would like everyone to make an appearance so

15    we have a record who is hear today.  Can we start with the

16    Debtor's counsel and Debtor's representative.

17         MR. KHANG (telephonic):  Good morning.  This is

18    Joon Khang appearing on behalf of the Debtor.

19         MR. MARCH (telephonic):  This is Daniel Steven

20    March for The Litigation Practice Group, shareholder.

21         MR. DIAB (telephonic):  Tony Diab on behalf of

22    Litigation Practice Group.

23         TRUSTEE NG:  Anyone else in the audience?  If so,

24    can you please announce your name?

25         MR. BROWN (telephonic):  Good morning.  Ronald

2

1  Brown, attorney for SDCO Tustin Executive Center, the

2  landlord to the Debtor.

3          TRUSTEE NG:  Thank you.

4          MR. CUSIO (telephonic):  Good morning.  David

5  Cusio (phonetic) on behalf of Debt Validation Fund 2, MCDVI

6  Fund 1, and MCDVI Fund 2.

7          TRUSTEE NG:  Thank you.

8          MR. STOCKHOLD (telephonic):  Good morning.

9  Matthew Stockhold (phonetic), also appearing on behalf of

10 Debt Validation Fund 2, MCDVI Fund 1, and MCDVI Fund 2.

11         MR. LEE (telephonic):  This is Eric Lee, an

12 investor in Validation Partners, a creditor.

13         MR. WHITE (telephonic):  Good morning.  Frank

14 White for (indiscernible).

15         UNIDENTIFIED SPEAKER:  Good morning --

16         MR. WHITE:  Frank White -- go ahead.

17         UNIDENTIFIED SPEAKER:  Ann --

18         MR. ZUCK (telephonic):  (Indiscernible) Debt

19 Validation Fund 2.

20         TRUSTEE NG:  Okay.  I'm sorry.  I didn't hear that

21 name just now.

22         MR. ZUCK:  Dave Zuck (phonetic), Validation Fund

23 2.

24         TRUSTEE NG:  Okay.

25      (Multiple speakers.)

3

1          MR. NAHMIAS (telephonic):  This is Alan Nahmias,

2   Mirman, Bubman and Nahmias, on behalf of All Service

3   Financial.

4          MS. JAY (telephonic):  Ann Jay on behalf of

5   (indiscernible) Enterprise.

6          UNIDENTIFIED SPEAKER:  (Indiscernible.)

7          TRUSTEE NG:  I'm sorry.  I didn't hear that one.

8      (No response.)

9          TRUSTEE NG:  I'm sorry.  Can you repeat that,

10  whoever just spoke?

11          MR. CARR (telephonic):  Chris Carr (phonetic) on

12  behalf of Gloria (indiscernible).

13          TRUSTEE NG:  Okay.  Anyone else?

14          UNIDENTIFIED SPEAKER:  (Audio glitch.)

15          MS. SCHULMAN:  This is Amy Schulman on behalf of

16  the Commonwealth of Pennsylvania Office of Attorney General,

17  Bureau of Consumer Protection.

18          TRUSTEE NG:  Thank you.

19          MR. WHITE:  Frank White for Creditor Maverick Bank

20  Card, Inc.

21          MR. MCKENNA (telephonic):  Ryan McKenna of MCDVI

22  Fund 1 and MCDVI Fund 2.

23          MR. BRELJE (telephonic):  Michael Brelje

24  (phonetic) on behalf of Debt Validation Fund MCDVI 1, MCDVI

25  2.

*Briggs Reporting Company, Inc.*

EXHIBIT 1
Page 11

4

1          TRUSTEE NG:  Okay.  Is that everyone?

2          MR. MCKENNA (telephonic):  Sean McKenna on behalf

3    of MCDVI Funds 1 and 2.

4          MR. DRAGER (telephonic):  Jason Drager (phonetic)

5    on behalf of Ketterline (phonetic) Beach.

6          TRUSTEE NG:  Thank you.

7          MR. BARRY (telephonic):  Jack Barry (phonetic) on

8    behalf of Debt Validation Fund 2.

9          MR. GORDON (telephonic):  Brendan Gordon

10   (phonetic) on behalf of Debt Validation Fund 2.

11         TRUSTEE NG:  Okay.  Is that everyone?

12      (No response.)

13         TRUSTEE NG:  All right.  I hear no response, so

14   we're going to go ahead.

15         There are a lot of people here today.  For some

16   this might be your first time.  I'm just going to explain

17   what's going to happen today.

18         So, I'm going to ask everyone who's not going to

19   speak for now to mute because this meeting is being

20   recorded, and once I've finished all the questions, we'll

21   open up the forum to -- for any creditors who would like to

22   ask questions at the end.  At that point, you know, you can

23   unmute yourself and announce your name and if you're

24   representing someone, please, you know, announce the party

25   that you're representing.

5

1          Mr. Khang, who's going to appear on behalf of the

2    Debtor today?

3          MR. KHANG:  Appearing for the Debtor are Daniel

4    March, who is the President and sole shareholder of the

5    Debtor, as well as Tony Diab, who is the person most

6    knowledgeable with dealings with vendors of the Debtor.

7          TRUSTEE NG:  Okay.  So, we're going to swear in

8    both parties.

9          Mr. March, I know I can't see you, but can you

10   please raise your right hand and let me know when you're

11   done?

12         MR. MARCH:  I have done it.

13             DANIEL MARCH - WITNESS - SWORN

14         TRUSTEE NG:  And can you state your full name and

15   address for the record, please?

16         MR. MARCH:  Daniel Steven March, M-A-R-C-H.

17         TRUSTEE NG:  And your address for the record,

18   please?

19         MR. MARCH:  17291 Irvine Boulevard, Suite 101,

20   Tustin, California 92780.

21         TRUSTEE NG:  Is this your personal residence or is

22   this the Debtor's location?

23         MR. MARCH:  This is the Debtor's location.

24         TRUSTEE NG:  Okay.  I'm sorry.  Can you state that

25   address again?

6

1          MR. MARCH:  17291 Irvine Boulevard, Suite 101,

2  Tustin, California 92780.

3          TRUSTEE NG:  Thank you.

4          Is there any reason why you would not be able to

5  answer my question accurately and truthfully today?

6          MR. MARCH:  I don't believe so, no.

7          TRUSTEE NG:  Thank you so much.

8          Mr. Diab, could you please raise your right hand

9  and let me know when you're done.

10          MR. DIAB:  Yes.  I've raised my right hand.

11                TONY DIAB - WITNESS - SWORN

12          TRUSTEE NG:  Can you please state your full name

13  and the address for the record, please?

14          MR. DIAB:  Tony Diab.  Address is 20101 Southwest

15  Cyprus Street, Newport Beach, California 92660.

16          TRUSTEE NG:  And is this your personal residence?

17          MR. DIAB:  Yes.

18          TRUSTEE NG:  Thank you.  And is there any reason

19  why you would not be able to answer my question truthfully

20  and accurately today?

21          MR. DIAB:  None.

22          TRUSTEE NG:  Okay.  Mr. Khang, I'm going to ask

23  you to confirm whether or not the voice we just heard is, in

24  fact, the Debtor representative Mr. March and Mr. Diab?

25          MR. KHANG:  Yes.  I confirm that that -- the

7

1   voices are of Daniel March and Tony Diab.

2          TRUSTEE NG:  Thank you.

3          One of you can answer the question, Mr. March or

4   Mr. Diab.  If your answers are different, than I want to

5   hear from both of you, but if the answer is the same, only

6   one person needs to answer the question.

7          TRUSTEE NG:  Can you please provide the -- you

8   provided me the address for the Debtor just now, and you

9   mentioned that's the physical office at the Debtor, right?

10         MR. MARCH:  Yes.

11         TRUSTEE NG:  The petition lists a different

12  address at 17542 17th Street, Suite 100.  Is that a

13  different location?

14         MR. MARCH:  Yes.  That was the former address.

15  It's the one that's executory leases.  So, that is at

16  another building that we occupied only about three weeks

17  ago.

18         TRUSTEE NG:  Okay.  So, the Debtor moved out three

19  weeks ago?

20         MR. MARCH:  Yes.

21         TRUSTEE NG:  Did the Debtor terminate the lease?

22         MR. MARCH:  Can you repeat that, please?

23         TRUSTEE NG:  Was the lease terminated or what was

24  the reason for moving out?

25         MR. MARCH:  We moved out.  We gave notice, and we

8

1 moved out, vacated the premises.

2          TRUSTEE NG:  Okay.

3          MR. MARCH:  The lease is still pending.  There's

4 -- yeah, there's still a lease on the location.

5          TRUSTEE NG:  So, the Debtor still has to pay the

6 monthly rent for this location?

7          MR. MARCH:  We are not paying the monthly rent.

8 We intend to abandon that and --

9          TRUSTEE NG:  Okay.

10          MR. MARCH:  -- (indiscernible) the lease.

11          TRUSTEE NG:  For the new location on Irvine

12 Boulevard, is that a lease as well?

13          MR. MARCH:  What is that?  I'm sorry.  Can you

14 repeat that?

15          TRUSTEE NG:  Is that a lease as well?

16          MR. MARCH:  Yes.  That's a lease.

17          TRUSTEE NG:  And when did the Debtor enter into

18 that lease?

19          MR. MARCH:  Oh, let's see.  It was a personal

20 lease, and it's also myself litigation and The Litigation

21 Practice Group.  I think that lease -- I know it expires I

22 believe next year.  I think the Litigation Practice Group

23 began paying on that about two years ago.

24          TRUSTEE NG:  So, this lease was entered two years

25 ago?

9

1          MR. MARCH:  It's -- it's probably been about three

2  years, ago, and it was on my own personal behalf.  It was my

3  own personal office, and The Litigation Practice Group is

4  now paying for that lease.

5          TRUSTEE NG:  Is LPG on the lease as well?

6          MR. MARCH:  Can you repeat that?  You're breaking

7  in and out.  I --

8          TRUSTEE NG:  I know I'm --

9          MR. MARCH:  -- I'm on a land line.  So --

10          TRUSTEE NG:  Yeah.  I know.  I'm having some

11  difficulty.  I think it's kind of -- if you guys can't hear

12  me, just let me know.  I'll try to do my best to repeat it.

13      You mentioned this is a personal lease.  Because I

14  can't recognize the voice, is it -- this is Daniel March,

15  right?

16          MR. MARCH:  Well, it was a personal lease when I

17  originally signed it, and then Litigation Practice Group, we

18  agreed to pay that lease, and they're also the insurer and

19  making payments on the insurance on the lease itself.

20          TRUSTEE NG:  Okay.  I'm going to ask for a copy of

21  the lease agreement.

22          MR. MARCH:  I can do that.  I know I provided the

23  insurance agreement.  I can provide the lease agreement as

24  well.

25          TRUSTEE NG:  And how much is the monthly rent for

10

1  this lease?

2          MR. MARCH:  You know, I don't -- I don't recall.

3  It's about $2100.

4          TRUSTEE NG:  The -- the Debtor's cash flow

5  projection lists rent for $1450.  Is that for the current

6  lease or the one that you were going to abandon?

7          MR. MARCH:  I'm sorry.  That entire conversation

8  broke up.

9          TRUSTEE NG:  Okay.  The Debtor's projection lists

10 a rent for $1450.  Is that for the current lease or the one

11 that you were going to abandon?

12         MR. MARCH:  The one we are going to abandon.

13         TRUSTEE NG:  Okay.  So, do you know what amount is

14 for the current lease?

15         MR. MARCH:  I actually don't.

16         TRUSTEE NG:  Do you think --

17         MR. MARCH:  I will get that lease.

18         TRUSTEE NG:  Okay.  Do you think it's more than

19 the $1450?

20         MR. MARCH:  Yeah.

21         TRUSTEE NG:  Excuse me.

22         UNIDENTIFIED SPEAKER:  It's really hard to hear.

23         MR. MARCH:  Tony may be able to --

24         TRUSTEE NG:  Do you think we should --

25         UNIDENTIFIED SPEAKER:  Call in --

11

1          TRUSTEE NG:  -- call in from here and do a --

2          MR. MARCH:  -- on the amount of the lease.  I

3  don't have --

4          UNIDENTIFIED SPEAKER:  You have to dial the

5  number, 91, then the number, and then --

6          TRUSTEE NG:  I'm sorry.  I couldn't hear what you

7  said.  I'm going to call in a different number, so hopefully

8  it's better.  So, can everyone hold on for a second?

9          MR. MARCH:  I can call -- I can call in on my cell

10  phone, and that might be clearer.

11          TRUSTEE NG:  I think it might be me actually.  So,

12  I'm going to try to call in a different number with my land

13  line.  So, maybe that would be better.

14          MR. MARCH:  Okay.

15      (Pause.)

16          TRUSTEE NG:  Can everybody hear me?  Can everybody

17  hear me better now?

18          UNIDENTIFIED SPEAKER:  Yes.

19          UNIDENTIFIED SPEAKER:  Yes.

20          TRUSTEE NG:  Okay.  Thank you.  Appreciate that.

21          UNIDENTIFIED SPEAKER:  That's better.

22          UNIDENTIFIED SPEAKER:  Yes.

23          TRUSTEE NG:  Okay.  So, let's go back -- you were

24  going to provide me with a lease -- a copy of the lease

25  agreement, and is the Debtor current with the lease?

12

1          MR. MARCH:  Oh, yes.

2          TRUSTEE NG:  I'm sorry?

3          MR. MARCH:  Yes.

4          TRUSTEE NG:  And when was the Debtor -- lease

5    payment -- when was the last time?

6          MR. MARCH:  It would have been for the month of

7    April.

8          TRUSTEE NG:  And you don't recall the amount?

9          MR. MARCH:  I don't.

10          TRUSTEE NG:  Okay.

11          MR. MARCH:  I think it's about $2100.

12          TRUSTEE NG:  Okay.  And does the Debtor also have

13   a lease in Las Vegas?

14          MR. DIAB:  This is Tony Diab --

15          TRUSTEE NG:  Yes.

16          MR. DIAB:  I can answer the question with regard

17   to the Las Vegas place.  There was a lease in Las Vegas.

18   That lease was abandoned in November of 2022, and it's my

19   understanding that the -- that the space has not been

20   occupied since November of 2022.  But the lease itself has

21   not been terminated.  It will be one of the executory

22   contracts terminated by this proceeding.

23          TRUSTEE NG:  Okay.  So, we have not received the

24   real property questionnaire, and then we certainly need one

25   for the new lease.  So, you can send it to your attorney,

13

1   and -- and he can send it to us.  Okay.

2           MR. MARCH:  Understood.

3           TRUSTEE NG:  And it looks like this Debtor was

4   formed in February of 2009.  Does that sound right?

5           MR. DIAB:  Yes, it would have been February 22nd,

6   2019 that LPG was filed with the Secretary of State in

7   California.

8           TRUSTEE NG:  Is it 2019?  I'm sorry.

9           MR. DIAB:  Yeah.  I heard you say 2009.  So, I

10  was --

11          TRUSTEE NG:  I apologize.  I meant 2019.

12          Who were the original members -- Roughly 2019.

13          MR. DIAB:  The original shareholder Litigation

14  Practice Group was John Thompson, and that would have been

15  in February of 2019.

16          TRUSTEE NG:  When did he not become the -- the

17  member of the LPG?

18          MR. DIAB:  He conveyed his interest in November of

19  2019 to Dan March, who has been the sole shareholder since.

20          TRUSTEE NG:  And did you, Dan, have to pay

21  anything for that interest for the law firm?

22          MR. MARCH:  No.

23          MR. DIAB:  No.  John transferred the interest in

24  exchange for a release of liability, because he had concerns

25  on the liability front and asked to be swapped out as a

*Briggs Reporting Company, Inc.*

EXHIBIT 1
Page 21

14

1 shareholder of LPG.  We obviously located Dan March who took

2 over, and it was in exchange of a release of liability only,

3 no compensation to John for the shares.

4          TRUSTEE NG:  Okay.  I'm sorry.  Was it Tony?  Was

5 it Mr. Diab?  Were you the one talking just now?

6          MR. DIAB:  Yes.

7          TRUSTEE NG:  Okay.  It might be helpful if -- you

8 know, because I can't recognize the voice, it might be

9 helpful if, you know, you guys speak, then you would first

10 announce your name first so I know who's speaking.

11          When you said you located Dan March, was it you

12 who made the decision to locate Mr. March and convey the

13 interest to him?

14          MR. DIAB:  Actually, there were a group of us that

15 were managing two entities at the time.  And, so, the entity

16 called CAT, Incorporated, which would be (indiscernible),

17 and I had two partners.  So, this is (indiscernible).  I had

18 two partners, Brian Really (phonetic) and Santo De Rudi

19 (phonetic), and the three of us and Dan were comfortable

20 with his competence in this space.  We met with him several

21 times, and we decided to pursue him for the position of

22 managing shareholder for LPG, but it was a joint decision

23 between the three of us, and we obviously offered it to Dan,

24 and he accepted.

25          TRUSTEE NG:  Okay.  So, you said you were managing

15

1  the Debtor at the time.  So, that would be around October

2  2009?

3          MR. DIAB:  This would have been October, November

4  of 2019, managing a related entity called Post Processing.

5          TRUSTEE NG:  Okay.

6          MR. DIAB:  And John was still the shareholder

7  managing LPG at the time, but his management was really

8  hands off.  So, it was important to us that he was also

9  managing LPG.

10          TRUSTEE NG:  So, are you still a managing member

11  of LPG?

12          MR. DIAB:  No.  Well, there was never a time where

13  I was a managing member.  I had a formal role in the

14  shareholder member (indiscernible), but I continue to this

15  day to manage the vendors, which includes the marketing

16  companies that (indiscernible) who now has the credit vendor

17  for credit reporting services, the payment processors, the

18  call centers that we hire to assist the clients, et cetera,

19  so all these things and then the (indiscernible) formed in

20  October, November 2019, it remains the case now.

21          TRUSTEE NG:  Okay.  So, do you have an official

22  title?

23          MR. MARCH:  And this is Dan March.  That's --

24  that's all correct.

25          TRUSTEE NG:  Okay.  Do you have official title

16

1  with the Debtor, Mr. Diab?

2          MR. DIAB:  We've -- no.  We've never worked out an

3  official title.  Vendor manager seems like the most accurate

4  description, but also we've never fixed that description to

5  my position.  So, no formal title.

6          TRUSTEE NG:  Were you ever an employee of the

7  Debtor?

8          MR. DIAB:  No.  I was -- at one point in time I

9  was myself an independent contractor of the Debtor, and then

10 subsequent, I had entities that were independent contractors

11 of the Debtor, but I was never employed on a W-2 basis.

12         TRUSTEE NG:  Okay.  So, are you a 1099 employee

13 then?

14         MR. DIAB:  So, I was.  I haven't received any

15 compensation in this calendar year, but I did as recent as

16 2022 through the entity as a 1099 contractor.

17         TRUSTEE NG:  So, you said the last time you

18 received compensation was in 2022?

19         MR. DIAB:  Correct.  And -- and that's mostly a

20 function of 2023 of the financial issues that we've had, not

21 any other reason.  It's just a function of the issues we've

22 dealt with for the first five months of this year.

23         TRUSTEE NG:  Do you recall when was -- what month

24 did you receive compensation?

25         MR. DIAB:  I think the last time I would have

17

1  received something would have been the beginning of December

2  of 2022.

3           TRUSTEE NG:  And do you recall your compensation?

4           MR. DIAB:  The amount that we received that month,

5  I don't.  I would have to look at records, but it would have

6  been probably around $20,000.

7           TRUSTEE NG:  And did --

8           MR. DIAB:  Give or take.

9           TRUSTEE NG:  Okay.  And did you receive -- say for

10 2022, did you receive compensation every month?

11          MR. DIAB:  No.  There were some months where I did

12 not receive compensation.  It was inconsistent and based on

13 available funds (indiscernible).

14          TRUSTEE NG:  Was there a written agreement between

15 you and LPG regarding your -- your employment terms?

16          MR. DIAB:  So, there was no written agreement

17 between the entities and I.  There was a written agreement

18 between me as an individual and LPG when I was compensated

19 as an individual but not between the entities and LPG.  I

20 was compensated through the entity.

21          TRUSTEE NG:  I'm sorry.  What entity was it you

22 were compensated through?

23          MR. DIAB:  So, in 2021, the entity was called

24 Vulcan Consulting Group, ALC.

25          TRUSTEE NG:  Can you spell the name?

18

1          MR. DIAB:  And in 2022 -- yes.  Vulcan Consulting
2  Group is V-U-L-C-A-N, second word Consulting, standard
3  spelling, and then the third word Group, and that was an
4  LLC.
5          TRUSTEE NG:  And does the Debtor have any interest
6  in this LLC?
7          MR. DIAB:  No.
8          TRUSTEE NG:  Does Mr. March have any interest in
9  this LLC?
10          MR. DIAB:  No.
11          TRUSTEE NG:  Who is the owner of this LLC?
12          MR. DIAB:  The -- the member of the LLC is Lisa
13  Cohen (phonetic).
14          TRUSTEE NG:  Lisa Cohen?
15          MR. DIAB:  Yes.
16          TRUSTEE NG:  And is this person an attorney?
17          MR. DIAB:  No.  Vulcan Consulting Group is not a
18  law firm, and she's not an attorney.
19          TRUSTEE NG:  Okay.  And what kind of arrangement
20  does the Debtor have with this consult -- Vulcan Consulting
21  Group?
22          MR. DIAB:  There were two reasons why the Debtor
23  would transfer money to this group.  One was this group was,
24  one, a consulting group which we'll call VCG.  VCG was
25  paying the merchant cash advances that LPG had taken in

19

1  December of 2021.  So, LPG would send money to Vulcan

2  Consulting Group which would then send money to the lender

3  in New York who had made cash advances to LPG and Vulcan.

4  Vulcan is one of the (indiscernible) cash advance

5  agreements, and LPG is the other.  The other reason LPG

6  would transfer money to Vulcan was to provide compensation.

7  So, those two transfers would have occurred in 2021.  No

8  transfers have happened since about August of 2021.

9          TRUSTEE NG:  So, for 2021, how much did you

10 receive total compensation?

11          MR. DIAB:  So, me as an individual from Vulcan?

12          TRUSTEE NG:  Yes.

13          MR. DIAB:  It would have been between 200 to 250

14 thousand.

15          TRUSTEE NG:  Did you receive compensation in any

16 other capacity from any other entity for your work done in

17 connection with LPG?

18          MR. DIAB:  In early 2021, early January and

19 February, I still received compensation directly from LPG,

20 and the compensation in those two months was just sent

21 directly from LPG to Tony Diab as an individual, would have

22 been roughly 60 to 80 thousand dollars.

23          TRUSTEE NG:  Why didn't the Debtor, LPG, just send

24 you compensation, you know, since you're the 1099 employee?

25 Why did they have to go through this, you know, third party

20

1  to do it?

2         MR. DIAB:  There were two concerns that we had.

3  One is because of my background, we tried to limit

4  visibility of things because of the way it -- the way that

5  it would make various vendors and attorneys feel because of

6  my background.  I actually tried to limit the number of

7  times that LPG interacted with Tony as an individual, and

8  that was just the optics of it in terms of managing

9  relationships with those who were concerned about my

10 background, and we made that switch in early 2021 based on

11 feedback that we were receiving.  And, so, that was the

12 primary reason why we started to do the compensation in an

13 indirect manner.  So, I would say that was the primary

14 reason.

15        The secondary reason is that the compensation was

16 always -- it was inconsistent, inconsistent meaning we

17 didn't know how much money would be available, the fact that

18 we didn't want to harm the business.  So, it would be a

19 function how much was available in terms of free cash flow.

20 That's what we would choose as pay through to me.  And, so,

21 the money would go to Vulcan into their -- Vulcan would

22 cover it for expenses like these cash advances, and then as

23 soon as money was made, it would be passed through.  And,

24 so, that was easier in terms of managing the cash flow than

25 having me on a set pay schedule.

21

1        TRUSTEE NG:  Okay.  And what about in 2022?  How

2    much did you receive total in 2022?

3        MR. DIAB:  In 2022, for the year, it probably

4    would have been -- so, it's complicated by -- by a factor.

5    So, it probably would have been a total of about $480,000

6    that went through Strategic Consulting Solutions.  When LPG

7    had its financial difficulties in 2022, most of that money

8    was given back, and Strategic ended up net zero at the end

9    of 2022, but that was only because the business needed the

10   money.  So, we essentially put it back in through Strategic.

11   So, Strategic would have received about 480 and would have

12   put back in about 480.  So, it was net zero, but that money

13   was paid throughout the course of the year.

14       TRUSTEE NG:  Okay.  So, at some point you decided

15   that you're not going to get paid through VCG, and then the

16   Debtor decided to pay you through Strategic Consulting, is

17   that right?

18       MR. DIAB:  Correct.  And the reason for that, just

19   to clarify, there was a dispute with the cash advance

20   companies in the State of New York.  There were several

21   lawsuits that were filed between these cash advance

22   companies, Vulcan Consulting Group and LPG.  And, for that

23   reason, we ceased using Vulcan Consulting Group and started

24   to use Strategic Consulting Solutions in place of it

25   starting in 2022.

22

1          TRUSTEE NG:  And what is the Debtor's

2 relationship, you know, to Strategic Consulting Solutions?

3          MR. DIAB:  It's identical to VCG's.  So, Strategic

4 would make cash advance payments, would make payments to me,

5 and those were the two functions that it served, and it had

6 a -- essentially, it was just based on the -- the negative

7 publicity that Vulcan received by virtue of I think it was

8 about a dozen lawsuits that were filed back and forth

9 between certain cash advance companies that include us, and

10 for that reason, we offered not to continue to use them as a

11 vehicle, and we locked in Strategic Consulting in its place.

12          TRUSTEE NG:  Okay.  And did you receive any

13 compensation for 2023?

14          MR. DIAB:  For 2023, this calendar year, there's

15 not been compensation to date.  There has been one transfer

16 of about $11,000 for Strategic Consulting Solutions.  That's

17 the only transfer that I can think of, but that didn't come

18 through to me, but Strategic would have received about

19 $11,000 this calendar year.

20          TRUSTEE NG:  Okay.  Do you expect to receive some

21 kind of compensation, you know, in this bankruptcy case from

22 the Debtor?

23          MR. DIAB:  I'm sorry.  Could you repeat that

24 question?

25          TRUSTEE NG:  Do you intend to -- you know, expect

*Briggs Reporting Company, Inc.*

EXHIBIT 1
Page 30

23

1  to, you know, get some kind of compensation from the Debtor

2  in this case?

3          MR. DIAB:  No.  So, we've -- obviously, if there's

4  any compensation in my work for LPG, it will be done when

5  the Chapter 11 proceeding is done.  The vendors that I used

6  to manage are pretty much all gone.  Dan has a -- a limited

7  staff at the other office that he referenced.  And, so, once

8  this case is concluded, there won't be any further role for

9  me at LPG.  And, so, no compensation is contemplated.

10          TRUSTEE NG:  Okay.  Going back to --

11          MR. MARCH:  And I agree.  This is Dan.

12          TRUSTEE NG:  Thank you, Mr. March.

13          Going back to Mr. March, so, you joined the law

14  firm sometime in October or November of 2019.  And, prior to

15  that, did you have any relationship with the Debtor?

16          MR. MARCH:  No, I did not.

17          TRUSTEE NG:  Okay.  And, so, since you joined the

18  law firm, has there been any change in stock ownership?

19          MR. MARCH:  No, there has not.

20          TRUSTEE NG:  And who are the current officers?

21          MR. MARCH:  It is just myself.

22          TRUSTEE NG:  Okay.  And -- and your title is CEO

23  and President, is that right?

24          MR. MARCH:  Yes.

25          TRUSTEE NG:  When was the last time the Debtor had

24

1 other officers?

2          MR. MARCH:  It wouldn't have been with me.  So, I

3 don't know if it was with John Thompson or not.  I don't

4 know if John had other officers.  I don't believe so.

5          TRUSTEE NG:  Okay.  But since you joined the firm,

6 you -- you're the only officer, is that right?

7          MR. MARCH:  That's correct.

8          TRUSTEE NG:  So, the current Tustin location, how

9 many people work out from this office?

10         MR. MARCH:  There are currently two --

11         TRUSTEE NG:  And who are these people?

12         MR. MARCH:  -- others.  Olga Esquivel, E-S-Q-U-I-

13 V-E-L, and Carl -- the last name is difficult for me.  Tony,

14 do you know his last name (indiscernible)?

15         MR. DIAB:  That's Carl Wekashu (phonetic).

16         MR. MARCH:  Yeah.  It's so hard I can't even spell

17 it.

18         TRUSTEE NG:  And what is their title?

19         MR. MARCH:  They are just staff members.  I don't

20 say just staff members, but they are -- they are handling

21 litigation that is currently going on in the State of

22 California.

23         TRUSTEE NG:  Okay.

24         MR. MARCH:  So, we have approximately 400 to 600

25 pending lawsuits that we are defending and litigating in the

25

1  State of California.  They're also handling previous

2  bankruptcy filings that we have pending from former LPG

3  clients.

4          TRUSTEE NG:  So, the 400 to 600 lawsuits that you

5  -- you know, you're referencing, are they -- is the Debtor

6  the Defendant in any of those lawsuits?

7          MR. MARCH:  The Defender --

8          TRUSTEE NG:  The Defendant --

9          MR. MARCH:  -- is the --

10         TRUSTEE NG:  The Debtor.

11         MR. MARCH:  We are defending -- we are -- yeah, we

12  are -- Litigation Practice Group, the Debtor, is the

13  attorney of record for these clients in California.

14         TRUSTEE NG:  Okay.  Oh, so, these are lawsuits

15  where the -- the -- LPG is representing clients to defend

16  those cases?

17         MR. MARCH:  Yes.

18         TRUSTEE NG:  Okay.  Understood.  And, is -- is

19  there a paralegal in -- in the office or anything like that?

20         MR. MARCH:  Olga Esquivel would be characterized

21  -- she's a certified paralegal.

22         TRUSTEE NG:  Okay.  And how many attorneys work

23  from the Tustin office?

24         MR. MARCH:  Just myself --

25         TRUSTEE NG:  Okay.

26

1          MR. MARCH:  -- at this point.  I think we only
2 have three active employees, including myself.

3          TRUSTEE NG:  Okay.  Are you in the office every
4 day or how often are you in the office?

5          MR. MARCH:  I'm in the office every single day,
6 including Saturdays.

7          TRUSTEE NG:  And what about the staff, the two
8 staff that you mention?

9          MR. MARCH:  They are in every single day.  Olga
10 will not come in on Fridays in the office, but she works
11 from home.  She's able to contact and give information to
12 the attorneys that are working on the cases.

13          TRUSTEE NG:  And what about Mr. Diab, is he in the
14 office every day?

15          MR. MARCH:  No, Mr. Diab doesn't go to the office.

16          TRUSTEE NG:  And how often does he go to the
17 office?

18          MR. MARCH:  No, Mr. Diab never comes in.

19          TRUSTEE NG:  Oh, he does not come in the office.
20 Okay.

21          MR. MARCH:  Correct.

22          TRUSTEE NG:  And you previously mentioned the
23 Debtor does not have any other location, is that right,
24 other than the Tustin location?

25          MR. MARCH:  Correct, correct.

27

1           TRUSTEE NG:  And was that the case in 2022 as

2    well?

3           MR. MARCH:  No.  I think we vacated the offices at

4    17542 17th Street probably -- I'm going to say it's about

5    February.  March is probably the last time anyone was in the

6    office (indiscernible).

7           TRUSTEE NG:  Okay.  I --

8           MR. DIAB:  This is Tony Diab.  That's correct.

9           TRUSTEE NG:  Other than the prior Tustin location,

10   did the Debtor ever have any offices like anywhere else in

11   the country?

12          MR. DIAB:  This is Tony.  I can answer that

13   question for other locations that we had.  We also had an

14   office in Las Vegas, Nevada that we vacated in November of

15   2022 and it has not been occupied since.  In addition, we

16   have an office in -- we had an office in Asheville, North

17   Carolina, a lease that we've abandoned.  We had an office in

18   Fort Lauderdale, Florida, which is, again, a lease that is

19   being abandoned.  It was abandoned before we filed the

20   petition.  The attorneys closed that space in North Carolina

21   and Florida in March, and we no longer have need for the

22   office space in those two jurisdictions.

23          There was an office in Atlanta, Georgia, and the

24   situation there, the attorneys offered to go remote, and the

25   lease was let go in February of 2023, this year.  There was

28

1 also compensation to attorneys who had their own offices,

2 but those were not leases for LPG.  They were reimbursements

3 paid to the attorneys who were LPG employees in states like

4 Minnesota, Indiana, South Dakota, Oklahoma, and Nevada.

5 There's a second Nevada location.  This was a reimbursement

6 for an attorney who had her own office there and employed by

7 LPG.  But, again, those were not LPG leases.

8          There was also a lease in Belview, Washington

9 which was taken over I think by the attorney who was

10 occupying that space.  He was a former LPG employee who also

11 left the firm and asked to take the lease with him, and he

12 did.  And, so, that was assigned to him.  This would have

13 been in, again, February of this year.  And then Peter

14 Snyder out of Washington, this was in LPG's name but was

15 assigned to Peter, and he just took over that lease.  And

16 that should be the total of -- of all the locations.

17          TRUSTEE NG:  Okay.  So, the Belview, Washington

18 location that the former attorney took over, what's the name

19 of that law firm now?

20          MR. DIAB:  It's now Law Offices of Peter Snyder.

21          TRUSTEE NG:  I can't hear you.

22          MR. DIAB:  He's a sole -- sole practitioner.

23          TRUSTEE NG:  Okay.

24          MR. DIAB:  It's Peter Snyder is the sole

25 practitioner for Law Offices of Peter Snyder.

29

1          TRUSTEE NG:  I see.  Okay.  So, those -- all the

2  leases were either abandoned or let go sometime prior to

3  them filing bankruptcy this year, is that right?

4          MR. DIAB:  Correct.

5          TRUSTEE NG:  Okay.  So, for 2022, how many

6  employees did the Debtor have?

7          MR. DIAB:  This is Tony.  We would have employed

8  between 350 and 420, depending on the point in that year.

9  The high mark would have been about 420 full-time employees

10  for LPG in 2022.

11          TRUSTEE NG:  And when did LPG start losing these

12  employees?

13          MR. DIAB:  The real terminations began in November

14  when we let go of the -- the Nevada office.  So, the Nevada

15  office had at its peak about 88 employees, and they were all

16  let go in October and November of 2022.  So, that would have

17  been the first large reduction in the workforce.  And then

18  in January we resumed -- we probably cut between 30 and 40

19  employees in January, and then in February, when we were

20  unable to make payroll, we lost virtually everyone.

21          TRUSTEE NG:  So, by February this year, LPG

22  basically lost all its employees?

23          MR. DIAB:  Yeah.  So, as of March of this year,

24  the month we filed the petition, there were maybe 15

25  employees left.  And after the filing of the petition, we're

30

1  now at -- at three employees, Dan, Olga and Carl, as

2  referenced before.

3              TRUSTEE NG:  Okay.  Of those 300 or, you know, 350

4  employees that you mentioned that was hired in 2022, how

5  many of them were attorneys?

6              MR. DIAB:  At one -- at one point there were about

7  40 W-2 attorneys, meaning they were full employees of LPG,

8  and about 22 contractors, 1099.  And, so, we were at about

9  62 attorneys at the high mark in 2022.

10             TRUSTEE NG:  Okay.  And do you know where these

11 attorneys went?

12             MR. DIAB:  Some of the attorneys started their own

13 practice.  Some of the attorneys went to other firms that do

14 similar work as LPG and they represent individual debtors in

15 collection actions in cases, and some of them we don't know

16 because they just left, and they didn't tell us what they

17 were doing.  But several of them now have their own practice

18 doing similar work as solo practitioners.

19             TRUSTEE NG:  Okay.  The projection shows the

20 Debtor has Worker's Comp, is that right?

21             MR. DIAB:  That's correct.

22             TRUSTEE NG:  We don't have proof of that

23 insurance.  So, you will need to send us a copy of the

24 insurance proof of coverage.

25             UNIDENTIFIED SPEAKER:  And that was Worker's Comp,

*Briggs Reporting Company, Inc.*

EXHIBIT 1
Page 38

31

1 correct?

2       TRUSTEE NG:  Correct.  That hasn't expired, right?

3 Is the Worker's Comp --

4       UNIDENTIFIED SPEAKER:  (Indiscernible).  Yeah,

5 we'll send a copy of that policy.  It remains active.

6       TRUSTEE NG:  Okay.  So, other than Mr. Diab, does

7 the Debtor have any other independent contractor?

8       MR. DIAB:  Not at this time.

9       TRUSTEE NG:  Okay.  Can you just give me a brief

10 summary of the reason for filing for bankruptcy?

11       MR. DIAB:  We -- the -- the -- I guess there are

12 two parts that sort of combined to force us to be in this

13 position.  The most important factor was the payment process

14 of Merits Fund, LLC began holding money at the very end of

15 January, then processed payments of LPG clients and then

16 remit those payments through the LPG (indiscernible).  They

17 stopped sending that revenue through to LPG at the very end

18 of January, beginning of February.  And, as a result, LPG

19 failed to make two consecutive payrolls.  At that point, we

20 lost so many of our attorneys that we couldn't continue to

21 represent clients' states for lack of a -- a valid license

22 to practice law in those states.  And, so we were forced to

23 essentially go the direction of reorganization because we

24 didn't have attorneys to represent clients, and we couldn't

25 maintain those attorney-client relationships in those

32

1  states.

2          The other factor was the litigation

3  (indiscernible) which essentially involved a lot of

4  (indiscernible) and essentially driving employees to turn on

5  us.  So, we had a group of employees that were providing

6  information (indiscernible) and providing information to

7  adverse parties in litigation, and that group was -- was

8  sizable, and those employees, one of them discovered that

9  they had provided that information and (indiscernible), and

10  that was January, and since left us in a position where we

11  were missing a lot of key positions, and we had enough

12  information public that our marketing companies didn't want

13  to continue to work with us, and so we didn't want to

14  onboard clients.  So, that created pressure.  We simply were

15  not seeing the volume business.  We had a lot of clients

16  leaving (indiscernible) clients possibly coming in.  Then

17  the marketing companies (indiscernible) to the information

18  disclosed in that litigation, although they wanted to work

19  with us, but they (indiscernible) future.  And then right

20  after that, the money was held by the payment processor and

21  essentially caused the -- the forced reorganization.

22          TRUSTEE NG:  Okay.  Let's talk about the pre-

23  petition bank account.  The Union Bank 4858, what was this

24  account used for pre-petition?

25          MR. DIAB:  That was an operating account.  It was

33

1 an operating account that was essentially started all the

2 way back in 2020.  At one point we had stopped using Union

3 Bank and instead was using other banks, but that operating

4 account remained open.  And in 2022, we started to use it

5 again as a primary bank account.  We had switched from Union

6 Bank to Chase as a primary account and then from Chase to

7 Bank of America and then from Bank of America back to Union

8 Bank.  That last switch took place in January of this year.

9 So, that was (indiscernible).

10          TRUSTEE NG:  Okay.  So, we actually --

11          MR. MARCH:  And that's all correct.

12          TRUSTEE NG:  I'm sorry.  Okay.

13          We actually do not have the final closing

14 statement for this account.  We only have a closing receipt.

15 So, we would need that final closing statement.  And our

16 office previously requested bank statements for 2023, and we

17 did not receive the bank statements.  So, we will need that

18 as well.

19          MR. MARCH:  Union Bank?

20          TRUSTEE NG:  Union Bank 45 -- 4858.

21          MR. MARCH:  And that's for 2022 and '23?

22          TRUSTEE NG:  No, just 2023.  We did receive the

23 2022 statements.  And we also -- that would include the

24 closing bank statement that we need.

25          MR. MARCH:  Okay.

34

1          TRUSTEE NG:  So, at the time of the filing, how

2 much was in that bank account?

3          MR. MARCH:  And that was the amount that was

4 transferred into the Debtor in Possession's account.

5          TRUSTEE NG:  So, that's like $4500 or so?

6          MR. MARCH:  Yes, ma'am.

7          TRUSTEE NG:  Okay.  And do you know the balance as

8 of end of January of this year?

9          MR. MARCH:  I don't.

10          TRUSTEE NG:  Would it be around the $4500 or would

11 it be substantially, you know, more?

12          MR. DIAB:  This is Tony.  It should have been

13 substantially more than the $4500.  I (indiscernible), but

14 we would have to pull the -- the records to see the exact

15 balance.

16          TRUSTEE NG:  Okay.  So, I -- I think I -- I don't

17 have the 2023 bank statements, but I have the bank

18 statements 1/22.  It shows that as of December 31, there was

19 only like $2100 or so in the bank account.  So, for the

20 following two months, you know, January and February 2023,

21 do you think it would be somewhere around that amount?

22          MR. DIAB:  No, it should have been substantially

23 more in December of 2022.  LPG was still using the Chase

24 account and transitioning to the Bank of America.  So, the

25 Chase and Bank of America accounts would have had the

35

1 activity for LPG in December.  In January the Chase account

2 was -- was terminated.  The Bank of America account was the

3 primary account until the end of the month, and then at the

4 end of January is when the switch was taken to the -- back

5 to Union Bank.  And that switch from Bank of America to

6 Union Bank was in connection with Kevin Suerta (phonetic),

7 the head of our accounting department potentially being

8 removed from LPG.  He had the relationship with Bank of

9 America, and when he left, Bank of America terminated LPG's

10 relationship, and that's what caused the switch back to

11 Union Bank right around February 1st or so.

12          TRUSTEE NG:  When was the Bank of America account

13 terminated?

14          MR. DIAB:  The Bank of America account was closed

15 the first week of February.  I don't have the exact date,

16 but it would have been somewhere between February 5th but

17 maybe as late as February 10th.

18          TRUSTEE NG:  Okay.

19          MR. DIAB:  And it was closed by Bank of America

20 account notice.

21          TRUSTEE NG:  Okay.  So, we did ask for bank

22 statements for all 2023.  So, we will -- you know, for the

23 -- for the two months in 2023, we will need that bank

24 statements.

25          MR. MARCH:  Okay.

36

1          TRUSTEE NG:  And the case, 3158, that account is

2  not listed in the compliance declaration or the schedules.

3  What account is this?

4          MR. DIAB:  That was the same operating account or

5  main operating account for Chase that was used from about

6  March or April of 2021 all the way until December of 2022

7  when we decided to make the switch to Bank of America --

8          TRUSTEE NG:  Okay.

9          MR. DIAB:  -- since we still had some transactions

10 into January 2023, and that would have been it.

11          TRUSTEE NG:  So, is that account closed?

12          MR. DIAB:  Yes, that account was closed.  Again,

13 it was closed by Chase after we stopped utilizing the

14 account.  That closure would have happened in I believe

15 February formally.

16          TRUSTEE NG:  Of this year?

17          MR. DIAB:  I know we stopped using it in January.

18          TRUSTEE NG:  Okay.

19          MR. DIAB:  Of this year, correct.

20          TRUSTEE NG:  What was the balance at the time

21 Chase closed the account?

22          MR. MARCH:  I believe the balance at the time

23 would have been very close to zero as --

24          TRUSTEE NG:  Okay.

25          MR. MARCH:  -- (indiscernible).

37

1          TRUSTEE NG:  Okay.  And what about the Chase 3133,

2 what was this account for?

3          MR. DIAB:  That account was only used to make

4 payments to our marketing affiliates.  So, it was

5 exclusively used for marketing affiliates, and it was always

6 kept at a zero balance until payment needs to be made, and

7 then the exact amount of the payment would transfer from the

8 315 account to the 3133 account, and then it would go out

9 the same day, and that was always kept to a zero balance at

10 the close of business.

11          TRUSTEE NG:  And is this account closed?

12          MR. DIAB:  Yes, that account was closed by Chase

13 also.  It was -- it was no longer used as of January and

14 formally closed sometime in February by Chase.

15          TRUSTEE NG:  Okay.  And the Union Bank 4874, what

16 kind of account was that?

17          MR. DIAB:  That -- that was the local account for

18 Litigation Practice Group.  And, so, that -- that attorney-

19 client trust account remains open at this point in time.

20 Those client checks that's outstanding in the sense of the

21 clients that haven't deposited it.  So, that account

22 actually remains open.  It is an attorney-client trust

23 account with a balance about $3300, which I believe is the

24 amount of the check that's outstanding.

25          TRUSTEE NG:  I'm sorry.  Did you say $3300?

38

1          MR. DIAB:  That sounds correct, yes.

2          TRUSTEE NG:  Okay.  And is it the Debtor's

3  intention to keep this account open?

4          MR. DIAB:  No.  As soon as that last check is

5  negotiated, the account will be closed.

6          MR. MARCH:  And this is Dan, and that's because I

7  don't believe we have any more affirmative cases pending.

8          TRUSTEE NG:  Okay.  And when do you expect the

9  account to be closed?

10          MR. DIAB:  We've attempted to contact this

11  individual client to find out why they haven't deposited the

12  check.  (Indiscernible) and it looks -- if it takes longer

13  than this month (indiscernible).

14          TRUSTEE NG:  Okay.  So, once it's closed, please

15  go ahead and send to us the proof of closure.  What about

16  the Chase 3568?

17          MR. DIAB:  That was the Iolta (phonetic) account

18  at Chase, and that account was emptied.  The money was moved

19  to the Iolta account at Union Bank in January of 2023, and

20  that account was also closed by Chase at the same time as

21  the Iolta.

22          TRUSTEE NG:  Okay.  So, sometime in February or

23  something in 2023?

24          MR. DIAB:  Correct.

25          TRUSTEE NG:  Okay.  And I noticed that the Debtor

39

1  opened three post-petition bank accounts at Wells Fargo.

2  What is the -- the balance right now in the -- in the

3  general account?

4          MR. MARCH:  That should be that $4500 that was

5  transferred from Union when we closed the account.

6          TRUSTEE NG:  Okay.  What about the payroll and tax

7  account, any money in there?

8          MR. MARCH:  There might be the -- they require $50

9  each to open both of those accounts as well.

10          TRUSTEE NG:  Okay.  So, do you have voided checks

11 for those accounts?

12          MR. MARCH:  I have a voided check for the

13 (indiscernible) account.  I don't know that we have checks

14 -- I don't think we received checks yet --

15          TRUSTEE NG:  Okay.

16          MR. MARCH:  -- a checkbook for the payroll

17 account.  But I don't know that we have one for the

18 (indiscernible).

19          TRUSTEE NG:  Okay.  Yeah, you can go ahead and

20 send the voided check for the general account to your

21 counsel, and you can send it to us.  That would be great.

22 Thank you.

23          MR. MARCH:  Okay.  And we did that yesterday.

24          TRUSTEE NG:  Okay.  Does the Debtor have

25 malpractice insurance?

40

1         MR. DIAB:  Yes.  The malpractice policy remains

2  active.  We purchase a one-year account on the policy in

3  March of 2023, and that would extend to March 31st, 2024 for

4  the malpractice policy which is a $1,000,000 policy.

5         TRUSTEE NG:  Okay.

6         MR. DIAB:  Two thousand dollar deductible.

7         TRUSTEE NG:  So, we would need the proof of the

8  insurance coverage for that as well.  What about tax return

9  2022, was it filed?

10        MR. DIAB:  No, we have not yet filed the 2022 tax

11 return.

12        TRUSTEE NG:  Has there been an extension filed?

13        MR. DIAB:  I believe -- I think so.  The

14 (indiscernible) and Associates was the accounting firm

15 handling the tax funds for LPG.  My understanding it filed

16 the extension for LPG which suffered a loss in 2022.  We

17 don't anticipate tax liability.

18        TRUSTEE NG:  Okay.  And, so, the insurance

19 coverage for the general liability, I noticed that the

20 Debtor is not listed as the insured.  Has the Debtor

21 contacted the insurance company to make that change?

22        MR. DIAB:  We were not under the impression that

23 LPG was not listed as the insured.  So, we'll contact them

24 and correct that.

25        TRUSTEE NG:  And, also, the U.S. Trustee has to be

41

 1  listed as an additional interested party for notification

 2  purpose.

 3          MR. DIAB:  Understood.

 4          TRUSTEE NG:  Can you just give me a brief summary

 5  of the nature of the Debtor's business?

 6          MR. DIAB:  So, this is Tony again.  I'll give a

 7  summary before and after the reorganization.  LPG when it

 8  started and up until February 2023, the business model was

 9  an entity to represent individuals in connection with their

10  disputes against their creditors.  That took three forms.

11  One was defending collection actions in court filed by

12  creditors.  Another was prosecuting bankruptcy petitions

13  under Chapter 7 and Chapter 13 of the U.S. Bankruptcy laws.

14  And then the third avenue was initiating action either as

15  freestanding complaints or as counterclaims or cross-

16  complaints under the Fair Debt Collection Practices Act and

17  Fair Credit Reporting Act.  So, we would sue the creditors

18  for their violations of those federal laws.  And, so, those

19  were the three avenues through which LPG represented

20  individual consumers.

21          In February, when we lost employees who didn't

22  return and we could no longer perform that function, the

23  clients were referred to other law firms for those law firms

24  to handle those cases, and LPG became essentially a residual

25  on the side if it was sent to other law firms as a referral

*Briggs Reporting Company, Inc.*

EXHIBIT 1
Page 49

42

1  fee for sending those clients out to other law firms.

2          And, so, the business as it exists now is a

3  combination of completing those four to six hundred

4  California cases (indiscernible) and then receiving

5  compensation for these referrals that were sent to other law

6  firms, and that was the revenue stream that was funding the

7  Chapter 11 plan, and it's the revenue stream that LPG has at

8  this point in time.

9          TRUSTEE NG:  So, the other law firms that you

10 mentioned, what are the names of those law firms?

11         MR. DIAB:  The parties I think -- the law firms

12 that currently are represented -- LPG clients are Oakstone

13 Law Group, PC, Consumer Legal Group, which is out of New

14 York, also a PC, and then Phoenix Law, PC.  Phoenix Law and

15 Oakstone Law are both California entities.  Consumer Legal

16 Group is a New York entity.

17         TRUSTEE NG:  Okay.  So, prior to this change in

18 your business model that you just mentioned, how many

19 clients did the Debtor have, like, say, in 2022 before the

20 change?

21         MR. DIAB:  At its peak, LPG was representing a

22 total of about 67,000 clients, some of whom have completed

23 their payments, some of whom (indiscernible) payment to LPG.

24 But at its peak, it would have been 67,000 active clients

25 being represented by LPG.

*Briggs Reporting Company, Inc.*

EXHIBIT 1

43

1          TRUSTEE NG:  Okay.  Of these 67,000 clients, did

2   they enter into like some kind of retainer agreement or a

3   legal services agreement with LPG?

4          MR. DIAB:  Yes, and that -- the terminology would

5   vary based on the state, but it was a legal services

6   agreement that the client would execute with LPG.  It was a

7   flat fee representation.  In exchange for the flat fee, LPG

8   agreed to provide the services I referenced before on any

9   one of those three, depending on the client's needs, and the

10  client's payment would be broken up anywhere from one

11  payment to as many as 72 payments, depending on the client's

12  budget.  So, some clients would make one payment.  Some

13  would make semimonthly payments for two years.  Some would

14  pay for 20 months.  It varied depending on the client's

15  budget, but it was always a written agreement between the

16  client and LPG for those services that were referenced

17  before.

18          TRUSTEE NG:  Would the written agreements specify

19  the terms like whether they pay a one-time flat fee or

20  whether they're going to, you know, pay monthly payments?

21  Would that be specified in the agreement?

22          MR. DIAB:  Yes.  The agreement would give specific

23  dates and amounts for all payments.  And, so, if it was

24  broken up into 30 payments, all 30 payments would be

25  identified by date and amount.

44

1          TRUSTEE NG:  Okay.  So, if they chose to make

2    monthly payments, and how did they pay the Debtor per month?

3          MR. DIAB:  Well, the clients would be set up with

4    automatic electronic withdrawals from the bank account.  The

5    contract with LPG includes an electronic funds transfer

6    authorization form.  And, so, the client would execute the

7    agreement and the EFT form, and then each month on the

8    payment date, LPG would withdraw the client's payment

9    automatically from their deposit account.  Some clients who

10   didn't have a deposit account would make the payments by

11   debit card.  The process was the same.  Each month on the

12   payment date, the amount of payment would be withdrawn from

13   the client's debit card, and -- and that would happen each

14   month on the specified date.  LPG never accepted credit card

15   payment for the obvious reasons.

16         TRUSTEE NG:  Okay.  So, for these electronic

17   payments, did LPG contract with a vendor to collect these

18   fees or how did it work?

19         MR. DIAB:  Yes.  So, LPG, over the course of its

20   history from February 2019 to present has used no less than

21   a dozen different payment processes.  These processes

22   collect the payment for a fee and then remit the payment to

23   LPG.  So, we use different payment processes.  They have

24   different policies.  Some processes hold reserves to cover

25   charge backs or unauthorized transaction reports.  Some

45

1  don't hold reserves but charge higher fees.  But we've used

2  different processes over the years.  As of 2023, this

3  calendar year, the two processes we were using were EquiPay,

4  which is currently holding the last $700,000 in LPG client

5  payments.  The other was Merits Fund, which is holding an

6  undisclosed amount.  They haven't told us how much they're

7  holding.  We think it's in the range of 12 to 14 million,

8  but we don't know because they won't provide that

9  information.  So, it's still a mystery.

10         TRUSTEE NG:  Okay.  So, what about 2022?  Did LPG

11 use these two processors as well?

12         MR. DIAB:  Correct.  So, in -- in 2022, in

13 addition to the two processors I just referenced, LPG also

14 utilized a company called World Global, which was processing

15 payments through Optimum Bank in Fort Lauderdale, Florida,

16 and we were also using a company called EPPS.  EPPS is a

17 payment processor that's based out of Sacramento I believe,

18 but they were also processing payments for about three

19 months in 2022.

20         TRUSTEE NG:  And once they -- you know, these

21 processors collected the fees typically, how soon would they

22 remit the payments to LPG?

23         MR. DIAB:  Each processor has slightly different

24 policies, but the range would be anywhere from a one-day

25 hold to a six-day hold, meaning that they would collect the

46

1 payment on a Monday, fund it to LPG as soon as Wednesday or

2 as late as the following Monday.  It depends on the payment

3 processor, but that funding timeline, the number of days

4 that they hold the payments was so that the payment

5 processor could confirm that the payment actually went

6 through.  Different banks will report balances on different

7 time lines.  So, the paying processor would hold the funds

8 to ensure that the payment cleared.  But the worst case

9 scenario, we would get it one week after the client's

10 payment was initiated.

11          TRUSTEE NG:  And what was the reason for that

12 business model change that you mentioned?

13          MR. DIAB:  The change in 2023 was caused by the

14 payment processor refusing to remit funds to LPG, refusing

15 to hand over the proper payroll.  The -- the first payroll

16 of February, LPG was unable to cover.  A lot of employees

17 walked out at that time.  The second payroll, again, LPG was

18 unable to fund the payroll, and almost all remaining

19 employees left at that time.  So, when we lost those

20 employees, those happened to be the attorneys who were the

21 licenses under which we operate jurisdictions under in

22 California.  We could no longer continue the existing

23 business model.  We didn't have the money to fund our

24 existing payroll.  We certainly couldn't go out and hire new

25 attorneys licensed in those jurisdictions.  So, we opted to

47

1 make this switch and still retain some sort of revenue for

2 LPG.  But it was precipitated by the payment processor

3 holding funds and our inability to cover essential costs

4 like payroll.

5          TRUSTEE NG:  Did you make the decision to the

6 business to change its business model?

7          MR. DIAB:  Both Dan and I discussed this in

8 February, that the payroll was being missed, and we jointly

9 made the decision that this was sort of the only option.  It

10 was either that or close the doors.  And, so, we opted for

11 this -- this reorganization.

12          TRUSTEE NG:  Okay.  So, since 20 -- like '23,

13 2023, this year, the Debtor is only actively representing

14 clients in California, is that right?

15          MR. DIAB:  So, at this time, we're not looking for

16 any new clients.

17          TRUSTEE NG:  Okay.

18          MR. DIAB:  At this point in time, LPG is not

19 onboarding anybody.

20          TRUSTEE NG:  Okay.  But do you have existing

21 clients in California that you kept?  You meaning the

22 Debtor.

23          MR. DIAB:  Correct.  And --

24          MR. MARCH:  We do.

25          MR. DIAB:  Yes, that's correct.

48

1          TRUSTEE NG:  And then that's the 400 to 600, you

2     know, files that you talked about earlier?

3          MR. MARCH:  Yes.

4          MR. DIAB:  Correct.

5          TRUSTEE NG:  So, does that mean the remaining --

6     because you said that at its peak in 2022, the Debtor had

7     about 67,000 clients.  So, does that mean the remaining, you

8     know, minus the 400, 600 files in California, the remaining

9     were transferred to the three law firms that you just talked

10    about?

11          MR. DIAB:  Either transferred or terminated.  Some

12    clients opted to terminate the relationship rather than be

13    serviced by another firm, but all the 67,000 or so clients

14    were either transferred or they terminated their

15    relationship with LPG.

16          TRUSTEE NG:  Can you give me a breakdown how many

17    were transferred to each law firm?

18          MR. DIAB:  So, approximately 15,000 were

19    transferred to Oakstone Law Group.  About 12,000 were

20    transferred to Consumer Legal Group, and the remainder were

21    transferred to Phoenix Law.

22          TRUSTEE NG:  So, that's about 40,000 or so?

23          MR. DIAB:  Yeah, it would have been roughly, a

24    little bit less than 40.

25          TRUSTEE NG:  Okay.  So -- and when did these

49

1 transfers actually take place?

2          MR. DIAB:  So, the -- the transfers took place in

3 February and March.  The first transfer to Oakstone took

4 place in early February of 2023.  In early February, a small

5 group was transferred to Consumer Legal Group, and then in

6 early March, a larger group was transferred to Consumer

7 Legal Group.  In mid March, the remaining clients were

8 transferred to Phoenix Law.

9          TRUSTEE NG:  How were these clients selected?  You

10 know, say, for the Oakstone, the 15,000, you know, clients,

11 how were they selected to be transferred to oakstone?

12          MR. DIAB:  So, in Oakstone's case, it was slightly

13 different because there's as -- a company called Pec

14 Corporation which had done a receivable purchase agreement

15 and had an interest in the receivable of the 15,000 clients

16 that were transferred to Oakstone.  Pec Corp. wanted those

17 clients all to be kept together because it had an interest

18 in the revenue stream from those clients.  And, so, it

19 insisted that the clients be kept together and be

20 transferred to one law firm as a group, and that was the

21 impetus for the Oakstone transfer.

22          For the other transfers, it was a function of the

23 initial -- the initial transfer of client facility was based

24 on the initial attorneys withdrawing from their cases and

25 the need to shift chose clients to another law firm.

50

1      And then with Phoenix, it was simply the
2 remainder.  Everything that was left got pushed to Phoenix
3 in March.  And, so, it was so that the decision was Oakstone
4 would be driven by Pec Corp.  Consumer Legal Group was
5 driven by necessity in terms of jurisdiction, and then
6 Phoenix received the remainder.

7      TRUSTEE NG:  Well, did Pec Corp. specifically
8 mention I want the files to transfer to Oakstone or who made
9 the decision to go to Oakstone?

10      MR. DIAB:  The decision to refer the clients to
11 Oakstone was made by Litigation Practice Group.  In LPG's
12 contract with the clients, LPG reserves the right to utilize
13 other law firms to service client files.  That's based on
14 the volume of work that we do.  We sometimes become
15 overloaded in a state, and also sometimes we lose counsel in
16 a state.  And, so, we reserve to ourselves the right to
17 transfer the servicing of the client to another law firm.
18 And, so, that was exercised with regard to all these
19 transfers.  LPG made the decision.

20      TRUSTEE NG:  Okay.

21      MR. DIAB:  But any client that objected had the
22 opportunity to terminate the representation and receive a
23 full refund of fees, and there were probably five or so
24 thousand clients that opted for the termination and refund.

25      TRUSTEE NG:  Five thousand you said?

51

1          MR. DIAB:  Yeah, approximately.

2          TRUSTEE NG:  So, like, you know, in terms of

3  sending these clients to the three law firms, was it, again,

4  a joint decision between you and Dan?

5          MR. DIAB:  Yeah, it would have been a decision

6  between me, Dan, and then the receiving law firm because

7  they also had criteria for the clients they received.  For

8  instance, CLG wasn't going to take any client that was in

9  the State of North Dakota because of regulatory issues in

10 North Dakota, that type of a conversation.

11         TRUSTEE NG:  Okay.  And all the transfers have

12 been completed?

13         MR. DIAB:  Correct.  All the transfers have been

14 completed.  The terminations that were requested by clients

15 have also been completed.  There are some refunds that are

16 pending.  They haven't been sent out because we're waiting

17 for (indiscernible).  But, otherwise, that process has been

18 completed.

19         TRUSTEE NG:  The refund, is that pertaining to the

20 5,000 clients who -- who, you know, canceled the agreement?

21         MR. DIAB:  Yes, correct.

22         MR. MARCH:  Yes.

23         TRUSTEE NG:  Did LPG receive any consideration in

24 connection with the transfers of the files to these three

25 law firms?

52

1         MR. DIAB:  So, not at the time of transfer, but

2    LPG receives an ongoing residual payment on the clients that

3    continue to perform.  That means that the clients make

4    payments to these three law firms.  These law firms under

5    separate agreements, would make a payment through to LPG

6    (indiscernible) and get a referral fee, but it's essentially

7    the commission that the law firms are paying for the

8    referral, and that's a separate agreement for each of the

9    three.  It's a 20 percent referral agreement with Oakstone,

10   20 percent with Phoenix, and 40 percent with Consumer Legal

11   Group, and that's percent of the revenue stream generated by

12   this client.

13        MR. MARCH:  Actual receipts.

14        TRUSTEE NG:  These are actual receipts that these

15   law firms receive from these clients, and then whatever they

16   receive, the actual amount they transfer -- I guess for

17   Oakstone and Phoenix, they gave -- they transferred 20

18   percent back to the Debtor, is that right?

19        MR. MARCH:  That's correct.  That's the agreement

20   between those -- with those two entities.

21        TRUSTEE NG:  Is there a written agreement with all

22   these law firms regarding the referral fees?

23        MR. DIAB:  There is a written agreement with

24   Consumer Legal Group and with Oakstone Law Group.  There is

25   not yet a written agreement with Phoenix Law.  That

*Briggs Reporting Company, Inc.*

EXHIBIT 1
Page 60

53

1 agreement has not been reduced to writing yet, but it's

2 something that we intend to do.

3        TRUSTEE NG:  Why wasn't there a written agreement

4 when the trials have already been transferred?

5        MR. DIAB:  At the time that LPG was transferring

6 the files, there was a combination of a lack of manpower on

7 the LPG side, and the transition was -- for lack of a better

8 word, it was rushed.  We were trying to push the clients

9 over as soon as possible.  They -- the lawsuits come in

10 daily.  These clients are receiving them and submitting some

11 to us on a daily basis, and we have to properly assign the

12 counsel.  So, we moved fast, received the transaction, but

13 the -- the agreement is in place at the 20 percent referral

14 fee, and -- and also, just to be clear, LPG maintains its

15 contractual right with regard to these clients.  If they

16 were ever nonperforming (indiscernible) retake the

17 representation, it would just have to find counsel licensed

18 in the jurisdiction in which these clients reside.

19        TRUSTEE NG:  Okay.  I think we asked for the

20 written agreements with these three law firms.  And so far I

21 think we only received one with -- maybe it was CLG.  I

22 don't have the one with Phoenix.  I mean, when do you think

23 you'll get into writing?

24        MR. DIAB:  That's something that we -- we

25 anticipate completing probably within the next week, and

54

1  we'll send that to you as soon as that's completed.  The

2  agreement with Oakstone should have been sent through.  I'll

3  make sure to re-send that.

4          TRUSTEE NG:  I think it was just a letter.  I

5  don't have the actual agreement.

6          MR. MARCH:  That's true.

7          MR. DIAB:  Understood.

8          TRUSTEE NG:  So, we would need the agreement as

9  well.

10          I noticed that in the amended schedule

11  (indiscernible) was filed with the Court on May 1st.  It

12  doesn't list any of these contracts.  Were these law firms?

13  Is there a reason why?

14      (Pause.)

15          MR. DIAB:  Sorry.  This is Tony.  I'm not sure,

16  but we'll obviously connect with counsel and submit amended

17  schedules.

18          TRUSTEE NG:  Okay.  So, Oakstone you're expecting

19  20 percent from the actual receipts.  Based on the 15,000

20  clients or so that was transferred, you know, what is the

21  average monthly gross income you think you can get form

22  that?

23          MR. DIAB:  In the future we anticipate receiving

24  roughly $700,000 solely from Oakstone.  Like LPG, Oakstone

25  is using the same payment process as (indiscernible) and

55

1 have the payment processing issue at the time of transition.

2 So, they were behind in collecting payments, meaning they

3 didn't collect the clients' payments that they were

4 attempting to collect because the new processor was holding

5 those funds.  But once that issue is behind us, which it

6 appears to be this month, it should be roughly $700,000.

7           TRUSTEE NG:  And --

8           MR. DIAB:  Again, it's dependent on actual client

9 performance, but that should be the revenue stream from

10 Oakstone.

11           TRUSTEE NG:  Is that based on the historical, you

12 know, receipt that LPG received from these clients you're

13 expecting about 700?  That's the 20 percent, you know,

14 referral fee?

15           MR. DIAB:  Correct.  That's based on -- on what we

16 -- what we have in terms of our data on this client basis

17 performance.  We don't know that the performance is going to

18 be the same post-transfer, but we imagine it would be

19 roughly similar, and that's where we came up with that

20 number.

21           TRUSTEE NG:  And -- and is Oakstone going to pay

22 the referral fee on a monthly basis or how often?

23           MR. DIAB:  Yes.  It was worked out with -- with

24 both Consumer Legal Group and with Oakstone it was a monthly

25 reconciliation and a monthly payment.  So, it would be one

56

1 payment at the conclusion of the month.  With Phoenix, the

2 agreement was more frequent.  It was supposed to be a -- a

3 weekly payment that's sent through.  We worked a few of the

4 reconciliations, but that would be a weekly, for the other

5 two entities, monthly payments.

6          TRUSTEE NG:  And which account is those money

7 going to go into?

8          MR. DIAB:  The general operating account at Wells

9 Fargo.

10         TRUSTEE NG:  Okay.

11         MR. DIAB:  That -- that Dan referenced.

12         TRUSTEE NG:  Did LPG receive any referral fees

13 from any of these entities since the filing of bankruptcy?

14         MR. DIAB:  Not yet, but we anticipate receiving

15 the first payment of $240,000 from Oakstone at the end of

16 this week.  It's scheduled for Friday of this week for that

17 first payment to come through.

18         TRUSTEE NG:  And how are they going to transfer

19 it?  Is it going to be a wire transfer?  Are they going to

20 give you a check?  How does that work?

21         MR. DIAB:  So, we had requested a wire transfer

22 into that operating account.  It's a method that we

23 requested.  They haven't confirmed that that's how they'll

24 send it.  They may send by ACH.

25         TRUSTEE NG:  Okay.  So, other than the $240,000

57

1  that you're expecting this week from Oakstone, do you expect

2  any other fees from the other two law firms this month?

3          MR. DIAB:  We're awaiting reconciliations from

4  CLG.  We anticipate receiving from CLG next week between 150

5  and 250 thousand, but they have to finish their

6  reconciliation.  And, again, it's a payment processing issue

7  that they've had.  For Phoenix, we don't have numbers yet,

8  but those would be payments that were supposed to begin this

9  week.  So, we're more likely to receive that amount tomorrow

10 or Thursday in terms of the number, and then we receive the

11 actual wire on Friday, but we don't yet know the amount for

12 the Phoenix entity.

13         TRUSTEE NG:  Okay.  So, other than the client

14 files that we just discussed, you know, to the three law

15 firms, did the Debtor transfer any other assets to any other

16 third parties within the last year?

17         MR. DIAB:  No, no other transfers.

18         TRUSTEE NG:  Okay.  So, what happens if those

19 three law firms decided to transfer the files to another new

20 law firm?  Like, will the Debtor continue to receive

21 payments at that point?

22         MR. DIAB:  Well, post-transfer, the -- the

23 receiving law firm begin to collect payments.  LPG is no

24 longer collecting payments direct from clients.  LPG may

25 begin onboarding clients again in the future.  At this time

58

1 the focus is on obviously the -- the bankruptcy, the Chapter

2 11 reorganization and these referral fees coming through.

3 LPG at some point in the future may resume enrolling

4 clients.  We (indiscernible) only and then may just go

5 through this again, but right now there's been no final

6 decision on that front.  For now it's simply just a

7 (indiscernible) model.

8          TRUSTEE NG:  So, if these law firms decided to

9 transfer their files out to a different entity, then

10 basically LPG would lose its referral fees completely?

11          MR. DIAB:  These entities don't have contracts

12 with the client.  They don't have the right contractually to

13 transfer the files.  Doesn't mean that they couldn't anyway.

14 But only LPG has the contractual right to transfer the file.

15 So, we could dispute it if one of these law firms were to

16 try to transfer a client, but technically, if these law

17 firms were to do so, we would have a hard time collecting

18 any fees from a third party recipient.

19          TRUSTEE NG:  Well, do you anticipate any transfer

20 of client files from these three law firms and another law

21 firm?

22          MR. DIAB:  No, we do not, and we have a good

23 relationship with these three.  We don't anticipate it, but

24 it's something that could happen.  It's certainly a

25 possibility.

59

1        TRUSTEE NG:  So --

2        MR. DIAB:  We do have visibility, and so we would

3   see if the clients were transferred.  I mean, we have

4   visibility over the clients (indiscernible).  We can see

5   them and know.

6        TRUSTEE NG:  Okay.  So, you mentioned Oakstone and

7   Phoenix are both California corporation, right?

8        MR. DIAB:  Correct.

9        MR. MARCH:  Yes.

10        TRUSTEE NG:  Does the Debtor have any interest in

11   these law firms at all?

12        MR. MARCH:  No.

13        MR. DIAB:  No.

14        TRUSTEE NG:  What about you, Mr. March or Mr.

15   Diab?

16        MR. MARCH:  That was a no from Dan.

17        MR. DIAB:  Yeah.  This is Tony.  That's a no for

18   me as well.

19        TRUSTEE NG:  Okay.  And with respect to Oakstone,

20   who is the owner for the shareholder of Oakstone Law Group?

21        MR. MARCH:  Scott Eadie, E-A-D-I-E.

22        TRUSTEE NG:  And is he an attorney?

23        MR. MARCH:  Yes.

24        TRUSTEE NG:  And was he ever an attorney of LPG?

25        MR. MARCH:  Yes.

60

1          TRUSTEE NG:  For what period?

2          MR. MARCH:  I think he said his two-year

3 anniversary was a month ago.

4          TRUSTEE NG:  So, two-year -- two-year anniversary

5 meaning --

6          MR. MARCH:  I believe it's two years.

7          TRUSTEE NG:  -- he's been with the LPG for two

8 years?

9          MR. MARCH:  He's been with LPG for about two

10 years.

11          TRUSTEE NG:  And was that his first job out of law

12 school?

13          MR. MARCH:  Oh, no.  Scott and I go back to junior

14 high school, and I'm 66 years old.

15          TRUSTEE NG:  Is this Tony talking or is it Dan?

16 I'm sorry.

17          MR. MARCH:  That was Dan March.  I'm sorry.

18          TRUSTEE NG:  I'm sorry.  Okay.

19          MR. MARCH:  I've known Mr. Eadie -- yeah, Mr.

20 Eadie I think in 1984 or '85 received his certificate.  He's

21 been practicing since about '84.

22          TRUSTEE NG:  Why did he leave LPG?

23          MR. MARCH:  There were simply no funds to pay him

24 or anyone else.

25          TRUSTEE NG:  And then he started -- when -- so,

*Briggs Reporting Company, Inc.*

EXHIBIT 1
Page 68

61

1  when he left LPG, he went to start Oakstone Law Group?

2         MR. DIAB:  This is Tony.  Just to be clear, he was

3  referred.  We recommended Scott as a head attorney, Dan and

4  I, more than two years.  He's been practicing with LPG for

5  two years.  He practiced in a number of different areas for

6  years before that, and Pec Corporation is managed by

7  somebody named Eng Tang (phonetic), and Eng asked for

8  referrals, who do we think would be a good person to head

9  the law firm that's going to house the files in which Pec

10 Corp. has an interest in the receivable, and Dan and I both

11 pointed to Scott and thought he was the perfect fit for it,

12 and so we had recommended him, but Scott had missed two

13 payrolls, and LPG was not a viable employment at that time,

14 which obviously helped to motivate Scott's decision.

15         TRUSTEE NG:  Okay.  I noticed that the Oakstone

16 Law Group, it was formed in January 2023.  Is that right?

17         MR. DIAB:  That sounds correct, yes.

18         TRUSTEE NG:  Was it a joint decision between you

19 and Dan that -- that there would be a new law firm, Oakstone

20 Law Group?

21         MR. DIAB:  No.  Dan and I didn't have that -- a

22 part in the naming or the formation of Oakstone and have

23 been driving its formation.  He had been in conversation

24 with us about moving the files that he had an interest in,

25 and so we were collaborating but not the driving force

62

1 behind the formation for that entity, but the entity was

2 formed in January, and the agreement was reached in January.

3         TRUSTEE NG:  When you say collaboration, is it

4 collaboration with who?

5         MR. DIAB:  It was just Eng Tang.  So,

6 collaboration between LPG and Eng about the release of these

7 files that have Pec Corporation interest in them.  And it

8 was -- it was then a function of the pressures that I think

9 he had relating to the Validation Partners lawsuits and the

10 fact that we had grown to a client account that was

11 untenable.  It was difficult to represent that number, and

12 Eng had been pushing for these files to be moved to a

13 different entity.  And, so, we essentially agreed in January

14 that we would move them to the destination that we chose,

15 and then in the course of those conversations, we

16 recommended Scott as an attorney to (indiscernible) that

17 entity.

18         TRUSTEE NG:  And -- and Eng Taing, is that last

19 name T-A-I-N-G?

20         MR. DIAB:  That's -- yeah, that sounds correct.

21         TRUSTEE NG:  Was he an attorney with LPG?

22         MR. DIAB:  No.  He was an investor in Validation

23 Partners.  He was one of the many individuals that gave

24 money to Validation Partners, and Validation Partners

25 defaulted.  Pec Corporation then sought recourse against LPG

63

1  directly, and LPG was making payments to Pec Corp. and had

2  essentially paid Pec Corp. for an assignment of Pec Corp.'s

3  claim against Validation Partners.  So Pec Corp. ended up

4  receiving payments from LPG, and LPG received a right to go

5  after Validation Partners for a little less than 30 million.

6  And, so, Eng had been receiving these payments from LPG but

7  became increasingly concerned about the effect that the

8  Validation Partners' litigation was having on LPG and wanted

9  the -- the files in which Pec Corp. had an interest to be

10 transferred.  And, so, we complied with that request.

11          TRUSTEE NG:  Okay.

12          MR. DIAB:  But Eng is not an attorney and not

13 practicing.

14          TRUSTEE NG:  Okay.  And who's Michael Thomas?

15          MR. DIAB:  I'm not familiar with Michael Thomas.

16          TRUSTEE NG:  Okay.  This person --

17          MR. MARCH:  I'm not familiar with Michael Thomas.

18          TRUSTEE NG:  Okay.  For some reason, this person

19 signed the Articles of Incorporation for Oakstone.  So, you

20 don't know this name?

21          MR. DIAB:  No.  I'm not familiar with that name.

22 I would imagine it's somebody that Eng hired or --

23          TRUSTEE NG:  Okay.

24          MR. DIAB:  -- or Scott hired or somebody hired to

25 assist with that formation.

64

1          TRUSTEE NG:  How many attorneys do they have at

2    Oakstone?

3          MR. DIAB:  That I'm not sure.  I do know that they

4    have attorneys licensed in most jurisdictions in the

5    country, but I don't know the exact attorney count.

6          TRUSTEE NG:  How many offices do they have?

7          MR. DIAB:  I'm only aware of one office that

8    appears on the website.  I'm not -- I'm not familiar with

9    whether they have any local attorney offices, although I

10   know that they have enough attorneys to where I'm sure that

11   some of them have offices in these other jurisdictions,

12   these other states, but I'm not aware of any other

13   locations.

14         TRUSTEE NG:  And what's the -- what's the location

15   on the website?  It's in California?

16         MR. DIAB:  Correct.  So, the -- the location on

17   the website is an office that's sort of a -- a receptionist

18   only type of an office, and the processing for Oakstone is

19   done in California, and that's the -- the Irvine office is

20   where Scott is housed and where the work is primarily done.

21         TRUSTEE NG:  Okay.  So, you were going to transfer

22   15,000 -- 15,000 clients to this law firm who just started

23   in January, and you don't know how many attorneys they have?

24   Like, what if they can't handle the 15,000 clients?

25         MR. DIAB:  We confirmed that they had licensed

65

1  counsel in the jurisdictions in which these 15,000 clients

2  reside.  I don't know how many other attorneys they're

3  employing, but they did confirm that they had attorneys

4  licensed in the states where this batch of 15,000 clients

5  resided.

6          TRUSTEE NG:  Okay.  And Phoenix Law Group, who is

7  the owner of Phoenix Law Group?

8          MR. DIAB:  His name is Ty Carss.  So Ty, T-Y,

9  Carss, C-A-R-S-S.

10          TRUSTEE NG:  C-A-R-S-S, is that what you said?

11          MR. DIAB:  Yes.

12          TRUSTEE NG:  Okay.  Is this a female?  I'm sorry.

13          MR. DIAB:  No, male.

14          TRUSTEE NG:  Okay.  And is this person an

15  attorney?

16          MR. DIAB:  Yes, he's a licensed attorney.  He's

17  been practicing for a little over 20 years.

18          TRUSTEE NG:  Licensed where?

19          MR. DIAB:  In the State of California.

20          TRUSTEE NG:  Okay.

21          MR. DIAB:  State and Federal Court.

22          TRUSTEE NG:  And was this person an attorney for

23  LPG?

24          MR. DIAB:  No, never any affiliation with LPG of

25  any kind, employee or contractor.

66

1          TRUSTEE NG:  Okay.  And I think this firm is also

2  formed in January 10, 2023.  So, how did LPG find this Law

3  firm?

4          MR. DIAB:  So, this Law firm was previously -- I'm

5  sorry.  This -- this is now -- law firm's a successor to a

6  prior law firm called Gallant Law Group who LPG had done

7  some work with.  But, essentially, this law firm, Phoenix

8  Law was formed to take over the pipeline that previously was

9  Gallant Law Group.  The head attorney for Gallant Law Group

10 was a gentleman named Robert Tobia (phonetic), in

11 Philadelphia, Pennsylvania, and he essentially moved this

12 docket over to Ty into Phoenix, which is an entity that was

13 formed on the 10th of January.

14          We began discussing transfers in early February

15 and then Phoenix where Ty transfers (indiscernible).

16          TRUSTEE NG:  Okay.  And do you know how many

17 attorneys they have at Phoenix Law Group?

18          MR. DIAB:  I do not know their attorney count, no.

19          TRUSTEE NG:  Do you know if any of your LPG former

20 attorneys are in any of the law firms?

21          MR. DIAB:  I know that there are certain LPG

22 attorneys that are employed by Oakstone Law Group.  They

23 were recruited by Scott and by Eng.  There's no LPG

24 attorneys working for Phoenix Law as far as I know.

25          TRUSTEE NG:  And how many former LPG attorneys at

67

1 Oakstone right now?

2          MR. DIAB:  I believe the number is between 12 and

3 15.

4          TRUSTEE NG:  And what about --

5          MR. DIAB:  I know that it's -- it's a bit fluid

6 because Oakstone may have also lost attorneys recently.

7 Sorry.

8          TRUSTEE NG:  And what about Consumer Legal Group?

9          MR. DIAB:  So, the principal of Consumer Legal

10 Group is Aryeh Weber, Aryeh, A-R-Y-E-H.  Last name W-E-B-E-

11 R.  And he's the principal of Consumer Legal Group which I

12 want to say was formed in June or July of 2022.

13          TRUSTEE NG:  Okay.  And was he ever an attorney

14 with -- with LPG?

15          MR. DIAB:  No, zero connection to LPG either as an

16 employee or contractor.

17          TRUSTEE NG:  And, so, how did the Debtor find

18 Consumer Legal Group then?

19          MR. DIAB:  Well, I know the individuals who had

20 started that group on the processing side.  The individuals

21 who are managing the processing center for CLG are known to

22 me.  I've met Aryeh Weber one -- maybe -- I met him once in

23 the summer of 2022 and again I think in January of this

24 year, but I don't really know Aryeh, but I do know the

25 people who are managing the processing center for Mr. Weber

68

1  for CLG.

2          TRUSTEE NG:  Okay.  So, that was a joint decision

3  with you and Dan to transfer the clients to CLG based on

4  your -- I guess your affiliations with the people at that

5  firm?

6          MR. DIAB:  Correct.  And CLG had more restrictions

7  on which jurisdictions they could onboard, but the clients

8  that were selected for CLG were based on jurisdictions where

9  they did have licensed counsel.

10          TRUSTEE NG:  Is there a reason why CLG is given 40

11  percent for referral fee versus the 20 percent that the

12  others are paying?

13          MR. DIAB:  Well, we were able to negotiate, and so

14  the arm's-length negotiations, with Eng it was probably a

15  more -- sorry.  Eng is Oakstone.  With Oakstone, it was

16  probably more of a friendly negotiation by virtue of the

17  fact that (indiscernible) from LPG to Pec Corp., Pec Corp.

18  being the entity to which Eng would be the (indiscernible).

19  And, so, that agreement was more favorable and likely

20  because of the pressure that existed from the amount that

21  was owed.  Phoenix was filed just as a copycat of Oakstone

22  once the Oakstone terms were set.  And, so, we did Phoenix

23  the same way.  CLG was more of an aggressive negotiation.

24  They were in greater need of clients because they had been

25  at it since the summer.  They weren't really growing, and so

69

1 we were able to get a better deal by then.

2          TRUSTEE NG:  Okay.  Did LPG obtain the written

3 consent from its clients, the former clients, to transfer

4 the files to the three law firms at the time of the

5 transfer?

6          MR. DIAB:  LPG did not.  LPT notified the clients

7 but did not receive written consent at that time.  At the

8 time that the client executed the legal services agreement,

9 the legal services agreement gave LPG the right to transfer

10 the servicing, and it's our position that they consented at

11 that time, that there was no substantive consent sought or

12 received at the time of the actual transfer.

13          TRUSTEE NG:  Can you point to me where the legal

14 service agreement, where it gave the right to LPG to

15 transfer the clients' files?

16          MR. DIAB:  Yes.  LPG has used different models of

17 the agreement for the licensing provision.

18          TRUSTEE NG:  Okay.

19          MR. DIAB:  I will open the agreement and read

20 that.  Just one second.

21          TRUSTEE NG:  Okay.  Thank you.

22      (Pause.)

23          MR. DIAB:  So, in the legal services agreement

24 itself, the -- the template agreement that was sent to the

25 Trustee's Office, that would be page three of six --

70

1              TRUSTEE NG:  Okay.

2              MR. DIAB:  -- it goes under the -- so, the heading

3    is Applicable Law and Confidentiality, and that's the

4    (indiscernible) that LPG (indiscernible) other attorneys to

5    provide the services, and then LPG retains the right to

6    utilize other attorneys to assist in the representation of

7    these clients.  It also says that the client has a right to

8    know the attorney that's working on their file.

9              TRUSTEE NG:  Okay.  I did read that provision, but

10   the language does not cover attorneys who are not directly

11   employed by LPG, is that right?

12             MR. DIAB:  So, our reading of this provision it

13   doesn't put any restrictions that the attorneys that we'd

14   utilize have to be employed by LPG.

15             TRUSTEE NG:  Okay.  So, it says --

16             MR. DIAB:  We describe affiliation.

17             TRUSTEE NG:  Okay.  So, is it LPG's position that

18   these law firms are affiliated attorney to LPG?

19             MR. DIAB:  Yes.

20             TRUSTEE NG:  Okay.

21             MR. DIAB:  Yes.  And the -- the agreement with

22   Consumer Legal Group states that, that that's the basis.

23             TRUSTEE NG:  What would be the affiliation --

24             MR. DIAB:  And, just to be clear, there were --

25   I'm sorry.  There were different templates used over the

71

1 years, but they all contain a provision similar to this one.

2             TRUSTEE NG:  Okay.

3             MR. DIAB:  I'm sorry.  Go ahead.

4             TRUSTEE NG:  But what would be the affiliation?  I

5 mean, I asked you earlier.  You said you or Tony Diab, the

6 Debtor, does not have any interest in any of these law

7 firms.  So, what would be the affiliation between the Debtor

8 and these three entities or three Law firms?

9             MR. DIAB:  Affiliation is the transfer of the

10 client files out.  So, we affiliate the attorneys to assist

11 in the representation of the clients.  We compensate for

12 that affiliation.  In this case, it's 80 percent of revenue

13 for Oakstone and Phoenix and 60 percent of revenue for CLG,

14 but the affiliation just means that we are working with the

15 law firm in these other jurisdictions to provide the

16 services, and that's how we styled that term, "affiliation".

17 So -- so, in our view, an affiliation doesn't mean that

18 there's a -- an employment relationship, W-2 or 1099.  It

19 means that we've retained these firms to provide this

20 service for this particular client, just a discrete

21 representation.

22             TRUSTEE NG:  Okay.

23             MR. DIAB:  Not an ongoing general one.

24             TRUSTEE NG:  Okay.  And you indicated earlier that

25 LPG had notified all clients?  Was that the case?

72

1          MR. DIAB:  Yes.

2          TRUSTEE NG:  And how did they notify -- how did

3  LPG notify the clients?

4          MR. DIAB:  Notifications were sent from LPG to the

5  clients by email notifying them of the transfer, and then

6  the -- the other law firm then reached out by email and by

7  phone to describe the transfer, and on LPG's side, we send

8  notification to the clients using email, which is one of the

9  methods of notification that the clients agree to receive in

10 their contract, and so we did it by email only.  I believe

11 there was also a text message blast, but it was primarily by

12 email.

13         TRUSTEE NG:  Okay.  And was the email sent -- the

14 notification email sent, you know, concurrent or shortly

15 after the files were transferred to these law firms?

16         MR. DIAB:  It was sent before, but it would have

17 been shortly before.  So, we would send the email from LPG.

18 The receiving firm, for instance, Oakstone, would then send

19 their email and then the transfer was completed after that,

20 and the transfer with the electronic portion of the client

21 file so that Oakstone would then have access at that point

22 to the client's files.

23         TRUSTEE NG:  And that's -- the email provides the

24 -- these former clients like rights if they want to cancel

25 the agreement?

73

1          MR. DIAB:  So, it does indicate that the clients

2  if they -- if they I guess do not want the transfer, do not

3  approve of it, they remain contractually entitled to

4  terminate the contract and receive a refund.  We put that in

5  all of our agreements, that the clients have the ability to

6  terminate at any time.  We never try to collect from our

7  clients or enforce the -- the remaining payment on the

8  agreement.  They always have that right to cancel.

9          TRUSTEE NG:  Okay.  So, the 5,000 clients that you

10  said earlier that they cancel, how much would the refund

11  total amount be?

12          MR. DIAB:  So, that refund total would have been

13  between 300 and 350 thousand.  We also had other clients

14  that weren't canceling but had requested refunds for other

15  reasons.  So, we right now have pending right around

16  $500,000 worth of refund requests, which will be sent from

17  our general Debtor in Possession account once the funding

18  arrives from our payment processes.

19          TRUSTEE NG:  Okay.  And how much of those $500,000

20  have been already paid?

21          MR. DIAB:  Could you ask that again?

22          MR. MARCH:  Yeah, I didn't --

23          TRUSTEE NG:  You mentioned the total amount would

24  be somewhere around $500,000, the refund amount.  Of that

25  $500,000, how much have LPG already paid?  Or is it the

74

1  entire amount paid?

2          MR. DIAB:  So, the $500,000, yeah, that's the

3  remaining balance.  LPG probably paid about $200,000 and had

4  about $500,000 still pending, and that 500 remains owed at

5  this time.

6          TRUSTEE NG:  Okay.  Understood.

7          So, did the terms of the payment in terms of the

8  clients, did they change after the files had been

9  transferred to the -- you know, the three law firms?

10          MR. DIAB:  No.  The -- the payment terms remain

11  the same, and the -- the only operative contract remains

12  with LPG.  And, so, all the payment terms remain exactly the

13  same as they were prior to the transfer.

14          TRUSTEE NG:  Okay.  So, you previously mentioned

15  that, you know, some clients have opted to do like monthly

16  payments.  So, for those clients, how does the new law firm,

17  you know, have access to the monthly -- you know, the auto

18  payment from their bank account?

19          MR. DIAB:  The client file that was transferred

20  the receiving Law firm includes payment records of all the

21  payments that had cleared, all the payments that were still

22  due and owing, and the amount of those payments and the bank

23  account from which the payments were supposed to be drafted.

24  So, all of the payment data was conveyed to the Law clerks

25  for them to process those payments.

75

1          TRUSTEE NG:  Okay.  And then does the Law firm use

2 a new -- some kind of electronic agreement so, therefore,

3 they can, you know, debit or withdraw money from the

4 account, those clients' accounts?

5          MR. DIAB:  If they're simply collecting the

6 amounts that were in LPG's contract, they don't.  The LPG

7 EFT form allows LPG to assign the collection of payments to

8 third parties.  And, so, as long as it's an identical

9 payment to what's set forth in the contract, no EFT is

10 needed.  If the payment changes even by one penny or one

11 day, then they have to collect a new EFT form from the

12 client to -- to continue to collect payment.

13          TRUSTEE NG:  Okay.  Have LPG actually assigned the

14 EFT forms to the new Law firms?

15          MR. DIAB:  Not yet.  That was part of -- of what

16 was sent.  Those EFT forms were given to each of the law

17 firms for each of the clients.

18          TRUSTEE NG:  So, they have -- that has not been

19 done?

20          MR. DIAB:  That has been done.  That was already

21 completed.  The EFT forms were already assigned to each of

22 the law firms.

23          TRUSTEE NG:  Okay.  So, since the transfer of the

24 client files, have there been any situations where, you

25 know, the Debtor would continue to receive monthly, you

76

1  know, autopayment from these clients, former clients now,

2  but the law firm, the new firm also, you know, receiving

3  monthly payments from them?  Therefore, you know, those

4  clients have to pay twice?

5          MR. DIAB:  It's a two-part answer.  Yes, that

6  happens, but it was over our objection.  Merrich Bine, the

7  payment processes that I referenced before continued to

8  collect payments in the months of February and March over

9  our objection.  We had asked them to stop.  The new law

10 firm, Oakstone, Phoenix, CLG asked them to stop, but they

11 continued to collect payments, and they were collecting

12 payments using the batch of files that LPG -- sorry --

13 (indiscernible) files of the file containing the payment

14 information for a batch of clients.  It then would use this

15 payment data from LPG that was outdated payment data and

16 pull the payments from the clients.  And, so, there were

17 some clients who had the payment pulled by Merits Find on

18 behalf of LPG.  But the new law firm was also collecting

19 payment at the same time.  All of those double payments were

20 refunded to the clients or were supposed to have been

21 refunded to the clients, and some of the $500,000 is refunds

22 that LPG is currently trying to send some of that pending

23 $500,000 consisted of these what we call double debits, of

24 payments pulling from Merits Find and pulling from the new

25 law firm.  LPG agreed to give that refund.  And, so, Merrich

77

1  Bine (phonetic) since stopped.  An agreement was reached.

2  They ceased collecting payments on March the 10th, and they

3  haven't collected any payments since.  They've adhered to

4  the agreement that they stop collecting any payments, but

5  there's still an open question about what was collected

6  between January 30th and March 10th.  We don't have that

7  data yet.

8           TRUSTEE NG:  And how is the Debtor going to get

9  that data?

10          MR. DIAB:  Likely through an adversary action.

11  It's -- it's not forthcoming voluntarily.  So, it appears

12  the only way we'll be able to obtain it is by filing an

13  action inside of this proceeding.

14          TRUSTEE NG:  Okay.  What do you think that -- you

15  know, you call it the double debit.  Like, what do you think

16  that refund pertaining to the double credit -- double debit

17  would be?

18          MR. DIAB:  Well, it's probably about $100,000 out

19  of the $500,000 that's pending.  Or out of the $500,000,

20  probably about 350 are clients that are canceling, 100 are

21  the double debits.

22          TRUSTEE NG:  Okay.

23          MR. DIAB:  Fifty are other miscellaneous reasons.

24          TRUSTEE NG:  Okay.  So, you mentioned the Debtor's

25  not actively looking for new clients in California, is that

*Briggs Reporting Company, Inc.*

EXHIBIT 1
Page 85

78

1 right?

2　　　　　MR. DIAB:  Not at this time, correct.

3　　　　　MR. MARCH:  Correct.

4　　　　　TRUSTEE NG:  So, once those 400, 600 files, you

5 know, are completed, then the Debtor will no longer have an

6 income stream from California clients?

7　　　　　MR. DIAB:  Well, we do anticipate -- and I've

8 spoken with Dan about this.  This is Tony.  But Dan intends

9 to continue his bankruptcy process.  And, so, he'll continue

10 to take on clients who are filing Chapter 7 petitions in

11 California Bankruptcy Courts across the state, and that will

12 be a continued revenue stream.  But the ultimate question is

13 whether we'll also take on other non-bankruptcy clients, and

14 at this time we just don't have the infrastructure.

15　　　　　If the referral fees are processing the way that

16 they're supposed to and the reorganization fell into place,

17 then we do anticipate taking on what we'll call normal

18 clients, so, the non-bankruptcy clients in the State of

19 California, but the decision has not been made.

20　　　　　TRUSTEE NG:  Okay.  If LPG is going to take on new

21 clients in California, does LPG have any plans to retain new

22 counsel?  I mean, it's only one attorney right now, and

23 there's only so much work he can do.

24　　　　　MR. DIAB:  If we were to onboard new California

25 clients, we would add customer service reps, and we would

79

1  likely add another attorney licensed in the state.  And, so,

2  the first step is whether we have the budget available to do

3  so.

4          TRUSTEE NG:  Okay.

5          MR. DIAB:  If we do, then we'll likely add

6  California clients.

7          TRUSTEE NG:  Okay.  So, other than the referral

8  fees as we talked about and then the -- the existing income

9  from the clients in California or potentially maybe start

10  getting new clients, does the Debtor have any other source

11  of income?

12          MR. DIAB:  So, the bankruptcy docket and the

13  referral fees are the only source of income at this time.

14          TRUSTEE NG:  Okay.

15          MR. DIAB:  And we don't anticipate any other

16  source of income except the potential for California clients

17  on -- on the old model.

18          TRUSTEE NG:  Okay.  According to the Debtor's

19  amended statement of financial affairs that was filed with

20  the Court on May 1st, 2023 -- that's Docket Number 54 -- the

21  Debtor gross annual income for 2022 was $155 million.  So,

22  that's about $13 million or so, you know, gross per month.

23  Does that sound right to you?

24          MR. DIAB:  Yes, that sounds accurate for 2022.

25          TRUSTEE NG:  So, for 2022, when the Debtor was

*Briggs Reporting Company, Inc.*

EXHIBIT 1
Page 87

80

1 making $13 million gross per month, what was the gross

2 monthly expenses, the average?

3          MR. DIAB:  So, for -- for the calendar year 2022,

4 it would have probably been about 13 and a half million.  We

5 probably suffered a loss just under $6 million for the year.

6 That's according to the financials that we have.  As I said,

7 the tax return hasn't been filed, but that's what we have in

8 terms of the -- the bookkeeping.

9          TRUSTEE NG:  Okay.  So, according to the same

10 amended SOFA, the gross income for this year from January

11 1st, 2023 to the petition date, that was about $30 million.

12 So, that's about for the three-month period or so, so give

13 or take, maybe about $10 million a month.  Does that sound

14 right?

15          MR. DIAB:  Yes, but that depends on the exact

16 amount that Merrich Bine was collecting.  So, we don't have

17 the exact data.  So, we're estimating, and the estimate is

18 based on a batch of files that we believe that they were

19 running.  And when I say believed, we looked at the clients

20 that were complaining of double debits and things, and we

21 isolated the batch of files that would be the rerun, but we

22 have no confirmation of that.  So, the $30 million is based

23 on an estimate of what Merrich Bine, the payment processor,

24 collected.

25          TRUSTEE NG:  Okay.

81

1          MR. DIAB:  Once we have the actual data, we can

2   give a firm number.

3          TRUSTEE NG:  I was under the impression that you

4   mentioned -- I mean, and I understand that you said you

5   don't know the exact amount, but it was somewhere around

6   like 12 to 14 million dollars I mean or do you think now

7   it's actually closer to 30?

8          MR. DIAB:  No.  Sorry.  So, LPG did collect

9   payments throughout the month of January.  It also collected

10  payments from March 10th to about March 20th, and then

11  Merrich Bine was collecting payments from about January 31st

12  -- 30th or 31st until March 10th.  It's that six-week period

13  that represented the 12 to 14 million that is the mystery.

14  We know that we collected -- we being, sorry, LPG collected

15  about $12 million in the month of January.  We think there's

16  between 12 and 14 million from Merrich Bine, and then

17  there's three to four million that we collected in March

18  before the petition and we stopped collecting the payments.

19         TRUSTEE NG:  Okay.  So, that $30 million estimate

20  for the three months or so, does that include any referral

21  fees?

22         MR. DIAB:  No.  So, there were no referral fees

23  paid that were part of that, that figure.  And today, as we

24  sit here today, we have yet to receive any referral fees

25  that were supposed to be paid for the first time at the end

82

1 of this week.

2          TRUSTEE NG:  So, the --

3          MR. DIAB:  By Friday, the 5th.

4          TRUSTEE NG:  Okay.  So, the amount that LPG

5 collected, you said, you know, not from the other -- is it

6 from the Apple Pay or who -- who collected it on behalf of

7 LPG?

8          MR. DIAB:  So, the LPG payments that were

9 collected in January were from EquiPay and from Merrich

10 Bine.  Merrich Bine was submitting payments in January,

11 collecting it from the clients and sending the money to us.

12 So, we collected from those two processors in the month of

13 January and from EquiPay alone in the month of March.

14          TRUSTEE NG:  Okay.  So, for 2023, year to date,

15 did the Debtor post a profit or loss?

16          MR. DIAB:  So, it's a -- it's a loss, but that's

17 because the money held by Merrich Bine is not accessible.

18 We would be if that 12 to 14 million were conveyed, but it's

19 not.  It's being held by them, and so we've operated at a

20 substantial loss.

21          TRUSTEE NG:  Okay.  So, your office submitted a

22 cash flow projection late Friday, last Friday evening, and

23 that projection shows gross revenue.  Like for April the

24 projection was $240,000.  It doesn't say whether it's gross

25 or net.  I mean, is it -- do you know if it's gross or net?

*Briggs Reporting Company, Inc.*

EXHIBIT 1
Page 90

83

1          MR. DIAB:  That was that gross figure for April.

2          TRUSTEE NG:  Okay.  So, and then May the

3   projection is $740,000, and for June it's $1.2 million

4   gross.  So, you know --

5          MR. DIAB:  Correct.

6          TRUSTEE NG:  -- we talked about the first three

7   months I mean earlier.  It's about, you know, $10 million

8   including the money held by Merrich Bine, I think the $12

9   million.  But, so, how do you go from 10 million for the

10  first three months to $240,000 in April?

11         MR. DIAB:  Well, in -- in April it was two

12  different factors.  The first, we were only collecting 20

13  percent of the revenue stream from two of the firms and 40

14  percent from the other.  But also a lot of the clients who

15  were we'll just say victimized by the -- by the payment

16  processing in February and March were unwilling to make

17  payments in April or received accommodations to wipe out the

18  payment in April, either because they had two payments

19  drafts or because they had a payment draft on the wrong date

20  or in the wrong amount.  And, so, the revenue for these

21  other firms was lower by virtue of the fact that Merrick

22  Fund continued to collect payments in the month of February

23  and March.  And, so, the revenue was lower in April than it

24  otherwise would have been.  The June figure is when we think

25  that everything is back to normal, meaning that the payments

84

1 are processing, the clients are performing in a normal way,

2 and that's when we come closer to the -- the 1.2 figure.  We

3 think eventually we'll peak out somewhere around $2 million

4 per month once everything's processing normal.  But the

5 impact was substantial.  A lot of clients had payments

6 paused.  A lot of clients canceled, and a lot of clients are

7 refusing to make payments.  They want accommodations.  So,

8 the other law firms are working through that right now.

9         TRUSTEE NG:  Okay.  But the 1.2 in June, that's

10 still substantially less than the 10 million, you know, per

11 month that they were receiving for the first three months

12 prior to the bankruptcy.

13         MR. DIAB:  Agreed.  So, I think that the 2 million

14 figure that should be after June, that's more the realistic

15 figure (indiscernible), but there were a lot of clients --

16 there were clients that cancelled before billing transfers,

17 and there were clients that cancelled as a result of the

18 payment processing issues.  So, just estimated based on the

19 clients, yes, it was (indiscernible) based on the clients

20 but still appeared to be performing at these three other law

21 firms based on this cancellation rate that spiked during the

22 payment processing dispute.

23         TRUSTEE NG:  Okay.

24         MR. MARCH:  And I -- I think the -- the idea is

25 that we won't have any -- I mean, we're only going to have

*Briggs Reporting Company, Inc.*

EXHIBIT 1
Page 92

85

1 three -- three employees on payroll as opposed to 350 people

2 on payroll.

3           TRUSTEE NG:  Okay.  The projection shows the

4 $675,000 revenue in March -- that's gross -- being held by

5 EquiPay.  Is that --

6      (Pause for outside noise.)

7           TRUSTEE NG:  Is EquiPay not -- the projections

8 show $675,000 being held in March revenue, gross revenue,

9 being held by EquiPay.  Is EquiPay not paying the Debtor as

10 well?

11           MR. DIAB:  Correct.  So, EquiPay is refusing to

12 send that amount through.  That's money that was collected

13 in March.  So, we're looking at it as -- as March revenue,

14 that EquiPay is holding that amount and refusing to send

15 that through to LPG.  That's likely to be another adversary

16 action, although our counsel is trying to get cooperation,

17 but right now it looks like they'll have to file to get that

18 money released.

19           TRUSTEE NG:  What is the reason for holding the

20 Debtor's revenue?  Did they provide you a reason?

21           MR. MARCH:  So, it was a combination of two

22 factors.  One reason, which was true for both EquiPay and

23 Merrich Bine was the litigation with Validation Partners.

24 They believed that the litigation was going to result in the

25 closure of LPG, the appointment of a receive and LPG

86

1  shutting down, in which case, both of those payment

2  processors would be on the hook for charge backs and

3  unauthorized transaction, and they didn't want to be left

4  holding the bag.  So, they used that as an excuse.  Whether

5  it's good faith or bad faith, I don't know, but that was the

6  explanation given, that the litigation with Validation

7  Partners put LPG in a -- a risk of being shut down.

8           The other factor that's cited by EquiPay is the

9  high bounce rate in the month of February.  We explained

10 that the bounce rate was high but that we were attempting to

11 collect payments at the same time as Merrich Bine, and then

12 we stopped.  But during that period where both LPG and

13 Merrich Bine were trying to collect payments, LPG through

14 EquiPay, Merrich Bine on its own, the client bounce rate

15 spiked because the clients can't afford to make two payments

16 at the same time.  And, so, we explained that that higher

17 NSF rate was a function of the payment processing dispute,

18 but EquiPay still felt that the high NSF rate warranted

19 holding funds at least for a short period of time.  We've

20 never been given a date certain when they'll release the

21 funds.

22           TRUSTEE NG:  Okay.  And is the Debtor still using

23 EquiPay or Merrich Bine?

24           MR. DIAB:  No, we're not currently using either to

25 process anything.

87

1          TRUSTEE NG:  So --

2          MR. DIAB:  And our understanding is that none of

3    the three Law firms are using either to process payments

4    themselves.

5          TRUSTEE NG:  So, who does the Debtor use for the

6    existing, you know, 400, 600 clients in California for

7    payment processing?

8          MR. DIAB:  Those clients are -- are no longer

9    making payments.

10          TRUSTEE NG:  Okay.

11          MR. DIAB:  Dan is continuing to handle the

12    litigation for those clients until the end, but they're not

13    making payments at this time, and no other service is being

14    provided to other banks, including those lawsuits.

15          TRUSTEE NG:  Okay.  So, according to the

16    projection that we received, the monthly expenses for April,

17    May and June -- well, I guess for May and June is about

18    $260,000.  For April it's a little bit more.  It's $358,000

19    because of the one-time liability, professional liability

20    expense.  So, I mean, without that expense, would you say

21    the expenses average per month is about $263,000 or so?

22          MR. DIAB:  Yes, and that should remain the case

23    moving forward, that (indiscernible) normal month over month

24    over month.

25          TRUSTEE NG:  Okay.  I mean, they --

88

1          MR. DIAB:  On the cost side.

2          TRUSTEE NG:  Okay.  There is an entry for refunds,

3  $50,000 per month.  Is that the expected payment the

4  Debtor's going to make, $50,000 a month on those refunds?

5          MR. DIAB:  No.  So, those are for additional

6  refunds, meaning the refunds that we anticipate clients

7  requesting from LPG.  If LPG collected money from a client

8  and the client chooses to cancel and request a refund, even

9  if they're currently being serviced by another law firm, the

10  money that They paid the LPG would be refunded by LPG.  So,

11  we're estimating $50,000 a month in new refunds that we'll

12  have to address month over month --

13          TRUSTEE NG:  Okay.

14          MR. DIAB:  -- moving forward.

15          TRUSTEE NG:  And the pay -- I mean, the rent has

16  to be amended because it lists only the 1450, and you

17  mentioned earlier the Debtor moved to a new location.  So,

18  we would need amended cash flow projection.

19          I notice that a lot of the expenses that was

20  previously listed, you know, in -- in the balance sheet that

21  you submitted to us was not there any more.  Like, I don't

22  see any expenses for office supplies or the malpractice

23  insurance that we talked about or software or Lexis, you

24  know, any of those equipments or, you know, I don't see that

25  anymore.  So, I don't know if we were just omitted or the

89

1 Debtor does not have those expenses anymore.

2          MR. DIAB:  We -- based on the -- essentially the

3 operation that we envision moving forward, those vendors and

4 those contracts were not needed.  And, so, that's why

5 they're not listed on our new operating budget.  The current

6 operating budget just consists of the salaries for Dan, Olga

7 and Carl and then the base expenses that they have for the

8 office out of which they're operating.  We will revise the

9 1450 figure if it was short of -- of -- I think Dan

10 referenced 2100 might be a more accurate number.  So, we'll

11 revise that for --

12          MR. MARCH:  It's actually --

13          MR. DIAB:  -- the malpractice.

14          MR. MARCH:  It's actually $1,491 a month in rent.

15          TRUSTEE NG:  Okay.

16          MR. DIAB:  Okay.  So, we'll still revise that

17 number.  And the malpractice also is a one-time payment of

18 94 or 96 thousand, which covers us all the way until March

19 2024.

20          TRUSTEE NG:  Did the Debtor make the one-time

21 payment?

22          MR. DIAB:  The one-time payment is outstanding.

23 It's part of that March budget that we intend to fund

24 through the -- the funds that we receive from EquiPay.

25          TRUSTEE NG:  So, has that been paid, the $96,000?

90

1          MR. DIAB:  It has not been paid.  The -- the

2  carrier understands that we're waiting on the funds from our

3  payment process and we'll make the payment at that time, and

4  they're cooperating.

5          TRUSTEE NG:  So, is --

6          MR. DIAB:  At least for now.

7          TRUSTEE NG:  Is the malpractice insurance active

8  then if the Debtor did not pay the $96,000?

9          MR. DIAB:  Yes.  It remains active provided that

10  we make the payment forthwith, although we haven't defined

11  that period of time.  But the policy has remained active.

12  The policy's initial termination date was actually June of

13  this year, but we did the one-year extension in March, and

14  it was negotiated at that price based on a March to March

15  period for the malpractice policy.

16          TRUSTEE NG:  Is there a deadline the Debtor had to

17  have made that $96,000?

18          MR. DIAB:  We have not been given a deadline.

19  It's expected to happen soon, but they understand that it's

20  a function of when we receive the money for the payment

21  processor.

22          TRUSTEE NG:  Okay.

23          MR. DIAB:  They have not given us a hard deadline.

24          TRUSTEE NG:  Okay.

25          MR. DIAB:  But they inquire.

91

1          TRUSTEE NG:  I don't see that expense in your

2     projection.  So, you need to revise the projection to

3     include the expense.

4          MR. DIAB:  Okay.  Understood.

5          TRUSTEE NG:  It looks like the largest payroll --

6     largest expense in the projection is the payroll for

7     $209,000.  I assume that includes the $100,000 per month

8     monthly payment that the Debtor intends to pay Mr. March, is

9     that right?

10          MR. DIAB:  That's correct.

11          MR. MARCH:  Yes.

12          TRUSTEE NG:  Okay.  And, previously, I think,

13     Tony, you mentioned that you don't expect to receive

14     anything from the Debtor in this bankruptcy, is that right?

15          MR. DIAB:  That's correct.

16          TRUSTEE NG:  Okay.  Mr. March, have you received

17     any compensation since the filing of the bankruptcy?

18          MR. MARCH:  No.  Well, the last -- no.  The last

19     payment I think I received compensation was March 17th.  I

20     think all the employees are owed from March 17th.

21          TRUSTEE NG:  And how much was that payment?

22          MR. MARCH:  Oh, for everybody or for --

23          TRUSTEE NG:  Just --

24          MR. MARCH:  For me it would have been the $100,000

25     a month.

Case 8:23-bk-10571-SC   Doc 191-1   Filed 07/07/23   Entered 07/07/23 21:44:24   Desc
Declaration of Richard A. Marshack   Page 101 of 289

92

1          TRUSTEE NG:  Okay.

2          MR. MARCH:  Yeah.  I'm not sure about Carl.  But

3 there's -- that's just with my office right now.

4          TRUSTEE NG:  Okay.

5          MR. MARCH:  That's with the three staff members.

6          TRUSTEE NG:  So, for 2023, other than that March

7 17 payment, $100,000, did you receive any other payments?

8          MR. MARCH:  Since then?  No.

9          TRUSTEE NG:  No, no, not since then.  Like prior

10 to -- other than the March 17, '23, did you receive a

11 payment in February or January of this year?

12          MR. MARCH:  Yes.  I believe I was current through

13 March 17th.

14          TRUSTEE NG:  Okay.

15          MR. MARCH:  I think that was the last payment

16 anyone received.

17          TRUSTEE NG:  Was it like a monthly payment that

18 they paid you the $100,000?

19          MR. MARCH:  No.  It was every two weeks on a

20 regular basis.

21          TRUSTEE NG:  And how much was every two weeks?

22          MR. MARCH:  Well, the net was about $23,000.  The

23 gross would have been close to $50,000, so about $48,000

24 payable every two weeks gross.

25          TRUSTEE NG:  Okay.  And how long --

93

1           MR. MARCH:  The net was 23.

2           TRUSTEE NG:  And how long have you been receiving

3  that?

4           MR. MARCH:  Let's see.  It's been about since I

5  think January of 2022.

6           TRUSTEE NG:  What about prior to --

7           MR. MARCH:  I didn't receive -- there was -- there

8  was 200 -- it was not that.  It would have been about --

9  let's see.  I was $200,000 short in 2022 of $100,000 a

10 month.

11          TRUSTEE NG:  So, like in --

12          MR. MARCH:  For the year.

13          TRUSTEE NG:  -- 2022, you did not receive the $1.1

14 million?  You only received $900,000?  Is that what you're

15 saying?

16          MR. MARCH:  About $900,000 or I think the -- it's

17 $850,000 I believe is what it was.

18          TRUSTEE NG:  Okay.  And what was the source of the

19 funds for your compensation?

20          MR. MARCH:  It just came out of general and from

21 general into payroll and payroll to the employees --

22          TRUSTEE NG:  Which general is --

23          MR. MARCH:  -- who received them at the same time,

24 all the employees did.

25          TRUSTEE NG:  Is it the --

94

1          MR. MARCH:  That would have been the --

2          TRUSTEE NG:  -- the 4858?

3          MR. MARCH:  From Union Bank for this year.  It

4  might have been Bank of America for one payment.  I think

5  that's all we had it for, and -- and from Chase.

6          TRUSTEE NG:  Which -- which Chase account?

7          MR. MARCH:  I don't know if I ever -- let's see.

8  I received it from the payroll.  I received paychecks.

9          So, Tony, which account is the -- I think we're

10  looking at the Chase one.

11          MR. DIAB:  The paychecks -- paychecks would drop

12  payroll from the general operating account, the account

13  ending 3158.  Bank of America had a separate payroll account

14  that just held the payroll money when we were using Bank of

15  America for that month and a half.

16          For Union Bank, again, it was the general

17  operating account for payroll, which is the 4854 account.

18          TRUSTEE NG:  Okay.  So, I'm going to ask for proof

19  of payment from January 2022 to March 17, 2023.

20          What about 2021?  What was your compensation in

21  2021?

22          MR. MARCH:  You know, I don't recall that.

23          TRUSTEE NG:  Is it close to what you were

24  receiving in 2022?

25          MR. MARCH:  No.  I think it was about -- I think

95

1 it was $50,000 a month.

2          TRUSTEE NG:  I'm sorry.  I can't hear you.

3          MR. MARCH:  I think it might have been about

4 $50,000 a month.

5          TRUSTEE NG:  Fifty thousand a month?

6          MR. DIAB:  As I recall, it was -- it was in 2021

7 that Dan's compensation went from the 50 to 100 figure, but

8 I'm not sure what month of 2021 that switch was made.  I

9 think it was maybe August of 2021.

10          TRUSTEE NG:  Okay.  And prior to that, in 2020?

11          MR. MARCH:  Oh, that I don't remember at all.  It

12 was --

13          TRUSTEE NG:  Do you think it was about --

14          MR. MARCH:  Might have been --

15          TRUSTEE NG:  Do you think it's about the $50,000?

16          MR. MARCH:  No.  I think it was about $ 11,000 a

17 month.

18          TRUSTEE NG:  Okay.  So, why was the income, you

19 know, increased from $50,000 to $100,000 in 2022 when -- you

20 know, when the Debtor's facing all these financial

21 difficulties?

22          MR. DIAB:  Sorry, this is Tony.  As I recall, the

23 change was made in August of 2021 --

24          TRUSTEE NG:  Okay.

25          MR. DIAB:  -- when LPG was doing much better.

96

1          TRUSTEE NG:  Okay.

2          MR. DIAB:  It didn't have any -- any of these

3 issues, and Dan had taken on a much more active role when we

4 decided to ramp up the growth and -- and based on the size

5 of the docket and the number of attorneys he was managing,

6 it was right around August of '21 that we decided to -- to

7 increase that compensation.  And then in -- as you noted, in

8 2022, when we had the financial difficulty, he ended up

9 taking a haircut of between two and three hundred thousand,

10 which he obviously voluntarily did because of the issues

11 that we faced.

12          TRUSTEE NG:  According to the bank statements that

13 was attached to the Debtor's monthly operating report filed

14 with the Court on May 1st, 2013 (sic), docket number 55, it

15 looks like the Debtor only has about $6300 in the bank

16 account as of March 31st, 2023.  How is the Debtor going to

17 be able to pay for the $100,000 a month?

18          MR. DIAB:  The -- this is Tony again.  We

19 anticipated revenue from referral fees in addition to the

20 money that's being held by the payment processor.  We have

21 no problem clearing that -- the current operating budget of

22 $253,000, which includes the $100,000 salary to Dan, but

23 that does -- the revenue source moving forward, the payment

24 process, there's a one-time payment that we would receive.

25 But the referral fees moving forward should be more than

97

1  enough to cover that amount that's due.

2          TRUSTEE NG:  The employment app --

3          MR. MARCH:  And I think that starts this Friday.

4          TRUSTEE NG:  Okay.  The employment application

5  filed with the Court by your attorney also asks for a

6  $20,000 post-petition retainer.  Has that been paid?

7          MR. DIAB:  It has not at this time, no.

8          TRUSTEE NG:  And is this -- is this going to be

9  the same source of funds going to pay that retainer or what

10  other source of funds?

11          MR. DIAB:  Correct.  It would be either the -- the

12  funds released by EquiPay if they release funds first or the

13  revenue received from the referral fees if that's received

14  first would go to pay the $20,000 post-petition retainer.

15          TRUSTEE NG:  Okay.  But the EquiPay, you

16  anticipate you will probably have to file some kind of

17  adversary action in order to get the funds back, right?

18          MR. DIAB:  Correct, unless they break -- their

19  conversation's not going well -- we don't think that they're

20  going to do it voluntarily.

21          TRUSTEE NG:  What about --

22          MR. DIAB:  That's correct.

23          TRUSTEE NG:  What about Merrich Bine, do you think

24  they're going to voluntarily give back the money or do you

25  think the Debtor needs to file some kind of adversary

98

1  proceeding?

2          MR. DIAB:  Yeah, that -- that one I can confirm

3  there's no chance that they voluntarily return anything.

4          TRUSTEE NG:  Okay.

5          MR. DIAB:  And, so, that, again, would have to be

6  some formal proceeding.

7          TRUSTEE NG:  Okay.  I note that the Debtor filed

8  the March monthly operating report using the wrong form.

9  The Debtor actually used the small business debtor form, and

10 this is not a small business debtor case.  So, we cannot

11 accept that monthly operating report for that reason.  And,

12 also, pursuant to the IDI letter that we sent to your

13 counsel on March 22nd, we specifically indicated that

14 certain supporting documentation must be filed along with

15 the monthly operating report, and that includes the balance

16 sheets, the P and L statement, the general ledger and things

17 like that, and none of those were attached to the monthly

18 operating report.  So, the Debtor needs to refile the

19 monthly operating report using the correct form and provide

20 the supporting documentation.  I mean, if you don't have a

21 copy of the IDI letter, you can certainly contact our

22 office, and we'll be happy to send you a new one.

23          Does that work for you?

24          MR. DIAB:  Yes, understood.

25          TRUSTEE NG:  Thank you so much.

99

1          I note that there are three secured creditors
2    listed in the Debtor's amended Schedule D that was filed
3    yesterday, Docket Number 52.  Does the Debtor need the
4    consent of these secured creditors to use the cash
5    collateral to pay any business expenses, including the
6    insider compensation?
7          MR. DIAB:  This is Tony.  I don't have an answer
8    to that question.
9          TRUSTEE NG:  Okay.  And I note that the amended
10   Schedule D still does not list the dates upon which the debt
11   was incurred or the last four digits of the account number.
12   So, that has to be -- that has to be amended.
13          Since the Debtor filed for bankruptcy, has the
14   Debtor made any expenses payment?
15      (Pause.)
16          MR. DIAB:  No.
17          MR. MARCH:  No.  I don't think so.
18          TRUSTEE NG:  So, the Debtor didn't pay for rent or
19   payroll or electricity for the -- you know, no payments were
20   ever made?
21          MR. DIAB:  Post-petition, no payments have been
22   made.  We've been waiting on funds from the payment
23   processor or, in the alternative, for these referral fees to
24   kick in.  At this time, no payments have been made post-
25   petition.  No funds have been available.

100

1          TRUSTEE NG:  So, no payments to the two staff were

2 made post-petition?

3          MR. DIAB:  Correct.  That's two payrolls that have

4 been missed.

5          TRUSTEE NG:  What about the lease of the new

6 place?

7          MR. DIAB:  So, the -- the April payment was made

8 at the end of March, but the -- the May payment has not been

9 made.  Today is the 2nd.  We have I believe until Friday to

10 make that payment without penalty, but that has not been

11 paid for the month of May.

12          TRUSTEE NG:  So, the April payment --

13          MR. DIAB:  The 1491 figure that was given.

14          TRUSTEE NG:  Okay.  So, the April figure, the

15 April rent payment, was that -- what was the source of the

16 funds to pay that payment?

17          MR. DIAB:  So, that was paid out of the Union Bank

18 operating account.  It was paid.  In the middle of March we

19 made the payment for the month of April, but I don't know

20 the exact date.  I do know it would have gone from the Union

21 Bank account ending 4854.

22          TRUSTEE NG:  Okay.  What kind of account --

23          MR. DIAB:  I'm just trying to source of funds --

24          TRUSTEE NG:  I'm sorry.  Go ahead.

25          MR. DIAB:  I'm sorry.  Just to answer your

101

1  question, the source of funds, that would have been client

2  payments that we could receive in March because we did

3  receive some client payments.  The 675 was held, but

4  clients' payments -- I'm sorry.  Client payments would have

5  been the source of the rent payment that was made in March

6  for the month of April.

7          TRUSTEE NG:  Okay.  What kind of accounting

8  systems and software did the Debtor -- does the Debtor use

9  to track financial activity?

10          MR. DIAB:  LPG currently uses Quickbooks.  In

11  2022, we had switched to NetSuite and then switched back

12  from NetSuite to Quickbooks.  In 2023, it's exclusively been

13  Quickbooks as the bookkeeping software.

14          TRUSTEE NG:  Okay.  And who has access to the

15  Quickbooks?

16          MR. DIAB:  So, there was a -- a former accountant

17  who was in the accounting department named Breanne

18  (phonetic).  Dan has access to the Quickbooks.  And,

19  although I don't have access, I could give access.

20  Carpenter and Associates, the accountants who handle the tax

21  filings, also have access to the Quickbooks account.

22          TRUSTEE NG:  Okay.  We received a balance sheet

23  for end of fiscal year 2022 late last Friday evening and an

24  income statement for fiscal year 2022.  When were these

25  documents prepared?

*Briggs Reporting Company, Inc.*

EXHIBIT 1
Page 109

Case 8:23-bk-10571-SC    Doc 191-1    Filed 07/07/23    Entered 07/07/23 21:44:24    Desc
Declaration of Richard A. Marshack    Page 111 of 289

102

1          MR. DIAB:  They would have been finalized in

2     January of 2023.  They were prepared throughout the course

3     of the year in 2022 with bookkeeping entries, but those

4     financials were formalized in January.  No financials for

5     the year 2023 have been prepared.  The accounting

6     department, along with others, left in February, and they

7     have not replaced them.  The accountants themselves, they're

8     working on the tax filings but have not completed financials

9     for this calendar year, for 2023.  Their tax focus was 2022

10    tax year.

11          TRUSTEE NG:  And who prepared them, your

12    accountant?

13          MR. DIAB:  It was our accounting department.  Our

14    accounting department as of January consisted of three

15    individual bookkeepers and then an acting CFO, not a

16    technical officer or director of the company but somebody

17    who was fulfilling the role of CFO named Kevin Kirkler

18    (phonetic).

19          TRUSTEE NG:  And when was he the CFO of the

20    Debtor?

21          MR. DIAB:  He was hired in August to fill that

22    role.  He was terminated at the very beginning of February.

23    And, so, he was employed during that period of time.  The

24    termination in -- in early February was the result of -- of

25    certain discoveries that came to light for me and Dan, and

103

1 then the decision was made to part ways with Kevin.

2        TRUSTEE NG:  Okay.  And you mentioned that -- is

3 it two bookkeepers in the accounting department?

4        MR. DIAB:  Well, there were -- there were three

5 people working underneath Kevin during the time when Kevin

6 was employed.  The three people were Gabriel Monroy

7 (phonetic), Breanne Pierwich (phonetic) from

8 (indiscernible), and then the third individual was Eddie,

9 Eddie Ball (phonetic), and those three individuals were the

10 bookkeepers essentially working under Cameron during that

11 period of time.

12        TRUSTEE NG:  And are they still with LPG?

13        MR. DIAB:  No.  They left along with others in

14 February and March.

15        TRUSTEE NG:  Okay.

16        MR. DIAB:  And are no longer employed by LPG,

17 although Breanne does answer questions for us often when we

18 -- when we ask where to find a piece of information, but

19 she's not employed.

20        TRUSTEE NG:  So, was the balance sheet and the

21 income statement submitted to us prepared by this department

22 prior to their departure?

23        MR. DIAB:  It was prepared prior to her departure,

24 but it was pulled by me last week to be able to send

25 through, which is another way of saying it was not verified

104

1 by anybody in the accounting department that that's the

2 correct version, but it's the last version that I had

3 received from the accounting department.  It's the only

4 version I had access to.

5         TRUSTEE NG:  Okay.  Because the initial seven-day

6 package that was submitted to our office on April 17th, '23,

7 the Debtor at that time indicated that it has not prepared

8 an financial statements in 2022 or in the past year.  So,

9 but you're saying these were actually prepared by the -- you

10 know, by the department, the accounting department prior to

11 their departure, and you pulled it last week or so, is that

12 right?

13        MR. DIAB:  That's correct.  And, to be clear, the

14 -- the documents that were sent were never reviewed by a CPA

15 nor certified by a CPA.  It was our internal accounting

16 department only.

17        TRUSTEE NG:  I don't think we ever received a

18 profit and loss statement even though we asked for it.  Is

19 there a profit and loss statement?

20        MR. DIAB:  For 2022 there is.  None has been

21 prepared -- yeah, for 2023, none have been prepared for the

22 first four months of the year.

23        TRUSTEE NG:  The Debtor was making $155 million

24 gross in 2022, and you don't have a P and L statement?

25        MR. DIAB:  We have the P and L for 2022.  We don't

*Briggs Reporting Company, Inc.*

EXHIBIT 1

Page 112

105

1  have it for 2023.

2          TRUSTEE NG:  Okay.

3          MR. DIAB:  It was submitted for 2022, along with

4  the balance sheet.

5          TRUSTEE NG:  So, we don't -- no, we did not

6  receive the P and L statement for 2022.  So, can you please

7  go ahead and send it to your attorney, and he can send it to

8  us?

9          UNIDENTIFIED SPEAKER:  (Indiscernible) we have

10  your income statement for --

11          TRUSTEE NG:  Oh, we have the income statement.

12          UNIDENTIFIED SPEAKER:  It's the same thing as the

13  P and L.

14          TRUSTEE NG:  Okay.

15          UNIDENTIFIED SPEAKER:  Sorry.

16          TRUSTEE NG:  And the accounts receivable,

17  according to the balance sheet for end of fiscal year 2022

18  that we received last Friday evening, the title of that

19  document, it says "Litigation Practice Group, PC, Parent

20  Consolidated."  So, what entities are consolidated with the

21  Debtor?

22          MR. DIAB:  I'm not aware of any being consolidated

23  with the Debtor.  So, I don't -- yeah, I don't know why that

24  notation was made, but I would have to inquire of Kevin if

25  there was anybody else included in that, but there should

106

1 not be any other entities.

2          TRUSTEE NG:  Are you still in good terms with

3 Kevin?  I thought he was let go.

4          MR. DIAB:  We -- so, we have a -- we have an open

5 line of communication.  It's not the best relationship, but

6 I am able to reach out to him, and he reaches out to me.

7          TRUSTEE NG:  Okay.

8          MR. DIAB:  And answers questions from time to

9 time.

10          TRUSTEE NG:  Okay.  Yeah, I will need explanation

11 why it says, you know, there's consolidation.  If there is,

12 in, fact, a consolidation, we need to know the reason for

13 that.

14          The balance sheets it says for end of fiscal year

15 2022.  Does that mean those figures listed in that balance

16 sheet is as of December 31st, 2022?

17          MR. DIAB:  Correct.

18          MR. MARCH:  That's my understanding, yes.

19          TRUSTEE NG:  Okay.  Thank you.  So, the balance

20 sheet shows that the total accounts receivables as of

21 December 31st, 2022 to be $6.6 million.  Does that sound

22 right to you?

23          MR. DIAB:  Yes.  So, my understanding of how they

24 calculate the accounts receivable on the balance sheet, they

25 don't book all future payments due on all contracts.  What

107

1 they're looking at is NSF's that were unresolved because

2 those amounts are owed to the company, and the company is

3 supposed to collect until they have a clearing entry to

4 remove the -- the NFS's that are owed.  But that figure does

5 not include future payments pursuant to contracts, and that

6 was a decision that the accountants made based on

7 (indiscernible) system that we book all the future contract

8 payments.  We just got hit with a huge tax liability in the

9 current year, and so they opt not to include AR beyond the

10 payments that we sought from clients but didn't collect.

11          TRUSTEE NG:  If the Debtor were to include the

12 future AR, what would the figure look like?

13          MR. DIAB:  As of right now or as of December --

14          TRUSTEE NG:  As of December -- I mean, is there a

15 difference?  I mean, is there a huge difference?  Well, what

16 about as of right -- as of right now?

17          MR. DIAB:  As of right now, I think that we were

18 putting the figure at roughly 60 million based on the

19 referral fees model that we're now adopting.  As of December

20 of 2022, when we still had all of the direct client payments

21 to account for, it probably would have been closer to $300

22 million in terms of all future contracts and payments due

23 thereunder.

24          TRUSTEE NG:  So, how did it go from 300 to 60

25 million dollars?

108

1          MR. DIAB:  That's a function of the percentage

2  split for the companies that are now servicing the clients,

3  so the 40 percent from CLG and 20 percent each from Phoenix

4  and Oakstone.  That's how the number is now 60 million,

5  because the remaining AR is going to belong to the firm

6  that's doing the servicing for the clients.

7          TRUSTEE NG:  Okay.  So, the Debtor's Schedule B

8  filed with the Court on April 4th -- and that's Docket

9  Number 33 -- shows the AR in the amount of $120 million.

10  So, how do you reconcile the numbers you just told me and

11  the $120 million?

12          MR. DIAB:  So, the $120 million would have to be

13  revised based upon the cancellations that we actually saw

14  happen as a result of these transitions and everything else

15  that was happening.  So, the 123 would have been a figure

16  that we would have determined in March at the time that we

17  were filing the petitions based on all of the clients

18  remaining onboard.  And in reality, clients cancelled with

19  LPG before the transfer and cancelled with the receiving law

20  firms post-transfer, in part because of the payment issue

21  with Merrich Bine, in part because they objected to the

22  transition.  And, so, the client base shrunk as a result of

23  -- of the movement from us, and that's why the future AR

24  also shrunk.

25          The 120 was a very rough figure.  The 60 million

*Briggs Reporting Company, Inc.*

EXHIBIT 1
Page 116

109

1  itself is a rough figure.  This client base is inconsistent

2  in terms of payment streams.  Sometimes they perform really

3  well.  Sometimes they perform poorly.  So, it's a -- a best

4  guess.

5          TRUSTEE NG:  Okay.  And have the Debtors taken any

6  steps to try to recover the AR?

7          MR. DIAB:  I would say no.  The -- the policy

8  we've had from the inception of LPG is that we won't seek to

9  collect from clients that don't make payments.  We'll

10 encourage them to make payments.  We'll try to retain them

11 so that they remain clients, but if they want to leave, we

12 don't collect any payments that were owed at the time that

13 they leave.  We don't even make demands out of them, engage

14 in collection action.

15         TRUSTEE NG:  Okay.  So, and that's to both

16 existing clients or clients who decided to leave LPG that

17 the policy is they don't -- that LPG does not try to make

18 any demands or collect on the AR?

19         MR. DIAB:  Correct, and that's a function of the

20 positions the clients are in as individual discovering of

21 that and also concerns about how the State Bar would view

22 that practice, how seeking to collect from these individual

23 clients, that policy decision was made early on, and we

24 haven't changed it since.

25         TRUSTEE NG:  Okay.  So, the combined bank accounts

*Briggs Reporting Company, Inc.*

EXHIBIT 1
Page 117

110

1 on that balance sheet shows that, you know, the balance as

2 of December 31st, 2022 was $2.5 million, but the Debtor only

3 listed $4500 in the Union Bank account as of the petition

4 date.

5          So, what happened to all that money?

6          MR. DIAB:  So, the operating costs in January but

7 then also when February -- in the month of February, when

8 the payment processing was no longer paying anything through

9 because the process was (indiscernible), all the existing

10 money that we had sort of in the bank from all these various

11 accounts we used to keep LPG operating as long as possible.

12 And then, when that money was gone, that's when we

13 essentially made a payroll and saw the mass exodus of

14 employees.  But any money that would have been in the

15 account at the end of December or the beginning of January

16 was used to cover all the expenses in January and February

17 of this year.

18          TRUSTEE NG:  Okay.  The balance sheet shows the

19 total liability as of December 31st to be $9.9 million.

20 Does that sound right?

21          MR. DIAB:  That sounds accurate, yes.

22          TRUSTEE NG:  And then the Debtor's schedule shows

23 liabilities about $140 million or so.  So, how do you go

24 from 9.9 as of December 31st of last year to $140 million

25 within the three months?

111

1          MR. DIAB:  We dispute the vast majority of the 140

2 million.  We were obviously advised by counsel that if

3 somebody is claiming a balance is owed, we have to report

4 that to the Court, but we do not believe that the vast

5 majority of purported creditors are actually creditors.

6 They either are seeking moneys that are not owed or they're

7 seeking to enforce contracts that they had already breached

8 and they're not permitted to enforce.  So, we think that the

9 actual amount owed to creditors is much closer to about $10

10 million, maybe a little bit less, in terms of actual

11 creditors.  These disputes obviously are going to have to be

12 adjudicated, but -- but we've marked the debts as disputed

13 on our schedules.

14          TRUSTEE NG:  Okay.  And --

15          MR. DIAB:  The balance sheet shows our -- our

16 position.

17          TRUSTEE NG:  I'm sorry.  I couldn't hear you.

18          MR. DIAB:  The balance sheet shows our position

19 with regard to who's actually a creditor and who's not.

20          TRUSTEE NG:  Okay.

21          MR. DIAB:  As of this time.

22          TRUSTEE NG:  Okay.  We -- we -- our office

23 requested a list of receivables with an aging, and we did

24 receive some kind of report from your office, but it does

25 not identify any account holders, and there's no aging is

112

1 listed, just amount each month.  So, we would need a revised

2 aging report with those information in order for us to have

3 a meaningful understanding of what's going on.  You can send

4 it to your attorney.

5          MR. DIAB:  Just to clarify -- I apologize for

6 interrupting, but to clarify, you would prefer to see each

7 one of the clients and their payment streams?

8          TRUSTEE NG:  Right.

9          MR. DIAB:  And then multiplying out our 20 percent

10 or 40 percent?  Got it.

11          TRUSTEE NG:  Right.  I think if you have any

12 question, you can also contact our office after the meeting,

13 and we can explain to you what we need, but I think that

14 would be the information that we need so we can have an

15 understanding of what's going on.

16          On January 6th, '23, of this year, the Superior

17 Court for the State of California Orange County, Judge

18 Sherman, issued an order enjoining LPG from spending any

19 money that would result in less than $4.48 million cash in

20 hand.  And, similarly, on March 10th, '23, the State Court

21 issued a minute order enjoining the Debtor to spend any

22 money that would result in less than $4.48 million cash on

23 hand.

24          Are you aware of those two orders?

25          MR. DIAB:  Yes, we're aware of the orders.

113

1          TRUSTEE NG:  And can you explain why the Debtor

2    only has $4500 in the bank account as of the petition date?

3          MR. DIAB:  There's money held by the payment

4    processor which collects payments from clients.  Those

5    payments are held by the payment processor in an account for

6    benefit of LPG.  We believe that those funds belong to LPG

7    and would satisfy the minimum balance that the Superior

8    Court wanted us to hold.  And, so, our position is if the

9    payment processor's holding the $4.5 million, then we're

10    satisfying the Court's order.

11          In our operating account, we have never for one

12    minute in our history had four and a half million in the

13    operating account.  So, to the extent that -- that we're

14    enjoined from spending money to bring the -- the account

15    balance below four and a half million, we've never been

16    above it.  So, we couldn't bring it below.  But we don't

17    think that the Court was -- was using that hyper technical

18    interpretation.  We believe that they meant the total

19    account balances across all accounts adds up to the four and

20    a half million, which is easily the case when you look at

21    the payment processor's account and the amount of money

22    that's being held there.

23          TRUSTEE NG:  Well, actually --

24          MR. DIAB:  But that's the interpretation we've

25    taken.  It's never --

114

1          TRUSTEE NG:  Okay.  Understood.

2          MR. DIAB:  Go ahead.

3          TRUSTEE NG:  We have reviewed the bank statements

4 that you sent to our office like yesterday.  There were a

5 lot of them, and those bank statements, the Chase 3158, the

6 Chase 3133, I mean, they did have substantial deposits.  I

7 mean, even as of December the deposits were $8 million.  I

8 mean, the withdrawal was -- was a lot, was $8 million as

9 well, same as Chase 3133.  As of December, the deposit was

10 $4.38 million, and the withdrawals were $4.31 million.

11          So, it appears that the Debtor did have

12 substantial deposits in excess of the $4.5 million that the

13 Court ordered in expense account at one point.

14          MR. DIAB:  But the way that the deposits work, the

15 payment processors will send money through on a -- on a

16 daily basis any time it's (indiscernible) day.  And, so,

17 we'll receive the $4 million, $8 million, whatever the

18 number is.  We'll receive it as daily deposits of anywhere

19 from $100,000 to $1.5 million, but it never comes in as a

20 batch of four or five million or more than that amount.  The

21 largest it would ever come in as is $1.5, $1.6 million at

22 any one point in time, and when the money comes in, it's

23 obviously then spent on all the operating expenses that we

24 had operating a law firm that's -- that at the time was

25 active in 48 different states.  But the -- so, the payment

115

1 processing trickles in in small batches, and it's spent at

2 the time that it trickles in.  It never pools.  It never

3 has, and it never would if this business model is to

4 succeed.

5          TRUSTEE NG:  Okay.  So, the Debtor listed a

6 transfer of $50,000 to City Capital within the 90 days prior

7 to the filing.  Do you know when the transfer took place?

8          MR. DIAB:  The transfer would have been in

9 February of 2023.  I don't know the exact date, but probably

10 somewhere around February 20th to 25th.

11          TRUSTEE NG:  And what was the reason?

12          MR. DIAB:  But that was the one transfer that was

13 made to City Capital.

14          TRUSTEE NG:  And what was the reason for that

15 transfer?

16          MR. DIAB:  City Capital had issued a loan.  It was

17 a -- another merchant cash advance.  So, that cash advance

18 called for payments of $50,000.  We made one such payment,

19 and then we defaulted on that obligation, and that's one of

20 the obligations that we reported as a secured obligation.

21          TRUSTEE NG:  Okay.  And the Debtor also lists a

22 transfer $12 million to Merrick Bank, and when was that

23 transfer?

24          MR. DIAB:  So, Merrick Bank collected the money

25 from LPG's clients.  The money was never sent to LPG.

116

1 Merrich Bine is holding that amount we believe, but, again,

2 that's an estimate.  We don't know the exact amount that

3 they're holding, but that amount that was being held and is

4 being held by Merrich Bine we're regarding as LPG funds, and

5 that's the reason for that notation.  But no amount was ever

6 sent from LPG to Merrich Bine.  That was collected from LPG

7 clients and held by Merrich Bine.

8           TRUSTEE NG:  Okay.  So, how long did the Debtor

9 actually use Merrich Bine services?

10           MR. DIAB:  So, Merrich Bine began processing

11 payments in September of 2022, and the last payment process

12 is March 10th of 2023, so, from September '22 to March of

13 '23.

14           TRUSTEE NG:  And they have been officially

15 terminated by the Debtor?

16           MR. DIAB:  Correct, and it was -- it was by mutual

17 consent because they had a contract to process payments, and

18 they agreed to stop.  They essentially agreed at least

19 temporarily to give up their contractual right at our

20 request that they stop collecting payments, and so that took

21 place in March.  The agreement was reached March 10th, and

22 they have not collected the payments since.

23           TRUSTEE NG:  Okay.  And the Debtor listed Merrich

24 Bank in its Schedule F as a creditor with a claim of $8

25 million.  What is the basis of that claim?

117

1        MR. DIAB:  In addition to being a payment

2  processor, Merrich Bine had purchased receivables from LPG.

3  They entered into receivable purchase agreements on three or

4  four different occasions, and those purchase agreements

5  called for payments out of LPG's receivable to Merrich Bine,

6  and so Merrich Bine was both a payment processor and also a

7  financier in the form of receivable purchaser.

8        TRUSTEE NG:  Okay.  I think previously you

9  mentioned that the Debtor may, you know, take -- may -- may

10 initiate, you know, adversary proceedings against either

11 Merrich Bine or Apocay (phonetic) in this bankruptcy case.

12 Does the Debtor contemplate any other litigation against any

13 other party in this bankruptcy?

14       MR. DIAB:  Yes, a number of other adversary

15 actions are contemplated.  As I mentioned earlier, there's a

16 dispute with Kevin Kirkler, the former acting CFO, and that

17 dispute involves money that LPG believes was taking

18 wrongfully, that LPG is going to seek to have returned.

19 Also, LPG believes there was a misappropriation of trade

20 secrets by Kevin Kirkler and another individual who is a

21 creditor named Mario Acevedo.  We believe that they shared

22 information with a competitor, and that competitor is

23 actively stealing clients from LPG.  They're LPG clients

24 that are located at other Law firms now, but they still have

25 a contract with LPG, and this Law firm is reselling them on

*Briggs Reporting Company, Inc.*

EXHIBIT 1
Page 125

118

1 this other platform that this Law firm runs.  And, so, we

2 anticipate an adversary complaint for the misappropriation

3 of LPG's trade secrets, including client lists.

4          And then there's a related action against a

5 company called Point Break Holdings, which is partnered with

6 Mario and Kevin in this new Law firm venture, and they're

7 also actively stealing clients from -- from the Law firms

8 that are LPG clients.  So, there's going to be an adversary

9 action against them for that interference with contractual

10 relations as well as violation of a contract that Point

11 Break had with LPG that restricted such conduct.  And, so,

12 those adversary actions are contemplated.

13          There was an -- one additional adversary action

14 would be against Debt Validation Fund and DVI Fund related

15 to money that was paid to them pursuant to agreements that

16 they both breached.  And, so, we would seek to return the

17 funds from those two individual purported creditors and seek

18 to -- to have those funds returned as a result of the breach

19 or the agreement by those two parties.

20          Dan, can you think of any other adversaries that

21 we discussed?

22          MR. MARCH:  No.  I was going to say that --

23 against Validation Partners, that's about $30 million.

24          MR. DIAB:  Yeah.  So, Validation Partners, which

25 is also listed as a creditor, we received an assignment from

*Briggs Reporting Company, Inc.*

EXHIBIT 1

Page 126

119

1  Pec Corporation of a roughly $30 million claim that Pec

2  Corporation had against Validation Partners, meaning

3  Validation Partners owed Pec Corporation $30 million that

4  was assigned to LPG.  So, that's an asset of LPG that we're

5  going to seek.  It's that $30 million assignment that we'll

6  file as an adversary action against Validation Partners.

7  And, so, that's I guess the last of the adversaries.

8          TRUSTEE NG:  Okay.  And what about the -- the

9  potential lawsuit against Kevin?  How much was taken

10 wrongfully allegedly by him or his -- Mario?

11         MR. DIAB:  So, for Kevin, the amount in

12 controversy is $205,000, and that relates to transactions in

13 a bank account that -- that do not appear to have been

14 authorized by Dan or by myself, and that's one that is --

15 there's an ongoing conversation with Kevin and a desire to

16 resolve it amicably, but we don't know that that's going to

17 be the case, but that would be the amount in controversy.

18         TRUSTEE NG:  Okay.  And does the Debtor expect

19 anyone to sue the Debtor in this bankruptcy case?

20         MR. DIAB:  I'm sorry.  Could you repeat that

21 question?

22         TRUSTEE NG:  Do you expect anybody to sue the

23 Debtor in this bankruptcy case?

24         MR. DIAB:  So, the active lawsuits that were

25 already pending at the time of the filing of the petition

120

1  are the only lawsuits we envision.  We don't envision there

2  being any other lawsuits filed.

3          TRUSTEE NG:  Okay.  What is the plan for

4  reorganization here?

5          MR. DIAB:  So, our goal is to make all secured

6  creditors whole using the revenue stream from referral fees,

7  and then the balance of those referral fees would be made

8  available to the unsecured creditors pro rata.  The

9  complicating factor is the uncertain payment stream from the

10 client base.  And, so, over the next couple of months, we'll

11 have a good sense of exactly how this client base is going

12 to perform, that is of each service by three law firms that

13 are not LPG.  And then that would be the amount that's

14 available, but we think it would be easy to make secured

15 creditors whole, and there would be a sizeable amount left

16 for unsecured creditors.

17         TRUSTEE NG:  Okay.  At this point, I'm going to

18 turn to my colleagues, Marilyn Sorensen or the AUST, Cam

19 Miskins, to see if they have any follow-up questions.

20         MS. SORENSEN:  I do not, Queenie.

21         TRUSTEE NG:  Thank you.  I hear no response.

22 So --

23         MR. MISKINS:  I do not.

24         TRUSTEE NG:  Okay.  I'm sorry.  Cam, do you have

25 any questions?

Case 8:23-bk-10571-SC   Doc 191-1   Filed 07/07/23   Entered 07/07/23 21:44:24   Desc
Declaration of Richard A. Marshack   Page 130 of 289

121

1          MR. MISKINS:  No, I don't.

2          TRUSTEE NG:  Thank you.

3          So, at this point, I'm going to open the forum to

4  all creditors who would like to question the Debtor.  If so,

5  please announce yourself and state your name and if you're

6  an attorney and the party that you represent on the record,

7  please.

8          MR. BROWN (telephonic):  Hello.  Bob Brown.  I'm

9  an attorney.  I represent SDCO Tustin Executive Center.

10 It's the owner of the property located at 17542 East 7th

11 Street, Tustin, California, Suites 100, 105, 250 and 330.

12          Earlier in the examination, I heard the Debtors

13 representatives indicate they vacated that property in

14 February or March of 2023.  We have filed a motion for

15 relief from stay to recover possession of the property.

16          Has, in fact, the Debtor vacated those -- or

17 abandoned those premises?

18          MR. DIAB:  So, there -- there are no longer any

19 employees operating out of that space.  There's office

20 furniture that still has to be moved into storage, which we

21 anticipate completing by the end of this week, by Friday the

22 5th or Saturday the 6th, at which point we would be ready to

23 turn over possession.

24          MR. BROWN:  Okay.  Earlier I heard somebody say

25 that they vacated and gave the landlord notice that they'd

122

1  given up possession of the property, yet my client never

2  received that.  So, you anticipate vacating the property by

3  the end of next week?

4          MR. DIAB:  By the end of this week, correct, and

5  we'll have -- we'll make sure that notice is given to

6  (indiscernible) at the moment that everything has been

7  removed.

8          MR. BROWN:  Okay.  Very good.  I've got a motion

9  pending for relief from stay.  As I indicated, it's Docket

10  Number 19.  So, if Debtor's counsel would agree to give me

11  notice once the Debtor has vacated so we can take possession

12  of the property, I would appreciate that.  Obviously, we'll

13  dispose of any remaining items in the unit in accordance

14  with the Civil Code.  We will proceed with our motion for

15  relief from stay tomorrow just to make sure that this is

16  moving forward to conclusion.  But you anticipate being out

17  by the end of this week, correct?

18          MR. DIAB:  Correct.  And we don't have any

19  opposition to the motion as I understand it.

20          MR. BROWN:  Okay.  Very good.  Those are all the

21  questions that I have on behalf of my client.  Thank you.

22          TRUSTEE NG:  Thank you, Mr. Brown.

23      (Simultaneous speaking.)

24          MR. STOCKHOLD:  Go ahead, Dave.  This is Matt

25  Stockhold.

123

1          MR. CUSIO:  Okay.  This is David Cusio on behalf

2     of Debt Validation Fund 2, MCDVI Fund 1, and MCDVI Fund 2.

3          I want to follow up on a few things.  Mr. Diab,

4     you mentioned that the notes you had -- or, sorry -- the

5     notes that LPG had with my clients were breached by my

6     clients.  How do you believe those were breached?

7          MR. DIAB:  Well, we believe that for three

8     reasons.  The confidentiality term was breached when your

9     clients, both of them, shared confidential information to

10    Validation Partners, an adverse party in active litigation,

11    in November of 2023 -- of 2022, and they also violated the

12    non-disparagement clause by disparaging LPG and Dan March

13    and Tony Diab as individuals.  And then more important than

14    all of that, they continued to seek to support Validation

15    Partners in the collection of amounts that were allegedly

16    assigned.  So, the exchange was a promissory note for

17    assignment by the DVF and DVI Fund receivables from

18    Validation Partners.  But after that purported assignment,

19    the two entities continued to seek to collect and supported

20    Validation Partners in efforts to collect, which we think

21    violated both the covenant of good faith and fair dealing

22    and also, more directly, eviscerated the (indiscernible)

23    consideration to LPG for those two promissory notes.  And,

24    so, that's the position that would be outlined in the

25    adversary that we intend to file.

124

1          MR. CUSIO:  And what was the confidentiality?

2    What was the confidential information that was disclosed

3    improperly?

4          MR. DIAB:  It was financial information as well as

5    the content of various meetings.  I would have weekly

6    meetings with Dave Zuck, McKenna, Eng Taing,

7    (indiscernible), Kevin Kirkler, and we would provide

8    confidential information regarding LPG's operations,

9    including its financial status and financial transactions,

10   and that information was given to Mike McLaughlin

11   (phonetic), counsel for Validation Partners, at meetings

12   that were witnessed by Eng Taing.  And, so, that information

13   that was conveyed was used by Validation Partners in

14   connection with their active litigation.  But, specifically,

15   it was financial information and operational information

16   shared with -- with Ross and his attorney, Mike.

17         MR. CUSIO:  Okay.  I want to -- I'm going back to

18   what we were talking about much earlier this morning.

19         Mr. March, aside from work with LPG, do you have

20   personal cases that you handle personally?

21         MR. MARCH:  I have a few.  I -- I handle

22   bankruptcies, yes.

23         MR. CUSIO:  Okay.  And how long had LPG been

24   making the lease payment for your office?

25         MR. MARCH:  I would say it's been about two years.

125

1          MR. CUSIO:  Okay.  And do they cover -- does LPG

2   cover the entire rent?

3          MR. MARCH:  Yes.

4          MR. CUSIO:  So, you don't pay any of the rents due

5   on your office space?

6          MR. MARCH:  No.

7          MR. CUSIO:  What were Mr. -- sorry.  The original

8   member of LPG was John, and I didn't catch his last name.

9          MR. MARCH:  Thompson.

10          MR. DIAB:  The last name is -- yes.  I'm sorry.

11          MR. CUSIO:  Johnson?

12          MR. DIAB:  It was Thompson.

13          MR. MARCH:  Oh, Thompson.  I'm sorry.  You said he

14   had concerns about liability.  What were those concerns?

15          MR. DIAB:  This is Tony.  I can address that

16   because he had raised those concerns direct to me.

17   Specifically, his concern related to the marketing companies

18   and their compensation method.  He had concerns that the way

19   that the marketing companies that would onboard files to

20   LPG, he felt that that compensation method may violate the

21   fee sharing ban between lawyers and non-lawyers.  And, so,

22   he raised that styled as an objection, and he said, after we

23   discussed the issue, he would prefer not to be counsel of

24   record for LPG and a shareholder of LPG, and that's when we

25   essentially began a search for his replacement.  But that

126

1 was the issue that he had raised as his objection.

2          MR. CUSIO:  Okay.  Mr. Diab, you were talking

3 about the -- some of the entities, your entities that

4 received compensation from LPG.  You mentioned Vulcan

5 Consulting Group and Strategic Consulting Solutions.  Were

6 there any other entities associated with you who received

7 money from LPG?

8          MR. DIAB:  The only other entity would be BAD,

9 Incorporated, which did business in post-processing, and

10 post-processing received money from LPG from February 2019

11 when LPG was formed, until June of 2021 when BAD,

12 Incorporated was essentially dissolved.  It was never

13 dissolved formally because there's outstanding liabilities,

14 but it was essentially nonoperational as of June 2021.  That

15 entity I had an interest in, and it also was receiving

16 payments from LPG.

17          MR. CUSIO:  And who are -- is that an LLC?  What

18 kind of entity is that?

19          MR. DIAB:  BAD was formed as an LLC in I believe

20 it was January 2018.  It was converted to a -- an S

21 Corporation sometime around May of 2019, if memory serves.

22 And, so, it was BAD, Incorporated at the time that it ceased

23 operations.  It was made up, when it was an LLC, of three

24 partners, Brian Really, Arosh Asante (indiscernible) and

25 Tony Diab.  So B for Brian, A for Asante, D for Tony, BAD,

Case 8:23-bk-10571-SC    Doc 191-1    Filed 07/07/23    Entered 07/07/23 21:44:24    Desc
Declaration of Richard A. Marshack    Page 136 of 289

127

1 Inc.

2          MR. CUSIO:  Got it.  And then who were its

3 officers when it was an S Corp. or did it have officers?

4          MR. DIAB:  It did have officers.  Brian Really was

5 the CEO, and Arosh Asante Berudi (phonetic) was the

6 treasurer, CFO.  The secretary was (indiscernible).  I never

7 held an officer position for the entity and didn't receive

8 compensation from the entity, meaning I wasn't on payroll or

9 a 1099 for BAD, Inc.

10          MR. CUSIO:  Strategic Consulting, is that an LLC

11 or was it an LLC at the time?

12          MR. DIAB:  Yes, that was and even remains a

13 limited liability corporation -- company, sorry.

14          MR. CUSIO:  And who are the members of Strategic

15 Consulting?

16          MR. DIAB:  There's one member.  His name is James

17 Hinson.  He's a sole member, and I believe that entity was

18 formed toward the end of 2021, November'ish 2021.

19          MR. CUSIO:  Okay.  And how do you spell Mr.

20 Hinson's last name?

21          MR. DIAB:  James is standard spelling.  Hinson is

22 H-I-N-S-O-N.

23          MR. CUSIO:  And I believe you said that there were

24 never written agreements between LPG and Vulcan and LPG and

25 Strategic Consulting, is that correct?  Did I get that

128

1  correct?

2          MR. DIAB:  Yes, that's correct.

3          MR. CUSIO:   Are there ever times that money went

4  from any of the payment processors directly to an entity

5  that you were associated with or to yourself as an

6  individual?

7          MR. DIAB:  The former, yes.  It went to entities I

8  was associated with, never to me as an individual.  But

9  money would have been directed from payment processors

10 direct to Vulcan Consulting Group.  This would have been now

11 2021 because Vulcan was only used in 2020, 2021, and so

12 payments would have been directed at -- so, on the payment

13 processor to Vulcan without passing through any LPG

14 operating accounts.

15         MR. CUSIO:  And that was in 2021?

16         MR. DIAB:  Correct.

17         MR. CUSIO:  Did it ever happen with -- sorry --

18 Strategic Consulting?

19         MR. DIAB:  With Strategic Consulting no, but there

20 may have been -- there may have been one other entity that

21 had received those directed payments which was called

22 Lineman and Associates, but in reality, that was just a DBA

23 for World Global Fund, and World Global Fund was one of the

24 merchant cash advance companies that had given money to LPG.

25 And they also received directed payments that never passed

*Briggs Reporting Company, Inc.*

EXHIBIT 1
Page 136

129

1 through any LPG account, and I have no interest in that

2 entity, but they were a sizeable financier of LPG during its

3 growth.

4          MR. CUSIO:  There was a dispute between LPG and

5 World global, correct?

6          MR. DIAB:  Correct, a substantial one that arose

7 in April of 2022.

8          MR. CUSIO:  What was the amount at issue in that

9 dispute?

10          MR. DIAB:  So, similar to Merrich Bine, we didn't

11 get firm numbers.  Our understanding is that something in

12 the neighborhood of $10 million was collected from World

13 Global using various DBA's.  Money was collected direct from

14 LPG clients.  It was not authorized.  They called it a

15 payment processing error, but essentially on April 7th and

16 8th of 2022, World Global initiated debits of virtually all

17 LPG clients.  They essentially tried to pull payments from

18 almost all LPG clients on dates that were not authorized.

19 The clients had not had a payment due on those dates, but

20 the money was pulled anyway.  The dispute resulted with

21 World Global issuing a refund to the clients.  At least as

22 far as we know they issued refunds to all the clients that

23 were affected, but we don't have any confirmation that that

24 was the case because some of our clients would not notice a

25 payment and wouldn't necessarily contact us to report the

130

 1 additional payment, but it was our understanding that they

 2 had refunded all the clients, but this dispute was the month

 3 of April 2022, and it was roughly $10 million the amount in

 4 controversy.  Out of that, we think the vast majority was

 5 returned to clients.  We just don't have confirmation.

 6          MR. CUSIO:  Was there ever a dispute with World

 7 Global or what LPG claimed that World Global owed LPG money?

 8          MR. DIAB:  Could -- could you ask that again?

 9          MR. CUSIO:  Sure.  Was there ever a dispute where

10 LPG claimed that World Global owed LPG money?

11          MR. DIAB:  Yes.  So, both prior to and after this

12 payment processing error, LPG believes that World Global has

13 collected money that was due to LPG that wasn't being

14 remitted through.  Whether it was being held as a reserve or

15 simply not being reported, there was money that was supposed

16 to come to LPG that didn't, and that was before the payment

17 processing error.  After the payment processing error, there

18 was money due to LPG for the damage that was caused by World

19 Global's conduct, and that damage included additional

20 employee time and overtime.  It included refunds that had to

21 issue beyond the amount that was taken from clients to make

22 the clients whole.  For instance, somebody misses a car

23 payment, and now they have extra fees, and we have to make

24 them whole for that.  This is not the client's fault that

25 they couldn't make the payment.

131

1          We also lost a tremendous number of clients, and
2  we -- so, we demand compensation for the clients that it
3  canceled.  We also at that time lost our BBB rating, which
4  had been an A plus.  We went to a no rating which impacted
5  our ability to onboard new clients.  So, that was the range
6  of damage caused by the April disaster, and we demanded
7  compensation after April.  We never received it.
8          MR. CUSIO:  LPG filed a lawsuit against World
9  Global, is that correct?
10          MR. DIAB:  Correct.  It was filed under seal in
11  the Eastern District of New York and subsequently dismissed
12  for lack of diversity jurisdiction.  We didn't have the
13  membership of the LLC.  And, so, we couldn't show that there
14  was complete diversity between all of the members of the
15  World Global, LLC and Litigation Practice Group, and for
16  that reason, the court in the Eastern District of New York
17  declined to exercise diversity jurisdiction.  It is our
18  intention to refile in California, but we -- we have not yet
19  refiled.  We still have another 11 months to be able to file
20  that action, but we have not yet filed any action against
21  him.
22          MR. CUSIO:  And do you -- is it LPG's intent still
23  to file that action?  Is that another adversary proceeding?
24          MR. DIAB:  We have discussed resolution with the
25  members of World Global, and that's still a discussion

132

1 that's ongoing.  If we can't resolve things amicably, which

2 seems to be the case, then that would be added to the list

3 of adversaries that we would file.  We had a conversation on

4 that subject as recent as this past Friday with one of the

5 members of World Global.  So, we're still pursuing

6 resolution, but it doesn't appear likely, in which case that

7 would be an additional adversary.

8         MR. CUSIO:  Do you -- do you personally receive

9 compensation from a company called Prime Logix, L-O-G-I-X?

10         MR. DIAB:  No.  So, I don't receive any

11 compensation from Prime Logix, but I believe it's spelled L-

12 O-G-I-X.  Is that what you said?

13         MR. CUSIO:  Yes.

14         MR. DIAB:  Yes.  So, Prime Logix, which is a

15 Wyoming entity I don't have an interest in and I haven't

16 received any payments from that entity.

17         MR. CUSIO:  And what does Prime Logix do?

18         MR. DIAB:  Prime Logix was affiliated with the Law

19 Firm Gallant Law Group, which was the law firm that had

20 Robert Tobia (phonetic) as its principal.  Robert's an

21 attorney licensed in Pennsylvania who works out of an office

22 in Philadelphia, and prime would provide support in the form

23 of customer service, mail processing, payment processing,

24 and -- and other functions to Gallant, and then that ceased

25 when Gallant essentially was folded maybe December of 2022,

133

1   December, January.  Might have been January 2023.

2           MR. CUSIO:  Just -- just to clarify one thing, you

3   said that Prime Logix was affiliated with Gallant.  Does

4   that mean that -- are you using affiliate as there's common

5   ownership or the way you were using it earlier, that they

6   were working together?

7           MR. DIAB:  They were working together.  Prime

8   would have been the contracted party receiving payment from

9   Gallant, which was the party seeking assistance with

10  processing, but affiliation only in that they were working

11  together, and there was a financial arrangement, though,

12  overlapping ownership.

13          MR. CUSIO:  When money would go from the processor

14  to Vulcan without going through LPG, why would the money not

15  go through LPG?

16          MR. DIAB:  Well, it was a few different reasons.

17  One was the logistics of it.  There were delays, and

18  sometimes some payments had to be made on these cash advance

19  positions by Vulcan, and it couldn't delay because threats

20  were being made about filing TRO's, freezing bank accounts,

21  sending direction letters to vendors, et cetera.  And, so,

22  for expedience, we would sometimes send the money direct to

23  Vulcan to release to these cash advance companies.

24  Sometimes it was just a function of the bookkeeping that

25  when the money would go to LPG first, there was bookkeeping

*Briggs Reporting Company, Inc.*

EXHIBIT 1
Page 141

134

1 activity for the incoming revenue and then the outgoing

2 payment, and sometimes that would create delays but then

3 also create difficulties in how we recorded the transactions

4 between LPG and Vulcan after the transfer.  So, to make it

5 easy, we would do the transfer direct.  This wasn't sizable.

6 It wasn't raising millions of dollars.  It was probably a

7 few hundred thousand, but they were at points in time when

8 there was some time sensitivity, some urgency that required

9 the money to move fast, but that would be the -- sort of the

10 two-part reason, the bookkeeping and then the -- the need

11 for speed.

12          MR. CUSIO:  Mr. March, how long have you been the

13 only lawyer employed by LPG?

14          MR. MARCH:  Probably February of this year,

15 possibly even March.

16          MR. CUSIO:  As of the date of filing the

17 bankruptcy, were you the only attorney?

18          MR. MARCH:  Yes, that was actually working, yes.

19 I think there were a few attorneys -- there were still

20 attorneys working for LPG.  I don't know if they received

21 compensation.  As of March 17th, I think that was the last

22 one, amount that was paid to any attorneys at all at LPG,

23 including myself.

24          MR. CUSIO:  You said earlier -- I'm sorry.  I

25 don't remember if this was Mr. March or Mr. Diab -- that LPG

135

1 started losing employees in October and November of 2022.

2 Did I get that right?

3         MR. DIAB:  By -- sorry.  This is Tony, and I made

4 the statement earlier.  By choice, yes, we terminated

5 employees in the Las Vegas, Nevada office over the course of

6 October, November of 2022, and that was part of --

7         MR. CUSIO:  So, that --

8         MR. DIAB:  -- the (indiscernible).

9         MR. CUSIO:  Okay.  I want to make sure I

10 understand this correctly.  I believe you said that at the

11 peak, LPG had 67,000 active clients.  Is that correct?

12         MR. DIAB:  Correct, meaning a combination of

13 paying and completed payment clients, yes.

14         MR. CUSIO:  Payments and completed.  So, some of

15 these were not making payments any longer.  Were you still

16 -- was LPG still doing work on their behalf?

17         MR. DIAB:  Exactly.  So, we have clients that

18 complete the payments, sometimes early or sometimes on

19 track, but they have -- we have a lot that stretch well

20 beyond the completion of the payment stream.  And, so, we

21 may be handling a lawsuit for a year or two years after the

22 payments are finished.  We regard that as active because we

23 are continuing to do work, but there's no more payments

24 being made by the client.

25         MR. CUSIO:  And did I understand correctly that

136

1  the 400 to 600 California clients LPG still has, they have

2  completed their payment obligations, but LPG still has work

3  to close out those files, is that correct?

4        MR. DIAB:  That's correct.

5        MR. CUSIO:  And then the 67,000 active clients,

6  was that the number at the end of 2022?

7        MR. DIAB:  Yeah, that would have been -- so, that

8  -- that peak would have been somewhere around December 2022,

9  January 2023, that highwater mark.

10       MR. CUSIO:  And you said that a number of clients

11 had decided not to -- had decided -- I'm going to use the

12 word drop out.  That's not the right word but are no longer

13 working either with LPG, Oakstone, CLG or Phoenix, correct?

14       MR. DIAB:  That's correct.

15       MR. CUSIO:  And approximately what percentage of

16 th -- the 67,000 are -- decided to not work with any of

17 those entities?

18       MR. DIAB:  It would be that 5,000 figure that

19 we're aware of, meaning that was known to us before any

20 transfers were completed.  There were also subsequent

21 cancellations by clients who didn't want the transfer and

22 voiced that to the new law firm.  I don't have firm

23 statistics on that, but I would imagine it's probably

24 another 5,000.  So, probably 10,000 total clients out of the

25 67 that opted against transfer, either before or after the

137

1 transfer was completed.

2          MR. CUSIO:  Okay.  All right.  Just a second.

3 When -- you said that there were about 15,000 files that

4 were associated with Pec. How were those associated with

5 Pec?

6          MR. DIAB:  Pec had obtained some right to

7 receivable from the files, meaning it was entitled to some

8 percentage of the payment stream of those 15,000 clients,

9 and that was by virtue of a combination of receivable

10 purchases that Pec or a related entity had done.  Pec was

11 related to entities under the names 2Z, Carousel, and G2CC,

12 but it was a combination of receivable purchased by Pec and

13 then voluntary agreement between LPG and Pec to assign

14 receivables as a way of making Pec whole and satisfying the

15 obligations that LPG had under its promissory note to Pec

16 Corp.

17          MR. CUSIO:  Okay.

18          MR. DIAB:  What I would style an in-kind transfer.

19 Instead of money paid to Pec Corp., we gave them a right to

20 receivable, and Pec Corp. accepted that as satisfaction of

21 the obligation.

22          MR. CUSIO:  So, Pec received the right to the

23 receivable to get income stream, and then the files were

24 transferred to Oakstone, correct?

25          MR. DIAB:  Correct.  And, just to be clear, it was

138

1 a percentage, not the entire payment stream, but a

2 percentage of the payment stream on those files, but that is

3 correct.

4          MR. CUSIO:  There was a UCC1 filed in -- on

5 February 2nd of 2023 by First Corporate Solutions, and it

6 identified your Debtor as the Litigation Practice Group, and

7 it identifies a list of about 15,000 accounts.  Is that the

8 -- or is that list the list of accounts that were the

9 receivables for Pec?

10          MR. DIAB:  I'm not -- I'm not certain, but I

11 believe so.  I know that Pec filed a UCC1.  I didn't know

12 whether they filed it direct or used an agent, but if it was

13 15,000 files listed, then in all likelihood, that was the

14 Pec UCC1 filing.

15          MR. CUSIO:  Is LPG doing anything to oversee the

16 work that Oakstone, CLG or Phoenix are doing?

17          MR. DIAB:  Yes, minimal oversight just by virtue

18 of the fact that we have very few hands on deck at LPG, but

19 we do have access to the CRM's for the three entities to be

20 able to see client files and when clients call in to lodge

21 complaints regarding the new servicing, we're able to see

22 what servicing has been completed and send messages to those

23 law firms about the complaint that we're receiving from the

24 clients.  We continue to have -- so, LPG has the office now

25 with Dan, Olga and Carl.  And, so, a lot of these are coming

139

1  in by way of email.  And, so, we have some clients that will

2  call in and talk with Dan or Olga but other clients that

3  would email and then the message is relayed to the new firm.

4  If it's by email, usually by me, saying client so and so is

5  saying they can't get a call back on this case.  Can you

6  please contact them?  So, we have that minimal oversight and

7  the ability to communicate regarding client concerns, and

8  that's sort of the limit of the participation at this point.

9           MR. CUSIO:  What is -- you mentioned CRM.  What is

10  that?

11          MR. DIAB:  CRM is the -- essentially, it's all the

12  client data that's kept in one location.  The LPG CRM was

13  called Debt Pay Pro.  It was a Centric CRM.  It's network

14  based, and it would house all data regarding the clients.

15  So, it would have the case file.  It would have all the

16  clients' personal data, including credit reports.  It would

17  have their payment information, whatever they were using to

18  make their payments to us.  All the correspondence that we

19  received on behalf of the client or from the client would be

20  stored there.  And then notes are kept on every client

21  communication.  So, every time there's a call, an email or

22  letter, we record the content of the client communication

23  under the note section.  It's sort of a one-stop shop for

24  all information related to the client representation, and

25  each of the other firms also have CRM that performs a

140

1  singular function.  For some you've got (indiscernible).

2  For others they use proprietary systems but we have access

3  to the CRM for each of those three entities with regard to

4  LPG clients.

5          MR. CUSIO:  Did Debt Pay Pro track money that was

6  pulled from the clients' accounts?

7          MR. DIAB:  Yes.  Debt Pay Pro had a system for

8  tracking client payment information.  The payment processes

9  were either API'd into Debt Pay Pro so that the payment

10 processor would speak to Debt Pay Pro directly and

11 automatically update client information.  Others who didn't

12 have that direct connection would send information in TSC

13 files, Excel files, and then would take that data and

14 populate it into Debt Pay Pro.  But, either way, the client

15 payment information was updated in Debt Pay Pro using one

16 method or the other.

17         MR. CUSIO:  And does LPG still have Debt Pay Pro?

18         MR. DIAB:  Our access to Debt Pay Pro was cut off

19 at the time that we filed the petition.  DebtProPay

20 terminated our access just before the filing of the

21 petition, if memory serves.  I think they had terminated

22 access on Friday afternoon, and we filed the petition on

23 Monday, but we had not had access to our DebtPayPro since

24 that time, although we did have a backup with all of the

25 DebtPayPro data that we can still access, but we're

141

1 accessing the backup that was pulled (indiscernible)

2 DebtPayPro has as of I think it's March 17th.

3          MR. CUSIO:   What is the CRM that Oakstone uses?

4          MR. DIAB:   Oakstone was using a combination of

5 Freshworks and Freshsales which are CRM's that Eng had

6 found.  Eng is from Pec Corp.  He had found those as

7 platforms that he liked, and then they were also using a

8 proprietary system that -- that is not a public CRM.  It's

9 available for purchase.  So, they had the combination of the

10 proprietary system and then this Freshworks, Freshsales, and

11 then Eng was also building his own CRM, although I think

12 that project has now stopped, and but that's what Oakstone

13 was using.  CLG uses DebtPayPro, and it's a very similar

14 platform to the DebtPayPro version that we were using.  So,

15 DebtPayPro was very convenient.

16          MR. CUSIO:   And then what does Phoenix use as a

17 CRM?

18          MR. DIAB:   They use the same proprietary system.

19 So, the Oakstone system is a combination of Freshworks,

20 Freshsales.  It is a proprietary system.  Phoenix is just

21 using that proprietary CRM system that was written by

22 developers at -- at Phoenix.

23          MR. CUSIO:   And, so, Phoenix is sharing its system

24 with Oakstone?  Is that what I understand, the proprietary

25 system?

142

1          MR. DIAB:  Yeah.  I mean, I believe that Oakstone

2 pays for a license to utilize that CRM right now, but that's

3 correct that it's -- in part, because Oakstone is using

4 other platforms as well, but in part, they're utilizing that

5 system.

6          MR. CUSIO:  Who is Israel Orozco, O-R-O-Z-C-O?

7          MR. DIAB:  He was one of the attorneys at LPG.  He

8 was a California licensed attorney.  And, so, he had worked

9 on the California docket of cases at LPG.  He also had

10 helped with some of the FDCPA cases that another attorney,

11 Richard Meyer (phonetic), was handling at -- at LPG.  But he

12 is a California attorney.

13         MR. CUSIO:  And when did he stop working for LPG?

14         MR. DIAB:  So, formally he stopped in March along

15 with everybody else, but I think even to the present day he

16 continues to consult with Dan regarding matters.  He's

17 finishing out client files even though he's not being paid

18 because he's counsel of record in the cases, and I think he

19 still communicates with Dan about his California docket to

20 make sure each one of those cases is concluded.  I'm not

21 sure how many he was still handling, but my understanding is

22 he was still working on them as recent as last week, but his

23 formal employment ended in -- sometime in March, along with

24 everybody else.

25         MR. CUSIO:  How many lawyers are working for LPG

143

1 in that kind of context?

2          MR. DIAB:  Well, that's a good question.  So, how

3 many of the lawyers are still handling cases even though

4 they're not being compensated?  I think that's -- probably a

5 lot of the attorneys that were employed by LPG are finishing

6 out cases that had been assigned before the termination of

7 their employment or before they quit, and that's obviously

8 because of the Rules of Professional Conduct in every state

9 that limit the circumstances in which an attorney can

10 withdraw from a case.  And if you've got a $2,000 collection

11 case, the judge doesn't want to see a motion to withdraw.

12 They want to see a settlement.  So, I think it's probably a

13 fair number, although I don't have statistics on that.

14          MR. CUSIO:  On the 15,000 client files that Pec

15 had an interest in the receivables for, what is the document

16 that shows Pec had that interest in those specific -- those

17 specific client files?

18          MR. DIAB:  I believe it was a receivable purchase

19 agreement that was executed as satisfaction of the

20 promissory note that LPG had given to Pec Corp, but the

21 actual document itself would have been style a receivable

22 purchase agreement.

23          MR. CUSIO:  What is Grayson Law Center?

24          MR. DIAB:  Grayson was one of the platforms that

25 Eng had been throwing around as a potential other platform

Case 8:23-bk-10571-SC   Doc 191-1   Filed 07/07/23   Entered 07/07/23 21:44:24   Desc
Declaration of Richard A. Marshack   Page 153 of 289

144

1  to onboard clients.  My understanding is they're not

2  operational.  In fact, I believe that with all of the

3  accusations that were being made against Oakstone, the

4  thought was that new clients would be onboarded to a

5  different platform and not commingled with the LPG pipeline,

6  but that was a plan that my understanding hadn't gotten off

7  the ground to date, and I don't believe that they're still

8  trying to get that off the ground.  That would -- that would

9  be the function that it was supposed to serve, for new

10 clients that are unrelated to any LPG transfer.

11          MR. CUSIO:  Back in about October, there was a

12 transfer of receivables to StratCap (phonetic).  Why were

13 those receivables transferred to StratCap?

14          MR. DIAB:  There was no receivable transferred to

15 StratCap.  StratCap had sent an agreement to try to document

16 receivable purchases for the files that Validation Partners

17 had purportedly acquired, and I say purported because it was

18 an open question about whether Validation Partners had

19 documented all of the receivables that they had actually

20 purchased.  And, so, Russ put together the list of what he

21 thought were all the Validation Partners' receivables that

22 were purchased.  He wanted to execute a document and file a

23 UCC1 to sort of preserve the position of the Validation

24 Partners Investors, but he immediately upon filing, he

25 received objections from every different direction, and we

145

1 never proceeded with the agreement, meaning he never paid

2 the consideration that was due.  He never received any

3 payments on those files.  The actual transfer never took

4 place, but at least his desire to do a UCC1 filing to

5 perfect the interest in those files, in order to do so, you

6 have to have an underlying security agreement.  His fear was

7 lawsuits on individual investors claiming that Wes and Russ

8 as the co-managers of Validation Partners had failed to

9 fulfill their fiduciary duty because they had taken in

10 almost 70, 80 million dollars worth of money to buy

11 receivables, but they didn't perfect a single receivable

12 purchase.  And in that sense, in a proceeding like this,

13 they're treated as unsecured creditors, and Russ thought

14 that would create substantial liability for him as an

15 individual.  At that point in time, Russ had essentially

16 kicked Wes out of Validation Partners.  So, Wes couldn't do

17 anything to help Validation Partners perfect the interest of

18 the investors.  So, Wes was trying to do that but failed,

19 but he never received any payment pursuant to that

20 agreement.  He never paid the consideration called for by

21 the agreement.  In my understanding, he was withdrawing his

22 UCC1 filing, although I don't know if that's happened to

23 date.

24          MR. CUSIO:  After Mr. Thompson stopped being the

25 member of Litigation Practice Group, did he continue doing

Case 8:23-bk-10571-SC   Doc 191-1   Filed 07/07/23   Entered 07/07/23 21:44:24   Desc
Declaration of Richard A. Marshack   Page 155 of 289

1 work for Litigation Practice Group?

2         MR. DIAB:  He was listed as counsel of record on

3 certain cases.  And, in his position as counsel of record, I

4 don't know that he withdrew immediately upon relinquishing

5 his title of managing shareholder.  So, there was probably

6 matters that were active and lingered a few months after his

7 transition out as the head attorney at LPG.  But, again,

8 when you're listed on a docket, you'll stay there until some

9 form of motion is made, but I don't believe he engaged in

10 any actual after (indiscernible) after he transferred his

11 shares to Dan.

12         MR. CUSIO:  Did he continue to have access to an

13 LPG email account?

14         MR. DIAB:  I believe he did, and I believe he

15 still had access to the CRM.  I don't know that he ever

16 utilized it, but I believe he still did have some form of

17 login.  I don't know that John ever actually logged in,

18 though.

19         MR. CUSIO:  I want to make sure I got this

20 correct.  Did you say that Scott Eadie is the owner of

21 Oakstone?

22         MR. DIAB:  Correct.  My understanding is he is

23 sole shareholder and managing attorney for Oakstone.  So,

24 he'd be the sole owner.

25      (Pause.)

Case 8:23-bk-10571-SC    Doc 191-1    Filed 07/07/23    Entered 07/07/23 21:44:24    Desc
Declaration of Richard A. Marshack    Page 156 of 289

147

1          MR. CUSIO:  Did LPG default on its note with Pec?

2          MR. DIAB:  No.  LPG was still in compliance with

3   the terms of the Pec note at the time that it negotiated the

4   satisfaction of the note by virtue of the receivable

5   assignment.

6          MR. CUSIO:  Now, the -- you were asked some

7   questions about this earlier.  There's $120 million that's

8   listed in -- as accounts receivable over the last 90 days.

9   As I understand what you explained, that $120 million was

10  your expectation of the 20 percent -- the 20 to 40 percent,

11  20 percent with Oakstone and Phoenix and 40 percent with

12  CLG, that you expect LPG is going to receive, correct?

13         MR. DIAB:  Correct.

14         MR. CUSIO:  And then you had said that it's now

15  closer to 60?

16         MR. DIAB:  Correct.  Both were estimates.  And, as

17  you said, the strike between the 120 figure and the 60

18  figure is fallout from the transfer.  It resulted in a lot

19  more nonperformance than we anticipated.  Nonperformance

20  meaning a combination of cancellations and then clients that

21  aren't responsive and not making payments, which is

22  potentially going to turn into a cancellation.

23         MR. CUSIO:  So, when you mentioned the

24  approximately 10,000 cancellation, that was just official

25  cancellations?  Is that what I understand?

148

1          MR. DIAB:  Correct.  It doesn't include what I'll

2    call an NSF client, a client who had a bounced payment and

3    hasn't made an election of whether they're terminating the

4    agreement or not.  That number would be much larger,

5    probably another six to eight thousand clients, rough

6    estimate, but probably something like six to eight thousand

7    that are not performing and not responding.

8          MR. CUSIO:  So, if -- but if you had estimated 120

9    and now you're saying it's 60 million, that's about a 50

10   percent drop, right?

11         MR. DIAB:  Roughly 50 percent drop, correct.

12         MR. CUSIO:  But that only represents about 20,000

13   clients?

14         MR. DIAB:  Correct, and there were probably I

15   would say in the neighborhood of the high 40's, low 50's in

16   terms of performing clients at the time that -- that all

17   this began, so probably maybe about 40 percent of the

18   clients that would be in that nonperforming category, 40

19   percent of the formerly performing that are now not

20   performing.

21          In terms of determining receivable, though, some

22   clients are early in their contract and some are late.  And,

23   so, not every cancellation is going to have the same dollar

24   value.  A client that has two payments left versus a client

25   that has 20 payments left, I think would be weighted

149

1  differently.  But those are rough estimates.  They're not

2  precise figures.

3          MR. CUSIO:  Okay.  I -- sorry.  Hold on just a

4  second.  Are -- Mr. Diab, are you an owner of Validation

5  Partners?

6          MR. DIAB:  No.  I was -- so, Validation Partners

7  was owned by a couple of entities.  One of the entities was

8  StratCap, which is an entity that West Thomas owns, and Wes

9  sort of cut me into half of his entity, but I'm not myself

10 or through any entity that I own an owner in StratCap, which

11 is the indirect owner of Validation Partners, but I was

12 treated as the same thing, meaning, I was treated as though

13 I was essentially like one-quarter of Validation Partners.

14 That was from the beginning of Validation Partners, they

15 would treat me in that capacity and in that sense, sort of

16 an informal participant for Validation Partners.

17         MR. CUSIO:  What do you mean you were treated as

18 an owner, a 25 percent owner?

19         MR. DIAB:  Meaning I didn't actually -- sorry.

20 Meaning I didn't actually own anything.  There's nothing I

21 could sell.  I can't go to the bank and send a wire.  I

22 can't sign a document.  I can't sell a share, but I was

23 treated as though I could.  I was treated as though I was

24 one-fourth of the same, and Russ, to his credit, was always

25 very gracious in treating me in that same manner, as though

150

1 I were an actual owner, somebody who could actually do

2 something like sell a share, send a transfer.  So, that's

3 what I mean by informal.

4       MR. CUSIO:  Was Pec's promissory note with LPG

5 perfected?

6       MR. DIAB:  My understanding is that he did perfect

7 with the filing of the UCC.  I don't think that he filed it

8 under Pec Corp.  I think he filed it using an agent like a

9 CT Corp., but my understanding is that he did perfect it by

10 filing a UCC1.

11   (Pause.)

12       MR. CUSIO:  Okay.  I do not have additional

13 questions at this point.

14       MR. EDELMAN (telephonic):  This is Daniel Edelman.

15 I represent Carolyn Beach in the Mississippi litigation, and

16 I have some questions.

17       When Validation Partners' counsel was asking

18 questions, he referred to merchant cash advance companies.

19 Can you explain what these companies did and identify them?

20       MR. DIAB:  Yes.  So, merchant cash advance is a

21 receivable purchase.  It's styled a cash advance, but it's

22 actually just a purchase of receivables where the company

23 will buy a receivable at a factor rate.  A common factor

24 rate is a 149.  So, we would sell those dollars in

25 receivables.  We would receive them -- sorry.  We would sell

151

1  (indiscernible) in receivables.  We would only receive a

2  million dollars but have to pay $1.5 million.  So cash

3  advance is an expensive form of financing.  It almost always

4  takes the form of receivable purchase and comes along with

5  UCC1 filings and any enforcement mechanisms that are

6  available under Article 9 of he Uniform Commercial Code.  A

7  merchant cash advance companies -- sorry.  One step back.

8            LPG throughout its history has never been able to

9  qualify for financing from financial institutions, likely

10 because of the conflict of interest because we have

11 litigations for both plaintiff and defendant with every bank

12 in the country and almost every credit union.  And, so, we

13 really don't have the option to do financing through any

14 means other than receivable purchase.  Validation Partners

15 was a receivable purchase entity, but these cash advance

16 companies out of New York are also receivable purchasers,

17 and so the -- the names of receivable purchasers in New York

18 that we interacted with, World Global Fund was a large one,

19 Diverse Capital, Bridge Funding, Highbar Capital, Cobalt --

20            MR. EDELMAN:  I'm sorry.  What's the one you just

21 said?

22            MR. DIAB:  Highbar Capital, and then after that I

23 said Cobalt Funding Solutions, Cobalt, C-O-B-A-L-T.  There

24 was Clear Fund Solutions.  There was Clean Funding.

25            MR. EDELMAN:  Clean Funding?

152

1          MR. DIAB:  -- Capital -- yes, Clean Funding, Park

2 East Capital, EIN Capital.

3          MR. EDELMAN:  Can you spell -- what is this EIN

4 entity?

5          MR. DIAB:  EIN Capital, like an EIN number, is for

6 identification, but it was called EIN and then second word

7 Capital.

8          MR. EDELMAN:  Okay.

9          MR. DIAB:  There was Fundura, F-U-N-D-U-R-A.

10 There was MNS Funding, just the letters MNS and the second

11 word Funding.  There was Vertex, V-E-R-T-E-X.  And then I'm

12 trying to think of additional ones.  Green Fund was an

13 additional one.  And then MCA Cap, just the letters MCA and

14 then second word CAP.  I believe that's all of them -- I'm

15 sorry.  One more with a litigation in Florida, .69, LLC.

16          MR. EDELMAN:  .69, LLC.  Is there a list of the

17 names and addresses of these entities some place?

18          MR. DIAB:  Yeah.  The UCC1 filing in California,

19 the California Secretary of State maintains a listing of all

20 the UCC1's that were filed.  Each one of these cash advance

21 companies had filed a UCC.  Some are active.  Some are

22 terminated, but you'll see the exhaustive list there, and I

23 may have left some off.

24          MR. EDELMAN:  Okay.  You also mentioned some

25 receivable purchases.  Other than the merchant cash advance

Case 8:23-bk-10571-SC    Doc 191-1    Filed 07/07/23    Entered 07/07/23 21:44:24    Desc
Declaration of Richard A. Marshack    Page 162 of 289

153

1  companies, to whom did LPG sell receivables?

2           MR. DIAB:  So, LPG had I believe two different

3  receivable purchase agreements with Validation Partners,

4  LLC.  Validation Partners only attached one such agreement

5  to their complaint, but I believe that there is a second.

6  We're reviewing our records.  So, we had twice sold

7  receivables ourselves, meaning LPG sold receivables to

8  Validation Partners.  There was also a receivable assignment

9  to Pec Corporation.  It wasn't in exchange for money.  It

10 was in exchange for satisfaction of a promissory note, but

11 there was a conveyance of receivables to Pec Corporation.

12 And then that would be it in terms of the actual receivables

13 that LPG sold.

14           There were also receivables that parties that LPG

15 interacted with, they would also sell their receivables, but

16 that wasn't a contract with LPG.  That's a contract with a

17 third party, usually third party marketing companies, but

18 that's not -- not us.

19           MR. EDELMAN:  Okay.  What are these marketing

20 companies to which you refer?

21           MR. DIAB:  These are companies that locate and

22 onboard clients for LPG.  So, somebody opts in to receive,

23 you know, assistance with their debt, they get on the phone

24 with somebody.  They start talking through options, and the

25 person will say that LPG is a good fit based on your

154

1  circumstances, and then there's compensation for the cost of

2  the lead, for the time spent on the phones, for the customer

3  service function that's provided after the sale.  These

4  companies would follow up and communicate with clients,

5  quality assurance and quality control measures.  So, they're

6  compensated for all these things.  We refer to them as

7  marketing affiliates, but they're essentially sales floors

8  that -- that do marketing for LPG.

9          MR. EDELMAN:  How many of these marketing

10  companies or affiliates are there?

11          MR. DIAB:  Over the years, we've had probably more

12  than 100 that we've worked with.  Some of them have sent

13  just one client.  Some have sent 10,000.  But there's a lot

14  of different companies we've worked with.  A lot of times

15  the companies will approach us and say essentially we'd like

16  to do work.  We'd strike an agreement.  It lasts for a

17  certain period of time.  There's a lot of turnover.  So,

18  these marketing companies usually will run campaigns for a

19  period of time and then move on to something else, but well

20  over 100 that we've worked with over the course of our years

21  of existence.

22          MR. EDELMAN:  Is there a list of these marketing

23  companies somewhere?

24          MR. DIAB:  Yeah.  LPG -- we -- we maintain a list,

25  and that's something we could provide if we needed to.

*Briggs Reporting Company, Inc.*

EXHIBIT 1
Page 162

155

1        MR. EDELMAN:  Okay.  What is the general

2   compensation arrangement between LPG and the marketing

3   companies?

4        MR. DIAB:  It's changed over the years.  We record

5   different models.  But typically we're paying for the work

6   that's done in onboarding clients, and that -- that

7   onboarding function sometimes there will be additional

8   follow up after the contract is signed and the client is

9   enrolled.  But, essentially for -- it's payment for all the

10  different services that are rendered.  It starts with the

11  lead itself.  Then there's the sales function, which is

12  hourly time on the phone that he sells that to the clients,

13  and then there's the function after the sale, which is the

14  QA function, the QC function, ensuring that the client

15  understood what they signed up for, doing follow-up calls

16  several days later to reiterate what it is that they've

17  signed up for, how it works.  It's compensation for all

18  these different functions that it performed.

19       MR. EDELMAN:  Do the marketing companies transmit

20  the LPG client agreement to the client?

21       MR. DIAB:  The LPG CRM's that would transmit the

22  agreement.  So, there were employees, and there were

23  contractors that were inside of the CRM generating and

24  sending these e-signature documents to clients, and some of

25  them -- some of these contractors may have been marketing

156

1  companies.  That's correct.

2          MR. EDELMAN:  Okay.  Did the marketing companies

3  receive a percentage of the revenue stream from the client

4  or a fixed amount of money for a lead or how did that work?

5          MR. DIAB:  So, over the course of the five years

6  or so that we ran this, whether it was through LPG or

7  through predecessor law firms, essentially we would employ

8  different models.  Some of them are flat fees.  Some of them

9  are a percentage of the debt that's enrolled, and some of

10 them were a percentage of the revenue stream, which we're

11 not doing at this time.  We're not doing any onboarding at

12 this time, but we have tried to get away from that model,

13 but over the years of doing business, we've pegged it to

14 every different variable there is.

15          To your point, to be direct, there were times when

16 we were paying a percentage of the receivable.

17          MR. EDELMAN:  Do you recall who the largest

18 marketing companies were?

19          MR. DIAB:  I believe the largest was All Service

20 Financial, who I think is also on the phone through counsel,

21 has a dispute with us.  And I think in the end, All Service

22 is the biggest (indiscernible) that was a really sizable

23 litigating, GoFi, GoFi, G-O-F-I, and they are multiple

24 companies.  And they were also sizable kind of enrollments.

25          MR. EDELMAN:  And who were the one or two that you

157

1 mentioned previously?

2          MR. DIAB:  I'm sorry.  Could you say that again?

3          MR. EDELMAN:  Before GoFi, you mentioned one or

4 two large marketing companies.

5          MR. DIAB:  Yes, all --

6          MR. EDELMAN:  Can you repeat that?

7          MR. DIAB:  -- Service Financial.  Yeah.  So, it

8 was three words, All Service Financial.  They were the first

9 really large marketing company we worked with, and I think

10 they're still the largest today out of everybody.

11          MR. EDELMAN:  And that's the letter L Service

12 Financial?

13          MR. DIAB:  No.  All, so A-L-L, All Service

14 Financial.

15          MR. EDELMAN:  Oh, All.  Okay.  And what's your

16 third one?

17          MR. DIAB:  Those would be the two largest.  I

18 would say the next largest was a company called Paragon

19 Financial.  Paragon spelled P-A-R-A-G-O-N, and Paragon also

20 was -- was very sizable in terms of the onboarding that they

21 did, probably be the third largest.

22          MR. EDELMAN:  Do you know -- do you recall how

23 GoFi was compensated?

24          MR. DIAB:  GoFi never had a contract with LPG.  We

25 never formalized the terms, but they would receive a one-

158

1 time payment for the service of onboarding a client, the

2 payment range on the low end maybe $1100, on the high end

3 maybe $1640, $1700, or something in that range for the

4 service of getting a client from the point of lead to sale

5 to onboarding.  But we never had a formal agreement.

6          MR. EDELMAN:  Okay.  How was All Service Financial

7 compensated?

8          MR. DIAB:  At the time that All Service did its

9 agreement, a gentleman who's now passed away, named Brian

10 Really managed that relationship, and I don't know the terms

11 that were worked out with All Service, but that was back in

12 the Coast Processing days, so when BAD was still actively

13 managing a lot of these marketing relationships, and I

14 believe that Brian had worked out a share between Coast

15 Processing and All Service, but that's all conjecture on my

16 part.

17          MR. EDELMAN:  And Paragon Financial, how were they

18 compensated?

19          MR. DIAB:  GoFi and the same sort of arrangement

20 where LPG never had a contract with them, but we would work

21 through month by month in terms of compensation for the

22 service that they were actually performing, and the Paragon

23 relationship probably started in November of 2021 and

24 probably ended November of 2022.  I don't think we've

25 received anything from them since.

159

1          MR. EDELMAN:  Does the name Integrity Docs, LLC

2    mean anything in terms of relationship with LPG?

3          MR. DIAB:  Yeah.  Integrity Docs is a marketing

4    company that we've worked with at certain points in time.  I

5    believe I know the principal of Integrity, but I know that

6    Integrity was a marketing company, yes.

7          MR. EDELMAN:  Do you know how they were

8    compensated?

9          MR. DIAB:  That I don't know.  I know that they

10   were small, meaning they didn't do a lot of volume.  They

11   didn't have a ton of -- of clients, but they did onboard

12   clients, and I don't know the terms that they had.

13         MR. EDELMAN:  Does the name Vercy, V-E-R-C-Y, LLC

14   mean anything to you?

15         MR. DIAB:  Yes.  Vercy like Integrity, was an

16   affiliate that onboarded.  They onboarded around the same

17   time that Integrity was doing so, and generally they had a

18   -- essentially, it was an arrangement where they were paid

19   up front for the work that they did, but I don't know the

20   exact terms for Vercy's contract.

21         MR. EDELMAN:  Okay.  Does the name Debt Validation

22   Fund 2, LLC mean anything to you?

23         MR. DIAB:  Yeah.  I believe that that's the fund

24   that Dave Zuck managed.  They raised money and gave money to

25   Validation Partners to purchase receivables.  I believe

*Briggs Reporting Company, Inc.*

EXHIBIT 1
Page 167

Case 8:23-bk-10571-SC   Doc 191-1   Filed 07/07/23   Entered 07/07/23 21:44:24   Desc
Declaration of Richard A. Marshack   Page 169 of 289

160

1 that's the entity.

2       MR. EDELMAN:  Okay.  Is there a Debt Validation

3 Fund 1?

4       MR. DIAB:  Yes.  Debt -- again, if I remember

5 correct, Debt Validation Fund 1 would have been a direct

6 purchase of receivables that Dave Zuck did with Coast

7 Processing at the time where they would purchase I believe

8 it was All Service Financial clients and receive the

9 receivable from those clients in exchange for a payment that

10 was made, but that was not through Validation Partners.

11 That was something Direct that Dave did or his fund did with

12 the Coast Processing entity, if memory serves.

13       MR. EDELMAN:  Does the name MCDVI Fund 1 and 2,

14 LLC mean anything to you?

15       MR. DIAB:  Yes.  That would be the entities

16 managed by Ryan and Sean McKenna.  They had made investments

17 into Validation Partners, same purpose.

18     (Pause.)

19       MR. EDELMAN:  Does the name Flight Form, LLC mean

20 anything to you?

21       MR. DIAB:  Yes.  That was an entity that Eng Taing

22 had formed for the purpose of developing technologies that

23 would service clients in this industry.  It never got off

24 the ground.  My understanding is it never had any

25 transactions, never did any development.  It was identified

161

1  in a deposition that was taken in late January.  And, as a

2  result, Eng I think decided not to proceed with that

3  project, but that was a -- a company that he had formed for

4  the purpose of developing tech related to this industry,

5  this industry being unsecured debt.

6           MR. EDELMAN:  Does the name City Capital New York

7  mean anything?

8           MR. DIAB:  Yeah.  So, City Capital was a multi

9  cash advance company that issued I believe the -- the last

10 of all the cash advances.  That cash advance would have been

11 in February of this year, 2023, and they were a creditor,

12 received one payment, and then the filing took place, and

13 they're -- they're currently a creditor of LPG.

14          MR. EDELMAN:  Are there documents or files which

15 show the terms of LPG's dealings with these various merchant

16 cash advance companies?

17          MR. DIAB:  Yes.  For each one we have a receivable

18 purchase agreement that was executed.  Those receivable

19 purchase agreements have a security instrument underlying

20 the UCC1 filings for these entities, and we have those for

21 each one of the entities that I've referenced.

22          MR. EDELMAN:  Those are all the questions that I

23 have.

24          MR. KHANG:  Queenie, this is Joon Khang --

25          MS. SCHULMAN:  This is Amy Schulman from

*Briggs Reporting Company, Inc.*

EXHIBIT 1
Page 169

162

1  Pennsylvania --

2          MR. KHANG:  We've been going for

3  about --

4          MS. SCHULMAN:  -- the Attorney General --

5          MR. KHANG:  Hold on.  Hold on.

6          TRUSTEE NG:  Mr. Kahn, go ahead.

7          MR. KHANG:  I have a question real quick.  This is

8  Joon Khang.  Yeah, we've been going for about three and a

9  half hours.  I don't know how many more creditors are on the

10 line who are going to ask more questions.  But I didn't

11 anticipate we were going to be on this call all day.

12          Is there any point that we can either cut this off

13 or continue this meeting, because, you know, unfortunately,

14 there are other matters that need to be tended to today as

15 well.  So, Queenie, is there something we can do about that?

16          TRUSTEE NG:  Well, I would like to give, you know,

17 other creditors a chance to ask questions today because

18 they --

19          MR. KHANG:  Right.

20          TRUSTEE NG:  -- waited for a long time, and I

21 think it's only, you know, the fair thing to do.  Can I just

22 get an idea of how many creditors are planning to ask

23 questions?  I know the Attorney General just --

24          MS. SCHULMAN:  Amy Schulman from the Attorney

25 General's Office in Pennsylvania.  I have just a few quick

163

1 questions.

2          TRUSTEE NG:  Okay.  And anyone else intends to ask

3 questions?

4          MR. STOCKHOLD:  Yeah.  This is Matthew Stockhold

5 on behalf of Debt Validation Fund 2, MCDVI Fund 1 and MCDVI

6 Fund 2.  I have a few follow-up questions on the schedules.

7          TRUSTEE NG:  Okay.  Anyone else?

8          MR. WHITE:  And then this is Frank White.  I

9 represent Maverick Bank Card.  I have just a small handful

10 of questions for Mr. Diab.

11          TRUSTEE NG:  Okay.  All right.  Anyone else?

12      (No response.)

13          TRUSTEE NG:  So, I think, Joon, there are only

14 three more creditors who would like to ask questions.  If

15 your client needs a break, a short break, I'll be happy to

16 do that.  Do you -- is that what you need or, otherwise, we

17 can just go ahead and, you know, ask -- let those three

18 creditors ask questions since they waited a long time as

19 well.

20          MR. DIAB:  I would prefer to just finish the

21 questions.  I don't need a break at this time.

22          TRUSTEE NG:  Okay.  Why don't we go from the order

23 of --

24          MR. MARCH:  Okay.  All right.  Let's go forward,

25 yeah.

164

1          TRUSTEE NG:  Okay.  Thank you so much.

2          MR. WHITE:  This is Frank White.  I have a small

3  handful of questions, and also I have to drop off in about

4  15 minutes.  I'm wondering if everyone can indulge and let

5  me go first.  It won't take more than a couple of minutes.

6          TRUSTEE NG:  That's fine with me.  I hope that's

7  fine with the Debtor as well.

8          MR. KHANG:  That's fine.

9          TRUSTEE NG:  Thank you so much, Counsel.

10         MR. WHITE:  Thank you.

11         Mr. Diab, again, my name is Frank White.  I

12  represent a company called Maverick Bank Card, which at

13  least until the petition date was doing some volume of

14  credit card processing for the Debtor.  I'm just wondering

15  if you're familiar with that relationship?

16         MR. DIAB:  Yes.  My understanding is that Maverick

17  would do the actual processing that approved the EquiPay and

18  was just a broker sitting in between, but I'm familiar with

19  Maverick, yes.

20         MR. WHITE:  Okay.  And are you aware whether the

21  Debtor is currently doing any processing through Maverick at

22  all?

23         MR. DIAB:  Zero processing as of March the 20th.

24  Should be zero processing.

25         MR. WHITE:  Okay.  Is there any reason why that --

165

1  the processing agreement between the Debtor and Maverick

2  can't be consensually rejected?

3        MR. DIAB:  I don't see any reason, no.

4        MR. WHITE:  Okay.  Then I'll just -- I'll reach

5  out to Mr. Khang later this week to see if we can't just

6  consensually arrange for that.  That's all I needed to know.

7  Thank you.

8        MR. DIAB:  Thank you.

9        MS. SCHULMAN:  If anyone wouldn't mind, this is

10  Amy Schulman from the Attorney General's Office.  I just

11  have some very quick questions, and I also have to jump off

12  the -- as well.

13        TRUSTEE NG:  Go ahead, Ms. Schulman.

14        MS. SCHULMAN:  Okay.  So, again, I'm calling from

15  the Pennsylvania Attorney General's Office here in

16  Pennsylvania, and we have received several complaints from

17  consumers who allege they paid LPG for debt settlement

18  services that were not provided.  So, I have a few questions

19  stemming from this.  Number one, where should we be sending

20  the complaints?  We had previously sent them to LPG for

21  purposes of mediation, and those complaints were not

22  responded to, and I would like to get a response to those

23  complaints.

24        MR. DIAB:  The best is if you could send it by

25  email.  Is that possible if I give you an email address?

166

1          MS. SCHULMAN:  Okay.  Should I send them to --
2    yes, you or your counsel, just --

3          MR. DIAB:  If it's okay, it would be direct to us,
4    and it would be attention to Dan March and Tony Diab, and it
5    would be the email address, admin, A-D-M-I-N, @lpglaw.com.

6          MS. SCHULMAN:  Okay.  Next question, given the
7    fact that these accounts have largely been -- have been
8    transferred, can you identify the affiliated law firms here
9    in Pennsylvania that have received transfer of Pennsylvania
10   accounts?

11         MR. DIAB:  The -- the attorneys that are licensed
12   in the State of Pennsylvania that would be handling the
13   accounts from this universe of cases would be Jordan Kurth
14   (phonetic), Kelly Adams --

15         MS. SCHULMAN:  Can you -- I'm sorry.  Can you
16   spell these?

17         MR. DIAB:  Yes.  So, Jordan, J-O-R-D-A-N, Kurth,
18   K-U-R-T-H.  He's the first.  Kelly Adams is the second, K-E-
19   L-L-Y and then Adams, A-D-A-M-S.  The third would be Robert
20   Tobia.  Last name is spelled T-O-B-I-A.  And then the fourth
21   would be -- give me one second.

22      (Pause.)

23         MS. SCHULMAN:  And if you don't have the names, I
24   can follow up by way of email.  I don't want to hold
25   everyone up.

*Briggs Reporting Company, Inc.*

EXHIBIT 1
Page 174

167

1          MR. DIAB:  So, for the fourth one, I'll follow up

2   by email in response, yes.

3          MS. SCHULMAN:  Okay.

4          MR. DIAB:  Thank you.

5          MS. SCHULMAN:  Next quick question.  Did anyone

6   from LPG ever meet in person or face to face with

7   Pennsylvania consumers in connection with these debt

8   settlement services?

9          MR. DIAB:  Yes.  Employee Jordan Kurth, our

10  attorney in the State of Pennsylvania, would have had a lot

11  of face-to-face meetings.  It would not have been with every

12  Pennsylvania client but with a certain portion of that

13  population.  So, Jordan would be the only LPG employee to

14  have met face to face.  There was a contractor, the fourth

15  law firm, that I can't recall at the moment.  They would

16  also have had meetings, but they were contractors of LPG,

17  not employees.

18         MS. SCHULMAN:  Okay.  Do you have any sense of how

19  many of the accounts entered into with LPG were with

20  Pennsylvania consumers?

21         MR. DIAB:  I would say the Pennsylvania pipeline,

22  again, at its peak was probably -- probably 2,000 to 2500

23  clients I would imagine, no more than that.

24         MS. SCHULMAN:  And I just want to confirm that LPG

25  is no longer soliciting business in Pennsylvania, is that

168

1 correct?

2          MR. DIAB:  That's correct.

3          MS. SCHULMAN:  Okay.  And those are all my

4 questions today.  If for some reason additional questions

5 come to mind I'll reach out to that address at

6 admin@lpg.com.  Thank you everyone.  I really appreciate it.

7          TRUSTEE NG:  Thank you.  Thank you, Ms. Schulman.

8          MR. STOCKHOLD:  Hi.  This is Matt Stockhold

9 appearing on behalf of Debt Validation Fund 2, MCDVI Fund 1,

10 and MCDVI Fund 2.  I have a few follow-up questions.

11          On Schedule B, going back to the receivables for

12 $120 million, was any portion of that included in the $155

13 million dollar amount of revenue reported for 2022?

14          MR. DIAB:  No.  It should not have been.  It

15 should have been separate from that.

16          MR. STOCKHOLD:  And, along the same lines, is any

17 of that amount reported as part of the $30 million for the

18 first three months of 2023?

19          MR. DIAB:  Yes.  So, part of what was collected in

20 -- in 2023 may have overlapped with the $120 million figure.

21 The exact dollar amount of overlap I'm not sure, but there

22 would have been some overlap, yes.

23          MR. STOCKHOLD:  On the statement of financial

24 affairs, it says the gross income for the first three months

25 was $30 million.  Is that accurate?

*Briggs Reporting Company, Inc.*

EXHIBIT 1
Page 176

169

1          MR. DIAB:  Correct.  But included in that figure

2   is payments processed by Merrich Bine and retained by

3   Merrich Bine and not sent to LPG.

4          MR. STOCKHOLD:  And of those amounts, are those

5   included in the receivables?

6          MR. DIAB:  There would have been some overlap

7   between the receivable quote of $120 million and payments

8   that would have been collected in March, but the amount of

9   overlap I'm not sure, but they would have been sent.

10          MR. STOCKHOLD:  Also on Schedule B you listed

11   $120,000 for a customer list.  What's the basis for that?

12          MR. DIAB:  So, in terms of viewing what LPG has as

13   a -- as an asset, something potentially of value, when you

14   review the matter, one thing that LPG possesses are client

15   data for clients that did not sign up for LPG services,

16   people that were in one way or another sold but didn't sign

17   up.  And, so, if we were to take that data, pool it and sell

18   it, we think that the estimated value would be $120,000.  We

19   don't think the State Bar would let us do it, but we

20   reported that as a potential asset since we didn't have time

21   to resolve the question of whether that type of sale of opt-

22   in data was permissible, but that's what we're referring to

23   would be a sale of leads of people that did not sign up for

24   client -- for LPG services, but we have their opt-in to

25   receive solicitation regarding debt resolution.

170

1          MR. STOCKHOLD:  Did you obtain an appraisal of the

2  value of that list or is that something that you determined

3  internally?

4          MR. DIAB:  That's based on what marketing

5  companies tell us they would pay for records for opt-in

6  methods, meaning a client that is saying they want help with

7  unsecured debt.  This is what you would do, for instance,

8  pay for records, but it was determined by us anecdotally.

9  It was not appraised.

10          MR. STOCKHOLD:  On Schedule D, which lists

11  creditors who have secured claims, the first creditor on the

12  list is Diverse Capital, LLC in the amount of approximately

13  $1.2 million.  What's the basis for this claim?

14          MR. DIAB:  We -- we dispute the claim, but Diverse

15  Capital has entered into a settlement agreement with LPG.

16  LPG believes that it performed under the settlement

17  agreement.  Diverse believes that we did not perform.  And

18  on the basis of nonperformance, the original obligations

19  spring back into existence.  And, so, they're saying the

20  balance due after applying all payments on the

21  (indiscernible) is that $1.1, $1.2 million figure, but that

22  is predicated on a breach of the settlement agreement, and

23  we deny that there was any breach of that agreement, but

24  that's where they calculate the figure.  That's what would

25  be left over after applying all payments, including

Case 8:23-bk-10571-SC   Doc 191-1   Filed 07/07/23   Entered 07/07/23 21:44:24   Desc
Declaration of Richard A. Marshack   Page 180 of 289

171

1 settlement payments, to the original contractual obligation.

2 The balance owed would be that number that they quoted.

3          MR. WHITE:  Did they file a UCC1 financing

4 statement?

5          MR. DIAB:  Diverse did.  They filed it I believe

6 in December of 2021, but they filed it long ago.

7          MR. WHITE:  Do you know what they listed as

8 collateral in that statement?

9          MR. DIAB:  All accounts receivable of LPG was --

10 that's the standard language that was used in those UCC1's.

11          MR. WHITE:  Moving on to the next creditor, City

12 Capital New York, the amount of the claim is approximately

13 $2.9 million.  Is that a similar arrangement?

14          MR. DIAB:  No.  So, in the case of City Capital,

15 that was an advance that was taken in February while we were

16 trying to get through the period of time where payments were

17 being collected by Merrich Bine and not remitted to LPG.

18 So, we took a cash advance from Star Capital in February.

19 Despite that cash advance, we weren't able to stay afloat,

20 and so we defaulted on that position, but that was a new

21 agreement in February with Star, and it was an agreement

22 that we admittedly defaulted on.  We made one payment of

23 $50,000, and no other payments were made.

24          MR. WHITE:  And that was February of 2023?

25          MR. DIAB:  Correct.  That's when that position was

172

1 taken and the loan payment was made.

2          MR. WHITE:  Do you know if City Capital recorded

3 UCC1?

4          MR. DIAB:  They -- I do not believe that they did,

5 but I believe that they're related to an entity called BMS

6 Advance, LLC that did have a UCC1 previously recorded.  My

7 belief is that they're utilizing the BMF UCC1 that an

8 assignment took place, but I don't have verification of

9 that.  That's simply my belief in terms of how this industry

10 operates.

11          MR. WHITE:  Does the Debtor dispute this claim?

12          MR. DIAB:  No.  I don't believe that we have a

13 dispute as to the balance or the -- the claim.  There may be

14 a dispute as to whether it's cured because we don't know

15 whether it was perfected, but that would be the only open

16 question, not the balance or not the fact that it was a

17 default.

18          MR. WHITE:  To the extent that the Debtor plans to

19 challenge the validity or perfection of the lien, did you

20 amend the schedule to list it as disputed?

21          MR. DIAB:  Yes, we did.

22          MR. WHITE:  The next creditor on this is Fundura

23 Capital Group, listed as disputed, amount of $2.1 million.

24 Do you know if Fundura recorded a UCC1?

25          MR. DIAB:  Fundura recorded a UCC1 after the

173

1  initiation of litigation.  They filed suit in August of

2  2021, and we filed a counterclaim.  It didn't have a UCC1

3  filing.  They attempted to utilize the UCC1 of a related

4  company called Bridge Funding, but Bridge Funding's UCC had

5  been satisfied by a settlement.  The settlement was

6  consummated, paid in full, and the UCC1 of Bridge was

7  withdrawn.  When Fundura realized that -- that Fundura --

8  I'm sorry.  When Fundura realized that Bridge didn't have a

9  valid UCC1 on file, they attempted to file late.  They filed

10 in October I believe of 2021, but we're disputing that UCC1

11 as invalid.  It came after the filing of the lawsuit and

12 after we had successfully disputed the Bridge UCC1.  So, our

13 position is that it's an unsecured -- it's an unsecured

14 position that Fundura has, but also Fundura is an actual

15 loan.  Their receivable purchase agreement was paid in full,

16 and they attempted to do a no net renewal.  They attempted

17 to do a refinance where they simply increased the balance

18 that was owed.  That's not valid under New York law in our

19 position.  And, so, we're actually anticipating getting

20 money back from them.  We believe we overpaid them.  But on

21 the UCC issue, we don't believe they have a valid UCC1

22 filing of their usual filing, the filings they made in

23 October of -- of '21.

24          MR. WHITE:  Do you know what they listed as the

25 collateral securing the lien?

174

1          MR. DIAB:  It would have also said all accounts

2   receivable current and future.

3          MR. WHITE:  Does the Debtor anticipate filing an

4   adversary proceeding to challenge this claim?

5          MR. DIAB:  We already have -- so, we have the

6   active (indiscernible) claim.  We intend on removing the

7   action from New York State Court to this court, and so that

8   removal would likely be filed in the coming weeks.

9          MR. WHITE:  There are a number of creditors that

10  filed UCC1 financing statements that are not listed on

11  Schedule D.  So, I'll go through those just to see if the

12  Debtor's aware of them or what the relationship is.

13          Are you aware of an entity called Liberty Fund

14  Group?

15          MR. DIAB:  Yes.  Liberty had a position that was

16  satisfied in full.  THAT UCC1 should have been withdrawn.

17          MR. WHITE:  And you mentioned earlier StratCap

18  Management, LLC also appears to have filed a UCC1.  Do you

19  know what the status of that is?

20          MR. DIAB:  I believe they're withdrawing the UCC1,

21  but the underlying security agreement was never consummated.

22  So, it wouldn't be a valid UCC1 in any event, but I believe

23  they're withdrawing that.

24          MR. WHITE:  How about Franklin Capital Management,

25  LLC?

175

1        MR. DIAB:  Franklin Capital was a company that we

2   discussed a loan with.  They filed a UCC1 before any

3   documents were executed.  They asked us not to proceed with

4   it, but they never withdrew their UCC1 filing.  So, again, I

5   think it's an invalid UCC1 for lack of underlying security

6   agreement.

7        MR. WHITE:  Everyday Funding Group?

8        MR. DIAB:  Everyday Funding would have been an

9   entity related to Park East Capital and MCA Cap.  They did

10  have a position.  It was satisfied in full.  The UCC1 was

11  supposed to be removed as a result of that settlement.

12       MR. WHITE:  Are you familiar with Green Fund New

13  York?

14       MR. DIAB:  Yes.  Again, that was an entity with

15  which we settled.  We settled in full.  They were supposed

16  to terminate the UCC.  They never did.

17       MR. WHITE:  And you mentioned earlier World Global

18  Fund, LLC.  Are you aware of their UCC1 statement?

19       MR. DIAB:  Yes.  World Global had a UCC1 that was

20  filed, and a related entity, MNS Funding, had a UCC1 that

21  was filed.  Both have been satisfied.  I take that back.

22  World Global has been satisfied in full.  That one should

23  have been terminated.  MNS has a dispute as to whether

24  there's a balance still owed.  They haven't taken any action

25  on that, but they allege that there's a balance owed, and

176

1 that's why they're refusing to withdraw the UCC1 that

2 (indiscernible) between us and MNS.

3        MR. WHITE:  Is there a reason the Debtor did not

4 include MNS Fund in its Schedule D?

5        MR. DIAB:  No.  That's just an oversight.  We'll

6 have to add them based on what they're claiming is still

7 owed.  So, that's one that would have to be added.  We do

8 believe we satisfied it, but they -- I mean (indiscernible)

9 that's included in the amended schedule.

10        MR. WHITE:  What about MCA Capital Holdings, LLC?

11        MR. DIAB:  That is another entity that we had a

12 resolution.  We paid them in full.  They were supposed to

13 terminate their UCC1.

14        MR. WHITE:  BMF Advance?

15        MR. DIAB:  Similarly satisfied in full.  They had

16 filed a dismissal of the action in New York State Court

17 (indiscernible), but they still have their UCC1.  We believe

18 that City Capital is going to borrow that UCC1 and that's

19 why they haven't terminated, but they haven't formally

20 stated that to us.

21        MR. WHITE:  Would you amend the Schedule D to add

22 them then?

23        MR. DIAB:  BMF is not the one with the position.

24 Star Capital is, and so Star Capital -- not Star Capital,

25 sorry -- City Capital.  City Capital is listed as a -- as a

177

1 creditor, and City Capital is the one that would be using

2 the UCC1 to enforce the City Capital loan or advance I

3 should say.

4         MR. WHITE:  (Indiscernible) Franklin Capital

5 Management, LLC.  What about Franklin Capital Group, LLC?

6         MR. DIAB:  It's the same entity.  They filed two

7 different UCC's, but we didn't proceed with either entity as

8 a -- as a creditor.  So, they don't have any underlying

9 security agreement.

10        MR. WHITE:  And the next one is OHP LPG, LP.  Are

11 you familiar with that entity?

12        MR. DIAB:  Yes, but OHP had purchased receivables

13 of marketing companies, third parties, not of -- of LPG.

14 So, they shouldn't be filing a UCC1 on LPG.  They should

15 file it on the -- the marketing companies themselves, but --

16 but I'm aware of who they are and the fact that they filed a

17 UCC1.

18        MR. WHITE:  What about Proof Positive, LLC?

19        MR. DIAB:  That's similar.  Proof Positive has

20 purchased affiliate receivables but filed a UCC1 on LPG even

21 though LPG is not a party to the Proof Positive security

22 agreements.  So, I think it was just an erroneous filing,

23 but we're aware of who they are and the fact that they've

24 filed a UCC1.

25        MR. WHITE:  Are you aware of the fact that Debt

178

1 Validation Fund 2, LLC, MCDVI Fund 1, LLC, and MCDVI Fund 2,

2 LLC filed UCC1 statements?

3          MR. DIAB:  Yes, I'm aware of those filings.  I

4 believe they took place in January.

5          MR. WHITE:  Is there a reason they were not -- is

6 there a reason they were not listed on Schedule D?

7          MR. DIAB:  So, those -- so, for two reasons.  The

8 underlying agreement had been breached before the filing of

9 the UCC1.  So, we don't believe that there's an underlying

10 security agreement that would rise to a valid UCC1 filing,

11 and at the second (indiscernible), we believe that that

12 filing was in the preference period, and we're going to

13 avoid it, but we consider them to be at most an unsecured

14 creditor and at least a debtor that owes us money for what

15 they took pursuant to those agreements that they breached.

16 That's our position on that subject.

17          MR. WHITE:  So, that was on Schedule F?

18          MR. DIAB:  I'm sorry.  Could you say that again?

19          MR. WHITE:  Did you list them on Schedule F?

20          MR. DIAB:  I know that they were listed on one of

21 the schedules, but I believe they were listed as an

22 unsecured creditor.

23          MR. WHITE:  You mentioned in your earlier

24 testimony a number of other entities such as .69, LLC, Green

25 Fund, Vertex, Highbar, Cobalt Funding.  Do any of those

Case 8:23-bk-10571-SC   Doc 191-1   Filed 07/07/23   Entered 07/07/23 21:44:24   Desc
Declaration of Richard A. Marshack   Page 188 of 289

179

1 entities have UCC1 financing statements on file?

2          MR. DIAB:  Yeah.  I think almost all of them have

3 UCC1 financing statements.  Some have terminated.  Some have

4 chosen not to terminate even though they should terminate

5 them, but I believe each one of those having a UCC1 at some

6 point.  A lot of the times they would file the UCC's under

7 CT Corporation, CFC or -- or some other agent for service of

8 process, but they -- so, they would file anonymously, but

9 they had UCC1's that are filed.

10          MR. WHITE:  But the Debtor took the position not

11 to list those on Schedule D?

12          MR. DIAB:  Yeah.  So, the -- the actual agreements

13 were satisfied.  There's no balance owed, and the UCC1's

14 that remain active are erroneous, should be terminated.

15          MR. WHITE:  Is there an employment agreement with

16 Mr. March?

17          MR. MARCH:  Yes.

18          MR. DIAB:  Mr. March -- and, yeah, his employment

19 with LPG, yes, he's got an employment agreement.

20          MR. MARCH:  Yes.

21          MR. WHITE:  Was there any amount owed to Mr. March

22 as of the petition date?

23          MR. DIAB:  Under -- as I said earlier, he was

24 shorted in the year 2022, but he voluntarily agreed not to

25 receive that additional compensation and in that sense is

180

1  not a creditor.  But he -- he was short in his -- his

2  contractual compensation for the year 2022.

3            MR. WHITE:  Does he intend to file a claim against

4  the Debtor?

5            MR. DIAB:  No.

6            MR. WHITE:  Is there any money owed to any

7  employees as of the petition date?

8            MR. DIAB:  Yes.  There are, I believe, two pre-

9  petition payrolls that were missed and one post-petition

10 payroll that was missed.  No, I take that back, now two.

11 So, two pre-petition and two post-petition payrolls that are

12 outstanding.

13           MR. WHITE:  And, Mr. Diab, the testimony earlier

14 was that somewhere around early 2021, you no longer received

15 compensation directly from the Debtor but it went through

16 the LLC's, and the reason for that was mentioned that it was

17 because it was Mr. Diab's background or to limit it.  Can

18 you provide more insight on that?

19           MR. DIAB:  Yeah.  One of the reasons was

20 background because of my disbarred status.  It raises

21 questions when my name appears on payroll records or any

22 other record.  So, we tried to eliminate that potential

23 source of prejudice against LPG by eliminating the use of my

24 name on -- on anything.  And, so, for that reason, the

25 payment would go to one of these LLC's, and then the LLC in

181

1 turn would pay me some portion.  But that decision was made

2 mostly because of the reaction that we would get when --

3 when that name was found on -- on a record.

4          MR. WHITE:  Before the disbarment, did you

5 practice law in California?

6          MR. DIAB:  Yes.  I was practicing law in

7 California and Nevada.  I had done so since 2010 in

8 California and 2012 in Nevada.

9          MR. WHITE:  And when -- when were you disbarred?

10          MR. DIAB:  Would have been -- it took effect in

11 January 2019.  I believe for both right about the same time

12 or right around --

13          MR. WHITE:  So, was that in California or Nevada?

14          MR. DIAB:  I believe they both entered orders --

15 sorry.  Nevada went first, but Nevada would have entered an

16 order right around January of 2019, and I think it was

17 actually February the 11th, 2019 that the -- that the

18 California Bar entered their involuntary inactive status,

19 and that's when LPG wanted to take over matters that I had

20 previously been handling.  This is now February 2019.

21          MR. WHITE:  So, what were the grounds for the --

22 what were the grounds for the disbarment?

23          MR. DIAB:  Both disbarments were related to the

24 same underlying representation.  It was the representation

25 of a (indiscernible) named Bashal Shamaria (phonetic) that I

182

1  was undertaken.  He was a Las Vegas resident, and the

2  representation was in Nevada under the Nevada rules.  There

3  was also one small civil matter in the State of California

4  that I was handling for Bashal, and I was doing those

5  representations moonlighting while I was at a firm.  So, I

6  was employed at Shakardi and Fagan as an attorney and then

7  handling this -- these group of matters for Bashal on the

8  side essentially, and it was going through that

9  representation that the Nevada Bar made their -- you know,

10 their findings and decided to charge.  And when they issued

11 their charging document, I took a default and choose to

12 allow the disbarment to take place in Nevada.  California

13 then came in with a reciprocal action.  After the disbarment

14 started in Nevada, California essentially said the same, and

15 I did the same thing where I took a default in the

16 California proceeding, chose not to participate, and the

17 default was entered right around February 11, 2019, and I

18 remember the date because we had a deposition that same day,

19 and it was the last deposition that I did, and then right

20 after that, the involuntary inactive set in.  And then about

21 a week later, LPG was formed.

22        MR. WHITE:  And LPG was formed to take over your

23 client files?

24        MR. DIAB:  Yeah.  So, essentially all the files

25 that were being handled by the entity as a sole

183

1  proprietorship called Diab Law, all those entities had to be

2  moved to another law firm.  And, so, John had agreed to

3  launch LPG primarily to handle the Debtor cases that are

4  still the LPG, you know, pipeline to this day.  In addition,

5  there were, I don't know, 40 or 50 other cases that LPG took

6  on, everything from wrongful death to intellectual property

7  to employment law.  And all those matters were taken over by

8  LPG, and it's something that the State Bar was informed of

9  at the time.  When the involuntary inactive status set in,

10 we had to find counsel in short order because no appearances

11 were permissible.  And, so, the cases were all moved from

12 Diab Law to LPG in February 2019.

13         There's another attorney in addition to John

14 Thompson named Clara Young that was handling a lot of the

15 cases for Diab Law, and she continues to handle them as an

16 employee of LPG.  And, so, those cases were continued.  The

17 same attorney was handling them, the -- the associate,

18 Clara.  And, so, she just moved from one firm to the other

19 and continued to handle those same batch of cases.

20         MR. WHITE:  Do you know if LPG has any liability

21 stemming from the disbarment?

22         MR. DIAB:  No.  There was no overlap on the

23 disbarment aspect, but there was some liability related to

24 some of the cases that were transitioned, which LPG resolved

25 years ago.  There's some clients at the point of transition

184

1 that didn't -- essentially they were complaining about the

2 representation that Diab Law had rendered.  But now that

3 they were represented by LPG, LPG satisfied the dispute and

4 essentially settled with the clients.  There was a handful

5 of them.  This happened back in 2019 when the files were

6 transferred, but nothing stretched beyond that in 2019, at

7 least not that I'm aware of.

8          MR. WHITE:  Was there ever a criminal referral

9 relating to this disbarment?

10          MR. DIAB:  No, none, in Nevada or California.

11          MR. WHITE:  Turning to the list of the creditors

12 that have the 20 largest unsecured claims, there are a

13 number there that are listed as disputed.  I know you listed

14 my clients' claims as disputed and gave the reasons why

15 regrettably they're disputed.  What about Merrich Banes?

16 There was a claim for $8 million.  What's the basis for that

17 dispute?

18          MR. DIAB:  So, Merrich Bine was owed money on

19 receivable purchase agreements (indiscernible), but based on

20 what (indiscernible) like the damage caused by the payment

21 processing dispute in February and March, we don't believe

22 that we continue to owe them.  We think, if anything, we're

23 a net creditor because the damage was substantial, but

24 that's a difficult matter to have to be litigated, but on

25 paper they would still be owed but for the fact that they

185

1  collected payments and refused to send that, those amounts

2  to LPG and, thereby, caused damage.  If you take that away,

3  they would still be owed an additional I think roughly $8

4  million.  I believe that they believe the number to be

5  larger.  So, that $8 million figure is disputed, but whether

6  anything is owed is also disputed on account of the conduct.

7  That will require an adversary proceeding to resolve.

8          MR. WHITE:  Validation Partners, LLC is listed as

9  having a $25 million claim that is disputed.  What's the

10  basis for that dispute?

11          MR. DIAB:  The $25 million figure came from the

12  complaint that Validation Partners filed, and the dispute is

13  twofold.  One is that we also have a credit against

14  Validation Partners for the assignment from Pec Corp. for

15  about $28 million, which would make Validation Partners a

16  net debtor, not a net creditor.  But separate from that, we

17  don't believe there's any support for -- we don't believe

18  there's any support for the $25 million figure.  We think at

19  most the amount that would be owed, forget about our

20  assignment and our claims, the amount that would be owed

21  would be around $14 million, maybe $15 million, not $25

22  million to Validation Partners.  That's based on their

23  actual contract.  So, it's a two-part dispute.  One is we

24  don't think the $25 million is correct.  We think that

25  they're a net debtor and owe money to LPG and to the

186

1 bankruptcy estate.

2          MR. WHITE:  Business Centers of America is listed

3 as disputed in the amount of $2.4 million.  What's the basis

4 for that dispute?

5          MR. DIAB:  Business Centers of America had an

6 agreement with Coast Processing, the entity that I

7 referenced earlier.  They never had an agreement with LPG,

8 but we believe that they were claiming that LPG owed them

9 money.  They subsequently filed a lawsuit and did not name

10 LPG.  So, they may also join in stating that LPG does not

11 owe them any money, but -- but the claim had been made by

12 Business Centers of America that they are owed $2.4 million

13 and that LPG has to pay it as the company servicing the

14 clients that were relevant to the receivable purchase that

15 Business Centers of America made.  So, we reported it as

16 disputed, but the nature of that dispute is that LPG never

17 undertook an obligation to Business Centers of America.

18 Another entity did, and we think that they agree by virtue

19 of the fact that they filed suit and did not bring LPG, but

20 they haven't stated it a release of LPG in any way.  So,

21 they still have a question about whether LPG is liable.

22          MR. WHITE:  The Debtor is also disputing a $1.4

23 million claim by J.P. Morgan Chase for a corporate credit

24 card.  What's the reason for that dispute?

25          MR. DIAB:  So, there's a dispute about what amount

187

1 was owed on the corporate credit card account that LPG has

2 to J.P. Morgan Chase.  We think that they're adding interest

3 and fees that they're not allowed to add to the balance that

4 was owed, and so we're disputing the amount.  We're not

5 disputing whether there's something owed, just how much is

6 owed as of today.

7           MR. WHITE:  The Debtor's also disputing a

8 approximately $250,000 claim for Outsource Accelerated,

9 Limited, an offshore call center.  What's the basis for

10 that?

11          MR. DIAB:  Yes.  Outsource Accelerated would bill

12 in advance before the services were rendered, sort of like a

13 retainer, and then they would pull from the amount as they

14 would render services.  We terminated their agreement, and

15 they still wanted us to prepay for a month of service even

16 though we weren't going to utilize them.  So, we disputed

17 the amount of the claim.  We think that they provided may 10

18 or 20 thousand dollars worth of service but not $250,000,

19 and they still wanted us to prepay the entire month, and we

20 believe it's because they were going to take that money and

21 keep it, but we didn't see any contractual right for them to

22 demand that amount.  So, that's the dispute there is that

23 they wanted to prepay even though we'd agreed they weren't

24 going to provide the services.  So, we weren't going to

25 prepay that amount.

188

1          MR. WHITE:  Net Suite Oracle is listed as being

2    owed $100,000 for bookkeeping software.  Why is that

3    disputed?

4          MR. DIAB:  Well, we attempted to switch from

5    Quickbooks to Net Suite in 2022.  The transition didn't

6    work, and Net Suite, who had assured us that it would,

7    continued to work with us for about six months and could not

8    get the data imported over.  It made our books a mess for

9    the year 2022, but because their platform didn't work, we

10   instructed them that we're not going to pay them, and we

11   switched back to Quickbooks.  I think -- obviously I think

12   that they're disputing that and they're still pursuing

13   collection, and that fee would have been their licensing

14   fee, but the licensing fee in our opinion (indiscernible)

15   because we didn't end up using Net Suite and because Net

16   Suite failed to import the information over to Quickbooks,

17   which caused substantial damage on the accounting side.

18          MR. WHITE:  Moving on to Schedule G, Executory

19   Contracts, besides the office leases and the lease with

20   Sharp Electronics, the Debtor listed some contracts with

21   California clients, but there are no other contracts listed

22   on Schedule G, for example, for the -- with the law firms

23   that the client files were transferred to or any other.

24          Is the Debtor going to amend Schedule G to include

25   all of its contracts?

189

1           MR. DIAB:  Yeah.  I believe the Schedule G is one

2  of the -- the schedules that would have to be amended.  So,

3  I do believe that an amended schedule will be filed.

4           MR. WHITE:  I have a few questions to finish up.

5  Does Mr. March, is he still working on the approximately 400

6  to 600 California cases that remain?

7           MR. DIAB:  Yes, he is.  He's handling those, and I

8  can allow him to speak obviously to that issue.

9           MR. MARCH:  Yes.  Yes, we are.

10          MR. WHITE:  And, as I understand from your prior

11 testimony, there's no current revenue stream for those

12 cases?

13          MR. MARCH:  That's correct.

14          MR. WHITE:  So, is the only monthly revenue from

15 the law firms that are paying 20 or 40 percent, is that

16 correct?

17          MR. MARCH:  Yes.

18          MR. WHITE:  And approximately how much each month

19 do you anticipate receiving from those firms?

20          MR. DIAB:  When the payments are processed, per

21 the usual, meaning they're out of the range of damage caused

22 by the payment processing dispute with Merrich Bane.  We

23 anticipate it will be roughly $2 million a month that would

24 come through from its resources.

25          MR. WHITE:  And of those $2 million, is the Debtor

190

1  entitled to all of those as earned fees or does a certain

2  amount of that pass through to other entities or, for

3  example, as part of -- you described three buckets of

4  services.  One was, you know, resolving debts on behalf of

5  individuals.  Does the Debtor provide services such as

6  collecting installment payments and then negotiating with

7  those clients' creditors to pay them off or does the Debtor

8  retain all those funds?

9          MR. DIAB:  All of those funds would be retained.

10  Those funds are earned services fees paid to these other

11  three law firms that would be passed through on this

12  referral agreement.  So, all of that money would be retained

13  by LPG and obviously available to fund a plan.

14          MR. WHITE:  So, based on the $2 million in

15  revenue, what's the net income per month do you estimate?

16          MR. DIAB:  Roughly $1.75 million, with the cost,

17  roughly $250,000.

18          MR. WHITE:  And the 90 days leading up to the

19  bankruptcy case, the Debtor generated approximately $30

20  million in income but only paid City Capital.  Is there a

21  reason no other creditors were paid during that period?

22          MR. DIAB:  About 12 to 14 million out of that 30

23  was being held.  And, so, that money wasn't available to us.

24  It's still essentially being held by Merrich Bine.  So, the

25  amount that was actually available to us was much less and

191

1 went towards operating expenses mostly in January, but the

2 reason that more wasn't paid to either City Capital or any

3 other creditor is that the money was used for operating

4 expenses, and roughly half of it is not in our possession.

5 It's being held by the processor.

6          MR. WHITE:  And what was the basis for saying this

7 was an improper holding by Merrich Bine?

8          MR. DIAB:  Merrich Bine is a creditor and a

9 payment processor.  Under the agreement, they're permitted

10 to hold the money that was currently due and owing under

11 their creditor status as a receivable buyer, and the

12 remaining amount was supposed to be remitted to LPG.  The

13 remaining amount wasn't remitted to LPG, and that's the

14 amount that we believe rightfully belongs to us and is being

15 withheld, in violation of the contract between the parties

16 and also violation of law.  They don't have the right to

17 hold.  And if you're going to hold in the payment process,

18 you're have to give notice to the individual clients that --

19 that the third party is holding the funds, and no such

20 rights were given to our clients that Merrich Bine was

21 holding funds of the clients.  So, that's -- that's our

22 position on Merrich.

23          MR. WHITE:  And in the year leading up to the

24 filing, Mr. March testified that he received approximately

25 $100,000 per month.  Were there any other payments made to

192

1 officers or directors of the Debtor during that one-year

2 period?

3          MR. DIAB:  No.

4          MR. WHITE:  Did Mr. Diab receive any payments

5 during that period?

6          MR. DIAB:  During the year 2022?  No.  There were

7 -- (indiscernible) there were indirect payments made to

8 Strategic Consulting Solutions that were made back to LPG so

9 that it was a net zero at the end of the year.  So, for the

10 year as a whole, it was a net zero, but there was roughly

11 $480,000 sent to Strategic Consulting before it was sent

12 back to LPG.

13          MR. WHITE:  During that one-year were there any

14 payments made by the Debtor to any relatives of Mr. March?

15          MR. MARCH:  No.

16          MR. DIAB:  No.  I'm sorry.

17          MR. WHITE:  And same question for you, Mr. Diab,

18 any payments made to any of your relatives by the Debtor

19 during that one-year period?

20          MR. DIAB:  No.

21          MR. WHITE:  And were there any payments made to

22 any other insiders during the year leading up to the

23 bankruptcy filing?

24          MR. DIAB:  Did you say any other insider payments?

25 No.

193

1          MR. WHITE:  Those are all my questions for now.

2   Thank you.

3          TRUSTEE NG:  Thank you.

4          Are there any other creditors who would like to

5   ask questions?

6      (No response.)

7          TRUSTEE NG:  I just have a couple of follow-up

8   questions.  The Debtor indicated that they're moving to a

9   new address.  So, the Debtor needs to file a notice of

10  change of address with the Court with the new address.

11         The Debtor mentioned earlier that it missed two

12  pre-petition payroll.  I think that's what they said, and

13  then I don't recall seeing any employees listed in Schedule

14  E or F.  So, that looks like it has to be amended.

15         And, finally, I think the Debtor indicated that

16  Mr. March has an employment agreement with LPG.  I don't

17  think that's listed in Schedule G, and I'd also like a copy

18  of the employment agreement.  So, that's all the --

19         MR. MARCH:  Okay.

20         TRUSTEE NG:  -- information I have.  And I hear no

21  further response from anyone wanting to question the Debtor.

22  So, the matter is being concluded, and I want to thank

23  everyone for coming today.  I appreciate your help, Mr.

24  Khang and Mr. Diab and Mr. March.  Thank you so much.

25         UNIDENTIFIED SPEAKER:  Thank you.

194

1          MR. SHANKMAN (telephonic):  This is Paul Shankman.
2    I have a few questions.

3          TRUSTEE NG:  Okay.  Can you please go ahead.
4    Thank you.

5          MR. SHANKMAN:  Yes.  This is Paul Shankman of
6    Fordis, LLP, and I represent Creditor Outsource, which is a
7    provider of employee services to the Debtor.  We have filed
8    a claim, Number 13, for over $300,000.  I have just a few
9    questions.

10          The Debtor had mentioned that the payment
11   processors were holding I believe several million dollars
12   which the estate contends should be property of the estate
13   and contemplates acting towards recovering those moneys.  Is
14   that correct?

15          MR. DIAB:  Correct.

16          MR. SHANKMAN:  And is there any reason why over a
17   month has passed since the filing of the case and no action
18   has been taken before the Court to do so since that seems to
19   be part of the lifeblood of the restructuring of this
20   estate?

21          MR. DIAB:  We have two issues.  One was an attempt
22   to voluntarily (indiscernible) with Merrich Bine, and that
23   conversation has been ongoing.  The other is that LPG
24   doesn't have resources.  We don't have manpower.  We don't
25   have money.  And, so, it's difficult for us to do much of

195

1  anything right now, but it's a high priority for us to

2  proceed with these adversaries, but we are also in direct

3  discussions with (indiscernible) trying to resolve the

4  dispute.  We just haven't been able to do so.

5          MR. SHANKMAN:  How much is in the DIP account

6  presently?

7          MR. DIAB:  I believe the balance is $6,000 and

8  change if I remember correctly.

9          MR. SHANKMAN:  Okay.  Madam Trustee, I have no

10 further questions.

11         TRUSTEE NG:  Thank you so much?  Are there any

12 other creditors who would like to ask questions?

13    (No response.)

14         TRUSTEE NG:  Okay.  I hear no response, and so

15 this matter is being concluded.  Thank you again everyone

16 for coming today.

17         ALL:  Thank you.

18    (Proceedings concluded.)

19

20         I certify that the foregoing is a correct

21 transcript from the electronic sound recording of the

22 proceedings in the above-entitled matter.

23

24 /s/ Holly Steinhauer_____    5-17-23_____
   Transcriber                    Date

25

**EXHIBIT 2**

EXHIBIT 2
Page 204

### AGREEMENT OF PURCHASE AND SALE
### AND
### JOINT ESCROW INSTRUCTIONS

TO: [TRUSTEE ACCOUNT]

Escrow No.:
Escrow Officer:
Title Order No.:
Title Officer: _____

("Escrow Holder")

THIS AGREEMENT OF PURCHASE AND SALE AND JOINT ESCROW INSTRUCTIONS ("Agreement"), dated as of July 7, 2023 ("Effective Date"), is made by and between, Richard A. Marshack, solely in his capacity as the duly appointed and acting Chapter 11 Trustee ("Trustee") in the Bankruptcy Case (as defined below) of Debtor (as defined below) ("Seller"), and Consumer Legal Group, P.C. as Buyer ("Buyer" with any designation requiring mutual written agreement and Bankruptcy Court approval), with reference to the following:

### RECITALS

**A.** On March 20, 2023 ("Petition Date"), Litigation Practice Group, PC, a California professional corporation ("Debtor"), filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Central District of California, Case No. 8:23-bk-10571-SC ("Bankruptcy Case").

**B.** On May 4, 2023, an Order Directing the United States Trustee to Appoint Chapter 11 Trustee was entered whereby the Court, as further set forth therein, approved the appointment of a Chapter 11 trustee in the Bankruptcy Case. On or about May 8, 2023, the Trustee filed the Application for Order Approving Appointment of Chapter 11 Trustee and, on the same day, the Bankruptcy Court approved the appointment of the Trustee as the Chapter 11 Trustee in the Bankruptcy Case.

**C.** The bankruptcy estate ("Estate") of Debtor is the owner of certain personal property leases, personal property, receivables, prepayments, legal service agreements, intellectual property, permits, licenses, books and files, and various other assets and rights (as defined in Section 1(a), the "Property").

**D.** Seller desires to sell all of the Estate's right, title, and interest in and to the Property, whatever that may be, AS IS, WHERE-IS, WITHOUT REPRESENTATIONS OR WARRANTY, and in its PRESENT condition to Buyer, and Buyer desires to purchase all of the Estate's right, title, and interest in and to the Property upon the terms and subject to the conditions hereinafter set forth and in the Sale Order (as defined herein).

**E.** Seller has filed or will file with the Bankruptcy Court, the Expedited Motion of Trustee Richard A. Marshack for Entry of (I) an Order (A) Approving Sale of Assets

1

EXHIBIT 2
Page 205

Free and Clear of all Liens, Claims, Encumbrances and Interests Pursuant to 11 U.S.C. 363(b) and (II) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and Other Agreements; Declaration of Richard A. Marshack in Support Thereof ("Sale Motion"). This Agreement is subject to entry by the Bankruptcy Court of an order ("Sale Order") approving the sale to the Buyer. A true and accurate copy of the proposed Sale Order is attached as Exhibit "A." The Sale Order has not yet been entered by the Bankruptcy Court and the hearing associated with the same has not yet occurred given the expedited nature of the sale process. Reference to the foregoing, is not intended to be a representation, warranty by Seller, which are expressly disclaimed, with regard to the Sale Motion, Sale Order, and the Court's approval of same.

## **AGREEMENTS**

**NOW THEREFORE,** in consideration of the mutual covenants and agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer agree, subject to Court approval, that the terms and conditions of this Agreement and the instructions to Escrow Holder with regard to the escrow to be created as set forth below ("Escrow") are as follows:

1. **Purchase and Sale.** Subject to the Bankruptcy Court entering the Sale Order, substantially in the same form as attached, Seller agrees to sell, transfer, and convey to Buyer, and Buyer agrees to purchase from Seller, all of Seller's and the Estate's right, title, and interest in and to the Property whatever that may be, AS IS, WHERE-IS, WITHOUT REPRESENTATION OR WARRANTY, and in its PRESENT condition.

(a)    The Property shall consist of all of Seller's and the Estate's right, title, and interest in and to the following property AS IS, WHERE IS, WITHOUT REPRESENTATION OR WARRANTY, and in its PRESENT condition (collectively, "Property"). Seller makes absolutely no representations or warranties of any kind whatsoever concerning the Property, except for the representations expressly set forth in this Agreement. Buyer understands the condition of the Property and is not relying on any representation from Seller or any other person or entity except for the representations, if any, expressly set forth in this Agreement:

(1)    The Estate's interest in personal property leases only as identified on Exhibit "A-1" ("Leases");

(2)    The Estate's interest in equipment and furniture only as identified on Exhibit "A-2" ("Personal Property");

(3)    The Estate's interest in certain consumer client-related accounts receivable and notes receivable only as identified on Exhibit "A-3" ("Receivables"). These generally consist of approximately 22,000 active paying files. These will be defined as Active Executory Contracts in this Asset Purchase and Sale Agreement. For

2

EXHIBIT 2
Page 206

avoidance of doubt, the Receivables are only those that come due on or after the Closing date not otherwise paid by clients prior to Closing as of 5:00 p.m. PT on the Closing date that arise from, relate to, or are generated as a result of, the assignment of the consumer client contracts and the underlying obligation to deliver services including legal services and for which such services were actually delivered, by or for Debtor and any derivative Debtor entity including, but not limited to: Phoenix Law, PC, and Oakstone Law Group, PC. The transfer shall comply with all applicable laws including the notice to client requirements applicable to the sale of a law firm, as further described below. Failure to transfer any such Receivables because of the refusal of one or more clients to consent to the transfer shall not represent a condition precedent to Buyer's performance of its obligations, or otherwise permit Buyer to terminate this Agreement;

(4)     The Estate's interest in prepaid expenses, deposits, and advances only as identified on Exhibit "A-4" ("Prepayments"). The Prepayments specifically do not include any and all funds received by Seller from and after the March 20, 2023, petition date, through the date of Closing from any source including but not limited to ACH processing of client accounts pursuant to Debtor's legal services agreements;

(5)     The Estate's interest in the legal service agreements ("LSA's") only as identified on Exhibit "A-5." The inability to transfer any Property or LSA to Buyer because of the refusal of one or more clients to consent to:  (i) the transfer of their file to Buyer; or (ii) the amended LSA with Buyer, attached as Exhibit "A-5" ("Modified LSA") shall not represent a condition precedent to Buyer's performance of its obligations, or otherwise permit Buyer to terminate this Agreement;

(6)     The Estate's interest in the intellectual property owned including, but not limited to, patents, copyrights, trademarks, trade secrets, telephone numbers, data, and the server on which such intellectual property is stored and maintained, and any and all logins and related passwords ("Intellectual Property") only as identified on Exhibit "A-6." Buyer agrees to provide Seller with any data, documents, or electronic records or files on purchased computers and equipment within two business days after request, which request shall be made via email to Seller and Seller's attorneys. This shall include logins and passwords for e-mail and other outside accounts used by Seller. An agreement as to what constitutes material covered by this Section 1(a)(6) is a material term of this Agreement and is subject to an express contingency removal;

(7)     The Estate's interest in the pending applications, authorizations, and licenses relating to the Property including, but not limited to the agreements in connection with administrative, promotion, advertising, and marketing services related to destination management services provided as a marketing cooperative (inasmuch as same are terminable in the event of a sale of the assets to a "competitor" these do not appear to have significant value) only as identified on Exhibit "A-7" (collectively, the "Assumed Permits"). Seller's obligation to transfer any Assumed Permits is to the extent assignable or transferable in accordance with the terms and conditions of such permits and/or pending applications therefore or applicable law;

(8)     The Estate's interest in debtor's proprietary CRM database, Luna, to the extent such transfer does not violate any laws, copyrights, licenses, and/or trademarks, to which Seller makes no representations or warranties and all books, files, documents, and records, electronic or otherwise, including without limitation information stored on CRM databases Debt Pay Pro and Luna ("CRM Databases"), relating to the Property sold pursuant to this Agreement (provided, however, Buyer will provide Seller with a login and password and other reasonable access to such documents and records during the two-year period following Closing) (collectively,

3

EXHIBIT 2
Page 207

the "Books and Records"), only as identified on Exhibit "A-8." Seller's failure to turn over such Books and Records shall not represent a condition precedent to Buyer's performance of its obligations, or otherwise permit Buyer to terminate this Agreement;

(9)    The Estate's interest in the assets, properties, and rights identified in due diligence and only as identified on Exhibit "A-9" ("Later Identified Assets"); and,

(10)    The Estate's interest in those executory contracts and unexpired leases and other related agreements of Debtor and/or the Estate (collectively, "Executory Contracts") only as identified on Exhibit "A-10" ("Schedule of Assumed Contracts"), as such may be amended from time to time, all subject to Section 1(c) below, and with a specific designation of such active executory contracts ("Active Executory Contracts") and inactive executory contracts ("Inactive Executory Contracts" and collectively with the Active Executory Contracts, "Assumed Contracts") to the extent assignable or transferable in accordance with the terms and conditions of such executory contracts and unexpired leases and other related agreements or applicable law. To the extent the Schedule of Assumed Contracts conflicts with the aforementioned final schedules, the Schedule of Assumed Contracts shall control. Seller makes no representations or warranties as any of the Assumed Contracts which will be assigned as-is, where-is, and without any representations or warranties. Buyer acknowledges and represents that Buyer, by and through its agents and representatives, reviewed and/or had access to documents and information, including but not limited to the Executory Contracts prior to executing this Agreement. Buyer acknowledges and represents that all Assumed Contracts shall be promptly performed, regardless of when actual assumption occurs.

(11)    All software licenses and access is included in the sale and will be immediately provided to Buyer upon Closing.

(12)    Upon Closing, Seller shall coordinate with Buyer to turn over access to, custody and control of the ACH payment processing portal(s) utilized by Seller including, but not limited to, FIS/Worldpay.

**(b)**    For the avoidance of doubt, the following assets, properties, or rights of Debtor, Seller, and/or the Estate, whether or not relating to the Property, shall be expressly excluded from the Property (collectively, "Excluded Assets"):

**(1)**    All of Seller's and the Estate's cash on hand and/or in financial institutions (other than deposits included in Section 1(a)(4) above), deposit accounts, cash equivalents, surety bonds (or related deposits) marketable securities, bonds, and short-term investments, but excluding all cash proceeds from any accounts receivable paid by a client through an ACH transfer or otherwise after 5:00 p.m. PT on the Closing Date;

**(2)**    All rights relating to the overpayment or rebates of taxes paid;

**(3)**    All claims for insurance proceeds and any and all rights to and under any insurance policies in place prior to the Closing;

**(4)**    All tax records and information, and all corporate books and records, board minutes, organizational documents including financial information not already disclosed; (provided, however, Seller shall provide Buyer reasonable access to such documents and records during the 2-year period following Closing);

EXHIBIT 2
Page 208

**(5)**    All rights, suits, claims, choses in action, causes of action, defenses, rights of setoff, judgments, damages, rights to payment, litigation rights of any kind or nature whatsoever (whether arising in contract, tort or otherwise), or any equitable remedy for breach of performance if such breach gives rise to a right to payment ("Claims") (including, without limitation, Seller's right to prosecute avoidance actions under Chapter 5 of Title 11 of the United States Code) or any interest in any of the foregoing;

**(6)**    All real property leases of any kind for any location of the Debtor unless specifically requested by Buyer prior to Closing and, if requested and agreed to by Seller, Buyer will be liable for all cure amounts and all other payments, and liabilities not disclaimed by the Sale Order, arising under such lease from and after closing and notwithstanding anything in this subparagraph, under no circumstances shall any such Buyer request, or Seller's response to said request, result in the termination of this Agreement;

**(7)**    All Executory Contracts which are not Assumed Contracts, including those listed as Rejected Contracts as of the date that is the 30th day after entry of the Sale Order ("Excluded Contracts");

**(8)**    All of Seller's or the Estate's claims, causes of action, rights of setoff, and rights of recovery relating to any assets other than as specifically stated above related to the Property.

**(9)**    Seller's rights under this Agreement or the other Transaction Documents;

**(10)**    All claims for refunds, and/or credits for taxes applicable to the period prior to the Closing;

**(11)**    All records relating to Excluded Assets;

**(12)**    All personnel records and other records that Debtor or Seller is required by law to retain in its possession and any retained copies of any record or document included in the Property (collectively, "Retained Records");

**(13)**    All actions or causes of action arising in favor of Seller or the Estate pursuant to the Bankruptcy Code, and all preference, avoidance, and/or similar other rights, claims, and actions of Debtor, Seller, and/or the Estate including, without limitation, any such rights, claims, and actions arising under Chapter 5 of Title 11 of the United State Code;

**(14)**    Those items excluded pursuant to the provisions of Section 1(a) above;

**(15)**    All records, writings, and other items that are protected from discovery by the attorney-client privilege, the attorney work product doctrine or any other cognizable privilege or protection except to the extent necessary, permitted, consented to, and/or authorized to effectuate the transfer of Contracts and/or Assumed Contracts and other Property pursuant to the foregoing terms of this Agreement; and

**(16)**    All rights, claims, offsets, credits, causes of action, defenses, counterclaims, affirmative defenses, rights of setoff, and/or avoidance actions with respect to or relating to any liens, claims, encumbrances or interests against, in, with respect to or relating to the Property held by any person and including, without

EXHIBIT 2
Page 209

limitation, any claims relating to claims or liens of Tony Diab, Rosa Bianca Loli, Lisa Cohen, Eng Taing, Heng Taing, and their affiliates and/or the related relief from stay proceeding(s), the appeal(s) relating thereto and/or the surety bonds and related deposits).

**(17)** All claims, causes of actions, rights, offsets, defenses, counterclaims, defenses, avoidance actions, affirmative defenses that are Property of the Estate as defined by the case law and/or by the Bankruptcy Code and/or any other statutes or common law.

**(c)** After 120 days have elapsed after the Closing Date. Buyer may no longer revise **A-10 (Schedule of Assumed Contracts) to include or exclude any Executory Contract as** an Assumed Contract. To the extent that any cure amounts arise in connection with any Assumed Contract, as to such obligation, Buyer shall be solely liable for satisfying in full any such cure amount. Buyer's exercise of its exclusive and/or independent legal judgment in revising Schedule A-10 (the Schedule of Assumed Contracts) within 120-days of the Closing shall not be construed as a breach of this Agreement

**(d)** Without limiting the provisions of this Section 1 or any other provision of this Agreement, Buyer acknowledges that Seller is not selling or otherwise transferring to Buyer any property that Seller may not sell or transfer under applicable law including, without limitation, any such property the sale, transfer, or use of which is restricted under applicable licensing, copyright, patent, trademark, or other similar laws or which may not be transferred without the consent of a third party (including any licensor), and the use, disposition, sale, or disposition of certain of the Property by Buyer may be limited as a result thereof. Buyer assumes responsibility for obtaining all required licenses, copyrights, patents trademarks, permits and/or other agreements and/or rights as may be required so that Buyer may lawfully use, sell, operate, or dispose of the Property and/or businesses thereon.

## 2.    Purchase Price; Deposit; Payment of Purchase Price; Assumption of Liability.

**(a)** The aggregate purchase price ("Purchase Price") for the Property shall be the sum of: (i) one million dollars ($1,000,000.00) as an initial deposit, due by July 13, 2023, to be held in the Law Offices Ronald Richards & Associates, APC IOTLA account to be released to the Escrow Holders upon the site visit occurring on July 12, 2023 and continuing to July 13, 2023. ("Initial Deposit"); The balance of seven million dollars ($7,000,000.00) (the "Second Deposit" and, collectively with the Initial Deposit the "Deposit") shall be due by July 24, 2023, or ten days after entry of the Sale Order, whichever is later. The Buyer shall provide proof of funds to the Trustee for the Second Deposit on or before July 24, 2023, regardless of the status of entry of the Sale Order. After deduction of an administrative overhead in the amount of twenty percent (20%), Buyer shall pay a  fee equal to: (a) twenty percent (20%) of all amounts collected by Buyer on Active Executory Contracts (defined above) from and after the Closing, plus (b) fifteen percent (15%) of all amounts collected by Buyer on Inactive Executory Contracts (defined above), each calculated on a quarterly basis, (subsections (a) and (b) collectively, the "Fee"), and paid into the Escrow Holder's Account on a monthly basis, beginning on the first business day on or after the end of the first fiscal quarter (March 31, June 30, September 30, and December 31) post-Closing, and continuing on the same payment schedule thereafter.  Pending Seller's receipt of the Fee due in each quarter, 20% of all amounts received from the Active Executory Contracts and 15% of all amounts received on the Inactive Executory Contracts shall be paid to Seller on a monthly basis (the "Monthly Fee Amount").  The Monthly Fee Amount shall constitute property of the Estate and shall be held, in trust, by Seller.  Within three-business days

EXHIBIT 2
Page 210

of the receipt and sufficiency of the quarterly Fee due to Seller hereunder, Seller shall remit to Buyer the Monthly Fee Amount received hereunder for each month upon which the quarterly Fee is calculated.  There shall be no setoffs or offsets against the Fee unless ordered by the Court.  Except as to the Monthly Fee Amount, this provision shall not be construed to interfere with Buyer's custody and/or control over the disposition of the amounts received, post-Closing, from the Active Executory Contracts or Inactive Executory Contracts in accordance with the other provisions of this Agreement.

Pursuant to the Note ¨Liberty Note¨ executed by the Trustee in favor of Liberty Acquisitions, Inc., Buyer's affiliate, Liberty Acquisitions, Inc. shall receive the entire outstanding balance of the Liberty Note, plus interest, owed pursuant to the terms of the Liberty Note between Seller and Liberty Acquisitions, Inc., within one business day after Buyer wires the $1,000,000 deposit pursuant to the terms of the Liberty Note.

If Buyer sells, transfers, or assigns any Assumed Contracts, the buyer, transferee, or assignee of such shall take such Assumed Contract subject to this Agreement and this Section 2(a). Any such sale, transfer or assignment must be made with approval from the United States Bankruptcy Court.

Prior to Closing, the Buyer shall have full inspection of and access rights to the Active Executory Contracts. If, in the 90-day period following the Closing, there is a 5% variance below the number of Active Executory Contracts as of the Closing date, then the purchase price shall be reduced by $400.00 for each Active Executory Contract cancelled in the 90-days after the Closing. The reduction shall be offset against any Fees owed. No court order is needed for Buyer to apply this offset.  This will be a self-executing provision. The remaining balance of the Initial Deposit is fully refundable until two business days after the site visit described in paragraph 5 occurs.  Buyer shall have the unqualified right to have its Initial Deposit returned so long as it notifies Seller within two business days of the site visit.

The source of the Purchase Price, Fee, or any related amount due from Buyer shall not derive from any proceeds related to the Assumed Contracts or related Property ("Source of Funds") as further detailed in Section 12(h)-(i).

Seller shall retain a purchase money security interest in the Assumed Contracts sold to Buyer, and a first-in-priority blanket lien in and against all Property sold for so long as monetary and non-monetary obligations to the Estate remain outstanding. As a condition of Closing, Buyer shall execute any documents requested by Seller to perfect the subject security interest on all assets including Fees, accounts receivable, and inventory as further detailed in Sections 7 and 8. To the extent such documents are not presented prior to Closing, Buyer agrees to execute and delivery any further documentation necessary to perfect and maintain perfection of its security interests within five business days after presentation. The Sale Order shall specifically provide that Seller shall have a senior lien on all Property sold and all other assets of Buyer's.

Seller shall seek a provision in the sale order that no creditor of Seller shall file a lawsuit against Buyer, as Seller's assignee or successor-in-interest, for its servicing and acquisition of the Active Executory Contracts or Inactive Executory Contracts for acts that occur prior to the date of the Closing. Buyer and Seller shall agree upon that language.  This is a material term of this Agreement and if this language is not agreed upon or rejected by the Court the Buyer shall be entitled to a return of its Deposit.

Nothing herein shall prevent the Seller from retaining any and all right to make reasonable demands for accountings and audits with respect to the Assumed Contracts

EXHIBIT 2
Page 211

or related inquiries and Buyer therefore agrees to comply with requests related to the same ("Audit Rights").

The Deposit shall only be returned to Buyer if Trustee chooses not to execute the APA or if the Bankruptcy Court does not approve the proposed sale. The Deposit shall be held by Seller and shall be nonrefundable except as otherwise expressly provided in this Section 2(a)(1) and Section 13 below. The Deposit (without any interest thereon) shall be applicable to the Purchase Price upon the Closing.

**BUYER AND SELLER AGREE THAT BASED UPON THE CIRCUMSTANCES NOW EXISTING, KNOWN OR UNKNOWN, IT WOULD BE IMPRACTICAL OR EXTREMELY DIFFICULT TO ESTABLISH SELLER'S DAMAGE BY REASON OF BUYER'S DEFAULT UNDER THIS AGREEMENT AND FAILURE TO CLOSE ESCROW. ACCORDINGLY, BUYER AND SELLER AGREE THAT IN THE EVENT OF A FAILURE TO CLOSE ESCROW AS A RESULT OF SECTION 13 HEREUNDER, SUBJECT TO BUYER'S OBLIGATIONS TO PAY ALL COSTS AND EXPENSES AS DUE HEREUNDER, IT WOULD BE REASONABLE AT SUCH TIME TO AWARD SELLER, AS SELLER'S SOLE AND EXCLUSIVE REMEDY AT LAW, "LIQUIDATED DAMAGES" EQUAL TO THE AMOUNT REPRESENTED BY THE DEPOSIT. THEREFORE, IF THE PARTIES HERETO FAIL TO CLOSE ESCROW AS A RESULT OF SECTION 13 HEREUNDER, SELLER MAY, AMONG OTHER THINGS, RETAIN THE DEPOSIT AND/OR CANCEL THE ESCROW, WHEREUPON (A) SELLER SHALL IMMEDIATELY BE ENTITLED TO RETAIN THE DEPOSIT, (B) SELLER SHALL BE RELIEVED FROM ALL OBLIGATIONS AND LIABILITIES HEREUNDER, AND, (C) PROMPTLY FOLLOWING ESCROW HOLDER'S RECEIPT OF SUCH INSTRUCTION TO CANCEL THE ESCROW, ESCROW HOLDER SHALL CANCEL THE ESCROW.**

_____                    _____
Seller Initials                           Buyer Initials

(2)    Prior to the Closing, Buyer shall deposit or cause to be deposited with Escrow Holder in immediately available funds the balance of the Deposit plus Escrow Holder's estimate of Buyer's share of closing costs (including asset transfer taxes or other fees and expenses related to the asset purchase), pro-rations and charges payable pursuant to this Agreement.

**(b)**    Buyer will cooperate with and provide for assurances that may be required from a court-appointed Monitor (defined below) that all applicable consumer protection laws and regulations are being followed and or the Committee Appointed pursuant to 11 U.S.C. § 1102, including, but not necessarily limited to: transparency, protocols, and monitoring until the final Assumed Contract is fully performed with final payment issued to Seller, which may include and not be limited to the ability to review books and records as it relates to the servicing of the Active Executory Contracts an Inactive Executory Contracts Buyer is purchasing. .. Monitor shall have neither the

EXHIBIT 2
Page 212

right nor the standing to pursue any claims against the Seller. Nothing in this paragraph is intended to give anyone including the Monitor access to Buyer's current clients or unrelated files due to attorney client privilege and the privacy rights of those clients of the firm. The review by the Monitor shall be limited to the Active Executory Contracts and Inactive Executory Contracts being purchased hereunder.

**(c)**    The Purchase Price shall be allocated among the Purchased Assets as determined by the Seller at Closing. The following  assets shall, for purposes of this sale, be valued at $4,000,000.00 unless the Trustee otherwise designates another value: (i) Assumed Executory Contracts; (ii) CRM Databases; (iii) Goodwill, (iv) Intellectual Property; (v) equipment and furniture; and (vi) purchased assets that are priceless in value.

**(d)**    After Buyer is given an opportunity for the inspection, Buyer agrees to advance funds sufficient to cover payroll and operating expenses of the Debtor's business, which come due from the date of signature of this Agreement (in no event later than two days after Buyers July 12, 2023 site visit), through and including the Closing ("Additional Advances"). The amount and terms of such Additional Advances shall be subject to approval of the U.S. Bankruptcy Court.  The amounts of such Additional Advances shall be repaid to Buyer by Seller within one business day after the occurrence of the latest of the following events: (i) entry of the Sale Order;  (ii) Closing; and (iii) receipt and sufficiency of the entire $8,000,000.00 down payment (consisting of the $1,000,000.00 Initial Deposit and the $7,000,000.00 second deposit) by the Seller.   This provision would only apply if contingencies are waived by Buyer.

## 2.1.    Compliance with California State Bar Rule 1.17 – Sale of a Law Practice

**(a)**    **If the Bankruptcy Court rules that this sale can be completed pursuant to California State Bar Rule 1.17(b)(1) and/or the ABA Model rule on the sale of a law practice and determines that Trustee is a "person acting in a representative capacity," then the buyer shall comply with such rules.**

**2.2**    **Court Appointed Monitor.**    Buyer and Seller acknowledge and agree and jointly request that the Court order appointment of a Monitor ("Monitor"), the terms of which appointment shall govern the Monitor's duties. These duties shall include but are not limited to: Buyer's compliance with all applicable laws and regulations in the handling of the Active Executory Contracts and Inactive Executory Contracts assumed pursuant to this Agreement. Buyer and Seller further acknowledge and agree that the Monitor shall have the right, but not the obligation, to review and inspect all data relating or referring to Buyer's handling of the Active Executory Contracts and Inactive Executory Contracts which Monitor deems necessary for the performance of his or her duties, but that a random sampling of less than 1% of the Active Executory Contracts and Inactive Executory Contracts shall be sufficient.  Monitor is authorized to retain one paralegal to assist in the performance of his or her duties.  Buyer and Seller further acknowledge and agree that the Monitor may seek further instruction and clarification of his or her duties from the U.S. Bankruptcy Court.  The Monitor's term shall be no greater than one (1) year.  Monitor shall file status reports every four (4) months or as otherwise ordered by the Court. Fees and expenses of the Monitor shall be paid by

9

EXHIBIT 2
Page 213

Seller, up to the first $100,000.00 and additional fees and expenses of the Monitor shall be paid by Buyer, up to $100,000.00. The Court shall have retained jurisdiction to resolve any disputes over such fees and costs.

**2.3     Consumer Privacy Protection.**  In connection with the proposed sale, Buyer agrees to comply with all applicable provisions of state and federal law in the handling of consumer personal identifying information.  If ordered by the U.S. Bankruptcy Court, Buyer and Seller agree that the Monitor shall be authorized to audit a random sampling of less than 1% of Active Executory Contracts and Inactive Executory Contracts for compliance with applicable consumer privacy protection laws in as part of the Monitor's duties pursuant to Section 2.2, above, including, but not limited to the provision for payment of the Monitor's fee, the first $100,000.00 of which shall be paid by Seller and additional fees and costs of Monitor to be paid by Buyer, up to $100,000.00.

**3.     Opening of Escrow.** For purposes of this Agreement, Escrow shall be deemed opened on the Date the Seller files the Sale Motion and Escrow Holder has received Buyer's executed original of this Agreement from Buyer, and Escrow Holder shall notify Buyer and Seller, in writing, of the date Escrow is opened and provide each of the parties hereto with a full set of signature pages to this Agreement. Buyer and Seller agree to execute, deliver, and be bound by any reasonable and customary supplemental escrow instructions of Escrow Holder or other instruments as may reasonably be required by Escrow Holder in order to consummate the transactions contemplated by this Agreement; provided, however, that any such supplemental instructions shall not conflict with, amend, or supersede any portions of this Agreement or the Sale Order. To the extent of any inconsistency between the provisions of such supplemental instructions and the provisions of this Agreement and the Sale Order, the provisions of this Agreement and the Sale Order shall control.

**4.     Closing of Escrow.** The consummation of the contemplated transactions ("Closing") shall be held at the offices of the Escrow Holder on the date ("Closing Date") that is the one Business Day after occurrence of both (i) entry of the Sale Order and (ii) deposit and availability of funds from the Deposit in the Escrow Holder's Account; if the Court waives the 14-day stay set forth in Bankruptcy Rule 6004(h). If the Court does not waive the 14-day stay set forth in Bankruptcy Rule 6004(h), then Closing will occur on the fifteenth (15th) day after the entry in the Bankruptcy Case of the Sale Order, provided that both the Deposit has been made.  If the Closing Date does not occur by such date because of an uncured breach of this Agreement by Buyer, Seller shall have the right to extend the Closing Date; provided further, Buyer and Seller may mutually agree to extend the Closing Date in writing. At the Closing, Seller and Buyer shall perform the obligations set forth in, respectively, Sections 7 and 8 hereof, the performance of which obligations shall be concurrent conditions; provided that any Transaction Documents or other documents requiring recording shall not be recorded until Escrow Holder has received in escrow the full amount of the Cash and executed Transaction Documents from Buyer, adjusted as set forth herein and approval from Seller and Buyer to proceed with the Closing. The Cash and all documents associated with the Purchase Price shall be deposited with the Escrow Holder as escrowee.

EXHIBIT 2
Page 214

**5.**     <u>**Condition of the Property.**</u> Provided the Seller allows the Buyer's team unlimited access for diligence to all data bases, accounting, and client interactions on July 12, 2023 and July 13, 2023, including staff at Phoenix and Oakstone, including Ty Carss, Buyer acknowledges having had the opportunity to review and investigate, in its sole discretion, all aspects as to the condition of the Property, to the extent review and investigation is applicable including, without limitation, the suitability for Buyer's intended use; and Buyer expressly acknowledges and agrees that Buyer is purchasing the Property on an "as is, where is" basis and that neither Seller nor any Person has made any representations, warranties, covenants or agreements of whatsoever kind and nature concerning the Property, including, without limitation, its merchantability, condition or use, which are not expressly set forth herein. As such, there are no such conditions to Buyer's obligation to consummate the transactions contemplated herein. Buyer further acknowledges and agrees that Buyer has retained independent counsel and advisors, and has had the opportunity to review and discuss this Agreement and the other Transaction Document, and understands the terms and conditions set forth in the Transaction Documents and the status and condition of the Property, all prior to entering into this Agreement and the other Transaction Documents. To the extent that Buyer has not undertaken investigations or other forms of due diligence in regard to the condition of the Property, Buyer hereby expressly acknowledges that Buyer is relying solely on Buyer's own due diligence and investigations, and further expressly waives any and all claims and causes of action of whatsoever kind and nature as to any matters which may have been disclosed if such investigations were undertaken. Notwithstanding the foregoing, for the avoidance of doubt, Buyer is buying Seller's interests in the Property free and clear of all liens, claims, and interests.

BUYER AGREES THAT SELLER SHALL HAVE NO LIABILITY OR OBLIGATION WHATSOEVER FOR ANY INACCURACY IN OR OMISSION FROM ANY REPORT FURNISHED TO BUYER, AND BUYER HAS CONDUCTED ITS OWN INVESTIGATION OF THE CONDITION OF THE PROPERTY TO THE EXTENT BUYER DEEMS SUCH AN INVESTIGATION TO BE NECESSARY OR APPROPRIATE.

**Without limiting the foregoing provisions of this Section 5, Buyer expressly acknowledges and agrees that: THE PROPERTY IS BEING TRANSFERRED "AS IS" AND "WHERE IS;" BUYER AGREES TO ACQUIRE THE PROPERTY FROM SELLER "AS IS" AND "WHERE IS", AND ACKNOWLEDGES THAT SELLER MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND WHATSOEVER WITH RESPECT TO THE PROPERTY (INCLUDING AS TO THE ACTUAL NATURE, QUALITY, QUANTITY, OWNERSHIP, LOCATION OR VALUE), LIABILITIES, ASSUMED CONTRACTS OR ASSUMED LIABILITIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY REPRESENTATION OR WARRANTY REGARDING TITLE TO OR CONDITION OF THE PROPERTY, OR THE VALUE THEREOF, OR THE FITNESS, DESIRABILITY, OR MERCHANTABILITY THEREOF OR SUITABILITY THEREOF FOR ANY PARTICULAR PURPOSE, OR THE EXISTENCE OR AMOUNT OF ACCOUNTS, LIABILITIES, ASSUMED LIABILITIES, LIENS, CLAIMS OR ENCUMBRANCES. BUYER FURTHER ACKNOWLEDGES AND REPRESENTS THAT IT IS FULLY INFORMED AND ADVISED WITH RESPECT TO THE PROPERTY, ASSUMED CONTRACTS, ASSUMED LIABILITIES AND OPERATIONS OF THE PROPERTY, IT HAS REVIEWED AND INSPECTED THE PROPERTY, HAS HAD THE OPPORTUNITY TO INSPECT THE BOOKS AND RECORDS RELATING TO THE PROPERTY AND THE PUBLIC FILING RECORDS AND ENTERS**

EXHIBIT 2
Page 215

**INTO THIS AGREEMENT AFTER INDEPENDENT INVESTIGATION OF THE FACTS AND CIRCUMSTANCES RELATING TO THE PROPERTY AND THE TRANSACTIONS DESCRIBED IN THIS AGREEMENT. BUYER FURTHER ACKNOWLEDGES THAT SELLER IS THE TRUSTEE APPOINTED IN THE BANKRUPTCY CASE AND HAS LITTLE OR NO INFORMATION RELATING TO THE PROPERTY AND MATTERS PERTAINING THERETO AND THAT ANY INFORMATION PROVIDED BY THE TRUSTEE OR HIS AGENTS OR REPRESENTATIVES IS BASED UPON INFORMATION AND BELIEF AS PROVIDED BY DEBTOR OR ITS REPRESENTATIVES OR AGENTS AND/OR MATTERS FILED IN THE BANKRUPTCY CASE BY OTHER PERSONS OR PUBLIC RECORDS, AND SELLER HAS NOT INDEPENDENTLY REVIEWED ANY SUCH INFORMATION FOR ACCURACY OR COMPLETENESS. SELLER HAS NO OBLIGATION OR LIABILITY WHATSOEVER WITH RESPECT TO ANY SEPARATE AGREEMENTS, INDEMNITIES, REPRESENTATIONS OR WARRANTIES ENTERED INTO BY BUYER WITH ANY OTHER PERSON.**

**6.    <u>Conditions to Closing.</u>**

    **(a)    <u>Conditions to Buyer's Obligations.</u>** Buyer's obligation to consummate the transactions contemplated by this Agreement at the Closing is subject to the satisfaction of the following conditions:

    (1)    The Bankruptcy Court shall have entered the Sale Order, which, among other things, approves and authorizes pursuant to applicable provisions of the Bankruptcy Code the sale and transfer of the Property to Buyer approved and enacted with all Property transferred free and clear of liens, liabilities, adverse claims of ownership, and other interests of any kind and nature, with such liens, liabilities, adverse claims of ownership and other interests, if any, to attach to the proceeds of the sale and provides (or related findings provide) a finding that Buyer is a good faith buyer of the Property under Section 363(m) of the Bankruptcy Code; and

    (2)    Seller shall have delivered to or for the benefit of Buyer all of Seller's Deliverables (as defined at Section 7 below), and otherwise timely performed all of the obligations required by the terms of this Agreement. By way of illustration and not of limitation, Buyer expressly acknowledges and agrees that, except as expressly set forth in this Section 6(a), there are no "contingencies" to Closing, including, without limitation, no due diligence or financing contingency as a condition to Buyer's obligations hereunder.

    **(b)    <u>Conditions to Seller's Obligations.</u>** Seller's obligation to consummate the transactions contemplated by this Agreement at the Closing is subject to the satisfaction of the following conditions for Seller's benefit, (or Seller's waiver thereof, it being agreed that Seller may waive any or all of such conditions at his sole discretion)

    (1)    The Bankruptcy Court shall have entered the Sale Order, which, among other things, approves and authorizes pursuant to applicable provisions of the Bankruptcy Code the sale and transfer of the Property to Buyer approved and enacted with all Property transferred free and clear of liens, liabilities, adverse claims of ownership, and other interests of any kind and nature, with such liens, liabilities, adverse claims of ownership and other interests, if any, to attach to the proceeds of the sale and provides (or related findings provide) a finding that Buyer is a good faith buyer of the Property under Section 363(m) of the Bankruptcy Code;

12

EXHIBIT 2
Page 216

(2)    No stay or injunction is in effect under applicable law or court order of the Sale Order or otherwise restraining or prohibiting the consummation of the transactions contemplated by this Agreement;

(3)    Buyer shall have delivered to or for the benefit of Seller all of the items as set forth in Section 8 below, and otherwise timely performed all of the obligations required by the terms of this Agreement to be performed by Buyer; and

(4)    Receipt of the sum of eight million ($8,000,000.00) minus repayment of the outstanding balance of the Liberty Note to be repaid from the Initial Deposit pursuant to the terms of the Liberty Note, equaling the total Deposit into the Escrow Holder's Account.

**7.    Deposits by Seller**. At or prior to the Closing, Seller shall deposit or cause to be deposited with Escrow Holder the following documents and instruments ("Seller's Deliverables"), each of which shall have been duly executed and, where applicable, acknowledged and/or sworn on behalf of Seller and shall be dated as of the Closing Date:

**(a)**    An affidavit by Seller certifying that Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code of 1986, as amended, which affidavit shall be in such form as may be prescribed by federal regulations;

**(b)**    A duly executed California Form 593-C with respect to California withholding requirements;

**(c)**    A Bill of Sale, the form of which is attached hereto and incorporated herein as Exhibit "D" ("Bill of Sale");

Any necessary security agreements, financing statements, etc. as applicable, pursuant to Section 2(a) (collectively, "Financial Documents");

**(d)**    A General Assignment and Assumption Agreement, the form of which is attached hereto and incorporated herein as Exhibit "E" ("Assumption Agreement");

**(e)**    Documentation related to the Consumer Protections, including consent protocol and Modified LSA's and,

**(f)**    Any other documents, certificates, instruments, and agreements reasonably necessary to consummate the sale of the Property as contemplated herein.

**8.    Deposits by Buyer.** At or prior to the Closing, (a) Buyer shall deposit or cause to be deposited with Escrow Holder the balance of the Cash in immediately available funds, and (b) Buyer shall deliver for the benefit of Seller the following, each of which shall have been duly executed and, where applicable, acknowledged and/or sworn on behalf of Buyer and shall be dated as of the Closing Date:

**(a)**    The Assumption Agreement;

**(b)**    Resolutions (in form and substance reasonable to Seller) from Buyer's _____, duly authorizing Buyer to enter into and perform its obligations under this Agreement and the other Transaction Documents; and

13

EXHIBIT 2
Page 217

(c)   Any other documents, instruments, certificates and agreements reasonably requested by Seller to consummate the sale of the Property as contemplated herein.

**9.    Taxes; Costs and Expenses.** The cost of all documentary transfer taxes and all taxes, fees, charges, costs, and liabilities due in connection with the sale of the Property (other than income taxes due by Seller in connection with said sale) shall be the obligation of and promptly paid by Buyer. The escrow fee of Escrow Holder shall be shared equally by Seller and Buyer. Buyer and Seller shall pay, respectively, the Escrow Holder's reasonable and customary charges to buyers and sellers for document drafting and miscellaneous charges, which charges shall be provided in advance and in writing by each of Buyer and Seller prior to the Closing.

**10.    Disbursements and Other Actions by Escrow Holder; Actions at Closing.**

(a)Upon the Closing, Escrow Holder shall promptly undertake all of the following in the manner in

(1)    **Closing Statement.** Escrow Holder shall generate and circulate to each of Buyer and Seller a written closing statement ("Closing Statement"), listing, among other things, the flow of funds, and require that each of Buyer and Seller execute and deliver said Closing Statement as a condition of Closing.

(2)    **Funds.** Pursuant to the Closing Statement, and subject to limitations provided in Section 2(a)(1), disburse from funds deposited by Buyer with Escrow Holder towards payment of the Purchase Price to Seller and payment of expenses expressly agreed to by Seller pursuant to the terms and conditions hereof and set forth in the Closing Statement,

(3)    Deliver to Buyer, Seller's signatures and duly executed documents, originals as necessary, with respect to the documents in Section 7 and to Seller, Buyer's signatures and duly executed documents, originals as necessary, with respect to the documents in Section 8.

(b)    Except as otherwise provided herein, upon the Closing (and subject to satisfaction of all of E

**11.    Seller Affirmations.**

(a)    Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code of 1986, as amended (i.e., Seller is not a non-resident alien, foreign corporation, foreign partnership, foreign trust or foreign estate as those terms are defined in the Code and regulations promulgated thereunder).

(b)    Seller will fund the costs, fees, and expenses related to any court-appointed Monitor or committee for its services up to one hundred thousand dollars ($100,000.00) (the "Initial Coverage").

(c)  Seller's onsite agent Lori Ensley shall represent and warrant that the data being provided to Buyer has not been tampered with to the best of her knowledge since June 2, 2023.

**12.    Buyer's Covenants, Representations and Warranties.** In consideration of Seller entering into this Agreement and as an inducement to Seller to consummate the transactions contemplated herein, Buyer hereby makes the following representations and warranties to Seller as of the Effective Date of this Agreement:

EXHIBIT 2
Page 218

(a)     Buyer is a professional corporation duly organized and validly existing under the laws of New York and is in good standing in New York and in every jurisdiction in which the failure to be in good standing may have a material adverse effect on Buyer, its business, and/or assets. Buyer has full organizational power and authority to enter into and execute this Agreement and the other Transaction Documents to which it is a party and the transactions contemplated hereby and thereby. This Agreement and such Transaction Documents and all transactions required hereunder and thereunder to be performed by Buyer have, subject to the Sale Order, been duly and validly authorized and approved by all necessary action on the part of Buyer. This Agreement and such other Transaction Documents have been duly and validly executed and delivered on behalf of Buyer by its duly authorized partners/ officers, as the case may be, and constitute the valid and legally binding obligations of Buyer and are enforceable, subject to the Sale Order and general equity principles, in accordance with their respective terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, or similar laws affecting the rights of creditors generally. Furthermore, the undersigned represents and warrants that he/she is duly authorized to execute and deliver this Agreement by and on behalf of Buyer. Buyer represents and warrants that it is not the subject of any disciplinary or regulatory investigations.

(b)     Neither the execution and delivery of this Agreement or such Transaction Documents, nor the consummation of the transactions hereby or thereby contemplated, will constitute a violation or breach of any provision of any contract or other instrument to which Buyer is a party or by which any of the assets of such Buyer may be affected or secured, or any order, writ, injunction, decree, statute, rule, or regulation to which Buyer is subject, or will result in an acceleration of any debt or the creation of any lien, charge, or encumbrance on any of the assets of Buyer which will prevent or interfere with the consummation of the transactions contemplated herein and in the other Transaction Documents, or which might be deemed to adversely affect Buyer's ability to fully and promptly perform its obligations hereunder or under the other Transaction Documents.

(c)     The execution and delivery by Buyer of this Agreement and the other Transaction Documents, and the consummation of the transactions contemplated hereby and thereby in accordance with the Sale Order will not require the consent, approval or action of, or any filing with or notice to, any Person or any public, governmental, judicial, or regulatory authority, other than the Bankruptcy Court. There are no material actions, suits, claims, investigations, hearings, or proceedings of any type pending (or, to the knowledge of Buyer, threatened) whether at law or in equity, which will prevent the consummation of the transactions as contemplated herein or which might otherwise affect Buyer's ability to close the transactions contemplated herein and in the other Transaction Documents.

(d)     Buyer expressly acknowledges and agrees that Buyer has sufficient financial resources, including, without limitation, the necessary liquid funds, to promptly pay the balance of the Purchase Price and to pay and perform the Assumed Contracts and the Assumed Liabilities as and when due, and to consummate the transactions contemplated herein and in the other Transaction Documents, to assume and pay in full as due any claims, charges, expenses or liabilities due with respect to the Conditions of Title or otherwise arising in connection with the Assumed Contracts or any other Property, and to perform all of Buyer's obligations hereunder and under the other Transaction Documents. Furthermore, with respect to the Assumed Contracts, Buyer shall establish adequate assurance of the future performance of such Assumed Contracts as required by Sections 365(b)(1)(C) and/or 365(f)(2)(B) of the Bankruptcy Code, as applicable.

15

EXHIBIT 2
Page 219

**(e)**    There are no actions, suits, claims, investigations, hearings, or proceedings of any type pending (or, to the knowledge of Buyer, threatened), at law or in equity, that might affect Buyer's ability to close the transactions contemplated hereby.

**(f)    BY CLOSING THIS TRANSACTION, BUYER ACKNOWLEDGES TO SELLER THAT BUYER HAS HAD THE OPPORTUNITY TO CONDUCT PRIOR TO THE EFFECTIVE DATE AND WILL CONDUCT PRIOR TO THE CLOSING DATE SUCH INSPECTIONS AND INVESTIGATIONS OF THE PROPERTY AS BUYER DEEMS NECESSARY OR DESIRABLE TO SATISFY ITSELF AS TO THE PROPERTY AND ITS ACQUISITION THEREOF AND THE OBLIGATIONS IN CONNECTION THEREWITH. BUYER FURTHER WARRANTS AND REPRESENTS TO SELLER THAT BUYER WILL RELY SOLELY ON ITS OWN REVIEW AND OTHER INSPECTIONS AND INVESTIGATIONS IN THIS TRANSACTION AND NOT UPON ANY INFORMATION PROVIDED BY OR ON BEHALF OF SELLER, OR ITS REPRESENTATIVES OR ANY OTHER PERSON WITH RESPECT THERETO. BUYER HEREBY ASSUMES THE RISK ON ANY RELATED MATTERS AND EXPRESSLY ACKNOWLEDGES AND AGREES THAT IT HAS CONCLUDED ITS DUE DILIGENCE.**

**(g)**    Buyer represents and warrants that all materials submitted by Buyer, its Affiliates and its and their duly authorized representatives to Seller prior to the Effective Date in connection with Buyer, any such Affiliate, and its and their financial ability to consummate the transactions contemplated herein and in the other Transaction Documents (the "Bid Documentation") are true, correct, complete in all material respects and sets forth in a manner that is not misleading as of the Effective Date hereof and as of such date received by Seller through the Closing Date.

**(h)**    The Purchase Price consists of amounts wholly independent, and free and clear, from the Property as defined in Section 1(a) and therefore excludes any and all consumer payments as a source of funds related to the Purchase Price;

**(i)**    Any subsequent amounts paid to Seller, including any Fee from Buyer or its transferee or assignee, shall not derive from any proceeds resulting from the Assumed Contracts or related Property.

**(j)**    Buyer represents and warrants that all LSA's and the implementation thereof have been modified ("Modified LSA's") for compliance with the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"), the Telemarketing Sales Rule, 16 C.F.R. Part 310 (the "TSR"), and to the extent applicable, if ever, the Credit Repair Organizations Act, 15 U.S.C. § 1679 (the "CROA"), as well as all applicable laws and regulations as well as any Order of the U.S. Bankruptcy Court.

**(k)**    Buyer represents and warrants that the performance of the Modified LSA's will similarly comply with the TCPA, TSR, and to the extent applicable, if ever, the CROA, as well as all applicable laws and regulations as well as any Order of the U.S. Bankruptcy Court;

**(l)**    Buyer represents and warrants that it will cooperate with the requests, oversight, and inquiries of the court-appointed Monitor or Committee, whose appointment shall be for a one (1) year term, as further provided in the Sale Order;

EXHIBIT 2
Page 220

(m)    Buyer represents and warrants that it will cover the costs, fees, and expenses related to the court-appointed Monitor for its services after the Initial Coverage has expired, as further provided in the Sale Order. (Subsections (h)-(m) collectively, the "Consumer Protections");

(n)    Buyer covenants to provide , profit and loss statements, balance sheets and other financial information in connection with the filing of the Sale Motion, as may be requested by Trustee from time to time, related to the Active Executory Contracts and Inactive Executory Contracts being purchased by Buyer;

(o)    Buyer covenants to provide Seller with visibility into Buyer's ACH processing merchant account and related bank accounts, as well as customer relationship management software, such as Debt Pay Pro (or other similar software) for the purpose of monitoring Buyer's compliance with this Agreement as it relates to Active and Inactive Executory Contracts it is purchasing.  In furtherance of this paragraph, Buyer covenants to provide any reports relating to the foregoing ACH merchant account, related bank accounts and customer relationship management software;

(p)    Buyer will maintain books and records the sufficiency of which will enable Seller to identify the following information:

(i)    Detailed calculation of any and all monies paid to Buyer from Seller related to this Agreement including

(a) Details of any and all monies received in whatever form by Buyer from each client from all Active Executory Contracts and Inactive Executory Contracts including, but not necessarily limited to, client name, date received, amount, reference number, currency, remitting account, remitting accountholder name, etc.;

(b) Details of the nature and application of each transaction described above; and

(c) Detailed status and progress report of Buyer's work with regard to each client.

(iii)    Such books and records must be maintained reasonably separate from Buyer's other operations such that Seller can readily determine activity related to Clients.  Buyer shall have the right to inspect Seller's original, unaltered documentation other materials in Buyer's possession or under its control with respect to the subject matter and terms of this Agreement.  Such documentation may include, but is not necessarily limited to, bank statements, deposit slips, check registers, Client files, and information contained in Buyer's credit management software or other such electronic platform used by Buyer to service Clients.  Buyer agrees that it will maintain and preserve these books and records until such time that a final decree is obtained in the

EXHIBIT 2
Page 221

bankruptcy proceeding underlying this matter or as otherwise instructed by Seller.

(iv)    Buyer shall have the right to inspect, or have an agent, accountant, or other representative, inspect such books and records upon thirty days' notice.

**(q)**    Upon execution of an appropriate Non-Disclosure Agreement and waiver of all contingencies, Buyer shall have the right to manage, operate, and control all key personnel at the current law firms serving the receivables.  Buyer shall be given access to the firm's data bases, employees, software, and client management. Russ Squires and any other outside creditor agents shall resign effective immediately or be terminated by the Trustee as condition precedent for removing the contingencies, and Buyer shall select staff to operate the firm with Buyer's attorneys pending the Closing. Seller agrees to remove any claims made by Russ Squires against the Buyer to the bankruptcy court.

**(r)**    Upon Closing. Buyer shall be allowed to transition the Active Executory Contracts and Inactive Executory Contracts to its own employees and attorneys for servicing in coordination with the Seller's existing personnel.

**(s)**    At Buyer's expense, Seller shall cooperate and support a special counsel motion for the Law Offices of Ronald Richards & Associates and/or Greenspoon Marder jointly, APC to pursue any claims against any third party that interferes with the Active Executory Contracts and Inactive Executory Contracts being purchased by Buyer.  If either firm declines the representation, Buyer is free to retain additional counsel at its expense and choice.

**(t)**    Buyer shall not have any formal or informal business arrangements with Tony Diab during any time period for which a Fee is due to Seller under this Agreement.

## **13.    Termination; Return of the Balance of the Deposit.**

**(a)**    This Agreement may be terminated at any time prior to the Closing as follows:

(1)    By mutual written consent of the parties;

(2)    By Seller, in his sole discretion, if Seller determines that proceeding with seeking Court approval of this Agreement is not in the best interest of the Estate or if Buyer breaches, in any material respect, its representations or warranties or fails to perform in any material respect its covenants or agreements set forth in this Agreement or in the other Transaction Documents;

(3)    By Seller if the proposed sale is not approved by the United States Bankruptcy Court.

**(b)**    Upon termination of this Agreement as set forth in Section 13(a) above, Seller shall retain the Deposit as expressly provided in Section 13(c) below, and Seller shall retain any and all of its rights and remedies against Buyer, subject to the provisions of Section 2(2)(1) above relating to liquidated damages.

**(c)**    With respect to the Deposit:

EXHIBIT 2

Page 222

**(1)**     Except as otherwise provided in Section 13(c)(2) below, the Deposit is nonrefundable. Upon the termination of this Agreement and written notice thereof to Buyer and Escrow Holder, Seller shall retain the Deposit, together with any and all interest that may have accrued thereon.

**(2)**     In the event that this Agreement is terminated by Buyer or Seller, as applicable pursuant to Sections 13(a)(2), (a)(3), (a)(5) or (a)(6), and subject to the other terms hereof, then Seller shall promptly refund the Deposit, without interest thereon, to Buyer pursuant to this Section 13(c)(2).

**(d)**     Without limiting the other provisions of Section 13, Buyer acknowledges that the Deposit is subject to forfeiture if:

**(1)**     Buyer seeks to terminate this Agreement before Bankruptcy Court approval is obtained;

**(2)**     Buyer attempts to modify or withdraw its offer or terminate this Agreement without closing the transactions contemplated hereby;

**(3)**     if Buyer fails to close without any fault of Seller.

## 14.     <u>Bankruptcy Court Approval; and Sale Hearing.</u>

**(a)**     Seller filed pleadings (collectively, "<u>Sale Motion</u>") in the Bankruptcy Case to request approval of this Agreement.

**(b)**     In the event this Agreement and the contemplated sale and assignments are not approved by the Bankruptcy Court, this Agreement shall be null and void and the Deposit (without interest) shall be promptly returned to Buyer as set forth in Section 13, unless any modifying condition or term to this Agreement imposed or proposed by the Bankruptcy Court to this Agreement is reasonably acceptable to Seller and Buyer, in which event this Agreement will be modified accordingly. Except as otherwise provided in this Agreement or order of the Bankruptcy Court, upon Buyer being approved as the buyer, or if there is an overbid, the Successful Bidder, at the Sale Hearing, the Deposit will remain non-refundable and in the event of default by Buyer will be forfeited to Seller. In the event of any breach by Seller, the Buyer shall have a general, unsecured prepetition claim for damages.

**(c)**     Escrow Holder shall close the Escrow, pursuant to any applicable escrow instructions, only after all conditions herein have been met and all distributions and/or refunds made.

**(d)**     For purposes hereof:

**(1)     "Affiliate"** shall mean, as applied to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, that Person;

**(2)     "Person"** means and includes natural persons, corporations, limited partnerships, limited liability companies, general partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts, Indian tribes or other organizations, whether or not legal entities;

19

EXHIBIT 2
Page 223

**15.    Notices.** All notices or other communications required or permitted hereunder shall be in writing, and shall be personally delivered or delivered by facsimile or email (provided a duplicate copy is also sent via pre-paid, first class, certified or registered air mail (or the functional equivalent in any country), return receipt requested, to the intended recipient thereof at its email, and/or facsimile number set out below) or by overnight courier such as FedEx, Express Mail, etc., for the next Business Day delivery, and shall be deemed received upon the earlier of (i) if personally delivered or sent via facsimile or email, the Business Day of delivery to the address of the person to receive such notice, or (ii) if delivered by overnight courier, the next Business Day.

[INSERT NOTICES]

**Notice of change of address shall be given by written notice in the manner detailed in this Section 15. Rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was given shall be deemed to constitute receipt of the notice, demand, request or communication sent. Failure to provide "courtesy-only" copies shall not invalidate the notice otherwise given.**

**16.    Assignment.** This Agreement may not be assigned, nor may the obligations be delegated by, the parties hereto without the prior written consent of the other party or parties hereto, provided, however, that Buyer may assign its rights under this Agreement to an entity or entities (formed or to be formed) upon notice to Seller (provided, however, that Buyer directly or indirectly holds not less than a majority ownership interest in, and exercises exclusive control over, all such permitted assignee, and such assignment shall not limit, modify, amend or terminate any obligations of Buyer and/or assignee, as Buyer hereunder). Any assignment must be made and  notice provided to Seller no later than prior to the Sale Hearing Nothing in this Section 16 shall prevent Buyer from assigning any of the Purchased Assets in accordance with this Agreement.

**17.    Confidentiality.** As a condition of entering into this Agreement and discussing the transactions contemplated herein, Buyer represents, warrants and covenants to Seller that:

    **(a)**    Except as required by applicable law, or as mutually agreed upon by the parties in writing, Buyer shall maintain the confidentiality of, and may not disclose to any Person any confidential, secret, or proprietary information of or regarding Seller, the Estate and/or Debtor which is either marked "confidential" or "proprietary" or, by its nature, is confidential or proprietary to Seller, the Estate and/or Debtor (**"Confidential Information"),** including, without limitation, any Confidential Information obtained by Buyer and its officers, directors, Affiliates, agents and representatives, during its due diligence investigation of the Property. Seller makes no representations or warranties as to the accuracy or completeness of the Confidential Information. Buyer shall hold all Confidential Information of Seller in confidence and shall protect the same with reasonable care.

    **(b)**    For purposes hereof, the parties acknowledge and agree that any documents or information that are otherwise in the public domain (through no fault of Buyer) or are disclosed in connection with the Bankruptcy Case, and are not "sealed" by the Bankruptcy Court, shall not be deemed Confidential Information hereunder.

EXHIBIT 2
Page 224

(c)     Buyer reaffirms its obligations contained in the Confidentiality and Non-Disclosure Agreement previously executed by Buyer and/or its Affiliates in favor of Seller and the Estate.  In the event of a conflict between the previously executed agreement and this Agreement, this Agreement shall control.

## 18.     **Cooperation; Bankruptcy Court Approvals.**

(a)     Buyer agrees to use commercially reasonable good faith efforts to assist Seller and cooperate with its respective legal counsel and accountants in connection with any steps required to be taken as part of their respective obligations under this Agreement and the other Transaction Documents; and all parties shall use their commercially reasonable good faith efforts to promptly consummate the transactions contemplated herein and to fulfill their obligations hereunder.  Buyer further agrees to cooperate with Seller after the Closing, as to matters pertinent to this Agreement.

(b)     If, following the Closing, Seller receives or becomes aware that it holds any property, right, claim, demand or asset which constitutes Purchased Assets, then Seller shall transfer such Property to Buyer as promptly as practicable for no additional consideration. If, following the Closing, Buyer receives or becomes aware that it holds any property, right, claim, demand or asset which does not constitute Purchased Assets, then Buyer shall transfer or return such property, right, claim, demand or asset which does not constitute Property to Seller as promptly as practicable for no additional consideration.

(c)     Buyer acknowledges that this Agreement and its terms will be made public as part of the Bankruptcy Case and filings therein.

(d)     Buyer acknowledges that notwithstanding its execution of this Agreement, and/or the reference to the "Effective Date" herein, Seller's execution of and entry into this Agreement and the other Transaction Documents is expressly subject to obtaining approval of the Bankruptcy Court and that this Agreement is not valid until entry of a Bankruptcy Court Order approving said Agreement.

(e)     Pursuant to the terms of this Agreement, Seller shall maintain ownership of all funds derived from the Active Executory Contracts through the date of Closing. However, Seller and Buyer agree to an adjustment of the amounts retained by Seller from the Active Executory Contracts from the date of signature of the Agreement through Closing (the "Adjustment Period") to the extent Buyer demonstrates that Seller materially modified the timing of the ACH transactions related to the Active Executory Contracts during the Adjustment Period.

19.     **Refunds**.     Any refund request related to money received on an Active Executory Contract from June 2, 2023 through the date of the Closing shall be paid by Seller. Any refund request related to money received on an Active Executory Contract or Inactive Executory Contract after the Closing shall be paid by Buyer.  For refunds requested for amounts paid on an Active Executory Contract or Inactive Executory Contract for the period before June 2, 2023, a claim shall be filed in the U.S. Bankruptcy Court. Nothing in this paragraph shall be construed to prevent clients from requesting a refund for any reason.  Buyer shall not be in breach of this Agreement to the extent a client seeks a refund only from Seller; Seller shall not be in breach of this Agreement to the extent a client seeks a refund only from Buyer.

EXHIBIT 2
Page 225

**21.**    **Miscellaneous.**

   **(a)**    **Time of Essence**. Time is of the essence of each and every term, condition, obligation and provision hereof.

   **(b)**    **Captions.** Any captions or headings of the sections, subsections, paragraphs or subparagraph

   **(c)**    **No Obligation to Third Parties.** Except as otherwise expressly provided herein, the execution and delivery of this Agreement shall not be deemed to confer any rights upon nor obligate either of Buyer or Seller to, any person or entity other than the parties.

   **(d)**    **Exhibits and Recitals.** The Exhibits attached hereto are hereby incorporated herein by this reference for all purposes. The Recitals set forth above are hereby incorporated by reference.

   **(e)**    **Amendment to this Agreement.** The terms of this Agreement may not be modified or amended except by an instrument in writing executed by each of the parties hereto, and may need approval by the Bankruptcy Court if the Trustee in his sole discretion believes the amendment or modification needs further court approval.

   **(f)**    **Waiver.** Any term or condition of this Agreement may be waived at any time by the party that is entitled to the benefit thereof, but only if such waiver is evidenced by a writing signed by such party. No failure on the part of any party hereto to exercise, and no delay in exercising any right, power or remedy created hereunder, shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or remedy by any such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. No waiver by any party hereto of any breach of or default in any term or condition of this Agreement shall constitute a waiver of or assent to any succeeding breach of or default in the same or any other term or condition hereof.

   **(g)**    **Governing Law.** This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of California without regards to the rules of such state relating to the conflict of laws. Subject to **Section 21(i) below,** the parties hereto hereby submit to personal jurisdiction in the State of California, Central District of California; County of Orange.

   **(h)**    **Bankruptcy Court Jurisdiction.** The parties hereto agree that the Bankruptcy Court shall have exclusive jurisdiction over all disputes and other matters relating to the interpretation and enforcement of this Agreement and the other Transaction Documents (and/or any ancillary document executed pursuant hereto) and/or the Property, provided, however, that if the Bankruptcy Court abstains from exercising, or declines to exercise jurisdiction with respect to any such action: (A) such abstention or refusal shall have no effect upon, and shall not control, prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such action, and (B) the parties hereto expressly agree that any disputes between such parties shall be submitted to any other court of competent jurisdiction in the Central District of California; Orange County, California.

   **(i)**    **Fees and Other Expenses.** If either Party incurs attorneys' fees to enforce this Agreement because of a breach of this Agreement by the other Party, the prevailing Party shall be entitled to recover reasonable attorneys' fees as set forth by the court from the other Party.

EXHIBIT 2
Page 226

**(j)    Entire Agreement**. This Agreement supersedes any prior agreements, negotiations and communications, oral or written, and contains the entire agreement between Buyer and Seller as to the subject matter hereof; provided, however, that this Agreement and the other Transaction Documents remain subject to the Sale Order or such Order related to the Sale of the Property as the Bankruptcy Court may enter, as applicable. No subsequent agreement, representation or promise made by either party hereto, or by or to an employee, officer, agent or representative of either party shall be of any effect unless it is in writing and executed by the party to be bound thereby.

**(k)    Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the successors and permitted assigns of the parties hereto.

**(l)    Business Days.** As used in this Agreement, the term "Business Day" or "Business Days" shall be defined as any day on which national banking institutions in Orange County, California, are open for the transaction of banking business (excepting any Saturday or Sunday).

**(m)    Signatures by Electronic Delivery.** Any and all documents to be executed by any party hereto (including this Agreement) may when executed be transmitted to the other party and to Escrow Holder (as applicable) by facsimile and/or by email of a .pdf or other electronic data format, and such facsimile and/or email of a .pdf or other electronic data format transmission shall constitute delivery of such document, provided, however, that the original of such document bearing the original signature(s) is sent on the date of the facsimile or email of the .pdf or other electronic data format transmission to the recipient via overnight courier for the next Business Day delivery.

**(n)    Counterparts.** This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which, together, shall constitute one and the same instrument.

**(o)    Partial Invalidity.** All rights and restrictions contained herein may be exercised and shall be applicable and binding only to the extent that they do not violate any applicable laws, and are intended to be limited to the extent necessary to render this Agreement legal, valid and enforceable. If any term of this Agreement, or part thereof, not essential to the commercial purpose of this Agreement shall be held to be illegal, invalid or unenforceable by a court of competent jurisdiction, it is the intention of the parties that the remaining terms hereof, or part thereof shall constitute their agreement with respect to the subject matter hereof and all such remaining terms, or parts thereof, shall remain in full force and effect. To the extent legally permissible, any illegal, invalid or unenforceable provision of this Agreement shall be replaced by a valid provision that will implement the commercial purpose of the illegal, invalid or unenforceable provision.

**(p)    No Construction Against Preparer**. No provision of this Agreement or the other Transaction Documents shall be construed against or interpreted to the disadvantage of any party by any court or other governmental or judicial authority by reason of such party's having or being deemed to have prepared or imposed such provision.

**(q)    LIMITATION OF LIABILITY SELLER, THE ESTATE AND THEIR REPRESENTATIVES. THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS, AND ANY CLAIM OF BUYER AGAINST SELLER AND/OR THE ESTATE SHALL BE EXPRESSLY LIMITED TO SELLER'S AND THE ESTATE'S INTEREST IN THE PROPERTY AND IN NO**

23

EXHIBIT 2
Page 227

**EVENT OR CIRCUMSTANCE WILL ANY OF SELLER, THE ESTATE OR THEIR RESPECTIVE EMPLOYEES, AGENTS, ATTORNEYS OR OTHER REPRESENTATIVES HAVE ANY LIABILITY FOR ANY CLAIM, CAUSE OF ACTION, OR OTHER LIABILITY ARISING OUT OF OR IN CONNECTION WITH ANY ONE OR MORE OF THE FOLLOWING: (1) THIS AGREEMENT, (2) ANY ONE OR MORE OF THE OTHER TRANSACTION DOCUMENTS, OR (3) ANY OTHER AGREEMENT CONTEMPLATED UNDER THIS AGREEMENT, WHETHER BASED ON CONTRACT, COMMON LAW, STATUTE, EQUITY, OR OTHERWISE. NOTWITHSTANDING ANYTHING IN THIS AGREEMENT OR THE OTHER TRANSACTION DOCUMENTS TO THE CONTRARY, IN NO EVENT OR CIRCUMSTANCE WILL SELLER, THE ESTATE OR THEIR RESPECTIVE EMPLOYEES, AGENTS, ATTORNEYS OR OTHER REPRESENTATIVES BE LIABLE FOR NOR SHALL BUYER SEEK ANY CONSEQUENTIAL, SPECIAL OR PUNITIVE DAMAGES OF ANY TYPE OR NATURE WHATSOEVER. THE PROVISIONS OF THIS SECTION 21(r) SHALL SURVIVE BOTH THE CLOSING AND THE TERMINATION OF THIS AGREEMENT REGARDLESS OF THE BASIS OR REASON FOR ANY SUCH TERMINATION.**

**FURTHER, NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT OR THE OTHER TRANSACTION DOCUMENTS, THE LIABILITY OF SELLER HEREUNDER AND THEREUNDER SHALL BE NONRECOURSE. SELLER IS SELLING THE PROPERTY SOLELY IN HIS CAPACITY AS TRUSTEE APPOINTED IN THE BANKRUPTCY CASE, AND NO LIABILITY OR OBLIGATION SHALL BE ASSERTED AGAINST OR ACCRUE TO THE TRUSTEE INDIVIDUALLY AS A RESULT OF THE SALE OR OTHER TRANSACTIONS CONTEMPLATED HEREIN OR THE OTHER TRANSACTION DOCUMENTS OR OTHERWISE.**

**(r)** On a motion by Seller presented to the U.S. Bankruptcy Court presiding over this case, the court may enforce or direct compliance with this Agreement.

**(s)** Richard Marshack is signing in his official capacity and there shall be no scenario relating in any manner to the administration of the Debtor's case or this Agreement or this sale or the operation of Debtor's business where Buyer or any agents or representatives of the Buyer shall have any recourse to Richard Marshack personally or to any professionals, agents and employees of the Debtor's business or the estate and no recourse to members of the creditors committee or professionals of the creditors committee. Buyer acknowledges that none of the above individuals or entities including the trustee in his official capacity or his personal capacity is making any representations or warranties or promises or covenants.

**[SIGNATURE PAGE IMMEDIATELY FOLLOWING]**

24

EXHIBIT 2
Page 228

**Seller:**

RICHARD A. MARSHACK, Chapter 11 Trustee of the Litigation Practice Group

By: _____          Dated:

Richard A. Marshack, solely in his capacity as Chapter 11 Trustee

**Buyer:**

Consumer Legal Group, P.C.

By: _Jason J. Rebhun_____          Dated: _7/7/2023_

Its: _Agent_____

25

EXHIBIT 2
Page 229

**EXHIBIT 3**

EXHIBIT 3
Page 230

| Loan Funds | | | |
|---|---|---|---|
| Resolution Ventures | $ 249,663.98 | | |
| Liberty Acquisitions | $ 60,000.00 | | |
| Liberty Acquisitions | $ 490,336.02 | (net 500,000-9663.98) | |
| | $ 800,000.00 | | |
| | | | |
| | | | |
| Disbursements | | | |
| 6/16/23 payroll | $ 247,072.24 | | |
| 6/30/23 payroll | $ 192,604.55 | | |
| HUGE Domain services | $ 954.60 | | |
| Employee insurance | $ 60,000.00 | | |
| Employee insurance | $ 436.96 | | |
| Google services account | $ 7,954.02 | | |
| 6/16/23 payroll taxes | $ 93,000.00 | | |
| 6/30/23 payroll taxes | $ 90,000.00 | | |
| Zoom account 3 months - (due 5/4/23) | $ 4,406.16 | | |
| | $ 696,428.53 | | |
| | | | |
| Loan funds remaining | $ 103,571.47 | | |
| | | | |
| | | | |

EXHIBIT 3
Page 231

|  | Pay date 7/14/23 | Pay date 7/28/23 | Other costs |
|---|---|---|---|
| Wages (gross pay) | $ 262,215.00 | $ 262,215.00 |  |
| Payroll taxes ER portion | $ 45,000.00 | $ 45,000.00 |  |
| Employee Insurance | $ 55,584.00 | $ 48,900.00 |  |
| Malpractice insurance (due 7/18/23) |  |  | $ 9,750.00 |
| BRI cobra premium (due 7/30/23) |  |  | $ 75.00 |
| Workers comp (due 7/13/23) |  |  | $ 1,500.00 |
| Bond premium (due now) |  |  | $ 10,045.00 |
| Lori - Bicher & Assoc fees (80% May/June) |  |  | $ 13,138.00 |
| Lori - Bicher & Assoc expenses |  |  | $ 845.00 |
| Estimate for unknown contingencies |  |  | $ 30,000.00 |
|  | $ 362,799.00 | $ 356,115.00 | $ 65,353.00 |
|  |  |  |  |
|  |  |  |  |

EXHIBIT 3
Page 232

**EXHIBIT 4**

EXHIBIT 4
Page 233

**Services Provided**

The Consumer Legal Group PC, a licensed law corporation and its employed and affiliated attorneys (collectively "CLG") will provide legal services wherein it will represent You ("You") in connection with disputes You (may) have with the creditors listed below (see Enrolled Accounts). CLG is prepared to do the following as part of its representation of You:

- Assist You in stopping creditors and any related debt collectors from harassing or contacting You in connection with any of the debts identified below;
- Dispute the legal validity of the debts identified below based upon information provided by You;
- Assist You in addressing erroneous or inaccurate information in connection with debts identified below;
- Represent You in any lawsuit filed against You in connection with any of these debts;
- Defend You against any collection activity or lawsuit on any debt identified below at any point in time, without expiration;
- Initiate legal action in a court of competent jurisdiction against any creditor that violates any state or federal law in connection with any debt identified below; and
- Determine Your qualification for bankruptcy under Chapter 7 or Chapter 13 of the U.S. Bankruptcy Code, and counsel You regarding the procedures and effects of bankruptcy as well as Your qualification to file the same. CLG does not engage in the practice of bankruptcy law but we will evaluate Your file and determine the best course of action for You which may be bankruptcy.

Importantly, pursuant to relevant Rules of Professional Conduct, by way of general information and as a disclaimer, CLG makes no representation or guarantee that it will accomplish all of the tasks identified herein given that some matters, information, and ability are outside and beyond CLG's control.

CLG (or its local counsel as designated on a case-by-case basis) will serve as Your attorney for all purposes in connection with these disputes and will be available to render legal assistance necessary to resolve these debts. The fees that are set forth below are flat fees that are all inclusive – no additional fee or cost will be charged by CLG at any time during the duration of Your dispute with the creditors identified below. Fees paid to CLG are in connection with and contemplation of the services described herein and are earned by CLG at the time they are paid and are for services rendered to You as set forth herein.

You understand that You are hiring a New York law firm which employs attorneys who are licensed to practice law in the states of New York and New Jersey, primarily because not every creditor is located or has an office in the state where You live and not all creditors are based in the state where You live. You acknowledge that CLG performs services pursuant to the Fair Debt Collections Practices Act as well as other federal statutes and You have an issue which may arise thereunder. You therefore authorize CLG to represent You, regardless of the state where You reside and that You authorize CLG to engage local counsel in the individual state where You reside to represent You as if CLG was representing You itself.

EXHIBIT 4
Page 234

**Client Authorization**

You authorize CLG to challenge, where applicable and based on the information You provide, each of the debts listed below, which You believe and advise CLG to be in any way invalid, inaccurate, or otherwise without a legal basis. You also authorize CLG to obtain a copy of Your credit report to assist in the process of analyzing Your account and developing a strategy regarding the resolution of debts that are excessive or otherwise unauthorized by law. However, it is expressly understood and agreed that CLG is not a credit repair organization, is not engaged in credit repair, and will not be undertaking any work as to Your credit repair, even though CLG's work services towards resolving debt may have an effect and impact on Your credit. You further authorize CLG, acting under power of attorney for You, to affix Your signature to documents sent on Your behalf in relation to the matters addressed herein. Finally, You authorize CLG to communicate with You via email, text message, telephone, and facsimile. Any of the authorizations set forth herein can be revoked at any time by written communication to CLG.

You understand that failure to pay debts as they become due will adversely affect Your credit score and will likely continue to incur late fees and penalties on the accounts during period of representation.

**Description of Services to be Performed**

CLG will obtain Your credit reports, analyze them, and develop strategies for correcting invalid or unlawful debts for which You should not be held legally responsible. Again, it is expressly understood and agreed that CLG is not a credit repair organization, is not engaged in credit repair, and will not be undertaking any work as to Your credit repair, even though CLG's work services towards resolving debt may have an effect and impact on Your credit. Where appropriate, CLG will use existing laws and interact with creditors and credit bureaus on Your behalf to invalidate Your debts and remove such invalid debts from Your credit reports. CLG will also interact with collection agencies, as applicable, to invalidate Your debts by requiring them to supply evidence of Your indebtedness to them, or any other legal mechanism(s). CLG will also investigate Your "delinquent" accounts to determine the most effective method for invalidating Your debts or otherwise removing any legal liability for such debts, up to and including the initiation of lawsuits on Your behalf against Your creditors and their third-party debt collectors.

In addition, if a lawsuit is filed against You, CLG will represent You in such a lawsuit and will not charge any additional fees for such representation provided such a lawsuit was initiated after the date You sign this Agreement and after at least one payment to CLG has been made in accordance with the schedule contemplated herein.  In the event a lawsuit was initiated against You before the date You execute this Agreement and You elect to have CLG represent You, an additional fee of $500.00 will be charged. Where appropriate, if legal fees are recovered from an adverse party, CLG will retain such fees for its services.  You will be responsible for any damages resulting from any lawsuit.  Any costs incurred in a lawsuit will be paid by CLG out of the fees set forth below, including the fees of any attorney retained on Your behalf in a jurisdiction in which CLG is not admitted to practice law. No additional payment from You to CLG will be necessary for the

EXHIBIT 4
Page 235

defense of any lawsuit filed against You after the date You execute this Agreement and after at least one payment to CLG has been made in accordance with the schedule contemplated herein. You will, however, be responsible for any damages resulting from such lawsuits or any settlements reached during such lawsuits.

CLG does not, as part of its representation of You, include the following services: (i) tax, financial planning, or accounting advice (note that the discharge of debt can trigger a taxable event so the appropriate tax professional should be consulted), (ii) modification, collection, or improvement of Your credit reports or credit score, (iii) bankruptcy services, (iv) except as provided for herein, representation in any matter before any court or arbitration hearing, including but not limited to foreclosure proceedings; (v) guarantee elimination of harassment or collection calls from credits or collectors though we will do our best to cause them to be ceased. CLG does not guarantee any services nor any outcome in Your (or any) legal matter.

## Fees

You will pay the fees set forth below for the legal services provided by CLG (CLG's services are outlined above). No fee or other cost will be charged or collected beyond the flat fee set forth below (or the $500 charge for a lawsuit which was initiated prior to Your signing this Agreement). This is the only amount that You must pay to CLG for its services, which includes any cost, filing fee or vendor's fee associated with CLG's representation of You, and this fee is not escrowed but rather earned received by CLG. This fee does NOT, however, include any settlement that You may have to pay to any creditor if You opt to settle a debt prior to or during the course of a lawsuit.

## Refund Policy

You may cancel this agreement at any time and will not be required to pay for any further services as of the date of cancellation.  Any fee You pay, however, shall be deemed earned at the time it is paid and is not refundable. {PAGEBREAK}

## Debt Settlement

You understand that CLG is not a settlement company and the fees You are paying are for the services of CLG's attorneys. It is expressly understood and agreed that CLG is not a credit repair organization, is not engaged in credit repair, and will not be undertaking any work as to Your credit repair, even though CLG's work services towards resolving debt may have an effect and impact on Your credit.

If You enroll any debt that is legally deemed "secured" (which is subject to and governed by a security interest) such as a car loan wherein a lender has a right to repossess the vehicle or other secured item, You are prepared and understand that the item may be repossessed or You may otherwise lose possession of the item while CLG works its process to challenge and dispute the underlying debt.

## Actions Required of You

EXHIBIT 4
Page 236

You agree to provide CLG with all correspondence You receive from any creditor, credit bureau, attorney, or court of law.  You further agree to keep a log of all communications, including telephonic and electronic communications, from any creditor or credit reporting agency to You from the date You execute this Agreement until the conclusion of Your representation.

You agree to: (i) provide CLG with all information and documents regarding the debt(s) You seek to modify. Such information provided must contain the current account balance and the name of the creditor and account number; (ii) As an ongoing obligation, You will provide all information related to the debt as requested by CLG. All information provided by You must be truthful and accurate. CLG is under no obligation to verify information supplied by You. You will forward all correspondence from creditors and collection agencies, including collection letters, demands and complaints within five (5) days to CLG. If a creditor or collection agency telephones client, You will not engage in debt resolution discussions. If a creditor or collection agency engages in harassing or abusive conduct, You will promptly notify CLG and provide complete and accurate information regarding such contacts; (iii) You will timely respond to all requests, communications or documentation from CLG or its representatives and will promptly provide CLG with any change of address or other contact information; (iv) You shall make payments as set forth herein, a copy of said schedule is attached hereto and incorporated by this reference. You agree to make all the payments on the designated dates; and (v) You agree to timely and fully pay all debt modification settlements negotiated by CLG.

You expressly understand and agree that communication with CLG and any agent (including counsel) engaged by CLG to act on Your behalf is of paramount importance. Proper representation and service cannot be provided if You cease or fail to communicate with CLG or its agent(s). If CLG attempts to contact You and is unsuccessful because You do not answer, return calls, respond to communication, You understand and acknowledge that such (in)action can have significant consequences, including potential judgments or garnishments. In such a case, CLG reserves the right to cease representing You and to terminate this Agreement, in accordance with relevant state bar ethical and court obligations and considerations.

**Right to Conduct Business Electronically and Contact You**

You agree that CLG may contact You electronically and telephonically and that all business with CLG may be conducted electronically. You further agree that CLG may transmit data, including that regarding Your credit profile, electronically.  You further agree that any electronic communication carries the risk of disclosure to a third party and that CLG will not be held responsible for any such inadvertent disclosure of information. A facsimile or email transmission of this signed agreement, via an email attachment or otherwise, will be as valid as the original signed agreement. This agreement may not be modified except in writing by both parties.

**Malpractice Insurance**

CLG hereby discloses that it maintains a malpractice insurance policy that covers and insures its representation of You. If You desire to make a claim against that insurance policy, You must first contact CLG and disclose Your claim and the nature of the claim, at which point CLG agrees to

EXHIBIT 4
Page 237

assist You in obtaining any and all information necessary to prepare a file a claim. Any claim brought against CLG must be brought within six (6) months of the claimed offense.

## Applicable Law and Confidentiality

You understand and agree that CLG is based out of the State of New York, is a licensed law corporation under the State Bar of New York, and that New York law applies to this Agreement.  You further understand that CLG is bound to strict rules of confidentiality and attorney-client privilege in connection with the rules applicable to attorneys licensed to practice law in the State of New York. You further understand and agree that You have sought the representation of CLG with full knowledge of its location and licensing, and that CLG works with other/local/outside attorneys licensed in nearly all 50 states and the District of Columbia as affiliated counsel to allow CLG to provide a complete representation of You in nearly every state in which You are sued or in which a dispute might arise. You have the right to know the licensed attorney with whom CLG has affiliated in any state and at any time but understand and agree that CLG may choose to change the local attorney with whom it is affiliated in any given jurisdiction, always provided only that CLG shall have an affiliated attorney engaged to represent Your interests. At any time that You would like to know the identity of local counsel, which is working on Your file, please do not hesitate to contact us though as part of our protocol, we often introduce You to local counsel as the matter develops.

This Agreement constitutes the entire agreement of CLG and You, it being understood and agreed that all prior and contemporaneous representations, statements, understandings and agreements, whether oral/verbal or written, between CLG and You or made on CLG's behalf, at any time, or which were purportedly made on CLG's behalf, concerning the subject matter of this Agreement, the scope of services to be performed, any guarantees or representations as to what CLG will do, are merged into this Agreement, which alone fully and completely expresses their agreement, and that the same is entered into after full investigation. You agree that You have not relied upon any statement or representation, of any kind, made by anyone, whether oral/verbal or written, not embodied in this Agreement made by the other or any third party acting on behalf of the other.

Fee Dispute Resolution: Part 1215 of Title 22 of the Codes, Rules and Regulations of the State of New York, which governs written letters of engagement, if the client has a dispute with the attorney regarding fees, the client has the option of instituting civil litigation or proceeding in arbitration. The client has the right to arbitrate fee disputes between $1,000 and $50,000 pursuant to part 137 of the rules of the chief administrator.  Arbitration is considered to be an efficient and less costly method of resolving disputes. If the client chooses arbitration as a forum, the arbitration result will be final and binding.  A single arbitrator will hear disputes of $6,000 or less.  A panel of three arbitrators, one member of which is not an attorney, will hear disputes of more than $6,000 up to $50,000.  Arbitrators are usually chosen by an independent arbitration association and are impartial as well as being familiar with the areas of law and/or facts involved in the dispute.  Should there be a dispute regarding fees, the law of New York shall apply in arbitration as well as civil litigation.

{PAGEBREAK}

EXHIBIT 4
Page 238

**Client Acknowledgements**

By signing this agreement, You acknowledge that CLG has not instructed You to breach any contract, fail to make any required payment, or fail to perform any obligation You have lawfully incurred. CLG reserves the right to terminate this agreement if (a) required by the State Bar of New York Rules of Professional Conduct, (b) You refuse to communicate with CLG or respond to reasonable requests for information necessary to represent You in an effective way, (c) You fail to make timely payment of the amount due under hereunder, or (d) Your payments are returned multiple times for any reason. CLG will not pay any of the debts identified below and does not guarantee that any debt You now have or may incur will be invalidated or settled in association with CLG's representation of You. You understand and agree that You must forward any communication You receive in printed or electronic form from any creditor, court, or representative of other a creditor or a court to the address, email, or fax number provided below, and that You must keep a log of all telephonic communications with any creditor or credit reporting agency. You, the client, may cancel this Agreement at any time by submitting three days' written notice of cancellation by mail, email, or fax, and shall not be responsible for any payments due after the date of cancellation. A payment due within three days of the date of written cancellation shall be processed and shall not be refunded.

If, during the course of representation, CLG believes a creditor or agent of any creditor may have violated a federal or state consumer protection law (including, but not limited to, the Fair Debt Collection Practices Act or Truth in Lending Act) with respect to You, You authorize CLG to pursue such claim against such party on Your behalf. You recognize that CLG may incur additional attorney fees in pursuing such a claim. CLG may recover any additional fees from the creditor using federal or state consumer protection laws that permit attorney's fees to be recovered from the creditor or creditor's agent if the claim is successful. If a debt listed hereon is settled together with a claim against the creditor for a violation of consumer protection law, and the creditor pays CLG's attorney's fees incurred in pursuing the claim, CLG may credit You with a pro rata portion of fees paid with respect to the debt settled.

**You may cancel this contract without penalty or obligation at any time before midnight of the 3rd business day after the date on which You signed the contract. A separate though related "Notice of Right to Cancel" is being provided to Client contemporaneous with this Agreement. See the attached notice of cancellation form for an explanation of this right.**

| | |
|---|---|
| Client Signature: | {SIGNATURE} |
| Date: | {SIGNDATE} |
| Co-Applicant Signature: | {COSIGNATURE} |
| Date: | {COSIGNDATE} |

**CONSUMER LEGAL GROUP PC**

**Aryeh Weber, Chairman
PO Box 412 Elmsford, NY 10523**

EXHIBIT 4
Page 239

**Support@ConsumerLegalGroup.org**
**Tel. 212.920.1247**

{{NEW_PAGE}}

Program Acknowledgements

The monthly payments I am making go towards Consumer Legal Group PC attorney representation fees.

Initial:

{{INITIAL}}

The attorney fees I am paying will go to Consumer Legal Group PC and not to my creditors. The fees do not accumulate towards a settlement, and they will not be used to pay my creditors / debts.

Initial:

{{INITIAL}}

Consumer Legal Group PC is a law firm specializing in debt resolution; NOT debt settlement. I understand the difference.

Initial:

{{INITIAL}}

If I receive a lawsuit on an enrolled account, Consumer Legal Group PC will represent me and handle all legal proceedings at no additional cost.

Initial:

{{INITIAL}}

Depending on my current credit standing, this program may have a temporary negative effect on my credit.

Initial:

{{INITIAL}}

I understand that if any of the enrolled debts are auto loans, secured, or have any type of collateral, those items may be repossessed.

Initial:

{{INITIAL}}

{PAGEBREAK}

EXHIBIT 4
Page 240

**Enrolled Accounts**

{Creditor List}

{PAGEBREAK}

**Client Intake Form**

**Name:** {FULLNAME}
**Address:** {FULLADDRESS}

**Home Phone:** {PHONE}
**Cell Phone:** {PHONE3}
**Email:** {EMAIL}
**Last 4 SSN:** {ENCSSN}

{PAGEBREAK}

**Schedule of Payments**

I agree to this payment schedule – **Client Initials:** {INITIAL}

{DraftSchedule}

{PAGEBREAK}

**Electronic Payment Authorization**

| | |
|---|---|
| **Bank Name:** | {BANKNAME} |
| **Name on Account:** | {NAMEONACCT} |
| **Account Type:** | {ACCTTYPE} |
| | Other (specify: {INPUT}) |
| **Routing Number:** | {ROUTINGNUM} |
| **Account Number:** | {ACCOUNTNUM} |
| **Next Payment Date:** | {PM1_DATE}            **Amount:** ${PM1} |
| **Recurring Payment Start Date:** | {StartDate} |

By signing below, I authorize and permit CLG or their designees to initiate electronic funds transfer via an Automated Clearing House system (ACH) from my account listed above.  I will also provide CLG with a voided check or savings deposit slip.

If necessary, CLG may make adjustments if errors have occurred during the transaction.  The date of the draft is listed above, however, if the draft date falls on a weekend or bank holiday, the debit transaction will take place on the next business day.  This authority will remain in effect until CLG

EXHIBIT 4
Page 241

is notified by the Client in writing at least 5 days prior to the next scheduled draft date.  No other forms of cancellation by Client(s) will be observed.  If the debit is returned because of non-sufficient funds or uncollected funds, then the originator and its financial institution may reinitiate the entry up to two (2) times.  The reversal of funds from a client's account that was drafted in error cannot be made until seven business days from the draft date.  The Client agrees to waive all rights of reversal or refusal of any payment on any draft that CLG may make against the Client's bank account while services are performed.  The Client agrees with all of the provisions and conditions outlined within.

### Acknowledgment of Refunds & Draft Date Changes

ACH Refunds: If a refund is due such will be made through the ACH process only.  Refunds may take up to 10 days to process.  In the event my EFT or draft is returned from my bank unpaid, I agree that a fee of $25.00 or as allowed by law may be charged to my account via draft or EFT.  Furthermore, I warrant that I am authorized to execute this payment authorization and the above information is true and correct.  Draft Date Changes: I may stop any ACH debit by providing written notice to CLG at least three (3) business days prior to the scheduled payment.  If I should need to notify CLG of my intent to cancel and/or revoke this authorization, I must contact CLG not less than three (3) business days prior to the questioned debit being initiated.

**Client Signature:** **{SIGNATURE}**
**Date:** **{SIGNDATE}**
**Printed Name:** **{FULLNAME}**

{PAGEBREAK}

### Preauthorized Checking and ACH Authorization Form

**Account Owner Name:** {NAMEONACCT}
**Address:** {ADDRESS} {ADDRESS2}   **City:** {CITY}   **State:** {STATE}   **Zip:** {ZIP}
**Mobile Phone #:** {PHONE2}   **E-Mail:** {EMAIL}

### DESIGNATED BANK ACCOUNT INFORMATION

**Bank Name:** {BANKNAME}
**Name as it appears on bank ACCOUNT:**   {NAMEONACCT}

**Routing Number:** {ROUTINGNUM}   **Account Number:** {ACCOUNTNUM}   **Checking or Saving:** {ACCTTYPE}

EXHIBIT 4
Page 242

**DESIGNATED CREDIT/DEBIT INFORMATION**

**Card Holder Name:** {CC_NAME}
**Card Number:**        {CC_NUM}
**Expiration Date:**    {CC_EXP}
**CVC:**                {CC_CVV}

**DESIGNATED ACCOUNT PAYMENT AUTHORIZATION SCHEDULE**

**Total Amount of Debit:**     ${PM1}     **Date of Next Debit:**     {PM1_DATE}

I hereby apply for and agree to establish a non-interest bearing special purpose account (the "Account") with a bank ("Bank") selected by CLG and/or its successors for the purpose of accumulating funds to pay for such goods and services as I so direct, or any other service provider selected by CLG, to perform. This application is subject to Bank's customer identification program, as required by the USA PATRIOT ACT and other applicable laws, and accordingly, I hereby represent that the above information is true and complete to the best of my knowledge and belief. The bank account information provided above may be subject to account validation processes to include pre-notation and a $0.01 micro-deposit.

I hereby authorize Bank, directly or any other service provider selected by CLG, to administer the Account on my behalf by (a) periodically transferring and depositing funds to the Account, via any payment media currently in use, and (b) periodically disbursing funds from the Account pursuant to instructions that I may give from time to time. I hereby authorize payments from the Account for the fees and charges provided for in this application and in the agreement. I hereby grant permission for Bank to share information regarding the Account with any service provider to facilitate the transactions I may initiate that involve the Account, and with any other party that is essential to the administration of the Account on my behalf. My signature below provides permission to be contacted by phone at the number provided with this authorization. A payment reminder may be sent to my phone number via text messaging prior to the payment schedule above.

This authorization shall remain in full force and effect until I provide a verbal or written termination notice to CLG or such other service provider as is selected by CLG. Any such notice, and any other written notice that is provided for in this Application or the Agreement, shall be sent to CLG directly at the address set forth in the Agreement.

Account Holder's
Signature:              {SIGNATURE}          Date:    {SIGNDATE}

EXHIBIT 4
Page 243

**EXHIBIT 5**

EXHIBIT 5
Page 244

# NANCY B. RAPOPORT, J.D.

William S. Boyd School of Law
University of Nevada, Las Vegas
4505 S. Maryland Parkway
Mail Stop 451003
Las Vegas, NV 89154-1003
nancy.rapoport@unlv.edu
Cell:  713-202-1881

SSRN author page:  http://ssrn.com/author=260022
Google Scholar page:  http://scholar.google.com/citations?user=s7ElcsEAAAAJ&hl=en
IMDB.com page:  http://imdb.com/name/nm1904564/
Blog:  https://nancyrapoports.blog/

## EDUCATION

**Stanford Law School, J.D. (1985)**

*Selected activities and honors:*

- Note Editor, STANFORD LAW REVIEW (1984-85).
- Thesis:  *Computer Program for Secured Transactions* (1985).
- Technical assistant in various law school and all-university plays (1983-85).
- First Place, Stanford Women's Intramural Powerlifting Competition (1985).

**Rice University, B.A., *summa cum laude,* Legal Studies and Honors Psychology (1982)**

*Selected activities, honors, and scholarships:*

- Senior Thesis:  *The Effects of Time of Day on Cognitive Performance,* Psychology Department (1982).
- Phi Beta Kappa (1981).
- Houston Psychological Association Award for Excellence in Psychology (1982).
- Jones College Scholar (1981-82) and Academic Coordinator, Jones College (1980-82).
- President, Rice Hillel (1980-82).
- Student Advisor, Lovett College (1979-80).
- Member, Student Admissions Committee (1979-82).
- Founder, Rapoport Prize in Legal Studies (1982).
- Scholarships:  Max Roy Scholarship (1979-80, 1981-82); Jones College Scholarship (1981-82); Board of Governors Scholarship (1980-81).

EXHIBIT 5
Page 245

Nancy B. Rapoport
Page 2

## EMPLOYMENT

**University of Nevada, Las Vegas**

- **Special Counsel to the President (2016-18).**
- **Acting Senior Vice President for Finance and Business (summer of 2017).**
- **Acting Executive Vice President & Provost (2015-16).**
- **Senior Advisor to the UNLV President (2014-15) (member of UNLV's Cabinet).**
- **Provost's Leadership Development Academy Coordinator (2013-14); Co-Coordinator (2014-15).**

- **William S. Boyd School of Law, University of Nevada, Las Vegas**
  - **UNLV Distinguished Professor (awarded in 2022).**
  - **Garman Turner Gordon Professor of Law (2007-present) (formerly the Gordon Silver Professor of Law).**
  - **Interim Dean (2012-13).**

  *Courses:*  Basic Bankruptcy Law; Contracts; Professional Responsibility; Seminar on Corporate Scandals; Colloquium on Lawyers in Pop Culture; Business Law & Ethics; Bankruptcy Ethics.

- **Affiliate Professor of Business Law and Ethics, Lee Business School (renewable; 2014-present)**
  - **Co-Chair, Task Force on Scholarship, Lee Business School Strategic Planning Team (2014).**

*Responsibilities and Accomplishments as Special Counsel to the President:*

- The Executive Director of the Office of Compliance, the Ombuds Panel, the Special Projects Director, and the Interim Executive Director of the Office of Community Engagement reported to me.
- Coordinated, with Kyle Kaalberg (Special Projects Director), the continued implementation of UNLV's strategic plan (Top Tier).  In late 2018, UNLV was added to the list of Carnegie R1 institutions.
- Served as a member of the President's Cabinet.
- Coordinated and monitored compliance activities across UNLV.
- Interacted frequently with members of the Board of Regents and the Nevada System of Higher Education.

*Responsibilities and Accomplishments as Acting Executive Vice President and Provost:*

- The deans of the School of Allied Health Sciences, the Lee Business School, the School of Community Health Sciences (now the School of Public Health), the School of Dental Medicine, the College of Education, the Howard R. Hughes College of Engineering, the College of Fine Arts, the Graduate College, the Honors College, the William F. Harrah

EXHIBIT 5
Page 246

Nancy B. Rapoport
Page 3

College of Hotel Administration, the William S. Boyd School of Law, the College of Liberal Arts, the School of Medicine (co-reporting to the President), the School of Nursing, the College of Sciences, and the Greenspun College of Urban Affairs all reported to me, as did the Senior Vice Provost, the Vice Provost for Information Technology, the Assistant Vice President of Academic Resources, the Associate Vice Provost for the Office of Decision Support, and the Special Assistant to the Executive Vice President and Provost.

- Chaired the board of directors of UNLV Singapore Ltd.
- Worked with President Jessup, two co-chairs of the Top Tier Plan, and the chairs and co-chairs of five committees, to implement year one of the Top Tier strategic plan.
- Repaired relationships with the Faculty Senate.
- Hired three new deans (Liberal Arts, Fine Arts, and Allied Health) and one acting dean (Sciences).
- Reinstituted the three-year dean review process and provided more autonomy to the deans of schools and colleges.

*Responsibilities and Accomplishments as Acting Senior Vice President for Finance & Business:*

- The departments of Planning and Construction, Budgets, Campus Audit, Human Resources, Facilities Management, Administration (Delivery Service, Telecommunication Services, Parking Services, and Real Estate), Risk Management and Safety, Purchasing, and the Controller reported to me.
- Served as a member of the negotiating team for the Las Vegas Stadium (Las Vegas Raiders).
- Repaired a challenging set of internal management issues.

*Responsibilities and Accomplishments as Senior Advisor to the UNLV President:*

- Developed the strategic plan (Top Tier) by working in concert with former Presidents Donald Snyder and Len Jessup, Jim Thomson (the Special Advisor to the President for Regional Development and also the former CEO of the RAND Corp.), our consultants (Academic Leadership Associates), Kyle Kaalberg (then the Special Assistant to the President's Chief of Staff), over 200 stakeholders inside and outside UNLV.
- Continued to serve as the point person for the execution of UNLV's strategic plan during all other central administration roles.

*Responsibilities and Accomplishments as Interim Dean of Boyd School of Law:*

- The Associate Dean for Academic Affairs, the Associate Dean for Student Affairs, the Associate Dean for Administration and External Affairs, the Associate Dean for Faculty Development and Research, the Director of the Wiener-Rogers Law Library, the Director of Information Technology and the Budget Director all reported to me.
- Managed a budget of roughly $20 million.
- Facilitated the conversion process for legal writing professors to move from long-term contracts to tenure-track positions and facilitated the hiring of two new tenure-track professors.

EXHIBIT 5
Page 247

Nancy B. Rapoport
Page 4

- Significant fundraising success; systematized certain internal functions; and facilitated a review of our curriculum.
- *Honors:* Named "Faculty Member of the Year" (and faculty commencement speaker) by Boyd law students in 2021; named "Dean of the Year" by Boyd law students in 2013.

**University of Houston Law Center**
**Professor of Law (2006-07).**
**Dean (2000-06).**

*Responsibilities and Accomplishments as Dean:*

- The Associate Dean for Academic Affairs, the Associate Dean for Student Affairs, the Director of the O'Quinn Law Library, the Associate Dean for Information Technology, the Associate Dean for Finance and Administration and Chief Operating Officer of the Law Foundation, the Associate Dean for External Affairs and Executive Director of the Law Foundation, and the Director of CLE all reported to me.
- Presided over a record increase in the amount and size of gifts to the Law Center, even during a downturn in the economy; raised seven new Law Center professorships, in partnership with a special campaign of the University of Houston, in under two months.
- Facilitated the establishment of several new centers, programs, and institutes, including the Criminal Justice Institute, the Institute for Energy, Law & Enterprise (now the Program in Energy, Environment & Natural Resources), and the Center for Consumer Law.
- Reinvigorated the Blakely Advocacy Institute (BAI) and acquired the A.A. White Center for Dispute Resolution as part of the BAI.
- Encouraged the first major revamping of the Law Center's curriculum in twenty years.
- Hired fourteen new faculty members (three of which hold endowed chairs at the Law Center).
- Facilitated the Law Center's recovery from the devastation caused by Tropical Storm Allison on June 9, 2001, which poured over 12 feet of water into the Law Center's sub-basement and destroyed much of its library collection (over 175,000 volumes and 1,000,000 microfiche lost) and all of the Law Center's facilities. As part of the lessons learned during our recovery, hosted Loyola University New Orleans College of Law after Hurricane Katrina, until it could recover and return to New Orleans.

**University of Nebraska College of Law**
**Dean and Professor of Law (1998-00).**

*Responsibilities and Accomplishments as Dean:*

- The Associate Dean, the Assistant Dean for Administration and Student Services, the Assistant Dean for Career Services and Alumni Relations, the Director of the Law Library, the Director of Development, the Office Manager, and the Acting Head of the Nebraska Institute for Technology in the Practice of Law all reported to me.

EXHIBIT 5
Page 248

Nancy B. Rapoport
Page 5

- Instituted the creation of a new Access database to enable all Law College administrative units to organize and share information; improved our systems for the scheduling of Law College events, the timely review of employees, and the cultivation and stewardship of donors; initiated the design of the new "image" of the Law College; and revamped the furnishings of the student lounge (at zero cost to the Law College).
- Raised significant funds for such needs as scholarships and professorships.
- Encouraged the establishment of new student organizations (including an organization for law students who preferred non-traditional career paths and a GLBT student organization).
- Encouraged the development of a link between an undergraduate "learning community" and the Law College.

**Moritz College of Law, The Ohio State University**
**Professor (1998).**
**Associate Dean for Student Affairs (1996-98).**
**Associate Professor (with tenure) (1995-98).**
**Assistant Professor (1991-95).**

*Responsibilities and Accomplishments as Associate Dean for Student Affairs:*

- Assistant Dean of Admissions and Financial Aid, the Financial Aid Counselor and Staff Assistant, and the Placement Director reported to me.
- Counseled potential applicants regarding admission to College of Law and counseled existing students on academic and non-academic issues.
- With our Development Director, facilitated the establishment and maintenance of scholarships and other relationships with donors.

**Morrison & Foerster LLP**
**Associate, Bankruptcy and Workouts Group, Business Department (1986-91).**

- Bankruptcy cases included *In re Toy Liquidating Co. (Worlds of Wonder), Plexus, Greyhound, Nucorp,* and *California Land & Cattle Co.*
- Significant experience in bankruptcies involving industries such as toy manufacturers, computers, livestock, and television stations.

**The Hon. Joseph T. Sneed, United States Court of Appeals for the Ninth Circuit**
**Judicial Clerk (1985-86).**

**PUBLICATIONS, GRANTS, SPECIAL TRAINING, AND PRESENTATIONS**

**Works in progress**

- Nancy B. Rapoport, *Training Law Students to Model Civility When Social Media Makes Civility Harder to Maintain,* ___ U. PITT. L. REV. ___ (2023) (invited speaker at *The Jurisprudence and Legacy of the Honorable Joseph F. Weis Jr. Symposium*).

EXHIBIT 5
Page 249

Nancy B. Rapoport
Page 6

- Nancy B. Rapoport & Joseph R. Tiano, Jr., *Reimagining "Reasonableness" Under Section 330(a) in a World of Technology, Data, and Artificial Intelligence*, ____ AM. BANKR. L.J. ____ (forthcoming 2023) (peer-reviewed).
- Nancy B. Rapoport, *Review of 2022 Books on Legal Education*, ____ GREEN BAG ____ (2023) (solicited manuscript).
- Nancy B. Rapoport, *Training Law Students to Model Civility When Social Media Makes Civility Harder to Maintain*, University of Pittsburgh School of Law, Symposium on the Jurisprudence and Legacy of the Honorable Joseph F. Weis Jr., ____ U. PITT. L. REV. ____ (2023) (invited speaker).
- Aspen Practice Perfect Series, *Professional Responsibility* (forthcoming 2024) (with Andrew M. Perlman and Melissa B. Shultz).

**Books**

- BERNARD A. BURK, VERONICA J. FINKELSTEIN & NANCY B. RAPOPORT, ETHICAL LAWYERING: A GUIDE FOR THE WELL-INTENTIONED (Aspen Publishing 2021) (second edition forthcoming 2024).
- NANCY B. RAPOPORT & JEFFREY D. VAN NIEL, CORPORATE SCANDALS AND THEIR IMPLICATIONS (3d ed.) (West Academic 2018).
- BLOOMBERG BNA BANKRUPTCY LAW TREATISE, A TREATISE WITH REAL-TIME UPDATES (contributing editor) (Bloomberg BNA 2014).
- NANCY B. RAPOPORT & JEFFREY D. VAN NIEL, LAW FIRM JOB SURVIVAL MANUAL: FROM FIRST INTERVIEW TO PARTNERSHIP (Wolters Kluwer 2014).
- NANCY B. RAPOPORT & JEFFREY D. VAN NIEL, LAW SCHOOL SURVIVAL MANUAL: FROM LSAT TO BAR EXAM (Aspen Publishers / Wolters Kluwer 2010).
- NANCY B. RAPOPORT, JEFFREY D. VAN NIEL & BALA G. DHARAN, ENRON AND OTHER CORPORATE FIASCOS: THE CORPORATE SCANDAL READER (Foundation Press 2d ed. 2009).
- STEVEN L. EMANUEL, STRATEGIES & TACTICS FOR THE MBE (Aspen Publishers / Wolters Kluwer 2009) (one of several revision authors).
- NANCY B. RAPOPORT & BALA G. DHARAN, ENRON: CORPORATE FIASCOS AND THEIR IMPLICATIONS (Foundation Press 2004).
- DAVID B. GOODWIN & NANCY B. RAPOPORT, AN ORAL HISTORY OF THE HONORABLE JOSEPH T. SNEED, Ninth Circuit Historical Society (1994) (solicited oral history).

**Reports**

- Reporter, American College of Bankruptcy Diversity, Equity, and Inclusion Committee (2022-present).
- Reporter, American College of Bankruptcy Select Commission on Diversity, Equity, and Inclusion (2021-2022).

EXHIBIT 5
Page 250

Nancy B. Rapoport
Page 7

- LOIS R. LUPICA & NANCY B. RAPOPORT, CO-REPORTERS, FINAL REPORT OF THE ABI NATIONAL ETHICS TASK FORCE (2013), available at https://abi-org-corp.s3.amazonaws.com/materials/Final_Report_ABI_Ethics_Task_Force.pdf.

**Book chapters**

- Nancy B. Rapoport, *Compromising One's Principles: The Lesson of Mahlon Perkins and the Berkey-Kodak Case,* in NANCY B. RAPOPORT & JEFFREY D. VAN NIEL, CORPORATE SCANDALS AND THEIR IMPLICATIONS 545 (3d ed.) (West Academic 2018).
- Nancy B. Rapoport, *Social Media Ethics Missteps for Lawyers (and Others),* PROCEEDINGS OF THE SIXTIETH ANNUAL ROCKY MOUNTAIN MINERAL LAW INSTITUTE 3-1 (July 2014), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2557095.
- Nancy B. Rapoport, *Analysis and the Arts,* in ZENON BANKOWSKI, MAKSYMILIAN DEL MAR & PAUL MAHARG, THE ARTS AND THE LEGAL ACADEMY: BEYOND TEXT IN LEGAL EDUCATION 101 (Ashgate Press 2012) (solicited essay), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2464202.
- COLLIER COMPENSATION, EMPLOYMENT AND APPOINTMENT OF TRUSTEES AND PROFESSIONALS IN BANKRUPTCY CASES (Lexis-Nexis 2009) (one of several revision authors).
- Nancy B. Rapoport, *Swimming with Shark,* in LAWYERS IN YOUR LIVING ROOM! LAW ON TELEVISION 163 (Michael Asimow, ed., 2009) (solicited manuscript), chapter available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1157053.
- Nancy B. Rapoport, *Reflections of a Former Dean, in* LAW SCHOOL LEADERSHIP STRATEGIES: TOP DEANS ON BENCHMARKING SUCCESS, INCORPORATING FEEDBACK FROM FACULTY AND STUDENTS, AND BUILDING THE ENDOWMENT 199 (Aspatore Books 2006) (solicited), abstract available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=979321.
- Nancy B. Rapoport, *Bankruptcy Ethics Issues for Solos and Small Firms, in* ATTORNEY LIABILITY IN BANKRUPTCY (Corinne Cooper, ed. & Catherine E. Vance, contributing ed., ABA 2006) (solicited manuscript).
- Nancy B. Rapoport, *Lord of the Flies: The Development of Rules Within an Adolescent Culture, in* SCREENING JUSTICE—THE CINEMA OF LAW: FIFTY SIGNIFICANT FILMS OF LAW, ORDER AND SOCIAL JUSTICE 253 (Rennard Strickland, Teree Foster & Taunya Banks, eds. 2006) (solicited manuscript), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=949168.
- Nancy B. Rapoport & Jeffrey D. Van Niel, *Dr. Jekyll & Mr. Skilling: How Enron's Public Image Morphed from the Most Innovative Company in the* Fortune 500 *to the Most Notorious Company Ever, in* ENRON: CORPORATE FIASCOS AND THEIR IMPLICATIONS 77 (Nancy B. Rapoport & Bala G. Dharan, eds.) (Foundation Press 2004), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=505662.

**Articles, book reviews, and essays**

- John G. Cameron & Nancy B. Rapoport, *Ethics For Real Estate Lawyers and Practice Today,* 39 THE PRACTICAL REAL ESTATE LAWYER 30 (ALI CLE, May 2023), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4417451.

EXHIBIT 5
Page 251

Nancy B. Rapoport
Page 8

- Nancy Rapoport, *Stanford Law Protest Highlights Rise of Incivility,* LAW360 (Mar. 28, 2023), available at https://www.law360.com/personal-injury-medical-malpractice/articles/1590537/stanford-law-protest-highlights-rise-of-incivility-in-discourse.
- Nancy B. Rapoport & Joseph R. Tiano, Jr., *Billing Judgment,* 96 AM. BANKR. L.J. 311 (2022) (peer-reviewed publication), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4172409.
- Joseph R. Tiano, Nancy B. Rapoport & William J. Siroky, *The Specter of Malpractice: When Law Firm General Counsel and Risk Management Professionals Are Confronted With Potential Malpractice Claims and Ethics Violations,* 81 MARYLAND L. REV. (ONLINE) 1 (2021), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3932534.
- Nancy B. Rapoport, *Being a First—Over and Over Again,* DENVER L. REV. FORUM (7/31/2021) available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3897378.
- Nancy B. Rapoport, *Telling the Story on Your Timesheets: A Fee Examiner's Tips for Creditors' Lawyers and Bankruptcy Estate Professionals,* 15 BROOK. J. OF CORP. FIN. & COM. L. 359 (2021), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3853962.
- Nancy B. Rapoport & Joe Tiano, *Biglaw Surprises Some With Record Profits in 2020—Now What?,* Above the Law (April 30, 2021), available at https://abovethelaw.com/2021/04/biglaw-surprises-some-with-record-profits-in-2020-now-what/.
- Nancy B. Rapoport & Joseph R. Tiano, Jr., *The Legal Industry's Second Chance To Get It Right,* 57 WILLAMETTE L. REV. 1 (2021), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3773197.
- Nancy B. Rapoport & Joseph R. Tiano, Jr., *Using Data Analytics to Predict an Individual Lawyer's Legal Malpractice Risk Profile (Becoming an LPL "Precog"),* 6 U. PA. J. L. & PUB. AFF. 267 (2020), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3760626.
- Nancy B. Rapoport, *Help Your Provost Help You During Promotion and Tenure Decisions,* 24 THE GREEN BAG 83 (2020) (peer-reviewed), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3748896.
- Nancy B. Rapoport, *Want to Take Control of Professional Fees in Large Chapter 11 Bankruptcy Cases? Talking With Your Client's General Counsel is a Good First Step,* Harvard Law School Bankruptcy Roundtable, July 28, 2020, available at http://blogs.harvard.edu/bankruptcyroundtable/2020/07/28/want-to-take-control-of-professional-fees-in-large-chapter-11-bankruptcy-cases-talking-with-your-clients-general-counsel-is-a-good-first-step/.
- Nancy B. Rapoport, *Training Law Students To Maintain Civility in Their Law Practices as a Way To Improve Public Discourse,* North Carolina Law Review 2019 Symposium, 98 N.C. L. REV. 1143 (2020) (solicited manuscript), available at https://ssrn.com/abstract=3616995.
- Nancy B. Rapoport & Joe Tiano, *COVID-19 Could Catalyze The Legal Industry Renaissance,* Above the Law (April 29, 2020), available at https://abovethelaw.com/2020/04/covid-19-could-catalyze-the-legal-industry-renaissance/.
- Nancy B. Rapoport, *Using General Counsel to Set the Tone for Work in Large Chapter 11 Cases,* 88 FORDHAM L. REV. 1727 (2020) (solicited manuscript) (presented at the Stein Center for Law and Ethics Colloquium on Corporate Lawyers (October 2019)), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3591118.

EXHIBIT 5
Page 252

Nancy B. Rapoport
Page 9

- Nancy B. Rapoport, *Client-Focused Management of Expectations for Legal Fees in Large Chapter 11 Cases,* 28 AM. BANKR. INST. L. REV. 39 (2020), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3541347.

- Nancy B. Rapoport & Joseph R. Tiano, Jr., *Leveraging Legal Analytics and Spend Data as a Law Firm Self-Governance Tool,* XIII J. BUS., ENTREPRENEURSHIP & L. 171 (2019) (presented at Arizona State University's 7th Annual Conference on the Governance of Emerging Technologies & Science: Law, Policy & Ethics (May 2019)), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3525660.

- Nancy B. Rapoport & Joseph R. Tiano, Jr., *Legal Analytics, Social Science, and Legal Fees: Reimagining "Legal Spend" Decisions in an Evolving Industry,* Georgia State Symposium on Legal Analytics, 35 GA. ST. U. L. REV. 1269 (2019), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3418465.

- Dwayne J. Hermes, Erica R. LaVarnway & Nancy B. Rapoport, *A Solutions-Oriented Approach: Changing How Insurance Litigation Is Handled by Defense Law Firms,* 2017 J. PROF'L L. 129 (peer-reviewed annual journal of the Center for Professional Responsibility of the American Bar Association), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3104055.

- Nancy B. Rapoport, *How Teams Can Help You (or Hurt You) When It Comes to Ethics,* December 2017 ABI J. 24, available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3085229.

- Nancy B. Rapoport & Charlie Douglas, *High Performance Organizational Teams,* LISI Estate Planning Newsletter #2563 (July 3, 2017), available at http://www.leimbergservices.com and at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2998424.

- Nancy B. Rapoport, *In Praise of Margaret Howard,* 74 WASH. & LEE L. REV. 641 (2017), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2981404.

- Nancy B. Rapoport, *Ethics: Why We Must Play Well with Others (and Why We Don't),* Rocky Mountain Mineral Law Foundation, MANUAL OF THE ADVANCED PUBLIC LANDS SPECIAL INSTITUTE 587 (2017), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2917346.

- Nancy B. Rapoport, *On Shared Governance, Missed Opportunities, and Student Protests*, 17 NEV. L.J. 1 (2016), available at http://ssrn.com/abstract=2885539.

- Randy D. Gordon & Nancy B. Rapoport, *Virtuous Billing,* 15 NEV. L.J. 698 (2015), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2670628.

- Nancy B. Rapoport, *"Nudging" Better Lawyer Behavior: Using Default Rules and Incentives to Change Behavior in Law Firms,* 4 ST. MARY'S J. L. ETHICS & MALP. 42 (2014) (solicited manuscript for symposium on Legal Malpractice and Ethics), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2460078.

- Nancy B. Rapoport, *The Client Who Did Too Much,* 47 AKRON L. REV. 121 (2014) (solicited as part of the Joseph G. Miller and William C. Becker Center for Professional Responsibility's Symposium on Navigating the Practice of Law in the Wake of Ethics 20/20), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2412496.

- Nancy B. Rapoport, *Plus Ça Change, Plus C'est La Même Chose,* 17 GREEN BAG 55 (2013) (solicited manuscript), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2404069.

- Lois R. Lupica & Nancy B. Rapoport, *Best Practices for Working with Fee Examiners,* 32 AM. BANKR. INST. J. 20 (June 2013), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2279642.

EXHIBIT 5
Page 253

Nancy B. Rapoport
Page 10

- Nancy B. Rapoport, *Rethinking U.S. Legal Education: No More "Same Old, Same Old,"* 45 CONN. L. REV. 1409 (2013), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2275315.

- Nancy B. Rapoport, *Managing U.S. News & World Report—The Enron Way,* 42 GONZAGA L. REV. 423 (2013), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2255194.

- Nancy B. Rapoport, Book Review, Brian Z. Tamanaha, *Failing Law Schools* (2012), 47 L. & SOC. REV. 229 (2013) (solicited review), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2233617.

- Nancy B. Rapoport, *Black Swans, Ostriches, and Ponzi Schemes,* 42 GOLDEN GATE L. REV. 627 (2012) (solicited manuscript for symposium), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2131393.

- Nancy B. Rapoport, *The Case for Value Billing in Chapter 11,* 7 J. BUS. L. & TECH. LAW 117 (2012), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2039506.

- Nancy B. Rapoport, *Changing the Modal Law School: Rethinking U.S. Legal Education in (Most) Schools,* 116 PENN ST. L. REV. 1119 (2012), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2038409 (republished at 122 DICKINSON L. REV. 189 (2017)).

- Jennifer Gross & Nancy B. Rapoport, *Is the Attorney-Client Privilege Under Attack?,* GP | SOLO MAGAZINE 47 (October-November 2010), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1704026.

- Nancy B. Rapoport, *Rethinking Fees in Chapter 11 Bankruptcy Cases,* 5 J. BUS. & TECH. LAW 263 (2010) (solicited manuscript for University of Maryland School of Law's symposium on *Examining Government Reform in the Financial Crisis*), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1625102.

- Nancy B. Rapoport, *Through Gritted Teeth and Clenched Jaw: Court-Initiated Sanctions Opinions in Bankruptcy Courts,* 41 ST. MARY'S L.J. 701 (2010) (solicited manuscript for St. Mary's 9th Annual Symposium on *Legal Malpractice and Professional Responsibility),* available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1628275.

- C.R. Bowles & Nancy B. Rapoport, *Debtor Counsel's Fiduciary Duty: Is There a Duty to Rat in Chapter 11?,* 29 AM. BANKR. INST. JOURNAL 16 (2010), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1544930.

- Nancy B. Rapoport, *Academic Freedom and Academic Responsibility* (reviewing MATTHEW W. FINKIN & ROBERT C. POST, FOR THE COMMON GOOD: PRINCIPLES OF AMERICAN ACADEMIC FREEDOM (Yale University Press 2009)), in 13 GREEN BAG 2D 189 (Winter 2010) (solicited manuscript), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1544932.

- Eric Van Horn & Nancy B. Rapoport, *Restructuring the Misperception of Lawyers: Another Task for Bankruptcy Professionals,* 28 AM. BANKR. INST. JOURNAL 44 (2009), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1472211.

- Nancy B. Rapoport, *Where Have All the (Legal) Stories Gone?,* M/E INSIGHTS 7 (Fall 2009) (publication of the Association of Media and Entertainment Counsel), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1545443.

EXHIBIT 5
Page 254

Nancy B. Rapoport
Page 11

- Nancy B. Rapoport, *The real reason why businesses make bad decisions* (reviewing JONATHAN R. MACEY, CORPORATE GOVERNANCE: PROMISES KEPT, PROMISES BROKEN (Princeton University Press 2008)), in 18 BUS. LAW TODAY 52 (July/Aug. 2009) (solicited manuscript), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1425118.

- Nancy B. Rapoport, *Lessons From Enron—And Why We Don't Learn From Them,* May/June 2009 COMMERCIAL LENDING REVIEW 23, available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1413937.

- Colin Marks & Nancy B. Rapoport, *Corporate Ethical Responsibility and the Lawyer's Role in a Contemporary Democracy,* 77 FORDHAM L. REV. 1269 (2009) (solicited manuscript), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1376475.

- Nancy B. Rapoport & Roland Bernier III, *(Almost) Everything We Learned About Pleasing Bankruptcy Judges, We Learned in Kindergarten,* 27 AM. BANKR. INST. J. 16 (July/August 2008), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1157103.

- Nancy B. Rapoport, *The Curious Incident of the Law Firm That Did Nothing in the Night-Time* (reviewing MILTON C. REGAN, JR., EAT WHAT YOU KILL: THE FALL OF A WALL STREET LAWYER (Univ. of Michigan Press 2004)), in 10 LEGAL ETHICS 98 (2007), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1017627 and at http://www.tandfonline.com/doi/abs/10.1080/1460728X.2007.11423884.

- Nancy B. Rapoport, *Bankruptcy Pro Bono Representation of Consumers: The Seven Deadly Sins,* 44 HOUS. LAWYER 18 (June 2007), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1051221.

- Nancy B. Rapoport, *Not Quite "Them," Not Quite "Us": Why It's Difficult for Former Deans to Go Home Again,* 38 U. TOLEDO L. REV. 581 (2006) (solicited manuscript), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=936251.

- Nancy B. Rapoport, *Eating Our Cake and Having It, Too: Why Real Change Is So Difficult in Law Schools,* 81 IND. L.J. 359 (2006) (solicited manuscript) (symposium at Indiana University-Bloomington School of Law—*The Next Generation of Law School Rankings*), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=703843.

- Nancy B. Rapoport, *Enron and the New Disinterestedness—The Foxes Are Guarding the Henhouse,* 13 AM. BANKR. INST. L. REV. 521 (2005) (solicited manuscript), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=936167.

- Nancy B. Rapoport, *Decanal Haiku,* 37 U. TOLEDO L. REV. 131 (2005) (solicited manuscript), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=936166.

- Nancy B. Rapoport, *Recent Developments in Bankruptcy Law,* 35 TEXAS TECH. L. REV. 543 (2004) (solicited manuscript), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=938551.

- Nancy B. Rapoport, *"Venn" and the Art of Shared Governance,* 35 U. TOLEDO L. REV. 169 (2003) (solicited manuscript), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=936247.

- Nancy B. Rapoport, *Examining Enron's enablers: Watkins' perspective makes Swartz's account stand out,* HOUSTON CHRONICLE, March 23, 2003, at *Zest* 15 (solicited book review).

EXHIBIT 5
Page 255

Nancy B. Rapoport
Page 12

- Nancy B. Rapoport, *Enron, Titanic, and the Perfect Storm*, 71 FORDHAM L. REV. 1373 (2003) (solicited manuscript for a special issue on ethics), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=498122; also included as an essay in ENRON: CORPORATE FIASCOS AND THEIR IMPLICATIONS 927 (Nancy B. Rapoport & Bala G. Dharan, eds.) (Foundation Press 2004).

- Nancy B. Rapoport, *The Intractable Problem of Bankruptcy Ethics: Square Peg, Round Hole,* 30 HOFSTRA L. REV. 977 (2002) (solicited manuscript for ethics symposium), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=936235.

- Nancy B. Rapoport, *In Memoriam: Yale Rosenberg,* 39 HOUS. L. REV. 869 (2002) (solicited essay), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1598446.

- Nancy B. Rapoport & Jeffrey D. Van Niel, *"Retail Choice" Is Coming: Have You Hugged Your Utilities Lawyer Today? (Part II),* August 2002 NORTON BANKRUPTCY LAW ADVISER 2, available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=963913.

- Nancy B. Rapoport, *Multidisciplinary Practice After In Re Enron: Should the Debate on MDP Change At All?,* TEXAS BAR JOURNAL 446 (May 2002), available at http://www.texasbar.com/Template.cfm?Section=Home&Template=/ContentManagement/ContentDisplay.cfm&ContentID=5999.

- Nancy B. Rapoport & Jeffrey D. Van Niel, *"Retail Choice" Is Coming: Have You Hugged Your Utilities Lawyer Today? (Part I),* February 2002 NORTON BANKRUPTCY LAW ADVISER 4, available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=963912.

- Nancy B. Rapoport, *Is "Thinking Like a Lawyer" Really What We Want to Teach?,* in *Erasing Lines: Integrating the Law School Curriculum,* 2001 ALWD CONF. PROCEEDINGS 91, available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=936248.

- Nancy B. Rapoport, *When Local IS Global: Using a Consortium of Law Schools to Encourage Global Thinking,* 20 PENN STATE INT'L LAW REVIEW 19 (2001) (transcript of AALS Annual Meeting session).

- Nancy B. Rapoport, *Of Cat-Herders, Conductors, Fearless Leaders, and Tour Guides,* 33 U. TOLEDO L. REV. 161 (2001) (solicited manuscript), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=936245.

- Nancy B. Rapoport, *Presidential Ethics: Should a Law Degree Make a Difference?,* 14 GEO. J. L. ETHICS 725 (2001), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=260021.

- Nancy B. Rapoport, *Going from "Us" to "Them" in Sixty Seconds,* 31 U. TOLEDO L. REV. 703 (2000) (solicited manuscript), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=936171.

- Nancy B. Rapoport, *Dressed for Excess: How Hollywood Affects the Professional Behavior of Lawyers,* 14 NOTRE DAME J. OF LAW, ETHICS & PUBLIC POLICY 49 (2000) (solicited manuscript), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=936188.

- Nancy B. Rapoport, *Ratings, Not Rankings: Why U.S. News & World Report Shouldn't Want To Be Compared To Time and Newsweek—or The New Yorker,* 60 OHIO ST. L.J. 1097 (1999), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=936246.

- Nancy B. Rapoport, *Living "Top-Down" in a "Bottom-Up" World: Musings on the Relationship Between Jewish Ethics and Legal Ethics,* 78 NEB. L. REV. 18 (1999), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=936241.

EXHIBIT 5
Page 256

Nancy B. Rapoport
Page 13

- Nancy B. Rapoport, *Moral Bankruptcy: Modeling Appropriate Attorney Behavior in Bankruptcy Cases,* THE NEBRASKA LAWYER 14 (March 1999) (solicited manuscript), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1598447.
- Nancy B. Rapoport, *The Need For New Bankruptcy Ethics Rules: How Can "One Size Fits All" Fit Anybody?,* 10 PROFESSIONAL LAWYER 20 (1998) (solicited manuscript), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=939448.
- Nancy B. Rapoport, *Our House, Our Rules: The Need for a Uniform Code of Bankruptcy Ethics,* 6 AM. BANKR. INST. L. REV. 45 (1998) (solicited manuscript), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=936343.
- C.R. Bowles & Nancy B. Rapoport, *Has the DIP's Attorney Become the Ultimate Creditors' Lawyer in Bankruptcy Reorganization Cases?,* 5 AM. BANKR. INST. L. REV. 47 (1997) (symposium manuscript), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=936240.
- Nancy B. Rapoport, *Ethics: Is Disinterestedness Still a Viable Concept? A Roundtable Discussion,* 5 AM. BANKR. INST. L. REV. 201 (1997) (solicited transcript) (with co-panelists John D. Ayer, the Hon. Charles N. Clevert, the Hon. Joel Pelofsky & Bettina Whyte), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=936340.
- Nancy B. Rapoport, *Turning the Microscope on Ourselves: Self-Assessment by Bankruptcy Lawyers of Potential Conflicts of Interest in Columbus, Ohio,* 58 OHIO ST. L.J. 1421 (1997), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=938611.
- Nancy B. Rapoport, *Avoiding Judicial Wrath: The Ten Commandments for Bankruptcy Practitioners,* 5 J. BANKR. L. & PRAC. 615 (September/October 1996) (solicited manuscript), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=940769.
- Nancy B. Rapoport, *Seeing the Forest* and *The Trees: The Proper Role of the Bankruptcy Attorney,* 70 IND. L.J. 783 (1995), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=938527.
- Nancy B. Rapoport, *Worth Reading: Review of Annual Survey of Bankruptcy Law,* TURNAROUNDS AND WORKOUTS (Beard Group, Inc.), January 15, 1995, at 6 (solicited book review).
- Nancy B. Rapoport, *Turning and Turning in the Widening Gyre: The Problem of Potential Conflicts of Interest in Bankruptcy,* 26 CONN. L. REV. 913 (1994), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=936337.

**Op-eds**

- Nancy Rapoport & Mary Langsner, *Why does the bankruptcy code discriminate against disabled veterans?,* THE HILL (Jan. 24, 2019), available at https://thehill.com/opinion/finance/426854-why-does-the-bankruptcy-code-discriminate-against-disabled-veterans.
- Lois R. Lupica & Nancy Rapoport, *Consumer Debtors Should Not Have To Go It Alone,* DOW JONES DAILY BANKRUPTCY REVIEW (May 1, 2013), available at http://bankruptcynews.dowjones.com/article?an=DJFDBR0020130501e951qbfa8&from=alert&pid=10&ReturnUrl=http%3a%2f%2fbankruptcynews.dowjones.com%3a80%2farticle%3fan%3dDJFDBR0020130501e951qbfa8%26from%3dalert%26pid%3d10.
- Nancy Rapoport, *Board Smart Not to Raise the Superintendent Salary Stakes,* LAS VEGAS SUN, September 5, 2010, available at http://www.lasvegassun.com/news/2010/sep/05/board-smart-not-raise-superintendent-salary-stakes/.

EXHIBIT 5
Page 257

Nancy B. Rapoport
Page 14

- Nancy B. Rapoport, *Enron an Example: Grads Lost in Trees,* HOUSTON CHRONICLE, February 24, 2002, at 4H.
- Nancy B. Rapoport, *Wrestling with the Problem of Potential Conflicts of Interest in Bankruptcy,* 26 BANKRUPTCY COURT DECISIONS WEEKLY NEWS AND COMMENT (LRP Publications), March 7, 1995, at A3 (solicited editorial).

**Grants**

- 2002 participant, Harvard Institutes for Higher Education Management and Leadership in Education (MLE) Program (partial scholarship from Harvard, $1,000 in 2001—had to withdraw, due to the aftermath of Tropical Storm Allison, but returned to participate in 2002).
- 1999 participant, Harvard Institutes for Higher Education Management Development Program (MDP) (partial scholarship from Harvard, $1,000).
- 1995 Instructional Technology Small Grant (Ohio State funds; $850).
- 1995 West Publishing/NCAIR Fellow ($15,000 grant for developing a computer program that teaches law students about conflicts of interest in bankruptcy law).
- 1994 participant in Summer Institute of the Law & Society Association (Wellesley, Massachusetts).
- 1993 University Seed Grant for the study of creditor representation in bankruptcy (1993 grant from Ohio State University's Office of Research & the College of Law).

**Podcasts (as guest speaker)**

- PLUS blog (with Joseph R. Tiano, Jr.), *Becoming an LPL "Precog",* https://plusblog.org/2022/10/10/plus-podcast-becoming-an-lpl-precog/.
- Jay Edelson, NON-COMPLIANT, *Episode 13: The One Where Professor Nancy Rapoport Discusses the Future of Law Firms,* July 1, 2020, available at https://podcasts.apple.com/us/podcast/episode-13-one-where-professor-nancy-rapoport-discusses/id1491233296?i=1000481718338.
- Jay Edelson, NON-COMPLIANT, *Episode 14: The (Second) One Where Professor Nancy Rapoport Discusses the Future of Law Firms,* July 13, 2020, available at https://podcasts.apple.com/us/podcast/episode-14-second-one-where-professor-nancy-rapoport/id1491233296?i=1000484787064.

**Selected academic presentations**

*Anthropology of higher education / higher education generally*

- Society for Applied Anthropology's 79th annual meeting, *Moving Seamlessly From Faculty Status to Administrator and Then Back Again* (March 2019).
- Society for Applied Anthropology's 78th annual meeting, *Concentric and Overlapping Circles of Leadership in Higher Education* (April 2018).
- Society for Applied Anthropology's 77th annual meeting, *Women and Diversity: Being a "First"* (March 2017).

EXHIBIT 5
Page 258

Nancy B. Rapoport
Page 15

- Presentation at 2010 Annual Meeting of Association of American Law Schools, Section on Women in Legal Education, *Succeeding in Legal Education* (January 2010).
- Presentation at 2009 Annual Meeting of Association of American Law Schools, Committee on Curriculum Issues, *Redesigning Legal Education* (January 2009).
- Presentations at the 2007 Annual Meeting of Association of American Law Schools:
  - *Workshop on the Ratings Game (or Not!): The Search for Sensible Assessment,* moderator for plenary discussion, *We Didn't Even Bring the Box: A Roundtable Discussion on Creative Alternatives,* http://www.aals.org/am2007/wednesday/ratings.html.
  - Panelist, Section on Continuing Legal Education, Co-Sponsored by Section on
  - Professional Responsibility, *Legal Ethics CLE in the Law School Setting: Can It Be Practical, Academic, and Interesting at the Same Time?*
  - Panelist, Section for the Law School Dean, *What I Wish I Had Known Then: A Conversation Among Deans.*
- Symposium at Indiana University-Bloomington School of Law, *Eating Our Cake and Having It, Too: Why Real Change Is So Difficult in Law Schools* (March 2005).
- "Better Learning, Better Lawyers" Conference, *Legal Education in the 21ˢᵗ Century: Radical Design for a Changing Profession* (August 2002).
- Moderator of plenary session of the Annual Meeting of Association of American Law Schools, *Mini-Workshop on Major Issues of the 21ˢᵗ Century: The Impact on the Legal Academy and Law Students* (January 2000).

*Social science and ethics / social science and governance / social science and lawyer behavior / bankruptcy law*

- University of Pittsburgh School of Law, *Irrepressible Civility, Professionalism, and Ethics in Defining the Lawyering Career,* Symposium on The Jurisprudence and Legacy of the Honorable Joseph F. Weis Jr. (with Abraham C. Reich and Nathan M. Crystal) (March 2023).
- The Stein Center for Law and Ethics, Fordham University School of Law, Colloquium on Corporate Lawyers, *Using General Counsel to Set the Tone for Work in Large Chapter 11 Cases* (October 2019).
- Pontificia Universidad Javeriana Cali (Colombia)'s International Congress of Corporate Law, *Corporate Social Responsibility and Social Science* (November 2017) (invited speaker).
- Colombia's Superintendency of Companies, *Corporate Governance, Compliance and Business Ethics* (May 2016) (invited speaker).
- Colombia's Superintendency of Companies, Responsibility of Administrators and Business Ethics Seminar, *Why Smart People Make Bad Decisions* (March 2015) (invited speaker).
- Boyd School of Law, Conference on Psychology and Lawyering: Coalescing the Field, *Using Psychology to Change Law Firms' Default Incentive Structures* (with Randy D. Gordon) (invited panelist) (February 2014).
- The Ohio State University Moritz College of Law, faculty workshop presentation on *"Nudging" Better Lawyer Behavior: Using Default Rules and Incentives to Change Behavior in Law Firms* (November 2013).
- The Joseph G. Miller and William C. Becker Center for Professional Responsibility's Symposium on Navigating the Practice of Law in the Wake of Ethics 20/20, *What It Means To Be a Lawyer in These Uncertain Times (Part I)* (invited panelist) (April 2013).

EXHIBIT 5
Page 259

- Roger Williams University School of Law, Women Who Lead Series, *Why the World Needs Nay-Sayers* (keynote speaker) (March 2010).
- Distinguished Lecturer, The Chapman Dialogue Series, Chapman University School of Law, *Why No Amount of Regulation Is Likely to Prevent Corporate Scandals* (February 2010).
- Association of American Law Schools, Annual Meeting, Section on Continuing Legal Education (co-sponsored by Section for the Law School Dean), *Exploring the Options for the Future of Legal Education* (with Kellye Y. Teste, Daniel McCarroll, Gary A. Munneke, and Ellen Y. Suni) (January 2010).
- Presentation at Fordham Law School's Colloquium, *The Lawyers' Role in a Contemporary Democracy* (with Colin Marks) (September 2008).
- Adjunct professor, St. John's University School of Law, LL.M. in Bankruptcy Program (Enron seminar), St. John's University School of Law Faculty, *Enron: Is It Still Relevant?* (March 2006 & March-April 2007).
- AALS Workshop—Do You Know Where Your Students Are?  Langdell Logs On to the 21st Century, AALS Annual Meeting, *The Changing Face of the Deanship* (January 2002).
- The 2001 Legal Ethics Conference, Hofstra University School of Law, *Legal Ethics—What Needs Fixing?* (September 2001).
- AALS Bankruptcy Workshop, *Teaching Bankruptcy as a Vehicle for Teaching Other Values* (May 2001).
- ALWD (Association of Legal Writing Directors) Biennial Conference, *Do "Best Practices" in Legal Education Include an Obligation to the Legal Profession to Integrate Theory, Skills, and Doctrine in the Law School Curriculum?* (July 2001).
- AALS Workshop for New Law Teachers, *Satisfying Your Multiple Constituencies (How Your Dean Can Help)* (July 2000 & July 1999).
- Annual Meeting of the Association of American Law Schools, Creditors' & Debtors' Rights Section, *Local Cultures + Judicial Discretion = National Confusion?: Equities, Equations, and the "Uniformity" of the Bankruptcy Code* (January 1998).

**Selected continuing legal education programs and other professional presentations**

*Legal education / the legal profession generally*

- *Convergence of Legal Risk Management and Business Strategy Consulting,* Legal Foresight Summit (with David Kamien, Scott Leeb, and Mark Ford) (March 2023).
- *Using Data Analytics to Predict an Individual Lawyer's Legal Malpractice Risk Profile,* General Counsel Roundtable (with Joseph R. Tiano, Jr.) (June 2022).
- *Navigating Ethical Issues in the New Remote World,* 128th Annual Convention of the Commercial Law League of America (keynote) (May 2022).
- *Ethics in the Movies:  Lessons for Real Life,* United States District Court Conference, District of Nevada (plenary) (May 2022).
- *The Specter of Malpractice,* General Counsel Roundtable (with Joseph R. Tiano, Jr.) (April 2022).

EXHIBIT 5
Page 260

Nancy B. Rapoport
Page 17

- *Leveraging Legal Analytics and Spend Data as a Law Firm Self-Governance Tool,* Arizona State University's 7th Annual Conference on the Governance of Emerging Technologies & Science: Law, Policy & Ethics (with Joseph R. Tiano, Jr.) (May 2019).
- 2019 Mid-Year Meeting, National Organization of Bar Counsel, *A Look Inside the Incubator— The Challenges Facing Today's Law Students, Law Schools, and Newly-Minted Lawyers* (with Nelson Page and Ari Telisman) (January 2019).
- Law School Admission Council's Annual Meeting, *"Soothing the Savage Beast": The Art of Working Effectively With Difficult People (*with Floyd Weatherspoon) (June 2011).
- Houston Bar Minority Opportunities in the Legal Profession Committee & Minority Corporate Counsel Association: Business Development in a Belt-Tightening Economy, *Overcoming Barriers and Opening Doors to Your Personal Success* (February 2002).
- LSAC Academic Support Conference, *Why Support Academic Support Programs?* (June 2000).
- LSAC Annual Meeting, *Establishing a Partnership With a New Dean* (June 2000).
- American Bar Association's Workshop for New Law Deans, *Reflections of an Ex-Novice Dean* (June 1999).
- Annual Conference of the National Association for Law Placement, *Reliable Evaluation of Law Schools: Going Beyond Law School Rankings* (April 1999).

*Bankruptcy / Ethics*

- American College of Bankruptcy, *Attorney Fees in Consumer Cases: A Policy and Ethics Discussion* (with Joyce Babin and Areya Holder Aurzada) (March 2023).
- American Bankruptcy Institute, Winter Leadership Conference, *Don't Just Say No: Technology, Ethics and the Changing Practice of Law* (with Prof. Lois Lupica and Joseph R. Tiano, Jr.) (December 2022).
- State Bar of Montana, Annual Meeting of Bankruptcy Section, *Billing Judgment* (July 2022).
- Annual meeting of the National Association of Chapter 13 Trustees, *Ethical Implications of Remote Lawyering Post-Pandemic* (plenary) (July 2022).
- Ninth Circuit Conference of Chief Bankruptcy Judges, Bankruptcy Court Clerks and Bankruptcy Lawyer Representatives, *Billing Judgment* (March 2022).
- Annual Meeting of National Conference of Bankruptcy Judges, *Start Your Engines! Jeopardy— the Broken Bench Edition* (with Demetra Liggins and Judges Pamela Pepper and Catherine J. Furay) (October 2021).
- Los Angeles Chapter, Federal Bar Association, 17th Annual Bankruptcy Ethics Symposium, keynote address, *Telling the Story on Your Timesheets: A Fee Examiner's Tips for Creditors' Lawyers and Bankruptcy Estate Professionals* (November 2020).
- AMERICAN BANKRUPTCY INSTITUTE LAW REVIEW panel discussion, *Professional Fees in Bankruptcy* (with co-panelists Judge Kevin Carey, attorney Douglas Deutsch, Professor Stephen Lubben, and Professor John Pottow) (April 2019).
- National Conference of Bankruptcy Judges, *NCBJ Plenary: Broken Bench Awards Show: The Best Little Show in Texas* (October 2018).
- ABI 38th Annual Midwestern Bankruptcy Institute, *Sanctions and Social Science* (October 2018) (with Adam Miller).

EXHIBIT 5
Page 261

Nancy B. Rapoport
Page 18

- Fifth Annual James T. King Bankruptcy Symposium, *Ethics and Getting Paid* (July 2018) (with the Hon. Erithe A. Smith and M. Jonathan Hayes).
- American Bankruptcy Institute, VALCON 2018, *Special Problems Presenting Financial Consultants as Expert Witnesses and Ethics Hot Topics* (May 2018) (with Michael Richman, George Angelich, and Ted Gavin).
- American Bankruptcy Institute's Annual Spring Meeting, *Ethics Jeopardy* (with Nan Roberts Eitel, Lois Lupica, and Bill Rochelle) (April 2017).
- American Bankruptcy Institute's Annual Spring Meeting, *A Primer on Dealing with Fee Examiner*s (with Van Durrer, II, William K. Harrington, Robert J. Keach, and John F. Theil) (April 2016).
- 29th Annual Central California Bankruptcy Institute, *How to Use Social Science to Improve Ethics in a Law Firm* (September 2015).
- 89th Annual National Conference of Bankruptcy Judges, *Ethics and Social Media* (panel discussion with the Hon. Hannah Blumenstiel and Peter Fessenden) (September 2015).
- National Association of Legal Fee Analysts (NALFA) webinar, *Bankruptcy Fee Examiners in Large Chapter 11 Cases* (panel discussion with Walter W. Theus, Jr., Senior Trial Attorney, USDOJ U.S. Trustee Program and Jeffrey L. Cohen, Partner, Cooley, LLP) (May 2015).
- Bankruptcy Section of the Federal Bar Association and the Los Angeles Chapter of the Federal Bar Association, 11th Annual Bankruptcy Ethics Symposium, *An Ethics Conversation* (with Gillian N. Brown) (November 2014).
- Texas Bankruptcy Law Section Bench/Bar Conference, *Recent Attorney Fee Issues* (June 2013).
- Rocky Mountain Bankruptcy Conference:  IWIRC session on bankruptcy ethics; keynote speaker on *Bankruptcy Ethics in Pop Culture* (January 2013).
- Speaker at three sessions of the 86th Annual National Conference of Bankruptcy Judges: ABA session on *Ethical Issues Involving Pro Bono Representation:  Spotting the Issues, Solving the Problems;* NCBJ session on *The Ethics of Organizers—Ethical Challenges in Forming Official and Unofficial Committees;* and CLLA session on *Pre-Bankruptcy Ethics—How to Avoid the Minefields Before Battle Begins* (October 2012).
- Sacramento Valley Bankruptcy Forum's 11th Annual Northern California Bankruptcy Conference, *Stupid Lawyer Tricks* (March 2012).
- National Association of Bankruptcy Trustees' Spring Meeting, panelist on *Friend Me? Ethics and Professionalism Issues Related to the Use of Social Media* (March 2012).
- ABA Business Law Section's Annual Spring Meeting, panelist for the sessions on *Ethical Issues in Commercial Transactions, Should In-House Counsel Be Navigating in the Choppy Waters of Corporate Compliance?,* and *Consumer Bankruptcy Clinics for Law Schools* (March 2012).
- Southeastern Bankruptcy Law Institute, SBLI Visiting Scholar Presentation, *The Case for Value Billing in Chapter 11* (October 2011).
- Bankruptcy Law Section of the State Bar of Texas Bench/Bar Conference, *"Money, Money, Money" -- Red Flags to Fee Examiners and Solutions to Those Red Flags* (with the Hon. H. Christopher Mott, Kemp Sawers, and Warren H. Smith) (June 2011).
- American Bankruptcy Institute's Annual Spring Meeting, *Fulfilling the Fiduciary Duty in a Complex Commercial World* (with Richard M. Meth & Judith Greenstone Miller (plenary) (April 2011).

EXHIBIT 5
Page 262

Nancy B. Rapoport
Page 19

- Annual Meeting of National Conference of Bankruptcy Judges, *(Almost) Everything You Wanted to Know About…Getting Retained* and *Committee Solicitation Issues – The Problems, the Rules and the Enforcers* (October 2009).

- ABI Southwest Bankruptcy Conference, *Multimedia Ethics Presentation; Perspectives from the Bench and Ethical Issues;* and *Ethics—Walking in the Grey Areas: Advising Clients and Avoiding Pitfalls in Ethically Unsettled Areas* (September 2009).

- ALI-ABI Live Telephone Seminar and Audio Webcast:  Ethics and Professionalism Series, *When Bankruptcy Comes Calling on Your Client: Five Common Ethical Mistakes* (April 2009).

- ABI Annual Spring Meeting, *Multimedia Ethics Presentation* (plenary) (April 2009).

- Alaska Bar Association and Alaska Bankruptcy Bar, *Ethics and Popular Culture* and *Issues in Bankruptcy Ethics* (March 2009).

- National Conference of Bankruptcy Judges, 82d Annual Conference, *Ethical Fee Limits: Getting Paid and Getting What You Deserve* (Sept. 2008).

- American Bankruptcy Institute's 16th Annual Southwest Bankruptcy Conference, *Multimedia Ethics Extravaganza* (plenary) (Sept. 2008).

- National Conference of Consumer Bankruptcy Attorneys, 16th Annual Conference, *Ethics Issues* (May 2008).

- American Bankruptcy Institute's 26th Anniversary Annual Spring Meeting, *Beyond Ethics: The Coexistence of Zealousness, Professionalism and Civility in the Insolvency Community* (April 2008).

- American Bankruptcy Institute's 19th Annual Winter Leadership Conference, *Presentation of Fee Study* (February 2008).

- National Conference of Bankruptcy Judges, 81st Annual Conference, Commercial Law League of America's 22nd Annual Educational Program's panel on *Preemption and Federalism Issues in Bankruptcy* (October 2007).

- American Bankruptcy Institute's 15th Annual Southwest Bankruptcy Conference, *Ethics: Negotiating the Sanctions Minefield* (September 2007).

- American Bankruptcy Institute's 25th Annual Spring Meeting, *The Application of State Ethics Rules in Bankruptcy: Are We Just Holding Our Noses and Looking the Other Way?* (April 2007).

- 25th Anniversary Jay L. Westbrook Bankruptcy Conference, University of Texas CLE (with Martin Bienenstock), *Conflicts Writ Large: Intercreditor Issues and Issues with Fees and Overbilling* (November 2006).

- Annual Meeting of National Conference of Bankruptcy Judges, ABA Luncheon Meeting, *Examining the Examiner* (October 2004).

- Annual Meeting of National Conference of Bankruptcy Judges, *Current Bankruptcy Ethics Issues: It's Not That You Ought To!  It's That You "Got To!"* (October 2004).

- Commercial Law League of America, Annual Meeting, *Bankruptcy Ethics* (April 2003).

- 4th Annual Barry L. Zaretsky Roundtable, Brooklyn Law School, *Ethics, Governance, and Bankruptcy After Enron* (April 2003).

- The University of Texas School of Law CLE: The 21st Annual Bankruptcy Conference & Personal Injury Conference, *Debtor Wrongdoing: Ethical Implications for Lawyers* (November 2002).

- National Association of Bankruptcy Trustees, Annual Conference, *What's Wrong With Us??!!—A Fascinating Look at Ourselves, Through the Eyes of Judges and Others* (August 2002).

EXHIBIT 5
Page 263

Nancy B. Rapoport
Page 20

- 10th Annual Southwest Bankruptcy Conference, American Bankruptcy Institute, *A Look Inside the Mega-Case* (September 2002).
- 20th Annual Bankruptcy Conference, University of Texas Law School, *Bankruptcy Ethics—How Do We Find Out What We're Doing Wrong (Or Right)?* (November 2001).
- Annual Meeting of National Conference of Bankruptcy Judges, *Tell Me What You Really Want—How Behavior (On Both Sides of the Bench) Can Impact Your Case* (October 2001).
- Winter Leadership Conference, American Bankruptcy Institute, *Bankruptcy Ethics* (December 2000).
- Twenty-Fourth Annual Bankruptcy Law & Practice Seminar, Stetson University College of Law, *Ethical Problems: Dual Representation in Chapter 11,* and *Ethics: Pre-Bankruptcy Planning and Ethical Limitations* (December 1999).
- Annual Meeting of National Conference of Bankruptcy Judges, *Disinterestedness and the Chapter 11 Professional* (October 1997).
- Eastern District of Pennsylvania Bankruptcy Conference, *Bankruptcy Issues* (January 1996, January 1997, January 1998, and January 1999).

*Social science generally / social science and ethics*

- General session, International Conference of Shopping Centers, U.S. Law Conference, *Ethics Wise and Wonderful: Traditional Rules, Modern Trends* (general session) (with John G. Cameron, Jr.) (October 2022).
- The Annual CLLA Luncheon at the National Conference of Bankruptcy Judges, B*rave New World: Ethics Issues That We Never Knew We Had* (October 2022).
- General session, *Teams, Cognitive Errors, and Legal Ethics,* International Council of Shopping Centers, U.S. Law Conference (October 2020) (virtual presentation).
- Southeastern Bankruptcy Law Institute, *Life in the Time of COVID: Ethical Issues Facing Attorneys During the Pandemic* (with Judges Bess Creswell and James Sacca and George L. Washington, Jr.) (May 2021).
- Plenary session, *Ethics and Professionalism: Why Lawyers Do Dumb Things—The Social Science Reasons,* National Association of Chapter 13 Trustees, 54th Annual Meeting (with Mary K. Viegelahn (July 2019).
- *What Social Science Can Teach Us About Good People and Bad Choices* and *Images of Lawyers in Film: Legal Ethics and the Movies,* 2018 American Bankruptcy Institute Midwest Regional Seminar (August 2018).
- 2017 Mutual Funds and Investment Management Conference, *Building Successful and Ethical Teams* (March 2017).
- National Association of Estate Planners' 52nd Annual Conference, *Nudging More Ethical Behavior Through Incentives and Checklists* (November 2015).
- The Eugene Kuntz Conference on Natural Resources Law and Policy, *Nudging Better Behavior: How Social Science Can Help Us Make Better Decisions* (November 2015).
- Institute for Energy Law, 66th Annual Oil & Gas Conference, *"Nudging" Better Behavior* (February 2015).
- National Association of Estate Planners and Councils, 50th Annual Conference, *Social Science, Human Error & Behavior* (November 2013).

EXHIBIT 5
Page 264

Nancy B. Rapoport
Page 21

- ABA Annual Meeting, Business Law Section, *Cognitive Biases, Blind Spots, and Other Impairments of Ethical Vision:  How Good Lawyers Can Go Astray* (with Dr. Larry Richard, James Jones, and Charles McCallum) (August 2013).

*Judicial ethics*

- Federal Judicial Center Workshop for Bankruptcy Judges, *(NOT) Ripped from the Headlines: Navigating Ethical Issues and Instilling Public Confidence in the Judicial System* (with the Hon. Christopher M. Alston, the Hon. D. Sims Crawford, and the Hon. Michele J. Kim) (plenary sessions) (April 2022; July 2022).
- Federal Judicial Center Workshop for Bankruptcy Judges, Plenary Session, *Judicial Ethics— Words Matter* (with the Hon. John Hoffman, Jr. and the Hon. Peter W. Bowie (Ret.)) (plenary sessions) (April 2021; July 2021).
- Federal Judicial Center, *Judicial Ethics* (with the Hon. Peter Bowie, the Hon. Arthur Federman, and Prof. Elizabeth Thornburg) (plenary sessions) (April 2013; August 2013).
- College for New Judges, Texas Center for the Judiciary, *Images of Judges in Movies* (December 2002 & November 2003).

*Corporate ethics*

- Summit for Corporate Governance, *"If You Don't Know, Now You Know": A Guide to a Board's Role in Managing (Unexpected) Risk in the Aftermath of the COVID-19 Pandemic* (with Michael J. Bonner, John Holland, and Jordan Rae Kelly) (September 2021).
- Boyd School of Law Summit on Corporate Governance, in partnership with Greenberg Traurig, LLP:  as a moderator, *Asleep at the Switch: Lessons Learned from the Failure of Board Oversight In Recent Corporate Scandals and Cybersecurity Gaffes* (with panelists Cuneyt Akay, Paul Ferrillo, and Jordan Kelly, and as a panelist, *Not Too Much, Not Too Little: What is Just Right?:  Challenges Faced in Executive and Board Compensation* (with co-panelist Laura Wanlass and moderator Flora Perez (November 2019).
- Department of Energy & Contractor Attorneys' Association, Inc.'s Annual Meeting, *Ethics in the Corporate World* (May 2009).
- *Lessons To Be Learned From the Rise and Fall of High-Profile Corporate Entities—The Scandals—How to Identify Red Flags in Revenue Reporting and Financial Statements* (NACD Houston Chapter, Sept. 2004) (with Bala G. Dharan and Steven C. Currall).
- State Bar of Texas Annual Meeting, Business Law & Corporate Counsel Sections, *Moral Independence of Lawyers vs. Moral Interdependence* (June 2003).
- Southeastern Finance Association and Southern Academy of Legal Studies, *Corporate Scandals (Enron, Andersen, Tyco & World Com)—What Went Wrong?* (keynote speaker) (March 2003).
- The University of Texas School of Law CLE: The 24th Annual Corporate Counsel Institute, *Conflicts, Ethical Duties and Independence: Lessons from Enron* (August 2002).
- NASA National Managers Association, *Lessons in Character from Enron* (April 2002).
- The University of Texas School of Law CLE: The 25th Annual Page Keeton Products Liability & Personal Injury Conference, *Dressed for Excess* (November 2001).

EXHIBIT 5
Page 265

Nancy B. Rapoport
Page 22

*Women*

- Gardere Women's Council Ethics CLE, keynote speaker, *Women on Boards* (June 2013).
- State Bar of Texas Annual Meeting, Women & the Law Section, *Images of Women Lawyers in the Media* (June 2003).

*Miscellaneous*

- Emanuel Bar Review Lecturer (2008-2010).
- BAR/BRI, lecturer on *Succeeding in Law School* (2002-2006).

**Selected media appearances**

- Appearances on a variety of local, national, and international news broadcasts, and in local, national, and international news articles, on various bankruptcy, corporate law, and other legal issues, including the Enron bankruptcy case, the Arthur Andersen trial, and the Anna Nicole death (December 2001-present).
- Appeared in Academy Award®-nominated documentary, *Enron: The Smartest Guys in the Room* (Magnolia Pictures 2005).

**Special training**

- Attended three Harvard Institutes of Higher Education leadership programs (IEM in 2016, MLE in 2002, and MDP in 1999).
- Attended STAR: A Systematic Approach to Mediation Strategies, Straus Institute for Dispute Resolution, Pepperdine University School of Law (June 2008) (attended on a grant from Pepperdine).

**Contributor to the following blogs**

- ABOVE THE LAW, https://abovethelaw.com/.
- NANCY RAPOPORT'S BLOG, https://nancyrapoports.blog/.
- NANCY RAPOPORT'S BLOGSPOT (former blog), http://nancyrapoport.blogspot.com/.
- LAW SCHOOL SURVIVAL MANUAL, http://lawschoolsurvivalmanual.blogspot.com/.
- CORPORATE SCANDAL WATCH, http://corporatescandalwatch.blogspot.com/.
- UNLV LAW BLOG, Contributing Editor, http://unlvlawblog.blogspot.com.
- MONEYLAW, Contributing Editor, http://money-law.blogspot.com/.
- LEGAL PROFESSION, Contributing Editor: http://lawprofessors.typepad.com/legal_profession/.
- JURIST, Contributing Editor, http://jurist.law.pitt.edu/.
- CREDIT SLIPS, Guest Blogger, http://www.creditslips.org/.
- THE FACULTY LOUNGE, Guest Blogger, http://www.thefacultylounge.org/.
- THE CONGLOMERATE, Guest Blogger, http://www.theconglomerate.org/.
- FEMINIST LAW PROFESSORS, Guest Blogger, http://feministlawprofs.law.sc.edu/.

EXHIBIT 5
Page 266

Nancy B. Rapoport
Page 23

- RACE TO THE BOTTOM, Guest Blogger, http://www.theracetothebottom.org/home/.

## HONORS, BAR ADMISSIONS, MEMBERSHIPS, AND COMMUNITY SERVICE

**Selected honors**

- Recipient of the 2022 UNLV Alumni Association's Outstanding Faculty Member of the Year Award.
- Named a UNLV Distinguished Professor in 2022.
- ABI Task Force For Veterans and Servicemembers' Affairs Challenge Coin (2019).
- Recipient of one of the NAACP Legacy Builder Awards (Las Vegas Branch #1111) (2018).
- Commercial Law League of America's Lawrence P. King Award for Excellence in Bankruptcy (2017).
- Inducted into Phi Kappa Phi, Chapter 100 (2017).
- Southeastern Bankruptcy Law Institute Distinguished Visiting Scholar (week-long visits at Georgia State College of Law) (2011).
- 2008 Public Service Counsel of the Year, 4th annual event, Association of Media and Entertainment Counsel (2009).
- Fellow, American College of Bankruptcy (2005-present) (Class 16).
- Named a "Woman of Vision" by the Houston Delta Gamma Foundation (2004).
- Admitted to American Leadership Forum, Class XXII (2004).  Withdrew due to family illness.
- Named "Best Local Girl Made Good," HOUSTON PRESS, September 25, 2003, at 24.
- Fellow, American Bar Foundation (2002-present; Life Fellow since 2015).
- Rice University Distinguished Alumna (2002).
- Named by the Greater Houston Area Chapter of the National Council of Jewish Women as a "Woman of Influence" (2001).
- Elected to membership in the American Law Institute (2001).
- Named a Legal Pioneer for Women in the Law (first woman to serve as the dean of a Nebraska law school), Nebraska State Bar Association (2000).
- Louis Nemzer Memorial Lecture (yearly lecture honoring a Jewish member of the Ohio State faculty) (1998).
- Outstanding Professor of the Year, The Ohio State University College of Law (third-year students voting) (co-winner, with Professor Barbara Rook Snyder) (1997).

**Bar admissions**

- United States District Court, District of Nevada (2009).
- Nevada Supreme Court (2007).
- United States District Court, Northern District of Texas (2003).
- Texas Supreme Court (2001).
- United States Supreme Court (2000).

EXHIBIT 5
Page 267

Nancy B. Rapoport
Page 24

- Nebraska Supreme Court (1999).
- Ohio Supreme Court (1993).
- United States District Court for the District of Hawaii (1988).
- California Supreme Court (1987).
- United States Court of Appeals for the Ninth Circuit (1987).
- United States District Courts for the Northern, Eastern, Central, and Southern Districts of California (1987).

**Editorial boards**

- AMERICAN BANKRUPTCY LAW JOURNAL ADVISORY BOARD (three-year term, starting in 2023).
- THE BUSINESS LAWYER (2014-present).
- REYNOLDS COURTS & MEDIA LAW JOURNAL (2011-2013).
- Association of American Law Schools, JOURNAL OF LEGAL EDUCATION (2007-2010).
- State Bar of Texas, TEXAS BAR JOURNAL Board of Editors (2003-06); State Bar of Texas, TEXAS BAR JOURNAL, Editorial Board Committee (2001-2004).
- CALIFORNIA BANKRUPTCY JOURNAL (1995-2002).

**Selected board memberships**

- Claremont Graduate University Board of Trustees (2021-present) (serving on Academic Affairs, Audit, and Student Success committees, 2021-23); Vice-Chair, Audit and Risk Management Committee, 2022-2023); Chair, Audit and Risk Management Committee (2023-present).
- Setona Sub-HOA Board (President, 2021-present).
- Rice University, External Advisory Board, Center for Teaching Excellence (2019-present); Chair (2022-present).
- Nevada Board of Bar Examiners (2018-2020).
- Economic Club of Las Vegas (2017-present).
- National Museum of Organized Crime & Law Enforcement ("The Mob Museum") (2013-2022); Secretary of the Board (2016-2022); Member, Advisory Council (2022-present).
- JURIST Board of Directors (http://jurist.law.pitt.edu/) (2008-2014).
- American Bankruptcy Institute Board of Directors (2008-2017); Executive Committee (2012-2016); Vice President of Research Grants (2013-2016).
- American Board of Certification (board certification for bankruptcy lawyers) (2007-2014) (Dean of Faculty, 2011-2013).
- Association of Rice Alumni Board (2006-2009).
- NALP Foundation for Law Career Research and Education (2005-2009).
- Texas Center for Legal Ethics (2004-2006).
- Texas Supreme Court Historical Society (2004); Advisory Board (2004-2006).
- Vinson & Elkins Women's Initiative Advisory Board (2003-2010).
- Houston Area Women's Center (2003-2006).

EXHIBIT 5
Page 268

Nancy B. Rapoport
Page 25

- Advisory Council Member, WWW United, Inc. (2002-2006).
- Texas Environmental Health Institute (a joint project of the Texas Department of Health & the Texas Natural Resource Conservation Commission, which is the Texas Commission on Environmental Quality (TCEQ)) (2002-2004).
- Houston World Affairs Council (2002-2005).
- Houston Hillel (2002-2007).
- Mayor's Advisory Board of World Energy Cities Partnership (2001-2004).
- Houston Disaster Relief Advisory Board (2001-2004).
- Houston Chapter of the Texas General Counsel Forum (2001-2005).
- Anti-Defamation League Southwest Regional Board (2001-2006).
- Law School Admission Council Board of Trustees (2001-2004).

**Selected service activities and memberships**

- Member, Foundational Subject Requirement and Performance Test Task Force, Nevada Supreme Court Bar Licensing Commission (2023-present).
- Member, American Bar Association's Business Law Section, Corporate Governance Committee, Academic Affairs Subcommittee (2022-present).
- Member, Association of Professional Responsibility Lawyers (2022-present; 2014-16).
- (Co-Chair (with Joseph R. Tiano, Jr.) of SALI project to develop a bankruptcy taxonomy (2021-present) (sali.org).
- Member, Operation Stand-By, militaryprobono.org (2021-present).
- Secretary and Reporter, American Bankruptcy Institute's Task Force for Veterans and Servicemembers Affairs (2018-present).
- Member, Federal Bar Association's Professional Ethics Committee (2018-present); Ethics Hotline subcommittee (2018-2019); Co-Chair, Speakers' Bureau, 2019-present).
- Member, Heterodox Academy (2017-present).
- Member, Society for Applied Anthropology (2017-present).
- Member, National Association of Legal Fee Analysts (2014-2018) (resigned).
- Member, Law School Admission Council Diversity Retention Workshop 2015 Planning Work Group (2014-2015).
- Member, Federalist Society (2013-present).
- Member, Federal Bar Association (2012-present).
- Member, Advisory Committee to the American Bankruptcy Institute's Commission to Study the Reform of Chapter 11 (2012-2015) (Governance Subcommittee).
- Co-Reporter, American Bankruptcy Institute's National Ethics Standards Task Force (2011-2013).
- Co-Chair, American Bankruptcy Institute's Task Force on Young and New Members (2011-2012).
- Association of Media and Entertainment Counsel, Law School Section (Co-Chair, 2010-2011; member and temporary Co-Chair, 2012-2013); member, Law School Advisory Board (2014); Chair, Law School Advisory Board (January 2018-present).

EXHIBIT 5
Page 269

Nancy B. Rapoport
Page 26

- American Bar Association, Section on Legal Education, Committee on Law School Administration (2008-2010); Chair-Elect (2010); Chair (2011-2013).
- American Bar Association, Section on Business Law, Committee on Corporate Counsel, Subcommittee on Corporate Governance (co-chair, with Roberta Torian) (2007-2010).
- Advisory Committee, American Bankruptcy Institute's consumer bankruptcy fee study (advisor to Professor Lois Lupica) (2008-2011).
- Rice Alumni Volunteers for Admission (2007-present) and liaison for RAVA to Association of Rice Alumni Board (2007-2009); involved in Rice Annual Fund solicitations since 2007.
- Advisory Committee, American Bankruptcy Institute's Chapter 11 fee study (advisor to Professor Stephen Lubben) (2005-2007).
- American Bankruptcy Institute's Task Force on Pro Bono (2007).
- American Bar Association's Task Force on Attorney Discipline (2005).
- Planning committee for 2007 Annual Meeting of Association of American Law Schools, *Workshop on The Ratings Game* (2006-2007).
- City of Houston Mayor's Pension Governance Advisory Committee (2004-2006).
- American Bar Association, Advisory Group on Loan Repayment, Standing Committee on Legal Aid & Indigent Defendants (SCLAID) (2003-2006).
- Faculty member, ABA New Deans' School (May-June 2003, June 2004, and June 2005).
- Advisory Committee, Baylor College of Medicine-UH Law Center MD/JD Program (2004-2006).
- Academic advisor, National Governmental Affairs Committee, Commercial Law League of America (CLLA) (2002-2006).
- Co-chair (with Dean Stuart Deutsch), ABA Deans' Workshop (for mid-year ABA meeting in 2003).
- Advisory Committee, *The Birth of the Dot-Com Era,* project for the Library of Congress (Project Manager, Prof. David Kirsch, University of Maryland) (advising the Library of Congress on what to do with the records of now-defunct law firm of Brobeck, Phleger & Harrison) (2004-2007).
- National Association of Corporate Directors (2004-2006).
- Commercial Law League of America, Professional Responsibility Committee (2003-2005).
- Member, ABA Commission on Loan Repayment & Forgiveness (2001-2003).
- Member, AALS Professional Development Committee (2000-2003).
- Communication Skills Committee, ABA Section of Legal Education and Admissions to the Bar (1998-2002).
- Chair, AALS Planning Committee for the *Mini-Workshop on Major Issues of the 21st Century: the Impact on the Legal Academy and Law Students* (1999-2000).
- Member, Law School Admission Council (LSAC) Services & Programs Committee (1999-2000), Workgroup on Alternative Admissions Models (2000-2003), and Gay, Lesbian, Bisexual & Transgendered Issues Workgroup (2000-2001).
- Nebraska State Bar Association (1999-present).
- National Association of College & University Attorneys (1998-2006).
- Commercial Law League of America (1998-present).
- Ohio State Bar Association (1997-present).

EXHIBIT 5
Page 270

Nancy B. Rapoport
Page 27

- American Bankruptcy Institute (1994-present).
- AIDS Legal Referral Panel of the Bar Association of San Francisco (1989-91).
- Bar Association of San Francisco (1987-91).
- American Bar Association (1987-present).


## EXPERT AND EXPERT WITNESS ACTIVITY

- Expert for Legal Aid Center of Southern Nevada in In the Matter of the Guardianship of the Person and Estate of Katherine June Jones, Case No. G-19-, 052263-A, District Court, Clark County, Nevada (2023-present).
- Expert for McDermott Will & Emery LLP in *In re* Power Property Management, Cause No. DC-19-00695, 134th Judicial District Court, Dallas County, Texas (2023-present).
- Expert for McDonald Carano LLP in 4R4 Sons, LLC, Horizon Kids dba Kidz, Kidz, Kidz v. Tru G. Wilhelm, Inc. and counterclaim Tru G. Wilhelm v. Horizon Kidz, 4R4 Sons, LLC, Chrisetta M. Rush and Arthur T. Rush, individually and in their capacities as trustees of the Rush Family Revocable Trust (2022-present).
- Expert for Shumaker, Loop & Kendrick, LLP, in Adela 117, LLC v. JP Morgan Chase Bank, Case No. 2021-CF-004270-NC, Circuit Court of the Twelfth Judicial Circuit in and for Sarasota County, Florida (2022-2023) (testified in deposition and at trial).
- Expert for The Claro Group in *In re* Diocese of Camden, New Jersey, Case No. 20-21257, United States Bankruptcy Court, District of New Jersey (2022-present).
- Expert for Lowenstein Sandler LLP in *In re* Diocese of Camden, New Jersey, Case No. 20-21257, United States Bankruptcy Court, District of New Jersey (2022).
- Expert for Wynn Resorts and Orrick Herrington & Sutcliffe LLP in Nielsen v. Wynn Resorts, Ltd., Case No. A-19-803879-C, Eighth Judicial District Court, Clark County, NV (2022-present).
- Expert for Lipson Neilson PC in Estate of Tony Hsieh v. Premsrirut, Clark County District Court, Case No. A-22-847455-B, Las Vegas, NV (2022-present).
- Expert for Shumaker, Loop & Kendrick, LLP, in Adela 117, LLC and Newport Sports Mgmt., Inc. v. JPMorgan Chase Bank et al., Case No., 2021-CA-004270-NC, Circuit Court of the Twelfth Judicial Circuit in and for Sarasota County, Florida (2022).
- Expert for Krevolin & Horst Law Firm in Blackhall Real Estate, LLC v. Smith, JAMS Arbitration No. 1440007245, Atlanta, Georgia (2021).
- Expert for the United States Trustee in *In re* Star Mountain Resources, Inc., Case No. 2:18-bk-01594-DPC, United States Bankruptcy Court for the District of Arizona (2021).
- Expert for the Chapter 7 Trustee in *In re* Green-Light International, LLC, Case No. 2:17-bk-18265-BB, United States Bankruptcy Court for the Central District of California (2021).
- Consultant for law firms regarding a disclosure issue (2021).
- Expert for Beasley Allen Law Firm in *In re* Imerys Talc America, Inc., Case No. 19-10289, United States Bankruptcy Court for the District of Delaware (2020-present) and *In re* LTL Management LLC, Case No. 21-30589, United States Bankruptcy Court for the Western District of North Carolina, transferred to the United States Bankruptcy Court for the District of New Jersey (2021-present).

EXHIBIT 5
Page 271

Nancy B. Rapoport
Page 28

- Expert for Bonds Ellis Eppich Schafer Jones LLP in *In re* Highland Capital Management, L.P., Case No. 19-34054, United States Bankruptcy Court for the Northern District of Texas (2020).
- Fee examiner in *In re* Zetta Jet USA, Inc. (2:17-bk-21386-SK) and *In re* Zetta Jet PTE, Ltd., Case No. 2:17-bk-21387-SK, United States Bankruptcy Court for the Central District of California—Los Angeles Division (2020-present).
- Expert for Sidley Austin LLP in *In re* Boy Scouts of America and Delaware BSA, LLC, United States Bankruptcy Court for the District of Delaware, Case No. 20-10343 (LSS) (2020-2022) (testified at hearing in 2020; testified in arbitration in 2022).
- Expert for Porter Hedges LLP in *In re* McDermott Int'l, United States Bankruptcy Court for the Southern District of Texas, Case No. 20-30336 (DRJ) (2020-present).
- Expert for Diamond McCarthy LLP and Snow Covered Capital, LLC in Snow Covered Capital, LLC v. Weidner, United States District Court for the District of Nevada, Case No. 2:19-cv-00595-JAD-NJK (2019-present) (testified at deposition).
- Expert for The Richter Firm and Shumaker, Loop & Kendrick in Wise v. Smith et al., Court of Common Pleas, State of South Carolina, Case No. 2019-CP-3300017 (2019-2020) (testified at deposition).
- Independent monitor for UpRight Law (2018-2023).
- Fee examiner in *In re* Toys "R" Us Property Company I, LLC, United States Bankruptcy Court for the Eastern District of Virginia, Case No. 18-31429 (KLP) (2018-2019).
- Fee examiner in *In re* Toys "R" Us, Inc., United States Bankruptcy Court for the Eastern District of Virginia, Case No. 17-34665 (KLP) (2018-2019).
- Expert for the Trustee in two *In re* ICPW Liquidation Corp. cases, United States Bankruptcy Court for the Central District of California, Case Nos. 1:17-bk-12408-MB and 1:17-bk-12409-MB (2018).
- Expert for Hoover Slovacek LLP in Midstates Petroleum Company v. Production Specialists, Inc. dba Regal Oilfield Sup., United States Bankruptcy Court for the Southern District of Texas, Case No. 4:16-bk-32237 (2017-2019).
- Expert for Panish Shea & Boyle LLP in Moradi v. Nevada Property 1, LLC, District Court, Clark County, Nevada, Case No. A-14-698824-C (2017).
- Expert for Diamond State Insurance Company in Gieseke v. Diamond State Insurance Company, U.S. District Court for the District of Nevada, Case No. 3:16-cv-00103-MMD-WGC (2016).
- Expert for Mar-Bow Value Partners, LLC, and Lakeview Capital, Inc., on a confidential matter involving Federal Rule of Bankruptcy Procedure 2014 (2016-present).
- Independent member of Fee Committee, *In re* Caesars Entertainment Operating Co., Inc., U.S. Bankruptcy Court, Northern District of Illinois, Case No. 15-01145 (ABG) (2015-2018).
- Expert for Craig Marquiz in Home Gambling Network, Inc. v. Piche, United States District Court for the District of Nevada, Case No. 2:05-cv-00610-DAE-VCF (2015).
- Expert for the Debtor in *In re* The Catholic Bishop of Spokane, a/k/a The Catholic Diocese of Spokane, United States Bankruptcy Court, Eastern District of Washington, Case No. 04-08822-FPC11 (2014).

EXHIBIT 5
Page 272

Nancy B. Rapoport
Page 29

- Expert for the Trustee in *In re* Fundamental Long Term Care, Inc., United States Bankruptcy Court, Middle District of Florida, Case No. 8:11-bk-22258-MGW (2014-2015) (testified at deposition and at trial).
- Expert for the Liquidating Trustee in Mukamal v. Fulbright & Jaworski L.L.P (*In re* Palm Beach Finance Partners, L.P. and Palm Beach Finance Partners II, L.P.), United States Bankruptcy Court, Southern District of Florida, Case No. 09-36379-BKC-PGH (2014) (withdrew due to scheduling issues).
- Expert for the law firm of Lipson Neilson Cole Seltzer Garin, P.C. in a case involving conflicts of interest (2014).
- Consultant for the Liquidating Trust for *In re* Residential Capital, LLC, United States Bankruptcy Court, Southern District of New York, Case No. 12-12020 (MG), regarding the reasonableness of fees (2014).
- Expert for the law firm of Frank J. Cremen in Grievance File #SG 1-1156, State Bar of Nevada (2013-2014) (testified at hearing).
- Expert for Irell & Manella LLP, in State of Nevada v. Gary Trafford, et al., Clark County District Court, Case No. C-11-277573-1 (2013).
- Expert for a Nevada law firm (firm and client names kept confidential) in a matter involving attorney disciplinary procedures (2012).
- Expert for the Fee Examiner in Matter of Lehman Brothers Holdings, Inc., U.S. Bankruptcy Court, Southern District of New York, Case No. 08-13555-jmp (2012).
- Expert for the Fee Examiner in *In re* Motors Liquidation Co. (f/k/a General Motors Corp.), U.S. Bankruptcy Court, Southern District of New York, Case No. 09-50026 (2011-2012).
- Expert for Alverson Taylor Mortensen & Sanders in Stanish et al. v. Catholic Healthcare West, Nevada District Court, Clark County, Case No. A-11-639674-C (2011).
- Fee examiner in *In re* Station Casinos, Inc., U.S. Bankruptcy Court, District of Nevada, Case Nos. BK-09-52477 through BK-11-51219 (2011).
- Expert for the Office of the United States Trustee in three cases: *In re* Mark Andrew Brown, U.S. Bankruptcy Court, Western District of Maryland, Case No. 09-44254-jwv7; *In re* Tracy L. Quarm, U.S. Bankruptcy Court, Northern District of Ohio, Case No. 09-20498; and *In re* John W. Young, U.S. Bankruptcy Court, Northern District of Ohio, Case No. 10-11404 (2010) (testified in discovery depositions and at trial; deposition and trial testimony done via videotape).
- Expert for the Trustee in The Pappg Grantor Trust v. Scott (*In re* Baltimore Emergency Services II, LLC, et al.), U.S. Bankruptcy Court, District of Maryland, Adversary No. 03-8294-esd (2010).
- Expert for Lionel, Sawyer & Collins in Michael Racusin v. Lionel Sawyer & Collins, American Arbitration Association, Case No. 79 194 Y 00108 08 (2009-2010) (testified in arbitration).
- Expert for the Reorganized Debtor in *In re* ASARCO, LLC, et al., U.S. Bankruptcy Court, Southern District of Texas, Case No. 05-21207 (2010) (testified at trial).
- Expert for BuckleySandler LLP in Pulte Homes, Inc. v. Terry Goddard, In His Official Capacity as Attorney General for the State of Arizona and Catherine Cortez Masto, In Her Official Capacity as Attorney General for the State of Nevada, D.C. Circuit, Civil Action No. 1:10-cv-00377 (2010).

EXHIBIT 5
Page 273

Nancy B. Rapoport
Page 30

- Court's fee expert and chair of the Fee Review Committee in *In re* Pilgrim's Pride Corp., U.S. Bankruptcy Court, Northern District of Texas, Case No. 08-45664 (DML) (2009-2010) (testified at hearing).
- Expert for plaintiff in Judy M. Jackson, M.D. v. Ira Levine et al., Nevada District Court, Clark County, Case No. A538983 (2009-2010) (testified in deposition and at trial).
- Expert for the Trustee in Asset Funding Group, L.L.C., Scobar Adventures, L.L.C., AFG Investment Fund 2, L.L.C., and HW Burbank, L.L.C. v. Adams and Reese, L.L.P., U.S. District Court, Eastern District of Louisiana, Case No. 07-2965 (2009) (testified in deposition; made available for trial, but case settled).
- Expert for Clausen Miller in *In re* Raymond Professional Group, Inc. (Raymond Professional Group, Inc. v. William A. Pope Company), Adv. No. 07-A-00639, U.S. Bankruptcy Court, Northern District of Illinois (2008-2009) (testified in deposition and at hearing).
- Expert for the plaintiff in Todd v. Guidance Software, Inc., U.S. District Court, Central District of California, Case No. SACV 08-1354 JVS (ANx) (2008-2009).
- Expert for the Debtor in Sports Shinko Co. v. Franklin K. Mukai, U.S. District Court, D. Hawaii, Case No. CV 04-00127 ACK/BMK (2007-2008).
- Expert for the Trustee in *In re* Mego Financial Corp., et al., U.S. Bankruptcy Court, D. Nev., Case Nos. BK-N-03-52300-GWZ through BK-N-03-52304-GWZ and BK-N-03-52470-GWZ through BK-N-03-52474-GWZ (2007-2008) (testified at deposition).
- Expert for Pillsbury Winthrop in *In re* SONICblue Incorporated, U.S. Bankruptcy Court, Northern District of California, Case Nos. 03-51775 through 03-51778 MM (2007) (made available to testify in court early in the case; did not testify).
- Expert for the Trustee in *In re* Southwest Florida Heart Group, P.A., U.S. Bankruptcy Court, Middle District of Florida, Case No. 9:05-bk-17167-ALP (2007) (testified in deposition).
- Expert for Beirne, Maynard & Parsons in Brazos Electric Power Cooperative, Inc. v. Tenaska IV Texas Partners and related cases (2003-2004; 2006-2007) (testified in depositions).
- Expert for Beirne, Maynard & Parsons in Hicks v. Charles Pfizer & Co., U.S. District Court, Eastern District of Texas, Civil Action No. 1:04CV201 (2006).
- Expert for Benjamin Hall, Esq., in Costilla Energy, Inc., by and through its litigation trustee, George Hicks v. Joint Energy Development Investments II, 49th Judicial District, Zapata County, Texas (2006-2008) (testified in deposition).
- Expert for Winstead, Secrest & Minick in an issue involving conflicts of interest (2005).
- Expert for Beckley, Singleton in Fremont Investment & Loan v. Beckley Singleton, Chtd. and Sidney Bailey, U.S. District Court, D. Nevada, Case No. CV-S-03-1406-JCM-RJJ (2003) (2005-2006) (testified in deposition).
- Expert for the debtor in *In re* ACandS, Inc., U.S. Bankruptcy Court, D. Delaware, Case No. 02-12687 (2004-2005) (testified at hearing).
- Court's fee expert and chair of the Fee Review Committee in *In re* Mirant Corporation, U.S. Bankruptcy Court, Northern District of Texas, Case No. 03-46590 (2003-2006; 2011-2012) (testified in deposition and at hearing).
- Expert witness for Latham & Watkins regarding Section 414 of H.R. 333 (changes in "disinterestedness" standard of 11 U.S.C. § 101(14)) (March-April 2003).

EXHIBIT 5
Page 274

Nancy B. Rapoport
Page 31

- Expert witness for the Office of Disciplinary Counsel, *In re* Charles William Ewing, Case No. 97-5, before the Board of Commissioners on Grievances and Discipline of the Bar of the Supreme Court of Ohio (1998).

## PUBLIC TESTIMONY

- Testified at the June 2012 public meeting of the United States Trustee Program regarding the proposed new fee guidelines for larger chapter 11 cases (testimony available at http://www.justice.gov/ust/eo/rules_regulations/guidelines/docs/proposed/Prof_Rapoport_Comment.pdf, http://www.justice.gov/ust/eo/rules_regulations/guidelines/docs/proposed/Prof_Rapoport_SupplementalComment.pdf, and http://www.justice.gov/ust/eo/rules_regulations/guidelines/docs/proposed/Prof_Rapoport_Comment2.pdf; transcript available at http://www.justice.gov/ust/eo/rules_regulations/guidelines/docs/proposed/Transcript_June4_Public_Meeting.pdf; Director Clifford J. White III's statement on the adopted guidelines, available at http://www.justice.gov/ust/eo/rules_regulations/guidelines/docs/Fee_Guidelines_Cliff_White_Statement.pdf).

## ADVICE COLUMN

- "Ms. Ps and Qs":  ethics advice column for the National Association of Chapter 13 Trustees (2011-present).

## SELECTED AMICUS BRIEFS

- *Brief for Amici Erwin Chemerinsky and Other Legal Scholars in Support of Appellees,* Aearo Technologies, LLC v. Those Parties Listed on Appendix A to the Complaint and Jone & Jane Does, 1-1000 (In re Aearo Technologies, LLC), United States Court of Appeals for the Seventh Circuit, Case No. 22-2606 (Feb. 1, 2023).
- *Brief of 83 Legal Ethics Professors as Amici Curiae in Support of Hearing En Banc,* United States v. Varner, United States Court of Appeals for the Fifth Circuit, Case No. 19-40016 (Mar. 20, 2020).
- *Amicus Brief of Neutral Fee Examiners Supporting Neither Party,* Baker Botts L.L.P. v. ASARCO LLC, Case No. 14-103, United States Supreme Court (Dec. 10, 2014), 2014 WL 6984132.
- *Brief of Amici Curiae, In re* David Marshall Brown, Case No. 12-Cv-60016-KAM, United States District Court, Southern District of Florida (filed by co-counsel George Castrataro) (April 11, 2012), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2038267.

EXHIBIT 5
Page 275

Nancy B. Rapoport
Page 32

- *Brief in Support of Respondent for Amici Curiae Professors Richard Aaron, Laura Beth Bartell, Jagdeep S. Bhandari, Susan Block-Lieb, Robert D'Agostino, Jessica Dawn Gabel, Kenneth N. Klee, George W. Kuney, C. Scott Pryor, Nancy B. Rapoport, Marie T. Reilly, Lynne F. Riley, Keith Sharfman, and Michael Sousa,* RadLAX Gateway Hotel, LLC and RadLAX Gateway Deck, LLC v. Amalgamated Bank, Case No. 11-166, United States Supreme Court (March 5, 2012).
- *Brief of Legal Ethics Professors and Practitioners and the Ethics Bureau at Yale as Amici Curiae in Support of Petitioner,* Maples v. Thomas, Case No. 10-63, United States Supreme Court (May 25, 2011).
- *Brief of Amicus Curiae,* Warren v. Seidel, United States District Court for the District of Ohio, Case No. 2:10-cv-01049-MHW (2010), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1843496.
- *Brief of 30 Leading Ethicists as Amici Curiae in Support of the Petitioner,* Charles Dean Hood v. State of Texas, Case No. 09-8610, United States Supreme Court (February 18, 2010), available at 2010 WL 638469.
- *Brief of Amicus Curiae,* Danny Joe McClure and Kimberly Deskins McClure, Plaintiffs, v. Bank of America, Creditors Financial Group, LLC, and Peter Rebelo, Defendants, Bankr. N.D. Tex. 2010, Adv. No. 08-04000-DML, available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1550353.


## INTERESTS (INCLUDING SELECTED BALLROOM DANCE COMPETITION RESULTS)

- Ailurophile; Jane Austen and Aaron Sorkin fan.
- Obsessed with the history of the Titanic and with the U.S. space program.

*Ballroom dance*

- Pro/am competition results:

  - United States Dance Championships (ballroom dance's national competition):

    - 5th in S1 US Open to the World Pro/Am Rhythm Scholarship Championship; 4th in "C"  Open to the World 9-Dance Championship (with Igor Dogoter) (2022).
    - 4th in S1 Open Gold US National Pro/Am Rhythm Scholarship Championship; 5th in S1 Open Gold US National Pro/Am Smooth Scholarship Championship; 4th in "C" Open Gold US Open to the World 9-Dance Championship (with Igor Dogoter) (2021).
    - 6th in "C" U.S. National Open Gold Rhythm Scholarship & 4th in "C" Open to the World Pro/Am American Style 9-Dance Championship (with Sergei Shapoval) (2019).
    - 4th in "C" Open to the World Pro/Am American Style 9-Dance Championship (with Sergei Shapoval) (2018).

EXHIBIT 5
Page 276

Nancy B. Rapoport
Page 33

- 2nd in "C" Open to the World Pro/Am American Style 9-Dance Championship (with Sergei Shapoval) (2017).
- 5th in "C" Open to the World Pro/Am American Style 9-Dance Championship (with Sergei Shapoval) (2016).
- 4th in the "C" Open to the World Pro/Am American Style 9-Dance Championship (with Sergei Shapoval) (2015).
- 5th in U.S. Open Pro/Am American Style 9-Dance Championship "B" Division (missed 4th by a Rule 11 tie) & 1st in U.S. Open Pro/Am Rising Star American Smooth Competition "B" Division (with Sergei Shapoval) (2014).
- 6th in U.S. National Pro/Am American Rhythm 5 Dance Scholarship "B" Division; 2nd in U.S. Open Pro/Am American Style 9-Dance Championship ("B" Division") and 5th in U.S. Open Pro/Am Rising Star American Smooth Competition (with Sergei Shapoval) (2013).
- 5th in Open "B" 9-Dance Championship and 6th in Rising Star "B" American Smooth Competition (with Sergei Shapoval) (2012).
- 4th in Open "B" Rhythm Scholarship and 4th in Open "B" 9-Dance Championship (with Sergei Shapoval) (2011).

o Las Vegas Lights Dance Challenge:  1st in Open Gold American Style 6-Dance; 1st in Open CM Rhythm Multi-Dance; 1st in Open CM Smooth Multi-Dance; 1st in Open CM Rhythm Scholarship; 1st in Open CM Smooth Scholarship (with Igor Dogoter) (2022).

o Vegas Open:  2d in S1 Open Multi-dance Rhythm;  2n in Senior Open Rhythm Scholarship; 2d in S1 Open Multi-dance Smooth; 1st in Open "C" 9-dance Scholarship; 3rd in S1 Open Smooth Scholarship (with Igor Dogoter) (2023); 1st in S1 9-Dance; 2d in S1 Open Rhythm Multi-Dance Challenge; 2d  in S1 Open Rhythm Scholarship; 2d in S1 Open Smooth Multi-Dance Challenge; 4th in S1 Open Smooth Scholarship (with Igor Dogoter) (2022).

o Holiday Dance Classic:  2d in "C" DanceSport Series Rhythm Championship; 6th in "C" Open Rhythm Scholarship; 2d in "C" DanceSport Series Smooth Championship (2022) (with Igor Dogoter); 4th in "C" DanceSport Series Rhythm Championship; 5th in "C" DanceSport Series Smooth Championship; 5th in S1 Smooth Scholarship (with Igor Dogoter) (2021).

o Great Gatsby Gala:  1st in World DanceSport Series "S1" American Rhythm; 2d in 9-Dance; 2d in World DanceSport Series "S1" American Smooth; 4th in "S1" Scholarship American Smooth (missed 3d by a Rule 11 tie) (with Igor Dogoter) (2021).

o Viva Las Vegas:  1st in World Challenge American Smooth Open (L-B); 1st in World Challenge American Rhythm Open (L-B); top Gold student (with Igor Dogoter) (2022); 1st in World Challenge American Smooth Open (L-B); 2d in World Challenge American Rhythm Open (L-B) (with Igor Dogoter) (2021).

EXHIBIT 5
Page 277

Nancy B. Rapoport
Page 34

- o Ballroom Beach Bash: 3[d] in Senior Open Rhythm Scholarship; 2[d] in "C" Open 9-dance; 4th in Senior Open Smooth Scholarhip (with Igor Dogoter) (2023); 1st in S1 Open Rhythm Scholarship, 1st in "C" 9-dance; 4th in SR Open Smooth (with Igor Dogoter) (2022); 1st in "C" Open Gold Smooth Scholarship; 7th in "C" Open Advanced Smooth Scholarship (with Igor Dogoter) (2021).

- o California Open DanceSport Championships (online competition): 3[d] in "B" Open Smooth Championship & 2[d] in "C" Best of the Best Open Smooth (with Igor Dogoter) (2021).

- o Fred Astaire National Dance Championships: 4th place in Open B Rhythm Scholarship, 2nd place in American Rhythm 9-Dance Division, and 6th place in Open B Smooth Scholarship (with Sergei Shapoval) (2018).

- o Fred Astaire World Championships: 5th in Open B Rhythm Scholarship & 6th in Open B Smooth Scholarship (with Sergei Shapoval) (2017).

- o Emerald Ball: 5th in Open S1 Rhythm Championship and 5th in Open B American 9-Dance (with Igor Dogoter) (2023); 5th in Open B American 9-Dance Championship (2019) (with Sergei Shapoval); 4th in Open B American Rhythm Scholarship (with Sergei Shapoval) (2011).

- o California Star Ball: 1st in Pro/Am Open Rhythm Scholarship Competition and 3rd in the Open American Smooth Competition (2010); 1st in Open Rhythm Scholarship (with Sergei Shapoval) (2009).

- o Embassy Ball: 1st in the B Division, Open-to-the-World Latin Pro/Am Competition (with Billy King) (2005).

- o Ohio Star Ball: DanceSport SuperBowl Region 5 Representative, Ladies' B Latin (with Billy King) (2005); 1st in International Latin (B) Scholarship (with Bill Sparks) (1993).

- Amateur competition results:

  - o Vegas Open Dance Challenge:
    - 2023, 3rd in Pre-Novice Smooth; 5th in Novice Smooth (with Ben Ow).

  - o Holiday Dance Classic:
    - 2022, 1st in Amateur "C" Smooth Novice (with Ben Ow).

  - o United States Amateur Dance Sport Competition (national amateur ranking competition):

    - 1996, 3rd place, American Rhythm Division (with Christopher Holgate).

EXHIBIT 5
Page 278

Nancy B. Rapoport
Page 35

- 1994 & 1995, 2nd place, American Rhythm Division (with Christopher Holgate).

o Ohio Star Ball:  1st in Amateur American Rhythm & 6th place, Amateur American Smooth Division (with David Freeman) (1993).

**PERSONAL INFORMATION**

- Native Texan (born in Bryan, Texas).
- Married to Jeffrey D. Van Niel; no children; two cats (Diana Prince and Shadow Grace).

EXHIBIT 5
Page 279

**EXHIBIT 6**

EXHIBIT 6
Page 280



# Matthew G. Bouslog

PARTNER | Orange County

**T** 949.851.5553
**E** mbouslog@allenmatkins.com

Matt represents debtors, creditors, and investors in complex restructuring matters, including in- and out-of-court restructurings, distressed acquisitions, and bankruptcy-related litigation. He also has significant experience with cross-border bankruptcy matters.

He also regularly advises clients on corporate governance and fiduciary duties and bankruptcy-related issues in real estate, finance, corporate, and litigation matters.

In addition to his restructuring experience, Matt represents clients in UCC Article 9 matters and enforcement of rights and remedies generally.

Matt frequently speaks and writes on bankruptcy, finance, UCC, and real estate topics for the Orange County Bar Association, Strafford, and the Financial Lawyers Conference, and he has been published in the *ABI Journal* and the *Norton Journal of Bankruptcy Law and Practice*.

Prior to joining Allen Matkins, Matt served as a judicial clerk for the Honorable Robert N. Kwan of the United States Bankruptcy Court for the Central District of California. While attending law school, he served as a judicial extern for the Honorable Thomas B. Donovan of the United States Bankruptcy Court for the Central District of California and for the Honorable Stephen V. Wilson of the United States District Court for the Central District of California.

### EDUCATION

J.D., University of California – Los Angeles, Order of the Coif
B.S., *magna cum laude* Brigham Young University

### SERVICES

Restructuring, Insolvency & Bankruptcy
Commercial Finance
Receiverships, Lenders & Special Creditor Remedies
Litigation & Counseling
Mergers & Acquisitions
Real Estate Finance

### INDUSTRIES

Energy & Utilities
Financial Services
Healthcare Facilities & Operations
Investment Management
Life Sciences

### REPRESENTATIVE MATTERS

- **Credit Repair Service Provider.** Counsel to ad hoc group of lenders representing over $200 million of senior debt in out-of-court workout*

Allen Matkins

EXHIBIT 6
Page 281

- **Global Pharmaceutical Company.** Counsel to ad hoc group of lenders representing approximately $4.8 billion of senior debt*

- **Real Estate Portfolio.** Counsel to senior lender and mezzanine lender holding more than $100 million in loans, in connection with chapter 11 sale of office and retail properties*

- **Consumer Goods Manufacturer**. Counsel to debtor in successful out-of-court restructuring of approximately $125 million in debt*

- **Hotel Operator**. Counsel to senior lender in connection with chapter 11 case of owner and operator of luxury resort and hotel*

- **Engineering and Turbocharger Manufacturer**. Counsel to ad hoc group of lenders representing approximately $1.5 billion of senior debt*

- **Healthcare Company**. Lender and landlord counsel in $880 million out-of-court restructuring of loan and lease arrangements*

- **Consumer Goods Manufacturer**. Counsel to parent organization in establishing $1 billion qualified settlement fund for payment of asbestos claims*

- **Battery Manufacturer**. Counsel to debtor-in-possession financing lender*

- **National Restaurant Chain**. Counsel to buyer in distressed out-of-court acquisition*

- **Natural Gas Distribution Services MLP**. Counsel to stalking horse bidder in acquiring assets in Alabama and Mississippi for $31.5 million*

- **Biotechnology Company**. Counsel to Official Committee of Equity Security Holders; shareholders received cash distribution and participation in liquidating trust*

- **Investment Company.** Counsel to prepackaged chapter 11 plan sponsor in acquiring controlling interest in the reorganized debtor and preserving approximately $140 million in net operating losses*

- **Toll Road Operator**. Debtor counsel to toll road operator; confirmed chapter 11 plan that restructured approximately $1.5 billion in debt*

- **Media Company**. Counsel to former shareholders and board members in successfully defending multi-district litigation involving claims for breach of fiduciary duty and claims seeking to avoid payments in connection with $7 billion pre-bankruptcy leveraged buyout*

- **Renewable Energy Company**. Counsel to stalking horse bidder in acquiring "solar materials" division for $150 million*

**Allen Matkins**

EXHIBIT 6
Page 282

- **Printing and Communications Company**. Debtor counsel to printing and communications company with operations in the U.S., Mexico, and Canada; completed $300 million sale and confirmed chapter 11 plan*

- **Global Investment Bank**. Debtor counsel to global investment bank; confirmed chapter 11 plan that restructured over $2.5 billion in debt in first-ever restructuring of a Shari'ah-compliant entity in what was named as the *American Lawyer*'s Global Finance Deal of the Year Grand Prize Winner, was awarded the prestigious Innovation in Finance Law award by the *Financial Times*, and was named as the *M&A Advisor*'s Cross-Border Deal of the Year in the "Over $1 Billion" category*

- **Vitamin and Supplement Manufacturer**. Special transactional counsel to vitamin and supplement manufacturer in $155 million sale*

- **Video Game Developer**. Debtor counsel to video game developer with operations in the U.S., Canada, Europe, and Asia; completed sales of assets totaling approximately $70 million and confirmed chapter 11 plan*

- **Steam Power Manufacturer**. Counsel to chapter 11 plan sponsor, which contributed $325 million to establish section 524(g) asbestos settlement trust*

- **Global Financial Services Firm.** Counsel to liquidator of Swiss banking affiliate of a global financial services firm in its chapter 15 case and in connection with $12.5 billion claim against the firm*

  *\* Matters completed prior to joining Allen Matkins.*

## ACCOLADES
- *The Best Lawyers in America: Ones to Watch;* Bankruptcy and Creditor Debtor Rights/Insolvency and Reorganization Law (2021 – 2023)
- *The Best Lawyers in America: Ones to Watch;* Mergers and Acquisitions Law (2021 – 2023)
- *The Best Lawyers in America: Ones to Watch;* Real Estate Law (2021 – 2023)

## BAR ADMISSIONS
- California

Allen Matkins

EXHIBIT 6
Page 283

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:       655 W. Broadway, Suite 800, San Diego, California  92101

A true and correct copy of the foregoing document entitled (*specify*):
**DECLARATION OF RICHARD A. MARSHACK IN SUPPORT OF MOTION OF TRUSTEE RICHARD A. MARSHACK FOR ENTRY OF AN ORDER (A) APPROVING SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS PURSUANT TO 11 U.S.C. § 363(b) AND (B) APPROVING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND OTHER AGREEMENTS**
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On July 7, 2023, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒     Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On July 7, 2023, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐     Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on July 7, 2023, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**JUDGE'S COPY**
The Honorable Scott C. Clarkson
United States Bankruptcy Court
Central District of California
Ronald Reagan Federal Building and Courthouse
411 West Fourth Street, Suite 5130 / Courtroom 5C
Santa Ana, CA 92701-4593

☐     Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| July 7, 2023 | Caron Burke | /s/ Caron Burke |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

August 2010       **F 9013-3.1.PROOF.SERVICE**

1.      **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:

Eric Bensamochan on behalf of Interested Party Eric Bensamochan
eric@eblawfirm.us, G63723@notify.cincompass.com

Ronald K Brown on behalf of Creditor SDCO Tustin Executive Center, Inc.
ron@rkbrownlaw.com

Christopher Celentino on behalf of Plaintiff Richard A. Marshack
christopher.celentino@dinsmore.com, caron.burke@dinsmore.com

Christopher Celentino on behalf of Trustee Richard A Marshack (TR)
christopher.celentino@dinsmore.com, caron.burke@dinsmore.com

Shawn M Christianson on behalf of Interested Party Courtesy NEF
cmcintire@buchalter.com, schristianson@buchalter.com

Randall Baldwin Clark on behalf of Interested Party Randall Baldwin Clark
rbc@randallbclark.com

Leslie A Cohen on behalf of Interested Party Courtesy NEF
leslie@lesliecohenlaw.com, jaime@lesliecohenlaw.com;clare@lesliecohenlaw.com

Daniel A Edelman on behalf of Creditor Carolyn Beech
dedelman@edcombs.com, courtecl@edcombs.com

Christopher Ghio on behalf of Plaintiff Richard A. Marshack
christopher.ghio@dinsmore.com

Christopher Ghio on behalf of Trustee Richard A Marshack (TR)
christopher.ghio@dinsmore.com

Jeffrey I Golden on behalf of Interested Party Courtesy NEF
jgolden@go2.law,
kadele@ecf.courtdrive.com;cbmeeker@gmail.com;lbracken@wgllp.com;gestrada@wgllp.com;golden.j
effreyi.b117954@notify.bestcase.com

Richard H Golubow on behalf of Creditor Debt Validation Fund II, LLC
rgolubow@wghlawyers.com, jmartinez@wghlawyers.com;svillegas@wghlawyers.com

Richard H Golubow on behalf of Creditor MC DVI Fund 1, LLC
rgolubow@wghlawyers.com, jmartinez@wghlawyers.com;svillegas@wghlawyers.com

Richard H Golubow on behalf of Creditor MC DVI Fund 2, LLC
rgolubow@wghlawyers.com, jmartinez@wghlawyers.com;svillegas@wghlawyers.com

D Edward Hays on behalf of Interested Party Courtesy NEF

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*          **F 9013-.1.PROOF.SERVICE**

ehays@marshackhays.com,
ehays@ecf.courtdrive.com;kfrederick@ecf.courtdrive.com;cmendoza@marshackhays.com;cmendoza
@ecf.courtdrive.com

D Edward Hays on behalf of Trustee Richard A Marshack (TR)
ehays@marshackhays.com,
ehays@ecf.courtdrive.com;kfrederick@ecf.courtdrive.com;cmendoza@marshackhays.com;cmendoza
@ecf.courtdrive.com

Alan Craig Hochheiser on behalf of Creditor City Capital NY
ahochheiser@mauricewutscher.com, arodriguez@mauricewutscher.com

Garrick A Hollander on behalf of Creditor Debt Validation Fund II, LLC
ghollander@wghlawyers.com, jmartinez@wghlawyers.com;svillegas@wghlawyers.com

Garrick A Hollander on behalf of Creditor MC DVI Fund 1, LLC
ghollander@wghlawyers.com, jmartinez@wghlawyers.com;svillegas@wghlawyers.com

Garrick A Hollander on behalf of Creditor MC DVI Fund 2, LLC
ghollander@wghlawyers.com, jmartinez@wghlawyers.com;svillegas@wghlawyers.com

Joon M Khang on behalf of Debtor The Litigation Practice Group P.C.
joon@khanglaw.com

Ira David Kharasch on behalf of Interested Party Ad Hoc Consumer Claimants Committee
ikharasch@pszjlaw.com

Ira David Kharasch on behalf of Interested Party Courtesy NEF
ikharasch@pszjlaw.com

Nicholas A Koffroth on behalf of Creditor Committee Committee of Unsecured Creditors
nkoffroth@foxrothschild.com, khoang@foxrothschild.com

David S Kupetz on behalf of Defendant Marich Bein, LLC
David.Kupetz@lockelord.com, mylene.ruiz@lockelord.com

David S Kupetz on behalf of Interested Party Courtesy NEF
David.Kupetz@lockelord.com, mylene.ruiz@lockelord.com

Christopher J Langley on behalf of Interested Party Courtesy NEF
chris@slclawoffice.com,
omar@slclawoffice.com;langleycr75251@notify.bestcase.com;ecf123@casedriver.com

Daniel A Lev on behalf of Interested Party Courtesy NEF
daniel.lev@gmlaw.com, cheryl.caldwell@gmlaw.com;dlev@ecf.courtdrive.com

Michael D Lieberman on behalf of Creditor Phillip A. Greenblatt, PLLC
mlieberman@lipsonneilson.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                        F 9013-.1.PROOF.SERVICE

Yosina M Lissebeck on behalf of Trustee Richard A Marshack (TR)
Yosina.Lissebeck@Dinsmore.com, caron.burke@dinsmore.com

Richard A Marshack (TR)
pkraus@marshackhays.com, rmarshack@iq7technology.com;ecf.alert+Marshack@titlexi.com

Laila Masud on behalf of Interested Party Courtesy NEF
lmasud@marshackhays.com, lmasud@ecf.courtdrive.com;kfrederick@ecf.courtdrive.com

Laila Masud on behalf of Interested Party Richard A. Marshack
lmasud@marshackhays.com, lmasud@ecf.courtdrive.com;kfrederick@ecf.courtdrive.com

Laila Masud on behalf of Plaintiff Richard Marshack
lmasud@marshackhays.com, lmasud@ecf.courtdrive.com;kfrederick@ecf.courtdrive.com

Laila Masud on behalf of Trustee Richard A Marshack (TR)
lmasud@marshackhays.com, lmasud@ecf.courtdrive.com;kfrederick@ecf.courtdrive.com

Kenneth Misken on behalf of U.S. Trustee United States Trustee (SA)
Kenneth.M.Misken@usdoj.gov

Byron Z Moldo on behalf of Interested Party Byron Moldo
bmoldo@ecjlaw.com, amatsuoka@ecjlaw.com,dperez@ecjlaw.com

Alan I Nahmias on behalf of Interested Party Courtesy NEF
anahmias@mbn.law, jdale@mbnlawyers.com

Victoria Newmark on behalf of Interested Party Courtesy NEF
vnewmark@pszjlaw.com

Queenie K Ng on behalf of U.S. Trustee United States Trustee (SA)
queenie.k.ng@usdoj.gov

Teri T Pham on behalf of Attorney Teri Pham
tpham@epglawyers.com, ttpassistant@epglawyers.com

Douglas A Plazak on behalf of Defendant Greyson Law Center PC
dplazak@rhlaw.com

Ronald N Richards on behalf of Defendant Consumer Legal Group, PC
ron@ronaldrichards.com, 7206828420@filings.docketbird.com

Ronald N Richards on behalf of Interested Party Courtesy NEF
ron@ronaldrichards.com, 7206828420@filings.docketbird.com

Gregory M Salvato on behalf of Interested Party Courtesy NEF

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                    **F 9013-.1.PROOF.SERVICE**

gsalvato@salvatoboufadel.com,
calendar@salvatolawoffices.com;jboufadel@salvatoboufadel.com;gsalvato@ecf.inforuptcy.com

Olivia Scott on behalf of Creditor Azzure Capital LLC
olivia.scott3@bclplaw.com

Olivia Scott on behalf of Creditor Hi Bar Capital LLC
olivia.scott3@bclplaw.com

Jonathan Serrano on behalf of Plaintiff Richard A. Marshack
jonathan.serrano@dinsmore.com

Jonathan Serrano on behalf of Trustee Richard A Marshack (TR)
jonathan.serrano@dinsmore.com

Paul R Shankman on behalf of Attorney Paul R. Shankman
PShankman@fortislaw.com, info@fortislaw.com

Paul R Shankman on behalf of Creditor United Partnerships, LLC
PShankman@fortislaw.com, info@fortislaw.com

Leslie Skorheim on behalf of U.S. Trustee United States Trustee (SA)
leslie.skorheim@usdoj.gov

Andrew Still on behalf of Interested Party Courtesy NEF
astill@swlaw.com, kcollins@swlaw.com

United States Trustee (SA)
ustpregion16.sa.ecf@usdoj.gov

Sharon Z. Weiss on behalf of Creditor Azzure Capital LLC
sharon.weiss@bclplaw.com, raul.morales@bclplaw.com,REC_KM_ECF_SMO@bclplaw.com

Sharon Z. Weiss on behalf of Creditor Hi Bar Capital LLC
sharon.weiss@bclplaw.com, raul.morales@bclplaw.com,REC_KM_ECF_SMO@bclplaw.com

Johnny White on behalf of Interested Party Courtesy NEF
JWhite@wrslawyers.com, jlee@wrslawyers.com;eweiman@wrslawyers.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                    **F 9013-.1.PROOF.SERVICE**