PETER C. ANDERSON
United States Trustee
Kenneth M. Misken (SBN 349167)
Assistant United States Trustee
Queenie K. Ng (SBN 223803)
Leslie A. Skorheim (SBN 293596)
Attorneys for the U.S. Trustee
Ronald Reagan Federal Building
411 West Fourth Street, Suite 7160
Santa Ana, CA  92701-8000
Tel: (714) 338-3403
Fax: (714) 338-3421
Email: queenie.k.ng@usdoj.gov

# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>THE LITIGATION PRACTICE GROUP, P.C.,<br><br><br><br>Debtor. | Case Number 8:23-bk-10571-SC<br><br>Chapter 11<br><br>NOTICE OF MOTION AND MOTION BY UNITED STATES TRUSTEE TO CONVERT CASE TO CHAPTER 7 PURSUANT TO 11 U.S.C. § 1112(b); MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF MARILYN SORENSEN, JAIMEE ZAYICEK, LESLIE SKORHEIM, AND QUEENIE NG IN SUPPORT THEREOF<br><br>DATE:    August 10, 2023<br>TIME:    10:00 a.m.<br>CTRM:    5C – Virtual[1]<br>         411 W. 4th Street<br>         Santa Ana, CA 92701 |

**TO THE HONORABLE SCOTT CLARKSON, UNITED STATES BANKRUPTCY JUDGE, DEBTOR, DEBTOR'S COUNSEL, CHAPTER 11 TRUSTEE, AND ALL PARTIES IN INTEREST:**

---

[1] Accessibility information will be posted into the Court's tentative ruling prior to the hearing. Parties can obtain such accessibility information on Judge Clarkson's posted hearing calendar which may be viewed online at: http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

NOTICE IS HEREBY GIVEN that on the above date and time and in the indicated courtroom, the United States Trustee for Region 16 (hereinafter "U.S. Trustee") will move and does hereby move this Court for an Order converting this case under 11 U.S.C. § 1112(b) and Local Bankruptcy Rule 9011-2 on the grounds set forth below.

If you wish to oppose this Motion, you must file a written response with the Bankruptcy Court and serve a copy of it upon the U.S. Trustee at the address set forth in the upper left-hand corner of this document and upon the Debtor no less than fourteen (14) days prior to the hearing above. If you fail to file a written response to this Motion within such time period, the Court may treat such failure as a waiver of your right to oppose the Motion and may grant the requested relief. *See* Local Bankruptcy Rule ("LBR") 9013(f) and (h).

This Motion is based on this notice, the attached Memorandum of Points and Authorities, the papers, pleadings, and files of record and such evidence as the Court might receive at the time of the hearing on this Motion.

Respectfully submitted,
PETER C. ANDERSON
UNITED STATES TRUSTEE

Dated: July 12, 2023

By:   */s/ Kenneth Misken*

Kenneth M. Misken
Assistant United States Trustee

# **Table of Contents**

I.   INTRODUCTION ...................................................................................8

II.  STATEMENT OF FACTS ......................................................................9

A.  The Bankruptcy Case ...........................................................................9

B.  Adversary Proceeding ........................................................................11

C.  LPG's Ownership and Management ...................................................11

D.  LPG's Business Structure ..................................................................13

E.  Legal Services Agreement with LPG and Proof of Claims Filed .................16

F.  Pre-petition Activity ..........................................................................20

G.  Consumer Complaints against LPG ...................................................21

H.  The Trustee's Actions ........................................................................22

III.  ARGUMENT ......................................................................................23

A.  The Court Should Not Countenance Continued Operation of an Illegal Business. .......23

B.  The Court has Cause to Convert this Case under 11 U.S.C. § 1112 ..............25

1.  Continued Operation and Sale of LPG's Debt Resolution Business in Any Form

Violates Federal and State Law ..................................................................26

The Telemarketing Sales Rule ...................................................................27

Credit Repair Organizations Act ("CROA") ...........................................27

California Business and Professions Code § 17200 .................................29

California Rules of Professional Responsibility ......................................30

Unconscionable Consumer Contracts .....................................................31

2.  Gross Mismanagement of the Estate is Cause to Convert ...................32

3.  Failure to File Monthly Operating Reports is Cause to Convert ...................33

4.  Failure to Maintain Adequate Insurance is Cause to Convert ...................34

C.  Conversion is the Appropriate Remedy and is in the Best Interest of Creditors and the

Estate ..........................................................................................................35

IV.  CONCLUSION ...................................................................................36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Arenas*,
  535 B.R. 845 (B.A.P. 10th Cir. 2015) (*Arenas II*)............................................. 24

*In re AVI, Inc.*,
  389 B.R. 721 (B.A.P. 9th Cir. 2008) ..................................................... 26

*Balboa Capital Corp. v. Shaya Medical P.C., Inc.*,
  623 F. Supp. 1059 (C.D. Cal. 2022) ..................................................... 31

*In re Basrah Custom Design, Inc.*,
  600 B.R. 368 (Bankr. E.D. Mich. 2019)................................................. 24

*Cal-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
  20 Cal. 4th 163 (1999) ....................................................................... 29

*In re Consolidated Pioneer Mortg. Entities*,
  248 B.R. 368 (B.A.P. 9th Cir. 2000) ..................................................... 25

*In re Cook Invs. NW, SPNWY, LLC*,
  No. 17-5516 BHS, 2017 WL 10716993 (W.D. Wash. Dec. 18, 2017) ............. 24

*De La Torre v. CashCall, Inc.*,
  5 Cal 5th 966 (2018) .......................................................................... 31

*In re Devers*,
  759 F.2d 751 (9th Cir. 1985) ............................................................... 32

*Epic Systems Corp. v. Lewis*,
  584 U.S. __, 138 S. Ct. 1612 (2018) (Thomas, J., concurring) ........................ 25

*Farmers Inc. Exch. v. Superior Ct.*,
  2 Cal. 4th 377 (1992) ......................................................................... 30

*Freeman v. Time, Inc.*,
  68 F.3d 285 (9th Cir. 1995) ................................................................. 29

*Garvin v. Cook Invs. NW, SPNWY, LLC*,
    922 F.3d 1031 (9th Cir. 2019) ................................................................ 24, 25

*Johnson v. Yellow Cab Transit Co.*,
    321 U.S. 383 (1944) ................................................................................. 23

*In re Johnson*,
    532 B.R. 53 (Bankr. W.D. Mich. 2015) ................................................. 24

*Lavie v. Procter & Gamble Co.*,
    105 Cal. App. 4th 496 (2003) ................................................................ 29

*In re Medpoint Management*,
    LLC. 528 B.R. 178 (Bankr. D. Ariz. 2015) ........................................... 33

*In re Mense*,
    509 B.R. 269 (Bankr. C.D. Cal. 2014) ................................................... 35

*In re Nelson*,
    343 B.R. 671 (B.A.P. 9th Cir. 2006) ................................................. 25, 26

*Pepper v. Litton*,
    308 U.S. 295 (1939) ................................................................................. 23

*Perdue v. Crocker National Bank*,
    38 Cal. 3d 913 (1985) ............................................................................. 31

*Polk v. Gontmakher*,
    2019 WL 4058970 (W.D. Wa. 2019) ..................................................... 25

*Rannis v. Recchia*,
    380 Fed. Appx. 646 (9th Cir. 2010) ....................................................... 27

*In re Rent-Rite Super Kegs W. Ltd.*,
    484 B.R. 799 (Bankr. D. Colo. 2012) ............................................... 23, 33

*Sanchez v. Valencia Holding Co., LLC*,
    61 Cal. 4th 899 (2015) ............................................................................ 31

*In re Sanders*,
    2013 WL 1490971 (B.A.P. 9th Cir. Apr. 11, 2013) .............................. 26

*Sender v. Simon*,
    84 F.3d 1299 (10th Cir. 1996) ......................................................... 23, 29

*Sonic-Calabasas A, Inc. v. Moreno*,
　57 Cal. 4th 1109 (2013) ................................................... 31

*Stout v. FreeScore, LLC*,
　743 F.3d 680 (9th Cir. 2014) ............................................. 27

*Tri-Q v. Sta-Hi Corp.*,
　63 Cal. 2d 199 (1965) ..................................................... 24

*United States v. Acme Process Equipment Co.*,
　385 U.S. 138 (1966)........................................................ 25

*In re Van Eck*,
　425 B.R. 54 (Bankr. D. Conn. 2010) .................................... 34

*In re Way to Grow*,
　610 B.R. 338 (D. Colo. 2019).............................................. 24

*Yvanova v. New Century Mortg. Corp.*,
　62 Cal. 4th 919, 365 P.3d 845 (2016) ................................... 29

**Statutes**

11 U.S.C. § 322(a)............................................................. 33

11 U.S.C. § 341(a)..............................................................9

*11 U.S.C. § 542* .............................................................. 11

11 U.S.C. § 1112 .............................................................. 25

11 U.S.C. § 1112(b)(1).................................................... 25, 26

11 U.S.C. § 1112(b)(2)........................................................ 26

11 U.S.C. § 1112(b)(4)(B) .................................................... 32

12 U.S.C. §§ 5531 and 5536 ................................................. 27

15 U.S.C. § 1679a(3)(A)(i-ii) ................................................ 27

15 U.S.C. § 1679b(b) ......................................................... 28

15 U.S.C. §§ 1679c(a)-(b) .................................................... 28

15 U.S.C. § 1679e ................................................................. 28

15 U.S.C § 1679f(c) .............................................................. 29

Cal. Civ. Code § 1670.5 ......................................................... 31

California Business and Professions Code § 17200 ................................... 27, 29, 30

Controlled Substances Act ....................................................... 24

Credit Repair Reorganization Act, 15 U.S.C. § 1679 et seq...................... 18, 26, 27

Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §
    6101 et seq. .............................................................. 27

## Other Authorities

16 C.F.R. § 310 et seq. ......................................................... 27

16 C.F.R. §§ 310.3 and 310.4 .................................................... 27

16 C.F.R. § 310.4(a)(2) ......................................................... 27

*7 Collier On Bankruptcy* ¶ 1112.05[2]........................................... 26

*7 Collier on Bankruptcy* ¶ 1112.07 (16th ed. 2018) ............................. 23

CA Rule of Professional Responsibility 1.5 ....................................... 30

CA Rule of Professional Responsibilty 5.4 ........................................ 30

Local Bankruptcy Rule 2015-2(a)................................................. 33

Local Bankruptcy Rule 9011-2 ....................................................2

McNichols, *The New Highwayman: Enforcement of U.S. Patents on Cannabis
    Products*, 101 J. Pat. & Trademark Off. Soc'y 24, 46 (2019) ................... 25

Rest.2d Contracts, § 7 .......................................................... 29

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

### I. INTRODUCTION

The Litigation Practice Group P.C. ("LPG") filed this chapter 11 petition on March 20, 2023. LPG held itself out as an attorney-model, debt relief service provider; however, it was an illegal debt invalidation scam. The U.S. Trustee initially requested appointment of a chapter 11 trustee early in the case to pursue improper prepetition transfers and thereafter appointed Richard Marshack as chapter 11 Trustee ("Trustee"). But the Trustee has, instead, continued operation of LPG's consumer debt resolution business and now seeks to sell the customer accounts and accompanying income streams despite numerous red flags reflecting that the business operations were illegal and despite significant concerns about protecting the privacy interests of consumers who would be affected by the contemplated sale. The Court should not countenance this use of chapter 11, and, accordingly, the U.S. Trustee requests the Court to convert this case to one under chapter 7 pursuant to 11 U.S.C. § 1112(b). Cause to convert this case exists because: (1) the continued operations and sale of LPG's debt validation business likely violates federal and state law; (2) there is continued gross mismanagement of the estate; (3) the Trustee has failed to file monthly operating reports and has not provided a detailed accounting of the money borrowed post-petition; and (4) adequate insurance has not been maintained.

Conversion to chapter 7 would immediately stop the harm caused by continued operation of LPG's business. LPG should stop operating, ACH withdrawals should stop, all ACH funds that have been withdrawn should be returned to consumers, and all executory consumer contracts should be rejected as they are unconscionable and should not be enforced. Conversion will allow a chapter 7 trustee to return any illegally collected funds to consumers, advise consumers of the options they have available to seek alternative assistance, and pursue any preference actions, fraudulent transfers, and collection or turnover of estate assets. Shutting down LPG and converting this case to chapter 7 is in the best interest of the estate and, most importantly, consumers.

## II. STATEMENT OF FACTS

### A.    The Bankruptcy Case

1.    On March 20, 2023, LPG filed a voluntary chapter 11 petition in the United States Bankruptcy Court for the Central District of California [Bankr. Dkt. #1].

2.    On March 30, 2023, the U.S. Trustee filed a Motion to Dismiss or Convert the Case pursuant to 11 U.S.C. § 1112(b) [Bank. Dkt. #21].

3.    On April 4, 2023, LPG filed its bankruptcy schedules [Bankr. Dkt. #33] and its statement of financial affairs [Bankr. Dkt. #34].

4.    The meeting of creditors pursuant to 11 U.S.C. § 341(a) ("341(a) Meeting") was noticed for April 24, 2023 [Bank. Dkt. #11] but was conducted by the U.S. Trustee on May 2, 2023.

5.    On May 4, 2023, the Court granted the U.S. Trustee's § 1112(b) motion and entered an Order Directing U.S. Trustee to Appoint a Chapter 11 Trustee [Bankr. Dkt. #58].

6.    On May 8, 2023, the Court entered an Order Approving the U.S. Trustee's Application for the Appointment of a Chapter 11 Trustee.  Richard Marshack was appointed as the chapter 11 Trustee in this case [Bankr. Dkt. #65].

7.    On June 15, 2023, the Trustee filed a Declaration of Trustee in Lieu of filing Monthly Operating Reports ("MORs") for April and May 2023 [Bankr. Dkt. #112].  To date, the MORs for April and May have not been filed.  The Trustee filed a similar declaration for the MOR for June 2023 [Bankr. Dkt. #184].

8.    On June 16, 2023, the Trustee filed an emergency motion seeking authorization to incur post-petition financing ("Motion for Post-Petition Financing") [Bankr. Dkt. #119], which was set for hearing on June 20, 2023.

9.    Following the hearing, on June 22, 2023, the Court entered an interim order granting the Motion for Post-Petition Financing ("Interim Order for Post-Petition

Financing") [Bankr. Dkt. #131], thereby granting the Motion for Post-Petition Financing on an interim basis.

10.     On June 23, 2023, the U.S. Trustee appointed an official committee of unsecured creditors [Bankr. Dkt. #134].  On June 29, 2023, the U.S. Trustee filed an amended notice of appointment of official committee of unsecured creditors [Bankr. Dkt. #157].  As a result, the Trustee withdrew his previously filed motion for authority to reimburse an ad hoc committee of consumer creditors' fees and expenses [Bankr. Dkts. #102 and 149].

11.     On June 29, 2023, the Trustee filed an Ex-Parte Notice of Non-Material Modification to Promissory Note with Additional Lender as Part of Previously Approved Post-Petition Financing and Request for Approval of Same ("Modification Notice of Post-Petition Financing") [Bankr. Dkt. #156].  Finding good cause to do so, the Court set a hearing on the Modification Notice of Post-Petition Financing for June 30, 2023 [Bankr. Dkt. #158].

12.     At the hearing on June 30, 2023, the Court expressed various concerns with how this case was progressing but ultimately granted the requested modification by the order entered on July 3, 2023 [Bankr Dkt. #168].  A final hearing on the Motion for Post-Petition Financing and Modification Notice of Post-Petition Financing is set for August 10, 2023.

13.     On July 6, 2023, the Trustee filed (1) a Motion for Order Approving Stipulation with Phoenix Law, PC ("Phoenix 9019 Motion") [Bankr. Dkt. #176] and (2) a Motion for Order Approving Stipulation with Consumer Legal Group, PC et. al. ("CLG 9019 Motion") [Bankr. Dkt. #178].  The Trustee has requested that both 9019 Motions be set on shortened notice, with a proposed hearing date of July 11, 2023, even though the Trustee had a fully signed settlement agreement with Phoenix on June 27, 2023, and a fully signed settlement agreement with CLG on June 30, 2023 [Bankr. Dkt. #177 & 179].  The Trustee has created his "emergency."  The U.S. Trustee opposes both motions.

14.    On July 7, 2023, the Trustee filed a Motion to Approve Management Agreement with Resolution Processing ("Management Agreement Motion") [Bankr. Dkt. #188], which is set for hearing on August 10, 2023.

15.    Also on July 7, 2023, the Trustee filed a motion for sale of property of the estate pursuant to section 363(b) ("Sale Motion") [Bankr. Dkt. #191].  The Trustee has requested that it be set on shortened notice, with a proposed hearing date of July 14, 2023. The U.S. Trustee opposes the Sale Motion.

### B.    Adversary Proceeding

16.    On May 25, 2023, the Trustee initiated an adversary proceeding, *Marshack v. Diab et al.* (Adv. No. 8:23-ap-1046-SC), against LPG's alter egos, fraudulent transferees, and other related parties [Adv. Dkt. #1] (hereinafter "Complaint").

17.    On May 26, 2023, the Court entered the *Amended Order on Trustee, Richard Marshack's Omnibus Emergency Motion for: (1) Turnover of Estate Property and Recorded Information Pursuant to 11 U.S.C. § 542; (2) Preliminary Injunction; (3) Lock-Out; (4) Re-Direction of United States Parcel Services Mail; (5) Order to Show Cause re Compliance with Court Order; (6) Other Relief as Necessary to Efficient Administration of This Matter* [Adv. Dkt. # 21] (the "TRO"), authorizing turnover of estate property and recorded information, lock-out, and an order to show cause regarding compliance with court order, among other relief [Adv. Dkt. #21].

18.    On June 12, 2023, the Court held a hearing regarding a preliminary injunction. The Court granted a preliminary injunction, thereby extending the TRO with certain modifications [Adv. Dkt. #50].

19.    On June 15, 2023, the Trustee filed an amended complaint to add additional defendants [Adv. Dkt. #62].

### C.    LPG's Ownership and Management

20.    Tony Diab ("Diab") is a disbarred attorney.  He was disbarred in Nevada in January 2019 and, around the same time, was put on "involuntary inactive status" by the

State Bar of California. He was subsequently disbarred in California in January 2020. *See* Declaration of Marilyn Sorensen ("Sorensen Decl."), Ex. 2, Transcript of 341(a) Meeting held on May 2, 2023 ("341(a) Transcript"), pg. 247-48.[2]  Diab was disbarred in both Nevada and California for, among other things, the misappropriation of client settlement funds and the forging of a judge's signature. *See* Declaration of Queenie Ng ("Ng Decl."), ¶ 5, Ex. 12.

21.    Despite his disbarment, Mr. Diab formed LPG on February 22, 2019, a mere 12 days after he was put on involuntary active status in California. Diab concedes that LPG was formed to take over all client files that were being handled by his sole proprietorship, Diab Law. *See* Sorensen Decl., Ex. 2, pg. 80, 249-50; *see also* Declaration of Leslie Skorheim ("Skorheim Decl."), Ex. 9, Transcript of Preliminary Injunction Hearing held on June 12, 2023 ("June 12th Hearing Transcript"), pg. 480.

22.    The original purported shareholder of LPG was John Thompson ("Thompson"), who agreed to launch LPG primarily to handle the cases from Diab Law. All cases were moved from Diab Law to LPG in February 2019. *See* Sorensen Decl., Ex. 2, at pg. 80, 249-50.

23.    Then, sometime in November 2019, Thompson's interest in LPG was transferred to Daniel March ("March"), who has been the purported sole shareholder and officer ever since. *Id.*, at pg. 80, 90-91.

24.    March did not pay for the shares of LPG; rather, Thompson transferred his interest in exchange for a release of liability. *Id.*, at pg. 80. According to Diab, Thompson was concerned with the way LPG compensated the marketing companies as he viewed it as violating the "fee sharing ban between lawyers and non-lawyers." *Id.*, at pg. 192. This concern caused Thompson to resign as counsel and shareholder of LPG, being replaced by March. *Id.*, at pg. 80, 192.

---

[2] All page references herein refer to the bate stamped page number located in the bottom right conner of all exhibits.

25.     Despite being disbarred, Diab has controlled and operated LPG since its inception.  Although he has no official title, Diab confirmed he managed LPG's relationships with third parties, including marketing affiliates, credit vendors, payment processors, call centers, and investors.  *Id.*, at pg. 82; Skorheim Decl., Ex. 9, pg. 477.  Diab also admitted that in June 2021 he took over the function as acting CFO and had control over the ACH payments drawn from consumers, including when the draws are made, where the money is deposited, and how the money is used by LPG.  *See* Skorheim Decl., Ex. 9, pg. 479-482.  Diab was also involved in the decision for LPG to file for bankruptcy and, prior to filing, negotiated agreements with other law firms to transfer its client files. *Id.*, at pg. 472, 478.

26.     Diab further conceded to limiting the visibility of his involvement in LPG because of his background.  *See* Sorensen Decl., Ex. 2, pg. 87 (speaking in the third person, Diab testified at the 341(a) Hearing that he "actually tried to limit the number of times that LPG interacted with Tony as an individual, and that was just the optics of it in terms of managing relationships with those who were concerned about my background…").

## D.    LPG's Business Structure

27.     LPG holds itself out as a law firm that provides consumer debt resolution. LPG services more than 50,000 customers across the United States, with annual revenue estimated to total $155,000,000 in 2022.  *See* Sorensen Decl., Ex. 1, Statement of Financial Affairs ("SOFA") #1, pg. 46; *see also* Sorensen Decl., Ex. 2, pg. 109,146.

28.     LPG aimed to assist individuals in connection with disputes against their creditors in essentially two ways: (1) debt invalidation or pre-litigation negotiation or both and (2) defending against collection actions.  *See* Skorheim Decl., Ex. 9, pg. 455-58.  But only 8-9% of the consumers actually reached litigation at which time LPG would assign counsel.  *Id.*, at pg. 457.  For all other cases, LPG nonlawyer employees would merely send a representation letter to all creditors enrolled in the program by the client contesting the

debt without conducting any legal analysis on whether the client had any defenses.  *Id*., at pg. 456.

29.    Historically, LPG had a business partner called BAT, Inc., dba Coast Processing ("Coast Processing"), which was owed by Brian Reale, Arash Asante Bayrooti, and Diab.  Coast Processing was the primary entity through which LPG ran its client development operations.  In June 2021, Coast Processing ceased operations and all work previously performed by it was assumed by LPG.  *See* Sorensen Decl., Ex. 2, pg. 81, 193-94.

30.    LPG used "marketing affiliates" to locate and onboard new consumers for LPG.  *Id.*, at pg. 220-21; *see also* Skorheim Decl., Ex. 9, pg. 490.  At the 341(a) Meeting, Diab explained that over the years LPG used more than 100 different marketing affiliates.[3]

31.    These marketing affiliates would run campaigns and market the services provided by LPG, locating potential consumers clients.  *See* Sorensen Decl., Ex. 2, pg. 220-21; *see also* Ng Decl., Ex. 11, pg. 536, 551 (BBB complaint explains that the consumer received marketing materials in the mail or via social media).

32.    The full process for onboarding new consumers used by these marketing affiliates consisted of finding potential consumers, selling LPG's program to these consumers, signing up and enrolling these consumers with LPG, making follow up calls to these consumers, and acting as a customer service representative.  *See* Sorensen Decl., Ex. 2, pg. 220-23.  In fact, Diab admits that these marketing affiliates were contractors of LPG with access to its customer records management system and were generating and sending the attorney services agreement to consumers for e-signature.  *Id.*, at pg. 222-23.

33.    To determine whether to sign up a new client, these marketing affiliates often pulled the client's credit report, vetted the account to ensure that only unsecured debt was

---

[3] Diab confirmed that the following entities were included in the various marketing affiliates used by LPG: (1) All Service Financial; (2) GoFi, LLC; (3) Paragon Financial, LLC; (4) Integrity Docs, LLC; and (5) Vercy, LLC.  *See generally* Sorensen Decl., Ex. 2, pg. 223-26.  The U.S. Trustee has requested a list from the Trustee of all marketing affiliates used by LPG, but has yet to receive it.

enrolled, and confirmed that the consumer had sufficient income to pay the monthly fee. *See* Skorheim Decl., Ex. 9, pg. 455-56; *see generally* Ng Decl., Ex. 10 (LPG Sales & Educatioal Script).

34.    Once enrolled, LPG would send standard form letters on behalf of all consumer clients without any regard to the fact and circumstances of each consumer's situation.  These standard form letters were boilerplate requests to cease and desist communications with the consumer, as well as generic notices to creditors and the credit bureaus disputing the consumers debts.  *See* Sorensen Decl., Ex. 8 (POC #82); *see also* Ng Decl., Ex. 11, pg. 548-50, 554 (According to the BBB complaints, LPG would send "cease and desist" letters to the consumer's creditors and the credit bureaus); *see also* Skorheim Decl., Ex. 9, pg. 456 ("… we would send out representation letters to all the creditors …"). These letters were routinely sent by non-attorney employees of LPG and were generally the only action, if any, taken by LPG.  *See generally* Ng Decl., Ex. 11 (BBB complaints); *see also* Skorheim Decl., Ex. 9, pg. 456-57 (most of the LPG employees were used for sending out these form letters and communicating with consumers, only 8-9% would reach litigation, and at that point, LPG would assign counsel).

35.    Initially, LPG used a client records management system called Debt Pay Pro ("DPP").  DPP was a cloud-based network system that housed all data regarding LPG consumer clients (case file, personal data, credit reports, payment information, correspondence, etc.), tracked payment information, and automated the dispute process. *See* Sorensen Decl., Ex. 2, pg. 206.  Diab confirmed that LPG stopped using DPP just before filing the bankruptcy petition and does not have access to its prior system.  *Id.*, at pg. 207.  Thereafter, it is the U.S. Trustee's understanding that LPG started using a system called Luna which does not contain any historical information of LPG or its consumer clients.

36.    Consumers paid fees to LPG over time through monthly debits from their bank accounts, averaging anywhere from 24-36 months but could be as long as 72 months.  *Id.*,

at pg. 110; *see also* Skorheim Decl., Ex. 9, pg. 451-52.  These monthly payments were never intended to service any of the client's debt, but rather pay LPG for its services.  *See* Skorheim Decl., Ex. 9, pg. 452.   The amount of a client's monthly payment was a percentage of the amount of debt enrolled in the program with LPG.  *Id*.  LPG and the Trustee assert that consumers were charged around 40%, but the proof of claims filed show that consumers were charged as high as 62% of the amount of debt enrolled with LPG.  *See* Sorensen Decl., Ex. 3 (POC #31).

37.    These monthly debits were collected by payment processors[4] and then remitted to LPG.  *See* Sorensen Decl., Ex. 2, pg. 110-111.

38.    LPG shared the fees with the marketing affiliates for their services by paying them either a flat fee, a percentage of the debt that is enrolled, or a portion of the revenue stream LPG earns in the debt resolution process.  *Id.*, at pg. 223; *see* Skorheim Decl., Ex. 9, pg. 493 (ACH fee collected from consumer is LPG's revenue and is used to compensate the marketing affiliates).

39.    Because LPG and its marketing affiliates received only incremental payments over time, they would sell the future cash flow or receivables on account of LPG's client files to factoring companies.  *See* Sorensen Decl., Ex. 2, pg. 220.

### E.    Legal Services Agreement with LPG and Proof of Claims Filed

40.    As noted previously, LPG's marketing affiliates would generate and send the Legal Services Agreement to consumers for e-signature.  *See* Sorensen Decl., Ex. 2, pg. 222-23.  The marketing affiliates were not attorneys, yet they would explain the provisions of the Legal Services Agreement to the consumers.  *See generally* Ng Decl., Ex. 10, pg. 525-26.

---

[4] At the 341(a) Meeting, Diab testified that over the course of LPG's history (Feb. 2019 to present) it has used no less than a dozen different payment process companies.  In the 2022-23 timeframe, LPG was using World Global, EPPS, EquiPay, and Merits Fund.  *See* Sorensen Decl., Ex. 2, pg. 111-112.

41.    LPG's Legal Service Agreement contains various provisions that are unfavorable to the consumer.  For example, the Legal Service Agreement contains an earned upon receipt provision stating that the cost of legal services is a monthly fee paid to LPG which "is earned the moment it is transmitted to LPG."  *See e.g.*, Sorensen Decl., Ex. 3 (POC #31), pg. 280.  These monthly fees were unconscionably high, consisting of anywhere from 40-60% of the debt enrolled by the consumer.  *See* Sorensen Decl., Ex. 3 (POC #31 – 62%); Ex. 4 (POC #40 – 39%); Ex. 5 (POC #50 – 43%); Ex. 6 (POC #51 – 51%); Ex. 7 (POC #53 – 46%); Ex. 8 (POC #82 – 52%).

42.    The Legal Services Agreement also requires the consumers to authorize LPG to act under power of attorney, being able to "affix [the consumers] signature to documents sent on your behalf in relation to the matters addressed herein."  *See e.g.*, Sorensen Decl., Ex. 3 (POC #31), pg. 281.

43.    Even though the monthly fee is described as the cost for legal services, the Legal Services Agreement included a term that "if legal fees are recovered from an adverse party, LPG will retain such fees for its services."  *See e.g.*, Sorensen Decl., Ex. 3 (POC #31), pg. 280.  The consumers were also responsible for any damages resulting from lawsuits or any settlements reached in course of such lawsuits.  *Id.*

44.    The Legal Services Agreement also required the consumer to acknowledge that "LPG has not instructed [them] to breach any contract, fail to make any required payment, or fail to perform any obligation you have lawfully incurred."  *See* Sorensen Decl., Ex. 3 (POC #31), pg. 281.  Yet, when onboarding consumers, the marketing affiliates encouraged them to stop making payments on their debt and described this term as an acknowledgment that they "are making the decision to stop payments to creditors voluntarily."  *See* Ng Decl., Ex. 10 (LPG Sales Script), pg. 526.

45.    The vast majority of proofs of claim ("POC") filed in this case are by consumers who contracted for LPG's services. *See generally* Claims Register.  The amount of these claims range from around $2,000 up to $50,000, the median being about $7,000.

Several of these consumers attach the Legal Services Agreement they entered into with LPG to their POC.  To highlight a few:

    a.  POC # 31 was filed by Debra Price in the amount of $50,000 for "actual and statutory damages including legal fees and costs."  *See* Sorensen Decl., Ex. 3.  It attaches the legal services agreement with LPG indicating that Ms. Price enrolled $15,185 of debt and was to pay $260.10 per month for 36 months, totaling $9,363.68.  These monthly payments were to be made from February 26, 2021, to January 26, 2024, and equaled 62% of the total debt enrolled.  Also attached to POC #31, Ms. Price includes the complaint she filed in the United States District Court, Middle District of Pennsylvania against LPG, et al., alleging various violations of the Credit Repair Reorganization Act, 15 U.S.C. § 1679 et seq.  *Id*.

    b.  POC # 40 was filed by Arven Allen Knight in the amount of $5,500 stating that "LPG was to help settle debt and did not satisfy the agreement."  *See* Sorensen Dec., Ex. 4.  It attaches the legal services agreement with LPG indicating that Mr. Knight enrolled $14,628 of debt and was to pay $257.61 per month for 22 months, totaling $5,667.36.  These monthly payments were to be made from August 24, 2021, to May 30, 2023, and equaled 39% of the total debt enrolled.  Also attached to POC # 40 is documentation showing the unauthorized transfer of Mr. Knight's client file to Consumer Legal Group, as well as his request to cancel his contract and obtain a full refund of fees paid.  *Id.*

    c.  POC # 50 was filed by Abigail Beaudin in the amount of $19,017.60 for "fraudulent legal services by a disbarred, misrepresenting attorney and debt settlement scam program."  *See* Sorensen Decl., Ex. 5.  It attaches the legal services agreement with LPG indicating that Ms. Beaudin enrolled $33,113 of debt and was to pay $197.46 per month for 72 months, totaling

$14,216.97.  These monthly payments were to be made from November 16, 2020, to November 1, 2023, and equaled 43% of the total debt enrolled.  *Id*.

d.  POC # 51 was filed by Hunter Hastings in the amount of $10,021.56 for "services rendered for debt validation; services were incomplete."  *See* Sorensen Decl., Ex. 6.  It attaches the legal services agreement with LPG indicating that Mr. Hastings enrolled $20,660 of debt and was to pay $217.86 per month for 48 months, totaling $10,457.12.  These monthly payments were to be made from March 12, 2021, to December 30, 2022, and equaled 51% of the total debt enrolled.  Also attached to POC #51 are the various notifications that Mr. Hastings received about his client file being transferred to Phoenix.  *Id*.

e.  POC # 53 was filed by Debra M. Archambault in the amount of $10,295 for "debt solutions, never rendered according to contract with LPG/theft of personal funds."  *See* Sorensen Decl., Ex. 7.  It attaches the legal services agreement with LPG indicating that Ms. Archambault enrolled $53,658 of debt and was to pay $857.92 per month for 28 months, totaling $24,879.72.  The monthly payments were to be made from September 27, 2021, to December 26, 2023, and equaled 46% of the total debt enrolled.  Also attached to POC #53, Ms. Archambault provides documentation regarding the complaint she submitted to the Better Business Bureau "due to their fraudulent activities and misrepresenting the purpose of the debt resolution program" and states that $10,295.04 was withdrawn from her checking account.  *Id*.

f.  POC # 82 was filed by Carolyn Beech as a class proof of claim for an unliquidated amount based on "money illegally obtained."  *See* Sorensen Decl., Ex. 8.  It attaches the legal services agreement Ms. Beech entered into with LPG indicating that $12,650.44 of debt was enrolled and that she

was to pay $296.95 per month for 24 months, totaling $7,126.19. The monthly payments were made from December 20, 2022, to November 20, 2023, and equaled 56% of the total debt enrolled. POC # 82 also attaches the various allegations and supporting documentation that are substantially the same as those filed in a class action lawsuit in the Southern District of Mississippi (Case No. 1:22cv57-HSO-BWR) against LPG and related entities and individuals.

## F.    Pre-petition Activity

46.    In or around February and March 2023, LPG transferred substantially all of the consumer files to three other law firms: Oakstone Law Group, PC ("Oakstone"); Consumer Legal Group, PC ("CLG"); and Phoenix Law, PC ("Phoenix"). *See* Sorensen Decl., Ex. 2, pg. 109, 115. The Trustee alleges in his Complaint that Oakstone, CLG, and Phoenix are the alter egos of LPG [Adv. Dkt. #1].

47.    Diab testified at the 341(a) Meeting that approximately 15,000 files were transferred to Oakstone,[5] about 12,000 files were transferred to CLG, and the remainder were transferred to Phoenix, totaling about 40,000 files. *See* Sorensen Decl., Ex. 2, pg. 115. From these transfers, Diab confirmed that LPG was entitled to receive a percentage of the revenue stream generated by these files (i.e., 20% referral agreement with Oakstone, 20% referral agreement with Phoenix, and 40% referral agreement with CLG). *Id.*, at pg. 119.

48.    LPG did not obtain written consent from the consumers prior to transferring their files to these other law firms, claiming that the terms of the legal services agreement gave LPG the right to transfer the files to other attorneys to provide services.[6] *Id.*, at pg.

---

[5] Oakstone eventually closed post-petition (April-May 2023) and the prior LPG client files were then transferred to Phoenix Law. *See* Skorheim Decl., Ex. 9, pg. 484.

[6] The provision in the Legal Services Agreement cited by LPG states: "You further understand and agree that you have sought the representation of LPG with full knowledge of its location and licensing, and that LPG works with attorney's licensed in all 50 states and the District of Columbia as affiliated counsel to allow LPG to provide a

136-37; *see also* Skorheim Decl., Ex. 9, pg. 472-73. Although required by law, LPG did not obtain client authorization to transfer their physical file and personal information to another law firm. *See* Skorheim Decl., Ex. 9, pg. 473-74. Nonetheless, all payments remained the same and the only operative contract was with LPG. *See* Sorensen Decl., Ex. 2, pg. 141.

### G.    Consumer Complaints against LPG

49.    As admitted by LPG in its response to SOFA # 7, there have been several complaints filed against LPG in various state and district courts across the country. *See* Sorensen Decl., Ex. 1 (SOFA), pg. 60-64; *see also* Declaration of Jaimee Zayicek ("Zayicek Decl."), ¶¶ 3-12, Ex. 13-21.

50.    LPG also lists several creditors on Schedule E/F with the designation "Pending Litigation – SOFA #7." *See* Sorensen Decl., Ex. 1 (Schedule E/F), pg. 19-43; Zayicek Decl., ¶¶ 13-18, Exs. 22-26.

51.    Based on the U.S. Trustee's investigation, there is one additional complaint filed against LPG not listed in its SOFA or Schedule E/F. *See* Zayicek Decl., ¶ 19, Ex. 27.

52.    These complaints were generally filed by consumers against LPG alleging violations of the Telephone Consumer Protection Act and Credit Repair Organization Act. *See generally*, Zayicek Decl., Exs. 13-27.

53.    Additionally, the U.S. Trustee received approximately 1,240 complaints submitted to the Better Business Bureau ("BBB") against LPG. *See* Ng Decl., ¶ 4. The theme of these complaints is that consumers paid thousands of dollars to LPG but received no benefit. They were unable to communicate with anyone at LPG, and its affiliated

---

complete representation of you in any state in which you are sued or in which a dispute may arise. You have the right to know the licensed attorney with whom LPG has affiliated in any state and at any time but understand and agree that LPG may choose to change the local attorney with whom it is affiliated in any jurisdiction…" *See* Sorensen Decl., Ex. 8 (POC #82); *see also* Skorheim Decl., Ex. 9, pg. 474-75. This provision does not provide LPG authority to transfer the consumer's file to a new law firm and does not alleviate LPG from obtaining the consumer's consent to do so. Moreover, there were several variations of the Legal Service Agreement used by LPG and not all of them include this provision. *See e.g.,* Sorensen Decl., Ex. 3 (POC #31) & Ex. 4 (POC #40).

counsel, and saw no improvement to their credit or outstanding debt.  These consumers are generally requesting a full refund of fees paid to LPG.  *See generally*, Ng Decl., Ex. 11.

## H.    The Trustee's Actions

54.    The Trustee was appointed by the U.S. Trustee to pursue improper pre-petition transfers, not to operate what may be an illegal business and then sell it with no proposed privacy protections in place for consumers and no notice or opportunity for meaningful input from those most directly impacted by the sale, the consumers.  The Trustee has now operated LPG for more than 60 days and continues to borrow money post-petition to fund ongoing operations.

55.    The Trustee has acknowledged the potential risk that the debtor's underlying business model is unlawful.  Despite the U.S. Trustee's request to stop all ACH withdrawals, the Trustee continues to collect them.  Nevertheless, the Trustee did at least agree to segregate those funds, rather than use them to fund the debtor's ongoing operations.  But mere segregation of these funds does not make it acceptable to continue collecting them if unlawful.  The Trustee has collected approximately $5 million from consumers and expects to receive $1 million per month going forward.  *See* Trustee's Status Report, Bankr. Dkt. #172.

56.    The Trustee has narrowly focused his efforts on selling LPG's consumer contracts, when he should have focused on definitively determining whether LPG was lawfully entitled to make the ACH withdrawals and whether LPG could to use those funds prior to any meaningful services having been provided to consumers.  Instead, the harm to consumers continues to mount each day that the Trustee continues collecting consumer payments rather than liquidating preferences and fraudulent conveyances for the benefit of creditors and the estate.

57.    Moreover, the Trustee's compromise motion with CLG contemplates allowing an entity, that the Trustee has accused of receiving a fraudulent transfer of consumer accounts, to retain those accounts and assume the ACH pulls from consumers (who likely

had no knowledge and provided no consent to the transfer of their accounts, much less their personally identifiable information).  In exchange, CLG is to be trusted with providing the services that customers retained LPG to provide, while CLG remits 40% of the proceeds from its ACH pulls to the estate.  These funds belong to the consumers and should be returned directly to them rather than paid to the estate.

## III.    ARGUMENT

### A.    The Court Should Not Countenance Continued Operation of an Illegal Business.

The Court should not permit the Trustee to continue operating LPG's consumer debt resolution business because its source of income is based on the Legal Services Agreements, which are illegal under federal and state laws.

Bankruptcy proceedings are "inherently proceedings in equity."  *Pepper v. Litton*, 308 U.S. 295, 304-05 (1939).  A court in equity ordinarily should not "lend its judicial power to a plaintiff who seeks to invoke that power for the purpose of consummating a transaction in clear violation of law."  *See Johnson v. Yellow Cab Transit Co.*, 321 U.S. 383, 387 (1944); 7 *Collier on Bankruptcy* ¶ 1112.07 (16th ed. 2018) ("[A]s a general rule, equitable remedies are not available to any party who fails to act in an equitable fashion."). "The Court's power to adjust the debtor-creditor relationship . . .  goes to the essence of the Court's equitable jurisdiction and requires the Court to look to equitable factors to determine the propriety of the Debtor's filing."  *In re Rent-Rite Super Kegs W. Ltd.*, 484 B.R. 799, 806 (Bankr. D. Colo. 2012) (dismissing chapter 11 case of debtor who leased commercial space to a marijuana grow operation).

Courts cannot aid in enforcing an agreement that was fraudulently procured in the furtherance of illegal purposes.  *See Sender v. Simon*, 84 F.3d 1299, 1307 (10th Cir. 1996). Courts generally will not enforce an illegal contract based upon "the elementary principle that one who has himself participated in a violation of law cannot be permitted to assert in a court of justice any right founded upon or growing out of the illegal transaction."  *Sender v.*

*Simon*, 84 F.3d at 1307 (*quoting Merrill v. Abbott (In re Independent Clearing House Co.)*, 77 B.R. 843, 857 (D. Utah 1987)); *see also Tri-Q v. Sta-Hi Corp.,* 63 Cal. 2d 199, 218-19 (1965).

In an analogous situation, Courts have repeatedly cautioned against bankruptcy courts' undue entanglement and promotion of conduct violating federal drug laws. For example, in the *Way to Grow* case, the Colorado District Court affirmed the bankruptcy court's dismissal of a debtors' bankruptcy case because of the debtors' involvement in the illegal marijuana trade. The District Court summarized that it "is frankly inconceivable that Congress could have ever intended that federal judicial officials could, in the course of adjudicating disputes under the Bankruptcy Code, approve a reorganization plan that relies on violations of federal criminal law." *In re Way to Grow*, 610 B.R. 338, 346 (D. Colo. 2019). Similarly, the bankruptcy court in *Johnson* cautioned that "federal judicial officers take an oath to uphold federal law and countenancing the Debtor's continued operations of his marijuana business under the court's protection is hardly consistent with that oath." *In re Johnson*, 532 B.R. 53, 56 (Bankr. W.D. Mich. 2015). The Tenth Circuit BAP in *Arenas* has also highlighted judges' oaths to uphold federal law. *In re Arenas*, 535 B.R. 845, 854 (B.A.P. 10th Cir. 2015) (*Arenas II*). And the bankruptcy court in *Basrah Custom Design* stated that "a federal court cannot be asked to enforce the protections of the Bankruptcy Code in aid of a Debtor whose activities constitute a continuing federal crime . . .." *In re Basrah Custom Design, Inc.*, 600 B.R. 368, 379 (Bankr. E.D. Mich. 2019) (citation and internal punctuation omitted).[7]

---

[7] The Ninth Circuit's decision of *Garvin v. Cook Invs. NW, SPNWY, LLC*, 922 F.3d 1031, 1033 (9th Cir. 2019), in which the court affirmed confirmation of a plan by a chapter 11 debtor involved in a violation of the Controlled Substances Act, is not to the contrary. Cook is both procedurally and factually distinguishable from the present case as well as the numerous cases in which bankruptcy petitions by illegal businesses have been dismissed. First, Cook addressed only the narrow issue of whether the debtor's plan could be confirmed; it expressly did not address the question of whether the case would have been dismissed had a timely motion been filed. *Id.* at 1034. Second, the lower court decision in Cook was based in part on a finding that the debtor's illegal income (derived from its lease of real property to a marijuana business) was only a small part of its overall business, and that the plan could be confirmed without including or relying on income from illegal sources. *In re Cook Invs. NW, SPNWY, LLC*, No. 17-

Federal courts' refusal to intervene on behalf of a litigant engaged in illegal conduct is not limited to bankruptcy cases. Federal courts have repeatedly refused to entertain cases arising from illegal conduct such as gambling, drug trafficking, and accepting kickbacks. *See e.g.*, *United States v. Acme Process Equipment Co.*, 385 U.S. 138 (1966); *Epic Systems Corp. v. Lewis*, 584 U.S. __, 138 S. Ct. 1612, 1633 (2018) (Thomas, J., concurring). *See generally* McNichols, *The New Highwayman: Enforcement of U.S. Patents on Cannabis Products*, 101 J. Pat. & Trademark Off. Soc'y 24, 46 (2019). *See, e.g.*, *Polk v. Gontmakher*, 2019 WL 4058970 *2 (W.D. Wa. 2019) (dismissing action seeking to enforce a purported ownership interest in a marijuana business).

Here, the Court is being asked to use its powers under federal bankruptcy law to change the estate's relationship with consumer clients through chapter 11, notwithstanding that the primary assets of this estate are derived from illegal and unconscionable contracts. While the above case law focuses on dismissal, shutting down LPG and converting this case to chapter 7 is in the best interest of the estate and, most importantly, consumers. Conversion to chapter 7 would immediately stop the harm caused by continued operation of LPG's illegal business. Conversion will also allow a chapter 7 trustee to return any illegally collected funds to consumers, advise consumers of the options they have available to seek alternative assistance, and pursue any preference actions, fraudulent transfers, and collection or turnover of estate assets.

## B.    The Court has Cause to Convert this Case under 11 U.S.C. § 1112

Under 11 U.S.C. § 1112(b)(1), the Court may dismiss or convert a case if a movant establishes "cause." The bankruptcy court has broad discretion in determining what constitutes "cause" adequate for dismissal or conversion under 11 U.S.C. § 1112(b). *See In re Consolidated Pioneer Mortg. Entities*, 248 B.R. 368, 375 (B.A.P. 9th Cir. 2000). Once

---

5516 BHS, 2017 WL 10716993, at *4 (W.D. Wash. Dec. 18, 2017), aff'd sub nom. *Garvin v. Cook Invs. NW, SPNWY, LLC*, 922 F.3d 1031 (9th Cir. 2019). By contrast, in this case, the Debtor's entire business model is based on illegal conduct.

"cause" is established, the Court must dismiss the case or convert it to chapter 7, "whichever is in the best interest of creditors and the estate … unless the court determines that the appointment under section 1104(a) of ta trustee or an examiner is in the best interest of creditors of the estate."  *See* 11 U.S.C. § 1112(b)(1); *In re Nelson*, 343 B.R. 671, 675 (B.A.P. 9th Cir. 2006); *In re AVI, Inc*., 389 B.R. 721, 729 (B.A.P. 9th Cir. 2008); *see also 7 Collier On Bankruptcy* ¶ 1112.05[2] (Alan N. Resnick & Henry J. Sommers eds., 16th ed.) ("Once the movant has established cause, the burden shifts to the respondent to demonstrate by evidence the unusual circumstances that establish that dismissal or conversion is not in the best interest of creditors and the estate.").

The Court, however, may not convert or dismiss a case if there exist "unusual circumstances" that establish dismissal or conversion is not in the best interest of creditors and the estate.  *See* 11 U.S.C. § 1112(b)(2).  The debtor bears the burden of proving the "unusual circumstances."  *In re Sanders*, 2013 WL 1490971, at *7 (B.A.P. 9th Cir. Apr. 11, 2013) (citing *In re Orbit Petroleum, Inc.*, 395 B.R. 145, 148 (Bankr. D.N.M. 2008)); *see also 7 Collier On Bankruptcy* ¶ 1112.05[2] (Alan N. Resnick & Henry J. Sommers eds., 16th ed.) ("Once the movant has established cause, the burden shirts to the respondent to demonstrate by evidence the unusual circumstances that establish that dismissal or conversion is not in the best interest of creditors and the estate.").

As discussed more fully below, there is cause to convert this case because (1) the continued operations and sale of LPG's debt resolution business in any form violates federal and state law, (2) the estate has been grossly mismanaged, (3) the Trustee has failed to file monthly operating reports and provide an accounting of all funds borrowed post-petition, and (4) adequate insurance has not been maintained.

### 1.     Continued Operation and Sale of LPG's Debt Resolution Business in Any Form Violates Federal and State Law

Various federal and state laws provide explicit safeguards for consumers using a debt validation business.  LPG operates a business that has violated these protections, including:

(a) the Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310 et seq.; (b) Credit Repair Organization Act ("CROA"), 15 U.S.C. § 1679, et seq.; (c) California Business and Professions Code § 17200; and (d) California Rules of Professional Responsibility. Additionally, as described below, the contracts entered between LPG and its consumers are unconscionable under California law and thus not enforceable.

## The Telemarketing Sales Rule

Federal law provides explicit safeguards for consumers using a debt validation business under the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. § 6101 et seq., and its implementing rule, the Telemarketing Sales Rule ("TSR"), 16 C.F.R. §§ 310.3 and 310.4, and the Consumer Financial Protection Act ("CFPA"), 12 U.S.C. §§ 5531 and 5536.

Under the TSR, companies can only charge fees for telemarketed services after providing consumers with documentation reflecting that the promised results have been achieved. That documentation cannot be provided to consumers until more than six months after the results were achieved. 16 C.F.R. § 310.4(a)(2). Simply based on the Legal Services Agreement entered into between LPG and each consumer, monthly fees for legal services were paid to and collected by LPG prior to any services being provided to the consumer. *See* Sorensen Decl., Exs. 3-8. This facially violates the TSR.

## Credit Repair Organizations Act ("CROA")

LPG falls within the definition of a credit repair organization ("CRO") under the Credit Repair Organizations Act, 15 U.S.C. § 1679, et. seq. ("CROA"). Based on the services it purports to provide LPG "*represent[s] that it can or will sell, provide, or perform a service for the purpose of providing advice or assistance to a consumer with regard to improving a consumer's credit report, credit history, or credit rating.*" *Stout v. FreeScore, LLC*, 743 F.3d 680, 685 (9th Cir. 2014); *see also* 15 U.S.C. § 1679a(3)(A)(i-ii); *Rannis v. Recchia*, 380 Fed. Appx. 646 (9th Cir. 2010) (holding that an attorney qualified as a "credit repair organization" under CROA by using interstate commerce and mail in

providing credit resolution services for the purpose of improving clients credit reports, in exchange for valuable consideration).

In its Legal Services Agreement, LPG claims that it will assist in removing erroneous or inaccurate information appearing on the consumer's credit reports by contesting debt appearing therein.  *See* Sorensen Decl., Ex. 3-8.  Similarly, the educational outreach script used by LPG's marketing affiliates states: "At Litigation Practice Group, our goal is to not only help you clear your debt, but also to help get you back to a normal credit standing."  *See* Ng Decl., Ex. 10, pg. 528.  This is also emphasized in LPG's sales script, where the marketing affiliates claim that most consumers "are back to normal credit standing on average within 3 years."  *Id*., at 523.  Additionally, attached to POC #82 is a document titled "Smarter Path to Debt Relief Services" which states that LPG can provide useful services if the consumer answered the following questions in the affirmative: (1) "Has your credit score already been negatively impacted?" and (2) "My credit report was damaged and needs to be worked on by a knowledgeable lawyer."  *See* Sorensen Decl., Ex. 8 (POC # 82), pg. 410, 414.  It is reasonable that a consumer reading these materials would believe that LPG promised to assist in improving their credit record, history, or rating.

Thus, as a CRO, LPG was required to comply with the CROA.  Yet, its Legal Service Agreement violates 15 U.S.C. § 1679b(b) because it permits LPG to charge and receive money for removing debts from consumer's credit reports before such services were fully performed.  Additionally, the Legal Service Agreement does not contain the written disclosures informing consumers of their rights under the Fair Credit Reporting Act and the CROA in violation of 15 U.S.C. §§ 1679c(a)-(b).  The statement in the Legal Service Agreement regarding cancellation rights is also deficient—it differs from that required by the CROA—and it is not bold and conspicuous, in violation of 15 U.S.C. §

1679e.[8]  The CROA dictates that any contract found not to comply with the CROA "shall be treated as void" and "may not be enforced by any Federal or State court or any other person."  15 U.S.C § 1679f(c); *see generally* Sorensen Decl., Ex. 3-8.  LPG's Legal Service Agreement clearly violates the CROA and is thereby void.[9]

## California Business and Professions Code § 17200

LPG has engaged in unlawful, unfair, or fraudulent business practices.  *See* Cal. Bus. & Prof. Code § 17200 ("UCL").  The UCL's coverage is "sweeping, embracing anything that can properly be called a business practice and that at the same time is forbidden by law."  *Cal-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999).  Under the fraudulent prong of UCL, the conduct must likely deceive members of the public, which is evaluated from the vantage point of a reasonable consumer.  *Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir. 1995).  There must be a probability "that a significant portion of the general consuming public or targeted consumers, acting reasonably in the circumstances, could be misled."  *Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496, 508 (2003).  UCL fraud is distinct from common law fraud and does not require a showing of intent, scienter, actual reliance, or damage.  *See id*.

Through its marketing affiliates, LPG advertised its program to consumers as a way to resolve their debt and get back to good credit standing.  *See* Ng Decl., Ex. 10 (LPG Sales

---

[8] Pursuant to 15 U.S.C. § 1679e, each contract shall be accompanied by a form titled "Notice of Cancellation" that contains in bold face type the statement: "You may cancel this contract, without any penalty or obligation, at any time before midnight of the 3rd day which begins after the date the contract is signed by you.  To cancel this contract, mail or deliver a signed, dated copy of this cancellations notice, or any other written notice to [name of credit repair organization] at [address of credit repair organization] before midnight on [date]."  LPG's Legal Service Agreement did not include a separate "Notice of Cancellation" form and instead included a one-line sentence buried at the very end of the contract under Client Acknowledgments.  *See e.g.,* Sorensen Decl., Ex. 8, pg. 394 (POC #82) (not bold-faced type).

[9] As explained by the California Supreme Court, a "void contract is without legal effect. (Rest.2d Contracts, § 7, com. a.)  It binds no one and is a mere nullity. Such a contract has no existence whatever.  It has no legal entity for any purpose and neither action nor inaction of a party to it can validate it...."  *Yvanova v. New Century Mortg. Corp.*, 62 Cal. 4th 919, 929, 365 P.3d 845, 852 (2016) (citation omitted).  Without any legal effect or existence, the Trustee cannot enforce or sell the consumer contracts.  *See also Sender v. Simon*, 84 F.3d 1299, 1307 (10th Cir. 1996) (Courts cannot aid in enforcement of an agreement that was fraudulently procured in the furtherance of illegal purposes).

& Educational Script).  The common theme, however, in the approximately 1,240 BBB complaints against LPG is that it did not provide the advertised services.  *See generally* Ng Decl., Ex. 11.  Consumers paid LPG high monthly fees for nothing—their debt was not invalidated, settled, or decreased, and their credit scores were negatively impacted.  Even though they continued to pay LPG, these consumers were often still sued by their creditors and inadequately represented by LPG's affiliated attorneys.  *Id*.

Additionally, a UCL claim under the unlawful prong "borrows violations of other laws and treats" them as unlawful business practices "independently actionable under section 17200."  *Farmers Inc. Exch. v. Superior Ct.*, 2 Cal. 4th 377, 383 (1992).  As discussed above, the Debtor has violated the TSR and CROA, thereby also creating a violation of section 17200.

## California Rules of Professional Responsibility

As a purported law firm, LPG also fails to comply with several California Rules of Professional Responsibility.  Of significance, Rule 1.5 restricts a lawyer from making an agreement for, charging, or collecting "an unconscionable or illegal fee."  The fee received by LPG by way of an ACH withdrawal from the consumer is illegal because it violates the TSR and CROA.  Additionally, as discussed more fully below, the monthly fee paid by consumers to LPG is unconscionable because it generally equates to more than 50% of the total debt enrolled with LPG.  *See* Sorensen Decl., Ex. 3-8.

Rule 5.4 also prohibits a law firm from sharing legal fees with an organization that is not authorized to practice law.  LPG characterizes the ACH withdrawals from consumers as legal fees.  They were never intended to service any of the consumer's debt, but rather pay LPG for its services.  *See* Skorheim Decl., Ex. 9, pg. 452.  To locate and onboard new consumers, LPG uses marketing affiliates.  These marketing affiliates are not authorized to practice law.  Yet, in violation of Rule 5.4, LPG collects legal fees in the form of ACH withdrawals from consumers and use this revenue to compensate the various marketing affiliates for their services.  *See* Skorheim Decl., Ex. 9, pg. 493.

Although the above focuses on California Rules of Professional Responsibility, LPG claims to serve consumers throughout the United States.  Thus, it is likely that LPG has failed to comply with the Rules of Professional Responsibility in various other states as well.

## Unconscionable Consumer Contracts

All of LPG's Legal Services Agreements are also unconscionable and thus, unenforceable.  If the Court as a matter of law finds a contract to have been unconscionable at the time it was made the Court may refuse to enforce the contract.  Cal. Civ. Code § 1670.5.  Under California law, the unconscionability of a contract is analyzed under the elements of procedural and substantive unconscionability.  *See Balboa Capital Corp. v. Shaya Medical P.C., Inc.*, 623 F. Supp. 1059, 1067 (C.D. Cal. 2022), *citing Armendariz v. Found. Health Psychare Servs., Inc.*, 24 Cal. 4th 83 (2000).  Procedural unconscionability "focus[es] on 'oppression' or 'surprise' in how the contract was formed, while substantive unconscionability entails 'overly-harsh' or 'one-sided' results based on the terms of the agreement."  *Id.*  Although both the procedural and substantive elements are necessary, they need not be present in the same degree, and a "sliding scale" is used to evaluate unconscionability.  *Id.*  Evaluating unconscionability is highly dependent on context. *Sanchez v. Valencia Holding Co., LLC*, 61 Cal. 4th 899, 911 (2015).  The doctrine often requires inquiry into the "commercial setting, purpose, and effect" of the contract.  *Id.*; *see also* Civ. Code. § 1670.5(b).  The "ultimate issue in every case is whether the terms of the contract are sufficiently unfair, in view of all relevant circumstances, that a court should withhold enforcement."  *Id*. at 912.

The doctrine of unconscionability also reaches contract terms relating to the price of services exchanged.  *De La Torre v. CashCall, Inc.*, 5 Cal 5th 966, 975-76 (2018); *see also Sonic-Calabasas A, Inc. v. Moreno*, 57 Cal. 4th 1109, 1145 (2013) ("the unconscionability doctrine is concerned … with [among other things] 'unreasonably and unexpectedly harsh terms having to do with price or other central aspects of the transaction' "); *Perdue v.*

*Crocker National Bank*, 38 Cal. 3d 913, 926 (1985) (holding that the price term, like any other term in a contract, may be unconscionable).

The Legal Service Agreement appears to be a pre-printed form, offered by the party with the superior bargaining power.  There was no opportunity for the consumers to negotiate any of the terms.  Without even speaking to a lawyer, the consumers were induced into signing LPG's Legal Service Agreement by the marketing affiliates, believing that LPG's services would help them.  These monthly payments were also unconscionably high, consisting of anywhere from 40-60% of the debt enrolled by the consumer.  *See* Sorensen Decl., Ex. 3 (POC #31 – 62%); Ex. 4 (POC #40 – 39%); Ex. 5 (POC #50 – 43%); Ex. 6 (POC #51 – 51%); Ex. 7 (POC #53 – 46%); Ex. 8 (POC #82 – 52%; P).  But LPG provided very little services, if any, for these high fees.  In most cases, LPG merely sent standardized form letters to the consumers' creditors and the credit bureaus (i.e., boilerplate "cease and desist" communication letters and a generic notice disputing the consumer's debt).  *See* Sorensen Decl., Ex. 8 (POC #82); Ng Decl., Ex. 11, pg. 548-50, 554.  Even though these consumers were making monthly payments to LPG, their credit did not improve, and they still received collection notices, subpoenas, and/or summons from their creditors.  *See generally* Ng Decl., Ex. 11 (BBB Complaints).  As such, LPG's Legal Service Agreements are unconscionable and thus, unenforceable.

## 2.    Gross Mismanagement of the Estate is Cause to Convert

Bankruptcy estates must be managed with an aim to "protect and conserve property . . . for the benefit of creditors."  *In re Devers*, 759 F.2d 751, 754 (9th Cir. 1985).  "[G]ross mismanagement of the estate" is cause to dismiss or convert a chapter 11 bankruptcy case.  11 U.S.C. § 1112(b)(4)(B).  Here, the estate has been grossly mismanaged by the Trustee failing to shut down LPG's business and seeking its sale as an operating business.  The potential assets the Trustee currently seeks to monetize are all derived from illegal contracts under the operation of a debt resolution business that violates state and federal law.  LPG is continuing to operate as an illegal business post-

petition and, although segregated, ACH withdrawals are still being pulled pursuant to void, unconscionable consumer contracts in violation of the TSR and CROA.  The continued operation of LPG subjects the bankruptcy estate to extensive civil fines, thereby exposing it to potentially significant financial losses.  This constitutes gross mismanagement of the estate and requires conversion.  *See*, *e.g.*, *In re Rent-Rite Super Kegs West Ltd.*, 484 B.R. 799, 805-06 (Bankr. D. Col. 2012).[10]

Moreover, the Trustee has narrowly focused his efforts on attempting to sell LPG's illegal and unconscionable contracts.  .  He has failed to pursue or collect any preferences and fraudulent conveyances for the benefit of creditors and the estate, which is a quintessential duty of a trustee.

Additionally, pursuant to 11 U.S.C. § 322(a), a trustee must file with the Court a bond in favor of the United States within 7 days of selected under § 1104, but the Trustee did not file bond until more than 60 days after he was appointed.  *See* Bankr. Dkt. #186.  Based on all the foregoing, there is cause to convert this case based on the gross mismanagement of the estate by the Trustee.

### 3.    Failure to File Monthly Operating Reports is Cause to Convert

Under § 1112(b)(4)(F), the term cause includes "an unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter …"  Further, under § 1112(b)(4)(H), the term cause includes failure to timely provide information or attend meetings reasonably requested by the United States Trustee.  Additionally, Local Bankruptcy Rule 2015-2(a) provides the Monthly Operating Reports must be filed no later than the 21st day of the following month using the mandatory data-enable form adopted by the United States Trustee.

---

[10] *See also In re Medpoint Management*, LLC. 528 B.R. 178, 185 (Bankr. D. Ariz. 2015) ("The Court finds that the prospects of a possible forfeiture or seizure of [the debtor's] assets pose an unacceptable risk to the [estate].").

To date, the Trustee has not filed Monthly Operating Reports ("MORs") for the months of April and May 2023. Instead, the Trustee filed a declaration on June 15, 2023 [Bankr. Dkt. #112] in lieu of filing the required MORs, complaining that he has not obtained or received sufficient records from LPG to prepare the MORs and is unable to answer a majority of the questions due to the mandatory data-enabled MOR form. But these issues do not excuse the Trustee from his statutory obligation to timely file the MORs.

The Trustee has also failed to provide the Court and all parties in interest any sort of accounting of the funds borrowed post-petition. It is the U.S. Trustee's understanding that these funds are not being used for any expense of the estate but instead are funding the payroll for a third-party entity (Phoenix). Likewise, the Trustee has not provided any documentation regarding the funds he has improperly drawn from consumers via ACH pulls. These funds are supposedly in a segregated account and not being used, but the Trustee has not provided documentation or accounting of this. Given the circumstances of this case, it is essential to provide all parties in interest up-to-date financials of LPG and an accounting of funds received and disbursed. Failure by the Trustee to do so is cause to convert this case to chapter 7.

### 4. Failure to Maintain Adequate Insurance is Cause to Convert

Under § 1112(b)(4)(C), the term "cause" includes failure to "maintain appropriate insurance that poses a risk to the estate." Moreover, pursuant to the U.S. Trustee's Guidelines and Requirements for Chapter 11 Debtors in Possession (effective September 1, 2022), the debtor "must name the U.S. Trustee as an additional interested party on each and every insurance policy. As such, the U.S. Trustee will receive notification of any non-payment of premium or cancellation of policy." A debtor must maintain property and liability insurance coverage so that the assets of the bankruptcy estate are protected against loss. *See In re Van Eck*, 425 B.R. 54 (Bankr. D. Conn. 2010).

To date, the U.S. Trustee has received no evidence that adequate insurance is being maintained by either LPG or the Trustee, including commercial generally liability, workers' compensation, automobile insurance, malpractice insurance, or any other required insurance. The U.S. Trustee acknowledges that on April 25, 2023, he received a certificate of general liability insurance. *See* Sorensen Decl., ¶ 4. But this policy was not adequate as the insured party is listed as "Daniel March"—not LPG—and it does not list the U.S. Trustee as an interested party. Because there is no evidence that adequate insurance is being maintained, cause exists to convert this case.

## C.     Conversion is the Appropriate Remedy and is in the Best Interest of Creditors and the Estate

Having determined that cause exists to dismiss or convert a case, the Court must determine whether dismissal or conversion is in the best interest of creditors and the estate. 11 U.S.C. § 1112(b). "The standard for choosing conversion or dismissal based on 'the best interest of creditors and the estate' implies a balancing test to be applied through case-by-case analysis." *In re Mense*, 509 B.R. 269, 285 (Bankr. C.D. Cal. 2014) (quoting *In re Staff Inv. Co.*, 146 B.R. 256, 260 (Bankr. E.D. Cal. 1993)).

Here conversion to chapter 7 is the best remedy and provides the most safeguards for consumers. The harm to consumers continues to mount with each day that the Trustee collects consumer payments based on an illegally operated business and is accelerated now that he seeks to sell this revenue stream from illegal contracts to third parties. Conversion to chapter 7 would immediately stop the continued harm and allow a chapter 7 trustee to return these illegally collected funds to the consumers who were victims of unconscionable and illegal contracts that cannot and should not be enforced. Contrary to the Trustee's arguments, shutting down LPG will not create any additional harm to the consumers. In fact, the majority of complaints submitted to the BBB by consumers show that they want a full refund of fees paid to LPG and for the contracts to be cancelled. *See generally* Ng Decl., Ex. 11. Moreover, several consumers have also opposed the CLG

9019 Motion filed by the Trustee, claiming that they paid a large sum of money but obtained no benefit and requesting that their contracts be cancelled, and funds returned. *See* Bankr. Dkt. #185, Appendix B.

As such, LPG should stop operating, ACH withdrawals should stop being pulled, all ACH funds that have been pulled should be returned, and all executory consumer contracts should be rejected.  Consumers will be free to engage directly with their local counsel if they so choose.  *See* Bankr. Dkt. #185, Appendix B; *see also* Ng. Decl., Ex. 11.  Upon conversion, a chapter 7 trustee can then pursue any preference actions, fraudulent transfers, and collection/turnover of estate assets, as well as provide all consumers an explanation of the options they have available to seek alternative assistance.

## IV.   CONCLUSION

Based on the foregoing, and upon such other and further oral and/or documentary evidence as may be presented at the time of the hearing, the U.S. Trustee respectfully requests that the case be converted to chapter 7 pursuant to 11 U.S.C. § 1112(b).

Respectfully submitted,

PETER C. ANDERSON
UNITED STATES TRUSTEE

DATED: July 12, 2023

By:   */s/ Kenneth Misken*
Kenneth M. Misken
Assistant United States Trustee

## DECLARATION OF MARILYN SORENSEN

I, Marilyn Sorensen, hereby declare as follows:

1. I am employed by the Office of the U.S. Trustee for Region 16 as a Bankruptcy Analyst. My duties and responsibilities include the review and analysis of Chapter 11 cases, including the case of *The Litigation Practice Group, P.C.* (Bankr. Case No. 8:23-bk-10571-SC). I make this declaration upon my own personal knowledge except as to those statements made upon information and belief.

2. This bankruptcy case was filed on March 20, 2023, by the filing of a chapter 11 petition. The debtor Litigation Practice Group, P.C. ("LPG") filed its Bankruptcy Schedules and its Statement of Financial Affairs on April 4, 2023. Attached hereto as **Exhibit 1** are true and correct copies of the Bankruptcy Petition, Schedules, and Statement of Financial Affairs that I obtained from PACER.

3. On May 2, 2023, the U.S. Trustee conducted the meeting of creditors pursuant to 11 U.S.C. § 341(a) ("341(a) Meeting"). I attended the 341(a) Meeting by telephone. The U.S. Trustee had the recording of the 341(a) Meeting transcribed. Attached hereto as **Exhibit 2** is a true and correct copy of the transcript of the 341(a) Meeting held on May 2, 2023.

4. On April 25, 2023, The U.S. Trustee received a copy of a certificate of generally liability insurance. On this certificate, the insured party was "Daniel March", and it did not list the U.S. Trustee as an interested party. I communicated the deficiencies to LPG and its counsel. To date, the U.S. Trustee has received no additional proof of adequate insurance being maintained by LPG or the Chapter 11 Trustee.

5. I retrieved the following proof of claims filed in this case from the claims register on PACER:

 a. Proof of Claim # 31 filed by Debra Price. Attached hereto as **Exhibit 3** is a true and correct copy.

 b. Proof of Claim # 40 filed by Arven Allen Knight. Attached hereto as **Exhibit 4** is a true and correct copy.

    c.  Proof of Claim # 50 filed by Abigail Beaudin.  Attached hereto as **Exhibit 5** is a true and correct copy.

    d.  Proof of Claim # 51 filed by Hunter Hastings.  Attached hereto as **Exhibit 6** is a true and correct copy.

    e.  Proof of Claim # 53 filed by Debra M. Archambault.  Attached hereto as **Exhibit 7** is a true and correct copy.

    f.  Proof of Claim # 82 filed by Carolyn Beech.  Attached hereto as **Exhibit 8** is a true and correct copy.

I declare under penalty of perjury and under the laws of the State of California and the United States of America that the foregoing is true and correct, and if called as a witness I could and would completely testify thereto.  Executed this 12th day of July 2023 in Santa Ana, California.

Marilyn Sorensen
Bankruptcy Analyst

## DECLARATION OF LESLIE SKORHEIM

I, Leslie Skorheim, hereby declare as follows:

1. I am an attorney employed by the Office of the U.S. Trustee for Region 16. I am an attorney assigned to the Chapter 11 case of *The Litigation Practice Group, P.C.* (Bankr. Case No. 8:23-bk-10571-SC) (hereinafter, the debtor is referred to as "LPG"). I make this declaration upon my own personal knowledge except as to those statements made upon information and belief.

2. I personally attended the hearing on June 12, 2023, with respect to the Preliminary Injunction in the adversary case *Marshack v. Diab et al.* (Adv. No. 8:23-ap-1046-SC).

3. After the June 12, 2023, hearing, the U.S. Trustee's Office obtained an audio recording of the hearing from the U.S. Bankruptcy Court. The audio was sent to Briggs Reporting Company, Inc. to be transcribed. I received a copy of the transcript via email on June 27, 2023.

4. Attached hereto as **Exhibit 9** is a true and correct copy of relevant pages from the transcript of the hearing held on June 12, 2023, in the adversary case *Marshack v. Diab et al.* (Adv. No. 8:23-ap-1046-SC). The relevant pages of the transcript attached hereto as Exhibit 9 consist of the live testimony by Daniel March and Tony Diab at the June 12, 2023, hearing.

I declare under penalty of perjury and under the laws of the State of California and the United States of America that the foregoing is true and correct, and if called as a witness I could and would completely testify thereto. Executed this 12th day of July 2023 in Santa Ana, California.

Leslie Skorheim
Attorney for U.S. Trustee

## DECLARATION OF QUEENIE NG

I, Queenie Ng, hereby declare as follows:

1. I am an attorney employed by the Office of the U.S. Trustee for Region 16. I am an attorney assigned to the Chapter 11 case of *The Litigation Practice Group, P.C.* (Bankr. Case No. 8:23-bk-10571-SC) (hereinafter, the debtor is referred to as "LPG"). I make this declaration upon my own personal knowledge except as to those statements made upon information and belief.

2. On June 13, 2023, I received an email from the Chapter 11 Trustee's Special Counsel (Christopher Celentino) which attached "scripts" that they believed were utilized by LPG in its operations. One of the scripts attached to this email was titled "LPG Sales Script." Attached hereto as **Exhibit 10** is a true and correct copy of the LPG Sales Script.

3. On June 6, 2023, I received an email from Michelle Marin, Director of Operations (Pacific Southwest) with the Better Business Bureau ("BBB"). Attached to this email were numerous complaints submitted to the BBB against LPG during 2020 to 2023.

4. On June 12, 2023, I received another email from Ms. Marin with the BBB, which attached additional complaints submitted to the BBB against LPG during 2019. Total, the U.S. Trustee received approximately 1,240 complaints from the BBB. Attached hereto as **Exhibit 11** are true and correct copies of several complaints received by the U.S. Trustee from the BBB that were submitted to the BBB against LPG in 2022-2023.

5. I went onto the State Bar website for Nevada and California and retrieved the orders disbarring Tony Diab from the practice of law. Attached hereto as **Exhibit 12** are true and correct copies of these State Bar Orders.

I declare under penalty of perjury and under the laws of the State of California and the United States of America that the foregoing is true and correct, and if called as a witness I could and would completely testify thereto. Executed this 12th day of July 2023 in Irvine, California.

Queenie Ng
Attorney for U.S. Trustee

## DECLARATION OF JAIMEE ZAYICEK

I, Jaimee Zayicek, declare and state as follows:

1. I am employed by the Office of the United States Trustee for Region 16 as a Paralegal Specialist. My duties and responsibilities include the review and analysis of Chapter 11 cases, including the case of *The Litigation Practice Group, P.C.* (Bankr. Case No. 8:23-bk-10571-SC). I make this declaration upon my own personal knowledge except as to those statements made upon information and belief.

3. On July 7, 2023, I reviewed the Debtor's Statement of Financial Affairs (Docket No. 34). In response to question number 7, the Debtor listed several pending actions (*see* Docket No. 34-1). Accordingly, I accessed the nationwide PACER case locater website and searched each pending action listed by the Debtor.

4. On July 7, 2023, using PACER case locater I searched for case number 1:22-cv-00917, the lawsuit titled *Eaton v. The Litigation Practice Group, P.C.* Upon accessing the case docket, I reviewed and downloaded a copy of the Notice of Removal with Complaint. A true and correct copy of which is attached hereto as **Exhibit 13**.

5. On July 7, 2023, using PACER case locater I searched for case number 1:22-cv-00057, the lawsuit titled *Beech v. Litigation Practice Group, P.C.* Upon accessing the case docket, I reviewed and downloaded a copy of the Complaint. A true and correct copy which is attached hereto as **Exhibit 14**.

6. On July 7, 2023, using PACER case locater I searched for case number 3:22-cv-00707, the lawsuit titled *Price v. Litigation Practice Group, P.C.* Upon accessing the case docket, I reviewed and downloaded a copy of the Complaint. A true and correct copy of which is attached hereto as **Exhibit 15**.

7. On July 7, 2023, using PACER case locater I searched for case number 6:22-cv-00814, the lawsuit titled *Topp v. Litigation Practice Group, P.C.* Upon accessing the case docket, I reviewed and downloaded a copy of the Complaint. A true and correct copy of which is attached hereto as **Exhibit 16**.

8.  On July 7, 2023, using PACER case locater I searched for case number 2:22-cv-01959, the lawsuit titled *Rizo v. Litigation Practice Group, P.C.*  Upon accessing the case docket, I reviewed and downloaded a copy of the Complaint.  A true and correct copy of which is attached hereto as **Exhibit 17**.

9.  On July 7, 2023, using PACER case locater I searched for case number 2:22-cv-07915, the lawsuit titled *Graham v. Litigation Practice Group, P.C.*  Upon accessing the case docket, I reviewed and downloaded a copy of the Complaint.  A true and correct copy of which is attached hereto as **Exhibit 18**.

10. On July 7, 2023, using PACER case locater I searched for case number 3:22-cv-02094, the lawsuit titled *Klaus v. Litigation Practice Group, P.C.*  Upon accessing the case docket, I reviewed and downloaded a copy of the Complaint.  A true and correct copy of which is attached hereto as **Exhibit 19**.

11. On July 7, 2023, using PACER case locater I searched for case number 3:22-cv-00342, the lawsuit titled *Scarlett v. Litigation Practice Group, P.C.*  Upon accessing the case docket, I reviewed and downloaded a copy of the Complaint.  A true and correct copy of which is attached hereto as **Exhibit 20**.

12. On July 7, 2023, using PACER case locater I searched for case number 3:22-cv-02093, the lawsuit titled *Sheffield v. Litigation Practice Group, P.C.*  Upon accessing the case docket, I reviewed and downloaded a copy of the Complaint.  A true and correct copy of which is attached hereto as **Exhibit 21**.

13. On July 7, 2023, I also performed searches on PACER of individuals listed as creditors on the Debtor's Schedule E/F (Docket No. 33).  While the individual creditors are listed as creditors with a description "Pending litigation – SOFA #7", they are not listed on the Debtor's Statement of Financial Affairs.  Accordingly, using PACER, I searched for a lawsuit filed by Anibal Colon against the Litigation Practice Group and found case number 6:22-cv-02343.  Upon accessing the case docket, I reviewed and downloaded a copy of the Complaint.  A true and correct copy of which is attached hereto as **Exhibit 22**.

14. On July 7, 2023, based on my review of the Debtor's Schedules, I searched PACER for a lawsuit filed by Kathleen Lacey against the Litigation Practice Group and found case number 2:22-cv-13043.  Upon accessing the case docket, I reviewed and downloaded a copy of the Complaint.  A true and correct copy of which is attached hereto as **Exhibit 23**.

15. On July 7, 2023, based on my review of the Debtor's Schedules, I searched PACER for a lawsuit filed by Kimberly Birdsong against the Litigation Practice Group and found case number 8:23-cv-00184. Upon accessing the case docket, I reviewed and downloaded a copy of the Complaint.  A true and correct copy of which is attached hereto as **Exhibit 24**.

17. On July 7, 2023, based on my review of the Debtor's Schedules, I searched PACER for a lawsuit filed by Kevin Carpenter against the Litigation Practice Group and found case number 8:23-cv-00263.  Upon accessing the case docket, I reviewed and downloaded a copy of the Complaint.  A true and correct copy of which is attached hereto as **Exhibit 25**.

18. On July 7, 2023, based on my review of the Debtor's Schedules, I searched PACER for a lawsuit filed by Karen Suell against the Litigation Practice Group and found case number 6:23-cv-00087. Upon accessing the case docket, I reviewed and downloaded a copy of the Complaint.  A true and correct copy of which is attached hereto as **Exhibit 26**.

19. Furthermore, based on the U.S. Trustee's ongoing investigation into this case, the U.S. Trustee was provided an additional lawsuit filed against the Litigation Practice Group titled *Heier v. Litigation Practice Group*, case number 3:21-cv-00617.  On July 7, 2023, I used PACER to locate the case docket for this matter and reviewed and downloaded a copy of the Complaint.  A true and correct copy of which is attached as **Exhibit 27**.  Neither the lawsuit nor the individual is listed in the debtor's Schedule E/F or Statement of Financial Affairs.

//

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I declare under penalty of perjury and under the laws of the State of California and the United States of America that the foregoing is true and correct, and if called as a witness I could and would completely testify thereto.  Executed this 12th day of July 2023 at Long Beach, California.

Jaimee Zayicek
Bankruptcy Paralegal

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

**411 West Fourth Street, Suite 7160, Santa Ana, CA 92701**

A true and correct copy of the foregoing document entitled (*specify*):

**NOTICE OF MOTION AND MOTION BY UNITED STATES TRUSTEE TO CONVERT CASE TO CHAPTER 7 PURSUANT TO 11 U.S.C. § 1112(b); MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF MARILYN SORENSEN, JAIMEE ZAYICEK, LESLIE SKORHEIM, AND QUEENIE NG IN SUPPORT THEREOF**

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document.  On (date) **July 12, 2023**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

**SEE ATTACHED SERVICE LIST (IF APPLICABLE)**

☒  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:  On (date) **July 12, 2023,** I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows.  Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**SEE ATTACHED SERVICE LIST (IF APPLICABLE)**

☒  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (date) **July 12, 2023,** I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**SEE ATTACHED SERVICE LIST (IF APPLICABLE)**

☒  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| July 12, 2023 | Leslie Skorheim | _(signature)_ |
|---|---|---|
| Date | Print Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

**ADDITIONAL SERVICE INFORMATION**

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")**

| Name | Capacity | Email Address |
| --- | --- | --- |
| Byron Moldo | | bmoldo@ecjlaw.com |
| Ronald Brown | SDCO Tustin Executive Center, Inc. | ron@rkbrownlaw.com |
| Joon Khang | Debtor's Attorney | joon@khanglaw.com |
| Ira Kharasch | | ikharasch@pszjlaw.com |
| Olivia Scott | Azzure Capital LLC | olivia.scott3@bclplaw.com |
| Olivia Scott | Hi Bar Capital LLC | olivia.scott3@bclplaw.com |
| Sharon Weiss | Azzure Capital LLC | sharon.weiss@bclplaw.com |
| Daniel Edelman | Carolyn Beech | dedelman@edcombs.com |
| Eric Bensamochan | | eric@eblawfirm.us |
| Alan Craig Hochheiser | City Capital NY | ahochheiser@mauricewutscher.com |
| Randall Baldwin Clark | | rbc@randallbclark.com |
| Nicholas Koffroth | Committee of Unsecured Creditors | nkoffroth@foxrothschild.com |
| Shawn Crhistianson | | cmcintire@buchalter.com |
| Leslie Cohen | | leslie@lesliecohenlaw.com |
| Jeffrey Golden | | jgolden@go2.law |
| D Edward Hays | | ehays@marshackhays.com |
| David Kupetz | | David.Kupetz@lockelord.com |
| Christopher Langley | | chris@slclawoffice.com |
| Daniel Lev | | daniel.lev@gmlaw.com |
| Laila Masud | | lmasud@marshackhays.com |
| Alan Nahmias | | anahmias@mbn.law |
| Victoria Newmark | | vnewmark@pszjlaw.com |
| Ronald Richards | | ron@ronaldrichards.com |
| Gregory Salvato | | gsalvato@salvatoboufadel.com |
| Andrew Still | | astill@swlaw.com |
| Johnny White | | JWhite@wrslawyers.com |
| Richard Golubow | Debt Validation Fund II LLC | rgolubow@wghlawyers.com |
| Richard Golubow | MC DVI Fund 1, LLC | rgolubow@wghlawyers.com |
| Richard Golubow | MC DIV Fund 2, LLC | rgolubow@wghlawyers.com |
| Garrick Hollander | | ghollander@wghlawyers.com |
| Christopher Celentino | Trustee's Special Counsel | christopher.celentino@dinsmore.com |
| Christopher Ghio | | christopher.ghio@dinsmore.com |
| Yosina Lissebeck | | Yosina.Lissebeck@Dinsmore.com |
| Jonathan Serrano | | jonathan.serrano@dinsmore.com |
| Teri Pham | | tpham@epglawyers.com |
| Michael Lieberman | Phillip A. Greenblatt, PLLC | mlieberman@lipsonneilson.com |
| Paul Shankman | United Partnerships, LLC | PShankman@fortislaw.com |
| Kenneth Misken | UST | Kenneth.M.Misken@usdoj.gov |
| Leslie Skorheim | UST | leslie.skorheim@usdoj.gov |
| Queenie Ng | UST | Queenie.K.Ng@usdoj.gov |
| Jenny L Doling | | jd@jdl.law |

*SEE NEF FOR CONFIRMATION OF ELECTRONIC TRANSMISSION TO THE U.S. TRUSTEE AND ANY TRUSTEE IN THIS CASE, AND TO ANY ATTORNEYS WHO RECEIVE SERVICE BY NEF.*

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                        **F 9013-3.1.PROOF.SERVICE**

2.      **SERVED BY U.S. MAIL**

Debtor:
**The Litigation Practice Group P.C.**
17542 17th St., Suite 100
Tustin, CA 92780

**Jason Patterson Stopnitzky**
52 Cupertino Circle
Aliso Viejo, CA 92656

**Grobstein Teeple LLP**
23832 Rockfield Blvd suite 245
Lake Forest, CA 92630

3.      **SERVED BY (state method for each person served):**

**PERSONAL DELIVERY, FACSIMILE OR EMAIL**

Judge's Copy

Honorable Scott C. Clarkson – bin on the 5th Floor

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

PETER C. ANDERSON
United States Trustee
Kenneth M. Misken (SBN 349167)
Assistant United States Trustee
Queenie K. Ng (SBN 223803)
Leslie A. Skorheim (SBN 293596)
Attorneys for the U.S. Trustee
Ronald Reagan Federal Building
411 West Fourth Street, Suite 7160
Santa Ana, CA  92701-8000
Tel: (714) 338-3403
Fax: (714) 338-3421
Email: queenie.k.ng@usdoj.gov

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION

| | |
|---|---|
| In Re:<br><br>THE LITIGATION PRACTICE GROUP, P.C.,<br><br>                Debtor. | CASE NUMBER:  8:23-bk-10571-SC<br><br>CHAPTER 11<br><br>NOTICE OF HEARING |

TO THE HONORABLE SCOTT CLARKSON AND OTHER INTERESTED PARTIES:

      NOTICE IS HEREBY GIVEN that the following hearing will be held on **August 10, 2023 at 10:00 a.m. in Courtroom 5C – Virtual (Accessibility information will be posted into the Court's tentative ruling prior to the hearing), located at 411 West Fourth Street, Santa Ana, CA 92701**

*NOTICE OF MOTION AND MOTION BY UNITED STATES TRUSTEE TO CONVERT CASE TO CHAPTER 7 PURSUANT TO 11 U.S.C. § 1112(b); MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF MARILYN SORENSEN, JAIMEE ZAYICEK, LESLIE SKORHEIM, AND QUEENIE NG IN SUPPORT THEREOF*

      Please be advised that because of the COVID-19 pandemic, the Court will conduct the hearing using ZoomGov audio and video technology. Hearing participants and members of the public may participate in and/or observe the hearing using ZoomGov.

**For more information on appearing before Judge Clarkson by ZoomGov, please see the "Notice Re Telephonic Appearance Procedures for Judge Scott C. Clarkson's Cases" on the Court's website at:**

**https://www.cacb.uscourts.gov/judges/honorable-scott-c-clarkson under the "Telephonic Instructions" section.**

Objections, if any, to the above shall be in writing and filed with the Court and served upon the court party named in the upper left-hand corner of this notice at least fourteen (14) days prior to the hearing date.  See Local Bankruptcy Rule 9013-1(f)&(h).

DATED: 07/12/23                          KATHLEEN J. CAMPBELL
                                         Clerk of Court