PETER C. ANDERSON
United States Trustee
Kenneth M. Misken (SBN 349167)
Assistant United States Trustee
Queenie K. Ng (SBN 223803)
Leslie Skorheim (SBN 293596)
Attorney for the U.S. Trustee
Ronald Reagan Federal Building
411 West Fourth Street, Suite 7160
Santa Ana, CA  92701-8000
Tel: (714) 338-3405
Fax: (714) 338-3421
Email: kenneth.m.misken@usdoj.gov

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>**THE LITIGATION PRACTICE GROUP, P.C.,**<br><br><br><br><br>Debtor. | Case Number 8:23-bk-10571-SC<br><br>Chapter 11<br><br>**UNITED STATES TRUSTEE'S OPPOSITION TO NOTICE OF MOTION AND MOTION OF TRUSTEE RICHARD A. MARSHACK FOR ENTRY OF AN ORDER (A) APPROVING SALE, SUGJECT TO OVERBID, OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS PURSUANT TO 11 U.S.C. § 363(b) AND (B) APPROVING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND OTHER AGREEMENTS**<br><br>DATE:    July 21, 2023<br>TIME:    10:00 a.m.<br>CTRM:    5C – In Person & Virtual<br>             411 W. 4th Street<br>             Santa Ana, CA 92701 |

**TO THE HONORABLE SCOTT CLARKSON, UNITED STATES**

**BANKRUPTCY JUDGE, DEBTOR, DEBTOR'S COUNSEL, CHAPTER 11**

**TRUSTEE, AND ALL PARTIES IN INTEREST:**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>Table of Contents</u>

I.   INTRODUCTION ..................................................................................................1

II.  STATEMENT OF FACTS .....................................................................................2

III.  PRIOR PLEADINGS FILED BY U.S. TRUSTEE ARE HEREBY
INCORPORATED BY REFERENCE TO SUPPORT THIS OPPOSITION ......................4

  A. CONVERSION MOTION ...............................................................................5

  B. RULE 9019 OPPOSITION ..............................................................................6

  C. RESPONSE BRIEF .........................................................................................7

IV.  ARGUMENT .......................................................................................................10

  A. THE TRUSTEE HAS FAILED TO MEET HIS BURDEN UNDER SECTION 363
  OF THE BANKRUPTCY CODE ..........................................................................10

    i. The Trustee has Failed to Provide Adequate Notice of the Sale .........................11

    ii. Trustee has Failed to Show that a Sound Business Purpose Exists ...................12

    iii.The Trustee has Failed to Show that the Purchase Price Will Benefit the
    Estate. .....................................................................................................14

    iv. The Trustee has Failed to Show that the Sale is Beneficial to Consumers. ......15

    v. The Deficiency in the Opt-Out Plan. ...............................................................17

    vi.Consumers Cannot Consent to a New Contract by their Silence and Should Be
    Required to Affirmatively Opt In to the Sale. .......................................................18

    vii. The Trustee's Proposed Consumer Protections are Inadequate. ....................21

      a. Court Appointed Monitor .......................................................................21

      b. Compliance with other State Bar Rules.................................................23

      c. Modified Purchase Agreement still violates the TSR ..........................23

  B. CLG IS NOT A GOOD FAITH PURCHASER UNDER 11 U.S.C. § 363(m) ........23

  C. Trustee's Comments about PGX Holdings, Inc. are Irrelevant. ...........................25

V. CONCLUSION..................................................................................................26

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re 240 N. Brand Partners, Ltd.*,
    200 B.R. 653 (B.A.P. 9th Cir. 996)....................................................... 10

*In re Ariz. Heart Inst. Inc.*,
    2010 Bankr. LEXIS 5841 (Bankr. D. Ariz. 2010)............................................ 22

*Bird, Marella, Boxer & Wolpert v. Superior Ct.*,
    106 Cal App.4th 419 (2003) ............................................................. 9

*Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*,
    722 F.2d 1063 (2nd Cir. 1983)...................................................... 11, 13

*In re Continental Air Lines, Inc.*,
    780 F.2d 1223 (5th Cir. 1986) ......................................................... 12

*In re Emerge Energy Services LP*,
    No. 19-11563, 2019 WL 7634308 (Bankr. D. Del. Dec. 5, 2019) ................... 19

*Kolani v. Gluska*,
    64 Cal.App.4th 402 (1998) ............................................................ 7, 8

*Lewis & Queen v. N.M. Ball Sons*,
    48 Cal. 2d 141 (1957) ..................................................................... 8

*In re Lowenschuss*,
    67 F.3d 1394 (9th Cir. 1995) ............................................................ 18

*In re M Capital Corp.*,
    290 B.R. 743 (9th Cir. BAP 2003)...................................................... 24

*Mann v. Gullickson*,
    2016 WL 6473215 ................................................................... 8, 17

*Meekins v. Lakeview Loan Servicing, LLC*,
    2020 WL 1922765 (E.D. Va. Apr. 21, 2020) ........................................ 19

*Patterson v. Mahwah Bergen Retail Grp., Inc. (In re Ascena)*,
    636 B.R. 641 (E.D. Va. 2022).................................................... 19, 20

iii

*In re PGX Holdings, Inc.*,
   Case No. 23-10718 (Bankr. D. Del.) .................................................... 2

*Rivera-Colon v. AT&T Mobility Puerto Rico, Inc.*,
   913 F.3d 200 (1st Cir. 2019)........................................................ 19

*Sender v. Simon*,
   84 F.3d 1299 (10th Cir. 1996) ...................................................... 8

*In re Slates*,
   2012 WL 5359489 (B.A.P. 9th Cir. Oct. 31, 2012).................................... 10, 11

*In re SunEdison, Inc.*,
   576 B.R. 453 (Bankr. S.D.N.Y. 2017) .......................................... 18, 19

*In re Titusville Country Club*,
   128 B.R. 396 (Bankr. W.D. Pa. 1991) ................................................ 11

*In re Walter*,
   83 B.R. 14 (B.A.P. 9th Cir. 1988)................................................. 11, 13

*Wong v. Tenneco, Inc.*,
   39 Cal. 3d 126 (1985) ............................................................... 8

*Yvanova v. New Century Mortg. Corp.*,
   62 Cal. 4th 919 (2016) .......................................................... 8

**Statutes**

11 U.S.C. § 363(b) ...................................................................... i, 1

11 U.S.C. § 363(b)(1)................................................................. 10, 13

11 U.S.C. § 363(m) ................................................................ 2, 10, 23, 25

11 U.S.C. § 1112(b) ...................................................................... 2

15 U.S.C. § 1679(b) ...................................................................... 5

15 U.S.C. § 1679e ........................................................................ 5

California Business and Professions Code § 17200 ................................................ 5

iv

**Other Authorities**

16 C.F.R. § 310.4 .................................................................................................... 7

16 C.F.R. § 310.4(a)(5)(i)(A)-(E) ........................................................................... 18

16 C.F.R. § 310.4(a)(s) ............................................................................................. 5

California Rule of Professional Conduct 1.5 ....................................................... 5, 9

California Rule of Professional Conduct 5.3.1 ........................................................ 9

California Rule of Professional Conduct 5.4 ....................................................... 5, 9

California Rules of Professional Conduct Rule 8.4 ................................................. 2

California State Bar Rule1.17 .............................................. 2, 11, 12, 23

Federal Rule of Civil Procedure 30(b)(6) ............................................................. 24

Rest.2d Contracts, § 7 ............................................................................................. 8

Restatement (Second) of Contracts § 69(1)(b) ..................................................... 20

v

The United States Trustee (hereinafter "U.S. Trustee") files this opposition ("Opposition") to the Chapter 11 Trustee's Notice of Motion and Motion for Entry of an Order (A) Approving Sale, Subject to Overbid, of Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests Pursuant to 11 U.S.C. § 363(b) and (B) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and Other Agreements ("Sale Motion"), filed as Bankruptcy Docket Number 191.  Through the Sale Motion, the Chapter 11 Trustee ("Trustee") seeks an order approving the sale of substantially all of the assets of LPG and the assumption and assignment of certain executory consumer contracts to Consumer Legal Group, P.C. ("CLG") pursuant to the Asset Purchase Agreement ("APA").  The U.S. Trustee opposes the Sale Motion for the reasons set forth below.

## I.    INTRODUCTION

The Trustee asserts that LPG's business must be sold because stopping LPG's activities would be harmful to the consumers.  To the contrary, preventing the sale of the consumers' accounts and stopping LPG's business activities ensures that the consumers suffer no further harm and places the choice of provider, the services to be purchased, and the information to be shared firmly back into the consumer's hands, where it belongs. [1]  It will also allow the monies that they have already paid, which are being held separately, to be returned to them, thereby at least beginning to redress the harm they have already suffered.

The Trustee, too, has not met his burden under section 363 of the Bankruptcy Code. The Trustee has failed to provide reasonable and adequate notice to consumers and has failed to show that a sound business purpose for the sale exists, that the purchase price is adequate, and that the sale is beneficial to the estate and to the consumers.

---

[1] Further compounding these concerns are overarching privacy considerations regarding the maintenance and transfer of consumers' sensitive financial and personal information.

Nevertheless, should the Court approve the sale, all consumers should be required to affirmatively opt-in to the sale rather than be bound by the new agreement simply for failing to respond. The Trustee has failed to explain what "opt-out means", what needs to take place, and what it means for inactive files which are not executory. In any event, consent to contractual reformation cannot be established by failure to accept a counterparty's offer. The Trustee's proposed consumer protections built into the APA are also inadequate.

Also, CLG is not a good faith purchaser under section 363(m) of the Bankruptcy Code. Among other things, CLG is alleged to have assisted the Debtor with the unethical transfer of approximately 12,000 client files prior to the bankruptcy case.[2] And finally, the Trustee's conclusions about the PGX Holdings, Inc.[3] bankruptcy case are irrelevant, and in any event, the objection deadline for that sale has not even passed.

Accordingly, the Sale Motion should be denied to protect the integrity of the bankruptcy system, all interested parties, and this Court, and for failing to meet the requirements of § 363.

## II. STATEMENT OF FACTS

The factual background of this bankruptcy case and the history of LPG, including its ownership and business operations, are set forth fully in the U.S. Trustee's Motion to Convert Case to Chapter 7 Pursuant to 11 U.S.C. § 1112(b) ("Conversion Motion") [filed July 12, 2023, Bankr. Dkt. #218]. *See* Conversion Motion, pg. 9-23. The full statement of facts in the Conversion Motion is incorporated by reference. Additional relevant facts to the Sale Motion follow.

---

[2] Neither the Chapter 11 Trustee nor Consumer Legal Group has produced any evidence that the 12,000 clients were notified 90 days prior to the transfer of the 12,000 client files to Consumer Legal Group. California State Bar Rule 1.17 requires clients to receive 90 days' notice prior to a transfer of client files. Rule 8.4 of the California Rules of Professional Conduct provides that "[i]t is professional misconduct for a lawyer to . . . assist, solicit, or induce" another lawyer to violate the ethical rules.

[3] *In re PGX Holdings, Inc.,* Case No. 23-10718 (Bankr. D. Del.)

1.      On July 6, 2023, the Trustee filed (1) a Motion for Order Approving Stipulation with Phoenix Law, PC ("Phoenix 9019 Motion") [Bankr. Dkt. #176] and (2) a Motion for Order Approving Stipulation with Consumer Legal Group, PC et. al. ("CLG 9019 Motion") [Bankr. Dkt. #178]. The U.S. Trustee opposed both these motions ("Rule 9019 Opposition") [Bankr. Dkt. #209]. The Court heard these motions on July 11, 2023. Both motions were continued to July 21, 2023, to be heard concurrently with the Sale Motion.

2.      On July 7, 2023, the Trustee filed the instant Sale Motion [Bankr Dkt. #191]. The Court has set a hearing on the Sale Motion for July 21, 2023. With the Sale Motion, the Trustee filed his declaration that attached the APA and the Modified Legal Service Agreement. *See* Declaration of Richard Marshack ("Marshack Decl.") [Bankr. Dkt. #191-1], Ex. 2 and 4, respectively.

3.      On July 10, 2023, the Court issued an Order Requesting Additional Briefing re: Sale Motion ("Order") [Bankr. Dkt. #206]. In its order, the Court expressed deep concern over the legality and propriety of the operation of the Debtor's business. It requested, among other things, additional briefing with respect to the authority and ability of the Court to permit the sale under section 363 with an emphasis on the public policy concerns of "allowing a business utilizing questionable legal operations back into commerce without further restrictions and controls." *See* Order [Bankr. Dkt. #206].

4.      In response to the Order, the U.S. Trustee filed his Response to the Order Requesting Additional Briefing re: Sale Motion ("Response Brief") [Bankr. Dkt. #259] (filed July 17, 2023).

5.      On July 12, 2023, the U.S. Trustee filed his Conversion Motion [Bankr. Dkt. #218], which is set for hearing for August 10, 2023.[4]

---

[4] To correct an error in filing, the U.S. Trustee refiled his Conversion Motion on July 13, 2023 [Bankr. Dkt. #232]. The pleading filed as Bankr. Dkt. #218 is identical to that filed as Bankr. Dkt. #232. Thus, the U.S. Trustee refers to Bankr. Dkt. #218 as the operative pleading.

6.      On July 12, 2023, this Court entered an Order Directing the Appointment of a Consumer Privacy Ombudsman and Requiring Notice (the "PCO Order") [Bankr. Dkt. #226].  In the PCO Order, the Court directed the U.S. Trustee to appoint a consumer privacy ombudsman and provide timely notice of the Sale Motion to the appointed ombudsman.  The U.S. Trustee appointed Lucy Thompson [Bankr Dkt. 251].

7.      On July 17, 2023, the Court entered the Order Approving the Appointment of Lucy L. Thomson as the Consumer Privacy Ombudsman ("CPO").  [Bankr. Dkt. 253].

8.      On July 17, 2023, the U.S. Trustee filed a Notice of Compliance of Court's Order Directing the Appointment of a Consumer Privacy Ombudsman and Requiring Notice [Bankr. Dkt. #255].

## III.    PRIOR PLEADINGS FILED BY U.S. TRUSTEE ARE HEREBY INCORPORATED BY REFERENCE TO SUPPORT THIS OPPOSITION

The U.S. Trustee has analyzed and briefed most of the issues supporting denial of this Sale Motion in the pleadings and briefs already filed: (1) Conversion Motion [Bankr. Dkt. #218]; (2) Rule 9019 Opposition [Bankr. Dkt. # 209]; and (3) Response Brief [Bankr. Dkt. #259].  The Conversion Motion, Rule 9019 Opposition, and Response Brief are incorporated by reference.

The U.S. Trustee has also received letters from the Consumer Financial Protection Bureau ("CFPB"), the California Department of Financial Protection and Innovation ("DFPI"), the Office of the Attorney General for the Commonwealth of Pennsylvania ("PA-AG"), and the Office of the Attorney General for New York ("NY-AG") raising concerns about LPG's operation and the sale.  True and accurate copies of the letters from CFPB, DFPI, PA-AG, and NY-AG are attached to the Response Brief as Exhibits "A" through "D," respectively, and are incorporated by reference.[5]  Below is a summary of the prior pleadings filed by the U.S. Trustee and the arguments raised therein.

---

[5] The U.S. Trustee attached these letters to its Response Brief to ensure transparency and in the interest of full disclosure.

## A. CONVERSION MOTION

The U.S. Trustee's Conversion Motion [Bankr. Dkt. 218] explains why the Trustee should stop operating LPG's illegal consumer debt resolution business that was operated and controlled by a disbarred attorney.  The business's income stems from the Legal Services Agreements, that were illegal and unconscionable under federal and state laws and, thus, void and unenforceable:

- The Legal Service Agreements provide for monthly fees paid to and collected by LPG prior to any services being provided to the consumer in violation of 16 C.F.R. § 310.4(a)(s) of the Telemarking Sales Rule ("TSR").

- The Legal Service Agreements provide for LPG to charge and receive money for removing debts from consumer's credit reports before such services were fully performed in violation of 15 U.S.C. § 1679(b) of the Credit Repair Organization Act ("CROA").

- The Legal Service Agreements do not contain written disclosures informing consumers of their rights under the Fair Credit Reporting Act and the CROA in violation of 15 U.S.C. § 1679c(a)-(b) of the CROA.

- The statement in the Legal Service Agreements regarding cancellation rights is deficient from that required by CROA, and it is not bold and conspicuous, in violation of 15 U.S.C. § 1679e.

- The fees paid pursuant to the Legal Service Agreements are unconscionable under California law and the California State Bar Rules of Professional Conduct.

- The Legal Service Agreements violate TSR and CROA, thereby also creating a violation of California Business and Professions Code § 17200.

- LPG fails to comply with several California State Bar Rules of Professional Conduct, including but not limited to, Rule 1.5 (illegal or unconscionable fees) and Rule 5.4 (illegal fee sharing).

*See* Conversion Motion, pg. 23-24, 27-28, 31.[6]

The Court should not countenance the use of chapter 11 to operate nor sell an illegal debt validation scam. Rather, conversion to chapter 7 would immediately stop the harm caused by the continued operations of LPG's business and allow a chapter 7 trustee to begin the process of redressing the harm to consumers by returning the funds they have already paid. Shutting down LPG and converting this case to chapter 7 is in the best interest of the estate and, most importantly, consumers. *See* Conversion Motion, pg. 35.

## B. RULE 9019 OPPOSITION

In the Rule 9019 Opposition [Bankr. Dkt. #209], the U.S. Trustee contends that consumers were not provided reasonable and adequate notice of the settlements as required by FRBP 2002. *See* Rule 9019 Opposition, pg. 12-14. The Trustee also failed to offer any evidence proving the critical elements necessary for approval of the settlements under FRBP 9019, including, among other things, failing to show that he made an informed judgment after diligent investigation to determine that the compromise is fair and equitable and in the best interest of the estate.[7]

Moreover, the proposed settlement with CLG is essentially a de facto sale of LPG's assets and, as such, the Trustee failed to show that a sound business purpose exists under § 363 of the Bankruptcy Code. In this respect:

---

[6] Similarly, the Office of Enforcement ran a search on Consumer Sentinel for complaints concerning LPG on June 13, 2023. The search yielded 811 results, and the Office of Enforcement has anonymized a sample of 500 of the complaints (attached as Exhibit "1" to the CFPB Letter). *See* CFPB Letter, Ex. A to Response Brief, at pg. 4. According to the CFPB, the "consumers describe LPG charging advance fees for debt 'invalidation' and settlement of debts but failing to provide promised services." *Id.* at pg. 3. Further, "[n]umerous other consumers have alleged that LPG took upfront fees for debt relief without providing any services. Some consumers asserted that LPG failed to provide promised legal representation and allowed creditors to take judgments against them. Other claims that LPG took unauthorized ACH draws and has been non-responsive to requests to cancel those draws. Notably consumers reported that LPG sold its services through telemarking calls; the complaints do not suggest that LPG completed these sales after bona fide face-to-face sale meetings." *Id.* at pg. 5.

[7] As evidenced by the declarations submitted by Carolyn Beech and Diane Scarnavack filed in support of their Objections to the settlement with CLG ("Beech Opposition"), some consumers do not support the settlement. See Bankr. Dkt. #185 (filed July 7, 2023).

- Adequate and reasonable notice was not provided to consumers even though the "consumer clients … and all creditors including consumer creditors" are affected by the relief requested.

- The LPG Legal Services Agreements are illegal and unconscionable under various federal and state laws. Thus, they are void and unenforceable and cannot be sold or transferred to CLG.

- The Trustee cannot reform illegal, void, and unenforceable contracts. *See Kolani v. Gluska*, 64 Cal.App.4th 402, 407 (1998) ("courts reform contracts only where the parties have made a mistake and not for the purpose of saving an illegal contract. Illegal contracts are void.").

- As part of the settlement, CLG agreed to abide by the TSA and CROA, but the Trustee does not specify or provide any evidence as to how CLG would comply with the TSA, CROA, or other applicable law.

*See* Rule 9019 Opposition, pg. 21-28.

The TSR, 16 C.F.R. § 310.4 shows that the ACH funds pulled by the Trustee belong to the consumers and cannot be transferred to the estate through settlement. *See* Rule 9019 Opposition, pg. 28-30. And finally, in his request to appoint a consumer privacy ombudsman, the U.S. Trustee emphasized LPG's privacy policy regarding the consumers' personally identifiable information ("PII") and how LPG assured its consumers that it would take "appropriate security measures to prevent the authorized access, disclosure, modification, or unauthorized destruction of the personal data." *See* Rule 9019 Opposition, pg. 30-32.

**C. RESPONSE BRIEF**

In his Response Brief [Bankr. Dkt. #259], the U.S. Trustee highlights all the deficiencies in the notice of the sale provided to consumer clients. *See* Response Brief, pg. 12-13. But, most importantly, the Response Brief cites extensive authority barring the reformation of illegal and unconscionable contracts:

7

- As a court of equity, this Court cannot aid in enforcing an agreement that was fraudulently procured in furtherance of an illegal purpose. *See Sender v. Simon*, 84 F.3d 1299, 1307 (10th Cir. 1996) (courts generally will not enforce an illegal contract based upon "the elementary principle that one who has himself participated in a violation of law cannot be permitted to assert in a court of justice any right founded upon or growing out of the illegal transaction.").

- Courts have opined that "one of the principles courts apply in deciding whether an illegal contract can be enforced is whether a party calls on a court to order another party to carry out an illegal object." *Mann v. Gullickson*, 2016 WL 6473215 at *6 (N.D. Cal. Nov. 2, 2016 (citing *Kashani v. Tsann Kuen China Enter. Co.*, 118 Cal. App. 4th 531, 543 (2004)); *see also Wong v. Tenneco, Inc.*, 39 Cal. 3d 126, 135 (1985); *Lewis & Queen v. N.M. Ball Sons*, 48 Cal. 2d 141, 150 (1957) ("[T]he courts generally will not enforce an illegal bargain or lend their assistance to a party who seeks compensation for an illegal act.").

- As explained by the California Supreme Court, a "void contract is without legal effect. (Rest.2d Contracts, § 7, com. a.)  It binds no one and is a mere nullity. Such a contract has no existence whatever.  It has no legal entity for any purpose and neither action nor inaction of a party to it can validate it...." *Yvanova v. New Century Mortg. Corp.*, 62 Cal. 4th 919, 929 (2016) (citation omitted).

- In general, "courts reform contracts only where the parties have made a mistake and not for the purpose of saving an illegal contract.  Illegal contracts are void." *Kolani*, 64 Cal. App. 4th at 407.

*See* Response Brief, pg. 13-18.

Here, there was no mistake between the parties at the time the Legal Service Agreements were entered — LPG and Tony Diab (the party with the superior bargaining power and who was disbarred in Nevada and California for stealing client money and forging a judge's signature) intended to offer the illegal and unconscionable Legal Service

8

Agreements to the consumers.  The Trustee cannot unilaterally change the terms of the contract.

Similarly, in the Response Brief, the U.S. Trustee contends that the Court should not reform an illegal contract for public policy reasons.  *See* Response Brief, pg. 18-21.  The Rules of Professional Conduct "are not only ethical standards to guide the conduct of members of the bar; but they also serve as an expression of public policy to protect the public." *Bird, Marella, Boxer & Wolpert v. Superior Ct.*, 106 Cal App.4th 419, 431 (2003).  LPG has violated several California State Bar Rules of Professional Conduct, including but not limited to, Rule 1.5 (illegal or unconscionable fees), Rule 5.4 (illegal fee sharing), Rule 5.3.1 (unauthorized practice of law), and California Business & Professions § 6125 (unauthorized practice of law).  Thus, as a matter of public policy, the Legal Service Agreement is unenforceable as any enforcement would require the victims of Diab's fraud and illegality to continue performing its obligations while cleansing the fraudulent and illegal acts of a disbarred attorney.  Further, if an illegal contract is reformed, it would allow the wrongdoer to retain the benefit of the bargain, while forcing the victims (consumers) to continue to perform their obligations.  *See* Response Brief, pg. 18-21.

Notwithstanding the inability to reform the illegal consumer contracts, the U.S. Trustee explains how the Modified Legal Service Agreement does not comply with applicable law.  *See* Response Brief, pg. 22-23.  In violation of the TSR, the Modified Legal Agreement still permits CLG to take advance fees for debt relief services, provides for a schedule of ACH withdrawals that are earned upon receipt, and does not provide consumers a refund of fees that have not been earned if they withdraw from the debt relief service.  *See id.*

Finally, the Response Brief explains that any funds the Trustee obtained in violation of the TSR, CROA, and applicable laws belong to the consumers and should be returned, even if the consumer contracts are reformed.  *See* Response Brief, pg. 23-26.

## IV.    ARGUMENT

The U.S. Trustee opposes this sale because the Trustee has not met his burden under section 363 of the Bankruptcy Code and because of the reasons explained in the above pleadings.  The Trustee has failed to provide reasonable and adequate notice to consumers and has failed to show that a sound business purpose exists, that the purchase price is adequate, and that the sale is beneficial to the estate's main beneficiaries, the consumers.

Nevertheless, should the Court approve the sale over the U.S. Trustee's objection, all consumers should have the ability to affirmatively opt in to the sale — rather than be bound by a failure to opt out when they have no obligation to act.  Consent to contractual reformation cannot be established by failure to accept a counterparty's offer.  The Trustee's proposed consumer protections built into the APA are also inadequate.

Also, CLG is not a good faith purchaser under section 363(m) because, among other things, it allegedly assisted the Debtor with the unethical transfer of approximately 12,000 client files prior to the bankruptcy case.  And finally, the Trustee's conclusions about the PGX Holdings, Inc. bankruptcy case are irrelevant.  Accordingly, the Sale Motion should be denied.

### A.    THE TRUSTEE HAS FAILED TO MEET HIS BURDEN UNDER SECTION 363 OF THE BANKRUPTCY CODE

Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate …"  11 U.S.C. § 363.  Proposed sales are reviewed to determine whether they are within the best interest of the estate resulting from a fair and reasonable price, are supported by a valid business judgment, and proposed in good faith.  *See In re 240 N. Brand Partners, Ltd.*, 200 B.R. 653, 659 (B.A.P. 9th Cir. 996) (citing *In re Wilde Horse Enterprises, Inc.*, 136 B.R. 830, 841 (Bankr. C.D. Cal. 1991)); s*ee also In re Slates*, 2012 WL 5359489, at *11 (B.A.P. 9th Cir. Oct. 31, 2012).

In determining whether a sale satisfies the business judgment standard, courts have required that: (1) accurate and reasonable notice of the sale has been given to interested persons; (2) a sound business purposes exists; (3) the sale yields an adequate price (i.e., one that is fair and reasonable); and (4) the parties to the sale have acted in good faith. *In re Titusville Country Club*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *see also In re Walter*, 83 B.R. 14, 19-20 (B.A.P. 9th Cir. 1988); *In re Slates*, 2012 WL 5359489, at *11; *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1069 (2nd Cir. 1983).

### i.      The Trustee has Failed to Provide Adequate Notice of the Sale

On July 13, 2023, the Trustee filed a Declaration (the "Sale Decl.") of Christopher Celentino Regarding Notice of Sale to Consumer Clients [Bankr. Dkt. # 233].  The email (the "Sale Email") (attached as Exhibit "A" to the Sale Declaration) informs the consumers that they have "ninety (90) days from the date of the sale to either (1) "opt out" of further representation by the new law firm, recognizing that doing so will cancel your contract for services; or (2) you will be offered a new 'cured' contract with the new lawyers to be signed by you, and to allow for services to be performed on your behalf."  Sale Decl., at p. 7.  But the Sale Email failed to alert the consumers that, unless they affirmatively "opt out," i.e., should they do nothing in response, they will be deemed to have entered into a new contract and bound by the Modified Legal Services Agreement (Marshack Decl., Ex. 4). Further, the Sale Email informs consumers that they must "retain counsel" if they have an objection to the proposed sale, but they do not need to have a lawyer.[8]

Additionally, the Trustee proposes to provide notice to the consumers pursuant to California State Bar Rule 1.17.  The California State Bar Rule 1.17 provides for sale of a law practice, stating:

---

[8] In his Response Brief, the U.S. Trustee recommended that the Trustee include all pleadings relating to the Sale Motion, including the U.S. Trustee's Opposition, to the DropBox available for all consumers to review to ensure that consumers make an informed decision.  The U.S. Trustee has been informed that they have added additional pleadings to the DropBox for consumers to access.

. . .

(a)  If the sale contemplates the transfer of responsibility for work
not yet completed or responsibility of client files . . . then:

. . .

(2) in all other circumstances, **not less than 90 days prior to the
transfer**:

(i) the seller, or the lawyer appointed to act for the seller
pursuant to Business and Professions Code section 6180.5, shall
cause a written notice to be given to each client whose matter is
included in the sale, stating that the interest in the law practice is
being transferred to the purchaser; that the client has the right to
retain other counsel; that the client may take possession of any
client materials and property, as required by rule 1.16(e)(1); and
that if no response is received to the notice within 90 days after it
is sent, or if the client's rights would be prejudiced by a failure of
the purchaser to act during that time, the purchaser may act on
behalf of the client until otherwise notified by the client; and

(ii) the seller, or the lawyer appointed to act for the seller
pursuant to Business and Professions Code section 6180.5, shall
obtain the written consent of the client prior to the transfer.  If
reasonable efforts have been made to locate the client and no
response to paragraph (b)(2)(i) notice received within 90 days,
consent shall be presumed until otherwise notified by the client.

*See* California State Bar Rule 1.17 (emphasis added).

The Trustee failed to comply with California State Bar Rule 1.17 because that rule
requires notice to consumers at least 90 days before the sale.  *Id.*  Moreover, presuming
consent because no response was received within 90 days does not satisfy California State
Bar Rule 1.17; that rule requires that reasonable efforts were made to locate the client.  The
Trustee has not provided proper notice and has not explained what reasonable efforts were
taken to locate all consumers to provide them the required accurate and appropriate notice
of the sale.

**ii.    Trustee has Failed to Show that a Sound Business Purpose Exists**

The decision to sell property out of the ordinary course of a debtor's business must
be based on reasonable business judgment.  *In re Continental Air Lines, Inc.*, 780 F.2d

12

1223, 1226 (5th Cir. 1986); *In re Lionel Corp.*, 722 F.2d at 1070.  In determining whether the business purpose is justified under 11 U.S.C. § 363(b)(1), bankruptcy courts apply a flexible, case-by-case approach.  *See In re Walter*, 83 B.R. 14, 19 (B.A.P. 9th Cir. 1988) ("the bankruptcy judge should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike.") (quoting *Continental Air*, 780 F.2d at 1226).  First, and foremost, there is no sound business purpose in selling illegal and unconscionable contracts obtained by a disbarred attorney's fraudulent and illegal acts.  The Trustee seeks to sell the accounts of the victims of this fraudulent debt validation scheme and circumvent fundamental concerns relating to the lawfulness of LPG's business by obtaining approval of an expedited sale that will prevent the proper notice and scrutiny contemplated by, and essential to, the equity and integrity of the bankruptcy system.

The Trustee argues that winding down LPG "stands to potentially subject the consumer clients to predatory practices of other substandard debt relief companies, illegal marketing ploys, and bad actors, including but not limited to Tony Diab and his entourage of alter egos." *See* Marshack Decl., ¶ 14.  The U.S. Trustee agrees with the CFPB that the Trustee's concerns about consumers being "thrown out on the street" if a sale is not approved are overblown.  *See* Response Brief, Ex. A, pg. 38.  Complaints submitted by consumers include demands for refunds and cancellation of contracts.  *Id.*, at pg. 32 (CFPB Letter attaches FTC complaints); *see also* Ng. Conversion Decl., Ex. 11 (BBB Complaints); Bankr. Dkt. #185 (Consumer Declarations in support of the Beech Opposition to the CLG Rule 9019 Motion).  Stopping LPG's activities ensures that consumers suffer no further harm and restores to consumers their absolute right to choose providers, the services to be purchased, and the information to be shared.  Additionally, as recognized by the CFPB, the ongoing harm of potentially illegal advance fees pursuant to the Modified Legal Services Agreement outweighs any risk of consumers being left without questionable

debt relief services.  *See* Response Brief, Ex. A, pg. 38.  The proposed Modified Legal Services Agreement "would likely put consumers in a worse position." *Id.*, at pg. 37.

### iii.    The Trustee has Failed to Show that the Purchase Price Will Benefit the Estate.

The Sale Motion claims that the purchase price is approximately $42 million.  *See* Sale Motion, pg. 12:6-7.  But the actual sale price is linked to the number of consumer contracts that are transferred to CLG (i.e., consumers that have not opted out).  *See* Marshack Decl., Ex. 2 (APA), § 2.  The Trustee fails to discuss the impact on the sale price, and whether such sale will still benefit the estate if numerous consumers opt out of the sale. There is substantial evidence that LPG consumers are unhappy, requesting their contracts be cancelled and unearned fees be returned to them.  *See* Response Brief, Ex. A, pg. 32; Ng Conversion Decl., Ex. 11 (BBB Complaints); Bankr. Dkt. #185 (consumer declarations in support of the Beech Opposition to the CLG Rule 9019 Motion).  In fact, by email dated July 13, 2023, the Trustee notified the U.S. Trustee that Consumer Legal Group was lowering the price because there are fewer client files than anticipated.  It appears that the number of active client files has decreased from 22,000 to approximately 14,000 (a 36% decrease).  Because the anticipated price is now lower, a new notice and hearing are warranted.

But if what the Trustee says is correct, what benefit will the estate receive? And who will receive this benefit?  The Trustee presents no claims analysis.  The Trustee fails to provide a complete breakdown of what funds are coming into the estate, when these funds would be received, where these funds are going, and who would be getting paid, including anticipated trustee fees, professional fees, additional administrative fees from post-petition funding, etc.  The claims register shows secured debt of approximately $19 million and with the increasing amount of professional fees, this case may be administratively insolvent, leaving nothing to be paid to unsecured creditors and consumers.

14

### iv. The Trustee has Failed to Show that the Sale is Beneficial to Consumers.

The Trustee also fails to provide sufficient evidence showing the actual benefit consumers would receive from the sale. The Trustee claims that "[w]hen law abiding, barred attorneys operating on principles of transparency as opposed to secrecy supply these services, the consumer client can achieve their goals, emotional gratitude and a brighter financial future." *See* Sale Motion, pg. 6:23-26. But the only evidence submitted to support this statement are declarations from affiliated attorneys of LPG. The Trustee acknowledges that of the 40,000 clients transferred to Phoenix, only 5,000 were in active litigation or received legal services from an attorney between June 2, 2023, and June 28, 2023. *See* Sale Motion, pg. 6:12-16. What benefit are the other 35,000 clients receiving?

Likewise, there is little evidence that CLG will provide adequate legal services to benefit consumers. CLG has an "F" rating on the BBB website.[9] *See* Declaration of Jaimee Zayicek attached hereto ("Zayicek Decl."), ¶ 6. Several consumers filed complaints with BBB against CLG alleging that it took unauthorized ACH draws and has been non-responsive to refund requests. *Id.*, at Ex. 5. For example, one consumer submitted a complaint against CLG on May 3, 2023, alleging:

> On April 3, 2023[,] $270.70 was removed from My checking account by CLG, otherwise known as Consumer Legal Group. This transaction was NOT authorized. In fact [I] have the email showing where I DECLINED to use their services. Now the company refuses to refund the money taken from my account without my consent. I have contacted the company on numerous occasions asking for the money to be refunded, but they always have a lame excuse that I did not follow cancellation procedures. How do you CANCEL a service you DECLINED from initial contact? I have the email showing where I DECLINED to sign and use their services. I have all the emails requesting a refund, and all the documentation to show I. Imported the refund policy paperwork.

---

[9] *See* https://www.bbb.org/us/ny/new-york/profile/debt-relief-services/consumer-legal-group-pc-0121-87158089.

*See* Zayicek Decl., Ex. 5, pg. 12.

On May 2, 2023, another consumer filed a BBB complaint against CLG, alleging that "[t]his company keeps withdrawing [] money from my account and I Want it to stop. This company is as [*sic*] Scam. I will have to close my account." *Id.*, at Ex. 5, pg.13. There is little or no evidence showing that CLG will provide adequate legal services that would benefit consumers.

CLG is a New York based firm that has only been operating since 2022. *See* Declaration of Jason Rebhun in support of the Sale Motion ("Rebhun Declaration"), at ¶ 6 [Bankr. Dkt. #191-4]. CLG has "dozens of employees who are not part of CLG's legal 'team,' as well as four full-time attorneys (and is in the final state of hiring one more full-time attorney who are expected to be on board[] by the end of July 2023), three part-time attorneys, and eight paralegals." *Id.* at ¶ 7. CLG's website, at https://consumerlegalgroup.com/our-legal-team/, lists only one attorney (Aryeh Weber) on its legal team.

At Mr. Rebhun's deposition on July 17, 2023, he testified that the pictures of the individuals on the website are most likely stock photos, not real photos of real attorneys. *See* Declaration of Marilyn Sorensen ("Sorensen Decl."), Ex. 6, Transcript of Deposition of Jason Rebhun (designated as the person most knowledgeable for CLG) taken on July 17, 2023 ("CLG Depo. Transcript"), pg. 49:1-5. Mr. Rebhun was also unable to identify the officers and directors of CLG. *Id.*, at pg. 36:23-37:1. He further testified that CLG was incorporated in May 2022, but he does not know how long CLG has been in business. *Id.*, at pg. 34:18-20. He further testified that he did not know how many consumer clients that CLG had, and he could not give an approximate number. *Id.*, at pg. 153:25-155:19.

The New York State Unified Court System shows that CLG has appeared in only one case in New York state court, which was a landlord tenant dispute. And there were no cases in New York found for the search of attorney Jason Rebhun or Aryeh Weber. *See* Zayicek Decl., at ¶¶ 3-5; *see also* Response Brief, Ex. D, pg. 555 (the NY-AG also

16

confirms that CLG appears on behalf of a client in only one case).  According to the PA-AG, CLG is not even licensed to perform debt settlement in the state of Pennsylvania.  *See* Response Brief, Ex. C, pg. 550.

CLG's attorneys are licensed in New York and New Jersey.  *See* Rebhun Declaration, at ¶ 7.  Therefore, like LPG, CLG will most likely hire local counsel to service its consumer clients outside of these states, which adds another layer of costs to financially struggling consumers.  LPG and CLG share a similar business model, and there is no assurance from the Trustee that the services provided by the local attorneys affiliated with CLG will provide benefits to the consumers.

In determining whether to enforce illegal contracts, courts have considered the end result to "avoid unjust enrichment" to a defendant and a "disproportionately harsh penalty" upon the plaintiff.  *Mann v. Gullickson*, 2016 WL 6473215, at *6 (N.D. Cal. Nov. 2, 2016). Here, permitting the Trustee to replace the illegal consumer agreements and then sell them to CLG provides no benefit to the consumers.  Those likely to be paid from the sale are the Trustee, his professionals, the secured creditors (who funded all the wrong-doing), and the post-petition lenders (who continue to fund the wrong-doing).  Consumers are not being protected and will not benefit from the sale.  Rather, their contracts are being sold to CLG with little evidence that they will receive adequate legal services from CLG or a full refund of unearned fees (as provided under LPG's Legal Service Agreement).

### v.    The Deficiency in the Opt-Out Plan.

The Trustee contemplates providing the consumers with an "opportunity to object, opt-out or be excluded from the sale and assumption and assignment during the notice period or thereafter if no response is received."  *See* Sale Motion, pg. 13:6-8.  As noted by the Official Committee of Unsecured Creditors ("Committee"), however, the Sale Motion and the APA contain very limited discussion of the "opt-out" procedure.  There is no evidence provided by the Trustee about the information this "opt-out" notice to consumers will contain, who will be responsible for providing the notice, who will determine whether

a consumer has opted out and what role, if any, the buyer will have in connection with this process. Any notice must adequately explain, in layman's terms, the options available to consumers. This should include clear notice that consumers must affirmatively "opt out", the consequences of their failure to do so, and the consequences (if any) of the failure to respond at all. Additionally, the notice must clearly and adequately explain the steps a consumer needs to take to effectively opt out, the consequence for failing to respond, and that should they opt-out they would be entitled to a refund of any unearned fees.[10]

### vi.    Consumers Cannot Consent to a New Contract by their Silence and Should Be Required to Affirmatively Opt In to the Sale.

In connection with the sale, the Trustee proposes to issue a new Legal Service Agreement (i.e., the Modified Legal Service Agreement) between consumers and CLG. *See* Marshack Decl., Ex. 4. This is not "reformation;" it is "replacement." As such, the Trustee needs to obtain the consumers' informed, voluntary, and affirmative consent; that is, they must affirmatively opt in to any new agreement. What the Trustee postulates is akin to a third-party release, *i.e.,* the imposition of a new contract with a non-debtor on creditors, which is forbidden by the Ninth Circuit. *See In re Lowenschuss*, 67 F.3d 1394, 1401 (9th Cir. 1995) (citations omitted) ("This court has repeatedly held, without exception, that "§ 524(e) precludes bankruptcy courts from discharging the liabilities of non-debtors"). That is, should the sale be approved, these consumers will be bound to new contracts — with non-debtors — to which they have not agreed, upending the core concept of offer and acceptance in contract formation and principles of legal due process.

Following the basic principles of contract law, when one has no duty to act, then failing to act cannot be deemed consent and cannot have the legal consequence of waiving or altering any rights. The court in *SunEdison* applied principles of contract law in

---

[10] As recognized by the CFPB, the 90-day opt-out period offers no benefit to the consumers because the consumers are already entitled to a refund of all fees paid and unearned. *See* Response Brief, Ex. A, pg. 37; *see also* 16 C.F.R. § 310.4(a)(5)(i)(A)-(E).

concluding that inaction or silence by nonvoting parties does not constitute consent. *See In re SunEdison, Inc.*, 576 B.R. 453 (Bankr. S.D.N.Y. 2017). Although the court found consent to a third-party release may be express or manifested by conduct, mere silence does not constitute consent absent a duty to speak. *Id.*, at 458-61. "Charging all inactive creditors with full knowledge of the scope and implications of the proposed third-party releases and implying a 'consent' to the third-party releases based on the creditors' inaction, is simply not realistic or fair, and would stretch the meaning of 'consent' beyond the breaking point." *Id.* at 461 (quoting *In re Chassix Holdings, Inc.*, 533 B.R. 64, 81 (Bankr. S.D.N.Y. 2015)); *see also In re Emerge Energy Services LP*, No. 19-11563, 2019 WL 7634308, *18 (Bankr. D. Del. Dec. 5, 2019) (finding that the "failure of a creditor or equity holder to return a ballot or Opt-Out Form manifested their intent to provide a release. Carelessness, inattentiveness, or mistake are three reasonable alternative explanations.").

Similarly, in *Ascena*, the district court on appeal rejected the Debtors' contention that failing to opt out of a release evidenced consent to that release. *See Patterson v. Mahwah Bergen Retail Grp., Inc.* (*In re Ascena*), 636 B.R. 641, 684-85 (E.D. Va. 2022). In its decision, the district court analyzed basic contract law, and in doing so, found that silence with no duty to act cannot show consent:

First, contrary to Debtors' statement that "actual principles of contract law have long provided that the manifestation of assent may be made wholly by failure to act" (Appellee Br. at 65), black letter contract law dictates otherwise. *See Meekins v. Lakeview Loan Servicing, LLC*, 2020 WL 1922765, at *4 (E.D. Va. Apr. 21, 2020) ("A party's silence, however, is insufficient to show its intention to be bound by the terms of a contract.") (quotations omitted). Indeed, in one of the cases cited by Debtors for its acceptance-by-silence proposition, the First Circuit stated, "it's basic contract law that an offeror cannot unilaterally impose on another party the obligation to respond and reject their offer." *Rivera-Colon v. AT&T Mobility Puerto Rico, Inc.*, 913 F.3d 200, 211 (1st Cir. 2019) (*citing* 1 Corbin on Contracts § 3.19 (2018) ("It should here be plainly set forth that an offeror has no power to cause the silence of the offeree to operate as an acceptance when the offeree does not intend it

to do so."); 2 Williston on Contracts § 6:50 (4th ed. 1993) ("Merely sending an unsolicited offer does not impose upon the party receiving it any duty to speak or deprive the party of its privilege of remaining silent *686 without accepting.")). Limited exceptions to this rule exist, such as previous dealings or when an offeror gives the offeree reason to believe that silence or inaction will manifest assent, and the offeree remains silent or inactive with the intent to accept the offer. Restatement (Second) of Contracts § 69(1)(b). However, neither Debtors nor the Bankruptcy Court identified any facts that would support the application of an exception to the general rule of contracts that silence cannot manifest assent. Nor does the record reveal any such facts. Indeed, the Court has already found as a matter of fact that consent did not occur. Accordingly, any attempt to claim that contract law supports a finding of consent to third-party releases based on inaction rings hollow.

*Id.* at 685-86.

Here, there should be no exception to the general rule of contracts. Consumers' failure to opt out of the sale cannot equate to consent to the Modified Legal Service Agreement with CLG. Consumers should not be assumed to acquiesce to the continuation of services that many are complaining about especially when the Legal Services Agreement was entered into with a law firm being controlled and operated by a disbarred attorney; requiring an opt-in provision will ensure that those who understand and wish to enter into new agreements can do so without being bound by an illegal contract.

Moreover, the Trustee has failed to describe what exactly is being sold under the APA or how it will be protected. According to the Sale Motion, the sale consists of "consumer client accounts" but the motion does not elaborate on what information is included in each consumer client account. *See* Sale Motion, pg. 13. Does it include bank account information, social security numbers, homes addresses, dates of birth, credit card information and numbers, email addresses, payment history, records of encounters and personal communication with consumers, demographic data, etc.? This is highly sensitive data, and the Trustee has failed to show how such information will be adequately protected in the proposed sale. The Sale Motion also provides no evidence of CLG's capabilities and

intentions of protecting the privacy records and data of consumers, or that it will abide by all applicable privacy laws.

Given both the inadequacy of consent via silence and the considerable privacy concerns inherent in the proposed transaction, if the Court approves any sale in this case, the consumers should be required to opt in, not opt out, to the sale of their client file to the proposed purchaser. *See also* Response Brief, Ex. A, pg. 39.

### vii.    The Trustee's Proposed Consumer Protections are Inadequate.

The Trustee contends that the consumer protections built into the APA cure any potential violations or concerns over consumer protection laws. *See* Marshack Decl., ¶ 12. But many of these so-called consumer protections are inadequate and do not resolve the infirmities in this sale described herein.

### a.  Court Appointed Monitor

The Trustee seeks to insulate this legally questionable transaction by asking the Court to appoint a monitor in conjunction with the proposed sale and, in doing so, relies on the case of *Purdue Pharma* as support. *See* Trustee's Add'l Brief [Bankr. Dkt. #260], pg. 14; *see also* Sale Motion, pg. 12-13, 17-18. The facts of that case are significantly different and shed no light on the relief sought here. First, Purdue Pharma is a *legal* pharmaceutical business that previously did *illegal* things in promoting the sale and use of opioids, to which the company has agreed to plead guilty. Here, in contrast, the debtor's entire business model itself is likely illegal. Second, the court in *Purdue Pharma* entered an injunction against Purdue Pharma and its beneficial owners, the Sackler Family, from engaging in any criminal conduct in the sale and marketing of opioids, and the monitor was appointed to ensure that the pre-petition, illegal conduct in the promotion and marketing of opioids had actually ceased and did not continue while the case was pending in bankruptcy court. Here, the debtor is not being enjoined from operating an illegal business in bankruptcy and is, instead, asking that the court allow the business to continue under different ownership. Third, the monitor in *Purdue Pharma* is monitoring the activities of

the debtor-in-possession itself (and its beneficial owners who themselves have settled the Government's civil claims against them).  The monitor sought here is not of the debtor-in-possession's conduct; it is the conduct of the entity that purchases the debtor-in-possession's assets.  *Purdue Pharma* is no support whatsoever for the appointment of a monitor.

The Trustee further relies on *In re Ariz. Heart Inst. Inc.,* 2010 Bankr. LEXIS 5841 (Bankr. D. Ariz. 2010), as authority for appointing a monitor for the proposed sale, stating that bankruptcy courts and trustees have the continuing authority to enforce the terms of an Asset Purchase Agreement ("APA") approved by the bankruptcy court.   In *Ariz. Heart Inst.,* the court simply approved the sale and stated that it retained jurisdiction to adjudicate any disputes related to, for example, entitlement to assets or proceeds of the assets, peaceful use of the assets, and prorations under the APA (including taxes).  That is a far cry from a bankruptcy court exercising continuing jurisdiction and oversight of a purchaser's business practices simply because it purchased estate assets.  That would be a vast expansion of a bankruptcy court's authority, unconfined by any limiting principle.  Given the ubiquity of debtors selling substantially all of their assets in chapter 11, the authority sought here for a monitor could effectively transform bankruptcy courts into roving regulators and enforcement agencies over a host of non-debtors.

Additionally, the Sale Motion and the APA provide little, if any, detail about the specific duties, terms of appointment, and mechanisms for compensating the Monitor, and how appointing the Monitor will enhance consumer protection and ensure CLG's compliance with certain consumer protection laws and obligations.  As the Committee argues, it has "no oversight over the Monitor or role in selecting the Monitor designated to serve as a consumer watchdog."  Committee's Opposition to Application for Order Setting Hearing on Shortened Notice Regarding Sale Motion, pg. 5:14-17 [Bankr. Dkt. # 198].  The Trustee suggests retaining either Nancy Rapoport or Matthew Bouslog as the Court appointed Monitor.  *See* Sale Motion, at pg. 17-18.  Both Ms. Rapoport and Mr. Bouslog

appear to be bankruptcy attorneys and may not necessarily have consumer protection experience.  The mere appointment of a Monitor without a clearly defined role and demonstrated benefit to consumers does not resolve the infirmities in the sale described herein.

### b.  Compliance with other State Bar Rules

The Trustee proposes to comply with California State Bar Rule 1.17.  But, as discussed above, notice under Rule 1.17 is deficient.  And given that LPG has clients throughout the nation, the Trustee must comply with the State Bar rules in all 48 jurisdictions, not just California State Bar Rule 1.17.  For instance, the Florida State Bar Rule 4-1.17, which governs the sale of a law practice, requires that any sale of a law practice be sold to "1 or more lawyers or law firms authorized to practice law in Florida." CLG is not authorized to practice law in Florida and has not provided the proper notice under Florida State Bar Rules.

### c.  Modified Purchase Agreement still violates the TSR

Notwithstanding the Trustee's inability to replace the consumer contracts as discussed above, the Modified Purchase Agreement does not comply with all federal and state laws, rules, and regulations as it still violates the TSR.  *See* Response Brief, pg. 22-23.

## B.   CLG IS NOT A GOOD FAITH PURCHASER UNDER 11 U.S.C. § 363(m)

The Trustee proposes to sell LPG to CLG for $42 million, subject to overbid.  *See* Sale Motion, at pg. 1-2.  But what exactly is being sold is unclear.  The Trustee defines CLG as the "Good Faith Purchaser" and requests such a finding under section 363(m).  *Id.* at pg. 23-24.

Under 11 U.S.C. § 363(m), in relevant part, if a sale order is subsequently reversed or modified on appeal, such reversal or modification does not affect the validity of the sale if the purchaser was a good faith purchaser and no stay pending appeal was obtained. Although the Bankruptcy Code does not define the term "good faith," courts have found

that a "good faith purchaser" is one who buys 'in good faith' and 'for value.'" *In re M Capital Corp.*, 290 B.R. 743, 746 (9th Cir. BAP 2003). "Typically, lack of good faith is shown by fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *Id.*, at 746-47. The burden of proof to show "good faith" is on the proponent of good faith, or, in this case, the Trustee. *See id.*, at 747.

In the Complaint filed by the Trustee against LPG's alter egos, fraudulent transferees, and other related parties (Adv. No. 8:23-ap-1046-SC), the Trustee alleges that CLG is an alter ego of the Debtor. "As he did with LPG, [Tony] Diab controls and operates the Alter Egos, despite them being nominally owned by licensed attorneys." *See* Complaint, at ¶ 59. The Trustee also obtained a preliminary injunction against CLG based on his allegation that CLG was a transferee of LPG's pre-petition fraudulent transfer of 12,000 customer files that siphoned-off $3.3 million in the Debtor's annual revenue. *Id.* at ¶ 61. Further, on July 3, 2023, CLG's special purpose affiliate, Liberty Acquisitions Group Inc. ("Liberty") was authorized to loan the estate $560,000.00, on a superpriority basis, on 24 hours' notice [Bankr. Dkt. # 168].[11]

The Trustee fails to explain how CLG can go from being an alleged alter ego of a disbarred attorney to a good faith purchaser. [12] In the Sale Motion, the Trustee again

---

[11] By email dated July 12, 2023, the U.S. Trustee requested the Chapter 11 Trustee to identify the following information for Resolution Partners, Liberty Acquisitions, Sapphire Management Holdings, LLC, Capital, LLC, and StratCat Management: (1) the state of incorporation/organization/formation; and (2) the owners, members, partners of each. As of July 18, 2023, the Chapter 11 Trustee has not produced this information. CLG's Rule 30(b)(6) witness, Jason Rebhun, was unable, or unwilling, to explain Liberty Acquisitions relationship to CLG at the deposition of CLG on July 17, 2023.

[12] Similarly, it appears that the Trustee has failed to complete his due diligence as to all the various entities that may be associated or affiliated with LPG. The U.S. Trustee was recently contacted by LendingClub Bank ("LendingClub"), who is involved with some of LPG's current/former clients. On July 5, 2023, LendingClub received a cease-and-desist letter from "Elite Legal Practice," an entity located in Los Angeles, CA. Interestingly, the letter was sent using an LPG envelope. At a minimum, this creates confusions as it seems that the various entities at play may all be connected.

Further, LendingClub received a letter from CLG on July 5, 2023, listing CLG's address as "P.O. Box 412, Elmsford, NY 10523." This address is listed on their website too. That address is incorrect. Neither consumers nor

24

focuses on the alleged benefit consumers will receive from the sale to support a finding of good faith.  *See* Sale Motion, pg. 23-24.  But this does not support a good faith purchaser finding with respect to CLG.  To the contrary, as discussed above, CLG has only been operating since 2022, has an "F" rating on BBB with numerous complaints against it, and has no presence in the New York state system.  CLG also colluded with LPG and Tony Diab in the transfer of the 12,000 clients prior to the bankruptcy case without providing the clients with the required notice at least 90 days prior to the transfer.  Accordingly, the Trustee has failed to establish that CLG is a good faith purchaser under section 363(m).  This Court should not allow the Trustee's sale to CLG.[13]

## C.    Trustee's Comments about PGX Holdings, Inc. are Irrelevant.

Finally, the Trustee contends in the Sale Motion that the U.S. Trustee's and CFPB's failures to object in the bankruptcy case of PGX Holdings, Inc. means that "the offending conduct and policies and procedures employed by LPG … can be cured."  *See* Sale Motion, pg. 2.  These conclusions are unfounded and irrelevant to this case.  In PGX Holdings, Inc. (No.  23-10718, Bankr. D. Del.), a motion was filed on June 6, 2023, which among other

---

creditors are able to send any communications to CLG.  The U.S. Trustee is informed that CLG had provided a new address to the Office of the New York State Attorney General ("NY-AG") as to where complaints should be addressed.  The NY-AG had requested CLG to update its website, so consumers also have a working mailing address.  As of the filing of this Opposition, CLG has yet to update its website to list a correct mailing address.

[13] On July 13, 2023, the Trustee informed the U.S. Trustee that he may be receiving a bid from Russ Squires ("Squires") of Validation Partners, LLC ("Validation Partners").  In the event Validation Partners and/or Russ Squires are the successful bidders and purchasers, the Trustee must provide evidence that Validation Partners and/or Russ Squires are good faith purchasers under section 363(m).  On April 21, 2023, Carolyn Beech ("Beech") filed a First Amended Complaint – Class Action in the District Court for the Southern District of Mississippi (Southern Division) (Case No. 1:22-cv-057 HSO-BWR) against, among other parties, Squires and Validation Partners, alleging that: (1) between August 2021 and August 2022, Validation Partners purchased over 40,000 consumer accounts from different marking affiliates and LPG with a total value of $400,000,000; (2) Validation Partners loaned LPG in the total sum in excess of $3.8 million between December 2021 and June 2022; (3) the funding by Validation Partners was essential to the continued operation of LPG; (4) Validation Partners was fully aware of the nature of LPG's business; and (5) Validation Partners received money obtained from consumers on LPG contracts violation of CROA.  As such, Beech alleged that Validation Partners and Squires are liable for the acts of LPG because they knowingly financed the Debtor's illegal operation.  *See* Validation Partner Complaint, at ¶¶ 27, 29, 30, 40 [Dkt. # 48 of Case No. 1:22-cv-057 HSO-BWR].  On June 8, 2023, Beech obtained a default against Squires and Validation Partners in the Validation Partners lawsuit [Dkt. # 75 of Case No. 1:22-cv-057 HSO-BWR].

things, requested approval of bidding procedures and the scheduling of a sale hearing. The U.S. Trustee opposed this motion with respect to the breakup fee for the stalking horse bidder. Notably, no order has been entered approving the proposed bidding procedures or setting a sale hearing. Because the time to object to the sale in PGX Holdings, Inc. has not passed, no conclusions can be drawn about positions that have not been taken in that matter.

## V.    CONCLUSION

Based on the foregoing, and upon such other and further oral and/or documentary evidence as may be presented at the time of the hearing, the U.S. Trustee respectfully opposes any sale and requests that the Sale Motion be denied.

Respectfully submitted,

PETER C. ANDERSON
UNITED STATES TRUSTEE

DATED:    7/19/2023

By:   */s/ Kenneth Misken*
Kenneth M. Misken
Assistant U.S. Trustee

1

## DECLARATION OF JAIMEE ZAYICEK

2

I, Jaimee Zayicek, declare and state as follows:

3

1. I am employed by the Office of the United States Trustee for Region 16 as a

4

Paralegal Specialist. My duties and responsibilities include the review and analysis of

5

Chapter 11 cases, including the case of *The Litigation Practice Group, P.C.* (Bankr. Case

6

No. 8:23-bk-10571-SC). I make this declaration upon my own personal knowledge except

7

as to those statements made upon information and belief.

8

3. On July 14, 2023, I accessed the New York State Unified Court System's online

9

case search database and used the attorney/firm search feature. I searched for any cases in

10

which attorney Aryeh Weber was representing either plaintiffs or defendants. There were

11

no results. Attached as Exhibit "1" is a true and correct copy of the search results.

12

4. I also searched for any cases in which attorney Jason Rehbun was representing

13

either plaintiffs or defendants. There were no results. Attached as Exhibit "2" is a true and

14

correct copy of the search results.

15

5. Finally, I searched for any cases in which Consumer Legal Group was representing

16

either plaintiffs or defendants. There was one result. Attached as Exhibit "3" is a true and

17

correct copy of the search results.

18

19

//

20

21

//

22

23

24

//

25

26

27

28

27

6.  On July 19, 2023, I accessed the Better Business Bureau's ("BBB") website at www.bbb.org and searched for Consumer Legal Group, P.C. ("CLG"). CLG has a "F" rating with the BBB.   A true and accurate copy of the CLG's "F" Rating with BBB is attached hereto as Exhibit "4".   True and accurate copies of the BBB Complaints against CLG are attached hereto as Exhibit "5."

I declare under penalty of perjury and under the laws of the State of California and the United States of America that the foregoing is true and correct, and if called as a witness I could and would completely testify thereto.  Executed this 19th day of July 2023 at Long Beach, California.

Jaimee Zayicek
Bankruptcy Paralegal

## DECLARATION OF MARILYN SORENSEN

I, Marilyn Sorensen, hereby declare as follows:

1. I am employed by the Office of the U.S. Trustee for Region 16 as a Bankruptcy Analyst. My duties and responsibilities include the review and analysis of Chapter 11 cases, including the case of *The Litigation Practice Group, P.C.* (Bankr. Case No. 8:23-bk-10571-SC). I make this declaration upon my own personal knowledge except as to those statements made upon information and belief.

2. After the July 17, 2023, deposition of Jason Rebhun, on behalf of the Consumer Legal Group, P.C., I requested a transcript from the court reporter Focus Litigation Solutions.

3. Attached hereto as **Exhibit 6** is a true and correct copy of the transcript of the deposition held on July 17, 2023.

I declare under penalty of perjury and under the laws of the State of California and the United States of America that the foregoing is true and correct, and if called as a witness I could and would completely testify thereto. Executed this 19th day of July 2023 in Lake Forest, California.

Marilyn Sorensen
Bankruptcy Analyst

# Exhibit 1

# Exhibit 1



# New York State Unified Court System

## *WebCivil Local - Case Search Results*

**No cases found.**

New Search    Return To Search

Exhibit 1  0001

# Exhibit 2

# Exhibit 2



# New York State Unified Court System

## *WebCivil Local - Case Search Results*

**No cases found.**

New Search        Return To Search

Exhibit 2  0002

# Exhibit 3

# Exhibit 3



# New York State Unified Court System

## *WebCivil Local - Case Search Results*

1 Case(s) Match Your Search.  **Page 1 of 1 pages**
[New Search]  [Edit Search]

Please click the number in the first column or the index number to view case details.

| | Court | Index Number | Case Status | Plaintiff | First Plaintiff Firm | Defendant | First Defendant Firm | Appearance Date | Judge/Part |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Kings County Civil Court | LT-307667-23/KI | Active | L & M PROSPECT PLAZA, LLC | SDK Heiberger LLP | KEITH DARBY | Consumer Legal Group att: jack gross | 08/10/2023 | Honorable Agata E. Rumprecht-Behrens Part G |

[New Search]  [Edit Search]

Exhibit 3  0003



# New York State Unified Court System

## *WebCivil Local - Case Detail*

| | |
|---|---|
| Court: | **Kings County Civil Court** |
| Index Number: | **LT-307667-23/KI** |
| Case Name: | **L & M PROSPECT PLAZA, LLC vs. DARBY, KEITH** |
| Case Type: | **Landlord and Tenant** |
| Classification: | **Non-Payment** |
| Filing Date: | **03/06/2023** |
| Disposition Date: | |
| Calendar Number: | |
| Jury Demand: | **No** |
| Judge Name: | |

Attorney/Firm(s) For Petitioner - L & M PROSPECT PLAZA, LLC:

**SDK Heiberger LLP**                                    Attorney Type: **Firm**
**205 East 42nd Street, 6th Floor**
**New York, New York  10017-**
**(917) 351-1335**


Attorney/Firm(s) For Respondent - KEITH DARBY:

**Consumer Legal Group att: jack gross**                Attorney Type: **Firm**
**p.o. box 412**
**Elmsford, New York  10523-**
**(212) 920-1247**

[ Close ]   [ Show All Appearances ]   [ Add to eTrack ]

Exhibit 3  0004

# Exhibit 4

# Exhibit 4



## Business Profile

# Consumer Legal Group, P.C.

Debt Relief Services



## Contact Information

📍 11 Broadway Ste 300
   New York, NY 10004-1398

🌐 Visit Website

📞 (212) 920-1247

## Customer Reviews

This business has 0 reviews

[ Read Reviews ]

Be the First to Review!

## Customer Complaints

**12** complaints closed in last 3 years

**12** complaints closed in last 12 months

[ Read Complaints ]

## BBB Rating & Accreditation



**F**

THIS BUSINESS IS NOT BBB ACCREDITED

Search for Accredited
Businesses in this category

**Years in Business:** 1

**Customer Reviews are not used in the
calculation of BBB Rating**

Reasons for BBB Rating

Exhibit 4  0005

[File a Complaint](#)

## Related Categories

[Debt Relief Services](#)

## Business Details

**Location of This Business**
11 Broadway Ste 300, New York, NY 10004-1398

**BBB File Opened:** 11/3/2022

**Years in Business:** 1

**Business Started:** 5/18/2022

**Licensing Information:**

This business is in an industry that may require professional licensing, bonding or registration. BBB encourages you to check with the appropriate agency to be certain any requirements are currently being met.

**Type of Entity:** Professional Corporation (PC)

**Business Management**
Aryeh Weber, Principal

**Contact Information**
Principal
Aryeh Weber, Principal
Customer Contact
Aryeh Weber, Principal

**Additional Contact Information**
Website Addresses
[https://consumerlegalgroup.org/](https://consumerlegalgroup.org/)

## Customer Complaints

12 Customer Complaints

**Most Recent Customer Complaint**

**Complaint Type:** Problems with Product/Service
**Status:** Resolved



06/06/2023

**Exhibit 4   0006**

On 5/22, I spoke with a representative and a supervisor about a payment reminder I had received that Saturday prior. I called them first thing Monday morning. Realized that they are not authorized to withdraw funds from my bank. I was told that it wouldnt be done. Well, they ******** my account by processing a payment that wasnt supposed to...

## Customer Reviews

0 Customer Reviews

**What do you think? Be the first to review!**

How BBB Processes Complaints and Reviews

Start a Review

## Local BBB

BBB Serving Metropolitan New York

More Info on Local BBB

## BBB Reports On

BBB reports on known marketplace practices.

See What BBB Reports On

BBB Business Profiles may not be reproduced for sales or promotional purposes.

BBB Business Profiles are provided solely to assist you in exercising your own best judgment. BBB asks third parties who publish complaints, reviews and/or responses on this website to affirm that the information provided is accurate. However, BBB does not verify the accuracy of information provided by third parties, and does not guarantee the accuracy of any information in Business Profiles.

When considering complaint information, please take into account the company's size and volume of transactions, and understand that the nature of complaints and a firm's responses to them are often more important than the number of complaints.

BBB Business Profiles generally cover a three-year reporting period. BBB Business Profiles are subject to change at any time. If you choose to do business with this business, please let the business know that you contacted BBB for a BBB Business Profile.

As a matter of policy, BBB does not endorse any product, service or business.

© 2023, International Association of Better Business Bureaus, Inc., separately incorporated
Better Business Bureau organizations in the US, Canada and Mexico and BBB Institute for
Marketplace Trust, Inc. All rights reserved. *In Canada, trademark(s) of the International
Association of Better Business Bureaus, used under License.

# Exhibit 5

# Exhibit 5



## Complaints

# Consumer Legal Group, P.C.

Debt Relief Services



Not BBB Accredited

View Business profile

**Need to file a complaint?**
BBB is here to help. We'll guide you through the process.

File a Complaint

## Complaint Details

Note that complaint text that is displayed might not represent all complaints filed with BBB. See details.

**Complaint Type:**
Problems with Product/Service
**Status:**
Resolved



**Initial Complaint**
06/06/2023

On 5/22, I spoke with a representative and a supervisor about a payment reminder I had received that Saturday prior. I called them first thing Monday morning. Realized that they are not authorized to withdraw funds from my bank. I was told that it wouldnt be done. Well, they ******** my account by processing a payment that wasnt supposed to be done where I also accrued an NSF fee. The $240.61 was refunded without the additional fee a week later. I closed my account on that same day. Received confirmation that any further payments would not occur. Today 6/2/23, they again withdrew my account which incurred another NSF fee. I called them and I was told, issue would be resolved ASAP, yet still wanting me to fill out a refund request. HOW or WHY?! I DONT have a contract or request their services with them so why should I have to fill out a refund request for them to refund me the money they werent supposed to take out in the first place. They fraudulently withdrew my account. And Im only assuming that I will have to wait another week for my $240.61 to be refunded, not to mention a total of $58 in NSF fees Ill just have to swallow.

Exhibit 5 0009



**Business response**
06/27/2023

Hello *******,
We appreciate your communication with us so we could properly address your concerns.
Our team is confirming that we have resolved this matter to your liking. We worked
together to find the best possible solution. We wish you all the best moving forward and
thank you for choosing us.
All the best,
Consumer Legal Group



**Customer response**
06/29/2023

Better Business Bureau:

I have reviewed the response made by the business in reference to complaint **ID** ********, and
find that this resolution is partially satisfactory to me and the matter has partially been
resolved. They refused to refund the banks NSF fees that accrued both times that they
withdrew funds without my consent.

Sincerely,

**********************************

**Complaint Type:**
Billing/Collection Issues
**Status:**
Unanswered



**Initial Complaint**
05/15/2023

About two years ago (First payment was on 7/7/21) I was desperate for a way to fix my
debt/credit situation. I am a disabled 61 year old and my wife has some major health issues
also (multiple strokes, Covid, diabetic). We were not bringing in enough money to pay our
regular bills let alone cover our credit cards, mounting medical and other debts. I started
looking online and found many different types of services. It was a very stressful time and we
struggled to find the right fit. A company called ******************** Group promised to return the
money spent for the service for any debt they could not resolve, but said I needed to give
them at least a year. The twice monthly payments would equal a little less than the minimum

Exhibit 5  0010

payments to all the credit cards. Seemed like a pretty good guarantee so we chose them.
Early on it was a struggle as they said but as the collections started coming in it was nice that
they were now calling them instead. Fast forward to about about nine months ago and my
calls stopped being answered and/or returned. Written messages were also being ignored,
The only contact I was receiving from them was the money they continued to take from my
checking account twice a month. Only .1 debt had been resolved and while we did pay an
amount less than what we owed, if I add in the money spent on the service the amount is
much, much more than I owed. After 3 months of no contact I finally received a Notice of
Transition of Legal Services from a ******************************** from LPG stating the Consumer
Legal Group would now be taking care of me and how much better prepared for my situation. I
never signed anything with the new group called CPG and the company is no different.
Websites are almost identical, even the clients page and they make sure they deduct money
from my account twice a month. (continued in attachment but almost done)

**Complaint Type:**
Problems with Product/Service
**Status:**
Unanswered

 **Initial Complaint**
05/03/2023

I would like to get all or some of the money returned from Consumer who took over
************** when they were red flagged. I paid LPG a total of ******* for the 4 mos we were with
them without seeing any progress. I asked them what I was paying the ******* a month for and
they said it was legal fees. Then Consumer Legal Group took over and for 2 mos. I did not see
where anything was being done. No phone calls or emails. When I contacted them they said it
would take up to 48 mos. to resolve it. They too said that the ******* a month was going toward
legal fees. Well if I paid that amount each month for legal fees I would be in a worst financial
way than I am. My husband and I live on our social security from month to month which isnt
easy. I could have been paying the fees they charged to my creditors. They were very
misleading when they were explaining how the program worked. I would like to retrieve all or
at least half of what we paid between the two of them.

 **Customer response**
05/28/2023

Better Business Bureau:

At this time, **I have not been contacted by Consumer Legal Group, P.C.** regarding complaint
**ID ********.**

Sincerely,

***********************

Exhibit 5  0011

**Complaint Type:**
Problems with Product/Service
**Status:**
Unanswered


**Initial Complaint**
05/03/2023

Our account with LPG has been doubled billed again for at least the 3rd time for $792.80, by LPG then Consumer Legal. The date of occurrence was 3/8/2023. We've tried to call via phone and have no resolution, nor been able to discuss with LPG. LPG hides behind the **************** team and just moved ** to Consumer Legal Group PC on 3/1/2023 and Consumer Legal Group billed us the second time after LPG billed the first. We've asked Consumer Legal for return of the money, as we did not get retained by them.We've faxed twice now, due to receiving a blocked email message using the ************. We have finally made it thru this nightmare to the last month and they double bill ** again. Now we've received notice that we were moved to Phoenix Law as of 3/30. LPG has been terrible to deal with and horribly represented us legally. We've paid for 18 months and have nothing to show for it. We would have been better off telling the sales lawyer to go away and let ** handle our situation on our own. LPG is a predator and needs to be shut down. Our client id is ********* Our advice to others is to run away from LPG and will ensure that we reach out to numerous media outlets as well, in order to protect others.

**Complaint Type:**
Problems with Product/Service
**Status:**
Unanswered


**Initial Complaint**
05/03/2023

On April 3, 2023 $270.70 was removed from My checking account by CLG, otherwise known as Consumer Legal Group. This transaction was NOT authorized. In fact o have the email showing where I DECLINED to use their services. Now the company refuses to refund the money taken from my account without my consent. I have contacted the company on numerous occasions asking for the money to be refunded, but they always have a lame excuse that I did not follow cancellation procedures. How do you CANCEL a service you DECLINED from initial contact? I have the email showing where I DECLINED to sign and use their services. I have all the emails requesting a refund, and all the documentation to show I. Imported the refund policy paperwork.

**Complaint Type:**
Problems with Product/Service
**Status:**
Unanswered

Exhibit 5  0012



**Initial Complaint**
05/02/2023

This company keeps withdrawing,money from my account and I Want it to stop. This company is as Scam. I will have to close my account.

**Complaint Type:**
Advertising/Sales Issues
**Status:**
Answered



**Initial Complaint**
11/28/2022

I have been receiving multiple calls per day from this company since last week. They have called each day ***** times, with all unique phone numbers from all over the world. They only leave a few voicemails. They have identified themselves variously as CLG, the advantage approval department, and the Consumer Legal Group. They say I am approved for $51,000. On one call they asked for a "*******". I have answered a few calls and told them I didn't request a loan and that they have the wrong number associated with this account in their system. I have also told multiple people on these calls that I am on the Do Not Call list. I even returned a couple of the voicemails so I could clear up the misunderstanding and reiterate that I'm on the *** list. They are not interested in fixing it. They just hang up on me if I say anything other than "I'm interested ". And still, they call me multiple times per day. I don't answer now, but it's aggravating. I missed several Dr.s calls because I have the phone ringer turned off. What kind of recourse do I have? How do I get them to stop calling? I deleted the caller ID's from last week, but attached are some recent ID's. Thank you for your help.



**Business response**
12/01/2022

*To Whom It may *************************** you for bringing this to our attention.  I have reviewed the firm's files and I can confirm that no calls have been made to this individual by any individual here or on our behalf.  ****************** is not and has not been a client of ours, and we have no records of any communications to her or her phone number. Further, We have no knowledge or affiliation with any "Advantage Approval Department".  As a law firm, we are dedicated to giving our clients the best service possible, and any suggestions are always welcome. We will further look into this matter and do everything we can to make sure it doesn't happen in the future. If this ever comes up again please let us know so that we can get to the bottom of this.*
*All the best!*
*****

Exhibit 5  0013

Case 8:23-bk-10571-SC    Doc 296    Filed 07/19/23    Entered 07/19/23 18:24:54    Desc
                              Main Document      Page 53 of 311

*Some consumers may elect to not publish the details of their complaints, some complaints may not meet BBB's standards for publication, or BBB may display a portion of complaints when a high volume is received for a particular business. ↩

BBB Business Profiles may not be reproduced for sales or promotional purposes.

BBB Business Profiles are provided solely to assist you in exercising your own best judgment. BBB asks third parties who publish complaints, reviews and/or responses on this website to affirm that the information provided is accurate. However, BBB does not verify the accuracy of information provided by third parties, and does not guarantee the accuracy of any information in Business Profiles.

When considering complaint information, please take into account the company's size and volume of transactions, and understand that the nature of complaints and a firm's responses to them are often more important than the number of complaints.

BBB Business Profiles generally cover a three-year reporting period. BBB Business Profiles are subject to change at any time. If you choose to do business with this business, please let the business know that you contacted BBB for a BBB Business Profile.

As a matter of policy, BBB does not endorse any product, service or business.

## BBB Rating & Accreditation

# F

THIS BUSINESS IS NOT BBB ACCREDITED

Search for Accredited
Businesses in this category

**Years in Business:** 1

**Customer Reviews are not used in the calculation of BBB Rating**

Reasons for BBB Rating

## Contact Information

 11 Broadway Ste 300
New York, NY 10004-1398

🌐 Visit Website

Exhibit 5  0014

📞 (212) 920-1247

## Complaints Summary

**12** total complaints in the last 3 years.

**12** complaints closed in the last 12 months.

© 2023, International Association of Better Business Bureaus, Inc., separately incorporated Better Business Bureau organizations in the US, Canada and Mexico and BBB Institute for Marketplace Trust, Inc. All rights reserved. *In Canada, trademark(s) of the International Association of Better Business Bureaus, used under License.

Exhibit 5  0015

# Exhibit 6

# Exhibit 6

1              UNITED STATES BANKRUPTCY COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                   SANTA ANA DIVISION

4

5    In re:                    )  Chapter 11
                               )
6    THE LITIGATION PRACTICE   )  Case No. 8:23-bk-10571-SC
     GROUP, P.C.,              )
7                              )
             Debtor.           )
8    _____)

9

10

11

12

13

14

15              Deposition of JASON REDHUN

16                 Conducted Virtually

17                Monday, July 17, 2023

18             7:04 a.m. - 15:56 p.m. PST

19

20

21

22   Job No.:  7220

23   Pages:  1 - 206

24   Stenographically Reported By:  Cara M. Foster, RPR
                                    CSR No. 11973
25

1    Deposition of JASON REDHUN, conducted virtually via Zoom
videoconference.

2

3

4

5

6

7

8              Pursuant to notice, before Cara M. Foster,

9    Registered Professional Reporter and Stenographic

10   Certified Shorthand Reporter Number 11973, in and for

11   the State of California.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    A P P E A R A N C E S

 2

 3   ON BEHALF OF CONSUMER LEGAL GROUP, P.C. DEPONENT JASON
     REDHUN:
 4
        LAW OFFICES OF RONALD RICHARDS & ASSOCIATES
 5      A Professional Corporation
        By:  Ronald N. Richards, Esq.
 6      PO Box 11480
        Beverly Hills, California 90213
 7      310.56.1001
        ron@ronaldrichards.com
 8

 9   ON BEHALF OF THE OFFICIAL COMMITTEE OF UNSECURED
     CREDITORS:
10
        FOX ROTHSCHILD LLP
11      By:  Robert F. Elgidely, Esq.
        101 Park Avenue
12      17th Floor
        New York, New York 10178
13      212.878.7900
        relgidely@foxrothschild.com
14

15
     ON BEHALF OF THE UNITED STATES TRUSTEE:
16
        OFFICE OF THE UNITED STATES TRUSTEE
17      By:  Kenneth M. Misken, Esq.
        411 W. Fourth Street
18      Suite 7160
        Santa Ana, California 92701-8000
19      714.338.3400
        kenneth.m.misken@usdoj.gov
20

21   ON BEHALF OF THE CREDITORS DEBT VALIDATION FUND 2, MCDVI
     Fund 1 and MCDVI Fund 2
22
        CAPPELLO & NOEL LLP
23      By:  David L. Cousineau, Esq.
        831 State Street
24      Santa Barbara, California 93101-3227
        805.564.2444
25      dcousineau@cappellonoel.com
```

1                    A P P E A R A N C E S

2                          (cont.)

3

4    ON BEHALF OF THE CHAPTER 11 TRUSTEE AND RICHARD A.
     MARSHACK:

5

       DINSMORE & SHOHL
6      By:  Sara A. Johnston, Esq.
       City Center
7      100 W. Main Street
       Suite 900
8      Lexington Kentucky, 40507
       859.425.1021
9      sara.johnston@dinsmore.com

10

11

12

13

14

15

16

17

18

19

20   ALSO PRESENT:

21      Soloman Feig
        Queenie Ng
22      Mike Shields
        Chirstopher Celentino
23      Richard Marshak

24

25

```
 1                        I N D E X

 2                                              PAGE

 3  JASON REDHUN

 4     Examination by Mr. Elgidely......................    7

 5     Examination by Mr. Richards.....................  179

 6     Examination by Mr. Misken.......................  198

 7

 8

 9

10                    E X H I B I T S

11  EXHIBIT              DESCRIPTION              PAGE

12                    (none marked)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    P R O C E E D I N G S

2                              *  *  *

3          THE STENOGRAPHER:  We are going on the record.

4     The time is 7:04 a.m. Pacific Standard Time.

5          I would like to introduce myself.  My name is

6     Cara Foster.  I am your California CSR for today.  My

7     license number is 11973.

8          Before I swear in the witness, would counsel

9     place their appearances on the record, please?

10         MR. RICHARDS:  Ronald Richards for the

11    deponent, Jason Redhun of the CLG Law Group.

12         MR. ELGIDELY:  Robert Elgidely of Fox

13    Rothschild on behalf of the Creditors Committee.

14         MR. MISKEN:  Kenneth Misken, Assistant

15    United States Trustee on behalf of the United States

16    Trustee.

17         MR. COUSINEAU:  David Cousineau on behalf of

18    Creditors Debt Validation Fund 2, MCDVI Fund 1 and MCDVI

19    Fund 2.

20         MS. JOHNSTON:  Sara Johnston with Dinsmore &

21    Shohl on behalf of the Chapter 11 Trustee, Richard

22    Marshack.

23                    JASON REDHUN,

24    was called for examination, and after having been duly

25    sworn under penalty of perjury by the stenographic
```

1    certified shorthand reporter, was examined and testified

2    as follows:

3                              EXAMINATION

4    BY MR. ELGIDELY:

5        Q.    Good morning, Mr. Redhun.

6        A.    Good morning.

7        Q.    My name is Robert Elgidely.  I am one of the

8    attorneys for the Creditors Committee in the Litigation

9    Practice Group case.

10            Do you understand that?

11       A.    Yes.

12       Q.    Okay.  Have you ever had your deposition taken

13   before?

14       A.    Yes.

15       Q.    Okay.  As you know, there are ground rules for

16   depositions that are intended to make the process

17   proceed as smoothly as possible.  I'm going to ask you

18   this morning, and it sounds like this afternoon, some

19   questions under oath, and the court reporter is going to

20   record your responses.

21            In order for her to do so, you need to give

22   verbal responses.  Responses such as yeah or uh-huh are

23   not acceptable; yes or no responses followed by an

24   explanation if appropriate.

25            Please wait for me to finish my question before

1   you begin to respond so that the court reporter can take

2   down my full question, as well as your full response.

3   That way, Mr. Redhun, we will get an accurate transcript

4   of this proceeding.

5           If you don't understand a question that I'm

6   asking, please tell me and I will rephrase it.

7   Otherwise, I will assume that you understood the

8   question that I'm asking.

9           As you also know, from time to time your

10  counsel may lodge objections to certain of my questions.

11  Typically, those objections will be to the form of my

12  question.  In those instances, you need to respond to my

13  question.  Those objections are just to preserve the

14  objections for later proceedings if necessary.

15          The only time you're not allowed to respond to

16  one of my questions is if your counsel instructs you not

17  to respond on the basis of some privilege, such as the

18  attorney-client privilege.

19          MR. RICHARDS:  Counsel, I don't agree with

20  that.  He's designated voluntarily for certain items

21  that we went through beforehand.  If you ask him

22  something that he's not been designated for, he's just

23  not going to answer.  I don't need to give him an

24  instruction.  He's only going to answer things that he

25  has personal knowledge about.

1        The other thing is, I would not assume this

2   witness is going to be here all day.  He's here for

3   limited issues.  So I would just advise you to get to

4   the heart of the matter and ask him the relevant

5   questions that we've designated him for so everyone has

6   a chance to ask their questions.

7        And I'm going to cut you off without prejudice

8   if you go on and on so every other party can ask some

9   questions.  So at least, without waiving your right to

10  continue the depo in the future, but I pulled this

11  lawyer off of his caseload today so he can provide some

12  testimony to the Committee on the relevant areas that we

13  designated him on.

14       So I would just ask you to respect his time.

15  He has a busy caseload himself.  And at this point in

16  the matter, we're still in the vetting process of the

17  transaction as well.

18       So this is a completely voluntary deposition at

19  this point, and I would just ask you to respect his

20  time, and let's start asking questions.  He's

21  well-prepared for the deposition.

22       MR. ELGIDELY:  Mr. Richard, can I start asking

23  questions or do you want to keep going?

24       MR. RICHARDS:  No, go ahead.

25       MR. ELGIDELY:  I understand your issue.  If

1   there is an issue, we'll bring it before the judge.

2   BY MR. ELGIDELY:

3       Q.   Mr. Redhun, where are you located this morning?

4       A.   New York.

5       Q.   Okay.  Are you in your office?

6       A.   Yes.

7       Q.   Okay.  And where is your office located?

8       A.   11 Broadway, 3rd Floor.

9       Q.   Okay.  Is that the offices of the Consumer

10  Legal Group?

11      A.   Yes.

12      Q.   Okay.  And how long has Consumer Legal Group

13  occupied those offices?

14      A.   I can't say for certain.  More than a couple of

15  months.

16      Q.   Okay.  Where was Consumer Legal Group located

17  before that location?

18      A.   I don't have the exact address.  It was, I

19  think, Red Hook, Brooklyn.  I was certainly in Brooklyn

20  and it certainly was an industrial area.  I think it's

21  Red Hook.

22      Q.   Okay.  As you know, sir, as an attorney, you're

23  not permitted to exchange text messages with anybody

24  during the course of your deposition or emails or

25  anything of that nature.

1          Do you understand that?

2     A.     Yes.

3     Q.     Okay.

4     A.     Well, I understand that's requested.  I'm not

5  sure that's the rule, but I'll honor your request.

6     Q.     Okay.  You understand that you're under oath

7  today during your deposition and you're not allowed to

8  communicate with anybody concerning the substance of

9  your testimony in the process of your deposition?

10         Do you understand that?

11    A.     Yes, of course.

12         MR. RICHARDS:  Counsel, just so we're clear, he

13  has a family and his office.  You're not suggesting if

14  his wife texts him if there's an emergency at the house

15  or someone at the office has a question, he's not

16  allowed to look at his phone?

17         MR. ELGIDELY:  If he needs to take a break, he

18  can take a break to communicate with somebody.  I'm not

19  going to permit, and the rules do not allow for,

20  communications in the middle of a deposition.  That's

21  highly unusual, and it will be something that we would

22  have to bring to the attention of the court.  It doesn't

23  matter who that individual he is communicating with

24  is.

25  BY MR. ELGIDELY:

1      Q.   Mr. Redhun, are you in the room -- is somebody

2 else in the room with you or is it just yourself?

3      A.   Just me.

4      Q.   Okay.  What did you do to prepare for your

5 deposition today, sir?

6      A.   I'm not sure that I did anything to prepare for

7 today's deposition.  Maybe I spoke with counsel, but I'm

8 obviously not going to speak to those communications.

9      Q.   Okay.  Did you review any documents in

10 preparation for your deposition?

11      A.   No, I don't think so.

12      Q.   Okay.  And you indicated that you spoke with

13 counsel.  And again, without telling me what you spoke

14 about which is privileged, when did you speak with

15 counsel concerning your deposition testimony?

16      A.   Well, counsel and I spoke last night about the

17 link for today's deposition.  And then I don't know that

18 we've had any other independent conversations about this

19 testimony.  It could be something that I discussed with

20 him in passing.  I just don't want to say, no, I didn't,

21 when it's possible I did speak with him.

22      Q.   Okay.  So is it fair to say that you have not

23 had any lengthy meetings with counsel concerning your

24 testimony today?

25      A.   That's correct.

1    Q.    Okay.  Thank you.

2         Let me share my screen.  Bear with me for one

3    moment, please.  Bear with me.  I'm just having some

4    technical difficulties.

5         Mr. Redhun, are you able to see the subpoena to

6    testify at the deposition that I've shared on the screen

7    today?

8    A.    I see you have a file with 16 different files

9    in them.  You haven't opened the actual subpoena.

10   Q.    It's showing on my screen.  So bear with me for

11   one second while I close that.

12        Mr. Redhun, have you reviewed the subpoena that

13   was issued for your testimony today?

14   A.    Yes.

15   Q.    Okay.

16   A.    And it was not my testimony, it was the

17   testimony of Consumer Legal Group.

18   Q.    Correct.

19        Sir, are you the individual that's been

20   designated by Consumer Legal Group to provide testimony

21   concerning the 20 categories that were set forth in the

22   subpoena?

23   A.    I'm here, aren't I?

24        MR. RICHARDS:  I'm going to object because you

25   know that we had a conference, and we limited those to

1    the categories we set forth in the conference.  But he's

2    here to testify to the areas that we've designated him

3    for.

4    BY MR. ELGIDELY:

5        Q.   And who designated you to provide that

6    testimony, sir?

7             MR. RICHARDS:  I'm going to object.  It calls

8    for privilege.  I'll instruct him not to answer.

9    BY MR. ELGIDELY:

10       Q.   Okay.  Why were you designated, Mr. Redhun, to

11   be the representative with the most knowledge from

12   Consumer Legal Group concerning the subjects of

13   testimony set forth in the subpoena?

14            MR. RICHARDS:  Objection.  Invades

15   attorney-client work-product.  I instruct him not to

16   answer.

17            MR. ELGIDELY:  This is going to be fun,

18   Mr. Richards.

19            MR. RICHARDS:  Well, he's a lawyer and you're

20   now trying to get into why we designated him and my

21   mental thought process and our communications.  I don't

22   see how he could answer that question without invading

23   the privilege.

24            Let's just stick with the facts.  These are --

25   why he was designated after consultation with counsel is

 1    not a fact.  That's privilege.

 2           MR. ELGIDELY:  Mr. Richards, we're going to

 3    have a lengthy call with the judge, but let's move

 4    forward in the interest of time.

 5    BY MR. ELGIDELY:

 6       Q.    What is your relationship with Consumer Legal

 7    Group, Mr. Redhun?

 8       A.    I'm an attorney here.

 9       Q.    Okay.  Are you an employee of Consumer Legal

10    Group?

11       A.    Yes.

12       Q.    How long have you been employed with Consumer

13    Legal Group?

14       A.    A few months.  I don't know exactly how long.

15       Q.    Okay.  Are you a shareholder of Consumer Legal

16    Group?

17       A.    No.

18       Q.    Are you an officer?

19       A.    No.

20       Q.    Are you a director?

21       A.    No.

22       Q.    Okay.  And in the few months that you've been

23    employed by Consumer Legal Group, have you -- do you

24    work full-time or part-time in those few months?

25       A.    I don't understand the distinction.

1    Q.   Okay.  Part time is less than full time.

2  That's less than eight hours a day, typically.

3        Are you regularly employed by Consumer Legal

4  Group as your full duties, or do you provide duties in

5  any other capacity or any other work?

6    A.   I'm not sure I understand the question.

7    Q.   Okay.  Sir, as an attorney that's been

8  practicing for over 13 years, is it your testimony that

9  you don't know the difference between full time or part

10  time?

11    A.   No, I know the difference.  But there are

12  certain days where I work more than eight hours.

13  There's certain days I work less hours than eight.

14    Q.   Okay.  Do you work anywhere else?

15    A.   Yes.

16    Q.   Where else do you work?

17    A.   I have my own practice.

18    Q.   Okay.  And in terms of the percentage of time

19  in the last few months that you've worked with Consumer

20  Legal Group, what percentage of your time has been

21  devoted to your law practice versus your work for

22  Consumer Legal Group?

23    A.   I'm not sure that I can put a percentage on it.

24  It's certainly not 50/50, some days it might be 50/50,

25  some days it might be 80/20, one way or the other, and

1  the other days it might be 80/20 the other way.  It

2  depends on the day.

3      Q.    Got it.

4            Okay.  Let me try to share my screen again.

5  Let's see if it works this time.  Bear with me.

6            Okay.  Can you see your LinkedIn profile on the

7  screen, sir?

8      A.    Yes.

9      Q.    Okay.  So your LinkedIn profile, it reflects

10 that --

11           And this is your LinkedIn profile; correct?

12 This is your picture?

13     A.    It looks like it.  That's certainly my picture,

14 yes.

15     Q.    Okay.  And on your LinkedIn profile, it says

16 that you are the President of the Law Offices of Jason

17 Redhun, P.C.; is that correct?

18     A.    That's correct.

19     Q.    Okay.  And is that the law firm that you were

20 testifying about earlier where you were employed in

21 addition to your work at Consumer Legal Group?

22     A.    Yes.

23     Q.    Okay.  Your bio on LinkedIn doesn't say

24 anything about Consumer Legal Group, does it?

25     A.    It does not appear to.

1    Q.   Okay.  And do you know why that is?

2    A.   Because I haven't made any changes to it.

3    Q.   Okay.  In the motion to sell that the trustee

4  has filed, the trustee indicated that Consumer Legal

5  Group has substantial experience in the consumer debt

6  legal industry -- sir, I don't know if you could hear

7  me?

8         The trustee said in the motion to sell that

9  Consumer Legal Group has substantial experience in the

10  consumer debt legal industry and a history of providing

11  legally compliant legal services to its clients.

12         Do you agree with those statements?

13    A.   The statements made by the trustee?

14    Q.   Yes.

15    A.   Yes.

16    Q.   Okay.  And the trustee's declaration in support

17  of the motion to sell states, "I determined that the bid

18  from CLG was the highest and best bid, based not only on

19  the consideration proposed, but also on CLG's history,

20  experience, and prior compliance with applicable law."

21         Do you agree with those statements?

22    A.   Sure.  Yeah.

23    Q.   Okay.  Mr. Redhun, I've put on the screen the

24  New York's Department of State Division of Corporations

25  Entity Information for Consumer Legal Group.

1          Do you see that?

2     A.    Yes.

3     Q.    Okay.  And on the date of Initial Department of

4  State Filing, it reflects a date of May 18, 2022;

5  correct?

6     A.    That's what it says there.

7     Q.    Okay.  So is it fair to say that Consumer Legal

8  Group has been in business just over a year?

9     A.    Well, the corporation, according to what's on

10  the screen, was incorporated in May of 2022.

11     Q.    Okay.  And in order for a corporation to be in

12  business it needs to incorporate; correct?

13     A.    Not always.

14     Q.    Okay.  So on behalf of the company, are you

15  testifying today that Consumer Legal Group, P.C.

16  conducted business prior to May 18, 2022?

17     A.    That's not my testimony.

18     Q.    Okay.  Well, I'm asking you, how long has

19  Consumer Legal Group been in business?

20     A.    I don't know.

21     Q.    Okay.  So you think it was about May 18, 2022,

22  before it was incorporated; is that your testimony?

23     A.    No.

24          MR. RICHARDS:  Misstates his testimony.

25          THE WITNESS:  You asked me -- and I'll explain

1    my answer.

2          You asked me if a corporation can conduct

3    business without being incorporated.  That is not a

4    clear yes or no answer because it is possible for a

5    corporation to have de jure status, whereupon it acts in

6    furtherance of a corporation without the formal act of

7    incorporating, provided that at some point it engages in

8    the formal act of incorporating.  And essentially, it

9    ratifies the prior pre-incorporation acts.  At which

10   point, those pre-incorporation acts would be considered

11   part of the corporation's business.  So it is possible

12   for a corporation to act without formally incorporating,

13   and then informally incorporating and then ratifying

14   those prior acts --

15   BY MR. ELGIDELY:

16       Q.   Mr. Redhun.

17       A.   Please don't interrupt my answer.

18       Q.   Please --

19       A.   Please don't interrupt my answer.

20       Q.   Okay.  Go ahead.

21       A.   Notwithstanding what I just said, I don't know

22   when Consumer Legal Group was incorporated.  I was not

23   involved with that, so I can't answer questions about

24   that.  I can answer questions about general corporate

25   law like I just did.

1    Q.   Okay.

2    A.   Which is what your answer elicited.

3    Q.   I understand.

4         So, Mr. Redhun, you're designated to provide

5    testimony on behalf of Consumer Legal Group today;

6    correct?

7    A.   Yes.

8         MR. RICHARDS:   Asked and answered.

9    BY MR. ELGIDELY:

10   Q.   How long has it been in business?

11   A.   I don't know.   What I could see, based on the

12   screen, is that it was incorporated on May 18, 2022.

13   Q.   Okay.  Do you have any reason to believe, based

14   upon the facts of which you have knowledge, that it

15   conducted business prior to May 18, 2022?

16   A.   I don't believe so, but I don't know.  I can't

17   say for sure.

18   Q.   Okay.  So if you look at the Department of

19   State, Entity Information for this entity, you'll see

20   that it is an active corporation and that it has a --

21   let me just see here.  Bear with me.  There are no

22   individuals listed for the chief executive officer.

23        Who is the chief executive officer of Consumer

24   Legal Group?

25   A.   I don't know if Consumer Legal Group has a

1    chief executive officer.

2        Q.    Okay.  And where was its principal executive

3    office?

4        A.    Well, our office is at 11 Broadway.

5        Q.    Okay.  Is that the principal executive office

6    or is there another branch office?

7        A.    I don't believe that there is another branch

8    office, but I also can state with certainty that the 11

9    Broadway address is its principal place of business.

10       Q.    Okay.  Is that where you go to work every time

11   you go to work for Consumer Legal Group?

12       A.    Yes.

13       Q.    Okay.  Now, if you look at "assumed named

14   history", sir, you'll see that Consumer Legal Group

15   registered assumed names of Legal Processing and Legal

16   Fees on March 3, 2023.

17            Do you see that on the Department of State's

18   information?

19       A.    Yes.

20       Q.    Okay.  And why were these assumed names

21   registered with the Department of State on March 3,

22   2023?

23       A.    I don't know.

24       Q.    Okay.

25            MR. RICHARDS:  Counsel, just for clarification,

1  are you saying that they registered those exact names or

2  that's the category that the Secretary of State has

3  assigned those assumed names?  I think we're not clear

4  about that.

5  BY MR. ELGIDELY:

6      Q.   Okay.  These are the exact names that were

7  registered by the company on these dates.

8           So my question --

9           MR. RICHARDS:  How do you know that?

10           MR. ELGIDELY:  Sir, if you look at the

11  certificate of assumed name, when you click on the

12  information.  And then if you go to the first page of

13  the Department of State's information page, you run

14  those names and they come up as being registered by the

15  Consumer Legal Group.

16           MR. RICHARDS:  I'm trying to make sure I

17  understand your question.

18           Are you saying that they've registered the name

19  Legal Processing without anything else?  That's the name

20  of the law firm now?

21           MR. ELGIDELY:  Correct, it is a d/b/a.

22           And, Mr. Richards, on a break, you can verify

23  the basis or the foundation for my question by going to

24  the Department of State's website and searching for the

25  assumed names.  And you will see that Legal Processing

1   is registered as an assumed name with the Department of

2   State for Consumer Legal Group, as is Legal Fees.

3          MR. RICHARDS:  Okay.  My only comment was there

4   was a certificate that is linked to that name, and I was

5   just wondering if you actually downloaded the actual

6   certificate that would show what the name was?  Like the

7   full name, because it's usually company d/b/a something

8   else.  So that's why I just don't know the answer to

9   that.

10          MR. ELGIDELY:  Okay.  You can verify that

11   during the break of the deposition, sir.

12          MR. RICHARDS:  All right.

13          MR. ELGIDELY:  I was hoping the witness would

14   have some knowledge about why these assumed names were

15   registered, and why they were registered on those

16   particular dates.

17          MR. RICHARDS:  I just want to say one thing for

18   the record.  Since I had sent you the corporate records

19   on Friday, if you had asked me to clarify that, I could

20   have probably gotten that information.  And I'll try to

21   get you that information before the hearing.

22          I don't think there's a -- I don't know the

23   reason for that either.  Frankly, it's the first time

24   I've seen that, but I'll find out because it just

25   doesn't make sense to me that someone would reserve

1    a generic name and the Secretary of State would allow

2    you to have something like Legal Fees.  That doesn't

3    make any sense to me.  Yeah, okay -- yeah, that's not

4    their company.  But I'll try to figure out what the

5    basis of why those entries were because I have no

6    knowledge either.

7           MR. ELGIDELY:  Okay.  That's fine.

8    BY MR. ELGIDELY:

9       Q.   So, Mr. Redhun, do you know why Consumer Legal

10   Group was registering assumed names approximately 15

11   days before the petition date?

12          MR. RICHARDS:  I'm just going to make one

13   objection.  That to the extent it assumes a fact not in

14   evidence of those specific names.

15          And if you have any knowledge about why they

16   were registering just assumed names in general, you can

17   answer.

18          THE WITNESS:  I have no knowledge about that.

19   BY MR. ELGIDELY:

20      Q.   Okay.  You testified that you started working

21   for Consumer Legal Group a few months ago.  Was that

22   after March 2023 or before March 2023?

23      A.   Before.

24      Q.   Okay.  And are you the attorney that's in

25   charge of the operation of Consumer Legal Group or are

1  you just being designated today to provide testimony on

2  behalf of the entity?

3      A.   Well, the form of your question is

4  objectionable.  But I would ask you to define and

5  interpret what you mean when you say "in charge"?

6          MR. RICHARDS:  Well, it's compound.  Let's just

7  answer one at a time, if we could, if you don't mind.

8          MR. ELGIDELY:  It's fine.  We'll move on.

9          And obviously, Mr. Richards, the more we get

10  delayed in terms of lengthy explanations of the basis of

11  your objections, that's going to delay the conclusion of

12  this deposition.

13          MR. RICHARDS:  I just said it's compound.  Why

14  don't we just ask one part and then the next part so we

15  know in the record.

16          MR. ELGIDELY:  I'm going to move on.

17          MR. RICHARDS:  Are you withdrawing the question

18  now?

19          MR. ELGIDELY:  I'm withdrawing the question.

20          MR. RICHARDS:  Okay.  Fine.

21  BY MR. ELGIDELY:

22      Q.   Okay.  Mr. Redhun, how many employees does

23  Consumer Legal Group have?

24      A.   I don't have an exact number.

25      Q.   Okay.  Give me an approximate number?

```
 1        A.    Maybe about 100.

 2        Q.    Okay.  And 100 W-2 employees Consumer Legal

 3   Group has in the past year?

 4        A.    I don't know.  I don't get into how the

 5   employees are paid.

 6             MR. RICHARDS:  Hold on.  Mr. Redhun, he just

 7   asked you to give him an estimate of how many employees,

 8   not how many they are paid.

 9             You go to work every day.  This is important.

10   How many people are there?  We do need to know that.

11             THE WITNESS:  I'd say 100.  If you want to give

12   me a couple of seconds, I could mentally run through the

13   floor.

14             MR. RICHARDS:  By the way, Counsel, is your

15   name produced Elgidely?

16             MR. ELGIDELY:  Elgidely.

17             MR. RICHARDS:  Elgidely.  If it's important for

18   you to know how many are W-2 versus something else, I've

19   been to the office, so I'm assuming most are W-2.  But

20   if that breakdown is important, we could get that from

21   financing and provide that to you.  That's not a

22   problem.

23             MR. ELGIDELY:  Yes, I would like a list of all

24   the employees.

25             MR. RICHARDS:  No, we're not going to give you
```

1   a "list of all of the employees", but we could give you

2   a list of the numeric employees and how they are

3   allocated.  But we're not just going to dump a list of

4   employees into the public record.

5           MR. ELGIDELY:  No, you could give that to me

6   under the "attorneys' eyes basis only", Mr. Richards.

7           MR. RICHARDS:  Okay.  I'll work on that.

8   BY MR. ELGIDELY:

9     Q.    Mr. Redhun, how many independent contractors

10  had Consumer Legal Group utilized in the past year?

11    A.    I couldn't answer that.  I have no idea.

12    Q.    Okay.  I notice, Mr. Redhun, you signed the

13  asset purchase agreement as "agent" for Consumer Legal

14  Group.

15          Can you tell me why you signed as "agent" for

16  the entity?

17    A.    I'm not an officer of the corporation.

18    Q.    Okay.

19          MR. RICHARDS:  Mr. Elgidely, just one question.

20  On the independent contractors, are you also including

21  local counsel that CLG employs in other states or just

22  people that work in New York at the office?

23       MR. ELGIDELY:  Just people in New York that

24  work in the office.

25          MR. RICHARDS:  Okay.  Thank you.

1           MR. ELGIDELY:  Thank you.

2    BY MR. ELGIDELY:

3       Q.    So, Mr. Redhun, you indicated you signed the

4    asset purchase agreement as "agent" because you're not

5    an officer or director of the entity; is that your

6    testimony?

7       A.    Correct.

8       Q.    Okay.  Is there any reason why an owner or an

9    officer or a director of the company wasn't able to sign

10   the asset purchase agreement?

11          MR. RICHARDS:  I'm going to object to the

12   extent it invades attorney-client privilege and

13   work-product.

14          If you can answer that question independently

15   of our discussions with respect to you signing it, feel

16   free to answer.

17          THE WITNESS:  No, I am heavily involved in the

18   subject matter of what's going on, and I am in constant

19   discussions with counsel.  Basically hands are all over

20   this so it's me.

21   BY MR. ELGIDELY:

22      Q.    Okay.  But that's not my question, Mr. Redhun.

23          I mean, who has more authority on behalf of the

24   corporation, the owner of the company or you?

25      A.    What do you mean "authority"?

1    Q.    Authority to act on behalf of the company.

2          Does the owner of the company have more

3    authority or do you have more authority?

4          MR. RICHARDS:  I'm just going to object to the

5    extent it calls for a legal conclusion, it's vague,

6    ambiguous, and unintelligible.

7          MR. ELGIDELY:  Mr. Richards, he's a lawyer.

8    Even if it calls for a legal conclusion, I think that he

9    can testify whether an owner of the company has greater

10   corporate authority to sign an asset purchase agreement

11   to purchase the assets of this business versus an

12   agent.

13         MR. RICHARDS:  Okay.  How about we just

14   stipulate to the obvious that an owner of a company has

15   greater authority.  That's not really a fact in this

16   case, but I'll stipulate for the record that the owner

17   of CLG has more authority than Mr. Redhun because I

18   don't think it matters.

19         MR. ELGIDELY:  Mr. Richards, do you want to

20   testify on behalf of the company or is Mr. Redhun

21   testifying?  I'm not sure, based upon your objections

22   here.

23         You know, typically an attorney objects based

24   on form or on privilege, but you continue to answer my

25   questions and provide lengthy explanations.  Now you're

1  providing stipulations sir.

2         So it's not clear as to who the witness is for

3  this company.  Is it Mr. Redhun or is it you?  And if

4  it's you, sir, I'd ask you to limit your objections

5  based on the form or based on the issues of privilege or

6  work-project.

7         MR. RICHARDS:  Counsel, please don't raise your

8  voice.  Why are you raising your voice?

9         MR. ELGIDELY:  Because I'm confused who the

10  witness is, sir.

11         MR. RICHARDS:  There're rules of civility in

12  the Central District.  I'm just doing my job.  Don't

13  raise your voice.  The record should reflect you're

14  yelling.  And with respect to --

15         MR. ELGIDELY:  No speaking objections, sir,

16  please.

17         MR. RICHARDS:  Sir, I made an objection based

18  on calls for a legal conclusion.  I set forth a bunch of

19  objections, and then you addressed me and argued with me

20  about why I made the objection.

21         So I was just explaining and trying to short

22  circuit it by saying, we would stipulate to the legal

23  conclusion, and now you're getting upset by it.

24         I'm happy to just make objections.  Don't

25  comment on them, and I won't comment to you.

1   BY MR. ELGIDELY:

2       Q.    Mr. Redhun, who are the owners of Consumer

3   Legal Group?

4       A.    Aryeh Weber.

5       Q.    Just one owner?

6       A.    Yes, that I'm aware of.

7       Q.    Okay.  Who are the officers of Consumer Legal

8   Group?

9       A.    I don't know.

10      Q.    Who are the directors of Consumer Legal

11  Group?

12      A.    I don't know.

13      Q.    Did Consumer Legal Group previously occupy

14  offices at 40 Wall Street?

15      A.    No.  I have an office at 40 Wall Street.

16      Q.    You're on the 45th floor?

17      A.    That's correct.

18      Q.    Do you share offices with Hidrock Properties?

19      A.    I wouldn't say we share.  I mean, I kind of

20  sublease.

21      Q.    Okay.  You sublease from Hidrock Properties?

22      A.    Yes.

23      Q.    And, Mr. Redhun, are you familiar with Consumer

24  Legal Groups' website?

25      A.    Yes.

1      Q.    Bear with me for one second.  I'll put that up

2    here.

3            Mr. Redhun, do you see the website that I

4    pulled up on the screen here?

5      A.    Yes, but there's something not correct about

6    what I'm looking at.

7      Q.    What is not correct, sir?

8      A.    Well, for starters, the CLG logo on the left is

9    overwriting text on the website.  The ABA, the American

10   Bar Association, line looks to be cut off.  It looks to

11   me there's some sort of technological issue with what's

12   on your screen.

13     Q.    Okay.  Other than the line and the logo, do you

14   see any errors in the content of what you're looking at?

15           Does this look familiar to you?

16     A.    Well, I can only see a very, very small part of

17   it.  And to be frank, I generally look at the substance,

18   not these sort of, like, buzz words.

19     Q.    Okay.  Have you ever visited

20   consumerlegalgroup.com, the website?

21     A.    Yes.

22     Q.    Okay.  Did you prepare any of the content on

23   this website?

24     A.    I may have.  I think so.  I certainly have

25   edited it.

1    Q.    If you go to "About CLG", if you click on that,

2    "Our Firm", who are these individuals who are depicted

3    on the website?

4    A.    I don't know.  Those probably are stock

5    images.

6    Q.    Okay.  So these aren't actual people who work

7    at Consumer Legal Group?

8    A.    They could be because they're a lot of people

9    there whose faces look familiar.  But, you know, I have

10   a very specific role.  I go do my job.  I don't really

11   fraternize or socialize with the people, so I don't

12   know.

13        MR. RICHARDS:  I just have one objection,

14   Counsel.  I did not produce this witness to go over how

15   the website was constructed.  Of course, if you want to

16   ask about content, feel free.  But you didn't give us

17   any acknowledgement in advance that you had specific

18   website questions.  And I don't think this witness

19   manages the website.

20        MR. ELGIDELY:  Okay.  Is that an objection to

21   scope, Mr. Richards?

22        MR. RICHARDS:  Yes, it's an objection to

23   scope.

24        MR. ELGIDELY:  All right.

25        MR. RICHARDS:  I don't want you to get into the

1  minutiae of how the website is managed unless this

2  witness really does manage it.

3      MR. ELGIDELY:  Again, I'd ask you not to make

4  speaking objections.  If you want to object to scope,

5  all you have to do is say you object to scope.

6      MR. RICHARDS:  I object to scope, potentially.

7  BY MR. ELGIDELY:

8      Q.   Mr. Redhun, I've clicked on "About CLG", and I

9  clicked on "Our Legal Team", and it loaded this page

10  which reflects Mr. Weber's picture and some information

11  regarding the nature of his practice.

12      Do you see that on the screen, sir?

13      A.   I do.

14      Q.   Okay.  You're not on here as part of the

15  Consumer Legal Groups' team, are you?

16      A.   No, it doesn't look like it.

17      Q.   Okay.  In your declaration of the support of

18  the motion to sell, you indicated that Consumer Legal

19  Group employed four attorneys as part of its team and

20  three -- I'm sorry.  Four full-time attorneys and three

21  part-time staff attorneys.

22      Do you see any of the other attorneys on this

23  screen as part of the Consumer Legal Groups' team?

24      A.   I don't.  No.

25      Q.   Okay.  And are you one of the four full-time

1    attorneys, or are you one of the three part-time

2    attorneys that's referenced in your declaration?

3        A.    I think I consider myself full time, but give

4    me a second.  And let me see if I want to clarify

5    that.

6        Q.    What are you looking at, sir, to clarify

7    that?

8        A.    I was not looking at anything.  I was counting

9    on my fingers.

10           No, I think I classify myself as part time

11    then.

12        Q.    Okay.  Who are the other two part-time

13    attorneys that work at Consumer Legal Group?

14        A.    I don't see why their names are relevant to

15    this.

16        Q.    Sir, this is absolutely relevant.  Consumer

17    Legal Group is proposing to purchase the assets of the

18    debtor.  And the nature of Consumer Legal Groups'

19    business, you know, who Consumer Legal Group is and how

20    it's going to service these accounts is

21    absolutely relevant.  As well as the fact that in your

22    declaration, you make a point of stating that there are

23    four full-time and three part-time staff attorneys at

24    Consumer Legal Group.

25           MR. RICHARDS:  Well, Counsel, you indicated

```
 1   that we could provide you those for "attorneys' eyes

 2   only" and that's what I think the basis of the concern

 3   is.

 4        Do you want him to email them to me and I can

 5   email them to you?

 6        MR. ELGIDELY:  No, Mr. Richards.  I asked you

 7   to give me the names of the hundreds of employees that

 8   Consumer Legal Group employs after the deposition.

 9        But I'm asking him now with the names of six

10   individuals.  The two other part-time staff attorneys

11   and the four full-time attorneys that work at Consumer

12   Legal Group.  Since it is only six and it's relevant,

13   I'm sure Mr. Redhun can answer the question.

14        THE WITNESS:  Okay.  Would you mind restating

15   the question?

16   BY MR. ELGIDELY:

17     Q.   Yes.

18        Who are the other two part-time staff attorneys

19   employed by Consumer Legal Group?

20     A.   John Borelli and Albert Hamowi.

21     Q.   Okay.  How do you spell Borelli?

22     A.   B-o-r-e-l-l-i.

23     Q.   B-o-r-e -- go ahead.

24     A.   L-l-i.

25     Q.   Okay.  And Mr. Borelli is a part-time staff
```

1   attorney employed at Consumer Legal Group?

2        A.   Yes.

3        Q.   Okay.  And who's the other part-time staff

4   attorney?

5        A.   Albert Hamowi, H-a-m-o-w-i.

6        Q.   Did you say "Albert"?

7        A.   Yes.

8        Q.   And how do you spell the last name?

9        A.   H-a-m-o-w-i.

10       Q.   Okay.  And who are the four full-time attorneys

11  employed by Consumer Legal Group?

12       A.   Jack Gross, Pandy Shen, Danitza Campbell, and

13  Ben --

14       Q.   Sir, I need you to slow down.

15            You said Jack Gross.  Is that G-r-o-s-e?

16       A.   No.  I think his last name is G-r-o-s-s.

17       Q.   Oh, I'm sorry, Gross, G-r-o-s-s.  Okay.

18            And then Pandy you said?

19       A.   Pandy Shen, S-h-e-n.  I believe that's her last

20  name.

21       Q.   S-h-e-n?

22       A.   Yes.

23       Q.   Okay.  Go on.

24       A.   Danitza Campbell.

25       Q.   How do you spell Danitza?

1          A.    D-a-n-i-t-z-a.

2          Q.    Okay.  Next?

3          A.    And then there's Ben -- I think his last name

4    is Ozure, but I'm not 100 percent sure.

5          Q.    And how do you spell that?

6          A.    I think it's O-z-u-r, but I'm not certain.

7          Q.    Okay.  And in your declaration, you indicated

8    that you manage this team of attorneys; correct?

9          A.    Yes.

10         Q.    Okay.  And when did John Borelli start working

11   for Consumer Legal Group?

12         A.    A few months ago.

13         Q.    Okay.  About the same time you did?

14         A.    Yes.  Same answer for Albert.

15         Q.    Okay.  And how about Jack Gross?

16         A.    Jack came on after me.  I don't know the date

17   or the month for you.

18         Q.    Okay.  And you said you started some time prior

19   to March of 2023; correct?

20         A.    There's a long -- yeah.

21         Q.    And Pandy Shen?

22         A.    I don't know if she came on before Jack or

23   after Jack.  I don't remember, honestly.

24         Q.    Okay.  But during 2023?

25         A.    You know what, I couldn't even tell you if 2023

1    or late 2022.  I don't remember.  I'm telling you, the

2    time flies by.  I could hardly keep track of my own

3    stuff.

4         Q.    Okay.  How about Danitza Campbell?

5         A.    Also, I don't know if Danitza Campbell came

6    before Pandy, after Pandy, before Jack -- I don't know.

7    And Ben is recent.

8         Q.    Okay.  Would it be fair to say then,

9    Mr. Redhun, that this team of attorneys at Consumer

10   Legal Group, the majority of these individuals, were

11   only hired in 2023?

12        A.    I wouldn't say that.  That's not a proper

13   characterization of testimony.

14        Q.    Okay.  Which ones were hired prior to 2023?

15        A.    Again, I just told you.  I don't know when

16   everybody was hired.

17        Q.    So you tell me that my characterization is

18   improper, but you can't identify any of the lawyers who

19   were hired prior to 2023?

20        A.    Well, I would not commit to stating that all

21   those individuals were hired in 2023.  That's my

22   testimony.

23        Q.    Which ones do you think were hired in 2022?

24        A.    I don't know.  I don't know.  We can get their

25   employment records and find out when they started.  I

1   don't know.

2        Q.   All right.   I'll ask your attorney to send that

3   to me at the conclusion of the deposition.

4             How many consumer clients did CLG provide

5   consumer debt resolution services to in 2022?

6        A.   I don't have that number.

7        Q.   Approximately?

8        A.   I'm not -- I'd be speculating, so I'm not going

9   to answer.

10       Q.   So being the designated representative of

11  Consumer Legal Group concerning the purchase of the

12  debtor's assets, you're unable to testify today

13  concerning the number of consumer clients that CLG

14  provided consumer debt resolution services to during

15  2022?

16       A.   I don't want to answer -- I don't want to give

17  an answer that potentially may be false.   And I'd be

18  speculating as to what the exact number is, and I can

19  tell you why I can't give you an exact number.

20       Q.   Okay.   I'm asking you, sir, what the

21  exact number is or the approximate number.

22            You're unable to give me an approximate?

23       A.   That's correct.

24       Q.   Okay.   Was it less than 5,000 or more than

25  5,000?

1    A.   I would say more than five, but again, I'd be

2  speculating as to what that answer is.

3    Q.   Okay.  Do you have any records or any

4  documentation that would reflect the number of consumer

5  clients in 2022?

6    A.   I'm sure the company could get you that

7  information.

8    Q.   Okay.  Great.  I am requesting that.

9         In 2023, excluding the 12,546 client files that

10  CLG acquired from the debtor, how many consumer clients

11  did CLG provide consumer debt resolution services to?

12    A.   Again, I'd be speculating if I answered.

13    Q.   Okay.  And you're unable to even approximate;

14  is that your answer?

15    A.   Correct.

16    Q.   Okay.  How many 1099's did Consumer Legal Group

17  issue to local counsel and other states in 2023 related

18  to consumer debt resolution services?

19    A.   I don't have the exact number because certain

20  attorneys cover more than one state.

21    Q.   Okay.  Just give me an approximate?

22    A.   Did you ask about the year?

23    Q.   Yes, 2022.

24    A.   I'm not sure because the local counsel network

25  is my -- that's one of the things that I do, and I don't

1   recall at the end of 2022 how many people I had in place

2   for that, so I'm not sure.

3       Q.   Okay.  You're unable to approximate?

4       A.   Again, I don't want to give an approximation.

5       Q.   Okay.  How about in 2023, how many 1099's were

6   issued to local counsel for consumer debt resolution

7   services?

8       A.   Probably more than 20, I would say.

9       Q.   More than 20.

10          So more than 20 1099's?

11      A.   Yes, but again, I don't get into how those tax

12  structures are in place.  I'm pretty sure that we pay

13  with 1099's.  But, again, some counsel have more than

14  one state.  Some counsel have, like, three states.  So,

15  again, I couldn't tell you for sure.

16      Q.   In the time that Consumer Legal Group has been

17  doing business, has it been the subject of any

18  complaints by any State Attorney General Offices

19  concerning alleged violation of consumer protection

20  laws?

21      A.   Not that I'm aware of.

22      Q.   And what about Consumer Financial Protection

23  Bureau, were there any complaints concerning alleged

24  violations of consumer protection laws to your

25  knowledge?

1    A.    Not that I'm aware.

2         MR. RICHARDS:  Counsel, when you say

3    "complaints", you mean like actions filed against the

4    firm?

5         MR. ELGIDELY:  No, I'm talking more in terms of

6    any investigations, any inquiries, any, you know, target

7    letters, or anything of that nature.

8         MR. RICHARDS:  Okay.  I think his answer is

9    sufficient then.

10   BY MR. ELGIDELY:

11   Q.    Well, Mr. Redhun, do you agree in terms of when

12   I say "complaints", do you understand that includes

13   investigations, target, letters, inquiries, and anything

14   in relation to alleged violations of consumer protection

15   laws?

16   A.    Yes.

17   Q.    Okay.  And your answer with regard to the State

18   Attorney General Offices, that's still no to your

19   knowledge; is that still your answer?

20   A.    Correct.

21   Q.    Okay.  Great.

22        How about Consumer Financial Protection Bureau,

23   a no to your knowledge?

24   A.    Correct.

25   Q.    Okay.  How about the Federal Trade Commission,

1    anything of that nature from the Federal Trade

2    Commission?

3        A.    Not to my knowledge.

4        Q.    Okay.  I'm going to share my screen.  Bear with

5    me for a moment.

6             Well, are you aware, sir, of what the Consumer

7    Legal Groups rating is with the Better Business Bureau?

8        A.    No.

9        Q.    Okay.  Were you aware that the Consumer Legal

10   Group has an F rating with the Better Business Bureau?

11       A.    I told you, I wasn't aware of what the rating

12   was.

13            MR. RICHARDS:  Counsel, this is outside the

14   scope.  And I can tell you that they service some of the

15   LPG files, they got wrongly dragged into Better Business

16   Bureau issues.  And that was disclosed to the trustee,

17   and those were not from clients of CLG.  Those were LPG

18   clients that filed complaints.  So I'm not going to have

19   him get into that.  But we did disclose that to the

20   trustee.

21         MR. ELGIDELY:  I was asking the witness for his

22   testimony and the corporation's testimony.

23            Again, Mr. Richard, I would ask you not to

24   testify unless you are offering to be the witness in

25   today's deposition.

```
 1              MR. RICHARDS:  It's outside the scope.
 2   BY MR. ELGIDELY:
 3        Q.   All right.  Let me share my screen.  Bear with
 4   me.  I'm trying to pull this up.
 5              Mr. Redhun, are you able to see the document
 6   that I pulled up from the Better Business Bureau?
 7        A.   Yes.
 8        Q.   Okay.  Have you ever visited the Better
 9   Business Bureau website concerning the information it
10   reports on Consumer Legal Group?
11        A.   No.
12        Q.   Okay.  Do you see there it reflects an F BBB
13   rating?
14        A.   You changed something on your screen.
15        Q.   I'm sorry.
16              MR. RICHARDS:  We're reading your notes,
17   Counsel.  Should we close our eyes?
18              MR. ELGIDELY:  No, that's fine.  You can read
19   them.
20              MR. RICHARDS:  All right.  Let's move on,
21   Counsel.  He doesn't know anything about the Better
22   Business Bureau.
23              MR. ELGIDELY:  Mr. Richards, this is my
24   deposition, please.  I'm not moving on, okay.
25   BY MR. ELGIDELY:
```

1    Q.    Can you see that now, Mr. Redhun, the Better

2   Business Bureau rating?

3    A.    Yes.

4    Q.    Okay.  And you see there it reports an F

5   rating?

6    A.    Yes.

7    Q.    Okay.  And you see that there are several

8   complaints against the Consumer Legal Group; correct?

9         MR. RICHARDS:  Hold on, please.  Go back.  It

10   says, "12 complaints closed"; correct?

11         MR. ELGIDELY:  Okay.  I'm not asking if they

12   were closed.  They were opened, Mr. Richards.  I'm

13   asking --

14         MR. RICHARDS:  It says, "12 complaints closed."

15         MR. ELGIDELY:  Mr. Richards, please.

16   BY MR. ELGIDELY:

17    Q.    Mr. Redhun, do you see there are 12 customer

18   complaints against Consumer Legal Group reported with

19   the Better Business Bureau?

20    A.    I can't say that they were reported to the

21   Better Business Bureau.  What I could say is that the

22   screen reflects there were 12 complaints -- and you just

23   changed the screen, and I can't see.

24    Q.    Right.  Now, I'm pulling up the complaints,

25   sir, so that you can see what the subject of the

1    complaints are.

2         Do you see that there was an initial complaint

3    made on June 6, 2023?

4    A.    I see what's stated there.  I can't speak to

5    the complaint, obviously.

6    Q.    Okay.  And do you see there was another

7    complaint filed on May 15, 2023?

8    A.    I see somebody filed something that's reported

9    on this website.

10   Q.    Okay.  And you see that there was another

11   complaint on May 3, 2023?

12   A.    Same answer.

13   Q.    A second complaint filed on May 3, 2023?

14   A.    Yeah, but if you look at the complaint, it

15   says, "Our account with LPG."

16   Q.    Right, but you recall that Consumer Legal Group

17   acquired accounts from LPG, over 12,000; correct?

18   A.    Yes.

19   Q.    Okay.  And then it says, "By LPG, then Consumer

20   Legal."

21         You actually see the name "Consumer Legal

22   Group" in this complaint; correct?

23   A.    I do.

24   Q.    Okay.  And then you see there's another

25   complaint filed on May 2, 2023?

1    A.    Yeah.   Could I read the complaint?   Would you

2    let me read it for a second?

3    Q.    Sure.

4          MR. RICHARDS:   Counsel, I mean, if he doesn't

5    have personal knowledge of this, what facts are we

6    trying to elicit?   I don't really understand the basis

7    of this.

8          MR. ELGIDELY:   Okay.   Mr. Richards --

9          MR. RICHARDS:   If he knows about it, he should

10   answer it.   But why are you showing him complaints --

11         MR. ELGIDELY:   Mr. Richards, yet again, another

12   speaking objection.

13         You know, this is my first deposition I've ever

14   taken with somebody with so many speaking objections and

15   so much testimony provided by the lawyer.

16         The witness asked me to show him the complaint

17   on May 2, 2023, so that he can see it says, "This

18   company", referring to Consumer Legal Group, "keeps

19   withdrawing from my account, and I want it to stop.

20   This company is a scam.   I will have to close my

21   account."

22         Did I read that correctly, Mr. Redhun?

23   A.    Yes.   And I will state that we have almost

24   always issued a refund to almost anybody that

25   complains.

1    Q.   Okay.  Well, let's talk about refunds.

2         Okay.  And the complaint June 6, 2023, it says,

3    "These $240.61 was refunded without the additional fee a

4    week later."

5         The complainant then goes on to say that he was

6    asked on June 2, 2023 that he needed to fill out a

7    refund request, and he asked "How or why?  I don't have

8    a contract or request for services with them, so why

9    would I have to fill out a refund request for them to

10   refund me the money they weren't supposed to take out in

11   the first place?  Then fraudulently withdraw my account,

12   and I'm only assuming that I will have to wait another

13   week for my $240 to be refunded, not to mention the

14   total of $58 in NSF fees I'll just have to swallow."

15        Did I read that correctly?

16   A.   Yes.

17   Q.   So you agree, sir, that the Better Business

18   Bureau website concerning Consumer Legal Group reflects

19   complaints concerning refunds to customers; correct?

20   A.   Counsel, anybody can file a complaint about

21   anything they want on any website.  That's not assuming

22   it's remotely factually accurate.

23   Q.   Well, that's not my question, sir.  I'm asking

24   you if the Better Business Bureau's website for Consumer

25   Legal Group reflects complaints about customers, whether

1    they were factually correct or incorrect, concerning

2    refunds to customers?

3         A.    It only makes sense then to read the two items

4    that were beneath that complaint to give context to the

5    complaint.

6         Q.    Okay.  And in terms of the -- let me get back

7    on the screen here.  Bear with me for one moment.

8              Okay.  Sir, is there a reason why you don't

9    look at the Better Business Bureau website concerning

10   Consumer Legal Group in your capacity as one of the team

11   of lawyers at CLG?

12        A.    It's not relevant to what I have to do.

13        Q.    Okay.  In your declaration you testified about

14   standard operating procedures that you implemented at

15   CLG; correct?

16        A.    Correct.

17        Q.    When were those SOPs implemented?

18        A.    Initially, and then they get tweaked over

19   time.

20        Q.    Okay.  But when was "initially", sir?  When

21   were they first implemented?

22        A.    Well, I can't answer that.  I don't know for

23   sure.

24        Q.    Approximately?

25        A.    When I first started, there may have been some

1    in place already.  I'm not sure.  But I know that when I

2    started, that was one of the things I took care of.

3        Q.    Okay.  Did you produce or did the company

4    produce to the Creditors Committee these standard

5    operating procedures that were first implemented and the

6    amendments thereto?

7        A.    I don't know.  I would have to ask counsel.

8        Q.    Okay.  Do you know whether the company produced

9    the standard operating procedures to the trustee?

10        A.    Again, I would have to consult with counsel.

11    I've never produced anything directly to the trustee.

12        Q.    Okay.  You also reference in your declaration

13    policies and procedures that are maintained and utilized

14    by CLG; correct?

15        A.    Maybe.  I don't know.  I don't have the

16    declaration in front of me.

17        Q.    Well, as the witness for CLG, are you aware of

18    policies and procedures separate and apart from the SOPs

19    that are referenced in your declaration?

20        A.    I would need a specific question to be able to

21    answer that specifically.

22        Q.    Okay.  Does CLG mean team policies and

23    procedures separate and apart from the standard

24    operating procedures?

25        A.    Well, we have general policies.  We have

1  specific SOPs.  So I'm not sure exactly -- again, I'm

2  not trying to be evasive, but you're asking me a very

3  broad and general question, and I'm not able to answer

4  such a broad and general question.

5      Q.   Okay.  Were all of the policies that are

6  utilized in the operation of CLG's business produced to

7  the trustee and to the Creditors Committee?

8      A.   I don't know.  I don't have personal knowledge

9  about what was produced.

10     Q.   Sir, I'm just trying to understand the basis

11  for the assertion and the motion and the trustee's

12  motion and declaration that CLG has substantial

13  experience in the consumer debt legal industry and a

14  history of providing legally compliant legal services to

15  its clients.

16          Do you know what those assertions are based

17  upon?  What documents are those assertions based upon?

18     A.   I don't know that they're based on specific

19  documents.  That statement is based upon my experience,

20  you know, as well as the other attorneys in the

21  office.

22     Q.   Okay.  And the trustee also refers to CLG's

23  history experience in prior compliance with applicable

24  law.

25          And you recall that the New York Department of

1  State reflects the date of corporation of May 18, 2022.

2  So I'm trying to understand what documents CLG provided

3  to the trustee showing its long history experience in

4  compliance with applicable law?

5      Can you tell me what those documents were?

6      MR. RICHARDS:  I'm going to object.  It assumes

7  a fact not in evidence.  Lack of personal knowledge.

8  Calls for speculation as to what the trustee and his

9  counsel put those arguments or comments in their papers,

10  and outside the scope.

11  BY MR. ELGIDELY:

12      Q.   Okay.  Let me pull up another document here.

13      MR. RICHARDS:  Madam Court Reporter, we've been

14  going an hour whenever.  You need to take a break, will

15  you let us know, please?  Lawyers will keep talking if

16  you don't interrupt us.

17      THE STENOGRAPHER:  Thank you.

18      MR. RICHARDS:  You're welcome.

19  BY MR. ELGIDELY:

20      Q.   Mr. Redhun, can you see the email that I pulled

21  up or do you still see my notes?

22      A.   I see what looks to be an Outlook inbox.

23      Q.   Okay.  Do you see an email from Ronald Richards

24  to Nicholas Koffroth from my office?

25      A.   I see a number of emails.

1          MR. ELGIDELY:  Actually, let's take a

2   five-minute break so I can get these documents in order.

3   Hold on one second, please.  We'll take five minutes.

4          THE WITNESS:  Come back at 11:10?

5          MR. ELGIDELY:  11:10.  Thank you.

6          (Off the record:  8:05 a.m. - 8:13 a.m.)

7          THE WITNESS:  Before you ask anything, 9 or 10

8   of these complaints are related to LPG.  And, obviously,

9   you know, we're not really responsible for what LBG is.

10  So to the extent there are two or three complaints

11  related to CLG, given the thousands of clients that we

12  do service, you know, those numbers kind of speak for

13  themselves.  Even if all 12 were related to CLG, that

14  also is not even a drop in the bucket.  That's an eye

15  drop of a drop.

16  BY MR. ELGIDELY:

17      Q.   Mr. Redhun, are you now prepared to testify

18  what the number of clients that CLG had in the consumer

19  debt legal industry when before you weren't even able to

20  approximate the number?

21      A.   I know there were thousands.  Thousands is at

22  least two, and it goes into 900,000, right.  I know that

23  there are thousands.

24      Q.   Okay.  I appreciate that information.  And,

25  obviously, the complaints themselves and the responses

 1   thereto are the best evidence of the nature of the

 2   complaints.

 3           So let's move forward, sir.  So we were talking

 4   at the break about the representations about the long

 5   history that CLG had providing legally compliant

 6   consumer debt legal services to clients.  And my

 7   questions were in relation to the standard operating

 8   procedures and the policies and procedures.

 9           Do you recall that?

10   A.    Yes.

11   Q.    Okay.  And sitting here today, you can't recall

12   whether those SOPs and policies and procedures were

13   provided to the Chapter 11 trustee prior to the filing

14   of the sale motion?

15   A.    That's correct.  I don't know what was

16   produced.

17   Q.    Okay.  And is it the same answer with regard to

18   the Creditors Committee, you don't know if the SOP,

19   policies or procedures were filed to the financial

20   committee before the sales motion was filed?

21   A.    That's correct.

22   Q.    Mr. Richards has sent me an email on Saturday

23   morning attaching three documents.  It's called "Partial

24   production" is the subject line.  And what he attached

25   was an IRS employer identification number letter, a

1  certificate of corporation for CLG, and a supplemental

2  declaration that was signed by you.

3        Do you know if this was the extent of the

4  documentation that was provided to the trustee regarding

5  the long history that CLG had providing legally

6  compliant consumer debt legal services to clients?

7        MR. RICHARDS:  I'm just going to object that it

8  misstates the transmission.  It was not to you.

9  BY MR. ELGIDELY:

10       Q.   Okay.  It was to my firm; correct,

11  Mr. Richards?

12       MR. RICHARDS:  It was to Mr. Nicholas

13  Koffroth.

14  BY MR. ELGIDELY:

15       Q.   Nicholas Koffroth; correct?

16       MR. RICHARDS:  Yes.  I just don't want the

17  witness to get confused.  I sent it to him, not to

18  you?

19       MR. ELGIDELY:  All right.  Thank you, Mr.

20  Richards.

21  BY MR. ELGIDELY:

22       Q.   Mr. Redhun, my question is, the three documents

23  that are attached to Mr. Richards' email to the Fox

24  Rothschild Law Firm, are these the three documents that

25  were provided to the trustee to establish CLG's long

1    history of providing legally compliant legal services to

2    clients?

3        A.   I don't know.  I'm not the right person to

4    answer about what Mr. Richards might have produced to

5    somebody else.

6        Q.   Okay.  Who would be the right person?

7        A.   Mr. Richards.

8        Q.   Okay.  So if we look in the employer

9    identification number letter here, are you able to see

10   that?  I just opened it.

11        Are you able to see the letter, sir, on your

12   screen?

13       A.   No.  I see your email.

14       Q.   Okay.  Let me stop sharing the email and go to

15   the letter.

16        Do you see the letter now, sir?

17       A.   Yes.

18       Q.   And you'll see the letter is dated the same

19   date on the New York Department of State website

20   concerning the corporation date of CLG; correct?

21       A.   I don't recall offhand what the CLG date of the

22   corporation was.

23       Q.   Would you like me to go back to the website to

24   refresh your recollection?

25       A.   If you need to.  I'll stipulate that the date

1  of this notice, according to this document, states May

2  18, 2022.

3      Q.   Okay.  Do you have any reason to believe that

4  CLG had an employer identification number prior to May

5  18, 2022?

6      A.   I don't understand the question, but I think I

7  understand what you're asking me.

8          I think but -- I have no way of answering that

9  one way or the other.

10         MR. RICHARDS:  Mr. Elgidely, can you please

11  take that down?  I'm going to call back the document.

12  Something didn't get redacted.  I'm going to resend the

13  same document but redact the identifying personal

14  information.  I'm going to send it right now.  For some

15  reason, I see something that I intended to redact is

16  still on the screen so I'll send you one more version of

17  that with one more redaction.

18  BY MR. ELGIDELY:

19     Q.   Mr. Redhun, do you know whether the Consumer

20  Legal Group entity that you're testifying on behalf of

21  today had an employer identification number prior to May

22  18, 2022?

23     A.   I don't know one way or the other.

24     Q.   Okay.  Can you testify today about the

25  documents that you provided to the trustee to establish

1    CLG's long history of providing legally compliant legal

2    services to clients in the consumer debt legal industry?

3        A.    Again, I can only testify about things I know.

4    I don't know what was produced to the trustee.

5        Q.    Okay.

6        A.    I'm happy to answer questions about CLG's

7    operations.  I think that's what I'm here for.

8            MR. RICHARDS:  Mr. Elgidely, I've now sent you

9    back the same document.  You can repost it and use that

10   one.  It's called "V2".  I redacted the inadvertent

11   identifying information.  Just let me know that you got

12   it.  I apologize for not catching that.

13           MR. ELGIDELY:  No problem.

14   BY MR. ELGIDELY:

15       Q.    Mr. Redhun, were you aware that on May 25 of

16   this year, the trustee had filed a lawsuit against

17   Consumer Legal Group and others?

18       A.    I'm aware that the trustee filed a suit.  I

19   don't know about the date.

20       Q.    Okay.  If you look at the top of the complaint,

21   you'll see here it says May 25, 2023.

22           Do you see that here at the top of the

23   complaint?

24       A.    I do.

25       Q.    Do you have any reason to dispute that it was

1    filed on May 25, 2023?

2        A.    No.

3        Q.    Okay.  And you see in the caption of the

4    complaint, it reflects Consumer Legal Group as a

5    defendant.

6            You see that on the bottom of the page there?

7        Q.    Along with a bunch of other defendants?

8        A.    Yes.

9        Q.    In the complaint, sir, the trustee alleged that

10   the debtor transferred over 12,000 client files to

11   Consumer Legal Group.

12           Do you understand that?

13       A.    Understand the allegation or understand that

14   the trustee made the allegation?

15       Q.    Do you understand that that's what the trustee

16   was alleging in the lawsuit that the debtor fraudulently

17   transferred over 12,000 client files to CLG?

18       A.    It's my understanding that the complaint

19   alleges a slew of things against a lot of different

20   people.

21       Q.    Okay.  Well, we can go to the exact

22   allegations.

23           Is it your testimony, sir, that you don't know

24   what the trustee was suing CLG for?

25       A.    I know what I remember reading, but given that

 1    we're taking a deposition with testimony and a lot of

 2    interested people, let's go to the actual allegation.

 3        Q.    Sure.  I'm happy to do that.

 4            MR. RICHARDS:  And just to caution the witness,

 5    please don't testify to anything that I've told you

 6    about the lawsuit or my impressions or comments.

 7            THE WITNESS:  Understood.

 8    BY MR. ELGIDELY:

 9        Q.    Okay.  Let me pull up the amended complaint

10    that was filed.

11            So you looked at the original complaint, sir,

12    right, and you saw the date was May 25, 2023; correct?

13        A.    When you say "original", what do you mean?

14        Q.    The first complaint?

15        A.    Is there more than one?

16        Q.    Yes.  I'm going to pull up the amended

17    complaint.

18            Could you see this says "Complaint 4", and it

19    lists six causes of action against Consumer Legal Group?

20        A.    I see that.

21        Q.    Okay.  And you see the date is May 25, 2023;

22    correct?

23        A.    Yes.

24        Q.    Okay.  Thank you.

25            Let me pull up the amended complaint.

1          Sir, do you see an amended complaint that was

2     filed on June 15, 2023, by the trustee against Consumer

3     Legal Group and a host of other -- you see Consumer

4     Legal Group, LPC on page 2 of 31?

5          You see that there, sir?

6     A.    Yes.  I don't know that I've ever seen this

7     document before.

8     Q.    Okay.  And you see it says "amended complaint"

9     as opposed to what the other document just said

10    "complaint"; correct?

11    A.    Yes.

12    Q.    Okay.  And let me get to the allegations

13    concerning Consumer Legal Group.

14         If you look at paragraph 67, sir, you see "In

15    addition to fraudulent client file transfers to the

16    alter egos described above, trustee is informed and

17    believes and based thereon alleges that Diab" --

18         Do you know who Diab is?

19    A.    I know who the trustee alleges that he is.

20    Q.    Have you had any conversations with Tony Diab

21    at any point in time?

22    A.    Maybe.

23    Q.    Okay.  Why do you say "maybe"?

24    A.    Because I'm not sure.

25    Q.    Okay.  What was the subject of that

1  conversation?

2      A.   I don't recall.  I haven't -- I don't think

3  I've spoken to Tony Diab in at least 10 months, I would

4  say.

5      Q.   Okay.  Do you know why you were speaking with

6  him 10 months ago, approximately?

7      A.   I think I wanted to know who he was using as

8  local counsel in various states.

9      Q.   I'm sorry.  You broke up a moment ago.

10         Can you repeat what the nature of your

11  conversation was with Mr. Diab approximately 10 months

12  ago?

13     A.   I think it had to do with finding local counsel

14  in the various states.

15     Q.   Okay.  How did you come to connect with

16  Mr. Diab?

17     A.   I don't recall.

18     Q.   Okay.  It was just a random call?  You just

19  punched some numbers in on your phone and Mr. Diab

20  answered or --

21         MR. RICHARDS:  Objection.  That's

22  argumentative.  Come on.

23  BY MR. ELGIDELY:

24     Q.   Mr. Redhun, did somebody introduce you to

25  Mr. Diab?

1       A.   I don't think anybody introduced me.  I think

2    that -- I knew that he was the principal of LPG, and he

3    had a network of local counsel.  And I think I probably

4    reached out to him on a professional basis to see if he

5    would share with me his network.

6       Q.   How did you know he was the principal of the

7    debtor?

8       A.   I mean, you can look it up.  But I don't recall

9    how I initially made that contact.

10      Q.   Excuse me?

11      A.   I don't recall how I initially made that

12   contact with him.

13      Q.   Okay.  Well, would you have any emails or any

14   documents that would reflect how you initially made

15   contact with Mr. Diab?

16      A.   Unlikely.

17      Q.   Why is it "unlikely"?

18      A.   Because I remember speaking to him on the

19   phone.

20      Q.   Was it just a Google search that led you to

21   Mr. Diab?

22      A.   I don't recall, and I don't want to give a

23   speculative answer.

24      Q.   Okay.  Why was the debtor something that was of

25   interest to you approximately 10 months ago?

1          MR. RICHARDS:  Objection.

2          THE WITNESS:  That's not what I said.

3          MR. RICHARDS:  That's vague.  That misstates

4    his testimony, and we need to be specific.  You mean,

5    LPG, why was that of interest or Tony Diab?

6    BY MR. ELGIDELY:

7        Q.   Okay.  Why was the debtor entity LPG, why did

8    you initiate a call approximately 10 months ago -- or

9    have a call approximately 10 months ago with Mr. Diab,

10   who you understood at the time was the principal of

11   LPG?

12       A.   Because it's my understanding that he had a

13   network of local counsel in the various states, and I

14   knew that I needed to create my own local counsel

15   network.  So why reinvent the wheel when I could see if

16   he would be willing to share his network with me.

17       Q.   Okay.  Well, sir, you're running your law firm,

18   Jason Redhun, P.C., at the time 10 months ago;

19   correct?

20       A.   Yes.

21       Q.   You weren't running Consumer Legal Group at the

22   time; correct?

23       A.   Correct.

24       Q.   So why was LPG's business and the network of

25   local counsel of interest to you approximately 10 months

1  before you even worked for Consumer Legal Group?

2     A.   Because part of my work starting at CLG was to

3  create this network.

4     Q.   Okay.  So now you are testifying that you had

5  started CLG?

6          MR. RICHARDS:  Objection.  That misstates his

7  testimony.

8  BY MR. ELGIDELY:

9     Q.   Sir, I'm sorry.  You're breaking up a little

10  bit.

11         But I understood your testimony that part of

12  your work in starting CLG was to create this network of

13  local counsel?

14         MR. RICHARDS:  That misstates his testimony --

15  hold on.  Please give me an opportunity to object.  That

16  misstates his testimony.

17  BY MR. ELGIDELY:

18     Q.   So, Mr. Redhun, why don't you clarify your

19  testimony in that regard?

20     A.   I didn't say that I started CLG.

21     Q.   So why again was LPG's business approximately

22  10 months ago, you know, of relevance to you since you

23  didn't work for CLG at the time such that you needed to

24  contact Mr. Diab about the network of local counsel?

25     A.   Part of the duties of mine at CLG is the local

1  counsel network.  When I came to CLG, when I onboarded

2  at CLG, I knew that I had to set up that network.

3  Instead of starting to call random people all over, I

4  called somebody whom I believed already had a network in

5  place to see if they would share that network so I

6  didn't have to start from scratch.

7  Q.  Okay.  I'm only confused, Mr. Redhun, because

8  you testified that you started working for CLG a few

9  months ago.  But now you're testifying that you

10  contacted Mr. Diab about a network of local counsel

11  approximately 10 months ago.

12  So in terms of the timeline, please, how do you

13  reconcile those two answers?

14  A.  That's a good question.  Because I don't know

15  that I officially came on board at CLG until after the

16  local counsel network was in place.

17  It could be when I approximated 10 months, I

18  was mistaken, which is why I approximated.  It could be

19  that I was at CLG longer than a couple of months.  I

20  don't have a timeline ready to go for you.  But my

21  answer in terms of creating the network of local counsel

22  speaks for itself.  That's one of the things I need to

23  do.

24  Q.  Okay.  So did you know whether Mr. Diab was a

25  licensed attorney approximately 10 months ago when you

1  had this call with him?

2      A.   I had no idea nor was it of any interest -- I

3  could care less.

4      Q.   How did you find Mr. Diab's phone number?

5      A.   I don't recall.

6      Q.   Okay.  Did you send him any emails to initiate

7  the call or coordinate the scheduling of the call?

8      A.   When you're asking something from somebody,

9  it's typical that you call up and maintain a friendly

10 approach as opposed to a very cold email.

11     Q.   Okay.  So is it your testimony that you did

12 coordinate the call prior to actually having the call?

13     A.   When you say "coordinate", I'm not sure what

14 you mean.

15     Q.   Okay.  Did you say, please let me know if

16 you're available on such and such day at such time so

17 that we can have a call regarding your network of local

18 counsel or something to that effect?

19     A.   I mean, I probably just called the way I

20 have -- I'm still trying to replace local counsel in

21 certain states to this day.

22     Q.   Why didn't you call Mr. March?  Why did you

23 call Mr. Diab?

24     A.   I don't know.  That's a good question.

25     Q.   And at the time, were you contemplating the

1    formation of CLG when you called Mr. Diab?

2        A.    That's not my prerogative.  It wasn't me that

3    incorporates CLG.  I had nothing to do with that.

4        Q.    Okay.  Were you contemplating CLG acquiring

5    LPG's business at the time of this phone call?

6        A.    That's not a "me" question.

7        Q.    Okay.  I thought, Mr. Redhun, though you

8    testified that the reason you called Mr. Diab was to

9    establish this network of local counsel for purposes of

10   serving consumer clients; is that accurate?

11       A.    That's accurate.

12       Q.    Okay.  And did you service consumer clients

13   through your individual P.C. prior to coming on board

14   with CLG?

15       A.    Yes.  I still do.

16       Q.    Your law firm, your P.C. has a portfolio with

17   consumer clients that you represent with regard to

18   consumer debt services?

19       A.    Now, it's a lot less than it once was.

20       Q.    Okay.  How much was it at its height?

21       A.    I don't know that I could pinpoint a specific

22   area because there are times of my life and times of the

23   year where I was busy doing X kind of work.  And

24   then sometimes the X kind of work would dwindle, and I

25   would pick up Y, or I'd start doing a little bit of Z.

1    And then, you know, A or B would come along, and I'd

2    focus on that even though I had some files left over

3    from X, Y, and Z.  So it's tough to differentiate

4    between the lines.  When you are solo and you have a

5    small operation, you are kind of doing different things

6    until certain things take on more precedence than

7    others.

8         Q.   Okay.  And this is the time during which you

9    were a subtenant of Hidrock Properties; correct?

10         A.   I don't recall because I've moved offices, I'd

11    say, in the last year and a half.

12         Q.   Okay.  Going back to paragraph 67 of the

13    complaint.

14              The trustee alleges that the LPG fraudulently

15    transferred files without client consent to various

16    fraudulent transferees.

17              Do you see that in paragraph 67?

18         A.   I see the allegation.

19         Q.   And in paragraph 69, "The trustee alleges that

20    at or around the petition date, Diab admitted that LPG

21    had transferred or sold approximately" -- and then it

22    goes on -- "12,000 files to CLG, approximately $3.3

23    million in revenue."

24              Were you aware that was what the trustee was

25    alleging in or about June 2023?

1        A.    No.

2        Q.    You had no idea what the trustee was alleging

3   against CLG in June of 2023?

4        A.    I was not aware that there was a complaint

5   filed.

6        Q.    Okay.  That's not my question, sir.

7             My question is, did you understand the trustee

8   was alleging in his lawsuit against CLG that the debtor,

9   LPG, had fraudulently transferred 12,000 files

10   approximately to CLG and that represented approximately

11   $3.3 million in revenue?

12             Did you understand that's what the trustee was

13   suing CLG for?

14        A.    No, because I was unaware that there was

15   another complaint filed.

16        Q.    You weren't aware that's what the original

17   complaint alleged, sir?

18        A.    If they are similar allegations in the original

19   complaint, then yes, I was aware of what the similar

20   allegation was in the original complaint.

21        Q.    Okay.  When did you first become aware that LPG

22   was suing CLG?

23        A.    I don't have an exact date.  Within the last

24   couple of months, I would say.

25        Q.    Okay.  So for approximately the last couple of

1    months, you knew that the trustee was suing CLG;

2    correct?

3        A.   Yes.

4        Q.   And you knew that it related to LPG's transfer

5    of approximately 12,000 files to CLG; correct?

6        A.   I knew that was the claim that the trustee was

7    making.

8        Q.   Correct.  You knew that for approximately the

9    last couple of months; correct?

10       A.   Yeah, that's why CLG was named in the first

11   place.

12       Q.   Okay.  And you know that the trustee was

13   alleging that the file transfer represented

14   approximately $3.3 million in revenue for the past

15   couple of months?

16       A.   I don't know if I knew that.

17       Q.   Okay.  What, if any, involvement did you have

18   on behalf of CLG relating to these file transfers?

19       A.   None related to the transfers, except for our

20   duties in servicing them when they came to CLG and

21   working on those files.

22       Q.   Do you know how the company became aware of the

23   opportunity to acquire these files?

24       A.   I'm not aware.  I'm not entirely certain.

25   Again, it's not something I deal with.

1      Q.    I'm sorry.  I couldn't hear you.  Your signal

2   broke up for a minute.

3          MR. RICHARDS:  You didn't hear his answer,

4   Mr. Elgidely?

5          MR. ELGIDELY:  I did not.

6          MR. RICHARDS:  Okay.  Can the court reporter

7   read it back?

8          (The stenographer read back the answer.)

9   BY MR. ELGIDELY:

10     Q.    So, Mr. Redhun, you indicated that

11  approximately 10 months ago you contacted Mr. Diab

12  regarding his network of local counsel; correct?

13     A.    That was my testimony, yes.

14     Q.    Okay.  And sitting here today as the

15  representative of the company in response to the company

16  subpoena, is it your testimony that you don't have any

17  idea how CLG first learned of the opportunity to acquire

18  the LPG files?

19     A.    That's correct.  I deal with the legal end of

20  it.  I don't deal with anything else.

21     Q.    Okay.  Who would have dealt with the

22  acquisition of these files from LPG?  Who at CLG?

23     A.    I don't know.

24     Q.    Were you aware that the company has a duty to

25  designate an individual that has knowledge concerning

1    the subject matters that are set forth in the Committee

2    subpoena?

3            MR. RICHARDS:  I'm going to object.  Now,

4    you're asking him for privilege, work-product, and his

5    own legal opinion.  We went through the categories he

6    would testify to, and so this is an argumentative

7    question.

8            MR. ELGIDELY:  Okay.  I disagree, Mr. Richards,

9    and again note your speaking objection.

10   BY MR. ELGIDELY:

11       Q.   Mr. Redhun, what if any efforts did you make to

12   identify an individual at CLG who could testify about

13   the acquisition of LPG's files which is set forth in the

14   trustee's complaints?

15           MR. RICHARDS:  I'm going to object.  It's not

16   in your deposition notice that specific category.

17   BY MR. ELGIDELY:

18       Q.   Okay.  Mr. Redhun, what did you do?

19       A.   Well, we previously had a call and agreed to a

20   scope of what the questions would be at this deposition.

21   And I don't know that this was specified as part of that

22   list, but I'm here to testify and answer questions about

23   CLG's business and legal operations.

24       Q.   Would Mr. Weber be the individual that is able

25   to testify concerning CLG's acquisition of files from

1    LPG?

2         A.    I don't know.

3         Q.    So your testimony, sir, under oath today is

4    that you have no idea who at CLG has knowledge

5    concerning its acquisition of files from LPG?

6         A.    No, that's not my knowledge.

7         Q.    What is it then?

8         A.    What is that?

9         Q.    What is it?  Who is the individual?  If you

10   have knowledge, please tell me who those individuals

11   are?

12        A.    I don't know that -- sorry.  Go ahead,

13   Richard.

14             MR. RICHARDS:  Counsel, the witness is prepared

15   to testify to the things he was designated for.  Now

16   you're saying, please tell me who the individuals are

17   when this witness isn't designated.  How can he answer

18   that truthfully unless he personally interviewed to

19   figure out who was part of that transaction?  This is

20   not an appropriate question.  You're trying to trick the

21   witness.  He's not designated for this.

22             MR. ELGIDELY:  The Committee issued a subpoena

23   to CLG's corporate representative and listed 20

24   categories of subject matters that would be -- that the

25   witness -- that we sought testimony concerning.

1    During our prior call, Mr. Richards, you

2    indicated that Mr. Redhun could not testify to certain

3    areas, but that doesn't excuse CLG from providing other

4    witnesses who could testify to those other subject

5    matters.

6         So because the issue of good faith relates to

7    the relationship and dealings between CLG and LPG prior

8    to the bankruptcy filing, the knowledge of a CLG witness

9    concerning the relationship and transactions between

10   those parties is absolutely relevant.

11        And I'm just trying to determine.  I'm not

12   asking the witness what occurred, you know, with regard

13   to these transactions.

14        I'm asking him, based upon his experience as

15   the senior lawyer at CLG, who at CLG has knowledge

16   concerning its acquisition of files from LPG before the

17   bankruptcy.

18        MR. RICHARDS:  Respectfully, I think we're

19   talking past each other.  All I said was, he simply was

20   not engaged in preparation for this deposition to answer

21   those questions.  We also told you on such short notice,

22   this is who we would be producing to answer these

23   categories.

24        We didn't limit perspective if you had to take

25   another deposition in the future, someone on other

1    categories.

2         But it's not fair to ask this witness on a

3    transaction he didn't participate in who would be the

4    people that would have knowledge when he was never

5    prepared to testify to that.

6         So let's move on to another subject because

7    he's not going to be able to tell you the parties to

8    that specific transaction because I didn't prep him for

9    that, he wasn't designated for that, and we told you

10   that before we did the deposition.

11        And you're implying on the record that we

12   somehow had a duty to produce someone else, when we

13   expressly told you, here's the only person we're going

14   to produce to answer these operational categories.

15        Like I said, other stuff that you need for the

16   purpose of the motion, I'm going to get you separately

17   and send it over.  So I'm happy to work with you and

18   cooperate with you, but let's not burden this witness

19   who has been testifying now for an hour and 45 minutes

20   of things he has no personal knowledge of.  It's not

21   fair to him.

22        MR. ELGIDELY:  First of all, the time crunch,

23   the Committee didn't commit the time crunch.  CLG and

24   LPG created the time crunch.

25        Secondly, you indicated you were designating

1    this witness.  We didn't choose the witness.  We chose

2    the categories of testimony and the scope of testimony

3    that the Committee was seeking.

4         So you can't just select a witness with limited

5    knowledge and then, you know, tie the hands behind the

6    back of the Committee regarding the scope.

7         This witness purports to be the senior attorney

8    at CLG regarding this consumer debt practice.  And

9    certainly in his experience and his knowledge as to the

10   acquisition of over 12,000 files from LPG, he can

11   testify about who at the company may have knowledge

12   concerning that transaction.  That's absolutely relevant

13   to CLG's good faith.

14         So I'm going to continue the questioning.

15   BY MR. ELGIDELY:

16       Q.    Mr. Redhun, does John Borelli have knowledge

17   concerning the acquisition of LPG files?

18       A.    No.

19       Q.    How about Albert Hamowi?

20       A.    No.

21       Q.    How about Jack Gross?

22       A.    Unlikely.

23       Q.    How about Pandy Shen?

24       A.    Unlikely.

25       Q.    How about Danitza Campbell?

1    A.    Unlikely.

2    Q.    How about Ben Ozur?

3    A.    No.

4    Q.    How about Mr. Weber?

5    A.    Potentially.

6    Q.    Okay.  Thank you.

7         So sitting here today, you have no knowledge

8    about how the opportunity to acquire these files from

9    LPG came about; is that your testimony?

10   A.    No, I'm saying that I'm not -- I'm not sure.  I

11   know that they're -- there's probably a very simple

12   answer that I'm not privy to.

13        The same way that an associate at a law firm is

14   given an assignment and he's told to work on that, and

15   that's kind of the scope of his work and his

16   involvement.

17   Q.    Okay.  And is it your testimony that it's pure

18   coincidence that you contacted Tony Diab 10 months ago

19   concerning his network and local counsel and CLG's

20   subsequent acquisition of approximately 12,000 files

21   from LPG, that's pure coincidence?

22   A.    Not a coincidence.

23   Q.    Okay.  Were they related then?

24   A.    No.

25   Q.    If it's not related and it's not coincidence,

1    what is it?

2        A.    Because if you have a business that operates

3    and does similar work than you, it is not unreasonable

4    to reach out, to go ahead and get samples that way.

5    I'll call certain colleagues of mine and say, hey, do

6    you have a memo of law on a specific performance issue

7    when the seller died?  That I do all the time in my

8    practice.  So it's not unreasonable to think to call up

9    people that may be able to point you in the right

10   direction to getting your job done.

11       Q.    Okay.  Did your call with Tony Diab

12   approximately 10 months ago spur conversations

13   concerning the acquisition of LPG files?

14       A.    No, because that's not something that I dealt

15   with, have any involvement, I'm responsible for, or I'm

16   nothing like that.  I'm a boots on the ground person.

17       Q.    So CLG's subsequent acquisition of LPG files

18   had nothing to do with your call with Tony Diab

19   approximately 10 months ago; is that your testimony?

20       A.    I believe so, yes.  That's correct.

21       Q.    What, if any, consideration did CLG pay for the

22   12,000 files?

23       A.    I don't know.  I would have to find out who

24   would know the answer to that question.

25       Q.    Do you know whether CLG had performed an

1    appraisal or a valuation of the compliant files before

2    it acquired them?

3        A.   I don't know that we did.  But, again, I don't

4    know.

5        Q.   Where are the closing documents maintained for

6    CLG's acquisition of client files from LPG?

7        A.   I need to think about that.  I'm not really

8    sure.

9        Q.   Okay.  Again, you're the senior attorney at CLG

10   that handles these consumer debt files?

11       A.   I am an attorney working at a law firm that

12   services clients.  There's a difference between a

13   rainmaker and a guy that sits in an office, or a

14   female -- I don't mean to go into that -- but there's a

15   difference between somebody whose job it is to bring

16   business into the firm and somebody's whose job it is to

17   bring in the actual work.  I'm the person who does the

18   work.

19       Q.   Who is CLG's rainmaker?

20       A.   I was giving you a metaphor basically outlining

21   the distinguishing factor between what I do and what I

22   don't do.

23       Q.   And in your experience as the senior attorney

24   at CLG overseeing the team of lawyers on consumer debt

25   files, you don't know who the rainmaker is during that

1    period of time?

2        A.    My job and my role is to make sure that when

3    clients have files with suits attached to them that were

4    coming in, they're being handled efficiently, by

5    confident people, where things are not falling through

6    the cracks, we're getting information from the clients,

7    relaying that information, and we're taking care and

8    protecting the client's interest.  That's not my job.

9    That's what we do at CLG.  That's our role.

10            We are there to represent mostly people that

11    cannot afford proper legal representation who are being

12    sued and heavily outmatched by well-resourced and

13    powerful corporate institutions.  And these individuals

14    who can never, in their wildest dreams, afford an

15    attorney at Fox Rothschild, who would otherwise be left

16    unrepresented, defending themselves, pro se by huge

17    collection corporations, we are the last line of the

18    defense between those individuals and them having their

19    financial condition turned upside down, having judgments

20    entered against them, having their wages garnished, and

21    having their homes and assets taken away.  That's what

22    I'm charge of.

23        Q.    Okay.  But being in charge of a team of seven

24    lawyers, including yourself, you don't know who was

25    involved in acquiring the client files from LPG; is that

1    your testimony?

2         A.    Servicing these clients is more than a

3    full-time job.  We go from putting out fire to fire --

4    well, thankfully recently, those fires are no longer as

5    prudent as they once were.

6         Q.    Sir, again, my question is limited to your

7    knowledge about who was involved in the acquisition of

8    files from LPG.

9              And it's your testimony that as the senior

10   lawyer at CLG and the individual that signed the asset

11   purchase agreement as an agent, the person that's been

12   designated by the company for the deposition today, you

13   have no knowledge of what individual or what individuals

14   were involved on behalf of CLG in the acquisition of LPG

15   files; is that your testimony?

16        A.    You asked a very loaded and compounded

17   question.

18             I can tell you what we've been working on in

19   connection with the case that we're all here about in

20   terms of why --

21        Q.    Sir, I'll rephrase the question.

22             Who was involved at CLG in the acquisition of

23   files from LPG?

24        A.    I don't have the answer to that right now.

25        MR. ELGIDELY:  Okay.  Thank you.

1          All right.  The time is 11:52 Eastern Time.  I

2    understand that you have a court appearance, Mr. Redhun.

3          How long do you anticipate that court

4    appearance will take?

5          THE WITNESS:  I don't know.  The last two times

6    the court attorney was delayed for about 15 minutes, and

7    then the whole conference lasted anywhere between

8    20 minutes and 30 minutes.  So let's give me 45 minutes

9    to cover myself.  And if I'm not back, it's because I'm

10   still on that conference.

11     MR. ELGIDELY:  Okay.  So we'll resume the

12   deposition at 12:45 Eastern Time; is that acceptable to

13   you?  Or would you prefer 1 o'clock to give you a little

14   bit more time?

15         THE WITNESS:  No, I want to get this over with

16   so let's keep it 12:45.  And what I'll do is, I'll email

17   Mr. Richards, and I'll tell him if I'm delayed or not.

18     MR. ELGIDELY:  Okay.  So we'll all sign back on

19   at 12:45 Eastern Time.  And just to give you a sense of

20   how long it will take, maybe another hour to 90 minutes.

21   I don't anticipate that we'll be going much longer, but

22   we'll sign back on at 12:45 Eastern.

23         (Off the record:  8:53 a.m. - 10:04 a.m.)

24   BY MR. ELGIDELY:

25     Q.   Good afternoon, Mr. Redhun.

1      A.    Good afternoon.

2      Q.    Just to remind you, you are still under oath.

3            Do you understand that?

4      A.    Yes.

5      Q.    Okay.  Great.

6            Mr. Redhun, before we had taken a break, we

7    were talking about the trustee's complaint against CLG

8    that was filed on May 25th.

9            Do you recall that?

10     A.    Yes.

11     Q.    Okay.  Do you know why CLG has not filed an

12   answer to the complaint in the past two months?

13     A.    I was --

14           MR. RICHARDS:  Hold on.  That calls for

15   attorney-client privilege, work-product, and that's in

16   our stipulation.  You probably don't know that because

17   you're not the main counsel, but there's a stipulation

18   giving us an extension of time.

19   BY MR. ELGIDELY:

20     Q.    Okay.  Let me go to share my screen.  Bear with

21   me for one second.

22           Mr. Redhun, I've put on the screen a

23   stipulation.  I don't think it's the stipulation that

24   Mr. Richards was referring to, but it was filed with the

25   court on July 6, the day before the motion to sell was

1  filed.  And it is a stipulation in the lawsuit regarding

2  the partial settlement of claims and modification of the

3  order on the trustees omnibus emergency motion as to

4  covered parties and Defendants Consumer Legal Group,

5  P.C. and LGS Holdco LLC.

6          Are you familiar with this stipulation, sir?

7      A.   I think so.  I would prefer to see all 13

8  pages.  So if you could zoom out so I could see the

9  entire complex?

10          MR. RICHARDS:  Mr. Elgidely, that was the

11  stipulation I was referring to.  There should be a

12  provision in there that has an extension.

13  BY MR. ELGIDELY:

14      Q.   Before I go through all the 13 pages,

15  Mr. Redhun, I just want to ask you, on the 13th page, is

16  that your signature on behalf of Consumer Legal Group,

17  P.C?

18      A.   Yes.

19      Q.   Okay.  Do you know why an owner, officer, or

20  director of Consumer Legal Group, P.C. did not sign this

21  stipulation?

22      A.   No.

23          What's the date on this?

24      Q.   The day before the motion to settle was filed,

25  July 6, but you signed it, it looks like, on June 29.

1          Do you see that to the left of your signature

2     block?

3          A.   Yeah.  I do see that.

4          I don't know why I signed it as opposed to

5     anybody else.  I know that I've been working on it with

6     everything so maybe that's the answer.

7          Q.   Okay.  Did you have any discussions with

8     anybody at Consumer Legal Group other than Mr. Richards

9     concerning the motions that culminated in this

10    stipulation?

11         A.   Yes.

12         Q.   Who did you discuss it with?

13         A.   Mr. Weber.

14         Q.   Okay.  And what did you say to Mr. Weber?

15         A.   I think that might be privileged.

16         Q.   You're a party to the lawsuit.  One corporate

17    representative speaking to another corporate

18    representative, what is the basis of your privilege

19    assertion?

20         A.   Well, that would certainly fall within the

21    context of document or information prepared in the

22    contemplation of litigation, which is privileged.

23         Q.   Do you represent -- are you the attorney for

24    Consumer Legal Group in this litigation?

25         Have you filed an appearance?

1        A.    No.

2        Q.    Okay.  Has Mr. Weber?

3        A.    Not that I'm aware of.

4        Q.    Okay.  So sitting here today, you are unwilling

5    to tell me what you and Mr. Weber discussed concerning

6    the negotiations that culminated in this stipulation?

7        A.    Well --

8             MR. RICHARDS:  My only objection is, it's lack

9    of personal knowledge and assumes a fact not in evidence

10   with respect to his negotiations.

11            MR. ELGIDELY:  He said he just talked to

12   Mr. Weber.  I mean, how is that lack of personal

13   knowledge?  I asked him, did he have any communications

14   with other representatives of Consumer Legal Group other

15   than you, Mr. Richards, concerning the negotiations that

16   culminated in this stipulation, and he testified, yes,

17   Mr. Weber.  And so I think he has personal knowledge of

18   what he said to Mr. Weber and what Mr. Weber said to him

19   and those are non-privileged.

20            MR. RICHARDS:  I'm not quarreling with you.  I

21   was just trying to point out that I negotiated with the

22   trustee one-on-one with his counsel and that there was

23   no negotiation.  You used the word "negotiation" in your

24   question with Redhun for this stipulation.  That's all

25   I'm telling you.  I don't know what he talked about with

1   Mr. Weber, and if it was him passing along a message for

2   me.  I don't know.

3            MR. ELGIDELY:  That's why I asked him.  This is

4   fair game.

5   BY MR. ELGIDELY:

6       Q.    Mr. Redhun, unless Mr. Richards is going to

7   assert the attorney-client privilege in response to my

8   question concerning what discussions you had with

9   Mr. Weber that resulted in this stipulation, you'll have

10  to answer the question, sir?

11      A.    Well, I think that any communication between

12  parties themselves concerning pending litigation, which

13  results in a stipulation that gets filed in court, are

14  certainly protected by the attorney-client privilege or

15  work-product.

16       MR. ELGIDELY:  Mr. Richards, is that your

17  position?

18            MR. RICHARDS:  Come on, Counsel.  Did I make an

19  objection or instruction?

20            MR. ELGIDELY:  No, but --

21            MR. RICHARDS:  Hold on.  He's in New York.  He

22  runs his law office.  I don't know the context.  I don't

23  know if he's passing on a message.  I'd have to go

24  off-line and explore the privilege, and we don't have

25  the time to do that.

```
 1              I'm not saying anything right now.  He's a

 2     lawyer.  He knows what he's doing with respect to

 3     privilege, and I don't know what privilege he's

 4     referring to.

 5              Again, I don't know.  I'm just saying, I didn't

 6     make an objection or an instruction to that question.

 7     And I can't -- without further talking to my client, I

 8     can't help out or not help up.  He's going to have to

 9     make that decision on his own.

10     BY MR. ELGIDELY:

11          Q.    Mr. Redhun, you signed the NSF purchase

12     agreement as an agent for Consumer Legal Group;

13     correct?

14          A.    Yes.

15          Q.    Okay.  You signed this stipulation as the

16     authorized representative of Consumer Legal Group;

17     correct?

18          A.    Yes.

19          Q.    Okay.  Earlier you testified, as evidenced in

20     the two declarations you filed in support of the motion

21     to sell, that you were the senior attorney handling the

22     subject files at Consumer Legal Group overseeing a team

23     of four full-time attorneys, three part-time attorneys,

24     and eight paralegals; correct?

25          A.    Yes.
```

1    Q.   Okay.  When you had conversations with

2  Mr. Webber concerning the terms and conditions of this

3  stipulation, were you speaking to him as a

4  representative of Consumer Legal Group?

5    A.   I was speaking to him as an attorney working at

6  Consumer Legal Group.

7    Q.   Okay.  So is it your position that every

8  communication you had with Mr. Weber, you had as an

9  attorney that was subject to the attorney-client

10  privilege?

11        MR. RICHARDS:  I'm going to object.  That's

12  overbroad, that question, and it misstates his

13  testimony.

14        MR. ELGIDELY:  It's intentionally broad.

15  BY MR. ELGIDELY:

16    Q.   So again, Mr. Redhun, is it your testimony that

17  every conversation you had with Mr. Weber was in your

18  capacity as an attorney, and therefore, protected from

19  disclosure by the attorney-client privilege?

20    A.   No, not every communication.

21    Q.   Okay.  So did you render advice to Mr. Weber

22  regarding the terms and conditions of this stipulation

23  during these conversations?

24    A.   Well, which conversations are you referring to

25  because you just conceded that you asked a very broad

1    question?

2        Q.    I'm asking about the stipulation, sir.

3        Did you render legal advice to Mr. Weber

4    concerning the terms and conditions of the stipulation

5    with the trustee?

6        A.    I think any answer that I would give you, other

7    than my answers immune from response from this because

8    of the attorney-client privilege, might theoretically

9    waive that privilege, and it's not proper here.

10       Q.    Again my question, sir, is, when you discussed

11   the terms and conditions of the stipulation that was

12   ultimately filed with the court on July 6, 2023, with

13   Mr. Weber, did you render legal advice to Mr. Weber

14   concerning those terms and conditions?  That's a yes or

15   no answer.

16       A.    I have to think if I can even answer that

17   question yes or no without violating the privilege.

18   Give me a second.

19       Q.    How much time do you need to think, sir?  Do

20   you want to take a five-minute break?

21       A.    Sure.

22       MR. RICHARDS:  Mr. Elgidely, then I'm going to

23   instruct him to call me because I have no way of

24   understanding this issue.

25       Is that okay with you?  Not that he's

1   precluded, but I just want to disclose I'm going to talk

2   to him now because you're taking a break, and I don't

3   understand the issues.

4         MR. ELGIDELY:  Mr. Richards, you said, I didn't

5   invoke the objection, he did.  He's an attorney.  He

6   knows what the attorney-client privilege is.

7         So again, during my deposition, I don't want

8   him to confer with you, Mr. Richards.  It is either it

9   is privileged and you, Mr. Richards, as counsel of

10  record are invoking the privilege on behalf of the

11  client or supporting the client's invocation of the

12  privilege or it's not privileged.  So I just want an

13  answer.  Yes, we'll take five minutes.

14        MR. RICHARDS:  Hold on.  I'm not agreeing to go

15  off the record yet.

16        In California, we don't have a rule you can't

17  talk to your client during the deposition.  I'm just

18  letting you know, I know some states do.  There's

19  nothing improper.  The local rules don't like it when

20  there's a question pending, but he has a constitutional

21  right to talk to his lawyer, and there's no preclusion

22  whatsoever in California.

23        So I'm letting you know right now that, if you

24  want to take a break -- he's going to ask me my opinion

25  on the privileged issue because he has a right to do

1  that, and I'm going to invite him to do that.  If you

2  don't want him to ask me, we should not take a break,

3  and you should either accept what he's saying, ask

4  further questions, or move on.

5          I just want you to let you know, if we take a

6  break, that will happen.  I'm just disclosing it so you

7  have an opportunity to ask some more questions before I

8  talk to him.

9          MR. ELGIDELY:  Okay.  Mr. Richards, I'm not

10  going to take a break.  I disagree with you regarding

11  California law.  You can't consult with counsel while a

12  question is pending.  You can consult with counsel, I

13  agree with that, but you can't consult with counsel

14  regarding a pending question before the question is

15  answered.

16          So I'll move on.  And I don't agree that it's

17  privileged, but I'll move on in the interest of time.

18          MR. RICHARDS:  No problem.  I just want to also

19  point out, he did answer the question.  You just didn't

20  like his answer, and we can move on.

21          MR. ELGIDELY:  He would not testify about what

22  he said to Mr. Weber.  He didn't answer that question,

23  Mr. Richards.  He said he had conversations, and I asked

24  him what the conversations were.  And I asked, did you

25  give legal advice, and he said I can't even answer that

1   question.  I can't answer yes or not because it might

2   waive the privilege.  I'm going to move on.  Let's not

3   waste any more time on this.

4          MR. RICHARDS:  You got it.

5   BY MR. ELGIDELY:

6      Q.   But your testimony, Mr. Redhun, was there were

7   conversations with Mr. Weber concerning the terms of the

8   conditions of this stipulation; correct?

9      A.   I don't think you asked me in the plural.  I

10  think you asked me if I spoke with Mr. Weber, and I

11  think I answered that in the affirmative.

12     Q.   Was it just one conversation or were there

13  multiple conversations?

14     A.   I don't recall.  There was certainly one.

15     Q.   Okay.  Do you recall whether that conversation

16  was before or after you signed the stipulation on behalf

17  of the company?

18     A.   I don't recall.

19     Q.   Mr. Richards was your counsel of record at the

20  time this stipulation was being negotiated; correct?

21     A.   He was counsel for Consumer Legal Group.

22     Q.   Right.  That's what I mean.

23          Well, you're here on behalf of Consumer Legal

24  Group; correct?

25     A.   Yes.

1    Q.    Okay.  So Mr. Richards was counsel of record

2    for Consumer Legal Group at all relevant times during

3    the adversary proceeding from May 25 through the present

4    day; correct?

5    A.    That's my understanding.

6    Q.    Does Consumer Legal Group have any other

7    counsel of record in the adversary proceeding followed

8    by the trustee?

9    A.    I don't know.

10        MR. RICHARDS:  Mr. Elgidely, just to point out,

11   there are two firms Greenspoon Marder and my office so

12   we have a truthful record.

13        MR. ELGIDELY:  Okay.  I appreciate that.

14        MR. RICHARDS:  Those are the two law firms

15   representing CLG, Greenspoon Marder, specifically Dan

16   Lev and myself, Law Offices of Ronald Richards &

17   Associates, A.P.C.  Both bar and admitted to the Central

18   District Bankruptcy Court.

19        MR. ELGIDELY:  Okay.  I was just going to the

20   signature block to see if any of the attorneys from CLG

21   signed it, but I don't see any of the attorneys'

22   signatures.

23        MR. RICHARDS:  Just for the record, that's

24   because we haven't made an appearance in the case yet

25   because the stipulation provided an extension.  That's

1    why.

2            MR. ELGIDELY:  Understood.  Thank you.

3    BY MR. ELGIDELY:

4        Q.    So, Mr. Redhun, looking to the terms of the

5    stipulation in the opening paragraph, it says that

6    "Consumer Legal Group, P.C. along with its related

7    company LGS Holdco, LLC."

8            Do you see that in the first paragraph?

9        A.    Yes, I do.

10       Q.    How is LGS Holdco related to CLG?

11       A.    It's my understanding that they are related

12   with respect to capital and financing.

13       Q.    What do you mean by that?

14       A.    I don't understand the question.

15       Q.    Well, you said they were related regarding

16   capital and financing, and I'm asking you to explain

17   that.

18           What does that mean?

19       A.    I think that LGS Holdco has loaned money to

20   Consumer Legal Group.

21       Q.    Typically, when a company like -- such as a

22   bank, loans money to a customer as a borrower, that's an

23   arms length relationship; correct?  That doesn't make

24   them related?

25       A.    I'm not going to answer hypotheticals or

1    questions about "typical".

2        Q.   Okay.  So I'm asking you, other than the fact

3    that LGS Holdco, LLC loaned money to Consumer Legal

4    Group, P.C., what if any other relationship exists

5    between the two entities?

6        A.   I think that is the extent of their

7    relationship.

8        Q.   Okay.  There's no common ownership of these two

9    entities?

10           MR. RICHARDS:  I'm going to object.  It

11   misstates the evidence.  He already testified to that.

12           MR. ELGIDELY:  Okay.  I'm asking the questions,

13   Mr. Richards.  You can object.  It's noted for the

14   record.

15   BY MR. ELGIDELY:

16       Q.   I didn't hear an answer.

17           Mr. Redhun, is there any common ownership

18   between Consumer Legal Group and LGS Holdco?

19       A.   Not to my knowledge.

20       Q.   Okay.  Any common officers or directors?

21       A.   Not to my knowledge.

22       Q.   Was LGS Holdco involved in fundings CLG's

23   acquisition of the 12,000 plus files from LPG in early

24   2023?

25       A.   I'm not entirely sure.  That's my answer.  I

1    know I left you hanging on the end, but I'm not entirely

2    sure.

3        Q.    Okay.  Do you know what LGS stands for?

4        A.    I do not.

5        Q.    In Section 1.3 of the stipulation, it contains

6    various deliverables by CLG.

7            Do you want to take a moment to review 1.3?

8        A.    Yeah.  Do me a favor and zoom out?

9        Q.    Can you still read it?

10       A.    Yeah, it's clearly cut off on the bottom.

11       Q.    I'm going to scroll down as you read to get to

12   that section.

13           Okay.  Did you read 1.3 through (i) to the

14   bottom of page 4 -- strike that.  Let me try it a

15   different way.

16           Does Section 1.3 provides that "Within seven

17   calendar days of CLG's signature of this stipulation,

18   CLG will provide a declaration to the trustee under

19   penalty of perjury from its managing attorney attesting

20   to the following."

21           And in Roman (i) it says, "CLG's lack of any

22   personal business, or financial arrangements with LPG or

23   Tony Diab, aside from its purchase of the CLG acquired

24   clients or anything else that has been disclosed to

25   trustee."

1          Did I read that correctly?

2      A.    Yes.

3      Q.    Was such a declaration provided to the

4   trustee?

5      A.    I don't know.

6      Q.    You signed this stipulation, sir, obligating

7   the company to provide this declaration within seven

8   calendar days of June -- we'll call it June 30, the last

9   signer of the stipulation, and today is July 17.

10         So sitting here today, you don't know if this

11  declaration has been provided to the trustee pursuant to

12  1.3 (i)?

13     A.    I don't have any personal knowledge whether a

14  declaration was provided to the trustee.

15     Q.    Okay.

16     A.    If your question is, if I provided one to the

17  trustee, I have not provided anything to the trustee

18  directly.

19     Q.    Okay.  Do you know who the managing attorney of

20  CLG is?

21     A.    It might be me.

22     Q.    Who else could it be?

23     A.    Jack, but it's probably me.

24     Q.    Okay.  Did you sign such a declaration within

25  seven calendar days of your signature of the

1   stipulation?

2       A.    I believe so.

3       Q.    Okay.  Can you email that to me?

4           Are you at a location where you could email

5   that declaration to me?

6           MR. RICHARDS:  Counsel, we provided two

7   declarations at the request of the trustee, and then we

8   set up this deposition.  So the parties to the agreement

9   have not -- and the judge continued the hearing on the

10  motion to the date of the sale.

11          There's not a separate declaration he signed

12  other than the two that we've been provided.  If the

13  trustee needs a third that's going to say the same thing

14  that he's going to testify to today, I'm sure they'll

15  ask us for one.

16          But I'm letting you know that we got redirected

17  on other things, and the stipulation has not been

18  approved yet.  And so if there's something missing, the

19  trustee would let us know if they want a third

20  declaration, but we've gone back and forth.

21          So I don't have anything to send you other than

22  the two we've sent you which should cover that concern.

23  But if it doesn't, the trustee will let us know and

24  we'll provide a third.

25          There's a reason why one was not provided.  So

1    I don't think we should spend time on looking for

2    something that's not there.

3            MR. ELGIDELY:  Respectfully, Mr. Richards, I

4    know you don't want to spend time on it, but this is my

5    deposition, our witness, and we're trying to get to

6    cooperation with the discovery from this proposed buyer

7    of the debtor's assets.

8    BY MR. ELGIDELY:

9        Q.    Mr. Redhun, the Section 1.3, doesn't say that,

10   that these deliverables will be provided upon court

11   approval of the stipulation, does it?

12        It says within seven calendar days of CLG's

13   signature of the stipulation; correct?

14        A.    Without reading the entire agreement, I can't

15   give you my opinion.  But I would also say that a

16   stipulation is really subject to being so ordered by the

17   judge.

18        Q.    Sir, I'm asking you what this says.  The first

19   clause in 1.3, does it say within certain days of

20   approval of the stipulation or does it say within a

21   certain number of days of CLG's signature of the

22   stipulation?

23        A.    There might be other language in the agreement

24   that triggers that exact thing that you're asking

25   about.

1    Q.   You're right, there could be.  But I'm asking

2  you about what this says?

3    A.   1.3 speaks for itself.  I don't know why you

4  need me to opine on that.

5    Q.   Okay.  It says, "within seven calendar days of

6  CLG's signature of the stipulation."

7         So my only question was whether it was

8  provided -- sounds like you don't know if it was

9  provided, but certainly something was provided.  So I

10 appreciate that explanation, Mr. Richards.

11        So with regard to Roman (i) it says at the end

12 "or anything else that has been disclosed to the

13 trustee."

14        Do you know what that language means?  I mean,

15 was there something else that was disclosed to the

16 trustee that's intended to encompass, or was it limited

17 to the lack of any personal business or financial

18 arrangements with LPG or Tony Diab?

19   A.   The language of anything else that has been

20 disclosed to this trustee is rather vague.

21        Like I've said, I have not provided anything

22 directly to the trustee.  So I don't know that I'm the

23 proper person to answer that question.

24   Q.   Okay.  Going to Roman (ii), which also follows

25 the language of "within seven calendar days of CLG's

**Exhibit 6  0119**

1  signature of the stipulation" it says, "A list and

2  summary of all attorneys employed or retained by CLG to

3  service the CLG acquired clients."

4       Do you know -- and maybe Mr. Richards can

5  add -- whether such a list has been provided to the

6  trustee?

7     A.   Again, I don't know.  So I'm not the right

8  person to answer that question.

9       MR. ELGIDELY:  Mr. Richards?

10       THE WITNESS:  He's not under oath here.  He's

11  not testifying.

12       MR. ELGIDELY:  Well, he's been testifying all

13  morning.  All day he's been testifying.

14       THE WITNESS:  No, he's been doing his job.

15       MR. ELGIDELY:  Okay.

16       MR. RICHARDS:  I'm not going to become the de

17  facto deponent.

18       I can just tell you that there's settlement

19  communications that have involved numerous exchanges,

20  and that I don't think there's a concern about our

21  compliance with the stipulation, and if there is one, it

22  will be brought to my attention quickly.

23       But I don't want to get into how the different

24  things have changed, but I could tell you that no one

25  has contended we're in breach of the deliverables under

1   the settlement agreement.

2   BY MR. ELGIDELY:

3       Q.    Okay.  So, Mr. Redhun, as the individual that's

4   signed this on behalf of CLG, you don't know if the

5   deliverable in 1.3(ii) was provided?

6       A.    I have no personal knowledge.  Yes, I'm going

7   to state the same answer.

8       Q.    Okay.  And would the same thing hold true

9   regarding (iii), (iv), (v), and (vi) Roman numerals?

10      A.    Yes, sir.

11      Q.    So this stipulation was filed July 6 in which

12  the trustee had touted the long history of legal

13  compliance by CLG.  But yet, Section 1.3 (iv) requires a

14  detailed summary of the services CLG provides within

15  seven calendar days.

16          Do you know why the trustee was asking for this

17  information the day before the motion to settle was

18  filed?

19      A.    That's not a question for me.  That's a better

20  question for the trustee.

21      Q.    Okay.  1.4 says "CLG agrees that within 10

22  calendar days after execution of this stipulation by all

23  parties, CLG will provide trustee with financial

24  statements, profit and loss statements, and balance

25  sheets."

1          Do you know, Mr. Redhun, as the individual who

2    signed this stipulation on behalf of CLG, whether that

3    deliverable was delivered timely?

4         A.   Again, I have not provided or communicated

5    anything with the trustee directly, so I can't answer

6    your question.  "Cannot" to the extent that maybe you

7    heard "can" or whatever.  Sorry.

8         Q.   How about 1.6, do you know if that deliverable

9    was provided?

10        A.   I'm going to give the same answer.  I have no

11   personal knowledge as to whether CLG provided anything

12   directly to the trustee.

13          MR. RICHARDS:  And my objection will just be

14   outside the scope.

15          MR. ELGIDELY:  Okay.  I understand.

16   BY MR. ELGIDELY:

17        Q.   Section 1.8 of this stipulation provides for

18   CLG's payment of 40 percent from CLG fee share clients

19   to the debtor's estate.

20          Are you familiar with that provision?

21        A.   I don't see the word "debtor's estate" in

22   there.  I also would need to see what the definition

23   within the stipulation of CLG fee share clients is.  I

24   would also need to see the rest of the paragraph before

25   I could even potentially give you an answer.

1      Q.   All right.  Let's do that.

2           If you look at the second whereas clause, it

3  speaks to -- it says, "For some of the CLG acquired

4  clients, CLG contends that it paid reasonably equivalent

5  value.  And that's defined as CLG non-fee share clients.

6  And for others, CLG agreed to pay 40 percent of the

7  revenue earned from the CLG acquired clients, and that's

8  defined as CLG fee share clients."

9           Do you see that, sir?

10     A.   Yes.

11     Q.   Okay.  Now, your other question is you wanted

12  to see the whole provision, so let's go back to that

13  provision.  1.8.

14          Why don't you take a moment to read that.

15     A.   Can you zoom out again, please?

16     Q.   Sure.

17     A.   Okay.  This is a dense paragraph.

18     Q.   It is.

19          But would it be fair, if I summarized it as

20  saying that CLG is going to pay 40 percent from all CLG

21  fee share clients to the trustee for the benefit of the

22  debtor's estate?

23     A.   Well, I would disagree with your part about the

24  debtor's estate.  I understand why you said that, but

25  this does not reference that.  So let's just start with

1    that.  The second thing of it is, it says CLG is going

2    to withhold 40 percent of receivables.

3        Q.    How about the language I just highlighted?

4        A.    Okay.  What's your question?

5        Q.    Okay.  So does this agreement or this provision

6    say that CLG, after an accounting, will provide the 40

7    percent of the CLG fee share client revenue to the

8    trustee?

9        A.    I didn't read that.  I don't mean to quibble

10   with you about the language, but I will.  I don't read

11   it that way.

12       Q.    How do you read it, sir?  How do you read it?

13       A.    So CLG is going to withhold 40 percent.  It's

14   going to work on harmonizing the accounting.  After the

15   accounting is harmonized and resolved, CLG will make

16   monthly payments of the resolved amounts, and then

17   provide the trustee with an accounting, and remit any

18   amounts previously withheld to the trustee.

19            So it's going to withhold 40 percent and then

20   do its thing.  It's going to do an accounting.  After

21   the accounting is resolved, it's going to make monthly

22   payments of the resolved amounts.  What resolved amounts

23   though?  The amount that's, I guess, subject to the

24   accounting.

25       Q.    So, Mr. Redhun, even though you signed this

1    document after discussing it with Mr. Weber and

2    presumably with Mr. Richards, you're unclear as to

3    what's to be remitted to the trustee from the 40

4    percent?

5         A.   No, I remember reading it.  And this was the

6    kind of thing where I had to stop everything that I was

7    doing and really give it my full-undivided attention.

8              And asking me a quick interpretation of what

9    we've already agreed upon is a dense paragraph, it's not

10   fair to me.

11        Q.   I don't mean to be unfair.

12             MR. RICHARDS:  Well, you sort are respectfully,

13   Robert, because he's really here for operations.  He's

14   not going to be segregating the money.  That's not what

15   he does there.

16             But, I mean, we understand the stipulation, but

17   again, I'm just letting you ask him the questions.  We

18   still haven't gotten into whether he knows whether he

19   has any relationship --

20             MR. ELGIDELY:  Mr. Richards, another speaking

21   objection.

22             MR. RICHARDS:  No, I'm not.  Sorry.

23             MR. ELGIDELY:  You're speaking more than the

24   witness today.

25             MR. RICHARDS:  I don't think so.

```
 1   BY MR. ELGIDELY:

 2       Q.   Mr. Redhun, in the second whereas clause, do

 3   you understand the second whereas clause?  How about we

 4   can start there.

 5           Did you understand it before you signed it?

 6       A.   Yes.

 7       Q.   Okay.  Do you understand it today?

 8       A.   Yes.

 9       Q.   Okay.  Now, what do you understand the

10   highlighted language to mean here?  I'm going to

11   highlight it for you.

12           What do you understand what it means here?

13       A.   What's the relevance of my understanding of

14   this?

15       Q.   Because it goes to the dealings with LPG before

16   the petition date, and it goes to the good faith of your

17   company CLG or the company you work for.

18       A.   What do you mean "good faith"?

19       Q.   Sir, I'm not here to answer your questions.

20           I'm asking you what you understand the

21   highlighted sentence to mean?

22       A.   Is your client contending that the agreement is

23   vague or ambiguous?

24       Q.   Sir, I'm not being deposed by you.  I'm asking

25   you this question, Mr. Redhun.
```

**Exhibit 6  0126**

1          It's clear to me that you don't want to testify

2     about this.  If you did, I don't know why you're

3     fighting me so much.

4          A.   I'll just say that the language speaks for

5     itself.

6          Q.   Okay.  So let me tell you how I interpret this

7     provision.

8          So at the time CLG acquired the 12,546 client

9     files from LPG, it has taken the position in this

10    litigation that it paid reasonably equivalent value for

11    some of the clients.  And that's defined in this whereas

12    clause as CLG non-fee share clients.

13         Do you agree with that so far?

14         A.   I would need to hear the first part of what

15    your interpretation was before I could agree to that.

16         I don't know why you're fighting me about this

17    language.  It speaks for itself.  You're not contending

18    that it's vague and ambiguous.

19         Q.   Mr. Redhun, there's a reason I'm asking this,

20    and I'm going to get to the reason, okay.

21         In this paragraph, again this sentence I should

22    say in the second whereas clause it says, "For some of

23    the CLG acquired clients, CLG contends that it agreed to

24    pay 40 percent of the revenue earned from the CLG

25    acquired clients."

1          Did I read that correctly?

2      A.    Yes.   What's there is what you read.

3      Q.    Okay.  And so at the time that CLG acquired

4   these so-called CLG fee share clients from LPG, it

5   agreed to pay 40 percent of the revenue earned back to

6   LPG, the debtor; correct?

7      A.    That's what this says.

8      Q.    Okay.  So in this stipulation that's a partial

9   settlement with the trustee, CLG is just agreeing to

10   comply with what it was already obligated to do, meaning

11   to give the 40 percent to LPG; correct?

12      A.    No, it's saying that the 40 percent that you

13   just read is a recital to this agreement because this

14   whole agreement is essentially a product of litigation

15   which is the product of various allegations between the

16   parties.

17      Q.    Okay.  Let me ask it this way, sir.

18          When CLG acquired these client files from LPG,

19   it agreed with regard to some of the files to pay 40

20   percent of the revenue earned back to LPG; correct?

21      A.    It doesn't say who the 40 percent is going to

22   go to actually.

23      Q.    Okay.  Let's go back to the second paragraph.

24   For others, CLG agreed to pay --

25          Who else would CLG pay 40 percent of the

1  revenue earned from files that it acquired from LPG?

2  Who else?

3      A.   I don't know, but this paragraph doesn't say

4  who.

5      Q.   Okay.  And you don't know who, as the person

6  who signed this stipulation on behalf of CLG?

7      A.   Now that you've highlighted the deficiency in

8  the drafting of it, you've made me feel a little bit

9  foolish.

10     Q.   Okay.  So, sir, isn't it true that under

11  Section 1.8 of the stipulation, CLG is merely agreeing

12  to honor its obligation to LPG by withholding and

13  remitting after an accounting, 40 percent of the revenue

14  earned from CLG fee share clients?

15         There's no additional money.  This is not like

16  the trustee's getting any additional money with regard

17  to the CLG fee share clients.  He's merely obtaining

18  CLG's compliance --

19     A.   Stop scrolling.

20     Q.   Merely obtaining CLG's compliance with its

21  preexisting obligation?

22     A.   Scroll down a little bit?

23     Q.   Sure.

24     A.   Stop.

25       I'll tell you why I can't answer your

1    question.

2        Q.    Please.

3        A.    I don't know if this paragraph relates to a

4    settlement agreement with the trustee or if it relates

5    to an agreement involving LPG.

6        Q.    Do you know who the trustee is a representative

7    of?

8        A.    He's the trustee appointed by this court on

9    behalf of the debtor estate.

10            And I'm going to insert one other thing about

11   bankruptcy.  I made a huge mistake taking that class in

12   law school.  I don't do any bankruptcy work.  I

13   understand more or less the way bankruptcy works, but

14   whenever I see a file approaching the realization, the

15   actual realization that it's going to go to bankruptcy,

16   I'm going to have to send it to somebody who has more

17   knowledge than me.

18            So I kind of sound a little stupid, I

19   understand that, but I'm also not going to answer

20   questions about things that I don't handle on a

21   day-to-day basis.

22       Q.    Understood.  Thank you for explaining that to

23   me.

24            Mr. Redhun, this stipulation was negotiated

25   obviously as a result of the lawsuit that the trustee

Exhibit 6  0130

1    filed, correct, against CLG?

2         A.    That's my understanding, yes.

3         Q.    It says, "partial statement of claims."

4              Do you know if there has been compliance by CLG

5    with regard to Section 1.10 in terms of CLG's obligation

6    to deliver to the trustee or to provide to the trustee

7    information relating to any and all payments made within

8    the preceding four years to LPG, Tony Diab, and any of

9    the covered entities and individuals described in the

10   June 2 order and to any of the defendants in the

11   fraudulent transfer action?

12        A.    Again, I don't have personal knowledge whether

13   CLG provided anything to the trustee, so I can't answer.

14   I'm sorry.

15        Q.    Understood.

16             What is your understanding of the scope of the

17   release that the trustee has given to CLG through this

18   stipulation?

19             MR. RICHARDS:  I'm going to object.  It calls

20   for a legal opinion/conclusion.  It's outside the scope

21   of his knowledge.  I'm going to instruct him not to

22   answer that.

23             MR. ELGIDELY:  I'm just asking him what his

24   personal understanding as a lawyer practicing over 13

25   years as the managing attorney of the proposed buyer of

1   the debtor's assets and as the party who signed this

2   stipulation.

3          Certainly, he has an opinion that is not the

4   product of consultation and advice from you,

5   Mr. Richards, or the Greenspoon Marder Firm as to his

6   understanding of the scope of the release that the

7   trustees providing through this stipulation.

8          MR. RICHARDS:  I don't know if he could answer

9   that without invading privilege.  It's also not

10  calculated to lead to the discovery of admissible

11  evidence.  His lay opinion about what the release means,

12  it speaks for itself.  I think you are going too far

13  afield.  Respectfully, I'm going to instruct him not to

14  answer on that question.

15         MR. ELGIDELY:  Okay.  Mr. Richards, where in

16  the stipulation does it provide for the extension of

17  time -- I think I missed it -- to answer the complaint?

18  I don't see that in here.

19         THE WITNESS:  Are we off the record?

20         MR. ELGIDELY:  Let's go off the record for 30

21  seconds.

22         (Off the record:  10:48 a.m. - 10:48 a.m.)

23         MR. ELGIDELY:  We're back on the --

24         MR. RICHARDS:  Counsel, asked me a

25  stipulation --

1          THE WITNESS:  Only one person can speak at a

2    time.  Come on.  You all know how this works.

3          MR. RICHARDS:  Counsel, asked me a question

4    before we went off the record, where in the stipulation

5    we get the extension.  I have 80 active files.  I

6    couldn't remember that exact paragraph within one second

7    so we went off the record and the deponent pointed out

8    it's 10.1.

9          MR. ELGIDELY:  Yes, which says, "CLG has

10   granted a 90-day extension of time to respond to the

11   complaint."

12   BY MR. ELGIDELY:

13       Q.   Mr. Redhun, do you know what the state of the

14   litigation would be between the trustee and CLG if the

15   sale goes through, if the sale is approved by the

16   court?

17       A.   That's a question that I think is more

18   appropriate for Mr. Richards.  And I'm exceptionally

19   grateful for his involvement and his understanding of

20   the way the bankruptcy law works.

21   BY MR. ELGIDELY:

22       Q.   So my question is whether the litigation

23   between CLG and the trustee would continue to remain

24   pending, notwithstanding the sale of the debtor's asset

25   to CLG if it's approved by the court?

1          MR. RICHARDS:  Objection.  Calls for

2     speculation.  Attorney-client.  Work-product.  Lack of

3     personal knowledge.  Outside the scope.

4     BY MR. ELGIDELY:

5          Q.   Okay.  And all of those objections, you still

6     can answer that, Mr. Redhun.  Particularly, since there

7     are some filings with the court concerning what the

8     state of the litigation would be if the sale of the

9     debtor's assets is approved by the court to CLG?

10         A.   Okay.  I don't mean to be annoying, but just

11    ask me your question again pointedly.

12              MR. RICHARDS:  Can't we just read it back?

13              MR. ELGIDELY:  No.  Mr. Richards, again, this

14    is my deposition, okay.

15    BY MR. ELGIDELY:

16         Q.   Are you aware, Mr. Redhun, that the litigation

17    between the trustee and CLG would continue, according to

18    documents filed with the court, notwithstanding the sale

19    of the debtor's assets to CLG, if such sale is approved

20    by the court?

21              MR. RICHARDS:  Objection.  Calls for

22    speculation.  Lack of personal knowledge.

23    Attorney-client.  Work-product.  Outside the scope.

24              MR. ELGIDELY:  Mr. Richards, it's certainly the

25    witness who signed the stipulation on behalf of CLG and

Exhibit 6   0134

1   who was intimately involved.  Earlier he testified this

2   sale is all me, and he's been party to all of these

3   documents, has personal knowledge of what the state of

4   the litigation would be.  But if you're instructing the

5   witness not to answer this very simple question, and you

6   don't want to cooperate on that point, then that's fine.

7   We'll move forward.

8           MR. RICHARDS:  Well, I never instructed him not

9   to answer, Counsel.  I made --

10          MR. ELGIDELY:  You asserted attorney-client

11  privilege.

12          MR. RICHARDS:  I did, but I didn't instruct him

13  not to answer.  I just objected.  There was no

14  instruction.  I'm allowed to object under privilege.

15  I'm just telegraphing that I'm making an objection.  And

16  the witness, I didn't instruct him.  He can answer it if

17  he wants.

18          THE WITNESS:  I would like to think that if the

19  court approved the sale, the court would recognize that

20  tens of thousands of mostly indigent consumers would now

21  have confident proper legal representation, otherwise

22  they would be left unrepresented.

23          So I would like to think after CLG is

24  recognized for helping all of these individuals out, the

25  litigation would end against them, but I can't say for

```
 1   sure.

 2   BY MR. ELGIDELY:

 3       Q.   Okay.  But is it your understanding and belief

 4   at the time you signed this stipulation on behalf of

 5   CLG, that the litigation between the trustee and CLG

 6   would conclude if the court approved the sale of the

 7   debtor's assets to CLG?

 8       A.   I don't know if that stipulation that we just

 9   went over pertained to the pending claims by the trustee

10   against CLG or if it pertained to the potential

11   acquisition of those claims, so I can't answer.

12       Q.   Do you want me to pull it up again?

13       A.   Sure.

14       Q.   Okay.  Is it on your screen?

15       A.   Yeah, but I don't have control over it.

16       Q.   I understand.  I'm happy to scroll as you

17   request, sir.

18            So you see it's a stipulation that was filed in

19   the lawsuit and it says, "Partial settlement of claims

20   and modification of order on the trustee's emergency

21   motion with regard to Consumer Legal Group and LGS

22   Holdco."

23            Do you see that to the right of the caption?

24       A.   Yes.

25       Q.   And if you go down further.  So you see this
```

1    whereas clause at line 7 through 11.  "Whereas, neither

2    the claims set forth in the adversary proceeding as

3    amended, included but not limited to the trustee's

4    action for avoidance or recovery, nor CLG's defenses

5    thereto are being resolved by this stipulation and the

6    parties reserve all of the rights, claims, and

7    defenses."

8           My question again, sir, is whether it was your

9    understanding, belief, hope, whatever it may be, that if

10   the sale of the debtor's assets to CLG is approved by

11   the court that the litigation between the trustee and

12   CLG would conclude?

13       A.   Well, like you said, that would be my hope.

14       Q.   Okay.  Did anybody make any promises or

15   representations to you concerning what would happen with

16   that litigation in the event the bankruptcy court

17   approves the sale of the debtor's assets to CLG?

18       A.   Well, Mr. Richards should have immediately

19   spoken up and said attorney-client privilege.

20          But any communications that I had with

21   Mr. Richards would be protected by the attorney-client

22   privilege, and I have not spoken or communicated with

23   the trustee directly.

24          MR. RICHARDS:  The reason why I didn't object

25   is because I assumed he's referring to communications

```
 1    with you outside of me.

 2             MR. ELGIDELY:  Correct.

 3             THE WITNESS:  I took a shot at you.  You know

 4    that.

 5             MR. RICHARDS:  It seems like everybody likes to

 6    do that.  Okay.  Thanks.

 7             THE WITNESS:  And you know there's love there?

 8             MR. RICHARDS:  I know.

 9             MR. ELGIDELY:  Can you guys do that off the

10    record, please?

11             MR. RICHARDS:  Sure.

12    BY MR. ELGIDELY:

13        Q.   Is LGS Holdco the source of any funds for the

14    purchase of the debtor's assets?

15        A.   You mean, the prospective files?

16        Q.   The pending motion to sell?

17             MR. RICHARDS:  I'm going to object.  That is

18    going to invade attorney-client privilege, work-product,

19    and financial privacy.

20             But I told you this when we spoke at the break,

21    that none of the funds are coming from HCH, and they

22    won't be coming from LGS Holdco.  I can represent that

23    as well, but this is outside the scope of the witness's

24    knowledge.

25             MR. ELGIDELY:  Again, you're testifying.  I
```

1    don't know if the witness --

2         MR. RICHARDS:  Listen, I'm a lawyer.  I can

3    make a representation on -- this is not an adversarial

4    deposition.  It's an informational deposition.  So if I

5    have something that would help the Committee, there's

6    nothing inappropriate about me volunteering that.  It's

7    just that this witness is not going to be involved in

8    the financing of the acquisitions.  That's not what he

9    does.

10        MR. ELGIDELY:  To clarify, Mr. Richards, the

11   reason I said that is because obviously we like to get

12   sworn testimony from the actual buyer about what is

13   happening with regard to this transaction rather than

14   representations of counsel.

15        And sometimes clients tell us everything.

16   Sometimes they tell us half of things.  I'm not saying

17   that's the case here, but this client is here to be

18   deposed under oath regarding a substantial transaction

19   relating to debtor's assets.  And in light of the

20   allegations regarding the prior principals of LPG, it's

21   important that the Committee obtain sworn testimony by

22   the actual buyer.

23        MR. RICHARDS:  I know, but you asked me that at

24   the break, and I said that because it's so much money,

25   we don't know what account or what entity is going to

```
 1  capitalize.

 2          MR. ELGIDELY:  Mr. Richards, you don't need to

 3  keep testifying, okay.

 4          MR. RICHARDS:  I'm not.  But I'm saying that

 5  the sworn testimony could be provided at the time of

 6  funding that this witness is not the right witness to

 7  get that from.  That's all I was trying to tell you.

 8          THE WITNESS:  What I can say is that whatever

 9  money that will be paid is not coming from anything else

10  to do with Tony Diab or LPG.  And it's not coming from

11  any money that would be withheld or set aside pursuant

12  to the language in that stipulation.

13  BY MR. ELGIDELY:

14      Q.   Mr. Redhun, earlier I asked you whether you had

15  seen the trustee's allegation that the 12,000 plus files

16  that LPG transferred to CLG represented $3.3 million in

17  revenue.

18          Do you recall us going through that allegation

19  of the complaint?

20      A.   Yes.

21      Q.   Now, is any of the revenue or funds generated

22  from those 12,000 plus files being utilized in whole or

23  in part to purchase the debtor's assets in this proposed

24  transaction?

25      A.   No.
```

1    Q.    Okay.  So even though Mr. Richards says you

2    don't know anything about where the source of the funds

3    is coming from to pay the purchase price, you know for a

4    fact that it's not coming from the $3.3 million in

5    revenue that's result from the 12,000 plus files that

6    were previously transferred from LPG to CLG?

7    A.    Correct.

8    Q.    Okay.  Thank you.  That's helpful.

9          Earlier you testified that you were heavily

10   involved in the negotiations for the purchase of the

11   debtor's assets; correct?

12   A.    I don't know if I said "heavily".  I'm

13   actively -- I'm doing a lot of the work.  I don't know

14   if I used the word "heavily".  That's what I want to

15   say.

16   Q.    Okay.  It's fair to say that you are actively

17   involved in the negotiation for the purchase of the

18   debtor's assets?

19   A.    Yes.

20   Q.    Okay.  And what was the nature of your

21   involvement in that regard?

22   A.    That's a very broad question.  Let's go if you

23   could limit it, please.

24   Q.    Okay.  Did you have any discussions with the

25   trustee?

1        A.    No.

2        Q.    Were you on any conference calls in which the

3   trustee was participating?

4        A.    I'm not sure.

5        Q.    And by "conference calls", I mean telephonic or

6   by videoconferencing equipment or otherwise?

7        A.    Yeah, I'm not sure.

8        Q.    Well, did you participate in any meetings in

9   which the trustee was present?

10        A.    No.

11        Q.    Okay.  Did you provide any documents directly

12   to the trustee or the trustee's counsel?

13        A.    Not me.

14        Q.    Okay.  So if there was a document that was --

15   that Mr. Richards requested, you provided it to

16   Mr. Richards, and you would expect that Mr. Richards

17   would pass that along?

18        A.    Well, if Mr. Richards asked me for something, I

19   would give it to him regardless of what he needs it for

20   or uses it for.

21        Q.    Okay.  But in terms of negotiations for the

22   sale and purchase of these assets, did you provide

23   certain documents in connection with those efforts?

24        A.    Maybe.  I'm trying to think, but maybe.  I

25   think I can better answer your question by saying that I

 1    did a lot of the due diligence.

 2        Q.   Okay.

 3        A.   We can talk about that if you'd like.  That's

 4    where I think you want to go.

 5        Q.   Okay.  I'm actually not talking about the due

 6    diligence with regard to LPG's assets.  I'm asking about

 7    what information you gave regarding CLG's business to

 8    the trustee, the trustee's counsel, or your counsel.

 9             Did you provide any documents relating to CLG's

10    business to anybody?

11        A.   Not that I'm aware of.

12        Q.   Do you know if any of your team of lawyers that

13    you oversee provided any documents to the trustee, the

14    trustee's counsel, or Mr. Richards regarding CLG's

15    business or operations?

16        A.   I can only answer about me.

17        Q.   But you supervise the lawyers, so you don't

18    know what they do even though you supervise them?

19        A.   Well, you're asking me if somebody did

20    something and you're also asking me, how could you not

21    know everything you do because you supervise them.

22    That's not a fair characterization of that question.

23        Q.   Okay.  Who was the person most actively

24    involved at CLG with regard to the negotiations for the

25    purchase of the debtor's assets?

1    A.   CLG's counsel, Mr. Richards.

2    Q.   Okay.  Who was the person underneath the CLG

3  umbrella in terms of the corporate umbrella that was

4  most active with regard to the negotiations for the

5  purchase of the debtor's assets?

6    A.   That would probably be me.

7    Q.   And did you instruct anybody that you

8  supervised to provide any documents to trustee,

9  trustee's counsel, or your counsel regarding CLG's

10  business or operations?

11    A.   I'm not sure I can answer that because I think

12  that goes to the privilege issue again.

13    Q.   Okay.  What, if any, documents do you recall

14  providing concerning CLG's business and operations?

15    MR. RICHARDS:  I believe you've asked and

16  answered that.

17  BY MR. ELGIDELY:

18    Q.   You can answer, Mr. Redhun.

19    A.   I probably turned over the legal services

20  agreement and probably the SOPs that I drafted.

21    Q.   Okay.  Earlier you testified you didn't know if

22  the SOP's were provided.  So now, do you recall having

23  provided those to the trustee or others involved in this

24  transaction?

25    A.   No, but if my answer that I just gave you

1   didn't have the word "probably" in the beginning of it,

2   I would have included that there.

3        Q.   So you may have?

4        A.   Meaning, if you ask me what documents we

5   needed, these would be the documents that I would give

6   over.

7        Q.   Okay.  In connection with my preparation for

8   this deposition, we received a handful of emails between

9   Mr. Richards and trustee's counsel concerning the

10   contemplated acquisition of the debtor's assets by CLG,

11   and those emails reflected a date range June 15 through

12   July 7.

13        Is that consistent with your recollection

14   concerning the time period of the negotiations for the

15   purchase of the debtor's assets?

16        A.   Sounds about right.  I'm not going to commit to

17   those dates, but that sounds right.

18        Q.   All right.  Let me actually pull up one of

19   those emails.  Bear with me for one second.  Okay.  Let

20   me share my screen.

21        Can you see the letter that I put up on

22   the screen, Mr. Redhun, with the letterhead of Law

23   Office of Ronald Richards & Associates?

24        A.   I see a letterhead.

25        Q.   Okay.  That's what I was asking you.

1          You see the letterhead and the date June 19?

2     A.    Yeah, I see that June 19 is listed on there.

3     Q.    Okay.  And you see the subject is "Revised

4  offer to purchase files", directed to Christopher Ghio

5  at Dinsmore?

6     A.    Yes.

7     Q.    Okay.  And this says it is a revised offer.

8          So do you recall how long before this revised

9  offer negotiations began concerning the CLG's possible

10  purchase of the debtor's assets?

11     A.    No.

12     Q.    Do you know approximately how long?

13     A.    No.

14     Q.    Okay.  Let me pull up another email.  Let me

15  share my screen.

16          Mr. Redhun, do you see a letter on

17  Mr. Richards' letterhead dated June 18 and it says

18  "Offer to purchase files"?

19     A.    Yes.

20     Q.    Okay.  And you recognize that this is an offer

21  to debtor's -- I'm sorry, to trustee's counsel to

22  purchase LPG files on June 18, 2023; correct?

23     A.    I don't know who Mr. Ghio represents.  I don't

24  know that it's relating to that.  I would need to read

25  the entire letter.  But also it's not a letter that I've

1   written, so I can't really comment on that.

2      Q.   Okay.  Well, do you think Mr. Richards would

3   send a letter without your authorization and consent?

4           MR. RICHARDS:  That calls for speculation.

5   Attorney-client privilege.  Don't answer that.

6   BY MR. ELGIDELY:

7      Q.   So you see in this letter it says, "I am

8   putting our offer to writing so we can have a framework

9   to discuss matter further.  Consumer Legal Group, P.C.

10  is offering the following."

11          Do you believe Consumer Legal Group was making

12  an offer to purchase files on June 18, Mr. Redhun?

13     A.   I believe so.  That's the topic of today's

14  conversation, no?

15     Q.   Well, my prior question you weren't, you know,

16  sure what it said until you read the whole thing and,

17  you know, this and that.

18          So I'm asking you now, looking at the terms of

19  this letter, does it refresh your recollection that, you

20  know, the prior document was an amended offer, does it

21  reflect an original offer to purchase files on June 18,

22  2023, from CLG?

23     A.   Can you zoom out, please?  Let me read the

24  entire thing.

25     Q.   Can you still read it?

1    A.    Yeah.  Give me a second.  Unless you can get

2  both sets of texts in the same window?

3    Q.    I can't.  Take your time.

4    A.    Scroll down, please.  Stop.  Okay.

5    Q.    Does this refresh your recollection that CLG

6  was making an offer to purchase files of LPG on June 18,

7  2023?

8    A.    Well, I don't want to add LPG into this, but

9  the letter speaks for itself, and it certainly looks

10  like it's an offer.

11    Q.    Okay.  Do you know if CLG was offering to buy

12  35,000 or more files from any other entity other than

13  LPG in June 2023?

14    A.    I can't answer that.  I know what I know.

15    Q.    Okay.  So somebody else may have been

16  negotiating a purchase of 35,000 or more files through

17  Mr. Richards in June that's unrelated to LPG; is that

18  your testimony?

19    A.    I'm saying, I don't know things that I don't

20  know.  I know what I know.

21    Q.    Okay.  And that was three days after the

22  trustee filed the amended complaint against CLG;

23  correct?

24    A.    The amended complaint was, what, 6/15 or 6/25?

25    Q.    6/15?

1    A.    So, yeah, three days later would be June 18.

2    Q.    Okay.  So the negotiations for the purchase of

3    the debtor's assets were done against the backdrop of

4    the litigation between the trustee and CLG; correct?

5    A.    Well, litigation between trustee and CLG has

6    been ongoing since the trustee filed its main

7    complaint.

8    Q.    Right.  But my question is, sir, in negotiating

9    the purchase of the debtor's assets, those negotiations

10   were taking place against the backdrop of the litigation

11   between the trustee and CLG; correct?

12         The litigation was pending when negotiations

13   started; correct?

14   A.    The negotiations were ongoing at the time that

15   the amended complaint was filed.

16   Q.    Okay.  Were there any negotiations between the

17   trustee and CLG before May 25?

18   A.    I don't know.

19   Q.    Okay.  Who would know?

20   A.    I don't know.

21   Q.    Do you have periodic meetings with Mr. Weber

22   and the team of lawyers that you supervise at CLG

23   concerning issues of interests to the business?

24   A.    We have way too many meetings about way too

25   many different things.

1    Q.    Okay.

2    A.    Way too often.

3    Q.    Okay.  So when was the first time the prospect

4  acquiring LPG's assets, when was the first time that

5  came to your attention or knowledge?

6         MR. RICHARDS:  I'm just going to object.  It's

7  going to invade attorney-client privilege,

8  work-product.

9         MR. ELGIDELY:  Are you instructing him not to

10 answer or no?

11        MR. RICHARDS:  I'm just instructing him to

12 answer if it's prior to my engagement.

13        MR. ELGIDELY:  Okay.  That's not --

14        MR. RICHARDS:  I don't want him to answer after

15 we were engaged, which I know the answer, but if he has

16 a different view he can answer, but I'm instructing him

17 not to answer after we were engaged.

18 BY MR. ELGIDELY:

19    Q.    Let me rephrase the question.  Maybe that will

20 help.

21        So other than through Mr. Richards, did you

22 have any discussions or -- well, strike that.

23        Other than Mr. Richards, did the potential

24 opportunity to purchase LPG's assets come to your

25 attention?

1          A.    I don't know if it came to my attention as much

2     as when I read the initial complaint from the trustee in

3     May -- in late May, I immediately recognized that there

4     was an opportunity there.

5          Q.    Okay.  So it was only after the complaint was

6     filed that you conceived the idea to acquire LPG's

7     assets?

8          A.    No.

9          Q.    Okay.  How is my statement incorrect?

10          A.    It was not only after, it was upon the reading

11     of.

12          Q.    Okay.  Simultaneously with?

13          A.    Yes, I think -- then I think the answer to that

14     would be, yes.

15          Q.    Okay.  So you're reading the trustee's

16     complaint on or about May 25, 2023; correct?

17          A.    Around that day.  I don't remember exactly that

18     day.

19          Q.    Okay.

20          A.    It could have been a day or two later.  I don't

21     know.

22          Q.    Okay.  And while you're reading the complaint,

23     did you think to yourself, hey, we may be able to --

24     hey, we, CLG, may be able to buy LPG's assets?

25          A.    No.  I thought that we could try and make a

1  deal in connection with defending ourselves in the

2  litigation.

3       Q.   Okay.  But again, sir, my question -- now, your

4  last answer confused your prior answers.

5            When did you first hear about or consider the

6  possible acquisition of the debtor's assets?

7       A.   I guess, I'm not sure.  But I guess my default

8  answer would be as soon as I heard about LPG's

9  bankruptcy filing, but again, I'm not really sure.  So I

10 can't answer that question.

11      Q.   So you believe it was before the trustee sued

12 CLG that you conceived the idea or was alerted to the

13 possibility of purchasing LPG's assets?

14      A.   So it wasn't my idea, and I wasn't alerted to

15 anything.  Any time I read any sort of pleading, in any

16 capacity I think about three things.  And one of those

17 things is reaching a resolution.  And that was the way I

18 analyzed and read the trustee's complaint in this

19 case.

20      Q.   Okay.  So when you read the trustee's complaint

21 and you were thinking about a way to resolve it, you

22 thought it could be resolved through a purchase of LPG's

23 assets?

24      A.   No, I thought that there was a potential deal

25 to be made with the trustee.

1    Q.    Okay.  And in these way too many meetings that

2  you have with Mr. Weber and your legal team, did the

3  subject of the acquisition of LPG's assets come up?

4    A.    I have not discussed the -- the potential

5  acquisition of LPG's assets with the legal team, it was

6  only discussed with Mr. Weber after the initial

7  complaint was filed.

8    Q.    Okay.  Have you ever had a conversation with

9  Mr. Weber and your legal team regarding the acquisition

10  of the assets of LPG?

11    A.    I can't answer that question on the grounds of

12  privilege.

13    Q.    Okay.  It's my understanding that CLG is going

14  to acquire approximately 22,000 customer files in

15  connection with this sale of the debtor's assets; is

16  that correct?

17    A.    I know that there are ongoing negotiations, and

18  I don't know if the number is 22,000.

19    Q.    Okay.  Did you ever have a conversation with

20  your team and say, hey, can we do this?  There are a lot

21  more files coming on board.  Do we have capacity?  Do we

22  have bandwidth?

23        Do you ever have any of those conversations?

24    A.    I don't need to have those conversations.

25    Q.    Okay.  How many customer files does CLG

1  currently have other than the 12,000 that it acquired

2  from LPG?

3      A.   I don't have an exact number.  I think we went

4  through this initially.

5      Q.   Is it more or less than 22,000?

6      A.   I don't have an exact number.  I think we went

7  through this initially.

8      Q.   I'm not asking for an exact number.  I'm asking

9  for an approximate.

10      How many customer files does CLG have in the

11  year 2023, excluding the 12,000 customer files that it

12  previously acquired from LPG?

13      A.   I couldn't answer that.  And let me preface my

14  answer with the following:

15      Files come in at various stages and files leave

16  at various stages.  So you could have an individual who

17  signs up, pays, and then can't afford the service

18  anymore.  Or you have a client that signs up but doesn't

19  make their initial payment.  Or you could have a

20  situation where the client discharges CLG.  Or you could

21  have a situation where CLG has resolved a particular

22  issue or matter for a particular client in which case it

23  no longer services that client.  So there's a flux of

24  numbers that really prevents an accurate statement to --

25  excuse me, an accurate answer to your question.

1    Q.    Okay.  And I'm not asking for, you know,

2    scientific precision, Mr. Redhun.  I'm asking you in

3    terms of an average or an approximate, does CLG during

4    2023 have more than 22,000 files?

5    A.    I don't believe so.  I think the number is

6    closer to not less than 10,000, coupled with the caveats

7    and the covering and all that stuff.

8    Q.    Okay.  That's helpful.

9          So does the 10,000 approximation that you have

10   given me include any of the 12,000 customer files that

11   CLG acquired from LPG in early 2023?

12   A.    I can't answer that question.

13   Q.    Did CLG have any customer files other than the

14   files that it acquired from LPG in early 2023?

15   A.    Probably.

16   Q.    How many?

17   A.    I don't know.

18   Q.    Approximately?

19   A.    I can't answer that question.

20   Q.    Isn't it fair to say that the files that CLG

21   acquired from LPG in early 2023 effectively put CLG in

22   business?

23   A.    I don't think that's accurate.

24   Q.    But you have no metrics that you can provide to

25   dispute that characterization, do you?

1      A.   We had our own client base, I just don't know

2  what that number looked like.

3      Q.   Okay.  I asked you of the 10,000, did any of it

4  include the files originally obtained from LPG in early

5  2023 and you couldn't answer that; correct?

6      A.   Because the answer was probably, but I'm not

7  100 percent sure.  Likelihood, yes.  But also maybe,

8  no.

9      Q.   Okay.  What percentage?

10     A.   The percentage of the 12,000 or the percentage

11 of CLG's 10,000, let's say?

12     Q.   Percentage of the 10,000?

13     A.   Probably around half, I would say.

14     Q.   Okay.  So before CLG acquired any of the LPG

15 files, it had approximately 5,000 of its own customer

16 files?

17     A.   Sounds about right.  But, again, that number

18 may be up, may be down.

19     Q.   So would it be fair to say that CLG doubled its

20 business or the number of its files when it acquired the

21 LPG files in early 2023?

22     A.   I don't know about doubled.  But as you saw,

23 based on those complaints that were filed on the BBB

24 website, not all those LPG clients were happy clients.

25     Q.   But that's not my question, sir.

1          So you started with 5,000 and then you acquired

2     12,000; correct?

3          A.   I don't know that all 12,000 were performing

4     files.

5          Q.   Did I say the word "performing"?  No.

6          A.   You're talking about doubling in size.  I look

7     at it from two perspectives.  I look at it from a

8     performing file or I look at it from a file where

9     there's too much damage already done to the particular

10    client in which case we're not going to be able to do

11    anything for that client.

12         Q.   Understood, and I appreciate that

13    clarification.

14         For this question, I'm asking you just about

15    files, whether they are performing or non-performing.

16         So before the acquisition of files from LPG,

17    according to your estimates, and I recognize they're

18    only estimates, CLG had approximately 5,000 files;

19    correct?

20         A.   Okay.

21         Q.   And then it acquired 12,000; correct?

22         A.   Okay.

23         Q.   So it doubled the number of files, did it not,

24    through this LPG acquisition?

25         A.   More than doubling five brings you to at

1    least 10.

2         Q.    That's a yes or no, sir.  I don't need you to

3    help me with the math.  I'm asking you, is it yes or no?

4    It had 5.  It got 12.  So it more than doubled the

5    number of files that it had; correct?

6         A.    Yes.

7         Q.    Okay.  So now CLG is proposing to acquire

8    22,000 files, so that's another doubling of the number

9    of files that CLG has; correct?

10         A.    Well, I don't know what the number of current

11    files it has now, so I can't say that.

12         Q.    Okay.  So at one point it had 12,000 customer

13    files it acquired from LPG; correct?

14         A.    Yes.

15         Q.    And then it's going to acquire through this

16    proposed sale 22,000 additional customer files;

17    correct?

18         A.    Hopefully.

19         Q.    That's nearly doubling the number of

20    files again; correct?

21         A.    Yes, close to doubling.

22         Q.    Okay.  And notwithstanding that, you don't feel

23    the need to have any conversations with any of the

24    attorneys that you supervise or with Mr. Weber whether

25    you have the ability at current staffing numbers to

1  service these numbers of files?

2      A.   We didn't say before our current staffing

3  numbers.

4      Q.   That's what we were talking about today, right?

5      So let me ask you this, Mr. Redhun.  When you

6  filed the motion to sell, according to your

7  declarations, you had four full-time attorneys at CLG;

8  correct?

9      A.   Yes.

10      MR. RICHARDS:  Objection.  He did not file the

11  motion to sell.  The trustee filed the motion to sell.

12  It misstates the evidence.

13      MR. ELGIDELY:  Thank you.  But he was a party

14  to the asset purchase agreement.

15      MR. RICHARDS:  No, he wasn't.  Actually, he was

16  not a party.  The trustee just filed a motion and used

17  its declaration.  There's no party in the motion.  It's

18  just the trustee's motion so you know that's not

19  accurate, Counsel.

20  BY MR. ELGIDELY:

21      Q.   All right.  Let me share my screen.  Hold on

22  one second, please, because I want to be accurate.  It's

23  always important to be accurate.

24      Mr. Redhun, I put on the screen, hopefully you

25  can see a document that was filed the day after the

 1   stipulation of partial settlement on July 7.  And it

 2   says, "Notice of motion and motion of trustee for entry

 3   of an order approving the sale."

 4        Do you see the first page of that document,

 5   sir?

 6      A.   Yes.

 7      Q.   Okay.  And attached to the motion was not only

 8   your declaration but it was -- let me get the exact page

 9   here.  It's Exhibit 2, page 250.

10        Do you see a document, which again is Exhibit 2

11   to the sale motion, entitled "Agreement of purchase and

12   sale and joint escrow instructions."

13        Do you see that document?

14      A.   Can you please zoom out?  All I see is a very

15   limited portion of the page.

16      Q.   Do you see the section where it says,

17   "Agreement of purchase and sale and joint escrow

18   instructions"?

19      A.   You mean the heading of the document?

20      Q.   Yes.

21      A.   Yes.  I see that.

22      Q.   Can you see in the first paragraph the

23   agreement is between the trustee and Consumer Legal

24   Group as buyer?

25      A.   Yes.

1    Q.    Okay.  And this was filed with the sales

2    motion, so let's go to the exhibit page of this

3    Exhibit 2.

4    A.    I need a bathroom break in a minute.

5    Q.    Okay.  Of course.  Let me get to the signature

6    page.

7         MR. RICHARDS:  Counsel, how much more time do

8    you think you have here?

9         MR. ELGIDELY:  Probably about 15 to 30

10   minutes.

11        MR. RICHARDS:  Okay.  Great.

12        Is this all prompted by my comment that we're

13   not party to the motion because I'm still sticking to

14   that?

15        MR. ELGIDELY:  Thank you, Mr. Richards.

16   BY MR. ELGIDELY:

17   Q.    Mr. Redhun, do you see that you signed the

18   exhibit to the sale motion on behalf of Consumer Legal

19   Group on July 7, 2023?

20   A.    So then we're all very technical and careful.

21   I see my signature on a piece of a page, but I don't see

22   anything else about the page.  I don't see any preceding

23   pages or any postdating pages.  Nothing like that.

24   Q.    Okay.

25   A.    I also note the page you're looking at right

1  now which is 279 of 940 has a draft that is identified

2  as the watermark, but the signature page did not have a

3  draft watermark.

4       Q.   I'm looking again at the sales motion, and I'm

5  looking at Exhibit 2 which is the agreement for the

6  purchase of the debtor's assets.

7            Do you see in the lower right-hand corner of

8  this 25th page it says "Exhibit 2"?

9       A.   I see a blank page.  It looks to be page 25 and

10  then on the bottom right in a different font it states

11  "Exhibit" in capital letters, page 229 even though we're

12  looking at page 274 of 940.

13      Q.   Do you see -- sir, is that your signature on

14  page 274?

15      A.   Yes.

16      Q.   And if you go back, there's page 24, page 23,

17  page 22, page 21, and 20.

18           MR. RICHARDS:  Okay.  Counsel, this is becoming

19  badgering.  It's an unsigned draft.

20           MR. ELGIDELY:  Please let me finish my

21  question.

22           MR. RICHARDS:  There's no question though.

23           MR. ELGIDELY:  I'm in the middle of a question.

24  The witness said, I can't see what I signed.

25           THE WITNESS:  No, I did not say that.  Don't

1    put words in my mouth.

2    BY MR. ELGIDELY:

3        Q.    Sir, did you not say you did not sign an asset

4    purchase agreement, all you see is a signature page?

5        A.    I conceded that was my signature, but I said, I

6    can't see what it's connected to.

7        Q.    Okay.  And that's what I'm trying to show you

8    before I got interrupted.  So let's keep going, and I'm

9    going to show you what it's connected to so you're

10   comforted.

11          You see the mark, Exhibit 2, continues to be in

12   the lower right-hand corner of every page of this

13   document.  And now we're getting to page 1 where at the

14   top it says, "Agreement of purchase and sale and joint

15   escrow instructions", which on the prior page you see it

16   says "Exhibit 2", and you'll see that this is attached

17   to the trustee's motion to sell.

18          Do you see that now, sir?

19       A.    Yes.

20          MR. ELGIDELY:  Okay.  Why don't we take a

21   five-minute restroom break?  I think you said you need

22   to use the restroom, Mr. Redhun?

23          THE WITNESS:  Yeah, I was looking to stop the

24   video.

25          (Off the record:  11:31 p.m. - 11:36 a.m.)

BY MR. ELGIDELY:

    Q.   Mr. Redhun, earlier you testified that you had
no involvement in CLG's acquisition of approximately
12,000 files in early 2023; correct?

    A.   Yeah, I don't remember being involved with that
to an extent, yeah.

    Q.   Okay.  That's different from what you said
earlier.

    What do you mean now by saying "to an
extent"?

    A.   Like, I don't have any specific recollection.

    Q.   Okay.  Is that something, if you were doubling
the number of customer files that CLG had, as a managing
attorney overseeing the team of lawyers and paralegals,
isn't that something you would remember whether you had
any involvement in that?

    A.   I don't understand the question.

    Q.   Okay.  So at that time, you were the managing
attorney at CLG; correct?

    A.   At which time?

    Q.   When CLG acquired approximately 12,000 files
from LPG?

    A.   I don't know.  I don't know if I was the
managing attorney.  I think -- I don't know -- let me
just say it like this.  We don't use labels like that.

1   I guess, if we're going to pinpoint one person as the

2   managing attorney, it would be me.

3       Q.   Okay.  Because one of your declarations or

4   something that CLG had filed referenced a managing

5   attorney you said, "that would be me"?

6       A.   Yes, but it's not like I have a sign on the

7   door that says managing attorney.  That's my point.

8       Q.   Okay.  But you were employed by CLG at the time

9   it acquired the 12,000 or so files from LPG; correct?

10      A.   I believe so.

11      Q.   Okay.  And you were the person primarily

12  responsible for handling the legal issues related to

13  those files at the time; correct?

14      A.   Yeah, probably.

15      Q.   Okay.  And sitting here today, you don't have

16  any recollection of being involved in CLG's acquisition

17  of those 12,000 or so files?

18      A.   I don't recall.  And the reason why I don't

19  recall is, I do too many things on a daily basis, that

20  these things, I have like a six-month memory band.

21      Q.   Okay.

22      A.   As I'm trying to testify here today, I have

23  briefs.  I've got files.  I've got a lot of stuff.  I

24  have my own personal life, obviously, to deal with.  So

25  I have a lot going on.

1    Q.   Okay.  Well, the acquisition took place six

2    months ago.  Today is July 17, and the acquisition was

3    in January and February from LPG; correct?

4    A.   Yeah.

5    Q.   And despite the fact that you are doubling the

6    number of customer files that you would be responsible

7    for, adding to your already full plate, you don't have a

8    recollection of being involved in that transaction?

9    A.   No.  It could be -- and again, I'm speculating.

10   It could be I was asked to draft something that didn't

11   end up being signed.  It could be I had nothing to do

12   with it, and I was just tasked with managing the

13   onboarding of all these new files.

14        I don't know that at the time we took all these

15   files over that we had our network and system in place

16   to make sure that not everything was falling through the

17   cracks.  So I feel like my job at CLG is juggling

18   fireballs, so it could be that was one of those

19   fireballs.

20   Q.   Okay.  Do you feel like that's something that

21   happens pretty regularly with you at CLG, you're

22   juggling fireballs?

23   A.   Not recently.  Since we have our system in

24   place, things have settled down.  Although, the newest

25   fire that I'm dealing with is trying to replace some of

1    the local counsel, which is a whole new product in and

2    of itself.

3        Q.    But historically, you felt like you were

4    juggling fireballs at CLG; correct?

5        A.    Not fireballs.  I have a lot going on.  Like

6    you said, I have a lot on my plate.

7        Q.    Okay.  In terms of the prior acquisition, that

8    being early 2023, the 12,000 or so files, you testified

9    that it was a rainmaker at CLG.  You're like a worker

10   bee, you handle operations and run the office, but there

11   was a rainmaker that brought in the 12,000 or so files.

12            Do you recall that testimony?

13       A.    Yes, but you're mischaracterizing my

14   testimony.

15       Q.    Thank you.  And you can correct it?

16       A.    What I said was, my role was doing the work and

17   staying in my line.  Not going out and finding new

18   sources of business.

19       Q.    And today, again, you can't testify who was the

20   rainmaker that brought in those 12,000 or so files from

21   LPG; correct?

22       A.    I don't know.

23       Q.    Okay.  And why, sir, if somebody else was the

24   rainmaker handling the acquisition of those 12,000 or so

25   files from LPG in early 2023, are you now the person

1   most actively involved under the CLG umbrella with

2   regard to the acquisition of 22,000 files from LPG?

3           Why isn't the rainmaker that --

4           MR. RICHARDS:  Objection.

5           MR. ELGIDELY:  Mr. Richards, let me finish my

6   question, please.

7   BY MR. ELGIDELY:

8       Q.   Why isn't the rainmaker who handled the 12,000

9   acquisition earlier this year handling the acquisition

10  of the 22,000 files now?

11          MR. RICHARDS:  Objection.  Vague.  Ambiguous.

12  Calls for speculation.  Conjecture.  Unintelligible.

13          THE WITNESS:  So the short answer to your

14  question is that I have the birds-eye view and

15  understanding of how to triage and what to do first.

16          And now my involvement and my due diligence, I

17  know what to look for very carefully.  And when I do my

18  due diligence, I cannot only see this step in front of

19  me, but I always see two steps ahead in terms of how

20  we're going to need to do certain types of work, kind of

21  who fits into what role best, where certain things go,

22  and things like that.

23  BY MR. ELGIDELY:

24      Q.   So you didn't have -- you didn't have that

25  birds-eye view and ability to triage earlier this year?

1   You just now have it?

2       A.    Not as good as I do now.

3       Q.    Okay.  What do you attribute your professional

4   development to in the past, say, four months?

5       A.    Being in the "operating room".

6       Q.    What do you mean by that?

7       A.    Meaning, seeing how the sausage is made.

8   Seeing how the files look.  What to look for.  What to

9   anticipate.  What states are more advantageous than

10  others?  Seeing each of our team members and what their

11  strengths and weaknesses are.  Things like that.

12      Q.    Okay.  And you acquired all of this in four

13  months, all that knowledge?

14      A.    Well, it's a work in progress.

15      Q.    Okay.  Let me share my screen.

16       Sir, can you see on your screen the motion of

17  trustee for entry of the order approving the sale?  Can

18  you see that to the right of the caption of the case?

19      A.    Yes.

20      Q.    Okay.  It's right there.  On the second, going

21  on to the third page -- well, actually, it's page 1.

22  The cover page is not numbered.  But if you look at page

23  1, you'll see numbered paragraph 3 it says, "The total

24  purchase price for this sale is made up of an initial

25  deposit, a second deposit, and a percentage to the

```
1   estate derived from a fee."

2            And then it goes on to say that, "These terms

3   are all defined and set forth in the APA and must be

4   reviewed and accepted by any party seeking to overbid.

5   The total amount of the sale will be approximately $42

6   million."

7            Did I read that correctly?

8       A.    Yes.

9       Q.    Okay.  And do you know what the initial deposit

10  is for this purchase by CLG?

11      A.    No.  It's my understanding that negotiations

12  are ongoing.

13      Q.    Okay.  But didn't CLG -- actually, you on

14  behalf of CLG, sign an asset purchase agreement

15  providing for an initial deposit and second deposit?

16      A.    Yeah, but I'm not sure the agreement is

17  binding.  I think, if anything, it might be considered

18  an offer.

19      Q.    Okay.  Under the asset purchase agreement that

20  the trustee has sought court approval for, do you know

21  what the initial deposit amount is?

22      A.    No, but I'd like to say the document probably

23  speaks for itself.

24      Q.    Well, I'd like you to speak to it, sir, as the

25  designated individual at CLG who signed the asset
```

1  purchase.

2          So you're saying today, on this sizable

3  transaction, you don't know the amount of the initial

4  deposit without looking at the agreement.

5      A.    I have a rough idea of what it is, but I'm not

6  going to speculate.  We could look at the actual

7  agreement itself to answer that question.

8      Q.    Okay.  So sitting here today, you would have to

9  speculate as to the initial obligation of CLG in this

10  sizable transaction; is that your testimony?

11      A.    No.  I believe I know what it is, but I would

12  like to look at the document to ensure that I am

13  correct.

14          MR. RICHARDS:  Well, Counsel, the problem is

15  that after the site inspection, which we're subject to

16  an MDA so I'm not going to get into the issues, there

17  needs to be some adjustments.  And the witness is

18  hearing these, you know, in a privileged setting, it's

19  just going to get confusing.  And your client made some

20  red lines to the agreement that they want incorporated.

21          So that's why this document that was filed with

22  the court is clearly not going to be the final APA.  And

23  the witness saw emails from me up and back explaining

24  changes.  So I don't think it's fair to ask him about

25  this now because it's not going to be the final

1    document.

2          MR. ELGIDELY:  Okay.  Well, I'm not asking

3    about the final document, Mr. Richards.  I'm asking

4    about the document that's been filed with the court as

5    an agreement between the parties, trustee and CLG, that

6    reflects the terms and conditions of the sale and that

7    is the subject matter of this deposition.

8          So I understand that there could be some

9    additional modifications, that additional modifications

10   are likely, but I'm asking about what was filed with the

11   court.

12   BY MR. EGLIDELY:

13      Q.   So, we can go to the -- since you're not

14   certain, Mr. Redhun, let's go to the actual agreement

15   regarding the initial deposit and the subsequent

16   deposit.

17         So, do you know what the initial deposit is now

18   that you're looking at Section 2 of the APA?

19      A.   Yes.  And as I thought it was going to say, $1

20   million.

21      Q.   And do you know if that $1 million is going to

22   come back to CLG or any of its affiliates?

23      A.   When you say "come back to", what do you mean?

24      Q.   Are you familiar with the entity Liberty

25   Acquisitions?

1    A.    No.  I've seen that name somewhere, but I'm not

2    familiar with what that is.

3    Q.    So sitting here today, you don't know if

4    Liberty Acquisitions is a related party to CLG in any

5    way, shape, or form?

6    A.    They're not related.

7    Q.    Oh, they're not related.  Okay.

8         All right.  So let me take a look at that.

9    A.    I don't believe that they are related, let me

10   just say it like that.  Let me just answer your question

11   that way.

12   Q.    So, if you look at page 212 of 289, which is in

13   the upper right-hand corner of this filing, you see it

14   says, "Pursuant to the note, Liberty Note, executed by

15   the trustee in favor of Liberty Acquisitions, Inc.

16   Buyer's Affiliate."

17        Are you sitting here today disputing the fact

18   that Liberty Acquisitions, Inc. is the buyer's

19   affiliate?

20   A.    No.  It says right there it's an affiliate.

21   Q.    But you just testified that it's not related?

22   A.    Related in the corporate sense of the term.

23   Q.    Okay.  So how is Liberty Acquisitions, Inc.

24   affiliated with CLG?

25        MR. RICHARDS:  I'm going to -- Counsel, I told

1   you in our call, we're not going to get into testimony

2   that's going to scare or inhibit lenders, and that's

3   going to really get into work-product, financial

4   privacy.

5        I told the court in open court the capital that

6   is funding CLG is funding Liberty.  We did not -- we

7   disclosed that at the last hearing.  You weren't there.

8   And that's all -- that's why it's in the agreement as an

9   affiliate.  They're not some outside company.  They're a

10  company that funds -- they're a company in which the

11  capital is indirectly tied to other lenders that have

12  provided financing for CLG.

13       So this witness was specifically not designated

14  to get into the financial capitalization of CLG.  And

15  now you're kind of going there, and I'm going to ask you

16  to move on because I can't see us getting anywhere with

17  this without multiple objections and instructions.

18  Except, you could absolutely explore, is Liberty in any

19  way an owner or influencer?  Does he take direction from

20  Liberty, as you know, did the DIP loan and has been

21  asked to do another DIP loan with a pending motion.

22  BY MR. ELGIDELY:

23       Q.   Okay.  Mr. Redhun, do you see in this

24  paragraph -- I'll highlight the whole paragraph -- that

25  the asset purchase agreement that the trustee has sought

1    court approval for and that has been filed with the

2    court says that "Liberty Acquisitions, Inc., the buyer's

3    affiliate, will receive full repayment, plus

4    interest" -- so full repayment -- "within one business

5    day after CLG wires the $1 million deposit"?

6            Do you see where it says that?

7        A.    Yes.

8        Q.    Okay.  So when I asked you before whether any

9    of the $1 million would be coming back to CLG or any of

10   its affiliates, does this refresh your recollection that

11   some of the $1 million will be paid within one-business

12   day to CLG's affiliate Liberty Acquisitions?

13       A.    Well, my answer based on reading this would be

14   that Liberty Note would have to be repaid, and it would

15   be repaid through the buyer's deposit.

16       Q.    And the buyer is CLG; correct?

17       A.    Correct.

18       Q.    And CLG is an affiliate of Liberty; correct?

19       A.    Liberty Acquisitions, according to this.

20       Q.    Right.  So a million dollars leaves out of the

21   right pocket of CLG and ends up in the right pocket of

22   its affiliate Liberty Acquisitions; correct?  Some

23   portion of that million dollars.

24       A.    Whatever the amount of the note is.

25       Q.    Okay.

1          MR. RICHARDS:  And, for the record, I don't

2     know what you mean by "right pocket"?  I mean, there's

3     no -- Liberty is the DIP lender in a business point.

4     And the deal is, if there's going to be a financing of

5     the down payment, the DIP lender is going to get repaid.

6          I'm not going to get into the confidential

7     settlement negotiations or the business points with the

8     trustee, but that was a negotiated term.

9          MR. ELGIDELY:  Nor did I ask anybody to,

10     Mr. Richards.

11          MR. RICHARDS:  All right.  Good.

12     BY MR. ELGIDELY:

13     Q.    Mr. Redhun, you'll see that the agreement

14     that's been filed with the court for approval calls for

15     a second deposit of $7 million; correct?

16     A.    I see that.  Correct.

17     Q.    So that totals $8 million, less the amount paid

18     to CLG's affiliate Liberty Acquisitions; correct?

19     A.    Correct.

20     Q.    Okay.  So how do you and the trustee get to --

21     I think the number was $42 million?  If you know $8

22     million in cash is being paid, less the money being paid

23     to Liberty Acquisitions, how do you get to more than

24     five times the amount of cash being paid?

25          MR. RICHARDS:  Outside the scope.  Speculation.

```
 1   Lack of personal knowledge.

 2          Answer if you have an understanding of how the

 3   additional funds will be generated for the estate?

 4          THE WITNESS:  I don't -- I couldn't answer your

 5   question.

 6   BY MR. ELGIDELY:

 7      Q.    Okay.  Isn't it true that the $42 million is

 8   somehow based upon percentages of revenue generated from

 9   the customer or client files being sold to CLG?

10      A.    I don't know.  I can't answer that question.

11      Q.    You signed this APA, sir; correct?

12      A.    Yes.

13      Q.    Okay.  Did you read it before you signed it?

14      A.    More than once.

15          MR. RICHARDS:  Counsel, that's an argumentative

16   question.  He has counsel.  He doesn't need to read

17   every word of a document if he -- you know, that's not

18   required to sign a document.  He's bound by the

19   document, it's not signed by the trustee, and he's

20   not -- these are questions that are not really getting

21   facts as to what his operational role is in managing the

22   legal portion of this entity.  That's what he does

23   there.

24          MR. ELGIDELY:  Well, Mr. Richards, in my

25   experience, when somebody signs a document that is
```

1  binding on the company that they purport to represent

2  and reflects a substantial transaction, they at least

3  have a modicum of knowledge concerning the material

4  terms and conditions of the deal.

5         And, clearly, if there is a proposed sale at

6  $42 million with $8 million -- or less than $8 million

7  in cash being paid, you know, that's a material term

8  that we're entitled to explore.

9  BY MR. ELGIDELY:

10     Q.   So are you saying, Mr. Redhun, that

11  notwithstanding your signing of this document for a

12  sizable transaction, you don't know how the parties got

13  to $42 million?

14         MR. RICHARDS:  I'm going to object.  He didn't

15  draft the document.  You're invading attorney-client

16  privilege.

17         He doesn't need to know how I negotiated every

18  business point in confidential settlement communications

19  with the trustee.  Most clients, if you advise them of

20  the big points and there's other representations between

21  a client and a lawyer, a client doesn't need to

22  understand every legal provision of an agreement for a

23  business.  That's why there's a lawyer representing --

24  in fact, two lawyers have reviewed this document.

25         So this is not what he's here to testify to as

```
1   to how did the trustee come to the numbers in the sale

2   motion because he didn't negotiate this document.

3           MR. ELGIDELY:  Okay.  So you're telling me,

4   Mr. Richards, that if there's a provision of a contract

5   that that provision is privileged?

6           MR. RICHARDS:  No.  You're asking him how did

7   the trustee get to this number.  And the only way he's

8   going to be able to answer it is with communications

9   from me because he didn't negotiate it, I did.  So the

10  trustee and -- I didn't even negotiate with the trustee.

11  I negotiated with his lawyer, like many business

12  transactions.

13          And so you're asking this witness how did the

14  two lawyers come up with these numbers.  He doesn't

15  care.  He wants to know, is the document approved for

16  signing?  He asked the questions he asks and then he

17  signs it.  He doesn't need to be an expert on every

18  term.  So when you ask him, how did the term get in the

19  document, he's only going to know through privilege.

20  That's why it's privileged, not the term itself.

21  BY MR. ELGIDELY:

22  Q.   Okay.  Mr. Redhun, if you look at page 255,

23  again the purchase price, Subparagraph A you'll see that

24  there are various percentages referenced in this

25  paragraph.
```

 1            Are you familiar with what the effect of these

 2   percentages are?

 3        A.   I would need to read them again to be able to

 4   answer the question competently.

 5        Q.   Take your time.

 6        A.   I need to get control of the document though.

 7            MR. RICHARDS:  I mean, it's really outside his

 8   scope.

 9            MR. ELGIDELY:  It's not.

10   BY MR. ELGIDELY:

11        Q.   What provision do you want me to go to?

12            Can you see paragraph 2A clearly?

13        A.   Yes.

14            MR. RICHARDS:  My other objection is the

15   document speaks for itself.

16            MR. ELGIDELY:  Thank you, Mr. Richards.

17            THE WITNESS:  Okay.  Scroll down, please.  Down

18   please -- you know, there's a lot to read here.  I can't

19   imagine this is the best use of my time.

20   BY MR. ELGIDELY:

21        Q.   Maybe not to you but certainly to the Committee

22   and you are under subpoena.

23            So, sir, if you look at page 6 of the APA, it's

24   actually page 255 of the PDF, you'll see it says, "After

25   deduction of an administrative overhead in the amount of

1   20 percent, buyer" -- and you understood that to refer

2   to CLG; correct?

3        A.    Yes.

4        Q.    "Shall pay a fee equal to A) 20 percent of all

5   amounts collected by buyer on all active executory

6   contracts defined above from and after the closing, plus

7   15 percent of all amounts collected by buyer on inactive

8   executory contracts defined above, each calculated on a

9   quarter basis.  Subsections A and B, collectively the

10  fee."

11           Did I read that correctly?

12       A.    Yes.

13       Q.    Okay.  So is it your understanding, sir, that

14  the difference between the $8 million being paid from

15  the initial and second deposit and the $42 million

16  purchase price that's attributable to the payments of

17  the fee as specified in this sentence?

18       A.    That looks to be the case, but again, I would

19  need to just preface that -- before I could properly

20  answer, I would like to read this document, you know, in

21  its entirety to familiarize myself with the language.

22  This is very dense language.

23       Q.    Okay.  But sitting here today, do you know of

24  any way other than the fee that the purchase price gets

25  from $8 million to $42 million?

1      A.    No, I'm not really sure -- your question is how

2    did you go from $8 to $42 without the fee?

3      Q.    No.  My question is, the $42 million, does that

4    incorporate not only the two deposits totaling $8

5    million, but does that incorporate the fee and that's

6    what brings it to $42 million or is there something else

7    that brings it to $42 million -- let me rephrase the

8    question.

9          Other than the deposits and the fee that's

10   specified in this paragraph, is CLG paying any other

11   consideration to the trustee for the acquisition of

12   LPG's assets?

13     A.    I need to read the entire thing.  I'm sorry.

14     Q.    How do you value the fee, you know, to get from

15   $8 million to $42 million?  Was there an appraisal or

16   other type of formal valuation conducted of the revenue

17   that would be generated from these client files?

18          MR. RICHARDS:  Objection.  It assumes a fact

19   not in evidence.  It's outside the scope.  The trustee

20   valued it at $42 million.  I'm going to instruct him not

21   to answer.  You're now really going far afield.  He

22   never testified to that value.  It's not his words.

23          MR. ELGIDELY:  Okay.  I disagree, but let me

24   tell you why.  Bear with me for a moment.

25          MR. RICHARDS:  No problem.  Our client is

1    trying to save 35,000 people from being left without

2    counsel.  That's their number one goal here.

3           MR. ELGIDELY:  Thank you for the testimony,

4    Mr. Richards.

5           MR. RICHARDS:  It's a statement.  I'm not a

6    potted plant.

7           MR. ELGIDELY:  Okay.  That has nothing to do

8    with how you explain the difference between $8 million

9    and $42 million.

10          Mr. Richards, in your statement that number

11   originated with the trustee.

12          Okay.  Bear with me for one second.  I'm going

13   to share my screen again.

14   BY MR. ELGIDELY:

15     Q.   Mr. Redhun, do you recall us talking about

16   Mr. Richards' letter dated June 18, 2023, regarding the

17   offer to purchase?

18     A.   Yes.

19     Q.   Okay.  In paragraph number one it says, "We

20   value our offer at $50 million to the estate with our up

21   front payment."

22          Do you know who Mr. Richards was purporting to

23   talk on behalf of in this letter?

24     A.   You'd have to ask Mr. Richards.

25     Q.   Doesn't the first sentence say, "I am putting

1   our offer to writing so we can have a framework to

2   discuss our matter further.  Consumer Legal Group, P.C.

3   is offering the following:  One, we value our offer at

4   $50 million to the estate with our up front payment."

5          Is this a valuation that was conceived by the

6   trustee or is this a valuation that was conceived by

7   CLG?

8       A.   First of all, this is not my letter.  These are

9   not my words.  And this letter clearly implicates

10  conversations that are going on between Mr. Ghio and

11  Mr. Richards because it says, "I'm putting our offer to

12  writing."

13      Q.   Right.  My question though, sir, is, your

14  counsel of record -- "your" being Consumer Legal Group,

15  where you have been designated to testify on behalf

16  today, is saying, "We value our offer at $50 million to

17  the estate in this June 18 offer."

18         And my question quite simply is, how did you

19  get to that valuation?  Is there some appraisal or some

20  formal type of valuation that got you to the valuation

21  that CLG informed Mr. Ghio of on June 18, 2023?

22         MR. RICHARDS:  Okay.  That question assumes a

23  fact not in evidence, and there's no foundation that he

24  knows how I got to that value to put in my letter.  You

25  don't ask the gatekeeping question first.  You just

1   assume he knows.

2          MR. ELGIDELY:  The gatekeeping question was the

3   motion to sell that Mr. Redhun signed the asset purchase

4   agreement that's the critical document that drives the

5   motion to sell, and he submitted supporting

6   declarations.  He's designated by the company to testify

7   on its behalf.

8          Your letters state that CLG valued the asset.

9   The motion is subject to hire and better offers at a $42

10  million number and nobody can explain to me how the $42

11  million was arrived at.

12         MR. RICHARDS:  Well, my letter is an offer,

13  it's not what ultimately came to the court.  There's

14  been inspections and other things that have gone on

15  since then.  And you haven't established that Mr. Redhun

16  has competency to testify to why those numbers were in

17  an asset purchase agreement or in my letter.

18         I'm not going to waive the MDA or other

19  settlement negotiations of things that were uncovered

20  afterwards.

21         You first have to ask him, do you have any

22  basis to know why Mr. Richards put that in the letter.

23  The answer is no.  We should move on to another subject,

24  not just throw up a straw man and try to make him feel

25  like he's supposed to testify to something I didn't

1    designate him to testify to.

2         MR. ELGIDELY:  Well, again, the Committee

3    outlined subject matters for today's testimony.  You

4    chose to produce somebody that you said has limited

5    knowledge, even though that individual is the person

6    that signed the asset purchase agreement that contains

7    the numbers and figures, and your letters reflect that

8    CLG arrived at this valuation.

9         In fact, let me share this subsequent letter

10   here.

11        THE WITNESS:  Wait.  Can we look at the

12   agreement again, please?

13        MR. ELGIDELY:  Yeah, we'll get to that.  Let me

14   put up this letter.

15        MR. RICHARDS:  We doubled the two hour time

16   estimate.

17   BY MR. ELGIDELY:

18      Q.   If you look at the -- if you subtract all the

19   speaking objections, we're probably at a three-hour

20   deposition so far.

21        If you look at the June 19 letter from Mr.

22   Richards' files, and again, it says, "I am putting our

23   offer to writing so we can have the framework to discuss

24   matter further.  Consumer Legal Group, P.C. is offering

25   the following:  One, we value our offer at $42

```
 1   million" --

 2           (Zoom audio interruption.)

 3             THE WITNESS:  You are breaking up again.

 4             MR. RICHARDS:  I can't hear the speaking.

 5             THE STENOGRAPHER:  Mr. Elgidely is frozen.

 6   BY MR. ELGIDELY:

 7      Q.    Paragraph one says, "We value our offer at $42

 8   million."

 9             So, Mr. Redhun, do you know whether the

10   valuation was a valuation that originated with the

11   trustee or originated by CLG?

12      A.    I don't know who proposed that valuation.

13             But I would like to look at the agreement again

14   to see if I can answer your question like I've asked.

15             MR. RICHARDS:  I wouldn't do that, but that's

16   up to you.

17             MR. ELGIDELY:  Are you instructing the witness

18   not to look at a document that he asked to look at?

19             MR. RICHARDS:  No, he can look at it.

20             THE WITNESS:  I'm going to see if I can answer

21   your question to the extent that the document doesn't

22   speak for itself.

23   BY MR. ELGIDELY:

24      Q.    Okay.  Wonderful.

25             Even though a document says certain things,
```

1    there's information and testimony that could be provided

2    to amplify what the document says.

3         And that's all I'm trying to get at,

4    Mr. Redhun, what the basis for the $42 million number

5    is?  And it's hard for me to understand because nobody

6    explained to me how you got to $42 million.

7         Can you see the agreement now?

8    A.    No.

9         Can you zoom out?  You're showing me, like,

10   five lines of text in one shot.

11        Go to the page we were looking at before.  What

12   was that?  Page 6.  Okay.  Scroll down, please.

13        I can't read it when you keep scrolling through

14   the document.

15   Q.    Just tell me when you stop, sir.

16   A.    Stop.  Okay.  I think part of your answer is

17   set forth in the language itself.

18   Q.    Is this an $8 million proposed purchase or a

19   $42 million proposed purchase?

20   A.    It's an eight plus, and the plus is what's

21   written in the contract.

22   Q.    The language that I highlighted previously

23   regarding the fee?

24   A.    You've highlighted a lot of language.  I don't

25   think it's fair.

```
 1        Q.    I'll highlight it again.

 2              Is this the difference between the 8 and the

 3   42, sir?

 4        A.    More than that, but yes.

 5        Q.    What do you mean "more than that"?

 6        A.    The language that you need to highlight is more

 7   than what's just highlighted.

 8        Q.    Okay.  Where would you like me to continue

 9   highlighting to?  Tell me the word.

10        A.    I think you understand the principle.  It

11   speaks for itself.  And it says right there, "The buyer

12   shall pay a fee equal to", and I'm not going to read it.

13   It speaks for itself.

14        Q.    Your testimony is the difference between the $8

15   and the $42 million is reflected in the fee that's been

16   highlighted on page 6 of the asset purchase agreement?

17        A.    Yes.

18        Q.    Okay.  Thank you.

19              But you don't have an appraisal or valuation

20   for the difference between the 8 and 42?

21              Let me rephrase.  You don't have an appraisal

22   that reflects the value of the fee; correct?

23        A.    I don't have a written appraisal.

24        Q.    Do you have a written valuation?

25        A.    Not that I'm aware of.
```

1    Q.   Are you aware of anybody in this transaction

2  that has a written appraisal or written valuation?

3    A.   I don't think I can answer that question.

4    Q.   Mr. Redhun, the agreement required CLG to

5  provide written proof of its financial ability to

6  perform.

7         Do you know whether that written proof was

8  provided?

9    A.   I don't know.

10    Q.   What written proof would CLG provide concerning

11  its financial ability to perform?

12    A.   Well, you're asking me a hypothetical, but I

13  would like to think of some sort of proof of funds.

14    Q.   Okay.  Does CLG or any of its owners, officers,

15  directors, or employees have any past relationship that

16  we have not spoken about today with Tony Diab or any of

17  his entities?

18    A.   Absolutely not.

19    Q.   Okay.  Does CLG or any of its owners, officers,

20  or employees have any relationship that we have not

21  spoken about today with Daniel March?

22    A.   Absolutely not.

23    Q.   Same question with respect to Rosa Loli?

24    A.   I don't know who that is.

25    Q.   Rosa Bianca Loli?

1        A.    I don't think I know who that is.

2        Q.    Same question Lisa Cohen?

3        A.    I don't know who that is.  I know other Lisa

4   Cohens, but I can't imagine the person that's identified

5   there is the same people I know.

6        Q.    Same question for Eng, E-n-g, last name Tang,

7   T-a-n-g?

8        A.    I don't know who that is.

9        Q.    Same question with respect to Maria Tan,

10  T-a-n?

11       A.    I don't know who that is.

12       Q.    Same question with regard to Jake Akers,

13  A-k-e-r-s?

14       A.    I don't know who that is.

15       Q.    Same question with regard to Han Trinh,

16  T-r-i-n-h?

17       A.    I don't think I know who that is.

18       Q.    Same question with respect to Jayde Trinh,

19  J-a-y-d-e, last name T-r-i-n-h?

20       A.    I don't think I know who that is.

21       Q.    How about Wes Thomas?

22       A.    I also don't know who that is.

23       Q.    Scott Eadie, E-a-d-i-e.

24       A.    I don't know who that is.

25       Q.    Jimmy Chhor, C-h-h-o-r?

1    A.    I don't know who that is.

2    Q.    Same question but with regard to the owners,

3  officers, or directors of LGS Holdco, do you know

4  whether they have any relationship with any of your

5  co-defendants in the lawsuit filed by the trustee?

6    A.    I don't believe so.

7    Q.    And what do you base that belief from?

8    A.    We have absolutely nothing to do with Tony

9  Diab, Danny March, LPG in any capacity whatsoever.

10   Q.    When you say "we", are you testifying on behalf

11 of LGS Holdco when you say "we"?

12   A.    CLG.

13   Q.    Okay.  But I'm asking now about LGS Holdco,

14 which has been referenced as a related party on the

15 partial stipulation of settlement?

16   A.    CLG would not have anything to do with anybody

17 who has any affiliation with those LPG folk.

18   Q.    Okay.  How about Liberty Acquisitions, same

19 question?

20   A.    I don't know.  I don't think so.  Again, CLG

21 has -- CLG and its people, its related tentacles if you

22 will, have nothing to do with Tony or LPG or any of his

23 people.  I've had to clean up a lot of messes because of

24 what he did.

25   Q.    When you had your conversation with Mr. Diab 10

1    months ago to get information of his network of local

2    counsel, did you view his information as reliable or him

3    as sort of an expert in the field?

4         A.    I wouldn't call him an expert of anything, and

5    I wouldn't call any of the information he gave me

6    reliable.  I asked him for a contact and that's what he

7    gave me.

8            So it's not a matter of reliability or

9    credibility.  It's to the effect of, hey, do you know an

10   attorney in the State of Louisiana that can represent me

11   on this vacation house I'm buying?  Yeah, sure.  Call my

12   friend John Doe.  That's it, and then I called

13   John Doe.

14        Q.    And with regard to future work by CLG on these

15   customer files, does CLG have any intentions of entering

16   into any type of relationship with Mr. Diab or any of

17   his entities?

18        A.    That would be one of the highest levels of

19   stupidity that I could ever think of.

20        Q.    Is Mr. Diab or any of his entities providing

21   any of the consideration for the purchase of the

22   debtor's assets?

23        A.    Absolutely not.

24            MR. ELGIDELY:  With that, I have no further

25   questions, Mr. Redhun.  I know some of the attorneys

Exhibit 6  0193

1    that are present may have a question or two or a few

2    questions.  So I will turn it over to them at this

3    time.

4        MR. RICHARDS:  I'm actually going to cross him,

5    like I told him I was, and then you can turn it over if

6    someone wants to ask him some questions, but I'm going

7    to keep my cross with your direct.

8                        EXAMINATION

9    BY MR. RICHARDS:

10       Q.   Mr. Redhun, has Tony Diab ever provided any

11   direction to any lawyer working on the current CLG

12   clients in the form of an email to the firm?

13       A.   Not that I'm aware of.

14       Q.   Has Tony Diab ever physically been present at

15   the CLG offices and spoken with employees?

16       A.   I don't believe so.

17       Q.   Have you ever -- has an employee ever reported

18   to you that they received direction from someone named

19   Tony Diab?

20       A.   No.

21       Q.   With respect to your independence at the firm,

22   has anybody that has provided funds to the firm given

23   you any direction that you should ever compromise your

24   professional ethics when representing CLG clients?

25       A.   I would never compromise my professional ethics

 1    with anybody under any circumstances whatsoever.

 2        Q.    Who at CLG -- and I'm only talking between

 3    attorneys and others -- who has the final decision on

 4    all legal matters the firm is providing legal services

 5    for, the attorneys or somebody else?

 6        A.    Always the attorneys.  Most likely me.

 7        Q.    Okay.  With respect to the current clients that

 8    the firm is servicing, are you aware of any small claims

 9    action from any of those clients against the firm asking

10    for any funds back?

11        A.    No.

12        Q.    Are you aware of any civil action in New York

13    or surrounding counties for any funds back?

14        A.    No.

15        Q.    With respect to the contention that the firm is

16    "alter ego of LPG", I want to address my next question

17    to that.

18            You're familiar early on someone made that

19    allegation?

20        A.    Yes.

21        Q.    Are you personally aware that if the firm was

22    "alter ego of LPG", that there would be catastrophic

23    consequences?

24        A.    Yes.  That's my understanding.

25        Q.    Okay.  Do you have an understanding of whether

1 | my firm or Greenspoon would even represent an alter ego

2 | of Tony Diab in this case?

3 |     A.   I can't imagine anybody who is reputable

4 | would.

5 |     Q.   Okay.  At any time that you've been

6 | representing -- working at CLG, has anybody told you to

7 | conceal that Tony Diab is really giving direction or

8 | providing capital to CLG?

9 |     A.   Well, he's not so there's no need to conceal.

10 | The answer to your question is no.

11 |     Q.   If someone hypothetically had given you that

12 | direction, would you follow it based on your

13 | understanding of the current posture of the bankruptcy

14 | case?

15 |     A.   Absolutely not.

16 |     Q.   Would you immediately report that to my office

17 | if somebody asked you to hide Tony Diab's involvement

18 | with CLG in any way?

19 |     A.   At a minimum.

20 |     Q.   Okay.  And with respect to -- would you have

21 | any opposition reporting it to the OCC and to the

22 | trustee if you ever saw somehow Tony Diab appear at the

23 | firm?

24 |     A.   Would I have any opposition to that?

25 |     Q.   Yeah.

1    A.    No.

2    Q.    Okay.  And would you agree to report

3    immediately to the OCC and the trustee and the

4    United States Trustee if you ever saw any inclination

5    that Tony Diab had any involvement in CLG from now

6    through the time of purchase and afterwards?

7    A.    Yes.

8    Q.    With respect to the attorneys that you

9    supervise and the paralegals, have any of them ever

10   reported to you that they're taking direction from

11   anybody other than yourself and Mr. Kaufman?

12   A.    Who?  You mean, Mr. Weber?

13   Q.    Mr. Weber.  I'm sorry.  I got the name mixed

14   up.

15   A.    No.

16   Q.    Did anybody report to you that they're taking

17   direction from any other attorneys?

18   A.    No.  Some of the other attorneys may take

19   direction from the other attorneys in the office, but

20   everything remains within the office.  Not a single

21   outside influence whatsoever in any capacity.

22   Q.    With respect to "capacity", you testified that

23   you had a certain amount of attorneys and a certain

24   amount of paralegals.

25           Are those the only people at CLG that service

1  the existing client base?  Yes or no.

2      A.    No.

3      Q.    Okay.  Can you testify as to what types of

4  people interface with the clients of CLG?

5      A.    We have a slew of non-legal team personnel.

6      Q.    Why is it important that when clients of CLG

7  contact CLG that their calls are promptly addressed and

8  answered?

9      A.    Because I think the entire legal industry is a

10 service industry, so we pride ourselves on the support

11 and customer service that we give to our clients.

12         So given that our clients are generally facing

13 the worst times of their life and, you know, future

14 financial ruin, it would be wild to put them on hold or

15 not return their calls.  We offer a sort of a

16 hand-holding in addition to the legal services that we

17 provide.

18     Q.    How many customer service people answer client

19 calls in a day at CLG?

20     A.    I have no idea.  It's a lot.

21     Q.    Do you know what your call-drop rate is?

22     A.    I do not.

23     Q.    Do you know what the call-drop rate is?

24     A.    What the terms are?

25     Q.    Yes.

1       A.    I can guess.

2       Q.    Don't guess.

3             If  client calls were not being responded to,

4   would that be something you would know about as the

5   managing lawyer?

6       A.    Very quickly.

7       Q.    Okay.  And, again, these questions may sound

8   trivial, but I need them in the record.

9             If calls were not being returned, would that be

10  something you would typically hear about?

11      A.    Yes.

12      Q.    And so is one of your -- have you heard that

13  calls are not being returned at CLG?

14      A.    No, because we have a standing order to

15  communicate and correspond with clients as quickly as

16  humanly possible.

17      Q.    How many customer service people would you say

18  you have on the floor at GLG and working out of their

19  houses?

20      A.    I could only give you the ones that are on the

21  floor.  And probably no less than 50.

22      Q.    And are the phones busy all day long answering

23  calls from clients?

24      A.    All day long.

25      Q.    And with respect to your refund procedure, does

1    someone need to get your approval to get a refund or

2    could the customer service agent decide on their own

3    without attorney approval?

4         A.    The customer service people can give a refund

5    if asked.

6         Q.    So would you say the process is easy or

7    cumbersome?

8         A.    Which process?

9         Q.    Of getting a refund if someone calls customer

10   service and just says they want a refund?

11        What I'm trying to establish is, are there a

12   lot of approvals or can customer service do it on the

13   spot?

14        A.    Customer service can do it on the spot because

15   otherwise we'd have clients held in limbo, we'd have

16   quite an upset client base with us, and we would be

17   facing other complaints which we don't face because of

18   our approach and handling of consumer client refund

19   requests.

20        Q.    If your firm acquired these files, which I'm

21   not going to get into what we uncovered in the

22   inspection, but let's say a range of 10,000 to 15,000

23   files -- I just want to throw out a hypothetical

24   number -- do you see any problems in taking over the

25   servicing of these clients with your present capacity

1    today?

2        A.    No.

3        Q.    Can you testify why you don't believe as the

4    managing lawyer -- strike that.

5             Do you know that you have an ethical obligation

6    to only take work that you can competently handle?  Yes

7    or no.

8        A.    Yes.

9        Q.    Okay.  Do you see any issues with you being the

10   managing lawyer of the current capacity of CLG in

11   acquiring the asset that's being proposed to be sold?

12       A.    We have no issue.  We wouldn't be in this game,

13   and I wouldn't be testifying here today if there was an

14   issue.

15       Q.    And how many active litigation files do you

16   think you have presently for clients that are being

17   sued?

18       A.    I don't know if I have that number ready to

19   go.

20       Q.    Do you have a range?  Is it like 1,000 to

21   2,000?  Is it some sort of range?

22       A.    It's probably closer to 2,000.  I don't have an

23   exact number.

24       Q.    Does the 2,000 files stay -- if you don't

25   service the 2,000 litigation files and do nothing, does

1   that number grow or decrease?

2       A.    Which number do you mean?

3       Q.    Like, active litigation files -- let me lay a

4   foundation.

5             Is it important to try to settle and resolve

6   those cases or is it better to do nothing with respect

7   to the amount of open litigation files?

8       A.    We try to deal with every single one of them.

9   And ignoring the files just leads to a spiraling bigger

10  problem.

11      Q.    Does each month, new litigation files come in,

12  and other ones get closed?  I'm just trying to

13  understand the process for the record.

14      A.    Yes.

15      Q.    Can you just explain that?  Because at LPG, if

16  these clients aren't being handled, then the litigation

17  files could grow over there.

18            So I'm trying to understand, if you could

19  testify how that works, just in a general sense, so it's

20  clear for the record?

21      A.    Sure.  And I want to use two hypothetical

22  clients as an example.

23            Client A can have five debts enrolled with

24  Consumer Legal Group.  Three of those debts could

25  escalate to litigation while they're with us.  If we

1    don't do anything with those three, aside from the

2    catastrophic consequences to that particular client, the

3    likelihood of the other two debts that are enrolled with

4    us, would also be escalated to litigation.  Now, we

5    would have five.

6         If we're going to settle and start working on

7    resolutions or invalidation of those particular debts,

8    we would also look to make some sort of deal or

9    resolution on the other two debts.  So that number --

10   that particular client could have five active debts and

11   at any given moment, some of those debts could be in

12   litigation and some not.

13        Conversely, you could have one client with one

14   debt that's enrolled with us.  That debt could be

15   resolved before litigation and that debt could be

16   resolved after litigation has commenced or six months

17   after litigation has commenced.

18        So that particular client, let's assume that

19   God forbid we drop the ball with respect to that client,

20   that dropping the ball is isolating to that particular

21   client wouldn't affect the numbers.  Whereas, dropping

22   the ball with Client A, for example, would lead to

23   bigger problems.

24   Q.   Okay.  When I came to CLG to inspect the

25   offices and saw the people working, were those real

1  people working on the floor or were they actors?

2      A.   They're all real people.

3      Q.   Has anybody ever instructed you to withhold any

4  materials from the trustee's office or from my office if

5  we've requested them?

6      A.   No.

7      Q.   Okay.  With respect to the files that you

8  would -- let me strike that.

9          Can you testify as to how mail is typically

10  sorted from these clients?

11      A.   We have a mail house where everything -- the

12  incoming is open, scanned, sent to an email address, and

13  uploaded to our portal.  When those things happen, there

14  are certain tasks that get triggered based on some of

15  those transpiring events.

16          For example, if there's a legal document that

17  comes through, the legal team is tagged, and there's a

18  task created for the legal team to review that

19  particular document.  So we have multiple ways of making

20  sure that we hit all of the pieces of mail and that

21  nothing falls through.

22      Q.   Do you have sort of an estimate as to how

23  quickly you process mail?

24      A.   Within a couple of days.

25      Q.   Okay.  With respect to the current debtor, you

1    went and visited the current debtor; correct?

2        A.    We visited Phoenix.

3        Q.    And because we signed an MDA, I'm not going to

4    ask you anything about what you saw.  But generally, if

5    I told you that the debtor's mail was not being uploaded

6    or not being scanned, is that a problem generally in

7    your business?

8        A.    It's a monumental problem.

9        Q.    So would you say that uploading, scanning, and

10   processing mail is extremely important?

11       A.    It's like checking an inbox for court.

12       Q.    So do you believe that CLG -- let's say,

13   hypothetically there was 20,000 pieces of mail that was

14   uploaded.

15             How would CLG, if it acquired these files, how

16   would they get up to speed quickly with unopened mail?

17   What would you do?

18             That's what I'm saying.  How are you going to

19   handle that problem which is a lot of pieces of mail?

20       A.    Once we open all of the unopened mail and it's

21   uploaded, we look for triage.  So we look for things

22   that have actual pending litigation matters tied to

23   those particular files.  And then we would have at least

24   one paralegal start looking at that particular file

25   within the court to see what the status is of that

```
 1    particular file, while another paralegal looks up and

 2    opens up the next one.

 3          Based on what the first person finds, it might

 4    be too late.  You know, a default judgment might have

 5    already been entered.  In which case, I'll move to the

 6    next one to see if I can save that file, vis-á-vis the

 7    client having been served but no responsive pleading is

 8    due yet.  Or where there's a motion for a default

 9    judgment filed in which case we can oppose it or send it

10    to local counsel immediately to have it opposed.

11          Certain files are going to have a garnishment

12    attached to them because there was no action taken on

13    them for quite a while.  Those are effectively, for a

14    lack of better way of saying it, dead on arrival.  So

15    those would take the least priority of everything that

16    we'd be looking at.

17       Q.   Okay.  So, do you have sort of a plan if the

18    court approved the sale, how you're going to tackle

19    those files?

20       A.   Yes.

21       Q.   Okay.  Could you just -- in a big picture, just

22    outline how you're going to allocate the resources to

23    deal -- again, this is just a potential issue that may

24    come up -- is unopened mail.  How are you going to deal

25    with that?
```

1      A.    Once we get the mail open, scanned, and

2    uploaded, I have one paralegal who is phenomenal.  She's

3    amazing.  She's super efficient.  I would have her take,

4    I would say the head, I would have another one take a

5    tail, and have them start working it up.

6          And then we have a different paralegal who's

7    really good at looking up different individual

8    courthouses through their online websites and calling

9    the court to find out the status of individual files.

10         I have the local liaison paralegal on standby

11   ready to dispatch emergency files to various local

12   counsels.  And we also have the attorneys ready to go to

13   make judgment calls based on how to file particular

14   files.

15         Not to mention, of course, that we have other

16   paralegals that can step in and fill in a lot of those

17   different roles and really start going through, what we

18   call in our office, kind of like the review summons

19   test.

20         So immediately, I would put probably about four

21   paralegals on the review summons.  We break it up by

22   numbers or by letters -- I don't know.  We would figure

23   that part out.

24         And then once we have that information

25   elicited, it would go to the next layer of people to

1    start looking into these specific files.  And then we

2    have the next layer of what to do with those particular

3    files.

4         Q.   And when you finally absorb those files, do you

5    have an estimate as to like an outside amount of time

6    that once mail is not answered, it becomes irreversible

7    or do you just have to try your best once you get the

8    unopened mail?

9         A.   We would try our best.

10             First of all, there's almost nothing that is

11   irreversible.  Our worst case scenario is when a client

12   was personally served, owes the debt, and the creditor

13   followed all the proper procedures in getting a default

14   judgment which led to a garnishment.  In those cases

15   there's really not a whole lot you can do.  Even

16   vacating a default judgment, you need to show a

17   meritorious defense and a reasonable excuse for the

18   default, neither of which we would be able to show in

19   this particular case.  Those we just skip over to the

20   next one.

21        Q.   When counsel showed you the Better Business

22   Bureau, do you have an understanding as to whether or

23   not the Better Business Bureau's complaints will even

24   let you open closed complaints once they're closed?

25        A.   I don't have any knowledge about the Better

1    Business Bureau.  What I could say is that, even if

2    everything on there is true and accurate, everything

3    they're saying is right, that's such a statistical drop

4    in the overall bucket of what we're showing.  Not to

5    mention that half of garbage was related to LPG and

6    dealt with refunds, and we have an overwhelmingly

7    favorable refund policy.  That is so non-important and

8    not relevant to me.  I couldn't care less about that.

9        Q.    Are there any other websites that you're aware

10   of where you have positive reviews?

11       A.    Yeah.  I'm not the Internet guy.  I think it's

12   called Trust Pilot.

13       Q.    Trust Pilot, okay.

14             And if the U.S. Trustee or the OCC contacts

15   somebody on the Better Business Bureau side, and for

16   whatever reason they haven't gotten a refund yet, would

17   these one or two people, out of thousands of clients,

18   would you be immediately willing to give them a refund,

19   as the managing attorney, if somehow this refund was

20   overlooked?

21       A.    Almost certainly.

22       Q.    Would you be willing to commit to that now --

23       A.    Yes.

24       Q.    -- if somebody pulled a customer out of the hat

25   and said, I found one out of 20,000 that didn't get a

1   refund or a fee like the person would, would you

2   immediately promise to make sure their fee is

3   refunded?

4        A.   Yes.  It would be illogical for us not to do

5   that.

6        Q.   With respect to the 12 complaints you saw in a

7   year, did you find that -- when you say, "a drop in the

8   bucket" or some other word, would you find that

9   statistically material that out of thousands of clients

10  someone filed a complaint?

11       A.   I don't think it would rise to maybe even half

12  of one percent.

13       Q.   Did you ever warrant to anyone that a client of

14  a lawyer would never file a complaint against a law

15  firm?

16       A.   I don't warrant anything to anybody about

17  anything.  It's one of the ethical rules and guidelines,

18  other than we will do our best to help you.  That I can

19  promise everybody.

20       Q.   But sitting here today, are you aware of any

21  client of CLG that has an ongoing complaint with CLG for

22  a refund of a fee or their actual payments that were

23  made that CLG has not resolved?  That's the big

24  question.

25       A.   No.  If anybody came to my office to talk to me

1    about a refund, I will throw them out and tell them to

2    give it back to them.

3         Q.    So are you aware that Tony Diab had a different

4    posture when it came to refunds or not?

5         A.    I have no idea what he did.  Nothing surprises

6    me.

7         Q.    Okay.  If someone had advanced or lent money to

8    CLG told you, please don't give a refund because it

9    affects our bottom line, would you ever follow that

10   advice?

11        A.    That's stupid.

12        Q.    Okay.  In other words, is there any reason you

13   could think that your independent judgment as the lawyer

14   running CLG is influenced by any other person or

15   source?

16        A.    It is not.

17        Q.    It is not, okay.

18             And with respect to your background, have you

19   handled large escrows in the New York area in real

20   estate deals?

21        A.    Yes.

22        Q.    Could you just give the Committee just sort of

23   an example of the transactional dollar amount of

24   purchases you've handled as a lawyer as a fiduciary for

25   various parties?

1     A.    I think the highest one I've ever dealt was a

2    $175 million purchase.    Recently, I was involved with --

3    probably about two months ago with the $17 million

4    purchase.

5          I'm in the process right now -- I say we, but

6    it's really my clients -- we bought portfolio property

7    in New Jersey for, I think, $6.8 million and we're

8    selling it now for about $9.2.    We have staggered

9    closing so I'm involved with millions of dollars of

10   purchases on a weekly/monthly basis.

11    Q.    Okay.    I want to be clear for the record.

12          Your firm specifically handled a $175 million

13   transaction, money coming in and money coming out of

14   your account; is that correct, sir?

15    A.    Yes.

16    Q.    Do you have any military training and

17   background?

18    A.    Yes.

19    Q.    Can you please tell the Committee what your

20   military training and background is?

21    A.    I volunteered for the Israeli military back in

22   2002.

23    Q.    And what was your role in the military?

24    A.    I was the gunner of a combat tank division.

25    Q.    And how long were you in the Israeli defense

1   forces?

2       A.    Couple of years.

3       Q.    And were you honorably discharged?

4       A.    Yeah, they don't have that over there because

5   everybody continues to do reserve duty.  But, yes, I

6   never had a single complaint whatsoever in any capacity

7   against me.

8       Q.    And besides a law license, do you hold any

9   other professional licenses?

10      A.    I hold a New York State real estate broker's

11  license.  A driver's license.  I don't know.  I think

12  that's it.

13      Q.    Okay.  And do you have any concerns at all

14  about your fiduciary duty to clients who would be

15  acquiring from this estate if the court approved it?

16      A.    No, I would not agree to participate in any

17  part of this whole process if I felt that we couldn't

18  pull it off.

19       MR. RICHARDS:  Okay.  I don't think I have any

20  further questions.  Thank you.

21           Ken, do you have a couple?

22           MR. MISKEN:  Yeah, I have a couple.

23                        EXAMINATION

24  BY MR. MISKEN:

25      Q.    My name is Ken Misken.  I'm the Assistant

1    United States Trustee.

2         Can you just tell me what states you're

3    admitted to the state bar in?

4         A.    New York and New Jersey.

5         Q.    And do you actively practice in those two

6    jurisdictions?

7         A.    Yes.

8         Q.    Do you appear in state courts?

9         A.    And federal courts.

10        Q.    And federal courts.   In both?

11        A.    Yes.

12        Q.    Are there any other jurisdictions in which you

13   appear on behalf of clients?

14        A.    No.

15        Q.    How about the lawyers that are employed by

16   Consumer Legal Group, which jurisdictions are they

17   admitted in?

18        A.    New York and New Jersey.   One of them -- no, I

19   think that's it.   I know one of them was working on --

20   she passed the bar in one particular state, and we're

21   working on trying to get her admitted in that state, but

22   New York and New Jersey.

23        Q.    Do you recall what state that was?

24        A.    North Carolina.

25        Q.    Do you know what jurisdictions Consumer Legal

 1    Group attorneys are actively representing consumers?  Is

 2    that just New York and New Jersey?

 3        A.   Correct.

 4             MR. RICHARDS:  Ken, can I just clarify?

 5             Do you mean if they get local counsel and they

 6    are pro hac'd in?

 7             MR. MISKEN:  No, directly.  The Consumer Legal

 8    Group attorneys themselves.  Not getting local counsel

 9    or affiliated counsel to represent the consumers.

10             THE WITNESS:  Just New York and New Jersey

11    where we are admitted.  We wouldn't go anywhere else.

12    BY MR. MISKEN:

13        Q.   And that would be both in state court and

14    federal court?

15        A.   Yes.  I don't know if they're admitted in

16    federal court, but I know that I am.  So I would be

17    doing those if we went there.

18        Q.   Okay.  And you may have said this earlier, but

19    in paragraph 15 of your declaration that's attached to

20    the trustee's motion to sale, you state that CLG uses

21    proprietary software to operate its business?

22        A.   Yes, sir.

23        Q.   What software is that?

24        A.   I know -- I don't know what it's formally

25    called.  I know what we call it.  It's called Debt Pay

```
 1   Pro.

 2        Q.   Does CLG have a privacy policy?

 3        A.   What do you mean?

 4        Q.   Earlier I believe you testified that you

 5   drafted some specific SOPs and said that you have

 6   general policies.

 7             Do any of those general policies have privacy

 8   policies regarding, you know, client information?

 9        A.   We have the privacy policies that's part of our

10   website.  I also make it a point of telling every single

11   new hire, and pretty frequently, that -- you know, like

12   Fight Club.  The first word about us is you don't speak

13   about us.  So everybody is really under tight-lipped.

14        Q.   And then with regard to the sale, CLG is

15   proposing to purchase this consumer's client accounts;

16   correct?

17        A.   Yeah, but it's not that simple.  Clients have a

18   right to choose counsel that they want.  So, you know,

19   we follow the ethical rules as part of that acquisition,

20   and the clients have a right to say no to us.

21        Q.   Do you know as part of that transaction if CLG

22   receives a client file, will CLG also be receiving that

23   client's bank account information?

24        A.   Well, once the client signs a new agreement

25   with CLG, part of that new agreement and the information
```

1  that's requested is that client's bank account

2  information.

3      Q.   So the trustee will not be transferring client

4  bank account information to CLG?

5      A.   I don't know that I can answer that question.

6          MR. RICHARDS:  Ken, I think they use a

7  processor.  If you have a concern about that we could

8  certainly address it.  We don't need the client banking

9  information.  There's a 90-day window, but we could

10 discuss that off-line if you want.  Definitely, it's not

11 going to be floating around.

12 BY MR. MISKEN:

13     Q.   But you will be receiving copies of the legal

14 services agreements, right, from each consumer that LPG

15 signed with them?

16     A.   Maybe.  I couldn't care less about that.  What

17 I care about is my stuff.

18     Q.   Okay.  So you don't know if you'll actually be

19 receiving any bank account information; correct?

20     A.   I don't know.  And again, when they come to us,

21 it's kind of like a fresh start.

22     Q.   Any other personally identifiable information,

23 do you know whether Consumer Legal Group will be getting

24 like date of birth, home address, email address, or any

25 of that type of information?

1     A.   I don't know, but I know that part of the

2  information that we get and we need in order to do our

3  jobs properly is requesting a lot of that information.

4          So regardless of whether the trustee sends us

5  that information for a particular client, we kind of

6  just get -- think about it like this.  We disregard that

7  until the client signs a new service agreement with us

8  and which we ask for that information anyway.

9     Q.   What would happen if a client file is

10  transferred from the estate to Consumer Legal Group but

11  then the consumer does not sign a new agreement with

12  Consumer Legal Group?

13     A.   That is a good question.

14          I don't know that I would feel comfortable

15  servicing a client that hasn't formally engaged us to

16  service them or represent them.  I don't know that

17  ethically we have the right to represent them.

18          I would like for my own protection, when I say

19  "me", I mean CLG, we would want powers of attorney,

20  legal services agreement signed, you know, giving us

21  privity with that particular client.  Clients that

22  refuse, I don't know.  I probably would turn those

23  away.

24          MR. MISKEN:  Okay.  I think those are all the

25  questions I have.  Thank you.

Exhibit 6  0218 Page: 203

1          THE WITNESS:  Thank you.

2          MR. RICHARDS:  All right.  Great.  Thank you

3  very much.

4          MR. COUSINEAU:  No questions at this point.

5          MR. ELGIDELY:  I was just going to tell the

6  witness that, obviously, he has the right to read his

7  deposition or to waive the right to read his deposition.

8          Of course, to the extent he reads and makes any

9  substantive changes to his testimony that we have the

10  right to recall the witness and inquire about those

11  changes.

12          But, Mr. Redhun, we need you to state on the

13  record at this time whether you would like to read or

14  waive?

15          THE WITNESS:  I would like to read.

16          MR. RICHARDS:  We would like to read it.  And

17  you can send it to my office ronaldrichards.com.  The

18  court reporter can send me the copy you want him to

19  review.

20          MR. ELGIDELY:  Thank you.

21          MR. RICHARDS:  Thank you very much.

22          THE STENOGRAPHER:  We are going off the record.

23  The time is 12:56 p.m.

24                         * * *

25          CERTIFICATE OF STENOGRAPHIC REPORTER

1

2          I, CARA M. FOSTER, a Stenographic Certified

3   Shorthand Reporter and Registered Professional Reporter,

4   hereby certify that the witness in the foregoing

5   deposition:

6          That JASON REDHUN, the witness whose deposition

7   is hereinbefore set forth, was duly sworn by me before

8   the commencement of such deposition and that such

9   deposition was taken before me and is a true record of

10  the testimony given by such witness.

11         I further certify that the deposition of

12  JASON REDHUN, occurred remotely via videoconference on

13  Monday, July 17, 2023, commencing at 7:04 a.m. to 12:56

14  p.m. PST.

15         I further certify that I am not related to any

16  of the parties to this action by blood or marriage, I am

17  not employed by or an attorney to any of the parties to

18  this action, and that I am in no way interested,

19  financially or otherwise, in the outcome of this matter.

20

21

22

23

24

25  IN WITNESS WHEREOF, I have hereunto set my hand this

1    19th day of July, 2023.

2

3

4

5

6

7

8    _____
              Cara M. Foster
9          RPR, CSR No. 11973

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   WITNESS'S CHANGES OR CORRECTIONS

2       Deponent: JASON REDHUN

3       NOTE: If you are adding to your testimony, print the

4       exact words you want to add.  If you are deleting words

5       from your testimony, print the exact words you want to

6       delete.  Specify with "Add" or "Delete" and sign below.

7       Page      Line      Change/Add/Delete.

8       _____     _____     _____

9       _____     _____     _____

10      _____     _____     _____

11      _____     _____     _____

12      _____     _____     _____

13      _____     _____     _____

14      _____     _____     _____

15      _____     _____     _____

16      _____     _____     _____

17      _____     _____     _____

18      _____     _____     _____

19      _____     _____     _____

20      _____     _____     _____

21      _____     _____     _____

22      _____     _____     _____

23      _____     _____     _____

24      _____     _____     _____

25      Date:_____Signature:_____

1

2

3

4                  DECLARATION UNDER PENALTY OF PERJURY

5                             ---oOo---

6

7          I, the undersigned, declare under penalty

8     of perjury that I have read the foregoing transcript,

9     and I have made any corrections, additions or

10    deletions that I was desirous of making; and that the

11    foregoing is a true and correct transcript of

12    my testimony contained therein.

13          EXECUTED this ____ day of _____, 2023.

14

15

16

17                              _____

18                              JASON REDHUN

19

20

21

22

23

24

25

Focus Litigation Solutions

400 Capitol Mall, Suite 1450

Sacramento, CA 95814

Telephone (916) 228-4593
Production@FocusLitigationSolutions.com

July 19, 2023

Jason Redhun
c/o Ronald N. Richards, Esq.
P.O. Box 11480
Beverly Hills, CA 90213

Re: The Litigation Practice Group, P.C.
Date of Deposition: July 17, 2023

The transcript of your deposition taken in the
above-entitled matter has been transcribed.  The original
transcript will be held for 30 days from the date of this
letter before it is sealed and forwarded to the noticing
attorney.

You have the right to review, sign and make
corrections to your transcript within the 30-day period.
Please call the above number, or e-mail to make an appointment
for your review.  It is our policy not to release the original
transcript and complimentary copies are not provided.

If you are represented by an attorney, we advise that
you contact your attorney to discuss this matter.  If you are
an independent witness and have questions, please contact the
attorney who requested you to testify or this office for
further instructions.

If you wish to waive signature, please sign and date
below and return this letter to the above address.  In the event
you have not read, corrected, and signed your deposition within
(30) days of receipt of this letter, it may be used with the
full force and effect as though it had been read, corrected, and
signed.

Cc: All counsel

_____    _____

 DATE                       Jason Redhun

Exhibit 6  0224

## WORD INDEX

**< $ >**

**$1** 157:*19, 21* 160:*5, 9, 11*

**$17** 197:*3*

**$175** 197:*2, 12*

**$240** 50:*13*

**$240.61** 50:*3*

**$3.3** 71:*22* 72:*11* 73:*14* 125:*16* 126:*4*

**$42** 155:*5* 161:*21* 162:*7* 163:*6, 13* 166:*15, 25* 167:*2, 3, 6, 7, 15, 20* 168:*9* 170:*9, 10* 171:*25* 172:*7* 173:*4, 6, 19* 174:*15*

**$50** 168:*20* 169:*4, 16*

**$58** 50:*14*

**$6.8** 197:*7*

**$7** 161:*15*

**$8** 161:*17, 21* 163:*6* 166:*14, 25* 167:*2, 4, 15* 168:*8* 173:*18* 174:*14*

**$9.2** 197:*8*

**< 1 >**

**1** 1:*23* 3:*21* 6:*18* 85:*13* 148:*13* 154:*21, 23*

**1,000** 186:*20*

**1.10** 116:*5*

**1.3** 100:*5, 7, 13, 16* 101:*12* 103:*9, 19* 104:*3* 106:*13*

**1.3(ii** 106:*5*

**1.4** 106:*21*

**1.6** 107:*8*

**1.8** 107:*17* 108:*13* 114:*11*

**10** 55:*7* 64:*3, 6, 11* 65:*25* 66:*8, 9, 18, 25* 67:*22* 68:*11, 17, 25* 74:*11* 80:*18* 81:*12, 19* 106:*21* 143:*1* 177:*25*

**10,000** 140:*6, 9* 141:*3, 11, 12* 185:*22*

**10.1** 118:*8*

**10:04** 85:*23*

**10:48** 117:*22*

**100** 4:*7* 27:*1, 2, 11* 39:*4* 141:*7*

**101** 3:*11*

**10178** 3:*12*

**1099's** 42:*16* 43:*5, 10, 13*

**11** 1:*5* 4:*4* 6:*21* 10:*8* 22:*4, 8* 56:*13* 122:*1*

**11:10** 55:*4, 5*

**11:31** 148:*25*

**11:36** 148:*25*

**11:52** 85:*1*

**11480** 3:*6*

**11973** 1:*24* 2:*10* 6:*7* 206:*9*

**12** 47:*10, 14, 17, 22* 55:*13* 143:*4* 195:*6*

**12,000** 48:*17* 61:*10, 17* 71:*22* 72:*9* 73:*5* 79:*10* 80:*20* 81:*22* 99:*23* 125:*15, 22* 126:*5* 139:*1, 11* 140:*10* 141:*10* 142:*2, 3, 21* 143:*12* 149:*4, 21* 150:*9, 17* 152:*8, 11, 20, 24* 153:*8*

**12,546** 42:*9* 112:*8*

**12:45** 85:*12, 16, 19, 22*

**12:56** 204:*23* 205:*13*

**13** 16:*8* 87:*7, 14* 116:*24*

**13th** 87:*15*

**15** 25:*10* 48:*7* 63:*2* 85:*6* 130:*11* 146:*9* 166:*7* 200:*19*

**15,000** 185:*22*

**15:56** 1:*18*

**16** 13:*8*

**17** 1:*17* 101:*9* 151:*2* 205:*13*

**179** 5:*5*

**17th** 3:*12*

**18** 19:*4, 16, 21* 21:*12, 15* 54:*1* 59:*2, 5, 22* 131:*17, 22* 132:*12, 21*

**133:***6* 134:*1* 168:*16* 169:*17, 21*

**19** 131:*1, 2* 171:*21*

**198** 5:*6*

**19th** 206:*1*

**< 2 >**

**2** 3:*21* 6:*18, 19* 48:*25* 49:*17* 50:*6* 63:*4* 116:*10* 145:*9, 10* 146:*3* 147:*5, 8* 148:*11, 16* 157:*18*

**2,000** 186:*21, 22, 24, 25*

**20** 13:*21* 43:*8, 9, 10* 76:*23* 85:*8* 147:*17* 166:*1, 4*

**20,000** 190:*13* 194:*25*

**2002** 197:*22*

**2022** 19:*4, 10, 16, 21* 21:*12, 15* 40:*1, 23* 41:*5, 15* 42:*5, 23* 43:*1* 54:*1* 59:*2, 5, 22*

**2023** 1:*17* 22:*16, 22* 25:*22* 39:*19, 24, 25* 40:*11, 14, 19, 21* 42:*9, 17* 43:*5* 48:*3, 7, 11, 13, 25* 49:*17* 50:*2, 6* 60:*21* 61:*1* 62:*12, 21* 63:*2* 71:*25* 72:*3* 93:*12* 99:*24* 131:*22* 132:*22* 133:*7, 13* 136:*16* 139:*11* 140:*4, 11, 14, 21* 141:*5, 21* 146:*19* 149:*4* 152:*8, 25* 168:*16* 169:*21* 205:*13* 206:*1*

**206** 1:*23*

**21** 147:*17*

**212** 158:*12*

**212.878.7900** 3:*13*

**22** 147:*17*

**22,000** 138:*14, 18* 139:*5* 140:*4* 143:*8, 16* 153:*2, 10*

**229** 147:*11*

**23** 147:*16*

**24** 147:*16*

**25** 60:*15, 21* 61:*1* 62:*12, 21* 97:*3* 134:*17* 136:*16* 147:*9*

**250** 145:*9*

**255** 164:*22* 165:*24*

**25th** 86:*8* 147:*8*

**274** 147:*12, 14*

**279** 147:*1*

**289** 158:*12*

**29** 87:*25*

**2A** 165:*12*

**< 3 >**

**3** 22:*16, 21* 48:*11, 13* 154:*23*

**30** 85:*8* 101:*8* 117:*20* 146:*9*

**31** 63:*4*

**310.56.1001** 3:*7*

**35,000** 133:*12, 16* 168:*1*

**3rd** 10:*8*

**< 4 >**

**4** 62:*18* 100:*14*

**40** 32:*14, 15* 107:*18* 108:*6, 20* 109:*2, 6, 13, 19* 110:*3* 112:*24* 113:*5, 11, 12, 19, 21, 25* 114:*13*

**40507** 4:*8*

**411** 3:*17*

**42** 174:*3, 20*

**45** 78:*19* 85:*8*

**45th** 32:*16*

**< 5 >**

**5** 143:*4*

**5,000** 41:*24, 25* 141:*15* 142:*1, 18*

**50** 184:*21*

**50/50** 16:*24*

**< 6 >**

**6** 48:*3* 50:*2* 86:*25* 87:*25* 93:*12* 106:*11* 165:*23* 173:*12* 174:*16*

**6/15** 133:*24, 25*

**6/25** 133:*24*
**67** 63:*14* 71:*12, 17*
**69** 71:*19*

**< 7 >**
**7** 5:*4* 122:*1* 130:*12*
145:*1* 146:*19*
**7:04** 1:*18* 6:*4*
205:*13*
**714.338.3400** 3:*19*
**7160** 3:*18*
**7220** 1:*22*

**< 8 >**
**8** 174:*2, 20*
**8:05** 55:*6*
**8:13** 55:*6*
**8:23-bk-10571-SC** 1:*6*
**8:53** 85:*23*
**80** 118:*5*
**80/20** 16:*25* 17:*1*
**805.564.2444** 3:*24*
**831** 3:*23*
**859.425.1021** 4:*8*

**< 9 >**
**9** 55:*7*
**90** 85:*20*
**900** 4:*7*
**900,000** 55:*22*
**90213** 3:*6*
**90-day** 118:*10* 202:*9*
**92701-8000** 3:*18*
**93101-3227** 3:*24*
**940** 147:*1, 12*

**< A >**
**a.m** 1:*18* 6:*4* 55:*6*
85:*23* 117:*22* 148:*25*
205:*13*
**A.P.C** 97:*17*
**ABA** 33:*9*
**ability** 143:*25*
153:*25* 175:*5, 11*
**able** 13:*5* 29:*9* 46:*5*
52:*20* 53:*3* 55:*19*
58:*9, 11* 75:*24* 78:*7*
81:*9* 136:*23, 24*
142:*10* 164:*8* 165:*3*
193:*18*

**absolutely** 36:*16, 21*
77:*10* 79:*12* 159:*18*
175:*18, 22* 177:*8*
178:*23* 181:*15*
**absorb** 193:*4*
**accept** 95:*3*
**acceptable** 7:*23*
85:*12*
**accepted** 155:*4*
**account** 48:*15* 49:*19,
21* 50:*11* 124:*25*
197:*14* 201:*23* 202:*1,
4, 19*
**accounting** 109:*6, 14,
15, 17, 20, 21, 24*
114:*13*
**accounts** 36:*20*
48:*17* 201:*15*
**accurate** 8:*3* 50:*22*
70:*10, 11* 139:*24, 25*
140:*23* 144:*19, 22, 23*
194:*2*
**acknowledgement**
34:*17*
**acquire** 73:*23* 74:*17*
80:*8* 136:*6* 138:*14*
143:*7, 15*
**acquired** 42:*10*
48:*17* 82:*2* 100:*23*
105:*3* 108:*3, 7* 112:*8,
23, 25* 113:*3, 18*
114:*1* 139:*1, 12*
140:*11, 14, 21* 141:*14,
20* 142:*1, 21* 143:*13*
149:*21* 150:*9* 154:*12*
185:*20* 190:*15*
**acquiring** 70:*4*
83:*25* 135:*4* 186:*11*
198:*15*
**acquisition** 74:*22*
75:*13, 25* 76:*5* 77:*16*
79:*10, 17* 80:*20*
81:*13, 17* 82:*6* 84:*7,
14, 22* 99:*23* 121:*11*
130:*10* 137:*6* 138:*3,
5, 9* 142:*16, 24* 149:*3*
150:*16* 151:*1, 2*
152:*7, 24* 153:*2, 9*
167:*11* 201:*19*

**acquisitions** 124:*8*
157:*25* 158:*4, 15, 18,
23* 160:*2, 12, 19, 22*
161:*18, 23* 177:*18*
**act** 20:*6, 8, 12* 30:*1*
**action** 62:*19* 116:*11*
122:*4* 180:*9, 12*
191:*12* 205:*16, 18*
**actions** 44:*3*
**active** 21:*20* 118:*5*
129:*4* 166:*5* 186:*15*
187:*3* 188:*10*
**actively** 126:*13, 16*
128:*23* 153:*1* 199:*5*
200:*1*
**actors** 189:*1*
**acts** 20:*5, 9, 10, 14*
**actual** 13:*9* 24:*5*
34:*6* 62:*2* 82:*17*
115:*15* 124:*12, 22*
156:*6* 157:*14* 190:*22*
195:*22*
**add** 105:*5* 133:*8*
**adding** 151:*7*
**addition** 17:*21* 63:*15*
183:*16*
**additional** 50:*3*
114:*15, 16* 143:*16*
157:*9* 162:*3*
**address** 10:*18* 22:*9*
180:*16* 189:*12* 202:*8,
24*
**addressed** 31:*19*
183:*7*
**adjustments** 156:*17*
**administrative** 165:*25*
**admissible** 117:*10*
**admitted** 71:*20*
97:*17* 199:*3, 17, 21*
200:*11, 15*
**advance** 34:*17*
**advanced** 196:*7*
**advantageous** 154:*9*
**adversarial** 124:*3*
**adversary** 97:*3, 7*
122:*2*
**advice** 92:*21* 93:*3,
13* 95:*25* 117:*4*
196:*10*

**advise** 9:*3* 163:*19*
**affect** 188:*21*
**Affiliate** 158:*16, 19,
20* 159:*9* 160:*3, 12,
18, 22* 161:*18*
**affiliated** 158:*24*
200:*9*
**affiliates** 157:*22*
160:*10*
**affiliation** 177:*17*
**affirmative** 96:*11*
**afford** 83:*11, 14*
139:*17*
**afield** 117:*13* 167:*21*
**afternoon** 7:*18*
85:*25* 86:*1*
**agent** 28:*13, 15* 29:*4*
30:*12* 84:*11* 91:*12*
185:*2*
**ago** 25:*21* 39:*12*
64:*6, 9, 12* 65:*25*
66:*8, 9, 18* 67:*22*
68:*9, 11, 25* 74:*11*
80:*18* 81:*12, 19*
151:*2* 178:*1* 197:*3*
**agree** 8:*19* 18:*12, 21*
44:*11* 50:*17* 95:*13,
16* 112:*13, 15* 182:*2*
198:*16*
**agreed** 75:*19* 108:*6*
110:*9* 112:*23* 113:*5,
19, 24*
**agreeing** 94:*14*
113:*9* 114:*11*
**agreement** 28:*13*
29:*4, 10* 30:*10* 84:*11*
91:*12* 102:*8* 103:*14,
23* 106:*1* 109:*5*
111:*22* 113:*13, 14*
115:*4, 5* 129:*20*
144:*14* 145:*11, 17, 23*
147:*5* 148:*4, 14*
155:*14, 16, 19* 156:*4,
7, 20* 157:*5, 14* 159:*8,
25* 161:*13* 163:*22*
170:*4, 17* 171:*6, 12*
172:*13* 173:*7* 174:*16*
175:*4* 201:*24, 25*
203:*7, 11, 20*

**agreements** 202:*14*
**agrees** 106:*21*
**ahead** 9:*24* 20:*20*
37:*23* 76:*12* 81:*4*
153:*19*
**Akers** 176:*12*
**A-k-e-r-s** 176:*13*
**Albert** 37:*20* 38:*5, 6*
39:*14* 79:*19*
**alerted** 137:*12, 14*
**allegation** 61:*13, 14*
62:*2* 71:*18* 72:*20*
125:*15, 18* 180:*19*
**allegations** 61:*22*
63:*12* 72:*18* 113:*15*
124:*20*
**alleged** 43:*19, 23*
44:*14* 61:*9* 72:*17*
**alleges** 61:*19* 63:*17,
19* 71:*14, 19*
**alleging** 61:*16* 71:*25*
72:*2, 8* 73:*13*
**allocate** 191:*22*
**allocated** 28:*3*
**allow** 11:*19* 25:*1*
**allowed** 8:*15* 11:*7,
16* 120:*14*
**alter** 63:*16* 180:*16,
22* 181:*1*
**amazing** 192:*3*
**ambiguous** 30:*6*
111:*23* 112:*18*
153:*11*
**amended** 62:*9, 16, 25*
63:*1, 8* 122:*3* 132:*20*
133:*22, 24* 134:*15*
**amendments** 52:*6*
**American** 33:*9*
**amount** 109:*23*
155:*5, 21* 156:*3*
160:*24* 161:*17, 24*
165:*25* 182:*23, 24*
187:*7* 193:*5* 196:*23*
**amounts** 109:*16, 18,
22* 166:*5, 7*
**amplify** 173:*2*
**ANA** 1:*3* 3:*18*
**analyzed** 137:*18*
**annoying** 119:*10*

**answer** 8:*23, 24* 14:*8,
16, 22* 20:*1, 4, 17, 19,
23, 24* 21:*2* 24:*8*
25:*17* 26:*7* 28:*11*
29:*14, 16* 30:*24*
37:*13* 39:*14* 41:*9, 16,
17* 42:*2, 14* 44:*8, 17,
19* 48:*12* 49:*10*
51:*22* 52:*21* 53:*3*
56:*17* 58:*4* 60:*6*
65:*23* 68:*21* 74:*3, 8*
75:*22* 76:*17* 77:*20,
22* 78:*14* 80:*12*
81:*24* 84:*24* 86:*12*
88:*6* 90:*10* 93:*6, 15,
16* 94:*13* 95:*19, 20,
22, 25* 96:*1* 98:*25*
99:*16, 25* 104:*23*
105:*8* 106:*7* 107:*5,
10, 25* 111:*19* 114:*25*
115:*19* 116:*13, 22*
117:*8, 14, 17* 119:*6*
120:*5, 9, 13, 16*
121:*11* 127:*25*
128:*16* 129:*11, 18, 25*
132:*5* 133:*14* 135:*10,
12, 14, 15, 16, 17*
136:*13* 137:*4, 8, 10*
138:*11* 139:*13, 14, 25*
140:*12, 19* 141:*5, 6*
153:*13* 156:*7* 158:*10*
160:*13* 162:*2, 4, 10*
164:*8* 165:*4* 166:*20*
167:*21* 170:*23*
172:*14, 20* 173:*16*
175:*3* 181:*10* 183:*18*
202:*5*
**answered** 21:*8* 42:*12*
64:*20* 95:*15* 96:*11*
129:*16* 183:*8* 193:*6*
**answering** 59:*8*
184:*22*
**answers** 68:*13* 93:*7*
137:*4*
**anticipate** 85:*3, 21*
154:*9*
**anybody** 10:*23* 11:*8*
49:*24* 50:*20* 65:*1*
88:*5, 8* 122:*14*
128:*10* 129:*7* 161:*9*

175:*1* 177:*16* 179:*22*
180:*1* 181:*3, 6*
182:*11, 16* 189:*3*
195:*16, 25*
**anymore** 139:*18*
**anyway** 203:*8*
**APA** 155:*3* 156:*22*
157:*18* 162:*11*
165:*23*
**apart** 52:*18, 23*
**apologize** 60:*12*
**appear** 17:*25* 181:*22*
199:*8, 13*
**appearance** 85:*2, 4*
88:*25* 97:*24*
**appearances** 6:*9*
**applicable** 18:*20*
53:*23* 54:*4*
**appointed** 115:*8*
**appraisal** 82:*1*
167:*15* 169:*19*
174:*19, 21, 23* 175:*2*
**appreciate** 55:*24*
97:*13* 104:*10* 142:*12*
**approach** 69:*10*
185:*18*
**approaching** 115:*14*
**appropriate** 7:*24*
76:*20* 118:*18*
**approval** 103:*11, 20*
155:*20* 160:*1* 161:*14*
185:*1, 3*
**approvals** 185:*12*
**approved** 102:*18*
118:*15, 25* 119:*9, 19*
120:*19* 121:*6* 122:*10*
164:*15* 191:*18*
198:*15*
**approves** 122:*17*
**approving** 145:*3*
154:*17*
**approximate** 26:*25*
41:*21, 22* 42:*13, 21*
43:*3* 55:*20* 139:*9*
140:*3*
**approximated** 68:*17,
18*
**approximately** 25:*10*
41:*7* 51:*24* 64:*6, 11*
65:*25* 66:*8, 9, 25*

67:*21* 68:*11, 25*
71:*21, 22* 72:*10, 25*
73:*5, 8, 14* 74:*11*
80:*20* 81:*12, 19*
131:*12* 138:*14*
140:*18* 141:*15*
142:*18* 149:*3, 21*
155:*5*
**approximation** 43:*4*
140:*9*
**area** 10:*20* 70:*22*
196:*19*
**areas** 9:*12* 14:*2* 77:*3*
**argued** 31:*19*
**argumentative** 64:*22*
75:*6* 162:*15*
**arguments** 54:*9*
**arms** 98:*23*
**arrangements** 100:*22*
104:*18*
**arrival** 191:*14*
**arrived** 170:*11* 171:*8*
**Aryeh** 32:*4*
**aside** 100:*23* 125:*11*
188:*1*
**asked** 19:*25* 20:*2*
21:*8* 24:*19* 27:*7*
37:*6* 49:*16* 50:*6, 7*
84:*16* 89:*13* 90:*3*
92:*25* 95:*23, 24* 96:*9,
10* 117:*24* 118:*3*
124:*23* 125:*14*
127:*18* 129:*15* 141:*3*
151:*10* 159:*21* 160:*8*
164:*16* 172:*14, 18*
178:*6* 181:*17* 185:*5*
**asking** 8:*6, 8* 9:*20,
22* 19:*18* 37:*9* 41:*20*
45:*21* 47:*11, 13*
50:*23* 53:*2* 59:*7*
69:*8* 75:*4* 77:*12, 14*
93:*2* 98:*16* 99:*2, 12*
103:*18, 24* 104:*1*
106:*16* 110:*8* 111:*20,
24* 112:*19* 116:*23*
128:*6, 19, 20* 130:*25*
132:*18* 139:*8* 140:*1,
2* 142:*14* 143:*3*
157:*2, 3, 10* 164:*6, 13*

asks  164:*16*

assert  90:7

asserted  120:*10*

assertion  53:*11*  88:*19*

assertions  53:*16, 17*

asset  28:*13*  29:4, *10*
30:*10*  84:*10*  118:*24*
144:*14*  148:*3*  155:*14*,
*19, 25*  159:*25*  170:3,
*8, 17*  171:6  174:*16*
186:*11*

assets  30:*11*  36:*17*
41:*12*  83:*21*  103:7
117:*1*  119:9, *19*
121:7  122:*10, 17*
123:*14*  124:*19*
125:*23*  126:*11, 18*
127:*22*  128:6, *25*
129:5  130:*10, 15*
131:*10*  134:3, 9
135:4, *24*  136:7, *24*
137:6, *13, 23*  138:3, *5,
10, 15*  147:6  167:*12*
178:*22*

assigned  23:3

assignment  80:*14*

Assistant  6:*14*
198:*25*

associate  80:*13*

ASSOCIATES  3:3
97:*17*  130:*23*

Association  33:*10*

assume  8:7  9:*1*
170:*1*  188:*18*

assumed  22:*13, 15,
20*  23:3, *11, 25*  24:*1,
14*  25:*10, 16*  122:*25*

assumes  25:*13*  54:6
89:9  167:*18*  169:*22*

assuming  27:*19*
50:*12, 21*

attached  56:*24*
57:*23*  83:3  145:7
148:*16*  191:*12*
200:*19*

attaching  56:*23*

attention  11:*22*
105:*22*  110:7  135:5,

25  136:*1*

attesting  100:*19*

attorney  10:*22*  15:8
16:7  25:*24*  30:*23*
38:*1, 4*  41:2  43:*18*
44:*18*  68:*25*  79:7
82:9, *11, 23*  83:*15*
85:6  88:*23*  91:*21*
92:5, 9, *18*  94:5
100:*19*  101:*19*
116:*25*  149:*14, 19, 24*
150:2, 5, 7  178:*10*
185:3  194:*19*  203:*19*
205:*17*

attorney-client  8:*18*
14:*15*  29:*12*  86:*15*
90:7, *14*  92:9, *19*
93:8  94:6  119:2, *23*
120:*10*  122:*19, 21*
123:*18*  132:5  135:7
163:*15*

attorneys  7:8  28:6
35:*19, 20, 21, 22*  36:*1,
2, 13, 23*  37:*1, 10, 11,
18*  38:*10*  39:8  40:9
42:*20*  53:*20*  91:*23*
97:*20, 21*  105:2
143:*24*  144:7  178:*25*
180:3, 5, 6  182:8, *17,
18, 19, 23*  192:*12*
200:*1, 8*

attributable  166:*16*

attribute  154:3

audio  172:2

authority  29:*23, 25*
30:*1, 3, 10, 15, 17*

authorization  132:3

authorized  91:*16*

available  69:*16*

Avenue  3:*11*

average  140:3

avoidance  122:4

aware  32:6  43:*21*
44:*1*  45:6, 9, *11*
52:*17*  60:*15, 18*
71:*24*  72:*4, 16, 19, 21*
73:*22, 24*  74:*24*  89:3
119:*16*  128:*11*
174:*25*  175:*1*  179:*13*

180:*8, 12, 21*  194:9
195:*20*  196:3

**< B >**

back  47:9  51:6  55:4
58:*23*  59:*11*  60:9
71:*12*  74:7, 8  79:6
85:9, *18, 22*  102:*20*
108:*12*  113:5, *20, 23*
117:*23*  119:*12*
147:*16*  156:*23*
157:*22, 23*  160:9
180:*10, 13*  196:2
197:*21*

backdrop  134:3, *10*

background  196:*18*
197:*17, 20*

badgering  147:*19*

balance  106:*24*

ball  188:*19, 20, 22*

band  150:*20*

bandwidth  138:*22*

bank  98:*22*  201:*23*
202:*1, 4, 19*

banking  202:8

BANKRUPTCY  1:*1*
77:8, *17*  97:*18*
115:*11, 12, 13, 15*
118:*20*  122:*16*  137:9
181:*13*

Bar  33:*10*  97:*17*
199:3, *20*

Barbara  3:*24*

base  141:*1*  177:7
183:*1*  185:*16*

based  18:*18*  21:*11,
13*  30:*21, 23*  31:5, *17*
53:*16, 17, 18, 19*
63:*17*  77:*14*  141:*23*
160:*13*  162:8  181:*12*
189:*14*  191:3  192:*13*

Basically  29:*19*  82:*20*

basis  8:*17*  23:*23*
25:5  26:*10*  28:6
37:2  49:6  53:*10*
65:4  88:*18*  115:*21*
150:*19*  166:9  170:*22*
173:4  197:*10*

bathroom  146:4

BBB  46:*12*  141:*23*

Bear  13:2, 3, *10*  17:5
21:*21*  33:*1*  45:4
46:3  51:7  86:*20*
130:*19*  167:*24*
168:*12*

becoming  147:*18*

bee  152:*10*

began  131:9

beginning  130:*1*

BEHALF  3:3, 9, *13,
21*  4:4  6:*13, 15, 17,
21*  19:*14*  21:5  26:2
29:*23*  30:*1, 20*  59:*20*
73:*18*  84:*14*  87:*16*
94:*10*  96:*16, 23*
106:4  107:2  114:6
115:9  119:*25*  121:4
146:*18*  155:*14*
168:*23*  169:*15*  170:7
177:*10*  199:*13*

belief  121:*3*  122:9
177:7

believe  21:*13, 16*
22:7  38:*19*  59:3
81:*20*  102:2  129:*15*
132:*11, 13*  137:*11*
140:5  150:*10*  156:*11*
158:9  177:6  179:*16*
186:3  190:*12*  201:4

believed  68:4

believes  63:*17*

Ben  38:*13*  39:3
40:7  80:2

beneath  51:4

benefit  108:*21*

best  18:*18*  56:*1*
153:*21*  165:*19*  193:7,
9  195:*18*

Better  45:7, *10, 15*
46:6, 8, *21*  47:*1, 19,
21*  50:*17, 24*  51:9
106:*19*  127:*25*  170:9
187:6  191:*14*  193:*21,
23, 25*  194:*15*

Beverly  3:6

Bianca  175:*25*

bid  18:*17, 18*

big  163:*20*  191:*21*
195:*23*

**bigger** 187:*9* 188:*23*
**binding** 155:*17* 163:*1*
**bio** 17:*23*
**birds-eye** 153:*14, 25*
**birth** 202:*24*
**bit** 67:*10* 70:*25*
85:*14* 114:*8, 22*
**blank** 147:*9*
**block** 88:*2* 97:*20*
**blood** 205:*16*
**board** 68:*15* 70:*13*
138:*21*
**boots** 81:*16*
**B-o-r-e** 37:*23*
**Borelli** 37:*20, 21, 25*
39:*10* 79:*16*
**B-o-r-e-l-l-i** 37:*22*
**borrower** 98:*22*
**bottom** 61:*6* 100:*10,
14* 147:*10* 196:*9*
**bought** 197:*6*
**bound** 162:*18*
**Box** 3:*6*
**branch** 22:*6, 7*
**breach** 105:*25*
**break** 11:*17, 18*
23:*22* 24:*11* 54:*14*
55:*2* 56:*4* 86:*6*
93:*20* 94:*2, 24* 95:*2,
6, 10* 123:*20* 124:*24*
146:*4* 148:*21* 192:*21*
**breakdown** 27:*20*
**breaking** 67:*9* 172:*3*
**briefs** 150:*23*
**bring** 10:*1* 11:*22*
82:*15, 17*
**brings** 142:*25* 167:*6,
7*
**broad** 53:*3, 4* 92:*14,
25* 126:*22*
**Broadway** 10:*8* 22:*4,
9*
**broke** 64:*9* 74:*2*
**broker's** 198:*10*
**Brooklyn** 10:*19*
**brought** 105:*22*
152:*11, 20*
**bucket** 55:*14* 194:*4*
195:*8*

**bunch** 31:*18* 61:*7*
**burden** 78:*18*
**Bureau** 43:*23* 44:*22*
45:*7, 10, 16* 46:*6, 9,
22* 47:*2, 19, 21* 50:*18*
51:*9* 193:*22* 194:*1,
15*
**Bureau's** 50:*24*
193:*23*
**business** 19:*8, 12, 16,
19* 20:*3, 11* 21:*10, 15*
22:*9* 30:*11* 36:*19*
43:*17* 45:*7, 10, 15*
46:*6, 9, 22* 47:*2, 19,
21* 50:*17, 24* 51:*9*
53:*6* 66:*24* 67:*21*
70:*5* 75:*23* 81:*2*
82:*16* 100:*22* 104:*17*
128:*7, 10, 15* 129:*10,
14* 134:*23* 140:*22*
141:*20* 152:*18* 160:*4*
161:*3, 7* 163:*18, 23*
164:*11* 190:*7* 193:*21,
23* 194:*1, 15* 200:*21*
**busy** 9:*15* 70:*23*
184:*22*
**buy** 133:*11* 136:*24*
**buyer** 103:*6* 116:*25*
124:*12, 22* 145:*24*
160:*16* 166:*1, 5, 7*
174:*11*
**Buyer's** 158:*16, 18*
160:*2, 15*
**buying** 178:*11*
**buzz** 33:*18*

**< C >**
**calculated** 117:*10*
166:*8*
**calendar** 100:*17*
101:*8, 25* 103:*12*
104:*5, 25* 106:*15, 22*
**CALIFORNIA** 1:*2*
2:*11* 3:*6, 18, 24* 6:*6*
94:*16, 22* 95:*11*
**call** 15:*3* 59:*11*
64:*18* 66:*8, 9* 68:*3*
69:*1, 7, 9, 12, 17, 22,
23* 70:*5* 75:*19* 77:*1*
81:*5, 8, 11, 18* 93:*23*

101:*8* 159:*1* 178:*4, 5,
11* 192:*18* 200:*25*
**call-drop** 183:*21, 23*
**called** 6:*24* 56:*23*
60:*10* 68:*4* 69:*19*
70:*1, 8* 178:*12*
194:*12* 200:*25*
**calling** 192:*8*
**calls** 14:*7* 30:*5, 8*
31:*18* 54:*8* 86:*14*
116:*19* 119:*1, 21*
127:*2, 5* 132:*4*
153:*12* 161:*14* 183:*7,
15, 19* 184:*3, 9, 13, 23*
185:*9* 192:*13*
**Campbell** 38:*12, 24*
40:*4, 5* 79:*25*
**capacity** 16:*5* 51:*10*
92:*18* 137:*16* 138:*21*
177:*9* 182:*21, 22*
185:*25* 186:*10* 198:*6*
**capital** 98:*12, 16*
147:*11* 159:*5, 11*
181:*8*
**capitalization** 159:*14*
**capitalize** 125:*1*
**CAPPELLO** 3:*21*
**caption** 61:*3* 121:*23*
154:*18*
**Cara** 1:*24* 2:*8* 6:*6*
205:*2* 206:*8*
**care** 52:*2* 69:*3* 83:*7*
164:*15* 194:*8* 202:*16,
17*
**careful** 146:*20*
**carefully** 153:*17*
**Carolina** 199:*24*
**Case** 1:*6* 7:*9* 30:*16*
84:*19* 97:*24* 124:*17*
137:*19* 139:*22*
142:*10* 154:*18*
166:*18* 181:*2, 14*
191:*5, 9* 193:*11, 19*
**caseload** 9:*11, 15*
**cases** 187:*6* 193:*14*
**cash** 161:*22, 24*
163:*7*
**catastrophic** 180:*22*
188:*2*
**catching** 60:*12*

**categories** 13:*21*
14:*1* 75:*5* 76:*24*
77:*23* 78:*1, 14* 79:*2*
**category** 23:*2* 75:*16*
**causes** 62:*19*
**caution** 62:*4*
**caveats** 140:*6*
**Celentino** 4:*22*
**Center** 4:*6*
**CENTRAL** 1:*2*
31:*12* 97:*17*
**certain** 8:*10, 20*
10:*14* 16:*12, 13* 39:*6*
42:*19* 69:*21* 71:*6*
73:*24* 77:*2* 81:*5*
103:*19, 21* 127:*23*
153:*20, 21* 157:*14*
172:*25* 182:*23*
189:*14* 191:*11*
**certainly** 10:*19, 20*
16:*24* 17:*13* 33:*24*
79:*9* 88:*20* 90:*14*
96:*14* 104:*9* 117:*3*
119:*24* 133:*9* 165:*21*
194:*21* 202:*8*
**certainty** 22:*8*
**certificate** 23:*11*
24:*4, 6* 57:*1* 204:*25*
**Certified** 2:*10* 7:*1*
205:*2*
**certify** 205:*4, 11, 15*
**chance** 9:*6*
**changed** 46:*14* 47:*23*
105:*24*
**changes** 18:*2* 156:*24*
204:*9, 11*
**Chapter** 1:*5* 4:*4*
6:*21* 56:*13*
**characterization**
40:*13, 17* 128:*22*
140:*25*
**charge** 25:*25* 26:*5*
83:*22, 23*
**checking** 190:*11*
**Chhor** 176:*25*
**C-h-h-o-r** 176:*25*
**chief** 21:*22, 23* 22:*1*
**Chirstopher** 4:*22*
**choose** 79:*1* 201:*18*

chose 79:1 171:4
Christopher 131:4
circuit 31:22
circumstances 180:1
City 4:6
civil 180:12
civility 31:11
claim 73:6
claims 87:2 116:3
121:9, 11, 19 122:2, 6
180:8
clarification 22:25
142:13
clarify 24:19 36:4, 6
67:18 124:10 200:4
class 115:11
classify 36:10
clause 103:19 108:2
111:2, 3 112:12, 22
122:1
clean 177:23
clear 11:12 20:4
23:3 31:2 112:1
187:20 197:11
clearly 100:10
156:22 163:5 165:12
169:9
CLG 6:11 18:18
28:21 30:17 33:8
34:1 35:8 41:4, 13
42:10, 11 45:17
51:11, 15 52:14, 17,
22 53:12 54:2 55:11,
13, 18 56:5 57:1, 5
58:20, 21 59:4 61:17,
24 67:2, 5, 12, 20, 23,
25 68:1, 2, 8, 15, 19
70:1, 3, 4, 14 71:22
72:3, 8, 10, 13, 22
73:1, 5, 10, 18, 20
74:17, 22 75:12 76:4
77:3, 7, 8, 15 78:23
79:8 81:21, 25 82:9,
24 83:9 84:10, 14, 22
86:7, 11 97:15, 20
98:10 100:6, 18, 23
101:20 105:2, 3
106:4, 13, 14, 21, 23
107:2, 11, 18, 23
108:3, 4, 5, 6, 7, 8, 20

109:1, 6, 7, 13, 15
111:17 112:8, 12, 23,
24 113:3, 4, 9, 18, 24,
25 114:6, 11, 14, 17
116:1, 4, 13, 17 118:9,
14, 23, 25 119:9, 17,
19, 25 120:23 121:5,
7, 10 122:10, 12, 17
125:16 126:6 128:24
129:2 130:10 132:22
133:5, 11, 22 134:4, 5,
11, 17, 22 136:24
137:12 138:13, 25
139:10, 20, 21 140:3,
11, 13, 20, 21 141:14,
19 142:18 143:7, 9
144:7 149:13, 19, 21
150:4, 8 151:17, 21
152:4, 9 153:1
155:10, 13, 14, 25
156:9 157:5, 22
158:4, 24 159:6, 12,
14 160:5, 9, 16, 18, 21
162:9 166:2 167:10
169:7, 21 170:8
171:8 172:11 175:4,
10, 14, 19 177:12, 16,
20, 21 178:14, 15
179:11, 15, 24 180:2
181:6, 8, 18 182:5, 25
183:4, 6, 7, 19 184:13
186:10 188:24
190:12, 15 195:21, 23
196:8, 14 200:20
201:2, 14, 21, 22, 25
202:4 203:19
CLG's 18:19 53:6,
22 57:25 60:1, 6
75:23, 25 76:23
79:13 80:19 81:17
82:6, 19 99:22
100:17, 21 103:12, 21
104:6, 25 107:18
114:18, 20 116:5
122:4 128:7, 9, 14
129:1, 9, 14 131:9
141:11 149:3 150:16
160:12 161:18
click 23:11 34:1
clicked 35:8, 9

client 42:9 61:10, 17
63:15 71:15 82:6
83:25 91:7 94:11, 17
109:7 111:22 112:8
113:18 124:17
139:18, 20, 22, 23
141:1 142:10, 11
156:19 162:9 163:21
167:17, 25 183:1, 18
184:3 185:16, 18
187:23 188:2, 10, 13,
18, 19, 21, 22 191:7
193:11 195:13, 21
201:8, 15, 22, 24
202:3, 8 203:5, 7, 9,
15, 21
clients 18:11 41:4,
13 42:5, 10 45:17, 18
53:15 55:11, 18 56:6
57:6 58:2 60:2
70:10, 12, 17 82:12
83:3, 6 84:2 100:24
105:3 107:18, 23
108:4, 5, 7, 8, 21
112:11, 12, 23, 25
113:4 114:14, 17
124:15 141:24
163:19 179:12, 24
180:7, 9 183:4, 6, 11,
12 184:15, 23 185:15,
25 186:16 187:16, 22
189:10 194:17 195:9
197:6 198:14 199:13
201:17, 20 203:21
client's 83:8 94:11
201:23 202:1
close 13:11 46:17
49:20 143:21
closed 47:10, 12, 14
187:12 193:24
closer 140:6 186:22
closing 82:5 166:6
197:9
Club 201:12
co-defendants 177:5
Cohen 176:2
Cohens 176:4
coincidence 80:18, 21,
22, 25

cold 69:10
colleagues 81:5
collected 166:5, 7
collection 83:17
collectively 166:9
combat 197:24
come 23:14 55:4
64:15, 22 71:1 90:18
118:2 135:24 138:3
139:15 157:22, 23
164:1, 14 187:11
191:24 202:20
comes 189:17
comfortable 203:14
comforted 148:10
coming 70:13 83:4
123:21, 22 125:9, 10
126:3, 4 138:21
160:9 197:13
commenced 188:16,
17
commencement 205:8
commencing 205:13
comment 24:3 31:25
132:1 146:12
comments 54:9 62:6
Commission 44:25
45:2
commit 40:20 78:23
130:16 194:22
COMMITTEE 3:9
6:13 7:8 9:12 52:4
53:7 56:18, 20 75:1
76:22 78:23 79:3, 6
124:5, 21 165:21
171:2 196:22 197:19
common 99:8, 17, 20
communicate 11:8,
18 184:15
communicated 107:4
122:22
communicating 11:23
communication 90:11
92:8, 20
communications
11:20 12:8 14:21
89:13 105:19 122:20,
25 163:18 164:8
company 19:14 23:7
24:7 25:4 29:9, 24

30:*1, 2, 9, 14, 20* 31:*3*
42:*6* 49:*18, 20* 52:*3,*
*8* 73:*22* 74:*15, 24*
79:*11* 84:*12* 96:*17*
98:*7, 21* 101:*7*
111:*17* 159:*9, 10*
163:*1* 170:*6*
**competency** 170:*16*
**competently** 165:*4*
186:*6*
**complainant** 50:*5*
**complains** 49:*25*
**complaint** 48:*2, 5, 7,*
*11, 13, 14, 22, 25* 49:*1,*
*16* 50:*2, 20* 51:*4, 5*
60:*20, 23* 61:*4, 9, 18*
62:*9, 11, 14, 17, 18, 25*
63:*1, 8, 10* 71:*13*
72:*4, 15, 17, 19, 20*
86:*7, 12* 117:*17*
118:*11* 125:*19*
133:*22, 24* 134:*7, 15*
136:*2, 5, 16, 22*
137:*18, 20* 138:*7*
195:*10, 14, 21* 198:*6*
**complaints** 43:*18, 23*
44:*3, 12* 45:*18* 47:*8,*
*10, 14, 18, 22, 24* 48:*1*
49:*10* 50:*19, 25* 55:*8,*
*10, 25* 56:*2* 75:*14*
141:*23* 185:*17*
193:*23, 24* 195:*6*
**completely** 9:*18*
**complex** 87:*9*
**compliance** 18:*20*
53:*23* 54:*4* 105:*21*
106:*13* 114:*18, 20*
116:*4*
**compliant** 18:*11*
53:*14* 56:*5* 57:*6*
58:*1* 60:*1* 82:*1*
**comply** 113:*10*
**compound** 26:*6, 13*
**compounded** 84:*16*
**compromise** 179:*23,*
*25*
**conceal** 181:*7, 9*
**conceded** 92:*25*
148:*5*

**conceived** 136:*6*
137:*12* 169:*5, 6*
**concern** 37:*2* 102:*22*
105:*20* 202:*7*
**concerning** 11:*8*
12:*15, 23* 13:*21*
14:*12* 41:*11, 13*
43:*19, 23* 46:*9* 50:*18,*
*19* 51:*1, 9* 58:*20*
63:*13* 74:*25* 75:*25*
76:*5, 25* 77:*9, 16*
79:*12, 17* 80:*19*
81:*13* 88:*9* 89:*5, 15*
90:*8, 12* 92:*2* 93:*4,*
*14* 96:*7* 119:*7*
122:*15* 129:*14* 130:*9,*
*14* 131:*9* 134:*23*
163:*3* 175:*10*
**concerns** 198:*13*
**conclude** 121:*6*
122:*12*
**conclusion** 26:*11*
30:*5, 8* 31:*18, 23*
41:*3*
**condition** 83:*19*
**conditions** 92:*2, 22*
93:*4, 11, 14* 96:*8*
157:*6* 163:*4*
**conduct** 20:*2*
**Conducted** 1:*16* 2:*1*
19:*16* 21:*15* 167:*16*
**confer** 94:*8*
**conference** 13:*25*
14:*1* 85:*7, 10* 127:*2,*
*5*
**confident** 83:*5*
120:*21*
**confidential** 161:*6*
163:*18*
**confused** 31:*9* 57:*17*
68:*7* 137:*4*
**confusing** 156:*19*
**Conjecture** 153:*12*
**connect** 64:*15*
**connected** 148:*6, 9*
**connection** 84:*19*
127:*23* 130:*7* 137:*1*
138:*15*
**consent** 71:*15* 132:*3*

**consequences** 180:*23*
188:*2*
**consider** 36:*3* 137:*5*
**consideration** 18:*19*
81:*21* 167:*11* 178:*21*
**considered** 20:*10*
155:*17*
**consistent** 130:*13*
**constant** 29:*18*
**constitutional** 94:*20*
**constructed** 34:*15*
**consult** 52:*10* 95:*11,*
*12, 13*
**consultation** 14:*25*
117:*4*
**CONSUMER** 3:*3*
10:*9, 12, 16* 13:*17, 20*
14:*12* 15:*6, 9, 12, 15,*
*23* 16:*3, 19, 22* 17:*21,*
*24* 18:*4, 5, 9, 10, 25*
19:*7, 15, 19* 20:*22*
21:*5, 23, 25* 22:*11, 14*
23:*15* 24:*2* 25:*9, 21,*
*25* 26:*23* 27:*2* 28:*10,*
*13* 32:*2, 7, 10, 13, 23*
34:*7* 35:*15, 18, 23*
36:*13, 16, 18, 19, 24*
37:*8, 11, 19* 38:*1, 11*
39:*11* 40:*9* 41:*4, 5,*
*11, 13, 14* 42:*4, 10, 11,*
*16, 18* 43:*6, 16, 19, 22,*
*24* 44:*14, 22* 45:*6, 9*
46:*10* 47:*8, 18* 48:*16,*
*19, 21* 49:*18* 50:*18,*
*24* 51:*10* 53:*13*
55:*18* 56:*6* 57:*6*
59:*19* 60:*2, 17* 61:*4,*
*11* 62:*19* 63:*2, 3, 13*
66:*21* 67:*1* 70:*10, 12,*
*17, 18* 79:*8* 82:*10, 24*
87:*4, 16, 20* 88:*8, 24*
89:*14* 91:*12, 16, 22*
92:*4, 6* 96:*21, 23*
97:*2, 6* 98:*6, 20* 99:*3,*
*18* 121:*21* 132:*9, 11*
145:*23* 146:*18* 169:*2,*
*14* 171:*24* 185:*18*
187:*24* 199:*16, 25*
200:*7* 202:*14, 23*
203:*10, 11, 12*

**consumerlegalgroup.co**
**m** 33:*20*
**consumers** 120:*20*
200:*1, 9*
**consumer's** 201:*15*
**cont** 4:*2*
**contact** 65:*9, 12, 15*
67:*24* 178:*6* 183:*7*
**contacted** 68:*10*
74:*11* 80:*18*
**contacts** 194:*14*
**contains** 100:*5* 171:*6*
**contemplated** 130:*10*
**contemplating** 69:*25*
70:*4*
**contemplation** 88:*22*
**contended** 105:*25*
**contending** 111:*22*
112:*17*
**contends** 108:*4*
112:*23*
**content** 33:*14, 22*
34:*16*
**contention** 180:*15*
**context** 51:*4* 88:*21*
90:*22*
**continue** 9:*10* 30:*24*
79:*14* 118:*23* 119:*17*
174:*8*
**continued** 102:*9*
**continues** 148:*11*
198:*5*
**contract** 50:*8* 164:*4*
173:*21*
**contractors** 28:*9, 20*
**contracts** 166:*6, 8*
**control** 121:*15* 165:*6*
**conversation** 64:*1, 11*
92:*17* 96:*12, 15*
132:*14* 138:*8, 19*
177:*25*
**conversations** 12:*18*
63:*20* 81:*12* 92:*1, 23,*
*24* 95:*23, 24* 96:*7, 13*
138:*23, 24* 143:*23*
169:*10*
**Conversely** 188:*13*
**cooperate** 78:*18*
120:*6*
**cooperation** 103:*6*

Exhibit 6 0231 Page: 7

coordinate 69:7, *12,
13*

copies 202:*13*

copy 204:*18*

corner 147:7 148:*12*
158:*13*

corporate 20:*24*
24:*18* 30:*10* 76:*23*
83:*13* 88:*16, 17*
129:*3* 158:*22*

Corporation 3:*5*
19:*9, 11* 20:*2, 5, 6, 12*
21:*20* 28:*17* 29:*24*
54:*1* 57:*1* 58:*20, 22*

Corporations 18:*24*
83:*17*

corporation's 20:*11*
45:*22*

correct 12:*25* 13:*18*
17:*11, 17, 18* 19:*5, 12*
21:*6* 23:*21* 29:*7*
32:*17* 33:*5, 7* 39:*8,
19* 41:*23* 42:*15*
44:*20, 24* 47:*8, 10*
48:*17, 22* 50:*19* 51:*1,
15, 16* 52:*14* 56:*15,
21* 57:*10, 15* 58:*20*
62:*12, 22* 63:*10*
66:*19, 22, 23* 71:*9*
73:*2, 5, 8, 9* 74:*12, 19*
81:*20* 91:*13, 17, 24*
96:*8, 20, 24* 97:*4*
98:*23* 103:*13* 113:*6,
11, 20* 116:*1* 123:*2*
126:*7, 11* 131:*22*
133:*23* 134:*4, 11, 13*
136:*16* 138:*16* 141:*5*
142:*2, 19, 21* 143:*5, 9,
13, 17, 20* 144:*8*
149:*4, 19* 150:*9, 13*
151:*3* 152:*4, 15, 21*
156:*13* 160:*16, 17, 18,
22* 161:*15, 16, 18, 19*
162:*11* 166:*2* 174:*22*
190:*1* 197:*14* 200:*3*
201:*16* 202:*19*

correctly 49:*22*
50:*15* 101:*1* 113:*1*
155:*7* 166:*11*

correspond 184:*15*

counsel 6:*8* 8:*10, 16,
19* 11:*12* 12:*7, 13, 15,
16, 23* 14:*25* 22:*25*
27:*14* 28:*21* 29:*19*
31:*7* 34:*14* 36:*25*
42:*17, 24* 43:*6, 13, 14*
44:*2* 45:*13* 46:*17, 21*
49:*4* 50:*20* 52:*7, 10*
54:*9* 64:*8, 13* 65:*3*
66:*13, 14, 25* 67:*13,
24* 68:*1, 10, 16, 21*
69:*18, 20* 70:*9* 74:*12*
76:*14* 80:*19* 86:*17*
89:*22* 90:*18* 94:*9*
95:*11, 12, 13* 96:*19,
21* 97:*1, 7* 102:*6*
117:*24* 118:*3* 120:*9*
124:*14* 127:*12* 128:*8,
14* 129:*1, 9* 130:*9*
131:*21* 144:*19* 146:*7*
147:*18* 152:*1* 156:*14*
158:*25* 162:*15, 16*
168:*2* 169:*14* 178:*2*
191:*10* 193:*21* 200:*5,
8, 9* 201:*18*

counsels 192:*12*

counties 180:*13*

counting 36:*8*

couple 10:*14* 27:*12*
68:*19* 72:*24, 25* 73:*9,
15* 189:*24* 198:*2, 21,
22*

coupled 140:*6*

course 10:*24* 11:*11*
34:*15* 146:*5* 192:*15*
204:*8*

COURT 1:*1* 7:*19*
8:*1* 11:*22* 54:*13*
74:*6* 85:*2, 3, 6* 86:*25*
90:*13* 93:*12* 97:*18*
103:*10* 115:*8* 118:*16,
25* 119:*7, 9, 18, 20*
120:*19* 121:*6* 122:*11,
16* 155:*20* 156:*22*
157:*4, 11* 159:*5*
160:*1, 2* 161:*14*
170:*13* 190:*11, 25*
191:*18* 192:*9* 198:*15*
200:*13, 14, 16* 204:*18*

courthouses 192:*8*

courts 199:*8, 9, 10*

Cousineau 3:*23* 6:*17*
204:*4*

cover 42:*20* 85:*9*
102:*22* 154:*22*

covered 87:*4* 116:*9*

covering 140:*7*

cracks 83:*6* 151:*17*

create 66:*14* 67:*3, 12*

created 78:*24* 189:*18*

creating 68:*21*

credibility 178:*9*

creditor 193:*12*

CREDITORS 3:*9, 21*
6:*13, 18* 7:*8* 52:*4*
53:*7* 56:*18*

critical 170:*4*

cross 179:*4, 7*

crunch 78:*22, 23, 24*

CSR 1:*24* 6:*6* 206:*9*

culminated 88:*9*
89:*6, 16*

cumbersome 185:*7*

current 143:*10, 25*
144:*2* 179:*11* 180:*7*
181:*13* 186:*10*
189:*25* 190:*1*

currently 139:*1*

customer 47:*17*
98:*22* 138:*14, 25*
139:*10, 11* 140:*10, 13*
141:*15* 143:*12, 16*
149:*13* 151:*6* 162:*9*
178:*15* 183:*11, 18*
184:*17* 185:*2, 4, 9, 12,
14* 194:*24*

customers 50:*19, 25*
51:*2*

cut 9:*7* 33:*10*
100:*10*

< D >

d/b/a 23:*21* 24:*7*

daily 150:*19*

damage 142:*9*

Dan 97:*15*

Daniel 175:*21*

Danitza 38:*12, 24, 25*

40:*4, 5* 79:*25*

D-a-n-i-t-z-a 39:*1*

Danny 177:*9*

date 19:*3, 4* 25:*11*
39:*16* 54:*1* 58:*19, 20,
21, 25* 60:*19* 62:*12,
21* 71:*20* 72:*23*
87:*23* 102:*10* 111:*16*
130:*11* 131:*1* 202:*24*

dated 58:*18* 131:*17*
168:*16*

dates 23:*7* 24:*16*
130:*17*

David 3:*23* 6:*17*

day 9:*2* 16:*2* 17:*2*
27:*9* 69:*16, 21* 86:*25*
87:*24* 97:*4* 105:*13*
106:*7* 136:*17, 18, 20*
144:*25* 160:*5, 12*
183:*19* 184:*22, 24*
206:*1*

days 16:*12, 13, 24, 25*
17:*1* 25:*11* 100:*17*
101:*8, 25* 103:*12, 19,
21* 104:*5, 25* 106:*15,
22* 133:*21* 134:*1*
189:*24*

day-to-day 115:*21*

dcousineau@cappellon
oel.com 3:*25*

de 20:*5* 105:*16*

dead 191:*14*

deal 73:*25* 74:*19, 20*
137:*1, 24* 150:*24*
161:*4* 163:*4* 187:*8*
188:*8* 191:*23, 24*

dealing 151:*25*

dealings 77:*7* 111:*15*

deals 196:*20*

dealt 74:*21* 81:*14*
194:*6* 197:*1*

DEBT 3:*21* 6:*18*
18:*5, 10* 41:*5, 14*
42:*11, 18* 43:*6* 53:*13*
55:*19* 56:*6* 57:*6*
60:*2* 70:*18* 79:*8*
82:*10, 24* 188:*14, 15*
193:*12* 200:*25*

Debtor 1:*7* 36:*18*
42:*10* 61:*10, 16* 65:*7,

*24* 66:7 72:8 113:6
115:9 189:25 190:*1*
**debtor's** 41:*12* 103:7
107:*19, 21* 108:22, 24
117:*1* 118:24 119:9,
*19* 121:7 122:*10, 17*
123:*14* 124:*19*
125:23 126:*11, 18*
128:*25* 129:5 130:*10,
15* 131:*10, 21* 134:3,
*9* 137:6 138:*15*
147:6 178:22 190:5
**debts** 187:*23, 24*
188:*3, 7, 9, 10, 11*
**decide** 185:2
**decision** 91:9 180:3
**declaration** 18:*16*
35:*17* 36:*2, 22* 39:7
51:*13* 52:*12, 16, 19*
53:*12* 57:2 100:*18*
101:*3, 7, 11, 14, 24*
102:*5, 11, 20* 144:*17*
145:*8* 200:*19*
**declarations** 91:*20*
102:7 144:7 150:3
170:6
**decrease** 187:*1*
**deduction** 165:25
**default** 137:7 191:*4,
8* 193:*13, 16, 18*
**defendant** 61:5
**defendants** 61:7
87:4 116:*10*
**defending** 83:*16*
137:*1*
**defense** 83:*18*
193:*17* 197:25
**defenses** 122:4, 7
**deficiency** 114:7
**define** 26:4
**defined** 108:5, *8*
112:*11* 155:3 166:6,
*8*
**Definitely** 202:*10*
**definition** 107:22
**delay** 26:*11*
**delayed** 26:*10* 85:6,
*17*
**deliver** 116:6

**deliverable** 106:5
107:*3, 8*
**deliverables** 100:6
103:*10* 105:25
**delivered** 107:3
**dense** 108:*17* 110:9
166:22
**Department** 18:*24*
19:3 21:*18* 22:*17, 21*
23:*13, 24* 24:*1* 53:25
58:*19*
**depends** 17:2
**depicted** 34:2
**depo** 9:*10*
**DEPONENT** 3:3
6:*11* 105:*17* 118:7
**deposed** 111:*24*
124:*18*
**deposit** 154:25 155:9,
*15, 21* 156:4 157:*15,
16, 17* 160:5, *15*
161:*15* 166:*15*
**Deposition** 1:*15* 2:*1*
7:*12* 9:*18, 21* 10:24
11:7, *9, 20* 12:5, *7, 10,
15, 17* 13:6 24:*11*
26:*12* 37:*8* 41:*3*
45:25 46:*24* 49:*13*
62:*1* 75:*16, 20* 77:20,
*25* 78:*10* 84:*12*
85:*12* 94:7, *17* 102:*8*
103:5 119:*14* 124:*4*
130:8 157:7 171:*20*
204:7 205:5, *6, 8, 9,
11*
**depositions** 7:*16*
**deposits** 167:*4, 9*
**derived** 155:*1*
**described** 63:*16*
116:9
**DESCRIPTION** 5:*11*
**designate** 74:25
171:*1*
**designated** 8:*20, 22*
9:5, *13* 13:20 14:2, 5,
*10, 20, 25* 21:4 26:*1*
41:*10* 76:15, *17, 21*
78:9 84:*12* 155:25
159:*13* 169:*15* 170:6

**designating** 78:25
**despite** 151:5
**detailed** 106:*14*
**determine** 77:*11*
**determined** 18:*17*
**development** 154:4
**devoted** 16:*21*
**Diab** 63:*17, 18, 20*
64:*3, 11, 16, 19, 25*
65:*15, 21* 66:5, *9*
67:24 68:*10, 24*
69:23 70:*1, 8* 71:20
74:*11* 80:*18* 81:*11,
18* 100:23 104:*18*
116:*8* 125:*10* 175:16
177:9, *25* 178:*16, 20*
179:*10, 14, 19* 181:2,
*7, 22* 182:5 196:3
**Diab's** 69:*4* 181:*17*
**died** 81:7
**difference** 16:9, *11*
82:*12, 15* 166:*14*
168:*8* 174:2, *14, 20*
**different** 13:8 61:*19*
71:5 100:*15* 105:23
134:25 135:*16*
147:*10* 149:7 192:6,
*7, 17* 196:3
**differentiate** 71:3
**difficulties** 13:4
**diligence** 128:*1, 6*
153:*16, 18*
**DINSMORE** 4:4
6:*20* 131:5
**DIP** 159:*20, 21*
161:*3, 5*
**direct** 179:7
**directed** 131:4
**direction** 81:*10*
159:*19* 179:*11, 18, 23*
181:*7, 12* 182:*10, 17,
19*
**directly** 52:*11*
101:*18* 104:22 107:*5,
12* 122:23 127:*11*
200:7
**director** 15:20 29:5,
*9* 87:20
**directors** 32:*10*
99:*20* 175:*15* 177:3

**disagree** 75:*8* 95:*10*
108:23 167:23
**discharged** 198:3
**discharges** 139:20
**disclose** 45:*19* 94:*1*
**disclosed** 45:*16*
100:*24* 104:*12, 15, 20*
159:7
**disclosing** 95:6
**disclosure** 92:*19*
**discovery** 103:6
117:*10*
**discuss** 88:*12* 132:9
169:*2* 171:*23* 202:*11*
**discussed** 12:*19* 89:5
93:*10* 138:4, *6*
**discussing** 110:*1*
**discussions** 29:*15, 19*
88:7 90:*8* 126:24
135:22
**dispatch** 192:*11*
**dispute** 60:25 140:25
**disputing** 158:*17*
**disregard** 203:6
**distinction** 15:25
**distinguishing** 82:*21*
**DISTRICT** 1:*2*
31:*12* 97:*18*
**DIVISION** 1:*3*
18:*24* 197:24
**document** 46:5
54:*12* 59:*1, 11, 13*
60:9 63:7, *9* 88:*21*
110:*1* 127:*14* 132:20
144:25 145:*4, 10, 13,
19* 148:13 155:22
156:*12, 21* 157:*1, 3, 4*
162:*17, 18, 19, 25*
163:*11, 15, 24* 164:2,
*15, 19* 165:6, *15*
166:20 170:*4* 172:*18,
21, 25* 173:2, *14*
189:*16, 19*
**documentation** 42:*4*
57:4
**documents** 12:9
53:*17, 19* 54:2, 5
55:2 56:23 57:22, 24
59:25 65:*14* 82:5
119:*18* 120:3 127:*11,*

23  128:*9*, *13*  129:*8*,
*13*  130:*4*, *5*
**Doe**  178:*12*, *13*
**doing**  31:*12*  43:*17*
70:*23*, *25*  71:*5*  91:*2*
105:*14*  110:*7*  126:*13*
152:*16*  200:*17*
**dollar**  196:*23*
**dollars**  160:*20*, *23*
197:*9*
**door**  150:*7*
**doubled**  141:*19*, *22*
142:*23*  143:*4*  171:*15*
**doubling**  142:*6*, *25*
143:*8*, *19*, *21*  149:*12*
151:*5*
**downloaded**  24:*5*
**draft**  147:*1*, *3*, *19*
151:*10*  163:*15*
**drafted**  129:*20*  201:*5*
**drafting**  114:*8*
**dragged**  45:*15*
**dreams**  83:*14*
**driver's**  198:*11*
**drives**  170:*4*
**drop**  55:*14*, *15*
188:*19*  194:*3*  195:*7*
**dropping**  188:*20*, *21*
**due**  128:*1*, *5*  153:*16*,
*18*  191:*8*
**duly**  6:*24*  205:*7*
**dump**  28:*3*
**duties**  16:*4*  67:*25*
73:*20*
**duty**  74:*24*  78:*12*
198:*5*, *14*
**dwindle**  70:*24*

**< E >**
**Eadie**  176:*23*
**E-a-d-i-e**  176:*23*
**earlier**  17:*20*  91:*19*
120:*1*  125:*14*  126:*9*
129:*21*  149:*2*, *8*
153:*9*, *25*  200:*18*
201:*4*
**early**  99:*23*  140:*11*,
*14*, *21*  141:*4*, *21*
149:*4*  152:*8*, *25*
180:*18*

**earned**  108:*7*  112:*24*
113:*5*, *20*  114:*1*, *14*
**Eastern**  85:*1*, *12*, *19*,
*22*
**easy**  185:*6*
**edited**  33:*25*
**effect**  69:*18*  165:*1*
178:*9*
**effectively**  140:*21*
191:*13*
**efficient**  192:*3*
**efficiently**  83:*4*
**efforts**  75:*11*  127:*23*
**EGLIDELY**  157:*12*
**ego**  180:*16*, *22*  181:*1*
**egos**  63:*16*
**eight**  16:*2*, *12*, *13*
91:*24*  173:*20*
**either**  24:*23*  25:*6*
94:*8*  95:*3*
**Elgidely**  3:*11*  5:*4*
6:*12*  7:*4*, *7*  9:*22*, *25*
10:*2*  11:*17*, *25*  14:*4*,
*9*, *17*  15:*2*, *5*  20:*15*
21:*9*  23:*5*, *10*, *21*
24:*10*, *13*  25:*7*, *8*, *19*
26:*8*, *16*, *19*, *21*  27:*15*,
*16*, *17*, *23*  28:*5*, *8*, *19*,
*23*  29:*1*, *2*, *21*  30:*7*,
*19*  31:*9*, *15*  32:*1*
34:*20*, *24*  35:*3*, *7*
37:*6*, *16*  44:*5*, *10*
45:*21*  46:*2*, *18*, *23*, *25*
47:*11*, *15*, *16*  49:*8*, *11*
54:*11*, *19*  55:*1*, *5*, *16*
57:*9*, *14*, *19*, *21*  59:*10*,
*18*  60:*8*, *13*, *14*  62:*8*
64:*23*  66:*6*  67:*8*, *17*
74:*4*, *5*, *9*  75:*8*, *10*, *17*
76:*22*  78:*22*  79:*15*
84:*25*  85:*11*, *18*, *24*
86:*19*  87:*10*, *13*
89:*11*  90:*3*, *5*, *16*, *20*
91:*10*  92:*14*, *15*
93:*22*  94:*4*  95:*9*, *21*
96:*5*  97:*10*, *13*, *19*
98:*2*, *3*  99:*12*, *15*
103:*3*, *8*  105:*9*, *12*, *15*
106:*2*  107:*15*, *16*
110:*20*, *23*  111:*1*

116:*23*  117:*15*, *20*, *23*
118:*9*, *12*, *21*  119:*4*,
*13*, *15*, *24*  120:*10*
121:*2*  123:*2*, *9*, *12*, *25*
124:*10*  125:*2*, *13*
129:*17*  132:*6*  135:*9*,
*13*, *18*  144:*13*, *20*
146:*9*, *15*, *16*  147:*20*,
*23*  148:*2*, *20*  149:*1*
153:*5*, *7*, *23*  157:*2*
159:*22*  161:*9*, *12*
162:*6*, *24*  163:*9*
164:*3*, *21*  165:*9*, *10*,
*16*, *20*  167:*23*  168:*3*,
*7*, *14*  170:*2*  171:*2*, *13*,
*17*  172:*5*, *6*, *17*, *23*
178:*24*  204:*5*, *20*
**elicit**  49:*6*
**elicited**  21:*2*  192:*25*
**email**  37:*4*, *5*  54:*20*,
*23*  56:*22*  57:*23*
58:*13*, *14*  69:*10*
85:*16*  102:*3*, *4*
131:*14*  179:*12*
189:*12*  202:*24*
**emails**  10:*24*  54:*25*
65:*13*  69:*6*  130:*8*, *11*,
*19*  156:*23*
**emergency**  11:*14*
87:*3*  121:*20*  192:*11*
**employed**  15:*12*, *23*
16:*3*  17:*20*  35:*19*
37:*19*  38:*1*, *11*  105:*2*
150:*8*  199:*15*  205:*17*
**employee**  15:*9*
179:*17*
**employees**  26:*22*
27:*2*, *5*, *7*, *24*  28:*1*, *2*,
*4*  37:*7*  175:*15*, *20*
179:*15*
**employer**  56:*25*  58:*8*
59:*4*, *21*
**employment**  40:*25*
**employs**  28:*21*  37:*8*
**encompass**  104:*16*
**ends**  160:*21*
**Eng**  176:*6*
**E-n-g**  176:*6*
**engaged**  77:*20*

135:*15*, *17*  203:*15*
**engagement**  135:*12*
**engages**  20:*7*
**enrolled**  187:*23*
188:*3*, *14*
**ensure**  156:*12*
**entered**  83:*20*  191:*5*
**entering**  178:*15*
**entire**  87:*9*  103:*14*
131:*25*  132:*24*
167:*13*  183:*9*
**entirely**  73:*24*  99:*25*
100:*1*
**entirety**  166:*21*
**entities**  99:*5*, *9*  116:*9*
175:*17*  178:*17*, *20*
**entitled**  145:*11*  163:*8*
**Entity**  18:*25*  21:*19*
26:*2*  28:*16*  29:*5*
59:*20*  66:*7*  124:*25*
133:*12*  157:*24*
162:*22*
**entries**  25:*5*
**entry**  145:*2*  154:*17*
**equal**  166:*4*  174:*12*
**equipment**  127:*6*
**equivalent**  108:*4*
112:*10*
**errors**  33:*14*
**escalate**  187:*25*
**escalated**  188:*4*
**escrow**  145:*12*, *17*
148:*15*
**escrows**  196:*19*
**Esq**  3:*5*, *11*, *17*, *23*
4:*6*
**essentially**  20:*8*
113:*14*
**establish**  57:*25*
59:*25*  70:*9*  185:*11*
**established**  170:*15*
**estate**  107:*19*, *21*
108:*22*, *24*  115:*9*
155:*1*  162:*3*  168:*20*
169:*4*, *17*  196:*20*
198:*10*, *15*  203:*10*
**estimate**  27:*7*  171:*16*
189:*22*  193:*5*
**estimates**  142:*17*, *18*

ethical 186:5 195:17
201:19
ethically 203:17
ethics 179:24, 25
evasive 53:2
event 122:16
events 189:15
everybody 40:16
123:5 195:19 198:5
201:13
evidence 25:14 54:7
56:1 89:9 99:11
117:11 144:12
167:19 169:23
evidenced 91:19
exact 10:18 23:1, 6
26:24 41:18, 19, 21
42:19 61:21 72:23
103:24 118:6 139:3,
6, 8 145:8 186:23
exactly 15:14 53:1
136:17
Examination 5:4, 5, 6
6:24 7:3 179:8
198:23
examined 7:1
example 187:22
188:22 189:16
196:23
exceptionally 118:18
exchange 10:23
exchanges 105:19
excluding 42:9
139:11
Excuse 65:10 77:3
139:25 193:17
executed 158:14
execution 106:22
executive 21:22, 23
22:1, 2, 5
executory 166:5, 8
EXHIBIT 5:11
145:9, 10 146:2, 3, 18
147:5, 8, 11 148:11,
16
existing 183:1
exists 99:4
expect 127:16
experience 18:5, 9, 20
53:13, 19, 23 54:3

77:14 79:9 82:23
162:25
expert 164:17 178:3,
4
explain 19:25 98:16
168:8 170:10 187:15
explained 173:6
explaining 31:21
115:22 156:23
explanation 7:24
104:10
explanations 26:10
30:25
explore 90:24
159:18 163:8
expressly 78:13
extension 86:18
87:12 97:25 117:16
118:5, 10
extent 25:13 29:12
30:5 55:10 57:3
99:6 107:6 149:6, 10
172:21 204:8
extremely 190:10
eye 55:14
eyes 28:6 37:1 46:17

< F >
face 185:17
faces 34:9
facing 183:12 185:17
fact 15:1 25:13
30:15 36:21 54:7
89:9 99:2 126:4
151:5 158:17 163:24
167:18 169:23 171:9
facto 105:17
factor 82:21
facts 14:24 21:14
49:5 162:21
factually 50:22 51:1
fair 12:22 19:7 40:8
78:2, 21 90:4 108:19
110:10 126:16
128:22 140:20
141:19 156:24
173:25
faith 77:6 79:13
111:16, 18

fall 88:20
falling 83:5 151:16
falls 189:21
false 41:17
familiar 32:23 33:15
34:9 87:6 107:20
157:24 158:2 165:1
180:18
familiarize 166:21
family 11:13
far 112:13 117:12
167:21 171:20
favor 100:8 158:15
favorable 194:7
February 151:3
Federal 44:25 45:1
199:9, 10 200:14, 16
fee 50:3 107:18, 23
108:8, 21 109:7
113:4 114:14, 17
155:1 166:4, 10, 17,
24 167:2, 5, 9, 14
173:23 174:12, 15, 22
195:1, 2, 22
feel 29:15 34:16
114:8 143:22 151:17,
20 170:24 203:14
Fees 22:16 24:2
25:2 50:14
Feig 4:21
felt 152:3 198:17
female 82:14
fiduciary 196:24
198:14
field 178:3
Fight 201:12
fighting 112:3, 16
figure 25:4 76:19
192:22
figures 171:7
file 13:8 50:20
63:15 73:13, 18
115:14 142:8 144:10
190:24 191:1, 6
192:13 195:14
201:22 203:9
filed 18:4 44:3
45:18 48:7, 8, 13, 25
56:19, 20 60:16, 18
61:1 62:10 63:2

72:5, 15 86:8, 11, 24
87:1, 24 88:25 90:13
91:20 93:12 106:11,
18 116:1 119:18
121:18 133:22 134:6,
15 136:6 138:7
141:23 144:6, 11, 16,
25 146:1 150:4
156:21 157:4, 10
160:1 161:14 177:5
191:9 195:10
files 13:8 42:9
45:15 61:10, 17 71:2,
15, 22 72:9 73:5, 21,
23 74:18, 22 75:13,
25 76:5 77:16 79:10,
17 80:8, 20 81:13, 17,
22 82:1, 6, 10, 25
83:3, 25 84:8, 15, 23
91:22 99:23 112:9
113:18, 19 114:1
118:5 123:15 125:15,
22 126:5 131:4, 18,
22 132:12, 21 133:6,
12, 16 138:14, 21, 25
139:10, 11, 15 140:4,
10, 13, 14, 20 141:4,
15, 16, 20, 21 142:4,
15, 16, 18, 23 143:5, 8,
9, 11, 13, 16, 20 144:1
149:4, 13, 21 150:9,
13, 17, 23 151:6, 13,
15 152:8, 11, 20, 25
153:2, 10 154:8
162:9 167:17 171:22
178:15 185:20, 23
186:15, 24, 25 187:3,
7, 9, 11, 17 189:7
190:15, 23 191:11, 19
192:9, 11, 14 193:1, 3,
4
Filing 19:4 56:13
77:8 137:9 158:13
filings 119:7
fill 50:6, 9 192:16
final 156:22, 25
157:3 180:3
finally 193:4
Financial 43:22
44:22 56:19 83:19

100:*22*  104:*17*
106:*23*  123:*19*  159:*3*,
*14*  175:*5*, *11*  183:*14*
**financially**  205:*19*
**financing**  27:*21*
98:*12*, *16*  124:*8*
159:*12*  161:*4*
**find**  24:*24*  40:*25*
69:*4*  81:*23*  192:*9*
195:*7*, *8*
**finding**  64:*13*  152:*17*
**finds**  191:*3*
**fine**  25:*7*  26:*8*, *20*
46:*18*  120:*6*
**fingers**  36:*9*
**finish**  7:*25*  147:*20*
153:*5*
**fire**  84:*3*  151:*25*
**fireballs**  151:*18*, *19*,
*22*  152:*4*, *5*
**fires**  84:*4*
**firm**  17:*19*  23:*20*
34:*2*  44:*4*  57:*10*, *24*
66:*17*  70:*16*  80:*13*
82:*11*, *16*  117:*5*
179:*12*, *21*, *22*  180:*4*,
*8*, *9*, *15*, *21*  181:*1*, *23*
185:*20*  195:*15*
197:*12*
**firms**  97:*11*, *14*
**first**  23:*12*  24:*23*
49:*13*  50:*11*  51:*21*,
*25*  52:*5*  62:*14*  72:*21*
73:*10*  74:*17*  78:*22*
98:*8*  103:*18*  112:*14*
135:*3*, *4*  137:*5*  145:*4*,
*22*  153:*15*  168:*25*
169:*8*, *25*  170:*21*
191:*3*  193:*10*  201:*12*
**fits**  153:*21*
**five**  42:*1*  55:*3*  94:*13*
142:*25*  161:*24*
173:*10*  187:*23*  188:*5*,
*10*
**five-minute**  55:*2*
93:*20*  148:*21*
**flies**  40:*2*
**floating**  202:*11*

**Floor**  3:*12*  10:*8*
27:*13*  32:*16*  184:*18*,
*21*  189:*1*
**flux**  139:*23*
**focus**  71:*2*
**folk**  177:*17*
**follow**  181:*12*  196:*9*
201:*19*
**followed**  7:*23*  97:*7*
193:*13*
**following**  100:*20*
132:*10*  139:*14*  169:*3*
171:*25*
**follows**  7:*2*  104:*24*
**font**  147:*10*
**foolish**  114:*9*
**forbid**  188:*19*
**forces**  198:*1*
**foregoing**  205:*4*
**form**  8:*11*  26:*3*
30:*24*  31:*5*  158:*5*
179:*12*
**formal**  20:*6*, *8*
167:*16*  169:*20*
**formally**  20:*12*
200:*24*  203:*15*
**formation**  70:*1*
**forth**  13:*21*  14:*1*, *13*
31:*18*  75:*1*, *13*
102:*20*  122:*2*  155:*3*
173:*17*  205:*7*
**forward**  15:*4*  56:*3*
120:*7*
**Foster**  1:*24*  2:*8*  6:*6*
205:*2*  206:*8*
**found**  194:*25*
**foundation**  23:*23*
169:*23*  187:*4*
**four**  35:*19*, *20*, *25*
36:*23*  37:*11*  38:*10*
91:*23*  116:*8*  144:*7*
154:*4*, *12*  192:*20*
**Fourth**  3:*17*
**FOX**  3:*9*  6:*12*
57:*23*  83:*15*
**framework**  132:*8*
169:*1*  171:*23*
**frank**  33:*17*
**Frankly**  24:*23*
**fraternize**  34:*11*

**fraudulent**  63:*15*
71:*16*  116:*11*
**fraudulently**  50:*11*
61:*16*  71:*14*  72:*9*
**free**  29:*16*  34:*16*
**frequently**  201:*11*
**fresh**  202:*21*
**Friday**  24:*19*
**friend**  178:*12*
**friendly**  69:*9*
**front**  52:*16*  153:*18*
168:*21*  169:*4*
**frozen**  172:*5*
**full**  8:*2*  16:*1*, *4*, *9*
24:*7*  36:*3*  151:*7*
160:*3*, *4*
**full-time**  15:*24*
35:*20*, *25*  36:*23*
37:*11*  38:*10*  84:*3*
91:*23*  144:*7*
**full-undivided**  110:*7*
**fun**  14:*17*
**FUND**  3:*21*  6:*18*, *19*
**funding**  125:*6*  159:*6*
**fundings**  99:*22*
**funds**  123:*13*, *21*
125:*21*  126:*2*  159:*10*
162:*3*  175:*13*  179:*22*
180:*10*, *13*
**further**  91:*7*  95:*4*
121:*25*  132:*9*  169:*2*
171:*24*  178:*24*
198:*20*  205:*11*, *15*
**furtherance**  20:*6*
**future**  9:*10*  77:*25*
178:*14*  183:*13*

**< G >**
**game**  90:*4*  186:*12*
**garbage**  194:*5*
**garnished**  83:*20*
**garnishment**  191:*11*
193:*14*
**gatekeeping**  169:*25*
170:*2*
**general**  20:*24*  25:*16*
43:*18*  44:*18*  52:*25*
53:*3*, *4*  187:*19*  201:*6*,
*7*

**generally**  33:*17*
183:*12*  190:*4*, *6*
**generated**  125:*21*
162:*3*, *8*  167:*17*
**generic**  25:*1*
**getting**  31:*23*  81:*10*
83:*6*  114:*16*  148:*13*
159:*16*  162:*20*  185:*9*
193:*13*  200:*8*  202:*23*
**Ghio**  131:*4*, *23*
169:*10*, *21*
**give**  7:*21*  8:*23*
26:*25*  27:*7*, *11*, *25*
28:*1*, *5*  34:*16*  36:*3*
37:*7*  41:*16*, *19*, *22*
42:*21*  43:*4*  51:*4*
65:*22*  67:*15*  85:*8*, *13*,
*19*  93:*6*, *18*  95:*25*
103:*15*  107:*10*, *25*
110:*7*  113:*11*  127:*19*
130:*5*  133:*1*  183:*11*
184:*20*  185:*4*  194:*18*
196:*2*, *8*, *22*
**given**  55:*11*  61:*25*
80:*14*  116:*17*  140:*10*
179:*22*  181:*11*
183:*12*  188:*11*
205:*10*
**giving**  82:*20*  86:*18*
181:*7*  203:*20*
**GLG**  184:*18*
**go**  9:*8*, *24*  20:*20*
22:*10*, *11*  23:*12*  27:*9*
34:*1*, *10*, *14*  37:*23*
38:*23*  47:*9*  58:*14*, *23*
61:*21*  62:*2*  68:*20*
76:*12*  81:*4*  82:*14*
84:*3*  86:*20*  87:*14*
90:*23*  94:*14*  108:*12*
113:*22*, *23*  115:*15*
117:*20*  121:*25*
126:*22*  128:*4*  146:*2*
147:*16*  153:*21*
157:*13*, *14*  165:*11*
167:*2*  173:*11*  186:*19*
192:*12*, *25*  200:*11*
**goal**  168:*2*
**God**  188:*19*

goes 50:*5* 55:*22*
71:*22* 111:*15, 16*
118:*15* 129:*12* 155:*2*
going 6:*3* 7:*17, 19*
8:*23, 24* 9:*2, 7, 23*
11:*19* 12:*8* 13:*24*
14:*7, 17* 15:*2* 23:*23*
25:*12* 26:*11, 16*
27:*25* 28:*3* 29:*11, 18*
30:*4* 36:*20* 41:*8*
45:*4, 18* 54:*6, 14*
57:*7* 59:*11, 12, 14*
62:*16* 71:*12* 75:*3, 15*
78:*7, 13, 16* 79:*14*
85:*21* 90:*6* 91:*8*
92:*11* 93:*22* 94:*1, 24*
95:*1, 10* 96:*2* 97:*19*
98:*25* 99:*10* 100:*11*
102:*13, 14* 104:*24*
105:*16* 106:*6* 107:*10*
108:*20* 109:*1, 13, 14,
19, 20, 21* 110:*14*
111:*10* 112:*20*
113:*21* 115:*10, 15, 16,
19* 116:*19, 21* 117:*12,
13* 123:*17, 18* 124:*7,
25* 125:*18* 130:*16*
135:*6, 7* 138:*13*
142:*10* 143:*15* 148:*8,
9* 150:*1, 25* 152:*5, 17*
153:*20* 154:*20* 156:*6,
16, 19, 22, 25* 157:*19,
21* 158:*25* 159:*1, 2, 3,
15* 161:*4, 5, 6* 163:*14*
164:*8, 19* 167:*20, 21*
168:*12* 169:*10*
170:*18* 172:*20*
174:*12* 179:*4, 6*
185:*21* 188:*6* 190:*3,
18* 191:*11, 18, 22, 24*
192:*17* 202:*11* 204:*5,
22*
Good 7:*5, 6* 68:*14*
69:*24* 77:*6* 79:*13*
85:*25* 86:*1* 111:*16,
18* 154:*2* 161:*11*
192:*7* 203:*13*
Google 65:*20*
gotten 24:*20* 110:*18*

194:*16*
granted 118:*10*
grateful 118:*19*
Great 42:*8* 44:*21*
86:*5* 146:*11* 204:*2*
greater 30:*9, 15*
Greenspoon 97:*11,
15* 117:*5* 181:*1*
G-r-o-s-e 38:*15*
Gross 38:*12, 15, 17*
39:*15* 79:*21*
G-r-o-s-s 38:*16, 17*
ground 7:*15* 81:*16*
grounds 138:*11*
GROUP 1:*6* 3:*3*
6:*11* 7:*9* 10:*10, 12,
16* 13:*17, 20* 14:*12*
15:*7, 10, 13, 16, 23*
16:*4, 20, 22* 17:*21, 24*
18:*5, 9, 25* 19:*8, 15,
19* 20:*22* 21:*5, 24, 25*
22:*11, 14* 23:*15* 24:*2*
25:*10, 21, 25* 26:*23*
27:*3* 28:*10, 14* 32:*3,
8, 11, 13* 34:*7* 35:*19*
36:*13, 17, 19, 24* 37:*8,
12, 19* 38:*1, 11* 39:*11*
40:*10* 41:*11* 42:*16*
43:*16* 45:*10* 46:*10*
47:*8, 18* 48:*16, 22*
49:*18* 50:*18, 25*
51:*10* 59:*20* 60:*17*
61:*4, 11* 62:*19* 63:*3,
4, 13* 66:*21* 67:*1*
87:*4, 16, 20* 88:*8, 24*
89:*14* 91:*12, 16, 22*
92:*4, 6* 96:*21, 24*
97:*2, 6* 98:*6, 20* 99:*4,
18* 121:*21* 132:*9, 11*
145:*24* 146:*19* 169:*2,
14* 171:*24* 187:*24*
199:*16* 200:*1, 8*
202:*23* 203:*10, 12*
Groups 32:*24* 35:*15,
23* 36:*18* 45:*7*
grow 187:*1, 17*
guess 109:*23* 137:*7*
150:*1* 184:*1, 2*
guidelines 195:*17*

gunner 197:*24*
guy 82:*13* 194:*11*
guys 123:*9*

< H >
hac'd 200:*6*
half 71:*11* 124:*16*
141:*13* 194:*5* 195:*11*
Hamowi 37:*20* 38:*5*
79:*19*
H-a-m-o-w-i 38:*5, 9*
Han 176:*15*
hand 205:*25*
handful 130:*8*
hand-holding 183:*16*
handle 115:*20*
152:*10* 186:*6* 190:*19*
handled 83:*4* 153:*8*
187:*16* 196:*19, 24*
197:*12*
handles 82:*10*
handling 91:*21*
150:*12* 152:*24* 153:*9*
185:*18*
hands 29:*19* 79:*5*
hanging 100:*1*
happen 95:*6* 122:*15*
189:*13* 203:*9*
happening 124:*13*
happens 151:*21*
happy 31:*24* 60:*6*
62:*3* 78:*17* 121:*16*
141:*24*
hard 173:*5*
harmonized 109:*15*
harmonizing 109:*14*
hat 194:*24*
HCH 123:*21*
head 192:*4*
heading 145:*19*
hear 18:*6* 74:*1, 3*
99:*16* 112:*14* 137:*5*
172:*4* 184:*10*
heard 107:*7* 137:*8*
184:*12*
hearing 24:*21* 102:*9*
156:*18* 159:*7*
heart 9:*4*
heavily 29:*17* 83:*12*

126:*9, 12, 14*
height 70:*20*
held 185:*15*
help 91:*8* 124:*5*
135:*20* 143:*3* 195:*18*
helpful 126:*8* 140:*8*
helping 120:*24*
hereinbefore 205:*7*
hereunto 205:*25*
hey 81:*5* 136:*23, 24*
138:*20* 178:*9*
hide 181:*17*
Hidrock 32:*18, 21*
71:*9*
highest 18:*18* 178:*18*
197:*1*
highlight 111:*11*
159:*24* 174:*1, 6*
highlighted 109:*3*
111:*10, 21* 114:*7*
173:*22, 24* 174:*7, 16*
highlighting 174:*9*
highly 11:*21*
Hills 3:*6*
hire 170:*9* 201:*11*
hired 40:*11, 14, 16,
19, 21, 23*
historically 152:*3*
history 18:*10, 19*
22:*14* 53:*14, 23* 54:*3*
56:*5* 57:*5* 58:*1* 60:*1*
106:*12*
hit 189:*20*
Hold 27:*6* 47:*9*
55:*3* 67:*15* 86:*14*
90:*21* 94:*14* 106:*8*
144:*21* 183:*14* 198:*8,
10*
Holdco 87:*5* 98:*7, 10,
19* 99:*3, 18, 22*
121:*22* 123:*13, 22*
177:*3, 11, 13*
home 202:*24*
homes 83:*21*
honestly 39:*23*
honor 11:*5* 114:*12*
honorably 198:*3*
Hook 10:*19, 21*
hope 122:*9, 13*

**Hopefully** 143:*18*
144:*24*
**hoping** 24:*13*
**host** 63:*3*
**hour** 54:*14* 78:*19*
85:*20* 171:*15*
**hours** 16:*2, 12, 13*
**house** 11:*14* 178:*11*
189:*11*
**houses** 184:*19*
**huge** 83:*16* 115:*11*
**humanly** 184:*16*
**hundreds** 37:*7*
**hypothetical** 175:*12*
185:*23* 187:*21*
**hypothetically** 181:*11*
190:*13*
**hypotheticals** 98:*25*

**< I >**
**idea** 28:*11* 69:*2*
72:*2* 74:*17* 76:*4*
136:*6* 137:*12, 14*
156:*5* 183:*20* 196:*5*
**identifiable** 202:*22*
**identification** 56:*25*
58:*9* 59:*4, 21*
**identified** 147:*1*
176:*4*
**identify** 40:*18* 75:*12*
**identifying** 59:*13*
60:*11*
**ignoring** 187:*9*
**ii** 104:*24*
**iii** 106:*9*
**illogical** 195:*4*
**images** 34:*5*
**imagine** 165:*19*
176:*4* 181:*3*
**immediately** 122:*18*
136:*3* 181:*16* 182:*3*
191:*10* 192:*20*
194:*18* 195:*2*
**immune** 93:*7*
**implemented** 51:*14,*
*17, 21* 52:*5*
**implicates** 169:*9*
**implying** 78:*11*

**important** 27:*9, 17,*
*20* 124:*21* 144:*23*
183:*6* 187:*5* 190:*10*
**impressions** 62:*6*
**improper** 40:*18*
94:*19*
**inactive** 166:*7*
**inadvertent** 60:*10*
**inappropriate** 124:*6*
**inbox** 54:*22* 190:*11*
**inclination** 182:*4*
**include** 140:*10* 141:*4*
**included** 122:*3* 130:*2*
**includes** 44:*12*
**including** 28:*20*
83:*24*
**incoming** 189:*12*
**incorporate** 19:*12*
167:*4, 5*
**incorporated** 19:*10,*
*22* 20:*3, 22* 21:*12*
156:*20*
**incorporates** 70:*3*
**incorporating** 20:*7, 8,*
*12, 13*
**incorrect** 51:*1* 136:*9*
**independence** 179:*21*
**independent** 12:*18*
28:*9, 20* 196:*13*
**independently** 29:*14*
**indicated** 12:*12* 18:*4*
29:*3* 35:*18* 36:*25*
39:*7* 74:*10* 77:*2*
78:*25*
**indigent** 120:*20*
**indirectly** 159:*11*
**individual** 11:*23*
13:*19* 70:*13* 74:*25*
75:*12, 24* 76:*9* 84:*10,*
*13* 106:*3* 107:*1*
139:*16* 155:*25* 171:*5*
192:*7, 9*
**individuals** 21:*22*
34:*2* 37:*10* 40:*10, 21*
76:*10, 16* 83:*13, 18*
84:*13* 116:*9* 120:*24*
**industrial** 10:*20*
**industry** 18:*6, 10*
53:*13* 55:*19* 60:*2*

183:*9, 10*
**influence** 182:*21*
**influenced** 196:*14*
**influencer** 159:*19*
**informally** 20:*13*
**Information** 18:*25*
21:*19* 22:*18* 23:*12,*
*13* 24:*20, 21* 35:*10*
42:*7* 46:*9* 55:*24*
59:*14* 60:*11* 83:*6, 7*
88:*21* 106:*17* 116:*7*
128:*7* 173:*1* 178:*1, 2,*
*5* 192:*24* 201:*8, 23,*
*25* 202:*2, 4, 9, 19, 22,*
*25* 203:*2, 3, 5, 8*
**informational** 124:*4*
**informed** 63:*16*
169:*21*
**inhibit** 159:*2*
**Initial** 19:*3* 48:*2*
136:*2* 138:*6* 139:*19*
154:*24* 155:*9, 15, 21*
156:*3, 9* 157:*15, 17*
166:*15*
**Initially** 51:*18, 20*
65:*9, 11, 14* 139:*4, 7*
**initiate** 66:*8* 69:*6*
**inquire** 204:*10*
**inquiries** 44:*6, 13*
**insert** 115:*10*
**inspect** 188:*24*
**inspection** 156:*15*
185:*22*
**inspections** 170:*14*
**instances** 8:*12*
**institutions** 83:*13*
**instruct** 14:*8, 15*
93:*23* 116:*21* 117:*13*
120:*12, 16* 129:*7*
167:*20*
**instructed** 120:*8*
189:*3*
**instructing** 120:*4*
135:*9, 11, 16* 172:*17*
**instruction** 8:*24*
90:*19* 91:*6* 120:*14*
**instructions** 145:*12,*
*18* 148:*15* 159:*17*
**instructs** 8:*16*

**intended** 7:*16* 59:*15*
104:*16*
**intentionally** 92:*14*
**intentions** 178:*15*
**interest** 15:*4* 65:*25*
66:*5, 25* 69:*2* 83:*8*
95:*17* 160:*4*
**interested** 62:*2*
205:*18*
**interests** 134:*23*
**interface** 183:*4*
**Internet** 194:*11*
**interpret** 26:*5* 112:*6*
**interpretation** 110:*8*
112:*15*
**interrupt** 20:*17, 19*
54:*16*
**interrupted** 148:*8*
**interruption** 172:*2*
**interviewed** 76:*18*
**intimately** 120:*1*
**introduce** 6:*5* 64:*24*
**introduced** 65:*1*
**invade** 123:*18* 135:*7*
**Invades** 14:*14* 29:*12*
**invading** 14:*22*
117:*9* 163:*15*
**invalidation** 188:*7*
**investigations** 44:*6, 13*
**invite** 95:*1*
**invocation** 94:*11*
**invoke** 94:*5*
**invoking** 94:*10*
**involved** 20:*23*
29:*17* 83:*25* 84:*7, 14,*
*22* 99:*22* 105:*19*
120:*1* 124:*7* 126:*10,*
*17* 128:*24* 129:*23*
149:*5* 150:*16* 151:*8*
153:*1* 197:*2, 9*
**involvement** 73:*17*
80:*16* 81:*15* 118:*19*
126:*21* 149:*3, 16*
153:*16* 181:*17* 182:*5*
**involving** 115:*5*
**irreversible** 193:*6, 11*
**IRS** 56:*25*
**isolating** 188:*20*
**Israeli** 197:*21, 25*

**issue** 9:25  10:1
33:11  42:17  77:6
81:6  93:24  94:25
129:12  139:22
186:12, 14  191:23
**issued** 13:13  43:6
49:24  76:22
**issues** 9:3  31:5
45:16  94:3  134:23
150:12  156:16  186:9
**items** 8:20  51:3
**its** 18:11  22:2, 9
35:19  53:15  54:3
70:20  76:5  77:16
98:6  100:19, 23
109:20  114:12, 20
134:6  141:15, 19, 20
144:17  157:22
160:10, 22  166:21
170:7  175:5, 11, 14,
19  177:21  200:21
**iv** 106:9, 13

**< J >**
**Jack** 38:12, 15  39:15,
16, 22, 23  40:6  79:21
101:23
**Jake** 176:12
**January** 151:3
**JASON** 1:15  2:1
3:3  5:3  6:11, 23
17:16  66:18  205:6,
12
**Jayde** 176:18
**J-a-y-d-e** 176:19
**Jersey** 197:7  199:4,
18, 22  200:2, 10
**Jimmy** 176:25
**Job** 1:22  31:12
34:10  81:10  82:15,
16  83:2, 8  84:3
105:14  151:17
**jobs** 203:3
**John** 37:20  39:10
79:16  178:12, 13
**Johnston** 4:6  6:20
**joint** 145:12, 17
148:14
**judge** 10:1  15:3
102:9  103:17

**judgment** 191:4, 9
192:13  193:14, 16
196:13
**judgments** 83:19
**juggling** 151:17, 22
152:4
**July** 1:17  86:25
87:25  93:12  101:9
106:11  130:12  145:1
146:19  151:2  205:13
206:1
**June** 48:3  50:2, 6
63:2  71:25  72:3
87:25  101:8  116:10
130:11  131:1, 2, 17,
22  132:12, 21  133:6,
13, 17  134:1  168:16
169:17, 21  171:21
**jure** 20:5
**jurisdictions** 199:6,
12, 16, 25

**< K >**
**Kaufman** 182:11
**keep** 9:23  40:2
54:15  85:16  125:3
148:8  173:13  179:7
**keeps** 49:18
**Ken** 198:21, 25
200:4  202:6
**Kenneth** 3:17  6:14
**kenneth.m.misken@us
doj.gov** 3:19
**Kentucky** 4:8
**kind** 32:19  55:12
70:23, 24  71:5  80:15
110:6  115:18  153:20
159:15  192:18
202:21  203:5
**knew** 65:2  66:14
68:2  73:1, 4, 6, 8, 16
**know** 7:15  8:9
10:22  12:17  13:25
15:14  16:9, 11  18:1,
6  19:20  20:21  21:11,
16, 25  22:23  23:9
24:8, 22  25:9  26:15
27:4, 10, 18  30:23
32:9, 12  34:4, 9, 12
36:19  39:16, 22, 25

40:5, 6, 15, 24  41:1
44:6  46:21  49:13
51:22  52:1, 7, 8, 15
53:8, 16, 18, 20  54:15
55:9, 12, 21, 22  56:15,
18  57:3  58:3  59:19,
23  60:3, 4, 11, 19
61:23, 25  63:6, 18, 19
64:5, 7  65:6  67:22
68:14, 24  69:15, 24
70:21  71:1  73:12, 16,
22  74:23  75:21  76:2,
12  77:12  79:5  80:11
81:23, 24, 25  82:3, 4,
25  83:24  85:5  86:11,
16  87:19  88:4, 5
89:25  90:2, 22, 23
91:3, 5  94:18, 23
95:5  97:9  100:1, 3
101:5, 10, 19  102:16,
19, 23  103:4  104:3, 8,
14, 22  105:4, 7  106:4,
16  107:1, 8  112:2, 16
114:3, 5  115:3, 6
116:4  117:8  118:2,
13  121:8  123:3, 7, 8
124:1, 23, 25  126:2, 3,
12, 13  128:12, 18, 21
129:21  131:12, 23, 24
132:15, 17, 20  133:11,
14, 19, 20  134:18, 19,
20  135:15  136:1, 21
138:17, 18  140:1, 17
141:1, 22  142:3
143:10  144:18
149:23, 24  151:14
152:22  153:17  155:9,
20  156:3, 11, 18
157:17, 21  158:3
159:20  161:2, 21
162:10, 17  163:7, 12,
17  164:15, 19  165:18
166:20, 23  167:14
168:22  170:22  172:9,
12  175:7, 9, 24  176:1,
3, 5, 8, 11, 14, 17, 20,
22, 24  177:1, 3, 20
178:9, 25  183:13, 21,
23  184:4  186:5, 18
191:4  192:22  198:11

199:19, 25  200:15, 16,
24, 25  201:8, 11, 18,
21  202:5, 18, 20, 23
203:1, 14, 16, 20, 22
**knowledge** 8:25
14:11  21:14  24:14
25:6, 15, 18  43:25
44:19, 23  45:3  49:5
53:8  54:7  74:25
76:4, 6, 10  77:8, 15
78:4, 20  79:5, 9, 11,
16  80:7  84:7, 13
89:9, 13, 17  99:19, 21
101:13  106:6  107:11
115:17  116:12, 21
119:3, 22  120:3
123:24  135:5  154:13
162:1  163:3  171:5
193:25
**knows** 49:9  91:2
94:6  110:18  169:24
170:1
**Koffroth** 54:24
57:13, 15

**< L >**
**labels** 149:25
**Lack** 54:7  89:8, 12
100:21  104:17  119:2,
22  162:1  191:14
**language** 103:23
104:14, 19, 25  109:3,
10  111:10  112:4, 17
125:12  166:21, 22
173:17, 22, 24  174:6
**large** 196:19
**lasted** 85:7
**late** 40:1  136:3
191:4
**LAW** 3:3  6:11
16:21  17:16, 19
18:20  20:25  23:20
53:24  54:4  57:24
66:17  70:16  80:13
81:6  82:11  90:22
95:11  97:14, 16
115:12  118:20
130:22  195:14  198:8
**laws** 43:20, 24  44:15

lawsuit 60:16 61:16
62:6 72:8 87:1
88:16 115:25 121:19
177:5
lawyer 9:11 14:19
30:7 49:15 77:15
84:10 91:2 94:21
116:24 124:2 163:21,
23 164:11 179:11
184:5 186:4, 10
195:14 196:13, 24
lawyers 40:18 51:11
54:15 82:24 83:24
128:12, 17 134:22
149:14 163:24
164:14 199:15
lay 117:11 187:3
layer 192:25 193:2
LBG 55:9
lead 117:10 188:22
leads 187:9
learned 74:17
leave 139:15
leaves 160:20
led 65:20 193:14
left 33:8 71:2 83:15
88:1 100:1 120:22
168:1
LEGAL 3:3 10:10,
12, 16 13:17, 20
14:12 15:6, 9, 13, 15,
23 16:3, 20, 22 17:21,
24 18:4, 6, 9, 10, 11,
25 19:7, 15, 19 20:22
21:5, 24, 25 22:11, 14,
15 23:15, 19, 25 24:2
25:2, 9, 21, 25 26:23
27:2 28:10, 13 30:5,
8 31:18, 22 32:3, 7,
10, 13, 24 34:7 35:9,
15, 18, 23 36:13, 17,
18, 19, 24 37:8, 12, 19
38:1, 11 39:11 40:10
41:11 42:16 43:16
45:7, 9 46:10 47:8,
18 48:16, 20, 21
49:18 50:18, 25
51:10 53:13, 14
55:19 56:6 57:6
58:1 59:20 60:1, 2,

17 61:4, 11 62:19
63:3, 4, 13 66:21
67:1 74:19 75:5, 23
83:11 87:4, 16, 20
88:8, 24 89:14 91:12,
16, 22 92:4, 6 93:3,
13 95:25 96:21, 23
97:2, 6 98:6, 20 99:3,
18 106:12 116:20
120:21 121:21
129:19 132:9, 11
138:2, 5, 9 145:23
146:18 150:12
162:22 163:22 169:2,
14 171:24 180:4
183:9, 16 187:24
189:16, 17, 18 199:16,
25 200:7 202:13, 23
203:10, 12, 20
legally 18:11 53:14
56:5 57:5 58:1 60:1
lender 161:3, 5
lenders 159:2, 11
length 98:23
lengthy 12:23 15:3
26:10 30:25
lent 196:7
letter 56:25 58:9, 11,
15, 16, 18 130:21
131:16, 25 132:3, 7,
19 133:9 168:16, 23
169:8, 9, 24 170:12,
17, 22 171:9, 14, 21
letterhead 130:22, 24
131:1, 17
letters 44:7, 13
147:11 170:8 171:7
192:22
letting 94:18, 23
102:16 110:17
Lev 97:16
levels 178:18
Lexington 4:8
LGS 87:5 98:7, 10,
19 99:3, 18, 22 100:3
121:21 123:13, 22
177:3, 11, 13
liaison 192:10
Liberty 157:24
158:4, 14, 15, 18, 23

159:6, 18, 20 160:2,
12, 14, 18, 19, 22
161:3, 18, 23 177:18
license 6:7 198:8, 11
licensed 68:25
licenses 198:9
life 70:22 150:24
183:13
light 124:19
Likelihood 141:7
188:3
likes 123:5
limbo 185:15
limit 31:4 77:24
126:23
limited 9:3 13:25
79:4 84:6 104:16
122:3 145:15 171:4
line 33:10, 13 56:24
83:17 122:1 152:17
196:9
lines 71:4 156:20
173:10
link 12:17
linked 24:4
LinkedIn 17:6, 9, 11,
15, 23
Lisa 176:2, 3
list 27:23 28:1, 2, 3
75:22 105:1, 5
listed 21:22 76:23
131:2
Listen 124:2
lists 62:19
LITIGATION 1:6
7:8 88:22, 24 90:12
112:10 113:14
118:14, 22 119:8, 16
120:4, 25 121:5
122:11, 16 134:4, 5,
10, 12 137:2 186:15,
25 187:3, 7, 11, 16, 25
188:4, 12, 15, 16, 17
190:22
little 67:9 70:25
85:13 114:8, 22
115:18
LLC 87:5 98:7 99:3
L-l-i 37:24

LLP 3:9, 21
loaded 35:9 84:16
loan 159:20, 21
loaned 98:19 99:3
loans 98:22
local 28:21 42:17, 24
43:6 64:8, 13 65:3
66:13, 14, 25 67:13,
24, 25 68:10, 16, 21
69:17, 20 70:9 74:12
80:19 94:19 152:1
178:1 191:10 192:10,
11 200:5, 8
located 10:3, 7, 16
location 10:17 102:4
lodge 8:10
logo 33:8, 13
Loli 175:23, 25
long 10:12 15:12, 14
19:18 21:10 39:20
54:3 56:4 57:5, 25
60:1 85:3, 20 106:12
131:8, 12 184:22, 24
197:25
longer 68:19 84:4
85:21 139:23
look 11:16 21:18
22:13 23:10 33:15,
17 34:9 35:16 48:14
51:9 58:8 60:20
63:14 65:8 108:2
142:6, 7, 8 153:17
154:8, 22 156:6, 12
158:8, 12 164:22
165:23 171:11, 18, 21
172:13, 18, 19 188:8
190:21
looked 62:11 141:2
looking 33:6, 14
36:6, 8 98:4 103:1
132:18 146:25 147:4,
5, 12 148:23 156:4
157:18 173:11
190:24 191:16 192:7
193:1
looks 17:13 33:10
54:22 87:25 133:9
147:9 166:18 191:1
loss 106:24

**lot** 34:*8* 61:*19* 62:*1*
70:*19* 126:*13* 128:*1*
138:*20* 150:*23, 25*
152:*5, 6* 165:*18*
173:*24* 177:*23*
183:*20* 185:*12*
190:*19* 192:*16*
193:*15* 203:*3*
**Louisiana** 178:*10*
**love** 123:*7*
**lower** 147:*7* 148:*12*
**LPC** 63:*4*
**LPG** 45:*15, 17* 48:*15,
17, 19* 55:*8* 65:*2*
66:*5, 7, 11* 71:*14, 20*
72:*9, 21* 74:*18, 22*
76:*1, 5* 77:*7, 16*
78:*24* 79:*10, 17* 80:*9,
21* 81:*13, 17* 82:*6*
83:*25* 84:*8, 14, 23*
99:*23* 100:*22* 104:*18*
111:*15* 112:*9* 113:*4,
6, 11, 18, 20* 114:*1, 12*
115:*5* 116:*8* 124:*20*
125:*10, 16* 126:*6*
131:*22* 133:*6, 8, 13,
17* 138:*10* 139:*2, 12*
140:*11, 14, 21* 141:*4,
14, 21, 24* 142:*16, 24*
143:*13* 149:*22* 150:*9*
151:*3* 152:*21, 25*
153:*2* 177:*9, 17, 22*
180:*16, 22* 187:*15*
194:*5* 202:*14*
**LPG's** 66:*24* 67:*21*
70:*5* 73:*4* 75:*13*
128:*6* 135:*4, 24*
136:*6, 24* 137:*8, 13,
22* 138:*3, 5* 167:*12*

**< M >**
**Madam** 54:*13*
**mail** 189:*9, 11, 20, 23*
190:*5, 10, 13, 16, 19,
20* 191:*24* 192:*1*
193:*6, 8*
**Main** 4:*7* 86:*17*
134:*6*
**maintain** 69:*9*

**maintained** 52:*13*
82:*5*
**majority** 40:*10*
**making** 73:*7* 120:*15*
132:*11* 133:*6* 189:*19*
**man** 170:*24*
**manage** 35:*2* 39:*8*
**managed** 35:*1*
**manages** 34:*19*
**managing** 100:*19*
101:*19* 116:*25*
149:*13, 18, 24* 150:*2,
4, 7* 151:*12* 162:*21*
184:*5* 186:*4, 10*
194:*19*
**March** 22:*16, 21*
25:*22* 39:*19* 69:*22*
175:*21* 177:*9*
**Marder** 97:*11, 15*
117:*5*
**Maria** 176:*9*
**mark** 148:*11*
**marked** 5:*12*
**marriage** 205:*16*
**MARSHACK** 4:*4*
6:*22*
**Marshak** 4:*23*
**material** 163:*3, 7*
195:*9*
**materials** 189:*4*
**math** 143:*3*
**matter** 9:*4, 16* 11:*23*
29:*18* 132:*9* 139:*22*
157:*7* 169:*2* 171:*24*
178:*8* 205:*19*
**matters** 30:*18* 75:*1*
76:*24* 77:*5* 171:*3*
180:*4* 190:*22*
**MCDVI** 3:*21* 6:*18*
**MDA** 156:*16* 170:*18*
190:*3*
**mean** 26:*5* 29:*23, 25*
32:*19* 44:*3* 49:*4*
52:*22* 62:*13* 65:*8*
66:*4* 69:*14, 19* 82:*14*
89:*12* 96:*22* 98:*13,
18* 104:*14* 109:*9*
110:*11, 16* 111:*10, 18,
21* 119:*10* 123:*15*
127:*5* 145:*19* 149:*9*

**154:**6 157:*23* 161:*2*
165:*7* 174:*5* 182:*12*
187:*2* 200:*5* 201:*3*
203:*19*
**meaning** 113:*10*
130:*4* 154:*7*
**means** 104:*14*
111:*12* 117:*11*
**meetings** 12:*23*
127:*8* 134:*21, 24*
138:*1*
**members** 154:*10*
**memo** 81:*6*
**memory** 150:*20*
**mental** 14:*21*
**mentally** 27:*12*
**mention** 50:*13*
192:*15* 194:*5*
**merely** 114:*11, 17, 20*
**meritorious** 193:*17*
**message** 90:*1, 23*
**messages** 10:*23*
**messes** 177:*23*
**metaphor** 82:*20*
**metrics** 140:*24*
**middle** 11:*20* 147:*23*
**Mike** 4:*22*
**military** 197:*16, 20,
21, 23*
**million** 71:*23* 72:*11*
73:*14* 125:*16* 126:*4*
155:*6* 157:*20, 21*
160:*5, 9, 11, 20, 23*
161:*15, 17, 21, 22*
162:*7* 163:*6, 13*
166:*14, 15, 25* 167:*3,
5, 6, 7, 15, 20* 168:*8, 9,
20* 169:*4, 16* 170:*10,
11* 172:*1, 8* 173:*4, 6,
18, 19* 174:*15* 197:*2,
3, 7, 12*
**millions** 197:*9*
**mind** 26:*7* 37:*14*
**mine** 67:*25* 81:*5*
**minimum** 181:*19*
**minute** 74:*2* 146:*4*
**minutes** 55:*3* 78:*19*
85:*6, 8, 20* 94:*13*
146:*10*
**minutiae** 35:*1*

**mischaracterizing**
152:*13*
**Misken** 3:*17* 5:*6*
6:*14* 198:*22, 24, 25*
200:*7, 12* 202:*12*
203:*24*
**missed** 117:*17*
**missing** 102:*18*
**Misstates** 19:*24* 57:*8*
66:*3* 67:*6, 14, 16*
92:*12* 99:*11* 144:*12*
**mistake** 115:*11*
**mistaken** 68:*18*
**mixed** 182:*13*
**modicum** 163:*3*
**modification** 87:*2*
121:*20*
**modifications** 157:*9*
**moment** 13:*3* 45:*5*
51:*7* 64:*9* 100:*7*
108:*14* 167:*24*
188:*11*
**Monday** 1:*17* 205:*13*
**money** 50:*10* 98:*19,
22* 99:*3* 110:*14*
114:*15, 16* 124:*24*
125:*9, 11* 161:*22*
196:*7* 197:*13*
**month** 39:*17* 187:*11*
**monthly** 109:*16, 21*
**months** 10:*15* 15:*14,
22, 24* 16:*19* 25:*21*
39:*12* 64:*3, 6, 11*
65:*25* 66:*8, 9, 18, 25*
67:*22* 68:*9, 11, 17, 19,
25* 72:*24* 73:*1, 9, 15*
74:*11* 80:*18* 81:*12,
19* 86:*12* 151:*2*
154:*4, 13* 178:*1*
188:*16* 197:*3*
**monumental** 190:*8*
**morning** 7:*5, 6, 18*
10:*3* 56:*23* 105:*13*
**motion** 18:*3, 8, 17*
35:*18* 53:*11, 12*
56:*14, 20* 78:*16*
86:*25* 87:*3, 24* 91:*20*
102:*10* 106:*17*
121:*21* 123:*16* 144:*6,
11, 16, 17, 18* 145:*2, 7,

*11* 146:*2, 13, 18*
147:*4* 148:*17* 154:*16*
159:*21* 164:*2* 170:*3,
5, 9* 191:*8* 200:*20*
**motions** 88:*9*
**mouth** 148:*1*
**move** 15:*3* 26:*8, 16*
46:*20* 56:*3* 78:*6*
95:*4, 16, 17, 20* 96:*2*
120:*7* 159:*16* 170:*23*
191:*5*
**moved** 71:*10*
**moving** 46:*24*
**multiple** 96:*13*
159:*17* 189:*19*

**< N >**
**name** 6:*5* 7:*7* 23:*11,
18, 19* 24:*1, 4, 6, 7*
25:*1* 27:*15* 38:*8, 16,
20* 39:*3* 48:*21* 158:*1*
176:*6, 19* 182:*13*
198:*25*
**named** 22:*13* 73:*10*
179:*18*
**names** 22:*15, 20*
23:*1, 3, 6, 14, 25*
24:*14* 25:*10, 14, 16*
36:*14* 37:*7, 9*
**nature** 10:*25* 35:*11*
36:*18* 44:*7* 45:*1*
56:*1* 64:*10* 126:*20*
**nearly** 143:*19*
**necessary** 8:*14*
**need** 7:*21* 8:*12, 23*
27:*10* 38:*14* 52:*20*
54:*14* 58:*25* 66:*4*
68:*22* 78:*15* 82:*7*
93:*19* 104:*4* 107:*22,
24* 112:*14* 125:*2*
131:*24* 138:*24* 143:*2,
23* 146:*4* 148:*21*
153:*20* 162:*16*
163:*17, 21* 164:*17*
165:*3, 6* 166:*19*
167:*13* 174:*6* 181:*9*
184:*8* 185:*1* 193:*16*
202:*8* 203:*2* 204:*12*
**needed** 50:*6* 66:*14*
67:*23* 130:*5*

**needs** 11:*17* 19:*12*
102:*13* 127:*19*
156:*17*
**negotiate** 164:*2, 9, 10*
**negotiated** 89:*21*
96:*20* 115:*24* 161:*8*
163:*17* 164:*11*
**negotiating** 133:*16*
134:*8*
**negotiation** 89:*23*
126:*17*
**negotiations** 89:*6, 10,
15* 126:*10* 127:*21*
128:*24* 129:*4* 130:*14*
131:*9* 134:*2, 9, 12, 14,
16* 138:*17* 155:*11*
161:*7* 170:*19*
**neither** 122:*1* 193:*18*
**network** 42:*24* 65:*3,
5* 66:*13, 15, 16, 24*
67:*3, 12, 24* 68:*1, 2, 4,
5, 10, 16, 21* 69:*17*
70:*9* 74:*12* 80:*19*
151:*15* 178:*1*
**never** 52:*11* 78:*4*
83:*14* 120:*8* 167:*22*
179:*25* 195:*14* 198:*6*
**New** 3:*12* 10:*4*
18:*24* 28:*22, 23*
53:*25* 58:*19* 90:*21*
151:*13* 152:*1, 17*
180:*12* 187:*11*
196:*19* 197:*7* 198:*10*
199:*4, 18, 22* 200:*2,
10* 201:*11, 24, 25*
203:*7, 11*
**newest** 151:*24*
**Ng** 4:*21*
**Nicholas** 54:*24*
57:*12, 15*
**night** 12:*16*
**NOEL** 3:*21*
**non-fee** 108:*5* 112:*12*
**non-important** 194:*7*
**non-legal** 183:*5*
**non-performing**
142:*15*
**non-privileged** 89:*19*
**North** 199:*24*

**note** 75:*9* 146:*25*
158:*14* 160:*14, 24*
**noted** 99:*13*
**notes** 46:*16* 54:*21*
**notice** 2:*8* 28:*12*
59:*1* 75:*16* 77:*21*
145:*2*
**Notwithstanding**
20:*21* 118:*24* 119:*18*
143:*22* 163:*11*
**NSF** 50:*14* 91:*11*
**Number** 2:*10* 6:*7*
26:*24, 25* 41:*6, 13, 18,
19, 21* 42:*4, 19* 54:*25*
55:*18, 20* 56:*25* 58:*9*
59:*4, 21* 69:*4* 103:*21*
138:*18* 139:*3, 6, 8*
140:*5* 141:*2, 17, 20*
142:*23* 143:*5, 8, 10,
19* 149:*13* 151:*6*
161:*21* 164:*7* 168:*2,
10, 19* 170:*10* 173:*4*
185:*24* 186:*18, 23*
187:*1, 2* 188:*9*
**numbered** 154:*22, 23*
**numbers** 55:*12*
64:*19* 139:*24* 143:*25*
144:*1, 3* 164:*1, 14*
170:*16* 171:*7* 188:*21*
192:*22*
**numerals** 106:*9*
**numeric** 28:*2*
**numerous** 105:*19*

**< O >**
**oath** 7:*19* 11:*6* 76:*3*
86:*2* 105:*10* 124:*18*
**object** 13:*24* 14:*7*
29:*11* 30:*4* 35:*4, 5, 6*
54:*6* 57:*7* 67:*15*
75:*3, 15* 92:*11* 99:*10,
13* 116:*19* 120:*14*
122:*24* 123:*17* 135:*6*
163:*14*
**objected** 120:*13*
**Objection** 14:*14*
25:*13* 31:*17, 20*
34:*13, 20, 22* 49:*12*
64:*21* 66:*1* 67:*6*
75:*9* 89:*8* 90:*19*

91:*6* 94:*5* 107:*13*
110:*21* 119:*1, 21*
120:*15* 144:*10* 153:*4,
11* 165:*14* 167:*18*
**objectionable** 26:*4*
**objections** 8:*10, 11,
13, 14* 26:*11* 30:*21*
31:*4, 15, 19, 24* 35:*4*
49:*14* 119:*5* 159:*17*
171:*19*
**objects** 30:*23*
**obligated** 113:*10*
**obligating** 101:*6*
**obligation** 114:*12, 21*
116:*5* 156:*9* 186:*5*
**obtain** 124:*21*
**obtained** 141:*4*
**obtaining** 114:*17, 20*
**obvious** 30:*14*
**obviously** 12:*8* 26:*9*
48:*5* 55:*8, 25* 115:*25*
124:*11* 150:*24* 204:*6*
**OCC** 181:*21* 182:*3*
194:*14*
**occupied** 10:*13*
**occupy** 32:*13*
**occurred** 77:*12*
205:*12*
**o'clock** 85:*13*
**offer** 131:*4, 7, 9, 18,
20* 132:*8, 12, 20, 21*
133:*6, 10* 155:*18*
168:*17, 20* 169:*1, 3,
11, 16, 17* 170:*12*
171:*23, 25* 172:*7*
183:*15*
**offering** 45:*24*
132:*10* 133:*11* 169:*3*
171:*24*
**offers** 170:*9*
**offhand** 58:*21*
**OFFICE** 3:*13* 10:*5,
7* 11:*13, 15* 22:*3, 4, 5,
6, 8* 27:*19* 28:*22, 24*
32:*15* 53:*21* 54:*24*
82:*13* 90:*22* 97:*11*
130:*23* 152:*10*
181:*16* 182:*19, 20*
189:*4* 192:*18* 195:*25*
204:*17*

**officer**  15:*18*  21:*22,
*23*  22:*1*  28:*17*  29:*5,
*9*  87:*19*
**officers**  32:*7*  99:*20*
175:*14, 19*  177:*3*
**OFFICES**  3:*3*  10:*9,
13*  17:*16*  32:*14, 18*
43:*18*  44:*18*  71:*10*
97:*16*  179:*15*  188:*25*
**OFFICIAL**  3:*9*
**officially**  68:*15*
**off-line**  90:*24*  202:*10*
**Oh**  38:*17*  158:*7*
**Okay**  7:*12, 15*  10:*5,
7, 9, 12, 16, 22*  11:*3, 6*
12:*4, 9, 12, 22*  13:*1,
15*  14:*10*  15:*9, 15, 22*
16:*1, 7, 14, 18*  17:*4, 6,
9, 15, 19, 23*  18:*1, 3,
16, 23*  19:*3, 7, 11, 14,
18, 21*  20:*20*  21:*1, 13,
18*  22:*2, 5, 10, 13, 20,
24*  23:*6*  24:*3, 10*
25:*3, 7, 20, 24*  26:*20,
22, 25*  27:*2*  28:*7, 12,
18, 25*  29:*8, 22*  30:*13*
32:*7, 21*  33:*13, 19, 22*
34:*6, 20*  35:*14, 17, 25*
36:*12*  37:*14, 21, 25*
38:*3, 10, 17, 23*  39:*2,
7, 10, 13, 15, 18, 24*
40:*4, 8, 14*  41:*20, 24*
42:*3, 8, 13, 16, 21*
43:*3, 5*  44:*8, 17, 21,
25*  45:*4, 9*  46:*8, 12,
24*  47:*4, 7, 11*  48:*6,
10, 19, 24*  49:*8*  50:*1,
2*  51:*6, 8, 13, 20*  52:*3,
8, 12, 22*  53:*5, 22*
54:*12, 23*  55:*24*
56:*11, 17*  57:*10*  58:*6,
8, 14*  59:*3, 24*  60:*5,
20*  61:*3, 21*  62:*9, 21,
24*  63:*8, 12, 23, 25*
64:*5, 15, 18*  65:*13, 24*
66:*7, 17*  67:*4*  68:*7,
24*  69:*6, 11, 15*  70:*4,
7, 12, 20*  71:*8, 12*
72:*6, 21, 25*  73:*12, 17*
74:*6, 14, 21*  75:*8, 18*

80:*6, 17, 23*  81:*11*
82:*9*  83:*23*  84:*25*
85:*11, 18*  86:*5, 11, 20*
87:*19*  88:*7, 14*  89:*2,
4*  91:*15, 19*  92:*1, 7,
21*  93:*25*  95:*9*  96:*15*
97:*1, 13, 19*  99:*2, 8,
12, 20*  100:*3, 13*
101:*15, 19, 24*  102:*3*
104:*5, 24*  105:*15*
106:*3, 8, 21*  107:*15*
108:*11, 17*  109:*4, 5*
111:*7, 9*  112:*6, 20*
113:*3, 8, 17, 23*  114:*5,
10*  117:*15*  119:*5, 10,
14*  121:*3, 14*  122:*14*
123:*6*  125:*3*  126:*1, 8,
16, 20, 24*  127:*11, 14,
21*  128:*2, 5, 23*  129:*2,
13, 21*  130:*7, 19, 25*
131:*3, 7, 14, 20*  132:*2*
133:*4, 11, 15, 21*
134:*2, 16, 19*  135:*1, 3,
13*  136:*5, 9, 12, 15, 19,
22*  137:*3, 20*  138:*1, 8,
13, 19, 25*  140:*1, 8*
141:*3, 9, 14*  142:*20,
22*  143:*7, 12, 22*
145:*7*  146:*1, 5, 11, 24*
147:*18*  148:*7, 20*
149:*7, 12, 18*  150:*3, 8,
11, 15, 21*  151:*1, 20*
152:*7, 23*  154:*3, 12,
15, 20*  155:*9, 13, 19*
156:*8*  157:*2*  158:*7,
23*  159:*23*  160:*8, 25*
161:*20*  162:*7, 13*
164:*3, 22*  165:*17*
166:*13, 23*  167:*23*
168:*7, 12, 19*  169:*22*
172:*24*  173:*12, 16*
174:*8, 18*  175:*14, 19*
177:*13, 18*  180:*7, 25*
181:*5, 20*  182:*2*
183:*3*  184:*7*  186:*9*
188:*24*  189:*7, 25*
191:*17, 21*  194:*13*
196:*7, 12, 17*  197:*11*
198:*13, 19*  200:*18*

202:*18*  203:*24*
**omnibus**  87:*3*
**onboarded**  68:*1*
**onboarding**  151:*13*
**once**  70:*19*  84:*5*
162:*14*  190:*20*  192:*1,
24*  193:*6, 7, 24*
201:*24*
**one-business**  160:*11*
**one-on-one**  89:*22*
**ones**  40:*14, 23*
184:*20*  187:*12*
**ongoing**  134:*6, 14*
138:*17*  155:*12*
195:*21*
**online**  192:*8*
**open**  159:*5*  187:*7*
189:*12*  190:*20*  192:*1*
193:*24*
**opened**  13:*9*  47:*12*
58:*10*
**opening**  98:*5*
**opens**  191:*2*
**operate**  200:*21*
**operates**  81:*2*
**operating**  51:*14*
52:*5, 9, 24*  56:*7*
154:*5*
**operation**  25:*25*
53:*6*  71:*5*
**operational**  78:*14*
162:*21*
**operations**  60:*7*
75:*23*  110:*13*  128:*15*
129:*10, 14*  152:*10*
**opine**  104:*4*
**opinion**  75:*5*  94:*24*
103:*15*  117:*3, 11*
**opinion/conclusion**
116:*20*
**opportunity**  67:*15*
73:*23*  74:*17*  80:*8*
95:*7*  135:*24*  136:*4*
**oppose**  191:*9*
**opposed**  63:*9*  69:*10*
88:*4*  191:*10*
**opposition**  181:*21, 24*
**order**  7:*21*  19:*11*
55:*2*  87:*3*  116:*10*

121:*20*  145:*3*  154:*17*
184:*14*  203:*2*
**ordered**  103:*16*
**original**  62:*11, 13*
72:*16, 18, 20*  132:*21*
**originally**  141:*4*
**originated**  168:*11*
172:*10, 11*
**outcome**  205:*19*
**outline**  191:*22*
**outlined**  171:*3*
**outlining**  82:*20*
**Outlook**  54:*22*
**outmatched**  83:*12*
**outside**  45:*13*  46:*1*
54:*10*  107:*14*  116:*20*
119:*3, 23*  123:*1, 23*
159:*9*  161:*25*  165:*7*
167:*19*  182:*21*  193:*5*
**overall**  194:*4*
**overbid**  155:*4*
**overbroad**  92:*12*
**overhead**  165:*25*
**overlooked**  194:*20*
**oversee**  128:*13*
**overseeing**  82:*24*
91:*22*  149:*14*
**overwhelmingly**  194:*6*
**overwriting**  33:*9*
**owes**  193:*12*
**owner**  29:*8, 24*  30:*2,
9, 14, 16*  32:*5*  87:*19*
159:*19*
**owners**  32:*2*  175:*14,
19*  177:*2*
**ownership**  99:*8, 17*
**Ozur**  80:*2*
**O-z-u-r**  39:*6*
**Ozure**  39:*4*

**< P >**
**P.C**  1:*6*  3:*3*  17:*17*
19:*15*  66:*18*  70:*13,
16*  87:*5, 17, 20*  98:*6*
99:*4*  132:*9*  169:*2*
171:*24*
**p.m**  1:*18*  148:*25*
204:*23*  205:*14*
**Pacific**  6:*4*

**PAGE** 5:2, 11 23:12, 13 35:9 61:6 63:4 87:15 100:14 145:4, 8, 9, 15 146:2, 6, 21, 22, 25 147:2, 8, 9, 11, 12, 14, 16, 17 148:4, 12, 13, 15 154:21, 22 158:12 164:22 165:23, 24 173:11, 12 174:16
**Pages** 1:23 87:8, 14 146:23
**paid** 27:5, 8 108:4 112:10 125:9 160:11 161:17, 22, 24 163:7 166:14
**Pandy** 38:12, 18, 19 39:21 40:6 79:23
**papers** 54:9
**paragraph** 63:14 71:12, 17, 19 98:5, 8 107:24 108:17 110:9 112:21 113:23 114:3 115:3 118:6 145:22 154:23 159:24 164:25 165:12 167:10 168:19 172:7 200:19
**paralegal** 190:24 191:1 192:2, 6, 10
**paralegals** 91:24 149:14 182:9, 24 192:16, 21
**Park** 3:11
**Part** 16:1, 9 20:11 26:14 33:16 35:14, 19, 23 36:10 67:2, 11, 25 75:21 76:19 108:23 112:14 125:23 173:16 192:23 198:17 201:9, 19, 21, 25 203:1
**Partial** 56:23 87:2 113:8 116:3 121:19 145:1 177:15
**participate** 78:3 127:8 198:16
**participating** 127:3
**particular** 24:16 139:21, 22 142:9

**Particularly** 119:6
**parties** 77:10 78:7 87:4 90:12 102:8 106:23 113:16 122:6 157:5 163:12 196:25 205:16, 17
**part-time** 15:24 35:21 36:1, 12, 23 37:10, 18, 25 38:3 91:23
**party** 9:8 88:16 117:1 120:2 144:13, 16, 17 146:13 155:4 158:4 177:14
**pass** 127:17
**passed** 199:20
**passing** 12:20 90:1, 23
**pay** 43:12 81:21 108:6, 20 112:24 113:5, 19, 24, 25 126:3 166:4 174:12 200:25
**paying** 167:10
**payment** 107:18 139:19 161:5 168:21 169:4
**payments** 109:16, 22 116:7 166:16 195:22
**pays** 139:17
**PDF** 165:24
**penalty** 6:25 100:19
**pending** 90:12 94:20 95:12, 14 118:24 121:9 123:16 134:12 159:21 190:22
**people** 27:10 28:22, 23 34:6, 8, 11 43:1 61:20 62:2 68:3 78:4 81:9 83:5, 10 168:1 176:5 177:21, 23 182:25 183:4, 18 184:17 185:4 188:25 189:1, 2 192:25 194:17

**percent** 39:4 107:18 108:6, 20 109:2, 7, 13, 19 110:4 112:24 113:5, 11, 12, 20, 21, 25 114:13 141:7 166:1, 4, 7 195:12
**percentage** 16:18, 20, 23 141:9, 10, 12 154:25
**percentages** 162:8 164:24 165:2
**perform** 175:6, 11
**performance** 81:6
**performed** 81:25
**performing** 142:3, 5, 8, 15
**period** 83:1 130:14
**periodic** 134:21
**perjury** 6:25 100:19
**permit** 11:19
**permitted** 10:23
**person** 58:3, 6 78:13 81:16 82:17 84:11 104:23 105:8 114:5 118:1 128:23 129:2 150:1, 11 152:25 171:5 176:4 191:3 195:1 196:14
**personal** 8:25 49:5 53:8 54:7 59:13 78:20 89:9, 12, 17 100:22 101:13 104:17 106:6 107:11 116:12, 24 119:3, 22 120:3 150:24 162:1
**personally** 76:18 180:21 193:12 202:22
**personnel** 183:5
**perspective** 77:24
**perspectives** 142:7
**pertained** 121:9, 10
**petition** 25:11 71:20 111:16
**phenomenal** 192:2
**Phoenix** 190:2
**phone** 11:16 64:19 65:19 69:4 70:5
**phones** 184:22

**physically** 179:14
**pick** 70:25
**picture** 17:12, 13 35:10 191:21
**piece** 146:21
**pieces** 189:20 190:13, 19
**Pilot** 194:12, 13
**pinpoint** 70:21 150:1
**place** 6:9 22:9 43:1, 12 50:11 52:1 68:5, 16 73:11 134:10 151:1, 15, 24
**plan** 191:17
**plant** 168:6
**plate** 151:7 152:6
**pleading** 137:15 191:7
**please** 6:9 7:25 8:6 13:3 20:17, 18, 19 31:7, 16 46:24 47:9, 15 54:15 55:3 59:10 62:5 67:15 68:12 69:15 76:10, 16 108:15 115:2 123:10 126:23 132:23 133:4 144:22 145:14 147:20 153:6 165:17, 18 171:12 173:12 196:8 197:19
**plural** 96:9
**plus** 99:23 125:15, 22 126:5 160:3 166:6 173:20
**PO** 3:6
**pocket** 160:21 161:2
**point** 9:15, 19 20:7, 10 36:22 63:21 81:9 89:21 95:19 97:10 120:6 143:12 150:7 161:3 163:18 201:10 204:4
**pointed** 118:7
**pointedly** 119:11
**points** 161:7 163:20
**policies** 52:13, 18, 22, 25 53:5 56:8, 12, 19 201:6, 7, 8, 9
**policy** 194:7 201:2

**portal** 189:*13*
**portfolio** 70:*16* 197:*6*
**portion** 145:*15*
160:*23* 162:*22*
**position** 90:*17* 92:7
112:*9*
**positive** 194:*10*
**possibility** 137:*13*
**possible** 7:*17* 12:*21*
20:*4, 11* 131:*9* 137:*6*
184:*16*
**postdating** 146:*23*
**posture** 181:*13* 196:*4*
**potential** 121:*10*
135:*23* 137:*24* 138:*4*
191:*23*
**potentially** 35:*6*
41:*17* 80:5 107:*25*
**potted** 168:*6*
**powerful** 83:*13*
**powers** 203:*19*
**PRACTICE** 1:*6* 7:*9*
16:*17, 21* 35:*11* 79:8
81:*8* 199:5
**practicing** 16:*8*
116:*24*
**precedence** 71:*6*
**preceding** 116:*8*
146:*22*
**precision** 140:*2*
**precluded** 94:*1*
**preclusion** 94:*21*
**preexisting** 114:*21*
**preface** 139:*13*
166:*19*
**prefer** 85:*13* 87:7
**pre-incorporation**
20:*9, 10*
**prejudice** 9:7
**prep** 78:*8*
**preparation** 12:*10*
77:*20* 130:7
**prepare** 12:*4, 6*
33:*22*
**prepared** 55:*17*
76:*14* 78:5 88:*21*
**prerogative** 70:*2*
**PRESENT** 4:*20*
97:3 127:*9* 179:*1, 14*

185:*25*
**presently** 186:*16*
**preserve** 8:*13*
**President** 17:*16*
**presumably** 110:*2*
**pretty** 43:*12* 151:*21*
201:*11*
**prevents** 139:*24*
**previously** 32:*13*
75:*19* 109:*18* 126:*6*
139:*12* 173:*22*
**price** 126:*3* 154:*24*
164:*23* 166:*16, 24*
**pride** 183:*10*
**primarily** 150:*11*
**principal** 22:*2, 5, 9*
65:*2, 6* 66:*10*
**principals** 124:*20*
**principle** 174:*10*
**prior** 18:*20* 19:*16*
20:*9, 14* 21:*15* 39:*18*
40:*14, 19* 53:*23*
56:*13* 59:*4, 21* 69:*12*
70:*13* 77:*1, 7* 124:*20*
132:*15, 20* 135:*12*
137:*4* 148:*15* 152:7
**priority** 191:*15*
**privacy** 123:*19*
159:*4* 201:*2, 7, 9*
**privilege** 8:*17, 18*
14:*8, 23* 15:*1* 29:*12*
30:*24* 31:5 75:*4*
86:*15* 88:*18* 90:7, *14,
24* 91:3 92:*10, 19*
93:*8, 9, 17* 94:*6, 10,
12* 96:*2* 117:*9*
120:*11, 14* 122:*19, 22*
123:*18* 129:*12* 132:5
135:7 138:*12* 163:*16*
164:*19*
**privileged** 12:*14*
88:*15, 22* 94:*9, 12, 25*
95:*17* 156:*18* 164:*5,
20*
**privity** 203:*21*
**privy** 80:*12*
**pro** 83:*16* 200:*6*
201:*1*
**probably** 24:*20* 34:*4*
43:*8* 65:*3* 69:*19*

80:*11* 86:*16* 101:*23*
129:*6, 19, 20* 130:*1*
140:*15* 141:*6, 13*
146:*9* 150:*14* 155:*22*
171:*19* 184:*21*
186:*22* 192:*20* 197:3
203:*22*
**problem** 27:*22*
60:*13* 95:*18* 156:*14*
167:*25* 187:*10* 190:*6,
8, 19*
**problems** 185:*24*
188:*23*
**procedure** 184:*25*
**procedures** 51:*14*
52:5, *9, 13, 18, 23, 24*
56:*8, 12, 19* 193:*13*
**proceed** 7:*17*
**proceeding** 8:*4* 97:3,
7 122:*2*
**proceedings** 8:*14*
**process** 7:*16* 9:*16*
11:*9* 14:*21* 185:*6, 8*
187:*13* 189:*23* 197:5
198:*17*
**Processing** 22:*15*
23:*19, 25* 190:*10*
**processor** 202:7
**produce** 34:*14* 52:3,
*4* 78:*12, 14* 171:*4*
**produced** 27:*15* 52:*8,
11* 53:*6, 9* 56:*16*
58:*4* 60:*4*
**producing** 77:*22*
**product** 113:*14, 15*
117:*4* 152:*1*
**production** 56:*24*
**Professional** 2:*9* 3:5
65:*4* 154:*3* 179:*24,
25* 198:*9* 205:*3*
**profile** 17:6, *9, 11, 15*
**profit** 106:*24*
**progress** 154:*14*
**promise** 195:*2, 19*
**promises** 122:*14*
**prompted** 146:*12*
**promptly** 183:7
**proof** 175:5, *7, 10, 13*

**proper** 40:*12* 83:*11*
93:*9* 104:*23* 120:*21*
193:*13*
**properly** 166:*19*
203:*3*
**Properties** 32:*18, 21*
71:*9*
**property** 197:*6*
**proposed** 18:*19*
103:*6* 116:*25* 125:*23*
143:*16* 163:*5* 172:*12*
173:*18, 19* 186:*11*
**proposing** 36:*17*
143:7 201:*15*
**proprietary** 200:*21*
**prospect** 135:*3*
**prospective** 123:*15*
**protected** 90:*14*
92:*18* 122:*21*
**protecting** 83:*8*
**protection** 43:*19, 22,
24* 44:*14, 22* 203:*18*
**provide** 9:*11* 13:*20*
14:5 16:*4* 21:*4* 26:*1*
27:*21* 30:*25* 37:*1*
41:*4* 42:*11* 100:*18*
101:7 102:*24* 106:*23*
109:*6, 17* 116:*6*
117:*16* 127:*11, 22*
128:*9* 129:*8* 140:*24*
175:5, *10* 183:*17*
**provided** 20:7 41:*14*
49:*15* 54:*2* 56:*13*
57:*4, 25* 59:*25* 97:*25*
101:3, *11, 14, 16, 17*
102:*6, 12, 25* 103:*10*
104:*8, 9, 21* 105:5
106:5 107:*4, 9, 11*
116:*13* 125:5 127:*15*
128:*13* 129:*22, 23*
159:*12* 173:*1* 175:*8*
179:*10, 22*
**provides** 100:*16*
106:*14* 107:*17*
**providing** 18:*10*
31:*1* 53:*14* 56:5
57:5 58:*1* 60:*1* 77:3
117:7 129:*14* 155:*15*
178:*20* 180:*4* 181:*8*

**provision** 87:*12*
107:*20* 108:*12, 13*
109:*5* 112:7 163:*22*
164:*4, 5* 165:*11*
**prudent** 84:*5*
**PST** 1:*18* 205:*14*
**public** 28:*4*
**pull** 46:*4* 54:*12*
62:9, *16, 25* 121:*12*
130:*18* 131:*14*
198:*18*
**pulled** 9:*10* 33:*4*
46:*6* 54:*20* 194:*24*
**pulling** 47:*24*
**punched** 64:*19*
**purchase** 28:*13* 29:*4,*
*10* 30:*10, 11* 36:*17*
41:*11* 84:*11* 91:*11*
100:*23* 123:*14*
125:*23* 126:*3, 10, 17*
127:*22* 128:*25* 129:*5*
130:*15* 131:*4, 10, 18,*
*22* 132:*12, 21* 133:*6,*
*16* 134:*2, 9* 135:*24*
137:*22* 144:*14*
145:*11, 17* 147:*6*
148:*4, 14* 154:*24*
155:*10, 14, 19* 156:*1*
159:*25* 164:*23*
166:*16, 24* 168:*17*
170:*3, 17* 171:*6*
173:*18, 19* 174:*16*
178:*21* 182:*6* 197:*2,*
*4* 201:*15*
**purchases** 196:*24*
197:*10*
**purchasing** 137:*13*
**pure** 80:*17, 21*
**purport** 163:*1*
**purporting** 168:*22*
**purports** 79:*7*
**purpose** 78:*16*
**purposes** 70:*9*
**Pursuant** 2:*8* 101:*11*
125:*11* 158:*14*
**put** 16:*23* 18:*23*
33:*1* 54:*9* 86:*22*
130:*21* 140:*21*
144:*24* 148:*1* 169:*24*

170:*22* 171:*14*
183:*14* 192:*20*
**putting** 84:*3* 132:*8*
168:*25* 169:*11*
171:*22*

**< Q >**
**quarreling** 89:*20*
**quarter** 166:*9*
**Queenie** 4:*21*
**question** 7:*25* 8:*2, 5,*
*8, 12, 13* 11:*15* 14:*22*
16:*6* 23:*8, 17, 23*
26:*3, 17, 19* 28:*19*
29:*14, 22* 37:*13, 15*
50:*23* 52:*20* 53:*3, 4*
57:*22* 59:*6* 68:*14*
69:*24* 70:*6* 72:*6, 7*
75:*7* 76:*20* 81:*24*
84:*6, 17, 21* 89:*24*
90:*8, 10* 91:*6* 92:*12*
93:*1, 10, 17* 94:*20*
95:*12, 14, 19, 22* 96:*1*
98:*14* 101:*16* 104:*7,*
*23* 105:*8* 106:*19, 20*
107:*6* 108:*11* 109:*4*
111:*25* 115:*1* 117:*14*
118:*3, 17, 22* 119:*11*
120:*5* 122:*8* 126:*22*
127:*25* 128:*22*
132:*15* 134:*8* 135:*19*
137:*3, 10* 138:*11*
139:*25* 140:*12, 19*
141:*25* 142:*14*
147:*21, 22, 23* 149:*17*
153:*6, 14* 156:*7*
158:*10* 162:*5, 10, 16*
165:*4* 167:*1, 3, 8*
169:*13, 18, 22, 25*
170:*2* 172:*14, 21*
175:*3, 23* 176:*2, 6, 9,*
*12, 15, 18* 177:*2, 19*
179:*1* 180:*16* 181:*10*
195:*24* 202:*5* 203:*13*
**questioning** 79:*14*
**questions** 7:*19* 8:*10,*
*16* 9:*5, 6, 9, 20, 23*
20:*23, 24* 30:*25*
34:*18* 56:*7* 60:*6*
75:*20, 22* 77:*21* 95:*4,*

*7* 99:*1, 12* 110:*17*
111:*19* 115:*20*
162:*20* 164:*16*
178:*25* 179:*2, 6*
184:*7* 198:*20* 203:*25*
204:*4*
**quibble** 109:*9*
**quick** 110:*8*
**quickly** 105:*22*
184:*6, 15* 189:*23*
190:*16*
**quite** 169:*18* 185:*16*
191:*13*

**< R >**
**rainmaker** 82:*13, 19,*
*25* 152:*9, 11, 20, 24*
153:*3, 8*
**raise** 31:*7, 13*
**raising** 31:*8*
**random** 64:*18* 68:*3*
**range** 130:*11* 185:*22*
186:*20, 21*
**rate** 183:*21, 23*
**ratifies** 20:*9*
**ratifying** 20:*13*
**rating** 45:*7, 10, 11*
46:*13* 47:*2, 5*
**reach** 81:*4*
**reached** 65:*4*
**reaching** 137:*17*
**read** 46:*18* 49:*1, 2,*
*22* 50:*15* 51:*3* 74:*7,*
*8* 100:*9, 11, 13* 101:*1*
108:*14* 109:*9, 10, 12*
113:*1, 2, 13* 119:*12*
131:*24* 132:*16, 23, 25*
136:*2* 137:*15, 18, 20*
155:*7* 162:*13, 16*
165:*3, 18* 166:*11, 20*
167:*13* 173:*13*
174:*12* 204:*6, 7, 13,*
*15, 16*
**reading** 46:*16* 61:*25*
103:*14* 110:*5* 136:*10,*
*15, 22* 160:*13*
**reads** 204:*8*
**ready** 68:*20* 186:*18*
192:*11, 12*

**real** 188:*25* 189:*2*
196:*19* 198:*10*
**realization** 115:*14, 15*
**really** 30:*15* 34:*10*
35:*2* 49:*6* 55:*9* 82:*7*
103:*16* 110:*7, 13*
132:*1* 137:*9* 139:*24*
159:*3* 162:*20* 165:*7*
167:*1, 21* 181:*7*
192:*7, 17* 193:*15*
197:*6* 201:*13*
**reason** 21:*13* 24:*23*
29:*8* 51:*8* 59:*3, 15*
60:*25* 70:*8* 102:*25*
112:*19, 20* 122:*24*
124:*11* 150:*18*
194:*16* 196:*12*
**reasonable** 193:*17*
**reasonably** 108:*4*
112:*10*
**recall** 43:*1* 48:*16*
53:*25* 56:*9, 11* 58:*21*
64:*2, 17* 65:*8, 11, 22*
69:*5* 71:*10* 86:*9*
96:*14, 15, 18* 125:*18*
129:*13, 22* 131:*8*
150:*18, 19* 152:*12*
168:*15* 199:*23*
204:*10*
**receivables** 109:*2*
**receive** 160:*3*
**received** 130:*8*
179:*18*
**receives** 201:*22*
**receiving** 201:*22*
202:*13, 19*
**recital** 113:*13*
**recognize** 120:*19*
131:*20* 142:*17*
**recognized** 120:*24*
136:*3*
**recollection** 58:*24*
130:*13* 132:*19* 133:*5*
149:*11* 150:*16* 151:*8*
160:*10*
**reconcile** 68:*13*
**record** 6:*3, 9* 7:*20*
24:*18* 26:*15* 28:*4*
30:*16* 31:*13* 55:*6*
78:*11* 85:*23* 94:*10,*

*15* 96:*19* 97:*1, 7, 12,*
*23* 99:*14* 117:*19, 20,*
*22* 118:*4, 7* 123:*10*
148:*25* 161:*1* 169:*14*
184:*8* 187:*13, 20*
197:*11* 204:*13, 22*
205:*9*
**records** 24:*18* 40:*25*
42:*3*
**recovery** 122:*4*
**Red** 10:*19, 21* 156:*20*
**redact** 59:*13, 15*
**redacted** 59:*12* 60:*10*
**redaction** 59:*17*
**REDHUN** 1:*15* 2:*1*
3:*3* 5:*3* 6:*11, 23* 7:*5*
8:*3* 10:*3* 12:*1* 13:*5,*
*12* 14:*10* 15:*7* 17:*17*
18:*23* 20:*16* 21:*4*
25:*9* 26:*22* 27:*6*
28:*9, 12* 29:*3, 22*
30:*17, 20* 31:*3* 32:*2,*
*23* 33:*3* 35:*8* 37:*13*
40:*9* 44:*11* 46:*5*
47:*1, 17* 49:*22* 54:*20*
55:*17* 57:*22* 59:*19*
60:*15* 64:*24* 66:*18*
67:*18* 68:*7* 70:*7*
74:*10* 75:*11, 18* 77:*2*
79:*16* 85:*2, 25* 86:*6,*
*22* 87:*15* 89:*24* 90:*6*
91:*11* 92:*16* 96:*6*
98:*4* 99:*17* 103:*9*
106:*3* 107:*1* 109:*25*
111:*2, 25* 112:*19*
115:*24* 118:*13* 119:*6,*
*16* 125:*14* 129:*18*
130:*22* 131:*16*
132:*12* 140:*2* 144:*5,*
*24* 146:*17* 148:*22*
149:*2* 157:*14* 159:*23*
161:*13* 163:*10*
164:*22* 168:*15* 170:*3,*
*15* 172:*9* 173:*4*
175:*4* 178:*25* 179:*10*
204:*12* 205:*6, 12*
**redirected** 102:*16*
**refer** 166:*1*
**reference** 52:*12*
108:*25*

**referenced** 36:*2*
52:*19* 150:*4* 164:*24*
177:*14*
**referring** 49:*18*
86:*24* 87:*11* 91:*4*
92:*24* 122:*25*
**refers** 53:*22*
**reflect** 31:*13* 42:*4*
65:*14* 132:*21* 171:*7*
**reflected** 130:*11*
174:*15*
**reflects** 17:*9* 19:*4*
35:*10* 46:*12* 47:*22*
50:*18, 25* 54:*1* 61:*4*
157:*6* 163:*2* 174:*22*
**refresh** 58:*24* 132:*19*
133:*5* 160:*10*
**refund** 49:*24* 50:*7, 9,*
*10* 184:*25* 185:*1, 4, 9,*
*10, 18* 194:*7, 16, 18,*
*19* 195:*1, 22* 196:*1, 8*
**refunded** 50:*3, 13*
195:*3*
**refunds** 50:*1, 19*
51:*2* 194:*6* 196:*4*
**refuse** 203:*22*
**regard** 44:*17* 56:*17*
67:*19* 70:*17* 77:*12*
104:*11* 113:*19*
114:*16* 116:*5* 121:*21*
124:*13* 126:*21* 128:*6,*
*24* 129:*4* 153:*2*
176:*12, 15* 177:*2*
178:*14* 201:*14*
**regarding** 35:*11*
57:*4* 69:*17* 74:*12*
79:*6, 8* 87:*1* 92:*22*
95:*10, 14* 98:*15*
106:*9* 124:*18, 20*
128:*7, 14* 129:*9*
138:*9* 157:*15* 168:*16*
173:*23* 201:*8*
**regardless** 127:*19*
203:*4*
**Registered** 2:*9* 22:*15,*
*21* 23:*1, 7, 14, 18*
24:*1, 15* 205:*3*
**registering** 25:*10, 16*
**regularly** 16:*3*

151:*21*
**reinvent** 66:*15*
**related** 42:*17* 55:*8,*
*11, 13* 73:*4, 19* 80:*23,*
*25* 98:*6, 10, 11, 15, 24*
150:*12* 158:*4, 6, 7, 9,*
*21, 22* 177:*14, 21*
194:*5* 205:*15*
**relates** 77:*6* 115:*3, 4*
**relating** 73:*18* 116:*7*
124:*19* 128:*9* 131:*24*
**relation** 44:*14* 56:*7*
**relationship** 15:*6*
77:*7, 9* 98:*23* 99:*4, 7*
110:*19* 175:*15, 20*
177:*4* 178:*16*
**relaying** 83:*7*
**release** 116:*17* 117:*6,*
*11*
**relevance** 67:*22*
111:*13*
**relevant** 9:*4, 12*
36:*14, 16, 21* 37:*12*
51:*12* 77:*10* 79:*12*
97:*2* 194:*8*
**relgidely@foxrothschil
d.com** 3:*13*
**reliability** 178:*8*
**reliable** 178:*2, 6*
**remain** 118:*23*
**remains** 182:*20*
**remember** 39:*23*
40:*1* 61:*25* 65:*18*
110:*5* 118:*6* 136:*17*
149:*5, 15*
**remind** 86:*2*
**remit** 109:*17*
**remitted** 110:*3*
**remitting** 114:*13*
**remotely** 50:*22*
205:*12*
**render** 92:*21* 93:*3,*
*13*
**repaid** 160:*14, 15*
161:*5*
**repayment** 160:*3, 4*
**repeat** 64:*10*
**rephrase** 8:*6* 84:*21*
135:*19* 167:*7* 174:*21*
**replace** 69:*20* 151:*25*

**report** 181:*16* 182:*2,*
*16*
**Reported** 1:*24* 47:*18,*
*20* 48:*8* 179:*17*
182:*10*
**Reporter** 2:*9, 10* 7:*1,*
*19* 8:*1* 54:*13* 74:*6*
204:*18, 25* 205:*3*
**reporting** 181:*21*
**reports** 46:*10* 47:*4*
**repost** 60:*9*
**represent** 70:*17*
83:*10* 88:*23* 123:*22*
163:*1* 178:*10* 181:*1*
200:*9* 203:*16, 17*
**representation** 83:*11*
120:*21* 124:*3*
**representations** 56:*4*
122:*15* 124:*14*
163:*20*
**representative** 14:*11*
41:*10* 74:*15* 76:*23*
88:*17, 18* 91:*16* 92:*4*
115:*6*
**representatives** 89:*14*
**represented** 72:*10*
73:*13* 125:*16*
**representing** 97:*15*
163:*23* 179:*24* 181:*6*
200:*1*
**represents** 131:*23*
**reputable** 181:*3*
**request** 11:*5* 50:*7, 8,*
*9* 102:*7* 121:*17*
**requested** 11:*4*
127:*15* 189:*5* 202:*1*
**requesting** 42:*8*
203:*3*
**requests** 185:*19*
**required** 162:*18*
175:*4*
**requires** 106:*13*
**resend** 59:*12*
**reserve** 24:*25* 122:*6*
198:*5*
**resolution** 41:*5, 14*
42:*11, 18* 43:*6*
137:*17* 188:*9*
**resolutions** 188:*7*
**resolve** 137:*21* 187:*5*

resolved 109:*15, 16, 21, 22* 122:*5* 137:*22* 139:*21* 188:*15, 16* 195:*23*

resources 191:*22*

respect 9:*14, 19* 29:*15* 31:*14* 89:*10* 91:*2* 98:*12* 175:*23* 176:*9, 18* 179:*21* 180:*7, 15* 181:*20* 182:*8, 22* 184:*25* 187:*6* 188:*19* 189:*7, 25* 195:*6* 196:*18*

Respectfully 77:*18* 103:*3* 110:*12* 117:*13*

respond 8:*1, 12, 15, 17* 118:*10*

responded 184:*3*

response 8:*2* 74:*15* 90:*7* 93:*7*

responses 7:*20, 22, 23* 55:*25*

responsible 55:*9* 81:*15* 150:*12* 151:*6*

responsive 191:*7*

rest 107:*24*

restating 37:*14*

restroom 148:*21, 22*

result 115:*25* 126:*5*

resulted 90:*9*

results 90:*13*

resume 85:*11*

retained 105:*2*

return 183:*15*

returned 184:*9, 13*

revenue 71:*23* 72:*11* 73:*14* 108:*7* 109:*7* 112:*24* 113:*5, 20* 114:*1, 13* 125:*17, 21* 126:*5* 162:*8* 167:*16*

review 12:*9* 100:*7* 189:*18* 192:*18, 21* 204:*19*

reviewed 13:*12* 155:*4* 163:*24*

reviews 194:*10*

Revised 131:*3, 7, 8*

RICHARD 4:*4, 23* 6:*21* 9:*22* 45:*23* 76:*13*

RICHARDS 3:*3, 5* 5:*5* 6:*10* 8:*19* 9:*24* 11:*12* 13:*24* 14:*7, 14, 18, 19* 15:*2* 19:*24* 21:*8* 22:*25* 23:*9, 16, 22* 24:*3, 12, 17* 25:*12* 26:*6, 9, 13, 17, 20* 27:*6, 14, 17, 25* 28:*6, 7, 19, 25* 29:*11* 30:*4, 7, 13, 19* 31:*7, 11, 17* 34:*13, 21, 22, 25* 35:*6* 36:*25* 37:*6* 44:*2, 8* 45:*13* 46:*1, 16, 20, 23* 47:*9, 12, 14, 15* 49:*4, 8, 9, 11* 54:*6, 13, 18, 23* 56:*22* 57:*7, 11, 12, 16, 20, 23* 58:*4, 7* 59:*10* 60:*8* 62:*4* 64:*21* 66:*1, 3* 67:*6, 14* 74:*3, 6* 75:*3, 8, 15* 76:*14* 77:*1, 18* 85:*17* 86:*14, 24* 87:*10* 88:*8* 89:*8, 15, 20* 90:*6, 16, 18, 21* 92:*11* 93:*22* 94:*4, 8, 9, 14* 95:*9, 18, 23* 96:*4, 19* 97:*1, 10, 14, 16, 23* 99:*10, 13* 102:*6* 103:*3* 104:*10* 105:*4, 9, 16* 107:*13* 110:*2, 12, 20, 22, 25* 116:*19* 117:*5, 8, 15, 24* 118:*3, 18* 119:*1, 12, 13, 21, 24* 120:*8, 12* 122:*18, 21, 24* 123:*5, 8, 11, 17* 124:*2, 10, 23* 125:*2, 4* 126:*1* 127:*15, 16, 18* 128:*14* 129:*1, 15* 130:*9, 23* 131:*17* 132:*2, 4* 133:*17* 135:*6, 11, 14, 21, 23* 144:*10, 15* 146:*7, 11, 15* 147:*18, 22* 153:*4, 5, 11* 156:*14* 157:*3* 158:*25* 161:*1, 10, 11, 25* 162:*15, 24* 163:*14* 164:*4, 6* 165:*7, 14, 16* 167:*18, 25* 168:*4, 5, 10, 16, 22, 24* 169:*11, 22* 170:*12, 22* 171:*15,*

22 172:*4, 15, 19* 179:*4, 9* 198:*19* 200:*4* 202:*6* 204:*2, 16, 21*

right 9:*9* 24:*12* 34:*24* 41:*2* 46:*3, 20* 47:*24* 48:*16* 55:*22* 57:*19* 58:*3, 6* 59:*14* 62:*12* 81:*9* 84:*24* 85:*1* 91:*1* 94:*21, 23, 25* 96:*22* 104:*1* 105:*7* 108:*1* 121:*23* 125:*6* 130:*16, 17, 18* 134:*8* 141:*17* 144:*4, 21* 146:*25* 147:*10* 154:*18, 20* 158:*8, 20* 160:*20, 21* 161:*2, 11* 169:*13* 174:*11* 194:*3* 197:*5* 201:*18, 20* 202:*14* 203:*17* 204:*2, 6, 7, 10*

right-hand 147:*7* 148:*12* 158:*13*

rights 122:*6*

rise 195:*11*

Robert 3:*11* 6:*12* 7:*7* 110:*13*

role 34:*10* 83:*2, 9* 152:*16* 153:*21* 162:*21* 197:*23*

roles 192:*17*

Roman 100:*21* 104:*11, 24* 106:*9*

ron@ronaldrichards.com 3:*7*

RONALD 3:*3, 5* 6:*10* 54:*23* 97:*16* 130:*23*

ronaldrichards.com 204:*17*

room 12:*1, 2* 154:*5*

Rosa 175:*23, 25*

ROTHSCHILD 3:*9* 6:*13* 57:*24* 83:*15*

rough 156:*5*

RPR 1:*24* 206:*9*

ruin 183:*14*

rule 11:*5* 94:*16*

rules 7:*15* 11:*19* 31:*11* 94:*19* 195:*17* 201:*19*

run 23:*13* 27:*12* 152:*10*

running 66:*17, 21* 196:*14*

runs 90:*22*

< S >

sale 56:*14* 102:*10* 118:*15, 24* 119:*8, 18, 19* 120:*2, 19* 121:*6* 122:*10, 17* 127:*22* 138:*15* 143:*16* 145:*3, 11, 12, 17* 146:*18* 148:*14* 154:*17, 24* 155:*5* 157:*6* 163:*5* 164:*1* 191:*18* 200:*20* 201:*14*

sales 56:*20* 146:*1* 147:*4*

samples 81:*4*

SANTA 1:*3* 3:*18, 24*

Sara 4:*6* 6:*20*

sara.johnston@dinsmore.com 4:*9*

Saturday 56:*22*

sausage 154:*7*

save 168:*1* 191:*6*

saw 62:*12* 141:*22* 156:*23* 181:*22* 182:*4* 188:*25* 190:*4* 195:*6*

saying 23:*1, 18* 31:*22* 76:*16* 80:*10* 91:*1, 5* 95:*3* 108:*20* 113:*12* 124:*16* 125:*4* 127:*25* 133:*19* 149:*9* 156:*2* 163:*10* 169:*16* 190:*18* 191:*14* 194:*3*

says 17:*15* 19:*6* 47:*10, 14* 48:*15, 19* 49:*17* 50:*2* 60:*21* 62:*18* 63:*8* 98:*5* 100:*21* 103:*12, 18* 104:*2, 5, 11* 105:*1* 106:*21* 108:*3* 109:*1* 112:*22* 113:*7* 116:*3* 118:*9* 121:*19* 126:*1* 131:*7, 17* 132:*7*

145:*2, 16*  147:*8*
148:*14, 16*  150:*7*
154:*23*  158:*14, 20*
160:*2, 6*  165:*24*
168:*19*  169:*11*
171:*22*  172:*7, 25*
173:*2*  174:*11*  185:*10*
**scam**  49:*20*
**scanned**  189:*12*
190:*6*  192:*1*
**scanning**  190:*9*
**scare**  159:*2*
**scenario**  193:*11*
**scheduling**  69:*7*
**school**  115:*2*
**scientific**  140:*2*
**scope**  34:*21, 23*  35:*4,
5, 6*  45:*14*  46:*1*
54:*10*  75:*20*  79:*2, 6*
80:*15*  107:*14*  116:*16,
20*  117:*6*  119:*3, 23*
123:*23*  161:*25*  165:*8*
167:*19*
**Scott**  176:*23*
**scratch**  68:*6*
**screen**  13:*2, 6, 10*
17:*4, 7*  18:*23*  19:*10*
21:*12*  33:*4, 12*  35:*12,
23*  45:*4*  46:*3, 14*
47:*22, 23*  51:*7*  58:*12*
59:*16*  86:*20, 22*
121:*14*  130:*20, 22*
131:*15*  144:*21, 24*
154:*15, 16*  168:*13*
**scroll**  100:*11*  114:*22*
121:*16*  133:*4*  165:*17*
173:*12*
**scrolling**  114:*19*
173:*13*
**se**  83:*16*
**search**  65:*20*
**searching**  23:*24*
**second**  13:*11*  33:*1*
36:*4*  48:*13*  49:*2*
55:*3*  86:*21*  93:*18*
108:*2*  109:*1*  111:*2, 3*
112:*22*  113:*23*  118:*6*
130:*19*  133:*1*  144:*22*
154:*20, 25*  155:*15*

161:*15*  166:*15*
168:*12*
**Secondly**  78:*25*
**seconds**  27:*12*  117:*21*
**Secretary**  23:*2*  25:*1*
**Section**  100:*5, 12, 16*
103:*9*  106:*13*  107:*17*
114:*11*  116:*5*  145:*16*
157:*18*
**see**  13:*5, 8*  14:*22*
17:*5, 6*  19:*1*  21:*11,
19, 21*  22:*14, 17*
23:*25*  33:*3, 14, 16*
35:*12, 22*  36:*4, 14*
46:*5, 12*  47:*1, 4, 7, 17,
23, 25*  48:*2, 4, 6, 8, 10,
21, 24*  49:*17*  54:*20,
21, 22, 23, 25*  58:*9, 11,
13, 16, 18*  59:*15*
60:*21, 22*  61:*3, 6*
62:*18, 20, 21*  63:*1, 3,
5, 8, 14*  65:*4*  66:*15*
68:*5*  71:*17, 18*  87:*7,
8*  88:*1, 3*  97:*20, 21*
98:*8*  107:*21, 22, 24*
108:*9, 12*  115:*14*
117:*18*  121:*18, 23, 25*
130:*21, 24*  131:*1, 2, 3,
16*  132:*7*  144:*25*
145:*4, 10, 13, 14, 16,
21, 22*  146:*17, 21, 22*
147:*7, 9, 13, 24*  148:*4,
6, 11, 15, 16, 18*
153:*18, 19*  154:*16, 18,
23*  158:*13*  159:*16, 23*
160:*6*  161:*13, 16*
164:*23*  165:*12, 24*
172:*14, 20*  173:*7*
185:*24*  186:*9*  190:*25*
191:*6*
**seeing**  154:*7, 8, 10*
**seeking**  79:*3*  155:*4*
**seen**  24:*24*  63:*6*
125:*15*  158:*1*
**segregating**  110:*14*
**select**  79:*4*
**sell**  18:*3, 8, 17*  35:*18*
86:*25*  91:*21*  123:*16*
144:*6, 11*  148:*17*

170:*3, 5*
**seller**  81:*7*
**selling**  197:*8*
**send**  41:*2*  59:*14, 16*
69:*6*  78:*17*  102:*21*
115:*16*  132:*3*  191:*9*
204:*17, 18*
**sends**  203:*4*
**senior**  77:*15*  79:*7*
82:*9, 23*  84:*9*  91:*21*
**sense**  24:*25*  25:*3*
51:*3*  85:*19*  158:*22*
187:*19*
**sent**  24:*18*  56:*22*
57:*17*  60:*8*  102:*22*
189:*12*
**sentence**  111:*21*
112:*21*  166:*17*
168:*25*
**separate**  52:*18, 23*
102:*11*
**separately**  78:*16*
**served**  191:*7*  193:*12*
**service**  36:*20*  45:*14*
55:*12*  70:*12*  105:*3*
139:*17*  144:*1*  182:*25*
183:*10, 11, 18*  184:*17*
185:*2, 4, 10, 12, 14*
186:*25*  203:*7, 16*
**services**  18:*11*  41:*5,
14*  42:*11, 18*  43:*7*
50:*8*  53:*14*  56:*6*
57:*6*  58:*1*  60:*2*
70:*18*  82:*12*  106:*14*
129:*19*  139:*23*  180:*4*
183:*16*  202:*14*
203:*20*
**servicing**  73:*20*  84:*2*
180:*8*  185:*25*  203:*15*
**serving**  70:*10*
**set**  13:*21*  14:*1, 13*
31:*18*  68:*2*  75:*1, 13*
102:*8*  122:*2*  125:*11*
155:*3*  173:*17*  205:*7,
25*
**sets**  133:*2*
**setting**  156:*18*
**settle**  87:*24*  106:*17*
187:*5*  188:*6*
**settled**  151:*24*

**settlement**  87:*2*
105:*18*  106:*1*  113:*9*
115:*4*  121:*19*  145:*1*
161:*7*  163:*18*  170:*19*
177:*15*
**seven**  83:*23*  100:*16*
101:*7, 25*  103:*12*
104:*5, 25*  106:*15*
**shape**  158:*5*
**share**  13:*2*  17:*4*
32:*18, 19*  45:*4*  46:*3*
65:*5*  66:*16*  68:*5*
86:*20*  107:*18, 23*
108:*5, 8, 21*  109:*7*
112:*12*  113:*4*  114:*14,
17*  130:*20*  131:*15*
144:*21*  154:*15*
168:*13*  171:*9*
**shared**  13:*6*
**shareholder**  15:*15*
**sharing**  58:*14*
**sheets**  106:*25*
**Shen**  38:*12, 19*
39:*21*  79:*23*
**S-h-e-n**  38:*19, 21*
**Shields**  4:*22*
**SHOHL**  4:*4*  6:*21*
**short**  31:*21*  77:*21*
153:*13*
**Shorthand**  2:*10*  7:*1*
205:*3*
**shot**  123:*3*  173:*10*
**show**  24:*6*  49:*16*
148:*7, 9*  193:*16, 18*
**showed**  193:*21*
**showing**  13:*10*  49:*10*
54:*3*  173:*9*  194:*4*
**side**  194:*15*
**sign**  29:*9*  30:*10*
85:*18, 22*  87:*20*
101:*24*  148:*3*  150:*6*
155:*14*  162:*18*
203:*11*
**signal**  74:*1*
**signature**  87:*16*  88:*1*
97:*20*  100:*17*  101:*25*
103:*13, 21*  104:*6*
105:*1*  146:*5, 21*
147:*2, 13*  148:*4, 5*
**signatures**  97:*22*

signed  28:*12, 15*
29:*3*  57:*2*  84:*10*
87:*25*  88:*4*  91:*11, 15*
96:*16*  97:*21*  101:*6*
102:*11*  106:*4*  107:*2*
109:*25*  111:*5*  114:*6*
117:*1*  119:*25*  121:*4*
146:*17*  147:*24*
151:*11*  155:*25*
162:*11, 13, 19*  170:*3*
171:*6*  190:*3*  202:*15*
203:*20*
signer  101:*9*
signing  29:*15*  163:*11*
164:*16*
signs  139:*17, 18*
162:*25*  164:*17*
201:*24*  203:*7*
similar  72:*18, 19*
81:*3*
simple  80:*11*  120:*5*
201:*17*
simply  77:*19*  169:*18*
Simultaneously
136:*12*
single  182:*20*  187:*8*
198:*6*  201:*10*
sir  10:*22*  12:*5*
13:*19*  14:*6*  16:*7*
17:*7*  18:*6*  22:*14*
23:*10*  24:*11*  31:*1, 4,*
*10, 15, 17*  33:*7*  35:*12*
36:*6, 16*  38:*14*  41:*20*
45:*6*  47:*25*  50:*17, 23*
51:*8, 20*  53:*10*  56:*3*
58:*11, 16*  61:*9, 23*
62:*11*  63:*1, 5, 14*
66:*17*  67:*9*  72:*6, 17*
76:*3*  84:*6, 21*  87:*6*
90:*10*  93:*2, 10, 19*
101:*6*  103:*18*  106:*10*
108:*9*  109:*12*  111:*19,*
*24*  113:*17*  114:*10*
121:*17*  122:*8*  134:*8*
137:*3*  141:*25*  143:*2*
145:*5*  147:*13*  148:*3,*
*18*  152:*23*  154:*16*
155:*24*  162:*11*
165:*23*  166:*13*

169:*13*  173:*15*  174:*3*
197:*14*  200:*22*
site  156:*15*
sits  82:*13*
sitting  56:*11*  74:*14*
80:*7*  89:*4*  101:*10*
150:*15*  156:*8*  158:*3,*
*17*  166:*23*  195:*20*
situation  139:*20, 21*
six  37:*9, 12*  62:*19*
151:*1*  188:*16*
six-month  150:*20*
sizable  156:*2, 10*
163:*12*
size  142:*6*
skip  193:*19*
slew  61:*19*  183:*5*
slow  38:*14*
small  33:*16*  71:*5*
180:*8*
smoothly  7:*17*
so-called  113:*4*
socialize  34:*11*
software  200:*21, 23*
sold  71:*21*  162:*9*
186:*11*
solo  71:*4*
Soloman  4:*21*
somebody  11:*18*
12:*1*  48:*8*  49:*14*
58:*5*  64:*24*  68:*4*
69:*8*  82:*15*  115:*16*
128:*19*  133:*15*
152:*23*  162:*25*  171:*4*
180:*5*  181:*17*  194:*15,*
*24*
somebody's  82:*16*
soon  137:*8*
SOP  56:*18*
SOPs  51:*17*  52:*18*
53:*1*  56:*12*  129:*20*
201:*5*
SOP's  129:*22*
sorry  35:*20*  38:*17*
46:*15*  64:*9*  67:*9*
74:*1*  76:*12*  107:*7*
110:*22*  116:*14*
131:*21*  167:*13*
182:*13*

sort  33:*11, 18*
110:*12*  137:*15*
175:*13*  178:*3*  183:*15*
186:*21*  188:*8*  189:*22*
191:*17*  196:*22*
sorted  189:*10*
sought  76:*25*  155:*20*
159:*25*
sound  115:*18*  184:*7*
sounds  7:*18*  104:*8*
130:*16, 17*  141:*17*
source  123:*13*  126:*2*
196:*15*
sources  152:*18*
speak  12:*8, 14, 21*
48:*4*  55:*12*  118:*1*
155:*24*  172:*22*
201:*12*
speaking  31:*15*  35:*4*
49:*12, 14*  64:*5*  65:*18*
75:*9*  88:*17*  92:*3, 5*
110:*20, 23*  171:*19*
172:*4*
speaks  68:*22*  104:*3*
108:*3*  112:*4, 17*
117:*12*  133:*9*  155:*23*
165:*15*  174:*11, 13*
specific  25:*14*  34:*10,*
*17*  52:*20*  53:*1, 18*
66:*4*  70:*21*  75:*16*
78:*8*  81:*6*  149:*11*
193:*1*  201:*5*
specifically  52:*21*
97:*15*  159:*13*  197:*12*
specified  75:*21*
166:*17*  167:*10*
speculate  156:*6, 9*
speculating  41:*8, 18*
42:*2, 12*  151:*9*
speculation  54:*8*
119:*2, 22*  132:*4*
153:*12*  161:*25*
speculative  65:*23*
speed  190:*16*
spell  37:*21*  38:*8, 25*
39:*5*
spend  103:*1, 4*
spiraling  187:*9*
spoke  12:*7, 12, 13, 16*
96:*10*  123:*20*

spoken  64:*3*  122:*19,*
*22*  175:*16, 21*  179:*15*
spot  185:*13, 14*
spur  81:*12*
staff  35:*21*  36:*23*
37:*10, 18, 25*  38:*3*
staffing  143:*25*  144:*2*
stages  139:*15, 16*
staggered  197:*8*
Standard  6:*4*  51:*14*
52:*4, 9, 23*  56:*7*
standby  192:*10*
standing  184:*14*
stands  100:*3*
start  9:*20, 22*  39:*10*
68:*6*  70:*25*  108:*25*
111:*4*  188:*6*  190:*24*
192:*5, 17*  193:*1*
202:*21*
started  25:*20*  39:*18*
40:*25*  51:*25*  52:*2*
67:*5, 20*  68:*8*  134:*13*
142:*1*
starters  33:*8*
starting  67:*2, 12*  68:*3*
State  2:*11*  3:*23*
18:*24*  19:*4*  21:*19*
22:*8, 21*  23:*2*  24:*2*
25:*1*  42:*20*  43:*14, 18*
44:*17*  49:*23*  54:*1*
58:*19*  106:*7*  118:*13*
119:*8*  120:*3*  170:*8*
178:*10*  198:*10*  199:*3,*
*8, 20, 21, 23*  200:*13,*
*20*  204:*12*
stated  48:*4*
statement  53:*19*
116:*3*  136:*9*  139:*24*
168:*5, 10*
statements  18:*12, 13,*
*21*  106:*24*
STATES  1:*1*  3:*13*
6:*15*  18:*17*  28:*21*
42:*17*  43:*14*  59:*1*
64:*8, 14*  66:*13*  69:*21*
94:*18*  147:*10*  154:*9*
182:*4*  199:*1, 2*
State's  22:*17*  23:*13,*
*24*

stating 36:22 40:20
statistical 194:3
statistically 195:9
status 20:5 190:25
192:9
stay 186:24
staying 152:17
STENOGRAPHER
6:3 54:17 74:8
172:5 204:22
Stenographic 2:9
6:25 204:25 205:2
Stenographically 1:24
step 153:18 192:16
steps 153:19
stick 14:24
sticking 146:13
stipulate 30:14, 16
31:22 58:25
stipulation 86:16, 17,
23 87:1, 6, 11, 21
88:10 89:6, 16, 24
90:9, 13 91:15 92:3,
22 93:2, 4, 11 96:8,
16, 20 97:25 98:5
100:5, 17 101:6, 9
102:1, 17 103:11, 13,
16, 20, 22 104:6
105:1, 21 106:11, 22
107:2, 17, 23 110:16
113:8 114:6, 11
115:24 116:18 117:2,
7, 16, 25 118:4
119:25 121:4, 8, 18
122:5 125:12 145:1
177:15
stipulations 31:1
stock 34:4
stop 49:19 58:14
110:6 114:19, 24
133:4 148:23 173:15,
16
straw 170:24
Street 3:17, 23 4:7
32:14, 15
strengths 154:11
strike 100:14 135:22
186:4 189:8
structures 43:12

stuff 40:3 78:15
140:7 150:23 202:17
stupid 115:18 196:11
stupidity 178:19
subject 29:18 43:17
47:25 56:24 63:25
75:1 76:24 77:4
78:6 91:22 92:9
103:16 109:23 131:3
138:3 156:15 157:7
170:9, 23 171:3
subjects 14:12
sublease 32:20, 21
submitted 170:5
Subparagraph 164:23
subpoena 13:5, 9, 12,
22 14:13 74:16 75:2
76:22 165:22
Subsections 166:9
subsequent 80:20
81:17 157:15 171:9
substance 11:8 33:17
substantial 18:5, 9
53:12 124:18 163:2
substantive 204:9
subtenant 71:9
subtract 171:18
sued 83:12 137:11
186:17
sufficient 44:9
suggesting 11:13
suing 61:24 72:13,
22 73:1
suit 60:18
Suite 3:18 4:7
suits 83:3
summarized 108:19
summary 105:2
106:14
summons 192:18, 21
super 192:3
supervise 128:17, 18,
21 134:22 143:24
182:9
supervised 129:8
supplemental 57:1
support 18:16 35:17
91:20 183:10
supporting 94:11
170:5

supposed 50:10
170:25
sure 11:5 12:6 16:6,
23 18:22 21:17
23:16 30:21 37:13
39:4 42:6, 24 43:2,
12, 15 49:3 51:23
52:1 53:1 62:3
63:24 69:13 80:10
82:8 83:2 93:21
99:25 100:2 102:14
108:16 114:23 121:1,
13 123:11 127:4, 7
129:11 132:16 137:7,
9 141:7 151:16
155:16 167:1 178:11
187:21 189:20 195:2
surprises 196:5
surrounding 180:13
swallow 50:14
swear 6:8
sworn 6:25 124:12,
21 125:5 205:7
system 151:15, 23

< T >
tackle 191:18
tagged 189:17
tail 192:5
take 8:1 11:17, 18
50:10 54:14 55:1, 3
59:11 71:6 77:24
85:4, 20 93:20 94:13,
24 95:2, 5, 10 100:7
108:14 133:3 148:20
158:8 159:19 165:5
182:18 186:6 191:15
192:3, 4
taken 7:12 49:14
83:21 86:6 112:9
191:12 205:9
talk 50:1 94:1, 17,
21 95:8 128:3
168:23 195:25
talked 89:11, 25
talking 44:5 54:15
56:3 77:19 86:7
91:7 128:5 142:6
144:4 168:15 180:2

Tan 176:9
T-a-n 176:10
Tang 176:6
T-a-n-g 176:7
tank 197:24
target 44:6, 13
task 189:18
tasked 151:12
tasks 189:14
tax 43:11
Team 35:9, 15, 19, 23
39:8 40:9 51:10
52:22 82:24 83:23
91:22 128:12 134:22
138:2, 5, 9, 20 149:14
154:10 183:5 189:17,
18
technical 13:4 146:20
technological 33:11
telegraphing 120:15
telephonic 127:5
tell 8:6 28:15 39:25
40:17 41:19 43:15
45:14 54:5 76:10, 16
78:7 84:18 85:17
89:5 105:18, 24
112:6 114:25 124:15,
16 125:7 167:24
173:15 174:9 196:1
197:19 199:2 204:5
telling 12:13 40:1
89:25 164:3 201:10
tens 120:20
tentacles 177:21
term 158:22 161:8
163:7 164:18, 20
terms 16:18 26:10
44:5, 11 51:6 68:12,
21 84:20 92:2, 22
93:4, 11, 14 96:7
98:4 116:5 127:21
129:3 132:18 140:3
152:7 153:19 155:2
157:6 163:4 183:24
test 192:19
testified 7:1 25:20
51:13 68:8 70:8
89:16 91:19 99:11
120:1 126:9 129:21

149:2 152:8 158:21
167:22 182:22 201:4
**testify** 13:6 14:2
30:9, 20 41:12 45:24
55:17 59:24 60:3
62:5 75:6, 12, 22, 25
76:15 77:2, 4 78:5
79:11 95:21 102:14
112:1 150:22 152:19
163:25 169:15 170:6,
16, 25 171:1 183:3
186:3 187:19 189:9
**testifying** 17:20
19:15 30:21 59:20
67:4 68:9 78:19
105:11, 12, 13 123:25
125:3 177:10 186:13
**testimony** 9:12 11:9
12:15, 19, 24 13:13,
16, 17, 20 14:6, 13
16:8 19:17, 22, 24
21:5 26:1 29:6
40:13, 22 45:22
49:15 61:23 62:1
66:4 67:7, 11, 14, 16,
19 69:11 74:13, 16
76:3, 25 79:2 80:9,
17 81:19 84:1, 9, 15
92:13, 16 96:6
124:12, 21 125:5
133:18 152:12, 14
156:10 159:1 168:3
171:3 173:1 174:14
204:9 205:10
**text** 10:23 33:9
173:10
**texts** 11:14 133:2
**Thank** 13:1 28:25
29:1 54:17 55:5
57:19 62:24 80:6
84:25 98:2 115:22
126:8 144:13 146:15
152:15 165:16 168:3
174:18 198:20
203:25 204:1, 2, 20,
21
**thankfully** 84:4
**Thanks** 123:6
**theoretically** 93:8
**thereon** 63:17

**thereto** 52:6 56:1
122:5
**thing** 9:1 24:17
102:13 103:24 106:8
109:1, 20 110:6
115:10 132:16, 24
167:13
**things** 8:24 42:25
52:2 60:3 61:19
68:22 71:5, 6 76:15
78:20 83:5 102:17
105:24 115:20
124:16 133:19
134:25 137:16, 17
150:19, 20 151:24
153:21, 22 154:11
170:14, 19 172:25
189:13 190:21
**think** 10:19, 20
12:11 19:21 23:3
24:22 30:8, 18 33:24
34:18 36:3, 10 37:2
38:16 39:3, 6 40:23
44:8 59:6, 8 60:7
64:2, 7, 13 65:1, 3
77:18 81:8 82:7
86:23 87:7 88:15
89:17 90:11 93:6, 16,
19 96:9, 10, 11 98:19
99:6 103:1 105:20
110:25 117:12, 17
118:17 120:18, 23
127:24, 25 128:4
129:11 132:2 136:13,
23 137:16 139:3, 6
140:5, 23 146:8
148:21 149:24
155:17 156:24
161:21 173:16, 25
174:10 175:3, 13
176:1, 17, 20 177:20
178:19 183:9 186:16
194:11 195:11
196:13 197:1, 7
198:11, 19 199:19
202:6 203:6, 24
**thinking** 137:21
**third** 102:13, 19, 24
154:21
**Thomas** 176:21

**thought** 14:21 70:7
136:25 137:22, 24
157:19
**thousands** 55:11, 21,
23 120:20 194:17
195:9
**three** 35:20 36:1, 23
43:14 55:10 56:23
57:22, 24 91:23
133:21 134:1 137:16
187:24 188:1
**three-hour** 171:19
**throw** 170:24 185:23
196:1
**tie** 79:5
**tied** 159:11 190:22
**tight-lipped** 201:13
**time** 6:4 8:9, 15
9:14, 20 15:4 16:1, 9,
10, 18, 20 17:5 22:10
24:23 26:7 36:3, 10
39:13, 18 40:2 43:16
51:19 63:21 66:10,
18, 22 67:23 69:16,
25 70:5 71:8 78:22,
23, 24 81:7 83:1
85:1, 12, 14, 19 86:18
90:25 93:19 95:17
96:3, 20 103:1, 4
112:8 113:3 117:17
118:2, 10 121:4
125:5 130:14 133:3
134:14 135:3, 4
137:15 146:7 149:18,
20 150:8, 13 151:14
165:5, 19 171:15
179:3 181:5 182:6
193:5 204:13, 23
**timeline** 68:12, 20
**timely** 107:3
**times** 70:22 85:5
97:2 161:24 183:13
**today** 6:6 9:11 11:7
12:5, 24 13:7, 13
19:15 21:5 26:1
41:12 56:11 59:21,
24 74:14 76:3 80:7
84:12 89:4 101:9, 10
102:14 110:24 111:7
144:4 150:15, 22

151:2 152:19 156:2,
8 158:3, 17 166:23
169:16 175:16, 21
186:1, 13 195:20
**today's** 12:7, 17
45:25 132:13 171:3
**told** 40:15 45:11
62:5 77:21 78:9, 13
80:14 123:20 158:25
159:5 179:5 181:6
190:5 196:8
**Tony** 63:20 64:3
66:5 80:18 81:11, 18
100:23 104:18 116:8
125:10 175:16 177:8,
22 179:10, 14, 19
181:2, 7, 17, 22 182:5
196:3
**top** 60:20, 22 148:14
**topic** 132:13
**total** 50:14 154:23
155:5
**totaling** 167:4
**totals** 161:17
**tough** 71:3
**touted** 106:12
**track** 40:2
**Trade** 44:25 45:1
**training** 197:16, 20
76:19 78:3, 8 79:12
124:13, 18 125:24
129:24 151:8 156:3,
10 163:2, 12 175:1
197:13 201:21
**transactional** 196:23
**transactions** 77:9, 13
164:12
**transcript** 8:3
**transfer** 73:4, 13
116:11
**transferees** 71:16
**transferred** 61:10, 17
71:15, 21 72:9
125:16 126:6 203:10
**transferring** 202:3
**transfers** 63:15
73:18, 19
**transmission** 57:8
**transpiring** 189:15

triage 153:*15, 25*
190:*21*
trick 76:*20*
triggered 189:*14*
triggers 103:*24*
Trinh 176:*15, 18*
T-r-i-n-h 176:*16, 19*
trivial 184:*8*
true 106:*8* 114:*10*
162:*7* 194:*2* 205:*9*
Trust 194:*12, 13*
TRUSTEE 3:*13* 4:*4*
6:*15, 16, 21* 18:*3, 4, 8,
13* 45:*16, 20* 52:*9, 11*
53:*7, 22* 54:*3, 8*
56:*13* 57:*4, 25* 59:*25*
60:*4, 16, 18* 61:*9, 14,
15, 24* 63:*2, 16, 19*
71:*14, 19, 24* 72:*2, 7,
12* 73:*1, 6, 12* 89:*22*
93:*5* 97:*8* 100:*18, 25*
101:*4, 11, 14, 17*
102:*7, 13, 19, 23*
104:*13, 16, 20, 22*
105:*6* 106:*12, 16, 20,
23* 107:*5, 12* 108:*21*
109:*8, 17, 18* 110:*3*
113:*9* 115:*4, 6, 8, 25*
116:*6, 13, 17* 118:*14,
23* 119:*17* 121:*5, 9*
122:*11, 23* 126:*25*
127:*3, 9, 12* 128:*8, 13*
129:*8, 23* 133:*22*
134:*4, 5, 6, 11, 17*
136:*2* 137:*11, 25*
144:*11, 16* 145:*2, 23*
154:*17* 155:*20* 157:*5*
158:*15* 159:*25* 161:*8,
20* 162:*19* 163:*19*
164:*1, 7, 10* 167:*11,
19* 168:*11* 169:*6*
172:*11* 177:*5* 181:*22*
182:*3, 4* 194:*14*
199:*1* 202:*3* 203:*4*
trustees 87:*3* 117:*7*
trustee's 18:*16* 53:*11*
75:*14* 86:*7* 114:*16*
121:*20* 122:*3* 125:*15*
127:*12* 128:*8, 14*
129:*9* 130:*9* 131:*21*

136:*15* 137:*18, 20*
144:*18* 148:*17* 189:*4*
200:*20*
truthful 97:*12*
truthfully 76:*18*
try 17:*4* 24:*20* 25:*4*
100:*14* 136:*25*
170:*24* 187:*5, 8*
193:*7, 9*
trying 14:*20* 23:*16*
31:*21* 46:*4* 49:*6*
53:*2, 10* 54:*2* 69:*20*
76:*20* 77:*11* 89:*21*
103:*5* 125:*7* 127:*24*
148:*7* 150:*22* 151:*25*
168:*1* 173:*3* 185:*11*
187:*12, 18* 199:*21*
turn 179:*2, 5* 203:*22*
turned 83:*19* 129:*19*
tweaked 51:*18*
two 36:*12* 37:*10, 18*
51:*3* 55:*10, 22* 68:*13*
85:*5* 86:*12* 91:*20*
97:*11, 14* 99:*5, 8*
102:*6, 12, 22* 136:*20*
142:*7* 153:*19* 163:*24*
164:*14* 167:*4* 171:*15*
179:*1* 187:*21* 188:*3,
9* 194:*17* 197:*3*
199:*5*
type 167:*16* 169:*20*
178:*16* 202:*25*
types 153:*20* 183:*3*
typical 69:*9* 99:*1*
Typically 8:*11* 16:*2*
30:*23* 98:*21* 184:*10*
189:*9*

< U >
U.S 194:*14*
uh-huh 7:*22*
ultimately 93:*12*
170:*13*
umbrella 129:*3*
153:*1*
unable 41:*12, 22*
42:*13* 43:*3*
unaware 72:*14*
unclear 110:*2*

uncovered 170:*19*
185:*21*
underneath 129:*2*
understand 7:*10* 8:*5*
9:*25* 11:*1, 4, 6, 10*
15:*25* 16:*6* 21:*3*
23:*17* 44:*12* 49:*6*
53:*10* 54:*2* 59:*6, 7*
61:*12, 13, 15* 72:*7, 12*
85:*2* 86:*3* 94:*3*
98:*14* 107:*15* 108:*24*
110:*16* 111:*3, 5, 7, 9,
12, 20* 115:*13, 19*
121:*16* 149:*17* 157:*8*
163:*22* 173:*5* 174:*10*
187:*13, 18*
understanding 61:*18*
66:*12* 93:*24* 97:*5*
98:*11* 111:*13* 116:*2,
16, 24* 117:*6* 118:*19*
121:*3* 122:*9* 138:*13*
153:*15* 155:*11* 162:*2*
166:*13* 180:*24, 25*
181:*13* 193:*22*
understood 8:*7* 62:*7*
66:*10* 67:*11* 98:*2*
115:*22* 116:*15*
142:*12* 166:*1*
unfair 110:*11*
unintelligible 30:*6*
153:*12*
UNITED 1:*1* 3:*13*
6:*15* 182:*4* 199:*1*
unopened 190:*16, 20*
191:*24* 193:*8*
unreasonable 81:*3, 8*
unrelated 133:*17*
unrepresented 83:*16*
120:*22*
UNSECURED 3:*9*
unsigned 147:*19*
unusual 11:*21*
unwilling 89:*4*
uploaded 189:*13*
190:*5, 14, 21* 192:*2*
uploading 190:*9*
upper 158:*13*
upset 31:*23* 185:*16*
upside 83:*19*

use 60:*9* 148:*22*
149:*25* 165:*19*
187:*21* 202:*6*
uses 127:*20* 200:*20*
usually 24:*7*
utilized 28:*10* 52:*13*
53:*6* 125:*22*

< V >
V2 60:*10*
vacating 193:*16*
vacation 178:*11*
vague 30:*5* 66:*3*
104:*20* 111:*23*
112:*18* 153:*11*
VALIDATION 3:*21*
6:*18*
valuation 82:*1*
167:*16* 169:*5, 6, 19,
20* 171:*8* 172:*10, 12*
174:*19, 24* 175:*2*
value 108:*5* 112:*10*
167:*14, 22* 168:*20*
169:*3, 16, 24* 171:*25*
172:*7* 174:*22*
valued 167:*20* 170:*8*
various 64:*8, 14*
66:*13* 71:*15* 100:*6*
113:*15* 139:*15, 16*
164:*24* 192:*11*
196:*25*
verbal 7:*22*
verify 23:*22* 24:*10*
version 59:*16*
versus 16:*21* 27:*18*
30:*11*
vetting 9:*16*
vi 106:*9*
video 148:*24*
videoconference 2:*1*
205:*12*
videoconferencing
127:*6*
view 135:*16* 153:*14,
25* 178:*2*
violating 93:*17*
violation 43:*19*
violations 43:*24*
44:*14*

**Virtually** 1:*16* 2:*1*
**vis-á-vis** 191:*6*
**visited** 33:*19* 46:*8*
190:*1, 2*
**voice** 31:*8, 13*
**voluntarily** 8:*20*
**voluntary** 9:*18*
**volunteered** 197:*21*
**volunteering** 124:*6*

**< W >**
**W-2** 27:*2, 18, 19*
**wages** 83:*20*
**wait** 7:*25* 50:*12*
171:*11*
**waive** 93:*9* 96:*2*
170:*18* 204:*7, 14*
**waiving** 9:*9*
**Wall** 32:*14, 15*
**want** 9:*23* 12:*20*
24:*17* 27:*11* 30:*19*
34:*15, 25* 35:*4* 36:*4*
37:*4* 41:*16* 43:*4*
49:*19* 50:*21* 57:*16*
65:*22* 85:*15* 87:*15*
93:*20* 94:*1, 7, 12, 24*
95:*2, 5, 18* 100:*7*
102:*19* 103:*4* 105:*23*
112:*1* 120:*6* 121:*12*
126:*14* 128:*4* 133:*8*
135:*14* 144:*22*
156:*20* 165:*11*
180:*16* 185:*10, 23*
187:*21* 197:*11*
201:*18* 202:*10*
203:*19* 204:*18*
**wanted** 64:*7* 108:*11*
**wants** 120:*17* 164:*15*
179:*6*
**warrant** 195:*13, 16*
**waste** 96:*3*
**watermark** 147:*2, 3*
**way** 8:*3* 16:*25* 17:*1*
27:*14* 59:*8, 9, 23*
69:*19* 80:*13* 81:*4*
93:*23* 100:*15* 109:*11*
113:*17* 115:*13*
118:*20* 134:*24* 135:*2*
137:*17, 21* 138:*1*
158:*5, 11* 159:*19*

164:*7* 166:*24* 181:*18*
191:*14* 205:*18*
**ways** 189:*19*
**weaknesses** 154:*11*
**Webber** 92:*2*
**Weber** 32:*4* 75:*24*
80:*4* 88:*13, 14* 89:*2,
5, 12, 17, 18* 90:*1, 9*
92:*8, 17, 21* 93:*3, 13*
95:*22* 96:*7, 10* 110:*1*
134:*21* 138:*2, 6, 9*
143:*24* 182:*12, 13*
**Weber's** 35:*10*
**website** 23:*24* 32:*24*
33:*3, 9, 20, 23* 34:*3,
15, 18, 19* 35:*1* 46:*9*
48:*9* 50:*18, 21, 24*
51:*9* 58:*19, 23*
141:*24* 201:*10*
**websites** 192:*8* 194:*9*
**week** 50:*4, 13*
**weekly/monthly**
197:*10*
**welcome** 54:*18*
**well** 8:*2* 9:*17* 11:*4*
12:*16* 14:*19* 19:*9, 18*
22:*4* 26:*3, 6* 33:*8, 16*
36:*21, 25* 40:*20*
44:*11* 45:*6* 50:*1, 23*
51:*22* 52:*17, 25*
53:*20* 61:*21* 65:*13*
66:*17* 75:*19* 84:*4*
88:*20* 89:*7* 90:*11*
92:*24* 96:*23* 98:*15*
105:*12* 108:*23*
110:*12* 120:*8* 122:*13,
18* 123:*23* 127:*8, 18*
128:*19* 132:*2, 15*
133:*8* 134:*5* 135:*22*
143:*10* 151:*1* 154:*14,
21* 155:*24* 156:*14*
157:*2* 160:*13* 162:*24*
170:*12* 171:*2* 175:*12*
181:*9* 201:*24*
**well-prepared** 9:*21*
**well-resourced** 83:*12*
**went** 8:*21* 75:*5*
118:*4, 7* 121:*9* 139:*3,
6* 190:*1* 200:*17*

**we're** 9:*16* 11:*12*
15:*2* 23:*3* 27:*25*
28:*3* 46:*16* 55:*9*
62:*1* 77:*18* 78:*13*
83:*6, 7* 84:*19* 103:*5*
105:*25* 117:*23*
142:*10* 146:*12, 20*
147:*11* 148:*13* 150:*1*
153:*20* 156:*15* 159:*1*
163:*8* 171:*19* 188:*6*
194:*4* 197:*7* 199:*20*
**Wes** 176:*21*
**we've** 9:*5* 12:*18*
14:*2* 54:*13* 84:*18*
102:*12, 20, 22* 110:*9*
189:*5*
**whatsoever** 94:*22*
177:*9* 180:*1* 182:*21*
198:*6*
**wheel** 66:*15*
**WHEREOF** 205:*25*
**wife** 11:*14*
**wild** 183:*14*
**wildest** 83:*14*
**willing** 66:*16* 194:*18,
22*
**window** 133:*2* 202:*9*
**wires** 160:*5*
**withdraw** 50:*11*
**withdrawing** 26:*17,
19* 49:*19*
**withheld** 109:*18*
125:*11*
**withhold** 109:*2, 13,
19* 189:*3*
**withholding** 114:*12*
**witness** 6:*8* 9:*2*
19:*25* 24:*13* 25:*18*
27:*11* 29:*17* 31:*2, 10*
34:*14, 18* 35:*2* 37:*14*
45:*21, 24* 49:*16*
52:*17* 55:*4, 7* 57:*17*
62:*4, 7* 66:*2* 76:*14,
17, 21, 25* 77:*8, 12*
78:*2, 18* 79:*1, 4, 7*
85:*5, 15* 103:*5*
105:*10, 14* 110:*24*
117:*19* 118:*1* 119:*25*
120:*5, 16, 18* 123:*3, 7*
124:*1, 7* 125:*6, 8*

147:*24, 25* 148:*23*
153:*13* 156:*17, 23*
159:*13* 162:*4* 164:*13*
165:*17* 171:*11* 172:*3,
17, 20* 200:*10* 204:*1,
6, 10, 15* 205:*4, 6, 10,
25*
**witnesses** 77:*4*
**witness's** 123:*23*
**Wonderful** 172:*24*
**wondering** 24:*5*
**word** 89:*23* 107:*21*
126:*14* 130:*1* 142:*5*
162:*17* 174:*9* 195:*8*
201:*12*
**words** 33:*18* 148:*1*
167:*22* 169:*9* 196:*12*
**work** 16:*5* 16:*5, 12,
13, 14, 16, 21* 17:*21*
22:*10, 11* 27:*9* 28:*7,
22, 24* 34:*6* 36:*13*
37:*11* 67:*2, 12, 23*
70:*23, 24* 78:*17*
80:*14, 15* 81:*3* 82:*17,
18* 109:*14* 111:*17*
115:*12* 126:*13*
152:*16* 153:*20*
154:*14* 178:*14* 186:*6*
**worked** 16:*19* 67:*1*
**worker** 152:*9*
**working** 25:*20* 39:*10*
68:*8* 73:*21* 82:*11*
84:*18* 88:*5* 92:*5*
179:*11* 181:*6* 184:*18*
188:*6, 25* 189:*1*
192:*5* 199:*19, 21*
**work-product** 14:*15*
29:*13* 75:*4* 86:*15*
90:*15* 119:*2, 23*
123:*18* 135:*8* 159:*3*
**work-project** 31:*6*
**works** 17:*5* 115:*13*
118:*2, 20* 187:*19*
**worst** 183:*13* 193:*11*
**writing** 132:*8* 169:*1,
12* 171:*23*
**written** 132:*1* 173:*21*
174:*23, 24* 175:*2, 5, 7,
10*

**wrongly**  45:*15*

**< Y >**
**yeah**  7:*22*  18:*22*
 25:*3*  39:*20*  48:*14*
 49:*1*  73:*10*  88:*3*
 100:*8, 10*  121:*15*
 127:*7*  131:*2*  133:*1*
 134:*1*  148:*23*  149:*5,
 6*  150:*14*  151:*4*
 155:*16*  171:*13*
 178:*11*  181:*25*
 194:*11*  198:*4, 22*
 201:*17*
**year**  19:*8*  27:*3*
 28:*10*  42:*22*  60:*16*
 70:*23*  71:*11*  139:*11*
 153:*9, 25*  195:*7*
**years**  16:*8*  116:*8, 25*
 198:*2*
**yelling**  31:*14*
**York**  3:*12*  10:*4*
 28:*22, 23*  53:*25*
 58:*19*  90:*21*  180:*12*
 196:*19*  198:*10*  199:*4,
 18, 22*  200:*2, 10*
**York's**  18:*24*

**< Z >**
**Zoom**  2:*1*  87:*8*
 100:*8*  108:*15*  132:*23*
 145:*14*  172:*2*  173:*9*

## WORD LIST

**< $ >**
**$1**  *(5)*
**$17**  *(1)*
**$175**  *(2)*
**$240**  *(1)*
**$240.61**  *(1)*
**$3.3**  *(5)*
**$42**  *(22)*
**$50**  *(3)*
**$58**  *(1)*
**$6.8**  *(1)*
**$7**  *(1)*
**$8**  *(12)*
**$9.2**  *(1)*

**< 1 >**
**1**  *(7)*
**1,000**  *(1)*
**1.10**  *(1)*
**1.3**  *(9)*
**1.3(ii**  *(1)*
**1.4**  *(1)*
**1.6**  *(1)*
**1.8**  *(3)*
**10**  *(20)*
**10,000**  *(6)*
**10.1**  *(1)*
**10:04**  *(1)*
**10:48**  *(2)*
**100**  *(6)*
**101**  *(1)*
**10178**  *(1)*
**1099's**  *(4)*
**11**  *(8)*
**11:10**  *(2)*
**11:31**  *(1)*
**11:36**  *(1)*
**11:52**  *(1)*
**11480**  *(1)*
**11973**  *(4)*
**12**  *(7)*
**12,000**  *(30)*
**12,546**  *(2)*
**12:45**  *(4)*
**12:56**  *(2)*
**13**  *(4)*
**13th**  *(1)*

**15**  *(8)*
**15,000**  *(1)*
**15:56**  *(1)*
**16**  *(1)*
**17**  *(4)*
**179**  *(1)*
**17th**  *(1)*
**18**  *(18)*
**19**  *(3)*
**198**  *(1)*
**19th**  *(1)*

**< 2 >**
**2**  *(17)*
**2,000**  *(4)*
**20**  *(9)*
**20,000**  *(2)*
**2002**  *(1)*
**2022**  *(17)*
**2023**  *(52)*
**206**  *(1)*
**21**  *(1)*
**212**  *(1)*
**212.878.7900**  *(1)*
**22**  *(1)*
**22,000**  *(8)*
**229**  *(1)*
**23**  *(1)*
**24**  *(1)*
**25**  *(9)*
**250**  *(1)*
**255**  *(2)*
**25th**  *(2)*
**274**  *(2)*
**279**  *(1)*
**289**  *(1)*
**29**  *(1)*
**2A**  *(1)*

**< 3 >**
**3**  *(5)*
**30**  *(4)*
**31**  *(1)*
**310.56.1001**  *(1)*
**35,000**  *(3)*
**3rd**  *(1)*

**< 4 >**
**4**  *(2)*

**40**  *(18)*
**40507**  *(1)*
**411**  *(1)*
**42**  *(2)*
**45**  *(2)*
**45th**  *(1)*

**< 5 >**
**5**  *(1)*
**5,000**  *(5)*
**50**  *(1)*
**50/50**  *(2)*

**< 6 >**
**6**  *(9)*
**6/15**  *(2)*
**6/25**  *(1)*
**67**  *(3)*
**69**  *(1)*

**< 7 >**
**7**  *(5)*
**7:04**  *(3)*
**714.338.3400**  *(1)*
**7160**  *(1)*
**7220**  *(1)*

**< 8 >**
**8**  *(2)*
**8:05**  *(1)*
**8:13**  *(1)*
**8:23-bk-10571-SC**  *(1)*
**8:53**  *(1)*
**80**  *(1)*
**80/20**  *(2)*
**805.564.2444**  *(1)*
**831**  *(1)*
**859.425.1021**  *(1)*

**< 9 >**
**9**  *(1)*
**90**  *(1)*
**900**  *(1)*
**900,000**  *(1)*
**90213**  *(1)*
**90-day**  *(2)*
**92701-8000**  *(1)*
**93101-3227**  *(1)*
**940**  *(2)*

**< A >**
**a.m**  *(10)*
**A.P.C**  *(1)*
**ABA**  *(1)*
**ability**  *(4)*
**able**  *(17)*
**absolutely**  *(10)*
**absorb**  *(1)*
**accept**  *(1)*
**acceptable**  *(2)*
**accepted**  *(1)*
**account**  *(10)*
**accounting**  *(8)*
**accounts**  *(3)*
**accurate**  *(11)*
**acknowledgement**  *(1)*
**acquire**  *(7)*
**acquired**  *(28)*
**acquiring**  *(5)*
**acquisition**  *(34)*
**acquisitions**  *(13)*
**act**  *(4)*
**action**  *(8)*
**actions**  *(1)*
**active**  *(7)*
**actively**  *(6)*
**actors**  *(1)*
**acts**  *(4)*
**actual**  *(12)*
**add**  *(2)*
**adding**  *(1)*
**addition**  *(3)*
**additional**  *(7)*
**address**  *(7)*
**addressed**  *(2)*
**adjustments**  *(1)*
**administrative**  *(1)*
**admissible**  *(1)*
**admitted**  *(7)*
**advance**  *(1)*
**advanced**  *(1)*
**advantageous**  *(1)*
**adversarial**  *(1)*
**adversary**  *(3)*
**advice**  *(6)*
**advise**  *(2)*
**affect**  *(1)*
**Affiliate**  *(9)*

affiliated (2)
affiliates (2)
affiliation (1)
affirmative (1)
afford (3)
afield (2)
afternoon (3)
agent (7)
ago (20)
agree (11)
agreed (7)
agreeing (3)
agreement (49)
agreements (1)
agrees (1)
ahead (6)
Akers (1)
A-k-e-r-s (1)
Albert (5)
alerted (2)
allegation (8)
allegations (5)
alleged (5)
alleges (5)
alleging (5)
allocate (1)
allocated (1)
allow (2)
allowed (4)
alter (4)
amazing (1)
ambiguous (4)
amended (10)
amendments (1)
American (1)
amount (13)
amounts (6)
amplify (1)
ANA (2)
analyzed (1)
annoying (1)
answer (128)
answered (8)
answering (2)
answers (3)
anticipate (3)
anybody (22)
anymore (1)
anyway (1)

APA (5)
apart (2)
apologize (1)
appear (4)
appearance (4)
appearances (1)
applicable (3)
appointed (1)
appraisal (7)
appreciate (4)
approach (2)
approaching (1)
appropriate (3)
approval (7)
approvals (1)
approved (11)
approves (1)
approving (2)
approximate (9)
approximated (2)
approximately (32)
approximation (2)
area (3)
areas (3)
argued (1)
argumentative (3)
arguments (1)
arms (1)
arrangements (2)
arrival (1)
arrived (2)
Aryeh (1)
aside (3)
asked (33)
asking (49)
asks (1)
assert (1)
asserted (1)
assertion (2)
assertions (2)
asset (18)
assets (39)
assigned (1)
assignment (1)
Assistant (2)
associate (1)
ASSOCIATES (3)
Association (1)
assume (4)

assumed (11)
assumes (5)
assuming (3)
attached (7)
attaching (1)
attention (6)
attesting (1)
attorney (37)
attorney-client (19)
attorneys (38)
attributable (1)
attribute (1)
audio (1)
authority (8)
authorization (1)
authorized (1)
available (1)
Avenue (1)
average (1)
avoidance (1)
aware (29)

< B >
back (29)
backdrop (2)
background (3)
badgering (1)
balance (1)
ball (3)
band (1)
bandwidth (1)
bank (5)
banking (1)
BANKRUPTCY (12)
Bar (4)
Barbara (1)
base (4)
based (21)
Basically (2)
basis (16)
bathroom (1)
BBB (2)
Bear (13)
becoming (1)
bee (1)
began (1)
beginning (1)
BEHALF (35)
belief (3)

believe (20)
believed (1)
believes (1)
Ben (4)
beneath (2)
benefit (1)
best (7)
Better (21)
Beverly (1)
Bianca (1)
bid (3)
big (3)
bigger (2)
binding (2)
bio (1)
birds-eye (2)
birth (1)
bit (5)
blank (2)
block (2)
blood (1)
board (3)
boots (1)
B-o-r-e (1)
Borelli (5)
B-o-r-e-l-l-i (1)
borrower (1)
bottom (5)
bought (1)
bound (1)
Box (1)
branch (2)
breach (1)
break (19)
breakdown (1)
breaking (2)
briefs (1)
bring (4)
brings (3)
broad (5)
Broadway (3)
broke (2)
broker's (1)
Brooklyn (2)
brought (3)
bucket (3)
bunch (2)
burden (1)
Bureau (16)

Bureau's  (2)
business  (54)
busy  (3)
buy  (2)
buyer  (10)
Buyer's  (4)
buying  (1)
buzz  (1)

< C >
calculated  (2)
calendar  (8)
CALIFORNIA  (9)
call  (30)
call-drop  (2)
called  (11)
calling  (1)
calls  (23)
Campbell  (5)
capacity  (11)
capital  (6)
capitalization  (1)
capitalize  (1)
CAPPELLO  (1)
caption  (3)
Cara  (5)
care  (7)
careful  (1)
carefully  (1)
Carolina  (1)
Case  (17)
caseload  (2)
cases  (2)
cash  (3)
catastrophic  (2)
catching  (1)
categories  (8)
category  (2)
causes  (1)
caution  (1)
caveats  (1)
Celentino  (1)
Center  (1)
CENTRAL  (3)
certain  (23)
certainly  (16)
certainty  (1)
certificate  (5)
Certified  (3)

certify  (3)
chance  (1)
changed  (3)
changes  (4)
Chapter  (4)
characterization  (4)
charge  (4)
checking  (1)
Chhor  (1)
C-h-h-o-r  (1)
chief  (3)
Chirstopher  (1)
choose  (2)
chose  (2)
Christopher  (1)
circuit  (1)
circumstances  (1)
City  (1)
civil  (1)
civility  (1)
claim  (1)
claims  (8)
clarification  (2)
clarify  (6)
class  (1)
classify  (1)
clause  (7)
clean  (1)
clear  (7)
clearly  (5)
CLG  (252)
CLG's  (38)
click  (2)
clicked  (2)
client  (56)
clients  (65)
client's  (4)
close  (4)
closed  (6)
closer  (2)
closing  (3)
Club  (1)
co-defendants  (1)
Cohen  (1)
Cohens  (1)
coincidence  (4)
cold  (1)
colleagues  (1)
collected  (2)

collection  (1)
collectively  (1)
combat  (1)
come  (17)
comes  (1)
comfortable  (1)
comforted  (1)
coming  (12)
commenced  (2)
commencement  (1)
commencing  (1)
comment  (5)
comments  (2)
Commission  (2)
commit  (4)
COMMITTEE  (19)
common  (3)
communicate  (3)
communicated  (2)
communicating  (1)
communication  (3)
communications  (9)
company  (34)
competency  (1)
competently  (2)
complainant  (1)
complains  (1)
complaint  (54)
complaints  (25)
completely  (1)
complex  (1)
compliance  (8)
compliant  (7)
comply  (1)
compound  (2)
compounded  (1)
compromise  (2)
conceal  (2)
conceded  (2)
conceived  (4)
concern  (4)
concerning  (44)
concerns  (1)
conclude  (2)
conclusion  (6)
condition  (1)
conditions  (8)
conduct  (1)
Conducted  (5)

confer  (1)
conference  (6)
confident  (2)
confidential  (2)
confused  (4)
confusing  (1)
Conjecture  (1)
connect  (1)
connected  (2)
connection  (5)
consent  (2)
consequences  (2)
consider  (2)
consideration  (4)
considered  (2)
consistent  (1)
constant  (1)
constitutional  (1)
constructed  (1)
consult  (4)
consultation  (2)
CONSUMER  (149)
consumerlegalgroup.co
m  (1)
consumers  (3)
consumer's  (1)
cont  (1)
contact  (6)
contacted  (3)
contacts  (1)
contains  (2)
contemplated  (1)
contemplating  (2)
contemplation  (1)
contended  (1)
contending  (2)
contends  (2)
content  (3)
contention  (1)
context  (3)
continue  (6)
continued  (1)
continues  (2)
contract  (3)
contractors  (2)
contracts  (2)
control  (2)
conversation  (9)
conversations  (14)

Conversely *(1)*
cooperate *(2)*
cooperation *(1)*
coordinate *(3)*
copies *(1)*
copy *(1)*
corner *(3)*
corporate *(9)*
Corporation *(14)*
Corporations *(2)*
corporation's *(2)*
correct *(105)*
correctly *(6)*
correspond *(1)*
counsel *(92)*
counsels *(1)*
counties *(1)*
counting *(1)*
couple *(11)*
coupled *(1)*
course *(6)*
COURT *(45)*
courthouses *(1)*
courts *(3)*
Cousineau *(4)*
cover *(4)*
covered *(2)*
covering *(1)*
cracks *(2)*
create *(3)*
created *(2)*
creating *(1)*
credibility *(1)*
creditor *(1)*
CREDITORS *(8)*
critical *(1)*
cross *(2)*
crunch *(3)*
CSR *(3)*
culminated *(3)*
cumbersome *(1)*
current *(9)*
currently *(1)*
customer *(24)*
customers *(3)*
cut *(3)*

< D >
d/b/a *(2)*

daily *(1)*
damage *(1)*
Dan *(1)*
Daniel *(1)*
Danitza *(6)*
D-a-n-i-t-z-a *(1)*
Danny *(1)*
date *(20)*
dated *(3)*
dates *(3)*
David *(2)*
day *(21)*
days *(19)*
day-to-day *(1)*
dcousineau@cappellon
oel.com *(1)*
de *(2)*
dead *(1)*
deal *(12)*
dealing *(1)*
dealings *(2)*
deals *(1)*
dealt *(4)*
DEBT *(23)*
Debtor *(13)*
debtor's *(31)*
debts *(7)*
decide *(1)*
decision *(2)*
declaration *(23)*
declarations *(5)*
decrease *(1)*
deduction *(1)*
default *(6)*
defendant *(1)*
defendants *(3)*
defending *(2)*
defense *(3)*
defenses *(2)*
deficiency *(1)*
define *(1)*
defined *(6)*
Definitely *(1)*
definition *(1)*
delay *(1)*
delayed *(3)*
deliver *(1)*
deliverable *(3)*
deliverables *(3)*

delivered *(1)*
dense *(3)*
Department *(10)*
depends *(1)*
depicted *(1)*
depo *(1)*
DEPONENT *(4)*
deposed *(2)*
deposit *(14)*
Deposition *(47)*
depositions *(1)*
deposits *(2)*
derived *(1)*
described *(2)*
DESCRIPTION *(1)*
designate *(2)*
designated *(22)*
designating *(1)*
despite *(1)*
detailed *(1)*
determine *(1)*
determined *(1)*
development *(1)*
devoted *(1)*
Diab *(40)*
Diab's *(2)*
died *(1)*
difference *(9)*
different *(13)*
differentiate *(1)*
difficulties *(1)*
diligence *(4)*
DINSMORE *(3)*
DIP *(4)*
direct *(1)*
directed *(1)*
direction *(10)*
directly *(8)*
director *(4)*
directors *(4)*
disagree *(4)*
discharged *(1)*
discharges *(1)*
disclose *(2)*
disclosed *(6)*
disclosing *(1)*
disclosure *(1)*
discovery *(2)*
discuss *(5)*

discussed *(5)*
discussing *(1)*
discussions *(6)*
dispatch *(1)*
dispute *(2)*
disputing *(1)*
disregard *(1)*
distinction *(1)*
distinguishing *(1)*
DISTRICT *(3)*
DIVISION *(3)*
document *(45)*
documentation *(2)*
documents *(22)*
Doe *(2)*
doing *(11)*
dollar *(1)*
dollars *(3)*
door *(1)*
doubled *(5)*
doubling *(7)*
downloaded *(1)*
draft *(5)*
drafted *(2)*
drafting *(1)*
dragged *(1)*
dreams *(1)*
driver's *(1)*
drives *(1)*
drop *(6)*
dropping *(2)*
due *(5)*
duly *(2)*
dump *(1)*
duties *(4)*
duty *(4)*
dwindle *(1)*

< E >
Eadie *(1)*
E-a-d-i-e *(1)*
earlier *(12)*
early *(10)*
earned *(6)*
Eastern *(4)*
easy *(1)*
edited *(1)*
effect *(3)*
effectively *(2)*

efficient  *(1)*
efficiently  *(1)*
efforts  *(2)*
**EGLIDELY**  *(1)*
ego  *(3)*
egos  *(1)*
eight  *(5)*
either  *(4)*
Elgidely  *(197)*
elicit  *(1)*
elicited  *(2)*
email  *(16)*
emails  *(8)*
emergency  *(4)*
employed  *(12)*
employee  *(2)*
employees  *(12)*
employer  *(4)*
employment  *(1)*
employs  *(2)*
encompass  *(1)*
ends  *(1)*
**Eng**  *(1)*
**E-n-g**  *(1)*
engaged  *(4)*
engagement  *(1)*
engages  *(1)*
enrolled  *(3)*
ensure  *(1)*
entered  *(2)*
entering  *(1)*
entire  *(6)*
entirely  *(3)*
entirety  *(1)*
entities  *(6)*
entitled  *(2)*
**Entity**  *(12)*
entries  *(1)*
entry  *(2)*
equal  *(2)*
equipment  *(1)*
equivalent  *(2)*
errors  *(1)*
escalate  *(1)*
escalated  *(1)*
escrow  *(3)*
escrows  *(1)*
**Esq**  *(5)*
essentially  *(2)*

establish  *(4)*
established  *(1)*
estate  *(14)*
estimate  *(4)*
estimates  *(2)*
ethical  *(3)*
ethically  *(1)*
ethics  *(2)*
evasive  *(1)*
event  *(1)*
events  *(1)*
everybody  *(5)*
evidence  *(9)*
evidenced  *(1)*
exact  *(17)*
exactly  *(3)*
**Examination**  *(7)*
examined  *(1)*
example  *(4)*
exceptionally  *(1)*
exchange  *(1)*
exchanges  *(1)*
excluding  *(2)*
**Excuse**  *(4)*
executed  *(1)*
execution  *(1)*
executive  *(5)*
executory  *(2)*
**EXHIBIT**  *(11)*
existing  *(1)*
exists  *(1)*
expect  *(1)*
experience  *(11)*
expert  *(3)*
explain  *(5)*
explained  *(1)*
explaining  *(3)*
explanation  *(2)*
explanations  *(2)*
explore  *(1)*
expressly  *(1)*
extension  *(6)*
extent  *(11)*
extremely  *(1)*
eye  *(1)*
eyes  *(3)*

**< F >**
face  *(1)*

faces  *(1)*
facing  *(2)*
fact  *(14)*
facto  *(1)*
factor  *(1)*
facts  *(4)*
factually  *(2)*
fair  *(14)*
faith  *(4)*
fall  *(1)*
falling  *(2)*
falls  *(1)*
false  *(1)*
familiar  *(9)*
familiarize  *(1)*
family  *(1)*
far  *(4)*
favor  *(2)*
favorable  *(1)*
**February**  *(1)*
**Federal**  *(6)*
fee  *(25)*
feel  *(8)*
**Fees**  *(4)*
**Feig**  *(1)*
felt  *(2)*
female  *(1)*
fiduciary  *(2)*
field  *(1)*
**Fight**  *(1)*
fighting  *(2)*
figure  *(3)*
figures  *(1)*
file  *(16)*
filed  *(50)*
files  *(125)*
**Filing**  *(5)*
filings  *(1)*
fill  *(3)*
final  *(4)*
finally  *(1)*
**Financial**  *(13)*
financially  *(1)*
financing  *(6)*
find  *(7)*
finding  *(2)*
finds  *(1)*
fine  *(5)*
fingers  *(1)*

finish  *(3)*
fire  *(3)*
fireballs  *(5)*
fires  *(1)*
firm  *(25)*
firms  *(2)*
first  *(28)*
fits  *(1)*
five  *(9)*
five-minute  *(3)*
flies  *(1)*
floating  *(1)*
**Floor**  *(7)*
flux  *(1)*
focus  *(1)*
folk  *(1)*
follow  *(3)*
followed  *(3)*
following  *(5)*
follows  *(2)*
font  *(1)*
foolish  *(1)*
forbid  *(1)*
forces  *(1)*
foregoing  *(1)*
form  *(6)*
formal  *(4)*
formally  *(3)*
formation  *(1)*
forth  *(11)*
forward  *(3)*
**Foster**  *(5)*
found  *(1)*
foundation  *(3)*
four  *(12)*
**Fourth**  *(1)*
**FOX**  *(4)*
framework  *(3)*
frank  *(1)*
**Frankly**  *(1)*
fraternize  *(1)*
fraudulent  *(3)*
fraudulently  *(4)*
free  *(2)*
frequently  *(1)*
fresh  *(1)*
**Friday**  *(1)*
friend  *(1)*
friendly  *(1)*

front  *(4)*
frozen  *(1)*
full  *(10)*
full-time  *(9)*
full-undivided  *(1)*
fun  *(1)*
FUND  *(6)*
funding  *(3)*
fundings  *(1)*
funds  *(10)*
further  *(10)*
furtherance  *(1)*
future  *(4)*

< G >
game  *(2)*
garbage  *(1)*
garnished  *(1)*
garnishment  *(2)*
gatekeeping  *(2)*
general  *(10)*
generally  *(4)*
generated  *(4)*
generic  *(1)*
getting  *(11)*
Ghio  *(4)*
give  *(40)*
given  *(10)*
giving  *(4)*
GLG  *(1)*
go  *(46)*
goal  *(1)*
God  *(1)*
goes  *(8)*
going  *(139)*
Good  *(14)*
Google  *(1)*
gotten  *(3)*
granted  *(1)*
grateful  *(1)*
Great  *(5)*
greater  *(2)*
Greenspoon  *(4)*
G-r-o-s-e  *(1)*
Gross  *(5)*
G-r-o-s-s  *(2)*
ground  *(2)*
grounds  *(1)*
GROUP  *(115)*

Groups  *(5)*
grow  *(2)*
guess  *(6)*
guidelines  *(1)*
gunner  *(1)*
guy  *(2)*
guys  *(1)*

< H >
hac'd  *(1)*
half  *(5)*
Hamowi  *(3)*
H-a-m-o-w-i  *(2)*
Han  *(1)*
hand  *(1)*
handful  *(1)*
hand-holding  *(1)*
handle  *(4)*
handled  *(6)*
handles  *(1)*
handling  *(5)*
hands  *(2)*
hanging  *(1)*
happen  *(4)*
happening  *(1)*
happens  *(1)*
happy  *(6)*
hard  *(1)*
harmonized  *(1)*
harmonizing  *(1)*
hat  *(1)*
HCH  *(1)*
head  *(1)*
heading  *(1)*
hear  *(8)*
heard  *(3)*
hearing  *(4)*
heart  *(1)*
heavily  *(5)*
height  *(1)*
held  *(1)*
help  *(6)*
helpful  *(2)*
helping  *(1)*
hereinbefore  *(1)*
hereunto  *(1)*
hey  *(5)*
hide  *(1)*
Hidrock  *(3)*

highest  *(3)*
highlight  *(4)*
highlighted  *(8)*
highlighting  *(1)*
highly  *(1)*
Hills  *(1)*
hire  *(2)*
hired  *(6)*
historically  *(1)*
history  *(11)*
hit  *(1)*
Hold  *(12)*
Holdco  *(13)*
home  *(1)*
homes  *(1)*
honestly  *(1)*
honor  *(2)*
honorably  *(1)*
Hook  *(2)*
hope  *(2)*
Hopefully  *(2)*
hoping  *(1)*
host  *(1)*
hour  *(4)*
hours  *(3)*
house  *(3)*
houses  *(1)*
huge  *(2)*
humanly  *(1)*
hundreds  *(1)*
hypothetical  *(3)*
hypothetically  *(2)*
hypotheticals  *(1)*

< I >
idea  *(11)*
identifiable  *(1)*
identification  *(4)*
identified  *(2)*
identify  *(2)*
identifying  *(2)*
ignoring  *(1)*
ii  *(1)*
iii  *(1)*
illogical  *(1)*
images  *(1)*
imagine  *(3)*
immediately  *(8)*
immune  *(1)*

implemented  *(4)*
implicates  *(1)*
implying  *(1)*
important  *(8)*
impressions  *(1)*
improper  *(2)*
inactive  *(1)*
inadvertent  *(1)*
inappropriate  *(1)*
inbox  *(2)*
inclination  *(1)*
include  *(2)*
included  *(2)*
includes  *(1)*
including  *(2)*
incoming  *(1)*
incorporate  *(3)*
incorporated  *(6)*
incorporates  *(1)*
incorporating  *(4)*
incorrect  *(2)*
independence  *(1)*
independent  *(4)*
independently  *(1)*
indicated  *(9)*
indigent  *(1)*
indirectly  *(1)*
individual  *(16)*
individuals  *(12)*
industrial  *(1)*
industry  *(7)*
influence  *(1)*
influenced  *(1)*
influencer  *(1)*
informally  *(1)*
Information  *(37)*
informational  *(1)*
informed  *(2)*
inhibit  *(1)*
Initial  *(14)*
Initially  *(7)*
initiate  *(2)*
inquire  *(1)*
inquiries  *(2)*
insert  *(1)*
inspect  *(1)*
inspection  *(2)*
inspections  *(1)*
instances  *(1)*

institutions  (1)
instruct  (9)
instructed  (2)
instructing  (5)
instruction  (4)
instructions  (4)
instructs  (1)
intended  (3)
intentionally  (1)
intentions  (1)
interest  (8)
interested  (2)
interests  (1)
interface  (1)
Internet  (1)
interpret  (2)
interpretation  (2)
interrupt  (3)
interrupted  (1)
interruption  (1)
interviewed  (1)
intimately  (1)
introduce  (2)
introduced  (1)
invade  (2)
Invades  (2)
invading  (3)
invalidation  (1)
investigations  (2)
invite  (1)
invocation  (1)
invoke  (1)
invoking  (1)
involved  (20)
involvement  (10)
involving  (1)
irreversible  (2)
IRS  (1)
isolating  (1)
Israeli  (2)
issue  (13)
issued  (4)
issues  (8)
items  (2)
its  (32)
iv  (2)

< J >
Jack  (9)

Jake  (1)
January  (1)
JASON  (10)
Jayde  (1)
J-a-y-d-e  (1)
Jersey  (6)
Jimmy  (1)
Job  (11)
jobs  (1)
John  (5)
Johnston  (3)
joint  (3)
judge  (4)
judgment  (6)
judgments  (1)
juggling  (3)
July  (12)
June  (25)
jure  (1)
jurisdictions  (4)

< K >
Kaufman  (1)
keep  (8)
keeps  (1)
Ken  (4)
Kenneth  (2)
kenneth.m.misken@us
doj.gov  (1)
Kentucky  (1)
kind  (13)
knew  (8)
know  (269)
knowledge  (50)
knows  (6)
Koffroth  (3)

< L >
labels  (1)
Lack  (9)
language  (16)
large  (1)
lasted  (1)
late  (3)
LAW  (25)
laws  (3)
lawsuit  (9)
lawyer  (20)
lawyers  (12)

lay  (2)
layer  (2)
LBG  (1)
lead  (2)
leads  (1)
learned  (1)
leave  (1)
leaves  (1)
led  (2)
left  (7)
LEGAL  (166)
legally  (6)
lender  (2)
lenders  (2)
length  (1)
lengthy  (4)
lent  (1)
letter  (25)
letterhead  (4)
letters  (6)
letting  (4)
Lev  (1)
levels  (1)
Lexington  (1)
LGS  (14)
liaison  (1)
Liberty  (19)
license  (4)
licensed  (1)
licenses  (1)
life  (3)
light  (1)
Likelihood  (2)
likes  (1)
limbo  (1)
limit  (3)
limited  (8)
line  (7)
lines  (3)
link  (1)
linked  (1)
LinkedIn  (5)
Lisa  (2)
list  (7)
listed  (3)
Listen  (1)
lists  (1)
LITIGATION  (34)
little  (6)

LLC  (3)
L-l-i  (1)
LLP  (2)
loaded  (2)
loan  (2)
loaned  (2)
loans  (1)
local  (29)
located  (3)
location  (2)
lodge  (1)
logo  (2)
Loli  (2)
long  (19)
longer  (4)
look  (38)
looked  (2)
looking  (19)
looks  (9)
loss  (1)
lot  (20)
Louisiana  (1)
love  (1)
lower  (2)
LPC  (1)
LPG  (82)
LPG's  (16)

< M >
Madam  (1)
mail  (14)
Main  (1)
maintain  (1)
maintained  (2)
majority  (1)
making  (5)
man  (1)
manage  (2)
managed  (1)
manages  (1)
managing  (15)
March  (8)
Marder  (3)
Maria  (1)
mark  (1)
marked  (1)
marriage  (1)
MARSHACK  (2)
Marshak  (1)

| | | | |
|---|---|---|---|
| material  (3) | month  (2) | Number  (49) | online  (1) |
| materials  (1) | monthly  (2) | numbered  (2) | open  (6) |
| math  (1) | months  (36) | numbers  (12) | opened  (3) |
| matter  (11) | monumental  (1) | numerals  (1) | opening  (1) |
| matters  (7) | morning  (6) | numeric  (1) | opens  (1) |
| MCDVI  (4) | motion  (40) | numerous  (1) | operate  (1) |
| MDA  (3) | motions  (1) | | operates  (1) |
| mean  (40) | mouth  (1) | **< O >** | operating  (6) |
| meaning  (3) | move  (15) | oath  (6) | operation  (3) |
| means  (3) | moved  (1) | object  (21) | operational  (2) |
| meetings  (5) | moving  (1) | objected  (1) | operations  (7) |
| members  (1) | multiple  (3) | Objection  (26) | opine  (1) |
| memo  (1) | | objectionable  (1) | opinion  (5) |
| memory  (1) | **< N >** | objections  (15) | opinion/conclusion |
| mental  (1) | name  (21) | objects  (1) | (1) |
| mentally  (1) | named  (3) | obligated  (1) | opportunity  (7) |
| mention  (3) | names  (14) | obligating  (1) | oppose  (1) |
| merely  (3) | nature  (8) | obligation  (5) | opposed  (4) |
| meritorious  (1) | nearly  (1) | obtain  (1) | opposition  (2) |
| message  (2) | necessary  (1) | obtained  (1) | order  (10) |
| messages  (1) | need  (41) | obtaining  (2) | ordered  (1) |
| messes  (1) | needed  (4) | obvious  (1) | original  (6) |
| metaphor  (1) | needs  (5) | obviously  (9) | originally  (1) |
| metrics  (1) | negotiate  (3) | OCC  (3) | originated  (3) |
| middle  (2) | negotiated  (6) | occupied  (1) | outcome  (1) |
| Mike  (1) | negotiating  (2) | occupy  (1) | outline  (1) |
| military  (4) | negotiation  (3) | occurred  (2) | outlined  (1) |
| million  (51) | negotiations  (18) | o'clock  (1) | outlining  (1) |
| millions  (1) | neither  (2) | offer  (24) | Outlook  (1) |
| mind  (2) | network  (23) | offering  (5) | outmatched  (1) |
| mine  (2) | never  (8) | offers  (1) | outside  (15) |
| minimum  (1) | New  (32) | offhand  (1) | overall  (1) |
| minute  (2) | newest  (1) | OFFICE  (29) | overbid  (1) |
| minutes  (9) | Ng  (1) | officer  (8) | overbroad  (1) |
| minutiae  (1) | Nicholas  (3) | officers  (5) | overhead  (1) |
| mischaracterizing  (1) | night  (1) | OFFICES  (12) | overlooked  (1) |
| Misken  (11) | NOEL  (1) | OFFICIAL  (1) | oversee  (1) |
| missed  (1) | non-fee  (2) | officially  (1) | overseeing  (3) |
| missing  (1) | non-important  (1) | off-line  (2) | overwhelmingly  (1) |
| Misstates  (9) | non-legal  (1) | Oh  (2) | overwriting  (1) |
| mistake  (1) | non-performing  (1) | Okay  (387) | owes  (1) |
| mistaken  (1) | non-privileged  (1) | omnibus  (1) | owner  (9) |
| mixed  (1) | North  (1) | onboarded  (1) | owners  (4) |
| modicum  (1) | note  (6) | onboarding  (1) | ownership  (2) |
| modification  (2) | noted  (1) | once  (10) | Ozur  (1) |
| modifications  (2) | notes  (2) | one-business  (1) | O-z-u-r  (1) |
| moment  (8) | notice  (6) | one-on-one  (1) | Ozure  (1) |
| Monday  (2) | Notwithstanding  (5) | ones  (4) | |
| money  (14) | NSF  (2) | ongoing  (5) | **< P >** |

P.C (15)
p.m (4)
Pacific (1)
PAGE (44)
Pages (5)
paid (12)
Pandy (7)
papers (1)
paragraph (24)
paralegal (5)
paralegals (6)
Park (1)
Part (26)
Partial (7)
participate (3)
participating (1)
particular (19)
Particularly (1)
parties (13)
part-time (10)
party (11)
pass (1)
passed (1)
passing (3)
pay (13)
paying (1)
payment (5)
payments (5)
pays (1)
PDF (1)
penalty (2)
pending (10)
people (28)
percent (22)
percentage (8)
percentages (3)
perform (2)
performance (1)
performed (1)
performing (4)
period (2)
periodic (1)
perjury (2)
permit (1)
permitted (1)
person (20)
personal (21)
personally (4)
personnel (1)

perspective (1)
perspectives (1)
pertained (2)
petition (3)
phenomenal (1)
Phoenix (1)
phone (5)
phones (1)
physically (1)
pick (1)
picture (4)
piece (1)
pieces (3)
Pilot (2)
pinpoint (2)
place (13)
plan (1)
plant (1)
plate (2)
pleading (2)
please (37)
plural (1)
plus (8)
PO (1)
pocket (3)
point (17)
pointed (1)
pointedly (1)
points (2)
policies (12)
policy (2)
portal (1)
portfolio (2)
portion (3)
position (3)
positive (1)
possibility (1)
possible (7)
postdating (1)
posture (2)
potential (5)
potentially (4)
potted (1)
powerful (1)
powers (1)
PRACTICE (8)
practicing (2)
precedence (1)
preceding (2)

precision (1)
precluded (1)
preclusion (1)
preexisting (1)
preface (2)
prefer (2)
pre-incorporation (2)
prejudice (1)
prep (1)
preparation (3)
prepare (3)
prepared (4)
prerogative (1)
PRESENT (6)
presently (1)
preserve (1)
President (1)
presumably (1)
pretty (3)
prevents (1)
previously (6)
price (5)
pride (1)
primarily (1)
principal (6)
principals (1)
principle (1)
prior (23)
priority (1)
privacy (5)
privilege (37)
privileged (10)
privity (1)
privy (1)
pro (3)
probably (24)
problem (9)
problems (2)
procedure (1)
procedures (12)
proceed (1)
proceeding (4)
proceedings (1)
process (10)
Processing (4)
processor (1)
produce (6)
produced (8)
producing (1)

product (4)
production (1)
Professional (8)
profile (4)
profit (1)
progress (1)
promise (2)
promises (1)
prompted (1)
promptly (1)
proof (4)
proper (6)
properly (2)
Properties (3)
property (1)
proposed (10)
proposing (3)
proprietary (1)
prospect (1)
prospective (1)
protected (3)
protecting (1)
protection (6)
provide (27)
provided (38)
provides (3)
providing (14)
provision (10)
prudent (1)
PST (2)
public (1)
pull (9)
pulled (5)
pulling (1)
punched (1)
purchase (58)
purchases (2)
purchasing (1)
pure (2)
purport (1)
purporting (1)
purports (1)
purpose (1)
purposes (1)
Pursuant (4)
put (14)
putting (5)

< Q >

quarreling *(1)*
quarter *(1)*
Queenie *(1)*
question *(123)*
questioning *(1)*
questions *(33)*
quibble *(1)*
quick *(1)*
quickly *(5)*
quite *(3)*

< R >
rainmaker *(9)*
raise *(2)*
raising *(1)*
random *(2)*
range *(4)*
rate *(2)*
ratifies *(1)*
ratifying *(1)*
rating *(6)*
reach *(1)*
reached *(1)*
reaching *(1)*
read *(44)*
reading *(8)*
reads *(1)*
ready *(4)*
real *(4)*
realization *(2)*
really *(23)*
reason *(16)*
reasonable *(1)*
reasonably *(2)*
recall *(27)*
receivables *(1)*
receive *(1)*
received *(2)*
receives *(1)*
receiving *(3)*
recital *(1)*
recognize *(3)*
recognized *(2)*
recollection *(8)*
reconcile *(1)*
record *(35)*
records *(3)*
recovery *(1)*
Red *(3)*

redact *(2)*
redacted *(2)*
redaction *(1)*
REDHUN *(104)*
redirected *(1)*
refer *(1)*
reference *(2)*
referenced *(5)*
referring *(6)*
refers *(1)*
reflect *(5)*
reflected *(2)*
reflects *(12)*
refresh *(4)*
refund *(18)*
refunded *(3)*
refunds *(5)*
refuse *(1)*
regard *(21)*
regarding *(22)*
regardless *(2)*
Registered *(11)*
registering *(2)*
regularly *(2)*
reinvent *(1)*
related *(24)*
relates *(3)*
relating *(5)*
relation *(2)*
relationship *(11)*
relaying *(1)*
release *(3)*
relevance *(2)*
relevant *(11)*
relgidely@foxrothschil
d.com *(1)*
reliability *(1)*
reliable *(2)*
remain *(1)*
remains *(1)*
remember *(9)*
remind *(1)*
remit *(1)*
remitted *(1)*
remitting *(1)*
remotely *(2)*
render *(3)*
repaid *(3)*
repayment *(2)*

repeat *(1)*
rephrase *(5)*
replace *(2)*
report *(3)*
Reported *(6)*
Reporter *(11)*
reporting *(1)*
reports *(2)*
repost *(1)*
represent *(10)*
representation *(3)*
representations *(4)*
representative *(9)*
representatives *(1)*
represented *(3)*
representing *(5)*
represents *(1)*
reputable *(1)*
request *(6)*
requested *(4)*
requesting *(2)*
requests *(1)*
required *(2)*
requires *(1)*
resend *(1)*
reserve *(3)*
resolution *(7)*
resolutions *(1)*
resolve *(2)*
resolved *(11)*
resources *(1)*
respect *(23)*
Respectfully *(4)*
respond *(5)*
responded *(2)*
response *(4)*
responses *(5)*
responsible *(4)*
responsive *(1)*
rest *(1)*
restating *(1)*
restroom *(2)*
result *(2)*
resulted *(1)*
results *(1)*
resume *(1)*
retained *(1)*
return *(1)*
returned *(2)*

revenue *(15)*
review *(6)*
reviewed *(3)*
reviews *(1)*
Revised *(3)*
RICHARD *(6)*
RICHARDS *(233)*
right *(57)*
right-hand *(3)*
rights *(1)*
rise *(1)*
Robert *(4)*
role *(7)*
roles *(1)*
Roman *(4)*
ron@ronaldrichards.c
om *(1)*
RONALD *(6)*
ronaldrichards.com
*(1)*
room *(3)*
Rosa *(2)*
ROTHSCHILD *(4)*
rough *(1)*
RPR *(2)*
ruin *(1)*
rule *(2)*
rules *(6)*
run *(3)*
running *(3)*
runs *(1)*

< S >
sale *(31)*
sales *(3)*
samples *(1)*
SANTA *(3)*
Sara *(2)*
sara.johnston@dinsmo
re.com *(1)*
Saturday *(1)*
sausage *(1)*
save *(2)*
saw *(8)*
saying *(21)*
says *(51)*
scam *(1)*
scanned *(3)*
scanning *(1)*

scare  *(1)*
scenario  *(1)*
scheduling  *(1)*
school  *(1)*
scientific  *(1)*
scope  *(22)*
Scott  *(1)*
scratch  *(1)*
screen  *(31)*
scroll  *(6)*
scrolling  *(2)*
se  *(1)*
search  *(1)*
searching  *(1)*
second  *(24)*
Secondly  *(1)*
seconds  *(2)*
Secretary  *(2)*
Section  *(10)*
see  *(130)*
seeing  *(3)*
seeking  *(2)*
seen  *(4)*
segregating  *(1)*
select  *(1)*
sell  *(13)*
seller  *(1)*
selling  *(1)*
send  *(11)*
sends  *(1)*
senior  *(6)*
sense  *(6)*
sent  *(6)*
sentence  *(4)*
separate  *(3)*
separately  *(1)*
served  *(2)*
service  *(20)*
services  *(21)*
servicing  *(5)*
serving  *(1)*
set  *(14)*
sets  *(1)*
setting  *(1)*
settle  *(4)*
settled  *(1)*
settlement  *(11)*
seven  *(8)*
shape  *(1)*

share  *(26)*
shared  *(1)*
shareholder  *(1)*
sharing  *(1)*
sheets  *(1)*
Shen  *(4)*
S-h-e-n  *(2)*
Shields  *(1)*
SHOHL  *(2)*
short  *(3)*
Shorthand  *(3)*
shot  *(2)*
show  *(6)*
showed  *(1)*
showing  *(5)*
side  *(1)*
sign  *(11)*
signal  *(1)*
signature  *(15)*
signatures  *(1)*
signed  *(33)*
signer  *(1)*
signing  *(3)*
signs  *(6)*
similar  *(3)*
simple  *(3)*
simply  *(2)*
Simultaneously  *(1)*
single  *(4)*
sir  *(79)*
site  *(1)*
sits  *(1)*
sitting  *(11)*
situation  *(2)*
six  *(5)*
six-month  *(1)*
sizable  *(3)*
size  *(1)*
skip  *(1)*
slew  *(2)*
slow  *(1)*
small  *(3)*
smoothly  *(1)*
so-called  *(1)*
socialize  *(1)*
software  *(2)*
sold  *(3)*
solo  *(1)*
Soloman  *(1)*

somebody  *(19)*
somebody's  *(1)*
soon  *(1)*
SOP  *(1)*
SOPs  *(6)*
SOP's  *(1)*
sorry  *(13)*
sort  *(12)*
sorted  *(1)*
sought  *(3)*
sound  *(2)*
sounds  *(5)*
source  *(3)*
sources  *(1)*
speak  *(9)*
speaking  *(14)*
speaks  *(11)*
specific  *(14)*
specifically  *(4)*
specified  *(3)*
speculate  *(2)*
speculating  *(5)*
speculation  *(6)*
speculative  *(1)*
speed  *(1)*
spell  *(4)*
spend  *(2)*
spiraling  *(1)*
spoke  *(6)*
spoken  *(6)*
spot  *(2)*
spur  *(1)*
staff  *(6)*
staffing  *(2)*
stages  *(2)*
staggered  *(1)*
Standard  *(6)*
standby  *(1)*
standing  *(1)*
stands  *(1)*
start  *(13)*
started  *(10)*
starters  *(1)*
starting  *(1)*
State  *(32)*
stated  *(1)*
statement  *(6)*
statements  *(5)*
STATES  *(20)*

State's  *(3)*
stating  *(2)*
statistical  *(1)*
statistically  *(1)*
status  *(3)*
stay  *(1)*
staying  *(1)*
STENOGRAPHER  *(5)*
Stenographic  *(4)*
Stenographically  *(1)*
step  *(2)*
steps  *(1)*
stick  *(1)*
sticking  *(1)*
stipulate  *(4)*
stipulation  *(63)*
stipulations  *(1)*
stock  *(1)*
stop  *(9)*
straw  *(1)*
Street  *(5)*
strengths  *(1)*
strike  *(4)*
structures  *(1)*
stuff  *(5)*
stupid  *(2)*
stupidity  *(1)*
subject  *(20)*
subjects  *(1)*
sublease  *(2)*
submitted  *(1)*
Subparagraph  *(1)*
subpoena  *(9)*
Subsections  *(1)*
subsequent  *(4)*
substance  *(2)*
substantial  *(5)*
substantive  *(1)*
subtenant  *(1)*
subtract  *(1)*
sued  *(3)*
sufficient  *(1)*
suggesting  *(1)*
suing  *(4)*
suit  *(1)*
Suite  *(2)*
suits  *(1)*
summarized  *(1)*

summary  (2)
summons  (2)
super  (1)
supervise  (6)
supervised  (1)
supplemental  (1)
support  (4)
supporting  (2)
supposed  (2)
sure  (48)
surprises  (1)
surrounding  (1)
swallow  (1)
swear  (1)
sworn  (5)
system  (2)

< T >
tackle  (1)
tagged  (1)
tail  (1)
take  (30)
taken  (7)
talk  (8)
talked  (2)
talking  (11)
Tan  (1)
T-a-n  (1)
Tang  (1)
T-a-n-g  (1)
tank  (1)
target  (2)
task  (1)
tasked  (1)
tasks  (1)
tax  (1)
Team  (22)
technical  (2)
technological  (1)
telegraphing  (1)
telephonic  (1)
tell  (28)
telling  (5)
tens  (1)
tentacles  (1)
term  (6)
terms  (26)
test  (1)
testified  (17)

testify  (34)
testifying  (14)
testimony  (61)
text  (3)
texts  (2)
Thank  (24)
thankfully  (1)
Thanks  (1)
theoretically  (1)
thereon  (1)
thereto  (3)
thing  (12)
things  (30)
think  (93)
thinking  (1)
third  (4)
Thomas  (1)
thought  (6)
thousands  (7)
three  (15)
three-hour  (1)
throw  (3)
tie  (1)
tied  (2)
tight-lipped  (1)
time  (80)
timeline  (2)
timely  (1)
times  (6)
today  (40)
today's  (5)
told  (14)
Tony  (22)
top  (3)
topic  (1)
total  (3)
totaling  (1)
totals  (1)
tough  (1)
touted  (1)
track  (1)
Trade  (2)
training  (2)
transaction  (17)
transactional  (1)
transactions  (3)
transcript  (1)
transfer  (3)
transferees  (1)

transferred  (8)
transferring  (1)
transfers  (3)
transmission  (1)
transpiring  (1)
triage  (3)
trick  (1)
triggered  (1)
triggers  (1)
Trinh  (2)
T-r-i-n-h  (2)
trivial  (1)
true  (5)
Trust  (2)
TRUSTEE  (134)
trustees  (2)
trustee's  (21)
truthful  (1)
truthfully  (1)
try  (10)
trying  (24)
turn  (3)
turned  (2)
tweaked  (1)
two  (31)
type  (4)
types  (2)
typical  (2)
Typically  (6)

< U >
U.S  (1)
uh-huh  (1)
ultimately  (2)
umbrella  (3)
unable  (4)
unaware  (1)
unclear  (1)
uncovered  (2)
underneath  (1)
understand  (46)
understanding  (22)
understood  (9)
unfair  (1)
unintelligible  (2)
UNITED  (7)
unopened  (4)
unreasonable  (2)
unrelated  (1)

unrepresented  (2)
UNSECURED  (1)
unsigned  (1)
unusual  (1)
unwilling  (1)
uploaded  (5)
uploading  (1)
upper  (1)
upset  (2)
upside  (1)
use  (6)
uses  (2)
usually  (1)
utilized  (4)

< V >
V2  (1)
vacating  (1)
vacation  (1)
vague  (6)
VALIDATION  (2)
valuation  (14)
value  (11)
valued  (2)
various  (11)
verbal  (1)
verify  (2)
version  (1)
versus  (3)
vetting  (1)
vi  (1)
video  (1)
videoconference  (2)
videoconferencing  (1)
view  (4)
violating  (1)
violation  (1)
violations  (2)
Virtually  (2)
vis-á-vis  (1)
visited  (1)
voice  (3)
voluntarily  (1)
voluntary  (1)
volunteered  (1)
volunteering  (1)

< W >
W-2  (3)

wages  (*1*)
wait  (*3*)
waive  (*5*)
waiving  (*1*)
Wall  (*2*)
want  (*50*)
wanted  (*2*)
wants  (*3*)
warrant  (*2*)
waste  (*1*)
watermark  (*2*)
way  (*30*)
ways  (*1*)
weaknesses  (*1*)
Webber  (*1*)
Weber  (*30*)
Weber's  (*1*)
website  (*21*)
websites  (*2*)
week  (*2*)
weekly/monthly  (*1*)
welcome  (*1*)
well  (*63*)
well-prepared  (*1*)
well-resourced  (*1*)
went  (*9*)
we're  (*32*)
Wes  (*1*)
we've  (*10*)
whatsoever  (*5*)
wheel  (*1*)
WHEREOF  (*1*)
wife  (*1*)
wild  (*1*)
wildest  (*1*)
willing  (*3*)
window  (*2*)
wires  (*1*)
withdraw  (*1*)
withdrawing  (*3*)
withheld  (*2*)
withhold  (*4*)
withholding  (*1*)
witness  (*77*)
witnesses  (*1*)
witness's  (*1*)
Wonderful  (*1*)
wondering  (*1*)
word  (*9*)

words  (*5*)
work  (*37*)
worked  (*2*)
worker  (*1*)
working  (*17*)
work-product  (*10*)
work-project  (*1*)
works  (*5*)
worst  (*2*)
writing  (*4*)
written  (*9*)
wrongly  (*1*)

< Y >
yeah  (*29*)
year  (*11*)
years  (*4*)
yelling  (*1*)
York  (*16*)
York's  (*1*)

< Z >
Zoom  (*8*)

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

**411 West Fourth Street, Suite 7160, Santa Ana, CA 92701-8000**

A true and correct copy of the foregoing document entitled (*specify*):

**UNITED STATES TRUSTEE'S OPPOSITION TO NOTICE OF MOTION AND MOTION OF TRUSTEE RICHARD A. MARSHACK FOR ENTRY OF AN ORDER (A) APPROVING SALE, SUGJECT TO OVERBID, OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS PURSUANT TO 11 U.S.C. § 363(b) AND (B) APPROVING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND OTHER AGREEMENTS**

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document.  On (date) **July 19, 2023**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

**SEE ATTACHED SERVICE LIST (IF APPLICABLE)**

☒  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:  On (*date*) **July 19, 2023,** I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

**SEE ATTACHED SERVICE LIST (IF APPLICABLE)**

☒  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **July 17, 2023,** I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

**SEE ATTACHED SERVICE LIST (IF APPLICABLE)**

☒  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| July 19, 2023 | Leslie Skorheim | */s/ Leslie Skorheim* |
|---|---|---|
| Date | Print Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

### ADDITIONAL SERVICE INFORMATION

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")**

| Name | Capacity | Email Address |
|---|---|---|
| Byron Moldo | | bmoldo@ecjlaw.com |
| Ronald Brown | SDCO Tustin Executive Center, Inc. | ron@rkbrownlaw.com |
| Joon Khang | Debtor's Attorney | joon@khanglaw.com |
| Ira Kharasch | | ikharasch@pszjlaw.com |
| Olivia Scott | Azzure Capital LLC | olivia.scott3@bclplaw.com |
| Olivia Scott | Hi Bar Capital LLC | olivia.scott3@bclplaw.com |
| Sharon Weiss | Azzure Capital LLC | sharon.weiss@bclplaw.com |
| Daniel Edelman | Carolyn Beech | dedelman@edcombs.com |
| Eric Bensamochan | | eric@eblawfirm.us |
| Alan Craig Hochheiser | City Capital NY | ahochheiser@mauricewutscher.com |
| Randall Baldwin Clark | | rbc@randallbclark.com |
| Nicholas Koffroth | Committee of Unsecured Creditors | nkoffroth@foxrothschild.com |
| Shawn Christianson | | cmcintire@buchalter.com |
| Leslie Cohen | | leslie@lesliecohenlaw.com |
| Jeffrey Golden | | jgolden@go2.law |
| D Edward Hays | | ehays@marshackhays.com |
| David Kupetz | | David.Kupetz@lockelord.com |
| Christopher Langley | | chris@slclawoffice.com |
| Daniel Lev | | daniel.lev@gmlaw.com |
| Laila Masud | | lmasud@marshackhays.com |
| Alan Nahmias | | anahmias@mbn.law |
| Victoria Newmark | | vnewmark@pszjlaw.com |
| Ronald Richards | | ron@ronaldrichards.com |
| Gregory Salvato | | gsalvato@salvatoboufadel.com |
| Andrew Still | | astill@swlaw.com |
| Johnny White | | JWhite@wrslawyers.com |
| Richard Golubow | Debt Validation Fund II LLC | rgolubow@wghlawyers.com |
| Richard Golubow | MC DVI Fund 1, LLC | rgolubow@wghlawyers.com |
| Richard Golubow | MC DIV Fund 2, LLC | rgolubow@wghlawyers.com |
| Garrick Hollander | | ghollander@wghlawyers.com |
| Christopher Celentino | Trustee's Special Counsel | christopher.celentino@dinsmore.com |
| Christopher Ghio | | christopher.ghio@dinsmore.com |
| Yosina Lissebeck | | Yosina.Lissebeck@Dinsmore.com |
| Jonathan Serrano | | jonathan.serrano@dinsmore.com |
| Teri Pham | | tpham@epglawyers.com |
| Michael Lieberman | Phillip A. Greenblatt, PLLC | mlieberman@lipsonneilson.com |
| Paul Shankman | United Partnerships, LLC | PShankman@fortislaw.com |
| Kenneth Misken | UST | Kenneth.M.Misken@usdoj.gov |
| Leslie Skorheim | UST | leslie.skorheim@usdoj.gov |
| Queenie Ng | UST | Queenie.K.Ng@usdoj.gov |
| Jenny L Doling | | jd@jdl.law |
| Lucy L. Thomson | | lucythomson_cpo@earthlink.net |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                    **F 9013-3.1.PROOF.SERVICE**

*SEE NEF FOR CONFIRMATION OF ELECTRONIC TRANSMISSION TO THE U.S. TRUSTEE AND ANY TRUSTEE IN THIS CASE, AND TO ANY ATTORNEYS WHO RECEIVE SERVICE BY NEF.*

2.    **SERVED BY U.S. MAIL**


3.    **SERVED BY (state method for each person served):**

      **PERSONAL DELIVERY, FACSIMILE OR EMAIL**

      Judge's Copy

      Honorable Scott C. Clarkson – to be placed in bin on the 5th Floor on 7/20/2023

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                    **F 9013-3.1.PROOF.SERVICE**