QUINN EMANUEL URQUHART & SULLIVAN LLP
Eric D. Winston (SBN 202407)
ericwinston@quinnemanuel.com
Jeremy D. Andersen (SBN 227287)
jeremyandersen@quinnemanuel.com
Razmig Y. Izakelian (SBN 292137)
razmigizakelian@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

*Attorneys for OHP-CDR, LP*

# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>THE LITIGATION PRACTICE GROUP, P.C.,<br><br>Debtor. | Chapter 11<br><br>Case No. 8:23-bk-10571-SC<br><br>**LIMITED OBJECTION AND RESERVATION OF RIGHTS CONCERNING THE TRUSTEE'S MOTION TO SELL THE DEBTOR'S ASSETS**<br><br>**Hearing Date and Time**<br><br>Date: July 21, 2023<br><br>Time: 10:00 a.m.<br><br>Location:  *Via ZoomGov* |

OHP-CDR, LP ("<u>OHP-CDR</u>") files this limited objection and reservation of rights ("<u>Limited Objection</u>") to the *Motion of Trustee Richard A. Marshack for Entry of an Order (A) Approving Sale, Subject to Overbid, of Assets Free and Clear of all Liens, Claims, Encumbrances and Interests Pursuant to 11 U.S.C. § 363(b) and (B) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and Other Agreements* [ECF 191] ("<u>Motion</u>").[1]

## I.     INTRODUCTION

OHP-CDR is a secured creditor, and is the manager of an entity called PurchaseCo80, LLC ("<u>PurchaseCo</u>"), which owns a substantial number of the debtor's receivables.  OHP-CDR does not object to the proposed sale of assets ("<u>Sale</u>"); to the contrary, it supports the Sale.  It files this Limited Objection to reserve its rights with respect to the use of any Sale proceeds prior to paying and/or resolving OHP-CDR's secured claims and PurchaseCo's ownership interests.

## II.    BACKGROUND

### A.     LPG's Business

The Litigation Practice Group, P.C. ("<u>LPG</u>" or "<u>Debtor</u>") is a law firm that provides consumer debt resolution.  Amended Complaint ¶ 50.[2]  LPG acquires clients through "marketing affiliates," and in turn, "pays the marketing affiliates a percentage of fees earned through the debt resolution process."  *Id.* ¶ 55.  However, because "LPG and its marketing affiliates receive only incremental payments over a period of time, LPG [and the marketing affiliates] would often sell the future cash flow at a discounted rate" to "factoring companies that buy the receivables on account of these files."  *Id.* ¶¶ 57-58.

---

[1]  All terms not defined herein have the meaning ascribed to them in the Motion.

[2]  "Amended Complaint" refers to the *Amended Complaint* filed by the Trustee on June 15, 2023 in *Marshack v. Diab et al.*, Adv. Pro. No. 8:23-ap-01046-SC, ECF 62.

B.    **Ownership of the Receivables and the Lien**

OHP-CDR[3] purchased a number of the above-mentioned receivables through PurchaseCo. Pursuant to the September 1, 2022 Limited Liability Company Agreement of PurchaseCo80, LLC ("LLC Agreement"),[4] OHP-CDR contributed the "OHP Funding Capital," LLC Agreement § 3.02, which was used to purchase a number of receivables from both LPG and "marketing affiliates," *id.* § 7.02(e), and which OHP-CDR has identified to the trustee.

In addition, OHP-CDR has a lien on substantially all of the Debtors' assets.  As set forth in the LLC Agreement, LPG granted OHP-CDR a first priority security interest in all of its personal property to secure repayment of the "OHP Funding Capital," *id.* § 8.03, and OHP-CDR (then named OHP-LPG, LP) recorded a UCC-1 financing statement with the California Secretary of State.  Ex. A (Claim No. 44, Attachment ¶ 15).  As of the petition date, LPG owed OHP-CDR at least $16,538,954, including $9,538,954 in outstanding "OHP Funding Capital."  *Id.* ¶ 3.

III.    **SUPPORT FOR THE SALE**

OHP-CDR supports the Sale, subject to the limited objection and reservation of rights below.

IV.    **LIMITED OBJECTION AND RESERVATION OF RIGHTS**

The trustee seeks approval of the Sale free and clear of all liens and interests with any and all liens and interests to attach to the Sale proceeds, and the trustee has agreed to a similar reservation with respect to ownership interests in receivables.

Therefore, OHP-CDR only objects to the Motion to extent it proposes to use any Sale proceeds before paying and/or resolving OHP-CDR's secured claims and PurchaseCo's ownership interests.    OHP-CDR further reserves: (i) the right to object to any revised asset purchase agreement or form of order; and (ii) all of its rights with respect to the use of cash collateral and adequate protection to be provided in connection with the use cash collateral, which are not before

---

[3]  OHP-CDR was formerly known as OHP-LPG, LP.  *See* Ex. A (Claim No. 44, Attachment ¶ 2).
[4]  The LLC Agreement is attached to OHP-CDR's proof of claim.  *See* Ex. A.

1   the Court at this time.

2

3   DATED:  July 19, 2023                    Respectfully submitted,

4

5                                            By   _/s/ Razmig Y. Izakelian____
                                                 Razmig Y. Izakelian
6
                                                 *Attorneys for OHP-CDR, LP*
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

865 S. Figueroa Street, 10th Floor, Los Angeles, CA 90017

A true and correct copy of the foregoing document entitled (*specify*): LIMITED OBJECTION AND RESERVATION OF RIGHTS CONCERNING THE TRUSTEE'S MOTION TO SELL THE DEBTOR'S ASSETS

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) July 19, 2023, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 7/19/23 | Razmig Y. Izakelian | /s/ Razmig Y. Izakelian |
|---------|---------------------|-------------------------|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

Eric Bensamochan on behalf of Creditor Affirma, LLC
eric@eblawfirm.us, G63723@notify.cincompass.com

Eric Bensamochan on behalf of Creditor Oxford Knox, LLC
eric@eblawfirm.us, G63723@notify.cincompass.com

Eric Bensamochan on behalf of Interested Party Courtesy NEF
eric@eblawfirm.us, G63723@notify.cincompass.com

Eric Bensamochan on behalf of Interested Party Eric Bensamochan
eric@eblawfirm.us, G63723@notify.cincompass.com

Ronald K Brown on behalf of Creditor SDCO Tustin Executive Center, Inc.
ron@rkbrownlaw.com

Christopher Celentino on behalf of Plaintiff Richard A. Marshack
christopher.celentino@dinsmore.com, caron.burke@dinsmore.com

Christopher Celentino on behalf of Trustee Richard A Marshack (TR)
christopher.celentino@dinsmore.com, caron.burke@dinsmore.com

Shawn M Christianson on behalf of Interested Party Courtesy NEF
cmcintire@buchalter.com, schristianson@buchalter.com

Randall Baldwin Clark on behalf of Interested Party Randall Baldwin Clark
rbc@randallbclark.com

Leslie A Cohen on behalf of Interested Party Courtesy NEF
leslie@lesliecohenlaw.com, jaime@lesliecohenlaw.com;clare@lesliecohenlaw.com

Jenny L Doling on behalf of Interested Party INTERESTED PARTY
jd@jdl.law, dolingjr92080@notify.bestcase.com;15994@notices.nextchapterbk.com

Jenny L Doling on behalf of Interested Party National Association of Consumer Bankruptcy
Attorneys
jd@jdl.law, dolingjr92080@notify.bestcase.com;15994@notices.nextchapterbk.com

Jenny L Doling on behalf of Interested Party National Consumer Bankruptcy Rights Center
jd@jdl.law, dolingjr92080@notify.bestcase.com;15994@notices.nextchapterbk.com

Daniel A Edelman on behalf of Creditor Carolyn Beech
dedelman@edcombs.com, courtecl@edcombs.com

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                                                    F 9013-3.1.PROOF.SERVICE

Christopher Ghio on behalf of Plaintiff Richard A. Marshack
christopher.ghio@dinsmore.com, Kristina.Heller@Dinsmore.com

Christopher Ghio on behalf of Trustee Richard A Marshack (TR)
christopher.ghio@dinsmore.com, Kristina.Heller@Dinsmore.com

Jeffrey I Golden on behalf of Creditor Anaheim Arena Management, LLC
jgolden@go2.law,
kadele@ecf.courtdrive.com;cbmeeker@gmail.com;lbracken@wgllp.com;gestrada@wgllp.com;gol
den.jeffreyi.b117954@notify.bestcase.com

Jeffrey I Golden on behalf of Creditor Anaheim Ducks Hockey Club, LLC
jgolden@go2.law,
kadele@ecf.courtdrive.com;cbmeeker@gmail.com;lbracken@wgllp.com;gestrada@wgllp.com;gol
den.jeffreyi.b117954@notify.bestcase.com

Jeffrey I Golden on behalf of Interested Party Courtesy NEF
jgolden@go2.law,
kadele@ecf.courtdrive.com;cbmeeker@gmail.com;lbracken@wgllp.com;gestrada@wgllp.com;gol
den.jeffreyi.b117954@notify.bestcase.com

Richard H Golubow on behalf of Creditor Debt Validation Fund II, LLC
rgolubow@wghlawyers.com, jmartinez@wghlawyers.com;svillegas@wghlawyers.com

Richard H Golubow on behalf of Creditor MC DVI Fund 1, LLC
rgolubow@wghlawyers.com, jmartinez@wghlawyers.com;svillegas@wghlawyers.com

Richard H Golubow on behalf of Creditor MC DVI Fund 2, LLC
rgolubow@wghlawyers.com, jmartinez@wghlawyers.com;svillegas@wghlawyers.com

D Edward Hays on behalf of Interested Party Courtesy NEF
ehays@marshackhays.com,
ehays@ecf.courtdrive.com;kfrederick@ecf.courtdrive.com;cmendoza@marshackhays.com;cmendo
za@ecf.courtdrive.com

D Edward Hays on behalf of Trustee Richard A Marshack (TR)
ehays@marshackhays.com,
ehays@ecf.courtdrive.com;kfrederick@ecf.courtdrive.com;cmendoza@marshackhays.com;cmendo
za@ecf.courtdrive.com

Alan Craig Hochheiser on behalf of Creditor City Capital NY

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                    **F 9013-3.1.PROOF.SERVICE**

ahochheiser@mauricewutscher.com, arodriguez@mauricewutscher.com

Garrick A Hollander on behalf of Creditor Debt Validation Fund II, LLC
ghollander@wghlawyers.com, jmartinez@wghlawyers.com;svillegas@wghlawyers.com

Garrick A Hollander on behalf of Creditor MC DVI Fund 1, LLC
ghollander@wghlawyers.com, jmartinez@wghlawyers.com;svillegas@wghlawyers.com

Garrick A Hollander on behalf of Creditor MC DVI Fund 2, LLC
ghollander@wghlawyers.com, jmartinez@wghlawyers.com;svillegas@wghlawyers.com

Razmig Izakelian on behalf of Creditor OHP-CDR, LP
razmigizakelian@quinnemanuel.com

Joon M Khang on behalf of Debtor The Litigation Practice Group P.C.
joon@khanglaw.com

Ira David Kharasch on behalf of Interested Party Ad Hoc Consumer Claimants Committee
ikharasch@pszjlaw.com

Ira David Kharasch on behalf of Interested Party Courtesy NEF
ikharasch@pszjlaw.com

Meredith King on behalf of Interested Party Courtesy NEF
mking@fsl.law, ssanchez@fsl.law;jwilson@fsl.law

Nicholas A Koffroth on behalf of Creditor Committee Committee of Unsecured Creditors
nkoffroth@foxrothschild.com, khoang@foxrothschild.com

David S Kupetz on behalf of Defendant Marich Bein, LLC
David.Kupetz@lockelord.com, mylene.ruiz@lockelord.com

David S Kupetz on behalf of Interested Party Courtesy NEF
David.Kupetz@lockelord.com, mylene.ruiz@lockelord.com

Christopher J Langley on behalf of Interested Party Courtesy NEF
chris@slclawoffice.com,
omar@slclawoffice.com;langleycr75251@notify.bestcase.com;ecf123@casedriver.com

Daniel A Lev on behalf of Interested Party Consumer Legal Group, P.C.
daniel.lev@gmlaw.com, cheryl.caldwell@gmlaw.com;dlev@ecf.courtdrive.com

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                                      F 9013-3.1.PROOF.SERVICE

Daniel A Lev on behalf of Interested Party Courtesy NEF
daniel.lev@gmlaw.com, cheryl.caldwell@gmlaw.com;dlev@ecf.courtdrive.com

Daniel A Lev on behalf of Interested Party Liberty Acquisitions Group Inc.
daniel.lev@gmlaw.com, cheryl.caldwell@gmlaw.com;dlev@ecf.courtdrive.com

Michael D Lieberman on behalf of Creditor Phillip A. Greenblatt, PLLC
mlieberman@lipsonneilson.com

Yosina M Lissebeck on behalf of Trustee Richard A Marshack (TR)
Yosina.Lissebeck@Dinsmore.com, caron.burke@dinsmore.com

Richard A Marshack (TR)
pkraus@marshackhays.com, rmarshack@iq7technology.com;ecf.alert+Marshack@titlexi.com

Laila Masud on behalf of Interested Party Courtesy NEF
lmasud@marshackhays.com, lmasud@ecf.courtdrive.com;kfrederick@ecf.courtdrive.com

Laila Masud on behalf of Interested Party Richard A. Marshack
lmasud@marshackhays.com, lmasud@ecf.courtdrive.com;kfrederick@ecf.courtdrive.com

Laila Masud on behalf of Plaintiff Richard Marshack
lmasud@marshackhays.com, lmasud@ecf.courtdrive.com;kfrederick@ecf.courtdrive.com

Laila Masud on behalf of Trustee Richard A Marshack (TR)
lmasud@marshackhays.com, lmasud@ecf.courtdrive.com;kfrederick@ecf.courtdrive.com

Kenneth Misken on behalf of U.S. Trustee United States Trustee (SA)
Kenneth.M.Misken@usdoj.gov

Byron Z Moldo on behalf of Interested Party Byron Moldo
bmoldo@ecjlaw.com, amatsuoka@ecjlaw.com,dperez@ecjlaw.com

Alan I Nahmias on behalf of Interested Party Courtesy NEF
anahmias@mbn.law, jdale@mbnlawyers.com

Victoria Newmark on behalf of Interested Party Courtesy NEF
vnewmark@pszjlaw.com

Queenie K Ng on behalf of U.S. Trustee United States Trustee (SA)
queenie.k.ng@usdoj.gov

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                                   F 9013-3.1.PROOF.SERVICE

Keith C Owens on behalf of Creditor Committee Committee of Unsecured Creditors
kowens@foxrothschild.com, khoang@foxrothschild.com

Teri T Pham on behalf of Attorney Teri Pham
tpham@epglawyers.com, ttpassistant@epglawyers.com

Douglas A Plazak on behalf of Defendant Greyson Law Center PC
dplazak@rhlaw.com

Douglas A Plazak on behalf of Defendant Han Trinh
dplazak@rhlaw.com

Douglas A Plazak on behalf of Defendant Jayde Trinh
dplazak@rhlaw.com

Douglas A Plazak on behalf of Defendant Scott James Eadie
dplazak@rhlaw.com

Ronald N Richards on behalf of Defendant Consumer Legal Group, PC
ron@ronaldrichards.com, 7206828420@filings.docketbird.com

Ronald N Richards on behalf of Interested Party Courtesy NEF
ron@ronaldrichards.com, 7206828420@filings.docketbird.com

Gregory M Salvato on behalf of Creditor Mari Agape
gsalvato@salvatoboufadel.com,
calendar@salvatolawoffices.com;jboufadel@salvatoboufadel.com;gsalvato@ecf.inforuptcy.com

Gregory M Salvato on behalf of Interested Party Courtesy NEF
gsalvato@salvatoboufadel.com,
calendar@salvatolawoffices.com;jboufadel@salvatoboufadel.com;gsalvato@ecf.inforuptcy.com

Olivia Scott on behalf of Creditor Azzure Capital LLC
olivia.scott3@bclplaw.com

Olivia Scott on behalf of Creditor Hi Bar Capital LLC
olivia.scott3@bclplaw.com

Jonathan Serrano on behalf of Plaintiff Richard A. Marshack
jonathan.serrano@dinsmore.com

Jonathan Serrano on behalf of Trustee Richard A Marshack (TR)

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                                    F 9013-3.1.PROOF.SERVICE

jonathan.serrano@dinsmore.com

Paul R Shankman on behalf of Attorney Paul R. Shankman
PShankman@fortislaw.com, info@fortislaw.com

Paul R Shankman on behalf of Creditor United Partnerships, LLC
PShankman@fortislaw.com, info@fortislaw.com

Leslie Skorheim on behalf of U.S. Trustee United States Trustee (SA)
leslie.skorheim@usdoj.gov

Howard Steinberg on behalf of Defendant BankUnited, N.A.
steinbergh@gtlaw.com, pearsaltt@gtlaw.com;howard-steinberg-6096@ecf.pacerpro.com

Andrew Still on behalf of Creditor Alteryx, Inc.
astill@swlaw.com, kcollins@swlaw.com

Andrew Still on behalf of Interested Party Courtesy NEF
astill@swlaw.com, kcollins@swlaw.com

United States Trustee (SA)
ustpregion16.sa.ecf@usdoj.gov

Sharon Z. Weiss on behalf of Creditor Azzure Capital LLC
sharon.weiss@bclplaw.com, raul.morales@bclplaw.com,REC_KM_ECF_SMO@bclplaw.com

Sharon Z. Weiss on behalf of Creditor Hi Bar Capital LLC
sharon.weiss@bclplaw.com, raul.morales@bclplaw.com,REC_KM_ECF_SMO@bclplaw.com

Johnny White on behalf of Creditor Debt Relief Group, LLC
JWhite@wrslawyers.com, jlee@wrslawyers.com

Johnny White on behalf of Interested Party Courtesy NEF
JWhite@wrslawyers.com, jlee@wrslawyers.com

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                        F 9013-3.1.PROOF.SERVICE

# EXHIBIT A

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor 1 | The Litigation Practice Group P.C. |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | Central District of California |
| Case number | 8:23-bk-10571 |

## Official Form 410

# Proof of Claim

04/22

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309)** that you received.

---

**Part 1:   Identify the Claim**

| | |
|---|---|
| 1. Who is the current creditor? | OHP-CDR, LP |
| | Name of the current creditor (the person or entity to be paid for this claim) |
| | Other names the creditor used with the debtor _____ |
| 2. Has this claim been acquired from someone else? | ☑ No<br>☐ Yes.  From whom? _____ |

| 3. Where should notices and payments to the creditor be sent?<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|---|
| | Jeremy Andersen, Razmig Izakelian | |
| | Name | Name |
| | 865 S. Figueroa Street, 10th Floor | |
| | Number      Street | Number      Street |
| | Los Angeles          CA          90017 | |
| | City          State          ZIP Code | City          State          ZIP Code |
| | Contact phone (213) 443-3000 | Contact phone _____ |
| | Contact email jeremyandersen@quinnemanuel.com | Contact email _____ |
| | Uniform claim identifier for electronic payments in chapter 13 (if you use one):<br><br>__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ | |

| 4. Does this claim amend one already filed? | ☑ No<br>☐ Yes.  Claim number on court claims registry (if known) _____          Filed on ____ / ____ / ____<br>                                                                                                                      MM   /  DD   /  YYYY |
|---|---|

| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☑ No<br>☐ Yes.  Who made the earlier filing? _____ |
|---|---|

---

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____  ____  ____  ____

**7. How much is the claim?**    $ ____At least $16,938,954.00____.    **Does this amount include interest or other charges?**

☐ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See attached.

**9. Is all or part of the claim secured?**

☐ No

☑ Yes.   The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☑ Other. Describe:    All personal property

**Basis for perfection:**    See attached

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**    $ See attached

**Amount of the claim that is secured:**    $ See attached

**Amount of the claim that is unsecured:** $ See attached    (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**    $ See attached

**Annual Interest Rate** (when case was filed) _____ % See attached

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**    $ _____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☑ No | |
|---|---|---|
| | ☐ Yes. *Check one:* | **Amount entitled to priority** |

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).    $_____

☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).    $_____

☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).    $_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).    $_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).    $_____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies.    $_____

\* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3:    Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☑ I am the creditor.
☐ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  05 / 24 / 2023
                  MM / DD / YYYY

Signature

Print the name of the person who is completing and signing this claim:

| Name | Adam | | Blum |
|---|---|---|---|
| | First name | Middle name | Last name |

Title    Manager

Company    OHP - CDR, LP
Identify the corporate servicer as the company if the authorized agent is a servicer.  c/o Quin Emanuel, Attn: Jeremy Andersen, Razmig Izakelian

Address    865    S. Figueroa St.
           Number    Street
           Los Angeles        CA    90017
           City               State  ZIP Code

Contact phone    213-443-3000    Email    jeremyandersen@quinnemanuel.com

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | Chapter 11 |
| **LITIGATION PRACTICE GROUP P.C.** | Case No. 8:23-bk-10571-SC |
| Debtor. | |

### ATTACHMENT TO PROOF OF CLAIM FILED BY OHP-CDR, LP

1.      On March 20, 2023 (the "Petition Date"), Litigation Practice Group P.C. (the "Debtor") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court"). On May 8, 2023, the Bankruptcy Court entered its *Order Approving the U.S. Trustee's Application for the Appointment of a Chapter 11 Trustee* and appointed Richard A. Marshack as the chapter 11 trustee in the above-captioned case (the "Chapter 11 Trustee").

2.      The proof of claim and this attachment thereto (together, the "Proof of Claim") is filed by OHP-CDR, LP, formerly known as OHP-LPG, LP ("OHP-CDR").

3.      On the basis of the facts and claims set forth below, OHP-CDR asserts a claim of at least $16,538,954 against the Debtor including: (i) $9,538,954 in connection with the Guaranty (as defined below); (ii) damages caused by the Debtor's breaches of the LLC Agreement in an amount of at least $7 million (as defined below); and (iii) additional amounts that may be owing in connection with the foregoing, including interest and fees relating thereto.

4.      In filing this Proof of Claim, OHP-CDR reserves all its rights, claims, privileges, and defenses against the Debtor, including all its rights to assert setoff, counterclaims, recoupment, or defenses arising from any and all or its transactions or dealings with the Debtor.

1

## CLAIM

### I.    The Parties

5.    OHP-CDR, formerly named OHP-LPG, LP, is a limited partnership organized under the laws of the State of Delaware, with its headquarters in Austin, Texas.

6.    The Debtor is a corporation organized under the laws of the State of California, with its headquarters in Tustin, California.

### II.    The Debtor's Business

7.    The Debtor is a debt validation law firm that provides debtor's rights services in the form of debt validation, consultation, and litigation defense.  The legal services it offers include: (i) removal of invalid debts through correspondence with credit bureaus; (ii) validation of consumer debts through correspondence including disputes with original creditors, validation demands to third party debt collectors and assignees, and disputes with credit bureaus; (iii) defense of collection actions; and (iv) negotiation of settlements of consumer debts.

8.    One of the ways that the Debtor generated clients was by utilizing the services of marketing companies called "Affiliates."  These Affiliates were companies that owned and operated systems of generating leads consisting of consumers interested in the legal services offered by the Debtor.  The Affiliates were retained by the Debtor to provide marketing and customer service functions, and would receive, as payment, a percentage of the fees generated by the Debtor for each file referred to the Debtor by the Affiliate.

### III.    The LLC Agreement

9.    On September 1, 2022, OHP-CDR (then named OHP-LPG, LP), the Debtor, and Mario Azevedo ("Azevedo") entered into the *Limited Liability Company Agreement of PurchaseCo80, LLC*, as amended from time to time (the "LLC Agreement" and "PurchaseCo").

2

A true and correct copy of the LLC Agreement is attached hereto as **Exhibit A**.  The purpose of PurchaseCo was to, among other things, acquire cash flow streams representing interests in customer payments for debt validation services.  The LLC Agreement was subsequently amended, replacing Azevedo with Azevedo Solutions Group ("ASG").  OHP-CDR, the Debtor, and ASG are referred to as the "Members."

10.     Pursuant to the LLC Agreement, each of OHP-CDR, the Debtor, and ASG made "Initial Capital Contributions" to PurchaseCo.  In addition to Initial Capital Contribution, OHP-CDR made an "Equity Investment" of $22,000 and had the option of providing "OHP Funding Capital" of up to $10,000,000.00.  OHP-CDR provided the full amount of OHP Funding Capital of $10,000,000 pursuant to the procedures set forth in section 3.02 of the LLC Agreement.

11.     The funding provided to PurchaseCo, including the OHP Funding Capital, was to be used by PurchaseCo to purchase from the Debtor and/or the Affiliates cash flow streams representing an interest in customer payments for debt validation services (the "Eligible Receivables").  The LLC Agreement required the Debtor to operate in a manner consistent with its historical practices, and to collect the Eligible Receivables and remit them to PurchaseCo.

12.     Pursuant to section 6.01 of the LLC Agreement, any available cash, after allowance for PurchaseCo's obligations then due and payable along with reasonable reserves, was required to be distributed to the Members pursuant to a specified waterfall ("Waterfall").  The Waterfall required that any available cash: (i) first be distributed to OHP-CDR until OHP-CDR received a return of all of the OHP Funding Capital paid into PurchaseCo; (ii) second to OHP-CDR until OHP-CDR received a return of its Equity Investment; (iii) third to the Debtor and ASG until they received a return of their Equity Investments; (iv) fourth to OHP-CDR until OHP-CDR received distributions equal to the greater of 88% of the OHP Funding Capital paid into PurchaseCo and a

3

20% IRR on the total OHP Funding Capital paid into Purchase Co; (v) fifth to the Debtor and ASG

in an amount equal to 13.5% of what was paid to OHP-CDR under subsection (iv) above; (vi) sixth

to the Members to the extent they had contributed additional capital contributions; and (vii) last,

pro rata to the Members in accordance with their membership interests.

13.     PurchaseCo was managed by a Manager, and the Debtor was appointed as the initial

Manager.  The LLC Agreement also contained numerous operational covenants, which are set

forth in section 7.02.  Those covenants required, among other things, the Debtor and ASG to grant

PurchaseCo a right of first offer to purchase any cash flow stream representing an interest in

customer payments for debt validation services, and the Debtor, as Manager, to maintain a

minimum cash balance.  Specifically, the operational covenants include:

> Presentment of Cash Flows; Right of First Offer.  During the Term, LPG and
> Azevedo grant to the Company a right of first offer to purchase any cash flow
> stream representing an interest in customer payments for debt validation services.
> On no less than a monthly basis, LPG shall present OHP with a written list of cash
> flows for consideration to be Eligible Receivables, which shall be presented to OHP
> without price markups and on the same terms as originally presented to LPG by the
> applicable LPG Receivable Affiliate. OHP shall have five (5) days after receipt of
> such list to accept or decline such cash flows as Eligible Receivables. Should OHP
> fail to respond prior to the expiration of such five (5)-day period, the applicable
> cash flows shall be deemed approved by OHP and the Company in all respects.
> Should OHP decline any presented cash flow stream, it may be sold to third-parties
> for a period of thirty (30) days on identical economic terms as were presented to
> OHP. After the thirty (30)-day period or upon any change in economic terms of the
> offering, the Company's and OHP's rights under this Section 7.02(a) shall be
> renewed as to such cash flow. For so long as any of LPG or Azevedo hold any
> Membership Interest, directly or indirectly, LPG and Azevedo shall not (and shall
> cause each of the LPG Limited Guarantors to not) enter into side letters or
> agreements with any LPG Receivable Affiliates or among each other which would
> result in price markups to the Company or additional payments to LPG as a result
> of any cash flow being acquired by the Company, or which would violate the
> Company's and OHP's rights in this Section 7.02(a) or elsewhere in this
> Agreement. Any commissions or similar payments received by LPG or Azevedo as
> a result of the Company's purchase of Eligible Receivables shall be promptly paid
> to the Company not as Additional Capital Contributions and without any
> corresponding increase in the Percentage Interest of such party.

4

LLC Agreement § 7.02(a).

>    Maintenance of Minimum Cash Balance and Available Cash. At all times, the
>    Manager shall cause the Available Cash to be no less than the Minimum Cash
>    Balance. All Available Cash shall be kept in depository accounts to which OHP has
>    direct access and joint control.

LLC Agreement § 7.02(b).

>    Deposit Account Control Agreements; Phone Conference. Until the later of (i) LPG
>    no longer being Manager, and (ii) LPG no longer holding, directly or indirectly,
>    any Membership Interest, LPG shall grant and provide OHP access to all of LPG's
>    depository accounts (the "LPG Accounts"), within fourteen (14) days of the
>    Effective Date, through deposit account control agreements or similar instruments
>    at the discretion of OHP. Such agreements or instruments shall include, without
>    limitation, the right of OHP to take sole custody and control over the funds therein
>    and to approve expenditures outside of the ordinary course of business. In addition
>    to granting OHP access to the LPG Accounts, within seven (7) days of the Effective
>    Date, LPG and OHP shall attend a phone conference for the purposes of discussing
>    regulatory issues attended and facilitated by Tony Diab.

LLC Agreement § 7.02(e).

>    Purchase of Eligible Receivables; Collections and Management. (i) The Manager
>    shall cause the Company to acquire Eligible Receivables first with Available Cash
>    in excess of the Minimum Cash Balance, second with OHP Funding Capital, and
>    third with Additional Capital Contributions. (ii) Within seven (7) days of the
>    Effective Date, OHP shall attach certain agreements to be assigned to the Company
>    as Exhibit K (the "Assigned Eligible Receivables"). Upon attachment of the
>    Assigned Eligible Receivables, OHP's rights in the Assigned Eligible Receivables
>    will be assigned to the Company pursuant to an assignment agreement and deemed
>    as approved Eligible Receivables acquired with OHP Funding Capital in the
>    amount listed on Exhibit L. (iii) The Manager shall operate the Company at all
>    times in compliance with all Applicable Law and shall promptly, within forty-eight
>    (48) hours, notify OHP of the Manager's or the Company's receipt or becoming
>    aware of any notices of defaults, claims, investigations, or actions of any kind
>    against the Company, LPG (whether in its capacity as Manager or otherwise), any
>    of the LPG Limited Guarantors, or any of the LPG Receivable Affiliates. (iv) From
>    the Effective Date and thereafter, LPG shall continue operate in a manner consistent
>    with its historical practices, including, without limitation, in its solicitation,
>    relationships, and purchases with LPG Receivable Affiliates. (v) From the Effective
>    Date and thereafter, LPG will operate its collections and management practices
>    with LPG Receivable Affiliates consistent with the terms detailed in the ACB
>    Holdings Agreement, listed on Exhibit H.

LLC Agreement § 7.02(f).

Major Decisions. The Company shall not, and shall not enter into any commitment
to (and the Manager shall not authorize the Company to), do any of the following
without the affirmative written consent of OHP: … (ii) make any material change
to the nature of the business conducted by the Company or enter into any business
other than the Business; … (iv) approve the Budget for any Fiscal Year or any
amendment, modification or supplement thereto or authorize or incur expenses by
an amount in excess of ten percent (10%) of the corresponding amounts set forth in
the then-current Budget; … (v) authorize any distribution other than as required by
ARTICLE VI or Section 13.03(c); (vi) establish any reserve for expenses,
indebtedness, obligations, or anticipated capital expenditures under Section
6.01(a); (vii) other than the OHP Funding Capital, Equity Investments, and as set
forth in Section 8.03, incur any Indebtedness, pledge or grant liens on any assets,
or guarantee, assume, endorse, or otherwise become responsible for the obligations
of any other Person; (viii) make any loan, advance, capital contribution or other
investment in or to any Person other than to the extent approved or authorized in
the Budget then in effect; (ix) make any single capital expenditure not set forth in
the Budget in excess of five thousand dollars ($5,000.00); (x) enter into or effect
any transaction or series of related transactions involving the purchase, lease,
license, exchange or other acquisition (including by merger, consolidation,
acquisition of stock or acquisition of assets) of any assets and/or equity interests of
any Person, other than in the ordinary course of business; (xi) enter into or effect
any transaction or series of related transactions involving the sale, lease, license,
exchange or other disposition (including by merger, consolidation, sale of stock or
sale of assets) of any assets other than in the ordinary course of business; (xii)
approve any merger, consolidation, or combination with or into any other Person
….

LLC Agreement § 7.02(h).

14.     Additionally, the LLC Agreement at section 11.03 included a "non-compete"
clause, stating that so long as the Debtor and ASG held membership interests in PurchaseCo and
for two years thereafter, the Debtor, Tony Diab ("Diab"), and ASG shall not engage in any business
competitive with PurchaseCo's business.

15.     As set forth in section 8.03 of the LLC Agreement, to secure repayment of the OHP
Funding Capital, LPG granted OHP-CDR a first priority security interest in all of its personal
property, including, among other things, all accounts, contract rights, rights to payment of money,
commercial tort claims, deposit accounts, and all other financial assets.  On January 25, 2023,

6

OHP-CDR (then OHP-LPG, LP) recorded a UCC-1 Financing Statement with the California

Secretary of State.  A true and correct copy of the UCC-1 Financing Statement is attached hereto

as **Exhibit B**.

### IV.    The Guaranty

16.    In connection with the LLC Agreement, the Debtor entered into a guaranty

("Guaranty") with OHP-CDR.  A true and correct copy of the Guaranty is attached hereto as

**Exhibit C**.

17.    Pursuant to sections 3, 4, 5, and 9 of the Guaranty, the Debtor unconditionally and

irrevocably guaranteed to pay, when due, the OHP Funding Capital as a primary obligor.

### V.    Breaches of the LLC Agreement and Guaranty

18.    The Debtor almost immediately defaulted under the terms of the LLC Agreement,

in the following ways:

a.    It failed, as manager of PurchaseCo, to remit payments from Eligible

Receivables to PurchaseCo, in violation of section 7.02(a) of the LLC Agreement;

b.    It failed to abide by PurchaseCo's right of first offer to purchase the Eligible

Receivables purchased by the Debtor, in violation of section 7.02(a) of the LLC Agreement;

c.    It incurred third-party debt, equity, and merchant cash advance obligations

beginning on September 23, 2022, in violation of section 7.02(h) of the LLC Agreement;

d.    It paid commissions from Eligible Receivables to Affiliates and other

parties rather than PurchaseCo, in violation of section 7.02(h) of the LLC Agreement;

e.    It paid Tony Diab for personal matters rather than for the payment of

Eligible Receivables for PurchaseCo, in violation of section 7.02(h) of the LLC Agreement; and

f.    It failed to grant and provide OHP-CDR access to all of the Debtor's

depository accounts, in violation of section 7.02(e) of the LLC Agreement.

19.     On December 1, 2022, OHP-CDR sent the Debtor a *Notice of Default and Reservation of Rights* (the "December 1, 2022 Notice of Default"), outlining these defaults and giving the Debtor, in accordance with the terms of the LLC Agreement, seven days to cure the defaults.  The December 1, 2022 Notice of Default stated that, to the best of OHP-CDR's knowledge, the Debtor had failed to remit Eligible Receivables to PurchaseCo in an amount totaling $3,293,732.81 as of that date.

20.     The Debtor failed to timely to cure the defaults, and OHP-CDR sent multiple subsequent notices of default and reservations of rights, including on January 27, 2023, February 17, 2023, and March 6, 2023, outlining the same defaults as set forth in the December 1, 2022 Notice of Default.  As set forth in the March 6, 2023 *Notice of Default and Reservation of Rights* ("March 6, 2023 Notice of Default"), as of that date, to the best of OHP-CDR's knowledge, the Debtor had failed to remit over $7 million of Eligible Receivables to PurchaseCo.  Additionally, on February 28, 2023, OHP-CDR removed LPG as Manager of PurchaseCo, and appointed itself as the Manager of PurchaseCo.

## VI.    OHP-CDR's Claims

### a.   **OHP Funding Capital**

21.     The Debtor has breached the Guaranty by failing to pay the OHP Funding Capital.

22.     Under the Guaranty, the Debtor unconditionally and irrevocably guaranteed to pay, among other things, the OHP Funding Capital as a primary obligor.

23.     As set forth above, the Debtor has failed to comply with several of the operational covenants set forth in section 7.02 of the LLC Agreement which despite numerous notices of default beginning on December 1, 2022, have not  been cured.  Pursuant to section 9.01(b) of the

8

LLC Agreement, the failure to cure the defaults constitutes an Event of Default, and OHP has the right to accelerate the repayment of any unpaid OHP Funding Capital. Therefore, under the Guaranty, the Debtor is obligated to pay OHP-CDR the outstanding OHP Funding Capital of $9,538,954.

### b. Violations of the Operational Covenants

24.      The Debtor has breached both the Guaranty and the LLC Agreement by failing to comply with the operational covenants set forth in section 7.02 of the LLC Agreement.

25.      Pursuant to the Guaranty, the Debtor unconditionally and irrevocably guaranteed to pay, among other things, the "Guaranteed Performance Obligations," which is defined to include "all of the obligations of [PurchaseCo] and each Guarantor [including the Debtor] under the LLC Agreement … other than the obligation to pay money." Additionally, as set forth above, pursuant to section 7.02 of the LLC Agreement, the Debtor, as manager of PurchaseCo, had numerous obligations.

26.      As set forth in the December 1, 2022 Notice of Default and subsequent notices, the Debtor breached several of the operational covenants set forth in section 7.02 of the LLC Agreement. OHP-CDR is entitled to damages caused by those breaches, including, without limitation, payment of all monies associated with cash flow streams that should have been offered to OHP-CDR, Eligible Receivables that have not been paid to OHP-CDR which as of March 6, 2023 totaled at least $7 million, and attorney's fees as set forth in the LLC Agreement.

## RESERVATION OF RIGHTS

27.    This Proof of Claim is filed to protect OHP-CDR from any asserted forfeiture of

claims.  OHP-CDR reserves its right to amend and/or supplement this Proof of Claim for any

purposes and to the extent permitted by applicable law.

28.    The Proof of Claim does not encompass claims or rights that OHP-CDR may have

that arise after the Petition Date that are entitled to an administrative priority.  OHP-CDR expressly

reserves its right to file and assert at the appropriate time any claims and rights that are entitled to

an administrative priority.

29.    OHP-CDR, on its own behalf and on behalf of its officers, directors, members, and

managers, hereby reserves all of its rights and defenses, whether under title 11 of the United States

Code or other applicable law, as to any claims or defenses that may be asserted by the Debtor or

Chapter 11 Trustee, including, without limitation, any rights of setoff and/or recoupment.  OHP-

CDR, on its own behalf and on behalf of its officers, directors, members, and managers, hereby

further reserves all of its rights as against the Debtor and/or Chapter 11 Trustee in this chapter 11

proceeding.  OHP-CDR, on its own behalf and on behalf of its officers, directors, members, and

managers, does not waive, and hereby expressly reserves, any right of action that it has or may

have against the Debtor and/or Chapter 11 Trustee, or any other person or persons, including the

Debtor's officers, directors, members, managers, and non-debtor affiliates.

30.    OHP-CDR, on its own behalf and on behalf of its officers, directors, members, and

managers, hereby further reserves all rights accruing to it, and the filing of this Proof of Claim is

not and shall not be deemed or construed as: (i) a waiver, release, or limitation of its rights against

any person, entity, or property (including, without limitation, the Debtor, the Debtor's officers,

directors, members, or managers, the Debtor's non-debtor affiliates, the Chapter 11 Trustee, or

10

any other person or entity that is or may become a debtor in a case pending in this Court); (ii) a

consent by OHP-CDR or any of its officers, directors, members, and managers to the jurisdiction

or venue of this Court or any other court with respect to proceedings, if any, commenced in any

case against or otherwise involving OHP-CDR or its officers, directors, members, and managers;

(iii) a waiver, release, or limitation of the right of OHP-CDR and/or its officers, directors,

members, and managers to trial by jury in this Court or any other court in any proceeding as to any

and all matters so triable herein, whether or not the same be designated legal or private rights or in

any case, controversy, or proceeding related hereto, notwithstanding the designation or not of such

matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether or not such jury trial

right is pursuant to statute or the U.S. Constitution; (iv) a consent by OHP-CDR or any of its

officers, directors, members, and managers to a jury trial in this Court or any other court in any

proceeding as to any and all matters so triable herein or in any case, controversy, or proceeding

related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise; (v) a waiver, release, or limitation of

the right of OHP-CDR or any of its officers, directors, members, and managers to have any and

all final orders in any and all non-core matters or proceedings entered only after de novo review

by a U.S. District Court Judge; (vi) consent to this Court hearing or deciding any matter or

proceeding, to the extent this Court lacks the constitutional authority to do so, under *Stern v.

Marshall* or otherwise; (vii) a waiver of the right to move to withdraw the reference with respect

to the subject matter of this Proof of Claim, any objection thereto or other proceeding which may

be commenced in this case against or otherwise involving OHP-CDR; (viii) an election of

remedies; or (ix) a consent to the final determination or adjudication of any claim or right pursuant

to 28 U.S.C. § 157(c).

11

31.     Any payments made with respect to the claims referenced herein should be sent to the following address:

> OHP-CDR, LP
> c/o Jeremy Andersen, Razmig Izakelian
> Quinn Emanuel Urquhart & Sullivan, LLP
> 865 S. Figueroa Street, 10th Floor
> Los Angeles, CA 90017
> Phone:  213-443-3000
> Email: jeremyandersen@quinnemanuel.com
>           razmigizakelian@quinnemanuel.com

32.     All notices and communications concerning the Proof of Claim should be sent to the following addresses:

> OHP-CDR, LP
> c/o Jeremy Andersen, Razmig Izakelian
> Quinn Emanuel Urquhart & Sullivan, LLP
> 865 S. Figueroa Street, 10th Floor
> Los Angeles, CA 90017
> Phone:  213-443-3000
> Email: jeremyandersen@quinnemanuel.com
>           razmigizakelian@quinnemanuel.com

33.     To the extent that OHP-CDR has or may have a right to subrogation, indemnification, reimbursement, or other similar claim, whether arising under 11 U.S.C. § 509, common law, equity,  any written or oral agreement, or otherwise, OHP-CDR expressly preserves such rights.

# EXHIBIT A

LIMITED LIABILITY COMPANY AGREEMENT

among

PURCHASECO80, LLC

and

THE MEMBERS NAMED HEREIN

dated as of

September 1, 2022

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS .................................................................................................. 1

    Section 1.01    Definitions ............................................................................. 1

    Section 1.02    Interpretation......................................................................... 10

ARTICLE II ORGANIZATION........................................................................................... 11

    Section 2.01    Formation............................................................................... 11

    Section 2.02    Name...................................................................................... 11

    Section 2.03    Principal Office...................................................................... 11

    Section 2.04    Registered Office; Registered Agent ..................................... 11

    Section 2.05    Purpose; Powers.................................................................... 11

    Section 2.06    Term...................................................................................... 12

    Section 2.07    No State-Law Partnership...................................................... 12

ARTICLE III CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS ............................. 12

    Section 3.01    Initial Capital Contributions; Updates to Membership Interests ........................ 12

    Section 3.02    Equity Investments and OHP Funding Capital....................... 12

    Section 3.03    Additional Capital Contributions........................................... 13

    Section 3.04    Maintenance of Capital Accounts........................................... 14

    Section 3.05    Succession Upon Transfer ..................................................... 14

    Section 3.06    Negative Capital Accounts .................................................... 14

    Section 3.07    No Withdrawals from Capital Accounts................................. 14

    Section 3.08    Loans from Members............................................................. 15

    Section 3.09    Modifications........................................................................ 15

ARTICLE IV MEMBERS.................................................................................................... 15

    Section 4.01    Admission of New Members .................................................. 15

    Section 4.02    No Personal Liability............................................................. 15

    Section 4.03    No Withdrawal...................................................................... 15

    Section 4.04    No Interest in Company Property ........................................... 15

    Section 4.05    Certification of Membership Interests .................................... 16

i

DocuSign Envelope ID: 28F66340-71FF-4418-A383-B1A8537S685D

ARTICLE V ALLOCATIONS ................................................................................................ 16

    Section 5.01    Allocation of Net Income and Net Loss ................................................ 16

    Section 5.02    Regulatory and Special Allocations...................................................... 16

    Section 5.03    Tax Allocations ..................................................................................... 17

    Section 5.04    Allocations in Respect of Transferred Membership Interests.............. 18

ARTICLE VI DISTRIBUTIONS AND PAYMENTS ........................................................... 18

    Section 6.01    General................................................................................................... 18

    Section 6.02    Tax Distributions .................................................................................. 19

    Section 6.03    Tax Withholding; Withholding Advances ............................................ 20

    Section 6.04    Payments of Excess Funding Base ...................................................... 21

    Section 6.05    Distributions in Kind ............................................................................ 21

ARTICLE VII MANAGEMENT AND COVENANTS REGARDING THE OPERATION
OF THE COMPANY............................................................................................................ 21

    Section 7.01    Management by Manager; No Authority of Members........................... 21

    Section 7.02    Operational Covenants; Certain Rights of OHP ................................... 21

    Section 7.03    Removal; Resignation; Vacancies ........................................................ 24

    Section 7.04    Compensation; No Employment........................................................... 25

    Section 7.05    No Personal Liability ............................................................................ 25

    Section 7.06    Budget................................................................................................... 25

    Section 7.07    Other Activities; Business Opportunities.............................................. 25

ARTICLE VIII EXCULPATION AND INDEMNIFICATION; SECURITY INTEREST ..... 25

    Section 8.01    Exculpation of Covered Persons .......................................................... 25

    Section 8.02    Indemnification ..................................................................................... 26

    Section 8.03    Guarantees and Granting of Security Interest for OHP Funding Capital............ 27

    Section 8.04    Survival................................................................................................. 28

ARTICLE IX EVENTS OF DEFAULT ............................................................................... 28

    Section 9.01    Rights Upon Event of Default .............................................................. 28

    Section 9.02    Power of Attorney................................................................................. 28

    Section 9.03    Remedies Not Exclusive ....................................................................... 29

ARTICLE X TRANSFER ........................................................................................................ 29

    Section 10.01   Restrictions on Transfer................................................................................ 29

    Section 10.02   Permitted Transfers ...................................................................................... 30

    Section 10.03   Drag-Along Rights........................................................................................ 30

ARTICLE XI OTHER COVENANTS AND AGREEMENTS OF THE MEMBERS ............................. 31

    Section 11.01   Change of Control Notice ............................................................................ 31

    Section 11.02   Related-Party Agreements ............................................................................ 31

    Section 11.03   Non-Compete................................................................................................. 31

ARTICLE XII ACCOUNTING; TAX MATTERS.......................................................................... 31

    Section 12.01   Company Financial Statements .................................................................... 31

    Section 12.02   LPG Financial Statements ............................................................................ 32

    Section 12.03   Systems Access; Inspection Rights............................................................... 33

    Section 12.04   Income Tax Status ........................................................................................ 33

    Section 12.05   Tax Matters Representative .......................................................................... 33

    Section 12.06   Tax Returns .................................................................................................. 34

    Section 12.07   Company Funds ............................................................................................ 34

ARTICLE XIII DISSOLUTION AND LIQUIDATION.................................................................... 34

    Section 13.01   Events of Dissolution.................................................................................... 34

    Section 13.02   Effectiveness of Dissolution ........................................................................ 35

    Section 13.03   Liquidation................................................................................................... 35

    Section 13.04   Cancellation of Certificate ........................................................................... 36

    Section 13.05   Survival of Rights, Duties and Obligations ................................................. 36

ARTICLE XIV MISCELLANEOUS............................................................................................ 36

    Section 14.01   Expenses ....................................................................................................... 36

    Section 14.02   Further Assurances ....................................................................................... 36

    Section 14.03   Notices ......................................................................................................... 36

    Section 14.04   Headings ...................................................................................................... 36

    Section 14.05   Severability .................................................................................................. 36

    Section 14.06   Entire Agreement ......................................................................................... 37

Section 14.07    Successors and Assigns ...................................................................... 37

Section 14.08    No Third-Party Beneficiaries............................................................... 37

Section 14.09    Amendment......................................................................................... 37

Section 14.10    Waiver................................................................................................. 37

Section 14.11    Governing Law ................................................................................... 37

Section 14.12    Submission to Jurisdiction ................................................................. 37

Section 14.13    WAIVER OF JURY TRIAL; ARBITRATION. .................................. 38

Section 14.14    Equitable Remedies ........................................................................... 41

Section 14.15    Attorneys' Fees.................................................................................. 41

Section 14.16    Remedies Cumulative ........................................................................ 41

Section 14.17    Counterparts....................................................................................... 41

DocuSign Envelope ID: 3B5663A0-71F5-4415-A383-91A8537S625D

## LIMITED LIABILITY COMPANY AGREEMENT

This LIMITED LIABILITY COMPANY AGREEMENT of PURCHASECO80, LLC, a Delaware limited liability company (the "Company"), is entered into as of September 1, 2022 (the "Effective Date"), by and among the Company, OHP – LPG, LP, a Delaware limited partnership ("OHP"), LITIGATION PRACTICE GROUP PC, a California professional corporation ("LPG"), and MARIO AZEVEDO, an individual ("Azevedo").

R E C I T A L S:

WHEREAS, the Company was formed under the laws of the State of Delaware by the filing of a Certificate of Formation with the Secretary of State of Delaware (the "Secretary of State") on January 16, 2019 (the "Certificate of Formation"), for the purposes set forth in Section 2.05 of this Agreement; and

WHEREAS, the Members wish to enter into this Agreement setting forth the terms and conditions governing the operation and management of the Company.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.01    Definitions. Capitalized terms used herein and not otherwise defined shall have the meanings set forth in this Section 1.01:

"AAA" has the meaning given such term in Section 14.13(b)(ii).

"ACB Holdings Agreement" means that certain B.A.T. Inc. dba Coast Processing - Affiliate Agreement, dated as of September 29, 2020, by and between LPG and ACB Holdings, LP.

"Additional Capital Contributions" has the meaning set forth in Section 3.03.

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(a)    crediting to such Capital Account any amount that such Member is obligated to restore or is deemed to be obligated to restore pursuant to Treasury Regulations Sections 1.704-1(b)(2)(ii)(c), 1.704-2(g)(1) and 1.704-2(i); and

(b)    debiting to such Capital Account the items described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

"Adjusted Taxable Income" of a Member for a Fiscal Year (or portion thereof) with respect to the Membership Interest held by such Member means the federal taxable income allocated by the Company to the Member with respect to its Membership Interest (as adjusted by any final determination in connection with any tax audit or other proceeding) for such Fiscal Year (or portion thereof); *provided*, that such taxable income shall be computed (a) minus any excess taxable loss or excess taxable credits of the Company for any prior period allocable to such Member with respect to its Membership Interest that were not previously taken into account for purposes of determining such Member's Adjusted Taxable

1

DocuSign Envelope ID: 78F56340-71F5-4715-8383-71AB537S685D

Income in a prior Fiscal Year to the extent such loss or credit would be available under the Code to offset income of the Member (or, as appropriate, the direct or indirect owners of the Member) determined as if the income, loss, and credits from the Company were the only income, loss, and credits of the Member (or, as appropriate, the direct or indirect owners of the Member) in such Fiscal Year and all prior Fiscal Years; and (b) taking into account any special basis adjustment with respect to such Member resulting from an election by the Company under Code Section 754.

"Affiliate" means, with respect to any Person, any other Person who, directly or indirectly (including through one or more intermediaries), controls, is controlled by, or is under common control with, such Person. For purposes of this definition, "control," when used with respect to any specified Person, shall mean the power, direct or indirect, to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities or partnership or other ownership interests, by contract or otherwise; and the terms "controlling" and "controlled" shall have correlative meanings; *provided, however*, that the term "Affiliate" does not, when used with respect to a Member, include the Company.

"Agreement" means this Limited Liability Company Agreement, as executed and as it may be amended, modified, supplemented, or restated from time to time, as provided herein.

"Ancillary Agreements" means the other agreements delivered by or among any of the Initial Members and the other parties signatory thereto in connection with this Agreement, including, without limitation, any Loan Agreement, that certain indemnification agreement attached as Exhibit F dated as of the Effective Date and entered into by Azevedo and LPG for the benefit of OHP and the Company, agreements between LPG or Azevedo and any of the LPG Receivable Affiliates attached as Exhibit G (the "LPG Receivable Affiliate Agreements"), and any agreement of a company owned by Tony Diab or his Affiliate, attached as Exhibit J.

"Applicable Law" means all applicable provisions of (a) constitutions, treaties, statutes, laws (including the common law), rules, regulations, decrees, ordinances, codes, proclamations, declarations, or orders of any Governmental Authority; (b) any consents or approvals of any Governmental Authority; and (c) any orders, decisions, advisory or interpretative opinions, injunctions, judgments, awards, decrees of, or agreements with, any Governmental Authority.

"Arbitration Agreement" has the meaning given to such term in Section 14.13(b)(i).

"Arbitration Rules" has the meaning given such term in Section 14.13(b)(ii).

"Arbitrator" and "Arbitrators" have the meanings given such terms in Section 14.13(b)(iii).

"Available Cash" means all cash or cash equivalents of the Company (a) that are not, and are not required to be, designated as "restricted" on the financial statements of the Company; (b) that are not contractually required, and have not been contractually committed by the Company, to be used for a specific purpose; (c) that are not subject to (i) any provision of law, statute, rule, or regulation; (ii) any provision of the organizational documents of the Company; or (iii) any order of any governmental authority; (d) in which no Person has a lien (other than liens held by OHP); and (e) that are held in a deposit account or securities account.

"Azevedo" has the meaning set forth in the preamble.

"Bankruptcy" means, with respect to a Member, the occurrence of any of the following: (a) the filing of an application by such Member for, or a consent to, the appointment of a trustee of such

Member's assets; (b) the filing by such Member of a voluntary petition in bankruptcy or the filing of a pleading in any court of record admitting in writing such Member's inability to pay its debts as they come due; (c) the making by such Member of a general assignment for the benefit of such Member's creditors; (d) the filing by such Member of an answer admitting the material allegations of, or such Member's consenting to, or defaulting in answering a bankruptcy petition filed against such Member in any bankruptcy proceeding; or (e) the expiration of sixty (60) days following the entry of an order, judgment or decree by any court of competent jurisdiction adjudicating such Member bankrupt or appointing a trustee of such Member's assets.

"BBA" means the Bipartisan Budget Act of 2015.

"Book Depreciation" means, with respect to any Company asset for each Fiscal Year, the Company's depreciation, amortization, or other cost recovery deductions determined for federal income tax purposes, except that if the Book Value of an asset differs from its adjusted tax basis at the beginning of such Fiscal Year, Book Depreciation shall be an amount which bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; *provided*, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero and the Book Value of the asset is positive, Book Depreciation shall be determined with reference to such beginning Book Value using any permitted method selected by unanimous consent of the Members in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g)(3).

"Book Value" means, with respect to any Company asset, the adjusted basis of such asset for federal income tax purposes, except as follows:

(a)      the initial Book Value of any Company asset contributed by a Member to the Company shall be the gross Fair Market Value of such Company asset as of the date of such contribution;

(b)      immediately prior to the distribution by the Company of any Company asset to a Member, the Book Value of such asset shall be adjusted to its gross Fair Market Value as of the date of such distribution;

(c)      the Book Value of all Company assets shall be adjusted to equal their respective gross Fair Market Values as of the following times:

(i)      the acquisition of an additional Membership Interest by a new or existing Member in consideration for more than a *de minimis* Capital Contribution;

(ii)      the distribution by the Company to a Member of more than a *de minimis* amount of property (other than cash) as consideration for all or a part of such Member's Membership Interest; and

(iii)      the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g);

(d)      the Book Value of each Company asset shall be increased or decreased, as the case may be, to reflect any adjustments to the adjusted tax basis of such Company asset pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Account balances pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m); *provided*, that Book Values shall not be adjusted pursuant to this

3

DocuSign Envelope ID: 28F663A0-71E5-4415-A383-91AB537S665D

paragraph (d) to the extent that an adjustment pursuant to paragraph (c) above is made in conjunction with a transaction that would otherwise result in an adjustment pursuant to this paragraph (d); and

(e)     if the Book Value of a Company asset has been determined pursuant to paragraph (a) or adjusted pursuant to paragraphs (c) or (d) above, such Book Value shall thereafter be adjusted to reflect the Book Depreciation taken into account with respect to such Company asset for purposes of computing Net Income and Net Losses.

"Budget" has the meaning set forth in Section 7.06(a).

"Business" has the meaning set forth in Section 2.05(a).

"Cancellation Rate" means, as of such date of determination, an amount, expressed as a percentage, equal to (a) the total dollar amount of undiscounted expected future cash flows from Eligible Receivables purchased by the Company that have been cancelled or written off, or which are more than sixty (60) days past due, *divided by* (b) the total dollar amount of undiscounted received and expected future cash flows from all Eligible Receivables purchased by the Company.

"Capital Account" has the meaning set forth in Section 3.04.

"Capital Contribution" means, for any Member, the total amount of cash and cash equivalents and the Book Value of any property contributed to the Company by such Member.

"Certificate of Formation" has the meaning set forth in the Recitals.

"Change of Control" means any transaction or series of related transactions (whether as a result of a tender offer, merger, consolidation, reorganization, acquisition, sale or transfer of equity securities, proxy, power of attorney or otherwise) that results in, or that is in connection with (a) any independent third-party acquiring beneficial ownership, directly or indirectly, of a majority of the then issued and outstanding voting securities or combined voting rights of the applicable Person; or (b) the sale, lease, exchange, conveyance, transfer, or other disposition (whether for cash, shares of stock (or other equity interests) or securities or other consideration) of all or substantially all of the property and assets of such Person.

"Change of Control Notice" has the meaning set forth in Section 11.01.

"Class Action Waiver" has the meaning given such term in Section 14.13(b)(v).

"Code" means the Internal Revenue Code of 1986.

"Company" has the meaning set forth in the Preamble.

"Company Interest Rate" has the meaning set forth in Section 6.03(c).

"Company Minimum Gain" means "partnership minimum gain" as defined in Treasury Regulations Section 1.704-2(b)(2), substituting the term "Company" for the term "partnership" as the context requires.

"Covered Person" has the meaning set forth in Section 8.01(a).

4

"Delaware Act" means the Delaware Limited Liability Company Act, Title 6, Chapter 18, §§ 18-101, *et seq.*

"Designated Individual" has the meaning set forth in Section 12.05(a).

"Disputes" has the meaning given such term in Section 14.13(b)(i).

"Dissolution" means, with respect to a Member, the occurrence of any of the following: (a) if such Member is a partnership or limited liability company, the dissolution and commencement of winding up of such partnership or limited liability company; or (b) if such Member is a corporation, the dissolution of the corporation or the revocation of its charter.

"Drag-Along Member" has the meaning set forth in Section 10.03(a).

"Drag-Along Notice" has the meaning set forth in Section 10.03(a).

"Drag-Along Sale" has the meaning set forth in Section 10.03(b).

"Effective Date" has the meaning set forth in the introductory paragraph.

"Electronic Transmission" means any form of communication not directly involving the physical transmission of paper, including the use of, or participation in, one or more electronic networks or databases (including one or more distributed electronic networks or databases), that creates a record that may be retained, retrieved and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

"Eligible Receivables" means any cash flow stream representing an interest in customer payments for debt validation services which meets the following criteria:

(a) such cash flow stream is to be purchased by the Company from LPG Receivable Affiliates;

(b) such cash flow represents the entire interest therein held by LPG Receivable Affiliates; and

(c) the purchase of such cash flow stream is approved by OHP in accordance with Section 3.02(c).

"Equity Investments" has the meaning set forth in Section 3.02(a).

"Estimated Tax Amount" of a Member for a Fiscal Year means the Member's Tax Amount for such Fiscal Year as estimated in good faith from time to time by the Manager. In making such estimate, the Manager shall take into account amounts shown on Internal Revenue Service Form 1065 filed by the Company and similar state or local forms filed by the Company for the preceding taxable year and such other adjustments as the Manager reasonably determines are necessary or appropriate to reflect the estimated operations of the Company for the Fiscal Year.

"Event of Default" means any of the following:

(a) LPG, Tony Diab, or Azevedo are in breach of any of their respective representations, warranties, or covenants contained in this Agreement or any of the Ancillary

Agreements and such breach remains uncured for a period of seven (7) days after written notice thereof by OHP or the Company, as applicable, to the breaching party(ies);

(b) the Company is in material default of any of its contractual obligations (whether or not resulting in acceleration), including, without limitation, obligations under any of the Ancillary Agreements;

(c) the Company, LPG, Tony Diab, or Azevedo consent to the appointment of a receiver, trustee, or liquidator of all or substantially all of their respective assets, file a voluntary petition in bankruptcy, make a general assignment for the benefit of creditors, or if any order, judgment or decree is entered by any court of competent jurisdiction on the application of a creditor or otherwise adjudicating such Person bankrupt or appointing a receiver, trustee, or liquidator of such Person or of all or a substantial part of its or his assets and such order, judgment, or decree continues unstayed and in effect for sixty (60) calendar days after its entry;

(d) Azevedo or Tony Diab is convicted of, or pleads guilty or no contest to, a felony or a crime of moral turpitude;

(e) the Company, LPG, or any of the LPG Limited Guarantors become subject to a civil judgment in an amount greater than fifty thousand dollars ($50,000.00); or

(f) the Company, LPG, or any of the LPG Limited Guarantors become subject to any disciplinary review, disciplinary action, or investigation by any Governmental Authority.

"Excess Amount" has the meaning set forth in Section 6.02(c).

"Exchange Act" means the Securities Exchange Act of 1934.

"Fair Market Value" of any asset as of any date means the purchase price that a willing buyer having all relevant knowledge would pay a willing seller for such asset in an arm's-length transaction, as reasonably determined by the Manager in good faith.

"Fiscal Year" means the calendar year, unless the Company is required to have a taxable year other than the calendar year, in which case Fiscal Year shall be the period that conforms to its taxable year.

"Funding Capital Request Period" has the meaning set forth in Section 3.02(c).

"GAAP" means United States generally accepted accounting principles in effect from time to time.

"Governmental Authority" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization (for example, without limitation, state bar associations for attorneys or boards governing other licensed professionals) or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law), or any arbitrator, court or tribunal of competent jurisdiction.

"Indebtedness" of any Person means (without duplication) all (a) indebtedness of such Person for borrowed money; (b) obligations of such Person which are evidenced by notes, bonds, debentures or similar instruments; (c) obligations of such Person that have been, or should be, in accordance with

DocuSign Envelope ID: 78F66340-71E5-4415-A383-91A8537S685D

GAAP, recorded as capital leases; (d) obligations of such Person that have been, or should be, in accordance with GAAP, recorded as a sale-leaseback transaction or a leveraged lease; (e) obligations of such Person in respect of letters of credit or acceptances issued or created for the account of such Person; (f) liabilities for the deferred purchase price of property or services (other than current liabilities incurred in the ordinary course of business); and (g) direct or indirect guarantees (including "keep well" arrangements, support agreements and similar agreements) with respect to Indebtedness of any other Person.

"Initial Budget" has the meaning set forth in Section 7.06(a).

"Initial Capital Contribution" has the meaning set forth in Section 3.01(a).

"Initial Members" means OHP, LPG, and Azevedo.

"IRR" means internal rate of return, as determined by OHP in its sole and reasonable discretion.

"Joinder Agreement" means the joinder agreement in form and substance attached hereto as Exhibit A.

"Liquidator" has the meaning set forth in Section 13.03(a).

"Loan Agreement" means any loan agreement(s) entered into by and between LPG, as borrower, and OHP, as lender, on or after the Effective Date.

"Losses" has the meaning set forth in Section 8.02(a).

"LPG" has the meaning set forth in the preamble.

"LPG Accounts" has the meaning set forth in Section 7.02(e).

"LPG Company Guarantors" means LPG and each subsidiary of LPG now owned or hereafter acquired.

"LPG Customer Agreement" means the standard form of customer agreement entered into by LPG, attached as Exhibit I.

"LPG Limited Guarantors" means Azevedo, Tony Diab, Daniel March, each member of LPG's senior management team as of such date of determination, and each Person owning at least five percent (5%) of the issued and outstanding equity interests in LPG as of such date of determination.

"LPG Receivable Affiliates" means lead-generating and marketing companies from which cash flows are purchased.

"Manager" shall mean the Person appointed by OHP to serve as "Manager" of the Company as such term is defined in the Delaware Act and subject to rights and restrictions as set forth in this Agreement. The initial Manager shall be LPG.

"Material Adverse Change" means, with respect to any Person, any effect, change, event, occurrence, development, or state of facts that, individually or in the aggregate with all other such effects, changes, events, occurrences, developments, or states of fact, (a) has had, or would reasonably be expected to have, a material adverse effect on the business, assets, liabilities, condition (financial or otherwise), or results of operations of such Person, whether alone or with such Person's Affiliates; or (b)

would, or would reasonably be expected to, prevent or materially impair the ability of such Person to observe or perform its obligations, liabilities, or agreements, whether under this Agreement, the Ancillary Agreements, or otherwise. Notwithstanding the forgoing, the following shall not be taken into account in determining whether there has been a "Material Adverse Change": (i) general business or economic conditions; (ii) national or international political or social conditions, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack; (iii) financial, banking, or securities markets (including any disruption thereof and any decline in the price of any security or any market index); or (iv) changes in GAAP.

"Member" means (a) each Initial Member; and (b) each Person who is hereafter admitted as a Member in accordance with the terms of this Agreement and the Delaware Act, in each case so long as such Person is shown on the Company's books and records as the owner of a Membership Interest. The Members shall constitute the "members" (as that term is defined in the Delaware Act) of the Company.

"Member Nonrecourse Debt" means "partner nonrecourse debt" as defined in Treasury Regulations Section 1.704-2(b)(4), substituting the term "Company" for the term "partnership" and the term "Member" for the term "partner" as the context requires.

"Member Nonrecourse Debt Minimum Gain" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if the Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Treasury Regulations Section 1.704-2(i)(3).

"Member Nonrecourse Deduction" means "partner nonrecourse deduction" as defined in Treasury Regulations Section 1.704-2(i), substituting the term "Member" for the term "partner" as the context requires.

"Membership Interest" means an interest in the Company owned by a Member, including such Member's right to (a) its distributive share of Net Income, Net Losses, and other items of income, gain, loss, and deduction of the Company; (b) its distributive share of the assets of the Company; (c) vote on, consent to or otherwise participate in any decision of the Members as provided in this Agreement; and (d) any and all other benefits to which such Member may be entitled as provided in this Agreement or the Delaware Act. The Membership Interest of each Member shall be expressed as a Percentage Interest.

"Minimum Cash Balance" means twenty-five thousand dollars ($25,000.00).

"Net Income" and "Net Loss" mean, for each Fiscal Year or other period specified in this Agreement, an amount equal to the Company's taxable income or taxable loss, or particular items thereof, determined in accordance with Code Section 703(a) (where, for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or taxable loss), but with the following adjustments:

       (a)     any income realized by the Company that is exempt from federal income taxation, as described in Code Section 705(a)(1)(B), shall be added to such taxable income or taxable loss, notwithstanding that such income is not includable in gross income;

       (b)     any expenditures of the Company described in Code Section 705(a)(2)(B), including any items treated under Treasury Regulations Section 1.704-1(b)(2)(iv)(I) as items described in Code Section 705(a)(2)(B), shall be subtracted from such taxable income or taxable loss, notwithstanding that such expenditures are not deductible for federal income tax purposes;

        (c)      any gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of the property so disposed, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

        (d)      any items of depreciation, amortization and other cost recovery deductions with respect to Company property having a Book Value that differs from its adjusted tax basis shall be computed by reference to the property's Book Value (as adjusted for Book Depreciation) in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g);

        (e)      if the Book Value of any Company property is adjusted as provided in the definition of Book Value, then the amount of such adjustment shall be treated as an item of gain or loss and included in the computation of such taxable income or taxable loss; and

        (f)      to the extent an adjustment to the adjusted tax basis of any Company property pursuant to Code Sections 732(d), 734(b) or 743(b) is required, pursuant to Treasury Regulations Section 1.704 1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis).

"Nonrecourse Deductions" has the meaning set forth in Treasury Regulations Section 1.704-2(b).

"Nonrecourse Liability" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"OHP" has the meaning set forth in the preamble.

"OHP Funding Capital" has the meaning set forth in Section 3.02(b).

"Percentage Interest" means, with respect to a Member at any time, the percentage set forth opposite such Member's name on Exhibit B hereto (such percentage being understood to be reflective of the economic interest in the Company represented by such Member's Membership Interest). The Percentage Interests shall at all times aggregate to one hundred percent (100%).

"Person" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association, or other entity.

"Quarterly Estimated Tax Amount" of a Member for any calendar quarter of a Fiscal Year means the excess, if any, of (a) the product of (i) a quarter (¼) in the case of the first calendar quarter of the Fiscal Year, half (½) in the case of the second calendar quarter of the Fiscal Year, three-quarters (¾) in the case of the third calendar quarter of the Fiscal Year, and one (1) in the case of the fourth calendar quarter of the Fiscal Year and (ii) the Member's Estimated Tax Amount for such Fiscal Year; over (b) all distributions previously made during such Fiscal Year to such Member.

"Regulatory Allocations" has the meaning set forth in Section 5.02(e).

"Related-Party Agreement" means any agreement, arrangement, transaction or understanding between the Company and any Member or Manager or any of his, her, or its Affiliates.

"Representative" means, with respect to any Person, any and all directors, managers, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"Revised Partnership Audit Rules" has the meaning set forth in Section 12.05(a).

"Secretary of State" has the meaning set forth in the Recitals.

"Securities Act" means the Securities Act of 1933.

"Shortfall Amount" has the meaning set forth in Section 6.02(b).

"Tax Amount" of a Member for a Fiscal Year means the product of (a) the Tax Rate for such Fiscal Year and; (b) the Adjusted Taxable Income of the Member for such Fiscal Year with respect to its Membership Interest.

"Tax Distribution" has the meaning set forth in Section 6.02(a).

"Tax Matters Representative" has the meaning set forth in Section 12.05(a).

"Tax Rate" of a Member, for any period, means the highest effective marginal rate of combined federal, state, and local tax rate imposed for such period based on (a) the highest general marginal rate of tax imposed on corporations under Section 11(b) of the Code; (b) the highest general combined marginal rate of state and city taxes imposed on corporations operating in New York, New York; and (c) assuming the deductibility of state and city income taxes for federal income tax purposes.

"Taxing Authority" has the meaning set forth in Section 6.03(b).

"Term" has the meaning set forth in Section 2.06.

"Transfer" means to, directly or indirectly, sell, transfer, assign, pledge, encumber, hypothecate or similarly dispose of, either voluntarily or involuntarily, by operation of law or otherwise, or to enter into any contract, option or other arrangement or understanding with respect to the sale, transfer, assignment, pledge, encumbrance, hypothecation or similar disposition of, any Membership Interest owned by a Person or any interest (including a beneficial interest or any direct or indirect economic or voting interest) in any Membership Interest owned by a Person. "Transfer" when used as a noun shall have a correlative meaning. "Transferor" and "Transferee" mean a Person who makes or receives a Transfer, respectively.

"Transferring Member" has the meaning set forth in Section 10.02.

"Treasury Regulations" means the final or temporary regulations issued by the United States Department of Treasury pursuant to its authority under the Code, and any successor regulations.

"Unpaid OHP Funding Capital" means the excess, if any, of (a) OHP Funding Capital paid as of the date of any such determination; over (b) the aggregate amount of all distributions made to OHP pursuant to or in accordance with Section 6.01(b)(i).

"Withholding Advances" has the meaning set forth in Section 6.03(b).

Section 1.02    Interpretation. For purposes of this Agreement: (a) the words "include," "includes," and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. The definitions given for any defined terms in this Agreement shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any

pronoun shall include the corresponding masculine, feminine, and neuter forms. Unless the context otherwise requires, references herein: (i) to Articles, Sections and Exhibits mean the Articles and Sections of, and Exhibits attached to, this Agreement; (ii) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented or modified from time to time to the extent permitted by the provisions thereof; and (iii) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

## ARTICLE II
## ORGANIZATION

Section 2.01    Formation.

(a)    The Company was formed on August 3, 2022, pursuant to the provisions of the Delaware Act, upon the filing of the Certificate of Formation with the Secretary of State.

(b)    This Agreement shall constitute the "limited liability company agreement" (as that term is used in the Delaware Act) of the Company. The rights, powers, duties, obligations and liabilities of the Members shall be determined pursuant to the Delaware Act and this Agreement. To the extent that the rights, powers, duties, obligations and liabilities of any Member are different by reason of any provision of this Agreement than they would be under the Delaware Act in the absence of such provision, this Agreement shall, to the extent permitted by the Delaware Act, control.

Section 2.02    Name. The name of the Company is "PurchaseCo80, LLC."

Section 2.03    Principal Office. The principal office of the Company is located at 17542 17th St., Suite 100, Tustin, CA 92780, or such other place as may from time to time be determined by the Manager. The Manager shall give prompt notice of any such change to each of the Members.

Section 2.04    Registered Office; Registered Agent.

(a)    The registered office of the Company shall be the office of the initial registered agent named in the Certificate of Formation or such other office (which need not be a place of business of the Company) as the Manager may designate from time to time in the manner provided by the Delaware Act and Applicable Law.

(b)    The registered agent for service of process on the Company in the State of Delaware shall be the initial registered agent named in the Certificate of Formation or such other Person or Persons as the Manager may designate from time to time in the manner provided by the Delaware Act and Applicable Law.

Section 2.05    Purpose; Powers.

(a)    The purposes of the Company are to engage in (i) the acquisition of cash flow streams representing interests in customer payments for debt validation services (the "Business"); and (ii) any and all lawful activities necessary or incidental thereto.

   (b)  The Company shall have all the powers necessary or convenient to carry out the purposes for which it is formed, including the powers granted by the Delaware Act.

   Section 2.06  <u>Term</u>. The term of the Company ("<u>Term</u>") commenced on the date the Certificate of Formation was filed with the Secretary of State and shall continue in existence perpetually until the Company is dissolved in accordance with the provisions of this Agreement.

   Section 2.07  <u>No State-Law Partnership</u>. The Members intend that the Company shall not be a partnership (including a limited partnership) or joint venture, and that no Member or Manager of the Company shall be a partner or joint venturer of any other Member or Manager of the Company, for any purposes other than as set forth in <u>Section 12.04</u>.

ARTICLE III
CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

   Section 3.01  <u>Initial Capital Contributions; Updates to Membership Interests</u>.

   (a)  Contemporaneously with the execution of this Agreement, each Initial Member has made an initial Capital Contribution (each, an "<u>Initial Capital Contribution</u>") and is deemed to own a Membership Interest in the amount set forth opposite such Member's name on <u>Exhibit B</u> hereto.

   (b)  The Manager shall update <u>Exhibit B</u> hereto upon the Transfer of any Membership Interest to any new or existing Member in accordance with this Agreement, to reflect any Additional Capital Contribution in accordance with <u>Section 3.03</u>, or as otherwise required by the terms hereof.

   Section 3.02  <u>Equity Investments and OHP Funding Capital</u>.

   (a)  In addition to their Initial Capital Contributions, contemporaneously with the execution of this Agreement, OHP shall advance twenty two thousand dollars ($22,000.00), Azevedo shall advance one thousand eight hundred dollars ($1,800.00), and LPG shall advance one thousand three hundred dollars ($1,300.00) to the balance sheet of the Company in order to fund its initial operation of the Business (the "<u>Equity Investments</u>"). The Equity Investments shall not increase the Capital Accounts of either OHP or LPG and shall not proportionally increase the Percentage Interests either of OHP or LPG; *however*, OHP and LPG shall each receive a priority return of their Equity Investments in accordance with <u>Section 6.01(b)(ii)</u> and <u>Section 6.01(b)(iii)</u>.

   (b)  In addition to its Initial Capital Contribution and Equity Investment, OHP may, but shall not be obligated to, make additional advances of up to ten million dollars ($10,000,000.00) in the aggregate to the balance sheet of the Company or Affiliate in order to fund its operation of the Business of the Company or any Affiliate (the "<u>OHP Funding Capital</u>"); *provided*, except as otherwise agreed in writing by OHP:

     (i)  the maximum aggregate amount of OHP Funding Capital that can be requested during the period beginning on the Effective Date and ending on the six (6) month anniversary thereof shall be five million dollars ($5,000,000.00);

     (ii)  OHP shall not be requested to make advances of OHP Funding Capital more frequently than once per calendar month, beginning on the first day of the first full calendar month immediately succeeding the Effective Date;

12

DocuSign Envelope ID: 7BF6632A071E5441543833-91AB537S825D

        (iii)     the maximum amount of OHP Funding Capital that can be requested per calendar month is two million dollars ($2,000,000.00);

        (iv)     each request for OHP Funding Capital shall be made in accordance with the procedures set forth in <u>Section 3.02(c)</u>; and

        (v)     each of the LPG Company Guarantors and each of the LPG Limited Guarantors shall have signed and delivered to OHP a guaranty agreement substantially in the forms attached hereto as <u>Exhibit C</u> and <u>Exhibit D</u>, respectively.

        (c)     Each request for OHP Funding Capital shall be made by the Company in writing and delivered to OHP reasonably in advance of the date on which the Company expects to utilize such capital. Each OHP Funding Capital request shall be accompanied by a statement of historical and projected performance statistics of Eligible Receivables purchased, organized by LPG Receivable Affiliate. In addition to the foregoing, during the five (5) business days immediately following delivery of an OHP Funding Capital request (the "<u>Funding Capital Request Period</u>"), the Company, LPG, and Azevedo shall promptly provide, or cause to be provided, any supplementary documentation or information as reasonably requested by OHP or its representatives in connection with such Person's review of the OHP Funding Capital request. OHP shall review each request on a case-by-case basis and shall notify the Company and LPG of its decision prior to the expiration of the Funding Capital Request Period. Should OHP fail to respond prior to the expiration of the Funding Capital Request Period, the OHP Funding Capital request shall be deemed approved by OHP in all respects. Subject to the conditions set forth in <u>Section 3.02(b)</u> and the foregoing provisions of this <u>Section 3.02(c)</u>, OHP shall make any approved OHP Funding Capital advance by wire transfer of immediately available funds within ten (10) business days after such approval. The OHP Funding Capital shall not increase the Capital Account of OHP and shall not proportionally increase the Percentage Interest of OHP; *however*, OHP shall receive a priority return of the OHP Funding Capital in accordance with <u>Section 6.01(b)(i)</u>.

Section 3.03    <u>Additional Capital Contributions</u>.

        (a)     Should the Manager determine that the Company requires capital in excess of the amounts set forth in <u>Section 3.01</u> and <u>Section 3.02</u>, but only after exhaustion of such amounts, the Manager may request (but not require) additional Capital Contributions from the Members ("<u>Additional Capital Contributions</u>"); *provided*, that such Additional Capital Contributions shall not exceed the corresponding amounts expressly provided for in the then-current Budget.

        (b)     Upon the Manager making a determination to call for Additional Capital Contributions, the Manager shall deliver to the Members a written notice of the Company's need for Additional Capital Contributions, which notice shall specify in reasonable detail (i) the purpose for such Additional Capital Contributions; (ii) the aggregate amount of such Additional Capital Contributions; (iii) each Member's pro rata share of such aggregate amount of Additional Capital Contributions (based upon such Member's Percentage Interest); and (iv) the date (which date shall not be less than fourteen (14) days following the date that such notice is given) on which such Additional Capital Contributions are due. Promptly after each collection of Additional Capital Contributions, the Manager shall update <u>Exhibit B</u> hereto to reflect changes in Membership Interests commensurate with the payment by, or failure or declination to pay by, the Members of any Additional Capital Contributions.

13

(c)     Except as set forth in <u>Section 3.02</u> or <u>Section 3.06</u>, no Member shall be required to make Additional Capital Contributions, advances, capital infusions, loans to the Company.

Section 3.04     <u>Maintenance of Capital Accounts</u>. The Company shall establish and maintain for each Member a separate capital account (a "<u>Capital Account</u>") on its books and records in accordance with this <u>Section 3.04</u>. Each Capital Account shall be established and maintained in accordance with the following provisions:

(a)     Each Member's Capital Account shall be increased by the amount of:

(i)     such Member's Capital Contributions, including such Member's initial Capital Contribution and any Additional Capital Contributions (other than the Equity Investments and OHP Funding Capital);

(ii)     any Net Income or other item of income or gain allocated to such Member pursuant to <u>ARTICLE V</u>; and

(iii)     any liabilities of the Company that are assumed by such Member or secured by any property distributed to such Member.

(b)     Each Member's Capital Account shall be decreased by:

(i)     the cash amount or Book Value of any property distributed to such Member pursuant to <u>ARTICLE VI</u> and <u>Section 13.03(c)</u>;

(ii)     the amount of any Net Loss or other item of loss or deduction allocated to such Member pursuant to <u>ARTICLE V</u>; and

(iii)     the amount of any liabilities of such Member assumed by the Company or that are secured by any property contributed by such Member to the Company.

Section 3.05     <u>Succession Upon Transfer</u>. In the event that any Membership Interest is Transferred in accordance with the terms of this Agreement, the Transferee shall succeed to the Capital Account of the Transferor to the extent it relates to the Transferred Membership Interest and, subject to <u>Section 5.04</u>, shall receive allocations and distributions pursuant to <u>ARTICLE V</u>, <u>ARTICLE VI</u>, and <u>ARTICLE XIII</u> in respect of such Membership Interest.

Section 3.06     <u>Negative Capital Accounts</u>. In the event that any Member shall have a deficit balance in its Capital Account, such Member shall have no obligation, including during the Term or upon dissolution or liquidation of the Company, to restore such negative balance or make any Capital Contributions to the Company by reason thereof, except as may be required by Applicable Law or in respect of any negative balance resulting from a withdrawal of capital or dissolution in contravention of this Agreement.

Section 3.07     <u>No Withdrawals from Capital Accounts</u>. No Member shall be entitled to withdraw any part of its Capital Account or to receive any distribution from the Company, except as otherwise provided in this Agreement. No Member shall receive any interest, salary, management, or service fees, or drawing with respect to its Capital Contributions or its Capital Account, except as otherwise provided in this Agreement or any of the Ancillary Agreements. The Capital Accounts are maintained for the sole purpose of allocating items of income, gain, loss, and deduction among the

Members and shall have no effect on the amount of any distributions to any Members, in liquidation or otherwise.

Section 3.08    Loans from Members. Loans by any Member to the Company shall not be considered Capital Contributions and shall not affect the maintenance of such Member's Capital Account, other than to the extent provided in Section 3.04(a)(iii), if applicable.

Section 3.09    Modifications. The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Treasury Regulations. If the Manager determines that it is prudent to modify the manner in which the Capital Accounts, or any increases or decreases to the Capital Accounts, are computed in order to comply with such Treasury Regulations, the Manager, acting alone, may authorize such modifications.

ARTICLE IV
MEMBERS

Section 4.01    Admission of New Members.

(a)    A new Member may be admitted from time to time in connection with a Transfer of a Membership Interest in accordance with this Agreement, subject to compliance with the provisions of ARTICLE X, and following compliance with the provisions of Section 4.01(b).

(b)    In order for any Person not already a Member of the Company to be admitted as a Member, such Person shall have executed and delivered to the Company a written undertaking substantially in the form of the Joinder Agreement. Upon the amendment of Exhibit B hereto by the Manager and the satisfaction of any other applicable conditions as may reasonably be deemed necessary by the Manager to effect such admission, such Person shall be admitted as a Member and deemed listed as such on the books and records of the Company. The Manager shall also adjust the Capital Accounts of the Members as necessary in accordance with Section 3.05.

Section 4.02    No Personal Liability. Except as otherwise provided in the Delaware Act, by Applicable Law, or expressly in this Agreement or any of the Ancillary Agreements, no Member will be obligated personally for any debt, obligation, or liability of the Company or the other Members, whether arising in contract, tort or otherwise, solely by reason of being a Member.

Section 4.03    No Withdrawal. So long as a Member continues to hold any Membership Interest, such Member shall not have the ability to withdraw or resign as a Member prior to the dissolution and winding up of the Company and any such withdrawal or resignation or attempted withdrawal or resignation by a Member prior to the dissolution or winding up of the Company shall be null and void. As soon as any Person who is a Member ceases to hold any Membership Interests, such Person shall no longer be a Member. A Member shall not cease to be a Member as a result of the Bankruptcy of such Member or as a result of any other events specified in § 18-304 of the Delaware Act.

Section 4.04    No Interest in Company Property. Neither the Eligible Receivables purchased by the Company, nor any real or personal property of the Company shall be deemed to be owned by any Member individually, but shall be owned by, and title shall be vested solely in, the Company. Without limiting the foregoing, each Member hereby irrevocably waives during the term of the Company any right that such Member may have to maintain any action for partition with respect to the property of the Company.

DocuSign Envelope ID: 29F6634A-71E5-4415-A383-B1AB537S685D

Section 4.05    Certification of Membership Interests.

(a)    The Manager may, but shall not be required to, issue certificates representing the Membership Interests held by the Members.

(b)    If the Manager issues certificates representing Membership Interests in accordance with Section 4.05(a), then in addition to any other legend required by Applicable Law, all certificates representing issued and outstanding Membership Interests shall bear a legend substantially in the following form:

THE MEMBERSHIP INTERESTS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A LIMITED LIABILITY COMPANY AGREEMENT AMONG THE COMPANY AND ITS MEMBERS, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL EXECUTIVE OFFICE OF THE COMPANY. NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THE MEMBERSHIP INTERESTS REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH LIMITED LIABILITY COMPANY AGREEMENT.

THE MEMBERSHIP INTERESTS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS AND MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED EXCEPT PURSUANT TO (A) A REGISTRATION STATEMENT EFFECTIVE UNDER SUCH ACT AND LAWS, OR (B) AN EXEMPTION FROM REGISTRATION THEREUNDER.

# ARTICLE V
## ALLOCATIONS

Section 5.01    Allocation of Net Income and Net Loss. For each Fiscal Year (or portion thereof), after giving effect to the special allocations set forth in Section 5.02, Net Income and Net Loss of the Company shall be allocated among the Members pro rata in accordance with their Membership Interests.

Section 5.02    Regulatory and Special Allocations. Notwithstanding the provisions of Section 5.01:

(a)    If there is a net decrease in Company Minimum Gain (determined according to Treasury Regulations Section 1.704-2(d)(1)) during any Fiscal Year, each Member shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g). The items to be so allocated shall be determined in accordance with Treasury Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2). This Section 5.02 is intended to comply with the "minimum gain chargeback" requirement in Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(b)    Member Nonrecourse Deductions shall be allocated in the manner required by Treasury Regulations Section 1.704-2(i). Except as otherwise provided in Treasury Regulations Section 1.704-2(i)(4), if there is a net decrease in Member Nonrecourse Debt Minimum Gain

during any Fiscal Year, each Member that has a share of such Member Nonrecourse Debt Minimum Gain shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to that Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain. Items to be allocated pursuant to this paragraph shall be determined in accordance with Treasury Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2). This Section 5.02(b) is intended to comply with the "minimum gain chargeback" requirements in Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c)     Nonrecourse Deductions shall be allocated to the Members in accordance with their Membership Interests.

(d)     In the event any Member unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), Net Income shall be specially allocated to such Member in an amount and manner sufficient to eliminate the Adjusted Capital Account Deficit created by such adjustments, allocations or distributions as quickly as possible. This Section 5.02(d) is intended to comply with the qualified income offset requirement in Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(e)     The allocations set forth in paragraphs (a), (b), (c) and (d) above (the "Regulatory Allocations") are intended to comply with certain requirements of the Treasury Regulations under Code Section 704. Notwithstanding any other provisions of this ARTICLE V (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating Net Income and Net Losses among Members so that, to the extent possible, the net amount of such allocations of Net Income and Net Losses and other items and the Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to such Member if the Regulatory Allocations had not occurred.

Section 5.03     Tax Allocations.

(a)     Subject to Section 5.03(b), Section 5.03(c), and Section 5.03(d), all income, gains, losses, and deductions of the Company shall be allocated, for federal, state and local income tax purposes, among the Members in accordance with the allocation of such income, gains, losses, and deductions pursuant to Section 5.01 and Section 5.02, except that if any such allocation for tax purposes is not permitted by the Code or other Applicable Law, the Company's subsequent income, gains, losses and deductions shall be allocated among the Members for tax purposes, to the extent permitted by the Code and other Applicable Law, so as to reflect as nearly as possible the allocation set forth in Section 5.01 and Section 5.02.

(b)     Items of Company taxable income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall be allocated among the Members in accordance with Code Section 704(c) and the traditional method with curative allocations of Treasury Regulations Section 1.704-3(c), so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Book Value.

(c)     If the Book Value of any Company asset is adjusted pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(f) as provided in clause (c) of the definition of Book Value in Section 1.01, subsequent allocations of items of taxable income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset

for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c).

      (d)     Allocations of tax credit, tax credit recapture and any items related thereto shall be allocated to the Members according to their interests in such items as determined by the Manager after taking into account the principles of Treasury Regulations Section 1.704-1(b)(4)(ii).

      (e)     Allocations pursuant to this <u>Section 5.03</u> are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Income, Net Losses, distributions or other items pursuant to any provisions of this Agreement.

Section 5.04    <u>Allocations in Respect of Transferred Membership Interests</u>. In the event of a Transfer of a Membership Interest during any Fiscal Year made in compliance with the provisions of <u>ARTICLE IX</u>, Net Income, Net Losses and other items of income, gain, loss and deduction of the Company attributable to such Membership Interest for such Fiscal Year shall be determined using the interim closing of the books method.

## ARTICLE VI
## DISTRIBUTIONS AND PAYMENTS

Section 6.01    <u>General</u>.

      (a)     Until such time as all principal and accrued interest under a Loan Agreement, if any is outstanding, is paid in full, any Available Cash, after allowance for payment of all Company obligations then due and payable, including debt service, operating expenses, commitments to purchase Eligible Receivables, and such other reasonable reserves (including the Minimum Cash Balance) as OHP, acting in accordance with <u>Section 7.02(h)(vi)</u>, may require, shall be distributed to the Members, on at least a quarterly basis, pro rata in accordance with their respective Percentage Interests; *provided*, *however*, that all distributions to LPG and Azevedo under this <u>Section 6.01(a)</u> shall be deemed distributed to such Members but paid directly to OHP, on behalf of such Members, and the balance due under a Loan Agreement, if outstanding, shall be correspondingly reduced.

      (b)     After all principal and accrued interest under a Loan Agreement, if any is outstanding, is paid in full, any Available Cash, after allowance for payment of all Company obligations then due and payable, including debt service, operating expenses, commitments to purchase Eligible Receivables, and such other reasonable reserves (including the Minimum Cash Balance) as OHP, acting in accordance with <u>Section 7.02(h)(vi)</u>, may require, shall be distributed to the Members, when determined by OHP, in the following order and priority:

      (i)     *first*, to OHP until such time as OHP has received a return of all OHP Funding Capital paid into the Company as of such date of determination, but which has not been repaid pursuant to <u>Section 6.04</u>;

      (ii)     *next*, to OHP until such time as OHP has received a return of its Equity Investment;

      (iii)     *next*, to LPG and Azevedo until such time as LPG and Azevedo have received a return of their Equity Investment;

(iv)    *next*, to OHP until such time as OHP receives distributions under this Section 6.01(b)(iv) equal to the greater of (x) eighty eight percent (88%) of the maximum OHP Funding Capital paid as of such date of determination, and (y) a twenty percent (20%) IRR on the total OHP Funding Capital paid as of such date of determination;

(v)    *next*, to LPG and Azevedo in an amount equal to thirteen and a half percent (13.5%) of the amount paid to OHP under Section 6.01(b)(iv); and

(vi)    *next*, to the Members in an amount equal to their respective Additional Capital Contributions, if any;

(vii)    *thereafter,* pro rata in accordance with their respective Percentage Interests.

(A)    Notwithstanding the foregoing, as a condition precedent to LPG and Azevedo receiving distributions under Section 6.01(b)(vii), OHP shall have received:

(i) all LPG Receivable Affiliate Agreements currently in effect; and

(ii) the LPG Customer Agreement, with written approval from OHP of any deviation of the terms therein.

(c)    Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any distribution to the Members if such distribution would violate § 18-607 of the Delaware Act or other Applicable Law.

Section 6.02    Tax Distributions.

(a)    Subject to Section 6.01(c), at least five (5) days before each date prescribed by the Code for a calendar-year corporation to pay quarterly installments of estimated tax, the Company shall use commercially reasonable efforts to distribute cash to each Member in proportion to and to the extent of such Member's Quarterly Estimated Tax Amount for the applicable calendar quarter (each such distribution, a "Tax Distribution").

(b)    If, at any time after the final Quarterly Estimated Tax Amount has been distributed pursuant to Section 6.02(a) with respect to any Fiscal Year, the aggregate Tax Distributions to any Member with respect to such Fiscal Year are less than such Member's Tax Amount for such Fiscal Year (a "Shortfall Amount"), the Company shall use commercially reasonable efforts to distribute cash in proportion to and to the extent of such Member's Shortfall Amount. The Company shall use commercially reasonable efforts to distribute Shortfall Amounts with respect to a Fiscal Year before the seventy-fifth (75th) day of the next succeeding Fiscal Year; *provided*, that if the Company has made distributions in such next succeeding Fiscal Year other than pursuant to this Section 6.02, the Manager may apply such distributions to reduce any Shortfall Amount.

(c)    If the aggregate Tax Distributions made to any Member pursuant to this Section 6.02 for any Fiscal Year exceed such Member's Tax Amount (an "Excess Amount"), such Excess Amount shall reduce subsequent Tax Distributions that would be made to such Member pursuant to this Section 6.02.

(d)     Notwithstanding the foregoing provisions of this <u>Section 6.02</u>, if a Loan Agreement remains outstanding and any principal or accrued interest is unpaid to OHP under a Loan Agreement, all distributions payable to LPG and Azevedo under this <u>Section 6.02</u> shall be paid directly to OHP, on behalf of LPG, until LPG's debt under a Loan Agreement has been paid in full.

Section 6.03     <u>Tax Withholding; Withholding Advances</u>.

(a)     Each Member agrees to furnish the Company with any representations and forms as shall be reasonably requested by the Manager to assist it in determining the extent of, and in fulfilling, any withholding obligations it may have.

(b)     The Company is hereby authorized at all times to make payments ("<u>Withholding Advances</u>") with respect to each Member in amounts required to discharge any obligation of the Company (as determined by the Tax Matters Representative based on the advice of legal or tax counsel to the Company) to withhold or make payments to any federal, state, local or foreign taxing authority (a "<u>Taxing Authority</u>") with respect to any distribution or allocation by the Company of income or gain to such Member and to withhold the same from distributions to such Member. Any funds withheld from a distribution by reason of this <u>Section 6.03(b)</u> shall nonetheless be deemed distributed to the Member in question for all purposes under this Agreement.

(c)     Any Withholding Advance made by the Company to a Taxing Authority on behalf of a Member and not simultaneously withheld from a distribution to that Member shall, with interest thereon accruing from the date of payment at a rate equal to the prime rate published in the *Wall Street Journal* on the date of payment plus two percent (2.0%) per annum (the "<u>Company Interest Rate</u>"):

(i)     be promptly repaid to the Company by the Member on whose behalf the Withholding Advance was made (which repayment by the Member shall not constitute a Capital Contribution, but shall credit the Member's Capital Account if the Manager shall have initially charged the amount of the Withholding Advance to the Capital Account); or

(ii)     with the consent of OHP, be repaid by reducing the amount of the next succeeding distribution or distributions to be made to such Member (which reduction amount shall be deemed to have been distributed to the Member, but which shall not further reduce the Member's Capital Account if the Manager shall have initially charged the amount of the Withholding Advance to the Capital Account).

Interest shall cease to accrue from the time the Member on whose behalf the Withholding Advance was made repays such Withholding Advance (and all accrued interest) by either method of repayment described above.

(d)     Each Member hereby agrees to indemnify and hold harmless the Company and the other Members from and against any liability with respect to taxes, interest or penalties that may be asserted by reason of the Company's failure to deduct and withhold tax on amounts distributable or allocable to such Member. The provisions of this <u>Section 6.03(d)</u> and the obligations of a Member pursuant to <u>Section 6.03(c)</u> shall survive the termination, dissolution, liquidation and winding up of the Company and the withdrawal of such Member from the Company or Transfer of its Membership Interest. The Company may pursue and enforce all rights

and remedies it may have against each Member under this Section 6.03, including bringing a lawsuit to collect repayment with interest of any Withholding Advances.

(e)     Neither the Company, nor the Manager shall be liable for any excess taxes withheld in respect of any distribution or allocation of income or gain to a Member. In the event of an overwithholding, a Member's sole recourse shall be to apply for a refund from the appropriate Taxing Authority.

Section 6.04     Payments of Excess Funding Base. On a regular basis, but no less than prior to each request for an OHP Funding Capital payment, the Manager shall evaluate the difference between (a) the amount (i) paid by the Company to LPG Receivable Affiliates for Eligible Receivables; plus (ii) payable to LPG Receivable Affiliates for cash flows that met the criteria for Eligible Receivables within the current calendar month but have yet to be paid for by the Company; and minus (b) the amount of Unpaid OHP Funding Capital. Should this evaluation yield a positive number, the Company shall promptly pay OHP an amount in cash equal to such number.

Section 6.05     Distributions in Kind. No Member has the right to demand or receive property other than cash in payment for its share of any distribution made in accordance with this Agreement. Non-cash distributions are not permitted without the unanimous consent of the Members.

## ARTICLE VII
## MANAGEMENT AND COVENANTS REGARDING THE OPERATION OF THE COMPANY

Section 7.01     Management by Manager; No Authority of Members. Except for certain decisions and rights of OHP as set forth in this Agreement, the day-to-day business and affairs of the Company shall be managed, operated, and controlled by or under the direction of the Manager. The Manager shall have, and is hereby granted, the full, complete, and exclusive power, authority, and discretion for, on behalf of, and in the name of the Company, to take such actions as it may in its sole discretion deem necessary or advisable to carry out any and all of the objectives and purposes of the Company, subject only to the terms of this Agreement. The Manager shall be appointed by OHP. Except as expressly provided herein or by Applicable Law, no Member, in its capacity as a Member, shall have any power or authority over the business and affairs of the Company or any power or authority to act for or on behalf of, or to bind, the Company.

Section 7.02     Operational Covenants; Certain Rights of OHP.

(a)     Presentment of Cash Flows; Right of First Offer. During the Term, LPG and Azevedo grant to the Company a right of first offer to purchase any cash flow stream representing an interest in customer payments for debt validation services. On no less than a monthly basis, LPG shall present OHP with a written list of cash flows for consideration to be Eligible Receivables, which shall be presented to OHP without price markups and on the same terms as originally presented to LPG by the applicable LPG Receivable Affiliate. OHP shall have five (5) days after receipt of such list to accept or decline such cash flows as Eligible Receivables. Should OHP fail to respond prior to the expiration of such five (5)-day period, the applicable cash flows shall be deemed approved by OHP and the Company in all respects. Should OHP decline any presented cash flow stream, it may be sold to third-parties for a period of thirty (30) days on identical economic terms as were presented to OHP. After the thirty (30)-day period or upon any change in economic terms of the offering, the Company's and OHP's rights under this Section 7.02(a) shall be renewed as to such cash flow. For so long as any of LPG or Azevedo hold any Membership Interest, directly or indirectly, LPG and Azevedo shall not (and shall cause each of the LPG Limited Guarantors to not) enter into side letters or agreements with any LPG

Receivable Affiliates or among each other which would result in price markups to the Company or additional payments to LPG as a result of any cash flow being acquired by the Company, or which would violate the Company's and OHP's rights in this Section 7.02(a) or elsewhere in this Agreement. Any commissions or similar payments received by LPG or Azevedo as a result of the Company's purchase of Eligible Receivables shall be promptly paid to the Company not as Additional Capital Contributions and without any corresponding increase in the Percentage Interest of such party.

(b)     Maintenance of Minimum Cash Balance and Available Cash. At all times, the Manager shall cause the Available Cash to be no less than the Minimum Cash Balance. All Available Cash shall be kept in depository accounts to which OHP has direct access and joint control.

(c)     Maintenance of Cancellation Rate. The Manager shall cause the Cancellation Rate to be equal to or less than forty percent (40%), calculated on a monthly basis as of the last business day of each calendar month, beginning on the first full calendar month immediately succeeding the Effective Date.

(d)     Insurance Policies. Within thirty (30) days of the Effective Date, the Manager shall cause the Company to obtain and maintain throughout the Term insurance policies in amounts (but in no event less than the amount of Unpaid OHP Funding Capital) and through carriers reasonably acceptable to OHP. For so long as LPG is the Manager, such policies shall include, at a minimum, general liability insurance policies and key man life insurance policies on members of LPG's senior management team.  From the Effective Date and thereafter, the Company shall pledge the life insurance policy insuring Tony Diab, as more particularly described in a Loan Agreement.

(e)     Deposit Account Control Agreements; Phone Conference. Until the later of (i) LPG no longer being Manager, and (ii) LPG no longer holding, directly or indirectly, any Membership Interest,  LPG shall grant and provide OHP access to all of LPG's depository accounts (the "LPG Accounts"), within fourteen (14) days of the Effective Date, through deposit account control agreements or similar instruments at the discretion of OHP. Such agreements or instruments shall include, without limitation, the right of OHP to take sole custody and control over the funds therein and to approve expenditures outside of the ordinary course of business. In addition to granting OHP access to the LPG Accounts, within seven (7) days of the Effective Date, LPG and OHP shall attend a phone conference for the purposes of discussing regulatory issues attended and facilitated by Tony Diab.

(f)     Purchase of Eligible Receivables; Collections and Management.

(i)     The Manager shall cause the Company to acquire Eligible Receivables first with Available Cash in excess of the Minimum Cash Balance, second with OHP Funding Capital, and third with Additional Capital Contributions.

(ii)     Within seven (7) days of the Effective Date, OHP shall attach certain agreements to be assigned to the Company as Exhibit K (the "*Assigned Eligible Receivables*"). Upon attachment of the Assigned Eligible Receivables, OHP's rights in the Assigned Eligible Receivables will be assigned to the Company pursuant to an assignment agreement and deemed as approved Eligible Receivables acquired with OHP Funding Capital in the amount listed on Exhibit L.

(iii)    The Manager shall operate the Company at all times in compliance with all Applicable Law and shall promptly, within forty-eight (48) hours,  notify OHP of the Manager's or the Company's receipt or becoming aware of any notices of defaults, claims, investigations, or actions of any kind against the Company, LPG (whether in its capacity as Manager or otherwise), any of the LPG Limited Guarantors, or any of the LPG Receivable Affiliates.

(iv)    From the Effective Date and thereafter, LPG shall continue operate in a manner consistent with its historical practices, including, without limitation, in its solicitation, relationships, and purchases with LPG Receivable Affiliates.

(v)    From the Effective Date and thereafter, LPG will operate its collections and management practices with LPG Receivable Affiliates consistent with the terms detailed in the ACB Holdings Agreement, listed on Exhibit H.

(g)    Commitment of LPG Limited Guarantors. For so long as LPG is Manager, the Manager shall cause all of the LPG Limited Guarantors to devote all, or substantially all, of such Person's professional time to the management and business of LPG and, indirectly, the management and business of the Company and the Business.

(h)    Major Decisions. The Company shall not, and shall not enter into any commitment to (and the Manager shall not authorize the Company to), do any of the following without the affirmative written consent of OHP:

(i)    amend, modify or waive the Certificate of Formation or this Agreement;

(ii)    make any material change to the nature of the business conducted by the Company or enter into any business other than the Business;

(iii)    issue, repurchase, or redeem any Membership Interest, admit additional Members (other than as provided in Section 10.02) or accept any Additional Capital Contribution other than as provided in Section 3.03;

(iv)    approve the Budget for any Fiscal Year or any amendment, modification or supplement thereto or authorize or incur expenses by an amount in excess of ten percent (10%) of the corresponding amounts set forth in the then-current Budget;

(v)    authorize any distribution other than as required by ARTICLE VI or Section 13.03(c);

(vi)    establish any reserve for expenses, indebtedness, obligations, or anticipated capital expenditures under Section 6.01(a);

(vii)    other than the OHP Funding Capital, Equity Investments, and as set forth in Section 8.03, incur any Indebtedness, pledge or grant liens on any assets, or guarantee, assume, endorse, or otherwise become responsible for the obligations of any other Person;

(viii)    make any loan, advance, capital contribution or other investment in or to any Person other than to the extent approved or authorized in the Budget then in effect;

DocuSign Envelope ID: 79F663A0-71E5-4475-A383-B1A8537S6P5D

(ix)      make any single capital expenditure not set forth in the Budget in excess of five thousand dollars ($5,000.00);

(x)      enter into or effect any transaction or series of related transactions involving the purchase, lease, license, exchange or other acquisition (including by merger, consolidation, acquisition of stock or acquisition of assets) of any assets and/or equity interests of any Person, other than in the ordinary course of business;

(xi)      enter into or effect any transaction or series of related transactions involving the sale, lease, license, exchange or other disposition (including by merger, consolidation, sale of stock or sale of assets) of any assets other than in the ordinary course of business;

(xii)      approve any merger, consolidation, or combination with or into any other Person;

(xiii)      establish a subsidiary or enter into any joint venture or similar business arrangement;

(xiv)      settle any lawsuit, action, dispute or other proceeding or assume any liability;

(xv)      initiate or consummate an initial public offering or make a public offering and sale of any membership interests or any other securities of the Company or any successor entity;

(xvi)      appoint or remove the Company's auditors or make any changes in the accounting methods or policies of the Company (other than as required by GAAP);

(xvii)      except as expressly provided in this Agreement, enter into, amend, waive, supplement, or terminate (other than pursuant to its terms) any Related-Party Agreement; or

(xviii)      initiate a bankruptcy proceeding (or consent to any involuntary bankruptcy proceeding).

Section 7.03      Removal; Resignation; Vacancies.

(a)      OHP shall have the right to remove the Manager appointed at any time with or without cause, effective upon written notice to such Manager.

(b)      OHP shall have the right to require the Company to hire, at the Company's expense and upon written notice to the Company and the Manager, one or more independent, third-party administrators or back-up servicers to assist or take over for the Manager in the collection and management of purchased Eligible Receivables, and any activities incidental thereto.

(c)      The Manager may resign at any time by delivering its, his, or her written resignation to OHP and the Company upon at least ninety (90) days' prior written notice. OHP's or the Company's acceptance of a resignation shall not be necessary to make it effective.

Section 7.04      Compensation; No Employment.

(a)      The Manager shall serve without compensation in its, his, or her capacity as such. The Manager shall be entitled to reimbursement from the Company for its, his, or her reasonable and necessary out-of-pocket expenses incurred in the performance of its, his, or her duties as a Manager, pursuant to such policies as may from time to time be established by OHP.

(b)      This Agreement does not, and is not intended to, confer upon the Manager any rights with respect to employment by the Company, and nothing herein shall be construed to have created any employment agreement or relationship with the Manager.

Section 7.05      No Personal Liability. Except as otherwise provided in the Delaware Act or by Applicable Law, the Manager shall not be obligated personally for any debt, obligation or liability of the Company, whether arising in contract, tort or otherwise, solely by reason of being the Manager.

Section 7.06      Budget.

(a)      The initial annual budget for the Company through the Fiscal Year ending December 31, 2022 (the "Initial Budget"), which has previously been approved by the Initial Members and the Manager, is attached hereto as Exhibit E. The Manager shall operate the Company in accordance with the Initial Budget, as it may be amended, modified, or replaced in accordance with Section 7.06(b) (the "Budget").

(b)      At least ninety (90) days before the beginning of each Fiscal Year, the Manager shall prepare and submit to OHP proposed revisions to the Budget for such upcoming Fiscal Year. The Company shall operate in accordance with the existing Budget until a revised Budget is approved in accordance with Section 7.02(h)(iv).

Section 7.07      Other Activities; Business Opportunities. Except as set forth in any Ancillary Agreements or in Section 7.02(a), Section 7.02(g), and Section 11.03: (i) nothing contained in this Agreement shall prevent any Member, the Manager, or any of their Affiliates from engaging in any other activities or businesses, regardless of whether those activities or businesses are similar to or competitive with the Business; and (ii) neither the Members, the Manager, nor any of their Affiliates shall be obligated to inform the Company or any Member of any business opportunity of any type or description.

## ARTICLE VIII
### EXCULPATION AND INDEMNIFICATION; SECURITY INTEREST

Section 8.01      Exculpation of Covered Persons.

(a)      As used herein, the term "Covered Person" shall mean each of the following, subject to the consent of OHP, which may be granted or withheld in OHP's sole discretion: (i) each Member; (ii) each officer, director, shareholder, partner, member, Affiliate, employee, agent, or representative of each Member; and (iii) each Manager, employee, agent, or representative of the Company.

(b)      Except as set forth in ARTICLE IX, no Covered Person shall be liable to the Company for any loss, damage, or claim incurred by reason of any action taken or omitted to be taken by such Covered Person in his, her, or its capacity as a Covered Person, whether or not such Person continues to be a Covered Person at the time such loss, damage, or claim is incurred or imposed, so long as such action or omission does not constitute fraud, gross negligence, willful

misconduct, or a breach by such Covered Person of any of such Covered Person's or his, her, or its Affiliates' agreements contained herein or in any of the Ancillary Agreements, as determined by OHP in its sole discretion.

(c)     A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements (including financial statements and information, opinions, reports or statements as to the value or amount of the assets, liabilities, Net Income, or Net Losses of the Company or any facts pertinent to the existence and amount of assets from which distributions might properly be paid) of the following Persons or groups: (i) a Manager; (ii) one or more employees of the Company; (iii) any attorney, independent accountant, appraiser, or other expert or professional employed or engaged by or on behalf of the Company; or (iv) any other Person selected in good faith by or on behalf of the Company, in each case as to matters that such relying Person reasonably believes to be within such other Person's professional or expert competence. The preceding sentence shall in no way limit any Person's right to rely on information to the extent provided in § 18-406 of the Delaware Act.

Section 8.02     Indemnification.

(a)     To the fullest extent permitted by the Delaware Act, as the same now exists or may hereafter be amended, substituted, or replaced (but, in the case of any such amendment, substitution, or replacement, only to the extent that such amendment, substitution, or replacement permits the Company to provide broader indemnification rights than the Delaware Act permitted the Company to provide prior to such amendment, substitution, or replacement), the Company shall indemnify, hold harmless, defend, pay, and reimburse any Covered Person from and against any and all losses, claims, damages, judgments, fines, or liabilities, including reasonable legal fees or other expenses incurred in investigating or defending against such losses, claims, damages, judgments, fines, or liabilities, and any amounts expended in settlement of any claims (other than in connection with any claims brought by (i) a Member or its Affiliate against another Member or its Affiliate or (ii) the Company) (collectively, "Losses") to which such Covered Person may become subject by reason of:

1.     any act or omission or alleged act or omission performed or omitted to be performed on behalf of the Company in connection with the Business of the Company; or

2.     such Covered Person being or acting in connection with the Business of the Company as a Member or a Manager or that such Covered Person is or was serving at the request of the Company as a member, manager, partner, director, officer, employee, or agent of any other Person;

provided, that (x) such Covered Person acted in good faith and in a manner believed by such Covered Person to be in, or not opposed to, the best interests of the Company and within the scope of such Covered Person's authority conferred on him, her, or it by the Company and, with respect to any criminal proceeding, had no reasonable cause to believe his, her, or its conduct was unlawful, and (y) such Covered Person's conduct did not constitute fraud, gross negligence, willful misconduct or a breach by such Covered Person of any of such Covered Person's or his, her or its Affiliates' agreements contained herein or in any of the Ancillary Agreements, in each case as determined by OHP in its sole discretion.

(b)     The indemnification provided by this Section 8.02 shall not be deemed exclusive of any other rights to indemnification to which those seeking indemnification may be entitled

DocuSign Envelope ID: 78F5634D-71F5-4418-A383-B1A8537S685D

under any agreement or otherwise. The provisions of this <u>Section 8.02</u> shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this <u>Section 8.02</u> and shall inure to the benefit of the executors, administrators, legatees, and distributees of such Covered Person.

(c)     Notwithstanding anything herein to the contrary, nothing in this <u>ARTICLE VIII</u> shall (or shall be construed to) (i) relieve any Member or other Person from any liability or obligation of such Person pursuant to any of the Ancillary Agreements, or to in any way impair the enforceability of any provision of the Ancillary Agreements against any party thereto; or (ii) require the Company to indemnify, hold harmless, defend, pay or reimburse any Covered Person with respect to any Loss to the extent a Member or its Affiliate is required to indemnify, hold harmless, defend, pay or reimburse such Covered Person with respect thereto.

(d)     To the extent available on commercially reasonable terms, the Company may purchase, at its expense, insurance to cover Losses covered by the foregoing indemnification provisions and to otherwise cover Losses for any breach or alleged breach by any Covered Person of such Covered Person's duties in such amount and with such deductibles as the Manager and OHP may determine; <i>provided</i>, that (i) all Members and the Manager shall be treated equally under any such insurance policies; and (ii) the failure to obtain such insurance shall not affect the right to indemnification of any Covered Person under the indemnification provisions contained herein, including the right to be reimbursed or advanced expenses or otherwise indemnified for Losses hereunder. If any Covered Person recovers any amounts in respect of any Losses from any insurance coverage, then such Covered Person shall, to the extent that such recovery is duplicative, reimburse the Company for any amounts previously paid to such Covered Person by the Company in respect of such Losses.

(e)     Notwithstanding anything contained herein to the contrary, any indemnity by the Company relating to the matters covered in this <u>Section 8.02</u> shall be provided out of and to the extent of Company assets only, and no Member (unless such Member otherwise agrees in writing) shall have personal liability on account thereof or shall be required to make additional Capital Contributions to help satisfy such indemnity by the Company.

(f)     If this <u>Section 8.02</u> or any portion hereof shall be invalidated on any ground by any arbitrator or, as applicable, a court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Covered Person pursuant to this <u>Section 8.02</u> to the fullest extent permitted by any applicable portion of this <u>Section 8.02</u> that shall not have been invalidated and to the fullest extent permitted by Applicable Law.

(g)     The provisions of this <u>Section 8.02</u> shall be a contract between the Company, on the one hand, and each Covered Person who served in such capacity at any time while this <u>Section 8.02</u> is in effect, on the other hand, pursuant to which the Company and each such Covered Person intend to be legally bound. No amendment, modification, or repeal of this <u>Section 8.02</u> that adversely affects the rights of a Covered Person to indemnification for Losses incurred or relating to a state of facts existing prior to such amendment, modification or repeal shall apply in such a way as to eliminate or reduce such Covered Person's entitlement to indemnification for such Losses without the Covered Person's prior written consent.

Section 8.03     <u>Guarantees and Granting of Security Interest for OHP Funding Capital</u>. To secure the repayment of any OHP Funding Capital which may become due by the Company to OHP, and also to secure any other indebtedness or liability of the Company to OHP, direct or indirect, absolute or

contingent, due or to become due, now existing or hereafter arising, including all future advances or loans which may be made at the option of OHP to the Company, the Company and the LPG Company Guarantors hereby grant and convey to OHP a first priority security interest in all of their respective personal property wherever located, whether now owned or existing or hereafter acquired, created or arising, including the following: All goods, accounts, equipment, inventory, contract rights or rights to payment of money, leases, license agreements, franchise agreements, general intangibles, commercial tort claims, documents, instruments (including any promissory notes), chattel paper (whether tangible or electronic), cash, deposit accounts (including the LPG Accounts), fixtures, letters of credit rights (whether or not the letter of credit is evidenced by a writing), securities, and all other investment property, supporting obligations, and financial assets, whether now owned or hereafter acquired, wherever located; and all of the Company's and the LPG Company Guarantors' books relating to the foregoing, and any and all claims, rights and interests in any of the above and all substitutions for, additions, attachments, accessories, accessions and improvements to and replacements, products, proceeds (both cash and non-cash) and insurance proceeds of any or all of the foregoing.

Section 8.04    Survival. The provisions of this ARTICLE VIII shall survive the dissolution, liquidation, winding up, and termination of the Company.

## ARTICLE IX
## EVENTS OF DEFAULT

Section 9.01    Rights Upon Event of Default. Upon the occurrence of an Event of Default, OHP shall have the right, but not the obligation, to take, or cause the Company to take, any or all of the following actions:

(a)    withhold, without penalty, any approved OHP Funding Capital;

(b)    accelerate the repayment of any Unpaid OHP Funding Capital and declare such amount immediately due and owing;

(c)    freeze all of the Company's bank accounts and the LPG Accounts, and withdraw and disburse all or any portion of thereof as OHP deems necessary or reasonable to remedy such Event of Default;

(d)    remove the Manager and appoint a new Manager;

(e)    assume control over all management and operational authority over the Company as granted to LPG pursuant to Section 7.01; and

(f)    divert all distributions or sums otherwise payable to LPG, Azevedo, or the LPG Receivable Affiliates and cause such amounts to be instead payable solely to OHP until all amounts to be distributed to OHP pursuant to Section 6.01(b)(i), Section 6.01(b)(ii), Section 6.01(b)(iii), and Section 6.01(b)(iv) are paid in full.

Section 9.02    Power of Attorney. Effective only upon the occurrence of an Event of Default, LPG and Azevedo hereby irrevocably appoint, and shall cause the LPG Receivable Affiliates to irrevocably appoint, OHP as such Person's true and lawful attorney-in-fact to take, in such Person's name, place, and stead, all actions necessary or advisable to accomplish the remedies of OHP set forth in Section 9.01.

Section 9.03    <u>Remedies Not Exclusive</u>. No remedy herein conferred upon or reserved to OHP is intended to be exclusive of any other remedy, and every such remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing, at law or in equity or by statute or otherwise.

ARTICLE X
TRANSFER

Section 10.01    <u>Restrictions on Transfer</u>.

(a)    Except as otherwise provided in this <u>ARTICLE X</u>, no Member shall Transfer all or any portion of its Membership Interest without the written consent of OHP, which consent may be granted or withheld in the sole discretion of OHP. No Transfer of a Membership Interest to a Person not already a Member of the Company shall be deemed completed until the prospective Transferee is admitted as a Member of the Company in accordance with <u>Section 4.01(b)</u>.

(b)    Notwithstanding any other provision of this Agreement (including <u>Section 10.02</u>), each Member agrees that it will not Transfer all or any portion of its Membership Interest, and the Company agrees that it shall not issue any Membership Interests:

(i)    except as permitted under the Securities Act and other applicable federal or state securities or blue sky laws, and then, with respect to a Transfer of Membership Interests, only upon delivery to the Company of an opinion of counsel in form and substance satisfactory to the Company to the effect that such Transfer may be effected without registration under the Securities Act;

(ii)    if such Transfer or issuance would cause the Company to be considered a "publicly traded partnership" under Code Section 7704(b);

(iii)    if such Transfer or issuance would affect the Company's existence or qualification as a limited liability company under the Delaware Act;

(iv)    if such Transfer or issuance would cause the Company to lose its status as a partnership for federal income tax purposes;

(v)    if such Transfer or issuance would cause the Company to be required to register as an investment company under the Investment Company Act of 1940; or

(vi)    if such Transfer or issuance would cause the assets of the Company to be deemed "Plan Assets" as defined under the Employee Retirement Income Security Act of 1974 or its accompanying regulations or result in any "prohibited transaction" thereunder involving the Company.

(c)    Any Transfer or attempted Transfer of any Membership Interest in contravention of this Agreement shall be null and void, no such Transfer shall be recorded on the Company's books or otherwise recognized by the Company, and the purported Transferee in any such Transfer shall not be treated as the owner of such Membership Interest for any purposes of this Agreement or have any rights as a Member (and the purported Transferor shall continue to be treated as the owner of such Membership Interest and as a Member).

29

(d)     For the avoidance of doubt, any Transfer of a Membership Interest permitted by this Agreement shall be deemed a sale, transfer, assignment or other disposal of such Membership Interest in its entirety as intended by the parties to such Transfer, and shall not be deemed a sale, transfer, assignment or other disposal of any less than all of the rights and benefits described in the definition of the term "Membership Interest," unless otherwise explicitly agreed to by the parties to such Transfer.

Section 10.02   <u>Permitted Transfers</u>. The provisions of <u>Section 10.01(a)</u> shall not apply to any Transfer by a Member (a "<u>Transferring Member</u>") (a) of all of its Membership Interest in the event of a Change of Control of such Transferring Member, (b) to an Affiliate that is wholly-owned, directly or indirectly, by the Transferring Member or the ultimate parent of such Transferring Member, or (c) if the Transferring Member is OHP, of all of its Membership Interest to its Affiliate; *provided,* that in all foregoing circumstances such Transferring Member shall have guaranteed in a writing delivered to the Company and the other Member the performance by the Transferee of all of such Transferring Member's obligations under this Agreement and all of its and its Affiliates' obligations under any of the Ancillary Agreements to which such Transferring Member or its Affiliate is a party.

Section 10.03   <u>Drag-Along Rights</u>.

(a)     If at any time OHP receives a bona fide offer from an independent third-party to consummate, in one transaction or a series of related transactions, a Change of Control of the Company (a "<u>Drag-Along Sale</u>"), OHP shall have the right to require that each other Member (each, a "<u>Drag-Along Member</u>") participates in such sale in the manner set forth in this <u>Section 10.03</u>.

(b)     OHP shall exercise its rights pursuant to this <u>Section 10.03</u> by delivering a written notice (the "<u>Drag-Along Notice</u>") to the Company and each Drag-Along Member no more than ten (10) after the execution and delivery by all of the parties thereto of a letter of intent or definitive agreement entered into with respect to the Drag-Along Sale and, in any event, no later than thirty (30) days prior to the closing date of such Drag-Along Sale. The Drag-Along Notice shall make reference to OHP's rights hereunder and shall describe in reasonable detail:

(i)     the name of the person or entity to whom such Membership Interests or assets are proposed to be sold;

(ii)    the proposed date, time, and location of the closing of the sale; and

(iii)   the percentage of Membership Interests to be sold by OHP, the proposed amount of consideration for the Drag-Along Sale, and the other material terms and conditions of the Drag-Along Sale.

(c)     If the Drag-Along Sale is structured as a sale of Membership Interests, each Drag-Along Member shall sell in the Drag-Along Sale the percentage of Membership Interests equal to the product obtained by multiplying (i) the percentage of Membership Interests held by such Drag-Along Member by (ii) a fraction (1) the numerator of which is equal to the percentage of Membership Interests OHP proposes to sell or transfer in the Drag-Along Sale and (2) the denominator of which is equal to the percentage of Membership Interests held by OHP at such time.

(d)     If the Drag-Along Sale is structured as a sale of all or substantially all of the assets of the Company or as a merger, consolidation, recapitalization, or reorganization of the

Company, then notwithstanding anything to the contrary in this Agreement, each Drag-Along Member shall vote in favor of the transaction and otherwise consent to and raise no objection to such transaction.

(e)     Each Member shall take all actions as may be reasonably necessary to consummate the Drag-Along Sale, including, without limitation, promptly entering into agreements and delivering certificates and instruments, in each case, consistent with the agreements being entered into and the certificates being delivered by OHP.

## ARTICLE XI
## OTHER COVENANTS AND AGREEMENTS OF THE MEMBERS

Section 11.01     Change of Control Notice. In the event of a Change of Control of a Member, such Member shall promptly, but not later than thirty (30) days prior to such Change of Control, notify the other Members in writing thereof, setting forth the date and identity of the party or parties that will acquire control of such Member.

Section 11.02     Related-Party Agreements. Except as expressly provided in this Agreement, the Company shall not, directly or indirectly, enter into, enter into any commitment to enter into, extend, amend, waive, supplement, or terminate (other than pursuant to its terms) any Related-Party Agreement (including any of the Ancillary Agreements) other than (a) to the extent approved by OHP in accordance with Section 7.02(h)(xvii); or (b) as are reasonably required by the Company on terms that are no less favorable to the Company than those that would have been obtained in a comparable transaction entered into with an unaffiliated third party on an arm's-length basis.

Section 11.03     Non-Compete. For so long as either of LPG and Azevedo hold any Membership Interests, directly or indirectly, and for a period of two (2) years thereafter, LPG and its Affiliates, Tony Diab, and Azevedo shall neither, directly or indirectly, (a) in any manner whatsoever engage in any capacity with any business competitive with the Business, for such Person's own benefit or for the benefit of any Person other than the Company, nor (b) have any interest as owner, sole proprietor, stockholder, partner, lender, director, officer, manager, employee, consultant, agent, or otherwise in any business competitive with the Business; provided, however, that (i) LPG and Azevedo may hold, directly or indirectly, solely as an investment, not more than one percent (1%) of the outstanding securities of any person or entity which is listed on any national securities exchange or regularly traded in the over-the-counter market notwithstanding the fact that such person or entity is engaged in a business competitive with the Business, and (ii) the restrictions contained in this Section 11.03 shall not apply to LPG's or Azevedo's operation of LPG solely in compliance with the terms of this Agreement and solely during the time in which either of LPG and Azevedo hold any Membership Interests, directly or indirectly.

## ARTICLE XII
## ACCOUNTING; TAX MATTERS

Section 12.01     Company Financial Statements. The Company shall furnish to each Member the following reports, at the Company's expense:

(a)     As soon as available, and in any event within one hundred twenty (120) days after the end of each Fiscal Year, audited consolidated balance sheets of the Company as at the end of each such Fiscal Year and audited consolidated statements of income, cash flows and Members' equity for such Fiscal Year, in each case setting forth in comparative form the figures for the previous Fiscal Year, accompanied by the certification of independent certified public

accountants of recognized national standing selected by OHP in accordance with <u>Section 7.02(h)(xvi)</u>, certifying to the effect that, except as set forth therein, such financial statements have been prepared in accordance with GAAP, applied on a basis consistent with prior years, and fairly present in all material respects the financial condition of the Company as of the dates thereof and the results of their operations and changes in their cash flows and Members' equity for the periods covered thereby.

(b)      As soon as available, and in any event within forty-five (45) days after the end of each quarterly accounting period in each Fiscal Year (other than the last fiscal quarter of the Fiscal Year), unaudited consolidated balance sheets of the Company as at the end of each such fiscal quarter and for the current Fiscal Year to date and unaudited consolidated statements of income, cash flows and Members' equity for such fiscal quarter and for the current Fiscal Year to date, in each case setting forth in comparative form the figures for the corresponding periods of the previous fiscal quarter, all in reasonable detail and all prepared in accordance with GAAP, consistently applied (subject to normal year-end audit adjustments and the absence of notes thereto), and certified by LPG.

(c)      As soon as available, and in any event within thirty (30) days after the end of each monthly accounting period in each fiscal quarter (other than the last month of the fiscal quarter), unaudited consolidated balance sheets of the Company as at the end of each such monthly period and for the current Fiscal Year to date and unaudited consolidated statements of income, cash flows and Members' equity for each such monthly period and for the current Fiscal Year to date, all in reasonable detail and all prepared in accordance with GAAP, consistently applied (subject to normal year-end audit adjustments and the absence of notes thereto).

(d)      As soon as available, and in any event within thirty (30) days after the end of each monthly accounting period in each fiscal quarter, a statement of historical and projected performance statistics of Eligible Receivables purchased, organized by LPG Receivable Affiliate, together with projections for requests of OHP Funding Capital.

Section 12.02      <u>LPG Financial Statements</u>. LPG shall furnish to OHP the following reports at LPG's expense:

(a)      As soon as available, and in any event within one hundred twenty (120) days after the end of each fiscal year, audited consolidated balance sheets of LPG as at the end of each such fiscal year and audited consolidated statements of income and cash flows, in each case setting forth in comparative form the figures for the previous fiscal year, accompanied by the certification of independent certified public accountants of recognized national standing selected by OHP, certifying to the effect that, except as set forth therein, such financial statements have been prepared in accordance with GAAP, applied on a basis consistent with prior years, and fairly present in all material respects the financial condition of the LPG as of the dates thereof and the results of their operations and changes in their cash flows for the periods covered thereby.

(b)      As soon as available, and in any event within forty-five (45) days after the end of each quarterly accounting period in each fiscal year (other than the last fiscal quarter of the fiscal year), unaudited consolidated balance sheets of LPG as at the end of each such fiscal quarter and for the current fiscal year to date and unaudited consolidated statements of income and cash flows for such fiscal quarter and for the current fiscal year to date, in each case setting forth in comparative form the figures for the corresponding periods of the previous fiscal quarter, all in reasonable detail and all prepared in accordance with GAAP, consistently applied (subject to

32

DocuSign Envelope ID: 78F66340-71F5-4415-A383-B1AB537S696D

normal year-end audit adjustments and the absence of notes thereto), and certified by an executive officer of LPG.

(c)     As soon as available, and in any event within thirty (30) days after the end of each monthly accounting period in each fiscal quarter (other than the last month of the fiscal quarter), unaudited consolidated balance sheets of LPG as at the end of each such monthly period and for the current fiscal year to date and unaudited consolidated statements of income and cash flows for each such monthly period and for the current fiscal year to date, all in reasonable detail and all prepared in accordance with GAAP, consistently applied (subject to normal year-end audit adjustments and the absence of notes thereto).

Section 12.03     Systems Access; Inspection Rights.

(a)     At all times, LPG shall cause OHP and the Company to have and maintain access to LPG's debt management systems including, without limitation, DebtPayPro.

(b)     Upon reasonable notice from a Member and at such Member's expense, the Company shall afford such Member and its Representatives access during normal business hours to:

(i)     the Company's properties, offices, and other facilities; and

(ii)     the corporate, financial and similar records, reports and documents of the Company, including all books and records, minutes of proceedings, internal management documents, reports of operations, reports of adverse developments and copies of any management letters and communications with Members (which right of access shall include the right to examine such documents and to make copies thereof or extracts therefrom);

Section 12.04     Income Tax Status. It is the intent of the Company and the Members that the Company shall be treated as a partnership for U.S., federal, state, and local income tax purposes. Neither the Company nor any Member shall make an election for the Company to be classified as other than a partnership pursuant to Treasury Regulations Section 301.7701-3.

Section 12.05     Tax Matters Representative.

(a)     The Members hereby appoint OHP as the "partnership representative" as provided in Code Section 6223(a) (the "Tax Matters Representative"). The Tax Matters Representative shall appoint an individual (the "Designated Individual") meeting the requirements of Treasury Regulation Section 301.6223-1(c)(3) as the sole person authorized to represent the Tax Matters Representative in audits and other proceedings governed by the partnership audit procedures set forth in Subchapter C of Chapter 63 of the Code as amended by the BBA (the "Revised Partnership Audit Rules"). The Tax Matters Representative shall resign if it is no longer a Member. In the event of the resignation of the Tax Matters Representative, the Members shall select a replacement. Any person appointed as the Designated Individual shall be subject to the requirements and obligations of the Tax Matters Representative for purposes of this Section 12.05.

(b)     The Tax Matters Representative is authorized and required to represent the Company in connection with all examinations of the Company's affairs by Taxing Authorities, including resulting administrative and judicial proceedings, and to expend Company funds for

professional services and costs associated therewith. The Tax Matters Representative shall promptly notify the Members in writing of the commencement of any tax audit of the Company, upon receipt of a tax assessment and upon the receipt of a notice of final partnership adjustment, and shall keep the Members reasonably informed of the status of any tax audit and resulting administrative and judicial proceedings.

(c) To the extent permitted by applicable law and regulations, the Tax Matters Representative will cause the Company to annually elect out of the Revised Partnership Audit Rules pursuant to Code Section 6221(b). For any year in which applicable law and regulations do not permit the Company to elect out of the Revised Partnership Audit Rules, then within forty-five (45) days of any notice of final partnership adjustment, the Tax Matters Representative will cause the Company to elect the alternative procedure under Code Section 6226, and furnish to the Internal Revenue Service and each Member during the year or years to which the notice of final partnership adjustment relates a statement of the Member's share of any adjustment set forth in the notice of final partnership adjustment.

(d) Each Member agrees that such Member shall not treat any Company item inconsistently on such Member's federal, state, foreign or other income tax return with the treatment of the item on the Company's return. Any deficiency for taxes imposed on any Member (including penalties, additions to tax or interest imposed with respect to such taxes and any taxes imposed pursuant to Code Section 6226) will be paid by such Member and if required to be paid (and actually paid) by the Company, will be recoverable from such Member as provided in Section 6.03(d).

(e) The Tax Matters Representative will make an election under Code Section 754, if requested in writing by a Member.

(f) The provisions of this Section 12.05 and the obligations of a Member or former Member pursuant to Section 12.05 shall survive the termination, dissolution, liquidation, and winding up of the Company and the Transfer of a Member's Membership Interest.

Section 12.06 Tax Returns. At the expense of the Company, the Manager shall endeavor to cause the preparation and timely filing (including extensions) of all tax returns required to be filed by the Company pursuant to the Code as well as all other required tax returns in each jurisdiction in which the Company owns property or does business. As soon as reasonably possible after the end of each Fiscal Year, the Manager will cause to be delivered to each Person who was a Member at any time during such Fiscal Year, IRS Schedule K-1 to Form 1065 and such other information with respect to the Company as may be necessary for the preparation of such Person's federal, state and local income tax returns for such Fiscal Year.

Section 12.07 Company Funds. All funds of the Company shall be deposited in its name in such checking, savings or other accounts, or held in its name in the form of such other investments as shall be designated by the Manager. The funds of the Company shall not be commingled with the funds of any other Person and OHP shall have unrestricted, direct access to all such accounts.

## ARTICLE XIII
## DISSOLUTION AND LIQUIDATION

Section 13.01 Events of Dissolution. The Company shall be dissolved and its affairs wound up only upon the occurrence of any of the following events:

DocuSign Envelope ID: 79F66240-71E5-441E-A383-21A8537S685D

    (a) The unanimous determination of the Manager and OHP to dissolve the Company; or

    (b) The entry of a decree of judicial dissolution under § 18-802 of the Delaware Act.

  Section 13.02 <u>Effectiveness of Dissolution</u>. Dissolution of the Company shall be effective on the day on which the event described in <u>Section 13.01</u> occurs, but the Company shall not terminate until the winding up of the Company has been completed, the assets of the Company have been distributed as provided in <u>Section 13.03</u> and the Certificate of Formation shall have been cancelled as provided in <u>Section 13.04</u>.

  Section 13.03 <u>Liquidation</u>. If the Company is dissolved pursuant to <u>Section 13.01</u>, the Company shall be liquidated and its business and affairs wound up in accordance with the Delaware Act and the following provisions:

    (a) OHP shall act as liquidator to wind up the Company (the "<u>Liquidator</u>"). The Liquidator shall have full power and authority to sell, assign and encumber any or all of the Company's assets and to wind up and liquidate the affairs of the Company in an orderly and business-like manner.

    (b) As promptly as possible after dissolution and again after final liquidation, the Liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable.

    (c) The Liquidator shall liquidate the assets of the Company and distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by mandatory provisions of Applicable Law:

      (i) *first*, to the payment of all outstanding principal and interest under a Loan Agreement, if any remains outstanding;

      (ii) *second*, to the payment of all of the Company's debts and liabilities to its creditors (including Members, if applicable) and the expenses of liquidation (including sales commissions incident to any sales of assets of the Company);

      (iii) *third*, to the establishment of and additions to reserves that are determined by the Liquidator to be reasonably necessary for any contingent unforeseen liabilities or obligations of the Company; and

      (iv) *fourth*, to the Members in accordance with the order, priority, and provisions set forth in <u>Section 6.01(b)</u>.

    (d) All documents and records of the Company, including financial records, shall be delivered to OHP upon dissolution of the Company. OHP shall retain such documents and records for a period of not less than seven (7) years and shall make such documents and records reasonably available during normal business hours to the other Members and their Representatives for inspection and copying; *provided* that such access shall not unduly interfere with the management and business of OHP or its Affiliates.

Section 13.04   <u>Cancellation of Certificate</u>. Upon completion of the distribution of the assets of the Company as provided in <u>Section 13.03(c)</u>, the Company shall be terminated and the Liquidator shall cause the cancellation of the Certificate of Formation in the State of Delaware and of all qualifications and registrations of the Company as a foreign limited liability company in jurisdictions other than the State of Delaware and shall take such other actions as may be necessary to terminate the Company.

Section 13.05   <u>Survival of Rights, Duties and Obligations</u>. Dissolution, liquidation, winding up or termination of the Company for any reason shall not release any party from any Loss that at the time of such dissolution, liquidation, winding up or termination already had accrued to any other party or thereafter may accrue in respect of any act or omission prior to such dissolution, liquidation, winding up or termination. For the avoidance of doubt, none of the foregoing shall replace, diminish or otherwise adversely affect any Member's right to indemnification pursuant to <u>Section 8.02</u>.

ARTICLE XIV
MISCELLANEOUS

Section 14.01   <u>Expenses</u>. LPG shall promptly reimburse OHP for all costs and expenses, including fees and disbursements of counsel, financial advisors and accountants, incurred in connection with the preparation and execution of this Agreement, or any amendment or waiver hereof, and the transactions contemplated hereby.  Except as set forth in the immediately preceding sentence, all costs and expenses, including fees and disbursements of counsel, financial advisors and accountants, incurred in connection with the preparation and execution of this Agreement, or any amendment or waiver hereof, and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses.

Section 14.02   <u>Further Assurances</u>. In connection with this Agreement and the transactions contemplated hereby, the Company and each Member hereby agrees, at the request of the Company or any Member, to execute and deliver such additional documents, instruments, conveyances and assurances and to take such further actions as may be required to carry out the provisions hereof and give effect to the transactions contemplated hereby.

Section 14.03   <u>Notices</u>. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or email of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient; or (d) on the third (3rd) day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications to the Members must be sent to the address set forth on their respective signature pages hereto. Such communications to the Company or the Manager must be sent to: 17542 17th St., Suite 100, Tustin, CA 92780. The parties may change their address for notice at any time, as shall be specified in a notice given in accordance with this <u>Section 14.03</u>.

Section 14.04   <u>Headings</u>. The headings in this Agreement are inserted for convenience or reference only and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision of this Agreement.

Section 14.05   <u>Severability</u>. If any term or provision of this Agreement is held to be invalid, illegal or unenforceable under Applicable Law in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Except as provided in <u>Section 8.02(f)</u>, upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties

36

hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

Section 14.06   Entire Agreement. This Agreement, together with the Certificate of Formation, the Ancillary Agreements, and all Exhibits, constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter.

Section 14.07   Successors and Assigns. Subject to the restrictions on Transfers set forth herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and permitted assigns. This Agreement may not be assigned by any Member except as permitted by this Agreement and any assignment in violation of this Agreement shall be null and void.

Section 14.08   No Third-Party Beneficiaries. Except as provided in ARTICLE VIII, which shall be for the benefit of and enforceable by Covered Persons as described therein, this Agreement is for the sole benefit of the parties hereto (and their respective heirs, executors, administrators, successors and permitted assigns) and nothing herein, express or implied, is intended to or shall confer upon any other Person, including any creditor of the Company, any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 14.09   Amendment. No provision of this Agreement may be amended or modified except by an instrument in writing executed by all Members. Any such written amendment or modification will be binding upon the Company and each Member. Notwithstanding the foregoing, amendments to Exhibit B hereto that are necessary to reflect any Transfer of a Membership Interest in accordance with this Agreement may be made by the Manager without the consent of or execution by the Members.

Section 14.10   Waiver. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. For the avoidance of doubt, nothing contained in this Section 14.10 shall diminish any of the explicit and implicit waivers described in this Agreement, including in Section 14.13 hereof.

Section 14.11   Governing Law. All issues and questions concerning the application, construction, validity, interpretation and enforcement of this Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Delaware.

Section 14.12   Submission to Jurisdiction. To the extent a dispute is not resolved in arbitration as set forth in Section 14.13(b) (the "Arbitration Agreement"), the parties hereby agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort or

otherwise, shall be brought in the United States District Court for the Western District of Texas, Austin Division. Each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding that is brought in any such court has been brought in an inconvenient form. Service of process, summons, notice or other document by registered mail to the address set forth in <u>Section 14.03</u> shall be effective service of process for any suit, action or other proceeding brought in any such court.

Section 14.13    <u>WAIVER OF JURY TRIAL; ARBITRATION</u>.

(a)    EACH PARTY HERETO HEREBY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

(b)    <u>Binding Arbitration</u>.

(i)    This <u>Section 14.13(b)</u> shall be referred to as the "<u>Arbitration Agreement</u>." Upon demand of any party, whether made before or after institution of any judicial proceeding, any dispute, claim or controversy arising out of, connected with or relating to this Agreement, any Ancillary Agreements, and/or any Related-Party Agreements ("<u>Disputes</u>")[1], between or among the parties hereto and to any Ancillary Agreements, and/or any Related-Party Agreements, related third parties, and the parties' respective employees, agents, representatives, affiliates, beneficiaries, related entities and assigns, shall be resolved by binding arbitration as provided herein. Institution of a judicial proceeding by a party does not waive the right of that party to demand arbitration hereunder. This Arbitration Agreement is intended to be as broad as legally permissible. Disputes may include, but are not limited to, tort claims, counterclaims, claims arising from Ancillary Agreements or Related-Party Agreements executed in the future, disputes as to whether a matter is subject to arbitration, or claims concerning any aspect of the past, present or future relationships arising out of or connected with this Agreement, any Ancillary Agreements, and/or any Related-Party Agreement. The Arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the validity, scope, applicability, enforceability, or waiver of this Arbitration Agreement including, but not limited to, any claim that all or any part of this Arbitration Agreement is void or voidable. The obligation to arbitrate any Dispute will survive the satisfaction in full of all obligations under this Agreement and the termination of this Agreement, any Ancillary Agreements, and/or any Related-Party Agreement for any reason. The parties hereto do not waive any applicable federal or state substantive law except as provided herein. A judgment upon the award may be entered in any court having jurisdiction.

---

[1]    The following is not covered under this Arbitration Agreement: disputes or any portion thereof that an applicable federal statute expressly states cannot be arbitrated or cannot be the subject of a pre-dispute arbitration agreement.

(ii)     This Arbitration Agreement is governed by the FAA (9 U.S.C. § 1 et seq.).  Unless otherwise agreed in writing by the parties, and notwithstanding any conflicting choice of law provision in any of the Ancillary Agreements and/or Related-Party Agreements between the parties, Delaware law shall control the interpretation, application, and enforcement of this Agreement; provided, however, the Federal Arbitration Act will be applied to the Arbitration Agreement.   In reaching any determination or award, the Arbitrator shall apply the substantive laws of the State of Delaware and the applicable laws of the United States of America, without giving effect to any principles of conflict of laws under the laws of the State of Delaware, to all Disputes covered by this Arbitration Agreement.   Any arbitration proceeding will be conducted by the American Arbitration Association (the "AAA"), or such other administrator as the parties shall mutually agree upon.   Any arbitration proceeding shall be conducted in accordance with the AAA Commercial Arbitration Rules, including the AAA Emergency Procedures for Protection,  unless the claim or counterclaim is at least one million dollars ($1,000,000) exclusive of claimed interest, arbitration fees and costs, in which case the AAA's optional procedures for large, complex commercial disputes shall also apply (the commercial dispute resolution procedures and the optional procedures for large, complex commercial disputes to be referred to, as applicable, as the "Arbitration Rules").   Any arbitration shall proceed in a location in Austin, Texas selected by the AAA.  The expedited procedures set forth in Sections E-1 through E-10, et seq. of the Arbitration Rules shall be applicable to claims of less than one million dollars ($1,000,000).  All applicable statutes of limitations shall apply to any Dispute.  Either party may file dispositive motions, including without limitation a motion for summary judgment, and the Arbitrator(s) will apply the standards governing such motions under the Federal Rules of Civil Procedure. Each party may take the deposition of four individual fact witnesses and any expert witness designated by another party.  Each party also may propound requests for production of documents and ten (10) interrogatory requests to the other party. And, each party shall have the right to subpoena witnesses and documents for discovery or the arbitration hearing, including testimony and documents relevant to the case from third parties, in accordance with any applicable state or federal law (including, without limitation, pursuant to California Code of Civil Procedure § 1283.05). Additional discovery shall be conducted by mutual stipulation, and the Arbitrator(s) will have exclusive authority to entertain requests for additional discovery, and to grant or deny such requests, based on the Arbitrator(s)'s determination whether additional discovery is warranted by the circumstances of a particular case.  If there is any inconsistency between the terms hereof and the Arbitration Rules, the terms and procedures set forth herein shall control.  Subject to applicable law as determined by the Arbitrator(s), any party who fails or refuses to submit to arbitration following a demand by any other party shall bear all costs and expenses incurred by such other party in compelling arbitration of any Dispute.  Notwithstanding anything in the foregoing to the contrary, any arbitration proceeding demanded hereunder shall begin within ninety (90) days of the appointment of the Arbitrator(s) and shall be concluded within one hundred and twenty (120) days after such appointment, unless otherwise mutually agreed in writing by the parties.  These time limitations may not be extended unless a party hereto shows cause for extension and then such extension shall not exceed a total of sixty (60) days, unless otherwise mutually agreed in writing by the parties.

(iii)     Any arbitration proceeding in which the amount in controversy is five million dollars ($5,000,000) or less will be decided by a single arbitrator who shall not render an award of greater than five million dollars ($5,000,000) (the "Arbitrator").  Any

dispute in which the amount in controversy exceeds five million dollars ($5,000,000) shall be decided by majority vote of a panel of three arbitrators (the "Arbitrators").

The Arbitrator(s) must have at least ten (10) years of relevant legal experience as an attorney or a judge and be knowledgeable in the subject matter of the dispute. The parties shall select the Arbitrator(s) by mutual agreement. If the parties are unable to mutually select an arbitrator, the Arbitrator(s) shall be selected as follows:

To the extent the arbitration is conducted by a single arbitrator (as set forth above), AAA will give each party a list of nine (9) arbitrators (who are subject to the qualifications listed above) drawn from its panel of arbitrators. Each party will have ten (10) calendar days to strike all names on the list it deems unacceptable. If only one common name remains on the lists of all parties, that individual will be designated as the Arbitrator. If more than one common name remains on the lists of all parties, the parties will strike names alternately from the list of common names by telephone conference administered by AAA, with the claimant to strike first until only one remains. If no common name remains on the lists of all parties, AAA will furnish an additional list of nine (9) arbitrators from which the parties will strike alternately by telephone conference administered by AAA, with the claimant to strike first, until only one name remains. That person will be designated as the Arbitrator. If the individual selected cannot serve, AAA will issue another list of nine (9) arbitrators and repeat the alternate striking selection process.

To the extent the arbitration is conducted by a panel of three arbitrators (as set forth above), AAA will give each party a list of twenty-seven (27) arbitrators (who are subject to the qualifications listed above) drawn from its panel of arbitrators. Each party will have ten (10) calendar days to strike all names on the list it deems unacceptable. Any common names remaining will be designated as the Arbitrators. To the extent more than three common names remains on the lists of all parties, the parties will strike names alternately from the list of common names by telephone conference administered by AAA, with the claimant to strike first until only three remain. If less than three common names remain on the lists of all parties, AAA will furnish an additional list of arbitrators (9 for each arbitrator that remains to be selected) from which the parties will strike alternately by telephone conference administered by AAA, with the claimant to strike first, until the number of arbitrators needed to comprise the three-arbitrator panel remain. Those persons will be designated as the Arbitrators. If any individual selected cannot serve, AAA will issue another list of nine (9) arbitrators and repeat the alternate striking selection process.

(iv)     Notwithstanding the preceding binding arbitration provisions, the parties hereto and to any Ancillary Agreement and/or Related-Party Agreement preserve, without diminution, certain remedies that such Persons may employ or exercise freely, either alone, in conjunction with or during a Dispute. Each such Person shall have and hereby reserves the right to proceed in any court of proper jurisdiction or by self-help to exercise or prosecute the following remedies, as applicable: (A) all rights to foreclose against any real or personal property or other security by exercising a power of sale granted in any agreement or under applicable law or by judicial foreclosure and sale, including a proceeding to confirm the sale, (B) all rights of self-help including peaceful occupation of property and collection of rents, set off, and peaceful possession of property, (C) obtaining provisional or ancillary remedies including injunctive relief, sequestration, garnishment, attachment, appointment of receiver and in filing an

involuntary bankruptcy proceeding, and (D) when applicable, a judgment by confession of judgment. Preservation of these remedies does not limit the power of an arbitrator to grant similar remedies that may be requested by a party in a Dispute.

(v)     The parties agree there will be no right or authority for any dispute to be brought, heard or arbitrated as a class, collective and/or consolidated action (the "Class Action Waiver"). Nor shall any Arbitrator have the authority to hear or arbitrate any such dispute, regardless of any other language in this Arbitration Agreement, or any provision of any of the rules or procedures of the AAA that might otherwise apply including, without limitation, the AAA Supplemental Rules for Class Action Arbitration. Notwithstanding the broad delegation to the Arbitrator(s) to resolve arbitrability disputes, no Arbitrator shall have the right to interpret the extent, applicability and/or enforceability of this Class Action Waiver; rather, any issue or dispute as to whether this Agreement permits such class, collective and/or consolidated action arbitration shall be resolved and/or interpreted solely by a court of competent jurisdiction. This Class Action Waiver shall be severable from this Arbitration Agreement if there is a final judicial determination that the Class Action Waiver is invalid, unenforceable, unconscionable, void or voidable. In such instances, the class or collective action must be litigated in court—not in arbitration.

(vi)    Other than as set forth in the Class Action Waiver, if any provision of this Arbitration Agreement is adjudged to be invalid, unenforceable, unconscionable, void or voidable, in whole or in part, such adjudication will not affect the validity of the rest of the Arbitration Agreement; all remaining provisions will remain in effect.

Section 14.14    Equitable Remedies. Each party hereto acknowledges that a breach or threatened breach by such party of any of its obligations under this Agreement would give rise to irreparable harm to the other parties, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by such party of any such obligations, each of the other parties hereto shall, in addition to any and all other rights and remedies that may be available to them in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from an arbitrator or, as applicable, a court of competent jurisdiction (without any requirement to post bond).

Section 14.15    Attorneys' Fees. In the event that any party hereto institutes any legal suit, action or proceeding, including arbitration, against another party in respect of a matter arising out of or relating to this Agreement, the prevailing party in the suit, action or proceeding shall be entitled to receive, in addition to all other damages to which it may be entitled, the costs incurred by such party in conducting the suit, action or proceeding, including reasonable attorneys' fees and expenses and costs.

Section 14.16    Remedies Cumulative. Except as expressly provided herein to the contrary, the rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise.

Section 14.17    Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of Electronic Transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[Remainder of Page Intentionally Left Blank. Signature Pages to Follow.]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

**COMPANY:**

PURCHASECO80, LLC,
a Delaware limited liability company

By:    Litigation Practice Group PC, its manager

By:     *Daniel S March*
Name:  Daniel S March
Title:  Managing Shareholder

LIMITED LIABILITY COMPANY AGREEMENT – Signature Page

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

**OHP:**

OHP – LPG, LP,
a Delaware limited partnership

By:    Old Hickory Fund I GP, LLC, its general partner

By: _____
           Adam C. Blum, Manager

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

**LPG:**

LITIGATION PRACTICE GROUP PC,
a California professional corporation

By: _____

Name:  Daniel S March

Title:  Managing Shareholder

Address:

LIMITED LIABILITY COMPANY AGREEMENT – Signature Page

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

**AZEVEDO:**

By: _Mario Azevedo_ _____
     Mario Azevedo
     Address:

# EXHIBIT B

U230005834326



**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**UCC FINANCING STATEMENT (UCC 1)**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

| For Office Use Only |
| --- |
| **-FILED-** |
| File No.: U230005834326 |
| Date Filed: 1/25/2023 |

B1439-9197 01/25/2023 8:33 AM Received by California Secretary of State

Submitter Information:

| | |
| --- | --- |
| Contact Name | BEE |
| Organization Name | CAPITOL SERVICES, INC. |
| Phone Number | 214-745-5400 |
| Email Address | barchaphorn@winstead.com |
| Address | PO BOX 1831 |
| | AUSTIN, TX 78767 |

Debtor Information:

| Debtor Name | Mailing Address |
| --- | --- |
| THE LITIGATION PRACTICE GROUP, PC | 17542 E 17TH STREET, STE 100 TUSTIN, CA 92780 |

Secured Party Information:

| Secured Party Name | Mailing Address |
| --- | --- |
| OHP – LPG, LP | 303 COLORADO STREET, SUITE 2550 AUSTIN, TX 78701 |

Indicate how documentation of Collateral is provided:
Entered as Text

Description:
All assets of the Debtor, whether now owned or hereafter acquired, wherever located.

Indicate if Collateral is held in a Trust or is being administered by a Decedent's Personal Representative:
Not Applicable

Select an alternate Financing Statement type:

Select an additional alternate Financing Statement type:

Select an alternative Debtor/Secured Party designation for this Financing Statement:

Optional Filer Reference Information:
62697-25 - CA - STATE

# EXHIBIT C

DocuSign Envelope ID: 592D5B1F-DB58-49E5-89A0-9F6A0F9FDF632

## GUARANTY

THIS GUARANTY (this "Guaranty") is entered into as of September 1, 2022, by and among each of the signatories party hereto and each other Person who becomes a party hereto pursuant to Section 22 (including any permitted successors and assigns, collectively, the "Guarantors" and each individually, a "Guarantor") for the benefit of OHP - LPG, LP, a Delaware limited partnership ("OHP"), and its Affiliates (OHP and its Affiliates, together with their successors and assigns, herein sometimes collectively called "Beneficiaries").  Unless otherwise defined herein, all capitalized terms have the meanings given to such terms in the LLC Agreement (as defined herein).

## BACKGROUND

The Guarantors, the other parties thereto, and OHP have entered into that certain Limited Liability Company Agreement of the Company dated as of the date hereof (as it may be amended, restated, supplemented, or otherwise modified from time to time, the "LLC Agreement").

It is a condition precedent to effectiveness of the LLC Agreement that Guarantors shall have executed and delivered this Guaranty, and each Guarantor is entering into this Guaranty in order to, among other things, induce OHP to extend OHP Funding Capital (as defined in the LLC Agreement) to Company under the LLC Agreement.

Each Guarantor is a member of an Affiliate of a member in the Company, and the extension of credit to Company is a substantial and direct benefit to each Guarantor.

NOW, THEREFORE, for valuable consideration, the receipt and adequacy of which are hereby acknowledged, each Guarantor hereby guarantees to Beneficiaries the prompt payment and performance of the Guaranteed Obligations, this Guaranty being upon the following terms and conditions:

1.      Definitions.  Capitalized terms used herein and not otherwise defined herein have the meanings given such terms in the LLC Agreement.  As used in this Guaranty, the following terms have the following meanings:

"Company" means PURCHASECO80, LLC, a Delaware limited liability company, and without limitation, Company's successors and assigns (regardless of whether such successor or assign is formed by or results from any merger, consolidation, conversion, sale or transfer of assets, reorganization, or otherwise) including Company as a debtor-in-possession, and any receiver, trustee, liquidator, conservator, custodian, or similar party hereafter appointed for Company or all or substantially all of its assets pursuant to any Debtor Relief Laws from time to time in effect.

"Debtor Relief Laws" means the Bankruptcy Code of the United States of America, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

"Guaranteed Obligations" means, as of any date, all OHP Funding Capital which has been paid into the Company as of such date of determination, but which has not been repaid, and the Guaranteed Performance Obligations.

DocuSign Envelope ID: 532D5E1F-DB58-49B5-83A0-9F6A0F9FEF32

"Guaranteed Performance Obligations" means all of the obligations of Company and each Guarantor under the LLC Agreement and the Ancillary Agreements, other than an obligation to pay money.

"Release Date" means the date upon which both of the following have occurred: (a) the Guaranteed Obligations are paid and performed in full and (b) the ability of the Company to request OHP Funding Capital has expired or terminated.

2.   Payment.   Each Guarantor hereby unconditionally and irrevocably guarantees to Beneficiaries the punctual payment when due, whether by lapse of time, by acceleration of maturity, or otherwise, and at all times thereafter, of the Guaranteed Obligations. This Guaranty covers the Guaranteed Obligations, whether presently outstanding or arising subsequent to the date hereof, including all amounts advanced by any Beneficiary in stages or installments. The guaranty of the Guarantors as set forth in this Section 2 is a continuing guaranty of payment and not a guaranty of collection. Each Guarantor acknowledges and agrees that such Guarantor may be required to pay and perform the Guaranteed Obligations in full without assistance or support from Company, any other Guarantor, or any other party. Each Guarantor agrees that if all or any part of the Guaranteed Obligations shall not be punctually paid when due, whether on the scheduled payment date, by lapse of time, by acceleration of maturity or otherwise, such Guarantor shall, immediately upon demand by a Beneficiary, pay the amount due on the Guaranteed Obligations to such Beneficiary at Beneficiary's address as set forth herein. Such demand(s) may be made at any time coincident with or after the time for payment of all or part of the Guaranteed Obligations, and may be made from time to time with respect to the same or different items of Guaranteed Obligations. Such demand shall be made, given and received in accordance with the notice provisions hereof.

3.   Performance.   Each Guarantor hereby unconditionally and irrevocably guarantees to Beneficiaries the timely performance of the Guaranteed Performance Obligations. If any of the Guaranteed Performance Obligations are not satisfied or complied with in any respect whatsoever, and without the necessity of any notice from a Beneficiary to any Guarantor, each Guarantor agrees to indemnify and hold Beneficiaries harmless from any and all loss, cost, liability or expense that Beneficiaries may suffer by any reason of any such non-performance or non-compliance. The obligations and liability of the Guarantors under this Section 3 shall not be limited or restricted by the existence of, or any terms of, the guaranty of payment under Section 2 of this Guaranty.

4.   Primary Liability of the Guarantors.

(a)   This Guaranty is an absolute, irrevocable and unconditional guaranty of payment and performance. Each Guarantor is and shall be jointly and severally liable for the payment and performance of the Guaranteed Obligations, as set forth in this Guaranty, as a primary obligor.

(b)   In the event of default in payment or performance of the Guaranteed Obligations, or any part thereof, when such Guaranteed Obligations become due (including as a result of an Event of Default under the LLC Agreement), whether by its terms, by acceleration, or otherwise, each Guarantor shall promptly pay the amount due thereon to Beneficiaries without notice or demand, of any kind or nature, in lawful money of the United States of America or perform the obligations to be performed hereunder, and it shall not be necessary for any Beneficiary in order to enforce such payment and performance by any Guarantor first, or contemporaneously, to institute suit or exhaust remedies against Company or others liable on the Guaranteed Obligations, including any other Guarantor, or to enforce any rights, remedies, powers, privileges or benefits of any Beneficiary against any security or collateral which shall ever have been given to secure the Guaranteed Obligations.

(c)     Suit may be brought or demand may be made against all parties who have signed this Guaranty or any other guaranty in favor of Beneficiaries covering all or any part of the Guaranteed Obligations, or against any one or more of them, separately or together, without impairing the rights of any Beneficiary against any party hereto.  Any time that a Beneficiary is entitled to exercise its rights or remedies hereunder, such Beneficiary may in its discretion elect to demand payment and/or performance.  If a Beneficiary elects to demand performance, it shall at all times thereafter have the right to demand payment until all of the Guaranteed Obligations have been paid and performed in full.  If a Beneficiary elects to demand payment, it shall at all times thereafter have the right to demand performance until all of the Guaranteed Obligations have been paid and performed in full.

5.     <u>Other Guaranteed Debt</u>.  If any Guarantor becomes liable for any indebtedness owing by Company to Beneficiaries, or any or some of them, by endorsement or otherwise, other than under this Guaranty, such liability shall not be in any manner impaired or affected hereby, and the rights and remedies hereunder shall be cumulative of any and all other rights and remedies that Beneficiaries may ever have against the Guarantors.  The exercise by Beneficiary of any right or remedy hereunder or under any other instrument, or at law or in equity, shall not preclude the concurrent or subsequent exercise of any other right or remedy by such Beneficiary or any other Beneficiary.

6.     <u>Subrogation</u>.  Until the Release Date has occurred, each Guarantor hereby covenants and agrees that it shall not assert, enforce, or otherwise exercise (a) any right of subrogation to any of the rights, remedies or liens of Beneficiaries or any other beneficiary against Company or its Affiliates or any other guarantor of the Guaranteed Obligations or any collateral or other security, or (b) unless such rights are expressly made subordinate to the Guaranteed Obligations (in form and upon terms acceptable to OHP) and the rights or remedies of Beneficiaries under this Guaranty and the other Ancillary Agreements, any right of recourse, reimbursement, contribution, indemnification, or similar right against Company or its Affiliates or any other guarantor of all or any part of the Guaranteed Obligations.

7.     <u>Subordinated Debt</u>.  All principal of and interest on all indebtedness, liabilities, and obligations of Company or its Affiliates to any Guarantor (the "<u>Subordinated Debt</u>") now or hereafter existing, due or to become due to any Guarantor, or held or to be held by any Guarantor, whether created directly or acquired by assignment or otherwise, and whether evidenced by written instrument or not, shall be expressly subordinated to the Guaranteed Obligations.  Until the Release Date, each Guarantor agrees not to receive or accept any payment from Company with respect to the Subordinated Debt; and, in the event any Guarantor receives any payment on the Subordinated Debt in violation of the foregoing, such Guarantor will hold any such payment in trust for Beneficiaries and forthwith turn it over to Beneficiaries in the form received, to be applied to the Guaranteed Obligations.

8.     <u>Obligations Not to be Diminished</u>.  Each Guarantor hereby agrees that its obligations under this Guaranty shall not be released, discharged, diminished, impaired, reduced, or affected for any reason or by the occurrence of any event, including, without limitation, one or more of the following events, whether or not with notice to or the consent of such Guarantor:  (a) the taking or accepting of collateral as security for any or all of the Guaranteed Obligations or the release, surrender, exchange, or subordination of any collateral now or hereafter securing any or all of the Guaranteed Obligations; (b) any partial release of the liability of Company or any other Guarantor or the full or partial release of any other guarantor or obligor from liability for any or all of the Guaranteed Obligations; (c) the death, disability, dissolution, insolvency, or bankruptcy of Company, any other Guarantor, or any other party at any time liable for the payment of any or all of the Guaranteed Obligations; (d) any renewal, extension, modification, waiver, amendment, or rearrangement of any or all of the Guaranteed Obligations or any instrument, document, or agreement evidencing, securing, or otherwise relating to any or all of the Guaranteed Obligations; (e) any adjustment, indulgence, forbearance, waiver, or compromise that may be granted or given by any

Beneficiary to Company, any other Guarantor, or any other party ever liable for any or all of the Guaranteed Obligations; (f) any neglect, delay, omission, failure, or refusal of any Beneficiary to take or prosecute any action for the collection of any of the Guaranteed Obligations or to foreclose or take or prosecute any action in connection with any instrument, document, or agreement evidencing, securing, or otherwise relating to any or all of the Guaranteed Obligations; (g) the unenforceability or invalidity of any or all of the Guaranteed Obligations or of any instrument, document, or agreement evidencing, securing, or otherwise relating to any or all of the Guaranteed Obligations; (h) any payment by Company or any other party to any Beneficiary is held to constitute a preference under applicable Debtor Relief Laws or if for any other reason any Beneficiary is required to refund any payment or pay the amount thereof to someone else; (i) the settlement or compromise of any portion of the Guaranteed Obligations; (j) the non-perfection of any security interest or lien securing any or all of the Guaranteed Obligations; (k) any impairment of any collateral securing any or all of the Guaranteed Obligations; (l) the failure of any Beneficiary to sell any collateral securing any or all of the Guaranteed Obligations in a commercially reasonable manner or as otherwise required by law; (m) any change in the corporate existence, structure, or ownership of Company or any other Guarantor; or (n) any other circumstance which might otherwise constitute a defense available to, or discharge of, Company, any Guarantor, or any other obligor, other than payment.

9.    Waivers.  Each Guarantor waives (a) any right to revoke this Guaranty with respect to future indebtedness; (b) any right to require any Beneficiary to do any of the following before such Guarantor is obligated to pay the Guaranteed Obligations or before any Beneficiary may proceed against such Guarantor: (i) sue or exhaust remedies against Company, the Guarantors, and other guarantors or obligors, (ii) sue on an accrued right of action in respect of any of the Guaranteed Obligations or bring any other action, exercise any other right, or exhaust all other remedies, or (iii) enforce rights against Company's assets or the collateral pledged by Company or any other Person to secure the Guaranteed Obligations; (c) any right relating to the timing, manner, or conduct of such Beneficiary's enforcement of rights against Company's assets or the collateral pledged by Company or any other Person to secure the Guaranteed Obligations; (d) if any Guarantor and Company (or a third-party) have each pledged assets to secure the Guaranteed Obligations, any right to require any Beneficiary to proceed first against the other collateral before proceeding against collateral pledged by any Guarantor; (e) except as expressly required by any applicable law, promptness, diligence, notice of any default under the Guaranteed Obligations, notice of acceleration or intent to accelerate, demand for payment, notice of acceptance of this Guaranty, presentment, notice of protest, notice of dishonor, notice of the incurring by Company of additional indebtedness, notice of any suit or other action by any Beneficiary against Company or any other Person, any notice to any party liable for the obligation which is the subject of the suit or action, and all other notices and demands with respect to the Guaranteed Obligations and this Guaranty; (f) each of the foregoing rights or defenses regardless whether they arise under (i) Chapter 43 et seq. of the Texas Civil Practice and Remedies Code, as amended, (ii) Section 17.001 of the Texas Civil Practice and Remedies Code, as amended, (iii) Rule 31 of the Texas Rules of Civil Procedure, as amended, (iv) common law, in equity, under contract, by statute, or otherwise; and (g) any and all rights under Sections 51.003, 51.004 and 51.005 of the Texas Property Code, as amended.

10.    Insolvency.  Should any Guarantor become insolvent, or fail to pay such Guarantor's debts generally as they become due, or voluntarily seek, consent to, or acquiesce in the benefit or benefits of any Debtor Relief Law, or become a party to (or be made the subject of) any proceeding provided for by any Debtor Relief Law (other than as a creditor or claimant) that could suspend or otherwise adversely affect the rights and remedies of Beneficiaries granted hereunder, then, in any such event, the Guaranteed Obligations shall be, as between such Guarantor and Beneficiaries, a fully matured, due, and payable obligation of such Guarantor to Beneficiaries (without regard to whether Company is then in default under the LLC Agreement or whether the Guaranteed Obligations, or any part thereof is then due and owing by Company to Beneficiaries), payable in full by such Guarantor to Beneficiaries upon demand, which shall be the estimated amount owing in respect of the contingent claim created hereunder.

11.    Termination.  Each Guarantor's obligations hereunder shall remain in full force and effect until the Release Date.  If at any time any payment of the OHP Funding Capital or any other amount payable by Company under the LLC Agreement or the Ancillary Agreements is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy, or reorganization of Company or otherwise, each Guarantor's obligations hereunder with respect to such payment shall be reinstated as though such payment had been due but not made at such time.

12.    Representations and Warranties.  Each Guarantor represents and warrants as follows:

(a)    If such Guarantor is not a natural Person, such Guarantor (i) is duly organized or formed, validly existing and, as applicable, in good standing under the laws of the jurisdiction of its incorporation or organization; (ii) has all requisite power and authority, and all requisite governmental licenses, authorizations, consents and approvals, to own or lease its assets and carry on its business; and (iii) is duly qualified and is licensed and, as applicable, in good standing under the laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Change.

(b)    Such Guarantor has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to execute, deliver, and perform its obligations under this Guaranty and the other Ancillary Agreements to which it is a party.

(c)    The execution, delivery and performance by such Guarantor of this Guaranty have been duly authorized by all necessary corporate or other organizational action, and do not and will not (i) if such Guarantor is not a natural Person, contravene the terms of its organizational documents, (ii) conflict with or result in any breach or contravention of, or the creation of any lien under, or require any payment to be made under (A) any material agreement or instrument to which such Guarantor is a party or by which it or any of its property is bound or subject, or (B) any material order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Guarantor or its property is subject or (iii) violate any law in any material respect.

(d)    There are no actions, suits, proceedings, claims, disputes or investigations pending or, to the knowledge of such Guarantor, threatened, at law, in equity, in arbitration or before any Governmental Authority, by or against such Guarantor or against any of its properties or revenues that (i) could reasonably be expected to be adversely determined, and, if so determined, either individually or in the aggregate could reasonably be expected to have a Material Adverse Change or (ii) purport to affect or pertain to this Guaranty or any of the transactions contemplated hereby.

(e)    This Guaranty has been duly executed and delivered by such Guarantor.  This Guaranty constitutes a legal, valid and binding obligation of such Guarantor, enforceable against such Guarantor in accordance with its terms, except as limited by Debtor Relief Laws and general principles of equity.

(f)    No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, such Guarantor of this Guaranty, except for such approvals, consents, exemptions, authorizations, actions or notices that have been duly obtained, taken or made and in full force and effect.

(g)    Such Guarantor has, independently and without reliance upon any Beneficiary and based upon such documents and information as such Guarantor has deemed appropriate, made its

own analysis and decision to enter into this Guaranty, and such Guarantor has adequate means to obtain from Company on a continuing basis information concerning the financial condition and assets of Company, and such Guarantor is not relying upon any Beneficiary to provide (and no Beneficiary shall have duty to provide) any such information to such Guarantor either now or in the future.

      (h)     The value of the consideration received and to be received by each Guarantor is reasonably worth at least as much as the liability and obligation of such Guarantor hereunder, and such liability and obligation may reasonably be expected to benefit such Guarantor directly or indirectly.

     13.    <u>Covenants</u>.  To the extent not already required by the LLC Agreement, so long as this Guaranty remains in full force and effect, each Guarantor shall, unless Beneficiaries shall otherwise consent in writing:

      (a)     furnish to Beneficiaries written notice of the occurrence of any Event of Default promptly upon obtaining knowledge thereof;

      (b)     furnish to Beneficiaries such additional information concerning such Guarantor, Company or any other Person under the control of such Guarantor as Beneficiaries may reasonably request;

      (c)     obtain at any time and from time to time all authorizations, licenses, consents or approvals as shall now or hereafter be necessary under all applicable laws or regulations or otherwise in connection with the execution, delivery and performance of this Guaranty and will promptly furnish copies thereof to Beneficiaries; and

      (d)     comply with ARTICLE VII of the LLC Agreement.

     In addition to the foregoing, each Guarantor agrees to comply with any requirements in the LLC Agreement applicable to such Guarantor.

     14.    <u>No Fraudulent Transfer</u>.  It is the intention of each Guarantor and Beneficiaries that the amount of the Guaranteed Obligations guaranteed by such Guarantor by this Guaranty shall be in, but not in excess of, the maximum amount permitted by fraudulent conveyance, fraudulent transfer, or similar laws applicable to such Guarantor.  Accordingly, notwithstanding anything to the contrary contained in this Guaranty or any other agreement or instrument executed in connection with the payment of any of the Guaranteed Obligations, the amount of the Guaranteed Obligations guaranteed by each Guarantor by this Guaranty shall be limited to that amount which after giving effect thereto would not (a) render such Guarantor insolvent, (b) result in the fair saleable value of the assets of such Guarantor being less than the amount required to pay its debts and other liabilities (including contingent liabilities) as they mature, or (c) leave such Guarantor with unreasonably small capital to carry out its business as now conducted and as proposed to be conducted, including its capital needs, as such concepts described in clauses (a), (b) and (c) of this <u>Section 14</u>, are determined under applicable law, if the obligations of such Guarantor hereunder would otherwise be set aside, terminated, annulled or avoided for such reason by a court of competent jurisdiction in a proceeding actually pending before such court.

     15.    <u>Successors and Assigns</u>.  This Guaranty is for the benefit of Beneficiaries and their successors and assigns, and, in the event of an assignment of the Guaranteed Obligations in accordance with the provisions of the LLC Agreement, or any part thereof, the rights and remedies hereunder, to the extent applicable to the indebtedness so assigned, may be transferred with such indebtedness.  This

Guaranty is binding on each Guarantor, and its heirs, administrators, personal representatives, successors and permitted assigns; provided that, no Guarantor may assign its obligations under this Guaranty without obtaining the prior written consent of OHP, and any assignment purported to be made without the prior written consent of OHP shall be null and void.

16. _LLC Agreement_. The LLC Agreement, and all of the terms thereof, are incorporated herein by reference, the same as if stated verbatim herein, and each Guarantor agrees that Beneficiaries may exercise any and all rights granted to it under the LLC Agreement and the Ancillary Agreements without affecting the validity or enforceability of this Guaranty.

17. _Amendments_. No amendment or waiver of any provision herein nor consent to any departure therefrom by any Guarantor shall be effective unless the same shall be in writing and signed by OHP, and then, such amendment, waiver, or consent shall be effective only in the specific instance and for the specific purpose for which given.

18. _Setoff Rights_. If an Event of Default has occurred and is continuing, Beneficiaries shall have the right to set off and apply against this Guaranty or the Guaranteed Obligations or both, at any time and without notice to any Guarantor, any and all sums at any time credited by or owing from any Beneficiary to any Guarantor whether or not the Guaranteed Obligations are then due and irrespective of whether or not such Beneficiary shall have made any demand under this Guaranty. As security for this Guaranty and the Guaranteed Obligations, each Guarantor hereby grants Beneficiaries a security interest in all money, instruments, certificates of deposit, and other property of such Guarantor now or hereafter held by Beneficiaries, including, without limitation, property held in safekeeping. In addition to Beneficiaries' right of setoff and as further security for this Guaranty and the Guaranteed Obligations, each Guarantor hereby grants Beneficiaries a security interest in all deposits (general or special, time or demand, provisional or final) and all other accounts of such Guarantor now or hereafter on deposit with or held by Beneficiaries or any or some of them and all other sums at any time credited by or owing from each Beneficiary to such Guarantor. The rights and remedies of Beneficiaries hereunder are in addition to other rights and remedies (including, without limitation, other rights of setoff) which Beneficiaries may have.

19. _Time of Essence_. Time shall be of the essence in this Guaranty with respect to all of each Guarantor's obligations hereunder.

20. _Governing Law; Venue; Service of Process_. This Guaranty shall be governed by and construed in accordance with the laws of the State of New York and the applicable laws of the United States of America. To the extent a dispute is not resolved in arbitration as set forth in Section 24(b) (the "Arbitration Agreement"), each Guarantor hereby agrees that any such action or proceeding against such Guarantor under or in connection with this Guaranty may be brought in any state or federal court in Austin, Texas. For any such action or proceeding that is not resolved in arbitration pursuant to the Arbitration Agreement, each Guarantor hereby irrevocably (a) submits to the nonexclusive jurisdiction of such courts, and (b) waives any objection it may now or hereafter have as to the venue of any such action or proceeding brought in any such court or that any such court is an inconvenient forum. Each Guarantor agrees that service of process upon it may be made by certified or registered mail, return receipt requested, at its address specified or determined in accordance with the provisions of Section 26. Nothing herein shall affect the right of Beneficiaries to serve process in any other manner permitted by law. Other than as set forth in the Arbitration Agreement, nothing herein shall limit the right of Beneficiaries to bring any action or proceeding against any Guarantor or with respect to any of its property in courts in other jurisdictions. Other than as set forth in the Arbitration Agreement, any action or proceeding by any Guarantor against OHP or any Beneficiary shall be brought only in a court located in Austin, Texas.

21.   Counterparts.  This Guaranty may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Delivery of an executed counterpart of a signature page of this Guaranty by facsimile or in electronic (e.g., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Guaranty.

22.   Additional Guarantors.  Any Person who was not a "Guarantor" under this Guaranty at the time of initial execution hereof shall become a "Guarantor" hereunder if required pursuant to the terms of the LLC Agreement by executing and delivering to OHP a Guaranty Supplement in substantially the form of Exhibit A (each, a "Guaranty Supplement").  Any such Person shall thereafter be deemed a "Guarantor" for all purposes under this Guaranty.

23.   Death of a Guarantor.  Should any Guarantor that is a natural Person die or become legally incapacitated, or should any Guarantor become insolvent, or fail to pay such Guarantor's debts generally as they become due, or voluntarily seek, consent to, or acquiesce in the benefit or benefits of any Debtor Relief Law or become a party to (or be made the subject of) any proceeding provided for by any Debtor Relief Law (other than as a creditor or claimant) that could suspend or otherwise adversely affect the rights of the OHP granted hereunder, then, in any such event, the Guaranteed Obligations shall be, as between such Guarantor and Beneficiaries, a fully matured, due, payable and performable obligation of such Guarantor to Beneficiaries (without regard to whether there is an Event of Default under the LLC Agreement or whether the Guaranteed Obligations, or any part thereof, are then due and owing or unperformed by the Company), payable and/or performable in full by such Guarantor upon demand of OHP, which shall be the estimated amount owing in respect of the contingent claim created hereunder.

24.   WAIVER OF RIGHT TO TRIAL BY JURY; BINDING ARBITRATION.

(a)   Waiver of Jury Trial.  EACH PARTY HERETO (INCLUDING OHP) HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS GUARANTY OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  IF AND TO THE EXTENT THAT THE FOREGOING WAIVER OF THE RIGHT TO A JURY TRIAL IS UNENFORCEABLE FOR ANY REASON IN SUCH FORUM, EACH OF THE PARTIES HERETO (INCLUDING OHP) HEREBY CONSENTS TO THE ADJUDICATION OF ALL CLAIMS PURSUANT TO JUDICIAL REFERENCE AS PROVIDED IN CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 638, AND THE JUDICIAL REFEREE SHALL BE EMPOWERED TO HEAR AND DETERMINE ALL ISSUES IN SUCH REFERENCE, WHETHER FACT OR LAW.  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND CONSENT AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS GUARANTY BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

(b)   Binding Arbitration.

(i)   Upon demand of any party, whether made before or after institution of any judicial proceeding, any dispute, claim or controversy arising out of, connected with or

relating to this Guaranty ("Disputes")[1], between or among the parties hereto, shall be resolved by binding arbitration as provided herein. Institution of a judicial proceeding by a party does not waive the right of that party to demand arbitration hereunder. This Arbitration Agreement is intended to be as broad as legally permissible. Disputes may include, but are not limited to, tort claims, counterclaims, claims arising from documents executed in connection with this Guaranty in the future, disputes as to whether a matter is subject to arbitration, or claims concerning any aspect of the past, present or future relationships arising out of or connected with this Guaranty. The Arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the validity, scope, applicability, enforceability, or waiver of this Arbitration Agreement including, but not limited to, any claim that all or any part of this Arbitration Agreement is void or voidable. The obligation to arbitrate any Dispute will survive the repayment in full of all Guaranteed Obligations, the occurrence of the Release Date, and the termination of this Guaranty for any reason. The parties hereto do not waive any applicable federal or state substantive law except as provided herein. A judgment upon the award may be entered in any court having jurisdiction.

(ii)     This Arbitration Agreement is governed by the FAA (9 U.S.C. § 1 et seq.). Unless otherwise agreed in writing by the parties, and notwithstanding any conflicting choice of law provision in this Guaranty between the parties, New York law shall control the interpretation, application, and enforcement of this Guaranty; provided, however, the Federal Arbitration Act will be applied to the Arbitration Agreement. In reaching any determination or award, the arbitrator shall apply the substantive laws of the State of New York and the applicable laws of the United States of America, without giving effect to any principles of conflict of laws under the laws of the State of New York, to all Disputes covered by this Arbitration Agreement. Any arbitration proceeding will be conducted by the American Arbitration Association (the "AAA"), or such other administrator as the parties shall mutually agree upon. Any arbitration proceeding shall be conducted in accordance with the AAA Commercial Arbitration Rules, unless the claim or counterclaim is at least $1,000,000 exclusive of claimed interest, arbitration fees and costs, in which case the arbitration shall be conducted in accordance with the AAA's optional procedures for large, complex commercial disputes (the commercial dispute resolution procedures or the optional procedures for large, complex commercial disputes to be referred to, as applicable, as the "Arbitration Rules"). Any arbitration shall proceed in a location in New York, New York or Austin, Texas selected by the AAA. The expedited procedures set forth in Sections E-1 through E-10, et seq. of the Arbitration Rules shall be applicable to claims of less than $1,000,000. All applicable statutes of limitations shall apply to any Dispute. If there is any inconsistency between the terms hereof and the Arbitration Rules, the terms and procedures set forth herein shall control. Subject to applicable law as determined by the arbitrator, any party who fails or refuses to submit to arbitration following a demand by any other party shall bear all costs and expenses incurred by such other party in compelling arbitration of any Dispute. Notwithstanding anything in the foregoing to the contrary, any arbitration proceeding demanded hereunder shall begin within 90 days after such demand thereof and shall be concluded within 120 days after such demand, unless otherwise mutually agreed in writing by the parties. These time limitations may not be extended

---

[1] The following is not covered under this Arbitration Agreement: disputes or any portion thereof that an applicable federal statute expressly states cannot be arbitrated or cannot be the subject of a pre-dispute arbitration agreement.

unless a party hereto shows cause for extension and then such extension shall not exceed a total of 60 days, unless otherwise mutually agreed in writing by the parties.

(i)     Any arbitration proceeding in which the amount in controversy is $5,000,000 or less will be decided by a single arbitrator selected according to the Arbitration Rules, and who shall not render an award of greater than $5,000,000.  Any dispute in which the amount in controversy exceeds $5,000,000 shall be decided by majority vote of a panel of three arbitrators.

(ii)     Notwithstanding the preceding binding arbitration provisions, the parties hereto preserve, without diminution, certain remedies that such Persons may employ or exercise freely, either alone, in conjunction with or during a Dispute.  Each such Person shall have and hereby reserves the right to proceed in any court of proper jurisdiction or by self-help to exercise or prosecute the following remedies, as applicable:  (A) all rights to foreclose against any real or personal property or other security by exercising a power of sale granted in connection with the LLC Agreement or under applicable law or by judicial foreclosure and sale, including a proceeding to confirm the sale, (B) all rights of self-help including peaceful occupation of property and collection of rents, set off, and peaceful possession of property, (C) obtaining provisional or ancillary remedies including injunctive relief, sequestration, garnishment, attachment, appointment of receiver and in filing an involuntary bankruptcy proceeding, and (D) when applicable, a judgment by confession of judgment.  Preservation of these remedies does not limit the power of an arbitrator to grant similar remedies that may be requested by a party in a Dispute.

(iii)     The parties agree there will be no right or authority for any dispute to be brought, heard or arbitrated as a class, collective and/or consolidated action (the "Class Action Waiver").  Nor shall any arbitrator have the authority to hear or arbitrate any such dispute, regardless of any other language in this Arbitration Agreement, or any provision of any of the rules or procedures of the AAA that might otherwise apply including, without limitation, the AAA Supplemental Rules for Class Action Arbitration.  Notwithstanding the broad delegation to the arbitrator to resolve arbitrability disputes, no arbitrator shall have the right to interpret the extent, applicability and/or enforceability of this Class Action Waiver; rather, any issue or dispute as to whether this Guaranty permits such class, collective and/or consolidated action arbitration shall be resolved and/or interpreted solely by a court of competent jurisdiction.  This Class Action Waiver shall be severable from this Arbitration Agreement if there is a final judicial determination that the Class Action Waiver is invalid, unenforceable, unconscionable, void or voidable.  In such instances, the class or collective action must be litigated in court – not in arbitration.

(iv)     Other than as set forth in the Class Action Waiver, if any provision of this Arbitration Agreement is adjudged to be invalid, unenforceable, unconscionable, void or voidable, in whole or in part, such adjudication will not affect the validity of the rest of the Arbitration Agreement; all remaining provisions will remain in effect.

25.     OHP Acts for Beneficiaries.  OHP shall (absent written notification by a Beneficiary to the contrary) act for all Beneficiaries for the purposes of making demands hereunder, obtaining information, amending or waiving provisions hereof and otherwise taking action on behalf of the Beneficiaries, and (absent written notice to the contrary) each Guarantor shall be entitled to rely on the authority of OHP to act for all Beneficiaries without further investigation.

26.     <u>Notices and Deliveries</u>.  All notices and other communications to any Guarantor shall be made to such Guarantor's address specified on its signature page hereto.  All notices and other communications provided for herein shall be effectuated in the manner provided for in Section 14.03 of the LLC Agreement.

27.     <u>Electronic Signatures and Electronic Records</u>.  Each Guarantor consents to the use of electronic and/or digital signatures by any Guarantor or OHP, or any one or more of them.  This Guaranty and any other Ancillary Agreement may be signed electronically or digitally in a manner specified solely by OHP.  Each Guarantor agrees not to deny the legal effect or enforceability of this Guaranty or any other Ancillary Agreement solely because (a) this Guaranty or such other Ancillary Agreement is entirely in electronic or digital form, including any use of electronically or digitally generated signatures, (b) an electronic or digital record was used in the formation of this Guaranty or such other Ancillary Agreement, or (c) this Guaranty or such other Ancillary Agreement was subsequently converted to an electronic or digital record by any Guarantor or OHP, or any one or more of them.  Each Guarantor agrees not to object to the admissibility of this Guaranty or any other Ancillary Agreement in the form of an electronic or digital record, or a paper copy of an electronic or digital document, or a paper copy of a document bearing an electronic or digital signature, on the grounds that the record or signature is not in its original form or is not the original of this Guaranty or such other Ancillary Agreement.

28.     <u>NO ORAL AGREEMENTS</u>.  THIS GUARANTY, THE LLC AGREEMENT AND THE OTHER ANCILLARY AGREEMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS BY THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

*[Remainder of Page Intentionally Left Blank.  Signature Pages to Follow.]*

GUARANTY AGREEMENT – Page 11

EXECUTED as of the first date herein set forth.

**GUARANTORS:**

ADDRESS:

17542 17th St., Suite 100
Tustin, CA 92780

Attention: _____

**LITIGATION PRACTICE GROUP PC**, *a*
*California professional corporation*

By: _____
Name: Daniel S. March
Title: Managing Shareholder