1                 UNITED STATES BANKRUPTCY COURT

2                 CENTRAL DISTRICT OF CALIFORNIA

3                          --oOo--

4  In Re:                        )  Case No. 8:23-bk-10571-SC
                                 )
5  THE LITIGATION PRACTICE GROUP )  Chapter 11
   PC,                           )
6                                )  Santa Ana, California
            Debtor.             )  Friday, July 21, 2023
7  _____)  10:00 a.m.

8                                CONT'D HEARING RE: CHAPTER 11
                                 TRUSTEE'S MOTION FOR ORDER
9                                APPROVING STIPULATION BETWEEN
                                 THE DEBTOR; CONSUMER LEGAL
10                               GROUP, PC; LGS HOLDCO, LLC;
                                 AND SET FORTH, INC. F/K/A
11                               DEBTPAYPRO

12                               CONT'D HEARING RE: CHAPTER 11
                                 TRUSTEE'S MOTION FOR ORDER
13                               APPROVING STIPULATION RE
                                 AVOIDANCE AND RECOVERY OF
14                               AVOIDABLE TRANSFERS TO
                                 DEFENDANT PHOENIX LAW, PC, AND
15                               TURNOVER OF ALL RELATED
                                 PROPERTY TO THE TRUSTEE AND
16                               ORDER OF DISMISSAL WITHOUT
                                 PREJUDICE OF DEFENDANTS
17                               WILLIAM TAYLOR CARSS, AND
                                 MARIA EEYA TAN

18

19

20

21

22

23

24
   Proceedings produced by electronic sound recording;
25  transcript produced by transcription service.

ii

1                          HEARING RE: MOTION OF TRUSTEE

2                          RICHARD A. MARSHACK FOR ENTRY
                           OF AN ORDER (A) APPROVING

3                          SALE, SUBJECT TO OVERBID, OF
                           ASSETS FREE AND CLEAR OF ALL

4                          LIENS, CLAIMS, ENCUMBRANCES
                           AND INTERESTS PURSUANT TO 11

5                          U.S.C. SECTION 363(B) AND (B)
                           APPROVING ASSUMPTION AND

6                          ASSIGNMENT OF CERTAIN
                           EXECUTORY CONTRACTS AND

7                          UNEXPIRED LEASES AND OTHER
                           AGREEMENTS

8                 TRANSCRIPT OF PROCEEDINGS

9      BEFORE THE HONORABLE SCOTT C. CLARKSON
             UNITED STATES BANKRUPTCY JUDGE

10  APPEARANCES:

11  For Chapter 11 Trustee      CHRISTOPHER CELENTINO, ESQ.
     Richard Marshack:        CHRISTOPHER B. GHIO, ESQ.

12                      YOSINA M. LISSEBECK, ESQ.
                      PETER W. BOWIE, ESQ.

13                      Dinsmore & Shohl, LLP
                      655 West Broadway

14                      Suite 800
                      San Diego, California 92101

15                      (619) 400-0500

16                      D. EDWARD HAYS, ESQ.
                      Marshack Hays

17                      870 Roosevelt
                      Irvine, California 92620

18                      (949) 333-7777

19  For the Committee:          NICHOLAS A. KOFFROTH, ESQ.
                      KEITH C. OWENS, ESQ.

20                      Fox Rothschild
                      Constellation Place

21                      10250 Constellation Boulevard
                      Suite 900

22                      Los Angeles, California 90067
                      (424) 285-7070

23

24

25

iii

1  APPEARANCES:  (cont'd.)

2  For the United States          KENNETH M. MISKEN, ESQ.
      Trustee:                    QUEENIE K. NG, ESQ.
3                                 LESLIE SKORHEIM, ESQ.
                                  Ronald Reagan Federal Building
4                                 411 West Fourth Street
                                  Santa Ana, California 92701
5                                 (714) 338-3405

6  For Consumer Legal Group:      RONALD RICHARDS, ESQ.
                                  Law Offices of Ronald Richards
7                                    and Associates
                                  Post Office Box 11480
8                                 Beverly Hills, California
                                     90213
9                                 (310) 556-1001

10                                DANIEL A. LEV, ESQ.
                                  Greenspoon Marder
11                                333 South Grand Avenue
                                  Suite 3400
12                                Los Angeles, California 90071
                                  (213) 626-2311
13

14 For Affirma LLC and Oxford     JEFFREY I. GOLDEN, ESQ.
      Knox LLC:                   DAVID M. GOODRICH, ESQ.
15                                Golden Goodrich
                                  650 Town Center Drive
16                                Suite 600
                                  Costa Mesa, California 92626
17                                (714) 955-1000

18 For Debt Relief Group, LLC:    JOHNNY WHITE, ESQ.
                                  Wolf, Rifkin, Shapiro,
19                                   Schulman & Rabkin
                                  11400 West Olympic Boulevard
20                                Ninth Floor
                                  Los Angeles, California 90064
21                                (310) 478-4100

22 For the Proposed Monitor:      NANCY RAPOPORT, ESQ.

23

24

25

iv

1  APPEARANCES:  (cont'd.)

2  For Azure Capital, LLC:          SHARON Z. WEISS, ESQ.
                                    Bryan, Cave, Leighton &
3                                     Paisner
                                    120 Broadway
4                                   Suite 300
                                    Santa Monica, California 90601
5                                   (310) 576-2276

6  For the Consumer Privacy         LUCY THOMSON
     Ombudsman:
7

8  For Debt Validation Fund II,     RICHARD H. GOLUBOW, ESQ.
     LLC, MC DVI Fund I, LLC,       Winthrop, Golubow & Hollander
9    and MC DVI Fund II, LLC:       1301 Dove Street
                                    Fifth Floor
10                                  Newport Beach, California
                                      92660
11                                  (949) 720-4100

12                                  DAVID L. COUSINEAU, ESQ.
                                    Cappello & Noel
13                                  831 State Street
                                    Santa Barbara, California
14                                    93101
                                    (805) 564-2444
15

16 For Sunset Coast Legal           ERIC BENSAMOCHAN, ESQ.
     Group:                         The Bensamochan Law Firm
17                                  9025 Wilshire Boulevard
                                    Suite 215
18                                  Beverly Hills, California
                                      90211
19                                  (818) 574-5740

20 For Oracle America, Inc.:        SHAWN M. CHRISTIANSON, ESQ.
                                    Buchalter
21                                  425 Market Street
                                    Suite 2900
22                                  San Francisco, California
                                      94105
23                                  (415) 227-0900

24

25

v

1    APPEARANCES:   (cont'd.)

2    For Carolyn Beech and Diane        DANIEL A. EDELMAN, ESQ.
       Scarnavack:                      Edelman, Combs, Latturner and
3                                          Goodwin
                                        20 South Clark Street
4                                       Suite 1500
                                        Chicago, Illinois 60603
5                                       (312) 739-4200

6    For the National Association       JENNY L. DOLING, ESQ.
       of Consumer Bankruptcy           J. Doling Law
7      Attorneys and the National       36-915 Cook Street
       Consumer Bankruptcy Rights       Suite 101
8      Center:                          Palm Desert, California 92211
                                        (760) 884-4444
9

10   For OHP-CDR, LP:                   RAZMIG Y. IZAKELIAN, ESQ.
                                        Quinn, Emanuel, Urquhart &
11                                        Sullivan
                                        865 South Figueroa Street
12                                      Tenth Floor
                                        Los Angeles, California 90017
13                                      (213) 443-3000

14   For Creditor Alteryx, Inc.:        ANDREW B. STILL, ESQ.
                                        Snell & Wilmer
15                                      600 Anton Boulevard
                                        Suite 1400
16                                      Costa Mesa, California 92626
                                        (714) 427-7000
17

18   Court Recorder:                    Sally Daniels
                                        United States Bankruptcy Court
19                                      411 West Fourth Street
                                        Suite 2030
20                                      Santa Ana, California 92701

21   Transcriber:                       Briggs Reporting Company, Inc.
                                        9711 Cactus Street
22                                      Suite B
                                        Lakeside, California 92040
23                                      (310) 410-4151

24

25

vi

1                         I N D E X

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Russell Squires | 178 | 182 | 184 | -- |

| EXHIBITS | IDENTIFIED | RECEIVED |
|---|---|---|
| Plaintiff's: | | |
| (None.) | | |
| | | |
| Defendant's: | | |
| (None.) | | |

1

1     <u>SANTA ANA, CALIFORNIA  FRIDAY, JULY 21, 2023  10:00 AM</u>

2                     --oOo--

3     (Call to order of the Court.)

4         THE COURT:  Good morning, everyone.  Please be

5 seated, and welcome.

6         ALL:  Good morning, your Honor.

7         THE COURT:  This is the Friday, July 21, 2023,

8 10:00 o'clock calendar.  We have at least three things on

9 the calendar this morning.  Let's take up Number 1, the

10 Chapter 11 Trustee's motion for an order approving

11 stipulation between the Debtor, Consumer Legal Group, LGS

12 Holdco, LLC, and Set Forth, Inc.

13         May I have appearances on that particular matter.

14         MR. CELENTINO:  Good morning, your Honor.

15 Christopher Celentino of Dinsmore and Shohl, special counsel

16 to Richard Marshack, the Chapter 11 Trustee.  Also present

17 with me are my colleagues, Christopher Ghio, G-H-I-O, Yosina

18 Lissebeck, L-I-S-S-E-B-E-C-K, and Peter W. Bowie.

19         THE COURT:  Good morning to all of you.

20         MR. KOFFROTH:  Good morning, your Honor.  Nicholas

21 Koffroth, Fox Rothschild LLP, on behalf of the Committee.

22 Also in court today is my partner, Keith Owens.

23         THE COURT:  Good morning to both of you.

24         MR. OWENS:  Good morning, your Honor.

25         MR. MISKEN:  Good morning, your Honor.  Ken Misken

2

1  on behalf of the United States Trustee, and with me today is

2  my colleagues Queenie Ng and Leslie Skorheim.

3          THE COURT:  Good morning.

4          Are there any other parties wishing to be heard on

5  this particular Number 1 matter on the Zoom hearings, on the

6  Zoom conference?

7          MR. HAYS:  Good morning, your Honor.  For the

8  Trustee --

9          MR. RICHARDS:  Good morning, your Honor.  Ronald

10 Richards -- well, go ahead, Ed.

11         MR. HAYS:  Thank you, Counsel.

12         Good morning, your Honor.  For the Trustee, Ed

13 Hays of Marshack Hays.

14         THE COURT:  Good morning, Mr. Hays.

15         Mr. Richards?

16         MR. RICHARDS:  Good morning, your Honor.  Ronald

17 Richards, Law Offices of Ronald Richards and Associates,

18 APC, for Consumer Legal Group.

19         THE COURT:  Good morning.

20         Are there other appearances?

21         MR. LEV:  Good morning, your Honor.  Yes.  Daniel

22 Lev, your Honor, Greenspoon Marder, also on behalf of

23 Consumer Legal Group.

24         THE COURT:  Hello, Mr. Lev.  Good to see you.

25         MR. LEV:  Thank you, your Honor.

3

1          MR. GOLDEN:  Good morning, your Honor.  Jeffrey

2  Golden of Golden Goodrich on behalf of Affirma LLC and

3  Oxford.  Also in the courtroom of my firm is David Goodrich

4  as well, your Honor.

5          THE COURT:  Thank you, Mr. Golden.  Mr. Golden,

6  are you appearing on this Item Number 1?

7          MR. GOLDEN:  Your Honor, just -- I did not file

8  anything, but just to observe, your Honor.

9          THE COURT:  All right.  I'm only asking those who

10 are appearing on this matter to make appearances at this

11 point.  I'm not prohibiting you from speaking on the matter

12 later, but I just want to control the audience, and knowing

13 what we're going to be talking about, so we don't get far

14 afield on this particular matter.

15         MR. GOLDEN:  Yes, your Honor.

16         THE COURT:  Are there any other appearances?

17    (No response.)

18         THE COURT:  Mr. Celentino, would you like to

19 proceed on Item Number 1?  And I'll let you know that I have

20 read all of the pleadings.  I have read all of the evidence.

21 I have read all of the points in favor and in opposition to

22 this.

23         MR. CELENTINO:  Your Honor, I appreciate that very

24 much.  I would like, if your Honor will indulge me -- it is

25 your calendar, and we're happy to take this matter first.

4

1  We had two thoughts, that we'd like to be heard, and if

2  they're not the thoughts that you agree with, we'll address

3  this matter.

4          Our first thought was, this might be the right one

5  to take at the end of the day today, because a lot of the

6  issues that are related to this particular one, and the

7  opposition to it, may have an impact on the good faith

8  finding in an auction, if we get there, and that would be my

9  first suggestion.

10         My second suggestion is totally unrelated to the

11  matter that you've called first.  It's related to the

12  parties that are present on the Zoom call.  We have the

13  proposed monitor for Item Number 3, the sale, Ms. Rapoport,

14  who has made who has made an appearance, and she is on the

15  Zoom call.  She, I understand, has an important appointment

16  and will not be able to attend for the day.  I was going to

17  suggest when the matters were called that perhaps we could

18  accommodate Ms. Rapoport for the ability of her to express

19  her interest in serving as the monitor, if we get that far

20  today, so that she can make her other appointments.

21         That would be as a matter of professional

22  courtesy, and not an attempt to create professional

23  discourtesy to your Honor's decision to make this particular

24  matter the first matter.  I just thought it would be an

25  opportunity for us to introduce the parties in the courtroom

5

1  to Ms. Rapoport.  The first matter may take so long that she

2  would have to log off.  So that would be my suggestion, as a

3  professional courtesy to her, but no discourtesy to your

4  Honor.

5          THE COURT:  Your motions, Item Number 1 and Item

6  Number 2, state specifically, "They must be heard prior to

7  the sale of the assets of the Debtor."

8          MR. CELENTINO:  Your Honor, the Trustee's belief,

9  notwithstanding that statement in the motion when it was

10  filed, is that circumstances have overcome that statement

11  with respect to the CLG stipulation and order.  We don't

12  believe that statement has changed with respect to the

13  Phoenix statement, because the Phoenix settlement, if

14  approved, sets the stage for the sale of the assets that are

15  part of the sale motion.

16          THE COURT:  Well, that's Item Number 2.

17          MR. CELENTINO:  Yes.  The first item, to the

18  extent that, when it was filed many weeks ago, that seemed

19  to be an important "go first," at this moment today, in

20  light of developments that have changed, it would be the

21  Trustee's request that he withdraws that sentence and that

22  this matter be considered third.  That is clearly up to your

23  Honor, and it is a modification to the motion because of the

24  changes of circumstances where we are today.  We'll of

25  course stand by our statement weeks ago.

6

1          THE COURT:  Well, what I'll be glad to do is put

2   Items Number 1 and 2 in reverse order.  The problem is that,

3   when you get to Item Number 3, the sale, will these not

4   being resolved harm your ability to promote your motion?

5          MR. CELENTINO:  We do not believe so, your Honor,

6   because that document affects a standstill agreement between

7   Consumer Law Group and the Trustee that allows, essentially,

8   the approval of a standstill of litigation that is not

9   instrumental to be decided in order for the sale motion of

10  the files transferred to the estate by the Phoenix

11  settlement, and that is my belief.

12         THE COURT:  Do you think that we need to go to

13  Item Number 2 before the sale motion?

14         MR. CELENTINO:  I think we need to go to Item

15  Number 2 before the sale motion.

16         THE COURT:  Then let's go to Item Number 2.

17         MR. CELENTINO:  Thank you.

18         THE COURT:  Nobody opposing Item Number 1 is going

19  to worry about Item Number 1 not being heard.

20         MR. CELENTINO:  That's correct, your Honor.

21         THE COURT:  That's my point.

22         MR. CELENTINO:  That's right.

23         THE COURT:  So let's move to Item Number 2.

24         MR. CELENTINO:  Thank you.

25         THE COURT:  This is the continued hearing on the

7

1   Chapter 11 Trustee's motion for an order approving

2   stipulation re: avoidance and recovery of avoidable

3   transfers to defendant Phoenix Law, PC, and turnover of all

4   related property, et cetera, and the fact is, if anyone

5   wants to add on to the appearance for Number 2, please do it

6   now.

7        (No response.)

8            THE COURT:  Hearing none, Mr. --

9            MR. WHITE:  My apologies.  Sorry.  Johnny White

10  for Debt Relief Group, LLC.

11           THE COURT:  Did you file papers with respect to

12  Item Number 2?

13           MR. WHITE:  Yes, we did, your Honor.

14           THE COURT:  Okay.  Thanks for your appearance.

15           Mr. Celentino.

16           MR. CELENTINO:  Your Honor, Ms. Lissebeck of our

17  firm has handled this matter, and I'm going to turn over the

18  podium to her to address the Court.

19           THE COURT:  Thank you.

20           MS. LISSEBECK:  Good morning, your Honor.

21           THE COURT:  Good morning.

22           MS. LISSEBECK:  The last time I was before your

23  Honor, he made it very clear that there needed to be

24  sufficient evidence to support the motion.  We supplemented

25  the record with a declaration that satisfied, we hope, your

8

1  Honor's issues as far as the evidence related to the

2  criteria to approve the settlement.

3         Based on the evidence before the Court now, with,

4  basically, that first declaration that we provided to the

5  Court, along with our original motion and then the

6  supplemental declaration, we believe that this Court now has

7  sufficient evidence to be able to approve the settlement

8  with Phoenix.  It's a clawback of all of the files that were

9  transferred fraudulently, and it allows us to move forward

10  with the sale here today.

11         THE COURT:  Well, let's take an inventory of all

12  of the pleadings that were involved with Item Number 2.  The

13  first is your motion, and that motion is Docket Number 176.

14  Then we have in support of that motion the declaration of

15  Chapter 11 Trustee Marshack on Docket Number 199, and then

16  we have oppositions of the creditor Debt Relief Group,

17  Docket Number 211, and that was refiled and redacted as 241.

18  I appreciate that effort, because it did contain some

19  confidential information of consumers, and so we have now

20  sealed and redacted that, and so, hopefully, it didn't get

21  out too much.  And then the United States Trustee opposed

22  this matter on the 11th of July, Docket Number 205, and,

23  finally, I believe you're speaking of the new Marshack

24  declaration filed on the 17th of July of this year, Docket

25  Number 265.  Is that correct?

9

1          MS. LISSEBECK:  Yes, except for the United States

2     Trustee's -- I do not believe the United States Trustee

3     opposed the Phoenix motion, but maybe they can clarify that.

4          THE COURT:  Okay.  Well, if they didn't -- I

5     thought 209 was their opposition, but maybe it was just for

6     Item Number 1.  We'll find out.

7          MS. LISSEBECK:  That's what I have, your Honor.

8          THE COURT:  But I've considered that declaration

9     with respect to the facts and the evidence provided in that

10    in a totality of this entire matter, and, just for the

11    record, there are lots of briefing, and there's lot of

12    evidence that has been submitted, and I have reviewed all of

13    the evidence.  I have reviewed all of the pleadings, and

14    what I'm telling you is, the crossovers do exist, and I

15    always will review my own court record to determine what the

16    evidence is, and I am not prohibited from limiting my

17    examination of the evidence on particular motions to other

18    court matters and the evidence supporting that.

19         MS. LISSEBECK:  We appreciate that, your Honor.

20         THE COURT:  Well, the Ninth Circuit tells me I

21    can, so thanks for your appreciation.  Please proceed.

22         MS. LISSEBECK:  No.  So I believe that I was

23    through, that I believe that the evidence supports the

24    granting of that motion.

25         THE COURT:  Okay.

*Briggs Reporting Company, Inc.*

10

1        MS. LISSEBECK:  If you'd like me to address any

2   specifics, I'm happy to.

3        THE COURT:  No.  Let's hear what the parties that

4   oppose this motion have to say.  Who would like to go first?

5        Mr. Misken, good morning.

6        MR. MISKEN:  Good morning, your Honor.  Ken Misken

7   on behalf of the United States Trustee.  The United States

8   Trustee filed a very limited objection to the Phoenix Law

9   settlement, just asserting that there was not adequate

10  notice of the motion, and there was no valid reason

11  necessitating a hearing on shortened notice.  The hearing

12  got moved over.  So I think those issues have been resolved

13  as to the Phoenix Law.  So that's it, your Honor.

14       THE COURT:  Mr. Misken, thank you very much.  I

15  appreciate it.

16       Are there any other parties inside the courtroom

17  that would oppose this particular motion?

18    (No response.)

19       THE COURT:  Moving on to Zoom, I believe -- Mr.

20  White, would you like to oppose the motion?

21       MR. WHITE:  Yes.  Well, yes, your Honor.  We did

22  file a (indiscernible) court a limited enough objection,

23  opposition, in which we identified a number of -- I believe

24  about 193 customers on the list of customers that were

25  proposed to be filmed, that were referred to Phoenix

11

1  post-petition, pursuant to a post-petition contract with our

2  client, and insofar as they are post-petition assets of a

3  third party, we don't believe that there can be property

4  avoided pursuant to 547 or 548 of the Bankruptcy Code, and

5  it would be prejudicial to creditors of Phoenix, such as my

6  client, for the Bankruptcy Code to purport to not hold those

7  assets, and I haven't seen that issue addressed in any

8  subsequent filings.

9           THE COURT:  Thank you.

10          Let's see what Ms. Lissebeck has to say.

11          MS. LISSEBECK:  Your Honor, based on the documents

12 that we reviewed, and the opposition that was presented to

13 the Court, the contract that was entered into by this

14 creditor and Phoenix was entered into pre-petition, and then

15 there was work that was done post-petition, prior to the

16 appointment of the Chapter 11 Trustee.  Everything was

17 concluded prior to the appointment of the Chapter 11

18 Trustee, as far as this contract.  I believe the creditor

19 stated that everything was finished by April.  The Trustee

20 was appointed by May.

21          We believe, based on the preliminary injunction

22 order that your Honor provided to us, that there is alter

23 ego claims with Phoenix, and so that any sort of

24 pre-petition contract with Phoenix would also be a

25 pre-petition contract with the Debtor, and that this

12

1  creditor would have a claim against the estate for any

2  monetary diminution that it may have suffered.

3       We also preserve all rights to be able to review

4  the contract, because we believe that there were withdrawals

5  that were made, and we, as the Trustee, are very concerned

6  about those withdrawals that were made by this creditor, and

7  we will be reviewing those as our duties progress of going

8  forward with the avoidance actions.

9       THE COURT:  Thank you.

10      I want to make an observation, and that is that

11  Zoom is utilized as a courtesy to the parties and attorneys

12  who are attending.  There is a telephone which ends 959.

13  They won't mute, and they're disrupting our record.  Now, I

14  must tell you that this is the same phone number that

15  disrupted our hearing two days ago.  So I don't know who it

16  is, but, if they don't keep on mute, I'm going to eliminate

17  them from the Zoom conference call, and I note now that they

18  have finally put themselves on mute.

19      All right.  How is Mr. White's client being

20  prejudice at all by approval of this, from their point of

21  view, Ms. Lissebeck?  Explain to me what you think their

22  prejudice is.

23      MS. LISSEBECK:  I do not think they have a

24  prejudice, because they would have a claim against the

25  estate.

13

1          THE COURT:  Okay.  And I think that's proper,

2    also.  It sounds like they have an administrative claim.

3          MS. LISSEBECK:  Perhaps.  We'd have to review it,

4    but yes, if it's a post-petition --

5          THE COURT:  Well, no, no.  They have an

6    administrative claim, and you can seek to disallow it --

7          MS. LISSEBECK:  Absolutely, your Honor.

8          THE COURT:  -- and I want Mr. White to understand

9    that.

10          Mr. White, can you come back on board, here?

11          MR. WHITE:  Yes, your Honor.

12          THE COURT:  Mr. White, if your client has any

13   damages or any claims against the estate -- and from what

14   I've now heard, you very well might have claims for

15   post-petition administrative assistance to the estate -- you

16   can easily and swiftly file that administrative claim, and

17   then we can work out these problems, but, in my view, the

18   settlement doesn't affect you in any other way.  You have

19   monetary damages that you are not being eliminated from in

20   this settlement, and so I think I have resolved your issue

21   here, Mr. White, but I want to hear one more time from you

22   that you at least appreciate what I'm saying.  You don't

23   have to agree with it, in which case don't file an

24   administrative claim, but what do you have to say?

25          MR. WHITE:  I appreciate your comments.  I

*Briggs Reporting Company, Inc.*

14

1 disagree with counsel for the Trustee's comments that this

2 was a contract that was entered into pre-petition.  I don't

3 believe that's the case.  It was entered into with Phoenix

4 post-petition.  It's a contract of March 23rd, 2023.

5          I guess we can file an administrative claim, but,

6 you know, it assumes that we have a contract with the

7 estate, and (indiscernible) we have (indiscernible) against

8 Phoenix, and by taking the assets that were, you know,

9 before Phoenix, post-petition, I think it is prejudicial to

10 the creditors of Phoenix, and we may get to share in some

11 hypothetical recovery against this Debtor, but that's

12 speculative at this stage, and I do believe that it is

13 prejudicial.

14          THE COURT:  Right.  Well, let me explain one more

15 time, just for the record, that the adversary proceeding

16 that was filed includes the fraudulent transfer allegations,

17 and that this now resolves the fraudulent transfer

18 allegations.

19          Am I right about that, Ms. Lissebeck?

20          MS. LISSEBECK:  Correct, your Honor.

21          THE COURT:  You see?  And that's why it is

22 basically the alter ego status now.  So, Mr. White, I really

23 encourage you to file an administrative claim, if it's

24 all -- if your efforts or your client's efforts were, in

25 fact, exercised post-petition, and you can demonstrate that

*Briggs Reporting Company, Inc.*

15

1  you added value to the estate, and I'd be more than happy to

2  hear that at any time you'd like to file that hearing.

3          So, for those reasons, are there any other parties

4  wishing to oppose this motion?

5      (No response.)

6          THE COURT:  The Court has utilized the <u>A and C</u>

7  <u>Properties</u> factors.  That can be found at 784 F.2d 1377, at

8  1380, and that's the Ninth Circuit, 1986.  That is the

9  standards that Bankruptcy Courts utilize to approve or

10 disapprove settlements.

11         Now, I also point out that, in the same case from

12 the Ninth Circuit, the standard of review for the approval

13 of a settlement is abuse of discretion.  As an abuse of

14 discretion, the Ninth Circuit or the BAP or District Court

15 would review de novo whether the Bankruptcy Court identified

16 the correct rule to apply to the relief request, and, if so,

17 they consider whether the application of the legal standard

18 is a illogical, improbable, implausible, or without support

19 in inferences that may be drawn from the facts and the

20 record, and that is the -- those are the <u>A and C</u> factors and

21 the standards utilized.

22         I have done that, and I find that the evidence

23 supporting the settlement is within the realm of logical,

24 plausible, and it contains support of any inferences that I

25 draw, and what I draw is the inferences that this was a

16

1  fraudulent transfer, and that the recipient of the transfer,

2  in fact, admits it.

3          For all of those reasons, please prepare an order

4  and lodge it as soon as you can.

5          MS. LISSEBECK:  Thank you, your Honor.

6          THE COURT:  Thank you.

7          Mr. Celentino, you want to -- we want to move to

8  Item Number 3, and you want to discuss with Ms. Rapoport, I

9  believe, some matters.

10          MR. CELENTINO:  I do, your Honor.  I believe there

11  will probably be many other appearances on Item Number 3,

12  and it's obviously a request to take issues in Item Number 3

13  out of order, but it is clearly as a professional courtesy

14  to Ms. Rapoport, and not as a discourtesy to anybody else

15  attending the hearing.  We will not have the ability to

16  speak with her or have her introduction to the Court after

17  just a few more minutes.

18          THE COURT:  Well, let's have Ms. Rapoport make an

19  appearance on Item Number 3.  Let me call Item Number 3, and

20  everyone will have an opportunity to make appearances

21  following Ms. Rapoport's comments, and then we'll let her be

22  on her way.

23          Ms. Rapoport -- excuse me.

24          MS. RAPOPORT:  Good morning, your Honor.

25          THE COURT:  Excuse me.  Professor Rapoport.  I

17

1  apologize.

2        MS. RAPOPORT:  Thank you, your Honor.  I'm hearing

3  feedback, your Honor.  Are you?

4        THE COURT:  No, I'm not.

5        MS. RAPOPORT:  Okay.  Well, then, I'll absorb

6  that, your Honor.  Anyway, Nancy Rapoport, proposed monitor.

7  I very much appreciate you letting me address you this

8  morning, given my schedule.

9        THE COURT:  Please proceed.

10        MS. RAPOPORT:  Thank you, your Honor.  I have been

11  instructed by Mr. Celentino that a monitor would be an

12  appropriate part of any proposed sale.  I have been an

13  independent monitor in one other matter before.

14        As I envision the role of a monitor, the two basic

15  things that a monitor does is, first, look at all of the

16  policies that are in place to make sure that they comport

17  with the ethics rules, and then, second, make sure that

18  those policies are followed, in addition, making sure that

19  the Court, the unsecured creditors' committee, the Trustee,

20  are all aware of what's going on in the case.

21        So it would a situation in which I would look at

22  the policies and procedures, make any comments to make sure

23  they comport with the ethics rules generally, and then a

24  "trust but verify" sampling of what's going on continually

25  to make sure that you are comfortable with whatever the

18

1  buyer is doing to protect the clients that the buyer would

2  be taking over in this case.

3          We have not yet spelled out exactly what my duties

4  would be, and what I've asked Mr. Celentino to do is make

5  sure that I understand what you would want me to do, so that

6  everyone is clear that I am comporting with what would make

7  you comfortable with an independent monitor.

8          THE COURT:  Well, let me interrupt for --

9          MS. RAPOPORT:  I have -- yes.

10          THE COURT:  Let me interrupt for one second and

11  give you an example, because I think everybody should be on

12  the same page.  The reports are important.  The exercise of

13  judgment of what the Court needs to know is important, but,

14  also, I think that I would like to see a monitor actually

15  implement testers.  Do you know what I mean by that?

16          MS. RAPOPORT:  Is it the same thing as the sort of

17  "secret shoppers," your Honor?

18          THE COURT:  That's it, secret shopper.  I think

19  that a monitor would be the perfect vehicle to -- and

20  perhaps law students from UNLV -- to call up and seek

21  assistance from the successful bidder who has taken over

22  these assets, and determine whether or not they are

23  violating any federal or state or even local regulations or

24  statutes.  That's one more thing that I think would be

25  important, and a report on that.

*Briggs Reporting Company, Inc.*

19

1    So I think you've hit the nail on the head with

2 what the Court wants, and I'm sure that there are other

3 parties, including the United States Trustee, who have

4 brilliant ideas, also, on what a good monitor would do in

5 this case.  So that's the kind of thing we're looking for.

6    MS. RAPOPORT:  Your Honor, I think my law students

7 would love to be secret shoppers.  They would learn a great

8 deal from the experience.  I also have one last student in

9 particular who could operate as my paralegal.  He actually

10 serves on the American Bankruptcy Institute's Veterans Task

11 Force with both your Honor and me, and he's a Marine

12 sergeant.  So anything I give him he will execute.  So he

13 could be my right-hand person, should you choose to appoint

14 me.

15    THE COURT:  Well, as Bill Dana (phonetic) would

16 say, "Please don't say, 'Execute.'"

17    MS. RAPOPORT:  Thank you, your Honor.  Are there

18 other questions that I can answer for you?

19    THE COURT:  No, but someone in the audience might.

20    Mr. Owens, do you have anything?

21    MR. OWENS:  Your Honor, Keith Owens for the

22 Committee.  I would just say that I had a conversation with

23 my colleague, Nick Koffroth, and we've spoken with Ms.

24 Rapoport.  We think she's highly qualified.  She would do, I

25 think, a phenomenal job in terms of keeping things on the

20

1  up-and-up and making sure that -- I like her idea, and I'm

2  sure there are many others, in terms of how to make sure

3  that there's compliance not only with keeping funds properly

4  segregated and held in the proper way, but also compliance

5  with their legal obligations with the buyer is -- Ms.

6  Rapoport would do a phenomenal job of doing that, we're

7  pretty confident.

8          THE COURT:  Unannounced visits is another

9  mechanism that can be utilized.

10         MR. OWENS:  So, your Honor, our understanding is,

11 the way the sale order reads, is that the order would have

12 the appointment of a monitor to be appointed by separate

13 order of the Court, and so I think the details, assuming --

14 in the event that the Court does approve a sale today, I

15 think that the (indiscernible) idea would be that the

16 monitor's duties would be spelled out separately in an

17 application to appoint the monitor, and that's -- at least,

18 that's what I had envisioned with Mr. Celentino.

19         THE COURT:  Thank you.

20         MR. OWENS:  Thank you, your Honor.

21         THE COURT:  And let me say this very carefully.

22 In the event that the sale would go forward, would the

23 United States Trustee be opposed to the appointment of a

24 monitor?

25         MR. MISKEN:  Your Honor, Ken Misken on behalf of

21

1  the United States Trustee.  If the sale does go forward, the

2  United States Trustee does not have an objection to the

3  appointment of a monitor.  Our concern was to make sure that

4  the monitor's duties are spelled out, and as Mr. Owens just

5  said, that's the plan, is that a separate order -- those

6  duties would be spelled out.

7          THE COURT:  Could I get your commitment to join in

8  that effort to help spell out those duties?

9          MR. MISKEN:  Yes, your Honor.

10         THE COURT:  Thank you very much.  Appreciate your

11 help.

12         Okay.  Are there any other questions for Professor

13 Rapoport at this time?

14    (No response.)

15         Professor Rapoport, we appreciate your attendance

16 here today.  We are sorry to inconvenience you with respect

17 to the timing of this hearing, but you are excused.

18         MS. RAPOPORT:  Thank you, your Honor.  Have a good

19 rest of the day.

20         THE COURT:  Thank you.

21         Mr. Celentino, we're going to go back into regular

22 order now.  You have a motion on behalf of the Chapter 11

23 Trustee.  Please proceed.

24         MR. CELENTINO:  Matter Number 3, your Honor, the

25 sale order?

22

1          THE COURT:  That is correct.

2          MR. CELENTINO:  Are you satisfied that we have all

3    the appearances for folks who want to appear on that?

4          THE COURT:  Well, are there any other parties

5    wishing to make an appearance on Item Number 3?  This is the

6    motion of Trustee Richard Marshack for an entry of an order

7    approving the sale, subject to overbid, of assets free and

8    clear of all liens, claims, encumbrances, et cetera.

9          Ms. Weiss.

10         MS. WEISS:  Thank you.  I apologize for not making

11   my introduction sooner.

12         THE COURT:  No, it's fine.

13         MS. WEISS:  Sharon Weiss, Bryan Cave Leighton

14   Paisner, LLP, on behalf of secured creditor Azure Capital,

15   LLC.  We also did file a limited reservations of rights,

16   your Honor.

17         THE COURT:  And the Court has reviewed that.

18         MS. WEISS:  Thank you, your Honor.

19         THE COURT:  Thank you.

20         MR. GOLUBOW:  Good morning, your Honor.

21         MS. THOMSON:  Your Honor --

22         THE COURT:  One second, please.

23         MS. THOMSON:  -- Lucy Thomson.

24         THE COURT:  One second, please.  We go in

25   the order, Ms. Thomson, of the courtroom first, and then

23

1    Zoom.

2            MS. THOMSON:  Thank you.

3            THE COURT:  We won't forget anyone.

4            MR. GOLUBOW:  Good morning, your Honor.  Richard

5    Golubow, Winthrop Golubow Hollander.  Also in the courtroom

6    is my co-counsel, David Cousineau of Cappello and Noel.  We

7    represent --

8            MS. CHRISTIANSON:  (Indiscernible.)

9            THE COURT:  Ms. Christianson, would you mute your

10   microphone, please.

11           MS. THOMSON:  Your Honor, that is not my

12   microphone.

13           MS. CHRISTIANSON:  (Indiscernible.)

14           MS. THOMSON:  I think it's someone else.  I'm

15   happy to mute it, but I think it's someone else.

16           THE COURT:  Well, I'm asking you to mute your

17   microphone, though.  Will you mute your -- thank you.

18           Mr. Golubow and Mr. Cousineau.  Where is Mr.

19   Cousineau?  There you are.

20           MR. COUSINEAU:  Good morning, your Honor.

21           MR. GOLUBOW:  Yes.

22           THE COURT:  Say hi to Barry for me.

23           MR. GOLUBOW:  And we represent Validation Fund II,

24   LLC, MC DVI Fund I, LLC, and MC DVI Fund II, LLC.

25           THE COURT:  Thank you.  Good day.

*Briggs Reporting Company, Inc.*

24

1          MR. BENSAMOCHAN:  Good morning, your Honor.  Eric

2 Bensamochan appearing on behalf of Bensamochan Law Firm,

3 Sunset Coast Legal Group, as bidders.

4          THE COURT:  For the record, for the transcriber,

5 spell your last name, please.

6          MR. BENSAMOCHAN:  I'm sorry.

7 B-E-N-S-A-M-O-C-H-A-N.

8          THE COURT:  Thank you.

9          MR. BENSAMOCHAN:  Thank you, your Honor.

10          THE COURT:  Are there any other appearances?

11          Mr. Goodrich, would you like to make an

12 appearance?

13          MR. GOODRICH:  Thank you, your Honor.  My

14 co-counsel, Jeff Golden, already made our appearances, but,

15 for the record, David Goodrich, Golden Goodrich, on behalf

16 of Affirma, LLC, and Oxford creditors.

17          THE COURT:  I very much appreciate you being here

18 today.

19          Okay.  On Zoom, who would like to make an

20 appearance?  Ms. Christianson, I cut you off earlier.  Would

21 you like to make an appearance now?

22          MS. CHRISTIANSON:  Yes.  Thank you, your Honor.

23 Good morning.  Shawn Christianson of Buchalter appearing on

24 behalf of Oracle America, Inc.

25          THE COURT:  Good morning to you.

25

1          Ms. Thomson.

2          MS. THOMSON:  Good morning, your Honor.  My name

3    is Lucy Thomson.  I'm the consumer privacy ombudsman in the

4    case.  My report to the Court was filed this morning.

5          THE COURT:  And I have completely read it.  Thank

6    you very much for your very extensive report.

7          MS. THOMSON:  Thank you.

8          THE COURT:  Other appearances, please.

9          MR. EDELMAN:  Good morning, your Honor.  I'm

10   Daniel A. Edelman, and I'm representing Carolyn Beech and

11   Diane Scarnavack, two consumers.

12          THE COURT:  Good morning to you, sir.  Thank you

13   for coming.

14          Ms. Doling.

15          MS. DOLING:  Your Honor, Jenny Doling appearing on

16   behalf of amicus curiae, the National Association of

17   Consumer Bankruptcy Attorneys, and the National Consumer

18   Bankruptcy Rights Center.  Thank you, your Honor.

19          THE COURT:  And the Court entered an order

20   yesterday approving the opportunity for your two clients to

21   file amici briefs.  Thank you.

22          MS. DOLING:  Appreciate that.

23          THE COURT:  Other appearances, please.

24          MR. IZAKELIAN:  Good morning, your Honor.  Razmig

25   Izakelian of Quinn Emmanuel for secured creditor OHP-CDR,

26

1  LP.  We filed a brief statement and reservation notice.

2          THE COURT:  Thank you very much.

3          MR. STILL:  Good morning, your Honor.  Andrew

4  Still of Snell Wilmer for Alteryx, Inc., creditor and

5  sublandlord of the Michelson Drive (phonetic) property.  We

6  did file a brief objection to the sale motion.

7          THE COURT:  Thank you, Mr. Still.  I think we're

8  done.  All right.

9          Mr. Celentino, as you get into your presentation,

10  could you do me a favor and start off with the statutory

11  requirements for a court to approve, simply approve, any 363

12  sale?

13          MR. CELENTINO:  One minute, your Honor.  Your

14  Honor, the statutory requirements for approving a 363 sale

15  are set forth in the Ninth Circuit case of <u>Lionel</u>, and we

16  have put that in our briefing, and we've indicated to the

17  Court -- if you'll allow me one second, please.

18          THE COURT:  Take your time.

19          MR. CELENTINO:  As set forth, your Honor, in our

20  omnibus brief that we filed yesterday, Document 313, we talk

21  in section two about the authorization under Section 363 for

22  a court to approve a sale.  The factors are found in the

23  <u>Lionel</u> case, are the typical factors, and the factors are,

24  the sale must be marketed, negotiated, and structured in

25  good faith for the benefit of the estate.

27

1          We have provided your Honor with extensive

2 declarations from Richard Marshack, the Trustee, including

3 the declaration filed yesterday.  It may be Document 312.

4 Give me one second.  I had a different order of

5 presentation.  It is Document 316, is -- excuse me, 311.

6          In Document 311, the Trustee provides detail on

7 the marketing effort that the team went through at a time

8 when we're in a crisis situation with the case.  We believe

9 that that establishes quite clearly that a lot of effort has

10 been made to find parties interested in these particular

11 assets, which we perceive to be melting-ice assets.

12          I will suggest, your Honor, that this is a

13 different case, and the extent of the marketing and the

14 appropriateness of the marketing must be addressed in the

15 context of the circumstances of the case.  This is a case

16 that is hotly contested on the issue of whether or not, A,

17 the --

18          THE COURT:  I really want just you to tell me what

19 the standards are.  We're going to set the stage here, and

20 you have done it.  You have told me the Lionel standard, and

21 I appreciate that.  Now, are you selling the assets free and

22 clear of liens?

23          MR. CELENTINO:  We are, your Honor, yes.

24          THE COURT:  And would you please describe, without

25 argument, just describe the law of 363(f)?

*Briggs Reporting Company, Inc.*

28

1          MR. CELENTINO:  The law of 363(f), your Honor,

2  allows the Trustee to sell the assets free and clear of

3  claims, liens, and interests under specified numerated

4  categories, and those categories, in this particular case,

5  is the dispute as to the extent, nature, and validity of

6  those secured interests.

7          Under Section 363(f), a sale that is free and

8  clear of such interests allows those interests to attach as

9  of and with the priority that they would have if they were

10 valid, and it defers to a later date the determination of

11 that validity.  The question for the Court under Section

12 363(f), any sale free and clear, is "Has the Trustee

13 demonstrated that there's a bona fide dispute?"

14         THE COURT:  May I interrupt again?

15         MR. CELENTINO:  Yes.

16         THE COURT:  And I apologize.  363(f) says that a

17 Trustee may sell property, under Subsection (b) or (c), free

18 and clear of any interest in such property of an entity

19 other than the estate only if, one, applicable

20 non-bankruptcy law permits the sale of such property free

21 and clear of such interests, and the evidence I've seen is

22 that that's not applicable here.

23         It is applicable in terms that there are no

24 non-bankruptcy laws not permitting the sale, but then number

25 two is "Such entity consents," and you would think that the

29

1  first thing you would want to address is, do you have

2  any dissenters of this sale, of holders of secured claims?

3          MR. CELENTINO:  We have one dissenter of holders

4  of secured claims present in the courtroom, your Honor.

5  That is Azure, represented by Ms. Weiss, asserts a priority

6  lien on the assets of the estate.

7          THE COURT:  So you're telling me that Ms. Weiss

8  actually opposes the sale free and clear, and then, of

9  course, holding her interest as a protected interest for

10 later determination?

11         MR. CELENTINO:  She does not, your Honor.  She

12 consents to the sale.  She consents, as I understand the

13 opposition, as a reservation of rights, not to the sale

14 itself, but to reserve and preserve her client's priority

15 and claimed secured interest, which is what the Trustee has

16 proposed.

17         THE COURT:  Ms. Weiss.

18         MS. WEISS:  Thank you, your Honor.  Mr. Celentino

19 is correct.  Azure Capital does not oppose the sale.  We

20 simply say that the sale proceeds should be held until our

21 secured claim is resolved.

22         THE COURT:  That's what I read, too.

23         MS. WEISS:  Right.

24         THE COURT:  And so, Mr. Celentino, I'm just --

25 maybe I'm just a simple Missourian.  You know, when I read

30

1  363(f), and it says, "Such entity consents," the first thing

2  I would do is not worry about disputes.  I would say, "Are

3  there any secured creditors who have filed oppositions that

4  say they don't consent to selling the property free and

5  clear?"  And I don't think Ms. Weiss opposes that.  She just

6  wants to have the money that is paid to the estate protected

7  from your -- from anyone taking it until the claim is

8  resolved.

9          MS. WEISS:  Correct, your Honor.  And I do, just

10  for the record, want to add that we are filing a proof of

11  claim today, and probably within the next hour and a half.

12          THE COURT:  Well, take two hours.

13          MS. WEISS:  Take two hours.  Thank you, your

14  Honor.  Just waiting for my client to get here, and he'll be

15  in court, and he needs to sign it.

16          THE COURT:  Okay.  A wet signature.  How

17  impressive.

18          MS. WEISS:  It's the only way to go when you're

19  not the e-filer.

20          THE COURT:  Truly.

21          MS. WEISS:  Yes.

22          THE COURT:  Okay.  Thank you.

23          MS. WEISS:  So, thank you, your Honor.  So, yes,

24  that is our reservation, and, other than that, the more

25  money into the estate, the better, because there will be

31

1  more available to pay our secured claim.

2          THE COURT:  Thank you.

3          MS. WEISS:  Okay.

4          UNIDENTIFIED SPEAKER:  If it's allowed.

5          THE COURT:  Thank you.

6          Mr. Celentino, so wouldn't it just be easier to

7  utilize (f)(2) such (sic) all entities consent or have not

8  opposed?

9          MR. CELENTINO:  363(f)(2) is applicable in this

10 particular case, your Honor, correct.  I was indicating --

11 and the standard is that, at the motion stage, the Trustee

12 needs to establish there's a bona fide dispute.  We have

13 established that bona fide dispute, and the only creditor

14 that came forth with any, quote, "opposition" is Ms. Weiss'

15 reservation of rights, which is a consent, as she's

16 indicated, with the proceeds to attach, as the Trustee has

17 requested in the motion.

18         THE COURT:  So, Mr. Celentino, now, let's suppose

19 this was a taco stand in Orange County, and you were the

20 Chapter 7 or Chapter 11 Trustee wanting to sell it to

21 another party.  Do you believe that the Court has sufficient

22 evidence, with respect to 363(f) and the other aspects of

23 363, to just do a typical sale, and that you have not drawn

24 any opposition on the basis of the actual statutory

25 provisions of 363 or the assumption of assignment of

32

1  contracts that the taco stand might have with a merchant

2  bank or any other entity?  Have you met those requirements

3  in this particular case?

4          MR. CELENTINO:  We have met those requirements in

5  this case, your Honor.  There is -- to the extent that

6  opposition raised by the United States Trustee asserts that

7  the Trustee has not met his burden of establishing

8  appropriate marketing, best interest to the estate, we have

9  sufficient evidence, in my view, as set forth in the

10 multiple declarations that are on file in support of the

11 motion, which I was going to move into evidence as

12 appropriate, as well as the recent declaration of Richard

13 Marshack, which addresses those details specifically.

14          This particular case, again, in context, your

15 Honor, is one in which you've already presided over a hotly

16 contested motion for a preliminary injunction, and granted

17 that, many of the facts of which establish the necessity for

18 the sale, in and of itself.  So we believe that the

19 evidentiary record for your Honor, set forth in all of the

20 documents I can move into evidence, if that is appropriate

21 for you now, including 311 from the Trustee filed yesterday,

22 are, in our view, overwhelming evidence in support of the

23 motion.

24          THE COURT:  Thank you, Mr. Celentino.  The

25 declarations have been filed, and they are part of the

33

1 evidentiary body of this record right now.  I have not seen,

2 I don't think, any objections to the evidence, but maybe I'm

3 wrong.

4         MR. CELENTINO:  I have seen no objection to any of

5 the declarations that we've submitted in support of the

6 motion, and that's why I would move them into evidence as

7 unopposed, and not challenged, and not objected to.  So,

8 your Honor, they stand on their face, in that term that they

9 are being -- I'm moving that they be introduced in their

10 entirety, since there is no objection to the content.

11         THE COURT:  Would you please bring up Mr.

12 Marshack's declaration, Docket Number 316, that was filed at

13 8:23 this morning, because many people may have been on the

14 road, may have been unable to download it at the time, but I

15 think it's an interesting exercise on my part just to put

16 that declaration in front of everyone before I admit it.  So

17 would you like to tell me what that declaration says?

18         And there are copies for anyone who would like to

19 have them in the courtroom.  Otherwise, if you're on Zoom,

20 you can go quickly to Docket Number 316, but I'm going to

21 have Mr. Celentino paraphrase as he'd like this two-page

22 declaration, so that everyone understands what it is.

23         MR. CELENTINO:  Yes, your Honor.  Thank you.  As

24 you may or may not have known, Pacer was inactive for a good

25 portion of this morning.  So it would have been to you much

34

1  earlier but for that issue, and we did serve it to the

2  parties via electronic mail as soon as it was finalized and

3  signed.  So it was served on the essential parties in the

4  case.

5           THE COURT:  The Court takes judicial notice that

6  it could not get into Pacer for a while, either, today.

7           MR. CELENTINO:  So, as an officer of the Court,

8  that was my representation as well, your Honor, and once

9  Pacer became active, we filed it immediately, and we brought

10 plenty of copies for anybody who would like to see it.

11          THE COURT:  Well, let's paraphrase this for

12 everyone.

13          MR. CELENTINO:  This is the declaration of Mr.

14 Marshack regarding the receipt of qualified overbids, and he

15 indicates that he has received two bids from qualified

16 overbidders, and then, for the benefit of the Court and the

17 parties, he has attached a chart that summarizes the

18 essential economic terms of the initial stalking horse bid

19 of Consumer Law Group, which is indicated as "the CLG

20 offer," and the two additional offers from the overbidders,

21 the offer from Morning Law Group and the offer from Mr. Eric

22 Bensamochan's law firm and Sun Coast (phonetic) Legal Group.

23          THE COURT:  Thank you.  I'd like you to simply

24 focus on the net recoveries to the estate by each office --

25 by each offer.

35

1          MR. CELENTINO:  So, as we'd indicated in a

2   previous hearing, your Honor, and as this particular

3   document sets forth, the notice of the APA that went out

4   contained a due diligence provision that allowed the initial

5   stalking horse bidder to adjust the purchase price in the

6   event that their due diligence provided, in their view, that

7   there were less active files for which they were paying a

8   first premium.

9          So, on the basis of that adjustment, the CLG

10  offer, net, proposes to product $30,166,000 and change to

11  the estate.  Taking into account the same assumptions from

12  CLG's due diligence, the offer from Morning Law Group

13  purports to produce a net to the estate of $83,191,000 and

14  change.  Taking into account the same assumptions from the

15  due diligence report that was conducted by CLG and confirmed

16  by the Trustee, the offer from Mr. Bensamochan's firm

17  purports to net $81,175,000 and change for the estate.

18          THE COURT:  The Court has reviewed the

19  declaration, Docket Number 316.  All it does is purport to

20  have received two other qualified bidders, overbidders, and

21  then provide a summary of those economic terms of the

22  original bid by Consumer Law Group and the remaining two,

23  and it finally says a conclusory statement:

24          "Recognizing the goal is to produce the

25          highest and best bid at the time of the

36

1          auction, after careful consideration and

2          the exercise of my best business

3          judgment, and after the auction to

4          establish the economic terms, I will

5          announce my selection of the highest and

6          best offer to the Court."

7          So I will admit this into evidence, although it's

8    already there, and we'll be off.

9          MR. CELENTINO:  Thank you.

10         THE COURT:  Let's talk about assumption and

11   assignment standards under 365.

12         MR. CELENTINO:  Assumption and assignment

13   standards, your Honor.  In order to assume and assign an

14   executory contract under Section 365, the Trustee needs to

15   notify the party of the intent to assume and assign.  The

16   contracting party has an opportunity to demand a cure

17   payment.

18         The proposed APA is consistent with 365 in this

19   case, in that it contemplates that, to the extent the Court

20   establishes, or the creditor establishes, or the parties

21   otherwise agree to an appropriate cure payment, the cure

22   payment is to be paid by the buyer.  In this particular

23   context, Section 365 -- not in this particular context, but

24   Section 365 also provides for an opportunity for the Court

25   to approve the assumption and assignment over the objection

37

1  of the party to the executory contract.

2          In the event that they don't consent to the cure,

3  the Court can determine the cure, and the Court is

4  authorized under the statute to allow the assumption of the

5  executory contract, with certain limited exceptions, if the

6  Court is satisfied with the offeror or assumption party's

7  evidence of sufficiency, sufficient future performance under

8  the contract.

9          So, in this particular case, we have several

10  different types of contracts that are part of the sale, the

11  most important of which are the contracts with the

12  consumers, who comprise approximately, as best we can tell,

13  35,000 what we would call "potentially active files," and I

14  know the words "potentially active," "paused," "inactive,"

15  and "active" are all vernaculars in the industry, and

16  everybody defines them a little bit differently, but, in the

17  press, in the documentation, there have been assertions that

18  there are up to 49 to 50,000 clients of this particular

19  organization.

20          As an officer of the Court, I am making the

21  representation that it appears the best number to use for

22  the total of live persons with live e-mail addresses, and

23  not necessarily live contracts, but live e-mail addresses,

24  that do not have completed contracts or otherwise haven't

25  formally opted out or canceled those contracts, is

38

1  approximately 35,000, and that's the group that the Trustee,

2  from day one in this case, and day one of his hearing before

3  your Honor, understood that watching out, protecting, and

4  developing the appropriate remedy for that group is the

5  course.  I do have an opening statement that I wanted to

6  make, but I'm obviously -- I'm going through the standards.

7          THE COURT:  But I wanted to set the stage.

8          MR. CELENTINO:  I appreciate it.  And so adequate

9  assurance of future performance in the event that there is a

10  consent is the test, and this buyer, as set forth in 365,

11  will have to pay the cure, if it is established that there

12  is a cure that is due and owing.

13          THE COURT:  Thank you.  Now you may proceed with

14  your presentation.

15          MR. CELENTINO:  Thank you.  I appreciate that.

16          As indicated, from the very first day that I

17  interacted with Mr. Marshack about this case, Mr. Marshack

18  understood two things very clearly.

19          First, folks, generally speaking, were going to

20  overlook the importance and the necessity of watching out

21  for what we now know to be 35,000 live, real people whose

22  e-mail addresses appear to be live, and who we appear to be

23  able to reach, who, at one point or another, were, and many

24  of whom are still, active clients of The Litigation Practice

25  Group, the Debtor.

1          The Trustee welcomed formulating an appropriate

2    remedy that would balance the fiduciary duties to the

3    millions of dollars of creditor claims that exist in the

4    case, and balance that against the best interest of those

5    consumers.

6          The second decision that the Trustee made was

7    ultimately, if the decision is made to protect and provide

8    for those consumers, any person to take over that

9    responsibility is going to have to subject themselves to a

10   monitor, to immediately and for the time that money is still

11   owed to the estate from that buyer, consent to that

12   monitor's making sure that the buyer is properly protecting

13   the consumer.

14         The problem that the Trustee had when he tried to

15   determine a remedy is there was only one remedy, in the

16   Trustee's view, that could balance the interest of the

17   consumer with the fiduciary duties of the estate, including

18   the interest to creditors, and that only opportunity is to

19   provide that consumer a choice, and a soft landing should

20   that be their choice, to have a law firm represent them,

21   many of whom are involved in active litigation, many of whom

22   are receiving threatening letters, lawsuits, demands on

23   credit card debt they have no possible way of paying.  At

24   the same time, they have no means, or the most part, to be

25   able to retain any one of the lawyers in the room or on the

40

1    Zoom call, for the most part.

2        THE COURT:  Well, they could -- believe me, they

3    could retain Ms. Doling.  She's been doing it for years, and

4    she's been doing a great job of it.

5        MR. CELENTINO:  Understand, and that's part of the

6    problem that we have that I want to address.  For the most

7    part, your Honor, it's very difficult for these consumers to

8    find counsel, and it would be especially difficult for them

9    to find counsel tomorrow, on their own, with no assistance,

10   in light of their active matters, if the Trustee were to do

11   what some of the parties have argued the Trustee should do,

12   which is drop them like a hot potato, and that issue has

13   kept the Trustee up at night.  It has kept me up at night.

14   We communicate late at night and early in the morning,

15   because we want to make sure we're doing the right thing.

16   So I wanted to make sure that the Court can put this in

17   context.

18        We have the amicus brief of NACBA, which I think,

19   on the issue of what to do with money that sits in the

20   Trustee's account, money that was turned over from the

21   payments made by consumers in the post-Trustee period -- I

22   think that part of the brief we should defer for addressing

23   another day, because today is not a day where there's

24   anything pending before your Honor as to what to do with

25   those funds.  Your Honor ordered them frozen on day one.

41

1  They remain frozen and in the possession of the Trustee, and

2  there is no motion pending to do anything with those funds.

3        We may work out what to do with those funds with

4  the parties before there is a motion filed, but the other

5  part of the brief, which says, "Because Consumer Law Group

6  operated inappropriately, there should be some penalty

7  against the Trustee from attempting to provide support and

8  help to those consumers," we take issue with.  I want the

9  Court to make sure to comprehend this.

10       The parties we're talking about would fill the

11  Staples Center almost two times.  If they are dropped today,

12  thousands of them have court hearings that will take place

13  in short order, without the benefit of counsel.  I didn't

14  see in the amicus brief, and I don't see any other person

15  who suggests there shouldn't be an offer made to the

16  consumer to make a choice.  I don't see anybody volunteering

17  to protect them or provide for them, and that hasn't

18  happened yet.

19       Nobody has made that offer.  They're not going to

20  make that offer because, as a matter of policy, it appears

21  they made the decision that the Trustee and the consumers

22  have to be punished for the bad acts of the prior

23  management, punished in the sense that the Office of the

24  United States Trustee has taken the position that it is not

25  appropriate, in balancing all of those issues that we're

42

trying to balance, that those consumers should be offered

their own choice, and that is the one thing that I

understand very clearly.

We're at a fork in the road.  These people are

scared.  I know from the communications after sending the

notice that the vast majority of them will make an offer of

proof, are interested in what's going on in their case, and

how do they avoid problems with their creditors?  That's

what they're most interested in.  They didn't object to the

sale as a general rule.  They wanted to make sure someone

was watching after them now, today.

So the Trustee is at that fork in the road, and

the fork in the road is, we can go to the right, where,

immediately, there's a jam, and there's a blockage, and that

blockage is, we say to that consumer, "You're on your own.

Tell us where to send your electronic file.  You figure it

out, and we don't have the money to do that."  That's the

fork in the one road that is proposed, if you say, "There

can be no sale, because of the past transgressions of prior

management."

The other fork in the road that the Trustee has

chosen, that the creditors' committee supports, that filing

creditors support, that secured creditors support, that fork

in the road says, "We're going to restore the integrity and

dignity of these American citizens by giving them an option

43

1  of accepting the soft landing that we believe will suffice,

2  and the opportunity to make their own decision that that's

3  not the soft landing they want."

4        Quite frankly, your Honor, that's the American

5  way.  That's the Missouri way.  The Missouri way is to come

6  up with the option for a person with dignity to make their

7  choice, not to have the government and any consumer

8  organization send them down the path that has a dead end.

9        That's the option that we have today, and it's

10 against that context that we have issues that have been

11 briefed for your Honor.  I don't know if your Honor wants to

12 address those issues on an issue-by-issue basis, or if your

13 Honor would like us to address them all, and then let the

14 party address them all.  I had a list, and I might -- if I

15 may go through the list of things I think that are going to

16 be argued before we get to a sale -- thank you, Richard --

17 if we get to a sale, these are the things I think we need to

18 get to before we get to an auction.  So, if I may, I'll list

19 the issues, and if there are others that I have forgotten,

20 I'm sure I'll be reminded.

21        The first thing I think we have to deal with is

22 the subject matter that the Trustee is proposing to sell.

23 There have been broad allegations that the subject matter is

24 illegal, and because the subject matter is illegal, the

25 Trustee can't sell it.

44

1          The second issue has to do with the issue of

2  severability.  Your Honor made some preliminary comments on

3  the hearing on Wednesday about your Honor's thought of

4  severability and reformation when the subject matter of the

5  sale is not illegal, but the document has a flaw.

6  Bankruptcy Courts, all of the time -- and the Trustee has

7  provided authority for that, that Bankruptcy Courts all of

8  the time -- sever the infirm provision of that otherwise not

9  illegal contract for the purposes of allowing that not

10  illegal contract to be conformed to legality, assigned, and

11  sold.

12          The third issue that has come up, that is the most

13  important issue for the Trustee, is a layer of consumer

14  protection safeguards that the Trustee is (sic) determined,

15  and all of the proposed buyers have accepted in this

16  particular case, and this is where I want to make sure that

17  I make my point about those safeguards up front.  If we take

18  the path that has the dead end, leaves all of the records

19  that have been worked on for these consumers in limbo, if we

20  take that path, and a different lawyer is retained, maybe

21  Ms. Doling or others, there is no ability for this Court to

22  monitor and provide and assure that the new lawyer that

23  consumer picks will follow the safeguards.

24          THE COURT:  And I want to interject.  I

25  mispronounced her name earlier.  It's "Doling."

45

1          MR. CELENTINO:  Thank you.  I repeated "Dooling."

2  I apologize.

3          Apologize, Ms. Doling.

4          So, with that, your Honor, I wanted to talk about

5  the sub-issues on the privacy and consumer protection

6  safeguards.  I think, and the Trustee thinks, and we make

7  our offer of proof, that it's axiomatic that a choice of a

8  firm that is going to be monitored, that is going to agree

9  to comply with the law that folks assert the Debtor didn't

10  comply with, is a different choice than "You're on your own.

11  Open the Yellow Pages and go figure it out, and maybe you

12  find Ms. Doling, maybe you don't."  That doesn't seem to be

13  the answer.

14          THE COURT:  Well, there's another choice, also,

15  and that is you get to listen to the radio and call another

16  800 number, with a company that might be operating illegally

17  and nobody is regulating, and they go into another

18  situation, which we have found to be basically the case with

19  this pre-petition Debtor but now is, I'm bring told,

20  remedied.

21          So that is the other choice, that they will -- the

22  Court will also make a judicial notice that, in driving in

23  to work today, it heard at least five advertisements for

24  companies that will assist desperate but honest Debtors,

25  and, of course, the telephone psychic.

*Briggs Reporting Company, Inc.*

46

1        MR. MARSHACK:  For the record, your Honor, none of

2 those were from LPG.

3        THE COURT:  I understand that.  But what I'm

4 saying is that they might as well call the psychic.

5        MR. CELENTINO:  And I'm pretty sure the psychic

6 ad, your Honor, was not Mr. Marshack.

7        There is another possible choice.  The other

8 possible choice is that NACBA or somebody has a number of

9 members who could each volunteer for 10 of these clients to

10 help them.  That's a possibility.  It's not been offered,

11 and it's not going to happen.  My point is, this is two

12 auditoriums full of people that we need to protect.

13        UNIDENTIFIED SPEAKER:  Hey, the air cut off.  Yes.

14        MR. CELENTINO:  Can't tell if that's the same one,

15 your Honor.

16        THE COURT:  One second.  One second.  You see,

17 what we've done with Zoom is we've replaced the ringing

18 telephone in the courtroom with the open microphone on Zoom,

19 and the secret is not to blow a gasket, but to just calmly

20 identify the person who doesn't mute their microphone, and

21 either warn them twice and then eliminate them from the Zoom

22 hearing completely, but, by even saying that, they get the

23 message, and so nobody has gone ape.  Nobody has caused any

24 real disruption.  It will be the last time I mention it, but

25 it does happen.  But that's the price you pay with the

47

1    21st-century technology, but we're all adults and we can all

2    get through it.

3         Please proceed, Mr. Celentino.

4         MR. CELENTINO:  Thank you, your Honor.

5         THE COURT:  You were talking about privacy and

6    security.

7         MR. CELENTINO:  I'm talking about consumer

8    protections, and the subset of the protections that I think

9    are to be debated as part of today's hearing.  There is a

10   provision that the Trustee has provided that there will be a

11   consumer notice of the opt-out provision of the model rules

12   that apply to law firms.

13        Second, there is the provision that an assumption

14   and assignment motion and notice will go out to those same

15   consumers, so they have two chances to protect their

16   interest, either by asserting there's a cure or by following

17   the opt-out procedures.

18        The third protection that is built into the asset

19   purchase agreement is the appointment of a monitor.  The

20   choice of the monitor is up to the Court.  As set forth in

21   Mr. Marshack's declaration submitted yesterday, he doesn't

22   have a personal connection with Ms. Rapoport.  He did the

23   research to determine that she's eminently qualified for the

24   position, and that is our nomination, but it is not our

25   expectation to take the choice away from this Court.

*Briggs Reporting Company, Inc.*

1          We, in fact, trust this Court to retain, at our

2    expense, at the estate's expense, and as a partial expense

3    of the proposed buyer, the right person to make sure that

4    there is monitoring going on, and that there is compliance

5    with the law.

6          The next issue that is relevant to today, and it

7    occurred this morning, is that we have the report of the

8    privacy ombudsman, and so there are some privacy issues that

9    we'll have to discuss today, and I'm prepared to discuss

10   those in whatever order your Honor decides, but that is an

11   issue for us to discuss.

12         We've already discussed the standards and the

13   evidence under Section 363.  We've already discussed the

14   standards and the evidence under 363(f).  We've already

15   discussed the standards and the evidence that exist here

16   under 365.  So then we are on to two additional things.

17         We have a couple of parties that have filed

18   concerns.  One is Oracle, that we would have to address.

19   The other is the landlord for the premises in which the

20   Debtor operates for free, and that's a little interesting

21   twist, and we can discuss that.  It's addressed in that

22   pleading, and I will be prepared to address it.

23         Assuming we get through all of that, or when we

24   get through all of that --

25              THE COURT:  Go ahead.

49

1          MR. CELENTINO:  I'm good at pausing, your Honor.

2   I understand.

3          THE COURT:  That's okay.

4          MR. CELENTINO:  When we get through all of that,

5   assuming it is the Court's determination that an auction --

6   that a sale can happen, then we would commence an auction to

7   establish the highest bid, but the test isn't the highest

8   bid.  I had heard Ms. Weiss, my friend, say that let it be

9   the highest amount to pay her client, but that's not the

10  test that is impressed and imposed upon the Trustee.

11         The test under the case law is highest and best,

12  and there are lots of cases that discuss the relationship

13  between what is highest and what is best.  It requires the

14  Trustee to make a qualification or an analysis of other

15  factors and articulate them to the Court.

16         So, in the declaration that we just discussed

17  earlier -- I believe it was Record Number 316 -- the Trustee

18  is reminding your Honor that he will have to use his

19  business judgment to evaluate where we sit at the end of

20  that auction for the purpose of which bid he believes is

21  both highest and best, and that doesn't necessarily mean the

22  highest number it could mean, and, in light of this case,

23  should mean, the party that the Trustee believes, in his

24  judgment, in consultation with the creditors' committee,

25  will do the best for these consumers, and the UST, and the

50

1  parties.

2         So we will have that dialogue, if your Honor will

3  allow us a few minutes after the auction to have that

4  dialogue, and take into account the recommendations that are

5  made by the parties here on those non-economic factors that

6  may be considered, for example, retention of the employees

7  who stuck with the Debtor and the Trustee, for example, a

8  working arrangement with the landlord whose property the

9  Debtor occupies for free because of the Debtor's arrangement

10  with the actual tenant.  That landlord has something to say

11  about the buyer, and the like.

12         We have continuity for the consumers that's

13  relevant.  We have a team that operate through Litigation

14  Practice Group of approximately 26 lawyers that are handling

15  several thousand litigation matters.  It matters to the

16  clients whether or not those lawyers are going to be

17  retained on a going-forward basis by the buyer, for example,

18  or whether the buyer is going to suggest to the client

19  somebody else.  We recognize it's always the client's

20  choice, but, for pending litigation matters, continuity is a

21  relevant determination.

22         So those are all things that will go into the

23  Trustee's final recommendation to the Court of what to do,

24  if we get there.  I am prepared to address the

25  issue-by-issue.  I'm prepared to address the Court with the

51

1 Trustee's to all of those.  I'm prepared to do it in any way

2 that your Honor thinks would allow you best to serve as the

3 decision maker.

4        THE COURT:  Well, I think you need a break.

5 You've been talking for an hour and 15 minutes, and so let's

6 have the opposition be heard, and then you'll have a full

7 and complete opportunity to respond, but what we will now do

8 is take a 10-minute break, and we'll be back.  The Zoom

9 attendees should just continue to mute your microphone, turn

10 off your cameras, if you'd like, and we'll back at 11:25

11 Pacific Time.

12        MR. CELENTINO:  Thank you, your Honor.

13        THE COURT:  Thank you.

14        UNIDENTIFIED SPEAKER:  Thank you, your Honor.

15    (Proceedings recessed briefly.)

16        THE COURT:  All right.  We're back on the record.

17 Let's hear from the United States Trustee.

18        MR. MISKEN:  Hello, your Honor.  Ken Misken on

19 behalf of the United States Trustee.  The U.S. Trustee has

20 filed multiple documents outlining his position regarding

21 the legality of any sale, the Court's ability to reform

22 contracts, and the other issues that we briefed.  We think

23 that we fully briefed the issues, that we'll just rest on

24 the briefs.  Your Honor said that you have read everything.

25 You've read all the evidence.  Based upon Wednesday's

52

1  conversation at the financing hearing that you believe you

2  have the ability to reform the contracts, we'll just rest on

3  our pleadings, your Honor.

4       THE COURT:  Let me make a few comments.  The

5  entire participation by the United States Trustee in this

6  particular matter has been entirely in good faith.  It has

7  been an excellent presentation in all aspects.  The United

8  States Trustee has honored its job, and the people who work

9  for the United States Trustee, by being the active

10 participant that they need to be and definitely are.

11      This Court can only applaud the efforts by the

12 United States Trustee, and particularly the professionals,

13 but, also, I know that you take direction from Mr. Anderson,

14 who is, again, one of the finest Trustees in our country.

15 And so I want you to know how much this Court appreciates

16 the efforts and the time, and the important briefing and

17 arguments that the U.S. Trustee makes.

18      The Chapter 7 -- pardon me.  The United States

19 Trustee attorneys who typically appear before me, in my

20 particular division, and those in Riverside, when I was a

21 Riverside judge, only did their best, and they always were

22 up to the occasion, and so I want to make sure that everyone

23 at the U.S. Trustee's Office understands my view, because I

24 don't get a chance very often to say these things in open

25 court.  But you serve in an incredibly invaluable position.

53

1  You are an enormous asset to the bankruptcy system, and I

2  appreciate everything that you and your colleagues do.

3           MR. MISKEN:  I appreciate that, your Honor, and I

4  just want to say thank you to my colleagues.  They have been

5  an excellent resource and help throughout this case.

6  They're great people to work with.

7           THE COURT:  Well, the time and energy that your

8  offices have put into this is not taken lightly by this

9  Court.  I know that you've had some very late evenings, if

10  not complete all-nighters, in preparing excellent briefings,

11  and, also, I want to point out that the law required me to

12  ask you to appoint a privacy ombudsman within seven days of

13  the sale hearing.

14           I issued that order, and your offices were right

15  on the spot, and also found an excellent privacy ombudsman

16  who I don't have to approve, but I note that she is here.

17  It's Lucy Thomson.  She is a nationally known privacy

18  expert, and has served in an enormous amount of cases

19  throughout the United States, even bigger, much bigger, than

20  this case.  So I welcome Ms. Thomson, and I welcome the

21  activities of the U.S. Trustee.  Thank you very much.

22           MR. MISKEN:  And I would just like to echo that,

23  your Honor.  Ms. Thomson jumped right into this case,

24  prepared a report quickly.  She probably had long nights and

25  evenings as well.  So I want to say thank you to her as

54

1  well.

2         THE COURT:  And she's in Washington, so she was

3  three hours ahead of us.

4         MR. MISKEN:  Correct.

5         THE COURT:  So thank you very much.

6         MR. MISKEN:  So that's it, your Honor.  Thank you.

7         THE COURT:  Now, for the record only, I'll tell

8  you again that I have read and examined all of the evidence

9  in support of the opposition that the Trustee -- and all of

10  the various elements that you've raised.  The importance of

11  those elements cannot be understated.  Without your pressure

12  point, that would add to the pressure point of this Court,

13  in making sure that, if there were to be a sale, that it

14  would be a sale that we would be able to sustain as a legal

15  sale.  We're not there yet, but the fact is that we want to

16  get it right the first time, and that's our goal.

17         MR. MISKEN:  And the U.S. Trustee does reserve its

18  right to object to the successful bidder on those issues.

19  I'm just talking about --

20         THE COURT:  No, of course.

21         MR. MISKEN:  Yes.  Okay.

22         THE COURT:  Of course.  Thank you very much.

23         MR. MISKEN:  Thank you, your Honor.

24         THE COURT:  Would another party like to -- well,

25  let's talk go the privacy ombudsman, because the privacy

55

1  ombudsman filed an excellent report.  The Court has reviewed

2  it several times already.

3          Ms. Thomson, the floor is yours.

4          MS. THOMSON:  Thank you very much, your Honor.

5  This case -- there's a lot at stake in this case, which is

6  very obvious from all the filings from all the parties.

7  This is not the sale of a grocery store or a department

8  store.  This is the sale of very sensitive personal and

9  financial data.  So, from a privacy standpoint, it's the

10  most sensitive data that could be sold, and, also, the

11  stakes are high, as you and counsel said, about the future

12  of the consumers and their legal needs.  So there's very

13  important issues for all the parties to address.

14          I wanted to just reiterate that your Honor has

15  received dozens of complaints from so many clients, and,

16  also, your Honor --

17          THE COURT:  Stop, Ms. Thomson.  That was

18  impressive, that they were able to be generated so quickly,

19  and I'd like your impression on that.  How old are those

20  complaints?  The complaints that I saw were in the last

21  three weeks, and somebody went out and solicited those

22  complaints.  Who did that, Ms. Thomson?

23          MS. THOMSON:  Your Honor, I'm sorry.  I didn't

24  have time to review all of the complaints.  If I had a few

25  more days, I could address that question.

56

1          THE COURT:  Yes, but I'm confused.  You were

2  appointed to be the privacy ombudsman, and when I read your

3  report, it was an advocacy piece on issues that were outside

4  of your wheelhouse.  So my question is this.  On the

5  consumer complaints, they seemed to all be generated in the

6  month of July, the ones that I saw, and I'd like an

7  explanation, if you know, but, if you don't know, that's

8  fine.  But it looked like somebody went out and solicited

9  those complaints.

10          MS. THOMSON:  Your Honor, I can't answer that.  I

11  can't address that issue.

12          THE COURT:  Okay.

13          MS. THOMSON:  But what I can say is that your

14  Honor and the U.S. Trustee received letters from all the

15  regulators who have authority over this area, including --

16          THE COURT:  I agree.  I agree.  And those letters

17  were also solicited.  They were in July.  They weren't in a

18  year ago.  They weren't two years ago.  They weren't five

19  years ago.  They were during the pendency of this case.  And

20  I have to tell you that -- where was the consumer protection

21  two years ago?  Who's watching out for those who need

22  psychic help today, not psychiatric, psychic help, today,

23  with the ads that are going on?  It seems like those

24  complaints came, and the letters that came, were just in the

25  last two weeks.

57

1      MS. THOMSON:  Well, your Honor is right.  I

2 certainly can't speak for the government, but what the

3 letter said was that they were concerned about the operation

4 of this business, and so I think the only point that I

5 wanted to make here was that there seems to be diametrically

6 opposed views about the nature of the services that the

7 clients need.

8      THE COURT:  Yes, but I'm talking -- Ms. Thomson,

9 again, I'm going to interrupt you, and I apologize.  You're

10 the privacy ombudsman.  I want to hear about privacy in this

11 issue -- in this case.  How does the data get protected?

12      MS. THOMSON:  Yes, your Honor.  I addressed that

13 question in my report, and that's the essence here.  Well,

14 the context of the case was only brought up to say that one

15 of the factors for approving the sale or not is whether the

16 sale would violate any non-bankruptcy laws, so that's the

17 hawk (sic) for this discussion, because some of the

18 regulators are saying that there's violations of these

19 non-bankruptcy laws that need to be addressed, and that's

20 the key point there.

21      So, as far as the services that the consumers are

22 being given, some regulators say that these people have been

23 subject to pressure and fraud, and those people --

24      THE COURT:  Ms. Thomson, I'm going to interrupt

25 you one more time.  You're the privacy ombudsman.  I expect

*Briggs Reporting Company, Inc.*

58

1  you to be discussing privacy issues and data protection

2  here.  I'm not interested in your trying to read what the

3  regulators have said about prior acts of this Debtor.  I've

4  read all of those, and I also note that they're new

5  arrivals, but that's not your wheelhouse, Ms. Thomson.  I

6  want to talk specifically, because I'm very interested in

7  the privacy issues that you've been assigned as an

8  ombudsman.

9          MS. THOMSON:  So the question is, what data could

10  be sold if your Honor wants to approve the sale?  And I set

11  forth the data that the company has, and it includes

12  personally identifiable data as defined by the Bankruptcy

13  Code, and it also includes sensitive personal and financial

14  records and bank records, and normally, in bankruptcy cases,

15  those types of financial and bank records are not sold.

16          THE COURT:  Well, you're incorrect, Ms. Thomson.

17  All you need to do is look at the Lehman Brothers-Barclay's

18  transaction to see that over 111,000 accounts containing

19  personal data and banking records were transferred within

20  four days, without any notice whatsoever to those Lehman

21  Brothers account holders.  That happens all the time, Ms.

22  Thomson.  The issue I see is, what will a buyer do with the

23  information they receive, and will they continue to protect

24  it, and will they be able to sell it?  Now, I know that

25  Google sells its information, and they have not an opt-in,

59

1    but an opt-out activity.  I know that TikTok does it.  I

2    know that Facebook does it.  It happens all the time.

3            What I'm concerned about is what you should be

4    concerned about, and I know you are, and that is the actual

5    systematic privacy things that we need to look at, and what

6    we're looking for from you is a way that the Trustee can

7    implement a transfer of data, because data, in bankruptcy,

8    is transferred all the time.  Unfortunately, the privacy

9    ombudsmans aren't appointed all the time, and the Court must

10   take it upon themselves to make sure of that.

11           UNIDENTIFIED SPEAKER:  (Indiscernible.)

12           MS. THOMSON:  Thank you, your Honor.  I've

13   overseen the --

14           THE COURT:  One second.  One second, Ms. Thomson.

15   One second.  There's somebody on the line who's interrupting

16   on the Zoom again, and I think we'll cure that.

17           But that's what I'm interested in, Ms. Thomson.

18   What do we need to do to protect the privacy interest of the

19   clients of the current owner of these assets?

20           MS. THOMSON:  Thank you, your Honor.  That's

21   exactly right.  Just for the record, I've overseen the

22   transfer of 400,000,000 personal records in various cases,

23   and I've worked on these solutions that you're looking for,

24   so one of them is the notice and consent process that would

25   need to be implemented, and my recommendation is that this

60

1  be done, but with an opt-in process, and I know there's been

2  a lot of discussion about opt-in and opt-out, but, actually,

3  assuming that there's a requirement for actual notice, what

4  you call it isn't really that important.

5      The most important thing is that all clients are

6  contacted and have an opportunity to make a decision about

7  whether they want to participate with a new company, and so

8  this notice would need to be sent after the auction, and

9  after a bidder is selected, so that the clients can be given

10 a good summary of what services the bidder would provide,

11 and what the cost would be, because it seems that there's

12 two categories of people here.  Some people want to get out

13 of the contract, and under the federal laws that apply, they

14 have a right to stop having money taken out of their bank

15 account.

16     THE COURT:  Ms. Thomson, I'm going to interrupt

17 you again.  I'm here for privacy issues with you.  I am not

18 here for discussions of the merits of how the Trustee is

19 going to implement the sale of notify anyone.  I'm talking

20 about privacy protection, and I think that there are two

21 levels of privacy protection.  The first is that you don't

22 want private information to be leaking out of the current

23 assets, and the second is that you don't want privacy

24 matters to be leaking out of a buyer.  That's what I'm

25 interested in.

*Briggs Reporting Company, Inc.*

61

1          I'm not interested in your views at this point,

2    although they're interesting, but, at this point, I'm not

3    interested in your views on whether it should be opt-in or

4    opt-out.  It's not relevant to the privacy issue.  I want

5    you to address the privacy issue.

6          MS. THOMSON:  Thank you, your Honor.

7    (Indiscernible) talking about what would be in the privacy

8    policy for the new company, and there should be a provision

9    that the new company cannot sell any of the records of these

10   clients, and that's a pretty standard requirement where

11   sensitive data is involved, and this is certainly the most

12   sensitive data, and this is an opportunity for the Court to

13   ask for an appropriate privacy policy to be addressed, to be

14   created and applied to this new company, and whether

15   (indiscernible) is selected, it's important to review the

16   privacy policy and see whether any changes need to be made.

17   So that's something that I've worked on in other cases.

18          Protection of the records you said was very

19   important, and absolutely it is.  I've written books about

20   data breaches, and protecting the data once the buyer gets

21   it is critically important.  So those are two areas that the

22   privacy policy needs to cover.

23          THE COURT:  And will you be able -- will you be

24   available to assist both the Trustee and the prospective

25   buyer to help find the appropriate level of protection, and

*Briggs Reporting Company, Inc.*

62

1  protection and privacy requirements?

2          MS. THOMSON:  Yes, your Honor.

3          THE COURT:  Terrific.

4          MS. THOMSON:  So you were asking about the opt-in

5  and opt-out, and the reason for bringing that up --

6          THE COURT:  No, I wasn't asking about the opt-in

7  and opt-out.  I was saying it was irrelevant to your

8  discussion.

9          MS. THOMSON:  Well, if your Honor will permit me

10 just to give you one sentence on this, all the bankruptcy

11 cases that I've been involved with have applied the

12 qualified buyer criteria, which I discussed in my report,

13 where the Court goes through about five steps, and first is

14 due diligence on the buyer, to make sure that that's an

15 appropriate purchaser of these records, and that that buyer

16 will meet the needs of the client group, and then there's

17 other factors that the Court considers, which is what we've

18 just talked about, which is the privacy policy needs to be

19 appropriate, needs security.  Constraints need to be

20 included.

21          So that's why it's relevant, just because this is

22 something that the Bankruptcy Courts have done in many

23 cases, and I gave your Honor the cites for about 15 cases

24 where these qualified buyer criteria was applied, and doing

25 this kind of due diligence is helpful because some of these

63

1 people need lawyers, but some of them need to get out of

2 these contracts, and so it seems to me that it would be

3 helpful to understand the nature of this client group, and

4 make sure that the records of people who don't need the

5 services are not sent to the buyer, and that all the

6 appropriate records they need are.  So that's the relevance.

7          THE COURT:  Well, again, you've gone into the area

8 of public policy that has nothing to do with privacy.

9          MS. THOMSON:  Well, it does, because transferring

10 the records to the buyer is privacy protection, because the

11 alternative -- in some of the cases, the courts have ordered

12 a targeted sale, where some data is deleted if it doesn't --

13 isn't needed by the purchaser, and that's a step in privacy

14 protection that is often done in these cases, and it's

15 helpful --

16          THE COURT:  I appreciate that, Ms. Thomson.  Do

17 you have anything else?

18          MS. THOMSON:  No.  I'm happy to answer any

19 questions you have, but I'm happy to help developing the

20 notice and opt-in or out process.  That's what I've done in

21 many prior cases.

22          THE COURT:  I truly appreciate that, and I welcome

23 that.  We are looking forward to your active participation

24 in developing those systems.  Thank you very much.

25          MS. THOMSON:  Thank you.

64

1          THE COURT:  Are there any other parties wishing to

2    oppose the sale at this time?

3          MR. EDELMAN:  Your Honor, I would like to speak on

4    behalf of my clients, Beech and Scarnavack.

5          THE COURT:  Yes, Mr. Edelman.  How are you today?

6          MR. EDELMAN:  Very well, and I appreciate the

7    opportunity to address this.  I'd like to address what I

8    think is the crucial aspect of the benefit to the consumer

9    of selling what amounts to a customer list to COG or one of

10   the competing bidders.  In my view, there is no benefit to

11   the consumer.  Under federal law, a collection action must

12   be filed against a consumer where they reside or where they

13   signed a contract in writing.  That means that, to defend a

14   collection action, they need an attorney in the jurisdiction

15   where they are located, basically.

16         According to Mr. Marshack's counsel, LPG and the

17   other bidders have counsel in about 26 states, so there is

18   somebody who will represent the consumer and, in the absence

19   of LPG or CLG or one of these other intermediaries, could

20   work out whatever terms are desired with the consumer.  I do

21   some such work in Illinois.  I know of others that do it in

22   Illinois.  I know of others that do it in neighboring

23   states.  My co-counsel in the Beech case in Mississippi, Mr.

24   Graeber, represents consumers in defense matters in that

25   state.

*Briggs Reporting Company, Inc.*

65

1          THE COURT:  Mr. Edelman.  Mr. Edelman, may I ask

2  you a question?

3          MR. EDELMAN:  Yes, your Honor.

4          THE COURT:  What jurisdiction is Ms. Beech in?

5          MR. EDELMAN:  Mississippi.

6          THE COURT:  Mississippi.  And you represent her

7  today, correct?

8          MR. EDELMAN:  That is correct.

9          THE COURT:  Have you tried to acquire an attorney

10 for her in Mississippi?

11         MR. EDELMAN:  She is represented by Mr. Graeber,

12 who is my co-counsel in the class action that was filed last

13 year against LPG, and now others, in the Southern District

14 of Mississippi, and he has her --

15         THE COURT:  No, I'm not referring to the class

16 action.  I'm talking about -- there was a reason,

17 apparently, that she needed some assistance in the beginning

18 with respect to creditors coming after her.  Is that right?

19         MR. EDELMAN:  Two collection agents.

20         THE COURT:  Right.  Does she need an attorney now

21 with respect to the collection action in Mississippi?

22         MR. EDELMAN:  No.  Mr. Graeber is representing her

23 in that regard.

24         THE COURT:  Right.  So she doesn't even have a

25 connection today with the Debtor or the Chapter 11

66

1  Trustee -- is that correct? -- except that she might have a

2  claim against them in the action that you believe is a class

3  action.  Is that right?

4           MR. EDELMAN:  That is correct.

5           THE COURT:  Okay.

6           MR. EDELMAN:  And my point --

7           THE COURT:  So she's taken care of.  She's not --

8  she's going to opt out if any contract is actually sold with

9  regard to her matter, or she may have already substituted

10 out whatever help that she got from LPG, if any, to Mr.

11 Graeber.

12          MR. EDELMAN:  My point, though, is somebody like

13 Mr. Graeber is necessary to represent the consumer who is

14 being sued in the local jurisdiction, and there are such

15 persons.  NACBA furnishes such services.  There's a sister

16 organization called the National Association of Consumer

17 Advocates that also furnishes defense services.  You can

18 find such services on the Internet.

19          My point is that CLG or these other intermediaries

20 serve no purpose.  The consumer needs a local attorney, a

21 local attorney familiar with the local rules of procedure,

22 local rules of evidence, particularly state consumer

23 protection laws that can be used.

24          THE COURT:  Mr. Edelman?

25          MR. EDELMAN:  The --

67

1          THE COURT:  Mr. Edelman?

2          MR. EDELMAN:  Yes.

3          THE COURT:  I agree with you entirely.

4          MR. EDELMAN:  My point, then, is that charging

5   high fees, 40 to 60 percent of the amount of the debt, and

6   paying it to an intermediary, who basically just sets up the

7   consumer with an attorney in their jurisdiction, does not

8   benefit the consumer.

9          THE COURT:  Well, Mr. Edelman, I disagree, and let

10  me explain why, and understand that I'm having a

11  conversation with you.  I'm not arguing with you.  I'm

12  having a conversation with you.

13         MR. EDELMAN:  Yes, your Honor.

14         THE COURT:  You see, today a Debtor -- or a

15  borrower -- may owe $10,000, but tomorrow they are going to

16  owe $10,200, and the next day, they're going to owe $11,000,

17  and if they go to a payday loan company, in three days,

18  they're going to owe -- in two weeks, they're going to owe

19  twice the amount.

20         So, when I saw the declarations, for instance,

21  that came in with respect to clients, they started off with

22  their baseline of how much they owed, and then you saw the

23  fees that were being charged, but, if nothing had been done,

24  that baseline, in a matter of six months, would have perhaps

25  been increased by hundreds, if not thousands, of dollars.

68

1         And so, in fact, the business practice of any

2 lawyer who is retained to settle debts in the jurisdiction

3 that they're allowed to practice in has to also understand

4 that there is a problem if you do not succeed.  Your client

5 is not only going to owe the original amount of when they

6 walked into your law office, but, in a couple of years,

7 they're going to owe twice as much, and the deals that are

8 made by lawyers are "I'm going to settle this debt today, so

9 that you don't owe twice as much in five years or six

10 years," and at 22-percent interest just on a legal credit

11 card, that jumps incredibly, but payday loans, title loans,

12 which are, in my opinion, reprehensible, but they're not

13 illegal.

14         And, more importantly, if you've ever dealt -- and

15 Ms. Doling can attest to this -- if you've ever dealt with

16 somebody who's walked into your law office and said, "I am

17 destitute, and I have a child with a dental problem that

18 needs to be done today.  What am I going to do?  And I have

19 a paycheck here, and they're going to make me pay 40-percent

20 interest for a three-week loan in my particular state, but

21 my kid is sick, and I have no insurance, and they need the

22 dental work now," or "they need the surgery now.  What do

23 you think I should do, Mr. Clarkson, the lawyer?," and I

24 would have to tell them, "I can't make the judgment for you,

25 but I think title loans and payday loans are reprehensible.

69

1  But you've got to do what you've got to do."  And I would

2  then say, "I'm not going to advise you, but what is the

3  option that you have?  Knock off the 7-Eleven?  Well, that's

4  not going to happen.  Take an illegal loan shark loan?  Go

5  down on the inner city and find someone to lend you money?

6  Sell some drugs?  Don't buy food for the kids?"

7          You know, these types of operations, again,

8  they're reprehensible.  They charge outrageous amounts of

9  interest, and if you don't have attorneys to nip it in the

10 bud as fast as you can, as you say -- I'm agreeing with you,

11 Mr. Edelman -- the consumer is really out of luck, but when

12 "out of luck" really means the kids don't get food.  They

13 don't get medical attention.  They don't get -- they have to

14 find a hospital that will take them, and in America right

15 now, there is an outrageous shortage of community hospitals

16 that are rural, and the only thing they can do is find cash

17 quick.  The only thing they can do is find an attorney who

18 may be charging them a lot of money to do what they do, but,

19 if you'll recall, in this business operation, they don't

20 take the money up front.  They take payments.

21         So, Mr. Edelman, I need to let you know that I

22 completely understand your clients' and your position on

23 this, and it's a balancing act, but I wanted to at least

24 appreciate your comments here today.

25         MR. EDELMAN:  Let me respond to your Honor's

70

1   comments.  With respect to interest, the collection of

2   interest, I can tell you from personal experience that in

3   Illinois collection actions, the defendants generally don't

4   pay interest.  If they settle the debt, they settle for a

5   fraction of the principal.  The interest exists in theory,

6   only in theory

7         THE COURT:  Mr. Edelman, let me comment on that.

8   The majority get default judgments, and then their car is

9   seized.  They don't even get the Court to make a deal.  The

10  majority of people get their cars towed by the city of

11  Chicago, and when they file bankruptcy, they can't even get

12  their cars back, under City of Chicago v. Fulton.

13        MR. EDELMAN:  There are attorneys who take

14  payments, and who will negotiate debts, and who will

15  represent consumers and get them out of paying interest.  If

16  a consumer doesn't reach out to appropriate places for help,

17  you're right.  They are likely to have a default judgment.

18  The question is, should they reach out to a local attorney,

19  or should they reach out to somebody like CLG or Morning Law

20  or one of these other intermediaries?

21        My point is simply that these intermediaries take

22  a lot of money, and do not contribute anything to the

23  welfare of the consumer.  If the consumer dealt directly,

24  say, with the lawyers in 26 states that are currently

25  representing them in collection actions, they would pay less

71

1  money and get the same result.

2        My objection is to charges of 40 to 60 percent,

3  which I don't charge, and I don't know of anyone else who

4  does defense work who charges that, in exchange for hooking

5  the person up with a local attorney.  It is not worth it to

6  the consumer.  It is simply wasted money.  They should not

7  be paying it.  There is no reason to recommend, suggest,

8  cause the consumers to do business with the intermediary.

9  It does not benefit the consumers at all.

10        THE COURT:  Thank you, Mr. Edelman.  We have to

11  move on, Mr. Edelman.  There are many other people that want

12  to speak against the motion.

13        MR. EDELMAN:  Understood, your Honor.  Thank you.

14        THE COURT:  Thank you.

15        Who else would like to speak against the motion?

16        Mr. Owens.

17        MR. OWENS:  Your Honor, it's not against the

18  motion.

19        THE COURT:  Well, you have a comment about the

20  motion.

21        MR. OWENS:  We have a comment, yes.  So, your

22  Honor, we filed a limited objection.  We are definitely

23  supporting a sale.  The issue was that we wanted to bake in

24  some protections for consumers, and we thought that the form

25  of the asset purchase agreement and of the order that we saw

72

1 needed work.

2          So, after submitting our pocket brief, and

3 extensive research, and educating ourselves and the Court

4 and everyone else about what we felt was legal, what could

5 be done, reformation, et cetera, which the Court addressed

6 at the last hearing, we turned our efforts to working with

7 the Trustee to try to get to a place where we felt

8 comfortable, and so I'm pleased to report that we've

9 negotiated significant provisions in the asset purchase

10 agreement and sale order, the proposed sale order, which I

11 believe will be accepted, or, if accepted, will satisfy us,

12 the committee, and will be walking hand in hand with respect

13 to the auction.

14          So I want to thank the Trustee and counsel for

15 doing a tremendous job.  I mean, they've worked really hard,

16 and they've worked with us, and we're satisfied, with those

17 changes, that this can get done.  We reserve rights with

18 respect to the auction.  That's all I wanted to say.

19          THE COURT:  Thank you very much.

20          MR. OWENS:  Thank you.

21          THE COURT:  Anyone else?  How about on Zoom?

22 Anyone?

23          Yes.  Ms. Doling, representing the amicus.

24          MS. DOLING:  Yes, your Honor.  Thank you.

25 Jenny Doling, J. Doling Law, on behalf of NCBRC and NACBA.

73

1          We just have two quick issues, one, the notice to

2    the consumer clients, and, two, NACBA's educational role

3    that we may be able to play here.  Counsel for the Trustee

4    talked a lot about consumer clients having choices, and that

5    they have the choice to opt out of their contracts.  The

6    problem with that narrative is that these consumer clients

7    likely do not know or understand their choices.  Some

8    consumers are auditory learners, some are visual, some are

9    non-English speakers.  They don't know what they don't know,

10   and it's our observation that they have not received

11   adequate notice of these proceedings.

12          The e-mail notice they did receive was totally

13   inadequate in that it did not use simply layman terms, did

14   not provide sufficient time for them to respond.  It did not

15   explain why they might want to opt out of the contract.  It

16   did not warn them that their agreement with LPG may have

17   been an illegal contract to begin with, and that they may be

18   able to terminate it, request a full accounting of all fees

19   paid, and request a refund.

20          They were not informed that they are the assets of

21   this bankruptcy case.  They have not been included on the

22   matrix or listed as potential creditors.  It's important for

23   these consumers to understand that the debt settlement and

24   invalidation companies cannot force a creditor to settle a

25   debt, that settlement does not improve their credit, that

74

1  settlement is usually far more expensive than bankruptcy,

2  that settlement does not protect your assets, whereas

3  bankruptcy can help protect your assets.

4         Counsel discussed providing a soft landing for

5  these consumers, and we take issue with that soft landing

6  being another debt invalidation firm.  We take issue with it

7  happening before these consumers have received adequate

8  notice of what is really happening.  These consumers could

9  take their refunds, likely file a simple Chapter 7, and

10 start rebuilding their credit.  So notice is one of our

11 concerns.

12        The other issue we wanted to address, the

13 Trustee's counsel mentioned that NACBA has not offered

14 assistance.  NACBA is not a law firm.  We can offer

15 assistance to potential consumer bankruptcy Debtors through

16 our attorney finder that is on NACBA's web site.  We have a

17 number of attorneys in all 50 states, Puerto Rico, Guam, and

18 the Virgin Islands.  NACBA has also generated a video to

19 show its consumers, explaining the suspect debt settlement

20 industry and how it preys on consumers.  NACBA would also

21 like to see a consumer ombudsman appointed to communicate

22 these points to these consumers.  There are 35,000 of them,

23 that we know of.

24        THE COURT:  Ms. Doling, are you aware that, on one

25 of the first says of this Court hearing this case, that I

75

1  recommended that a consumer ombudsman be appointed?

2          MS. DOLING:  I (indiscernible) that, your Honor.

3          THE COURT:  I can only recommend these things,

4  and, in fact, I believe that a counsel from Pachulski,

5  Stang, Ziehl and Jones actually appeared at one of our

6  hearings with an ad hoc committee of consumers, and then,

7  and only then, did the United States Trustee re-solicit for

8  committee members.

9          And so let me ask you this.  Do your organizations

10 have a web site that could be included in a notice to all of

11 these consumers, where they could actually go and see their

12 opportunities and their options?  Could that be something

13 that your clients, the amici here, would consent to having a

14 notice sent out, upon a sale, to all of those consumers?

15         MS. DOLING:  Yes, your Honor, and we've taken the

16 liberty to start drafting a notice that we thought might be

17 helpful to sending out to these consumers with that

18 information.  We'd be happy to share that with the Court or

19 the Trustee, however your Honor might want to receive that.

20         THE COURT:  Well, I think that you should send it

21 to Mr. Celentino.

22         MS. DOLING:  Will do.

23         THE COURT:  Thank you.

24         MS. DOLING:  Thank you, your Honor.

25         THE COURT:  Thank you very much.

76

1          Would anyone else like to discuss the sale?  Mr.

2   Celentino -- wait.  We have somebody.

3          MR. IZAKELIAN:  Good afternoon, your Honor.

4   Razmig Izakelian, Quinn Emanuel, for secured creditor

5   OHP-CDR.  There was a brief discussion of Section 363(f)

6   earlier.  I just wanted to say that our position is the same

7   as Ms. Weiss'.  We're in support of the sale.  We just want

8   the sale proceeds to be protected to (indiscernible) another

9   day.

10         We've had some helpful discussions with the

11  Trustee.  The last version of the sale order I saw after our

12  discussion with the Trustee seemed okay with us, but we'd

13  just like to the final version of the proposed order before

14  (indiscernible).

15         THE COURT:  And just like Ms. Weiss, do us a

16  favor, do the Court a favor, and get your proof of claim in

17  fairly quickly.

18         MR. IZAKELIAN:  Our proof of claim has been filed.

19  It was filed on May 25.

20         THE COURT:  Even better.  Thanks so much.

21         Anyone else?

22         MS. CHRISTIANSON:  (Indiscernible.)  Yes, your

23  Honor.  Shawn Christianson again.  My comments are directed

24  solely to the narrow issue that was raised during the order

25  shortening time hearing, at which we discussed the concerns

77

1  raised by the purchase agreement which suggested that

2  software licenses and assets will be immediately transferred

3  as essentially part of the sale, and our concern is that

4  that is an inappropriate approach.

5       We've discussed this with Mr. Ghio briefly, and I

6  heard, I believe, Mr. Celentino say earlier that they had,

7  perhaps, a proposal with respect to how they wish to address

8  this.  We have not seen anything yet on that, so we just

9  wish to preserve our concern in that regard.

10      THE COURT:  Could those software licenses even be

11 transferred without your client's approval?

12      MS. CHRISTIANSON:  They could not, under Ninth

13 Circuit law, your Honor.  Catapult Entertainment would

14 preclude that.

15      THE COURT:  Yes.  I misspoke at the last hearing

16 and said, "Caterpillar."  I was thinking of the tractor, but

17 Catapult, of course, is the appropriate Ninth Circuit

18 decision that's kept most large tech firms from filing in

19 the Ninth Circuit, and somebody that needs to be corrected

20 by statute, perhaps.

21      All right.  Thank you for your input there, Ms.

22 Christianson.

23      MS. CHRISTIANSON:  Thank you, your Honor.

24      THE COURT:  Anyone else?

25      MR. STILL:  Yes, your Honor.  Andrew Still.  May I

78

1  be heard on behalf of the landlord?

2          THE COURT:  Of course, Mr. Still.

3          MR. STILL:  Thank you, your Honor, and I'll be

4  brief.  I represent Alteryx, Inc., a creditor in the

5  sublandlord of the Michelson Drive property.  We filed a

6  very brief objection on the grounds that the property from

7  which the Debtor operates is not property of the estate, and

8  my understanding is that the Trustee contends that it is, in

9  that he can assume an assigned sublease under 365.  The

10  sublease at issue, your Honor, was entered into between my

11  client, as a sublessor, and Innovative Solutions, Inc., and

12  Prime Logics (phonetic), LLC, as sublessees, and then the

13  Debtor guaranteed the sublessees' obligations under the

14  sublease.

15          Alteryx is not aware of any agreement between

16  sublessees and any other parties, including the Debtor, and

17  any such sublease would be a violation of the sublease.  So

18  it's our position that the sublease does not constitute

19  property of the estate, and, like, I said, I understand

20  that, nevertheless, the Trustee intends to assume and assign

21  it, or at least the motion is unclear in that regard.  I'm

22  not sure.

23          Your Honor, rent remains unpaid in the amount of

24  over $333,000, which was approved post-petition.  So, to the

25  extent the sublease is assumed and assigned, despite our

79

1  objection, these defaults would need to be cured, and the

2  Trustee or any assignee would need to provide adequate

3  assurance of future performance.  And that's our objection,

4  your Honor.

5          THE COURT:  Thank you.  So, to clarify one moment,

6  you don't believe that the lease can be assumed and

7  assigned, because it's not property of the estate?

8          MR. STILL:  That's correct, your Honor.

9          THE COURT:  Okay.  Well, the buyers are now on

10  notice that there is an issue of whether or not the

11  assignment of a leasehold is viable under the sale.  They

12  are duly noted.

13          MR. STILL:  Thank you, your Honor.

14          THE COURT:  Anyone else?

15      (No response.)

16          THE COURT:  Mr. Celentino, would you like to

17  respond?

18          MR. CELENTINO:  I do have some responses, your

19  Honor, if I may --

20          THE COURT:  Please.

21          MR. CELENTINO:  -- because I think it will be

22  important for our record.  I'll star with the last one

23  first, because I think that's pretty straightforward.  I

24  appreciate Mr. Still.  We've had communications.  I've been

25  out of the office a little bit, so I'm a little bit behind

80

1  in reaching him.  If he would please send me a copy of the

2  guarantee we're not aware exists that LPG is a guarantor of

3  that lease.  That would be important to know.

4          As we've indicated in our communications, at the

5  end of today, with a little bit of luck, we have a winning

6  bidder that will then work out the next form of

7  arrangements, and I'm not sure that the winning bidder is

8  actually going to want to take an assumption or assignment.

9  I'm not particularly -- I'm not sure whether they're going

10 to make the offer that I suggested to Mr. Still was coming.

11 One of the bidders had an offer for the landlord that would

12 be a consensual opportunity for the bidder to stay in the

13 premises.

14          The point of our understanding is not that there's

15 a guarantee by the Debtor but that, in fact, Prime Logics is

16 the subtenant to Mr. Still's client, and that Prime Logics,

17 one of our defendants in our litigation, had provided, free

18 of charge, a portion of the space that Prime Logic rents to

19 the Phoenix Law Group, which, as a result of the stipulation

20 of Item Number 2, is, in effect, the Debtor, and that that

21 portion of the space is made available by Prime Logics to

22 Phoenix for free.

23          THE COURT:  Well, don't get Mr. Still wrong.  Mr.

24 Still's client probably would like you to pony up $330,000

25 right now to cure.  I'm not suggesting that they would do

81

1 that, but I would suspect that they would be interested in

2 having you cut a check, or the buyer cut a check, to cure

3 the $333,000-plus.

4          MR. CELENTINO:  That's right.

5          THE COURT:  You know, so I don't think that's a

6 big issue.

7          MR. CELENTINO:  No, I just wanted to make sure

8 that the --

9          THE COURT:  Either you will cure or you won't

10 cure, and if there's a guarantee, then it's a claim.  It has

11 nothing to do with the participation of a lease that can or

12 cannot be assumed and assigned.

13          MR. CELENTINO:  And that was the conclusion, your

14 Honor, I was getting to.  I just wanted there to be a little

15 bit better record.  I will let -- I will communicate with

16 Mr. Still after the hearing, and we'll move forward as

17 appropriate under either an assignment or assumption or a

18 move order.

19          THE COURT:  I appreciate that.

20          MR. CELENTINO:  With respect to the -- with Mr.

21 Izakelian's comments, we are happy to share our proposed

22 order, and the language that he has requested is in the

23 draft of the proposed order that we've been discussing to,

24 we think, good fruition with the committee, as a starting

25 spot before we actually serve it out to -- before we have a

1  communication with whomever might be the successful bidder.

2  We thought it was important for the committee and the

3  Trustee to have an agreement on what they would support in

4  such an order, so that we then have a starting spot without

5  controversy.

6          I wanted to discuss for a moment -- if I can turn

7  to the privacy matter, because this is pretty important.  We

8  have two overbidders that will be the subject of the hearing

9  today, and those two overbidders, as I understand -- Ms.

10 Thomson is the privacy ombudsman, and I understand there are

11 two things that are relevant.  One is, how do we continue to

12 protect the data once it's transferred to the buyer?  And

13 the second is, what do we do, or what can they do, with

14 respect to a sale?

15         Now, I want to address those two so that Ms.

16 Thomson understands what we understand the process will be.

17 We are selling, if we are authorized to do so, to law firms.

18 Law firms are governed and required to have their own

19 privacy policies.  The law firms that have qualified to

20 overbid are going to make their privacy policy available for

21 Ms. Thomson for Ms. Thomson to comment upon.

22         We understand that Ms. Thomson's time and

23 commenting upon that privacy policy to confirm that it is

24 appropriate is going to be an expense of this estate.  We

25 understand that.  We also have in our provision the

83

1  appointment of a monitor to implement the sale, and one of

2  the things we can discuss with the monitor is whether or not

3  the monitor will be the right person to conclude that the

4  privacy policy as implemented, with comments from Ms.

5  Thomson, is being complied with.  We've thought about it.

6  We're ahead of the curve there.  I just wanted to make sure

7  everybody knows that.

8          Second is the issue of a subsequent sale of this

9  data, and the current draft of the order and what we are

10 proposing is that there will be no sale of the data absent

11 court order, for as long as obligations are here.

12         THE COURT:  Now, let me make sure I understand.

13 You're saying that, when you say "subsequent sale," the

14 buyer can't resell it?

15         MR. CELENTINO:  Correct.

16         THE COURT:  And what law firm can sell data of

17 their client?

18         MR. CELENTINO:  That's the answer, your Honor.

19         THE COURT:  Well, no, I'm asking.  What law firm

20 can actually go out and sell the data of their client to a

21 third party?

22         MR. CELENTINO:  They can't.  So the order --

23         THE COURT:  Say it for the record.

24         MR. CELENTINO:  Yes.  They cannot.  So the order

25 will provide that the law firm buyer cannot sell, and if

84

1  there is some circumstance under which they want to do that,

2  they will have to file a motion here to explain to your

3  Honor the uniqueness of that approach.  We've got that one

4  prepared and planned.  It's not going to be an issue, we do

5  not believe, and I just wanted to make sure that the parties

6  understand.

7          The gentleman who was representing Ms. Beech and

8  Ms. Scarnavack --

9          THE COURT:  That's Mr. Edelman and his excellent

10 observations.

11         MR. CELENTINO:  Mr. Edelman.  Good.  That's fine.

12 I just had a couple of observations.  First, the statements

13 that he's made about how the Debtor operated are

14 contradicted by the declaration of Mr. Pruin (phonetic),

15 which we've submitted, who is one of the lawyers that works

16 for LPG, and there is a misstatement by Mr. Edelman, and it

17 is corrected and made clear in the declaration that's on in

18 court, and the evidence, and the evidence is that LPG has

19 lawyers licensed in all 50 states that can assist in those

20 local challenges.

21         Sometimes the local representation is, in fact,

22 the LPG lawyer in that jurisdiction filing the complaint in

23 the first instance, not waiting for the creditor.  Your

24 Honor's observations are correct about the direct

25 circumstances that many of these folks find themselves in,

85

1  and Mr. Pruin addresses quite clearly the importance of

2  immediately reaching out as a lawyer and stopping and

3  abating the accrual of interest by a challenge to the debt,

4  and that is probably the breathing space that most of these

5  people need.

6         With respect to the notice to the consumer, and

7  what Ms. Doling said, I'm looking forward to communicating

8  with her.  We anticipate that the notice to the consumer

9  will be part of the monitor's obligation.  The monitor wants

10 to look at the proposed notice to consumer that the

11 committee and the Trustee have already agreed to that will

12 otherwise circulate to the other parties.

13        Again, we thought it was appropriate for us to

14 step forward with something that at least has two parties'

15 agreement for everybody else's comment, and we are

16 anticipating in that notice to the consumer that the monitor

17 will allow us the benefit of her opinion, and we're happy to

18 share with the monitor anything that Ms. Doling sends to me.

19        With respect to the second notice that the

20 consumer has to get, because bankruptcy law requires it,

21 there will be a second notice that goes to the consumer on

22 the assumption and assignment of their contract.  If it

23 weren't a bankruptcy, the plain notice to the consumer and

24 the opt-out provision that the model rules provide would be

25 appropriate, but, because it is a bankruptcy, we have to

86

1  comply with 365 as well, because that's what we're selling.

2          So the last part that I wanted to discuss, if, in

3  fact, it's still an issue for anybody, is the difference

4  between opt-in and opt-out, and this is something that I've

5  talked at great length with legal experts about, and legal

6  ethics experts about, and this is because the issue in this

7  case is, these are legal services contracts.  Thousands of

8  these parties are involved in active litigation in states

9  across the country where they have lawyers representing

10  them.

11          It is important, on the date of the closing, for

12  the buyer to assume the obligation for delivering quality

13  legal services to those parties.  It is less important as to

14  whether or not those parties are obligated to pay, and that

15  is the point of an opt-out.  If it is an opt-in, the parties

16  create an unnecessary and inappropriate gap where nobody has

17  to provide the legal services to that party until they opt

18  in, because, as we've been told, the Debtor can't keep doing

19  it, because the Debtor's contract doesn't comply with the

20  law.

21          So the point that we're trying to get to as soon

22  as we can -- and this is the urgency that is established for

23  the reason for this motion being heard at this time -- is we

24  need protection for the consumer.  Licensed law firm

25  undertakes the obligation to protect that consumer, and that

87

1  consumer has the right to opt out, which means their

2  obligation to pay is governed by the notice, the opt-out

3  provision, and the ability to opt out of an assumption and

4  assignment.

5          You create a potential for a gap and a potential

6  for loss of services to the consumer if you require an

7  opt-in, and that is why the model rules for law firms in all

8  50 states that have adopted the model rule patterned on

9  1.17, have a period of time within which the consumer can

10 opt out.  California happens to have the longest period of

11 time.

12         THE COURT:  May I interrupt for one second?

13         MR. CELENTINO:  Yes.

14         THE COURT:  Would you please call your colleague

15 from your law firm up to the podium, Mr. Bowie?  I want to

16 ask --

17         MR. CELENTINO:  I would be happy to do that.

18         THE COURT:  I want to ask him about the ethics

19 issues here.

20         MR. CELENTINO:  I would be happy to do that, your

21 Honor.  Peter Bowie from my firm, who I believe needs no

22 introduction.

23         THE COURT:  Good afternoon, Mr. Bowie.

24         MR. BOWIE:  Your Honor.

25         THE COURT:  Mr. Bowie, I received a declaration

88

1  from you and have reviewed it carefully.  I will tell you

2  that, just like Professor Rapoport, your experience in

3  international and national ethics with respect to law firms

4  is beyond reproach, in this Court's view.

5          My question to you is, has Mr. Celentino -- and I

6  say this as -- I know that you're senior to him in both,

7  perhaps, expertise, age, and wisdom -- is he correct with

8  his analysis that the ethical considerations of a law firm

9  in taking another file from another lawyer -- are they bound

10 by ethical considerations on the matters of not revealing

11 private information and actually fulfilling the

12 responsibilities that they need to undertake in taking that

13 file?

14         MR. BOWIE:  It's my understanding, your Honor,

15 that it in fact is a matter of ethics, and that that has

16 applicability in a context where there is an obligation to

17 transfer with the transfer of title, in that context, as I

18 understand it.

19         THE COURT:  Have you ever seen a situation where a

20 lawyer has become incapacitated and the files had to be

21 shifted to another law firm or another lawyer?

22         MR. BOWIE:  Yes, sir.

23         THE COURT:  And what is the process, generally,

24 when that is undertaken in California?

25         MR. BOWIE:  Well, California is a great state as

89

1  an example of exemplars of how to do these things, and the

2  kinds of reporting that are required, and the licensing

3  that's required for what's happening with those documents.

4          THE COURT:  What about other states?

5          MR. BOWIE:  I don't know about a lot of them.

6  Most of my focus in this particular case has been looking at

7  the question of the ethics, if you will, of what's a judge

8  supposed to do, in the context where there are concerns that

9  we have raised here, about what happened, and how did we get

10  to this point with this particular entity?  I'd note just

11  that the canons provide that the judge's circumstance is one

12  where the judge is responsible to actually put themselves in

13  a position where they are in compliance because they have to

14  engage in the ethics of doing it, but it is not disruptive

15  of the connections.

16          THE COURT:  Do you believe I have a judicial

17  ethical consideration to review the sale motion in that

18  context?

19          MR. BOWIE:  I believe that you have a

20  responsibility to review that, yes, but you also have the

21  duty to hear and decide on matters, so long as you're not

22  disqualified, and it's unusual in that sense that the code

23  contemplates that you just don't say, "I don't want to do

24  this.  I don't feel like doing this.  It makes me worry

25  about something else."  In fact, you have a responsibility

90

1    under Canon 3A to be sure to take a look at this.

2            THE COURT:  Well, in the Ninth Circuit case in

3    2017 called In Re: Spanish Peaks Holdings II LLC, there was

4    an interesting quote, and it is:

5            "The primary function of the Bankruptcy

6            Code is to set out the rules for

7            dividing up assets that are insufficient

8            to pay a Debtor's creditors in full.

9            One such rule, contained in 363(f),

10           authorizes a Trustee in bankruptcy to

11           sell, with some exceptions and

12           limitations, a Debtor's assets free and

13           clear of third parties."

14           As a bankruptcy judge, do I have the authority to

15   really look at 363 and 365, and make the basic

16   determinations, notwithstanding public policy issues, and

17   perhaps take them under consideration later?

18           MR. BOWIE:  I think you have that option.  I

19   believe you do.

20           THE COURT:  Mr. Bowie, I appreciate you being here

21   today.

22           MR. BOWIE:  Thank you, sir.

23           THE COURT:  Thank you.

24           Mr. Celentino.

25           MR. CELENTINO:  I think there are no other issues

91

1  for us to address, your Honor.  I think the Trustee has made

2  an evidentiary record.  The Trustee has offered arguments.

3  The Trustee has made it clear that the facts support, and

4  the applicable laws support, a sale of these assets under

5  Section 363.

6         The facts make it clear, and the law supports,

7  that there can be an assumption and assignment of these

8  contracts, subject to the provisions of Section 365, and the

9  cure and/or adequate assurance, all of which are addressed

10 in the Trustee's moving papers and the Trustee's

11 supplemental papers.

12        We have consent from the two secured creditors who

13 have appeared, and under Ninth Circuit law, the failure of

14 the remainder to appear and object can be implied as consent

15 for the purposes of Section 363(f).

16        I think we have established that we are paying

17 close attention to the balance of all of the needs of all of

18 the constituents in the case, not just the creditors, but

19 also the consumers.  The Trustee's proposed sale provides,

20 as the Court has noted and as we have argued, for extra

21 protections for the consumer creditors, and I wanted to make

22 sure that the record is not -- is clear in this sense.

23        We have a handful of complaints that have been

24 recently filed, that your Honor's instinct is probably the

25 case, that somebody was out there to try to collect and put

92

1  before your Honor, and the point, of course, to even all of

2  the complaints referred to by the United States Trustee and

3  others add up to less than one percent of the number of the

4  consumers that we're trying to protect.

5        THE COURT:  Well, I want to add something to that,

6  Mr. Celentino.

7        MR. CELENTINO:  Please.

8        THE COURT:  You take a different spin on it than I

9  do.  I am happy that someone is now looking at the

10  operations of these types of businesses.  They've been

11  waiting at the train station, and not getting on the train,

12  to help police the consumer protection that needs to be

13  done, and so I welcome those complaints.

14        I'm telling you, however, that I note that they

15  just showed up, and I'm wondering where they were two,

16  three, four, five years ago, and all I can do is hope that

17  this type of case has brought to the forefront the matters

18  of importance of consumer protection with respect to the

19  types of services that are being offered by calling a 1-800

20  number.

21        The real pity is, Mr. Doling's clients don't have

22  enough funding to put on a big enough advertising campaign

23  to counteract that, and I wish they did.  I wish that there

24  would be more donations, for instance, from the ABI and from

25  other big groups that can afford it, to give the national

*Briggs Reporting Company, Inc.*

93

1  associations that are interested in consumer protection the

2  wherewithal to compete with the commercial market, the legal

3  commercial market.  I have no desire to see illegal

4  operations continue.

5       And so one of the things that I will be

6  considering is, in the balancing of interests, is that we

7  perhaps are taking off the street one bad actor and putting

8  on a good actor, and that's what I hope occurs here.

9       MR. CELENTINO:  Your Honor, I wanted to say that

10 by referring the Court to the evidence submitted by the

11 Trustee of the declarations of consumers who have been

12 helped during the period that the Trustee has been in

13 office, and I think that's lost on everybody here.  Did the

14 Debtor do everything right by everybody, all 35,000?

15 Probably not.  Did we do the best we could in the six weeks

16 the Trustee has been in the case?  Absolutely.  Did we help

17 some of those folks?  Enough that they were willing to file

18 a declaration for this Court and all of these parties to

19 see, that we did something that they felt was a benefit and

20 a relief to them.

21       The point is exactly what your Honor has made.

22 We're giving consumers a choice, and we're making sure that

23 the person who walks out with the obligation for those

24 consumers at the end of today has a monitor and a privacy

25 policy that, under any circumstances, will take this former

94

1  bad actor off the street, and give an opportunity, and a

2  post-sale opportunity, for the buyer to do right by those

3  consumers.

4        We seem to have lost, at some point, the notion

5  that reforming privacy policies, reforming the wrong

6  statements and severing -- and getting the statements right,

7  and having a monitor ensure compliance -- that is something

8  that won't exist if a sale isn't approve, a new buyer isn't

9  obligated to do those things, and we let these 35,000 people

10 out in the street.  Maybe they'll find Ms. Doling's

11 organization.  Maybe they'll find one of the other 800

12 numbers where there will be no monitoring.

13       And I will say -- and I just want the record to be

14 clear -- it has been difficult for Mr. Marshack to balance

15 all of these interests.  Some of the briefing has been very

16 hot.  Some of the briefing here has been very pointed.

17       THE COURT:  Well, I think we've taken care of --

18       MR. CELENTINO:  No, I just wanted to -- if I may,

19 I just wanted to finish, and it's important for me to let

20 your Honor know that Mr. Marshack never lost sight of the

21 end game, that we can do something better in this case for

22 these folks than the current alternatives that might be out

23 there to them.

24       THE COURT:  Thank you.

25       MR. CELENTINO:  And so we agree with you on that.

95

1          THE COURT:  Okay.  We're going to do one more
2 thing for the record.  You may sit down.
3          Is Mr. Golden still with us on the Zoom call?
4          MR. GOLDEN:  Yes, your Honor.
5          THE COURT:  Mr. Golden, you and your partner
6 represent which participant in this case?
7          MR. GOLDEN:  Your Honor, we represent two
8 participants, Affirma LLC and Oxford Knox LLC, your Honor.
9          THE COURT:  And you're the main attorney on this
10 matter, correct?
11          MR. GOLDEN:  Yes, your Honor.
12          THE COURT:  Could I invite your partner, Mr.
13 Goodrich, to come to the podium?
14          Mr. Goodrich, good morning -- or good afternoon.
15          MR. GOODRICH:  Good afternoon, your Honor.
16          THE COURT:  Are you a licensed attorney?
17          MR. GOODRICH:  Yes, I am, your Honor.
18          THE COURT:  Have you ever been appointed as a
19 Chapter 11 Trustee in any case in the Central District of
20 California?
21          MR. GOODRICH:  I have, your Honor.
22          THE COURT:  And approximately how many cases?
23          MR. GOODRICH:  I think five.
24          THE COURT:  Five cases.  And I will ask you -- I
25 know the answer to this case -- are you a current Chapter 11

96

1  Trustee in a case that's pending before me?

2          MR. GOODRICH:  No, your Honor.  That case was

3  confirmed.  I'm now the disbursing agent under a confirmed

4  Chapter 11 plan.

5          THE COURT:  That's a good clarification.  Was that

6  the Murrietta case?

7          MR. GOODRICH:  It was, your Honor.

8          THE COURT:  I remember the Murrietta case, and I'm

9  putting this on the record for an example to be made, to let

10  any person that wants to read the transcripts understand my

11  thinking about the process here.

12          Do you remember when you were appointed as a

13  Chapter 11 Trustee in the Murrietta case?

14          MR. GOODRICH:  Yes, I do, your Honor.

15          THE COURT:  That was in 2017, I believe?

16          MR. GOODRICH:  Yes.

17          THE COURT:  What was the primary asset in the

18  Murrietta case?

19          MR. GOODRICH:  The Murriettas were individual

20  Chapter 11 Debtors who owned a restaurant called El Toro

21  Bravo in Costa Mesa on 19th Avenue.

22          THE COURT:  One restaurant, correct?

23          MR. GOODRICH:  Correct, one restaurant and a

24  tortilleria.

25          THE COURT:  And what was the -- when you first

97

1  arrived -- the general gross revenue on either a quarterly

2  or annual basis?

3         MR. GOODRICH:  Well, your Honor, it depends on

4  what we're talking about, whether it was the Debtors'

5  records or what reality was.

6         THE COURT:  What the reality was.

7         MR. GOODRICH:  The reality was at that time that

8  the restaurant made roughly a million and a half dollars a

9  year.

10         THE COURT:  Now, when you became the Trustee, were

11  they obeying all of federal and state laws?

12         MR. GOODRICH:  Unfortunately, no.

13         THE COURT:  Well, give us an example of some of

14  the state laws that the Debtors were violating at the time

15  you took over.

16         MR. GOODRICH:  At the time I took over, the

17  restaurant -- actually, the day after I took over, it was

18  closed by the county, the health department, the fire

19  department, and I think there were four entities.  I think

20  OSHA was the other one, the federal government.

21         THE COURT:  OSHA.  And these were Health Code

22  violations and safety violations?

23         MR. GOODRICH:  Yes, all of them were.

24         THE COURT:  And it was closed?

25         MR. GOODRICH:  The restaurant was closed for

98

1 approximately eight days.  It took us -- well, I don't want

2 to put it on the public record, but there were things at the

3 restaurant that prevented us from opening, and it was for

4 the good of the consumer.

5          THE COURT:  Now, what about federal laws?

6          MR. GOODRICH:  Federal laws were OSHA violations,

7 primarily, and also the Debtors were not paying payroll

8 taxes at that time.

9          THE COURT:  How long had they not been paying

10 payroll taxes?

11          MR. GOODRICH:  Approximately a year and a half to

12 two years.

13          THE COURT:  And were those violations of federal

14 law?

15          MR. GOODRICH:  I believe so.

16          THE COURT:  Okay.  So we had federal OSHA

17 violations and payroll violations in this restaurant case?

18          MR. GOODRICH:  Correct.

19          THE COURT:  And we had Health and Safety Code

20 violations with respect to county, city, and state?

21          MR. GOODRICH:  That's correct, your Honor.

22          THE COURT:  Okay.  So did we close it down?  Did

23 we destroy the restaurant?  Did we convert it to Chapter 7?

24 Did we stop operating it?  What happened there?

25          MR. GOODRICH:  Your Honor, with a little luck and

99

1  a lot of hard work, I employed a team that helped me get the

2  Debtor back in compliance with state law first, and the

3  restaurant reopened, and we confirmed a plan that has almost

4  paid all of the tax obligations off.

5          It also paid the fines that were issued by OSHA.

6  The Court, if the Court recalls, sustained my objection to

7  the OSHA claim, which was north of a million dollars, and

8  reduced it down to, I think, $76,000.  So that claim is

9  almost paid in full.

10          We took care of all the health and safety

11  violations, including a door that was blocked that prevented

12  the employees from leaving the building in case of a fire.

13  We took care of the rodent infestation.  We took care of a

14  lot of other issues that were happening in the restaurant as

15  far as health and safety, as well as the employees.

16          THE COURT:  What about fire door issues and

17  concerns of just the safety of the customer?

18          MR. GOODRICH:  Well, the customers were okay,

19  because there are two doors to the front of the building,

20  but, in the back where the employees are, at any given time,

21  there are 19 employees in a roughly 21-square-foot

22  building -- 2,100 square feet -- and so the issue the fire

23  department had was there's not enough safety exits in case

24  of a fire, and, as most people probably realize, a

25  restaurant has a kitchen, with grease fires sometimes.

100

1        So we have a machine that's from 1970-something

2   that makes the tortillas.  It's rickety.  It is dangerous.

3   It still works, however, and it makes tortillas that make

4   the business very profitable.  Those items are dangerous,

5   and if there were a fire, there was only one door for the

6   employees to leave, and it's a roll-up door, and that

7   roll-up door was not always open.  So, if that roll-up door

8   is not open, it might be very difficult for the employees to

9   leave the building.

10        THE COURT:  Now, you filed a plan of

11   reorganization.  Was it a plan of liquidation or

12   reorganization?

13        MR. GOODRICH:  Reorganization.

14        THE COURT:  Reorganization.  And you had to

15   undertake an extreme effort of bringing the company -- or

16   not the company, the restaurant -- out of violation of the

17   federal and the state regulatory and statutory concerns,

18   correct?

19        MR. GOODRICH:  That's correct, your Honor.

20        THE COURT:  And did you succeed?

21        MR. GOODRICH:  We have succeeded, and we're almost

22   completed in payment in full.  I'm almost ready to turn the

23   restaurant back over to the individual Debtor who is still

24   alive.

25        THE COURT:  Now, if somebody had said to you

101

1  during the plan of reorganization, at the confirmation

2  hearing, "You can't confirm this plan because they operated

3  illegally before," what would your response have been?

4      MR. GOODRICH:  Difficult question to ask.  The

5  United States Trustee is the one that might most likely

6  raise that issue, and, as the Court is aware, Mr. Golden and

7  I both, we serve the U.S. Trustee's Office as Trustees that

8  are on a panel.  When we're 11 Trustees, we're not coming

9  off a panel.  We're selected individually.  Sometimes the

10  U.S. Trustee's Office will pick individuals who are not on

11  the panel for Chapter 7 cases, and sometimes they'll pick

12  panel Trustees like Mr. Goldman and I.  In that situation,

13  I'd have to assess exactly what the violations were, and

14  whether or not it's like a violation of tax law.

15      For example, if the payroll taxes have not been

16  paid, but the plan proposes to pay that back, I'm not quite

17  sure that that's the type of violation of federal law that

18  would hold up a plan, because, well, there are a lot of

19  cases where federal and state taxes have not been paid by

20  Debtors, and the plan pays those taxes back.  If it were

21  something else, let's say it were an illegal activity, I

22  think I'd have to assess what that activity is and whether

23  or not it would be appropriate to confirm the plan.

24      THE COURT:  Was the restaurant growing or selling

25  marijuana, for instance?

102

1          MR. GOODRICH:  It was not, your Honor.

2          THE COURT:  At least not out at the front.

3          MR. GOODRICH:  They better not have been selling

4 it whatsoever, your Honor.  I am a very, very difficult

5 Trustee when it comes to things like that.

6          THE COURT:  Excellent.  Excellent.  All right.

7 So, now, you say that the plan is about ready to pay off

8 everything.  Is that correct?

9          MR. GOODRICH:  That's correct.  I think we have

10 about 300,000 left to go.

11         THE COURT:  Now, unfortunately, I believe Mr.

12 Murrietta passed away, but his wife is still with us.  They

13 were in their 80s, perhaps 90s?

14         MR. GOODRICH:  Mr. Murrietta passed away at age

15 86.  I think Mrs. Murrietta is now 86.

16         THE COURT:  What will happen -- under the plan,

17 what happens to the asset once you complete your job as the

18 liquidating Trustee -- or the disbursing Trustee?

19         MR. GOODRICH:  I'm going to return it to Mrs.

20 Murrietta.

21         THE COURT:  And what are you returning to her in

22 terms of a value?

23         MR. GOODRICH:  I'm returning an absolute gem.  The

24 business is incredibly profitable.  It will have no debt,

25 and if it's managed correctly after my term is up, she'll

103

1 live comfortably for the rest of her life, and her family

2 will probably live comfortably for the rest of their lives

3 as well.  It's a million dollars in profit every year, if

4 not more, and it's easily franchisable.  They could open up

5 multiple stores and make a lot of money.

6          THE COURT:  By this questioning and the answers

7 that you've provided, I'm trying to make sure people

8 understand that the Chapter 11 process is something that can

9 be a net positive to any industry that is eligible to be in

10 Chapter 11, and you have served the Debtor, the creditors,

11 the government, with respect to the payment of taxes,

12 enormously.

13          And so I thank you for letting us have that story,

14 because now you'll at least understand a little bit about

15 how I appreciate the Chapter 11 process, and how it can even

16 transcend to these very large cases.

17          Thank you, Mr. Goodrich.

18          MR. GOODRICH:  Thank you, your Honor.

19          THE COURT:  Thank you, Mr. Golden.

20          Mr. Celentino, how do you want to proceed?  I'm

21 going to now rule that I will allow you to conduct an

22 auction.  It's your -- I mean, it's Mr. Marshack's auction.

23 How would you like to proceed?  And then, again, I'm not

24 going to be ruling on anything until we know that we have a

25 deal.  And understand, it's 15 minutes until 1:00.

*Briggs Reporting Company, Inc.*

1          MR. CELENTINO:  Your Honor, if the Court is

2    planning on allowing the auction to take place with at least

3    what it has just said, it's going to rule that it will at

4    least allow the auction to take place, may I suggest, for

5    some of us that have been up all night, that we take a

6    break, allow the parties to have a quick lunch break, we

7    will formulate an approach on the auction, and that we come

8    back in a short period of time, if it's not inconvenient for

9    your Honor, to actually conduct that auction, and make the

10   presentation concerning the bids and the bidders?

11         THE COURT:  What time would you like court to

12   recommence?  It's now 15 until 1:00, Pacific Time.

13         MR. MARSHACK:  Your Honor, Richard Marshack,

14   Chapter 11 Trustee.  I need every bit of an hour, because

15   not only am I going to try to draw conclusions, but I need

16   to have time, plenty of time with the --

17         THE COURT:  Well, that's fine.  You need an hour.

18         MR. MARSHACK:  -- with the U.S. Trustee and the

19   creditors' committee.

20         THE COURT:  See how easy that is, Mr. Marshack?

21         MR. MARSHACK:  I need an hour, maybe even 2:00

22   o'clock.

23         THE COURT:  That's all you need to say.

24         MR. MARSHACK:  How about if --

25         THE COURT:  We will come back at 15 until 2:00 --

105

1        MR. MARSHACK:  Thank you, your Honor.

2        THE COURT:  -- or, alternatively, 1:45.

3        MR. MARSHACK:  We would choose 1:45, your Honor.

4        THE COURT:  So, now, for the folks on Zoom, you

5   may sign off, and 15 minutes before the time of returning,

6   we will be back on, so that you can come aboard.  So let's

7   put it into perspective.  On Pacific Time, 1:30, we will

8   reopen Zoom, and we will have court opened again at 15

9   minutes until 2:00.

10       Mr. Marshack, is that fine for you?

11       MR. MARSHACK:  Your Honor, may everybody leave

12  their personal belongings in the courtroom?

13       THE COURT:  We will be more than happy to allow

14  that.  Let me ask -- that's fine.

15       MR. MARSHACK:  Thank you, your Honor.

16       THE COURT:  Okay.  Court is in recess until 15

17  minutes until 2:00.

18      (Proceedings recessed to reconvene.)

19

20

21

22

23

24

25

1                        <u>AFTERNOON SESSION</u>

2                           --oOo--

3            THE CLERK:  All rise and come to order.  This

4     United States Bankruptcy Court is now in session.  The

5     Honorable Scott C. Clarkson, presiding.

6            THE COURT:  Please be seated.

7        (Music playing.)

8            UNIDENTIFIED SPEAKER:  Sorry.

9            THE COURT:  I thought we were going to go into

10    John Cougar here for a second.  I could name that tune in

11    two notes.

12            Mr. Celentino.

13            MR. CELENTINO:  Thank you, your Honor.  And thank

14    you for affording us that opportunity.  We appreciate it

15    very much.

16            I would like to make my presentation.  I

17    understand that there are, in fact, as auctions sometimes

18    happen, others may wish to have comments.  But at least for

19    the portion of what we would like to do today, we'd like to

20    go forward with an auction.

21            We have presented to the Court the initial bid of

22    the stalking horse bidder, Consumer Legal Group.  Mr.

23    Marshack is thankful to Consumer Legal Group for making

24    their bid.  In fact, at a time when many bidders were scared

25    because of the circumstances of the case, and they never the

1  less had the wherewithal to make a bid that is competitive

2  and that we appreciated very much.

3          If I may grab document 316, your Honor?  If your

4  Honor will turn to me to what is page four of that document

5  316, we have two different competing overbids.  And I

6  understand that there are a few changes in material -- in

7  economic terms on one, and there are a few changes in what

8  would be the non-economic terms on another.

9          For the purposes of the overbid proceeding, I

10 think I want to make clear, so that we know what Mr.

11 Marshack has been asked to consider, so that we can provide

12 the Court with Mr. Marshack analysis.

13         With respect to the offer from Morning Law Group,

14 there have been discussions between the committee and the

15 Trustee, and the committee and the Trustee have reached a

16 consensus on material modifications to the APA for the

17 benefit of the estate, the consumer, and we think the buyer.

18         And we understand from Morning Law Group that

19 these material modifications, subject to confirming that

20 there are no other material modifications, are going to be

21 acceptable to Morning Law Group.

22         We're going to spell out in that APA that as of

23 the date of the closing, there will be an association

24 agreement and indemnity entered into, so that for the 90-day

25 period that the consumers have to assume or reject and

108

1  object to the assignment assumption on the one hand, and

2  they have the parallel state law proceeding to opt out on

3  the other.

4         The Morning Law Group will enter into that service

5  agreement and indemnity the estate for providing the

6  services to the consumers at a time when it isn't obvious

7  that the consumers will be obligated to pay for those

8  services.  And we thought that was pretty important.

9         Second, that the monitor will have as an expanded

10  duty -- or it is contemplated by us, that the monitor will

11  also give input on the reformation of the fee agreement.

12  That came up in this morning's hearing before your Honor.

13  We think that's appropriate, and we want to make sure that

14  there is an attestation by the Morning Law Group that they

15  understand that.

16         In addition to monitoring their economic

17  performance and compliance with the representations,

18  warranties and statutes, that the monitor will have an

19  opportunity to review and recommend bulk changes to the fee

20  agreement as she believes appropriate, ethically

21  appropriate.

22         Third, with respect to the privacy circumstance,

23  that Morning Law Group will make its privacy policy

24  available for review by the Privacy Ombudsman, so that if

25  there are any major flaws identified by that Privacy

109

Ombudsman -- and by that flaw, I mean a topic dealt with
inappropriately, they will be in a position to modify their
privacy policy consistently.  We're not talking about syntax
or something like that, we're talking about a private policy
and the substance of it.

Fourth, that they understand that there are two
parallel paths that I mentioned before, not just the opt-out
notice, but also the assignment and assumption path on those
contracts, and that they will comply with the provisions as
put forth in the notice that will be part of the sale order.

And fifth and last, and this is important to
Morning Law Group.  Mr. Squires is here as a representative
of Morning Law Group because, notwithstanding the best of
circumstances, Joshua Armstrong, who has submitted the
declaration in support of the offer of Morning Law Group, is
right now in Ireland and unable to be here.

And he's done his declaration of good faith, but
we want to make sure that the Court understands, and Mr.
Squires wanted the Court to understand, because Mr. Squires
is a member of the post-trustee management team, and that
management team is up for consideration in August, by making
the bid today and being considered, Mr. Squires is
withdrawing from further operation under the management
team.  He will submit an administrative claim for his past
services up through today.  He will have no role in the

110

1  future management of the Debtor's operation until such time

2  as, of course, he closes on the transaction with Morning Law

3  Group.

4        Gary Depew and Alex Rubin are going to remain

5  employees under the management agreement to the Trustee.

6  They are necessary in our view to be the Trustee's eyes and

7  ears at the operation to ensure that the database is

8  properly maintained, that customer service representatives

9  are doing their job.  To make sure that the lawyers are

10  getting communication and doing their job.  And most

11  important, to make sure that the electronic communications

12  are maintained.

13        But Mr. Squires has agreed to that position.  It

14  is my understanding that when he acknowledges those

15  agreements, that that satisfies the concern of the creditors

16  committee concerning Morning Law Group.

17        Is that correct, Mr. Owens?

18        MR. OWENS:  Yes, that's correct.  So, the proviso

19  that the limited objection will be withdrawn, assuming that

20  those conditions are satisfied, the sale order and the APA

21  are consistent with what Mr. Celentino represented.  And we

22  do reserve rights with respect to the CLG settlement

23  agreement, which is not being heard yet, but that's after

24  this hearing -- after this sale auction.

25        THE COURT:  Thank you.

111

1      MR. OWENS:  Thank you, your Honor.

2      MR. CELENTINO:  So having said that, your Honor,

3  before we present a proposed bid from the Morning Law Group,

4  we want to make sure that they understand if they're the

5  successful bidder, those conditions I just expressed are

6  appropriate.  And whether or not they're the successful

7  bidder, a withdrawal of Mr. Squires from the management team

8  effective before the bid begins, is effective no matter

9  what.  And I want to make sure that the record reflects that

10  Mr. Squires and Morning Law Group agree to those

11  circumstances.

12      Is that the case?

13      MR. SQUIRES:  Yes.

14      MR. CELENTINO:  Could you take the podium and say,

15  yes, or answer the question?

16      MR. SQUIRES:  Yes, I understand that agreement.

17      MR. MARSHACK:  If you don't mind?

18      Your Honor, the order, if they are the prevailing,

19  bidder, will require that Mr. Russ personally will be

20  obligated to -- along with his company, will be obligated to

21  cooperate with the monitor.  And that he will acknowledge to

22  this Court that if he's not cooperative, that the Court may

23  conduct proceedings to make sure that he cooperates with the

24  monitor.  Mister --

25      THE COURT:  Well let me ask you this.  What

112

1  jurisdiction will I have to enforce anything with respect to

2  the third-party buyer?

3          MR. MARSHACK:  Consent in the agreement.  In the

4  agreement they are consenting to give you jurisdiction to

5  enforce their contract with this estate.

6          THE COURT:  Ninth Circuit says I can't do that.

7  Ninth Circuit says that I can't -- somebody just can't

8  consent.  That I've got to actually have jurisdiction.

9  And --

10          MR. MARSHACK:  I'll leave it to the lawyers to --

11          THE COURT:  -- one of the things you might

12  consider is, would this be your related-to matter, yeah,

13  under Wellness and Stern v. Marshall.  But just because you

14  say, I consent to the jurisdiction doesn't necessarily mean

15  you get it.  I only can exercise jurisdiction of what I

16  have.

17          MR. CELENTINO:  Your Honor, Mr. Squires is -- has

18  consented to jurisdiction of this Court.  He's filed a claim

19  in the case.  He is a prepetition creditor, and he has

20  agreed to be part of the Trustee's management team under a

21  document that we have submitted to the Court, which

22  obligates him to fiduciary duties to the estate.  So, he has

23  consented to the jurisdiction of this Court and has acted

24  consistent with the Court's subject matter jurisdiction over

25  him.

1          So, I think at this -- at this point, related to

2    matter or otherwise, it's a-- the core matter of the

3    bankruptcy case is this auction.  The core matter of the

4    Trustee's operation was to retain management to assist him.

5    And Mr. Squires has agreed to the jurisdiction of the Court

6    as a fiduciary duty to the Trustee in that management

7    agreement.  I think that is sufficient in addition to the

8    Section 105(a) power that the Court has to appoint the

9    monitor in the first place.

10          So, it will be consent and it will be the 105(a)

11   power to appoint the monitor and the consent of Mr. Squires

12   and the other bidders, because we have to deal with that

13   next.  But the consent of Mr. Squires I think is

14   appropriate.

15          MR. SQUIRES:  I consent.

16          MR. CELENTINO:  Mr. Ghio brought up a good point,

17   too, your Honor.  We'll add that by incorporating the sale

18   terms and the overbid terms and the monitor terms into the

19   plan that we propose to the Court, your Honor will also have

20   jurisdiction over the parties to the plan.

21          And that we will include in the plan these

22   essential provisions that lead us to the opportunity to

23   confirm a plan in the case.  And I think that also is

24   sufficient jurisdiction.

25          THE COURT:  How else can I help you?

114

1          MR. CELENTINO:  We'd like to turn to the terms of

2  the second overbid, your Honor, because it has adjusted,

3  also.  And the Court need -- and the parties need to

4  understand the adjustment that's been made, so that we can

5  then have Mr. Marshack's recommendation to the Court on how

6  to start the auction and take place.

7          The same terms as Mr. Squires' and Morning Law

8  have been tendered to Bensamochan Law Firm by the committee

9  and by the Trustee.  Those terms are the service agreement

10  with indemnity, the monitor consent and review of the fee

11  agreement, in addition to compliance.

12          The privacy policy review by the Privacy

13  Ombudsman, and that there is a parallel path that's not just

14  an opt out/opt in by the creditor under the notice to

15  consumer, but there is a 365 assumption and assignment

16  notice.  So, there are two parallel paths for establishing

17  the final list of consumer clients.

18          Bensamochan Law Firm does not have to have to deal

19  with whether or not they were part of the management team,

20  because they're not.  So, that issue doesn't -- doesn't

21  apply.

22          May I -- may I have the consent from you, Eric, to

23  those terms?

24          MR. BENSAMOCHAN:  Eric Bensamochan on behalf of

25  the Bensamochan Law Firm.  I so consent.

*Briggs Reporting Company, Inc.*

115

1          THE COURT:  Thank you.

2          MR. CELENTINO:  With that in mind, your Honor,

3 there is a modification to the economic terms that Mr.

4 Bensamochan has indicated to us.  That modification is as

5 follows.  The -- that particular contract has what amounts

6 to $1,000,000 down payment, keeping in mind that this is the

7 lender that made --

8          THE COURT:  They get credit for the 250,000.

9          MR. CELENTINO:  The get credit for the 250 from

10 Wednesday.

11          In addition, what we are informed is, for the

12 first 12 months of operations, they are going to make a

13 additional what -- down payment wouldn't be correct, but an

14 additional cash payment not tied at all to the services, and

15 not tied at all to the operations, but from a different

16 source, of $300,000 a month for 12 months, increasing their

17 amount of cash at the end of the first full year to the

18 equivalent of $4.6 million.

19          Do I understand that correctly?  Would you take

20 the podium, sir, so the record can hear?

21          MR. BENSAMOCHAN:  That is correct.

22          MR. CELENTINO:  Thank you.

23          Your Honor, following up on your question, I am

24 reminded by Mr. Hays, and I am sorry in the heat of the

25 moment I had forgotten myself, that 28 U.S.C. Section

116

1  1334(b) provides that the district court shall have original

2  but not exclusive jurisdiction of all civil proceedings

3  arising under Title 11 or as interrelated to Title 11.

4       So, pursuant to the sale, the estate has an

5  interest in the proper servicing of the files and the

6  percentage income that the estate will -- the estate will

7  receive from either of these transactions.  And, therefore,

8  I believe the Court has the proper jurisdiction under

9  1334(b) over both of these bidders and their principals.  I

10  don't know if your Honor would like more on that or not, but

11  that's what I think is appropriate.

12       With that in mind then, your Honor, if we can

13  proceed.  As indicated, the Trustee is thankful to Consumer

14  Law Group for putting us in the position that we are to

15  actually have overbidders.  Analyzing the two offers as they

16  have been presented to the Trustee, the Trustee believes

17  that the auction -- highest auction price is offered by the

18  Morning Law Group.

19       The Morning Law Group's total down payment exceeds

20  on day one the one year down payment of the Bensamochan Law

21  Firm, even with the addition of the $300,000 a month from a

22  different source.

23       Looking at the comparison -- comparative

24  statistics, the actual offer from the Morning Law Group

25  exceeds the Bensamochan Law Group by $2,000,000 in the

*Briggs Reporting Company, Inc.*

117

1  aggregate in terms of what is the appropriate evaluation by

2  the Trustee.  It is for that reason that the Trustee

3  believes the offer from the Morning Law Group is a

4  successful first and highest overbid of the CLG offer, and

5  the Trustee will undertake the auction to begin with the

6  offer from the Morning Law Group, to determine if either CLG

7  or the Bensamochan Law Firm would like to make a bid that

8  exceeds the valuation that the Trustee has attested to the

9  Morning Law Group.

10         THE COURT:  And let me make something clear to the

11 parties that have never been involved in a significant

12 auction like this.  You can ask for a recess.  You can ask

13 for time to consider.  You can ask for time to discuss with

14 the Trustee or his professionals.  It's not a cattle auction

15 down at the state fair.  So, if you want a time to discuss

16 just ask, and we will be more than happy to provide that.

17         MR. CELENTINO:  According -- thank you, your

18 Honor.  According to the notice, the next increment, should

19 there be an overbidder, would be $500,000.  The offer of the

20 Bensamochan Law Group is about $2,000,000 low on the back

21 end, and it is low on the front end.

22         So, if there is an offer, that offer on the front

23 end or the back end would have to add up to $500,000 more

24 than the offer of the Morning Law Group to be a next

25 overbid.

118

1          THE COURT:  So, do you want to explain to any

2   overbidder how much that would be?

3          MR. CELENTINO:  May I have one second, your

4   Honor --

5          THE COURT:  Of course.

6          MR. CELENTINO:  -- to do the math?  I don't do

7   math very well in my head.

8          THE COURT:  Well, this is technical, and there are

9   a lot of moving parts in this auction.

10      (Pause.)

11          MR. CELENTINO:  In order for the next bid to be

12  higher on the economics, your Honor, the down payment would

13  need to be increased to $6,000,000.  So, that's an

14  additional $500,000.  And the back end adjustment for future

15  payments would have to be increased by $2,016,017.  And that

16  -- let me make sure that I've done that number right.

17          I made a math error, your Honor.  One second.

18  Again, please bear with me, your Honor, while I make the

19  calculation.

20          THE COURT:  I'm in no hurry.

21          MR. CELENTINO:  Thank you.

22          THE COURT:  My time is valued about a nickel an

23  hour.

24      (Pause.)

25          MR. CELENTINO:  My mistake, your Honor.  On the

119

1 front end, the component, the difference between the current

2 Morning Law Group offer and the Bensamochan Law Group offer,

3 is a $1.9 million cash increase on the front end, and the

4 $2,017,016 that I indicated on the back end.  Two million.

5         THE COURT:  Does that include the procedures

6 $500,000 overbid minimum?

7         MR. CELENTINO:  So, the $500,000 overbid minimum

8 would -- you're correct, would be an additional $500,000 at

9 the front end.  I'm going to do that math one more time,

10 since I made that mistake.

11         THE COURT:  I actually figured it out in my head.

12         MR. CELENTINO:  That's awesome.  I -- obviously at

13 a penny an hour, you're undercompensated.

14         THE COURT:  I'm worth it.  There's got to a

15 mathematician ombudsman somewhere.

16         MR. CELENTINO:  Two-point-four-million dollars on

17 the up side, your Honor, and $2,017,000 -- two-million-

18 seventeen-thousand-sixteen dollars on the back end.

19         THE COURT:  Now, let me ask you this before we

20 start chilling the bidding.  Would you take less than that?

21 Not with -- I mean, the only reason that you've made that

22 statement is the -- is the $500,000 increment that's

23 required.  Would you take less than that?

24         MR. CELENTINO:  I think the Trustee would consider

25 less than that, your Honor.

120

1          THE COURT:  Okay.

2          MR. CELENTINO:  Given the $500,000 minimum

3    increment, I believe that the number that I had provided

4    earlier by -- a five-figure number higher would be

5    appropriate, if it's offered.  So, it could be $1,910,000

6    cash on the front end, but the back end is where the

7    differential is substantial, and that back end can be

8    increased by making a percentage increase that equals that

9    $2,017,016.

10          THE COURT:  Exactly.  What I'm trying to point out

11   is to the -- uninitiated, is that there are various ways you

12   can adjust these types of bidding that's going on, and it

13   will still result in the Trustee being able to determine

14   whether the overbid that comes next is a higher and better

15   bid.

16          So, let's not chill the bid -- the reason that you

17   have these increment adjustments, in terms of hard numbers,

18   is so that you move faster normally with bidding.  But in

19   this case we don't need to move very fast.  We can have

20   everyone think about the amount of money they want to spend,

21   how much their risk is, what their deltas are and the like.

22          And so, what I want to do is make sure that

23   anybody that wants to overbid isn't chilled in any way.

24          MR. OWENS:  Your Honor, my apologies.  Keith Owens

25   for the committee.  I think there may be a discrepancy in

121

1  the numbers, which I'd like to a minute to discuss with Mr.

2  Celentino.

3          THE COURT:  Let's not get the numbers wrong.

4          MR. OWENS:  That's what I -- it's better to nip it

5  in the bud.

6          THE COURT:  Let's not come back again because we

7  want to save a few minutes.

8          MR. OWENS:  Thank you, your Honor.

9          MR. MARSHACK:  Could we meet outside for two

10 minutes?

11         THE COURT:  Should we go into recess?

12         MR. MARSHACK:  Yes.

13         THE COURT:  All right.

14         MR. MARSHACK:  Your Honor, I may be proposing that

15 we just pivot.  The gentleman to my left and gentleman to my

16 right may walk me out of this, but I'm -- I may be proposing

17 that we go with a pure sealed bid.  Everybody give me your

18 highest bid.  So --

19         THE COURT:  No, I don't think you should do that.

20 I think -- you know, the fact is, you don't know if there's

21 collusion then.  I want to hear it in open court.

22         MR. MARSHACK:  Thank you, your Honor.

23         MR. CELENTINO:  Our apologizes, your Honor, but

24 we'll go get it right.

25         THE COURT:  You don't need to apologize.  This is

122

1   what the process is.  So, we're still on the record, but

2   we're going to go off the record in a minute.  Please,

3   everyone understand.  In significant auctions like this,

4   these sometimes take hours and days.  So, don't be

5   surprised, don't be concerned.  These types of negotiations

6   always happen in these types of cases.

7           So, we'll go off the record now, and we'll wait

8   for Mr. Marshack to advise.

9      (Proceedings recessed briefly.)

10          THE CLERK:  Please be seated and come to order.

11  Court is back in session.

12          THE COURT:  Hello, again.

13          ALL PARTIES:  Good afternoon, your Honor.

14          MR. CELENTINO:  For the record, your Honor,

15  notwithstanding what was a very good test for me, if math

16  were on the law school admission test, I wouldn't be before

17  you I'm pretty sure.  So, my apologies.

18          The committee brought to our attention that we had

19  two errors in our numbers.  And then the Bensamochan Law

20  Group brought to our attention that there is a provision

21  that is in their offer that they are not waiving, so I need

22  to make those corrections so our record is clear.

23          As you see, your Honor, the documents are based on

24  assumptions of what we believe the data says and what we

25  believe the percentages of the receivables would be worth.

123

1  In the Morning Law Group transaction, the Morning Law Group

2  is not agreeing to pay an additional sum regarding the admin

3  loans that are place.

4          So, we have made a mistake by deducting those from

5  their amount.  Those will be a result of the estate.  So

6  that admin loan number and that net number from the Morning

7  Law Group is incorrect.  The estate will be bearing those

8  fees, and the total number, the 84,000 -- excuse me, the

9  $84,490,990 is intact, that total of that offer evaluated by

10 the Trustee.

11         The two errors that we have in the Bensamochan Law

12 Group numbers change things a bit.  Under the admin loan

13 column, they are to be deducted for the repayment of their

14 $250,000.  So that would reduce the net by a lower amount

15 than we reduced it before, but that's not the difficult

16 issue.

17         The difficult issue is, the Bensamochan Law Group

18 pointed out to us that they are going to insist on a 20-

19 percent administrative fee, which is their right.  That is

20 in the APA, and that 20-percent administrative fee would

21 come off the top.  We had understood they were accepting the

22 joint agreement that was proposed by the Trustee and the

23 committee, and that joint agreement eliminated that 20-

24 percent fee.  That is fine with the Morning Law Group.  That

25 is not fine with the Bensamochan Law Firm.

124

1          So that changes these numbers in the columns as

2     follows.   In the second column the number that was

3     59,000,000 reduces to 47,295,300.   In the third column, the

4     number that was 4,967,000 and change, becomes 4,857,567.   In

5     the third column they have increased their 45-percent to 55-

6     percent, and that's 7,451 becomes 7,286,350.

7          And last in the fourth column, the number that

8     9,935,000 becomes 9,715,134.   Adjusting then, your Honor,

9     for the $250,000 deduction from the new total, the back-end

10    offer on that particular bid would be 69,154,351, based on

11    the assumptions that are applied to all of the offers by the

12    Trustee, same assumption, in terms of the value of the file,

13    the number of the files and the length of the files.

14         As a result, at the current offer from the Morning

15    Law Group on the economics, on the front end, it is

16    currently $950,000 higher than the competing offer.   On the

17    back end, it is based on assumptions, which may not prove

18    true, but based on assumptions, it is the difference between

19    84,490,900 on the one end, and 69,154,351 on the other.   Mr.

20    Ghio is going to tell me that number, but it is a

21    substantial number.   That's -- the delta, your Honor, would

22    be 15,336,549 on the back end.

23         With that in mind, I do believe that Mr.

24    Bensamochan has an additional comment that he would like to

25    make on the up-front numbers, and he would like to make an

125

1  additional bid in that regard, and I'm going to allow him to

2  take the podium and announce that, if that's the right time.

3          THE COURT:  Well, he understands he's making the

4  statement to Mr. Marshack, not to me.

5          MR. CELENTINO:  I understand.  I understand.

6          THE COURT:  You understand that I'm not conducting

7  this auction.

8          MR. BENSAMOCHAN:  No, I fully understand, your

9  Honor.

10          MR. CELENTINO:  I just want --

11          THE COURT:  Come -- he wants you to come forward I

12  think.  I have no idea why, but come forward.

13          MR. CELENTINO:  I'd like him to come forward so he

14  can be heard by the parties, your Honor.

15          THE COURT:  Okay.  He wants you to talk to Mr.

16  Marshack --

17          MR. BENSAMOCHAN:  Okay.

18          THE COURT:  -- at the podium.

19          MR. BENSAMOCHAN:  Mr. Marshack and counsel, the

20  Bensamochan Firm is increasing the offer of $300,000 a month

21  for 12 months to 300,000 a month for 15 months from outside

22  sources, and waiving the $250,000 loan made to the estate a

23  few days ago, increasing the down payment from 750 to

24  1,000,000.  That's it.

25          THE COURT:  That's a good statement.  Well done.

126

1          MR. BENSAMOCHAN:  Thank you, your Honor.

2          MR. CELENTINO:  And your cash down payment is

3 still 750?

4          MR. BENSAMOCHAN:  Plus the 250 waiver.

5          MR. CELENTINO:  Thank you, your Honor.

6          The economics then of the offers, $5.5 million

7 from the Morning Law Group, paid cash at closing.  Five-

8 point-five-million dollars from the Bensamochan Law Group,

9 1,000,000 of which is paid at closing, 4.5 million of which

10 is paid in monthly increments over 15 months.

11          I believe those to be -- well, are there any

12 persons in the courtroom who wish to address Mr. Marshack

13 with any additional bids for his consideration?

14          MR. OWENS:  I would like people to address me and

15 the creditors committee, okay?

16          MR. CELENTINO:  I believe, your Honor, we have

17 come to the conclusion of the economics of the offers.  As

18 indicated in my earlier presentation, I do know that Mr.

19 Marshack would now like to caucus with the parties-in-

20 interest at the United States Trustee's Office, the

21 creditors committee, and I'm certain he will want to hear

22 from anybody who has an opinion, so that he can caucus with

23 the creditors, and in 15 minutes come back and make his

24 recommendation to your Honor, if you'll entitle us to that

25 15 minutes, so we can recommend the bid that he believes is

127

1  the highest and best.

2          THE COURT:  We will adjourn until 3:15.

3          MR. CELENTINO:  Thank you, your Honor.

4          THE COURT:  You're welcome.

5      (Proceedings recessed briefly.)

6          THE CLERK:  Please come to order.  Court is back

7  in session.

8          THE COURT:  Please be seated.  How we doing?

9          UNIDENTIFIED SPEAKER:  Very well, your Honor.

10          MR. CELENTINO:  I note committee counsel is not

11  back yet, your Honor.

12          THE COURT:  Who?

13          MR. CELENTINO:  Committee counsel is not back yet.

14          THE COURT:  Mr. Owens and mister --

15          MR. CELENTINO:  Mr. Owens, Mr. Koffroth are not

16  back.

17          THE COURT:  Koffroth.  All right.  We'll wait.

18  But please keep your telephones away from the microphones.

19  It causes interference on the recording system.

20          MR. OWENS:  I'm sorry to keep you waiting.  I

21  know.  We are trying to poll our committee, and we are

22  having an issue.  And so I'm in there with -- we're trying

23  to reach our committee and it will take a little bit of

24  time.

25          THE COURT:  Is it a technology issue or a policy

128

1  issue?

2        MR. OWENS:  It's a policy issue, and it's just

3  trying to get a hold of the folks that we need to get a hold

4  of.  So --

5        THE COURT:  Please, go ahead.

6        MR. OWENS:  -- we will do our best and we will

7  report back.

8        THE COURT:  Do you want us to adjourn, or do you

9  want us --

10        MR. OWENS:  I don't want to hold you up from --

11  and I apologize, but I -- yes.

12        THE COURT:  So, what I'm asking you is, do you

13  want us to proceed or do you want us to wait for you?

14        MR. OWENS:  I think if you could adjourn for 10

15  minutes.

16        THE COURT:  Ten minutes it is.

17        MR. OWENS:  Yeah.

18        THE COURT:  No problem.

19        MR. OWENS:  Thank you, your Honor.

20        THE COURT:  Solve problems now, you won't have

21  them later.

22        MR. OWENS:  Thank you.

23        THE COURT:  We're off the record.

24      (Proceedings recessed briefly.)

25        THE CLERK:  Please come to order.  Court is back

129

1  in session.

2       THE COURT:  No, sit down.  No more standing.  It's

3  4:00 o'clock.  No standing.

4       You can stand, Mr. Celentino.

5       MR. CELENTINO:  Thank you, your Honor.  I will

6  have some additional good news after this, but Mr. Marshack

7  has asked me to present to the Court that based on the

8  bidding and the offers and his review of the offers and the

9  agreements, there are several factors that are important to

10  him in recommending the approval of the bid of Morning Law

11  Group, and we would like to make a quick record on that.

12       Economically speaking, the Morning Law Group bid

13  was best.  There are several things that were set forth in

14  the declarations that we know to be the intention of the

15  Morning Law Group, and they filed two good-faith

16  declarations this morning for our consideration on the issue

17  of good faith.

18       The first is that the operations manager, Eeyah,

19  E-E-Y-A-H, Tan, T-A-N, is going to be retained by the

20  Morning Law Group, and she will be maintained and provided

21  with complete password access to the operation, so that the

22  provision of the agreement that says that the Trustee and

23  the committee and the monitor will continue to receive

24  reports, will also include that Ms. Tan and Mr. Squires will

25  keep in touch with the Trustee and allow the Trustee open

1  access to the books and records of the business.

2        We think that that, coupled with the monitor,

3  gives us the best opportunity to pay close attention to make

4  a good resolution here for the customers.

5        Second, we understand that most of the current

6  employees working in the facility, at least 80-percent, will

7  be maintained by Morning Law Group.  That continuity the

8  Trustee feels is important for the consumer clients, many of

9  whom having received this notice, were interested only in

10 knowing whether their accounts are being maintained, and

11 that their litigation is being handled.

12        Third, the Morning Law Group has pledged as part

13 of their plan that they are going to continue to use the

14 current network of LPG special counsel that make the state

15 law appearances in the 50 states in the U.S.  They are

16 currently handling approximately 2,000 litigation matters as

17 we speak, and the continuity for the clients and the

18 consumers will be very important.

19        So, it is for all of those reasons that the

20 Trustee believes that the bid of the Morning Law Group

21 should be approved by this Court as the highest and best

22 bid.

23        THE COURT:  Okay.  Let's -- get me some numbers

24 here.  What is the down payment that you're going to get,

25 and when you're -- when are you going to get it?

131

1          MR. CELENTINO:  So, we have received, your Honor,

2    the $500,000.  The second $500,000 that results in the

3    $1,000,000 down payment is in a client trust account.  It

4    will be wired to the Trustee by Monday.  After that, the

5    remaining balance of the down payment is due at closing.

6    Closing will take place according to the agreement on or

7    before the 24th or the 31st, and that is the drop-dead date

8    is the 31st of July.  That --

9          THE COURT:  And how much will that down payment

10   be?

11         MR. CELENTINO:  The total down payment will be the

12   $500,000 that has been loaned will be retained, and the

13   balance of $5,000,000 will be paid.

14         THE COURT:  So, just because I'm confused, I'll

15   ask.  You're going to -- you've received 500,000.  You're

16   going to receive 500,000 by Monday, and you're going to

17   received 5,000,000 --

18         MR. CELENTINO:  We will received 4.5 million at

19   closing.

20         THE COURT:  And that will be between the 24th and

21   the 31st?

22         MR. CELENTINO:  Based on the document that was

23   signed by the parties, yes, your Honor.

24         THE COURT:  And for the record, this is the 21st.

25         MR. CELENTINO:  Correct.

*Briggs Reporting Company, Inc.*

132

1          THE COURT:  Now, Mr. Owens, have you resolved any

2    difficulties that you might have been having?

3          MR. OWENS:  Yes, your Honor, we have.  And we

4    would support that offer as the highest offer, with the

5    caveat that the APA -- or the PSA that has been signed is

6    going to be modified as previously stated on the record to

7    include the provisions that we want in there.  And I think

8    that Mr. Squires has agreed, too, subject to final approval,

9    if they're not materially different.

10         THE COURT:  Mr. Marshack, would you come to the

11   podium?  Being the Chapter 11 Trustee, is the bid that Mr.

12   Celentino has described truly in your judgment the best and

13   highest offer that the estate could receive today?

14         MR. MARSHACK:  Absolutely, your Honor.  And one

15   factor that I want to emphasize.  Not only monetarily is it

16   the best, but we have loyal employee and they're going to

17   get to keep their jobs.  That's important.

18         THE COURT:  Thank you.

19         Well, the Court has now heard from the Trustee,

20   that the Morning Law Group is the bid that the Trustee

21   desires to accept.  And that it is in his best -- pardon me,

22   in his business judgment the best offer, both highest and

23   best that is achievable at this time.

24         Would anyone like to discuss that decision and the

25   Trustee's business judgment, and where it might be falling

133

1 short, so that I can consider the possibility that it is

2 falling short?

3        How about on Zoom?  Hearing none, I'm ready to

4 rule.

5        MR. MARSHACK:  One last item, your Honor, before

6 that ruling.

7        MR. CELENTINO:  I understand that the Bensamochan

8 Law Group would like to be considered a backup bidder in the

9 event that there is no closing by the Morning Law Group.

10 And that it would be Mr. Marshack's exercise of his judgment

11 and highest -- the second highest and second best bid should

12 be accepted as a backup bid.  And I understand that that is

13 acceptable for the Bensamochan Law Group, and we would like

14 to have them as an approved backup bidder.

15        THE COURT:  Well, what we should do is put that

16 bid on the record, so that we fully appreciate it and

17 understand it.

18        MR. CELENTINO:  Thank you, your Honor.

19        MR. MARSHACK:  As the backup bidder, they -- I am

20 authorized --

21        THE COURT:  Is this on the record or are you

22 talking to your counsel?

23        MR. MARSHACK:  I'm talking to you.  I'm talking to

24 the Court on the record.

25        I am -- as the backup bidder, I would be

134

1  authorized but not obligated to close the transaction to the

2  backup bidder.

3          THE COURT:  No, I understand.

4          MR. MARSHACK:  I just wanted to make it for the

5  record --

6          THE COURT:  But you need to make it clear to this

7  gentleman here.  It sounds like he's nodding his head, yes.

8          MR. CELENTINO:  I believe he understands, your

9  Honor.

10          THE COURT:  What are the terms of the backup bid?

11          MR. CELENTINO:  The terms of the backup bid, your

12  Honor -- and we will put this in a document to correct the

13  mathematical mistake in document 316.  And so we'll conform

14  it.

15          The amount received to date as the deposit is

16  $750,000.  The $250,000 loan made to the estate by the

17  Bensamochan Law Firm is also going to be allowed to be

18  retained by the estate, so that the deposit is $1,000,000.

19          That law firm has agreed that they will make 15

20  additional payments on a monthly basis of $300,000 a month.

21  So that the total amount received in cash over time is going

22  to be $4.5 million from the time payments plus the

23  $1,000,000 that we will have at close, so that the cash

24  component in the first 15 months adds up to $4,500,000.

25          In addition to that, taking a 20-percent

135

1  administrative fee from the accounts receivable on a going-

2  forward basis for active accounts, they're going to pay a

3  50-percent per month on the active files.  And on the

4  inactive files, they have bumped that to -- up to 55-percent

5  per month over the course of what is remaining on those

6  active files.

7          The Trustee values the combined transaction at

8  $69,154,351.  And that is the offer that has been made with

9  all of the caveats and all of the same terms as Mr. Squires

10  and the Morning Law Group have agreed to, with the exception

11  that the Bensamochan Law Group did not have to resign in

12  order to be a bidder today, is that correct?

13          THE COURT:  One thing -- I'm sorry.  Go ahead.

14          MR. CELENTINO:  Did I state that correctly, Mr.

15  Bensamochan?  Thank you.

16          THE COURT:  So one thing I did not get is the same

17  final number, which is the estimate of the Morning Law Group

18  bid.  I didn't get the aggregate number that is projected.

19  I understand that it's subject to many factors, but you put

20  a $69,000,000 number on the --

21          MR. CELENTINO:  The Morning Law Group number, your

22  Honor, did not change.  That math was correct I'm proud to

23  say.  That total number was valued at $84,490,990 based on

24  the assumptions based on our review of the data.

25          THE COURT:  Okay.  Thank you.

136

1          And we have Ms. Weiss.

2          MS. WEISS:  Thank you, your Honor.  Excuse me.

3  Sharon Weiss on behalf of Azor Capital.  Your Honor, we,

4  again, have no objection to this sale or the Trustee's

5  business judgment, but I do want to make it clear.  I don't

6  know if I've had the benefit of seeing the last version of

7  the proposed sale order.  And I wanted to make sure that --

8  and remind the Court of our -- of our limited objection,

9  which is that the sale proceeds need to stay segregated

10 until our secured claim is resolved.

11          THE COURT:  I think that's the proposal, but he

12 would get off his phone for second and answer the question.

13          MS. WEISS:  Say, yes, Sharon.

14          MR. CELENTINO:  Yes, your Honor, that is the

15 proposal, and that has not changed from our statement from

16 this morning.  It is in the proposed sale order that we will

17 circulate.

18          THE COURT:  Yeah.  My goal is just to make sure

19 everyone's assured.

20          MS. WEISS:  Thank you, your Honor.

21          THE COURT:  Thank you.

22          Are there any other comments or questions?

23          MR. CELENTINO:  One last comment, your Honor, and

24 it is an important one.  Because we talked about this on

25 Wednesday, and your Honor heard me say that there is a

1  proposal on Friday that will make it positive for the

2  employees until that time of closing.

3          Both documents in the APA's provide that from and

4  after the winning bid, and if the backup bidder is called

5  into service, from and after the backup bidder being called

6  into service, those parties are obligated to advance funds

7  to maintain the operation and take care of the employees.

8  And you noted that, I know, when you read the APA, I just

9  wanted to make sure the record was clear.  And that closes

10 the loop on the comment I made on Wednesday with a bit of

11 foreshadowing that I think is important.

12         THE COURT:  And it closes the loop on the amount

13 of post-petition financing.

14         MR. CELENTINO:  That the Trustee will be seeking,

15 your Honor, yes.

16         THE COURT:  That's right.

17         MS. CHRISTIANSON:  Your Honor, if I may.  Along

18 the lines of Ms. Weiss' comment, I think we wanted to also

19 confirm that Oracle's reservation is reserved in the -- in

20 the sale order.  And that there's -- it clear that there is

21 no transfer of any Oracle license agreement in that order.

22         MR. CELENTINO:  Confirmed.  And to save Mr.

23 Izakelian the actual appearance, also, he made the same

24 reservation, and that is likewise confirmed.

25         MS. CHRISTIANSON:  Thank you for --

138

1          MR. IZAKELIAN:  I appreciate that.  Thank you.

2          MS. CHRISTIANSON:  I thank you, your Honor.

3          THE COURT:  My pleasure -- or Mr. Celentino's

4  pleasure.

5          MR. CELENTINO:  I'm sorry.

6          THE COURT:  No, no.  We were just talking about

7  you while you were talking to your client.

8          MR. CELENTINO:  That will teach me to turn my

9  back.  I think it's --

10          THE COURT:  Never turn your back in court.

11          MR. CELENTINO:  I think -- I never will again.  I

12  think it's important, your Honor, to have Mr. Squires

13  audibly acknowledge that he is moving forward, and then I

14  think your Honor should rule.

15          MR. SQUIRES:  Mr. Squires.  Yes, we are moving

16  forward.

17          THE COURT:  What are you moving forward about?

18          MR. SQUIRES:  With the purchase.

19          THE COURT:  Okay.

20          MR. MARSHACK:  Mr. Squires, and that includes

21  making sure the next -- my next payroll is due in a week.

22  I'm just making sure you will show up with the money for the

23  payroll, right?

24          MR. SQUIRES:  Indeed.

25          MR. MARSHACK:  Okay.  And just for the record, Ms.

139

1  Weiss and no other secured creditor is going to claim an

2  interest in the payroll money?  Do I have -- is -- we should

3  ask that question.  So, I want to make sure that's free and

4  clear money I'm getting for my payroll.

5          MR. IZAKELIAN:  Good afternoon, your Honor.

6  Razmig Izakelian of Quinn Manuel for OHTCBR.  If it's their

7  payroll, that's fine.  We don't have an objection to that.

8          THE COURT:  Thank you.

9          Ms. Weiss.

10          MS. WEISS:  Thank you, your Honor.  For Azor

11  Capital.  We have no objection to money for payroll.  And

12  (indiscernible) ensure it's property of the estate that's

13  being paid by the -- by the buyer.

14          THE COURT:  You're absolutely right.

15          MS. WEISS:  Okay.  Thank you, your Honor.

16          THE COURT:  Do you want to proceed on the item

17  number one now, before we do anything else?

18          MR. CELENTINO:  I've got great news on item number

19  one.

20          THE COURT:  Let me hear it.  Please make my day.

21          MR. CELENTINO:  The Consumer Law Group, the

22  committee and the Trustee have agreed at -- with the Court'

23  indulgence, to continue hearing of that matter, if it's

24  necessary at all, to the August 10th date on which we have a

25  few other matters pending.  And we will re-evaluate the

140

1 pursuit of that matter prior to that time and inform the

2 Court if we do need the time on the calendar.  But if we do

3 need the time on the calendar, it seems that would be a good

4 date for us to reserve it, and it doesn't need to take place

5 today.

6          THE COURT:  Does that have any impact on this sale

7 today?

8          MR. CELENTINO:  It does not.

9          THE COURT:  Thank you.  Well then, it is

10 continued.  Make yourself comfortable, folks.

11          Today the Court has held multiple hearings and has

12 continued one in this case, including the Chapter 11

13 Trustee's motion for entry of an order approving the sale of

14 assets of the Debtor.  That would be docket 191.

15          The appearances have been noted on the record, and

16 the Court now has fully considered the motion, the

17 oppositions, the replies, the supplemental pleadings, the

18 comments of the newly-appointed privacy customer -- Consumer

19 Privacy Ombudsman, the comments of Professor Nancy Rapaport

20 (phonetic), the entire docket as a whole, the oral arguments

21 presented at the hearing.  And for the reasons that I'm

22 going to state now and discuss, I'm going to find that there

23 exists good cause to grant the motion on the terms of the

24 bid that has been now adjudged as the best and highest by

25 the Chapter 11 Trustee.

141

1    In addition to setting a briefing schedule on this

2 motion itself, the Court specifically requested briefing on

3 the authority and ability of the Court to permit a sale of

4 this Debtor's assets, in light of the allegations that such

5 sale could permit the continuance of possibility of legal

6 operations by a successor organization.  That order was at

7 docket number 206.

8    Multiple interested parties filed briefing in

9 response to this request, all of which were carefully

10 reviewed and considered by the Court in reaching this

11 decision.  I applaud everyone in their effort in drafting

12 those supplemental briefs, as well as all of the other

13 pleadings.

14    The primary function of a bankruptcy -- of the

15 bankruptcy code is to set out the rules for dividing up

16 assets that are insufficient to pay a debtor's creditors in

17 full.  One such rule contained in 11 U.S.C. Section 363(f)

18 authorizes a trustee in bankruptcy to sell, with some

19 exceptions and limitations, a debtor's assets free and clear

20 of third-party interest.

21    The Trustee has filed his motion seeking an entry

22 of an order, which I'll now call "the sale order," approving

23 the sale subject to overbid of certain assets of the Debtor

24 and assumption and assignment of certain executory contracts

25 and unexpired leases, and other agreements, including the

1 customer contracts.  We'll call those from now on "the

2 contracts."

3         The stalking horse bidder was Consumer Legal

4 Group.  They were overbid, but we want to thank -- the Court

5 thanks the Consumer Legal Group for its efforts.

6         In response to the motion, as well as the

7 responses to various ancillary motions associated with the

8 proposed sale, including post-petition financing requests by

9 the Trustee pursuant to 11 U.S.C. Section 364, and request

10 for approvals of compromises under Federal Rule of

11 Bankruptcy Procedure 9019, that reflect realities of

12 ownership of estate property.

13        The Court has now observed a significant shift in

14 party-in-interest opinion on the soundness of the motion.

15 This of course is typical of fast paced, sometimes

16 lightening fast bankruptcy proceedings where there exist the

17 so-called melting ice cube situation, which was referred to

18 by Mr. Celentino.

19        Just for the record, the Trustee's related

20 compromise motions were first originally heard on July 11,

21 2023 as docket number 176 and 178, and continued to today.

22 And we have resolved the first and we are continuing the

23 second.

24        The Court reviewing, for instance, the evolvement

25 of the Official Committee of Unsecured Creditors' positions

143

1  on this case, recognize -- recognizes that it takes time and

2  much analysis to fully appreciate both the law and the facts

3  of a particular case.

4       The committee, with well-articulated briefing, has

5  played a very important role in the development of a crafted

6  solution brought to market by the Trustee and his

7  professionals.

8       The United States Trustee, while opposing aspects

9  of the asset sale proposals and the ancillary motions, has

10  opposed the sale in good faith.  It has acted completely in

11  good faith.  The opposition in fact, and the various

12  oppositions filed by the U.S. Trustee, have added value to

13  this Court's consideration and the proposed solutions to

14  dealing with those oppositions to the motion.

15       Those are very valuable aspects to any proceedings

16  in a bankruptcy setting.  Oppositions in good faith will

17  promote the advancement of the end result.  And so, no one

18  should say, well, he opposed it or they opposed it, and they

19  were obstructionists.  It's not the case.  They add to the

20  value and to the results.  And with that, I've already

21  stated earlier in this record how much the Court appreciates

22  that.

23       The contracts, which I'll call "the assets,"

24  they're set forth in the APA, and that's attached to Exhibit

25  2 to the declaration of Trustee Marshack at 91 -- pardon me.

144

1  Docket 191-1.  The APA and this Court's sale order that will

2  be forthcoming will -- would provide and will provide the

3  sale of the assets to a purchaser free and clear of all

4  liens, claims and encumbrances and interest pursuant to the

5  terms of the executed APA and the sale order.

6          And to make note of the secured creditors that are

7  here, and actually preserve their obligation -- their rights

8  and their funds to be later hopefully distributed swiftly to

9  those secured creditors.

10         Furthermore, the APA requires that the contracts

11 upon assignment to a good-faith purchaser will be reformed

12 to comply with applicable law, to require performance in

13 accordance with applicable law, and to permit consumer

14 consent to the transfer of the contract to a good-faith

15 purchaser and counsel in accordance with California Model

16 Rule 1.17 and/or comparable state ethics provisions.

17         The Court has also carefully reviewed the

18 declaration of Peter Bowie, Esquire, a senior member of the

19 Trustee's legal team.  With respect to this views on the

20 ethical considerations of the Chapter 11 Trustee, the

21 attorneys currently representing the Debtor's clients, and

22 the ethical responsibilities of any prospective buyer of the

23 assets of this estate.

24         Mr. Bowie is a distinguished expert on legal

25 ethics and has for years taught legal and judicial ethics to

1 federal judges and attorneys across the nation.  Mr. Bowie

2 also addressed various questions presented by this Court

3 regarding ethical considerations concerning the transaction

4 before Court.  That discussion has assisted the Court in

5 considerations and determinations made today.

6       The statutory basis for relief requested by the

7 Trustee are 11 U.S.C. Section 105(a), 363, 365, 503 and 507.

8 Also, Rules of Bankruptcy 2002, 6004, 6006, 9006, 9007, and

9 9014 of the Federal Rules of Bankruptcy Procedures.

10      The Debtor is a law firm that provides consumer

11 debt resolution services.  Although the evidence of this

12 Court has been presented and the Court observes that the

13 Debtor should have been subject to certain state and federal

14 civil regulatory actions with respect to its former

15 operations, the Court finds little evidence that such

16 regulatory actions have actually been commenced earlier than

17 maybe a month ago, but there may be some complaints.

18      Now, the Court is also cognizant of the private

19 causes of action that have been commenced and are pending,

20 but now stayed against the Debtor, not the Trustee yet.  The

21 fact is, that the cure for these problems will be addressed,

22 but there has been a cure.

23      One aspect of the services sought by the Debtor's

24 consumer clients included being provided attorney services

25 to handle pending litigation, whether on the defense or

146

1  offensive side of pleadings, to address creditors

2  threatening litigation and/or debt collection agencies

3  engaged in unfair debt collection practices pursuant to the

4  Fair Debt Collection Practices Act and California's

5  Rosenthal Fair Debt Collection Practices Act, among others.

6        I cite for that the declaration of R. Reid Prune

7  (phonetic) at docket number 191-3.  The declaration of Jason

8  Rubhun, R-U-B-H-U-N, at docket number 191-4, declaration of

9  Peter Schneider (phonetic) at docket number 161-5, and the

10  declaration of William Tiecars (phonetic), and that is at

11  docket number 191-2.

12        These are functions that can only be handled by

13  attorney and whose service -- whose services would otherwise

14  not be affordable.  Other services provided by the Debtor

15  include settlement negotiations and debt invalidation

16  strategies.  That comes from the declaration of Tiecars,

17  docket 191-2.

18        The Court is appreciative of Mr. Edelman's

19  comments about the fact that clients, or I should say,

20  debtors in distress, need to outreach to local counsels.  I,

21  again, have already said that I wish that pro bono programs,

22  local bar associations and national consumer rights

23  organizations would have a much higher and better

24  advertising budget to actually let those services be known

25  to exist.  It is imperative that we talk to the people that

1  do this, including in fact Congress and state legislatures,

2  to promote the utilization of help desk, help telephone

3  numbers, pro bono -- pro bone programs.

4       I will tell you that I am one of the persons most

5  proud of the pro bono programs that are provided by the Los

6  Angeles County Bar, the Orange County Bar, the Inland Empire

7  Bar.  We really do a great job here.  They also do a great

8  job down in the Southern District of California, and the

9  Northern and Eastern Districts of California.  Each one of

10  those are supported by the State Bar and other outside

11  organizations, and they need to continue to do this.

12       I disagree with Mr. Edelman -- I think that is his

13  name, that that is the only source.  We are in a free market

14  society, and as long as companies are able to stay within

15  the boundaries of the law, and hopefully better than that,

16  and stay ethical, and let people know that they're

17  available, they should be doing so, and they charge for it.

18       And apparently they make a lot of money doing it,

19  and they make it on the -- they don't do retail.  They don't

20  do the retail services, and we -- I've already seen the

21  amount of money that is coming in -- or has come in to the

22  estate and prior to that.

23       The United States Trustee has opposed the Trustee

24  operating the Debtor in the beginning.  The Court and the

25  United States Trustee both have opposed any use of the

1  Trustee by any funds derived from payments received from

2  clients since the Trustee's appointment to fund post-

3  petition operations.

4         The declaration of Trustee Marshack at docket

5  number 191-1 states that he has faithfully obeyed the

6  Court's order and has not used any of those funds for any

7  operational purposes.  This obviously has caused

8  indigestion, and various trips to the Court to attempt to

9  and succeed to get post-petition financing.  It could not

10 have been easy.

11        The compliance has created issues in administering

12 the Debtor's estate, requiring emergency relief.  The

13 Trustee has sought and the Court has granted emergency

14 interim financing from third parties that do not encumber

15 client funds, secured parties' funds or files, in order to

16 prevent irreparable harm to consumer clients and the estate

17 during the interim.

18        At the time of the filing of the sale motion, the

19 Court-approved financing was nearly depleted.  Application

20 for an order shortening time was -- the evidence of that and

21 the declaration of Mr. Marshack at docket number 192.  Since

22 that time, he has received further financing, which the

23 Court has approved as being legally proper and further being

24 within the confines of the Trustee's good business judgment.

25 You'll find that at docket number 310.

149

1          Now the Trustee believes that without closing the

2   sale pursuant to his motion, and at least between the 24th

3   and the 30th of this month, that the situation will domino

4   into an effective -- an effective situation of leaving about

5   32,000 clients without representation and significantly

6   impairing the Trustee's ability to protect the interest of

7   the consumer clients and the Debtor's estate.  You find that

8   through his declaration at docket number 191-1.  You also

9   have heard it several times here today.

10          As such, the Trustee has demonstrated that the

11  exigent circumstances now exist to approve the Trustee's

12  proposed sale on a shorten time period for the protection of

13  the consumer clients, the Debtor's estates and all parties-

14  in-interest.

15          Now, parties have argued that this Court should

16  not approve a transaction this large on such an expedited

17  schedule.  Now the Court has given consideration of the due

18  process considerations, including the noticing of the

19  motion, and the Court has articulated -- and the objections

20  that have been articulated by certain parties, both orally

21  and in writing.

22          The Court has concluded that this is not a

23  question of due process being denied.  This is a question of

24  due process being pursued in good faith by all parties to

25  the transaction, including the objectors.

150

1          Suggestions by this Court point out that pressure

2 on the Court to approve improvident agreements and actions

3 might exist, but there has been no excess pressure placed on

4 the Court in this instance.

5          Had this motion been heard on four days' notice,

6 without the benefit of sophisticated briefing and

7 participation of creditors committee and the United States

8 Trustee, and other parties-in-interest, significantly more

9 pressure would have been in existence.

10          In this particular case, however, the Court has

11 now had the opportunity to review carefully the briefing

12 from major parties in this proceeding, and has observed the

13 value of expanding the time of consideration to include the

14 committees involvement and evolvement and appreciation of

15 the Trustee's actions.

16          The same is true with the Office of the U.S.

17 Trustee.  You may not see it, but I did, that they have

18 evolved, and they know that there's a balancing that's going

19 on here.  And they're doing their job, and they will always

20 do their job, and it will always be a good job, but I've

21 seen the transition.

22          The issue of notice or lack of notice to Debtor's

23 clients and customers has been raised.  However, the

24 creditors committee is significantly populated by consumers

25 or consumer representatives and is represented by quite

*Briggs Reporting Company, Inc.*

151

1  capable counsel.  Further, any due process issues with

2  respect to clients is now resolved by the fact that the

3  clients under the APA and the sale order may terminate the

4  contract pursuant to the terms of the motion, the APA and

5  the sale order.

6          Now, the United States Trustee asserts, and others

7  have asserted, that the clients should be required to opt in

8  instead of opting out of the sale of their client file to

9  the proposed purchaser.  You will give an example -- I'll

10  give the example of docket number five -- pardon me, 259 on

11  page 26.  That's the U.S. Trustee's allegation.

12          This Court respectfully disagrees, and the

13  arguments presented by Trustee's counsel with respect to the

14  inappropriateness and ethical problems of an opt-in process

15  as it pertains to legal representation is accurate in this

16  Court's view.  As noted by the committee, appropriately

17  drafted opt-out provisions are sufficient and supported by

18  case law.  That's docket number 264, page 21 to 24.

19          Addressing further the issue of the due process

20  argument.  No client will be prejudiced by the sale of their

21  contract because they can always opt out.  Quote:

22              "When, as here, the party asserting

23              a violation of its due process rights

24              was not prejudiced by the alleged due

25              process violation, the alleged violation

1        cannot constitute reversible error."

2        See Rosson, R-O-S-S-O-N, v. Fitzgerald, In Re

3  Rosson 545 F.3d 764 at 776, (9th. Cir. 2008).

4        Trustee and his attorneys have adequately

5  demonstrated that they have spoken with numerous potential

6  purchasers and have effectively marketed the assets.  I draw

7  your attention to Trustee Marshack's declaration, docket

8  191-1.  He provides evidence of receiving several proposals

9  from other parties.

10        And asset purchase agreement has been negotiated,

11  and a second asset purchase agreement was apparently in

12  existence and has now been demonstrated by the bidding that

13  went on here today that it did exist.  This bolsters --

14  pardon me.  This is bolstered by the Trustee's most recent

15  declaration of today -- at least it was filed today, and

16  reviewed on the record by the Court, exhibiting and

17  comparing the proposed overbids.

18        The Trustee argues that the Debtor's consumer

19  clients are entitled to receive the legal services they

20  sought, contracted for, and in many instances, they are

21  required to combat lawsuits and unfair debt collection

22  practices protected under the Fair Debt Collection Practices

23  Act and the Rosenthal Act, among others.

24        Consumer protection activities are -- by reliable

25  and knowledgeable counsels are imperative to a sound

153

consumer protection system.  For example, on July 14, 2023,

the Ninth Circuit Court of Appeals in the case called <u>Brown</u>

<u>v. Transworld Systems</u>, Number 22-35244 (9th Cir. 2023),

issued its published opinion reversing a district court's

dismissal of Mr. Brown's remaining Fair Debt Collection

Practices claim based on a theory that defendants knowingly

brought a meritless post-discharge debt collection lawsuit

because they knew they could not prove ownership of Mr.

Brown's debts.

This is the kind of work entities, such as the

Debtor when operating honestly, are engaged in.  The Ninth

Circuit, agreeing with other circuits, held that certain

litigation acts, including service -- service and filing can

constitute distinct violations of the Fair Debt Collection

Practices Act that triggers statute of limitations.

The Ninth Circuit panel concluded Mr. Brown

sufficiently alleged one post-filing -- post-filing of

bankruptcy, Fair Debt Collection Practices Act violation in

the filing of an affidavit that presented a new basis.

Various consumer law centers and consumer lawyers worked on

behalf of Mr. Brown in that instance with -- with this

effort in the Ninth Circuit and below, and the law has now

been clarified in the Ninth Circuit about this practice of

Fair Debt Collection Practices and violations of the

discharge injunction.

154

1          Honest attorneys working on behalf of honest but

2    unfortunate debtors for the -- for probably little or no

3    compensation individually, or otherwise risking compensation

4    recovery, undertook those efforts.

5          The Court's decision to approve this sale today,

6    and at the same time requiring strict and stricter consumer

7    controls and protections, will enhance access to justice.

8    To this end, the Court continues to rely on federal and

9    state regulators and the courts to further advance the cause

10   of consumer protection.

11         In this particular interest -- pardon me.  In this

12   particular instance, I'm going to rely also on the monitor

13   that's going to be appointed.  Excuse me.

14         The Trustee further argues that the contracts are

15   valuable assets that can be assigned to a law firm for the

16   benefit of consumer clients who choose not to opt out of the

17   sale and assignment of the benefit -- to the benefit of the

18   estate.

19         Those sale will -- pardon me.  The assets will be

20   of benefit to the estate once they're sold.  It will also

21   benefit the creditors, including the consumer creditors.

22         The Trustee maintains that a sale of Debtor's

23   assets and a continuation of actual legal services provided

24   to consumer clients, including the assignment of Debtor's

25   consumer contracts, is in the best interest of all

155

1  interested parties, and those most impacted by it, the

2  consumer.  That's in Mr. Marshack's declaration at docket

3  number 191-1.

4        The Trustee has provided a similar situation by

5  way of example.  In a similar pending bankruptcy case called

6  In Re PGX Holding, Inc., which is now ongoing in the

7  District of Delaware.  That's where the consumer finance

8  protection bureau obtained a prepetition judgment again PGX

9  Holding based upon violations that are very similar to the

10  ones that were alleged against the Debtor here.

11        In the pending PGX example, the debtor has brought

12  a motion to sell its executory contracts.  You can find that

13  at the Delaware docket number 66.  The Trustee points out

14  that in PGX the U.S. Trustee only objected to the debtor's

15  sale motion to the extent the sale motion sought to provide

16  a breakup fee of $1,000,000.  It was denied by the way.

17        The difference is in this case versus the

18  PGX case, is that the PGX case, they changed its business

19  model and got legal prepetition, which I applaud, and

20  everybody should applaud.  They removed and cured the

21  offending conduct.

22        Here, the difference is that they're doing it now,

23  but the result's the same.  They are desiring to sell a

24  consumer protection compliant business pursuant to 363, and

25  that is appropriate if the proper reformations are to the

156

1 system occurs.

2       In its order issued on July 10, 2023 at docket

3 number 206, this Court requested from any parties-in-

4 interest briefing on the issue of the past bad acts of

5 Debtor with respect to the lack of legal or ethical behavior

6 on its business practices and how that could affect a sale

7 under 363.

8       The Court has carefully reviewed all of these

9 carefully presented and thought out briefs, and the Court is

10 deeply appreciative of all points of view.  Their efforts

11 have assisted this Court enormously.

12       Through the continuing and persuasive insistence

13 of this Court and the U.S. Trustee, the Trustee and his

14 professionals have engaged in a unrelenting and expensive

15 process of converting the Debtor's business into a consumer

16 protection complaint business.

17       This Court is satisfied that the herculean and,

18 frankly, high-risk efforts of the Trustee have resulted in

19 an excellent start, but it's only a start.  And that the

20 consumer protection aspects of this proposed sale cannot be

21 discounted in any way.  The continued efforts to redirect

22 the legal and ethical compass of the prepetition company

23 will likely in this Court's opinion succeed.

24       The Court finds in examining all of the evidence

25 before it, and appreciating the totality of the

157

1    circumstances, including the alleged past bad acts of the

2    Debtor, that there is no fair reason to discount or refuse

3    to approve the sale based on the prior bad acts of the

4    Debtor when considering the current and future reformation

5    of the business practices and the inclusion of people like

6    Professor Nancy Rapaport as the monitor.  Indeed, adding one

7    more consumer protection compliant company in an industry of

8    some bad actors can't be a bad result.

9          Let's talk briefly about reformation, illegality

10   and severability.  Bankruptcy courts have an equitable power

11   to reform a trustee's deed of trust, for instance, but

12   that's just not deeds of trust, it's almost any contract or

13   will or other instrument.

14         The Court's equitable powers are consistent with

15   California law, which by the way you look at from the

16   federal bench, which permits severability of contracts that

17   are improper, either because they're illegal or

18   unconscionable.  In fact, the Court may sever any

19   unconscionable provision.  And that's California Civil Code

20   Section 1670.5(a).  That provides if a court as a matter of

21   law finds the contract or any clause of a contract to have

22   been unconscionable at the time it was made, the court may

23   refuse to enforce the contract or it may enforce the

24   remainder of the contract without the unconscionable clause,

25   or it may limit the application of any unconscionable clause

158

1 as to avoid any unconscionable results.

2         Further, comment two of the legislative committee

3 of Section 1670.1 -- pardon me, .5, incorporating the

4 comments from the Uniform Commercial Code states, quote:

5              "Under this section the court in

6              its discretion may refuse to enforce a

7              contract as a whole if it is permeated

8              by the unconscionability, or it may

9              strike any single clause or group of

10             clauses which are so tainted or which

11             are contrary to the essential purpose of

12             the agreement, or it may simply limit

13             unconscionable clauses so as to avoid

14             unconscionable results."

15         You find that by the way in the case of Armedariz

16 v. Foundation Health Psychcare Services, 24 Cal.4th 83 at

17 122 (2000).  Thus, the statute appearing to give the trial

18 court discretion as to whether to sever or restrict the

19 unconscionable provisions or whether to refuse to enforce

20 the entire agreement is present.  But it also appears to

21 contemplate the latter course when the agreement is

22 permeated by unconscionability.

23         California Civil Code 1598 provides, quote:

24              "Where a contract has but a single

25              object and such object is unlawful,

159

1      whether in whole or in part, or wholly

2      impossible of performance or so vaguely

3      expressed to be unascertainable, the

4      entire contract is void."

5      California Civil Code Section 1599 provides:

6  "Where a contract has several distinct objects, one of which

7  is at least lawful and one of which is unlawful in whole or

8  in part, the contract is void as to the latter but valid as

9  to the rest.  Thus, the court may sever portions of the

10 contract."

11      The parts of the contract that are being severing

12 (sic) have been promoted by the Trustee, have been agreed to

13 by the creditors committee, but in the end, it will be the

14 customer/client themselves that will choose to either opt in

15 or opt out.

16      Some parties have said that the agreements are

17 void as a result of alleged illegality, but the case law

18 that I have already cited shows that this Court can take a

19 view of -- a liberal view of severability, enforcing valid

20 parts of an apparently indivisible contract, where the

21 interest of justice or the policy of law would be furthered.

22 And you find that in <u>Addair</u>, A-D-D-A-I-R, <u>v. Stockton</u>

23 <u>Unified School District</u>, 162 Cal.App 4th 1436, and that's

24 2008.

25      As further noted by the committee, bankruptcy

160

1  courts are generally able to reform an agreement, including

2  through the broad, equitable authority under Section 105(a)

3  of the Bankruptcy Code.  And they cite In Re Creger, C-R-E-

4  G-E-R, 403 B.R. 381 at 386 from the Western District of

5  Virginia, I believe that would be Roanoke, observing that

6  when:

7          "With respect to a reformed

8          agreement a bankruptcy court may grant

9          such equitable relief under Section 105

10         if necessary or appropriate to carry out

11         the provisions of this Title."

12         And you find that at In Re Gilmore, 284 B.R. 801

13  (Bankr. E.D. Va. 2002), noting that the availability of

14  reformation of an agreement is a equitable remedy and

15  available to courts.

16         Here, the central purpose of the contract is not

17  tainted by -- or with illegality, but is merely collateral

18  to the main purpose, legal services.  Morever, the interest

19  of justice and policy of law would be furthered by the

20  severance and reformation of the contracts, rather than the

21  mere voidance of the contracts as a whole.

22         Finally, to the extent that the contracts contain

23  illegal provisions, the Court has the authority to reform

24  the contracts to avoid fraud or mistake, whichever the case

25  may be.

161

1          The cannabis cases have been discussed.  In

2   Hacienda Company, LLC, 647 B.R. 748 (Bankr. C.D. Cal.), the

3   court found that a debtor's tie to cannabis did not require

4   dismissal or otherwise foreclose court from exercising its

5   equitable powers simply due to the illegality of cannabis

6   under federal law.  And I encourage people to read that --

7   that decision.  It was a well thought out decision that

8   actually appreciated the nuance of the -- of the issues.

9          I want to take a little break here, have a drink

10  of water, and then remind everybody that it was the United

11  States Trustee's Office, following the lead of their

12  directive of Washington, that was keeping people of the same

13  sex who were married from being able to file joint petitions

14  in bankruptcy.  I was one of the proud members signing the

15  decision.

16          I believe 20 judges of the Central District, the

17  first in the nation to say that the United States Trustee's

18  general policy of opposing the continuation and seeking the

19  dismissal of bankruptcy cases because same-sex couples

20  legally married in states couldn't file joint petitions

21  because they believed that the marriage act -- Defense of

22  Marriage Act was constitutional.  We said it wasn't, and we

23  were -- as Article I courts and judges, we signed saying,

24  this is unconstitutional, and the parties can in fact file a

25  joint Chapter 13 decision -- or a case.  We were upheld.

162

1        And sooner or later, the significant nuance of

2  marijuana cases will come forth, and people will understand

3  that just because some landlord happened to lease to a pot

4  shop four years before and they're gone, but they still want

5  those cases dismissed because they get a directive from

6  Washington to have those cases -- motions filed, is

7  something that I hope is corrected.  There is -- you can sit

8  around and actually think about filing these motions before

9  you do it.

10        The legal standards for the sale and assumption,

11  this Court is guided by considering the standards of review

12  in approving Section 363 and 365 assumption and assignment

13  of executory contracts placed upon its decisions by the

14  Ninth Circuit Court of Appeals.

15        The decision of a bankruptcy court approving a

16  sale of estate property under 363 is reviewed for abuse of

17  discretion.  I cite to you the July 21, 2023 decision of the

18  United States Bankruptcy Appellate Panel of the Ninth

19  Circuit that I just got a hour ago and it was filed today,

20  the standards of review for 363 sales.

21            "A bankruptcy court's decision to

22            approve a sale of estate property under

23            363 or to approve a compromise of a

24            claim under Rule 9019 are reviewed for

25            abuse of discretion."

163

1          Now, that's nothing new because all they have to

2  do is go back to Debbie Reynolds Hotel and Casino, Inc. from

3  the Ninth Circuit in 2001 at 255 F.3d 1061 at 1065:

4                "A bankruptcy court's abuse of

5                discretion is if it applies an incorrect

6                legal standard or its factual findings

7                are illogical and plausible or without

8                support of the record."

9          And, of course, you have to go all the back to

10  2011 in TrafficSchool.com, Inc. v. Edriver, Inc. at 653 F.3d

11  820 to reread the issue of how a bankruptcy court might

12  abuse its discretion.  So that's hot off the presses.

13          Of course, this Court relies on Clear Channel

14  Outdoor, Inc. v. Knupfer, In Re PW, LCC at 391 B.R. 295 at

15  32 (9th. Cir. B.R. 2008) with respect to the abuse of

16  discretion standard on this matter.

17                "With respect to determinations of

18                bankruptcy courts 365 orders on

19                assumption and assignments, a reviewing

20                court must accept the bankruptcy court's

21                findings of fact unless they are clearly

22                erroneous.  A finding is clearly

23                erroneous when although there is

24                evidence to support it, the reviewing

25                court on the entire evidence is left

164

1          with the  definite and firm conviction

2          that a mistake has been committed."

3          In Re Banks, 263 F.3d 862 at 869 (9th Cir. 2001),

4    quoting Anderson v. Bessemer City, 470 U.S. 564, United

5    States Supreme Court (1985).  Also see Top Rank, Inc. v.

6    Ortiz, In Re Ortiz, 400 B.R. 755 at 760-761, where they

7    again cited the United States Supreme Court in -- that said

8    in 2019:

9          "That a trustee may assume or

10          reject any executory contract subject to

11          the court's approval."

12          Section 365 enables the trustee upon entering --

13   or the debtor or its trustee upon entering bankruptcy to

14   decide whether the contract is a good deal for the estate

15   going forward.  If so, the Debtor will want to assume the

16   contract, fulfilling its obligations while benefitting from

17   the counterparties' performance.  But if not, the debtor

18   will want to reject the contract repudiating any further

19   performance of its duties.

20          The bankruptcy court will generally approve that

21   choice under the deferential business judgment rule.  And

22   that's NLRB v. Bildsco & Bildsco 465 U.S. 513 at 523 (1984)

23   United States Supreme Court.

24          The trustee and the debtor -- the trustee, after

25   notice and hearing, may use, sell or lease property in the

165

1   ordinary course of business, and the requirements of 363(b)

2   were established to protect creditors' interest in the

3   estate and assets of the estate.

4          To this end, it is the Court's obligation to

5   assure the optional value -- that optimal value is realized

6   by the estate under the circumstances.

7          A bankruptcy court can authorize the sale of

8   substantially all of the assets of an estate under 363(b),

9   under a proper showing that the sale is in the best interest

10  of the estate, that there is sound business purpose for the

11  sale, and that it was proposed in good faith.

12         A bankruptcy court's finding of good faith is

13  primarily a factual determination, which is reviewed for

14  clear error.  I find that the good faith has been determined

15  and evidenced by the evidence -- and all of the evidence

16  before it.

17         In other words, the Court must determine whether

18  the proposed sale is fair and reasonable, was adequately

19  marketed, was negotiated and proposed in good faith, and is

20  made to a purchaser proceeding in good faith and is at arms'

21  length.  I find for all of those, that the Trustee has met

22  every standard.

23         For instance, good faith encompasses fair value

24  and further speaks to the integrity of the transaction.

25  Typical bad faith or misconduct would include collusion

166

1  between the seller and buyer or any attempt to take unfair

2  advantage of other potential purchasers.  I find that none

3  of that has happened here.

4          Mr. Marshack, do you propose a 363(m) finding?

5          MR. MARSHACK:  I do, your Honor.

6          THE COURT:  The proponent of a Section 363(m) good

7  faith has the burden of proof.  After full and fair

8  consideration of all the evidence before the Court,

9  including the declaration of the -- of the buyers and the

10  backup buyers, I find that the 363(m) standards have been

11  met.

12          MR. MARSHACK:  Thank you, your Honor.

13          THE COURT:  The Court finds that the purchase

14  price is fair and reasonable.  That the Trustee has now

15  submitted evidence in the form of both his declarations and

16  the statements made today, that the bid is the highest and

17  best bid based on not only the considerations that he

18  originally proposed with the CLG Group, but also the

19  analysis that he has provided with respect to the current

20  buyer.

21          Given the circumstances of this particular case,

22  including the financial limitations faced by the Trustee and

23  in need of -- and the need to protect the consumer clients,

24  and that the Trustee and his counsel have spoken with

25  multiple parties about purchasing the property, the property

167

1  was adequately marketed.

2      The evidence that the sale was negotiated and

3  proposed in good faith can similarly be deduced by the

4  Trustee's declaration and the activities today in court.

5      The property may be sold free and clear of liens

6  if only one of the five conditions of 363(f) are met.  In

7  this situation the Trustee under 363(f) may sell -- the

8  Trustee may sell property if such entity consents.  All of

9  the parties who have appeared have consented.

10     And the statement that the Ninth Circuit has

11 concluded correctly in my opinion, that he non-appearing

12 secured creditors by their nonappearance consent, meets the

13 requirement.  However, the suggestion that there might be

14 disputes also rings true, even if it's just an accounting

15 dispute, but we don't have to go there.  But if we had to,

16 we could, and I would find as such.

17     And, again, the Trustee seeks a 363(m) finding.

18 The reversal or modification or modification on appeal of an

19 authorization under subsection (b) or (c) of this Section,

20 of a sale or lease of property does not affect the validity

21 of the sale or lease under such authorization to an entity

22 that purchased or leased such property in good faith,

23 whether or not such entity knew of the pendency of an

24 appeal, unless such authorization or such sale or lease were

25 stayed pending appeal.

168

1          "Though the bankruptcy code and

2          rules do not provide a definition of

3          good faith, courts generally have

4          followed traditional principles in

5          holding that a good-faith purchaser is

6          one who buys in good faith and for

7          value."

8          I cite for you In Re M Capital Corporation, 290

9    B.R. 743 at 746 (9th Cir. BAP 2003).

10         Based on the evidence before the Court, including

11   the testimony that we've received through declaration, the

12   Court finds that a good-faith finding is warranted to both

13   the winning bidder and the backup bidder.

14         With respect to Section 365(f)(1):

15          "The assumption and assignment of

16          contracts, you're authorized, Mr.

17          Trustee, to assume and assign an

18          executory contract, notwithstanding any

19          -- notwithstanding a provision of an

20          executory contract or an applicable law

21          that prohibits, restricts or conditions

22          the assignment of such contract."

23         You can get that from Dewey Ranch Hockey, LLC, 406

24   B.R. 30 at 36 (Bankr. D. Ariz. 2009).

25         Section 365 generally requires three acts to

169

1  assume an executory contract, hearing of enforceable

2  defaults, compensation of any actual pecuniary loss

3  resulting from such defaults, and providing adequate

4  assurance of future performance.

5          This is going to be a retroactive application

6  because of the -- of the opt out provision that's included

7  in the APA, and that's perfectly permissible.  Moreover, a

8  trustee must also show that he exercised reasonable business

9  judgment in deciding to assume and reject executory

10 contracts.

11         You'll find that from Durkin v. Benedor Corp., In

12 Re GI Industries, Inc., 204 F.3d. 1276 at 1282 (9th. Cir.

13 2000).  That stated that, "a bankruptcy court applies the

14 business judgment rule to evaluate a trustee's rejection

15 decision," but it goes both ways.  In Re Hertz, 536 B.R. 432

16 at 442 (Bankr. C.D. of Cal. 2015):

17              "The propriety of a decision to

18              assume or reject an unexpired lease

19              normally is determined on the

20              deferential business judgment rule."

21         Further, whether a contract is in breach or in

22 default for any reason is not a measure of assumability or

23 assignability.  A party seeking to assume a contract need

24 not cure immaterial breaches.

25              In this case the Trustee has requested that all

170

1  illegal terms of the contracts be reformed prior to the

2  assumption and assignment, and this Court will approve those

3  reformations.  The identified terms requiring reformation

4  this Court finds were not necessarily material to the

5  performance of the contract.  They involve payment terms

6  that were most likely illegal and improper.

7          Indeed, the Court assumes that the clients in the

8  main did not understand the various consumer protection

9  statues and regulations that required contracts under such

10 that we've had here today to be included, and they did not

11 concern themselves with the -- with the lack of such

12 provisions -- of legal provisions, but that doesn't make it

13 right.  Those contracts should have been legal, and they

14 will be legal or this Court will have something more to say

15 about that.

16         The clients' goals were to secure assistance with

17 respect to financial difficulties, including offensive

18 collateral -- pardon me, offensive collection efforts and

19 litigation.  And I've already discussed the issues that I've

20 had with unfortunate, perhaps sometimes loathsome payday

21 loan or title loan operations around the country, even check

22 cashing services, they're not illegal.

23         And, in fact, testimony before Congress, in

24 efforts to try to make them illegal, have demonstrated that

25 there are people in our society that need money quickly.

171

1  For instance, they have a flat tire.  They need to get to

2  work.  They're going to lose their job.  They don't have

3  $200 or $100 to put a new tire on.  They need to go quickly

4  and get some help.  It's an unfortunate situation that

5  shouldn't occur, but it does occur, and they pay a lot of in

6  the vernacular "juice" for that.

7        Consumer protection organizations need to be

8  watching for these companies and enforcing the laws that are

9  on the books now, both in state and federal statutes, to

10  make sure that these debtors -- borrowers are getting at

11  least their basic rights.

12        The United States Trustee argues that reformation

13  of the contracts are -- is appropriate because, among other

14  arguments, "the Court does not have authority reform a

15  fraudulently procured contract to save the illegality of the

16  contract."  That's the Trustee's pocket brief, docket number

17  259, page 16 and 17.  Rather, the U.S. Trustee argues that

18  the Court has authority to reform only where parties have

19  made a mistake.  Well, that's just not the law.

20        The committee, who has also carefully evaluated

21  the legality of the contracts as a matter of law, including

22  the Credit Repair Organization Act and the Telemarketing

23  Services Act, have come to the conclusion that contracts are

24  not void under this provision, such that they could not be

25  reformed or that such reformation would revitalize an

172

1 illegal contract.  The committee's got it right, and the

2 Court adopts the committee's position on this, because it

3 is, again, right.

4           The U.S. Trustee further notes that even if the

5 contract is reformed, the funds obtained from the consumer

6 pursuant to an illegal contract must be returned to the

7 consumers immediately and cannot be included as part of the

8 assets sold.

9           Well, first of all, I don't think they would be a

10 part of the assets being sold.

11           Would that be right, Mr. Marshack?

12           MR. MARSHACK:  You are correct, your Honor.

13           THE COURT:  Thank you.

14           That comes, by the way, from docket number 259,

15 page 26 of the U.S. Trustee's brief.

16           As noted above, the Trustee and the committee have

17 taken different positions with regard to the purported

18 illegality of the contracts.  Having reviewed the entire

19 record before it and the law, the Court agrees with the

20 Trustee and the committee and finds the U.S. Trustee's

21 argument regarding illegality insufficient to cause any

22 return of the funds at this time.

23           Finally, under Federal Rule of Bankruptcy

24 Procedure 6004, the Trustee has requested a waiver of

25 Federal Rule of Bankruptcy Procedure 6004(d) and 6004(h),

173

1 which provides that this order -- my court's order today

2 will be stayed until the expiration of 14 days after the

3 order unless otherwise ordered by the Court.

4         The Trustee has submitted evidence that such a

5 waiver is required to minimize potential disruption and to

6 make sure the sale closes.  That would be the Trustee's

7 declaration, docket number 191-1.  This Court agrees and

8 hereby waives the 14-day stay period under Federal Rule of

9 Civil Procedure 6004(d) and (h).

10         Having considered all of the foregoing and the

11 unique circumstances of this case, the Court finds that good

12 cause exists to grant the motion.  The Court also reserves

13 its right to write out a decision and actually have it

14 entered, which will supplement my comments today.

15         Is there anything else I can help you out with

16 today?

17         MR. MARSHACK:  One small thing, your Honor -- two

18 small things.  Will this Court be designating a monitor

19 today or at a later date, and if so, are we to prepare that

20 order or will the Court be preparing that order?

21         THE COURT:  You will be preparing the order, and

22 as soon as you can.

23         MR. MARSHACK:  Who will -- who -- it is up to this

24 Court to designate the monitor.  Who will this Court be

25 designating?

1          THE COURT:  Well, I will designate under the terms

2     of Professor Nancy Rapaport's declaration, under the terms

3     of employment that she has suggested, that is our person.

4          MR. MARSHACK:  Thank you, your Honor.  I just

5     wanted to be clear.  We left that power in you, the

6     creditors committee and myself.  So, we're glad to know that

7     you have selected Nancy Rapaport.

8          Just one comment globally.  My brother has been

9     watching these proceedings.  I think sometimes we take for

10    granted how good a system we work in.  He just wrote me, "I

11    so much admire the manner in which this hearing was

12    conducted, the orderliness and courtesy."  We all thank you,

13    your Honor.

14         THE COURT:  Well, thank you, Mr. Marshack.

15         Let's hear from the U.S. Trustee.

16         MR. MISKEN:  Yes, your Honor.  Ken Misken on

17    behalf of the United States Trustee.  And I just wanted to

18    address the 363(m) finding of good faith.

19         Given that the declarations were filed early this

20    morning or right before the hearing, I had some discussions

21    with Mr. Celentino and Mr. Marshack.  And what -- I think

22    what I would propose is the United States does object to the

23    363(m) finding for the record.  But instead of arguing about

24    that now, I believe that the buyer, the successful bidder,

25    has agreed to a deposition -- some sort of discovery on that

175

1 issue sometime next week.

2          THE COURT:  Well, let me ask you this.  First of

3 all, I fully appreciate your view point.  Is the buyer here

4 today?

5          MR. CELENTINO:  A representative of the buyer is

6 here today.

7          THE COURT:  Is the representative of the buyer

8 willing to take the stand right now and be questioned about

9 his good faith?

10          MR. MISKEN:  Your Honor, on my behalf, I would

11 need time to prepare for that.  We just found out that

12 Morning Law Group was a bidder this morning --

13          THE COURT:  Right.

14          MR. MISKEN:  -- or a successful bidder.  And we

15 would want to do some document requests and take their

16 deposition before analyzing them here.

17          THE COURT:  Will it delay this sale, and is this

18 an effort to delay the sale?

19          MR. MISKEN:  No, your Honor.  We may not do the

20 deposition.  I just wanted to reserve that right.

21          THE COURT:  I understand.

22          MR. MISKEN:  And for the record --

23          THE COURT:  But let's -- and I appreciate that.

24          Would you please call the representative of the

25 buyer to the stand?

176

1          MR. CELENTINO:  I would, your Honor.  May he have

2     a two-second bathroom break before he takes the stand?

3          THE COURT:  Well, we'll take a five-minute

4     bathroom break.

5          MR. CELENTINO:  Thank you.

6          THE COURT:  We'll give the fellah a break.

7          We'll go off the record.

8        (Proceedings recessed briefly.)

9          THE CLERK:  Please come to order.  Court is back

10    in session.

11         THE COURT:  Well, what did I tell you?  Sit down.

12    Stretch.  We're back on the record.

13         11 U.S.C. Section 363 reads as follows:

14              "The reversal or modification on

15              appeal of an authorization under

16              subsection (b) or (c) of this Section of

17              a sale or lease of property does not

18              affect the validity of a sale or lease

19              under such authorization to an entity

20              that purchased or leased such property

21              in good faith, whether or not such

22              entity knew of the pendency of the

23              appeal, whether such authorization and

24              such sale or lease were stayed pending

25              appeal -- unless such authorization is

177

1          -- was stayed pending appeal."

2          Though the bankruptcy code and rules do not

3  provide a definition of good faith, courts generally have

4  followed the traditional principles in holding that a good-

5  faith purchaser is one who, quote, "buys in good faith," end

6  quote, and, quote, "for value."  In Re M Capital

7  Corporation, 290 B.R. 743 at 746 (9th. Cir. BAP 2003).  Also

8  citing in that decision, In Re Abbotts Dairies of

9  Pennsylvania, Inc., 788, F.2d 143 at 147 (3d. Cir. 1986).

10          Typically, lack of good faith is shown by fraud,

11  collusion between the purchaser and other bidders of the

12  trustee or an attempt to take grossly unfair advantage of

13  other bidders.  And I draw from that -- from In Re M Capital

14  Corporation, 290 B.R. at 746-47.

15          Where good faith has been challenged, facts must

16  establish -- the facts must be established to obtain the

17  safety that section offers.  Though the bankruptcy code and

18  rules do not provide a definition good faith, again, courts

19  generally have followed the traditional equitable principles

20  in holding that a good-faith purchaser is one who buys in

21  good faith and for value.

22          You can also look at In Re Ewell, E-W-E-L-L, 958

23  F.2d 276 at 281 (9th. Cir.) -- pardon me, 1992, quoting In

24  Re Suchy, S-U-C-H-Y, 785 F.2d 900 at 902 (9th. Cir. 1985).

25          Understanding now these principles and the law,

178

1  would we please hear from the proposed buyer?

2          MR. CELENTINO:  In support of the Trustee's motion

3  for a good-faith finding under 363(m), your Honor, we would

4  like to call to the stand the representative of Morning Law,

5  the winning bidder, Russell Squires.

6      (Pause.)

7          THE CLERK:  Please raise your right hand.

8              RUSSELL SQUIRES - WITNESS - SWORN

9          THE WITNESS:  I do.

10          THE CLERK:  Please state your name and if you can

11  speak into the microphone.

12          THE WITNESS:  My name is Russell Squires.

13          THE CLERK:  Thank you.

14          MR. CELENTINO:  Thank you, your Honor.

15                  DIRECT EXAMINATION

16  BY MR. CELENTINO:

17  Q    Mr. Squires, you are appearing as the authorized

18  representative of Morning Law today, correct?

19  A    Yes.

20  Q    You signed and submitted a declaration in support of

21  the bid of Morning Law that was filed with the Court this

22  morning, correct?

23  A    Yes.

24  Q    You prepared that declaration yourself, correct?

25  A    Yes.

179

1 Q    Are the facts stated in that declaration true and

2 correct?

3 A    Yes.

4 Q    And you state they are true and correct under penalty

5 of perjury?

6 A    Yes.

7           MR. CELENTINO:  That declaration, your Honor, is

8 number 317 --

9           THE COURT:  Thank you.

10          MR. CELENTINO:  -- for the record.

11          THE COURT:  And it is part of the record.

12          MR. CELENTINO:  Yes.

13 BY MR. CELENTINO:

14 Q    Mr. Squires, when was the last time you had a

15 conversation with Tony Diab?

16 A    I believe it was November, and we had a mediation

17 conference.

18          THE COURT:  November of what --

19          THE WITNESS:  '22.

20          THE COURT:  Thank you.

21 BY MR. CELENTINO:

22 Q    Since the filing of the bankruptcy case, have you had

23 any personal contact with Mr. Diab?

24 A    No.

25 Q    Are you a friend of Mr. Diab's?

180

1    A    No.

2    Q    Are you a fan of Mr. Diab's?

3    A    No.

4    Q    Do you have any economic arrangement today with Mr.

5    Diab?

6    A    No.

7    Q    Have you pledged that for the time period in which you

8    owe funds to the Trustee under this bid, that you will no

9    relationship with Mr. Diab?

10   A    Yes.

11   Q    In the course of preparing your bid, did you get any

12   special assistance or a preference from the Trustee?

13   A    No.

14   Q    Did you have hard-fought negotiations with the Trustee

15   and his agents?

16   A    Yes.

17   Q    Did you find it to be so hard-fought that you often

18   stated it was frustrating?

19   A    Yes.

20   Q    Did the Trustee drive a hard bargain with you?

21   A    Yes.

22          MR. CELENTINO:  I have no further questions, your

23   Honor.

24          THE COURT:  Are you paying value?

25          THE WITNESS:  Could you explain the --

181

1            THE COURT:  Are you paying anything for what

2  you're buying?

3            THE WITNESS:  Yes.

4            THE COURT:  What are you paying?

5            THE WITNESS:  In cash, 5.5 million.

6            THE COURT:  Well, over the period that you have an

7  obligation under the asset purchase agreement and sale

8  order, are you paying money?

9            THE WITNESS:  Yes.

10           THE COURT:  How much money to you think you're

11 paying?  What is your estimate?

12           THE WITNESS:  According to the documents there

13 or --

14           THE COURT:  Well, you're the buyer.

15           THE WITNESS:  Correct.  Correct.

16           THE COURT:  If you don't know how much you're

17 paying, I would get out of this real quick.

18           THE WITNESS:  I have a very deep understanding of

19 the numbers.

20           THE COURT:  Well, why don't you tell us what it

21 is.

22           THE WITNESS:  If I was to say my belief right now,

23 with the actual performance --

24           THE COURT:  Yes.

25           THE WITNESS:  -- is probably going to be north of

182

1  50 or $60,000,000.

2          THE COURT:  Okay.

3          THE WITNESS:  When you add in the performance of

4  the contracts and the amount of people that don't pay,

5  that's likely what will be -- if it -- delivered to the

6  Court.

7          THE COURT:  Well, I don't get it.  And --

8          THE WITNESS:  Delivered to the estate.  Sorry.

9          THE COURT:  Okay.

10         You don't have anything else?

11         MR. CELENTINO:  I do not, your Honor.

12         THE COURT:  Let's hear from the U.S. Trustee.

13         MR. MISKEN:  Thank you, your Honor.

14         THE COURT:  Maybe we can save them a deposition.

15         MR. MISKEN:  Ken Misken on behalf of the United

16 States Trustee.

17                    CROSS EXAMINATION

18 BY MR. MISKEN:

19 Q    Hello, Mr. Squires.  Are you an officer or director of

20 Morning Law Group, PC?

21 A    I am not.

22 Q    Are you an employee?

23 A    I am not.

24 Q    What's your relationship with Morning Law Group, PC?

25 A    I have been partnered with the partner -- I have worked

183

1  with the owner of the -- of Morning Law Group, PC for the

2  last six months.

3  Q    So, in your declaration in paragraph three you say

4  that:

5              "I have known the owner of Morning

6         Law Group, Joshua Armstrong, for five

7         years, having worked with him since

8         2019."

9       Is that correct?

10 A    That is correct.

11 Q    And are you an agent of Morning Law Group?

12 A    No.

13 Q    Are you a lawyer?

14 A    No, I am not.

15             THE COURT:  Let me ask you a question.

16             THE WITNESS:  Yes.

17             THE COURT:  What authority do you have to bind

18 this buyer?

19             THE WITNESS:  The buyer has --

20             THE COURT:  You're the buyer, Morning Star (sic),

21 right?

22             THE WITNESS:  Morning Law Group.

23             THE COURT:  "Morning Law Group."  What authority

24 do you have to enter into this agreement?

25             THE WITNESS:  It has been entered into by Josh

*Briggs Reporting Company, Inc.*

184

1   Armstrong, the lawyer who is in Ireland right now --

2          THE COURT:  I didn't ask you that.  What authority

3   do you have?

4          THE WITNESS:  Me personally?  Nothing.

5          THE COURT:  Do you know anything about Mr.

6   Armstrong who's in Ireland?

7          THE WITNESS:  Yes.

8          THE COURT:  What do you know about him?

9          THE WITNESS:  I've been working with him for five

10  years.  He was --

11         THE COURT:  Okay.  So, Mr. Celentino, I mean, I

12  have now concerns that he doesn't have authority to make --

13  everything that you asked him was what his connection was,

14  not the company.  I don't even know if he knows anything

15  about the company.

16         MR. CELENTINO:  Your Honor, I -- then may I

17  redirect?

18         THE COURT:  Well, you should --

19         MR. CELENTINO:  Thank you.

20         THE COURT:  -- or because you're about ready to

21  lose the 363 finding.

22                   REDIRECT EXAMINATION

23  BY MR. CELENTINO:

24  Q    Mr. Squires, are you here as an authorized

25  representative and agent of Morning Law?

185

1  A    Yes.

2  Q    You were authorized by Mr. Armstrong to make the

3  appearance for Morning Law today, correct?

4  A    Yes.

5  Q    And Mr. Armstrong has an undetainable reason, otherwise

6  he would be here, correct?

7  A    Yes.

8  Q    And you and Mr. Armstrong worked together to form

9  Morning Star (sic) about six months ago, correct?

10 A    Correct.

11 Q    And in the formation of Morning Star (sic), you worked

12 with Mr. Armstrong to develop that firm to be in a position

13 to make the bid it made today, correct?

14 A    Yes.

15 Q    And the bid that was submitted by Mr. Armstrong on

16 behalf of Morning Law, you helped him assist in the

17 preparation of that bid, correct?

18 A    Yes.

19 Q    And you are aware that it was Mr. Armstrong who put

20 forth the terms and conditions that were set forth in the

21 bid that has been accepted, correct?'

22 A    Yes.

23 Q    And as the agent of Morning Star (sic) authorized by

24 Mr. Armstrong to be here today, you've bound and are

25 authorized to bind Morning Law to this transaction, correct?

186

1  A    Yes.

2  Q    And the Trustee has every reason to believe that he can

3  rely on your representations as the agent of Morning Star

4  (sic), correct?

5  A    Yes.

6  Q    And the Court is relying on those representations.

7  There is -- is there any reason the Court can rely on those

8  representations of your authority on behalf of Morning Law?

9  A    No.

10         THE COURT:  How well do you know Mr. Armstrong?

11         THE WITNESS:  Very, very well, sir.

12         THE COURT:  And do you have his telephone number?

13         THE WITNESS:  Absolutely.

14         THE COURT:  Can you get him on a Zoom deposition

15  tomorrow?

16         THE WITNESS:  He's in Ireland.  I don't know.  I

17  could -- I could try.  He's told me that he would be

18  available to talk by Monday.

19         THE COURT:  Mr. Celentino, I have to tell you that

20  I'm starting to now agree with the U.S. Trustee, that a

21  direct -- I mean, this is a big number we're talking about.

22  This is big stuff.  This isn't the buying the -- the

23  restaurant down the street.  This is a big issue.  And the

24  U.S. Trustee has raised lots of issues with this sale.  And

25  363 is designed to not have buyers walk away.  And,

187

1  therefore, I take my job seriously when it comes to issuing

2  363(m) finding.

3          I don't see why the U.S. Trustee couldn't take a

4  quick deposition on Zoom of Mr. Armstrong.

5          No offense, sir.

6          THE WITNESS:  I understand.

7          THE COURT:  But the fact is, that I don't have the

8  confidence that you -- you're not a lawyer.  You don't

9  practice law with Mr. Armstrong.  You're not even a

10  paralegal of Mr. Armstrong, are you?

11          THE WITNESS:  No, I'm not.

12          THE COURT:  You're not -- you don't have any

13  affiliation.  You're not an employee of Armstrong?

14          THE WITNESS:  No.

15          THE COURT:  What are we going to do?  Let's hear

16  from the U.S. Trustee.

17          MR. MISKEN:  Well, your Honor, Ken Misken on

18  behalf of the United States Trustee.  When kind of working

19  through this issue, I -- there's three different ways that

20  we could proceed.

21          THE COURT:  Right, but you're going to ask Mr.

22  Armstrong the same questions that I asked and what Mr.

23  Celentino asked.  Those are the questions that we need to

24  know.

25          MR. MISKEN:  And we'll -- what --

188

1          THE COURT:  It's not going to be deep fact

2  finding.  You're not going to do any deep -- a disruption of

3  this sale?

4          MR. MISKEN:  No, your Honor.  And that's what I

5  suggested to Mr. Celentino and Mr. Marshack was, to have a

6  mechanism to allow the U.S. Trustee to talk to Mr.

7  Armstrong.

8          THE COURT:  Right.  It's called a telephone --

9          MR. MISKEN:  And --

10          THE COURT:  -- or a Zoom call.

11          MR. MISKEN:  And what I proposed is -- you know,

12  there's a case.  It that's called Thomas v. Namba.

13          THE COURT:  I know it.

14          MR. MISKEN:  So, what that court says is that the

15  U.S. Trustee -- or any party-in-interest, can come in under

16  9023 and request the Court to amend its findings.

17          THE COURT:  Right.

18          MR. MISKEN:  And that's what I suggested to Mr.

19  Celentino, is that they give me the opportunity to interview

20  and talk to Mr. Armstrong, and then if we have any issues

21  during the 14-day period under 9023 --

22          THE COURT:  Well, what are you going to do about

23  the closing?

24          MR. MISKEN:  -- we could come back in.

25          THE COURT:  What are you going to do about the

*Briggs Reporting Company, Inc.*

189

1  closing?

2      MR. CELENTINO:  Your Honor, it's our proposal, and

3  I understand that Mr. Armstrong will sit for that telephone,

4  that deposition or anything that they -- is requested of him

5  as early as tomorrow, but for certain on Monday.  So,

6  knowing that we weren't going to be able to submit an order

7  that would -- signed off by all the parties to you, we

8  anticipated that call would happen and the U.S. Trustee

9  would be satisfied.

10      Perhaps we can continue the hearing to, say,

11  Tuesday, in the event that has happened.  In the meantime --

12      THE COURT:  I'm not going to be here.

13      MR. CELENTINO:  Sorry?

14      THE COURT:  I'm not going to be here.

15      MR. CELENTINO:  Then I would suggest, your Honor,

16  that we take the recommendation of Mr. Armstrong, which was

17  what we had agreed to -- I mean, excuse me, of Mr. Misken,

18  which was what we had agreed to.  We will work over the

19  weekend to get the signature of Mr. Armstrong on the

20  documents that have been reformed today.  That will go a

21  long way to answering many of these questions.

22      And second, that Mr. Misken can make the

23  arrangement to have the transcribed deposition, telephone

24  call, whatever it is that he needs to satisfy him.  In the

25  meantime, we'll be working together as professionals to

1 submit an order to your Honor early next week.  The order

2 won't be entered until we learn from Mr. Misken if he has

3 any issues.  And if he has any issues, we'll have to come

4 back to the Court, or he'll make his motion as he's

5 indicated.  That was the plan that we had for today, and

6 that was what we were willing to agree to.

7           THE COURT:  Is that fine with you?

8           MR. MISKEN:  That is correct, your Honor.

9           THE COURT:  Then that will be the order.

10           You're excused.  Thank you, sir.

11           That will be the order.  You get your opportunity.

12           MR. MISKEN:  No, that's fine.  I didn't want to

13 slow down the sale, as Mr. Celentino said, but I still

14 wanted that ability to talk to Mr. Armstrong.

15           MR. CELENTINO:  And for --

16           THE COURT:  No, I think you deserve it now --

17           MR. CELENTINO:  He does.

18           THE COURT:  -- now that I completely understand.

19           MR. CELENTINO:  He does, your Honor.  And for the

20 record, Mr. Armstrong submitted a declaration today --

21           THE COURT:  No, I understand, but --

22           MR. CELENTINO:  -- he's just not here for cross-

23 examination today.

24           THE COURT:  Well, I understand.

25           MR. CELENTINO:  So that's the issue.

191

1        THE COURT:  And that's -- you know, Ireland is a

2   very nice place.  I bet he gets a big Irish breakfast.  But,

3   you know, he can enjoy Ireland all he wants, but if he wants

4   to enjoy this process, he's going to have to show up

5   sometime.

6        MR. CELENTINO:  We understand.  He's committed to

7   be here on Monday, I understand.  And we'll work with him to

8   be here earlier than that, so he can acknowledge his

9   declaration to the U.S. Trustee and give them the

10  opportunity to ask all the questions we've just asked.

11       THE COURT:  Okay.

12       MR. MISKEN:  Yeah, we can work out a scheduling on

13  -- for Monday.  No problem, your Honor.

14       THE COURT:  Now when you say -- I'm not involved

15  in this, am I, because I'm not going to be here.

16       MR. MISKEN:  No.

17       THE COURT:  Okay.

18       MR. MISKEN:  That's my -- no, is my understanding.

19       MR. CELENTINO:  No reason for you to be involved,

20  your Honor.

21       THE COURT:  Thank you.  I have a national Federal

22  Judicial Center program I have to attend.  I'm involved in

23  it directly.

24       MR. CELENTINO:  Your Honor, may we reserve the

25  right to file a subsequent declaration or the transcript of

192

1 the deposition, if it happens, so it's here in the record?

2          THE COURT:  You should.

3          MR. CELENTINO:  We will.  Thank you.

4          THE COURT:  Okay.  Mr. Owens.

5          MR. OWENS:  It goes without saying, your Honor,

6 but the committee would like to participate obviously in the

7 deposition --

8          THE COURT:  Well, you can.

9          MR. OWENS:  -- which we will coordinate with

10 counsel.

11          THE COURT:  Thank you.

12          MR. OWENS:  Thank you.

13          THE COURT:  Is there anything else I can help you

14 out with today?

15          UNIDENTIFIED SPEAKER:  No, thank you, your Honor.

16          THE COURT:  Mr. Golubow.

17          MR. GOLUBOW:  Yes, your Honor.  Just something I

18 wanted to clarify for the record.  Is everyone else okay

19 with respect to the 363(m) protection for the backup bidder?

20          THE COURT:  Well, I don't know.

21          MR. GOLUBOW:  I just want to make sure that that

22 doesn't become an issue, just in the unlikely event that

23 Morning Law is not the successful bidder.

24          THE COURT:  Again, I don't know the answer to your

25 question.

193

1           Do you have an answer to my question?

2           MR. CELENTINO:  The Trustee was satisfied, your

3    Honor, on the basis of the evidence that was submitted by

4    Mr. Benacian (phonetic) in his declaration.  That's what we

5    moved, and that's what I thought the Court reviewed.

6           THE COURT:  I did.

7           MR. CELENTINO:  And I think that Mr. Misken may

8    have his own comment.

9           THE COURT:  Well, Mr. Misken?

10          MR. MISKEN:  Ken Misken, your Honor, United States

11   Trustee.  It was my understanding that there wasn't a

12   finding of good faith for the backup bidder.

13          THE COURT:  Yes, there was.

14          MR. MISKEN:  Was it?  Okay.  Then --

15          THE COURT:  So, what do you want to do?

16          MR. MISKEN:  I would reserve the same right to

17   talk to him in case the lead bidder --

18          THE COURT:  Well, I wouldn't reserve the right, I

19   would talk to him.

20          MR. MISKEN:  No.  That's -- that's what I mean.

21   Yeah.

22          THE COURT:  And I think there perhaps he would

23   voluntarily talk to you, either in a sworn situation or just

24   informally over a coffee.

25          MR. MISKEN:  Yeah.  That's what I'll do, your

194

1  Honor.

2          THE COURT:  Okay.

3          MR. MISKEN:  Thank you.

4          THE COURT:  Thank you.  But he's buying.  All

5  right.

6          MR. MISKEN:  I cannot accept that, your Honor.

7          THE COURT:  You can't accept that.  I'm sorry.

8  We'll tell Mr. Anderson if you do.

9          Is there anything else I can help anyone out with

10 today?

11         MR. CELENTINO:  You've been very helpful.  Thank

12 you, your Honor.  We have nothing else from the Trustee's

13 side.

14         MR. SQUIRES:  Does the Court validate parking?

15         THE COURT:  If you wait another half hour, you can

16 sneak out for free.

17         All right.  Thank you.  Court is adjourned.

18         ALL PARTIES:  Thank you, your Honor.

19     (Proceedings concluded.)

20         I certify that the foregoing is a correct

21 transcript from the electronic sound recording of the

22 proceedings in the above-entitled matter.

23

24 /s/ Holly Steinhauer          7-28-23
   Transcriber                   Date

25

*Briggs Reporting Company, Inc.*