D. EDWARD HAYS, #162507
ehays@marshackhays.com
LAILA MASUD, #311731
lmasud@marshackhays.com
BRADFORD N. BARNHARDT, #328705
bbarnhardt@marshackhays.com
MARSHACK HAYS WOOD LLP
870 Roosevelt
Irvine, California 92620
Telephone: (949) 333-7777
Facsimile: (949) 333-7778

Attorneys for Chapter 11 Trustee,
RICHARD A. MARSHACK

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

| | |
|---|---|
| In re | Case No. 8-23-bk-10571-SC |
| THE LITIGATION PRACTICE GROUP, P.C., | Chapter 11 |
| Debtor. | TRUSTEE'S MOTION FOR RECONSIDERATION OF ORDER DENYING MOTION TO APPROVE COMPROMISE WITH AZZURE CAPITAL LLC; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF D. EDWARD HAYS IN SUPPORT |
| | Date:   December 13, 2023 |
| | Time:  1:30 p.m. |
| | Ctrm: 5C -Via ZoomGov[1] |
| | Place: 411 West Fourth Street |
| | Santa Ana, CA  92701 |

TO THE HONORABLE SCOTT C. CLARKSON, UNITED STATES BANKRUPTCY JUDGE,

THE OFFICE OF THE UNITED STATES TRUSTEE, AND ALL INTERESTED PARTIES:

Richard A. Marshack, in his capacity as Chapter 11 Trustee ("Trustee") of the Bankruptcy

Estate ("Estate") of The Litigation Practice Group P.C. ("Debtor"), respectfully submits this Motion

("Motion") for reconsideration of the order [Dk. No. 581] denying the Motion to Approve

---

[1] Check Judge Clarkson's tentative prior to hearing for further Zoom instructions.

Compromise Between Trustee and Azzure Capital, LLC, filed on August 16, 2023 [Dk. 392], as follows:

## 1.    Summary of Argument

A court order can be reconsidered if necessary to correct an error of law upon which an order is based. In this case, the Court initially granted Trustee's motion to approve a compromise with Azzure. Subsequently, the Court *sua sponte* denied the motion finding that it would not be fair and equitable to the objecting secured creditor, OHP-CDR, LP and PurchaseCo80, LLC ("OHPP").

During the initial hearing, the Court made it clear on the record that it was not deciding the priority dispute between Azzure and OHPP and that such dispute would be decided in the adversary proceeding filed by OHPP against Trustee and Azzure. The Court's order denying the compromise stated that it would not be fair and equitable to OHPP if the priority dispute was decided by the compromise. But, Trustee understood and accepted that the priority dispute would still have to be litigated in the OHPP adversary.

While it is true that an order approving a compromise can form the basis of claim preclusion, Trustee would still have to establish all of the elements, including privity, for it to affect OHPP's claims in the adversary. Moreover, the application of claim preclusion is discretionary. As such, even if Trustee could establish the elements, the Court may decide against its application if doing so would work an injustice against OHPP.

Trustee brings this Motion because the compromise with Azzure can and should be approved and can be done in a way that does not prejudice OHPP. Trustee respectfully requests that the Court reconsider its order denying the compromise and enter an order approving the compromise. The benefits to the Estate arising from the compromise can and should be realized and can be done in a way where the Court is assured that OHPP has a full and fair opportunity to litigate its claims. Moreover, filing a new motion to approve the Azzure compromise may give other parties that never opposed the initial motion (thereby waiving or forfeiting any opposition) a second opportunity to prevent Trustee from securing the benefits of the settlement (and also avoiding any risk of Azzure

MOTION TO RECONSIDER AND VACATE ORDER RE AZZURE COMPROMISE

1  taking the position that there is no longer an agreement with the Trustee because the proposed

2  compromise was denied).

3  **2.    Pertinent Factual Background**

4      **A.  Azzure's Prepetition Loan and Security Interest**

5      On or around February 7, 2023, Azzure made a secured loan to The Litigation Practice

6  Group P.C ("Debtor") in the total principal amount of $2.55 million ("Azzure Loan"), which loan

7  was evidenced by a promissory note issued to and for the benefit of Azzure, granting a security

8  interest to Azzure in certain "Collateral" defined in Section 9 of that promissory note ("Note").[2]

9      Azzure asserts that the Azzure Loan has a present balance due of over $5 million which

10 includes accrued interest as set forth in the Note, plus attorneys' fees and costs, as permitted under

11 New York law.[3] Trustee disputes this contention which includes a dispute whether the embedded

12 annual interest rate on Azzure's Loan is enforceable against this California Debtor, and asserts that

13 the amount due on Azzure's claim is substantially less than the $5.1 million figure Azzure asserts.

14     Azzure further asserts that the security interest memorialized in the Note was perfected by

15 the assignment of an already-filed UCC-1 Financing Statement, filed under number U210050853928

16 on May 28, 2021 ("UCC Financing Statement"), which expressly lists "The Litigation Practice

17 Group P.C." as one of the debtors.[4] Trustee disputes that Azzure's security interest has been properly

18 perfected by the assignment of the previous UCC Financing Statement referenced above which was

19 originally filed reflecting Cobalt Funding Solutions as the secured party, and then assigned to Bae

20 Enterprises, Inc., prior to its assignment to Azzure.

21

22

23

24

---

25 [2] *See* proof of claim filed by Azzure on July 24, 2023, as claim no. 127-1 ("Azzure POC"). A copy
26 of the Note is attached to the Azzure POC as Exhibit 1, on pp. 5-14.

27 [3] Azzure POC, Ex. 1, p. 15-24.

28 [4] Azzure POC, Ex. 1, p. 38.

MOTION TO RECONSIDER AND VACATE ORDER RE AZZURE COMPROMISE
4839-5201-1600V1/9999-100

## B.  Bankruptcy Filing and Sale of Substantially All Assets of Debtor

On March 20, 2023, Debtor filed a voluntary petition under Chapter 11 of Title 11 of the United States Code, initiating bankruptcy Case No. 8:23-bk-10571-SC in the United States Bankruptcy Court for the Central District of California, Santa Ana Division.

On May 4, 2023, the Court entered an "Order Directing United States Trustee to Appoint Chapter 11 Trustee." Docket No. 58. Richard A. Marshack was appointed as the Chapter 11 trustee of the Debtor's estate. Docket Nos. 62-65.

On July 7, 2023, as Dk. No. 191, Trustee filed a sale motion in the Bankruptcy seeking to sell substantially all of Debtor's assets including, leases, equipment, furniture, consumer client accounts, prepayments, legal service agreements, intellectual property, pending licenses, and certain proprietary property, all of which is defined in Section V.A. of the sale motion ("Sale Motion").

By Order of July 22, 2023, the Court authorized Trustee's sale of the Debtor's property. Docket. No. 320.

## C.  The Azzure Compromise Motion

On August 16, 2023, Trustee filed a motion to approve an agreement/compromise ("Agreement") with Azzure ("Compromise Motion"). Dk. No. 392.

As noted in the Compromise Motion, prepetition Azzure made a secured loan to Debtor in the total principal amount of $2.55 million. Azzure contended that the amount due under this loan now exceeds $5 million ("Azzure Loan"). Trustee disputed the amount owed on multiple grounds including, but not limited to, whether the embedded annual 170% fixed interest rate in the Loan is enforceable against Debtor under California law and whether the lien created and previously-filed UCC-1 assigned to Azzure properly perfected its lien. In order to avoid further litigation the Trustee and Azzure entered into the Agreement.

Pursuant to the terms of the Agreement, Azzure was to have an allowed, perfected secured claim of $3.5 million. Of this amount, $1.9 million was to be paid to Azzure, and the $1.6 million balance was to be paid to the Estate. *See*, Motion at p. 3. In so doing, Trustee was compromising the perfection issue in exchange for avoidance, recovery, and preservation of the $1.6 million to be

MOTION TO RECONSIDER AND VACATE ORDER RE AZZURE COMPROMISE
4839-5201-1600V1/9999-100

1    paid to the Estate. The next result of the Motion - had it been approved – would mean the

2    perfection issue was resolved and not subject to any further collateral attack.

3        On August 30, 2023, the Official Committee of Unsecured Creditors filed a non-opposition

4    to the Compromise Motion. Docket No. 471. The same day, creditor OHPP filed a limited objection

5    to the Compromise Motion. Docket No. 470. The primary concern raised by OHPP in its Opposition

6    deals with the determination of the priority of the various alleged secured claims. OHPP contends

7    that its lien and interests are senior to Azzure's relying on the argument that the Azzure never filed

8    its own UCC-1 financing statement – instead it took an assignment of another entity's previously

9    filed and financing statement that was senior in priority to OHPP. This exact issue is what concerned

10    Trustee and was the basis of the proposed compromise.

11        On September 6, 2023, Trustee filed a reply in support of the Compromise Motion

12    highlighting the above. Docket No. 493. Similarly, on September 6, 2023, Azzure also filed a reply

13    in support of the Compromise Motion. Thereafter, on September 12, 2023, Fundura Capital Group

14    ("Fundura") filed an untimely objection seemingly raising the same concern as OHPP. Docket No.

15    499.

16        On September 13, 2023, the Court held a hearing on the Compromise Motion wherein it

17    granted the Compromise Motion ("Compromise Motion Hearing"). Attached to the Declaration of

18    D. Edward Hays ("Hays Declaration") as **Exhibit 2** is a true and correct copy of the transcript of

19    the Compromise Motion Hearing.

20        After further contemplation, the Court determined that the Compromise Motion could not

21    be approved and therefore denied the Compromise Motion, without prejudice ("Order"). *See*,

22    Docket No. 581.[5] While the Court agreed that a proposed compromise should be approved if it was

23    in the best interest of the estate and is "fair and equitable" for creditors, the Court believed that

24    "Trustee's focus was too narrow and the relief sought, by virtue of certain terms in the Agreement,

25

26

27    _____

28    [5] Attached to the Hays Declaration as **Exhibit 1** is a true and correct copy of the Order.

4

was premature." Order, 2: 18-22. Specifically, the Court believed that the following section of the

Agreement dealing with priorities was worrisome.

## i.        The Offending Clause of the Agreement

Section 1(C) of the Agreement provides as follows:

**C. Priority of the Compromised Secured Claim**. The Compromised Secured Claim is

believed by the parties to be first-in-priority with respect to all of the Bankruptcy estate's

debts and liabilities.

Compromise Motion, Ex. 1, p. 16, ¶1(c).

As was shown in the responses prior to the hearing, the Azzure lien was likely in third

position (if validly perfected). Instead, Fundura and MNS raised secured claims based on UCC-1's

that were recorded prior to Azzure's financing statement.

Also, it was the Court's view that the provision setting forth, in no uncertain terms, that

Azzure was the senior lienholder entitled to all of the rights and privileges of that status, was

premature and could not be approved at this time as OHPP and Fundura were not made parties to

the compromise, and if their rights, if any, were abrogated without their consent, the Agreement is

not, in fact, fair and equitable. Rather the Court believed an adversary proceeding – which was

pending[6] - was the proper conduit for such determination of rights of lien status. As stated by the

Court:

"Furthermore, the arguments made during the hearing by Trustee's counsel,

among others, claiming that doctrines of claim or issue preclusion would destroy

OHPCDR and PurchaseCo's opportunity to be heard on the merits of their claims

and interests, advance the position that approval of the Agreement, particularly

the agreement that Azzure is the senior lienholder of Estate property as to all other

parties in interest, is premature at this time."

---

[6] *See*, Case No. 8:23-ap-01098.

MOTION TO RECONSIDER AND VACATE ORDER RE AZZURE COMPROMISE
4839-5201-1600V1/9999-100

1   But, the compromise did not request that the Court find that the Azzure lien was in fact in

2   first position. Instead, Trustee only wanted to settle the legal issue of whether a secured creditor

3   could perfect their lien by taking assignment of a previously-filed UCC-1. The compromise can be

4   approved without any determination as to whether Azzure lien is in first, second, third, or fourth

5   position. Also, even though an order approving a compromise can give rise to claim preclusion,

6   Trustee would still have to prove all elements including privity and its application by the Court is

7   discretionary. As such, preservation of OHPP's rights in the adversary did not require denial of the

8   Azzure compromise.

9   **3.     Legal Argument**

10          **A.     Trustee has timely sought reconsideration.**

11          Rule 9023 of the Federal Rules of Bankruptcy Procedure ("FRBP"), provides that Rule 59 of

12   the Federal Rules of Civil Procedure ("FRCP") applies in bankruptcy and that a court may

13   reconsider a prior order upon motion filed within 14 days. Grounds for reconsideration include

14   avoiding manifest error of law or injustice. Moreover, FRBP 9024 provides authority for a court to

15   grant relief from an order on "just terms" where there is an error of law.

16          A motion for reconsideration is treated as a motion to alter or amend judgment under

17   FRCP 59(e) if it is timely filed. *Schertzer v. Bank of Am.*, 2023 U.S.Dist.LEXIS 19645, at *3

18   (Bankr. S.D. Cal. Jan. 3, 2023) (citing *Am. Ironworks & Erectors Inc. v. N. Am. Constr. Corp.*,

19   248 F.3d 892, 898-99 (9th Cir. 2001)). The burden of proof is on the party bringing the Rule

20   59(e) or 60(b) motion. *In re Welch*, 647 B.R. 673, 676 (Bankr. D.S.C. 2023) (Rule 59(e)); *Bryant*

21   *v. Thomas*, 2015 U.S.Dist.LEXIS 120079, at *6 (S.D. Cal. June 18, 2015) (Rule 60(b)). In this

22   case, the Order was entered on October 17, 2023. This Motion is being filed on October 31,

23   2023. As such, the Motion is timely.

24   / / /

25   / / /

26

27

28

MOTION TO RECONSIDER AND VACATE ORDER RE AZZURE COMPROMISE
4839-5201-1600V1/9999-100

**B.    For Claim Preclusion to Apply, Trustee would have to establish all elements including Privity**

Res judicata aka claim preclusion, "provides that 'a final judgment on the merits bars further claims by parties or their privies based on the same cause of action.'"[7] Res judicata also bars claims that could have been raised in the prior action.[8] The doctrine is applicable whenever there is (1) an identity of claims, (2) a final judgment on the merits, and (3) identity or privity between parties. *Id.* Importantly, res judicata only applies if the party against whom the earlier decision is asserted had a "full opportunity and fair opportunity to litigate the claim."[9]

It is well-established that a court order for allowance or disallowance of a claim is in the nature of a final judgment and is entitled to res judicata effect. *See Katchen v. Landy*, 382 U.S. 323, 334 (1966) ("The normal rules of res judicata and collateral estoppel apply to the decisions of bankruptcy courts."). Importantly, court-approved settlements generally receive the same res judicata effect as judgments that result from litigation. *See Tritz v. U.S. Postal Serv.*, 721 F.3d 1133, 1141 (9th Cir. 2013) ("Court-approved settlement agreements . . . have res judicata effect."); *Int'l Union of Operating Engineers-Employers Const. Indus. Pension, Welfare & Training Tr. Funds v. Karr*, 994 F.2d 1426, 1429 (9th Cir. 1993) ("After the parties entered into a settlement agreement, the district court dismissed the entire action with prejudice. The dismissal of the action with prejudice constitutes a final judgment on the merits.").

Put differently, bankruptcy court orders approving settlements via Fed. R. Bankr. P. 9019 conclusively resolve disputes between the parties and are "final" orders for purposes of res judicata. *In re Dominelli*, 820 F.2d 313, 316 (9th Cir. 1987) ("The trustee's action, resulting in a settlement of the claim … amounts to a final judgment on the merits"); *In re Gibraltar Res., Inc*., 210 F.3d at, 576 ("A bankruptcy court's approval of a settlement order… is a 'final' order…A settlement agreement

---

[7] *In re Schimmels*, 127 F.3d 875, 881 (9th Cir. 1997) (*quoting Montana v. United States*, 440 U.S. 147, 153 1979)); *United States v. Bhatia*, 545 F.3d 757, 759 (9th Cir. 2008); *In re Dominelli*, 820 F.2d 313, 316 (9th Cir. 1987) ("Dominelli") (quoting *Montana v. United States*, 440 U.S. 147, 153 (1979)).
[8] *Owens v. Kaiser Found. Health Plan, Inc*., 244 F.3d 708, 713 (9th Cir. 2001) (citation omitted).
[9] *In re Dominelli*, 820 F.2d at 316 (internal citations omitted).

7

approved and embodied in a judgment by a court is 'entitled to full res judicata effect.'"" (citations

omitted)).

In *Dominelli*, pursuant to 11 U.S.C. § 558, a junior creditor attempted to enforce a debtor's

usury defense against a senior creditor where trustee, acting on a cross-claim against the senior

creditor in action commenced by the junior creditor, had settled the usury claim. *In re Dominelli*,

820 F.2d 313, 316 (9th Cir. 1987). The Bankruptcy Court approved the settlement over the objection

of the junior creditor because the junior creditor had complete opportunity to present his case. *Id*. at

317. Ultimately, the Ninth Circuit held that the junior secured creditor was in fact in privity with the

bankruptcy trustee and was bound by the trustee's settlement of the claim of another senior secured

creditor. *In re Dominelli*, 820 F.2d at 316-17.

Privity is found where there is "a substantial identity between the issues in controversy and

[a] showing [that] the parties in the two actions are really and substantially in interest the same."

*Lowell Staats Mining Co. v. Philadelphia Elec. Co*., 878 F.2d 1271, 1275 (10th Cir. 1989). As once

put by the Ninth Circuit:

> We have in this nation a "'deep-rooted historic tradition that everyone should have his
>
> own day in court,'" and presume, consequently, that "'a judgment or decree among
>
> parties to a lawsuit resolves issues as among them, but it does not conclude the rights
>
> of strangers to those proceedings.'" … there are narrow exceptions to this principle,
>
> usually denominated by the term "privity" …

*Headwaters Inc. v. United States Forest Serv*., 399 F.3d 1047, 1050 (9th Cir. 2005)(internal citations

omitted). As elaborated further by the Ninth Circuit,

> "[T]he term 'privity' is now used to describe various relationships between litigants
>
> that would not have come within the traditional definition of that term." *Richards*,
>
> 517 U.S. at 798. *Richards* cited two sources for this statement: the Restatement
>
> (Second) of Judgments and *Martin v. Wilks*, 490 U.S. 755, 104 L. Ed. 2d 835, 109 S.
>
> Ct. 2180 (1989). The former adds to the traditional privity categories circumstances in
>
> which "a person who is not a party to an action . . . is represented by a party,"

8

MOTION TO RECONSIDER AND VACATE ORDER RE AZZURE COMPROMISE

1    including trustees and beneficiaries, other fiduciary relationships and consensual or

2    legal representational relationships, and "the representative of a class of persons

3    similarly situated, designated as such with the approval of the court, of which the

4    person is a member." RESTATEMENT (SECOND) OF JUDGMENTS § 41(1).

5    *Martin*, in the portion quoted in *Richards*, adds "certain limited circumstances [in

6    which] a person, although not a party, has his interests adequately represented by

7    someone with the same interests who is a party," including " 'class' or 'representative'

8    suits" and "control of litigation on behalf of [**12]  one of the parties in the

9    litigation," as well as "special remedial scheme[s] . . . expressly foreclosing

10    successive litigation by nonlitigants, as for example in bankruptcy or probate." 490

11    U.S. at 762 n.2.

12    *Headwaters Inc. v. United States Forest Serv.*, 399 F.3d 1047, 1053 (9th Cir. 2005)

13         Secured creditors, however, may not always be in privity with a bankruptcy trustee. *See, In

14    re Medomak Canning*, 922 F.2d 895 (1st Cir. 1990); *see also, Slone v. Anderson (In re Anderson)*,

15    511 B.R. 481, 506-07 (Bank. S.D. Ohio 2013) (holding that bankruptcy trustee not in privity with

16    secured creditors who brought foreclosure action because they did not have identity of interest with

17    all creditors and were representing only their individual interests in the prior suit), *aff'd,* 510 B.R.

18    113 (B.A.P. 6th Cir. 2014). Indeed, secured creditors may be able to assert defenses when the liens

19    securing their claims are directly at stake. *Henry Ansbacher & Co. v. Klebanow (In re Ira Haupt &*

20    *Co.*), 362 F.2d 569, 570 (2d Cir. 1966); *In re Video Cassette Games, Inc.*, 108 B.R. 347, 349 (Bankr.

21    N.D. Ga. 1989); *In re Savidge,* 57 B.R. 389 (D. Del. 1985); *First Bank Billings v. Feterl Mfg. Co. (In*

22    *re Parker Montana Co.*), 47 B.R. 419 (D. Mont. 1985).

23         In sum, legal authority exists that holds that a Trustee may or may not be in privity with a

24    secured creditor. So, in this case, Trustee may or may not be in privity with OHPP and/or Fundura

25    such that the Agreement would be binding on them. To the extent that the Court finds that they are

26    not in privity, then the Agreement would not be preclusive.

27

28

9

MOTION TO RECONSIDER AND VACATE ORDER RE AZZURE COMPROMISE

1  Lastly, even if all elements of claim preclusion could be established by Trustee, its

2  application by the Court is discretionary *Robi v. Five Platters, Inc*., 838 F.2d 318, 321 (9th Cir.

3  1988); *Alary Corp. v. Sims (In re Assoc'd Vintage Group, Inc*.), 283 B.R. 549, 554 (9th Cir. BAP

4  2002).

5  Because approval of the Agreement may not preclude OHPP's claims in its adversary

6  proceeding, and the Court will have to ultimately find good cause to exercise its discretion before

7  applying claim preclusion in a manner that is fair and equitable, the Court is respectfully requested

8  to reconsider its order and approve the proposed compromise. Prior to filing this Motion, Trustee

9  contacted counsel for OHPP proposing a stipulation for reconsideration that would preserve its

10  claims. If an agreement can be reached, Trustee will promptly notify the Court.

11  **4.      Conclusion**

12  For all the foregoing reasons, Trustee respectfully requests that the Court enter an Order:

13  1)   Granting the Motion and vacating the Order;

14  2)   Approving the Agreement; and

15  3)   Awarding such other and further relief to any party that the Court deems just and

16       proper.

17

18  Dated:  October 31, 2023                      MARSHACK HAYS WOOD LLP

19

20                                               By:  */s/ D. Edward Hays*
                                                     D. EDWARD HAYS
21                                                   LAILA MASUD
                                                     BRADFORD N. BARNHARDT
22                                                   Attorneys for the Chapter 11 Trustee for
                                                     the Estate of The Litigation Practice Group,
23                                                   P.C., Richard A. Marshack

24

25

26

27

28

MOTION TO RECONSIDER AND VACATE ORDER RE AZZURE COMPROMISE
4839-5201-1600V1/9999-100

# Declaration of D. Edward Hays

I, D. EDWARD HAYS, say and declare as follows:

1.      I am an individual over 18 years of age and competent to make this Declaration. If called upon to do so, I could and would competently testify as to the facts set forth in this Declaration.

2.      I am an attorney at law licensed to practice in this state and admitted to practice in this Court. I am a founding partner of Marshack Hays Wood LLP formerly known as Marshack Hays LLP ("Firm"), counsel to Richard A. Marshack in his capacity as Chapter 11 Trustee for the Bankruptcy Estate ("Estate") of Litigation Practice Group, P.C. ("Debtor"). I make this declaration in support of Trustee's motion for reconsideration ("Motion"). All capitalized terms not otherwise defined in this declaration shall have the meaning ascribed to them in the Motion.

3.      Attached as **Exhibit 1** is a true and correct copy of the subject order denying compromise entered by the Court on October 17, 2023, as Dk. No. 581.

4.      On September 13, 2023, the Court held a hearing on the Compromise Motion wherein it granted the Compromise Motion ("Compromise Motion Hearing"). Attached as **Exhibit 2** is a true and correct copy of the transcript from the Compromise Motion Hearing.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration is executed on October 31, 2023.


_/s/ D. Edward Hays_____
D. EDWARD HAYS

MOTION TO RECONSIDER AND VACATE ORDER RE AZZURE COMPROMISE
4839-5201-1600V1/9999-100

**EXHIBIT 1**

---

**Fill in this information to identify the case:**

Debtor 1    The Litigation Practice Group PC

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the: Central District of California

Case number   8:23-bk-10571-SC

---

Official Form 410

# Proof of Claim

04/22

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) **that you received.**

| Part 1: | Identify the Claim |
| --- | --- |

| 1. **Who is the current creditor?** | Azzure Capital LLC |
| --- | --- |
| | Name of the current creditor (the person or entity to be paid for this claim) |
| | Other names the creditor used with the debtor |

| 2. **Has this claim been acquired from someone else?** | ☒ No |
| --- | --- |
| | ☐ Yes. From whom? |

3. **Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
| --- | --- |
| Bryan Cave Leighton Paisner LLP c/o Sharon Z. Weiss | Azzure Capital LLC, Attn: Mordechai Herbst |
| Name | Name |
| 120 Broadway, Suite 300 | 1820 Avenue M, Suite 695 |
| Number     Street | Number     Street |
| Santa Monica    CA    90401 | Brooklyn    NY    11230 |
| City    State    ZIP Code | City    State    ZIP Code |
| Contact phone (310) 576-2100 | Contact phone |
| Contact email sharon.weiss@bclplaw.com | Contact email |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

| 4. **Does this claim amend one already filed?** | ☒ No |
| --- | --- |
| | ☐ Yes. Claim number on court claims registry (if known) _____     Filed on ___/___/_____ |
| | MM / DD / YYYY |

| 5. **Do you know if anyone else has filed a proof of claim for this claim?** | ☒ No |
| --- | --- |
| | ☐ Yes. Who made the earlier filing? |

---

EXHIBIT 1, PAGE 12

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---------|------------------------------------------------------------------|

**6. Do you have any number you use to identify the debtor?**

☒ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____  ____  ____  ____

**7. How much is the claim?**

$ _No Less Than 5,000,000.00 see payoff schedule_    **Does this amount include interest or other charges?**

☒ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

_money loaned_

**9. Is all or part of the claim secured?**

☐ No

☒ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☒ Other. Describe:    _Personal property etc. defined in the UCC-1_

**Basis for perfection:**    _UCC-1 Financing Statement (Attached)_

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**    $ _No Less Than 5,000.000.00_

**Amount of the claim that is secured:**    $ _5,000,000.00_

**Amount of the claim that is unsecured:**    $ _Unknown_    (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**    $ _____

**Annual Interest Rate** (when case was filed) _170.00_ %

☒ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☒ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**    $ _____

**11. Is this claim subject to a right of setoff?**

☒ No

☐ Yes. Identify the property: _____

EXHIBIT 1, PAGE 13

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☒ No

☐ Yes. *Check one:*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ _____ |
| ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ _____ |
| ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ _____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ _____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ _____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $ _____ |

\* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

---

**Part 3:   Sign Below**

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☒ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   07/21/2023
                   MM / DD / YYYY

_____
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Mordechai Herbst | | |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | Managing Member | | |
| Company | Azzure Capital LLC | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 1865 65th Street, Suite 695 | | |
| | Number      Street | | |
| | Brooklyn | NY | 11230 |
| | City | State | ZIP Code |
| Contact phone | _____ | Email | _____ |

---

EXHIBIT 1, PAGE 14

# EXHIBIT 1

## BUSINESS SECURED PROMISSORY NOTE AND SECURITY AGREEMENT

### Two Million, Five Hundred Fifty Thousand Dollars ($2,550,000.00)

This promissory note (the "Note") is made and effective February 7, 2023 (the "Effective Date"), by and between The Litigation Practice Group PC, a California professional corporation, and Tony Diab, an individual, (collectively, the "Borrowers"), and Azzure Capital LLC, a New York limited liability company (the "Payee").

**1.      PROMISE OF PAYMENT.**

FOR VALUE RECEIVED, the Borrowers promise to pay to the Payee the principal amount of two million, five hundred fifty thousand dollars ($2,550,000.00), together with interest accruing on the unpaid balance thereof until due.  The interest rate on this Note shall be an annual rate of interest equal to one hundred seventy percent (170%) percent, or the maximum amount allowed by applicable law, whichever is less.  Interest shall be computed on the basis of a year of 365 days and the actual number of days elapsed.

All payments shall be made by made via wire transfer to:

| | |
|---|---|
| Name on Account: | Azzure Capital Operating |
| Address on Account: | 1865 65th Street<br>Brooklyn, New York |
| Name of Bank: | Optimum Bank |
| Address of Bank: | 2929 E. Commercial Blvd.<br>Fort Lauderdale, Florida 33308 |
| Routing No.: | ▮▮▮5096 |
| Account No.: | ▮▮▮1779 |

**2.      WEEKLY INSTALLMENT PAYMENTS.**

The Borrowers will pay said principal and interest to the Payee in fifty-two (52) equal installment payments, on Tuesday of each week or, in the event that a Tuesday falls on a bank holiday, on the next business day.  All payments will be applied first to interest and the remainder to principal, and interest shall cease to accrue on any principal so paid.  Acceptance by the Payee of any payment differing from the designated installment payment listed above does not relieve the Borrowers of the obligation to honor the requirements of this Note.  A schedule of the Payments and the applicable remaining balance under the Note is attached hereto as **Schedule A**.

EXHIBIT 1, PAGE 16

3.      **ORIGINATION FEE.**

The Borrowers shall pay to the Payee on or before the Effective Date one-time loan origination fee (the "Origination Fee") in the amount of fifty thousand dollars ($50,000.00), which fee has been fully earned, is due and payable upon the execution of this Note, and is non-refundable.

4.      **INITIAL DATE.**

The first payment under this Note is due and payable on the first (1st) Tuesday after the Effective Date.  A like installment shall be due on the same day of each succeeding month thereafter.

5.      **PREPAYMENT.**

The Borrowers may prepay this Note, in whole or in part, at any time before maturity without penalty or premium other than the payment of all interest that has come due through the date the Payee receives the payment due under this Note in full.

6.      **EVENTS OF DEFAULT.**

The Borrowers will be deemed to be in default under this Note on the occurrence of any of the following events (each an "Event of Default"): (i) on the Borrowers' failure to make any payment when due under this Note; (ii) failure by Borrower to observe, perform, keep or abide by any term, covenant or condition contained in this Note or any other document or instrument given to the Payee in connection with or related to this Note, including any security agreement or other agreement or document now or hereafter evidencing or creating or perfecting any security for the payment of this Note; (iii) the further encumbering of the Collateral, as defined below, without the express written consent of the Payee; (iv) on the filing regarding either of the Borrowers of any voluntary or involuntary petition for relief under the United States Bankruptcy Code or the initiation of any proceeding under federal law or law of any other jurisdiction for the general relief of debtors; (v) on the execution by either of the Borrowers of an assignment for the benefit of creditors or the appointment of a receiver, custodian, trustee, or similar party to take possession of either of the Borrowers' assets or property; (vi) the death of any of the Borrowers or the Payee; and (vii) a misrepresentation by the Borrowers to the Payee for the purpose of obtaining or extending credit.

7.      **ACCELERATION; REMEDIES ON DEFAULT.**

On the occurrence of any Event of Default, at the option of the Payee, all principal and other amounts owed under this Note shall become immediately due and payable without notice or demand by the Payee, and the Payee, in addition to its rights and remedies under this Note, may pursue any legal or equitable remedies that are available to it.

8.      **REPRESENTATIONS, WARRANTIES, AND COVENANTS.**

The Borrowers make the following representations, warranties and covenants:

2

(a)    the Borrowers are the owner of or is acquiring the Collateral, as defined below, free of all liens, encumbrances and security interests (except Payee's security interest), and is the owner of all other Collateral free of all liens, encumbrances and security interests;

(b)    the proceeds of this Note will be used for business purposes only, and not for personal, consumer, family or household purposes or to purchase personal, consumer, family or household goods. The Borrowers understand the Payee is relying on the accuracy of this representation in disbursing the loan proceeds secured by the Note and that Borrowers' agreement not to use such loan proceeds for personal, consumer, family or household purposes or to purchase personal, consumer, family or household goods means that certain important duties imposed upon entities making loans for consumer/personal purposes, and certain important rights conferred upon consumers, pursuant to federal or state law will not apply to this Note, or any other document or instrument given to the Payee in connection with or related to this Note.  The Borrowers also understands that the Payee will be unable to confirm whether the proceeds secured by this Note will be used for business purposes only.   The Borrowers acknowledge and agrees that a breach by the Borrowers of the provisions of this subsection 8(b) will not affect the Payee's right to enforce the Borrowers' promise to pay for all amounts owed under this Note, regardless of the purpose for which the proceeds secured by this Note are in fact obtained or use any remedy legally available to the Payee, even if that remedy would not have been available had the proceeds of secured by this Note been used for consumer purposes;

(c)    the Collateral will be kept at the Borrowers' address set forth in Section 13;

(d)    the Borrowers' names set forth above are their exact names on its organizing and/or registered documents, if any, and is the Borrowers' principal place of business. The Borrowers shall immediately advise the Payee of any change in Borrowers' name(s) or address(es);

(e)    the Borrowers are duly organized, validly existing and in good standing under the law of the jurisdiction in which it is organized, and has all licenses and authorizations necessary to carry on its business as now being conducted; the Borrowers have the full power and authority to execute, deliver and perform all transactions contemplated by this Note and the performance of and compliance with the terms of this Note will not violate the Borrowers' organizational documents or constitute a default of any contract, agreement or other instrument to which the Borrowers are a party;

(f)    The Borrowers have duly authorized the execution, delivery and performance of this Note and has duly executed and delivered this Note, and this Note constitutes a legal, valid and binding obligation of the Borrowers, enforceable against it in accordance with its terms;

(g)    there is no action, suit, proceeding or investigation pending or, to the Borrowers' knowledge, threatened against or affecting it or any of its assets before or by any

EXHIBIT 1, PAGE 18

court or other governmental authority which, if determined adversely to it, would have a material adverse effect on its financial condition, business or prospects, or the value of the Collateral; and

(h)    the Borrower will provide any financial information on request or permit an examination of its books and records to permit the Payee to confirm Borrowers' ability to pay its obligations under the Note and all other financial obligations.

(i)    the Borrower has not been notified by any of its lenders that it is in default under the terms of any of its credit agreements, nor has the Borrowers done, caused to be done, or failed to do any act or omission that would result in a default under any credit agreement.

9.    **GRANT OF SECURITY INTEREST**

The Borrowers hereby grant to the Payee a security interest in all of the following property of the Borrowers (collectively, the "Collateral"):

(a)    all accounts, deposit accounts, contract rights, chattel paper, instruments, documents, general intangibles, commercial tort claims and other rights to payment of every kind now existing or at any time herein arising;

(b)    all inventory, goods held for sale or lease or to be furnished under contracts for service, or goods so leased or furnished, raw materials, component parts, work in process and other materials used or consumed in the Borrowers' business, now or any time hereafter owned or acquired by the Borrowers, wherever located, and all products thereof, whether in possession of the Borrowers, any warehousemen, any bailee or any other person or entity, or in process of delivery, and whether located at the Borrowers' places of business or elsewhere;

(c)    all right, title and interest of the Borrowers under licenses, guaranties, warranties, management agreements, marking or sales agreements, escrow contracts, indemnity agreements, insurance policies, service agreements, maintenance agreements and other similar contracts of every kind in which the Borrowers now have or at any time hereafter shall have an interest;

(d)    all the Borrowers goods, tools, machinery, furnishings, furniture and other equipment and fixtures of every kind now existing or hereafter acquired, and improvements, replacements, accessions and additions thereto, wherever located, including, without limitation, any of the foregoing now or at any time hereafter located at or installed on the land or in the improvements of any real property owned or leased by the Borrowers, and all such goods after they have been severed and removed from any of said real property;

(e)    all present and former general intangibles, all tax refunds of every kind of nature to which the Borrowers now or hereafter may become entitled, however arising, all other refunds, and all deposits, goodwill, choses in action, trade secrets, computer programs, software, customer lists, trademarks, trade names, patents, licenses, copyrights, technology, processes, proprietary information and insurance proceeds relating to or arising out of its business;

4

      (f)     all present and future books and records, including, without limitation, books of account and ledgers of every kind and nature, all electronically recorded data relating to the Borrowers or the business thereof, all receptacles and containers for such records, and all files and correspondence, relating to or arising out of its business;

      (g)     all present and future accessions, appurtenances, components, repairs, repair parts, spare parts, replacements, substitutions, additions, issue and/or improvements to or of or with respect to any of the foregoing;

      (h)     all other tangible and intangible property of the Borrowers relating to or arising out of its business;

      (i)     (i) trademarks, service marks, trade dress, and trade names and registrations and applications for registration thereof; (ii) (A) rights to art, audiovisual works, animations, cartoons, characters, choreography, compilations, collective works, emblems, films, film clips, graphics, images, illustrations, likenesses, motion pictures, musical compositions, performances, photographs, pictorial works, songs, song lyrics, sound recordings, video recording rights, scripts, screenplays, text, including, without limitation, the literary works, (B) publication rights, options, production rights, distribution rights, display rights, attribution rights, integrity rights, performance rights, mechanical rights, approval rights, and moral rights associated with the foregoing, and (C) publicity rights or privacy rights (or waivers or quitclaims thereof) of any person or entity; (iii) copyrights (registered or unregistered), registrations and applications for registration thereof, including all renewals, derivative works, enhancements, modifications, updates, new releases or other revisions thereof, and all works of authorship; (iv) trade secrets and other confidential information, including, but not limited to, ideas, processes, formulas, compositions, inventions (whether patentable or unpatentable and whether or not reduced to practice), know-how, production processes and techniques, drawings, specifications, designs, plans, proposals, technical data, copyrightable works, and financial and marketing plans; (v) other intellectual property rights; (vi) rights to third party warranties relating to the foregoing; (vii) copies and intangible embodiments of all of the foregoing (in whatever form or medium); (viii) all licenses where the Borrowers is licensee except where such license prohibits the granting of the security interest contemplated hereby in such license, and the goodwill symbolized by all of the foregoing an connected therewith throughout the world; (ix) all domain names and URL's and the goodwill symbolized by all of the foregoing and connected therewith throughout the world;

      (j)     all rights, remedies, powers and/or privileges of the Borrowers with respect to any of the foregoing; and

      (k)     whatever is receivable or received when any of the foregoing or the proceeds thereof are sold, leased, collected, exchanged or otherwise disposed of, whether such disposition is voluntary or involuntary, including, without limitation, all rights to payment, including returned premiums, with respect to any insurance relating to any of the foregoing, and all rights to payment with respect to any cause of action affecting or relating to any of the foregoing.

EXHIBIT 1, PAGE 20

### 10.    INSPECTION OF COLLATERAL AND PLACE OF BUSINESS.

The Payee and the Payee's representatives and agents shall have the right at any reasonable time or times to inspect the Collateral wherever located and the interior and exterior of any of the Borrowers' places of business, and the Borrowers shall assist the Payee and its representatives and agents in making any such inspection.  During an inspection of any the Borrowers' places of business, the Payee or the Payee's representatives and agents may examine, among other things, whether the Borrowers (i) have a place of business that is separate from any personal residence, (ii) is open for business, (iii) has sufficient inventory and/or staff to conduct the Borrowers' business and (iv) has one or more credit card terminals or point of sale systems if Borrower processes credit card transactions.  When performing an inspection, the Payee or the Payee's representatives and agents may photograph the interior and exterior of any Borrower place of business, including any signage. Any photograph will become and remain the sole property of the Payee and will be shared with the Payee's employees, representatives and agents. The Borrowers grant the Payee the irrevocable and permanent right to display and share any photograph in all forms, including composite and modified representations, for all purposes, with the Payee's employees, representatives and agents.

### 11.    TIME OF ESSENCE.

Time is of the essence with respect to every provision of this Note.

### 12.    JOINT AND SEVERAL LIABILITY; SUCCESSORS AND ASSIGNS.

This Note shall be the joint and several obligations of all the Borrowers and the provisions of this Note shall be binding upon and shall inure to the benefit of the successors, heirs, and assigns of the Borrowers and the Payee.  The Borrowers may not assign their rights or delegate their obligations under this Note in whole or in part without the prior written consent of the Payee.  All references in this Note to the Borrowers and the Payee shall be deemed to include, as applicable, a reference to their respective successors, heirs and assigns.

### 13.    NOTICE.

Any notice or other communication provided for herein or given hereunder to a party hereto shall be in writing and shall be given in person, by overnight courier, or by mail (registered or certified mail, postage prepaid, return receipt requested) to the respective party as follows:

EXHIBIT 1, PAGE 21

If to the Payee:

Azzure Capital LLC
1820 Avenue M, Suite #695
Brooklyn, New York 11230

If to the Borrowers:

The Litigation Practice Group PC
17542 E 17th Street
Ste 100
Tustin, CA 92780

and

Tony M. Diab
20101 SW Cypress St
Newport Beach, CA 92660

**14.   GOVERNING LAW.**

**THIS NOTE SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES. THE BORROWERS HEREBY CONSENT TO THE EXCLUSIVE JURISDICTION OF ANY STATE COURT LOCATED WITHIN THE COUNTY OF NASSAU, STATE OF NEW YORK AND IRREVOCABLY AGREES THAT ALL ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS NOTE SHALL BE LITIGATED IN SUCH COURTS. THE BORROWERS EXPRESSLY SUBMITS AND CONSENTS TO THE JURISDICTION OF THE AFORESAID COURTS AND WAIVE ANY DEFENSE OF FORUM NON CONVENIENS. EACH BORROWER HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE UPON SUCH BORROWER BY CERTIFIED MAIL, ADDRESSED TO SUCH BORROWER AT THE ADDRESSES LISTED ABOVE AND SERVICE SO MADE SHALL BE DEEMED TO BE COMPLETE FIVE (5) DAYS AFTER THE SAME HAS BEEN POSTED.**

EXHIBIT 1, PAGE 22

**15.    ENTIRE AGREEMENT.**

This Note constitutes the final, complete, and exclusive statement of the agreement of the parties with respect to the subject matter hereof, and supersedes any and all other prior and contemporaneous agreements and understandings, both written and oral, between the parties.

**16.    NO IMPLIED WAIVER.**

The Payee's failure to exercise any right or remedy provided in this Note shall not be construed as a waiver of any future exercise of that right or exercise of any other right or remedy to which the Payee may be entitled.

**17.    COLLECTION COSTS.**

The Borrowers agree to pay any and all costs, including reasonable attorneys' fees of twenty-five percent (25%) of the amount due at default based upon the standard contingency fee charged by collection attorneys in the state of New York, incurred by the Payee in collecting sums payable under this Note without protest of any kind.

**18.    SEVERABILITY.**

If one or more of the provisions of this Note shall be declared or held to be invalid, illegal, or unenforceable in any respect in any jurisdiction, the validity, legality, and enforceability of the remaining provisions hereof shall not in any way be affected or impaired thereby and any such declaration or holding shall not invalidate or render unenforceable such provision in any other jurisdiction.

**19.    WAIVER OF JURY TRIAL.**

**EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.**

**20.    NO ORAL MODIFICATION.**

This Note may be modified only by a writing signed by both the Borrowers and the Payee.

**21.    HEADINGS.**

Headings used in this Note are provided for convenience only and shall not be used to construe meaning or intent.

[CONTINUED BELOW]

8

EXHIBIT 1, PAGE 23

DocuSign Envelope ID: A4C2F449-6755-4FE9-A9FC-F5F3A72F2042

**BEFORE SIGNING THIS NOTE, THE BORROWERS READ AND UNDERSTOOD ALL OF THE PROVISIONS HEREOF.  AFTER DUE CONSIDERATION AND THE OPPORTUNITY TO CONSULT WITH AN ATTORNEY, ACCOUNTANT, OR OTHER COMPETENT PROFESSIONAL OF THEIR CHOICE, THE BORROWERS KNOWINGLY, WILLFULLY, AND VOLUNTARILY AGREE TO THE TERMS OF THIS NOTE.**

**IN WITNESS WHEREOF,** the parties have executed this Note as of the date first above written.

PAYEE:               **AZZURE CAPITAL LLC**

By: _Mordechai Herbst_
Name: Mordi Herbst
Title:  Managing Member

BORROWERS:           **THE LITIGATION PRACTICE GROUP PC**

By: _____
Name: Daniel S. March, managing shareholder

**TONY M. DIAB**

By: _____
Name: Tony M. Diab

9

**BEFORE SIGNING THIS NOTE, THE BORROWERS READ AND UNDERSTOOD ALL OF THE PROVISIONS HEREOF. AFTER DUE CONSIDERATION AND THE OPPORTUNITY TO CONSULT WITH AN ATTORNEY, ACCOUNTANT, OR OTHER COMPETENT PROFESSIONAL OF THEIR CHOICE, THE BORROWERS KNOWINGLY, WILLFULLY, AND VOLUNTARILY AGREE TO THE TERMS OF THIS NOTE.**

**IN WITNESS WHEREOF**, the parties have executed this Note as of the date first above written.

PAYEE:                          **AZZURE CAPITAL LLC**


                                By:    _____
                                Name: Mordi Herbst
                                Title:  Managing Member


BORROWERS:                      **THE LITIGATION PRACTICE GROUP PC**


                                By:    _____
                                Name: Daniel S. March, managing shareholder


                                **TONY M. DIAB**


                                By:    _____
                                Name: Tony M. Diab


9

EXHIBIT 1, PAGE 25

| Date | Schedule Prin Payment | Schedule Int Payment | Amount Paid | Amount Due | Additional Interest | Total Due |
|---|---|---|---|---|---|---|
| 2/7/2023 | $ - | $ - | $ - | $ - | | $ - |
| 2/8/2023 | $ - | $ - | $ - | $ - | | $ - |
| 2/9/2023 | $ - | $ - | $ - | $ - | | $ - |
| 2/10/2023 | $ - | $ - | $ - | $ - | | $ - |
| 2/11/2023 | $ - | $ - | $ - | $ - | | $ - |
| 2/12/2023 | $ - | $ - | $ - | $ - | | $ - |
| 2/13/2023 | $ - | $ - | $ - | $ - | | $ - |
| 2/14/2023 | $ 63,732.76 | $ 83,365.38 | $ 70,000.00 | $ 77,098.14 | | $ 77,098.14 |
| 2/15/2023 | $ - | $ - | $ 90,000.00 | $ (12,901.86) | | $ (12,901.86) |
| 2/16/2023 | $ - | $ - | $ - | $ (12,901.86) | | $ (12,901.86) |
| 2/17/2023 | $ - | $ - | $ - | $ (12,901.86) | | $ (12,901.86) |
| 2/18/2023 | $ - | $ - | $ - | $ (12,901.86) | | $ (12,901.86) |
| 2/19/2023 | $ - | $ - | $ - | $ (12,901.86) | | $ (12,901.86) |
| 2/20/2023 | $ - | $ - | $ - | $ (12,901.86) | | $ (12,901.86) |
| 2/21/2023 | $ 65,816.33 | $ 81,281.81 | $ - | $ 134,196.28 | | $ 134,196.28 |
| 2/22/2023 | $ - | $ - | $ - | $ 134,196.28 | | $ 134,196.28 |
| 2/23/2023 | $ - | $ - | $ - | $ 134,196.28 | | $ 134,196.28 |
| 2/24/2023 | $ - | $ - | $ 160,000.00 | $ (25,803.72) | | $ (25,803.72) |
| 2/25/2023 | $ - | $ - | $ - | $ (25,803.72) | | $ (25,803.72) |
| 2/26/2023 | $ - | $ - | $ - | $ (25,803.72) | | $ (25,803.72) |
| 2/27/2023 | $ - | $ - | $ 160,000.00 | $ (185,803.72) | | $ (185,803.72) |
| 2/28/2023 | $ 67,968.02 | $ 79,130.12 | $ - | $ (38,705.58) | | $ (38,705.58) |
| 3/1/2023 | $ - | $ - | $ - | $ (38,705.58) | | $ (38,705.58) |
| 3/2/2023 | $ - | $ - | $ - | $ (38,705.58) | | $ (38,705.58) |
| 3/3/2023 | $ - | $ - | $ - | $ (38,705.58) | | $ (38,705.58) |
| 3/4/2023 | $ - | $ - | $ - | $ (38,705.58) | | $ (38,705.58) |
| 3/5/2023 | $ - | $ - | $ - | $ (38,705.58) | | $ (38,705.58) |
| 3/6/2023 | $ - | $ - | $ - | $ (38,705.58) | | $ (38,705.58) |
| 3/7/2023 | $ 70,190.05 | $ 76,908.09 | $ - | $ 108,392.56 | | $ 108,392.56 |
| 3/8/2023 | $ - | $ - | $ - | $ 108,392.56 | | $ 108,392.56 |
| 3/9/2023 | $ - | $ - | $ 160,000.00 | $ (51,607.44) | | $ (51,607.44) |
| 3/10/2023 | $ - | $ - | $ - | $ (51,607.44) | | $ (51,607.44) |
| 3/11/2023 | $ - | $ - | $ - | $ (51,607.44) | | $ (51,607.44) |
| 3/12/2023 | $ - | $ - | $ - | $ (51,607.44) | | $ (51,607.44) |
| 3/13/2023 | $ - | $ - | $ - | $ (51,607.44) | | $ (51,607.44) |
| 3/14/2023 | $ 72,484.72 | $ 74,613.42 | $ - | $ 95,490.70 | | $ 95,490.70 |
| 3/15/2023 | $ - | $ - | $ - | $ 95,490.70 | | $ 95,490.70 |
| 3/16/2023 | $ - | $ - | $ - | $ 95,490.70 | | $ 95,490.70 |
| 3/17/2023 | $ - | $ - | $ - | $ 95,490.70 | | $ 95,490.70 |
| 3/18/2023 | $ - | $ - | $ - | $ 95,490.70 | | $ 95,490.70 |
| 3/19/2023 | $ - | $ - | $ - | $ 95,490.70 | | $ 95,490.70 |
| 3/20/2023 | $ - | $ - | $ - | $ 95,490.70 | | $ 95,490.70 |
| 3/21/2023 | $ 74,854.42 | $ 72,243.72 | $ - | $ 242,588.84 | | $ 242,588.84 |
| **Defaulted** | | | | **$ 3,184,551.64** | **$ 14,832.16** | **$ 3,199,383.80** |
| 3/22/2023 | $ - | $ - | $ - | $ 3,199,383.80 | $ 14,901.24 | $ 3,214,285.04 |
| 3/23/2023 | $ - | $ - | $ - | $ 3,214,285.04 | $ 14,970.64 | $ 3,229,255.68 |
| 3/24/2023 | $ - | $ - | $ - | $ 3,229,255.68 | $ 15,040.37 | $ 3,244,296.05 |
| 3/25/2023 | $ - | $ - | $ - | $ 3,244,296.05 | $ 15,110.42 | $ 3,259,406.47 |
| 3/26/2023 | $ - | $ - | $ - | $ 3,259,406.47 | $ 15,180.80 | $ 3,274,587.27 |
| 3/27/2023 | $ - | $ - | $ - | $ 3,274,587.27 | $ 15,251.50 | $ 3,289,838.77 |
| 3/28/2023 | $ 77,301.58 | $ 69,796.56 | $ - | $ 3,289,838.77 | $ 15,322.54 | $ 3,305,161.31 |

EXHIBIT 1, PAGE 26

| Date | | | | | | |
|---|---|---|---|---|---|---|
| 3/29/2023 | $ - | $ - | $ 160,000.00 | $ 3,145,161.31 | $ 14,648.70 | $ 3,159,810.00 |
| 3/30/2023 | $ - | $ - | $ - | $ 3,159,810.00 | $ 14,716.92 | $ 3,174,526.93 |
| 3/31/2023 | $ - | $ - | $ - | $ 3,174,526.93 | $ 14,785.47 | $ 3,189,312.39 |
| 4/1/2023 | $ - | $ - | $ - | $ 3,189,312.39 | $ 14,854.33 | $ 3,204,166.73 |
| 4/2/2023 | $ - | $ - | $ - | $ 3,204,166.73 | $ 14,923.52 | $ 3,219,090.24 |
| 4/3/2023 | $ - | $ - | $ - | $ 3,219,090.24 | $ 14,993.02 | $ 3,234,083.26 |
| 4/4/2023 | $ 79,828.75 | $ 67,269.39 | $ - | $ 3,234,083.26 | $ 15,062.85 | $ 3,249,146.12 |
| 4/5/2023 | $ - | $ - | $ - | $ 3,249,146.12 | $ 15,133.01 | $ 3,264,279.13 |
| 4/6/2023 | $ - | $ - | $ - | $ 3,264,279.13 | $ 15,203.49 | $ 3,279,482.62 |
| 4/7/2023 | $ - | $ - | $ - | $ 3,279,482.62 | $ 15,274.30 | $ 3,294,756.92 |
| 4/8/2023 | $ - | $ - | $ - | $ 3,294,756.92 | $ 15,345.44 | $ 3,310,102.36 |
| 4/9/2023 | $ - | $ - | $ - | $ 3,310,102.36 | $ 15,416.92 | $ 3,325,519.28 |
| 4/10/2023 | $ - | $ - | $ - | $ 3,325,519.28 | $ 15,488.72 | $ 3,341,008.00 |
| 4/11/2023 | $ 82,438.53 | $ 64,659.61 | $ - | $ 3,341,008.00 | $ 15,560.86 | $ 3,356,568.86 |
| 4/12/2023 | $ - | $ - | $ - | $ 3,356,568.86 | $ 15,633.33 | $ 3,372,202.19 |
| 4/13/2023 | $ - | $ - | $ - | $ 3,372,202.19 | $ 15,706.15 | $ 3,387,908.34 |
| 4/14/2023 | $ - | $ - | $ - | $ 3,387,908.34 | $ 15,779.30 | $ 3,403,687.64 |
| 4/15/2023 | $ - | $ - | $ - | $ 3,403,687.64 | $ 15,852.79 | $ 3,419,540.43 |
| 4/16/2023 | $ - | $ - | $ - | $ 3,419,540.43 | $ 15,926.63 | $ 3,435,467.06 |
| 4/17/2023 | $ - | $ - | $ - | $ 3,435,467.06 | $ 16,000.81 | $ 3,451,467.86 |
| 4/18/2023 | $ 85,133.64 | $ 61,964.50 | $ - | $ 3,451,467.86 | $ 16,075.33 | $ 3,467,543.19 |
| 4/19/2023 | $ - | $ - | $ - | $ 3,467,543.19 | $ 16,150.20 | $ 3,483,693.39 |
| 4/20/2023 | $ - | $ - | $ - | $ 3,483,693.39 | $ 16,225.42 | $ 3,499,918.82 |
| 4/21/2023 | $ - | $ - | $ - | $ 3,499,918.82 | $ 16,300.99 | $ 3,516,219.81 |
| 4/22/2023 | $ - | $ - | $ - | $ 3,516,219.81 | $ 16,376.91 | $ 3,532,596.72 |
| 4/23/2023 | $ - | $ - | $ - | $ 3,532,596.72 | $ 16,453.19 | $ 3,549,049.91 |
| 4/24/2023 | $ - | $ - | $ - | $ 3,549,049.91 | $ 16,529.82 | $ 3,565,579.73 |
| 4/25/2023 | $ 87,916.85 | $ 59,181.29 | $ - | $ 3,565,579.73 | $ 16,606.81 | $ 3,582,186.54 |
| 4/26/2023 | $ - | $ - | $ - | $ 3,582,186.54 | $ 16,684.16 | $ 3,598,870.70 |
| 4/27/2023 | $ - | $ - | $ - | $ 3,598,870.70 | $ 16,761.86 | $ 3,615,632.56 |
| 4/28/2023 | $ - | $ - | $ 60,000.00 | $ 3,555,632.56 | $ 16,560.48 | $ 3,572,193.04 |
| 4/29/2023 | $ - | $ - | $ - | $ 3,572,193.04 | $ 16,637.61 | $ 3,588,830.66 |
| 4/30/2023 | $ - | $ - | $ - | $ 3,588,830.66 | $ 16,715.10 | $ 3,605,545.76 |
| 5/1/2023 | $ - | $ - | $ - | $ 3,605,545.76 | $ 16,792.95 | $ 3,622,338.71 |
| 5/2/2023 | $ 90,791.06 | $ 56,307.08 | $ - | $ 3,622,338.71 | $ 16,871.17 | $ 3,639,209.88 |
| 5/3/2023 | $ - | $ - | $ - | $ 3,639,209.88 | $ 16,949.74 | $ 3,656,159.62 |
| 5/4/2023 | $ - | $ - | $ - | $ 3,656,159.62 | $ 17,028.69 | $ 3,673,188.31 |
| 5/5/2023 | $ - | $ - | $ - | $ 3,673,188.31 | $ 17,108.00 | $ 3,690,296.31 |
| 5/6/2023 | $ - | $ - | $ - | $ 3,690,296.31 | $ 17,187.68 | $ 3,707,483.99 |
| 5/7/2023 | $ - | $ - | $ - | $ 3,707,483.99 | $ 17,267.73 | $ 3,724,751.73 |
| 5/8/2023 | $ - | $ - | $ - | $ 3,724,751.73 | $ 17,348.16 | $ 3,742,099.88 |
| 5/9/2023 | $ 93,759.23 | $ 53,338.91 | $ - | $ 3,742,099.88 | $ 17,428.96 | $ 3,759,528.84 |
| 5/10/2023 | $ - | $ - | $ - | $ 3,759,528.84 | $ 17,510.13 | $ 3,777,038.98 |
| 5/11/2023 | $ - | $ - | $ 60,000.00 | $ 3,717,038.98 | $ 17,312.24 | $ 3,734,351.21 |
| 5/12/2023 | $ - | $ - | $ - | $ 3,734,351.21 | $ 17,392.87 | $ 3,751,744.08 |
| 5/13/2023 | $ - | $ - | $ - | $ 3,751,744.08 | $ 17,473.88 | $ 3,769,217.96 |
| 5/14/2023 | $ - | $ - | $ - | $ 3,769,217.96 | $ 17,555.26 | $ 3,786,773.22 |
| 5/15/2023 | $ - | $ - | $ - | $ 3,786,773.22 | $ 17,637.03 | $ 3,804,410.25 |
| 5/16/2023 | $ 96,824.43 | $ 50,273.71 | $ - | $ 3,804,410.25 | $ 17,719.17 | $ 3,822,129.42 |
| 5/17/2023 | $ - | $ - | $ - | $ 3,822,129.42 | $ 17,801.70 | $ 3,839,931.12 |
| 5/18/2023 | $ - | $ - | $ - | $ 3,839,931.12 | $ 17,884.61 | $ 3,857,815.73 |
| 5/19/2023 | $ - | $ - | $ - | $ 3,857,815.73 | $ 17,967.91 | $ 3,875,783.63 |
| 5/20/2023 | $ - | $ - | $ - | $ 3,875,783.63 | $ 18,051.60 | $ 3,893,835.23 |

EXHIBIT 1, PAGE 27

| Date | | | | | | |
|---|---|---|---|---|---|---|
| 5/21/2023 | $ - | $ - | $ - | $ 3,893,835.23 | $ 18,135.67 | $ 3,911,970.90 |
| 5/22/2023 | $ - | $ - | $ - | $ 3,911,970.90 | $ 18,220.14 | $ 3,930,191.04 |
| 5/23/2023 | $ 99,989.85 | $ 47,108.29 | $ - | $ 3,930,191.04 | $ 18,305.00 | $ 3,948,496.04 |
| 5/24/2023 | $ - | $ - | $ 50,000.00 | $ 3,898,496.04 | $ 18,157.38 | $ 3,916,653.42 |
| 5/25/2023 | $ - | $ - | $ - | $ 3,916,653.42 | $ 18,241.95 | $ 3,934,895.36 |
| 5/26/2023 | $ - | $ - | $ - | $ 3,934,895.36 | $ 18,326.91 | $ 3,953,222.27 |
| 5/27/2023 | $ - | $ - | $ - | $ 3,953,222.27 | $ 18,412.27 | $ 3,971,634.54 |
| 5/28/2023 | $ - | $ - | $ - | $ 3,971,634.54 | $ 18,498.02 | $ 3,990,132.57 |
| 5/29/2023 | $ - | $ - | $ - | $ 3,990,132.57 | $ 18,584.18 | $ 4,008,716.75 |
| 5/30/2023 | $ 103,258.75 | $ 43,839.39 | $ - | $ 4,008,716.75 | $ 18,670.74 | $ 4,027,387.48 |
| 5/31/2023 | $ - | $ - | $ - | $ 4,027,387.48 | $ 18,757.70 | $ 4,046,145.18 |
| 6/1/2023 | $ - | $ - | $ - | $ 4,046,145.18 | $ 18,845.06 | $ 4,064,990.24 |
| 6/2/2023 | $ - | $ - | $ - | $ 4,064,990.24 | $ 18,932.83 | $ 4,083,923.07 |
| 6/3/2023 | $ - | $ - | $ - | $ 4,083,923.07 | $ 19,021.01 | $ 4,102,944.08 |
| 6/4/2023 | $ - | $ - | $ - | $ 4,102,944.08 | $ 19,109.60 | $ 4,122,053.68 |
| 6/5/2023 | $ - | $ - | $ - | $ 4,122,053.68 | $ 19,198.61 | $ 4,141,252.29 |
| 6/6/2023 | $ 106,634.51 | $ 40,463.63 | $ - | $ 4,141,252.29 | $ 19,288.02 | $ 4,160,540.31 |
| 6/7/2023 | $ - | $ - | $ - | $ 4,160,540.31 | $ 19,377.86 | $ 4,179,918.17 |
| 6/8/2023 | $ - | $ - | $ - | $ 4,179,918.17 | $ 19,468.11 | $ 4,199,386.28 |
| 6/9/2023 | $ - | $ - | $ - | $ 4,199,386.28 | $ 19,558.79 | $ 4,218,945.07 |
| 6/10/2023 | $ - | $ - | $ - | $ 4,218,945.07 | $ 19,649.88 | $ 4,238,594.95 |
| 6/11/2023 | $ - | $ - | $ - | $ 4,238,594.95 | $ 19,741.40 | $ 4,258,336.35 |
| 6/12/2023 | $ - | $ - | $ - | $ 4,258,336.35 | $ 19,833.35 | $ 4,278,169.70 |
| 6/13/2023 | $ 110,120.64 | $ 36,977.50 | $ - | $ 4,278,169.70 | $ 19,925.72 | $ 4,298,095.42 |
| 6/14/2023 | $ - | $ - | $ - | $ 4,298,095.42 | $ 20,018.53 | $ 4,318,113.95 |
| 6/15/2023 | $ - | $ - | $ - | $ 4,318,113.95 | $ 20,111.76 | $ 4,338,225.71 |
| 6/16/2023 | $ - | $ - | $ - | $ 4,338,225.71 | $ 20,205.43 | $ 4,358,431.15 |
| 6/17/2023 | $ - | $ - | $ - | $ 4,358,431.15 | $ 20,299.54 | $ 4,378,730.69 |
| 6/18/2023 | $ - | $ - | $ - | $ 4,378,730.69 | $ 20,394.09 | $ 4,399,124.78 |
| 6/19/2023 | $ - | $ - | $ - | $ 4,399,124.78 | $ 20,489.07 | $ 4,419,613.85 |
| 6/20/2023 | $ 113,720.74 | $ 33,377.40 | $ - | $ 4,419,613.85 | $ 20,584.50 | $ 4,440,198.35 |
| 6/21/2023 | $ - | $ - | $ - | $ 4,440,198.35 | $ 20,680.38 | $ 4,460,878.73 |
| 6/22/2023 | $ - | $ - | $ - | $ 4,460,878.73 | $ 20,776.70 | $ 4,481,655.42 |
| 6/23/2023 | $ - | $ - | $ - | $ 4,481,655.42 | $ 20,873.46 | $ 4,502,528.89 |
| 6/24/2023 | $ - | $ - | $ - | $ 4,502,528.89 | $ 20,970.68 | $ 4,523,499.57 |
| 6/25/2023 | $ - | $ - | $ - | $ 4,523,499.57 | $ 21,068.35 | $ 4,544,567.92 |
| 6/26/2023 | $ - | $ - | $ - | $ 4,544,567.92 | $ 21,166.48 | $ 4,565,734.41 |
| 6/27/2023 | $ 117,438.53 | $ 29,659.61 | $ - | $ 4,565,734.41 | $ 21,265.06 | $ 4,586,999.47 |
| 6/28/2023 | $ - | $ - | $ - | $ 4,586,999.47 | $ 21,364.11 | $ 4,608,363.58 |
| 6/29/2023 | $ - | $ - | $ - | $ 4,608,363.58 | $ 21,463.61 | $ 4,629,827.19 |
| 6/30/2023 | $ - | $ - | $ - | $ 4,629,827.19 | $ 21,563.58 | $ 4,651,390.77 |
| 7/1/2023 | $ - | $ - | $ - | $ 4,651,390.77 | $ 21,664.01 | $ 4,673,054.78 |
| 7/2/2023 | $ - | $ - | $ - | $ 4,673,054.78 | $ 21,764.91 | $ 4,694,819.69 |
| 7/3/2023 | $ - | $ - | $ - | $ 4,694,819.69 | $ 21,866.28 | $ 4,716,685.97 |
| 7/4/2023 | $ 121,277.87 | $ 25,820.27 | $ - | $ 4,716,685.97 | $ 21,968.13 | $ 4,738,654.10 |
| 7/5/2023 | $ - | $ - | $ - | $ 4,738,654.10 | $ 22,070.44 | $ 4,760,724.54 |
| 7/6/2023 | $ - | $ - | $ - | $ 4,760,724.54 | $ 22,173.24 | $ 4,782,897.78 |
| 7/7/2023 | $ - | $ - | $ - | $ 4,782,897.78 | $ 22,276.51 | $ 4,805,174.29 |
| 7/8/2023 | $ - | $ - | $ - | $ 4,805,174.29 | $ 22,380.26 | $ 4,827,554.56 |
| 7/9/2023 | $ - | $ - | $ - | $ 4,827,554.56 | $ 22,484.50 | $ 4,850,039.06 |
| 7/10/2023 | $ - | $ - | $ - | $ 4,850,039.06 | $ 22,589.22 | $ 4,872,628.28 |
| 7/11/2023 | $ 125,242.72 | $ 21,855.42 | $ - | $ 4,872,628.28 | $ 22,694.43 | $ 4,895,322.71 |
| 7/12/2023 | $ - | $ - | $ - | $ 4,895,322.71 | $ 22,800.13 | $ 4,918,122.85 |

EXHIBIT 1, PAGE 28

| Date | | | | | | |
|---|---|---|---|---|---|---|
| 7/13/2023 | $ - | $ - | $ - | $ 4,918,122.85 | $ 22,906.33 | $ 4,941,029.17 |
| 7/14/2023 | $ - | $ - | $ - | $ 4,941,029.17 | $ 23,013.01 | $ 4,964,042.18 |
| 7/15/2023 | $ - | $ - | $ - | $ 4,964,042.18 | $ 23,120.20 | $ 4,987,162.38 |
| 7/16/2023 | $ - | $ - | $ - | $ 4,987,162.38 | $ 23,227.88 | $ 5,010,390.26 |
| 7/17/2023 | $ - | $ - | $ - | $ 5,010,390.26 | $ 23,336.06 | $ 5,033,726.32 |
| 7/18/2023 | $ 129,337.19 | $ 17,760.95 | $ - | $ 5,033,726.32 | $ 23,444.75 | $ 5,057,171.08 |
| 7/19/2023 | $ - | $ - | $ - | $ 5,057,171.08 | $ 23,553.95 | $ 5,080,725.03 |
| 7/20/2023 | $ - | $ - | $ - | $ 5,080,725.03 | $ 23,663.65 | $ 5,104,388.68 |
| 7/21/2023 | $ - | $ - | $ - | $ 5,104,388.68 | $ 23,773.87 | $ 5,128,162.54 |
| 7/22/2023 | $ - | $ - | $ - | $ 5,128,162.54 | $ 23,884.59 | $ 5,152,047.13 |
| 7/23/2023 | $ - | $ - | $ - | $ 5,152,047.13 | $ 23,995.84 | $ 5,176,042.97 |
| 7/24/2023 | $ - | $ - | $ - | $ 5,176,042.97 | $ 24,107.60 | $ 5,200,150.57 |
| 7/25/2023 | $ 133,565.53 | $ 13,532.61 | $ - | $ 5,200,150.57 | $ 24,219.88 | $ 5,224,370.45 |
| 7/26/2023 | $ - | $ - | $ - | $ 5,224,370.45 | $ 24,332.68 | $ 5,248,703.13 |
| 7/27/2023 | $ - | $ - | $ - | $ 5,248,703.13 | $ 24,446.01 | $ 5,273,149.15 |
| 7/28/2023 | $ - | $ - | $ - | $ 5,273,149.15 | $ 24,559.87 | $ 5,297,709.02 |
| 7/29/2023 | $ - | $ - | $ - | $ 5,297,709.02 | $ 24,674.26 | $ 5,322,383.28 |
| 7/30/2023 | $ - | $ - | $ - | $ 5,322,383.28 | $ 24,789.18 | $ 5,347,172.46 |
| 7/31/2023 | $ - | $ - | $ - | $ 5,347,172.46 | $ 24,904.64 | $ 5,372,077.10 |
| 8/1/2023 | $ 137,932.09 | $ 9,166.05 | $ - | $ 5,372,077.10 | $ 25,020.63 | $ 5,397,097.73 |
| 8/2/2023 | $ - | $ - | $ - | $ 5,397,097.73 | $ 25,137.17 | $ 5,422,234.90 |
| 8/3/2023 | $ - | $ - | $ - | $ 5,422,234.90 | $ 25,254.24 | $ 5,447,489.15 |
| 8/4/2023 | $ - | $ - | $ - | $ 5,447,489.15 | $ 25,371.87 | $ 5,472,861.01 |
| 8/5/2023 | $ - | $ - | $ - | $ 5,472,861.01 | $ 25,490.04 | $ 5,498,351.05 |
| 8/6/2023 | $ - | $ - | $ - | $ 5,498,351.05 | $ 25,608.76 | $ 5,523,959.81 |
| 8/7/2023 | $ - | $ - | $ - | $ 5,523,959.81 | $ 25,728.03 | $ 5,549,687.84 |
| 8/8/2023 | $ 142,441.41 | $ 4,656.73 | $ - | $ 5,549,687.84 | $ 25,847.86 | $ 5,575,535.70 |
| 8/9/2023 | $ - | $ - | $ - | $ 5,575,535.70 | $ 25,968.25 | $ 5,601,503.95 |
| 8/10/2023 | $ - | $ - | $ - | $ 5,601,503.95 | $ 26,089.20 | $ 5,627,593.15 |
| 8/11/2023 | $ - | $ - | $ - | $ 5,627,593.15 | $ 26,210.71 | $ 5,653,803.85 |
| 8/12/2023 | $ - | $ - | $ - | $ 5,653,803.85 | $ 26,332.79 | $ 5,680,136.64 |
| 8/13/2023 | $ - | $ - | $ - | $ 5,680,136.64 | $ 26,455.43 | $ 5,706,592.07 |
| 8/14/2023 | $ - | $ - | $ - | $ 5,706,592.07 | $ 26,578.65 | $ 5,733,170.72 |
| 8/15/2023 | $ - | $ - | $ - | $ 5,733,170.72 | $ 26,702.44 | $ 5,759,873.16 |
| 8/16/2023 | $ - | $ - | $ - | $ 5,759,873.16 | $ 26,826.81 | $ 5,786,699.96 |
| 8/17/2023 | $ - | $ - | $ - | $ 5,786,699.96 | $ 26,951.75 | $ 5,813,651.72 |
| 8/18/2023 | $ - | $ - | $ - | $ 5,813,651.72 | $ 27,077.28 | $ 5,840,729.00 |
| 8/19/2023 | $ - | $ - | $ - | $ 5,840,729.00 | $ 27,203.40 | $ 5,867,932.39 |
| 8/20/2023 | $ - | $ - | $ - | $ 5,867,932.39 | $ 27,330.10 | $ 5,895,262.49 |
| 8/21/2023 | $ - | $ - | $ - | $ 5,895,262.49 | $ 27,457.39 | $ 5,922,719.88 |
| 8/22/2023 | $ - | $ - | $ - | $ 5,922,719.88 | $ 27,585.27 | $ 5,950,305.15 |
| 8/23/2023 | $ - | $ - | $ - | $ 5,950,305.15 | $ 27,713.75 | $ 5,978,018.90 |
| 8/24/2023 | $ - | $ - | $ - | $ 5,978,018.90 | $ 27,842.83 | $ 6,005,861.73 |
| 8/25/2023 | $ - | $ - | $ - | $ 6,005,861.73 | $ 27,972.51 | $ 6,033,834.23 |
| 8/26/2023 | $ - | $ - | $ - | $ 6,033,834.23 | $ 28,102.79 | $ 6,061,937.02 |
| 8/27/2023 | $ - | $ - | $ - | $ 6,061,937.02 | $ 28,233.68 | $ 6,090,170.70 |
| 8/28/2023 | $ - | $ - | $ - | $ 6,090,170.70 | $ 28,365.18 | $ 6,118,535.88 |
| 8/29/2023 | $ - | $ - | $ - | $ 6,118,535.88 | $ 28,497.29 | $ 6,147,033.17 |
| 8/30/2023 | $ - | $ - | $ - | $ 6,147,033.17 | $ 28,630.02 | $ 6,175,663.19 |
| 8/31/2023 | $ - | $ - | $ - | $ 6,175,663.19 | $ 28,763.36 | $ 6,204,426.55 |
| 9/1/2023 | $ - | $ - | $ - | $ 6,204,426.55 | $ 28,897.33 | $ 6,233,323.88 |
| 9/2/2023 | $ - | $ - | $ - | $ 6,233,323.88 | $ 29,031.92 | $ 6,262,355.80 |
| 9/3/2023 | $ - | $ - | $ - | $ 6,262,355.80 | $ 29,167.14 | $ 6,291,522.94 |

EXHIBIT 1, PAGE 29

| Date | | | | | | |
|---|---|---|---|---|---|---|
| 9/4/2023 | $ - | $ - | $ - | $ 6,291,522.94 | 29,302.98 | $ 6,320,825.92 |
| 9/5/2023 | $ - | $ - | $ - | $ 6,320,825.92 | 29,439.46 | $ 6,350,265.38 |
| 9/6/2023 | $ - | $ - | $ - | $ 6,350,265.38 | 29,576.58 | $ 6,379,841.96 |
| 9/7/2023 | $ - | $ - | $ - | $ 6,379,841.96 | 29,714.33 | $ 6,409,556.29 |
| 9/8/2023 | $ - | $ - | $ - | $ 6,409,556.29 | 29,852.73 | $ 6,439,409.02 |
| 9/9/2023 | $ - | $ - | $ - | $ 6,439,409.02 | 29,991.77 | $ 6,469,400.79 |
| 9/10/2023 | $ - | $ - | $ - | $ 6,469,400.79 | 30,131.46 | $ 6,499,532.25 |
| 9/11/2023 | $ - | $ - | $ - | $ 6,499,532.25 | 30,271.79 | $ 6,529,804.04 |
| 9/12/2023 | $ - | $ - | $ - | $ 6,529,804.04 | 30,412.79 | $ 6,560,216.83 |
| 9/13/2023 | $ - | $ - | $ - | $ 6,560,216.83 | 30,554.43 | $ 6,590,771.26 |
| 9/14/2023 | $ - | $ - | $ - | $ 6,590,771.26 | 30,696.74 | $ 6,621,468.00 |
| 9/15/2023 | $ - | $ - | $ - | $ 6,621,468.00 | 30,839.71 | $ 6,652,307.72 |
| 9/16/2023 | $ - | $ - | $ - | $ 6,652,307.72 | 30,983.35 | $ 6,683,291.07 |
| 9/17/2023 | $ - | $ - | $ - | $ 6,683,291.07 | 31,127.66 | $ 6,714,418.72 |
| 9/18/2023 | $ - | $ - | $ - | $ 6,714,418.72 | 31,272.64 | $ 6,745,691.36 |
| 9/19/2023 | $ - | $ - | $ - | $ 6,745,691.36 | 31,418.29 | $ 6,777,109.65 |
| 9/20/2023 | $ - | $ - | $ - | $ 6,777,109.65 | 31,564.62 | $ 6,808,674.27 |
| 9/21/2023 | $ - | $ - | $ - | $ 6,808,674.27 | 31,711.63 | $ 6,840,385.90 |
| 9/22/2023 | $ - | $ - | $ - | $ 6,840,385.90 | 31,859.33 | $ 6,872,245.23 |
| 9/23/2023 | $ - | $ - | $ - | $ 6,872,245.23 | 32,007.72 | $ 6,904,252.95 |
| 9/24/2023 | $ - | $ - | $ - | $ 6,904,252.95 | 32,156.79 | $ 6,936,409.75 |
| 9/25/2023 | $ - | $ - | $ - | $ 6,936,409.75 | 32,306.57 | $ 6,968,716.31 |
| 9/26/2023 | $ - | $ - | $ - | $ 6,968,716.31 | 32,457.03 | $ 7,001,173.35 |
| 9/27/2023 | $ - | $ - | $ - | $ 7,001,173.35 | 32,608.20 | $ 7,033,781.55 |
| 9/28/2023 | $ - | $ - | $ - | $ 7,033,781.55 | 32,760.08 | $ 7,066,541.63 |
| 9/29/2023 | $ - | $ - | $ - | $ 7,066,541.63 | 32,912.66 | $ 7,099,454.29 |
| 9/30/2023 | $ - | $ - | $ - | $ 7,099,454.29 | 33,065.95 | $ 7,132,520.24 |
| 10/1/2023 | $ - | $ - | $ - | $ 7,132,520.24 | 33,219.96 | $ 7,165,740.20 |
| 10/2/2023 | $ - | $ - | $ - | $ 7,165,740.20 | 33,374.68 | $ 7,199,114.88 |
| 10/3/2023 | $ - | $ - | $ - | $ 7,199,114.88 | 33,530.12 | $ 7,232,645.00 |
| 10/4/2023 | $ - | $ - | $ - | $ 7,232,645.00 | 33,686.29 | $ 7,266,331.29 |
| 10/5/2023 | $ - | $ - | $ - | $ 7,266,331.29 | 33,843.19 | $ 7,300,174.48 |
| 10/6/2023 | $ - | $ - | $ - | $ 7,300,174.48 | 34,000.81 | $ 7,334,175.29 |
| 10/7/2023 | $ - | $ - | $ - | $ 7,334,175.29 | 34,159.17 | $ 7,368,334.47 |
| 10/8/2023 | $ - | $ - | $ - | $ 7,368,334.47 | 34,318.27 | $ 7,402,652.74 |
| 10/9/2023 | $ - | $ - | $ - | $ 7,402,652.74 | 34,478.11 | $ 7,437,130.85 |
| 10/10/2023 | $ - | $ - | $ - | $ 7,437,130.85 | 34,638.69 | $ 7,471,769.54 |
| 10/11/2023 | $ - | $ - | $ - | $ 7,471,769.54 | 34,800.02 | $ 7,506,569.56 |
| 10/12/2023 | $ - | $ - | $ - | $ 7,506,569.56 | 34,962.10 | $ 7,541,531.66 |
| 10/13/2023 | $ - | $ - | $ - | $ 7,541,531.66 | 35,124.94 | $ 7,576,656.61 |
| 10/14/2023 | $ - | $ - | $ - | $ 7,576,656.61 | 35,288.54 | $ 7,611,945.14 |
| 10/15/2023 | $ - | $ - | $ - | $ 7,611,945.14 | 35,452.90 | $ 7,647,398.04 |
| 10/16/2023 | $ - | $ - | $ - | $ 7,647,398.04 | 35,618.02 | $ 7,683,016.06 |
| 10/17/2023 | $ - | $ - | $ - | $ 7,683,016.06 | 35,783.91 | $ 7,718,799.97 |
| 10/18/2023 | $ - | $ - | $ - | $ 7,718,799.97 | 35,950.58 | $ 7,754,750.54 |
| 10/19/2023 | $ - | $ - | $ - | $ 7,754,750.54 | 36,118.02 | $ 7,790,868.56 |
| 10/20/2023 | $ - | $ - | $ - | $ 7,790,868.56 | 36,286.24 | $ 7,827,154.80 |
| 10/21/2023 | $ - | $ - | $ - | $ 7,827,154.80 | 36,455.24 | $ 7,863,610.04 |
| 10/22/2023 | $ - | $ - | $ - | $ 7,863,610.04 | 36,625.03 | $ 7,900,235.07 |
| 10/23/2023 | $ - | $ - | $ - | $ 7,900,235.07 | 36,795.62 | $ 7,937,030.69 |
| 10/24/2023 | $ - | $ - | $ - | $ 7,937,030.69 | 36,966.99 | $ 7,973,997.68 |
| 10/25/2023 | $ - | $ - | $ - | $ 7,973,997.68 | 37,139.17 | $ 8,011,136.85 |
| 10/26/2023 | $ - | $ - | $ - | $ 8,011,136.85 | 37,312.14 | $ 8,048,448.99 |

EXHIBIT 1, PAGE 30

| Date | | | | | | |
|---|---|---|---|---|---|---|
| 10/27/2023 | $ - | $ - | $ - | $ 8,048,448.99 | $ 37,485.93 | $ 8,085,934.92 |
| 10/28/2023 | $ - | $ - | $ - | $ 8,085,934.92 | $ 37,660.52 | $ 8,123,595.44 |
| 10/29/2023 | $ - | $ - | $ - | $ 8,123,595.44 | $ 37,835.92 | $ 8,161,431.36 |
| 10/30/2023 | $ - | $ - | $ - | $ 8,161,431.36 | $ 38,012.15 | $ 8,199,443.51 |
| 10/31/2023 | $ - | $ - | $ - | $ 8,199,443.51 | $ 38,189.19 | $ 8,237,632.69 |
| 11/1/2023 | $ - | $ - | $ - | $ 8,237,632.69 | $ 38,367.06 | $ 8,275,999.75 |
| 11/2/2023 | $ - | $ - | $ - | $ 8,275,999.75 | $ 38,545.75 | $ 8,314,545.50 |
| 11/3/2023 | $ - | $ - | $ - | $ 8,314,545.50 | $ 38,725.28 | $ 8,353,270.78 |
| 11/4/2023 | $ - | $ - | $ - | $ 8,353,270.78 | $ 38,905.64 | $ 8,392,176.43 |
| 11/5/2023 | $ - | $ - | $ - | $ 8,392,176.43 | $ 39,086.85 | $ 8,431,263.28 |
| 11/6/2023 | $ - | $ - | $ - | $ 8,431,263.28 | $ 39,268.90 | $ 8,470,532.18 |
| 11/7/2023 | $ - | $ - | $ - | $ 8,470,532.18 | $ 39,451.79 | $ 8,509,983.97 |
| 11/8/2023 | $ - | $ - | $ - | $ 8,509,983.97 | $ 39,635.54 | $ 8,549,619.51 |
| 11/9/2023 | $ - | $ - | $ - | $ 8,549,619.51 | $ 39,820.15 | $ 8,589,439.66 |
| 11/10/2023 | $ - | $ - | $ - | $ 8,589,439.66 | $ 40,005.61 | $ 8,629,445.27 |
| 11/11/2023 | $ - | $ - | $ - | $ 8,629,445.27 | $ 40,191.94 | $ 8,669,637.20 |
| 11/12/2023 | $ - | $ - | $ - | $ 8,669,637.20 | $ 40,379.13 | $ 8,710,016.33 |
| 11/13/2023 | $ - | $ - | $ - | $ 8,710,016.33 | $ 40,567.20 | $ 8,750,583.53 |
| 11/14/2023 | $ - | $ - | $ - | $ 8,750,583.53 | $ 40,756.14 | $ 8,791,339.68 |
| 11/15/2023 | $ - | $ - | $ - | $ 8,791,339.68 | $ 40,945.97 | $ 8,832,285.64 |
| 11/16/2023 | $ - | $ - | $ - | $ 8,832,285.64 | $ 41,136.67 | $ 8,873,422.32 |
| 11/17/2023 | $ - | $ - | $ - | $ 8,873,422.32 | $ 41,328.27 | $ 8,914,750.58 |
| 11/18/2023 | $ - | $ - | $ - | $ 8,914,750.58 | $ 41,520.76 | $ 8,956,271.34 |
| 11/19/2023 | $ - | $ - | $ - | $ 8,956,271.34 | $ 41,714.14 | $ 8,997,985.48 |
| 11/20/2023 | $ - | $ - | $ - | $ 8,997,985.48 | $ 41,908.43 | $ 9,039,893.91 |
| 11/21/2023 | $ - | $ - | $ - | $ 9,039,893.91 | $ 42,103.62 | $ 9,081,997.52 |
| 11/22/2023 | $ - | $ - | $ - | $ 9,081,997.52 | $ 42,299.71 | $ 9,124,297.24 |
| 11/23/2023 | $ - | $ - | $ - | $ 9,124,297.24 | $ 42,496.73 | $ 9,166,793.96 |
| 11/24/2023 | $ - | $ - | $ - | $ 9,166,793.96 | $ 42,694.66 | $ 9,209,488.62 |
| 11/25/2023 | $ - | $ - | $ - | $ 9,209,488.62 | $ 42,893.51 | $ 9,252,382.13 |
| 11/26/2023 | $ - | $ - | $ - | $ 9,252,382.13 | $ 43,093.29 | $ 9,295,475.41 |
| 11/27/2023 | $ - | $ - | $ - | $ 9,295,475.41 | $ 43,294.00 | $ 9,338,769.41 |
| 11/28/2023 | $ - | $ - | $ - | $ 9,338,769.41 | $ 43,495.64 | $ 9,382,265.05 |
| 11/29/2023 | $ - | $ - | $ - | $ 9,382,265.05 | $ 43,698.22 | $ 9,425,963.27 |
| 11/30/2023 | $ - | $ - | $ - | $ 9,425,963.27 | $ 43,901.75 | $ 9,469,865.02 |
| 12/1/2023 | $ - | $ - | $ - | $ 9,469,865.02 | $ 44,106.22 | $ 9,513,971.24 |
| 12/2/2023 | $ - | $ - | $ - | $ 9,513,971.24 | $ 44,311.65 | $ 9,558,282.88 |
| 12/3/2023 | $ - | $ - | $ - | $ 9,558,282.88 | $ 44,518.03 | $ 9,602,800.91 |
| 12/4/2023 | $ - | $ - | $ - | $ 9,602,800.91 | $ 44,725.37 | $ 9,647,526.29 |
| 12/5/2023 | $ - | $ - | $ - | $ 9,647,526.29 | $ 44,933.68 | $ 9,692,459.97 |
| 12/6/2023 | $ - | $ - | $ - | $ 9,692,459.97 | $ 45,142.96 | $ 9,737,602.94 |
| 12/7/2023 | $ - | $ - | $ - | $ 9,737,602.94 | $ 45,353.22 | $ 9,782,956.15 |
| 12/8/2023 | $ - | $ - | $ - | $ 9,782,956.15 | $ 45,564.45 | $ 9,828,520.61 |
| 12/9/2023 | $ - | $ - | $ - | $ 9,828,520.61 | $ 45,776.67 | $ 9,874,297.28 |
| 12/10/2023 | $ - | $ - | $ - | $ 9,874,297.28 | $ 45,989.88 | $ 9,920,287.16 |
| 12/11/2023 | $ - | $ - | $ - | $ 9,920,287.16 | $ 46,204.08 | $ 9,966,491.23 |
| 12/12/2023 | $ - | $ - | $ - | $ 9,966,491.23 | $ 46,419.27 | $ 10,012,910.51 |
| 12/13/2023 | $ - | $ - | $ - | $ 10,012,910.51 | $ 46,635.47 | $ 10,059,545.98 |
| 12/14/2023 | $ - | $ - | $ - | $ 10,059,545.98 | $ 46,852.68 | $ 10,106,398.66 |
| 12/15/2023 | $ - | $ - | $ - | $ 10,106,398.66 | $ 47,070.90 | $ 10,153,469.56 |
| 12/16/2023 | $ - | $ - | $ - | $ 10,153,469.56 | $ 47,290.13 | $ 10,200,759.69 |
| 12/17/2023 | $ - | $ - | $ - | $ 10,200,759.69 | $ 47,510.39 | $ 10,248,270.08 |
| 12/18/2023 | $ - | $ - | $ - | $ 10,248,270.08 | $ 47,731.67 | $ 10,296,001.75 |

EXHIBIT 1, PAGE 31

Case 8:23-bk-10571-SC    Claim 127-1    Filed 07/24/23    Desc Main Document    Page 21 of 77

| Date | | | | | | |
|---|---|---|---|---|---|---|
| 12/19/2023 | $ - | $ - | $ - | $ 10,296,001.75 | $ 47,953.98 | $ 10,343,955.73 |
| 12/20/2023 | $ - | $ - | $ - | $ 10,343,955.73 | $ 48,177.33 | $ 10,392,133.06 |
| 12/21/2023 | $ - | $ - | $ - | $ 10,392,133.06 | $ 48,401.72 | $ 10,440,534.77 |
| 12/22/2023 | $ - | $ - | $ - | $ 10,440,534.77 | $ 48,627.15 | $ 10,489,161.92 |
| 12/23/2023 | $ - | $ - | $ - | $ 10,489,161.92 | $ 48,853.63 | $ 10,538,015.55 |
| 12/24/2023 | $ - | $ - | $ - | $ 10,538,015.55 | $ 49,081.17 | $ 10,587,096.72 |
| 12/25/2023 | $ - | $ - | $ - | $ 10,587,096.72 | $ 49,309.77 | $ 10,636,406.49 |
| 12/26/2023 | $ - | $ - | $ - | $ 10,636,406.49 | $ 49,539.43 | $ 10,685,945.91 |
| 12/27/2023 | $ - | $ - | $ - | $ 10,685,945.91 | $ 49,770.16 | $ 10,735,716.07 |
| 12/28/2023 | $ - | $ - | $ - | $ 10,735,716.07 | $ 50,001.97 | $ 10,785,718.04 |
| 12/29/2023 | $ - | $ - | $ - | $ 10,785,718.04 | $ 50,234.85 | $ 10,835,952.89 |
| 12/30/2023 | $ - | $ - | $ - | $ 10,835,952.89 | $ 50,468.82 | $ 10,886,421.71 |
| 12/31/2023 | $ - | $ - | $ - | $ 10,886,421.71 | $ 50,703.88 | $ 10,937,125.59 |
| 1/1/2024 | $ - | $ - | $ - | $ 10,937,125.59 | $ 50,940.04 | $ 10,988,065.63 |
| 1/2/2024 | $ - | $ - | $ - | $ 10,988,065.63 | $ 51,177.29 | $ 11,039,242.92 |
| 1/3/2024 | $ - | $ - | $ - | $ 11,039,242.92 | $ 51,415.65 | $ 11,090,658.57 |
| 1/4/2024 | $ - | $ - | $ - | $ 11,090,658.57 | $ 51,655.12 | $ 11,142,313.70 |
| 1/5/2024 | $ - | $ - | $ - | $ 11,142,313.70 | $ 51,895.71 | $ 11,194,209.40 |
| 1/6/2024 | $ - | $ - | $ - | $ 11,194,209.40 | $ 52,137.41 | $ 11,246,346.82 |
| 1/7/2024 | $ - | $ - | $ - | $ 11,246,346.82 | $ 52,380.25 | $ 11,298,727.06 |
| 1/8/2024 | $ - | $ - | $ - | $ 11,298,727.06 | $ 52,624.21 | $ 11,351,351.27 |
| 1/9/2024 | $ - | $ - | $ - | $ 11,351,351.27 | $ 52,869.31 | $ 11,404,220.58 |
| 1/10/2024 | $ - | $ - | $ - | $ 11,404,220.58 | $ 53,115.55 | $ 11,457,336.13 |
| 1/11/2024 | $ - | $ - | $ - | $ 11,457,336.13 | $ 53,362.94 | $ 11,510,699.06 |
| 1/12/2024 | $ - | $ - | $ - | $ 11,510,699.06 | $ 53,611.48 | $ 11,564,310.54 |
| 1/13/2024 | $ - | $ - | $ - | $ 11,564,310.54 | $ 53,861.17 | $ 11,618,171.71 |
| 1/14/2024 | $ - | $ - | $ - | $ 11,618,171.71 | $ 54,112.03 | $ 11,672,283.74 |
| 1/15/2024 | $ - | $ - | $ - | $ 11,672,283.74 | $ 54,364.06 | $ 11,726,647.80 |
| 1/16/2024 | $ - | $ - | $ - | $ 11,726,647.80 | $ 54,617.26 | $ 11,781,265.07 |
| 1/17/2024 | $ - | $ - | $ - | $ 11,781,265.07 | $ 54,871.65 | $ 11,836,136.71 |
| 1/18/2024 | $ - | $ - | $ - | $ 11,836,136.71 | $ 55,127.21 | $ 11,891,263.92 |
| 1/19/2024 | $ - | $ - | $ - | $ 11,891,263.92 | $ 55,383.97 | $ 11,946,647.89 |
| 1/20/2024 | $ - | $ - | $ - | $ 11,946,647.89 | $ 55,641.92 | $ 12,002,289.81 |
| 1/21/2024 | $ - | $ - | $ - | $ 12,002,289.81 | $ 55,901.08 | $ 12,058,190.89 |
| 1/22/2024 | $ - | $ - | $ - | $ 12,058,190.89 | $ 56,161.44 | $ 12,114,352.33 |
| 1/23/2024 | $ - | $ - | $ - | $ 12,114,352.33 | $ 56,423.01 | $ 12,170,775.34 |
| 1/24/2024 | $ - | $ - | $ - | $ 12,170,775.34 | $ 56,685.80 | $ 12,227,461.14 |
| 1/25/2024 | $ - | $ - | $ - | $ 12,227,461.14 | $ 56,949.82 | $ 12,284,410.96 |
| 1/26/2024 | $ - | $ - | $ - | $ 12,284,410.96 | $ 57,215.06 | $ 12,341,626.02 |
| 1/27/2024 | $ - | $ - | $ - | $ 12,341,626.02 | $ 57,481.55 | $ 12,399,107.57 |
| 1/28/2024 | $ - | $ - | $ - | $ 12,399,107.57 | $ 57,749.27 | $ 12,456,856.84 |
| 1/29/2024 | $ - | $ - | $ - | $ 12,456,856.84 | $ 58,018.24 | $ 12,514,875.08 |
| 1/30/2024 | $ - | $ - | $ - | $ 12,514,875.08 | $ 58,288.46 | $ 12,573,163.53 |
| 1/31/2024 | $ - | $ - | $ - | $ 12,573,163.53 | $ 58,559.94 | $ 12,631,723.47 |
| 2/1/2024 | $ - | $ - | $ - | $ 12,631,723.47 | $ 58,832.68 | $ 12,690,556.16 |
| 2/2/2024 | $ - | $ - | $ - | $ 12,690,556.16 | $ 59,106.70 | $ 12,749,662.86 |
| 2/3/2024 | $ - | $ - | $ - | $ 12,749,662.86 | $ 59,381.99 | $ 12,809,044.85 |
| 2/4/2024 | $ - | $ - | $ - | $ 12,809,044.85 | $ 59,658.57 | $ 12,868,703.42 |
| 2/5/2024 | $ - | $ - | $ - | $ 12,868,703.42 | $ 59,936.43 | $ 12,928,639.84 |
| 2/6/2024 | $ - | $ - | $ - | $ 12,928,639.84 | $ 60,215.58 | $ 12,988,855.43 |
| 2/7/2024 | $ - | $ - | $ - | $ 12,988,855.43 | $ 60,496.04 | $ 13,049,351.46 |
| 2/8/2024 | $ - | $ - | $ - | $ 13,049,351.46 | $ 60,777.80 | $ 13,110,129.27 |
| 2/9/2024 | $ - | $ - | $ - | $ 13,110,129.27 | $ 61,060.88 | $ 13,171,190.14 |

EXHIBIT 1, PAGE 32

| Date | $ | $ | $ | $ | $ | $ |
|---|---|---|---|---|---|---|
| 2/10/2024 | - | - | - | 13,171,190.14 | 61,345.27 | 13,232,535.41 |
| 2/11/2024 | - | - | - | 13,232,535.41 | 61,630.99 | 13,294,166.40 |
| 2/12/2024 | - | - | - | 13,294,166.40 | 61,918.04 | 13,356,084.43 |
| 2/13/2024 | - | - | - | 13,356,084.43 | 62,206.42 | 13,418,290.85 |
| 2/14/2024 | - | - | - | 13,418,290.85 | 62,496.15 | 13,480,787.00 |
| 2/15/2024 | - | - | - | 13,480,787.00 | 62,787.23 | 13,543,574.23 |
| 2/16/2024 | - | - | - | 13,543,574.23 | 63,079.66 | 13,606,653.89 |
| 2/17/2024 | - | - | - | 13,606,653.89 | 63,373.46 | 13,670,027.35 |
| 2/18/2024 | - | - | - | 13,670,027.35 | 63,668.62 | 13,733,695.97 |
| 2/19/2024 | - | - | - | 13,733,695.97 | 63,965.16 | 13,797,661.13 |
| 2/20/2024 | - | - | - | 13,797,661.13 | 64,263.08 | 13,861,924.21 |
| 2/21/2024 | - | - | - | 13,861,924.21 | 64,562.39 | 13,926,486.59 |
| 2/22/2024 | - | - | - | 13,926,486.59 | 64,863.09 | 13,991,349.68 |
| 2/23/2024 | - | - | - | 13,991,349.68 | 65,165.19 | 14,056,514.87 |
| 2/24/2024 | - | - | - | 14,056,514.87 | 65,468.70 | 14,121,983.57 |
| 2/25/2024 | - | - | - | 14,121,983.57 | 65,773.62 | 14,187,757.19 |
| 2/26/2024 | - | - | - | 14,187,757.19 | 66,079.97 | 14,253,837.16 |
| 2/27/2024 | - | - | - | 14,253,837.16 | 66,387.73 | 14,320,224.89 |
| 2/28/2024 | - | - | - | 14,320,224.89 | 66,696.94 | 14,386,921.83 |
| 2/29/2024 | - | - | - | 14,386,921.83 | 67,007.58 | 14,453,929.41 |
| 3/1/2024 | - | - | - | 14,453,929.41 | 67,319.67 | 14,521,249.08 |
| 3/2/2024 | - | - | - | 14,521,249.08 | 67,633.21 | 14,588,882.30 |
| 3/3/2024 | - | - | - | 14,588,882.30 | 67,948.22 | 14,656,830.52 |
| 3/4/2024 | - | - | - | 14,656,830.52 | 68,264.69 | 14,725,095.21 |
| 3/5/2024 | - | - | - | 14,725,095.21 | 68,582.64 | 14,793,677.84 |
| 3/6/2024 | - | - | - | 14,793,677.84 | 68,902.06 | 14,862,579.90 |
| 3/7/2024 | - | - | - | 14,862,579.90 | 69,222.97 | 14,931,802.88 |
| 3/8/2024 | - | - | - | 14,931,802.88 | 69,545.38 | 15,001,348.26 |
| 3/9/2024 | - | - | - | 15,001,348.26 | 69,869.29 | 15,071,217.55 |
| 3/10/2024 | - | - | - | 15,071,217.55 | 70,194.71 | 15,141,412.27 |
| 3/11/2024 | - | - | - | 15,141,412.27 | 70,521.65 | 15,211,933.91 |
| 3/12/2024 | - | - | - | 15,211,933.91 | 70,850.10 | 15,282,784.02 |
| 3/13/2024 | - | - | - | 15,282,784.02 | 71,180.09 | 15,353,964.11 |
| 3/14/2024 | - | - | - | 15,353,964.11 | 71,511.61 | 15,425,475.72 |
| 3/15/2024 | - | - | - | 15,425,475.72 | 71,844.68 | 15,497,320.40 |
| 3/16/2024 | - | - | - | 15,497,320.40 | 72,179.30 | 15,569,499.70 |
| 3/17/2024 | - | - | - | 15,569,499.70 | 72,515.48 | 15,642,015.18 |
| 3/18/2024 | - | - | - | 15,642,015.18 | 72,853.22 | 15,714,868.40 |
| 3/19/2024 | - | - | - | 15,714,868.40 | 73,192.54 | 15,788,060.94 |
| 3/20/2024 | - | - | - | 15,788,060.94 | 73,533.43 | 15,861,594.37 |
| 3/21/2024 | - | - | - | 15,861,594.37 | 73,875.92 | 15,935,470.29 |
| 3/22/2024 | - | - | - | 15,935,470.29 | 74,220.00 | 16,009,690.29 |
| 3/23/2024 | - | - | - | 16,009,690.29 | 74,565.68 | 16,084,255.97 |
| 3/24/2024 | - | - | - | 16,084,255.97 | 74,912.97 | 16,159,168.94 |
| 3/25/2024 | - | - | - | 16,159,168.94 | 75,261.88 | 16,234,430.83 |
| 3/26/2024 | - | - | - | 16,234,430.83 | 75,612.42 | 16,310,043.24 |
| 3/27/2024 | - | - | - | 16,310,043.24 | 75,964.58 | 16,386,007.83 |
| 3/28/2024 | - | - | - | 16,386,007.83 | 76,318.39 | 16,462,326.22 |
| 3/29/2024 | - | - | - | 16,462,326.22 | 76,673.85 | 16,539,000.07 |
| 3/30/2024 | - | - | - | 16,539,000.07 | 77,030.96 | 16,616,031.03 |
| 3/31/2024 | - | - | - | 16,616,031.03 | 77,389.73 | 16,693,420.76 |
| 4/1/2024 | - | - | - | 16,693,420.76 | 77,750.18 | 16,771,170.94 |
| 4/2/2024 | - | - | - | 16,771,170.94 | 78,112.30 | 16,849,283.25 |

| Date | | | | | | |
|---|---|---|---|---|---|---|
| 4/3/2024 | $ - | $ - | $ - | $ 16,849,283.25 | 78,476.11 | $ 16,927,759.36 |
| 4/4/2024 | $ - | $ - | $ - | $ 16,927,759.36 | 78,841.62 | $ 17,006,600.98 |
| 4/5/2024 | $ - | $ - | $ - | $ 17,006,600.98 | 79,208.83 | $ 17,085,809.80 |
| 4/6/2024 | $ - | $ - | $ - | $ 17,085,809.80 | 79,577.74 | $ 17,165,387.55 |
| 4/7/2024 | $ - | $ - | $ - | $ 17,165,387.55 | 79,948.38 | $ 17,245,335.93 |
| 4/8/2024 | $ - | $ - | $ - | $ 17,245,335.93 | 80,320.74 | $ 17,325,656.67 |
| 4/9/2024 | $ - | $ - | $ - | $ 17,325,656.67 | 80,694.84 | $ 17,406,351.51 |
| 4/10/2024 | $ - | $ - | $ - | $ 17,406,351.51 | 81,070.68 | $ 17,487,422.19 |
| 4/11/2024 | $ - | $ - | $ - | $ 17,487,422.19 | 81,448.27 | $ 17,568,870.46 |
| 4/12/2024 | $ - | $ - | $ - | $ 17,568,870.46 | 81,827.62 | $ 17,650,698.07 |
| 4/13/2024 | $ - | $ - | $ - | $ 17,650,698.07 | 82,208.73 | $ 17,732,906.80 |
| 4/14/2024 | $ - | $ - | $ - | $ 17,732,906.80 | 82,591.62 | $ 17,815,498.42 |
| 4/15/2024 | $ - | $ - | $ - | $ 17,815,498.42 | 82,976.29 | $ 17,898,474.72 |
| 4/16/2024 | $ - | $ - | $ - | $ 17,898,474.72 | 83,362.76 | $ 17,981,837.48 |
| 4/17/2024 | $ - | $ - | $ - | $ 17,981,837.48 | 83,751.02 | $ 18,065,588.50 |
| 4/18/2024 | $ - | $ - | $ - | $ 18,065,588.50 | 84,141.10 | $ 18,149,729.60 |
| 4/19/2024 | $ - | $ - | $ - | $ 18,149,729.60 | 84,532.99 | $ 18,234,262.59 |
| 4/20/2024 | $ - | $ - | $ - | $ 18,234,262.59 | 84,926.70 | $ 18,319,189.29 |
| 4/21/2024 | $ - | $ - | $ - | $ 18,319,189.29 | 85,322.25 | $ 18,404,511.54 |
| 4/22/2024 | $ - | $ - | $ - | $ 18,404,511.54 | 85,719.64 | $ 18,490,231.18 |
| 4/23/2024 | $ - | $ - | $ - | $ 18,490,231.18 | 86,118.88 | $ 18,576,350.07 |
| 4/24/2024 | $ - | $ - | $ - | $ 18,576,350.07 | 86,519.99 | $ 18,662,870.05 |
| 4/25/2024 | $ - | $ - | $ - | $ 18,662,870.05 | 86,922.96 | $ 18,749,793.01 |
| 4/26/2024 | $ - | $ - | $ - | $ 18,749,793.01 | 87,327.80 | $ 18,837,120.81 |
| 4/27/2024 | $ - | $ - | $ - | $ 18,837,120.81 | 87,734.54 | $ 18,924,855.35 |
| 4/28/2024 | $ - | $ - | $ - | $ 18,924,855.35 | 88,143.16 | $ 19,012,998.51 |
| 4/29/2024 | $ - | $ - | $ - | $ 19,012,998.51 | 88,553.69 | $ 19,101,552.20 |
| 4/30/2024 | $ - | $ - | $ - | $ 19,101,552.20 | 88,966.13 | $ 19,190,518.34 |
| 5/1/2024 | $ - | $ - | $ - | $ 19,190,518.34 | 89,380.50 | $ 19,279,898.83 |
| 5/2/2024 | $ - | $ - | $ - | $ 19,279,898.83 | 89,796.79 | $ 19,369,695.62 |
| 5/3/2024 | $ - | $ - | $ - | $ 19,369,695.62 | 90,215.02 | $ 19,459,910.64 |
| 5/4/2024 | $ - | $ - | $ - | $ 19,459,910.64 | 90,635.20 | $ 19,550,545.84 |
| 5/5/2024 | $ - | $ - | $ - | $ 19,550,545.84 | 91,057.34 | $ 19,641,603.18 |
| 5/6/2024 | $ - | $ - | $ - | $ 19,641,603.18 | 91,481.44 | $ 19,733,084.62 |
| 5/7/2024 | $ - | $ - | $ - | $ 19,733,084.62 | 91,907.52 | $ 19,824,992.14 |
| 5/8/2024 | $ - | $ - | $ - | $ 19,824,992.14 | 92,335.58 | $ 19,917,327.72 |
| 5/9/2024 | $ - | $ - | $ - | $ 19,917,327.72 | 92,765.64 | $ 20,010,093.35 |
| 5/10/2024 | $ - | $ - | $ - | $ 20,010,093.35 | 93,197.70 | $ 20,103,291.05 |
| 5/11/2024 | $ - | $ - | $ - | $ 20,103,291.05 | 93,631.77 | $ 20,196,922.81 |
| 5/12/2024 | $ - | $ - | $ - | $ 20,196,922.81 | 94,067.86 | $ 20,290,990.67 |
| 5/13/2024 | $ - | $ - | $ - | $ 20,290,990.67 | 94,505.98 | $ 20,385,496.66 |
| 5/14/2024 | $ - | $ - | $ - | $ 20,385,496.66 | 94,946.15 | $ 20,480,442.81 |
| 5/15/2024 | $ - | $ - | $ - | $ 20,480,442.81 | 95,388.36 | $ 20,575,831.17 |
| 5/16/2024 | $ - | $ - | $ - | $ 20,575,831.17 | 95,832.64 | $ 20,671,663.81 |
| 5/17/2024 | $ - | $ - | $ - | $ 20,671,663.81 | 96,278.98 | $ 20,767,942.79 |
| 5/18/2024 | $ - | $ - | $ - | $ 20,767,942.79 | 96,727.40 | $ 20,864,670.19 |
| 5/19/2024 | $ - | $ - | $ - | $ 20,864,670.19 | 97,177.92 | $ 20,961,848.11 |
| 5/20/2024 | $ - | $ - | $ - | $ 20,961,848.11 | 97,630.53 | $ 21,059,478.64 |
| 5/21/2024 | $ - | $ - | $ - | $ 21,059,478.64 | 98,085.24 | $ 21,157,563.88 |
| 5/22/2024 | $ - | $ - | $ - | $ 21,157,563.88 | 98,542.08 | $ 21,256,105.96 |
| 5/23/2024 | $ - | $ - | $ - | $ 21,256,105.96 | 99,001.04 | $ 21,355,107.00 |
| 5/24/2024 | $ - | $ - | $ - | $ 21,355,107.00 | 99,462.14 | $ 21,454,569.14 |
| 5/25/2024 | $ - | $ - | $ - | $ 21,454,569.14 | 99,925.39 | $ 21,554,494.53 |

EXHIBIT 1, PAGE 34

| Date | | | | | | |
|---|---|---|---|---|---|---|
| 5/26/2024 | $ - | $ - | $ - | $ 21,554,494.53 | 100,390.80 | $ 21,654,885.33 |
| 5/27/2024 | $ - | $ - | $ - | $ 21,654,885.33 | 100,858.37 | $ 21,755,743.70 |
| 5/28/2024 | $ - | $ - | $ - | $ 21,755,743.70 | 101,328.12 | $ 21,857,071.82 |
| 5/29/2024 | $ - | $ - | $ - | $ 21,857,071.82 | 101,800.06 | $ 21,958,871.88 |
| 5/30/2024 | $ - | $ - | $ - | $ 21,958,871.88 | 102,274.20 | $ 22,061,146.08 |
| 5/31/2024 | $ - | $ - | $ - | $ 22,061,146.08 | 102,750.54 | $ 22,163,896.62 |
| 6/1/2024 | $ - | $ - | $ - | $ 22,163,896.62 | 103,229.11 | $ 22,267,125.73 |
| 6/2/2024 | $ - | $ - | $ - | $ 22,267,125.73 | 103,709.90 | $ 22,370,835.63 |
| 6/3/2024 | $ - | $ - | $ - | $ 22,370,835.63 | 104,192.93 | $ 22,475,028.56 |
| 6/4/2024 | $ - | $ - | $ - | $ 22,475,028.56 | 104,678.22 | $ 22,579,706.78 |
| 6/5/2024 | $ - | $ - | $ - | $ 22,579,706.78 | 105,165.76 | $ 22,684,872.54 |
| 6/6/2024 | $ - | $ - | $ - | $ 22,684,872.54 | 105,655.57 | $ 22,790,528.11 |
| 6/7/2024 | $ - | $ - | $ - | $ 22,790,528.11 | 106,147.67 | $ 22,896,675.77 |
| 6/8/2024 | $ - | $ - | $ - | $ 22,896,675.77 | 106,642.05 | $ 23,003,317.82 |
| 6/9/2024 | $ - | $ - | $ - | $ 23,003,317.82 | 107,138.74 | $ 23,110,456.56 |
| 6/10/2024 | $ - | $ - | $ - | $ 23,110,456.56 | 107,637.74 | $ 23,218,094.31 |
| 6/11/2024 | $ - | $ - | $ - | $ 23,218,094.31 | 108,139.07 | $ 23,326,233.38 |
| 6/12/2024 | $ - | $ - | $ - | $ 23,326,233.38 | 108,642.73 | $ 23,434,876.11 |
| 6/13/2024 | $ - | $ - | $ - | $ 23,434,876.11 | 109,148.74 | $ 23,544,024.84 |
| 6/14/2024 | $ - | $ - | $ - | $ 23,544,024.84 | 109,657.10 | $ 23,653,681.95 |
| 6/15/2024 | $ - | $ - | $ - | $ 23,653,681.95 | 110,167.83 | $ 23,763,849.78 |
| 6/16/2024 | $ - | $ - | $ - | $ 23,763,849.78 | 110,680.94 | $ 23,874,530.72 |
| 6/17/2024 | $ - | $ - | $ - | $ 23,874,530.72 | 111,196.44 | $ 23,985,727.17 |
| 6/18/2024 | $ - | $ - | $ - | $ 23,985,727.17 | 111,714.35 | $ 24,097,441.51 |
| 6/19/2024 | $ - | $ - | $ - | $ 24,097,441.51 | 112,234.66 | $ 24,209,676.17 |
| 6/20/2024 | $ - | $ - | $ - | $ 24,209,676.17 | 112,757.40 | $ 24,322,433.57 |
| 6/21/2024 | $ - | $ - | $ - | $ 24,322,433.57 | 113,282.57 | $ 24,435,716.14 |
| 6/22/2024 | $ - | $ - | $ - | $ 24,435,716.14 | 113,810.18 | $ 24,549,526.32 |
| 6/23/2024 | $ - | $ - | $ - | $ 24,549,526.32 | 114,340.26 | $ 24,663,866.58 |
| 6/24/2024 | $ - | $ - | $ - | $ 24,663,866.58 | 114,872.80 | $ 24,778,739.38 |
| 6/25/2024 | $ - | $ - | $ - | $ 24,778,739.38 | 115,407.83 | $ 24,894,147.21 |
| 6/26/2024 | $ - | $ - | $ - | $ 24,894,147.21 | 115,945.34 | $ 25,010,092.55 |
| 6/27/2024 | $ - | $ - | $ - | $ 25,010,092.55 | 116,485.36 | $ 25,126,577.92 |
| 6/28/2024 | $ - | $ - | $ - | $ 25,126,577.92 | 117,027.90 | $ 25,243,605.81 |
| 6/29/2024 | $ - | $ - | $ - | $ 25,243,605.81 | 117,572.96 | $ 25,361,178.77 |
| 6/30/2024 | $ - | $ - | $ - | $ 25,361,178.77 | 118,120.56 | $ 25,479,299.33 |
| 7/1/2024 | $ - | $ - | $ - | $ 25,479,299.33 | 118,670.71 | $ 25,597,970.04 |
| 7/2/2024 | $ - | $ - | $ - | $ 25,597,970.04 | 119,223.42 | $ 25,717,193.46 |
| 7/3/2024 | $ - | $ - | $ - | $ 25,717,193.46 | 119,778.71 | $ 25,836,972.17 |
| 7/4/2024 | $ - | $ - | $ - | $ 25,836,972.17 | 120,336.58 | $ 25,957,308.75 |
| 7/5/2024 | $ - | $ - | $ - | $ 25,957,308.75 | 120,897.05 | $ 26,078,205.81 |
| 7/6/2024 | $ - | $ - | $ - | $ 26,078,205.81 | 121,460.14 | $ 26,199,665.95 |
| 7/7/2024 | $ - | $ - | $ - | $ 26,199,665.95 | 122,025.84 | $ 26,321,691.79 |
| 7/8/2024 | $ - | $ - | $ - | $ 26,321,691.79 | 122,594.18 | $ 26,444,285.97 |
| 7/9/2024 | $ - | $ - | $ - | $ 26,444,285.97 | 123,165.17 | $ 26,567,451.14 |
| 7/10/2024 | $ - | $ - | $ - | $ 26,567,451.14 | 123,738.81 | $ 26,691,189.95 |
| 7/11/2024 | $ - | $ - | $ - | $ 26,691,189.95 | 124,315.13 | $ 26,815,505.08 |
| 7/12/2024 | $ - | $ - | $ - | $ 26,815,505.08 | 124,894.13 | $ 26,940,399.21 |
| 7/13/2024 | $ - | $ - | $ - | $ 26,940,399.21 | 125,475.83 | $ 27,065,875.05 |
| 7/14/2024 | $ - | $ - | $ - | $ 27,065,875.05 | 126,060.24 | $ 27,191,935.29 |
| 7/15/2024 | $ - | $ - | $ - | $ 27,191,935.29 | 126,647.37 | $ 27,318,582.66 |
| 7/16/2024 | $ - | $ - | $ - | $ 27,318,582.66 | 127,237.23 | $ 27,445,819.89 |
| 7/17/2024 | $ - | $ - | $ - | $ 27,445,819.89 | 127,829.85 | $ 27,573,649.74 |

EXHIBIT 1, PAGE 35

DocuSign Envelope ID: A4C2F449-6755-4FE9-A9FC-F5F3A72F2042

## COOPERATION AGREEMENT

DATE: February 7, 2023

In connection with the business loan to the Borrowers evidenced by the Business Secured Promissory Note and Security Agreement (the "Note") of even date herewith, the Borrower hereby agrees:

In the event any further documentation is required by the Payee in connection with the loan, Borrower hereby agrees to execute such documentation, including, but not limited to, any amendments, corrections, deletions or additions to the Note being executed on even date herewith.

Specifically, the Borrowers agree to provide any documentation and execute any further agreements, governmental forms, and/or documentation required by the Payee to perfect its security interest in the Collateral, as defined in the Note.

In the event Borrowers are required to furnish such necessary documentation and fails to do so within ten (10) days from receipt of written demand, then such failure shall be an event of default under the terms of the Note and the Payee or its successors and assigns shall have the right to demand payment in full under the Note and enforce all other rights against the Borrowers.

The terms "Borrowers" and "Payee" have the same meanings as set forth in the Business Promissory Note and Security Agreement.

**BORROWERS**                    **THE LITIGATION PRACTICE GROUP PC**

By: _____
Name: Daniel S. March, managing shareholder


**TONY M. DIAB**


By: _____
Name: Tony M. Diab

12

## COOPERATION AGREEMENT

DATE: February 7, 2023

     In connection with the business loan to the Borrowers evidenced by the Business Secured Promissory Note and Security Agreement (the "Note") of even date herewith, the Borrower hereby agrees:

     In the event any further documentation is required by the Payee in connection with the loan, Borrower hereby agrees to execute such documentation, including, but not limited to, any amendments, corrections, deletions or additions to the Note being executed on even date herewith.

     Specifically, the Borrowers agree to provide any documentation and execute any further agreements, governmental forms, and/or documentation required by the Payee to perfect its security interest in the Collateral, as defined in the Note.

     In the event Borrowers are required to furnish such necessary documentation and fails to do so within ten (10) days from receipt of written demand, then such failure shall be an event of default under the terms of the Note and the Payee or its successors and assigns shall have the right to demand payment in full under the Note and enforce all other rights against the Borrowers.

     The terms "Borrowers" and "Payee" have the same meanings as set forth in the Business Promissory Note and Security Agreement.

**BORROWERS**            **THE LITIGATION PRACTICE GROUP PC**

By: _____
Name: Daniel S. March, managing shareholder

**TONY M. DIAB**

By: _____
Name: Tony M. Diab

12

**Notary Acknowledgement**

STATE/COMMONWEALTH OF                    )
                                         ) ss
COUNTY OF                                )

      On the _____ day of February, 2023, before me, the undersigned, a notary public in and for said State/Commonwealth, personally appeared _____ personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within Cooperation Agreement and acknowledged to me that she/he executed the same in both her/his individual capacity and her/his capacity as a [TITLE] of _____, and that by her/his signature on the Cooperation Agreement, the individual, or the person upon behalf of which the individual acted, executed the Cooperation Agreement.


_____
Notary Public




.

STATE/COMMONWEALTH OF                    )
                                         ) ss
COUNTY OF                                )

      On the _____ day of February, 2023, before me, the undersigned, a notary public in and for said State/Commonwealth, personally appeared _____ personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within Cooperation Agreement and acknowledged to me that she/he executed the same in both her/his individual capacity and her/his capacity as a [TITLE] of _____, and that by her/his signature on the Cooperation Agreement, the individual, or the person upon behalf of which the individual acted, executed the Cooperation Agreement.


_____
Notary Public

EXHIBIT 1, PAGE 38

## ACKNOWLEDGMENT

A notary public or other officer completing this
certificate verifies only the identity of the individual
who signed the document to which this certificate is
attached, and not the truthfulness, accuracy, or
validity of that document.

State of California
County of _____ ORANGE _____ )

On _FEBRUARY 6, 2023_____ before me, _OLGA LUCIA ESQUIVEL-NOTARY PUBLIC_
_____
(insert name and title of the officer)

personally appeared _DANIEL S MARCH_____,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____    (Seal)

OLGA LUCIA ESQUIVEL
COMM. # 2282791
NOTARY PUBLIC-CALIFORNIA
ORANGE COUNTY
MY COMM. EXP. MAR. 25, 2023

EXHIBIT 1, PAGE 39

# PERSONAL GUARANTY

THIS PERSONAL GUARANTY, dated as of February 7, 2023 (this "Guaranty"), is executed and delivered by Tony Diab, an individual, with an address of 20101 SW Cypress St., Newport Beach, CA 92660 (the "Individual Guarantor") in favor of Azzure Capital LLC ("Lender").

WHEREAS, The Litigation Practice Group PC (the "Borrower"), and Lender are parties to that certain Secured Promissory Note, dated as of even date herewith (such promissory note, as amended, restated, supplemented, or otherwise modified from time to time, including any replacement agreement therefore, being hereinafter referred to as the "Note"), pursuant to which the Lender has agreed to make a loan (the "Loan") to the Borrower;

WHEREAS, as a condition to the making of the Loan, the Lender has required that the Individual Guarantor execute this Guaranty.

NOW, THEREFORE, in consideration of the premises and the agreements herein, and in order to induce the Lender to make and maintain the Loan and provide other financial accommodations pursuant to the Note, the Individual Guarantor hereby agrees with the Lender as follows:

Definitions.  Reference is hereby made to the Note for a statement of the terms thereof. All terms used in this Guaranty which are defined in the Note and not otherwise defined herein shall have the same meanings herein as set forth in the Note. The Following terms shall have the respective meanings indicated below:

"Insolvency Proceeding" means any proceeding commenced by or against any Person under any provision of the U.S. Bankruptcy Code or under any other bankruptcy or insolvency law, assignments for the benefit of creditors, formal or informal moratoria, compositions, or extensions generally with creditors, or proceedings seeking reorganization, arrangement, or other similar relief.

"Loan Party" means the Borrower and any Guarantor.

## Guaranty

(a) The Individual Guarantor hereby (i) unconditionally and irrevocably guarantees the punctual payment when due, whether at stated maturity, by acceleration or otherwise, of all of the Obligations of the Borrower now or hereafter existing under the Note, whether for principal, interest (including, without limitation, all interest that accrues after the commencement of any Insolvency Proceeding of the Borrower irrespective of whether a claim therefor is allowed in such Insolvency Proceeding), fees, commissions, expense reimbursements, indemnifications, or otherwise (such obligations, to the extent not paid by the Borrower, being the "Guaranteed Obligations"), and (ii) agree to pay any and all expenses (including reasonable counsel fees and expenses) incurred by the Lender in enforcing any rights under this Guaranty.  Without limiting the generality of the foregoing, the Individual Guarantor's liability shall extend to all amounts that constitute part of the Guaranteed Obligations and that would be owed by the Borrower to the Lender under the Note but for the fact that they are unenforceable or not allowable due to the existence of any Insolvency Proceeding involving the Borrower.

14

<u>Guaranty Absolute; Continuing Guaranty; Reinstatement.</u>

(b)  The Individual Guarantor absolutely and unconditionally hereby guarantees that the Guaranteed Obligations will be paid strictly in accordance with the terms of the Note, regardless of any law, regulation, or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of the Lender with respect thereto.  This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Individual Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay or satisfy any of the Guaranteed Obligations or against any collateral securing the Guaranteed Obligations, this Guaranty, or any other guaranty of the Obligations.  The obligations of the Individual Guarantor under this Guaranty are independent of the Guaranteed Obligations, and a separate action or actions may be brought and prosecuted against the Individual Guarantor to enforce such obligations, irrespective of whether any action is brought against any other Loan Party or whether any other Loan Party is joined in any such action or actions.  The liability of the Individual Guarantor under this Guaranty shall be irrevocable, absolute, and unconditional irrespective of, and the Individual Guarantor hereby irrevocably waives any defenses it may now or hereafter have in any way relating to any or all of the following:

(i)  any lack of validity or enforceability of the Note or any agreement or instrument relating thereto;

(ii)  any change in the time, manner, or place of payment of, or in any other term of, all or any of the Guaranteed Obligations, or any other amendment or waiver of, or any consent to, departure from the Note, including, without limitation, any increase in the Guaranteed Obligations resulting from the extension of additional credit to the Borrower or otherwise;

(iii)  any taking, exchange, release, or non-perfection of any collateral, or any taking, release, amendment, or waiver of, or consent to, departure from any other guaranty, for all or any of the Guaranteed Obligations;

(iv)  any change, restructuring, or termination of the corporate, limited liability company or partnership structure, or existence of the Borrower or any Guarantor; or

(v)  any other circumstance (including, without limitation, any statute of limitations) or any existence of, or reliance on, any representation by the Lender that might otherwise constitute a defense available to, or a discharge of, the Borrower or any other Guarantor or surety other than payment in full of all Guaranteed Obligations and the termination of all Commitments.

15

(c) This Guaranty is a continuing guaranty and shall remain in full force and effect until the later of (i) the cash payment in full of all of the Guaranteed Obligations and all other amounts payable under this Guaranty and the termination of all Commitments and (ii) the Maturity Date.  This Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Guaranteed Obligations is rescinded or must otherwise be returned by the Lender or any other Person upon the insolvency, bankruptcy, or reorganization of any Loan Party or otherwise, all as though such payment had not been made.

Waivers.  The Individual Guarantor hereby waives (a) promptness and diligence, (b) notice of acceptance and any other notice with respect to any of the Guaranteed Obligations and this Guaranty and any requirement that the Lender exhaust any right or take any action against the Borrower or any other Person or any collateral, (c) any right to compel or direct the Lender to seek payment or recovery of any amounts owed under this Guaranty from any one particular fund or source, or to exhaust any right or take any action against the Borrower or any other Person or any collateral, (d) any requirement that the Lender protect, secure, perfect, or insure any security interest, Lien, or any property subject thereto, or exhaust any right or take any action against the Borrower or any other Person or any collateral and (e) any other defense available to the Individual Guarantors.  The Individual Guarantor agrees that the Lender shall have no obligation to marshal any assets in favor of the Individual Guarantor or against, or in payment of, any or all of the Obligations.  The Individual Guarantor acknowledges that they will receive direct and indirect benefits from the financing arrangements contemplated herein and in the Note, and that the waiver set forth in this Section 4 is knowingly made in contemplation of such benefits.  The Individual Guarantor hereby waives any right to revoke this Guaranty, and acknowledge that this Guaranty is continuing in nature and applies to all Guaranteed Obligations, whether existing now or in the future.

Guarantor's Subordination of Rights to the Lender.

(a)    In the event that the Individual Guarantor should for any reason

(i)    advance or lend monies to any Loan Party or any of its subsidiaries for any reason whatsoever, whether or not such funds are used by such Loan Party or such subsidiary to make payment or payments under the Obligations,

(ii)    make any payment for or on behalf of any Loan Party or any of its subsidiaries under the Guaranteed Obligations, or

(iii)    make any payment to the Lender in total or partial satisfaction of the Individual Guarantor's obligations and liabilities hereunder, the Individual Guarantor hereby agrees that any and all rights that it may have or acquire to collect or to be reimbursed by such Loan Party or any such subsidiary (or by any other obligor, guarantor, surety, or endorser of the Obligations), whether the Individual Guarantor's rights of collection or reimbursement arise by way of subrogation to the rights of the Lender or otherwise, shall in all respects be subordinate, inferior, and junior to the Lender ((pursuant to a subordination agreement, in form and substance satisfactory to the Lender, or otherwise on terms and conditions (including, without limitation,

16

subordination provisions, payment terms, interest rates, covenants, remedies, defaults, and other material terms) satisfactory to the Lender)) and the Lender's rights to collect and enforce payment, performance, and satisfaction of the Obligations then remaining, until such time as the Obligations are fully paid and satisfied and the Commitments are terminated.

(b)  The Individual Guarantor further agrees to refrain from attempting to collect and/or enforce any of its aforesaid rights against any Loan Party or any of its subsidiaries (or any other obligor, guarantor, surety, or endorser of the Obligations), arising by way of subrogation or otherwise, until such time as the Obligations then remaining in favor of the Lender are fully paid and satisfied and the Commitments are terminated.

(c)  In the event that the Individual Guarantor should for any reason whatsoever receive any payment or payments from any Loan Party or any of its Subsidiaries (or any other obligor, guarantor, surety, or endorser of the Obligations) on any such amount or amounts that such Loan Party or such subsidiary (or such a third party) may owe to the Individual Guarantor for any of the reasons stated above, the Individual Guarantor agrees to accept such payment or payments for and on behalf of the Lender, advising such Loan Party or such subsidiary (or the third party payee) of such a fact, and the Individual Guarantor unconditionally agrees to immediately deliver such funds to the Lender, with such funds being held by the Individual Guarantor during any interim period, in trust for the Lender.  In the event that the Individual Guarantor should for any reason receive any such funds from any Loan Party or any of its subsidiaries (or any third party payee), and the Individual Guarantor should deposit such funds in one or more of the Individual Guarantor's deposit accounts, no matter where located, the Lender shall have the right to attach any and all of the Individual Guarantor's deposit accounts in which such funds were deposited, whether or not such funds were commingled with other monies of the Individual Guarantor, and whether or not such funds then remain on deposit in such an account or accounts.

Representations, Warranties and Covenants.  The Individual Guarantor hereby represents, warrants and covenants as follows:

(a)  The Individual Guarantor has the full power and legal capacity to execute, deliver and perform this Guaranty.

(b)  The execution, delivery, and performance by the Individual Guarantor of this Guaranty (i) does not and will not contravene any applicable law, governmental regulation, court decree, order, or contractual restriction binding on or otherwise affecting him or any of their properties, (ii) does not and will not result in or require the creation of any Lien upon or with respect to any of their properties, and (iii) does not and will not result in any default, noncompliance, suspension, revocation, impairment, forfeiture, or nonrenewal of any permit, license, authorization, or approval applicable to them or any of their properties.

17

(c) No authorization or approval, or other action by, and no notice to or filing with, any Governmental Authority or any other Person is required in connection with the due execution, delivery and performance by the Individual Guarantor of this Guaranty.

(d) This Guaranty, when delivered, will be a legal, valid, and binding obligation of the Individual Guarantor, enforceable against the Individual Guarantor in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or other similar laws.

(e) Pursuant to representations and warranties made by Lender, there are no pending or, to the best knowledge of the Individual Guarantor, threatened action, suits or proceedings affecting the Individual Guarantor or the Purchased Interest, or to which any of the properties of the Individual Guarantor (including the Purchased Interest) are subject, before any court or other Governmental Authority or any arbitrator that (i) if adversely determined, could have a Material Adverse Effect or (ii) relates to this Guaranty or any transaction contemplated hereby.

(f) The Individual Guarantor (i) has read and understands the terms and conditions of the Note, (ii) now have and will continue to have independent means of obtaining information concerning the affairs, financial condition, and business of the Borrower, and have no need of, or right to obtain from the Lender, any credit or other information concerning the affairs, financial condition, or business of the Borrower that may come under the control of the Lender, and (iii) will continue to keep themselves informed of the Borrower's financial condition, and of all other circumstances which bear upon the risk of nonpayment or nonperformance of the Guaranteed Obligations.

Right of Set-off.  Upon the occurrence, and during the continuance of any Event of Default, the Lender may, and is hereby authorized to, at any time and from time to time, without notice to the Individual Guarantor (any such notice being expressly waived by the Individual Guarantors), and to the fullest extent permitted by law, set-off and apply any and all Indebtedness owing by the Lender to or for the credit or the account of the Individual Guarantor against any and all obligations of the Individual Guarantor now or hereafter existing under this Guaranty or the Note, irrespective of whether or not the Lender shall have made any demand under this Guaranty or the Note and although such obligations may be contingent or unmatured.  The Lender agrees to notify the Individual Guarantor promptly after any such set-off and application made by the Lender, provided that the failure to give such notice shall not affect the validity of such set-off and application.  The rights of the Lender under this Section 7 are in addition to other rights and remedies (including, without limitation, other rights of set-off) which the Lender may have under this Guaranty, in law or otherwise.

Notices, Etc.  All notices and other communications provided for hereunder shall be in writing and shall be mailed (by certified mail, postage prepaid and return receipt requested), telecopied, or delivered by hand, Federal Express, or other reputable overnight courier, if, to the Individual Guarantor, to him at his address listed on the

signature page hereof, or if, to the Lender, to it at its address set forth in the Note; or as to
such Person at such other address as shall be designated by such Person in a written
notice to such other Person complying as to delivery with the terms of this Section 8.  All
such notices and other communications shall be effective (a) if mailed via certified mail,
when received or 3 days after deposited in the mails, whichever occurs first; (b) if
telecopied, when transmitted and confirmation is received; or (c) if delivered by hand,
Federal Express, or other reputable overnight courier, upon delivery.

Consent To Jurisdiction; Service of Process and Venue.  Any legal action or proceeding
with respect to this Guaranty or the Note may be brought in the courts of the State of
New York, and, by execution and delivery of this Guaranty, the Individual Guarantor
hereby irrevocably accepts, generally and unconditionally, the jurisdiction of the
aforesaid courts.  The Individual Guarantor hereby irrevocably consents to the service of
process out of any of the aforementioned courts at their addresses for notices as set forth on
the signature page hereof.  Nothing herein shall affect the right of the Lender to service of
process in any other manner permitted by law or to commence legal proceedings or
otherwise proceed against the Individual Guarantor in any other jurisdiction.  The
Individual Guarantor hereby expressly and irrevocably waives, to the fullest extent
permitted by law, any objection which they may now or hereafter have to the jurisdiction or
laying of venue of any such litigation brought in any such court referred to above and any
claim that any such litigation has been brought in an inconvenient forum.  To the extent
that the Individual Guarantor has or hereafter may acquire any immunity from jurisdiction
of any court or from any legal process (whether through service or notice, attachment prior
to judgment, attachment in aid of execution, or otherwise), the Individual Guarantor hereby
irrevocably waives such immunity in respect of their obligations under this Guaranty and
the note.

Waiver of Jury Trial, Etc.  The Individual Guarantor hereby waives, to the extent
permitted by applicable law, any right to a trial by jury in any action, proceeding or
counterclaim concerning any rights under this Guaranty or the Note, or under any
amendment, waiver, consent, instrument, document, or other agreement delivered or
which in the future may be delivered in connection herewith or therewith, or arising from
any relationship existing in connection with this Guaranty or the Note, and agrees that
any such action, proceeding, or counterclaim shall be tried before a court and not before a
jury.  The Individual Guarantor certifies that no representative, agent or attorney of the
Lender has represented, expressly or otherwise, that the Lender would not, in the event of
any action, proceeding or counterclaim, seek to enforce the foregoing waivers.  The
Individual Guarantor hereby acknowledges that this provision is a material inducement
for the Lender entering into the financing arrangement with Borrower.

Taxes.  Any and all payments by the Individual Guarantor hereunder shall be made free
and clear of, and without deduction, for any and all present or future taxes, levies,
imposts, deductions, charges, or withholdings, and all liabilities with respect thereto,
excluding taxes imposed on the net income of the Lender (or any transferee or assignee
thereof, including a participation holder) by the jurisdiction in which such Person is
organized or has its principal lending office.  If the Individual Guarantor shall be required
to deduct any taxes from, or in respect of, any sum payable hereunder to the Lender (or

19

any transferee, assignee, or participation holder), (i) the sum payable shall be increased by the amount (an "additional amount") necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 11) the Lender (or such transferee, assignee, or participation holder) shall receive an amount equal to the sum they would have received had no such deductions been made, (ii) the Individual Guarantor shall make such deductions and (iii) the Individual Guarantor shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

<u>Miscellaneous</u>.

    (a)    The Individual Guarantor will make each payment hereunder in lawful money of the United States of America and in immediately available funds to the Lender at such address specified by the Lender from time to time by notice to the Individual Guarantors.

    (b) No amendment or waiver of any provision of this Guaranty, and no consent to any departure by the Individual Guarantor therefrom, shall in any event be effective unless the same shall be in writing and signed by the Individual Guarantor and the Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

    (c) No failure on the part of the Lender to exercise, and no delay in exercising, any right hereunder or under the Note shall operate as a waiver thereof, nor shall any single or partial exercise of any right hereunder or under the Note preclude any other or further exercise thereof or the exercise of any other right.  The rights and remedies of the Lender provided herein and in the Note are cumulative and are, in addition to, and not exclusive of, any rights or remedies provided by law.

    (d) Any provision of this Guaranty which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or thereof or affecting the validity or enforceability of such provision in any other jurisdiction.

    (e) This Guaranty shall (i) be binding on the Individual Guarantor and their heirs, estate, successors, and assigns, and (ii) inure, together with all rights and remedies of the Lender hereunder, to the benefit of the Lender and its successors, transferees, and assigns.  None of the rights or obligations of the Individual Guarantor hereunder may be assigned or otherwise transferred without the prior written consent of the Lender, and any such assignment or transfer shall be null and void.

    (f) This Guaranty and the Note reflect the entire understanding of the transactions contemplated hereby and thereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.

    (g) Section headings herein are included for convenience of reference only and shall not constitute a part of this Guaranty for any other purpose.

EXHIBIT 1, PAGE 46

(h) This Guaranty and the Note shall be governed by, and construed in accordance with, the law of the State of New York applicable to contracts made and to be performed in the State of New York.

(i) This Guaranty may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement.  Delivery of an executed counterpart of this Guaranty by telecopier or electronic mail shall be equally as effective as delivery of an original executed counterpart of this Guaranty.  Any party delivering an executed counterpart of this Guaranty by telecopier or electronic mail also shall deliver an original executed counterpart of this Guaranty, but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Guaranty.

IN WITNESS WHEREOF, the undersigned have caused this Guaranty to be executed as of the date first above written.


INDIVIDUAL GUARANTOR


By:_____
        Tony Diab

21

# EXHIBIT 2



U210050853928



**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**UCC FINANCING STATEMENT (UCC 1)**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

| For Office Use Only |
| --- |
| **-FILED-** |
| File #: U210050853928 |
| Date Filed: 5/28/2021 |

Submitter Information:

| | |
| --- | --- |
| Contact Name | WOLTERS KLUWER LIEN SOLUTIONS |
| Organization Name | LIEN SOLUTIONS |
| Phone Number | 800-331-3282 |
| Email Address | uccfilingreturn@wolterskluwer.com |
| Address | P.O. BOX 29071 |
| | GLENDALE, CA 912099071 |

Debtor Information:

| Debtor Name | Mailing Address |
| --- | --- |
| THE LITIGATION PRACTICE GROUP PC | 17542 17TH ST TUSTIN, CA 92780 |
| BAT INC | 17542 17TH ST TUSTIN, CA 92780 |
| DANIEL STEPHEN MARCH | 20160 NOB HILL DR YORBA LINDA, CA 92886 |

Secured Party Information:

| Secured Party Name | Mailing Address |
| --- | --- |
| C T CORPORATION SYSTEM, AS REPRESENTATIVE | 330 N BRAND BLVD, SUITE 700; ATTN: SPRS GLENDALE, CA 91203 |

Indicate how documentation of Collateral is provided:
  Entered as Text

Description:
  All personal property of every kind and nature, including, without limitation, all accounts, contract rights, rights to the payment of money, insurance claims and proceeds, chattel paper, electric chattel paper, documents, instruments, securities and other investment property, deposit accounts, supporting obligations of every nature, and general intangibles, including without limitation, customer lists, and all books and records related thereto, and all recorded data of any kind and any nature, regardless of the medium of recording; together with, to the extent not listed above as the original collateral, all substitutions and replacements for and products of any of the foregoing property, and together with proceeds of any and all of the foregoing property.

Indicate if Collateral is held in a Trust or is being administered by a Decedent's Personal Representative:
  Not Applicable

Select an alternate Financing Statement type:

Select an additional alternate Financing Statement type:

Select an alternative Debtor/Secured Party designation for this Financing Statement:

Optional Filer Reference Information:
  80731402

B0398-3083  05/28/2021  10:42 AM Received by California Secretary of State

EXHIBIT 1, PAGE 49

# EXHIBIT 3

**Wire**



| Wire Number: | 73001 | IMAD: | 20230207GMQFMP01012709 |
|---|---|---|---|
| Transfer Start Date: | Feb 07, 2023 | OMAD: | 20230207B6B7HU3R00842102071337FT01 |
| Effective Date: | Feb 07, 2023 | Amount: | $2,500,000.00 |
| FED Acceptance Date: | | From Account: | ▉1779 |
| FED Acceptance Time: | | Account Type: | DDA |
| Transfer Status: | Complete | | |
| **Beneficiary** | | | |
| Identification Type: | DDA Account Number | Message To Beneficiary: | Funding |
| Identification Number: | ▉9512 | | |
| Name: | LITIGATION PRACTICE GROUP PC | | |
| Address: | 17542 17TH ST STE 100 | | |
| | TUSTIN, CA 92780 | Beneficiary Reference: | 138 |
| **Beneficiary Institution** | | | |
| Identification Type: | Fed Routing Number | Name: | BANK OF AMERICA, N.A., NY |
| Identification Number: | ▉9593 | Address: | |
| | | | NEW YORK NY |
| **Receiving Institution** | | | |
| Routing/Transit number: | ▉9593 | | |
| Institution Name: | BK AMER NYC | | |

Done

# EXHIBIT 4

FILED: NASSAU COUNTY CLERK 10/14/2021 05:37 PM    INDEX NO. 613095/2021
NYSCEF DOC. NO. 7                                              RECEIVED NYSCEF: 10/14/2021

# COBALT FUNDING SOLUTIONS

Tel: (202) 733-4200

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

This is an Agreement dated _____08/03/2021_____ by and between COBALT FUNDING SOLUTIONS ("CFS") and each merchant listed below (the "Merchant").

Merchant's Legal Name: THE LITIGATION PRACTICE GROUP PC/VULCAN CONSULTING GROUP LLC/ BAT INC(

D/B/A/: THE LITIGATION PRACTICE GROUP PC/VULCAN CONSULTING/ COAST PROCESSING.COM d/b/a COAST PROCESSING

Fed ID #: _____ / _____

Type of Entity:

☐ Corporation   ☑ Limited Liability Company   ☐ Limited Partnership   ☐ Limited Liability Partnership   ☐ Sole proprietor

Business Address: 17542 17TH STREET STE 100, TUSTIN, CA 92780/17542 17TH STREET STE 100, TUSTIN, CA 92780

Contact Address: 17542 17TH STREET STE 100, TUSTIN, CA 92780/ 20160 NOB HILL DRIVE, YORBA LINDA, CA 92886/8 ALMANZORA NEWPORT COAST, CA 92657/25961 GLEN CANYON DR LAGUNA HILLS CA 92653

Email Address: admin@litigationpracticegroup.com/tony@coastprocessing.com

| | |
|---|---|
| **Purchase Price** | $ 3,150,000.00 |
| This is the amount being paid to Merchant(s) for the Receivables Purchased Amount (defined below). | |
| **Receivables Purchased Amount** | $ 5,036,850.00 |
| This is the amount of Receivables (defined in Section 1 below) being sold. | |
| **Specified Percentage** | 25 % |
| This is the percentage of Receivables (defined below) to be delivered until the Receivables Purchased Amount is paid in full. | |
| **Net Funds Provided** | $ 2,845,260.00 |
| This is the net amount being paid to or on behalf of Merchant(s) after deduction of applicable fees listed in Section 2 below. | |
| **Initial Estimated Payment** | $ 77,550.00 |
| This is only applicable if an Addendum for Estimated Payments is being signed. This is the initial amount of periodic payments collected from Merchant(s) as an approximation of no more than the Specified Percentage of the Receivables and is subject to reconciliation as set forth in Section 4 below. | per _____ DAY |

## TERMS AND CONDITIONS

**1. Sale of Future Receipts.** Merchant(s) hereby sell, assign, and transfer to CFS (making CFS the absolute owner) in consideration of the funds provided ("Purchase Price") specified above, all of each Merchant's future accounts, contract rights, and other obligations arising from or relating to the payment of monies from each Merchant's customers and/or any third party payors (the "Receivables", defined as all payments made by cash, check, credit or debit card, electronic transfer, or other form of monetary payment in the ordinary course of each merchant's business), for the payment of each Merchant's sale of goods or services until the amount specified above (the "Receivables Purchased Amount") has been delivered by Merchant(s) to CFS. Each Merchant hereby acknowledges that until the Receivables Purchased Amount has been received in full by CFS, each Merchant's Receivables, up to the balance of the Receivables Purchased Amount, are the property of CFS and not the property of any Merchant. Each Merchant agrees that it is a fiduciary for CFS and that each Merchant will hold Receivables in trust for CFS in its capacity as a fiduciary for CFS.

The Receivables Purchased Amount shall be paid to CFS by each Merchant irrevocably authorizing only one depositing account acceptable to CFS (the "Account") to remit the percentage specified above (the "Specified Percentage") of each Merchant's settlement amounts due from each transaction, until such time as CFS receives payment in full of the Receivables Purchased Amount. Each Merchant hereby authorizes CFS to ACH debit the specified remittances from the Account on a daily basis as of the next business day after the date of this Agreement and will provide CFS with all required access codes and monthly bank statements. Each Merchant understands that it will be held responsible for any fees resulting from a rejected ACH attempt or an Event of Default (see Section 2). CFS is not responsible for any overdrafts or rejected transactions that may result from CFS's ACH debiting the Specified Percentage amounts under the terms of this Agreement.

I have read and agree to the terms and conditions set forth above:

| | |
|---|---|
| *David March* | *Tony Diab* |
| Name: DANIEL STEPHEN MARCH | Name: TONY M DIAB |
| Title: OWNER | Title: OWNER |
| Date: 08/03/2021 | Date: 08/03/2021 |

1

EXHIBIT 1, PAGE 53

FILED: NASSAU COUNTY CLERK 10/14/2021 05:37 PM                    INDEX NO. 613095/2021
NYSCEF DOC. NO. 7                                          RECEIVED NYSCEF: 10/14/2021

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**

**2. Additional Fees.** In addition to the Receivables Purchased Amount, each Merchant will be held responsible to CFS for the following fees, where applicable:

A. _____ $ 304,740.00 _____ - to cover underwriting and the ACH debit program, as well as related expenses. This will be deducted from payment of the Purchase Price.

B. Wire Fee - Merchant(s) shall receive funding electronically to the Account and will be charged $50.00 for a Fed Wire or $0.00 for a bank ACH. This will be deducted from payment of the Purchase Price.

C. Blocked Account/Default -Default Fee $2,500.00 or 33% of the outstanding Purchased Receipts, whichever amount is greater.- If CFS considers an Event of Default to have taken place under Section 34.

D. UCC Fee - $195.00 – to cover CFS filing a UCC-1 financing statement to secure its interest in the Receivables Purchased Amount. A $195.00 UCC termination fee will be charged if a UCC filing is terminated.

E. Court costs, arbitration fees, collection agency fees, attorney fees, expert fees, and any other expenses incurred in litigation, arbitration, or the enforcement of any of CFS's legal or contractual rights against each Merchant and/or each Guarantor, if required, as explained in other Sections of this Agreement. _____

**3. Cap on Collection of the Receivables Purchased Amount.** The amount that CFS will collect from Merchant(s) towards the Receivables Purchased Amount during any specific _____ DAY _____ will be capped at _____ $ 77,550.00 _____ (the "Cap"). If the Specified Percentage of all Receivables for a specific _____ DAY _____ is less than the Cap, then in addition to the Specified Percentage of Receivables for that _____ DAY _____, CFS will be permitted to collect any Receivables it did not previously collect due to the Cap such that the total amount collected during that _____ DAY _____ does not exceed the Cap. The Cap is not applicable to make up for a business day on which CFS is closed and does not ACH debit the Account, to subsequent attempts to collect a rejected or blocked ACH payment, or for the collection of any of the fees listed in Section 2 or if any Event of Default listed in Section 34 is considered by CFS to have taken place.

**4. Reconciliations.** Any Merchant may give written notice to CFS requesting that CFS conduct a reconciliation in order to ensure that the amount that CFS has collected equals the Specified Percentage of Merchant(s)'s Receivables under this Agreement. Any Merchant may give written notice requesting a reconciliation. A reconciliation may also be requested by e-mail to Support@cobaltfunding.com and such notice will be deemed to have been received if and when CFS sends a reply e-mail (but not a read receipt). If such reconciliation determines that CFS collected more than it was entitled to, then CFS will credit to the Account all amounts to which CFS was not entitled within seven days thereafter. If such reconciliation determines that CFS collected less than it was entitled to, then CFS will debit from the Account all additional amounts to which CFS was entitled within seven days thereafter. In order to effectuate this reconciliation, any Merchant must produce with its request the login and password for the Account and any and all bank statements and merchant statements covering the period from the date of this Agreement through the date of the request for a reconciliation. CFS will complete each such reconciliation within two business days after receipt of a written request for one accompanied by the information and documents required for it. Nothing herein limits the amount of times that such a reconciliation may be requested.

**5. Prepayments.** Although there is no obligation to do so, any Merchant may prepay any amount towards the Receivables Purchased Amount. There will be no penalty for any prepayment made by any Merchant. Any Merchant may elect to terminate this Agreement by prepaying CFS the amount of the balance of the Receivables Purchased Amount at that time. _____

**6. Merchant Deposit Agreement.** Merchant(s) shall appoint a bank acceptable to CFS, to obtain electronic fund transfer services and/or "ACH" payments. Merchant(s) shall provide CFS and/or its authorized agent with all of the information, authorizations, and passwords necessary to verify each Merchant's Receivables. Merchant(s) shall authorize CFS and/or its agent(s) to deduct the amounts owed to CFS for the Receivables as specified herein from settlement amounts which would otherwise be due to each Merchant and to pay such amounts to CFS by permitting CFS to withdraw the Specified Percentage by ACH debiting of the account. The authorization shall be irrevocable absent CFS's written consent.

**7. Term of Agreement.** The term of this Agreement is indefinite and shall continue until CFS receives the full Receivables Purchased Amount, or earlier if terminated pursuant to any provision of this Agreement. The provisions of Sections 4, 6, 7, 8, 10, 11, 13, 14, 15, 17, 18, 19, 22, 23, 28, 31, 32, 33, 34, 35, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, and 58 shall survive any termination of this Agreement.

**I have read and agree to the terms and conditions set forth above:**

Name: DANIEL STEPHEN MARCH                  Name: TONY M DIAB

Title: OWNER                                Title: OWNER

Date: 08/03/2021                            Date: 08/03/2021

2

EXHIBIT 1, PAGE 54

FILED: NASSAU COUNTY CLERK 10/14/2021 05:37 PM          INDEX NO. 613095/2021
NYSCEF DOC. NO. 7                                        RECEIVED NYSCEF: 10/14/2021

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**

**8. Ordinary Course of Business.** Each Merchant acknowledges that it is entering into this Agreement in the ordinary course of its business and that the payments to be made from each Merchant to CFS under this Agreement are being made in the ordinary course of each Merchant's business.

**9. Financial Condition.** Each Merchant and each Guarantor (Guarantor being defined as each signatory to the Guarantee of this Agreement) authorizes CFS and its agent(s) to investigate each Merchant's financial responsibility and history, and will provide to CFS any bank or financial statements, tax returns, and other documents and records, as CFS deems necessary prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable for release of financial information. CFS is authorized to update such information and financial profiles from time to time as it deems appropriate.

**10. Monitoring, Recording, and Electronic Communications.** CFS may choose to monitor and/or record telephone calls with any Merchant and its owners, employees, and agents. By signing this Agreement, each Merchant agrees that any call between CFS and any Merchant or its representatives may be monitored and/or recorded. Each Merchant and each Guarantor grants access for CFS to enter any Merchant's premises and to observe any Merchant's premises without any prior notice to any Merchant at any time after execution of this Agreement.

CFS may use automated telephone dialing, text messaging systems, and e-mail to provide messages to Merchant(s), Owner(s) (Owner being defined as each person who signs this Agreement on behalf of a Merchant), and Guarantor(s) about Merchant(s)'s account. Telephone messages may be played by a machine automatically when the telephone is answered, whether answered by an Owner, a Guarantor, or someone else. These messages may also be recorded by the recipient's answering machine or voice mail. Each Merchant, each Owner, and each Guarantor gives CFS permission to call or send a text message to any telephone number given to CFS in connection with this Agreement and to play pre-recorded messages and/or send text messages with information about this Agreement and/or any Merchant's account over the phone. Each Merchant, each Owner, and each Guarantor also gives CFS permission to communicate such information to them by e-mail. Each Merchant, each Owner, and each Guarantor agree that CFS will not be liable to any of them for any such calls or electronic communications, even if information is communicated to an unintended recipient. Each Merchant, each Owner, and each Guarantor acknowledge that when they receive such calls or electronic communications, they may incur a charge from the company that provides them with telecommunications, wireless, and/or Internet services, and that CFS has no liability for any such charges.

**11. Accuracy of Information Furnished by Merchant and Investigation Thereof.** To the extent set forth herein, each of the parties is obligated upon his, her, or its execution of the Agreement to all terms of the Agreement. Each Merchant and each Owner signing this Agreement represent that he or she is authorized to sign this Agreement for each Merchant, legally binding said Merchant to its obligations under this Agreement and that the information provided herein and in all of CFS's documents, forms, and recorded interview(s) is true, accurate, and complete in all respects. CFS may produce a monthly statement reflecting the delivery of the Specified Percentage of Receivables from Merchant(s) to CFS. An investigative report may be made in connection with the Agreement. Each Merchant and each Owner signing this Agreement authorize CFS, its agents and representatives, and any credit-reporting agency engaged by CFS, to (i) investigate any references given or any other statements obtained from or about each Merchant or any of its Owners for the purpose of this Agreement, and (ii) pull credit report at any time now or for so long as any Merchant and/or Owners(s) continue to have any obligation to CFS under this Agreement or for CFS's ability to determine any Merchant's eligibility to enter into any future agreement with CFS. Any misrepresentation made by any Merchant or Owner in connection with this Agreement may constitute a separate claim for fraud or intentional misrepresentation.

**12. Transactional History.** Each Merchant authorizes its bank to provide CFS with its banking and/or credit card processing history.

**13. Indemnification.** Each Merchant and each Guarantor jointly and severally indemnify and hold harmless each Merchant's credit card and check processors (collectively, "Processor") and Processor's officers, directors, and shareholders against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) incurred by Processor resulting from (a) claims asserted by CFS for monies owed to CFS from any Merchant and (b) actions taken by any Processor in reliance upon information or instructions provided by CFS.

I have read and agree to the terms and conditions set forth above:

Name: DANIEL STEPHEN MARCH

Title: OWNER

Date: 08/03/2021

Name: TONY M DIAB

Title: OWNER

Date: 08/03/2021

3

FILED: NASSAU COUNTY CLERK 10/14/2021 05:37 PM    INDEX NO. 613095/2021
NYSCEF DOC. NO. 7                                      RECEIVED NYSCEF: 10/14/2021

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**

**14. No Liability.** In no event will CFS be liable for any claims asserted by any Merchant under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect, or consequential damages, each of which is waived by each Merchant and each Guarantor.

**15. Sale of Receivables.** Each Merchant and CFS agree that the Purchase Price under this Agreement is in exchange for the Receivables Purchased Amount and that such Purchase Price is not intended to be, nor shall it be construed as a loan from CFS to any Merchant. CFS is entering into this Agreement knowing the risks that each Merchant's business may decline or fail, resulting in CFS not receiving the Receivables Purchased Amount. Each Merchant agrees that the Purchase Price in exchange for the Receivables pursuant to this Agreement equals the fair market value of such Receivables. CFS has purchased and shall own all the Receivables described in this Agreement up to the full Receivables Purchased Amount as the Receivables are created. Payments made to CFS in respect to the full amount of the Receivables shall be conditioned upon each Merchant's sale of products and services and the payment therefor by each Merchant's customers in the manner provided in this Agreement. Although certain jurisdictions require the disclosure of an Annual Percentage Rate or APR in connection with this Agreement, those disclosures do not change the fact that the transaction encompassed by this Agreement is not a loan and does not have an interest rate.

**16. Power of Attorney.** Each Merchant irrevocably appoints CFS as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to CFS, or, if CFS considers an Event of Default to have taken place under Section 34, to settle all obligations due to CFS from each Merchant, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral (which is defined in Section 33); (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents, or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign each Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to CFS; and (v) to file any claims or take any action or institute any proceeding which CFS may deem necessary for the collection of any of the unpaid Receivables Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Receivables Purchased Amount.

**17. Protections Against Default.** The following Protections 1 through 7 may be invoked by CFS, immediately and without notice to any Merchant in the event:

(a) Any Merchant takes any action to discourage the use of methods of payment ordinarily and customarily used by its customers or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks and credit cards for the purchase of any Merchant's services and products;

(b) Any Merchant changes its arrangements with any Processor in any way that is adverse to CFS;

(c) Any Merchant changes any Processor through which the Receivables are settled to another electronic check and/or credit card processor or permits any event to occur that could cause diversion of any Merchant's check and/or credit card transactions to another such processor;

(d) Any Merchant interrupts the operation of its business (other than adverse weather, natural disasters, or acts of God) or transfers, moves, sells, disposes, or otherwise conveys its business or assets without (i) the express prior written consent of CFS and (ii) the written agreement of any purchaser or transferee to the assumption of all of any Merchant's obligations under this Agreement pursuant to documentation satisfactory to CFS; or

(e) Any Merchant takes any action, fails to take any action, or offers any incentive—economic or otherwise—the result of which will be to induce any customer or customers to pay for any Merchant's goods or services with any means other than checks and/or credit cards that are settled through Processor. These protections are in addition to any other remedies available to CFS at law, in equity, or otherwise available pursuant to this Agreement.

(f) CFS considers any Event of Default listed in Section 34 to have taken place.

Protection 1: The full uncollected Receivables Purchased Amount plus all fees due under this Agreement may become due and payable in full immediately.

Protection 2. CFS may enforce the provisions of the Guarantee against Guarantor.

Protection 3. CFS may enforce its security interest in the Collateral identified in Section 33.

Protection 4. CFS may proceed to protect and enforce its rights and remedies by litigation or arbitration.

Protection 5. If requested by CFS, Merchant shall deliver to CFS an executed assignment of lease of each Merchant's premises in favor of CFS. Upon breach of any provision in this Section 17, CFS may exercise its rights under such assignment of lease.

**I have read and agree to the terms and conditions set forth above:**

Name: DANIEL STEPHEN MARCH                     Name: TONY M DIAB

Title: OWNER                                    Title: OWNER

Date: 08/03/2021                                Date: 08/03/2021

4

FILED: NASSAU COUNTY CLERK 10/14/2021 05:37 PM    INDEX NO. 613095/2021
NYSCEF DOC. NO. 7                                    RECEIVED NYSCEF: 10/14/2021

STANDARD MERCHANT CASH ADVANCE AGREEMENT

Protection 6. CFS may debit any Merchant's depository accounts wherever situated by means of ACH debit or electronic or facsimile signature on a computer-generated check drawn on any Merchant's bank account or otherwise, in an amount consistent with the terms of this Agreement.

Protection 7. CFS will have the right, without waiving any of its rights and remedies and without notice to any Merchant and/or Guarantor, to notify each Merchant's credit card and/or check processor of the sale of Receivables hereunder and to direct such credit card processor to make payment to CFS of all or any portion of the amounts received by such credit card processor on behalf of each Merchant. Each Merchant hereby grants to CFS an irrevocable power-of-attorney, which power-of-attorney will be coupled with an interest, and hereby appoints CFS and its representatives as each Merchant's attorney-in-fact to take any and all action necessary to direct such new or additional credit card and/or check processor to make payment to CFS as contemplated by this Section.

**18. Protection of Information.** Each Merchant and each person signing this Agreement on behalf of each Merchant and/or as Owner, in respect of himself or herself personally, authorizes CFS to disclose information concerning each Merchant, Owner and/or Guarantor's credit standing and business conduct to agents, affiliates, subsidiaries, and credit reporting bureaus. Each Merchant, Guarantor, and Owner hereby waives to the maximum extent permitted by law any claim for damages against CFS or any of its affiliates relating to any (i) investigation undertaken by or on behalf of CFS as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**19. Confidentiality.** Each Merchant understands and agrees that the terms and conditions of the products and services offered by CFS, including this Agreement and any other CFS documents (collectively, "Confidential Information") are proprietary and confidential information of CFS. Accordingly, unless disclosure is required by law or court order, Merchant(s) shall not disclose Confidential Information of CFS to any person other than an attorney, accountant, financial advisor, or employee of any Merchant who needs to know such information for the purpose of advising any Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising any Merchant and first agrees in writing to be bound by the terms of this Section 19.

**20. D/B/As.** Each Merchant hereby acknowledges and agrees that CFS may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between CFS and each Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**21. Financial Condition and Financial Information.** Each Merchant represents, warrants, and covenants that its bank and financial statements, copies of which have been furnished to CFS, and future statements which will be furnished hereafter at the request of CFS, fairly represent the financial condition of each Merchant at such dates, and that since those dates there have been no material adverse changes, financial or otherwise, in such condition, operation, or ownership of any Merchant. Each Merchant has a continuing affirmative obligation to advise CFS of any material adverse change in its financial condition, operation, or ownership.

**22. Governmental Approvals.** Each Merchant represents, warrants, and covenants that it is in compliance and shall comply with all laws and has valid permits, authorizations, and licenses to own, operate, and lease its properties and to conduct the business in which it is presently engaged.

**23. Authorization.** Each Merchant represents, warrants, and covenants that it and each person signing this Agreement on behalf of each Merchant has full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**24. Insurance.** Each Merchant represents, warrants, and covenants that it will maintain business-interruption insurance naming CFS as loss payee and additional insured in amounts and against risks as are satisfactory to CFS and shall provide CFS proof of such insurance upon request.

**25. Electronic Check Processing Agreement.** Each Merchant represents, warrants, and covenants that it will not, without CFS's prior written consent, change its Processor, add terminals, change its financial institution or bank account, or take any other action that could have any adverse effect upon any Merchant's obligations under this Agreement.

**26. Change of Name or Location.** Each Merchant represents, warrants, and covenants that it will not conduct its business under any name other than as disclosed to CFS or change any place(s) of its business without prior written consent from CFS.

I have read and agree to the terms and conditions set forth above:

Name: DANIEL STEPHEN MARCH

Title: OWNER

Date: 08/03/2021

Name: TONY M DIAB

Title: OWNER

Date: 08/03/2021

5

FILED: NASSAU COUNTY CLERK 10/14/2021 05:37 PM    INDEX NO. 613095/2021
NYSCEF DOC. NO. 7    RECEIVED NYSCEF: 10/14/2021

**27. Estoppel Certificate.** Each Merchant represents, warrants, and covenants that it will, at any time, and from time to time, upon at least two day's prior notice from CFS to that Merchant, execute, acknowledge, and deliver to CFS and/or to any other person or entity specified by CFS, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Receivables Purchased Amount or any portion thereof have been paid.

**28. No Bankruptcy.** Each Merchant represents, warrants, and covenants that as of the date of this Agreement, it does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against any Merchant. Each Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it. Each Merchant further warrants that there will be no statutory presumption that it would have been insolvent on the date of this Agreement.

**29. Unencumbered Receivables.** Each Merchant represents, warrants, and covenants that it has good, complete, and marketable title to all Receivables, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges, and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with this Agreement or adverse to the interests of CFS, other than any for which CFS has actual or constructive knowledge as of the date of this Agreement.

**30. Stacking.** Each Merchant represents, warrants, and covenants that it will not enter into with any party other than CFS any arrangement, agreement, or commitment that relates to or involves the Receivables, whether in the form of a purchase of, a loan against, collateral against, or the sale or purchase of credits against Receivables without the prior written consent of CFS.

**31. Business Purpose.** Each Merchant represents, warrants, and covenants that it is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and each Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family, or household purposes.

**32. Default Under Other Contracts.** Each Merchant represents, warrants, and covenants that its execution of and/or performance under this Agreement will not cause or create an event of default by any Merchant under any contract with another person or entity.

**33. Security Interest.** To secure each Merchant's payment and performance obligations to CFS under this Agreement and any future agreement with CFS, each Merchant hereby grants to CFS a security interest in collateral (the "Collateral"), that is defined as collectively: (a) all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined by Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by any Merchant; and (b) all proceeds, as that term is defined by Article 9 of the UCC. The parties acknowledge and agree that any security interest granted to CFS under any other agreement between any Merchant or Guarantor and CFS (the "Cross-Collateral") will secure the obligations hereunder and under this Agreement. Negative Pledge: Each Merchant agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Cross-Collateral, as applicable.

Each Merchant agrees to execute any documents or take any action in connection with this Agreement as CFS deems necessary to perfect or maintain CFS's first priority security interest in the Collateral and the Cross-Collateral, including the execution of any account control agreements. Each Merchant hereby authorizes CFS to file any financing statements deemed necessary by CFS to perfect or maintain CFS's security interest, which financing statements may contain notification that each Merchant has granted a negative pledge to CFS with respect to the Collateral and the Cross-Collateral, and that any subsequent lienor may be tortiously interfering with CFS's rights. Each Merchant shall be liable for and CFS may charge and collect all costs and expenses, including but not limited to attorney fees, which may be incurred by CFS in protecting, preserving, and enforcing CFS's security interest and rights. Each Merchant further acknowledges that CFS may use another legal name and/or D/B/A or an agent when designating the Secured Party when CFS files the above-referenced financing statement(s).

**34. Events of Default.** An "Event of Default" may be considered to have taken place if any of the following occur:
(1) Any Merchant violates any term or covenant in this Agreement;

I have read and agree to the terms and conditions set forth above:

Name: DANIEL STEPHEN MARCH    Name: TONY M DIAB

Title: OWNER    Title: OWNER

Date: 08/03/2021    Date: 08/03/2021

EXHIBIT 1, PAGE 58

FILED: NASSAU COUNTY CLERK 10/14/2021 05:37 PM    INDEX NO. 613095/2021
NYSCEF DOC. NO. 7                                    RECEIVED NYSCEF: 10/14/2021

STANDARD MERCHANT CASH ADVANCE AGREEMENT

(2) Any representation or warranty by any Merchant in any Agreement with CFS that has not been terminated proves to have been incorrect, false, or misleading in any material respect when made;

(3) Any Merchant fails to provide CFS with written notice of any material change in its financial condition, operation, or ownership within seven days thereafter (unless a different notice period is specifically provided for elsewhere in this Agreement);

(4) the sending of notice of termination by any Merchant or Guarantor;

(5) Any Merchant transports, moves, interrupts, suspends, dissolves, or terminates its business without the prior written consent of CFS other than a bankruptcy filing;

(6) Any Merchant transfers or sells all or substantially all of its assets without the prior written consent of CFS;

(7) Any Merchant makes or sends notice of any intended bulk sale or transfer by any Merchant without the prior written consent of CFS;

(8) Any Merchant uses multiple depository accounts without the prior written consent of CFS;

(9) Any Merchant changes the Account without the prior written consent of CFS;

(10) CFS is not provided with updated login or password information for the Account within one business day after any such change is made by any Merchant;

(11) Any Merchant fails to send bank statements, merchant account statements, or bank login information for the Account within two business days after a written request for same is made by CFS;

(12) Any Merchant changes any Processor or adds terminals without the prior written consent of CFS;

(13) Any Merchant performs any act that reduces the value of any Collateral granted under this Agreement;

(14) Any Merchant fails to deposit its Receivables into the Account;

(15) Any Merchant causes any ACH debit to the Account by CFS to be blocked or stopped;

(16) Four or more ACH debits to the Account by CFS are returned for not sufficient funds (NSF) without advance written notice from any Merchant;

(17) Any Merchant prevents CFS from collecting any part of the Receivables Purchased Amount;

(18) Any Merchant causes any ACH debit to the Account to be stopped that would result in an ACH Return Code of R08 or R10 and that Merchant does not within two business days thereafter provide CFS with written notice thereof explaining why that Merchant caused the ACH debit to be stopped, which notice may be given by e-mail to Support@cobaltfunding.com; or

(19) Any Merchant defaults under any of the terms, covenants, and conditions of any other agreement with CFS.

**35. Remedies.** In case any Event of Default occurs and is not waived, CFS may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement, or other provision contained herein, or to enforce the discharge of each Merchant's obligations hereunder, or any other legal or equitable right or remedy. All rights, powers, and remedies of CFS in connection with this Agreement, including each Protection listed in Section 17, may be exercised at any time by CFS after the occurrence of an Event of Default, are cumulative and not exclusive, and will be in addition to any other rights, powers, or remedies provided by law or equity. In addition to the foregoing, in case any Event of Default occurs and is not waived, CFS will be entitled to the issuance of an injunction, restraining order, or other equitable relief in CFS's favor, subject to court or arbitrator approval, restraining each Merchant's accounts and/or receivables up to the amount due to CFS as a result of the Event of Default, and each Merchant will be deemed to have consented to the granting of an application for the same to any court or arbitral tribunal of competent jurisdiction without any prior notice to any Merchant or Guarantor and without CFS being required to furnish a bond or other undertaking in connection with the application.

**36. Required Notifications.** Each Merchant is required to give CFS written notice at least one day prior to any filing under Title 11 of the United States Code. Merchant(s) are required to give CFS at least seven days' written notice prior to the closing of any sale of all or substantially all of any Merchant's assets or stock.

**37. Assignment.** This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns, except that Merchant(s) shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of CFS, which consent may be withheld in CFS's sole discretion. CFS may assign, transfer, or sell its rights under this Agreement, including, without limitation, its rights to receive the Receivables Purchased Amount, and its rights under Section 33 of this Agreement, the Guarantee, and any other agreement, instrument, or document executed in connection with the transactions contemplated by this Agreement (a "Related Agreement"), or delegate its duties hereunder or thereunder, either in whole or in part.

I have read and agree to the terms and conditions set forth above:

Name: DANIEL STEPHEN MARCH            Name: TONY M DIAB

Title: OWNER                          Title: OWNER

Date: 08/03/2021                      Date: 08/03/2021

7

FILED: NASSAU COUNTY CLERK 10/14/2021 05:37 PM    INDEX NO. 613095/2021
NYSCEF DOC. NO. 7    RECEIVED NYSCEF: 10/14/2021

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**

From and after the effective date of any such assignment or transfer by CFS, whether or not any Merchant has actual notice thereof, this Agreement and each Related Agreement shall be deemed amended and modified (without the need for any further action on the part of any Merchant or CFS) such that the assignee shall be deemed a party to this Agreement and any such Related Agreement and, to the extent provided in the assignment document between CFS and such assignee (the "Assignment Agreement"), have the rights and obligations of CFS under this Agreement and such Related Agreements with respect to the portion of the Receivables Purchased Amount set forth in such Assignment Agreement, including but not limited to rights in the Receivables, Collateral and Additional Collateral, the benefit of each Guarantor's guaranty regarding the full and prompt performance of every obligation that is a subject of the Guarantee, CFS's rights under Section 17 of this Agreement (Protections Against Default), and to receive damages from any Merchant following a breach of this Agreement by any Merchant. In connection with such assignment, CFS may disclose all information that CFS has relating to any Merchant or its business. Each Merchant agrees to acknowledge any such assignment in writing upon CFS's request.

**38. Notices.** All notices, requests, consents, demands, and other communications hereunder to CFS shall be delivered by certified mail, return receipt requested, or by overnight delivery with signature confirmation addressed to 99 Wall Street, New York, NY 10005 and shall become effective only upon receipt. All notices, requests, consents, demands, and other communications hereunder to Merchant(s) and Guarantor(s) shall be delivered by certified mail, return receipt requested, or by overnight delivery with signature confirmation addressed to their addresses set forth in this Agreement and shall become effective only upon receipt. Written notice may also be given to any Merchant or Guarantor by e-mail to the E-mail Address listed on the first page of this Agreement. Each Merchant must set its spam or junk mail filter to accept e-mails sent by Support@cobaltfunding.com and its domain. This Section is not applicable to service of process or notices in any legal proceedings.

**39. Choice of Law.** Each Merchant acknowledges and agrees that this Agreement was made in the State of New York, that the Purchase Price is being paid by CFS in the State of New York, that the Receivables Purchased Amount is being delivered to CFS in the State of New York, and that the State of New York has a reasonable relationship to the transactions encompassed by this Agreement. This Agreement and the relationship between CFS, each Merchant, and each Guarantor will be governed by and construed in accordance with the laws of the State of New York, without regard to any applicable principles of conflict of laws.

**40. Forum Selection and Venue.** Any litigation relating to this Agreement or involving CFS on one side and any Merchant or any Guarantor on the other must be commenced and maintained in any court located in the Counties of Nassau, New York, or Sullivan in the State of New York (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient, submit to the jurisdiction of the Acceptable Forums, and waive any and all objections to the jurisdiction or venue of the Acceptable Forums. If any litigation is initiated in any other venue or forum, the parties waive any right to oppose any motion or application made by any party to transfer such litigation to an Acceptable Forum. The parties agree that this Agreement encompasses the transaction of business within the City of New York and that the Civil Court of the City of New York ("Civil Court") will have jurisdiction over any litigation relating to this Agreement that is within the jurisdictional limit of the Civil Court. In addition to the Acceptable Forums, any action or proceeding to enforce a judgment or arbitration award against any Merchant or Guarantor or to restrain or collect any amount due to CFS may be commenced and maintained in any other court of competent jurisdiction.

**41. Jury Waiver.** The parties agree to waive trial by jury in any dispute between them.

**42. Counterclaim Waiver.** In any litigation or arbitration commenced by CFS, each Merchant and each Guarantor will not be permitted to interpose any counterclaim.

**43. Statutes of Limitations.** Each Merchant and each Guarantor agree that any claim that is not asserted against CFS within one year of its accrual will be time barred.

**44. Costs.** Each Merchant and each Guarantor must pay all of CFS's reasonable costs associated with a breach by any Merchant of the covenants in this Agreement and the enforcement thereof, including but not limited to collection agency fees, attorney fees, which may include a contingency fee of up to 40% of the amount claimed, expert witness fees, and costs of suit.

**45. Prejudgment and Postjudgment Interest.** If CFS becomes entitled to the entry of a judgment against any Merchant or any Guarantor, then CFS will be entitled to the recovery of prejudgment interest at a rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, and upon entry of any such judgment, it

**I have read and agree to the terms and conditions set forth above:**

Name: DANIEL STEPHEN MARCH            Name: TONY M DIAB

Title: OWNER                          Title: OWNER

Date: 08/03/2021                      Date: 08/03/2021

8

FILED: NASSAU COUNTY CLERK 10/14/2021 05:37 PM
NYSCEF DOC. NO. 7
INDEX NO. 613095/2021
RECEIVED NYSCEF: 10/14/2021

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**

will accrue interest at a rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, which rate will govern over the statutory rate of interest up until actual satisfaction of the judgment.

**46. Legal Fees.** If CFS prevails in any litigation or arbitration with any Merchant or any Guarantor, then that Merchant and/or Guarantor must pay CFS's reasonable attorney fees, which may include a contingency fee of up to 40% of the amount claimed.

**47. Class Action Waiver.** CFS, each Merchant, and each Guarantor agree that they may bring claims against each other relating to this Agreement only in their individual capacities, and not as a plaintiff or class action member in any purported class or representative proceedings.

**48. Arbitration.** Any action or dispute relating to this Agreement or involving CFS on one side and any Merchant or any Guarantor on the other, including, but not limited to issues of arbitrability, will, at the option of any party to such action or dispute, be determined by arbitration before a single arbitrator. The arbitration will be administered either by Arbitration Services, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.arbitrationservicesinc.com, or by Mediation & Commercial Arbitration, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.mcarbitration.org. Once an arbitration is initiated with one of these arbitral forums, it must be maintained exclusively before that arbitral forum and the other arbitral forum specified herein may not be used. Any arbitration relating to this Agreement must be conducted in the Counties of Nassau, New York, Queens, or Kings in the State of New York. Notwithstanding any provision of any applicable arbitration rules, any witness in an arbitration who does not reside in or have a place for the regular transaction of business located in New York City or the Counties of Nassau, Suffolk, or Westchester in the State of New York will be permitted to appear and testify remotely by telephone or video conferencing. In case any Event of Default occurs and is not waived, each Merchant and each Guarantor consents to CFS making an application to the arbitrator, without notice to any Merchant or any Guarantor, for the issuance of an injunction, restraining order, or other equitable relief in CFS's favor, subject to court or arbitrator approval, restraining each Merchant's accounts and/or receivables up to the amount due to CFS as a result of the Event of Default.

Each Merchant acknowledges and agrees that this Agreement is the product of communications conducted by telephone and the Internet, which are instrumentalities of interstate commerce, and that the transactions contemplated under this Agreement will be made by wire transfer and ACH, which are also instrumentalities of interstate commerce, and that this Agreement therefore evidences a transaction affecting interstate commerce. Accordingly, notwithstanding any provision in this Agreement to the contrary, all matters of arbitration relating to this Agreement will be governed by and construed in accordance with the provisions of the Federal Arbitration Act, codified as Title 9 of the United States Code, however any application for injunctive relief in aid of arbitration or to confirm an arbitration award may be made under Article 75 of the New York Civil Practice Law and Rules. The arbitration agreement contained in this Section may also be enforced by any employee, agent, attorney, member, manager, officer, subsidiary, affiliate entity, successor, or assign of CFS.

**49. Service of Process.** Each Merchant and each Guarantor consent to service of process and legal notices made by First Class or Priority Mail delivered by the United States Postal Service and addressed to the Contact Address set forth on the first page of this Agreement or any other address(es) provided in writing to CFS by any Merchant or any Guarantor, and unless applicable law or rules provide otherwise, any such service will be deemed complete three days after dispatch. Each Merchant and each Guarantor agrees that it will be precluded from asserting that it did not receive service of process or any other notice mailed to the Contact Address set forth on the first page of this Agreement if it does not furnish a certified mail return receipt signed by CFS demonstrating that CFS was provided with notice of a change in the Contact Address.

**50. Survival of Representation, etc.** All representations, warranties, and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

**51. Waiver.** No failure on the part of CFS to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**I have read and agree to the terms and conditions set forth above:**

Name: DANIEL STEPHEN MARCH
Title: OWNER
Date: 08/03/2021

Name: TONY M DIAB
Title: OWNER
Date: 08/03/2021

9

FILED: NASSAU COUNTY CLERK 10/14/2021 05:37 PM        INDEX NO. 613095/2021
NYSCEF DOC. NO. 7                                    RECEIVED NYSCEF: 10/14/2021

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**

**52. Independent Sales Organizations/Brokers.** Each Merchant and each Guarantor acknowledge that it may have been introduced to CFS by or received assistance in entering into this Agreement or its Guarantee from an independent sales organization or broker ("ISO"). Each Merchant and each Guarantor agree that any ISO is separate from and is not an agent or representative of CFS. Each Merchant and each Guarantor acknowledge that CFS is not bound by any promises or agreements made by any ISO that are not contained within this Agreement. Each Merchant and each Guarantor exculpate from liability and agree to hold harmless and indemnify CFS and its officers, directors, members, shareholders, employees, and agents from and against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) incurred by any Merchant or any Guarantor resulting from any act or omission by any ISO. Each Merchant and each Guarantor acknowledge that any fee that they paid to any ISO for its services is separate and apart from any payment under this Agreement. Each Merchant and each Guarantor acknowledge that CFS does not in any way require the use of an ISO and that any fees charged by any ISO are not required as a condition or incident to this Agreement.

**53. Modifications; Agreements.** No modification, amendment, waiver, or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by all parties.

**54. Severability.** If any provision of this Agreement is deemed invalid or unenforceable as written, it will be construed, to the greatest extent possible, in a manner which will render it valid and enforceable, and any limitation on the scope or duration of any such provision necessary to make it valid and enforceable will be deemed to be part thereof. If any provision of this Agreement is deemed void, all other provisions will remain in effect.

**55. Headings.** Headings of the various articles and/or sections of this Agreement are for convenience only and do not necessarily define, limit, describe, or construe the contents of such articles or sections.

**56. Attorney Review.** Each Merchant acknowledges that it has had an opportunity to review this Agreement and all addenda with counsel of its choosing before signing the documents or has chosen not to avail itself of the opportunity to do so.

**57. Entire Agreement.** This Agreement, inclusive of all addenda, if any, executed simultaneously herewith constitutes the full understanding of the parties to the transaction herein and may not be amended, modified, or canceled except in writing signed by all parties. Should there arise any conflict between this Agreement and any other document preceding it, this Agreement will govern. This Agreement does not affect any previous agreement between the parties unless such an agreement is specifically referenced herein. This Agreement will not be affected by any subsequent agreement between the parties unless this Agreement is specifically referenced therein. CFS will not be permitted to enforce any of its rights under this Agreement without the express written consent of Gene Rosen's Law Firm.

**58. Counterparts; Fax and Electronic Signatures.** This Agreement may be executed electronically and in counterparts. Facsimile and electronic copies of this Agreement will have the full force and effect of an original.

SIGNATURES TO FOLLOW ON NEXT PAGE

I have read and agree to the terms and conditions set forth above:

Name: DANIEL STEPHEN MARCH

Title: OWNER

Date: 08/03/2021

Name: TONY M DIAB

Title: OWNER

Date: 08/03/2021

10

FILED: NASSAU COUNTY CLERK 10/14/2021 05:37 PM          INDEX NO. 613095/2021
NYSCEF DOC. NO. 7                                        RECEIVED NYSCEF: 10/14/2021

Case 8:23-bk-10571-SC    Claim 127-1    Filed 07/24/23    Desc Main Document    Page 52
of 77

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**

**FOR THE MERCHANT/OWNER (#1)**

By: DANIEL STEPHEN MARCH          OWNER
        Print Name                        Title                              Signature

SS# ▆▆▆▆                                          Driver License Number: ▆▆▆▆


**FOR THE MERCHANT/OWNER (#2)**

By: TONY M DIAB          OWNER
        Print Name                        Title                              Signature

SS#: ▆▆▆▆                                          Driver License Number: ▆▆▆▆


Approved for COBALT FUNDING SOLUTIONS by: _____

11

EXHIBIT 1, PAGE 63

FILED: NASSAU COUNTY CLERK 10/14/2021 05:37 PM    INDEX NO. 613095/2021
NYSCEF DOC. NO. 7                                         RECEIVED NYSCEF: 10/14/2021

Case 8:23-bk-10571-SC    Claim 12/-1    Filed 07/24/23    Desc Main Document    Page 53
of 77

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**

## GUARANTEE

**G1. Personal Guarantee of Performance.** This is a personal guaranty of performance, dated _____08/03/2021_____, of the Standard Merchant Cash Advance Agreement, dated _____08/03/2021_____ ("Agreement"), inclusive of all addenda, if any, executed simultaneously therewith, by and between COBALT FUNDING SOLUTIONS ("CFS") and THE LITIGATION PRACTICE GROUP PC/VULCAN CONSULTING GROUP LLC/ BAT INC ███████ ("Merchant"). Each undersigned Guarantor hereby guarantees each Merchant's performance of all of the representations, warranties, and covenants made by each Merchant to CFS in the Agreement, inclusive of all addenda, if any, executed simultaneously therewith, as the Agreement may be renewed, amended, extended, or otherwise modified (the "Guaranteed Obligations"). Each Guarantor's obligations are due at the time of any breach by any Merchant of any representation, warranty, or covenant made by any Merchant in the Agreement.

**G2. Communications.** CFS may use automated telephone dialing, text messaging systems, and e-mail to provide messages to Guarantor(s) about Merchant(s)'s account. Telephone messages may be played by a machine automatically when the telephone is answered, whether answered by an Owner, a Guarantor, or someone else. These messages may also be recorded by the recipient's answering machine or voice mail. Each Guarantor gives CFS permission to call or send a text message to any telephone number given to CFS in connection with this Agreement and to play pre-recorded messages and/or send text messages with information about this Agreement and/or any Merchant's account over the phone. Each Guarantor also gives CFS permission to communicate such information to them by e-mail. Each Guarantor agrees that CFS will not be liable to any of them for any such calls or electronic communications, even if information is communicated to an unintended recipient. Each Guarantor acknowledges that when they receive such calls or electronic communications, they may incur a charge from the company that provides them with telecommunications, wireless, and/or Internet services, and that CFS has no liability for any such charges.

**G3. Guarantor Waivers.** If CFS considers any Event of Default to have taken place under the Agreement, then CFS may enforce its rights under this Guarantee without first seeking to obtain payment from any Merchant, any other guarantor, or any Collateral, Additional Collateral, or Cross-Collateral CFS may hold pursuant to this Guarantee or any other agreement or guarantee. CFS does not have to notify any Guarantor of any of the following events and Guarantor(s) will not be released from its obligations under this Guarantee even if it is not notified of: (i) any Merchant's failure to pay timely any amount owed under the Agreement; (ii) any adverse change in any Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; (iv) CFS's acceptance of the Agreement with any Merchant; and (v) any renewal, extension, or other modification of the Agreement or any Merchant's other obligations to CFS. In addition, CFS may take any of the following actions without releasing any Guarantor from any obligations under this Guarantee: (i) renew, extend, or otherwise modify the Agreement or any Merchant's other obligations to CFS; (ii) if there is more than one Merchant, release a Merchant from its obligations to CFS such that at least one Merchant remains obligated to CFS; (iii) sell, release, impair, waive, or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under the Agreement. Until the Receivables Purchased Amount and each Merchant's other obligations to CFS under the Agreement and this Guarantee are paid in full, each Guarantor shall not seek reimbursement from any Merchant or any other guarantor for any amounts paid by it under the Agreement. Each Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against any Merchant, any other guarantor, or any collateral provided by any Merchant or any other guarantor, for any amounts paid by it or acts performed by it under this Guarantee: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution.

**G4. Joint and Several Liability.** The obligations hereunder of the persons or entities constituting each Guarantor under this Guarantee are joint and several.

**G5. Injunctive Relief.** In case any Event of Default occurs and is not waived, CFS will be entitled to the issuance of an injunction, restraining order, or other equitable relief in CFS's favor, subject to court or arbitrator approval, restraining each Guarantor's accounts and/or receivables up to the amount due to CFS as a result of the Event of Default, and each Guarantor will be deemed to have consented to the granting of an application for the same to any court or arbitral tribunal of competent jurisdiction without any prior notice to any Merchant or Guarantor and without CFS being required to furnish a bond or other undertaking in connection with the application.

**I have read and agree to the terms and conditions set forth above:**

Name: DANIEL STEPHEN MARCH

Title: OWNER

Date: 08/03/2021

Name: TONY M DIAB

Title: OWNER

Date: 08/03/2021

12

EXHIBIT 1, PAGE 64

FILED: NASSAU COUNTY CLERK 10/14/2021 05:37 PM                    INDEX NO. 613095/2021
NYSCEF DOC. NO. 7                                                 RECEIVED NYSCEF: 10/14/2021

STANDARD MERCHANT CASH ADVANCE AGREEMENT

G6. **Choice of Law.** Each Guarantor acknowledges and agrees that the Agreement and this Guarantee were made in the State of New York, that the Purchase Price is being paid by CFS in the State of New York, that the Receivables Purchased Amount is being delivered to CFS in the State of New York, and that the State of New York has a reasonable relationship to the transactions encompassed by the Agreement and this Guarantee. This Guarantee and the relationship between CFS, each Merchant, and each Guarantor will be governed by and construed in accordance with the laws of the State of New York, without regard to any applicable principles of conflict of laws.

G7. **Forum Selection and Venue.** Any litigation relating to this Agreement or this Guarantee or involving CFS on one side and any Merchant or any Guarantor on the other must be commenced and maintained in any court located in the Counties of Nassau, New York, or Sullivan in the State of New York (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient, submit to the jurisdiction of the Acceptable Forums, and waive any and all objections to the jurisdiction or venue of the Acceptable Forums. If any litigation is initiated in any other venue or forum, the parties waive any right to oppose any motion or application made by any party to transfer such litigation to an Acceptable Forum. The parties agree that this Guarantee encompasses the transaction of business within the City of New York and that the Civil Court of the City of New York ("Civil Court") will have jurisdiction over any litigation relating to this Guarantee that is within the jurisdictional limit of the Civil Court. In addition to the Acceptable Forums, any action or proceeding to enforce a judgment or arbitration award against any Merchant or Guarantor or to restrain or collect any amount due to CFS may be commenced and maintained in any other court of competent jurisdiction.

G8. **Jury Waiver.** Each Guarantor agrees to waive trial by jury in any dispute with CFS.

G9. **Counterclaim Waiver.** In any litigation or arbitration commenced by CFS, each Merchant and each Guarantor will not be permitted to interpose any counterclaim.

G10. **Statutes of Limitations.** Each Merchant and each Guarantor agree that any claim that is not asserted against CFS within one year of its accrual will be time barred.

G11. **Costs.** Each Merchant and each Guarantor must pay all of CFS's reasonable costs associated with a breach by any Merchant of the covenants in this Agreement or this Guarantee and the enforcement thereof, including but not limited to collection agency fees, expert witness fees, and costs of suit.

G12. **Prejudgment and Postjudgment Interest.** If CFS becomes entitled to the entry of a judgment against any Merchant or any Guarantor, then CFS will be entitled to the recovery of prejudgment interest at a rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, and upon entry of any such judgment, it will accrue interest at a rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, which rate will govern over the statutory rate of interest up until actual satisfaction of the judgment.

G13. **Legal Fees.** If CFS prevails in any litigation or arbitration with any Merchant or any Guarantor, then that Merchant and/or Guarantor must pay CFS's reasonable attorney fees, which may include a contingency fee of up to 40% of the amount claimed.

G14. **Class Action Waiver.** CFS, each Merchant, and each Guarantor agree that they may bring claims against each other relating to this Agreement only in their individual capacities, and not as a plaintiff or class action member in any purported class or representative proceedings.

G15. **Arbitration.** Any action or dispute relating to this Agreement or this Guarantee or involving CFS on one side and any Merchant or any Guarantor on the other, including, but not limited to issues of arbitrability, will, at the option of any party to such action or dispute, be determined by arbitration before a single arbitrator. The arbitration will be administered either by Arbitration Services, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.arbitrationservicesinc.com, or by Mediation & Commercial Arbitration, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.mcarbitration.org. Once an arbitration is initiated with one of these arbitral forums, it must be maintained exclusively before that arbitral forum and the other arbitral forum specified herein may not be used. Any arbitration relating to this Agreement or this Guarantee must be conducted in the Counties of Nassau, New York, Queens, or Kings in the State of New York. Notwithstanding any provision of any applicable arbitration rules, any witness in an arbitration who does not reside in or have a place for the regular transaction of business located in New York City or the Counties of Nassau, Suffolk, or Westchester in the State of New York will be permitted to appear and testify remotely by telephone or video conferencing. In case any

**I have read and agree to the terms and conditions set forth above:**

| | |
|---|---|
| _David March_ | _Tony Diab_ |
| Name: DANIEL STEPHEN MARCH | Name: TONY M DIAB |
| Title: OWNER | Title: OWNER |
| Date: 08/03/2021 | Date: 08/03/2021 |

13

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**

Event of Default occurs and is not waived, each Guarantor consents to CFS making an application to the arbitrator, without notice to any Merchant or any Guarantor, for the issuance of an injunction, restraining order, or other equitable relief in CFS's favor, subject to court or arbitrator approval, restraining each Guarantor's accounts and/or receivables up to the amount due to CFS as a result of the Event of Default.

Each Guarantor acknowledges and agrees that the Agreement and this Guarantee are the product of communications conducted by telephone and the Internet, which are instrumentalities of interstate commerce, and that the transactions contemplated under the Agreement and this Guarantee will be made by wire transfer and ACH, which are also instrumentalities of interstate commerce, and that the Agreement and this Guarantee therefore evidence a transaction affecting interstate commerce. Accordingly, notwithstanding any provision in the Agreement or this Guarantee to the contrary, all matters of arbitration relating to the Agreement or this Guarantee will be governed by and construed in accordance with the provisions of the Federal Arbitration Act, codified as Title 9 of the United States Code, however any application for injunctive relief in aid of arbitration or to confirm an arbitration award may be made under Article 75 of the New York Civil Practice Law and Rules. The arbitration agreement contained in this Section may also be enforced by any employee, agent, attorney, member, manager, officer, subsidiary, affiliate entity, successor, or assign of CFS.

**G16. Service of Process.** Each Merchant and each Guarantor consent to service of process and legal notices made by First Class or Priority Mail delivered by the United States Postal Service and addressed to the Contact Address set forth on the first page of the Agreement or any other address(es) provided in writing to CFS by any Merchant or any Guarantor, and unless applicable law or rules provide otherwise, any such service will be deemed complete three days after dispatch. Each Merchant and each Guarantor agrees that it will be precluded from asserting that it did not receive service of process or any other notice mailed to the Contact Address set forth on the first page of the Agreement if it does not furnish a certified mail return receipt signed by CFS demonstrating that CFS was provided with notice of a change in the Contact Address.

**G17. Severability.** If any provision in this Guarantee is deemed invalid or unenforceable as written, it will be construed, to the greatest extent possible, in a manner which will render it valid and enforceable, and any limitation on the scope or duration of any such provision necessary to make it valid and enforceable will be deemed to be part thereof. If any provision of this Guarantee is deemed void, all other provisions will remain in effect.

**G18. Survival.** The provisions of Sections G2, G3, G4, G5, G6, G7, G8, G9, G10, G11, G12, G13, G14, G15, G16, G17, G18, G19, G20, G21, and G22 shall survive any termination of this Guarantee.

**G19. Headings.** Headings of the various articles and/or sections of this Guarantee are for convenience only and do not necessarily define, limit, describe, or construe the contents of such articles or sections.

**G20. Attorney Review.** Each Guarantor acknowledges that it has had an opportunity to review this Guarantee, the Agreement, and all addenda with counsel of its choosing before signing the documents or has chosen not to avail itself of the opportunity to do so.

**G21. Entire Agreement.** This Guarantee, inclusive of all addenda, if any, executed simultaneously herewith may not be amended, modified, or canceled except in writing signed by all parties. Should there arise any conflict between this Guarantee and any other document preceding it, this Guarantee will govern. This Guarantee does not affect any previous agreement between the parties unless such an agreement is specifically referenced in the Agreement or herein. This Guarantee will not be affected by any subsequent agreement between the parties unless this Guarantee is specifically referenced therein.

**G22. Counterparts; Fax and Electronic Signatures.** This Guarantee may be executed electronically and in counterparts. Facsimile and electronic copies of this Guarantee will have the full force and effect of an original.

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "STANDARD MERCHANT CASH ADVANCE AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS GUARANTEE. CAPITALIZED TERMS NOT DEFINED IN THIS GUARANTEE SHALL HAVE THE MEANING SET FORTH IN THE STANDARD MERCHANT CASH ADVANCE AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.

SIGNATURES TO FOLLOW ON NEXT PAGE

I have read and agree to the terms and conditions set forth above:

Name: DANIEL STEPHEN MARCH          Name: TONY M DIAB

Title: OWNER          Title: OWNER

Date: 08/03/2021          Date: 08/03/2021

14

FILED: NASSAU COUNTY CLERK 10/14/2021 05:37 PM    INDEX NO. 613095/2021
NYSCEF DOC. NO. 7    RECEIVED NYSCEF: 10/14/2021

Case 8:23-bk-10571-SC    Claim 127-1    Filed 07/24/23    Desc Main Document    Page 56

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**
of 71

### THE UNDERSIGNED HEREBY ACCEPT THE TERMS OF THIS GUARANTEE

**FOR THE GUARANTOR (#1)**

By: DANIEL STEPHEN MARCH          OWNER

Print Name          Title          Signature

SS#: ▮▮▮▮▮          Driver License Number: ▮▮▮▮▮

**FOR THE GUARANTOR (#2)**

By: TONY M DIAB          OWNER

Print Name          Title          Signature

SS#: ▮▮▮▮▮          Driver License Number: ▮▮▮▮▮

15

Case 8:23-bk-10571-SC   Claim 127-1   Filed 07/24/23   Desc Main Document      Page 57 of 77

STANDARD MERCHANT CASH ADVANCE AGREEMENT

### ADDENDUM TO STANDARD MERCHANT CASH ADVANCE AGREEMENT FOR ESTIMATED PAYMENTS

This is an Addendum, dated _____08/03/2021_____, to the Standard Merchant Cash Advance Agreement ("Agreement"), dated _____08/03/2021_____, between COBALT FUNDING SOLUTIONS ("CFS") and THE LITIGATION PRACTICE GROUP PC/VULCAN CONSULTING GROUP LLC/ BAT INC( 82-3967686) ("Merchant"). This Addendum incorporates the Agreement by reference. The terms of this Addendum will control to the extent they conflict with any of the terms in the Agreement.

Instead of debiting the _____25_____ Specified Percentage of Merchant's Receivables, CFS may instead debit _____$ 77,550.00_____ ("Estimated Payment") from the Account every _____DAY_____. The Estimated Payment is intended to be an approximation of no more than the Specified Percentage.

Any Merchant may give written notice to CFS requesting that CFS conduct a reconciliation in order to ensure that the amount that CFS has collected equals the Specified Percentage of Merchant(s)'s Receivables under this Agreement. Any Merchant may give written notice requesting a reconciliation. A request for reconciliation may also be made by e-mail to Support@cobaltfunding.com and such notice will be deemed to have been received if and when CFS sends a reply e-mail (but not a read receipt). If such reconciliation determines that CFS collected more than it was entitled to, then within seven days thereafter, CFS will credit to the Account all amounts to which CFS was not entitled and decrease the Estimated Payment so that it is consistent with the Specified Percentage of Merchant(s)'s Receivables from the date of the Agreement through the date of the reconciliation. If such reconciliation determines that CFS collected less than it was entitled to, then within seven days thereafter, CFS will debit from the Account all additional amounts to which CFS was entitled and increase the Estimated Payment so that it is consistent with the Specified Percentage of Merchant(s)'s Receivables from the date of the Agreement through the date of the reconciliation, with the increase being subject to any Cap in place on collections. In order to effectuate this reconciliation, any Merchant must produce with its request the login and password for the Account and any and all bank statements and merchant statements covering the period from the date of this Agreement through the date of the request for a reconciliation. CFS will complete each such reconciliation within two business days after receipt of a written request for one accompanied by the information and documents required for it. Nothing herein limits the amount of times that such a reconciliation may be requested.

**FOR THE MERCHANT/OWNER (#1)**

By: _DANIEL STEPHEN MARCH_    _OWNER_    _David March_
    Print Name    Title    Signature

**FOR THE MERCHANT/OWNER (#2)**

By: _TONY M DIAB_    _OWNER_    _Tony Diab_
    Print Name    Title    Signature

16

EXHIBIT 1, PAGE 68

Case 8:23-bk-10571-SC    Claim 127-1    Filed 07/24/23    Desc Main Document      Page 58
of 77

STANDARD MERCHANT CASH ADVANCE AGREEMENT

**ADDENDUM TO STANDARD MERCHANT CASH ADVANCE AGREEMENT FOR ADDITIONAL FEES**

This is an Addendum, dated _____08/03/2021_____, to the Standard Merchant Cash Advance Agreement ("Agreement"), dated _____08/03/2021_____, between COBALT FUNDING SOLUTIONS ("CFS") and ___THE LITIGATION PRACTICE GROUP PC/VULCAN CONSULTING GROUP LLC/ BAT INC( 82-3967686)___ ("Merchant"). This Addendum incorporates the Agreement by reference. The terms of this Addendum will control to the extent they conflict with any of the terms in the Agreement.

Each Merchant may be held responsible for an NSF/ Rejected ACH Fee of $50.00 for each time an ACH debit to the Account by CFS is returned or otherwise rejected. No Merchant will be held responsible for such a fee if any Merchant gives CFS advance notice of no more than one business day in advance that the Account has insufficient funds to be debited by CFS and no Merchant is otherwise in default of the terms of the Agreement. Each such fee may be deducted from any payment collected by CFS or may be collected in addition to any other payment collected by CFS under this Agreement.

**FOR THE MERCHANT/OWNER (#1)**

By: DANIEL STEPHEN MARCH          OWNER                          _Daniel March_
     Print Name                    Title                          Signature

**FOR THE MERCHANT/OWNER (#2)**

By: TONY M DIAB                    OWNER                          _Tony Diab_
     Print Name                    Title                          Signature

17

EXHIBIT 1, PAGE 69

# EXHIBIT 5

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

COBALT FUNDING SOLUTIONS, LLC

                                        Plaintiff,                    Index No: 613095/2021

        -against-

THE LITIGATION PRACTICE GROUP PC and VULCAN
CONSULTING GROUP LLC and BAT INC and COAST
PROCESSING.COM D/B/A/ COAST PROCESSING and
DANIEL S MARCH and TONY M DIAB,

                                        Defendants.

## STIPULATION OF SETTLEMENT

  **THIS SETTLEMENT AGREEMENT AND GENERAL RELEASE** ("Settlement Agreement")
is entered into as of February 8, 2022 (the "Execution Date"), by and between Cobalt Funding Solutions,
LLC ("PLAINTIFF") and THE LITIGATION PRACTICE GROUP PC and VULCAN CONSULTING
GROUP LLC and BAT INC and COAST PROCESSING.COM D/B/A/ COAST PROCESSING and
DANIEL S MARCH and TONY M DIAB ("Defendants") (collectively, the "Parties").

  **WHEREAS**, Plaintiff commenced an action against Defendants by the filing of a Summons and

Complaint on October 14, 2021, in the New York State Supreme Court for the County of Nassau under

Index Number 613095/2021 (the "Action"); and

  **WHEREAS**, the Parties wish to settle all disputes between them including, without limitation,

all claims that were, or could have been, asserted in the Action, pursuant to the terms and conditions

set forth in this Agreement;

  **NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which

are hereby acknowledged, the parties agree as follows:

  1. Settlement Amount. Plaintiff hereby agrees to accept the sum of $1,500,000 (the "Settlement

Amount") in full satisfaction of any and all claims Plaintiff may have against Defendants including, without

limitation, the claims that could be asserted in the Action. The Settlement Amount shall be paid as follows:

(a)  Seven payments in the amount of $75,000.00 respectively via wire transfer. Payments will commence on Thursday, February 10, 2022 and continue on the next 6 Thursdays thereafter.

(b)  Nine payments in the amount of $100,000.00 respectively via wire transfer. Payments will commence on Thursday, March 31, 2022 and continue on the next 8 Thursdays thereafter.

(c)  A final payment in the amount of $75,000.00 via wire transfer. Payments will made on Thursday, June 2, 2022.

(d)  The Attorney Trust Account for Plaintiff's counsel is below:

**The Klein Law Firm LLC Attorney Trust Account**
**ADDRESS:** 233 Benjamin St., Toms River, New Jersey 08755

**LAKELAND BANK**
**ACCOUNT #:** 664403398
**ROUTING #:** 021205376

If the due date of any payment falls on a bank holiday or weekend, said payment shall be due on the very next workday that is not a bank holiday.

2.  <u>Forbearance of Litigation:</u> Providing full compliance with the terms of this Agreement, all litigation and legal actions between the parties are hereby stayed. The parties also agree to:

(a)  withdraw their respective outstanding motions (Mtn Seq. #001 and #002) with the enclosed executed Stipulation of Withdrawal;

3.  <u>Dismissals.</u> Contemporaneously with the execution of this Agreement, the Parties, and/or their counsel, shall execute the enclosed Stipulation of Discontinuance without Prejudice to be filed within 3 business days after the third $75,000 payment is wired to Plaintiff.

4.  <u>Assignment of UCC.</u> Upon execution of this Settlement Agreement, Plaintiff shall also deliver to Bae Enterprises, Inc. the enclosed Assignment of UCC Financing Statements and Evidence of Assignment relating to the assignment of the UCC-1 financing statement, filed under number U210050853928, both of which are to be held in escrow pending the final $75,000 payment to Plaintiff

as contemplated herein. Upon Plaintiff's receipt of the final $75,000 payment, due on or before June 2, 2022, the Assignment Agreement of UCC Financing Statements and Evidence of Assignment will take full force and effect.

5. <u>Effective Date</u>. The Agreement shall become binding and be closed by the execution hereof by all parties.

6. <u>Waiver of Plaintiff's Liability</u>. As of the date that Defendants obligations to Plaintiff as detailed herein have been fully satisfied, the Defendants for itself and on behalf of all parents, divisions, subsidiaries, affiliates, related entities, representatives, successors, directors, officers, owners, agents, employees, insurance carriers, attorneys and assigns, hereby releases and forever discharges Plaintiff and its respective parents, divisions, subsidiaries, affiliates, related entities, representatives, successors, directors, officers, owners, agents, employees, insurance carriers, attorneys and assigns of and from any and all claims, counterclaims, demands, damages, debts, liabilities, accounts, actions, causes of action and suits, known or unknown, liquidated or contingent, arising from, which may arise in the future from, or which are related in any manner to the underlying Agreement, including any claims that were or could have been asserted, other than Plaintiff's obligations under this Settlement Agreement. Defendants acknowledges that any and all legal claims it maintains must be brought by a breach of this settlement agreement.

7. <u>Waiver of Defendants' Liability</u>. As of the date that Defendants obligations to Plaintiff as detailed herein have been fully satisfied,  the Plaintiff for itself and on behalf of all parents, divisions, subsidiaries, affiliates, related entities, representatives, successors, directors, officers, owners, agents, employees, insurance carriers, attorneys and assigns, hereby releases and forever discharges Defendants and their respective parents, divisions, subsidiaries, affiliates, related entities, representatives, successors, directors, officers, owners, agents, employees, insurance carriers, attorneys and assigns of and from any and all claims, counterclaims, demands, damages, debts, liabilities, accounts, actions, causes of action and suits, known or unknown, liquidated or contingent, arising from, which may arise in the future from, or which are related in any manner to the underlying Agreement, including any claims that were or could have been

asserted, other than Defendants' obligations under this Settlement Agreement. Plaintiff acknowledges that

any and all legal claims it maintains must be brought by a breach of this settlement agreement.

8. <u>Default and Right to Cure</u>. A default under this Stipulation will occur if payment is not received on

the date it is due. Defendants shall have a seven (7) day cure period within which to cure any default

hereunder upon notice via email to Defendants counsel at **ashlee@colonnacohenlaw.com** and Defendant

at **tony@coastprocessing.com**.

9. <u>Judgment</u>. In the event that this Stipulation is breached by Defendants, all terms of this Stipulation

except for those detailed in this Paragraph 9, will be void *ab initio* and Plaintiff may at its option, apply for

entry of a judgment against all Defendants, pursuant to CPLR §3215(i). Such application for entry of default

judgment will include an affidavit or affirmation specifying the default and the amount of the unpaid

balance of the entire abovementioned obligation.  Any Default Judgment entered hereunder will be for

$3,000,000, less any payments made under this Agreement, plus any accrued interest, costs and

disbursements. Defendants agree to accept service by email and waive any objections to service.

10. <u>Venue.</u> The Defendants recognize that because payment is to be made in the state of New

York, this Agreement shall be governed by and construed according to the laws of the State of

New York, without giving effect to its choice of law principles. The parties agree that all actions

and proceedings arising out of or relating directly or indirectly to this Agreement or any ancillary

agreement or any other related obligations shall be litigated solely and exclusively in in the

Supreme Court of the State of New York County of Nassau, and that such courts are convenient

forums. Each party hereby submits to the personal jurisdiction of such courts for purposes of any

such actions or proceedings. The Defendants waive their right to service of process of any

complaint or other process commenced arising from their obligations hereunder, and agree to

accept service of any commencement documents including but not limited to a Summons and

Complaint via email to their counsel **ashlee@colonnacohenlaw.com** and the Defendant at tony@coastprocessing.com**.**

11. <u>Confidentiality:</u>  The Parties agree that they will not disclose to any entity or other person the terms or conditions of this Settlement Agreement (subject to the exceptions expressly stated in this paragraph) without the prior written consent of the other Party. Notwithstanding the foregoing, the Parties may otherwise disclose the terms of this Settlement Agreement only in the following situations: (i) to his or her legal, insurance, or tax professionals; (ii) in any action or proceeding to enforce the terms and conditions of this Settlement Agreement; (iii) as required by a lawfully issued subpoena after notification to the other Party so as to give the other Party time to move to quash said subpoena; and (iv) to the extent necessary to the holder of a mortgage or security interest in any property. Any disclosure in violation of this section shall be deemed a material breach of this Stipulation of Settlement.

12. <u>Execution and Delivery of Documents</u>.   The Parties agree that they respectively shall, upon request by another party to this Agreement, execute and deliver promptly any and all such documentation, or documents of any and every kind and character as may be reasonably required, necessary or proper for the purpose of giving full force and effect to this agreement and to the covenants, conditions, and agreements contained herein.  Furthermore, the parties agree to cooperate and to do all things necessary to accomplish the intention of this agreement.

13. <u>Incorporation by Reference, Recitals</u>.  All documents referred to in this Agreement are made a part hereof and incorporated herein by reference.

14. <u>Copies</u>**.**   Any true executed copy of the Agreement shall be deemed to constitute an original of the same.

15. <u>Construction and Interpretation</u>.  No provision in this Agreement shall be interpreted for or against another party because that party's attorney drafted such provision.

EXHIBIT 1, PAGE 75

16. <u>Entire Agreement</u>.    This Agreement represents the full, complete and entire agreement between the parties and supersedes any previous agreement between the parties. This Agreement may only be modified in writing, accepted, and approved in writing by all Parties.

17. <u>Attorney Review</u>. Defendants acknowledge they had ample time to consult with an attorney of its choosing with respect to the terms of this Agreement, and has been advised to do so.

***<u>Signature Page to Follow</u>***

IN WITNESS WHEREOF, this Stipulation and Settlement Agreement has been agreed to and executed by the undersigned this 11<u>TH</u> day of <u>FEBRUARY</u>, 2022.


Tony Diab
_____
*Tony Diab*, individually, and on behalf of
*VULCAN CONSULTING GROUP LLC and BAT INC and COAST*
*PROCESSING.COM D/B/A/ COAST PROCESSING*


Daniel S. March
_____
*Daniel S. March*, individually, and on behalf of
*THE LITIGATION PRACTICE GROUP PC*


_____
Yehuda Klein, Esq.
Authorized Representative/Counsel for
*Cobalt Funding Solutions, LLC*
The Klein Law Firm LLC
P.O. Box 714
Lakewood, NJ 08701
646-330-9077

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

COBALT FUNDING SOLUTIONS, LLC

                              Plaintiff,

        -against-

THE LITIGATION PRACTICE GROUP PC and
VULCAN CONSULTING GROUP LLC and BAT
INC and COAST PROCESSING.COM D/B/A/
COAST PROCESSING and DANIEL S MARCH
and TONY M DIAB,

                              Defendants.

INDEX NUMBER: 613095/2021

**STIPULATION TO WITHDRAW
MOTION SEQ. #001 AND #002**

        **IT IS HEREBY STIPULATED AND AGREED,** Plaintiff's motion for a preliminary

injunction (Motion Seq. #001) and Defendants' motion to dismiss (Motion Seq. #002), are both

hereby withdrawn.

Dated: Brooklyn, New York
        February 11, 2022

**COLONNA COHEN LAW, PLLC**                **THE KLEIN LAW FIRM LLC**

/s/Ashlee Colonna Cohen
Ashlee Colonna Cohen, Esq.                    Yehuda Klein, Esq.
*Attorneys for Defendants*                     *Attorney for Plaintiff*
46 N Henry Street                              P.O. Box 714
Brooklyn, New York, 11222                      Lakewood, NJ 08701
Tel: (516) 567-0885                            646-330-9077
E-Mail: ashlee@colonnacohenlaw.com             Email: jay@thekleinfirm.com

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

COBALT FUNDING SOLUTIONS, LLC

                                                  Plaintiff,

                -against-

THE LITIGATION PRACTICE GROUP PC and
VULCAN CONSULTING GROUP LLC and BAT
INC and COAST PROCESSING.COM D/B/A/
COAST PROCESSING and DANIEL S MARCH
and TONY M DIAB,

                                                  Defendants.

INDEX NUMBER: 613095/2021

**STIPULATION OF
DISCONTINUANCE
WITHOUT PREJUDICE**

        **IT IS HEREBY STIPULATED AND AGREED,** by and between the parties, Plaintiff

COBALT FUNDING SOLUTIONS, LLC and Defendants THE LITIGATION PRACTICE GROUP PC

and VULCAN CONSULTING GROUP LLC and BAT INC and COAST PROCESSING.COM D/B/A/

COAST PROCESSING and DANIEL S MARCH and TONY M DIAB, pursuant to CPLR § 3217, that

whereas no party hereto is an infant or incompetent person for whom a committee has been

appointed and no person not a party has an interest in the subject matter of the action, the above-

entitled action be, and the same hereby is **DISCONTINUED WITHOUT PREJUDICE,**

without costs to either party as against the other. This stipulation may be filed without further

notice with the Clerk of the Court.

Dated: Brooklyn, New York
      February 11, 2022

**COLONNA COHEN LAW, PLLC**

/s/Ashlee Colonna Cohen
Ashlee Colonna Cohen, Esq.
*Attorneys for Defendants*
46 N Henry Street
Brooklyn, New York, 11222
Tel: (516) 567-0885
ashlee@colonnacohenlaw.com

**THE KLEIN LAW FIRM LLC**

Yehuda Klein, Esq.
*Attorney for Plaintiff*
P.O. Box 714
Lakewood, NJ 08701
646-330-9077
jay@thekleinfirm.com

## ASSIGNMENT OF UCC FINANCING STATEMENTS

Assignment of UCC Financing Statement ("Assignment") executed and delivered as of February ___, 2022, by Queen Funding, LLC and Cobalt Funding Solutions, LLC (each an "Assignor", and together the "Assignors") to Bae Enterprises, Inc. ("Assignee").

**RECITALS:**

Assignee desires to purchase from Assignors, and Assignors have agreed to sell and assign their respective UCC financing statements filed against The Litigation Practice Group PC, Bat, Inc., (together as "Company") and Daniel Stephen March, and as more specifically described as filing number U210050853928, filed with the California Secretary of State on May 28, 2021, respectively ("UCC Financing Statement"), and all of Assignors' rights under the UCC Financing Statements, including without limitation any and all collateral secured by the UCC financing Statements, for a purchase price of $1,500,000.00 (the "Purchase Price").

For good and valuable consideration, the receipt and adequacy of which is acknowledged, Assignors agree as follows:

1.    Contemporaneously with the execution of this Agreement,

(a)    Assignors sell, transfer and assign to Assignee the UCC Financing Statements and all of Assignors' rights,title, and interest under the UCC Financing Statements; and

(b)    Assignee is authorized to file a UCC-3 assignments, assigning from Assignors to Assignee the UCCFinancing Statements.

2.    Assignors represent and warrant to Assignee that (i) each Assignor's exact legal name is as set forth in the preamble above, and (ii) Assignors have not sold, assigned, or transferred the UCC Financing Statements to any other party. The sale, transfer and assignment is made without recourse, representations or warranties of any kind, except as set forthabove.

3.    Assignors shall execute the Evidence of Assignment attached hereto as Exhibit 1, which Assignee, Company, or any designee of any of the foregoing may, at any time after receipt by Assignors of the Purchase Price, provide to any other person as evidence of this Assignment.

4.    This Assignment and any dispute, controversy or claim (whether or not arising out of or in connection with this Assignment) between Assignors and Assignee shall be governed by and construed in accordance with the laws of the State of Wyoming, without reference to conflicts of laws and shall waive any right to trial by jury. Nothing shall limit the right of Assignee to bring any action or proceeding in the courts of any other jurisdiction if necessary or convenient to effect the relief sought.

5.    Assignors agree to indemnify and hold Assignee, and Assignee agrees to indemnify

and hold Assignors, harmless from and against all losses, costs, damages, liabilities and expenses, including, without limitation, in-house and outside attorneys' fees and disbursements, incurred in connection with this Assignment or the transactions contemplated hereby, or enforcing the obligations of Assignors and Assignee under this Assignment, or in exercising any rights or remedies of Assignor or Assignee or in the prosecution or defense of any action or proceeding concerning any matter arising under or in connection with this Assignment. Upon the date of this Agreement, Assignors and Assignee, for themselves, as well as their members, officers, agents, representatives, and attorneys, mutually release and discharge each other from any and all claims, known or unknown, from the beginning of time until this day.

      6.    Electronic and/or facsimile signatures on this Assignment shall be effective for all purposes.

      7.    Assignor's wire instructions are as set forth below:

**The Klein Law Firm LLC Attorney Trust Account**
**ADDRESS:** 233 Benjamin St., Toms River, New Jersey 08755

**LAKELAND BANK**
**ACCOUNT #:** 664403398
**ROUTING #:** 021205376

**ASSIGNORS:**

**QUEEN FUNDING, LLC**

By: _____

Its:  Managing Member_____

**COBALT FUNDING SOLUTIONS, LLC**

By: _____

Its:  Managing Member_____

## EXHIBIT 1

[Evidence of Assignment attached]

### Evidence of Assignment

To Whom It May Concern:

      Reference is made to that certain UCC financing statement, filing number U210050853928, filed with the California Secretary of State on May 28, 2021, respectively, against Bat, Inc. and The Litigation Practice Group PC (together as "Company") and Daniel Stephen March ("UCC Financing Statements").

      Queen Funding, LLC and Cobalt Funding Solutions, LLC (together, the "Assignors") hereby confirm that in connection with that certain Assignment of UCC Financing Agreements, dated as of February _____, 2022, between Assignors and Bae Enterprises, Inc. ("Assignee"), (i) Assignors have sold, transferred and assigned all of their rights, titles and interests in the UCC Financing Statements to Assignee, (ii) Assignors no longer have any rights or interest in the UCC Financing Statements, and (iii) this Evidence of Assignment may be relied upon by any person as evidence of the foregoing.

ASSIGNORS:

QUEEN FUNDING, LLC

By: _____

Its: _Managing Member_____

COBALT FUNDING SOLUTIONS, LLC

By: _____

Its: _Managing Member_____

Signature: _Daniel S. March___
Daniel S. March (Feb 11, 2022 10:09 PST)

**Email:** admin@lpglaw.com

Signature: _____
Tony Diab (Feb 11, 2022 10:47 PST)

**Email:** tony@coastprocessing.com

13

# Settlement Agreement Draft_ACC edits -2-11

Final Audit Report                                                      2022-02-11

| | |
|---|---|
| Created: | 2022-02-11 |
| By: | Ashlee Colonna Cohen (ashleecohenesq@gmail.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA-6GeEbPxFWens-iFq4E-giOfoaswP81T |

## "Settlement Agreement Draft_ACC edits -2-11" History

Document created by Ashlee Colonna Cohen (ashleecohenesq@gmail.com)
2022-02-11 - 5:43:34 PM GMT- IP address: 190.167.196.210

Document emailed to Daniel S. March (admin@lpglaw.com) for signature
2022-02-11 - 5:44:22 PM GMT

Email viewed by Daniel S. March (admin@lpglaw.com)
2022-02-11 - 6:08:38 PM GMT- IP address: 70.181.82.230

Document e-signed by Daniel S. March (admin@lpglaw.com)
Signature Date: 2022-02-11 - 6:09:17 PM GMT - Time Source: server- IP address: 70.181.82.230

Document emailed to Tony Diab (tony@coastprocessing.com) for signature
2022-02-11 - 6:09:19 PM GMT

Email viewed by Tony Diab (tony@coastprocessing.com)
2022-02-11 - 6:47:10 PM GMT- IP address: 66.249.84.27

Document e-signed by Tony Diab (tony@coastprocessing.com)
Signature Date: 2022-02-11 - 6:47:51 PM GMT - Time Source: server- IP address: 70.181.82.230

Agreement completed.
2022-02-11 - 6:47:51 PM GMT



EXHIBIT 1, PAGE 84

# EXHIBIT 6

February 7, 2023

Bae Enterprises Inc.
1309 Coffeen Ave
Ste 1200
Sheridan, WY 82801

Azzure Capital LLC
1820 Avenue M
Ste 695
Brooklyn, NY 11230

**Re:** **Assignment of UCC1 Financing Statements and Evidence of Assignment of
File Number U21005083928, filed date May 28, 2021**

To Whom it May Concern –

This assignment of UCC1 Financing Statement ("Assignment") executed and delivered as
of February 6, 2023, by Bae Enterprises, Inc. (an "Assignor") to Azzure Capital LLC
("Assignee").

RECITALS:

Assignee desires to purchase from Assignor, and Assignor has agreed to sell and assign their
respective UCC financing statements filed against The Litigation Practice Group PC,
("Company") and Daniel Stephen March, and as more specifically described as filing number
U210050853928, filed with the California Secretary of State on May 28, 2021, respectively
("UCC Financing Statement"), and all of Assignor's rights under the UCC Financing Statements,
including without limitation any and all collateral secured by the UCC financing Statements as
consideration for the loan issued by Assignee in favor of Assignor.

For good and valuable consideration, the receipt and adequacy of which is acknowledged,
Assignor agrees as follows:

1. Contemporaneously with the execution of this Agreement,

(a) Assignor sells, transfers and assigns to Assignee the UCC Financing Statements and all of
Assignor's rights, title, and interest under the UCC Financing Statements; and

(b) Assignee is authorized to file a UCC-3 assignment, assigning from Assignor to Assignee the
UCC Financing Statements.

2. Assignor represents and warrants to Assignee that (i) each Assignor's exact legal name is as
set forth in the preamble above, and (ii) Assignors has not sold, assigned, or transferred the UCC

Financing Statement to any other party. The sale, transfer and assignment is made without recourse, representations or warranties of any kind, except as set forth above.

3. Assignor shall execute the Evidence of Assignment attached hereto, which Assignee, Company, or any designee of any of the foregoing may, at any time after receipt by Assignor of the Purchase Price, provide to any other person as evidence of this Assignment.

4. This Assignment and any dispute, controversy or claim (whether or not arising out of or in connection with this Assignment) between Assignor and Assignee shall be governed by and construed in accordance with the laws of the State of New York, without reference to conflicts of laws and shall waive any right to trial by jury. Nothing shall limit the right of Assignee to bring any action or proceeding in the courts of any other jurisdiction if necessary or convenient to effect the relief sought.

5. Assignor agrees to indemnify and hold Assignee, and Assignee agrees to indemnify and hold Assignor, harmless from and against all losses, costs, damages, liabilities and expenses, including, without limitation, in-house and outside attorneys' fees and disbursements, incurred in connection with this Assignment or the transactions contemplated hereby, or enforcing the obligations of Assignors and Assignee under this Assignment, or in exercising any rights or remedies of Assignor or Assignee or in the prosecution or defense of any action or proceeding concerning any matter arising under or in connection with this Assignment. Upon the date of this Agreement, Assignor and Assignee, for themselves, as well as their members, officers, agents, representatives, and attorneys, mutually release and discharge each other from any and all claims, known or unknown, from the beginning of time until this day.

6. Electronic and/or facsimile signatures on this Assignment shall be effective for all purposes.

7. Assignee affirms that the balance due to Assignee by The Litigation Practice Group PC at the time of this assignment is $3,536,850.00.


Assignor: Bae Enterprises, Inc.

By: _____
Bianca Loli
Its: CEO

## Evidence of Assignment

To Whom it May Concern:

Reference is made to that certain UCC financing statement, filing number U210050853928, filed with the California Secretary of State on May 28, 2021, respectively, against Bat, Inc. and The Litigation Practice Group PC (together as "Company") and Daniel Stephen March ("UCC Financing Statements").

Bae Enterprises, Inc. (the "Assignor") hereby confirms that in connection with that certain Assignment of UCC Financing Agreements, dated as of February 6, 2023, between Assignor and Azzure Capital LLC ("Assignee"), (i) Assignors have sold, transferred and assigned all of their rights, titles and interests in the UCC Financing Statements to Assignee, (ii) Assignors no longer have any rights or interest in the UCC Financing Statements, and (iii) this Evidence of Assignment may be relied upon by any person as evidence of the foregoing.

Assignor: Bae Enterprises, Inc.

By: _____
Bianca Loli
Its: CEO

## Acknowledgment of Assignment

The Litigation Practice Group PC ("LPG") hereby acknowledges and affirms this assignment of the senior secured, first-priority interest in its accounts receivable in the amount of $3,536,850.00, this obligation being accurate, outstanding, and immediately due and payable as of February 6, 2023.

The Litigation Practice Group PC

By: _____
Daniel S. March
Its: Managing Shareholder

**EXHIBIT 2**

1              UNITED STATES BANKRUPTCY COURT

2          CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA

3                       --oOo--

4   In Re:                    )  Case No. 8:23-bk-10571-SC
                              )
5   THE LITIGATION PRACTICE   )
    GROUP, P.C.,              )  Chapter 11
6                             )
    Debtor,                   )  Santa Ana, California
7                             )  Wednesday, 1:30 P.M.
    --------------------------)  September 13, 2023
8

9                               HEARING RE: MOTION TO
                                APPROVE COMPROMISE BETWEEN
10                              TRUSTEE AND AZZURE
                                CAPITAL, LLC
11
                   TRANSCRIPT OF PROCEEDINGS
12          BEFORE THE HONORABLE SCOTT CLARKSON
               UNITED STATES BANKRUPTCY JUDGE
13

14  APPEARANCES:

15  For the Chapter 11      D. EDWARD HAYS, ESQ.
    Trustee:                Marshack Hays, LLP
16                          870 Roosevelt
                            Irvine, California  92620
17
    For OHP-CDR, LP;        RAZMIG Y. IZAKELIAN, ESQ.
18  PurchaseCo 80, LLC:     ERIC WINSTON, ESQ.
                            Quinn Emanuel Urquhart &
19                            Sullivan, LLP
                            865 South Figueroa Street
20                          10th Floor
                            Los Angeles, California  90017
21
    For Fundura Capital     MITCHELL B. LUDWIG, ESQ.
22  Group:                  Knapp Petersen & Clarke
                            550 North Brand Boulevard
23                          Suite #1500
                            Glendale, California  91203
24
    Proceedings produced by electronic sound recording;
25  transcript produced by transcription service.



P 888.272.0022 F 818.343.7119                www.benhyatt.com

```
 1   For the Official          KEITH C. OWENS, ESQ.
     Committee of Unsecured    Fox Rothschild, LLP
 2   Creditors:               10250 Constellation Boulevard
                               Suite #900
 3                             Los Angeles, California  90067

 4   For Debt Validation Fund  RICHARD GOLUBOW, ESQ.
     II, LLC; MC DVI Fund 1,   Winthrop Golubow Hollander, LLP
 5   LLC; MC DVI Fund 2, LLC   1301 Dove Street
                               Suite #500
 6                             Newport Beach, California  92660

 7   For Azzure Capital:       SHARON WEISS, ESQ.
                               GRETCHEN E. VAN DWINGELO, ESQ.
 8                             Bryan Cave Leighton Paisner
                               One Wells Fargo Center
 9                             301 South College Street
                               Suite #2150
10                             Charlotte, North Carolina  28202

11   Court Recorder:           Sally Daniels
                               U.S. Bankruptcy Court
12                             Central District of California
                               Ronald Reagan Federal Building and
13                             United States Courthouse
                               411 West Fourth Street
14                             Santa Ana, California  92701-4593
                               (855) 460-9641
15
     Court Transcriptionist:   Ruth Ann Hager, C.E.T.**D-641
16                             Ben Hyatt Certified Deposition
                                 Reporters
17                             17835 Ventura Boulevard
                               Suite #310
18                             Encino, California  91316

19

20

21

22

23

24

25
```

P 888.272.0022  F 818.343.7119



www.benhyatt.com

Page                                                                           3

1      SANTA ANA, CALIFORNIA, WEDNESDAY, SEPTEMBER 13, 2023

2                           2:07 P.M.

3                            --oOo—

4           THE COURT:  Let's call item #35, The Litigation

5      Practice Group, status conference.  May I have --

6           MR. HAYS:  Is it a status conference or a motion

7      to approve compromise?

8           THE COURT:  I'm sorry.  You're right.  #35.00 is

9      the motion to approve the compromise.

10          MR. HAYS:  Good afternoon, Your Honor.  For the

11     Trustee and moving party, Ed Hays of Marshack Hays Wood.

12          MR. IZAKELIAN:  Good afternoon, Your Honor.

13     Razmig Izakelian from Quinn Emanuel Urquhart & Sullivan,

14     for OHP-CDR, LP and PurchaseCo 80, LLC.  Eric Winston from

15     Quinn Emanuel is also on the speaker.

16          THE COURT:  Thank you.

17          MR. LUDWIG:  Good morning, Your Honor -- good

18     afternoon, Your Honor.  Mitchell Ludwig for creditor

19     Fundura Capital Group and I apologize for the interruption.

20          THE COURT:  It sounds like a technical problem to

21     me.  That was all.

22          MR. LUDWIG:  Yeah, two buttons on my computer.

23     One was set off, the other was not.  I apologize, Your

24     Honor.

25          THE COURT:  Well, that explains the technical

Page                                                            4

1  problem.  Thank you.

2            MR. OWENS:  Good afternoon, Your Honor.  Keith

3  Owens of Fox Rothschild appearing on behalf of the Official

4  Committee of Unsecured Creditors.

5            THE COURT:  Salute.

6            (Simultaneous conversation.)

7            THE COURT:  Mr. Golubow.

8            MR. GOLUBOW:  Richard Golubow of Winthrop Golubow

9  Hollander appearing on behalf of Debt Validation Fund II,

10 MC DVI Fund 1 and MC DVI Fund 2.

11           THE COURT:  Good afternoon.

12           MS. WEISS:  Good afternoon, Your Honor.

13           THE COURT:  Ms. Weiss.

14           MS. WEISS:  Thank you.  Sharon Weiss and

15 Gretchen -- I'm not going to say this right -- von Dwingelo

16 from Bryan Cave Leighton Paisner on behalf of Azzure

17 Capital.

18           Your Honor, I'm having a problem getting on

19 screen.  I'm working on it.  I'll be on screen as soon as

20 I'm able.

21           THE COURT:  We will stand by.  On the other hand,

22 your tile is fine.  We know who you are and we see your

23 title, thank you.

24           MR. WEISS:  Thank you, Your Honor.

25           THE COURT:  Anyone else?

Page                                                                      5

1              (No response.)

2              Mr. Hays, please proceed.

3              MR. HAYS:  Thank you, Your Honor.

4              What's presented to the Court today is a proposed

5    compromise between the Trustee and a creditor named Azzure

6    purported to be secured.  The Trustee investigated the

7    perfection issue of Azzure's claim and identified that

8    Azzure did not file its own UCC-1 to perfect its lien that

9    it obtained when it entered into its agreement with the

10   debtor.

11             Instead, Azzure took assignment of a previously

12   filed UCC-1 that was originally in favor of a lender named

13   Cobalt.  So the Trustee and his special counsel did a lot

14   of legal research and investigation and the question of

15   whether an assignment of a previous UCC-1 can secure a new

16   lien seemed to be pretty much a question of first

17   impression.  But the Trustee did identify a couple of cases

18   in which the courts approved that this was a proper

19   perfection because the UCC-1 in issue was never terminated

20   and it remained outstanding, and any creditor wanting to

21   make a loan to the debtor was charged with notice of

22   that -- of record UCC-1.

23             And so the Trustee determined that a likelihood

24   of prevailing was maybe at best 50/50 and the Trustee was

25   concerned about the administrative costs of litigating the

Page                                                                6

1  issue, the delays that would result to the estate from

2  litigating the issue and the Trustee decided that because

3  he could settle the claim by getting Azzure to reduce its

4  claimed 5.1 million dollars to a 3.5 million dollars on

5  condition that the Trustee settle the perfection issue and

6  allow the claim as an allowed secured claim.  In exchange,

7  Azzure agreed that it would take 1.9 million of the 3.5 and

8  the Trustee would avoid, recover and preserve 1.6 million

9  of the allowed secured claim out of that 3.5.

10          The issue to be settled by the compromise was the

11  perfection issue and if the Court approves the compromise

12  the Trustee with -- who's the only party withstanding to

13  seek to avoid a lien is unperfected.

14          If the Court approves this compromise after

15  notice to all creditors and, you know, we have an objection

16  here by OHP, then that issue is forever resolved and claim

17  preclusion or *res judicata* would result from the Court

18  approving this proposed compromise.

19          Azzure's recourse is under 9019 to oppose the

20  settlement as not fair and equitable are to try to

21  establish the A&C factors were not satisfied by the

22  Trustee.  In its opposition all it basically does, is

23  identify the issue that the Trustee was settling.  It

24  doesn't purport to argue how this is not fair or not

25  equitable or that the proposed compromise does not satisfy

P 888.272.0022  F 818.343.7119        BEN HYATT        www.benhyatt.com
                                    Certified Deposition Reporters

EXHIBIT 2, PAGE 94

Page                                                                                    7

1   the A&C factors.

2        So what the Trustee would like this court to do

3   is approve the proposed compromise by recognizing that the

4   perfection issue is resolved and the date of the Azzure

5   lien, which, you know, I can find here.  I think it's in --

6   shoot, I have it.  I'm sorry, Your Honor.

7        THE COURT:  I have the date.  I have the date.

8        MR. HAYS:  Okay.  January 25 -- or I'm sorry.

9   You have the date.  But whatever that date is, then that

10  issue is resolved and anybody whose perfection arose after

11  that date would be junior to that claim, and anybody whose

12  perfection arose prior to that date, such as Mr. Ludwig's

13  client who popped up about 48 hours ago, then if their

14  claim is an allowed claim, then they would have seniority

15  over it.

16       So we're not asking the Court to say that the

17  Azzure lien would be in first position or second position

18  or tenth position.  We're just correct -- asking the Court

19  to recognize that the perfection issue is settled and that

20  perfection issue would be binding on creditors, I believe

21  it was, two days ago.  OHP filed an adversary commenced

22  against the Trustee in Azzure alleging -- seeking a

23  determination as to the priority of its lien as against the

24  Azzure lien.  We don't believe that that's an appropriate

25  thing to be doing if the Court approved the compromise as

Page                                                                    8

1  proposed.

2         And the other issue that I would like to bring to

3  the Court's attention -- and it was in our brief -- is that

4  OHP's lien is a preference.  Their documentation was signed

5  on September 1st of 2022.  They funded their obligations

6  under those documents on September 2 of 2022 and we now

7  have the debtor's bank records confirming the receipt of

8  the approximate 6.2 or 6.3 million dollars that they

9  allege, but they didn't file their UCC-1 until January 25

10 of 2023.  So their lien is clearly a preference and, you

11 know, this whole fight is, I really think, a much ado about

12 nothing, because unless they have some defense -- and we've

13 asked them for a defense and they've never offered us a

14 defense -- unless they have a defense, we're going to

15 avoid, recover and preserve that lien, as well as being a

16 preferential transfer.  And the estate will step into its

17 shoes and the estate doesn't need to have this priority

18 issue, you know, resolved by way of some separate adversary

19 or anything else.

20        And so we believe that the A&C factors, including

21 probability of success have been satisfied given what we

22 found was case law recognizing an assignment can service

23 perfection, supports the settlement.  The difficulties in

24 collection factors, we don't believe is applicable.  The

25 complexity expense and delay factor of the A&C test we



P 888.272.0022  F 818.343.7119                              www.benhyatt.com
BEN HYATT
Certified Deposition Reporters

EXHIBIT 2, PAGE 96

Page                                                                    9

1  believe has been more than satisfied.  The legal issue

2  appears to be a question of first impression in this

3  circuit.  There are very few published cases.  The delay

4  and expense of litigating this issue would be substantial

5  and ultimately the paramount interests of creditors are

6  satisfied because the Trustee in his business judgment has

7  determined rather than litigate the all or nothing against

8  Azzure and potentially have a 5.1 million-dollar secured

9  claim, the Trustee has gotten that claim reduced to a 3.5

10 million-dollar secured claim.  And of that amount, the

11 estate will be getting 1.6 million and Azzure will be

12 getting 1.9.

13         So we believe that the test to approve the

14 settlement has been satisfied and that the OHP opposition

15 fails to present evidence or law as to why the Court should

16 not approve this settlement with this determination that

17 the Azzure lien, the issue of whether Azzure's lien is

18 perfected is now fully and finally resolved for purposes of

19 this bankruptcy case and we'd ask the Court to approve the

20 settlement.

21         THE COURT:  Thank you, Mr. Hays.  For the record,

22 I probably misheard you, but I want to make sure that even

23 if I misheard that, the record is correct.

24         I thought I heard you misstate that Azzure filed

25 an objection and that OHP was not the objecting party.  I

Page                                                                    10

1  understand -- I know that Azzure Capital, in fact, favors

2  the settlement and, in fact, they replied to the OHP-CDR,

3  LP and PurchaseCo 80, LLC limited objection.

4          And I may have misheard you, but I wanted to make

5  sure that the parties and anyone reviewing this transcript

6  were very clear.

7          MR. HAYS:  If I said that, Your Honor, it was

8  completely in error.  The only opposition we know of is the

9  OHP opposition and Fundura did file a limited reservation

10 of rights, if you will, I believe yesterday afternoon.

11 They're not opposed to the settlement, but it is OHP that

12 is the sole objecting party.

13         THE COURT:  Yes.  And so that everyone

14 understands, even those of newly arriving pleadings --

15 which were quite welcome, by the way -- were completely

16 read and considered and completely understood by this

17 Court, so I'll just make sure we say that.

18         Ms. Weiss, your client has filed a reply to the

19 limited objection to the motion of OHP-CDR.  Do you have

20 anything else to add?

21         MS. WEISS:  Excuse me, Your Honor.  Yes.  Thank

22 you for accommodating my technical difficulty.  Again,

23 Sharon Weiss on behalf of Azzure Capital.

24         We absolutely join in the motion and the reply

25 filed by the Trustee.  I did want to emphasize a couple of

Page                                                                11

1  different points, if I may.

2          First, Mr. Hays is right that the issue being

3  compromised is the perfection issue in itself.  To that

4  end, I will tell you from personal experience that this

5  issue is extremely complex.  It is way more complex than

6  anybody -- it's more complex than it looks from the face of

7  it because it's a little counter-intuitive to us bankruptcy

8  lawyers, but the UCC lawyer seemed to be able to parse

9  through it.

10         My firm spent quite a lot of time investigating

11 this issue.  I know that the Trustee's special counsel

12 spent quite a bit of time investigating the issue and the

13 Committee counsel also -- who has filed papers in support

14 of the 9019, also investigated this issue.

15         So I will also tell you that these negotiations

16 were not easy.  These -- this was not, you know, hey, let's

17 sit around a table and make a deal.  These negotiations

18 lasted over days, maybe even weeks, that were extended when

19 we brought in the Committee to join into those

20 conversations.  And so the benefit -- that is just a symbol

21 of how contentious the litigation would be if the

22 negotiations among professionals who know each other very

23 well lasted that long.

24         So I just wanted to stress to the Court that the

25 expense to the estate, the arm's length nature of these

Page                                                                    12

1  negotiations was very present on this very complex issue

2  and that Azzure Capital would not enter into this

3  compromise if it is going to have to litigate this issue --

4  perfection issue with anybody else.  So if that is not

5  understood to be part of this order, then Azure does not

6  consider this compromise or the settlement to be approved

7  and we will be back to litigation.

8          THE COURT:  Ms. Weiss, I want to amplify what

9  you've just said.  This Court when reviewing all of the

10  documents and the settlement agreement and then applying

11  all of that to the A&C factors actually had to look under

12  the hood, as they say, to the issues that to normal

13  bankruptcy attorneys sometimes get a little lost.  I had to

14  go through and understand almost completely now the lien

15  issues and the UCC issues and state law issues and actually

16  tried to find cases with respect to this matter on the

17  state and national level.

18          So I amplify your statement of how complex this

19  is, but I want you to understand that I took exceedingly

20  careful and painful analysis of research that required me

21  to understand what was being settled, why it was being

22  settled and analyzed the A&C factors, but especially the

23  risk factors that are required to be reviewed and the

24  collection activities also and to also look at the

25  compromise in the view of what is most beneficial to the

Page                                                                13

1  estate.

2        I've looked at all of those A&C factors, so I

3  wanted to just tell you that this Court has taken a look at

4  all of this.  Now --

5        MS. WEISS:  Thank you, Your Honor.  We all

6  collectively agreed that this was an interesting issue to

7  try and that you'd be the right judge to do that in

8  practum, but we decided that --

9        THE COURT:  No, no.  I'd be totally the wrong

10 judge.  I know too much now.

11       MS. WEISS:  Yeah, but it is a good --

12       THE COURT:  So let's hear from --

13       MS. WEISS:  -- settlement.

14       THE COURT:  Let's hear from OSP-CDR

15 representatives and other parties who oppose, even under a

16 limited circumstance the settlement.

17       MR. IZAKELIAN:  Good afternoon again, Your Honor.

18 It's Razmig Izakelian from Quinn Emanuel for OHP-CDR and

19 PurchaseCo.

20       We have a very odd circumstance I think here.

21 The motion asks for approval of a settlement between the

22 estate and the purported secured creditor, but the motion

23 itself was very unclear on what the priority issue was.  So

24 the motion was literally requesting first priority, but on

25 pages 2 and 5 of the motion it actually only said that

Page                                                                14

1  Azzure would be paid ahead of unsecured administrative

2  claims of the post-petition lenders.

3           Now, it didn't mention any other secured claims

4  in the motion.  It didn't talk about OHP's liens.  It

5  didn't talk about -- the Trustee hadn't objected to OHP's

6  claim.  And of course, the FRBP 7012 says that the priority

7  lien has to be decided by an adversary proceeding.

8           So taking all this together, when we read the

9  motion we thought that this was a compromise of the amount

10  of the secured claim and that the priority issues among

11  secured creditors were still going to be open.

12          THE COURT:  May I make an observation?

13          MR. IZAKELIAN:  Yes, of course, Your Honor.

14          THE COURT:  If you didn't look at that issue, you

15  would be committing malpractice.

16          MR. IZAKELIAN:  I understand, Your Honor.

17          THE COURT:  You know, I looked at it, too, and I

18  wanted to tell you, you have -- you owe no one any

19  explanations for your opposition or your explanation or

20  your encouragement to get down to the bottom line on this.

21  You absolutely identified an issue that was important to

22  your client and others and me.  So I wanted to tell you how

23  much I appreciate that.

24          MR. IZAKELIAN:  I appreciate that, Your Honor.

25          So the other issues that the motion did not

EXHIBIT 2, PAGE 102

Page                                                                    15

1   address is the issue of ownership of certain of LPG's

2   receivables.  As Your Honor knows by now and as the Trustee

3   has alleged in the alter ego complaint, I'll call it, LPG

4   sold certain of its receivables pre-petition.

5   PurchaseCo -- our position is that PurchaseCo owns a

6   substantial portion of those receivables and pursuant to

7   the sale order that the Court entered, there's a

8   reservation of rights.  They passed (phonetic) the sale

9   proceeds.  The Trustee has his defenses and objections.

10          Now, the motion didn't say when payment would be

11  made or what funds would be used to make such payment.  So

12  that was the other issue that we identified and we were

13  concerned about.

14          THE COURT:  Well, hold on.  Payments to who?

15          MR. IZAKELIAN:  To Azzure.

16          THE COURT:  Okay.

17          MR. IZAKELIAN:  So we reached out to the Trustee

18  to hopefully clarify these issues, but we didn't hear back

19  in time, so we filed brief objections just outlining that

20  any priority ownership issues out there as a result by an

21  adversary to the extent that it would be resolved by

22  motion, which we thought it wasn't.

23          So then the Trustee came back with the reply and

24  that's when we understood what the Trustee was really

25  asking for here.  It's when he showed his cards.

Page                                                              16

1   (Indiscernible) read the reply and the Trustee explicitly

2   said now the purpose of the settlement is to immediately

3   say Azzure -- the compromise amount and then to use funds

4   without giving other lienholders attempt to argue their

5   priorities.

6           THE COURT:  Well, stop right there.  To use

7   funds.  What funds are you referring to?

8           MR. IZAKELIAN:  I'm assuming that the Trustee has

9   estate funds, but there is a dispute here about whether a

10  substantial portion of those funds are actually estate

11  funds.

12          THE COURT:  You mean, the 1.3 million that is

13  being carved out by --

14          MR. IZAKELIAN:  Yes.

15          THE COURT:  -- (indiscernible)?

16          MR. IZAKELIAN:  The one point --

17          THE COURT:  One --

18          MR. IZAKELIAN:  Well, it would be 1.9 million to

19  Azure and then the additional 1.6 million that the

20  Trustee --

21          THE COURT:  That's right, 1.6 million.  But

22  that's recovered on behalf of the estate, correct?

23          MR. IZAKELIAN:  It's recovered on behalf of the

24  estate, but --

25          THE COURT:  Yeah.  And so you don't have a say in

Page                                                                  17

1    that.

2           MR. IZAKELIAN:  Well, to the extent that the

3    amount there is actually going to be paid with sale

4    proceeds, the 1.9 million to Azzure, to the extent that

5    those sale proceeds are owned by PurchaseCo, I don't think

6    the Trustee could use that.  And we have an open issue with

7    the Trustee to -- oh, the ownership dispute.  I understand

8    that, but --

9           THE COURT:  Well, you understand that Ms. Weiss's

10   clients have -- until I approve this settlement -- a lien

11   on all of that money.

12          MR. IZAKELIAN:  Yes, and OHP has a lien on all

13   that, too, as of now.  I understand that the Trustee has

14   raised preference issues and the Trustee hasn't actually

15   brought a preference action yet --

16          THE COURT:  No, I understand.  But Azzure has a

17   current lien of about five million.

18          MR. IZAKELIAN:  Yes, and OHP has a current lien

19   of about 9.8 million, I think, maybe 9.5 mil.  That's

20   right.

21          THE COURT:  And the fact is part of that money is

22   being recovered for the estate's purpose, not for your

23   client's purpose.  Another point is, you can't improve your

24   position on a situation like this.

25          MR. IZAKELIAN:  Exactly.  And the Trustee can't



Page                                                                        18

1   improve his position either, which is our point.  The

2   Trustee cited Section 551 in the reply, but if the Trustee

3   is to avoid the lien, he steps into Azzure's shoes with

4   respect to the priority.  So if Azzure is two years to OHC,

5   then the Trustee recovers two years to OHC.

6            So -- yeah.  So continuing, Your Honor, another

7   major issue that we identified, there's a real mismatch in

8   between what the Trustee and Azzure are pleading and now

9   what the settlement agreement actually says.

10           So the Trustee is now arguing that this

11  settlement resolves a perfection issue and if the

12  settlement is approved then perfection is as of May 20,

13  2021.

14           But the settlement agreement itself bears a

15  recital in there that there's a dispute over perfection,

16  but the actual terms of the settlement don't say when the

17  Azzure lien is actually perfected.  So if the Court were to

18  approve the settlement I don't know that that actually says

19  that Azzure was perfected as of X date.

20           THE COURT:  Well, let's find out.

21           Mr. Hays?

22           MR. HAYS:  Yes, Your Honor, I think the

23  settlement agreement is quite clear in recital C on the

24  settlement agreement, which is page 16 of 102 on the motion

25  with the court docket stamp.  It says:

Page                                                                    19

1          "Azzure asserts the security interest was

2      perfected by the assignment of the already filed UCC-1

3      that was filed on May 28, 2021."

4          And then it identifies that the Trustee disputes

5   that security interest as having been properly perfected.

6   And then the settlement agreement goes on to say in the

7   actual terms in paragraph 1(a) that if approved by the

8   Court:

9          "Azzure will have an allowed secured claim in the

10      total amount of 3.5 million dollars so the perfection

11      issue will no longer be an issue because it will be an

12      allowed secured claim."

13          And then it goes on in paragraph 1(c) to talk

14   about the priority of the compromised secured claim and

15   that part of the agreement says it's believed by the

16   parties to be first in priority with respect to other debts

17   and liabilities of the estate.  The reason we use the word

18   "believed to be" was there's some outstanding issue as

19   evidenced by the fact that Fundura jumped up two days ago

20   and, you know, there might be other senior claims.

21          But it was certainly the intent that it would --

22   that this issue was going to result in perfection as of the

23   May 28, 2021 date and that the parties thought that would

24   put it in first position, which would be ahead of OHP's

25   lien that was perfected in January of 2023.

Page                                                                          20

1          And then third, I think the settlement agreement

2    makes very clear that the par -- in paragraph 1(e) that:

3          "The parties generally release and fully

4          discharge each other from any and all claims arising

5          from the Azzure loan and that the release will be

6          binding upon the debtor and the debtor's estate."

7          And so the settlement -- in paragraph 1(f)

8    there's a 1542 waiver.  Settlement is very clear that the

9    perfection issue was getting resolved and settled with the

10   claim to be an allowed secured claim and that the agreement

11   would be binding upon not just the Trustee but also the

12   estate.

13         So I think that the settlement agreement makes it

14   very, very clear what was being settled and obviously if

15   there is a lien that was perfected prior to the date of the

16   Azzure lien on May 28, 2021 if their claim is allowed

17   invalid, it will have seniority.  But anybody who perfects

18   after May 28, 2021, which includes OHP until the Trustee

19   voids that lien and steps into its shoes because of the

20   preferential nature of that transfer, then all of those

21   junior lenders will be junior.  But this is exactly what

22   the settlement agreement was designed to do was resolve

23   this particular issue.

24         And I have some other comments to what

25   Mr. Izakelian said, but I wanted to answer the Court's



P 888.272.0022  F 818.343.7119    www.benhyatt.com

EXHIBIT 2, PAGE 108

Page                                                                     21

1  specific question first and --

2          THE COURT:  Well, I didn't want to interrupt him

3  too much.  What I wanted to do was get an answer to that

4  issue.

5          MR. HAYS:  Yes, understand.

6          THE COURT:  And you've solved that.

7          Let's go back now and let you continue with your

8  analysis.

9          MR. IZAKELIAN:  Sure.  So in addition to that,

10  the fundamental issue here, Your Honor, is that Bankruptcy

11  Rule 7012 requires an adversary proceeding to determine the

12  priority of the lien.

13          THE COURT:  Right.

14          MR. IZAKELIAN:  The Ninth Circuit has said that

15  parties are entitled to rely on these rules and that

16  they -- the priority lien cannot be resolved by a contested

17  matter.

18          THE COURT:  And did you file an adversary

19  proceeding?

20          MR. IZAKELIAN:  We have filed an adversary.

21          THE COURT:  And do you expect to have a ruling on

22  that adversary proceeding?

23          MR. IZAKELIAN:  In --

24          THE COURT:  Anytime?  Do you anticipate that

25  there will be a ruling on that adversary proceeding?

Page                                                        22

1          MR. IZAKELIAN:  If we cannot resolve --

2          THE COURT:  It's a rhetorical question.  Of

3  course you will.

4          MR. IZAKELIAN:  Yes.  Yes, of course, Your Honor.

5          THE COURT:  Okay.  So you're -- you have filed an

6  action against the Trustee and against the estate with

7  respect to determining what your priority is, correct?

8          MR. IZAKELIAN:  Against the estate and Azzure,

9  Your Honor, because our current dispute is with the estate

10 and Assure.  We haven't had a discussion with Fundura yet

11 and on --

12         THE COURT:  What -- now, explain to me, what is

13 at risk with respect to your client with that adversary

14 proceeding falling on the side of the estate and then I'm

15 going to ask you what's your upside.

16         MR. IZAKELIAN:  So the risk there, Your Honor,

17 and I think you identified the -- I think I understand what

18 you're driving at --

19         THE COURT:  Yeah.

20         MR. IZAKELIAN:  -- and there is a benefit to the

21 Trustee to finding OHP in first position because if the

22 Trustee is correct that OHP's lien is voidable as a

23 preference, then the Trustee could step into OHP's shoes in

24 first position as against debtor (phonetic).

25         I haven't seen a discussion of that or an



P 888.272.0022  F 818.343.7119     www.benhyatt.com

EXHIBIT 2, PAGE 110

Page                                                                                      23

1   analysis of that by the Trustee, neither the motion or the

2   reply.  And given the size of OHP lien that is an ultimate

3   bigger benefit to the estate because it's nine-point

4   something million at this point, as opposed to Azzure's

5   which was asserted at around five (indiscernible).

6          THE COURT:  Okay.  But what I'm trying to get

7   at -- I appreciate those comments and I believe Mr. Hays

8   does, too, but what I'm trying to get at is this question.

9   How does approval of this settlement today affect your

10  client if you were to prevail on the priority litigation?

11         MR. IZAKELIAN:  So our position is that it should

12  not affect our client because priority cannot be resolved

13  on the contested matter on --

14         THE COURT:  Nobody is seeking in this contested

15  matter to address the priority, I don't believe.

16         Mr. Hays, am I right about that?

17         MR. HAYS:  I actually don't think that's entirely

18  accurate, Your Honor.  What we want the Court to approve

19  are -- or enter an order that recognizes the perfection

20  issue is settled.  And any challenge to Azzure's perfection

21  is released and that settlement results in Azzure having a

22  properly perfected claim as of May 28, 2021, and the order

23  should specify that.

24         Therefore, anybody whose lien was perfected after

25  that date will be junior.  Anybody whose lien that was



EXHIBIT 2, PAGE 111

Page                                                                      24

1   perfected prior to that date will be senior and, as such,

2   because OHP's lien was admittedly perfected after that

3   date, it will be junior and it can't seek to collaterally

4   attack the effect of this settlement by relitigating the

5   perfection issue, which the Trustee was settled and

6   released that claim and the Trustee is the only party with

7   the standing to bring that claim to avoid the lien as being

8   unperfected.

9            Therefore, it will be *res judicata* on that issue

10  and it would, in essence, moot OHP's adversary seeking to

11  relitigate the perfection issue to establish its rights as

12  senior.  And to respond to Mr. Izakelian's comment that it

13  would benefit the estate to go litigate this issue, that is

14  just absolutely not correct because, as Ms. Weiss said,

15  there won't be a settlement if Azzure has to relitigate

16  this issue.  It entered into this settlement to get

17  finality on the perfection issue.  And if there's not

18  finality there, I'm afraid we don't have a settlement.  And

19  then the Trustee has already decided I don't want to

20  litigate the perfection issue because it's not in the best

21  interests of the estate.  Therefore, the Trustee won't be

22  asserting to advance OHP's lien rights as being senior

23  because it is a preference and they're still not saying

24  it's not a preference.  I think that's just really

25  screaming out to me.

EXHIBIT 2, PAGE 112

Page                                                                25

1              And that ultimately, all this is doing is

2    delaying the administration of this estate and putting at

3    risk the benefits that the Trustee is getting under this

4    settlement, which is reducing the amount of Azzure's claim

5    and getting 1.6 million for the estate.

6              THE COURT:  Mr. Izakelian, can you tell me when

7    your client's lien was perfected?

8              MR. IZAKELIAN:  It was perfected on January 25,

9    2023, I believe, when the Azzure transaction was entered in

10   early February 2023.

11             THE COURT:  Well, you added that on --

12             MR. IZAKELIAN:  Yes.

13             THE COURT:  -- so if you're disputing that the

14   Azzure lien wasn't perfected on May 28, 2021.

15             MR. IZAKELIAN:  So our concern here and the

16   reason we oppose the motion is -- I explain it right now --

17   we were concerned that the motion was going to affect our

18   priority rights and it wasn't clear whether it was doing

19   that or not.  I think it's clear now that the Trustee is

20   trying to essentially cut off our priority arguments

21   through a settlement of which we are not a party.

22             THE COURT:  Well, let me ask you this.  Why do

23   you think that the Azzure perfection was January 25, 2023?

24             MR. IZAKELIAN:  Well, we think the Azzure

25   perfection has happened at the earliest when Azzure entered

Page                                                                26

1  into the transaction.  There is case law out there that

2  says when a UCC financing statement is filed, when the

3  underlying obligation is paid off, the lien itself is

4  extinguished.  We understand that the underlying obligation

5  to Cobalt was paid off before the OHP transaction

6  September 20, '22.

7          So the ear -- so even if Azzure took an

8  assignment of this financing statement, it couldn't have

9  been effective until Azzure actually had an obligation

10 to -- until LPG actually had an obligation to Azzure to

11 back it up and that occurred after OHP financing statement.

12         THE COURT:  Ms. Weiss, how did we come up with

13 May 28, 2021 as the perfection date?

14         MS. WEISS:  So, Your Honor, in the Trustee's

15 motion there is legal authority that walks through the UCC

16 and the critical issue that we're addressing here is a

17 notice provision.  So while the Cobalt obligation was paid

18 off, the UCC itself was never terminated because as a non-

19 consumer UCC it's either expired by a term in five years

20 unless it's renewed, and it was under five years, or if

21 there's a payment the debtor can make a demand and 20 days

22 later it's authorized by the termination statement.

23         That's not what happened here.  So there was a

24 UCC of record that clearly split the debtor's name and put

25 parties on notice that there could be a debt.  So once

Page                                                                    27

1  Azzure stepped in and funded it, that UCC was valid and

2  there's no law that anyone is citing that said that the

3  priority is pushed back.  We're entitled to take that UCC

4  because it provided proper notice.  And all of this -- all

5  of the legal authority for this under the California UCC is

6  spelled out.

7         THE COURT:  And that's the research that I

8  undertook also independently.  And I did that --

9         MS. WEISS:  Research --

10        THE COURT:  -- because I anticipated objections

11 to that issue.  And so this isn't new to me.

12 Unfortunately, I -- you know, I have no Dodger game to

13 watch while I was doing it because the black out the games

14 and that's a pity.

15        But the fact is, I spent a whole lot of time

16 channeling Steven Weiss and trying to do the -- not talking

17 to him but channeling his methodologies and his expertise

18 and his report activity with our national conference.

19        MS. WEISS:  Your Honor, I was tempted to reach

20 out to him, too, but I had my colleague instead who was

21 thankfully able to walk through this.

22        THE COURT:  I appreciate OSC's comments -- I said

23 OSC.  That's not right.

24        MR. IZAKELIAN:  It's OHP, Your Honor.

25        THE COURT:  Yeah, OHC [*sic*], thank you.

Page                                                                    28

1          MR. IZAKELIAN:  So if I could respond briefly on

2   that point, Your Honor, they --

3          THE COURT:  Sure.

4          MR. IZAKELIAN:  I really have to emphasize here

5   that the financing statement supported another obligation

6   for a long period of time and there is ample case law out

7   there that says a financing statement is terminated, even

8   if no termination statement is filed, if the underlying

9   obligation is paid off.

10         We've alleged in the adversary proceeding that

11  the underlying obligation that supported that financing

12  statement was paid off before the OHP transaction.  And

13  again, this really just emphasizes the need for an

14  adversary proceeding here.

15         THE COURT:  I disagree entirely.  Your

16  priority -- you filed an action and you're going to be able

17  to deal with that.  But the fact is that this motion stands

18  on its own.  And I have to analyze the A&C factors, but I

19  also have to understand what the law is with respect to the

20  underlying principles of the settlement to try to determine

21  whether or not the A&C factors actually are met.  And I

22  don't -- I respectfully don't believe that your action that

23  was recently filed does that.  I don't think it's necessary

24  for the Court's analysis of the settlement because, again,

25  I have to look at a grouping of factors.  And one of them,

Page                                                                    29

1   of course, is -- you know, is there anything in this

2   settlement agreement that violates the law.

3            And I believe that the law, as stated by

4   Ms. Weiss and by Mr. Hays, and by my own independent

5   research indicates that they can, in fact, utilize the 2001

6   financing statement and I think they have.  And more

7   importantly, I think that all secured creditors after that

8   were on notice to make at least an inquiry of what was

9   going on.

10           And understand something else.  I now have a very

11  rich understanding of the history of this case and the --

12  its operations -- the operations of the debtor prepetition.

13  And the efforts made by individuals and companies wanting

14  to benefit from the largest of this company's activities

15  and that did not excuse those persons or entities from

16  actually understanding and following the law that is part

17  of our security laws and making sure that the priorities

18  are met.

19           I'm trying to understand one final thing and I

20  think already do, but I want to hear from you, counsel,

21  about the use of the funds by the estate that is -- that is

22  derived from this settlement.  Are you saying that you

23  still have claims on those funds, even though now the

24  recovery pursuant to this agreement would be for the

25  benefit of the estate and that a secured creditor cannot

Page                                                                    30

1   ever improve their position with respect to a recovery

2   action such as this?

3           MR. IZAKELIAN:  So that's actually a very good

4   question.  That brings up to the ownership point.  Our

5   position is that there can't -- there cannot be a lien

6   against a debtor's property if it is not actually debtor's

7   property.  So our position, of course, is that PurchaseCo

8   owns certain of the LPs receivables and pertinent to the

9   sale order those rights all attach to the sale proceeds.

10          To the extent that Azzure is claiming of being on

11  the sale proceeds, if they aren't property of the estate --

12          THE COURT:  How could you have a lien on them if

13  they're not property of the estate?

14          MR. IZAKELIAN:  Well, it would be an alternative

15  argument there.

16          THE COURT:  Yeah, I understand.  But you have --

17  you walked right into that.

18          MR. IZAKELIAN:  It is an alternative argument,

19  so --

20          THE COURT:  Well, it's an alternate argument that

21  doesn't play here.  You can't have it both ways.

22          MR. IZAKELIAN:  Well --

23          THE COURT:  You can't claim that the Trustee --

24  that Azzure Capital had a lien on property that doesn't

25  count because it's not property of the estate and then say

Page                                                                        31

1   that you do.

2        MR. IZAKELIAN:  Yeah, so -- and that's exactly

3   why we bring both the priority suit and the owner suits.

4        THE COURT:  Right, I understand.  Okay.  Anything

5   else?

6        MR. IZAKELIAN:  So in conclusion, we -- Your

7   Honor, our argument is that the Trustee cannot resolve the

8   priority of a non-settling party through a 9019 motion that

9   requires an adversary proceeding and that the Trustee

10  cannot use funds that don't belong to the estate.

11       THE COURT:  I'm not resolving a priority issue.

12  They're stating what the May 28, 2021 perfection issue is.

13  But the priority issue is between one secured creditor and

14  another secured creditor or general unsecured creditor and

15  a creditor who has -- for instance, have a 510(b) claim, if

16  you know what I'm talking about.  A subordinated claim.

17       MR. IZAKELIAN:  I understand --

18       THE COURT:  Those are priority issues.  This is

19  not a priority issue.  This is a determination and an

20  agreement of a date of perfection.  It may impact you, but

21  that's the trouble that we have with this situation.  It

22  may impact you, but it doesn't resolve a priority claim.

23       MR. IZAKELIAN:  I understood Trustee's counsel to

24  be arguing that it would resolve the priority claim.

25       THE COURT:  Well, you know, he -- you know, I

Page                                                                      32

1    didn't buy that argument.  The fact is if --

2            Mr. Hays, let's see if you can make my thinking

3    more clear.  You've resolved the perfection date.

4            MR. HAYS:  That is correct, Your Honor, and I

5    think Your Honor stated it accurately right now that that

6    will impact OHP and I think that this litigated and

7    resolved issue will be binding on them in the priority

8    action, but the priority action will still need to be

9    resolved.

10           THE COURT:  I agree.  Okay.

11           Mr. Owens, you've been very patient.  What does

12   the Creditors' Committee say about this?

13           MR. OWENS:  Good afternoon, Your Honor.  Keith

14   Owens for the record.

15           So as Ms. Weiss noted, we were involved in

16   confidential settlement discussions with counsel for the

17   Trustee and Azzure.  I mean, extensive discussions

18   regarding the lien perfection issue.  And we independently

19   analyzed those documents.  We reviewed the Trustee's

20   analysis that was provided to us by the Trustee's UCC

21   expert and we also independently had our own UCC expert

22   look at the issue.  Because, frankly, this is an issue that

23   seems in some respects counter-intuitive.  You'd think

24   you'd find something.

25           We turned over -- I won't say that we turned over



Page                                                                          33

1  every stone, but we turned over many stones and we couldn't

2  find any case law that sort of cut one way or the other or

3  any legal authority to cut one way or the other.  It was

4  our view and it is our view that it's a proper exercise of

5  the Trustee's judgment -- business judgment to settle with

6  Azzure because, you know, this is an all-or-nothing

7  proposition.  The estate is going to have to incur legal

8  fees to litigate this issue.  We don't have any binding

9  authority, let alone much authority at all on point in

10  terms of how this UCC-1 that's assigned should be

11  characterized.

12         You know, I note what -- you know, OHP is

13  briefing a lot of the same issues that we raised when were

14  looking at the analysis and the documents as well.  I mean,

15  the loan documents weren't assigned.  The UCC-1 was

16  assigned.  So the new loan -- but it relates back to the

17  original.  It was made under the original UCC-1 financing

18  statement.

19         And so given the lack of authority and the fact

20  that it's a zero sum game and that Azzure has reduced its

21  claim, you know, significantly as part of the settlement

22  and that the bankruptcy estate is going to be the

23  beneficiary of 1.6 million dollars of that claim, it's the

24  Committee's view that rather than roll the dice that this

25  settlement is in the best interests of the estate.



P 888.272.0022  F 818.343.7119                          www.benhyatt.com

Page                                                                    34

1          So that's why we call it the non-opposition, Your
2   Honor.
3          THE COURT:  Thank you.  Would anyone else like to
4   speak to the matter who hasn't already spoken?  Ms. Weiss,
5   did you have something else to add?
6          MS. WEISS:  (No response.)
7          THE COURT:  No?
8          MS. WEISS:  No, Your Honor.
9          THE COURT:  Mr. Ludwig, are you involved in this?
10         MR. LUDWIG:  I am, Your Honor.
11         THE COURT:  All right.
12         MR. LUDWIG:  I represent Fundura and, yes, I was
13  hired two days ago but I think Mr. Hays may have misspoken
14  or maybe didn't choose his words correctly when he said we
15  just popped up.  I just popped two days ago, but Fundura
16  has not popped up two days ago.  Fundura has been known by
17  the Trustee for a while.  In fact, I think it includes a
18  service.  Fundura has a recording UCC-1 removed, which is
19  of record.  It was recorded May 19, 2021.  So it was prior
20  in time to all of these UCC-1s that we're talking about.
21         And third, they did file a proof of claim on
22  August 24 attaching all of their transaction documents
23  including the UCC-1, which was about three weeks ago.
24         So while I know that's not going to make a
25  difference here today, but I just wanted to clarify.  I

Page                                                                35

1  didn't want the Court to get the impression that we have

2  not -- we're not previously known to the Trustee.  I've

3  also --

4          THE COURT:  So you don't have a problem with the

5  Trustee and Azzure setting May 28, 2021 as the recording --

6  or pardon me -- the perfection date?

7          MR. LUDWIG:  I don't, Your Honor.  The reason why

8  I have some concerns about what I -- the reservation of

9  rights, at least I think that's a better way of stating

10 what is filed, is because the motion on page -- looks like

11 5 says that they're going to determine the priority -- as a

12 first in priority with respect to the bankruptcy estate --

13         THE COURT:  Yeah, but you know, it -- that was a

14 misstatement and --

15         MR. LUDWIG:  Okay.

16         THE COURT:  -- the Court -- and it drew the

17 Court's attention immediately to that issue.  You know,

18 believe me, I was as alarmed as anyone else about something

19 coming on this quickly and not fully appreciating what the

20 Trustee was asking or saying.  And I had to come to grips

21 with the fact that it does not deal with a determination of

22 priorities.  It just sets the agreement between Azzure and

23 the estate of the perfection date of their lien.

24         MR. LUDWIG:  And I'm fine with that.  I spoke to

25 counsel for the Trustee.  Not Mr. Hays, but his colleague

Page                                                                    36

1   (indiscernible) and we discussed that very issue and she

2   assured me and gave me confidence that that was not the

3   case and the monies would not be changing hands until the

4   priority issues were resolved and they would not be

5   resolved as a result of the motion that she was going to

6   put in there.

7          And that's really my position.  That's all I

8   really have to say.

9          THE COURT:  And again, my earlier question to the

10  limited opposition was -- and I don't think I got a full

11  answer to this -- on the money side, how does this affect

12  the client?

13         MR. IZAKELIAN:  As far as OHP is concerned, if

14  funds are being paid to Azzure, which belong to PurchaseCo

15  that, of course, affects our client.  I just -- I think I

16  understand where this is going.  I'd just like to make

17  clear that any order here would be without prejudice to

18  PurchaseCo's ownership argument.

19         THE COURT:  Well, I'm not going to do that.

20         MR. IZAKELIAN:  Yes.  I just --

21         THE COURT:  I'm going to reject -- I'm going to

22  reject your ownership argument.

23         MR. IZAKELIAN:  But that's not before the Court,

24  Your Honor.

25         THE COURT:  That's right.  It's not before the

Page                                                                              37

1   Court and I'm going to reject the argument.

2          MR. IZAKELIAN:  As in -- I'm sorry.  To clarify

3   are you rejecting that PurchaseCo has an ownership interest

4   or that that is being argued today?

5          THE COURT:  Have you argued -- have you provided

6   any papers or evidence that you have an ownership interest?

7          MR. IZAKELIAN:  It was explained in the

8   objection, Your Honor.

9          THE COURT:  Yes, I didn't see the evidence.  I'm

10  sorry.

11         MR. IZAKELIAN:  It was attached to the proof of

12  claim and that's --

13         THE COURT:  Proof of claim is a proof of claim

14  and it indicates that you're owed something by an estate.

15         MR. IZAKELIAN:  Well, no.  It is attached in

16  OHP's proof of claim.  Purchase Co as an owner doesn't file

17  a claim because it's an ownership interest.  It's not a

18  claim.

19         THE COURT:  So you haven't filed a claim.

20         MR. IZAKELIAN:  It wouldn't be a claim there, but

21  we have asserted our ownership interest to the Trustee for

22  months now.

23         THE COURT:  But you haven't filed a claim.

24         MR. IZAKELIAN:  If --

25         THE COURT:  Because you're saying you don't have

EXHIBIT 2, PAGE 125

Page                                                                    38

1   a claim.

2           MR. IZAKELIAN:  It's asserted in the adversary

3   proceeding as well, Your Honor, the ownership interest.

4           THE COURT:  So you're saying you -- you don't

5   have a claim?

6           MR. IZAKELIAN:  No, there's an ownership

7   interest.

8           THE COURT:  Okay.

9           MR. IZAKELIAN:  For Purchase.

10          THE COURT:  I want to also make a comment about

11  the Ninth Circuit Court of Appeals decision today in *In Re:*

12  *Babaee*, B-A-B-A-E-E, Ninth Circuit Court of Appeals 22-

13  60022, which upheld the Bankruptcy Appellate Panel decision

14  in No. 21-1230 in the matter of *Babaee v. Marshack*.  That

15  came down today.  I don't know if anyone saw it, but I

16  wanted to put out that the Ninth Circuit Court of Appeals

17  has not remained silent on the issue of Article 3 standing

18  with respect to appeals and requirements of cases and

19  controversies that are involved in appeals.

20          Mr. Hays, did you get a chance to read that?

21          MR. HAYS:  I have not, Your Honor.  I just pulled

22  it up on the screen as you said it came out, but I was

23  unaware of it having been issued yet.

24          THE COURT:  Okay.  Well, that long storied case

25  has now come up and it's been resolved.  But I wanted to

P 888.272.0022  F 818.343.7119    **BEN**HYATT    www.benhyatt.com
Certified Deposition Reporters

EXHIBIT 2, PAGE 126

Page                                                                    39

1  make comment with respect to the focus -- refocus of the

2  Ninth Circuit on Article 3 standing and requirements of

3  cases and controversies.

4          All right.  Does anyone else have anything else

5  to say?

6          (No response.)

7          The OHP-CDR, LP and PurchaseCo 80, LLC objected,

8  but it was a limited objection and it didn't appear to be

9  of the compromise itself.  They also did not challenge

10 whether or not the Trustee satisfied the A&C standards.

11 Rather, they objected in their papers to the timing of

12 payment and now I've been able to draw out from them their

13 objection to the timing of payment.  You can review the

14 opposition at page 1, lines 8 to 10, to page 3, line 7 to

15 9.

16         They've argued that -- in summary fashion that

17 the Court may not approve a settlement under 9019 to the

18 extent that it establishes as there was lien priority.  It

19 establishes the date of the perfection of Azzure's lien.

20 There is a formal adversary proceeding ongoing that was

21 just filed by OHP and I believe another plaintiff.  Is that

22 correct?

23         MR. IZAKELIAN:  It was by OHP and by PurchaseCo.

24 PurchaseCo asserting ownership and OHP asserting --

25         THE COURT:  Gotcha.

Page                                                                      40

1        MR. IZAKELIAN:  -- the lien.

2        THE COURT:  And the adversary proceeding, I

3   believe, is of no consequence at this point.  We'll get to

4   the priority issues.

5        Now, compromises are favored in Bankruptcy Court.

6   We minimize litigation.  The administration of the

7   bankruptcy estate is expedited.  The fantastic cost of

8   litigation is avoided.

9        The Trustee is required to carry the burden of

10  proof with respect to the Trustee's judgment, the business

11  judgment in this matter.  And of course, we move on to the

12  A&C factors.  And I know that you all know this, but I'm

13  speaking for the record so that anyone reading this

14  transcript will appreciate the fact that I'm cognizant of

15  Rule 9019 and know that it's regularly used to resolve

16  disputes, especially like this very technical dispute.

17       The validation of liens are complex and

18  protracted and there's at least one case that was cited, I

19  believe, by Azzure, *In Re: Iridium Operating, LLC* at 478

20  F.3d 452 from the Second Circuit in 2007, where because

21  litigation is complex and protracted it weighs in favor of

22  approval under 9019.

23       In this case, the lender, Azzure, has conceded to

24  over a million and a half doll -- maybe more, but the

25  conceded issues and the compromises and the cash

Page                                                                          41

1  distributions that will go to the estate that will fund

2  more litigation is very important to this bankruptcy

3  estate.

4          There is a series of cases where disputed liens

5  are being satisfied -- the disputes are being satisfied

6  under 9019 in a wealth of cases.  We have *In Re: World*

7  *Health Alternatives* at 344 B.R. 291 from the Bankruptcy

8  Court in Delaware in 2006.  We have of course the A&C

9  factors at 784 F.2d 1377 and that's the Ninth Circuit,

10  1986.  That was with respect to a fraudulent transfer, but

11  it's -- still allows a court to set forth all of those A&C

12  factors.  And I have analyzed the factors as presented by

13  the Trustee and find that almost every factor falls in

14  favor of approval of the settlement.  And those factors

15  that don't fall in favor are simply factors that are of

16  non-consequence to this particular litigation.

17          I don't want to say that the objectors have

18  cherry-picked issues, but I think they mischaracterized the

19  issues.  And for those reasons, I'm going to approve the

20  compromise.

21          And Mr. Hays, I think that it would behoove you

22  to create an extensive order based upon my findings of the

23  A&C factors -- which factors which I have reviewed pursuant

24  to your own motion and the evidence that you provided with

25  respect to the A&C factors in your motion.

P 888.272.0022  F 818.343.7119     **BEN HYATT**
                                   Certified Deposition Reporters     www.benhyatt.com

Page                                                                          42

1           So if you would provide that order and send it

2    over to the Court and, of course, it's going to take seven

3    days.  You're going to have to file a notice of lodgment

4    and we will hold that order within seven days -- for at

5    least seven days.

6           MR. HAYS:  Understand, Your Honor.  Would you

7    prefer the findings to be separately stated under Rule 52

8    or included in a single order?

9           THE COURT:  No, I think you should separate them.

10          MR. HAYS:  And that would be my preference as

11   well, Your Honor.

12          THE COURT:  Yes.  I understand that there may be

13   an appeal.  I also understand the Supreme -- the Ninth

14   Circuit has now ruled on *In Re:* -- I guess it's pronounced

15   *Babaee*, but I'm not sure about that -- regarding standing

16   on specific issues that are congruent with the setting of a

17   date of perfection and I want to amplify that.

18          All right.  So there we have the ruling on the

19   matter in The Litigation Practice Group.  Is there a status

20   conference also set for this?

21          MR. HAYS:  I believe that the status conference,

22   Your Honor, has been vacated and continued per the Court's

23   calendar.

24          THE COURT:  Got it.  Okay.

25   (End at 3:06 p.m.)

Page                                                                    43

1                    *  *  *  *  *  *  *  *

2           I certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter.

5

6           *Ruth Ann Hager*

7    _____        Date:  9/21/2023

8    RUTH ANN HAGER, C.E.T.**D-641

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
870 Roosevelt, Irvine, CA 92620.

A true and correct copy of the foregoing document entitled: **TRUSTEE'S MOTION FOR RECONSIDERATION OF ORDER DENYING MOTION TO APPROVE COMPROMISE WITH AZZURE CAPITAL LLC; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF D. EDWARD HAYS IN SUPPORT** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **October 31, 2023**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**: On **October 31, 2023**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL:** Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **October 31, 2023**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**VIA PERSONAL DELIVERY:**
**PRESIDING JUDGE'S COPY**
HONORABLE SCOTT C. CLARKSON
UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
RONALD REAGAN FEDERAL BUILDING AND COURTHOUSE
411 WEST FOURTH STREET, SUITE 5130 / COURTROOM 5C
SANTA ANA, CA 92701-4593

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| October 31, 2023 | Layla Buchanan | /s/ Layla Buchanan |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                              **F 9013-3.1.PROOF.SERVICE**

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: CONTINUED:

- **ATTORNEY FOR CREDITOR AFFIRMA, LLC and CREDITOR OXFORD KNOX, LLC:** Eric Bensamochan eric@eblawfirm.us, G63723@notify.cincompass.com
- **ATTORNEY FOR CHAPTER 11 TRUSTEE RICHARD A MARSHACK (TR):** Peter W Bowie peter.bowie@dinsmore.com, caron.burke@dinsmore.com
- **ATTORNEY FOR CREDITOR SDCO TUSTIN EXECUTIVE CENTER, INC.:** Ronald K Brown ron@rkbrownlaw.com
- **ATTORNEY FOR CHAPTER 11 TRUSTEE RICHARD A MARSHACK (TR):** Christopher Celentino christopher.celentino@dinsmore.com, caron.burke@dinsmore.com
- **INTERESTED PARTY COURTESY NEF:** Shawn M Christianson cmcintire@buchalter.com, schristianson@buchalter.com
- **INTERESTED PARTY COURTESY NEF:** Randall Baldwin Clark rbc@randallbclark.com
- **INTERESTED PARTY COURTESY NEF:** Leslie A Cohen leslie@lesliecohenlaw.com, jaime@lesliecohenlaw.com; clare@lesliecohenlaw.com
- **INTERESTED PARTY COURTESY NEF:** Aaron E. DE Leest adeleest@DanningGill.com, danninggill@gmail.com; adeleest@ecf.inforuptcy.com
- **ATTORNEY FOR INTERESTED PARTY NATIONAL ASSOCIATION OF CONSUMER BANKRUPTCY ATTORNEYS and INTERESTED PARTY NATIONAL CONSUMER BANKRUPTCY RIGHTS CENTER:** Jenny L Doling jd@jdl.law, dolingjr92080@notify.bestcase.com; 15994@notices.nextchapterbk.com
- **ATTORNEY FOR CREDITOR CAROLYN BEECH:** Daniel A Edelman dedelman@edcombs.com, courtecl@edcombs.com
- **ATTORNEY FOR CREDITOR VALIDATION PARTNERS LLC:** William P Fennell william.fennell@fennelllaw.com, luralene.schultz@fennelllaw.com; wpf@ecf.courtdrive.com; hala.hammi@fennelllaw.com; naomi.cwalinski@fennelllaw.com; samantha.larimer@fennelllaw.com
- **ATTORNEY FOR CHAPTER 11 TRUSTEE RICHARD A MARSHACK (TR):** Christopher Ghio christopher.ghio@dinsmore.com, Kristina.Heller@Dinsmore.com
- **ATTORNEY FOR DEFENDANT STRIPE, INC.:** Eric D Goldberg eric.goldberg@dlapiper.com, eric-goldberg-1103@ecf.pacerpro.com
- **ATTORNEY FOR CREDITOR AFFIRMA, LLC; CREDITOR ANAHEIM ARENA MANAGEMENT, LLC; CREDITOR ANAHEIM DUCKS HOCKEY CLUB, LLC; and CREDITOR OXFORD KNOX, LLC:** Jeffrey I Golden jgolden@go2.law, kadele@ecf.courtdrive.com; cbmeeker@gmail.com; lbracken@wgllp.com; gestrada@wgllp.com; golden.jeffreyi.b117954@notify.bestcase.com
- **ATTORNEY FOR CREDITOR DEBT VALIDATION FUND II, LLC; CREDITOR MC DVI FUND 1, LLC; and CREDITOR MC DVI FUND 2, LLC:** Richard H Golubow rgolubow@wghlawyers.com, jmartinez@wghlawyers.com; svillegas@wghlawyers.com
- **INTERESTED PARTY COURTESY NEF:** David M Goodrich dgoodrich@go2.law, kadele@go2.law; dfitzgerald@go2.law; wggllp@ecf.courtdrive.com
- **ATTORNEY FOR CHAPTER 11 TRUSTEE RICHARD A MARSHACK (TR):** D Edward Hays ehays@marshackhays.com, ehays@ecf.courtdrive.com; kfrederick@ecf.courtdrive.com; cmendoza@marshackhays.com; cmendoza@ecf.courtdrive.com
- **ATTORNEY FOR CREDITOR CITY CAPITAL NY:** Alan Craig Hochheiser ahochheiser@mauricewutscher.com, arodriguez@mauricewutscher.com
- **ATTORNEY FOR CREDITOR DEBT VALIDATION FUND II, LLC; CREDITOR MC DVI FUND 1, LLC; and CREDITOR MC DVI FUND 2, LLC:** Garrick A Hollander ghollander@wghlawyers.com, jmartinez@wghlawyers.com; svillegas@wghlawyers.com
- **INTERESTED PARTY COURTESY NEF:** Richard L. Hyde richard@amintalati.com
- **ATTORNEY FOR CREDITOR and PLAINTIFF OHP-CDR, LP and PLAINTIFF PURCHASECO 80, LLC:** Razmig Izakelian razmigizakelian@quinnemanuel.com
- **ATTORNEY FOR DEBTOR THE LITIGATION PRACTICE GROUP P.C.:** Joon M Khang joon@khanglaw.com
- **ATTORNEY FOR INTERESTED PARTY AD HOC CONSUMER CLAIMANTS COMMITTEE:** Ira David Kharasch ikharasch@pszjlaw.com
- **ATTORNEY FOR DEFENDANT GALLANT LAW GROUP:** Meredith King mking@fsl.law, ssanchez@fsl.law; jwilson@fsl.law
- **ATTORNEY FOR COMMITTEE OF UNSECURED CREDITORS:** Nicholas A Koffroth nkoffroth@foxrothschild.com, khoang@foxrothschild.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                                                  **F 9013-3.1.PROOF.SERVICE**

- **ATTORNEY FOR DEFENDANT MARICH BEIN, LLC:** David S Kupetz David.Kupetz@lockelord.com, mylene.ruiz@lockelord.com
- **INTERESTED PARTY COURTESY NEF:** Christopher J Langley chris@slclawoffice.com, omar@slclawoffice.com; langleycr75251@notify.bestcase.com; ecf123@casedriver.com
- **ATTORNEY DEFENDANT OPTIMUMBANK HOLDINGS, INC.:** Matthew A Lesnick matt@lesnickprince.com, matt@ecf.inforuptcy.com; jmack@lesnickprince.com
- **ATTORNEY FOR DEFENDANT CONSUMER LEGAL GROUP, P.C.; DEFENDANT LGS HOLDCO, LLC; INTERESTED PARTY CONSUMER LEGAL GROUP, P.C.; and INTERESTED PARTY LIBERTY ACQUISITIONS GROUP INC:** Daniel A Lev daniel.lev@gmlaw.com, cheryl.caldwell@gmlaw.com; dlev@ecf.courtdrive.com
- **ATTORNEY FOR INTERESTED PARTY REVOLV3, INC.:** Britteny Leyva bleyva@mayerbrown.com, 2396393420@filings.docketbird.com; KAWhite@mayerbrown.com; ladocket@mayerbrown.com
- **ATTORNEY FOR CREDITOR PHILLIP A GREENBLATT, PLLC:** Michael D Lieberman mlieberman@lipsonneilson.com
- **ATTORNEY FOR CHAPTER 11 TRUSTEE RICHARD A MARSHACK (TR):** Yosina M Lissebeck Yosina.Lissebeck@Dinsmore.com, caron.burke@dinsmore.com
- **ATTORNEY FOR CREDITOR FUNDURA CAPITAL GROUP:** Mitchell B Ludwig mbl@kpclegal.com, kad@kpclegal.com
- **ATTORNEY FOR DEFENDANT HAN TRINH and DEFENDANT JAYDE TRINH:** Kathleen P March kmarch@bklawfirm.com, kmarch3@sbcglobal.net, kmarch@sbcglobal.net
- **CHAPTER 11 TRUSTEE RICHARD A MARSHACK (TR):** Richard A Marshack (TR) pkraus@marshackhays.com, rmarshack@iq7technology.com; ecf.alert+Marshack@titlexi.com
- **ATTORNEY FOR CHAPTER 11 TRUSTEE RICHARD A MARSHACK (TR):** Laila Masud lmasud@marshackhays.com, lmasud@ecf.courtdrive.com; kfrederick@ecf.courtdrive.com
- **ATTORNEY FOR US TRUSTEE:** Kenneth Misken Kenneth.M.Misken@usdoj.gov
- **INTERESTED PARTY COURTESY NEF:** Byron Z Moldo bmoldo@ecjlaw.com, amatsuoka@ecjlaw.com, dperez@ecjlaw.com
- **INTERESTED PARTY COURTESY NEF:** Alan I Nahmias anahmias@mbn.law, jdale@mbnlawyers.com
- **INTERESTED PARTY COURTESY NEF:** Victoria Newmark vnewmark@pszjlaw.com
- **ATTORNEY FOR US TRUSTEE:** Queenie K Ng queenie.k.ng@usdoj.gov
- **ATTORNEY FOR COMMITTEE OF UNSECURED CREDITORS:** Keith C Owens kowens@foxrothschild.com, khoang@foxrothschild.com
- **ATTORNEY FOR DEFENDANT GREYSON LAW CENTER PC; DEFENDANT HAN TRINH; DEFENDANT JAYDE TRINH; and DEFENDANT SCOTT JAMES EADIE:** Douglas A Plazak dplazak@rhlaw.com
- **ATTORNEY FOR DEFENDANT TOUZI CAPITAL, LLC and DEFENDANT ENG TAING:** Daniel H Reiss dhr@lnbyg.com, dhr@ecf.inforuptcy.com
- **ATTORNEY FOR DEFENDANT CONSUMER LEGAL GROUP, PC:** Ronald N Richards ron@ronaldrichards.com, 7206828420@filings.docketbird.com
- **ATTORNEY FOR CREDITOR MARI AGAPE:** Gregory M Salvato gsalvato@salvatoboufadel.com, calendar@salvatolawoffices.com; jboufadel@salvatoboufadel.com; gsalvato@ecf.inforuptcy.com
- **ATTORNEY FOR CREDITOR AZZURE CAPITAL LLC and CREDITOR HI BAR CAPITAL LLC:** Olivia Scott olivia.scott3@bclplaw.com
- **ATTORNEY FOR CHAPTER 11 TRUSTEE RICHARD A MARSHACK (TR):** Jonathan Serrano jonathan.serrano@dinsmore.com
- **ATTORNEY FOR CREDITOR UNITED PARTNERSHIPS, LLC:** Paul R Shankman PShankman@fortislaw.com, info@fortislaw.com
- **ATTORNEY FOR INTERESTED PARTY MORNING LAW GROUP, PC:** Zev Shechtman zs@DanningGill.com, danninggill@gmail.com; zshechtman@ecf.inforuptcy.com
- **ATTORNEY FOR US TRUSTEE:** Leslie Skorheim leslie.skorheim@usdoj.gov
- **ATTORNEY FOR DEFENDANT BANKUNITED, N.A.:** Howard Steinberg steinbergh@gtlaw.com, pearsallt@gtlaw.com; howard-steinberg-6096@ecf.pacerpro.com
- **ATTORNEY FOR CREDITOR ALTERYX, INC.:** Andrew Still astill@swlaw.com, kcollins@swlaw.com
- **US TRUSTEE:** United States Trustee (SA) ustpregion16.sa.ecf@usdoj.gov
- **ATTORNEY FOR CREDITOR AZZURE CAPITAL LLC and CREDITOR HI BAR CAPITAL LLC:** Sharon Z. Weiss sharon.weiss@bclplaw.com, raul.morales@bclplaw.com; REC_KM_ECF_SMO@bclplaw.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                                                     **F 9013-3.1.PROOF.SERVICE**

- **ATTORNEY FOR CREDITOR DEBT RELIEF GROUP, LLC:** Johnny White JWhite@wrslawyers.com, jlee@wrslawyers.com

**2.  SERVED BY UNITED STATES MAIL**: CONTINUED:

**DEBTOR – MAIL REDIRECTED TO TRUSTEE**
THE LITIGATION PRACTICE GROUP P.C.
17542 17TH ST, SUITE 100
TUSTIN, CA 92780-1981

**SECURED CREDITOR**
DIVERSE CAPITAL LLC
ATTN: OFFICER, A MANAGING OR GENERAL AGENT, OR TO ANY OTHER AGENT AUTHORIZED BY APPOINTMENT OR LAW TO RECEIVE SERVICE OF PROCESS
323 SUNNY ISLES BLVD, STE 503
SUNNY ISLES, FL 33160-4675

**SECURED CREDITOR / POC ADDRESS**
RIVER TREE LLC
C/O MAYS JOHNSON LAW FIRM
21 BATTERY PARK AVE, SUITE 201
ASHEVILLE, NC 28801

**SECURED CREDITOR / POC ADDRESS**
VENTURE PARTNERS LLC
ATTN: OFFICER, A MANAGING OR GENERAL AGENT, OR TO ANY OTHER AGENT AUTHORIZED BY APPOINTMENT OR LAW TO RECEIVE SERVICE OF PROCESS
1309 COFFEEN AVENUE, STE 1200
SHERIDAN, WY 82801

4877-5210-0236, v. 1

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                    **F 9013-3.1.PROOF.SERVICE**