RICHARD A. MARSHACK
rmarshack@marshackhays.com
MARSHACK HAYS WOOD LLP
870 Roosevelt
Irvine, California 92620
Telephone: (949) 333-7777
Facsimile: (949) 333-7778

Chapter 11 Trustee

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION

| In re | Case No. 8:23-bk-10571-SC |
|---|---|
| THE LITIGATION PRACTICE GROUP P.C, | Chapter 11 |
| Debtor. | **CHAPTER 11 TRUSTEE'S NOTICE OF INTENT TO:**<br>1. ABANDON ESTATE'S INTEREST, IF ANY, IN MAIL HELD AT FACILITY IN NEW JERSEY; AND<br>2. SHRED MAIL<br><br>[Pursuant to 11 U.S.C. § 554(a) and LBR 6007-1] |

TO THE HONORABLE SCOTT C. CLARKSON, UNITED STATES BANKRUPTCY COURT

JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE AND ALL CREDITORS, AND

OTHER INTERESTED PARTIES:

**PLEASE TAKE NOTICE** that Richard A. Marshack, the duly appointed, qualified and

acting Chapter 11 Trustee ("Trustee") of the Bankruptcy Estate ("Estate") of The Litigation Practice

Group P.C. ("Debtor"), intends to abandon the Estate's interest, if any, in property of the Estate as

detailed below, pursuant to 11 U.S.C. § 554(a) and Local Bankruptcy Rule ("LBR") 6007-1, without

further Court order:

/ / /

/ / /

1

## ASSETS TO BE ABANDONED

2    On or about April 15, 2023, Maverick Management Group LLC ("Maverick") entered into a

3 master services agreement ("Contract")[1] with TrustFlow ("TF") regarding bulk mail services.

4 Trustee's investigation has revealed the following:

5
- Maverick provided management services to Phoenix Law Group ("Phoenix') and
  Litigation Practice Group ("LPG").[2] Trustee is informed such services included,
6    human resources, such as payroll costs and expenses, as well as mail maintenance.
- The Contract is one such management service that was provided by Maverick to LPG.
7
- Specifically, mail directed to Debtor and/or relating to Debtor's clients would be
  handled by Maverick who then retained TF.
8
- TF would (a) collect the Debtor's mail ("Mail"), consisting of monthly credit card
  and other loan statements of Debtor's clients, from a Post Office box in New Jersey
9    ("PO Box"), (b) open each envelope, review and scan the contents, (c) create an index
     and (d) upload the scanned items with the index to a cloud-based portal so that Debtor
10   and its employees could access the Mail remotely.
- The TF facility is located in Millville, New Jersey ("Facility").
11
- Trustee is informed by Mike Balberchak, an executive with TF, that TF was not
  advised of Debtor's bankruptcy filing and continued to provide daily services until
12   mid-June 2023.[3]
- After receiving no response to attempts to contact Debtor, TF ceased providing the
13   services and instead began storing the Mail at its Facility. To that end, TF is currently
     holding approximately 18,000 pieces of mail in 75 record storage boxes.
14

15   After consulting with Morning Law Group ("MLG") - the buyer of substantially all of

16 Debtor's assets – MLG has determined that the Mail is not necessary for it to service the legal

17 services agreements/contracts that were the subject of the Sale held on July 21, 2023.[4] Rather MLG

18 is confident that all information and calendaring that needed to occur has been done/accomplished

19 through alternative means. Given this information, Trustee believes the Mail is of inconsequential

20 value and burdensome to the Estate as storage costs continue to accrue. Accordingly, Trustee

21 believes it is in the best interest of the Estate to abandon the Estate's interest, if any, in the Mail and

22 have the Mail destroyed by shredding. Because the Mail may contain consumer client account

23

24
---
[1] The Contract was amended on May 16, 2023 ("First Amendment"). A copy of the Contract and First Amendment is
25 attached as **Exhibit 1**.
[2] On June 23, 2023, the Court entered a preliminary injunction turning over to Trustee control over "*all contracts*,
26 records, reports, *information*, data, cost basis, payment information *and details* regarding the transfer or receipt *of any
Client files* or future Client ACH payments *from any other law firm, organization*, corporate entity, person(s),
27 investment or marketing group (otherwise known as capping companies) *to LPG*; Oakstone; Greyson; Gallant; Phoenix;
LGS Holdco., LLC; **Maverick**; and/or CLG." *See* Dk. No. 70, I Case No. 8:23-ap-01046.
28 [3] According to Mr. Balberchak, TF is owed in excess of $58,300 services rendered.
[4] *See*, Dk. No. 352 in Case No. 8:23-bk-10571-SC.

NOTICE OF INTENT TO ABANDON AND SHRED MAIL

1  information, Trustee intends to have the Mail (1) picked up by Trustee's special counsel, Dinsmore

2  & Shohl; and (2) have Dinsmore coordinate the shredding of the Mail.

3          **PLEASE TAKE FURTHER NOTICE** that any response and request for hearing as to the

4  proposed abandonment of the Mail must be in the form as required by LBR 9013-1(f) & (o) and filed

5  with the Clerk of the above-entitled Court. The deadline for any response and request for hearing is

6  14 days after the date of service of this Notice, plus an additional 3 days unless this Notice was

7  served by personal delivery or posting as described in F.R.Civ.P. 5(b)(2)(A)-(B). A copy of any

8  response or request for hearing must be served on Richard A. Marshack at the address noted above

9  and served on the Office of the United States Trustee, 411 W. Fourth Street, Suite 7160, Santa Ana,

10  CA 92701.

11          Failure to timely respond may be deemed as acceptance of the proposed abandonment. See

12  Local Bankruptcy Rules 6007-1 and 9013-1(h). As such, if no such objection or request for hearing

13  is served and filed within the seventeen (17) day period, the Trustee will proceed with the

14  abandonment on or after the eighteenth (18th) day after service of this Notice. Plainly put, if no

15  timely objection and request for hearing is filed and served, the Personal Property shall be deemed

16  abandoned without further order of the Court.

17

18  DATED:  November 24, 2023              Respectfully Submitted,

19

20                                        By:   /s/  Richard A. Marshack
                                              RICHARD A. MARSHACK
21                                            Chapter 11 Trustee

22

23

24

25

26

27

28

# MASTER SERVICES AGREEMENT

**THIS MASTER SERVICES AGREEMENT** (the "Agreement"), is made and entered into as of the 17th day of April, 2023 (the "Effective Date") by and between TrustFlow Digital Solutions, Inc., a Pennsylvania corporation with its principal place of business at 10 E.D. Preate Drive, Moosic, PA 18507 (hereinafter the "Company"), and Maverick Management Group, LLC, with its principal office at 3347 Michelson Dr Irvine, CA. 92612 **Suite 400** (hereinafter the "Client"). Such parties are hereinafter referred to collectively as the "Parties" or individually as a "Party".

**WHEREAS,** Company and its affiliates provide digital mailroom, scanning and indexing, virtual mailroom processing, outbound print and mail activities, and related information management services; and

**WHEREAS,** Client finds that Company is qualified and willing to perform certain work hereinafter described in accordance with the provisions of this Agreement.

**NOW THEREFORE,** in consideration of the mutual covenants set forth herein and intending to be legally bound, Company and Client hereto agree as follows:

1.     **Services and Fees**

    (a)     <u>Services and Statement of Work</u>. Company shall provide the services described in the initial Statement of Work and any additional Statements of Work, sequentially numbered, issued pursuant to this Agreement and signed by the Parties (the "Services"). Each Statement of Work incorporates by reference the terms of this Agreement, and shall set forth, as applicable: (i) a description of the services and deliverables to be provided by Company, (ii) the fees and expenses to be paid by Client, (iii) service level standards (iv) the term or duration of the Statement of Work, and (v) such additional terms and conditions as may be mutually agreed upon between the Parties.

    (b)     <u>Payment of Fees</u>. Client agrees to pay Company the fees and expenses set forth in the Statement of Work for Company's performance of the Services.

    (c)     <u>Taxes</u>. Company shall invoice Client for all applicable sales taxes related to the Services. Failure of Company to invoice Client for any sales taxes due shall not constitute Company's waiver of any right to receive payment for those taxes from Client.

    (d)     <u>Modifications and Amendments</u>. Statements of Work may be amended from time-to-time in a sequentially numbered writing signed by both Parties and such amendment shall be subject to the same terms and conditions as contained in this Agreement. Client agrees that Company is only responsible for providing the Services specifically set forth in a Statement of Work.

    (e)     <u>Conflicting Terms</u>. If the terms and conditions contained in this Agreement conflict with the terms and conditions contained in a Statement of Work, then for purposes of the Services set forth in such Statement of Work, the conflicting terms and conditions in the Statement of Work shall control. If the terms and conditions contained in this Agreement conflict with the terms and conditions contained in any exhibit, schedule, or attachment to this Agreement, excluding a Statement of Work, the terms and conditions in this Agreement shall control.

    (f)     <u>Pricing Adjustments</u>. Company may increase its rates for Services provided to Client annually on the effective date of any Statement of Work, at a rate not to exceed the greater of three

percent (3%) or the percentage rate increase in the CPI (all items) for Urban Wage Earners and Clerical Workers from the preceding calendar year as determined by the United States Bureau of Labor Statistics.

    (g)    <u>Terms of Payment</u>.  Invoices for Services shall be payable within thirty (30) days from the date of invoice.  All unpaid invoices shall bear interest at the rate of one and two-tenths percent (1.2%) per month until paid. Company has the right, notwithstanding any other provision of this Agreement, to suspend or terminate Services if any past due amounts are not paid within five (5) business days after Company notifies Client of the overdue amount.  If Company elects to suspend or terminate Services or is required take action to collect any amount due, Client agrees to pay Company all reasonable costs and expenses incurred by Company in suspending or terminating Services or in collecting any amounts due hereunder, including reasonable attorneys' fees.

    (h)    <u>Facilities and Performance</u>.  Company may provide Services to Client from any Company or Affiliate owned location, at any time. Affiliate, for purposes of this Agreement, means any entity that directly or indirectly controls, is controlled by, or is under common control with Company, where "control" means the ownership of, or the power to vote, at least fifty percent (50%) of the voting stock, shares or interests of an entity. In addition, certain Services may be performed by an Affiliate at any time and such Affiliate shall perform the Services on Company's behalf as a subcontractor. In such event, Company shall remain liable for all Services performed by its Affiliate.

    (i)    <u>Approvals and Authorizations</u>.  Client shall designate in the Statement of Work who within its company may sign approvals and authorizations when requested by Company or as otherwise required under this Agreement.

## 2.    <u>Term and Termination</u>

    (a)    <u>Term</u>.  This Agreement shall commence on the Effective Date and continue in effect for a period of three (3) year(s), unless earlier terminated as provided below. Upon expiration of the initial term and continuing thereafter, this Agreement shall automatically renew for consecutive one (1) year periods unless written notice of non-renewal is delivered by either Party to the other not less than sixty (60) days prior to the expiration of the initial or any renewal term.

    (b)    <u>Termination for Cause</u>.

    (i).    Either Party may terminate this Agreement or any Statement of Work issued hereunder at any time by giving written notice to the other Party, which notice shall be effective immediately or as otherwise set forth therein, if the other Party files a petition of any type as to its bankruptcy, is declared bankrupt, is or becomes insolvent, makes an assignment for the benefit of creditors, or commences liquidation or receivership proceedings.

    (ii).    Either Party may immediately terminate this Agreement or any Statement of Work issued hereunder without notice, if the other Party has breached a covenant, agreement, obligation or warranty under this Agreement or any Statement of Work and such breach remains uncured for a period of fifteen (15) days after written notice thereof is sent to such other Party (or if such breach cannot be remedied during such period, the other Party fails to make and maintain good faith, diligent attempts during such period to remedy the breach).

    (iii).    Company may terminate this Agreement or any Statement of Work issued hereunder at any time by providing written notice to Client of termination in

the event that Client fails to pay any amount due hereunder within five (5) business days after Company provides Client with written notice of nonpayment.

(c ) Termination for Convenience. Company may terminate this Agreement at any time for any reason with no more than 12 months notice. In the event of termination for this reason, Company and Client will work together to wind down through a Termination Assistance Agreement.

(d) Termination of Statement of Work.   Each Statement of Work in effect upon termination of this Agreement shall remain in full force and effect (unless terminated in accordance with this Section 2), and the provisions of this Agreement shall remain in full force and effect with respect to each such Statement of Work until each Statement of Work is terminated or the Services set forth therein are completed.

(e) Termination for Change in Control of Company. Client may terminate this Agreement and/or any Statement of Work by giving not less than sixty (60) days' notice to that effect to the Company if there is a Change in Control of the Company, where Client have a reasonable belief that it could have a detrimental impact on the services being supplied (including, but not limited to, a direct competitor of Client's, risk of insolvency etc)."

(f) Survival.  Upon such termination, all rights and duties of the Parties toward each other shall cease except:

    (i).    Client shall be obligated to pay, within fifteen (15) days of the effective date of termination, all amounts owing to Company for Services and all related expenses in accordance with the provisions of Section 1 herein; and

    (ii).    All provisions of this Agreement relating to warranties, confidentiality, non-solicitation, proprietary rights, limitation of liability, and indemnification obligations shall survive the termination or expiration of this Agreement.

(g)    Deposits upon Termination. Upon termination of this Agreement by Company for cause as provided in Subsection 2(b) above, Company may, after written notice to Client and a period of sixty (60) days following the date of termination, destroy all Deposits (as defined in Subsection 4(a) below) in Company's possession by secure shredding, erasing, burning, or pulverizing so as to render the Deposits unreadable and incapable of being reconstructed. Client shall bear the cost and expense of such destruction.

### 3.    Company Warranties

(a)    Quality of Services. Company warrants that the Services performed hereunder shall be rendered in a skilled manner by competent personnel and in a manner consistent with, and of such quality, as is the customary industry standard for comparable work. If Company fails to provide the Services as warranted (subject to any service level standards contained in the Statement of Work), parties will work together to determine a resolution.

(b)    Statutory Compliance & Privacy Law.  Company represents and warrants that to its best knowledge, and to the extent necessary to perform the Services, it is in full compliance with all applicable federal, state, or local laws, rules or regulations which pertain to this Agreement including but not limited to the Internal Revenue Code of 1986, as amended; the Immigration Reform and Control Act

of 1986; the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act; the Americans with Disabilities Act; Executive Order 11246; the Rehabilitation Act of 1973; the Vietnam Veterans Readjustment Act; the Gramm-Leach-Bliley Act: the Economic Espionage Act of 1996; and the Health Insurance Portability and Accountability Act of 1996 and the US Standards for Privacy of Individually Identifiable Health Information.

(c)  <u>Electronic Deliveries</u>.  Company warrants that, to the extent of its commercially reasonable efforts, any electronic deliveries or transfers of information sent to Client as part of the Services performed under this Agreement will not contain threats known as software viruses, time bombs, logic bombs, trojan horses, trap doors, or other malicious computer instructions, intentional devices or techniques that can or were designed to threaten, infect, attach, assault, vandalize, defraud, disrupt, damage, disable, or shut down a computer system or any component of such computer, including its security or user data.

4.  **Records and Document Management**

(a)  <u>Ownership</u>.  Client represents and warrants that it is the owner or legal custodian of the physical or electronic records, or other documents, items, data or information forming the basis of the Services, in whole or in part, (the "Deposits") and has full authority to store, keep and maintain the Deposits and to direct their disposition, including processing and destruction, in accordance with the terms of this Agreement. Client agrees to defend and hold harmless Company, from any and all claims and damages incurred by Company as a result of Company's compliance with the instructions of Client or the ownership, custody or disposition of the Deposits stored, kept, processed or maintained with or by the Company.

(b)  <u>Destruction of Physical Documents</u>.  Except as otherwise set forth in a signed writing or Statement of Work, if Services are for back-file scanning or imaging of physical documents, Client hereby authorizes Company, after a period of thirty (30) days following Company's delivery of scanned images to Client or the granting to Client of online access to the scanned images, to delete any scanned image files from Company's servers and to destroy the scanned physical documents in Company's possession. If Client desires Company to retain its scanned images or physical documents beyond thirty (30) days, Client shall notify Company in writing prior to expiration of the thirty (30) day period. Client shall be responsible for all costs and fees associated with retention of its scanned images or storage of its physical documents, and may be required to enter into a new Statement of Work with Company for such services. Client releases Company from all liability by reason of the deletion of scanned images and destruction of physical documents hereunder. Physical documents will be destroyed by secure shredding, burning, or pulverizing at Client's expense so as to render the physical documents unreadable and incapable of being reconstructed.

(c)  <u>Restrictions on Stored Items</u>.  Client shall not store with Company or deliver to Company for secure shredding any item that is highly flammable, explosive, toxic, radioactive, medical waste, organic material which may attract vermin or insects, or otherwise dangerous or unsafe to store or handle, or any item which is regulated under any federal or state law or regulation relating to the environment or hazardous materials. In addition, Client shall not store negotiable instruments, jewelry, check stock or other items that have intrinsic value.

(d)  <u>Medical Records</u>.  Company's performance of Services hereunder involving medical records shall not cause Company to be a "custodian" of the medical records or a "designee" of Client with respect to such medical records.

5.  **Security and Network Access**

(a)    Overview.    Company shall implement appropriate physical, electronic and administrative safeguards to secure, store, process and dispose of all Client information and protect the same from unauthorized access, use, disclosure, alteration, loss or destruction and shall be equivalent to those Company uses to protect its own most confidential information, but shall not be less than those that would be commercially reasonable in the industry. Client shall have the right to review the security procedures and their application with reasonable advance notice to Company.

(b)    Notifications.    Upon being made aware and within forty-eight (48) hours thereafter, Company agrees to notify Client with respect to any breach of security under the Agreement and to cooperate with Client to take any appropriate remedial actions as may be required under applicable state or federal law or as is necessary to ensure the continued safeguarding of Client's information.

(c)    Equipment and Network Security.    If access to Client's computer systems, other equipment or personal property ("Client's Systems") is required in order for Services to be performed by Company hereunder, then Client, in conjunction with Company, shall determine the reasonable nature and extent of such access. If Client provides Company with remote access to Client's Systems, then any and all information relating to such remote access shall be considered confidential information as that term is defined in Section 8 of this Agreement.

### 6.    Audit

Company will maintain records to substantiate its charges under this Agreement and each Statement of Work. Client, on an annual basis and with at least five (5) days written notice to Company, shall have access to such records for the purpose of conducting its own internal audit.

### 7.    Content, Ownership & Licenses

(a)    Client Ownership.    Client shall retain ownership of any content, data or information provided by Client to Company in any format or any trademarks, copyrights, patents, trade secrets or other intellectual property of Client existing as of the Effective Date or independently developed by Client during the term of this Agreement or any Statement of Work ("Client IP"), including any Client IP incorporated by Company into the Works (as defined below), and Company shall not re-use or distribute the Client IP to any third parties.

(b)    Company Ownership.    Company shall own all software, designs, reports, or other works of original authorship developed by Company prior to and in the course of performance of the Services (the "Works"). Works include derivatives whether created during or after the term of this Agreement. Company may license, market and distribute any such Works without obligation or notice to, or prior approval of Client.

(c)    Infringement.    Each Party represents and warrants that all materials, including, but not limited to source code, object code, reports, data, content and writings, provided or used by either Party in the provision of Services hereunder shall not knowingly contain any content or materials that are inaccurate or that infringe on or violate any applicable law, regulation or right of any third party, and that such Party owns the materials or otherwise has the right to use such materials pursuant to this Agreement. Code libraries employed by Company in the performance of Services hereunder are subject in all respects to licenses created by their owners, and Company will not introduce any such code libraries that have undue restrictions without Client's consent.

(d)    Retained Use.    Company shall retain the right to use without fee and for any purpose the algorithms, know-how, ideas, techniques, and concepts used or developed by Company in the course of performance of the Services.

(e)    Software License.  In the provision of Services hereunder, Client agrees that it may require access to various proprietary software systems of Company, now existing or created after the Effective Date, including, without limitation, integrated records management systems and image hosting platforms (the "Software"). As a result, Company hereby grants to Client, and Client hereby accepts, a limited, revocable, non-exclusive, non-sublicenseable, and non-transferable license to use the Software solely in conjunction with the Services during the term of this Agreement. The license grant and Client's use of the Software under this subsection is subject in all respects to (i) payment of the fees for such license as set forth in a Statement of Work, and (ii) all reasonable use restrictions and guidelines issued by Company governing the Software.

## 8.    Confidentiality

(a)    Each Party agrees to regard and preserve as confidential all information related to the business and activities of the other Party and their respective Affiliates, and each of their respective clients, customers, employees, suppliers and other entities with which they do business, that may be disclosed by one Party (the "Disclosing Party") to the other Party (the "Receiving Party") as a result of this Agreement.  As used in this Agreement, "Confidential Information" means all information, in any form, furnished or made available directly or indirectly by one Party or its Affiliates to the other Party, whether or not designated "Confidential Information," including (i) the specifications, designs, documents, correspondence, software, documentation, data and other materials and work products produced by either Party, (ii) all information concerning the operations, affairs and businesses of a Party or its Affiliates, the financial affairs of a Party or its Affiliates, and the relations of a Party or its Affiliates with its or their employees and service providers; (iii) intellectual property provided to a Party by or through the Disclosing Party or its Affiliates (if applicable); and (iv) other information or data stored on magnetic media or otherwise or communicated orally, or learned as a result of this Agreement and obtained, received, transmitted, processed, stored, archived or maintained by Company under this Agreement.

(b)    The Receiving Party agrees to hold Confidential Information of the Disclosing Party in trust and confidence for the Disclosing Party and not to disclose such Confidential Information to any person, firm or enterprise, or use (directly or indirectly) any such Confidential Information for its own benefit or the benefit of any other Party, unless authorized by the Disclosing Party in writing, and even then, to limit access to and disclosure of such Confidential Information to the Receiving Party's employees and consultants on a "need to know" basis only.

(c)    The Receiving Party may only use the Disclosing Party's Confidential Information for the sole purpose of performing its obligations under this Agreement.

(d)    Information shall not be considered "Confidential Information" to the extent, but only to the extent, that such information: (i) was already known to the Receiving Party free of any restriction at the time it was obtained from the Disclosing Party; (ii) is subsequently learned from an independent third party free of any restriction and without breach of this Agreement or any agreement with such third party; (iii) is or becomes publicly available through no fault of the Receiving Party; or, (iv) is independently developed by the Receiving Party without reference to any Confidential Information.

(e)    If any Confidential Information is subject to disclosure pursuant to an order, decree, subpoena or other validly issued judicial or administrative process requiring the Receiving Party or its subcontractors, agents, or representatives to disclose any Confidential Information of the Disclosing Party, the Receiving Party will promptly notify the Disclosing Party of such request or requirement so that the Disclosing Party may seek to avoid or minimize the required disclosure and/or to obtain an appropriate protective order or other appropriate relief to ensure that any Confidential Information so

disclosed is maintained in confidence to the maximum extent possible by the agency or other person receiving the disclosure. The Receiving Party shall give the Disclosing Party prior notice, to the extent possible and practicable, of the Confidential Information it believes, in the opinion of its legal counsel, it is required to disclose.

(f)        Each Party acknowledges and agrees that, in the event of a breach or threatened breach of any of the foregoing provisions by the other Party, the Receiving Party or the Disclosing Party, as the case may be, will have no adequate remedy in damages and, accordingly, each Party shall be entitled to seek injunctive relief against such breach or threatened breach by the other Party; provided, however, that no specification of a particular legal or equitable remedy shall be construed as a waiver, prohibition or limitation of any legal or equitable remedies in the event of a breach hereof.

(g)        The Receiving Party agrees, upon written request of the Disclosing Party, to return or destroy (such return and/or destruction to be certified in writing) all tangible Confidential Information within thirty (30) business days of the Disclosing Party's request; provided, however, the Receiving Party may retain Confidential Information stored pursuant to automated electronic back-up or archival systems used in the ordinary course of business, or to comply with legal or regulatory requirements, provided that any Confidential Information so retained is not generally accessible to employees or other persons in the ordinary course of business.

(h)        The Parties' obligations with respect to Confidential Information shall survive expiration or termination of this Agreement.

**9.        Business Continuity Plan and Disaster Recovery**

(a)        Company maintains plans to continue business in the event of an interruption to its business or unavailability of any site from which Services are being performed (the "Disaster Recovery and Business Continuity Plans"). Company agrees that its Disaster Recovery and Business Continuity Plans shall include, among other things, provision for the remote storage of computer software and data, for the remote storage of documentation, the availability of a location for off-site computer services and procedures covering all of the facilities used in connection with the Services in order to ensure continuance of Services in the event of a disaster. At a minimum, core processing facilities and operations will include redundant backup and security to ensure minimal exposure to systems failure or unauthorized access. Company will take commercially available measures to ensure the continuity of operations via tape or other off-site backup mechanism. Power backup will be maintained throughout the core processing facilities which affect performance of the Services should a power outage occur. Company, as provided in the Disaster Recovery and Business Continuity Plans and to the extent obtainable using all reasonable commercial efforts, will seek to have Services available within a forty-eight (48) hour period following any significant outage/incident, with a maximum of twenty-four (24) hours of data loss.

(b)        Client, upon reasonable notice, may schedule a visit to Company's place of business and review the specifics of its Disaster Recovery and Business Continuity Plans.

(c)        An event shall not be considered a force majeure event to the extent that proper implementation of the Disaster Recovery and Business Continuity Plans would have enabled Company to continue performance hereunder in a timely manner. In the event of a natural or other disaster beyond Company's control that interrupts the performance of any Services for any period, Company shall promptly respond to such disaster in accordance with its procedures contained in the Disaster Recovery and Business Continuity Plans in order to resume performance of Services.

**10.        Termination Assistance Services.**

Except where Client has defaulted under this Agreement, after expiration of the term or termination of this Agreement, Company shall, upon request from Client, provide Client with termination assistance and transition services at Company's prevailing rates then in effect for such services. Company agrees that the quality and level of performance during any transition assistance period shall not be degraded.

## 11. Judicial Orders and Inspections

Client agrees and understands that Company may be required to comply with any subpoena or similar order served upon it regarding physical or electronic records, or other documents, items or information forming the basis of the Services, in whole or in part, under this Agreement. Company agrees to promptly notify Client upon receipt thereof, unless such notice is prohibited by law. Client agrees to pay all reasonable costs and expenses incurred by Company for such compliance. Company will cooperate with Client's reasonable efforts to quash or limit any subpoena or similar order, at Client's expense. Client acknowledges that its information may be subject to inspection by federal, state or local governmental agencies ("Government Inspectors"), and in the event thereof, Company shall bear no responsibility for loss or damage caused by Government Inspectors.

## 12. Postage

If the Services provided hereunder require postage, such postage shall be due in advance to avoid suspension or termination of Services (including the re-performance of Services under paragraph 3(a)). Company will invoice Client for the estimated amount needed for one (1) month of fulfillment services. Company will make commercially reasonable efforts to process work in a manner so as to realize any available postage discounts. Client acknowledges that postage rates are subject to change based on changes to the United States Postal Service rate tables. At Company's discretion, Client may be required to set up and fund a separate postage account.

## 13. Disclaimer of Warranties

**EXCEPT AS OTHERWISE PROVIDED IN THIS AGREEMENT, COMPANY MAKES NO WARRANTIES HEREUNDER, AND EXPRESSLY DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.**

## 14. Mutual Indemnification

(a) By Company. Company agrees to indemnify, defend and hold harmless Client, its directors, shareholders, officers, employees, and agents, and defend any action brought against same with respect to any claim, demand, cause of action, or liability, including reasonable attorneys' fees, to the extent that such action is based upon a claim that arises out of the negligence or willful misconduct of Company.

(b) By Client. Client agrees to indemnify, defend and hold harmless Company, its directors, shareholders, officers, employees, and agents, and defend any action brought against same with respect to any claim, demand, cause of action, or liability, including reasonable attorneys' fees, to the extent that such action is based upon a claim that arises out of the negligence or willful misconduct of Client.

## 15. Limitation of Liability

(a)      <u>Liability Generally</u>.  Company shall not be liable for damages for any loss of or damage to Deposits however caused, or damages arising from or relating to the provision of Services hereunder, unless and only to the extent that such loss or damage is caused by Company's negligence or willful misconduct. Without limiting the foregoing, Company shall not be liable for damages which could not have been avoided by Company's exercise of such due care as a reasonably prudent person would have exercised under like commercial circumstances.

(b)      <u>Common Carrier</u>.  If Deposits are placed in the custody of a common carrier by Client, at the request of Client, or approval by Client, then the common carrier shall be solely responsible for any loss of or damage to such Deposits while in the custody of the common carrier.

(c)      <u>Limitation on Value of Deposits</u>.  Client agrees that the value of Deposits shall be limited to one dollar ($1.00)  per carton, per linear foot of open-shelf space, or per storage device for Deposits constituting physical records,  microfilm, microfiche or similar items stored or in Company's possession pursuant to this Agreement, and two dollars ($2.00) per carton, per linear foot of open-shelf space, or per storage device with respect to round reel tape, audio tape, video tape, film, data cartridges, data cassettes or any other non-paper media or items stored or in Company's possession pursuant to this Agreement.

(d)      <u>Limitation of Direct Damages</u>. **EXCEPT FOR INDEMNIFICATION OBLIGATIONS (SECTIONS 4(a) AND 14), BREACHES OF CONFIDENTIALITY (SECTION 8) OR VIOLATIONS OF PRIVACY LAWS (SECTION 3(b)) (COLLECTIVELY, THE "LIMITATION EXCLUSIONS")  AND PAYMENT OF FEES OR EXPENSES DUE UNDER THIS AGREEMENT OR ANY STATEMENT(S) OF WORK, THE ENTIRE LIABILITY FOR EITHER PARTY FOR ANY CLAIM, LOSS, DAMAGE, OR EXPENSE FROM ANY CAUSE WHATSOEVER, REGARDLESS OF THE FORM OF ACTION, WHETHER IN CONTRACT, TORT INCLUDING NEGLIGENCE, STRICT LIABILITY OR OTHERWISE, SHALL BE LIMITED, IN THE AGGREGATE, TO DIRECT DAMAGES IN AN AMOUNT NOT TO EXCEED THE SUM OF THE FEES PAID TO COMPANY DURING THE NINE (9) MONTHS PRECEDING THE EVENT GIVING RISE TO THE CLAIM UNDER THIS AGREEMENT, OR UNDER THE STATEMENT OF WORK AT ISSUE, WHICHEVER IS LESS. NOTWITHSTANDING THE FORGOING, THE ENTIRE LIABILITY FOR EITHER PARTY WITH REGARD TO THE LIMITATION EXCLUSIONS SHALL BE LIMITED IN THE AGGREGATE TO DIRECT DAMAGES IN AN AMOUNT NOT TO EXCEED THE SUM OF THE FEES PAID TO COMPANY DURING THE EIGHTEEN (18) MONTHS PRECEDING THE EVENT GIVING RISE TO THE CLAIM UNDER THIS AGREEMENT, OR UNDER THE STATEMENT OF WORK AT ISSUE, WHICHEVER IS LESS.**

(e)      <u>Limitation of Indirect Damages</u>.  **NEITHER PARTY SHALL HAVE LIABILITY WITH RESPECT TO OBLIGATIONS UNDER THIS AGREEMENT FOR CONSEQUENTIAL, EXEMPLARY, SPECIAL, INCIDENTAL, PUNITIVE, OR ANY OTHER INDIRECT DAMAGES, INCLUDING LOST PROFITS, EVEN IF A PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.**

**16.      Relationship**

Nothing in this Agreement shall in any way be construed to constitute an employer/employee relationship, joint venture, or partnership between the parties. Company shall perform Services under this Agreement as an independent contractor.

**17.      Non-Solicitation**

During the term of this Agreement and for a period of one (1) year following termination of this Agreement for any reason, Client covenants and agrees that Client will not directly or indirectly solicit, advise or encourage, or attempt to solicit, advise or encourage, any (i) client or vendor of Company to terminate, reduce or modify its relationship with Company in a manner which is adverse to Company, or (ii) employee or contractor of Company to terminate his, her, or its employment relationship with Company.

### 18.    Non-exclusive Services during Term

During the term of this Agreement Company will be free to provide the same or similar Services it is providing to Client on behalf of any other individual, business, commercial entity or the like.

### 19.    Dispute Resolution

Except for that part of a claim or controversy where injunctive or other equitable relief is appropriate, any controversy or claim arising out of or relating to this Agreement, the provision of Services or a Statement of Work, shall first be attempted to be resolved by direct communication between executive personnel of each organization. If direct communication fails to bring about a resolution within sixty (60) days after executive communications begin, then either Party may avail itself of any remedies available under law, including commencement of legal proceedings. The Parties agree to act in good faith in carrying out the provisions of this paragraph.

### 20.    Governing Law; Forum

This Agreement shall be construed in accordance with and governed by the laws of the State of Pennsylvania excepting its conflict of law provisions. Any action or proceeding arising out of, relating to, or concerning this Agreement shall be filed only in the state and federal courts in Lackawanna, Pennsylvania. The Parties hereby submit to the jurisdiction of and agree that both the federal and state courts in Lackawanna County, Pennsylvania are a convenient forum and agree not to raise as a defense that such courts are not a convenient forum.

### 21.    Cumulative Remedies and Offsets

Except as otherwise expressly provided in this Agreement, all remedies in this Agreement are cumulative and in addition to (not in lieu of) any other remedies available to a Party at law or in equity. In the event of claim by Client for loss or damage for which Company is responsible, Client shall not be entitled to adjust the amounts claimed against future or outstanding payments due, or which may become due, to Company.

### 22.    Insurance

Company shall procure and maintain during the term of this Agreement: (i) worker's compensation insurance covering its employees who provide services under this Agreement pursuant to applicable state laws and at the statutory limits required for each such state, (ii) general commercial liability insurance with a limit of not less than $1,000,000 combined single limit per occurrence for bodily injury and property damage liability which shall also include blanket contractual liability coverage, (iii) automobile liability insurance covering all owned, non-owned and leased automobiles with limits of not less than $1,000,000 combined single limit per occurrence for bodily injury and property damage liability, and (iv) technology errors and omissions insurance including cyber liability/network security/privacy coverage with limits of liability not less than $2,000,000.

23.     **Entire Agreement**

   This Agreement, including any exhibits, attachments and Statements of Work issued hereunder, is the entire agreement of the Parties and supersedes any prior agreements between them, whether written or oral, with respect to the subject matter hereof.  No waiver, amendment, alteration, or modification of any of the provisions of this Agreement shall be binding unless in writing and signed by duly authorized representatives of the Parties hereto.

24.     **Publicity**

   Client grants Company the right to use its trademarks, trade names, or other designations in Company's promotional materials, which right may be revoked by Client at any time, provided that Company (i) adheres to any specific guidelines issued by Client regarding use of its trademarks and trade names, and (ii) Company uses proper trademark attribution on all such uses indicating Client as the owner of such marks.

25.     **Headings**

   Headings in this Agreement are for convenience only and shall not be used to interpret or construe its provisions. The language in all parts of this Agreement shall be in all cases construed according to its fair meaning and not strictly for or against either Party.

26.     **Non-Waiver**

   No delay or failure by either Party to exercise any right hereunder, and no partial or single exercise of such right, shall constitute a waiver of that or any other right, unless otherwise expressly provided herein.

27.     **Force Majeure**

   Neither Party shall be liable for any failure of or delay in performance of its obligations under this Agreement or any Statement of Work issued hereunder to the extent such failure or delay is due to circumstances beyond its reasonable control, including, without limitation, acts of God, acts of public enemy, fires, floods, wars, civil disturbances, sabotage, accidents, insurrections, blockades, embargoes, storms, explosions, labor disputes (whether or not the employees' demands are reasonable and within the Party's power to satisfy), acts of any governmental body (whether civil or military, foreign or domestic), failure or delay of third parties or governmental bodies from whom a party is obtaining or must obtain approvals, franchises, or permits, or inability to obtain labor, materials, equipment, or transportation (collectively referred to herein as "Force Majeure"). Each Party shall use its best efforts to minimize the duration and consequences of any failure of or delay in performance resulting from a Force Majeure event.

28.     **Notices**

   All notices shall be in writing and shall be deemed to be delivered when deposited with the United States Postal Service, postage prepaid, return receipt requested, or when sent by facsimile (provided a confirmation copy is promptly sent) or overnight courier. All notices shall be directed to Company or Client at the respective addresses set forth in this Agreement or such other address as may be from time-to-time designated by written notice from one Party to the other.

29.     **Third Party Beneficiaries**

The Parties do not intend to confer any rights, privileges, or benefits upon any other individual(s) or entity(ies) not signatories to this Agreement or a Statement of Work issued hereunder. The Parties agree that nothing in this Agreement shall be construed or interpreted to confer any such rights, privileges, or benefits upon any individual or entity not a signatory to this Agreement or a Statement of Work.

### 30.    Counterparts

This Agreement may be executed manually or via electronic signature in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. As such, this Agreement is deemed "signed" if it includes a digital signature, symbol and/or action that is adopted or performed by either Party or Party's electronic agent with the present intent to authenticate or manifest assent to this Agreement.

### 31.    Severability

The invalidity or unenforceability of any provision of this Agreement, or any terms thereof, shall not affect the validity of this Agreement as a whole, which shall at all times remain in full force and effect.

**IN WITNESS WHEREOF**, each of the Parties has caused this Agreement to be executed effective as of the date first set forth above.

TrustFlow Digital Solutions, Inc.

*Jimmy Eyerman*

Print:  Jimmy Eyerman

Title: President & CEO

Date: April 15, 2023

Maverick Management Group, LLC By:

By:

Print: ROSA BIANCA COLI

Title: CEO

Date: 4·14·23

# MMG.TFDS.MSA

Final Audit Report                                                    2023-04-15

| | |
|---|---|
| Created: | 2023-04-15 |
| By: | Anita Ruskey (anita.ruskey@trustflowds.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAxr76RZrVxC_pvHN9Apzni-A8LaiKtjye |

## "MMG.TFDS.MSA" History

📄 Document created by Anita Ruskey (anita.ruskey@trustflowds.com)
   2023-04-15 - 11:54:06 AM GMT- IP address: 73.130.179.170

📧 Document emailed to jimmy.eyerman@trustflowds.com for signature
   2023-04-15 - 11:55:32 AM GMT

📄 Email viewed by jimmy.eyerman@trustflowds.com
   2023-04-15 - 2:17:37 PM GMT- IP address: 54.219.183.184

✍ Signer jimmy.eyerman@trustflowds.com entered name at signing as Jimmy Eyerman
   2023-04-15 - 2:37:47 PM GMT- IP address: 50.225.201.81

✍ Document e-signed by Jimmy Eyerman (jimmy.eyerman@trustflowds.com)
   Signature Date: 2023-04-15 - 2:37:49 PM GMT - Time Source: server- IP address: 50.225.201.81

✅ Agreement completed.
   2023-04-15 - 2:37:49 PM GMT

Names and email addresses are entered into the Acrobat Sign service by Acrobat Sign users and are unverified unless otherwise noted.

EDM Americas | Powered by Adobe Acrobat Sign

# FIRST AMENDMENT
## TO THE
## MASTER SERVICES AGREEMENT
### BETWEEN
### Maverick Management Group
## AND
## TRUSTFLOW DIGITAL SOLUTIONS, INC.

THIS FIRST AMENDMENT ("Amendment") is by and between Maverick Management Group, with offices at 3347 Michelson Dr Irvine, CA. 92612 **Suite 400** (hereinafter the "MMG"), and Trustflow Digital Solutions, Inc. (formally EDM Americas, Inc & Diversified Information Technologies, Inc), (hereinafter "TrustFlow") made effective as of May 12, 2023 (the "Amendment Effective Date").

WHERAS, MMG and TrustFlow (together, the "Parties") entered into an Agreement with an Effective Date of April 17, 2023.

WHERAS, the Parties desire to amend the Agreement as set forth in this Amendment.

NOW, THEREOFE for good and valuable consideration, the receipt and sufficiency of which is acknowledged and agreed, the Parties hereby agree to amend the Agreement as follows:

1. **Statement of Work Number 1 will be deleted in its entirety and replaced with Appendix A of this Amendment..**

This Amendment may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute only one instrument.

This Amendment and the provisions herein contained shall be binding upon and inure to the benefit of TrustFlow and MMG and their respective successors and assigns.

The remaining terms and conditions of the Agreement not modified herein shall remain in full force and effect. In the event of a conflict between the terms of the Agreement and this Amendment, the terms of this Amendment shall govern and control for purposes of such conflict. Except as amended by this Amendment, all terms used and not otherwise defined herein shall have the meanings assigned to them in the Agreement.

**IN WITNESS WHEREOF**, the Parties hereto, through their duly authorized officers, have executed this Amendment.

| Maverick Management Group | | TRUSTFLOW DIGITAL SOLUTIONS, INC. | |
|---|---|---|---|
| By: | *Audrey Limoges* | By: | *Jimmy Eyerman*  Jimmy Eyerman (May 16, 2023 08:51 CDT) |
| Name: | Audrey Limoges | Name: | Jimmy Eyerman |
| Title: | Executive assistant | Title: | President & CEO |
| Date Signed: | 05/ 15 / 2023 | Date Signed: | May 16, 2023 |

3. Documents are in good condition with all pages being 8 ½ x 11.
4. 24 document templates will be utilized and returned via USPS.
5. Return mail will be received and processed under the non-legal folder and sent to the EDMOnline portal
6. All paper documents will be retained 30 days after scanning and then securely destroyed.

## E.   SCOPE OF SERVICES

### *Receive, Prep & Scan*

1. TrustFlow will set up one or more PO boxes to receive mail at its Millville local USPS location
   a.   PO Box 749, Millville NJ 08332

2. All mail will be picked up daily by TrustFlow's courier from the local USPS in Millville NJ.
3. TrustFlow will receive and prep documents for scanning daily.
4. Prepping includes opening the envelope, removing documents, and mending any tears or removing staples.
5. Sorting envelopes into Legal and Non-Legal categories
6. Doc type sorting will be based on the following
   a.   Legal
      i.   Attorney Solicitation
      ii.   Check (literally checks sent by mail by client)
      iii.   Collection Letters
      iv.   Confirmation of Identity
      v.   Invoice
      vi.   Statement
      **vii.   Validation Response**
      **viii.   Verification of Address**
   **b.   Non-Legal**
      i.   Complaint
      ii.   Deposition Notice
      iii.   Garnishment
      iv.   Interrogatory
      v.   Levy
      vi.   Lien
      vii.   Litigation Threat
      viii.   Notice
      ix.   Notice of Intent to Lien
      x.   Petition
      xi.   Request for HIPPA Release

validation file, the name in the validation file will be used, regardless of whether the name in the validation file matches the document.

      vii. If any index value is missing the document will be routed to an EDMOnline queue to be reviewed by MMG.

  b. Documents with Checks

    If a document contains a check, the following index fields will be captured in addition to the index fields listed in the All Documents section above.

      i. Payee First Name

      ii. Payee Last Name

      iii. Amount

      iv. Check number

      v. An email will be auto generated and sent once daily notifying MMG checks are outstanding to be processed

      vi. A check log report will be created daily to include the index values above and provided daily via email.

      vii. Checks will be scanned and maintained with the original documents it was received with and can be searched in EDMOnline by any of the above index values or the DCN number.

      viii. All checks routed to EDMonline will be reviewed by MMG and MMG will provide a response within 48 hours by checking one of the following

         1. Return Check to Sender – Scan envelope and return check based on checking account name.

         2. Return check to MMG

         3. Destroy Check

      ix. MMG to provide contact and address to send checks.

2. Validation File – to be reviewed at a later date, not in scope

  a. MMG will deliver a validation file in comma separated text file format

      i. ReferenceNumber,FirstName,LastName

      ii. For example: 1234567890,John,Smith

  b. MMG will deliver the validation file periodically to a TrustFlow hosted SFTP site. TrustFlow will ingest the file into the data capture workflow, to be used at the indexing step.

### *Export via EDMOnline*

  a. TrustFlow will deliver output to TrustFlow's hosted EDMOnline portal

  b. All documents including checks will be exported as they are processed to EDMOnline portal

  c. Images will be delivered in B&W G4 Multipage TIFF format at 300dpi

  d. TIFF files will be named with a unique identifier, a document control number (DCN) , first name, last name or reference number e.g. 210000001_John Smith_TrustFlow Digital Solutions.TIFF

  e. EDMOnline will be setup for viewing and searching documents by the index values captured above and an exception queue for handling exceptions.

  f. EDMOnline will contain the following;

     o Inbound Mail

       • Month Current Month – ability to review current months mail

       • Mail By Month – ability to review mail by month

### *Service Level Agreements*

1. Turnaround time for the mail to be processed will be within 48 hours from receipt date.
2. Mail received M-F after 3pm EST will be dated for the next business day. Friday's mail received after 3pm EST will be dated with Monday's receipt date.
3. In the event the daily volumes are more than 120% of the expected volumes, service level turnaround times may exceed the service level above. Supplier will work to resolve any backlog that may occur by developing a mutually agreed upon plan.
4. Return mail is the last priority to be scanned and all other mail should be processed first.
5. A two (2%) random sample of all the documents processed will be audited for image quality.
6. Image quality is at the image level and calculated as follows: (total document images audited – total document images with errors / total documents images audited) - 98% image quality will be maintained
7. TrustFlow will provide data capture accuracy at 98% on a field level.
8. Index quality is at a field level and calculated as follows: (total document index fields audited – total document index fields with errors / total documents index fields audited
9. Image QA – A variable percentage of documents will be sent to a QA step in the workflow to ensure acceptable image quality.

### *Reporting*

- SLAs will be self-reported by TrustFlow, and the results will be available via excel reports.
- The following reports will be made available:
- Turnaround SLA Results
- Number of Inbound Envelopes
- Quality SLA Results
- Billing report
- Operational Q/C and Indexing

### *QA, PEAudit, POAP Modules*

1. TrustFlow will add a QA, PEAudit and POAP modules to the workflow process to allow a variable percentage of documents to be reviewed to ensure image and indexing quality metrics are being met.

### F. PROJECT DELIVERY

1. The project phases and estimated timelines are presented in the table below. Project Kick-off occurs after TrustFlow resource assignment. Resource availability may vary depending on capacity at the time of contract signature.

| Phase | Estimated Duration (weeks) |
|---|---|
| Project Kick Off | 2 |
| Requirements Gathering, Design | Included above |
| Solution Configuration | Included above |
| Testing | 2 |
| Production Roll-out | 1 |
| Solution Implementation Total | 5 |

- o        A mutually acceptable remedy plan will be proposed.
- o        If not accepted, the incident will be escalated to Level 2.
- o        If accepted, the action plan for the remedy plan will be executed.

2.        Level 2 – Operations Executive Management Review

- o        In the event an acceptable remedy plan cannot be mutually agreed to as outlined in Level 1, an executive operational representative from both organizations will meet in person to review the incident and find resolution.
- o        If the proposed resolution is accepted, a remedy plan will be executed.

## K. PRICING

| Estimated Monthly Cost | | | | |
|---|---|---|---|---|
| **Process** | **Unit of Measure** | **Monthly Units** | **Unit Price** | **Estimated Cost** |
| **Implementation/Set-Up Testing Fee** | | | | |
| Setup and Testing for scanning and EDMOnline portal | One-Time | 1 | 1 | $37,500.00 Already Paid |
| | | | | |
| | | | | |
| **Core Services** | | | | |
| Empty Boxes for temporary storage | Box | 80 | $3.50 | $280.00 |
| Receive, Sort, Prep, | Image | 200,000 | $.125 | $25,000.00 |
| Indexing – Name & Reference Number (avg 35 characters) | Character | 3,500,000 | $.009 | $31,500.00 |
| Identify Doc Types | Document | 100,000 | $.02 | $2,000.00 |
| Logging Checks + scanning and indexing charges | Check | TBD | $.75 | TBD |
| Destruction | Image | 200,000 | $.003 | $600.00 |
| Export Images | Image | 200,000 | $.001 | $200.00 |
| Courier Services – Pickup boxes from USPS | Trip | 20 | $30.00 | $600.00 |
| PO Box | Annual | 1 | pass-through | |
| EDMOnline Portal – Includes 10 user and 10 Gigabytes of storage | Monthly | 1 | $1,500.00 | $1,500.00 |
| Additional Users | User | TBD | $15.00 | |
| Additional Gigabytes | GB Month | TBD | $1.00 | |
| **Additional Services** | | | | |

- Minimum monthly billing of $3,000

**IN WITNESS WHEREOF,** the parties hereto, through their duly authorized officers, have executed this SOW as of the date first set forth above.

**L. APPROVALS**

Accepted By:

**Maverick Management Group, LLC**

By: *Audrey Limoges*

Name: *Audrey Limoges*

Title: Executive assistant

Date: 05/15/2023

**TrustFlow Digital Solutions, Inc.**

By: *Jimmy Eyerman*
Jimmy Eyerman (May 16, 2023 08:51 CDT)

Name: Jimmy Eyerman

Title: President & CEO

Date: May 16, 2023

# Amendment 1 Maverick Mailroom SOW

Final Audit Report                                                                                      2023-05-16

| | |
|---|---|
| Created: | 2023-05-16 |
| By: | Anita Ruskey (anita.ruskey@trustflowds.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAltvyxj_r9_V0cUhO6qy65wFd4ueJVEc5 |

## "Amendment 1 Maverick Mailroom SOW" History

📄 Document created by Anita Ruskey (anita.ruskey@trustflowds.com)
2023-05-16 - 1:06:01 PM GMT- IP address: 73.130.179.170

📧 Document emailed to jimmy.eyerman@trustflowds.com for signature
2023-05-16 - 1:07:40 PM GMT

📄 Email viewed by jimmy.eyerman@trustflowds.com
2023-05-16 - 1:28:20 PM GMT- IP address: 34.234.76.207

🖊 Signer jimmy.eyerman@trustflowds.com entered name at signing as Jimmy Eyerman
2023-05-16 - 1:51:51 PM GMT- IP address: 136.34.224.58

🖊 Document e-signed by Jimmy Eyerman (jimmy.eyerman@trustflowds.com)
Signature Date: 2023-05-16 - 1:51:53 PM GMT - Time Source: server- IP address: 136.34.224.58

✅ Agreement completed.
2023-05-16 - 1:51:53 PM GMT

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
870 Roosevelt, Irvine, CA 92620.

A true and correct copy of the foregoing document entitled: **NOTICE OF APPLICATION BY CHAPTER 11 TRUSTEE TO EMPLOY OMNI AGENT SOLUTIONS AS CLAIMS AND NOTICING AGENT** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **November 23, 2023**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**: On **November 27, 2023**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**DEBTOR – MAIL REDIRECTED TO TRUSTEE**
THE LITIGATION PRACTICE GROUP P.C.
~~17542 17TH ST~~
~~SUITE 100~~
~~TUSTIN, CA 92780-1981~~

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL:** Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **November 27, 2023**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

VIA EMAIL:
**INTERESTED PARTY**
MIKE BALBERCHAK
TRUSTFLOW DIGITAL SOLUTIONS
Mike.Balberchak@trustflowds.com

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| November 27, 2023 | Pamela Kraus | /s/ Pamela Kraus |
|---|---|---|
| Date | Printed Name | Signature |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: CONTINUED:

- **Eric Bensamochan**     eric@eblawfirm.us, G63723@notify.cincompass.com
- **Peter W Bowie**     peter.bowie@dinsmore.com, caron.burke@dinsmore.com
- **Ronald K Brown**     ron@rkbrownlaw.com
- **Christopher Celentino**     christopher.celentino@dinsmore.com, caron.burke@dinsmore.com
- **Shawn M Christianson**     cmcintire@buchalter.com, schristianson@buchalter.com
- **Randall Baldwin Clark**     rbc@randallbclark.com
- **Leslie A Cohen**     leslie@lesliecohenlaw.com, jaime@lesliecohenlaw.com;clare@lesliecohenlaw.com
- **Aaron E. DE Leest**     adeleest@DanningGill.com, danninggill@gmail.com;adeleest@ecf.inforuptcy.com
- **Jenny L Doling**     jd@jdl.law,
  dolingjr92080@notify.bestcase.com;15994@notices.nextchapterbk.com;jdoling@jubileebk.net
- **Daniel A Edelman**     dedelman@edcombs.com, courtecl@edcombs.com
- **William P Fennell**     william.fennell@fennelllaw.com,
  luralene.schultz@fennelllaw.com;wpf@ecf.courtdrive.com;hala.hammi@fennelllaw.com;naomi.cwalinski@fennelllaw.com;samantha.larimer@fennelllaw.com
- **Eric Gassman**     erg@gassmanlawgroup.com, gassman.ericb112993@notify.bestcase.com
- **Christopher Ghio**     christopher.ghio@dinsmore.com,
  nicolette.murphy@dinsmore.com;angelica.urena@dinsmore.com;deamira.romo@dinsmore.com
- **Amy Lynn Ginsburg**     efilings@ginsburglawgroup.com
- **Eric D Goldberg**     eric.goldberg@dlapiper.com, eric-goldberg-1103@ecf.pacerpro.com
- **Jeffrey I Golden**     jgolden@go2.law,
  kadele@ecf.courtdrive.com;cbmeeker@gmail.com;lbracken@wgllp.com;dfitzgerald@go2.law;golden.jeffreyi.b117954@notify.bestcase.com
- **Richard H Golubow**     rgolubow@wghlawyers.com, jmartinez@wghlawyers.com;svillegas@wghlawyers.com
- **David M Goodrich**     dgoodrich@go2.law, kadele@go2.law;dfitzgerald@go2.law;wggllp@ecf.courtdrive.com
- **D Edward Hays**     ehays@marshackhays.com,
  ehays@ecf.courtdrive.com;kfrederick@ecf.courtdrive.com;cmendoza@marshackhays.com;cmendoza@ecf.courtdrive.com
- **Alan Craig Hochheiser**     ahochheiser@mauricewutscher.com, arodriguez@mauricewutscher.com
- **Garrick A Hollander**     ghollander@wghlawyers.com, jmartinez@wghlawyers.com;svillegas@wghlawyers.com
- **Brian L Holman**     b.holman@musickpeeler.com
- **Richard L. Hyde**     richard@amintalati.com
- **Razmig Izakelian**     razmigizakelian@quinnemanuel.com
- **Joon M Khang**     joon@khanglaw.com
- **Ira David Kharasch**     ikharasch@pszjlaw.com
- **Meredith King**     mking@fsl.law, ssanchez@fsl.law;jwilson@fsl.law
- **Nicholas A Koffroth**     nkoffroth@foxrothschild.com, khoang@foxrothschild.com
- **David S Kupetz**     David.Kupetz@lockelord.com, mylene.ruiz@lockelord.com
- **Christopher J Langley**     chris@slclawoffice.com,
  omar@slclawoffice.com;langleycr75251@notify.bestcase.com;ecf123@casedriver.com
- **Matthew A Lesnick**     matt@lesnickprince.com, matt@ecf.inforuptcy.com;jmack@lesnickprince.com
- **Daniel A Lev**     daniel.lev@gmlaw.com, cheryl.caldwell@gmlaw.com;dlev@ecf.courtdrive.com
- **Britteny Leyva**     bleyva@mayerbrown.com,
  2396393420@filings.docketbird.com;KAWhite@mayerbrown.com;ladocket@mayerbrown.com
- **Michael D Lieberman**     mlieberman@lipsonneilson.com
- **Yosina M Lissebeck**     Yosina.Lissebeck@Dinsmore.com, caron.burke@dinsmore.com
- **Mitchell B Ludwig**     mbl@kpclegal.com, kad@kpclegal.com
- **Daniel S March**     marchlawoffice@gmail.com, marchdr94019@notify.bestcase.com
- **Kathleen P March**     kmarch@bkylawfirm.com, kmarch3@sbcglobal.net,kmarch@sbcglobal.net
- **Mark J Markus**     bklawr@bklaw.com, markjmarkus@gmail.com;markus.markj.r112926@notify.bestcase.com
- **Richard A Marshack (TR)**     pkraus@marshackhays.com,
  rmarshack@iq7technology.com;ecf.alert+Marshack@titlexi.com
- **Laila Masud**     lmasud@marshackhays.com, lmasud@ecf.courtdrive.com;kfrederick@ecf.courtdrive.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                    **F 9013-3.1.PROOF.SERVICE**

- **Kenneth Misken**    Kenneth.M.Misken@usdoj.gov
- **Byron Z Moldo**    bmoldo@ecjlaw.com, amatsuoka@ecjlaw.com,dperez@ecjlaw.com
- **Glenn D. Moses**    gmoses@venable.com,
  cascavone@venable.com;ipmalcolm@venable.com;jadelgado@venable.com
- **Alan I Nahmias**    anahmias@mbn.law, jdale@mbn.law
- **Victoria Newmark**    vnewmark@pszjlaw.com
- **Queenie K Ng**    queenie.k.ng@usdoj.gov
- **Keith C Owens**    kowens@foxrothschild.com, khoang@foxrothschild.com
- **Lisa Patel**    lpatel@lesnickprince.com, jmack@lesnickprince.com;jnavarro@lesnickprince.com
- **Michael R Pinkston**    rpinkston@seyfarth.com,
  jmcdermott@seyfarth.com,sfocalendar@seyfarth.com,5314522420@filings.docketbird.com,bankruptcydocket@seyfarth.com
- **Douglas A Plazak**    dplazak@rhlaw.com
- **Daniel H Reiss**    dhr@lnbyg.com, dhr@ecf.inforuptcy.com
- **Ronald N Richards**    ron@ronaldrichards.com, 7206828420@filings.docketbird.com
- **Kevin Alan Rogers**    krogers@wellsmar.com
- **Gregory M Salvato**    gsalvato@salvatoboufadel.com,
  calendar@salvatolawoffices.com;jboufadel@salvatoboufadel.com;gsalvato@ecf.inforuptcy.com
- **Olivia Scott**    olivia.scott3@bclplaw.com
- **Jonathan Serrano**    jonathan.serrano@dinsmore.com
- **Maureen J Shanahan**    Mstotaro@aol.com
- **Paul R Shankman**    PShankman@fortislaw.com, info@fortislaw.com
- **Zev Shechtman**    zs@DanningGill.com, danninggill@gmail.com;zshechtman@ecf.inforuptcy.com
- **Leslie Skorheim**    leslie.skorheim@usdoj.gov
- **Adam D Stein-Sapir**    info@pfllc.com
- **Howard Steinberg**    steinbergh@gtlaw.com, pearsallt@gtlaw.com;NEF-BK@gtlaw.com;howard-steinberg-6096@ecf.pacerpro.com
- **Andrew Still**    astill@swlaw.com, kcollins@swlaw.com
- **Michael R Totaro**    Ocbkatty@aol.com
- **United States Trustee (SA)**    ustpregion16.sa.ecf@usdoj.gov
- **Sharon Z. Weiss**    sharon.weiss@bclplaw.com,
  raul.morales@bclplaw.com,REC_KM_ECF_SMO@bclplaw.com
- **Johnny White**    JWhite@wrslawyers.com, jlee@wrslawyers.com

2.  <u>**SERVED BY UNITED STATES MAIL**</u>: continued:

| <u>20 LARGEST CREDITOR</u> | <u>20 LARGEST CREDITOR</u> | <u>20 LARGEST CREDITOR</u> |
|---|---|---|
| ANTHEM BLUE CROSS<br>ATTN: OFFICER, A MANAGING OR<br>GENERAL AGENT, OR TO ANY<br>OTHER AGENT AUTHORIZED BY<br>APPOINTMENT OR LAW TO<br>RECEIVE SERVICE OF PROCESS<br>PO BOX 511300<br>LOS ANGELES, CA 90051-7855 | AZEVEDO SOLUTIONS GROUPS, INC<br>ATTN: OFFICER, A MANAGING OR<br>GENERAL AGENT, OR TO ANY OTHER<br>AGENT AUTHORIZED BY<br>APPOINTMENT OR LAW TO RECEIVE<br>SERVICE OF PROCESS<br>420 ADOBE CANYON RD<br>KENWOOD, CA 95452-9048 | BUSINESS CENTERS OF AMERICA<br>ATTN: OFFICER, A MANAGING OR<br>GENERAL AGENT, OR TO ANY<br>OTHER AGENT AUTHORIZED BY<br>APPOINTMENT OR LAW TO<br>RECEIVE SERVICE OF PROCESS<br>1100 SIR FRANCIS DRAKE BLVD,<br>SUITE 1<br>KENTFIELD, CA 94904-1476 |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                                                **F 9013-3.1.PROOF.SERVICE**

**20 LARGEST CREDITOR**
CALIFORNIA FRANCHISE TAX
BOARD
PO BOX 942857
SACRAMENTO, CA 94257-0001

**RTD 05/30/23 UTF**
**20 LARGEST CREDITOR**
COLLABORATION ADVISORS
ATTN: OFFICER, A MANAGING OR
GENERAL AGENT, OR TO ANY OTHER
AGENT AUTHORIZED BY
APPOINTMENT OR LAW TO RECEIVE
SERVICE OF PROCESS
400 DORLA COURT
ZEPHYR COVE, NV 89448

**20 LARGEST CREDITOR**
CREDIT REPORTING SERVICE INC
ATTN: OFFICER, A MANAGING OR
GENERAL AGENT, OR TO ANY
OTHER AGENT AUTHORIZED BY
APPOINTMENT OR LAW TO
RECEIVE SERVICE OF PROCESS
548 MARKET ST, SUITE 72907
SAN FRANCISCO, CA 94104-5401

**20 LARGEST CREDITOR**
DEBT PAY PRO
ATTN: OFFICER, A MANAGING OR
GENERAL AGENT, OR TO ANY
OTHER AGENT AUTHORIZED BY
APPOINTMENT OR LAW TO
RECEIVE SERVICE OF PROCESS
1900 E GOLF ROAD, SUITE 550
SCHAUMBURG, IL 60173-5870

**20 LARGEST CREDITOR**
DEBT VALIDATION FUND II, LLC
C/O GARRICK A HOLLANDER
WINTHROP GOLUBOW HOLLANDER
LLP
1301 DOVE STREET, 5TH FLOOR
NEWPORT BEACH, CA 92660

**20 LARGEST CREDITOR**
DEBT VALIDATION FUND II, LLC
ATTN: OFFICER, A MANAGING OR
GENERAL AGENT, OR TO ANY
OTHER AGENT AUTHORIZED BY
APPOINTMENT OR LAW TO
RECEIVE SERVICE OF PROCESS
5075 LOWER VALLEY ROAD
ATGLEN, PA 19310-1774

**20 LARGEST CREDITOR**
DOCUMENT FULFILLMENT
SERVICES
ATTN: OFFICER, A MANAGING OR
GENERAL AGENT, OR TO ANY
OTHER AGENT AUTHORIZED BY
APPOINTMENT OR LAW TO
RECEIVE SERVICE OF PROCESS
2930 RAMONA AVE #100
SACRAMENTO, CA 95826-3838

**20 LARGEST CREDITOR**
EXECUTIVE CENTER LLC
ATTN: OFFICER, A MANAGING OR
GENERAL AGENT, OR TO ANY OTHER
AGENT AUTHORIZED BY
APPOINTMENT OR LAW TO RECEIVE
SERVICE OF PROCESS
5960 SOUTH JONES BLVD
LAS VEGAS, NV 89118-2610

**20 LARGEST CREDITOR / POC
ADDRESS**
EXELA ENTERPRISE SOLUTIONS
ATTN: OFFICER, A MANAGING OR
GENERAL AGENT, OR TO ANY
OTHER AGENT AUTHORIZED BY
APPOINTMENT OR LAW TO
RECEIVE SERVICE OF PROCESS
2701 E. GRAUWYLER ROAD
IRVING, TX 75061-3414

**20 LARGEST CREDITOR / POC
ADDRESS**
FIRST LEGAL NETWORK, LLC
ATTN: OFFICER, A MANAGING OR
GENERAL AGENT, OR TO ANY
OTHER AGENT AUTHORIZED BY
APPOINTMENT OR LAW TO
RECEIVE SERVICE OF PROCESS
PO BOX 743451
LOS ANGELES, CA 90074-3451

**20 LARGEST CREDITOR**
JP MORGAN CHASE
ATTN: OFFICER, A MANAGING OR
GENERAL AGENT, OR TO ANY OTHER
AGENT AUTHORIZED BY
APPOINTMENT OR LAW TO RECEIVE
SERVICE OF PROCESS
3 PARK PLAZA, STE 900
IRVINE, CA 92614-5208

**20 LARGEST CREDITOR**
LEXISNEXUS
ATTN: OFFICER, A MANAGING OR
GENERAL AGENT, OR TO ANY
OTHER AGENT AUTHORIZED BY
APPOINTMENT OR LAW TO
RECEIVE SERVICE OF PROCESS
15500 B ROCKFIELD BLVD
IRVINE, CA 92618-2722

**RTD 10/03/23 UTF**
**20 LARGEST CREDITOR**
MARICH BEIN LLC
ATTN: OFFICER, A MANAGING OR
GENERAL AGENT, OR TO ANY
OTHER AGENT AUTHORIZED BY
APPOINTMENT OR LAW TO
RECEIVE SERVICE OF PROCESS
99 WALL STREET, STE 2669
NEW YORK, NY 10005-4301

**20 LARGEST CREDITOR**
MC DVI FUND 1, LLC; MC DVI FUND 2,
LLC
C/O GARRICK A HOLLANDER
ATTN: OFFICER, A MANAGING OR
GENERAL AGENT, OR TO ANY OTHER
AGENT AUTHORIZED BY
APPOINTMENT OR LAW TO RECEIVE
SERVICE OF PROCESS
1598 COTTONWOOD DR
GLENVIEW, IL 60026-7769

**20 LARGEST CREDITOR**
NETSUITE-ORACLE
ATTN: OFFICER, A MANAGING OR
GENERAL AGENT, OR TO ANY
OTHER AGENT AUTHORIZED BY
APPOINTMENT OR LAW TO
RECEIVE SERVICE OF PROCESS
2300 ORACLE WAY
AUSTIN, TX 78741-1400

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

**20 LARGEST CREDITOR / POC ADDRESS**
OUTSOURCE ACCELERATOR LTD
C/O PAUL R. SHANKMAN, ESQ
FORTIS LLP
650 TOWN CENTER DRIVE, SUITE 1530
COSTA MESA, CA 92626

**20 LARGEST CREDITOR**
SHARP BUSINESS SYSTEMS
ATTN: OFFICER, A MANAGING OR
GENERAL AGENT, OR TO ANY OTHER
AGENT AUTHORIZED BY
APPOINTMENT OR LAW TO RECEIVE
SERVICE OF PROCESS
8670 ARGENT ST
SANTEE, CA 92071-4172

**20 LARGEST CREDITOR**
TASKUS HOLDINGS, INC.
ATTN: OFFICER, A MANAGING OR
GENERAL AGENT, OR TO ANY
OTHER AGENT AUTHORIZED BY
APPOINTMENT OR LAW TO
RECEIVE SERVICE OF PROCESS
1650 INDEPENDENCE DR
NEW BRAUNFELS, TX 78132-3959

**20 LARGEST CREDITOR**
TUSTIN EXECUTIVE CENTER
ATTN: OFFICER, A MANAGING OR
GENERAL AGENT, OR TO ANY
OTHER AGENT AUTHORIZED BY
APPOINTMENT OR LAW TO
RECEIVE SERVICE OF PROCESS
1630 S SUNKIST STEET, STE A
ANAHEIM, CA 92806-5816

**RTD 06/05/23 UTF**
**20 LARGEST CREDITOR**
VALIDATION PARTNERS LLC
ATTN: OFFICER, A MANAGING OR
GENERAL AGENT, OR TO ANY OTHER
AGENT AUTHORIZED BY
APPOINTMENT OR LAW TO RECEIVE
SERVICE OF PROCESS
1300 SAWGRASS PKWY, STE 110
SUNRISE, FL 33323

4885-6511-2722

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                   **F 9013-3.1.PROOF.SERVICE**