Christopher B. Ghio (State Bar No. 259094)
Christopher Celentino (State Bar No. 131688)
Yosina M. Lissebeck (State Bar No. 201654)
**DINSMORE & SHOHL LLP**
655 West Broadway, Suite 800
San Diego, CA 92101
Telephone:  619.400.0500
Facsimile:  619.400.0501
christopher.ghio@dinsmore.com
christopher.celentino@dinsmore.com
yosina.lissebeck@dinsmore.com

Special Counsel to Richard A. Marshack, Chapter 11 Trustee

Tyler Powell (Ky. Bar No. 90520 – Admitted pro hac vice)
Dinsmore & Shohl LLP
100 West Main Street, Suite 900
Lexington, KY 40507
Telephone: 859-425-1056
Facsimile:  859-425-1099
tyler.powell@dinsmore.com

Special Counsel to Richard A. Marshack, Chapter 11 Trustee

In Association With,

D. EDWARD HAYS, #162507
ehays@marshackhays.com
CHAD V. HAES, #2767221
chaes@marshackhays.com
MARSHACK HAYS WOOD LLP
870 Roosevelt
Irvine, California 92620
Telephone: (949) 333-7777
Facsimile: (949) 333-7778

General Counsel for Chapter 11 Trustee,
Richard A. Marshack

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION**

| | |
|---|---|
| In re: | Case No.: 8:23-bk-10571-SC |
| THE LITIGATION PRACTICE GROUP P.C., | Adv. Proc. No. 8:23-ap-XXXX-SC |
| Debtor. | Chapter 11 |

#41551136v1

RICHARD A. MARSHACK,
Chapter 11 Trustee,

Plaintiff,

v.

BRIDGE FUNDING CAP, LLC D/B/A
FUNDURA CAPITAL; MNS FUNDING, LLC;
AZZURE CAPITAL, LLC; MARICH BEIN,
LLC; DIVERSE CAPITAL, LLC; PECC CORP.;
PROOFPOSITIVE, LLC; MC DVI FUND 1,
LLC; MC DVI FUND 2, LLC; DEBT
VALIDATION FUND II, LLC; VENTURE
PARTNERS, LLC;

Defendants.

**TRUSTEE'S COMPLAINT FOR:**

**(1) DECLARATORY JUDGMENT AS TO THE VALIDITY OF THE SECURITY INTEREST OF DEFENDANT BRIDGE FUNDING CAP LLC.**

**(2) DECLARATORY JUDGMENT AS TO THE VALIDITY OF THE SECURITY INTEREST OF DEFENDANT MNS FUNDING, LLC.**

**(3) DECLARATORY JUDGMENT AS TO THE VALIDITY OF THE SECURITY INTEREST OF DEFENDANT AZZURE CAPITAL, LLC**

**(4) AVOIDANCE, RECOVERY, AND PRESERVATION OF FRAUDULENT TRANSFER AS TO DIVERSE CAPITAL, LLC.**

**(5) AVOIDANCE, RECOVERY, AND PRESERVATION OF PREFERENTIAL TRANSFERS MADE WITHIN NINETY DAYS OF THE PETITION DATE AS TO PROOFPOSITIVE, LLC, MC DVI FUND 1, LLC, MC DVI FUND 2, LLC, AND DEBT VALIDATION FUND II, LLC, AND VENTURE PARTNERS, LLC.**

**(6) AVOIDANCE, RECOVERY, AND PRESERVATION OF FRAUDULENT TRANSFERS AS TO BRIDGE FUNDING CAP, LLC; AZZURE CAPITAL, LLC; AND MNS FUNDING, LLC.**

**(7) DECLARATORY JUDGMENT AS TO ALL DEFENDANTS (I) TO DETERMINE THE NATURE, EXTENT, AND PRIORITY OF VALID AND PERFECTED SECURITY INTERESTS AGAINST THE DEBTOR INCLUDING THOSE SECURITY INTERESTS THAT ARE VALID BUT HAVE BEEN AVOIDED AND PRESERVED FOR THE BENEFIT OF THE ESTATE AND (II) TO DETERMINE THE SECURED AND UNSECURED AMOUNTS OF THE DEFENDANTS' CLAIMS IF NOT OTHERWISE DETERMINED HEREIN.**

**AND**

#41551136V1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**(8) SUBORDINATION OF PROOF OF CLAIM OF BRIDGE FUNDING CAP, LLC**

For his *Complaint for (1)Declaratory Judgment as to the Validity of the Security Interest of Defendant Bridge Funding Cap LLC; (2) Declaratory Judgment as to the Validity of the Security Interest of Defendant MNS Funding, LLC; (3) Declaratory Judgment as to the Validity of the Security Interest of Defendant Assure Capital, LLC; (4)Avoidance, Recovery, and Preservation of Fraudulent Transfer as to Diverse Capital, LLC; (5) Avoidance, Recovery, and Preservation of Preferential Transfers made within Ninety-days of the Petition Date as to ProofPositive, LLC, MC DVI Fund 1, LLC, MC DVI Fund 2, LLC, and Debt Validation Fund II, LLC, and Venture Partners, LLC; (6) Avoidance, Recovery, and Preservation of Fraudulent Transfers as to Bridge Funding Cap, LLC; Azzure Capital, LLC; and MNS Funding, LLC; (7) Declaratory Judgment As To All Defendants (I) To Determine The Nature, Extent, and Priority Of Valid And Perfected Security Interests Against The Debtor Including Those Security Interests That Are Valid But Have Been Avoided And Preserved For The Benefit Of The Estate And (II) To Determine The Secured And Unsecured Amounts Of The Defendants' Claims If Not Otherwise Determined Herein and (8)Subordination of Proof of Claim of Bridge Funding Cap, LLC* (the "Complaint"), Plaintiff Richard A. Marshack, the Chapter 11 Trustee (the "Trustee" or "Plaintiff") for the bankruptcy estate (the "Estate") of debtor The Litigation Practice Group P.C. (the "Debtor" or "LPG") in the above-captioned bankruptcy case (the "Bankruptcy Case"), alleges and avers as follows:

## STATEMENT OF JURISDICTION, NATURE OF PROCEEDING, AND VENUE

1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), (E), (F), (H), (K) and (O), 1334(b), and General Order No. 13-05 of the District Court for the Central District of California because this is a core proceeding arising in and/or related to the Bankruptcy Case, which is a case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), and which is pending in the United States Bankruptcy Court for the Central District of California, Santa Ana Division (the "Court"). Regardless of whether this proceeding is core, non-core, or otherwise, the Plaintiff consents to the entry of a final order and judgment by the Bankruptcy Court. Defendants are hereby notified that Rule 7008 of the Federal Rules of Bankruptcy Procedure requires them to plead whether consent is given to the entry of a final order and judgment by the bankruptcy court. Venue of this adversary proceeding properly lies in this

1  judicial district pursuant to 28 U.S.C. § 1409(a) because this proceeding is related to the Debtor's

2  pending Bankruptcy Case.

3                                **THE PARTIES**

4          2.      Debtor LPG is, and at all material times was, a professional corporation organized,

5  existing, and in good standing under the laws of the State of California, with its principal place of

6  business in Tustin, California.

7          3.      Defendant Bridge Funding Cap, LLC D/B/A/ Fundura Capital is, and at all material

8  times represented that it was, a New York – Domestic Limited Liability Company, ("Bridge").

9          4.      Defendant Bridge may be served by first class mail postage prepaid upon an officer or

10 managing partner:  Bridge Funding Cap LLC; 538 13th Avenue, Suite 324; Brooklyn, New York

11 11219.

12         5.      Defendant MNS Funding, LLC is, and at all material times represented that it was, a

13 New York – Domestic Limited Liability Company, ("MNS").

14         6.      Defendant MNS may be served by first class mail postage prepaid upon its registered

15 Agent: File Right LLC; 5314 16th Avenue, Suite 139; Brooklyn, New York 11204.

16         7.      Defendant Azzure Capital, LLC is, and at all material times represented that it was, a

17 New York – Domestic Limited Liability Company, ("Azzure").

18         8.      Defendant Azzure may be served by first class mail postage prepaid upon its registered

19 agent: The LLC; 1820 Avenue M, Suite #695; Brooklyn, New York 11230.

20         9.      Defendant, Marich Bein, LLC, and at all material times represented that it was, a New

21 York – Domestic Limited Liability Company ("Marich").

22         10.     Defendant Marich may be served by first class mail postage prepaid upon its registered

23 agent: The LLC, 99 Wall Street, Number 2669, New York, NY 10005.

24         11.     Defendant Diverse Capital, LLC, and at all material times represented that it was, a

25 Connecticut – Domestic Limited Liability Company, ("Diverse").

26         12.     Defendant Diverse may be served by first class mail postage prepaid upon its

27 registered agent: Registered Agent Solutions, Inc.; 2138 Silas Deane Hwy, Ste 101; Rocky Hill,

28 Connecticut 06067.

13. Defendant PECC Corp, and at all material times represented that it was, a Delaware-Corporation, ("PECC").

14. Defendant PECC may be served by first class mail postage prepaid upon its registered agent: Registered Agent Solutions, Inc.; 838 Walker Road Suite 21-2; Dover, Delaware 19904.

15. Defendant ProofPositive, LLC, and at all material times represented that it was, a Wyoming- Limited Liability Company, ("ProofPositive").

16. Defendant ProofPositive may be served by first class mail postage prepaid upon its registered agent: Registered Agents, Inc.; 30 N Gould St, Ste R; Sheridan, Wyoming 82801.

17. Defendant MC DVI Fund 1, LLC; and at all material times represented that it was, a Wyoming- Limited Liability Company- Corporation, ("MCDVI 1").

18. Defendant MCDVI 1 may be served by first class mail postage prepaid upon its registered agent: Corporate Direct, Inc.; 300 N Center Street, Unit 6; Casper, Wyoming 82601.

19. Defendant MC DVI Fund 2 LLC, and at all material times represented that it was, a Wyoming- Limited Liability Company- Corporation, ("MCDVI 2").

20. Defendant MCDVI 2 may be served by first class mail postage prepaid upon its registered agent: Corporate Direct, Inc.; 300 N Center Street, Unit 6; Casper, Wyoming 82601.

21. Defendant Debt Validation Fund II, LLC, and at all material times represented that it was, a Wyoming- Limited Liability Company- Corporation, ("DVF").

22. Defendant DVF may be served by first class mail postage prepaid upon its registered agent: Cloud Peak Law, LLC; 1095 Sugar View Dr., Ste 500, Sheridan, Wyoming 82801.

23. Defendant Venture Partners, LLC, and at all material times represented that it was, a Wyoming- Limited Liability Company, ("Venture").

24. Defendant Venture may be served by first class mail postage prepaid upon its registered agent: Cloud Peak Law, LLC; 1095 Sugar View Dr, Ste 500; Sheridan, Wyoming 82801.

## **GENERAL ALLEGATIONS**

25. On March 20, 2023 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, commencing the Bankruptcy Case.

26.    After the Office of the United States Trustee (the "UST") filed the *Motion by United States Trustee to Dismiss or Convert Case Pursuant to 11 U.S.C. § 1112(b)* [Bankr. Docket No. 21] and creditors DVF; MC DVI 1; and MC DVI 2, filed their *Motion to Dismiss Chapter 11 Case Pursuant to 11 U.S.C. §§ 105, 305, 349, & 1112, or in the Alternative Convert This Case to Chapter 7 or Appoint a Trustee* [Bankr. Docket No. 44], the Court entered the *Order Directing United States Trustee to Appoint Chapter 11 Trustee* [Bankr. Docket No. 58] on May 4, 2021, thereby granting the UST's motion and directing the UST to appoint a Chapter 11 Trustee in the Bankruptcy Case.

27.    Pursuant to the *Acceptance of Appointment as Chapter 11 Trustee* [Bankr. Docket No. 63], on May 8, 2023, the Plaintiff accepted his appointment as the Chapter 11 Trustee in the Bankruptcy Case, and he continues to serve in this capacity at this time.

28.    Trustee was not appointed until after events of the case and, therefore, bases these allegations on information and belief. *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) ("The *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible."); *Miller v. City of Los Angeles*, 2014 U.S. Dist. LEXIS 198871, 2014 WL 12610195, at *5 (C.D. Cal. Aug. 7, 2014) (recognizing that the plaintiff's "information and belief" pleading was allowed and "necessary at times"); *see also Mireskandari v. Daily Mail and General Trust PLC*, 2013 U.S. Dist. LEXIS 194437, 2013 WL 12129642, at *4 (C.D. Cal. July 31, 2013) ("The Federal Rules of Civil Procedure allow parties to plead facts on 'information and belief' if the facts 'will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.'" (citations omitted)).

29.    Plaintiff brings this action solely in his capacity as the Chapter 11 Trustee for the benefit of Debtor's Estate and its creditors.

30.    Before the bankruptcy filing, LPG operated a law firm for consumers across the country who sought assistance in contesting or resolving debts they would identify.  These consumer clients would pay fees to LPG over a period of time, ranging from 18 to 30 months, through monthly debits from their bank accounts. The monthly debits are controlled by LPG. Each set of payments due

4

by a client is referred to as a "file."

31.    These monthly payments would cover all legal services that LPG was to provide to these consumer clients including validation of the debts, review of documents to determine enforceability, and court appearances to halt lawsuits to obtain judgments.  LPG's services caused disputed debts to be corrected on the client's credit report, filed challenges to collection of certain debts under consumer protection laws, and resulted in debt settlement, which the client is responsible to pay. In certain instances, LPG would file a lawsuit in an effort to eliminate a disputed debt.

32.    Pursuant to applicable legal and ethical rules, these payments should have been held in trust until LPG had performed services or incurred costs related to the consumer client file, or achieved success on the client's behalf.

33.    To obtain clients, LPG contracted with marketing companies to refer clients to LPG. The marketing affiliates located clients who were victims of predatory lending or who are subject to claims for large debt that may not be valid or collectable under applicable law. After taking on these clients, LPG promised to pay the marketing affiliates a percentage of the fees that LPG earned from the file(s).

34.    Because LPG received payments from files over time, it often borrowed against its future cash flow from files to pay current expenses.  This borrowing was not only used to finance operations at LPG, but also to pay the fees owed to the marketing companies for providing the client referrals.  Upon information and belief, LPG sought financing from numerous entities where the future cash flow from the same files were pledged as collateral to the lender.  In other transactions, LPG said it was "selling" the files or the accounts receivable generated from certain files to a creditor in exchange for payment.

**FACTUAL BACKGROUND**

35.    On May 19, 2021, Bridge filed or had a third party file UCC Statement No. U210047914841 against the Debtor with the California Secretary of State ("Bridge Statement").  The Bridge Statement asserted Bridge had a security interest in the assets of the Debtor. A true and accurate copy of the Bridge Statement is attached as **Exhibit A**.

36.    Bridge has filed Proof of Claim No. 335 against the Debtor ("Bridge Claim").  The

1    Bridge Claim asserts the Debtor owes Bridge more than $2,344,004.82, excluding interest, fees, and

2    costs, and it is incorporated by reference herein.

3        37.    On May 28, 2021, MNS filed UCC Statement NO. U210050823723 against the Debtor

4    with the California Secretary of State ("MNS Statement").  The MNS Statement asserted MNS had a

5    security interest in all the assets of the Debtor. A true and accurate copy of the MNS Statement is

6    attached as **Exhibit B**.

7        38.    MNS has filed Proof of Claim No. 1060 against the Debtor ("MNS Claim").  The MNS

8    Claim asserts the Debtor owes Bridge more than $15,300,000, excluding interest, fees, and costs, and

9    it is incorporated by reference herein.

10       39.    On May 28, 2021, CT Corporation System, as agent for Cobalt Funding Solutions,

11   LLC, filed UCC Statement NO. U210050853928 against the Debtor with the California Secretary of

12   State ("Cobalt Statement").  The Cobalt Statement asserts a security interest in all the assets of the

13   Debtor.  A true and accurate copy of the Cobalt Statement is attached as **Exhibit C**.

14       40.    As set forth herein, Azzure asserts that the Cobalt Statement has been assigned to it

15   and that the Cobalt Statement secures repayment of all amounts owed to it.

16       41.    Azzure has filed Proof of Claim No. 127 against the Debtor ("Azzure Claim"), which

17   is incorporated by reference herein.  The Azzure Claim asserts that the Debtor owes Azzure more

18   than $5,000,000.00, excluding interest, fees, and costs and that the repayment of the Azzure Claim is

19   secured by a security interest in the Debtor's assets that is perfected by the Cobalt Statement.  The

20   Azzure Claim is incorporated by reference herein.

21       42.    On September 15, 2021, and again on December 1, 2021, Diverse filed UCC

22   Statement No. U210085288536 and U210106788229, respectively, against the Debtor with the

23   California Secretary of State (collectively "Diverse Statement").  The Diverse Statement asserted

24   Diverse had a security interest in the assets of the Debtor. A true and accurate copy of the Diverse

25   Statement is attached hereto as **Exhibit D**.

26       43.    As of filing, Diverse has not filed a proof of claim herein; however, upon information

27   and belief, Diverse asserts it is owed more than $1,485,606, excluding interest, costs, and fees

28   ("Diverse Claim").

44.     On February 2, 2023, PECC ("PECC") filed UCC Statement No. U230009059730 against the Debtor with the California Secretary of State ("PECC Statement").  The PECC Statement asserted PECC had a security interest in certain accounts of the Debtor identified on Exhibit A to the PECC Statement.  A separate adversary proceeding will be or has been filed against PECC to avoid the filing of the PECC Statement as a preferential transfer and preserve same for the estate and to recover other preferential and fraudulent transfers.  PECC is named as a defendant herein only as to Count 7 so that the priority of the PECC Statement can be determined in relation to the other parties and the amount and status of the claim can be determined.  A true and accurate copy of the PECC Statement (without exhibits) is attached as **Exhibit E**.

45.     On February 9, 2023, Proofpositive filed UCC Statement NO. U230009725118 against the Debtor with the California Secretary of State ("Proofpositive Statement").  The Proofpositive Statement asserted Proofpositive had a security interest in "$1,053,690.00 in Litigation Practice Group and associated Litigation Practice Group Affiliate customer accounts receivables files."  A true and accurate copy of the Proofpositive Statement is attached hereto as **Exhibit F**.

46.     On March 9, 2023, Venture filed UCC Statement No. 230016377733 against the Debtor with the California Secretary of State ("Venture Statement").  The Venture Statement asserted Venture had a security interest in "executed Accounts Receivables Purchase Agreements in the amount of $15,959,308.55 Debt Enrolled".  A true and accurate copy of the Venture Statement is attached hereto as **Exhibit G**.

47.     Venture and Proofpositive filed Proof of Claim No. 105 as a joint claim against the Debtor ("PPV Claim").  The PPV Claim asserts the Debtor owes Venture and Proofpositive more than $15,000,000, excluding interest, fees, and costs, and it is incorporated by reference herein.

48.     On February 10, 2023, DVF, MCDVI 1, and MCDVI 2 (collectively "DVF Parties") jointly filed UCC Statement No. 230009923531 against the Debtor with the California Secretary of State ("DVF Statement").  The DVF Statement asserted the DVF Parties had a security interest in all assets of the Debtor. A true and accurate copy of the DVF Statement is attached as **Exhibit H**.

49.     As of the date of filing, the DVF Parties have not filed a proof of claim herein; however, upon information and belief, the DVF Parties assert they are owed more than ten million

1    dollars excluding interest, costs, and fees.

2        50.    OHP-CDR, LP fka OHP-LPG, LP ("OHP") is not presently a defendant herein.  OHP

3    filed UCC Statement No. U230005834326 against the Debtor with the California Secretary of State

4    on January 25, 2023 ("OHP Statement").  The validity of the OHP Statement with respect to the

5    Debtor and Azzure is the subject of a pending adversary proceeding (Adversary Pro. No. 8:23-ap-

6    1098) ("OHP Adversary").  PurchaseCo 80, LLC ("PurchaseCo") is also not presently a defendant

7    herein; however, it is a co-Plaintiff in the OHP Adversary.  Upon information and belief, PurchaseCo

8    asserts that it purchased all receivables related to a certain group of client files in September 2022.  If

9    PurchaseCo is correct in its assertion and this "purchase" was legally possible, it purchased these

10   receivables subject to whatever valid liens were of record against the Debtor at the time of purchase.

11   Thus, OHP and PurchaseCo are indispensable parties, and Plaintiff will seek to consolidate the OHP

12   Adversary with this adversary.  This will permit all claims concerning the OHP Statement and the

13   ownership of receivables from certain files can be adjudicated.

14       51.    Marich asserts that it has a perfected security interest against the Debtor by way of

15   assignment of a UCC Statement No. 210057670018 originally filed by Clearfund Solutions, LLC

16   ("Clearfund") against the Debtor with the California Secretary of State on June 17, 2021 ("Clearfund

17   Statement").  A true and accurate copy of the Clearfund Statement is attached hereto as **Exhibit I**.

18       52.    Upon information and belief, the Clearfund Statement alone was assigned to Marich

19   on or about August 25, 2022, after the Debtor's debt to Clearfund had been satisfied ("Marich

20   Assignment").  A true and accurate copy of the Marich Assignment is attached hereto as **Exhibit J**.

21       53.    A separate adversary proceeding will be filed against Marich to determine whether the

22   assignment of the Clearfund Statement to Marich perfects the security interest granted to Marich by

23   the Debtor and to recover other preferential and fraudulent transfers.  Marich is named as a defendant

24   herein only as to Count 7 so that the priority of the Clearfund Statement can be determined in relation

25   to the other parties and the amount and status of its claim can be determined.

26                              **RESERVATION OF RIGHTS**

27       54.    Plaintiff reserves the right to bring all other claims or causes of action that Plaintiff

28   may have against any Defendant herein or subsequently added as a party with leave of court, on any

                                            8

1   and all grounds, as allowed under the law or in equity, including but not limited to, those claims not

2   known by the Trustee at this time but that he may discover during the pendency of this adversary

3   proceeding or that he may be entitled to assert based on the relief granted in this adversary proceeding.

4   These reserved claims include, but are not limited to, actions to avoid and recover payments or other

5   transfers made to parties herein pursuant to applicable law and objections to allowance and treatment

6   of claims of the Defendants pending all Defendants filing claims and the Court's rulings in this

7   adversary

**CLAIMS FOR RELIEF**
**COUNT ONE**
**DECLARATORY JUDGMENT AS TO THE VALIDITY OF THE**
**SECURITY INTEREST OF BRIDGE**

11      55.    Plaintiff incorporates all preceding paragraphs as if fully re-alleged herein.

12      56.    28 U.S.C. § 2201(a) provides that "In a case of actual controversy within its

13  jurisdiction…any court of the United States, upon the filing of an appropriate pleading, may declare

14  the rights and other legal relations of any interested party seeking such declaration, whether or not

15  further relief is or could be sought. Any such declaration shall have the force and effect of a final

16  judgment or decree and shall be reviewable as such."

17      57.    Federal Rule of Bankruptcy Procedure 7001 requires any proceeding "to determine

18  the validity, priority, or extent of a lien or other interest in property" or "to obtain a declaratory

19  judgment related to" determining the validity, priority, or extent of a lien or other interest in property

20  to be filed as an adversary proceeding.

21      58.    According to the verified answer and counterclaims filed on behalf of the Debtor and

22  other Defendants in state court litigation against Bridge, the Debtor's relationship with Bridge began

23  with the execution of a Merchant Cash Advance Agreement on or about May 17, 2021.  This

24  agreement allegedly documented Bridge's purchase of $749,500.00 in future receivables for a gross

25  purchase price of $500,000.00

26      59.    After the execution of this agreement, Bridge filed the Bridge Statement on May 19,

27  2021.

28      60.    Bridge only advanced $400,000.00 to the Debtor pursuant to the May 17th agreement.

1    Upon information and belief, Bridge retained the $100,000.00 difference to pay itself various fees.

2    61.    Following execution of the May 17th agreement, the Debtor paid $465,000.00 to

3    Bridge to be applied to it $749,500.00 debt.

4    62.    Again, according to the Debtor's verified state court answer and counterclaims, Bridge

5    approached the Debtor and related parties about refinancing the balance owed on the May 17th

6    agreement.  The result of this refinance was a May 27, 2021 agreement whereby Bridge allegedly

7    purchased $1,799,100.00 in future receivables in exchange for a purchase price of $900,000.00

8    According to the verified answer, the Debtor only received $267,000.00 in additional funds as a result

9    of this refinance.

10    63.    As of June 17, 2021, the Debtor had paid $1,050,000.00 to Bridge on its $1,799,100.00

11    debt owed under the May 27th agreement.

12    64.    Thereafter, Bridge declared the Debtor in default, and on June 28, 2021, Berkovitch

13    & Bouskila, PLLC sued the Debtor on behalf of Bridge in the Supreme Court of Nassau County Index

14    No. 608157/2021 ("Bridge Lawsuit").  A true and accurate copy of this Complaint including the May

15    27th agreement as an exhibit is attached as **Exhibit K**.

16    65.    While the Debtor claimed the Complaint sought to recover far more than was owed

17    under the May 27th agreement, the parties agreed to settle the Bridge Lawsuit provided that the Debtor

18    paid $849,240.00 ("Settlement Payment") to Bridge on or before July 1, 2021.

19    66.    A Stipulation of Settlement with Leave to Apply for Default Judgment Pursuant to

20    CPLR 3215(i) ("Stipulation") was prepared and executed to settle the Bridge Lawsuit.  The Debtor

21    executed the Stipulation on July 17, 2021.  A true and accurate copy of the Stipulation is attached as

22    **Exhibit L**.

23    67.    The Debtor wired the Settlement Payment to counsel for Bridge - Berkovitch &

24    Bouskila PLLC – on or before July 1, 2021.

25    68.    Paragraph 5 of the Stipulation is titled Effective Date and provides in relevant part

26    "that the Agreement shall become binding and be closed by the execution hereof by all parties."

27    69.    Paragraph 7 of the Stipulation is titled Waiver of Defendant's [sic] Liability and states

28    that Bridge as Plaintiff

waives all legal rights and claims as to the underlying Agreements that the debt arose from. Plaintiff acknowledges that any and all legal claims it maintains must be brought by a breach of this settlement agreement, and releases Defendants from any claims Plaintiff may have against Defendants from the beginning of time until this day.

70.     Paragraph 11 of the Stipulation is titled Execution and Delivery of Documents and states that

The Parties agree that they respectively shall … execute and deliver promptly any and all such documentation, or documents of any and every kind and character as may reasonably be required, necessary or proper for the purpose of giving full force and effect to this agreement…the parties agree to cooperate and to do all things necessary to accomplish the intention of this agreement.

71.     By its own terms, the Stipulation was effective when executed by the Debtor and other Defendants on July 19, 2021.

72.     While the Stipulation was not filed in the Bridge Lawsuit, counsel for Bridge did file a Notice discontinuing the Bridge Lawsuit in its entirety on July 1, 2021. The filing of the Notice is confirms that the Debtor performed under the terms of the Stipulation. A true and accurate copy of the Notice is attached as **Exhibit M**.

73.     Upon information and belief and according to the Debtor's verified state court answer and counterclaims, a representative from Fundura Capital Group ("Fundura") contacted Mr. Diab in early July to propose the Debtor execute a Merchant Cash Advance Agreement with Fundura.

74.     Upon information and belief and according to the Debtor's verified state court answer and counterclaims, Mr. Diab told Joe Kroen – the Fundura representative – that if Fundura was connected to Bridge that the Debtor was not interested in doing business with Fundura. In response, Mr. Kroen told Mr. Diab there was no connection between Fundura and Bridge.

75.     Fundura is listed as an assumed name of Bridge with the New York Secretary of State.

76.     On or about July 14, 2021, the Debtor and Bridge dba Fundura executed a Merchant Cash Advance Agreement documenting Bridge dba Fundura's purchase of $999,990.00 in future receivables for a gross purchase price of $500,000.00.

77.     While the July 14th Merchant Cash Advance Agreement granted Bridge dba Fundura a security interest in the Debtor's accounts, Bridge dba Fundura did not record a UCC-1 Statement against the Debtor following execution of the agreement.

78.     If Bridge dba Fundura had filed a UCC-1 Statement on or after July 14th, it would have been subordinate to multiple other UCC-1 Statements already of record.

79.     On or about July 15, 2021, Bridge dba Fundura wired $390,000.00 to the Debtor and/or its co-borrowers.  Bridge dba Fundura provided no explanation for the difference between the gross purchase price of $500,000.00 and the $390,000.00 actually advanced.

80.     Within a week Bridge dba Fundura declared the Debtor to be in default under the July 14th Agreement despite the fact that the Debtor had paid and even pre-paid the daily installment payments to Bridge dba Fundura.

81.     Upon information and belief and according to the Debtor's verified state court answer and counterclaims, Bridge dba Fundura, through its counsel Berkovitch & Bouskila PLLC, made demand for payment on the Debtor's payment processor.  However, Bridge dba Fundura asserted a perfected security interest in the Debtor's assets based on the Bridge Statement.

82.     Bridge dba Fundura did not terminate or release the Bridge Statement following receipt of the Settlement Payment and Stipulation.

83.     In response to the demand of Bridge dba Fundura and based on the recorded Bridge Statement, the Debtor's payment processor froze the Debtor's accounts.

84.     Bridge dba Fundura refused to authorize the payment processor to unfreeze the accounts despite the Debtor disputing there was a default and the receipt of multiple payments from the Debtor.

85.     Bridge dba Fundura proposed that the Debtor refinance the balance owed to it under the July 14th agreement via a new agreement.  This new Merchant Cash Advance Agreement was executed on or about July 22, 2021 and stated that Bridge dba Fundura was purchasing $1,986,000.00 in future receivables for a gross purchase price of $1,200,000.00 ("July 22nd Agreement").  A true and accurate copy of the July 22nd Agreement is attached as **Exhibit N.**

86.     Section 4.9 of the July 22nd Agreement provided that the July 22nd Agreement contained "the entire agreement between Merchant and FCG and supersedes all prior agreements and understandings relating to the subject matter hereof."

87.     Upon information and belief and according to the Debtor's verified state court answer

1    and counterclaims, the Debtor had paid more than $250,000.00 to Bridge dba Fundura on the July

2    14th Agreement before the July 22nd Agreement was executed.

3    88.    Despite these payments, the Debtor received no additional funds from the July 22nd

4    Agreement and according to the Debtor's verified answer and counterclaim in state court, $1,124,987

5    of the funds disbursed pursuant to the July 22nd Agreement was paid to Berkovitch and Bouskila

6    PLLC to satisfy all amounts owed under the July 14th Agreement.

7    89.    The Trustee does not know how this payoff amount was determined or who received

8    these funds given that the original amount to be repaid under the July 14th Agreement was

9    $999,990.00 and the Debtor had previously paid more than $250,000.00 to Bridge on that obligation.

10    90.    Upon information and belief and according to the Debtor's verified state court answer

11    and counterclaims, the Debtor paid $350,000.00 to Bridge dba Fundura pursuant to the July 22nd

12    Agreement from July 27, 2021 to August 4, 2021.

13    91.    On or about August 11, 2021, Bridge dba Fundura declared a default under the July

14    22nd Agreement and asserted its lien rights to the Debtor's accounts with the Debtor's payment

15    processor based on the Bridge Statement.  Again, the payment processor froze the Debtor's accounts.

16    92.    Upon information and belief, Bridge dba Fundura's numerous declarations of default

17    and demands to freeze the Debtor's accounts disrupted the Debtor's operations and caused the Debtor

18    to borrow additional amounts from Merchant Cash Advance lenders to maintain operations while its

19    accounts were frozen or suspended.

20    93.    Bridge dba Fundura first filed suit on the July 22nd Agreement in the Supreme Court

21    for Nassau County on or about August 25, 2021.  However, the Judge hearing the case refused to

22    enter a preliminary injunction and temporary restraining order to attach and restrain the Debtor's

23    accounts.  Bridge dba Fundura subsequently dismissed that action with prejudice.

24    94.    Bridge dba Fundura filed a second suit to enforce the July 22nd Agreement with the

25    Supreme Court of Nassau County on or about October 18, 2021 (Index Number 613192/2021).  The

26    Debtor filed a verified answer with counterclaims in this action which has been referenced in this

27    complaint.

28    95.    This case remained unresolved as of the Petition Date.

13

96.     The Bridge Statement perfected a security interest granted to Bridge in an earlier prior transaction.  However, Bridge subsequently released the Debtor "from any claims [Bridge] may have against Defendants from the beginning of time until this day."

97.     Bridge's release of all claims against the Debtor became effective when the Defendants, including the Debtor, executed the Stipulation on July 19, 2021.

98.     Due to the release of claims in the Stipulation, Bridge dba Fundura waived and released its ability to enforce the Bridge Statement and to enforce the July 14th Agreement because the release of claims began "from the beginning of time until this day [of execution]."

99.     Despite its release of all claims against the Debtor in the underlying documents, Bridge continued and still continues to assert that the amounts owed to it are secured by the Bridge Statement filed pursuant to those settled documents.

100.     In late 2022, the Debtor wrote to Bridge dba Fundura demanding that it release the Bridge Statement pursuant to Section 9-513 of the Uniform Commercial Code ("Release Letter"). The Debtor's basis for this demand was that it had not only discharged all obligations owed to Bridge dba Fundura pursuant to the first two Merchant Cash Advance Agreements executed in May 2021, but also that Bridge dba Fundura had waived and released all claims it ever had against the Debtor as of July 19, 2021.  A true and accurate copy of the Release Letter from the state court litigation is attached as **Exhibit O.**

101.     Upon information and belief, Fundura failed to respond to the Release Letter, and pursuant to Section 9-513(c) of the Uniform Commercial Code (N.Y. UCC §1-201(b)(20)/Cal. Comm. Code. § 9513), the Debtor terminated the Bridge Statement with the California Secretary of State.  A true and accurate copy of the Termination Statement filed with the Secretary of State is attached as **Exhibit P**.

102.     Bridge subsequently filed an "information statement" with the Secretary of State stating that it did not authorize the termination.  Section 9-518(e) of the Uniform Commercial Code states that an information statement "does not affect the effectiveness of an initial financing statement or other filed record."

103.     A search of the Debtor's name on the Secretary of State's website using standard

14

search logic shows the Bridge Statement to be terminated.

104.    The Bridge Statement is not enforceable against the Debtor or its estate because Bridge released all of its claims against the Debtor in the Stipulation.  Because Bridge waived any and all claims against the Debtor as of July 19, 2021, it has no right to use the Bridge Statement, which was filed pursuant to the settled documents, to perfect a subsequently granted security interest from a separate transaction.

105.    The Bridge Statement is not enforceable against the Debtor or its estate because Bridge was obligated to release the Bridge Statement pursuant to Paragraph 11 of the Stipulation.

106.    When Bridge failed to release the Bridge Statement pursuant to the Stipulation, the Debtor made an authenticated demand on Bridge to release the Bridge Statement pursuant to Section 9-513 of the Uniform Commercial Code.

107.    The Debtor was authorized to file the Termination Statement pursuant to Section 9-513 of the Uniform Commercial Code when Bridge failed to release the Bridge Statement within the time provided by the UCC.

108.    Section 544(a) of the Bankruptcy Code provides the Trustee with the rights and powers of a hypothetical judicial lien creditor and a hypothetical judgment creditor as of the commencement of the case "without regard to any knowledge of the trustee or of any creditor[.]"

109.    Because a standard search of the California Secretary of State's Office indicates that the Bridge Statement was terminated, the Bridge Statement was unperfected as of the Petition Date as to a hypothetical lien or judgment creditor.  As a result, the Bridge Statement is void and unenforceable as to the Trustee.

110.    An actual controversy exists regarding the validity, existence, and rights and obligations of the parties herein with respect to the Bridge Statement.

111.    Pursuant to 28 U.S.C. § 2201, and for the foregoing reasons, Trustee seeks a declaration from the Court that (i) adjudicates the validity, priority, and extent of the Bridge Statement; (ii) determines the amount of the Bridge Claim; and (iii) finds that Bridge does not have an ownership interest in client files or in any future accounts receivable therefrom as a matter of law.

**COUNT TWO**
**DECLARATORY JUDGMENT AS TO THE VALIDITY OF THE**
**SECURITY INTEREST OF MNS**

112.    Plaintiff incorporates all preceding paragraphs as if fully re-alleged herein.

113.    28 U.S.C. § 2201(a) provides that "In a case of actual controversy within its jurisdiction…any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."

114.    Federal Rule of Bankruptcy Procedure 7001 requires any proceeding "to determine the validity, priority, or extent of a lien or other interest in property" or "to obtain a declaratory judgment related to" determining the validity, priority, or extent of a lien or other interest in property to be filed as an adversary proceeding.

115.    While the MNS Statement asserts a lien against all of the Debtor's assets, MNS has not filed any documents with the MNS Claim that indicated that the Debtor granted it a security interest or authorized it to perfect that security interest through filing a UCC-1 statement.

116.    The only evidence of indebtedness filed with the MNS Claim is a printout of transactions and a lockbox agreement dated July 17, 2021.  The lockbox agreement was executed almost two months after the MNS Statement was filed.

117.    To the extent MNS asserts ownership of the "accounts" related to client files generally or to certain client files, the Trustee alleges that any purported sale of either client files, or the future "accounts" or right to payment from trust funds from clients is unenforceable as a matter of law.

118.    Trustee thus alleges that MNS never acquired title to or possession of any of underlying client files or related receivables from those files.  MNS could not acquire any accounts related to client files because such an account could only be generated when the Debtor performed legal services for the client.

119.    While the MNS Claim was filed as a secured claim that was entitled to priority over other creditors asserting secured claims, the Trustee cannot agree that MNS has a security interest or was entitled to record a UCC-1 statement against the Debtor based on the document tsfiled with the

MNS Claim.  The Trustee cannot also agree to the amount of the MNS Claim given the lack of documentation or detail on the calculation of the amount of the claim.

120.    An actual controversy exists regarding the validity, existence, and rights and obligations of the parties herein with respect to the MNS Statement.

121.    Pursuant to 28 U.S.C. § 2201, and for the foregoing reasons, Trustee seeks a declaration from the Court that (i) adjudicates the validity, priority, and extent of the MNS Statement; (ii) determines the amount of the MNS Claim; and (iii) finds that MNS does not have an ownership interest in client files or in any future accounts receivable therefrom as a matter of law.

**COUNT THREE**
**DECLARATORY JUDGMENT AS TO THE VALIDITY OF THE**
**SECURITY INTEREST OF AZZURE**

122.    Plaintiff incorporates all preceding paragraphs as if fully re-alleged herein.

123.    28 U.S.C. § 2201(a) provides that "In a case of actual controversy within its jurisdiction…any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."

124.    Federal Rule of Bankruptcy Procedure 7001 requires any proceeding "to determine the validity, priority, or extent of a lien or other interest in property" or "to obtain a declaratory judgment related to" determining the validity, priority, or extent of a lien or other interest in property to be filed as an adversary proceeding.

125.    On or around February 7, 2023, Azzure made a loan to the Debtor evidenced by a promissory note in the original principal amount of two million five hundred and fifty thousand dollars and no cents ($2,550,000.00) ("Azzure Note").  The Azzure Note carried an interest rate of one hundred and seventy percent (170%).  Azzure was granted a security interest against certain "Collateral" defined in Section 9 of the Azzure Note.

126.    Because any security interest filed after the execution of the Azzure Note would be subordinate to the numerous other UCC Statements of record, Azzure sought to obtain an assignment of a previously filed UCC-1 Statement.

127.    The Cobalt Statement was recorded on May 28, 2021 and the debt owed to Cobalt was satisfied in a settlement completed in February 2022.

128.    As part of this settlement, Cobalt and another lender, Queen Funding, LLC, with an interest in the debt assigned the Cobalt Statement to BAE Enterprises, Inc. ("BAE").  A true and accurate copy of the assignment of the Cobalt Statement to BAE is attached hereto as **Exhibit Q**.

129.    Upon information and belief, Tony Diab is the principal of BAE although at the time of the assignment to BAE it has been alleged that Mr. Diab's girlfriend – Biance Loli – was the CEO of BAE.

130.    Upon information and belief, Azzure demanded that BAE assign the Cobalt Statement to it as a condition of the Azzure transaction.  In February 2023, BAE purported to assign the Cobalt Statement to Azzure ("Azzure Assignment").  A true and accurate copy of the Azzure Assignment is attached hereto as **Exhibit R**.

131.    Bae only transferred its interest in the Cobalt Statement to Azzure.  Bae did not sell, assign, or transfer any obligation or other debt owed to it by the Debtor to Azzure.

132.    Upon information and belief, Azzure did not re-finance or acquire any debt of the Debtor that was secured by the Cobalt Statement.

133.    As a matter of law, the Trustee asserts that Azzure's attempt to "line jump" the Debtor's creditors fails.  The assignment of a recorded financing statement alone is not sufficient to perfect an obligation and security interest created months after the initial statement was recorded.

134.    The Cobalt Statement perfected a security interest granted to the original creditor to secure payment of an obligation.  When the obligation owed to the original creditor was satisfied, there was no longer a security interest for the Cobalt Statement to perfect.

135.    The Trustee also cannot agree on the amount of the Azzure Claim as it seeks to recover more than five million dollars ($5,000,000.00) despite the fact that the original principal balance of the Azzure Note was only just over two and a half million dollars.  The amount sought includes accrued interest as set forth in the Azzure Note, plus attorneys' fees and costs.

136.    The one hundred and seventy percent interest rate contained in the Azzure Note is not enforceable against the Debtor located in California.

137.    Further, to the extent Azzure asserts ownership of the "accounts" related to client files generally or to certain client files, the Trustee alleges that any purported sale of either client files, or the future "accounts" or right to payment from trust funds from clients is unenforceable as a matter of law.

138.    Trustee alleges that Azzure never acquired title to or possession of any of underlying files or related receivables from those files.  Azzure could not acquire any accounts related to client files because such an account could only be generated when the Debtor performed legal services for the client.

139.    Despite the foregoing, Azzure asserts that the Azzure Claim is perfected by and has priority pursuant to the Cobalt Statement.  Azzure further asserts that the Azzure Claim has priority over the security interests of any other creditors.

140.    An actual controversy exists between Azzure and the Trustee as to the Azzure Claim and the effectiveness of the Cobalt Statement.

141.    Pursuant to 28 U.S.C. § 2201, and for the foregoing reasons, Trustee seeks a declaration from the Court that (i) adjudicates the validity, priority, and ability of the Cobalt Statement to secure payment of the Azzure Claim; (ii) determines the amount of the Azzure Claim; and (iii) finds that Azzure does not have an ownership interest in client files or in any future accounts receivable therefrom as a matter of law.

**COUNT FOUR**
**Avoidance, Recovery, and Preservation of Fraudulent Transfers**
**Against Defendant Diverse**
**[11 U.S.C. §§ 548(a)(1)(B), 550, and 551]**

142.    Plaintiff incorporates all preceding paragraphs as if fully re-alleged herein.

143.    On August 6, 2021, the Debtor and Diverse executed a Merchant Agreement whereby it purportedly sold $374,750.00 of its future receivables in exchange for $250,000.00 ("First Diverse Agreement").  Repayment was to be a daily debit of the Debtor's account in the amount of $9,730.00 until Diverse was paid in full. The Trustee does not know what portion of the $250,000.00 the Debtor received or if the payment was even deposited in the Debtor's bank account.  A true and accurate copy of the First Diverse Agreement is attached as **Exhibit S.**

144.    On August 18, 2021, the Debtor and Diverse executed a Merchant Agreement whereby it purportedly sold $749,500.00 of its future receivables in exchange for $500,000.00 ("Second Diverse Agreement").  Repayment was to be a daily debit of the Debtor's account in the amount of $13,325.00 until Diverse was paid in full. The Trustee does not know what portion of the $500,000.00 the Debtor received or if the payment was even deposited in the Debtor's bank account.  A true and accurate copy of the Second Diverse Agreement is attached as **Exhibit T.**

145.    On August 18, 2021, the Debtor and Diverse executed a Merchant Agreement whereby it purportedly sold $1,499,000.00 of its future receivables in exchange for $1,000,000.00 ("Third Diverse Agreement").  Repayment was to be a daily debit of the Debtor's account in the amount of $24,985.00 until Diverse was paid in full. The Trustee does not know what portion of the $1,000,000.00 the Debtor received or if the payment was even deposited in the Debtor's bank account. A true and accurate copy of the Third Diverse Agreement is attached hereto as **Exhibit U.**

146.    On October 28, 2021, Diverse sued the Debtor and other parties in the Supreme Court of the State of New York, County of Kings after an alleged default on the three agreements identified above.  In the complaint, Diverse sought to recover (i) $279,050.00 on the First Diverse Agreement, (ii) $695,800.00 on the Second Diverse Agreement, and (iii) $1,384,660.00 on the Third Diverse Agreement.  Thus, the complaint sought to recover a total of $2,359,510.00.

147.    Upon information and belief, the parties settled the state court lawsuit as an order dismissing the suit without prejudice was filed on May 10, 2022.

148.    A few days later the Debtor made a $125,000 payment to Diverse on May 18, 2022. Upon information and belief, similar $125,000 monthly payments were made to Diverse from June 2022 to January 2023 with the exception of February 2023 when only $25,000 was paid and December 2022 when it appears no payment was made.  These payments from May 2022 to February 2023 totaled $1,025,000.00.

149.    Upon information and belief and despite these payments, Diverse still claims to be owed more than $1,400,000.00.  Diverse has not yet filed a proof of claim.

150.    The execution of the First, Second, and Third Diverse Agreements (collectively "Diverse Agreements") and the filing of the two Diverse Statements all occurred within two years of the Petition Date.

151.    On or after the date that the Diverse Agreements were executed and the Diverse Statements were recorded, the Debtor was indebted to one or more creditors, including but not limited those Defendants listed before Diverse in the caption of this adversary.

152.    Upon information and belief, the Debtor did not receive reasonably equivalent value in exchange for the execution of the Diverse Agreements because the Diverse Agreements were disguised loans contained usurious interest rates, required the Debtor to repay approximately 1.5 times the amount borrowed in a short amount of time, and/or withheld substantial sums from the amount loaned or paid to purchase receivables as "fees" such that the Debtor was obligated to repay amounts it never borrowed or obtained.  To the extent known to the Trustee, the specifics of the respective transactions are set out herein.

153.    The execution of the Diverse Agreements and subsequent filing of the Diverse Statements happened while Debtor:

a.    was insolvent or became insolvent was a result;

b.    was engaged or was about to engage in a transaction for which any property remaining with Debtor was of unreasonably small capital; or

c.    intended to incur, or believed that it would incur, debts beyond it ability to pay as such debts matured.

154.    When the Diverse Statements were executed in August, 2021 the Debtor had already been sued in New York state court by several other Merchant Cash Advance Lenders for nonpayment.  Upon information and belief, the Debtor was borrowing money from new Merchant Cash Advance Lenders to pay off amounts owed to prior Merchant Cash Advance Lenders.

155.    The execution of the Diverse Agreements and subsequent recording of the Diverse Statements should be avoided as fraudulent conveyances under 11 U.S.C. § 548(a)(1)(B), and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

## COUNT FIVE

**AVOIDANCE, RECOVERY, AND PRESERVATION OF PERFECTION OF SECURITY INTERESTS OF PROOFPOSITIVE, VENTURE, AND THE DVF PARTIES AS PREFERENTIAL TRANSFERS PURSUANT TO 11 U.S.C. §§ 548, 550, AND 551**

156.    Plaintiff incorporates all preceding paragraphs as if fully re-alleged herein.

157.    The Proofpositive Statement, DVF Statement, and Venture Statement (collectively "Preference Period Statements") were all filed within the ninety day period preceding the Petition Date.

158.    The filing of the Preference Period Statements constituted a transfer of an interest in property of the Debtor.

159.    The Proofpositive Statement was recorded more than thirty days after the Debtor granted that creditor the right to file a security interest to secure its performance under one or more obligations.

160.    The DVF Statement was recorded more than thirty days after the Debtor granted the creditors identified therein the right to file a security interest to secure its performance under one or more obligations owed to the DVF Parties.

161.    The Venture Statement was recorded more than thirty days after the Debtor granted that creditor the right to file a security interest to secure its performance under one or more obligations.

162.    The Debtor was indebted those defendants who recorded the Preference Period Statements prior to the recording of the above Statements.

163.    The filing of the Preference Period Statements was a transfer made to or for the benefit of a creditor within the meaning of 11 U.S.C. § 547(b)(1) because the recording of these statements perfected the security interest granted to the these creditors to secure the Debtor's obligations to them.

164.    The transfer of an interest in the Debtor's assets occurred when the Preference Period Statements were filed pursuant to 11 U.S.C. § 547(e)(2)(B).

165.    The filing of the Preference Period Statements was made for, or on account of, an antecedent debt or debts owed by the Debtor to the filers of the Preference Period Statements, each of which constituted a "debt" or "claim" (as those terms are defined in the Bankruptcy Code) of

Defendant.

166.   The Preference Period Statements were filed when the Debtor was insolvent. Plaintiff is also entitled to the presumption of insolvency in the ninety day period before the Petition Date pursuant to 11 U.S.C. § 547(f).

167.   Each of the Preference Period Statements were recorded in the ninety day period preceding the Petition Date.

168.   As a result of the filing of the Preference Period Statements, Proofpositive, DVF Parties, and Venture would be entitled to recover more than they would have received if: (i) the Debtor's case was under chapter 7 of the Bankruptcy Code; (ii) the respective Statement had not been filed; and (iii) the above creditors received payments of their debts under the provisions of the Bankruptcy Code. As evidenced by the Debtor's schedules filed in the underlying Bankruptcy Case, as well as the proofs of claim that have been received to date, the Debtor's liabilities exceed its assets to the point that unsecured creditors will not receive a full payout of their claims from the Debtor's bankruptcy estate.

169.   In accordance with the foregoing, the filing of the Preference Period Statements are avoidable pursuant to 11 U.S.C. § 547(b), and may be recovered and preserved for the benefit of the estate pursuant to 11 U.S.C. §§ 550 and 551.

170.   Because the priority of the avoided liens with respect to other creditors and the amount of the claims they secure must be determined, it has not been possible to settle these claims.  .

## COUNT SIX
## AVOIDANCE, RECOVERY, AND PRESERVATION OF FRAUDULENT TRANSFERS AGAINST DEFENDANTS BRIDGE, MNS, AND AZZURE
## [11 U.S.C. §§ 548(a)(1)(B), 550, and 551]

171.   Plaintiff incorporates all preceding paragraphs as if fully re-alleged herein.

172.   Counts One, Two, and Three ask the Court to find that the UCC Statements filed by Defendants Bridge, MNS, and Azzure are void and unenforceable for the specific reasons stated in those counts.

173.   If the Court determines that the UCC Statements filed by Bridge, MNS, and/or Azzure are valid and enforceable, the Trustee requests that the Court find that the execution of the underlying

agreements between the Debtor and those entities and the subsequent filing and/or assignment of any financing statements were fraudulent transfers (collectively "Transfers") subject to avoidance pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550 and 551.

174.    The Transfers between the Debtor and Bridge, MNS, and Azzure all occurred within the two years of the Petition Date.

175.    When Bridge and MNS filed their respective UCC Statements, the filing perfected whatever security interest the Defendant had been granted by the Debtor.

176.    When Azzure obtained an assignment of the Cobalt Statement filed by another creditor of the Debtor, it asserts that it perfected the security interest granted to it in the Azzure Note as of the date the Cobalt Statement was originally filed.

177.    On or after the date that the above Transfers occurred, the Debtor was indebted to one or more creditors, including but not limited to the some of the Defendants identified herein and State of California, Employment Development Department and Ace Funding Source, LLC as evidenced by UCC-1 Statements filed on November 3, 2020 and May 14, 2021, respectively.

178.    The Debtor did not receive reasonably equivalent value in exchange for the Transfer(s) because the underlying agreements contained usurious interest rates, required the Debtor to repay twice the amount of the money it actually borrowed over a short term, and/or withheld substantial sums from the amount loaned or paid to purchase receivables as "fees" such that the Debtor was obligated to repay amounts it never borrowed or obtained.  To the extent known to the Trustee, the specifics of the respective transactions are set out *supra* and are incorporated by reference herein.

179.    The Transfers happened while Debtor:

    a.    was insolvent or became insolvent was a result;

    b.    was engaged or was about to engage in a transaction for which any property remaining with Debtor was of unreasonably small capital; or

    c.    intended to incur, or believed that it would incur, debts beyond it ability to pay as such debts matured.

180.    The Transfers should be avoided as fraudulent conveyances under 11 U.S.C.

§ 548(a)(1)(B), and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

**COUNT SEVEN**
**DECLARATORY JUDGMENT AS TO ALL DEFENDANTS (I) TO DETERMINE THE NATURE, EXTENT, AND PRIORITY OF VALID AND PERFECTED SECURITY INTERESTS AGAINST THE DEBTOR INCLUDING THOSE SECURITY INTERESTS THAT ARE VALID BUT HAVE BEEN AVOIDED AND PRESERVED FOR THE BENEFIT OF THE ESTATE AND (II) TO DETERMINE THE SECURED AND UNSECURED AMOUNTS OF THE DEFENDANTS' CLAIMS IF NOT OTHERWISE DETERMINED HEREIN.**

181.    Plaintiff incorporates all preceding paragraphs as if fully re-alleged herein.

182.    28 U.S.C. § 2201(a) provides that "In a case of actual controversy within its jurisdiction…any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."

183.    Federal Rule of Bankruptcy Procedure 7001 requires any proceeding "to determine the validity, priority, or extent of a lien or other interest in property" or "to obtain a declaratory judgment related to" determining the validity, priority, or extent of a lien or other interest in property to be filed as an adversary proceeding.

184.    Based on the filed proofs of claim and the records of the California Secretary of State, the Defendants are asserting or had asserted a security interest against some or all of the Debtor's assets.  While applicable law provides that the priority of security interests is determined by the date of perfection by filing, some of the Defendants have challenged the validity and priority of the security interests of other Defendants.

185.    As stated in detail herein, the Trustee also asserts that the security interests of some Defendants are void, unenforceable, and/or are subject to avoidance and preservation for the benefit of the estate.  To the extent the Trustee is successful in avoiding and preserving those security interests for the benefit of the estate, the Trustee requests that the Court determine the priority of those avoided and preserved security interests as well.

186.    To the extent the any Defendants assert ownership of the "accounts" related to client files generally or to certain client files, the Trustee alleges that any purported sale of either client files, or the future "accounts" or right to payment from trust funds from clients is unenforceable as a matter of law.

187.    Trustee thus alleges that the Defendants never acquired title to or possession of any of underlying client files or related receivables from those files.  The Defendants could not acquire any accounts related to client files because such receivables could only be generated when the Debtor performed legal services for the client.

188.    Upon information and belief, each Defendant asserts a security interest against the Debtor's assets and some assert their interest is superior to the claims of other Defendants.  Given this, the Trustee has been unable to establish the amount, validity, or priority of the claim of any Defendant without the consent or acquiescence of the remaining Defendants.

189.    11 U.S.C. § 506(a) provides that a claim is only secured "to the extent of the value of such creditor's interest in the estate's interest in such property … and is an unsecured claim to the extent that the value of such creditor's interest … is less than the amount of such allowed claim."

190.    The Trustee has sought herein to avoid and preserve a number of the security interests of the Defendants that were perfected by the filing of a UCC Statement.  The Trustee has also asked for the lien of one Defendant to be subordinated in favor of the estate based on pre-petition conduct in the even the Court determines that Defendant has a valid lien.

191.    An actual controversy exists regarding the nature, extent, and, priority as well as the secured status, and the actual amount owed to the Defendants herein.  The Trustee is expressly reserves the right to object to the allowance of any claim once the (i) a claim is filed or (ii) the amount of the claim is determined.

192.    The Trustee respectfully requests that the Court determine the nature, extent, and priority of the security interests of the Defendants either through litigation or settlement including the priority of any security interests that may otherwise be valid but for the fact that the Trustee was able to avoid and preserve the perfection of that security interest for the benefit of the estate.

193.     Pursuant to 11 U.S.C. § 506(a), the Trustee also respectfully requests that the Court determine the amount of the claims of the Defendants herein, including the secured portion of such claims if not already determined herein or in another proceeding.

194.     Pursuant to 28 U.S.C. § 2201, and for the foregoing reasons, Plaintiff seeks a declaration from the Court that (i) adjudicates the priority and extent of the security interests of the Defendants who have enforceable security interests perfected by filings with the California Secretary of State including those otherwise valid security interests that the Trustee has been able to avoid and preserve for the benefit of the estate; (ii) determines the amount of the claims that are secured by valid security interests against the Debtor including the secured portion of those claims; and (iii) finds that no Defendant has an ownership interest in client files or in any future accounts receivable therefrom as a matter of law.

**COUNT EIGHT**
**SUBORDINATION OF PROOF OF CLAIM OF BRIDGE**
**[11 U.S.C. §§ 510(c)]**

195.     Plaintiff incorporates all preceding paragraphs as if fully re-alleged herein.

196.     The Bridge Claim was filed as a secured claim in the amount of $2,374,004.82 as Proof of Claim Number 335.

197.     As discussed herein, the Bridge Claim seeks to collect a debt pursuant to a July 22, 2021 Merchant Cash Advance Agreement executed under an assumed name.  However, Bridge claims that the repayment of this debt is secured by a security interest the Debtor granted to Bridge in a May 17, 2021 agreement that was perfected when the Bridge Statement was filed on or about May 19, 2021.

198.     The Debtor stated that it was tricked and defrauded into borrowing from Bridge doing business as Fundura.

199.     As discussed herein, Bridge both enforced the Bridge Statement against the Debtor pre-petition, which caused disruption to its business, and is now attempting to enforce the Bridge Statement against the Debtor post-petition to assert a secured claim.  However, Bridge released "all legal rights and claims as to the [prior] underlying agreements" and "release[d] Defendants from any

1  claims Plaintiff may have against Defendants from the beginning of time until this day [July 17,

2  2022]" in the Stipulation.  The Stipulation is attached as **Exhibit L** *supra*.

3      200.    The Stipulation also provided that the parties would "execute and deliver promptly

4  any and all such documentation, or documents of any and every kind and character as may be

5  reasonably required, necessary, or proper for the purpose of giving full force and effect to this

6  agreement[.]"  The parties further agreed "to cooperate and to do all things necessary to accomplish

7  the intention of this agreement."

8      201.    Despite the Stipulation's release of claims and the representations made therein,

9  Bridge has asserted and continues to assert the Bridge Statement perfects its subsequently granted

10  security interest against the Debtor.

11      202.    Bridge has also refused to release the Bridge Statement pursuant to the terms and

12  conditions of the Stipulation.

13      203.    In Count One the Trustee detailed the onerous fees that Bridge charged, the substantial

14  sums that the Debtor paid to Bridge pre-petition, and the business disruptions and increased

15  indebtedness caused by Bridge.

16      204.    In Count One, the Trustee has asserted that the Bridge Statement is not valid and

17  cannot perfect the security interest contained in the "Fundura agreement".  In Count Six, the Trustee

18  has asserted that if the Bridge Statement is valid and enforceable, then it is subject to avoidance as a

19  fraudulent transfer pursuant 11 U.S.C. § 548.  If either claim is successful, Bridge would be able to

20  assert an unsecured claim against the estate.  If the Trustee did not prevail on these claims, Bridge

21  would retain the right to assert a secured claim.

22      205.    While 11 U.S.C. § 510(c)(1) authorizes the equitable subordination of a claim for

23  purposes of distribution, § 510(c)(2) authorizes the Court to "order that any lien securing a

24  subordinated claim be transferred to the estate."

25      206.    The pre-petition actions of Bridge detailed herein with respect to the Debtor were

26  unconscionable.  Bridge not only misrepresented itself, but also the priority and validity of its security

27  interest with respect to other creditors.  Bridge imposed excessive and undisclosed fees and forced

28

defaults to impose higher fees and deeper indebtedness. Bridge also obtained substantial payments from the Debtor pursuant to the four agreements that were signed.

207. Bridge's actions also caused the Debtor to borrow additional sums of money from other merchant cash advance lenders as evidenced by the numerous UCC-1 Statements filed by various lenders in the spring and summer of 2021.

208. At a minimum, the actions of Bridge violated the requirement that parties act in "good faith" in the "performance and enforcement" of transactions governed by the Uniform Commercial Code. N.Y. UCC §1-201(b)(20). In Article 9, "good faith" is specifically defined as "honesty in fact and the observance of reasonable commercial standards of fair dealing." N.Y. UCC §9-102(a)(43).

209. Bridge did not act in good faith at all times herein.

210. If the Court determines that the Bridge Statement is a valid and enforceable security interest, then the Trustee respectfully requests that the Court order the lien of Bridge to be equitably subordinated given its pre-petition actions such that the lien is transferred to the estate pursuant to 11 U.S.C. § 510(c)(2).

211. If the Court determines that the Bridge Claim is an unsecured claim because the Bridge Statement does not perfect any security interest granted to Bridge, the Trustee asks that the Court order the Bridge Claim equitably subordinated to the claims of all general unsecured creditors herein pursuant to 11 U.S.C. § 510(c)(1).

WHEREFORE, Plaintiff respectfully requests that the Court grant judgment in his favor against the Defendants on the following counts:

**On The First, Second, and Third Claims for Relief**:

1. Entering a declaratory judgment adjudicating the validity, priority, and enforceability of the Bridge Statement, the Cobalt Statement, and the MNS Statement; (ii) determining the respective amounts of the Bridge Claim, the Azzure Claim, and the MNS Claim and the secured portions thereof (if any) pursuant to 11 U.S.C. § 506(a); and (iii) finding that neither Bridge, Azzure, nor MNS have an ownership interest in client files or in any future accounts receivable therefrom as a matter of law.

//

**On the Fourth Claim for Relief:**

1.      Entry of a judgment finding that the execution of the Diverse Agreements and recording of the Diverse Statement were fraudulent conveyances and are avoided and preserved for benefit of the estate pursuant to 11 U.S.C. §§ 548(a)(1)(B), 550, and 551.

**On the Fifth Claim for Relief:**

1.      Entry of a judgment finding the recording of the Preference Statements to be preferential transfers in favor of Proofpositive, DVF Parties, and Venture that are avoided and preserved for the benefit of the estate pursuant to 11 U.S.C. §§ 547(b), 550, and 551.

**On the Sixth Claim for Relief:**

1.      If the Court entered a declaratory judgment in favor of Bridge, Azzure, and/or MNS on Counts One, Two, or Three, the Trustee respectfully requests that the Court enter finding that the execution of the applicable agreement(s) and recording of the applicable Statement(s) were fraudulent conveyances and are avoided and preserved for benefit of the estate pursuant to 11 U.S.C. §§ 548(a)(1)(B), 550, and 551.

**On the Seventh Claim for Relief:**

1.      To the extent not already determined herein, entry of a declaratory judgment adjudicating the nature, extent, and priority of the valid security interests against the Debtor perfected by filings with the California Secretary of State including those valid security interests that are subject to avoidance and preservation for the benefit of the estate; (ii) determining the amount of the Defendants' claims, including the secured and unsecured portions of such claims, pursuant to 11 U.S.C. § 506(a); and (iii) finding that no Defendant has an ownership interest in client files or in any future accounts receivable therefrom as a matter of law.

**On the Eighth Claim for Relief:**

1.      In the event the Court determines that payment of the Bridge Claim is secured by a valid and enforceable security interest against the Debtor, that the Court enter an order equitably subordinating the perfected security interest of Bridge due to its pre-petition conduct such that the lien is transferred to the estate pursuant to 11 U.S.C. § 510(c)(2).   Alternatively, if the Court determines that the Bridge Claim is not secured by a valid and enforceable security interest against

1  the Debtor, that the Court enter an order equitably subordinating the Bridge Claim to the claims of

2  other unsecured creditors herein due to its pre-petition conduct pursuant to 11 U.S.C. § 510(c)(1) .

3  **On All Claims for Relief:**

4  1.    Awarding attorneys' fees as provided by contract or applicable law;

5  2.    Awarding costs of suit incurred here; and

6  3.    Granting any other and further relief as the Court deems just and proper.

7

8  Dated:  January 26, 2024              Respectfully submitted,

9                                        DINSMORE & SHOHL LLP

10

11                                       By: /s/ Tyler Powell_____
                                             Tyler Powell [pro hac vice]
12                                           Yosina M. Lissebeck

13                                           Special Counsel to Chapter 11 Trustee
                                             Richard A. Marshack
14
                                         In Association With,
15

16                                       MARSHACK HAYS WOOD LLP
                                         General Counsel for Chapter 11 Trustee
17

18

19

20

21

22

23

24

25

26

27

28