D. EDWARD HAYS, #162507
ehays@marshackhays.com
ALINA MAMLYUK, #284154
amamlyuk@marshackhays.com
MARSHACK HAYS WOOD LLP
870 Roosevelt
Irvine, California 92620
Telephone: (949) 333-7777
Facsimile: (949) 333-7778

Attorneys for Chapter 11 Trustee,
RICHARD A. MARSHACK

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION

| | |
|---|---|
| In re<br><br><br>THE LITIGATION PRACTICE GROUP, P.C.,<br><br>Debtor. | Case No. 8:23-bk-10571-SC<br><br>Chapter 11<br><br>OPPOSITION OF CHAPTER 11 TRUSTEE TO MOTION OF HAN TRINH FOR ALLOWANCE OF ADMINISTRATIVE EXPENSE CLAIM [Dk. No. 674]; DECLARATIONS OF ALINA MAMLYUK AND D. EDWARD HAYS, IN SUPPORT THEREOF<br><br>Date:     April 25, 2024<br>Time:     11:00 a.m.<br>Ctrm:     5C – Via Zoom[1]<br>Location: 411 W. Fourth Street<br>          Santa Ana, CA 92701 |

TO THE HONORABLE SCOTT C. CLARKSON, UNITED STATES BANKRUPTCY COURT

JUDGE; THE OFFICE OF THE UNITED STATES TRUSTEE; ALL INTERESTED PARTIES

INCLUDING ADMINISTRATIVE CLAIMANT HAN TRINH:

---

[1] ZoomGov: Video and audio connection information for each hearing will be provided on Judge Clarkson's publicly posted hearing calendar, which may be viewed online at: http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC, and then selecting "(SC) Scott Clarkson" from the "Select Judge" tab on the left-hand side of the page.

# TABLE OF CONTENTS

1.    Summary of Argument ................................................................................................2

2.    Pertinent Factual Background....................................................................................3

3.    Legal Argument .........................................................................................................5

    A.    Standard for Allowance Under 11 U.S.C §503(b)(1)(A)(i) and Required
        Burden of Proof...............................................................................................5

    B.    Outside of a pre-petition paystub and three declarations, Han does not provide
        any evidence to meet her burden of proof to establish that she remained
        Debtor's employee Post-Petition ....................................................................5

    C.    Evidence uncovered in the course of Trustee's investigation proves that Han
        was not Debtor's employee post-petition .......................................................7

        1.    Debtor does not list Han as a post-petition employee at the 341(a)
            meeting of creditors ...........................................................................7

        2.    Han's motion fails to show her employment with Debtor allegedly
            occurred at non-Debtor offices ..........................................................9

        3.    Han's motion is silent as to start of her employment with Greyson.................9

    D.    Han's Vacation Pay as an Administrative Expense fails because Han was not
        Debtor's employee post-petition and stopped accruing pre-petition vacation
        hours after February 17, 2023 .......................................................................11

    E.    Reimbursement of Personal Property Does Not Qualify as an Administrative
        Expense ..........................................................................................................12

4.    Conclusion ...............................................................................................................12

DECLARATION OF ALINA MAMLYUK .........................................................................13

DECLARATION OF D. EDWARD HAYS..........................................................................14

# TABLE OF AUTHORITIES

**Cases**

*Abercrombie v. Hayden Corp. (In re Abercrombie),*

    139 F.3d 755, 756 (9th Cir. 1998) ..................................................................... 4

1 *Boeing North America, Inc. v. Ybarra (In re Ybarra),*

2    424 F.3d 1018, 1025 (9th Cir. 2005) ............................................... 4

3 *Doctors Hosp. v. Vilar,*

4    1995 U.S. App. LEXIS 1576, at *2 (1st Cir. Jan. 26, 1995) ..................... 10

5 *In re Blanchard,*

6    547 B.R. 347, 352 (Bankr. C.D. Cal. 2016, Clarkson, J.) ...................... 4

7 *In re Dant & Russell, Inc.,*

8    853 F.2d 700, 706-707 (9th Cir. 1988) ........................................ 4

9 *In re Gilman,*

10    646 B.R. 277, 288 (Bankr. C.D. Cal. 2022, Kaufman, J.) ....................... 4

11 *In re Roth America, Inc.,*

12    975 F.2d 949 (3d Cir. 1992) .................................................. 10

13 *Matter of Schatz Federal Bearings Co., Inc.,*

14    5 B.R. 549, 552 (Bankr. S.D.N.Y. 1980) ....................................... 10

15 *Microsoft Corp. v. DAK Industries (In re DAK Industries),*

16    66 F.3d 1091, 1094 (9th Cir. 1995) ........................................... 4

17 **Statutes**

18 11 U.S.C § 503 ................................................................ 11

19 11 U.S.C. § 503(b)(1)(A) ...................................................... 11

20 11 U.S.C. § 503(b)(1)(A)(i) ................................................... 4

21

22

23

24

25

26

27

28

OPPOSITION OF CHAPTER 11 TRUSTEE TO MOTION OF HAN TRINH FOR RECOVERY OF
ADMINISTRATIVE EXPENSE

Richard A. Marshack, the duly appointed Chapter 11 Trustee ("Trustee") for the estate of The Litigation Practice Group, P.C. ("Debtor" or "LPG") respectfully submits this opposition ("Opposition") to the Motion Notice of Motion and Motion of Han Trinh ("Han") for an Order Granting Allowance and Payment of Administrative Claim, Pursuant to 11 USC 503(b)(1)(A)(i), Dk. No. 674 ("Motion") and submits the Declarations of D. Edward Hays ("Hays Declaration") and Shadae Clarke ("Clarke Declaration") in support.

## 1.    Summary of Argument

Based on Han's assertion of having been an LPG employee post-petition, she seeks an administrative expense payment of $136,280.56 for an alleged 11 full work-weeks of salary, vacation (accrued mainly pre-petition), penalties, and a list of personal items she claims were lost during a lockout at a non-LPG facility. Han, however, has not met her burden of proof to establish that she was an LPG employee post-petition *for even a day*.

The sworn testimony of Debtor's principal, Daniel March, at the 341(a) meeting of creditors was that only <u>two</u> employees remained on Debtor's payroll after the petition date. Han was not one of them. Further, in her declaration and deposition, Han states that in the post-petition period for which she seeks to collect a salary from the Debtor, she was working for a non-Debtor entity[2]. Lastly, Han indicates in the motion that her "lost" personal items were in a non-Debtor facility, further destroying any notion of Han having (1) worked for the Debtor at the time for which she wishes to be compensated and (2) engaged in business that would preserve Debtor's estate.

Han was not Debtor's employee post-petition and actively harmed Debtor's estate both immediately prior to and post-Petition Date. Specifically, Debtor fraudulently transferred all active legal service agreements prior to bankruptcy. The Motion for allowance of Han's administrative

---

[2] Declarations from attorneys working for LPG at the time describe great efforts Han undertook at least a month prior to petition date to actively harm Debtor's estate. This was done by draining Debtor of its two main assets—Legal Services Agreements ("LSAs") and working relationships / trade secrets of Debtor's attorneys—by helping transfer these assets to non-Debtor entities prior to bankruptcy. These declarations will be attached to Trustee's Opposition to the Motion for Administrative Claim filed by Greyson Law Center [dk. no. 676] and are hereby incorporated by reference.

OPPOSITION OF CHAPTER 11 TRUSTEE TO MOTION OF HAN TRINH FOR RECOVERY OF
ADMINISTRATIVE EXPENSE

1  claim must be denied.

2  **2.      Pertinent Factual Background**

3       Pre-petition, Debtor was a law firm that provided consumer debt resolution services servicing

4  more than 50,000 customers across the United States. In 2022, Debtor's annual revenue exceeded

5  $150 million.

6       On March 20, 2023 ("Petition Date"), Debtor filed a voluntary petition under Chapter 11 of

7  Title 11 of the United States Code, initiating bankruptcy Case No. 8:23-bk-10571-SC in the United

8  States Bankruptcy Court for the Central District of California, Santa Ana Division ("Bankruptcy

9  Case"). Prior to bankruptcy, Debtor fraudulently transferred all its assets and clients. As of the

10  petition date, Debtor had virtually no assets or clients.

11       On May 8, 2023, Richard A. Marshack was appointed as the Chapter 11 Trustee of the

12  Debtor's estate. *See* Dk. No. 65.

13       On June 8, 2023, Trustee filed an adversary case against numerous defendants, including Han

14  Trinh ("Han"), seeking, among other things, to avoid and recover Debtor's fraudulent transfers. *See*

15  Adv. Case No. 8:23-ap-01046-SC.

16       On June 15, 2023, Trustee filed an amended complaint in the Adversary Case. *See* Adv. Case

17  No. 8:23-ap-01046-SC Dk. No. 62.

18       On June 18, 2023, Han, Phuong (aka Jayde) Trinh ("Jayde"), Greyson Law Center PC

19  ("Greyson"), and Scott Eadie filed a response to the amended complaint in the Adversary Case. *See*

20  Adv. Case No. 8:23-ap-01046-SC Dk. No. 89.

21       On October 5, 2023, Trustee filed a Stipulation between Han, Jayde, and himself, to dismiss

22  Han Trinh and Jayde Trinh from the Adversary Case. *See* Adv. Case No. 8:23-ap-01046-SC Dk. No.

23  218.

24       On October 16, 2023, the Court entered an Order setting the Administrative Claims Bar Date

25  as November 21, 2023. *See* Dk. No. 577.

26

27

28

OPPOSITION OF CHAPTER 11 TRUSTEE TO MOTION OF HAN TRINH FOR RECOVERY OF
ADMINISTRATIVE EXPENSE

On October 27, 2023, Trustee filed a Stipulation between Han, Jayde, and himself, to dismiss Han and Jayde from the Second Amended Complaint. *See* Adv. Case No. 8:23-ap-01046-SC Dk. No. 249.

On November 17, 2023, Han filed the Motion as Dk. No. 674, seeking a $136,280.56 administrative claim asserting she is owed unpaid salary, late pay penalties, vacation pay, and an additional $14,433.56 for the "disappearance" of Han's personal property.

On January 5, 2024, Trustee filed a Status report Chapter 7 Trustee's Omnibus Status Report re. Motions for Allowance of Administrative Expense Claims Under 11 U.S.C. Section 503(b) (Jan. 5 Status Report"). *See* Dk. No. 815.

In the Jan. 5 Status Report, Trustee updated the court as to Trustee's findings in investigating Han Trinh's administrative claim, informing the Court that the Trustee intended to oppose the claim in its entirety.

On January 8, 2024, the Court entered an order granting the Jan. 5 Status Report. *See* Dk. No. 818.

On January 9, 2024, Han, Jayde, and Greyson filed an objection to the Court's order granting the Trustee's Jan. 5 Status Report.

On February 15, 2024, Trustee filed an Omnibus Unilateral Report Regarding Status of Motions for Allowance of Administrative Expense Claim Under 11 U.S.C. §503(b) ("Feb. 15 Status Report"). *See* Dk. No. 940.

In the Feb. 15 Status Report, Trustee indicated that the he was investigating the exact date and reason that Han's salary increased nearly ten-fold to determine whether any payments were preferential, and noted that Han was no longer a party to an adversary proceeding. *See* Dk. No. 940.

On February 19, 2024, Han, Jayde, and Greyson filed a Unilateral Status Report requesting that the Trustee file a pleading with the Court stating that the Trustee did not oppose Han, Jayde, and Greyson's motions for allowance and payment of administrative claims. *See* Dk. No. 945.

Trustee did not respond to Han, Jayde and Greyson's Unilateral Status Report.

OPPOSITION OF CHAPTER 11 TRUSTEE TO MOTION OF HAN TRINH FOR RECOVERY OF
ADMINISTRATIVE EXPENSE

**3.    Legal Argument**

    **A.    Standard for Allowance Under 11 U.S.C §503(b)(1)(A)(i) and Required Burden of Proof**

    Claims for "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case" may be entitled to administrative priority. 11 U.S.C. § 503(b)(1)(A)(i); *see Abercrombie v. Hayden Corp. (In re Abercrombie)*, 139 F.3d 755, 756 (9th Cir. 1998). "To be deemed an administrative expense, the claim must have arisen from a transaction with the debtor in possession, and directly and substantially benefited the estate." *Boeing North America, Inc. v. Ybarra (In re Ybarra)*, 424 F.3d 1018, 1025 (9th Cir. 2005). "In order to keep administrative costs to the estate at a minimum, 'the actual, necessary costs and expenses of preserving the estate…' are construed narrowly." *Microsoft Corp. v. DAK Industries (In re DAK Industries),* 66 F.3d 1091, 1094 (9th Cir. 1995). The rationale for strictly construing allowable administrative expenses logically flows from administrative expense priority "reduc[ing] the funds available for creditors and other claimants." *In re Gilman*, 646 B.R. 277, 288 (Bankr. C.D. Cal. 2022, Kaufman, J.); also *In re Dant & Russell, Inc.*, 853 F.2d 700, 706-707 (9th Cir. 1988).

    Further, unlike the proofs of claim where a filled out and filed claim is itself *prima facie* evidence of the validity and amount of the claim, requesting allowance of an administrative expense is a higher burden. "The burden of proving an administrative expense claim is on the claimant." *In re Gilman* at 288. Claimants must prove entitlement to their administrative expense by a preponderance of evidence. *In re Blanchard*, 547 B.R. 347, 352 (Bankr. C.D. Cal. 2016, Clarkson, J.). "[A]dministrative claims lack presumptive validity." *Id.*

    **B.    Outside of a pre-petition paystub and three declarations, Han does not provide any evidence to meet her burden of proof to establish that she remained Debtor's employee Post-Petition**

    Han has not met her burden of proof to establish entitlement to payment of an administrative expense. The Motion alleges that Han is owed (1) wages for 11 weeks of work, equivalent to

OPPOSITION OF CHAPTER 11 TRUSTEE TO MOTION OF HAN TRINH FOR RECOVERY OF
ADMINISTRATIVE EXPENSE

$63,461.54, allegedly performed from March 20, 2023, to June 2, 2023; (2) late payment penalties in the amount of $34,615.38; (3) payment for accrued vacation time in the amount of $38,203.64; and (4) compensation in the amount of $14,433.56 for items of Han's personal property that "disappeared."

Attached to the Motion is a copy of one paystub, dated March 3, 2023, which does not indicate accrued vacation hours. In addition, three declarations are attached—first Han's, second is her sister Jayde's, and third is their attorney's who, in this bankruptcy case, also represents a self-declared "direct competitor of LPG." *See,* Motion [Dk. 674], at 27, Exhibit A. Han's attorney's declaration does not make a single assertion nor add a single fact about Han's supposed post-petition employment status at LPG. (March Dec., Exh. 1). Instead, the attorney's declaration is a reiteration of facts that led up to Court's order regarding a lockout at non-LPG facility and thus is of no use in meeting the burden of proof in Han's administrative claim based on Han's claimed employment. *Id.* The attorney's declaration inexplicably jumps from paragraph 2 to 28 and, outside of protesting the Court's lockout order, nothing in the attorney's declaration pertains to the details of Han's post-petition employment with the Debtor. *Id.* at pg. 39.

Han's and Jayde's declarations are nearly identical copies of each other. Both include identical paragraphs 11 and 12, with only Han and Jayde's names interchanged, respectively, in their declarations:

"11. In our 2 plus years as LPG employees, to and including 6/2/23, Jayde and I were **essential** employees of LPG, because Jayde and I were the LPG employees who administered approximately 28,000 active litigation files of LPG clients, including hiring, managing, assigning, and monitoring performance of attorneys to represent LPG clients, for clients whose matters were not resolved short of lawsuits. Jayde and I were the **only** LPG employees administering LPG's 28,000 active litigation files. Without us administering LPG's 28,000 active litigation files, LPG could not carry on its business.

12. Jayde and I continued to do this **essential** work for LPG, administering LPG's thousands of active litigation files, during their 11 weeks of work Jayde and I did for LPG **post-petition**. During those 11 weeks, Jayde and I continued to respond to the many emails sent to LPG every day, by LPG's clients (people with debt problems who had contracted with LPG to represent them in trying to resolve/defend those clients' debt problems). Those LPG clients emailed LPG asking where were their attorneys, what was status of their lawsuits, etc." (Han Dec., Exh. 1 pgs. 20-21., Jayde Dec., Exh. 1 pgs. 25-26.

Other that Han and Jayde's bold contention that they alone held up Debtor's business without anyone else's contribution pre-petition and that they were "**the only** LPG's employees administering LPG's 28,000 active litigation files," Han's Motion attaches no further evidence of alleged work done on behalf of Debtor in the post-petition period. There is neither a description of Han's workday, nor a breakdown of how many hours a day or a week were spent in Debtor's employment. Further, there is no sense of what was involved in "administration" of Debtor's files or in "managing, assigning, and monitoring performance" of Debtor's attorneys in the post-petition period, considering that Debtor's two main assets—consumer client files and attorney contracts— were fraudulently transferred to non-Debtor entities prior to Petition Date. In essence, taking into account that Debtor was not operating in any meaningful way post-petition (and could not have operated as such, without consumer clients nor local counsel to represent them) it is unclear what Han asserts she was doing that would justify a pay out of a $300,000 salary for 11 weeks.

Additionally, Jayde's declaration regarding Han and Jayde's employment with the Debtor is directly controverted by an e-mail Jayde sent to Mr. March one day after the Petition Date. It reads "Mona[3] and I are no longer employed by LPG. I would suggest you respond to one of the numerous emails sent by the Illinois attorney, Firas, should you need any further clarification. In addition, I would also suggest you contact the client since they will be looking to you as the managing attorney of LPG." Rubin Dec., Ex. 45. Jayde's declaration is entirely unreliable as to probative value as it relates to Han's employment with the Debtor.

**C.    Evidence uncovered in the course of Trustee's investigation proves that Han was not Debtor's employee post-petition**

**1.    Debtor does not list Han as a post-petition employee at the 341(a) meeting of creditors**

At Debtor's 341(a) meeting of creditors on April 24, 2023, Debtor's only officer, Dan March ("March"), responded to U.S. Trustee Ng's questions regarding Debtor's post-petition state. A true

---

[3] Jayde's assistant

1 and correct copy of the 341(a) Transcript is attached to the Hays Decl., as Exhibit "1." Under oath,

2 Mr. March testified that Debtor had only one office location, in Tustin. *Id.* at 45, lines 22-25.

3 Further, Debtor's administrator, Tony Diab ("Diab"), clarified Mr. March's answer and responded

4 about a number of offices Debtor leased throughout the country to accommodate local counsel; these

5 leases were either abandoned or otherwise let go prior to Petition Date. *Id.* pgs 46-48. None of these

6 offices included 3345 Michelson Dr., Irvine, CA 92612, Suite 400 ("Michelson office"). The

7 Michelson office, to which Han refers as "the Greyson offices" where she allegedly worked for the

8 Debtor and where her employment with Debtor allegedly ended on June 2, 2023, were not in

9 Debtor's control nor was the Debtor leasing them. Instead, the tenant was Phoenix which was the

10 recipient of fraudulent transfers which were set avoided pursuant to a stipulation with its principal,

11 Ty Carss, which this Court approved.

12        Further, both Messrs. March and Diab testified that a drastic reduction in Debtor's workforce

13 occurred in several stages. Mr. Diab testified that while at its peak, Debtor employed around 420

14 people in 2022. But, Debtor laid off 88 people around November 2022; 30-40 people were let go

15 around January 2023; then virtually everyone with the exception of 15 people were laid off by

16 March 2023 (petition month) and only three people—March (Debtor's officer), Olga Esquivel, and

17 Carl Wekashu (two employees)—remained post-petition. *Id.* 48-49. Han was not one of the post-

18 petition employees.

19        Additionally, Mr. Diab did not testify at any point to Debtor's creditors at the 341(a) meeting

20 that Debtor made any promises to Han or any other employees that "Diab would have the

21 bankruptcy court approve LPG paying the salaries of Han, Jayde, and the other employees of LPG."

22 *See*, Ex. 1, at 27. Such a promise by the Debtor would have been absurd in light of there being no

23 ongoing business that could justify the payment of salaries such as Han's ($300,000.00/yr) or

24 Jayde's ($250,000.00/yr). Han's and Jayde's names (including their last name "Trinh") are not

25 mentioned even a single time in the 341(a) meeting despite their assertions that they remained

26 "essential" employees of the Debtor post-petition.

27

28

OPPOSITION OF CHAPTER 11 TRUSTEE TO MOTION OF HAN TRINH FOR RECOVERY OF
ADMINISTRATIVE EXPENSE

## 2.  Han's motion fails to show why her employment with Debtor allegedly occurred at non-Debtor offices

Han's motion does not explain how she—or, for that matter, her personal belongings for which she is seeking a $14,433.56 reimbursement in administrative expense allowance—came to be at a non-Debtor office at the time when she was supposedly fully employed by the Debtor. According to Han, she stopped working at the Debtor's Tustin office on May 29, 2023, and then on June 2, 2023, Trustee's field agents locked her out of the Michelson office (one that was not leased by the Debtor but by Phoenix). This would mean that all of the personal items that Han lists in the "Errata" filing—from the three monitors (in addition to an 86" screen) down to a two-pack of strawberry lip balm—inexplicably were moved, or shipped, or bolted to the walls in the Michelson office in just a few days right prior to the Greyson lockout. A true and correct copy of the Erratum filed on February 16, 2024, as Dk. No. 941, is attached to the Hays Decl. as Exhibit "2." This sequence of events lacks credibility.

More likely, Han was working at the Michelson office months before the lockout. Attorneys who worked for Debtor pre-petition were given Greyson employment contracts to sign that were dated the very next day after Petition Date. Israel Orozco and R. Reed Pruyn both filed administrative expense motions of their own and both attached a Greyson contract starting March 21, 2023. Pruyn's contract was filed on November 21, 2023, as Dk. No. 699, pg. 8. A true and correct copy of the Greyson contract for Israel Orozco is attached as Exhibit "3" to the Declaration of Alina Mamlyuk. If, in its motion, Greyson protests a lockout of its premises at the Michelson office and Han was working out of the Michelson office to which she had moved $14,433.56 of personal belongings, it is unlikely that Han was Debtor's employee on June 2, 2023, which casts additional doubt on the entirety of the timeline asserted in Han's motion.

## 3.  Han's motion is silent as to start of her employment with Greyson

Han's motion conspicuously avoids pinning a date at which Han began employment at Greyson. This evasiveness is telling. In Han's declaration attached to Greyson's motion for administrative claim, in the very second paragraph, Han fully admits to working as Greyson's

1  administrator since March 12, 2023. A true and correct copy of the Declaration of Han Trinh filed on

2  November 17, 2023, as Dk. No. 676-1, is attached to the Hays Decl. as Exhibit "4" ("Trinh

3  Declaration"). Han's workload at Greyson apparently also involved "administering Greyson's client

4  files, and hiring/firing/assigning/monitoring Greyson's attorney staff." *Id.* A few paragraphs below,

5  she proceeds to call Greyson the "direct competitor" of Debtor. *Id.* at 256, 263-264. In a deposition

6  taken by Trustee's office of Han Trinh on March 20, 2023, Han admits under oath that she worked

7  for Greyson both as early as May 3, 2023 and then as early as April 18, 2023[4]. Even earlier than that,

8  Han was sending Greyson employment letters to attorneys on April 10, 2023. *See*, Supplemental

9  Declaration of Alex Rubin ("Rubin Decl."), filed on April 11, 2024, as Dk. No. 1099, Ex. 34, pg. 77.

10  On March 21, 2023, the day after Debtor filed for bankruptcy, Han was included in an email written

11  by Jayde responding to Randall Baldwin Clark ("Clark"), one of Debtor's local counsel servicing

12  client files. Clark e-mails about being locked out of the client database called Forth. Jayde responds

13  that "No one has access to Forth moving forward. We were permanently locked out on Friday at

14  3pm. All files have been moved to different law firms. Legal LPG has access to some. Randall—

15  provide a number so we can reach out regarding new venture. [Thank you!]" *See*, Rubin Decl., Ex.

16  39, pg. 90. Considering that every single client file was fraudulently transferred out of Debtor's

17  database pre-petition, and a "new venture" was pitched to Debtor's attorneys, it is likely that Han's

18  employment with Greyson began prior to Petition Date, although it is not Trustee's burden to prove

19  this date. Importantly, Jayde's March 21, 2023, email re-confirms that at least as of Friday, March

20  17, 2023, Debtor's client files were transferred out of Debtor's possession and into different law

21  firms. This would mean, again, that there simply did not exist 28,000 client files for Han to

22  administer as Debtor's employee post-petition. There was simply no more work at LPG.

23       Han has not established that she was an employee of the Debtor in the post-petition period,

24  and therefore is not entitled to wages as an administrative expense. No entitlement to wages means

25  that Han is also not entitled to any penalty regarding those wages.

26

27  _____

28  [4] Transcript from Han's deposition will be filed upon completion of transcription and receipt by
    Trustee.

OPPOSITION OF CHAPTER 11 TRUSTEE TO MOTION OF HAN TRINH FOR RECOVERY OF
ADMINISTRATIVE EXPENSE

**D.      Han's Vacation Pay as an Administrative Expense fails because Han was not Debtor's employee post-petition and stopped accruing pre-petition vacation hours after February 17, 2023**

Han's claim for a payment of accrued vacation time also fails for lack of proof. Vacation time accrued pre-petition is not entitled to an administrative expense priority. "Severance and vacation pay, incident to post-petition employment are widely considered to be administrative expenses." *Doctors Hosp. v. Vilar*, 1995 U.S. App. LEXIS 1576, at *2 (1st Cir. Jan. 26, 1995) (citing e.g. Matter of Schatz Federal Bearings Co., Inc., 5 B.R. 549, 552 (Bankr. S.D.N.Y. 1980). *See also, In re Roth America, Inc.*, 975 F.2d 949 (3d Cir. 1992) where vacation pay is entitled to administrative priority only to the extent that these benefits were earned post-petition.

Han has not met her burden of proof to show that she was Debtor's employee post-petition, which would logically mean that she did not accrue any vacation pay post-petition. Also, the Paychex paystub attached to Han's motion does not show any accrued vacation pay whatsoever. In investigating Han's claim, Trustee obtained from Paychex the entire record of Han's paystubs for her employment with the Debtor. This record was provided to Han's counsel. In the record, it appears that vacation stopped accruing after February 17, 2023. A true and correct copy of the Han paystubs is attached to the Hays Decl. as Exhibit "5." *See*, Ex. 5, pg. 283. A Paychex representative explained that Han, along with Mr. March, was one of only two LPG employees authorized to process payroll with Paychex. As such, Han was completely aware that vacation accrual stopped mid-February. A true and correct copy of a March 27, 2024, email exchange with Paychex is attached to the Hays Decl. as Exhibit "6." Any claim that Han may have regarding her pre-petition vacation accrual would have to have been filed as a general proof of claim and would not be subject to administrative expense analysis.

/ / /

/ / /

### E.    Reimbursement of Personal Property Does Not Qualify as an Administrative Expense

Han alleges that the bankruptcy estate owes her $14,433.56 pursuant to 11 U.S.C § 503, for her personally owned items that "disappeared" from her office. Claims under Section 503 are limited to "actual, necessary costs and expenses of preserving the estate…" 11 U.S.C. § 503(b)(1)(A). Compensation for her personal property that Han alleges "disappeared" from a locked office is simply inapplicable to an administrative expense analysis. Further, it is entirely unclear from the Motion why an 86" TV, a laptop, several monitors, and a desk and chairs would be Han's personal property in the first place and not belonging to whatever employer Han was working for when the items were purchased. The personal property portion of the claim appears to be a blatant cash grab attached to an administrative expense motion and simply has no merit. As such, this portion of Han's administrative expense claim must also be denied.

### 4.    Conclusion

For the foregoing reasons, Trustee respectfully requests that the Court deny the Motion and disallow Han's Motion for allowance of administrative claim in its entirety.

DATED:  April 11 2024                    MARSHACK HAYS WOOD LLP

                                         */s/ D. Edward Hays*
                                    By: _____
                                         D. EDWARD HAYS
                                         ALINA MAMLYUK
                                         Attorneys for Chapter 11 Trustee,
                                         RICHARD A. MARSHACK

## DECLARATION OF ALINA MAMLYUK

I, Alina Mamlyuk, declare and state as follows:

1.      I am an individual over 18 years of age and competent to make this Declaration.

2.      If called upon to do so, I could and would competently testify as to the facts set forth in this Declaration.

3.      The facts set forth below are true of my personal knowledge.

4.      I am an attorney at law duly admitted to practice before this Court and all courts of the State of California.

5.      I am of counsel with the law firm of Marshack Hays Wood LLP, attorneys of record for Richard A. Marshack, the duly appointed Chapter 11 Trustee ("Trustee") for the estate of The Litigation Practice Group, P.C. ("Debtor" or "LPG").

6.      I reviewed the docket in this case prior to execution of this Declaration to refresh my memory as to the dates on which particular documents were filed.

7.      I make this declaration in support of the Trustee's Opposition to Motion of Han Trinh for Allowance of Administrative Expense Claim [Dk. 674]. Capitalized terms not defined in this declaration shall have the meaning ascribed to them in the Opposition.

8.      In the course of my investigation of administrative claim motions filed in this case, I contacted Israel Orozco who filed a request for payment of administrative expenses based on his servicing Debtor's client files as an attorney. [Dk. 862]

9.      In exchanging emails with him, I asked Israel Orozco to forward me documentation regarding his post-petition employment with Greyson.

10.      On April 1, 2024, Israel Orozco emailed me his employment contract with Greyson.

11.      A true and correct copy of the Greyson contract for Israel Orozco is attached here as Exhibit "3.".

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 11, 2024.

_/s/ Alina Mamlyuk_____
ALINA MAMLYUK

4883-4706-7571, v. 5

13

## DECLARATION OF D. EDWARD HAYS

I, D. Edward Hays, declare and state as follows:

1.    I am an individual over 18 years of age and competent to make this Declaration.

2.    If called upon to do so, I could and would competently testify as to the facts set forth in this Declaration.

3.    The facts set forth below are true of my personal knowledge.

4.    I am an attorney at law duly admitted to practice before this Court and all courts of the State of California.

5.    I am a partner with the law firm of Marshack Hays Wood LLP, attorneys of record for Richard A. Marshack, the duly appointed Chapter 11 Trustee ("Trustee") for the estate of The Litigation Practice Group, P.C. ("Debtor" or "LPG").

6.    I reviewed the docket in this case prior to execution of this Declaration to refresh my memory as to the dates on which particular documents were filed.

7.    I make this declaration in support of the Trustee's Opposition to Motion of Han Trinh for Allowance of Administrative Expense Claim [Dk. 674]. Capitalized terms not defined in this declaration shall have the meaning ascribed to them in the Opposition.

2.    On March 20, 2023 ("Petition Date"), Debtor filed a voluntary petition under Chapter 11 of Title 11 of the United States Code, initiating bankruptcy Case No. 8:23-bk-10571-SC in the United States Bankruptcy Court for the Central District of California, Santa Ana Division ("Bankruptcy Case").

3.    Prior to bankruptcy, Debtor fraudulently transferred all its assets and clients. As of the petition date, Debtor had virtually no assets or clients. Trustee has avoided and recovered some of these fraudulent transfers.

4.    On May 8, 2023, Richard A. Marshack was appointed as the Chapter 11 Trustee of the Debtor's estate.

OPPOSITION OF CHAPTER 11 TRUSTEE TO MOTION OF HAN TRINH FOR RECOVERY OF
ADMINISTRATIVE EXPENSE

5.     At Debtor's 341(a) meeting of creditors on April 24, 2023, Debtor's only officer, Dan March ("March"), responded to U.S. Trustee Queenie Ng's questions regarding Debtor's post-petition status. A true and correct copy of the 341(a) Transcript is attached as Exhibit 1.

6.     A true and correct copy of the Erratum filed by Han on February 16, 2024, as Dk. No. 941, is attached as Exhibit 2.

7.     A true and correct copy of the Declaration of Han Trinh filed on November 17, 2023, as Dk. No. 676-1, is attached as Exhibit 5 ("Trinh Declaration"). In this declaration, Han fully admits to working as Greyson's administrator since March 12, 2023.

8.     In a deposition of Han Trinh conducted on March 20, 2024, she admits under oath that she worked for Greyson both as early as May 3, 2023, and then as early as April 18, 2023.[5]

9.     Even earlier than that, Han was sending Greyson employment letters to attorneys on April 10, 2023. *See*, Supplemental Declaration of Alex Rubin ("Rubin Decl."), filed on April 11, 2024, as Dk. No. 1099, Ex. 34, pg. 77.

10.    On March 21, 2023, the day after Debtor filed for bankruptcy, Han was included in an email written by Jayde responding to Randall Baldwin Clark ("Clark"), one of Debtor's local counsel servicing client files. Clark e-mails about being locked out of the client database called Forth. Jayde responds that "No one has access to Forth moving forward. We were permanently locked out on Friday at 3pm. All files have been moved to different law firms. Legal LPG has access to some. Randall—provide a number so we can reach out regarding new venture. [Thank you!]" *See*, Rubin Decl., Ex. 39, pg. 90.

11.    In investigating Han's claim, Trustee obtained from Paychex the entire record of Han's paystubs for her employment with the Debtor. This record was provided to Han's counsel. In the record, it appears that vacation stopped accruing after February 17, 2023. A true and correct copy of the Han paystubs is attached as Exhibit 4.

---

[5] Transcript from Han's deposition will be filed upon completion of transcription and receipt by Trustee.

OPPOSITION OF CHAPTER 11 TRUSTEE TO MOTION OF HAN TRINH FOR RECOVERY OF ADMINISTRATIVE EXPENSE

12.    A Paychex representative explained that Han, along with Mr. March, was one of only two LPG employees authorized to process payroll with Paychex. As such, Han was completely aware that vacation accrual stopped mid-February. A true and correct copy of a March 27, 2024, email exchange with Paychex is attached as Exhibit 5.

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 11, 2024.

_/s/ D. Edward Hays_____
D. EDWARD HAYS

4883-4706-7571, v. 5

**EXHIBIT 1**

```
 1              OFFICE OF THE UNITED STATES TRUSTEE

 2                    SANTA ANA DIVISION

 3

 4  In Re:                    )  Case No. 8:23-bk-10571-SC
                              )
 5  THE LITIGATION PRACTICE   )  Chapter 11
    GROUP, PC,                )
 6                            )
            Debtor.           )
 7  _____)

 8                            341(a) MEETING

 9                  QUEENIE NG, Presiding

10                       --oOo--

11               Monday, April 24, 2023

12               411 West Fourth Street
                Santa Ana, California 92701
13

14  APPEARANCES:

15  For the Debtor:          JOON M. KHANG, ESQ.
                             Khang & Khang, LLP
16                           4000 Barranca Parkway
                             Suite 250
17                           Irvine, California 92604
                             (949) 419-3834
18

19  For the United States    QUEENIE K. NG, ESQ.
      Trustee:               MARILYN SORENSEN, ANALYST
20                           CAM MISKINS, ESQ.
                             Office of the United States
21                             Trustee
                             411 West Fourth Street
22                           Suite 7160
                             Santa Ana, California 92701
23                           (714) 338-3403

24

    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.
```

ii

1 | APPEARANCES:  (cont'd.)

2 | For All Service Financial:   ALAN I. NAHMIAS, ESQ.
Mirman, Bubman & Nahmias, LLP
3 | 21860 Burbank Boulevard
Suite 360
4 | Woodland Hills, California
91367
5 | (818) 995-2555

6 | For SDCO Tustin Executive   RONALD BROWN, ESQ.
Center:
7 |

8 | For DVF 2, MCDVI 1, MCDVI 2:  DAVID CUSIO, ESQ.
MATTHEW STOCKHOLD, ESQ.
9 | MICHAEL BRELJE, ESQ.

10 | For Maverick Bank Card,   FRANK WHITE, ESQ.
Inc.:
11 |

12 | For Carolyn Beach:   DANIEL EDELMAN, ESQ.

13 | For the Commonwealth of   AMY SCHULMAN, ESQ.
Pennsylvania:
14 |

15 | For Validation Fund 2:   DAVE ZUCK, ESQ.

16 | Transcriber:   Briggs Reporting Company, Inc.
9711 Cactus Street
17 | Suite B
Lakeside, California 92040
18 | (310) 410-4151

19 |

20 |

21 |

22 |

23 |

24 |

25 |

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 18

iii

<u>I N D E X</u>

| <u>WITNESSES:</u> | <u>EXAMINATION</u> |
|---|---|
| DANIEL MARCH | 5 |
| TONY DIAB | 6 |

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 19

1

1    SANTA ANA, CALIFORNIA MONDAY, APRIL 24, 2023  11:00 AM

2                           --oOo--

3          TRUSTEE NG:  Good morning, everyone.  My name is

4    Queenie Ng.  I'm the trial attorney for the United States

5    Trustee's Office, and the Assistant U.S. Trustee, Cam

6    Miskins (phonetic), is also attending today.

7          This is the 341(a) meeting of In Re The Litigation

8    Practice Group, PC, Case Number 8:23-bk-10751-SC.  This

9    Chapter 11 case was filed on March 20th, '23, and the

10   initial 341(a) was set for April 24th, '23 and was continued

11   to today, May 2nd, '23, at 9:30 pursuant to the Debtor's

12   request.

13         I note there are a lot of people on the phone

14   right now.  I would like everyone to make an appearance so

15   we have a record who is hear today.  Can we start with the

16   Debtor's counsel and Debtor's representative.

17         MR. KHANG (telephonic):  Good morning.  This is

18   Joon Khang appearing on behalf of the Debtor.

19         MR. MARCH (telephonic):  This is Daniel Steven

20   March for The Litigation Practice Group, shareholder.

21         MR. DIAB (telephonic):  Tony Diab on behalf of

22   Litigation Practice Group.

23         TRUSTEE NG:  Anyone else in the audience?  If so,

24   can you please announce your name?

25         MR. BROWN (telephonic):  Good morning.  Ronald

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 20

2

1  Brown, attorney for SDCO Tustin Executive Center, the

2  landlord to the Debtor.

3            TRUSTEE NG:  Thank you.

4            MR. CUSIO (telephonic):  Good morning.  David

5  Cusio (phonetic) on behalf of Debt Validation Fund 2, MCDVI

6  Fund 1, and MCDVI Fund 2.

7            TRUSTEE NG:  Thank you.

8            MR. STOCKHOLD (telephonic):  Good morning.

9  Matthew Stockhold (phonetic), also appearing on behalf of

10 Debt Validation Fund 2, MCDVI Fund 1, and MCDVI Fund 2.

11           MR. LEE (telephonic):  This is Eric Lee, an

12 investor in Validation Partners, a creditor.

13           MR. WHITE (telephonic):  Good morning.  Frank

14 White for (indiscernible).

15           UNIDENTIFIED SPEAKER:  Good morning --

16           MR. WHITE:  Frank White -- go ahead.

17           UNIDENTIFIED SPEAKER:  Ann --

18           MR. ZUCK (telephonic):  (Indiscernible) Debt

19 Validation Fund 2.

20           TRUSTEE NG:  Okay.  I'm sorry.  I didn't hear that

21 name just now.

22           MR. ZUCK:  Dave Zuck (phonetic), Validation Fund

23 2.

24           TRUSTEE NG:  Okay.

25      (Multiple speakers.)

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 21

3

1          MR. NAHMIAS (telephonic):  This is Alan Nahmias,

2  Mirman, Bubman and Nahmias, on behalf of All Service

3  Financial.

4          MS. JAY (telephonic):  Ann Jay on behalf of

5  (indiscernible) Enterprise.

6          UNIDENTIFIED SPEAKER:  (Indiscernible.)

7          TRUSTEE NG:  I'm sorry.  I didn't hear that one.

8      (No response.)

9          TRUSTEE NG:  I'm sorry.  Can you repeat that,

10  whoever just spoke?

11          MR. CARR (telephonic):  Chris Carr (phonetic) on

12  behalf of Gloria (indiscernible).

13          TRUSTEE NG:  Okay.  Anyone else?

14          UNIDENTIFIED SPEAKER:  (Audio glitch.)

15          MS. SCHULMAN:  This is Amy Schulman on behalf of

16  the Commonwealth of Pennsylvania Office of Attorney General,

17  Bureau of Consumer Protection.

18          TRUSTEE NG:  Thank you.

19          MR. WHITE:  Frank White for Creditor Maverick Bank

20  Card, Inc.

21          MR. MCKENNA (telephonic):  Ryan McKenna of MCDVI

22  Fund 1 and MCDVI Fund 2.

23          MR. BRELJE (telephonic):  Michael Brelje

24  (phonetic) on behalf of Debt Validation Fund MCDVI 1, MCDVI

25  2.

4

1          TRUSTEE NG:  Okay.  Is that everyone?

2          MR. MCKENNA (telephonic):  Sean McKenna on behalf

3  of MCDVI Funds 1 and 2.

4          MR. DRAGER (telephonic):  Jason Drager (phonetic)

5  on behalf of Ketterline (phonetic) Beach.

6          TRUSTEE NG:  Thank you.

7          MR. BARRY (telephonic):  Jack Barry (phonetic) on

8  behalf of Debt Validation Fund 2.

9          MR. GORDON (telephonic):  Brendan Gordon

10  (phonetic) on behalf of Debt Validation Fund 2.

11          TRUSTEE NG:  Okay.  Is that everyone?

12      (No response.)

13          TRUSTEE NG:  All right.  I hear no response, so

14  we're going to go ahead.

15          There are a lot of people here today.  For some

16  this might be your first time.  I'm just going to explain

17  what's going to happen today.

18          So, I'm going to ask everyone who's not going to

19  speak for now to mute because this meeting is being

20  recorded, and once I've finished all the questions, we'll

21  open up the forum to -- for any creditors who would like to

22  ask questions at the end.  At that point, you know, you can

23  unmute yourself and announce your name and if you're

24  representing someone, please, you know, announce the party

25  that you're representing.

5

1        Mr. Khang, who's going to appear on behalf of the

2   Debtor today?

3        MR. KHANG:  Appearing for the Debtor are Daniel

4   March, who is the President and sole shareholder of the

5   Debtor, as well as Tony Diab, who is the person most

6   knowledgeable with dealings with vendors of the Debtor.

7        TRUSTEE NG:  Okay.  So, we're going to swear in

8   both parties.

9        Mr. March, I know I can't see you, but can you

10  please raise your right hand and let me know when you're

11  done?

12        MR. MARCH:  I have done it.

13            DANIEL MARCH - WITNESS - SWORN

14        TRUSTEE NG:  And can you state your full name and

15  address for the record, please?

16        MR. MARCH:  Daniel Steven March, M-A-R-C-H.

17        TRUSTEE NG:  And your address for the record,

18  please?

19        MR. MARCH:  17291 Irvine Boulevard, Suite 101,

20  Tustin, California 92780.

21        TRUSTEE NG:  Is this your personal residence or is

22  this the Debtor's location?

23        MR. MARCH:  This is the Debtor's location.

24        TRUSTEE NG:  Okay.  I'm sorry.  Can you state that

25  address again?

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 24

6

1          MR. MARCH:  17291 Irvine Boulevard, Suite 101,

2   Tustin, California 92780.

3          TRUSTEE NG:  Thank you.

4          Is there any reason why you would not be able to

5   answer my question accurately and truthfully today?

6          MR. MARCH:  I don't believe so, no.

7          TRUSTEE NG:  Thank you so much.

8          Mr. Diab, could you please raise your right hand

9   and let me know when you're done.

10          MR. DIAB:  Yes.  I've raised my right hand.

11               TONY DIAB - WITNESS - SWORN

12          TRUSTEE NG:  Can you please state your full name

13   and the address for the record, please?

14          MR. DIAB:  Tony Diab.  Address is 20101 Southwest

15   Cyprus Street, Newport Beach, California 92660.

16          TRUSTEE NG:  And is this your personal residence?

17          MR. DIAB:  Yes.

18          TRUSTEE NG:  Thank you.  And is there any reason

19   why you would not be able to answer my question truthfully

20   and accurately today?

21          MR. DIAB:  None.

22          TRUSTEE NG:  Okay.  Mr. Khang, I'm going to ask

23   you to confirm whether or not the voice we just heard is, in

24   fact, the Debtor representative Mr. March and Mr. Diab?

25          MR. KHANG:  Yes.  I confirm that that -- the

7

1  voices are of Daniel March and Tony Diab.

2          TRUSTEE NG:  Thank you.

3          One of you can answer the question, Mr. March or

4  Mr. Diab.  If your answers are different, than I want to

5  hear from both of you, but if the answer is the same, only

6  one person needs to answer the question.

7          TRUSTEE NG:  Can you please provide the -- you

8  provided me the address for the Debtor just now, and you

9  mentioned that's the physical office at the Debtor, right?

10         MR. MARCH:  Yes.

11         TRUSTEE NG:  The petition lists a different

12 address at 17542 17th Street, Suite 100.  Is that a

13 different location?

14         MR. MARCH:  Yes.  That was the former address.

15 It's the one that's executory leases.  So, that is at

16 another building that we occupied only about three weeks

17 ago.

18         TRUSTEE NG:  Okay.  So, the Debtor moved out three

19 weeks ago?

20         MR. MARCH:  Yes.

21         TRUSTEE NG:  Did the Debtor terminate the lease?

22         MR. MARCH:  Can you repeat that, please?

23         TRUSTEE NG:  Was the lease terminated or what was

24 the reason for moving out?

25         MR. MARCH:  We moved out.  We gave notice, and we

8

1  moved out, vacated the premises.

2          TRUSTEE NG:  Okay.

3          MR. MARCH:  The lease is still pending.  There's

4  -- yeah, there's still a lease on the location.

5          TRUSTEE NG:  So, the Debtor still has to pay the

6  monthly rent for this location?

7          MR. MARCH:  We are not paying the monthly rent.

8  We intend to abandon that and --

9          TRUSTEE NG:  Okay.

10          MR. MARCH:  -- (indiscernible) the lease.

11          TRUSTEE NG:  For the new location on Irvine

12  Boulevard, is that a lease as well?

13          MR. MARCH:  What is that?  I'm sorry.  Can you

14  repeat that?

15          TRUSTEE NG:  Is that a lease as well?

16          MR. MARCH:  Yes.  That's a lease.

17          TRUSTEE NG:  And when did the Debtor enter into

18  that lease?

19          MR. MARCH:  Oh, let's see.  It was a personal

20  lease, and it's also myself litigation and The Litigation

21  Practice Group.  I think that lease -- I know it expires I

22  believe next year.  I think the Litigation Practice Group

23  began paying on that about two years ago.

24          TRUSTEE NG:  So, this lease was entered two years

25  ago?

9

1          MR. MARCH:  It's -- it's probably been about three

2 years, ago, and it was on my own personal behalf.  It was my

3 own personal office, and The Litigation Practice Group is

4 now paying for that lease.

5          TRUSTEE NG:  Is LPG on the lease as well?

6          MR. MARCH:  Can you repeat that?  You're breaking

7 in and out.  I --

8          TRUSTEE NG:  I know I'm --

9          MR. MARCH:  -- I'm on a land line.  So --

10          TRUSTEE NG:  Yeah.  I know.  I'm having some

11 difficulty.  I think it's kind of -- if you guys can't hear

12 me, just let me know.  I'll try to do my best to repeat it.

13     You mentioned this is a personal lease.  Because I

14 can't recognize the voice, is it -- this is Daniel March,

15 right?

16          MR. MARCH:  Well, it was a personal lease when I

17 originally signed it, and then Litigation Practice Group, we

18 agreed to pay that lease, and they're also the insurer and

19 making payments on the insurance on the lease itself.

20          TRUSTEE NG:  Okay.  I'm going to ask for a copy of

21 the lease agreement.

22          MR. MARCH:  I can do that.  I know I provided the

23 insurance agreement.  I can provide the lease agreement as

24 well.

25          TRUSTEE NG:  And how much is the monthly rent for

10

1   this lease?

2           MR. MARCH:  You know, I don't -- I don't recall.

3   It's about $2100.

4           TRUSTEE NG:  The -- the Debtor's cash flow

5   projection lists rent for $1450.  Is that for the current

6   lease or the one that you were going to abandon?

7           MR. MARCH:  I'm sorry.  That entire conversation

8   broke up.

9           TRUSTEE NG:  Okay.  The Debtor's projection lists

10  a rent for $1450.  Is that for the current lease or the one

11  that you were going to abandon?

12          MR. MARCH:  The one we are going to abandon.

13          TRUSTEE NG:  Okay.  So, do you know what amount is

14  for the current lease?

15          MR. MARCH:  I actually don't.

16          TRUSTEE NG:  Do you think --

17          MR. MARCH:  I will get that lease.

18          TRUSTEE NG:  Okay.  Do you think it's more than

19  the $1450?

20          MR. MARCH:  Yeah.

21          TRUSTEE NG:  Excuse me.

22          UNIDENTIFIED SPEAKER:  It's really hard to hear.

23          MR. MARCH:  Tony may be able to --

24          TRUSTEE NG:  Do you think we should --

25          UNIDENTIFIED SPEAKER:  Call in --

*Briggs Reporting Company, Inc.*

11

1          TRUSTEE NG:  -- call in from here and do a --

2          MR. MARCH:  -- on the amount of the lease.  I

3  don't have --

4          UNIDENTIFIED SPEAKER:  You have to dial the

5  number, 91, then the number, and then --

6          TRUSTEE NG:  I'm sorry.  I couldn't hear what you

7  said.  I'm going to call in a different number, so hopefully

8  it's better.  So, can everyone hold on for a second?

9          MR. MARCH:  I can call -- I can call in on my cell

10  phone, and that might be clearer.

11          TRUSTEE NG:  I think it might be me actually.  So,

12  I'm going to try to call in a different number with my land

13  line.  So, maybe that would be better.

14          MR. MARCH:  Okay.

15      (Pause.)

16          TRUSTEE NG:  Can everybody hear me?  Can everybody

17  hear me better now?

18          UNIDENTIFIED SPEAKER:  Yes.

19          UNIDENTIFIED SPEAKER:  Yes.

20          TRUSTEE NG:  Okay.  Thank you.  Appreciate that.

21          UNIDENTIFIED SPEAKER:  That's better.

22          UNIDENTIFIED SPEAKER:  Yes.

23          TRUSTEE NG:  Okay.  So, let's go back -- you were

24  going to provide me with a lease -- a copy of the lease

25  agreement, and is the Debtor current with the lease?

12

1              MR. MARCH:  Oh, yes.

2              TRUSTEE NG:  I'm sorry?

3              MR. MARCH:  Yes.

4              TRUSTEE NG:  And when was the Debtor -- lease

5    payment -- when was the last time?

6              MR. MARCH:  It would have been for the month of

7    April.

8              TRUSTEE NG:  And you don't recall the amount?

9              MR. MARCH:  I don't.

10             TRUSTEE NG:   Okay.

11             MR. MARCH:  I think it's about $2100.

12             TRUSTEE NG:  Okay.  And does the Debtor also have

13   a lease in Las Vegas?

14             MR. DIAB:  This is Tony Diab --

15             TRUSTEE NG:  Yes.

16             MR. DIAB:  I can answer the question with regard

17   to the Las Vegas place.  There was a lease in Las Vegas.

18   That lease was abandoned in November of 2022, and it's my

19   understanding that the -- that the space has not been

20   occupied since November of 2022.  But the lease itself has

21   not been terminated.  It will be one of the executory

22   contracts terminated by this proceeding.

23             TRUSTEE NG:  Okay.  So, we have not received the

24   real property questionnaire, and then we certainly need one

25   for the new lease.  So, you can send it to your attorney,

13

1  and -- and he can send it to us.  Okay.

2        MR. MARCH:  Understood.

3        TRUSTEE NG:  And it looks like this Debtor was

4  formed in February of 2009.  Does that sound right?

5        MR. DIAB:  Yes, it would have been February 22nd,

6  2019 that LPG was filed with the Secretary of State in

7  California.

8        TRUSTEE NG:  Is it 2019?  I'm sorry.

9        MR. DIAB:  Yeah.  I heard you say 2009.  So, I

10  was --

11        TRUSTEE NG:  I apologize.  I meant 2019.

12        Who were the original members -- Roughly 2019.

13        MR. DIAB:  The original shareholder Litigation

14  Practice Group was John Thompson, and that would have been

15  in February of 2019.

16        TRUSTEE NG:  When did he not become the -- the

17  member of the LPG?

18        MR. DIAB:  He conveyed his interest in November of

19  2019 to Dan March, who has been the sole shareholder since.

20        TRUSTEE NG:  And did you, Dan, have to pay

21  anything for that interest for the law firm?

22        MR. MARCH:  No.

23        MR. DIAB:  No.  John transferred the interest in

24  exchange for a release of liability, because he had concerns

25  on the liability front and asked to be swapped out as a

14

1 shareholder of LPG. We obviously located Dan March who took

2 over, and it was in exchange of a release of liability only,

3 no compensation to John for the shares.

4       TRUSTEE NG:  Okay.  I'm sorry.  Was it Tony?  Was

5 it Mr. Diab?  Were you the one talking just now?

6       MR. DIAB:  Yes.

7       TRUSTEE NG:  Okay.  It might be helpful if -- you

8 know, because I can't recognize the voice, it might be

9 helpful if, you know, you guys speak, then you would first

10 announce your name first so I know who's speaking.

11       When you said you located Dan March, was it you

12 who made the decision to locate Mr. March and convey the

13 interest to him?

14       MR. DIAB:  Actually, there were a group of us that

15 were managing two entities at the time.  And, so, the entity

16 called CAT, Incorporated, which would be (indiscernible),

17 and I had two partners.  So, this is (indiscernible).  I had

18 two partners, Brian Really (phonetic) and Santo De Rudi

19 (phonetic), and the three of us and Dan were comfortable

20 with his competence in this space.  We met with him several

21 times, and we decided to pursue him for the position of

22 managing shareholder for LPG, but it was a joint decision

23 between the three of us, and we obviously offered it to Dan,

24 and he accepted.

25       TRUSTEE NG:  Okay.  So, you said you were managing

15

1    the Debtor at the time.  So, that would be around October

2    2009?

3            MR. DIAB:  This would have been October, November

4    of 2019, managing a related entity called Post Processing.

5            TRUSTEE NG:  Okay.

6            MR. DIAB:  And John was still the shareholder

7    managing LPG at the time, but his management was really

8    hands off.  So, it was important to us that he was also

9    managing LPG.

10            TRUSTEE NG:  So, are you still a managing member

11    of LPG?

12            MR. DIAB:  No.  Well, there was never a time where

13    I was a managing member.  I had a formal role in the

14    shareholder member (indiscernible), but I continue to this

15    day to manage the vendors, which includes the marketing

16    companies that (indiscernible) who now has the credit vendor

17    for credit reporting services, the payment processors, the

18    call centers that we hire to assist the clients, et cetera,

19    so all these things and then the (indiscernible) formed in

20    October, November 2019, it remains the case now.

21            TRUSTEE NG:  Okay.  So, do you have an official

22    title?

23            MR. MARCH:  And this is Dan March.  That's --

24    that's all correct.

25            TRUSTEE NG:  Okay.  Do you have official title

16

1 with the Debtor, Mr. Diab?

2       MR. DIAB:  We've -- no.  We've never worked out an

3 official title.  Vendor manager seems like the most accurate

4 description, but also we've never fixed that description to

5 my position.  So, no formal title.

6       TRUSTEE NG:  Were you ever an employee of the

7 Debtor?

8       MR. DIAB:  No.  I was -- at one point in time I

9 was myself an independent contractor of the Debtor, and then

10 subsequent, I had entities that were independent contractors

11 of the Debtor, but I was never employed on a W-2 basis.

12       TRUSTEE NG:  Okay.  So, are you a 1099 employee

13 then?

14       MR. DIAB:  So, I was.  I haven't received any

15 compensation in this calendar year, but I did as recent as

16 2022 through the entity as a 1099 contractor.

17       TRUSTEE NG:  So, you said the last time you

18 received compensation was in 2022?

19       MR. DIAB:  Correct.  And -- and that's mostly a

20 function of 2023 of the financial issues that we've had, not

21 any other reason.  It's just a function of the issues we've

22 dealt with for the first five months of this year.

23       TRUSTEE NG:  Do you recall when was -- what month

24 did you receive compensation?

25       MR. DIAB:  I think the last time I would have

17

1 received something would have been the beginning of December

2 of 2022.

3        TRUSTEE NG:  And do you recall your compensation?

4        MR. DIAB:  The amount that we received that month,

5 I don't.  I would have to look at records, but it would have

6 been probably around $20,000.

7        TRUSTEE NG:  And did --

8        MR. DIAB:  Give or take.

9        TRUSTEE NG:  Okay.  And did you receive -- say for

10 2022, did you receive compensation every month?

11        MR. DIAB:  No.  There were some months where I did

12 not receive compensation.  It was inconsistent and based on

13 available funds (indiscernible).

14        TRUSTEE NG:  Was there a written agreement between

15 you and LPG regarding your -- your employment terms?

16        MR. DIAB:  So, there was no written agreement

17 between the entities and I.  There was a written agreement

18 between me as an individual and LPG when I was compensated

19 as an individual but not between the entities and LPG.  I

20 was compensated through the entity.

21        TRUSTEE NG:  I'm sorry.  What entity was it you

22 were compensated through?

23        MR. DIAB:  So, in 2021, the entity was called

24 Vulcan Consulting Group, ALC.

25        TRUSTEE NG:  Can you spell the name?

18

1          MR. DIAB:  And in 2022 -- yes.  Vulcan Consulting

2  Group is V-U-L-C-A-N, second word Consulting, standard

3  spelling, and then the third word Group, and that was an

4  LLC.

5          TRUSTEE NG:  And does the Debtor have any interest

6  in this LLC?

7          MR. DIAB:  No.

8          TRUSTEE NG:  Does Mr. March have any interest in

9  this LLC?

10          MR. DIAB:  No.

11          TRUSTEE NG:  Who is the owner of this LLC?

12          MR. DIAB:  The -- the member of the LLC is Lisa

13  Cohen (phonetic).

14          TRUSTEE NG:  Lisa Cohen?

15          MR. DIAB:  Yes.

16          TRUSTEE NG:  And is this person an attorney?

17          MR. DIAB:  No.  Vulcan Consulting Group is not a

18  law firm, and she's not an attorney.

19          TRUSTEE NG:  Okay.  And what kind of arrangement

20  does the Debtor have with this consult -- Vulcan Consulting

21  Group?

22          MR. DIAB:  There were two reasons why the Debtor

23  would transfer money to this group.  One was this group was,

24  one, a consulting group which we'll call VCG.  VCG was

25  paying the merchant cash advances that LPG had taken in

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 37

19

1  December of 2021.  So, LPG would send money to Vulcan

2  Consulting Group which would then send money to the lender

3  in New York who had made cash advances to LPG and Vulcan.

4  Vulcan is one of the (indiscernible) cash advance

5  agreements, and LPG is the other.  The other reason LPG

6  would transfer money to Vulcan was to provide compensation.

7  So, those two transfers would have occurred in 2021.  No

8  transfers have happened since about August of 2021.

9       TRUSTEE NG:  So, for 2021, how much did you

10  receive total compensation?

11       MR. DIAB:  So, me as an individual from Vulcan?

12       TRUSTEE NG:  Yes.

13       MR. DIAB:  It would have been between 200 to 250

14  thousand.

15       TRUSTEE NG:  Did you receive compensation in any

16  other capacity from any other entity for your work done in

17  connection with LPG?

18       MR. DIAB:  In early 2021, early January and

19  February, I still received compensation directly from LPG,

20  and the compensation in those two months was just sent

21  directly from LPG to Tony Diab as an individual, would have

22  been roughly 60 to 80 thousand dollars.

23       TRUSTEE NG:  Why didn't the Debtor, LPG, just send

24  you compensation, you know, since you're the 1099 employee?

25  Why did they have to go through this, you know, third party

20

1  to do it?

2        MR. DIAB:  There were two concerns that we had.

3  One is because of my background, we tried to limit

4  visibility of things because of the way it -- the way that

5  it would make various vendors and attorneys feel because of

6  my background.  I actually tried to limit the number of

7  times that LPG interacted with Tony as an individual, and

8  that was just the optics of it in terms of managing

9  relationships with those who were concerned about my

10  background, and we made that switch in early 2021 based on

11  feedback that we were receiving.  And, so, that was the

12  primary reason why we started to do the compensation in an

13  indirect manner.  So, I would say that was the primary

14  reason.

15        The secondary reason is that the compensation was

16  always -- it was inconsistent, inconsistent meaning we

17  didn't know how much money would be available, the fact that

18  we didn't want to harm the business.  So, it would be a

19  function how much was available in terms of free cash flow.

20  That's what we would choose as pay through to me.  And, so,

21  the money would go to Vulcan into their -- Vulcan would

22  cover it for expenses like these cash advances, and then as

23  soon as money was made, it would be passed through.  And,

24  so, that was easier in terms of managing the cash flow than

25  having me on a set pay schedule.

21

1          TRUSTEE NG:  Okay.  And what about in 2022?  How

2    much did you receive total in 2022?

3          MR. DIAB:  In 2022, for the year, it probably

4    would have been -- so, it's complicated by -- by a factor.

5    So, it probably would have been a total of about $480,000

6    that went through Strategic Consulting Solutions.  When LPG

7    had its financial difficulties in 2022, most of that money

8    was given back, and Strategic ended up net zero at the end

9    of 2022, but that was only because the business needed the

10   money.  So, we essentially put it back in through Strategic.

11   So, Strategic would have received about 480 and would have

12   put back in about 480.  So, it was net zero, but that money

13   was paid throughout the course of the year.

14         TRUSTEE NG:  Okay.  So, at some point you decided

15   that you're not going to get paid through VCG, and then the

16   Debtor decided to pay you through Strategic Consulting, is

17   that right?

18         MR. DIAB:  Correct.  And the reason for that, just

19   to clarify, there was a dispute with the cash advance

20   companies in the State of New York.  There were several

21   lawsuits that were filed between these cash advance

22   companies, Vulcan Consulting Group and LPG.  And, for that

23   reason, we ceased using Vulcan Consulting Group and started

24   to use Strategic Consulting Solutions in place of it

25   starting in 2022.

*Briggs Reporting Company, Inc.*

22

1          TRUSTEE NG:  And what is the Debtor's

2  relationship, you know, to Strategic Consulting Solutions?

3          MR. DIAB:  It's identical to VCG's.  So, Strategic

4  would make cash advance payments, would make payments to me,

5  and those were the two functions that it served, and it had

6  a -- essentially, it was just based on the -- the negative

7  publicity that Vulcan received by virtue of I think it was

8  about a dozen lawsuits that were filed back and forth

9  between certain cash advance companies that include us, and

10 for that reason, we offered not to continue to use them as a

11 vehicle, and we locked in Strategic Consulting in its place.

12         TRUSTEE NG:  Okay.  And did you receive any

13 compensation for 2023?

14         MR. DIAB:  For 2023, this calendar year, there's

15 not been compensation to date.  There has been one transfer

16 of about $11,000 for Strategic Consulting Solutions.  That's

17 the only transfer that I can think of, but that didn't come

18 through to me, but Strategic would have received about

19 $11,000 this calendar year.

20         TRUSTEE NG:  Okay.  Do you expect to receive some

21 kind of compensation, you know, in this bankruptcy case from

22 the Debtor?

23         MR. DIAB:  I'm sorry.  Could you repeat that

24 question?

25         TRUSTEE NG:  Do you intend to -- you know, expect

23

1  to, you know, get some kind of compensation from the Debtor

2  in this case?

3           MR. DIAB:  No.  So, we've -- obviously, if there's

4  any compensation in my work for LPG, it will be done when

5  the Chapter 11 proceeding is done.  The vendors that I used

6  to manage are pretty much all gone.  Dan has a -- a limited

7  staff at the other office that he referenced.  And, so, once

8  this case is concluded, there won't be any further role for

9  me at LPG.  And, so, no compensation is contemplated.

10          TRUSTEE NG:  Okay.  Going back to --

11          MR. MARCH:  And I agree.  This is Dan.

12          TRUSTEE NG:  Thank you, Mr. March.

13          Going back to Mr. March, so, you joined the law

14  firm sometime in October or November of 2019.  And, prior to

15  that, did you have any relationship with the Debtor?

16          MR. MARCH:  No, I did not.

17          TRUSTEE NG:  Okay.  And, so, since you joined the

18  law firm, has there been any change in stock ownership?

19          MR. MARCH:  No, there has not.

20          TRUSTEE NG:  And who are the current officers?

21          MR. MARCH:  It is just myself.

22          TRUSTEE NG:  Okay.  And -- and your title is CEO

23  and President, is that right?

24          MR. MARCH:  Yes.

25          TRUSTEE NG:  When was the last time the Debtor had

24

1 other officers?

2          MR. MARCH:  It wouldn't have been with me.  So, I

3 don't know if it was with John Thompson or not.  I don't

4 know if John had other officers.  I don't believe so.

5          TRUSTEE NG:  Okay.  But since you joined the firm,

6 you -- you're the only officer, is that right?

7          MR. MARCH:  That's correct.

8          TRUSTEE NG:  So, the current Tustin location, how

9 many people work out from this office?

10          MR. MARCH:  There are currently two --

11          TRUSTEE NG:  And who are these people?

12          MR. MARCH:  -- others.  Olga Esquivel, E-S-Q-U-I-

13 V-E-L, and Carl -- the last name is difficult for me.  Tony,

14 do you know his last name (indiscernible)?

15          MR. DIAB:  That's Carl Wekashu (phonetic).

16          MR. MARCH:  Yeah.  It's so hard I can't even spell

17 it.

18          TRUSTEE NG:  And what is their title?

19          MR. MARCH:  They are just staff members.  I don't

20 say just staff members, but they are -- they are handling

21 litigation that is currently going on in the State of

22 California.

23          TRUSTEE NG:  Okay.

24          MR. MARCH:  So, we have approximately 400 to 600

25 pending lawsuits that we are defending and litigating in the

25

1  State of California.  They're also handling previous

2  bankruptcy filings that we have pending from former LPG

3  clients.

4          TRUSTEE NG:  So, the 400 to 600 lawsuits that you

5  -- you know, you're referencing, are they -- is the Debtor

6  the Defendant in any of those lawsuits?

7          MR. MARCH:  The Defender --

8          TRUSTEE NG:  The Defendant --

9          MR. MARCH:  -- is the --

10         TRUSTEE NG:  The Debtor.

11         MR. MARCH:  We are defending -- we are -- yeah, we

12  are -- Litigation Practice Group, the Debtor, is the

13  attorney of record for these clients in California.

14         TRUSTEE NG:  Okay.  Oh, so, these are lawsuits

15  where the -- the -- LPG is representing clients to defend

16  those cases?

17         MR. MARCH:  Yes.

18         TRUSTEE NG:  Okay.  Understood.  And, is -- is

19  there a paralegal in -- in the office or anything like that?

20         MR. MARCH:  Olga Esquivel would be characterized

21  -- she's a certified paralegal.

22         TRUSTEE NG:  Okay.  And how many attorneys work

23  from the Tustin office?

24         MR. MARCH:  Just myself --

25         TRUSTEE NG:  Okay.

26

1          MR. MARCH:  -- at this point.  I think we only

2  have three active employees, including myself.

3          TRUSTEE NG:  Okay.  Are you in the office every

4  day or how often are you in the office?

5          MR. MARCH:  I'm in the office every single day,

6  including Saturdays.

7          TRUSTEE NG:  And what about the staff, the two

8  staff that you mention?

9          MR. MARCH:  They are in every single day.  Olga

10 will not come in on Fridays in the office, but she works

11 from home.  She's able to contact and give information to

12 the attorneys that are working on the cases.

13         TRUSTEE NG:  And what about Mr. Diab, is he in the

14 office every day?

15         MR. MARCH:  No, Mr. Diab doesn't go to the office.

16         TRUSTEE NG:  And how often does he go to the

17 office?

18         MR. MARCH:  No, Mr. Diab never comes in.

19         TRUSTEE NG:  Oh, he does not come in the office.

20 Okay.

21         MR. MARCH:  Correct.

22         TRUSTEE NG:  And you previously mentioned the

23 Debtor does not have any other location, is that right,

24 other than the Tustin location?

25         MR. MARCH:  Correct, correct.

27

1      TRUSTEE NG:  And was that the case in 2022 as

2  well?

3      MR. MARCH:  No.  I think we vacated the offices at

4  17542 17th Street probably -- I'm going to say it's about

5  February.  March is probably the last time anyone was in the

6  office (indiscernible).

7      TRUSTEE NG:  Okay.  I --

8      MR. DIAB:  This is Tony Diab.  That's correct.

9      TRUSTEE NG:  Other than the prior Tustin location,

10  did the Debtor ever have any offices like anywhere else in

11  the country?

12      MR. DIAB:  This is Tony.  I can answer that

13  question for other locations that we had.  We also had an

14  office in Las Vegas, Nevada that we vacated in November of

15  2022 and it has not been occupied since.  In addition, we

16  have an office in -- we had an office in Asheville, North

17  Carolina, a lease that we've abandoned.  We had an office in

18  Fort Lauderdale, Florida, which is, again, a lease that is

19  being abandoned.  It was abandoned before we filed the

20  petition.  The attorneys closed that space in North Carolina

21  and Florida in March, and we no longer have need for the

22  office space in those two jurisdictions.

23      There was an office in Atlanta, Georgia, and the

24  situation there, the attorneys offered to go remote, and the

25  lease was let go in February of 2023, this year.  There was

*Briggs Reporting Company, Inc.*

28

1  also compensation to attorneys who had their own offices,

2  but those were not leases for LPG.  They were reimbursements

3  paid to the attorneys who were LPG employees in states like

4  Minnesota, Indiana, South Dakota, Oklahoma, and Nevada.

5  There's a second Nevada location.  This was a reimbursement

6  for an attorney who had her own office there and employed by

7  LPG.  But, again, those were not LPG leases.

8         There was also a lease in Belview, Washington

9  which was taken over I think by the attorney who was

10 occupying that space.  He was a former LPG employee who also

11 left the firm and asked to take the lease with him, and he

12 did.  And, so, that was assigned to him.  This would have

13 been in, again, February of this year.  And then Peter

14 Snyder out of Washington, this was in LPG's name but was

15 assigned to Peter, and he just took over that lease.  And

16 that should be the total of -- of all the locations.

17        TRUSTEE NG:  Okay.  So, the Belview, Washington

18 location that the former attorney took over, what's the name

19 of that law firm now?

20        MR. DIAB:  It's now Law Offices of Peter Snyder.

21        TRUSTEE NG:  I can't hear you.

22        MR. DIAB:  He's a sole -- sole practitioner.

23        TRUSTEE NG:  Okay.

24        MR. DIAB:  It's Peter Snyder is the sole

25 practitioner for Law Offices of Peter Snyder.

EXHIBIT 1, PAGE 47

29

1          TRUSTEE NG:  I see.  Okay.  So, those -- all the

2   leases were either abandoned or let go sometime prior to

3   them filing bankruptcy this year, is that right?

4          MR. DIAB:  Correct.

5          TRUSTEE NG:  Okay.  So, for 2022, how many

6   employees did the Debtor have?

7          MR. DIAB:  This is Tony.  We would have employed

8   between 350 and 420, depending on the point in that year.

9   The high mark would have been about 420 full-time employees

10  for LPG in 2022.

11         TRUSTEE NG:  And when did LPG start losing these

12  employees?

13         MR. DIAB:  The real terminations began in November

14  when we let go of the -- the Nevada office.  So, the Nevada

15  office had at its peak about 88 employees, and they were all

16  let go in October and November of 2022.  So, that would have

17  been the first large reduction in the workforce.  And then

18  in January we resumed -- we probably cut between 30 and 40

19  employees in January, and then in February, when we were

20  unable to make payroll, we lost virtually everyone.

21         TRUSTEE NG:  So, by February this year, LPG

22  basically lost all its employees?

23         MR. DIAB:  Yeah.  So, as of March of this year,

24  the month we filed the petition, there were maybe 15

25  employees left.  And after the filing of the petition, we're

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 48

30

1    now at -- at three employees, Dan, Olga and Carl, as

2    referenced before.

3            TRUSTEE NG:  Okay.  Of those 300 or, you know, 350

4    employees that you mentioned that was hired in 2022, how

5    many of them were attorneys?

6            MR. DIAB:  At one -- at one point there were about

7    40 W-2 attorneys, meaning they were full employees of LPG,

8    and about 22 contractors, 1099.  And, so, we were at about

9    62 attorneys at the high mark in 2022.

10           TRUSTEE NG:  Okay.  And do you know where these

11   attorneys went?

12           MR. DIAB:  Some of the attorneys started their own

13   practice.  Some of the attorneys went to other firms that do

14   similar work as LPG and they represent individual debtors in

15   collection actions in cases, and some of them we don't know

16   because they just left, and they didn't tell us what they

17   were doing.  But several of them now have their own practice

18   doing similar work as solo practitioners.

19           TRUSTEE NG:  Okay.  The projection shows the

20   Debtor has Worker's Comp, is that right?

21           MR. DIAB:  That's correct.

22           TRUSTEE NG:  We don't have proof of that

23   insurance.  So, you will need to send us a copy of the

24   insurance proof of coverage.

25           UNIDENTIFIED SPEAKER:  And that was Worker's Comp,

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 49

31

1  correct?

2          TRUSTEE NG:  Correct.  That hasn't expired, right?

3  Is the Worker's Comp --

4          UNIDENTIFIED SPEAKER:  (Indiscernible).  Yeah,

5  we'll send a copy of that policy.  It remains active.

6          TRUSTEE NG:  Okay.  So, other than Mr. Diab, does

7  the Debtor have any other independent contractor?

8          MR. DIAB:  Not at this time.

9          TRUSTEE NG:  Okay.  Can you just give me a brief

10 summary of the reason for filing for bankruptcy?

11         MR. DIAB:  We -- the -- the -- I guess there are

12 two parts that sort of combined to force us to be in this

13 position.  The most important factor was the payment process

14 of Merits Fund, LLC began holding money at the very end of

15 January, then processed payments of LPG clients and then

16 remit those payments through the LPG (indiscernible).  They

17 stopped sending that revenue through to LPG at the very end

18 of January, beginning of February.  And, as a result, LPG

19 failed to make two consecutive payrolls.  At that point, we

20 lost so many of our attorneys that we couldn't continue to

21 represent clients' states for lack of a -- a valid license

22 to practice law in those states.  And, so we were forced to

23 essentially go the direction of reorganization because we

24 didn't have attorneys to represent clients, and we couldn't

25 maintain those attorney-client relationships in those

32

1 states.

2         The other factor was the litigation

3 (indiscernible) which essentially involved a lot of

4 (indiscernible) and essentially driving employees to turn on

5 us.  So, we had a group of employees that were providing

6 information (indiscernible) and providing information to

7 adverse parties in litigation, and that group was -- was

8 sizable, and those employees, one of them discovered that

9 they had provided that information and (indiscernible), and

10 that was January, and since left us in a position where we

11 were missing a lot of key positions, and we had enough

12 information public that our marketing companies didn't want

13 to continue to work with us, and so we didn't want to

14 onboard clients.  So, that created pressure.  We simply were

15 not seeing the volume business.  We had a lot of clients

16 leaving (indiscernible) clients possibly coming in.  Then

17 the marketing companies (indiscernible) to the information

18 disclosed in that litigation, although they wanted to work

19 with us, but they (indiscernible) future.  And then right

20 after that, the money was held by the payment processor and

21 essentially caused the -- the forced reorganization.

22         TRUSTEE NG:  Okay.  Let's talk about the pre-

23 petition bank account.  The Union Bank 4858, what was this

24 account used for pre-petition?

25         MR. DIAB:  That was an operating account.  It was

33

1  an operating account that was essentially started all the

2  way back in 2020.  At one point we had stopped using Union

3  Bank and instead was using other banks, but that operating

4  account remained open.  And in 2022, we started to use it

5  again as a primary bank account.  We had switched from Union

6  Bank to Chase as a primary account and then from Chase to

7  Bank of America and then from Bank of America back to Union

8  Bank.  That last switch took place in January of this year.

9  So, that was (indiscernible).

10          TRUSTEE NG:  Okay.  So, we actually --

11          MR. MARCH:  And that's all correct.

12          TRUSTEE NG:  I'm sorry.  Okay.

13          We actually do not have the final closing

14  statement for this account.  We only have a closing receipt.

15  So, we would need that final closing statement.  And our

16  office previously requested bank statements for 2023, and we

17  did not receive the bank statements.  So, we will need that

18  as well.

19          MR. MARCH:  Union Bank?

20          TRUSTEE NG:  Union Bank 45 -- 4858.

21          MR. MARCH:  And that's for 2022 and '23?

22          TRUSTEE NG:  No, just 2023.  We did receive the

23  2022 statements.  And we also -- that would include the

24  closing bank statement that we need.

25          MR. MARCH:  Okay.

34

1          TRUSTEE NG:  So, at the time of the filing, how

2  much was in that bank account?

3          MR. MARCH:  And that was the amount that was

4  transferred into the Debtor in Possession's account.

5          TRUSTEE NG:  So, that's like $4500 or so?

6          MR. MARCH:  Yes, ma'am.

7          TRUSTEE NG:  Okay.  And do you know the balance as

8  of end of January of this year?

9          MR. MARCH:  I don't.

10          TRUSTEE NG:  Would it be around the $4500 or would

11  it be substantially, you know, more?

12          MR. DIAB:  This is Tony.  It should have been

13  substantially more than the $4500.  I (indiscernible), but

14  we would have to pull the -- the records to see the exact

15  balance.

16          TRUSTEE NG:  Okay.  So, I -- I think I -- I don't

17  have the 2023 bank statements, but I have the bank

18  statements 1/22.  It shows that as of December 31, there was

19  only like $2100 or so in the bank account.  So, for the

20  following two months, you know, January and February 2023,

21  do you think it would be somewhere around that amount?

22          MR. DIAB:  No, it should have been substantially

23  more in December of 2022.  LPG was still using the Chase

24  account and transitioning to the Bank of America.  So, the

25  Chase and Bank of America accounts would have had the

35

1  activity for LPG in December.  In January the Chase account

2  was -- was terminated.  The Bank of America account was the

3  primary account until the end of the month, and then at the

4  end of January is when the switch was taken to the -- back

5  to Union Bank.  And that switch from Bank of America to

6  Union Bank was in connection with Kevin Suerta (phonetic),

7  the head of our accounting department potentially being

8  removed from LPG.  He had the relationship with Bank of

9  America, and when he left, Bank of America terminated LPG's

10 relationship, and that's what caused the switch back to

11 Union Bank right around February 1st or so.

12          TRUSTEE NG:  When was the Bank of America account

13 terminated?

14          MR. DIAB:  The Bank of America account was closed

15 the first week of February.  I don't have the exact date,

16 but it would have been somewhere between February 5th but

17 maybe as late as February 10th.

18          TRUSTEE NG:  Okay.

19          MR. DIAB:  And it was closed by Bank of America

20 account notice.

21          TRUSTEE NG:  Okay.  So, we did ask for bank

22 statements for all 2023.  So, we will -- you know, for the

23 -- for the two months in 2023, we will need that bank

24 statements.

25          MR. MARCH:  Okay.

36

1          TRUSTEE NG:  And the case, 3158, that account is

2   not listed in the compliance declaration or the schedules.

3   What account is this?

4          MR. DIAB:  That was the same operating account or

5   main operating account for Chase that was used from about

6   March or April of 2021 all the way until December of 2022

7   when we decided to make the switch to Bank of America --

8          TRUSTEE NG:  Okay.

9          MR. DIAB:  -- since we still had some transactions

10  into January 2023, and that would have been it.

11         TRUSTEE NG:  So, is that account closed?

12         MR. DIAB:  Yes, that account was closed.  Again,

13  it was closed by Chase after we stopped utilizing the

14  account.  That closure would have happened in I believe

15  February formally.

16         TRUSTEE NG:  Of this year?

17         MR. DIAB:  I know we stopped using it in January.

18         TRUSTEE NG:  Okay.

19         MR. DIAB:  Of this year, correct.

20         TRUSTEE NG:  What was the balance at the time

21  Chase closed the account?

22         MR. MARCH:  I believe the balance at the time

23  would have been very close to zero as --

24         TRUSTEE NG:  Okay.

25         MR. MARCH:  -- (indiscernible).

*Briggs Reporting Company, Inc.*

37

1          TRUSTEE NG:  Okay.  And what about the Chase 3133,

2 what was this account for?

3          MR. DIAB:  That account was only used to make

4 payments to our marketing affiliates.  So, it was

5 exclusively used for marketing affiliates, and it was always

6 kept at a zero balance until payment needs to be made, and

7 then the exact amount of the payment would transfer from the

8 315 account to the 3133 account, and then it would go out

9 the same day, and that was always kept to a zero balance at

10 the close of business.

11          TRUSTEE NG:  And is this account closed?

12          MR. DIAB:  Yes, that account was closed by Chase

13 also.  It was -- it was no longer used as of January and

14 formally closed sometime in February by Chase.

15          TRUSTEE NG:  Okay.  And the Union Bank 4874, what

16 kind of account was that?

17          MR. DIAB:  That -- that was the local account for

18 Litigation Practice Group.  And, so, that -- that attorney-

19 client trust account remains open at this point in time.

20 Those client checks that's outstanding in the sense of the

21 clients that haven't deposited it.  So, that account

22 actually remains open.  It is an attorney-client trust

23 account with a balance about $3300, which I believe is the

24 amount of the check that's outstanding.

25          TRUSTEE NG:  I'm sorry.  Did you say $3300?

38

1          MR. DIAB:  That sounds correct, yes.

2          TRUSTEE NG:  Okay.  And is it the Debtor's
3    intention to keep this account open?

4          MR. DIAB:  No.  As soon as that last check is
5    negotiated, the account will be closed.

6          MR. MARCH:  And this is Dan, and that's because I
7    don't believe we have any more affirmative cases pending.

8          TRUSTEE NG:  Okay.  And when do you expect the
9    account to be closed?

10          MR. DIAB:  We've attempted to contact this
11    individual client to find out why they haven't deposited the
12    check.  (Indiscernible) and it looks -- if it takes longer
13    than this month (indiscernible).

14          TRUSTEE NG:  Okay.  So, once it's closed, please
15    go ahead and send to us the proof of closure.  What about
16    the Chase 3568?

17          MR. DIAB:  That was the Iolta (phonetic) account
18    at Chase, and that account was emptied.  The money was moved
19    to the Iolta account at Union Bank in January of 2023, and
20    that account was also closed by Chase at the same time as
21    the Iolta.

22          TRUSTEE NG:  Okay.  So, sometime in February or
23    something in 2023?

24          MR. DIAB:  Correct.

25          TRUSTEE NG:  Okay.  And I noticed that the Debtor

39

1  opened three post-petition bank accounts at Wells Fargo.

2  What is the -- the balance right now in the -- in the

3  general account?

4          MR. MARCH:  That should be that $4500 that was

5  transferred from Union when we closed the account.

6          TRUSTEE NG:  Okay.  What about the payroll and tax

7  account, any money in there?

8          MR. MARCH:  There might be the -- they require $50

9  each to open both of those accounts as well.

10         TRUSTEE NG:  Okay.  So, do you have voided checks

11 for those accounts?

12         MR. MARCH:  I have a voided check for the

13 (indiscernible) account.  I don't know that we have checks

14 -- I don't think we received checks yet --

15         TRUSTEE NG:  Okay.

16         MR. MARCH:  -- a checkbook for the payroll

17 account.  But I don't know that we have one for the

18 (indiscernible).

19         TRUSTEE NG:  Okay.  Yeah, you can go ahead and

20 send the voided check for the general account to your

21 counsel, and you can send it to us.  That would be great.

22 Thank you.

23         MR. MARCH:  Okay.  And we did that yesterday.

24         TRUSTEE NG:  Okay.  Does the Debtor have

25 malpractice insurance?

40

1          MR. DIAB:  Yes.  The malpractice policy remains

2    active.  We purchase a one-year account on the policy in

3    March of 2023, and that would extend to March 31st, 2024 for

4    the malpractice policy which is a $1,000,000 policy.

5          TRUSTEE NG:  Okay.

6          MR. DIAB:  Two thousand dollar deductible.

7          TRUSTEE NG:  So, we would need the proof of the

8    insurance coverage for that as well.  What about tax return

9    2022, was it filed?

10          MR. DIAB:  No, we have not yet filed the 2022 tax

11    return.

12          TRUSTEE NG:  Has there been an extension filed?

13          MR. DIAB:  I believe -- I think so.  The

14    (indiscernible) and Associates was the accounting firm

15    handling the tax funds for LPG.  My understanding it filed

16    the extension for LPG which suffered a loss in 2022.  We

17    don't anticipate tax liability.

18          TRUSTEE NG:  Okay.  And, so, the insurance

19    coverage for the general liability, I noticed that the

20    Debtor is not listed as the insured.  Has the Debtor

21    contacted the insurance company to make that change?

22          MR. DIAB:  We were not under the impression that

23    LPG was not listed as the insured.  So, we'll contact them

24    and correct that.

25          TRUSTEE NG:  And, also, the U.S. Trustee has to be

41

1 listed as an additional interested party for notification

2 purpose.

3          MR. DIAB:  Understood.

4          TRUSTEE NG:  Can you just give me a brief summary

5 of the nature of the Debtor's business?

6          MR. DIAB:  So, this is Tony again.  I'll give a

7 summary before and after the reorganization.  LPG when it

8 started and up until February 2023, the business model was

9 an entity to represent individuals in connection with their

10 disputes against their creditors.  That took three forms.

11 One was defending collection actions in court filed by

12 creditors.  Another was prosecuting bankruptcy petitions

13 under Chapter 7 and Chapter 13 of the U.S. Bankruptcy laws.

14 And then the third avenue was initiating action either as

15 freestanding complaints or as counterclaims or cross-

16 complaints under the Fair Debt Collection Practices Act and

17 Fair Credit Reporting Act.  So, we would sue the creditors

18 for their violations of those federal laws.  And, so, those

19 were the three avenues through which LPG represented

20 individual consumers.

21          In February, when we lost employees who didn't

22 return and we could no longer perform that function, the

23 clients were referred to other law firms for those law firms

24 to handle those cases, and LPG became essentially a residual

25 on the side if it was sent to other law firms as a referral

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 60

42

1 fee for sending those clients out to other law firms.

2          And, so, the business as it exists now is a

3 combination of completing those four to six hundred

4 California cases (indiscernible) and then receiving

5 compensation for these referrals that were sent to other law

6 firms, and that was the revenue stream that was funding the

7 Chapter 11 plan, and it's the revenue stream that LPG has at

8 this point in time.

9          TRUSTEE NG:  So, the other law firms that you

10 mentioned, what are the names of those law firms?

11          MR. DIAB:  The parties I think -- the law firms

12 that currently are represented -- LPG clients are Oakstone

13 Law Group, PC, Consumer Legal Group, which is out of New

14 York, also a PC, and then Phoenix Law, PC.  Phoenix Law and

15 Oakstone Law are both California entities.  Consumer Legal

16 Group is a New York entity.

17          TRUSTEE NG:  Okay.  So, prior to this change in

18 your business model that you just mentioned, how many

19 clients did the Debtor have, like, say, in 2022 before the

20 change?

21          MR. DIAB:  At its peak, LPG was representing a

22 total of about 67,000 clients, some of whom have completed

23 their payments, some of whom (indiscernible) payment to LPG.

24 But at its peak, it would have been 67,000 active clients

25 being represented by LPG.

43

1          TRUSTEE NG:  Okay.  Of these 67,000 clients, did

2     they enter into like some kind of retainer agreement or a

3     legal services agreement with LPG?

4          MR. DIAB:  Yes, and that -- the terminology would

5     vary based on the state, but it was a legal services

6     agreement that the client would execute with LPG.  It was a

7     flat fee representation.  In exchange for the flat fee, LPG

8     agreed to provide the services I referenced before on any

9     one of those three, depending on the client's needs, and the

10    client's payment would be broken up anywhere from one

11    payment to as many as 72 payments, depending on the client's

12    budget.  So, some clients would make one payment.  Some

13    would make semimonthly payments for two years.  Some would

14    pay for 20 months.  It varied depending on the client's

15    budget, but it was always a written agreement between the

16    client and LPG for those services that were referenced

17    before.

18          TRUSTEE NG:  Would the written agreements specify

19    the terms like whether they pay a one-time flat fee or

20    whether they're going to, you know, pay monthly payments?

21    Would that be specified in the agreement?

22          MR. DIAB:  Yes.  The agreement would give specific

23    dates and amounts for all payments.  And, so, if it was

24    broken up into 30 payments, all 30 payments would be

25    identified by date and amount.

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 62

44

1          TRUSTEE NG:  Okay.  So, if they chose to make

2   monthly payments, and how did they pay the Debtor per month?

3          MR. DIAB:  Well, the clients would be set up with

4   automatic electronic withdrawals from the bank account.  The

5   contract with LPG includes an electronic funds transfer

6   authorization form.  And, so, the client would execute the

7   agreement and the EFT form, and then each month on the

8   payment date, LPG would withdraw the client's payment

9   automatically from their deposit account.  Some clients who

10  didn't have a deposit account would make the payments by

11  debit card.  The process was the same.  Each month on the

12  payment date, the amount of payment would be withdrawn from

13  the client's debit card, and -- and that would happen each

14  month on the specified date.  LPG never accepted credit card

15  payment for the obvious reasons.

16         TRUSTEE NG:  Okay.  So, for these electronic

17  payments, did LPG contract with a vendor to collect these

18  fees or how did it work?

19         MR. DIAB:  Yes.  So, LPG, over the course of its

20  history from February 2019 to present has used no less than

21  a dozen different payment processes.  These processes

22  collect the payment for a fee and then remit the payment to

23  LPG.  So, we use different payment processes.  They have

24  different policies.  Some processes hold reserves to cover

25  charge backs or unauthorized transaction reports.  Some

45

1  don't hold reserves but charge higher fees.  But we've used

2  different processes over the years.  As of 2023, this

3  calendar year, the two processes we were using were EquiPay,

4  which is currently holding the last $700,000 in LPG client

5  payments.  The other was Merits Fund, which is holding an

6  undisclosed amount.  They haven't told us how much they're

7  holding.  We think it's in the range of 12 to 14 million,

8  but we don't know because they won't provide that

9  information.  So, it's still a mystery.

10       TRUSTEE NG:  Okay.  So, what about 2022?  Did LPG

11  use these two processors as well?

12       MR. DIAB:  Correct.  So, in -- in 2022, in

13  addition to the two processors I just referenced, LPG also

14  utilized a company called World Global, which was processing

15  payments through Optimum Bank in Fort Lauderdale, Florida,

16  and we were also using a company called EPPS.  EPPS is a

17  payment processor that's based out of Sacramento I believe,

18  but they were also processing payments for about three

19  months in 2022.

20       TRUSTEE NG:  And once they -- you know, these

21  processors collected the fees typically, how soon would they

22  remit the payments to LPG?

23       MR. DIAB:  Each processor has slightly different

24  policies, but the range would be anywhere from a one-day

25  hold to a six-day hold, meaning that they would collect the

46

1  payment on a Monday, fund it to LPG as soon as Wednesday or

2  as late as the following Monday.  It depends on the payment

3  processor, but that funding timeline, the number of days

4  that they hold the payments was so that the payment

5  processor could confirm that the payment actually went

6  through.  Different banks will report balances on different

7  time lines.  So, the paying processor would hold the funds

8  to ensure that the payment cleared.  But the worst case

9  scenario, we would get it one week after the client's

10 payment was initiated.

11          TRUSTEE NG:  And what was the reason for that

12 business model change that you mentioned?

13          MR. DIAB:  The change in 2023 was caused by the

14 payment processor refusing to remit funds to LPG, refusing

15 to hand over the proper payroll.  The -- the first payroll

16 of February, LPG was unable to cover.  A lot of employees

17 walked out at that time.  The second payroll, again, LPG was

18 unable to fund the payroll, and almost all remaining

19 employees left at that time.  So, when we lost those

20 employees, those happened to be the attorneys who were the

21 licenses under which we operate jurisdictions under in

22 California.  We could no longer continue the existing

23 business model.  We didn't have the money to fund our

24 existing payroll.  We certainly couldn't go out and hire new

25 attorneys licensed in those jurisdictions.  So, we opted to

47

1 make this switch and still retain some sort of revenue for

2 LPG.  But it was precipitated by the payment processor

3 holding funds and our inability to cover essential costs

4 like payroll.

5          TRUSTEE NG:  Did you make the decision to the

6 business to change its business model?

7          MR. DIAB:  Both Dan and I discussed this in

8 February, that the payroll was being missed, and we jointly

9 made the decision that this was sort of the only option.  It

10 was either that or close the doors.  And, so, we opted for

11 this -- this reorganization.

12          TRUSTEE NG:  Okay.  So, since 20 -- like '23,

13 2023, this year, the Debtor is only actively representing

14 clients in California, is that right?

15          MR. DIAB:  So, at this time, we're not looking for

16 any new clients.

17          TRUSTEE NG:  Okay.

18          MR. DIAB:  At this point in time, LPG is not

19 onboarding anybody.

20          TRUSTEE NG:  Okay.  But do you have existing

21 clients in California that you kept?  You meaning the

22 Debtor.

23          MR. DIAB:  Correct.  And --

24          MR. MARCH:  We do.

25          MR. DIAB:  Yes, that's correct.

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 66

48

1          TRUSTEE NG:  And then that's the 400 to 600, you

2  know, files that you talked about earlier?

3          MR. MARCH:  Yes.

4          MR. DIAB:  Correct.

5          TRUSTEE NG:  So, does that mean the remaining --

6  because you said that at its peak in 2022, the Debtor had

7  about 67,000 clients.  So, does that mean the remaining, you

8  know, minus the 400, 600 files in California, the remaining

9  were transferred to the three law firms that you just talked

10 about?

11         MR. DIAB:  Either transferred or terminated.  Some

12 clients opted to terminate the relationship rather than be

13 serviced by another firm, but all the 67,000 or so clients

14 were either transferred or they terminated their

15 relationship with LPG.

16         TRUSTEE NG:  Can you give me a breakdown how many

17 were transferred to each law firm?

18         MR. DIAB:  So, approximately 15,000 were

19 transferred to Oakstone Law Group.  About 12,000 were

20 transferred to Consumer Legal Group, and the remainder were

21 transferred to Phoenix Law.

22         TRUSTEE NG:  So, that's about 40,000 or so?

23         MR. DIAB:  Yeah, it would have been roughly, a

24 little bit less than 40.

25         TRUSTEE NG:  Okay.  So -- and when did these

49

1 transfers actually take place?

2          MR. DIAB:  So, the -- the transfers took place in

3 February and March.  The first transfer to Oakstone took

4 place in early February of 2023.  In early February, a small

5 group was transferred to Consumer Legal Group, and then in

6 early March, a larger group was transferred to Consumer

7 Legal Group.  In mid March, the remaining clients were

8 transferred to Phoenix Law.

9          TRUSTEE NG:  How were these clients selected?  You

10 know, say, for the Oakstone, the 15,000, you know, clients,

11 how were they selected to be transferred to oakstone?

12          MR. DIAB:  So, in Oakstone's case, it was slightly

13 different because there's as -- a company called Pec

14 Corporation which had done a receivable purchase agreement

15 and had an interest in the receivable of the 15,000 clients

16 that were transferred to Oakstone.  Pec Corp. wanted those

17 clients all to be kept together because it had an interest

18 in the revenue stream from those clients.  And, so, it

19 insisted that the clients be kept together and be

20 transferred to one law firm as a group, and that was the

21 impetus for the Oakstone transfer.

22          For the other transfers, it was a function of the

23 initial -- the initial transfer of client facility was based

24 on the initial attorneys withdrawing from their cases and

25 the need to shift chose clients to another law firm.

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 68

50

1          And then with Phoenix, it was simply the

2   remainder.  Everything that was left got pushed to Phoenix

3   in March.  And, so, it was so that the decision was Oakstone

4   would be driven by Pec Corp.  Consumer Legal Group was

5   driven by necessity in terms of jurisdiction, and then

6   Phoenix received the remainder.

7          TRUSTEE NG:  Well, did Pec Corp. specifically

8   mention I want the files to transfer to Oakstone or who made

9   the decision to go to Oakstone?

10         MR. DIAB:  The decision to refer the clients to

11  Oakstone was made by Litigation Practice Group.  In LPG's

12  contract with the clients, LPG reserves the right to utilize

13  other law firms to service client files.  That's based on

14  the volume of work that we do.  We sometimes become

15  overloaded in a state, and also sometimes we lose counsel in

16  a state.  And, so, we reserve to ourselves the right to

17  transfer the servicing of the client to another law firm.

18  And, so, that was exercised with regard to all these

19  transfers.  LPG made the decision.

20         TRUSTEE NG:  Okay.

21         MR. DIAB:  But any client that objected had the

22  opportunity to terminate the representation and receive a

23  full refund of fees, and there were probably five or so

24  thousand clients that opted for the termination and refund.

25         TRUSTEE NG:  Five thousand you said?

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 69

51

1          MR. DIAB:  Yeah, approximately.

2          TRUSTEE NG:  So, like, you know, in terms of

3  sending these clients to the three law firms, was it, again,

4  a joint decision between you and Dan?

5          MR. DIAB:  Yeah, it would have been a decision

6  between me, Dan, and then the receiving law firm because

7  they also had criteria for the clients they received.  For

8  instance, CLG wasn't going to take any client that was in

9  the State of North Dakota because of regulatory issues in

10  North Dakota, that type of a conversation.

11          TRUSTEE NG:  Okay.  And all the transfers have

12  been completed?

13          MR. DIAB:  Correct.  All the transfers have been

14  completed.  The terminations that were requested by clients

15  have also been completed.  There are some refunds that are

16  pending.  They haven't been sent out because we're waiting

17  for (indiscernible).  But, otherwise, that process has been

18  completed.

19          TRUSTEE NG:  The refund, is that pertaining to the

20  5,000 clients who -- who, you know, canceled the agreement?

21          MR. DIAB:  Yes, correct.

22          MR. MARCH:  Yes.

23          TRUSTEE NG:  Did LPG receive any consideration in

24  connection with the transfers of the files to these three

25  law firms?

*Briggs Reporting Company, Inc.*

52

1          MR. DIAB:  So, not at the time of transfer, but

2   LPG receives an ongoing residual payment on the clients that

3   continue to perform.  That means that the clients make

4   payments to these three law firms.  These law firms under

5   separate agreements, would make a payment through to LPG

6   (indiscernible) and get a referral fee, but it's essentially

7   the commission that the law firms are paying for the

8   referral, and that's a separate agreement for each of the

9   three.  It's a 20 percent referral agreement with Oakstone,

10  20 percent with Phoenix, and 40 percent with Consumer Legal

11  Group, and that's percent of the revenue stream generated by

12  this client.

13          MR. MARCH:  Actual receipts.

14          TRUSTEE NG:  These are actual receipts that these

15  law firms receive from these clients, and then whatever they

16  receive, the actual amount they transfer -- I guess for

17  Oakstone and Phoenix, they gave -- they transferred 20

18  percent back to the Debtor, is that right?

19          MR. MARCH:  That's correct.  That's the agreement

20  between those -- with those two entities.

21          TRUSTEE NG:  Is there a written agreement with all

22  these law firms regarding the referral fees?

23          MR. DIAB:  There is a written agreement with

24  Consumer Legal Group and with Oakstone Law Group.  There is

25  not yet a written agreement with Phoenix Law.  That

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 71

53

1  agreement has not been reduced to writing yet, but it's

2  something that we intend to do.

3          TRUSTEE NG:  Why wasn't there a written agreement

4  when the trials have already been transferred?

5          MR. DIAB:  At the time that LPG was transferring

6  the files, there was a combination of a lack of manpower on

7  the LPG side, and the transition was -- for lack of a better

8  word, it was rushed.  We were trying to push the clients

9  over as soon as possible.  They -- the lawsuits come in

10 daily.  These clients are receiving them and submitting some

11 to us on a daily basis, and we have to properly assign the

12 counsel.  So, we moved fast, received the transaction, but

13 the -- the agreement is in place at the 20 percent referral

14 fee, and -- and also, just to be clear, LPG maintains its

15 contractual right with regard to these clients.  If they

16 were ever nonperforming (indiscernible) retake the

17 representation, it would just have to find counsel licensed

18 in the jurisdiction in which these clients reside.

19         TRUSTEE NG:  Okay.  I think we asked for the

20 written agreements with these three law firms.  And so far I

21 think we only received one with -- maybe it was CLG.  I

22 don't have the one with Phoenix.  I mean, when do you think

23 you'll get into writing?

24         MR. DIAB:  That's something that we -- we

25 anticipate completing probably within the next week, and

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 72

54

1  we'll send that to you as soon as that's completed.  The

2  agreement with Oakstone should have been sent through.  I'll

3  make sure to re-send that.

4          TRUSTEE NG:  I think it was just a letter.  I

5  don't have the actual agreement.

6          MR. MARCH:  That's true.

7          MR. DIAB:  Understood.

8          TRUSTEE NG:  So, we would need the agreement as

9  well.

10          I noticed that in the amended schedule

11  (indiscernible) was filed with the Court on May 1st.  It

12  doesn't list any of these contracts.  Were these law firms?

13  Is there a reason why?

14      (Pause.)

15          MR. DIAB:  Sorry.  This is Tony.  I'm not sure,

16  but we'll obviously connect with counsel and submit amended

17  schedules.

18          TRUSTEE NG:  Okay.  So, Oakstone you're expecting

19  20 percent from the actual receipts.  Based on the 15,000

20  clients or so that was transferred, you know, what is the

21  average monthly gross income you think you can get form

22  that?

23          MR. DIAB:  In the future we anticipate receiving

24  roughly $700,000 solely from Oakstone.  Like LPG, Oakstone

25  is using the same payment process as (indiscernible) and

*Briggs Reporting Company, Inc.*

55

1  have the payment processing issue at the time of transition.

2  So, they were behind in collecting payments, meaning they

3  didn't collect the clients' payments that they were

4  attempting to collect because the new processor was holding

5  those funds.  But once that issue is behind us, which it

6  appears to be this month, it should be roughly $700,000.

7          TRUSTEE NG:  And --

8          MR. DIAB:  Again, it's dependent on actual client

9  performance, but that should be the revenue stream from

10  Oakstone.

11          TRUSTEE NG:  Is that based on the historical, you

12  know, receipt that LPG received from these clients you're

13  expecting about 700?  That's the 20 percent, you know,

14  referral fee?

15          MR. DIAB:  Correct.  That's based on -- on what we

16  -- what we have in terms of our data on this client basis

17  performance.  We don't know that the performance is going to

18  be the same post-transfer, but we imagine it would be

19  roughly similar, and that's where we came up with that

20  number.

21          TRUSTEE NG:  And -- and is Oakstone going to pay

22  the referral fee on a monthly basis or how often?

23          MR. DIAB:  Yes.  It was worked out with -- with

24  both Consumer Legal Group and with Oakstone it was a monthly

25  reconciliation and a monthly payment.  So, it would be one

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 74

56

1 payment at the conclusion of the month.  With Phoenix, the

2 agreement was more frequent.  It was supposed to be a -- a

3 weekly payment that's sent through.  We worked a few of the

4 reconciliations, but that would be a weekly, for the other

5 two entities, monthly payments.

6        TRUSTEE NG:  And which account is those money

7 going to go into?

8        MR. DIAB:  The general operating account at Wells

9 Fargo.

10        TRUSTEE NG:  Okay.

11        MR. DIAB:  That -- that Dan referenced.

12        TRUSTEE NG:  Did LPG receive any referral fees

13 from any of these entities since the filing of bankruptcy?

14        MR. DIAB:  Not yet, but we anticipate receiving

15 the first payment of $240,000 from Oakstone at the end of

16 this week.  It's scheduled for Friday of this week for that

17 first payment to come through.

18        TRUSTEE NG:  And how are they going to transfer

19 it?  Is it going to be a wire transfer?  Are they going to

20 give you a check?  How does that work?

21        MR. DIAB:  So, we had requested a wire transfer

22 into that operating account.  It's a method that we

23 requested.  They haven't confirmed that that's how they'll

24 send it.  They may send by ACH.

25        TRUSTEE NG:  Okay.  So, other than the $240,000

57

1  that you're expecting this week from Oakstone, do you expect

2  any other fees from the other two law firms this month?

3          MR. DIAB:  We're awaiting reconciliations from

4  CLG.  We anticipate receiving from CLG next week between 150

5  and 250 thousand, but they have to finish their

6  reconciliation.  And, again, it's a payment processing issue

7  that they've had.  For Phoenix, we don't have numbers yet,

8  but those would be payments that were supposed to begin this

9  week.  So, we're more likely to receive that amount tomorrow

10  or Thursday in terms of the number, and then we receive the

11  actual wire on Friday, but we don't yet know the amount for

12  the Phoenix entity.

13          TRUSTEE NG:  Okay.  So, other than the client

14  files that we just discussed, you know, to the three law

15  firms, did the Debtor transfer any other assets to any other

16  third parties within the last year?

17          MR. DIAB:  No, no other transfers.

18          TRUSTEE NG:  Okay.  So, what happens if those

19  three law firms decided to transfer the files to another new

20  law firm?  Like, will the Debtor continue to receive

21  payments at that point?

22          MR. DIAB:  Well, post-transfer, the -- the

23  receiving law firm begin to collect payments.  LPG is no

24  longer collecting payments direct from clients.  LPG may

25  begin onboarding clients again in the future.  At this time

58

1  the focus is on obviously the -- the bankruptcy, the Chapter

2  11 reorganization and these referral fees coming through.

3  LPG at some point in the future may resume enrolling

4  clients.  We (indiscernible) only and then may just go

5  through this again, but right now there's been no final

6  decision on that front.  For now it's simply just a

7  (indiscernible) model.

8          TRUSTEE NG:  So, if these law firms decided to

9  transfer their files out to a different entity, then

10  basically LPG would lose its referral fees completely?

11          MR. DIAB:  These entities don't have contracts

12  with the client.  They don't have the right contractually to

13  transfer the files.  Doesn't mean that they couldn't anyway.

14  But only LPG has the contractual right to transfer the file.

15  So, we could dispute it if one of these law firms were to

16  try to transfer a client, but technically, if these law

17  firms were to do so, we would have a hard time collecting

18  any fees from a third party recipient.

19          TRUSTEE NG:  Well, do you anticipate any transfer

20  of client files from these three law firms and another law

21  firm?

22          MR. DIAB:  No, we do not, and we have a good

23  relationship with these three.  We don't anticipate it, but

24  it's something that could happen.  It's certainly a

25  possibility.

59

1          TRUSTEE NG:  So --

2          MR. DIAB:  We do have visibility, and so we would

3   see if the clients were transferred.  I mean, we have

4   visibility over the clients (indiscernible).  We can see

5   them and know.

6          TRUSTEE NG:  Okay.  So, you mentioned Oakstone and

7   Phoenix are both California corporation, right?

8          MR. DIAB:  Correct.

9          MR. MARCH:  Yes.

10          TRUSTEE NG:  Does the Debtor have any interest in

11  these law firms at all?

12          MR. MARCH:  No.

13          MR. DIAB:  No.

14          TRUSTEE NG:  What about you, Mr. March or Mr.

15  Diab?

16          MR. MARCH:  That was a no from Dan.

17          MR. DIAB:  Yeah.  This is Tony.  That's a no for

18  me as well.

19          TRUSTEE NG:  Okay.  And with respect to Oakstone,

20  who is the owner for the shareholder of Oakstone Law Group?

21          MR. MARCH:  Scott Eadie, E-A-D-I-E.

22          TRUSTEE NG:  And is he an attorney?

23          MR. MARCH:  Yes.

24          TRUSTEE NG:  And was he ever an attorney of LPG?

25          MR. MARCH:  Yes.

60

1          TRUSTEE NG:  For what period?

2          MR. MARCH:  I think he said his two-year

3 anniversary was a month ago.

4          TRUSTEE NG:  So, two-year -- two-year anniversary

5 meaning --

6          MR. MARCH:  I believe it's two years.

7          TRUSTEE NG:  -- he's been with the LPG for two

8 years?

9          MR. MARCH:  He's been with LPG for about two

10 years.

11          TRUSTEE NG:  And was that his first job out of law

12 school?

13          MR. MARCH:  Oh, no.  Scott and I go back to junior

14 high school, and I'm 66 years old.

15          TRUSTEE NG:  Is this Tony talking or is it Dan?

16 I'm sorry.

17          MR. MARCH:  That was Dan March.  I'm sorry.

18          TRUSTEE NG:  I'm sorry.  Okay.

19          MR. MARCH:  I've known Mr. Eadie -- yeah, Mr.

20 Eadie I think in 1984 or '85 received his certificate.  He's

21 been practicing since about '84.

22          TRUSTEE NG:  Why did he leave LPG?

23          MR. MARCH:  There were simply no funds to pay him

24 or anyone else.

25          TRUSTEE NG:  And then he started -- when -- so,

61

1  when he left LPG, he went to start Oakstone Law Group?

2          MR. DIAB:  This is Tony.  Just to be clear, he was

3  referred.  We recommended Scott as a head attorney, Dan and

4  I, more than two years.  He's been practicing with LPG for

5  two years.  He practiced in a number of different areas for

6  years before that, and Pec Corporation is managed by

7  somebody named Eng Tang (phonetic), and Eng asked for

8  referrals, who do we think would be a good person to head

9  the law firm that's going to house the files in which Pec

10 Corp. has an interest in the receivable, and Dan and I both

11 pointed to Scott and thought he was the perfect fit for it,

12 and so we had recommended him, but Scott had missed two

13 payrolls, and LPG was not a viable employment at that time,

14 which obviously helped to motivate Scott's decision.

15         TRUSTEE NG:  Okay.  I noticed that the Oakstone

16 Law Group, it was formed in January 2023.  Is that right?

17         MR. DIAB:  That sounds correct, yes.

18         TRUSTEE NG:  Was it a joint decision between you

19 and Dan that -- that there would be a new law firm, Oakstone

20 Law Group?

21         MR. DIAB:  No.  Dan and I didn't have that -- a

22 part in the naming or the formation of Oakstone and have

23 been driving its formation.  He had been in conversation

24 with us about moving the files that he had an interest in,

25 and so we were collaborating but not the driving force

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 80

62

1  behind the formation for that entity, but the entity was

2  formed in January, and the agreement was reached in January.

3          TRUSTEE NG:  When you say collaboration, is it

4  collaboration with who?

5          MR. DIAB:  It was just Eng Tang.  So,

6  collaboration between LPG and Eng about the release of these

7  files that have Pec Corporation interest in them.  And it

8  was -- it was then a function of the pressures that I think

9  he had relating to the Validation Partners lawsuits and the

10 fact that we had grown to a client account that was

11 untenable.  It was difficult to represent that number, and

12 Eng had been pushing for these files to be moved to a

13 different entity.  And, so, we essentially agreed in January

14 that we would move them to the destination that we chose,

15 and then in the course of those conversations, we

16 recommended Scott as an attorney to (indiscernible) that

17 entity.

18          TRUSTEE NG:  And -- and Eng Taing, is that last

19 name T-A-I-N-G?

20          MR. DIAB:  That's -- yeah, that sounds correct.

21          TRUSTEE NG:  Was he an attorney with LPG?

22          MR. DIAB:  No.  He was an investor in Validation

23 Partners.  He was one of the many individuals that gave

24 money to Validation Partners, and Validation Partners

25 defaulted.  Pec Corporation then sought recourse against LPG

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 81

63

1 directly, and LPG was making payments to Pec Corp. and had

2 essentially paid Pec Corp. for an assignment of Pec Corp.'s

3 claim against Validation Partners.  So Pec Corp. ended up

4 receiving payments from LPG, and LPG received a right to go

5 after Validation Partners for a little less than 30 million.

6 And, so, Eng had been receiving these payments from LPG but

7 became increasingly concerned about the effect that the

8 Validation Partners' litigation was having on LPG and wanted

9 the -- the files in which Pec Corp. had an interest to be

10 transferred.  And, so, we complied with that request.

11          TRUSTEE NG:  Okay.

12          MR. DIAB:  But Eng is not an attorney and not

13 practicing.

14          TRUSTEE NG:  Okay.  And who's Michael Thomas?

15          MR. DIAB:  I'm not familiar with Michael Thomas.

16          TRUSTEE NG:  Okay.  This person --

17          MR. MARCH:  I'm not familiar with Michael Thomas.

18          TRUSTEE NG:  Okay.  For some reason, this person

19 signed the Articles of Incorporation for Oakstone.  So, you

20 don't know this name?

21          MR. DIAB:  No.  I'm not familiar with that name.

22 I would imagine it's somebody that Eng hired or --

23          TRUSTEE NG:  Okay.

24          MR. DIAB:  -- or Scott hired or somebody hired to

25 assist with that formation.

64

1          TRUSTEE NG:  How many attorneys do they have at

2   Oakstone?

3          MR. DIAB:  That I'm not sure.  I do know that they

4   have attorneys licensed in most jurisdictions in the

5   country, but I don't know the exact attorney count.

6          TRUSTEE NG:  How many offices do they have?

7          MR. DIAB:  I'm only aware of one office that

8   appears on the website.  I'm not -- I'm not familiar with

9   whether they have any local attorney offices, although I

10  know that they have enough attorneys to where I'm sure that

11  some of them have offices in these other jurisdictions,

12  these other states, but I'm not aware of any other

13  locations.

14         TRUSTEE NG:  And what's the -- what's the location

15  on the website?  It's in California?

16         MR. DIAB:  Correct.  So, the -- the location on

17  the website is an office that's sort of a -- a receptionist

18  only type of an office, and the processing for Oakstone is

19  done in California, and that's the -- the Irvine office is

20  where Scott is housed and where the work is primarily done.

21         TRUSTEE NG:  Okay.  So, you were going to transfer

22  15,000 -- 15,000 clients to this law firm who just started

23  in January, and you don't know how many attorneys they have?

24  Like, what if they can't handle the 15,000 clients?

25         MR. DIAB:  We confirmed that they had licensed

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 83

65

1  counsel in the jurisdictions in which these 15,000 clients

2  reside.  I don't know how many other attorneys they're

3  employing, but they did confirm that they had attorneys

4  licensed in the states where this batch of 15,000 clients

5  resided.

6           TRUSTEE NG:  Okay.  And Phoenix Law Group, who is

7  the owner of Phoenix Law Group?

8           MR. DIAB:  His name is Ty Carss.  So Ty, T-Y,

9  Carss, C-A-R-S-S.

10           TRUSTEE NG:  C-A-R-S-S, is that what you said?

11           MR. DIAB:  Yes.

12           TRUSTEE NG:  Okay.  Is this a female?  I'm sorry.

13           MR. DIAB:  No, male.

14           TRUSTEE NG:  Okay.  And is this person an

15  attorney?

16           MR. DIAB:  Yes, he's a licensed attorney.  He's

17  been practicing for a little over 20 years.

18           TRUSTEE NG:  Licensed where?

19           MR. DIAB:  In the State of California.

20           TRUSTEE NG:  Okay.

21           MR. DIAB:  State and Federal Court.

22           TRUSTEE NG:  And was this person an attorney for

23  LPG?

24           MR. DIAB:  No, never any affiliation with LPG of

25  any kind, employee or contractor.

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 84

66

1        TRUSTEE NG:  Okay.  And I think this firm is also

2   formed in January 10, 2023.  So, how did LPG find this Law

3   firm?

4        MR. DIAB:  So, this Law firm was previously -- I'm

5   sorry.  This -- this is now -- law firm's a successor to a

6   prior law firm called Gallant Law Group who LPG had done

7   some work with.  But, essentially, this law firm, Phoenix

8   Law was formed to take over the pipeline that previously was

9   Gallant Law Group.  The head attorney for Gallant Law Group

10  was a gentleman named Robert Tobia (phonetic), in

11  Philadelphia, Pennsylvania, and he essentially moved this

12  docket over to Ty into Phoenix, which is an entity that was

13  formed on the 10th of January.

14        We began discussing transfers in early February

15  and then Phoenix where Ty transfers (indiscernible).

16        TRUSTEE NG:  Okay.  And do you know how many

17  attorneys they have at Phoenix Law Group?

18        MR. DIAB:  I do not know their attorney count, no.

19        TRUSTEE NG:  Do you know if any of your LPG former

20  attorneys are in any of the law firms?

21        MR. DIAB:  I know that there are certain LPG

22  attorneys that are employed by Oakstone Law Group.  They

23  were recruited by Scott and by Eng.  There's no LPG

24  attorneys working for Phoenix Law as far as I know.

25        TRUSTEE NG:  And how many former LPG attorneys at

67

1 Oakstone right now?

2          MR. DIAB:  I believe the number is between 12 and

3 15.

4          TRUSTEE NG:  And what about --

5          MR. DIAB:  I know that it's -- it's a bit fluid

6 because Oakstone may have also lost attorneys recently.

7 Sorry.

8          TRUSTEE NG:  And what about Consumer Legal Group?

9          MR. DIAB:  So, the principal of Consumer Legal

10 Group is Aryeh Weber, Aryeh, A-R-Y-E-H.  Last name W-E-B-E-

11 R.  And he's the principal of Consumer Legal Group which I

12 want to say was formed in June or July of 2022.

13          TRUSTEE NG:  Okay.  And was he ever an attorney

14 with -- with LPG?

15          MR. DIAB:  No, zero connection to LPG either as an

16 employee or contractor.

17          TRUSTEE NG:  And, so, how did the Debtor find

18 Consumer Legal Group then?

19          MR. DIAB:  Well, I know the individuals who had

20 started that group on the processing side.  The individuals

21 who are managing the processing center for CLG are known to

22 me.  I've met Aryeh Weber one -- maybe -- I met him once in

23 the summer of 2022 and again I think in January of this

24 year, but I don't really know Aryeh, but I do know the

25 people who are managing the processing center for Mr. Weber

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 86

68

1 for CLG.

2          TRUSTEE NG:  Okay.  So, that was a joint decision

3 with you and Dan to transfer the clients to CLG based on

4 your -- I guess your affiliations with the people at that

5 firm?

6          MR. DIAB:  Correct.  And CLG had more restrictions

7 on which jurisdictions they could onboard, but the clients

8 that were selected for CLG were based on jurisdictions where

9 they did have licensed counsel.

10          TRUSTEE NG:  Is there a reason why CLG is given 40

11 percent for referral fee versus the 20 percent that the

12 others are paying?

13          MR. DIAB:  Well, we were able to negotiate, and so

14 the arm's-length negotiations, with Eng it was probably a

15 more -- sorry.  Eng is Oakstone.  With Oakstone, it was

16 probably more of a friendly negotiation by virtue of the

17 fact that (indiscernible) from LPG to Pec Corp., Pec Corp.

18 being the entity to which Eng would be the (indiscernible).

19 And, so, that agreement was more favorable and likely

20 because of the pressure that existed from the amount that

21 was owed.  Phoenix was filed just as a copycat of Oakstone

22 once the Oakstone terms were set.  And, so, we did Phoenix

23 the same way.  CLG was more of an aggressive negotiation.

24 They were in greater need of clients because they had been

25 at it since the summer.  They weren't really growing, and so

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 87

69

1    we were able to get a better deal by then.

2            TRUSTEE NG:  Okay.  Did LPG obtain the written

3    consent from its clients, the former clients, to transfer

4    the files to the three law firms at the time of the

5    transfer?

6            MR. DIAB:  LPG did not.  LPT notified the clients

7    but did not receive written consent at that time.  At the

8    time that the client executed the legal services agreement,

9    the legal services agreement gave LPG the right to transfer

10   the servicing, and it's our position that they consented at

11   that time, that there was no substantive consent sought or

12   received at the time of the actual transfer.

13           TRUSTEE NG:  Can you point to me where the legal

14   service agreement, where it gave the right to LPG to

15   transfer the clients' files?

16           MR. DIAB:  Yes.  LPG has used different models of

17   the agreement for the licensing provision.

18           TRUSTEE NG:  Okay.

19           MR. DIAB:  I will open the agreement and read

20   that.  Just one second.

21           TRUSTEE NG:  Okay.  Thank you.

22        (Pause.)

23           MR. DIAB:  So, in the legal services agreement

24   itself, the -- the template agreement that was sent to the

25   Trustee's Office, that would be page three of six --

70

1          TRUSTEE NG:  Okay.

2          MR. DIAB:  -- it goes under the -- so, the heading

3   is Applicable Law and Confidentiality, and that's the

4   (indiscernible) that LPG (indiscernible) other attorneys to

5   provide the services, and then LPG retains the right to

6   utilize other attorneys to assist in the representation of

7   these clients.  It also says that the client has a right to

8   know the attorney that's working on their file.

9          TRUSTEE NG:  Okay.  I did read that provision, but

10  the language does not cover attorneys who are not directly

11  employed by LPG, is that right?

12         MR. DIAB:  So, our reading of this provision it

13  doesn't put any restrictions that the attorneys that we'd

14  utilize have to be employed by LPG.

15         TRUSTEE NG:  Okay.  So, it says --

16         MR. DIAB:  We describe affiliation.

17         TRUSTEE NG:  Okay.  So, is it LPG's position that

18  these law firms are affiliated attorney to LPG?

19         MR. DIAB:  Yes.

20         TRUSTEE NG:  Okay.

21         MR. DIAB:  Yes.  And the -- the agreement with

22  Consumer Legal Group states that, that that's the basis.

23         TRUSTEE NG:  What would be the affiliation --

24         MR. DIAB:  And, just to be clear, there were --

25  I'm sorry.  There were different templates used over the

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 89

71

1  years, but they all contain a provision similar to this one.

2              TRUSTEE NG:  Okay.

3              MR. DIAB:  I'm sorry.  Go ahead.

4              TRUSTEE NG:  But what would be the affiliation?  I

5  mean, I asked you earlier.  You said you or Tony Diab, the

6  Debtor, does not have any interest in any of these law

7  firms.  So, what would be the affiliation between the Debtor

8  and these three entities or three Law firms?

9              MR. DIAB:  Affiliation is the transfer of the

10 client files out.  So, we affiliate the attorneys to assist

11 in the representation of the clients.  We compensate for

12 that affiliation.  In this case, it's 80 percent of revenue

13 for Oakstone and Phoenix and 60 percent of revenue for CLG,

14 but the affiliation just means that we are working with the

15 law firm in these other jurisdictions to provide the

16 services, and that's how we styled that term, "affiliation".

17 So -- so, in our view, an affiliation doesn't mean that

18 there's a -- an employment relationship, W-2 or 1099.  It

19 means that we've retained these firms to provide this

20 service for this particular client, just a discrete

21 representation.

22             TRUSTEE NG:  Okay.

23             MR. DIAB:  Not an ongoing general one.

24             TRUSTEE NG:  Okay.  And you indicated earlier that

25 LPG had notified all clients?  Was that the case?

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 90

72

1          MR. DIAB:  Yes.

2          TRUSTEE NG:  And how did they notify -- how did

3   LPG notify the clients?

4          MR. DIAB:  Notifications were sent from LPG to the

5   clients by email notifying them of the transfer, and then

6   the -- the other law firm then reached out by email and by

7   phone to describe the transfer, and on LPG's side, we send

8   notification to the clients using email, which is one of the

9   methods of notification that the clients agree to receive in

10  their contract, and so we did it by email only.  I believe

11  there was also a text message blast, but it was primarily by

12  email.

13         TRUSTEE NG:  Okay.  And was the email sent -- the

14  notification email sent, you know, concurrent or shortly

15  after the files were transferred to these law firms?

16         MR. DIAB:  It was sent before, but it would have

17  been shortly before.  So, we would send the email from LPG.

18  The receiving firm, for instance, Oakstone, would then send

19  their email and then the transfer was completed after that,

20  and the transfer with the electronic portion of the client

21  file so that Oakstone would then have access at that point

22  to the client's files.

23         TRUSTEE NG:  And that's -- the email provides the

24  -- these former clients like rights if they want to cancel

25  the agreement?

73

1          MR. DIAB:  So, it does indicate that the clients

2   if they -- if they I guess do not want the transfer, do not

3   approve of it, they remain contractually entitled to

4   terminate the contract and receive a refund.  We put that in

5   all of our agreements, that the clients have the ability to

6   terminate at any time.  We never try to collect from our

7   clients or enforce the -- the remaining payment on the

8   agreement.  They always have that right to cancel.

9          TRUSTEE NG:  Okay.  So, the 5,000 clients that you

10  said earlier that they cancel, how much would the refund

11  total amount be?

12         MR. DIAB:  So, that refund total would have been

13  between 300 and 350 thousand.  We also had other clients

14  that weren't canceling but had requested refunds for other

15  reasons.  So, we right now have pending right around

16  $500,000 worth of refund requests, which will be sent from

17  our general Debtor in Possession account once the funding

18  arrives from our payment processes.

19         TRUSTEE NG:  Okay.  And how much of those $500,000

20  have been already paid?

21         MR. DIAB:  Could you ask that again?

22         MR. MARCH:  Yeah, I didn't --

23         TRUSTEE NG:  You mentioned the total amount would

24  be somewhere around $500,000, the refund amount.  Of that

25  $500,000, how much have LPG already paid?  Or is it the

74

1 entire amount paid?

2        MR. DIAB:  So, the $500,000, yeah, that's the

3 remaining balance.  LPG probably paid about $200,000 and had

4 about $500,000 still pending, and that 500 remains owed at

5 this time.

6        TRUSTEE NG:  Okay.  Understood.

7        So, did the terms of the payment in terms of the

8 clients, did they change after the files had been

9 transferred to the -- you know, the three law firms?

10       MR. DIAB:  No.  The -- the payment terms remain

11 the same, and the -- the only operative contract remains

12 with LPG.  And, so, all the payment terms remain exactly the

13 same as they were prior to the transfer.

14       TRUSTEE NG:  Okay.  So, you previously mentioned

15 that, you know, some clients have opted to do like monthly

16 payments.  So, for those clients, how does the new law firm,

17 you know, have access to the monthly -- you know, the auto

18 payment from their bank account?

19       MR. DIAB:  The client file that was transferred

20 the receiving Law firm includes payment records of all the

21 payments that had cleared, all the payments that were still

22 due and owing, and the amount of those payments and the bank

23 account from which the payments were supposed to be drafted.

24 So, all of the payment data was conveyed to the Law clerks

25 for them to process those payments.

75

1          TRUSTEE NG:  Okay.  And then does the Law firm use

2     a new -- some kind of electronic agreement so, therefore,

3     they can, you know, debit or withdraw money from the

4     account, those clients' accounts?

5          MR. DIAB:  If they're simply collecting the

6     amounts that were in LPG's contract, they don't.  The LPG

7     EFT form allows LPG to assign the collection of payments to

8     third parties.  And, so, as long as it's an identical

9     payment to what's set forth in the contract, no EFT is

10    needed.  If the payment changes even by one penny or one

11    day, then they have to collect a new EFT form from the

12    client to -- to continue to collect payment.

13         TRUSTEE NG:  Okay.  Have LPG actually assigned the

14    EFT forms to the new Law firms?

15         MR. DIAB:  Not yet.  That was part of -- of what

16    was sent.  Those EFT forms were given to each of the law

17    firms for each of the clients.

18         TRUSTEE NG:  So, they have -- that has not been

19    done?

20         MR. DIAB:  That has been done.  That was already

21    completed.  The EFT forms were already assigned to each of

22    the law firms.

23         TRUSTEE NG:  Okay.  So, since the transfer of the

24    client files, have there been any situations where, you

25    know, the Debtor would continue to receive monthly, you

*Briggs Reporting Company, Inc.*

76

1  know, autopayment from these clients, former clients now,

2  but the law firm, the new firm also, you know, receiving

3  monthly payments from them?  Therefore, you know, those

4  clients have to pay twice?

5          MR. DIAB:  It's a two-part answer.  Yes, that

6  happens, but it was over our objection.  Merrich Bine, the

7  payment processes that I referenced before continued to

8  collect payments in the months of February and March over

9  our objection.  We had asked them to stop.  The new law

10 firm, Oakstone, Phoenix, CLG asked them to stop, but they

11 continued to collect payments, and they were collecting

12 payments using the batch of files that LPG -- sorry --

13 (indiscernible) files of the file containing the payment

14 information for a batch of clients.  It then would use this

15 payment data from LPG that was outdated payment data and

16 pull the payments from the clients.  And, so, there were

17 some clients who had the payment pulled by Merits Find on

18 behalf of LPG.  But the new law firm was also collecting

19 payment at the same time.  All of those double payments were

20 refunded to the clients or were supposed to have been

21 refunded to the clients, and some of the $500,000 is refunds

22 that LPG is currently trying to send some of that pending

23 $500,000 consisted of these what we call double debits, of

24 payments pulling from Merits Find and pulling from the new

25 law firm.  LPG agreed to give that refund.  And, so, Merrich

77

1  Bine (phonetic) since stopped.  An agreement was reached.

2  They ceased collecting payments on March the 10th, and they

3  haven't collected any payments since.  They've adhered to

4  the agreement that they stop collecting any payments, but

5  there's still an open question about what was collected

6  between January 30th and March 10th.  We don't have that

7  data yet.

8              TRUSTEE NG:  And how is the Debtor going to get

9  that data?

10             MR. DIAB:  Likely through an adversary action.

11 It's -- it's not forthcoming voluntarily.  So, it appears

12 the only way we'll be able to obtain it is by filing an

13 action inside of this proceeding.

14             TRUSTEE NG:  Okay.  What do you think that -- you

15 know, you call it the double debit.  Like, what do you think

16 that refund pertaining to the double credit -- double debit

17 would be?

18             MR. DIAB:  Well, it's probably about $100,000 out

19 of the $500,000 that's pending.  Or out of the $500,000,

20 probably about 350 are clients that are canceling, 100 are

21 the double debits.

22             TRUSTEE NG:  Okay.

23             MR. DIAB:  Fifty are other miscellaneous reasons.

24             TRUSTEE NG:  Okay.  So, you mentioned the Debtor's

25 not actively looking for new clients in California, is that

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 96

78

1  right?

2          MR. DIAB:  Not at this time, correct.

3          MR. MARCH:  Correct.

4          TRUSTEE NG:  So, once those 400, 600 files, you

5  know, are completed, then the Debtor will no longer have an

6  income stream from California clients?

7          MR. DIAB:  Well, we do anticipate -- and I've

8  spoken with Dan about this.  This is Tony.  But Dan intends

9  to continue his bankruptcy process.  And, so, he'll continue

10  to take on clients who are filing Chapter 7 petitions in

11  California Bankruptcy Courts across the state, and that will

12  be a continued revenue stream.  But the ultimate question is

13  whether we'll also take on other non-bankruptcy clients, and

14  at this time we just don't have the infrastructure.

15          If the referral fees are processing the way that

16  they're supposed to and the reorganization fell into place,

17  then we do anticipate taking on what we'll call normal

18  clients, so, the non-bankruptcy clients in the State of

19  California, but the decision has not been made.

20          TRUSTEE NG:  Okay.  If LPG is going to take on new

21  clients in California, does LPG have any plans to retain new

22  counsel?  I mean, it's only one attorney right now, and

23  there's only so much work he can do.

24          MR. DIAB:  If we were to onboard new California

25  clients, we would add customer service reps, and we would

79

1  likely add another attorney licensed in the state.  And, so,

2  the first step is whether we have the budget available to do

3  so.

4          TRUSTEE NG:  Okay.

5          MR. DIAB:  If we do, then we'll likely add

6  California clients.

7          TRUSTEE NG:  Okay.  So, other than the referral

8  fees as we talked about and then the -- the existing income

9  from the clients in California or potentially maybe start

10  getting new clients, does the Debtor have any other source

11  of income?

12          MR. DIAB:  So, the bankruptcy docket and the

13  referral fees are the only source of income at this time.

14          TRUSTEE NG:  Okay.

15          MR. DIAB:  And we don't anticipate any other

16  source of income except the potential for California clients

17  on -- on the old model.

18          TRUSTEE NG:  Okay.  According to the Debtor's

19  amended statement of financial affairs that was filed with

20  the Court on May 1st, 2023 -- that's Docket Number 54 -- the

21  Debtor gross annual income for 2022 was $155 million.  So,

22  that's about $13 million or so, you know, gross per month.

23  Does that sound right to you?

24          MR. DIAB:  Yes, that sounds accurate for 2022.

25          TRUSTEE NG:  So, for 2022, when the Debtor was

80

1  making $13 million gross per month, what was the gross

2  monthly expenses, the average?

3         MR. DIAB:  So, for -- for the calendar year 2022,

4  it would have probably been about 13 and a half million.  We

5  probably suffered a loss just under $6 million for the year.

6  That's according to the financials that we have.  As I said,

7  the tax return hasn't been filed, but that's what we have in

8  terms of the -- the bookkeeping.

9         TRUSTEE NG:  Okay.  So, according to the same

10  amended SOFA, the gross income for this year from January

11  1st, 2023 to the petition date, that was about $30 million.

12  So, that's about for the three-month period or so, so give

13  or take, maybe about $10 million a month.  Does that sound

14  right?

15         MR. DIAB:  Yes, but that depends on the exact

16  amount that Merrich Bine was collecting.  So, we don't have

17  the exact data.  So, we're estimating, and the estimate is

18  based on a batch of files that we believe that they were

19  running.  And when I say believed, we looked at the clients

20  that were complaining of double debits and things, and we

21  isolated the batch of files that would be the rerun, but we

22  have no confirmation of that.  So, the $30 million is based

23  on an estimate of what Merrich Bine, the payment processor,

24  collected.

25         TRUSTEE NG:  Okay.

81

1       MR. DIAB:  Once we have the actual data, we can

2  give a firm number.

3       TRUSTEE NG:  I was under the impression that you

4  mentioned -- I mean, and I understand that you said you

5  don't know the exact amount, but it was somewhere around

6  like 12 to 14 million dollars I mean or do you think now

7  it's actually closer to 30?

8       MR. DIAB:  No.  Sorry.  So, LPG did collect

9  payments throughout the month of January.  It also collected

10 payments from March 10th to about March 20th, and then

11 Merrich Bine was collecting payments from about January 31st

12 -- 30th or 31st until March 10th.  It's that six-week period

13 that represented the 12 to 14 million that is the mystery.

14 We know that we collected -- we being, sorry, LPG collected

15 about $12 million in the month of January.  We think there's

16 between 12 and 14 million from Merrich Bine, and then

17 there's three to four million that we collected in March

18 before the petition and we stopped collecting the payments.

19      TRUSTEE NG:  Okay.  So, that $30 million estimate

20 for the three months or so, does that include any referral

21 fees?

22      MR. DIAB:  No.  So, there were no referral fees

23 paid that were part of that, that figure.  And today, as we

24 sit here today, we have yet to receive any referral fees

25 that were supposed to be paid for the first time at the end

*Briggs Reporting Company, Inc.*

82

1 of this week.

2          TRUSTEE NG:  So, the --

3          MR. DIAB:  By Friday, the 5th.

4          TRUSTEE NG:  Okay.  So, the amount that LPG

5 collected, you said, you know, not from the other -- is it

6 from the Apple Pay or who -- who collected it on behalf of

7 LPG?

8          MR. DIAB:  So, the LPG payments that were

9 collected in January were from EquiPay and from Merrich

10 Bine.  Merrich Bine was submitting payments in January,

11 collecting it from the clients and sending the money to us.

12 So, we collected from those two processors in the month of

13 January and from EquiPay alone in the month of March.

14          TRUSTEE NG:  Okay.  So, for 2023, year to date,

15 did the Debtor post a profit or loss?

16          MR. DIAB:  So, it's a -- it's a loss, but that's

17 because the money held by Merrich Bine is not accessible.

18 We would be if that 12 to 14 million were conveyed, but it's

19 not.  It's being held by them, and so we've operated at a

20 substantial loss.

21          TRUSTEE NG:  Okay.  So, your office submitted a

22 cash flow projection late Friday, last Friday evening, and

23 that projection shows gross revenue.  Like for April the

24 projection was $240,000.  It doesn't say whether it's gross

25 or net.  I mean, is it -- do you know if it's gross or net?

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 101

83

1          MR. DIAB:  That was that gross figure for April.

2          TRUSTEE NG:  Okay.  So, and then May the

3    projection is $740,000, and for June it's $1.2 million

4    gross.  So, you know --

5          MR. DIAB:  Correct.

6          TRUSTEE NG:  -- we talked about the first three

7    months I mean earlier.  It's about, you know, $10 million

8    including the money held by Merrich Bine, I think the $12

9    million.  But, so, how do you go from 10 million for the

10   first three months to $240,000 in April?

11         MR. DIAB:  Well, in -- in April it was two

12   different factors.  The first, we were only collecting 20

13   percent of the revenue stream from two of the firms and 40

14   percent from the other.  But also a lot of the clients who

15   were we'll just say victimized by the -- by the payment

16   processing in February and March were unwilling to make

17   payments in April or received accommodations to wipe out the

18   payment in April, either because they had two payments

19   drafts or because they had a payment draft on the wrong date

20   or in the wrong amount.  And, so, the revenue for these

21   other firms was lower by virtue of the fact that Merrick

22   Fund continued to collect payments in the month of February

23   and March.  And, so, the revenue was lower in April than it

24   otherwise would have been.  The June figure is when we think

25   that everything is back to normal, meaning that the payments

84

1 are processing, the clients are performing in a normal way,

2 and that's when we come closer to the -- the 1.2 figure.  We

3 think eventually we'll peak out somewhere around $2 million

4 per month once everything's processing normal.  But the

5 impact was substantial.  A lot of clients had payments

6 paused.  A lot of clients canceled, and a lot of clients are

7 refusing to make payments.  They want accommodations.  So,

8 the other law firms are working through that right now.

9         TRUSTEE NG:  Okay.  But the 1.2 in June, that's

10 still substantially less than the 10 million, you know, per

11 month that they were receiving for the first three months

12 prior to the bankruptcy.

13         MR. DIAB:  Agreed.  So, I think that the 2 million

14 figure that should be after June, that's more the realistic

15 figure (indiscernible), but there were a lot of clients --

16 there were clients that cancelled before billing transfers,

17 and there were clients that cancelled as a result of the

18 payment processing issues.  So, just estimated based on the

19 clients, yes, it was (indiscernible) based on the clients

20 but still appeared to be performing at these three other law

21 firms based on this cancellation rate that spiked during the

22 payment processing dispute.

23         TRUSTEE NG:  Okay.

24         MR. MARCH:  And I -- I think the -- the idea is

25 that we won't have any -- I mean, we're only going to have

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 103

85

1 three -- three employees on payroll as opposed to 350 people

2 on payroll.

3        TRUSTEE NG:  Okay.  The projection shows the

4 $675,000 revenue in March -- that's gross -- being held by

5 EquiPay.  Is that --

6     (Pause for outside noise.)

7        TRUSTEE NG:  Is EquiPay not -- the projections

8 show $675,000 being held in March revenue, gross revenue,

9 being held by EquiPay.  Is EquiPay not paying the Debtor as

10 well?

11        MR. DIAB:  Correct.  So, EquiPay is refusing to

12 send that amount through.  That's money that was collected

13 in March.  So, we're looking at it as -- as March revenue,

14 that EquiPay is holding that amount and refusing to send

15 that through to LPG.  That's likely to be another adversary

16 action, although our counsel is trying to get cooperation,

17 but right now it looks like they'll have to file to get that

18 money released.

19        TRUSTEE NG:  What is the reason for holding the

20 Debtor's revenue?  Did they provide you a reason?

21        MR. MARCH:  So, it was a combination of two

22 factors.  One reason, which was true for both EquiPay and

23 Merrich Bine was the litigation with Validation Partners.

24 They believed that the litigation was going to result in the

25 closure of LPG, the appointment of a receive and LPG

86

1  shutting down, in which case, both of those payment

2  processors would be on the hook for charge backs and

3  unauthorized transaction, and they didn't want to be left

4  holding the bag.  So, they used that as an excuse.  Whether

5  it's good faith or bad faith, I don't know, but that was the

6  explanation given, that the litigation with Validation

7  Partners put LPG in a -- a risk of being shut down.

8         The other factor that's cited by EquiPay is the

9  high bounce rate in the month of February.  We explained

10 that the bounce rate was high but that we were attempting to

11 collect payments at the same time as Merrich Bine, and then

12 we stopped.  But during that period where both LPG and

13 Merrich Bine were trying to collect payments, LPG through

14 EquiPay, Merrich Bine on its own, the client bounce rate

15 spiked because the clients can't afford to make two payments

16 at the same time.  And, so, we explained that that higher

17 NSF rate was a function of the payment processing dispute,

18 but EquiPay still felt that the high NSF rate warranted

19 holding funds at least for a short period of time.  We've

20 never been given a date certain when they'll release the

21 funds.

22        TRUSTEE NG:  Okay.  And is the Debtor still using

23 EquiPay or Merrich Bine?

24        MR. DIAB:  No, we're not currently using either to

25 process anything.

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 105

87

1          TRUSTEE NG:  So --

2          MR. DIAB:  And our understanding is that none of

3    the three Law firms are using either to process payments

4    themselves.

5          TRUSTEE NG:  So, who does the Debtor use for the

6    existing, you know, 400, 600 clients in California for

7    payment processing?

8          MR. DIAB:  Those clients are -- are no longer

9    making payments.

10         TRUSTEE NG:  Okay.

11         MR. DIAB:  Dan is continuing to handle the

12   litigation for those clients until the end, but they're not

13   making payments at this time, and no other service is being

14   provided to other banks, including those lawsuits.

15         TRUSTEE NG:  Okay.  So, according to the

16   projection that we received, the monthly expenses for April,

17   May and June -- well, I guess for May and June is about

18   $260,000.  For April it's a little bit more.  It's $358,000

19   because of the one-time liability, professional liability

20   expense.  So, I mean, without that expense, would you say

21   the expenses average per month is about $263,000 or so?

22         MR. DIAB:  Yes, and that should remain the case

23   moving forward, that (indiscernible) normal month over month

24   over month.

25         TRUSTEE NG:  Okay.  I mean, they --

88

1          MR. DIAB:  On the cost side.

2          TRUSTEE NG:  Okay.  There is an entry for refunds,

3    $50,000 per month.  Is that the expected payment the

4    Debtor's going to make, $50,000 a month on those refunds?

5          MR. DIAB:  No.  So, those are for additional

6    refunds, meaning the refunds that we anticipate clients

7    requesting from LPG.  If LPG collected money from a client

8    and the client chooses to cancel and request a refund, even

9    if they're currently being serviced by another law firm, the

10   money that They paid the LPG would be refunded by LPG.  So,

11   we're estimating $50,000 a month in new refunds that we'll

12   have to address month over month --

13         TRUSTEE NG:  Okay.

14         MR. DIAB:  -- moving forward.

15         TRUSTEE NG:  And the pay -- I mean, the rent has

16   to be amended because it lists only the 1450, and you

17   mentioned earlier the Debtor moved to a new location.  So,

18   we would need amended cash flow projection.

19         I notice that a lot of the expenses that was

20   previously listed, you know, in -- in the balance sheet that

21   you submitted to us was not there any more.  Like, I don't

22   see any expenses for office supplies or the malpractice

23   insurance that we talked about or software or Lexis, you

24   know, any of those equipments or, you know, I don't see that

25   anymore.  So, I don't know if we were just omitted or the

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 107

89

1 Debtor does not have those expenses anymore.

2          MR. DIAB:  We -- based on the -- essentially the

3 operation that we envision moving forward, those vendors and

4 those contracts were not needed.  And, so, that's why

5 they're not listed on our new operating budget.  The current

6 operating budget just consists of the salaries for Dan, Olga

7 and Carl and then the base expenses that they have for the

8 office out of which they're operating.  We will revise the

9 1450 figure if it was short of -- of -- I think Dan

10 referenced 2100 might be a more accurate number.  So, we'll

11 revise that for --

12          MR. MARCH:  It's actually --

13          MR. DIAB:  -- the malpractice.

14          MR. MARCH:  It's actually $1,491 a month in rent.

15          TRUSTEE NG:  Okay.

16          MR. DIAB:  Okay.  So, we'll still revise that

17 number.  And the malpractice also is a one-time payment of

18 94 or 96 thousand, which covers us all the way until March

19 2024.

20          TRUSTEE NG:  Did the Debtor make the one-time

21 payment?

22          MR. DIAB:  The one-time payment is outstanding.

23 It's part of that March budget that we intend to fund

24 through the -- the funds that we receive from EquiPay.

25          TRUSTEE NG:  So, has that been paid, the $96,000?

90

1          MR. DIAB:  It has not been paid.  The -- the

2    carrier understands that we're waiting on the funds from our

3    payment process and we'll make the payment at that time, and

4    they're cooperating.

5          TRUSTEE NG:  So, is --

6          MR. DIAB:  At least for now.

7          TRUSTEE NG:  Is the malpractice insurance active

8    then if the Debtor did not pay the $96,000?

9          MR. DIAB:  Yes.  It remains active provided that

10   we make the payment forthwith, although we haven't defined

11   that period of time.  But the policy has remained active.

12   The policy's initial termination date was actually June of

13   this year, but we did the one-year extension in March, and

14   it was negotiated at that price based on a March to March

15   period for the malpractice policy.

16         TRUSTEE NG:  Is there a deadline the Debtor had to

17   have made that $96,000?

18         MR. DIAB:  We have not been given a deadline.

19   It's expected to happen soon, but they understand that it's

20   a function of when we receive the money for the payment

21   processor.

22         TRUSTEE NG:  Okay.

23         MR. DIAB:  They have not given us a hard deadline.

24         TRUSTEE NG:  Okay.

25         MR. DIAB:  But they inquire.

*Briggs Reporting Company, Inc.*

91

1          TRUSTEE NG:  I don't see that expense in your

2     projection.  So, you need to revise the projection to

3     include the expense.

4          MR. DIAB:  Okay.  Understood.

5          TRUSTEE NG:  It looks like the largest payroll --

6     largest expense in the projection is the payroll for

7     $209,000.  I assume that includes the $100,000 per month

8     monthly payment that the Debtor intends to pay Mr. March, is

9     that right?

10         MR. DIAB:  That's correct.

11         MR. MARCH:  Yes.

12         TRUSTEE NG:  Okay.  And, previously, I think,

13    Tony, you mentioned that you don't expect to receive

14    anything from the Debtor in this bankruptcy, is that right?

15         MR. DIAB:  That's correct.

16         TRUSTEE NG:  Okay.  Mr. March, have you received

17    any compensation since the filing of the bankruptcy?

18         MR. MARCH:  No.  Well, the last -- no.  The last

19    payment I think I received compensation was March 17th.  I

20    think all the employees are owed from March 17th.

21         TRUSTEE NG:  And how much was that payment?

22         MR. MARCH:  Oh, for everybody or for --

23         TRUSTEE NG:  Just --

24         MR. MARCH:  For me it would have been the $100,000

25    a month.

92

1          TRUSTEE NG:  Okay.

2          MR. MARCH:  Yeah.  I'm not sure about Carl.  But

3  there's -- that's just with my office right now.

4          TRUSTEE NG:  Okay.

5          MR. MARCH:  That's with the three staff members.

6          TRUSTEE NG:  So, for 2023, other than that March

7  17 payment, $100,000, did you receive any other payments?

8          MR. MARCH:  Since then?  No.

9          TRUSTEE NG:  No, no, not since then.  Like prior

10  to -- other than the March 17, '23, did you receive a

11  payment in February or January of this year?

12          MR. MARCH:  Yes.  I believe I was current through

13  March 17th.

14          TRUSTEE NG:  Okay.

15          MR. MARCH:  I think that was the last payment

16  anyone received.

17          TRUSTEE NG:  Was it like a monthly payment that

18  they paid you the $100,000?

19          MR. MARCH:  No.  It was every two weeks on a

20  regular basis.

21          TRUSTEE NG:  And how much was every two weeks?

22          MR. MARCH:  Well, the net was about $23,000.  The

23  gross would have been close to $50,000, so about $48,000

24  payable every two weeks gross.

25          TRUSTEE NG:  Okay.  And how long --

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 111

93

1          MR. MARCH:  The net was 23.

2          TRUSTEE NG:  And how long have you been receiving

3   that?

4          MR. MARCH:  Let's see.  It's been about since I

5   think January of 2022.

6          TRUSTEE NG:  What about prior to --

7          MR. MARCH:  I didn't receive -- there was -- there

8   was 200 -- it was not that.  It would have been about --

9   let's see.  I was $200,000 short in 2022 of $100,000 a

10  month.

11          TRUSTEE NG:  So, like in --

12          MR. MARCH:  For the year.

13          TRUSTEE NG:  -- 2022, you did not receive the $1.1

14  million?  You only received $900,000?  Is that what you're

15  saying?

16          MR. MARCH:  About $900,000 or I think the -- it's

17  $850,000 I believe is what it was.

18          TRUSTEE NG:  Okay.  And what was the source of the

19  funds for your compensation?

20          MR. MARCH:  It just came out of general and from

21  general into payroll and payroll to the employees --

22          TRUSTEE NG:  Which general is --

23          MR. MARCH:  -- who received them at the same time,

24  all the employees did.

25          TRUSTEE NG:  Is it the --

94

1          MR. MARCH:  That would have been the --

2          TRUSTEE NG:  -- the 4858?

3          MR. MARCH:  From Union Bank for this year.  It

4  might have been Bank of America for one payment.  I think

5  that's all we had it for, and -- and from Chase.

6          TRUSTEE NG:  Which -- which Chase account?

7          MR. MARCH:  I don't know if I ever -- let's see.

8  I received it from the payroll.  I received paychecks.

9          So, Tony, which account is the -- I think we're

10  looking at the Chase one.

11          MR. DIAB:  The paychecks -- paychecks would drop

12  payroll from the general operating account, the account

13  ending 3158.  Bank of America had a separate payroll account

14  that just held the payroll money when we were using Bank of

15  America for that month and a half.

16          For Union Bank, again, it was the general

17  operating account for payroll, which is the 4854 account.

18          TRUSTEE NG:  Okay.  So, I'm going to ask for proof

19  of payment from January 2022 to March 17, 2023.

20          What about 2021?  What was your compensation in

21  2021?

22          MR. MARCH:  You know, I don't recall that.

23          TRUSTEE NG:  Is it close to what you were

24  receiving in 2022?

25          MR. MARCH:  No.  I think it was about -- I think

95

1  it was $50,000 a month.

2          TRUSTEE NG:  I'm sorry.  I can't hear you.

3          MR. MARCH:  I think it might have been about

4  $50,000 a month.

5          TRUSTEE NG:  Fifty thousand a month?

6          MR. DIAB:  As I recall, it was -- it was in 2021

7  that Dan's compensation went from the 50 to 100 figure, but

8  I'm not sure what month of 2021 that switch was made.  I

9  think it was maybe August of 2021.

10         TRUSTEE NG:  Okay.  And prior to that, in 2020?

11         MR. MARCH:  Oh, that I don't remember at all.  It

12  was --

13         TRUSTEE NG:  Do you think it was about --

14         MR. MARCH:  Might have been --

15         TRUSTEE NG:  Do you think it's about the $50,000?

16         MR. MARCH:  No.  I think it was about $ 11,000 a

17  month.

18         TRUSTEE NG:  Okay.  So, why was the income, you

19  know, increased from $50,000 to $100,000 in 2022 when -- you

20  know, when the Debtor's facing all these financial

21  difficulties?

22         MR. DIAB:  Sorry, this is Tony.  As I recall, the

23  change was made in August of 2021 --

24         TRUSTEE NG:  Okay.

25         MR. DIAB:  -- when LPG was doing much better.

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 114

1       TRUSTEE NG:  Okay.

2       MR. DIAB:  It didn't have any -- any of these

3  issues, and Dan had taken on a much more active role when we

4  decided to ramp up the growth and -- and based on the size

5  of the docket and the number of attorneys he was managing,

6  it was right around August of '21 that we decided to -- to

7  increase that compensation.  And then in -- as you noted, in

8  2022, when we had the financial difficulty, he ended up

9  taking a haircut of between two and three hundred thousand,

10  which he obviously voluntarily did because of the issues

11  that we faced.

12       TRUSTEE NG:  According to the bank statements that

13  was attached to the Debtor's monthly operating report filed

14  with the Court on May 1st, 2013 (sic), docket number 55, it

15  looks like the Debtor only has about $6300 in the bank

16  account as of March 31st, 2023.  How is the Debtor going to

17  be able to pay for the $100,000 a month?

18       MR. DIAB:  The -- this is Tony again.  We

19  anticipated revenue from referral fees in addition to the

20  money that's being held by the payment processor.  We have

21  no problem clearing that -- the current operating budget of

22  $253,000, which includes the $100,000 salary to Dan, but

23  that does -- the revenue source moving forward, the payment

24  process, there's a one-time payment that we would receive.

25  But the referral fees moving forward should be more than

97

1  enough to cover that amount that's due.

2           TRUSTEE NG:  The employment app --

3           MR. MARCH:  And I think that starts this Friday.

4           TRUSTEE NG:  Okay.  The employment application

5  filed with the Court by your attorney also asks for a

6  $20,000 post-petition retainer.  Has that been paid?

7           MR. DIAB:  It has not at this time, no.

8           TRUSTEE NG:  And is this -- is this going to be

9  the same source of funds going to pay that retainer or what

10 other source of funds?

11          MR. DIAB:  Correct.  It would be either the -- the

12 funds released by EquiPay if they release funds first or the

13 revenue received from the referral fees if that's received

14 first would go to pay the $20,000 post-petition retainer.

15          TRUSTEE NG:  Okay.  But the EquiPay, you

16 anticipate you will probably have to file some kind of

17 adversary action in order to get the funds back, right?

18          MR. DIAB:  Correct, unless they break -- their

19 conversation's not going well -- we don't think that they're

20 going to do it voluntarily.

21          TRUSTEE NG:  What about --

22          MR. DIAB:  That's correct.

23          TRUSTEE NG:  What about Merrich Bine, do you think

24 they're going to voluntarily give back the money or do you

25 think the Debtor needs to file some kind of adversary

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 116

98

1  proceeding?

2          MR. DIAB:  Yeah, that -- that one I can confirm

3  there's no chance that they voluntarily return anything.

4          TRUSTEE NG:  Okay.

5          MR. DIAB:  And, so, that, again, would have to be

6  some formal proceeding.

7          TRUSTEE NG:  Okay.  I note that the Debtor filed

8  the March monthly operating report using the wrong form.

9  The Debtor actually used the small business debtor form, and

10 this is not a small business debtor case.  So, we cannot

11 accept that monthly operating report for that reason.  And,

12 also, pursuant to the IDI letter that we sent to your

13 counsel on March 22nd, we specifically indicated that

14 certain supporting documentation must be filed along with

15 the monthly operating report, and that includes the balance

16 sheets, the P and L statement, the general ledger and things

17 like that, and none of those were attached to the monthly

18 operating report.  So, the Debtor needs to refile the

19 monthly operating report using the correct form and provide

20 the supporting documentation.  I mean, if you don't have a

21 copy of the IDI letter, you can certainly contact our

22 office, and we'll be happy to send you a new one.

23          Does that work for you?

24          MR. DIAB:  Yes, understood.

25          TRUSTEE NG:  Thank you so much.

*Briggs Reporting Company, Inc.*

99

1          I note that there are three secured creditors

2    listed in the Debtor's amended Schedule D that was filed

3    yesterday, Docket Number 52.  Does the Debtor need the

4    consent of these secured creditors to use the cash

5    collateral to pay any business expenses, including the

6    insider compensation?

7          MR. DIAB:  This is Tony.  I don't have an answer

8    to that question.

9          TRUSTEE NG:  Okay.  And I note that the amended

10   Schedule D still does not list the dates upon which the debt

11   was incurred or the last four digits of the account number.

12   So, that has to be -- that has to be amended.

13         Since the Debtor filed for bankruptcy, has the

14   Debtor made any expenses payment?

15     (Pause.)

16         MR. DIAB:  No.

17         MR. MARCH:  No.  I don't think so.

18         TRUSTEE NG:  So, the Debtor didn't pay for rent or

19   payroll or electricity for the -- you know, no payments were

20   ever made?

21         MR. DIAB:  Post-petition, no payments have been

22   made.  We've been waiting on funds from the payment

23   processor or, in the alternative, for these referral fees to

24   kick in.  At this time, no payments have been made post-

25   petition.  No funds have been available.

100

1          TRUSTEE NG:  So, no payments to the two staff were

2   made post-petition?

3          MR. DIAB:  Correct.  That's two payrolls that have

4   been missed.

5          TRUSTEE NG:  What about the lease of the new

6   place?

7          MR. DIAB:  So, the -- the April payment was made

8   at the end of March, but the -- the May payment has not been

9   made.  Today is the 2nd.  We have I believe until Friday to

10  make that payment without penalty, but that has not been

11  paid for the month of May.

12         TRUSTEE NG:  So, the April payment --

13         MR. DIAB:  The 1491 figure that was given.

14         TRUSTEE NG:  Okay.  So, the April figure, the

15  April rent payment, was that -- what was the source of the

16  funds to pay that payment?

17         MR. DIAB:  So, that was paid out of the Union Bank

18  operating account.  It was paid.  In the middle of March we

19  made the payment for the month of April, but I don't know

20  the exact date.  I do know it would have gone from the Union

21  Bank account ending 4854.

22         TRUSTEE NG:  Okay.  What kind of account --

23         MR. DIAB:  I'm just trying to source of funds --

24         TRUSTEE NG:  I'm sorry.  Go ahead.

25         MR. DIAB:  I'm sorry.  Just to answer your

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 119

101

1  question, the source of funds, that would have been client

2  payments that we could receive in March because we did

3  receive some client payments.  The 675 was held, but

4  clients' payments -- I'm sorry.  Client payments would have

5  been the source of the rent payment that was made in March

6  for the month of April.

7          TRUSTEE NG:  Okay.  What kind of accounting

8  systems and software did the Debtor -- does the Debtor use

9  to track financial activity?

10          MR. DIAB:  LPG currently uses Quickbooks.  In

11  2022, we had switched to NetSuite and then switched back

12  from NetSuite to Quickbooks.  In 2023, it's exclusively been

13  Quickbooks as the bookkeeping software.

14          TRUSTEE NG:  Okay.  And who has access to the

15  Quickbooks?

16          MR. DIAB:  So, there was a -- a former accountant

17  who was in the accounting department named Breanne

18  (phonetic).  Dan has access to the Quickbooks.  And,

19  although I don't have access, I could give access.

20  Carpenter and Associates, the accountants who handle the tax

21  filings, also have access to the Quickbooks account.

22          TRUSTEE NG:  Okay.  We received a balance sheet

23  for end of fiscal year 2022 late last Friday evening and an

24  income statement for fiscal year 2022.  When were these

25  documents prepared?

102

1        MR. DIAB:  They would have been finalized in

2   January of 2023.  They were prepared throughout the course

3   of the year in 2022 with bookkeeping entries, but those

4   financials were formalized in January.  No financials for

5   the year 2023 have been prepared.  The accounting

6   department, along with others, left in February, and they

7   have not replaced them.  The accountants themselves, they're

8   working on the tax filings but have not completed financials

9   for this calendar year, for 2023.  Their tax focus was 2022

10  tax year.

11        TRUSTEE NG:  And who prepared them, your

12  accountant?

13        MR. DIAB:  It was our accounting department.  Our

14  accounting department as of January consisted of three

15  individual bookkeepers and then an acting CFO, not a

16  technical officer or director of the company but somebody

17  who was fulfilling the role of CFO named Kevin Kirkler

18  (phonetic).

19        TRUSTEE NG:  And when was he the CFO of the

20  Debtor?

21        MR. DIAB:  He was hired in August to fill that

22  role.  He was terminated at the very beginning of February.

23  And, so, he was employed during that period of time.  The

24  termination in -- in early February was the result of -- of

25  certain discoveries that came to light for me and Dan, and

103

1 then the decision was made to part ways with Kevin.

2          TRUSTEE NG:  Okay.  And you mentioned that -- is

3 it two bookkeepers in the accounting department?

4          MR. DIAB:  Well, there were -- there were three

5 people working underneath Kevin during the time when Kevin

6 was employed.  The three people were Gabriel Monroy

7 (phonetic), Breanne Pierwich (phonetic) from

8 (indiscernible), and then the third individual was Eddie,

9 Eddie Ball (phonetic), and those three individuals were the

10 bookkeepers essentially working under Cameron during that

11 period of time.

12          TRUSTEE NG:  And are they still with LPG?

13          MR. DIAB:  No.  They left along with others in

14 February and March.

15          TRUSTEE NG:  Okay.

16          MR. DIAB:  And are no longer employed by LPG,

17 although Breanne does answer questions for us often when we

18 -- when we ask where to find a piece of information, but

19 she's not employed.

20          TRUSTEE NG:  So, was the balance sheet and the

21 income statement submitted to us prepared by this department

22 prior to their departure?

23          MR. DIAB:  It was prepared prior to her departure,

24 but it was pulled by me last week to be able to send

25 through, which is another way of saying it was not verified

104

1  by anybody in the accounting department that that's the

2  correct version, but it's the last version that I had

3  received from the accounting department.  It's the only

4  version I had access to.

5          TRUSTEE NG:  Okay.  Because the initial seven-day

6  package that was submitted to our office on April 17th, '23,

7  the Debtor at that time indicated that it has not prepared

8  an financial statements in 2022 or in the past year.  So,

9  but you're saying these were actually prepared by the -- you

10 know, by the department, the accounting department prior to

11 their departure, and you pulled it last week or so, is that

12 right?

13         MR. DIAB:  That's correct.  And, to be clear, the

14 -- the documents that were sent were never reviewed by a CPA

15 nor certified by a CPA.  It was our internal accounting

16 department only.

17         TRUSTEE NG:  I don't think we ever received a

18 profit and loss statement even though we asked for it.  Is

19 there a profit and loss statement?

20         MR. DIAB:  For 2022 there is.  None has been

21 prepared -- yeah, for 2023, none have been prepared for the

22 first four months of the year.

23         TRUSTEE NG:  The Debtor was making $155 million

24 gross in 2022, and you don't have a P and L statement?

25         MR. DIAB:  We have the P and L for 2022.  We don't

105

1  have it for 2023.

2          TRUSTEE NG:  Okay.

3          MR. DIAB:  It was submitted for 2022, along with

4  the balance sheet.

5          TRUSTEE NG:  So, we don't -- no, we did not

6  receive the P and L statement for 2022.  So, can you please

7  go ahead and send it to your attorney, and he can send it to

8  us?

9          UNIDENTIFIED SPEAKER:  (Indiscernible) we have

10  your income statement for --

11          TRUSTEE NG:  Oh, we have the income statement.

12          UNIDENTIFIED SPEAKER:  It's the same thing as the

13  P and L.

14          TRUSTEE NG:  Okay.

15          UNIDENTIFIED SPEAKER:  Sorry.

16          TRUSTEE NG:  And the accounts receivable,

17  according to the balance sheet for end of fiscal year 2022

18  that we received last Friday evening, the title of that

19  document, it says "Litigation Practice Group, PC, Parent

20  Consolidated."  So, what entities are consolidated with the

21  Debtor?

22          MR. DIAB:  I'm not aware of any being consolidated

23  with the Debtor.  So, I don't -- yeah, I don't know why that

24  notation was made, but I would have to inquire of Kevin if

25  there was anybody else included in that, but there should

106

1  not be any other entities.

2          TRUSTEE NG:  Are you still in good terms with

3  Kevin?  I thought he was let go.

4          MR. DIAB:  We -- so, we have a -- we have an open

5  line of communication.  It's not the best relationship, but

6  I am able to reach out to him, and he reaches out to me.

7          TRUSTEE NG:  Okay.

8          MR. DIAB:  And answers questions from time to

9  time.

10          TRUSTEE NG:  Okay.  Yeah, I will need explanation

11 why it says, you know, there's consolidation.  If there is,

12 in, fact, a consolidation, we need to know the reason for

13 that.

14          The balance sheets it says for end of fiscal year

15 2022.  Does that mean those figures listed in that balance

16 sheet is as of December 31st, 2022?

17          MR. DIAB:  Correct.

18          MR. MARCH:  That's my understanding, yes.

19          TRUSTEE NG:  Okay.  Thank you.  So, the balance

20 sheet shows that the total accounts receivables as of

21 December 31st, 2022 to be $6.6 million.  Does that sound

22 right to you?

23          MR. DIAB:  Yes.  So, my understanding of how they

24 calculate the accounts receivable on the balance sheet, they

25 don't book all future payments due on all contracts.  What

107

1  they're looking at is NSF's that were unresolved because

2  those amounts are owed to the company, and the company is

3  supposed to collect until they have a clearing entry to

4  remove the -- the NFS's that are owed.  But that figure does

5  not include future payments pursuant to contracts, and that

6  was a decision that the accountants made based on

7  (indiscernible) system that we book all the future contract

8  payments.  We just got hit with a huge tax liability in the

9  current year, and so they opt not to include AR beyond the

10 payments that we sought from clients but didn't collect.

11         TRUSTEE NG:  If the Debtor were to include the

12 future AR, what would the figure look like?

13         MR. DIAB:  As of right now or as of December --

14         TRUSTEE NG:  As of December -- I mean, is there a

15 difference?  I mean, is there a huge difference?  Well, what

16 about as of right -- as of right now?

17         MR. DIAB:  As of right now, I think that we were

18 putting the figure at roughly 60 million based on the

19 referral fees model that we're now adopting.  As of December

20 of 2022, when we still had all of the direct client payments

21 to account for, it probably would have been closer to $300

22 million in terms of all future contracts and payments due

23 thereunder.

24         TRUSTEE NG:  So, how did it go from 300 to 60

25 million dollars?

108

1        MR. DIAB:  That's a function of the percentage

2   split for the companies that are now servicing the clients,

3   so the 40 percent from CLG and 20 percent each from Phoenix

4   and Oakstone.  That's how the number is now 60 million,

5   because the remaining AR is going to belong to the firm

6   that's doing the servicing for the clients.

7        TRUSTEE NG:  Okay.  So, the Debtor's Schedule B

8   filed with the Court on April 4th -- and that's Docket

9   Number 33 -- shows the AR in the amount of $120 million.

10  So, how do you reconcile the numbers you just told me and

11  the $120 million?

12       MR. DIAB:  So, the $120 million would have to be

13  revised based upon the cancellations that we actually saw

14  happen as a result of these transitions and everything else

15  that was happening.  So, the 123 would have been a figure

16  that we would have determined in March at the time that we

17  were filing the petitions based on all of the clients

18  remaining onboard.  And in reality, clients cancelled with

19  LPG before the transfer and cancelled with the receiving law

20  firms post-transfer, in part because of the payment issue

21  with Merrich Bine, in part because they objected to the

22  transition.  And, so, the client base shrunk as a result of

23  -- of the movement from us, and that's why the future AR

24  also shrunk.

25       The 120 was a very rough figure.  The 60 million

109

1 itself is a rough figure.  This client base is inconsistent

2 in terms of payment streams.  Sometimes they perform really

3 well.  Sometimes they perform poorly.  So, it's a -- a best

4 guess.

5          TRUSTEE NG:  Okay.  And have the Debtors taken any

6 steps to try to recover the AR?

7          MR. DIAB:  I would say no.  The -- the policy

8 we've had from the inception of LPG is that we won't seek to

9 collect from clients that don't make payments.  We'll

10 encourage them to make payments.  We'll try to retain them

11 so that they remain clients, but if they want to leave, we

12 don't collect any payments that were owed at the time that

13 they leave.  We don't even make demands out of them, engage

14 in collection action.

15          TRUSTEE NG:  Okay.  So, and that's to both

16 existing clients or clients who decided to leave LPG that

17 the policy is they don't -- that LPG does not try to make

18 any demands or collect on the AR?

19          MR. DIAB:  Correct, and that's a function of the

20 positions the clients are in as individual discovering of

21 that and also concerns about how the State Bar would view

22 that practice, how seeking to collect from these individual

23 clients, that policy decision was made early on, and we

24 haven't changed it since.

25          TRUSTEE NG:  Okay.  So, the combined bank accounts

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 128

110

1   on that balance sheet shows that, you know, the balance as

2   of December 31st, 2022 was $2.5 million, but the Debtor only

3   listed $4500 in the Union Bank account as of the petition

4   date.

5          So, what happened to all that money?

6          MR. DIAB:  So, the operating costs in January but

7   then also when February -- in the month of February, when

8   the payment processing was no longer paying anything through

9   because the process was (indiscernible), all the existing

10  money that we had sort of in the bank from all these various

11  accounts we used to keep LPG operating as long as possible.

12  And then, when that money was gone, that's when we

13  essentially made a payroll and saw the mass exodus of

14  employees.  But any money that would have been in the

15  account at the end of December or the beginning of January

16  was used to cover all the expenses in January and February

17  of this year.

18         TRUSTEE NG:  Okay.  The balance sheet shows the

19  total liability as of December 31st to be $9.9 million.

20  Does that sound right?

21         MR. DIAB:  That sounds accurate, yes.

22         TRUSTEE NG:  And then the Debtor's schedule shows

23  liabilities about $140 million or so.  So, how do you go

24  from 9.9 as of December 31st of last year to $140 million

25  within the three months?

111

1          MR. DIAB:  We dispute the vast majority of the 140

2 million.  We were obviously advised by counsel that if

3 somebody is claiming a balance is owed, we have to report

4 that to the Court, but we do not believe that the vast

5 majority of purported creditors are actually creditors.

6 They either are seeking moneys that are not owed or they're

7 seeking to enforce contracts that they had already breached

8 and they're not permitted to enforce.  So, we think that the

9 actual amount owed to creditors is much closer to about $10

10 million, maybe a little bit less, in terms of actual

11 creditors.  These disputes obviously are going to have to be

12 adjudicated, but -- but we've marked the debts as disputed

13 on our schedules.

14          TRUSTEE NG:  Okay.  And --

15          MR. DIAB:  The balance sheet shows our -- our

16 position.

17          TRUSTEE NG:  I'm sorry.  I couldn't hear you.

18          MR. DIAB:  The balance sheet shows our position

19 with regard to who's actually a creditor and who's not.

20          TRUSTEE NG:  Okay.

21          MR. DIAB:  As of this time.

22          TRUSTEE NG:  Okay.  We -- we -- our office

23 requested a list of receivables with an aging, and we did

24 receive some kind of report from your office, but it does

25 not identify any account holders, and there's no aging is

112

1  listed, just amount each month.  So, we would need a revised

2  aging report with those information in order for us to have

3  a meaningful understanding of what's going on.  You can send

4  it to your attorney.

5          MR. DIAB:  Just to clarify -- I apologize for

6  interrupting, but to clarify, you would prefer to see each

7  one of the clients and their payment streams?

8          TRUSTEE NG:  Right.

9          MR. DIAB:  And then multiplying out our 20 percent

10 or 40 percent?  Got it.

11         TRUSTEE NG:  Right.  I think if you have any

12 question, you can also contact our office after the meeting,

13 and we can explain to you what we need, but I think that

14 would be the information that we need so we can have an

15 understanding of what's going on.

16         On January 6th, '23, of this year, the Superior

17 Court for the State of California Orange County, Judge

18 Sherman, issued an order enjoining LPG from spending any

19 money that would result in less than $4.48 million cash in

20 hand.  And, similarly, on March 10th, '23, the State Court

21 issued a minute order enjoining the Debtor to spend any

22 money that would result in less than $4.48 million cash on

23 hand.

24         Are you aware of those two orders?

25         MR. DIAB:  Yes, we're aware of the orders.

*Briggs Reporting Company, Inc.*

113

1          TRUSTEE NG:  And can you explain why the Debtor

2  only has $4500 in the bank account as of the petition date?

3          MR. DIAB:  There's money held by the payment

4  processor which collects payments from clients.  Those

5  payments are held by the payment processor in an account for

6  benefit of LPG.  We believe that those funds belong to LPG

7  and would satisfy the minimum balance that the Superior

8  Court wanted us to hold.  And, so, our position is if the

9  payment processor's holding the $4.5 million, then we're

10  satisfying the Court's order.

11          In our operating account, we have never for one

12  minute in our history had four and a half million in the

13  operating account.  So, to the extent that -- that we're

14  enjoined from spending money to bring the -- the account

15  balance below four and a half million, we've never been

16  above it.  So, we couldn't bring it below.  But we don't

17  think that the Court was -- was using that hyper technical

18  interpretation.  We believe that they meant the total

19  account balances across all accounts adds up to the four and

20  a half million, which is easily the case when you look at

21  the payment processor's account and the amount of money

22  that's being held there.

23          TRUSTEE NG:  Well, actually --

24          MR. DIAB:  But that's the interpretation we've

25  taken.  It's never --

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 132

114

1          TRUSTEE NG:  Okay.  Understood.

2          MR. DIAB:  Go ahead.

3          TRUSTEE NG:  We have reviewed the bank statements

4 that you sent to our office like yesterday.  There were a

5 lot of them, and those bank statements, the Chase 3158, the

6 Chase 3133, I mean, they did have substantial deposits.  I

7 mean, even as of December the deposits were $8 million.  I

8 mean, the withdrawal was -- was a lot, was $8 million as

9 well, same as Chase 3133.  As of December, the deposit was

10 $4.38 million, and the withdrawals were $4.31 million.

11          So, it appears that the Debtor did have

12 substantial deposits in excess of the $4.5 million that the

13 Court ordered in expense account at one point.

14          MR. DIAB:  But the way that the deposits work, the

15 payment processors will send money through on a -- on a

16 daily basis any time it's (indiscernible) day.  And, so,

17 we'll receive the $4 million, $8 million, whatever the

18 number is.  We'll receive it as daily deposits of anywhere

19 from $100,000 to $1.5 million, but it never comes in as a

20 batch of four or five million or more than that amount.  The

21 largest it would ever come in as is $1.5, $1.6 million at

22 any one point in time, and when the money comes in, it's

23 obviously then spent on all the operating expenses that we

24 had operating a law firm that's -- that at the time was

25 active in 48 different states.  But the -- so, the payment

115

1  processing trickles in in small batches, and it's spent at

2  the time that it trickles in.  It never pools.  It never

3  has, and it never would if this business model is to

4  succeed.

5        TRUSTEE NG:  Okay.  So, the Debtor listed a

6  transfer of $50,000 to City Capital within the 90 days prior

7  to the filing.  Do you know when the transfer took place?

8        MR. DIAB:  The transfer would have been in

9  February of 2023.  I don't know the exact date, but probably

10  somewhere around February 20th to 25th.

11        TRUSTEE NG:  And what was the reason?

12        MR. DIAB:  But that was the one transfer that was

13  made to City Capital.

14        TRUSTEE NG:  And what was the reason for that

15  transfer?

16        MR. DIAB:  City Capital had issued a loan.  It was

17  a -- another merchant cash advance.  So, that cash advance

18  called for payments of $50,000.  We made one such payment,

19  and then we defaulted on that obligation, and that's one of

20  the obligations that we reported as a secured obligation.

21        TRUSTEE NG:  Okay.  And the Debtor also lists a

22  transfer $12 million to Merrick Bank, and when was that

23  transfer?

24        MR. DIAB:  So, Merrick Bank collected the money

25  from LPG's clients.  The money was never sent to LPG.

116

1 Merrich Bine is holding that amount we believe, but, again,

2 that's an estimate.  We don't know the exact amount that

3 they're holding, but that amount that was being held and is

4 being held by Merrich Bine we're regarding as LPG funds, and

5 that's the reason for that notation.  But no amount was ever

6 sent from LPG to Merrich Bine.  That was collected from LPG

7 clients and held by Merrich Bine.

8          TRUSTEE NG:  Okay.  So, how long did the Debtor

9 actually use Merrich Bine services?

10          MR. DIAB:  So, Merrich Bine began processing

11 payments in September of 2022, and the last payment process

12 is March 10th of 2023, so, from September '22 to March of

13 '23.

14          TRUSTEE NG:  And they have been officially

15 terminated by the Debtor?

16          MR. DIAB:  Correct, and it was -- it was by mutual

17 consent because they had a contract to process payments, and

18 they agreed to stop.  They essentially agreed at least

19 temporarily to give up their contractual right at our

20 request that they stop collecting payments, and so that took

21 place in March.  The agreement was reached March 10th, and

22 they have not collected the payments since.

23          TRUSTEE NG:  Okay.  And the Debtor listed Merrich

24 Bank in its Schedule F as a creditor with a claim of $8

25 million.  What is the basis of that claim?

117

1        MR. DIAB:  In addition to being a payment

2   processor, Merrich Bine had purchased receivables from LPG.

3   They entered into receivable purchase agreements on three or

4   four different occasions, and those purchase agreements

5   called for payments out of LPG's receivable to Merrich Bine,

6   and so Merrich Bine was both a payment processor and also a

7   financier in the form of receivable purchaser.

8        TRUSTEE NG:  Okay.  I think previously you

9   mentioned that the Debtor may, you know, take -- may -- may

10  initiate, you know, adversary proceedings against either

11  Merrich Bine or Apocay (phonetic) in this bankruptcy case.

12  Does the Debtor contemplate any other litigation against any

13  other party in this bankruptcy?

14       MR. DIAB:  Yes, a number of other adversary

15  actions are contemplated.  As I mentioned earlier, there's a

16  dispute with Kevin Kirkler, the former acting CFO, and that

17  dispute involves money that LPG believes was taking

18  wrongfully, that LPG is going to seek to have returned.

19  Also, LPG believes there was a misappropriation of trade

20  secrets by Kevin Kirkler and another individual who is a

21  creditor named Mario Acevedo.  We believe that they shared

22  information with a competitor, and that competitor is

23  actively stealing clients from LPG.  They're LPG clients

24  that are located at other Law firms now, but they still have

25  a contract with LPG, and this Law firm is reselling them on

118

1 this other platform that this Law firm runs.  And, so, we

2 anticipate an adversary complaint for the misappropriation

3 of LPG's trade secrets, including client lists.

4        And then there's a related action against a

5 company called Point Break Holdings, which is partnered with

6 Mario and Kevin in this new Law firm venture, and they're

7 also actively stealing clients from -- from the Law firms

8 that are LPG clients.  So, there's going to be an adversary

9 action against them for that interference with contractual

10 relations as well as violation of a contract that Point

11 Break had with LPG that restricted such conduct.  And, so,

12 those adversary actions are contemplated.

13        There was an -- one additional adversary action

14 would be against Debt Validation Fund and DVI Fund related

15 to money that was paid to them pursuant to agreements that

16 they both breached.  And, so, we would seek to return the

17 funds from those two individual purported creditors and seek

18 to -- to have those funds returned as a result of the breach

19 or the agreement by those two parties.

20        Dan, can you think of any other adversaries that

21 we discussed?

22        MR. MARCH:  No.  I was going to say that --

23 against Validation Partners, that's about $30 million.

24        MR. DIAB:  Yeah.  So, Validation Partners, which

25 is also listed as a creditor, we received an assignment from

119

1  Pec Corporation of a roughly $30 million claim that Pec

2  Corporation had against Validation Partners, meaning

3  Validation Partners owed Pec Corporation $30 million that

4  was assigned to LPG.  So, that's an asset of LPG that we're

5  going to seek.  It's that $30 million assignment that we'll

6  file as an adversary action against Validation Partners.

7  And, so, that's I guess the last of the adversaries.

8          TRUSTEE NG:  Okay.  And what about the -- the

9  potential lawsuit against Kevin?  How much was taken

10  wrongfully allegedly by him or his -- Mario?

11          MR. DIAB:  So, for Kevin, the amount in

12  controversy is $205,000, and that relates to transactions in

13  a bank account that -- that do not appear to have been

14  authorized by Dan or by myself, and that's one that is --

15  there's an ongoing conversation with Kevin and a desire to

16  resolve it amicably, but we don't know that that's going to

17  be the case, but that would be the amount in controversy.

18          TRUSTEE NG:  Okay.  And does the Debtor expect

19  anyone to sue the Debtor in this bankruptcy case?

20          MR. DIAB:  I'm sorry.  Could you repeat that

21  question?

22          TRUSTEE NG:  Do you expect anybody to sue the

23  Debtor in this bankruptcy case?

24          MR. DIAB:  So, the active lawsuits that were

25  already pending at the time of the filing of the petition

120

1  are the only lawsuits we envision.  We don't envision there

2  being any other lawsuits filed.

3          TRUSTEE NG:  Okay.  What is the plan for

4  reorganization here?

5          MR. DIAB:  So, our goal is to make all secured

6  creditors whole using the revenue stream from referral fees,

7  and then the balance of those referral fees would be made

8  available to the unsecured creditors pro rata.  The

9  complicating factor is the uncertain payment stream from the

10  client base.  And, so, over the next couple of months, we'll

11  have a good sense of exactly how this client base is going

12  to perform, that is of each service by three law firms that

13  are not LPG.  And then that would be the amount that's

14  available, but we think it would be easy to make secured

15  creditors whole, and there would be a sizeable amount left

16  for unsecured creditors.

17          TRUSTEE NG:  Okay.  At this point, I'm going to

18  turn to my colleagues, Marilyn Sorensen or the AUST, Cam

19  Miskins, to see if they have any follow-up questions.

20          MS. SORENSEN:  I do not, Queenie.

21          TRUSTEE NG:  Thank you.  I hear no response.

22  So --

23          MR. MISKINS:  I do not.

24          TRUSTEE NG:  Okay.  I'm sorry.  Cam, do you have

25  any questions?

121

1          MR. MISKINS:  No, I don't.

2          TRUSTEE NG:  Thank you.

3          So, at this point, I'm going to open the forum to

4     all creditors who would like to question the Debtor.  If so,

5     please announce yourself and state your name and if you're

6     an attorney and the party that you represent on the record,

7     please.

8          MR. BROWN (telephonic):  Hello.  Bob Brown.  I'm

9     an attorney.  I represent SDCO Tustin Executive Center.

10    It's the owner of the property located at 17542 East 7th

11    Street, Tustin, California, Suites 100, 105, 250 and 330.

12         Earlier in the examination, I heard the Debtors

13    representatives indicate they vacated that property in

14    February or March of 2023.  We have filed a motion for

15    relief from stay to recover possession of the property.

16         Has, in fact, the Debtor vacated those -- or

17    abandoned those premises?

18         MR. DIAB:  So, there -- there are no longer any

19    employees operating out of that space.  There's office

20    furniture that still has to be moved into storage, which we

21    anticipate completing by the end of this week, by Friday the

22    5th or Saturday the 6th, at which point we would be ready to

23    turn over possession.

24         MR. BROWN:  Okay.  Earlier I heard somebody say

25    that they vacated and gave the landlord notice that they'd

122

1  given up possession of the property, yet my client never

2  received that.  So, you anticipate vacating the property by

3  the end of next week?

4         MR. DIAB:  By the end of this week, correct, and

5  we'll have -- we'll make sure that notice is given to

6  (indiscernible) at the moment that everything has been

7  removed.

8         MR. BROWN:  Okay.  Very good.  I've got a motion

9  pending for relief from stay.  As I indicated, it's Docket

10 Number 19.  So, if Debtor's counsel would agree to give me

11 notice once the Debtor has vacated so we can take possession

12 of the property, I would appreciate that.  Obviously, we'll

13 dispose of any remaining items in the unit in accordance

14 with the Civil Code.  We will proceed with our motion for

15 relief from stay tomorrow just to make sure that this is

16 moving forward to conclusion.  But you anticipate being out

17 by the end of this week, correct?

18        MR. DIAB:  Correct.  And we don't have any

19 opposition to the motion as I understand it.

20        MR. BROWN:  Okay.  Very good.  Those are all the

21 questions that I have on behalf of my client.  Thank you.

22        TRUSTEE NG:  Thank you, Mr. Brown.

23     (Simultaneous speaking.)

24        MR. STOCKHOLD:  Go ahead, Dave.  This is Matt

25 Stockhold.

*Briggs Reporting Company, Inc.*

123

1          MR. CUSIO:  Okay.  This is David Cusio on behalf

2     of Debt Validation Fund 2, MCDVI Fund 1, and MCDVI Fund 2.

3          I want to follow up on a few things.  Mr. Diab,

4     you mentioned that the notes you had -- or, sorry -- the

5     notes that LPG had with my clients were breached by my

6     clients.  How do you believe those were breached?

7          MR. DIAB:  Well, we believe that for three

8     reasons.  The confidentiality term was breached when your

9     clients, both of them, shared confidential information to

10    Validation Partners, an adverse party in active litigation,

11    in November of 2023 -- of 2022, and they also violated the

12    non-disparagement clause by disparaging LPG and Dan March

13    and Tony Diab as individuals.  And then more important than

14    all of that, they continued to seek to support Validation

15    Partners in the collection of amounts that were allegedly

16    assigned.  So, the exchange was a promissory note for

17    assignment by the DVF and DVI Fund receivables from

18    Validation Partners.  But after that purported assignment,

19    the two entities continued to seek to collect and supported

20    Validation Partners in efforts to collect, which we think

21    violated both the covenant of good faith and fair dealing

22    and also, more directly, eviscerated the (indiscernible)

23    consideration to LPG for those two promissory notes.  And,

24    so, that's the position that would be outlined in the

25    adversary that we intend to file.

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 142

124

1          MR. CUSIO:  And what was the confidentiality?

2    What was the confidential information that was disclosed

3    improperly?

4          MR. DIAB:  It was financial information as well as

5    the content of various meetings.  I would have weekly

6    meetings with Dave Zuck, McKenna, Eng Taing,

7    (indiscernible), Kevin Kirkler, and we would provide

8    confidential information regarding LPG's operations,

9    including its financial status and financial transactions,

10   and that information was given to Mike McLaughlin

11   (phonetic), counsel for Validation Partners, at meetings

12   that were witnessed by Eng Taing.  And, so, that information

13   that was conveyed was used by Validation Partners in

14   connection with their active litigation.  But, specifically,

15   it was financial information and operational information

16   shared with -- with Ross and his attorney, Mike.

17         MR. CUSIO:  Okay.  I want to -- I'm going back to

18   what we were talking about much earlier this morning.

19         Mr. March, aside from work with LPG, do you have

20   personal cases that you handle personally?

21         MR. MARCH:  I have a few.  I -- I handle

22   bankruptcies, yes.

23         MR. CUSIO:  Okay.  And how long had LPG been

24   making the lease payment for your office?

25         MR. MARCH:  I would say it's been about two years.

125

1          MR. CUSIO:  Okay.  And do they cover -- does LPG

2   cover the entire rent?

3          MR. MARCH:  Yes.

4          MR. CUSIO:  So, you don't pay any of the rents due

5   on your office space?

6          MR. MARCH:  No.

7          MR. CUSIO:  What were Mr. -- sorry.  The original

8   member of LPG was John, and I didn't catch his last name.

9          MR. MARCH:  Thompson.

10          MR. DIAB:  The last name is -- yes.  I'm sorry.

11          MR. CUSIO:  Johnson?

12          MR. DIAB:  It was Thompson.

13          MR. MARCH:  Oh, Thompson.  I'm sorry.  You said he

14   had concerns about liability.  What were those concerns?

15          MR. DIAB:  This is Tony.  I can address that

16   because he had raised those concerns direct to me.

17   Specifically, his concern related to the marketing companies

18   and their compensation method.  He had concerns that the way

19   that the marketing companies that would onboard files to

20   LPG, he felt that that compensation method may violate the

21   fee sharing ban between lawyers and non-lawyers.  And, so,

22   he raised that styled as an objection, and he said, after we

23   discussed the issue, he would prefer not to be counsel of

24   record for LPG and a shareholder of LPG, and that's when we

25   essentially began a search for his replacement.  But that

126

1    was the issue that he had raised as his objection.

2          MR. CUSIO:  Okay.  Mr. Diab, you were talking

3    about the -- some of the entities, your entities that

4    received compensation from LPG.  You mentioned Vulcan

5    Consulting Group and Strategic Consulting Solutions.  Were

6    there any other entities associated with you who received

7    money from LPG?

8          MR. DIAB:  The only other entity would be BAD,

9    Incorporated, which did business in post-processing, and

10   post-processing received money from LPG from February 2019

11   when LPG was formed, until June of 2021 when BAD,

12   Incorporated was essentially dissolved.  It was never

13   dissolved formally because there's outstanding liabilities,

14   but it was essentially nonoperational as of June 2021.  That

15   entity I had an interest in, and it also was receiving

16   payments from LPG.

17         MR. CUSIO:  And who are -- is that an LLC?  What

18   kind of entity is that?

19         MR. DIAB:  BAD was formed as an LLC in I believe

20   it was January 2018.  It was converted to a -- an S

21   Corporation sometime around May of 2019, if memory serves.

22   And, so, it was BAD, Incorporated at the time that it ceased

23   operations.  It was made up, when it was an LLC, of three

24   partners, Brian Really, Arosh Asante (indiscernible) and

25   Tony Diab.  So B for Brian, A for Asante, D for Tony, BAD,

127

1   Inc.

2           MR. CUSIO:  Got it.  And then who were its

3   officers when it was an S Corp. or did it have officers?

4           MR. DIAB:  It did have officers.  Brian Really was

5   the CEO, and Arosh Asante Berudi (phonetic) was the

6   treasurer, CFO.  The secretary was (indiscernible).  I never

7   held an officer position for the entity and didn't receive

8   compensation from the entity, meaning I wasn't on payroll or

9   a 1099 for BAD, Inc.

10          MR. CUSIO:  Strategic Consulting, is that an LLC

11  or was it an LLC at the time?

12          MR. DIAB:  Yes, that was and even remains a

13  limited liability corporation -- company, sorry.

14          MR. CUSIO:  And who are the members of Strategic

15  Consulting?

16          MR. DIAB:  There's one member.  His name is James

17  Hinson.  He's a sole member, and I believe that entity was

18  formed toward the end of 2021, November'ish 2021.

19          MR. CUSIO:  Okay.  And how do you spell Mr.

20  Hinson's last name?

21          MR. DIAB:  James is standard spelling.  Hinson is

22  H-I-N-S-O-N.

23          MR. CUSIO:  And I believe you said that there were

24  never written agreements between LPG and Vulcan and LPG and

25  Strategic Consulting, is that correct?  Did I get that

128

1 correct?

2          MR. DIAB:  Yes, that's correct.

3          MR. CUSIO:   Are there ever times that money went

4 from any of the payment processors directly to an entity

5 that you were associated with or to yourself as an

6 individual?

7          MR. DIAB:  The former, yes.  It went to entities I

8 was associated with, never to me as an individual.  But

9 money would have been directed from payment processors

10 direct to Vulcan Consulting Group.  This would have been now

11 2021 because Vulcan was only used in 2020, 2021, and so

12 payments would have been directed at -- so, on the payment

13 processor to Vulcan without passing through any LPG

14 operating accounts.

15          MR. CUSIO:  And that was in 2021?

16          MR. DIAB:  Correct.

17          MR. CUSIO:  Did it ever happen with -- sorry --

18 Strategic Consulting?

19          MR. DIAB:  With Strategic Consulting no, but there

20 may have been -- there may have been one other entity that

21 had received those directed payments which was called

22 Lineman and Associates, but in reality, that was just a DBA

23 for World Global Fund, and World Global Fund was one of the

24 merchant cash advance companies that had given money to LPG.

25 And they also received directed payments that never passed

129

1 through any LPG account, and I have no interest in that

2 entity, but they were a sizeable financier of LPG during its

3 growth.

4          MR. CUSIO:  There was a dispute between LPG and

5 World global, correct?

6          MR. DIAB:  Correct, a substantial one that arose

7 in April of 2022.

8          MR. CUSIO:  What was the amount at issue in that

9 dispute?

10          MR. DIAB:  So, similar to Merrich Bine, we didn't

11 get firm numbers.  Our understanding is that something in

12 the neighborhood of $10 million was collected from World

13 Global using various DBA's.  Money was collected direct from

14 LPG clients.  It was not authorized.  They called it a

15 payment processing error, but essentially on April 7th and

16 8th of 2022, World Global initiated debits of virtually all

17 LPG clients.  They essentially tried to pull payments from

18 almost all LPG clients on dates that were not authorized.

19 The clients had not had a payment due on those dates, but

20 the money was pulled anyway.  The dispute resulted with

21 World Global issuing a refund to the clients.  At least as

22 far as we know they issued refunds to all the clients that

23 were affected, but we don't have any confirmation that that

24 was the case because some of our clients would not notice a

25 payment and wouldn't necessarily contact us to report the

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 148

130

1 additional payment, but it was our understanding that they

2 had refunded all the clients, but this dispute was the month

3 of April 2022, and it was roughly $10 million the amount in

4 controversy.  Out of that, we think the vast majority was

5 returned to clients.  We just don't have confirmation.

6      MR. CUSIO:  Was there ever a dispute with World

7 Global or what LPG claimed that World Global owed LPG money?

8      MR. DIAB:  Could -- could you ask that again?

9      MR. CUSIO:  Sure.  Was there ever a dispute where

10 LPG claimed that World Global owed LPG money?

11      MR. DIAB:  Yes.  So, both prior to and after this

12 payment processing error, LPG believes that World Global has

13 collected money that was due to LPG that wasn't being

14 remitted through.  Whether it was being held as a reserve or

15 simply not being reported, there was money that was supposed

16 to come to LPG that didn't, and that was before the payment

17 processing error.  After the payment processing error, there

18 was money due to LPG for the damage that was caused by World

19 Global's conduct, and that damage included additional

20 employee time and overtime.  It included refunds that had to

21 issue beyond the amount that was taken from clients to make

22 the clients whole.  For instance, somebody misses a car

23 payment, and now they have extra fees, and we have to make

24 them whole for that.  This is not the client's fault that

25 they couldn't make the payment.

*Briggs Reporting Company, Inc.*

131

1          We also lost a tremendous number of clients, and

2   we -- so, we demand compensation for the clients that it

3   canceled.  We also at that time lost our BBB rating, which

4   had been an A plus.  We went to a no rating which impacted

5   our ability to onboard new clients.  So, that was the range

6   of damage caused by the April disaster, and we demanded

7   compensation after April.  We never received it.

8          MR. CUSIO:  LPG filed a lawsuit against World

9   Global, is that correct?

10          MR. DIAB:  Correct.  It was filed under seal in

11  the Eastern District of New York and subsequently dismissed

12  for lack of diversity jurisdiction.  We didn't have the

13  membership of the LLC.  And, so, we couldn't show that there

14  was complete diversity between all of the members of the

15  World Global, LLC and Litigation Practice Group, and for

16  that reason, the court in the Eastern District of New York

17  declined to exercise diversity jurisdiction.  It is our

18  intention to refile in California, but we -- we have not yet

19  refiled.  We still have another 11 months to be able to file

20  that action, but we have not yet filed any action against

21  him.

22          MR. CUSIO:  And do you -- is it LPG's intent still

23  to file that action?  Is that another adversary proceeding?

24          MR. DIAB:  We have discussed resolution with the

25  members of World Global, and that's still a discussion

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 150

132

1  that's ongoing.  If we can't resolve things amicably, which

2  seems to be the case, then that would be added to the list

3  of adversaries that we would file.  We had a conversation on

4  that subject as recent as this past Friday with one of the

5  members of World Global.  So, we're still pursuing

6  resolution, but it doesn't appear likely, in which case that

7  would be an additional adversary.

8          MR. CUSIO:  Do you -- do you personally receive

9  compensation from a company called Prime Logix, L-O-G-I-X?

10         MR. DIAB:  No.  So, I don't receive any

11 compensation from Prime Logix, but I believe it's spelled L-

12 O-G-I-X.  Is that what you said?

13         MR. CUSIO:  Yes.

14         MR. DIAB:  Yes.  So, Prime Logix, which is a

15 Wyoming entity I don't have an interest in and I haven't

16 received any payments from that entity.

17         MR. CUSIO:  And what does Prime Logix do?

18         MR. DIAB:  Prime Logix was affiliated with the Law

19 Firm Gallant Law Group, which was the law firm that had

20 Robert Tobia (phonetic) as its principal.  Robert's an

21 attorney licensed in Pennsylvania who works out of an office

22 in Philadelphia, and prime would provide support in the form

23 of customer service, mail processing, payment processing,

24 and -- and other functions to Gallant, and then that ceased

25 when Gallant essentially was folded maybe December of 2022,

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 151

133

1 December, January.  Might have been January 2023.

2        MR. CUSIO:  Just -- just to clarify one thing, you

3 said that Prime Logix was affiliated with Gallant.  Does

4 that mean that -- are you using affiliate as there's common

5 ownership or the way you were using it earlier, that they

6 were working together?

7        MR. DIAB:  They were working together.  Prime

8 would have been the contracted party receiving payment from

9 Gallant, which was the party seeking assistance with

10 processing, but affiliation only in that they were working

11 together, and there was a financial arrangement, though,

12 overlapping ownership.

13        MR. CUSIO:  When money would go from the processor

14 to Vulcan without going through LPG, why would the money not

15 go through LPG?

16        MR. DIAB:  Well, it was a few different reasons.

17 One was the logistics of it.  There were delays, and

18 sometimes some payments had to be made on these cash advance

19 positions by Vulcan, and it couldn't delay because threats

20 were being made about filing TRO's, freezing bank accounts,

21 sending direction letters to vendors, et cetera.  And, so,

22 for expedience, we would sometimes send the money direct to

23 Vulcan to release to these cash advance companies.

24 Sometimes it was just a function of the bookkeeping that

25 when the money would go to LPG first, there was bookkeeping

134

1 activity for the incoming revenue and then the outgoing

2 payment, and sometimes that would create delays but then

3 also create difficulties in how we recorded the transactions

4 between LPG and Vulcan after the transfer.  So, to make it

5 easy, we would do the transfer direct.  This wasn't sizable.

6 It wasn't raising millions of dollars.  It was probably a

7 few hundred thousand, but they were at points in time when

8 there was some time sensitivity, some urgency that required

9 the money to move fast, but that would be the -- sort of the

10 two-part reason, the bookkeeping and then the -- the need

11 for speed.

12        MR. CUSIO:  Mr. March, how long have you been the

13 only lawyer employed by LPG?

14        MR. MARCH:  Probably February of this year,

15 possibly even March.

16        MR. CUSIO:  As of the date of filing the

17 bankruptcy, were you the only attorney?

18        MR. MARCH:  Yes, that was actually working, yes.

19 I think there were a few attorneys -- there were still

20 attorneys working for LPG.  I don't know if they received

21 compensation.  As of March 17th, I think that was the last

22 one, amount that was paid to any attorneys at all at LPG,

23 including myself.

24        MR. CUSIO:  You said earlier -- I'm sorry.  I

25 don't remember if this was Mr. March or Mr. Diab -- that LPG

135

1 started losing employees in October and November of 2022.

2 Did I get that right?

3          MR. DIAB:  By -- sorry.  This is Tony, and I made

4 the statement earlier.  By choice, yes, we terminated

5 employees in the Las Vegas, Nevada office over the course of

6 October, November of 2022, and that was part of --

7          MR. CUSIO:  So, that --

8          MR. DIAB:  -- the (indiscernible).

9          MR. CUSIO:  Okay.  I want to make sure I

10 understand this correctly.  I believe you said that at the

11 peak, LPG had 67,000 active clients.  Is that correct?

12          MR. DIAB:  Correct, meaning a combination of

13 paying and completed payment clients, yes.

14          MR. CUSIO:  Payments and completed.  So, some of

15 these were not making payments any longer.  Were you still

16 -- was LPG still doing work on their behalf?

17          MR. DIAB:  Exactly.  So, we have clients that

18 complete the payments, sometimes early or sometimes on

19 track, but they have -- we have a lot that stretch well

20 beyond the completion of the payment stream.  And, so, we

21 may be handling a lawsuit for a year or two years after the

22 payments are finished.  We regard that as active because we

23 are continuing to do work, but there's no more payments

24 being made by the client.

25          MR. CUSIO:  And did I understand correctly that

136

1  the 400 to 600 California clients LPG still has, they have

2  completed their payment obligations, but LPG still has work

3  to close out those files, is that correct?

4         MR. DIAB:  That's correct.

5         MR. CUSIO:  And then the 67,000 active clients,

6  was that the number at the end of 2022?

7         MR. DIAB:  Yeah, that would have been -- so, that

8  -- that peak would have been somewhere around December 2022,

9  January 2023, that highwater mark.

10         MR. CUSIO:  And you said that a number of clients

11 had decided not to -- had decided -- I'm going to use the

12 word drop out.  That's not the right word but are no longer

13 working either with LPG, Oakstone, CLG or Phoenix, correct?

14         MR. DIAB:  That's correct.

15         MR. CUSIO:  And approximately what percentage of

16 th -- the 67,000 are -- decided to not work with any of

17 those entities?

18         MR. DIAB:  It would be that 5,000 figure that

19 we're aware of, meaning that was known to us before any

20 transfers were completed.  There were also subsequent

21 cancellations by clients who didn't want the transfer and

22 voiced that to the new law firm.  I don't have firm

23 statistics on that, but I would imagine it's probably

24 another 5,000.  So, probably 10,000 total clients out of the

25 67 that opted against transfer, either before or after the

137

1 transfer was completed.

2          MR. CUSIO:  Okay.  All right.  Just a second.

3 When -- you said that there were about 15,000 files that

4 were associated with Pec. How were those associated with

5 Pec?

6          MR. DIAB:  Pec had obtained some right to

7 receivable from the files, meaning it was entitled to some

8 percentage of the payment stream of those 15,000 clients,

9 and that was by virtue of a combination of receivable

10 purchases that Pec or a related entity had done.  Pec was

11 related to entities under the names 2Z, Carousel, and G2CC,

12 but it was a combination of receivable purchased by Pec and

13 then voluntary agreement between LPG and Pec to assign

14 receivables as a way of making Pec whole and satisfying the

15 obligations that LPG had under its promissory note to Pec

16 Corp.

17          MR. CUSIO:  Okay.

18          MR. DIAB:  What I would style an in-kind transfer.

19 Instead of money paid to Pec Corp., we gave them a right to

20 receivable, and Pec Corp. accepted that as satisfaction of

21 the obligation.

22          MR. CUSIO:  So, Pec received the right to the

23 receivable to get income stream, and then the files were

24 transferred to Oakstone, correct?

25          MR. DIAB:  Correct.  And, just to be clear, it was

138

1 a percentage, not the entire payment stream, but a

2 percentage of the payment stream on those files, but that is

3 correct.

4      MR. CUSIO:  There was a UCC1 filed in -- on

5 February 2nd of 2023 by First Corporate Solutions, and it

6 identified your Debtor as the Litigation Practice Group, and

7 it identifies a list of about 15,000 accounts.  Is that the

8 -- or is that list the list of accounts that were the

9 receivables for Pec?

10      MR. DIAB:  I'm not -- I'm not certain, but I

11 believe so.  I know that Pec filed a UCC1.  I didn't know

12 whether they filed it direct or used an agent, but if it was

13 15,000 files listed, then in all likelihood, that was the

14 Pec UCC1 filing.

15      MR. CUSIO:  Is LPG doing anything to oversee the

16 work that Oakstone, CLG or Phoenix are doing?

17      MR. DIAB:  Yes, minimal oversight just by virtue

18 of the fact that we have very few hands on deck at LPG, but

19 we do have access to the CRM's for the three entities to be

20 able to see client files and when clients call in to lodge

21 complaints regarding the new servicing, we're able to see

22 what servicing has been completed and send messages to those

23 law firms about the complaint that we're receiving from the

24 clients.  We continue to have -- so, LPG has the office now

25 with Dan, Olga and Carl.  And, so, a lot of these are coming

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 157

139

1  in by way of email.  And, so, we have some clients that will

2  call in and talk with Dan or Olga but other clients that

3  would email and then the message is relayed to the new firm.

4  If it's by email, usually by me, saying client so and so is

5  saying they can't get a call back on this case.  Can you

6  please contact them?  So, we have that minimal oversight and

7  the ability to communicate regarding client concerns, and

8  that's sort of the limit of the participation at this point.

9          MR. CUSIO:  What is -- you mentioned CRM.  What is

10  that?

11          MR. DIAB:  CRM is the -- essentially, it's all the

12  client data that's kept in one location.  The LPG CRM was

13  called Debt Pay Pro.  It was a Centric CRM.  It's network

14  based, and it would house all data regarding the clients.

15  So, it would have the case file.  It would have all the

16  clients' personal data, including credit reports.  It would

17  have their payment information, whatever they were using to

18  make their payments to us.  All the correspondence that we

19  received on behalf of the client or from the client would be

20  stored there.  And then notes are kept on every client

21  communication.  So, every time there's a call, an email or

22  letter, we record the content of the client communication

23  under the note section.  It's sort of a one-stop shop for

24  all information related to the client representation, and

25  each of the other firms also have CRM that performs a

140

1  singular function.  For some you've got (indiscernible).

2  For others they use proprietary systems but we have access

3  to the CRM for each of those three entities with regard to

4  LPG clients.

5        MR. CUSIO:  Did Debt Pay Pro track money that was

6  pulled from the clients' accounts?

7        MR. DIAB:  Yes.  Debt Pay Pro had a system for

8  tracking client payment information.  The payment processes

9  were either API'd into Debt Pay Pro so that the payment

10 processor would speak to Debt Pay Pro directly and

11 automatically update client information.  Others who didn't

12 have that direct connection would send information in TSC

13 files, Excel files, and then would take that data and

14 populate it into Debt Pay Pro.  But, either way, the client

15 payment information was updated in Debt Pay Pro using one

16 method or the other.

17       MR. CUSIO:  And does LPG still have Debt Pay Pro?

18       MR. DIAB:  Our access to Debt Pay Pro was cut off

19 at the time that we filed the petition.  DebtProPay

20 terminated our access just before the filing of the

21 petition, if memory serves.  I think they had terminated

22 access on Friday afternoon, and we filed the petition on

23 Monday, but we had not had access to our DebtPayPro since

24 that time, although we did have a backup with all of the

25 DebtPayPro data that we can still access, but we're

141

1  accessing the backup that was pulled (indiscernible)

2  DebtPayPro has as of I think it's March 17th.

3              MR. CUSIO:   What is the CRM that Oakstone uses?

4              MR. DIAB:   Oakstone was using a combination of

5  Freshworks and Freshsales which are CRM's that Eng had

6  found.  Eng is from Pec Corp.  He had found those as

7  platforms that he liked, and then they were also using a

8  proprietary system that -- that is not a public CRM.  It's

9  available for purchase.  So, they had the combination of the

10 proprietary system and then this Freshworks, Freshsales, and

11 then Eng was also building his own CRM, although I think

12 that project has now stopped, and but that's what Oakstone

13 was using.  CLG uses DebtPayPro, and it's a very similar

14 platform to the DebtPayPro version that we were using.  So,

15 DebtPayPro was very convenient.

16             MR. CUSIO:   And then what does Phoenix use as a

17 CRM?

18             MR. DIAB:   They use the same proprietary system.

19 So, the Oakstone system is a combination of Freshworks,

20 Freshsales.  It is a proprietary system.  Phoenix is just

21 using that proprietary CRM system that was written by

22 developers at -- at Phoenix.

23             MR. CUSIO:   And, so, Phoenix is sharing its system

24 with Oakstone?  Is that what I understand, the proprietary

25 system?

*Briggs Reporting Company, Inc.*

142

1        MR. DIAB:  Yeah.  I mean, I believe that Oakstone

2   pays for a license to utilize that CRM right now, but that's

3   correct that it's -- in part, because Oakstone is using

4   other platforms as well, but in part, they're utilizing that

5   system.

6        MR. CUSIO:  Who is Israel Orozco, O-R-O-Z-C-O?

7        MR. DIAB:  He was one of the attorneys at LPG.  He

8   was a California licensed attorney.  And, so, he had worked

9   on the California docket of cases at LPG.  He also had

10  helped with some of the FDCPA cases that another attorney,

11  Richard Meyer (phonetic), was handling at -- at LPG.  But he

12  is a California attorney.

13       MR. CUSIO:  And when did he stop working for LPG?

14       MR. DIAB:  So, formally he stopped in March along

15  with everybody else, but I think even to the present day he

16  continues to consult with Dan regarding matters.  He's

17  finishing out client files even though he's not being paid

18  because he's counsel of record in the cases, and I think he

19  still communicates with Dan about his California docket to

20  make sure each one of those cases is concluded.  I'm not

21  sure how many he was still handling, but my understanding is

22  he was still working on them as recent as last week, but his

23  formal employment ended in -- sometime in March, along with

24  everybody else.

25       MR. CUSIO:  How many lawyers are working for LPG

143

1  in that kind of context?

2          MR. DIAB:  Well, that's a good question.  So, how

3  many of the lawyers are still handling cases even though

4  they're not being compensated?  I think that's -- probably a

5  lot of the attorneys that were employed by LPG are finishing

6  out cases that had been assigned before the termination of

7  their employment or before they quit, and that's obviously

8  because of the Rules of Professional Conduct in every state

9  that limit the circumstances in which an attorney can

10 withdraw from a case.  And if you've got a $2,000 collection

11 case, the judge doesn't want to see a motion to withdraw.

12 They want to see a settlement.  So, I think it's probably a

13 fair number, although I don't have statistics on that.

14         MR. CUSIO:  On the 15,000 client files that Pec

15 had an interest in the receivables for, what is the document

16 that shows Pec had that interest in those specific -- those

17 specific client files?

18         MR. DIAB:  I believe it was a receivable purchase

19 agreement that was executed as satisfaction of the

20 promissory note that LPG had given to Pec Corp, but the

21 actual document itself would have been style a receivable

22 purchase agreement.

23         MR. CUSIO:  What is Grayson Law Center?

24         MR. DIAB:  Grayson was one of the platforms that

25 Eng had been throwing around as a potential other platform

144

1  to onboard clients.  My understanding is they're not

2  operational.  In fact, I believe that with all of the

3  accusations that were being made against Oakstone, the

4  thought was that new clients would be onboarded to a

5  different platform and not commingled with the LPG pipeline,

6  but that was a plan that my understanding hadn't gotten off

7  the ground to date, and I don't believe that they're still

8  trying to get that off the ground.  That would -- that would

9  be the function that it was supposed to serve, for new

10 clients that are unrelated to any LPG transfer.

11        MR. CUSIO:  Back in about October, there was a

12 transfer of receivables to StratCap (phonetic).  Why were

13 those receivables transferred to StratCap?

14        MR. DIAB:  There was no receivable transferred to

15 StratCap.  StratCap had sent an agreement to try to document

16 receivable purchases for the files that Validation Partners

17 had purportedly acquired, and I say purported because it was

18 an open question about whether Validation Partners had

19 documented all of the receivables that they had actually

20 purchased.  And, so, Russ put together the list of what he

21 thought were all the Validation Partners' receivables that

22 were purchased.  He wanted to execute a document and file a

23 UCC1 to sort of preserve the position of the Validation

24 Partners Investors, but he immediately upon filing, he

25 received objections from every different direction, and we

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 163

145

1  never proceeded with the agreement, meaning he never paid

2  the consideration that was due.  He never received any

3  payments on those files.  The actual transfer never took

4  place, but at least his desire to do a UCC1 filing to

5  perfect the interest in those files, in order to do so, you

6  have to have an underlying security agreement.  His fear was

7  lawsuits on individual investors claiming that Wes and Russ

8  as the co-managers of Validation Partners had failed to

9  fulfill their fiduciary duty because they had taken in

10  almost 70, 80 million dollars worth of money to buy

11  receivables, but they didn't perfect a single receivable

12  purchase.  And in that sense, in a proceeding like this,

13  they're treated as unsecured creditors, and Russ thought

14  that would create substantial liability for him as an

15  individual.  At that point in time, Russ had essentially

16  kicked Wes out of Validation Partners.  So, Wes couldn't do

17  anything to help Validation Partners perfect the interest of

18  the investors.  So, Wes was trying to do that but failed,

19  but he never received any payment pursuant to that

20  agreement.  He never paid the consideration called for by

21  the agreement.  In my understanding, he was withdrawing his

22  UCC1 filing, although I don't know if that's happened to

23  date.

24         MR. CUSIO:  After Mr. Thompson stopped being the

25  member of Litigation Practice Group, did he continue doing

146

1 work for Litigation Practice Group?

2          MR. DIAB:  He was listed as counsel of record on

3 certain cases.  And, in his position as counsel of record, I

4 don't know that he withdrew immediately upon relinquishing

5 his title of managing shareholder.  So, there was probably

6 matters that were active and lingered a few months after his

7 transition out as the head attorney at LPG.  But, again,

8 when you're listed on a docket, you'll stay there until some

9 form of motion is made, but I don't believe he engaged in

10 any actual after (indiscernible) after he transferred his

11 shares to Dan.

12          MR. CUSIO:  Did he continue to have access to an

13 LPG email account?

14          MR. DIAB:  I believe he did, and I believe he

15 still had access to the CRM.  I don't know that he ever

16 utilized it, but I believe he still did have some form of

17 login.  I don't know that John ever actually logged in,

18 though.

19          MR. CUSIO:  I want to make sure I got this

20 correct.  Did you say that Scott Eadie is the owner of

21 Oakstone?

22          MR. DIAB:  Correct.  My understanding is he is

23 sole shareholder and managing attorney for Oakstone.  So,

24 he'd be the sole owner.

25          (Pause.)

147

1          MR. CUSIO:  Did LPG default on its note with Pec?

2          MR. DIAB:  No.  LPG was still in compliance with

3  the terms of the Pec note at the time that it negotiated the

4  satisfaction of the note by virtue of the receivable

5  assignment.

6          MR. CUSIO:  Now, the -- you were asked some

7  questions about this earlier.  There's $120 million that's

8  listed in -- as accounts receivable over the last 90 days.

9  As I understand what you explained, that $120 million was

10 your expectation of the 20 percent -- the 20 to 40 percent,

11 20 percent with Oakstone and Phoenix and 40 percent with

12 CLG, that you expect LPG is going to receive, correct?

13         MR. DIAB:  Correct.

14         MR. CUSIO:  And then you had said that it's now

15 closer to 60?

16         MR. DIAB:  Correct.  Both were estimates.  And, as

17 you said, the strike between the 120 figure and the 60

18 figure is fallout from the transfer.  It resulted in a lot

19 more nonperformance than we anticipated.  Nonperformance

20 meaning a combination of cancellations and then clients that

21 aren't responsive and not making payments, which is

22 potentially going to turn into a cancellation.

23         MR. CUSIO:  So, when you mentioned the

24 approximately 10,000 cancellation, that was just official

25 cancellations?  Is that what I understand?

148

1          MR. DIAB:  Correct.  It doesn't include what I'll

2    call an NSF client, a client who had a bounced payment and

3    hasn't made an election of whether they're terminating the

4    agreement or not.  That number would be much larger,

5    probably another six to eight thousand clients, rough

6    estimate, but probably something like six to eight thousand

7    that are not performing and not responding.

8          MR. CUSIO:  So, if -- but if you had estimated 120

9    and now you're saying it's 60 million, that's about a 50

10   percent drop, right?

11         MR. DIAB:  Roughly 50 percent drop, correct.

12         MR. CUSIO:  But that only represents about 20,000

13   clients?

14         MR. DIAB:  Correct, and there were probably I

15   would say in the neighborhood of the high 40's, low 50's in

16   terms of performing clients at the time that -- that all

17   this began, so probably maybe about 40 percent of the

18   clients that would be in that nonperforming category, 40

19   percent of the formerly performing that are now not

20   performing.

21         In terms of determining receivable, though, some

22   clients are early in their contract and some are late.  And,

23   so, not every cancellation is going to have the same dollar

24   value.  A client that has two payments left versus a client

25   that has 20 payments left, I think would be weighted

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 167

149

1  differently.  But those are rough estimates.  They're not

2  precise figures.

3        MR. CUSIO:  Okay.  I -- sorry.  Hold on just a

4  second.  Are -- Mr. Diab, are you an owner of Validation

5  Partners?

6        MR. DIAB:  No.  I was -- so, Validation Partners

7  was owned by a couple of entities.  One of the entities was

8  StratCap, which is an entity that West Thomas owns, and Wes

9  sort of cut me into half of his entity, but I'm not myself

10 or through any entity that I own an owner in StratCap, which

11 is the indirect owner of Validation Partners, but I was

12 treated as the same thing, meaning, I was treated as though

13 I was essentially like one-quarter of Validation Partners.

14 That was from the beginning of Validation Partners, they

15 would treat me in that capacity and in that sense, sort of

16 an informal participant for Validation Partners.

17       MR. CUSIO:  What do you mean you were treated as

18 an owner, a 25 percent owner?

19       MR. DIAB:  Meaning I didn't actually -- sorry.

20 Meaning I didn't actually own anything.  There's nothing I

21 could sell.  I can't go to the bank and send a wire.  I

22 can't sign a document.  I can't sell a share, but I was

23 treated as though I could.  I was treated as though I was

24 one-fourth of the same, and Russ, to his credit, was always

25 very gracious in treating me in that same manner, as though

150

1  I were an actual owner, somebody who could actually do

2  something like sell a share, send a transfer.  So, that's

3  what I mean by informal.

4      MR. CUSIO:  Was Pec's promissory note with LPG

5  perfected?

6      MR. DIAB:  My understanding is that he did perfect

7  with the filing of the UCC.  I don't think that he filed it

8  under Pec Corp.  I think he filed it using an agent like a

9  CT Corp., but my understanding is that he did perfect it by

10 filing a UCC1.

11     (Pause.)

12     MR. CUSIO:  Okay.  I do not have additional

13 questions at this point.

14     MR. EDELMAN (telephonic):  This is Daniel Edelman.

15 I represent Carolyn Beach in the Mississippi litigation, and

16 I have some questions.

17     When Validation Partners' counsel was asking

18 questions, he referred to merchant cash advance companies.

19 Can you explain what these companies did and identify them?

20     MR. DIAB:  Yes.  So, merchant cash advance is a

21 receivable purchase.  It's styled a cash advance, but it's

22 actually just a purchase of receivables where the company

23 will buy a receivable at a factor rate.  A common factor

24 rate is a 149.  So, we would sell those dollars in

25 receivables.  We would receive them -- sorry.  We would sell

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 169

151

1 (indiscernible) in receivables.  We would only receive a

2 million dollars but have to pay $1.5 million.  So cash

3 advance is an expensive form of financing.  It almost always

4 takes the form of receivable purchase and comes along with

5 UCC1 filings and any enforcement mechanisms that are

6 available under Article 9 of he Uniform Commercial Code.  A

7 merchant cash advance companies -- sorry.  One step back.

8         LPG throughout its history has never been able to

9 qualify for financing from financial institutions, likely

10 because of the conflict of interest because we have

11 litigations for both plaintiff and defendant with every bank

12 in the country and almost every credit union.  And, so, we

13 really don't have the option to do financing through any

14 means other than receivable purchase.  Validation Partners

15 was a receivable purchase entity, but these cash advance

16 companies out of New York are also receivable purchasers,

17 and so the -- the names of receivable purchasers in New York

18 that we interacted with, World Global Fund was a large one,

19 Diverse Capital, Bridge Funding, Highbar Capital, Cobalt --

20         MR. EDELMAN:  I'm sorry.  What's the one you just

21 said?

22         MR. DIAB:  Highbar Capital, and then after that I

23 said Cobalt Funding Solutions, Cobalt, C-O-B-A-L-T.  There

24 was Clear Fund Solutions.  There was Clean Funding.

25         MR. EDELMAN:  Clean Funding?

152

1          MR. DIAB:  -- Capital -- yes, Clean Funding, Park

2   East Capital, EIN Capital.

3          MR. EDELMAN:  Can you spell -- what is this EIN

4   entity?

5          MR. DIAB:  EIN Capital, like an EIN number, is for

6   identification, but it was called EIN and then second word

7   Capital.

8          MR. EDELMAN:  Okay.

9          MR. DIAB:  There was Fundura, F-U-N-D-U-R-A.

10  There was MNS Funding, just the letters MNS and the second

11  word Funding.  There was Vertex, V-E-R-T-E-X.  And then I'm

12  trying to think of additional ones.  Green Fund was an

13  additional one.  And then MCA Cap, just the letters MCA and

14  then second word CAP.  I believe that's all of them -- I'm

15  sorry.  One more with a litigation in Florida, .69, LLC.

16         MR. EDELMAN:  .69, LLC.  Is there a list of the

17  names and addresses of these entities some place?

18         MR. DIAB:  Yeah.  The UCC1 filing in California,

19  the California Secretary of State maintains a listing of all

20  the UCC1's that were filed.  Each one of these cash advance

21  companies had filed a UCC.  Some are active.  Some are

22  terminated, but you'll see the exhaustive list there, and I

23  may have left some off.

24         MR. EDELMAN:  Okay.  You also mentioned some

25  receivable purchases.  Other than the merchant cash advance

153

1  companies, to whom did LPG sell receivables?

2        MR. DIAB:  So, LPG had I believe two different

3  receivable purchase agreements with Validation Partners,

4  LLC.  Validation Partners only attached one such agreement

5  to their complaint, but I believe that there is a second.

6  We're reviewing our records.  So, we had twice sold

7  receivables ourselves, meaning LPG sold receivables to

8  Validation Partners.  There was also a receivable assignment

9  to Pec Corporation.  It wasn't in exchange for money.  It

10 was in exchange for satisfaction of a promissory note, but

11 there was a conveyance of receivables to Pec Corporation.

12 And then that would be it in terms of the actual receivables

13 that LPG sold.

14        There were also receivables that parties that LPG

15 interacted with, they would also sell their receivables, but

16 that wasn't a contract with LPG.  That's a contract with a

17 third party, usually third party marketing companies, but

18 that's not -- not us.

19        MR. EDELMAN:  Okay.  What are these marketing

20 companies to which you refer?

21        MR. DIAB:  These are companies that locate and

22 onboard clients for LPG.  So, somebody opts in to receive,

23 you know, assistance with their debt, they get on the phone

24 with somebody.  They start talking through options, and the

25 person will say that LPG is a good fit based on your

154

1   circumstances, and then there's compensation for the cost of

2   the lead, for the time spent on the phones, for the customer

3   service function that's provided after the sale.  These

4   companies would follow up and communicate with clients,

5   quality assurance and quality control measures.  So, they're

6   compensated for all these things.  We refer to them as

7   marketing affiliates, but they're essentially sales floors

8   that -- that do marketing for LPG.

9          MR. EDELMAN:  How many of these marketing

10  companies or affiliates are there?

11         MR. DIAB:  Over the years, we've had probably more

12  than 100 that we've worked with.  Some of them have sent

13  just one client.  Some have sent 10,000.  But there's a lot

14  of different companies we've worked with.  A lot of times

15  the companies will approach us and say essentially we'd like

16  to do work.  We'd strike an agreement.  It lasts for a

17  certain period of time.  There's a lot of turnover.  So,

18  these marketing companies usually will run campaigns for a

19  period of time and then move on to something else, but well

20  over 100 that we've worked with over the course of our years

21  of existence.

22         MR. EDELMAN:  Is there a list of these marketing

23  companies somewhere?

24         MR. DIAB:  Yeah.  LPG -- we -- we maintain a list,

25  and that's something we could provide if we needed to.

155

1          MR. EDELMAN:  Okay.  What is the general

2   compensation arrangement between LPG and the marketing

3   companies?

4          MR. DIAB:  It's changed over the years.  We record

5   different models.  But typically we're paying for the work

6   that's done in onboarding clients, and that -- that

7   onboarding function sometimes there will be additional

8   follow up after the contract is signed and the client is

9   enrolled.  But, essentially for -- it's payment for all the

10  different services that are rendered.  It starts with the

11  lead itself.  Then there's the sales function, which is

12  hourly time on the phone that he sells that to the clients,

13  and then there's the function after the sale, which is the

14  QA function, the QC function, ensuring that the client

15  understood what they signed up for, doing follow-up calls

16  several days later to reiterate what it is that they've

17  signed up for, how it works.  It's compensation for all

18  these different functions that it performed.

19         MR. EDELMAN:  Do the marketing companies transmit

20  the LPG client agreement to the client?

21         MR. DIAB:  The LPG CRM's that would transmit the

22  agreement.  So, there were employees, and there were

23  contractors that were inside of the CRM generating and

24  sending these e-signature documents to clients, and some of

25  them -- some of these contractors may have been marketing

156

1  companies.  That's correct.

2        MR. EDELMAN:  Okay.  Did the marketing companies

3  receive a percentage of the revenue stream from the client

4  or a fixed amount of money for a lead or how did that work?

5        MR. DIAB:  So, over the course of the five years

6  or so that we ran this, whether it was through LPG or

7  through predecessor law firms, essentially we would employ

8  different models.  Some of them are flat fees.  Some of them

9  are a percentage of the debt that's enrolled, and some of

10 them were a percentage of the revenue stream, which we're

11 not doing at this time.  We're not doing any onboarding at

12 this time, but we have tried to get away from that model,

13 but over the years of doing business, we've pegged it to

14 every different variable there is.

15        To your point, to be direct, there were times when

16 we were paying a percentage of the receivable.

17        MR. EDELMAN:  Do you recall who the largest

18 marketing companies were?

19        MR. DIAB:  I believe the largest was All Service

20 Financial, who I think is also on the phone through counsel,

21 has a dispute with us.  And I think in the end, All Service

22 is the biggest (indiscernible) that was a really sizable

23 litigating, GoFi, GoFi, G-O-F-I, and they are multiple

24 companies.  And they were also sizable kind of enrollments.

25        MR. EDELMAN:  And who were the one or two that you

157

1 mentioned previously?

2        MR. DIAB:  I'm sorry.  Could you say that again?

3        MR. EDELMAN:  Before GoFi, you mentioned one or

4 two large marketing companies.

5        MR. DIAB:  Yes, all --

6        MR. EDELMAN:  Can you repeat that?

7        MR. DIAB:  -- Service Financial.  Yeah.  So, it

8 was three words, All Service Financial.  They were the first

9 really large marketing company we worked with, and I think

10 they're still the largest today out of everybody.

11        MR. EDELMAN:  And that's the letter L Service

12 Financial?

13        MR. DIAB:  No.  All, so A-L-L, All Service

14 Financial.

15        MR. EDELMAN:  Oh, All.  Okay.  And what's your

16 third one?

17        MR. DIAB:  Those would be the two largest.  I

18 would say the next largest was a company called Paragon

19 Financial.  Paragon spelled P-A-R-A-G-O-N, and Paragon also

20 was -- was very sizable in terms of the onboarding that they

21 did, probably be the third largest.

22        MR. EDELMAN:  Do you know -- do you recall how

23 GoFi was compensated?

24        MR. DIAB:  GoFi never had a contract with LPG.  We

25 never formalized the terms, but they would receive a one-

158

1  time payment for the service of onboarding a client, the

2  payment range on the low end maybe $1100, on the high end

3  maybe $1640, $1700, or something in that range for the

4  service of getting a client from the point of lead to sale

5  to onboarding.  But we never had a formal agreement.

6          MR. EDELMAN:  Okay.  How was All Service Financial

7  compensated?

8          MR. DIAB:  At the time that All Service did its

9  agreement, a gentleman who's now passed away, named Brian

10 Really managed that relationship, and I don't know the terms

11 that were worked out with All Service, but that was back in

12 the Coast Processing days, so when BAD was still actively

13 managing a lot of these marketing relationships, and I

14 believe that Brian had worked out a share between Coast

15 Processing and All Service, but that's all conjecture on my

16 part.

17         MR. EDELMAN:  And Paragon Financial, how were they

18 compensated?

19         MR. DIAB:  GoFi and the same sort of arrangement

20 where LPG never had a contract with them, but we would work

21 through month by month in terms of compensation for the

22 service that they were actually performing, and the Paragon

23 relationship probably started in November of 2021 and

24 probably ended November of 2022.  I don't think we've

25 received anything from them since.

159

1          MR. EDELMAN:  Does the name Integrity Docs, LLC

2    mean anything in terms of relationship with LPG?

3          MR. DIAB:  Yeah.  Integrity Docs is a marketing

4    company that we've worked with at certain points in time.  I

5    believe I know the principal of Integrity, but I know that

6    Integrity was a marketing company, yes.

7          MR. EDELMAN:  Do you know how they were

8    compensated?

9          MR. DIAB:  That I don't know.  I know that they

10   were small, meaning they didn't do a lot of volume.  They

11   didn't have a ton of -- of clients, but they did onboard

12   clients, and I don't know the terms that they had.

13         MR. EDELMAN:  Does the name Vercy, V-E-R-C-Y, LLC

14   mean anything to you?

15         MR. DIAB:  Yes.  Vercy like Integrity, was an

16   affiliate that onboarded.  They onboarded around the same

17   time that Integrity was doing so, and generally they had a

18   -- essentially, it was an arrangement where they were paid

19   up front for the work that they did, but I don't know the

20   exact terms for Vercy's contract.

21         MR. EDELMAN:  Okay.  Does the name Debt Validation

22   Fund 2, LLC mean anything to you?

23         MR. DIAB:  Yeah.  I believe that that's the fund

24   that Dave Zuck managed.  They raised money and gave money to

25   Validation Partners to purchase receivables.  I believe

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 178

160

1  that's the entity.

2          MR. EDELMAN:  Okay.  Is there a Debt Validation

3  Fund 1?

4          MR. DIAB:  Yes.  Debt -- again, if I remember

5  correct, Debt Validation Fund 1 would have been a direct

6  purchase of receivables that Dave Zuck did with Coast

7  Processing at the time where they would purchase I believe

8  it was All Service Financial clients and receive the

9  receivable from those clients in exchange for a payment that

10 was made, but that was not through Validation Partners.

11 That was something Direct that Dave did or his fund did with

12 the Coast Processing entity, if memory serves.

13         MR. EDELMAN:  Does the name MCDVI Fund 1 and 2,

14 LLC mean anything to you?

15         MR. DIAB:  Yes.  That would be the entities

16 managed by Ryan and Sean McKenna.  They had made investments

17 into Validation Partners, same purpose.

18     (Pause.)

19         MR. EDELMAN:  Does the name Flight Form, LLC mean

20 anything to you?

21         MR. DIAB:  Yes.  That was an entity that Eng Taing

22 had formed for the purpose of developing technologies that

23 would service clients in this industry.  It never got off

24 the ground.  My understanding is it never had any

25 transactions, never did any development.  It was identified

161

1  in a deposition that was taken in late January.  And, as a

2  result, Eng I think decided not to proceed with that

3  project, but that was a -- a company that he had formed for

4  the purpose of developing tech related to this industry,

5  this industry being unsecured debt.

6        MR. EDELMAN:  Does the name City Capital New York

7  mean anything?

8        MR. DIAB:  Yeah.  So, City Capital was a multi

9  cash advance company that issued I believe the -- the last

10  of all the cash advances.  That cash advance would have been

11  in February of this year, 2023, and they were a creditor,

12  received one payment, and then the filing took place, and

13  they're -- they're currently a creditor of LPG.

14        MR. EDELMAN:  Are there documents or files which

15  show the terms of LPG's dealings with these various merchant

16  cash advance companies?

17        MR. DIAB:  Yes.  For each one we have a receivable

18  purchase agreement that was executed.  Those receivable

19  purchase agreements have a security instrument underlying

20  the UCC1 filings for these entities, and we have those for

21  each one of the entities that I've referenced.

22        MR. EDELMAN:  Those are all the questions that I

23  have.

24        MR. KHANG:  Queenie, this is Joon Khang --

25        MS. SCHULMAN:  This is Amy Schulman from

162

1  Pennsylvania --

2          MR. KHANG:  We've been going for

3  about --

4          MS. SCHULMAN:  -- the Attorney General --

5          MR. KHANG:  Hold on.  Hold on.

6          TRUSTEE NG:  Mr. Kahn, go ahead.

7          MR. KHANG:  I have a question real quick.  This is

8  Joon Khang.  Yeah, we've been going for about three and a

9  half hours.  I don't know how many more creditors are on the

10  line who are going to ask more questions.  But I didn't

11  anticipate we were going to be on this call all day.

12          Is there any point that we can either cut this off

13  or continue this meeting, because, you know, unfortunately,

14  there are other matters that need to be tended to today as

15  well.  So, Queenie, is there something we can do about that?

16          TRUSTEE NG:  Well, I would like to give, you know,

17  other creditors a chance to ask questions today because

18  they --

19          MR. KHANG:  Right.

20          TRUSTEE NG:  -- waited for a long time, and I

21  think it's only, you know, the fair thing to do.  Can I just

22  get an idea of how many creditors are planning to ask

23  questions?  I know the Attorney General just --

24          MS. SCHULMAN:  Amy Schulman from the Attorney

25  General's Office in Pennsylvania.  I have just a few quick

163

1  questions.

2          TRUSTEE NG:  Okay.  And anyone else intends to ask

3  questions?

4          MR. STOCKHOLD:  Yeah.  This is Matthew Stockhold

5  on behalf of Debt Validation Fund 2, MCDVI Fund 1 and MCDVI

6  Fund 2.  I have a few follow-up questions on the schedules.

7          TRUSTEE NG:  Okay.  Anyone else?

8          MR. WHITE:  And then this is Frank White.  I

9  represent Maverick Bank Card.  I have just a small handful

10  of questions for Mr. Diab.

11          TRUSTEE NG:  Okay.  All right.  Anyone else?

12     (No response.)

13          TRUSTEE NG:  So, I think, Joon, there are only

14  three more creditors who would like to ask questions.  If

15  your client needs a break, a short break, I'll be happy to

16  do that.  Do you -- is that what you need or, otherwise, we

17  can just go ahead and, you know, ask -- let those three

18  creditors ask questions since they waited a long time as

19  well.

20          MR. DIAB:  I would prefer to just finish the

21  questions.  I don't need a break at this time.

22          TRUSTEE NG:  Okay.  Why don't we go from the order

23  of --

24          MR. MARCH:  Okay.  All right.  Let's go forward,

25  yeah.

164

1          TRUSTEE NG:  Okay.  Thank you so much.

2          MR. WHITE:  This is Frank White.  I have a small

3  handful of questions, and also I have to drop off in about

4  15 minutes.  I'm wondering if everyone can indulge and let

5  me go first.  It won't take more than a couple of minutes.

6          TRUSTEE NG:  That's fine with me.  I hope that's

7  fine with the Debtor as well.

8          MR. KHANG:  That's fine.

9          TRUSTEE NG:  Thank you so much, Counsel.

10         MR. WHITE:  Thank you.

11         Mr. Diab, again, my name is Frank White.  I

12  represent a company called Maverick Bank Card, which at

13  least until the petition date was doing some volume of

14  credit card processing for the Debtor.  I'm just wondering

15  if you're familiar with that relationship?

16         MR. DIAB:  Yes.  My understanding is that Maverick

17  would do the actual processing that approved the EquiPay and

18  was just a broker sitting in between, but I'm familiar with

19  Maverick, yes.

20         MR. WHITE:  Okay.  And are you aware whether the

21  Debtor is currently doing any processing through Maverick at

22  all?

23         MR. DIAB:  Zero processing as of March the 20th.

24  Should be zero processing.

25         MR. WHITE:  Okay.  Is there any reason why that --

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 183

165

1 the processing agreement between the Debtor and Maverick

2 can't be consensually rejected?

3          MR. DIAB:  I don't see any reason, no.

4          MR. WHITE:  Okay.  Then I'll just -- I'll reach

5 out to Mr. Khang later this week to see if we can't just

6 consensually arrange for that.  That's all I needed to know.

7 Thank you.

8          MR. DIAB:  Thank you.

9          MS. SCHULMAN:  If anyone wouldn't mind, this is

10 Amy Schulman from the Attorney General's Office.  I just

11 have some very quick questions, and I also have to jump off

12 the -- as well.

13          TRUSTEE NG:  Go ahead, Ms. Schulman.

14          MS. SCHULMAN:  Okay.  So, again, I'm calling from

15 the Pennsylvania Attorney General's Office here in

16 Pennsylvania, and we have received several complaints from

17 consumers who allege they paid LPG for debt settlement

18 services that were not provided.  So, I have a few questions

19 stemming from this.  Number one, where should we be sending

20 the complaints?  We had previously sent them to LPG for

21 purposes of mediation, and those complaints were not

22 responded to, and I would like to get a response to those

23 complaints.

24          MR. DIAB:  The best is if you could send it by

25 email.  Is that possible if I give you an email address?

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 184

166

1          MS. SCHULMAN:  Okay.  Should I send them to --

2    yes, you or your counsel, just --

3          MR. DIAB:  If it's okay, it would be direct to us,

4    and it would be attention to Dan March and Tony Diab, and it

5    would be the email address, admin, A-D-M-I-N, @lpglaw.com.

6          MS. SCHULMAN:  Okay.  Next question, given the

7    fact that these accounts have largely been -- have been

8    transferred, can you identify the affiliated law firms here

9    in Pennsylvania that have received transfer of Pennsylvania

10   accounts?

11         MR. DIAB:  The -- the attorneys that are licensed

12   in the State of Pennsylvania that would be handling the

13   accounts from this universe of cases would be Jordan Kurth

14   (phonetic), Kelly Adams --

15         MS. SCHULMAN:  Can you -- I'm sorry.  Can you

16   spell these?

17         MR. DIAB:  Yes.  So, Jordan, J-O-R-D-A-N, Kurth,

18   K-U-R-T-H.  He's the first.  Kelly Adams is the second, K-E-

19   L-L-Y and then Adams, A-D-A-M-S.  The third would be Robert

20   Tobia.  Last name is spelled T-O-B-I-A.  And then the fourth

21   would be -- give me one second.

22      (Pause.)

23         MS. SCHULMAN:  And if you don't have the names, I

24   can follow up by way of email.  I don't want to hold

25   everyone up.

*Briggs Reporting Company, Inc.*

167

1           MR. DIAB:  So, for the fourth one, I'll follow up

2    by email in response, yes.

3           MS. SCHULMAN:  Okay.

4           MR. DIAB:  Thank you.

5           MS. SCHULMAN:  Next quick question.  Did anyone

6    from LPG ever meet in person or face to face with

7    Pennsylvania consumers in connection with these debt

8    settlement services?

9           MR. DIAB:  Yes.  Employee Jordan Kurth, our

10   attorney in the State of Pennsylvania, would have had a lot

11   of face-to-face meetings.  It would not have been with every

12   Pennsylvania client but with a certain portion of that

13   population.  So, Jordan would be the only LPG employee to

14   have met face to face.  There was a contractor, the fourth

15   law firm, that I can't recall at the moment.  They would

16   also have had meetings, but they were contractors of LPG,

17   not employees.

18          MS. SCHULMAN:  Okay.  Do you have any sense of how

19   many of the accounts entered into with LPG were with

20   Pennsylvania consumers?

21          MR. DIAB:  I would say the Pennsylvania pipeline,

22   again, at its peak was probably -- probably 2,000 to 2500

23   clients I would imagine, no more than that.

24          MS. SCHULMAN:  And I just want to confirm that LPG

25   is no longer soliciting business in Pennsylvania, is that

168

1  correct?

2          MR. DIAB:  That's correct.

3          MS. SCHULMAN:  Okay.  And those are all my

4  questions today.  If for some reason additional questions

5  come to mind I'll reach out to that address at

6  admin@lpg.com.  Thank you everyone.  I really appreciate it.

7          TRUSTEE NG:  Thank you.  Thank you, Ms. Schulman.

8          MR. STOCKHOLD:  Hi.  This is Matt Stockhold

9  appearing on behalf of Debt Validation Fund 2, MCDVI Fund 1,

10  and MCDVI Fund 2.  I have a few follow-up questions.

11          On Schedule B, going back to the receivables for

12  $120 million, was any portion of that included in the $155

13  million dollar amount of revenue reported for 2022?

14          MR. DIAB:  No.  It should not have been.  It

15  should have been separate from that.

16          MR. STOCKHOLD:  And, along the same lines, is any

17  of that amount reported as part of the $30 million for the

18  first three months of 2023?

19          MR. DIAB:  Yes.  So, part of what was collected in

20  -- in 2023 may have overlapped with the $120 million figure.

21  The exact dollar amount of overlap I'm not sure, but there

22  would have been some overlap, yes.

23          MR. STOCKHOLD:  On the statement of financial

24  affairs, it says the gross income for the first three months

25  was $30 million.  Is that accurate?

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 187

169

1         MR. DIAB:  Correct.  But included in that figure

2    is payments processed by Merrich Bine and retained by

3    Merrich Bine and not sent to LPG.

4         MR. STOCKHOLD:  And of those amounts, are those

5    included in the receivables?

6         MR. DIAB:  There would have been some overlap

7    between the receivable quote of $120 million and payments

8    that would have been collected in March, but the amount of

9    overlap I'm not sure, but they would have been sent.

10        MR. STOCKHOLD:  Also on Schedule B you listed

11   $120,000 for a customer list.  What's the basis for that?

12        MR. DIAB:  So, in terms of viewing what LPG has as

13   a -- as an asset, something potentially of value, when you

14   review the matter, one thing that LPG possesses are client

15   data for clients that did not sign up for LPG services,

16   people that were in one way or another sold but didn't sign

17   up.  And, so, if we were to take that data, pool it and sell

18   it, we think that the estimated value would be $120,000.  We

19   don't think the State Bar would let us do it, but we

20   reported that as a potential asset since we didn't have time

21   to resolve the question of whether that type of sale of opt-

22   in data was permissible, but that's what we're referring to

23   would be a sale of leads of people that did not sign up for

24   client -- for LPG services, but we have their opt-in to

25   receive solicitation regarding debt resolution.

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 188

170

1          MR. STOCKHOLD:  Did you obtain an appraisal of the

2   value of that list or is that something that you determined

3   internally?

4          MR. DIAB:  That's based on what marketing

5   companies tell us they would pay for records for opt-in

6   methods, meaning a client that is saying they want help with

7   unsecured debt.  This is what you would do, for instance,

8   pay for records, but it was determined by us anecdotally.

9   It was not appraised.

10          MR. STOCKHOLD:  On Schedule D, which lists

11  creditors who have secured claims, the first creditor on the

12  list is Diverse Capital, LLC in the amount of approximately

13  $1.2 million.  What's the basis for this claim?

14          MR. DIAB:  We -- we dispute the claim, but Diverse

15  Capital has entered into a settlement agreement with LPG.

16  LPG believes that it performed under the settlement

17  agreement.  Diverse believes that we did not perform.  And

18  on the basis of nonperformance, the original obligations

19  spring back into existence.  And, so, they're saying the

20  balance due after applying all payments on the

21  (indiscernible) is that $1.1, $1.2 million figure, but that

22  is predicated on a breach of the settlement agreement, and

23  we deny that there was any breach of that agreement, but

24  that's where they calculate the figure.  That's what would

25  be left over after applying all payments, including

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 189

171

1 settlement payments, to the original contractual obligation.

2 The balance owed would be that number that they quoted.

3        MR. WHITE:  Did they file a UCC1 financing

4 statement?

5        MR. DIAB:  Diverse did.  They filed it I believe

6 in December of 2021, but they filed it long ago.

7        MR. WHITE:  Do you know what they listed as

8 collateral in that statement?

9        MR. DIAB:  All accounts receivable of LPG was --

10 that's the standard language that was used in those UCC1's.

11        MR. WHITE:  Moving on to the next creditor, City

12 Capital New York, the amount of the claim is approximately

13 $2.9 million.  Is that a similar arrangement?

14        MR. DIAB:  No.  So, in the case of City Capital,

15 that was an advance that was taken in February while we were

16 trying to get through the period of time where payments were

17 being collected by Merrich Bine and not remitted to LPG.

18 So, we took a cash advance from Star Capital in February.

19 Despite that cash advance, we weren't able to stay afloat,

20 and so we defaulted on that position, but that was a new

21 agreement in February with Star, and it was an agreement

22 that we admittedly defaulted on.  We made one payment of

23 $50,000, and no other payments were made.

24        MR. WHITE:  And that was February of 2023?

25        MR. DIAB:  Correct.  That's when that position was

172

1 taken and the loan payment was made.

2          MR. WHITE:  Do you know if City Capital recorded
3 UCC1?

4          MR. DIAB:  They -- I do not believe that they did,
5 but I believe that they're related to an entity called BMS
6 Advance, LLC that did have a UCC1 previously recorded.  My
7 belief is that they're utilizing the BMF UCC1 that an
8 assignment took place, but I don't have verification of
9 that.  That's simply my belief in terms of how this industry
10 operates.

11          MR. WHITE:  Does the Debtor dispute this claim?

12          MR. DIAB:  No.  I don't believe that we have a
13 dispute as to the balance or the -- the claim.  There may be
14 a dispute as to whether it's cured because we don't know
15 whether it was perfected, but that would be the only open
16 question, not the balance or not the fact that it was a
17 default.

18          MR. WHITE:  To the extent that the Debtor plans to
19 challenge the validity or perfection of the lien, did you
20 amend the schedule to list it as disputed?

21          MR. DIAB:  Yes, we did.

22          MR. WHITE:  The next creditor on this is Fundura
23 Capital Group, listed as disputed, amount of $2.1 million.
24 Do you know if Fundura recorded a UCC1?

25          MR. DIAB:  Fundura recorded a UCC1 after the

173

1  initiation of litigation.  They filed suit in August of

2  2021, and we filed a counterclaim.  It didn't have a UCC1

3  filing.  They attempted to utilize the UCC1 of a related

4  company called Bridge Funding, but Bridge Funding's UCC had

5  been satisfied by a settlement.  The settlement was

6  consummated, paid in full, and the UCC1 of Bridge was

7  withdrawn.  When Fundura realized that -- that Fundura --

8  I'm sorry.  When Fundura realized that Bridge didn't have a

9  valid UCC1 on file, they attempted to file late.  They filed

10 in October I believe of 2021, but we're disputing that UCC1

11 as invalid.  It came after the filing of the lawsuit and

12 after we had successfully disputed the Bridge UCC1.  So, our

13 position is that it's an unsecured -- it's an unsecured

14 position that Fundura has, but also Fundura is an actual

15 loan.  Their receivable purchase agreement was paid in full,

16 and they attempted to do a no net renewal.  They attempted

17 to do a refinance where they simply increased the balance

18 that was owed.  That's not valid under New York law in our

19 position.  And, so, we're actually anticipating getting

20 money back from them.  We believe we overpaid them.  But on

21 the UCC issue, we don't believe they have a valid UCC1

22 filing of their usual filing, the filings they made in

23 October of -- of '21.

24          MR. WHITE:  Do you know what they listed as the

25 collateral securing the lien?

174

1          MR. DIAB:  It would have also said all accounts

2    receivable current and future.

3          MR. WHITE:  Does the Debtor anticipate filing an

4    adversary proceeding to challenge this claim?

5          MR. DIAB:  We already have -- so, we have the

6    active (indiscernible) claim.  We intend on removing the

7    action from New York State Court to this court, and so that

8    removal would likely be filed in the coming weeks.

9          MR. WHITE:  There are a number of creditors that

10   filed UCC1 financing statements that are not listed on

11   Schedule D.  So, I'll go through those just to see if the

12   Debtor's aware of them or what the relationship is.

13         Are you aware of an entity called Liberty Fund

14   Group?

15         MR. DIAB:  Yes.  Liberty had a position that was

16   satisfied in full.  THAT UCC1 should have been withdrawn.

17         MR. WHITE:  And you mentioned earlier StratCap

18   Management, LLC also appears to have filed a UCC1.  Do you

19   know what the status of that is?

20         MR. DIAB:  I believe they're withdrawing the UCC1,

21   but the underlying security agreement was never consummated.

22   So, it wouldn't be a valid UCC1 in any event, but I believe

23   they're withdrawing that.

24         MR. WHITE:  How about Franklin Capital Management,

25   LLC?

175

1          MR. DIAB:  Franklin Capital was a company that we

2   discussed a loan with.  They filed a UCC1 before any

3   documents were executed.  They asked us not to proceed with

4   it, but they never withdrew their UCC1 filing.  So, again, I

5   think it's an invalid UCC1 for lack of underlying security

6   agreement.

7          MR. WHITE:  Everyday Funding Group?

8          MR. DIAB:  Everyday Funding would have been an

9   entity related to Park East Capital and MCA Cap.  They did

10  have a position.  It was satisfied in full.  The UCC1 was

11  supposed to be removed as a result of that settlement.

12         MR. WHITE:  Are you familiar with Green Fund New

13  York?

14         MR. DIAB:  Yes.  Again, that was an entity with

15  which we settled.  We settled in full.  They were supposed

16  to terminate the UCC.  They never did.

17         MR. WHITE:  And you mentioned earlier World Global

18  Fund, LLC.  Are you aware of their UCC1 statement?

19         MR. DIAB:  Yes.  World Global had a UCC1 that was

20  filed, and a related entity, MNS Funding, had a UCC1 that

21  was filed.  Both have been satisfied.  I take that back.

22  World Global has been satisfied in full.  That one should

23  have been terminated.  MNS has a dispute as to whether

24  there's a balance still owed.  They haven't taken any action

25  on that, but they allege that there's a balance owed, and

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 194

176

1  that's why they're refusing to withdraw the UCC1 that

2  (indiscernible) between us and MNS.

3          MR. WHITE:  Is there a reason the Debtor did not

4  include MNS Fund in its Schedule D?

5          MR. DIAB:  No.  That's just an oversight.  We'll

6  have to add them based on what they're claiming is still

7  owed.  So, that's one that would have to be added.  We do

8  believe we satisfied it, but they -- I mean (indiscernible)

9  that's included in the amended schedule.

10          MR. WHITE:  What about MCA Capital Holdings, LLC?

11          MR. DIAB:  That is another entity that we had a

12  resolution.  We paid them in full.  They were supposed to

13  terminate their UCC1.

14          MR. WHITE:  BMF Advance?

15          MR. DIAB:  Similarly satisfied in full.  They had

16  filed a dismissal of the action in New York State Court

17  (indiscernible), but they still have their UCC1.  We believe

18  that City Capital is going to borrow that UCC1 and that's

19  why they haven't terminated, but they haven't formally

20  stated that to us.

21          MR. WHITE:  Would you amend the Schedule D to add

22  them then?

23          MR. DIAB:  BMF is not the one with the position.

24  Star Capital is, and so Star Capital -- not Star Capital,

25  sorry -- City Capital.  City Capital is listed as a -- as a

177

1  creditor, and City Capital is the one that would be using

2  the UCC1 to enforce the City Capital loan or advance I

3  should say.

4          MR. WHITE:  (Indiscernible) Franklin Capital

5  Management, LLC.  What about Franklin Capital Group, LLC?

6          MR. DIAB:  It's the same entity.  They filed two

7  different UCC's, but we didn't proceed with either entity as

8  a -- as a creditor.  So, they don't have any underlying

9  security agreement.

10          MR. WHITE:  And the next one is OHP LPG, LP.  Are

11  you familiar with that entity?

12          MR. DIAB:  Yes, but OHP had purchased receivables

13  of marketing companies, third parties, not of -- of LPG.

14  So, they shouldn't be filing a UCC1 on LPG.  They should

15  file it on the -- the marketing companies themselves, but --

16  but I'm aware of who they are and the fact that they filed a

17  UCC1.

18          MR. WHITE:  What about Proof Positive, LLC?

19          MR. DIAB:  That's similar.  Proof Positive has

20  purchased affiliate receivables but filed a UCC1 on LPG even

21  though LPG is not a party to the Proof Positive security

22  agreements.  So, I think it was just an erroneous filing,

23  but we're aware of who they are and the fact that they've

24  filed a UCC1.

25          MR. WHITE:  Are you aware of the fact that Debt

178

1 Validation Fund 2, LLC, MCDVI Fund 1, LLC, and MCDVI Fund 2,

2 LLC filed UCC1 statements?

3         MR. DIAB:  Yes, I'm aware of those filings.  I

4 believe they took place in January.

5         MR. WHITE:  Is there a reason they were not -- is

6 there a reason they were not listed on Schedule D?

7         MR. DIAB:  So, those -- so, for two reasons.  The

8 underlying agreement had been breached before the filing of

9 the UCC1.  So, we don't believe that there's an underlying

10 security agreement that would rise to a valid UCC1 filing,

11 and at the second (indiscernible), we believe that that

12 filing was in the preference period, and we're going to

13 avoid it, but we consider them to be at most an unsecured

14 creditor and at least a debtor that owes us money for what

15 they took pursuant to those agreements that they breached.

16 That's our position on that subject.

17         MR. WHITE:  So, that was on Schedule F?

18         MR. DIAB:  I'm sorry.  Could you say that again?

19         MR. WHITE:  Did you list them on Schedule F?

20         MR. DIAB:  I know that they were listed on one of

21 the schedules, but I believe they were listed as an

22 unsecured creditor.

23         MR. WHITE:  You mentioned in your earlier

24 testimony a number of other entities such as .69, LLC, Green

25 Fund, Vertex, Highbar, Cobalt Funding.  Do any of those

179

1  entities have UCC1 financing statements on file?

2         MR. DIAB:  Yeah.  I think almost all of them have

3  UCC1 financing statements.  Some have terminated.  Some have

4  chosen not to terminate even though they should terminate

5  them, but I believe each one of those having a UCC1 at some

6  point.  A lot of the times they would file the UCC's under

7  CT Corporation, CFC or -- or some other agent for service of

8  process, but they -- so, they would file anonymously, but

9  they had UCC1's that are filed.

10        MR. WHITE:  But the Debtor took the position not

11  to list those on Schedule D?

12        MR. DIAB:  Yeah.  So, the -- the actual agreements

13  were satisfied.  There's no balance owed, and the UCC1's

14  that remain active are erroneous, should be terminated.

15        MR. WHITE:  Is there an employment agreement with

16  Mr. March?

17        MR. MARCH:  Yes.

18        MR. DIAB:  Mr. March -- and, yeah, his employment

19  with LPG, yes, he's got an employment agreement.

20        MR. MARCH:  Yes.

21        MR. WHITE:  Was there any amount owed to Mr. March

22  as of the petition date?

23        MR. DIAB:  Under -- as I said earlier, he was

24  shorted in the year 2022, but he voluntarily agreed not to

25  receive that additional compensation and in that sense is

180

1  not a creditor.  But he -- he was short in his -- his

2  contractual compensation for the year 2022.

3          MR. WHITE:  Does he intend to file a claim against

4  the Debtor?

5          MR. DIAB:  No.

6          MR. WHITE:  Is there any money owed to any

7  employees as of the petition date?

8          MR. DIAB:  Yes.  There are, I believe, two pre-

9  petition payrolls that were missed and one post-petition

10  payroll that was missed.  No, I take that back, now two.

11  So, two pre-petition and two post-petition payrolls that are

12  outstanding.

13          MR. WHITE:  And, Mr. Diab, the testimony earlier

14  was that somewhere around early 2021, you no longer received

15  compensation directly from the Debtor but it went through

16  the LLC's, and the reason for that was mentioned that it was

17  because it was Mr. Diab's background or to limit it.  Can

18  you provide more insight on that?

19          MR. DIAB:  Yeah.  One of the reasons was

20  background because of my disbarred status.  It raises

21  questions when my name appears on payroll records or any

22  other record.  So, we tried to eliminate that potential

23  source of prejudice against LPG by eliminating the use of my

24  name on -- on anything.  And, so, for that reason, the

25  payment would go to one of these LLC's, and then the LLC in

181

1 turn would pay me some portion.  But that decision was made

2 mostly because of the reaction that we would get when --

3 when that name was found on -- on a record.

4          MR. WHITE:  Before the disbarment, did you

5 practice law in California?

6          MR. DIAB:  Yes.  I was practicing law in

7 California and Nevada.  I had done so since 2010 in

8 California and 2012 in Nevada.

9          MR. WHITE:  And when -- when were you disbarred?

10          MR. DIAB:  Would have been -- it took effect in

11 January 2019.  I believe for both right about the same time

12 or right around --

13          MR. WHITE:  So, was that in California or Nevada?

14          MR. DIAB:  I believe they both entered orders --

15 sorry.  Nevada went first, but Nevada would have entered an

16 order right around January of 2019, and I think it was

17 actually February the 11th, 2019 that the -- that the

18 California Bar entered their involuntary inactive status,

19 and that's when LPG wanted to take over matters that I had

20 previously been handling.  This is now February 2019.

21          MR. WHITE:  So, what were the grounds for the --

22 what were the grounds for the disbarment?

23          MR. DIAB:  Both disbarments were related to the

24 same underlying representation.  It was the representation

25 of a (indiscernible) named Bashal Shamaria (phonetic) that I

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 200

182

1  was undertaken.  He was a Las Vegas resident, and the

2  representation was in Nevada under the Nevada rules.  There

3  was also one small civil matter in the State of California

4  that I was handling for Bashal, and I was doing those

5  representations moonlighting while I was at a firm.  So, I

6  was employed at Shakardi and Fagan as an attorney and then

7  handling this -- these group of matters for Bashal on the

8  side essentially, and it was going through that

9  representation that the Nevada Bar made their -- you know,

10 their findings and decided to charge.  And when they issued

11 their charging document, I took a default and choose to

12 allow the disbarment to take place in Nevada.  California

13 then came in with a reciprocal action.  After the disbarment

14 started in Nevada, California essentially said the same, and

15 I did the same thing where I took a default in the

16 California proceeding, chose not to participate, and the

17 default was entered right around February 11, 2019, and I

18 remember the date because we had a deposition that same day,

19 and it was the last deposition that I did, and then right

20 after that, the involuntary inactive set in.  And then about

21 a week later, LPG was formed.

22          MR. WHITE:  And LPG was formed to take over your

23 client files?

24          MR. DIAB:  Yeah.  So, essentially all the files

25 that were being handled by the entity as a sole

183

1  proprietorship called Diab Law, all those entities had to be

2  moved to another law firm.  And, so, John had agreed to

3  launch LPG primarily to handle the Debtor cases that are

4  still the LPG, you know, pipeline to this day.  In addition,

5  there were, I don't know, 40 or 50 other cases that LPG took

6  on, everything from wrongful death to intellectual property

7  to employment law.  And all those matters were taken over by

8  LPG, and it's something that the State Bar was informed of

9  at the time.  When the involuntary inactive status set in,

10 we had to find counsel in short order because no appearances

11 were permissible.  And, so, the cases were all moved from

12 Diab Law to LPG in February 2019.

13       There's another attorney in addition to John

14 Thompson named Clara Young that was handling a lot of the

15 cases for Diab Law, and she continues to handle them as an

16 employee of LPG.  And, so, those cases were continued.  The

17 same attorney was handling them, the -- the associate,

18 Clara.  And, so, she just moved from one firm to the other

19 and continued to handle those same batch of cases.

20       MR. WHITE:  Do you know if LPG has any liability

21 stemming from the disbarment?

22       MR. DIAB:  No.  There was no overlap on the

23 disbarment aspect, but there was some liability related to

24 some of the cases that were transitioned, which LPG resolved

25 years ago.  There's some clients at the point of transition

184

1 that didn't -- essentially they were complaining about the

2 representation that Diab Law had rendered.  But now that

3 they were represented by LPG, LPG satisfied the dispute and

4 essentially settled with the clients.  There was a handful

5 of them.  This happened back in 2019 when the files were

6 transferred, but nothing stretched beyond that in 2019, at

7 least not that I'm aware of.

8         MR. WHITE:  Was there ever a criminal referral

9 relating to this disbarment?

10         MR. DIAB:  No, none, in Nevada or California.

11         MR. WHITE:  Turning to the list of the creditors

12 that have the 20 largest unsecured claims, there are a

13 number there that are listed as disputed.  I know you listed

14 my clients' claims as disputed and gave the reasons why

15 regrettably they're disputed.  What about Merrich Banes?

16 There was a claim for $8 million.  What's the basis for that

17 dispute?

18         MR. DIAB:  So, Merrich Bine was owed money on

19 receivable purchase agreements (indiscernible), but based on

20 what (indiscernible) like the damage caused by the payment

21 processing dispute in February and March, we don't believe

22 that we continue to owe them.  We think, if anything, we're

23 a net creditor because the damage was substantial, but

24 that's a difficult matter to have to be litigated, but on

25 paper they would still be owed but for the fact that they

185

1  collected payments and refused to send that, those amounts

2  to LPG and, thereby, caused damage.  If you take that away,

3  they would still be owed an additional I think roughly $8

4  million.  I believe that they believe the number to be

5  larger.  So, that $8 million figure is disputed, but whether

6  anything is owed is also disputed on account of the conduct.

7  That will require an adversary proceeding to resolve.

8          MR. WHITE:  Validation Partners, LLC is listed as

9  having a $25 million claim that is disputed.  What's the

10  basis for that dispute?

11          MR. DIAB:  The $25 million figure came from the

12  complaint that Validation Partners filed, and the dispute is

13  twofold.  One is that we also have a credit against

14  Validation Partners for the assignment from Pec Corp. for

15  about $28 million, which would make Validation Partners a

16  net debtor, not a net creditor.  But separate from that, we

17  don't believe there's any support for -- we don't believe

18  there's any support for the $25 million figure.  We think at

19  most the amount that would be owed, forget about our

20  assignment and our claims, the amount that would be owed

21  would be around $14 million, maybe $15 million, not $25

22  million to Validation Partners.  That's based on their

23  actual contract.  So, it's a two-part dispute.  One is we

24  don't think the $25 million is correct.  We think that

25  they're a net debtor and owe money to LPG and to the

186

1 bankruptcy estate.

2          MR. WHITE:  Business Centers of America is listed

3 as disputed in the amount of $2.4 million.  What's the basis

4 for that dispute?

5          MR. DIAB:  Business Centers of America had an

6 agreement with Coast Processing, the entity that I

7 referenced earlier.  They never had an agreement with LPG,

8 but we believe that they were claiming that LPG owed them

9 money.  They subsequently filed a lawsuit and did not name

10 LPG.  So, they may also join in stating that LPG does not

11 owe them any money, but -- but the claim had been made by

12 Business Centers of America that they are owed $2.4 million

13 and that LPG has to pay it as the company servicing the

14 clients that were relevant to the receivable purchase that

15 Business Centers of America made.  So, we reported it as

16 disputed, but the nature of that dispute is that LPG never

17 undertook an obligation to Business Centers of America.

18 Another entity did, and we think that they agree by virtue

19 of the fact that they filed suit and did not bring LPG, but

20 they haven't stated it a release of LPG in any way.  So,

21 they still have a question about whether LPG is liable.

22          MR. WHITE:  The Debtor is also disputing a $1.4

23 million claim by J.P. Morgan Chase for a corporate credit

24 card.  What's the reason for that dispute?

25          MR. DIAB:  So, there's a dispute about what amount

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 205

187

1  was owed on the corporate credit card account that LPG has

2  to J.P. Morgan Chase.  We think that they're adding interest

3  and fees that they're not allowed to add to the balance that

4  was owed, and so we're disputing the amount.  We're not

5  disputing whether there's something owed, just how much is

6  owed as of today.

7       MR. WHITE:  The Debtor's also disputing a

8  approximately $250,000 claim for Outsource Accelerated,

9  Limited, an offshore call center.  What's the basis for

10  that?

11       MR. DIAB:  Yes.  Outsource Accelerated would bill

12  in advance before the services were rendered, sort of like a

13  retainer, and then they would pull from the amount as they

14  would render services.  We terminated their agreement, and

15  they still wanted us to prepay for a month of service even

16  though we weren't going to utilize them.  So, we disputed

17  the amount of the claim.  We think that they provided may 10

18  or 20 thousand dollars worth of service but not $250,000,

19  and they still wanted us to prepay the entire month, and we

20  believe it's because they were going to take that money and

21  keep it, but we didn't see any contractual right for them to

22  demand that amount.  So, that's the dispute there is that

23  they wanted to prepay even though we'd agreed they weren't

24  going to provide the services.  So, we weren't going to

25  prepay that amount.

188

1          MR. WHITE:  Net Suite Oracle is listed as being

2     owed $100,000 for bookkeeping software.  Why is that

3     disputed?

4          MR. DIAB:  Well, we attempted to switch from

5     Quickbooks to Net Suite in 2022.  The transition didn't

6     work, and Net Suite, who had assured us that it would,

7     continued to work with us for about six months and could not

8     get the data imported over.  It made our books a mess for

9     the year 2022, but because their platform didn't work, we

10    instructed them that we're not going to pay them, and we

11    switched back to Quickbooks.  I think -- obviously I think

12    that they're disputing that and they're still pursuing

13    collection, and that fee would have been their licensing

14    fee, but the licensing fee in our opinion (indiscernible)

15    because we didn't end up using Net Suite and because Net

16    Suite failed to import the information over to Quickbooks,

17    which caused substantial damage on the accounting side.

18         MR. WHITE:  Moving on to Schedule G, Executory

19    Contracts, besides the office leases and the lease with

20    Sharp Electronics, the Debtor listed some contracts with

21    California clients, but there are no other contracts listed

22    on Schedule G, for example, for the -- with the law firms

23    that the client files were transferred to or any other.

24         Is the Debtor going to amend Schedule G to include

25    all of its contracts?

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 207

189

1          MR. DIAB:  Yeah.  I believe the Schedule G is one

2     of the -- the schedules that would have to be amended.  So,

3     I do believe that an amended schedule will be filed.

4          MR. WHITE:  I have a few questions to finish up.

5     Does Mr. March, is he still working on the approximately 400

6     to 600 California cases that remain?

7          MR. DIAB:  Yes, he is.  He's handling those, and I

8     can allow him to speak obviously to that issue.

9          MR. MARCH:  Yes.  Yes, we are.

10         MR. WHITE:  And, as I understand from your prior

11    testimony, there's no current revenue stream for those

12    cases?

13         MR. MARCH:  That's correct.

14         MR. WHITE:  So, is the only monthly revenue from

15    the law firms that are paying 20 or 40 percent, is that

16    correct?

17         MR. MARCH:  Yes.

18         MR. WHITE:  And approximately how much each month

19    do you anticipate receiving from those firms?

20         MR. DIAB:  When the payments are processed, per

21    the usual, meaning they're out of the range of damage caused

22    by the payment processing dispute with Merrich Bane.  We

23    anticipate it will be roughly $2 million a month that would

24    come through from its resources.

25         MR. WHITE:  And of those $2 million, is the Debtor

190

1  entitled to all of those as earned fees or does a certain

2  amount of that pass through to other entities or, for

3  example, as part of -- you described three buckets of

4  services.  One was, you know, resolving debts on behalf of

5  individuals.  Does the Debtor provide services such as

6  collecting installment payments and then negotiating with

7  those clients' creditors to pay them off or does the Debtor

8  retain all those funds?

9       MR. DIAB:  All of those funds would be retained.

10  Those funds are earned services fees paid to these other

11  three law firms that would be passed through on this

12  referral agreement.  So, all of that money would be retained

13  by LPG and obviously available to fund a plan.

14       MR. WHITE:  So, based on the $2 million in

15  revenue, what's the net income per month do you estimate?

16       MR. DIAB:  Roughly $1.75 million, with the cost,

17  roughly $250,000.

18       MR. WHITE:  And the 90 days leading up to the

19  bankruptcy case, the Debtor generated approximately $30

20  million in income but only paid City Capital.  Is there a

21  reason no other creditors were paid during that period?

22       MR. DIAB:  About 12 to 14 million out of that 30

23  was being held.  And, so, that money wasn't available to us.

24  It's still essentially being held by Merrich Bine.  So, the

25  amount that was actually available to us was much less and

191

1  went towards operating expenses mostly in January, but the

2  reason that more wasn't paid to either City Capital or any

3  other creditor is that the money was used for operating

4  expenses, and roughly half of it is not in our possession.

5  It's being held by the processor.

6       MR. WHITE:  And what was the basis for saying this

7  was an improper holding by Merrich Bine?

8       MR. DIAB:  Merrich Bine is a creditor and a

9  payment processor.  Under the agreement, they're permitted

10 to hold the money that was currently due and owing under

11 their creditor status as a receivable buyer, and the

12 remaining amount was supposed to be remitted to LPG.  The

13 remaining amount wasn't remitted to LPG, and that's the

14 amount that we believe rightfully belongs to us and is being

15 withheld, in violation of the contract between the parties

16 and also violation of law.  They don't have the right to

17 hold.  And if you're going to hold in the payment process,

18 you're have to give notice to the individual clients that --

19 that the third party is holding the funds, and no such

20 rights were given to our clients that Merrich Bine was

21 holding funds of the clients.  So, that's -- that's our

22 position on Merrich.

23      MR. WHITE:  And in the year leading up to the

24 filing, Mr. March testified that he received approximately

25 $100,000 per month.  Were there any other payments made to

192

1 officers or directors of the Debtor during that one-year

2 period?

3          MR. DIAB:  No.

4          MR. WHITE:  Did Mr. Diab receive any payments

5 during that period?

6          MR. DIAB:  During the year 2022?  No.  There were

7 -- (indiscernible) there were indirect payments made to

8 Strategic Consulting Solutions that were made back to LPG so

9 that it was a net zero at the end of the year.  So, for the

10 year as a whole, it was a net zero, but there was roughly

11 $480,000 sent to Strategic Consulting before it was sent

12 back to LPG.

13          MR. WHITE:  During that one-year were there any

14 payments made by the Debtor to any relatives of Mr. March?

15          MR. MARCH:  No.

16          MR. DIAB:  No.  I'm sorry.

17          MR. WHITE:  And same question for you, Mr. Diab,

18 any payments made to any of your relatives by the Debtor

19 during that one-year period?

20          MR. DIAB:  No.

21          MR. WHITE:  And were there any payments made to

22 any other insiders during the year leading up to the

23 bankruptcy filing?

24          MR. DIAB:  Did you say any other insider payments?

25 No.

193

1          MR. WHITE:  Those are all my questions for now.

2     Thank you.

3          TRUSTEE NG:  Thank you.

4          Are there any other creditors who would like to

5     ask questions?

6       (No response.)

7          TRUSTEE NG:  I just have a couple of follow-up

8     questions.  The Debtor indicated that they're moving to a

9     new address.  So, the Debtor needs to file a notice of

10    change of address with the Court with the new address.

11         The Debtor mentioned earlier that it missed two

12    pre-petition payroll.  I think that's what they said, and

13    then I don't recall seeing any employees listed in Schedule

14    E or F.  So, that looks like it has to be amended.

15         And, finally, I think the Debtor indicated that

16    Mr. March has an employment agreement with LPG.  I don't

17    think that's listed in Schedule G, and I'd also like a copy

18    of the employment agreement.  So, that's all the --

19         MR. MARCH:  Okay.

20         TRUSTEE NG:  -- information I have.  And I hear no

21    further response from anyone wanting to question the Debtor.

22    So, the matter is being concluded, and I want to thank

23    everyone for coming today.  I appreciate your help, Mr.

24    Khang and Mr. Diab and Mr. March.  Thank you so much.

25         UNIDENTIFIED SPEAKER:  Thank you.

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 212

194

1          MR. SHANKMAN (telephonic):  This is Paul Shankman.

2    I have a few questions.

3          TRUSTEE NG:  Okay.  Can you please go ahead.

4    Thank you.

5          MR. SHANKMAN:  Yes.  This is Paul Shankman of

6    Fordis, LLP, and I represent Creditor Outsource, which is a

7    provider of employee services to the Debtor.  We have filed

8    a claim, Number 13, for over $300,000.  I have just a few

9    questions.

10          The Debtor had mentioned that the payment

11    processors were holding I believe several million dollars

12    which the estate contends should be property of the estate

13    and contemplates acting towards recovering those moneys.  Is

14    that correct?

15          MR. DIAB:  Correct.

16          MR. SHANKMAN:  And is there any reason why over a

17    month has passed since the filing of the case and no action

18    has been taken before the Court to do so since that seems to

19    be part of the lifeblood of the restructuring of this

20    estate?

21          MR. DIAB:  We have two issues.  One was an attempt

22    to voluntarily (indiscernible) with Merrich Bine, and that

23    conversation has been ongoing.  The other is that LPG

24    doesn't have resources.  We don't have manpower.  We don't

25    have money.  And, so, it's difficult for us to do much of

195

1 anything right now, but it's a high priority for us to

2 proceed with these adversaries, but we are also in direct

3 discussions with (indiscernible) trying to resolve the

4 dispute.  We just haven't been able to do so.

5           MR. SHANKMAN:  How much is in the DIP account

6 presently?

7           MR. DIAB:  I believe the balance is $6,000 and

8 change if I remember correctly.

9           MR. SHANKMAN:  Okay.  Madam Trustee, I have no

10 further questions.

11           TRUSTEE NG:  Thank you so much?  Are there any

12 other creditors who would like to ask questions?

13      (No response.)

14           TRUSTEE NG:  Okay.  I hear no response, and so

15 this matter is being concluded.  Thank you again everyone

16 for coming today.

17           ALL:  Thank you.

18      (Proceedings concluded.)

19

20           I certify that the foregoing is a correct

21 transcript from the electronic sound recording of the

22 proceedings in the above-entitled matter.

23

24 /s/ Holly Steinhauer_____    5-17-23_____
   Transcriber                    Date

25

*Briggs Reporting Company, Inc.*

EXHIBIT 1, PAGE 214

**EXHIBIT 2**

Kathleen P. March, Esq., (CA SBN 80366)
**THE BANKRUPTCY LAW FIRM, PC**
10524 W. Pico Blvd, Suite 212, LA, CA 90064
Phone: 310-559-9224; Fax: 310-559-9133
Email: kmarch@BKYLAWFIRM.com
*Counsel of Record for Han Trinh*

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA—SANTA ANA DIV.

| | |
|---|---|
| In re | Bankruptcy Case No. 8:23-bk-10571-SC |
| | Chapter 11 |
| THE LITIGATION PRACTICE GROUP, P.C., | |
| | **ERRATUM TO MOTION OF HAN TRINH** |
| Debtor. | **FOR AN ORDER GRANTING** |
| | **ALLOWANCE AND PAYMENT OF** |
| | **ADMINISTRATIVE CLAIM, PURSUANT** |
| | **TO 11 U.S.C. §503(b)(1)(A)(i) [DKT. 674,** |
| | **FILED 11/17/23]; ERRATUM ATTACHES** |
| | **EXHIBIT B WHICH WAS ERRONEOUSLY** |
| | **LEFT OFF** |
| | |
| | <u>Next hearing on Han's Motion (and on other</u> |
| | <u>parties' Motions) for allowance and payment of</u> |
| | <u>administrative claim, to be treated as a status</u> |
| | <u>conference, set for:</u> |
| | Date: February 29, 2024 |
| | Time:  11:00 a.m. |
| | Place:  Courtroom of Bankruptcy Judge Scott |
| | Clarkson, by Zoom or in person at: |
| | 411 West Fourth Street, Courtroom 5C |
| | Santa Ana, CA 92701-4593 |

---

ERRATUM TO MOTION OF HAN TRINH FOR AN ORDER GRANTING ALLOWANCE AND PAYMENT
OF ADMINISTRATIVE CLAIM, PURSUANT TO 11 U.S.C. §503(b)(1)(A)(i) [DKT. 674, FILED 11/17/23];
ERRATUM ATTACHES EXHIBIT B WHICH WAS ERRONEOUSLY LEFT OFF

1

This ERRATUM to Han Trinh's ("Han's") Motion for allowance and payment of Han's administrative claim, pursuant to 11 U.S.C. §503(b)(1)(A), is being filed to attach **Exhibit B**, which was erroneously not attached when the Motion was filed.

**Exhibit B**, as described in Han's Declaration to the Motion, is a list of what Han paid for the items that Trustee's field agents "lost" from the Greyson office, after they locked Han out of it.  The amount owed to Han, by the bankruptcy estate, for her personally owned items, which "disappeared"/were "lost" from the locked office, after the lockout on 6/2/23, is $14,433.56 as shown on attached **Exhibit B**.

Dated: February 16, 2024                    THE BANKRUPTCY LAW FIRM, PC

                                            __/s/ Kathleen P. March_____
                                            By: Kathleen P. March, Esq
                                            *Attorneys for Han Trinh on Motion*

EXHIBIT 2, PAGE 216

**amazon.com**

### Final Details for Order ██████████
Print this page for your records.

**Order Placed:** September 23, 2021
**Amazon.com order number:** ██████████
**Order Total:** $233.82

| Shipped on September 24, 2021 | |
|---|---|
| **Items Ordered** | **Price** |
| 1 of: HP 24mh FHD Monitor – Computer Monitor with 23.8-Inch IPS Display (1080p) – Built-In Speakers and VESA Mounting – Height/Tilt Adjustment for Ergonomic Viewing – HDMI and DisplayPort – (1D0J9AA#ABA) | $217.00 |
| Sold by: DealerLuxes (SN Recorded) (seller profile) | |
| Supplied by: Other | |
| Condition: New | |

**Shipping Address:**
Han Trinh
██████████

**Shipping Speed:**
Standard Shipping

| Payment information | |
|---|---|
| **Payment Method:** | Item(s) Subtotal: $217.00 |
| Amazon.com Visa Signature | Last digits: 3132 | Shipping & Handling: $0.00 |
| **Billing address** | ----- |
| Han Trinh | Total before tax: $217.00 |
| | Estimated tax to be collected: $16.82 |
| | ----- |
| | **Grand Total: $233.82** |
| **Credit Card transactions** | Visa ending in 3132: September 24, 2021: $233.82 |

To view the status of your order, return to Order Summary.

Conditions of Use | Privacy Notice © 1996-2023, Amazon.com, Inc. or its affiliates

---

**amazon.com**

### Final Details for Order ██████████
Print this page for your records.

**Order Placed:** July 10, 2021
**Amazon.com order number:** ██████████
**Order Total:** $0.00

| Shipped on July 10, 2021 | |
|---|---|
| **Items Ordered** | **Price** |
| 1 of: Daily Ritmo Small Lined Pastel Sticky Notes |Turquoise, Peach, Lilac, Grey Checklist| 3 in x 3 in, 50 Sheets/Pad, 4 Pads | $9.99 |
| Sold by: Daily Ritmo (seller profile) | |
| Supplied by: Other | |
| Condition: New | |
| 1 of: Vebach Wireless Charger, Metal Frame Qi Certified Fast Wireless Charging Pad 7.5W fo iPhone 12 Pro Max/12/12 Mini/SE/11/11 Pro/11 Pro Max/XS/XR/8, 10W for Samsung Galaxy S20/S10/S9/Note 10 | $21.99 |
| Sold by: Hey Store (seller profile) | |
| Supplied by: Other | |
| Condition: New | |

**Shipping Address:**
Han Trinh
██████████

**Shipping Speed:**
FREE Prime Delivery

| Shipped on July 10, 2021 | |
|---|---|
| **Items Ordered** | **Price** |
| 1 of: Aelfox Memory Foam Keyboard Wrist Rest&Gaming Mouse Wrist Rest, Ergonomic Design for Office, Home Office, Laptop, Desktop Computer, Gaming Keyboard (Black) | $20.99 |
| Sold by: Aelfox (seller profile) | |
| Supplied by: Other | |
| Condition: New | |
| 1 of: DAILY RITMO Large Lined Sticky Notes, Pastel Collection, 4 in x 6 in, 50 Sheets/Pad, 4 Pads | $12.99 |
| Sold by: Daily Ritmo (seller profile) | |
| Supplied by: Other | |
| Condition: New | |

Partial

**Shipping Address:**
Han Trinh
██████████

**Shipping Speed:**
FREE Prime Delivery

| Payment information | |
|---|---|
| **Payment Method:** | Item(s) Subtotal: $65.96 |
| Amazon.com Visa Signature | Last digits: 3132 | Shipping & Handling: $0.00 |
| Gift Card | |

# EXHIBIT B

EXHIBIT 2, PAGE 217

Condition: New

**Shipping Address:**
Han Trinh

**Shipping Speed:**
FREE Prime Delivery

| **Shipped on July 10, 2021** | |
|---|---|
| **Items Ordered** | **Price** |
| 1 of: Aeifox Memory Foam Keyboard Wrist Rest&Gaming Mouse Wrist Rest, Ergonomic Design for Office, Home Office, Laptop, Desktop Computer, Gaming Keyboard (Black)<br>Sold by: Aeifox (seller profile)<br>Supplied by: Other | $20.99 |
| Condition: New | |
| 1 of: DAILY RITMO Large Lined Sticky Notes, Pastel Collection, 4 in x 6 in, 50 Sheets/Pad, 4 Pads<br>Sold by: Daily Ritmo (seller profile)<br>Supplied by: Other | $12.99 |

<span style="color:red">Partial</span>

Condition: New

**Shipping Address:**
Han Trinh

**Shipping Speed:**
FREE Prime Delivery

| **Payment information** | |
|---|---|
| **Payment Method:**<br>Amazon.com Visa Signature \| Last digits: 3132<br>Gift Card | Item(s) Subtotal: $65.96<br>Shipping & Handling:   $0.00 |
| **Billing address**<br>Han Trinh | Total before tax: $65.96<br>Estimated tax to be collected:   $5.11<br>Gift Card Amount: -$71.07 |
| | **Grand Total:   $0.00** |

To view the status of your order, return to Order Summary.

Have an issue with your gift card? Read about common issues or contact us.

Conditions of Use | Privacy Notice © 1996-2023, Amazon.com, Inc. or its affiliates

amazon.com

**Final Details for Order**
Print this page for your records.

Order Placed: June 16, 2021
Amazon.com order number:
Order Total: $355.41

| **Shipped on June 17, 2021** | |
|---|---|
| **Items Ordered** | **Price** |
| 1 of: HON Ignition 2.0 Mid-Back Adjustable Lumbar Work Mesh Computer Chair for Office Desk (Black Fabric)<br>Sold by: Amazon.com Services LLC<br>Supplied by: Other | $313.86 |
| Condition: New | |

**Shipping Address:**
Han Trinh

**Shipping Speed:**
FREE Prime Delivery

| **Shipped on June 17, 2021** |
|---|
| |

**Shipping Address:**
Han Trinh

**Shipping Speed:**
FREE Prime Delivery

| **Payment information** | |
|---|---|
| **Payment Method:**<br>Visa \| Last digits: 8977 | Item(s) Subtotal: $329.85<br>Shipping & Handling:   $0.00 |

| Items Ordered | Price |
|---|---|
| 1 of: HON Ignition 2.0 Mid-Back Adjustable Lumbar Work Mesh Computer Chair for Office Desk (Black Fabric) Sold by: Amazon.com Services LLC Supplied by: Other | $313.86 |
| Condition: New | |

**Shipping Address:**
Han Trinh

**Shipping Speed:**
FREE Prime Delivery

| **Shipped on June 17, 2021** |
|---|

**Shipping Address:**
Han Trinh

**Shipping Speed:**
FREE Prime Delivery

| **Payment information** | |
|---|---|
| **Payment Method:** Visa \| Last digits: 8977 | Item(s) Subtotal: $329.85 Shipping & Handling: $0.00 |
| **Billing address** | Total before tax: $329.85 Estimated tax to be collected: $25.56 |
| | **Grand Total: $355.41** |
| **Credit Card transactions** | Visa ending in 8977: June 17, 2021: $17.23 Visa ending in 8977: June 17, 2021: $338.18 |

To view the status of your order, return to Order Summary.

Conditions of Use | Privacy Notice © 1996-2023, Amazon.com, Inc. or its affiliates

amazon.com

**Final Details for Order**
Print this page for your records.

**Order Placed:** June 2, 2021
**Amazon.com order number:**
**Order Total: $177.78**

| **Shipped on June 2, 2021** |
|---|

| Items Ordered | Price |
|---|---|
| 1 of: Office Chair, High Back Premium PU Leather Office Computer Swivel Desk Task Chair, Ergonomic Executive Chair with Lumbar Padding and Flip-up Armrests (61AB33WH) Sold by: XLYMQ2018 (seller profile) Supplied by: Other | $164.99 |
| Condition: New | |

**Shipping Address:**
Han Trinh

**Shipping Speed:**
Standard Shipping

| **Payment information** | |
|---|---|
| **Payment Method:** Visa \| Last digits: 8977 | Item(s) Subtotal: $164.99 Shipping & Handling: $0.00 |
| **Billing address** | Total before tax: $164.99 Estimated tax to be collected: $12.79 |
| | **Grand Total: $177.78** |
| **Credit Card transactions** | Visa ending in 8977: June 2, 2021: $177.78 |

To view the status of your order, return to Order Summary.

Conditions of Use | Privacy Notice © 1996-2023, Amazon.com, Inc. or its affiliates

**EXHIBIT 2, PAGE 219**

| | |
|---|---|
| Condition: New | |
| 1 of: *Rose Gold Desk Organizer for Women Cute Home Office Accessories & Supplies Decor, Girly Desktop Stationary Essentials Organization Set, Mesh Caddy Storage 5 Compartments +1 Mini Sliding Drawer*<br>Sold by: Three Way Cut (seller profile) | Product question? Ask Seller<br>Supplied by: Other | $19.99 |
| Condition: New | |
| 1 of: *Aelfox Memory Foam Keyboard Wrist Rest&Gaming Mouse Wrist Rest, Ergonomic Design for Office, Home Office, Laptop, Desktop Computer, Gaming Keyboard (Black)*<br>Sold by: Aelfox (seller profile)<br>Supplied by: Other | $20.99 |
| Condition: New | |
| 1 of: *KIDMEN Rosegold Desk Accessory Kit,Set of Stapler, Staple Remover,1000pcs Staples,Tape Dispenser,Big Diamond Ballpoint Pen and 10pcs Binder Clips*<br>Sold by: kidmen (seller profile)<br>Supplied by: Other | $19.99 |
| Condition: New | |
| 1 of: *Knodel Dual-Sided Desk Mat, Desk Pad, Upgrade Sewing PU Leather Desk Blotter Protector, Mouse Pad, Writing Mat for Office and Home (35.4" x 17", Dark Blue)*<br>Sold by: Knodel (seller profile)<br>Supplied by: Other | $14.99 |
| Condition: New | |
| 1 of: *Logitech G502 HERO High Performance Wired Gaming Mouse, HERO 25K Sensor, 25,600 DPI, RGB, Adjustable Weights, 11 Programmable Buttons, On-Board Memory, PC / Mac*<br>Sold by: Amazon.com Services LLC<br>Supplied by: Other | $46.99 |
| Condition: New | |
| 5 of: *WALI Tempered Glass Monitor Riser Desktop Stand Height Adjustable Table Top for Flat Screen LCD LED TV, Laptop, Notebook, Display (GTT01)*<br>Sold by: Wali Electric (seller profile) | Product question? Ask Seller<br>Supplied by: Other | $16.99 |
| Condition: New | |

**Shipping Address:**
Han Trinh

**Shipping Speed:**
Amazon Day Delivery

| **Payment information** | |
|---|---|
| **Payment Method:**<br>Visa | Last digits: 8977 | Item(s) Subtotal: $303.89<br>Shipping & Handling: $0.00 |
| **Billing address** | ------<br>Total before tax: $303.89<br>Estimated tax to be collected: $23.57<br>------<br>**Grand Total:$327.46** |
| **Credit Card transactions** | Visa ending in 8977: May 25, 2021 $327.46 |

To view the status of your order, return to Order Summary.

Conditions of Use | Privacy Notice © 1996-2023, Amazon.com, Inc. or its affiliates

**amazon**.com

**Final Details for Order**

Print this page for your records.

Order Placed: May 24, 2021
Amazon.com order number:
Order Total: $1,142.90

| **Shipped on May 25, 2021** | |
|---|---|
| **Items Ordered** | **Price** |
| 2 of: *Knodel Dual-Sided Desk Mat, Desk Pad, Upgrade Sewing PU Leather Desk Blotter Protector, Mouse Pad, Writing Mat for Office and Home (35.4" x 17", Pink)*<br>Sold by: Knodel (seller profile)<br>Supplied by: Other | $14.99 |
| Condition: New | |
| 1 of: *Cloud Nine C669 Ergonomic Mechanical Keyboard for PC – Cherry MX Blue Switches – RGB Light Up LED Backlit with USB – Ergo Split Key Board with Macro*<br>Sold by: Cloud Nine Ergo (seller profile)<br>Supplied by: Other | $219.00 |
| Condition: New<br>**Partial** | |

**Shipping Address:**
Han Trinh

**Shipping Speed:**
FREE Prime Delivery

| **Shipped on May 25, 2021** | |
|---|---|
| **Items Ordered** | **Price** |
| 2 of: *Jelly Comb K565 Ergonomic Wireless Keyboard and Mouse, 2.4Hz Full-Sized Ergonomic Keyboard with Palm Rest and Wireless Mouse for PC, Computer, Laptops, Windows XP/7/8/10-Black*<br>Sold by: DENG CAI (seller profile)<br>Supplied by: Other | $24.99 |
| Condition: New | |
| 1 of: *Multibey NE060607 Light Luxury Fashion Paper Clips, Rose Gold Edition, In Round Paper Clip Holder With Magnetic Lid, 28 mm, 100 Piece Per Box*<br>Sold by: DUOBEY TECH WORLD (seller profile) | Product question? Ask Seller<br>Supplied by: Other | $8.99 |
| Condition: New | |
| 1 of: *Wireless Keyboard Mouse, Jelly Comb 2.4GHz Ultra Slim Full Size Rechargeable Wireless Keyboard and Mouse Combo for Windows, Laptop, Notebook, PC, Desktop, Computer (White and Gold)*<br>Sold by: Jelly Comb Direct (seller profile) | Product question? Ask Seller<br>Supplied by: Other | $39.99 |
| Condition: New | |

**Shipping Address:**
Han Trinh

**Shipping Speed:**
FREE Prime Delivery

| Shipped on May 26, 2021 | |
|---|---|
| **Items Ordered**<br>1 of: HP 27-Inch FHD Monitor with Built-in Audio (27fwa, White)<br>Sold by: Amazon.com Services LLC<br>Supplied by: Other<br><br>Condition: New | **Price**<br>$242.24 |

**Shipping Address:**
Han Trinh

**Shipping Speed:**
FREE Prime Delivery

| Shipped on May 26, 2021 | |
|---|---|
| **Items Ordered**<br>1 of: HP 27-Inch FHD Monitor with Built-in Audio (27fwa, White)<br>Sold by: Amazon.com Services LLC<br>Supplied by: Other<br><br>Condition: New | **Price**<br>$242.24 |

**Shipping Address:**
Han Trinh

**Shipping Speed:**
FREE Prime Delivery

| Payment information | |
|---|---|
| **Payment Method:**<br>Visa | Last digits: 8977 | Item(s) Subtotal: $1,051.42<br>Shipping & Handling: $0.00 |
| **Billing address** | Total before tax: $1,051.42<br>Estimated tax to be collected: $81.48<br>CA Electronic Waste Recycling Fee $10.00 |
| | **Grand Total: $1,142.90** |

amazon.com

**Final Details for Order**
Print this page for your records.

Order Placed: April 14, 2022
Amazon.com order number:
Order Total: $259.95

| Shipped on April 15, 2022 | |
|---|---|
| Condition: New<br>1 of: Klein Tools 32581 4-in-1 Electronics Screwdriver Set with Precision Machines Bits: 2 Slotted, 2 Phillips, and Cushion Grip Handles, 4-Piece<br>Sold by: Amazon.com Services LLC<br>Supplied by: Other | $9.97 |

**Shipping Address:**
Han Trinh
17542 17TH ST STE 105
TUSTIN, CA 92780-7934
United States

**Shipping Speed:**
FREE Prime Delivery

| Shipped on April 17, 2022 | |
|---|---|
| **Items Ordered**<br>1 of: Precision Screwdriver Set with Case, All-in-One Multi-Function Repair Tool Kit Includes 39 Bits for Apple Products Klein Tools 32717<br>Sold by: Amazon.com Services LLC<br>Supplied by: Other | **Price**<br>$29.97 |
| Condition: New<br>1 of: CRAFTSMAN Pliers, 6-Piece Mini Set with Pouch (CMHT81716)<br>Sold by: Amazon.com Services LLC<br>Supplied by: Other | $22.00 |
| Condition: New<br>2 of: Mounting Dream UL Listed TV Mount for Most 37-70 Inch TV, Universal Tilt TV Wall Mount Fit 16", 18", 24" Stud with Loading 132 lbs & Max VESA 600x400mm, Low Profile Flat Wall Mount Bracket MD2268-LK<br>Sold by: Mounting Dream (seller profile) | Product question? Ask Seller<br>Supplied by: Other | $29.99 |
| Condition: New | |

| | |
|---|---|
| 1 of: *Precision Screwdriver Set with Case, All-in-One Multi-Function Repair Tool Kit Includes 39 Bits for Apple Products Klein Tools 32717* <br> Sold by: Amazon.com Services LLC <br> Supplied by: Other | $29.97 |
| Condition: New <br> 1 of: *CRAFTSMAN Pliers, 6-Piece Mini Set with Pouch (CMHT81716)* <br> Sold by: Amazon.com Services LLC <br> Supplied by: Other | $22.00 |
| Condition: New <br> 2 of: *Mounting Dream UL Listed TV Mount for Most 37-70 Inch TV, Universal Tilt TV Wall Mount Fit 16", 18", 24" Stud with Loading 132 lbs & Max VESA 600x400mm, Low Profile Flat Wall Mount Bracket MD2268-LK* <br> Sold by: Mounting Dream (seller profile) | Product question? Ask Seller <br> Supplied by: Other | $29.99 |
| Condition: New <br> 1 of: *Magnetic Wireless Car Charger for Magsafe Mount iPhone 13/13 Pro/ 13 Pro Max/ 13 Mini/iPhone12/12 Pro/ 12 Pro Max/12 Mini, QI 15 W Car Charging, Car Dashboard and Air Vent Car Phone Holder* <br> Sold by: Magjeyx (seller profile) <br> Supplied by: Other | $33.99 |
| Condition: New <br> 1 of: *2 in 1 Magnetic Wireless Charger Stand - Max 15W Fast Wireless Charging Station Compatible with Mag-Safe Charger, iPhone 13 12/13 12 Pro/13 12 Pro Max/13 12 Mini/AirPods 2/3/Pro,with QC 3.0 Adapter* <br> Sold by: enian (seller profile) <br> Supplied by: Other | $35.99 |
| Condition: New <br> 1 of: *ZUBARR Magnetic Wireless Charger Pad Compatible with MagSafe case,Only Supports iPhone Series 12/13/ Mini Pro Pro max and Wireless-Charger AirPods Series [with USB-C 20W PD Adapter and Storage Case]* <br> Sold by: ZUBARR Seller (seller profile) <br> Supplied by: Other | $24.99 |
| Condition: New | |

**Shipping Address:**
Han Trinh
17542 17TH ST STE 105
TUSTIN, CA 92780-7934
United States

**Shipping Speed:**
FREE Prime Delivery

| Payment information | |
|---|---|
| **Payment Method:** <br> Amazon.com Visa Signature | Last digits: 3132 <br> **Billing address** <br> Han Trinh | Item(s) Subtotal: $249.26 <br> Shipping & Handling: $0.00 <br> Your Coupon Savings: -$8.00 <br> ------ <br> Total before tax: $241.26 <br> Estimated tax to be collected: $18.69 <br> ------ <br> **Grand Total:$259.95** |
| **Credit Card transactions** | Visa ending in 3132: April 18, 2022: <br> Visa ending in 3132: April 15, 2022: |

To view the status of your order, return to Order Summary.

Conditions of Use | Privacy Notice © 1996-2023, Amazon.com, Inc. or its affiliates

amazon.com

**Final Details for Order**
Print this page for your records.

**Order Placed:** January 17, 2022
**Amazon.com order number:**
**Order Total: $34.47**

| Shipped on January 22, 2022 | |
|---|---|
| **Items Ordered** | **Price** |
| 1 of: *SHS Round Mesh Stainless Steel Wastebasket Trash Can Recycling Bin for Home, Office, Bathroom, Bedroom & Kitchen, 3.5 Gallon / 12L, 11" Height x 10" Diameter Garbage Can (Rose Gold)* <br> Sold by: Saddlehorn Studios / FRAMes HANKS (seller profile) <br> Supplied by: Other | $31.99 |
| Condition: New | |

**Shipping Address:**
17542 E. 17th St.
Suite 105
Tustin, CA 92780
United States

**Shipping Speed:**
Two-Day Shipping

| Payment information | |
|---|---|
| **Payment Method:** <br> Amazon.com Visa Signature | Last digits: 3132 <br> **Billing address** <br> Han Trinh | Item(s) Subtotal: $31.99 <br> Shipping & Handling: $0.00 <br> ------ <br> Total before tax: $31.99 <br> Estimated tax to be collected: $2.48 <br> ------ <br> **Grand Total:$34.47** |
| **Credit Card transactions** | Visa ending in 3132: January 22, 2022: $34.47 |

To view the status of your order, return to Order Summary.

Conditions of Use | Privacy Notice © 1996-2023, Amazon.com, Inc. or its affiliates



**Shipped on January 14, 2022**

| Items Ordered | Price |
|---|---|
| 1 of: AtaliorBird Mouse Pad 5Pcs Set, 800x400mm PU Leather Desk Pad& Ergonomic Memory Foam Keyboard Wrist Pad&Mouse Wrist Rest for Laptop Office, Including 2 Free PU&Cork Coaster, Pink&Green<br>Sold by: VapowStore (seller profile)<br>Supplied by: Other<br><br>Condition: New | $21.99 |

**Shipping Address:**
17542 E. 17th St.
Suite 105
Tustin, CA 92780
United States

**Shipping Speed:**
One-Day Shipping

**Shipped on January 13, 2022**

| Items Ordered | Price |
|---|---|
| 1 of: KIDMEN Rosegold Desk Accessory Kit,Set of Stapler, Staple Remover,1000pcs Staples,Tape Dispenser,Big Diamond Ballpoint Pen and 10pcs Binder Clips<br>Sold by: kidmen (seller profile)<br>Supplied by: Other<br><br>Condition: New | $19.99 |
| 1 of: Utopia Bedding Throw Pillows Insert (Pack of 2, White) - 18 x 18 Inches Bed and Couch Pillows - Indoor Decorative Pillows<br>Sold by: Utopia Deals (seller profile) | Product question? Ask Seller<br>Supplied by: Other<br><br>Condition: New | $15.99 |

**Shipping Address:**
17542 E. 17th St.
Suite 105
Tustin, CA 92780
United States

**Shipping Speed:**
One-Day Shipping

**Payment information**

| Payment Method:<br>Amazon.com Visa Signature | Last digits: 3132<br><br>Billing address<br>Han Trinh | Item(s) Subtotal: $403.38<br>Shipping & Handling: $0.00<br>Your Coupon Savings: -$2.00<br>-----<br>Total before tax: $401.38<br>Estimated tax to be collected: $31.09 |
|---|---|

amazon.com

**Final Details for Order** ████████
Print this page for your records.

Order Placed: September 23, 2021
Amazon.com order number: ████████
Order Total: $689.58

**Shipped on September 24, 2021**

████████████████████████████████████████

**Shipping Address:**
Han Trinh
████████

**Shipping Speed:**
Standard Shipping

**Payment information**

| Payment Method:<br>Amazon.com Visa Signature | Last digits: 3132<br><br>Billing address<br>Han Trinh | Item(s) Subtotal: $639.98<br>Shipping & Handling: $0.00<br>-----<br>Total before tax: $639.98<br>Estimated tax to be collected: $49.60<br>-----<br>**Grand Total:** **$689.58** |
|---|---|

| Credit Card transactions | Visa ending in 3132: September 24, 2021: $689.58 |
|---|---|

To view the status of your order, return to Order Summary.

Conditions of Use | Privacy Notice © 1996-2023, Amazon.com, Inc. or its affiliates

EXHIBIT 2, PAGE 224

**Final Details for Order** ▮▮▮▮▮▮▮▮▮
Print this page for your records.

Order Placed: July 10, 2021
Amazon.com order number: ▮▮▮▮▮▮
Order Total: $240.43

| Shipped on July 11, 2021 |
|---|

Shipping Address:
Han Trinh

Shipping Speed:
Two-Day Shipping

| Payment information | |
|---|---|
| **Payment Method:** Amazon.com Visa Signature \| Last digits: 3132 Gift Card | Item(s) Subtotal: $249.99<br>Shipping & Handling: $0.00 |
| **Billing address** Han Trinh | Total before tax: $249.99<br>Estimated tax to be collected: $19.37<br>Gift Card Amount: -$28.93 |
| | **Grand Total:$240.43** |
| **Credit Card transactions** | Visa ending in 3132: July 11, 2021: $240.43 |

To view the status of your order, return to Order Summary.

Have an issue with your gift card? Read about common issues or contact us.

Conditions of Use | Privacy Notice © 1996-2021, Amazon.com, Inc. or its affiliates.

amazon.com

**Final Details for Order** ▮▮▮▮▮▮▮▮▮▮
Print this page for your records.

Order Placed: May 24, 2021
Amazon.com order number: ▮▮▮▮▮▮▮
Order Total: $327.46

| Shipped on May 25, 2021 | |
|---|---|
| **Items Ordered** | **Price** |
| 1 of: Logitech MX Vertical Wireless Mouse – Advanced Ergonomic Design Reduces Muscle Strain, Control and Move Content Between 3 Windows and Apple Computers (Bluetooth or USB), Rechargeable, Graphite<br>Sold by: Amazon.com Services LLC<br>Supplied by: Other | $95.99 |
| **Partial – Incorrect Cables Provided** | |
| Condition: New<br>1 of: Rose Gold Desk Organizer for Women Cute Home Office Accessories & Supplies Decor, Girly Desktop Stationary Essentials Organization Set, Mesh Caddy Storage 5 Compartments +1 Mini Sliding Drawer<br>Sold by: Three Way Cut (seller profile) \| Product question? Ask Seller<br>Supplied by: Other | $19.99 |
| Condition: New<br>1 of: Aelfox Memory Foam Keyboard Wrist Rest&Gaming Mouse Wrist Rest, Ergonomic Design for Office, Home Office, Laptop, Desktop Computer, Gaming Keyboard (Black)<br>Sold by: Aelfox (seller profile)<br>Supplied by: Other | $20.99 |
| Condition: New<br>1 of: KIDMEN Rosegold Desk Accessory Kit,Set of Stapler, Staple Remover,1000pcs Staples,Tape Dispenser,Big Diamond Ballpoint Pen and 10pcs Binder Clips<br>Sold by: kidmen (seller profile)<br>Supplied by: Other | $19.99 |
| Condition: New<br>1 of: Knodel Dual-Sided Desk Mat, Desk Pad, Upgrade Sewing PU Leather Desk Blotter Protector, Mouse Pad, Writing Mat for Office and Home (35.4" x 17", Dark Blue)<br>Sold by: Knodel (seller profile)<br>Supplied by: Other | $14.99 |
| Condition: New<br>1 of: Logitech G502 HERO High Performance Wired Gaming Mouse, HERO 25K Sensor, 25,600 DPI, RGB, Adjustable Weights, 11 Programmable Buttons, On-Board Memory, PC / Mac<br>Sold by: Amazon.com Services LLC<br>Supplied by: Other | $46.99 |
| Condition: New<br>5 of: WALI Tempered Glass Monitor Riser Desktop Stand Height Adjustable Table Top for Flat Screen LCD LED TV, Laptop, Notebook, Display (GTT01)<br>Sold by: Wali Electric (seller profile) \| Product question? Ask Seller<br>Supplied by: Other | $16.99 |
| Condition: New | |

Shipping Address:
Han Trinh

Shipping Speed:
Amazon Day Delivery



**Items that were locked behind my office door that I could not find receipts for. Tax is obviously not included in most of these since I cannot calculate that.**

TWO of these 32" monitors [$699 x2]

https://www.lg.com/us/monitors/lg-32uq750-w-4k-uhd-monitor#

ONE of this 38" monitor [$1,599.99]

https://www.lg.com/us/monitors/lg-38wn95c-w-ultrawide-monitor

One Dynabook Docking Station [$239.99]

https://us.dynabook.com/accessory/PA5356U-1PRP

One 20W USB-C Power Adapter [$19]

https://www.apple.com/shop/product/MHJA3AM/A/20w-usb-c-power-adapter?fnode=62ffaaef937ca49246833b87c9285a3fc04a2a607f49ccfbeedc56f390159d56ef2181151d733775cfcaffadbc6dee913545220a747e883bc8a21fd7f0adbaf98fe9d2d368034c84ddac6fb127aa34c4ee610dc598cbaa9d95706e1e9271ea7d

One 240W USB-C Charge Cable (2m) [$29]

https://www.apple.com/shop/product/MU2G3AM/A/240w-usb-c-charge-cable-2-m?fnode=62ffaaef937ca49246833b87c9285a3fc04a2a607f49ccfbeedc56f390159d56ef2181151d733775cfcaffadbc6dee913545220a747e883bc8a21fd7f0adbaf98fe9d2d368034c84ddac6fb127aa34c4ee610dc598cbaa9d95706e1e9271ea7d

One Wireless Charger [$23.89]

https://www.amazon.com/gp/product/B07F9RBSP5/ref=ppx_yo_dt_b_search_asin_title?ie=UTF8&th=1

One 8-Count Sharpie S-Gel Pens [$10.19]

https://www.amazon.com/gp/product/B08BX64NFK/ref=ppx_yo_dt_b_search_asin_title?ie=UTF8&th=1

One 12-Count Sharpie Gel Pens [$14.49]

https://www.amazon.com/gp/product/B082PMSSS7/ref=ppx_yo_dt_b_search_asin_title?ie=UTF8&th=1

One Bath and Body Works Lotion (Perfect Peony Fragrance) [$29.75]

https://www.amazon.com/Perfect-Peony-Body-Lotion-2020/dp/B087YYLRBW/ref=sr_1_1?crid=1VRDR6J0DJ54T&keywords=bath+and+body+works+peony+body+lotion&qid=1696224560&sprefix=bath+and+body+works+peony+body+lotion%2Caps%2C145&sr=8-1

One 2-pack 10 outlet Long Power Strips [$88.99]

https://www.amazon.com/gp/product/B08GCRXBC4/ref=ppx_yo_dt_b_asin_title_o00_s00?ie=UTF8&psc=1

One Logitech MX Vertical Wireless Mouse [$99.99]

https://www.amazon.com/gp/product/B07FNJB8TT/ref=ppx_yo_dt_b_search_asin_title?ie=UTF8&psc=1

One Wireless Keyboard and Mouse (white) [$27.99]

https://www.amazon.com/gp/product/B086KX4Q6C/ref=ppx_yo_dt_b_search_asin_title?ie=UTF8&th=1

One 8-pack rectangle Puffs Plus Lotion Facial Tissue [$13.49]

https://www.target.com/p/puffs-plus-lotion-facial-tissue/-/A-84780543?preselect=84637339#lnk=sametab

One Office Desk Organizer Office [$34.99]

https://www.walmart.com/ip/Nvzi-Office-Desk-Organizer-Office-Supplies-Caddy-5-Compartments-Metal-Desktop-Organizers-Storage-with-Removable-Wooden-Partition-Black/1925073795?wmlspartner=wlpa&selectedSellerId=101307082

One USB-C to USB-C 3.1 Gen 2 Cable [$24.99]

EXHIBIT 2, PAGE 228

https://www.dell.com/en-us/shop/usb-c-to-usb-c-31-gen-2-cable-100w-power-delivery-10gbps-dp-alt-mode/apd/ac251905/pc-accessories?gacd=9684992-1102-5761040-266906002-0&dgc=ST&SA360CID=71700000109860316&gad=1&gclid=Cj0KCQjw1OmoBhDXARIsAAAYGSGpRxn9o9wYeOYJ2jEG68eItHlYbgLXEr3glP70DYEUnoo3zo-OT4AaAp5xEALw_wcB&gclsrc=aw.ds

One Swingline Stapler [$17.99]

https://www.amazon.com/Swingline-SWI74701-Classic-Stapler-Sheets/dp/B0006HUQ9M/ref=sr_1_46?crid=1VOAGTQHJ2005&keywords=staple&qid=1696293765&s=office-products&sprefix=staples%2Coffice-products%2C168&sr=1-46&th=1

One Scotch Magic Tape 6 Tape Rolls w/ Dispenser [$24.49]

https://www.amazon.com/Scotch-Brand-Applications-Engineered-810K6C38/dp/B000Y52D5G/ref=sxin_16_pa_sp_search_thematic_sspa?content-id=amzn1.sym.9cbe3359-611f-40e8-a779-21650339bb99%3Aamzn1.sym.9cbe3359-611f-40e8-a779-21650339bb99&crid=3RM6UFCI284Y4&cv_ct_cx=tape+dispenser&keywords=tape+dispenser&pd_rd_i=B000Y52D5G&pd_rd_r=db3397be-c5e6-4e46-97a9-183cf28c441e&pd_rd_w=4vHtL&pd_rd_wg=OK0T9&pf_rd_p=9cbe3359-611f-40e8-a779-21650339bb99&pf_rd_r=RWGVMY9YEXG8KZQYEVXS&qid=1696293908&s=office-products&sbo=RZvfv%2F%2FHxDF%2BO5021pAnSA%3D%3D&sprefix=tape+dispenser%2Coffice-products%2C135&sr=1-1-364cf978-ce2a-480a-9bb0-bdb96faa0f61-spons&sp_csd=d2lkZ2V0TmFtZT1zcF9zZWFyY2hfdGhlbWF0aWM&psc=1

One 32 FL OZ hand sanitizer [$16.79]

https://www.amazon.com/365-Everyday-Value-Sanitizer-Lavender/dp/B07GLN1YBG/ref=sr_1_55_f3_0o_wf?keywords=hand+sanitizer+pump&qid=1696294077&sr=8-55

One HP LaserJet Pro Printer [$759.00]

https://www.amazon.com/HP-LaserJet-Multifunction-M428fdw-Wireless/dp/B07RRFFMNN/ref=sr_1_30?crid=TPAT6VTFQBOS&keywords=hp+printer&qid=1696294346&sprefix=hp+printer%2Caps%2C140&sr=8-30&ufe=app_do%3Aamzn1.fos.ac2169a1-b668-44b9-8bd0-5ec63b24bcb5

One ThinkPad P16 Gen 2 Intel (16') Mobile Workstation + added on software  [$6,096.25]

https://www.lenovo.com/us/en/p/laptops/thinkpad/thinkpadp/thinkpad-p16-gen-2-(16-inch-intel)/21fa0028us?cid=us:sem|se|google|pmax_smb_pcs|||21FA0028US|18337003604|||shopping|mix|commercialconsumer&gclid=Cj0KCQjw1OmoBhDXARIsAAAYGSHLe02EJ-60iK8-C90LCWhb-gnVzOq-EW1ABSkTUpFj_UrfwC3m_esaAtqpEALw_wcB

One 2 Pack EOS Lip Balm (Strawberry Sorbet) [$5.99]

https://www.amazon.com/eos-Organic-Stick-Lip-Balm/dp/B01MF63BCU/ref=sr_1_2?crid=3DEO9WG1EP8LQ&keywords=esos+lip+chapstick&qid=1696295068&rdc=1&sprefix=esos+lip+chapstick%2Caps%2C139&sr=8-2

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
10524 W. Pico Blvd., Ste. 212, Los Angeles, CA 90064

A true and correct copy of the foregoing document entitled (*specify*): **ERRATUM TO MOTION OF HAN TRINH FOR AN ORDER GRANTING ALLOWANCE AND PAYMENT OF ADMINISTRATIVE CLAIM, PURSUANT TO 11 U.S.C. §503(b)(1)(A)(i) [DKT. 674, FILED 11/17/23]; ERRATUM ATTACHES EXHIBIT B WHICH WAS ERRONEOUSLY LEFT OFF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) ___2/16/24___, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

See next page

☒ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) ___2/16/24___, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

The Litigation Practice Group P.C.
17542 17th St
Suite 100
Tustin, CA 92780

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) ___2/16/24___, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

No Judge's Copy required because this document is under 25 pages.

By email, to Alina Mamlyuk, Esq. at <u>amamlyuk@marshackhays.com</u>

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| 2/16/24 | Kathleen P. March | /s/ Kathleen P. March |
| Date | Printed Name | Signature |

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**

EXHIBIT 2, PAGE 231

1. <u>**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**</u>:

- **Bradford Barnhardt**   bbarnhardt@marshackhays.com, bbarnhardt@ecf.courtdrive.com,alinares@ecf.courtdrive.com
- **Eric Bensamochan**   eric@eblawfirm.us, G63723@notify.cincompass.com
- **Peter W Bowie**   peter.bowie@dinsmore.com, caron.burke@dinsmore.com
- **Ronald K Brown**   ron@rkbrownlaw.com
- **Christopher Celentino**   christopher.celentino@dinsmore.com, caron.burke@dinsmore.com
- **Shawn M Christianson**   cmcintire@buchalter.com, schristianson@buchalter.com
- **Randall Baldwin Clark**   rbc@randallbclark.com
- **Leslie A Cohen**   leslie@lesliecohenlaw.com, jaime@lesliecohenlaw.com;clare@lesliecohenlaw.com
- **Aaron E. DE Leest**   adeleest@DanningGill.com, danninggill@gmail.com;adeleest@ecf.inforuptcy.com
- **Anthony Paul Diehl**   anthony@apdlaw.net, Diehl.AnthonyB112492@notify.bestcase.com,ecf@apdlaw.net
- **Jenny L Doling**   jd@jdl.law, dolingjr92080@notify.bestcase.com;15994@notices.nextchapterbk.com;jdoling@jubileebk.net
- **Daniel A Edelman**   dedelman@edcombs.com, courtecl@edcombs.com
- **Meredith Fahn**   fahn@sbcglobal.net
- **William P Fennell**   william.fennell@fennelllaw.com, luralene.schultz@fennelllaw.com;wpf@ecf.courtdrive.com;hala.hammi@fennelllaw.com;naomi.cwalinski@fennelllaw.com;samantha.larimer@fennelllaw.com
- **Marc C Forsythe**   mcforsythe@goeforlaw.com, mforsythe@goeforlaw.com;dcyrankowski@goeforlaw.com
- **Jeremy Freedman**   jeremy.freedman@dinsmore.com, nicolette.murphy@dinsmore.com
- **Eric Gassman**   erg@gassmanlawgroup.com, gassman.ericb112993@notify.bestcase.com
- **Christopher Ghio**   christopher.ghio@dinsmore.com, nicolette.murphy@dinsmore.com;angelica.urena@dinsmore.com;deamira.romo@dinsmore.com
- **Amy Lynn Ginsburg**   efilings@ginsburglawgroup.com
- **Eric D Goldberg**   eric.goldberg@dlapiper.com, eric-goldberg-1103@ecf.pacerpro.com
- **Jeffrey I Golden**   jgolden@go2.law, kadele@ecf.courtdrive.com;cbmeeker@gmail.com;lbracken@wgllp.com;dfitzgerald@go2.law;golden.jeffreyi.b117954@notify.bestcase.com
- **Richard H Golubow**   rgolubow@wghlawyers.com, jmartinez@wghlawyers.com;svillegas@wghlawyers.com
- **David M Goodrich**   dgoodrich@go2.law, kadele@go2.law;dfitzgerald@go2.law;wggllp@ecf.courtdrive.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**

EXHIBIT 2, PAGE 232

- **D Edward Hays**   ehays@marshackhays.com,
  ehays@ecf.courtdrive.com;alinares@ecf.courtdrive.com;cmendoza@marshackhays.com;cm
  endoza@ecf.courtdrive.com
- **Alan Craig Hochheiser**   ahochheiser@mauricewutscher.com,
  arodriguez@mauricewutscher.com
- **Garrick A Hollander**   ghollander@wghlawyers.com,
  jmartinez@wghlawyers.com;svillegas@wghlawyers.com
- **Brian L Holman**   b.holman@musickpeeler.com
- **Richard L. Hyde**   richard@amintalati.com
- **Peter L Isola**   pisola@hinshawlaw.com
- **Razmig Izakelian**   razmigizakelian@quinnemanuel.com
- **Sweeney Kelly**   kelly@ksgklaw.com
- **Joon M Khang**   joon@khanglaw.com
- **Ira David Kharasch**   ikharasch@pszjlaw.com
- **Meredith King**   mking@fsl.law, ssanchez@fsl.law;jwilson@fsl.law
- **Nicholas A Koffroth**   nkoffroth@foxrothschild.com, khoang@foxrothschild.com
- **David S Kupetz**   David.Kupetz@lockelord.com, mylene.ruiz@lockelord.com
- **Christopher J Langley**   chris@slclawoffice.com,
  langleycr75251@notify.bestcase.com;ecf123@casedriver.com;john@slclawoffice.com
- **Matthew A Lesnick**   matt@lesnickprince.com,
  matt@ecf.inforuptcy.com;jmack@lesnickprince.com
- **Daniel A Lev**   daniel.lev@gmlaw.com,
  cheryl.caldwell@gmlaw.com;dlev@ecf.courtdrive.com
- **Britteny Leyva**   bleyva@mayerbrown.com,
  2396393420@filings.docketbird.com;KAWhite@mayerbrown.com;ladocket@mayerbrown.
  com
- **Marc A Lieberman**   marc.lieberman@flpllp.com,
  safa.saleem@flpllp.com,addy@flpllp.com
- **Michael D Lieberman**   mlieberman@lipsonneilson.com
- **Yosina M Lissebeck**   Yosina.Lissebeck@Dinsmore.com, caron.burke@dinsmore.com
- **Mitchell B Ludwig**   mbl@kpclegal.com, kad@kpclegal.com
- **Daniel S March**   marchlawoffice@gmail.com, marchdr94019@notify.bestcase.com
- **Kathleen P March**   kmarch@bkylawfirm.com,
  kmarch3@sbcglobal.net,kmarch@sbcglobal.net
- **Mark J Markus**   bklawr@bklaw.com,
  markjmarkus@gmail.com;markus.markj.r112926@notify.bestcase
- **Richard A Marshack (TR)**   pkraus@marshackhays.com,
  rmarshack@iq7technology.com;ecf.alert+Marshack@titlexi.com
- **Laila Masud**   lmasud@marshackhays.com,
  lmasud@ecf.courtdrive.com;lbuchanan@marshackhays.com;alinares@ecf.courtdrive.com
- **Sarah S. Mattingly**   sarah.mattingly@dinsmore.com
- **William McCormick**   Bill.McCormick@ag.tn.gov

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                    **F 9013-3.1.PROOF.SERVICE**
                                               EXHIBIT 2, PAGE 233

- **Kenneth Misken**    Kenneth.M.Misken@usdoj.gov
- **Byron Z Moldo**    bmoldo@ecjlaw.com, amatsuoka@ecjlaw.com,dperez@ecjlaw.com
- **Glenn D. Moses**    gmoses@venable.com,
  cascavone@venable.com;ipmalcolm@venable.com;jadelgado@venable.com
- **Jamie D Mottola**    Jamie.Mottola@dinsmore.com, jhanawalt@ecf.inforuptcy.com
- **Alan I Nahmias**    anahmias@mbn.law, jdale@mbn.law
- **Victoria Newmark**    vnewmark@pszjlaw.com
- **Jacob Newsum-Bothamley**    jacob.bothamley@dinsmore.com,
  angelica.urena@dinsmore.com;deamira.romo@dinsmore.com
- **Queenie K Ng**    queenie.k.ng@usdoj.gov
- **Israel Orozco**    israel@iolawcorp.com
- **Keith C Owens**    kowens@foxrothschild.com, khoang@foxrothschild.com
- **Lisa Patel**    lpatel@lesnickprince.com,
  jmack@lesnickprince.com;jnavarro@lesnickprince.com
- **Michael R Pinkston**    rpinkston@seyfarth.com,
  jmcdermott@seyfarth.com,sfocalendar@seyfarth.com,5314522420@filings.docketbird.com,
  bankruptcydocket@seyfarth.com
- **Douglas A Plazak**    dplazak@rhlaw.com
- **Tyler Powell**    tyler.powell@dinsmore.com,
  jennifer.pitcock@dinsmore.com;rosetta.mitchell@dinsmore.com
- **Daniel H Reiss**    dhr@lnbyg.com, dhr@ecf.inforuptcy.com
- **Ronald N Richards**    ron@ronaldrichards.com, 7206828420@filings.docketbird.com
- **Vanessa Rodriguez**    vanessa.rodriguez@dinsmore.com, angelica.urena@dinsmore.com
- **Kevin Alan Rogers**    krogers@wellsmar.com
- **Gregory M Salvato**    gsalvato@salvatoboufadel.com,
  calendar@salvatolawoffices.com;jboufadel@salvatoboufadel.com;gsalvato@ecf.inforuptcy.
  com
- **Olivia Scott**    olivia.scott3@bclplaw.com
- **Jonathan Serrano**    jonathan.serrano@dinsmore.com
- **Maureen J Shanahan**    Mstotaro@aol.com
- **Paul R Shankman**    PShankman@fortislaw.com, info@fortislaw.com
- **Zev Shechtman**    zs@DanningGill.com,
  danninggill@gmail.com;zshechtman@ecf.inforuptcy.com
- **Leslie Skorheim**    leslie.skorheim@usdoj.gov
- **Adam D Stein-Sapir**    info@pfllc.com
- **Howard Steinberg**    steinbergh@gtlaw.com, pearsallt@gtlaw.com;NEF-
  BK@gtlaw.com;howard-steinberg-6096@ecf.pacerpro.com
- **Andrew Still**    astill@swlaw.com, kcollins@swlaw.com
- **Michael R Totaro**    Ocbkatty@aol.com
- **United States Trustee (SA)**    ustpregion16.sa.ecf@usdoj.gov
- **William J Wall**    wwall@wall-law.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**

EXHIBIT 2, PAGE 234

- **Sharon Z. Weiss**    sharon.weiss@bclplaw.com,
  raul.morales@bclplaw.com,REC_KM_ECF_SMO@bclplaw.com
- **Johnny White**    JWhite@wrslawyers.com, jlee@wrslawyers.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**

EXHIBIT 2, PAGE 235

**EXHIBIT 3**



# GREYSON LAW CENTER

---

**Israel Orozco**                                                                                      March 21, 2023

Dear Mr. Orozco,

Congratulations! It is with great pleasure that Greyson Law Center PC would like to offer full-time employment to you for the position of Associate Attorney. The terms and conditions of employment are outlined below. The Firm reserves the right to alter or rescind this offer at any time during the employment process. The following outlines the details of this offer.

**1. Start Date**
March 27, 2023

**2. Compensation**
You will be classified as an exempt employee with an annual salary of $164,000.00 per year paid in accordance with Firm payroll practices. Employee agrees to maintain a license in good standing in California and New York.

The Employee agrees to represent all clients of Greyson Law Center assigned to Employee who have active matters located in any jurisdiction in which Employee is admitted to practice law. The Employee may employ the assistance of appearance or coverage counsel at Employee's discretion to manage Employee's docket of cases, and Greyson Law Center agrees to cover such cost on behalf of Employee.

The Employee will be provided office space convenient to their current residence. All bar dues and malpractice insurance will be covered by Greyson Law Center. The Employee may also retain a legal administrative assistant or paralegal to assist in the management of Employee's docket of cases.

**Annual Salary Increase.** The Employee shall be eligible for salary increases annually of zero to three percent (0-3%). Such salary increase shall be based upon the overall performance of the Employee during the preceding twelve (12)-month period.

**3. Benefits**
   a)  **Enrollment.** Should you choose to enroll, the benefits will be effective the first day of the month following your hire date. Greyson Law Center offers a competitive benefit plan which includes the following:



# GREYSON LAW CENTER

I.   Paid Time Off: You will be eligible to accrue three (3) weeks of Vacation and forty (40) hours of Sick Time per year. You will need to inform Human Resources prior to your Vacation.
II.  Medical, Dental, and Vision Plan
III. 401(k) Plan and company-match (if eligibility requirements are met)
IV.  Paid Holidays

**4. Duties**

a) Attorney-Employees are required to represent clients of Greyson Law Center in accordance with the applicable rules of professional conduct governing the jurisdiction in which such legal representation is rendered.

b) The Employee is not required to maintain records of hours except as required by any applicable rule of professional conduct.

c) If any ethical conflict arises, Employee may decline a case assignment, but must promptly notify Greyson Law Center of such denial and must assist Greyson Law Center in good faith to find representation for such client.

d) If Employee requires any support material to provide legal services in accordance with the applicable rules of professional conduct, Employee shall promptly notify Greyson Law Center of the same and Greyson Law Center agrees to comply with such requests in good faith and with the exercise of reasonable diligence.

e) The Employee agrees to permit Greyson Law Center to publish Employee's profile to its website, mobile application, and on any firm letterhead or correspondence.

f) The Employee agrees to complete all required continuing legal education coursework and to comply with ethical standards expected of any officer of the court.

g) The Employee agrees to serve as counsel for the Firm and its clients for all purposes in the jurisdiction(s) in which Employee is licensed.

h) The Employee agrees to use Greyson Law Center's customer relations management software.

i) The Employee agrees to use their name and information on correspondence directed to Greyson Law Center's clients in the state(s) in which the attorney is licensed.

**5. Outside Activities**

a) **General.** During the term of this Agreement you may not, without the prior written consent of the Firm, directly or indirectly as principal, agent, shareholder, partner, employee or otherwise engage in or be interested in any other business which will require your attendance or attention during the Firm's business hours or which is or may be contrary to the interest of, or in competition with, the Firm or which may require the use of confidential information of the Firm.



# GREYSON LAW CENTER

**6. Confidentiality**

    a) **General Confidentiality.** You shall not disclose or use either during or after your employment with the Firm any secret or confidential information, or information which in good faith and good conscience ought to be treated as confidential relating to the Firm, its employees, or its customers without the prior written consent of the Firm.

    b) **Confidential information.** Confidential information includes, but is not limited to, customer lists, supplier lists and lists of employees and contractors and information about the Firm's finances, business plans, proposals, technologies, and developments.

    c) **Absenteeism and Illness.** Punctual attendance is necessary. It is the responsibility of the Employee to inform Greyson Law Center prior to your start of any absenteeism and illness. The Firm has the right to require you to supply proof of illness and fitness to return to work in the form of a doctor's certificate or other form satisfactory to the Firm.

**7. At-Will Statement**

    a) **General At-Will.** This letter constitutes the full commitments that have been extended to you. However, Greyson Law Center does not guarantee employment for a specified length of time.

    b) **Mutual Consent.** Employment is at the mutual consent of each employee and Greyson Law Center.

    c) **Right to Terminate.** Accordingly, both parties retain the right to terminate the employment relationship at-will with or without cause.

    d) **Identification Documents and Other Paperwork.** Upon employment, you will be asked to provide identification documents in accordance with the provisions of the Immigration Reform Act of 1986 and complete the I-9 form within three days of employment. You will also be given additional paperwork necessary to complete your file.

If the terms and conditions stated above are acceptable to you, please indicate by signing below and returning to me via email. Please respond within two business days of the date on this correspondence. If you have any questions, please contact me at admin@greysonpc.com.

We look forward to a favorable reply! Sincerely,

Sincerely,

*Scott J Eadie*

Scott J. Eadie
Managing Attorney

EXHIBIT 3, PAGE 238



# GREYSON LAW CENTER

I accept the above offer to be employed by Greyson Law Center PC and understand the terms and conditions set forth in this letter.

**Israel Orozco**
_____
Print: First name and last name

_____          **03/24/2023**_____
Signature                                                                         Date

440 N. Barranca Ave. #1331, Covina, CA 91723 • greysonpc.com

**EXHIBIT 4**

Case 8:23-bk-10571-SC    Doc 1103    Filed 04/11/24    Entered 04/11/24 22:07:29    Desc
Main Document    Page 246 of 306

Case 8:23-bk-10571-SC    Doc 676-1    Filed 11/17/23    Entered 11/17/23 18:30:52    Desc
Declaration of Han Trinh with Exhibits    Page 1 of 71

## DECLARATION OF HAN TRINH

I, HAN TRINH, declare:

1.  I make this Declaration in support of the Motion for Allowance and Payment of Administrative Expense of Greyson Law Center, PC ("Greyson").

2.  From when Greyson Law Center PPC ("Greyson") was incorporated as a California corporation on 5/12/23, to present, I have been the administrator of Greyson, administering Greyson's client files, and hiring/firing/assigning/monitoring Greyson's attorney staff.  I have personal knowledge of everything in this declaration, and could and would testify competently thereto, if called on to do so at trial or hearing.

3.  On 6/2/23, Trustee Marshack, by his attorney Celentino, and by Celentino's field agents, locked Scott Eadie, Jayde Trinh, and me out of Greyson's office. That lockout was done pursuant to the 5/26/23 Lockout and Preliminary Injunction Order, which Celentino had obtained based on the **false allegation** that Greyson was an alter ego of debtor LPG, when Greyson was not an alter ego of LPG, and instead was a **direct competitor of LPG**.  The lockout started on 6/2/23 and my office was never unlocked after 6/2/23.  Celentino demanded that all Greyson personnel (except not me, Jayde and Scott Eadie) should come in to Greyson and work pursuant to the supervision of Celentino's field agents.  Some did so, and none of them were ever paid by Celentino for their work  .  On 6/2/23, Trustee/his field agents seized or froze everything that Greyson had.  This included

DECLARATION OF HAN TRINH IN SUPPORT OF GREYSON LAW CENTER PC MOTION FOR
ALLOWANCE AND PAYMENT OF ADMINISTRATIVE CLAIM, TO BE PAID BY BANKRUPTCY ESTATE
OF DEBTOR LITIGATION PRACTICES GROUP PC ("LPG")    1

EXHIBIT 4, PAGE 240

Case 8:23-bk-10571-SC    Doc 1103    Filed 04/11/24    Entered 04/11/24 22:07:29    Desc
Main Document    Page 247 of 306

Case 8:23-bk-10571-SC    Doc 676-1    Filed 11/17/23    Entered 11/17/23 18:30:52    Desc
Declaration of Han Trinh with Exhibits    Page 2 of 71

Celentino's field agents seized my computer, Jayde's computer and Scott Eadie's computer, and all the other computers that were in the Greyson offices, and demanded that the Greyson IT personnel give Celentino's field agents access to the data in the computers, which Greyson IT personnel did, including access to those computers' "cloud data storage". On 6/2/23, I and Scott Eadie and Jayde were locked out of the computers/their data/the cloud data storage. Celentino/his field agents never returned the computers, to present, and never allowed me or any other Greyson personnel to access the data in those computers (or their cloud storage) to **present.** Celentino's field agents accessed the Greyson LUNA account, which contained the client files of Greyson's 48 clients, and was how Greyson managed Greyson's clients. I was locked out from the LUNA account on 6/2/23. The field agents seized and removed, from Greyson's office space, boxes of Greyson checks, one box for each of Greyson's 6 bank accounts, none were ever returned to **present**. Celentino/field agents seized Greyson's bank accounts (after demanding and receiving the log in credentials from me, for those bank accounts; and seized Greyson's payment processors accounts. Celentino/his field agents demanded from Greyson's IT staff the managing access to Greyson's hundred-plus emails, got that access and then progressively locked Greyson personnel out of those emails, from 6/2/23 and continuing to 6/13/23 (and never gave access to those emails back to Greyson to **present**). Celentino/his field agents seized Greyson's website/domain (and never gave access to Greyson's

DECLARATION OF HAN TRINH IN SUPPORT OF GREYSON LAW CENTER PC MOTION FOR
ALLOWANCE AND PAYMENT OF ADMINISTRATIVE CLAIM, TO BE PAID BY BANKRUPTCY ESTATE
OF DEBTOR LITIGATION PRACTICES GROUP PC ("LPG")                                                    2

EXHIBIT 4, PAGE 241

Case 8:23-bk-10571-SC    Doc 1103    Filed 04/11/24    Entered 04/11/24 22:07:29    Desc
Main Document    Page 248 of 306

Case 8:23-bk-10571-SC    Doc 676-1    Filed 11/17/23    Entered 11/17/23 18:30:52    Desc
Declaration of Han Trinh with Exhibits    Page 3 of 71

domain back to Greyson to **present**), which prevented clients and others from communicating with Greyson through the Greyson website.  Celentino/his field agents seized and locked Greyson out of Greyson's LUNA client management account until 7/7/23.  Celintino/his field agents redirected Greyson's US mail to Celentino, promised to forward that mail to Greyson, and never did so to present, despite telling the Court he would do so.    What Celentino/his field agents did effectively shut down Greyson's ability to operate, for two months after 6/2/23.  Despite this, I continued doing administration work for Greyson, as soon as I was released from the lockout on 6/12/23, to present, as best I could.

4.    Jayde and I had managed legal operations at debtor Litigation Practice Group PC ("LPG").  We had interviewed, hired, and trained attorneys together, and had basically built LPG's attorney network from scratch. Jayde would supervise the attorney network while I made sure lawsuits were being processed and assigned to the attorney network in a timely manner. Before us, LPG was only using 1099 attorneys. The attorney network Jayde and I built together were mostly W-2 attorney employees of LPG. There were 5-6 attorneys that remained 1099 as an exception due to the relationship they and their firm built with LPG. After LPG started letting people go due to lack of funds, some of the attorneys found work elsewhere as 1099 (independent contractors, paid by accepted assigned lawsuits/cases). Many of LPG's attorneys became W2 attorneys at Oakstone Law Group for a brief amount of time, and did additional work at Consumer Legal

DECLARATION OF HAN TRINH IN SUPPORT OF GREYSON LAW CENTER PC MOTION FOR
ALLOWANCE AND PAYMENT OF ADMINISTRATIVE CLAIM, TO BE PAID BY BANKRUPTCY ESTATE
OF DEBTOR LITIGATION PRACTICES GROUP PC ("LPG")    3

EXHIBIT 4, PAGE 242

Case 8:23-bk-10571-SC    Doc 1103    Filed 04/11/24    Entered 04/11/24 22:07:29    Desc
Main Document    Page 249 of 306

Case 8:23-bk-10571-SC    Doc 676-1    Filed 11/17/23    Entered 11/17/23 18:30:52    Desc
Declaration of Han Trinh with Exhibits    Page 4 of 71

Group, Phoenix Law Group, and other law firms, as 1099 independent contractors. The network of attorneys that LPG and Phoenix were previously using was Jayde's and my network of attorneys that we established at LPG. They followed us to Greyson Law Center PC.

5.      The Greyson entity incorporated on 3/9/23 as California corporation 5561924 (I'll call it "Greyson ONE") was financially supported by Eng Taing through his investment business/company/entity Touzi Capital and/or personal funds, or so Eng Taing claimed.  Greyson ONE was incorporated on 3/9/23, because Oakstone, where Eng Taing and Scott Eadie and others were working was in financial trouble.  After my consultation period with Eng Taing and Scott Eadie, I told them that Oakstone was so badly managed it could not survive, including because Oakstone had former LPG clients, which were liabilities, more than assets.  I told Eng Taing and Scott Eadie that they should hand over Oakstone's clients to any law firm that would take these clients and start over. To be clear, Jayde Trinh and I were never employees of Oakstone Law Group PC.

6.      Jayde and I supervised the team of Greyson ONE attorneys.   But Greyson ONE was short lived.  There were many problems and disagreements at Greyson ONE, between Eng Taing, and Scott Eadie, and it soon appeared that Eng Taing was using Greyson ONE as a "back channel" to pay Eng's investors, with the result that there was no money to pay Greyson ONE's payroll and expenses. Jimmy Chhor, Eng Taing's cousin, dissolved Greyson ONE on 5/2/23. On

DECLARATION OF HAN TRINH IN SUPPORT OF GREYSON LAW CENTER PC MOTION FOR
ALLOWANCE AND PAYMENT OF ADMINISTRATIVE CLAIM, TO BE PAID BY BANKRUPTCY ESTATE
OF DEBTOR LITIGATION PRACTICES GROUP PC ("LPG")    4

EXHIBIT 4, PAGE 243

5/11/23, an unknown number sent a screenshot to the attorneys working for

Greyson ONE, showing Greyson ONE was dissolved.  The records of the

California Secretary of State report Greyson ONE as "terminated" (attached to

Declaration of Kathleen P. March, Esq. to this Motion).

7.      The present Greyson Law Center PC ("Greyson" herein) was

incorporated on 5/12/23, CA corporation no.5714736, by Scott Eadie, who was,

and at all times has been, the 100% shareholder of the 5/12/23 Greyson Law

Center PC.

8.      Greyson attorneys were hired by Phoenix Law Group, Consumer

Legal Group, and other law firms to work cases for those entities, because those

entities had no attorneys. Scott, Jayde, and I held multiple network meetings with

the Greyson attorneys and determined that Phoenix Law and Consumer Legal

should pay Greyson, for using Greyson attorneys, and then Greyson would pay

Greyson's attorneys.

9.      Scott Eadie, Jayde, and I determined that the range of what attorneys

were being paid per case by other law firms, ranged from $1,400-$2,500.  Scott,

Jayde, I, and the Greyson attorneys, settled on charging Phoenix and Consumer

Legal, and other law firms that used Greyson's attorneys, $2,000 per case, to be

paid to Greyson, to use Greyson's attorneys.  $2,000 per case was a low amount,

considering Greyson had to pay the attorneys, had to pay rent, and other overhead,

to supply attorneys nationwide.

DECLARATION OF HAN TRINH IN SUPPORT OF GREYSON LAW CENTER PC MOTION FOR
ALLOWANCE AND PAYMENT OF ADMINISTRATIVE CLAIM, TO BE PAID BY BANKRUPTCY ESTATE
OF DEBTOR LITIGATION PRACTICES GROUP PC ("LPG")                                          5

Case 8:23-bk-10571-SC    Doc 1103    Filed 04/11/24    Entered 04/11/24 22:07:29    Desc
Main Document      Page 251 of 306

Case 8:23-bk-10571-SC    Doc 676-1    Filed 11/17/23    Entered 11/17/23 18:30:52    Desc
Declaration of Han Trinh with Exhibits    Page 6 of 71

10.    Phoenix Law Group had not yet paid a lot of the Greyson attorneys' 1099 invoices so those attorneys told Phoenix to just pay Greyson directly instead, and Greyson would pay those attorneys. Phoenix rarely paid any invoices our attorneys sent to them as 1099 contractors on time and that was no different when Greyson started being the one issuing invoices, which put Greyson in a bind of never making payroll on time. By the time Phoenix said it had funds to pay for work by Greyson attorneys, I just told them to send the wire in the amount due for that payroll.  That left a large amount still owed to Greyson by Phoenix, which was a bad situation for Greyson.

11.    A considerable number of clients of Phoenix Law Group and Consumer Legal Group were unhappy with those firms and told our Greyson attorneys that they wanted to hire our attorneys directly. Our attorneys would state that they work for Greyson and basically informed their contracted clients that they had the right to choose who handles their files/accounts. If the clients wanted to hire our attorneys directly, they were welcome to check out Greyson if they were interested. That was how we obtained Greyson's first 48 clients—they had been clients of other law firms, but they signed contracts to switch to Greyson representing them.

12.    While Greyson was working on building its client base, the lockout order and preliminary injunction were executed on Greyson, on Friday, 06/02/2023.

DECLARATION OF HAN TRINH IN SUPPORT OF GREYSON LAW CENTER PC MOTION FOR
ALLOWANCE AND PAYMENT OF ADMINISTRATIVE CLAIM, TO BE PAID BY BANKRUPTCY ESTATE
OF DEBTOR LITIGATION PRACTICES GROUP PC ("LPG")                                    6

EXHIBIT 4, PAGE 245

Case 8:23-bk-10571-SC    Doc 1103    Filed 04/11/24    Entered 04/11/24 22:07:29    Desc
Main Document    Page 252 of 306

Case 8:23-bk-10571-SC    Doc 676-1    Filed 11/17/23    Entered 11/17/23 18:30:52    Desc
Declaration of Han Trinh with Exhibits    Page 7 of 71

13.    The first time I ever heard about a Trustee, the lockout order, and the preliminary injunction against Greyson was when Tony Diab phoned me and asked me to come onto a three-way call with Tony Diab and Special Counsel to the Trustee, Christopher Celentino, on 06/02/2023.

14.    It was totally unexpected when Diab phoned me, saying Celentino wanted to speak with me.  I asked Diab who Celentino was. Diab told me Celentino would explain who he was and what was going on.  I told Diab he could merge me into the three-way call with Diab and Celentino. Celentino asked me if I knew he was, and I told him no.

15.    Celentino told me that Marshack has been appointed as Chapter 11 Trustee, that Celentino was Marshack's special counsel, that Tony Diab was no longer in control of debtor LPG, that Marshack was now in control of debtor LPG, and that Marshack had obtained an Order of the Bankruptcy Court locking out Greyson personnel from the Greyson Law Center PC office located at 3345 Michelson Dr., Irvine, CA, 92612, Suite 400 and enjoining Greyson personnel from touching anything related to Greyson.

16.    Celentino told me that Celentino would like to be able to go back to Judge Clarkson and let him know that I have been fully cooperative and helpful, since it would work better in my favor if I were to do as Celentino requested.

17.    Celentino told me he was aware I had sent everyone home.  I told Celentino that it was a well-known protocol amongst Greyson employees that if

DECLARATION OF HAN TRINH IN SUPPORT OF GREYSON LAW CENTER PC MOTION FOR
ALLOWANCE AND PAYMENT OF ADMINISTRATIVE CLAIM, TO BE PAID BY BANKRUPTCY ESTATE
OF DEBTOR LITIGATION PRACTICES GROUP PC ("LPG")                                                7

EXHIBIT 4, PAGE 246

they were not paid on time, they were allowed to go home, with no consequences against them, until they received their pay. I also told Celentino that staff had heard a huge commotion going on next door to Greyson's office, at Phoenix Law Group. For everyone's safety, I had Greyson's human resources department tell all Greyson personnel to leave the Greyson premises. I was not aware that it was the Trustee's personnel that were next door at Phoenix Law Group, locking the Phoenix personnel out of Phoenix Law Group.   Everyone at Greyson assumed that the commotion at Phoenix Law Group was another angry Phoenix Law Group investor coming to demand money from Phoenix Law Group, in a belligerent way.

18.    Celentino told me to tell Greyson's staff to return to work at Greyson. He did NOT pay the Greyson staff for coming back and working at Greyson, and he never paid them. I told Celentino that when I got off the call with him, I would have Greyson's HR person to notify Greyson's staff to come back to work at Greyson.

19.    Celentino asked me to give Celentino an email to contact me through, so he could send me the court papers, so I gave him my work email, admin@greysonlawpc.com. After getting off the phone with him, I received an email from Celentino saying I consented to the use of email and that on behalf of Greyson Law Center PC, which I had not agreed to do. But I replied to Celentino that I had received the document that he had served on me, for Greyson Law Center PC **(Exhibit A)**.

EXHIBIT 4, PAGE 247

Case 8:23-bk-10571-SC    Doc 1103    Filed 04/11/24    Entered 04/11/24 22:07:29    Desc
Main Document      Page 254 of 306

Case 8:23-bk-10571-SC    Doc 676-1    Filed 11/17/23    Entered 11/17/23 18:30:52    Desc
Declaration of Han Trinh with Exhibits    Page 9 of 71

20.    Since I did not fully understand the extent of the lockout and

Injunction Order, I called Celentino on Monday, 06/05/2023. He asked me

questions regarding Greyson and my involvement with Tony Diab. I told

Celentino that **Greyson had NO involvement with Tony Diab**. I told Celentino

that the only continued relationship Jayde Trinh and I had with Tony Diab and

Dan March, Esq, had ended when Jayde and I were locked out of Greyson's

offices on 6/2/23, was that, up to 6/2/23,  Jayde and I had continued to oversee the

thousands of lawsuits of LPG clients, which were active litigations, answering the

many daily emails from LPG clients who wanted to know where were there

attorneys and what was the status of their cases.

21.    I told Celentino that he had no idea how difficult it had been for me

and Jayde, working at LPG, and that I hated Diab, and that Diab had no link to, or

part in, Greyson.

22.    I also warned Celentino, that to my knowledge, the people (Russell

Squires, Gary Depew, and Alex Rubin) who were appointed by the Trustee to run

Greyson, during the lockout on 6/2/23 onward, were related to Validation Partners

LLC and Morning Financial LLC --unsecured creditors of LPG. I told Celentino

that Validation Partners and Morning Financial were competitors of Greyson, so

they should **not** be running Greyson during the lockout. Celentino did not respond

to me about that concern but said he would like to hear more from me and that

DECLARATION OF HAN TRINH IN SUPPORT OF GREYSON LAW CENTER PC MOTION FOR
ALLOWANCE AND PAYMENT OF ADMINISTRATIVE CLAIM, TO BE PAID BY BANKRUPTCY ESTATE
OF DEBTOR LITIGATION PRACTICES GROUP PC ("LPG")                                    9

EXHIBIT 4, PAGE 248

Case 8:23-bk-10571-SC    Doc 1103    Filed 04/11/24    Entered 04/11/24 22:07:29    Desc
Main Document    Page 255 of 306

Case 8:23-bk-10571-SC    Doc 676-1    Filed 11/17/23    Entered 11/17/23 18:30:52    Desc
Declaration of Han Trinh with Exhibits    Page 10 of 71

maybe we could meet that Wednesday, 06/07/2023. I told Celentino: absolutely.

05/03 status conference

23.    Between Monday (6/5/23) and Wednesday (6/7/23), I received various emails from Celentino's office, including an email from Jonathan Serrano requesting my home address for mailing purposes (which is how I was served the adversary proceeding documents in the mail that I received later in the week) **(Exhibit B)**. Another email I received from Jonathan Serrano requested that he wanted me to hand over a list of all Greyson employees, including their titles and salaries in a three-column spreadsheet **(Exhibit C)**. I thought that was strange since I did not see how that would assist Celentino in their investigation, but I instructed HR to do so.

24.    Jayde and I were locked out of the offices we occupied at Greyson, from 6/2/23 through the sale of LPG assets to Morning Law Group 8/4/23, which ended with my personal belongings being sold off to Morning Law Group as well.

25.    Many of Greyson staff members were emailing Celentino's team-- Jonathan Serrano, Edward Hayes, Christopher Ghio, Trustee personnel etc. – asking them what was going on and when would they be paid by Trustee, since Trustees' field agents (Lori Bicher/Ensley, Gary Depew Alex Rubin, and Russell Squires) had taken over Greyson's operations, as of 6/2/23, and had told the rest of the Greyson staff (not me and Jayde) that the rest of the Greyson staff were to come back to Greyson to continue working as usual.

EXHIBIT 4, PAGE 249

Case 8:23-bk-10571-SC    Doc 1103    Filed 04/11/24    Entered 04/11/24 22:07:29    Desc
Main Document    Page 256 of 306

Case 8:23-bk-10571-SC    Doc 676-1    Filed 11/17/23    Entered 11/17/23 18:30:52    Desc
Declaration of Han Trinh with Exhibits    Page 11 of 71

26.    Since there was much resistance from the Greyson employees, Celentino asked me if Jayde and I could relay the Trustee's message to the Greyson's employees if the Trustee's field agents were to gather the Greyson employees together. "Indeed, we will gather them all together and put you both on speak(er) so you and Ja(y)de can express this sentiment to all the employees" **(Exhibit D)**.

27.    I did **<u>not</u>** respond to that email because I felt at a loss and uncomfortable. My thought process was, I was supposed to be locked out of everything related to Greyson and Judge Clarkson's preliminary injunction froze everything at Greyson, so it seemed wrong for me to try to convince Greyson staff to keep working, when they had yet to be paid, and had no commitment that the Trustee would pay them.

28.    On Wednesday, 06/07/2023, I called Celentino again to see when and where we would be meeting that day. I left him a voicemail. When it was getting late in the day, I decided to call his law office, Dinsmore & Shohl LLP, and requested to speak to him or someone from his office. I was told they would pass on my message. Instead of getting a call, I got an email from Celentino directly.

29.    Celentino's email to me stated Celentino wanted to make sure that I knew the Order I had been served on me required me to appear before Judge Clarkson on 06/12/2023 at 1:30PM. **(Exhibit E)**. I responded that I had reviewed all the court documents that I received and that I could not find where it stated that

EXHIBIT 4, PAGE 250

I was required to appear. I also asked if we were going to still be meeting.

Celentino then emailed back to me, stating that "it looks like you were accidentally

left out of the first round of the order. We will fix that for future appearances and

depositions. I wouldn't want Judge Clarkson to miss your testimony about you and

Ja(y)de being the brainchildren behind Greyson, your anger, and your complete

disassociation from Tony in all respects, and your alleged complete lack of

involvement in the operations that appear to have seriously hurt clients and

creditors. There is no reason for us to meet until after hearing before Judge

Clarkson on Monday. His direction will guide further action" **(Exhibit F and

Exhibit G)**.  I do not know if that was in response to me not passing on the

message to Greyson's staff like he wanted or he had not planned on meeting me at

all to begin with.

30.    Greyson staff members were continuously emailing Celentino and the

Trustee's Personnel (and copying me), regarding their payroll, wanting to know

why they had to continue working if they were not being paid, and informing them

that Greyson's operations were falling apart **(Exhibit H, Exhibit I, Exhibit J,

Exhibit K, Exhibit L, Exhibit M, Exhibit N, Exhibit O, Exhibit P, Exhibit Q

and Exhibit R).** Greyson's HR person had sent multiple emails to Celentino and

other Trustee Personnel regarding how to go about payroll and how she should

proceed with her duties **(Exhibit S and Exhibit T)** with no response until a couple

of days later, she got a response that just stated, "okay".  If other staff members did

EXHIBIT 4, PAGE 251

Case 8:23-bk-10571-SC    Doc 1103    Filed 04/11/24    Entered 04/11/24 22:07:29    Desc
Main Document      Page 258 of 306

Case 8:23-bk-10571-SC    Doc 676-1    Filed 11/17/23    Entered 11/17/23 18:30:52    Desc
Declaration of Han Trinh with Exhibits    Page 13 of 71

receive a response from the Trustee, it was a copy and paste response that attorney

Jonathan Serrano was sending out to everyone **(Exhibit U).**

31.    Celentino emailed one of Greyson's W-2 CA attorneys, Israel Orozco,

asking if Scott Eadie (who was the managing attorney for Greyson) was a lawyer,

and stating that Jayde Trinh (who is an attorney) was not a lawyer, and asking

which lawyer was supervising Greyson Law Center **(Exhibit V)**. Scott Eadie is

Greyson Law Center's Managing Attorney. Attorney Orozco responded with an

explanation as to who Scott Eadie and Jayde Trinh were and their job descriptions

**(Exhibit W and Exhibit X)**. Celentino responded that he would reach out to Scott

and Jayde, but never did so, from the Lockout and Preliminary Injunction Order on

6/2/23, to present **(Exhibit Y)**.

32.    I attended the Bankruptcy Court hearing held 6/12/23.  At the

bankruptcy court hearing on 06/12/2023, Trustee's attorney, Celentino, admitted

**that Greyson was NOT an alter ego of debtor LPG**.  Pages 33-34 of the 6/12/23

court transcript where Celentino admitted this are attached as **Exhibit G** to the

Declaration of Kathleen P. March, Esq. to this Motion.

33.    **Greyson was a direct competitor with LPG, not an alter ego of**

**LPG**.  Greyson was doing the same business as LPG had been doing (representing

consumer clients in defending them against debt claims made by creditors,

including defending those clients in court suits, if necessary).  But Scott Eadie,

---

DECLARATION OF HAN TRINH IN SUPPORT OF GREYSON LAW CENTER PC MOTION FOR
ALLOWANCE AND PAYMENT OF ADMINISTRATIVE CLAIM, TO BE PAID BY BANKRUPTCY ESTATE
OF DEBTOR LITIGATION PRACTICES GROUP PC ("LPG")                    13

EXHIBIT 4, PAGE 252

Case 8:23-bk-10571-SC    Doc 1103    Filed 04/11/24    Entered 04/11/24 22:07:29    Desc
Main Document    Page 259 of 306

Case 8:23-bk-10571-SC    Doc 676-1    Filed 11/17/23    Entered 11/17/23 18:30:52    Desc
Declaration of Han Trinh with Exhibits    Page 14 of 71

Esq, Jayde, I, and the Greyson W-2 and 1099 attorneys, were trying to do that business better than LPG, and other law firms that were doing that business.

34.    It was **unfair competition** by LPG against Greyson, that Trustee Marshack/Celentino/Trustee's field agents locked Scott, Jayde, other Greyson personnel, and me out of Greyson's office, and froze all Greyson's property and data, on 6/2/23 , **then froze even more Greyson systems data on 6/12/23**, when Trustee's attorney Celentino had obtained the 5/26/23 Lockout and Preliminary Injunction Order as to Greyson—by sealed motion, with no notice to Greyson-- by making the **FALSE** allegation that Greyson was the alter ego of debtor LPG (the allegation Celentino admitted was false, at the 6/12/23 court hearing).

35.    LPG's bankruptcy estate has a duty to pay Greyson for the damage that Celentino and Celentino's field agents caused to Greyson, by getting that lockout order and preliminary injunction, by the false "alter ego" allegation, and pay Greyson for the further damage that Trustee caused Greyson, by failing to undo the lockout and by failing to immediately after the 6/12/23 court hearing, unfreeze all the Greyson items and data that Trustee/Celentino/Trustee's field agents had locked using the preliminary injunction—Celentino has never unlocked Greysons' emails to present--so Greyson could regain access to  Greyson's own data, to present.

36.    **Celentino and his Field Agents Seized/locked Greyson's LUNA account and database (which Greyson used to Manage Greyson's clients) on**

EXHIBIT 4, PAGE 253

Case 8:23-bk-10571-SC    Doc 1103    Filed 04/11/24    Entered 04/11/24 22:07:29    Desc
Main Document    Page 260 of 306

Case 8:23-bk-10571-SC    Doc 676-1    Filed 11/17/23    Entered 11/17/23 18:30:52    Desc
Declaration of Han Trinh with Exhibits    Page 15 of 71

**6/12/23—after the Court hearing where Celentino Admitted Greyson was Not an Alter Ego of LPG--and did NOT Restore Greyson's Access to LUNA until 7/7/23, despite Greyson's attorney Plazak demanding on 6/13/23 that Celentino return access to LUNA to Greyson.**  On Greyson's LUNA account, Greyson could only access/see Greyson's clients, and could not see clients of any other law firms that also used LUNA software.

37.    Celentino and Trustee personnel locked Greyson out **completely** from accessing Greyson's LUNA account, **after** the court hearing on 6/12/23, despite the fact that, at the court hearing on 6/12/23, Celentino admitted, to the Court, on the record, that Greyson was NOT an alter ego of LPG.  Celentino had no basis for locking Greyson out of accessing Greyson's LUNA account, after the 6/12/23 hearing, in which Celentino **admitted** Greyson was NOT an alter ego of LPG

38.    I told Celentino several times that on Greyson's LUNA account, Greyson could only access/see Greyson's clients, and could not see clients of any other law firms that also used LUNA software.  Despite my explaining this to Celentino, repeatedly, Celentino refused to allow Greyson to access Greyson's LUNA account, until a month later with a time limit of two weeks to gather all the necessary data before the login credentials provided would expire. Locking Greyson out of its data has severely damaged Greyson.

DECLARATION OF HAN TRINH IN SUPPORT OF GREYSON LAW CENTER PC MOTION FOR
ALLOWANCE AND PAYMENT OF ADMINISTRATIVE CLAIM, TO BE PAID BY BANKRUPTCY ESTATE
OF DEBTOR LITIGATION PRACTICES GROUP PC ("LPG")    15

EXHIBIT 4, PAGE 254

Case 8:23-bk-10571-SC    Doc 1103    Filed 04/11/24    Entered 04/11/24 22:07:29    Desc
Main Document    Page 261 of 306

Case 8:23-bk-10571-SC    Doc 676-1    Filed 11/17/23    Entered 11/17/23 18:30:52    Desc
Declaration of Han Trinh with Exhibits    Page 16 of 71

39.   I told Celentino (through Plazak) that I was personally paying for Greyson's domain and Microsoft Office account and in no way was funding from LPG or its alter egos, contrary to what Celentino was alleging. Celentino not giving Greyson back its Microsoft Office account and domain was detrimental in more ways than one. Most of Greyson's mail was being scanned and received in Greyson's contact@greysonlawpc.com inbox. The rest of the mail was being delivered to Greyson's office at 3345 Michelson Drive, Irvine, CA 92612, Suite 400. At the 6/12/23 hearing, it was agreed upon that Greyson's "mail continue going to the Trustee, but the Trustee immediately reviews all mail that is going to Greyson and immediately turn it over if they feel that it would otherwise maintaining it would interfere with Greyson's operations. They could act as a gatekeeper but do it quickly." Celentino responded, "Quickly, your honor, is fine." Attorney Plazak asked for clarification, "by 'quickly', my assumption would be one to two business days?" The court affirmed, "That's what I think." Celentino stated that if they would be allowed to actually scan it to him, we can do it pretty quick. So it's not a problem" (6/12/23 Hearing Transcript pgs. 245 and 246; full 6/12/23 court hearing transcript is Exhibit G to March Decl). The Trustee interfered with Greyson's operations by not making sure that Greyson's mail was being forwarded, sent to, and received by Greyson. Lawsuits that Greyson clients mailed and emailed to Greyson were never received, checks clients mailed into Greyson were also lost, etc. By not returning Greyson's domain

---

DECLARATION OF HAN TRINH IN SUPPORT OF GREYSON LAW CENTER PC MOTION FOR
ALLOWANCE AND PAYMENT OF ADMINISTRATIVE CLAIM, TO BE PAID BY BANKRUPTCY ESTATE
OF DEBTOR LITIGATION PRACTICES GROUP PC ("LPG")                                    16

Case 8:23-bk-10571-SC    Doc 1103    Filed 04/11/24    Entered 04/11/24 22:07:29    Desc
Main Document    Page 262 of 306

Case 8:23-bk-10571-SC    Doc 676-1    Filed 11/17/23    Entered 11/17/23 18:30:52    Desc
Declaration of Han Trinh with Exhibits    Page 17 of 71

(greysonlawpc.com), Greyson was not able to update Greyson's website with new contact information in hopes Greyson's clients would be able to reach them since the Trustee did not return Greyson's 48 seized client files to Greyson for a month after the 6/12/23 hearing.

40.    It was **illegal interference with Greyson's LUNA account and data**—**which was Greyson's property**-- for Celentino to lock Greyson out of Greyson's LUNA account on 6/12/23, **after** the hearing on 6/12/23, and keep Greyson locked out of Greyson's LUNA account until 7/7/23.  Celentino's conduct constituted the **conversion** (unlawful taking) of Greyson's LUNA account and data, which I understand is a tort.  Because Greyson was a direct competitor of LPG, Celentino converting Greyson's LUNA account and data, constituted <u>unfair competition</u>, by LPG, with Greyson.

41.    Greyson attorney Plazak emailed Celentino on 6/13/23, requesting Celentino to give Greyson access to Greyson's LUNA account and data, which Celentino had finished seizing after Court on 6/12/23.

42.    **It was not until 7/7/23 that Celentino/his field agents handed over temporary login credentials to Greyson, to allow Greyson to re-access LUNA** so that Greyson could access Greyson's client list and manage the clients' services**. Those were temporary login credentials which would expire in two weeks' time.**

DECLARATION OF HAN TRINH IN SUPPORT OF GREYSON LAW CENTER PC MOTION FOR
ALLOWANCE AND PAYMENT OF ADMINISTRATIVE CLAIM, TO BE PAID BY BANKRUPTCY ESTATE
OF DEBTOR LITIGATION PRACTICES GROUP PC ("LPG")    17

EXHIBIT 4, PAGE 256

Case 8:23-bk-10571-SC    Doc 1103    Filed 04/11/24    Entered 04/11/24 22:07:29    Desc
Main Document    Page 263 of 306

Case 8:23-bk-10571-SC    Doc 676-1    Filed 11/17/23    Entered 11/17/23 18:30:52    Desc
Declaration of Han Trinh with Exhibits    Page 18 of 71

43.    Greyson's W-2 attorney employees used Greyson's LUNA account to list and manage the services for the clients that each of those attorneys was servicing for Greyson.  They were also given individual accounts to Phoenix Law Group's LUNA account and individual accounts to Consumer Legal's Debt Pay Pro account by those law firms directly so that they could be able to access information regarding clients they were representing when assigned a case. From my knowledge, they were to leave documentation regarding the status of the case assignment and all communications with the clients in each of those law firms' database so that those law firms would be up to date regarding the status of the lawsuit and be able to provide updates to their clients when necessary. Only Greyson attorneys were given access to those law firms' CRM. Greyson itself and non-attorney staff had no means of access to any clients other than Greyson's.

44.    When Celentino finalized locking Greyson out of Greyson's LUNA account and emails, on 6/12/23, after Court that day, lockout also  included locking Greyson's W-2 attorney employees out of the Greyson LUNA account, preventing Greyson's attorneys from accessing the data on clients they were appearing for in lawsuits. Celentino/his field agents  refused to allow Greyson's W-2 attorney employees to access to any of their client data on Greyson's LUNA account, unless each Greyson attorney sent Celentino and additional people (Alex

DECLARATION OF HAN TRINH IN SUPPORT OF GREYSON LAW CENTER PC MOTION FOR
ALLOWANCE AND PAYMENT OF ADMINISTRATIVE CLAIM, TO BE PAID BY BANKRUPTCY ESTATE
OF DEBTOR LITIGATION PRACTICES GROUP PC ("LPG")                                                    18

EXHIBIT 4, PAGE 257

Case 8:23-bk-10571-SC   Doc 1103   Filed 04/11/24   Entered 04/11/24 22:07:29   Desc
Main Document      Page 264 of 306

Case 8:23-bk-10571-SC   Doc 676-1   Filed 11/17/23   Entered 11/17/23 18:30:52   Desc
Declaration of Han Trinh with Exhibits   Page 19 of 71

Rubin, an employee of Validation Partners LLC) a copy of their current

employment agreement/contract with Greyson.

45.   Celentino had no right to demand this because Greyson's contracts

with Greyson's attorneys were property of Greyson, and **LPG was a direct**

**competitor of Greyson**.  In addition, Jonathan Serrano, Esq., an attorney of

Celentino's firm demanded—though he had no right to demand this—that I give a

list of all Greyson employees and what each of them was paid.  Greyson's Human

Resources Director gave this list to Serrano, and thereafter, Morning Law Group

(winning buyer of LPG's assets at the 8/4/23 bankruptcy court sale of the LPG

assets) "poached" (i.e. hired away from Greyson, to work for Morning Law

Group) almost all of Greyson's W-2 attorneys, obviously using Greyson's list,

which Trustee had no right to give to **Morning Law Group, which was a**

**competitor of Greyson**. Greyson employees were even receiving insurance cards

with Resolution Processing LLC, the processing center used by Morning Law

Group, as their listed employer around early September 2023.

46.   Morning Law Group was the winning buyer of debtor LPG's assets, at

the sale held by the Bankruptcy Court on 8/4/23 and "poached" Greyson's

attorneys shortly thereafter. Morning Law Group, Resolution Processing, and

Phoenix Law Group have many of the same employees and/or former employees.

To my knowledge, former defendants within the adversary, Phoenix Law Group's

DECLARATION OF HAN TRINH IN SUPPORT OF GREYSON LAW CENTER PC MOTION FOR
ALLOWANCE AND PAYMENT OF ADMINISTRATIVE CLAIM, TO BE PAID BY BANKRUPTCY ESTATE
OF DEBTOR LITIGATION PRACTICES GROUP PC ("LPG")                    19

EXHIBIT 4, PAGE 258

Case 8:23-bk-10571-SC    Doc 1103    Filed 04/11/24    Entered 04/11/24 22:07:29    Desc
Main Document    Page 265 of 306

Case 8:23-bk-10571-SC    Doc 676-1    Filed 11/17/23    Entered 11/17/23 18:30:52    Desc
Declaration of Han Trinh with Exhibits    Page 20 of 71

Managing Attorney William Ty Carss and Director of Operations Maria Eeyah

Tan are now official employees of Resolution Processing. On 6/2/23, when

Celentino and the Trustee field agents executed the lockout and preliminary

injunction on Phoenix Law Group and Consumer Legal Group--which are LPG's

"alter egos"--these field agents also executed the lockout and preliminary

injunction on  Greyson (wrongful as to Greyson, because by Celentino admitted,

at the 6/12/23 hearing, that Greyson is NOT to be an alter ego of LPG).  Celentino

and field agents took everything of all 3 entities.

47.    The Greyson data seized included all Greyson's protocols for

servicing clients and included all Greyson's trade secrets. Greyson's protocols,

confidential employee and client information, and trade secrets are now being used

by Morning Law Group, the buyer at the 8/4/23 sale, and its processor, Resolution

Processing LLC. One of the Trustee's field agents, Gary Depew, who was present

to seize the assets of all these entities, is the Chief Strategy Officer of Resolution

Processing LLC, which is the B2B company that is servicing buyer Morning Law

Groups' clients, which are the LPG clients that Morning Law Group purchased in

the LPG asset sale held 8/4/23.  Gary Depew is also the Co-Founder and Chief

Operating Officer of Morning Financial LLC. Seizing Greyson's protocols for

servicing clients, and seizing all Greyson's trade secrets, and locking Greyson out

from using Greyson's data, was and is wrongful.  But it is obvious that these field

DECLARATION OF HAN TRINH IN SUPPORT OF GREYSON LAW CENTER PC MOTION FOR
ALLOWANCE AND PAYMENT OF ADMINISTRATIVE CLAIM, TO BE PAID BY BANKRUPTCY ESTATE
OF DEBTOR LITIGATION PRACTICES GROUP PC ("LPG")                    20

EXHIBIT 4, PAGE 259

Case 8:23-bk-10571-SC    Doc 1103    Filed 04/11/24    Entered 04/11/24 22:07:29    Desc
Main Document    Page 266 of 306

Case 8:23-bk-10571-SC    Doc 676-1    Filed 11/17/23    Entered 11/17/23 18:30:52    Desc
Declaration of Han Trinh with Exhibits    Page 21 of 71

agents who seized the data that shows Greyson's protocols for servicing clients, seized the data including all Greyson's trade secrets, which is now conveniently accessible to Resolution Processing LLC and Morning Law Group, is illegal use of Greyson's proprietary data, and is unfair competition against Greyson by Morning Law Group and Resolution Processing.

48.    During the 6/2/23 lockout Celentino's staff seized my computer, managing attorney Scott Eadie's computer, and all the other computers in the Greyson offices, and **have never returned those computers to Greyson, and never allowed Greyson to access Greyson's data in Greyson's computers, to present.** Celentino required the Greyson IT staff to give him access to the data in those computers, and the IT staff did so, including to those computers' "cloud" storage. I, Jayde Trinh and Scott Eadie were all locked out of accessing those computers' "cloud storage" and no longer had the computers themselves, as the field agents took them all on 6/2/23. This cut Greyson off from all the data and documents stored on all those computers, including stored on the "cloud storage" of those computers.

49.    Celentino only got the 5/26/23 Lockout and Preliminary Injunction Order against Greyson, based on the **false allegation** that Greyson was the alter ego of debtor LPG. When Celentino admitted, at the 6/12/23 hearing, that Greyson was NOT the alter ego of LPG, Celentino **had a duty to immediately**

EXHIBIT 4, PAGE 260

**UNDO the lockout order and UNDO the preliminary injunction**, as to

Greyson.  (Discussed in March Decl to this Motion)  But instead of requesting the

Court to UNDO the Lockout and Preliminary Injunction, as to Greyson, Celentino

kept Greyson locked down for months, and for some things,  kept Greyson locked

down  to present.

50.    My understanding, from attending the 6/12/23 hearing, was that all

Greyson personnel, including Scott, Jayde, and I, who had been locked out of our

offices at Greyson, on 6/2/23, were allowed to return to our offices at Greyson, and

that Trustee/Celentino/Trustee's field agents, would give Greyson back access to

Greyson's bank accounts, payment processors, email, client files, domain, and to

everything else that Trustee/Celentino/Trustee's field agents had frozen, on 6/2/23.

**But this did NOT happen, to present.**

51.    Attorney Douglas Plazak represented Greyson at the 6/12/23 hearing.

The day after the 6/12/23 hearing, Celentino emailed Plazak, demanding that

Plazak show Celentino signed retention agreements for our 48 clients that had

moved to Greyson, from LPG and other firms, before he would hand over the 48

client files (which had been seized in the Lockout of Greyson on 6/2/23) back to

Greyson **(Decl Plazak)**. Attorney Plazak responded stating that the LPG

bankruptcy estate had seized, and therefore had access to, Greyson's LUNA

Customer Management Relationship account, while Celentino/his field agents, had

frozen/locked Greyson out of accessing Greyson's LUNA account, with the result

DECLARATION OF HAN TRINH IN SUPPORT OF GREYSON LAW CENTER PC MOTION FOR
ALLOWANCE AND PAYMENT OF ADMINISTRATIVE CLAIM, TO BE PAID BY BANKRUPTCY ESTATE
OF DEBTOR LITIGATION PRACTICES GROUP PC ("LPG")                                                22

EXHIBIT 4, PAGE 261

Case 8:23-bk-10571-SC    Doc 1103    Filed 04/11/24    Entered 04/11/24 22:07:29    Desc
Main Document    Page 268 of 306

Case 8:23-bk-10571-SC    Doc 676-1    Filed 11/17/23    Entered 11/17/23 18:30:52    Desc
Declaration of Han Trinh with Exhibits    Page 23 of 71

that Celentino had the capability to confirm the status of the Greyson's clients, while Greyson did not have access to do so.  Plazak requested Celentino to Trustee to immediately return to Greyson, Greyson's 48 client files which Celentino's field agents had taken. **(see Decl Plazak to this Motion)**. But Celentino delayed returning the 48 client files for a month, with the result that Greyson lost 22 of the 48 clients, because the clients and Greyson could not contact each other for a month.

52.    At the 6/12/23 hearing, Celentino had stated, "They [Greyson] have nothing to do with the **transferred operation of LPG that's in the hands of Phoenix**. And they can do with those 48 clients with the Court's blessing—it would be the trustee's request—they can do with those 48 clients and the 90 employees and the 28 attorneys whatever they wish" **(Transcript of 6/12/23 Hearing pg. 228 is attached as Exhibit G to March Decl).** "We don't want to manage Greyson. **We don't want any interaction with Greyson.** We will not pay the payroll of Greyson. And we want that to be clear because that's what the TRO says, there is to be no movement of monies" **(Transcript of 6/12/23 Hearing pg. 227).**

53.    But what Celentino said at the 6/12/23 hearing was NOT how he acted.   After the 6/12/23 hearing Celentino finalized locking Greyson out of Greyson's LUNA account, which was the software Greyson used to keep track of and service its clients.  Doing that made it even more difficult for Greyson to try to

EXHIBIT 4, PAGE 262

Case 8:23-bk-10571-SC    Doc 1103    Filed 04/11/24    Entered 04/11/24 22:07:29    Desc
Main Document    Page 269 of 306

Case 8:23-bk-10571-SC    Doc 676-1    Filed 11/17/23    Entered 11/17/23 18:30:52    Desc
Declaration of Han Trinh with Exhibits    Page 24 of 71

operate.   Celentino/his field agents actions toward Greyson, after the 6/12/23

hearing, were aimed at keeping Greyson shutdown—so Greyson could not

compete effectively with LPG/Phoenix, and so Phoenix could take Greyson's 22

high fee clients.  Celentino obviously gave Phoenix access to Greyson's 48 client

files, and did not give those files back to Greyson, until Phoenix had taken those of

Greyson's clients that Phoenix wanted (the 22 high fee clients).

54.    Trustee/Celentino/Trustee's field agents **prevented Greyson from**

**operating for 2 months, after 6/2/23, by seizing, then not returning, Greyson's**

**48 client files to Greyson  for a month, never returning Greyson's domain to**

**present, never returning  Greyson's access to Greyson's emails to present,**

**seizing on 6/2/23 Greyson's computers, and never returning Greyson's**

**computer/their data to Greyson to present, never returning access to**

**Greyson's Microsoft Office account to present, and never forwarding**

**Greyson's mail (which Celentino had the US postal service send to Celentino)**

**on to Greyson,  to present.** The conduct of Celentino/his field agents toward

Greyson was certainly negligent.  But that conduct was more than just negligence,

that conduct constituted **unfair competition by LPG, against Greyson, a direct**

**competitor of LPG.   It is my understanding that unfair competition is illegal.**

Celentino had no right to prevent Greyson from accessing everything that the

Trustee seized and/or froze on 6/2/23, and had no right to seize Greyson's LUNA

account, which Celentino locked Greyson out of on 6/12/23, **after** the 6/12/23

DECLARATION OF HAN TRINH IN SUPPORT OF GREYSON LAW CENTER PC MOTION FOR
ALLOWANCE AND PAYMENT OF ADMINISTRATIVE CLAIM, TO BE PAID BY BANKRUPTCY ESTATE
OF DEBTOR LITIGATION PRACTICES GROUP PC ("LPG")          24

EXHIBIT 4, PAGE 263

Case 8:23-bk-10571-SC    Doc 1103    Filed 04/11/24    Entered 04/11/24 22:07:29    Desc
Main Document      Page 270 of 306

Case 8:23-bk-10571-SC    Doc 676-1    Filed 11/17/23    Entered 11/17/23 18:30:52    Desc
Declaration of Han Trinh with Exhibits    Page 25 of 71

Court hearing.  The 5/26/23 Lockout and Preliminary Injunction order were

wrongfully obtained by the Trustee, against Greyson, by the false allegation that

Greyson was an alter ego of LPG, when Greyson was a direct competitor of LPG,

not an alter ego of LPG. Celentino/field agents locking Greyson out of LUNA and

Greyson's emails on 6/12/23, after Celentino admitted to the Court that Greyson

was not an alter ego of LPG, was even more wrongful, an Celentino/his field

agents **have never let Greyson back in to Greyson's emails to present**.

55.    It was additionally wrongful that Celentino/field agents demanded that

Greyson prove Greyson did not use any listed defendant's money to purchase any

of Greyson's property/systems/email, domain, etc. that Celentino had frozen on

6/2/23 and 6/12/23, before Trustee would restore Greyson's access to those items

**(see Decl Plazak to this Motion)**.  Even though I had proof  that I was paying for

Greyson's domain ($30.16/month), virtual mailbox ($74.19/month), MyFax

Services ($12/month), and Microsoft accounts ($2,312.25/month) with my own

money, Celentino kept disputing that Greyson had purchased its own domain since

he alleged (falsely as I bought that domain, and was paying the monthly fee for

that domain) that any monies used by Greyson or even by me personally were

stolen from LPG or derived from LPG since it was yet to be determined if I had

provided any value to LPG in the first place.  Celentino's position was that if

Greyson wanted access to its domain and emails, Greyson would have to wait until

the Trustee offered to sell those back to Greyson, or Greyson had to give in to

DECLARATION OF HAN TRINH IN SUPPORT OF GREYSON LAW CENTER PC MOTION FOR
ALLOWANCE AND PAYMENT OF ADMINISTRATIVE CLAIM, TO BE PAID BY BANKRUPTCY ESTATE
OF DEBTOR LITIGATION PRACTICES GROUP PC ("LPG")                                25

EXHIBIT 4, PAGE 264

Case 8:23-bk-10571-SC    Doc 1103    Filed 04/11/24    Entered 04/11/24 22:07:29    Desc
Main Document      Page 271 of 306

Case 8:23-bk-10571-SC    Doc 676-1    Filed 11/17/23    Entered 11/17/23 18:30:52    Desc
Declaration of Han Trinh with Exhibits    Page 26 of 71

(wrongful) demands made by Celentino/field agents. Celentino/his field agents agents did not even return to Greyson, boxes of blank Greyson business checks, which were clearly Greyson's and were clearly not property of debtor LPG, which Celentino's field agents had seized on 6/2/23.

56.    The way that Celentino and Trustee's field agents acted was **an abuse of power**. Greyson must properly be allowed and paid the administrative claims against the LPG bankruptcy estate, that Greyson here moves for the $300,633 of damages Celentino and Trustee's field agents caused to Greyson, and for the $5,134,000 that LPG alter ego Phoenix owes Greyson, pursuant to the post-petition contract for Phoenix to pay Greyson $2,000 for each lawsuit where Greyson attorneys appeared for Phoenix, defending Phoenix consumer debtor clients in those lawsuits.

57.    Other than Plazak's communications with Celentino, as Greyson's administrator, I was the Greyson employee who had to repeatedly request Celentino/his field agents to return / return access to, everything belonging to Greyson, which Celentino/his field agents had seized/frozen and improperly refused to promptly return to Greyson that the Trustee had improperly taken or frozen. We were so desperate to get back access that I requested Celentino to allow Greyson to access 4 out of Greyson's 100+ email accounts, for 24 hours. Celentino/his field agents still turned down that request, unless Greyson agreed to follow Celentino's demanded protocols—which Celentino had no right to demand.

DECLARATION OF HAN TRINH IN SUPPORT OF GREYSON LAW CENTER PC MOTION FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE CLAIM, TO BE PAID BY BANKRUPTCY ESTATE OF DEBTOR LITIGATION PRACTICES GROUP PC ("LPG")                26

EXHIBIT 4, PAGE 265

Case 8:23-bk-10571-SC    Doc 1103    Filed 04/11/24    Entered 04/11/24 22:07:29    Desc
Main Document    Page 272 of 306

Case 8:23-bk-10571-SC    Doc 676-1    Filed 11/17/23    Entered 11/17/23 18:30:52    Desc
Declaration of Han Trinh with Exhibits    Page 27 of 71

Celentino denied Greyson access, **even AFTER the 06/12/2023 hearing (Exhibit CC)**.

58.    Creating protocols for Greyson and their employees to follow, and demanding those protocols be followed, is contrary to Celentino's statement at the 6/12/23 court  hearing, that:  "I want to be clear. We don't want anything to do with Greyson" **(6/12/23 Hearing Transcript pg. 249)**.

59.    With no access to Greyson's emails, domain, clients, payment processors, etc., Greyson was pretty much unable to operate, following the aftermath of Celentino and the Trustee's personnel reckless decision to withhold and not return all access. With Celentino denying Greyson and Greyson's W-2 attorneys to access Greyson's LUNA account, which Greyson used to manage clients, from 6/12/23 to 7/7/23, Greyson was **severely crippled**.

60.    Celentino/his field agents severely damaged Greyson by Celentino, causing Phoenix NOT to pay Greyson for the services ($2,000 per case) that Phoenix had contracted to pay to Greyson, to have Greyson attorneys represent Phoenix's consumer debtor clients in lawsuits.  That contract and work was after 3/2/23, the date on which LPG filed bankruptcy, and so was post-petition contract/services.   This includes that Celentino refused to make any payment of Greyson invoices **(Exhibit C)** for services Greyson attorneys performed for Phoenix, which Greyson properly billed and was in the middle of billing Phoenix for. Those invoices remain unpaid to present.  Phoenix Law Group and Consumer

DECLARATION OF HAN TRINH IN SUPPORT OF GREYSON LAW CENTER PC MOTION FOR
ALLOWANCE AND PAYMENT OF ADMINISTRATIVE CLAIM, TO BE PAID BY BANKRUPTCY ESTATE
OF DEBTOR LITIGATION PRACTICES GROUP PC ("LPG")                                    27

EXHIBIT 4, PAGE 266

Case 8:23-bk-10571-SC    Doc 1103    Filed 04/11/24    Entered 04/11/24 22:07:29    Desc
Main Document    Page 273 of 306

Case 8:23-bk-10571-SC    Doc 676-1    Filed 11/17/23    Entered 11/17/23 18:30:52    Desc
Declaration of Han Trinh with Exhibits    Page 28 of 71

Legal Group who were both found to be an alter ego of LPG, so the LPG

bankruptcy estate should have paid those invoices for post-petition services but did

not do so.

61.    Unable to operate, Greyson had to make the difficult decision to do a

mass layoff. The few employees that Greyson rehired, after 6/18/23, took a

massive pay cut so Greyson could try to survive what Celentino/his field agents

had done to Greyson basically so that the firm could sustain itself.

62.    Celentino said, at the 6/12/23 hearing, that Greyson could do whatever

we wish with the 90 employees and 28 attorneys of Greyson.  That was contrary to

Celentino having told me, on 6/2/23, that I was required to have all Greyson

employees return to the office to work, where the Trustee's field agents announced

in a meeting with Greyson employees that they, Lori Bicher, Alex Rubin, Gary

Depew, and Russell Squires, had taken over Greyson and operations was to

continue under them.  Those Greyson employees that worked, from 6/2/23 until

6/12/23, at Celentino's instruction never got paid for that work. Cutting access to

Greyson's phone system, emails, CRM account, etc., throughout the lockout order,

which crippled Greyson as a business. Greyson employees were sitting around

doing nothing because they were not instructed what to do, how to proceed, and

Greyson's usual operations were compromised since access was being taken away

one by one. Plenty of Greyson employees spoke directly and emailed the Trustee,

Trustee personnel, and the field agents asking for answers, guidance, and updates

EXHIBIT 4, PAGE 267

Case 8:23-bk-10571-SC   Doc 1103   Filed 04/11/24   Entered 04/11/24 22:07:29   Desc
Main Document       Page 274 of 306

Case 8:23-bk-10571-SC   Doc 676-1   Filed 11/17/23   Entered 11/17/23 18:30:52   Desc
Declaration of Han Trinh with Exhibits   Page 29 of 71

with no real update other than being often being told that they wish they could tell the employees the whole truth and that they felt bad for the employees who have been misled by Greyson's management team.

63.  Greyson's W-2 attorneys could not communicate with Greyson or with the clients they were appearing for, due to Celentino having locked them out of Greyson's emails, website, and LUNA access. The only updates they were able to get were by contacting Greyson's HR Department. But being attorneys, they could not just stop working on the lawsuits assigned to them.  They contacted Celentino/his personnel regarding what they were supposed to do since they wanted to make sure they did not violate the lockout order. They were informed to continue as usual with their representation of clients. Celentino had advised that the Celintino/his field agents would contact all attorneys who were handling LPG/Phoenix client files over the next 24 hours to either offer them some kind of deal to continue working directly for LPG/Phoenix, or they would be advised to cease all work on such files. They did no such thing. They kept stating that it was not their intention for the attorneys to work pro-bono and they did plan to get them paid. Requiring a protocol that Greyson's attorneys had to follow to gain traction regarding getting their pay and legal expenses such as sending an email of all the clients they were currently representing, a list of how many lawsuits they were currently working on, an expense report of what they have and had to pay out of pocket to cover legal expenses such as Nationwide Coverage, filing fees, etc. They

DECLARATION OF HAN TRINH IN SUPPORT OF GREYSON LAW CENTER PC MOTION FOR
ALLOWANCE AND PAYMENT OF ADMINISTRATIVE CLAIM, TO BE PAID BY BANKRUPTCY ESTATE
OF DEBTOR LITIGATION PRACTICES GROUP PC ("LPG")                                    29

EXHIBIT 4, PAGE 268

Case 8:23-bk-10571-SC    Doc 1103    Filed 04/11/24    Entered 04/11/24 22:07:29    Desc
Main Document      Page 275 of 306

Case 8:23-bk-10571-SC    Doc 676-1    Filed 11/17/23    Entered 11/17/23 18:30:52    Desc
Declaration of Han Trinh with Exhibits    Page 30 of 71

continued having such conversations and delayed direct reimbursements and payments to the attorneys until official sale date 8/4/23, which as of that date, the clients the attorneys represented now belong to Morning Law Group. What was really going on was that Celentino was demanding Greyson to supply Celentino with (and Greyson did so) the list of all Greyson employees and what they were paid, so that Phoenix, and later Morning Law Group (winning bidder at the LPG asset sale) could use that Greyson data to "poach" (aka hire those employees away from Greyson, to work for Phoenix or Morning Law Group).

64.    Greyson took a huge loss due to the Trustee's mishandling of Greyson's operations during the lockout order, improper at to Greyson, because it was obtained based on **false allegations** of Celentino's  declarants that Greyson was an alter ego of LPG. While Greyson was reeling from the damages created by the Trustee's carelessness, Morning Law Group began reaching out to Greyson's former attorneys one by one negotiating 1099 and W-2 contracts with them. Some attorneys were hired to just finish up their already assigned cases and some attorneys were hired to finish up their assigned cases and take on new cases. They were also told in their contract, which also had a no competition clause, that they were not allowed to work with any named defendants within the bankruptcy adversary; essentially cutting Greyson's ties with its former attorney network completely. Since Jayde and I were named defendants at the time, the connection that we had with our attorney network that we built together was severed as well.

DECLARATION OF HAN TRINH IN SUPPORT OF GREYSON LAW CENTER PC MOTION FOR
ALLOWANCE AND PAYMENT OF ADMINISTRATIVE CLAIM, TO BE PAID BY BANKRUPTCY ESTATE
OF DEBTOR LITIGATION PRACTICES GROUP PC ("LPG")                                      30

EXHIBIT 4, PAGE 269

Case 8:23-bk-10571-SC    Doc 1103    Filed 04/11/24    Entered 04/11/24 22:07:29    Desc
                    Main Document      Page 276 of 306

Case 8:23-bk-10571-SC    Doc 676-1    Filed 11/17/23    Entered 11/17/23 18:30:52    Desc
           Declaration of Han Trinh with Exhibits     Page 31 of 71

65.    Although Morning Law Group won the bid for assets, the Court and

Trustee requires them to follow certain procedures. One of them would be

informing their newly obtained clients of their right to opt in or opt out of being

represented by Morning Law. The original notice that Morning Law sent out to the

clients got sent to Greyson's clients as well, which created mass confusion for the

clients and questions if Greyson had any affiliation with LPG or Phoenix. Not to

mention the way Morning Law's Opt-Out response was worded. "Thank you for

contacting Morning Law Group, PC., the court-approved interim operator of

Litigation Practice Group, Phoenix Law Group, and certain other related law firms

(collectively, the "Previous Firms.")" **(Exhibit DD)**. "If you complete the opt-out

process: 1. You will no longer be represented by Phoenix Law Group, PC,

Litigation Practice Group, PC or one of its affiliated entities (if applicable),

including without limitation Greyson Law Center PC, Oakstone Law Group PC,

Phoenix Law Group PC, or Gallant Law Group PC" **(Exhibit EE)**. There was no

need to mention Greyson Law Center in that context or even at all.  A lot of clients

emailed, called, and left voicemails questioning the legitimacy of Greyson and

demanded clarity **(Exhibit FF and Exhibit GG).** Clients that were in the process

of being onboarded chose to not follow through with Greyson's representation and

the ones that did decide to follow through had to be reassured extensively.

66.    The official date of the sale was 8/4/23, but when I went to the

Greyson office on 8/1/23 with other Greyson employees to attempt to gather my

---

DECLARATION OF HAN TRINH IN SUPPORT OF GREYSON LAW CENTER PC MOTION FOR
ALLOWANCE AND PAYMENT OF ADMINISTRATIVE CLAIM, TO BE PAID BY BANKRUPTCY ESTATE
OF DEBTOR LITIGATION PRACTICES GROUP PC ("LPG")                                    31

personal belongings and to prepare to move to a different office space, we

discovered that we were completely locked out of Greyson's offices. We

immediately notified Attorney Plazak, who asked Celentino to let Greyson into the

locked Greyson offices to remove Greyson property.  Celentino responded

Greyson would not be allowed to move anything out of Greyson's office space

because as far as their assessment and review of records, money that came to

Greyson was sourced from theft of money and resources of LPG. That was totally

false, and Celentino had no evidence for that allegation.  He demanded that

Greyson demonstrate a source of funds from elsewhere **(see Decl Plazak)**. This

goes against what Celentino stated multiple times at the 6/12/23 hearing. "I don't –

I have no interest in whether they appear at the premises or they don't appear at

the premises. They're in a separate suite" **(Transcript of 6/12/23 Hearing pg.

228)**. "They're in a different suite. We have no interest in preventing them from

being in their suite" **(Transcript of 6/12/23 Hearing pg. 246).** "They have their

own fobs. They know how to get in and out" **(Transcript of 6/12/23 Hearing pg.

249)**.

   67.    Greyson did not receive access to any of Greyson's clients' files until

Friday, 07/07/2023 after business hours –**35 DAYS after the Lockout Order

(Exhibit GG)**. We were not able to attempt to contact any of our clients until

Monday, 07/10/2023. From that date, it took us about a month to be able to get a

hold of all our clients.

Case 8:23-bk-10571-SC    Doc 1103    Filed 04/11/24    Entered 04/11/24 22:07:29    Desc
Main Document    Page 278 of 306

Case 8:23-bk-10571-SC    Doc 676-1    Filed 11/17/23    Entered 11/17/23 18:30:52    Desc
Declaration of Han Trinh with Exhibits    Page 33 of 71

68.    By then, 22 (Total amount of fees the 22 clients would have paid

Greyson if they had not moved to Phoenx is $300,633.62) out of 46 clients (Total

value: $454,726.73) that were returned to us chose to no longer be represented by

Greyson, due to those 22 clients not being able to get a hold of us for over a month

(and vice versa, because Celentino locked Greyson's email).   Phoenix (which

Celentino was running as being an "alter ego" of debtor LPG) took most of the 22

of the 46 Greyson clients that were the high paying clients, during the month that

Celentino had siezed, and refused to return to Greyson, the 48 Greyson client files

that Celentino's field agents seized at Greyson's office, on 6/2/23.  During that

same month, Celentino kept Greyson shut out from Greyson's emails,  and kept

Greyson locked out of Greyson's LUNA account (which was Greyson's data base

for all Greyson's clients).  It is a miracle that Greyson retained any of the 46

Greyson clients, under these circumstances. We were only able to retain the 24 low

fee Greyson clients (Total value: $154.093.11).

69.    If the 22 clients Greyson lost had continued with Greyson's

representation, Greyson would have collected a total of $300,633.62 from those 22

clients. The itemization of these 22 "high fee" clients, showing the fees each

would have paid, which total $300,633.62, is **Exhibit HH** hereto.  The itemization

of the 24 "low fee" clients, showing the fees each would have paid is **Exhibit II**.

Because Celentino had seized all of Greyson's client files and client data, Phoenix

was able to take the "high fee" Greyson clients, which is obviously what

DECLARATION OF HAN TRINH IN SUPPORT OF GREYSON LAW CENTER PC MOTION FOR
ALLOWANCE AND PAYMENT OF ADMINISTRATIVE CLAIM, TO BE PAID BY BANKRUPTCY ESTATE
OF DEBTOR LITIGATION PRACTICES GROUP PC ("LPG")                                           33

EXHIBIT 4, PAGE 272

Case 8:23-bk-10571-SC    Doc 1103    Filed 04/11/24    Entered 04/11/24 22:07:29    Desc
Main Document    Page 279 of 306

Case 8:23-bk-10571-SC    Doc 676-1    Filed 11/17/23    Entered 11/17/23 18:30:52    Desc
Declaration of Han Trinh with Exhibits    Page 34 of 71

happened.  That was unfair competition against Greyson, because LPG/Phoenix were and are direct competitors of Greyson.

70.    In addition, due to Trustee's adversary proceeding suing Greyson as an alter ego of debtor LPG—an allegation Celentino admitted was false, at the 6/12/23 hearing-- certain vendors refuse to work with us **(Exhibit JJ)**. Even though Celentino admitted at the 06/12/2023 hearing that Greyson was not an alter ego of LPG, our payment processor at the time, Payliance, dropped us due to not wanting to have anything to do or with LPG or related to LPG. It took Greyson six weeks to find new payment processors that were willing to work with us. This means that we could not even process any payments made by Greyson clients, even after Greyson signed contracts with those Client and new Clients, obligating the Clients to pay Greyson.

71.    Right before the Lockout Order and Preliminary Injunction was executed on Greyson on 6/2/23, Greyson was receiving lists of lawsuits, as to which Phoenix Law Group had contracted with Greyson, for Greyson to supply Greyson's W-2 attorneys to work on, for Phoenix, for payment of $2,000 per lawsuit, to be paid to Greyson. Phoenix Law Group owed Greyson the contracted $2,000 per lawsuit, for that work, so that Greyson could pay the Greyson W-2 attorneys and Greyson's operations.

72.    To date, Phoenix has paid ZERO to Greyson, because Celentino has not permitted Phoenix to pay Greyson for **any** of the work done by Greyson

DECLARATION OF HAN TRINH IN SUPPORT OF GREYSON LAW CENTER PC MOTION FOR
ALLOWANCE AND PAYMENT OF ADMINISTRATIVE CLAIM, TO BE PAID BY BANKRUPTCY ESTATE
OF DEBTOR LITIGATION PRACTICES GROUP PC ("LPG")    34

EXHIBIT 4, PAGE 273

Case 8:23-bk-10571-SC    Doc 1103    Filed 04/11/24    Entered 04/11/24 22:07:29    Desc
Main Document    Page 280 of 306

Case 8:23-bk-10571-SC    Doc 676-1    Filed 11/17/23    Entered 11/17/23 18:30:52    Desc
Declaration of Han Trinh with Exhibits    Page 35 of 71

attorneys, which Phoenix contracted to pay Greyson for. (Han Trinh Decl).

Greyson needed those payments, per contract, so that Greyson could pay the

Greyson W-2 attorneys.

73.     Pursuant to Phoenix's **post-petition** contract with Greyson, for

Phoenix to pay Greyson $2,000 per lawsuit, to use Greyson attorneys to defend

Phoenix clients in lawsuits, Phoenix owes Greyson **$5,134,000**, NONE of which

Celentino has allowed Phoenix to pay to Greyson:


**1.**   Greyson's Texas and Oklahoma attorney worked, post-petition, on

approximately 1,500 lawsuits for Phoenix Law Group, pursuant to

Greyson's contract with Phoenix Law Group. 1,500 x $2,000 =

$3,000,000.

**2.**   One of Greyson's California attorneys worked post-petition, on

approximately 140 lawsuits for Phoenix Law Group, pursuant to

Greyson's contract with Phoenix Law Group.   140 x $2,000 = $280,000.

**3.**   Greyson's Louisiana attorney worked post-petition, on approximately 375

lawsuits for Phoenix Law Group, pursuant to Greyson's contract with

Phoenix Law Group. 375 x $2,000 = $750,000.

**4.**   Greyson's Florida attorney worked post-petition, on approximately 250

lawsuits for Phoenix Law Group, pursuant to Greyson's contract with

Phoenix Law Group. 250 x $2,000 = $500,000.

DECLARATION OF HAN TRINH IN SUPPORT OF GREYSON LAW CENTER PC MOTION FOR
ALLOWANCE AND PAYMENT OF ADMINISTRATIVE CLAIM, TO BE PAID BY BANKRUPTCY ESTATE
OF DEBTOR LITIGATION PRACTICES GROUP PC ("LPG")                                    35

EXHIBIT 4, PAGE 274

Case 8:23-bk-10571-SC    Doc 1103    Filed 04/11/24    Entered 04/11/24 22:07:29    Desc
Main Document    Page 281 of 306

Case 8:23-bk-10571-SC    Doc 676-1    Filed 11/17/23    Entered 11/17/23 18:30:52    Desc
Declaration of Han Trinh with Exhibits    Page 36 of 71

**5.** Greyson's Nevada and Arizona attorney worked post-petition on approximately 20 lawsuits at the time, for Phoenix Law Group, pursuant to Greyson's contract with Phoenix Law Group. 20 x $2,000 = $40,000.

**6.** Greyson's West Virgina attorney worked post-petition on approximately 30 lawsuits for Phoenix Law Group pursuant to Greyson's contract with Phoenix Law Group. 30 x $2,000 = $60,000.

**7.** Greyson's Illinois, Iowa, and Arkansas attorney worked post-petition on approximately 150 lawsuits for Phoenix Law Group, pursuant to Greyson's contract with Phoenix Law Group. 150 x $2,000 = $300,000.

**8.** Greyson's Managing Attorney, Scott Eadie, worked post-petition on approximately 102 lawsuits for Phoenix Law Group, pursuant to Greyson's contract with Phoenix Law Group. 102 x $2,000 = $204,000.

74.    Just for these attorneys' work alone, Greyson is owed **$5,134,000** by Phoenix Law Group—which Celentino had taken over running as being an alter ego of debtor LPG.  But when Celentino took over running Phoenix Law Group (as being an alter ego of debtor LPG), Celentino refused**, wrongfully,** to pay Greyson the  contracted for $2,000 per lawsuit, for **any** of the lawsuits where Greyson attorneys been hired to litigate the suits for Phoenix Law  Center, for $2,000 per lawsuit to be paid to Greyson by Phoenix Law Center.

DECLARATION OF HAN TRINH IN SUPPORT OF GREYSON LAW CENTER PC MOTION FOR
ALLOWANCE AND PAYMENT OF ADMINISTRATIVE CLAIM, TO BE PAID BY BANKRUPTCY ESTATE
OF DEBTOR LITIGATION PRACTICES GROUP PC ("LPG")                                                    36

EXHIBIT 4, PAGE 275

Case 8:23-bk-10571-SC    Doc 1103    Filed 04/11/24    Entered 04/11/24 22:07:29    Desc
Main Document    Page 282 of 306

Case 8:23-bk-10571-SC    Doc 676-1    Filed 11/17/23    Entered 11/17/23 18:30:52    Desc
Declaration of Han Trinh with Exhibits    Page 37 of 71

75.     Greyson's accounting department had sent Phoenix over 2000 invoices ($2,000 per lawsuit), for this work, pursuant to the Greyson-Phoenix contract, before the 6/2/23 lockout;  and was preparing to send the rest of the invoices to Phoenix, but were prevented from doing so because on 6/2/23, Celentino/his field agents seized all the computers from Greyson's offices, locked Greyson out of accessing the data on those computers (including locking Greyson out of accessing the "cloud" backup for that data, which cut off Greyson's ability to complete sending invoices.

76.     Celentino demanded that each Greyson attorney email Celentino a list of all the clients/lawsuits each Greyson attorney was working on for Phoenix, for the $2,000 per case fee to be paid by Phoenix to Greyson.  Greyson could not send those lists, because Trustee field agents locked Greyson and Greyson's W-2 attorney employees out of Greyson's data bases and emails, including locking Greyson and its attorneys out of Greyson's LUNA account, as explained supra.  Plus, Celentino and the Trustee's field agents have never allowed Greyson or Greyson's attorneys to access Greyson's emails, after Celentino and the filed agents locked those emails, despite multiple demands for access.  The accounting department, Greyson's W-2 attorney employees, and I would have been able to provide exact data if I had been given back access to Greyson's systems, but Celentino and the Trustee's field agents, wrongfully refused to allow Greyson to access Greyson's data bases, to present.

DECLARATION OF HAN TRINH IN SUPPORT OF GREYSON LAW CENTER PC MOTION FOR
ALLOWANCE AND PAYMENT OF ADMINISTRATIVE CLAIM, TO BE PAID BY BANKRUPTCY ESTATE
OF DEBTOR LITIGATION PRACTICES GROUP PC ("LPG")                                    37

EXHIBIT 4, PAGE 276

77.    For all these reasons, Greyson should be allowed an administrative claim of not less than **$5,134,000**, as itemized immediately supra, to be paid by debtor LPG's bankruptcy estate.  That is in addition to the $300,633 of fees itemized supar, that Greyson lost because Celentino's improper delay caused Greyson to lose the 22 "high fee" Greyson clients, to Phoenix.

78.    As Greyson's Motion requests, the Bankruptcy Court should order Trustee to immediately pay that **$5,134,000 + $300,633 =** **$5,434,633** administrative claim to Greyson, all which damage is due to **wrongful/illegal post-petition** conduct by Trustee/Celentino/Trustee's field agents. I declare under penalty of perjury that the foregoing is true and correct and that this Declaration is executed at Orange, California on November _17_, 2023.

_HAN TRINH_

CS CamScanner

EXHIBIT 4, PAGE 277

**EXHIBIT 5**

LITIGATION PRACTICE GROUP PC
17542 17th St Ste 100
Tustin CA  92780

1607-7926
LOC:LPG Law CA
EE ID: 1031

*Payrolls by Paychex, Inc.*

NON-NEGOTIABLE

HAN TRINH
2128 WEST CHERRY DRIVE
ORANGE CA  92868

NON-NEGOTIABLE

| PERSONAL AND CHECK INFORMATION | |
| --- | --- |
| Han Trinh | |
| 2128 West Cherry Drive | |
| Orange, CA  92868 | |
| Soc Sec #: xxx-xx-xxxx    **Employee ID:**  1031 | |

**Home Department:** 1 LPG CA

**Pay Period:** 02/27/23 **to** 03/12/23
**Check Date:**  03/17/23   **Check #:**  Unknown

NET PAY ALLOCATIONS

| DESCRIPTION | THIS PERIOD ($) | YTD ($) |
| --- | --- | --- |
| Check Amount | -5297.85 | -5297.85 |
| Chkg 860 | 0.00 | 37384.90 |
| **NET PAY** | **-5297.85** | **32087.05** |

| EARNINGS | BASIS OF PAY | DESCRIPTION | HRS/UNITS | RATE THIS PERIOD ($) | YTD HOURS | YTD ($) |
| --- | --- | --- | --- | --- | --- | --- |
| | | Salary | | -11538.47 | | 69230.82 |
| | | Holiday | | M24.0000 | | |
| | | **Total Hours** | | | 24.0000 | |
| | | **Gross Earnings** | | -11538.47 | | 69230.82 |
| | | **Total Hrs Worked** | | | | |
| | | Dir Dep Reimb | | | | 300.00 |
| | | **REIMB & OTHER PAYMENTS** | | | | 300.00 |

| WITHHOLDINGS | DESCRIPTION | FILING STATUS | THIS PERIOD ($) | YTD ($) |
| --- | --- | --- | --- | --- |
| | Social Security | $-690.62 | -690.62 | 4143.73 |
| | Medicare | $-161.51 | -161.51 | 969.10 |
| | Fed Income Tax | $-1,841.42 | -1841.42 | 11048.52 |
| | CA Income Tax | $-739.71 | -739.71 | 4438.26 |
| | CA Disability | $-100.25 | -100.25 | 601.50 |
| | **TOTAL** | | -3533.51 | 21201.11 |

| DEDUCTION | DESCRIPTION | THIS PERIOD ($) | YTD ($) |
| --- | --- | --- | --- |
| | 401k EE Pretax | -2307.69 | 13846.14 |
| | Medical Pre-tax | -399.42 | 2396.52 |
| | **TOTAL** | -2707.11 | 16242.66 |

| NET PAY | THIS PERIOD ($) | YTD ($) |
| --- | --- | --- |
| | **-5297.85** | **32087.05** |

*Payrolls by Paychex, Inc.*

0942  1607-7926  Litigation Practice Group PC • 17542 17th St Ste 100 • Tustin CA  92780 • (949) 715-0648

LITIGATION PRACTICE GROUP PC
17542 17th St Ste 100
Tustin CA  92780

1607-7926
LOC:LPG Law CA
EE ID: 1031        DD

NON-NEGOTIABLE

HAN TRINH
2128 WEST CHERRY DRIVE
ORANGE CA  92868

NON-NEGOTIABLE

Payrolls by Paychex, Inc.

Payrolls by Paychex, Inc.

**PERSONAL AND CHECK INFORMATION**
Han Trinh
2128 West Cherry Drive
Orange, CA  92868
Soc Sec #: xxx-xx-xxxx    **Employee ID:**  1031

**Home Department:** 1 LPG CA

**Pay Period:**  02/27/23 to 03/12/23
**Check Date:**  03/17/23    **Check #:**  13141
NET PAY ALLOCATIONS

| DESCRIPTION | THIS PERIOD ($) | YTD ($) |
|---|---|---|
| Check Amount | 0.00 | 0.00 |
| Chkg 860 | 5297.85 | 37384.90 |
| **NET PAY** | **5297.85** | **37384.90** |

| EARNINGS | BASIS OF PAY | DESCRIPTION | HRS/UNITS | RATE | THIS PERIOD ($) | YTD HOURS | YTD ($) |
|---|---|---|---|---|---|---|---|
| | | Salary | | | 11538.47 | | 80769.29 |
| | | Holiday | | | | M24.0000 | |
| | | **Total Hours** | | | | 24.0000 | |
| | | **Gross Earnings** | | | 11538.47 | | 80769.29 |
| | | **Total Hrs Worked** | | | | | |
| | | Dir Dep Reimb | | | | | 300.00 |
| | | **REIMB & OTHER PAYMENTS** | | | | | 300.00 |

| WITHHOLDINGS | DESCRIPTION | FILING STATUS | THIS PERIOD ($) | YTD ($) |
|---|---|---|---|---|
| | Social Security | | 690.62 | 4834.35 |
| | Medicare | | 161.51 | 1130.61 |
| | Fed Income Tax | SMS | 1841.42 | 12889.94 |
| | CA Income Tax | SMI2 1 0 | 739.71 | 5177.97 |
| | CA Disability | | 100.25 | 701.75 |
| | **TOTAL** | | 3533.51 | 24734.62 |

| DEDUCTION | DESCRIPTION | THIS PERIOD ($) | YTD ($) |
|---|---|---|---|
| | 401k EE Pretax | 2307.69 | 16153.83 |
| | Medical Pre-tax | 399.42 | 2795.94 |
| | **TOTAL** | 2707.11 | 18949.77 |

| NET PAY | THIS PERIOD ($) | YTD ($) |
|---|---|---|
| | **5297.85** | **37384.90** |

Payrolls by Paychex, Inc.
0942 1607-7926  Litigation Practice Group PC DBA • 17542 17th St Ste 100 • Tustin CA  92780 • (949) 715-0648

EXHIBIT 5, PAGE 279

LITIGATION PRACTICE GROUP PC
17542 17th St Ste 100
Tustin CA  92780

1607-7926
LOC:LPG Law CA
EE ID: 1031          DD

*Payrolls by Paychex, Inc.*

*Payrolls by Paychex, Inc.*

HAN TRINH
2128 WEST CHERRY DRIVE
ORANGE CA  92868

NON-NEGOTIABLE

NON-NEGOTIABLE

**PERSONAL AND CHECK INFORMATION**
Han Trinh
2128 West Cherry Drive
Orange, CA  92868
Soc Sec #: xxx-xx-xxxx     **Employee ID:** 1031

**Home Department:** 1 LPG CA

**Pay Period:** 02/13/23 to 02/26/23
**Check Date:** 03/03/23   **Check #:** 13033

NET PAY ALLOCATIONS

| DESCRIPTION | THIS PERIOD ($) | YTD ($) |
|---|---|---|
| Check Amount | 0.00 | 0.00 |
| Chkg 860 | 5297.84 | 32087.05 |
| **NET PAY** | **5297.84** | **32087.05** |

| EARNINGS | BASIS OF PAY | DESCRIPTION | HRS/UNITS | RATE | THIS PERIOD ($) | YTD HOURS | YTD ($) |
|---|---|---|---|---|---|---|---|
| | | Salary | | | 11538.47 | | 69230.82 |
| | | Holiday | | | | M24.0000 | |
| | | **Total Hours** | | | | 24.0000 | |
| | | **Gross Earnings** | | | 11538.47 | | 69230.82 |
| | | **Total Hrs Worked** | | | | | |
| | | Dir Dep Reimb | | | | | 300.00 |
| | | **REIMB & OTHER PAYMENTS** | | | | | 300.00 |

| WITHHOLDINGS | DESCRIPTION | FILING STATUS | THIS PERIOD ($) | YTD ($) |
|---|---|---|---|---|
| | Social Security | | 690.62 | 4143.73 |
| | Medicare | | 161.52 | 969.10 |
| | Fed Income Tax | SMS | 1841.42 | 11048.52 |
| | CA Income Tax | SMI2 1 0 | 739.71 | 4438.26 |
| | CA Disability | | 100.25 | 601.50 |
| | **TOTAL** | | 3533.52 | 21201.11 |

| DEDUCTION | DESCRIPTION | THIS PERIOD ($) | YTD ($) |
|---|---|---|---|
| | 401k EE Pretax | 2307.69 | 13846.14 |
| | Medical Pre-tax | 399.42 | 2396.52 |
| | **TOTAL** | 2707.11 | 16242.66 |

| NET PAY | THIS PERIOD ($) | YTD ($) |
|---|---|---|
| | **5297.84** | **32087.05** |

*Payrolls by Paychex, Inc.*
0942  1607-7926  Litigation Practice Group PC DBA • 17542 17th St Ste 100 • Tustin CA  92780 • (949) 715-0648

LITIGATION PRACTICE GROUP PC
17542 17th St Ste 100
Tustin CA  92780

1607-7926
LOC:LPG Law CA
EE ID: 1031          DD

NON-NEGOTIABLE

Payrolls by Paychex, Inc.

HAN TRINH
2128 WEST CHERRY DRIVE
ORANGE CA  92868

NON-NEGOTIABLE

| PERSONAL AND CHECK INFORMATION | EARNINGS | BASIS OF PAY | DESCRIPTION | HRS/UNITS | RATE | THIS PERIOD ($) | YTD HOURS | YTD ($) |
|---|---|---|---|---|---|---|---|---|

**PERSONAL AND CHECK INFORMATION**
Han Trinh
2128 West Cherry Drive
Orange, CA  92868
Soc Sec #: xxx-xx-xxxx      **Employee ID:**  1031

**Home Department:** 1 LPG CA

**Pay Period:** 02/13/23 **to** 03/26/23
**Check Date:**  03/03/23    **Check #:**  12867
(VOID)

**NET PAY ALLOCATIONS**

| DESCRIPTION | THIS PERIOD ($) | YTD ($) |
|---|---|---|
| Check Amount | 0.00 | 0.00 |
| Chkg 860 | -5297.84 | 26789.21 |
| **NET PAY** | **-5297.84** | **26789.21** |

**EARNINGS**

| BASIS OF PAY | DESCRIPTION | HRS/UNITS | RATE | THIS PERIOD ($) | YTD HOURS | YTD ($) |
|---|---|---|---|---|---|---|
| | Salary | | | -11538.47 | | 57692.35 |
| | Holiday | | M24.0000 | | | |
| | **Total Hours** | | | | 24.0000 | |
| | **Gross Earnings** | | | -11538.47 | | 57692.35 |
| | **Total Hrs Worked** | | | | | |
| | Dir Dep Reimb | | | | | 300.00 |
| | **REIMB & OTHER PAYMENTS** | | | | | 300.00 |

**WITHHOLDINGS**

| DESCRIPTION | FILING STATUS | THIS PERIOD ($) | YTD ($) |
|---|---|---|---|
| Social Security | Override $-690.62 | -690.62 | 3453.11 |
| Medicare | Override $-161.52 | -161.52 | 807.58 |
| Fed Income Tax | Override $-1,841.42 | -1841.42 | 9207.10 |
| CA Income Tax | Override $-739.71 | -739.71 | 3698.55 |
| CA Disability | Override $-100.25 | -100.25 | 501.25 |
| **TOTAL** | | -3533.52 | 17667.59 |

**DEDUCTION**

| DESCRIPTION | THIS PERIOD ($) | YTD ($) |
|---|---|---|
| 401k EE Pretax | -2307.69 | 11538.45 |
| Medical Pre-tax | -399.42 | 1997.10 |
| **TOTAL** | -2707.11 | 13535.55 |

| NET PAY | THIS PERIOD ($) | YTD ($) |
|---|---|---|
| | **-5297.84** | **26789.21** |

Payrolls by Paychex, Inc.
0942 1607-7926 Litigation Practice Group PC DBA • 17542 17th St Ste 100 • Tustin CA 92780 • (949) 715-0648

EXHIBIT 5, PAGE 281

LITIGATION PRACTICE GROUP PC
17542 17th St Ste 100
Tustin CA  92780

1607-7926
LOC:LPG Law CA
EE ID: 1031          DD

HAN TRINH
2128 WEST CHERRY DRIVE
ORANGE CA  92868

*Payrolls by Paychex, Inc.*

NON-NEGOTIABLE

NON-NEGOTIABLE

**PERSONAL AND CHECK INFORMATION**
Han Trinh
2128 West Cherry Drive
Orange, CA  92868
Soc Sec #: xxx-xx-xxxx     **Employee ID:** 1031

**Home Department:** 1 LPG CA

**Pay Period:** 02/13/23 to 03/26/23
**Check Date:** 03/03/23    **Check #:** 12867

NET PAY ALLOCATIONS

| DESCRIPTION | THIS PERIOD ($) | YTD ($) |
|---|---|---|
| Check Amount | 0.00 | 0.00 |
| Chkg 860 | 5297.84 | 32087.05 |
| **NET PAY** | **5297.84** | **32087.05** |

| EARNINGS | BASIS OF PAY | DESCRIPTION | HRS/UNITS | RATE | THIS PERIOD ($) | YTD HOURS | YTD ($) |
|---|---|---|---|---|---|---|---|
| | | Salary | | | 11538.47 | | 69230.82 |
| | | Holiday | | | | M24.0000 | |
| | | **Total Hours** | | | | 24.0000 | |
| | | **Gross Earnings** | | | 11538.47 | | 69230.82 |
| | | **Total Hrs Worked** | | | | | |
| | | Dir Dep Reimb | | | | | 300.00 |
| | | **REIMB & OTHER PAYMENTS** | | | | | 300.00 |

| WITHHOLDINGS | DESCRIPTION | FILING STATUS | THIS PERIOD ($) | YTD ($) |
|---|---|---|---|---|
| | Social Security | | 690.62 | 4143.73 |
| | Medicare | | 161.52 | 969.10 |
| | Fed Income Tax | SMS | 1841.42 | 11048.52 |
| | CA Income Tax | SMI2 1 0 | 739.71 | 4438.26 |
| | CA Disability | | 100.25 | 601.50 |
| | **TOTAL** | | **3533.52** | **21201.11** |

| DEDUCTION | DESCRIPTION | THIS PERIOD ($) | YTD ($) |
|---|---|---|---|
| | 401k EE Pretax | 2307.69 | 13846.14 |
| | Medical Pre-tax | 399.42 | 2396.52 |
| | **TOTAL** | **2707.11** | **16242.66** |

| NET PAY | THIS PERIOD ($) | YTD ($) |
|---|---|---|
| | **5297.84** | **32087.05** |

*Payrolls by Paychex, Inc.*
0942  1607-7926  Litigation Practice Group PC DBA • 17542 17th St Ste 100 • Tustin CA  92780 • (949) 715-0648

EXHIBIT 5, PAGE 282

LITIGATION PRACTICE GROUP PC
17542 17th St Ste 100
Tustin CA  92780

1607-7926
LOC:LPG Law CA
EE ID: 1031          DD

*Payrolls by Paychex, Inc.*

NON-NEGOTIABLE

HAN TRINH
2128 WEST CHERRY DRIVE
ORANGE CA  92868

NON-NEGOTIABLE

**PERSONAL AND CHECK INFORMATION**
Han Trinh
2128 West Cherry Drive
Orange, CA  92868
Soc Sec #: xxx-xx-xxxx      **Employee ID:** 1031

**Home Department:** 1 LPG CA

**Pay Period:** 02/13/23 to 02/24/23
**Check Date:** 02/24/23    **Check #:** 12736
NET PAY ALLOCATIONS

| DESCRIPTION | THIS PERIOD ($) | YTD ($) |
|---|---|---|
| Check Amount | 0.00 | 0.00 |
| Chkg 860 | 5297.83 | 26789.21 |
| **NET PAY** | **5297.83** | **26789.21** |

| EARNINGS | BASIS OF PAY | DESCRIPTION | HRS/UNITS | RATE THIS PERIOD ($) | YTD HOURS | YTD ($) |
|---|---|---|---|---|---|---|
| | | Salary | | 11538.47 | | 57692.35 |
| | | Holiday | | | M24.0000 | |
| | | **Total Hours** | | | 24.0000 | |
| | | **Gross Earnings** | | 11538.47 | | 57692.35 |
| | | **Total Hrs Worked** | | | | |
| | | Dir Dep Reimb | | | | 300.00 |
| | | **REIMB & OTHER PAYMENTS** | | | | 300.00 |

| WITHHOLDINGS | DESCRIPTION | FILING STATUS | THIS PERIOD ($) | YTD ($) |
|---|---|---|---|---|
| | Social Security | | 690.63 | 3453.11 |
| | Medicare | | 161.52 | 807.58 |
| | Fed Income Tax | SMS | 1841.42 | 9207.10 |
| | CA Income Tax | SMI2 1 0 | 739.71 | 3698.55 |
| | CA Disability | | 100.25 | 501.25 |
| | **TOTAL** | | 3533.53 | 17667.59 |

| DEDUCTION | DESCRIPTION | THIS PERIOD ($) | YTD ($) |
|---|---|---|---|
| | 401k EE Pretax | 2307.69 | 11538.45 |
| | Medical Pre-tax | 399.42 | 1997.10 |
| | **TOTAL** | 2707.11 | 13535.55 |

| NET PAY | THIS PERIOD ($) | YTD ($) |
|---|---|---|
| | **5297.83** | **26789.21** |

*Payrolls by Paychex, Inc.*
0942  1607-7926  Litigation Practice Group PC DBA • 17542 17th St Ste 100 • Tustin CA  92780 • (949) 715-0648

EXHIBIT 5, PAGE 283

LITIGATION PRACTICE GROUP PC
17542 17th St Ste 100
Tustin CA  92780

1607-7926
LOC:LPG Law CA
EE ID: 1031          DD

Payrolls by Paychex, Inc.

NON-NEGOTIABLE

Payrolls by Paychex, Inc.

NON-NEGOTIABLE

HAN TRINH
2128 WEST CHERRY DRIVE
ORANGE CA  92868

| PERSONAL AND CHECK INFORMATION |
|---|
| Han Trinh |
| 2128 West Cherry Drive |
| Orange, CA  92868 |
| Soc Sec #: xxx-xx-xxxx    **Employee ID:** 1031 |

**Home Department:** 1 LPG CA

**Pay Period:** 01/30/23 to 02/12/23
**Check Date:** 02/17/23    **Check #:** 12689

NET PAY ALLOCATIONS

| DESCRIPTION | THIS PERIOD ($) | YTD ($) |
|---|---|---|
| Check Amount | 0.00 | 0.00 |
| Chkg 860 | 5297.85 | 21491.38 |
| **NET PAY** | **5297.85** | **21491.38** |

TIME OFF (Based on Policy Year)

| DESCRIPTION | BEG BAL | CURR ACCRUE | CURR DEDUCT | AVAIL BAL |
|---|---|---|---|---|
| Sick | 40.00 hrs | 0.00 hrs | 0.00 hrs | 40.00 hrs |
| DESCRIPTION | BEG BAL | CURR ACCRUE | CURR DEDUCT | AVAIL BAL |
| Vacation | 194.04 hrs | 6.16 hrs | 0.00 hrs | 200.20 hrs |

| EARNINGS | BASIS OF PAY | DESCRIPTION | HRS/UNITS | RATE THIS PERIOD ($) | YTD HOURS | YTD ($) |
|---|---|---|---|---|---|---|
| | | Salary | | 11538.47 | | 46153.88 |
| | | Holiday | | | 24.0000 | |
| | | **Total Hours** | | | 24.0000 | |
| | | **Gross Earnings** | | 11538.47 | | 46153.88 |
| | | **Total Hrs Worked** | | | | |
| | | Dir Dep Reimb | | | | 300.00 |
| | | **REIMB & OTHER PAYMENTS** | | | | 300.00 |

| WITHHOLDINGS | DESCRIPTION | FILING STATUS | THIS PERIOD ($) | YTD ($) |
|---|---|---|---|---|
| | Social Security | | 690.62 | 2762.48 |
| | Medicare | | 161.51 | 646.06 |
| | Fed Income Tax | SMS | 1841.42 | 7365.68 |
| | CA Income Tax | SMI2 1 0 | 739.71 | 2958.84 |
| | CA Disability | | 100.25 | 401.00 |
| | **TOTAL** | | **3533.51** | **14134.06** |

| DEDUCTION | DESCRIPTION | THIS PERIOD ($) | YTD ($) |
|---|---|---|---|
| | 401k EE Pretax | 2307.69 | 9230.76 |
| | Medical Pre-tax | 399.42 | 1597.68 |
| | **TOTAL** | **2707.11** | **10828.44** |

| NET PAY | THIS PERIOD ($) | YTD ($) |
|---|---|---|
| | **5297.85** | **21491.38** |

Payrolls by Paychex, Inc.
0942 1607-7926  Litigation Practice Group PC DBA • 17542 17th St Ste 100 • Tustin CA  92780 • (949) 715-0648

EXHIBIT 5, PAGE 284

LITIGATION PRACTICE GROUP PC
17542 17th St Ste 100
Tustin CA  92780

1607-7926
LOC:LPG Law CA
EE ID: 1031          DD

HAN TRINH
2128 WEST CHERRY DRIVE
ORANGE CA  92868

NON-NEGOTIABLE

NON-NEGOTIABLE

*Payrolls by Paychex, Inc.*

*Payrolls by Paychex, Inc.*

---

**PERSONAL AND CHECK INFORMATION**
Han Trinh
2128 West Cherry Drive
Orange, CA  92868
Soc Sec #: xxx-xx-xxxx    **Employee ID:**  1031

**Home Department:** 1 LPG CA

**Pay Period:** 02/06/23 to 02/19/23
**Check Date:** 02/10/23    **Check #:** 12486

NET PAY ALLOCATIONS

| DESCRIPTION | THIS PERIOD ($) | YTD ($) |
|---|---|---|
| Check Amount | 0.00 | 0.00 |
| Chkg 860 | 300.00 | 16193.53 |
| **NET PAY** | **300.00** | **16193.53** |

| EARNINGS | BASIS OF PAY | DESCRIPTION | HRS/UNITS | RATE THIS PERIOD ($) | YTD HOURS | YTD ($) |
|---|---|---|---|---|---|---|
| | | Salary | | | | 34615.41 |
| | | Holiday | | M24.0000 | | |
| | | **Total Hours** | | | 24.0000 | |
| | | **Gross Earnings** | | | | 34615.41 |
| | | **Total Hrs Worked** | | | | |
| | | Dir Dep Reimb | | 300.00 | | 300.00 |
| | | **REIMB & OTHER PAYMENTS** | | 300.00 | | 300.00 |

| WITHHOLDINGS | DESCRIPTION | FILING STATUS | THIS PERIOD ($) | YTD ($) |
|---|---|---|---|---|
| | Social Security | | | 2071.86 |
| | Medicare | | | 484.55 |
| | Fed Income Tax | SMS | | 5524.26 |
| | CA Income Tax | SMI2 1 0 | | 2219.13 |
| | CA Disability | | | 300.75 |
| | **TOTAL** | | | 10600.55 |

| DEDUCTION | DESCRIPTION | THIS PERIOD ($) | YTD ($) |
|---|---|---|---|
| | 401k EE Pretax | | 6923.07 |
| | Medical Pre-tax | | 1198.26 |
| | **TOTAL** | | 8121.33 |

| NET PAY | THIS PERIOD ($) | YTD ($) |
|---|---|---|
| | **300.00** | **16193.53** |

EXHIBIT 5, PAGE 285

LITIGATION PRACTICE GROUP PC
17542 17th St Ste 100
Tustin CA  92780

1607-7926
LOC:LPG Law CA
EE ID: 1031

HAN TRINH
2128 WEST CHERRY DRIVE
ORANGE CA  92868

NON-NEGOTIABLE

NON-NEGOTIABLE

*Payrolls by Paychex, Inc.*

*Payrolls by Paychex, Inc.*

**PERSONAL AND CHECK INFORMATION**
Han Trinh
2128 West Cherry Drive
Orange, CA  92868
Soc Sec #: xxx-xx-xxxx    **Employee ID:**  1031

**Home Department:** 1 LPG CA

**Pay Period:** 01/16/23 **to** 01/29/23
**Check Date:** 02/03/23    **Check #:** 12251
NET PAY ALLOCATIONS

| DESCRIPTION | THIS PERIOD ($) | YTD ($) |
|---|---|---|
| Check Amount | 5297.84 | 0.00 |
| Chkg 860 | 0.00 | 15893.53 |
| **NET PAY** | **5297.84** | **15893.53** |

| EARNINGS | BASIS OF PAY | DESCRIPTION | HRS/UNITS | RATE | THIS PERIOD ($) | YTD HOURS | YTD ($) |
|---|---|---|---|---|---|---|---|
| | | Salary | | | 11538.47 | | 34615.41 |
| | | Holiday | M8.0000 | | | M24.0000 | |
| | | **Total Hours** | 8.0000 | | | 24.0000 | |
| | | **Gross Earnings** | | | 11538.47 | | 34615.41 |
| | | **Total Hrs Worked** | | | | | |

| WITHHOLDINGS | DESCRIPTION | FILING STATUS | THIS PERIOD ($) | YTD ($) |
|---|---|---|---|---|
| | Social Security | | 690.62 | 2071.86 |
| | Medicare | | 161.52 | 484.55 |
| | Fed Income Tax | SMS | 1841.42 | 5524.26 |
| | CA Income Tax | SMI2 1 0 | 739.71 | 2219.13 |
| | CA Disability | | 100.25 | 300.75 |
| | **TOTAL** | | 3533.52 | 10600.55 |

| DEDUCTION | DESCRIPTION | THIS PERIOD ($) | YTD ($) |
|---|---|---|---|
| | 401k EE Pretax | 2307.69 | 6923.07 |
| | Medical Pre-tax | 399.42 | 1198.26 |
| | **TOTAL** | 2707.11 | 8121.33 |

| NET PAY | THIS PERIOD ($) | YTD ($) |
|---|---|---|
| | **5297.84** | **15893.53** |

EXHIBIT 5, PAGE 286

LITIGATION PRACTICE GROUP PC
17542 17th St Ste 100
Tustin CA  92780

1607-7926
LOC:LPG Law CA
EE ID: 1031        DD

*Payrolls by Paychex, Inc.*

*Payrolls by Paychex, Inc.*

NON-NEGOTIABLE

NON-NEGOTIABLE

HAN TRINH
2128 WEST CHERRY DRIVE
ORANGE CA  92868

---

**PERSONAL AND CHECK INFORMATION**
Han Trinh
2128 West Cherry Drive
Orange, CA  92868
Soc Sec #: xxx-xx-xxxx      **Employee ID:**  1031

**Home Department:** 1 LPG CA

**Pay Period:** 01/16/23 **to** 01/29/23
**Check Date:** 02/03/23    **Check #:** 11932
(VOID)

**EARNINGS**

| | BASIS OF PAY | DESCRIPTION | HRS/UNITS | RATE | THIS PERIOD ($) | YTD HOURS | YTD ($) |
|---|---|---|---|---|---|---|---|
| | | Salary | | | -11538.47 | | 23076.94 |
| | | Holiday | M-8.0000 | | | M16.0000 | |
| | | **Total Hours** | -8.0000 | | | 16.0000 | |
| | | **Gross Earnings** | | | -11538.47 | | 23076.94 |
| | | **Total Hrs Worked** | | | | | |

**WITHHOLDINGS**

| DESCRIPTION | FILING STATUS | THIS PERIOD ($) | YTD ($) |
|---|---|---|---|
| Social Security | Override-$690.62 | -690.62 | 1381.24 |
| Medicare | Override-$161.52 | -161.52 | 323.03 |
| Fed Income Tax | Override-$1,841.42 | -1841.42 | 3682.84 |
| CA Income Tax | Override-$739.71 | -739.71 | 1479.42 |
| CA Disability | Override-$100.25 | -100.25 | 200.50 |
| **TOTAL** | | -3533.52 | 7067.03 |

**NET PAY ALLOCATIONS**

| DESCRIPTION | THIS PERIOD ($) | YTD ($) |
|---|---|---|
| Check Amount | 0.00 | -5297.84 |
| Chkg 860 | -5297.84 | 15893.53 |
| **NET PAY** | **-5297.84** | **10595.69** |

**DEDUCTION**

| DESCRIPTION | THIS PERIOD ($) | YTD ($) |
|---|---|---|
| 401k EE Pretax | -2307.69 | 4615.38 |
| Medical Pre-tax | -399.42 | 798.84 |
| **TOTAL** | -2707.11 | 5414.22 |

| NET PAY | THIS PERIOD ($) | YTD ($) |
|---|---|---|
| | **-5297.84** | **10595.69** |

*Payrolls by Paychex, Inc.*
0942 1607-7926  Litigation Practice Group PC DBA • 17542 17th St Ste 100 • Tustin CA  92780 • (949) 715-0648

EXHIBIT 5, PAGE 287

**EXHIBIT 6**

**Layla Buchanan**

---

**Subject:**              FW: LP

---

**From:** aharth@paychex.com <aharth@paychex.com>
**Date:** Wednesday, March 27, 2024 at 4:48 PM
**To:** Alina Mamlyuk <amamlyuk@marshackhays.com>
**Cc:** Ed Hays <EHays@MarshackHays.com>, Layla Buchanan <LBuchanan@marshackhays.com>
**Subject:** Re: FW: LPG Paychex records

Good afternoon,

 Hope you are well. Below is a screenshot of the contact list. I added you and Pam under a different note section as this area is no longer accessible to make changes. So these were the only valid contacts at that time. Hope this helps.

Add or Edit Contacts

View or change information as of: 03/27/2024 

| Han Trinh | Daniel S March |
| *Required |

# Alexander Harth

Account Manager, Multi-Product Service

Office: 866-804-5693 ext. 5100779

paychex.com


HR | Payroll | Benefits | Insurance
The Power of Simplicity®

---

**From:** amamlyuk@marshackhays.com
**To:** aharth@paychex.com
**Sent:** Wed, Mar 27, 2024, 02:06 PM PDT
**Subject:** FW: LPG Paychex records

EXHIBIT 6, PAGE 288

Hi, Alexander—

Please provide me a document that Sierra White references below which shows Han Trinh and Daniel March as the only authorized persons who could process LPG's payroll through Paychex.  I need it for Trustee's documents for response to court and I need it urgently please.

Also, please let me know if you are able to see internally who (Han Trinh or Daniel March) submitted payroll for processing for any given pay period.

Thank you,

Alina Mamlyuk

(949) 333-7777

**From:** swhite5@paychex.com <swhite5@paychex.com>
**Date:** Wednesday, March 27, 2024 at 1:28 PM
**To:** Alina Mamlyuk <amamlyuk@marshackhays.com>, aharth@paychex.com <aharth@paychex.com>
**Cc:** Layla Buchanan <LBuchanan@marshackhays.com>, Pam Kraus <pkraus@marshackhays.com>, Ed Hays <EHays@MarshackHays.com>
**Subject:** Re: LPG Paychex records

Good Afternoon,

- For Check Stubs we only keep them for 3 years.
- For Authorized People able to Process Payroll  we only show Han Thrihn and Daniel March as Authorized.
- I am not aware of what you mean for Vendor Agreement or Amended Agreement
- We do not have a VOID Report, what exactly are you seeking.

Also, Alexander is Back in Office an any further request will need to be directed to him as the Account Manager.

Thank you

*Sierra White*

2

Service Partner - MPSC Service

1-844-729-9247 Ext 5101411

swhite5@paychex.com



---

**From:** amamlyuk@marshackhays.com

**To:** swhite5@paychex.com;aharth@paychex.com

**Sent:** Wed, Mar 27, 2024, 10:06 AM MST

**Subject:** Re: LPG Paychex records

Warning: This email is from outside the company. Be careful clicking links or attachments.

Good morning, Sierra—

Thank you for your emails this morning--I downloaded all of the reports Paychex provided for Han Trinh and Phuong Trinh ("Two Employees") and I want to confirm the following:

The earliest paystubs I see for Two Employees are for pay period 6/21/21 to 07/04/21, with the checks issued on 07/09/21 to each of them.  Can you please let me know whether these are the first paychecks issued to Two Employees by Paychex or whether this is as far back as Paychex archived records go.  I am turning these over in discovery and need to make an indication to opposing counsel.  Also, there was no report consolidating copies of paychecks issued to Two Employees, only the paystubs—is this forthcoming today as well?

Do you have an estimate when the other items in my original request will be available to us?  They are the following items:

EXHIBIT 6, PAGE 290

3. A copy of the vendor agreement(s) that LPG executed with Paychex. If there were amended agreements, please include these copies.

4. A possible signature card or a list of authorized LPG personnel who were allowed to submit and process payroll through Paychex. Who at LPG had the authority to modify, alter or void any paychecks or payroll data?

5. A list of any possible VOIDED paychecks or specific pay periods when LPG did not meet its payroll obligation, thus creating gaps in Paychex processing as it relates to Two Employees.

6. If there were gaps described in question 5, and any paychecks were possibly cut internally at LPG, what was the policy regarding reconciling official payroll data and keeping year-to-date totals consistent for W-2 purposes?

Thank you,

Alina Mamlyuk

(949) 333-7777

**From:** swhite5@paychex.com <swhite5@paychex.com>
**Date:** Wednesday, March 27, 2024 at 9:16 AM
**To:** Alina Mamlyuk <amamlyuk@marshackhays.com>, aharth@paychex.com <aharth@paychex.com>
**Cc:** Layla Buchanan <LBuchanan@marshackhays.com>, Pam Kraus <pkraus@marshackhays.com>
**Subject:** Re: LPG Paychex records

 

NEW FEATURE: You can now view all secure messages in a single inbox view.

To better protect your company and employees, Paychex requires all outgoing email containing sensitive information be sent securely.

Click here by 2024-04-03 12:16 EDT to login or register in order to read your message and/or view attachment(s).

You must click on the link above at least once within **three days** of receiving this email, or the link will expire and you will not be able to access the secured message and/or attachment(s).

As long as you've clicked the above link within the three days, you can open the attachment on this message for up to **60 days**.

EXHIBIT 6, PAGE 291

[More Info](#)

**Disclaimer**:  This email and its content are confidential and intended solely for the use of the addressee. Please notify the sender if you have received this email in error or simply delete it.

Secured by Proofpoint Encryption, Copyright © 2009-2024 Proofpoint, Inc. All rights reserved.

---

The information contained in this message may be privileged, confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify your representative immediately and delete this message from your computer. Thank you.

EXHIBIT 6, PAGE 292

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
870 Roosevelt, Irvine, CA 92620.

A true and correct copy of the foregoing document entitled: **CHAPTER 11 TRUSTEE'S OPPOSITION TO MOTION
FILED BY HAN TRINH FOR ALLOWANCE OF ADMINISTRATIVE EXPENSE CLAIM [Dk. No. 674]; DECLARATIONS
IN SUPPORT** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-
2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General
Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On  **April
11, 2024**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the
following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**: On _, I served the following persons and/or entities at the last known addresses
in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the
United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration
that mailing to the judge will be completed no later than 24 hours after the document is filed.

**DEBTOR – MAIL REDIRECTED TO TRUSTEE**
THE LITIGATION PRACTICE GROUP P.C.
~~17542 17TH ST, SUITE 100~~
~~TUSTIN, CA 92780-1981~~

☒  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL:** Pursuant to
F.R.Civ.P. 5 and/or controlling LBR, on  **April 11, 2024**, I served the following persons and/or entities by personal
delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission
and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the
judge will be completed no later than 24 hours after the document is filed.

> **VIA PERSONAL DELIVERY:**
> **PRESIDING JUDGE'S COPY**
> HONORABLE SCOTT C. CLARKSON
> UNITED STATES BANKRUPTCY COURT
> 411 WEST FOURTH STREET, SUITE 5130 /
> COURTROOM 5C
> SANTA ANA, CA 92701-4593

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| April 11, 2024 | Layla Buchanan | /s/ Layla Buchanan |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: CONTINUED:

| | | |
|---|---|---|
| **ATTORNEY FOR CHAPTER 11 TRUSTEE RICHARD A MARSHACK (TR)** | Bradford Barnhardt | bbarnhardt@marshackhays.com, bbarnhardt@ecf.courtdrive,alinares@ecf.courtdrive.com |
| **ATTORNEY FOR CREDITOR AFFIRMA, LLC and CREDITOR OXFORD KNOX, LLC** | Eric Bensamochan | eric@eblawfirm.us, G63723@notify.cincompass.com |
| **ATTORNEY FOR DEFENDANT LEUCADIA ENTERPRISES, INC.** | Michael Jay Berger | michael.berger@bankruptcypower.com, yathida.nipha@bankruptcypower.com;michael.berger@ecf.inforuptcy.com |
| **ATTORNEY FOR CHAPTER 11 TRUSTEE RICHARD A MARSHACK (TR)** | Peter W Bowie | peter.bowie@dinsmore.com, caron.burke@dinsmore.com |
| **ATTORNEY FOR CREDITOR SDCO TUSTIN EXECUTIVE CENTER, INC** | Ronald K Brown | ron@rkbrownlaw.com |
| **ATTORNEY FOR CHAPTER 11 TRUSTEE RICHARD A MARSHACK (TR)** | Christopher Celentino | christopher.celentino@dinsmore.com, caron.burke@dinsmore.com |
| **INTERESTED PARTY COURTESY NEF** | Shawn M Christianson | cmcintire@buchalter.com, schristianson@buchalter.com |
| **INTERESTED PARTY COURTESY NEF** | Randall Baldwin Clark | rbc@randallbclark.com |
| **ATTORNEY FOR DEFENDANT LISA COHEN and DEFENDANT ROSA BIANCA LOLI:** | Leslie A Cohen | leslie@lesliecohenlaw.com, jaime@lesliecohenlaw.com;clare@lesliecohenlaw.com |
| **INTERESTED PARTY COURTESY NEF** | Anthony Paul Diehl | anthony@apdlaw.net, Diehl.AnthonyB112492@notify.bestcase.com,ecf@apdlaw.net |
| **ATTORNEY FOR INTERESTED PARTY NATIONAL ASSOCIATION OF CONSUMER BANKRUPTCY ATTORNEYS and INTERESTED PARTY NATIONAL CONSUMER BANKRUPTCY RIGHTS CENTER** | Jenny L Doling | jd@jdl.law, dolingjr92080@notify.bestcase.com;15994@notices.nextchapterbk.com;jdoling@jubileebk.net |
| **ATTORNEY FOR CREDITOR CAROLYN BEECH** | Daniel A Edelman | dedelman@edcombs.com, courtecl@edcombs.com |
| **CREDITOR** | Meredith Fahn | fahn@sbcglobal.net |
| **ATTORNEY FOR CREDITOR VALIDATION PARTNERS LLC** | William P Fennell | william.fennell@fennelllaw.com, luralene.schultz@fennelllaw.com;wpf@ecf.courtdrive.com;hala.hammi@fennelllaw.com;naomi.cwalinski@fennelllaw.com;samantha.larimer@fennelllaw.com |
| **INTERESTED PARTY COURTESY NEF** | Alan W Forsley | alan.forsley@flpllp.com, awf@fkllawfirm.com,awf@fl-lawyers.net,addy@flpllp.com |
| **ATTORNEY FOR DEFENDANT CLEAR VISION LLC dba LIBERTY1 FINANCIAL** | Marc C Forsythe | mforsythe@goeforlaw.com, mforsythe@goeforlaw.com;dcyrankowski@goeforlaw.com |
| **ATTORNEY FOR CHAPTER 11 TRUSTEE RICHARD A MARSHACK (TR)** | Jeremy Freedman | jeremy.freedman@dinsmore.com, nicolette.murphy@dinsmore.com |
| **ATTORNEY FOR CREDITOR HERRET CREDIT** | Eric Gassman | erg@gassmanlawgroup.com, gassman.ericb112993@notify.bestcase.com |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012

**F 9013-3.1.PROOF.SERVICE**

| ATTORNEY FOR CHAPTER 11 TRUSTEE RICHARD A MARSHACK (TR) | Christopher Ghio | christopher.ghio@dinsmore.com, nicolette.murphy@dinsmore.com;angelica.urena@dinsmore.com;deamira.romo@dinsmore.com |
|---|---|---|
| ATTORNEY FOR CREDITOR AMY GINSBURG; CREDITOR KENTON COBB; and CREDITOR SHANNON BELLFIELD | Amy Lynn Ginsburg | efilings@ginsburglawgroup.com |
| ATTORNEY FOR DEFENDANT STRIPE, INC | Eric D Goldberg | eric.goldberg@dlapiper.com, eric-goldberg-1103@ecf.pacerpro.com |
| ATTORNEY FOR CREDITOR AFFIRMA, LLC; CREDITOR ANAHEIM ARENA MANAGEMENT, LLC; CREDITOR ANAHEIM DUCKS HOCKEY CLUB, LLC; and CREDITOR OXFORD KNOX, LLC | Jeffrey I Golden | jgolden@go2.law, kadele@ecf.courtdrive.com;cbmeeker@gmail.com;lbracken@wgllp.com;dfitzgerald@go2.law;golden.jeffreyi.b117954@notify.bestcase.com |
| ATTORNEY FOR CREDITOR DEBT VALIDATION FUND II, LLC; CREDITOR MC DVI FUND 1, LLC; and CREDITOR MC DVI FUND 2, LLC | Richard H Golubow | rgolubow@wghlawyers.com, jmartinez@wghlawyers.com;svillegas@wghlawyers.com |
| ATTORNEY FOR CREDITOR OPPORTUNITY FUND NORTHERN CALIFORNIA | Mark Good | mark@markgood.com |
| *AFFECTED PARTY ATTORNEY FOR CREDITOR UNITED PARTNERSHIPS, LLC* | *David M Goodrich* | *dgoodrich@go2.law, kadele@go2.law;dfitzgerald@go2.law;wggllp@ecf.courtdrive.com* |
| ATTORNEY FOR CHAPTER 11 TRUSTEE RICHARD A MARSHACK (TR) | D Edward Hays | ehays@marshackhays.com, ehays@ecf.courtdrive.com;alinares@ecf.courtdrive.com;cmendoza@marshackhays.com;cmendoza@ecf.courtdrive.com |
| ATTORNEY FOR CREDITOR CITY CAPITAL NY | Alan Craig Hochheiser | ahochheiser@mauricewutscher.com, arodriguez@mauricewutscher.com |
| ATTORNEY FOR CREDITOR DEBT VALIDATION FUND II, LLC; CREDITOR MC DVI FUND 1, LLC; and CREDITOR MC DVI FUND 2, LLC | Garrick A Hollander | ghollander@wghlawyers.com, jmartinez@wghlawyers.com;svillegas@wghlawyers.com |
| ATTORNEY FOR CREDITOR SHARP ELECTRONICS CORPORATION | Brian L Holman | b.holman@musickpeeler.com |
| INTERESTED PARTY COURTESY NEF | Richard L. Hyde | richard@amintalati.com |
| ATTORNEY FOR INTERESTED PARTY MERCHANTS CREDIT CORPORATION | Peter L Isola | pisola@hinshawlaw.com |
| ATTORNEY FOR CREDITOR, PLAINTIFF, and COUNTER-DEFENDANT OHP-CDR, LP and PLAINTIFF and COUNTER-DEFENDANT PURCHASECO 80, LLC | Razmig Izakelian | razmigizakelian@quinnemanuel.com |
| ATTORNEY FOR CHAPTER 11 TRUSTEE RICHARD A MARSHACK (TR) | Sara Johnston | sara.johnston@dinsmore.com |
| ATTORNEY FOR FIDELITY NATIONAL INFORMATION SERVICES, INC. DBA FIS | Sweeney Kelly | kelly@ksgklaw.com |
| ATTORNEY FOR DEBTOR THE LITIGATION PRACTICE GROUP P.C. | Joon M Khang | joon@khanglaw.com |
| ATTORNEY FOR INTERESTED PARTY AD HOC CONSUMER CLAIMANTS COMMITTEE | Ira David Kharasch | sikharasch@pszjlaw.com |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012

**F 9013-3.1.PROOF.SERVICE**

| ATTORNEY FOR DEFENDANT GALLANT LAW GROUP | Meredith King | mking@fsl.law, ssanchez@fsl.law;jwilson@fsl.law |
|---|---|---|
| ATTORNEY FOR COMMITTEE OF UNSECURED CREDITORS | Nicholas A Koffroth | nkoffroth@foxrothschild.com, khoang@foxrothschild.com |
| ATTORNEY FOR DEFENDANT MARICH BEIN, LLC | David S Kupetz | David.Kupetz@lockelord.com, mylene.ruiz@lockelord.com |
| INTERESTED PARTY COURTESY NEF | Christopher J Langley | chris@slclawoffice.com, langleycr75251@notify.bestcase.com;ecf123@casedriver.com;john@slclawoffice.com |
| ATTORNEY FOR CHAPTER 11 TRUSTEE RICHARD A MARSHACK (TR) | Kelli Ann Lee | Kelli.lee@dinsmore.com, kristy.allen@dinsmore.com |
| ATTORNEY DEFENDANT OPTIMUMBANK HOLDINGS, INC | Matthew A Lesnick | matt@lesnickprince.com, matt@ecf.inforuptcy.com;jmack@lesnickprince.com |
| ATTORNEY FOR DEFENDANT CONSUMER LEGAL GROUP, P.C.; DEFENDANT LGS HOLDCO, LLC; INTERESTED PARTY CONSUMER LEGAL GROUP, P.C.; and INTERESTED PARTY LIBERTY ACQUISITIONS GROUP INC | Daniel A Lev | daniel.lev@gmlaw.com, cheryl.caldwell@gmlaw.com;dlev@ecf.courtdrive.com |
| ATTORNEY FOR INTERESTED PARTY REVOLV3, INC. | Britteny Leyva | bleyva@mayerbrown.com, 2396393420@filings.docketbird.com;KAWhite@mayerbrown.com;ladocket@mayerbrown.com |
| INTERESTED PARTY COURTESY NEF ADVERSARY PROCEEDING #: 8:23-AP-01148-SC | Marc A Lieberman | marc.lieberman@flpllp.com, safa.saleem@flpllp.com,addy@flpllp.com |
| ATTORNEY FOR CREDITOR PHILLIP A GREENBLATT, PLLC | Michael D Lieberman | mlieberman@lipsonneilson.com |
| ATTORNEY FOR CHAPTER 11 TRUSTEE RICHARD A MARSHACK (TR) | Yosina M Lissebeck | Yosina.Lissebeck@Dinsmore.com, caron.burke@dinsmore.com |
| ATTORNEY FOR CREDITOR FUNDURA CAPITAL GROUP | Mitchell B Ludwig | mbl@kpclegal.com, kad@kpclegal.com |
| INTERESTED PARTY AND ATTORNEY | Daniel S March | marchlawoffice@gmail.com, marchdr94019@notify.bestcase.com |
| ***ATTORNEY FOR CREDITOR and DEFENDANT GREYSON LAW CENTER PC, CREDITOR and DEFENDANT HAN TRINH; and CREDITOR and DEFENDANT PHUONG (JAYDE) TRINH*** | *Kathleen P March* | *kmarch@bkylawfirm.com, kmarch3@sbcglobal.net,kmarch@sbcglobal.net* |
| ATTORNEY FOR CREDITOR DAVID ORR | Mark J Markus | bklawr@bklaw.com, markjmarkus@gmail.com;markus.markj.r112926@notify.bestcase.com |
| CHAPTER 11 TRUSTEE | Richard A Marshack (TR) | pkraus@marshackhays.com, ecf.alert+Marshack@titlexi.com |
| ATTORNEY FOR CHAPTER 11 TRUSTEE RICHARD A MARSHACK (TR) | Laila Masud | lmasud@marshackhays.com, lmasud@ecf.courtdrive.com;lbuchanan@marshackhays.com;alinares@ecf.courtdrive.com |
| ATTORNEY FOR CHAPTER 11 TRUSTEE RICHARD A MARSHACK (TR) | Sarah S. Mattingly | sarah.mattingly@dinsmore.com |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012

**F 9013-3.1.PROOF.SERVICE**

| INTERESTED PARTY COURTESY NEF | William McCormick | Bill.McCormick@ag.tn.gov |
|---|---|---|
| ATTORNEY FOR US TRUSTEE | Kenneth Misken | Kenneth.M.Misken@usdoj.gov |
| INTERESTED PARTY COURTESY NEF | Byron Z Moldo | bmoldo@ecjlaw.com, aantonio@ecjlaw.com,dperez@ecjlaw.com |
| ATTORNEY FOR CREDITOR ADP, INC | Glenn D. Moses | gmoses@venable.com, cascavone@venable.com;jpmalcolm@venable.com;jadelgado@venable.com |
| ATTORNEY FOR CHAPTER 11 TRUSTEE RICHARD A MARSHACK (TR) | Jamie D Mottola | Jamie.Mottola@dinsmore.com, jhanawalt@ecf.inforuptcy.com |
| INTERESTED PARTY COURTESY NEF | Alan I Nahmias | anahmias@mbn.law, jdale@mbn.law |
| INTERESTED PARTY COURTESY NEF | Victoria Newmark | vnewmark@pszjlaw.com |
| ATTORNEY FOR CHAPTER 11 TRUSTEE RICHARD A MARSHACK (TR) | Jacob Newsum-Bothamley | jacob.bothamley@dinsmore.com, angelica.urena@dinsmore.com;deamira.romo@dinsmore.com |
| ATTORNEY FOR US TRUSTEE | Queenie K Ng | queenie.k.ng@usdoj.gov |
| CREDITOR | Israel Orozco | israel@iolawcorp.com |
| ATTORNEY FOR COMMITTEE OF UNSECURED CREDITORS | Keith C Owens | kowens@foxrothschild.com, khoang@foxrothschild.com |
| ATTORNEY FOR DEFENDANT OPTIMUMBANK HOLDINGS, INC. | Lisa Patel | lpatel@lesnickprince.com, jmack@lesnickprince.com;jnavarro@lesnickprince.com |
| ATTORNEY FOR CREDITOR WELLS MARBLE AND HURST, PLLC | Michael R Pinkston | rpinkston@seyfarth.com, jmcdermott@seyfarth.com,sfocalendar@seyfarth.com,5314522420@filings.docketbird.com,bankruptcydocket@seyfarth.com |
| ATTORNEY FOR DEFENDANT SCOTT JAMES EADIE | Douglas A Plazak | dplazak@rhlaw.com |
| ATTORNEY FOR CHAPTER 11 TRUSTEE RICHARD A MARSHACK (TR) | Tyler Powell | tyler.powell@dinsmore.com, jennifer.pitcock@dinsmore.com;rosetta.mitchell@dinsmore.com |
| ATTORNEY FOR DEFENDANT TOUZI CAPITAL, LLC and DEFENDANT ENG TAING | Daniel H Reiss | dhr@lnbyg.com, dhr@ecf.inforuptcy.com |
| ATTORNEY FOR DEFENDANT CONSUMER LEGAL GROUP, PC | Ronald N Richards | ron@ronaldrichards.com, 7206828420@filings.docketbird.com |
| ATTORNEY FOR CHAPTER 11 TRUSTEE RICHARD A MARSHACK (TR) | Vanessa Rodriguez | vanessa.rodriguez@dinsmore.com, angelica.urena@dinsmore.com |
| ATTORNEY FOR CREDITOR WELLS MARBLE AND HURST, PLLC | Kevin Alan Rogers | krogers@wellsmar.com |
| ATTORNEY FOR CREDITOR MARI AGAPE | Gregory M Salvato | gsalvato@salvatoboufadel.com, calendar@salvatolawoffices.com;jboufadel@salvatoboufadel.com;gsalvato@ecf.inforuptcy.com |
| ATTORNEY FOR CREDITOR AZZURE CAPITAL LLC and CREDITOR HI BAR CAPITAL LLC | Olivia Scott | olivia.scott3@bclplaw.com |
| ATTORNEY FOR CHAPTER 11 TRUSTEE RICHARD A MARSHACK (TR) | Jonathan Serrano | jonathan.serrano@dinsmore.com |
| ATTORNEY FOR RANDALL BALDWIN CLARK ATTORNEY AT LAW PLLC | Maureen J Shanahan | Mstotaro@aol.com |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

| ATTORNEY FOR CREDITORS UNITED PARTNERSHIPS, LLC and MNS FUNDING LLC | Paul R Shankman | PShankman@fortislaw.com, info@fortislaw.com |
|---|---|---|
| ATTORNEY FOR INTERESTED PARTY MORNING LAW GROUP, PC | Zev Shechtman | Zev.Shechtman@saul.com, zshechtman@ecf.inforuptcy.com;easter.santamaria@saul.com |
| ATTORNEY FOR US TRUSTEE | Leslie Skorheim | leslie.skorheim@usdoj.gov |
| ATTORNEY FOR CREDITOR PIONEER FUNDING GROUP, LLC | Adam D Stein-Sapir | info@pfllc.com |
| ATTORNEY FOR DEFENDANT BANKUNITED, N.A. | Howard Steinberg | steinbergh@gtlaw.com, pearsallt@gtlaw.com;NEF-BK@gtlaw.com;howard-steinberg-6096@ecf.pacerpro.com |
| ATTORNEY FOR CREDITOR ALTERYX, INC. | Andrew Still | astill@swlaw.com, kcollins@swlaw.com |
| ATTORNEY FOR CREDITOR RANDALL BALDWIN CLARK ATTORNEY AT LAW PLLC and INTERESTED PARTY RANDALL BALDWIN CLARK | Michael R Totaro | Ocbkatty@aol.com |
| US TRUSTEE | United States Trustee (SA) | ustpregion16.sa.ecf@usdoj.gov |
| ATTORNEY FOR WITNESS BRADFORD LEE 8:23-ap-01046-SC | William J Wall | wwall@wall-law.com |
| ATTORNEY FOR CREDITOR and DEFENDANT AZZURE CAPITAL LLC and CREDITOR HI BAR CAPITAL LLC | Sharon Z. Weiss | sharon.weiss@bclplaw.com, raul.morales@bclplaw.com,REC_KM_ECF_SMO@bclplaw.com |
| ATTORNEY FOR CREDITOR DEBT RELIEF GROUP, LLC | Johnny White | JWhite@wrslawyers.com, jlee@wrslawyers.com |
| CLAIM AGENT FOR CHAPTER 11 TRUSTEE RICHARD A MARSHACK (TR) | Reina Zepeda | rzepeda@omniagnt.com |

4877-8605-0486

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**