FILED & ENTERED

AUG 27 2024

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY bolte        DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA – Santa Ana Division

In re

The Litigation Practice Group, P.C.,

    Debtor.

Case No. 8:23-bk-10571-SC

Chapter 11

**ORDER AND MEMORANDUM DECISION DENYING APPLICATION FOR ADMINISTRATIVE CLAIM OF JAYDE TRINH**

Date: July 17, 2024
Time: 11:00 a.m.
Ronald Reagan Federal Building &
U.S. Courthouse
Courtroom 5C
411 West Fourth Street
Santa Ana, CA 92701

    Before the Court is the "Motion of Phuong (aka Jayde) Trinh for an Order Granting Allowance and Payment of Administrative Claim, Pursuant to 11 U.S.C. Section 503(b)(1)(A)(i)" ("Application") [Dk. 675][1] filed by Phoung (aka Jayde) Trinh ("Jayde"), which came on for hearing on July 17, 2024. Appearances are as noted on the record.

---

[1] Unless otherwise indicated, references to "[Dk. X]" refer to the main docket in this bankruptcy case. References to pleadings filed in related adversary proceedings shall include the last four digits of the adversary number and referenced docket number: e.g., "[1046 Adv. Dk. X]".

Based upon the Application, the evidence listed below,[2] and the docket as a whole, the discussion on the record, and as set forth in detail below, the Application is DENIED.

## I.  Background – Litigation Practice Group, P.C.

The Litigation Practice Group ("LPG" or "Debtor") filed its Chapter 11 bankruptcy on March 20, 2023 ("Petition Date"). Through the various proceedings and evidence produced in both the main case and the various adversary proceedings, including but not limited to various Motions for Temporary Restraining Orders, Preliminary Injunctions, Motions to Dismiss, a Motion for Appointment of a Chapter 11 Trustee, a Motion to Sell Assets, a multitude of pleadings filed by both secured and unsecured creditors (supported by evidence presented under oath) in support of their claims, and especially the pleadings and evidence presented by the "Watchdog of the Bankruptcy System" aka the Office of the United States Trustee (an arm of the United States Department of Justice), *it is clear to this Court that Debtor, since its pre-petition inception (and through the time of the appointment of the Chapter 11 Trustee) was, in this Court's opinion, operating a criminal enterprise.* It is also clear to this Court that the administrative claim sought by Jayde is not supported by the evidence before the Court as the evidence provided by Jayde is based on declarative evidence arising from herself, principals of Debtor, operators of Greyson, and operators of Debtor's previous illegal or unethical pre-petition activities, and is simply unconvincing, fabricated, and/or uncredible to this Court.

The Court also finds that Greyson Law Center, PC ("Greyson") and the two related Administrative Claim Applicants, Phuong (aka Jayde) Trinh ("Jayde") and Han

---

[2] Movant's counsel, at the July 17, 2024, hearing, requested that the Court consider the declaration of Daniel March [Dk. 501], filed in connection with Greyson's Reply to Trustee's Opposition to Greyson's Motion to Vacate the Lockout/Preliminary Injunction Order, to be a part of these proceedings. The Court agreed to the request. Additionally, as the Court is considering the docket as a whole, this Order references pleadings filed or entered in connection with other matters. To the extent the Court cites to any evidence to which an evidentiary objection was asserted, those evidentiary objections are overruled or as otherwise set forth in entered orders. The evidence is given the weight it deserves.

Trinh ("Han") (together, the "Trinhs" or "Trinh Sisters"), were closely associated with the fraudulent, unethical practices of Debtor, and that Greyson was a byproduct entity spun-off from Debtor with the direct assistance of the Trinhs. As Debtor's enterprise spiraled out of control from fraudulent, unethical mismanagement, as well as possible criminal activities, the evidence demonstrates that the Trinhs were powerful employees of Debtor who in the end disembarked from Debtor's sinking ship and participated in significant aspects of the creation and management of Greyson.

Pre-petition, Debtor was a law firm that allegedly provided consumer debt resolution services on a nationwide basis, with client files numbering in the several tens of thousands, if not more.[3]  To be clear, operations of law firms with a declared specialty of assisting consumer debtors with financial difficulties are not normally criminal enterprises. The distinction to be made is *how* any law firm, and its lawyers and staff, operates the legal services entity, as well as its truly intended purpose.[4]

---

[3] It is important to note that this Court has never received any significant and trustworthy evidence that Debtor accomplished meaningful results for its clients, but only anecdotal examples of viable success for its clients. By reviewing the Estate's claims register, there is evidence of consumer claims for the fraud and demanded but undelivered refunds of approximately $500 million. There is ample evidence that the pre-petition Debtor never placed the collected funds into an attorney-client trust account, and that Debtor or its principals simply looted the payments received through the client automatic withdrawals, stiffing both the clients and outside attorneys who may have been working on client cases with the hopes of being paid. There is also evidence before the Court that Debtor was running a Ponzi scheme and paying some outside (or "network") attorneys with funds obtained from new clients. In this case, it appears that some of the "lenders" may have been serving as "investors," hoping for very high returns before "the music stopped." The Ninth Circuit has recently explained, "[b]y definition, a Ponzi scheme is destined to fail because the pool of available investors is not limitless.  When the Ponzi scheme operator's pool of investors inevitably runs dry, the scheme collapses and the swindler and their entities often end up in bankruptcy or equitable receivership. *See generally* David R. Hague, Expanding the Ponzi Scheme Presumption, 64 DePaul L. Rev. 867 (2015).  In bankruptcy, the court-appointed trustee is tasked with taking immediate control of the entity, ceasing ongoing fraudulent activity, locating and collecting assets for the bankruptcy or receivership estate, and achieving a final, equitable distribution of the remaining assets. *See* 11 U.S.C. § 704." *Kirkland v. Rund (In re EPD Inv. Co., LLC)*, 2024 U.S. App. LEXIS 21363, at *15 (9th Cir. Aug. 23, 2024).  Finally, there is evidence that Debtor was encumbering (or as some creditors assert, "double or triple selling") their accounts or receivables to multiple lenders. With respect to Greyson's requested Administrative Claim before the Court, there has been no evidence presented that any work allegedly performed by Greyson assisted any clients or added any value to the Estate. This will be further explained in this decision.

[4] This, of course, was the early major concern raised by this Court, the Office of the U.S. Trustee, and proponents of allowing Debtor to remain in Chapter 11 as a going concern after the appointment of the Chapter 11 Trustee on May 8, 2023. Straightforwardly, the Court and others had to consider whether a business (the law firm) could be operationally reformed by the Trustee to morph into strict compliance

Through a system of advertising and a network of referring lawyers throughout the country, this Debtor "signed up" clients facing significant financial difficulty and promised results (i.e. meaningful relief from creditor pressure) with a full money-back guarantee. *See* Adv. 24-01011, Dk. 104-1, Decl. Nancy Rapoport, ¶ 7. As more explicitly stated below, Debtor's unethical and most likely illegal enterprise was in operations at all times prior to the appointment of the Trustee.  Once a client was signed up, the client was required to pay Debtor, primarily through the automatic system of monthly withdrawals controlled by Debtor from the clients' bank accounts. Like almost every streaming system in the country, the automatic withdrawals were made monthly, where it is made difficult for the consumer to cancel or "make it stop."[5]

An important protection (perhaps one of the most important protections) afforded clients represented by lawyers requires that funds paid lawyers must be maintained in a client trust account until earned. Debtor did not provide this protection. The Court has evidence from both the reports filed by the Trustee, the schedules and statements of financial affairs presented by Debtor, and the State Bar of California

---

with various state and federal laws that regulate law firm/lawyer operations as well as consumer protection regulations. The U.S. Trustee vigorously, honestly, and in good faith advocated that Debtor (pre-appointment of the Trustee) should be sent to the dust pile of all illegally or unethically operated law firms. The Trustee, vigorously, honestly, and in good faith, advocated that the law firm be reformed and then monetized for the benefit of the creditors of the bankruptcy Estate. After careful consideration, and with significant consideration of all creditors, including the over 40,000 consumer creditors/clients of Debtor, the Court provided the Chapter 11 Trustee and the Committee of Unsecured Creditors with the opportunity to (1) end the illegal practices of Debtor and (2) attempt to recapture estate value and provide recovery to the creditors of the Estate. At the time of this writing, the Court, through various status reports, the reports of a Court Appointed Ethics Compliance Monitor, and the pleadings and evidence presented to it throughout this case, concludes that at least the first goal may have been reached. Concerning the second goal (creditor recovery), the Court and the creditors still await revealing results.

[5] Streaming enterprises didn't invent this process. For those senior enough to remember, the "Book of the Month Club" and various iterations (including hard copy Encyclopedia sales, where the companies "sold" the stream of books arriving each month and immediately sold the monthly payments to a third party) developed the highly successful automatic invoicing process, which if ignored would result in massive bill collector harassment and legal judgments to the unsuspecting consumer. Gym memberships were sold, and their accounts were laid off, in a similar fashion. These activities eventually resulted in the passage of the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692 –1692, which was approved in 1977 (and subsequently amended). It is a consumer protection law, attempting to prevent abusive debt collection practices. The Act created guidelines under which debt collectors may conduct business, defines rights of consumers involved with debt collectors, and prescribes penalties and remedies for violations of the Act.

(received pursuant to Judicial Notice) that almost all of the funds which were not transferred to complaining secured creditors or unhappy "network" counsels (to placate them just enough) may have been looted by the principal or principals controlling the pre-petition Debtor.

Richard Marshack ("Marshack" or "Trustee") was appointed as Chapter 11 Trustee on May 8, 2023, following the entry of an order directing the United States Trustee to Appoint a Chapter 11 Trustee. *See* Order [Dk. 58].  Shortly after his appointment, on May 25, 2023,[6] the Trustee filed an adversary complaint alleging that Debtor was secretly being operated by a California disbarred attorney, Anthony Diab ("Tony Diab" or "Diab") and operating in a manner inconsistent with federal and state law. As alleged by the Trustee, Diab created a web of affiliated businesses designed to locate and funnel clients who were victims of predatory lending or subject to uncollectible debts to various other law firms, which were either alter egos or significantly connected to Debtor.

Greyson and Phoenix Law, P.C. ("Phoenix") were among the entities originally identified in the Trustee's complaint as alter egos.[7] The complaint also alleged that at or around the Petition Date, Diab transferred approximately 40,000 files to Phoenix. Greyson serviced some of those clients.[8]

Phoenix returned all the client files it had received from Debtor back to Debtor pursuant to a Stipulation for Judgment (1) Avoiding, Recovery, and Preserving Transfers to Defendant, Phoenix Law Group, Inc., (2) Turning Over All Transferred Property to Trustee and (3) Dismissing Without prejudice Defendants William Taylor

---

[6] The adversary proceeding was filed without notice to parties based upon the assertion of exigent circumstances, and the entry of a temporary restraining order issued the next day, on May 26, 2023 [1046 Adv. Dk. 13, amended at 1046 Adv. Dk. 21]. The adversary proceeding was subsequently numbered 8:23-ap-01046-SC and a preliminary injunction was subsequently issued on June 23, 2024 [1046 Adv. Dk. 70].

[7] *See* ¶ 59 of the complaint. The Trustee subsequently revised his allegation as to the alter ego status of Greyson in the amended complaint filed June 15, 2023 [1046 Adv. Dk. 62].

[8] *See* ¶ 61 of the complaint.

Carss and Marie Eeya Tan filed June 27, 2023 ("Avoidance Stipulation") [1046 Adv. Dk. 77], approved after a hearing held on July 21, 2023, by an order entered August 7, 2023 [Dk. 365].[9] Pursuant to the Avoidance Stipulation, its parties agreed that the transfers of client files and all material and property related thereto including but not limited to, payments, communications, and documents to Phoenix were fraudulent and the Trustee was entitled to judgment avoiding, recovering, and preserving, the transfers pursuant to 11 U.S.C. § 547, 548, and 550.

The Avoidance Stipulation further provided, *inter alia*, that:

> Any and all liability whether at law or equity relating in any way to Phoenix's handling of the Transfers including the Files that arose or came into existence following the date of their transfer to Phoenix until Trustee closes a court-approved sale to a third-party buyer ("Post Transfer Claims") will remain with Phoenix. Phoenix, Mr. Carss, and Ms. Tan shall use their best efforts to cooperate with Trustee and his retained professionals to provide services to the clients until closing, and nothing herein shall impose or create any liability for Post Transfer Claims on Trustee or Debtor's Estate.

Avoidance Stipulation, ¶4 [1046 Adv. Dk. 77].

The Trustee moved for the sale of the business, which sale was approved by an order entered August 2, 2023 [Dk. 352].[10]

Later, Jayde filed her Application on November 17, 2023[11] [Dk. 675]. The Application seeks payment of a total of $112,825.14, consisting of (1) $52,884.64 in wages, (2) $28,846.15 in penalties, and (3) $31,094.35 in accrued vacation.

The Trustee filed an opposition to the Application [Dk. 1104], to which Jayde replied [Dk. 1124]. The Trustee filed a Sur-Reply [Dk. 1320], and a lengthy hearing was

---

[9] Mr. Plazak, Greyson, Han, and Jayde's former counsel received NEF notice of the entered order.

[10] A Federal and State consumer law compliance monitor was appointed by the Court to monitor the buyer's compliance with various consumer protection requirements.

[11] Jayde was originally represented by Doug Plazak, Esq. However, Jayde since employed new counsel, Kathleen March, Esq. Ms. March filed the Motion on behalf of Jayde.

held on July 17, 2024, which included the opportunity of Movant's counsel to reply at that time.[12]

## II. Han Trinh, Jayde Trinh, and the Two Greyson Entities

### A. Han Trinh and Jayde Trinh

From January 2021 to December 2022, Han Trinh was the Legal Assistant for LPG, and then in January 2023, Han became the Administrator of LPG. [*See* 1046 Adv. Dk. 47-2, Decl. Han Trinh, ¶2]. Han asserts that when she first started working at LPG, she earned an hourly rate of $17.31, but by June 2, 2023, she was earning an annual salary of $300,000. [Dk. 674, Decl. Han Trinh, ¶ 7]. Jane Dearwester, an attorney who previously worked for LPG, states in her declaration that Han was referred to as "General Han" by Tony Diab and others at LPG and was somewhat feared by LPG's staff and attorneys with her "unlimited authority to manage the business of LPG and LPG's employees." [*See* 1046 Adv. Dk. 493-4, pg. 2 at ¶8; Adv. Dk. 493-3, pg. 3 at ¶9]. An email sent from Tony Diab to Han Trinh and Jayde Trinh refers to Han Trinh as "Gen. Han." [Adv 1046, Dk. 493-10, Ex. 49].

From November 30, 2020, Jayde Trinh asserts she was employed as a W-2 employee of LPG. [*See* Dk. 675, pg. 1:26-28]. As early as of October 2021, Jayde held herself out to be the "General Counsel of LPG."[13] [*See* 1046 Adv. Dk. 493-4, pg. 2 at ¶¶5,10]. Jayde asserts when she first started working at LPG, she earned an annual

---

[12] At the beginning of the hearing, which was a consolidated hearing with the related administrative claims by Greyson and Han, the Court advised the counsels that it had read every pleading and reviewed all of the evidence provided by the parties *at least twice and had extensively studied the issues and arguments of the parties*. The Court implored the counsels to limit their oral arguments to matters that they did not include in their pleadings, and to not, step by step, repeat presentations of the evidence before the Court. Unfortunately, the Court received over an hour and half of repetitive arguments, even with reminders from the Court during that period to not simply repeat everything contained in the pleadings and evidence. The Court received a complaint that it had allowed the Trustee's counsel to address, for under ten minutes, without interruption, its arguments. To this end, this decision attempts to recite all the pleadings and evidence before it, with the caveat that if its written recitation has missed a listing, all of the evidence and the pleadings have been considered. The parties should be assured that this Court has carefully reviewed all of the pleadings and evidence before it.

[13] Jayde was provisionally licensed by the California State Bar on December 2, 2020. [Dk. 1125, Decl. Jayde Trinh, ¶33] and was admitted as an attorney to the California State Bar on November 24, 2021.

salary of $120,000, but by June 2, 2023, she was earning an annual salary of $250,000, plus LPG repaid Jayde's student loans from law school [Dk. 675, Decl. Jayde Trinh, ¶7; Dk. 1125, Ex. A, pg. 55]. Though Jayde's official title at LPG was "General Counsel" or "Attorney," Jayde was also referred to as "Hammer Jayde" by Tony Diab [*See* 1046 Dk. 493-10, Ex. 49].[14]

The roles of Jayde and Han Trinh at LPG were described by Jayde in email correspondence [*See* 1046 Adv. Dk. 493-3, Ex. 19]. Jayde, or "Attorney,"[15] handled "inquiries regarding litigation," "[o]other questions that require authority," "settlement reporting," and "liaison for Local Counsel." [*Id.*]. Han, or "Legal," was responsible for locating clients or lawsuits, questions regarding legal docs, assigning local counsel, and questions regarding client files. [*Id.*].

Jayde and Han Trinh were also heavily intertwined with Tony Diab. According to the managing member of Marich Bein, Hershy Deutsch, who made frequent trips to LPG's offices,[16] Han shared an office with Diab, and she was considered "Diab's right-hand person." [*See* 1046 Adv. Dk. 493-3, pg.3 at ¶9]. However, according to Mr. Deutsch, it was evident to him that LPG and its employees did not just consider Han to be "an extension of Diab" but rather a "top-level executive of LPG in her own right," even without an official title as such. [*Id.*].

The manner and behavior of Han and Jayde while employed for LPG has been described for the Court, especially when LPG employees began resigning once they learned of LPG's impending closure and the stoppage of payments to its employees. For instance, when an employee, Rocio Prado-Garcia, sent Han a resignation email explaining their inability to continue working while not having "gainful employment"

---

[14] An email sent from Tony Diab to Han Trinh and Jayde Trinh refers to Jayde Trinh as "Hammer Jayde." [*Id.*].

[15] "Attorney" was known to be Jayde Trinh, and "Legal" was Han Trinh. [*See* 1046 Adv. Dk. 493-4, pg. 54 at Ex. 19].

[16] Hershy Deutsch made frequent trips to LPG's offices after Marich Bein and LPG entered into various Assignment of Servicing Rights Agreements and Account Receivable Purchase Agreement in 2022.

and without being appropriately compensated, Han forwarded this employee's troubling resignation email to Jayde (amongst other recipients) and stated, "Wanna bet she did not write this herself?" [Dk. 493-10, Decl. Alex Rubin, Ex. 30, pg. 68]. In the same email chain, Jayde in reference to another impending resignation of another employee ("Anthony") stated "[h]e probably thinks we need them and if he takes them, then we'll drown. LMAO. This is hilarious." [*Id.*].

Further, Han, in one instance, received an email from an attorney regarding LPG's continual lack of payment for services performed and his unanswered phone calls to Han. [*See* 1046 Adv. Dk. 493-10, Ex. 32]. In the email, the attorney detailed his spouse's cancer spreading at a rapid rate, which had required immediate medical attention at a local hospital, and how he had a small firm that could not absorb a write-off of the overdue payment of $35,383.66. [*Id.*]. Han, using her LPG credentials, responded, "Please send the invoice to *admin@oakstonepc.com*. Thank you!" [*Id.*] (*emphasis added*).

Again, on March 29, 2023, in a different email chain, Han sent Jayde a message from an attorney (Randall Clark) regarding Mr. Clark's inability to give extremely distraught clients information regarding their accounts being transferred from "LPG Oakstone."[17] [*See* 1046 Adv. Dk. 493-10, Ex. 40]. Jayde responded to the concerns by stating, "Hans [sic] problem. She was supposed to call last week." [*Id*]

On April 13, 2023, a different attorney reached out to LPG stating, "My fear is that if Oakstone signs her [former LPG client] up and Phoenix begins billing her account, she will be double-charged until this can be straightened out." [*See* 1046 Adv. Dk. 493-10, Ex. 42]. This attorney's email was forwarded to Jayde and Han, to which Jayde replied, "Linda, you need to text Han. Cause I'm pretty sure we can start but it's not Oakstone. Clear up with her cause she changes sh*t (expletive modified) every other day." [*Id.*].

---

[17] Oakstone is alleged by the Trustee to be an alter ego of LPG. [See 1046 Adv. Dk. 583].

This evidence presents a continual demonstration of their indifference to concerned clients seeking debt resolution services, as well as their personal knowledge of the asset transfers and manipulations of Debtor.

As the client transfers occurred from LPG to other entities, no one at LPG, including Han and Jayde who had specific knowledge of the transfers (as evidenced by LPG attorneys reaching out to the Trinhs confused about the client transfers) informed clients or the attorneys representing them of their completed or impending transfers.[18] Debtor's clients rightfully became concerned when they began receiving notices in January-February 2023 that they were now purportedly represented by the fraudulent transferee law firms. [*See* Dk. 493-4, Decl. Dearwester, Ex. 11]. Clients involved in the transfers had not signed substitutions consenting to their files being transferred. [*Id.,* Ex. 13]. Attorneys began demanding answers about the sudden change, which is when Han and Jayde began sending out new contracts to attorneys to sign with different entities. [*Id.,* Dearwester Decl., Ex. 16].

An example of this chaos, in February 2023, an out-of-state attorney, Jane Dearwester, began receiving emails from concerned LPG clients explaining they had received communications that their client files were being transferred and/or sold to Oakstone, Consumer, and Phoenix. [*See* 1046 Adv. Dk. 493-4, pg. 4: 22]. When Ms. Dearwester sent an email to Han, Jayde, and Diab, informing them that LPG clients could not be transferred without the clients' consent, Ms. Dearwester never received a response. [*See* 1046 Adv. Dk. 493-4, Ex. 13]. In fact, Han and Jayde began telling LPG attorneys that they needed answers quickly on whether the attorneys were "coming to Oakstone." [*See* 1046 Adv. Dk. 493-4, Exs. 17, 18].

In yet another instance of an unauthorized transfer, on February 7, 2023, an attorney forwarded the "welcome email" its client had received from Oakstone. [*See* 1046 Adv. Dk. 493-10, Ex. 26]. The attorney emailed the Trinh sisters and Diab, stating

---

[18] This is especially concerning given Jayde Trinh's status as an attorney.

"[i]n another email, I inform you that Illinois clients must consent to the transfer of their files." [*Id.*]. No response was provided. [*Id.*]. No action was taken.

On January 26, 2023, another attorney reached out to Jayde and Han, writing "[i]t seems that his [the client] DPP[19] file has also been completely wiped and we cannot retrieve the necessary documents that we need for his case. He is emailing us for clarification about the email above [client received a "welcome email" from Consumer Legal Group] but we have no idea what to tell him . . ." [*See* Dk. 1099, pg. 9, Ex. 25].

The foregoing examples are just a few from the submitted evidence demonstrating Han and Jayde's personal involvement with Diab, as well as their knowledge and participation in the improper and most likely systematically improper transfer of clients' files.

In addition, Han and Jayde, while working for LPG, concurrently worked for Greyson, as discussed below [Dk. 1124, Decl. Han Trinh, ¶6, 12; Dk. 1125, Decl. Jayde Trinh, ¶ 2, 13] despite vehemently arguing that LPG was a direct competitor of Greyson. [*See, e.g.*, Dk. 290-1, Decl. Han Trinh, ¶33]. This is also despite Han and Jayde claiming no involvement in the transfer of files to entities such as Phoenix, wherein Phoenix then used Greyson attorneys to work on LPG files that were fraudulently transferred. In fact, Han attached to one of her declarations "screenshots of a list of some emails from han@lpglaw.com and legal@lpglaw.com" proving that while allegedly performing "essential work" for LPG, she knew exactly which client files were transferred and to which entity, including Phoenix, which was a pipeline of work for concurrent employer, Greyson. [Dk. 1124, Decl. Han Trinh, Ex. B].

## B. The Greyson Entities

On March 9, 2023, Greyson Law Center PC (5561924) ("Greyson One") was incorporated with the California Secretary of State. [1046 Adv. Dk. 290-1, Decl. Han

---

[19] DPP, Debt Pay Pro, is analogous to "LUNA" and "Forth" since these are all client relationship management accounts, which contained information regarding a clients' data, files, and accounting information.

Trinh ¶ 5]. Greyson One came to be in March of 2023, when Scott Eadie, a former LPG attorney, advised Han Trinh that he wanted to create a new organization that had a similar business as that performed by LPG. [1046 Adv. Dk. 47-1, Decl. Eadie, ¶2-3; 1046 Adv. Dk. 47-2, Decl. Han Trinh, ¶3]. Greyson One was set up by Mr. Eadie, Eng Taing ('Mr. Taing'), and Han Trinh. [1046 Adv. Dk. 47-1¶ 4]. When discussing the name "Greyson" in a group text message with Jayde Trinh and Mr. Taing, Han stated "your baby's name, Jayde! Your idea is coming to fruition lol." [1046 Adv. Dk. 493-11, pg. 24, Ex. O].[20]

Greyson One was seemingly "receiving assistance from Eng Taing, Dongliang Jaing, and Anthony Gabriel." [1046 Adv. Dk. 47-2, ¶7]. Greyson One was stationed in the office space at 3161 Michelson Drive. [*Id.*]. Greyson One moved into the premises under the impression that the sublease included Greyson One. [*Id.*]. Han and Jayde both supervised the team of Greyson One attorneys.[21] [*Id.*]. However, restrictive access was put into place only allowing Mr. Taing, Mr. Jaing, Mr. Arthur, and Mr. Gabriel to enter the premises. Therefore, Mr. Eadie claims to have severed ties with Mr. Taing and, according to Mr. Eadie, Mr. Taing closed Greyson One's bank accounts. [*Id.*, ¶9]. Thereafter, Mr. Eadie and Han Trinh opened new bank accounts for Greyson One at Citibank. [1046 Adv. Dk. 47-1, ¶9].

Greyson One, however, was short lived as it was dissolved in May of 2023, and the records from the California Secretary of State report Greyson One as "terminated." [*Id.*; Decl. Kathleen March]. Han Trinh and Mr. Eadie learned of Greyson One's

---

[20] On March 8, 2023, Jayde also sent text messages in which she inquires "Can we spell Greyson with an 'E'? Grayson with an 'a' is fine for my dog but it looks fratty. LOL let me know your thoughts." [*See* 1046 Adv. Dk. 493-11, pg. 24, Ex. O].

[21] On March 21, 2023 (one day post-petition), Greyson One sent employment contracts to several attorney who were previously employed by Debtor, for which the start date was stated to be March 27, 2023. [*See* Dk. 1105, Decl. Mamlyuk, Ex. 33; *see also* Clarke Dec. Ex. 2; *See also*, Dk. 699, pg.8 (R. Pryun's Greyson contract)]. Local counsel R. Reed Pruyn, Israel Orozco, and Shadae Clarke were just three of the attorneys who received employment agreements with Greyson One [*Id.*].

dissolution on May 10, 2023. [1046 Adv. Dk. 47-1, ¶9]. When Mr. Eadie and Han Trinh checked online, they then realized that Greyson One's Articles of Incorporation were never applied for under Mr. Eadie's name. [1046 Adv. Dk. 47-1, ¶9]. Therefore, on May 12, 2023, Mr. Eadie and Han Trinh filed new Articles of Incorporation when they discovered they could not reinstate the original business (Greyson One). [1046 Adv. Dk. 47-1, ¶9]. This is when Mr. Eadie changed the domain name from "Greyson PC" to "GreysonLaw PC" to avoid any further association with Greyson One. [1046 Adv. Dk. 47-1, ¶9].

Greyson represents that it is owned 100% by Scott Eadie, Esq., who is identified as the managing attorney and President of Greyson with Mr. Eadie's declarations and various exhibits provided in support. [Dk. 1127, Decl. Soctt Eadie dated 2/8/24; Dk. 1127, Decl. Scott Eadie dated 3/27/24]. [22] However, Han Trinh has provided an email to the Court wherein Israel Orozco states that Jayde Trinh serves as the supervising attorney for Greyson. [Dk. 676, Decl. Han Trinh, Exhibit W].

Han Trinh and Scott Eadie declare under penalty of perjury that Greyson had no involvement with Tony Diab. [Dk. 676-1, Decl. Han Trinh, ¶20; Dk. 1127, Decl. Scott Eadie dated 2/8/24, ¶8]. Han goes as far as saying she hated Diab, and that Diab had no link to, or part in, Greyson. [Dk. 676-1, Decl. Han Trinh, ¶21]. However, on "May 19," Tony Diab sent a text message to William "Ty" Carss, Phoenix's principal, stating "[u]ntil **we** close Greyson, the plan is the following. For any new assignment, email it to: legal@greysonlawpc.com and attorney@greysonlawpc.com Bianca is working on a new flow but for now send all assignments there. As for a card expenses, they will continue using the Greyson card for now." (emphasis added). [1046 Adv. Dk. 493-2, Decl.

---

[22] Greyson states Mr. Eadie never managed Debtor. Notably, however, exhibits have been provided evidencing Mr. Eadie's involvement in both LPG and Oakstone [Dk. 1105, Exhibit 32; Dk. 1099, Exhibits 33, 44, 46, 47]. Oakstone is alleged by the Trustee to be an alter ego of LPG [See 1046 Adv. Dk. 583]. For instance, there is a letter from Daniel March to Mr. Eadie "to document the agreement" that LPG will transfer clients to Oakstone" [Dk. 1105, Exhibit 47] and there is an email from Han's LPG email account to Mr. Eadie attaching the "master client list" which shows numerous clients at the law firm Oakstone [Dk. 1099, Exhibit 33].

William 'Ty' Carss, Ex. B].  Tony Diab, on "May 23" responded to Mr. Carss' question "Do we or Greyson have access to a GA attorney?" by answering, "[y]es, greyson does." [1046 Adv. Dk. 493-2, Decl. William 'Ty' Carss, Ex. B]. Yet, Tony Diab declares that "[a]ny discussion I had with any individual at Greyson regarding file transfer was in my capacity as transferor, not transferee, of any file. No file was ever transferred to any Greyson entity by me, even though numerous discussions regarding file transfer took place." [Dk. 1127, Decl. Diab dated 2/12/24, ¶5e]. Diab clearly had a link to, and part in, Greyson. Han, Jayde, and Diab appear to argue that despite all of their involvement in illegally transferring client files to Phoenix, who then used Greyson to service files, Diab did not have a part in, or say toward, Greyson.

Due to the failure of Greyson One, Han Trinh and her "team" were looking for a new office space for Greyson. [1046 Adv. Dk. 47-2, ¶10]. Han Trinh was advised by Wes Thomas, LPG's former Chief Financial Officer and close associate of Diab,[23] that there was an open office space available where Greyson could use the office space, existing furniture, and existing IT equipment for free. [1046 Adv. Dk. 47-2, ¶10]. That available office space was the prior office of Oakstone, an LPG affiliate. [Dk. 1125, Decl. Han Trinh, ¶27]. The tenant, at that time, of the office space was Phoenix, the recipient of fraudulent transfers from Debtor, who then provided those client files to Greyson to allegedly service. Han Trinh accepted Mr. Thomas' offer on behalf of Greyson as the Administrator. [1046 Adv. Dk. 47-2, ¶10]. Greyson then moved its office to the free space located at 3345 Michelson Drive, Suite 400B, in Irvine, CA on April 29, 2023. [1046 Adv. Dk. 47-2, ¶10-11].

From May 3, 2023, Greyson employed approximately 140 people at the Suite 400B location, with 94 of the employees working remotely in California and approximately 60 employees working remotely in other states. [1046 Adv. Dk. 47-2, ¶

---

[23] A Notice that Clerk has Entered Default Against Wes Thomas was entered on August 22, 2023 [1046 Dk. 145].

12].[24] As of June 2, 2023, however, Greyson only had 48 clients of its own. [1046 Adv. Dk. 47-1, ¶ 11-12].[25] To Han and Jayde, however, their most important asset was the "network of attorneys." Han believes that the "Greyson attorney network belongs to Jayde and [her] alone" and that they "owned" the network of attorneys. [*See* Dk. 1105, pg. Decl. Shadae Clark, Ex. 5]. Han admits that the Greyson attorney network "were W2 attorneys for LPG until February 2023." [*Id.*].

As noted *supra*, and detrimental to the credibility of Han and Jayde, at the same time the Greyson entities were incorporated, and operating, Jayde Trinh and Han Trinh were also working for LPG. [Dk. 1124, Decl Han Trinh, ¶6, 12; Dk. 1125, Decl. Jayde Trinh, ¶ 2, 13]. Again, this is despite Greyson, Han Trinh, and Jayde Trinh vehemently arguing that LPG was a direct competitor of Greyson. [*See e.g.*, 1046 Adv. Dk. 290-1, Decl. Han Trinh, ¶33].

## III.    History of Hearings

The Application was originally set for hearing on January 19, 2024, at 11:00 a.m. [Dk. 675]. That hearing was subsequently converted to a status conference and continued to February 29, 2024, at 11:00 a.m., with a status report due 14 days in advance, pursuant to an order entered January 8, 2024 [Dk. 818]. On February 29, 2024, by tentative, the Court issued a scheduling order and excused appearances; a scheduling order was subsequently entered on March 6, 2024 [Dk. 986], which set the matter for hearing on April 25, 2024, at 11:00 a.m.  On April 24, 2024, in consideration of the significant amount of pleadings filed, which contained voluminous exhibits, this

---

[24] Greyson even had an employee, Brad Lee, who worked for Greyson and Phoenix at the same time. [Dk. 1127, Decl. Diab dated 2/12/24 ¶5e].

[25] Of the 48 clients, approximately 20 were obtained after LPG clients elected to follow their attorney who "belonged" to Greyson. [1046 Adv. Dk. 47-1, ¶11]. Further, while attorneys who work with Greyson are W-2 employees of Greyson, they typically perform work for other clients wholly outside Greyson for their own private practices. [*Id.*]

Court entered a *sua sponte* order continuing the hearing to June 13, 2024 [Dk. 1138].[26] Further, the Court permitted the filing of additional responsive pleadings.

On June 7, 2024, this Court entered an order continuing the hearing to July 17, 2024, at 1:30 p.m. [Dk. 1324], noting that "the resolution of ancillary matters filed by Movant's counsel and which are pending before the Court are necessarily required to be resolved before the Court can rule on the pending applications."[27]

On June 10, 2024, Greyson, Han Trinh, and Jayde Trinh filed a motion to "un-continue" the June 13, 2024 hearings which the Court had continued to July 17, 2024 [Dk. 1335].[28] The Court denied the motion to "un-continue" by an order entered June 11, 2024 [Dk. 1338].

The hearing was held on July 17, 2024, at 1:30 p.m.

## IV.    Evidence on the Record

### 1. The Motion [Dk. 675]

Jayde Trinh filed her Motion for an order granting allowance and payment of administrative claim, pursuant to 11 USC § 503(b)(1)(A)(i) on November 17, 2023 [Dk. 675].

---

[26] The hearing was originally set for 10:00 a.m. [Dk. 1138]; it was subsequently changed to 1:30 p.m. [Dk. 1306].

[27] The other ancillary matters pending before the Court were final resolution of Greyson's Motion to Compel Production of Document [Dk. 1209], Greyson's Motion to Vacate the Preliminary Injunction [Dk. 749], and both Han Trinh and Greyson's motions for administrative claims. [Dks. 674, 676].

[28] The caption of the motion, with stylistic formatting removed, is: "Notice of Motion and Motion of Greyson Law Center PC, Han Trinh, & Phuong (Jayde) Trinh, for an order un-continuing the hearings on Greyson, Han Trinh's, & Jayde Trinh's administrative claim motions, to restore the 6/13/24 at 1:30 pm hearing date of said motions, which 6/13/24 hearing date was continued from 6/13/24 to 7/17/24, by the Court's sua sponte order [Dkt.1324, entered 6/7/24], which is erroneous, and is highly prejudicial to all 3 claimants; alternatively, if 6/13/24 is not convenient for the Court, the Court is requested to reset the hearing date for any day from 6/14/24 to 6/21/24. Declaration of Kathleen P. March, w/(proposed) order granting un-continuance, from 7/17/24 back to 6/13/24" [Dk. 1335].

**A.  Declaration of Jayde Trinh and Exhibits [Dk. 675]**

Attached to the Motion is the declaration of Jayde Trinh, Han Trinh, which in turn attached Exhibit A, which is a paystub from LPG for Jayde from February 13, 2023, to February 26, 2023.[29]

**C.  Declaration of Han Trinh and Exhibits**

Attached to the Motion is also the declaration of Han Trinh, which in turn attaches Exhibit A, a paystub from LPG for Han from February 13, 2023, to February 26, 2023.[30]

**D. Declaration of Kathleen P. March and Exhibits**

The Motion also attaches the declaration of Kathleen P. March. Attached to Ms. March's declaration are the following exhibits:

(1) Exhibit A - A portion of LPG's pacer bankruptcy docket, with docket numbers 52 through 167.

(2) Exhibit B - An order from this Court entered on May 8, 2023, approving the U.S. Trustee's application for the appointment of a Chapter 11 Trustee.

(3) Exhibit C - A portion of LPG's pacer docket for adversary 8:23-ap-01046-SC, with docket numbers 1 through 82.

(4) Exhibit D - An order entered by this Court on May 26, 2023, for turnover of estate property and recorded information, preliminary injunction, lock-out, re-direction of United States Parcel Services mail, order to show cause re compliance with court order, and other relief as necessary for efficient administration of this matter.

---

[29] In Jayde Trinh's declaration, Jayde states under penalty of perjury that her paystub attached as Exhibit A to her declaration shows she was paid $11,538.47 for the pay period of February 13, 2023, to February 26, 2023. However, this appears to be the pay Han Trinh received. Exhibit A shows Jayde was paid $9,615.39 in gross earnings for that pay period. Jayde also states in her declaration that Exhibit A shows the last paycheck she received from LPG but attached to Exhibit C in Kathleen March's declaration in Dk. 1124 is a paystub for Jayde for February 27, 2023, through March 12, 2023.

[30] Han states in her declaration that Exhibit A shows the last paycheck she received from LPG but attached to Exhibit B in Kathleen March's declaration in Dk. 1124 is a paystub for Han for February 27, 2023, through March 12, 2023.

(5) Exhibit E – The Trustee's memorandum of points and authorities in support of his motion for permission to file an omnibus emergency motion, under seal, after service of courtesy copy and after hearing, dated May 25, 2023.

(6) Exhibit F - This Court's order entered on May 26, 2023, granting the Trustee's motion to seal.

(7) Exhibit G - The transcript of pages 33 and 34 of the hearing held before this Court on June 12, 2023, regarding the preliminary injunction and a status conference regarding a case management conference and requiring a status report.

## 2. The Trustee's Status Report and Motion to Continue [Dk. 815]

On January 5, 2024, the Trustee filed an Omnibus Status Report Re: Motions for Allowance of Administrative Expense Claims Under 11 U.S.C. §503(B) ("Omnibus Motion") [Dk. 815]. Therein, the Trustee states his intention to oppose Han Trinh's administrative claim [Dk. 674], as follows:

> The claimant is an insider whom Trustee is already suing in this bankruptcy case for avoidance, recovery, and preservation of fraudulent transfers [8:23-ap-01046-SC] (Dk. No. 93). Unless any avoided transfer is repaid, Trustee also contends that any allowed administrative claim would be subject to disallowance under 11 U.S.C. § 502(d).

[Dk. 815, pg. 3 of 17].

On January 5, 2024, the Trustee filed a motion for an order that (1) initial hearings be status conferences and (2) to continue hearings on merits of motions for allowance of administrative expense claim under 11 U.S.C. § 503(b) [Dk. 816]. It includes a memorandum of points and authorities and the declaration of D. Edward Hays.

## 3. OHP-CDR, LP and PurchaseCo 80, LLC's Limited Opposition [Dk. 817]

OHP-CDR, LP and PurchaseCo 80, LLC filed on January 5, 2024, a limited objection to the motions for allowance and payment of administrative expenses [Dk. 817]. It states the two entities object to the administrative expense motions "to the

extent that they seek payment of any administrative expenses before resolution of OHP-CDR's and PurchaseCo's secured claims and interests." [*Id.*, pg. 2: 19-21].

On January 8, 2024, this Court entered an order granting the Trustee's omnibus motion for an order continuing hearings on the motions for allowance of administrative expense claim under 11 U.S.C. § 503(b) [Dk. 818].

### 4. Greyson's January 9 Opposition to the Court's Continuance and Declarations [Dk. 822]

On January 9, 2024, Greyson, Han Trinh, and Jayde Trinh filed an objection[31] to this Court's order granting the Trustee's request to continue the January 19, 2024, hearings [Dk. 822]. Attached to the objection are the declarations of Han Trinh, Phuong (Jayde) Trinh, and Kathleen P. March in support of the objection. Attached to Ms. March's declaration are the following exhibits:

(1) Exhibit A - This Court's order entered on October 16, 2023, approving a stipulation between the Chapter 11 Trustee, office of the United States Trustee, and the official committee of unsecured creditors to set administrative bar date.

(2) Exhibit B - The first notice of administrative claims bar date, which sets the bar date of November 21, 2023.

(3) Exhibit C - The transcript for the hearing held for the adversary (8:23-ap-01046-SC) on June 12, 2023, regarding the preliminary injunction and status conference hearing regarding a case management conference and requiring a status report. This transcript includes pages 195 through 211 and page 264.

(4) Exhibit D - Two orders from this Court: a stipulated order to dismiss Han and Jayde Trinh, without prejudice, from adversary proceeding 8:23-ap-01046-SC and a

---

[31] The caption of the Objection, with stylistic formatting removed, is: "(1) Objection of Han Trinh, Jayde Trinh and Greyson Law Center, P.C. to Court having decided Trustee Marshack's motion [Dk. 816, filed 1/5/24 and set for hearing on 1/19/24], without allowing Han, Jayde, & Greyson time to file opposition to Trustee's motion, (when Trustee's 'Status Report' to motion makes blatant falsehoods regarding Han and Jayde); (2) request that Court vacate Court's 1/8/24 [Dkt. 818] order, as granted prematurely; (3) request that Court re-decide Trustee's motion, in light of this pleading, opposing Trustee's motion; and (4) request that Court strike Trustee's 'Status Report' [Dkt. 815, filed 1/5/24, which states it is for hearing on 1/19/24 at 11:00am, as an unauthorized pleading, with no admissible evidence." [Dk. 822].

stipulated order to dismiss Han and Jayde Trinh, without prejudice, from the second amended complaint of the Trustee, filed October 13, 2023, in adversary proceeding 8:23-ap-01046-SC.

On January 16, 2024, this Court entered an order overruling the objection and request to strike filed by Greyson, Han, and Jayde on January 9, 2024, as Dk. 822 and denying the relief sought in the objection [Dk. 848].

**5. The February Unilateral Reports by the Trustee [Dk. 940] and Greyson [Dk. 945] and their Exhibits**

On February 15, 2024, the Trustee filed an omnibus unilateral report regarding the status of motions for allowance of administrative expense claim under 11 U.S.C. § 503(b). [Dk. 940]. The status report states that the Trustee is investigating and verifying the claim of $5,134,000 from Greyson. Attached as Exhibit 1 is a letter signed by Ty Carss and addressed to Judith Skiba stating Phoenix has terminated Skiba's contract and has enclosed a refund check.

On February 19, 2024, Greyson, Han, and Jayde filed a unilateral status report for the February 29, 2024, hearings [Dk. 945]. The status report attaches the declaration of Kathleen P. March, which attached three emails from Ms. March to Alina Mamlyuk responding to Mamlyuk's requests for information regarding Greyson's, Han's, and Jayde's administrative claims.

**6. The Trustee's First Supplemental Declaration of Alex Rubin [Dk. 1099]**

On April 11, 2024, the Trustee filed the Supplemental Declaration of Alex Rubin in Support of Trustee's Oppositions to Administrative Claims Filed by Han Trinh [Dk. 674], Phuong "Jayde" Trinh [Dk. 675]; and Greyson Law Center [Dk. 676] ("FSD Rubin") [Dk. 1099]. Attached to FSD Rubin are the following exhibits:

(1) Exhibit 23 - An email from Admin to Han and Reid Wood dated January 23, 2023, which discusses files being moved.

(2) Exhibit 24 - A January 23, 2023, email from Han to Jayde Trinh forwarding Jayde the email contained in Exhibit 23.

(3) Exhibit 25 – A January 26, 2023, email from Richard Meier to Admin, Han, and Mario Azevedo forwarding a welcoming email sent to Daniel Wine for having his case transferred from LPG to Consumer Legal Group.

(4) Exhibit 26 - An email dated February 7, 2023, sharing an email sent to Arnold saying his case was transferred from LPG to Oakstone Law Group.

(5) Exhibit 27 – An email string dated February 8, 2023, between Jayde Trinh, Han Trinh, Reid Wood, and Pamella Moraes regarding a client whose case was transferred to Oakstone Legal Group.

(6) Exhibit 28 - An email dated February 9, 2023, from Han to Accounting sharing an email from Anthony Osborn regarding payments. It also includes invoices dated December 1, 2022, and January 3, 2023, from Gehling Osborn Law Firm, PLC.

(7) Exhibit 29 - Two emails dated February 13, 2023, from Reid Wood to Han sharing guidelines and scripts on how to answer client questions for being moved to new file groups.

(8) Exhibit 30 - An email dated February 23, 2023, from Jayde to Israel Orozco and Han discussing resignations from Samer and Rocio Prado-Garcia. The emails also make light of the resignations and how Vanessa did not feel comfortable.

(9) Exhibit 31 - An email dated March 21, 2023, from Admin to Han and Jayde Trinh stating the list attached to the email is the full list of clients transferred to Phoenix and Oakstone. Only one page of each list is included in the exhibit, as the rest are intentionally left out "for brevity."

(10) Exhibit 32 - An email dated March 23, 2023, from Han to Anthony Osborn telling Osborn to send an invoice to admin@oakstonepc.com. This is in response to an email dated March 22, 2023, from Osborn explaining that his wife is battling cancer and that he has tried calling twice regarding an overdue payment of $35,383.66 to his law firm.

(11) Exhibit 33 - An email dated March 23, 2023, from Han to Scott Eadie stating that the attached list is a master client list for clients that "went to CLG.[32]" That full list is intentionally not included in the exhibit "for brevity."

(12) Exhibit 34 - An email chain dated April 10, 2023, between Han and Jennifer McLaughlin concerning McLaughlin's offer letter for "Greystone" and informing McLaughlin that LPG's work phones were shut off and reactivated on April 10.

(13) Exhibit 35 - An email dated April 14, 2023, from Melissa Wilkes to Han inquiring as to when cases were transferred from LPG to Phoenix. It also includes an email discussing disconnection of the phones.

(14) Exhibit 36 - An email dated April 24, 2023, from Peter Osterman to Han and Jayde Trinh stating that he does not have email accounts for "CLG" or "PLG" but does have them for "LPG, GLC and OLG."

(15) Exhibit 37 - An email dated May 11, 2023, from Han to Joshua Figueroa, Chance Typhair, and Cayden Cohen, regarding money Paychex is holding. It also includes a CitiBusiness Account Opening Confirmation for Greyson Law Center PC.

(16) Exhibit 38 - An email dated May 16, 2023, from Han to ctyphair@paychex.com, aharth@paychex.com, and Cora Devine stating Greyson's company ID is 16092497.

(17) Exhibit 39 - An email chain dated March 21, 2023, between Jayde, Randall Clark, and Han stating Pamella Moraes does not have access to Forth and nor does anyone else because they were locked out. It also states that all files have been moved to different firms and that Legal LPG has access to some of them. There is also a line addressed to Clark that appears to be from "Ty" asking for him to reach out regarding a new venture.

(18) Exhibit 40 - An email dated March 29, 2023, from Jayde to Legal and Attorney saying it is Han's "problem" to talk with Randall Clark about transfers.

---

[32] "CLG" is an acronym for Consumer Legal Group, which is alleged by Trustee to be a fraudulent transferee of LPG. [See 1046 Adv. Dk. 583].

(19) Exhibit 41 - An email chain dated April 7, 2023, between Jayde and Denise Mikrut regarding the LPG phones.

(20) Exhibit 42 - An email chain between Legal, Jayde, and Attorney regarding whether a client can reach out to Oakstone.

(21) Exhibit 43 - An email chain dated May 11, 2023, between Jayde and Ana Gurrola regarding "AG complaints" and stating they were shredded.

(22) Exhibit 44 - An email from Attorney dated April 26, 2023, instructing employees not to use Oakstone's Luna and to instead use Greyson's Luna. It also instructions not to use Fresh Sales and Slack.

(23) Exhibit 45 - An email dated March 21, 2023, from Jayde to Daniel March, Admin, and Mona Montiero stating that Mona and Jayde are no longer employed by LPG.

(24) Exhibit 46 - An email dated March 23, 2023, from Scott Eadie to Nicole Filtz, Vanessa Buchner, and Carl Summer stating that he believes the mail is being sent to "Dan's office." It also discusses files and scans.

(25) Exhibit 47 - An email dated April 30, 2023, from Tony Diab to Daniel March stating that attached to the email is an agreement for Oakstone referrals sent to Joon, which also includes that agreement.

**7.  The Trustee's Opposition and Evidence [Dk. 1104]**

On April 11, 2024, the Trustee filed an opposition to Jayde's Motion [Dk. 1104]. Included is the declaration of D. Edward Hays. Attached to Hays' declaration are the following exhibits:

(1) Exhibit 1 - A transcript of LPG's 341(a) meeting of creditors held on April 24, 2023.

(2) Exhibit 2 - A declaration of Han Trinh that was included as Dk. 676-1 in the main case, although the exhibits included in Dk. 676-1 are not attached.

(3) Exhibit 3 - A list of paystubs from LPG for Jayde Trinh for January 16, 2023, to March 12, 2023.[33]

### 8. Jayde Trinh's Reply and Evidence [Dk. 1125]

On April 18, 2024, Jayde Trinh filed a reply ("Reply") to the Trustee Opposition [Dk. 1125]. Attached to the Reply are the declarations of Jayde Trinh, Kathleen P. March, Han Trinh, Tony Diab, Ana Gurrola, Ramona (Mona) Montiero, Denise Mikrut, Collin O. Donner, David Orr, Israel Orozco, Peter Osterman, George Chamberlain, Brenda Mendez, Haley Simmoneau, Linda Prey, Maria Thach, Michael Vu, and Morgan Lee, and Mallory McCarthy.

### A. Jayde Trinh Declaration and Exhibits

Attached to the declaration of Jayde Trinh in the Reply are the following exhibits:

(1) Exhibit A - A series of emails dated March 20-22, and 28 of 2023 and April 5, 2023. They are addressed to or sent from "attorney@lpglaw.com." There are also text messages dated March 23, April 25, May 5, May 10, May 24 of 2023.

(2) Exhibit B - A text on March 15, 2023, to "Tony" regarding payroll and a parking invoice addressed to LPG with a due date of March 15, 2023. Jayde's declaration states this exhibit shows she did not know about the LPG bankruptcy until April 2023, as was attempting to have LPG pay bills [Dk. 1125, Decl. Jayde Trinh, pg. 21, ¶ 28].

(3) Exhibit C - A series of text messages dated February 8, 2023, and February 21, 2023. They discuss certain LPG employees wanting to leave due to stress. Included is a text from Tony Diab indicating there would be a "winding up" happening.

(4) Exhibit D - The Articles of Incorporation, Statement of Information, and Certificate of Dissolution from the California Secretary of State's office for Oakstone Law Group PC.

---

[33] There appears to be a possible error on a paystub for Jayde Trinh on pages 258 and 259 of 270, as the pay period says February 13, 2023, to March 26, 2023. However, the check date is March 3, 2023. The usual pay period for the other paystubs is two weeks. While the paystub on page 252 says "VOID," the one on page 253 does not.

(5) Exhibit E - An email dated December 2, 2020, from the Office of Admissions for the State Bar of California to Jayde Trinh. It states Jayde was approved to practice as a Provisionally Licensed Lawyer effective December 2, 2020, until June 1, 2022, unless extended by the Supreme Court.

**B. Kathleen March Declaration and Exhibits**

Attached to Kathleen March's declaration in the Reply are the following exhibits:

(1) Exhibit A - An email dated February 14, 2024, from Ms. March to Alina Mamlyuk explaining Han Trinh's salary and asking for five documents for discovery. It also includes paystubs from LPG for Han Trinh and Jayde Trinh for January 30, 2023, through February 12, 2023.

(2) Exhibit B - An email dated March 4, 2024, from Ms. March to Alina Mamlyuk regarding Han Trinh's pay and includes her paystubs from LPG for June 21, 2021, through March 12, 2023.[34]

(3) Exhibit C - Jayde Trinh's paystubs from LPG for June 21, 2021, through March 12, 2023.

(4) Exhibit D - An email from Ms. March to Alina Mamlyuk dated March 4, 2024, asking for Jayde Trinh's W-2 forms for 2023.

(5) Exhibit E - An email from Ms. March to Alina Mamlyuk dated February 14, 2024, and includes the same materials as Exhibit A attached to Ms. March's declaration.

(6) Exhibit F - A request to produce documents dated February 29, 2024, filed by Jayde Trinh and propounded on the Trustee in relation to Jayde's motion for allowance and payment of administrative claim.

(7) Exhibit G - A request to produce documents dated February 29, 2024, filed by Han Trinh and propounded on the Trustee in relation to Han's motion for allowance and payment of administrative claim.

---

[34] The possible error referenced in footnote 30 appears here again on pages 69 and 70 of 380 of the Reply.

(8) Exhibit H - An email from Ms. March to Alina Mamlyuk dated April 4, 2024, claiming a prior email from Mamlyuk includes incorrect information about the facts. It also provides Ms. March's explanation of events related to this case involving timing.

### C. Han Trinh Declaration and Exhibits

Attached to Jayde Trinh's declaration in the Reply are the following exhibits:

(1) Exhibit A - A paycheck printout from Paychex which Han's declaration states demonstrates that LPG had five active employees as of June 2, 2023 ("Daniel March, Olga Esquivel, Phuong Trinh (Jayde), Carl Wuestehube, and Han Trinh"). [Dk. 1124, Han Reply Decl., ¶ 7].

(2) Exhibit B – Han's declaration describes this as "screenshots of a list of some emails from han@lpglaw.com and legal@lpglaw.com" showing "a large volume of LPG work" that Han Trinh and her team were doing from March 20, 2023, through June 2, 2023. [Dk. 1124, Han Reply Decl., ¶ 8].

(3) Exhibit C – A screenshot from the website "elitelegalpractice.com" showing a description of Richard Meier. It says Meier is a consumer litigation attorney, and it lists the jurisdictions in which he is admitted.

(4) Exhibit D - A screenshot from the website "elitelegalpractice.com" showing a description of Yasmeen Villamil and of Rosy Prado, who are both legal assistants.

(5) Exhibit E – A Notice to Vacate from the Orange County Sheriff's Department for the occupant at 17542 E. 17th Street, Suite 105, Tustin, CA 92780. The occupant was notified that the property was to be turned over by May 30, 2023.

(6) Exhibit F - A receipt of an order for a cargo van for use on May 19, 2023, in Costa Mesa.

### D. Declaration of Israel Orozco and Exhibits

Attached to the declaration of Israel Orozco's in the Reply are the following exhibits:

(1) Exhibit A - An email from Richard Meier to Orozco dated February 9, 2023, stating that day was Meier's last. Orozco's declaration states Meier was an attorney at LPG [Dk. 1125, Israel Orozco Decl., pg. 328, ¶ 8].

(2) Exhibit B - An email dated February 15, 2023, from Richard Meier to various LPG email accounts providing cases that needed substitutions.

**9. The Trustee's Sur-Response and Evidence [Dk. 1320]**

On June 6, 2024, the Trustee filed a "sur-response to Han Trinh's reply to Trustee's opposition to motion of Phuong (aka Jayde) Trinh for allowance of administrative expense claim." [Dk. 1320].[35] Included are the declarations of Alina Mamlyuk and D. Edward Hays in support thereof. Attached is Exhibit I, which is an email exchange between Alexander Harth and Alina Mamlyuk. Mamlyuk inquired if Paychex could see who logged into the Paychex portal through LPG, and Harth responded Paychex does not keep track of when users log in.

**10.    The Court's Order Continuing the Hearing [Dk. 1324]**

On June 7, 2024, the Court entered an Order continuing the hearings on the administrative claims of Greyson Law Center PC [Dk. 676], Han Trinh [Dk. 674], and Phuong (Aka Jayde) Trinh [Dk. 675] which, *inter alia*, ordered that no further pleadings were permitted to be filed in connection with the administrative claims absent further order from the Court [Dk. 1324].

**V. Discussion**

At the hearing held on July 17, 2024, Counsel for Greyson requested that this Court review the declaration of Daniel March [1046 Adv. Dk. 501], which was not included in Jayde's Motion but has been filed within this Court's bankruptcy docket. The

---

[35] The Trustee's reference to Han Trinh in the caption appears to be an error as the pleading, substantively, is a sur-response to Jayde's Reply.

Court understands it can review its own dockets and advises that it has examined the

Declaration.[36]

As stated by the United States Supreme Court, "[i]n the exercise of its equitable

jurisdiction the bankruptcy court has the power to sift the circumstances surrounding

any claim to see that injustice or unfairness is not done in administration of the

bankrupt estate." *Pepper v. Litton*, 308 U.S. 295, 307-08, 60 S. Ct. 238, 246 (1939). The

Court in *Pepper v. Litton* further held:

> [W]hen there is added the existence of a "planned and fraudulent scheme," ... the necessity of equitable relief against that fraud becomes insistent. No matter how technically legal each step in that scheme may have been, once its basic nature was uncovered it was the duty of the bankruptcy court in the exercise of its equity jurisdiction to undo it. Otherwise, the fiduciary duties of dominant or management stockholders would go for naught; exploitation would become a substitute for justice; and equity would be perverted as an instrument for approving what it was designed to thwart.

*Id.*, at 312.

The Court now understands through the records of the State Bar of California

that Mr. March, days after he swore within his declaration that he was a member in

good standing with the State Bar, attempted to resign from the State Bar, and was later

disbarred by the State Bar, allegedly for behavior with respect to activities of Debtor. Mr.

March failed to mention in his declaration that, while he was attesting to the fact that he

---

[36] *See*, Request for Judicial Notice of Actions of State Bar of California filed by the Trustee as Docket 64 in Adv. No. 8:23-ap-01098, of which the Court takes judicial notice. "[T]he Court can take judicial notice of the documents filed in the Cases . . . [and] the Adversary Proceeding . . . *Tuma v. Firstmark Leasing Corp. (In re Tuma)*, 916 F.2d 488, 491 (9th Cir. 1990) (noting that a court may take judicial notice of its own docket)." *King v. Exp. Dev. Can. (In re Zetta Jet USA, Inc.)*, 644 B.R. 12, 25 (Bankr. C.D. Cal. 2022). "The Court may not, however, infer the truth of the facts stated in those documents. *In re Harmony Holdings, LLC*, 393 B.R. 409, 413 (Bankr. D.S.C. 2008) (indicating that bankruptcy judges may take judicial notice of bankruptcy court records but may not 'infer the truth of the facts contained in documents, unfettered by rules of evidence or logic, simply because such documents were filed with the court')." *Id.* The Court may, however, take judicial notice of facts in the public record "not subject to reasonable dispute that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Kihagi v. City of San Francisco*, 2016 U.S. Dist. LEXIS 5651, *7-8 (USDC NDCA 2016). *See also, Talos v. Spearman*, 2018 U.S. Dist. LEXIS 16943, *1 (USDC CDCA 2018) (Court took judicial notice of attorney's state bar admission status). In this case, the truth of the offer of State Bar resignation and then the disbarment of Mr. March is accepted by the Court.

was a member of good standing at the time he signed the declaration, he was under active investigation for looting millions of dollars of client money from Debtor.

For the reasons set forth below, after consideration of all the pleadings filed in connection with the Motion, as well as the docket as a whole, the Court finds that Jayde Trinh has failed to meet her burden to establish a *prima facie* administrative claim against the Estate.

## A.    Administrative Claims

Section 503(b)(1)(A)(i) provides in relevant part that, after notice and a hearing, there shall be allowed administrative expenses for the actual, necessary costs and expenses of preserving the estate including, wages, salaries, and commissions for services rendered after the commencement of the case. "The terms 'actual' and 'necessary' are to be construed narrowly and 'must be the actual and necessary costs of preserving the estate for the benefit of its creditors." *Einstein/Noah Bagel Corp. v. Smith (in Re Bce W.*, 319 F.3d 1166, 1173 (9th Cir. 2003) (citing *AMTRAK v. Dant & Russell, Inc. (In re Dant & Russell, Inc.)*, 853 F.2d 700, 706 (9th Cir. 1988). This narrow construction implements a presumption that a bankruptcy estate has limited resources which should be equally distributed among creditors. *Boeing N. Am., Inc. v. Ybarra (In re Ybarra)*, 424 F.3d 1018, 1026 (9th Cir. 2005).

Bankruptcy courts have broad discretion in deciding whether to allow an administrative expense.[37] *Microsoft Corp. v. DAK Indus. (In re DAK Indus.)*, 66 F.3d 1091, 1094 (9th Cir. 1995). The purpose of administrative priority status is to encourage third parties to do business with the bankruptcy estate for the benefit of the estate as a

---

[37] A bankruptcy court's decision to award or deny administrative expense claims is reviewed for abuse of discretion. *Microsoft Corp. v. DAK Indus. (In re DAK Indus.)*, 66 F.3d 1091, 1094 (9th Cir. 1995). Courts apply a two-part test to determine if the bankruptcy court has abused its discretion. United States v. Hinkson, 585 F.3d 1247, 1251 (9th Cir. 2009) (en banc). First, the Court determines *de novo* whether the bankruptcy court identified the correct legal rule to apply to the relief requested. *Id.* Second, if the bankruptcy court correctly applied the legal rule, then its factual findings are examined for clear error. *Id.* The bankruptcy court's factual findings are affirmed unless it is determined that those findings are "(1) 'illogical,' (2) 'implausible,' or (3) without 'support in inferences that may be drawn from the facts in the record.'" *Id.* at 1261-1262, n. 21-22.

1  whole. *Boeing N. Am., Inc. v. Ybarra (In re Ybarra)*, 424 F.3d 1018, 1026 (9th Cir.

2  2005) (citations omitted).

3      The claimant has the burden of proving by a preponderance of evidence that it

4  has an administrative expense claim. *See In re Blanchard,* 547 B.R. 347, 352 (Bankr.

5  C.D. Cal. 2016) (internal citation omitted). In order to limit abuses of the

6  administrative-expense priority, the court requires a claimant "to show that the debt: (1)

7  arose from a transaction with the debtor-in-possession and (2) directly and substantially

8  benefitted the estate." *In re L. Scott Apparel*, 2019 Bankr. LEXIS 1303, 211 (Bankr. C.D.

9  Cal. Jan. 29, 2019) (citing *Abercrombie v. Hayden Corp. (In re Abercrombie)*, 139 F.3d

10  755, 757 (9th Cir. 1998)); *In re DAK Indus., Inc.*, 66 F.3d 1091, 1094 (9th Cir. 1995).

11  **VI. Analysis**

12      Jayde has not met her burden to establish that she has an administrative claim

13  under § 503(b)(1)(A).

14  **A. Wages**

15      Jayde asserts she is owed $52,884.64 in salary for 11 weeks of post-petition work

16  performed for Debtor. To obtain administrative expense status, Jayde needs to establish

17  that her work "directly and substantially benefitted the estate." *In re DAK Indus.,* 66

18  F.3d at 1094. Jayde has failed to establish by a preponderance of the evidence that she

19  worked for Debtor post-petition; further, Jayde has not met her burden to establish that

20  work performed, if any, was for the benefit of the Estate.

21      The Motion asserts that Han and Jayde "were essential employees of LPG,

22  because Han and Jayde were the LPG employees who administered approximately

23  28,000 active litigation files of LPG clients, including hiring, managing, assigning, and

24  monitoring performance of attorneys to represent LPG clients, for clients whose matters

25  were not resolved short of law suit." [Dk. 674, pg. 3:26-pg. 4:2]. Jayde states in her

26  declaration that she and Han continued to do the "essential" work for LPG,

27  administering thousands of active litigation files for 11 weeks post-petition, and

28  continued to respond to emails sent to LPG every day from LPG's clients. According to

Jayde, between March 20, 2023, and June 2, 2024, there was an increased volume of communications to which Jayde and her team had to respond, compared to before March 20, 2023, when LPG filed bankruptcy. Jayde asserts that LPG benefitted from her work because, by her "fielding all the client and attorney communications from 3/20/23 to 6/2/23, kept LPG's client base from falling apart – which allowed Trustee Marshack to sell the LPG client files, in July 2023, for many millions of dollars." [Dk. 1125, Decl. Jayde Trinh, ¶23].

The Court notes, however, as discussed further *infra*, the evidence provided by Jayde does not establish that Jayde performed work, post-petition, for LPG that benefitted the Estate. Movant repeatedly asserts that she was an "essential employee" of LPG though she provides very little detail and evidence as to what work she performed post-petition, let alone how it benefitted the Estate. Jayde attaches to her Reply, as Exhibit A, what Jayde declares "are documents showing [she] was working after 3/21/23." [Dk. 1225, Decl. Jayde Trinh, ¶ 10]. Exhibit A, however, only contains limited information. It contains 6 pages of emails dated March 20-22, March 28[38] of 2023 and April 5, 2023, which are addressed to or sent from "attorney@lpglaw.com." This is insufficient to establish beyond a preponderance of the evidence that Jayde was performing work for LPG post-petition and or that it benefitted the Estate. Also attached to Exhibit A are 5 pages of screenshots of certain text messages dated March 23, April 25, May 5, May 10, May 24 of 2023. These texts are also insufficient to establish by a preponderance of the evidence that Jayde was performing work for LPG post-petition or that it benefitted the Estate.

To obtain administrative expense status, Movant needs to establish that work "directly and substantially benefitted the estate." *In re DAK Indus.*, 66 F.3d at 1094.

In Han's declaration attached to the Reply as Exhibit B, she states that there "are screenshots of a list of some emails from han@lpglaw.com and legal@lpglaw.com

---

[38] Pages 25 and 26 of Exhibit A, showing an email dated May 28, appear to be duplicate pages.

proving that my team and I were doing a large volume of LPG work, from 03/20/23

thru 06/02/23 and "proving that Jayde and [Han] never stopped working for LPG until

the lockout."[39]

The screenshots contained on the first 34 pages of the exhibit reflect an inbox

folder for "H," presumably Han Trinh. The remaining 26 pages of email snippets are

from the "Sent" folder for "L." However, very little information or context is given to the

screenshots of the emails. The only information the snippets provide is the title of the

sender, partial subject lines, and a snippet of the beginning portion of the body of the

email.[40] While the screenshots of emails combined with Jayde's evidence of pre-petition

paystubs show that Jayde worked *under the banner of LPG* (meaning, she used LPG

emails) for 11 weeks post-petition, it is unclear how, if at all, Jayde's work benefitted the

Estate.[41]

The screenshots of emails received by and sent by Han do not provide convincing

evidence of work performed by Jayde, nor are they evidence that Jayde performed work

for the benefit of the Estate. To the contrary, the emails evidence Jayde's knowledge of

the ongoing schemes being carried out by LPG. In the "sent" folder for "L" the following

emails were sent to "Attorney," known to be Jayde:

---

[39] The Court finds it troubling that Jayde throughout her pleadings asserts she simultaneously worked for LPG and Greyson as vehemently argued that it is a direct competitor of LPG. Jayde admits that she was employed by Greyson and LPG at the same time. [Dk. 1125, Decl. Jayde Trinh, ¶13]. If Greyson and LPG were direct competitors, how could Jayde permissibly work at both simultaneously regardless of whether Jayde had "plenty of time" to work at both. [*Id.*].

[40] The screenshots of the emails appear to have been made on a phone.

[41] The Court notes that the Trustee argues that if Jayde is determined to have worked for LPG, she should be regarded as an insider as a "person in control of the debtor." The Trustee makes this assertion to argue that as Jayde's claim would therefore be disallowed as she did not comply with the requirements of seeking insider compensation. The Trustee first raises this argument in his sur-response, authorized by this Court, filed June 6, 2024 [Dk. 1320]. The Court, however, did not permit any filings in response to the sur-response by Movant. The Court deems the insider argument waived for purposes of this Motion, as no new facts were alleged in the Reply, compared to the Motion, that would not have alerted the Trustee to raise the argument in the Opposition if applicable.  If the Trustee wishes to re-raise this theory at a future time, Jayde will be able to address this issue straightforwardly.

(1) An email dated June 2, 2023, stating "[t]he new complaint attached is for a CLG transfer. No file was in litigation. CL was with LPG since 1/31/22..." [Dk. 1125, Decl. Han Trinh, Exhibit B, pg. 263 of 380].

(2) An email dated May 22, 2023, stating "Oakstone then to Phoenix." [*Id*. at pg. 275].

(3) An email dated May 18, 2023, stating "Oakstone transfer but no longer showing up. So maybe Phoenix now." [*Id*. at pg. 278].

(4) An email dated May 17, 2023, "[i]t is a Phoenix transfer." [*Id*. at 280].

(5) An email dated May 10, 2023, stating "[t]his client is with CLG" [*Id*. at 288].

(6) Two emails dated May 4, 2023, stating "Phoenix Client" [*Id*. at 289].

These emails demonstrate Jayde's awareness that files had been transferred away from LPG, which transfers are alleged by the Trustee to be a part of a fraudulent transfer scheme. These emails also suggest that Jayde, as an attorney, was therefore aiding non-debtor entities, such as Phoenix, Oakstone, and CLG, by working on files that had already been transferred out of Debtor's possession. Further, for files that were transferred to Phoenix, Jayde, as an employee of Greyson, knew Greyson was receiving files from Phoenix to service.

For cases transferred to Oakstone, though Debtor was supposedly contracted to received 20% of the revenue from funds recovered [*See* Dk. 1099, Ex. 47] the client files were transferred without client approval; this violates the professional rules of conduct, which was brought to Jayde's attention by concerned attorneys. [*See, e.g.,* Dk. 1099, Ex. 26 (an email stating, "[i]n another email, I inform you that Illinois clients must consent to the transfer of their files.")]. Therefore, Jayde's involvement in furthering these unethical activities far from benefitted the Estate, but instead increased its potential liability to malpractice claims.

Declarations filed in support of Jayde's Motion state that Jayde was told that LPG was beginning to wind up and files that were disappearing from LPG were files that had already been transferred to other law firms that could better serve the clients. [*See e.g.*,

Dk. 1125, Decl. Han, ¶17; Decl. Israel Orozco, ¶4]. Regardless of the truth of this assertion, it does not change the fact that Jayde has not demonstrated that her work benefitted the Estate, as outlined above. The evidence provided in support of the Motion fails to establish, on a quantifiable basis, that work performed by Jayde benefitted the Estate.

The evidence submitted in support of the Trustee's Opposition further demonstrates that, contrary to establishing that her work benefitted the Estate, Jayde may have exposed the Estate to liability for her actions.

The Trustee, in the declaration of Alex Rubin filed in support of the Opposition, attaches certain emails wherein Jayde is involved in communications discussing the transfers of files out of Debtor's possession (or been made aware of by Han). [*See* Dk. 1099, Ex. 24]. For example, on February 8, 2023, Jayde forwarded an email from Pamella Moraes (from an email associated with Randall Clark) inquiring about a client's "[t]ransition to Oakstone Legal Group" to Han Trinh and Reid Wood [*Id.*, Exhibit 27]. On March 21, 2023, an email was sent from "Admin" to Jayde and Han stating "[t]his shows all clients that ended up at Phoenix and at Oakstone" with "FullList" attached [*Id.*, Exhibit 31]. On March 21, 2023, Jayde sent an email to Randall Clark and Han stating "[a]ll files have been moved to different law firms. Legal LPG has access to some. Randall – please provide a number so we can reach out regarding new venture. Ty!" [*Id.*, Exhibit 39]. A "new venture" has nothing to do with working for LPG and definitely not work which was for the benefit of the Estate.

There is also an email from Han to Jayde and lpgcounsel@lpglaw.com, dated April 7, 2023, wherein Han states "Hello Counsels, I've email everyone in their Greyson email re [phones]. Please respond there. Thank you!" [*Id.*, Exhibit 35]. In yet another example, an email dated April 24, 2023, from Peter Osterman was sent to Han and

Jayde Trinh stating that he does not have email accounts for "CLG" or "PLG" but does have them for "LPG, GLC[42] and OLG."

In an email chain between Han and Jayde and others, Jayde in response to whether "Legal" can inform a client to cancel out from Phoenix and reach out to Oakstone to sign up, states "I'm pretty sure we can but it's not Oakstone." This is evidence of work being performed by Jayde which was detrimental to the Estate, as discussed further below. [*Id.*, Exhibit 42]. On April 26, 2023, Jayde sent an email to numerous LPG employees[43] states:

> Effectively immediately, please do NOT use the Oakstone's CRM, Luna. You (and your staff) should be able to access Greyson's CRM Luna (Version 2 - more advanced). It is the same website, except replace the OS with GS in the beginning of the web link. All information and data should be in there - old and new. You should be able to log in using the same Oakstone's Luna credentials for Greyson's Luna. Please note that there is a chance Luna 2 will not allow you to log in due to information being ported in the morning so you may have to wait until the afternoon.

[*Id.*, Exhibit 44]. Once more, this evidence shows Jayde working for who she characterizes as a direct competitor, Greyson, through her LPG email account.

The foregoing emails demonstrate Jayde's direct and indirect involvement in the transfers of files and looting of LPG to the benefit of non-debtor entities, showing that work performed was not for the benefit of the Estate.

Jayde's response to the Trustee's Opposition in unavailing. Jayde, in her declaration filed in support of the Reply, states "I never participated, in any way, in transferring LPG client files to other Law Firms or in transferring LPG money anywhere. Nor did LPG send any LPG client files and legal service agreements or LPG money, to

---

[42] GLC is known to be Greyson.

[43] The "to" line reads: Scott Eadie; Aaron Davis; Amy Ginsburg; Ashley Lambert-Bland; Attorney; Collin Donner; David Orr; Denise Mikrut; Douglas Stiele; George Chamberlain; Haley Simmoneau; Israel Orozco; Jayde Trinh; Kenneth Merriweather; Kent Cobb; Laronda Kelley; Melissa Wilkes; Peter Osterman; R. Reed Pruyn; Robert Williams; Tiffany Cornelius; Vincent Jackson; Kelly Adams; Kamaria Womack; R. Reed Pruyn; Shadae Clarke; rmastenlaw@gmail.com; Jhosselinne Ramirez Gonzalez.

Greyson Law Center PC." [Dk. 1125, Decl. Jayde Trinh, ¶19]. Yet, the emails provided by the Trustee clearly show otherwise.

Movant also provides the Court with a paystub from LPG for Jayde, pre-petition, with a pay period of February 13, 2023, to February 26, 2023. [Dk. 675, Decl. Jayde Trinh, Ex. A]. However, pre-petition pay stubs are not sufficient evidence of post-petition, actual, necessary costs and expenses of preserving the Estate. Although wages or a salary earned pre-petition may be probative evidence on an administrative claim, the claimant must still prove the value of the benefit to the Estate by a preponderance of the evidence. *Boruff v. Cook Inlet Energy LLC (In re Cook Inlet Energy LLC)*, 583 B.R. 494, 498 (B.A.P. 9th Cir. 2018) (citations omitted).  For the reasons stated *supra*, Jayde has failed to prove the value of the benefit to the Estate by a preponderance of the evidence, and pre-petition paystubs do not support the argument that she performed work for the benefit of the Estate in these circumstances.

Jayde also states the work she performed allowed the Trustee to sell the LPG client files, in July 2023, for many millions of dollars. This assertion is unfounded and unsupported. The benefit to the Estate must be actual, not potential. *In re Allen Care Ctrs.*, 163 B.R. 180, 188 (Bankr. D. Or. 1994). First, the order approving the sale ("Sale Order") [Dk. 352] reflects in relevant part that the aggregate purchase price for the property involved "shall be the sum of Five Million Five Hundred Thousand Dollars ($5,500,000)". [Dk. 352, pg. 31]. In additional to the foregoing, "the buyer shall pay a fee equal to: (a) fifty percent (50%) of all amounts collected by Buyer on Active Executory Contracts … from and after the Closing, plus (b) forty percent (40%) of all amounts collected by Buyer on Inactive Executory Contracts." [*Id.*]. No convincing evidence to support the assertion that the Trustee would not have been able to complete a sale without Jayde has been provided.

Second, approximately 20,000 files that were a part of the Sale were files that were recovered by the Trustee, from Phoenix, through the stipulation resolving an avoidance action. This had nothing to do with alleged work performed by Jayde, but

rather the efforts of the Trustee to recover the files. In addition, the Trustee had to seek a temporary restraining order and preliminary injunction against alter egos of LPG, and other entities and individuals, to preserve Estate assets and stop the continuing transfers of files to non-debtor entities.

Further, Jayde has not established that she is entitled to, on a quantum meruit basis, a pro rata rate of her pre-petition salary with Debtor. As noted *supra*, Jayde's pre-petition salary is not dispositive when determining the benefit of services rendered to an estate. *See In re Cook Inlet Energy LLC*, 583 B.R. 494 (B.A.P. 9th Cir. 2018) (collecting cases). Jayde's evidence shows minimal work performed (a handful of emails) which is insufficient.

Jayde has not met her burden that she performed work, post-petition, which benefitted the Estate. The evidence provided lends to the conclusion that work performed was *possibly*, at times, for the benefit of the Estate, but at most times was for the benefit of a third party, which does not entitle Jayde Trinh to an administrative claim. *See Data Leverage, LLC v. Avery (In re Data Leverage, LLC)*, 640 B.R. 210, 217 (C.D. Cal. 2022) (citing *In re Sierra Pac. Broads.*, 185 B.R. 575, 578 (B.A.P. 9th Cir. 1995)). The clear issue for Movant is a sliver of work performed that was *possibly* for the benefit of the Estate does not meet the standard for entitlement to an administrative claim.

Thus, Jayde has failed to establish, by a preponderance of the evidence that she has an administrative claim. She has not met her burden to demonstrate that she performed work which benefited the Estate, as required.

### B. Penalties

Jayde asserts she is owed $28,846.15 in penalties for not being paid final wages in a timely manner.

California Labor Code § 203(a), in relevant, part provides that if an employer willfully fails to pay, without abatement or reduction, any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the

due date thereof at the same rate until paid, but the wages shall not continue for more than 30 days.

No legal authority was provided by Movant as to why the penalty is an administrative expense; however, the Court recognizes that penalty wages are entitled to administrative priority as a cost of doing business. *See Gonzalez v. Gottlieb (In re Metro Fulfillment, Inc.)*, 294 B.R. 306 (B.A.P. 9th Cir. 2003). Nevertheless, as Jayde has failed to establish that she is entitled to an administrative claim for alleged wages owed, she is likewise not entitled to the penalties sought.

### C. Accrued Vacation

Jayde asserts she is owed $31,094.35 for accrued vacation.

California Labor Code § 227.3 states, "[u]nless otherwise provided by a collective-bargaining agreement, whenever a contract of employment or employer policy provides for paid vacations, and an employee is terminated without having taken off his vested vacation time, all vested vacation shall be paid to him as wages at his final rate."

Again, no legal authority is provided as to why accrued vacation is entitled to be treated as an administrative claim. Accrued vacation pay should be given administrative priority only to the extent that it is for compensation for services rendered post-petition. *In re Roth Am., Inc.*, 975 F.2d 949, 958 (3d Cir. 1992) (citing *In re Health Maint. Found.*, 680 F.2d 619, 622 (9th Cir. 1982)). As Jayde has failed to demonstrate that she performed work for the benefit of the Estate which would entitle her to an administrative claim, she cannot have an administrative claim for alleged accrued vacation hours.

//

//

### VIII.  Conclusion

The Court, for the reasons stated above, finds that Jayde has failed to meet her burden to establish entitlement to an administrative claim. The Motion is DENIED.

**IT IS SO ORDERED.**

Date: August 27, 2024

Scott C. Clarkson
United States Bankruptcy Judge