**FILED & ENTERED**

**AUG 27 2024**

**CLERK U.S. BANKRUPTCY COURT**
**Central District of California**
**BY bolte      DEPUTY CLERK**

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA – Santa Ana Division**

In re

The Litigation Practice Group, P.C.,

    Debtor.

Case No. 8:23-bk-10571-SC

Chapter 11

**ORDER AND MEMORANDUM DECISION DENYING APPLICATION FOR ADMINISTRATIVE CLAIM OF HAN TRINH**

Date: July 17, 2024
Time: 11:00 a.m.
Ronald Reagan Federal Building &
U.S. Courthouse
Courtroom 5C
411 West Fourth Street
Santa Ana, CA 92701

    Before the Court is the "Motion of Han Trinh for an Order Granting Allowance and Payment of Administrative Claim, Pursuant to 11 U.S.C. Section 503(b)(1)(A)(i)" ("Application" or "Motion") [Dk. 674][1] filed by Han Trinh ("Han" or "Movant"), which came on for hearing on July 17, 2024. Appearances are as noted on the record.

---

[1] Unless otherwise indicated, references to "[Dk. X]" refer to the main docket in this bankruptcy case. References to pleadings filed in related adversary proceedings shall include the last four digits of the adversary number and referenced docket number: e.g., "[1046 Adv. Dk. X]".

Based upon the Application, the evidence described below[2], and the docket as a whole, and for the reasons set forth on the record and as set forth in detail within this decision below, the Application is DENIED.

## I. Background – Litigation Practice Group, P.C.

The Litigation Practice Group ("LPG" or "Debtor") filed its Chapter 11 bankruptcy on March 20, 2023 ("Petition Date").  Through the various proceedings and evidence produced in both the main case and the various adversary proceedings, including but not limited to various Motions for Temporary Restraining Orders, Preliminary Injunctions, Motions to Dismiss, a Motion for Appointment of a Chapter 11 Trustee, a Motion to Sell Assets, a multitude of pleadings filed by both secured and unsecured creditors (supported by evidence presented under oath) in support of their claims, and especially the pleadings and evidence presented by the "Watchdog of the Bankruptcy System" aka the Office of the United States Trustee (an arm of the United States Department of Justice), *it is clear to this Court that Debtor, since its pre-petition inception (and through the time of the appointment of the Chapter 11 Trustee) was, in this Court's opinion, operating a criminal enterprise.* It is also clear to this Court that the administrative claim sought by Han is not supported by the evidence before the Court as the evidence provided by Han is based on declarative evidence arising from herself, principals of Debtor, operators of Greyson, and operators of Debtor's previous illegal or unethical pre-petition activities, and is simply unconvincing, fabricated, and/or uncredible to this Court.

The Court also finds that Greyson Law Center, PC ("Greyson") and the two related Administrative Claim Applicants, Phuong (aka Jayde) Trinh ("Jayde") and Han

---

[2] Movant's counsel, at the July 17, 2024, hearing, requested that the Court consider the declaration of Daniel March [Dk. 501], filed in connection with Greyson's Reply to Trustee's Opposition to Greyson's Motion to Vacate the Lockout/Preliminary Injunction Order, to be a part of these proceedings. The Court agreed to the request. Additionally, as the Court is considering the docket as a whole, this Order references pleadings filed or entered in connection with other matters. To the extent the Court cites to any evidence to which an evidentiary objection was asserted, those evidentiary objections are overruled or as otherwise set forth in entered orders. The evidence is given the weight it deserves.

Trinh ("Han") (together, the "Trinhs" or "Trinh Sisters"), were closely associated with

the fraudulent, unethical practices of Debtor, and that Greyson was a byproduct entity

spun-off from Debtor with the direct assistance of the Trinhs. As Debtor's enterprise

spiraled out of control from fraudulent, unethical mismanagement, as well as possible

criminal activities, the evidence demonstrates that the Trinhs were powerful employees

of Debtor who in the end disembarked from the Debtor's sinking ship and participated

in significant aspects of the creation and management of Greyson.

Pre-petition, Debtor was a law firm that allegedly provided consumer debt

resolution services on a nationwide basis, with client files numbering in the several tens

of thousands, if not more.[3]  To be clear, operations of law firms with a declared specialty

of assisting consumer debtors with financial difficulties are not normally criminal

enterprises. The distinction to be made is *how* any law firm, and its lawyers and staff,

operates the legal services entity, as well as its truly intended purpose.[4]

---

[3] It is important to note that this Court has never received any significant and trustworthy evidence that Debtor accomplished meaningful results for its clients, but only anecdotal examples of viable success for its clients. By reviewing the Estate's claims register, there is evidence of consumer claims for the fraud and demanded but undelivered refunds of approximately $500 million. There is ample evidence that the pre-petition Debtor never placed the collected funds into an attorney-client trust account, and that Debtor or its principals simply looted the payments received through the client automatic withdrawals, stiffing both the clients and outside attorneys who may have been working on client cases with the hopes of being paid. There is also evidence before the Court that Debtor was running a Ponzi scheme and paying some outside (or "network") attorneys with funds obtained from new clients. In this case, it appears that some of the "lenders" may have been serving as "investors," hoping for very high returns before "the music stopped." The Ninth Circuit has recently explained, "[b]y definition, a Ponzi scheme is destined to fail because the pool of available investors is not limitless.  When the Ponzi scheme operator's pool of investors inevitably runs dry, the scheme collapses, and the swindler and their entities often end up in bankruptcy or equitable receivership. *See generally* David R. Hague, Expanding the Ponzi Scheme Presumption, 64 DePaul L. Rev. 867 (2015).  In bankruptcy, the court-appointed trustee is tasked with taking immediate control of the entity, ceasing ongoing fraudulent activity, locating and collecting assets for the bankruptcy or receivership estate, and achieving a final, equitable distribution of the remaining assets. *See* 11 U.S.C. § 704." *Kirkland v. Rund (In re EPD Inv. Co., LLC)*, 2024 U.S. App. LEXIS 21363, at *15 (9th Cir. Aug. 23, 2024).  Finally, there is evidence that Debtor was encumbering (or as some creditors assert, "double or triple selling") their accounts or receivables to multiple lenders. With respect to Greyson's requested Administrative Claim before the Court, there has been no evidence presented that any work allegedly performed by Greyson assisted any clients or added any value to the Estate. This will be further explained in this decision.

[4] This, of course, was the early major concern raised by this Court, the Office of the U.S. Trustee, and proponents of allowing Debtor to remain in Chapter 11 as a going concern after the appointment of the Chapter 11 Trustee on May 8, 2023. Straightforwardly, the Court and others had to consider whether a business (the law firm) could be operationally reformed by the Trustee to morph into strict compliance

Through a system of advertising and a network of referring lawyers throughout the country, this Debtor "signed up" clients facing significant financial difficulty and promised results (i.e. meaningful relief from creditor pressure) with a full money-back guarantee. *See* Adv. 24-01011, Dk. 104-1, Decl. Nancy Rapoport, ¶ 7. As more explicitly stated below, Debtor's unethical and most likely illegal enterprise was in operation at all times prior to the appointment of the Trustee.  Once a client was signed up, the client was required to pay Debtor, primarily through the automatic system of monthly withdrawals controlled by Debtor from the clients' bank accounts. Like almost every streaming system in the country, the automatic withdrawals were made monthly, where it is made difficult for the consumer to cancel or "make it stop."[5]

An important protection (perhaps one of the most important protections) afforded clients represented by lawyers requires that funds paid lawyers must be maintained in a client trust account until earned. Debtor did not provide this protection. The Court has evidence from both the reports filed by the Trustee, the schedules and statements of financial affairs presented by Debtor, and the State Bar of California

---

with various state and federal laws that regulate law firm/lawyer operations as well as consumer protection regulations. The U.S. Trustee vigorously, honestly, and in good faith advocated that Debtor (pre-appointment of the Trustee) should be sent to the dust pile of all illegally or unethically operated law firms. The Trustee, vigorously, honestly, and in good faith, advocated that the law firm be reformed and then monetized for the benefit of the creditors of the bankruptcy Estate. After careful consideration, and with significant consideration of all creditors, including the over 40,000 consumer creditors/clients of the Debtor, the Court provided the Chapter 11 Trustee and the Committee of Unsecured Creditors with the opportunity to (1) end the illegal practices of Debtor and (2) attempt to recapture estate value and provide recovery to the creditors of the Estate. At the time of this writing, the Court, through various status reports, the reports of a Court Appointed Ethics Compliance Monitor, and the pleadings and evidence presented to it throughout this case, concludes that at least the first goal may have been reached. Concerning the second goal (creditor recovery), the Court and the creditors still await revealing results.

[5] Streaming enterprises didn't invent this process. For those senior enough to remember, the "Book of the Month Club" and various iterations (including hard copy Encyclopedia sales, where the companies "sold" the stream of books arriving each month and immediately sold the monthly payments to a third party) developed the highly successful automatic invoicing process, which if ignored would result in massive bill collector harassment and legal judgments to the unsuspecting consumer. Gym memberships were sold and their accounts were laid off in a similar fashion. These activities eventually resulted in the passage of the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692 –1692, which was approved in 1977 (and subsequently amended). It is a consumer protection law, attempting to prevent abusive debt collection practices. The Act created guidelines under which debt collectors may conduct business, defines rights of consumers involved with debt collectors, and prescribes penalties and remedies for violations of the Act.

(received pursuant to Judicial Notice) that almost all of the funds which were not transferred to complaining secured creditors or unhappy "network" counsels (just to placate them enough) may have been looted by the principal or principals controlling the pre-petition Debtor.

Richard Marshack ("Marshack" or "Trustee") was appointed as Chapter 11 Trustee on May 8, 2023, following the entry of an order directing the United States Trustee to Appoint a Chapter 11 Trustee. *See* Order [Dk. 58].  Shortly after his appointment, on May 25, 2023,[6] the Trustee filed an adversary complaint alleging that Debtor was secretly being operated by a California disbarred attorney, Anthony Diab ("Tony Diab" or "Diab") and operating in a manner inconsistent with federal and state law. As alleged by the Trustee, Diab created a web of affiliated businesses designed to locate and funnel clients who were victims of predatory lending or subject to uncollectible debts to various other law firms, which were either alter egos or significantly connected to Debtor.

Greyson and Phoenix Law, P.C. ("Phoenix") were among the entities originally identified in the Trustee's complaint as alter egos[7]. The complaint also alleged that at or around the Petition Date, Diab transferred approximately 40,000 files to Phoenix. Greyson serviced some of those clients.[8]

Phoenix returned all the client files it had received from Debtor back to Debtor pursuant to a Stipulation for Judgment (1) Avoiding, Recovery, and Preserving Transfers to Defendant, Phoenix Law Group, Inc., (2) Turning Over All Transferred Property to Trustee and (3) Dismissing Without prejudice Defendants William Taylor

---

[6] The adversary proceeding was filed without notice to parties based upon the assertion of exigent circumstances, and the entry of a temporary restraining order issued the next day, on May 26, 2023 [1046 Adv. Dk. 13, amended at 1046 Adv. Dk. 21]. The adversary proceeding was subsequently numbered 8:23-ap-01046-SC and a preliminary injunction was subsequently issued on June 23, 2024 [1046 Adv. Dk. 70].

[7] *See* ¶ 59 of the complaint. The Trustee subsequently revised his allegation as to the alter ego status of Greyson in the amended complaint filed June 15, 2023 [1046 Adv. Dk. 62].

[8] *See* ¶ 61 of the complaint.

Carss and Marie Eeya Tan filed June 27, 2023 ("Avoidance Stipulation") [1046 Adv. Dk. 77], approved after a hearing held on July 21, 2023, by an order entered August 7, 2023 [Dk. 365][9]. Pursuant to the Avoidance Stipulation, its parties agreed that the transfers of client files and all material and property related thereto including but not limited to, payments, communications, and documents to Phoenix were fraudulent and the Trustee was entitled to judgment avoiding, recovering, and preserving, the transfers pursuant to 11 U.S.C. § 547, 548, and 550.

The Avoidance Stipulation further provided, inter alia, that:

> Any and all liability whether at law or equity relating in any way to Phoenix's handling of the Transfers including the Files that arose or came into existence following the date of their transfer to Phoenix until Trustee closes a court-approved sale to a third-party buyer ("Post Transfer Claims") will remain with Phoenix. Phoenix, Mr. Carss, and Ms. Tan shall use their best efforts to cooperate with Trustee and his retained professionals to provide services to the clients until closing, and nothing herein shall impose or create any liability for Post Transfer Claims on Trustee or Debtor's Estate.

Avoidance Stipulation, ¶4 [1046 Adv. Dk. 77].

The Trustee moved for the sale of the business, which sale was approved by an order entered August 2, 2023 [Dk. 352].[10]

Later, Han filed her Application on November 17, 2023[11] [Dk. 674]. The Application seeks payment of a total of $150,714.12, consisting of (1) $63,461.54 in wages, (2) $34,615.38 in penalties, (3) $38,203.64 in accrued vacation, and (4) $14,433.56 for personal items taken from Han's office at Greyson.

---

[9] Mr. Plazak, Greyson, Han, and Jayde's former counsel received NEF notice of the entered order.

[10] A Federal and State consumer law compliance monitor was appointed by the Court to monitor the buyer's compliance with various consumer protection requirements.

[11] Han was originally represented by Doug Plazak, Esq. However, Han since employed new counsel, Kathleen March, Esq. Ms. March filed the Motion on behalf of Han.

The Trustee filed an opposition to the Application [Dk. 1103], to which Han replied [Dk. 1124]. The Trustee filed a Sur-Reply [Dk. 1319], and a lengthy hearing was held on July 17, 2024.[12]

## II. Han Trinh, Jayde Trinh, and the Two Greyson Entities

### A. Han Trinh and Jayde Trinh

From January 2021 to December 2022, Han Trinh was the Legal Assistant for LPG, and then in January 2023, Han became the Administrator of LPG. [*See* 1046 Adv. Dk. 47-2, Decl. Han Trinh, ¶2]. Han asserts that when she first started working at LPG, she earned an hourly rate of $17.31, but by June 2, 2023, she was earning an annual salary of $300,000. [Dk. 674, Decl. Han Trinh, ¶ 7]. Jane Dearwester, an attorney who previously worked for LPG, states in her declaration that Han was referred to as "General Han" by Tony Diab and others at LPG and was somewhat feared by LPG's staff and attorneys with her "unlimited authority to manage the business of LPG and LPG's employees." [*See* 1046 Adv. Dk. 493-4, pg. 2 at ¶8; Adv. Dk. 493-3, pg. 3 at ¶9]. An email sent from Tony Diab to Han Trinh and Jayde Trinh refers to Han Trinh as "Gen. Han." [Adv 1046, Dk. 493-10, Ex. 49].

From November 30, 2020, Jayde Trinh asserts she was employed as a W-2 employee of LPG. [*See* Dk. 675, pg. 1:26-28]. As early as of October 2021, Jayde held herself out to be the "General Counsel of LPG."[13] [*See* 1046 Adv. Dk. 493-4, pg. 2 at

---

[12] At the beginning of the hearing, which was a consolidated hearing with the related administrative claims by Greyson and Jayde, the Court advised the counsels that it had read every pleading and reviewed all of the evidence provided by the parties *at least twice and had extensively studied the issues and arguments of the parties*. The Court implored the counsels to limit their oral arguments to matters that they did not include in their pleadings, and to not, step by step, repeat presentations of the evidence before the Court. Unfortunately, the Court received over an hour and half of repetitive arguments, even with reminders from the Court during that period to not simply repeat everything contained in the pleadings and evidence. The Court received a complaint that it had allowed the Trustee's counsel to address, for under ten minutes, without interruption, its arguments. To this end, this decision attempts to recite all the pleadings and evidence before it, with the caveat that if its written recitation has missed a listing, all of the evidence and the pleadings have been considered. The parties should be assured that this Court has carefully reviewed all of the pleadings and evidence before it.

[13] Jayde was provisionally licensed by the California State Bar on December 2, 2020. [Dk. 1125, Decl. Jayde Trinh, ¶33] and was admitted as an attorney to the California State Bar on November 24, 2021.

¶¶5,10]. Jayde asserts when she first started working at LPG, she earned an annual salary of $120,000, but by June 2, 2023, she was earning an annual salary of $250,000, plus LPG repaid Jayde's student loans from law school [Dk. 675, Decl. Jayde Trinh, ¶7; Dk. 1125, Ex. A, pg. 55]. Though Jayde's official title at LPG was "General Counsel" or "Attorney," Jayde was also referred to as "Hammer Jayde" by Tony Diab [*See* 1046 Dk. 493-10, Ex. 49]. An email sent from Tony Diab to Han Trinh and Jayde Trinh refers to Jayde Trinh as "Hammer Jayde." [*Id.*].

The roles of Jayde and Han Trinh at LPG were described by Jayde in email correspondence [*See* 1046 Adv. Dk. 493-3, Ex. 19]. Jayde, or "Attorney,"[14] handled "inquiries regarding litigation," "[o]ther questions that require authority", "settlement reporting", and "liaison for Local Counsel." [*Id.*]. Han, or "Legal," was responsible for locating clients or lawsuits, questions regarding legal docs, assigning local counsel, and questions regarding client files. [*Id.*].

Jayde and Han Trinh were also heavily intertwined with Tony Diab. According to the managing member of Marich Bein, Hershy Deutsch, who made frequent trips to LPG's offices[15], Han shared an office with Diab, and she was considered "Diab's right-hand person." [*See* 1046 Adv. Dk. 493-3, pg.3 at ¶9]. However, according to Mr. Deutsch, it was evident to him that LPG and its employees did not just consider Han to be "an extension of Diab" but rather a "top-level executive of LPG in her own right," even without an official title as such. [*Id.*].

The manner and behavior of Han and Jayde while employed for LPG has been described for the Court, especially when LPG employees began resigning once they learned of LPG's impending closure and the stoppage of payments to its employees. For instance, when an employee, Rocio Prado-Garcia, sent Han a resignation email

---

[14] "Attorney" was known to be Jayde Trinh, and "Legal" was Han Trinh. [*See* 1046 Adv. Dk. 493-4, pg. 54 at Ex. 19].

[15] Hershy Deutsch made frequent trips to LPG's offices after Marich Bein and LPG entered into various Assignment of Servicing Rights Agreements and Account Receivable Purchase Agreement in 2022.

explaining their inability to continue working while not having "gainful employment" and without being appropriately compensated, Han forwarded this employee's troubling resignation email to Jayde (amongst other recipients) and stated, "Wanna bet she did not write this herself?" [Dk. 493-10, Decl. Alex Rubin, Ex. 30, pg. 68]. In the same email chain, Jayde in reference to another impending resignation of another employee ("Anthony") stated "[h]e probably thinks we need them and if he takes them, then we'll drown. LMAO. This is hilarious." [*Id.*].

Further, Han, in one instance, received an email from an attorney regarding LPG's continual lack of payment for services performed and his unanswered phone calls to Han. [*See* 1046 Adv. Dk. 493-10, Ex. 32]. In the email, the attorney detailed his spouse's cancer spreading at a rapid rate, which had required immediate medical attention at a local hospital, and how he had a small firm that could not absorb a write-off of the overdue payment of $35,383.66. [*Id.*]. Han, using her LPG credentials, responded, "Please send the invoice to *admin@oakstonepc.com*. Thank you!" [*Id.*] (*emphasis added*).

Again, on March 29, 2023, in a different email chain, Han sent Jayde a message from an attorney (Randall Clark) regarding Mr. Clark's inability to give extremely distraught clients information regarding their accounts being transferred from "LPG Oakstone."[16] [*See* 1046 Adv. Dk. 493-10, Ex. 40]. Jayde responded to the concerns by stating, "Hans [sic] problem. She was supposed to call last week." [*Id*] On April 13, 2023, a different attorney reached out to LPG stating, "My fear is that if Oakstone signs her [former LPG client] up and Phoenix begins billing her account, she will be double-charged until this can be straightened out." [*See* 1046 Adv. Dk. 493-10, Ex. 42]. This attorney's email was forwarded to Jayde and Han, to which Jayde replied, "Linda, you need to text Han. Cause I'm pretty sure we can start but it's not Oakstone. Clear up with her cause she changes sh*t (expletive modified) every other day." [*Id.*]. This evidence

---

[16] Oakstone is alleged by the Trustee to be an alter ego of LPG. [See 1046 Adv. Dk. 583].

presents a continual demonstration of their indifference to concerned clients seeking debt resolution services, as well as their personal knowledge of the asset transfers and manipulations of Debtor.

As the client transfers occurred from LPG to other entities, no one at LPG, including Han and Jayde who had specific knowledge of the transfers (as evidenced by LPG attorneys reaching out to the Trinhs confused about the client transfers) informed clients or the attorneys representing them of their completed or impending transfers.[17] Debtor's clients rightfully became concerned when they began receiving notices in January-February 2023 that they were now purportedly represented by the fraudulent transferee law firms. [*See* 1046 Adv. Dk. 493-4, Decl. Dearwester, Ex. 11]. Clients involved in the transfers had not signed substitutions consenting to their files being transferred. [*Id.,* Ex. 13]. Attorneys began demanding answers about the sudden change, which is when Han and Jayde began sending out new contracts to attorneys to sign with different entities. [*See* Dearwester Decl., Ex. 16].

An example of this chaos, in February 2023, an out-of-state attorney, Jane Dearwester, began receiving emails from concerned LPG clients explaining they had received communications that their client files were being transferred and/or sold to Oakstone, Consumer, and Phoenix. [*See* 1046 Adv. Dk. 493-4, pg. 4: 22]. When Ms. Dearwester sent an email to Han, Jayde, and Diab, informing them that LPG clients could not be transferred without the clients' consent, Ms. Dearwester never received a response. [*See* 1046 Adv. Dk. 493-4, Ex. 13]. In fact, Han and Jayde began telling LPG attorneys that they needed answers quickly on whether the attorneys were "coming to Oakstone." [*See* 1046 Adv. Dk. 493-4, Exs. 17, 18].

In yet another instance of an unauthorized transfer, on February 7, 2023, an attorney forwarded the "welcome email" its client had received from Oakstone. [*See* 1046 Adv. Dk. 493-10, Ex. 26]. The attorney emailed the Trinh sisters and Diab, stating

---

[17] This is especially concerning given Jayde Trinh's status as an attorney.

"[i]n another email, I inform you that Illinois clients must consent to the transfer of their files." [*Id*.]. No response was provided. [*Id*.]. No action was taken.

On January 26, 2023, another attorney reached out to Jayde and Trinh, writing "[i]t seems that his [the client] DPP[18] file has also been completely wiped and we cannot retrieve the necessary documents that we need for his case. He is emailing us for clarification about the email above [client received a "welcome email" from Consumer Legal Group] but we have no idea what to tell him . . ." [*See* Dk. 1099, pg. 9, Ex. 25].

The foregoing examples are just a few from the submitted evidence demonstrating Han and Jayde's personal involvement with Diab, as well as their knowledge and participation in the improper and most likely systematically improper transfer of clients' files.

In addition, Han and Jayde, while working for LPG, concurrently worked for Greyson, as discussed below [Dk. 1124, Decl. Han Trinh, ¶6, 12; Dk. 1125, Decl. Jayde Trinh, ¶ 2, 13] despite Greyson, Han Trinh, and Jayde Trinh vehemently arguing that LPG was a direct competitor of Greyson. [*See, e.g*., Dk. 290-1, Decl. Han Trinh, ¶33]. This is also despite Han and Jayde claiming no involvement in the transfer of files to entities such as Phoenix, wherein Phoenix then used Greyson attorneys to work on LPG files that were fraudulently transferred. In fact, Han attached to one of her declarations "screenshots of a list of some emails from han@lpglaw.com and legal@lpglaw.com" proving that while allegedly performing "essential work" for LPG, she knew exactly which client files were transferred and to which entity, including Phoenix, which was a pipeline of work for concurrent employer, Greyson. [Dk. 1124, Decl. Han Trinh, Ex. B].

## B. The Greyson Entities

On March 9, 2023, Greyson Law Center PC (5561924) ("Greyson One") was incorporated with the California Secretary of State. [1046 Adv. Dk. 290-1, Decl. Han

---

[18] DPP, Debt Pay Pro, is analogous to "LUNA" and "Forth" since these are all client relationship management accounts, which contained information regarding a clients' data, files, and accounting information.

Trinh ¶ 5]. Greyson One came to be in March of 2023, when Scott Eadie, a former LPG attorney, advised Han Trinh that he wanted to create a new organization that had a similar business as that performed by LPG. [1046 Adv. Dk. 47-1, Decl. Eadie, ¶2-3; 1046 Adv. Dk. 47-2, Decl. Han Trinh, ¶3]. Greyson One was set up by Mr. Eadie, Eng Taing ('Mr. Taing'), and Han Trinh. [1046 Adv. Dk. 47-1, ¶ 4]. When discussing the name "Greyson" in a group text message with Jayde Trinh and Mr. Taing, Han stated "your baby's name, Jayde! Your idea is coming to fruition lol." [1046 Adv. Dk. 493-11, pg. 24, Ex. O].[19]

Greyson One was seemingly "receiving assistance from Eng Taing, Dongliang Jaing, and Anthony Gabriel." [1046 Adv. Dk. 47-2, ¶7]. Greyson One was stationed in the office space at 3161 Michelson Drive. [*Id.*]. Greyson One moved into the premises under the impression that the sublease included Greyson One. [*Id.*]. Han and Jayde both supervised the team of Greyson One attorneys.[20] [*Id.*]. However, restrictive access was put into place only allowing Mr. Taing, Mr. Jaing, Mr. Arthur, and Mr. Gabriel to enter the premises. Therefore, Mr. Eadie claims to have severed ties with Mr. Taing and, according to Mr. Eadie, Mr. Taing closed Greyson One's bank accounts. [*Id.*, ¶9]. Thereafter, Mr. Eadie and Han Trinh opened new bank accounts for Greyson One at Citibank. [1046 Adv. Dk. 47-1, ¶9].

Greyson One, however, was short lived as it was dissolved in May of 2023, and the records from the California Secretary of State report Greyson One as "terminated." [*Id.*; Decl. Kathleen March]. Han Trinh and Mr. Eadie learned of Greyson One's

---

[19] On March 8, 2023, Jayde also sent text messages in which she inquires "Can we spell Greyson with an 'E'? Grayson with an 'a' is fine for my dog but it looks fratty. LOL let me know your thoughts." [*See* 1046 Adv. Dk. 493-11, pg. 24, Ex. O].

[20] On March 21, 2023 (one day post-petition), Greyson One sent employment contracts to several attorney who were previously employed by Debtor, for which the start date was stated to be March 27, 2023. [*See* Dk. 1105, Decl. Mamlyuk, Ex. 33; *see also* Clarke Dec. Ex. 2; *See also*, Dk. 699, pg.8 (R. Pryun's Greyson contract)]. Local counsel R. Reed Pruyn, Israel Orozco, and Shadae Clarke were just three of the attorneys who received employment agreements with Greyson One [*Id.*].

dissolution on May 10, 2023. [1046 Adv. Dk. 47-1, ¶9]. When Mr. Eadie and Han Trinh
checked online, they then realized that Greyson One's Articles of Incorporation were
never applied for under Mr. Eadie's name. [1046 Adv. Dk. 47-1, ¶9]. Therefore, on May
12, 2023, Mr. Eadie and Han Trinh filed new Articles of Incorporation when they
discovered they could not reinstate the original business (Greyson One). [1046 Adv. Dk.
47-1, ¶9]. This is when Mr. Eadie changed the domain name from "Greyson PC" to
"GreysonLaw PC" to avoid any further association with Greyson One. [1046 Adv. Dk. 47-
1, ¶9].

Greyson represents that it is owned 100% by Scott Eadie, Esq., who is identified
as the managing attorney and President of Greyson with Mr. Eadie's declarations and
various exhibits provided in support. [Dk. 1127, Decl. Soctt Eadie dated 2/8/24; Dk.
1127, Decl. Scott Eadie dated 3/27/24]. [21] However, Han Trinh has provided an email to
the Court wherein Israel Orozco states that Jayde Trinh serves as the supervising
attorney for Greyson. [Dk. 676, Decl. Han Trinh, Exhibit W].

Han Trinh and Scott Eadie declare under penalty of perjury that Greyson had no
involvement with Tony Diab. [Dk. 676-1, Decl. Han Trinh, ¶20; Dk. 1127, Decl. Scott
Eadie dated 2/8/24, ¶8]. Han goes as far as saying she hated Diab, and that Diab had no
link to, or part in, Greyson. [Dk. 676-1, Decl. Han Trinh, ¶21]. However, on "May 19,"
Tony Diab sent a text message to William "Ty" Carss, Phoenix's principal, stating
"[u]ntil **we** close Greyson, the plan is the following. For any new assignment, email it to:
legal@greysonlawpc.com and attorney@greysonlawpc.com Bianca is working on a new
flow but for now send all assignments there. As for a card expenses, they will continue
using the Greyson card for now." (emphasis added). [1046 Adv. Dk. 493-2, Decl.

---

[21] Greyson states Mr. Eadie never managed Debtor. Notably, however, exhibits have been provided
evidencing Mr. Eadie's involvement in both LPG and Oakstone [Dk. 1105, Exhibit 32; Dk. 1099, Exhibits
33, 44, 46, 47]. Oakstone is alleged by the Trustee to be an alter ego of LPG [*See* 1046 Adv. Dk. 583]. For
instance, there is a letter from Daniel March to Mr. Eadie "to document the agreement" that LPG will
transfer clients to Oakstone" [Dk. 1105, Exhibit 47] and there is an email from Han's LPG email account to
Mr. Eadie attaching the "master client list" which shows numerous clients at the law firm Oakstone [Dk.
1099, Exhibit 33].

William 'Ty' Carss, Ex. B].  Tony Diab, on "May 23" responded to Mr. Carss' question "Do we or Greyson have access to a GA attorney?" by answering, "[y]es, greyson does." [1046 Adv. Dk. 493-2, Decl. William 'Ty' Carss, Ex. B]. Yet, Tony Diab declares that "[a]ny discussion I had with any individual at Greyson regarding file transfer was in my capacity as transferor, not transferee, of any file. No file was ever transferred to any Greyson entity by me, even though numerous discussions regarding file transfer took place." [Dk. 1127, Decl. Diab dated 2/12/24, ¶5e]. Diab clearly had a link to, and part in, Greyson. Han, Jayde, and Diab appear to argue that despite all of their involvement in illegally transferring client files to Phoenix, who then used Greyson to service files, Diab did not have a part in, or say toward, Greyson.

Due to the failure of Greyson One, Han Trinh and her "team" were looking for a new office space for Greyson. [1046 Adv. Dk. 47-2, ¶10]. Han Trinh was advised by Wes Thomas, LPG's former Chief Financial Officer and close associate of Diab[22], that there was an open office space available where Greyson could use the office space, existing furniture, and existing IT equipment for free. [1046 Adv. Dk. 47-2, ¶10]. That available office space was the prior office of Oakstone, an LPG affiliate. [Dk. 1125, Decl. Han Trinh, ¶27].  The tenant, at that time, of the office space was Phoenix, the recipient of fraudulent transfers from Debtor, who then provided those client files to Greyson to allegedly service. Han Trinh accepted Mr. Thomas' offer on behalf of Greyson as the Administrator. [1046 Adv. Dk. 47-2, ¶10]. Greyson then moved its office to the free space located at 3345 Michelson Drive, Suite 400B, in Irvine, CA on April 29, 2023. [1046 Adv. Dk. 47-2, ¶10-11].

From May 3, 2023, Greyson employed approximately 140 people at the Suite 400B location, with 94 of the employees working remotely in California and approximately 60 employees working remotely in other states. [1046 Adv. Dk. 47-2, ¶

---

[22] A Notice that Clerk has Entered Default Against Wes Thomas was entered on August 22, 2023 [1046 Dk. 145].

12].[23] As of June 2, 2023, however, Greyson only had 48 clients of its own. [1046 Adv. Dk. 47-1, ¶ 11-12].[24] To Han and Jayde, however, their most important asset was the "network of attorneys." Han believed that the "Greyson attorney network belong[ed] to Jayde and [her] alone" and that they "owned" the network of attorneys. [*See* Dk. 1105, Decl. Shadae Clark, Ex. 5]. Han admitted that the Greyson attorney network "were W2 attorneys for LPG until February 2023." [*Id.*].

    As noted *supra*, and detrimental to the credibility of Han and Jayde, at the same time the Greyson entities were incorporated, and operating, Jayde Trinh and Han Trinh were also working for LPG. [Dk. 1124, Decl Han Trinh, ¶6, 12; Dk. 1125, Decl. Jayde Trinh, ¶ 2, 13]. Again, this is despite Greyson, Han Trinh, and Jayde Trinh vehemently arguing that LPG was a direct competitor of Greyson. [*See, e.g.*, 1046 Adv. Dk. 290-1, Decl. Han Trinh, ¶33].

**III.    History of Hearings**

    The Application was originally set for hearing on January 19, 2024, at 11:00 a.m. [Dk. 674]. That hearing was subsequently converted to a status conference and continued to February 29, 2024, at 11:00 a.m., with a status report due 14 days in advance, pursuant to an order entered January 8, 2024 [Dk. 818]. On February 29, 2024, by tentative, the Court issued a scheduling order and excused appearances; a scheduling order was subsequently entered on March 6, 2024 [Dk. 986], which set the matter for hearing on April 25, 2024, at 11:00 a.m.  On April 24, 2024, in consideration of the significant amount of pleadings filed, which contained voluminous exhibits, this

---

[23] Greyson even had an employee, Brad Lee, who worked for Greyson and Phoenix at the same time. [Dk. 1127, Decl. Diab dated 2/12/24 ¶5e].

[24] Of the 48 clients, approximately 20 were obtained after LPG clients elected to follow their attorney who "belonged" to Greyson. [1046 Adv. Dk. 47-1, ¶11]. Further, while attorneys who work with Greyson are W-2 employees of Greyson, they typically perform work for other clients wholly outside Greyson for their own private practices. [*Id.*]

Court entered a *sua sponte* order continuing the hearing to June 13, 2024 [Dk. 1138].[25] Further, the Court permitted the filing of additional responsive pleadings.

On June 7, 2024, this Court entered an order continuing the hearing to July 17, 2024, at 1:30 p.m. [Dk. 1324], noting that "the resolution of ancillary matters filed by Movant's counsel and which are pending before the Court are necessarily required to be resolved before the Court can rule on the pending applications."[26]

On June 10, 2024, Greyson, Han Trinh, and Jayde Trinh filed a motion to "un-continue" the June 13, 2024, hearings which the Court had continued to July 17, 2024 [Dk. 1335].[27] The Court denied the motion to "un-continue" by an order entered June 11, 2024 [Dk. 1338].

The hearing was held on July 17, 2024, at 1:30 p.m.

## IV.    Evidence on the Record

### 1.    The Motion [Dk. 674]

Han Trinh filed her Motion for an order granting allowance and payment of administrative claim, pursuant to 11 USC § 503(b)(1)(A)(i) on November 17, 2023 [Dk. 674].

On February 16, 2024, Han Trinh filed an erratum ("the Errata") to the Motion. [Dk. 941]. The Errata contained Exhibit B to the Declaration of Han Trinh, which was originally to be contained in the Motion. This Exhibit B is information pertaining to

---

[25] The hearing was originally set for 10:00 a.m. [Dk. 1138]; it was subsequently changed to 1:30 p.m. [Dk. 1306].

[26] The other ancillary matters pending before the Court were final resolution of Greyson's Motion to Compel Production of Document [Dk. 1209], Greyson's Motion to Vacate the Preliminary Injunction [Dk. 749], and both Jayde Trinh and Greyson's motions for administrative claims. [Dks. 676, 675].

[27] The caption of the motion, with stylistic formatting removed, is: "Notice of Motion and Motion of Greyson Law Center PC, Han Trinh, & Phuong (Jayde) Trinh, for an order un-continuing the hearings on Greyson, Han Trinh's, & Jayde Trinh's administrative claim motions, to restore the 6/13/24 at 1:30 pm hearing date of said motions, which 6/13/24 hearing date was continued from 6/13/24 to 7/17/24, by the Court's sua sponte order [Dkt.1324, entered 6/7/24], which is erroneous, and is highly prejudicial to all 3 claimants; alternatively, if 6/13/24 is not convenient for the Court, the Court is requested to reset the hearing date for any day from 6/14/24 to 6/21/24. Declaration of Kathleen P. March, w/(proposed) order granting un-continuance, from 7/17/24 back to 6/13/24" [Dk. 1335].

several orders from amazon.com. It also shows a receipt from Southern California Security Center for $795.22. It also lists items Han states were in her locked office, as well as their prices.

**A. Declaration of Han Trinh and Exhibits [Dk. 674]**

Attached to the Motion is the declaration of Han Trinh, which in turn attached Exhibit A, a paystub from LPG for Han for February 13, 2023, to February 26, 2023.

**B. Declaration of Jayde Trinh and Exhibits [Dk. 674]**

Attached to the Motion is also the declaration of Phuong (Jayde) Trinh, which in turn attached Exhibit A, a paystub from LPG for Jayde for February 13, 2023, to February 26, 2023.

**C. Declaration of Kathleen P. March and Exhibits [Dk. 674]**

The Motion also attaches the declaration of Kathleen P. March. Attached to Ms. March's declaration are the following exhibits:

(1) Exhibit A - a portion of LPG's pacer bankruptcy docket, with docket numbers 52 through 167.

(2) Exhibit B - an order from this Court entered on May 8, 2023, approving the U.S. Trustee's application for the appointment of a Chapter 11 Trustee.

(3) Exhibit C - a portion of LPG's pacer docket for adversary 8:23-ap-01046-SC, with docket numbers 1 through 82.

(4) Exhibit D - an order entered by this Court on May 26, 2023, for turnover of estate property and recorded information, preliminary injunction, lock-out, re-direction of United States Parcel Services mail, order to show cause re compliance with court order, and other relief as necessary for efficient administration of this matter.

(5) Exhibit E – The Trustee's memorandum of points and authorities in support of his motion for permission to file an omnibus emergency motion, under seal, after service of courtesy copy and after hearing, dated May 25, 2023.

(6) Exhibit F - This Court's order entered on May 26, 2023, granting the Trustee's motion to seal.

(7) Exhibit G - The transcript of pages 33 and 34 of the hearing held before this Court on June 12, 2023, regarding the preliminary injunction and a status conference regarding a case management conference and requiring a status report.

### 2.  The Trustee's Status Report and Motion to Continue [Dk. 815]

On January 5, 2024, the Trustee filed an Omnibus Status Report Re: Motions for Allowance of Administrative Expense Claims Under 11 U.S.C. §503(B) ("Omnibus Motion") [Dk. 815]. Therein, the Trustee states his intention to oppose Han Trinh's administrative claim [Dk. 674], as follows:

> The claimant is an insider whom Trustee is already suing in this bankruptcy case for avoidance, recovery, and preservation of fraudulent transfers [8:23-ap-01046-SC] (Dk. No. 93). Unless any avoided transfer is repaid, Trustee also contends that any allowed administrative claim would be subject to disallowance under 11 U.S.C. § 502(d).

[Dk. 815, pg. 3 of 17].

On January 5, 2024, the Trustee filed a motion for an order that (1) initial hearings be status conferences and (2) to continue hearings on merits of motions for allowance of administrative expense claim under 11 U.S.C. § 503(b) [Dk. 816]. It includes a memorandum of points and authorities, and it includes a declaration of D. Edward Hays.

### 3.  OHP-CDR, LP and PurchaseCo 80, LLC's Limited Opposition [Dk. 817]

OHP-CDR, LP and PurchaseCo 80, LLC filed on January 5, 2024, a limited objection to the motions for allowance and payment of administrative expenses [Dk. 817]. It states that the two entities object to the administrative expense motions "to the extent that they seek payment of any administrative expenses before resolution of OHP-CDR's and PurchaseCo's secured claims and interests." [*Id.*, pg. 2: 19-21].

On January 8, 2024, this Court entered an order granting the Trustee's omnibus motion for an order continuing hearings on the motions for allowance of administrative expense claim under 11 U.S.C. § 503(b) [Dk. 818].

### 4. Greyson's January 9 Opposition to the Court's Continuance and Declarations [Dk. 822]

On January 9, 2024, Greyson, Han Trinh, and Jayde Trinh filed an objection[28] to this Court's order granting the Trustee's request to continue the January 19, 2024, hearings [Dk. 822]. Attached to the objection are the declarations of Han Trinh, Phuong (Jayde) Trinh, and Kathleen P. March in support of the objection. Attached to Ms. March's declaration are the following exhibits:

(1) Exhibit A - This Court's order entered on October 16, 2023, approving a stipulation between the Chapter 11 Trustee, office of the United States Trustee, and the official committee of unsecured creditors to set administrative bar date.

(2) Exhibit B - The first notice of administrative claims bar date, which sets the bar date of November 21, 2023.

(3) Exhibit C - The transcript for the hearing held for the adversary (8:23-ap-01046-SC) on June 12, 2023, regarding the preliminary injunction and status conference hearing regarding a case management conference and requiring a status report. This transcript includes pages 195 through 211 and page 264.

(4) Exhibit D - Two orders from this Court: a stipulated order to dismiss Han and Jayde Trinh, without prejudice, from adversary proceeding 8:23-ap-01046-SC and a stipulated order to dismiss Han and Jayde Trinh, without prejudice, from the second amended complaint of the Trustee, filed October 13, 2023, in adversary proceeding 8:23-ap-01046-SC.

---

[28] The caption of the Objection, with stylistic formatting removed, is: "(1) Objection of Han Trinh, Jayde Trinh and Greyson Law Center, P.C. to Court having decided Trustee Marshack's motion [Dk. 816, filed 1/5/24 and set for hearing on 1/19/24], without allowing Han, Jayde, & Greyson time to file opposition to Trustee's motion, (when Trustee's 'Status Report' to motion makes blatant falsehoods regarding Han and Jayde); (2) request that Court vacate Court's 1/8/24 [Dkt. 818] order, as granted prematurely; (3) request that Court re-decide Trustee's motion, in light of this pleading, opposing Trustee's motion; and (4) request that Court strike Trustee's 'Status Report' [Dkt. 815, filed 1/5/24, which states it is for hearing on 1/19/24 at 11:00am, as an unauthorized pleading, with no admissible evidence." [Dk. 822].

On January 16, 2024, this Court entered an order overruling the objection and request to strike filed by Greyson, Han, and Jayde on January 9, 2024, as Dk. 822 and denying the relief sought in the objection [Dk. 848].

**5.  The February Unilateral Reports by the Trustee [Dk. 940] and Greyson [Dk. 945] and their Exhibits**

On February 15, 2024, the Trustee filed an omnibus unilateral report regarding the status of motions for allowance of administrative expense claim under 11 U.S.C. § 503(b). [Dk. 940]. The status report states that the Trustee is investigating and verifying the claim of $5,134,000 from Greyson. Attached as Exhibit 1, is a letter signed by Ty Carss and addressed to Judith Skiba stating Phoenix has terminated Skiba's contract and has enclosed a refund check.

On February 19, 2024, Greyson, Han, and Jayde filed a unilateral status report for the February 29, 2024 hearings [Dk. 945]. The status report attaches the declaration of Kathleen P. March, which attached three emails from Ms. March to Alina Mamlyuk responding to Mamlyuk's requests for information regarding Greyson's, Han's, and Jayde's administrative claims.

**6.  The Trustee's First Supplemental Declaration of Alex Rubin [Dk. 1099]**

On April 11, 2024, the Trustee filed the Supplemental Declaration of Alex Rubin in Support of Trustee's Oppositions to Administrative Claims Filed by Han Trinh [Dk. 674], Phuong "Jayde" Trinh [Dk. 675]; and Greyson Law Center [Dk. 676] ("FSD Rubin") [Dk. 1099]. Attached to FSD Rubin are the following exhibits:

(1) Exhibit 23 - An email from Admin to Han and Reid Wood dated January 23, 2023, which discusses files being moved.

 (2) Exhibit 24 - A January 23, 2023, email from Han to Jayde Trinh forwarding Jayde the email contained in Exhibit 23.

(3) Exhibit 25 – A January 26, 2023, email from Richard Meier to Admin, Han, and Mario Azevedo forwarding a welcoming email sent to Daniel Wine for having his case transferred from LPG to Consumer Legal Group.

(4) Exhibit 26 - An email dated February 7, 2023, sharing an email sent to Arnold saying his case was transferred from LPG to Oakstone Law Group.

(5) Exhibit 27 – An email string dated February 8, 2023, between Jayde Trinh, Han Trinh, Reid Wood, and Pamella Moraes regarding a client whose case was transferred to Oakstone Legal Group.

(6) Exhibit 28 - An email dated February 9, 2023, from Han to Accounting sharing an email from Anthony Osborn regarding payments. It also includes invoices dated December 1, 2022, and January 3, 2023, from Gehling Osborn Law Firm, PLC.

 (7) Exhibit 29 - Two emails dated February 13, 2023, from Reid Wood to Han sharing guidelines and scripts on how to answer client questions for being moved to new file groups.

(8) Exhibit 30 - An email dated February 23, 2023, from Jayde to Israel Orozco and Han discussing resignations from Samer and Rocio Prado-Garcia. The emails also make light of the resignations and how Vanessa did not feel comfortable.

(9) Exhibit 31 - An email dated March 21, 2023, from Admin to Han and Jayde Trinh stating the list attached to the email is the full list of clients transferred to Phoenix and Oakstone. Only one page of each list is included in the exhibit, as the rest are intentionally left out "for brevity."

(10) Exhibit 32 - An email dated March 23, 2023, from Han to Anthony Osborn telling Osborn to send an invoice to admin@oakstonepc.com. This is in response to an email dated March 22, 2023, from Osborn explaining that his wife is battling cancer and that he has tried calling twice regarding an overdue payment of $35,383.66 to his law firm.

(11) Exhibit 33 - An email dated March 23, 2023, from Han to Scott Eadie stating that the attached list is a master client list for clients that "went to CLG.[29]" That full list is intentionally not included in the exhibit "for brevity."

(12) Exhibit 34 - An email chain dated April 10, 2023, between Han and Jennifer McLaughlin concerning McLaughlin's offer letter for "Greystone" and informing McLaughlin that LPG's work phones were shut off and reactivated on April 10.

(13) Exhibit 35 - An email dated April 14, 2023, from Melissa Wilkes to Han inquiring as to when cases were transferred from LPG to Phoenix. It also includes an email discussing disconnection of the phones.

(14) Exhibit 36 - An email dated April 24, 2023, from Peter Osterman to Han and Jayde Trinh stating that he does not have email accounts for "CLG" or "PLG" but does have them for "LPG, GLC and OLG."

(15) Exhibit 37 - An email dated May 11, 2023, from Han to Joshua Figueroa, Chance Typhair, and Cayden Cohen, regarding money Paychex is holding. It also includes a CitiBusiness Account Opening Confirmation for Greyson Law Center PC.

(16) Exhibit 38 - An email dated May 16, 2023, from Han to ctyphair@paychex.com, aharth@paychex.com, and Cora Devine stating Greyson's company ID is 16092497.

(17) Exhibit 39 - An email chain dated March 21, 2023, between Jayde, Randall Clark, and Han stating Pamella Moraes does not have access to Forth and nor does anyone else because they were locked out. It also states that all files have been moved to different firms and that Legal LPG has access to some of them. There is also a line addressed to Clark that appears to be from "Ty" asking for him to reach out regarding a new venture.

(18) Exhibit 40 - An email dated March 29, 2023, from Jayde to Legal and Attorney saying it is Han's "problem" to talk with Randall Clark about transfers.

---

[29] "CLG" is an acronym for Consumer Legal Group, which is alleged by Trustee to be a fraudulent transferee of LPG. [See 1046 Adv. Dk. 583].

(19) Exhibit 41 - An email chain dated April 7, 2023, between Jayde and Denise Mikrut regarding the LPG phones.

(20) Exhibit 42 - An email chain between Legal, Jayde, and Attorney regarding whether a client can reach out to Oakstone.

(21) Exhibit 43 - An email chain dated May 11, 2023, between Jayde and Ana Gurrola regarding "AG complaints" and stating they were shredded.

(22) Exhibit 44 - An email from Attorney dated April 26, 2023, instructing employees not to use Oakstone's Luna and to instead use Greyson's Luna. It also instructions not to use Fresh Sales and Slack.

(23) Exhibit 45 - An email dated March 21, 2023, from Jayde to Daniel March, Admin, and Mona Montiero stating that Mona and Jayde are no longer employed by LPG.

(24) Exhibit 46 - An email dated March 23, 2023, from Scott Eadie to Nicole Filtz, Vanessa Buchner, and Carl Summer stating that he believes the mail is being sent to "Dan's office." It also discusses files and scans.

(25) Exhibit 47 - An email dated April 30, 2023, from Tony Diab to Daniel March stating that attached to the email is an agreement for Oakstone referrals sent to Joon, which also includes that agreement.

## 7. The Trustee's Opposition and Evidence [Dk. 1103]

On April 11, 2024, Marshack filed an opposition to Han's Motion [Dk. 1103]. Included are the declarations of Alina Mamlyuk and D. Edward Hays. Attached to Hays' declaration are the following exhibits:

(1) Exhibit 1 - A transcript of LPG's 341(a) meeting of creditors held on April 24, 2023.

(2) Exhibit 2 - An erratum to the motion of Han Trinh for an order granting allowance and payment of administrative claim, pursuant to 11 U.S.C. § 503(b)(1)(A)(i).

(3) Exhibit 3 - An offer letter dated March 21, 2023, and addressed to Israel Orozco for employment at Greyson Law Center PC. It includes Orozco's signature of acceptance dated March 24, 2023.

(4) Exhibit 4 - A declaration of Han Trinh that was included as Dk. 676-1 in the main case, although the exhibits included in Dk. 676-1 are not attached.

(5) Exhibit 5 - A list of paystubs from LPG for Jayde Trinh for January 16, 2023, to March 12, 2023.[30]

(6) Exhibit 6 - An email chain from March of 2024, regarding paychecks.

**8.  Han's Trinh's Reply and Evidence [Dk. 1124]**

On April 18, 2024, Han Trinh filed a reply ("Reply") to the Trustee's Opposition [Dk. 1124]. Attached to the Reply are the declarations of Han Trinh, Kathleen P. March, Jayde Trinh, Tony Diab, Ana Gurrola, Ramona (Mona) Montiero, Denise Mikrut, Collin O. Donner, David Orr, Israel Orozco, Peter Osterman, George Chamberlain, Brenda Mendez, Haley Simmoneau, Linda Prey, Maria Thach, Michael Vu, and Morgan Lee.

**A.  Han Trinh Declaration and Exhibits [Dk. 1124]**

Attached to the declaration of Han Trinh in the Reply are the following exhibits:

(1) Exhibit A - A paycheck printout from Paychex which Han's declaration states demonstrates that LPG had five active employees as of June 2, 2023 ("Daniel March, Olga Esquivel, Phuong Trinh (Jayde), Carl Wuestehube, and Han Trinh"). [Dk. 1124, Han Reply Decl., ¶ 7].

(2) Exhibit B – Han's declaration describes this as "screenshots of a list of some emails from han@lpglaw.com and legal@lpglaw.com" showing "a large volume of LPG work" that Han Trinh and her team were doing from March 20, 2023, through June 2, 2023. [Dk. 1124, Han Reply Decl., ¶ 8].

---

[30] There appears to be a possible error on a paystub for Han Trinh on pages 288 and 289 of 306 on Dk. 1103. The pay period says February 13, 2023, to March 26, 2023. However, the check date is March 3, 2023. The usual pay period for the other paystubs is two weeks. While the paystub on page 288 says "VOID," the one on page 289 does not.

(3) Exhibit C – A screenshot from the website "elitelegalpractice.com" showing a description of Richard Meier. It says Meier is a consumer litigation attorney, and it lists the jurisdictions in which he is admitted.

(4) Exhibit D - A screenshot from the website "elitelegalpractice.com" showing a description of Yasmeen Villamil and of Rosy Prado, who are both legal assistants.

(5) Exhibit E – A Notice to Vacate from the Orange County Sheriff's Department for the occupant at 17542 E. 17th Street, Suite 105, Tustin, CA 92780. The occupant was notified that the property was to be turned over by May 30, 2023.

(6) Exhibit F - A receipt of an order for a cargo van for use on May 19, 2023, in Costa Mesa.

**B. Kathleen March Declaration and Exhibits [Dk. 1124]**

Attached to Kathleen March's declaration in the Reply are the following exhibits:

(1) Exhibit A - An email dated February 14, 2024, from Ms. March to Alina Mamlyuk explaining Han Trinh's salary and asking for five documents for discovery. It also includes paystubs from LPG for Han Trinh and Jayde Trinh for January 30, 2023, through February 12, 2023.

(2) Exhibit B - An email dated March 4, 2024, from Ms. March to Alina Mamlyuk regarding Han Trinh's pay and includes her paystubs from LPG for June 21, 2021, through March 12, 2023.[31]

(3) Exhibit C - Jayde Trinh's paystubs from LPG for June 21, 2021, through March 12, 2023.[32]

---

[31] There appears to be a typo on a paystub for Han Trinh on pages 127 and 128 of 382 on Dk. 1124. The pay period stated is February 13, 2023, to March 26, 2023. However, the check date is March 3, 2023. The usual pay period for the other paystubs is two weeks. While the paystub on page 127 says "VOID," the one on page 128 does not.

[32] There appears to be a typo on a paystub for Jayde Trinh on pages 184 and 185 of 382 on Dk. 1124. The pay period stated is February 13, 2023, to March 26, 2023. However, the check date is March 3, 2023. The usual pay period for the other paystubs is two weeks. While the paystub on page 184 says "VOID," the one on page 185 does not.

(4) Exhibit D - An email from Ms. March to Alina Mamlyuk dated March 4, 2024, asking for Jayde Trinh's W-2 forms for 2023.

(5) Exhibit E - An email from Ms. March to Alina Mamlyuk dated February 14, 2024, and includes the same materials as Exhibit A attached to Ms. March's declaration.

(6) Exhibit F - A request to produce documents dated February 29, 2024, filed by Jayde Trinh and propounded on Trustee Marshack in relation to Jayde's motion for allowance and payment of administrative claim.

(7) Exhibit G - A request to produce documents dated February 29, 2024, filed by Han Trinh and propounded on Trustee Marshack in relation to Han's motion for allowance and payment of administrative claim.

(8) Exhibit H - An email from Ms. March to Alina Mamlyuk dated April 4, 2024, claiming a prior email from Mamlyuk includes incorrect information about the facts. It also provides Ms. March's explanation of events related to this case involving timing.

**C. Jayde Trinh Declaration and Exhibits [Dk. 1124]**

Attached to Jayde Trinh's declaration in the Reply are the following exhibits:

(1) Exhibit A - A series of emails dated March 20, 21, 22, and 28 of 2023 and April 5, 2023, addressed to or sent from "attorney@lpglaw.com." There are also text messages dated March 23, April 25, May 5, May 10, May 24 of 2023. It is not clear who the sender of the text messages is. Jayde's declaration states this exhibit shows she was working after March 21, 2023 [Dk. 1124, Decl. Jayde Trinh, pg. 268, ¶ 10].

(2) Exhibit B - A text on March 15, 2023, to "Tony" regarding payroll and a parking invoice addressed to LPG with a due date of March 15, 2023. Jayde's declaration states this exhibit shows she did not know about the LPG bankruptcy until April 2023, as she was attempting to have LPG pay bills [Dk. 1124, Decl. Jayde Trinh, pg. 272, ¶ 28].

(3) Exhibit C - A series of text messages dated February 8, 2023, and February 21, 2023, which discuss certain LPG employees wanting to leave due to stress. Included is a text from Tony Diab indicating there would be "winding up" happening.

(4) Exhibit D - The Articles of Incorporation, Statement of Information, and Certificate of Dissolution from the California Secretary of State's office for Oakstone Law Group PC.

(5) Exhibit E - An email dated December 2, 2020, from the Office of Admissions for the State Bar of California to Jayde Trinh. It states Jayde was approved to practice as a Provisionally Licensed Lawyer effective December 2, 2020, while her Application for Determination of Moral Character is processed.

### D. Israel Orozco Declaration and Evidence [Dk. 1124]

Attached to Israel Orozco's declaration in the Reply are the following exhibits:

(1) Exhibit A - An email from Richard Meier to Orozco dated February 9, 2023, stating that day was Meier's last. Orozco's declaration says Meier was an attorney at LPG [Dk. 1124, Israel Orozco Decl., pg. 332, ¶ 8].

(2) Exhibit B - An email dated February 15, 2023, from Richard Meier to various LPG email accounts conveying cases that needed substitution.

### 9. The Trustee's Sur-Response and Evidence [Dk. 1321]

On June 6, 2024, Trustee filed a sur-response to Han Trinh's Reply [Dk. 1319]. Included are declarations of Alina Mamlyuk and D. Edward Hays in support thereof. Attached is Exhibit I, which is an email exchange between Alexander Harth and Alina Mamlyuk. Mamlyuk inquired whether Paychex could see who logged into the Paychex portal through LPG, and Harth responded Paychex does not keep track of when users log in.

### 10. The Court's Order Continuing the Hearing [Dk. 1324]

On June 7, 2024, the Court entered an Order continuing the hearings on the administrative claims of Greyson Law Center PC [Dk. 676], Han Trinh [Dk. 674], and Phuong (Aka Jayde) Trinh [Dk. 675] which, *inter alia*, ordered that no further pleadings were permitted to be filed in connection with the administrative claims absent further order from the Court [Dk. 1324].

## V.    Discussion

During the hearing held on July 17, 2024, Counsel for Greyson requested that this Court review the declaration of Daniel March [1046 Adv. Dk. 501], which was not included in Han's Motion but has been filed within this Court's bankruptcy docket. The Court understands it can review its own dockets and advises that it has examined the Declaration.[33]

As stated by the United States Supreme Court, "[i]n the exercise of its equitable jurisdiction the bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate." *Pepper v. Litton*, 308 U.S. 295, 307-08, 60 S. Ct. 238, 246 (1939). The Court in *Pepper v. Litton* further held:

> [W]hen there is added the existence of a "planned and fraudulent scheme," ... the necessity of equitable relief against that fraud becomes insistent. No matter how technically legal each step in that scheme may have been, once its basic nature was uncovered it was the duty of the bankruptcy court in the exercise of its equity jurisdiction to undo it. Otherwise, the fiduciary duties of dominant or management stockholders would go for naught; exploitation would become a substitute for justice; and equity would be perverted as an instrument for approving what it was designed to thwart.

*Id.*, at 312.

The Court now understands through the records of the State Bar of California that Mr. March, days after he swore within his declaration that he was a member in

---

[33] *See*, Request for Judicial Notice of Actions of State Bar of California filed by the Trustee as Docket 64 in Adv. No. 8:23-ap-01098, of which the Court takes judicial notice. "[T]he Court can take judicial notice of the documents filed in the Cases . . . [and] the Adversary Proceeding . . . *Tuma v. Firstmark Leasing Corp. (In re Tuma)*, 916 F.2d 488, 491 (9th Cir. 1990) (noting that a court may take judicial notice of its own docket)." *King v. Exp. Dev. Can. (In re Zetta Jet USA, Inc.)*, 644 B.R. 12, 25 (Bankr. C.D. Cal. 2022). "The Court may not, however, infer the truth of the facts stated in those documents. *In re Harmony Holdings, LLC*, 393 B.R. 409, 413 (Bankr. D.S.C. 2008) (indicating that bankruptcy judges may take judicial notice of bankruptcy court records but may not 'infer the truth of the facts contained in documents, unfettered by rules of evidence or logic, simply because such documents were filed with the court')." *Id.*  The Court may, however, take judicial notice of facts in the public record "not subject to reasonable dispute that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Kihagi v. City of San Francisco*, 2016 U.S. Dist. LEXIS 5651, *7-8 (USDC NDCA 2016). *See also, Talos v. Spearman*, 2018 U.S. Dist. LEXIS 16943, *1 (USDC CDCA 2018) (Court took judicial notice of attorney's state bar admission status).  In this case, the truth of the offer of State Bar resignation and then the disbarment of Mr. March is accepted by the Court.

good standing with the State Bar, attempted to resign from the State Bar, and was later

disbarred by the State Bar, allegedly for behavior with respect to activities of Debtor. Mr.

March failed to mention in his declaration that, while he was attesting to the fact that he

was a member of good standing at the time he signed the declaration, he was under

active investigation for looting millions of dollars of client money from Debtor.

For the reasons set forth below, after consideration of all the pleadings filed in

connection with the Motion, as well as the docket as a whole, the Court finds that Han

Trinh has failed to meet her burden to establish a *prima facie* administrative claim

against the Estate.

### A.    Administrative Claims

Section 503(b)(1)(A)(i) provides in relevant part that, after notice and a hearing,

there shall be allowed administrative expenses for the actual, necessary costs and

expenses of preserving the estate including, wages, salaries, and commissions for

services rendered after the commencement of the case. "The terms 'actual' and

'necessary' are to be construed narrowly and 'must be the actual and necessary costs of

preserving the estate for the benefit of its creditors." *Einstein/Noah Bagel Corp. v.

Smith (in Re Bce W.*, 319 F.3d 1166, 1173 (9th Cir. 2003) (citing *AMTRAK v. Dant &

Russell, Inc. (In re Dant & Russell, Inc.)*, 853 F.2d 700, 706 (9th Cir. 1988). This narrow

construction implements a presumption that a bankruptcy estate has limited resources

which should be equally distributed among creditors. *Boeing N. Am., Inc. v. Ybarra (In

re Ybarra)*, 424 F.3d 1018, 1026 (9th Cir. 2005).

Bankruptcy courts have broad discretion in deciding whether to allow an

administrative expense.[34] *Microsoft Corp. v. DAK Indus. (In re DAK Indus.)*, 66 F.3d

---

[34] A bankruptcy court's decision to award or deny administrative expense claims is reviewed for abuse of
discretion. *Microsoft Corp. v. DAK Indus. (In re DAK Indus.)*, 66 F.3d 1091, 1094 (9th Cir. 1995). Courts
apply a two-part test to determine if the bankruptcy court has abused its discretion. United States v.
Hinkson, 585 F.3d 1247, 1251 (9th Cir. 2009) (en banc). First, the Court determines *de novo* whether the
bankruptcy court identified the correct legal rule to apply to the relief requested. *Id.* Second, if the
bankruptcy court correctly applied the legal rule, then its factual findings are examined for clear error. *Id.*
The bankruptcy court's factual findings are affirmed unless it is determined that those findings are "(1)

1091, 1094 (9th Cir. 1995). The purpose of administrative priority status is to encourage

third parties to do business with the bankruptcy estate for the benefit of the estate as a

whole. *Boeing N. Am., Inc. v. Ybarra (In re Ybarra)*, 424 F.3d 1018, 1026 (9th Cir.

2005) (citations omitted).

The claimant has the burden of proving by a preponderance of evidence that it

has an administrative expense claim. *See In re Blanchard,* 547 B.R. 347, 352 (Bankr.

C.D. Cal. 2016) (internal citation omitted). In order to limit abuses of the

administrative-expense priority, the court requires a claimant "to show that the debt: (1)

arose from a transaction with the debtor-in-possession and (2) directly and substantially

benefitted the estate." *In re L. Scott Apparel*, 2019 Bankr. LEXIS 1303, 211 (Bankr. C.D.

Cal. Jan. 29, 2019) (citing *Abercrombie v. Hayden Corp. (In re Abercrombie)*, 139 F.3d

755, 757 (9th Cir. 1998)); *In re DAK Indus., Inc.*, 66 F.3d 1091, 1094 (9th Cir. 1995).

There is a "venerable but limited exception" to the post-petition transaction-for-

the-benefit-of-the-estate requirement under § 503(b)(1)(A). *See In re Abercrombie*, 139

F.3d 755, 758 (9th Cir. 1998) (citing *Reading v. Brown*, 391 U.S. 471 (1968)). The so-

called *Reading* exception provides that a post-petition tort committed by the debtor-in-

possession within the course and scope of its continued operation of the estate's

business may, itself, be considered a cost of doing business and is, therefore, entitled to

administrative expense priority under § 503(b)(1)(A).[35]  In this case, as set forth below,

the *Reading* exception requirements are not met by Han Trinh.

---

'illogical,' (2) 'implausible,' or (3) without 'support in inferences that may be drawn from the facts in the record.'" *Id*. at 1261-1262, n. 21-22.

[35] The *Reading* exception avoids a moral hazard. *See* Kenneth N. Klee, BANKRUPTCY AND THE SUPREME COURT, Pg. 304 (LexisNexis, 2008) ("Although most of these expenses involve actual benefit to the estate, in order to avoid a moral hazard, the category also includes postpetition tort claims against the representative of the estate.").

## VI.    Analysis

Han has not met her burden to establish that she has an administrative claim under § 503(b)(1)(A).

### A. Wages

Han asserts she is owed $63,461.54 in salary for 11 weeks of post-petition work performed for Debtor. While Han has established by a preponderance of the evidence that she worked for Debtor post-petition, she has not established how much she worked nor has met her burden that any work performed was for the benefit of the Estate.

The Motion asserts that Han and Jayde "were essential employees of LPG, because Han and Jayde were the LPG employees who administered approximately 28,000 active litigation files of LPG clients, including hiring, managing, assigning, and monitoring performance of attorneys to represent LPG clients, for clients whose matters were not resolved short of law suit." [Dk. 674, pg. 3: 14-20]. Han states in her declaration that she and Jayde continued to do the "essential" work for LPG, administering thousands of active litigation files for 11 weeks post-petition, and continued to respond to emails sent to LPG every day from LPG's clients. According to Han, between March 20, 2023, and June 2, 2024, there was an increased volume of communications to which Han, Jayde, and their teams had to respond, compared to before March 20, 2023, when LPG filed bankruptcy. Han asserts that LPG benefitted from her work because, by her receiving and answering the high volume of client and attorney communications post-petition, she kept LPG's client base from falling apart, which allowed the Trustee to sell the LPG client files in July 2023.

The Court notes, however, as discussed further *infra*, the evidence of the emails provided by Han shows Han's knowledge of, and involvement in, the fraudulent transfers of client files from LPG to other entities. Indeed, much of the evidence before the Court is that Han was instrumental (and perhaps primarily so) in diverting Debtor's assets to other entities. Her coordination efforts with attorneys, clients, and other parties, internally, demonstrate that she was quite at the center of operations for these

tasks. For instance, Phoenix, was sending the fraudulently transferred files to Greyson to service. Han was well aware of this activity due to her simultaneously held positions at LPG and Greyson.

Movant repeatedly asserts that she was an "essential employee" of LPG though she provides very little detail as to what work she performed post-petition, let alone how it benefitted the Estate. Han declares she continued to do "essential" work for LPG post-petition as she continued to respond to emails and answered phone calls to inform clients where their attorneys were and the status of their matters. Han fails to establish that the work she performed was for the benefit of the Estate, and it continues to be this Court's view upon examination of the evidence that her efforts were part of the scheme to strip Debtor of its assets.

Han also fails to establish why any work performed would be valued at a pro-rata share of her $300,000 annual salary. Han does not provide any insight or evidence to demonstrate exactly what "administering litigation files" means, especially in her capacity as a non-attorney, but it appears to involve only receiving phone calls and sending emails.

To obtain administrative expense status, Han needs to establish that work "directly and substantially benefitted the estate." *In re DAK Indus.*, 66 F.3d at 1094.

In Han's declaration attached to the Reply as Exhibit B, she states that there "are screenshots of a list of some emails from han@lpglaw.com and legal@lpglaw.com proving that my team and I were doing a large volume of LPG work, from 03/20/23 thru 06/02/23."[36] First, this statement evidences that the screenshots do not provide for work only performed by Han, but instead is work completed by Han and her "team."

---

[36] The Court finds it troubling that Han asserts she simultaneously worked for LPG and Greyson as Greyson has vehemently argued that it is a direct competitor of LPG. Han states that she joined Greyson as an administrator in April 2023. [Dk. 1124, Decl. Han Trinh, ¶11-12]. Yet, she states she worked for LPG at the same time. If Greyson and LPG were direct competitors, how could Han permissibly work at both simultaneously regardless of whether Han "plenty of time" to work at both. [*See* Dk. 1124, Decl. Han Trinh, ¶ 12].

Regardless, the screenshots of emails combined with Han's evidence of 56 pre-petition paystubs show, by a preponderance of the evidence, that Han worked under the banner of LPG for 11 weeks post-petition, as alleged. What is unclear, however, is how, if at all, Han's work benefitted the Estate.[37]

The screenshots contained on the first 34 pages of the exhibit reflect an inbox folder for "H," presumably Han Trinh. There are approximately 100 emails which appear unopened, and many email snippets appear to be automated messages received, or are plainly irrelevant to servicing clients or preserving the Estate. To provide a few examples, there are emails received from MGM Rewards, an email from "TDAutoFinance.com Web Support" with the subject line "Your Recent Payment" and all the reader can see is "Dear **Vulcan**, Thank you for scheduling your TD Auto Finance payment online. Your transaction information is..." (emphasis added). Screenshots of emails *received* do not provide convincing evidence of work performed by Han, nor are they evidence that work was performed for the benefit of the Estate. To the contrary, the emails evidence Han's knowledge of the ongoing schemes being carried out by LPG.

The remaining 26 pages of email snippets are from the "Sent" folder for "L." No snippets from the sent "H" folder are provided. Again, very little information or context is given to the screenshots of the emails. However, a review of the information available from the screenshots further demonstrate that there are many emails that have nothing to do with servicing clients or preserving LPG's estate. For example, numerous emails are simply informing counsel that a client is no longer with LPG, but transferred elsewhere, such as to "CLG" or "Phoenix," and suggesting that counsel contact the other

---

[37] The Court notes that the Trustee argues that if Han is determined to have worked for LPG, she should be regarded as an insider as a "person in control of the debtor." The Trustee makes this assertion to argue that as Han's claim would therefore be disallowed as she did not comply with the requirements of seeking insider compensation. The Trustee first raises this argument in his sur-response, authorized by this Court, filed June 6, 2024 [Dk. 1319]. The Court, however, did not permit any filings in response to the sur-response by Movant. The Court deems the insider argument waived for purposes of this Motion, as no new facts were alleged in the Reply, compared to the Motion, that would not have alerted the Trustee to raise the argument in the Opposition if applicable. If the Trustee wishes to re-raise this theory at a future time, Han will be able to address this issue straightforwardly.

firms. Han has not established why or how informing counsels that clients were

transferred to a different firm is for the benefit of the Estate, nor is it adequately

explained how it prevented LPG's client base from falling apart. In fact, these emails

demonstrate Han's awareness that files had been transferred away from LPG, which

transfers are alleged by the Trustee to be a part of a fraudulent transfer scheme. Han's

responses regarding where client files had been transferred to does not show Han

"administering" LPG's client files, but rather shows her aiding non-debtor entities, such

as Phoenix and Greyson, in administering files that had already been transferred to

them from Debtor, for Han's other employer, Greyson, to service.

For cases transferred to Oakstone, though Debtor was supposedly contracted to

received 20% of the revenue from funds recovered [*See* Dk. 1099, Ex. 47] the client files

were transferred without client approval; this violates the professional rules of conduct,

which was brought to Han's attention by concerned attorneys. [*See, e.g., id*., Ex. 26 (an

email stating, "[i]n another email, I inform you that Illinois clients must consent to the

transfer of their files.")]. Therefore, Han's involvement in furthering these unethical

activities far from benefitted the Estate, but instead increased its potential liability to

malpractice claims.

Han's declaration states that she was told that LPG was beginning to wind up and

files that were disappearing from LPG were files that had already been transferred to

other law firms that could better serve the clients. [Dk. 1124, Decl. Han, ¶17]. Regardless

of the truth of this assertion, it does not change the fact that she has not demonstrated

that her work benefitted the Estate, as outlined above. The evidence provided in support

of the Motion fails to establish, on a quantifiable basis, that work performed by Han

benefitted the Estate.

The Trustee, in the declaration of Alex Rubin filed in support of the Opposition,

attaches certain emails wherein Han is involved in communications discussing the

transfers of files out of Debtor's possession. [*See* Dk. 1099, Ex. 23]. There is also an

email from Han to lpgcounsel@lpglaw.com, dated April 7, 2023, wherein Han states

"Hello Counsels, I've email everyone in their Greyson email re [phones]. Please respond there. Thank you!" [*Id.*, Exhibit 35]. This email is evidence that Han was not performing work for the benefit of the Estate, but rather for the benefit of an alleged direct competitor, Greyson.

Further, Exhibit 37 is an email from Han to Paychex attempting to change Guardian Processing, LLC's Paychex account, which had previously been LPG's account, to a Greyson account in order to have approximately $184,000 of LPG funds deposited into Greyson's account, and attaches a Greyson bank statement. [*Id.*, Ex. 37]. In that email, Han states, from her LPG email account, "Greyson Law Center PC is another law firm we are affiliated with." [*Id.*]. This is evidence of Han attempting to divert funds away from Debtor and to an alleged direct competitor, which clearly does not benefit the Estate.

There is another email from Han's LPG email account to Paychex, this time advising that LPG has filed bankruptcy and provides a "debtor in possession account," in the same thread, Paychex, in discussing issues approving the change, states "[t]his account had a bank letter sent in that reflected **Greyson Law Center PC**". [*Id.*, Ex. 38] (emphasis added). This does not make sense as Greyson is purported to be a direct competitor of LPG; yet Han asserts she was working for the benefit of the Estate.

There are multiple other emails attached as exhibits demonstrating Han's direct and indirect involvement in the transfers of files and looting of LPG to the benefit of non-debtor entities, showing that work performed was not for the benefit of the Estate. [*See e.g., id.*, Exhibits 25, 26, 27, 29, 30, 31, 32, 33, 35, 36]. Han, in her declaration filed in support of the Reply states "Jayde and I never participated, in any way, in transferring LPG client files and legal service agreements to other Law Firms or in transferring LPG money anywhere not relating to LPG expenses. Nor did LPG send any LPG client files and legal service agreements or LPG money, to Greyson Law Center PC." [Dk. 1124, Decl. Han Trinh, ¶17]. Yet, the emails provided by the Trustee clearly show otherwise.

Movant also provides the Court with a paystub from LPG for Han, pre-petition, with a pay period of February 13, 2023, to February 26, 2023. [Dk. 674, Decl. Han Trinh, Ex. A; Dk. 1124, Decl. Han Trinh, Ex. B]. However, pre-petition pay stubs are not sufficient evidence of post-petition, actual, necessary costs and expenses of preserving the Estate. Although wages or a salary earned pre-petition may be probative evidence on an administrative claim, the claimant must still prove the value of the benefit to the estate by a preponderance of the evidence. *Boruff v. Cook Inlet Energy LLC (In re Cook Inlet Energy LLC)*, 583 B.R. 494, 498 (B.A.P. 9th Cir. 2018) (citations omitted).  For the reasons stated *supra*, Han has failed to prove the value of the benefit to the Estate by a preponderance of the evidence, and pre-petition paystubs do not support the argument that she performed work for the benefit of the Estate in these circumstances.

Further, attached as Exhibit A to Han's declaration filed in support of the Reply is LPG's payroll processor, Paychex, showing that as of June 2, 2023, LPG had 5 active employees: Daniel March, Olga Esquivel, Phuong Trinh (Jayde), Carl Wuestehube, and Han Trinh. Again, however, this is not evidence that Han performed work for the benefit of the Estate, post-petition.

Han asserts that the work she performed allowed the Trustee to sell LPG client files to Morning Law Group. Han further argues that the "Trustee would not have been able to sell LPG's client files for 42 million or more if LPG's client base had completely fallen apart." [Dk. 1124, pg. 9 of 382, ¶ 12-15][38]. This assertion is unfounded and unsupported. The benefit to the estate must be actual, not potential. *In re Allen Care Ctrs.*, 163 B.R. 180, 188 (Bankr. D. Or. 1994). First, the order approving the sale ("Sale Order") [Dk. 352] reflects in relevant part that the aggregate purchase price for the property involved shall be the sum of Five Million Five Hundred Thousand Dollars ($5,500,000). [Dk. 352, pg. 31]. In additional to the foregoing, "the buyer shall pay a fee

---

[38] The Court notes that Movant's counsel acknowledges the Sale Order terms in her declaration filed in support of the Reply. [Dk. 1124, Decl. Kathleen March, ¶ 2].

equal to: (a) fifty percent (50%) of all amounts collected by Buyer on Active Executory Contracts … from and after the Closing, plus (b) forty percent (40%) of all amounts collected by Buyer on Inactive Executory Contracts." [*Id.*]. No convincing evidence to support the assertion that the Trustee would not have been able to complete a sale without Han completing emails and phone calls has been provided.[39]

Second, Han's clear indirect and direct involvement of the transferring of files away from Debtor did not help the Estate, but rather cost the Estate. The Estate had to expend resources, for example, to avoid and recover client files transferred to Phoenix, transfers in which Han was involved. When Han was communicating to counsels and/or clients about cases that had been transferred to Phoenix or other entities, it was not for the benefit of the Estate, but rather for the benefit of the non-debtor entities, as it was those non-debtor entities who were apparently servicing the client files; one such entity it benefitted was Greyson.

Third, approximately 20,000 files that were a part of the Sale were files that were recovered by the Trustee, from Phoenix, through the stipulation resolving an avoidance action. This had nothing to do with work performed by Han, but rather the efforts of the Trustee to recover the files. In addition, the Trustee had to seek a temporary restraining order and preliminary injunction against alter egos of LPG, and other entities and individuals, to preserve Estate assets and stop the continuing transfers of files to non-debtor entities; again, transfers in which Han was involved.

Movant's work, while still employed and acting through email accounts of LPG, is so intertwined with work performed for the benefit of non-debtor entities, including Greyson, that she has not been able to establish by a preponderance of the evidence that any work performed was for the benefit of the Estate.

Han has not established that she is entitled to, on a quantum meruit basis, a pro rata rate of her pre-petition salary with Debtor. As noted *supra*, Han's pre-petition

---

[39] Especially considering that Han, through emails and phone calls, was facilitating the fraudulent transfers of client files away from Debtor.

salary is not dispositive when determining the benefit of services rendered to an estate. *See In re Cook Inlet Energy LLC*, 583 B.R. 494 (B.A.P. 9th Cir. 2018) (collecting cases).

The evidence provided by both parties demonstrates that Han did work at LPG post-petition; however, Han has not met her burden that the work performed benefitted the Estate. The evidence provided demonstrates that the work performed was *possibly*, at times, for the benefit of the Estate, but at most times was for the benefit of a third party, which does not entitle Han Trinh to an administrative claim. *See Data Leverage, LLC v. Avery (In re Data Leverage, LLC)*, 640 B.R. 210, 217 (C.D. Cal. 2022) (citing *In re Sierra Pac. Broads.*, 185 B.R. 575, 578 (B.A.P. 9th Cir. 1995)). The clear issue for Movant is a sliver of work performed that was *possibly* for the benefit of the Estate is not the standard required for entitlement to an administrative claim.

Thus, Han has failed to establish that she has an administrative claim as she has not met her burden to demonstrate that work performed was for the benefit of the Estate, as required.

## B. Penalties

Han asserts she is owed $34,615.38 in penalties for not being paid final wages in a timely manner.

California Labor Code § 203(a), in relevant, part provides that if an employer willfully fails to pay, without abatement or reduction, any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid, but the wages shall not continue for more than 30 days.

No legal authority was provided by Movant as to why the penalty is an administrative expense; however, the Court recognizes that penalty wages are entitled to administrative priority as a cost of doing business. *See Gonzalez v. Gottlieb (In re Metro Fulfillment, Inc.)*, 294 B.R. 306 (B.A.P. 9th Cir. 2003). Nevertheless, as Han has failed to establish that she is entitled to an administrative claim for alleged wages owed, she is likewise not entitled to the penalties sought.

### C. Accrued Vacation

Han asserts she is owed $38,203.64 for accrued vacation.

California Labor Code § 227.3 states, "[u]nless otherwise provided by a collective-bargaining agreement, whenever a contract of employment or employer policy provides for paid vacations, and an employee is terminated without having taken off his vested vacation time, all vested vacation shall be paid to him as wages at his final rate."

Again, no legal authority is provided as to why accrued vacation is entitled to be treated as an administrative claim. Accrued vacation pay should be given administrative priority only to the extent that it is for compensation for services rendered post-petition. *In re Roth Am., Inc.*, 975 F.2d 949, 958 (3d Cir. 1992) (citing *In re Health Maint. Found.*, 680 F.2d 619, 622 (9th Cir. 1982)). As Han has failed to demonstrate that work performed was for the benefit of the Estate that would entitle her to an administrative claim, she cannot have an administrative claim for alleged accrued vacation hours.

### D. "Lost" Personal Property of Han

Han asserts she is owed $14,433.56 for personal items, which were in Han's office at Greyson, but then "disappeared" from that locked office after the Trustee performed the lockout on June 2, 2023.

There is a "venerable but limited exception" to the post-petition transaction-for-the-benefit-of-the-estate requirement under § 503(b)(1)(A). *See In re Abercrombie*, 139 F.3d 755, 758 (9th Cir. 1998) (citing *Reading v. Brown*, 391 U.S. 471 (1968)). [40] The so-called *Reading* exception provides that a post-petition tort committed by the debtor-in-possession within the course and scope of its continued operation of the estate's

---

[40] On an additional note, Greyson's counsel Ms. March provided a personal declaration in support of Greyson's Motion to Vacate the Preliminary Injunction (which was sought by the Trustee in order to preserve property allegedly subject to fraudulent transfers by a debtor.) [Dk. 290-2, pg. 28, ¶ 24, pg. 107 of 439]: "In 35 years of bankruptcy work, I have never seen a lockout and preliminary injunction order, as was issued here, issued in a fraudulent transfer case." However, the Ninth Circuit Court of Appeals affirmed Bankruptcy Judge March's issuance of a preliminary injunction in an adversary case involving fraudulent transfers in the decision *Rubin v. Pringle (In re Focus Media Inc.),* 387 F.3d 1077, 1084-85 (9th Cir. 2004).

business may, itself, be considered a cost of doing business and is, therefore, entitled to administrative expense priority under § 503(b)(1)(A)[41].

Here, Han alleges that the Trustee's attorneys, Dinsmore & Shohl LLP/their filed agents, negligently "lost" Han's property or intentionally converted it. Han's claim here fails, as Han has failed to provide any evidence that she personally paid for or owned any of the items for which she seeks reimbursement. Nor has any evidence beyond her own vague declaration been provided to establish that any of the allegedly lost items were at the Greyson offices or seized.

Han asserts she owned, personally, an 86-inch screen TV, an oriental vase, computers/computer equipment, and additional items.[42] An erratum to Han Trinh's Motion was filed on February 16, 2024, to include Exhibit B, which is a list of what Han states she paid for her personal items, or for items for which she could find no receipt, names and prices ("List") [Dk. 941].

The List contains no convincing evidence that Han Trinh used personal money to purchase any of the items or that they were stored in and seized from her Greyson office. For example, the List contains screenshots of orders from Amazon. On the Amazon orders, however, certain shipping addresses, billing addresses, order numbers, and items purchased have been redacted. Further, there is no verification of what bank account was used for the purchases[43], nor even whose Amazon account was used to place the orders. [*Id.*]. Also attached is a screenshot of a receipt for Southern Calif

---

[41] In the Trustee's Response [Dk. 1319, pg. 17:3-14], the Trustee notes that Han Trinh raises the "fundamental fairness" argument for the first time in her Reply and notes that the Trustee fully briefed the rule at pg. 10 of his Opposition to Greyson's administrative claim [Dk. 1105], which he incorporates in full. The Trustee summarizes the test for the application of the fundamental fairness test as: (1) active wrongdoing by the Trustee; (2) arising from the operation of the debtor's business; and (3) fairness. The Trustee argues, and the Court agrees, that Han's reply does not identify these factors, let alone attempt to apply any facts to the factors and weigh them accordingly.

[42] In her Declaration, Han states that her 86-inch TV, oriental vase, and a few other small items were returned to her. [Dk. 674, Decl. of Han Trinh, ¶27]. In the text of her declaration, no further detail is provided as to the statement about "computers/computer equipment and additional items…"

[43] The Court notes that there are varying payment methods on the Amazon order screenshots, including a Visa ending in 8977, another Visa ending 3132, and gift cards.

Security Center, yet the only information provided by the receipt is that it was paid by an Amex card ending in 8624. There are also pages of "[i]tems that were locked behind my office door that I could not find receipts for," which items included a "2 Pack EOS Lip Balm" valued at $5.99 and a ThinkPad P16 Gen Intel (16') Mobile Workstation valued at $6,096.25 [*Id.*, pgs. 13-16 of 21]. No evidence, beyond Han's own declaration [Dk. 674] and the subsequent submission of the List, has been provided to show that (1) the items on the List (without receipts) were ever purchased, (2) if they were purchased by Han personally, or if they were, that they were not reimbursed by any entity, (3) whether the items were in fact in her Greyson office, or (4) or were even seized by the Trustee in the first instance. In short, Han Trinh fails to submit any corroborating evidence of her claims, when such evidence would not have been difficult to provide; thus, the Court is not persuaded that her claim is more probably true than not true.

Therefore, Han Trinh fails to establish that the Trustee and/or his attorneys negligently or intentionally "lost" any personal items belonging to Han. As such, Han has also failed to meet her burden to establish entitlement to an administrative claim under the *Reading* exception.

**VII.    Conclusion**

The Court, for the reasons stated above, finds that Han has failed to meet her burden to establish entitlement to an administrative claim. The Motion is DENIED.

**IT IS SO ORDERED.**

Date: August 27, 2024

Scott C. Clarkson
United States Bankruptcy Judge