| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| Kathleen P. March, Esq., (CA SBN 80366)<br>THE BANKRUPTCY LAW FIRM, PC<br>10524 W. Pico Blvd, Suite 212, LA, CA 90064<br>Phone: 310-559-9224; Fax: 310-559-9133<br>Email: kmarch@BKYLAWFIRM.com | |

☐ *Individual appearing without attorney*
☒ *Attorney for:* Greyson Law Center, PC

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION**

| In re:<br><br>THE LITIGATION PRACTICE GROUP, P.C.,<br><br><br>Debtor(s). | CASE NO.: 8:23-bk-10571-SC<br>ADVERSARY NO.:<br>(*if applicable*)<br>CHAPTER: 11 |
|---|---|
| <br><br>Plaintiff(s) (*if applicable*).<br><br>vs.<br><br><br><br>Defendant(s) (*if applicable*). | **NOTICE OF APPEAL**<br>**AND STATEMENT OF ELECTION** |

**Part 1:  Identify the appellant(s)**

1.  Name(s) of appellant(s):  Greyson Law Center, PC, a California Professional Corporation ("Greyson")

2.  Position of appellant(s) in the adversary proceeding or bankruptcy case that is the subject of this appeal:

For appeals in an adversary proceeding.
☐ Plaintiff
☐ Defendant
☐ Other (*describe*):

For appeals in a bankruptcy case and not in an  adversary proceeding.
☐ Debtor
☐ Creditor
☐ Trustee
☒ Other (*describe*):  Greyson is an 11 USC 503(b)(1)(A) administrative expense claimant

**Part 2:  Identify the subject of this appeal**

1. Describe the judgment—or the appealable order or decree—from which the appeal is taken:
   Order [dkt.1546] denying Greyson's Motion for Allowance and Payment of an Administrative Claim
   seeking $5,434,633, including appealing Order's footnote 2, overruling evidentiary objections to
   declarations which Court relied on.

2. State the date on which the judgment—or the appealable order or decree—was entered: 08/27/2024

**Part 3:  Identify the other parties to the appeal**

List the names of all parties to the judgment—or the appealable order or decree—from which the appeal is taken and the
names, addresses, and telephone numbers of their attorneys (attach additional pages if necessary):

1. Party:  Chapter 11 Trustee, Richard A. Marshack

   Attorney:

   MARSHACK HAYS WOOD LLP, 870 Roosevelt, Irvine, California 92620
   Telephone: (949) 333-7777; Facsimile: (949) 333-7778
   By:
   D. EDWARD HAYS, #162507, ehays@marshackhays.com
   ALINA MAMLYUK, #284154, amamlyuk@marshackhays.com

2. Party:

   Attorney:

**Part 4:  Optional election to have appeal heard by District Court (applicable only in certain districts)**

If a Bankruptcy Appellate Panel is available in this judicial district, the Bankruptcy Appellate Panel will hear this appeal
unless, pursuant to 28 U.S.C. § 158(c)(1), a party elects to have the appeal heard by the United States District Court.  If
an appellant filing this notice wishes to have the appeal heard by the United States District Court, check below.  Do not
check the box if the appellant wishes the Bankruptcy Appellate Panel to hear the appeal.

☐   Appellant(s) elect to have the appeal heard by the United States District Court rather than by the Bankruptcy
    Appellate Panel.

**Part 5:  Sign below**

 **The Bankruptcy Law Firm, PC**
**By:** /s/ Kathleen P. March, Esq. _____    Date: 09/09/2024___
Signature of attorney for appellant(s) (or appellant(s)
if not represented by an attorney)

Fee waiver notice: If appellant is a child support creditor or its representative and appellant has filed the form specified in
§ 304(g) of the Bankruptcy Reform Act of 1994, no fee is required.

**[Note to inmate filers:** If you are an inmate filer in an institution and you seek the timing benefit of Fed. R. Bankr. P.
8002(c)(1), complete Director's Form 4170 (Declaration of Inmate Filing) and file that declaration along with the Notice of
Appeal.]

# EXHIBIT A



FILED & ENTERED

AUG 27 2024

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY bolte        DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA – Santa Ana Division

In re

The Litigation Practice Group, P.C.,

    Debtor.

Case No. 8:23-bk-10571-SC

Chapter 11

**ORDER AND MEMORANDUM DECISION DENYING MOTION FOR ADMINISTRATIVE CLAIM OF GREYSON LAW CENER P.C.**

Date: July 17, 2024
Time: 11:00 a.m.
Ronald Reagan Federal Building &
U.S. Courthouse
Courtroom 5C
411 West Fourth Street
Santa Ana, CA 92701

    Before the Court is the "Motion of Greyson Law Center P.C. for an Order Granting Allowance and Payment of Administrative Claim, Pursuant to 11 U.S.C. Section 503(b)(1)(A)" ("Motion") [Dk. 676][1] filed by Greyson Law Center PC ("Greyson"), which came on for hearing on July 17, 2024. Appearances are as noted on the record.

    The Motion seeks payment of a total of $5,434,633, consisting of (1) $300,633 "for the 22 of 48" clients lost to the Chapter 11 Trustee, Richard Marshack's (the

---

[1] Unless otherwise indicated, references to "[Dk. X]" refer to the main docket in this bankruptcy case. References to pleadings filed in related adversary proceedings shall include the last four digits of the adversary number and referenced docket number: e.g., "[1046 Adv. Dk. X]".

1  "Trustee") alleged negligence, conversion, and unfair competition and (2) $5,134,000

2  comprised of the work Greyson attorneys performed on Phoenix Law, P.C. ("Phoenix")

3  clients at a rate of $2,000 per case pursuant to an alleged Greyson-Phoenix agreement,

4  when Phoenix was Debtor's "alter ego."

5        Based upon the Motion, the evidence listed below[2], the lack of evidence as also

6  set forth, and the docket as a whole, the discussion on the record, and as set forth in

7  detail within this decision, the Motion is DENIED.

8  ## I.     Background – Litigation Practice Group, P.C.

9        The Litigation Practice Group ("LPG" or "Debtor") filed its Chapter 11 bankruptcy

10  on March 20, 2023 ("Petition Date").  Through the various proceedings and evidence

11  produced in both the main case and the various adversary proceedings, including but

12  not limited to various Motions for Temporary Restraining Orders, Preliminary

13  Injunctions, Motions to Dismiss, a Motion for Appointment of a Chapter 11 Trustee, a

14  Motion to Sell Assets, a multitude of pleadings filed by both secured and unsecured

15  creditors (supported by evidence presented under oath) in support of their claims, and

16  especially the pleadings and evidence presented by the "Watchdog of the Bankruptcy

17  System" aka the Office of the United States Trustee (an arm of the United States

18  Department of Justice), *it is clear to this Court that Debtor, since its pre-petition*

19  *inception (and through the time of the appointment of the Chapter 11 Trustee) was, in*

20  *this Court's opinion, operating a criminal enterprise.* It is also clear to this Court that

21  the administrative claims sought by Greyson are not supported by the evidence before

22  the Court as the evidence provided is based on declarative evidence arising from

23  principals of Debtor, operators of Greyson, and operators of Debtor's previous illegal or

24

25

26  [2] Movant's counsel, at the July 17, 2024, hearing, requested that the Court consider the declaration of
Daniel March [Dk. 501], filed in connection with Greyson's Reply to Trustee's Opposition to Greyson's

27  Motion to Vacate the Lockout/Preliminary Injunction Order, to be a part of these proceedings. The Court
agreed to the request. Additionally, as the Court is considering the docket as a whole, this Order

28  references pleadings filed or entered in connection with other matters. To the extent the Court cites to any
evidence to which an evidentiary objection was asserted, those evidentiary objections are overruled or as
otherwise set forth in entered orders. The evidence is given the weight it deserves.

unethical pre-petition activities, and is simply unconvincing, fabricated, and/or uncredible to this Court.

The Court also finds that Greyson Law Center, PC ("Greyson") and the two related Administrative Claim Applicants, Phuong (aka Jayde) Trinh ("Jayde") and Han Trinh ("Han") (together, the "Trinhs" or "Trinh Sisters"), were closely associated with the fraudulent, unethical practices of Debtor, and that Greyson was a byproduct entity spun-off from the Debtor with the direct assistance of the Trinhs. As Debtor's enterprise spiraled out of control from fraudulent, unethical mismanagement, as well as possible criminal activities, the evidence demonstrates that the Trinhs were powerful employees of Debtor who in the end disembarked from Debtor's sinking ship and participated in significant aspects of the creation and management of Greyson.

Pre-petition, Debtor was a law firm that allegedly provided consumer debt resolution services on a nationwide basis, with client files numbering in the several tens of thousands, if not more.[3]  To be clear, operations of law firms with a declared specialty of assisting consumer debtors with financial difficulties are not normally criminal

---

[3] It is important to note that this Court has never received any significant and trustworthy evidence that Debtor accomplished meaningful results for its clients, but only anecdotal examples of viable success for its clients. By reviewing the Estate's claims register, there is evidence of consumer claims for the fraud and demanded but undelivered refunds of approximately $500 million. There is ample evidence that the pre-petition Debtor never placed the collected funds into an attorney-client trust account, and that Debtor or its principals simply looted the payments received through the client automatic withdrawals, stiffing both the clients and outside attorneys who may have been working on client cases with the hopes of being paid. There is also evidence before the Court that Debtor was running a Ponzi scheme and paying some outside (or "network") attorneys with funds obtained from new clients. In this case, it appears that some of the "lenders" may have been serving as "investors," hoping for very high returns before "the music stopped." The Ninth Circuit has recently explained, "[b]y definition, a Ponzi scheme is destined to fail because the pool of available investors is not limitless.  When the Ponzi scheme operator's pool of investors inevitably runs dry, the scheme collapses, and the swindler and their entities often end up in bankruptcy or equitable receivership. *See generally* David R. Hague, Expanding the Ponzi Scheme Presumption, 64 DePaul L. Rev. 867 (2015).  In bankruptcy, the court-appointed trustee is tasked with taking immediate control of the entity, ceasing ongoing fraudulent activity, locating and collecting assets for the bankruptcy or receivership estate, and achieving a final, equitable distribution of the remaining assets. *See* 11 U.S.C. § 704." *Kirkland v. Rund (In re EPD Inv. Co., LLC)*, 2024 U.S. App. LEXIS 21363, at *15 (9th Cir. Aug. 23, 2024).  Finally, there is evidence that Debtor was encumbering (or as some creditors assert, "double or triple selling") their accounts or receivables to multiple lenders. With respect to Greyson's requested Administrative Claim before the Court, there has been no evidence presented that any work allegedly performed by Greyson assisted any clients or added any value to the Estate. This will be further explained in this decision.

enterprises. The distinction to be made is *how* any law firm, and its lawyers and staff, operates the legal services entity, as well as its truly intended purpose.[4]

Through a system of advertising and a network of referring lawyers throughout the country, this Debtor "signed up" clients facing significant financial difficulty and promised results (i.e. meaningful relief from creditor pressure) with a full money-back guarantee. *See* Adv. 24-01011, Dk. 104-1, Decl. Nancy Rapoport, ¶ 7. As more explicitly stated below, Debtor's unethical and most likely illegal enterprise was in operations at all times prior to the appointment of the Trustee.  Once a client was signed up, the client was required to pay Debtor, primarily through the automatic system of monthly withdrawals controlled by Debtor from the clients' bank accounts. Like almost every streaming system in the country, the automatic withdrawals were made monthly, where it is made difficult for the consumer to cancel or "make it stop."[5]

---

[4] This, of course, was the early major concern raised by this Court, the Office of the U.S. Trustee, and proponents of allowing Debtor to remain in Chapter 11 as a going concern after the appointment of the Chapter 11 Trustee on May 8, 2023. Straightforwardly, the Court and others had to consider whether a business (the law firm) could be operationally reformed by the Trustee to morph into strict compliance with various state and federal laws that regulate law firm/lawyer operations as well as consumer protection regulations. The U.S. Trustee vigorously, honestly, and in good faith advocated that Debtor (pre-appointment of the Trustee) should be sent to the dust pile of all illegally or unethically operated law firms. The Trustee, vigorously, honestly, and in good faith, advocated that the law firm be reformed and then monetized for the benefit of the creditors of the bankruptcy Estate. After careful consideration, and with significant consideration of all creditors, including the over 40,000 consumer creditors/clients of the Debtor, the Court provided the Chapter 11 Trustee and the Committee of Unsecured Creditors with the opportunity to (1) end the illegal practices of Debtor and (2) attempt to recapture estate value and provide recovery to the creditors of the Estate. At the time of this writing, the Court, through various status reports, the reports of a Court Appointed Ethics Compliance Monitor, and the pleadings and evidence presented to it throughout this case, concludes that at least the first goal may have been reached. Concerning the second goal (creditor recovery), the Court and the creditors still await revealing results.

[5] Streaming enterprises didn't invent this process. For those senior enough to remember, the "Book of the Month Club" and various iterations (including hard copy Encyclopedia sales, where the companies "sold" the stream of books arriving each month and immediately sold the monthly payments to a third party) developed the highly successful automatic invoicing process, which if ignored would result in massive bill collector harassment and legal judgments to the unsuspecting consumer. Gym memberships were sold, and their accounts were laid off, in a similar fashion. These activities eventually resulted in the passage of the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692 –1692, which was approved in 1977 (and subsequently amended). It is a consumer protection law, attempting to prevent abusive debt collection practices. The Act created guidelines under which debt collectors may conduct business, defines rights of consumers involved with debt collectors, and prescribes penalties and remedies for violations of the Act.

4

An important protection (perhaps one of the most important protections) afforded clients represented by lawyers requires that funds paid lawyers must be maintained in a client trust account until earned. Debtor did not provide this protection. The Court has evidence from both the reports filed by the Trustee, the schedules and statements of financial affairs presented by Debtor, and the State Bar of California (received pursuant to Judicial Notice) that almost all of the funds which were not transferred to complaining secured creditors or unhappy "network" counsels (just to placate them enough) may have been looted by the principal or principals controlling the pre-petition Debtor.

Richard Marshack ("Marshack" or "Trustee") was appointed as Chapter 11 Trustee on May 8, 2023, following the entry of an order directing the United States Trustee to Appoint a Chapter 11 Trustee. *See* Order [Dk. 58].  Shortly after his appointment, on May 25, 2023[6], the Trustee filed an adversary complaint alleging that Debtor was secretly being operated by a California disbarred attorney, Anthony Diab ("Tony Diab" or "Diab") and operating in a manner inconsistent with federal and state law. As alleged by the Trustee, Diab created a web of affiliated businesses designed to locate and funnel clients who were victims of predatory lending or subject to uncollectible debts to various other law firms, which were either alter egos or significantly connected to Debtor.

Greyson and Phoenix Law, P.C. ("Phoenix") were among the entities originally identified in the Trustee's complaint as alter egos[7]. The complaint also alleged that at or

---

[6] The adversary proceeding was filed without notice to parties based upon the assertion of exigent circumstances, and the entry of a temporary restraining order issued the next day, on May 26, 2023 [1046 Adv. Dk. 13, amended at 1046 Adv. Dk. 21]. The adversary proceeding was subsequently numbered 8:23-ap-01046-SC and a preliminary injunction was subsequently issued on June 23, 2024 [1046 Adv. Dk. 70].

[7] *See* ¶ 59 of the complaint. The Trustee subsequently revised his allegation as to the alter ego status of Greyson in the amended complaint filed June 15, 2023 [1046 Adv. Dk. 62].

around the Petition Date, Diab transferred approximately 40,000 files to Phoenix. Greyson serviced some of those clients.[8]

Phoenix returned all the client files it had received from Debtor back to Debtor pursuant to a Stipulation for Judgment (1) Avoiding, Recovery, and Preserving Transfers to Defendant, Phoenix Law Group, Inc., (2) Turning Over All Transferred Property to Trustee and (3) Dismissing Without prejudice Defendants William Taylor Carss and Marie Eeya Tan filed June 27, 2023 ("Avoidance Stipulation") [1046 Adv. Dk. 77], approved after a hearing held on July 21, 2023, by an order entered August 7, 2023 [Dk. 365][9]. Pursuant to the Avoidance Stipulation, its parties agreed that the transfers of client files and all material and property related thereto including but not limited to, payments, communications, and documents to Phoenix were fraudulent and the Trustee was entitled to judgment avoiding, recovering, and preserving, the transfers pursuant to 11 U.S.C. § 547, 548, and 550.

The Avoidance Stipulation further provided, inter alia, that:

> Any and all liability whether at law or equity relating in any way to Phoenix's handling of the Transfers including the Files that arose or came into existence following the date of their transfer to Phoenix until Trustee closes a court-approved sale to a third-party buyer ("Post Transfer Claims") will remain with Phoenix. Phoenix, Mr. Carss, and Ms. Tan shall use their best efforts to cooperate with Trustee and his retained professionals to provide services to the clients until closing, and nothing herein shall impose or create any liability for Post Transfer Claims on Trustee or Debtor's Estate.

Avoidance Stipulation, ¶4 [1046 Adv. Dk. 77].

The Trustee moved for the sale of the business, which sale was approved by an order entered August 2, 2023 [Dk. 352].[10]

---

[8] *See* ¶ 61 of the complaint.

[9] Mr. Plazak, Greyson, Han, and Jayde's former counsel received NEF notice of the entered order.

[10] A Federal and State consumer law compliance monitor was appointed by the Court to monitor the buyer's compliance with various consumer protection requirements.

Later, Greyson filed its Motion for an administrative claim[11] on November 17, 2023 [Dk. 676]. As previously noted, the Motion seeks payment of a total of $5,434,633, consisting of (1) $300,633 "for the 22 of 48" clients lost to the Trustee's negligence, conversion, and unfair competition and (2) $5,134,000 comprised of the work Greyson attorneys performed *for Phoenix clients* at a rate of $2,000 per case pursuant to an alleged Greyson-Phoenix agreement, when Phoenix is allegedly Debtor's "alter ego." Greyson asserts that the $300,633 portion falls under the "Fundamental Fairness" exception and need not benefit the Estate. As for the $5,134,000 portion, Greyson asserts the Greyson-Phoenix agreement benefitted Debtor because it was "essential for Phoenix/LPG to carry on its business."[12] [Dk. 676, pg. 29:21, 31:17].

The Trustee filed an opposition to the Motion [Dk. 1105, with the supplemental declaration of Randall Baldwin Clark at Dk. 1137], to which Greyson replied [Dk. 1127], with the Declaration of Han Trinh [Dk. 1128] in support. The Trustee filed a Sur-Reply [Dk. 1321], and a lengthy hearing was held on July 17, 2024[13].

## II.    The Greyson Entities, Han Trinh, and Jayde Trinh

### A. The Greyson Entities

On March 9, 2023, Greyson Law Center PC (5561924) ("Greyson One") was incorporated with the California Secretary of State. [1046 Adv. Dk. 290-1, Decl. Han

---

[11] Greyson was originally represented by Doug Plazak, Esq. However, Greyson since employed new counsel, Kathleen March, Esq. Ms. March filed the Motion on behalf of Greyson.

[12] All stylistic and formatting emphases by Greyson in its pleadings, including bolding, underling, and capitalization, have been omitted from the quotes herein, unless otherwise noted.

[13] At the beginning of the hearing, which was a consolidated hearing with the related administrative claims by the Trinhs, the Court advised the counsels that it had read every pleading and reviewed all of the evidence provided by the parties *at least twice and had extensively studied the issues and arguments of the parties*. The Court implored the counsels to limit their oral arguments to matters that they did not include in their pleadings, and to not, step by step, repeat presentations of the evidence before the Court. Unfortunately, the Court received over an hour and half of repetitive arguments, even with reminders from the Court during that period to not simply repeat everything contained in the pleadings and evidence. The Court received a complaint that it had allowed the Trustee's counsel to address, for under ten minutes, without interruption, its arguments. To this end, this decision attempts to recite all the pleadings and evidence before it, with the caveat that if its written recitation has missed a listing, all of the evidence and the pleadings have been considered. The parties should be assured that this Court has carefully reviewed all of the pleadings and evidence before it.

Trinh ¶ 5]. Greyson One came to be in March of 2023, when Scott Eadie, a former LPG
attorney, advised Han Trinh that he wanted to create a new organization that had a
similar business as that performed by LPG. [1046 Adv. Dk. 47-1, Decl. Eadie, ¶2-3; 1046
Adv. Dk. 47-2, Decl. Han Trinh, ¶3]. Greyson One was set up by Mr. Eadie, Eng Taing
('Mr. Taing"), and Han Trinh. [1046 Adv. Dk. 47-1¶ 4]. When discussing the name
"Greyson" in a group text message with Jayde Trinh and Mr. Taing, Han stated "your
baby's name, Jayde! Your idea is coming to fruition lol." [1046 Adv. Dk. 493-11, pg. 24,
Ex. O].[14]

Greyson One was seemingly "receiving assistance from Eng Taing, Dongliang
Jaing, and Anthony Gabriel." [1046 Adv. Dk. 47-2, ¶7]. Greyson One was stationed in
the office space at 3161 Michelson Drive. [*Id.*]. Greyson One moved into the premises
under the impression that the sublease included Greyson One. [*Id.*]. Han and Jayde
both supervised the team of Greyson One attorneys.[15] [*Id.*]. However, restrictive access
was put into place only allowing Mr. Taing, Mr. Jaing, Mr. Arthur, and Mr. Gabriel to
enter the premises. Therefore, Mr. Eadie claims to have severed ties with Mr. Taing and,
according to Mr. Eadie, Mr. Taing closed Greyson One's bank accounts. [*Id.*, ¶9].
Thereafter, Mr. Eadie and Han Trinh opened new bank accounts for Greyson One at
Citibank. [1046 Adv. Dk. 47-1, ¶9].

Greyson One, however, was short lived as it was dissolved in May of 2023, and
the records from the California Secretary of State report Greyson One as "terminated."
[*Id.*; Decl. Kathleen March]. Han Trinh and Mr. Eadie learned of Greyson One's

---

[14] On March 8, 2023, Jayde also sent text messages in which she inquires "Can we spell Greyson with an
'E'? Grayson with an 'a' is fine for my dog but it looks fratty. LOL let me know your thoughts." [*See* 1046
Adv. Dk. 493-11, pg. 24, Ex. O].

[15] On March 21, 2023 (one day post-petition), Greyson One sent employment contracts to several attorney
who were previously employed by Debtor, for which the start date was stated to be March 27, 2023. [*See*
Dk. 1105, Decl. Mamlyuk, Ex. 33; *see also* Clarke Dec. Ex. 2; *See also*, Dk. 699, pg.8 (R. Pryun's Greyson
contract)]. Local counsel R. Reed Pruyn, Israel Orozco, and Shadae Clarke were just three of the attorneys
who received employment agreements with Greyson One [*Id.*].

dissolution on May 10, 2023. [1046 Adv. Dk. 47-1, ¶9]. When Mr. Eadie and Han Trinh

checked online, they then realized that Greyson One's Articles of Incorporation were

never applied for under Mr. Eadie's name. [1046 Adv. Dk. 47-1, ¶9]. Therefore, on May

12, 2023, Mr. Eadie and Han Trinh filed new Articles of Incorporation when they

discovered they could not reinstate the original business (Greyson One). [1046 Adv. Dk.

47-1, ¶9]. This is when Mr. Eadie changed the domain name from "Greyson PC" to

"GreysonLaw PC" to avoid any further association with Greyson One. [1046 Adv. Dk. 47-

1, ¶9].

Greyson represents that it is owned 100% by Scott Eadie, Esq., who is identified

as the managing attorney and President of Greyson with Mr. Eadie's declarations and

various exhibits provided in support. [Dk. 1127, Decl. Soctt Eadie dated 2/8/24; Dk.

1127, Decl. Scott Eadie dated 3/27/24]. [16]  However, Han Trinh has provided an email to

the Court wherein Israel Orozco states that Jayde Trinh serves as the supervising

attorney for Greyson. [Dk. 676, Decl. Han Trinh, Exhibit W].

Han Trinh and Scott Eadie declare under penalty of perjury that Greyson had no

involvement with Tony Diab. [Dk. 676-1, Decl. Han Trinh, ¶20; Dk. 1127, Decl. Scott

Eadie dated 2/8/24, ¶8]. Han goes as far as saying she hated Diab, and that Diab had no

link to, or part in, Greyson. [Dk. 676-1, Decl. Han Trinh, ¶21]. However, on "May 19,"

Tony Diab sent a text message to William "Ty" Carss, Phoenix's principal, stating

"[u]ntil **we** close Greyson, the plan is the following. For any new assignment, email it to:

legal@greysonlawpc.com and attorney@greysonlawpc.com. Bianca is working on a new

flow but for now send all assignments there. As for a card expenses, they will continue

using the Greyson card for now." (emphasis added). [1046 Adv. Dk. 493-2, Decl.

---

[16] Greyson states Mr. Eadie never managed Debtor. Notably, however, exhibits have been provided
evidencing Mr. Eadie's involvement in both LPG and Oakstone [Dk. 1105, Exhibit 32; Dk. 1099, Exhibits
33, 44, 46, 47]. Oakstone is alleged by the Trustee to be an alter ego of LPG [See 1046 Adv. Dk. 583]. For
instance, there is a letter from Daniel March to Mr. Eadie "to document the agreement" that LPG will
transfer clients to Oakstone" [Dk. 1105, Exhibit 47] and there is an email from Han's LPG email account to
Mr. Eadie attaching the "master client list" which shows numerous clients at the law firm Oakstone [Dk.
1099, Exhibit 33].

William 'Ty' Carss, Ex. B].  Tony Diab, on "May 23" responded to Mr. Carss' question "Do we or Greyson have access to a GA attorney?" by answering, "[y]es, greyson does." [1046 Adv. Dk. 493-2, Decl. William 'Ty' Carss, Ex. B]. Yet, Tony Diab declares that "[a]ny discussion I had with any individual at Greyson regarding file transfer was in my capacity as transferor, not transferee, of any file. No file was ever transferred to any Greyson entity by me, even though numerous discussions regarding file transfer took place." [Dk. 1127, Decl. Diab dated 2/12/24, ¶5e]. Diab clearly had a link to, and part in, Greyson. Han, Jayde, and Diab appear to argue that despite all of their involvement in illegally transferring client files to Phoenix, who then used Greyson to service files, Diab did not have a part in, or say toward, Greyson.

Due to the failure of Greyson One, Han Trinh and her "team" were looking for a new office space for Greyson. [1046 Adv. Dk. 47-2, ¶10]. Han Trinh was advised by Wes Thomas, LPG's former Chief Financial Officer and close associate of Diab,[17] that there was an open office space available where Greyson could use the office space, existing furniture, and existing IT equipment for free. [1046 Adv. Dk. 47-2, ¶10]. That available office space was the prior office of Oakstone, an LPG affiliate. [Dk. 1125, Decl. Han Trinh, ¶27].  The tenant, at that time, of the office space was Phoenix, the recipient of fraudulent transfers from Debtor, who then provided those client files to Greyson to allegedly service. Han Trinh accepted Mr. Thomas' offer on behalf of Greyson as the Administrator. [1046 Adv. Dk. 47-2, ¶10]. Greyson then moved its office to the free space located at 3345 Michelson Drive, Suite 400B, in Irvine, CA on April 29, 2023. [1046 Adv. Dk. 47-2, ¶10-11].

From May 3, 2023, Greyson employed approximately 140 people at the Suite 400B location, with 94 of the employees working remotely in California and approximately 60 employees working remotely in other states. [1046 Adv. Dk. 47-2, ¶

---

[17] A Notice that Clerk has Entered Default Against Wes Thomas was entered on August 22, 2023 [1046 Dk. 145].

12].[18] As of June 2, 2023, however, Greyson only had 48 clients of its own. [1046 Adv. Dk. 47-1, ¶ 11-12].[19] To Han and Jayde, however, their most important asset was the "network of attorneys." Han believed that the "Greyson attorney network belong[ed] to Jayde and [her] alone" and that they "owned" the network of attorneys. [*See* Dk. 1105, Decl. Shadae Clark, Ex. 5]. Han admitted that the Greyson attorney network "were W2 attorneys for LPG until February 2023." [*Id.*].

Further, as discussed further *infra*, and detrimental to the credibility of Han and Jayde, at the same time the Greyson entities were incorporated, and operating, Jayde Trinh and Han Trinh were also working for LPG [Dk. 1124, Decl Han Trinh, ¶6, 12; Dk. 1125, Decl. Jayde Trinh, ¶ 2, 13]. Again, this is despite Greyson, Han Trinh, and Jayde Trinh vehemently arguing that LPG was a direct competitor of Greyson. [*See e.g.*, 1046 Adv. Dk. 290-1, Decl. Han Trinh, ¶33].

## B. Han Trinh and Jayde Trinh

From January 2021 to December 2022, Han Trinh was the Legal Assistant for LPG, and then in January 2023, Han became the Administrator of LPG. [*See* 1046 Adv. Dk. 47-2, Decl. Han Trinh, ¶2]. Han asserts that when she first started working at LPG, she earned an hourly rate of $17.31, but by June 2, 2023, she was earning an annual salary of $300,000. [Dk. 674, Decl. Han Trinh, ¶ 7]. Jane Dearwester, an attorney who previously worked for LPG, states in her declaration that Han was referred to as "General Han" by Tony Diab and others at LPG and was somewhat feared by LPG's staff and attorneys with her "unlimited authority to manage the business of LPG and LPG's employees." [*See* 1046 Adv. Dk. 493-4, pg. 2 at ¶8; Adv. Dk. 493-3, pg. 3 at ¶9]. An email

---

[18] Greyson even had an employee, Brad Lee, who worked for Greyson and Phoenix at the same time. [Dk. 1127, Decl. Diab dated 2/12/24 ¶5e].

[19] Of the 48 clients, approximately 20 were obtained after LPG clients elected to follow their attorney who "belonged" to Greyson. [1046 Adv. Dk. 47-1, ¶11]. Further, while attorneys who work with Greyson are W-2 employees of Greyson, they typically perform work for other clients wholly outside Greyson for their own private practices. [*Id.*]

sent from Tony Diab to Han Trinh and Jayde Trinh refers to Han Trinh as "Gen. Han." [Adv 1046, Dk. 493-10, Ex. 49].

From November 30, 2020, Jayde Trinh asserts she was employed as a W-2 employee of LPG. [*See* Dk. 675, pg. 1:26-28]. As early as of October 2021, Jayde held herself out to be the "General Counsel of LPG."[20] [*See* 1046 Adv. Dk. 493-4, pg. 2 at ¶¶5,10]. Jayde asserts when she first started working at LPG, she earned an annual salary of $120,000, but by June 2, 2023, she was earning an annual salary of $250,000, plus LPG repaid Jayde's student loans from law school [Dk. 675, Decl. Jayde Trinh, ¶7; Dk. 1125, Ex. A, pg. 55]. Though Jayde's official title at LPG was "General Counsel" or "Attorney," Jayde was also referred to as "Hammer Jayde" by Tony Diab [*See* 1046 Dk. 493-10, Ex. 49]. An email sent from Tony Diab to Han Trinh and Jayde Trinh refers to Jayde Trinh as "Hammer Jayde." [*Id.*].

The roles of Jayde and Han Trinh at LPG were described by Jayde in email correspondence [*See* 1046 Adv. Dk. 493-3, Ex. 19]. Jayde, or "Attorney,"[21] handled "inquiries regarding litigation," "[o]ther questions that require authority," "settlement reporting", and "liaison for Local Counsel." [*Id.*]. Han, or "Legal," was responsible for locating clients or lawsuits, questions regarding legal docs, assigning local counsel, and questions regarding client files. [*Id.*].

Jayde and Han Trinh were also heavily intertwined with Tony Diab. According to the managing member of Marich Bein, Hershy Deutsch, who made frequent trips to LPG's offices[22], Han shared an office with Diab, and she was considered "Diab's right-hand person." [*See* 1046 Adv. Dk. 493-3, pg.3 at ¶9]. However, according to Mr. Deutsch, it was evident to him that LPG and its employees did not just consider Han to

---

[20] Jayde was provisionally licensed by the California State Bar on December 2, 2020. [Dk. 1125, Decl. Jayde Trinh, ¶33] and was admitted as an attorney to the California State Bar on November 24, 2021.

[21] "Attorney" was known to be Jayde Trinh, and "Legal" was Han Trinh. [*See* 1046 Adv. Dk. 493-4, pg. 54 at Ex. 19].

[22] Hershy Deutsch made frequent trips to LPG's offices after Marich Bein and LPG entered into various Assignment of Servicing Rights Agreements and Account Receivable Purchase Agreement in 2022.

be "an extension of Diab" but rather a "top-level executive of LPG in her own right," even without an official title as such. [*Id.*].

The manner and behavior of Han and Jayde while employed for LPG has been described for the Court, especially when LPG employees began resigning once they learned of LPG's impending closure and the stoppage of payments to its employees. For instance, when an employee, Rocio Prado-Garcia, sent Han a resignation email explaining their inability to continue working while not having "gainful employment" and without being appropriately compensated, Han forwarded this employee's troubling resignation email to Jayde (amongst other recipients) and stated, "Wanna bet she did not write this herself?" [Dk. 493-10, Decl. Alex Rubin, Ex. 30, pg. 68]. In the same email chain, Jayde in reference to another impending resignation of another employee ("Anthony") stated "[h]e probably thinks we need them and if he takes them, then we'll drown. LMAO. This is hilarious." [*Id.*].

Further, Han, in one instance, received an email from an attorney regarding LPG's continual lack of payment for services performed and his unanswered phone calls to Han. [*See* 1046 Adv. Dk. 493-10, Ex. 32]. In the email, the attorney detailed his spouse's cancer spreading at a rapid rate, which had required immediate medical attention at a local hospital, and how he had a small firm that could not absorb a write-off of the overdue payment of $35,383.66. [*Id.*]. Han, using her LPG credentials, responded, "Please send the invoice to *admin@oakstonepc.com*. Thank you!" [*Id.*] (*emphasis added*).

Again, on March 29, 2023, in a different email chain, Han sent Jayde a message from an attorney (Randall Clark) regarding Mr. Clark's inability to give extremely distraught clients information regarding their accounts being transferred from "LPG Oakstone."[23] [*See* 1046 Adv. Dk. 493-10, Ex. 40]. Jayde responded to the concerns by stating, "Hans [sic] problem. She was supposed to call last week." [*Id*]. On April 13,

---

[23] Oakstone is alleged by the Trustee to be an alter ego of LPG. [See 1046 Adv. Dk. 583].

2023, a different attorney reached out to LPG stating, "My fear is that if Oakstone signs her [former LPG client] up and Phoenix begins billing her account, she will be double-charged until this can be straightened out." [*See* 1046 Adv. Dk. 493-10, Ex. 42]. This attorney's email was forwarded to Jayde and Han, to which Jayde replied, "Linda, you need to text Han. Cause I'm pretty sure we can start but it's not Oakstone. Clear up with her cause she changes sh*t (expletive modified) every other day." [*Id.*]. This evidence presents a continual demonstration of their indifference to concerned clients seeking debt resolution services, as well as their personal knowledge of the asset transfers and manipulations of Debtor.

As the client transfers occurred from LPG to other entities, no one at LPG, including Han and Jayde who had specific knowledge of the transfers (as evidenced by LPG attorneys reaching out to the Trinhs confused about the client transfers) informed clients or the attorneys representing them of their completed or impending transfers.[24] Debtor's clients rightfully became concerned when they began receiving notices in January-February 2023 that they were now purportedly represented by the fraudulent transferee law firms. [*See* Dk. 493-4, Decl. Dearwester, Ex. 11]. Clients involved in the transfers had not signed substitutions consenting to their files being transferred. [*Id.,* Ex. 13]. Attorneys began demanding answers about the sudden change, which is when Han and Jayde began sending out new contracts to attorneys to sign with different entities. [*See* Dearwester Decl., Ex. 16].

An example of this chaos, in February 2023, an out-of-state attorney, Jane Dearwester, began receiving emails from concerned LPG clients explaining they had received communications that their client files were being transferred and/or sold to Oakstone, Consumer, and Phoenix. [*See* 1046 Adv. Dk. 493-4, pg. 4: 22]. When Ms. Dearwester sent an email to Han, Jayde, and Diab, informing them that LPG clients could not be transferred without the clients' consent, Ms. Dearwester never received a

---

[24] This is especially concerning given Jayde Trinh's status as an attorney.

response. [*See* 1046 Adv. Dk. 493-4, Ex. 13]. In fact, Han and Jayde began telling LPG

attorneys that they needed answers quickly on whether the attorneys were "coming to

Oakstone." [*See* 1046 Adv. Dk. 493-4, Exs. 17, 18].

In yet another instance of an unauthorized transfer, on February 7, 2023, an

attorney forwarded the "welcome email" its client had received from Oakstone. [*See*

1046 Adv. Dk. 493-10, Ex. 26]. The attorney emailed the Trinh sisters and Diab, stating

"[i]n another email, I inform you that Illinois clients must consent to the transfer of

their files." [*Id.*]. No response was provided. [*Id.*]. No action was taken.

On January 26, 2023, another attorney reached out to Jayde and Trinh, writing

"[i]t seems that his [the client] DPP[25] file has also been completely wiped and we cannot

retrieve the necessary documents that we need for his case. He is emailing us for

clarification about the email above [client received a "welcome email" from Consumer

Legal Group] but we have no idea what to tell him . . ." [*See* Dk. 1099, pg. 9, Ex. 25].

The foregoing examples are just a few from the submitted evidence

demonstrating Han and Jayde's personal involvement with Diab, as well as their

knowledge and participation in the improper and most likely systematically improper

transfer of clients' files.

In addition, Han and Jayde, while working for LPG, concurrently worked for

Greyson, as discussed above [Dk. 1124, Decl. Han Trinh, ¶6, 12; Dk. 1125, Decl. Jayde

Trinh, ¶ 2, 13] despite Greyson, Han Trinh, and Jayde Trinh vehemently arguing that

LPG was a direct competitor of Greyson. [*See, e.g.*, Dk. 290-1, Decl. Han Trinh, ¶33].

This is also despite Han and Jayde claiming no involvement in the transfer of files to

entities such as Phoenix, wherein Phoenix then used Greyson attorneys to work on LPG

files that were fraudulently transferred. In fact, Han attached to one of her declarations

"screenshots of a list of some emails from han@lpglaw.com and legal@lpglaw.com"

---

[25] DPP, Debt Pay Pro, is analogous to "LUNA" and "Forth" since these are all client relationship
management accounts, which contained information regarding a clients' data, files, and accounting
information.

proving that while allegedly performing "essential work" for LPG, she knew exactly

which client files were transferred and to which entity, including Phoenix, which was a

pipeline of work for concurrent employer, Greyson. [Dk. 1124, Decl. Han Trinh, Ex. B].

### III. History of Hearings and Proceedings Relevant to the Motion

The Application was originally set for hearing on January 19, 2024, at 11:00 a.m.

That hearing was subsequently converted to a status conference and continued to

February 29, 2024, at 11:00 a.m., with a status report due 14 days in advance, pursuant

to an order entered January 8, 2024 [Dk. 818]. On February 29, 2024, by tentative, the

Court issued a scheduling order and excused appearances; a scheduling order was

subsequently entered on March 6, 2024 [Dk. 986], which set the matter for hearing on

April 25, 2024, at 11:00 a.m.  On April 24, 2024, in consideration of the significant

amount of pleadings filed, which contained voluminous exhibits, this Court entered a

*sua sponte* order continuing the hearing to June 13, 2024 [Dk. 1138][26]. Further, the

Court permitted the filing of additional responsive pleadings.

On June 7, 2024, this Court entered an order continuing the hearing to July 17,

2024, at 1:30 p.m. [Dk. 1324], noting that "the resolution of ancillary matters filed by

Movant's counsel and which are pending before the Court are necessarily required to be

resolved before the Court can rule on the pending applications."[27]

On June 10, 2024, Greyson Law Center PC, Han Trinh ("Han"), and Jayde Trinh

("Jayde" or "Phoung") filed a motion to "un-continue" the June 13, 2024, hearings

which the Court had continued to July 17, 2024[28]. The Court denied the motion to "un-

---

[26] The hearing was originally set for 10:00 a.m. [Dk. 1138]; it was subsequently changed to 1:30 p.m. [Dk. 1306].

[27] The other ancillary matters pending before the Court were final resolution of Greyson's Motion to Compel Production of Document [Dk. 1209], Greyson's Motion to Vacate the Preliminary Injunction [Dk. 749] and both the Trinhs' motions for administrative claims. [Dks. 674, 675].

[28] The caption of the motion, with all stylistic formatting removed, is: "Notice of Motion and Motion of Greyson Law Center PC, Han Trinh, & Phuong (Jayde) Trinh, for an order un-continuing the hearings on Greyson, Han Trinh's, & Jayde Trinh's administrative claim motions, to restore the 6/13/24 at 1:30 pm hearing date of said motions, which 6/13/24 hearing date was continued from 6/13/24 to 7/17/24, by the Court's sua sponte order [Dkt.1324, entered 6/7/24], which is erroneous, and is highly prejudicial to all 3

continue" by an order entered June 11, 2024 [Dk. 1338].  The hearing was held on July 17, 2024, at 1:30 p.m.

### IV. Evidence on the Record

#### 1. The Motion [Dk. 676]

Greyson filed its Motion for an order granting allowance and payment of administrative claim, pursuant to 11 USC § 503(b)(1)(A) on November 17, 2023 [Dk. 676].

### A. Declaration of Han Trinh and Exhibits [Dk. 676]

Attached to the Motion is the declaration of Han Trinh [Dk. 676-1], which in turn attaches the following exbibits:

(1) Exhibit A - An email from Christopher Celentino to Han Trinh saying Han consented to the use of email and including attachments of documents served.

(2) Exhibit B - An email from Jonathan Serrano to Han asking for Han's home address for mailing purposes.

(3) Exhibit C - An email from Jonathan Serrano to Han asking for a list of Greyson's employees, their titles, and their salaries in a spreadsheet.

(4) Exhibit D - An email from Christopher Celentino to Han sharing a statement this Court provided, that everyone must cooperate with the Trustee, and also states that Han and Jayde Trinh can share this message with employees.

(5) Exhibit E - An email from Celentino to Serrano, Jonathan, and Han informing Han the order she was served requires an appearance before this Court on June 12, 2023.

(6) Exhibit F - An email from Celentino to Serrano and Han saying Han was left out of the first part of the order but that will be fixed for future appearances because

---

claimants; alternatively, if 6/13/24 is not convenient for the Court, the Court is requested to reset the hearing date for any day from 6/14/24 to 6/21/24. Declaration of Kathleen P. March, w/(proposed) order granting un-continuance, from 7/17/24 back to 6/13/24" [Dk. 1335].

Celentino does not want Han to miss out on sharing that she and Jayde were the
"brainchildren behind Greyson" and her anger and disassociation from Tony Diab.

(7)  Exhibit G - A continuation of the email from Exhibit F wherein Celentino
adds there is no reason to meet with Han before the hearing with this Court.

(8) Exhibit H - An email from Morgan Antenucci to HR and 6 others stating that
Antenucci, who signs of as being from Greyson's document department, has not been
paid for the pay date May 26 and cannot pay bills without the paycheck;

(9) Exhibit I - An email from Antenucci to Celentino and 6 others inquiring
whether there is a date by which late pay will be received and also stating that
operations are "falling apart due to lack of direction."

(10) Exhibit J - An email from Courtney Kelley to HR, GLC Accounting, and 47
others stating that Kelley recognized former LPG competitors in the office who were
making announcements that they are officers of the Trustee. Kelley specifically states
that she recognized Russ, Gary, and Alex from Validation Partners and Morning
Financial.

(11) Exhibit K - An email relaying that Lori announced she was affiliated with
LPG, Phoenix, and Greyson and that her team is taking over Greyson. The email
expresses confusion for why Greyson is being treated as connected to Phoenix and LPG.

(12) Exhibit L - A continuation from the email in Exhibit K stating that the sender
will resign if forced to work with Phoenix or LPG, and the rest of the team at Greyson
only wants to work for Greyson and Han.

(13) Exhibit M - A further continuation of the email from Exhibit K relaying that
the team at Greyson only wants to be working with Greyson clients and that the team is
lost without direction from Han.

(14) Exhibit N – A draft email from Reid Wood to Celentino and 4 others seeking
clarification on who is in charge of Greyson in Han's absence because Lori stated she is a
representative of the Trustee, but Wood fears Greyson will completely break down
without Han.

(15) Exhibit O - An email dated June 8 from Aly Housel to Celentino and 5 others stating that Lori shared that she and her colleagues would be taking over Greyson but that Housel does not want to be affiliated with Phoenix or LPG and is uncomfortable with restricted access to Luna.

(16) Exhibit P - A continuation of the email from Exhibit O and asks where Han and Scott are and if employees will be paid on Friday.

(17) Exhibit Q - A handwritten statement by Aly Housel conveying that on June 5, 2023, several people entered the Greyson office and claimed to be the Trustees of the Chapter 11 bankruptcy and were from LPG. It also states that Greyson employees were restricted in their use of Zoom and CM and that holds were placed on their paychecks.

(18) Exhibit R - An email wherein the sender states their home will be foreclosed because Greyson did not prioritize its employees' needs. It also includes a response from "AC" to GLC Admin, HR, and 8 others asking to help Barry.

(19) Exhibit S - An email to HR from Christopher Ghio stating he was told to reach out to HR regarding payroll and asked for further instructions on how to move forward.

(20) Exhibit T - An email dated June 7 from Maria Thach to Greyson employees stating that payroll for the week has been processed but not submitted, and that she is waiting for the Trustee to approve payroll for May 26.

(21) Exhibit U - An email from Jonathan Serrano to Barry Katipunan stating that no one can be paid absent a court order.

(22) Exhibit V - An email from Celentino inquiring whether Scott Eadie is a lawyer, stating that Jayde is not a lawyer, and inquiring into who is the lawyer supervising the law firm.

(23) Exhibit W - An email from Israel Orozco to Celentino advising that Scott is a lawyer, with his bar number, that Jayde Trinh is a lawyer, with her bar number and that Jayde is the supervising attorney for Greyson, while Han Trinh is not an attorney but handles much of the administrative tasks.

(24) Exhibit X - An email from Orozco to Celentino stating that without Scott and Jayde, no one is supervising the attorneys but that the attorneys are competent and continue to do what is best for the clients.

(25) Exhibit Y - An email from Celentino responding to Orozco's email from Exhibit X thanking him for the information.

(26) Exhibit CC - An email from Celentino to Alyssa Calaro stating that Alyssa Calaro accessed the email AlyssaCalaro@greysonlawpc.com and sent an email, so he is asking to check that all access is cut off.

(27) Exhibit DD - An email, with the "to" line and emails redacted, dated September 6, 2023, from optout@morninglawgroup.com thanking the receiver for contacting Morning Law and discussing the process for opting out of the legal services agreement with the "Previous Firms."

(28) Exhibit EE - An email continuation of Exhibit DD which states Greyson is an affiliated entity of Phoenix and LPG.

(29) Exhibit FF - An email with all sender and receiver information redacted, sharing that the sender signed another opt-out form from Phoenix Law and is inquiring whether that also means they opted-out of services with Greyson accidentally.

(30) Exhibit GG - An email from Gina Kripotos to Doug Plazak providing login information for Luna to access data on client files for 2 weeks.

(31) Exhibit HH - A list described to be the "high fee" clients Greyson lost and the total fees Greyson would have collected of $300,663.62.

(32) Exhibit II - A list described to be "low fee" clients Greyson lost and the total fees Greyson would have collected of $154,093.11.

(33) Exhibit JJ - A service agreement addendum.

### B.  Declaration of Douglas Plazak and Exhibits [Dk. 676]

Attached to the Motion is also the declaration of Douglas Plazak. [Dk. 676-2]. Attached to the declaration are the following exhibits:

(1) Exhibit A - An email dated June 13, 2023, from Christopher Celentino to Plazak asking Plazak to send the signed retention agreements for the 48 Greyson clients on a list provided by Han.

(2) Exhibit B - An email dated June 20, 2023, from Plazak to Celentino responding to the email in Exhibit A, with Plazak stating that LPG, and not Greyson, has access to the signed retention agreements.

(3) Exhibit C - An email dated June 28, 2023, from Plazak to Christopher Ghio asking if there is anything further Greyson must provide in connection to the 48 client files discussed above.

(4) Exhibit D - A follow-up email repeating what is in Exhibit C.

(5) Exhibit E - An email dated July 7, 2023, from Gina Kripotos to Plazak providing login information for Luna to access data on client files for 2 weeks.

## C.  Declaration of Kathleen P. March and Exhibits [Dk. 676]

Attached to the Motion is also a declaration of Kathleen P. March. [Dk. 676-3]. Attached to the declaration are the following exhibits:

(1) Exhibit A - A portion of LPG's pacer bankruptcy docket, with docket numbers 52 through 167.

(2) Exhibit B - An order from this Court entered on May 8, 2023, approving the U.S. Trustee's application for the appointment of a Chapter 11 Trustee.

(3) Exhibit C - A portion of LPG's pacer docket for adversary 8:23-ap-01046-SC, with docket numbers 1 through 82.

(4) Exhibit D - An order entered by this Court on May 26, 2023, for turnover of estate property and recorded information, preliminary injunction, lock-out, re-direction of United States Parcel Services mail, order to show cause re compliance with court order, and other relief as necessary for efficient administration of this matter.

(5) Exhibit E – The Trustee's memorandum of points and authorities in support of his motion for permission to file an omnibus emergency motion after service of courtesy copy and after hearing, and under seal, dated May 25, 2023.

(6) Exhibit F - This Court's order entered on May 26, 2023, granting the Trustee's motion to seal.

(7) Exhibit G - Transcript of the hearing held before this Court on June 12, 2023, regarding the preliminary injunction and a status conference regarding a case management conference and requiring a status report.

(8) Exhibit H - A screenshot from the California Secretary of State's website showing a search of "greyson law" with results of a terminated "Greyson Law Center PC" and an active "Greyson law Center PC," with Scott Eadie as the agent.

**2. Trustee's Status Report and Motion to Continue [Dk. 815]**

On January 5, 2024, the Trustee filed an omnibus status report regarding the motions for allowance of administrative claims under 11 U.S.C. § 503(b). [Dk. 815]. It states:

> Trustee needs time to investigate and verify that Greyson Law Center's ('GLC's') claim does not contain any overlap or double billing with any of the other Admin Claimants who allege they worked for GLC. Trustee needs to verify that there [sic] multiple claims are not allowed for the identical services. Trustee also requires time to conduct discovery into the amount of any allowable claim. Trustee is informed that the fee structure and rates sought by Greyson differ markedly from Debtor's previous agreements with outside counsel."

[*Id.*, pg. 4].

Trustee filed, on January 5, 2024, a motion for an order that (1) initial hearings be status conferences and (2) to continue hearings on merits of motions for allowance of administrative expense claim under 11 U.S.C. § 503(b). [Dk. 816]. It includes a memorandum of points and authorities, and it includes a declaration of D. Edward Hays.

**3. OHP-CDR, LP and PurchaseCo 80, LLC's Limited Opposition [Dk. 817]**

OHP-CDR, LP and PurchaseCo 80, LLC filed on January 5, 2024, a limited objection to motions for allowance and payment of administrative expenses. [Dk. 817]. It states the two entities object to the administrative expense motions "to the extent that

they seek payment of any administrative expenses before resolution of OHP-CDR's and

PurchaseCo's secured claims and interests." [*Id.*, pg. 2, 19-21].

On January 8, 2024, this Court entered an order granting the Trustee's omnibus

motion for an order continuing hearings on the motions for allowance of administrative

expense claim under 11 U.S.C. § 503(b). [Dk. 818].

### 4. Greyson's January 9 Opposition to the Court's Continuance and Declarations [Dk. 822]

On January 9, 2024, Greyson, Han Trinh, and Jayde Trinh filed an objection[29] to

this Court's granting the Trustee's request to continue the January 19, 2024, hearings

[Dk. 822]. Attached to the objection are declarations of Han Trinh, Phuong (Jayde)

Trinh, and Kathleen P. March in support of the objection. Attached to Ms. March's

declaration are the following exhibits:

(1) Exhibit A - This Court's order entered on October 16, 2023, approving a

stipulation between the Chapter 11 Trustee, office of the United States Trustee, and the

official committee of unsecured creditors to set administrative bar date.

(2) Exhibit B - The first notice of administrative claims bar date, which sets the

bar date of November 21, 2023.

(3) Exhibit C - The transcript for the hearing held for the adversary (8:23-ap-

01046-SC) on June 12, 2023, regarding the preliminary injunction and status

conference hearing regarding a case management conference and requiring a status

report. This transcript includes pages 195 through 211 and page 264.

(4) Exhibit D - Two orders from this Court: a stipulated order to dismiss Han and

Jayde Trinh, without prejudice, from adversary proceeding 8:23-ap-01046-SC and a

---

[29] The caption of the Objection, with stylistic formatting removed, is: "(1) Objection of Han Trinh, Jayde Trinh and Greyson Law Center, P.C. to Court having decided Trustee Marshack's motion [Dk. 816, filed 1/5/24 and set for hearing on 1/19/24], without allowing Han, Jayde, & Greyson time to file opposition to Trustee's motion, (when Trustee's 'Status Report' to motion makes blatant falsehoods regarding Han and Jayde); (2) request that Court vacate Court's 1/8/24 [Dkt. 818] order, as granted prematurely; (3) request that Court re-decide Trustee's motion, in light of this pleading, opposing Trustee's motion; and (4) request that Court strike Trustee's 'Status Report' [Dkt. 815, filed 1/5/24, which states it is for hearing on 1/19/24 at 11:00am, as an unauthorized pleading, with no admissible evidence." [Dk. 822].

stipulated order to dismiss Han and Jayde Trinh, without prejudice, from the second amended complaint of the Trustee, filed October 13, 2023 in adversary proceeding 8:23-ap-01046-SC.

On January 16, 2024, this Court entered an order overruling the objection and request to strike filed by Greyson, Han, and Jayde on January 9, 2024, as Dk. 822 and denying the relief sought in the objection. [Dk. 848].

### 5. The February Unilateral Reports by the Trustee [Dk. 940] and Greyson [Dk. 945] and their Exhibits

On February 15, 2024, the Trustee filed an omnibus unilateral report regarding the status of motions for allowance of administrative expense claim under 11 U.S.C. § 503(b). [Dk. 940]. The status report states that the Trustee is investigating and verifying the claim of $5,134,000 from Greyson. Attached as Exhibit 1 is a letter signed by Ty Carss and addressed to Judith Skiba stating Phoenix has terminated Skiba's contract and have enclosed a refund check.

On February 19, 2024, Greyson, Han, and Jayde filed a unilateral status report for the February 29, 2024, hearings 2/29/24 [Dk. 945]. The status report attaches the declaration of Kathleen P. March, which attached three emails from Ms. March to Alina Mamlyuk responding to Mamlyuk's requests for information regarding Greyson's, Han's, and Jayde's administrative claims.

### 6. The Trustee's First Supplemental Declaration of Alex Rubin [Dk. 1099]

On April 11, 2024, the Trustee filed the Supplemental Declaration of Alex Rubin in Support of Trustee's Oppositions to Administrative Claims Filed by Han Trinh [Dk. 674], Phuong "Jayde" Trinh [Dk. 675]; and Greyson Law Center [Dk. 676] ("FSD Rubin") [Dk. 1099]. Attached to FSD Rubin are the following exhibits:

(1) Exhibit 23 - An email from Admin to Han and Reid Wood dated January 23, 2023, which discusses files being moved.

24

(2) Exhibit 24 - A January 23, 2023, email from Han to Jayde Trinh forwarding Jayde the email contained in Exhibit 23.

(3) Exhibit 25 – A January 26, 2023, email from Richard Meier to Admin, Han, and Mario Azevedo forwarding a welcoming email sent to Daniel Wine for having his case transferred from LPG to Consumer Legal Group.

(4) Exhibit 26 - An email dated February 7, 2023, sharing an email sent to Arnold saying his case was transferred from LPG to Oakstone Law Group.

(5) Exhibit 27 – An email string dated February 8, 2023, between Jayde Trinh, Han Trinh, Reid Wood, and Pamella Moraes regarding a client whose case was transferred to Oakstone Legal Group.

(6) Exhibit 28 - An email dated February 9, 2023, from Han to Accounting sharing an email from Anthony Osborn regarding payments. It also includes invoices dated December 1, 2022, and January 3, 2023, from Gehling Osborn Law Firm, PLC.

(7) Exhibit 29 - Two emails dated February 13, 2023, from Reid Wood to Han sharing guidelines and scripts on how to answer client questions for being moved to new file groups.

(8) Exhibit 30 - An email dated February 23, 2023, from Jayde to Israel Orozco and Han discussing resignations from Samer and Rocio Prado-Garcia. The emails also make light of the resignations and how Vanessa did not feel comfortable.

(9) Exhibit 31 - An email dated March 21, 2023, from Admin to Han and Jayde Trinh stating the list attached to the email is the full list of clients transferred to Phoenix and Oakstone. Only one page of each list is included in the exhibit, as the rest are intentionally left out "for brevity."

(10) Exhibit 32 - An email dated March 23, 2023, from Han to Anthony Osborn telling Osborn to send an invoice to admin@oakstonepc.com. This is in response to an email dated March 22, 2023, from Osborn explaining that his wife is battling cancer and that he has tried calling twice regarding an overdue payment of $35,383.66 to his law firm.

(11) Exhibit 33 - An email dated March 23, 2023, from Han to Scott Eadie stating that the attached list is a master client list for clients that "went to CLG." [30] That full list is intentionally not included in the exhibit "for brevity".

(12) Exhibit 34 - An email chain dated April 10, 2023, between Han and Jennifer McLaughlin concerning McLaughlin's offer letter for "Greystone" and informing McLaughlin that LPG's work phones were shut off and reactivated on April 10.

(13) Exhibit 35 - An email dated April 14, 2023, from Melissa Wilkes to Han inquiring as to when cases were transferred from LPG to Phoenix. It also includes an email discussing disconnection of the phones.

(14) Exhibit 36 - An email dated April 24, 2023, from Peter Osterman to Han and Jayde Trinh stating that he does not have email accounts for "CLG" or "PLG" but does have them for "LPG, GLC and OLG."

(15) Exhibit 37 - An email dated May 11, 2023, from Han to Joshua Figueroa, Chance Typhair, and Cayden Cohen, regarding money Paychex is holding. It also includes a CitiBusiness Account Opening Confirmation for Greyson Law Center PC.

(16) Exhibit 38 - An email dated May 16, 2023, from Han to ctyphair@paychex.com, aharth@paychex.com, and Cora Devine stating Greyson's company ID is 16092497.

(17) Exhibit 39 - An email chain dated March 21, 2023, between Jayde, Randall Clark, and Han stating Pamella Moraes does not have access to Forth and nor does anyone else because they were locked out. It also states that all files have been moved to different firms and that Legal LPG has access to some of them. There is also a line addressed to Clark that appears to be from "Ty" asking for him to reach out regarding a new venture.

(18) Exhibit 40 - An email dated March 29, 2023, from Jayde to Legal and Attorney saying it is Han's "problem" to talk with Randall Clark about transfers.

---

[30] "CLG" is an acronym for Consumer Legal Group, which is alleged by Trustee to be a fraudulent transferee of LPG. [*See* 1046 Adv. Dk. 583].

(19) Exhibit 41 - An email chain dated April 7, 2023, between Jayde and Denise Mikrut regarding the LPG phones.

(20) Exhibit 42 - An email chain between Legal, Jayde, and Attorney regarding whether a client can reach out to Oakstone.

(21) Exhibit 43 - An email chain dated May 11, 2023, between Jayde and Ana Gurrola regarding "AG complaints" and stating they were shredded.

(22) Exhibit 44 - An email from Attorney dated April 26, 2023, instructing employees not to use Oakstone's Luna and to instead use Greyson's Luna. It also instructions not to use Fresh Sales and Slack.

(23) Exhibit 45 - An email dated March 21, 2023, from Jayde to Daniel March, Admin, and Mona Montiero stating that Mona and Jayde are no longer employed by LPG.

(24) Exhibit 46 - An email dated March 23, 2023, from Scott Eadie to Nicole Filtz, Vanessa Buchner, and Carl Summer stating that he believes the mail is being sent to "Dan's office." It also discusses files and scans.

(25) Exhibit 47 - An email dated April 30, 2023, from Tony Diab to Daniel March stating that attached to the email is an agreement for Oakstone referrals sent to Joon, which also includes that agreement.

**7.  The Trustee's Opposition and Evidence [Dk. 1105]**

On April 11, 2024, the Trustee filed an opposition to Greyson's Motion. [Dk. 1105]. Included are declarations of D. Edward Hays, Alina Mamlyuk, Shadae Clarke, and Jane Dearwester in support of the opposition. Attached to the opposition are the following exhibits:

(1) Exhibit 1 - An offer letter of employment dated February 18, 2023, addressed to Shadae Clarke for employment as an Associate Attorney at Oakstone Law Group PC. It also includes Clarke's signature of acceptance on February 20, 2023.

(2) Exhibit 2 - An offer letter of employment dated March 21, 2023, addressed to Shadae Clarke for employment as an Associate Attorney at Greyson Law Center PC. It also includes Clarke's signature of acceptance on March 26, 2023.

(3) Exhibit 3 - An email from Clarke to Alina Mamlyuk dated March 28, 2024, attaching an attorney referral form email and explaining the invoices she sent are for files worked on from May 31, 2023, to August 3, 2023.

(4) Exhibit 4 - An email from Doug Plazak to Han and Scott summarizing his phone call with Celentino. Topics include the issue of Greyson attorneys working on LPG and Phoenix client files, access to the Greyson email domain, Greyson's access to Luna, and non-payment of Greyson invoices by the Estate.

(5) Exhibit 5 - An email titled Re: Protocol G0990-001. It denounces various aspects of the email in Exhibit 4 and contains statements such as "Greyson attorney network belongs to Jayde and I alone," "Greyson wasn't even official until 03/12," "I've only received pay from Greyson twice! Once from Eng's Greyson … and once from Scott's Greyson…."

(6) Exhibit 6 - An email chain between Ty Carss, Shadae Clarke, and Christopher Celentino regarding establishing a relationship with Clarke and sharing a list of Phoenix clients Clarke was handling.

(7) Exhibit 7 - A fee/representation agreement between Phoenix Law PC and The Clarke Law Firm, LLC, Attorney Shadae Clarke. It states Clarke will be listed as counsel on assignments from Phoenix and that representation costs $2,000 per case received on or after June 16, 2023. The rate is $1,500 per case for cases accepted by Clarke from Greyson.

(8) Exhibit 8 - A W-2 and Tax Statement 2023 for Shadae Clarke while employed at Greyson.

(9) Exhibit 9 - An employment contract between LPG and Jane Dearwester dated September 20, 2021, signed by Daniel March and Dearwester.

(10) Exhibit 10 - An email chain between Mario Azevedo and Dearwester regarding working in North Carolina and Kentucky.

(11) Exhibit 11 - An email from Dearwester asking if they were hacked and forwarding an email from a client acknowledging that a case was transferred from LPG to Oakstone.

(12) Exhibit 12 - An email dated March 6, 2023, from Rayshaun Thompson to "Attorney" discussing issues with a case being transferred to Phoenix without client consent.

(13) Exhibit 13 - An email dated February 28, 2023, from Dearwester to dan@litigationpraticegroup.com stating LPG must stop transferring clients without receiving client consent and stating LPG has breached Dearwester's employment contract.

(14) Exhibit 14 - An email dated February 28, 2023, from Dearwester to dan@litigationpraticegroup.com asking for a phone call to understand what has been happening with client transfers.

(15) Exhibit 15 - An email dated March 6, 2023, from Kent Cobb to LPG Counsel stating he talked with Han on March 6, 2023, and learned LPG will be paying them the next day and that Oakstone will pay them that Friday.

(16) Exhibit 16 - An email from Jayde Trinh to Dearwester dated February 3, 2023, that explains files were transferred to other firms, including Oakstone, because client volume was too overwhelming for LPG. It also states Dan and Tony will not be involved in any new firms other than LPG moving forward.

(17) Exhibit 17 - An email chain between Laura Ceva, Laura Henna, and Dearwester regarding employment offers for Oakstone and information on the transition to Oakstone.

(18) Exhibit 18 - The same email as the one in Exhibit 15.

(19) Exhibit 19 - An email dated January 31, 2023, from General Counsel at LPG to Dearwester sharing who the appropriate contacts are for matters handled by "Legal" and by "Attorney."

(20) Exhibit 20 - An email chain between Dearwester and Joshua Walthall concerning payroll issues.

(21) Exhibit 21 - An email dated February 9, 2023, from Han Trinh to LPG Counsel stating direct deposits from Paychex were coming through.

(22) Exhibit 22 - An email chain between "Admin" and Dearwester regarding paychecks.

(23) Exhibit 23 - An email dated March 3, 2023, from Daniel March to "HRBlastAll" saying payroll will go out on March 6.

(24) Exhibit 24 - An email between Dearwester and Richard Meier about *Validation Partner, LLC vs. The Litigation Practice Group PC*.

(25) Exhibit 25 - A complaint dated February 24, 2023, filed by Marich Bein LLC in *Marich Bein LLC vs. The Litigation Practice Group, PC and Oakstone Law Group, PC* for breach of contract; intentional interference with contractual relations; conversion; avoidance and recovery of fraudulent transfers; declaratory relief; and temporary restraining order, and preliminary and permanent injunctions.

(26) Exhibit 26 - A complaint dated January 9, 2023, filed by Naz II Holding, LLC in *Naz II Holding, LLC vs. The Litigation Practice Group, PC, Tony Diab, Validation Partners, LLC and DOES 1-10* for intentional interference with contractual relations; intentional interference with prospective economic advantage; unfair competition in violation of Cal. Bus. & Prof. Code §§ 17200, et seq.; conversion; money had and received; accounts stated; and unjust enrichment.

(27) Exhibit 27 - A letter to Daniel March from Dearwester dated March 10, 2023, stating Dearwester's resignation from LPG.

(28) Exhibit 28 - An email chain between Dearwester and Admin about an email from Outsource Accelerator stating LPG owes $247,591.48 to 138 staff.

(29) Exhibit 29 - An email about LPG having a large credit line on its credit card and wiring funds to avoid cards being declined.

(30) Exhibit 30 - An email from Jason Rebhun to Dearwester asking for Dearwester to be local counsel for Consumer Legal Group on Tennessee cases given her prior work with LPG.

(31) Exhibit 31 - A screenshot of a message in a group called "New Year Hangover LPG Attorn…" from Kent C. relaying a message from Han that any legal administrators or paralegals who are hourly need to send their hours to mary@guardianprocessing.com.

(32) Exhibit 32 - An email Blair Richardson forwarded to Dearwester regarding his case being transferred from Oakstone to Phoenix, signed off by Scott Eadie.

(33) Exhibit 33 - An offer of employment dated March 21, 2023, from Greyson Law Center to Israel Orozco, with Orozco's signature accepting the offer on March 24, 2023.

(34) Exhibit 34 - An email dated April 4, 2024, from Mark J. Markus Law Office to Alina Mamlyuk about Greyson's claim and stating David Orr did not do work for Greyson on LPG cases after the lockout.

### 8.  Greyson's Reply and Evidence [Dk. 1127]

On April 18, 2024, Greyson filed a reply ("Reply") to the Trustee's opposition to Greyson's motion as Dk. 676. [Dk. 1127][31]. Included are two declarations of Tony Diab (one previously filed on April 2, 2024, and another signed on April 17, 2024), two declarations of Scott Eadie, a declaration of Douglas Plazak, a declaration of Jayde Trinh, and a declaration of Kathleen March.

---

[31] The Reply exceeded the 35-page limit permitted by the Local Rules. On April 18, 2024, Greyson filed a motion "for an order allowing Greyson's memorandum of points and authorities to its reply to opposition to [Dkt. 676] motion for payment of administrative claim to exceed the 35-page limit of CDCA LBR 9013-2(b)(1)." [Dk. 1126]. Included is a declaration of Kathleen P. March. Attached as Exhibit A, is the proposed order granting the motion.  Greyson's request was approved by an order entered April 19, 2024 [Dk. 1130].

## A. Kathleen March Declaration and Exhibits [Dk. 1127]

Attached to Ms. March's declaration in the Reply are the following exhibits:

(1) Exhibit A - Greyson's request for production of documents propounded on Trustee, dated February 29, 2024.

(2) Exhibit B – The Trustee's response to the request for production, which is dated March 29, 2024.

(3) Exhibit C - An email chain between Ms. March, Ed Hays, and Alina Mamlyuk regarding meeting and conferring, the production of documents, and various other aspects of the case.

(4) Exhibit D - Jason J. Rebhun's declaration in support of Trustee's emergency motion to sell LPG's assets.

(5) Exhibit E - A stipulation dated June 7, 2023, for a judgment (1) avoiding, recovering, and preserving transfers to defendant, Phoenix Law Group; (2) turning over of all transferred property to the Trustee; and (3) dismissing without prejudice defendants William Taylor Carss and Maria Eeya Tan.

(6) Exhibit F - An order dated August 7, 2023, from this Court granting the motion for an order approving stipulation re avoidance and recovery of avoidable transfers to defendant Phoenix Law, PC and turnover of all related property to the Trustee and order of dismissal without prejudice of defendants William Taylor Carss and Maria Eeya Tan.

(7) Exhibit G - dated July 6, 2023, the Trustee's notice of motion and motion for order approving stipulation re avoidance and recovery of avoidable transfers to defendant Phoenix Law, PC and turnover of all related property to the Trustee and order of dismissal without prejudice of defendants William Taylor Carss and Maria Eeya Tan. It also includes a memorandum of points and authorities and a declaration of Richard Marshack in support thereof.

(8) Exhibit H - An order dated July 7, 2023, from this Court granting the Trustee's application for an order setting a hearing on shortened notice.

(9) Exhibit I - A portion of a pacer docket list for this bankruptcy case showing docket numbers 172 through 218.

### B. Scott Eadie Declarations and Exhibits [Dk. 1127]

Attached to the first declaration of Scott Eadie in the Reply are the following exhibits:

(1) Exhibit A - A stock ledger listing Eadie as the 100% stockholder of Greyson Law Center PC.

(2) Exhibit B - The Articles of Incorporation filed May 12, 2023, with the California Secretary of State for Greyson Law Center PC.

(3) Exhibit C - The Statement of Information filed October 24, 2023, with the California Secretary of State for Greyson Law Center PC.

(4) Exhibit D - A screenshot of the search "greyson law center" in the California Secretary of State's website, showing a terminated Greyson Law Center PC and an active Greyson Law Center PC.

(5) Exhibit E - Pages 33 and 34 of the transcript from the June 12, 2023, hearing.

Attached to the second declaration of Scott Eadie in the Reply are the following exhibits:

(1) Exhibit A - The Articles of Incorporation filed with the California Secretary of State for Greyson Law Center PC.

(2) Exhibit B - A screenshot of the website for the State Bar of California showing profile information for Scott Eadie.

### C. Douglas Plazak Declaration and Exhibits [Dk. 1127]

Attached to the declaration of Douglas Plazak in the Reply are the following exhibits:

(1) Exhibit A - The Articles of Incorporation filed with the California Secretary of State for Greyson Law Center PC.

(2) Exhibit B – A portion of the claims register for this bankruptcy case (claims 1-1 through 104-1).

(3) Exhibit C - The order dated July 7, 2023, from this Court granting Trustee's application for an order setting a hearing on shortened notice.

(4) Exhibit D - Declaration dated July 10, 2023, of Trustee's counsel Jonathan Serrano regarding proof of notice of hearing and service for (1) motion for order approving stipulation with Phoenix Law, PC, William Taylor Carss, and Maria Eeya Tan; and (2) motion for order approving stipulation with Consumer Legal Group, PC, LGS HoldCo, LLC, and Set Forth, Inc.

(5) Exhibit E – A certificate of notice and order from this Court dated August 7, 2023, granting the motion for order approving stipulation re avoidance and recovery of avoidable transfers to defendant Phoenix Law, PC and turnover of all related property to Trustee and order of dismissal without prejudice of defendants William Taylor Carss and Maria Eeya Tan.

### D.  Han Trinh Declaration and Exhibits [Dk. 1128]

On April 18, 2024, Greyson filed a declaration of Han Trinh in support of Greyson's Reply to Trustee's Opposition. [Dk. 1128]. The following exhibits are attached to Han's declaration:

(1) Exhibit A (spread across Dks. 1128-1, 1128-2, and 1128-3) – described by Han as "2,480 Greyson to Phoenix invoices, each billing Phoenix $2,000 per case, where Greyson sent Greyson W2 attorneys to defend LPG clients in state court suits nationwide." [Dk. 1128, ¶ 1].

(2) Exhibit B (on Dk. 1128-3) - a list Han states she complied showing "which Greyson attorneys appeared in the lawsuits listed in those 2,480 Greyson to Phoenix invoices." [Dk. 1128, ¶ 4].

(3) Exhibit C (on Dk. 1128-3) - A copy of Phoenix Law's newsletter, "Phoenix Insider" for March 2023.

**9. Declaration of Randall Baldwin Clark and Exhibits [Dk. 1137]**

On April 23, 2024, the Trustee filed another declaration of Randall Baldwin Clark in support of his opposition. [Dk. 1137]. Attached to Clark's declaration are the following exhibits:

(1) Exhibit A - An email from "Legal" to "debt-defense@randallclark.org" dated May 9, 2022, regarding a client's debt and monthly payment information.

(2) Exhibit B - An email dated February 8, 2023, to Pamella Moraes, with sender information redacted, showing a forwarded message from Oakstone Law Group PC telling a client their filed was transitioned to Oakstone from LPG.

(3) Exhibit C - An email chain between Randall Clark, Jayde Trinh (jayde@lpglaw.com), and Han Trinh (han@lpglaw.com) regarding access to "Forth."

(4) Exhibit D - An email dated April 18, 2023, from Randall Clark to "admin@greysonpc.com" thanking the receiver for a phone call, saying he awaits a spreadsheet.

(5) Exhibit E - Emails dated May 8 and 12, 2023, involving legal@greysonlawpc.com sending Randall Clark a new case assignment and Randall Clark providing Greyson his new intake email (info@lastmilelegal.com) for a new firm he started to take on debt-settlement cases.

(6) Exhibit F - An email dated May 18, 2023, from GLC Legal, sharing information about a client's case to Randall Clark's firm.

(7) Exhibit G - Emails dated June 5 and 8, 2023, from Randall Clark to Greyson saying attached are invoices for two cases Clark worked on for Greyson, with the total being $1,285.52, and requesting information on payment.

(8) Exhibit H - An email dated March 29, 2023, from Randall Clark asking for a phone call from Oakstone Legal to answer questions about files transferred from LPG to Oakstone, stating clients are incessantly calling wanting to know what is happening.

(9) Exhibit I - An email dated May 18, 2023, from "Phoenix Paralegal" to Clark sharing Clark's credentials to access Luna. It also includes emails regarding a case that came to Clark from Oakstone.

(10) Exhibit J - An email chain between Randall Clark and Ty Carss regarding the Trustee, hearings, the lockout, and Clark responding "LPG is the gift that keeps on giving. Pass the penicillin."

### 10.  The Trustee's Sur-Response [Dk. 1321] and Evidence

On June 6, 2024, [Dk. 1321] Trustee filed a sur-response to Greyson's Reply. Included is the declaration of D. Edward Hays in support thereof. Attached to Hays's declaration is Exhibit 1, which is a copy of an excerpt from Han's deposition on March 20, 2024, by Trustee's counsel. This deposition is from the adversary 8:23-ap-01046-SC. Substantively, it includes pages 174 and 338.[32]

### V. Discussion

At the hearing held on July 17, 2024, Counsel for Greyson requested that this Court review the declaration of Daniel March [1046 Adv. Dk. 501], which was not included in Greyson's Motion but has been filed within this Court's bankruptcy docket. The Court understands it can review its own dockets and advises that it has examined the Declaration.[33]

---

[32] The Court, during oral arguments, permitted Greyson counsel to address the sur-reply.

[33] *See*, Request for Judicial Notice of Actions of State Bar of California filed by the Trustee as Docket 64 in Adv. No. 8:23-ap-01098, of which the Court takes judicial notice. "[T]he Court can take judicial notice of the documents filed in the Cases . . . [and] the Adversary Proceeding . . . *Tuma v. Firstmark Leasing Corp. (In re Tuma)*, 916 F.2d 488, 491 (9th Cir. 1990) (noting that a court may take judicial notice of its own docket)." *King v. Exp. Dev. Can. (In re Zetta Jet USA, Inc.)*, 644 B.R. 12, 25 (Bankr. C.D. Cal. 2022). "The Court may not, however, infer the truth of the facts stated in those documents. *In re Harmony Holdings, LLC*, 393 B.R. 409, 413 (Bankr. D.S.C. 2008) (indicating that bankruptcy judges may take judicial notice of bankruptcy court records but may not 'infer the truth of the facts contained in documents, unfettered by rules of evidence or logic, simply because such documents were filed with the court')." *Id.*  The Court may, however, take judicial notice of facts in the public record "not subject to reasonable dispute that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Kihagi v. City of San Francisco*, 2016 U.S. Dist. LEXIS 5651, *7-8 (USDC NDCA 2016). *See also, Talos v. Spearman*, 2018 U.S. Dist. LEXIS 16943, *1 (USDC CDCA 2018) (Court took judicial notice of attorney's state bar admission status).  In this case, the truth of the offer of State Bar resignation and then the disbarment of Mr. March is accepted by the Court.

As stated by the United States Supreme Court, "[i]n the exercise of its equitable jurisdiction the bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate." *Pepper v. Litton*, 308 U.S. 295, 307-08, 60 S. Ct. 238, 246 (1939). The Court in *Pepper v. Litton* further held:

> [W]hen there is added the existence of a "planned and fraudulent scheme," ... the necessity of equitable relief against that fraud becomes insistent. No matter how technically legal each step in that scheme may have been, once its basic nature was uncovered it was the duty of the bankruptcy court in the exercise of its equity jurisdiction to undo it. Otherwise, the fiduciary duties of dominant or management stockholders would go for naught; exploitation would become a substitute for justice; and equity would be perverted as an instrument for approving what it was designed to thwart.

*Id.*, at 312.

The Court now understands through the records of the State Bar of California that Mr. March, days after he swore within his declaration that he was a member in good standing with the State Bar, attempted to resign from the State Bar, and was later disbarred by the State Bar, allegedly for behavior with respect to activities of Debtor. Mr. March failed to mention in his declaration that, while he was attesting to the fact that he was a member of good standing at the time he signed the declaration, he was under active investigation for looting millions of dollars of client money from Debtor.

Further, as noted above, Greyson also submitted declarations of Tony Diab in support of its Motion. Diab, however, has been disbarred by both the State of California and Nevada, for offenses, such as stealing clients' funds and forging a judge's signature. [*See* 1046 Dk. 1, p. 7.]. Allegedly, Diab had been operating LPG by renting out Daniel March's law license, while he still had it, impersonating Mr. March, and forging Mr. March's signature. [*See* 1046 Dk. 1, pg. 7-8 at ¶46]. Given Diab's history, his uncorroborated declaration lacks credibility on its face.[34]

---

[34] Though ordinarily credibility determinations are not proper absent an evidentiary hearing, the Court is using this credibility determination as a finding that Greyson did not meet its burden of proof. *See Burton v. Maney (In re Burton)*, 610 B.R. 633, 639 n.11 (B.A.P. 9th Cir. 2020).

For the reasons set forth below, after consideration of all the pleadings filed in connection with the Motion, as well as the docket as a whole, the Court finds that Greyson has failed to meet its burden to establish a *prima facie* administrative claim against the Estate. There has been presented to the Court no empirical or economic analyses of any benefits to the Estate arising from the activities of Greyson.[35] The Court also finds that even if Greyson had performed work for Phoenix Law Group, it has failed to meet its burden to prove that it was a vendor of Debtor at the time of the performance of the alleged services, or that a contract truly existed for such work, or that any work actually benefited the Estate or the clients of the Estate.

### A.    Administrative Claims

Section 503(b)(1)(A) provides for administrative expenses, "including the actual, necessary costs and expenses of preserving the estate . . ." 11 U.S.C. § 503(b)(1)(A). The terms "actual" and "necessary" as used in § 503(b)(1)(A) are construed narrowly. *Burlington N.R.R. Co. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.)*, 853 F.2d 700, 706 (9th Cir. 1988) (citations omitted). This narrow construction implements a presumption that a bankruptcy estate has limited resources which should be equally distributed among creditors. *Boeing N. Am., Inc. v. Ybarra (In re Ybarra)*, 424 F.3d 1018, 1026 (9th Cir. 2005). Bankruptcy courts have broad discretion in deciding whether to allow an administrative expense.[36] *Microsoft Corp. v. DAK Indus. (In re*

---

[35] Empirical evidence refers to information or data obtained through observation, experimentation, or experience rather than through theory or pure logic. It is evidence that can be observed, measured, and verified, making it a cornerstone of the scientific method. In research, empirical evidence is gathered through experiments, surveys, or other forms of direct observation, and it is used to support or refute hypotheses or theories. Economic evidence is a type of empirical evidence specifically related to economic phenomena. It involves data and information that pertain to economic activities, such as production, consumption, distribution of wealth, prices, and labor markets. This evidence is used to analyze economic conditions, test economic theories, inform policy decisions, and understand the impacts of various economic policies or events. In summary, empirical evidence is data obtained through observation or experimentation, and economic evidence is empirical evidence focused on economic matters, used to analyze and understand economic issues.

[36] A bankruptcy court's decision to award or deny administrative expense claims is reviewed for abuse of discretion. *Microsoft Corp. v. DAK Indus. (In re DAK Indus.)*, 66 F.3d 1091, 1094 (9th Cir. 1995). Courts apply a two-part test to determine if the bankruptcy court has abused its discretion. First, the Court determines *de novo* whether the bankruptcy court identified the correct legal rule to apply to the relief

*DAK Indus.)*, 66 F.3d 1091, 1094 (9th Cir. 1995). The purpose of administrative priority status is to encourage third parties to do business with the bankruptcy estate for the benefit of the estate as a whole. *Boeing N. Am., Inc. v. Ybarra (In re Ybarra)*, 424 F.3d 1018, 1026 (9th Cir. 2005) (citations omitted).

The claimant has the burden of proving by a preponderance of evidence that it has an administrative expense claim. *See In re Blanchard,* 547 B.R. 347, 352 (Bankr. C.D. Cal. 2016) (internal citation omitted). An administrative claimant bears the initial burden of establishing that its claim "(1) arose from a transaction with the debtor-in-possession as opposed to the preceding entity (or, alternatively, that the claimant gave consideration to the debtor-in-possession); and (2) directly and substantially benefitted the estate." *In re DAK Indus., Inc.*, 66 F.3d 1091, 1094 (9th Cir. 1995).

There is a "venerable but limited exception" to the post-petition transaction-for-the-benefit-of-the-estate requirement under § 503(b)(1)(A). *See In re Abercrombie*, 139 F.3d 755, 758 (9th Cir. 1998) (citing *Reading v. Brown*, 391 U.S. 471 (1968)). The so-called *Reading* exception provides that a post-petition tort committed by the debtor-in-possession within the course and scope of its continued operation of the estate's business may, itself, be considered a cost of doing business and is, therefore, entitled to administrative expense priority under § 503(b)(1)(A).[37]  In this case, as set forth below, the *Reading* exception requirements are not met by Greyson.

//

//

---

requested. Second, if the bankruptcy court correctly applied the legal rule, then its factual findings are examined for clear error. The bankruptcy court's factual findings are affirmed unless it is determined that those findings are "(1) 'illogical,' (2) 'implausible,' or (3) without 'support in inferences that may be drawn from the facts in the record.'" *United States v. Hinkson*, 585 F.3d 1247, 1261-1262, n. 21-22 (9th Cir. 2009) (en banc).

[37] The *Reading* exception avoids a moral hazard. *See* Kenneth N. Klee, BANKRUPTCY AND THE SUPREME COURT, Pg. 304 (LexisNexis, 2008) ("Although most of these expenses involve actual benefit to the estate, in order to avoid a moral hazard, the category also includes postpetition tort claims against the representative of the estate.").

# VI. Analysis

Greyson has not met its burden to establish a *prima facie* administrative claim under § 503(b)(1)(A).

## A. Greyson-Phoenix Contract - $5,134,000 Portion of Claim

Greyson asserts that "Greyson's work for Phoenix is a classic 11 USC §503(b)(1)(A) claim: post-petition contract and work which was essential for Phoenix/LPG to carry on its business, thereby benefitting Phoenix/LPG, done for a reasonable price ($2,000 per lawsuit)." [676, pg. 23:20-24]. Greyson argues that it "is entitled to be granted an administrative claim of $5,134,000, for the $2,000 per case which Phoenix Law Center ("Phoenix")—an alter ego of LPG being run by Celentino—contracted to pay to Greyson, to utilize Greyson attorneys to defend Phoenix consumer debtor clients in lawsuits, but which Celentino has not allowed Phoenix to pay any amount of." [*Id.*, pg. 19:7-12].[38]

The Trustee opposes, arguing that Greyson seeks to be paid upon a contract that Greyson has not produced and has not otherwise established, thus failing to meet its burden of proof. The Trustee argues that the contract does not exist and if it did, it "would have Debtor pay for a premeditated fraud scheme wherein Debtor would have to pay a premium for the privilege of being systematically robbed of its two assets—its client files and its network of attorneys." [Dk. 1105, pg. 2, 18-21].

For the reasons set forth below, the Court finds that Greyson has not established that it has met its burden that it is entitled to an administrative claim.

---

[38] With respect to Greyson's alter ego argument, as noted at the July 17, 2024, hearing, this Court has not made any alter ego findings. To the extent that Greyson argues that any prior statements by the Trustee as to alter ego liability are judicial admissions, the Court "[u]ltimately . . . has discretion whether to accept a judicial admission." *Nat'l Commer. Recovery, Inc. v. McClanahan (In re McClanahan)*, 2014 Bankr. LEXIS 4268, at *19-20 (Bankr. E.D. Cal. Sep. 30, 2014) (citing *Singer v. State Farm Mut. Auto. Ins. Co.*, 116 F.3d 373, 376 (9th Cir. 1997)). Under the facts and circumstances of this case, the Court elects to exercise its discretion and not deem the Trustee's statements regarding Phoenix as an alter ego of LPG as a judicial admission. Regardless, the Court still addresses whether or not the alleged services provided benefitted the Estate.

### 1. Insufficient Evidence of a Benefit to the Estate

Greyson must establish by a preponderance of the evidence that work performed directly and substantially benefitted the estate." *In re DAK Indus., Inc.*, 66 F.3d 1091, 1094 (9th Cir. 1995).  Greyson has not met its burden.

In Greyson's Reply, Greyson asserts that LPG "received the benefit of Greyson sending Greyson attorneys to appear, on a 1099 basis, to defend the consumer clients in 2,480 lawsuits." [Dk. 1127, pg. 3:5-8]. The Reply alleges that "LPG received the benefit of that work because Phoenix returned all the clients files to LPG, by the . . . 'avoidance' Stipulation [Dk. 77], and . . . Order on Stipulation [Dk. 365], and LPG immediately thereafter sold . . . all the returned files to Morning Law for over 40 million dollars." [*Id.,* pg. 3, 9-13]. In Han's declaration[39] [Dk. 1128] filed April 18, 2024, Han asserts that LPG's bankruptcy estate was benefitted by Greyson attorneys appearing in the 2,480 state court lawsuits to defend consumer clients "because it would have been much more difficult for Trustee Marshack to sell LPG's consumer client files to Morning Law—or anyone else—if 2,480+ of those files were in default or had default judgments against them, and no buyer would have paid as much (or bought at all) under those circumstances.[40]" [*Id.,* pg. 11:19-27; *see also* Dk. 1127, pg. 11:14-22]. Conversely, the Trustee asserts that there is "absolutely no discernible benefit to Debtor's estate in the

---

[39] The Court notes inconsistencies between the following statements made by Han regarding the signing of the Greyson-Phoenix Contract: In Han's March 20, 2024, deposition, Han testified "I believe it was–it was either Bianca Loli–I couldn't read the signature. It's either Bianca Loli or Ty Carrs. It didn't say, like, print name. It just had a signature." [Dk. 1321, Exh. 1, pg. 21 of 29:9-12]. Yet, in the declaration filed one month later, Han declares, "On or about 5/19/23, I had a Greyson employee hand carry the proposed Greyson-Phoenix, $2,000 per lawsuit, Contract to Phoenix offices, for Phoenix to sign. I had already signed for Greyson, per instruction of Greyson managing attorney, Scott Eadie. Phoenix's office was next to Greyson's office, at that time. A few minutes later, the Greyson employee brought the Contract back to me, signed by Phoenix, by Rose Bianca Loli. I recognized the signature for Phoenix as having been made by Loli, because I was familiar with Loli's signature, which is elaborate and distinctive. Loli had authority, or at least apparent authority to sign the contract for Phoenix." [Dk. 1128, pg. 15 of 25, ¶ 39].

[40] The Court notes that of the more than 20,000 client files sold by Debtor to Morning Law Group, only 2,567 were represented by Greyson attorneys. *See* Order Approving Sale of Assets Approving Sale of Assets Free and Clear of All Liens, Claims, Encumbrances and Interests Pursuant to 11 U.S.C. § 363(B), (B) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and Other Agreements, and (C) Granting Related Relief [Dk. 352].

Greyson scheme." [Dk. 1105, pg. 2:22-23]. Greyson has failed to provide any convincing evidence that Greyson's representation of the 2,480 client files was, in fact, critical to the sale to Morning Law Group, which sold considerably more files than those allegedly serviced by Greyson attorneys.[41]

First, there is no evidence presented to the Court that any work performed by Greyson had any substantive effect or value on the operations of the business operations of the Estate. The only evidence provided is a remarkably unbelievable set of almost duplicative "invoices" that were created by Greyson to support its claim of moneys owed by Phoenix to Greyson.[42] *These invoices, which consisted of approximately 2,480 pages encompassing 2,480 individual invoices, covering a period of approximately only* **19 days** *total (plus one outlier invoice 6 months later),* contain very little information beyond a case name and amount owed. Greyson also provided the Court with a list [*Id.*, Exh. B] that Han "personally compiled, stating which Greyson attorneys appeared in the lawsuits listed in those 2,480 Greyson to Phoenix invoices." [*Id.*, pg. 2:3-5]. This list states that only three attorneys worked on the totality of the cases relating to the invoices: Haley Simmoneau, David Orr, and Collin Donner.[43] [*Id.*, Exh. B]. Yet, Greyson's Motion asserts that the $5,134,000 portion of Greyson's claim represents the work of eight local counsel and contains an alleged breakdown of the calculation. [Dk. 676, pgs. 21-22]. However, Greyson produced no backup for any of the work performed attributable to any attorneys, named or not, for the 19 days of invoices,

---

[41] Greyson provides Han's declaration as support. However, the assertions therein are not supported.

[42] The Court took the time to count and review each individual invoice in chambers using the courtesy copy provided by Greyson.

[43] Greyson's billing procedures have not been set forth in the record. It is unclear, for example, how Greyson was able to accomplish substantive work, and bill, 180 invoices for the work of three attorneys between the Friday that the alleged Greyson-Phoenix Contract was said to have been signed and the Monday that the invoices began on, or how it was able to accomplish billing a total of 2,480 invoices for the work of three attorneys over nineteen days.

and claims that only the Trustee has this information.[44]  The Court observes that the

identities of seven of the eight alleged attorneys who performed the work were not

presented. [45] Put simply, the invoices are not evidence of work performed that could

have benefitted the Estate.

Additionally, Greyson has never produced a copy of any contract with Phoenix

indicating that such a service agreement was in place, or that the alleged amount of the

"per case" fee was agreed to by Phoenix or Debtor.  The declarations from Diab and

(Mr.) March are not supported by any corroborative evidence and this Court simply

does not believe that these individuals, both disbarred and who operated the enterprise

of Debtor, are credible. Further, the declarations of Han Trinh and Jayde Trinh, the

related administrative claim seekers, employees of Debtor[46] who defected to Greyson

---

[44] This Motion has been pending since November 17, 2023, for more than eight months.  Discovery has ensued. Though Greyson complains that the Trustee is in the possession of evidence that would support Greyson's Motion, only one motion to compel production was brought and only sought the production of one document, the alleged Greyson-Phoenix Contract. [*See,* Dk. 1209.] The Trustee attested under oath that no such contract was in his possession, custody, or control. The Court denied Greyson's motion to compel and even took the extraordinary measure of requiring the Trustee to look again and to provide a sworn declaration of his findings. [*See,* Dk. 1323.] The Court, using its discretion, finds that any other complaint by Greyson that it could not produce evidence in support of the Motion because it is in the control of the Trustee, or his agents, is waived as Greyson failed to take appropriate steps, such as file a motion to compel. *See e.g., Helfand v. Gerson*, 105 F.3d 530, 536 (9th Cir. 1997); *Kamdem-Ouaffo v. Idahoan Foods, LLC*, 789 F. App'x 75, 76 (9th Cir. 2020) (citing *Lane v. Dep't of Interior*, 523 F.3d 1128, 1134 (9th Cir. 2008)).

[45] The Motion lists only one of these attorneys by name, instead referencing the attorneys as: "Greyson's Texas and Oklahoma attorney," "Greyson's California attorney," "Greyson's Louisiana attorney," "Greyson's Florida attorney," "Greyson's Nevada and Arizona attorney," "Greyson's West Virgina [sic] attorney," "Greyson's Illinois, Iowa, and Arkansas attorney," and Greyson's Managing Attorney, Scott Eadie." [Dk. 676, pgs. 21-22]. The Trustee's opposition provides evidence that "Greyson's Florida attorney" is David Orr. [Dk. 1105, Exh. 34, pg. 189 of 195].

[46] Han Trinh was originally an hourly paid employee, hired by Debtor in January 2021, seemingly in the capacity of "Admin" and was initially paid $17.31 an hour. Her last compensation (at the time of the collapse of the enterprise) was $300,000 [Dk. 674, Decl. Han Trinh, ¶7]. Jayde Trinh, an attorney, when hired by Debtor in November 2020, started at a salary rate of $120,000, but was paid $250,000 per year (in addition to Debtor paying her student loans) at the time of the collapse of the enterprise. [Dk. 675, Decl. Jayde Trinh, ¶7]. Han and Jayde Trinh have provided declarations in support of their claims, and in support of the Greyson claim, generally disavowing knowledge of the enterprise and its activities except when their "knowledge" directly benefits them.

when Debtor's enterprise collapsed, are equally unpersuasive as simply self-serving with little or no corroboration presented.[47]

In the Trustee's declaration [Dk. 1349] in support of his response and opposition to Greyson's motion to compel, the Trustee asserts that a "reasonable and substantial search and diligent inquiry was performed at the [Trustee's] direction regarding the purported contract between Greyson and Phoenix. [Dk. 1349, pg. 2:15-17]. The Trustee, who has personal knowledge given his role as the trustee of the bankruptcy estate and his role in directing his counsel to perform an extensive investigation related to this matter, asserted that Jonathan Serrano of Dinsmore and Shohl "reviewed each physical document secured on June 2, 2023" and "confirmed there is no Greyson – Phoenix contract in [his] possession, custody or control." [*Id.*, pg. 3:1-3]. The Trustee further asserts that Jeremy B. Freedman "performed a search of electronic records for a copy of the purported contract executed by Bianca Loli" and "reviewed Greyson's Microsoft account, Maverick Management's Google account used by Bianca Loli[48], and Phoenix' Google account used by Ty Carss, Diab and others." [*Id.*, pg. 3:4-6]. The Trustee asserts that the search "did not turn up any executed contract between Greyson and Phoenix." [*Id.*, pg. 3:14]. The Trustee also asserts that "no one at Dinsmore & Shohl, Marshack Hays, or any agent of Trustee has removed, destroyed or otherwise tampered with any evidence, in hardcopy or electronic form, other than to change log in credentials to prevent those locked out of certain electronic accounts remain locked out." [*Id.*, pg. 3:21-24]. The Court is satisfied with the Trustee's declaration.

Interestingly, the Trustee has produced an email from Jayde Trinh on May 26, 2023, stating that no final agreement between Greyson and Phoenix exists. [*Id.*, pg. 3:11-13; *See* 1046 Adv. Dk. 325-4, Exh. 9]. This evidence is in direct conflict with Han

---

[47] Though evidence and many declarations were filed in support of both Han and Jayde Trinh's administrative claims, the Court gives them little weight for the reasons stated in the Trustee's surresponses to the replies of both these claimants [Dks. 1319, 1320].

[48] Bianca Loli is listed in Phoenix's first newsletter as CEO of Phoenix and as positioned at the highest level of the chain of command alongside Ty Carrs. [Dk. 1128-3, Exh. C, pg. 856 of 863].

Trinh's Declaration in Support of Greyson's Reply, in which Han declares that the

Greyson-Phoenix Contract was "signed on or about 5/19/23." [Dk. 1128, pg. 1:18; *Id.*, pg.

3:9; *Id.*, pg. 14, ¶ 39].

      With respect to the evidence submitted by the Trustee on this matter, the Court

finds the Trustee, and his supporting evidence, to be more credible. The Trustee's

opposition [Dk. 1105], demonstrates that Greyson was an entity involved in a

"premeditated fraud scheme wherein Debtor would have to pay a premium for the

privilege of being systematically robbed of its two assets – its client files and its network

of attorneys." [*Id.*, pg. 2, 19-22]. In fact, during the Trustee's investigation of Greyson, in

relation to the adversary filed naming Greyson as a defendant, the Trustee discovered

that post-petition, Local Counsel[49] essentially continued working on the consumer client

files under Greyson. The Trustee reached out to Local Counsel to understand what work

they were performing and how they received the assignments. That is when the Trustee

uncovered another fraud: "Greyson's master plan was thuggishly straightforward:

Greyson intended to charge entities like Phoenix a 'rental fee' for the use of 'Greyson

attorneys,' even though they were the same attorneys that had worked for Debtor.[50]

Clarke Dec., Ex. 7. Trustee's Opposition, which is well-taken in this regard,

demonstrates that Greyson, since its inception, was designed to "kill" Debtor, by

fraudulently transferring all of Debtor's assets and then filing bankruptcy. Transferring

the cases was called "the hard part." See, First Supplemental Declaration of Alex Rubin

Dec., Ex. 23, filed on April 11, 2024, as Dk. No. 1099 ("FSD Rubin"). The Court notes,

however, the Trustee's arguments and evidence contained in the opposition are not

needed to deny Greyson's Motion, Greyson's administrative claim by itself is insufficient

to establish that it is entitled to a claim as it did not meet its burden, as more thoroughly

discussed *infra*.

---

[49] Debtor's network of attorneys throughout the country.

[50] The Court also notes that the Trustee produced, attached to the declaration of Shadae Clarke as Exhibit 5, an email from Han which states "Greyson attorney network belongs to Jayde and I alone." [Dk. 1105].

Greyson also argues that the alleged services afforded to Phoenix increased the value of the business sold by the Trustee. There is no evidence before the Court that any alleged services provided by Greyson in any way attributed to the value received upon the sale of accounts to a third party. That sale is explained as follows.

On August 2, 2023, the Court entered an Order (A) Approving Sale Of Assets Free And Clear Of All Liens, Claims, Encumbrances And Interests Pursuant To 11 U.S.C. § 363(B), (B) Approving Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases And Other Agreements, And (C) Granting Related Relief ("Sale Order") [Dk. 352], attached to the order as Exhibit 1 is the Agreement of Purchase and sale and Joint Escrow Instructions. The Property being sold consisted of Debtor's and the Estate's right, title, and interest in, as is, where is, without representation of warranty, and in its present condition, (1) identified leases, (2) personal property, (3) the Estate's interest in certain consumer client-related accounts receivable and notes receivable as identified therein, which generally consisted of approximately 22,000 active paying files, (4) prepaid expenses, deposits, and advances as identified therein, (5) legal services agreements subject to the consumer clients' right to opt out of the assumption, assignment, and transfer of their respective agreements, (6) identified intellectual property identified, (7) pending applications, authorizations, and licenses relating to agreements in connection with administrative, promotion, advertising, and marketing services, (8) proprietary interests in the CRM database Luna, (9) assets, properties, and rights identified, (10) executory contracts, unexpired leases, and other related agreements, (11) software licenses and access, (12) ACH payment processing portals utilized, and (13) all documents and corporate records.

The Sale Order also provided that the purchase price was $5,500,000 and a fee of 50% of all amounts collected by the buyer on Active Executory Contracts and 40% of all amounts collected by the buyer on Inactive Executory contracts. On August 21, 2023, the Trustee filed a Report of Sale [Dk. 416] which provided that the sale funded and

closed on August 4, 2023, and a 90-day consumer notice was sent out to the approximately 50,000 clients affected by the sale.

Greyson states in its motion that its post-petition work was essential for Phoenix/LPG to carry on its business, thereby benefitting Phoenix/LPG. However, as noted, Greyson provides no evidence to support such an assertion. The benefit to the estate must be actual, not potential. *In re Allen Care Ctrs.*, 163 B.R. 180, 188 (Bankr. D. Or. 1994). While Greyson generally argues that its services allowed the Trustee to sell LPG assets, no analysis of even a single file, is provided by Greyson in an attempt to demonstrate any work seemingly performed by Greyson attorneys for the benefit of the Estate. Therefore, Greyson has provided insufficient evidence for this Court to find any quantifiable benefit to Debtor's estate. *See e.g., Boruff v. Cook Inlet Energy LLC (In re Cook Inlet Energy LLC)*, 583 B.R. 494, 504 (B.A.P. 9th Cir. 2018).

Further, there is also no evidence demonstrating that, of the more than 20,000 client files sold by Debtor to Morning Law Group, Greyson's 2,480 client files allegedly serviced for Phoenix were included, or if they were included how that impacted the sale, how much was received for the client files serviced. There is no evidence of any specific work performed by Greyson that benefitted the Estate. There is no evidence of how much was paid to the Estate as a result of Greyson's alleged work. There is no evidence of how many clients requested refunds, for any reason, on the files Greyson serviced. Nothing in Greyson's pleadings establish that the alleged obligation is an administrative expense as Greyson has failed to show any direct and substantial benefit to the Estate as required. *In re DAK Indus.*, 66 F3d 1091, 1094.

It is the studied opinion of the Court that no proven expenses were incurred by Greyson[51], and that the services allegedly performed (but not proven here) were not incurred for the benefit of the Estate but instead to the benefit, if at all, to Greyson in the

---

[51] Greyson does not allege that it paid any attorney any fees with respect to the services allegedly performed for Greyson. This is not a reimbursement request. In fact, other counsels who could actually prove their services have been approved for administrative claims in this case.

hopes of capturing the transferred cases from Phoenix and collecting from them while also attempting to drain Debtor of clients and funds as Greyson has repeatedly asserted it was a competitor of LPG.[52] [Dk. 676, Han Decl., ¶3].

Greyson has not established that the expenses directly and substantially benefitted the Estate and there is insufficient evidence for this Court to find any quantifiable benefit to Debtor's estate. *See e.g., Boruff v. Cook Inlet Energy LLC (In re Cook Inlet Energy LLC)*, 583 B.R. 494, 504 (B.A.P. 9th Cir. 2018; *In re L. Scott Apparel*, 2019 Bankr. LEXIS 1303, at *211 (Bankr. C.D. Cal. Jan. 29, 2019) (citing *Abercrombie v. Hayden Corp. (In re Abercrombie)*, 139 F.3d 755, 757 (9th Cir. 1998)); *In re DAK Indus., Inc.*, 66 F.3d 1091, 1094 (9th Cir. 1995). Therefore, Greyson's $5,134,000 portion of its claim is denied on this ground.

### 2. Quantum Meruit

Greyson also asserts that even if there was no signed contract between Greyson and Phoenix, Greyson would still be entitled to be paid on a quantum meruit basis for the reasonable value of the services that Greyson attorneys provided to Phoenix. This argument also fails.

To establish a quantum meruit claim, the claimant must show "(1) that the plaintiff performed certain services for the defendant, (2) their reasonable value, (3) that they were rendered at defendant's request, and (4) that they are unpaid." *Avalon Surgery & Robotic Ctr. v. Cigna Health & Life Ins. Co.*, No. CV 20-5744 DSF (JEMx), 2021 U.S. Dist. LEXIS 203219, at *18 (C.D. Cal. July 19, 2021) (internal citations omitted). Greyson fails to establish what work was performed, its reasonable value, and how it benefitted the Estate.

As noted above, Greyson has failed to sufficiently show that it performed *any* services for Debtor beyond the creation of a multitude of invoices that were sent to

---

[52] The Court fails to comprehend why, if it was truly a direct competitor, Greyson would enter into a contract or perform services to the benefit of LPG?

Phoenix. As noted *supra*, the Court cannot determine, and Greyson has not shown by a preponderance of the evidence, what work Greyson *actually* performed. Through the voluminous evidence provided, Greyson failed to provide any evidence of work performed by its attorneys on the client files supposedly serviced.

For example, the Reply states "Phoenix had received cases from LPG, but Phoenix didn't have attorneys to service and defend those client's cases. (Han Trinh Decl). Greyson had W-2 Greyson attorneys, which Greyson could deploy to service and defend those clients' cases, which is why Phoenix contracted to pay Greyson $2,000 per case, to have Greyson do that." Yet, no evidence from attorneys who supposedly performed this work has been provided. There are many ways Greyson could have established that work was performed; for example, by providing declarations from the attorneys who worked on files, any work product produced during this period (which could have been filed under seal), any public pleadings filed noting the attorneys who filed the document, transcripts from hearings attended by Greyson attorneys, or even declarations from clients attesting that Greyson attorneys had been in contact with them in some form.

As Greyson has failed to establish what work was performed, Greyson also fails to establish reasonable value for any services. Even if Greyson established, as alleged, that "Greyson provided those attorneys to defend state court suits," Greyson would have had to establish that the actual services rendered were worth $2,000 per file, which Greyson failed to do. Greyson, throughout the Motion, repeatedly asserts that $2,000 per file is a "reasonable price" and points to the declaration of Jason Rebhun, filed by the Trustee in support of the Trustee's Motion to Sell, as evidence. [Dk. 1127, Decl. Kathleen March, ¶21]. The declaration of Jason Rebhun states that Consumer Law Group ("CLG") would pay local counsel for CLG between $1,500 to $2,500 per suit, and sometimes more. [Dk. 1127, Exhibit D, ¶ 11].

However, for Greyson's quantum meruit claim, it needed to establish the reasonable value of its own services provided. *See Palmer v. Gregg*, 65 Cal. 2d 657, 660

(1967) ("The measure of recovery in quantum meruit is the reasonable value of the services rendered, provided they were of direct benefit to the defendant"). As Greyson has failed to establish what work was performed, Greyson has also failed to establish the value of the services, if any. With the evidence provided, the Court cannot determine whether Greyson performed any work on the relevant cases, whether deadlines in lawsuits were missed, whether default judgments were entered, or even whether malpractice claims arose. Greyson, who has the burden of proof to establish its administrative claim, has provided no such insight to the Court in its thousands of pages of evidence.

As stated *supra*, Greyson has not submitted sufficient evidence to prove it performed any work, or that even if work was performed, that it provided benefit to the estate. Therefore, Greyson has not established that it is entitled to an administrative claim on a quantum meruit basis.

### B. *Reading* Exception - $300,633 Portion of Claim

"The Supreme Court has held that when bankruptcy trustees act pursuant to court orders, they are entitled to judicial immunity." *Mosser v. Darrow*, 341 U.S. 267, 274, 95 L. Ed. 927, 71 S. Ct. 680 (1951); *see also Lonneker Farms, Inc. v. Klobucher*, 804 F.2d 1096, 1097 (9th Cir. 1986) ('a trustee in bankruptcy or an official acting under the authority of the bankruptcy judge, is entitled to derived judicial immunity because he is performing an integral part of the judicial process'). Therefore, 'a trustee, who obtains court approval for actions under the supervision of the bankruptcy judge, is entitled to derived immunity.' *Read v. Duck (In re Jacksen)*, 105 B.R. 542, 545 (9th Cir. BAP 1989)." *Kowalski-Schmidt v. Forsch (In re Giordano)*, 212 B.R. 617, 622-23 (B.A.P. 9th Cir. 1997). Here, the Trustee is immune from any liability arising from the Trustee's performance of the Court-ordered lockout on June 2, 2023 (the "Lockout"), unless Greyson proves that the Trustee committed intentional or negligent violations of duties imposed by law. *See United States v. Hemmen*, 51 F.3d 883, 891 (9th Cir. 1995). No such evidence has been presented to the Court.

Greyson asserts that the *Reading* exception to 11 U.S.C. § 503(b)(1)(A) applies based on three underlying tort claims: (1) negligence by Dinsmore & Shohl LLP ("Dinsmore & Shohl") in obtaining the Lockout and Preliminary Injunction Order and delaying reversal of the lockout, (2) conversion by Dinsmore and Shohl in refusing and/or delaying the return Greyson's client files that were seized in the Lockout and Preliminary Injunction Order, and (3) unfair competition by LPG, a direct competitor of Greyson.[53] Greyson fails to prove any of the three underlying torts claims and thus does not have an administrative claim based upon the *Reading* Exception.

### 1. Negligence

Greyson asserts the *Reading* exception applies because "the Lockout and Preliminary Injunction Order was obtained . . . due to negligent error by Trustee . . . alleging . . . that Greyson was an alter ego of LPG, when Greyson was not an alter ego of LPG, but rather was a competitor of LPG." [Dk. 676, pg. 8, 25-pg. 9, 2]. For this claim to succeed under the *Reading* exception on the basis of negligence, Greyson must allege facts to support the four elements of negligence: (1) duty; (2) breach of duty; (3) causation; and (4) damages. *Burgess v. Superior Court,* 2 Cal. 4th 1064, 1072, 9 Cal. Rptr. 2d 615, 618, 831 P.2d 1197, 1200 (1992).

In addressing duty, Greyson asserts that "[b]ecause Celentino only obtained the lockout and preliminary injunction order against Greyson, by the FALSE allegations that Greyson was an alter ego of Greyson, Celentino had a duty to release the items he had frozen, promptly, after the 6/12/23 hearing . . ." [Dk. 676, pg. 13:19-24]. This assertion merely relies on Greyson's argument that the Lockout and Preliminary Injunction should not have been granted.

---

[53] On an additional note, Greyson's counsel Ms. March provided a personal declaration in support of Greyson's Motion to Vacate the Preliminary Injunction (which was sought by the Trustee in order to preserve property allegedly subject to fraudulent transfers by a debtor.) [Dk. 290-2, pg. 28, ¶ 24] (page 107 of 439): "In 35 years of bankruptcy work, I have never seen a lockout and preliminary injunction order, as was issued here, issued in a fraudulent transfer case." However, the Ninth Circuit Court of Appeals affirmed Bankruptcy Judge March's issuance of a preliminary injunction in an adversary case involving fraudulent transfers in the decision *Rubin v. Pringle (In re Focus Media Inc.),* 387 F.3d 1077, 1084-85 (9th Cir. 2004).

Additionally, Greyson asserts that the "Trustee's concealment of Trustee's adversary proceeding, motion for Lockout Order and preliminary injunction deprived Greyson . . . from being able to protect [itself] by appearing and opposing Trustee's Motion . . . (March Declaration hereto)." [Dk. 676, pg. 10:1-5]. Greyson states that "[b]y proceeding without notice to Greyson, Trustee assumed the risk that Greyson would be 'collateral damage' in the Lockout and Preliminary Injunction Order. (March Decl.)." [*Id.*, pg. 11, 1-4].

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, the authorization of a temporary restraining order must meet two criteria. Firstly, "specific facts in an affidavit or a verified complaint [must] show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed.R.Civ.P. 65(b)(1)(A). Secondly, the movant's attorney must certify "in writing any efforts made to give notice and the reasons why it should not be required." Fed.R.Civ.P. 65(b)(1)(B). The Trustee met both requirements of Federal Rule of Civil Procedure 65. Therefore, the Trustee's Motion for Lockout and TRO was appropriately filed under seal and granted considering the circumstances of this case.

First, Greyson is entirely incorrect that the preliminary injunction was granted on an erroneous statement that Greyson was an alter ego. The Trustee, at the June 12, 2023 hearing, clearly stated that Greyson was not an alter ego and withdrew such allegation. The preliminary injunction, and the reasons why it was granted as to Greyson, was not based on any allegation that Greyson was an alter ego. Although the Trustee's motion for the lockout and temporary restraining order ("Lockout and TRO Motion") [1046 Adv. Dk. 1] asserted that Greyson was an alter ego of Debtor, omission of this assertion, combined with the allegations regarding fraudulent transfers, would not have resulted in the Court denying the Lockout and TRO Motion, as demonstrated by the Court's order granting the Trustee's preliminary injunction against Greyson on June 23, 2023 [Adv 01046, Dk. 70]. The Court granted the TRO to maintain the status quo and to prevent assets from being continuously and fraudulently transferred away from Debtor's

Estate to Greyson. Therefore, despite the subsequent removal by the Trustee of this

allegation, the TRO, and subsequently, the preliminary injunction, still had or have a

valid basis.[54] Thus, the Trustee had no duty to "release the items he had frozen."[55] [Dk.

676, pg. 13:22-23]. Further, the Trustee has provided evidence that Greyson was funded

with LPG assets [56], and Greyson has not provided sufficient evidence to rebut this

finding. Greyson is not entitled to be in possession of Estate assets.

Greyson has provided neither relevant legal authority nor sufficient evidence to

demonstrate that the Trustee had a duty to return items to Greyson when the Trustee

was acting under this Court's orders. Thus, Greyson has failed to meet its burden of

proof for duty.

Regarding breach, Greyson asserts that "instead of taking steps to undo the . . .

Lockout and Preliminary Injunction Order . . . after the 6/12/23 hearing, Celentino/his

field agents increased the damage to Greyson, by seizing Greyson's LUNA account, and

locking Greyson out of Greyson's LUNA account, which was Greyson's client

management relationships software, which Greyson used to manage all Greyson's

clients. (Han Trinh Decl.)" [*Id.*, pg. 13, 25-pg. 14, 4]. However, without duty, there can

be no breach or liability. *Price v. Oberman, Tivoli & Pickert, Inc.*, 2019 Cal. Super.

LEXIS 10693, *14-15; *see also King v. Select Portfolio Servicing, 2016 Cal. Super.LEXIS*

---

[54] The standards for a temporary restraining order and a preliminary injunction are the same. *Johnson v. Macy*, 145 F. Supp. 3d 907, 913 (C.D. Cal. 2015) (citing *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n. 7 (9th Cir. 2001)). The facts presented to the Court, as well as the oral arguments of counsel, resulted in the Court granting the preliminary injunction. Further, generally a TRO is superseded by a preliminary injunction.

[55] Greyson failed to provide any legal authority showing that a trustee has a duty to return seized items upon a finding that *one* of the assertions made in a motion for a TRO was inaccurate when the assertion was corrected shortly thereafter at a hearing for a preliminary injunction. *Bretford Mfg., Inc. v. Smith Sys. Mfg*. Corp., 419 F.3d 576, 581 (7th Cir. 2005) ("It is not our job to do the legal research that [the plaintiff] has omitted").

[56] *See* "Joint Statement of Movant Greyson Law Center Pc, and of Respondent Trustee, Richard A. Marshack, of Issues for This Court to Decide Relating to Greyson's Motion To Vacate--as to Greyson--This Court's 5/26/23 Lockout and Preliminary Injunction [Dkt. 13] And The 6/23/23 Order [Dkt. 70] Which Continued Dkt. 13 in Effect Until This Court Rules Otherwise" [Adv 01046, Dk. 325, pgs. 15-18].

*25042* ("There can be no liability for breach of a duty where no duty exists. To establish liability in negligence, it is a fundamental principle of tort law that there must be a legal duty owed to the person injured and a breach of that duty which is the proximate cause of the resulting injury. Absent a legal duty, any injury is an injury without actionable wrong."). As the Trustee and Dinsmore & Shohl had no duty to release Estate property to Greyson, Greyson fails to meet its burden of proof for breach.

Regarding causation, Greyson asserts that "Celentino's field agents seizing the 48 Greyson client files[] and refusing to return them for a month . . . caused Greyson to lose 22 of those clients." [Dk. 676, pg. 17:23-26]. Greyson reasons that Greyson was prevented from contacting the 48 clients for a month because of Dinsmore & Shohl's seizure of the 48 client files and refusal to return such files for that month, and because Dinsmore & Shohl had locked Greyson and its attorneys from using Greyson's emails and LUNA client management relationship software and account. [*Id.*, pg. 17:26-pg. 18:8]. Greyson offers the Declaration of Han Trinh as support. However, it fails to provide any evidence that sufficiently shows that but for Dinsmore & Shohl not returning Greyson's files for a month, Greyson would have retained the 22 "high fee" clients. For example, there is no evidence that Greyson's 22 clients attempted to contact their Greyson attorneys during that time, no evidence that Greyson's 22 clients actually left Greyson, and no evidence that Greyson's 22 clients went to Phoenix, other than a chart in the exhibits of Han's declaration which lists the asserted 22 clients that left but includes no supporting evidence. [Dk. 676-1, Exh. HH, pg. 69 of 71].

Regarding damages, Greyson requests $300,633, "representing the fees Greyson[] lost because Greyson lost 22 of 48 Greyson clients, due to attorney Celentino's field agents seizing 48 Greyson client files." [Dk. 676, pg. 17:8-11]. Greyson relies on the aforementioned chart attached to Han's declaration exhibits, which merely lists dollar values next to the 22 client entries. Greyson provides no evidence to support the calculation of these values or whether such an amount was ever recovered by anyone.

While the Court can understand that lack of access to client files and software may have prevented Greyson's ability to perform work, Dinsmore & Shohl was acting pursuant to an Order of this Court and Greyson was not entitled to continue to work using Debtor's assets. Greyson fails to assert sufficient facts to support each element the underlying claim of negligence.

### 2. Conversion

For a claim of conversion to succeed under the *Reading* exception, Greyson must allege facts to support the three elements of conversion under California law: (1) the plaintiff owns or has a right to possess the personal property; (2) the defendant disposes "of the property in a manner that is inconsistent with the plaintiff's property rights; and (3) resulting damages." *Taylor v. Google, LLC*, No. 22-16654, 2024 U.S. App. LEXIS 4642, 2 (9th Cir. Feb. 28, 2024).

Greyson provides multiple conclusory statements that Dinsmore & Shohl's conduct constituted conversion.[57] However, "saying something does not make it so." *Mejia v. Garland*, No. 17-71455, 2021 U.S. App. LEXIS 23424, at *2 (9th Cir. Aug. 6, 2021). No evidence is provided that demonstrates that the Trustee or his agents disposed of any of Greyson's property in a manner inconsistent with Greyson's property rights. In fact, as noted in Movant's pleadings and supporting evidence, Greyson was given access to the data regarding their client files on July 7, 2023, for two weeks. Greyson was given access to their 48 files, which was consistent with this Court's Order. Furthermore, no evidence is provided that demonstrates that the Trustee or his agents acted contrary to this Court's Order to return Greyson's 48 client files. Thus, Greyson fails to assert sufficient facts to support the underlying claim of conversion.

---

[57] These conclusory statements include the following: "there was more than just negligence[] because Celentino's refusal and delay to return Greyson's client files[] constituted conversion of Greyson's client files" [Dk. 676, pg. 11:24-25] and "Celentino's field agents seizing, and holding Greyson's 48 client files for a month, was negligent, and constituted conversion of Greyson's property" [*Id.*, pg. 17:17-20].

### 3. Unfair Competition

For a claim to succeed under the *Reading* exception on the basis of unfair competition, Greyson must allege facts to show Dinsmore & Shohl's conduct constituted an unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising or any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code. *Shroyer v. New Cingular Wireless Servs.*, 622 F.3d 1035, 1043 (9th Cir. 2010); Cal. Bus. & and Prof. Code § 17200.

Greyson asserts that the conduct by Celentino's and his field agents damaged Greyson and "constitutes unfair competition against Greyson—by LPG, a direct competitor of Greyson." [Dk. 676, pg. 12:3-11]. Greyson argues that "[g]iving LPG access to Greyson's client base, while keeping Greyson locked out of Greyson's emails and LUNA account, made it impossible for Greyson to compete with LPG . . . (Han Trinh Decl.; March Decl.)." [*Id.*, pg. 14:21-25]. However, Greyson fails to provide compelling evidence to show unfair competition. In fact, the assertion by Greyson that "[t]hat was unfair competition against Greyson, because LPG/Phoenix were and are direct competitors of Greyson" is alarming as Greyson seeks over $5,000,000 from Debtor based on an alleged contract between Greyson and Phoenix ("Greyson-Phoenix Contract"). It does not make logical sense that, if Phoenix/LPG was a competitor of Greyson, that Greyson and Phoenix would be working together. Thus, Greyson's underlying claim of unfair competition fails.

Greyson's inability to establish a *prima facie* case for any of the three underlying claims—negligence, conversion, or unfair competition— is fatal to its $300,633 portion of its administrative claim. Therefore, Greyson cannot satisfy the requirements of the *Reading* Exception, and thus the $300,633 claim is DENIED.

### 4. Debtor is Not a Party to the Asserted Greyson-Phoenix Contract

Greyson's claim also fails because Debtor, a non-party to the asserted Greyson-Phoenix Contract, cannot not be liable for Greyson's $5,134,000 portion of its claim due to the Avoidance Stipulation this Court approved on August 7, 2023 [Dk. 365].

The Avoidance Stipulation states, "[i]n exchange for compliance with the Stipulation thereon, Phoenix will, among other things[,] . . . Agree that Phoenix is the sole party liable for any and all liabilities, causes of action, or claims, at law or equity, that arose or came into existence following the date that the Files were transferred to Phoenix until title to and ownership of the Files is transferred to a third party purchaser for value pursuant to a proper order of the Court." [Dk. 176, pg. 3:9-12].

Approximately 40,000 LPG client files were transferred to Phoenix around mid-March of 2023. [1046 Adv. Dk. 8, Exh. 8, pgs. 48-49]. The Court entered its Order Approving Motion of Trustee Richard A. Marshack for Entry of an Order (A) Approving Sale, Subject to Overbid, of Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests Pursuant to 11 U.S.C. §363(b) and (B) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and Other Agreements on July 22, 2023 [Dk. 320] ("Order Approving Sale"). Whether or not the files have been transferred to Morning Law Group, Debtor has no liability; liability either remains with Phoenix or is with Morning Law Group.[58]

The Trustee's first complaint [1046 Adv. Dk. 1] and first through fourth amended complaints [1046 Adv. Dks. 62, 226, 506, and 583] allege that Phoenix is an alter ego of LPG[59]. [1046 Adv. Dk. 1, ¶ 59; 1046 Adv. Dk. 62, ¶ 66; 1046 Adv. Dk. 226, ¶ 73; 1046

---

[58] The parties have brought issues with the sale to the Court's attention, but these issues are not before the Court and will not be addressed herein.

[59] The Trustee's first complaint also alleged that Greyson was an alter ego of LPG. [1046 Adv. Dk. 1, ¶ 59].

Adv. Dk. 506, ¶ 76; and 1046 Adv. Dk. 583, ¶ 76].[60] As previously noted, to the extent

that any party may argue that these statements are judicial admissions, the Court

"[u]ltimately . . . has discretion whether to accept a judicial admission." *Nat'l Commer.*

*Recovery, Inc. v. McClanahan (In re McClanahan)*, Nos. 13-12860-B-7, 13-1052, 2014

Bankr. LEXIS 4268, at *19-20 (Bankr. E.D. Cal. Sep. 30, 2014) (citing *Singer v. State*

*Farm Mut. Auto. Ins. Co.*, 116 F.3d 373, 376 (9th Cir. 1997)).

Here, because of the timing and exigency of the Trustee's actions in furtherance

of his appointed position, the Court elects to exercise its discretion and not accept these

statements as judicial admissions. When the Trustee was appointed to this case, he was

immediately faced with significant challenges—the Trustee was required to take

relatively quick action to prevent the dissipation of asserts from Debtor's estate.

Debtor's business was a substantial, nationwide operation with an immense number of

clients. The Trustee represented to the Court the web of new affiliated businesses[61] that

Diab[62] had formed. [1046 Adv. Dk. 1, ¶ 59]. The Trustee also noted the high-volume

transfer of LPG client files to three of those businesses that Diab formed: approximately

15,000 to Oakstone (representing approximately $4.2 million in revenue), 12,000 to

CLG (approximately $3.3 million in revenue), and the remaining approximately 40,000

to Phoenix (approximately $11.2 million in revenue). [*Id.*, ¶ 61]. Considering the

evidence that the Trustee presented within the approximately two and a half weeks that

he was in his position as Debtor's trustee, it appeared that Phoenix was alter ego;

however, no determination has been made.

---

[60] In between the Trustee's third and fourth amended complaint, the Trustee's sur-response to Greyson's Motion asserted that the Trustee denies Phoenix is an alter ego. [Dk. 1321, pg. 7:7]. Given the facts and circumstances of this case, to the extent that any party may deem the allegations a judicial admission, the Court is exercising its discretion.

[61] The businesses included Phoenix, Oakstone Law Group PG ("Oakstone"), Greyson, Gallant Law Group, P.C. ("Gallant"), and Consumer Legal Group, P.C. ("CLG"). [1046 Adv. Dk. 1, ¶ 45].

[62] The Trustee asserts that Diab controlled and operated LPG since its inception. [1046 Adv. Dk. 1, ¶ 45].

In this instance, in light of the magnitude and convoluted structure that the Trustee faced, the Court elects to use its discretion and does not accept the Trustee's admission that Phoenix is an alter ego. As noted by the Court in the July 17, 2024, hearing on this Motion, there has been no determination by this Court or any other court that Phoenix is an alter ego of LPG[63]. Greyson does not provide any argument or evidence, beyond pointing to the Trustee's prior statements, that Phoenix is an alter ego of LPG. As stated by the Trustee in his opposition "Greyson simply equates Phoenix to Debtor and calls it a day." [Dk. 1105, pg. 11:22-23]. Therefore, Greyson has failed to establish that even if there was an alleged debt owed, that the Estate would be liable for it.

### 5.  11 U.S.C. § 502(d)

Section 502 of the bankruptcy code relates to the allowance of claims or interests. Section 502(d) provides in relevant part that, notwithstanding subsections (a) and (b) of the section, the court shall disallow any claim of any entity from which property is recoverable under sections 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under sections 522(i), 542, 543, 550, or 553 of this title. The Trustee argues that the entirety of Greyson's claim is subject to disallowance pursuant to § 502(d) as the Trustee has initiated an adversary against Greyson seeking to avoid and recover fraudulent transfers made from Debtor to Greyson.

Section 502(d) may be asserted to hold the administrative claim in abeyance until a determination of the fraudulent transfer and/or preference action had been made.

---

[63] The Avoidance Stipulation between the Trustee and Phoenix is silent regarding whether Phoenix is an alter ego. The Order approving the Avoidance Stipulation merely makes a judgement on the issue of whether there were fraudulent transfers from LPG to Phoenix.

*MicroAge, Inc. v. Viewsonic Corp. (In re MicroAge, Inc.)*, 291 B.R. 503 (B.A.P. 9th Cir. 2002). However, this determination is currently unnecessary.

**VII. Conclusion**

For the reasons stated above, the Court finds that Greyson has failed to meet its burden to establish entitlement to an administrative claim. The Motion is DENIED.

**IT IS SO ORDERED.**

Date: August 27, 2024

Scott C. Clarkson
United States Bankruptcy Judge

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

10524 W. Pico Blvd., Ste. 212, Los Angeles, CA 90064

A true and correct copy of the foregoing document entitled: **NOTICE OF APPEAL AND STATEMENT OF ELECTION** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  <u>TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)</u>**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) _ 09/09/2024 _, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

See next page for CM/ECF list.

☒ Service information continued on attached page

**2.  <u>SERVED BY UNITED STATES MAIL</u>**:
On (*date*) _ 09/09/2024 _, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

The Litigation Practice Group P.C.
17542 17th St
Suite 100
Tustin, CA 92780

☐ Service information continued on attached page

**3.  <u>SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL</u>** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _ 09/09/2024 _, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

Hon. Scott Clarkson
United States Bankruptcy Court
Central District of California
411 West Fourth Street, Suite 5130
Santa Ana, CA 92701-4593

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| 09/09/2024 | Kathleen P. March | /s/ Kathleen P. March |
| *Date* | *Printed Name* | *Signature* |

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):**

- **Kyra E Andrassy**   kandrassy@raineslaw.com, bclark@raineslaw.com;jfisher@raineslaw.com
- **Bradford Barnhardt**   bbarnhardt@marshackhays.com, bbarnhardt@ecf.courtdrive.com,alinares@ecf.courtdrive.com
- **Eric Bensamochan**   eric@eblawfirm.us, G63723@notify.cincompass.com
- **Michael Jay Berger**   michael.berger@bankruptcypower.com, yathida.nipha@bankruptcypower.com;michael.berger@ecf.inforuptcy.com
- **Ethan J Birnberg**   birnberg@portersimon.com, kdwyer@portersimon.com
- **Peter W Bowie**   peter.bowie@dinsmore.com, caron.burke@dinsmore.com
- **Ronald K Brown**   ron@rkbrownlaw.com
- **Christopher Celentino**   christopher.celentino@dinsmore.com, caron.burke@dinsmore.com
- **Shawn M Christianson**   cmcintire@buchalter.com, schristianson@buchalter.com
- **Randall Baldwin Clark**   rbc@randallbclark.com
- **Leslie A Cohen**   leslie@lesliecohenlaw.com, jaime@lesliecohenlaw.com;clare@lesliecohenlaw.com
- **Aaron E. DE Leest**   adeleest@marshackhays.com, adeleest@marshackhays.com,alinares@ecf.courtdrive.com
- **Michael W Davis**   mdavis@dtolaw.com, ygodson@dtolaw.com
- **Anthony Paul Diehl**   anthony@apdlaw.net, Diehl.AnthonyB112492@notify.bestcase.com,ecf@apdlaw.net,9143954420@filings.docketbird.com
- **Ashley Dionisio**   adionisio@omniagnt.com
- **Jenny L Doling**   jd@jdl.law, dolingjr92080@notify.bestcase.com;15994@notices.nextchapterbk.com;jdoling@jubileebk.net
- **Daniel A Edelman**   dedelman@edcombs.com, courtecl@edcombs.com
- **Howard M Ehrenberg**   Howard.Ehrenberg@gmlaw.com, hehrenberg@ecf.courtdrive.com;hehrenberg@ecf.inforuptcy.com;Karen.Files@gmlaw.com;denise.walker@gmlaw.com
- **Meredith Fahn**   fahn@sbcglobal.net
- **Jeremy Faith**   Jeremy@MarguliesFaithlaw.com, Angela@MarguliesFaithLaw.com;Vicky@MarguliesFaithLaw.com;Amber@MarguliesFaithLaw.com
- **William P Fennell**   william.fennell@fennelllaw.com, wpf@ecf.courtdrive.com;hala.hammi@fennelllaw.com;naomi.cwalinski@fennelllaw.com;samantha.larimer@fennelllaw.com;office@fennelllaw.com;Brendan.Bargmann@fennelllaw.com
- **Alan W Forsley**   alan.forsley@flpllp.com, awf@fkllawfirm.com,awf@fl-lawyers.net,addy@flpllp.com
- **Marc C Forsythe**   mforsythe@goeforlaw.com, mforsythe@goeforlaw.com;dcyrankowski@goeforlaw.com;Forsythe.MarcR136526@notify.bestcase.com
- **Jeremy Freedman**   jeremy.freedman@dinsmore.com, bonnie.connolly@dinsmore.com
- **Eric Gassman**   erg@gassmanlawgroup.com, gassman.ericb112993@notify.bestcase.com
- **Christopher Ghio**   christopher.ghio@dinsmore.com, angelica.urena@dinsmore.com
- **Amy Lynn Ginsburg**   efilings@ginsburglawgroup.com
- **Eric D Goldberg**   eric.goldberg@dlapiper.com, eric-goldberg-1103@ecf.pacerpro.com
- **Jeffrey I Golden**   jgolden@go2.law, kadele@ecf.courtdrive.com;cbmeeker@gmail.com;lbracken@wgllp.com;dfitzgerald@go2.law;golden.jeffreyi.b117954@notify.bestcase.com
- **Richard H Golubow**   rgolubow@wghlawyers.com, jmartinez@wghlawyers.com;svillegas@wghlawyers.com
- **David M Goodrich**   dgoodrich@go2.law, kadele@go2.law;dfitzgerald@go2.law;wggllp@ecf.courtdrive.com
- **Spencer Keith Gray**   spencer.gray@dinsmore.com
- **D Edward Hays**   ehays@marshackhays.com, ehays@ecf.courtdrive.com;alinares@ecf.courtdrive.com;cmendoza@marshackhays.com;cmendoza@ecf.courtdrive.com
- **Alan Craig Hochheiser**   ahochheiser@mauricewutscher.com, arodriguez@mauricewutscher.com
- **Garrick A Hollander**   ghollander@wghlawyers.com, jmartinez@wghlawyers.com;svillegas@wghlawyers.com
- **Brian L Holman**   b.holman@musickpeeler.com
- **Richard L. Hyde**   rhyde@awglaw.com
- **Peter L Isola**   pisola@hinshawlaw.com, rmojica@hinshawlaw.com,iking@hinshawlaw.com
- **Razmig Izakelian**   razmigizakelian@quinnemanuel.com
- **Sara Johnston**   sara.johnston@dinsmore.com
- **Sweeney Kelly**   kelly@ksgklaw.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**

- **Joon M Khang**    joon@khanglaw.com
- **Ira David Kharasch**    ikharasch@pszjlaw.com
- **Meredith King**    mking@fsl.law, ssanchez@fsl.law;jwilson@fsl.law
- **Nicholas A Koffroth**    nkoffroth@foxrothschild.com, khoang@foxrothschild.com;ca.dkt@foxrothschild.com
- **David S Kupetz**    David.Kupetz@lockelord.com, mylene.ruiz@lockelord.com
- **Christopher J Langley**    chris@slclawoffice.com,
  langleycr75251@notify.bestcase.com;ecf123@casedriver.com;john@slclawoffice.com
- **Kelli Ann Lee**    Kelli.lee@dinsmore.com, kristy.allen@dinsmore.com
- **Matthew A Lesnick**    matt@lesnickprince.com, matt@ecf.inforuptcy.com;jmack@lesnickprince.com
- **Daniel A Lev**    daniel.lev@gmlaw.com, cheryl.caldwell@gmlaw.com;dlev@ecf.courtdrive.com
- **Britteny Leyva**    bleyva@mayerbrown.com,
  2396393420@filings.docketbird.com;KAWhite@mayerbrown.com;ladocket@mayerbrown.com
- **Marc A Lieberman**    marc.lieberman@flpllp.com, addy@flpllp.com,andrea@flpllp.com
- **Michael D Lieberman**    mlieberman@lipsonneilson.com
- **Yosina M Lissebeck**    Yosina.Lissebeck@Dinsmore.com, caron.burke@dinsmore.com;Wendy.Yones@Dinsmore.com
- **Mitchell B Ludwig**    mbl@kpclegal.com, kad@kpclegal.com
- **Daniel S March**    marchlawoffice@gmail.com, marchdr94019@notify.bestcase.com
- **Kathleen P March**    kmarch@bkylawfirm.com, kmarch3@sbcglobal.net,kmarch@sbcglobal.net
- **Mark J Markus**    bklawr@bklaw.com, markjmarkus@gmail.com;markus.markj.r112926@notify.bestcase.com
- **Richard A Marshack (TR)**    pkraus@marshackhays.com, ecf.alert+Marshack@titlexi.com
- **Laila Masud**    lmasud@marshackhays.com,
  lmasud@ecf.courtdrive.com;lbuchanan@marshackhays.com;alinares@ecf.courtdrive.com
- **Sarah S. Mattingly**    sarah.mattingly@dinsmore.com
- **William McCormick**    Bill.McCormick@ag.tn.gov
- **Kenneth Misken**    Kenneth.M.Misken@usdoj.gov
- **Byron Z Moldo**    bmoldo@ecjlaw.com, aantonio@ecjlaw.com,dperez@ecjlaw.com
- **Glenn D. Moses**    gmoses@venable.com, cascavone@venable.com;jpmalcolm@venable.com;jadelgado@venable.com
- **Jamie D Mottola**    Jamie.Mottola@dinsmore.com, jhanawalt@ecf.inforuptcy.com
- **Alan I Nahmias**    anahmias@mbn.law, jdale@mbn.law
- **Victoria Newmark**    vnewmark@pszjlaw.com
- **Queenie K Ng**    queenie.k.ng@usdoj.gov
- **Israel Orozco**    israel@iolawcorp.com
- **Keith C Owens**    kowens@foxrothschild.com, khoang@foxrothschild.com
- **Lisa Patel**    lpatel@lesnickprince.com, jmack@lesnickprince.com;jnavarro@lesnickprince.com
- **Michael R Pinkston**    rpinkston@seyfarth.com,
  jmcdermott@seyfarth.com,sfocalendar@seyfarth.com,5314522420@filings.docketbird.com;bankruptcydocket@seyfarth.com
- **Douglas A Plazak**    dplazak@rhlaw.com
- **Tyler Powell**    tyler.powell@dinsmore.com, jennifer.pitcock@dinsmore.com;caitlin.brock@dinsmore.com
- **Daniel H Reiss**    dhr@lnbyg.com, dhr@ecf.inforuptcy.com
- **Ronald N Richards**    ron@ronaldrichards.com, 7206828420@filings.docketbird.com
- **Vanessa Rodriguez**    vanessa.rodriguez@dinsmore.com, angelica.urena@dinsmore.com
- **Kevin Alan Rogers**    krogers@wellsmar.com
- **Gregory M Salvato**    gsalvato@salvatolawoffices.com,
  calendar@salvatolawoffices.com;jboufadel@salvatoboufadel.com;gsalvato@ecf.inforuptcy.com
- **Olivia Scott**    olivia.scott@hklaw.com
- **Jonathan Serrano**    jonathan.serrano@dinsmore.com
- **Maureen J Shanahan**    Mstotaro@aol.com
- **Paul R Shankman**    PShankman@fortislaw.com, info@fortislaw.com
- **Zev Shechtman**    Zev.Shechtman@saul.com, zshechtman@ecf.inforuptcy.com;hannah.richmond@saul.com
- **Jeffrey M Singletary**    jsingletary@swlaw.com, rmckay@swlaw.com
- **Leslie Skorheim**    leslie.skorheim@usdoj.gov
- **Adam D Stein-Sapir**    info@pfllc.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

- **Howard Steinberg**    steinbergh@gtlaw.com, pearsallt@gtlaw.com;NEF-BK@gtlaw.com;howard-steinberg-6096@ecf.pacerpro.com
- **John H. Stephens**    john.stephens@dinsmore.com, lizbeth.alonso@dinsmore.com
- **Andrew Still**    astill@swlaw.com, kcollins@swlaw.com
- **Matthew J Stockl**    matthew.stockl@dinsmore.com, katrice.ortiz@dinsmore.com
- **Michael R Totaro**    Ocbkatty@aol.com
- **United States Trustee (SA)**    ustpregion16.sa.ecf@usdoj.gov
- **William J Wall**    wwall@wall-law.com
- **Sharon Z. Weiss**    sharon.weiss@bclplaw.com, raul.morales@bclplaw.com,REC_KM_ECF_SMO@bclplaw.com
- **Johnny White**    JWhite@wrslawyers.com, jlee@wrslawyers.com
- **Reina Zepeda**    rzepeda@omniagnt.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.