YOSINA M. LISSEBECK (201654)
Yosina.Lissebeck@dinsmore.com
JACOB R. BOTHAMLEY (319457)
Jacob.Bothamley@dinsmore.com
**DINSMORE & SHOHL LLP**
655 West Broadway, Suite 800
San Diego, California 92101
Tele: 619.400.0500
Fax:  619.400.0501

Special Counsel to Richard A. Marshack,
Chapter 11 Trustee For The Bankruptcy Estate
Of The Litigation Practice Group P.C. and Liquidating
Trustee of the LPG Liquidation Trust

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>THE LITIGATION PRACTICE GROUP P.C.,<br><br>    Debtor. | Case No. 8:23-bk-10571-SC<br><br>Chapter 11<br><br>Adv. Proc. No. _____<br><br>**COMPLAINT FOR:** |
| RICHARD A. MARSHACK,<br>Chapter 11 Trustee For The Bankruptcy Estate<br>Of The Litigation Practice Group P.C. and<br>Liquidating Trustee of the LPG Liquidation<br>Trust<br><br>    Plaintiff,<br><br>    v.<br><br>NEW VISION DEBT LLC; NEW VISION<br>CAPITAL GROUP, LLC D/B/A NEW<br>VISION DEBT RELIEF LLC; NEW VISION<br>DEBT RELIEF, LLC; NEW VISION DEBT<br>RELIEF – 2; NEW VISION – 3; NEW<br>VISION – 6.<br><br>    Defendants. | **(1) AVOIDANCE, RECOVERY, AND PRESERVATION OF 2-YEAR ACTUAL FRAUDULENT TRANSFERS;**<br><br>**(2) AVOIDANCE, RECOVERY, AND PRESERVATION OF 2-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS;**<br><br>**(3) AVOIDANCE, RECOVERY, AND PRESERVATION OF 4-YEAR ACTUAL FRAUDULENT TRANSFERS;**<br><br>**(4) AVOIDANCE, RECOVERY, AND PRESERVATION OF 4-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS;**<br><br>**(5)  AVOIDANCE, RECOVERY AND PRESERVATION OF PREFERENTIAL TRANSFER MADE WITHIN NINETY DAYS OF THE PETITION DATE;** |



**(6) AVOIDANCE, RECOVERY, AND PRESERVATION OF UNAUTHORIZED POST-PETITION TRANSFERS;**

**(7) TURNOVER; AND**

**(8) DISALLOWANCE OF CLAIMS**

Place:      Courtroom 5C
            411 West Fourth Street
            Santa Ana, California 92701

Judge:      Hon. Scott C. Clarkson

For his *Complaint for (1) Avoidance, Recovery, and Preservation of 2-Year Actual Fraudulent Transfers; (2) Avoidance, Recovery, and Preservation of 2-Year Constructive Fraudulent Transfers; (3) Avoidance, Recovery, and Preservation of 4-Year Actual Fraudulent Transfers; (4) Avoidance, Recovery, and Preservation of 4-Year Constructive Fraudulent Transfers; (5) Avoidance, Recovery, and Preservation of Preferential Transfer; and (6) Avoidance, Recovery, and Preservation of Unauthorized Post-Petition Transfers; (7) Turnover; and (8) Disallowance of Claims* ("Complaint"), plaintiff Richard A. Marshack, the Chapter 11 Trustee For The Bankruptcy Estate of The Litigation Practice Group P.C. and Liquidating Trustee of the LPG Liquidation Trust ("Trustee" or "Plaintiff") for the bankruptcy estate ("Estate") of debtor The Litigation Practice Group P.C. ("Debtor" or "LPG") in the above-captioned bankruptcy case ("Bankruptcy Case"), alleges and avers as follows:

## STATEMENT OF JURISDICTION, NATURE OF PROCEEDING, AND VENUE

1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E), (H) and (O), 1334(b), and General Order No. 13-05 of the District Court for the Central District of California because this is a core proceeding arising in and/or related to the Bankruptcy Case, which is a case under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code"), and which is pending in the United States Bankruptcy Court for the Central District of California, Santa Ana Division ("Bankruptcy Court").

2.      Regardless of whether this proceeding is core, non-core, or otherwise, Plaintiff consents to the entry of a final order and judgment by the Bankruptcy Court.

3.      Defendants is notified that Rule 7008 of the Federal Rules of Bankruptcy Procedure requires Defendants to plead whether consent is given to the entry of a final order and judgment by the Bankruptcy Court.

4.      Venue of this adversary proceeding properly lies in this judicial district pursuant to 28 U.S.C. § 1409(a) because this proceeding is related to Debtor's pending Bankruptcy Case.

## THE PARTIES

5.      Plaintiff, Richard A. Marshack, is the duly-appointed, qualified, and acting Chapter 11 Trustee of Debtor's Estate and Liquidating Trustee of the LPG Liquidation Trust.

6.      Debtor is, and at all material times was, a professional corporation organized, existing, and in good standing under the laws of the State of California, with its principal place of business in Tustin, California.

7.      Defendant, New Vision Debt LLC ("New Vision"), is, and at all material times represented that it was, a limited liability company, existing under the laws of the State of Wyoming.[1]

8.      Related entity, New Vision Capital Group, LLC ("NVCG"), is, and at all material times represented that it was, a limited liability company, existing under the laws of the State of California. According to NVCG's Operating Agreement dated August 1, 2022, NVCG does business as "New Vision Debt Relief LLC" ("NVDR").[2] A true and correct copy of the NVCG Operating Agreement is attached hereto as **Exhibit 1** and incorporated herein. Trustee is also aware of other entities bearing the New Vision moniker such as New Vision 2 (or New Vision Debt Relief – 2), New Vision 3, and New Vision 6. Trustee believes these additional entities are alternate business names for NVCG or New Vision as the case may be. New Vision and NVCG, along with NVCG's alternate business names may also be collectively referred to as "Defendants".

---

[1] According to the California Secretary of State Website, there is also an entity called "New Vision Debt Inc.", which lists Sarvenaz Esfahani as the registered agent. This entity also shares the same address as defendant, New Vision Capital Group, LLC. However, the transfers of funds subject to this complaint were all paid to New Vision Debt *LLC*, which is why the LLC is the named defendant.

[2] For purposes of this complaint, New Vision Capital Group, LLC ("NVCG") and New Vision Debt Relief LLC ("NVDR") are interchangeable.

9.      New Vision may be served by first class mail postage prepaid upon its registered agent for service of process, Registered Agents Inc. which lists on its website an address in Sheridan, Wyoming of 30 N. Gould Street, Ste. R, Sheridan, Wyoming 82801. New Vision's listed principal address according to the California Secretary of State website is 1401 21st Street, Ste. R, Sacramento, CA 95811.

10.     NVCG's address is listed on the California Secretary of State website as 3857 Birch Street #25, Newport Beach, California 92660, but may be served by first class mail postage prepaid upon its registered agent for service of process, Incorp Services, Inc. and agent, Steven Pickett at 5716 Corsa Ave Suite 110, Westlake Village, California 91362.

## GENERAL ALLEGATIONS

### A.      The Bankruptcy Case

11.     On March 20, 2023 ("Petition Date"), Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, commencing the Bankruptcy Case.

12.     The Office of the United States Trustee ("UST") filed its *Motion by United States Trustee to Dismiss or Convert Case Pursuant to 11 U.S.C. § 1112(b)* [Bankr. Docket No. 21] and creditors Debt Validation Fund II, LLC; MC DVI Fund 1, LLC; and MC DVI Fund 2, LLC filed the *Motion by DVF and MC DVI to Dismiss Chapter 11 Case Pursuant to 11 U.S.C. §§ 105, 305, 349, & 1112, or in the Alternative Convert This Case to Chapter 7 or Appoint a Trustee* [Bankr. Docket No. 44]. On May 4, 2023, the Court entered its *Order Directing United States Trustee to Appoint Chapter 11 Trustee* [Bankr. Docket No. 58].

13.     Pursuant to the *Acceptance of Appointment as Chapter 11 Trustee* [Bankr. Docket No. 63], on May 8, 2023, Trustee accepted his appointment as the Chapter 11 Trustee in the Bankruptcy Case, and he continues to serve in this capacity at this time. The Court approved the Trustee's appointment in its *Order Approving the U.S. Trustee's Application for the Appointment of a Chapter 11 Trustee* [Docket No. 65].

14.     Trustee was not appointed until after events of the case and, therefore, bases these allegations on information and belief. *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) ("The *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts

alleged upon information and belief where the facts are peculiarly within the possession and control of the Defendants or where the belief is based on factual information that makes the inference of culpability plausible."); *Miller v. City of Los Angeles*, 2014 U.S. Dist. LEXIS 198871, 2014 WL 12610195, at *5 (C.D. Cal. Aug. 7, 2014) (recognizing that the plaintiff's "information and belief" pleading was allowed and "necessary at times"); *see also Mireskandari v. Daily Mail and General Trust PLC*, 2013 U.S. Dist. LEXIS 194437, 2013 WL 12129642, at *4 (C.D. Cal. July 31, 2013) ("The Federal Rules of Civil Procedure allow parties to plead facts on 'information and belief' if the facts 'will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.'" (citations omitted)).

15.    Plaintiff brings this action solely in his capacity as the Chapter 11 Trustee for the benefit of Debtor's Estate and its creditors.

**B.    Protective Order**

16.    On or about May 2, 2024, Plaintiff filed that certain Notice and Motion for Entry of Protective Order (the "Protective Order Motion"). On June 3, 2024, the Court entered its Order Granting Motion for Entry of Protective Order and the Protective Order [Docket No. 1270] (the "Protective Order"). A true and accurate copy of the Protective Order is attached as **Exhibit 2** and incorporated here.

17.    By its own terms, the Protective Order applies to this adversary proceeding and governs all discovery conducted herein.

**C.    LPG**

18.    LPG operated a law firm for consumers across the country who sought assistance in contesting or resolving debts they would identify.

19.    The consumers would pay LPG over a period of time via monthly debits from their bank accounts.

20.    The monthly payments were meant to cover all legal services LPG provided to the consumers including validation of the debts, review of documents to determine enforceability, and court appearances to halt lawsuits to obtain judgments.

21.     In certain instances, LPG would file a lawsuit in an effort to eliminate a disputed debt or to prosecute affirmative claims held by the consumers.

22.     LPG mismanaged the consumers' monthly payments.

23.     To obtain consumer clients, LPG contracted with marketing companies, who engaged in illegal capping.

24.     The marketing companies would advertise to or call to solicit them to become clients of LPG.

25.     The marketing affiliate went so far as to assist with the execution of an engagement letter between the consumer and LPG.

26.     In exchange, LPG agreed to pay the marketing affiliates a percentage the monthly payments collected by LPG from the consumers.

27.     Because LPG received payments from consumers over time, it often sought financing by borrowing against its future cash flows. This borrowing was not only used to finance operations at LPG, but also to pay the fees owed to the marketing companies for providing the client referrals.

28.     Many of the documents executed in connection with such financing described the transactions as account receivable purchase agreements.

**D.      Defendants**

29.     Defendants were marketing companies that procured clients for LPG.

30.     LPG agreed to pay, and in fact paid, Defendants a portion of the monthly payments received from consumers referred by Defendants.

31.     New Vision also entered into agreements pursuant to which it purported to purchase accounts receivable from LPG. Pursuant to these agreements, Debtor purported to sell to New Vision a portion of its income stream.

**i.      Affiliate Agreements**

32.     On or about October 20, 2022, Debtor entered into an affiliate agreement with New Vision ("Affiliate Agreement 1") signed by Sania Hashempour for New Vision on October 24, 2022. A true and accurate copy of Affiliate Agreement 1 is attached as **Exhibit 3** and incorporated here.

33.      Also on or about October 20, 2022, Debtor entered into an affiliate agreement with New Vision ("Affiliate Agreement 2") signed by Sarvanez Moarefian for New Vision on October 27, 2022. A true and accurate copy of the Affiliate Agreement 2 is attached as **Exhibit 4** and incorporated here.

34.      Aside from the different signatories for New Vision are the differing dates of the signatures on the last page of both affiliate agreements, which is titled "Electronic Funds Transfer Authorization". This portion of Affiliate Agreement 1 was signed by Sania Hashempour on October 24, 2022. (*See* **Exhibit 3**, p. 5.) By contrast, this portion of Affiliate Agreement 2 was signed by Sarvanez Moarefian on October 27, 2022. (*See* **Exhibit 4**, p. 5.) It is unclear which of these two affiliate agreements is or was operative, but for purposes of this complaint, it makes no difference.

35.      According to the NVCG Operating Agreement, NVCG's purpose is to "Act as an Affiliate to LPG (Litigation Practice Group)…" (*See* **Exhibit 1**, p. 1, § 1.3.) In connection with being an affiliate of LPG, the Operating Agreement makes reference to a signed and executed "Affiliate Contract" that is purportedly attached to the Operating Agreement. However, that "Affiliate Contract" does not appear attached to the version in Trustee's possession. In any case, based on the foregoing, Trustee believes such an affiliate contract does exist and will be produced in discovery.

36.      The New Vision Affiliate Agreements state that New Vision "owns and operates a system of generating leads consisting of consumers interested in the legal services offered by LPG." (*See* **Exhibit 3** & **Exhibit 4**.)

37.      The NVCG Operating Agreement also states that NVCG "owns and operates a system of generating leads consisting of consumers interested in the legal services referenced by signed and executed Affiliate Contracts… in this Limited Liability Operating Agreement." (*See* **Exhibit 1**, pp. 1-2, § 1.3.)

38.      Pursuant to the New Vision Affiliate Agreements, New Vision generated leads consisting of consumers interested in the legal services offered by LPG and referred those consumers to Debtor. (*See* **Exhibit 3** and **Exhibit 4**.) Trustee expects that the NVCG Affiliate Contract will contain similar language.

39.     New Vision went so far as to assist with the execution of an engagement letter with the consumer. (*See* **Exhibit 3** and **Exhibit 4**.) Trustee expects that the NVCG Affiliate Contract will contain similar language.

40.     Pursuant to the New Vision Affiliate Agreements, Debtor agreed to pay New Vision as follows:

> LPG shall pay 85% per file for each file that Affiliate places with LPG, not counting the monthly maintenance fee of $31.46 (15% of the $76.38 plus $20), which LPG shall retain to cover administrative costs for each file. LPG shall calculate the amount of each file, apply the above-identified percentage fee, and remit the same to Affiliate pursuant to an agreed-upon schedule not to exceed one remittance per seven (7) calendar days. If any consumer cancels LPG's services, or demands a refund for payment for such services, or both, then LPG shall be solely responsive [*sic*] for such cost and Affiliate shall not have to share such expenses.

(*See e.g.*, **Exhibit 3**, ¶ 6.)

41.     The Affiliate Agreements violate Sections 6151 and 6155 of the California Business and Professional Code, which prohibit referrals of potential clients to attorneys unless registered with the State Bar of California. CAL. BUS. & PROF. CODE § 6155. "Referral activity" includes "any entity 'which, in person, electronically, or otherwise, refers the consumer to an attorney or law firm not identified' in the advertising." *Jackson v. LegalMatch.com*, 42 Cal. App. 5th 760, 775 (2019). A referral includes receiving information from potential clients and sending that information to lawyers, even when the advertiser does not advertise the name of the attorneys and the clients do not clear the name of the potential attorney after the referral occurred. *Id.*

42.     Further, if any effect of an agreement is to accomplish an unlawful purpose, the agreement may be declared illegal regardless of the intention of the parties. *Stockton Morris Plan Co. v. Cal. Tractor & Equip. Corp.*, 112 Cal. App. 2d 684, 690 (1952) (citing *Fewel & Dawes, Inc. v. Pratt*, 17 Cal. 2d 85, 91 (1941)). This remains true regardless of whether the contract has been performed. *Stevens v. Boyes Hot Springs Co.*, 113 Cal. App. 479, 483 (1931) (A contract by a corporation to purchase its own stock has the effect of illegally withdrawing and paying to a stockholder a part of the capital stock of the corporation and is illegal and void, regardless of the fact that the contract is fully performed by the sellers and partially performed by the corporation.);

*Mansfield v. Hyde*, 112 Cal. App. 2d 133, 139 (1952), overruled, *Fomco, Inc. v. Joe Maggio, Inc.*, 8 Cal. Rptr. 459 (1960) (Where object of statute requiring licenses is to prevent improper persons from engaging in particular activity, or is for purpose of regulating occupation or business for protection of public, imposition of penalty amounts to prohibition against engaging in occupation or business without license, and contract made by unlicensed person in violation of statute is invalid.); *Firpo v. Murphy*, 72 Cal. App. 249, 252 (1925) (A contract to pay commissions to a real estate broker is illegal and he is not entitled to recover thereon where he fails to secure the license required by law to carry on his business.).

43.    Because the Affiliate Agreements violate federal and state law, they are void, unenforceable, and subject to avoidance as fraudulent. Any alleged consideration provided to Debtor under the Account Receivable Purchase Agreement (defined below) was unlawful.

44.    Unlawful consideration is that which is: "(1) contrary to an express provision of law; (2) contrary to the policy of express law, though not expressly prohibited; or (3) otherwise contrary to good morals." Cal. Civ. Code § 1667. "If any part of a single consideration for one or more objects, or of several considerations for a single object, is unlawful, the entire contract is void." Cal. Civ. Code § 1608.

### ii.    Account Receivable Purchase Agreements

### 1.    New Vision Account Receivable Purchase Agreement

45.    On or about November 24, 2022, New Vision entered into an Account Receivable Purchase Agreement ("ARPA") with Debtor and MRD Marketing LLC. A true and accurate copy of the ARPA is attached as **Exhibit 5** and incorporated here.

46.    Pursuant to the ARPA, Debtor purported to sell New Vision streams of monthly payments from consumers that were supposed to be held in trust until earned. (*See* **Exhibit 5**.)

### 2.    NVCG ARPAs

47.    On or about August 25, 2022, NVCG entered into an ARPA with ProofPositive LLC with ProofPositive LLC as the buyer and NVCG as the seller (ARPA 2). A true and accurate copy of ARPA 2 is attached as **Exhibit 6** and incorporated here.

48.    On or about August 26, 2022, NVCG entered into an ARPA with ProofPositive LLC with ProofPositive LLC as the buyer and NVCG as the seller (ARPA 3). A true and accurate copy of ARPA 2 is attached as **Exhibit 6.1** and incorporated here.

49.    As far as can be determined, the main difference between these two ARPAs is the total purchased accounts. For the ARPA dated August 25, 2022, 500 accounts were to be purchased for $500 per account ($250,000). By contrast, for the ARPA dated August 26, 2022, 200 accounts were to be purchased for $500 per account ($100,000). (*See* Section 2.3 of **Exhibit 6** and **Exhibit 6.1**.)

### 3.    NVDR ARPA

50.    On or about January 13, 2023, NVDR entered into an ARPA with ProofPositive LLC with ProofPositive LLC as the buyer and NVDR as the seller. ("ARPA 4"). This ARPA was likely never executed because it lacks signatures. A true and accurate copy of ARPA 4 is attached as **Exhibit 7** and incorporated here.

### 4.    "New Vision 2" ARPA

51.    On or about August 29, 2022, "New Vision 2" entered into an ARPA with ProofPositive LLC. An individual identified as Serj Guetssoyan signed the ARPA on behalf of New Vision 2. Mr. Guetssoyan is known to Trustee as, *inter alia*, the husband of Sania Hashempour, one of the named principals of New Vision. A true and accurate copy of the New Vision 2 ARPA is attached as **Exhibit 8** and incorporated here.

52.    Furthermore, Trustee is also in possession of a copy of a void ARPA between ProofPositive LLC and New Vision 2 dated, October 13, 2022. In this void agreement, the wire instructions on the final page lists New Vision as the account holder and New Vision's Newport Beach address. As mentioned above, Trustee believes that the New Vision 2 entity is likely just an alternate dba for NVCG. A true and accurate copy of the voided New Vision 2 ARPA with ProofPositive LLC is attached as **Exhibit 9** and incorporated herein.

53.    By entering into the ARPAs, Debtor and Defendants violated federal and state laws by selling unearned legal fees or funds that were supposed to be held in trust or used for the benefit of consumers.

54.     The effect of the ARPAs was to accomplish an unlawful purpose. Thus, the agreement may be declared illegal regardless of the intention of the parties. *Stockton Morris Plan Co. v. Cal. Tractor & Equip. Corp.*, 112 Cal. App. 2d 684, 690 (1952) (citing *Fewel & Dawes, Inc. v. Pratt*, 17 Cal. 2d 85, 91 (1941)). This remains true regardless of whether the contract has been performed. *Stevens v. Boyes Hot Springs Co.*, 113 Cal. App. 479, 483 (1931) (A contract by a corporation to purchase its own stock has the effect of illegally withdrawing and paying to a stockholder a part of the capital stock of the corporation and is illegal and void, regardless of the fact that the contract is fully performed by the sellers and partially performed by the corporation.); *Mansfield v. Hyde*, 112 Cal. App. 2d 133, 139 (1952), overruled, *Fomco, Inc. v. Joe Maggio, Inc.*, 8 Cal. Rptr. 459 (1960) (Where object of statute requiring licenses is to prevent improper persons from engaging in particular activity, or is for purpose of regulating occupation or business for protection of public, imposition of penalty amounts to prohibition against engaging in occupation or business without license, and contract made by unlicensed person in violation of statute is invalid.);  *Firpo v. Murphy*, 72 Cal. App. 249, 252 (1925) (A contract to pay commissions to a real estate broker is illegal and he is not entitled to recover thereon where he fails to secure the license required by law to carry on his business.).

55.     Because the ARPAs violate federal and state laws, they are void, unenforceable, and subject to avoidance as fraudulent. Any alleged consideration provided to Debtor under the ARPAs was unlawful.

56.      Unlawful consideration is that which is: "(1) contrary to an express provision of law; (2) contrary to the policy of express law, though not expressly prohibited; or (3) otherwise contrary to good morals." Cal. Civ. Code § 1667. "If any part of a single consideration for one or more objects, or of several considerations for a single object, is unlawful, the entire contract is void." Cal. Civ. Code § 1608.

**D.     Payments to Defendants**

57.     During the applicable reach-back period for fraudulent transfers, Debtor paid New Vision the sum of at least $344,791.38 between October 2022 and February 2023 ("New Vision Transfers"). A true and accurate list of the known payments made by Debtor to New Vision is

1    attached as **Exhibit 10** and incorporated here.

2        58.    During the applicable reach-back period for fraudulent transfers, Debtor paid NVCG

3    the sum of at least $627,170.52 between July 2021[3] and February 2023 ("NVCG Transfers"). A true

4    and accurate list of the known payments made by Debtor to NVCG is attached as **Exhibit 11** and

5    incorporated here.

6        59.    Finally, during the applicable reach back period for fraudulent transfers, Debtor paid

7    NVDR the sum of at least $156,012.14 between December of 2021 and February of 2023. A true

8    and accurate list of the known payments made by Debtor to NVCG is attached as **Exhibit 12** and

9    incorporated here. It should be noted that according to the notes on Debtor's transaction dated

10   February 9, 2023, this transfer was to "New Vision Debt Relief – 2". (*See* **Exhibit 12**.) However,

11   as noted, NVDR is a dba for NVCG, so those sums are properly combined, for a total of at least

12   **$783,182.66**.

13       60.    Trustee's records also indicate that an entity called "New Vision 6" received

14   $1,441.18 in pre-petition transfers within 4 years of the Petition Date. A true and accurate list of

15   transfers to New Vision 6 is attached as **Exhibit 13** and incorporated herein (Collectively, these

16   transfers along with the transfers to New Vision, NVCG, and the related entities are the "Transfers"

17   and total **$1,129,415.22**).

18                    **i.    The Preference Letters**

19       61.    On or about September 15, 2023, the Trustee sent a letter to New Vision (though

20   addressed to "New Vision Debt **Relief, LLC**" (the "Preference Letter") seeking to avoid litigation

21   by identifying suspected preferential transfers (i.e., transfers to New Vision from Debtor falling

22   within the 90-day preference window provided in 11 U.S.C. § 547) and offering an opportunity for

23   New Vision to come forward with any defenses or exculpatory information it might have. The

24   Preference Letter also included settlement terms relating to those suspected preferential transfers. A

25   true and accurate copy of the Preference Letter is attached hereto as **Exhibit 14** and incorporated

26

27   ---
     [3] Trustee is also aware of the possibility that additional transfers occurred prior to July 2021, and

28   may have come from an entity related to Debtor called BAT, LLC using funds from Debtor.
     Trustee's investigation into the possible additional transfers remains ongoing.

herein.

62.     The transfers to New Vision inside the 90-day preference window total at least $165,381.29. A true and accurate list of the presently known payments made by Debtor to New Vision inside the 90-day preference period is attached as **Exhibit 15** and incorporated herein.

63.     Also on or about September 15, 2023, the Trustee sent a letter to NVCG (the "Preference Letter 2" and collectively the "Preference Letters") with substantively identical terms as the Preference Letter above. A true and accurate copy of Preference Letter 2 is attached hereto as **Exhibit 16** and incorporated herein.

64.     The transfers to NVCG inside the 90-day preference window total at least $73,597.07. A true and accurate list of the presently known payments made by Debtor to NVCG inside the 90-day preference period is attached as **Exhibit 17** and incorporated herein.

65.     At least one payment inside the 90-day preference period was made to "New Vision Debt Relief – 2" for $17,219.01. Added to the transfers to NVCG, the total is $90,816.08. A true and accurate list of the presently known payments made by Debtor to "New Vision Debt Relief – 2" inside the 90-day preference period is attached as **Exhibit 18** and incorporated herein.

66.     At least one payment inside the 90-day preference period was made to "New Vision 6" for $1,441.18. A true and accurate lists of transfers to New Vision 6 inside the 90-day preference period is attached as **Exhibit 19** and incorporated herein. (Collectively with the New Vision and NVCG preference window transfers, "Preference Transfers"). In sum, these Preference Transfers total at least **$257,638.55**.

67.     On October 6, 2023, counsel for both New Vision and NVCG responded to the Preference Letter indicating the intent of both entities to raise affirmative defenses. Importantly, counsel for both entities confirmed their relatedness. A true and accurate copy of the Defendants' response to the Preference Letters is attached as **Exhibit 20** and incorporated herein.

###     ii.     Post-Petition Transfers

68.     Trustee is aware of at least one post-petition payment made to NVCG in the amount of $20,000 ("Post-Petition Transfers"). A true and accurate list of post-petition transfers to NVCG is attached as **Exhibit 21** and incorporated herein. As the investigation into Debtor remains ongoing,

additional post-petition transfers to Defendants may be discovered.

### E.    LPG's Ponzi Scheme

69.    Debtor was running a Ponzi scheme that utilized the Defendants as investors and the Debtor attracted new investors by making Transfers to them using the funds provided by another investor, thereby continuing the Ponzi scheme with each new investor that the Debtor could find.

### F.    LPG's Prepetition Creditors

70.    Debtor was insolvent when the Transfers were made. This insolvency is evidenced in part by the fact that 14 separate UCC-1 statements were of record securing debts of the Debtor as of September 1, 2022. These statements remained unreleased as of the Petition Date. These statements either reflected secured liens against the Debtor's assets then owned or thereafter acquired, or provided evidence of the assignment or sale of substantial portions of the Debtor's future income.

71.    When the Transfers were made, these prior UCC-1 statements secured the repayment of the following claimed amounts that are currently known to Trustee and are allegedly owed by the Debtor: (i) $2,374,004.82 owed to Fundura Capital Group as evidenced by Proof of Claim No. 335 purportedly secured by a UCC statement filed on or about May 19, 2021; (ii) approximately $15 million owed to MNS Funding, LLC as evidenced by Proof of Claim No. 1060 purportedly secured by a UCC statement filed on or about May 28, 2021; (iii) approximately $5,000,000 owed to Azzure Capital, LLC as evidenced by Proof of Claim No. 127 secured by a UCC statement filed on or about May 28, 2021; and (iv) approximately $1.5 million owed to Diverse Capital, LLC purportedly secured by UCC statements filed on or about September 15, 2021, and December 1, 2021.[4]

72.    As alleged above, LPG was borrowing against its assets and future income, often on unfavorable terms, not only to finance operations at LPG but also to pay the fees owed to the marketing affiliates for providing it with consumer clients. Pursuant to the agreements with the marketing companies, significant percentages of future payments were already promised to be paid

---

[4] Trustee reserves all rights, claims, and defenses with respect to these and any other purported secured or unsecured claims.

to the marketing affiliates from whatever future income the Debtor would receive.

73.     In addition, on Debtor's Schedule E/F [Bankr. Docket No. 33], Debtor scheduled 11 unsecured creditors with priority unsecured claims totaling $374,060.04. These priority unsecured creditors include Indiana Dept. of Revenue, Dept. of Labor and Industries, Arizona Dept. of Economic Security, Arkansas Dept. of Finance & Admin., California Franchise Tax Board, Georgia Dept. of Labor, Internal Revenue Service, Mississippi Dept. of Revenue, Nevada Dept. of Taxation, Utah State Tax Commission, and Wisconsin Dept. of Revenue (collectively, "Priority Unsecured Creditors").

74.     Another group of creditors that Debtor listed on its Schedule E/F [Bankr. Docket No. 33] are nonpriority unsecured creditors. Those 58 creditors have scheduled claims totaling $141,439,158.05 and include Ajilon; Anthem Blue Cross; Azevedo Solutions Groups, Inc.; Carolina Technologies & Consulting Invoice; Collaboration Advisors; Credit Reporting Service Inc.; CT Corporation – Inv.; Debt Pay Pro; Document Fulfillment Services; EnergyCare, LLC; Exela Enterprise Solutions; First Legal Network, LLC; GHA Technologies Inc.; Harrington Electric, Inc.; Imagine Reporting; Juize, Inc.; Krisp Technologies, Inc.; Liberty Mutual; Marc Lemauviel – Allegra; MarkSYS Holdings, LLC; Netsuite-Oracle; Pitney Bowes; Rapid Credit, Inc.; SBS Leasing A Program of De Lage Landen; Security Solutions; Sharp Business Systems; Streamline Performance, Inc.; Thomson Reuters; Twilio, Inc.; Nationwide Appearance Attorneys; Executive Center, LLC; Outsource Accelerator, Ltd.; TaskUs Holdings, Inc.; Marich Bein, LLC; Validation Partners; MC DVI Fund 1, LLC; MC DVI Fund 2, LLC; Debt Validation Fund II, LLC; Tustin Executive Center; LexisNexus; JP Morgan Chase; Business Centers of America; Michael Schwartz; Anibal Colon Jr.; Kathleen Lacey; David Ulery; Kimberly Birdsong; Kevin Carpenter; Karen Suell; Gloria Eaton; Carolyn Beech; Debra Price; Kenneth Topp; Darcey Williamson, Trustee; James Hammett; Johnny Rizo; Beverly Graham; Kathleen Scarlett; and Geneve and Myranda Sheffield (collectively, "Nonpriority Unsecured Creditors" and, together with the Secured Creditors and Priority Unsecured Creditors, "Prepetition Creditors").

/ / /

/ / /

**<u>FIRST CLAIM FOR RELIEF</u>**

**Avoidance, Recovery, and Preservation of Actual Fraudulent Transfers**

**[11 U.S.C. §§ 548(a)(1)(A), 550, and 551]**

**[Against All Defendants]**

75.     Plaintiff re-alleges and incorporates here by reference each and every allegation contained in paragraphs 1 through 74 as though set forth in full.

76.     The Affiliate Agreements, ARPAs, and all or a portion of the Transfers occurred within the two years prior to the Petition Date. However, as Trustee is likely not in possession of all relevant documentation between Debtor and Defendants, it is possible that additional transfers will be discovered.

77.     On or after the date that such agreements were executed and the Transfers were made, entities to which Debtor was or became indebted include the Prepetition Creditors. Based upon to totality of the circumstances, Trustee believes the Transfers were part of a scheme to hinder, delay, and/or defraud the Prepetition Creditors.

78.     The Transfers happened while Debtor was insolvent or rendered Debtor insolvent.

79.     Despite Debtor's obligation to the Prepetition Creditors, Debtor continued to pay Defendants sums received from consumers under the Affiliate Agreements, which constitute illegal capping agreements between Defendants and Debtor. Any obligation of the Debtor arising from such agreement is also avoidable as fraudulent.

80.     Despite Debtor's obligation to the Prepetition Creditors, Debtor continued to sell or transfer portions of its accounts receivable to Defendants, which is illegal under federal and state laws.

81.     Because the referrals from Defendants to Debtor are illegal under federal and state law, they are void. Moreover, any purported consideration constitutes unlawful consideration, which cannot constitute reasonably equivalent value. Thus, at the time the agreements were executed and the Transfers made, Debtor received less than reasonably equivalent value.

82.     The Transfers were made with actual intent to hinder, delay, or defraud creditors of Debtor.

83.     The Debtor's conduct was done with oppression, fraud, and malice, as defined in Civil Code section 3294, entitling the Trustee to, in addition to the actual damages, exemplary or punitive damages for making an example of the Debtor and to punish the Debtor.

84.     The Affiliate Agreements, ARPAs, and the Transfers of Debtor's funds are avoidable as fraudulent pursuant to 11 U.S.C. §§ 548(a)(1)(A), 550, 551, and the common law tort of intentional fraudulent transfers by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against his Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

85.     The Affiliate Agreements, ARPAs, and the Transfers should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(A) and under the common law tort of intentional fraudulent transfers and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

## SECOND CLAIM FOR RELIEF

**Avoidance, Recovery, and Preservation of Constructive Fraudulent Transfers**

**[11 U.S.C. §§ 548(a)(1)(B), 550, and 551]**

**[Against All Defendants]**

86.     Plaintiff re-alleges and incorporates here by reference each and every allegation contained in paragraphs 1 through 85 as though set forth in full.

87.     The Affiliate Agreements, ARPAs, and all or a portion of the Transfers occurred within the two years prior to the Petition Date. However, as Trustee is likely not in possession of all relevant documentation between Debtor and Defendants, it is possible that additional transfers will be discovered.

88.     On or after the date that such agreements were executed and such transfers were made, entities to which Debtor was or became indebted include the Prepetition Creditors.

89.     The Transfers happened while Debtor:

    a.  was insolvent or became insolvent was a result;

    b.  was engaged or was about to engage in a transaction for which any property

1      remaining with Debtor was of unreasonably small capital; or

2          c.   intended to incur, or believed that it would incur, debts beyond its ability to pay

3               as such debts matured.

4      90.    Because the referrals from Defendants to Debtor are illegal under federal and state

5    law, they are void and subject to avoidance as fraudulent. Any purported consideration constitutes

6    unlawful consideration, which cannot constitute reasonably equivalent value. Thus, at the time the

7    agreements were executed and the Transfers made, Debtor received less than reasonably equivalent

8    value.

9      91.    Furthermore, the Debtor did not receive the reasonably equivalent value of the

10   Transfers to the Defendant because by using the Defendant's money to run a Ponzi scheme there is

11   nothing in Estate for the creditors to share. Rather, the Transfers exacerbate the harm to creditors

12   by increasing the amount of claims while diminishing the Debtor's Estate. In this situation, the use

13   of the Defendants' money to further the Debtor's Ponzi scheme cannot be consideration for the

14   Transfers and cannot objectively be called reasonably equivalent value.

15     92.    The Defendants were therefore acting as investors in the Debtor's Ponzi scheme and

16   any transfers made to the Defendants can be avoided by the Plaintiff since the Transfers to the

17   investor Defendants are preferential and fraudulent such that they constitute property of the Estate

18   in which the Plaintiff can recover.

19     93.    Because the sale of the accounts receivable from Debtor to Defendants are illegal

20   under federal and state law, they are void and subject to avoidance as fraudulent. Any purported

21   consideration constitutes unlawful consideration, which cannot constitute reasonably equivalent

22   value. Thus, at the time the agreements were executed and the Transfers made, Debtor received less

23   than reasonably equivalent value.

24     94.    The Affiliate Agreements, ARPAs, and the Transfers should be avoided as fraudulent

25   under 11 U.S.C. § 548(a)(1)(B), and such transferred property, or the value thereof, should be

26   recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

27   / / /

28   / / /

18

**THIRD CLAIM FOR RELIEF**

**Avoidance, Recovery, and Preservation of Actual Fraudulent Transfers**

**[11 U.S.C. §§ 544(b), 550, and 551; CAL. CIV. CODE §§ 3439.04(a) and 3439.07]**

**[Against All Defendants]**

95.     Plaintiff re-alleges and incorporates here by reference each and every allegation contained in paragraphs 1 through 94 as though set forth in full.

96.     The Affiliate Agreements, ARPAs, and all or a portion of the Transfers occurred within the four years prior to the Petition Date. However, as Trustee is likely not in possession of all relevant documentation between Debtor and Defendants, it is possible that additional transfers will be discovered.

97.     On or after the date that such agreements were entered and such transfers were made, entities to which Debtor was or became indebted include the Prepetition Creditors. Based upon totality of the circumstances, the Transfers were part of a scheme to hinder, delay, and/or defraud the Prepetition Creditors.

98.     Despite Debtor's obligation to the Prepetition Creditors, Debtor continued to pay Defendants sums received from consumers under the Affiliate Agreements, which constitute illegal capping agreements between Defendants and Debtor.

99.     Because the referrals from Defendants to Debtor are illegal under federal and state law, they are void and subject to avoidance as fraudulent. Any purported consideration constitutes unlawful consideration, which cannot constitute reasonably equivalent value. Thus, at the time the agreements were executed and the Transfers made, Debtor received less than reasonably equivalent value.

100.    The Transfers were made with actual intent to hinder, delay, or defraud creditors of Debtor.

101.    The Debtor's conduct was done with oppression, fraud, and malice, as defined in Civil Code section 3294, entitling the Trustee to, in addition to the actual damages, exemplary or punitive damages for making an example of the Debtor and to punish the Debtor.

102.    The Affiliate Agreements, the ARPAs, and the Transfers are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and CAL. CIV. CODE §§ 3439.04(a) and 3439.07 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against his Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

103.    Accordingly, the Affiliate Agreements, the ARPAs, and the Transfers should be avoided as fraudulent under 11 U.S.C. § 544(b) and CAL. CIV. CODE §§ 3439.04(a) and 3439.07, and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551 and CAL. CIV. CODE § 3439.07.

## FOURTH CLAIM FOR RELIEF

**Avoidance, Recovery, and Preservation of Constructive Fraudulent Transfers**

**[11 U.S.C. §§ 544(b), 550, and 551; CAL. CIV. CODE §§ 3439.05, and 3439.07]**

**[Against All Defendants]**

104.    Plaintiff re-alleges and incorporates here by reference each and every allegation contained in paragraphs 1 through 103 as though set forth in full.

105.    The Affiliate Agreements, the ARPAs, and all or a portion of the transfers occurred within the four years prior to the Petition Date. However, as Trustee is likely not in possession of all relevant documentation between Debtor and Defendants, it is possible that additional transfers will be discovered.

106.    The transfers happened while Debtor:

    a.    was insolvent or became insolvent as a result;

    b.    was engaged or was about to engage in a transaction for which any property remaining with Debtor was of unreasonably small capital; or

    c.    intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

107.    Because the referrals from Defendants to Debtor are illegal under federal and state law, the agreements are void and subject to avoidance as fraudulent. Any purported consideration constitutes unlawful consideration, which cannot constitute reasonably equivalent value. Thus, at

the time the agreements were executed and the transfers made, Debtor received less than reasonably equivalent value.

108.    Because the sale of the accounts receivable from Debtor to Defendants is illegal under federal and state law, they are void and subject to avoidance as fraudulent. Any purported consideration constitutes unlawful consideration, which cannot constitute reasonably equivalent value. Thus, at the time the agreements were executed and the transfers made, Debtor received less than reasonably equivalent value.

109.    The Affiliate Agreements, the ARPAs, and the Transfers are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and CAL. CIV. CODE §§ 3439.05 and 3439.07 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against his Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

110.    Accordingly, the Affiliate Agreements, the ARPAs, and the Transfers should be avoided as fraudulent under 11 U.S.C. § 544(b) and CAL. CIV. CODE §§ 3439.05 and 3439.07, and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551 and CAL. CIV. CODE § 3439.07.

## FIFTH CLAIM FOR RELIEF

**Avoidance, Recovery, and Preservation of Preferential Transfer**

**to Defendants in Preference Period**

**[11 U.S.C. §§ 547, 550, and 551]**

**[Against All Defendants]**

111.    Plaintiff re-alleges and incorporates here by reference each and every allegation contained in paragraphs 1 through 110 as though set forth in full.

112.    As noted above, at least $165,381.29 of the Transfers from Debtor to New Vision occurred during the 90-day preference period. (*See* **Exhibit 15** incorporated here.) However, as Trustee is likely not in possession of all relevant documentation between Debtor and Defendants, it is possible that additional transfers will be discovered.

113.    As noted above, at least $90,816.08 of the transfers from Debtor to NVCG/NVDR occurred during the 90-day preference period. (*See* **Exhibits 17 & 18** incorporated here.) Also as noted, Trustee is aware of transfers to an entity called New Vision 6 during the 90-day preference period in the amount of $1,441.18. (*See* **Exhibit 19** incorporated here.) However, as Trustee is likely not in possession of all relevant documentation between Debtor and Defendants, it is possible that additional transfers will be discovered.

114.    These Preference Transfers, in the amount of at least **$257,638.55** were made for, or on account of, an antecedent debt or debts owed by the LPG to Defendants, each of which constituted a "debt" or "claim" (as those terms are defined in the Bankruptcy Code) of Defendants.

115.    The Preference Transfers happened while LPG was insolvent.

116.    Debtor is also entitled to the presumption of insolvency when the Preference Transfers happened pursuant to 11 U.S.C. § 547(f).

117.    As a result of the Preference Transfers, Defendants recovered more than it would have received if: (i) the Debtor's case was under chapter 7 of the Bankruptcy Code; (ii) the Preference Transfers had not been made; and (iii) Defendants received payments of its debts under the provisions of the Bankruptcy Code. As evidenced by the Debtor's schedules filed in the underlying Bankruptcy Case, as well as the proofs of claim that have been received to date, the Debtor's liabilities exceed its assets to the point that unsecured creditors will not receive a full payout of their claims from the Debtor's Estate.

118.    In accordance with the foregoing, the Preference Transfers are voidable pursuant to 11 U.S.C. § 547(b), and may be recovered and preserved for the benefit of the estate pursuant to 11 U.S.C. §§ 550 and 551.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

### SIXTH CLAIM FOR RELIEF

**Avoidance, Recovery, and Preservation of Unauthorized Post-Petition Transfers**

**[11 U.S.C. § 549]**

**[Against NVCG]**

119.    Plaintiff re-alleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 118 as though set forth in full.

120.    As noted above, NVCG received the Post-Petition Transfers in the amount of at least $20,000. The Post-Petition Transfers were neither authorized by any section of the Bankruptcy Code nor by any order of this Court.

### SEVENTH CLAIM FOR RELIEFS

**Turnover of Estate Property**

**[11 U.S.C. § 542]**

**[Against All Defendants]**

121.    Plaintiff re-alleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 120 as though set forth in full.

122.    Defendants have possession or control over property of the Estate in the form of the Transfers made pursuant to illegal and unenforceable agreements.

123.    The Transfers are not of inconsequential value to the Estate.

124.    The funds that are the subject of the Transfers are paramount to Debtor's ability to pay creditors.

125.    Accordingly, Trustee is entitled to a judgment for turnover of the Transfer pursuant to 11 U.S.C. § 542.

### EIGHTH CLAIM FOR RELIEF

**Disallowance of Claims**

**[11 U.S.C. § 502(d)]**

**[Against All Defendants]**

126.    Plaintiff re-alleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 125 as though set forth in full.

127.    On February 23, 2024, Defendants filed a Proof of Claim as Claim No. 102396-1, in the amount of $1.00 (noting that New Vision is still assessing the value of its claim and will be amending in the future). Defendant's basis for the Proof of Claim is based on its procurement and sale of consumer leads for LPG legal services. (*See* **Exhibit 22**.)

128.    Based on the Defendant's conduct set forth in paragraphs 1 through 127, the Proof of Claim and any other claims having been filed or to be filed by Defendant in the Bankruptcy case should be disallowed pursuant to 11 U.S.C. § 502(d).

## **RESERVATION OF RIGHTS**

129.    Plaintiff reserves the right to bring all other claims or causes of action that Plaintiff may have against Defendants, on any and all grounds, as allowed under the law or in equity, including, but not limited to, those claims not known by the Trustee at this time but that he may discovery during the pendency of this adversary proceeding.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for a judgment as follows:

**On The First, Second, Third, and Fourth Claims for Relief:**

1.    Avoiding, recovering, and preserving the Transfers against Defendants;

**On the Fifth Claim for Relief:**

2.    Avoiding, recovering, and preserving the Preference Transfers against Defendants;

**On the Sixth Claim for Relief:**

3.    Avoiding, recovering, and preserving the unauthorized Post-Petition Transfers against NVCG;

**On the Seventh Claim for Relief:**

4.    Ordering Defendants to immediately turn over the Transfers and/or Preference Transfers;

**On the Eighth Claim for Relief:**

5.    Order disallowing Defendant's proof(s) of claim;

1

**On All Claims for Relief:**

2

6.      Awarding costs of suit incurred here; and

3

7.      Granting any other and further relief as the Court deems just and proper.

4

Respectfully submitted,

5

Dated: October 18, 2024

DINSMORE & SHOHL LLP

6

7

By: /s/ Jacob R. Bothamley

8

Yosina M. Lissebeck
Jacob R. Bothamley

9

*Special Counsel to Richard A.
Marshack, Chapter 11 Trustee*

10

*For The Bankruptcy Estate Of The
Litigation Practice Group P.C. and*

11

*Liquidating Trustee of the LPG
Liquidation Trust*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

**LIMITED LIABILITY COMPANY OPERATING AGREEMENT**

**New Vision Capital Group, LLC**

A Member-Managed Limited Liability Company

**OPERATING AGREEMENT**

THIS OPERATING AGREEMENT is made and entered into effective August 1st, 2022  by and among: Sania Hashempour, Sarvanez Esfahani, Relief Center LLC and ProofPositive LLC ( LLC Members collectively referred to in this agreement as the "Members").

**SECTION 1**

**THE LIMITED LIABILITY COMPANY**

1.1  *Formation*. Effective August 1st, 2022, the Members formally join as Managing Members in an existing limited liability company under the name New Vision Capital Group L.L.C. (the "Company") on the terms and conditions in this Operating Agreement (the "Agreement") and pursuant to the Limited Liability Company Act of the State of California (the "Act").  The Members agree to file with the appropriate agency within the State of California charged with processing and maintaining such records all documentation required for the formation of the Company and documentation of this Limited Liability Company Operating Agreement. The rights and obligations of the parties are as provided in the Act except as otherwise expressly provided in this Agreement. This Limited Liability Company Operating Agreement supersedes and replaces all other previous versions and revisions that the Company may have.

1.2  *Name*. The business of the Company will be conducted under the name New Vision Capital Group, LLC or such other name upon which the Members may unanimously agree.

1.3  *Purpose*.  The purposes of the Company shall be (a) Act as an Affiliate to LPG (Litigation Practice Group) hereinafter referred to as LPG as referenced by aforementioned signed and executed Affiliate Contract documented as Exhibit A in this Limited Liability Operating Agreement; (b) Act as an Affiliate to Borrowers Club LLC hereinafter referred to as BC as referenced by aforementioned signed and executed Affiliate Contract documented as Exhibit B in this Limited Liability Operating Agreement; (c) Act as an Affiliate to any other Company that all Members agree upon and add as an Affiliate Contract addendum Exhibit in this Limited Liability Operating Agreement; (d) to invest and reinvest, in any manner and in any real or personal property which the Members deem appropriate; and (e) to conduct any other business or make any investment which a limited liability company may conduct or make under California law.

New Vision Capital Group, LLC owns and operates a system of generating leads consisting of consumers interested in the services referenced by signed and executed Affiliate Contracts

documented as Exhibits in this Limited Liability Operating Agreement. New Vision Capital Group, LLC acts solely as a marketing company and has no control whatsoever in the conduct, marketing, customer service, services or products provided by the Companies it provides services to or acts as an Affiliate to.

1.4 *Office*. The Company will maintain its principal business office within the State of California at the following address: 3857 Birch Street. Suite 25, Newport Beach, CA. 92660.

1.5 *Registered Agent*. SANIA HASHEMPOUR is the Company's initial registered agent in the State of California, and the registered office is 3857 Birch St. Suite 25, Newport Beach, CA. 92660.

1.6 *Term*. The term of the Company commences on August 1st, 2022 and shall continue perpetually unless sooner terminated as provided in this Agreement.

1.7 *Names and Addresses of Members*. The Members' names and addresses are attached as Schedule 1 to this Agreement. All notices to Members will not be considered delivered unless sent via certified postal mail or responded acknowledged email to a Members email address.

1.8 *Admission of Additional Members*. Except as otherwise expressly provided in this Agreement, no additional members may be admitted to the Company through issuance by the company of a new interest in the Company without the prior unanimous written consent of the Members.

## SECTION 2

## CAPITAL CONTRIBUTIONS

2.1 *Initial Contributions*. The Members initially shall contribute to the Company capital as described in Schedule 2 attached to this Agreement.

2.2 *Additional Contributions*.  No Member shall be obligated to make any additional contribution to the Company's capital without the prior unanimous written consent of the Members.

2.3 *Interest on Initial Capital Contributions*. Members earn interest of 15% annually on their capital contributions to the Company.

## SECTION 3

## ALLOCATION OF PROFITS AND LOSSES; DISTRIBUTIONS

3.1 *Profits/Losses*. For financial accounting and tax purposes, the Company's net profits or net losses shall be determined on an annual basis and shall be allocated to the Members in proportion to each Member's relative capital contribution in the Company as set forth in Schedule 2. Once Members capital contribution in the Company as set forth in Schedule 2 is complete for financial accounting and tax purposes, the Company's net profits or net losses shall be determined on an annual basis and shall be allocated to the Members in proportion to each Member's relative capital interest in the Company as set forth in Schedule 2 as amended from time to time in accordance with U.S. Department of the Treasury Regulation.

3.2 *Distributions.* The Members shall determine and distribute available funds quarterly or at more frequent intervals as they see fit.  Available funds, as referred to herein, shall mean the net cash of the Company available after appropriate provision for expenses and liabilities, as determined by the Managers.  Distributions in liquidation of the Company or in liquidation of a Member's interest shall be made in accordance with the positive capital account balances pursuant to U.S. Department of the Treasury Regulation. To the extent a Member shall have a negative capital account balance, there shall be a qualified income offset, as set forth in U.S. Department of the Treasury Regulation.

3.3 *No Right to Demand Return of Capital*. No Member has any right to any return of capital or other distribution except as expressly provided in this Agreement. No Member has any drawing account in the Company. In the event of dissolution of the Company, Members will be entitled to what hard assets and equipment of the Company in proportion to each Member's relative capital contribution in the Company as set forth in Schedule 2.

## SECTION 4

## INDEMNIFICATION

The Company and each Member shall indemnify any Member who was or is a party defendant or is threatened to be made a party defendant, pending or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative (other than an action by or in the right of the Company) by reason of the fact that he is or was a Member of the Company, Manager, employee or agent of the Company, or is or was serving at the request of the Company, against expenses (including attorney's fees), judgments, fines, and amounts paid in settlement actually and reasonably incurred in connection with such action, suit or proceeding if all remaining Members with the exclusion of the Member in question determine that he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interest of the Company, and with respect to any criminal action proceeding, has no reasonable cause to believe his/her conduct was unlawful. The termination of any action, suit, or proceeding by judgment, order, settlement, conviction, or upon a plea of "no lo Contendere" or its equivalent, shall not create a presumption that the person did or did not act in good faith and in a manner which he reasonably believed to be in the best interest of the Company, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his/her conduct was lawful. If upon a majority vote of the remaining Members the Member in question

is found to be culpable of actions harmful/detrimental to the Company in the sole determination of the remaining Members the Member in question will be treated as a *Death Buy Out* outlined in Section 8.5 of this Limited Liability Company Operating Agreement.

## SECTION 5

## POWERS AND DUTIES OF MANAGERS

5.1 *Management of Company*.

5.1.1 The Members, within the authority granted by the Act and the terms of this Agreement shall have the complete power and authority to manage and operate the Company and make all decisions affecting its business and affairs.

5.1.2 Except as otherwise provided in this Agreement, all decisions and documents relating to the management and operation of the Company shall be made and executed by a majority in Interest of the Members.

5.1.3 Third parties dealing with the Company shall be entitled to rely conclusively upon the power and authority of a majority in Interest of the Members to manage and operate the business and affairs of the Company.

5.2 *Decisions by Members*. Whenever in this Agreement reference is made to the decision, consent, approval, judgment, or action of the Members, unless otherwise expressly provided in this Agreement, such decision, consent, approval, judgment, or action shall mean a majority of the Members.

5.3 *Withdrawal by a Member*. A Member has no power to withdraw from the Company, except as otherwise provided in Section 8.

## SECTION 6

## SALARIES, REIMBURSEMENT, AND PAYMENT OF EXPENSES

6.1 *Organization Expenses*. Member ProofPositive LLC solely with the exclusion of all other Members will continue to make up the existing Monthly Shortfall between current Company Expenses and Company Monthly Residual from 07/01/2022 through 10/01/2022 Company Shortfall. It is expected that within this 120-day window that Company Shortfall shall be overtaken by Company Monthly Residual and existing Company Shortfall between Operating Expenses and Company Monthly Residual will be eliminated. This additional ProofPositive LLC Capital Contribution will be added as it is paid monthly by ProofPositive LLC to ProofPositive LLC's Capital Contribution account in Schedule 2. At the conclusion of or before in the event of Company Monthly Residual exceeding Company Monthly Expenses all expenses incurred in connection with organization of the Company will be paid by the Company.

DocuSign Envelope ID: 1225E6EF-820A-4733-AB1A-3A8354865A12

6.2 *Salary*. A salary will be paid to Member's for the performance of his or her duties under this Agreement. The salary is exclusively for Member's that are working in pursuit of Company business. All Member's whom are working full-time in pursuit of Company business that decline to take a salary such Member will have the amount equivalent to other Members salary added to his/her Capital Contribution amount on a monthly basis. All Members have voted unanimously to increase the salary paid to:

Sania Hashempour and Sarvenaz Esfahani from $4,500.00/Monthly to $9,000.00/Monthly commencing within 60-90 day window as Company Expenses allow:

While any Members are receiving salary and while any Member has not been paid back their Capital Contribution Members agree to not work or take interests in any competing interests of New Vision Capital Group, LLC as determined by a majority of the Members. This arrangement will remain in place until reimbursement of all Capital Contributions.

6.2 *Reimbursement of Capital Contribution*. Reimbursement of Capital Contribution outlined in Listing of Capital Contributions - Schedule 2 will commence upon monthly residuals in excess of $250,000.00/Monthly Gross being paid to New Vision Capital Group, LLC or majority vote by Members. Capital Contribution will be paid back at a rate of 20%/Monthly. Capital Contribution reimbursement shall take place in order of proportion to each Member's relative Capital Contribution in the Company starting with the largest and moving to the smallest as set forth in Schedule 2. [Example: ProofPositive LLC Capital Contribution=$300,000.00. Relief Center LLC Capital Contribution=$150,000.00. ProofPositive LLC would be the first in order of reimbursement of Capital Contribution at 20%/Monthly. As ProofPositive LLC Capital Contribution is reduced through its being paid by Company to a level where it is now equal to Relief Center LLC then Relief Center LLC and ProofPositive LLC would each be paid ½ or 10% each till each Members Capital Contribution was paid back in full.]

6.3 *Legal and Accounting Services*. The Company may obtain legal and accounting services to the extent reasonably necessary for the conduct of the Company's business.

### SECTION 7

### BOOKS OF ACCOUNT, ACCOUNTING REPORTS, TAX RETURNS,

### FISCAL YEAR, BANKING

7.1 *Method of Accounting*. The Company will use the method of accounting previously determined by the Members for financial reporting and tax purposes.

7.2 *Fiscal Year; Taxable Year*. The fiscal year and the taxable year of the Company is the calendar year.

DocuSign Envelope ID: D1225E6EF-929A-4733-AB1A-3A8354B65A12

7.3 *Capital Accounts*. The Company will maintain a Capital Account for each Member on a cumulative basis in accordance with federal income tax accounting principles.

7.4 *Banking*. All funds of the Company will be deposited in a separate bank account at J.P Morgan Chase Bank in the name of New Vision Capital Group LLC., Account: ███████████, Routing : ████████ or in an account or accounts of a savings and loan association in the name of the Company as determined by a Majority of the Members. Company funds will be invested or deposited with an institution, the accounts or deposits of which are insured or guaranteed by an agency of the United States government. All Members of Company will be named on all accounts and have access to all statements.

7.5 *Expenses*. All Company expenses in excess of $5,000.00 can not be made by a single Member but needs the verbal or written approval of a majority of the Members. If such verbal or written approval is deemed to not have been approved by a majority of the Members it is the sole responsibility of Member and not an encumbrance or expense on the Company.

## SECTION 8

### TRANSFER OF MEMBERSHIP INTEREST

8.1 *Sale or Encumbrance Prohibited*. Except as otherwise permitted in this Agreement, no Member may voluntarily or involuntarily transfer, sell, convey, encumber, pledge, assign, or otherwise dispose of (collectively, "Transfer") an interest in the Company without the prior written consent of a majority of the other non-transferring Members determined on a per capita basis.

8.2 *Right of First Refusal*. Notwithstanding Section 8.1, a Member may transfer all or any part of the Member's interest in the Company (the "Interest") as follows:

8.2.1 The Member desiring to transfer his or her Interest first must provide written notice (the "Notice") to the other Members, specifying the price and terms on which the Member is prepared to sell the Interest (the "Offer").

8.2.2 For a period of 30 days after receipt of the Notice, the Members may acquire all, but not less than all, of the Interest at the price and under the terms specified in the Offer. If the other Members desiring to acquire the Interest cannot agree among themselves on the allocation of the Interest among them, the allocation will be proportional to the Ownership Interests of those Members desiring to acquire the Interest.

8.2.3 Closing of the sale of the Interest will occur as stated in the Offer; provided, however, that the closing will not be less than 45 days after expiration of the 30-day notice period.

8.2.4 If the other Members fail or refuse to notify the transferring Member of their desire to acquire all of the Interest proposed to be transferred within the 30-day period following receipt

DocuSign Envelope ID: 1225E6EF-820A-4732-AB1A-3A8354865A12

of the Notice, then the Members will be deemed to have waived their right to acquire the Interest on the terms described in the Offer, and the transferring Member may sell and convey the Interest consistent with the Offer to any other person or entity; provided, however, that notwithstanding anything in Section 8.2 to the contrary, should the sale to a third person be at a price or on terms that are more favorable to the purchaser than stated in the Offer, then the transferring Member must reoffer the sale of the Interest to the remaining Members at that other price and other terms; provided, further, that if the sale to a third person is not closed within three months after the expiration of the 30-day period describe above, then the provisions of Section 8.2 will again apply to the Interest proposed to be sold or conveyed.

8.2.5  Notwithstanding the foregoing provisions of Section 8.2, should the sole remaining Member be entitled to and elect to acquire all the Interests of the other Members of the Company in accordance with the provisions of Section 8.2, the acquiring Member may assign the right to acquire the Interests to a spouse, lineal descendent, or an affiliated entity if the assignment is reasonably believed to be necessary to continue the existence of the Company as a limited liability company.

8.3  *Substituted Parties*. Any transfer in which the Transferee becomes a fully substituted Member is not permitted unless and until:

(1) The transferor and assignee execute and deliver to the Company the documents and instruments of conveyance necessary or appropriate in the opinion of counsel to the Company to effect the transfer and to confirm the agreement of the permitted assignee to be bound by the provisions of this Agreement; and

(2) The transferor furnishes to the Company an opinion of counsel, satisfactory to the Company, that the transfer will not cause the Company to terminate for federal income tax purposes or that any termination is not adverse to the Company or the other Members.

8.4  *Death, Incompetency, or Bankruptcy of Member*. On the death, adjudicated incompetence, or bankruptcy of a Member, unless the Company exercises its rights under Section 8.5, the successor in interest to the Member (whether an estate, bankruptcy trustee, or otherwise) will receive only the economic right to receive distributions whenever made by the Company and the Member's allocable share of taxable income, gain, loss, deduction, and credit (the "Economic Rights") unless and until a majority of the other Members determined on a per capita basis admit the transferee as a fully substituted Member in accordance with the provisions of Section 8.3.

8.4.1  Any transfer of Economic Rights pursuant to Section 8.4 will not include any right to participate in management of the Company, including any right to vote, consent to, and will not include any right to information on the Company or its operations or financial condition. Following any transfer of only the Economic Rights of a Member's Interest in the Company, the transferring Member's power and right to vote or consent to any matter submitted to the Members will be eliminated, and the Ownership Interests of the remaining Members, for

purposes only of such votes, consents, and participation in management, will be proportionately increased until such time, if any, as the transferee of the Economic Rights becomes a fully substituted Member.

8.5  *Death Buy Out*. Notwithstanding the foregoing provisions of Section 8, the Members covenant and agree that on the death of any Member, the Company, at its option, by providing written notice to the estate of the deceased Member within 90 days of the death of the Member, may purchase, acquire, and redeem the Interest of the deceased Member in the Company pursuant to the provision of Section 8.5.

8.5.1  The value of each Member's Interest in the Company will be determined on the date this Agreement is signed, and the value will be endorsed on Schedule 3 attached and made a part of this Agreement. The value of each Member's Interest will be redetermined unanimously by the Members annually, unless the Members unanimously decide to redetermine those values more frequently. The Members will use their best efforts to endorse those values on Schedule 3. The purchase price for a decedent Member's interest conclusively is the value last determined before the death of such Member; provided, however, that if the latest valuation is more than two years before the death of the deceased Member, the provisions of Section 8.5.2 will apply in determining the value of the Member's Interest in the Company.

8.5.2  If the Members have failed to value the deceased Member's Interest within the prior two-year period, the value of each Member's Interest in the Company on the date of death, in the first instance, will be determined by mutual agreement of the surviving Members and the personal representative of the estate of the deceased Member. If the parties cannot reach an agreement on the value within 30 days after the appointment of the personal representative of the deceased Member, then the surviving Members and the personal representative each must select a qualified appraiser within the next succeeding 30 days. The appraisers so selected must attempt to determine the value of the Company Interest owned by the decedent at the time of death based solely on their appraisal of the total value of the Company's assets and the amount the decedent would have received had the assets of the Company been sold at that time for an amount equal to their fair market value and the proceeds (after payment of all Company obligations) were distributed in the manner contemplated in Section 8. The appraisal may not consider and discount for the sale of a minority Interest in the Company. In the event the appraisers cannot agree on the value within 30 days after being selected, the two appraisers must, within 30 days, select a third appraiser. The value of the Interest of the decedent in the Company and the purchase price of it will be the average of the two appraisals nearest in amount to one another. That amount will be final and binding on all parties and their respective successors, assigns, and representatives. The costs and expenses of the third appraiser and any costs and expenses of the appraiser retained but not paid for by the estate of the deceased Member will be offset against the purchase price paid for the deceased Member's Interest in the Company.

8.5.3  Closing of the sale of the deceased Member's Interest in the Company will be held at the office of the Company on a date designated by the Company, not be later than 90 days after

DocuSign Envelope ID: 1225E6EF-820A-4733-AB1A-3A8354865A12

agreement with the personal representative of the deceased Member's estate on the fair market value of the deceased Member's Interest in the Company; provided, however, that if the purchase price are determined by appraisals as set forth in Section 8.5.2, the closing will be 30 days after the final appraisal and purchase price are determined. If no personal representative has been appointed within 60 days after the deceased Member's death, the surviving Members have the right to apply for and have a personal representative appointed.

8.5.4  At closing, the Company will pay the purchase price for the deceased Member's Interest in the Company. If the purchase price is less than $1,000.00, the purchase price will be paid in cash; if the purchase price is $1,000.00 or more, the purchase price will be paid as follows:

(1) $1,000.00 in cash, bank cashier's check, or certified funds;

(2) The balance of the purchase price by the Company executing and delivering its promissory note for the balance, with interest at the prime interest rate stated by primary banking institution utilized by the Company, its successors and assigns, at the time of the deceased Member's death. Interest will be payable monthly, with the principal sum being due and payable in three equal annual installments. The promissory note will be unsecured and will contain provisions that the principal sum may be paid in whole or in part at any time, without penalty.

8.5.5  At the closing, the deceased Member's estate or personal representative must assign to the Company all of the deceased Member's Interest in the Company free and clear of all liens, claims, and encumbrances, and, at the request of the Company, the estate or personal representative must execute all other instruments as may reasonably be necessary to vest in the Company all of the deceased Member's right, title, and interest in the Company and its assets. If either the Company or the deceased Member's estate or personal representative fails or refuses to execute any instrument required by this Agreement, the other party is hereby granted the irrevocable power of attorney which, it is agreed, is coupled with an interest, to execute and deliver on behalf of the failing or refusing party all instruments required to be executed and delivered by the failing or refusing party.

8.5.6  On completion of the purchase of the deceased Member's Interest in the Company, the Ownership Interests of the remaining Members will increase proportionately to their then-existing Ownership Interests.

## SECTION 9

## DISSOLUTION AND WINDING UP OF THE COMPANY

9.1  *Dissolution*. The Company will be dissolved on the happening of any of the following events:

DocuSign Envelope ID: 1225E6EF-920A-4732-AB1A-3A8354865A12

9.1.1 Sale, transfer, or other disposition of all or substantially all of the property of the Company;

9.1.2 The agreement of all of the Members;

9.1.3 By operation of law; or

9.1.4 The death, incompetence, expulsion, or bankruptcy of a Member, or the occurrence of any event that terminates the continued membership of a Member in the Company, unless there are then remaining at least the minimum number of Members required by law and all of the remaining Members, within 120 days after the date of the event, elect to continue the business of the Company.

9.2 *Winding Up*. On the dissolution of the Company (if the Company is not continued), the Members must take full account of the Company's assets and liabilities, and the assets will be liquidated as promptly as is consistent with obtaining their fair value, and the proceeds, to the extent sufficient to pay the Company's Capital Contributions and obligations with respect to the liquidation, will be applied and distributed, after any gain or loss realized in connection with the liquidation has been allocated in accordance with Section 2 of this Agreement, and the Members' Capital Accounts have been adjusted to reflect the allocation and all other transactions through the date of the distribution, in the following order:

9.2.1 To the payment and discharge of any Members outstanding Capital Contributions by percentage based on amounts of highest to lowest, then Company debts and liabilities owed to Members; and

9.2.2 To Members in the amount of their respective adjusted Capital Account balances on the date of distribution.

9.2.3 To payment and discharge of the expenses of liquidation and of all the Company's debts and liabilities to persons or organizations other than Members that a majority of the Members deem appropriate.

## SECTION 10

### GENERAL PROVISIONS

10.1 *Amendments*. Amendments to this Agreement may be proposed by any Member. A proposed amendment will be adopted and become effective as an amendment only on the written approval of a majority of the Members.

10.2 *Governing Law*. This Agreement and the rights and obligations of the parties under it are governed by and interpreted in accordance with the laws of the State of California (without regard to principles of conflicts of law).

DocuSign Envelope ID: 1235E6EF-829A-4733-AB1A-3A8354865A12

10.3 *Entire Agreement; Modification*. This Agreement constitutes the entire understanding and agreement between the Members with respect to the subject matter of this Agreement. No agreements, understandings, restrictions, representations, or warranties exist between or among the members other than those in this Agreement or referred to or provided for in this Agreement. No modification or amendment of any provision of this Agreement will be binding on any Member unless in writing and signed by all the Members.

10.4 *Attorney Fees*. In the event of any suit or action to enforce or interpret any provision of this Agreement (or that is based on this Agreement), the prevailing party is entitled to recover, in addition to other costs, reasonable attorney fees in connection with the suit, action, or arbitration, and in any appeals. The determination of who is the prevailing party and the amount of reasonable attorney fees to be paid to the prevailing party will be decided by the court or courts, including any appellate courts, in which the matter is tried, heard, or decided.

10.5 *Further Effect*. The parties agree to execute other documents reasonably necessary to further effect and evidence the terms of this Agreement, as long as the terms and provisions of the other documents are fully consistent with the terms of this Agreement.

10.6 *Severability*. If any term or provision of this Agreement is held to be void or unenforceable, that term or provision will be severed from this Agreement, the balance of the Agreement will survive, and the balance of this Agreement will be reasonably construed to carry out the intent of the parties as evidenced by the terms of this Agreement.

10.7 *Captions*. The captions used in this Agreement are for the convenience of the parties only and will not be interpreted to enlarge, contract, or alter the terms and provisions of this Agreement.

10.8 *Notices*. All notices required to be given by this Agreement will be in writing and will be effective when actually delivered or, if mailed, when deposited as certified mail, postage prepaid, directed to the addresses first shown above for each Member or to such other address as a Member may specify by notice given in conformance with these provisions to the other Members.

IN WITNESS WHEREOF, the parties to this Agreement execute this Operating Agreement as of the date and year first above written.

MEMBERS:

Relief Center LLC

Printed/Typed Name                    Signature

ProofPositive LLC

Printed/Typed Name                    Signature

Sarvenaz Esfahani

Printed/Typed Name                    Signature

Sania Hashempour

Printed/Typed Name                    Signature

---

**Listing of Members - Schedule 1**

LIMITED LIABILITY COMPANY OPERATING AGREEMENT

FOR **New Vision Capital Management Group, LLC**

LISTING OF MEMBERS

As of the 1st day of August 2022 the following is a list of Members of the Company:

NAME:                                   ADDRESS:

Relief Center LLC,:                     7 Anacapri Laguna Niguel, CA 92677

ProofPositive LLC.,:                    30 N Gould St Ste R, Sheridan, WY 82801

Sania Hashempour:                       3857 Birch st. #25 Newport Beach CA 92660

Sarvenaz Esfahani:                      3857 Birch st. #25 Newport Beach CA 92660

Authorized by Member(s) to provide Member Listing as of this _____ day of
8/4/2022
_____, 2022.
8/4/2022
8/4/2022
8/4/2022

Relief Center LLC

_____DocuSign by:_____
Brian Reale
7EC39A7938ED41F...

Printed/Typed Name                      Signature

ProofPositive LLC

_____DocuSigned by:_____
Gail Hanson
BFC40F37742742A...

Printed/Typed Name                      Signature

Sarvenaz Esfahani

_____DocuSigned by:_____
Sarvenaz Esfahani
FA15139629BF4F0...

DocuSign Envelope ID: 1225E6EF-820A-4733-AB1A-3A8354865A12

Printed/Typed Name                     Signature

Sania Hashempour

Printed/Typed Name                     Signature

---

**Listing of Capital Contributions - Schedule 2**

**LIMITED LIABILITY COMPANY OPERATING AGREEMENT**

**FOR New Vision Capital Group, LLC**

**CAPITAL CONTRIBUTIONS**

Pursuant to ARTICLE 2, the Members' initial contribution to the Company capital is stated to be $450,000.00.  The description and each individual portion of this initial contribution is as follows:

| NAME: | CONTRIBUTION: | % OWNERSHIP: |
|---|---|---|
| Relief Center LLC | $150,000.00 | 25% |
| ProofPositive LLC | $300,000.00 | 25% |
| Sania Hashempour | $0 | 25% |
| Sarvenaz Esfahani | $0 | 25% |

8/4/2022

8/4/2022

8/4/2022

SIGNED AND AGREED this_____ day of 8/4/2022 _____, 2022.

Relief Center LLC

DocuSigned by:

*Brian Reale*

7EC39A7938ED41F...

Printed/Typed Name                    Signature


ProofPositive LLC

DocuSigned by:

*Gail Hanson*

BFC40F37742742A...

Printed/Typed Name                    Signature


Sarvenaz Esfahani

DocuSigned by:

*Sarvenaz Esfahani*

PA15139029BF4F0...

Printed/Typed Name                    Signature


Sania Hashempour

DocuSigned by:

*Sania Hashempour*

276C459E2B0F45A...

Printed/Typed Name                    Signature

---

**Listing of Valuation of Members Interest - Schedule 3**

LIMITED LIABILITY COMPANY OPERATING AGREEMENT

FOR **New Vision Capital Group, LLC**

VALUATION OF MEMBERS INTEREST

Pursuant to ARTICLE 8, the value of each Member's interest in the Company is endorsed as follows:

| NAME: | VALUATION | ENDORSEMENT |
|---|---|---|
| Relief Center LLC | $150,000.00 | |
| ProofPositive LLC | $300,000.00 | |
| Sarvenaz Esfahani | $1.00 | |
| Sania Hashempour | $1.00 | |

SIGNED AND AGREED this _____ day of _____, 2022.

8/4/2022
8/4/2022
8/4/2022
8/4/2022

Relief Center LLC

*Brian Reale*
7EC39A7938ED41F...

Printed/Typed Name                           Signature

ProofPositive LLC

*Gail Hanson*
BFC40F37742742A...

Printed/Typed Name                           Signature

DocuSign Envelope ID: 1225E6EF-820A-4733-AB1A-3A8354865A12

Sarvenaz Esfahani

Printed/Typed Name                          Signature

Sania Hashempour

Printed/Typed Name                          Signature

**Signed And Executed Affiliate Contract Documented As Exhibit A (Referenced in Section 1-1.3)**

**(Insert Copy of Executed Document)**

**Signed And Executed Affiliate Contract Documented As Exhibit B (Referenced in Section 1-1.3)**

17

## AFFILIATE REFERRAL AGREEMENT

This Affiliate Referral Agreement (the "Agreement") is made and entered into effective this 9th day of August, 2021 between Nationwide Loan Consultants & Advisors, LLC, a Florida Limited Liability Company (hereinafter referred to as "Company"), and New Vision Capital Group, LLC d/b/a New Vision Debt Relief, a California Limited Liability Company (hereinafter referred to as "Associate"). The parties desire to enter a business relationship whereby Company provides services related to the unsecured loan industry through affiliates referred by Associate. The parties agree as follows:

WHEREAS, Company operates nationwide and provides research and matching services to individuals looking to obtain consumer loans (the "Services");

WHEREAS, Company utilizes affiliates that refer consumers to the Company;

WHEREAS, Associate wishes to refer affiliates to Company for the foregoing purpose; and

NOW, THEREFORE, in consideration of the mutual covenants, terms, and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      **RESPONSIBILITIES and PROCEDURE:** Associate agrees that in consideration of the mutual covenants set forth herein and other good and valuable consideration as set forth below shall refer affiliates ("Referred Affiliates") to Company, and not any other person or entity, for the provision of research services to such Referred Affiliate's client(s) in relation to borrowing opportunities in the consumer loan industry.

2.      **COMPENSATION:** Company shall pay Associate the sum of five (5%) percent of the gross profit on each transaction with clients derived from the Referred Affiliates ("Fee"). "*Gross Profit*" shall be considered as that amount of money (without reduction for expenses) that is collected and received by Company on each transaction in which Company rendered services to a client of a Referred Affiliate. The Fee identified above shall be paid on a semi-monthly basis. There shall be no escalation of compensation unless agreed to in writing by both parties. In the event Company is required or it elects, in its sole discretion, to issue a refund to a consumer (Referred Affiliate client) of all or a portion of any money upon which the Fee is based, then Associate shall not be entitled to receive or retain that portion of the Fee that correlates to the amount refunded to a consumer. If Company shall have paid Associate a Fee to which Associate was not entitled, either in part or in whole, Associate shall return such Fee or appropriate portions thereof to Company within three (3) days of being notified of such, or at Company's option, Company may deduct the amount of such Fee from future Fees or other amounts payable to Associate under this Agreement.

3.      **EXCLUSIVITY:** Associate agrees that during the term of this Agreement, Associate shall exclusively refer all affiliates to Company for Services, and not any other individual or entity. This means that during the term of this Agreement, Associate agrees that it will not refer affiliates whose clients are in the market for a consumer loan (leads) to any other individual or entity that provides research and matching services, such as those provided by the Company, unless Associate has the explicit written consent of the Company.

4.      **PROFESSIONAL RESPONSIBILITY:**     All parties shall perform their respective responsibilities in a professional, ethical and reasonable manner.  Associate shall not make any misrepresentations to any third party, including their clients, regarding any products/services of Company.

1

DocuSign Envelope ID: 225E6EF-820A-4732-AB1A-3A8354865A12

## ADDENDUM TO AFFILIATE REFERRAL AGREEMENT

This Addendum to the  Affiliate Agreement ("Agreement"), dated August 9, 2021, between Nationwide Loan Consultants and Advisors, LLC ("Company") and New Vision Capital Group, LLC d/b/a New Vision Debt Relief, a California Limited Liability Company  ("Associate") is hereby entered into effective June 13, 2022 and made an integral part of the aforementioned Agreement upon execution of this Addendum by all parties.  The parties agree as follows:

The compensation outlined in section 2 of the Agreement shall be increased from five (5%) percent to ten (10%) percent. Therefore, the first sentence of section 2 in the Agreement shall be deleted and replaced with the following sentence:

*Company shall pay Associate the sum of ten (10%) percent of the gross profit on each transaction with clients derived from the Referred Affiliates ("Fee").*

In all other aspects, the Agreement remains unchanged and in full force and effect.

This Addendum may be executed in multiple counterparts, all of which shall be deemed originals, and with the same effect as if all parties had signed the same document. All of such counterparts shall be construed together with and shall constitute one Addendum. A facsimile or electronic transmission shall be as valid and enforceable as an original. By signing below, the entity (ies) specified herein confirm(s) that the signer for an entity is authorized to execute this document on behalf of and bind the respective entity and each entity shall be entitled to rely on such representation.

COMPANY: Nationwide Loan Consultants & Advisors, LLC

By: Morgan Pepitone
Title: Director
Date: 6/14/2022

ASSOCIATE: New Vision Capital Group, LLC

By: *Sania Hashempour*
Title: *Managing Partner*
Date: 6/14/2022

1

# EXHIBIT 2

CHRISTOPHER B. GHIO (259094)
christopher.ghio@dinsmore.com
CHRISTOPHER CELENTINO (131688)
christopher.celentino@dinsmore.com
YOSINA M. LISSEBECK (201654)
yosina.lissebeck@dinsmore.com
DINSMORE & SHOHL LLP
655 West Broadway, Suite 800
San Diego, California 92101
Tele: 619.400.0500
Fax:  619.400.0501

Sarah S. Mattingly (Ky. Bar 94257)
sarah.mattingly@dinsmore.com
DINSMORE & SHOHL, LLP
101 S. Fifth Street, Suite 2500
Louisville, Kentucky 40202
Tele: 859-425-1096
Fax: 502-585-2207
(Admitted pro hac vice)

Special Counsel to Richard A. Marshack

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION**

| | |
|---|---|
| In Re | Case No: 23-bk-10571-SC |
| | Chapter 11 |
| The Litigation Practice Group P.C., | **ORDER GRANTING MOTION FOR ENTRY OF PROTECTIVE ORDER AND THE PROTECTIVE ORDER** |
| Debtor(s), | |
| | Date:    May 23, 2024 |
| | Time:    1:30 p.m. |
| | Judge:   Hon. Scott C. Clarkson |
| | Place:   Courtroom 5C (via Zoom)[1] |
| | 411 West Fourth Street |
| | Santa Ana, CA 92701 |

---

[1] Video and audio connection information for each hearing will be provided on Judge Clarkson's publicly posted hearing calendar, which may be viewed online at:
http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

The Court has read and considered the Notice of Motion and Motion for Entry of Protective Order (the "Motion") filed by Richard A. Marshack, in his capacity as the Chapter 11 Trustee (the "Trustee") of the Bankruptcy Estate ("Estate") of The Litigation Practice Group P.C., on May 2, 2024, pursuant to Federal Rule of Bankruptcy Procedure 7026 and Federal Rule of Civil Procedure 26(c)(1), as Dk. No. 1164 ("Motion"), and has found good cause to grant the Motion.

IT IS HEREBY ORDERED that:

1.     The Motion is granted;

2.     The below Protective Order shall apply to any contested matter arising in the main bankruptcy case and in all adversary proceedings filed by or against Trustee, present and future; and

3.     Govern the discovery conducted therein.

## PROTECTIVE ORDER

**1.     DEFINITIONS**

1.1     "Confidential Information" as used in this Protective Order shall mean documents and other information (regardless of how generated, stored or maintained) that a Party or non-party reasonably believes to contain or reflect non-public financial or business information, bank records, financial records, such as social security numbers, non-public financial or personal information of a Party or non-party, account numbers, sensitive digital information and identifiers, information subject to confidentiality agreements or provisions other than this Protective Order, and other non-public research, development, or commercial information that derives value or avoids injury by virtue of not being known to the public.

1.2     This "Action" is defined and hereby means any contested matter arising in the main bankruptcy case and in all adversary proceedings filed by or against Trustee, present and future.

1.3     "Designating Party" means a Party or non-party that designates Confidential Information during the Action.

1.4     "Receiving Party" means a Party that receives Confidential Information during the Action.

2

1.5    "Party" or "Parties" means person or entity subject to this Protective Order.

**2.    SCOPE OF THIS PROTECTIVE ORDER**

2.1    Unless otherwise ordered, this Protective Order shall govern certain documents and other products of discovery obtained in the Action from the Parties there to, and from third parties. As well as certain information copied or derived therefrom, excerpts, summaries or compilations thereof, including, but not limited to, documents voluntarily exchanged as part of early settlement discussions, documents produced pursuant to initial disclosures, requests authorized by the Federal Rules of Civil Procedure made applicable herein by the Federal Rules of Bankruptcy Procedure, answers to interrogatories, deposition transcripts, responses to requests for production, responses to requests for admission, subpoenas, affidavits, declarations, expert reports, and other such material and information as may be produced during the course of the Action and designated as Confidential Information.

**3.    DESIGNATION OF CONFIDENTIAL INFORMATION**

3.1    This Protective Order shall govern the production and handling of any Confidential Information in this Action. Any Party or non-party who produces Confidential Information in this Action may designate it as "Confidential" or "Attorneys' Eyes Only" consistent with the terms of this Protective Order. Whenever possible, the Designating Party must designate only those portions of a document, written discovery responses, deposition, transcript, or other material that contain the Confidential Information and refrain from designating entire documents. Regardless of any designations made hereunder, the Designating Party is not otherwise restricted from use or disclosure of its Confidential Information outside of this Action or for any business purposes. In addition, any Party may move to modify or seek other relief from any of the terms of this Protective Order if it has first tried in writing and in good faith to resolve its needs or disputes with the other Parties or Party as the case may be under the terms of this Protective Order. Further, nothing in this Protective Order shall prevent a Party from redacting documents consistent with the Federal Rules of Civil Procedure and utilizing the documents as needed through-out the Action.

3.2    <u>Application to Non-Parties:</u> Before a non-party is given copies of documents or materials designated as Confidential Information or Attorneys' Eyes Only as permitted hereunder, it

3

must first sign an acknowledgment to be bound to these terms that is attached hereto as <u>Exhibit A</u>; if it fails to do so, the Parties to this Action must resolve any such dispute before making disclosure of designated information as permitted hereunder to the non-party. If a non-party wishes to make designations hereunder, it must first sign attached <u>Exhibit A.</u>

3.3     <u>Timing and Provisional Protection:</u> Designations of Confidential Information may be made at any time. To avoid potential waiver of protection hereunder, the Designating Party should designate documents or materials containing Confidential Information at the time of production or disclosure, including on the record during the taking of any deposition. Deposition testimony will be deemed provisionally protected for a period of thirty (30) days after the transcript is released to the Parties by the court reporter, although the Parties may agree at any time to different timelines of provisional protection of information as Confidential or Attorneys' Eyes Only as part of one or more specific depositions. To retain any designations beyond the provisional period, a Designating Party must designate specific pages and lines of deposition testimony before the provisional period has expired. Such designations must be made in writing so that all counsel and court reporters may append the designation to all copies of the transcripts.

3.4     <u>Manner of Designation:</u> Confidential Information may be designated hereunder in any reasonable manner or method that notifies the Receiving Party of the designation level and identifies with specificity the information to which the designation applies. If made verbally, the Designating Party must promptly confirm the designation in writing. Whenever possible, the Designating Party should stamp, affix, or embed a legend of "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY" on each designated page of the document or electronic image that contains Confidential Information.

**4.     CHALLENGES TO DESIGNATED INFORMATION**

4.1     In the event that a Receiving Party disagrees at any time with any designation(s) made by the Designating Party, the Receiving Party must first try to resolve such challenge in good faith on an informal basis with the Designating Party. The Receiving Party must provide written notice of the challenge and the grounds therefor to the Designating Party, who must respond in writing to the challenge within fifteen (15) days. At all times, the Designating Party carries the burden of establishing the propriety of the designation and protection level. Unless and until the challenge is

resolved by the Parties or ruled upon by the Court, the designated information shall remain protected under this Protective Order. The failure of any Receiving Party to challenge a designation does not constitute a concession that the designation is proper or an admission that the designated information is otherwise competent, relevant, or material.

**5.        LIMITED ACCESS/USE OF PROTECTED INFORMATION**

5.1        Restricted Use: Information that is produced or exchanged in the course of the Action and designated under this Protective Order may be used for preparation for trial and preparation for any appeal of any and all matters in the Action, as well as related settlement negotiations, and for no other purpose, without the written consent of the Designating Party. No Confidential Information may be disclosed to any person except in accordance with the terms of this Protective Order, unless the parties are co-counsel or have entered into joint defense agreements. All persons in possession of Confidential Information agree to exercise reasonable care with regard to the custody, use, or storage of such information to ensure that its confidentiality is maintained. This obligation includes, but is not limited to, the Receiving Party providing to the Designating Party prompt notice of the receipt of any subpoena that seeks production or disclosure of any designated information and consulting with the Designating Party before responding to the subpoena. Any use or disclosure of Confidential or Attorneys' Eyes Only information in violation of the terms of this Protective Order may subject the disclosing person or party to sanctions.

5.2        Access to "Confidential" Information: The Party(ies) and all persons subject to this Protective Order agree that information designated as "CONFIDENTIAL" may only be accessed or reviewed by the following:

a)        The Court, its personnel, and court reporters;

b)        Counsel of record, or co-counsel for any Party, or other party that has entered into a joint defense agreement in the Action and their employees who assist counsel of record, or co-counsel in the Action and are informed of the duties and obligations imposed hereunder;

c)        The Parties, including their clients, agents and employees who are assisting or have reason to know of the Action;

///

d)      Experts or consultants employed by the Parties or their counsel, or co-counsel, for purposes of an Action, so long as each such expert or consultant has signed attached <u>Exhibit A;</u> and

e)      Other witnesses or persons with the Designating Party's consent or by court order.

5.3      <u>Access to "Attorneys' Eyes Only" Designations:</u> The Parties and all persons subject to this Protective Order agree that information designated as "ATTORNEYS' EYES ONLY" may only be accessed or reviewed by the following:

a)      The Court, its personnel, and court reporters;

b)      Counsel of record, or co-counsel for any Party, or other party that has entered into a joint defense agreement in the Action and their employees who assist counsel of record in the Action and are informed of the duties hereunder;

c)      In-house counsel for any Party in the Action and Richard A. Marshack, as Chapter 11 Trustee of The Litigation Practice Group P.C. who is informed of the duties and obligations imposed hereunder;

d)      Experts or consultants employed by the Parties or their counsel, or co-counsel for purposes of the Action,  and so long as each such expert or consultant has signed attached <u>Exhibit A;</u> and

e)      Other witnesses or persons to whom the Designating Party agrees in advance of disclosure or by court order.

5.4      <u>Non-Waiver Effect of Designations:</u> Neither the taking of, nor the failure to take, any action to enforce the provisions of this Protective Order, nor the failure to object to any designation, will constitute a waiver of any Party(ies)'s claim or defense in the Action or any other action or proceeding, including, but not limited to, a claim or defense that any designated information is or is not Confidential, is or is not entitled to particular protection, or embodies or does not embody information protectable by law.

5.5      <u>In-Court Use of Designated Information:</u> If information designated under this Protective Order will or may be offered in evidence at a hearing or trial related to any matter in the Action, then the offering party must give advance notice to the party or non-party that designated prior to offering the information so that any use or disclosure may be addressed in accordance with

6

the Court's case-management or other pre-trial order, or by a motion *in limine.* Nothing in this Protective Order shall be construed as a waiver by a Party of any objections that may be raised as to the admissibility at trial of any evidentiary materials.

## 6. CLAW-BACK REQUESTS

6.1    <u>Failure to Make Designation:</u> If, at any time, a Party or non-party discovers that it produced or disclosed Confidential Information without designation, it may promptly notify the Receiving Party and identify with particularity the Confidential Information to be designated and the level of designation (the claw-back notification). The Receiving Party may then request substitute production of the newly-designated information. Within thirty (30) days of receiving the claw-back notification, the Receiving Party must: (1) certify to the Designating Party it has appropriately marked or, if substitute production has been requested, destroyed all unmarked copies that it received, made, and/or distributed; and (2) if it was practicably unable to mark or destroy any information because disclosures occurred while the Receiving Party was under no duty of confidentiality under the terms of this Protective Order regarding that information, the Receiving Party must reasonably provide as much information as practicable to aid the Designating Party in protecting the information, consistently with the Receiving Party's attorney-client, work-product, and/or trial-preparation privileges.

6.2    <u>Inadvertent Production of Privileged Information:</u> If, at any time, a Party discovers that it produced information that it reasonably believes is subject to protection under the attorney/client, work-product, or trial-preparation privileges, then it must promptly notify each Receiving Party of the claim for protection, the basis for it, amend its privilege log accordingly, and comply with Fed. R. Civ. P. 26(b)(5). Whenever possible, the producing party must produce substitute information that redacts the information subject to the claimed protection. The Receiving Party must thereupon comply with Fed. R. Civ. P. 26(b)(5)(B) as to the information subject to the claimed protection.

/ / /

/ / /

/ / /

**7.    DURATION/CONTINUED RESTRICTIONS**

7.1    <u>Handling of Designated Information Upon Conclusion of the Main Bankruptcy Case:</u>
Upon conclusion of the Main Bankruptcy Case, by way of dismissal or closing of the case, the
Designating Party(ies) is/are responsible for ensuring that any Party or person to whom the
Designating Party shared or disclosed designated information in any of the matters under the Action
returns or destroys all of its copies, regardless of the medium in which it was stored. No witness or
Party may retain designated information that it received from any other Party or non-party under this
Protective Order; only counsel of record, or co-counsel, are the authorized agents who may retain one
copy for their respective legal files, and who must also describe to the Designating Party the extra
steps taken to protect its legal file containing paper and/or electronic copies of the designated
information so that it is not accessed, used, or disclosed inconsistently with the obligations under this
Protective Order. This provision does not apply to the Court or Court staff. Moreover, this provision
does not apply to Trustee, who may retain and use – consistent with this Order – Confidential
Information received in any Action during the entirety of the Bankruptcy.

7.2    <u>Continued Restrictions Under this Protective Order:</u> The restrictions on disclosure and
use of Confidential Information shall survive the conclusion of the Bankruptcy case and any matter
in the Action.

**8.    PRIVILEGED OR PROTECTED INFORMATION**

8.1    Nothing in this Protective Order shall require disclosure of information that is
protected by the attorney-client privilege, the work-product protection, or any other legally cognizable
privilege (a "Privilege or Protection").  If information subject to a claim of Privilege or Protection is
inadvertently produced, pursuant to Federal Rule of Evidence 502(d) such production shall not
constitute a waiver of, or estoppel as to, any claim of Privilege or Protection for such information or
any other information that may be protected from disclosure by a Privilege or Protection in any
proceeding.

8.2    If a Party receives a document that appears to be subject to a Privilege or Protection,
then it shall refrain from examining the document any more than is essential to ascertain if it is
privileged or protected and shall promptly notify the producing Party in writing that the receiving

Party possesses material that appears to be subject to a Privilege or Protection. The producing Party shall have seven (7) days after receiving such notice to assert a Privilege or Protection over the identified material. If the producing Party does not assert a claim of Privilege or Protection within the seven (7)-day period, the material in question shall be deemed not privileged or protected.

8.3     If a producing Party has produced a document subject to a claim of Privilege or Protection, upon written request by the producing Party, the document for which a claim of Privilege or Protection is made shall be sequestered or destroyed to the extent reasonably practicable, and the receiving Party shall not use the document for any purpose other than in connection with analyzing or disputing a claim of Privilege or Protection or in connection with a motion to compel the production of the document.

8.4     The receiving Party sequestering or destroying such material may then move the Court for an order compelling production of the material. The applicable producing Party bears the burden of establishing the applicable Privilege or Protection of any clawed-back document or information as and to the same extent that it would have borne such burden had it not produced the document or information.  Nothing in this Protective Order shall limit the Court's right or any receiving Party's right to request an in camera review of any information subject to a claim of Privilege or Protection.

### ###

Date: June 3, 2024

Scott C. Clarkson
United States Bankruptcy Judge

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT "A"

1

1    Christopher B. Ghio (State Bar No. 259094)
     Christopher Celentino (State Bar No. 131688)
2    Yosina M. Lissebeck (State Bar No. 201654)
     **DINSMORE & SHOHL LLP**
3    655 West Broadway, Suite 800
     San Diego, CA 92101
4    Telephone:  619.400.0500
     Facsimile:  619.400.0501
5    christopher.ghio@dinsmore.com
     christopher.celentino@dinsmore.com
6    yosina.lissebeck@dinsmore.com

7    Sarah S. Mattingly (Ky. Bar 94257)
     DINSMORE & SHOHL, LLP
8    101 S. Fifth Street, Suite 2500
     Louisville, KY 40202
9    Telephone: 859-425-1096
     Facsimile: 502-585-2207
10   Sarah.mattingly@dinsmore.com
     (Admitted pro hac vice)
11
     Special Counsel to Richard A. Marshack,
12   Chapter 11 Trustee

13

14

15                **UNITED STATES BANKRUPTCY COURT**

16                **CENTRAL DISTRICT OF CALIFORNIA**

17

18   In Re                              Case No. 8:23-BK-10571-SC

19                                      Chapter 11

20   The Litigation Practice Group P.C.,  **EXHIBIT A TO STIPULATED**
                                          **ORDER**
21          Debtor(s),
                                        Date:   May 23, 2024
22                                      Time:   1:30 p.m.
                                        Judge:  Hon. Scott C. Clarkson
23                                      Place:  Courtroom 5C[1] - Via Zoom
                                                411 W. Fourth Street
24                                              Santa Ana, CA  92701

25

26

27   ─────────────────────
     [1] Video and audio connection information for each hearing will be provided on Judge Clarkson's
28    publicly posted hearing calendar, which may be viewed online at:
       http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

                                        1

This is to certify that:

(a)     I am being given access to Confidential Information pursuant to the Stipulated Protective Order that was entered into the main bankruptcy case for Litigation Practice Group, but which is binding and controlling as set forth by the Court's Order on any and all contested matters and  any and all litigation commenced by Trustee;

(b)     I have read the Stipulated Protective Order; and

(c)     I agree to be bound by the terms and conditions thereof, including, without limitation, to the obligations regarding the use, non-disclosure and return of such Confidential Information. I further agree that in addition to being contractually bound by the Stipulated Protective Order, I am subject to the jurisdiction of the above reference Court for any violation thereof.

Date: _____

_____
Signature

_____
Printed Name

2

EXHIBIT 8
Page 3

# EXHIBIT 3

### The Litigation Practice Group PC - Affiliate Agreement

THIS AGREEMENT (the "Agreement") is made and effective as of the 20th day of October, 2022 by and between The Litigation Practice Group PC ("LPG") and **New Vision Debt LLC** (hereinafter "Affiliate").

RECITALS:

LPG is in the business of providing a package debtor's rights services in the form of debt validation, consultation, and litigation defense through a network of attorneys licensed to practice law in all 50 states and the District of Columbia.  The legal services offered include:

- Removal of invalid debts through correspondence directly with the three credit bureaus;
- Validation of consumer debts through correspondence including disputes with original creditors, validation demands to third party debt collectors and assignees, and disputes with all three credit bureaus;
- Defense of collection actions initiated by original creditors or third party assignees;
- Negotiation of advantageous settlements of consumer debts both pre and post litigation;
- Education of clients regarding federal laws applicable to consumer debt and credit reporting, and consultation regarding risk mitigation and litigation defense through its network of attorneys across the country.

Each of these services is offered without regard to the identity of the creditor or third-party debt collector or assignee.  LPG reviews all client files prior to the execution of the client's legal services agreement with the appropriate law firm, and maintains oversight through its administrative services over all file placements.

Affiliate owns and operates a system of generating leads consisting of consumers interested in the legal services offered by LPG.  Affiliate, acting in accordance with direction from LPG, shall obtain the names of Consumers and will market in a lawful manner, complying with the restrictions of the jurisdiction in which the consumer resides.  For consumers interested in utilizing LPG's services, Affiliate will assist LPG in having consumers execute an approved legal services agreement with a law firm to which LPG provides administrative support services, at which point consumers will become clients of that law firm, and that law firm will be exclusively responsible for and liable for the representation of consumers in the context of the provision of legal services.  Nothing in this Agreement nor in the eventual legal services agreement shall restrict Affiliate from offering any other service of any kind to consumer, including credit repair or debt relief programs.  Nor is Affiliate restricted from marketing on behalf of credit repair or debt relief entities, including but not limited to other law firms.  LPG and Affiliate hereby agree that any and all prior agreements entered into by LPG and Affiliate or any law firm to which LPG provides administrative support services and Affiliate are null and void and unenforceable, and this Agreement shall become the operative agreement for all files previously placed through the use of LPG's administrative support services.

Affiliate is being retained by LPG to provide marketing and customer service functions only.  All payments made to Affiliate are for services actually rendered, and do not constitute a revenue or fee sharing agreement.  The method used to determine the value of the services rendered by Affiliate to LPG were



1

DocuSign Envelope ID: 05A562E3-49A8-4538-B35F-1B61B7B61D07

selected by both parties based upon industry standard and effective valuation, and not for any other purpose.

LPG and Affiliate hereby agree to the following:

1. Each Party shall be solely responsible for bearing its own costs and expenses incurred in performing its responsibilities under this Agreement, including all tariffs, filings, licensing and/or other fees.

2. Affiliate shall comply with state and federal laws in communicating with consumers regarding LPG, any law firm utilized by LPG, or any of the programs of LPG or the assigned law firm.

3. Both LPG and the law firm it utilizes shall comply with all state and federal laws in performing its obligations under the legal services agreement entered into between LPG and the consumers referred by Affiliate.

4. If requested by LPG, Affiliate shall provide a copy of all marketing materials to LPG upon receiving a request from LPG. Affiliate shall endeavor to provide such materials within 10 business days of such request, but may provide such materials in any time frame that is commercially reasonable.

5. Affiliate agrees to keep any and all documents or communications between itself and LPG confidential pursuant to the provisions set forth below, and shall not share of disclose such documents to any party with prior, express written consent.

6. Affiliate shall be entitled to receive the following as full and complete compensation for its services to LPG: LPG shall pay 85% per file for each file that Affiliate places with LPG, not counting the monthly maintenance fee of $31.46 (15% of the $76.38 plus $20), which LPG shall retain to cover administrative costs for each file. LPG shall calculate the amount of each file, apply the above-identified percentage fee, and remit the same to Affiliate pursuant to an agreed-upon schedule not to exceed one remittance per seven (7) calendar days. If any consumer cancels LPG's services, or demands a refund for payment for such services, or both, then LPG shall be solely responsive for such cost and Affiliate shall not have to share such expense. LPG has exclusive discretion to grant or deny a requested refund or cancellation. Finally, LPG may treat a consumer's failure to remit payment in a timely manner as a cancellation of the legal services agreement executed by consumer with LPG, and has sole discretion to make such determination.

7. LPG shall bear all expenses related to the services it offers to consumers, and Affiliate shall bear all expenses related to its marketing of the same except as is set forth in this Paragraph. Neither LPG nor Affiliate shall be required to pay the expenses of the other.

8. LPG reserves all rights with regard to rejection or cancellation of a consumer, but will do so only in accordance with the recommendation of the law firm utilized in providing such service, and only subject to the applicable state bar rules for such representation.

9. This agreement shall continue to operate and bind LPG and Affiliate for a period of twelve (12) months from the date of execution of this Agreement. At that time, this Agreement will automatically

2



DocuSign Envelope ID: 05A569F3-49A6-4538-B35F-1B61B7B61D07

renew until either party sends written notice of cancellation of this Agreement, which shall be effective 30 days after LPG or Affiliate postmarks or emails a cancellation letter stating the intent of that party to terminate this Agreement. If such cancellation letter is sent by either party, it shall be effective 30 days from the date of postmark or email, and shall terminate this Agreement and release either party from the obligations contained herein.

10.     If either party shall default under this Agreement, defined as a failure to comply with any of the obligations set forth above, the Agreement shall terminate following notice of default and a cure period of 30 days from the date postmarked on the notice of default. The notice of default must state with specificity the act of default alleged.

11.     Upon termination of this Agreement for any reason whatsoever, LPG and Affiliate will refrain from making any disparaging or negative comment, remark, statement, or implication, whether written or oral.

12.     The confidential information of LPG or Affiliate shall include information regarding contracts, customer or client lists or information, hardware, software, screens, specifications, designs, plans, drawings, data, prototypes, discoveries, research, developments, methods, processes, procedures, improvements, 'Know-how', compilations, market research, marketing techniques and plans, marketing materials, business plans and strategies, documents, scripts, guidelines, price lists, pricing policies and financial information or other business and/or technical information and materials, in oral, demonstrative, written, graphic or machine-readable form, which is unpublished, not available to the general public or trade, and which is maintained as confidential and proprietary information by the disclosing party for regulatory, customer relations, and/or competitive reasons. Neither LPG nor Affiliate may disclose the confidential information of the other with the express written consent of the other. A failure to abide by this confidentiality term shall entitle the party whose confidential information was compromised to a reasonable sum not less than $50,000.00, nor more than $200,000.00. The disclosure of information in connection with a judicial proceeding shall not constitute a violation of this term. The parties agree to notify the other if any inadvertent disclosure of information occurs within 48 hours of becoming aware of such disclosure. The parties agree to work together in good faith to remediate any disclosure of confidential information. A party whose confidential information is disclosed shall be entitled to injunctive relief in any court of competent jurisdiction.

13.     If, after the passage of six months of the date of this Agreement, Affiliate fails, in any one calendar month, to have at least fifty (50) active consumers, LPG shall withhold 20% of the fees due to Affiliate for said month in an escrow account. Such fees shall be held in escrow until, in a single calendar month, Affiliate has fifty (50) or more active consumers, at which point, within five (5) business days of the end of such calendar month, LPG shall transfer the balance of such escrow account to Affiliate and retain nothing in such escrow account. If Affiliate shall cease operations for any reason, or this Agreement shall terminate for any reason, Affiliate will continue to receive fees due to it under this Agreement until all active consumers have completed or withdrawn from the program, at which point any remaining amounts being held in escrow shall be released to Affiliate in full.



3

14.     Affiliate agrees not to use the name LPG or any law firm in any advertising, publicity release, or sales presentation designed to promote Affiliate's service, unless LPG provides prior written consent to such specific use.

15.     Any fees incurred by LPG in connection with a customer's Non-Sufficient Funds ("NSF") fee shall be borne exclusively by LPG.

16.     This Agreement may not be assigned or transferred without the prior written consent of the other. This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and assigns.

17.     In the event of a breach, the prevailing party shall be entitled to reasonable attorneys' fees and collection costs, including all fees and costs on appeal.

18.     This Agreement contains the entire Agreement between the Parties, and shall not be modified, amended or supplemented, or any rights therein waived, unless specifically agreed upon in writing by LPG and Affiliate.

**The Litigation Practice Group PC**



**By: Daniel S. March, Managing Shareholder**

**New Vision Debt LLC**

By: Sarvenaz Moarefian

Title:  **Member**

4

DocuSign Envelope ID: 85A562E3-49A8-4539-B35F-1B61B7B61D07

## Electronic Funds Transfer Authorization

This Electronic Funds Transfer (EFT) authorization is for use in connection with the foregoing Agreement, and permits LPG to transfer any and all amounts due to **New Vision Debt LLC** ("Affiliate") under the foregoing Agreement by EFT.  By signing below, Affiliate hereby authorizes LPG to initiate EFT transfers at its discretion, with all fees and costs incurred by Affiliate in connection with such transfer to be borne by Affiliate, while all fees and costs incurred by LPG in connection with such transfer to be borne by LPG.

Account Holder Signature: _____ Date: ___10/24/2022_____

By: Sarvenaz Moarefian

Title:  Member

Account Owner Name: New Vision Debt LLC

Social Security Number / FEIN Number associated with account listed below: ███████

Address: 3857 Birch St #25

City: Newport Beach, CA 92660

Bank Name: Wells Fargo

Routing Number: ███████

Account Number: ███████

Account type :  Checking

5

# EXHIBIT 4

DocuSign Envelope ID: 0EB1E1BA-0605-41DA-8AEA-8FF2DD4D48C7

## The Litigation Practice Group PC - Affiliate Agreement

THIS AGREEMENT (the "Agreement") is made and effective as of the 20th day of October, 2022 by and between The Litigation Practice Group PC ("LPG") and **New Vision Debt LLC** (hereinafter "Affiliate").

RECITALS:

LPG is in the business of providing a package debtor's rights services in the form of debt validation, consultation, and litigation defense through a network of attorneys licensed to practice law in all 50 states and the District of Columbia.  The legal services offered include:

- Removal of invalid debts through correspondence directly with the three credit bureaus;
- Validation of consumer debts through correspondence including disputes with original creditors, validation demands to third party debt collectors and assignees, and disputes with all three credit bureaus;
- Defense of collection actions initiated by original creditors or third party assignees;
- Negotiation of advantageous settlements of consumer debts both pre and post litigation;
- Education of clients regarding federal laws applicable to consumer debt and credit reporting, and consultation regarding risk mitigation and litigation defense through its network of attorneys across the country.

Each of these services is offered without regard to the identity of the creditor or third-party debt collector or assignee.  LPG reviews all client files prior to the execution of the client's legal services agreement with the appropriate law firm, and maintains oversight through its administrative services over all file placements.

Affiliate owns and operates a system of generating leads consisting of consumers interested in the legal services offered by LPG.  Affiliate, acting in accordance with direction from LPG, shall obtain the names of Consumers and will market in a lawful manner, complying with the restrictions of the jurisdiction in which the consumer resides.  For consumers interested in utilizing LPG's services, Affiliate will assist LPG in having consumers execute an approved legal services agreement with a law firm to which LPG provides administrative support services, at which point consumers will become clients of that law firm, and that law firm will be exclusively responsible for and liable for the representation of consumers in the context of the provision of legal services.  Nothing in this Agreement nor in the eventual legal services agreement shall restrict Affiliate from offering any other service of any kind to consumer, including credit repair or debt relief programs.  Nor is Affiliate restricted from marketing on behalf of credit repair or debt relief entities, including but not limited to other law firms.  LPG and Affiliate hereby agree that any and all prior agreements entered into by LPG and Affiliate or any law firm to which LPG provides administrative support services and Affiliate are null and void and unenforceable, and this Agreement shall become the operative agreement for all files previously placed through the use of LPG's administrative support services.

Affiliate is being retained by LPG to provide marketing and customer service functions only.  All payments made to Affiliate are for services actually rendered, and do not constitute a revenue or fee sharing agreement.  The method used to determine the value of the services rendered by Affiliate to LPG were



1

DocuSign Envelope ID: 0FB1F4BA-0605-41DA-8AEA-8EE2DDAD48C7

selected by both parties based upon industry standard and effective valuation, and not for any other purpose.

LPG and Affiliate hereby agree to the following:

1.    Each Party shall be solely responsible for bearing its own costs and expenses incurred in performing its responsibilities under this Agreement, including all tariffs, filings, licensing and/or other fees.

2.    Affiliate shall comply with state and federal laws in communicating with consumers regarding LPG, any law firm utilized by LPG, or any of the programs of LPG or the assigned law firm.

3.    Both LPG and the law firm it utilizes shall comply with all state and federal laws in performing its obligations under the legal services agreement entered into between LPG and the consumers referred by Affiliate.

4.    If requested by LPG, Affiliate shall provide a copy of all marketing materials to LPG upon receiving a request from LPG.  Affiliate shall endeavor to provide such materials within 10 business days of such request, but may provide such materials in any time frame that is commercially reasonable.

5.    Affiliate agrees to keep any and all documents or communications between itself and LPG confidential pursuant to the provisions set forth below, and shall not share of disclose such documents to any party with prior, express written consent.

6.    Affiliate shall be entitled to receive the following as full and complete compensation for its services to LPG: LPG shall pay 85% per file for each file that Affiliate places with LPG, not counting the monthly maintenance fee of $31.46 (15% of the $76.38 plus $20), which LPG shall retain to cover administrative costs for each file.  LPG shall calculate the amount of each file, apply the above-identified percentage fee, and remit the same to Affiliate pursuant to an agreed-upon schedule not to exceed one remittance per seven (7) calendar days.  If any consumer cancels LPG's services, or demands a refund for payment for such services, or both, then LPG shall be solely responsive for such cost and Affiliate shall not have to share such expense.  LPG has exclusive discretion to grant or deny a requested refund or cancellation.  Finally, LPG may treat a consumer's failure to remit payment in a timely manner as a cancellation of the legal services agreement executed by consumer with LPG, and has sole discretion to make such determination.

7.    LPG shall bear all expenses related to the services it offers to consumers, and Affiliate shall bear all expenses related to its marketing of the same except as is set forth in this Paragraph.  Neither LPG nor Affiliate shall be required to pay the expenses of the other.

8.    LPG reserves all rights with regard to rejection or cancellation of a consumer, but will do so only in accordance with the recommendation of the law firm utilized in providing such service, and only subject to the applicable state bar rules for such representation.

9.    This agreement shall continue to operate and bind LPG and Affiliate for a period of twelve (12) months from the date of execution of this Agreement.  At that time, this Agreement will automatically



2

renew until either party sends written notice of cancellation of this Agreement, which shall be effective 30 days after LPG or Affiliate postmarks or emails a cancellation letter stating the intent of that party to terminate this Agreement.  If such cancellation letter is sent by either party, it shall be effective 30 days from the date of postmark or email, and shall terminate this Agreement and release either party from the obligations contained herein.

10.    If either party shall default under this Agreement, defined as a failure to comply with any of the obligations set forth above, the Agreement shall terminate following notice of default and a cure period of 30 days from the date postmarked on the notice of default.  The notice of default must state with specificity the act of default alleged.

11.    Upon termination of this Agreement for any reason whatsoever, LPG and Affiliate will refrain from making any disparaging or negative comment, remark, statement, or implication, whether written or oral.

12.    The confidential information of LPG or Affiliate shall include information regarding contracts, customer or client lists or information, hardware, software, screens, specifications, designs, plans, drawings, data, prototypes, discoveries, research, developments, methods, processes, procedures, improvements, 'Know-how', compilations, market research, marketing techniques and plans, marketing materials, business plans and strategies, documents, scripts, guidelines, price lists, pricing policies and financial information or other business and/or technical information and materials, in oral, demonstrative, written, graphic or machine-readable form, which is unpublished, not available to the general public or trade, and which is maintained as confidential and proprietary information by the disclosing party for regulatory, customer relations, and/or competitive reasons.  Neither LPG nor Affiliate may disclose the confidential information of the other with the express written consent of the other.  A failure to abide by this confidentiality term shall entitle the party whose confidential information was compromised to a reasonable sum not less than $50,000.00, nor more than $200,000.00.  The disclosure of information in connection with a judicial proceeding shall not constitute a violation of this term.  The parties agree to notify the other if any inadvertent disclosure of information occurs within 48 hours of becoming aware of such disclosure.  The parties agree to work together in good faith to remediate any disclosure of confidential information.  A party whose confidential information is disclosed shall be entitled to injunctive relief in any court of competent jurisdiction.

13.    If, after the passage of six months of the date of this Agreement, Affiliate fails, in any one calendar month, to have at least fifty (50) active consumers, LPG shall withhold 20% of the fees due to Affiliate for said month in an escrow account.  Such fees shall be held in escrow until, in a single calendar month, Affiliate has fifty (50) or more active consumers, at which point, within five (5) business days of the end of such calendar month, LPG shall transfer the balance of such escrow account to Affiliate and retain nothing in such escrow account.  If Affiliate shall cease operations for any reason, or this Agreement shall terminate for any reason, Affiliate will continue to receive fees due to it under this Agreement until all active consumers have completed or withdrawn from the program, at which point any remaining amounts being held in escrow shall be released to Affiliate in full.



3

DocuSign Envelope ID: 0FB1F1BA-0605-41DA-8AEA-8FE2DDAD48C7

14.     Affiliate agrees not to use the name LPG or any law firm in any advertising, publicity release, or sales presentation designed to promote Affiliate's service, unless LPG provides prior written consent to such specific use.

15.     Any fees incurred by LPG in connection with a customer's Non-Sufficient Funds ("NSF") fee shall be borne exclusively by LPG.

16.     This Agreement may not be assigned or transferred without the prior written consent of the other. This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and assigns.

17.     In the event of a breach, the prevailing party shall be entitled to reasonable attorneys' fees and collection costs, including all fees and costs on appeal.

18.     This Agreement contains the entire Agreement between the Parties, and shall not be modified, amended or supplemented, or any rights therein waived, unless specifically agreed upon in writing by LPG and Affiliate.

**The Litigation Practice Group PC**

DocuSigned by:

*Daniel S March*

9D494DB1993341E

**By: Daniel S. March, Managing Shareholder**

**New Vision Debt LLC**

DocuSigned by:

Sarvanez Moarefian

8367EC5EAAF646E...

By: Sarvenaz Moarefian

Title:  **Member**

4

DocuSign Envelope ID: 0FB1F1BA-0605-41DA-8AEA-8FE2DD4D48C7

## Electronic Funds Transfer Authorization

This Electronic Funds Transfer (EFT) authorization is for use in connection with the foregoing Agreement, and permits LPG to transfer any and all amounts due to **New Vision Debt LLC** ("Affiliate") under the foregoing Agreement by EFT.  By signing below, Affiliate hereby authorizes LPG to initiate EFT transfers at its discretion, with all fees and costs incurred by Affiliate in connection with such transfer to be borne by Affiliate, while all fees and costs incurred by LPG in connection with such transfer to be borne by LPG.

DocuSigned by:

Account Holder Signature: **Sarvanez Moarefian**  Date: 10/27/2022

8367EC5EAAF646E...

By: Sarvenaz Moarefian

Title:  Member

Account Owner Name: New Vision Debt LLC

Social Security Number / FEIN Number associated with account listed below: ███████

Address: 3857 Birch St #25

City: Newport Beach, CA 92660

Bank Name: Wells Fargo

Routing Number: ███████

Account Number: ███████

Account type :  Checking

5

# EXHIBIT 5

DocuSign Envelope ID: 3E5197DF6-7FB7-4B79-9F10-AA59FAA3840D

## ACCOUNTS RECEIVABLE PURCHASE AGREEMENT

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is made as of November 24, 2022 (the "**Agreement Date**"), by and between New Vision Debt LLC (collectively the "**Buyer**"), MRD Marketing LLC (the "**Seller**" or **"LPG"**, and together with the Buyer, the **"Parties"**), and The Litigation Practice Group PC ("LPG").

## RECITALS

WHEREAS, in the regular course of business, the Seller originates account receivables from **LPG** in connection with client on-boarding services provided by the Seller to LPG and its affiliates;

WHEREAS, the account receivables represent an obligation of various clients to pay Seller for services that Seller previously provided, but which LPG shall provide from the date of execution of this Agreement;

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables (the "**Purchased Accounts**").

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

## ARTICLE 1.
## DEFINITIONS

Section 1.1    Certain Definitions.  Certain defined terms used in this Agreement are set forth on **Exhibit A**.

## ARTICLE 2.
## ASSIGNMENT AND TRANSFER AND CONSIDERATION

Section 2.1    Assignment of the Purchased Accounts to the Buyer.  Upon execution of this Agreement and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all of the Seller's right, title, and interest in and to the Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens.  Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the "**Excluded Assets**").

Section 2.2    No Assumption of Liabilities.  The Buyer shall not assume any Liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the "**Excluded Liabilities**").

Section 2.3    Payment of Purchase Price.  Buyer shall pay $21,307.09 (total purchase price) for the Purchased Accounts (the "**Purchase Price**") by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in **Schedule 2.3** (the "**Wire Instructions**").  The Purchased Accounts are set forth on the attached spreadsheet.

Section 2.4    Guarantee of LPG.  If any file acquired by buyer shall fail to make a first payment, LPG will replace the file and bear any cost associated with such replacement.  The replacement file shall yield no less than the receivable of the failed file.  In addition, if any any calendar month a total of less than 80% of files make a cleared payment, LPG shall replace any non-performing files in such month so that the performance of the file

package as a whole equals 80%. This guarantee shall continue until the completion of the 24th month following execution of this agreement.

## ARTICLE 3.
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1    Organization; Good Standing.  The Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the Laws of the State of Delaware and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2    Power and Authority.  The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller, and assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.3    Title to, and Sufficiency of, the Purchased Accounts.  The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all of the Purchased Accounts, free and clear of all Liens.

Section 3.4    Consents.  The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.5    No Conflicts. The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

Section 3.6    <u>Compliance with Laws</u>.  The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.

Section 3.7    <u>Legal Proceedings</u>. There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements.  No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.8    <u>Condition of Purchased Accounts</u>.  Each Purchased Account shall have received no less than one processed payment.

Section 3.9    <u>Confidentiality</u>. Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the "**Confidential Information**").  Seller will at all times keep the  Confidential Information in confidence and trust.  Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer.  Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions.  Seller agrees that violation of this Section 3.9.  The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

## ARTICLE 4.
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1    <u>Organization; Good Standing</u>.  The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Florida.

Section 4.2    <u>Power and Authority</u>.  The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

DocuSign Envelope ID: 8F4D7DE6-7DB7-4B73-9F10-AA59EAA340D

Section 4.3     No Conflicts.  The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4     Sufficient Funds.  The Buyer has, and will have, sufficient funds available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

## ARTICLE 5.
## COVENANTS

Section 5.1     Appropriate Actions.

(a)     General.  Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

## ARTICLE 6.
## CLOSING

Section 6.1     Closing.  The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing.  The date on which the Closing occurs is hereinafter referred to as the "**Closing Date.**" The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2     Closing Deliverables of the Seller.  At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer:  (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **Exhibit B** (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3     Closing Deliverables of the Buyer.  At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to Section 6.2, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4     Indemnification by the Seller.  Subject to the limitations set forth in this Article 6, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of,

arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Seller pursuant to this Agreement", (c) any Excluded Asset or any Excluded Liability.

Section 6.5    <u>Indemnification by the Buyer</u>.  Subject to the limitations set forth in this <u>Article 6</u>, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurance related to the Purchased Accounts or Buyer occurring after the Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.6    <u>Indemnification Procedures</u>.

(a)    <u>No Restraints</u>.  Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, <u>provided</u>, <u>however</u>, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim.  The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; <u>provided</u>, <u>however</u>, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred.  In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense.  The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b)    No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim.  An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party

Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c)      If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**").  Such Notice of Claim shall specify the basis for such Direct Claim.  The failure by any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this Section 6.6(c).  If the Indemnifying Party does not notify the Indemnified Party within thirty days following its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this Article 6 or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this Article 6, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined.  In the event that the Indemnifying Party has timely disputed its Liability with respect to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

### ARTICLE 7.
### MISCELLANEOUS

Section 7.1      Entire Agreement; Amendment.  This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof.  This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2      Waivers.  The rights and remedies of the Parties to this Agreement are cumulative and not alternative.  To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for what it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3      Notices.  All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission. A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

DocuSign Envelope ID: 3F5497DF6-7DB7-4B78-9F10-AA59FAA2840D

Section 7.4    <u>Successors and Assigns</u>.  This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns.  Neither this Agreement nor any rights or obligations of a Party hereunder shall be assigned by a Party (unless to an Affiliate of such Party) without the prior written consent of the other Parties.  This Agreement will be binding upon any permitted assignee of any Party.  No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5    <u>Public Disclosure</u>.  Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6    <u>Expenses and Fees</u>.  Whether or not the Closing occurs, all fees and expenses incurred in connection with this transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.

Section 7.7    <u>Specific Performance</u>.  The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

Section 7.8    <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.9    <u>Governing Law</u>.  This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws principles.

Section 7.10    <u>Severability</u>.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 7.11    <u>Construction</u>.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

**New Vision Debt LLC**

By: _____
            BEC40E37742742A
            Name: Gail Hanson – Proof Positive LLC
            Title: Member

**SELLER:**

**MRD Marketing LLC**

By: _____
            9A02C1BA024949E9
            Name: Matt Clegg
            Title: Managing Partner

**APPROVAL OF ASSIGNMENT AND GUARANTEE**

The assignment of the Purchased Accounts set forth in this Agreement as well as the guarantee included therein is hereby approved, and with respect to the Purchased Accounts, the Buyer shall have all rights of Buyer as set forth in this agreement.

**The Litigation Practice Group P.C.**

By: _____
            9D494DB1993341E...
            Name: Daniel S. March
            Title: Managing Shareholder

*[Signature Page to Accounts Receivable Purchase Agreement]*

DocuSign Envelope ID: 3E4D7DE6-7DB7-4B73-8F10-AA59FAA2840D

## EXHIBIT A

## DEFINITIONS

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a)    "**Action**" shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b)    "**Agreement**" shall have the meaning set forth in the preamble to this Agreement.

(c)    "**Agreement Date**" shall have the meaning set forth in the preamble to this Agreement.

(d)    "**Affiliate**" shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii), with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals.  For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e)    "**Bill of Sale and Assignment and Assumption Agreement**" shall have the meaning set forth in Section 6.2.

(f)    "**Business**" shall mean the business of the Seller as conducted on the Agreement Date.

(g)    "**Buyer**" shall have the meaning set forth in the preamble to this Agreement.

(h)    "**Buyer Indemnified Parties**" shall have the meaning set forth in Section 6.4.

(i)    "**Closing**" shall have the meaning set forth in Section 6.1.

(j)    "**Closing Date**" shall have the meaning set forth in Section 6.1.

(k)    "**Direct Claim**" shall have the meaning set forth in Section 6.6(c).

(l)    "**Excluded Assets**" shall have the meaning set forth in Section 2.1.

(m)    "**Excluded Liabilities**" shall have the meaning set forth in Section 2.2.

(n)    "**Governmental Body**" shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

DocuSign Envelope ID: 3F5F97DE6-7DB7-4B7A-9F10-4A59FAA2840D

(o)     "**Indebtedness**" means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p)     "**Indemnified Party**" shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q)     "**Indemnifying Party**" shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r)     "**Knowledge**" shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s)     "**Law**" shall mean any law, statute, ordinance, regulation, rule, code, notice requirement, court decision, or agency guideline, of any foreign, federal, state, or local Governmental Body.

(t)     "**Liabilities**" shall mean any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on-or off-balance sheet, or other.

(u)     "**Lien**" shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v)     "**Losses**" shall have the meaning set forth in Section 6.4.

(w)     "**Notice of Claim**" shall have the meaning set forth in Section 6.6(c).

(x)     "**Organizational Documents**" shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y)     "**Party**" or "**Parties**" shall have the meaning set forth in the preamble to this Agreement.

(z)     "**Permitted Liens**" shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(aa)     "**Person**" shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

DocuSign Envelope ID: 3E5197DF6-7FB7-4B7E-9F10-AA59FAA8340D

(bb)     "**Purchase Price**" shall have the meaning set forth in <u>Section 2.3</u>.

(cc)     "**Purchased Accounts**" shall have the meaning set forth in the Recitals.

(dd)     "**Seller**" shall have the meaning set forth in the preamble to this Agreement.

(ee)     "**Seller Indemnified Parties**" shall have the meaning set forth in <u>Section 6.5</u>.

(ff)     "**Tax**" or "**Taxes**" shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(gg)     "**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(hh)     "**Third Party**" or "**Third Parties**" shall mean any Person other than the Parties or their respective Affiliates.

(ii)     "**Third-party Claim**" shall have the meaning set forth in <u>Section 6.6(a)</u>.

(jj)     "**Transaction Agreements**" shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(kk)     "**Upfront Cash Payment**" shall have the meaning set forth in <u>Section 2.3</u>.

(ll)     "**Wire Instructions**" shall have the meaning set forth in <u>Section 2.3</u>.

DocuSign Envelope ID: 3E5497DE6-7FB7-4B78-9F10-4A59FAA2840D

## EXHIBIT B

### FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this **"Agreement"**), is made by and between **Buyer**, and **Seller**.  Each of the Seller and the Buyer are sometimes referred to herein, individually, as a "**Party**" and, collectively, as the "**Parties**."

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the "**Purchase Agreement**"), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.      <u>Defined Terms</u>.  Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2.      <u>Sale of Purchased Accounts; Assignment</u>.  The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3.      <u>Further Assurances</u>.  Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

4.      <u>Terms of the Purchase Agreement</u>.  This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement.   The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference.  The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5.      <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Remainder of page intentionally left blank.]*

DocuSign Envelope ID: 3E4B7DE6-7DB7-4B73-9F10-AA59FAA2840D

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**BUYER: New Vision Debt LLC**

By: _____
*Gail Hanson*
BFC40F37742742A...

Name: Gail Hanson – Proof Positive LLC
Title: Member

**SELLER:**

**MRD Marketing LLC**

By: _____
*Matt Clegg*
9A02C1BA02494E9...

Name: Matt Clegg
Title: Managing Partner

Accounts Receivable Purchase Agreement

**Schedule 2.3**
**Wire Instructions**

**$21,307.09**

**Account Holder Name: MRD Marketing LLC**

**Address: 6863 Friars Rd, Ste 101 San Diego, CA 92108**

**Routing Number:** ██████████

**Account Number:** ██████████

# EXHIBIT 6

GH

SH

SE

## ACCOUNTS RECEIVABLE PURCHASE AGREEMENT

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is made as of August 25, 2022 (the "**Agreement Date**"), by and between ProofPositive LLC. (the "**Buyer**"), and New Vision Capital Group LLC (the "**Seller**", and together with the Buyer, the **"Parties"**).

## RECITALS

WHEREAS, in the regular course of business, the Seller originates account receivables from Litigation Practice Group LLC ("**LPG**") in connection with client on-boarding services provided by the Seller to LPG and its affiliates;

WHEREAS, the account receivables represent an obligation of various clients to pay Seller for services that Seller previously provided, but which The Litigation Practice Group PC ("LPG") shall provide from the date of execution of this Agreement;

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables (the "**Purchased Accounts**").

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

## ARTICLE 1.
### DEFINITIONS

Section 1.1    Certain Definitions.  Certain defined terms used in this Agreement are set forth on **Exhibit A**.

## ARTICLE 2.
### ASSIGNMENT AND TRANSFER AND CONSIDERATION

Section 2.1    Assignment of the Purchased Accounts to the Buyer. Upon execution of this Agreement and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all of the Seller's right, title, and interest in and to the Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens.  Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the "**Excluded Assets**").

Section 2.2 No Assumption of Liabilities. The Buyer shall not assume any Liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the "**Excluded Liabilities**").

Section 2.3    Payment of Purchase Price. Buyer shall pay $500.00, for each Purchased Account (the "**Purchase Price**") for a total of 500 Purchased Accounts.  The aggregate purchase price for the Purchased Accounts shall be $250,000.00 paid from ProofPositive LLC Capital Account of LIMITED LIABILITY COMPANY OPERATING AGREEMENT of New Vision Capital Group, LLC.

### ARTICLE 3.
### REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1    Organization; Good Standing. The Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the Laws of the State of California and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2   Power and Authority. The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.3    Title to, and Sufficiency of, the Purchased Accounts.  The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all of the Purchased Accounts, free and clear of all Liens.

Section 3.4    Consents. The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.5    No Conflicts. The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

Section 3.6   Compliance with Laws.  The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.

DocuSign Envelope ID: E2CA9C23-0BE3-4646-8CB1-6FCD73272748

Section 3.7   Legal Proceedings. There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements.  No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.8   Condition of Purchased Accounts. Each Purchased Account shall have received no less than one processed payment.

Section 3.9   Confidentiality. Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the "**Confidential Information**").  Seller will at all times keep the Confidential Information in confidence and trust.  Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer.  Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions.  Seller agrees that violation of this Section 3.9.  The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

## ARTICLE 4.
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1 Organization; Good Standing. The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Wyoming.

Section 4.2 Power and Authority. The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 4.3   No Conflicts. The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not

DocuSign Envelope ID: E2CA9C23-0BE3-4646-8CB1-6FCD73272748

conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4 <u>Sufficient Funds</u>. The Buyer has, and will have, sufficient capital accounts in LIMITED LIABILITY COMPANY OPERATING AGREEMENT of New Vision Capital Group, LLC available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

## ARTICLE 5.
## COVENANTS

Section 5.1     <u>Appropriate Actions</u>.

(a)     <u>General</u>. Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

## ARTICLE 6.
## CLOSING

Section 6.1     <u>Closing</u>. The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing.  The date on which the Closing occurs is hereinafter referred to as the "**Closing Date**." The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2     <u>Closing Deliverables of the Seller</u>.  At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer:  (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **Exhibit B** (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3     <u>Closing Deliverables of the Buyer</u>. At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to <u>Section 6.2</u>, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4     <u>Indemnification by the Seller</u>.  Subject to the limitations set forth in this <u>Article 6</u>, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties

of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Seller pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability.

Section 6.5     Indemnification by the Buyer.  Subject to the limitations set forth in this Article 6, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurrence related to the Purchased Accounts or Buyer occurring after the Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.6     Indemnification  Procedures.

(a)     No Restraints.  Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, provided, however, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim.  The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; provided, however, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred.  In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense. The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b)     No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim.  An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the

Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c)    If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**").  Such Notice of Claim shall specify the basis for such Direct Claim.  The failure by any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this Section 6.6(c).  If the Indemnifying Party does not notify the Indemnified Party within thirty days following its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this Article 6 or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this Article 6, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined.   In the event that the Indemnifying Party has timely disputed its Liability with respect to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

## ARTICLE 7.
## MISCELLANEOUS

Section 7.1  Entire Agreement; Amendment.  This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof.  This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2  Waivers.  The rights and remedies of the Parties to this Agreement are cumulative and not alternative. To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for which it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3    Notices.  All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission. A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

DocuSign Envelope ID: E2CA9C23-0BE8-4646-8CB1-6FCD73272748



Section 7.4    <u>Successors and Assigns</u>. This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns.  Neither this Agreement nor any rights or obligations of a Party hereunder shall be assigned by a Party (unless to an Affiliate of such Party) without the prior written consent of the other Parties.  This Agreement will be binding upon any permitted assignee of any Party. No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5    <u>Public Disclosure</u>.  Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6    <u>Expenses and Fees</u>. Whether or not the Closing occurs, all fees and expenses incurred in connection with this transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.

Section 7.7 <u>Specific Performance</u>. The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

Section 7.8    <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.9    <u>Governing Law</u>. This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws principles.

Section 7.10    <u>Severability</u>.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 7.11    <u>Construction</u>.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

8/25/2022

8/25/2022
8/25/2022

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

ProofPositive LLC

By: *Gail Hanson*

Name:  Gail Hanson

Title:    Managing  Member

**SELLER:**

New Vision
Capital
Group LLC

*Sania Hashempour*

*Sarvenaz Esfahani*

By: *Gail Hanson*

Name:

Title:

## APPROVAL OF ASSIGNMENT

The assignment of the Purchased Accounts set forth in this Agreement is hereby approved, and with respect to the Purchased Accounts, the Buyer shall have all rights of Buyer as set forth in this agreement.

**The Litigation Practice Group P.C.**

By: *Daniel March*

Name: Daniel S. March

Title: Managing Shareholder

DocuSign Envelope ID: E2CA9C23-0BE3-4646-8CB1-6FCD72272748

## EXHIBIT A

## DEFINITIONS

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a)      "**Action**" shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b)      "**Agreement**" shall have the meaning set forth in the preamble to this Agreement.

(c)      "**Agreement Date**" shall have the meaning set forth in the preamble to this Agreement.

(d)      "**Affiliate**" shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii) with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals.  For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e)      "**Bill of Sale and Assignment and Assumption Agreement**" shall have the meaning set forth in Section 6.2.

(f)      "**Business**" shall mean the business of the Seller as conducted on the Agreement Date.

(g)      "**Buyer**" shall have the meaning set forth in the preamble to this Agreement.

(h)      "**Buyer Indemnified Parties**" shall have the meaning set forth in Section 6.4.

(i)      "**Closing**" shall have the meaning set forth in Section 6.1.

(j)      "**Closing Date**" shall have the meaning set forth in Section 6.1.

(k)      "**Direct Claim**" shall have the meaning set forth in Section 6.6(c).

(l)      "**Excluded Assets**" shall have the meaning set forth in Section 2.1.

(m)      "**Excluded Liabilities**" shall have the meaning set forth in Section 2.2.

(n)      "**Governmental Body**" shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

DocuSign Envelope ID: E2CA9C23-0BE8-4646-8CB1-6FCD73272748

(o)      "**Indebtedness**" means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p)      "**Indemnified Party**" shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q)      "**Indemnifying Party**" shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r)      "**Knowledge**" shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s)      "**Law**" shall mean any law, statute, ordinance, regulation, rule, code, notice requirement, court decision, or agency guideline, of any foreign, federal, state, or local Governmental Body.

(t)      "**Liabilities**" shall mean any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on- or off-balance sheet, or other.

(u)      "**Lien**" shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v)      "**Losses**" shall have the meaning set forth in Section 6.4.

(w)      "**Notice of Claim**" shall have the meaning set forth in Section 6.6(c).

(x)      "**Organizational Documents**" shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y)      "**Party**" or "**Parties**" shall have the meaning set forth in the preamble to this Agreement.

(z)      "**Permitted Liens**" shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(aa)      "**Person**" shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

DocuSign Envelope ID: E2CA9C23-0BE3-4646-8CB1-6FCD73272748

(bb)    "**Purchase Price**" shall have the meaning set forth in Section 2.3.

(cc)    "**Purchased Accounts**" shall have the meaning set forth in the Recitals.

(dd)    "**Seller**" shall have the meaning set forth in the preamble to this Agreement.

(ee)    "**Seller Indemnified Parties**" shall have the meaning set forth in Section 6.5.

(ff)    "**Tax**" or "**Taxes**" shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(gg)    "**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(hh)    "**Third Party**" or "**Third Parties**" shall mean any Person other than the Parties or their respective Affiliates.

(ii)    "**Third-party Claim**" shall have the meaning set forth in Section 6.6(a).

(jj)    "**Transaction Agreements**" shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(kk)    "**Upfront Cash Payment**" shall have the meaning set forth in Section 2.3.

(ll)    "**Wire Instructions**" shall have the meaning set forth in Section 2.3.

DocuSign Envelope ID: E2CA8C23-0BE3-4646-8CB1-6FCD72272748

## EXHIBIT B

### FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this **"Agreement"**), is made by and between ProofPositive LLC. (the "**Buyer**"), and New Vision Capital Group LLC (the "**Seller**").  Each of the Seller and the Buyer are sometimes referred to herein, individually, as a "**Party**" and, collectively, as the "**Parties**."

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the "**Purchase Agreement**"), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.     <u>Defined Terms</u>.  Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2.     <u>Sale of Purchased Accounts; Assignment</u>.  The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3.     <u>Further Assurances</u>.  Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

4.     <u>Terms of the Purchase Agreement</u>.  This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement.  The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference.  The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5.     <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Remainder of page intentionally left blank.]*

Accounts Receivable Purchase Agreement

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.


**BUYER:**

ProofPositive LLC

By: _Gail Hanson_

Name:  Gail  Hanson

Title:    Managing  Member


**SELLER:**

New Vision
Capital
Group LLC

_Gail Hanson_

_Sania Hashempour_

By: _Sarvenaz Esfahani_

Name:

Title:

DocuSign Envelope ID: E2CA9C23-0BE8-4646-8CB1-6FCD73272748

**Schedule 2.3**

**Wire Instructions**

$250,000.00 paid from ProofPositive LLC Capital Account of LIMITED LIABILITY COMPANY OPERATING AGREEMENT of New Vision Capital Group, LLC.

Accounts Receivable Purchase Agreement

# EXHIBIT 6.1

DocuSign Envelope ID: 65BDB4B2-4077-4182-AAC4-F6036EC85DCA

## ACCOUNTS RECEIVABLE PURCHASE AGREEMENT

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is made as of August 26, 2022 (the "**Agreement Date**"), by and between ProofPositive LLC. (the "**Buyer**"), and New Vision Capital Group LLC (the "**Seller**", and together with the Buyer, the **"Parties"**).

### RECITALS

WHEREAS, in the regular course of business, the Seller originates account receivables from Litigation Practice Group LLC ("**LPG**") in connection with client on-boarding services provided by the Seller to LPG and its affiliates;

WHEREAS, the account receivables represent an obligation of various clients to pay Seller for services that Seller previously provided, but which The Litigation Practice Group PC ("LPG") shall provide from the date of execution of this Agreement;

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables (the "**Purchased Accounts**").

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

### ARTICLE 1.
### DEFINITIONS

Section 1.1    Certain Definitions.  Certain defined terms used in this Agreement are set forth on **Exhibit A**.

### ARTICLE 2.
### ASSIGNMENT AND TRANSFER AND CONSIDERATION

Section 2.1    Assignment of the Purchased Accounts to the Buyer.  Upon execution of this Agreement and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all of the Seller's right, title, and interest in and to the Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens.  Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the "**Excluded Assets**").

Section 2.2 No Assumption of Liabilities. The Buyer shall not assume any Liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the "**Excluded Liabilities**").

Section 2.3    Payment of Purchase Price. Buyer shall pay $500.00, for each Purchased Account (the "**Purchase Price**") for a total of 200 Purchased Accounts.  The aggregate purchase price for the Purchased Accounts shall be $100,000.00 which has been paid in full to New Vision Capital Group LLC through ProofPositive LLC deposits to New Vision Capital Group LLC throughout the month of August 2022.

8/25/2022

8/25/2022

8/26/2022

## ARTICLE 3.
### REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1 <u>Organization; Good Standing</u>. The Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the Laws of the State of California and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2 <u>Power and Authority</u>. The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby. This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.3 <u>Title to, and Sufficiency of, the Purchased Accounts</u>. The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all of the Purchased Accounts, free and clear of all Liens.

Section 3.4 <u>Consents</u>. The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.5 <u>No Conflicts</u>. The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

Section 3.6 <u>Compliance with Laws</u>. The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.

Section 3.7    Legal Proceedings. There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements.  No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.8    Condition of Purchased Accounts. Each Purchased Account shall have received no less than one processed payment.

Section 3.9    Confidentiality. Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the "**Confidential Information**").  Seller will at all times keep the  Confidential Information in confidence and trust.  Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer.  Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions.  Seller agrees that violation of this Section 3.9.  The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

**ARTICLE 4.**
**REPRESENTATIONS AND WARRANTIES OF THE BUYER**

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1 Organization; Good Standing. The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Wyoming.

Section 4.2 Power and Authority. The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 4.3    No Conflicts. The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not

conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4  Sufficient Funds.  The Buyer has, and will have, sufficient capital accounts in LIMITED LIABILITY COMPANY OPERATING AGREEMENT of New Vision Capital Group, LLC available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

## ARTICLE 5.
## COVENANTS

Section 5.1  Appropriate Actions.

(a)  General.  Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

## ARTICLE 6.
## CLOSING

Section 6.1  Closing.  The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing.  The date on which the Closing occurs is hereinafter referred to as the "**Closing Date.**" The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2  Closing Deliverables of the Seller.  At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer:  (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **Exhibit B** (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3  Closing Deliverables of the Buyer.  At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to Section 6.2, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4  Indemnification by the Seller.  Subject to the limitations set forth in this Article 6, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties

of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Seller pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability.

Section 6.5 <u>Indemnification by the Buyer</u>. Subject to the limitations set forth in this <u>Article 6</u>, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurrence related to the Purchased Accounts or Buyer occurring after the Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.6 <u>Indemnification Procedures</u>.

(a) <u>No Restraints</u>. Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, <u>provided</u>, <u>however</u>, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim. The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; <u>provided</u>, <u>however</u>, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred. In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense. The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b) No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim. An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the

DocuSign Envelope ID: 65B9B4B2-4B77-4182-AAC4-F6036EC85DCA

Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c)      If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**").  Such Notice of Claim shall specify the basis for such Direct Claim.  The failure by any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this Section 6.6(c).  If the Indemnifying Party does not notify the Indemnified Party within thirty days following its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this Article 6 or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this Article 6, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined.   In the event that the Indemnifying Party has timely disputed its Liability with respect to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

### ARTICLE 7.
### MISCELLANEOUS

Section 7.1  Entire Agreement; Amendment.  This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof.  This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2 Waivers.  The rights and remedies of the Parties to this Agreement are cumulative and not alternative. To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for which it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3      Notices. All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission. A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

DocuSign Envelope ID: 65BDB4B2-4B77-4182-AAC4-F6036EC85DCA

Section 7.4    <u>Successors and Assigns</u>. This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns.  Neither this Agreement nor any rights or obligations of a Party hereunder shall be assigned by a Party (unless to an Affiliate of such Party) without the prior written consent of the other Parties.  This Agreement will be binding upon any permitted assignee of any Party. No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5    <u>Public Disclosure</u>.  Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6    <u>Expenses and Fees</u>. Whether or not the Closing occurs, all fees and expenses incurred in connection with this transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.

Section 7.7 <u>Specific Performance</u>. The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

Section 7.8    <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.9    <u>Governing Law</u>. This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws principles.

Section 7.10    <u>Severability</u>.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 7.11    <u>Construction</u>.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

8/25/2022

8/25/2022

8/26/2022

DocuSign Envelope ID: 65BDB4B2-4B7F-4182-AAC4-F6036EC85DCA

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

ProofPositive LLC

By: *Gail Hanson*
      BFC40F37742742A...

Name:   Gail Hanson

Title:    Managing Member

**SELLER:**

New Vision Capital Group LLC

*Sarvenaz Esfahani*
FA15139629BF4F0...

*Sania Haslempour*
278C459E2B9F45A...

By: *Gail Hanson*
      BFC40F37742742A...

Name:

Title:

## APPROVAL OF ASSIGNMENT

The assignment of the Purchased Accounts set forth in this Agreement is hereby approved, and with respect to the Purchased Accounts, the Buyer shall have all rights of Buyer as set forth in this agreement.

**The Litigation Practice Group P.C.**

By: *Daniel March*
      9D494D51993341E...

Name: Daniel S. March

Title: Managing Shareholder

*[Signature Page to Accounts Receivable Purchase Agreement]*

8/28/2022

8/25/2022

8/25/2022

8/26/2022

DocuSign Envelope ID: 65BDB4B2-4B77-4182-AAC4-F6036EC85DCA

## EXHIBIT A

## DEFINITIONS

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a) "**Action**" shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b) "**Agreement**" shall have the meaning set forth in the preamble to this Agreement.

(c) "**Agreement Date**" shall have the meaning set forth in the preamble to this Agreement.

(d) "**Affiliate**" shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii), with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals.  For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e) "**Bill of Sale and Assignment and Assumption Agreement**" shall have the meaning set forth in Section 6.2.

(f) "**Business**" shall mean the business of the Seller as conducted on the Agreement Date.

(g) "**Buyer**" shall have the meaning set forth in the preamble to this Agreement.

(h) "**Buyer Indemnified Parties**" shall have the meaning set forth in Section 6.4.

(i) "**Closing**" shall have the meaning set forth in Section 6.1.

(j) "**Closing Date**" shall have the meaning set forth in Section 6.1.

(k) "**Direct Claim**" shall have the meaning set forth in Section 6.6(c).

(l) "**Excluded Assets**" shall have the meaning set forth in Section 2.1.

(m) "**Excluded Liabilities**" shall have the meaning set forth in Section 2.2.

(n) "**Governmental Body**" shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

DocuSign Envelope ID: 65DDB4B2-4677-4182-AAC4-F6036EC85DCA

(o)      "**Indebtedness**" means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p)      "**Indemnified Party**" shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q)      "**Indemnifying Party**" shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r)      "**Knowledge**" shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s)      "**Law**" shall mean any law, statute, ordinance, regulation, rule, code, notice requirement, court decision, or agency guideline, of any foreign, federal, state, or local Governmental Body.

(t)      "**Liabilities**" shall mean any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on- or off-balance sheet, or other.

(u)      "**Lien**" shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v)      "**Losses**" shall have the meaning set forth in Section 6.4.

(w)      "**Notice of Claim**" shall have the meaning set forth in Section 6.6(c).

(x)      "**Organizational Documents**" shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y)      "**Party**" or "**Parties**" shall have the meaning set forth in the preamble to this Agreement.

(z)      "**Permitted Liens**" shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(aa)     "**Person**" shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

(bb)    "**Purchase Price**" shall have the meaning set forth in Section 2.3.

(cc)    "**Purchased Accounts**" shall have the meaning set forth in the Recitals.

(dd)    "**Seller**" shall have the meaning set forth in the preamble to this Agreement.

(ee)    "**Seller Indemnified Parties**" shall have the meaning set forth in Section 6.5.

(ff)   "**Tax**" or "**Taxes**" shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(gg)   "**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(hh)  "**Third Party**" or "**Third Parties**" shall mean any Person other than the Parties or their respective Affiliates.

(ii)    "**Third-party Claim**" shall have the meaning set forth in Section 6.6(a).

(jj)    "**Transaction Agreements**" shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(kk)    "**Upfront Cash Payment**" shall have the meaning set forth in Section 2.3.

(ll)    "**Wire Instructions**" shall have the meaning set forth in Section 2.3.

DocuSign Envelope ID: 65BDB4B2-4B7F-4182-AAC4-F6036FC85DCA

## EXHIBIT B

### FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this "**Agreement**"), is made by and between ProofPositive LLC. (the "**Buyer**"), and New Vision Capital Group LLC (the "**Seller**").  Each of the Seller and the Buyer are sometimes referred to herein, individually, as a "**Party**" and, collectively, as the "**Parties**."

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the "**Purchase Agreement**"), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.    <u>Defined Terms</u>.  Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2.    <u>Sale of Purchased Accounts; Assignment</u>.  The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3.    <u>Further Assurances</u>.  Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

4.    <u>Terms of the Purchase Agreement</u>.  This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement.  The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference.  The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5.    <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Remainder of page intentionally left blank.]*

Accounts Receivable Purchase Agreement

DocuSign Envelope ID: 65BDB4B2-4B7F-4182-AAC4-F6036EC85DCA

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**BUYER:**

ProofPositive LLC

By: _Gail Hanson_
    ⌐BFC40F37742742A...
    Name:   Gail  Hanson
    Title:   Managing  Member

**SELLER:**

New Vision
Capital
Group LLC

_Sarvenaz Esfahani_
EA15139629BF4F0...

_Sania Hashempour_
276C459E2B0F45A...

_Gail Hanson_
BFC40F37742742A...

By: _____
    Name:
    Title:

DocuSign Envelope ID: 65BDB4B2-4B77-4182-AAC4-F6036FC85DCA

**Schedule 2.3**
**Wire Instructions**

The aggregate purchase price for the Purchased Accounts shall be $100,000.00 which has been paid in full to New Vision Capital Group LLC through ProofPositive LLC deposits to New Vision Capital Group LLC throughout the month of August 2022.

Accounts Receivable Purchase Agreement

8/25/2022

8/25/2022

8/26/2022

## ACCOUNTS RECEIVABLE PURCHASE AGREEMENT

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is made as of August 26, 2022 (the "**Agreement Date**"), by and between ProofPositive LLC. (the "**Buyer**"), and New Vision Capital Group LLC (the "**Seller**", and together with the Buyer, the **"Parties"**).

### RECITALS

WHEREAS, in the regular course of business, the Seller originates account receivables from Litigation Practice Group LLC ("**LPG**") in connection with client on-boarding services provided by the Seller to LPG and its affiliates;

WHEREAS, the account receivables represent an obligation of various clients to pay Seller for services that Seller previously provided, but which The Litigation Practice Group PC ("LPG") shall provide from the date of execution of this Agreement;

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables (the "**Purchased Accounts**").

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

### ARTICLE 1.
### DEFINITIONS

Section 1.1    Certain Definitions.  Certain defined terms used in this Agreement are set forth on **Exhibit A**.

### ARTICLE 2.
### ASSIGNMENT AND TRANSFER AND CONSIDERATION

Section 2.1    Assignment of the Purchased Accounts to the Buyer. Upon execution of this Agreement and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all of the Seller's right, title, and interest in and to the Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens.  Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the "**Excluded Assets**").

Section 2.2 No Assumption of Liabilities. The Buyer shall not assume any Liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the "**Excluded Liabilities**").

Section 2.3    Payment of Purchase Price. Buyer shall pay $500.00, for each Purchased Account (the "**Purchase Price**") for a total of 200 Purchased Accounts.  The aggregate purchase price for the Purchased Accounts shall be $100,000.00 which has been paid in full to New Vision Capital Group LLC through ProofPositive LLC deposits to New Vision Capital Group LLC throughout the month of August 2022.

DocuSign Envelope ID: 65BDB4B2-4B77-4182-AAC4-F6036EC85DCA

## ARTICLE 3.
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1 <u>Organization; Good Standing</u>. The Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the Laws of the State of California and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2 <u>Power and Authority</u>. The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby. This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.3 <u>Title to, and Sufficiency of, the Purchased Accounts</u>. The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all of the Purchased Accounts, free and clear of all Liens.

Section 3.4 <u>Consents</u>. The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.5 <u>No Conflicts</u>. The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

Section 3.6 <u>Compliance with Laws</u>. The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.

8/25/2022

8/26/2022

Section 3.7    Legal Proceedings. There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements.  No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.8    Condition of Purchased Accounts. Each Purchased Account shall have received no less than one processed payment.

Section 3.9    Confidentiality. Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the "**Confidential Information**").  Seller will at all times keep the  Confidential Information in confidence and trust.  Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer.  Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions.  Seller agrees that violation of this Section 3.9.  The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

**ARTICLE 4.**
**REPRESENTATIONS AND WARRANTIES OF THE BUYER**

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1 Organization; Good Standing. The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Wyoming.

Section 4.2 Power and Authority. The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 4.3    No Conflicts. The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not

conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4 <u>Sufficient Funds</u>. The Buyer has, and will have, sufficient capital accounts in LIMITED LIABILITY COMPANY OPERATING AGREEMENT of New Vision Capital Group, LLC available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

**ARTICLE 5.**
**COVENANTS**

Section 5.1 <u>Appropriate Actions</u>.

(a) <u>General</u>. Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

**ARTICLE 6.**
**CLOSING**

Section 6.1 <u>Closing</u>. The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing. The date on which the Closing occurs is hereinafter referred to as the "**Closing Date**." The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2 <u>Closing Deliverables of the Seller</u>. At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer: (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **Exhibit B** (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3 <u>Closing Deliverables of the Buyer</u>. At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to <u>Section 6.2</u>, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4 <u>Indemnification by the Seller</u>. Subject to the limitations set forth in this <u>Article 6</u>, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties

of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Seller pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability.

Section 6.5 <u>Indemnification by the Buyer</u>. Subject to the limitations set forth in this <u>Article 6</u>, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurrence related to the Purchased Accounts or Buyer occurring after the Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.6 <u>Indemnification Procedures</u>.

(a) <u>No Restraints</u>. Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, <u>provided</u>, <u>however</u>, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim. The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; <u>provided</u>, <u>however</u>, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred. In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense. The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b) No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim. An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the

DocuSign Envelope ID: 65BDB4B2-4B77-4182-AAC4-F6036EC85DCA

Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c)    If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**").  Such Notice of Claim shall specify the basis for such Direct Claim.  The failure by any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this Section 6.6(c).  If the Indemnifying Party does not notify the Indemnified Party within thirty days following its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this Article 6 or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this Article 6, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined.   In the event that the Indemnifying Party has timely disputed its Liability with respect to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

## ARTICLE 7.
## MISCELLANEOUS

Section 7.1  Entire Agreement; Amendment.  This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof.  This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2 Waivers.  The rights and remedies of the Parties to this Agreement are cumulative and not alternative. To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for which it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3    Notices.  All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission. A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

DocuSign Envelope ID: 65DDB4B2-4B77-4182-AAC4-F6036EC85DCA

Section 7.4   Successors and Assigns. This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns.  Neither this Agreement nor any rights or obligations of a Party hereunder shall be assigned by a Party (unless to an Affiliate of such Party) without the prior written consent of the other Parties.  This Agreement will be binding upon any permitted assignee of any Party. No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5   Public Disclosure.  Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6   Expenses and Fees. Whether or not the Closing occurs, all fees and expenses incurred in connection with this transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.

Section 7.7 Specific Performance. The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

Section 7.8   Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.9    Governing Law. This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws principles.

Section 7.10   Severability.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 7.11   Construction.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

ProofPositive LLC

By: _*Gail Hanson*_____
   BFC40F37742742A...
   Name:   Gail   Hanson
   Title:   Managing   Member

**SELLER:**

New Vision
Capital
Group LLC

_*Sarvenaz Esfahani*_
EA15139629BF4F0...

_*Sania Hashempour*_
278C459E2B9F45A...

By: _*Gail Hanson*_____
   BFC40F37742742A...
   Name:
   Title:

## APPROVAL OF ASSIGNMENT

The assignment of the Purchased Accounts set forth in this Agreement is hereby approved, and with respect to the Purchased Accounts, the Buyer shall have all rights of Buyer as set forth in this agreement.

**The Litigation Practice Group P.C.**

By: _*Daniel March*_____
   9D494D51993341E...
   Name: Daniel S. March
   Title: Managing Shareholder

*[Signature Page to Accounts Receivable Purchase Agreement]*

DocuSign Envelope ID: 65BDB4B2-4B77-4182-AAC4-F6036EC85DCA

## EXHIBIT A

## DEFINITIONS

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a)        "**Action**" shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b)        "**Agreement**" shall have the meaning set forth in the preamble to this Agreement.

(c)        "**Agreement Date**" shall have the meaning set forth in the preamble to this Agreement.

(d)        "**Affiliate**" shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii), with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals.  For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e)        "**Bill of Sale and Assignment and Assumption Agreement**" shall have the meaning set forth in <u>Section 6.2</u>.

(f)        "**Business**" shall mean the business of the Seller as conducted on the Agreement Date.

(g)        "**Buyer**" shall have the meaning set forth in the preamble to this Agreement.

(h)        "**Buyer Indemnified Parties**" shall have the meaning set forth in <u>Section 6.4</u>.

(i)        "**Closing**" shall have the meaning set forth in <u>Section 6.1</u>.

(j)        "**Closing Date**" shall have the meaning set forth in <u>Section 6.1</u>.

(k)        "**Direct Claim**" shall have the meaning set forth in <u>Section 6.6(c)</u>.

(l)        "**Excluded Assets**" shall have the meaning set forth in <u>Section 2.1</u>.

(m)        "**Excluded Liabilities**" shall have the meaning set forth in <u>Section 2.2</u>.

(n)        "**Governmental Body**" shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

DocuSign Envelope ID: 65B9B4B2-4B77-4182-AAC4-F60365C85DCA

(o)    "**Indebtedness**" means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p)    "**Indemnified Party**" shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q)    "**Indemnifying Party**" shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r)    "**Knowledge**" shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s)    "**Law**" shall mean any law, statute, ordinance, regulation, rule, code, notice requirement, court decision, or agency guideline, of any foreign, federal, state, or local Governmental Body.

(t)    "**Liabilities**" shall mean any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on- or off-balance sheet, or other.

(u)    "**Lien**" shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v)    "**Losses**" shall have the meaning set forth in Section 6.4.

(w)    "**Notice of Claim**" shall have the meaning set forth in Section 6.6(c).

(x)    "**Organizational Documents**" shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y)    "**Party**" or "**Parties**" shall have the meaning set forth in the preamble to this Agreement.

(z)    "**Permitted Liens**" shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(aa)    "**Person**" shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

DocuSign Envelope ID: 65B9B4B2-4B7F-4182-AAC4-F6036EC85DCA

(bb)    "**Purchase Price**" shall have the meaning set forth in <u>Section 2.3</u>.

(cc)    "**Purchased Accounts**" shall have the meaning set forth in the Recitals.

(dd)    "**Seller**" shall have the meaning set forth in the preamble to this Agreement.

(ee)    "**Seller Indemnified Parties**" shall have the meaning set forth in <u>Section 6.5</u>.

(ff)    "**Tax**" or "**Taxes**" shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(gg)    "**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(hh)    "**Third Party**" or "**Third Parties**" shall mean any Person other than the Parties or their respective Affiliates.

(ii)    "**Third-party Claim**" shall have the meaning set forth in <u>Section 6.6(a)</u>.

(jj)    "**Transaction Agreements**" shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(kk)    "**Upfront Cash Payment**" shall have the meaning set forth in <u>Section 2.3</u>.

(ll)    "**Wire Instructions**" shall have the meaning set forth in <u>Section 2.3</u>.

DocuSign Envelope ID: C5BDB4B2-4B77-4182-AAC4-F6036EC85DCA

## EXHIBIT B

## FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this **"Agreement"**), is made by and between ProofPositive LLC. (the "**Buyer**"), and New Vision Capital Group LLC (the "**Seller**"). Each of the Seller and the Buyer are sometimes referred to herein, individually, as a **"Party"** and, collectively, as the "**Parties**."

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the "**Purchase Agreement**"), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1. <u>Defined Terms</u>. Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2. <u>Sale of Purchased Accounts; Assignment</u>. The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3. <u>Further Assurances</u>. Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

4. <u>Terms of the Purchase Agreement</u>. This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement. The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference. The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5. <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Remainder of page intentionally left blank.]*

Accounts Receivable Purchase Agreement

8/25/2022

8/25/2022
8/26/2022

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**BUYER:**

ProofPositive LLC

By: _Gail Hanson_ _____
             — BFC40F37742742A...

Name:  Gail  Hanson

Title:   Managing  Member

**SELLER:**

New Vision
Capital
Group LLC



By: _____

Name:

Title:

**Schedule 2.3**
**Wire Instructions**

The aggregate purchase price for the Purchased Accounts shall be $100,000.00 which has been paid in full to New Vision Capital Group LLC through ProofPositive LLC deposits to New Vision Capital Group LLC throughout the month of August 2022.

Accounts Receivable Purchase Agreement

8/25/2022

8/26/2022

# EXHIBIT 7

**ACCOUNTS RECEIVABLE PURCHASE AGREEMENT**

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is made as of January 13, 2023 (the "**Agreement Date**"), by and between ProofPositive LLC (collectively the "**Buyer**"), and New Vision Debt Relief (the "**Seller" or "LPG**", and together with the Buyer, the **"Parties"**), and The Litigation Practice Group PC ("LPG").

**RECITALS**

WHEREAS, in the regular course of business, the Seller originates account receivables from **LPG** in connection with client on-boarding services provided by the Seller to LPG and its affiliates;

WHEREAS, the account receivables represent an obligation of various clients to pay Seller for services that Seller previously provided, but which LPG shall provide from the date of execution of this Agreement;

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables (the "**Purchased Accounts**").

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

**ARTICLE 1.**
**DEFINITIONS**

Section 1.1    <u>Certain Definitions</u>.  Certain defined terms used in this Agreement are set forth on **<u>Exhibit A</u>**.

**ARTICLE 2.**
**ASSIGNMENT AND TRANSFER AND CONSIDERATION**

Section 2.1    <u>Assignment of the Purchased Accounts to the Buyer</u>.  Upon execution of this Agreement and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all of the Seller's right, title, and interest in and to the Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens.  Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the "**Excluded Assets**").

Section 2.2    <u>No Assumption of Liabilities</u>.  The Buyer shall not assume any Liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the "**Excluded Liabilities**").

Section 2.3    <u>Payment of Purchase Price</u>.  Buyer shall pay $265,656.46 (total purchase price) for the Purchased Accounts (the "**Purchase Price**") by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in **<u>Schedule 2.3</u>** (the "**Wire Instructions**").  The Purchased Accounts are set forth on the attached spreadsheet.

Section 2.4    <u>Guarantee of LPG</u>.  If any file acquired by buyer shall fail to make a first payment, LPG will replace the file and bear any cost associated with such replacement.  The replacement file shall yield no less than the receivable of the failed file.  In addition, if any calendar month a total of less than 80% of files make a cleared payment, LPG shall replace any non-performing files in such month so that the performance of the file package as a whole equals 80%.  This guarantee shall continue until the completion of the 24th month following execution of this agreement.

DocuSign Envelope ID: D7C64ACF-956E-460E-87E8-8C71D4760973

## ARTICLE 3.
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1    Organization; Good Standing.  The Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the Laws of the State of California and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2    Power and Authority.  The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.3    Title to, and Sufficiency of, the Purchased Accounts.  The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all of the Purchased Accounts, free and clear of all Liens.

Section 3.4    Consents.  The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.5    No Conflicts. The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

Section 3.6    Compliance with Laws.  The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.

Section 3.7      Legal Proceedings.  There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements.  No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.8      Condition of Purchased Accounts.  Each Purchased Account shall have received no less than one processed payment.

Section 3.9      Confidentiality. Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the "**Confidential Information**").  Seller will at all times keep the  Confidential Information in confidence and trust.  Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer.  Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions.  Seller agrees that violation of this Section 3.9.  The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

## ARTICLE 4.
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1      Organization; Good Standing.  The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Wyoming.

Section 4.2      Power and Authority.  The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 4.3      No Conflicts.  The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give

rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4    <u>Sufficient Funds</u>.  The Buyer has, and will have, sufficient funds available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

## ARTICLE 5.
## COVENANTS

Section 5.1    <u>Appropriate Actions</u>.

(a)    <u>General</u>.  Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

## ARTICLE 6.
## CLOSING

Section 6.1    <u>Closing</u>.  The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing.  The date on which the Closing occurs is hereinafter referred to as the "**Closing Date**." The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2    <u>Closing Deliverables of the Seller</u>.  At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer:  (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **<u>Exhibit B</u>** (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3    <u>Closing Deliverables of the Buyer</u>.  At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to <u>Section 6.2</u>, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4    <u>Indemnification by the Seller</u>.  Subject to the limitations set forth in this <u>Article 6</u>, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or

DocuSign Envelope ID: D7C64ACF-9561-460E-87E8-8C71D4760873

obligation to be performed by the Seller pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability.

Section 6.5 _Indemnification by the Buyer_. Subject to the limitations set forth in this Article 6, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurance related to the Purchased Accounts or Buyer occurring after the Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.6 _Indemnification Procedures_.

(a) _No Restraints_. Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, provided, however, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim. The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; provided, however, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred. In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense. The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b) No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim. An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the

Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c)     If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**"). Such Notice of Claim shall specify the basis for such Direct Claim. The failure by any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this Section 6.6(c). If the Indemnifying Party does not notify the Indemnified Party within thirty days following its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this Article 6 or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this Article 6, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined. In the event that the Indemnifying Party has timely disputed its Liability with respect to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

**ARTICLE 7.**
**MISCELLANEOUS**

Section 7.1     Entire Agreement; Amendment. This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof. This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2     Waivers. The rights and remedies of the Parties to this Agreement are cumulative and not alternative. To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for what it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3     Notices. All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission. A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

DocuSign Envelope ID: D7C64ACF-9561-460E-97E8-8C71D4760873

Section 7.4    <u>Successors and Assigns</u>.  This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns.  Neither this Agreement nor any rights or obligations of a Party hereunder shall be assigned by a Party (unless to an Affiliate of such Party) without the prior written consent of the other Parties.  This Agreement will be binding upon any permitted assignee of any Party.  No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5    <u>Public Disclosure</u>.  Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6    <u>Expenses and Fees</u>.  Whether or not the Closing occurs, all fees and expenses incurred in connection with this transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.

Section 7.7    <u>Specific Performance</u>.  The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

Section 7.8    <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.9    <u>Governing Law</u>.  This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws principles.

Section 7.10    <u>Severability</u>.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 7.11    <u>Construction</u>.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

DocuSign Envelope ID: D7C64ACF-9561-460E-97E8-8C71D4760973

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

**ProofPositive LLC**

By: _____
      *Gail Hanson*
      Name: Gail Hanson
      Title: Member


**SELLER:**

**New Vision Debt Relief**

By: _____
      Name: Sania Hashempour
      Title: Principle


**APPROVAL OF ASSIGNMENT AND GUARANTEE**

The assignment of the Purchased Accounts set forth in this Agreement as well as the guarantee included therein is hereby approved, and with respect to the Purchased Accounts, the Buyer shall have all rights of Buyer as set forth in this agreement.


**The Litigation Practice Group P.C.**


By: _____
      Name: Daniel S. March
      Title: Managing Shareholder


*[Signature Page to Accounts Receivable Purchase Agreement]*

DocuSign Envelope ID: D7C64ACF-9561-460E-97E8-8C71D4760973

**EXHIBIT A**

**DEFINITIONS**

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a)  "**Action**" shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b)  "**Agreement**" shall have the meaning set forth in the preamble to this Agreement.

(c)  "**Agreement Date**" shall have the meaning set forth in the preamble to this Agreement.

(d)  "**Affiliate**" shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii) with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals.  For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e)  "**Bill of Sale and Assignment and Assumption Agreement**" shall have the meaning set forth in Section 6.2.

(f)  "**Business**" shall mean the business of the Seller as conducted on the Agreement Date.

(g)  "**Buyer**" shall have the meaning set forth in the preamble to this Agreement.

(h)  "**Buyer Indemnified Parties**" shall have the meaning set forth in Section 6.4.

(i)  "**Closing**" shall have the meaning set forth in Section 6.1.

(j)  "**Closing Date**" shall have the meaning set forth in Section 6.1.

(k)  "**Direct Claim**" shall have the meaning set forth in Section 6.6(c).

(l)  "**Excluded Assets**" shall have the meaning set forth in Section 2.1.

(m)  "**Excluded Liabilities**" shall have the meaning set forth in Section 2.2.

(n)  "**Governmental Body**" shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

DocuSign Envelope ID: D7C64ACF-956E-460E-97E8-8C71D4760873

(o)    "**Indebtedness**" means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p)    "**Indemnified Party**" shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q)    "**Indemnifying Party**" shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r)    "**Knowledge**" shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s)    "**Law**" shall mean any law, statute, ordinance, regulation, rule, code, notice requirement, court decision, or agency guideline, of any foreign, federal, state, or local Governmental Body.

(t)    "**Liabilities**" shall mean any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on- or off-balance sheet, or other.

(u)    "**Lien**" shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v)    "**Losses**" shall have the meaning set forth in Section 6.4.

(w)    "**Notice of Claim**" shall have the meaning set forth in Section 6.6(c).

(x)    "**Organizational Documents**" shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y)    "**Party**" or "**Parties**" shall have the meaning set forth in the preamble to this Agreement.

(z)    "**Permitted Liens**" shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(aa)    "**Person**" shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

(bb)    "**Purchase Price**" shall have the meaning set forth in <u>Section 2.3</u>.

(cc)    "**Purchased Accounts**" shall have the meaning set forth in the Recitals.

(dd)    "**Seller**" shall have the meaning set forth in the preamble to this Agreement.

(ee)    "**Seller Indemnified Parties**" shall have the meaning set forth in <u>Section 6.5</u>.

(ff)    "**Tax**" or "**Taxes**" shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(gg)    "**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(hh)    "**Third Party**" or "**Third Parties**" shall mean any Person other than the Parties or their respective Affiliates.

(ii)    "**Third-party Claim**" shall have the meaning set forth in <u>Section 6.6(a)</u>.

(jj)    "**Transaction Agreements**" shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(kk)    "**Upfront Cash Payment**" shall have the meaning set forth in <u>Section 2.3</u>.

(ll)    "**Wire Instructions**" shall have the meaning set forth in <u>Section 2.3</u>.

DocuSign Envelope ID: D7C64ACF-9561-460E-97E8-8C71D4760873

## EXHIBIT B

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this **"Agreement"**), is made by and between **Buyer**, and **Seller**.  Each of the Seller and the Buyer are sometimes referred to herein, individually, as a **"Party"** and, collectively, as the **"Parties."**

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the **"Purchase Agreement"**), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.      <u>Defined Terms</u>.  Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2.      <u>Sale of Purchased Accounts; Assignment</u>.  The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3.      <u>Further Assurances</u>.  Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

4.      <u>Terms of the Purchase Agreement</u>.  This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement.   The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference.  The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5.      <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Remainder of page intentionally left blank.*]

Accounts Receivable Purchase Agreement
Exhibit B – Bill of Sale

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.


**BUYER:**

**ProofPositive LLC**


By: _Gail Hanson_ _____
    Name: Gail Hanson
    Title: Member



**SELLER:**

**New Vision Debt Relief**



By: _____
    Name: Sania Hashempour
    Title: Principle

Accounts Receivable Purchase Agreement

DocuSign Envelope ID: D7C64ACF-9F64-460E-97E8-8C71D4760973

**Schedule 2.3**
**Wire Instructions**

__$265,656.46__

**Account Holder Name:**

**Address:**

**Routing Number:**

**Account Number:**

# EXHIBIT 8

DocuSign Envelope ID: E993F7AC-0075-48E7-A564-B4BC2G03546F

**ACCOUNTS RECEIVABLE PURCHASE AGREEMENT**

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is made as of August 29,2022 (the "**Agreement Date**"), by and between Proof Positive LLC (the "**Buyer**"), and New Vision 2 (the "**Seller**", and together with the Buyer, the **"Parties"**).

**RECITALS**

WHEREAS, in the regular course of business, the Seller originates account receivables from Litigation Practice Group LLC ("**LPG**") in connection with client on-boarding services provided by the Seller to LPG and its affiliates;

WHEREAS, the account receivables represent an obligation of various clients to pay Seller for services that Seller previously provided, but which The Litigation Practice Group PC ("LPG") shall provide from the date of execution of this Agreement;

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables (the "**Purchased Accounts**").

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

**ARTICLE 1.**
**DEFINITIONS**

Section 1.1    Certain Definitions.  Certain defined terms used in this Agreement are set forth on **Exhibit A**.

**ARTICLE 2.**
**ASSIGNMENT AND TRANSFER AND CONSIDERATION**

Section 2.1    Assignment of the Purchased Accounts to the Buyer.  Upon execution of this Agreement and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all of the Seller's right, title, and interest in and to the Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens.  Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the "**Excluded Assets**").

Section 2.2    No Assumption of Liabilities.  The Buyer shall not assume any Liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the "**Excluded Liabilities**").

Section 2.3    Payment of Purchase Price.  Buyer shall pay $**Refer to Sale Agreement**, for each Purchased Account (the "**Purchase Price**").  The aggregate purchase price for the Purchased Accounts shall be $**Refer to Sale Agreement**.  The Buyer shall pay the Purchase Price of $**Refer to Sale Agreement**(the "**Upfront Cash Payment**") paid to the Seller at the Closing by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in **Schedule 2.3** (the "**Wire Instructions**").

DocuSign Envelope ID: E933F7AC-0075-48E7-A564-B4BC2G08546F

## ARTICLE 3.
### REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1      <u>Organization; Good Standing</u>.  The Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the Laws of the State of Delaware and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2      <u>Power and Authority</u>.  The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.3      <u>Title to, and Sufficiency of, the Purchased Accounts</u>.  The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all of the Purchased Accounts, free and clear of all Liens.

Section 3.4      <u>Consents</u>.  The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.5      <u>No Conflicts</u>. The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

Section 3.6      <u>Compliance with Laws</u>.  The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.

Accounts Receivable Purchase Agreement
Page 2 of 7

DocuSign Envelope ID: E933F7AC-0075-48E7-A564-B4BC2G08546F

Section 3.7    <u>Legal Proceedings</u>.  There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements.  No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.8    <u>Condition of Purchased Accounts</u>.  Each Purchased Account shall have received no less than one processed payment.

Section 3.9    <u>Confidentiality</u>.  Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the "**Confidential Information**").  Seller will at all times keep the  Confidential Information in confidence and trust.  Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer.  Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions.  Seller agrees that violation of this Section 3.9.  The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

### ARTICLE 4.
### REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1    <u>Organization; Good Standing</u>.  The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Wyoming.

Section 4.2    <u>Power and Authority</u>.  The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 4.3    <u>No Conflicts</u>.  The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not

conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4    Sufficient Funds.  The Buyer has, and will have, sufficient funds available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

## ARTICLE 5.
## COVENANTS

Section 5.1    Appropriate Actions.

(a)    General.  Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

## ARTICLE 6.
## CLOSING

Section 6.1    Closing.  The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing.  The date on which the Closing occurs is hereinafter referred to as the "**Closing Date**." The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2    Closing Deliverables of the Seller.  At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer:   (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **Exhibit B** (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3    Closing Deliverables of the Buyer.  At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to Section 6.2, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4    Indemnification by the Seller.  Subject to the limitations set forth in this Article 6, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or

DocuSign Envelope ID: E933F7AC-0075-48E7-A564-B4BC2G08546F

obligation to be performed by the Seller pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability.

Section 6.5     Indemnification by the Buyer.  Subject to the limitations set forth in this Article 6, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurance related to the Purchased Accounts or Buyer occurring after the Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.6     Indemnification Procedures.

(a)     No Restraints.  Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, provided, however, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim.  The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; provided, however, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred.  In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense.  The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b)     No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim.  An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the

DocuSign Envelope ID: E923F7AC-0075-48E7-A564-B4BC2G08546F

Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c)    If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**").  Such Notice of Claim shall specify the basis for such Direct Claim.  The failure by any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this Section 6.6(c).  If the Indemnifying Party does not notify the Indemnified Party within thirty days following its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this Article 6 or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this Article 6, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined.  In the event that the Indemnifying Party has timely disputed its Liability with respect to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

### ARTICLE 7.
### MISCELLANEOUS

Section 7.1    Entire Agreement; Amendment.  This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof.  This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2    Waivers.  The rights and remedies of the Parties to this Agreement are cumulative and not alternative.  To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for which it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3    Notices.  All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission.  A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

DocuSign Envelope ID: E933F7AC-0075-48E7-A564-B4BC2G08546F

Section 7.4    <u>Successors and Assigns</u>.  This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns.  Neither this Agreement nor any rights or obligations of a Party hereunder shall be assigned by a Party (unless to an Affiliate of such Party) without the prior written consent of the other Parties.  This Agreement will be binding upon any permitted assignee of any Party.  No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5    <u>Public Disclosure</u>.  Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6    <u>Expenses and Fees</u>.  Whether or not the Closing occurs, all fees and expenses incurred in connection with this transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.

Section 7.7    <u>Specific Performance</u>.  The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

Section 7.8    <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.9    <u>Governing Law</u>.  This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws principles.

Section 7.10    <u>Severability</u>.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 7.11    <u>Construction</u>.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

Proof Positive

By: _____
      *Gail Hanson*
      BFC4UF3/742742A...
      Name: Gail Hanson
      Title:  Managing Member


**SELLER:**

New Vision 2

By: _____
      BEE1748/E4E5485...
      Name: Serj Guetssoyan
      Title:  Mr.


**APPROVAL OF ASSIGNMENT**

The assignment of the Purchased Accounts set forth in this Agreement is hereby approved, and with respect to the Purchased Accounts, the Buyer shall have all rights of Buyer as set forth in this agreement.


**The Litigation Practice Group P.C.**

By: _____
      *Daniel S March*
      8D484BB1893941E...
      Name: Daniel S. March
      Title: Managing Shareholder


*[Signature Page to Accounts Receivable Purchase Agreement]*

DocuSign Envelope ID: E933F7AC-0075-48E7-A564-B4BC2G08546F

**EXHIBIT A**

**DEFINITIONS**

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a)      "**Action**" shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b)      "**Agreement**" shall have the meaning set forth in the preamble to this Agreement.

(c)      "**Agreement Date**" shall have the meaning set forth in the preamble to this Agreement.

(d)      "**Affiliate**" shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii), with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals.  For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e)      "**Bill of Sale and Assignment and Assumption Agreement**" shall have the meaning set forth in Section 6.2.

(f)      "**Business**" shall mean the business of the Seller as conducted on the Agreement Date.

(g)      "**Buyer**" shall have the meaning set forth in the preamble to this Agreement.

(h)      "**Buyer Indemnified Parties**" shall have the meaning set forth in Section 6.4.

(i)       "**Closing**" shall have the meaning set forth in Section 6.1.

(j)      "**Closing Date**" shall have the meaning set forth in Section 6.1.

(k)       "**Direct Claim**" shall have the meaning set forth in Section 6.6(c).

(l)       "**Excluded Assets**" shall have the meaning set forth in Section 2.1.

(m)      "**Excluded Liabilities**" shall have the meaning set forth in Section 2.2.

(n)      "**Governmental Body**" shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

DocuSign Envelope ID: E933F7AC-0075-48E7-A564-B4BC2G08546F

(o)      "**Indebtedness**" means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p)      "**Indemnified Party**" shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q)      "**Indemnifying Party**" shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r)      "**Knowledge**" shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s)      "**Law**" shall mean any law, statute, ordinance, regulation, rule, code, notice requirement, court decision, or agency guideline, of any foreign, federal, state, or local Governmental Body.

(t)      "**Liabilities**" shall mean any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on- or off-balance sheet, or other.

(u)      "**Lien**" shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v)      "**Losses**" shall have the meaning set forth in Section 6.4.

(w)      "**Notice of Claim**" shall have the meaning set forth in Section 6.6(c).

(x)      "**Organizational Documents**" shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y)      "**Party**" or "**Parties**" shall have the meaning set forth in the preamble to this Agreement.

(z)      "**Permitted Liens**" shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(aa)      "**Person**" shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

(bb)    "**Purchase Price**" shall have the meaning set forth in <u>Section 2.3</u>.

(cc)    "**Purchased Accounts**" shall have the meaning set forth in the Recitals.

(dd)     "**Seller**" shall have the meaning set forth in the preamble to this Agreement.

(ee)     "**Seller Indemnified Parties**" shall have the meaning set forth in <u>Section 6.5</u>.

(ff)    "**Tax**" or "**Taxes**" shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(gg)     "**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(hh)    "**Third Party**" or "**Third Parties**" shall mean any Person other than the Parties or their respective Affiliates.

(ii)    "**Third-party Claim**" shall have the meaning set forth in <u>Section 6.6(a)</u>.

(jj)    "**Transaction Agreements**" shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(kk)    "**Upfront Cash Payment**" shall have the meaning set forth in <u>Section 2.3</u>.

(ll)    "**Wire Instructions**" shall have the meaning set forth in <u>Section 2.3</u>.

DocuSign Envelope ID: E933F7AC-0075-49E7-A564-B4BC2G08546F

**EXHIBIT B**

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this **"Agreement"**), is made by and between Proof Positive (the "**Buyer**"), and New Vision 2 (the "**Seller**"). Each of the Seller and the Buyer are sometimes referred to herein, individually, as a "**Party**" and, collectively, as the "**Parties**."

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the "**Purchase Agreement**"), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.      <u>Defined Terms</u>.  Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2.      <u>Sale of Purchased Accounts; Assignment</u>.  The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3.      <u>Further Assurances</u>.  Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

4.      <u>Terms of the Purchase Agreement</u>.  This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement.   The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference.  The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5.      <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Remainder of page intentionally left blank.]*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**BUYER:**

Proof Positive

By: _____
Name: Gail Hanson
Title: Managing Member

**SELLER:**

New Vision 2

By: _____
Name: Serj Guetssoyan
Title: Mr.

**Schedule 2.3**
**Wire Instructions**

**Account Holder Name:**

**Address:**

**Routing Number:**

**Account Number:**

| # | Full Name | Customer ID | Enrolled Date | Monthly Payment |
|---|---|---|---|---|
| 1 | | BATLLC-452990081 | 27-Jan-21 | 216.3 |
| 2 | | BATLLC-487951906 | 11-Aug-21 | 277.71 |
| 3 | | BATLLC-507280306 | 19-Oct-21 | 268.5 |
| 4 | | BATLLC-516959356 | 11-Nov-21 | 486.39 |
| 5 | | BATLLC-517494193 | 15-Nov-21 | 969.77 |
| 6 | | BATLLC-522439240 | 14-Feb-22 | 272.21 |
| 7 | | BATLLC-525510520 | 10-Dec-21 | 373.82 |
| 8 | | BATLLC-531475399 | 4-Jan-22 | 382.83 |
| 9 | | BATLLC-533570380 | 20-Jan-22 | 410.07 |
| 10 | | BATLLC-539149919 | 25-Jan-22 | 330.36 |
| 11 | | BATLLC-539895483 | 25-Jan-22 | 277.85 |
| 12 | | BATLLC-540118107 | 27-Jan-22 | 297.84 |
| 13 | | BATLLC-540781205 | 28-Jan-22 | 376.03 |
| 14 | | BATLLC-542457166 | 3-Feb-22 | 491.26 |
| 15 | | BATLLC-543053635 | 15-Feb-22 | 256.65 |
| 16 | | BATLLC-544791643 | 14-Feb-22 | 512.07 |
| 17 | | BATLLC-544957129 | 14-Feb-22 | 367.2 |
| 18 | | BATLLC-545926069 | 22-Feb-22 | 527.6 |
| 19 | | BATLLC-546228883 | 4-Apr-22 | 377.56 |
| 20 | | BATLLC-546876991 | 4-Mar-22 | 488.92 |
| 21 | | BATLLC-547460011 | 23-Feb-22 | 148.12 |
| 22 | | BATLLC-547463992 | 22-Feb-22 | 261.3 |
| 23 | | BATLLC-547628137 | 23-Feb-22 | 253.17 |
| 24 | | BATLLC-547665025 | 23-Feb-22 | 270.58 |
| 25 | | BATLLC-547897546 | 25-Feb-22 | 371.45 |
| 26 | | BATLLC-548730730 | 7-Mar-22 | 338.29 |
| 27 | | BATLLC-549042613 | 3-Mar-22 | 256.3 |
| 28 | | BATLLC-549318058 | 3-Mar-22 | 598.72 |
| 29 | | BATLLC-549690577 | 15-Mar-22 | 256.84 |
| 30 | | BATLLC-549834115 | 7-Mar-22 | 261.78 |
| 31 | | BATLLC-550490428 | 8-Mar-22 | 447.23 |
| 32 | | BATLLC-550997275 | 10-Mar-22 | 268.14 |
| 33 | | BATLLC-551188000 | 10-Mar-22 | 286.92 |
| 34 | | BATLLC-551279647 | 11-Mar-22 | 334.45 |
| 35 | | BATLLC-551686240 | 14-Mar-22 | 351.11 |
| 36 | | BATLLC-551731288 | 15-Mar-22 | 280.35 |
| 37 | | BATLLC-551739910 | 14-Mar-22 | 502.83 |
| 38 | | BATLLC-552019357 | 15-Mar-22 | 255.91 |
| 39 | | BATLLC-552070999 | 15-Mar-22 | 259.71 |
| 40 | | BATLLC-552345109 | 16-Mar-22 | 276.58 |
| 41 | | BATLLC-552413833 | 16-Mar-22 | 274.05 |
| 42 | | BATLLC-552603670 | 28-Mar-22 | 170.33 |
| 43 | | BATLLC-552625084 | 19-Mar-22 | 397.86 |
| 44 | | BATLLC-552993262 | 18-Mar-22 | 356.83 |
| 45 | | BATLLC-555087601 | 22-Mar-22 | 453.94 |
| 46 | | BATLLC-555283129 | 22-Mar-22 | 250.66 |

| | | | |
|---|---|---|---|
| 47 | BATLLC-555670222 | 24-Mar-22 | 273.39 |
| 48 | BATLLC-555700411 | 23-Mar-22 | 272.26 |
| 49 | BATLLC-556004437 | 24-Mar-22 | 275.74 |
| 50 | BATLLC-556199344 | 19-Apr-22 | 405.04 |
| 51 | BATLLC-556311775 | 28-Mar-22 | 312.03 |
| 52 | BATLLC-557207023 | 28-Mar-22 | 425.52 |
| 53 | BATLLC-557642467 | 30-Mar-22 | 294.9 |
| 54 | BATLLC-557656909 | 31-Mar-22 | 398.22 |
| 55 | BATLLC-557676790 | 30-Mar-22 | 1,023.08 |
| 56 | BATLLC-557854024 | 31-Mar-22 | 264.54 |
| 57 | BATLLC-558195838 | 1-Apr-22 | 269.86 |
| 58 | BATLLC-558239212 | 4-Apr-22 | 236.4 |
| 59 | BATLLC-560691322 | 8-Apr-22 | 308.7 |
| 60 | BATLLC-560720419 | 13-Apr-22 | 398.32 |
| 61 | BATLLC-560957437 | 15-Apr-22 | 322.9 |
| 62 | BATLLC-562327579 | 12-Apr-22 | 503.82 |
| 63 | BATLLC-562521295 | 13-Apr-22 | 317.48 |
| 64 | BATLLC-562533076 | 13-Apr-22 | 265.01 |
| 65 | BATLLC-562613548 | 14-Apr-22 | 259.98 |
| 66 | BATLLC-562637077 | 14-Apr-22 | 285.92 |
| 67 | BATLLC-563032783 | 19-Apr-22 | 281.6 |
| 68 | BATLLC-563055556 | 15-Apr-22 | 251.26 |
| 69 | BATLLC-563297995 | 18-Apr-22 | 329.2 |
| 70 | BATLLC-563303596 | 20-Apr-22 | 368.91 |
| 71 | BATLLC-563311609 | 22-Apr-22 | 280.15 |
| 72 | BATLLC-563499142 | 22-Apr-22 | 382.23 |
| 73 | BATLLC-564105979 | 19-Apr-22 | 254.17 |
| 74 | BATLLC-564156502 | 19-Apr-22 | 286.55 |
| 75 | BATLLC-564162103 | 19-Apr-22 | 601.25 |
| 76 | BATLLC-564222385 | 20-Apr-22 | 285.43 |
| 77 | BATLLC-564365875 | 20-Apr-22 | 270.5 |
| 78 | BATLLC-565098064 | 21-Apr-22 | 252.4 |
| 79 | BATLLC-565153501 | 25-Apr-22 | 252.65 |
| 80 | BATLLC-565259881 | 26-Apr-22 | 257.34 |
| 81 | BATLLC-565668622 | 6-May-22 | 469.86 |
| 82 | BATLLC-565732219 | 25-Apr-22 | 382.61 |
| 83 | BATLLC-565738336 | 25-Apr-22 | 414.07 |
| 84 | BATLLC-566174758 | 26-Apr-22 | 255.91 |
| 85 | BATLLC-566336803 | 26-May-22 | 556.04 |
| 86 | BATLLC-566436178 | 27-Apr-22 | 450.41 |
| 87 | BATLLC-566729983 | 29-Apr-22 | 374.81 |
| 88 | BATLLC-566812423 | 27-Apr-22 | 312.69 |
| 89 | BATLLC-567267295 | 29-Apr-22 | 281.52 |
| 90 | BATLLC-567334564 | 28-Apr-22 | 485.84 |
| 91 | BATLLC-567788479 | 29-Apr-22 | 255.58 |
| 92 | BATLLC-567856417 | 3-May-22 | 478.34 |
| 93 | BATLLC-567942628 | 29-Apr-22 | 489.46 |

| 94 | BATLLC-568086160 | 2-May-22 | 429.01 |
| 95 | BATLLC-568127656 | 2-May-22 | 293.71 |
| 96 | BATLLC-569020711 | 3-May-22 | 259.11 |
| 97 | BATLLC-570029335 | 16-May-22 | 290.15 |
| 98 | BATLLC-570041821 | 4-May-22 | 297.83 |
| 99 | BATLLC-570168610 | 3-May-22 | 452.74 |
| 100 | BATLLC-570292420 | 4-May-22 | 295.9 |
| 101 | BATLLC-570311983 | 4-May-22 | 348.82 |
| 102 | BATLLC-570346621 | 5-May-22 | 297.77 |
| 103 | BATLLC-570363397 | 4-May-22 | 606.98 |
| 104 | BATLLC-570498025 | 6-May-22 | 260.96 |
| 105 | BATLLC-570498943 | 13-May-22 | 282.47 |
| 106 | BATLLC-570570622 | 17-May-22 | 396.18 |
| 107 | BATLLC-570668908 | 6-May-22 | 728.25 |
| 108 | BATLLC-570912352 | 10-May-22 | 258.09 |
| 109 | BATLLC-572315449 | 10-May-22 | 130.48 |
| 110 | BATLLC-572611693 | 9-May-22 | 251.09 |
| 111 | BATLLC-573081910 | 10-May-22 | 381.1 |
| 112 | BATLLC-573167308 | 13-Jun-22 | 504.22 |
| 113 | BATLLC-573196021 | 12-May-22 | 459.05 |
| 114 | BATLLC-573440041 | 12-May-22 | 253.75 |
| 115 | BATLLC-573451849 | 12-May-22 | 270.62 |
| 116 | BATLLC-573589579 | 12-May-22 | 446.89 |
| 117 | BATLLC-573721972 | 12-May-22 | 500 |
| 118 | BATLLC-574205785 | 13-May-22 | 1,025.60 |
| 119 | BATLLC-574207528 | 18-May-22 | 301.12 |
| 120 | BATLLC-574426858 | 20-May-22 | 252.5 |
| 121 | BATLLC-574449922 | 16-May-22 | 333.25 |
| 122 | BATLLC-574756969 | 18-May-22 | 287.17 |
| 123 | BATLLC-575532964 | 19-May-22 | 364.25 |
| 124 | BATLLC-575590894 | 19-May-22 | 456.61 |
| 125 | BATLLC-575719633 | 19-May-22 | 347.06 |
| 126 | BATLLC-575745919 | 18-May-22 | 327.77 |
| 127 | BATLLC-576128257 | 1-Jun-22 | 242.75 |
| 128 | BATLLC-576134344 | 18-May-22 | 280.86 |
| 129 | BATLLC-576500560 | 19-May-22 | 256.94 |
| 130 | BATLLC-576628009 | 20-May-22 | 254.13 |
| 131 | BATLLC-576806785 | 20-May-22 | 274.43 |
| 132 | BATLLC-578979115 | 23-May-22 | 376.72 |
| 133 | BATLLC-580132234 | 25-May-22 | 254.4 |
| 134 | BATLLC-581286835 | 25-May-22 | 253.51 |
| 135 | BATLLC-581568649 | 26-May-22 | 259.88 |
| 136 | BATLLC-581570284 | 25-May-22 | 264.36 |
| 137 | BATLLC-581590420 | 3-Jun-22 | 377.58 |
| 138 | BATLLC-582342847 | 11-Jul-22 | 349.7 |
| 139 | BATLLC-582345733 | 27-May-22 | 309.89 |
| 140 | BATLLC-582374914 | 27-May-22 | 280.54 |

DocuSign Envelope ID: E933F7AC-9075-48E7-A564-B4BC2G08546F

| | | | |
|---|---|---|---|
| 141 | BATLLC-582628117 | 27-May-22 | 198.63 |
| 142 | BATLLC-583129939 | 31-May-22 | 253.29 |
| 143 | BATLLC-583167607 | 31-May-22 | 280.35 |
| 144 | BATLLC-583185505 | 31-May-22 | 379.59 |
| 145 | BATLLC-583189075 | 31-May-22 | 504.83 |
| 146 | BATLLC-583598809 | 1-Jun-22 | 288.76 |
| 147 | BATLLC-583679629 | 2-Jun-22 | 410.22 |
| 148 | BATLLC-583988665 | 10-Jun-22 | 269.14 |
| 149 | BATLLC-584007574 | 3-Jun-22 | 348.17 |
| 150 | BATLLC-584129884 | 3-Jun-22 | 411.34 |
| 151 | BATLLC-585015904 | 3-Jun-22 | 288.99 |
| 152 | BATLLC-585027436 | 6-Jun-22 | 314.18 |
| 153 | BATLLC-585034780 | 3-Jun-22 | 455.4 |
| 154 | BATLLC-586112935 | 7-Jun-22 | 369.81 |
| 155 | BATLLC-586116103 | 8-Jun-22 | 253.28 |
| 156 | BATLLC-587217208 | 8-Jun-22 | 283.23 |
| 157 | BATLLC-587530231 | 9-Jun-22 | 264.18 |
| 158 | BATLLC-587994172 | 10-Jun-22 | 313.31 |
| 159 | BATLLC-588750373 | 14-Jun-22 | 402.54 |
| 160 | BATLLC-588761575 | 14-Jun-22 | 522.06 |
| 161 | BATLLC-588799012 | 13-Jun-22 | 353.01 |
| 162 | BATLLC-588821161 | 14-Jun-22 | 260.42 |
| 163 | BATLLC-589022259 | 14-Jul-22 | 322.3 |
| 164 | BATLLC-589033273 | 14-Jun-22 | 303.72 |
| 165 | BATLLC-589039018 | 15-Jun-22 | 179.83 |
| 166 | BATLLC-589197232 | 16-Jun-22 | 393.27 |
| 167 | BATLLC-589452802 | 15-Jun-22 | 270.86 |
| 168 | BATLLC-589616791 | 15-Jun-22 | 276.06 |
| 169 | BATLLC-589634974 | 15-Jun-22 | 100 |
| 170 | BATLLC-589827625 | 16-Jun-22 | 356.75 |
| 171 | BATLLC-589874866 | 17-Jun-22 | 225.43 |
| 172 | BATLLC-590088502 | 17-Jun-22 | 264.67 |
| 173 | BATLLC-590817592 | 20-Jun-22 | 253.54 |
| 174 | BATLLC-591166237 | 23-Jun-22 | 255.14 |
| 175 | BATLLC-591287917 | 21-Jun-22 | 297.07 |
| 176 | BATLLC-591785215 | 22-Jun-22 | 250.78 |
| 177 | BATLLC-592046323 | 23-Jun-22 | 253.13 |
| 178 | BATLLC-594653374 | 27-Jun-22 | 294.45 |
| 179 | BATLLC-594693328 | 27-Jun-22 | 347.55 |
| 180 | BATLLC-595284574 | 28-Jun-22 | 253.58 |
| 181 | BATLLC-595783072 | 14-Jul-22 | 290.1 |
| 182 | BATLLC-595798597 | 29-Jun-22 | 282.83 |
| 183 | BATLLC-595800577 | 29-Jun-22 | 256.91 |
| 184 | BATLLC-595876168 | 29-Jun-22 | 501.08 |
| 185 | BATLLC-595984597 | 30-Jun-22 | 312.85 |
| 186 | BATLLC-596004973 | 30-Jun-22 | 303.89 |
| 187 | BATLLC-596146063 | 7-Jul-22 | 366.14 |

| | | | |
|---|---|---|---|
| 188 | BATLLC-596409544 | 1-Jul-22 | 286.22 |
| 189 | BATLLC-596442304 | 1-Jul-22 | 326.82 |
| 190 | BATLLC-596470717 | 1-Jul-22 | 257.35 |
| 191 | BATLLC-596471203 | 1-Jul-22 | 704.06 |
| 192 | BATLLC-597157491 | 5-Jul-22 | 260.18 |
| 193 | BATLLC-599902759 | 7-Jul-22 | 358.93 |
| 194 | BATLLC-599904796 | 7-Jul-22 | 282.01 |
| 195 | BATLLC-599913148 | 8-Jul-22 | 310.71 |
| 196 | BATLLC-599918305 | 7-Jul-22 | 250 |
| 197 | BATLLC-599923936 | 7-Jul-22 | 345.98 |
| 198 | BATLLC-599935288 | 7-Jul-22 | 268.98 |
| 199 | BATLLC-599970829 | 7-Jul-22 | 301.53 |
| 200 | BATLLC-600583273 | 8-Jul-22 | 269.07 |
| 201 | BATLLC-600615784 | 8-Jul-22 | 276.1 |
| 202 | BATLLC-600617554 | 8-Jul-22 | 356.99 |
| 203 | BATLLC-600619264 | 8-Jul-22 | 257.61 |
| 204 | BATLLC-600872080 | 12-Jul-22 | 254.15 |
| 205 | BATLLC-600926473 | 11-Jul-22 | 277.35 |
| 206 | BATLLC-600969700 | 12-Jul-22 | 281.6 |
| 207 | BATLLC-600984178 | 11-Jul-22 | 265.89 |
| 208 | BATLLC-601230835 | 12-Jul-22 | 354.21 |
| 209 | BATLLC-601294498 | 12-Jul-22 | 303.04 |
| 210 | BATLLC-601416202 | 20-Jul-22 | 594.26 |
| 211 | BATLLC-601775107 | 13-Jul-22 | 253.87 |
| 212 | BATLLC-601843231 | 13-Jul-22 | 454.51 |
| 213 | BATLLC-602045854 | 13-Jul-22 | 266.85 |
| 214 | BATLLC-602330062 | 18-Jul-22 | 278.4 |
| 215 | BATLLC-602365813 | 14-Jul-22 | 126.08 |
| 216 | BATLLC-602397496 | 14-Jul-22 | 267.38 |
| 217 | BATLLC-602858995 | 15-Jul-22 | 353.66 |
| 218 | BATLLC-602945854 | 15-Jul-22 | 285.06 |
| 219 | BATLLC-603055279 | 15-Jul-22 | 628.11 |
| 220 | BATLLC-604876432 | 18-Jul-22 | 623.24 |
| 221 | BATLLC-604963204 | 18-Jul-22 | 294.52 |
| 222 | BATLLC-605868271 | 19-Jul-22 | 356.26 |
| 223 | BATLLC-605881339 | 19-Jul-22 | 287.66 |
| 224 | BATLLC-605941858 | 20-Jul-22 | 759.63 |
| 225 | BATLLC-606174301 | 20-Jul-22 | 312 |
| 226 | BATLLC-606188353 | 20-Jul-22 | 269.3 |
| 227 | BATLLC-606287329 | 20-Jul-22 | 309.54 |
| 228 | BATLLC-606298177 | 20-Jul-22 | 404.45 |
| 229 | BATLLC-606497668 | 22-Jul-22 | 355.71 |
| 230 | BATLLC-606503776 | 22-Jul-22 | 259.42 |
| 231 | BATLLC-606515443 | 22-Jul-22 | 252.6 |
| 232 | BATLLC-606534892 | 22-Jul-22 | 469.56 |
| 233 | BATLLC-606543283 | 22-Jul-22 | 447.78 |
| 234 | BATLLC-607140571 | 25-Jul-22 | 253.27 |

| | | | |
|---|---|---|---|
| 235 | BATLLC-607166836 | 25-Jul-22 | 609.86 |
| 236 | BATLLC-607240369 | 27-Jul-22 | 348.31 |
| 237 | BATLLC-607264903 | 25-Jul-22 | 371.23 |
| 238 | BATLLC-607281358 | 25-Jul-22 | 464.17 |
| 239 | BATLLC-607467658 | 25-Jul-22 | 586.96 |
| 240 | BATLLC-607553095 | 25-Jul-22 | 1,366.99 |
| 241 | BATLLC-607673701 | 26-Jul-22 | 272.23 |
| 242 | BATLLC-607708162 | 26-Jul-22 | 234.63 |
| 243 | BATLLC-607882408 | 26-Jul-22 | 275.4 |
| 244 | BATLLC-608900263 | 28-Jul-22 | 359.14 |
| 245 | BATLLC-609615427 | 29-Jul-22 | 354.03 |
| 246 | BATLLC-610628686 | 1-Aug-22 | 254.42 |
| 247 | BATLLC-610689637 | 1-Aug-22 | 471.13 |
| 248 | BATLLC-611227789 | 2-Aug-22 | 253.22 |
| 249 | BATLLC-611266327 | 2-Aug-22 | 297.37 |
| 250 | BATLLC-611271043 | 2-Aug-22 | 257.41 |
| 251 | BATLLC-611343442 | 2-Aug-22 | 353 |
| 252 | BATLLC-611366302 | 2-Aug-22 | 271.9 |
| 253 | BATLLC-611375044 | 2-Aug-22 | 660.96 |
| 254 | BATLLC-611385271 | 2-Aug-22 | 283.67 |
| 255 | BATLLC-612324952 | 3-Aug-22 | 389.53 |
| 256 | BATLLC-612325258 | 3-Aug-22 | 265.31 |
| 257 | BATLLC-612330112 | 4-Aug-22 | 258.53 |
| 258 | BATLLC-612388519 | 3-Aug-22 | 286.96 |
| 259 | BATLLC-612608602 | 3-Aug-22 | 773.9 |
| 260 | BATLLC-612626548 | 3-Aug-22 | 300.22 |
| 261 | BATLLC-612665731 | 4-Aug-22 | 344.09 |
| 262 | BATLLC-614063795 | 4-Aug-22 | 289.06 |
| 263 | BATLLC-614092383 | 4-Aug-22 | 270.95 |
| 264 | BATLLC-615133441 | 8-Aug-22 | 267.82 |
| 265 | BATLLC-615509818 | 9-Aug-22 | 283.4 |
| 266 | BATLLC-615564499 | 9-Aug-22 | 294.07 |
| 267 | BATLLC-615564544 | 9-Aug-22 | 934.88 |
| 268 | BATLLC-615651985 | 9-Aug-22 | 527.57 |
| 269 | BATLLC-615703237 | 9-Aug-22 | 274.92 |
| 270 | BATLLC-616174966 | 10-Aug-22 | 385.26 |
| 271 | BATLLC-616191007 | 11-Aug-22 | 871.09 |
| 272 | BATLLC-616784791 | 11-Aug-22 | 400.68 |
| 273 | BATLLC-617367979 | 17-Aug-22 | 290.12 |
| 274 | BATLLC-617372809 | 12-Aug-22 | 551.93 |
| 275 | BATLLC-617399596 | 12-Aug-22 | 312.91 |
| 276 | BATLLC-617515969 | 12-Aug-22 | 269.68 |
| 277 | BATLLC-618510859 | 16-Aug-22 | 369.98 |
| 278 | BATLLC-620332402 | 19-Aug-22 | 275.45 |
| 279 | BATLLC-453115071 | 26-Jan-22 | 366.08 |
| 280 | BATLLC-472021566 | 4-Jun-21 | 273.64 |
| 281 | BATLLC-537605368 | 21-Jan-22 | 281.17 |

GH

| | | | |
|---|---|---|---|
| 282 | BATLLC-546007333 | 16-Feb-22 | 354.62 |
| 283 | BATLLC-546230203 | 23-Feb-22 | 269.06 |
| 284 | BATLLC-546576796 | 18-Feb-22 | 267.25 |
| 285 | BATLLC-547374223 | 22-Feb-22 | 353.6 |
| 286 | BATLLC-548192977 | 1-Mar-22 | 469.95 |
| 287 | BATLLC-550958362 | 9-Mar-22 | 390.35 |
| 288 | BATLLC-551262733 | 11-Mar-22 | 200.32 |
| 289 | BATLLC-551696467 | 15-Mar-22 | 266.42 |
| 290 | BATLLC-552968215 | 4-Apr-22 | 314.21 |
| 291 | BATLLC-554053549 | 22-Mar-22 | 354.63 |
| 292 | BATLLC-555705607 | 23-Mar-22 | 438.79 |
| 293 | BATLLC-555929371 | 24-Mar-22 | 254.59 |
| 294 | BATLLC-557121616 | 6-Apr-22 | 925.35 |
| 295 | BATLLC-557249158 | 28-Mar-22 | 718.69 |
| 296 | BATLLC-557669680 | 5-Apr-22 | 252.8 |
| 297 | BATLLC-557932294 | 31-Mar-22 | 144.73 |
| 298 | BATLLC-559422403 | 5-Apr-22 | 274.36 |
| 299 | BATLLC-560051125 | 8-Apr-22 | 306.07 |
| 300 | BATLLC-560499412 | 7-Apr-22 | 255.45 |
| 301 | BATLLC-561693688 | 12-Apr-22 | 259.71 |
| 302 | BATLLC-567535879 | 29-Apr-22 | 272.7 |
| 303 | BATLLC-570050986 | 3-May-22 | 253.4 |
| 304 | BATLLC-575706613 | 17-May-22 | 254.16 |
| 305 | BATLLC-576391174 | 19-May-22 | 267.2 |
| 306 | BATLLC-576630094 | 19-May-22 | 373.51 |
| 307 | BATLLC-581327656 | 14-Jun-22 | 255.64 |
| 308 | BATLLC-581636821 | 25-May-22 | 255.2 |
| 309 | BATLLC-582153253 | 27-May-22 | 273.56 |
| 310 | BATLLC-583580740 | 1-Jun-22 | 604.57 |
| 311 | BATLLC-583581748 | 1-Jun-22 | 368.42 |
| 312 | BATLLC-583811017 | 3-Jun-22 | 539.61 |
| 313 | BATLLC-586530796 | 9-Jun-22 | 278.46 |
| 314 | BATLLC-587204878 | 9-Jun-22 | 267.72 |
| 315 | BATLLC-587583397 | 10-Jun-22 | 352.53 |
| 316 | BATLLC-589451308 | 15-Jun-22 | 322.8 |
| 317 | BATLLC-589576108 | 15-Jun-22 | 235.28 |
| 318 | BATLLC-590210620 | 17-Jun-22 | 241.8 |
| 319 | BATLLC-591815956 | 19-Jul-22 | 805.31 |
| 320 | BATLLC-592211794 | 24-Jun-22 | 364.81 |
| 321 | BATLLC-599974048 | 7-Jul-22 | 357.98 |
| 322 | BATLLC-599974222 | 12-Jul-22 | 263.3 |
| 323 | BATLLC-600630100 | 8-Jul-22 | 272.52 |
| 324 | BATLLC-600998644 | 12-Jul-22 | 242.44 |
| 325 | BATLLC-601746163 | 14-Jul-22 | 324.48 |
| 326 | BATLLC-605183416 | 18-Jul-22 | 250.49 |
| 327 | BATLLC-605210758 | 18-Jul-22 | 284.35 |
| 328 | BATLLC-605870902 | 19-Jul-22 | 270.8 |

GH

| 329 | ███████████ | BATLLC-605872366 | 19-Jul-22 | 251.59 |
| 330 | █████████████ | BATLLC-608398489 | 27-Jul-22 | 268.49 |
| 331 | ███████████ | BATLLC-612584254 | 3-Aug-22 | 255.2 |



| First Payment Cleared Date | Company | Company - Partner | Lead Vendor |
|---|---|---|---|
| 10-Feb-21 | New Vision Debt Relief -2 | | |
| 1-Sep-21 | New Vision Debt Relief -2 | | |
| 3-Dec-21 | New Vision Debt Relief -2 | | |
| 9-Feb-22 | New Vision Debt Relief -2 | | |
| 29-Nov-21 | New Vision Debt Relief -2 | | |
| 15-Feb-22 | New Vision Debt Relief -2 | | |
| 4-Mar-22 | New Vision Debt Relief -2 | | |
| 24-Feb-22 | New Vision Debt Relief -2 | | |
| 11-Feb-22 | New Vision Debt Relief -2 | | |
| 24-Feb-22 | New Vision Debt Relief -2 | | |
| 11-Mar-22 | New Vision Debt Relief -2 | | |
| 23-Feb-22 | New Vision Debt Relief -2 | | |
| 11-Feb-22 | New Vision Debt Relief -2 | | |
| 18-Feb-22 | New Vision Debt Relief -2 | | |
| 7-Apr-22 | New Vision Debt Relief -2 | | |
| 24-Feb-22 | New Vision Debt Relief -2 | | |
| 18-Feb-22 | New Vision Debt Relief -2 | | |
| 4-Mar-22 | New Vision Debt Relief -2 | | |
| 12-Apr-22 | New Vision Debt Relief -2 | | |
| 1-Jul-22 | New Vision Debt Relief -2 | | |
| 10-Mar-22 | New Vision Debt Relief -2 | | |
| 11-Mar-22 | New Vision Debt Relief -2 | | |
| 25-Mar-22 | New Vision Debt Relief -2 | | |
| 25-Mar-22 | New Vision Debt Relief -2 | | |
| 1-Apr-22 | New Vision Debt Relief -2 | | |
| 18-May-22 | New Vision Debt Relief -2 | | |
| 24-Mar-22 | New Vision Debt Relief -2 | | |
| 11-Mar-22 | New Vision Debt Relief -2 | | |
| 1-Apr-22 | New Vision Debt Relief -2 | | |
| 4-Apr-22 | New Vision Debt Relief -2 | | |
| 17-May-22 | New Vision Debt Relief -2 | | |
| 1-Apr-22 | New Vision Debt Relief -2 | | |
| 5-Apr-22 | New Vision Debt Relief -2 | | |
| 18-Apr-22 | New Vision Debt Relief -2 | | |
| 1-Apr-22 | New Vision Debt Relief -2 | | |
| 4-Apr-22 | New Vision Debt Relief -2 | | |
| 15-Apr-22 | New Vision Debt Relief -2 | | |
| 10-May-22 | New Vision Debt Relief -2 | | |
| 8-Apr-22 | New Vision Debt Relief -2 | | |
| 7-Apr-22 | New Vision Debt Relief -2 | | |
| 11-Apr-22 | New Vision Debt Relief -2 | | |
| 7-Apr-22 | New Vision Debt Relief -2 | | |
| 29-Mar-22 | New Vision Debt Relief -2 | | |
| 1-Apr-22 | New Vision Debt Relief -2 | | |
| 5-Apr-22 | New Vision Debt Relief -2 | | |
| 8-Apr-22 | New Vision Debt Relief -2 | | |

| 8-Apr-22 | New Vision Debt Relief -2 |
| 13-Apr-22 | New Vision Debt Relief -2 |
| 20-May-22 | New Vision Debt Relief -2 |
| 18-May-22 | New Vision Debt Relief -2 |
| 21-Apr-22 | New Vision Debt Relief -2 |
| 21-Apr-22 | New Vision Debt Relief -2 |
| 13-Apr-22 | New Vision Debt Relief -2 |
| 22-Apr-22 | New Vision Debt Relief -2 |
| 28-Apr-22 | New Vision Debt Relief -2 |
| 5-Apr-22 | New Vision Debt Relief -2 |
| 12-Apr-22 | New Vision Debt Relief -2 |
| 6-May-22 | New Vision Debt Relief -2 |
| 11-Apr-22 | New Vision Debt Relief -2 |
| 5-May-22 | New Vision Debt Relief -2 |
| 3-May-22 | New Vision Debt Relief -2 |
| 18-Apr-22 | New Vision Debt Relief -2 |
| 29-Apr-22 | New Vision Debt Relief -2 |
| 22-Apr-22 | New Vision Debt Relief -2 |
| 22-Apr-22 | New Vision Debt Relief -2 |
| 22-Apr-22 | New Vision Debt Relief -2 |
| 27-Apr-22 | New Vision Debt Relief -2 |
| 11-May-22 | New Vision Debt Relief -2 |
| 10-May-22 | New Vision Debt Relief -2 |
| 12-May-22 | New Vision Debt Relief -2 |
| 17-Jun-22 | New Vision Debt Relief -2 |
| 6-May-22 | New Vision Debt Relief -2 |
| 3-Jun-22 | New Vision Debt Relief -2 |
| 11-May-22 | New Vision Debt Relief -2 |
| 6-May-22 | New Vision Debt Relief -2 |
| 22-Apr-22 | New Vision Debt Relief -2 |
| 29-Apr-22 | New Vision Debt Relief -2 |
| 4-May-22 | New Vision Debt Relief -2 |
| 16-May-22 | New Vision Debt Relief -2 |
| 6-May-22 | New Vision Debt Relief -2 |
| 10-Aug-22 | New Vision Debt Relief -2 |
| 20-Jul-22 | New Vision Debt Relief -2 |
| 6-May-22 | New Vision Debt Relief -2 |
| 26-May-22 | New Vision Debt Relief -2 |
| 2-Jun-22 | New Vision Debt Relief -2 |
| 29-Apr-22 | New Vision Debt Relief -2 |
| 6-May-22 | New Vision Debt Relief -2 |
| 16-May-22 | New Vision Debt Relief -2 |
| 25-Jul-22 | New Vision Debt Relief -2 |
| 12-May-22 | New Vision Debt Relief -2 |
| 12-May-22 | New Vision Debt Relief -2 |
| 11-May-22 | New Vision Debt Relief -2 |
| 12-May-22 | New Vision Debt Relief -2 |

| | |
|---|---|
| 20-May-22 | New Vision Debt Relief -2 |
| 18-May-22 | New Vision Debt Relief -2 |
| 13-May-22 | New Vision Debt Relief -2 |
| 10-Jun-22 | New Vision Debt Relief -2 |
| 20-May-22 | New Vision Debt Relief -2 |
| 6-May-22 | New Vision Debt Relief -2 |
| 6-Jun-22 | New Vision Debt Relief -2 |
| 2-Jun-22 | New Vision Debt Relief -2 |
| 25-May-22 | New Vision Debt Relief -2 |
| 23-May-22 | New Vision Debt Relief -2 |
| 22-Jun-22 | New Vision Debt Relief -2 |
| 15-Jun-22 | New Vision Debt Relief -2 |
| 15-Jun-22 | New Vision Debt Relief -2 |
| 27-May-22 | New Vision Debt Relief -2 |
| 23-May-22 | New Vision Debt Relief -2 |
| 13-Jul-22 | New Vision Debt Relief -2 |
| 25-May-22 | New Vision Debt Relief -2 |
| 15-Jun-22 | New Vision Debt Relief -2 |
| 22-Aug-22 | New Vision Debt Relief -2 |
| 24-May-22 | New Vision Debt Relief -2 |
| 15-Jun-22 | New Vision Debt Relief -2 |
| 3-Jun-22 | New Vision Debt Relief -2 |
| 6-Jun-22 | New Vision Debt Relief -2 |
| 19-May-22 | New Vision Debt Relief -2 |
| 28-Jun-22 | New Vision Debt Relief -2 |
| 15-Jun-22 | New Vision Debt Relief -2 |
| 27-May-22 | New Vision Debt Relief -2 |
| 8-Jun-22 | New Vision Debt Relief -2 |
| 20-Jun-22 | New Vision Debt Relief -2 |
| 6-Jun-22 | New Vision Debt Relief -2 |
| 8-Jun-22 | New Vision Debt Relief -2 |
| 31-May-22 | New Vision Debt Relief -2 |
| 10-Jun-22 | New Vision Debt Relief -2 |
| 15-Jun-22 | New Vision Debt Relief -2 |
| 25-May-22 | New Vision Debt Relief -2 |
| 13-Jun-22 | New Vision Debt Relief -2 |
| 8-Jul-22 | New Vision Debt Relief -2 |
| 24-Jun-22 | New Vision Debt Relief -2 |
| 31-May-22 | New Vision Debt Relief -2 |
| 20-Jun-22 | New Vision Debt Relief -2 |
| 6-Jun-22 | New Vision Debt Relief -2 |
| 22-Jun-22 | New Vision Debt Relief -2 |
| 20-Jul-22 | New Vision Debt Relief -2 |
| 7-Jul-22 | New Vision Debt Relief -2 |
| 11-Aug-22 | New Vision Debt Relief -2 |
| 10-Jun-22 | New Vision Debt Relief -2 |
| 12-Jul-22 | New Vision Debt Relief -2 |

| | |
|---|---|
| 10-Jun-22 | New Vision Debt Relief -2 |
| 24-Jun-22 | New Vision Debt Relief -2 |
| 14-Jun-22 | New Vision Debt Relief -2 |
| 15-Jun-22 | New Vision Debt Relief -2 |
| 20-Jun-22 | New Vision Debt Relief -2 |
| 10-Jun-22 | New Vision Debt Relief -2 |
| 17-Aug-22 | New Vision Debt Relief -2 |
| 7-Jul-22 | New Vision Debt Relief -2 |
| 10-Jun-22 | New Vision Debt Relief -2 |
| 17-Jun-22 | New Vision Debt Relief -2 |
| 20-Jun-22 | New Vision Debt Relief -2 |
| 16-Jun-22 | New Vision Debt Relief -2 |
| 27-Jun-22 | New Vision Debt Relief -2 |
| 13-Jun-22 | New Vision Debt Relief -2 |
| 23-Jun-22 | New Vision Debt Relief -2 |
| 10-Aug-22 | New Vision Debt Relief -2 |
| 7-Jul-22 | New Vision Debt Relief -2 |
| 21-Jul-22 | New Vision Debt Relief -2 |
| 21-Jun-22 | New Vision Debt Relief -2 |
| 7-Jul-22 | New Vision Debt Relief -2 |
| 6-Jul-22 | New Vision Debt Relief -2 |
| 8-Jul-22 | New Vision Debt Relief -2 |
| 3-Aug-22 | New Vision Debt Relief -2 |
| 6-Jul-22 | New Vision Debt Relief -2 |
| 16-Jun-22 | New Vision Debt Relief -2 |
| 20-Jul-22 | New Vision Debt Relief -2 |
| 14-Jul-22 | New Vision Debt Relief -2 |
| 28-Jul-22 | New Vision Debt Relief -2 |
| 20-Jul-22 | New Vision Debt Relief -2 |
| 1-Jul-22 | New Vision Debt Relief -2 |
| 7-Jul-22 | New Vision Debt Relief -2 |
| 28-Jun-22 | New Vision Debt Relief -2 |
| 15-Jul-22 | New Vision Debt Relief -2 |
| 14-Jul-22 | New Vision Debt Relief -2 |
| 7-Jul-22 | New Vision Debt Relief -2 |
| 8-Jul-22 | New Vision Debt Relief -2 |
| 15-Jul-22 | New Vision Debt Relief -2 |
| 11-Jul-22 | New Vision Debt Relief -2 |
| 11-Jul-22 | New Vision Debt Relief -2 |
| 21-Jul-22 | New Vision Debt Relief -2 |
| 28-Jul-22 | New Vision Debt Relief -2 |
| 19-Aug-22 | New Vision Debt Relief -2 |
| 28-Jul-22 | New Vision Debt Relief -2 |
| 8-Jul-22 | New Vision Debt Relief -2 |
| 12-Jul-22 | New Vision Debt Relief -2 |
| 11-Jul-22 | New Vision Debt Relief -2 |
| 15-Jul-22 | New Vision Debt Relief -2 |

21-Jul-22 New Vision Debt Relief -2
8-Aug-22 New Vision Debt Relief -2
21-Jul-22 New Vision Debt Relief -2
18-Jul-22 New Vision Debt Relief -2
13-Jul-22 New Vision Debt Relief -2
2-Aug-22 New Vision Debt Relief -2
28-Jul-22 New Vision Debt Relief -2
26-Jul-22 New Vision Debt Relief -2
2-Aug-22 New Vision Debt Relief -2
28-Jul-22 New Vision Debt Relief -2
28-Jul-22 New Vision Debt Relief -2
27-Jul-22 New Vision Debt Relief -2
15-Jul-22 New Vision Debt Relief -2
28-Jul-22 New Vision Debt Relief -2
28-Jul-22 New Vision Debt Relief -2
28-Jul-22 New Vision Debt Relief -2
5-Aug-22 New Vision Debt Relief -2
3-Aug-22 New Vision Debt Relief -2
29-Jul-22 New Vision Debt Relief -2
2-Aug-22 New Vision Debt Relief -2
4-Aug-22 New Vision Debt Relief -2
24-Aug-22 New Vision Debt Relief -2
4-Aug-22 New Vision Debt Relief -2
22-Jul-22 New Vision Debt Relief -2
4-Aug-22 New Vision Debt Relief -2
5-Aug-22 New Vision Debt Relief -2
29-Jul-22 New Vision Debt Relief -2
26-Jul-22 New Vision Debt Relief -2
26-Aug-22 New Vision Debt Relief -2
29-Jul-22 New Vision Debt Relief -2
18-Aug-22 New Vision Debt Relief -2
5-Aug-22 New Vision Debt Relief -2
27-Jul-22 New Vision Debt Relief -2
4-Aug-22 New Vision Debt Relief -2
4-Aug-22 New Vision Debt Relief -2
5-Aug-22 New Vision Debt Relief -2
15-Aug-22 New Vision Debt Relief -2
5-Aug-22 New Vision Debt Relief -2
11-Aug-22 New Vision Debt Relief -2
5-Aug-22 New Vision Debt Relief -2
24-Aug-22 New Vision Debt Relief -2
4-Aug-22 New Vision Debt Relief -2
15-Aug-22 New Vision Debt Relief -2
29-Jul-22 New Vision Debt Relief -2
2-Aug-22 New Vision Debt Relief -2
19-Aug-22 New Vision Debt Relief -2
3-Aug-22 New Vision Debt Relief -2

| Date | Entity |
|------|--------|
| 5-Aug-22 | New Vision Debt Relief -2 |
| 5-Aug-22 | New Vision Debt Relief -2 |
| 5-Aug-22 | New Vision Debt Relief -2 |
| 11-Aug-22 | New Vision Debt Relief -2 |
| 11-Aug-22 | New Vision Debt Relief -2 |
| 18-Aug-22 | New Vision Debt Relief -2 |
| 19-Aug-22 | New Vision Debt Relief -2 |
| 29-Jul-22 | New Vision Debt Relief -2 |
| 10-Aug-22 | New Vision Debt Relief -2 |
| 11-Aug-22 | New Vision Debt Relief -2 |
| 15-Aug-22 | New Vision Debt Relief -2 |
| 26-Aug-22 | New Vision Debt Relief -2 |
| 17-Aug-22 | New Vision Debt Relief -2 |
| 24-Aug-22 | New Vision Debt Relief -2 |
| 26-Aug-22 | New Vision Debt Relief -2 |
| 17-Aug-22 | New Vision Debt Relief -2 |
| 24-Aug-22 | New Vision Debt Relief -2 |
| 19-Aug-22 | New Vision Debt Relief -2 |
| 24-Aug-22 | New Vision Debt Relief -2 |
| 18-Aug-22 | New Vision Debt Relief -2 |
| 24-Aug-22 | New Vision Debt Relief -2 |
| 18-Aug-22 | New Vision Debt Relief -2 |
| 19-Aug-22 | New Vision Debt Relief -2 |
| 19-Aug-22 | New Vision Debt Relief -2 |
| 19-Aug-22 | New Vision Debt Relief -2 |
| 19-Aug-22 | New Vision Debt Relief -2 |
| 10-Aug-22 | New Vision Debt Relief -2 |
| 17-Aug-22 | New Vision Debt Relief -2 |
| 26-Aug-22 | New Vision Debt Relief -2 |
| 26-Aug-22 | New Vision Debt Relief -2 |
| 24-Aug-22 | New Vision Debt Relief -2 |
| 26-Aug-22 | New Vision Debt Relief -2 |
| 24-Aug-22 | New Vision Debt Relief -2 |
| 19-Aug-22 | New Vision Debt Relief -2 |
| 19-Aug-22 | New Vision Debt Relief -2 |
| 26-Aug-22 | New Vision Debt Relief -2 |
| 17-Aug-22 | New Vision Debt Relief -2 |
| 24-Aug-22 | New Vision Debt Relief -2 |
| 24-Aug-22 | New Vision Debt Relief -2 |
| 26-Aug-22 | New Vision Debt Relief -2 |
| 23-Aug-22 | New Vision Debt Relief -2 |
| 26-Aug-22 | New Vision Debt Relief -2 |
| 24-Aug-22 | New Vision Debt Relief -2 |
| 29-Aug-22 | New Vision Debt Relief -2 |
| 21-Feb-22 | New Vision Capital Group LLC |
| 7-Jul-21 | New Vision Capital Group LLC |
| 9-Mar-22 | New Vision Capital Group LLC |

17-Feb-22 New Vision Capital Group LLC
7-Mar-22 New Vision Capital Group LLC
1-Mar-22 New Vision Capital Group LLC
13-May-22 New Vision Capital Group LLC
23-Mar-22 New Vision Capital Group LLC
25-Mar-22 New Vision Capital Group LLC
18-Mar-22 New Vision Capital Group LLC
24-Mar-22 New Vision Capital Group LLC
20-Apr-22 New Vision Capital Group LLC
7-Apr-22 New Vision Capital Group LLC
13-Apr-22 New Vision Capital Group LLC
15-Apr-22 New Vision Capital Group LLC
21-Apr-22 New Vision Capital Group LLC
6-Apr-22 New Vision Capital Group LLC
11-May-22 New Vision Capital Group LLC
21-Apr-22 New Vision Capital Group LLC
14-Apr-22 New Vision Capital Group LLC
22-Apr-22 New Vision Capital Group LLC
21-Apr-22 New Vision Capital Group LLC
15-Apr-22 New Vision Capital Group LLC
13-May-22 New Vision Capital Group LLC
18-May-22 New Vision Capital Group LLC
25-May-22 New Vision Capital Group LLC
10-Jun-22 New Vision Capital Group LLC
1-Jun-22 New Vision Capital Group LLC
15-Jul-22 New Vision Capital Group LLC
15-Jun-22 New Vision Capital Group LLC
10-Jun-22 New Vision Capital Group LLC
24-Jun-22 New Vision Capital Group LLC
15-Jun-22 New Vision Capital Group LLC
4-Aug-22 New Vision Capital Group LLC
29-Jun-22 New Vision Capital Group LLC
24-Jun-22 New Vision Capital Group LLC
23-Jun-22 New Vision Capital Group LLC
6-Jul-22 New Vision Capital Group LLC
7-Jul-22 New Vision Capital Group LLC
5-Jul-22 New Vision Capital Group LLC
3-Aug-22 New Vision Capital Group LLC
21-Jul-22 New Vision Capital Group LLC
4-Aug-22 New Vision Capital Group LLC
20-Jul-22 New Vision Capital Group LLC
21-Jul-22 New Vision Capital Group LLC
5-Aug-22 New Vision Capital Group LLC
5-Aug-22 New Vision Capital Group LLC
11-Aug-22 New Vision Capital Group LLC
22-Jul-22 New Vision Capital Group LLC
22-Jul-22 New Vision Capital Group LLC

DocuSign Envelope ID: E933F7AC-0075-48E7-A564-B4BC2G08546F

22-Aug-22  New Vision Capital Group LLC
16-Aug-22  New Vision Capital Group LLC
11-Aug-22  New Vision Capital Group LLC

| Client Status | # Drafts Remaining | Debt Enrolled |
|---|---|---|
| Paused Per Legal - Payment Paused | 0 | 16,456.53 |
| Active File | 3 | 8,277.89 |
| Active File | 9 | 5,954.00 |
| Active File | 41 | 72,991.00 |
| Active File | 36 | 102,197.00 |
| Active File | 30 | 20,083.65 |
| Active File | 25 | 24,535.39 |
| Active File | 0 | 29,977.98 |
| Active File | 29 | 38,243.06 |
| Active File | 20 | 15,534.00 |
| Active File | 0 | 5,594.00 |
| Active File | 0 | 18,263.00 |
| Active File | 21 | 21,959.00 |
| Active File | 0 | 23,993.00 |
| Retention Call Required by Affiliate | 31 | 14,874.00 |
| Active File | 29 | 43,271.00 |
| Active File | 0 | 16,549.00 |
| Active File | 30 | 44,868.00 |
| Active File | 19 | 19,281.00 |
| Active File | 1 | 35,779.00 |
| Active File | 8 | 6,025.00 |
| Active File | 30 | 10,546.00 |
| Active File | 21 | 10,921.00 |
| Active File | 18 | 10,752.00 |
| Active File | 0 | 14,803.26 |
| Enroll Debt | 46 | 33,175.76 |
| Follow Up Regarding Payment | 19 | 9,895.00 |
| Active File | 30 | 45,661.00 |
| Active File | 37 | 18,924.00 |
| Paused Per Legal - Payment Not Paused | 0 | 12,780.00 |
| NSF | 0 | 21,051.00 |
| Active File | 0 | 13,636.00 |
| Active File | 32 | 20,113.00 |
| Active File | 0 | 17,015.00 |
| Active File | 0 | 13,636.00 |
| Active File | 1 | 16,121.00 |
| NSF | 31 | 42,321.00 |
| Active File | 23 | 6,451.00 |
| Active File | 18 | 9,258.00 |
| Active File | 0 | 14,816.00 |
| Active File | 31 | 18,789.00 |
| Active File | 61 | 22,436.00 |
| Active File | 43 | 38,001.00 |
| Active File | 33 | 23,890.81 |
| Active File | 0 | 16,315.00 |
| Active File | 21 | 10,353.00 |

DocuSign Envelope ID: E923F7AC-0075-48E7-A564-B4BC2G08546F

| | | |
|---|---|---|
| NSF | 31 | 16,381.00 |
| Active File | 11 | 7,235.00 |
| Active File | 18 | 9,679.00 |
| Active File | 18 | 8,356.00 |
| Paused Per Legal - Payment Not Paused | 21 | 14,882.95 |
| Active File | 17 | 21,621.00 |
| Active File | 0 | 27,226.00 |
| Active File | 0 | 23,013.00 |
| Active File | 26 | 69,479.00 |
| Active File | 0 | 8,338.00 |
| Active File | 26 | 15,365.00 |
| Paused Per Legal - Payment Not Paused | 77 | 30,551.00 |
| Active File | 0 | 12,739.00 |
| Active File | 0 | 35,587.00 |
| Active File | 0 | 21,746.00 |
| Paused- Other | 0 | 41,908.00 |
| Active File | 0 | 15,477.00 |
| Active File | 0 | 17,345.00 |
| Payment Change Required | 0 | 16,827.00 |
| Paused Per Legal - Payment Not Paused | 26 | 16,246.01 |
| Active File | 19 | 11,113.33 |
| Active File | 20 | 10,046.00 |
| Active File | 44 | 31,930.00 |
| Active File | 21 | 18,688.00 |
| Active File | 0 | 32,677.56 |
| Enroll Debt | 0 | 17,151.00 |
| Active File | 0 | 10,651.00 |
| Follow Up Regarding Payment | 26 | 14,263.00 |
| Active File | 32 | 51,761.00 |
| Paused Per Legal - Payment Not Paused | 0 | 13,016.38 |
| Active File | 16 | 8,706.00 |
| Active File | 26 | 13,373.00 |
| Active File | 32 | 16,073.00 |
| Active File | 0 | 28,683.00 |
| Enroll Debt | 46 | 54,324.00 |
| Active File | 0 | 30,054.00 |
| Active File | 32 | 32,677.00 |
| Active File | 18 | 8,774.00 |
| Active File | 33 | 41,369.07 |
| Active File | 0 | 21,242.00 |
| Retention NSF Review | 0 | 20,067.00 |
| NSF | 0 | 29,665.00 |
| Active File | 40 | 19,440.00 |
| NSF | 32 | 35,051.00 |
| Bankruptcy Inquiry | 14 | 9,552.00 |
| Active File | 44 | 45,835.00 |
| Active File | 16 | 5,465.00 |

| | | |
|---|---|---|
| Active File | 8 | 9,979.00 |
| Active File | 21 | 11,840.00 |
| Active File | 14 | 8,369.00 |
| Enroll Debt | 45 | 23,252.00 |
| Active File | 0 | 13,094.00 |
| Active File | 0 | 12,218.00 |
| Active File | 45 | 23,942.00 |
| Active File | 34 | 22,720.00 |
| Enroll Debt | 20 | 16,111.00 |
| Payment Change Required | 33 | 45,954.00 |
| Active File | 21 | 9,875.00 |
| Active File | 29 | 14,887.26 |
| Active File | 33 | 30,837.00 |
| Active File | 32 | 25,064.00 |
| Active File | 0 | 8,490.00 |
| Active File | 69 | 14,812.00 |
| Active File | 23 | 11,935.00 |
| Active File | 31 | 17,083.00 |
| Active File | 47 | 48,941.00 |
| Active File | 34 | 32,640.00 |
| Active File | 33 | 14,163.00 |
| Active File | 0 | 7,841.00 |
| Active File | 33 | 31,546.00 |
| Paused Per Legal - Payment Not Paused | 44 | 20,093.00 |
| Active File | 33 | 55,753.00 |
| Active File | 36 | 19,962.00 |
| Active File | 15 | 7,324.00 |
| Active File | 22 | 14,212.00 |
| Active File | 33 | 17,171.00 |
| Active File | 23 | 16,072.00 |
| Active File | 27 | 27,017.00 |
| Active File | 39 | 35,095.00 |
| Active File | 0 | 8,677.00 |
| Active File | 90 | 46,694.00 |
| Active File | 32 | 16,603.00 |
| Active File | 21 | 11,010.00 |
| Active File | 23 | 10,727.00 |
| Active File | 22 | 10,118.00 |
| NSF | 44 | 44,854.00 |
| Payment Change Required | 19 | 8,296.00 |
| Active File | 20 | 9,035.00 |
| NSF | 48 | 23,357.00 |
| NSF | 21 | 10,079.00 |
| NSF | 46 | 35,137.00 |
| Active File | 35 | 22,799.00 |
| Active File | 21 | 14,641.00 |
| Retention Call Required by Resolution Specialist | 15 | 8,287.00 |

| | | |
|---|---|---|
| Payment Change Required | 66 | 27,079.00 |
| Active File | 20 | 10,311.00 |
| Active File | 0 | 12,878.00 |
| Active File | 45 | 33,985.00 |
| Active File | 20 | 23,486.00 |
| Retention Call Required by Affiliate | 0 | 10,743.00 |
| Active File | 47 | 47,076.00 |
| Active File | 28 | 15,246.00 |
| Active File | 33 | 25,898.00 |
| Retention Call Required by Affiliate | 0 | 28,796.00 |
| Active File | 0 | 31,239.00 |
| Retention Call Required by Affiliate | 33 | 19,721.00 |
| Active File | 33 | 43,082.00 |
| Active File | 45 | 32,812.00 |
| Active File | 18 | 8,237.00 |
| Active File | 23 | 11,211.18 |
| Active File | 15 | 7,551.00 |
| Active File | 33 | 10,622.00 |
| Active File | 0 | 13,777.00 |
| Enroll Debt | 34 | 43,784.00 |
| Retention NSF Review | 46 | 30,750.00 |
| Enroll Debt | 12 | 7,655.00 |
| Active File | 35 | 20,333.00 |
| Active File | 16 | 10,663.00 |
| Active File | 0 | 9,502.00 |
| Active File | 18 | 16,965.00 |
| Active File | 28 | 14,955.00 |
| Active File | 31 | 16,428.00 |
| Active File | 40 | 25,726.00 |
| Active File | 22 | 15,622.00 |
| Enroll Debt | 68 | 36,460.00 |
| Enroll Debt | 21 | 10,777.00 |
| Enroll Debt | 34 | 12,306.00 |
| Active File | 21 | 10,433.00 |
| Active File | 16 | 9,220.00 |
| Active File | 34 | 14,490.00 |
| Active File | 47 | 18,810.00 |
| Active File | 46 | 25,695.00 |
| Active File | 34 | 22,605.00 |
| Active File | 29 | 12,183.00 |
| Active File | 46 | 23,246.04 |
| Active File | 31 | 14,916.00 |
| Active File | 0 | 7,224.00 |
| Active File | 0 | 36,423.00 |
| Active File | 36 | 23,502.00 |
| Active File | 0 | 9,338.00 |
| Active File | 22 | 16,185.52 |

| | | |
|---|---|---|
| Active File | 46 | 22,781.19 |
| Active File | 34 | 20,740.00 |
| Active File | 23 | 9,658.00 |
| Active File | 0 | 54,315.00 |
| Active File | 46 | 19,656.00 |
| Active File | 29 | 19,691.00 |
| Active File | 34 | 16,707.00 |
| Paused Per Legal - Payment Not Paused | 46 | 25,719.98 |
| Active File | 52 | 54,246.59 |
| Active File | 16 | 11,232.00 |
| NSF | 22 | 10,356.00 |
| Active File | 28 | 15,386.00 |
| Active File | 0 | 15,542.00 |
| Active File | 18 | 8,986.00 |
| Active File | 23 | 16,288.00 |
| Enroll Debt | 23 | 11,056.10 |
| Active File | 22 | 9,072.00 |
| Active File | 0 | 8,596.00 |
| Active File | 34 | 16,207.00 |
| Active File | 17 | 7,628.00 |
| Active File | 11 | 7,735.00 |
| Active File | 35 | 18,599.00 |
| Active File | 47 | 59,745.48 |
| Active File | 34 | 14,174.00 |
| Active File | 0 | 32,232.00 |
| Active File | 23 | 10,228.00 |
| Active File | 0 | 8,191.00 |
| Active File | 70 | 18,693.00 |
| Active File | 35 | 15,390.00 |
| Active File | 36 | 23,798.00 |
| Bankruptcy Inquiry | 35 | 21,318.11 |
| Active File | 23 | 31,904.00 |
| Active File | 34 | 54,191.00 |
| Active File | 19 | 9,907.00 |
| Active File | 17 | 13,365.00 |
| Active File | 15 | 7,651.00 |
| Active File | 0 | 39,795.00 |
| Enroll Debt | 23 | 13,453.00 |
| Active File | 23 | 10,375.00 |
| Active File | 35 | 19,184.00 |
| Active File | 11 | 9,242.00 |
| Retention Call Required by Resolution Specialist | 35 | 26,674.00 |
| Active File | 47 | 22,360.00 |
| Active File | 0 | 14,060.00 |
| Active File | 0 | 51,179.00 |
| Active File | 0 | 42,168.00 |
| Active File | 22 | 8,019.00 |

| | | |
|---|---|---|
| Active File | 0 | 20,539.00 |
| Active File | 17 | 11,337.00 |
| Active File | 47 | 29,317.00 |
| Active File | 35 | 29,423.00 |
| Active File | 21 | 23,984.00 |
| Active File | 23 | 67,766.00 |
| Enroll Debt | 23 | 10,551.01 |
| Active File | 0 | 39,773.00 |
| Active File | 21 | 8,752.00 |
| Active File | 17 | 11,824.00 |
| Active File | 29 | 19,324.00 |
| Active File | 0 | 7,024.00 |
| Active File | 23 | 22,485.00 |
| Active File | 29 | 11,763.00 |
| Active File | 0 | 8,933.00 |
| Active File | 27 | 11,272.00 |
| Active File | 43 | 32,261.00 |
| Active File | 0 | 8,191.00 |
| Active File | 51 | 76,232.28 |
| Active File | 47 | 25,686.00 |
| Active File | 17 | 11,726.00 |
| Active File | 17 | 7,602.00 |
| Active File | 0 | 8,648.00 |
| Active File | 0 | 10,164.00 |
| Active File | 0 | 72,269.00 |
| Active File | 0 | 21,743.00 |
| Active File | 47 | 29,725.00 |
| Active File | 23 | 11,561.00 |
| Active File | 0 | 10,474.00 |
| Active File | 0 | 13,715.00 |
| Retention Call Required by Affiliate | 23 | 11,221.00 |
| Active File | 0 | 15,815.00 |
| Active File | 44 | 94,331.00 |
| Active File | 0 | 22,997.00 |
| Active File | 0 | 14,283.00 |
| Active File | 0 | 15,407.00 |
| Active File | 23 | 41,318.00 |
| Active File | 44 | 45,645.00 |
| Active File | 23 | 10,333.00 |
| Active File | 0 | 24,296.00 |
| Active File | 25 | 16,085.00 |
| Active File | 0 | 6,932.00 |
| Active File | 35 | 26,621.00 |
| Active File | 0 | 19,101.00 |
| Active File | 22 | 7,820.00 |
| Active File | 19 | 14,581.00 |
| Bankruptcy Inquiry | 1 | 9,529.27 |

| | | |
|---|---|---|
| Active File | 42 | 23,692.00 |
| Active File | 19 | 12,184.00 |
| Active File | 5 | 6,808.00 |
| Active File | 45 | 39,456.81 |
| Active File | 0 | 39,900.19 |
| Paused Per Legal - Payment Not Paused | 0 | 31,267.00 |
| Active File | 0 | 49,480.00 |
| Active File | 19 | 12,003.00 |
| Active File | 0 | 22,405.17 |
| Active File | 0 | 50,544.00 |
| Active File | 23 | 29,742.48 |
| Enroll Debt | 14 | 8,860.00 |
| Active File | 19 | 49,738.00 |
| Active File | 31 | 64,523.00 |
| Enroll Debt | 19 | 8,994.00 |
| Active File | 53 | 17,101.00 |
| Paused Per Legal - Payment Not Paused | 33 | 21,135.00 |
| Active File | 43 | 25,722.00 |
| Active File | 31 | 14,316.00 |
| Active File | 0 | 19,430.00 |
| Active File | 45 | 21,158.00 |
| Enroll Debt | 19 | 8,052.08 |
| Active File | 32 | 14,200.00 |
| Active File | 16 | 7,687.00 |
| Payment Change Required | 33 | 24,942.00 |
| Active File | 18 | 7,963.00 |
| Active File | 22 | 9,926.00 |
| Active File | 0 | 15,946.00 |
| Active File | 46 | 69,694.00 |
| Active File | 0 | 24,484.00 |
| Active File | 35 | 39,891.00 |
| Active File | 0 | 16,531.00 |
| Active File | 43 | 19,704.00 |
| Active File | 27 | 17,861.00 |
| Payment Change Required | 22 | 14,687.00 |
| Active File | 23 | 8,334.00 |
| Active File | 0 | 5,880.70 |
| Active File | 47 | 85,071.00 |
| Follow Up Regarding Payment | 22 | 16,106.02 |
| Active File | 17 | 11,772.00 |
| NSF | 46 | 20,030.00 |
| Active File | 34 | 15,853.00 |
| Active File | 35 | 13,145.00 |
| Active File | 24 | 14,256.00 |
| Active File | 44 | 19,814.00 |
| Active File | 0 | 11,278.00 |
| Active File | 0 | 15,698.20 |

DocuSign Envelope ID: E933F7AC-0075-48E7-A564-B4BC2G08546F

| | | |
|---|---|---|
| Enroll Debt | 30 | 12,029.00 |
| Active File | 95 | 46,997.00 |
| Paused Per Legal - Payment Not Paused | 23 | 9,529.00 |

# EXHIBIT 9

DocuSign Envelope ID: D16A0CEC-D186-40A5-A237-825586A51DAE

### ACCOUNTS RECEIVABLE PURCHASE AGREEMENT

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is made as of October 13, 2022 (the "**Agreement Date**"), by and between New Vision Debt 2 (the "**Buyer**"), and Proof Positive LLC (the "**Seller**", and together with the Buyer, the **"Parties"**).

### RECITALS

WHEREAS, in the regular course of business, the Seller originates account receivables from Litigation Practice Group LLC ("**LPG**") in connection with client on-boarding services provided by the Seller to LPG and its affiliates;

WHEREAS, the account receivables represent an obligation of various clients to pay Seller for services that Seller previously provided, but which The Litigation Practice Group PC ("**LPG**") shall provide from the date of execution of this Agreement;

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables (the "**Purchased Accounts**").

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

### ARTICLE 1.
### DEFINITIONS

Section 1.1    <u>Certain Definitions</u>.  Certain defined terms used in this Agreement are set forth on **Exhibit A**.

### ARTICLE 2.
### ASSIGNMENT AND TRANSFER AND CONSIDERATION

Section 2.1    <u>Assignment of the Purchased Accounts to the Buyer</u>.  Upon execution of this Agreement and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all of the Seller's right, title, and interest in and to the Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens.  Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the "**Excluded Assets**").

Section 2.2    <u>No Assumption of Liabilities</u>.  The Buyer shall not assume any Liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the "**Excluded Liabilities**").

Section 2.3    <u>Payment of Purchase Price</u>.  Buyer shall pay $0.00, for each Purchased Account (the "**Purchase Price**").  The aggregate purchase price for the Purchased Accounts shall be $0.00  The Buyer shall pay the Purchase Price of $0.00 (the "**Upfront Cash Payment**") paid to the Seller at the Closing by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in **Schedule 2.3** (the "**Wire Instructions**").

DocuSign Envelope ID: D16A0CEC-D186-40A5-A237-825586A51DAE

## ARTICLE 3.
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1      Organization; Good Standing.  The Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the Laws of the State of Delaware and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2      Power and Authority.  The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.3      Title to, and Sufficiency of, the Purchased Accounts.  The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all of the Purchased Accounts, free and clear of all Liens.

Section 3.4      Consents.  The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.5      No Conflicts. The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

Section 3.6      Compliance with Laws.  The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.

DocuSign Envelope ID: D16A0CFC-D186-40A5-A237-825586A51DAE

Section 3.7 <u>Legal Proceedings</u>. There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements. No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.8 <u>Condition of Purchased Accounts</u>. Each Purchased Account shall have received no less than one processed payment.

Section 3.9 <u>Confidentiality</u>. Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the "**Confidential Information**"). Seller will at all times keep the Confidential Information in confidence and trust. Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer. Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions. Seller agrees that violation of this Section 3.9. The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

## ARTICLE 4.
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1 <u>Organization; Good Standing</u>. The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Florida.

Section 4.2 <u>Power and Authority</u>. The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby. This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 4.3 <u>No Conflicts</u>. The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not

DocuSign Envelope ID: D16A0CFC-D186-40A5-A237-825586A51DAE

conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4    Sufficient Funds.  The Buyer has, and will have, sufficient funds available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

## ARTICLE 5.
## COVENANTS

Section 5.1    Appropriate Actions.

(a)    General.  Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

## ARTICLE 6.
## CLOSING

Section 6.1    Closing.  The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing.  The date on which the Closing occurs is hereinafter referred to as the "**Closing Date.**" The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2    Closing Deliverables of the Seller.  At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer:  (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **Exhibit B** (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3    Closing Deliverables of the Buyer.  At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to Section 6.2, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4    Indemnification by the Seller.  Subject to the limitations set forth in this Article 6, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or

obligation to be performed by the Seller pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability.

Section 6.5    <u>Indemnification by the Buyer</u>.  Subject to the limitations set forth in this <u>Article 6</u>, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurance related to the Purchased Accounts or Buyer occurring after the Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.6    <u>Indemnification Procedures</u>.

(a)    <u>No Restraints</u>.  Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, <u>provided</u>, <u>however</u>, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim.  The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; <u>provided</u>, <u>however</u>, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred.  In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense. The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b)    No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim.  An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the

DocuSign Envelope ID: D16A0CFC-D186-40A5-A237-825586A571AE

Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c)    If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**").  Such Notice of Claim shall specify the basis for such Direct Claim.  The failure by any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this Section 6.6(c).  If the Indemnifying Party does not notify the Indemnified Party within thirty days following its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this Article 6 or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this Article 6, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined.  In the event that the Indemnifying Party has timely disputed its Liability with respect to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

# ARTICLE 7.
## MISCELLANEOUS

Section 7.1    Entire Agreement; Amendment.    This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof.  This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2    Waivers.    The rights and remedies of the Parties to this Agreement are cumulative and not alternative.  To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for which it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3    Notices.  All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission. A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

DocuSign Envelope ID: D16A0CFC-D186-40A5-A237-825586A51DAE

Section 7.4    <u>Successors and Assigns</u>.  This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns.  Neither this Agreement nor any rights or obligations of a Party hereunder shall be assigned by a Party (unless to an Affiliate of such Party) without the prior written consent of the other Parties.  This Agreement will be binding upon any permitted assignee of any Party.  No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5    <u>Public Disclosure</u>.  Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6    <u>Expenses and Fees</u>.  Whether or not the Closing occurs, all fees and expenses incurred in connection with this transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.

Section 7.7    <u>Specific Performance</u>.  The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

Section 7.8    <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.9    <u>Governing Law</u>.  This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws principles.

Section 7.10    <u>Severability</u>.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 7.11    <u>Construction</u>.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

New Vision Debt 2

By: _____

      Name: Serj Guetssoyan

      Title:

**SELLER:**

Proof Positive LLC

By: _____

      Name: Gail Hanson

      Title: Managing Member

**APPROVAL OF ASSIGNMENT**

The assignment of the Purchased Accounts set forth in this Agreement is hereby approved, and with respect to the Purchased Accounts, the Buyer shall have all rights of Buyer as set forth in this agreement.

**The Litigation Practice Group P.C.**

By: _____

      Name: Daniel S. March

      Title: Managing Shareholder

*[Signature Page to Accounts Receivable Purchase Agreement]*

**EXHIBIT A**

**DEFINITIONS**

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a)  "**Action**" shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b)  "**Agreement**" shall have the meaning set forth in the preamble to this Agreement.

(c)  "**Agreement Date**" shall have the meaning set forth in the preamble to this Agreement.

(d)  "**Affiliate**" shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii), with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals.  For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e)  "**Bill of Sale and Assignment and Assumption Agreement**" shall have the meaning set forth in Section 6.2.

(f)  "**Business**" shall mean the business of the Seller as conducted on the Agreement Date.

(g)  "**Buyer**" shall have the meaning set forth in the preamble to this Agreement.

(h)  "**Buyer Indemnified Parties**" shall have the meaning set forth in Section 6.4.

(i)  "**Closing**" shall have the meaning set forth in Section 6.1.

(j)  "**Closing Date**" shall have the meaning set forth in Section 6.1.

(k)  "**Direct Claim**" shall have the meaning set forth in Section 6.6(c).

(l)  "**Excluded Assets**" shall have the meaning set forth in Section 2.1.

(m)  "**Excluded Liabilities**" shall have the meaning set forth in Section 2.2.

(n)  "**Governmental Body**" shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

(o)     "**Indebtedness**" means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p)     "**Indemnified Party**" shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q)     "**Indemnifying Party**" shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r)     "**Knowledge**" shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s)     "**Law**" shall mean any law, statute, ordinance, regulation, rule, code, notice requirement, court decision, or agency guideline, of any foreign, federal, state, or local Governmental Body.

(t)     "**Liabilities**" shall mean any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on- or off-balance sheet, or other.

(u)     "**Lien**" shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v)     "**Losses**" shall have the meaning set forth in Section 6.4.

(w)     "**Notice of Claim**" shall have the meaning set forth in Section 6.6(c).

(x)     "**Organizational Documents**" shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y)     "**Party**" or "**Parties**" shall have the meaning set forth in the preamble to this Agreement.

(z)     "**Permitted Liens**" shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(aa)     "**Person**" shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

DocuSign Envelope ID: D16A0CFC-D186-40A5-A237-B25586A51DAE

(bb)     "**Purchase Price**" shall have the meaning set forth in <u>Section 2.3</u>.

(cc)     "**Purchased Accounts**" shall have the meaning set forth in the Recitals.

(dd)     "**Seller**" shall have the meaning set forth in the preamble to this Agreement.

(ee)     "**Seller Indemnified Parties**" shall have the meaning set forth in <u>Section 6.5</u>.

(ff)     "**Tax**" or "**Taxes**" shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(gg)     "**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(hh)     "**Third Party**" or "**Third Parties**" shall mean any Person other than the Parties or their respective Affiliates.

(ii)     "**Third-party Claim**" shall have the meaning set forth in <u>Section 6.6(a)</u>.

(jj)     "**Transaction Agreements**" shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(kk)     "**Upfront Cash Payment**" shall have the meaning set forth in <u>Section 2.3</u>.

(ll)     "**Wire Instructions**" shall have the meaning set forth in <u>Section 2.3</u>.

DocuSign Envelope ID: D16A0CFC-D186-40A5-A237-825586A51DAE

## EXHIBIT B

## FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this **"Agreement"**), is made by and between New Vision Debt 2 (the "**Buyer**"), and Proof Positive LLC(the "**Seller**").  Each of the Seller and the Buyer are sometimes referred to herein, individually, as a "**Party**" and, collectively, as the "**Parties**."

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the "**Purchase Agreement**"), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.    <u>Defined Terms</u>.  Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2.    <u>Sale of Purchased Accounts; Assignment</u>.  The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3.    <u>Further Assurances</u>.  Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

4.    <u>Terms of the Purchase Agreement</u>.  This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement.    The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference.  The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5.    <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Remainder of page intentionally left blank.]*

Accounts Receivable Purchase Agreement
Exhibit B – Bill of Sale

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**BUYER:**

New Vision Debt 2

By: _____
        Name: Serj Guetssoyan
        Title:

**SELLER:**

Proof Positive LLC

By: _____
        Name: Gail Hanson
        Title: Managing Member

VOID

Accounts Receivable Purchase Agreement

**Schedule 2.3**
**Wire Instructions**

**Account Holder Name: New Vision Debt LLC**

**Address: 3857 Birch St #25, Newport Beach, CA 92660**

**Routing Number:** ███████

**Account Number:** ███████



# EXHIBIT 10

**GROBSTEIN TEEPLE**

New Vision Debt LLC

In re: The Litigation Practice Group PC
Disbursement Details by Payee
4 Years Pre-Petition (03/20/2019 - 03/20/2023)

| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|
| Chase | The Litigation Practice Group PC | ▮ | 10/31/2022 | 10/17/2022 | | 19,026.37 | Fedwire Debit Via: Wells Fargo NA/I 21000248 NC: New Vision Debt LLC Newport Beach, CA 92660 US Imad: 1017B1Qgc08C0020237 Trn: 36831 002900o |
| Chase | The Litigation Practice Group PC | ▮ | 10/31/2022 | 10/21/2022 | | 15,299.07 | Ref: Weekly Disbursement/Time/I 4:23 Imad: 1021 Bi Qgc04C004958 Trn: 5052002940o |
| Chase | The Litigation Practice Group PC | ▮ | 10/31/2022 | 10/21/2022 | | 7,391.84 | Ref: Weekly Disbursement/Time/I 6:57 Imad: I 02BB1 QgcOZcO0 1570 Trn: 7395700301 Jo |
| Chase | The Litigation Practice Group PC | ▮ | 11/30/2022 | 11/9/2022 | | 19,267.82 | Fedwire Debit Via Wells Fargo NN1 21000248 NC New Vision Debt LLC Newport Beach, CA 92660 US Ret: Weekly Disbursement/Time/I 2:13 Imad: 1 109B1Qgc06C008395 Trn: 411630031 3Jo |
| Chase | The Litigation Practice Group PC | ▮ | 11/30/2022 | 11/9/2022 | | 3,008.72 | Fedwire Debit Via Wells Fargo NN121000248 NC New Vision Debt LLC Newport Beach, CA 92660 US Ret: Weekly Disbursement/Time/I 2:15 Imsd: I 09BIQgcO5CoO403 Trn: 416810031 No |
| Chase | The Litigation Practice Group PC | ▮ | 11/30/2022 | 11/10/2022 | | 20,759.80 | Fedwire Debit Vie Walls Fargo NN121000248 NC New Vision Debt LLC Newport Reach, CA 92660 US Ret: Weekly Disbursement/Time/I 7:26 Imad: 11 10B1Qgc08C048481 Trn: 8058800314o |
| Chase | The Litigation Practice Group PC | ▮ | 11/30/2022 | 11/25/2022 | | 27,924.63 | Fedwire Debit Via Walls Fargo NN121000248 NC New Vision Debt LLC Newport Beach, CA 92660 US Ret: Weekly Disbursement/Time/I 7:53 Imad: I 125B1Ogd07c029563 Trn: 4275500329Io |
| Chase | The Litigation Practice Group PC | ▮ | 11/30/2022 | 11/25/2022 | | 17,773.99 | Fedwire Debit Via Wells Fargo NN121000248 NC New Vision Debt LLC Newport Beach, CA 92660 US Ret: Weekly Disbursement/Time/I 7:53 Imsd: I 1 I 25B1Ogd05c009629 Trn: 4256500329Io |
| Chase | The Litigation Practice Group PC | ▮ | 12/31/2022 | 12/5/2022 | | 31,540.94 | Fedwire Debit Vie Wells Fargo NN121000248 NC New Vision Debt LLC Newport Beach, CA 92660 US Weekly Disbursement/time/I 5:00 Imsd: 120581 0gc08C03861 6 Trn: 5569900339Io |
| Chase | The Litigation Practice Group PC | ▮ | 12/31/2022 | 12/12/2022 | | 15,752.13 | Fedwire Debit Via Wells Fargo NN121000248 NC New Vision Debt LLC Newport Beach, CA 92660 US Rat: Weekly Disbursement/Time/I 7:04 Imad: 121281 Qgc08C05I 229 Trn: 7781 000346io |
| Chase | The Litigation Practice Group PC | ▮ | 12/31/2022 | 12/19/2022 | | 1,664.78 | Fedwire Debit Via Wells Fargo NN121000248 NC New Vision Debt LLC Newport Beach, CA 92660 US Ret: Weekly Disbursement/Time/I 7:25 Imad: 1219B1Ggo08C042799 Trn: 8041500353Io |
| Chase | The Litigation Practice Group PC | ▮ | 12/31/2022 | 12/21/2022 | | 23,148.91 | Fedwire Debit Vie. Wells Fargo NN121000248 NC New Vision Debt LLC Newport Beech, CA 92660 US Ret: Weekly Disbursement/Time/I 4:32 Imad: 122161 Qgc08C003946 Trn: 4803500361io |
| Chase | The Litigation Practice Group PC | ▮ | 12/31/2022 | 12/27/2022 | | 983.10 | Fedwire Debit Vie Wells Fargo NN121000248 NC New Vision Debt LLC Newport Beech, CA 92660 US Ret: Weekly Disbursement/Time/I 3:58 Imad: 1227BIQgc01C0I623i Trn: 4B03500361Jo |
| Chase | The Litigation Practice Group PC | ▮ | 12/31/2022 | 12/28/2022 | | 29,059.77 | Fedwire Debit Via Wells Fargo NN121000248 NC New Vision Debt LLC Newport Beech, CA 92660 US Ret: Weekly Disbursement/Time/I 7:01 mcd: I 22BB1 Cgc06C022798 Trn: 7406000362io |
| Chase | The Litigation Practice Group PC | ▮ | 12/31/2022 | 12/30/2022 | | 14,878.80 | Fedwire Debit Via Wells Fargo NN121000248 NC New Vision Debt LLC Newport Beach, CA 92660 US Ret: Weekly Disbursement/Time/I 4:36 Imad: 123081 Qgc06C067744 Trn: 55731 003641o |
| Chase | The Litigation Practice Group PC | ▮ | 12/31/2022 | 12/30/2022 | | 342.78 | Fedwire Debit Via Wells Fargo NN121000248 NC New Vision Debt LLC Newport Beach, CA 92660 US Weekly Disbursement/Time/I 7:15 Imad: 123081 0gc08C03508 Trn: 7092700364io |
| Chase | The Litigation Practice Group PC | ▮ | 1/31/2023 | 1/10/2023 | | 19,768.82 | Fedwire Debit Via Wells Fargo NN121000248 NC New Vision Debt LLC Nemport Beach, CA 92660 US Ret: Weekly Disbursement/Time/I 4:53 Imad: 01 10B1Qgc03C005369 Trn: 4991 00001 Oio |
| Bank of America | Litigation Practice Group PC | ▮ | 1/13/2023 | 1/13/2023 | | 20,030.85 | WIRE TYPE:WIRE OUT DATE:230113 TIME:1 657 ETTRN:2023011300502504 SERVICE REF:01 8390 BNF:NEW VISION DEBT LLC ID:1 194227912 BNF BK:WELLS FARGO BANK, NA ID:1 21000248 PMT DET:421 5005820 1 1.323 WEEKLY DISBURSEMENT |
| Bank of America | Litigation Practice Group PC | ▮ | 1/31/2023 | 1/18/2023 | | 250.38 | WIRE TYPE:WIRE OUT DATE:23011 18 TIME1 344 ET TRN:202301 1800426297 SERVICE REF:011234 BNF:NEW VISION DEBT LLC ID:1194227912 BNF BK:WELLS FARGO BANK, NA ID:121000248 PMT DET:4219571 12W EEKLY DISBURSEMENT |
| Chase | The Litigation Practice Group PC | ▮ | 1/31/2023 | 1/24/2023 | | 26,602.80 | Fedwire Debit Via Wells Fargo NN121000248 NC New Vision Debt LLC Newport Beach, CA 92660 US Ret: Weekly Disbursement/Time/I 5:47 Imad: 012481 Qgo08C032068 Trn: 5654300024o |
| Chase | The Litigation Practice Group PC | ▮ | 1/31/2023 | 1/24/2023 | | 1,233.70 | Fedwire Debit Via Wells Fargo NN121000248 A/C: New Vision Debt LLC Newport Beach, CA 92660 US Ret: Weekly Disbursement/Time/I 5:47 Imad: 012461 Qgc02COC0S190 Trn: 5655100024io |
| Chase | The Litigation Practice Group PC | ▮ | 2/28/2023 | 2/7/2023 | | 28,108.32 | Fedwire Debit Via Wells Fargo NN121000248 A/C New Vision Debt LLC Newport Beach, CA 92660 US Ret: Weekly Disbursement/Time/I7:47 Imad: 0207B1Qgc07C031941 Trn: 6648800038io |
| Chase | The Litigation Practice Group PC | ▮ | 2/28/2023 | 2/7/2023 | | 973.06 | Fedwire Debit Via Wells Fargo NN121000248 NC New Vision Debt LLC Newport Beach, CA 92660 US Ret: Weekly Disbursement/Time/I7:47 Imad: 0207B1Qgc07C031937 Trn: 6648700038io |
| | | | | | | **344,791.38** | |

DRAFT FORM - SUBJECT TO CHANGE

# EXHIBIT 11



In re: The Litigation Practice Group PC
Disbursement Details by Payee
4 Years Pre-Petition (03/20/2019 - 03/20/2023)

New Vision Capital Group, LLC

| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|
| UnionBank | The Litigation Practice Group PC | ▮ | 7/31/2021 | 7/28/2021 | | 4,611.18 | WIRE TRANS TRN 0728027693 072821 UBOC0930 UB1 32558N Sent To: JPMORGAN CHASE BANK, NA |
| UnionBank | The Litigation Practice Group PC | ▮ | 8/31/2021 | 8/4/2021 | | 2,560.01 | WIRE TRANS TRN 0804022002 080421 UBOC UB094731 N Sent To: JPMORGAN CHASE BANK, NA |
| UnionBank | The Litigation Practice Group PC | ▮ | 8/31/2021 | 8/11/2021 | | 4,690.48 | WIRE TRANS TRN 0811021527 081121 UBOC UB05995 2N Sent To: JPMORGAN CHASE BANK, NA |
| UnionBank | The Litigation Practice Group PC | ▮ | 8/31/2021 | 8/20/2021 | | 4,442.55 | WIRE TRANS TRN 0820019202 082021 UBOC UB012096N Sent To: JPMORGAN CHASE BANK, NA |
| UnionBank | The Litigation Practice Group PC | ▮ | 8/31/2021 | 8/20/2021 | | 994.56 | WIRE TRANS TRN 0820021984 082021 UBOC UB00997 5N Sent To: JPMORGAN CHASE BANK, NA |
| UnionBank | The Litigation Practice Group PC | ▮ | 8/31/2021 | 8/20/2021 | | 5,368.53 | WIRE TRANS TRN 0825024030 082521 UBOC UB987549N Sent To: JPMORGAN CHASE BANK, NA |
| UnionBank | The Litigation Practice Group PC | ▮ | 8/31/2021 | 8/25/2021 | | 4,450.68 | WIRE TRANS TRN 0901027852 090121 UBOC UB944379N Sent To: JPMORGAN CHASE BANK, NA |
| UnionBank | The Litigation Practice Group PC | ▮ | 9/30/2021 | 9/1/2021 | | 1,231.74 | WIRE TRANS TRN 0909021730 090921 UBOC UB90090 0N Sent To: JPMORGAN CHASE BANK, NA |
| UnionBank | The Litigation Practice Group PC | ▮ | 9/30/2021 | 9/9/2021 | | 3,308.16 | WIRE TRANS TRN 0916025588 091621 UBOC UB868548N Sent To: JPMORGAN CHASE BANK, NA |
| UnionBank | The Litigation Practice Group PC | ▮ | 9/30/2021 | 9/16/2021 | | 2,746.34 | WIRE TRANS TRN 0922021177 092221 UBOC UB842721N Sent To: JPMORGAN CHASE BANK, NA |
| UnionBank | The Litigation Practice Group PC | ▮ | 9/30/2021 | 9/22/2021 | | 6,667.16 | Beneficiary: 1/New Vision Capital Group, LLC |
| Optimum Bank | Coast Processing LLC dba LPG | ▮ | 9/30/2021 | 9/30/2021 | | 757.35 | WIRE TO New Vision Capital Group, |
| Optimum Bank | Coast Processing LLC dba LPG | ▮ | 10/29/2021 | 10/7/2021 | | 4,161.00 | WIRE TO New Vision Capital Group, |
| Optimum Bank | Coast Processing LLC dba LPG | ▮ | 10/29/2021 | 10/14/2021 | | 3,122.80 | WIRE TO New Vision Capital Group, |
| Optimum Bank | Coast Processing LLC dba LPG | ▮ | 10/29/2021 | 10/22/2021 | | 30,000.00 | WIRE TO New Vision Capital Group, |
| Optimum Bank | Coast Processing LLC dba LPG | ▮ | 11/30/2021 | 11/2/2021 | | 4,277.34 | WIRE TO New Vision Capital Group, |
| Optimum Bank | Coast Processing LLC dba LPG | ▮ | 11/30/2021 | 11/5/2021 | | 4,071.34 | WIRE TO New Vision Capital Group, |
| Optimum Bank | Coast Processing LLC dba LPG | ▮ | 11/30/2021 | 11/12/2021 | | 4,073.67 | WIRE TO New Vision Capital Group, |
| Optimum Bank | Coast Processing LLC dba LPG | ▮ | 11/30/2021 | 11/18/2021 | | 3,968.51 | WIRE TO New Vision Capital Group, |
| Optimum Bank | Coast Processing LLC dba LPG | ▮ | 11/30/2021 | 11/26/2021 | | 5,021.66 | WIRE TO New Vision Capital Group, |
| UnionBank | The Litigation Practice Group PC | ▮ | 12/31/2021 | 12/2/2021 | | 4,104.39 | WIRE TRANS TRN 1209021654 120921 UBOC UB426480N Sent To: JPMORGAN CHASE BANK, NA |
| UnionBank | The Litigation Practice Group PC | ▮ | 12/31/2021 | 12/9/2021 | | 180.21 | Beneficiary: 1/New Vision Capital Group, LLC |
| UnionBank | The Litigation Practice Group PC | ▮ | 12/31/2021 | 12/9/2021 | | 980.29 | WIRE TRANS TRN 1209021613 120921 UBOC UB426591N Sent To: NEW VISION CAPITAL GROUP, LLC |
| UnionBank | The Litigation Practice Group PC | ▮ | 12/31/2021 | 12/17/2021 | | 3,665.94 | Beneficiary: |
| UnionBank | The Litigation Practice Group PC | ▮ | 12/31/2021 | 12/17/2021 | | 1,462.49 | WIRE TRANS TRN 1217017531 121721 UBOC UB382935N Sent To: JPMORGAN CHASE BANK, NA |
| UnionBank | The Litigation Practice Group PC | ▮ | 12/31/2021 | 12/23/2021 | | 3,278.20 | WIRE TRANS TRN 1223024562 122321 UBOC UB341313N Sent To: JPMORGAN CHASE BANK, NA |
| UnionBank | The Litigation Practice Group PC | ▮ | 12/31/2021 | 12/31/2021 | | 409.32 | WIRE TRANS TRN 1231023055 123121 UBOC UB305895N Sent To: JPMORGAN CHASE BANK, NA |
| UnionBank | The Litigation Practice Group PC | ▮ | 12/31/2021 | 12/31/2021 | | 1,356.62 | WIRE TRANS TRN 1231023030 123121 UBOC UB305958N Sent To: NEW VISION CAPITAL GROUP, LLC |
| UnionBank | The Litigation Practice Group PC | ▮ | 1/31/2022 | 1/10/2022 | | 644.27 | Beneficiary: |
| UnionBank | The Litigation Practice Group PC | ▮ | 1/31/2022 | 1/10/2022 | | 1,174.78 | WIRE TRANS TRN 0110021648 011022 UBOC UB269103N Sent To: JPMORGAN CHASE BANK, NA |
| UnionBank | The Litigation Practice Group PC | ▮ | 1/31/2022 | 1/13/2022 | | 1,875.71 | WIRE TRANS TRN 0110021644 011022 UBOC UB269112N Sent To: JPMORGAN CHASE BANK Beneficiary: |
| UnionBank | The Litigation Practice Group PC | ▮ | 1/31/2022 | 1/13/2022 | | 1,317.90 | WIRE TRANS TRN 0113021449 011322 UBOC UB246609N Sent To: JPMORGAN CHASE BANK, NA |
| UnionBank | The Litigation Practice Group PC | ▮ | 1/31/2022 | 1/13/2022 | | 2,246.62 | 1/New Vision Capital Group, Beneficiary: WIRE TRANS TRN 0113021456 011322 UBOC UB246591 N Sent To: JPMORGAN CHASE BANK Beneficiary: 1/New Vision Capital Group LLC |

DRAFT FORM - SUBJECT TO CHANGE

1 of 4

**GROBSTEIN TEEPLE**

In re: The Litigation Practice Group PC
Disbursement Details by Payee
4 Years Pre-Petition (03/20/2019 - 03/20/2023)

New Vision Capital Group, LLC

| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|
| UnionBank | The Litigation Practice Group PC | [redacted] | 1/31/2022 | 1/21/2022 | | 2,602.77 | WIRE TRANS TAN 0121016134 012122 UBOC UB210954N Sent To: JPMORGAN CHASE BANK, NA Beneficiary: 1/New Vision Capital Group, LLC |
| UnionBank | The Litigation Practice Group PC | [redacted] | 1/31/2022 | 1/21/2022 | | 743.53 | WIRE TRANS TAN 0121016116 012122 UBOC UB210999N Sent To: NEW VISION CAPITAL GROUP, LLC Beneficiary: |
| UnionBank | The Litigation Practice Group PC | [redacted] | 1/31/2022 | 1/21/2022 | | 487.73 | WIRE TRANS TRN 0121016110 012122 UBOC UB211O17N Sent To: JPMORGAN CHASE BANK Beneficiary: 1/New Vision Capital Group LLC |
| UnionBank | The Litigation Practice Group PC | [redacted] | 1/31/2022 | 1/28/2022 | | 753.23 | WIRE TRANS TRN 0128019405 012822 UBOC UB1 701 OON Sent To: NEW VISION CAPITAL GROUP, LLC Beneficiary: |
| UnionBank | The Litigation Practice Group PC | [redacted] | 1/31/2022 | 1/28/2022 | | 1,785.30 | WIRE TRANS TAN 0128019422 012822 UBOC UB170052N Sent To: JPMORGAN CHASE BANK, NA Beneficiary: 1/New Vision Capital Group, LLC |
| UnionBank | The Litigation Practice Group PC | [redacted] | 1/31/2022 | 1/28/2022 | | 239.91 | WIRE TRANS TAN 0128019392 012822 UBOC UB170136N Sent To: JPMORGAN CHASE BANK Beneficiary: 1/New Vision Capital Group LLC |
| UnionBank | The Litigation Practice Group PC | [redacted] | 2/28/2022 | 2/4/2022 | | 454.92 | WIRE TRANS TRN 0204022621 020422 UBOC UB131481N Sent To: NEW VISION CAPITAL GROUP, LLC Beneficiary: |
| UnionBank | The Litigation Practice Group PC | [redacted] | 2/28/2022 | 2/4/2022 | | 1,270.04 | WIRE TRANS TRN 0204022638 020422 UBOC UB131292N Sent To: JPMORGAN CHASE BANK Beneficiary: 1/New Vision Capital Group LLC |
| UnionBank | The Litigation Practice Group PC | [redacted] | 2/28/2022 | 2/4/2022 | | 1,194.64 | WIRE TRANS TRN 0204022631 020422 UBOC UB13131O1N Sent To: JPMORGAN CHASE BANK, NA Beneficiary: 1/New Vision Capital Group, LLC |
| UnionBank | The Litigation Practice Group PC | [redacted] | 2/28/2022 | 2/11/2022 | | 5,314.69 | WIRE TRANS TAN 0211017717 021122 UBOC UB102915N Sent To: JPMORGAN CHASE BANK, NA Beneficiary: 1/New Vision Capital Group, LLC |
| UnionBank | The Litigation Practice Group PC | [redacted] | 2/28/2022 | 2/11/2022 | | 355.14 | WIRE TRANS TRN 0211017055 021122 UBOC UB103026N Sent To: NEW VISION CAPITAL GROUP, LLC Beneficiary: |
| UnionBank | The Litigation Practice Group PC | [redacted] | 2/28/2022 | 2/11/2022 | | 2,071.43 | WIRE TRANS TRN 0211017101 021122 UBOC UB102951N Sent To: JPMORGAN CHASE BANK Beneficiary: 1/New Vision Capital Group LLC |
| Chase | The Litigation Practice Group PC | [redacted] | 2/28/2022 | 2/18/2022 | | 3,355.32 | Book Transfer Debit NC: New Vision Capital Group, LLC Newport Beach CA 92560 US Ref: Weekly Disbursement Trn: 5187400049lo |
| Chase | The Litigation Practice Group PC | [redacted] | 2/28/2022 | 2/18/2022 | | 3,024.05 | Book Transfer Debit NC: New Vision Capital Group, LLC Newport Beach CA 92560 US Ref: Weekly Disbursement Trn: 5187300049lo |
| Chase | The Litigation Practice Group PC | [redacted] | 2/28/2022 | 2/25/2022 | | 4,159.23 | Book Transfer Debit NC: New Vision Capital Group, LLC Newport Beach CA 92560 US Ref: Weekly Disbursement Trn: 6366000056lo |
| Chase | The Litigation Practice Group PC | [redacted] | 2/28/2022 | 2/25/2022 | | 794.14 | Book Transfer Debit NC: New Vision Capital Group, LLC Newport Beach CA 92560 US Ref: Weekly Disbursement Trn: 6366000056lo |
| Chase | The Litigation Practice Group PC | [redacted] | 3/31/2022 | 3/4/2022 | | 4,864.52 | Book Transfer Debit NC: New Vision Capital Group, LLC Newport Beach CA 92560 US Ref: Weekly Disbursement Trn: 5364700063lo |
| Chase | The Litigation Practice Group PC | [redacted] | 3/31/2022 | 3/4/2022 | | 1,874.48 | Book Transfer Debit NC: New Vision Capital Group, LLC Newport Beach CA 92560 US Ref: Weekly Disbursement Trn: 5364600063lo |
| Chase | The Litigation Practice Group PC | [redacted] | 3/31/2022 | 3/10/2022 | | 12,269.86 | Book Transfer Debit A/C: New Vision Capital Group, LLC Newport Beach CA 92660 US Ref: Weekly Disbursement Trn: 7414000069lo |
| Chase | The Litigation Practice Group PC | [redacted] | 3/31/2022 | 3/18/2022 | | 7,615.37 | Book Transfer Debit A/C: New Vision Capital Group, LLC Newport Beach CA 92660 US Ref: Weekly Disbursement Trn: 4569500077lo |
| Chase | The Litigation Practice Group PC | [redacted] | 3/31/2022 | 3/24/2022 | | 5,635.49 | Book Transfer Debit NC: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ref: Weekly Disbursement Trn: 5975100083lo |
| Chase | The Litigation Practice Group PC | [redacted] | 4/30/2022 | 4/1/2022 | | 7,916.68 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ref: Weekly Disbursement Trn: 5023200091lo |
| Chase | The Litigation Practice Group PC | [redacted] | 4/30/2022 | 4/7/2022 | | 7,077.11 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ref: Weekly Disbursement Trn: 5690400097lo |
| Chase | The Litigation Practice Group PC | [redacted] | 4/30/2022 | 4/18/2022 | | 12,183.52 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ref: Weekly Disbursement Trn: 4355000080 |
| Chase | The Litigation Practice Group PC | [redacted] | 4/30/2022 | 4/21/2022 | | 4,409.91 | Book Transfer Debit NC: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ref: Weekly Disbursement Trn: 4866500111l0 |
| Chase | The Litigation Practice Group PC | [redacted] | 4/30/2022 | 4/28/2022 | | 9,977.01 | Book Transfer Debit NC: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ref: Weekly Disbursement Trn: 5917400118lo |
| Chase | The Litigation Practice Group PC | [redacted] | 5/31/2022 | 5/5/2022 | | 7,459.78 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ref: Weekly Disbursement Trn: 7132900125lo |
| Chase | The Litigation Practice Group PC | [redacted] | 5/31/2022 | 5/13/2022 | | 11,080.93 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ref: Weekly Disbursement Trn: 7443000133lo |

DRAFT FORM - SUBJECT TO CHANGE

**GROBSTEIN TEEPLE**

In re: The Litigation Practice Group PC
Disbursement Details by Payee
4 Years Pre-Petition (03/20/2019 - 03/20/2023)

New Vision Capital Group, LLC

| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|
| Chase | The Litigation Practice Group PC | ▮ | 5/31/2022 | 5/19/2022 | | 13,623.79 | Book Transfer Debit NC: New Vision Capital Group, LLC Santa Ana CA 92705-3538 us Ref: Weekly Disbursement Trn: 5546000391o |
| Chase | The Litigation Practice Group PC | ▮ | 5/31/2022 | 5/27/2022 | | 9,669.10 | Book Transfer Debit NC: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ref: Weekly Disbursement Trn: 7160001471o |
| Chase | The Litigation Practice Group PC | ▮ | 6/30/2022 | 6/3/2022 | | 10,008.32 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ref: Weekly Disbursement Trn: 6204300154lo |
| Chase | The Litigation Practice Group PC | ▮ | 6/30/2022 | 6/10/2022 | | 9,443.41 | Book Transfer Debit NC: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ref: Weekly Disbursement Trn: 5l423006ilo |
| Chase | The Litigation Practice Group PC | ▮ | 6/30/2022 | 6/17/2022 | | 17,805.08 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ret: Weekly Disbursement Trn: 4823006llo |
| Chase | The Litigation Practice Group PC | ▮ | 6/30/2022 | 6/23/2022 | | 9,420.08 | Book Transfer Debit NC: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ret: Weekly Disbursement Trn: 65l0300074o |
| Chase | The Litigation Practice Group PC | ▮ | 6/30/2022 | 6/30/2022 | | 12,216.77 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ret: Weekly Disbursement Trn: 55900008lo |
| Chase | The Litigation Practice Group PC | ▮ | 7/31/2022 | 7/8/2022 | | 9,886.50 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ref: Weekly Disbursement Trn: 4084400389lo |
| Chase | The Litigation Practice Group PC | ▮ | 7/31/2022 | 7/14/2022 | | 20,641.89 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ref: Weekly Disbursement Trn: 51071001951o |
| Chase | The Litigation Practice Group PC | ▮ | 7/31/2022 | 7/21/2022 | | 9,512.95 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ret: Weekly Disbursement Trn: 52384d00202lo |
| Chase | The Litigation Practice Group PC | ▮ | 7/31/2022 | 7/29/2022 | | 14,847.86 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ret: Weekly Disbursement Trn: 37067002020o |
| Chase | The Litigation Practice Group PC | ▮ | 8/31/2022 | 8/5/2022 | | 13,852.98 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ret: Weekly Disbursement Trn: 3005500217lo |
| Chase | The Litigation Practice Group PC | ▮ | 8/31/2022 | 8/11/2022 | | 17,111.06 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ret: Weekly Disbursement Trn: 3896800223ao |
| Chase | The Litigation Practice Group PC | ▮ | 8/31/2022 | 8/19/2022 | | 16,342.23 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ret: Weekly Disbursement Trn: 2834600231Jo |
| Chase | The Litigation Practice Group PC | ▮ | 8/31/2022 | 8/26/2022 | | 17,356.65 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ret: Weekly Disbursement Trn: 4483900338lo |
| Chase | The Litigation Practice Group PC | ▮ | 9/30/2022 | 9/2/2022 | | 20,743.38 | Book Transfer Debit NC: New Vision Capital Group, LLC Santa Ana CA 92705-3538 us Ret: Weekly Disbursement Trn: 3725900245lo |
| Chase | The Litigation Practice Group PC | ▮ | 9/30/2022 | 9/2/2022 | | 990.56 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ret: Weekly Disbursement Trn: 3734002451o |
| Chase | The Litigation Practice Group PC | ▮ | 9/30/2022 | 9/9/2022 | | 6,123.09 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ret: Weekly Disbursement Trn: 3435500252lo |
| Chase | The Litigation Practice Group PC | ▮ | 9/30/2022 | 9/9/2022 | | 1,420.31 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ref: Weekly Disbursement Trn: 3435400253lo |
| Chase | The Litigation Practice Group PC | ▮ | 9/30/2022 | 9/16/2022 | | 13,021.41 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ret: Weekly Disbursement Trn: 6656700259lo |
| Chase | The Litigation Practice Group PC | ▮ | 9/30/2022 | 9/16/2022 | | 1,390.88 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ret: Weekly Disbursement Trn: 6656600259lo |
| Chase | The Litigation Practice Group PC | ▮ | 9/30/2022 | 9/23/2022 | | 3,477.19 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ret: Weekly Disbursement Trn: 3032002660o |
| Chase | The Litigation Practice Group PC | ▮ | 9/30/2022 | 9/23/2022 | | 563.70 | Book Transfer Debit NC: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ret: Weekly Disbursement Trn: 3103100236lo |
| Chase | The Litigation Practice Group PC | ▮ | 10/31/2022 | 10/3/2022 | | 12,923.01 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ret: Weekly Disbursement Trn: 8037300276lo |
| Chase | The Litigation Practice Group PC | ▮ | 10/31/2022 | 10/3/2022 | | 1,465.81 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ret: Weekly Disbursement Trn: 8037200276lo |
| Chase | The Litigation Practice Group PC | ▮ | 10/31/2022 | 10/6/2022 | | 9,470.28 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ret: Weekly Disbursement Trn: 4309400279lo |
| Chase | The Litigation Practice Group PC | ▮ | 10/31/2022 | 10/6/2022 | | 347.17 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ret: Weekly Disbursement Trn: 4309300279lo |
| Chase | The Litigation Practice Group PC | ▮ | 10/31/2022 | 10/17/2022 | | 4,120.28 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ret: Weekly Disbursement Trn: 3683000290lo |

DRAFT FORM - SUBJECT TO CHANGE

3 of 4

In re: The Litigation Practice Group PC
Disbursement Details by Payee
4 Years Pre-Petition (03/20/2019 - 03/20/2023)

New Vision Capital Group, LLC

**GROBSTEIN TEEPLE**

| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|
| Chase | The Litigation Practice Group PC | | 10/31/2022 | 10/21/2022 | | 1,756.26 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ref: Weekly |
| Chase | The Litigation Practice Group PC | | 10/31/2022 | 10/28/2022 | | 2,283.26 | Book Transfer Debit NC: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ret: Weekly Disbursement Tm: 5052002940o |
| Chase | The Litigation Practice Group PC | | 10/31/2022 | 10/28/2022 | | 3,203.79 | Book Transfer Debit NC: New Vision Capital Group, LLC Sente Ana CA 92705-3538 US Rot Weekly Disbursement Tm: 7395900030Jo |
| Chase | The Litigation Practice Group PC | | 11/30/2022 | 11/10/2022 | | 2,421.38 | Rook Transfer Debit NC: New Vision Capital Group, LLC Sente Ane CA 92705-3538 US Ref Weekly Disbursement Tm 4l58600313lo |
| Chase | The Litigation Practice Group PC | | 11/30/2022 | 11/10/2022 | | 494.50 | Book Transfer Debit NC: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ref Extra Payment Disbursement Tm 8l058900314lo Cwed Tm. 852200031.8io |
| Chase | The Litigation Practice Group PC | | 11/30/2022 | 11/14/2022 | | 4,122.45 | Book Transfer Debit NC: New Vision Cepitel Group, LLC Sante Ana CA 92705-3538 US Ret Weekly Disbursement Tm 4226900329Jo |
| Chase | The Litigation Practice Group PC | | 11/30/2022 | 11/25/2022 | | 3,708.41 | Book Trenstem Debit NC: New Vision Ceptel Group, LLC S5nte Ans CA 92705-3538 US Ref Weekly Disbursement Tm 4275600029Jo |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 11/25/2022 | | 4,819.66 | Book Transfer Debit NC: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ret Weekly Disbursement Tm 5570000339Jo |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/5/2022 | | 4,262.80 | Book Transfer Debit NC: New Vision Capital Group, LLC Santa Ane CA 92705-3538 US Ref Weekly Disbursement Tm 7781103461o |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/12/2022 | | 4,512.67 | Book Trensfer Debit NC: New Vision Capital Group, LLC Santa Ane CA 92705-3530 US Ref Weekly Disbursement Tm 8041 800353lo |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/19/2022 | | 6,619.65 | Book Trensfer Debit NC: New Vision Cepitel Group, LLC Sents Ane CA 92705-3538 US Ref Weekly Disbursement Tm 6980500361lo |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/27/2022 | | 6,465.96 | Book Transfer Debit NC: New Vision Capital Group, LLC (C Sante Ana CA 92705-3538 US Ref Weekly Disbursement Tm 6980660361lo |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/27/2022 | | 4,915.89 | Disbursement Tm 5573300364l0 |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/30/2022 | | 3,849.71 | Book Transfer Debit NC: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ref: Weekly Disbursement Tm. 5573200364l0 |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/30/2022 | | 4,807.93 | Book Transfer Debit NC: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Rat: Weekly Disbursement Tmf 4991 6000 tOJ0 |
| Chase | The Litigation Practice Group PC | | 1/31/2023 | 1/10/2023 | | 4,508.31 | Book Transfer Debit NC: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ret: Weekly Disbursement Tm: 4991 7000l0Jo |
| Bank of America Litigation Practice Group PC | | | 1/31/2023 | 1/13/2023 | | 3,744.84 | WIRE TYPEWIRE OUT DATE230113 TIME1 657 ETTRN:20230113005024B8 SERVICE REF563398 BNF:NEW VISION CAPITAL GROUP, 1D386715662J BNF BK:JPMORGAN CHASE BANK, N. ID:0002 PMT 501578 01 1 323 NV4 WEEKLY DISBURSEMENT |
| Bank of America Litigation Practice Group PC | | | 1/31/2023 | 1/13/2023 | | 5,081.72 | WIRE TYPE:WIRE OUT DATE:230113 TIME:1 657 ETTRN:20230113005024950 SERVICE REF:563406 BNF:NEW VISION CAPITAL GROUP, ID:3867156623 BNF BK:JPMORGAN CHASE BANK, N. ID:0002 PMT DET:421 501350 01 1 3.23 NV3 WEEKLY DISBURSEMENT |
| Bank of America Litigation Practice Group PC | | | 1/31/2023 | 1/24/2023 | | 9,787.01 | Disbursement Tm 5670900024o |
| Chase | The Litigation Practice Group PC | | 2/28/2023 | 2/7/2023 | | 14,521.10 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ret: Weekly Disbursement Tm: 664910008Jo |
| Bank of America Litigation Practice Group PC | | | 2/28/2023 | 2/9/2023 | | 9,294.95 | WIRE TYPE:WIRE OUT DATE230209 TIME:1 546 ET TRN:20230209004299S4 SERVICE REF:468570 BNF:NEW VISION CAPITAL GROUP ID:3867156623 BNF BKJPMORGAN CHASE BANK, N. ID:0002 PMT DET:PCM XDFEPT POP Other |
| | | | | | | **627,170.52** | |

DRAFT FORM - SUBJECT TO CHANGE

4 of 4

# EXHIBIT 12



**In re: The Litigation Practice Group PC**
**Disbursement Details by Payee**
**4 Years Pre-Petition (03/20/2019 - 03/20/2023)**

**New Vision Debt Relief LLC**

| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|
| Optimum Bank | Coast Processing LLC dba LPG | | 12/31/2021 | 12/2/2021 | | 239.01 | WIRE TO New Vision Debt Relief |
| Chase | The Litigation Practice Group PC | | 2/28/2022 | 2/18/2022 | | 1,810.92 | Fedwire Debit Via: Union LA Aka Uboc/1 22000496 NC: New Vision Debt Relief Newport Beach, CA 92660 US Ref: Weekly Disbursement/Time/1 4:20 Imad: 021 881 Qgc0C008355 Tm: 5i875000490o |
| Chase | The Litigation Practice Group PC | | 2/28/2022 | 2/25/2022 | | 2,120.94 | Fedwire Debit Via: Union LA Aka Uboc/1 22000496 NC: New Vision Debt Relief Newport Beach, CA 92660 US Ret: Weekly Disbursement/Time/1 5:26 Imad: 022581 Qgc03c0i 1334 Tm: 6366200056lo |
| Chase | The Litigation Practice Group PC | | 3/31/2022 | 3/4/2022 | | 837.99 | Fedwire Debit Via: Union LA Aka Uboc/1 22000496 NC: New Vision Debt Relief Newport Beach, CA 92660 US Ref: Weekly Disbursement/Time/1 5:50 Imad: 030481 Qgc07C0i 36077 Tm: 5364800063Jo |
| Chase | The Litigation Practice Group PC | | 3/31/2022 | 3/10/2022 | | 3,747.46 | Fedwire Debit Via: Union LA Aka Uboc/1 22000496 A/C: New Vision Debt Relief Newport Beach, CA 92660 us US Ref: Weekly Disbursement/Time/1 6:56 Imad: 031 081 Qgc05cC0i 1928 Tm: 741 3900069Jo |
| Chase | The Litigation Practice Group PC | | 3/31/2022 | 3/18/2022 | | 2,501.15 | Fedwire Debit Via: union LA Aka uboc/1 22000496 NC: New Vision Debt Relief Newport Beach, CA 92660 us Ref: Weekly Disbursement/Time/1 3:20 Imad: 031 881 Qgc02C0C0B138 Tm: 4569400077Jo |
| Chase | The Litigation Practice Group PC | | 3/31/2022 | 3/24/2022 | | 1,890.78 | Fedwire Debit Via: union LA Aka Uboc/1 22000496 NC: New Vision Debt Relief Newport Beach, CA 92660 US Ref: Weekly Disbursement/Time/1 5:08 Imad: 032481 Qgc07C009086 Tm: 5975000083lo |
| Chase | The Litigation Practice Group PC | | 4/30/2022 | 4/1/2022 | | 2,707.21 | Fedwire Debit Via: union LA Aka Uboc/1 22000496 A/C: New Vision Debt Relief Newport Beach, CA 92660 us US Ref: Weekly Disbursement/Time/1 3:49 Imad: 0401 B1Qgc02C0Z2219 Tm: 50231009910 |
| Chase | The Litigation Practice Group PC | | 4/30/2022 | 4/7/2022 | | 2,023.39 | Fedwire Debit Via: union LA Aka uboc/1 22000496 NC: New Vision Debt Relief Newport Beach, CA 92660 us Ref: Weekly Disbursement/Time/1 4:50 Imad: 040781Qgc07C01 1448 Tm: 5690300097lo |
| Chase | The Litigation Practice Group PC | | 4/30/2022 | 4/18/2022 | | 3,688.93 | Fedwire Debit Via: union LA Aka Uboc/1 22000496 A/C: New Vision Debt Relief Newport Beach, CA 92660 US Ref: Weekly Disbursement/Time/12:50 mad: 041 881 Qgc0i C007923 Tm: 4355000108lo |
| Chase | The Litigation Practice Group PC | | 4/30/2022 | 4/21/2022 | | 2,296.64 | Fedwire Debit Via: union LA Aka Uboc/1 22000496 A/C: New Vision Debt Relief Newport Beach, CA 92660 US Ref: Weekly Disbursement/Time/1 3:12 Imad: 0421B1Qgc0C008060 Tm: 4866500liUo |
| Chase | The Litigation Practice Group PC | | 4/30/2022 | 4/28/2022 | | 2,675.92 | Fedwire Debit Via: Union LA Aka Uboc/1 22000496 A/C: New Vision Debt Relief Newport Beach, CA 92660 US Ref: Weekly Disbursement/Time/1 3:53 Imad: 042881 Qgc0iGC0i 3703 Tm: 59173001i8Jo |
| Chase | The Litigation Practice Group PC | | 5/31/2022 | 5/5/2022 | | 2,888.05 | Fedwire Debit Via: Union LA Aka Uboc/1 22000496 A/C: New Vision Debt Relief Newport Beach, CA 92660 US Ref: Weekly Disbursement/Time/17:05 Imad: 050581 Qgc0GC0 2981 Tm: 71328001 25Jo |
| Chase | The Litigation Practice Group PC | | 5/31/2022 | 5/13/2022 | | 2,931.47 | Fedwire Debit Via: Union LA Aka uboc/1 22000496 A/C: New Vision Debt Relief Newport Beach, CA 92660 us Ref: Weekly Disbursement/Time/1 5:50 Imad: 0518BIQgc07C0i86i 1 Tm: 74429001i3Jo |
| Chase | The Litigation Practice Group PC | | 5/31/2022 | 5/19/2022 | | 3,090.97 | Fedwire Debit Via: Union LA Aka Uboc/1 22000496 A/C: New Vision Debt Relief Newport Beach, CA 92660 us US Ref: Weekly Disbursement/Time/1 4:24 Imad: 051 991 Qgc08C024380 Tm: 5546000139Jo |
| Chase | The Litigation Practice Group PC | | 5/31/2022 | 5/27/2022 | | 3,729.93 | Fedwire Debit Via: Union LA Aka uboc/1 22000496 A/C: New Vision Debt Relief Newport Beach, CA 92660 us Ref: Weekly Disbursement/Time/6i49 Imad: 052781Qgc07C0i964 Tm: 7i60900047Jo |
| Chase | The Litigation Practice Group PC | | 6/30/2022 | 6/3/2022 | | 2,706.88 | Fedwire Debit Via: Union LA Aka Uboc/1 22000496 A/C: New Vision Debt Relief Newport Beach, CA 92660 us US Ref: Weekly Disbursement/Time/1 7:20 Imad: 060381 Qgc08C0300 7 Tm: 62042001 54Jo |
| Chase | The Litigation Practice Group PC | | 6/30/2022 | 6/10/2022 | | 3,257.67 | Fedwire Debit Via: Union LA Aka Uboc/1 22000496 A/C: New Vision Debt Relief Newport Beach, CA 92660 us Ref: Weekly Disbursement/Time/1 4:45 Imad: 061 081 Qgc03C005555 Tm: 5142200161Jo |
| Chase | The Litigation Practice Group PC | | 6/30/2022 | 6/17/2022 | | 2,799.86 | Fedwire Debit Via: Union LA Aka Uboc/1 22000496 A/C: New Vision Debt Relief Newport Beach, CA 92660 us US Ref: Weekly Disbursement/Time/1 3:15 Imad: 061 781 Qgc05C007788 Tm: 48221001 68Jo |
| Chase | The Litigation Practice Group PC | | 6/30/2022 | 6/23/2022 | | 4,236.43 | Fedwire Debit Via: Union LA Aka Uboc/1 22000496 NC: New Vision Debt Relief Newport Beach, CA 92660 US Ref: Weekly Disbursement/Time/15:31 Imad: 0623B1Qgc08C027600i Tm: 65102001740o |
| Chase | The Litigation Practice Group PC | | 6/30/2022 | 6/30/2022 | | 3,530.86 | Fedwire Debit Via: union LA Aka Uboc/1 22000496 NC: New Vision Debt Relief Newport Beach, CA 92660 us Ref: Weekly Disbursement/Time/1 3:37 Imad: 063081Qgc04C02311B Tm: 5590700i18Jo |
| Chase | The Litigation Practice Group PC | | 7/31/2022 | 7/8/2022 | | 2,088.06 | Fedwire Debit Via: union LA Aka Uboc/1 22000496 NC: New Vision Debt Relief Newport Beach, CA 92660 US Ret: Weekly Disbursement/Time/12:47 Imad: 0708B1Qgc07C0i 1543 Tm: 40463008910 |
| Chase | The Litigation Practice Group PC | | 7/31/2022 | 7/14/2022 | | 3,543.86 | Fedwire Debit Via: Union LA Aka Uboc/1 22000496 A/C: New Vision Debt Relief Newport Beach, CA 92660 US Ref: Weekly Disbursement/Time/12:54 Imad: 071 481 Qgc08C020486 Tm: 51070001 95lo |
| Chase | The Litigation Practice Group PC | | 7/31/2022 | 7/21/2022 | | 2,609.71 | Fedwire Debit Via: union LA Aka uboc/1 22000496 A/C: New Vision Debt Relief Newport Beach, CA 92660 us Ref: Weekly Disbursement/Time/i 3:55 Imad: 0721B1Qgc07C00693i Tm: 5238300020Jo |
| Chase | The Litigation Practice Group PC | | 7/31/2022 | 7/29/2022 | | 4,201.32 | Fedwire Debit Via: Union LA Aka Uboc/1 22000496 A/C: New Vision Debt Relief Newport Beach, CA 92660 US Ref: Weekly Disbursement/Time/1 2:24 Imad: 072981 Qgc05C0i 5570 Tm: 370660021 0Jo |
| Chase | The Litigation Practice Group PC | | 8/31/2022 | 8/5/2022 | | 3,924.60 | Fedwire Debit Via: union LA Aka uboc/1 22000496 A/C: New Vision Debt Relief Newport Beach, CA 92660 us Ref: Weekly Disbursement/Time/1 1:27 Imad: 0805B1Qgc06C008503 Tm: 3004002i7Jo |
| Chase | The Litigation Practice Group PC | | 8/31/2022 | 8/11/2022 | | 3,915.35 | Fedwire Debit Via: Union LA Aka Uboc/1 22000496 NC: New Vision Debt Relief Newport Beach, CA 92660 US US Ref: Weekly Disbursement/Time/1 1:28 Imad: 0811 B1Qgc02C0O5913 Tm: 3896700223Jo |
| Chase | The Litigation Practice Group PC | | 8/31/2022 | 8/19/2022 | | 2,367.42 | Fedwire Debit Via: union LA Aka uboc/1 22000496 A/C: New Vision Debt Relief Newport Beach, CA 92660 us US Ref: Weekly Disbursement/Time/10:44 Imad: 081 981 Qgc08C0 0931 Tm: 2834500231 lo |

DRAFT FORM - SUBJECT TO CHANGE

1 of 2

**GROBSTEIN TEEPLE**

In re: The Litigation Practice Group PC
Disbursement Details by Payee
4 Years Pre-Petition (03/20/2019 - 03/20/2023)

New Vision Debt Relief LLC

| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|
| Chase | The Litigation Practice Group PC | ▮ | 8/31/2022 | 8/26/2022 | | 4,528.47 | Fedwire Debit Via: Union LA Aka Uboc/1 22000496 NC: New Vision Debt Relief Newport Beach, CA 92660 Qgc04c000837 Tm: 4483000238Io |
| Chase | The Litigation Practice Group PC | ▮ | 9/30/2022 | 9/2/2022 | | 2,281.37 | Fedwire Debit Via: Union LA Aka Uboc/1 22000496 NC: New Vision Debt Relief Newport Beach, CA 92660 US Ref: Weekly Disbursement/Time/J 3:43 Imad: 0902B1Qgc04C0071091 Tm: 3725800245Jo |
| Chase | The Litigation Practice Group PC | ▮ | 9/30/2022 | 9/9/2022 | | 703.59 | Fedwire Debit Via: Union LA Aka Uboc/1 22000496 A/C: New Vision Debt Relief Newport Beach, CA 92660 US Ref: Weekly Disbursement/Time/J 1:57 Imad: 0909B1 Qgc02C006506 Tm: 3435300252Jo |
| Chase | The Litigation Practice Group PC | ▮ | 9/30/2022 | 9/16/2022 | | 1,019.48 | Fedwire Debit Via: union LA Aka uboc// 22000496 A/C: New Vision Debt Relief Newport Beach, CA 92660 us Ref: Weekly Disbursement/Time/J 6:44 imad: 0916B1Qgc01C008467 Tm: 6656500259Jo |
| Chase | The Litigation Practice Group PC | ▮ | 9/30/2022 | 9/23/2022 | | 849.90 | Fedwire Debit Via: union LA Aka uboc/1 22000496 A/C: New Vision Debt Relief Newport Beach, CA 92660 US Ref: Weekly Disbursement/Time/J 1:02 Imad: 0923BIQgc08C0 L10851 Tm: 3030002660o |
| Chase | The Litigation Practice Group PC | ▮ | 10/31/2022 | 10/3/2022 | | 1,414.05 | Fedwire Debit Via: Union LA Aka Uboc/1 22000496 A/C: New Vision Debt Relief Newport Beach, CA 92660 US Ref: Weekly Disbursement/Time/J7:25 imad: 1.00381 Qgc03C02I586 Tm: 803771 00276Io |
| Chase | The Litigation Practice Group PC | ▮ | 10/31/2022 | 10/6/2022 | | 3,446.47 | Fedwire Debit Via: Union LA Aka Uboc/1 22000496 A/C: New Vision Debt Relief Newport Beach, CA 92660 US Ref: Weekly Disbursement/Time/J 2:30 imad: 1006B1Qgc08C02452 Tm: 4309200279Jo |
| Chase | The Litigation Practice Group PC | ▮ | 10/31/2022 | 10/17/2022 | | 5,937.50 | Fedwire Debit Via: Union LA Aka Uboc/1 22000496 A/C: New Vision Debt Relief Newport Beach, CA 92660 US Ref: Weekly Disbursement/Time/J 1:33 Imad: 1017B1Qgc08C020231 Tm: 3682900200o |
| Chase | The Litigation Practice Group PC | ▮ | 10/31/2022 | 10/21/2022 | | 3,171.04 | Fedwire Debit Via: union LA Aka uboc/1 22000496 A/C: New Vision Debt Relief Newport Beach, CA 92660 us Ref: Weekly Disbursement/Time/J 4:23 Imad: 1021 Bi Qgc08C02824 Tm: 50520002940o |
| Chase | The Litigation Practice Group PC | ▮ | 10/31/2022 | 10/28/2022 | | 2,363.93 | Fedwire Debit Via: union LA Aka uboc/1 22000496 A/C: New Vision Debt Relief Newport Beach, CA 92660 US Ref: Weekly Disbursement/Time/J 6:57 imad: 1.02881 Qgc02C0 1579 Tm: 7395600301 Jo |
| Chase | The Litigation Practice Group PC | ▮ | 11/30/2022 | 11/9/2022 | | 4,589.52 | Fedwire Debit Via Union LA Aka Uboc/1 22000496 NC: New Vision Debt Relief Newport Beach, CA 92660 US Ref: Weekly Disbursement/Time/J 2:14 imsrt 1.109B1Qgc04C005050 Tm: 415850031 3I0 |
| Chase | The Litigation Practice Group PC | ▮ | 11/30/2022 | 11/10/2022 | | 4,038.29 | Fedwire Debit Via Union LA Aka Uboc/1 22000496 A/C: New Vision Debt Relief Newport Beach, CA 92660 US Ref: Weekly Disbursement/Time/J 7:26 imad. 11.10B1Qgc08C048472 Tm: 805870031 4Jo |
| Chase | The Litigation Practice Group PC | ▮ | 11/30/2022 | 11/10/2022 | | 371.41 | Fedwire Debit Via Union LA Ake Uboc/1 22000496 A/C: New Vision Debt Relief Newport Beach, CA 92660 US Ref: Weekly Dieburement/Timel/ 7:26 imacl iI.10B1Qgc08C04B500 Tm: 805860031 4Io |
| Chase | The Litigation Practice Group PC | ▮ | 11/30/2022 | 11/25/2022 | | 5,616.60 | Fedwire Debit Via: Union LA Aks Uboc/1 22000495 NC: New Vision Debt Relief Newport Beach, CA 92660 US Ret: Weekly Disbursement/Time// 7:53 Imet: I 25BIQgc08C02474I Tm: 4275400329Jo |
| Chase | The Litigation Practice Group PC | ▮ | 11/30/2022 | 11/25/2022 | | 4,440.85 | Fedwire Debit Via: Union LA Ake Uboc/1 22000496 NC: New Vision Debt Relief Newport Beach, CA 92660 US Ret: Weekly Disbursement/Time// 7:53 Imeti: I 25BIQgc02C029344 Tm: 4226700329Jo |
| Chase | The Litigation Practice Group PC | ▮ | 12/31/2022 | 12/5/2022 | | 7,772.43 | Fedwire Debit Via: Union LA Aka Uboc/1 22000496 NC: New Vision Debt Relief Newport Beach, CA 92660 US Ref: Weekly Disbursement/Time// 4:59 Imad: 120581 Qgc08C038600 Tm: sspsossggo |
| Chase | The Litigation Practice Group PC | ▮ | 12/31/2022 | 12/12/2022 | | 2,252.90 | Fadwira Debit Vie: Union LA Ake Uboc/1 22000496 NC: Now Vision Debt Relief Newport Beach, CA 92660 US Ret: Weekly Disbursement/Time// 7:04 Imad 121281 Qgc08C0S 240 Tm: 7780900345k |
| Chase | The Litigation Practice Group PC | ▮ | 12/31/2022 | 12/12/2022 | | 350.16 | Fadwira Debit Vie: Union LA Aka Uboc/1 22000496 NC: Now Vision Debt Relief Newport Beach, CA 92660 US Ret: Weekly Disbursement/Time// 7:04 imad 121281 Qgc08C03i 237 Tm: 7780800345k |
| Chase | The Litigation Practice Group PC | ▮ | 12/31/2022 | 12/19/2022 | | 5,282.39 | Fedwire Debit Via: Union LA Aka Uboc/1 22000496 NC: New Vision Debt Relief Newport Beach, CA 92660 US Ret: Weekly Disbursement/Time// 7:25 Imact 121 9BiQgc06C0I7811 Tm: 8044400353Jo |
| | | | | | | 17,219.01 | |
| Bank of America | Litigation Practice Group PC | | 2/28/2023 | 2/9/2023 | | 156,012.14 | WIRE TYPEWIRE OUT DATE 230209 TIME1 533 ETTRN2OZ3902090042392Z SERVICE REF014591 BNF-NEW VISION DEBT RELIEF -2 ID:1 194Z27912 BNF BK:WELLS FARGO BANK, N.A. ID:1 21 000248 PMT DET:ZUJPR6JIB PDP Other |

# EXHIBIT 13

In re: The Litigation Practice Group PC
Summary of Disbursements
4 Years Pre-Petition (03/20/2019 - 03/20/2023)

| Payee | Sum of Disbursements | Transaction Count |
|---|---|---|
| New Vision 6 | 1,441.18 | 1 |



# EXHIBIT 14

*Legal Counsel.*



DINSMORE & SHOHL LLP
100 West Main Street, Suite 900
Lexington, Kentucky 40507
www.dinsmore.com

Tyler Powell
(859) 425-1046 (direct) ^ (859) 425-1099 (fax)
Tyler.powell@dinsmore.com

September 15, 2023

**CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FEDERAL RULE OF EVIDENCE 408**

New Vision Debt Relief LLC
accounting@newvisiondebt.com

     Re:    In re: The Litigation Practice Group, P.C.
            U.S. Bankruptcy Court, Central District of California, Case No. 8:23-bk-10571

Dear Sir/Madam:

    This firm represents Richard A. Marshack, solely in his capacity as Chapter 11 Trustee ("Trustee") for the bankruptcy estate of The Litigation Practice Group, P.C. ("Debtor") in the above-referenced bankruptcy case. Pursuant to 11 U.S.C. § 1107 and his appointment as Trustee, the Trustee has the obligation to investigate and pursue claims, including avoidance actions.

    After a review of the Debtor's books and records, the Trustee believes that he may have claims against you to avoid and recover certain payments. This letter is written in an attempt to settle such claims, and its contents may not be used for any other purpose.

    Section 547 of the Bankruptcy Code permits a trustee or debtor-in-possession to avoid certain payments made to creditors within the 90-day period preceding the filing of a bankruptcy case. We have completed our preliminary investigation and have identified certain transfers from the Debtor(s) to you within the 90-day period prior to March 20, 2023, the date upon which the Debtor filed its bankruptcy case. These transfers are listed on the attached "Preference Transfer Schedule" showing the date and amount, according to the Debtor's books and records, of each transfer or other payment. The payments referenced on the "Preference Transfer Schedule" total $116,018.68. It appears that these transfers are preferential transfers which can be avoided by the Trustee and recovered from you pursuant to 11 U.S.C. §§ 547(b) and 550(a). This means that the Trustee can file suit in the bankruptcy court to recover these sums and object to payment of any claims you have against the Debtor until the suit is resolved.

    Additionally, if you have filed a proof of claim against the Debtor, that claim may be disallowed pursuant to Section 502(d) of the Bankruptcy Code for failure to return an avoidable transfer. This means that if the preference claims against you are not resolved, then you may not

receive a distribution from the Debtor's bankruptcy estate. The Trustee reserves the right to object to any proof of claim that you have filed or may file in the debtors' bankruptcy cases.





In the alternative, if you believe a valid defense to recovery exists for some or all of the transfers from the Debtor, please bring such defenses to our attention and we will assess any evidence you provide in support of a defense. We have made efforts to analyze your reasonably known affirmative defenses to the avoidance of the preference payments. Based on our currently available information and given the nature of your relationship with the Debtor, we do not believe there are any potential defenses to reduce your liability for the preference payments. There may be information or facts that we do not have to assess your potential defenses. If you intend to assert a defense, please provide all documents evidencing any alleged defenses under 11 U.S.C. § 547(c), including, but not limited to, contracts, invoices and any other documentation showing the date, terms and amounts for the transfers received and any documents evidencing shipment dates as to goods and services provided by you to the Debtors. To properly assert a defense, such information must show the date of receipt of the Debtors' payment and the amount, deposit date, and any proof of deposit for any or all of the transfers. In addition, if you assert an ordinary course of business defense, please provide the previous information for the one year period immediately preceding March of 2023, or for the period that you actually did business with the Debtor, if less than one year. Please make arrangements to provide any evidence in support of a defense to us as soon as possible.

If we have not received any reply to this letter by September 28, 2023, we will proceed to pursue recovery of the preferential transfers by filing suit against you in the bankruptcy court. The Trustee also reserves all rights to bring additional claims against you as the investigation into your relationship with the Debtor continues and/or after discovery begins once a suit is filed.

Of course, we would be happy to discuss this matter with you or your counsel.

Very truly yours,

DINSMORE & SHOHL LLP

Tyler Powell, Partner of Counsel

2

**The payment proposal set forth above is understood, acknowledged and voluntarily agreed to.  In exchange for a waiver and release from all claims that could be asserted by the Trustee of The Litigation Practice Group, P.C. pursuant to 11 U.S.C. §§ 547 and 550, I am authorized to accept this proposal on behalf of Point Break Holdings, LLC.  The sum of $_____ is enclosed.  I understand I may amend my claim to include the amount paid as part of my unsecured claim**.


_____

**BY**: _____

**TITLE**: _____

**DATE**: _____

*Enclosure*

3

**The Litigation Practice Group, P.C. Preference Transfer Schedule**

| Vendor Name | Payment Date | Payment Amount |
|---|---|---|
| New Vision Debt Relief LLC | 1/24/2023 | $1,233.70 |
| New Vision Debt Relief LLC | 1/24/2023 | $26,602.80 |
| New Vision Debt Relief LLC | 1/10/2023 | $19,768.82 |
| New Vision Debt Relief LLC | 12/30/2022 | $342.78 |
| New Vision Debt Relief LLC | 12/30/2022 | $14,878.80 |
| New Vision Debt Relief LLC | 12/28/2022 | $29,059.77 |
| New Vision Debt Relief LLC | 12/27/2022 | $983.10 |
| New Vision Debt Relief LLC | 12/21/2022 | $23,148.91 |
| | | **Total: $ 116,018.68** |

# EXHIBIT 15

In re: The Litigation Practice Group PC
Disbursement Details by Payee
90 Days Pre-Petition (12/20/2022 - 03/20/2023)

New Vision Debt LLC

| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|
| Chase | The Litigation Practice Group PC | ▮ | 12/31/2022 | 12/21/2022 | | 23,148.91 | Fedwire Debit Vie. Wells Fargo NN121000248 NC. New Vision Debt LLC Newport Beach, CA 92660 US Rot: Weekly Disbursement/Time/I 4:32 Imad:122161 Qgc08Q29946 Tm: 5987400355Io |
| Chase | The Litigation Practice Group PC | ▮ | 12/31/2022 | 12/27/2022 | | 983.10 | Fedwire Debit Vie. Wells Fargo NN121000248 NC. New Vision Debt LLC Newport Beach, CA 92660 US Ret: Weekly Disbursement/Time/I 3:58 Imad:i22780gc0iC0i623I Tm: 48035003 6ilo |
| Chase | The Litigation Practice Group PC | ▮ | 12/31/2022 | 12/28/2022 | | 29,059.77 | Fedwire Debit Vie Wells Fergo NN121000248 NC New Vision Debt LLC Newport Beach, CA 92660 US Ret: Weekly Disbursement/Time/I 7:01 mcd:.I22BB1 Cgc06C022798 Tm: 74060003 62io |
| Chase | The Litigation Practice Group PC | ▮ | 12/31/2022 | 12/30/2022 | | 14,878.80 | Fedwire Debit Via Wells Fargo NN121000243 NC New Vision Debt LLC Newport Beach, CA 92660 US Ret: Weekly Disbursement/Time/I 4:36 Imad: 123081 Ogc06C067744 Tm: 55731 003640 |
| Chase | The Litigation Practice Group PC | ▮ | 12/31/2022 | 12/30/2022 | | 342.78 | Fedwire Debit Via Wells Fargo NN121000248 NC New Vision Debt LLC Newport Beach, CA 92660 US Ret: Weekly Disbursement/Time/I 7:15 Imad:123081 0gc08C083508 Tm: 70927003641o |
| Chase | The Litigation Practice Group PC | ▮ | 1/31/2023 | 1/10/2023 | | 19,768.82 | Fedwire Debit Vie Wells Fargo NN121000248 NC New Vision Debt LLC Nenport Beach, CA 92660 US Ret: Weekly Disbursement/Time/I 4:53 Imad:01 1081Qgc03C005369 Tm: 4991 00001 0Io |
| Bank of America | Litigation Practice Group PC | ▮ | 1/31/2023 | 1/13/2023 | | 20,030.85 | WIRE TYPE:WIRE OUT DATE:2301 13 TIME:1 657 ET TRN:20230113005025O4 SERVICE REF-01 8390 BNF-NEW VISION DEBT LLC ID:1 1942279I2 BNF BK:WELLS FARGO BANK, NA ID:1 21 000248 PMT DET:-421 5009820 1.1 323 WEEKLY DISBURSEMENT |
| Bank of America | Litigation Practice Group PC | ▮ | 1/31/2023 | 1/18/2023 | | 250.38 | WIRE TYPE:WIRE OUT DATE:230I 18 TIME:1 344 ET TRN:202301 1800426297 SERVICE REF011234 BNF-NEW VISION DEBT LLC ID:11942279I2 BNF BK:WELLS FARGO BANK, NA ID:121000248 PMT DET:4219571 12W EEKLY DISBURSEMENT |
| Chase | The Litigation Practice Group PC | ▮ | 1/31/2023 | 1/24/2023 | | 26,602.80 | Fedwire Debit Via Wells Fargo NN121000248 NC New Vision Debt LLC Newport Beach, CA 92660 US Ret: Weekly Disbursement/Time/1 5:47 Imad: 012481 Ogc08C032068 Tm: 56543000240 |
| Chase | The Litigation Practice Group PC | ▮ | 1/31/2023 | 1/24/2023 | | 1,233.70 | Fedwire Debit Via. Wells Fargo NN121000248 NC. New Vision Debt LLC Newport Beach, CA 92660 US Ret: Weekly Disbursement/Time/I 5:47 Imad: 012461 0gc02CO0SI 90 Tm: 56551 000240 |
| Chase | The Litigation Practice Group PC | ▮ | 2/28/2023 | 2/7/2023 | | 28,108.32 | Fedwire Debit Via. Wells Fargo NA/121000248 A/C: New Vision Debt LLc Newport Beach, CA 92660 US Ref: Weekly Disbursement/Time/17-47 Imad: 0207B1Ogc07C031941 Tm: 66488000380 |
| Chase | The Litigation Practice Group PC | ▮ | 2/28/2023 | 2/7/2023 | | 973.06 | Fedwire Debit Via. Wells Fargo NN121000248 NC. New Vision Debt LLC Newport Beach, CA 92660 US Ref: Weekly Disbursement/Time/17-47 Imad: 0207B1Ogc07C031937 Tm: 66487000380 |
| | | | | | | **165,381.29** | |

DRAFT FORM - SUBJECT TO CHANGE

Page 217

# EXHIBIT 16



*Legal Counsel.*

**DINSMORE & SHOHL** LLP
100 West Main Street, Suite 900
Lexington, Kentucky 40507
www.dinsmore.com

Tyler Powell
(859) 425-1046 (direct) ^ (859) 425-1099 (fax)
Tyler.powell@dinsmore.com

September 15, 2023

**CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FEDERAL RULE OF EVIDENCE 408**

New Vision Capital Group LLC
3857 Birch St #25
Newport Beach, CA 92660
Accounting@newvisiondebt.com

Re:      In re: The Litigation Practice Group, P.C.
         U.S. Bankruptcy Court, Central District of California, Case No. 8:23-bk-10571

Dear Sir/Madam:

This firm represents Richard A. Marshack, solely in his capacity as Chapter 11 Trustee ("Trustee") for the bankruptcy estate of The Litigation Practice Group, P.C. ("Debtor") in the above-referenced bankruptcy case. Pursuant to 11 U.S.C. § 1107 and his appointment as Trustee, the Trustee has the obligation to investigate and pursue claims, including avoidance actions.

After a review of the Debtor's books and records, the Trustee believes that he may have claims against you to avoid and recover certain payments. This letter is written in an attempt to settle such claims, and its contents may not be used for any other purpose.

Section 547 of the Bankruptcy Code permits a trustee or debtor-in-possession to avoid certain payments made to creditors within the 90-day period preceding the filing of a bankruptcy case. We have completed our preliminary investigation and have identified certain transfers from the Debtor(s) to you within the 90-day period prior to March 20, 2023, the date upon which the Debtor filed its bankruptcy case. These transfers are listed on the attached "Preference Transfer Schedule" showing the date and amount, according to the Debtor's books and records, of each transfer or other payment. The payments referenced on the "Preference Transfer Schedule" total $ 40,954.46. It appears that these transfers are preferential transfers which can be avoided by the Trustee and recovered from you pursuant to 11 U.S.C. §§ 547(b) and 550(a). This means that the Trustee can file suit in the bankruptcy court to recover these sums and object to payment of any claims you have against the Debtor until the suit is resolved.

Additionally, if you have filed a proof of claim against the Debtor, that claim may be disallowed pursuant to Section 502(d) of the Bankruptcy Code for failure to return an avoidable

transfer. This means that if the preference claims against you are not resolved, then you may not receive a distribution from the Debtor's bankruptcy estate. The Trustee reserves the right to object to any proof of claim that you have filed or may file in the debtors' bankruptcy cases.



In the alternative, if you believe a valid defense to recovery exists for some or all of the transfers from the Debtor, please bring such defenses to our attention and we will assess any evidence you provide in support of a defense.  We have made efforts to analyze your reasonably known affirmative defenses to the avoidance of the preference payments. Based on our currently available information and given the nature of your relationship with the Debtor, we do not believe there are any potential defenses to reduce your liability for the preference payments.  There may be information or facts that we do not have to assess your potential defenses.  If you intend to assert a defense, please provide all documents evidencing any alleged defenses under 11 U.S.C. § 547(c), including, but not limited to, contracts, invoices and any other documentation showing the date, terms and amounts for the transfers received and any documents evidencing shipment dates as to goods and services provided by you to the Debtors.  To properly assert a defense, such information must show the date of receipt of the Debtors' payment and the amount, deposit date, and any proof of deposit for any or all of the transfers.  In addition, if you assert an ordinary course of business defense, please provide the previous information for the one year period immediately preceding March of 2023, or for the period that you actually did business with the Debtor, if less than one year.  Please make arrangements to provide any evidence in support of a defense to us as soon as possible.

If we have not received any reply to this letter by September 28, 2023, we will proceed to pursue recovery of the preferential transfers by filing suit against you in the bankruptcy court.  The Trustee also reserves all rights to bring additional claims against you as the investigation into your relationship with the Debtor continues and/or after discovery begins once a suit is filed.

Of course, we would be happy to discuss this matter with you or your counsel.

Very truly yours,

DINSMORE & SHOHL LLP

Tyler Powell, Partner of Counsel

2

**The payment proposal set forth above is understood, acknowledged and voluntarily agreed to.  In exchange for a waiver and release from all claims that could be asserted by the Trustee of The Litigation Practice Group, P.C. pursuant to 11 U.S.C. §§ 547 and 550, I am authorized to accept this proposal on behalf of Point Break Holdings, LLC.  The sum of $_____ is enclosed.  I understand I may amend my claim to include the amount paid as part of my unsecured claim**.

_____

**BY**: _____

**TITLE**: _____

**DATE**: _____

*Enclosure*

3

**The Litigation Practice Group, P.C. Preference Transfer Schedule**

| Vendor Name | Payment Date | Payment Amount |
|---|---|---|
| New Vision Capital Group LLC | 1/24/2023 | 9,787.01 |
| New Vision Capital Group LLC | 1/10/2023 | 4,508.31 |
| New Vision Capital Group LLC | 1/10/2023 | 4,807.93 |
| New Vision Capital Group LLC | 12/30/2022 | 3,849.71 |
| New Vision Capital Group LLC | 12/30/2022 | 4,915.89 |
| New Vision Capital Group LLC | 12/27/2022 | 6,619.65 |
| New Vision Capital Group LLC | 12/27/2022 | 6,465.96 |
| | | **Total: $ 40,954.46** |

# EXHIBIT 17

In re: The Litigation Practice Group PC
Disbursement Details by Payee
90 Days Pre-Petition (12/20/2022 - 03/20/2023)

New Vision Capital Group LLC

**GROBSTEIN TEEPLE**

| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|
| Chase | The Litigation Practice Group PC | ▮ | 12/31/2022 | 12/27/2022 | | 6,619.65 | Book Transfer Debit NC: New Vision Capital Group, LLC Sents Ane CA 92705-3530 US Ref: Weekly Disbursement Tm 698050036110 |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/27/2022 | | 6,465.96 | Book Transfer Debit NC: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ref: Weekly Disbursement Tm 698060036110 |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/30/2022 | | 4,915.89 | Book Transfer Debit NC: New Vision Capital Group, LLC [IC Sante Ana CA 92705-3538 US Ref: Weekly Disbursement Tm 557330036440 |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/30/2022 | | 3,849.71 | Book Transfer Debit NC: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ref. Weekly Disbursement Tm. 557320036440 |
| Chase | The Litigation Practice Group PC | | 1/31/2023 | 1/10/2023 | | 4,807.93 | Book Transfer Debit NC: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Rat: Weekly Disbursement Tm' 4991 6000 rOJ0 |
| Chase | The Litigation Practice Group PC | | 1/31/2023 | 1/10/2023 | | 4,508.31 | Book Transfer Debit NC: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Re: Weekly Disbursement Tm: 4991 70000Jo |
| Bank of America | Litigation Practice Group PC | | 1/31/2023 | 1/13/2023 | | 3,744.84 | WIRE TYPEWIRE OUT DATE230113 TIME1 657 ETTRN:2023011300502488 SERVICE REF563398 BNF:NEW VISION CAPITAL GROUP, ID3867156623 BNF BK:JPMORGAN CHASE BANK, N. ID:0002 PMT DET-421 501570 01 1 323 NN4 WEEKLY DISBURSEMENT |
| Bank of America | Litigation Practice Group PC | | 1/31/2023 | 1/13/2023 | | 5,081.72 | WIRE TYPE:WIRE OUT DATE 230113 TIME:1 657 ETTRN2023011300502495 SERVICE REF-563406 BNF-NEW VISION CAPITAL GROUP, ID-3867 1,56623 BNF BK-JPMORGAN CHASE BANK, N. ID:0002 PMT DET-421 501350 01. 1 3 23 NV3 WEEKLY DISBURSEMENT |
| Chase | The Litigation Practice Group PC | | 1/31/2023 | 1/24/2023 | | 9,787.01 | Book Transfer Debit NC: New Vision Capital Group, LLC Sante Ana CA 92705-3538 US Ref: Weekly Disbursement Tm 5670900024lo |
| Chase | The Litigation Practice Group PC | | 2/28/2023 | 2/7/2023 | | 14,521.10 | Book Transfer Debit A/C: New Vision Capital Group, LLC Santa Ana CA 92705-3538 US Ref: Weekly Disbursement Trn: 664910003810 |
| Bank of America | Litigation Practice Group PC | | 2/28/2023 | 2/9/2023 | | 9,294.95 | WIRE TYPE-WIRE OUT DATE230209 TIME-1 546 ET TRN-2023020900429954 SERVICE REF-468570 BNF-NEW VISION CAPITAL GROUPI ID-3867156623 BNF BKJPMORGAN CHASE BANK, N. ID:0002 PMT DET-PCM KOFEPT POP Other |
| | | | | | | **73,597.07** | |

DRAFT FORM - SUBJECT TO CHANGE

1 of 1

# EXHIBIT 18

In re: The Litigation Practice Group PC
Disbursement Details by Payee
90 Days Pre-Petition (12/20/2022 - 03/20/2023)

New Vision Debt Relief LLC

| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|
| Bank of America | Litigation Practice Group PC | ▮▮▮ | 2/28/2023 | 2/9/2023 | | 17,219.01 | WIRE TYPE:WIRE OUT DATE:230209 TIME1 533 ET TRN2023020900423927 SERVICE REF014591 BNF-NEW VISION DEBT RELIEF -2 ID:1 194227912 BNF BK:WELLS FARGO BANK, N.A. ID:1 21 000248 PMT DET ZUPRFJJB |
| | | | | | | | POP Other |
| | | | | | **17,219.01** | |

DRAFT FORM - SUBJECT TO CHANGE

1 of 1

# EXHIBIT 19

In re: The Litigation Practice Group PC
Summary of Disbursements
90 Days Pre-Petition (12/20/2022 - 03/20/2023)



| Payee | Sum of Disbursements | Transaction Count |
|-------|---------------------:|------------------:|
| New Vision 6 | 1,441.18 | 1 |

# EXHIBIT 20



**LAWYERS**

610 NEWPORT CENTER DRIVE, SUITE 700
NEWPORT BEACH, CALIFORNIA 92660

TELEPHONE 949.717.3000
FACSIMILE 949.717.3100

CALLJENSEN.COM

October 6, 2023

OUR FILE NUMBER
QUI10-01

**BY EMAIL ONLY**

Tyler Powell
Dinsmore & Shohl LLP
100 West Main Street, Suite 900
Lexington, KY 40507
Tyler.powell@dinsmore.com

Re:   **CONFIDENTIAL SETTLEMENT COMMUNICATION**
      <u>In re: The Litigation Practice Group, P.C.</u>, CDCA, Case No. 8:23-bk-10571

Mr. Powell:

This firm represents New Vision Debt LLC and related entity New Vision Capital Group, LLC (collectively "New Vision"). We received your letters dated September 15, 2023, regarding the Trustee's potential claims against New Vision, and thank you for the courtesy of giving us time to respond. We do not believe New Vision owes any money to the LPG estate.

Tyler Powell
October 6, 2023
Page 2

Very truly yours,

Kyle R. Bevan
For Call & Jensen
A Professional Corporation

# EXHIBIT 21

In re: The Litigation Practice Group PC
Summary of Disbursements
Post-Petition Activity (3/20/2023 - Present)

| Payee | Sum of Disbursements | Transaction Count |
|-------|---------------------:|------------------:|

| New Vision Capital Group LLC | 20,000.00 | 1 |



# EXHIBIT 22

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor 1 | New Vision Debt LLC |
| Debtor 2 (Spouse, if filing) | New Vision Capital Group LLC |
| United States Bankruptcy Court for the: | Central District of California |
| Case number | 8:23-bk-10571-SC |

**FILED**

FEB 23 2024

By Omni Agent Solutions, Claims Agent
For U.S. Bankruptcy Court
Central District of California

## Official Form 410

# Proof of Claim

04/22

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

---

**Part 1:     Identify the Claim**

**1. Who is the current creditor?**

New Vision Debt LLC, New Vision Capital Group LLC
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor  New Vision debt 2, New Vision 6, NV4,NV3

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

New Vision Debt LLC
Name

3857 Birch St #25
Number     Street

Newport Beach          CA          92705
City                          State           ZIP Code

Contact phone 9493107264

Contact email newvisioncapitalgroup@gmail.com

Where should payments to the creditor be sent? (if different)

New Vision Capital Group LLC
Name

3857 Birch St. #25
Number     Street

Newport Beach          CA          92660
City                          State           ZIP Code

Contact phone 9493107264

Contact email newvisioncapitalgroup@gmail.com

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**4. Does this claim amend one already filed?**

☑ No
☐ Yes.  Claim number on court claims registry (if known) _____
Filed on _____
          MM  / DD  / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes.  Who made the earlier filing? _____

102396-1 AD

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☐ No

☑ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor:  __B__  __A__  __T__  ____

**7. How much is the claim?**  $_____1.00 . **Does this amount include interest or other charges?**

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See Attachment A.

**9. Is all or part of the claim secured?**

☑ No

☐ Yes.  The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property**:  $_____

**Amount of the claim that is secured:**  $_____

**Amount of the claim that is unsecured:**  $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**  $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**  $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

---

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☑ No | |
|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Yes. *Check one:* | **Amount entitled to priority** |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3:    Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑ I am the creditor.
☐ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  02/22/2024
                   MM / DD / YYYY

*Sarvenaz Moarefian*
_____
Signature

**Print the name of the person who is completing and signing this claim:**

| | | |
|---|---|---|
| Name | Sarvenaz | Moarefian |
| | First name      Middle name | Last name |
| Title | Partner | |
| Company | Newvision Capital Group LLC | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | |
| Address | 3857 Birch St #25 | |
| | Number      Street | |
| | Newport Beach          CA      92660 | |
| | City                  State    ZIP Code | |
| Contact phone | 714-721-1199 | Email newvisioncapitalgroup@gmail.com |

# ATTACHMENT A

Newvision Capital Group, LLC, known as "NewvisionDebt," primarily association with The

Litigation Practice Group P.C. ("LPG") by offering support for marketing services.

"NewvisionDebt," on multiple occasions offered Financing to cover Marketing fee owed on

behalf of LPG. In exchange for account receivables at 70% to be assigned to "NewvisionDebt,"

LPG acknowledged this assignment, provided regular reports on collections and amounts owed

and occasionally made direct payments based on those reports. with accounting details to be

furnished in an updated Proof of Claim. "NewvisionDebt" is actively assessing the complete

scope of its claim and intends to amend the Proof of Claim once its review of records and

financing accounting for LPG is finalized.

*Attachment A to Proof of Claim Filed by Newvision Capital Group, LLC*

delivered. Thank you. Billing

The Litigation Practice Group P.C. Claims Processing
c/o Omni Agent Solutions
5955 De Soto Ave., Suite 100
Woodland Hills, CA 91367