John H. Stephens (82971)
john.stephens@dinsmore.com
Christopher Celentino (131688)
christopher.celentino@dinsmore.com
Yosina M. Lissebeck (201654)
yosina.lissebeck@dinsmore.com
Veneeta Jaswal (310108)
Veneeta.Jaswal@dinsmore.com
DINSMORE & SHOHL LLP
655 West Broadway, Suite 800
San Diego, CA 92101
Tele: 619.400.0500
Fax:  619.400.0501

Special Counsel to Richard A. Marshack, Chapter 11 Trustee for the Bankruptcy Estate of The Litigation Practice Group P.C., and Liquidating Trustee of the LPG Liquidation Trust

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>THE LITIGATION PRACTICE GROUP P.C.,<br><br>          Debtor. | Bankr. Case No. 8:23-bk-10571-SC<br><br>Adv. Proc. No.<br><br>Chapter 11<br><br>**TRUSTEE'S COMPLAINT FOR:** |
| RICHARD A. MARSHACK,<br><br>Chapter 11 Trustee,<br><br>          Plaintiff,<br><br>          v.<br><br>MCA CAPITAL HOLDINGS LLC,<br><br>          Defendant. | **(1) AVOIDANCE, RECOVERY, AND PRESERVATION OF 2-YEAR ACTUAL FRAUDULENT TRANSFERS;**<br><br>**(2) AVOIDANCE, RECOVERY, AND PRESERVATION OF 2-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS;**<br><br>**(3) AVOIDANCE, RECOVERY, AND PRESERVATION OF 4-YEAR ACTUAL FRAUDULENT TRANSFERS;**<br><br>**(4) AVOIDANCE, RECOVERY, AND PRESERVATION OF 4-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS;**<br><br>**(5) TURNOVER**<br><br>Judge: Hon. Scott C. Clarkson |

For his *Complaint for (1) Avoidance, Recovery, and Preservation of 2-Year Actual Fraudulent Transfers; (2) Avoidance, Recovery, and Preservation of 2-Year Constructive Fraudulent Transfers; (3) Avoidance, Recovery, and Preservation of 4-Year Actual Fraudulent Transfers; (4) Avoidance, Recovery, and Preservation of 4-Year Constructive Fraudulent Transfers; and (5) Turnover* ("Complaint"), plaintiff Richard A. Marshack, Chapter 11 Trustee for the bankruptcy estate ("Estate") of debtor The Litigation Practice Group P.C. ("Debtor" or "LPG"), and Liquidating Trustee of the LPG Liquidation Trust (together "Trustee" or "Plaintiff") in the above-captioned bankruptcy case ("Bankruptcy Case"), alleges as follows:

## STATEMENT OF JURISDICTION, NATURE OF PROCEEDING, AND VENUE

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E), (H) and (O), 1334(b), and General Order No. 13-05 of the District Court for the Central District of California because this is a core proceeding arising in and/or related to the Bankruptcy Case, which is a case under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code"), and is pending in the United States Bankruptcy Court for the Central District of California, Santa Ana Division ("Bankruptcy Court").

2. Regardless of whether this proceeding is core, non-core, or otherwise, Plaintiff consents to the entry of a final order and judgment by the Bankruptcy Court.

3. Defendant is hereby notified that Rule 7008 of the Federal Rules of Bankruptcy Procedure requires it to plead whether consent is given to the entry of a final order and judgment by the Bankruptcy Court.

4. Venue of this adversary proceeding properly lies in this judicial district pursuant to 28 U.S.C. § 1409(a) because this proceeding is related to Debtor's pending Bankruptcy Case.

/ / /

/ / /

**THE PARTIES**

5.      Plaintiff, Richard A. Marshack, is the duly-appointed, qualified, and acting Chapter 11 Trustee of Debtor's Estate and Liquidating Trustee of the LPG Liquidation Trust.

6.      Debtor LPG is, and at all material times was, a professional corporation organized, existing, and in good standing under the laws of the State of California, with its principal place of business in Tustin, California.

7.      Defendant, MCA Capital Holdings LLC ("Defendant" or "MCA Capital"), is, and at all material times represented that it was, a limited liability company, existing and in good standing under the laws of the State of New York.

8.      Defendant made its initial New York Department of State filing on April 26, 2021, and provided a Post Office address of The Limited Liability Company, 802 Avenue U, PH7, Brooklyn, NY 11223 for the New York Secretary of State to mail any process against Defendant.  The address for the Secretary of State to mail process against Defendant was changed on June 29, 2021, to 254 32nd Street, Building 2 C303, Brooklyn, NY 11232.  On February 18, 2022, Defendant filed with the Department of State a Certificate of Publication of its Notice of Formation designating the Secretary of State as the LLC's agent upon whom process against it may be served.  According to Defendant's Entity Information, process against Defendant to be mail-served by the Secretary of State is to be delivered to the Secretary of State by personal delivery; electronic service on the Secretary of State is said to be not permitted.

**RELEVANT DEFENDANT NAMED IN THE 1046 ACTION[1]**

9.      Tony Diab is, and at all times mentioned was, an individual residing in the State of California.  Diab owned, operated, dominated and controlled LPG, a national debt relief law firm.

/ / /

---

[1] On May 25, 2023, the Trustee filed an adversary complaint against a number of Debtor's insiders and fraudulent transferees seeking avoidance of transfers and damages.  See, Adv. Case No. 8:23-ap-01046 (the "1046 Action").  [Bankr. Docket No. 63.]  The 1046 Action remains pending.

3

## GENERAL ALLEGATIONS

**A.    LPG'S BANKRUPTCY CASE**

10.    On March 20, 2023 ("Petition Date"), Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, commencing the Bankruptcy Case.  Diab made the decision for LPG to file for bankruptcy in order to avoid numerous pending lawsuits, two of which sought an order appointing a receiver, including but not limited to: *Validation Partners, LLC v. The Litigation Practice Group, PC, et al.*, Case No. 30-2022-01281911-CU-BC-CXC (Orange County Super. Ct. September 20, 2022) and *Debt Validation Fund II, LLC, et al. v. The Litigation Practice Group PC, et al.,* Case No. 30-2023-01303355-CU-CO-CXC (Orange County Super. Ct. January 23, 2023), among many others.  In order to abscond with and delay discovery of substantial assets and continue to profit from LPG client files and from client payments made pursuant to LPG'S client Legal Services Agreements ("Client Funds"), Diab and other defendants devised a plan to fraudulently transfer funds, client files, Client Funds and assets in the form of ACH Receivables (the "ACH Receivables" or "Accounts Receivable") out of LPG to third parties prior to the filing of bankruptcy. The 1046 Action primarily seeks avoidance, recovery and damages arising out of the wholesale fraudulent transfer of client files and the related ACH Receivables.  This action deals primarily with the alleged transfer of client ACH Receivables to Defendant by means of a Merchant Cash Advance ("MCA") Agreement.

11.    The Office of the United States Trustee ("UST") filed its *Motion by United States Trustee to Dismiss or Convert Case Pursuant to 11 U.S.C. § 1112(b)* [Bankr. Docket No. 21] and creditors Debt Validation Fund II, LLC; MC DVI Fund 1, LLC; and MC DVI Fund 2, LLC filed the *Motion by DVF and MC DVI to Dismiss Chapter 11 Case Pursuant to 11 U.S.C. §§ 105, 305, 349, & 1112, or in the Alternative Convert This Case to Chapter 7 or Appoint a Trustee* [Bankr. Docket No. 44].  On May 4, 2023, the Court entered its *Order Directing United States Trustee to Appoint Chapter 11*

/ / /

1  *Trustee* [Bankr. Docket No. 58], thereby granting the UST's motion and directing the

2  UST to appoint a Chapter 11 Trustee in the Bankrupcy case.

3        12.     Pursuant to the *Acceptance of Appointment as Chapter 11 Trustee* [Bankr.

4  Docket No. 63], on May 8, 2023, Trustee accepted his appointment as the Chapter 11

5  Trustee in the Bankruptcy Case, and he continues to serve in this capacity at this time.

6  The Court approved the Trustee's appointment in its *Order Approving the U.S.*

7  *Trustee's Application for the Appointment of a Chapter 11 Trustee* [Bankr. Docket No.

8  65].

9        13.     Plaintiff Trustee was not appointed until after events of the case and,

10  therefore, bases these allegations on information and belief. *Soo Park v. Thompson*,

11  851 F.3d 910, 928 (9th Cir. 2017) ("The *Twombly* plausibility standard . . . does not

12  prevent a plaintiff from pleading facts alleged upon information and belief where the

13  facts are peculiarly within the possession and control of the defendant or where the

14  belief is based on factual information that makes the inference of culpability

15  plausible."); *Miller v. City of Los Angeles*, 2014 U.S. Dist. LEXIS 198871, 2014 WL

16  12610195, at *5 (C.D. Cal. Aug. 7, 2014) (recognizing that the plaintiff's "information

17  and belief" pleading was allowed and "necessary at times"); *see also Mireskandari v.*

18  *Daily Mail and General Trust PLC*, 2013 U.S. Dist. LEXIS 194437, 2013 WL

19  12129642, at *4 (C.D. Cal. July 31, 2013) ("The Federal Rules of Civil Procedure allow

20  parties to plead facts on 'information and belief' if the facts 'will likely have evidentiary

21  support after a reasonable opportunity for further investigation or discovery.'")

22  (Citations omitted.)

23        14.     Pursuant to the *Order Confirming Modified First Amended Joint Chapter*

24  *11 Plan of Liquidation* entered September 9, 2024, and the *Notice of Occurrence of*

25  *Effective Date of Modified First Amended Joint Chapter 11 Plan of Liquidation* filed

26  September 24, 2024, Richard A. Marshack also became the Liquidating Trustee of the

27  LPG Liquidation Trust, effective September 24, 2024.  [Bankr. Docket Nos. 1646 &

28  1762.]

15.     Plaintiff brings this action solely in his capacity as the Chapter 11 Trustee, and as the Liquidating Trustee of the LPG Liquidation Trust, for the benefit of Debtor's Estate and its creditors.

**B.     LPG's OWNERSHIP AND MANAGEMENT**

16.     Prior to the Petition Date, LPG operated a law firm for consumers across the country who sought assistance in contesting or resolving debts.  LPG serviced over 50,000 customers across the United States.  At all relevant times, LPG was controlled and operated by the individual named Tony Diab ("Diab"), the relevant defendant in the 1046 Action as alleged above.

17.     Despite having been disbarred in California and Nevada, Diab controlled and operated LPG since its inception.  Diab, however, endeavored to conceal his control over LPG, its finances, marketing, affiliates and operations.  For example, Diab purportedly required his LPG employees to call him "Admin," his email address was admin@lpglaw.com, and the name plate on his desk apparently read, "I don't work here."

**C.     LPG**

17.     The consumers that retained LPG to represent them would pay over a period of time via monthly ACH debits from their bank accounts.

18.     The monthly payments were meant to cover all legal services LPG provided to the consumers including validation of the debts, review of documents to determine enforceability, and court appearances to halt lawsuits to obtain judgments.

19.     In certain instances, LPG would file a lawsuit in an effort to eliminate a disputed debt or to prosecute affirmative claims held by the consumers.

20.     LPG mismanaged the consumers' monthly payments.

21.     To obtain consumer clients, LPG contracted with marketing companies, who engaged in illegal capping, and would advertise or call to solicit consumers to become clients of LPG in exchange for a percentage of the ACH Receivables collected by LPG from the consumers.

22.    The marketing affiliates went so far as to assist with the execution of an engagement letter between the consumer and LPG.

23.    Because LPG received payments from consumers over time, it often sought financing by borrowing against its future cash flows from the Accounts Receivable by means of, among other things, the MCA Agreements. This borrowing was not only used to finance operations at LPG and to pay fees owed to the marketing companies for providing the client referrals, but also was used to pay creditors that had provided earlier-in-time financing in a growing Ponzi scheme.

24.    Many of the documents executed in connection with such financing described the transactions as account receivable purchase agreements.  However, LPG was not selling accounts receivable to MCA lenders, it was obtaining short term loans in return for the transfer of future monthly payments made by clients that were required to be held in client-trust accounts.

25.    To facilitate the transfer of ACH Receivables to MCA lenders, Diab used entities he controlled including, without limitation, Vulcan Consulting Group LLC ("Vulcan").  Diab would use numerous ACH processing companies in order to easily transfer millions of dollars from Debtor to Vulcan and other entities he controlled, without oversight or detection, and to avoid payment disputes and complications.  The money that flowed from Debtor through Vulcan's bank account to Defendant consisted of Client Funds that Debtor held in its bank accounts and funneled to Vulcan by means of the ACH processing companies.  Debtor regularly made deposits into Vulcan's bank account such that Vulcan received Client Funds directly from Debtor in addition to future Accounts Receivable.

a.    **Affiliate Agreements**

26.    As part of its business, Debtor LPG routinely entered into affiliate agreements with non-attorney entities, including the marketing companies, and individuals ("Affiliate Agreements") many of whom are defendants in other adversary actions brought by the Trustee.

27. The Affiliate Agreements state that the affiliate owns and operates a system of generating leads consisting of consumers interested in the legal services offered by LPG.

28. Pursuant to the Affiliate Agreements, the affiliate generated leads consisting of consumers interested in the legal services offered by LPG and referred those consumers to Debtor.

29. Pursuant to the Affiliate Agreements, Debtor agreed to pay the affiliates a percentage, generally 75%, per file for each file the affiliate placed with LPG, less a monthly maintenance fee that LPG retained to cover administrative costs. LPG calculated the value of each file applying the percentage fee, less the maintenance fee, and remitted the amount to the affiliate pursuant to an agreed-upon schedule.

30. The Affiliate Agreements violate Sections 6151 and 6155 of the California Business and Professional Code, which prohibit referrals of potential clients to attorneys unless the referring entity is registered with the State Bar of California. A referral includes receiving information from potential clients and sending that information to lawyers, even when the advertiser does not advertise the name of the attorneys and the clients do not clear the name of the potential attorney after the referral occurred.

31. Further, if any effect of an agreement is to accomplish an unlawful purpose, the agreement may be declared illegal regardless of the intention of the parties.

32. Because the Affiliate Agreements violate federal and state law, they are void, unenforceable, and subject to avoidance as fraudulent. The alleged consideration provided under the Affiliate Agreements was unlawful.

33. Unlawful consideration is that which is: "(1) contrary to an express provision of law; (2) contrary to the policy of express law, though not expressly prohibited; or (3) otherwise contrary to good morals." Cal. Civ. Code § 1667. "If any part of a single consideration for one or more objects, or of several considerations for a single object, is unlawful, the entire contract is void." Cal. Civ. Code § 1608.

/ / /

### D. DIAB'S SCHEME

34.    As discussed above, the Debtor borrowed against its future ACH Receivables by purporting to transfer them to factoring companies pursuant to MCA Agreements or similar transactions.  In many instances, the ACH Receivables were transferred multiple times.

35.    Given that all or a substantial portion of Debtor's ACH Receivables were transferred multiple times, there were more claims for payment from any one ACH Receivable than the receivable would generate.  Thus, prior to the Petition Date, Debtor engaged in a scheme to defraud its creditors by transferring funds from clients in the form of future Accounts Receivable to various fraudulent conveyance partners, including the lenders under the MCA Agreements as alleged herein, and in the various adversary proceedings brought by the Trustee including, but not limited to, the 1046 Action.

### E. DEFENDANT'S DEALINGS WITH LPG

36.    Defendant was one of the transferees of LPG's future Accounts Receivable pursuant to MCA Agreements.  These ACH Receivables included funds that would be generated in the future from the unlawful Affiliate Agreements.

37.    Traditional merchant cash advances are a variation on "factoring" where a merchant sells a discounted portion of its accounts receivable, and the purchaser receives in return the actual income from the accounts receivable it purchased.  The amount paid to purchase the receivables is lower than the expected income thereby giving the seller a source of cash while losing the long-term benefit of the accounts receivable that it sold.

38.    The MCA Agreement transfers in this instance, however, were loans, not purchases of accounts receivable.  The reason for characterizing the transactions as a "purchase" rather than a loan was to avoid the application of usury laws.

/ / /

/ / /

39.    Under MCA Capital's MCA Agreement, LPG did not sell Accounts Receivable to MCA Capital.  Instead, LPG sold its interest in future income to MCA Capital, but the obligation to actually collect and the risk of non-payment of the receivables remained with LPG.  These transactions were loans, not sales, because under its MCA Agreements, MCA Capital bore little, if any, risk of ownership of the subject receivables.

### a.    Terms of Defendant's MCA Agreement with LPG

40.    LPG entered into an MCA Agreement with Defendant dated June 14, 2021, with a purchase price of $250,000.  (A true and complete copy of the 6/14/21 MCA Agreement is attached as **Exhibit 1**, and is incorporated herein.)  The terms of the 6/14/21 MCA Agreement are:

| | |
|---|---|
| Purchase Price: | $250,000 |
| Purchased Amount: | $374,750 |
| Net Funds Provided: | $225,000 |
| Specified Percentage: | 25% |
| Daily Remittance: | $12,491.66 |
| Term: | 30 business days ($374,750 / $12,491.66) |

41.    The stated effect of these terms is that in exchange for $250,000, Defendant would receive $374,750 in 30 business days, or *a return of $124,750 on its $250,000 (49.9%) in just six weeks*.  On information and belief, the 25% Specified Percentage is just an estimate of the Daily Remittance as a percent of LPG's receivables.

42.    The actual effect of the MCA Agreement is even more onerous because the agreement provides for "Additional Fees" that include, among others, a $25,000 fee to cover underwriting and the ACH debit program.  *Thus, the Net Funds Provided were only $225,000 for the $374,750 that Defendant would receive, giving Defendant a return of $149,750 (66.5%) on its investment in six weeks*.

/ / /

/ / /

43.    The transfers made pursuant to the 6/14/21 MCA Agreement, constituted a loan with a usurious interest rate, that were not made in the ordinary course of business.

44.    Under the terms of the MCA Agreement, Defendant was receiving repayment for its loan through debits to Debtor's bank accounts as reflected by the "Daily Remittance."    Defendant was not responsible for collecting the Accounts Receivable and thus had not purchased the specified receivables but, instead, had made a loan.

45.    The discrepancy between the interest rate determined pursuant to the terms of the MCA Agreements and the actual amount owed as a result of the Underwriting Fee being deducted from the Purchase Price is further indication of a loan.

46.    Defendant required personal guaranties from Debtor's principals and filed a UCC-1 Financing Statement in an attempt to perfect the security interest Debtor granted to it, again indicating that Defendant had not assumed the same risk of loss as the Debtor, and reflecting that the transaction was a loan.  (A true and complete copy of the UCC-1 Financing Statement is attached as **Exhibit 2**, and is incorporated herein.)

47.    Because the MCA Agreement violated federal and state laws, it is void, unenforceable, and subject to avoidance as fraudulent.  Moreover, even if the MCA Agreement was not void for being unlawful, Debtor received less than reasonable equivalent value in exchange for incurring the purported obligations.  As such, Debtor's obligations under the MCA Agreement are avoidable as fraudulent transfers.

**b.    Transfers to Defendant Pursuant to MCA Agreement**

48.    During the applicable reach-back periods and according to records currently available, Debtor paid Defendant the sum of at least $74,949.96 pursuant to the MCA Agreement although, on information and belief, the amount is believed to be significantly higher.  (A true and complete summary of payments made pursuant to the 6/14/21 MCA Agreement, based on account statements currently available, is attached as **Exhibit 3**, and is incorporated herein.)

/ / /

49.     On information and belief, Debtor first transferred substantial amounts of funds, which were used to pay Defendant, from Debtor's bank accounts to the bank accounts of its affiliate Vulcan Consulting Group LLC ("Vulcan"), and Defendant then made "pulls" from Vulcan's accounts.

50.     As alleged above, the funds that Debtor used to pay Defendant through its affiliate Vulcan consisted of Client's Funds, including ACH Receivables, and were deposits from clients brought to Debtor by means of the illegal Affiliate Agreements, which funds were required to be held in Debtor's client trust accounts.

51.     As a result, Debtor's transfers of Accounts Receivable to Defendant pursuant to the MCA Agreement ("Transfers"), totaling at least the amount of $74,949.96 were fraudulent and must be set aside.

**F.     DEFENDANT'S LAWSUIT AGAINST LPG**

52.     MCA Capital filed a lawsuit against LPG in August 2021 entitled *MCA Capital Holdings LLC v. The Litigation Practice Group PC, Vulcan Consulting Group LLC, and BAT Inc. and Daniel Stephen March*, Index No. 610577/2021 (the "*MCA Capital v. LPG Lawsuit*"). (A true and complete copy of the Summons and Verified Complaint is attached as **Exhibit 4**, and is incorporated herein.)

53.     In its complaint, MCA Capital alleges that LPG owed it the sum of $280,032.52, with 24% interest thereon from August 16, 2021, which includes $276,687.52 of the purchase amount on the 6/14/21 MCA Agreement, $2,500.00 for a default fee, $195.00 for a UCC fee, and $650.00 for "not sufficient funds" fees. MCA Capital demanded judgment in the sum of $280,032.52, plus attorney's fees in the amount of $70,008.13, together with costs, disbursements and any other relief that the New York court deemed just.

**a.     Transfer to Defendant for Settlement of MCA Capital Lawsuit**

54.     MCA Capital filed a Notice of Discontinuance in the *MCA Capital v. LPG Lawsuit* on August 24, 2021, one week after it was filed. (A true and complete copy of the Notice of Discontinuance is attached as **Exhibit 5**, and is incorporated herein.)

55.     On information and belief, LPG settled the *MCA Capital v. LPG Lawsuit* despite the usurious nature of MCA Capital's loan in the MCA Agreement.   On information and belief, LPG settled the lawsuit by payment of at least the amount of $280,032.52 (the "Settlement").

56.     As alleged above, the funds that Debtor used to pay Defendant consisted Accounts Receivable, and were actually deposits from clients brought to Debtor by means of the illegal Affiliate Agreements that were required to be held in Debtor's client trust accounts.

57.     As a result, LPG's transfers of Accounts Receivable to Defendant pursuant to the Settlement, totaling the amount of at least $280,032.52, were fraudulent and must be set aside.

## G.     LPG'S PONZI SCHEME

58.     The Ponzi Scheme Presumption exists in bankruptcy proceedings.

59.     The Ponzi Scheme Presumption can be utilized to establish a debtor's "intent to defraud future undertakers [investors] from the mere fact that a debtor was running a Ponzi scheme.   Indeed, no other reasonable inference is possible. A Ponzi scheme cannot work forever.   The investor pool is a limited resource and will eventually run dry.   The perpetrator must know that the scheme will eventually collapse as a result of the inability to attract new investors.   The perpetrator nevertheless makes payments to present investors, which, by definition, are meant to attract new investors. He must know all along, from the very nature of his activities, that investors at the end of the line will lose their money.   Knowledge to a substantial certainty constitutes intent in the eyes of the law, *cf. Restatement (Second) of Torts § 8A (1963 & 1964)*, and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them.   *Kirkland v. Rund (In re EPD Inv. Co., LLC)*, 114 F.4th 1148, 1153 (9th Cir. 2024) (by definition Ponzi scheme is destined to fail and the swindler and their entities often end in bankruptcy or equitable receivership);   *Cf. Coleman Am. Moving Servs., Inc. v. First Nat'l Bank & Trust Co. (In re American Properties, Inc.)*

(Bankr.D.Kan. 1981)14 B.R. 637, 643 (intentionally carrying out a transaction with full knowledge that its effect will be detrimental to creditors is sufficient for actual intent to hinder, delay or defraud within the meaning of § 548(a)(1)).” *Merrill v. Abbott (In re Independent Clearing House Co.)* (D. Utah 1987) 77 B.R. 843, 860. A trustee in bankruptcy is not required to show that an operator of a Ponzi scheme was subjectively aware his Ponzi scheme was destined to fail. *In re EPD Inv. Co., LLC*, 114 F.4[th] at 1153 (“[a] trustee's action to recover assets fraudulently conveyed in the course of a Ponzi scheme does not require that the trustee also prove the Ponzi-scheme operator was subjectively aware his Ponzi scheme was destined to fail.”)

60.    “But if all the debtor receives in return for a transfer is the use of the defendant's money to run a Ponzi scheme, there is nothing in the bankruptcy estate for creditors to share. In fact, by helping the debtor perpetuate his scheme, the transfers exacerbate the harm to creditors by increasing the amount of claims while diminishing the debtor's estate. In such a situation, the use of the defendant's money cannot objectively be called “reasonably equivalent value. *“In re Independent Clearing House Co.* 77 B.R. at 859. Therefore, “[t]he trustee can avoid the transfers if they were preferential or fraudulent. Transfers to investors in a Ponzi scheme are preferential and fraudulent. Therefore, they constitute “property of the estate,” and the trustee can recover them. *Id.* at 853 n.17 (citations omitted).

61.    Debtor was operating a Ponzi scheme that utilized affiliates and several other entities as investors to continue its unlawful business practices by using funds provided by current investors to attract new investors hoping for very high returns. Therefore, the Debtor was running a Ponzi scheme and the Ponzi Scheme Presumption can be utilized to infer that the Debtor had the intent to defraud investors within the meaning of 11 U.S.C. section 548(a)(1). This is evidenced by the Court in this Bankruptcy Case declaring that Debtor was operating a Ponzi scheme when it stated the following:

It is important to note that this Court has never received any significant and trustworthy evidence that Debtor accomplished meaningful results for its clients, but only anecdotal examples of viable success for its clients. By reviewing the Estate's claims register, there is evidence of consumer claims for the fraud and demanded but undelivered refunds of approximately $500 million. There is ample evidence that the pre-petition Debtor never placed the collected funds into an attorney-client trust account, and that Debtor or its principals simply looted the payments received through the client automatic withdrawals, stiffing both the clients and outside attorneys who may have been working on client cases with the hopes of being paid. There is also evidence before the Court that Debtor was running a Ponzi scheme and paying some outside (or "network") attorneys with funds obtained from new clients. In this case, it appears that some of the "lenders" may have been serving as "investors," hoping for very high returns before "the music stopped."  The Ninth Circuit has recently explained, "[b]y definition, a Ponzi scheme is destined to fail because the pool of available investors is not limitless. When the Ponzi scheme operator's pool of investors inevitably runs dry, the scheme collapses and the swindler and their entities often end up in bankruptcy or equitable receivership. See generally David R. Hague, Expanding the Ponzi Scheme Presumption, 64 DePaul L. Rev. 867 (2015). In bankruptcy, the court-appointed trustee is tasked with taking immediate control of the entity, ceasing ongoing fraudulent activity, locating and collecting assets for the bankruptcy or receivership estate, and achieving a final, equitable distribution of the remaining assets. See 11 U.S.C. § 704." *Kirkland v. Rund (In re EPD Inv. Co., LLC)*, 2024 U.S. App. LEXIS 21363, at *15 (9th Cir. Aug. 23, 2024). Finally, there is evidence that Debtor was encumbering (or as some creditors assert, "double or triple selling") their accounts or receivables to multiple lenders. With respect to Greyson's requested Administrative Claim [Dk. 676], and as more fully described in the concurrently entered order denying the claim, there has been no evidence presented that any work allegedly performed by Greyson assisted any clients or added any value to the Estate.

*See, Case 8:23-bk-10571-SC,* Doc 1545 Fn. 5

62.    Moreover, since the Transfers were made with the intent to further the Ponzi scheme, the Debtor did not receive an objectively reasonable equivalent value for the

Transfers, and the Trustee can avoid the Transfers because they were preferential and fraudulent.

63.    The transactions between Defendant and the Debtor were loans, not the sales of receivables, and as such Defendant was serving as an "investor," hoping for very high returns before "the music stopped."

**H.    THE SALE OF LPG'S ASSETS**

64.    On July 7, 2023, Richard Marshack in his capacity as the Chapter 11 Trustee moved the Court for an order (A) Approving Sale, Subject to Overbid, of Assets Free and Clear of All Liens, Claims, Encumbrances and Interests Pursuant to 11 U.S.C. § 363(b), and (B) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and Other Agreements.  [Bankr. Docket No. 191.] After supplemental briefing that addressed multiple oppositions, holding a lengthy hearing and an auction wherein Morning Law Group was the highest bidder, the Court granted the Sale Motion by order entered August 2, 2023.  [Bankr. Docket No. 352.]

**I.    LPG'S PREPETITION CREDITORS**

65.    Debtor was insolvent when each Transfer was made. This insolvency is evidenced in part by the fact that 14 separate UCC-1 statements were of record securing debts of the Debtor as of September 1, 2022. These statements remained unreleased as of the Petition Date. These statements either reflected secured liens against the Debtor's assets then owned or thereafter acquired, or provided evidence of the assignment or sale of substantial portions of the Debtor's future income.

66.    When the Transfers were made, these prior UCC-1 statements secured the repayment of the following claimed amounts that are currently known to Trustee and are allegedly owed by the Debtor: (i) $2,374,004.82 owed to Fundura Capital Group as evidenced by Proof of Claim No. 335 purportedly secured by a UCC statement filed on or about May 19, 2021; (ii) approximately $15 million dollars owed to MNS Funding, LLC as evidenced by Proof of Claim No. 1060 purportedly secured by a UCC statement filed on or about May 28, 2021; (iii) approximately $5,000,000 owed to Azzure Capital,

LLC as evidenced by Proof of Claim No. 127 secured by a UCC statement filed on or about May 28, 2021; and (iv) approximately $1.5 million dollars owed to Diverse Capital, LLC purportedly secured by UCC statements filed on or about September 15, 2021, and December 1, 2021.[2]

67.    As alleged above, LPG was borrowing against its assets and future income, often on unfavorable terms, not only to finance operations at LPG, but also to pay the fees owed to the marketing affiliates for providing consumer clients and to pay other loans to creditors that were in default or about to be in default as part of Diab's scheme to keep LPG creditors at bay for a long as possible until he could transfer LPG's assets, client files, Client Funds, and ACH Receivables to other entities under his control. Pursuant to the agreements with the marketing companies, significant percentages of future payments were already promised to be paid to the marketing affiliates from whatever future income the Debtor would receive.  And, of course, the payments LPG received in the form of ACH Receivables were also trust funds paid to LPG by its law firm clients, subject to return of funds in the event of a request for refund or termination of the representation before LPG had earned the funds.  In this regard, except to the extent earned, the ACH Receivables also represented a liability of the Debtor.

68.    In addition, on Debtor's Schedule E/F [Bankr. Docket No. 33], Debtor scheduled 11 unsecured creditors with priority unsecured claims totaling $374,060.04. These priority unsecured creditors include Indiana Dept. of Revenue, Dept. of Labor and Industries, Arizona Dept. of Economic Security, Arkansas Dept. of Finance & Admin., California Franchise Tax Board, Georgia Dept. of Labor, Internal Revenue Service, Mississippi Dept. of Revenue, Nevada Dept. of Taxation, Utah State Tax Commission, and Wisconsin Dept. of Revenue (collectively, "Priority Unsecured Creditors").

69.    Another group of creditors that Debtor listed on its Schedule E/F [Bankr. Docket No. 33] are nonpriority unsecured creditors. Those 58 creditors have scheduled

---

[2] Trustee reserves all rights, claims, and defenses with respect to these and any other purported secured or unsecured claims.

claims totaling $141,439,158.05 and include Ajilon; Anthem Blue Cross; Azevedo Solutions Groups, Inc.; Carolina Technologies & Consulting Invoice; Collaboration Advisors; Credit Reporting Service Inc.; CT Corporation – Inv.; Debt Pay Pro; Document Fulfillment Services; EnergyCare, LLC; Exela Enterprise Solutions; First Legal Network, LLC; GHA Technologies Inc.; Harrington Electric, Inc.; Imagine Reporting; Juize, Inc.; Krisp Technologies, Inc.; Liberty Mutual; Marc Lemauviel – Allegra; MarkSYS Holdings, LLC; Netsuite-Oracle; Pitney Bowes; Rapid Credit, Inc.; SBS Leasing A Program of De Lage Landen; Security Solutions; Sharp Business Systems; Streamline Performance, Inc.; Thomson Reuters; Twilio, Inc.; Nationwide Appearance Attorneys; Executive Center, LLC; Outsource Accelerator, Ltd.; TaskUs Holdings, Inc.; Marich Bein, LLC; Validation Partners; MC DVI Fund 1, LLC; MC DVI Fund 2, LLC; Debt Validation Fund II, LLC; Tustin Executive Center; LexisNexus; JP Morgan Chase; Business Centers of America; Michael Schwartz; Anibal Colon Jr.; Kathleen Lacey; David Ulery; Kimberly Birdsong; Kevin Carpenter; Karen Suell; Gloria Eaton; Carolyn Beech; Debra Price; Kenneth Topp; Darcey Williamson, Trustee; James Hammett; Johnny Rizo; Beverly Graham; Kathleen Scarlett; and Geneve and Myranda Sheffield (collectively, "Nonpriority Unsecured Creditors" and, together with the Secured Creditors and Priority Unsecured Creditors, "Prepetition Creditors").

70.     The bar date for submitting claims as part of the Bankruptcy Case has passed and Plaintiff now knows that over 5,000 claims were filed totaling approximately $500 million in priority, secured and unsecured claims.

## **FIRST CLAIM FOR RELIEF**

**Avoidance, Recovery, and Preservation of Two Year Actual Fraudulent Transfers**

**[11 U.S.C. §§ 548(a)(1)(A), 550, and 551]**

71.     Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 70 as though set forth in full.

72.     The client files, including Client Funds, ACH Receivables, and funds that are the subject of the Transfers alleged herein are those of LPG and the Debtor's Estate.

73.     The Affiliate Agreements, MCA Agreement and Settlement payment, and all or a portion of the Transfers alleged herein, occurred within the two years prior to the Petition Date.

74.     On or after the date that such agreements were executed and the Transfers were made, entities to which Debtor was or became indebted include the Prepetition Creditors.

75.     The Transfers happened while Debtor was insolvent or was rendered insolvent.

76.     Despite Debtor's obligation to the Prepetition Creditors, Debtor continued Transfers to Defendant, pursuant to the MCA Agreement and the Settlement, of Accounts Receivable that consisted of sums paid or to be paid by consumers under the Affiliate Agreements, which constitutes an illegal capping agreement between Debtor and the affiliates.

77.     Because the referrals from the affiliates to Debtor are illegal under federal and state law, they are void; and, because the MCA Agreement and Settlement transferred funds of the referrals, they too are void. Any purported consideration constitutes unlawful consideration, which cannot constitute reasonably equivalent value. The terms of the MCA Agreement also were usurious and failed to confer reasonably equivalent value to the Debtor.

78.     The Affiliate Agreements, MCA Agreement, Settlement, and the Transfers of funds are avoidable as fraudulent pursuant to 11 U.S.C. §§ 548(a)(1)(A), 550, and 551 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against Debtor's Estate under 11 U.S.C. § 502, or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

/ / /

79.     The Affiliate Agreements, MCA Agreement, Settlement, and the Transfers should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(A), and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

### SECOND CLAIM FOR RELIEF

**Avoidance, Recovery, and Preservation of Two Year Constructive Fraudulent Transfers**

**[11 U.S.C. §§ 548(a)(1)(B), 550, and 551]**

80.     Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 70 as though set forth in full.

81.     The Affiliate Agreements, MCA Agreement, Settlement, and all or a portion of the Transfers alleged herein occurred within the two years prior to the Petition Date.

82.     On or after the date that such agreements were executed and such Transfers were made, entities to which Debtor was or became indebted include the Prepetition Creditors.

83.     The Transfers happened while Debtor:

a.     was insolvent or became insolvent as a result;

b.     was engaged or was about to engage in a transaction for which any property remaining with Debtor was of unreasonably small capital; or

c.     intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

84.      Because the referrals from Affiliates to Debtor are illegal under federal and state law; and, because any Transfer of the Accounts Receivable, any loans repaid with the Accounts Receivable, and any settlement funded with the Accounts Receivable also are illegal under federal and state law, they are void and subject to avoidance as fraudulent.

/ / /

85.    The Affiliate Agreements, MCA Agreement, Settlement, and the Transfers of Debtor's funds are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and Cal. Civ. Code §§ 3439.04(a) and 3439.07 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against his Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

86.    The Affiliate Agreements, MCA Agreement, Settlement, and the Transfers should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(B), and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

## THIRD CLAIM FOR RELIEF

**Avoidance, Recovery, and Preservation of Four-Year Actual Fraudulent Transfers**

**[11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.04(a) and 3439.07]**

87.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 70 as though set forth in full.

88.    The Affiliate Agreements, MCA Agreement, Settlement, and all or a portion of the Transfers occurred within four years prior to the Petition Date.

89.    On or after the date that such agreements and settlement were entered and such Transfers were made, entities to which Debtor was or became indebted include the Prepetition Creditors.

90.    Despite Debtor's obligation to the Prepetition Creditors, Debtor continued to make Transfers to Defendant, pursuant to the MCA Agreement and the Settlement that consisted of sums paid or to be paid by consumers under the Affiliate Agreements, which constitute illegal capping agreements between Defendant and Debtor.

91.    Because the referrals from Affiliates to Debtor are illegal under federal and state law, they are void; and, because the MCA Agreement and Settlement transferred funds of the referrals, they too are void.  Accordingly, any obligation of the Debtor

arising from the MCA Agreement and the Settlement are avoidable as fraudulent. Any purported consideration constitutes unlawful consideration, which cannot constitute reasonable value. Thus, at the time the agreements were executed and the Transfers made, Debtor received less than reasonably equivalent value.

92.     The Affiliate Agreements, MCA Agreement, Settlement, and the Transfers of Debtor's funds are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and Cal. Civ. Code §§ 3439.04(a) and 3439.07 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against his Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

93.     Accordingly, the Affiliate Agreements, the MCA Agreement, Settlement, and the Transfers should be avoided as fraudulent under 11 U.S.C. §§ 544(b) and Cal. Civ. Code §§ 3439.04(a) and 3439.07, and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551 and Cal. Civ. Code § 3439.07.

## **FOURTH CLAIM FOR RELIEF**

**Avoidance, Recovery, and Preservation of Four-Year Constructive Fraudulent Transfers**

**[11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.05, and 3439.07]**

94.     Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 70 as though set forth in full.

95.     The Affiliate Agreements, MCA Agreement, Settlement, and all or a portion of the Transfers occurred within the four years prior to the Petition Date.

96.     The Transfers happened while Debtor:

a.     was insolvent or became insolvent as a result;

b.     was engaged or was about to engage in a transaction for which any property remaining with Debtor was of unreasonably small capital; or

/ / /

c.    intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

97.    Because the referrals from Affiliates to Debtor are illegal under federal and state law; and, because any Transfer of Accounts Receivable, loans repaid with Accounts Receivable, and settlement funded with Accounts Receivable also are illegal under federal and state law, they are void and subject to avoidance as fraudulent. Any purported consideration constitutes unlawful consideration, which cannot constitute reasonably equivalent value. Thus, at the time the agreements were executed and the Transfers made, Debtor received less than reasonably equivalent value.

98.    The Affiliate Agreements, MCA Agreement, Settlement, and the Transfers of Debtor's funds are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and Cal. Civ. Code §§ 3439.04(a) and 3439.07 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against his Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

99.    Accordingly, the Affiliate Agreements, MCA Agreement, Settlement, and the Transfers should be avoided as fraudulent under 11 U.S.C. §§ 544(b) and Cal. Civ. Code §§ 3439.05 and 3439.07, and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551 and Cal. Civ. Code § 3439.07.

## FIFTH CLAIM FOR RELIEF

### Turnover of Estate Property

### [11 U.S.C. § 542]

100.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 70 as though set forth in full.

101.    Defendant has possession or control over property of the Estate in the form of the Transfers made pursuant to illegal, unenforceable, and avoidable agreements.

/ / /

102. The Transfers are not of inconsequential value to the Estate.

103. The funds that are the subject of the Transfers are paramount to Debtor's ability to pay creditors.

104. Accordingly, upon entry of judgment that the agreements are avoided or declared unenforceable, Trustee is entitled to a further judgment for turnover of the Transfers pursuant to 11 U.S.C. § 542.

## **RESERVATION OF RIGHTS**

105. Plaintiff reserves the right to bring all other claims for relief or causes of action that Plaintiff may have against Defendant, on any and all grounds, as allowed under the law or in equity, including but not limited to, those claims not known by the Trustee at this time but that he may discover during the pendency of this adversary proceeding.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for a judgment as follows:

**On The First, Second, Third, and Fourth Claims for Relief:**

1. Avoiding Debtor's obligations under the Affiliate Agreements, MCA Agreement, and Settlement, and avoiding, recovering, and preserving the Transfers made to Defendant in the total aggregate amount of not less than $354,982.48;

2. Obtaining a money judgement of not less than $354,982.48;

**On the Fifth Claim for Relief:**

3. Ordering Defendant to immediately turn over the Transfers;

**On All Claims for Relief:**

3. Awarding pre-judgment interest at the maximum legal rate from the date of the last Transfer or the date the amount is fixed, to the date of judgment;

4. Awarding post-judgment interest at the maximum legal rate from the date of the judgment until the judgment is paid in full;

/ / /

/ / /

5.    Awarding Plaintiff his attorney's fees and costs of suit incurred herein, to the extent allow by law; and

6.    Granting any other and further relief as the Court deems just and proper.

Dated:  November 27, 2024

Respectfully submitted,

DINSMORE & SHOHL LLP

By: /s/ John H. Stephens
    John H. Stephens
    Christopher Celentino
    Yosina M. Lissebeck
    Veneeta Jaswal
    *Special Counsel to Richard A. Marshack, Chapter 11 Trustee, and Liquidating Trustee*

# EXHIBIT 1

Page **1** of **16**



ver. 4/15/21

## MCA CAPITAL HOLDINGS LLC
802 Avenue U, PH7, Brooklyn, NY 11223
(646) 419-5325

# STANDARD MERCHANT CASH ADVANCE AGREEMENT

This is an Agreement dated <u>06/14/2021</u> by and between MCA CAPITAL HOLDINGS LLC ("MCA") and each merchant listed below ("Merchant").

Merchant's Legal Name: <u>THE LITIGATION PRACTICE GROUP PC / VULCAN CONSULTING GROUP LLC</u>

D/B/A: <u>THE LITIGATION PRACTICE GROUP / VULCAN CONSULTING GROUP</u>     Fed ID #: ▓▓▓▓

Type of Entity:
<u>X</u> Corporation ___ Limited Liability Company ___ Limited Partnership ___ Limited Liability Partnership ___ Sole Proprietor

Business Address: <u>17542 17TH ST STE 100</u>     City: <u>TUSTIN</u>     State: <u>CA</u>     Zip: <u>92780</u>

Contact Address: <u>17542 17TH ST STE 100</u>     City: <u>TUSTIN</u>     State: <u>CA</u>     Zip: <u>92780</u>

E-mail Address: <u>admin@litigationpracticegroup.com</u>     Phone Number: _____

| | |
|---|---|
| **Purchase Price**<br>*This is the amount being paid to Merchant(s) for the Receivables Purchased Amount (defined below).* | $ 250,000.00 |
| **Receivables Purchased Amount**<br>*This is the amount of Receivables (defined in Section 1 below) being sold.* | $ 374,750.00 |
| **Specified Percentage**<br>*This is the percentage of Receivables (defined below) to be delivered until the Receivables Purchased Amount is paid in full.* | 25 % |
| **Net Funds Provided**<br>*This is the net amount being paid to or on behalf of Merchant(s) after deduction of applicable fees listed in Section 2 below.* | $ 225,000.00 |
| **Initial Estimated Payment**<br>*This is only applicable if an Addendum for Estimated Payments is being signed. This is the initial amount of periodic payments collected from Merchant(s) as an approximation of no more than the Specified Percentage of the Receivables and is subject to reconciliation as set forth in Section 4 below.* | $ 12,491.66<br>**per** DAY |

## TERMS AND CONDITIONS

    **1. Sale of Future Receipts.** Merchant(s) hereby sell, assign, and transfer to MCA (making MCA the absolute owner) in consideration of the funds provided ("Purchase Price") specified above, all of each Merchant's future accounts, contract rights, and other obligations arising from or relating to the payment of monies from each Merchant's customers and/or other third party payors (the "Receivables", defined as all payments made by cash, check, credit or debit card,

I have read and agree to the terms and conditions set forth above:

DocuSigned by:

*Daniel Stephen March*
242CC5601A23474

Name: <u>DANIEL STEPHEN MARCH</u>     Title: <u>OWNER</u>     Date: <u>06/14/2021</u>     6/14/2021

FILED: KINGS COUNTY CLERK 08/17/2021 ... INDEX NO. 516577/202
NYSCEF DOC. NO. 1     Main Document     Page 28 of 82     RECEIVED NYSCEF: 08/17/202

Page **2** of **16**

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

electronic transfer, or other form of monetary payment in the ordinary course of each merchant's business), for the payment of each Merchant's sale of goods or services until the amount specified above (the "Receivables Purchased Amount") has been delivered by Merchant(s) to MCA. Each Merchant hereby acknowledges that until the Receivables Purchased Amount has been received in full by MCA, each Merchant's Receivables, up to the balance of the Receivables Purchased Amount, are the property of MCA and not the property of any Merchant. Each Merchant agrees that it is a fiduciary for MCA and that each Merchant will hold Receivables in trust for MCA in its capacity as a fiduciary for MCA.

The Receivables Purchased Amount shall be paid to MCA by each Merchant irrevocably authorizing only one depositing account acceptable to MCA (the "Account") to remit the percentage specified above (the "Specified Percentage") of each Merchant's settlement amounts due from each transaction, until such time as MCA receives payment in full of the Receivables Purchased Amount. Each Merchant hereby authorizes MCA to ACH debit the specified remittances from the Account on a daily basis as of the next business day after the date of this Agreement and will provide MCA with all required access codes and monthly bank statements. Each Merchant understands that it will be held responsible for any fees resulting from a rejected ACH attempt or an Event of Default (see Section 2). MCA is not responsible for any overdrafts or rejected transactions that may result from MCA's ACH debiting the Specified Percentage amounts under the terms of this Agreement.

**2. Additional Fees.** In addition to the Receivables Purchased Amount, each Merchant will be held responsible to MCA for the following fees, where applicable:

A. $ 25,000.00  - to cover underwriting and the ACH debit program, as well as related expenses. This will be deducted from payment of the Purchase Price.

B. Wire Fee - Merchant(s) shall receive funding electronically to the Account and will be charged $50.00 for a Fed Wire or $0.00 for a bank ACH. This will be deducted from payment of the Purchase Price.

C. Blocked Account/Default - $2,500.00 - If MCA considers an Event of Default to have taken place under Section 34.

D. UCC Fee - $195.00 – to cover MCA filing a UCC-1 financing statement to secure its interest in the Receivables Purchased Amount. A $195.00 UCC termination fee will be charged if a UCC filing is terminated.

E. Court costs, arbitration fees, collection agency fees, attorney fees, expert fees, and any other expenses incurred in litigation, arbitration, or the enforcement of any of MCA's legal or contractual rights against each Merchant and/or each Guarantor, if required, as explained in other Sections of this Agreement.

**3. Cap on Collection of the Receivables Purchased Amount.** The amount that MCA will collect from Merchant(s) towards the Receivables Purchased Amount during any specific DAY will be capped at $ 12,491.66 (the "Cap"). If the Specified Percentage of all Receivables for a specific _____ is less than the Cap, then in addition to the Specified Percentage of Receivables for that DAY , MCA will be permitted to collect any Receivables it did not previously collect due to the Cap such that the total amount collected during that DAY does not exceed the Cap. The Cap is not applicable to make up for a business day on which MCA is closed and does not ACH debit the Account, to subsequent attempts to collect a rejected or blocked ACH payment, or for the collection of any of the fees listed in Section 2 or if any Event of Default listed in Section 34 is considered by MCA to have taken place.

**4. Reconciliations.** Any Merchant may give written notice to MCA requesting that MCA conduct a reconciliation in order to ensure that the amount that MCA has collected equals the Specified Percentage of Merchant(s)'s Receivables under this Agreement. Any Merchant may give written notice requesting a reconciliation. A reconciliation may also be requested by e-mail to Michael@mcacapitalholdings.com and such notice will be deemed to have been received if and when MCA sends a reply e-mail (but not a read receipt). If such reconciliation determines that MCA collected more than it was entitled to, then MCA will credit to the Account all amounts to which MCA was not entitled within seven days thereafter. If such reconciliation determines that MCA collected less than it was entitled to, then MCA will debit from the Account all additional amounts to which MCA was entitled within seven days thereafter. In order to effectuate this reconciliation, any Merchant must produce with its request the login and password for the Account and any and all bank statements and merchant statements covering the period from the date of this Agreement through the date of the request for a reconciliation. MCA will complete each such reconciliation within two business days after receipt of a written request for one accompanied by the information and documents required for it. Nothing herein limits the amount of times that such a reconciliation may be requested.

I have read and agree to the terms and conditions set forth above:

DANIEL STEPHEN MARCA

242CC5601A23474

Name: DANIEL STEPHEN MARCH     Title: OWNER     Date: 06/14/2021     6/14/2021

FILE: 823-5870-057-DOTY DOC#58089/10/10/27/24 06 Enter 11/27/24 10:55:23 Desc577/202
NYSCEF DOC. NO. 1          Main Document     Page 29 of 82     RECEIVED NYSCEF: 08/17/202

Page 3 of 16

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

**5. Prepayments.** Although there is no obligation to do so, any Merchant may prepay any amount towards the Receivables Purchased Amount. There will be no penalty for any prepayment made by any Merchant. Any Merchant may elect to terminate this Agreement by prepaying MCA the amount of the balance of the Receivables Purchased Amount at that time.

**6. Merchant Deposit Agreement.** Merchant(s) shall appoint a bank acceptable to MCA, to obtain electronic fund transfer services and/or "ACH" payments. Merchant(s) shall provide MCA and/or its authorized agent with all of the information, authorizations, and passwords necessary to verify each Merchant's Receivables. Merchant(s) shall authorize MCA and/or its agent(s) to deduct the amounts owed to MCA for the Receivables as specified herein from settlement amounts which would otherwise be due to each Merchant and to pay such amounts to MCA by permitting MCA to withdraw the Specified Percentage by ACH debiting of the account. The authorization shall be irrevocable absent MCA's written consent.

**7. Term of Agreement.** The term of this Agreement is indefinite and shall continue until MCA receives the full Receivables Purchased Amount, or earlier if terminated pursuant to any provision of this Agreement. The provisions of Sections 4, 6, 7, 8, 10, 11, 13, 14, 15, 17, 18, 19, 22, 23, 28, 31, 32, 33, 34, 35, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, and 58 shall survive any termination of this Agreement.

**8. Ordinary Course of Business.** Each Merchant acknowledges that it is entering into this Agreement in the ordinary course of its business and that the payments to be made from each Merchant to MCA under this Agreement are being made in the ordinary course of each Merchant's business.

**9. Financial Condition.** Each Merchant and each Guarantor (Guarantor being defined as each signatory to the Guarantee of this Agreement) authorizes MCA and its agent(s) to investigate each Merchant's financial responsibility and history, and will provide to MCA any bank or financial statements, tax returns, and other documents and records, as MCA deems necessary prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable for release of financial information. MCA is authorized to update such information and financial profiles from time to time as it deems appropriate.

**10. Monitoring, Recording, and Electronic Communications.** MCA may choose to monitor and/or record telephone calls with any Merchant and its owners, employees, and agents. By signing this Agreement, each Merchant agrees that any call between MCA and any Merchant or its representatives may be monitored and/or recorded. Each Merchant and each Guarantor grants access for MCA to enter any Merchant's premises and to observe any Merchant's premises without any prior notice to any Merchant at any time after execution of this Agreement.

MCA may use automated telephone dialing, text messaging systems, and e-mail to provide messages to Merchant(s), Owner(s) (Owner being defined as each person who signs this Agreement on behalf of a Merchant), and Guarantor(s) about Merchant(s)'s account. Telephone messages may be played by a machine automatically when the telephone is answered, whether answered by an Owner, a Guarantor, or someone else. These messages may also be recorded by the recipient's answering machine or voice mail. Each Merchant, each Owner, and each Guarantor gives MCA permission to call or send a text message to any telephone number given to MCA in connection with this Agreement and to play pre-recorded messages and/or send text messages with information about this Agreement and/or any Merchant's account over the phone. Each Merchant, each Owner, and each Guarantor also gives MCA permission to communicate such information to them by e-mail. Each Merchant, each Owner, and each Guarantor agree that MCA will not be liable to any of them for any such calls or electronic communications, even if information is communicated to an unintended recipient. Each Merchant, each Owner, and each Guarantor acknowledge that when they receive such calls or electronic communications, they may incur a charge from the company that provides them with telecommunications, wireless, and/or Internet services, and that MCA has no liability for any such charges.

**11. Accuracy of Information Furnished by Merchant and Investigation Thereof.** To the extent set forth herein, each of the parties is obligated upon his, her, or its execution of the Agreement to all terms of the Agreement. Each Merchant and each Owner signing this Agreement represent that he or she is authorized to sign this Agreement for each Merchant, legally binding said Merchant to its obligations under this Agreement and that the information provided herein and in all of MCA's documents, forms, and recorded interview(s) is true, accurate, and complete in all respects. MCA may produce a

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:
DANIEL STEPHEN MARCH
242DC5601A23474...
Name: _____  Title: OWNER  Date: 06/14/2021

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

monthly statement reflecting the delivery of the Specified Percentage of Receivables from Merchant(s) to MCA. An investigative report may be made in connection with the Agreement. Each Merchant and each Owner signing this Agreement authorize MCA, its agents and representatives, and any credit-reporting agency engaged by MCA, to (i) investigate any references given or any other statements obtained from or about each Merchant or any of its Owners for the purpose of this Agreement, and (ii) pull credit report at any time now or for so long as any Merchant and/or Owners(s) continue to have any obligation to MCA under this Agreement or for MCA's ability to determine any Merchant's eligibility to enter into any future agreement with MCA. Any misrepresentation made by any Merchant or Owner in connection with this Agreement may constitute a separate claim for fraud or intentional misrepresentation.

*Authorization for soft pulls:* Each Merchant and each Owner understands that by signing this Agreement, they are providing 'written instructions' to MCA under the Fair Credit Reporting Act, authorizing MCA to obtain information from their personal credit profile or other information from Experian, TransUnion, and Equifax. Each Merchant and each Guarantor authorizes MCA to obtain such information solely to conduct a pre-qualification for credit.

*Authorization for hard pulls:* Each Merchant and each Owner understands that by signing this Agreement, they are providing 'written instructions' to MCA under the Fair Credit Reporting Act, authorizing MCA to obtain information from their personal credit profile or other information from Experian, TransUnion, and Equifax. Each Merchant and each Guarantor authorizes MCA to obtain such information in accordance with a merchant cash advance application.

**12. Transactional History.** Each Merchant authorizes its bank to provide MCA with its banking and/or credit card processing history.

**13. Indemnification.** Each Merchant and each Guarantor jointly and severally indemnify and hold harmless each Merchant's credit card and check processors (collectively, "Processor") and Processor's officers, directors, and shareholders against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) incurred by Processor resulting from (a) claims asserted by MCA for monies owed to MCA from any Merchant and (b) actions taken by any Processor in reliance upon information or instructions provided by MCA.

**14. No Liability.** In no event will MCA be liable for any claims asserted by any Merchant under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect, or consequential damages, each of which is waived by each Merchant and each Guarantor.

**15. Sale of Receivables.** Each Merchant and MCA agree that the Purchase Price under this Agreement is in exchange for the Receivables Purchased Amount and that such Purchase Price is not intended to be, nor shall it be construed as a loan from MCA to any Merchant. MCA is entering into this Agreement knowing the risks that each Merchant's business may decline or fail, resulting in MCA not receiving the Receivables Purchased Amount. Each Merchant agrees that the Purchase Price in exchange for the Receivables pursuant to this Agreement equals the fair market value of such Receivables. MCA has purchased and shall own all the Receivables described in this Agreement up to the full Receivables Purchased Amount as the Receivables are created. Payments made to MCA in respect to the full amount of the Receivables shall be conditioned upon each Merchant's sale of products and services and the payment therefor by each Merchant's customers in the manner provided in this Agreement. Although certain jurisdictions require the disclosure of an Annual Percentage Rate or APR in connection with this Agreement, those disclosures do not change the fact that the transaction encompassed by this Agreement is not a loan and does not have an interest rate.

**16. Power of Attorney.** Each Merchant irrevocably appoints MCA as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to MCA, or, if MCA considers an Event of Default to have taken place under Section 34, to settle all obligations due to MCA from each Merchant, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral (which is defined in Section 33); (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents, or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign each Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to MCA; and (v) to file any claims or take any action or institute any proceeding which MCA may deem necessary for the collection of any of the unpaid Receivables Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Receivables Purchased Amount.

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:

DANIEL STEPHEN MARCH

Name: 242CC5601A23474...          Title: OWNER          Date: 06/14/2021

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

**17. Protections Against Default.** The following Protections 1 through 7 may be invoked by MCA, immediately and without notice to any Merchant in the event:

(a) Any Merchant takes any action to discourage the use of methods of payment ordinarily and customarily used by its customers or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks and credit cards for the purchase of any Merchant's services and products;

(b) Any Merchant changes its arrangements with any Processor in any way that is adverse to MCA;

(c) Any Merchant changes any Processor through which the Receivables are settled to another electronic check and/or credit card processor or permits any event to occur that could cause diversion of any Merchant's check and/or credit card transactions to another such processor;

(d) Any Merchant interrupts the operation of its business (other than adverse weather, natural disasters, or acts of God) or transfers, moves, sells, disposes, or otherwise conveys its business or assets without (i) the express prior written consent of MCA and (ii) the written agreement of any purchaser or transferee to the assumption of all of any Merchant's obligations under this Agreement pursuant to documentation satisfactory to MCA; or

(e) Any Merchant takes any action, fails to take any action, or offers any incentive—economic or otherwise—the result of which will be to induce any customer or customers to pay for any Merchant's goods or services with any means other than checks and/or credit cards that are settled through Processor. These protections are in addition to any other remedies available to MCA at law, in equity, or otherwise available pursuant to this Agreement.

(f) MCA considers any Event of Default listed in Section 34 to have taken place.

Protection 1: The full uncollected Receivables Purchased Amount plus all fees due under this Agreement may become due and payable in full immediately.

Protection 2. MCA may enforce the provisions of the Guarantee against Guarantor.

Protection 3. MCA may enforce its security interest in the Collateral identified in Section 33.

Protection 4. MCA may proceed to protect and enforce its rights and remedies by litigation or arbitration.

Protection 5. If requested by MCA, Merchant shall deliver to MCA an executed assignment of lease of each Merchant's premises in favor of MCA. Upon breach of any provision in this Section 17, MCA may exercise its rights under such assignment of lease.

Protection 6. MCA may debit any Merchant's depository accounts wherever situated by means of ACH debit or electronic or facsimile signature on a computer-generated check drawn on any Merchant's bank account or otherwise, in an amount consistent with the terms of this Agreement.

Protection 7. MCA will have the right, without waiving any of its rights and remedies and without notice to any Merchant and/or Guarantor, to notify each Merchant's credit card and/or check processor of the sale of Receivables hereunder and to direct such credit card processor to make payment to MCA of all or any portion of the amounts received by such credit card processor on behalf of each Merchant. Each Merchant hereby grants to MCA an irrevocable power-of-attorney, which power-of-attorney will be coupled with an interest, and hereby appoints MCA and its representatives as each Merchant's attorney-in-fact to take any and all action necessary to direct such new or additional credit card and/or check processor to make payment to MCA as contemplated by this Section.

**18. Protection of Information.** Each Merchant and each person signing this Agreement on behalf of each Merchant and/or as Owner, in respect of himself or herself personally, authorizes MCA to disclose information concerning each Merchant, Owner and/or Guarantor's credit standing and business conduct to agents, affiliates, subsidiaries, and credit reporting bureaus. Each Merchant, Guarantor, and Owner hereby waives to the maximum extent permitted by law any claim for damages against MCA or any of its affiliates relating to any (i) investigation undertaken by or on behalf of MCA as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**19. Confidentiality.** Each Merchant understands and agrees that the terms and conditions of the products and services offered by MCA, including this Agreement and any other MCA documents (collectively, "Confidential Information") are proprietary and confidential information of MCA. Accordingly, unless disclosure is required by law or court order, Merchant(s) shall not disclose Confidential Information of MCA to any person other than an attorney, accountant, financial advisor, or employee of any Merchant who needs to know such information for the purpose of advising any Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising any Merchant and first agrees in writing to be bound by the terms of this Section 19.

**20. D/B/As.** Each Merchant hereby acknowledges and agrees that MCA may be using "doing business as" or "d/b/a"

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:

Name: DANIEL STEPHEN MARCH     Title: OWNER     Date: 06/14/2021

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

names in connection with various matters relating to the transaction between MCA and each Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**21. Financial Condition and Financial Information.** Each Merchant represents, warrants, and covenants that its bank and financial statements, copies of which have been furnished to MCA, and future statements which will be furnished hereafter at the request of MCA, fairly represent the financial condition of each Merchant at such dates, and that since those dates there have been no material adverse changes, financial or otherwise, in such condition, operation, or ownership of any Merchant. Each Merchant has a continuing affirmative obligation to advise MCA of any material adverse change in its financial condition, operation, or ownership.

**22. Governmental Approvals.** Each Merchant represents, warrants, and covenants that it is in compliance and shall comply with all laws and has valid permits, authorizations, and licenses to own, operate, and lease its properties and to conduct the business in which it is presently engaged.

**23. Authorization.** Each Merchant represents, warrants, and covenants that it and each person signing this Agreement on behalf of each Merchant has full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**24. Insurance.** Each Merchant represents, warrants, and covenants that it will maintain business-interruption insurance naming MCA as loss payee and additional insured in amounts and against risks as are satisfactory to MCA and shall provide MCA proof of such insurance upon request.

**25. Electronic Check Processing Agreement.** Each Merchant represents, warrants, and covenants that it will not, without MCA's prior written consent, change its Processor, add terminals, change its financial institution or bank account, or take any other action that could have any adverse effect upon any Merchant's obligations under this Agreement.

**26. Change of Name or Location.** Each Merchant represents, warrants, and covenants that it will not conduct its business under any name other than as disclosed to MCA or change any place(s) of its business without prior written consent from MCA.

**27. Estoppel Certificate.** Each Merchant represents, warrants, and covenants that it will, at any time, and from time to time, upon at least two day's prior notice from MCA to that Merchant, execute, acknowledge, and deliver to MCA and/or to any other person or entity specified by MCA, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Receivables Purchased Amount or any portion thereof have been paid.

**28. No Bankruptcy.** Each Merchant represents, warrants, and covenants that as of the date of this Agreement, it does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against any Merchant. Each Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it. Each Merchant further warrants that there will be no statutory presumption that it would have been insolvent on the date of this Agreement.

**29. Unencumbered Receivables.** Each Merchant represents, warrants, and covenants that it has good, complete, and marketable title to all Receivables, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges, and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with this Agreement or adverse to the interests of MCA, other than any for which MCA has actual or constructive knowledge as of the date of this Agreement.

**30. Stacking.** Each Merchant represents, warrants, and covenants that it will not enter into with any party other than MCA any arrangement, agreement, or commitment that relates to or involves the Receivables, whether in the form of a purchase of, a loan against, collateral against, or the sale or purchase of credits against Receivables without the prior

I have read and agree to the terms and conditions set forth above:

DocuSigned by:

_DANIEL STEPHEN MARCH_
242CC5601A23474...
Name: _____  Title: OWNER _____  Date: 06/14/2021

Case 8:23-ap-01057-SC Doc 385-8 Filed 12/27/24 Entered 11/27/24 10:55:23 Desc
NYSCEF DOC. NO. 1   Main Document   Page 33 of 82   RECEIVED NYSCEF: 08/17/202

Page 7 of 16

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

written consent of MCA.

**31. Business Purpose.** Each Merchant represents, warrants, and covenants that it is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and each Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family, or household purposes.

**32. Default Under Other Contracts.** Each Merchant represents, warrants, and covenants that its execution of and/or performance under this Agreement will not cause or create an event of default by any Merchant under any contract with another person or entity.

**33. Security Interest.** To secure each Merchant's payment and performance obligations to MCA under this Agreement and any future agreement with MCA, each Merchant hereby grants to MCA a security interest in collateral (the "Collateral"), that is defined as collectively: (a) all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined by Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by any Merchant; and (b) all proceeds, as that term is defined by Article 9 of the UCC. The parties acknowledge and agree that any security interest granted to MCA under any other agreement between any Merchant or Guarantor and MCA (the "Cross-Collateral") will secure the obligations hereunder and under this Agreement. Negative Pledge: Each Merchant agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Cross-Collateral, as applicable.

Each Merchant agrees to execute any documents or take any action in connection with this Agreement as MCA deems necessary to perfect or maintain MCA's first priority security interest in the Collateral and the Cross-Collateral, including the execution of any account control agreements. Each Merchant hereby authorizes MCA to file any financing statements deemed necessary by MCA to perfect or maintain MCA's security interest, which financing statements may contain notification that each Merchant has granted a negative pledge to MCA with respect to the Collateral and the Cross-Collateral, and that any subsequent lienor may be tortiously interfering with MCA's rights. Each Merchant shall be liable for and MCA may charge and collect all costs and expenses, including but not limited to attorney fees, which may be incurred by MCA in protecting, preserving, and enforcing MCA's security interest and rights. Each Merchant further acknowledges that MCA may use another legal name and/or D/B/A or an agent when designating the Secured Party when MCA files the above-referenced financing statement(s).

**34. Events of Default.** An "Event of Default" may be considered to have taken place if any of the following occur:
(1) Any Merchant violates any term or covenant in this Agreement;
(2) Any representation or warranty by any Merchant in any Agreement with MCA that has not been terminated proves to have been incorrect, false, or misleading in any material respect when made;
(3) Any Merchant fails to provide MCA with written notice of any material change in its financial condition, operation, or ownership within seven days thereafter (unless a different notice period is specifically provided for elsewhere in this Agreement;
(4) the sending of notice of termination by any Merchant or Guarantor;
(5) Any Merchant transports, moves, interrupts, suspends, dissolves, or terminates its business without the prior written consent of MCA other than a bankruptcy filing;
(6) Any Merchant transfers or sells all or substantially all of its assets without the prior written consent of MCA;
(7) Any Merchant makes or sends notice of any intended bulk sale or transfer by any Merchant without the prior written consent of MCA;
(8) Any Merchant uses multiple depository accounts without the prior written consent of MCA;
(9) Any Merchant changes the Account without the prior written consent of MCA;
(10) MCA is not provided with updated login or password information for the Account within one business day after any such change is made by any Merchant;
(11) Any Merchant fails to send bank statements, merchant account statements, or bank login information for the Account within two business days after a written request for same is made by MCA;
(12) Any Merchant performs any act that reduces the value of any Collateral granted under this Agreement;
(13) Any Merchant fails to deposit its Receivables into the Account;

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:

DANIEL STEPHEN MARCH

242FC5601A23474...

Name: _____   Title: _____OWNER_____   Date: __08/44/2024__

Case 8:25-ap-10671-SC Doc 33-8 Filed 12/27/24 Entered 11/27/24 10:55:23 Desc
NYSCEF DOC. NO. 1    Main Document    Page 34 of 82    RECEIVED NYSCEF: 08/17/202

Page 8 of 16

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

(14) Any Merchant causes any ACH debit to the Account by MCA to be blocked or stopped without providing any advance written notice to MCA, which notice may be given by e-mail to Michael@mcacapitalholdings.com; or

(15) Any Merchant prevents MCA from collecting any part of the Receivables Purchased Amount;

(16) Any Merchant causes any ACH debit to the Account to be stopped or otherwise returned that would result in an ACH Return Code of R08, R10, or R29 and that Merchant does not within two business days thereafter provide MCA with written notice thereof explaining why that Merchant caused the ACH debit to be stopped or otherwise returned, which notice may be given by e-mail to Michael@mcacapitalholdings.com; or

(17) Any Merchant defaults under any of the terms, covenants, and conditions of any other agreement with MCA.

**35. Remedies.** In case any Event of Default occurs and is not waived, MCA may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement, or other provision contained herein, or to enforce the discharge of each Merchant's obligations hereunder, or any other legal or equitable right or remedy. All rights, powers, and remedies of MCA in connection with this Agreement, including each Protection listed in Section 17, may be exercised at any time by MCA after the occurrence of an Event of Default, are cumulative and not exclusive, and will be in addition to any other rights, powers, or remedies provided by law or equity. In addition to the foregoing, in case any Event of Default occurs and is not waived, MCA will be entitled to the issuance of an injunction, restraining order, or other equitable relief in MCA's favor, subject to court or arbitrator approval, restraining each Merchant's accounts and/or receivables up to the amount due to MCA as a result of the Event of Default, and each Merchant will be deemed to have consented to the granting of an application for the same to any court or arbitral tribunal of competent jurisdiction without any prior notice to any Merchant or Guarantor and without MCA being required to furnish a bond or other undertaking in connection with the application.

**36. Required Notifications.** Each Merchant is required to give MCA written notice at least one day prior to any filing under Title 11 of the United States Code. Merchant(s) are required to give MCA at least seven days' written notice prior to the closing of any sale of all or substantially all of any Merchant's assets or stock.

**37. Assignment.** This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns, except that Merchant(s) shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of MCA, which consent may be withheld in MCA's sole discretion. MCA may assign, transfer, or sell its rights under this Agreement, including, without limitation, its rights to receive the Receivables Purchased Amount, and its rights under Section 33 of this Agreement, the Guarantee, and any other agreement, instrument, or document executed in connection with the transactions contemplated by this Agreement (a "Related Agreement"), or delegate its duties hereunder or thereunder, either in whole or in part. From and after the effective date of any such assignment or transfer by MCA, whether or not any Merchant has actual notice thereof, this Agreement and each Related Agreement shall be deemed amended and modified (without the need for any further action on the part of any Merchant or MCA) such that the assignee shall be deemed a party to this Agreement and any such Related Agreement and, to the extent provided in the assignment document between MCA and such assignee (the "Assignment Agreement"), have the rights and obligations of MCA under this Agreement and such Related Agreements with respect to the portion of the Receivables Purchased Amount set forth in such Assignment Agreement, including but not limited to rights in the Receivables, Collateral and Additional Collateral, the benefit of each Guarantor's guaranty regarding the full and prompt performance of every obligation that is a subject of the Guarantee, MCA's rights under Section 17 of this Agreement (Protections Against Default), and to receive damages from any Merchant following a breach of this Agreement by any Merchant. In connection with such assignment, MCA may disclose all information that MCA has relating to any Merchant or its business. Each Merchant agrees to acknowledge any such assignment in writing upon MCA's request.

**38. Notices.** All notices, requests, consents, demands, and other communications hereunder shall be delivered by certified mail, return receipt requested, or by overnight delivery with signature confirmation to the respective parties to this Agreement at their addresses set forth in this Agreement and shall become effective only upon receipt. Written notice may also be given to any Merchant or Guarantor by e-mail to the E-mail Address listed on the first page of this Agreement. Each Merchant must set its spam or junk mail filter to accept e-mails sent by Michael@mcacapitalholdings.com and its domain. This Section is not applicable to service of process or notices in any legal proceedings.

**39. Choice of Law.** Each Merchant acknowledges and agrees that this Agreement was made in the State of New

I have read and agree to the terms and conditions set forth above:

DANIEL STEPHEN MARCH
242CC5601A23474
Name: _____  Title: OWNER  Date: 06/14/2021

Case 8-23-08601-rsc Doc 358 Filed 08/17/24 Entered 08/17/24 08:55:23 Desc
NYSCEF DOC. NO. 1                          Main Document      Page 35 of 82            RECEIVED NYSCEF: 08/17/202

Page 9 of 16

### STANDARD MERCHANT CASH ADVANCE AGREEMENT

York, that the Purchase Price is being paid by MCA in the State of New York, that the Receivables Purchased Amount is being delivered to MCA in the State of New York, and that the State of New York has a reasonable relationship to the transactions encompassed by this Agreement. This Agreement and the relationship between MCA, each Merchant, and each Guarantor will be governed by and construed in accordance with the laws of the State of New York, without regard to any applicable principles of conflict of laws.

**40. Forum and Venue Selection.** Any litigation relating to this Agreement or involving MCA on one side and any Merchant or any Guarantor on the other must be commenced and maintained in any court located in the Counties of Nassau, New York, or Sullivan in the State of New York (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient, submit to the jurisdiction of the Acceptable Forums, and waive any and all objections to the jurisdiction or venue of the Acceptable Forums. If any litigation is initiated in any other venue or forum, the parties waive any right to oppose any motion or application made by any party to transfer such litigation to an Acceptable Forum. The parties agree that this Agreement encompasses the transaction of business within the City of New York and that the Civil Court of the City of New York ("Civil Court") will have jurisdiction over any litigation relating to this Agreement that is within the jurisdictional limit of the Civil Court. In addition to the Acceptable Forums, any action or proceeding to enforce a judgment or arbitration award against any Merchant or Guarantor or to restrain or collect any amount due to MCA may be commenced and maintained in any other court of competent jurisdiction.

**41. Jury Waiver.** The parties agree to waive trial by jury in any dispute between them.

**42. Counterclaim Waiver.** In any litigation or arbitration commenced by MCA, each Merchant and each Guarantor will not be permitted to interpose any counterclaim.

**43. Statutes of Limitations.** Each Merchant and each Guarantor agree that any claim that is not asserted against MCA within one year of its accrual will be time barred.

**44. Costs.** Each Merchant and each Guarantor must pay all of MCA's reasonable costs associated with a breach by any Merchant of the covenants in this Agreement and the enforcement thereof, including but not limited to collection agency fees, attorney fees, which may include a contingency fee of up to 40% of the amount claimed, expert witness fees, and costs of suit.

**45. Prejudgment and Postjudgment Interest.** If MCA becomes entitled to the entry of a judgment against any Merchant or any Guarantor, then MCA will be entitled to the recovery of prejudgment interest at a rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, and upon entry of any such judgment, it will accrue interest at a postjudgment rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, which rate will govern over the statutory rate of interest up until actual satisfaction of the judgment.

**46. Legal Fees.** If MCA prevails in any litigation or arbitration with any Merchant or any Guarantor, then that Merchant and/or Guarantor must pay MCA's reasonable attorney fees, which may include a contingency fee of up to 40% of the amount claimed.

**47. Class Action Waiver.** MCA, each Merchant, and each Guarantor agree that they may bring claims against each other relating to this Agreement only in their individual capacities, and not as a plaintiff or class action member in any purported class or representative proceedings.

**48. Arbitration.** Any action or dispute relating to this Agreement or involving MCA on one side and any Merchant or any Guarantor on the other, including, but not limited to issues of arbitrability, will, at the option of any party to such action or dispute, be determined by arbitration before a single arbitrator. The arbitration will be administered either by Arbitration Services, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.arbitrationservicesinc.com, or by Mediation & Commercial Arbitration, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.mcarbitration.org. Once an arbitration is initiated with one of these arbitral forums, it must be maintained exclusively before that arbitral forum and the other arbitral forum specified herein may

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:

DANIEL STEPHEN MARCH

242CC5601A23474...

Name: _____  Title: ____OWNER____  Date: __08/14/2021__

Case 8:23-bk-10571-SC Doc 3508 Filed 10/27/24 Entered 11/27/24 10:55:23 Desc
NYSCEF DOC. NO. 1                Main Document        Page 36 of 82          RECEIVED NYSCEF: 08/17/202

Page 10 of 16

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

not be used. Any arbitration relating to this Agreement must be conducted in the Counties of Nassau, New York, Queens, or Kings in the State of New York. Notwithstanding any provision of any applicable arbitration rules, any witness in an arbitration who does not reside in or have a place for the regular transaction of business located in New York City or the Counties of Nassau, Suffolk, or Westchester in the State of New York will be permitted to appear and testify remotely by telephone or video conferencing. In case any Event of Default occurs and is not waived, each Merchant and each Guarantor consents to MCA making an application to the arbitrator, without notice to any Merchant or any Guarantor, for the issuance of an injunction, restraining order, or other equitable relief in MCA's favor, subject to court or arbitrator approval, restraining each Merchant's accounts and/or receivables up to the amount due to MCA as a result of the Event of Default.

Each Merchant acknowledges and agrees that this Agreement is the product of communications conducted by telephone and the Internet, which are instrumentalities of interstate commerce, that the transactions contemplated under this Agreement will be made by wire transfer and ACH, which are also instrumentalities of interstate commerce, and that this Agreement therefore evidences a transaction affecting interstate commerce. Accordingly, notwithstanding any provision in this Agreement to the contrary, all matters of arbitration relating to this Agreement will be governed by and construed in accordance with the provisions of the Federal Arbitration Act, codified as Title 9 of the United States Code, however any application for injunctive relief in aid of arbitration or to confirm an arbitration award may be made under Article 75 of the New York Civil Practice Law and Rules. The arbitration agreement contained in this Section may also be enforced by any employee, agent, attorney, member, manager, officer, subsidiary, affiliate entity, successor, or assign of MCA.

**49. Service of Process.** Each Merchant and each Guarantor consent to service of process and legal notices made by First Class or Priority Mail delivered by the United States Postal Service and addressed to the Contact Address set forth on the first page of this Agreement or any other address(es) provided in writing to MCA by any Merchant or any Guarantor, and unless applicable law or rules provide otherwise, any such service will be deemed complete upon dispatch. Each Merchant and each Guarantor agrees that it will be precluded from asserting that it did not receive service of process or any other notice mailed to the Contact Address set forth on the first page of this Agreement if it does not furnish a certified mail return receipt signed by MCA demonstrating that MCA was provided with notice of a change in the Contact Address.

**50. Survival of Representation, etc.** All representations, warranties, and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

**51. Waiver.** No failure on the part of MCA to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**52. Independent Sales Organizations/Brokers.** Each Merchant and each Guarantor acknowledge that it may have been introduced to MCA by or received assistance in entering into this Agreement or its Guarantee from an independent sales organization or broker ("ISO"). Each Merchant and each Guarantor agree that any ISO is separate from and is not an agent or representative of MCA. Each Merchant and each Guarantor acknowledge that MCA is not bound by any promises or agreements made by any ISO that are not contained within this Agreement. Each Merchant and each Guarantor exculpate from liability and agree to hold harmless and indemnify MCA and its officers, directors, members, shareholders, employees, and agents from and against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) incurred by any Merchant or any Guarantor resulting from any act or omission by any ISO. Each Merchant and each Guarantor acknowledge that any fee that they paid to any ISO for its services is separate and apart from any payment under this Agreement. Each Merchant and each Guarantor acknowledge that MCA does not in any way require the use of an ISO and that any fees charged by any ISO are not required as a condition or incident to this Agreement.

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by: DANIEL STEPHEN MARCH

Name: 242CC5601A23474...                Title: OWNER                Date: 06/14/2021

Case 8:25-bk-10571... Doc 385-8 Filed 10/27/26 Entered 11/27/24 10:55:23 Desc
NYSCEF DOC. NO. 1
Main Document      Page 37 of 82
RECEIVED NYSCEF: 08/17/202

Page **11** of 16

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

**53. Modifications; Agreements.** No modification, amendment, waiver, or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by all parties.

**54. Severability.** If any provision of this Agreement is deemed invalid or unenforceable as written, it will be construed, to the greatest extent possible, in a manner which will render it valid and enforceable, and any limitation on the scope or duration of any such provision necessary to make it valid and enforceable will be deemed to be part thereof. If any provision of this Agreement is deemed void, all other provisions will remain in effect.

**55. Headings.** Headings of the various articles and/or sections of this Agreement are for convenience only and do not necessarily define, limit, describe, or construe the contents of such articles or sections.

**56. Attorney Review.** Each Merchant acknowledges that it has had an opportunity to review this Agreement and all addenda with counsel of its choosing before signing the documents or has chosen not to avail itself of the opportunity to do so.

**57. Entire Agreement.** This Agreement, inclusive of all addenda, if any, executed simultaneously herewith constitutes the full understanding of the parties to the transaction herein and may not be amended, modified, or canceled except in writing signed by all parties. Should there arise any conflict between this Agreement and any other document preceding it, this Agreement will govern. This Agreement does not affect any previous agreement between the parties unless such an agreement is specifically referenced herein. This Agreement will not be affected by any subsequent agreement between the parties unless this Agreement is specifically referenced therein. MCA will not be permitted to enforce any of its rights under this Agreement if so expressed by in writing by Gene Rosen's Law Firm.

**58. Counterparts; Fax and Electronic Signatures.** This Agreement may be executed electronically and in counterparts. Facsimile and electronic copies of this Agreement will have the full force and effect of an original.

### EACH UNDERSIGNED HEREBY ACCEPTS THE TERMS OF THIS AGREEMENT

**FOR THE MERCHANT/OWNER (#1)**

DANIEL STEPHEN MARCH

By: _____    _____    DocuSigned by: _DANIEL STEPHEN MARCH_
        (Print Name)                  (Print Title)              242CC5601A23474...  (Signature)

SS# _███████_ _____    Driver License Number _____

**FOR THE MERCHANT/OWNER (#2)**

By: _____    _____    _____
        (Print Name)                  (Print Title)              (Signature)

SS# _____    Driver License Number _____

Approved for MCA CAPITAL HOLDINGS LLC by: _____

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

## GUARANTEE

**G1. Personal Guarantee of Performance.** This is a personal guaranty of performance, dated 06/14/2021 , of the Standard Merchant Cash Advance Agreement, dated 06/14/2021 ("Agreement"), inclusive of all addenda, if any, executed simultaneously therewith, by and between MCA CAPITAL HOLDINGS LLC ("MCA") and THE LITIGATION PRACTICE GROUP PC / VULCAN ("Merchant"). Each undersigned Guarantor hereby guarantees each Merchant's performance of all of the representations, warranties, and covenants made by each Merchant to MCA in the Agreement, inclusive of all addenda, if any, executed simultaneously herewith, as the Agreement may be renewed, amended, extended, or otherwise modified (the "Guaranteed Obligations"). Each Guarantor's obligations are due at the time of any breach by any Merchant of any representation, warranty, or covenant made by any Merchant in the Agreement.

**G2. Communications.** MCA may use automated telephone dialing, text messaging systems, and e-mail to provide messages to Guarantor(s) about Merchant(s)'s account. Telephone messages may be played by a machine automatically when the telephone is answered, whether answered by an Owner, a Guarantor, or someone else. These messages may also be recorded by the recipient's answering machine or voice mail. Each Guarantor gives MCA permission to call or send a text message to any telephone number given to MCA in connection with this Agreement and to play pre-recorded messages and/or send text messages with information about this Agreement and/or any Merchant's account over the phone. Each Guarantor also gives MCA permission to communicate such information to them by e-mail. Each Guarantor agrees that MCA will not be liable to any of them for any such calls or electronic communications, even if information is communicated to an unintended recipient. Each Guarantor acknowledges that when they receive such calls or electronic communications, they may incur a charge from the company that provides them with telecommunications, wireless, and/or Internet services, and that MCA has no liability for any such charges.

**G3. Guarantor Waivers.** If MCA considers any Event of Default to have taken place under the Agreement, then MCA may enforce its rights under this Guarantee without first seeking to obtain payment from any Merchant, any other guarantor, or any Collateral, Additional Collateral, or Cross-Collateral MCA may hold pursuant to this Guarantee or any other agreement or guarantee. MCA does not have to notify any Guarantor of any of the following events and Guarantor(s) will not be released from its obligations under this Guarantee even if it is not notified of: (i) any Merchant's failure to pay timely any amount owed under the Agreement; (ii) any adverse change in any Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; (iv) MCA's acceptance of the Agreement with any Merchant; and (v) any renewal, extension, or other modification of the Agreement or any Merchant's other obligations to MCA. In addition, MCA may take any of the following actions without releasing any Guarantor from any obligations under this Guarantee: (i) renew, extend, or otherwise modify the Agreement or any Merchant's other obligations to MCA; (ii) if there is more than one Merchant, release a Merchant from its obligations to MCA such that at least one Merchant remains obligated to MCA; (iii) sell, release, impair, waive, or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under the Agreement. Until the Receivables Purchased Amount and each Merchant's other obligations to MCA under the Agreement and this Guarantee are paid in full, each Guarantor shall not seek reimbursement from any Merchant or any other guarantor for any amounts paid by it under the Agreement. Each Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against any Merchant, any other guarantor, or any collateral provided by any Merchant or any other guarantor, for any amounts paid by it or acts performed by it under this Guarantee: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution.

**G4. Joint and Several Liability.** The obligations hereunder of the persons or entities constituting each Guarantor under this Guarantee are joint and several.

**G5. Injunctive Relief.** In case any Event of Default occurs and is not waived, MCA will be entitled to the issuance of an injunction, restraining order, or other equitable relief in MCA's favor, subject to court or arbitrator approval, restraining each Guarantor's accounts and/or receivables up to the amount due to MCA as a result of the Event of Default, and each Guarantor will be deemed to have consented to the granting of an application for the same to any court or arbitral tribunal

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:

DANIEL STEPHEN MARCH

242CC5601A23474...

Name: DANIEL STEPHEN MARCH    Title: OWNER    Date: 06/14/2021    6/14/2021

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

of competent jurisdiction without any prior notice to any Merchant or Guarantor and without MCA being required to furnish a bond or other undertaking in connection with the application.

**G6. Choice of Law.** Each Guarantor acknowledges and agrees that the Agreement and this Guarantee were made in the State of New York, that the Purchase Price is being paid by MCA in the State of New York, that the Receivables Purchased Amount is being delivered to MCA in the State of New York, and that the State of New York has a reasonable relationship to the transactions encompassed by the Agreement and this Guarantee. This Guarantee and the relationship between MCA, each Merchant, and each Guarantor will be governed by and construed in accordance with the laws of the State of New York, without regard to any applicable principles of conflict of laws.

**G7. Forum and Venue Selection.** Any litigation relating to this Agreement or this Guarantee or involving MCA on one side and any Merchant or any Guarantor on the other must be commenced and maintained in any court located in the Counties of Nassau, New York, or Sullivan in the State of New York (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient, submit to the jurisdiction of the Acceptable Forums, and waive any and all objections to the jurisdiction or venue of the Acceptable Forums. If any litigation is initiated in any other venue or forum, the parties waive any right to oppose any motion or application made by any party to transfer such litigation to an Acceptable Forum. The parties agree that this Guarantee encompasses the transaction of business within the City of New York and that the Civil Court of the City of New York ("Civil Court") will have jurisdiction over any litigation relating to this Guarantee that is within the jurisdictional limit of the Civil Court. In addition to the Acceptable Forums, any action or proceeding to enforce a judgment or arbitration award against any Merchant or Guarantor or to restrain or collect any amount due to MCA may be commenced and maintained in any other court of competent jurisdiction.

**G8. Jury Waiver.** Each Guarantor agrees to waive trial by jury in any dispute with MCA.

**G9. Counterclaim Waiver.** In any litigation or arbitration commenced by MCA, each Merchant and each Guarantor will not be permitted to interpose any counterclaim.

**G10. Statutes of Limitations.** Each Merchant and each Guarantor agree that any claim that is not asserted against MCA within one year of its accrual will be time barred.

**G11. Costs.** Each Merchant and each Guarantor must pay all of MCA's reasonable costs associated with a breach by any Merchant of the covenants in this Agreement or this Guarantee and the enforcement thereof, including but not limited to collection agency fees, expert witness fees, and costs of suit.

**G12. Prejudgment and Postjudgment Interest.** If MCA becomes entitled to the entry of a judgment against any Merchant or any Guarantor, then MCA will be entitled to the recovery of prejudgment interest at a rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, and upon entry of any such judgment, it will accrue interest at a postjudgment rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, which rate will govern over the statutory rate of interest up until actual satisfaction of the judgment.

**G13. Legal Fees.** If MCA prevails in any litigation or arbitration with any Merchant or any Guarantor, then that Merchant and/or Guarantor must pay MCA's reasonable attorney fees, which may include a contingency fee of up to 40% of the amount claimed.

**G14. Class Action Waiver.** MCA, each Merchant, and each Guarantor agree that they may bring claims against each other relating to this Agreement only in their individual capacities, and not as a plaintiff or class action member in any purported class or representative proceedings.

**G15. Arbitration.** Any action or dispute relating to this Agreement or this Guarantee or involving MCA on one side and any Merchant or any Guarantor on the other, including, but not limited to issues of arbitrability, will, at the option of any party to such action or dispute, be determined by arbitration before a single arbitrator. The arbitration will be administered either by Arbitration Services, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:

DANIEL STEPHEN MARCH
242CC5601A23474...
Name: _____  Title: OWNER  Date: 08/14/2021

FILED: NASSAU COUNTY CLERK 08/17/202 ... ... NO. 010577/202
NYSCEF DOC. NO. 1

Case 8:24-bk-10571-SC   Claim 5-8   Filed 10/27/24   Entered 11/27/24 10:55:23   Desc
Main Document      Page 40 of 82

RECEIVED NYSCEF: 08/17/202

Page **14** of **16**

### STANDARD MERCHANT CASH ADVANCE AGREEMENT

available at www.arbitrationservicesinc.com, or by Mediation & Commercial Arbitration, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.mcarbitration.org. Once an arbitration is initiated with one of these arbitral forums, it must be maintained exclusively before that arbitral forum and the other arbitral forum specified herein may not be used. Any arbitration relating to this Agreement or this Guarantee must be conducted in the Counties of Nassau, New York, Queens, or Kings in the State of New York. Notwithstanding any provision of any applicable arbitration rules, any witness in an arbitration who does not reside in or have a place for the regular transaction of business located in New York City or the Counties of Nassau, Suffolk, or Westchester in the State of New York will be permitted to appear and testify remotely by telephone or video conferencing. In case any Event of Default occurs and is not waived, each Guarantor consents to MCA making an application to the arbitrator, without notice to any Merchant or any Guarantor, for the issuance of an injunction, restraining order, or other equitable relief in MCA's favor, subject to court or arbitrator approval, restraining each Guarantor's accounts and/or receivables up to the amount due to MCA as a result of the Event of Default.

Each Guarantor acknowledges and agrees that the Agreement and this Guarantee are the product of communications conducted by telephone and the Internet, which are instrumentalities of interstate commerce, that the transactions contemplated under the Agreement and this Guarantee will be made by wire transfer and ACH, which are also instrumentalities of interstate commerce, and that the Agreement and this Guarantee therefore evidence a transaction affecting interstate commerce. Accordingly, notwithstanding any provision in the Agreement or this Guarantee to the contrary, all matters of arbitration relating to the Agreement or this Guarantee will be governed by and construed in accordance with the provisions of the Federal Arbitration Act, codified as Title 9 of the United States Code, however any application for injunctive relief in aid of arbitration or to confirm an arbitration award may be made under Article 75 of the New York Civil Practice Law and Rules. The arbitration agreement contained in this Section may also be enforced by any employee, agent, attorney, member, manager, officer, subsidiary, affiliate entity, successor, or assign of MCA.

**G16. Service of Process.** Each Merchant and each Guarantor consent to service of process and legal notices made by First Class or Priority Mail delivered by the United States Postal Service and addressed to the Contact Address set forth on the first page of the Agreement or any other address(es) provided in writing to MCA by any Merchant or any Guarantor, and unless applicable law or rules provide otherwise, any such service will be deemed complete upon dispatch. Each Merchant and each Guarantor agrees that it will be precluded from asserting that it did not receive service of process or any other notice mailed to the Contact Address set forth on the first page of the Agreement if it does not furnish a certified mail return receipt signed by MCA demonstrating that MCA was provided with notice of a change in the Contact Address.

**G17. Severability.** If any provision of this Guarantee is deemed invalid or unenforceable as written, it will be construed, to the greatest extent possible, in a manner which will render it valid and enforceable, and any limitation on the scope or duration of any such provision necessary to make it valid and enforceable will be deemed to be part thereof. If any provision of this Guarantee is deemed void, all other provisions will remain in effect.

**G18. Survival.** The provisions of Sections G2, G3, G4, G5, G6, G7, G8, G9, G10, G11, G12, G13, G14, G15, G16, G17, G18, G19, G20, G21, and G22 shall survive any termination of this Guarantee.

**G19. Headings.** Headings of the various articles and/or sections of this Guarantee are for convenience only and do not necessarily define, limit, describe, or construe the contents of such articles or sections.

**G20. Attorney Review.** Each Guarantor acknowledges that it has had an opportunity to review this Guarantee, the Agreement, and all addenda with counsel of its choosing before signing the documents or has chosen not to avail itself of the opportunity to do so.

I have read and agree to the terms and conditions set forth above:

DocuSigned by:

DANIEL STEPHEN MARCH

Name: 242CC5601A23474...  Title: OWNER  Date: 06/14/2021

Case 8:24-bk-10571-SC   Doc 3588  Filed 11/27/24   Entered 11/27/24 10:55:23   Desc
Main Document    Page 41 of 82
NYSCEF DOC. NO. 1
RECEIVED NYSCEF: 08/17/202

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

**G21. Entire Agreement.** This Guarantee, inclusive of all addenda, if any, executed simultaneously herewith may not be amended, modified, or canceled except in writing signed by all parties. Should there arise any conflict between this Guarantee and any other document preceding it, this Guarantee will govern. This Guarantee does not affect any previous agreement between the parties unless such an agreement is specifically referenced in the Agreement or herein. This Guarantee will not be affected by any subsequent agreement between the parties unless this Guarantee is specifically referenced therein.

**G22. Counterparts; Fax and Electronic Signatures.** This Guarantee may be executed electronically and in counterparts. Facsimile and electronic copies of this Guarantee will have the full force and effect of an original.

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "STANDARD MERCHANT CASH ADVANCE AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS GUARANTEE. CAPITALIZED TERMS NOT DEFINED IN THIS GUARANTEE SHALL HAVE THE MEANING SET FORTH IN THE STANDARD MERCHANT CASH ADVANCE AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.

### EACH UNDERSIGNED HEREBY ACCEPTS THE TERMS OF THIS GUARANTEE

**GUARANTOR (#1)**

By: DANIEL STEPHEN MARCH
_____
(Print Name)

Signature: DANIEL STEPHEN MARCH
242CC5601A23474...
(Signature)

SS# _____

Driver License Number _____

**GUARANTOR (#2)**

By: _____
(Print Name)

_____
(Signature)

SS# _____

Driver License Number _____

### STANDARD MERCHANT CASH ADVANCE AGREEMENT

# BANK INFORMATION

Dear Merchant,

Thank you for accepting this offer from MCA CAPITAL HOLDINGS LLC. We look forward to being your funding partner.

You authorize MCA CAPITAL HOLDINGS LLC to collect the Receivables Purchased Amount under this Agreement by ACH debiting your bank account with the bank listed below.

MCA CAPITAL HOLDINGS LLC will require viewing access to your bank account each business day.

MCA CAPITAL HOLDINGS LLC will also require viewing access to your bank account, prior to funding, as part of our underwriting process.

Please fill out the form below with the information necessary to access your account.

**\* Be sure to indicate capital or lower case letters.**

Name of bank: BANK OF THE WEST / BANK OF AMERICA

Name of account: THE LITIGATION PRACTICE GROUP / VULCAN CONSULTING GROUP

Account number: ▓▓▓▓▓▓▓▓▓▓▓▓     Routing number: 122242843 / 121000358

Bank portal website: www.bankofamerica.com

Username: ▓▓▓▓

Password: ▓▓▓▓▓

Security Question/Answer 1:

Security Question/Answer 2:

Security Question/Answer 3:

Any other information necessary to access your account:

If you have any questions please feel free to contact us directly at (646) 419-5325.

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:

Name: DANIEL STEPHEN MARCH     Title: OWNER     Date: 06/14/2021

242C C5601A23474...

23 of 29

## ADDENDUM TO STANDARD MERCHANT CASH ADVANCE AGREEMENT
### FOR ESTIMATED PAYMENTS

This is an Addendum, dated <u>06/14/2021</u>, to the Standard Merchant Cash Advance Agreement ("Agreement"), dated <u>06/14/2021</u>, between MCA Capital Holdings LLC ("MCA") and <u>THE LITIGATION PRACTICE GROUP PC / VULCAN CONSULTING GROUP LLC</u> ("Merchant"). This Addendum incorporates the Agreement by reference. The terms of this Addendum will control to the extent they conflict with any of the terms in the Agreement.

Instead of debiting the _____ % Specified Percentage of Merchant's Receivables, MCA may instead debit $ <u>12,491.66</u> ("Estimated Payment") from the Account every <u>DAY</u>. The Estimated Payment is intended to be an approximation of no more than the Specified Percentage.

Any Merchant may give written notice to MCA requesting that MCA conduct a reconciliation in order to ensure that the amount that MCA has collected equals the Specified Percentage of Merchant(s)'s Receivables under this Agreement. Any Merchant may give written notice requesting a reconciliation. A request for reconciliation may also be made by e-mail to Michael@mcacapitalholdings.com and such notice will be deemed to have been received if and when MCA sends a reply e-mail (but not a read receipt). If such reconciliation determines that MCA collected more than it was entitled to, then within seven days thereafter, MCA will credit to the Account all amounts to which MCA was not entitled and decrease the Estimated Payment so that it is consistent with the Specified Percentage of Merchant(s)'s Receivables from the date of the Agreement through the date of the reconciliation. If such reconciliation determines that MCA collected less than it was entitled to, then within seven days thereafter, MCA will debit from the Account all additional amounts to which MCA was entitled and increase the Estimated Payment so that it is consistent with the Specified Percentage of Merchant(s)'s Receivables from the date of the Agreement through the date of the reconciliation, with the increase being subject to any Cap in place on collections. In order to effectuate this reconciliation, any Merchant must produce with its request the login and password for the Account and any and all bank statements and merchant statements covering the period from the date of this Agreement through the date of the request for a reconciliation. MCA will complete each such reconciliation within two business days after receipt of a written request for one accompanied by the information and documents required for it. Nothing herein limits the amount of times that such a reconciliation may be requested.

**FOR THE MERCHANT/OWNER (#1)**

By: <u>DANIEL STEPHEN MARCH</u>          _DocuSigned by:_ DANIEL STEPHEN MARCH
      (Print Name and Title)          242CC5601A23474          (Signature)

**FOR THE MERCHANT/OWNER (#2)**

By: _____          _____
      (Print Name and Title)          (Signature)



## ADDENDUM TO STANDARD MERCHANT CASH ADVANCE AGREEMENT
## FOR ADDITIONAL FEES

This is an Addendum, dated 06/14/2021_____, to the Standard Merchant Cash Advance Agreement ("Agreement"), dated 06/14/2021_____, between MCA Capital Holdings LLC ("MCA") and THE LITIGATION PRACTICE GROUP PC / VULCAN CONSULTING GROUP LLC ("Merchant"). This Addendum incorporates the Agreement by reference. The terms of this Addendum will control to the extent they conflict with any of the terms in the Agreement.

Each Merchant may be held responsible for an NSF/ Rejected ACH Fee of $50.00 for each time an ACH debit to the Account by MCA is returned or otherwise rejected. No Merchant will be held responsible for such a fee if any Merchant gives MCA advance notice of no more than one business day in advance that the Account has insufficient funds to be debited by MCA and no Merchant is otherwise in default of the terms of the Agreement. Each such fee may be deducted from any payment collected by MCA or may be collected in addition to any other payment collected by MCA under this Agreement.

### FOR THE MERCHANT/OWNER (#1)

By: DANIEL STEPHEN MARCH        OWNER        DANIEL STEPHEN MARCH
_____
(Print Name and Title)                              (Signature)

### FOR THE MERCHANT/OWNER (#2)

By:_____
(Print Name and Title)                              (Signature)

NYSCEF DOC. NO. 1                                                              RECEIVED NYSCEF: 08/17/202



## ADDENDUM TO STANDARD MERCHANT CASH ADVANCE AGREEMENT

This is an Addendum, dated _____06/14/2021_____, to the Standard Merchant

Cash Advance Agreement ("Agreement"), dated _____06/14/2021_____,

between    MCA    CAPITAL    HOLDINGS    LLC    ("MCA")    and
THE LITIGATION PRACTICE GROUP PC / VULCAN CONSULTING _____ ("Merchant").

Merchant(s) instruct MCA to pay up to $_____ of the Purchase Price

set forth in the Agreement to _____

instead of to Merchant(s). The balance of the Purchase Price will be paid to Merchant(s).

Additional comments: _____

_____

_____

_____

**FOR THE MERCHANT/OWNER (#1)**

By:___DANIEL STEPHEN MARCH      OWNER___        ___*DANIEL STEPHEN MARCH*___
         (Print Name and Title)                                               (Signature)

DocuSigned by:
242CC5601A23474...

**FOR THE MERCHANT/OWNER (#2)**

By:_____        _____
         (Print Name and Title)                                               (Signature)

## DECLARATION OF ORDINARY COURSE OF BUSINESS

Each undersigned hereby declares the following:

1.   I am duly authorized to sign the Standard Merchant Cash Advance Agreement ("Agreement"), dated 06/14/2021 _____, between MCA Capital Holdings LLC ("MCA") and THE LITIGATION PRACTICE GROUP PC / VULCAN CONSULTING GROUP LLC _____ ("Merchant") on behalf of Merchant.

2.   This Declaration incorporates by reference the Agreement and every addendum to it.

3.   I acknowledge that I am authorized to sign the Agreement and every addendum to it on behalf of each Merchant.

4.   I acknowledge that I had sufficient time to review the Agreement and every addendum to it before signing it.

5.   I acknowledge that I had an opportunity to seek legal advice from counsel of my choosing before signing the Agreement and every addendum to it.

6.   I acknowledge that each Merchant is entering into the Agreement voluntarily and without any coercion.

7.   I acknowledge that each Merchant is entering into the Agreement in the ordinary course of its business.

8.   I acknowledge that the payments to be made from any Merchant to MCA under the Agreement are being made in the ordinary course of each Merchant's business.

9.   **I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on 06/14/2021 _____        6/14/2021
                        (Date)

**FOR THE MERCHANT/OWNER (#1)**

By: DANIEL STEPHEN MARCH   OWNER _____        DocuSigned by: DANIEL STEPHEN MARCH
        (Print Name and Title)                242CC5601A23474...
                                             (Signature)

**FOR THE MERCHANT/OWNER (#2)**

By: _____        _____
        (Print Name and Title)                (Signature)

# EXHIBIT 2

U210075685527



### STATE OF CALIFORNIA
*Office of the Secretary of State*
### UCC FINANCING STATEMENT (UCC 1)
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

| For Office Use Only |
| --- |
| **-FILED-** |
| File #: U210075685527 |
| Date Filed: 8/16/2021 |

**Submitter Information:**

| | |
| --- | --- |
| Contact Name | WOLTERS KLUWER LIEN SOLUTIONS |
| Organization Name | LIEN SOLUTIONS |
| Phone Number | 800-331-3282 |
| Email Address | uccfilingreturn@wolterskluwer.com |
| Address | P.O. BOX 29071 GLENDALE, CA 912099071 |

**Debtor Information:**

| Debtor Name | Mailing Address |
| --- | --- |
| THE LITIGATION PRACTICE GROUP PC | 17542 17TH ST STE 100 TUSTIN, CA 92780 |

**Secured Party Information:**

| Secured Party Name | Mailing Address |
| --- | --- |
| MCA CAPITAL HOLDINGS LLC | 802 AVENUE U BROOKLYN, NY 11223 |

**Indicate how documentation of Collateral is provided:**
Entered as Text

**Description:**
Merchant hereby sells, assigns and transfers to MCA all of Merchant's future accounts, contract rights and other obligations arising from or relating to the payment of monies from Merchant's customers and/or other third party payers for the payment of Merchant's sale of goods or services until the full amount ($374,750.00) has been remitted from the Merchant to MCA.

**Indicate if Collateral is held in a Trust or is being administered by a Decedent's Personal Representative:**
Not Applicable

**Select an alternate Financing Statement type:**

**Select an additional alternate Financing Statement type:**

**Select an alternative Debtor/Secured Party designation for this Financing Statement:**

**Optional Filer Reference Information:**
81977418

B0421-3591 08/16/2021 7:26 AM Received by California Secretary of State

# EXHIBIT 3

In re: The Litigation Practice Group PC
Disbursement Details by Payee
4 Years Pre-Petition (03/20/2019 - 03/20/2023)

MCA Capital Holdings LLC

**GROBSTEIN TEEPLE**

| Bank Name | Account Name | Account Number | Settlement Date | Transaction Date | Check Number | Credit/Deposit | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|---|
| Bank of America | Vulcan Consulting Group LLC dba DRD | | 6/30/2021 | 6/16/2021 | | | 12,491.66 | MCA Capital Hold DES:Litigation ID:Litigation Prac INDN:Litigation Practice Gr CO ID:XXXXXXXXX CCD |
| Bank of America | Vulcan Consulting Group LLC dba DRD | | 6/30/2021 | 6/17/2021 | | | 12,491.66 | MCA Capital Hold DES:Litigation ID:Litigation Prac INDN:Litigation Practice Gr CO ID:XXXXXXXXX CCD |
| Bank of America | Vulcan Consulting Group LLC dba DRD | | 6/30/2021 | 6/18/2021 | | | 12,491.66 | MCA Capital Hold DES:Litigation ID:Litigation Prac INDN:Litigation Practice Gr CO ID:XXXXXXXXX CCD |
| Bank of America | Vulcan Consulting Group LLC dba DRD | | 6/30/2021 | 6/21/2021 | | 12,491.66 | | MCA Capital Hold DES:Litigation ID:Litigation Prac INDN:Litigation Practice Gr CO ID:XXXXXXXXX CCD |
| Bank of America | Vulcan Consulting Group LLC dba DRD | | 6/30/2021 | 6/22/2021 | | | 12,491.66 | RETURN OF POSTED CHECK/ ITEM (RECEIVED ON 06-21) |
| Bank of America | Vulcan Consulting Group LLC dba DRD | | 6/30/2021 | 6/22/2021 | | | 12,491.66 | MCA Capital Hold DES:Litigation ID:Litigation Prac INDN:Litigation Practice Gr CO ID:XXXXXXXXX CCD |
| Bank of America | Vulcan Consulting Group LLC dba DRD | | 6/30/2021 | 6/23/2021 | | 12,491.66 | | RETURN OF POSTED CHECK/ ITEM (RECEIVED ON 06-22) |
| Bank of America | Vulcan Consulting Group LLC dba DRD | | 6/30/2021 | 6/23/2021 | | | 12,491.66 | MCA Capital Hold DES:Litigation ID:Litigation Prac INDN:Litigation Practice Gr CO ID:XXXXXXXXX CCD |
| Bank of America | Vulcan Consulting Group LLC dba DRD | | 6/30/2021 | 6/24/2021 | | 12,491.66 | | RETURN OF POSTED CHECK/ ITEM (RECEIVED ON 06-23) |
| | | | | | | 37,474.98 | 74,949.96 | |

DRAFT FORM - SUBJECT TO CHANGE

# EXHIBIT 4

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

Index No.
Date Filed:

-------------------------------------------------------------------X

MCA CAPITAL HOLDINGS LLC,

**SUMMONS**

           Plaintiff,

Basis of venue designated:
Contract

- against -

Plaintiff's address:
802 Avenue U, PH7
Brooklny, NY 11223

THE LITIGATION PRACTICE GROUP PC,
VULCAN CONSULTING GROUP LLC, and
DANIEL STEPHEN MARCH,

           Defendants.

-------------------------------------------------------------------X

To the above-named Defendants:

     **YOU ARE HEREBY SUMMONED** to answer the Complaint in this action and to serve a copy of your Answer, or if the Complaint is not served with this Summons, to serve a Notice of Appearance, on the Plaintiff's attorneys within 20 days after service of this Summons, exclusive of the day of service (or within 30 days after the service is completed if this Summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the Complaint.

Dated: Garden City, New York
       August 17, 2021

<u>GENE ROSEN'S LAW FIRM</u>
A PROFESSIONAL CORPORATION
Attorneys for Plaintiff

By: _____

     Gene W. Rosen, Esq.
     200 Garden City Plaza, Suite 405
     Garden City, New York 11530
     Tel (212) 529-3600 Ext. 101
     Fax (347) 578-8793
     Gene@GeneRosen.com

Defendants' addresses:

| The Litigation Practice Group PC | Vulcan Consulting Group LLC | Daniel Stephen March |
|---|---|---|
| 17542 17th St Ste 100 | 17542 17th St Ste 100 | 17542 17th St Ste 100 |
| Tustin, CA 92780 | Tustin, CA 92780 | Tustin, CA 92780 |

**SEE COMPLAINT ANNEXED HERETO**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

------------------------------------------------------------------X

MCA CAPITAL HOLDINGS LLC,                                     Index No.

                        Plaintiff,                           **VERIFIED COMPLAINT**

        - against -

THE LITIGATION PRACTICE GROUP PC,
VULCAN CONSULTING GROUP LLC, and
DANIEL STEPHEN MARCH,

                        Defendants.

------------------------------------------------------------------X

   Plaintiff, by its attorneys, Gene Rosen's Law Firm - A Professional Corporation, as and for

its complaint herein, alleges the following:

   1.  At all times hereinafter mentioned, Plaintiff was and still is a limited liability

company formed under the laws of the State of New York.

   2.  At all times hereinafter mentioned, upon information and belief, Defendant The

Litigation Practice Group PC ("Litigation") was and still is a corporation formed under the laws

of the State of California.

   3.  At all times hereinafter mentioned, upon information and belief, Defendant Vulcan

Consulting Group LLC ("Vulcan") was and still is a limited liability company formed under the

laws of the State of California.

   4.  At all times hereinafter mentioned, upon information and belief, Defendant Daniel

Stephen March ("March") was and still is a resident of the State of California.

   5.  The subject contract between the parties states in relevant part that any litigation

relating thereto must be commenced and maintained in any Court located in the County of Nassau

in the State of New York. **Exhibit "A" at ¶¶ 40 and G7.**

## AS AND FOR A FIRST CAUSE OF ACTION
### (Breach of Contract Against Litigation and Vulcan)

6.    Litigation and Vulcan ("Merchants") and Plaintiff entered into a written contract, dated June 14, 2021, a true and accurate copy of which is annexed hereto as **Exhibit "A"**, whereby Merchants sold Plaintiff $374,750.00 ("Purchased Amount") of their accounts, contract rights, and other obligations arising from or relating to the payment of monies from Merchants' customers and other third party payors ("Receivables") for the sum of $250,000.00 ("Purchase Price"), to be paid to Plaintiff from 25% of Merchants' receipts. **Exhibit "A" at page 1**.

7.    Merchants agreed that in the event of their default under the contract, the full uncollected Purchased Amount plus all fees due under the contract would become immediately due and payable in full to Plaintiff. **Exhibit "A" at ¶ 35**.

8.    Merchants agreed that if Plaintiff prevails in any litigation between the parties then Merchants must pay Plaintiff prejudgment interest at a rate of 24% per annum. **Exhibit "A" at ¶ 45**.

9.    Plaintiff paid the Purchase Price, less applicable contractual fees, on June 15, 2021.

10.    Merchants breached the contract by defaulting on their representations and warranties to Plaintiff under the contract and by preventing Plaintiff from collecting the Purchased Amount.

11.    Plaintiff held Merchants in breach of contract on August 16, 2021.

12.    Merchants owe Plaintiff $276,687.52 of the Purchased Amount.

13.    Merchants owe Plaintiff $195.00 for a UCC fee under the contract. **Exhibit "A" at ¶ 2(D)**.

14.    Merchants owes Plaintiff $650.00 for Not Sufficient Funds ("NSF") fees under the contract due to instances in which Plaintiff's withdrawals from the Designated Account were

- 2 -

blocked or rejected for insufficient funds. **Exhibit "A" at ¶ Addendum**.

    15.     Merchants owe Plaintiff $2,500.00 for a Default Fee under the contract. **Exhibit "A" at ¶ 2(C)**.

    16.     By reason of the foregoing, Plaintiff has been damaged by Merchants' breach of contract in the sum of $280,032.52 with 24% interest thereon from August 16, 2021.

### AS AND FOR A SECOND CAUSE OF ACTION
**(Attorney Fees Against Litigation and Vulcan)**

    17.     Pursuant to the terms of the contract, Merchants agreed to pay Plaintiff's reasonable attorneys' fees. **Exhibit "A" at ¶ 46**.

### AS AND FOR A THIRD CAUSE OF ACTION
**(Breach of Guaranty Against March)**

    18.     March executed a guarantee of performance of all the representations, warranties, and covenants made by Merchants in the contract. **Exhibit "A" at ¶ G13**.

    19.     By reason of the guarantee, March is obligated to Plaintiff in the sum of $280,032.52 with 16% interest thereon from August 16, 2021.

### AS AND FOR A FOURTH CAUSE OF ACTION
**(Attorney Fees Against March)**

    20.     By reason of the guarantee, March is obligated to pay Plaintiff's reasonable attorneys' fees. **Exhibit "A" at ¶¶ 46 and G13**.

- 3 -

**WHEREFORE,** Plaintiff demands judgment against Defendants, jointly and severally, on the first and third causes of action in the sum of $280,032.52 with interest thereon at a rate of 24% per annum from August 16, 2021, and on the second and fourth causes of action in the sum of $70,008.13 or such other amount as the Court deems just, together with the costs and disbursements of this action and any such other and further relief as the Court deems just.

Dated: Garden City, New York
   August 17, 2021

        GENE ROSEN'S LAW FIRM
        A PROFESSIONAL CORPORATION
        Attorneys for Plaintiff

     By: _____
        Gene W. Rosen, Esq.
        200 Garden City Plaza, Suite 405
        Garden City, New York 11530
        Tel (212) 529-3600 Ext. 101
        Fax (347) 578-8793
        Gene@GeneRosen.com

- 4 -

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
-------------------------------------------------------------------X
MCA CAPITAL HOLDINGS LLC,                          Index No.

           Plaintiff,                     **VERIFICATION**

    - against -

THE LITIGATION PRACTICE GROUP PC,
VULCAN CONSULTING GROUP LLC, and
DANIEL STEPHEN MARCH,

           Defendants.
-------------------------------------------------------------------X

      GENE W. ROSEN, an attorney admitted to practice law in the State of New York, affirms

the following under the penalties of perjury:

      I am a member of Gene Rosen's Law Firm – A Professional Corporation, attorneys for

Plaintiff; I have read the foregoing complaint and know the contents thereof; that the same is true

to my knowledge except those matters herein stated to be alleged upon information and belief, and

as to those matters I believe them to be true. The grounds for my belief as to those matters herein

not stated upon my knowledge is based upon the records in my possession. That the reason this

verification is not made by Plaintiff is that Plaintiff is not within the County wherein my firm has

its office.


Dated: Garden City, New York
       August 17, 2021



                    GENE ROSEN'S LAW FIRM
                    A PROFESSIONAL CORPORATION
                    Attorneys for Plaintiff

           By: _____
                    Gene W. Rosen, Esq.
                    200 Garden City Plaza, Suite 405
                    Garden City, New York 11530
                    Tel (212) 529-3600 Ext. 101
                    Fax (347) 578-8793
                    Gene@GeneRosen.com

**COMPLAINT**


**EXHIBIT "A"**



**Page 1 of 16**

<span style="float:right">ver. 4/15/21</span>

## MCA CAPITAL HOLDINGS LLC
802 Avenue U, PH7, Brooklyn, NY 11223
(646) 419-5325

# STANDARD MERCHANT CASH ADVANCE AGREEMENT

This is an Agreement dated <u>06/14/2021</u> by and between MCA CAPITAL HOLDINGS LLC ("MCA") and each merchant listed below ("Merchant").

Merchant's Legal Name: <u>THE LITIGATION PRACTICE GROUP PC / VULCAN CONSULTING GROUP LLC</u>

D/B/A/: <u>THE LITIGATION PRACTICE GROUP / VULCAN CONSULTING GROUP</u>    Fed ID #: ▓▓▓▓▓

Type of Entity:
<u>X</u> Corporation ___ Limited Liability Company ___ Limited Partnership ___ Limited Liability Partnership ___ Sole Proprietor

Business Address: <u>17542 17TH ST STE 100</u>    City: <u>TUSTIN</u>    State: <u>CA</u>    Zip: <u>92780</u>

Contact Address: <u>17542 17TH ST STE 100</u>    City: <u>TUSTIN</u>    State: <u>CA</u>    Zip: <u>92780</u>

E-mail Address: <u>admin@litigationpracticegroup.com</u>    Phone Number: _____

| | |
|---|---|
| **Purchase Price**<br>*This is the amount being paid to Merchant(s) for the Receivables Purchased Amount (defined below).* | $ 250,000.00 |
| **Receivables Purchased Amount**<br>*This is the amount of Receivables (defined in Section 1 below) being sold.* | $ 374,750.00 |
| **Specified Percentage**<br>*This is the percentage of Receivables (defined below) to be delivered until the Receivables Purchased Amount is paid in full.* | 25 % |
| **Net Funds Provided**<br>*This is the net amount being paid to or on behalf of Merchant(s) after deduction of applicable fees listed in Section 2 below.* | $ 225,000.00 |
| **Initial Estimated Payment**<br>*This is only applicable if an Addendum for Estimated Payments is being signed. This is the initial amount of periodic payments collected from Merchant(s) as an approximation of no more than the Specified Percentage of the Receivables and is subject to reconciliation as set forth in Section 4 below.* | $ 12,491.66<br>per DAY |

### TERMS AND CONDITIONS

**1. Sale of Future Receipts.** Merchant(s) hereby sell, assign, and transfer to MCA (making MCA the absolute owner) in consideration of the funds provided ("Purchase Price") specified above, all of each Merchant's future accounts, contract rights, and other obligations arising from or relating to the payment of monies from each Merchant's customers and/or other third party payors (the "Receivables", defined as all payments made by cash, check, credit or debit card,

I have read and agree to the terms and conditions set forth above:

DocuSigned by:
*DANIEL STEPHEN MARCH*
242CC5601A23474...
Name: <u>DANIEL STEPHEN MARCH</u>    Title: <u>OWNER</u>    Date: <u>06/14/2021</u>    6/14/2021

FILED: NASSAU COUNTY CLERK 08/17/2021 11:49 AM
Case 1:24-bk-10569-SCC Doc 1958-1 Filed 02/27/24 Entered 11/27/24 10:55:23 Desc
NYSCEF DOC. NO. 1          Main Document     Page 60 of 82          RECEIVED NYSCEF: 08/17/2021

Page 2 of 16

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

electronic transfer, or other form of monetary payment in the ordinary course of each merchant's business), for the payment of each Merchant's sale of goods or services until the amount specified above (the "Receivables Purchased Amount") has been delivered by Merchant(s) to MCA. Each Merchant hereby acknowledges that until the Receivables Purchased Amount has been received in full by MCA, each Merchant's Receivables, up to the balance of the Receivables Purchased Amount, are the property of MCA and not the property of any Merchant. Each Merchant agrees that it is a fiduciary for MCA and that each Merchant will hold Receivables in trust for MCA in its capacity as a fiduciary for MCA.

The Receivables Purchased Amount shall be paid to MCA by each Merchant irrevocably authorizing only one depositing account acceptable to MCA (the "Account") to remit the percentage specified above (the "Specified Percentage") of each Merchant's settlement amounts due from each transaction, until such time as MCA receives payment in full of the Receivables Purchased Amount. Each Merchant hereby authorizes MCA to ACH debit the specified remittances from the Account on a daily basis as of the next business day after the date of this Agreement and will provide MCA with all required access codes and monthly bank statements. Each Merchant understands that it will be held responsible for any fees resulting from a rejected ACH attempt or an Event of Default (see Section 2). MCA is not responsible for any overdrafts or rejected transactions that may result from MCA's ACH debiting the Specified Percentage amounts under the terms of this Agreement.

**2. Additional Fees.** In addition to the Receivables Purchased Amount, each Merchant will be held responsible to MCA for the following fees, where applicable:

A. $ 25,000.00      - to cover underwriting and the ACH debit program, as well as related expenses. This will be deducted from payment of the Purchase Price.

B. Wire Fee - Merchant(s) shall receive funding electronically to the Account and will be charged $50.00 for a Fed Wire or $0.00 for a bank ACH. This will be deducted from payment of the Purchase Price.

C. Blocked Account/Default - $2,500.00 - If MCA considers an Event of Default to have taken place under Section 34.

D. UCC Fee - $195.00 – to cover MCA filing a UCC-1 financing statement to secure its interest in the Receivables Purchased Amount. A $195.00 UCC termination fee will be charged if a UCC filing is terminated.

E. Court costs, arbitration fees, collection agency fees, attorney fees, expert fees, and any other expenses incurred in litigation, arbitration, or the enforcement of any of MCA's legal or contractual rights against each Merchant and/or each Guarantor, if required, as explained in other Sections of this Agreement.

**3. Cap on Collection of the Receivables Purchased Amount.** The amount that MCA will collect from Merchant(s) towards the Receivables Purchased Amount during any specific  DAY      will be capped at $ 12,491.66          (the "Cap"). If the Specified Percentage of all Receivables for a specific _____ is less than the Cap, then in addition to the Specified Percentage of Receivables for that  DAY   , MCA will be permitted to collect any Receivables it did not previously collect due to the Cap such that the total amount collected during that  DAY   does not exceed the Cap. The Cap is not applicable to make up for a business day on which MCA is closed and does not ACH debit the Account, to subsequent attempts to collect a rejected or blocked ACH payment, or for the collection of any of the fees listed in Section 2 or if any Event of Default listed in Section 34 is considered by MCA to have taken place.

**4. Reconciliations**. Any Merchant may give written notice to MCA requesting that MCA conduct a reconciliation in order to ensure that the amount that MCA has collected equals the Specified Percentage of Merchant(s)'s Receivables under this Agreement. Any Merchant may give written notice requesting a reconciliation. A reconciliation may also be requested by e-mail to Michael@mcacapitalholdings.com and such notice will be deemed to have been received if and when MCA sends a reply e-mail (but not a read receipt). If such reconciliation determines that MCA collected more than it was entitled to, then MCA will credit to the Account all amounts to which MCA was not entitled within seven days thereafter. If such reconciliation determines that MCA collected less than it was entitled to, then MCA will debit from the Account all additional amounts to which MCA was entitled within seven days thereafter. In order to effectuate this reconciliation, any Merchant must produce with its request the login and password for the Account and any and all bank statements and merchant statements covering the period from the date of this Agreement through the date of the request for a reconciliation. MCA will complete each such reconciliation within two business days after receipt of a written request for one accompanied by the information and documents required for it. Nothing herein limits the amount of times that such a reconciliation may be requested.

I have read and agree to the terms and conditions set forth above:

DocuSigned by:

DANIEL STEPHEN MARCH

—242CC5601A23474—
Name: DANIEL STEPHEN MARCH      Title: OWNER      Date: 06/14/2021      6/14/2021

FILED: Case 8-22 bk-10571-SC Doc 1958 / Filed 12/27/24 Entered 11/27/24 10:55:23 Desc 577/2021
NYSCEF DOC. NO. 1                        Main Document      Page 61 of 82       RECEIVED NYSCEF: 08/17/2021

Page 3 of 16

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

**5. Prepayments.** Although there is no obligation to do so, any Merchant may prepay any amount towards the Receivables Purchased Amount. There will be no penalty for any prepayment made by any Merchant. Any Merchant may elect to terminate this Agreement by prepaying MCA the amount of the balance of the Receivables Purchased Amount at that time.

**6. Merchant Deposit Agreement.** Merchant(s) shall appoint a bank acceptable to MCA, to obtain electronic fund transfer services and/or "ACH" payments. Merchant(s) shall provide MCA and/or its authorized agent with all of the information, authorizations, and passwords necessary to verify each Merchant's Receivables. Merchant(s) shall authorize MCA and/or its agent(s) to deduct the amounts owed to MCA for the Receivables as specified herein from settlement amounts which would otherwise be due to each Merchant and to pay such amounts to MCA by permitting MCA to withdraw the Specified Percentage by ACH debiting of the account. The authorization shall be irrevocable absent MCA's written consent.

**7. Term of Agreement.** The term of this Agreement is indefinite and shall continue until MCA receives the full Receivables Purchased Amount, or earlier if terminated pursuant to any provision of this Agreement. The provisions of Sections 4, 6, 7, 8, 10, 11, 13, 14, 15, 17, 18, 19, 22, 23, 28, 31, 32, 33, 34, 35, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, and 58 shall survive any termination of this Agreement.

**8. Ordinary Course of Business.** Each Merchant acknowledges that it is entering into this Agreement in the ordinary course of its business and that the payments to be made from each Merchant to MCA under this Agreement are being made in the ordinary course of each Merchant's business.

**9. Financial Condition.** Each Merchant and each Guarantor (Guarantor being defined as each signatory to the Guarantee of this Agreement) authorizes MCA and its agent(s) to investigate each Merchant's financial responsibility and history, and will provide to MCA any bank or financial statements, tax returns, and other documents and records, as MCA deems necessary prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable for release of financial information. MCA is authorized to update such information and financial profiles from time to time as it deems appropriate.

**10. Monitoring, Recording, and Electronic Communications.** MCA may choose to monitor and/or record telephone calls with any Merchant and its owners, employees, and agents. By signing this Agreement, each Merchant agrees that any call between MCA and any Merchant or its representatives may be monitored and/or recorded. Each Merchant and each Guarantor grants access for MCA to enter any Merchant's premises and to observe any Merchant's premises without any prior notice to any Merchant at any time after execution of this Agreement.

MCA may use automated telephone dialing, text messaging systems, and e-mail to provide messages to Merchant(s), Owner(s) (Owner being defined as each person who signs this Agreement on behalf of a Merchant), and Guarantor(s) about Merchant(s)'s account. Telephone messages may be played by a machine automatically when the telephone is answered, whether answered by an Owner, a Guarantor, or someone else. These messages may also be recorded by the recipient's answering machine or voice mail. Each Merchant, each Owner, and each Guarantor gives MCA permission to call or send a text message to any telephone number given to MCA in connection with this Agreement and to play pre-recorded messages and/or send text messages with information about this Agreement and/or any Merchant's account over the phone. Each Merchant, each Owner, and each Guarantor also gives MCA permission to communicate such information to them by e-mail. Each Merchant, each Owner, and each Guarantor agree that MCA will not be liable to any of them for any such calls or electronic communications, even if information is communicated to an unintended recipient. Each Merchant, each Owner, and each Guarantor acknowledge that when they receive such calls or electronic communications, they may incur a charge from the company that provides them with telecommunications, wireless, and/or Internet services, and that MCA has no liability for any such charges.

**11. Accuracy of Information Furnished by Merchant and Investigation Thereof.** To the extent set forth herein, each of the parties is obligated upon his, her, or its execution of the Agreement to all terms of the Agreement. Each Merchant and each Owner signing this Agreement represent that he or she is authorized to sign this Agreement for each Merchant, legally binding said Merchant to its obligations under this Agreement and that the information provided herein and in all of MCA's documents, forms, and recorded interview(s) is true, accurate, and complete in all respects. MCA may produce a

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:

Name: DANIEL STEPHEN MARCH   Title: OWNER   Date: 06/11/2021
242CC5C01A23474...

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

monthly statement reflecting the delivery of the Specified Percentage of Receivables from Merchant(s) to MCA. An investigative report may be made in connection with the Agreement. Each Merchant and each Owner signing this Agreement authorize MCA, its agents and representatives, and any credit-reporting agency engaged by MCA, to (i) investigate any references given or any other statements obtained from or about each Merchant or any of its Owners for the purpose of this Agreement, and (ii) pull credit report at any time now or for so long as any Merchant and/or Owners(s) continue to have any obligation to MCA under this Agreement or for MCA's ability to determine any Merchant's eligibility to enter into any future agreement with MCA. Any misrepresentation made by any Merchant or Owner in connection with this Agreement may constitute a separate claim for fraud or intentional misrepresentation.

*Authorization for soft pulls:* Each Merchant and each Owner understands that by signing this Agreement, they are providing 'written instructions' to MCA under the Fair Credit Reporting Act, authorizing MCA to obtain information from their personal credit profile or other information from Experian, TransUnion, and Equifax. Each Merchant and each Guarantor authorizes MCA to obtain such information solely to conduct a pre-qualification for credit.

*Authorization for hard pulls:* Each Merchant and each Owner understands that by signing this Agreement, they are providing 'written instructions' to MCA under the Fair Credit Reporting Act, authorizing MCA to obtain information from their personal credit profile or other information from Experian, TransUnion, and Equifax. Each Merchant and each Guarantor authorizes MCA to obtain such information in accordance with a merchant cash advance application.

**12. Transactional History.** Each Merchant authorizes its bank to provide MCA with its banking and/or credit card processing history.

**13. Indemnification.** Each Merchant and each Guarantor jointly and severally indemnify and hold harmless each Merchant's credit card and check processors (collectively, "Processor") and Processor's officers, directors, and shareholders against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) incurred by Processor resulting from (a) claims asserted by MCA for monies owed to MCA from any Merchant and (b) actions taken by any Processor in reliance upon information or instructions provided by MCA.

**14. No Liability.** In no event will MCA be liable for any claims asserted by any Merchant under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect, or consequential damages, each of which is waived by each Merchant and each Guarantor.

**15. Sale of Receivables.** Each Merchant and MCA agree that the Purchase Price under this Agreement is in exchange for the Receivables Purchased Amount and that such Purchase Price is not intended to be, nor shall it be construed as a loan from MCA to any Merchant. MCA is entering into this Agreement knowing the risks that each Merchant's business may decline or fail, resulting in MCA not receiving the Receivables Purchased Amount. Each Merchant agrees that the Purchase Price in exchange for the Receivables pursuant to this Agreement equals the fair market value of such Receivables. MCA has purchased and shall own all the Receivables described in this Agreement up to the full Receivables Purchased Amount as the Receivables are created. Payments made to MCA in respect to the full amount of the Receivables shall be conditioned upon each Merchant's sale of products and services and the payment therefor by each Merchant's customers in the manner provided in this Agreement. Although certain jurisdictions require the disclosure of an Annual Percentage Rate or APR in connection with this Agreement, those disclosures do not change the fact that the transaction encompassed by this Agreement is not a loan and does not have an interest rate.

**16. Power of Attorney.** Each Merchant irrevocably appoints MCA as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to MCA, or, if MCA considers an Event of Default to have taken place under Section 34, to settle all obligations due to MCA from each Merchant, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral (which is defined in Section 33); (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents, or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign each Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to MCA; and (v) to file any claims or take any action or institute any proceeding which MCA may deem necessary for the collection of any of the unpaid Receivables Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Receivables Purchased Amount.

**I have read and agree to the terms and conditions set forth above:**

Name: _DANIEL STEPHEN MARCH_ ___ Title: OWNER ___ Date: 06/14/2021

FILED: Case 8:23-bk-10571-SC Doc 1958-1 Filed 02/27/24 Entered 11/27/24 10:55:23 Desc
NYSCEF DOC. NO. 1
Main Document    Page 63 of 82
RECEIVED NYSCEF: 08/17/2021

Page 5 of 16

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

**17. Protections Against Default.** The following Protections 1 through 7 may be invoked by MCA, immediately and without notice to any Merchant in the event:

(a) Any Merchant takes any action to discourage the use of methods of payment ordinarily and customarily used by its customers or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks and credit cards for the purchase of any Merchant's services and products;

(b) Any Merchant changes its arrangements with any Processor in any way that is adverse to MCA;

(c) Any Merchant changes any Processor through which the Receivables are settled to another electronic check and/or credit card processor or permits any event to occur that could cause diversion of any Merchant's check and/or credit card transactions to another such processor;

(d) Any Merchant interrupts the operation of its business (other than adverse weather, natural disasters, or acts of God) or transfers, moves, sells, disposes, or otherwise conveys its business or assets without (i) the express prior written consent of MCA and (ii) the written agreement of any purchaser or transferee to the assumption of all of any Merchant's obligations under this Agreement pursuant to documentation satisfactory to MCA; or

(e) Any Merchant takes any action, fails to take any action, or offers any incentive—economic or otherwise—the result of which will be to induce any customer or customers to pay for any Merchant's goods or services with any means other than checks and/or credit cards that are settled through Processor. These protections are in addition to any other remedies available to MCA at law, in equity, or otherwise available pursuant to this Agreement.

(f) MCA considers any Event of Default listed in Section 34 to have taken place.

Protection 1: The full uncollected Receivables Purchased Amount plus all fees due under this Agreement may become due and payable in full immediately.

Protection 2. MCA may enforce the provisions of the Guarantee against Guarantor.

Protection 3. MCA may enforce its security interest in the Collateral identified in Section 33.

Protection 4. MCA may proceed to protect and enforce its rights and remedies by litigation or arbitration.

Protection 5. If requested by MCA, Merchant shall deliver to MCA an executed assignment of lease of each Merchant's premises in favor of MCA. Upon breach of any provision in this Section 17, MCA may exercise its rights under such assignment of lease.

Protection 6. MCA may debit any Merchant's depository accounts wherever situated by means of ACH debit or electronic or facsimile signature on a computer-generated check drawn on any Merchant's bank account or otherwise, in an amount consistent with the terms of this Agreement.

Protection 7. MCA will have the right, without waiving any of its rights and remedies and without notice to any Merchant and/or Guarantor, to notify each Merchant's credit card and/or check processor of the sale of Receivables hereunder and to direct such credit card processor to make payment to MCA of all or any portion of the amounts received by such credit card processor on behalf of each Merchant. Each Merchant hereby grants to MCA an irrevocable power-of-attorney, which power-of-attorney will be coupled with an interest, and hereby appoints MCA and its representatives as each Merchant's attorney-in-fact to take any and all action necessary to direct such new or additional credit card and/or check processor to make payment to MCA as contemplated by this Section.

**18. Protection of Information.** Each Merchant and each person signing this Agreement on behalf of each Merchant and/or as Owner, in respect of himself or herself personally, authorizes MCA to disclose information concerning each Merchant, Owner and/or Guarantor's credit standing and business conduct to agents, affiliates, subsidiaries, and credit reporting bureaus. Each Merchant, Guarantor, and Owner hereby waives to the maximum extent permitted by law any claim for damages against MCA or any of its affiliates relating to any (i) investigation undertaken by or on behalf of MCA as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**19. Confidentiality.** Each Merchant understands and agrees that the terms and conditions of the products and services offered by MCA, including this Agreement and any other MCA documents (collectively, "Confidential Information") are proprietary and confidential information of MCA. Accordingly, unless disclosure is required by law or court order, Merchant(s) shall not disclose Confidential Information of MCA to any person other than an attorney, accountant, financial advisor, or employee of any Merchant who needs to know such information for the purpose of advising any Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising any Merchant and first agrees in writing to be bound by the terms of this Section 19.

**20. D/B/As.** Each Merchant hereby acknowledges and agrees that MCA may be using "doing business as" or "d/b/a"

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:

DANIEL STEPHEN MARCH

242CC5601A23474...

Name: _____   Title: OWNER   Date: 08/14/2021

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

names in connection with various matters relating to the transaction between MCA and each Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**21. Financial Condition and Financial Information.** Each Merchant represents, warrants, and covenants that its bank and financial statements, copies of which have been furnished to MCA, and future statements which will be furnished hereafter at the request of MCA, fairly represent the financial condition of each Merchant at such dates, and that since those dates there have been no material adverse changes, financial or otherwise, in such condition, operation, or ownership of any Merchant. Each Merchant has a continuing affirmative obligation to advise MCA of any material adverse change in its financial condition, operation, or ownership.

**22. Governmental Approvals.** Each Merchant represents, warrants, and covenants that it is in compliance and shall comply with all laws and has valid permits, authorizations, and licenses to own, operate, and lease its properties and to conduct the business in which it is presently engaged.

**23. Authorization.** Each Merchant represents, warrants, and covenants that it and each person signing this Agreement on behalf of each Merchant has full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**24. Insurance.** Each Merchant represents, warrants, and covenants that it will maintain business-interruption insurance naming MCA as loss payee and additional insured in amounts and against risks as are satisfactory to MCA and shall provide MCA proof of such insurance upon request.

**25. Electronic Check Processing Agreement.** Each Merchant represents, warrants, and covenants that it will not, without MCA's prior written consent, change its Processor, add terminals, change its financial institution or bank account, or take any other action that could have any adverse effect upon any Merchant's obligations under this Agreement.

**26. Change of Name or Location.** Each Merchant represents, warrants, and covenants that it will not conduct its business under any name other than as disclosed to MCA or change any place(s) of its business without prior written consent from MCA.

**27. Estoppel Certificate.** Each Merchant represents, warrants, and covenants that it will, at any time, and from time to time, upon at least two day's prior notice from MCA to that Merchant, execute, acknowledge, and deliver to MCA and/or to any other person or entity specified by MCA, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Receivables Purchased Amount or any portion thereof have been paid.

**28. No Bankruptcy.** Each Merchant represents, warrants, and covenants that as of the date of this Agreement, it does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against any Merchant. Each Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it. Each Merchant further warrants that there will be no statutory presumption that it would have been insolvent on the date of this Agreement.

**29. Unencumbered Receivables.** Each Merchant represents, warrants, and covenants that it has good, complete, and marketable title to all Receivables, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges, and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with this Agreement or adverse to the interests of MCA, other than any for which MCA has actual or constructive knowledge as of the date of this Agreement.

**30. Stacking.** Each Merchant represents, warrants, and covenants that it will not enter into with any party other than MCA any arrangement, agreement, or commitment that relates to or involves the Receivables, whether in the form of a purchase of, a loan against, collateral against, or the sale or purchase of credits against Receivables without the prior

I have read and agree to the terms and conditions set forth above:

DocuSigned by:

DANIEL STEPHEN MARCH

242CC5001A23474...

Name: _____  Title: OWNER  Date: 08/14/2021

FILED: NASSAU COUNTY CLERK 08/17/2021 04:52 PM    INDEX NO. 609577/2021
NYSCEF DOC. NO. 1    Main Document    Page 65 of 82    RECEIVED NYSCEF: 08/17/2021

Case 24-50013-KMS Doc 19-8 Filed 02/27/24 Entered 11/27/24 10:55:23 Desc

Page 7 of 16

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

written consent of MCA.

**31. Business Purpose.** Each Merchant represents, warrants, and covenants that it is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and each Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family, or household purposes.

**32. Default Under Other Contracts.** Each Merchant represents, warrants, and covenants that its execution of and/or performance under this Agreement will not cause or create an event of default by any Merchant under any contract with another person or entity.

**33. Security Interest.** To secure each Merchant's payment and performance obligations to MCA under this Agreement and any future agreement with MCA, each Merchant hereby grants to MCA a security interest in collateral (the "Collateral"), that is defined as collectively: (a) all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined by Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by any Merchant; and (b) all proceeds, as that term is defined by Article 9 of the UCC. The parties acknowledge and agree that any security interest granted to MCA under any other agreement between any Merchant or Guarantor and MCA (the "Cross-Collateral") will secure the obligations hereunder and under this Agreement. Negative Pledge: Each Merchant agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Cross-Collateral, as applicable.

Each Merchant agrees to execute any documents or take any action in connection with this Agreement as MCA deems necessary to perfect or maintain MCA's first priority security interest in the Collateral and the Cross-Collateral, including the execution of any account control agreements. Each Merchant hereby authorizes MCA to file any financing statements deemed necessary by MCA to perfect or maintain MCA's security interest, which financing statements may contain notification that each Merchant has granted a negative pledge to MCA with respect to the Collateral and the Cross-Collateral, and that any subsequent lienor may be tortiously interfering with MCA's rights. Each Merchant shall be liable for and MCA may charge and collect all costs and expenses, including but not limited to attorney fees, which may be incurred by MCA in protecting, preserving, and enforcing MCA's security interest and rights. Each Merchant further acknowledges that MCA may use another legal name and/or D/B/A or an agent when designating the Secured Party when MCA files the above-referenced financing statement(s).

**34. Events of Default.** An "Event of Default" may be considered to have taken place if any of the following occur:
(1) Any Merchant violates any term or covenant in this Agreement;
(2) Any representation or warranty by any Merchant in any Agreement with MCA that has not been terminated proves to have been incorrect, false, or misleading in any material respect when made;
(3) Any Merchant fails to provide MCA with written notice of any material change in its financial condition, operation, or ownership within seven days thereafter (unless a different notice period is specifically provided for elsewhere in this Agreement;
(4) the sending of notice of termination by any Merchant or Guarantor;
(5) Any Merchant transports, moves, interrupts, suspends, dissolves, or terminates its business without the prior written consent of MCA other than a bankruptcy filing;
(6) Any Merchant transfers or sells all or substantially all of its assets without the prior written consent of MCA;
(7) Any Merchant makes or sends notice of any intended bulk sale or transfer by any Merchant without the prior written consent of MCA;
(8) Any Merchant uses multiple depository accounts without the prior written consent of MCA;
(9) Any Merchant changes the Account without the prior written consent of MCA;
(10) MCA is not provided with updated login or password information for the Account within one business day after any such change is made by any Merchant;
(11) Any Merchant fails to send bank statements, merchant account statements, or bank login information for the Account within two business days after a written request for same is made by MCA;
(12) Any Merchant performs any act that reduces the value of any Collateral granted under this Agreement;
(13) Any Merchant fails to deposit its Receivables into the Account;

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:
DANIEL STEPHEN MARCH
242CC5601A23474...

Name: _____  Title: OWNER  Date: 08/14/2021

FILED: NASSAU COUNTY CLERK 12/27/2024 10:55 AM INDEX NO. 616577/2021
NYSCEF DOC. NO. 1    Main Document    Page 66 of 82    RECEIVED NYSCEF: 08/17/2021

Page 8 of 16

### STANDARD MERCHANT CASH ADVANCE AGREEMENT

(14) Any Merchant causes any ACH debit to the Account by MCA to be blocked or stopped without providing any advance written notice to MCA, which notice may be given by e-mail to Michael@mcacapitalholdings.com; or

(15) Any Merchant prevents MCA from collecting any part of the Receivables Purchased Amount;

(16) Any Merchant causes any ACH debit to the Account to be stopped or otherwise returned that would result in an ACH Return Code of R08, R10, or R29 and that Merchant does not within two business days thereafter provide MCA with written notice thereof explaining why that Merchant caused the ACH debit to be stopped or otherwise returned, which notice may be given by e-mail to Michael@mcacapitalholdings.com; or

(17) Any Merchant defaults under any of the terms, covenants, and conditions of any other agreement with MCA.

**35. Remedies.** In case any Event of Default occurs and is not waived, MCA may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement, or other provision contained herein, or to enforce the discharge of each Merchant's obligations hereunder, or any other legal or equitable right or remedy. All rights, powers, and remedies of MCA in connection with this Agreement, including each Protection listed in Section 17, may be exercised at any time by MCA after the occurrence of an Event of Default, are cumulative and not exclusive, and will be in addition to any other rights, powers, or remedies provided by law or equity. In addition to the foregoing, in case any Event of Default occurs and is not waived, MCA will be entitled to the issuance of an injunction, restraining order, or other equitable relief in MCA's favor, subject to court or arbitrator approval, restraining each Merchant's accounts and/or receivables up to the amount due to MCA as a result of the Event of Default, and each Merchant will be deemed to have consented to the granting of an application for the same to any court or arbitral tribunal of competent jurisdiction without any prior notice to any Merchant or Guarantor and without MCA being required to furnish a bond or other undertaking in connection with the application.

**36. Required Notifications.** Each Merchant is required to give MCA written notice at least one day prior to any filing under Title 11 of the United States Code. Merchant(s) are required to give MCA at least seven days' written notice prior to the closing of any sale of all or substantially all of any Merchant's assets or stock.

**37. Assignment.** This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns, except that Merchant(s) shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of MCA, which consent may be withheld in MCA's sole discretion. MCA may assign, transfer, or sell its rights under this Agreement, including, without limitation, its rights to receive the Receivables Purchased Amount, and its rights under Section 33 of this Agreement, the Guarantee, and any other agreement, instrument, or document executed in connection with the transactions contemplated by this Agreement (a "Related Agreement"), or delegate its duties hereunder or thereunder, either in whole or in part. From and after the effective date of any such assignment or transfer by MCA, whether or not any Merchant has actual notice thereof, this Agreement and each Related Agreement shall be deemed amended and modified (without the need for any further action on the part of any Merchant or MCA) such that the assignee shall be deemed a party to this Agreement and any such Related Agreement and, to the extent provided in the assignment document between MCA and such assignee (the "Assignment Agreement"), have the rights and obligations of MCA under this Agreement and such Related Agreements with respect to the portion of the Receivables Purchased Amount set forth in such Assignment Agreement, including but not limited to rights in the Receivables, Collateral and Additional Collateral, the benefit of each Guarantor's guaranty regarding the full and prompt performance of every obligation that is a subject of the Guarantee, MCA's rights under Section 17 of this Agreement (Protections Against Default), and to receive damages from any Merchant following a breach of this Agreement by any Merchant. In connection with such assignment, MCA may disclose all information that MCA has relating to any Merchant or its business. Each Merchant agrees to acknowledge any such assignment in writing upon MCA's request.

**38. Notices.** All notices, requests, consents, demands, and other communications hereunder shall be delivered by certified mail, return receipt requested, or by overnight delivery with signature confirmation to the respective parties to this Agreement at their addresses set forth in this Agreement and shall become effective only upon receipt. Written notice may also be given to any Merchant or Guarantor by e-mail to the E-mail Address listed on the first page of this Agreement. Each Merchant must set its spam or junk mail filter to accept e-mails sent by Michael@mcacapitalholdings.com and its domain. This Section is not applicable to service of process or notices in any legal proceedings.

**39. Choice of Law.** Each Merchant acknowledges and agrees that this Agreement was made in the State of New

I have read and agree to the terms and conditions set forth above:

DocuSigned by:

DANIEL STEPHEN MARCH
242CC5001A23474...

Name: _____ Title: OWNER _____ Date: 06/14/2021 _____

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

York, that the Purchase Price is being paid by MCA in the State of New York, that the Receivables Purchased Amount is being delivered to MCA in the State of New York, and that the State of New York has a reasonable relationship to the transactions encompassed by this Agreement. This Agreement and the relationship between MCA, each Merchant, and each Guarantor will be governed by and construed in accordance with the laws of the State of New York, without regard to any applicable principles of conflict of laws.

**40. Forum and Venue Selection.** Any litigation relating to this Agreement or involving MCA on one side and any Merchant or any Guarantor on the other must be commenced and maintained in any court located in the Counties of Nassau, New York, or Sullivan in the State of New York (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient, submit to the jurisdiction of the Acceptable Forums, and waive any and all objections to the jurisdiction or venue of the Acceptable Forums. If any litigation is initiated in any other venue or forum, the parties waive any right to oppose any motion or application made by any party to transfer such litigation to an Acceptable Forum. The parties agree that this Agreement encompasses the transaction of business within the City of New York and that the Civil Court of the City of New York ("Civil Court") will have jurisdiction over any litigation relating to this Agreement that is within the jurisdictional limit of the Civil Court. In addition to the Acceptable Forums, any action or proceeding to enforce a judgment or arbitration award against any Merchant or Guarantor or to restrain or collect any amount due to MCA may be commenced and maintained in any other court of competent jurisdiction.

**41. Jury Waiver.** The parties agree to waive trial by jury in any dispute between them.

**42. Counterclaim Waiver.** In any litigation or arbitration commenced by MCA, each Merchant and each Guarantor will not be permitted to interpose any counterclaim.

**43. Statutes of Limitations.** Each Merchant and each Guarantor agree that any claim that is not asserted against MCA within one year of its accrual will be time barred.

**44. Costs.** Each Merchant and each Guarantor must pay all of MCA's reasonable costs associated with a breach by any Merchant of the covenants in this Agreement and the enforcement thereof, including but not limited to collection agency fees, attorney fees, which may include a contingency fee of up to 40% of the amount claimed, expert witness fees, and costs of suit.

**45. Prejudgment and Postjudgment Interest.** If MCA becomes entitled to the entry of a judgment against any Merchant or any Guarantor, then MCA will be entitled to the recovery of prejudgment interest at a rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, and upon entry of any such judgment, it will accrue interest at a postjudgment rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, which rate will govern over the statutory rate of interest up until actual satisfaction of the judgment.

**46. Legal Fees.** If MCA prevails in any litigation or arbitration with any Merchant or any Guarantor, then that Merchant and/or Guarantor must pay MCA's reasonable attorney fees, which may include a contingency fee of up to 40% of the amount claimed.

**47. Class Action Waiver.** MCA, each Merchant, and each Guarantor agree that they may bring claims against each other relating to this Agreement only in their individual capacities, and not as a plaintiff or class action member in any purported class or representative proceedings.

**48. Arbitration.** Any action or dispute relating to this Agreement or involving MCA on one side and any Merchant or any Guarantor on the other, including, but not limited to issues of arbitrability, will, at the option of any party to such action or dispute, be determined by arbitration before a single arbitrator. The arbitration will be administered either by Arbitration Services, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.arbitrationservicesinc.com, or by Mediation & Commercial Arbitration, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.mcarbitration.org. Once an arbitration is initiated with one of these arbitral forums, it must be maintained exclusively before that arbitral forum and the other arbitral forum specified herein may

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:

DANIEL STEPHEN MARCH

242CC5601A23474...

Name: _____   Title: OWNER _____   Date: 08/14/2021

FILED: Case 8-23-bk-10578-SC Doc 95-3 Filed 02/27/24 Entered 11/27/24 10:55:23 NO Desc 0577/2021
NYSCEF DOC. NO. 1    Main Document    Page 68 of 82    RECEIVED NYSCEF: 08/17/2021

Page 10 of 16

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

not be used. Any arbitration relating to this Agreement must be conducted in the Counties of Nassau, New York, Queens, or Kings in the State of New York. Notwithstanding any provision of any applicable arbitration rules, any witness in an arbitration who does not reside in or have a place for the regular transaction of business located in New York City or the Counties of Nassau, Suffolk, or Westchester in the State of New York will be permitted to appear and testify remotely by telephone or video conferencing. In case any Event of Default occurs and is not waived, each Merchant and each Guarantor consents to MCA making an application to the arbitrator, without notice to any Merchant or any Guarantor, for the issuance of an injunction, restraining order, or other equitable relief in MCA's favor, subject to court or arbitrator approval, restraining each Merchant's accounts and/or receivables up to the amount due to MCA as a result of the Event of Default.

Each Merchant acknowledges and agrees that this Agreement is the product of communications conducted by telephone and the Internet, which are instrumentalities of interstate commerce, that the transactions contemplated under this Agreement will be made by wire transfer and ACH, which are also instrumentalities of interstate commerce, and that this Agreement therefore evidences a transaction affecting interstate commerce. Accordingly, notwithstanding any provision in this Agreement to the contrary, all matters of arbitration relating to this Agreement will be governed by and construed in accordance with the provisions of the Federal Arbitration Act, codified as Title 9 of the United States Code, however any application for injunctive relief in aid of arbitration or to confirm an arbitration award may be made under Article 75 of the New York Civil Practice Law and Rules. The arbitration agreement contained in this Section may also be enforced by any employee, agent, attorney, member, manager, officer, subsidiary, affiliate entity, successor, or assign of MCA.

**49. Service of Process.** Each Merchant and each Guarantor consent to service of process and legal notices made by First Class or Priority Mail delivered by the United States Postal Service and addressed to the Contact Address set forth on the first page of this Agreement or any other address(es) provided in writing to MCA by any Merchant or any Guarantor, and unless applicable law or rules provide otherwise, any such service will be deemed complete upon dispatch. Each Merchant and each Guarantor agrees that it will be precluded from asserting that it did not receive service of process or any other notice mailed to the Contact Address set forth on the first page of this Agreement if it does not furnish a certified mail return receipt signed by MCA demonstrating that MCA was provided with notice of a change in the Contact Address.

**50. Survival of Representation, etc.** All representations, warranties, and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

**51. Waiver.** No failure on the part of MCA to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**52. Independent Sales Organizations/Brokers.** Each Merchant and each Guarantor acknowledge that it may have been introduced to MCA by or received assistance in entering into this Agreement or its Guarantee from an independent sales organization or broker ("ISO"). Each Merchant and each Guarantor agree that any ISO is separate from and is not an agent or representative of MCA. Each Merchant and each Guarantor acknowledge that MCA is not bound by any promises or agreements made by any ISO that are not contained within this Agreement. Each Merchant and each Guarantor exculpate from liability and agree to hold harmless and indemnify MCA and its officers, directors, members, shareholders, employees, and agents from and against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) incurred by any Merchant or any Guarantor resulting from any act or omission by any ISO. Each Merchant and each Guarantor acknowledge that any fee that they paid to any ISO for its services is separate and apart from any payment under this Agreement. Each Merchant and each Guarantor acknowledge that MCA does not in any way require the use of an ISO and that any fees charged by any ISO are not required as a condition or incident to this Agreement.

I have read and agree to the terms and conditions set forth above:

DocuSigned by:

DANIEL STEPHEN MARCH

242CC5601A23474...

Name: _____ Title: OWNER _____ Date: 06/14/2021

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

**53. Modifications; Agreements.** No modification, amendment, waiver, or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by all parties.

**54. Severability.** If any provision of this Agreement is deemed invalid or unenforceable as written, it will be construed, to the greatest extent possible, in a manner which will render it valid and enforceable, and any limitation on the scope or duration of any such provision necessary to make it valid and enforceable will be deemed to be part thereof. If any provision of this Agreement is deemed void, all other provisions will remain in effect.

**55. Headings.** Headings of the various articles and/or sections of this Agreement are for convenience only and do not necessarily define, limit, describe, or construe the contents of such articles or sections.

**56. Attorney Review.** Each Merchant acknowledges that it has had an opportunity to review this Agreement and all addenda with counsel of its choosing before signing the documents or has chosen not to avail itself of the opportunity to do so.

**57. Entire Agreement.** This Agreement, inclusive of all addenda, if any, executed simultaneously herewith constitutes the full understanding of the parties to the transaction herein and may not be amended, modified, or canceled except in writing signed by all parties. Should there arise any conflict between this Agreement and any other document preceding it, this Agreement will govern. This Agreement does not affect any previous agreement between the parties unless such an agreement is specifically referenced herein. This Agreement will not be affected by any subsequent agreement between the parties unless this Agreement is specifically referenced therein. MCA will not be permitted to enforce any of its rights under this Agreement if so expressed by in writing by Gene Rosen's Law Firm.

**58. Counterparts; Fax and Electronic Signatures.** This Agreement may be executed electronically and in counterparts. Facsimile and electronic copies of this Agreement will have the full force and effect of an original.

### EACH UNDERSIGNED HEREBY ACCEPTS THE TERMS OF THIS AGREEMENT

**FOR THE MERCHANT/OWNER (#1)**

By: _DANIEL STEPHEN MARCH_ _____ _____ _DANIEL STEPHEN MARCH_
      (Print Name)           (Print Title)         242CC5601A23474  (Signature)

SS# _ _____      Driver License Number _____

**FOR THE MERCHANT/OWNER (#2)**

By: _____ _____ _____
      (Print Name)           (Print Title)         (Signature)

SS# _____      Driver License Number _____

Approved for MCA CAPITAL HOLDINGS LLC by: _____

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

## GUARANTEE

**G1.  Personal  Guarantee  of  Performance.** This  is  a  personal  guaranty  of  performance,  dated
06/14/2021 _____, of the Standard Merchant Cash Advance Agreement, dated 06/14/2021 _____ ("Agreement"),
inclusive of all addenda, if any, executed simultaneously therewith, by and between MCA CAPITAL HOLDINGS LLC
("MCA") and THE LITIGATION PRACTICE GROUP PC / VULCAN ("Merchant"). Each undersigned Guarantor hereby guarantees each
Merchant's performance of all of the representations, warranties, and covenants made by each Merchant to MCA in the
Agreement, inclusive of all addenda, if any, executed simultaneously herewith, as the Agreement may be renewed,
amended, extended, or otherwise modified (the "Guaranteed Obligations"). Each Guarantor's obligations are due at the time
of any breach by any Merchant of any representation, warranty, or covenant made by any Merchant in the Agreement.

**G2. Communications.** MCA may use automated telephone dialing, text messaging systems, and e-mail to provide
messages to Guarantor(s) about Merchant(s)'s account. Telephone messages may be played by a machine automatically
when the telephone is answered, whether answered by an Owner, a Guarantor, or someone else. These messages may
also be recorded by the recipient's answering machine or voice mail. Each Guarantor gives MCA permission to call or send
a text message to any telephone number given to MCA in connection with this Agreement and to play pre-recorded
messages and/or send text messages with information about this Agreement and/or any Merchant's account over the phone.
Each Guarantor also gives MCA permission to communicate such information to them by e-mail. Each Guarantor agrees
that MCA will not be liable to any of them for any such calls or electronic communications, even if information is
communicated to an unintended recipient. Each Guarantor acknowledges that when they receive such calls or electronic
communications, they may incur a charge from the company that provides them with telecommunications, wireless, and/or
Internet services, and that MCA has no liability for any such charges.

**G3. Guarantor Waivers.** If MCA considers any Event of Default to have taken place under the Agreement, then
MCA may enforce its rights under this Guarantee without first seeking to obtain payment from any Merchant, any other
guarantor, or any Collateral, Additional Collateral, or Cross-Collateral MCA may hold pursuant to this Guarantee or any
other agreement or guarantee. MCA does not have to notify any Guarantor of any of the following events and Guarantor(s)
will not be released from its obligations under this Guarantee even if it is not notified of: (i) any Merchant's failure to pay
timely any amount owed under the Agreement; (ii) any adverse change in any Merchant's financial condition or business;
(iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guarantee of the
Guaranteed Obligations; (iv) MCA's acceptance of the Agreement with any Merchant; and (v) any renewal, extension, or
other modification of the Agreement or any Merchant's other obligations to MCA. In addition, MCA may take any of the
following actions without releasing any Guarantor from any obligations under this Guarantee: (i) renew, extend, or otherwise
modify the Agreement or any Merchant's other obligations to MCA; (ii) if there is more than one Merchant, release a
Merchant from its obligations to MCA such that at least one Merchant remains obligated to MCA; (iii) sell, release, impair,
waive, or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guarantee of the
Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guarantee
of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for
payment under the Agreement. Until the Receivables Purchased Amount and each Merchant's other obligations to MCA
under the Agreement and this Guarantee are paid in full, each Guarantor shall not seek reimbursement from any Merchant
or any other guarantor for any amounts paid by it under the Agreement. Each Guarantor permanently waives and shall not
seek to exercise any of the following rights that it may have against any Merchant, any other guarantor, or any collateral
provided by any Merchant or any other guarantor, for any amounts paid by it or acts performed by it under this Guarantee:
(i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution.

**G4. Joint and Several Liability.** The obligations hereunder of the persons or entities constituting each Guarantor
under this Guarantee are joint and several.

**G5. Injunctive Relief.** In case any Event of Default occurs and is not waived, MCA will be entitled to the issuance
of an injunction, restraining order, or other equitable relief in MCA's favor, subject to court or arbitrator approval, restraining
each Guarantor's accounts and/or receivables up to the amount due to MCA as a result of the Event of Default, and each
Guarantor will be deemed to have consented to the granting of an application for the same to any court or arbitral tribunal

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:

DANIEL STEPHEN MARCH

242CC5601A23474

Name: DANIEL STEPHEN MARCH     Title: OWNER     Date: 08/14/2021    6/14/2021

### STANDARD MERCHANT CASH ADVANCE AGREEMENT

of competent jurisdiction without any prior notice to any Merchant or Guarantor and without MCA being required to furnish a bond or other undertaking in connection with the application.

**G6. Choice of Law.** Each Guarantor acknowledges and agrees that the Agreement and this Guarantee were made in the State of New York, that the Purchase Price is being paid by MCA in the State of New York, that the Receivables Purchased Amount is being delivered to MCA in the State of New York, and that the State of New York has a reasonable relationship to the transactions encompassed by the Agreement and this Guarantee. This Guarantee and the relationship between MCA, each Merchant, and each Guarantor will be governed by and construed in accordance with the laws of the State of New York, without regard to any applicable principles of conflict of laws.

**G7. Forum and Venue Selection.** Any litigation relating to this Agreement or this Guarantee or involving MCA on one side and any Merchant or any Guarantor on the other must be commenced and maintained in any court located in the Counties of Nassau, New York, or Sullivan in the State of New York (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient, submit to the jurisdiction of the Acceptable Forums, and waive any and all objections to the jurisdiction or venue of the Acceptable Forums. If any litigation is initiated in any other venue or forum, the parties waive any right to oppose any motion or application made by any party to transfer such litigation to an Acceptable Forum. The parties agree that this Guarantee encompasses the transaction of business within the City of New York and that the Civil Court of the City of New York ("Civil Court") will have jurisdiction over any litigation relating to this Guarantee that is within the jurisdictional limit of the Civil Court. In addition to the Acceptable Forums, any action or proceeding to enforce a judgment or arbitration award against any Merchant or Guarantor or to restrain or collect any amount due to MCA may be commenced and maintained in any other court of competent jurisdiction.

**G8. Jury Waiver.** Each Guarantor agrees to waive trial by jury in any dispute with MCA.

**G9. Counterclaim Waiver.** In any litigation or arbitration commenced by MCA, each Merchant and each Guarantor will not be permitted to interpose any counterclaim.

**G10. Statutes of Limitations.** Each Merchant and each Guarantor agree that any claim that is not asserted against MCA within one year of its accrual will be time barred.

**G11. Costs.** Each Merchant and each Guarantor must pay all of MCA's reasonable costs associated with a breach by any Merchant of the covenants in this Agreement or this Guarantee and the enforcement thereof, including but not limited to collection agency fees, expert witness fees, and costs of suit.

**G12. Prejudgment and Postjudgment Interest.** If MCA becomes entitled to the entry of a judgment against any Merchant or any Guarantor, then MCA will be entitled to the recovery of prejudgment interest at a rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, and upon entry of any such judgment, it will accrue interest at a postjudgment rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, which rate will govern over the statutory rate of interest up until actual satisfaction of the judgment.

**G13. Legal Fees.** If MCA prevails in any litigation or arbitration with any Merchant or any Guarantor, then that Merchant and/or Guarantor must pay MCA's reasonable attorney fees, which may include a contingency fee of up to 40% of the amount claimed.

**G14. Class Action Waiver.** MCA, each Merchant, and each Guarantor agree that they may bring claims against each other relating to this Agreement only in their individual capacities, and not as a plaintiff or class action member in any purported class or representative proceedings.

**G15. Arbitration.** Any action or dispute relating to this Agreement or this Guarantee or involving MCA on one side and any Merchant or any Guarantor on the other, including, but not limited to issues of arbitrability, will, at the option of any party to such action or dispute, be determined by arbitration before a single arbitrator. The arbitration will be administered either by Arbitration Services, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:

DANIEL STEPHEN MARCH

—242CC5601A23474...

Name: _____   Title: ____ OWNER ____   Date: __06/14/2021__

Page **14** of 16

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

available at www.arbitrationservicesinc.com, or by Mediation & Commercial Arbitration, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.mcarbitration.org. Once an arbitration is initiated with one of these arbitral forums, it must be maintained exclusively before that arbitral forum and the other arbitral forum specified herein may not be used. Any arbitration relating to this Agreement or this Guarantee must be conducted in the Counties of Nassau, New York, Queens, or Kings in the State of New York. Notwithstanding any provision of any applicable arbitration rules, any witness in an arbitration who does not reside in or have a place for the regular transaction of business located in New York City or the Counties of Nassau, Suffolk, or Westchester in the State of New York will be permitted to appear and testify remotely by telephone or video conferencing. In case any Event of Default occurs and is not waived, each Guarantor consents to MCA making an application to the arbitrator, without notice to any Merchant or any Guarantor, for the issuance of an injunction, restraining order, or other equitable relief in MCA's favor, subject to court or arbitrator approval, restraining each Guarantor's accounts and/or receivables up to the amount due to MCA as a result of the Event of Default.

Each Guarantor acknowledges and agrees that the Agreement and this Guarantee are the product of communications conducted by telephone and the Internet, which are instrumentalities of interstate commerce, that the transactions contemplated under the Agreement and this Guarantee will be made by wire transfer and ACH, which are also instrumentalities of interstate commerce, and that the Agreement and this Guarantee therefore evidence a transaction affecting interstate commerce. Accordingly, notwithstanding any provision in the Agreement or this Guarantee to the contrary, all matters of arbitration relating to the Agreement or this Guarantee will be governed by and construed in accordance with the provisions of the Federal Arbitration Act, codified as Title 9 of the United States Code, however any application for injunctive relief in aid of arbitration or to confirm an arbitration award may be made under Article 75 of the New York Civil Practice Law and Rules. The arbitration agreement contained in this Section may also be enforced by any employee, agent, attorney, member, manager, officer, subsidiary, affiliate entity, successor, or assign of MCA.

**G16. Service of Process.** Each Merchant and each Guarantor consent to service of process and legal notices made by First Class or Priority Mail delivered by the United States Postal Service and addressed to the Contact Address set forth on the first page of the Agreement or any other address(es) provided in writing to MCA by any Merchant or any Guarantor, and unless applicable law or rules provide otherwise, any such service will be deemed complete upon dispatch. Each Merchant and each Guarantor agrees that it will be precluded from asserting that it did not receive service of process or any other notice mailed to the Contact Address set forth on the first page of the Agreement if it does not furnish a certified mail return receipt signed by MCA demonstrating that MCA was provided with notice of a change in the Contact Address.

**G17. Severability.** If any provision of this Guarantee is deemed invalid or unenforceable as written, it will be construed, to the greatest extent possible, in a manner which will render it valid and enforceable, and any limitation on the scope or duration of any such provision necessary to make it valid and enforceable will be deemed to be part thereof. If any provision of this Guarantee is deemed void, all other provisions will remain in effect.

**G18. Survival.** The provisions of Sections G2, G3, G4, G5, G6, G7, G8, G9, G10, G11, G12, G13, G14, G15, G16, G17, G18, G19, G20, G21, and G22 shall survive any termination of this Guarantee.

**G19. Headings.** Headings of the various articles and/or sections of this Guarantee are for convenience only and do not necessarily define, limit, describe, or construe the contents of such articles or sections.

**G20. Attorney Review.** Each Guarantor acknowledges that it has had an opportunity to review this Guarantee, the Agreement, and all addenda with counsel of its choosing before signing the documents or has chosen not to avail itself of the opportunity to do so.

I have read and agree to the terms and conditions set forth above:

DocuSigned by:

DANIEL STEPHEN MARCH

242CC5601A23474...

Name: _____  Title: OWNER  Date: 06/14/2021

FILED: Case 8:21-bk-10571-SC Doc 1958 Filed 02/27/24 Entered 11/27/24 10:55:23 Desc
NYSCEF DOC. NO. 1                    Main Document        Page 73 of 82        RECEIVED NYSCEF: 08/17/2021

Page 15 of 16

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

**G21. Entire Agreement.** This Guarantee, inclusive of all addenda, if any, executed simultaneously herewith may not be amended, modified, or canceled except in writing signed by all parties. Should there arise any conflict between this Guarantee and any other document preceding it, this Guarantee will govern. This Guarantee does not affect any previous agreement between the parties unless such an agreement is specifically referenced in the Agreement or herein. This Guarantee will not be affected by any subsequent agreement between the parties unless this Guarantee is specifically referenced therein.

**G22. Counterparts; Fax and Electronic Signatures.** This Guarantee may be executed electronically and in counterparts. Facsimile and electronic copies of this Guarantee will have the full force and effect of an original.

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "STANDARD MERCHANT CASH ADVANCE AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS GUARANTEE. CAPITALIZED TERMS NOT DEFINED IN THIS GUARANTEE SHALL HAVE THE MEANING SET FORTH IN THE STANDARD MERCHANT CASH ADVANCE AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.

### EACH UNDERSIGNED HEREBY ACCEPTS THE TERMS OF THIS GUARANTEE

**GUARANTOR (#1)**

By: ___DANIEL STEPHEN MARCH_____
              (Print Name)

DocuSigned by:
DANIEL STEPHEN MARCH
242CC5001A23474...
(Signature)

SS# _ ▮▮▮▮▮▮▮▮▮_____    Driver License Number _____

**GUARANTOR (#2)**

By: _____
              (Print Name)

_____
(Signature)

SS# _____    Driver License Number _____

FILED Case 8:23-bk-10571-SC Doc 1958 Filed 02/27/24 Entered 11/27/24 10:55:23 Desc 1577/2021
NYSCEF DOC. NO. 1
Main Document    Page 74 of 82
RECEIVED NYSCEF: 08/17/2021

Page 16 of 16

STANDARD MERCHANT CASH ADVANCE AGREEMENT

# BANK INFORMATION

Dear Merchant,

Thank you for accepting this offer from MCA CAPITAL HOLDINGS LLC. We look forward to being your funding partner.

You authorize MCA CAPITAL HOLDINGS LLC to collect the Receivables Purchased Amount under this Agreement by ACH debiting your bank account with the bank listed below.

MCA CAPITAL HOLDINGS LLC will require viewing access to your bank account each business day.

MCA CAPITAL HOLDINGS LLC will also require viewing access to your bank account, prior to funding, as part of our underwriting process.

Please fill out the form below with the information necessary to access your account.

**\* Be sure to indicate capital or lower case letters.**

Name of bank: BANK OF THE WEST / BANK OF AMERICA

Name of account: THE LITIGATION PRACTICE GROUP / VULCAN CONSULTING GROUP

Account number: ███████████████    Routing number: 122242843 / 121000358

Bank portal website: www.bankofamerica.com

Username: ███████

Password: ███████

Security Question/Answer 1:

Security Question/Answer 2:

Security Question/Answer 3:

Any other information necessary to access your account:

If you have any questions please feel free to contact us directly at (646) 419-5325.

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:

DANIEL STEPHEN MARCH

242CC5601A23474...

Name:                    Title: OWNER          Date: 08/14/2021

## ADDENDUM TO STANDARD MERCHANT CASH ADVANCE AGREEMENT
## FOR ESTIMATED PAYMENTS

This is an Addendum, dated 06/14/2021, to the Standard Merchant Cash Advance Agreement ("Agreement"), dated 06/14/2021, between MCA Capital Holdings LLC ("MCA") and THE LITIGATION PRACTICE GROUP PC / VULCAN CONSULTING GROUP LLC ("Merchant"). This Addendum incorporates the Agreement by reference. The terms of this Addendum will control to the extent they conflict with any of the terms in the Agreement.

Instead of debiting the _____ % Specified Percentage of Merchant's Receivables, MCA may instead debit $ 12,491.66 ("Estimated Payment") from the Account every DAY. The Estimated Payment is intended to be an approximation of no more than the Specified Percentage.

Any Merchant may give written notice to MCA requesting that MCA conduct a reconciliation in order to ensure that the amount that MCA has collected equals the Specified Percentage of Merchant(s)'s Receivables under this Agreement. Any Merchant may give written notice requesting a reconciliation. A request for reconciliation may also be made by e-mail to Michael@mcacapitalholdings.com and such notice will be deemed to have been received if and when MCA sends a reply e-mail (but not a read receipt). If such reconciliation determines that MCA collected more than it was entitled to, then within seven days thereafter, MCA will credit to the Account all amounts to which MCA was not entitled and decrease the Estimated Payment so that it is consistent with the Specified Percentage of Merchant(s)'s Receivables from the date of the Agreement through the date of the reconciliation. If such reconciliation determines that MCA collected less than it was entitled to, then within seven days thereafter, MCA will debit from the Account all additional amounts to which MCA was entitled and increase the Estimated Payment so that it is consistent with the Specified Percentage of Merchant(s)'s Receivables from the date of the Agreement through the date of the reconciliation, with the increase being subject to any Cap in place on collections. In order to effectuate this reconciliation, any Merchant must produce with its request the login and password for the Account and any and all bank statements and merchant statements covering the period from the date of this Agreement through the date of the request for a reconciliation. MCA will complete each such reconciliation within two business days after receipt of a written request for one accompanied by the information and documents required for it. Nothing herein limits the amount of times that such a reconciliation may be requested.

### FOR THE MERCHANT/OWNER (#1)

By: DANIEL STEPHEN MARCH
     (Print Name and Title)

DocuSigned by:
*DANIEL STEPHEN MARCH*
242CC5001A23474...
(Signature)

### FOR THE MERCHANT/OWNER (#2)

By:
     (Print Name and Title)
     (Signature)

Case 8:24-bk-10571-SC Doc 1958-1 Filed 02/27/24 Entered 11/27/24 10:55:23 Desc
Main Document      Page 76 of 82



## ADDENDUM TO STANDARD MERCHANT CASH ADVANCE AGREEMENT
## FOR ADDITIONAL FEES

    This is an Addendum, dated <u>06/14/2021</u>, to the Standard Merchant Cash Advance Agreement ("Agreement"), dated <u>06/14/2021</u>, between MCA Capital Holdings LLC ("MCA") and <u>THE LITIGATION PRACTICE GROUP PC / VULCAN CONSULTING GROUP LLC</u> ("Merchant"). This Addendum incorporates the Agreement by reference. The terms of this Addendum will control to the extent they conflict with any of the terms in the Agreement.

    Each Merchant may be held responsible for an NSF/ Rejected ACH Fee of $50.00 for each time an ACH debit to the Account by MCA is returned or otherwise rejected. No Merchant will be held responsible for such a fee if any Merchant gives MCA advance notice of no more than one business day in advance that the Account has insufficient funds to be debited by MCA and no Merchant is otherwise in default of the terms of the Agreement. Each such fee may be deducted from any payment collected by MCA or may be collected in addition to any other payment collected by MCA under this Agreement.

**FOR THE MERCHANT/OWNER (#1)**

By: <u>DANIEL STEPHEN MARCH</u>   OWNER           _DANIEL STEPHEN MARCH_
        (Print Name and Title)                (Signature)

**FOR THE MERCHANT/OWNER (#2)**

By:_____    _____
        (Print Name and Title)                (Signature)

DocuSign Envelope ID: ...



## ADDENDUM TO STANDARD MERCHANT CASH ADVANCE AGREEMENT

This is an Addendum, dated 06/14/2021 _____, to the Standard Merchant

Cash Advance Agreement ("Agreement"), dated 06/14/2021 _____,

between    MCA    CAPITAL    HOLDINGS    LLC    ("MCA")    and

THE LITIGATION PRACTICE GROUP PC / VULCAN CONSULTING _____ ("Merchant").

Merchant(s) instruct MCA to pay up to $_____ of the Purchase Price

set forth in the Agreement to _____

instead of to Merchant(s). The balance of the Purchase Price will be paid to Merchant(s).

Additional comments: _____

_____

_____

_____

**FOR THE MERCHANT/OWNER (#1)**

By:  DANIEL STEPHEN MARCH    OWNER                    _DANIEL STEPHEN MARCH_
     _____                242CC5601A23474...
          (Print Name and Title)                          (Signature)

**FOR THE MERCHANT/OWNER (#2)**

By:_____                    _____
          (Print Name and Title)                          (Signature)

## DECLARATION OF ORDINARY COURSE OF BUSINESS

Each undersigned hereby declares the following:

1.     I am duly authorized to sign the Standard Merchant Cash Advance Agreement ("Agreement"), dated 06/14/2021 _____, between MCA Capital Holdings LLC ("MCA") and THE LITIGATION PRACTICE GROUP PC / VULCAN CONSULTING GROUP LLC _____ ("Merchant") on behalf of Merchant.

2.     This Declaration incorporates by reference the Agreement and every addendum to it.

3.     I acknowledge that I am authorized to sign the Agreement and every addendum to it on behalf of each Merchant.

4.     I acknowledge that I had sufficient time to review the Agreement and every addendum to it before signing it.

5.     I acknowledge that I had an opportunity to seek legal advice from counsel of my choosing before signing the Agreement and every addendum to it.

6.     I acknowledge that each Merchant is entering into the Agreement voluntarily and without any coercion.

7.     I acknowledge that each Merchant is entering into the Agreement in the ordinary course of its business.

8.     I acknowledge that the payments to be made from any Merchant to MCA under the Agreement are being made in the ordinary course of each Merchant's business.

9.     **I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on 06/14/2021 _____ 6/14/2021
                          (Date)

**FOR THE MERCHANT/OWNER (#1)**

By: DANIEL STEPHEN MARCH     OWNER _____          _____ *DANIEL STEPHEN MARCH*
                  (Print Name and Title)                                    (Signature)

**FOR THE MERCHANT/OWNER (#2)**

By:_____                              _____
           (Print Name and Title)                              (Signature)

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NASSAU**

-------------------------------------------------------------------x

MCA CAPITAL HOLDINGS LLC,

                 Plaintiff/Petitioner,

    - against -                             Index No.

THE LITIGATION PRACTICE GROUP PC,
VULCAN CONSULTING GROUP LLC, and
DANIEL STEPHEN MARCH,

                 Defendant/Respondent.

-------------------------------------------------------------------x

### NOTICE OF ELECTRONIC FILING
#### (Mandatory Case)
(Uniform Rule § 202.5-bb)

**You have received this Notice because:**
         1) The Plaintiff/Petitioner, whose name is listed above, has filed this case using the New York State Courts E-filing system ("NYSCEF"), and

         2) You are a Defendant/Respondent (a party) in this case.

- **If you are represented by an attorney:**
  Give this Notice to your attorney. (<u>Attorneys</u>: see "Information for Attorneys" pg. 2).

- **If you are not represented by an attorney:**
  **You will be served with all documents in paper and you must serve and file your documents in paper, unless you choose to participate in e-filing.**

  **If you choose to participate in e-filing, you <u>must</u> have access to a computer and a scanner or other device to convert documents into electronic format, a connection to the internet, and an e-mail address to receive service of documents.**

  The **benefits of participating in e-filing** include:

  - serving and filing your documents electronically

  - free access to view and print your e-filed documents

  - limiting your number of trips to the courthouse

  - paying any court fees on-line (credit card needed)

  **To register for e-filing or for more information about how e-filing works:**

  - visit: www.nycourts.gov/efile-unrepresented or
  - contact the Clerk's Office or Help Center at the court where the case was filed. Court contact information can be found at www.nycourts.gov

To find legal information to help you represent yourself visit www.nycourthelp.gov

**Information for Attorneys**
**(E-filing is Mandatory for Attorneys)**

An attorney representing a party who is served with this notice must either:

    1) immediately record his or her representation within the e-filed matter on the NYSCEF site www.nycourts.gov/efile; or

    2) file the Notice of Opt-Out form with the clerk of the court where this action is pending and serve on all parties. Exemptions from mandatory e-filing are limited to attorneys who certify in good faith that they lack the computer hardware and/or scanner and/or internet connection or that they lack (along with all employees subject to their direction) the knowledge to operate such equipment. [Section 202.5-bb(e)]

    For additional information about electronic filing and to create a NYSCEF account, visit the NYSCEF website at www.nycourts.gov/efile or contact the NYSCEF Resource Center (phone: 646-386-3033; e-mail: efile@nycourts.gov).

Dated: Garden City, New York
       August 17, 2021

GENE ROSEN'S LAW FIRM
A PROFESSIONAL CORPORATION
Attorneys for Plaintiff

By: _____
    Gene W. Rosen, Esq.
    200 Garden City Plaza, Suite 405
    Garden City, New York 11530
    Tel (212) 529-3600 Ext. 101
    Fax (347) 578-8793
    Gene@GeneRosen.com

To:

| The Litigation Practice Group PC | Vulcan Consulting Group LLC | Daniel Stephen March |
| --- | --- | --- |
| 17542 17th St Ste 100 | 17542 17th St Ste 100 | 17542 17th St Ste 100 |
| Tustin, CA 92780 | Tustin, CA 92780 | Tustin, CA 92780 |

6/6/18

Index #                    Page 2 of 2                  EFM-1

# EXHIBIT 5

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

-----------------------------------------------------------------X

MCA CAPITAL HOLDINGS LLC,                     Index No. 610577/2021

                    Plaintiff,                **NOTICE OF**
                                              **DISCONTINUANCE**

        - against -

THE LITIGATION PRACTICE GROUP PC,
VULCAN CONSULTING GROUP LLC, and
DANIEL STEPHEN MARCH,

                    Defendants.

-----------------------------------------------------------------X

        PLEASE TAKE NOTICE that Plaintiff hereby discontinues this action against Defendants.


Dated: Garden City, New York
       August 24, 2021


                              GENE ROSEN'S LAW FIRM
                              A PROFESSIONAL CORPORATION
                              Attorneys for Plaintiff


                              By: _____
                                  Gene W. Rosen, Esq.
                                  200 Garden City Plaza, Suite 405
                                  Garden City, New York 11530
                                  Tel (212) 529-3600 Ext. 101
                                  Fax (347) 578-8793
                                  Gene@GeneRosen.com


To:

The Litigation Practice Group PC   Vulcan Consulting Group LLC   Daniel Stephen March
17542 17th St Ste 100              17542 17th St Ste 100         17542 17th St Ste 100
Tustin, CA 92780                   Tustin, CA 92780              Tustin, CA 92780