1 | CHRISTOPHER CELENTINO (131688)
christopher.celentino@dinsmore.com
2 | CHRISTOPHER B. GHIO (259094)
christopher.ghio@dinsmore.com
3 | YOSINA M. LISSEBECK (201654)
yosina.lissebeck@dinsmore.com
4 | DINSMORE & SHOHL LLP
655 West Broadway, Suite 800
5 | San Diego, CA 92101
Tele: 619.400.0500
6 | Fax: 619.400.0501

7 |
KAREN S. HOCKSTAD (OH 61308) (Admitted pro hac vice)
8 | karen.hockstad@dinsmore.com
MATTHEW H. SOMMER (OH 101721; NC 51004) (Admitted pro hac vice)
9 | matthew.sommer@dinsmore.com
DINSMORE & SHOHL LLP
10 | 191 W. Nationwide Blvd., Suite 200
Columbus, OH 43215
11 | Tele: 614-628-6930
Fax: 614-628-6890
12

13

14 | Special Counsel to Richard A. Marshack, Trustee of the LPG Liquidation Trust

15

**UNITED STATES BANKRUPTCY COURT**

16

**CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION**

17

| | |
|---|---|
| In re: | Bankr. Case No. 8:23-bk-10571 SC |
| THE LITIGATION PRACTICE GROUP P.C., | Adv. Proc. No. |
| Debtor. | Chapter 11 |
| | **TRUSTEE'S COMPLAINT FOR:** |
| RICHARD A. MARSHACK, Trustee of the LPG Liquidation Trust, | **(1) AVOIDANCE, RECOVERY, AND PRESERVATION OF 2-YEAR ACTUAL FRAUDULENT TRANSFERS;** |
| Plaintiff, | **(2) AVOIDANCE, RECOVERY, AND PRESERVATION OF 2-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS;** |
| v. | **(3) DEMAND FOR ACCOUNTING AGAINST WORLD GLOBAL FUND, LLC, OPTIMUMBANK HOLDINGS INC., OPTIMUMBANK, AND OPTIMUMBANK.COM;** |
| WORLD GLOBAL FUND, LLC WORLD GLOBAL FUND, LLC, D/B/A BRICKSTONE GROUP, D/B/A | |

SLATE ADVANCE, D/B/A GREENTREE ADVANCE, D/B/A SAFE VAULT, D/B/A PSF, D/B/A LPG, D/B/A BRAUFMAN AND ASSOCIATES, D/B/A WEINMAN AND ASSOCIATES, D/B/A DORCY AND WHITNEY, D/B/A KINGDOM CAPITAL, D/B/A PRIME FUNDING GRP, D/B/A GOLDCREST, D/B/A PARKSIDE CAPITAL, D/B/A MNS FUNDING, D/B/A KINGCASH, D/B/A W.B. FUND, D/B/A WGF CAPITAL, D/B/A TOT CAPITAL, D/B/A EVERYDAY GROUP, D/B/A CRYSTAL SPRINGS, D/B/A VERTEX CAPITAL, D/B/A FD FUND, D/B/A HYBRID ADVANCE, D/B/A RAPID CAP, D/B/A AY FUNDING, D/B/A COAST PROCESSING LLC, D/B/A VULCAN CONSULTING GROUP, D/B/A GATEWAY FUNDING, D/B/A SUPREME FUNDING;

SHIA DEMBITZER

SOLOMON FEIG

MOISHE GUBIN

OPTIMUMBANK HOLDINGS, INC.

OPTIMUMBANK

OPTIMUMBANK.COM

LPG CAPITAL LLC

LPG HOLDINGS LLC

MNS FUNDING LLC, D/B/A LEGAL FEES NETWORK, D/B/A THE GENESIS EQUITY GROUP

SSD INVESTMENT GROUP LLC

BRICKSTONE GROUP LTD.

WGF CAPITAL INC.

PSF 2020 INC.

PSF, LLC

SUPREME ADVANCE LLC

SLATE ADVANCE LLC

SAFE VAULT CAPITAL LLC

GOLDCREST ASSOCIATES LLC

**(4) TURNOVER OF ESTATE PROPERTY;**

**(5) FRAUD AND/OR CONVERSION/THEFT COMMITTED BY WORLD GLOBAL, LLC, DEMBITZER, FEIG, THE ALTER EGOS, AND THE DEMBITZER ALTER EGOS – THE FRAUDULENT ACH TRANSACTIONS;**

**(6) FRAUD AND/OR CONVERSION/THEFT COMMITTED BY WORLD GLOBAL, LLC, DEMBITZER, FEIG, THE ALTER EGOS, AND THE DEMBITZER – UNREIMBURSED FUNDS FROM THE MCA AGREEMENTS**

**(7) AIDING AND ABETTING FRAUD AND/OR CONVERSION/THEFT BY MOISHE GUBIN, OPTIMUMBANK HOLDINGS INC., OPTIMUMBANK, OPTIMUMBANK.COM;**

**(8) AIDING AND ABETTING BY MOISHE GUBIN, OPTIMUMBANK HOLDINGS INC., OPTIMUMBANK, OPTIMUMBANK.COM; AND**

**(9) CONSPIRACY TO COMMIT FRAUD**


Judge: Hon. Scott C. Clarkson

1    PARKSIDE CAPITAL GROUP LLC

2    HYBRID ADVANCE LLC

3    EOM BUSINESS CAPITAL LLC

4    GENESIS EQUITY GROUP FUNDING LLC

5    EVERYDAY GROUP LLC

6    WORLD GLOBAL FUND

7    WORLD GLOBAL LLC, N/K/A GLASS
     MEDIA, LLC
8
     FUNDING GATEWAY INC.
9
     FUNDING GATEWAY INC.
10
     FUNDING GATEWAY INC. D/B/A WEINMAN
11   AND ASSOCIATES

12   COAST PROCESSING LLC

13   VERTEX CAPITAL (US) FUNDING LLC

14   VERTEX CAPITAL PARTNERS LLC

15   CRYSTAL SPRINGS CAPITAL LLC

16   WEINMAN AND ASSOCIATES LLC

17         Defendants.

18

19

20         For his *Complaint for (1) Avoidance, Recovery, and Preservation of 2-Year Actual Fraudulent*

21   *Transfers; (2) Avoidance, Recovery, and Preservation of 2-Year Constructive Fraudulent Transfers;*

22   *(3) Demand for an Accounting; (4) Turnover of Estate Property; (5) Fraud and/or Conversion/Theft*

23   *committed by World Global Fund, LLC, Dembitzer, Feig, the Alter Egos, and the Dembitzer Alter*

24   *Egos – the Fraudulent ACH Transactions; (6) Fraud and/or Conversion/Theft committed by World*

25   *Global Fund, LLC, Dembitzer, Feig, the Alter Egos, and the Dembitzer Alter Egos – Unreimbursed*

26   *Funds from the MCA Agreements; (7) Aiding and Abetting Fraud and/or Conversion/Theft by Gubin*

27   *and Optimum; (8) Aiding and Abetting by Gubin and Optimum; and (9) Conspiracy to Commit Fraud*

28   ("Complaint"), Plaintiff Richard A. Marshack, the former Chapter 11 Trustee for the bankruptcy

     estate ("Estate") of debtor The Litigation Practice Group P.C. ("Debtor" or "LPG") and current

     liquidating trustee of the LPG Liquidation Trust (collectively, "Trustee" or "Plaintiff") in the above-

3

captioned bankruptcy case ("Bankruptcy Case"), alleges as follows:

## STATEMENT OF JURISDICTION, NATURE OF PROCEEDING, AND VENUE

1.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E), (H) and (O), 1334(b), and General Order No. 13-05 of the District Court for the Central District of California because this is a core proceeding arising in and/or related to the Bankruptcy Case, which is a case under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code"), and is pending in the United States Bankruptcy Court for the Central District of California, Santa Ana Division ("Bankruptcy Court").

2.     Regardless of whether this proceeding is core, non-core, or otherwise, Plaintiff consents to the entry of a final order and judgment by the Bankruptcy Court.

3.     Defendants are notified that Rule 7008 of the Federal Rules of Bankruptcy Procedure requires them to plead whether consent is given to the entry of a final order and judgment by the Bankruptcy Court.

4.     Venue of this adversary proceeding properly lies in this judicial district pursuant to 28 U.S.C. § 1409(a) because this proceeding is related to Debtor's pending Bankruptcy Case.

## THE PARTIES

5.     Plaintiff Richard A. Marshack is the duly-appointed, qualified, former Chapter 11 Trustee of Debtor's Estate and the current liquidating trustee of the LPG liquidating trust.

6.     LPG is, and at all relevant times was, a professional corporation organized, existing, and in good standing under the laws of the State of California, with its principal place of business in Tustin, California.

7.     Defendant World Global Fund, LLC ("Principal Defendant" or "World Global") is a limited liability company registered in the State of New York with its principal place of business located at 5308 13th Avenue, Suite 422, Brooklyn New York, 11219. World Global's registered agent is File Right LLC located at 5314 16th Avenue, Suite 139, Brooklyn, New York, 11204. World Global operates under the assumed names:

        a.     Brickstone Group

        b.     Slate Advance

        c.     Greentree Advance

        d.     Safe Vault

        e.     PSF

        f.     LPG

        g.     Braufman and Associates

     h.      Weinman and Associates

     i.      Dorcy and Whitney

     j.      Kingdom Capital

     k.      Prime Funding Grp

     l.      Goldcrest

     m.      Parkside Capital

     n.      MNS Funding

     o.      Kingcash

     p.      W.B. Fund

     q.      M&S Funding

     r.      WGF Capital

     s.      TOT Capital

     t.      Everyday Group

     u.      Crystal Springs

     v.      Vertex Capital

     w.      FD Fund

     x.      Hybrid Advance

     y.      Rapid Cap

     z.      AY Funding

8.     On information and belief, World Global also operates under the assumed names:

     a.      Coast Processing LLC

     b.      Vulcan Consulting Group

     c.      Gateway Funding

     d.      Supreme Advance

9.     On information and belief, World Global, together with Shia Dembitzer and Solomon Feig, registered World Global's assumed names in various states with the intent of hiding LPG's wrongfully withheld assets.

10.     On information and belief, Shia Dembitzer and Solomon Feig also set up shell entities with names similar or identical to the assumed names used by World Global and its alter egos in order to deceive creditors of both LPG and itself. These entities were set up in Wyoming, New York, New Jersey, California, and Florida.

11.     Shia Dembitzer ("Dembitzer") is an individual who was, at all relevant times, a citizen of the state of New York residing in Brooklyn, and, on information and belief, is a managing member

of World Global, is the Head of Operations of World Global's ACH division, and was employed by World Global and/or one of its alter egos. On information and belief, Dembitzer resides at 202 Foster Avenue, Apt. 5, Brooklyn, New York, 11230.

12.     Solomon Feig ("Feig") is an individual who is a citizen of the State of New York residing in Brooklyn, and, on information and belief, was a principal of World Global acting as either Chief Executive Officer or President. On information and belief, Feig resides at 4515 18th Avenue, Brooklyn, New York, 11204.

13.     Moishe Gubin ("Gubin") is an individual residing in the State of Indiana, and is the Chairman of the Board of Directors of OptimumBank Holdings, Inc. and a Board Member of OptimumBank and OptimumBank.com. Moishe Gubin had actual knowledge of the World Global network of assumed names and entities. On information and belief, Gubin resides at 1230 Ridgedale Road, South Bend, Indiana, 46614.

14.     OptimumBank Holdings, Inc. is a corporation registered in the State of Florida with its principal place of business at 2929 E. Commercial Blvd., Suite 303, Fort Lauderdale, Florida, 33308. OptimumBank Holdings, Inc.'s registered agent is Zwelling, AVI located at 292 E. Commercial Blvd, Suite 303, Fort Lauderdale, Florida, 33308. OptimumBank Holdings, Inc. is the parent company of OptimumBank and OptimumBank.com.

15.     OptimumBank is a corporation registered in the State of Florida with its principal place of business at 2929 E. Commercial Blvd., Suite 101, Fort Lauderdale, Florida, 33308. OptimumBank's registered agent is Mary Franco located at 2929 E. Commercial Blvd., Suite 101, Fort Lauderdale, Florida, 33308.

16.     OptimumBank.com (collectively with OptimumBank Holdings, Inc. and OptimumBank "Optimum")[1] is a corporation registered in the State of Florida with its principal place of business at 2929 E. Commercial Blvd., Suite 101, Fort Lauderdale, Florida, 33308. OptimumBank.com's registered agent is Mary Franco located at 2929 E. Commercial Blvd., Suite 101, Fort Lauderdale, Florida, 33308.

17.     LPG Capital LLC is a limited liability company registered in the State of New York. LPG Capital LLC lists "LPG Capital LLC" as its name for service via the Secretary of State and is located at 10 Jill Lane, Monsey, New York, 10952.

18.     LPG Holdings LLC is a limited liability company registered in the State of Wyoming.

---

[1] Optimum is a defendant who has filed an answer in the 1046 case, however the allegations against Optimum in this case are factually and legally distinct.

LPG Holdings LLC's registered agent is Registered Agents, Inc., 30 N. Gould Street, Suite R, Sheridan, Wyoming, 82801.

19.    MNS Funding LLC is a limited liability company registered in the State of New York. MNS Funding LLC's registered agent is File Right LLC located at 5314 16th Avenue, Suite 139, Brooklyn, New York, 11204. MNS Funding LLC operates under the assumed names: "Legal Fees Network" and "The Genesis Equity Group." MNS Funding LLC lists "The LLC" as its name for service via the Secretary of State and is located at 5314 16th Avenue, Suite 139, Brooklyn, New York, 11204.[2]

20.    SSD Investment Group, LLC, is a California limited liability company, is a successor in interest to World Global Fund, LLC and holds funds that are the subject of this Complaint.[3] SSD Investment Group is wholly owned by MNS Funding and lists Dembitzer as its manager.  SSD Investment Group, LLC is also organized in the State of Florida and lists Dembitzer as its manager and registered agent.

21.    Brickstone Group LTD. is a corporation registered in the State of New York with its principal place of business located at 20 West 47th Street, Suite 401, New York, New York, 10036. Brickstone Group LTD.'s Chief Executive Officer is Rabia Yaghoubzadeh. Brickstone Group LTD. lists "Brickstone Group LTD." as its name for service via the Secretary of State and is located at 20 West 47th Street, Suite 401, New York, New York, 10036.

22.    WGF Capital Inc. is a corporation registered in the State of New York. WGF Capital Inc. lists "Joshua Feig" as its name for service via the Secretary of State and is located at 1846 50 Street, Brooklyn, New York, 11204.

23.    PSF 2020 Inc. is a corporation registered in the State of New York. PSF 2020 Inc. lists "The Corporation" as its name for service via the Secretary of State and is located at 3921 14 Avenue, Brooklyn, New York, 11218.

24.    PSF, LLC is a limited liability company registered in the State of New York. PSF, LLC. lists "The LLC" as its name for service via the Secretary of State and is located at 520 8th

---

[2] The Trustee settled with MNS Funding, LLC [Docket Report 1491], however, the dismissal of MNS was without prejudice and did not release claims unknown to the Trustee at the time the Agreement was executed. Only claims unknown to the Trustee at the time of the Settlement are included in this Complaint.

[3] The Trustee settled with SSD Investments [Docket Report 1491], however, the dismissal of SSD was without prejudice and did not release claims unknown to the Trustee at the time the Agreement was executed. Only claims unknown to the Trustee at the time of the Settlement are included in this Complaint.

Avenue, Suite 1001, Attn: Rich Palma, New York, New York, 10008.

25.     Supreme Advance LLC is a limited liability company registered in the State of New York. Supreme Advance LLC's registered agent is File Right LLC located at 5314 16th Avenue, Suite 139, Brooklyn, New York, 11204. Supreme Advance LLC operates under the assumed name: "SNS Funding."

26.     Slate Advance LLC is a limited liability company registered in the State of New York. Slate Advance LLC lists "The LLC" as its name for service via the Secretary of State and is located at 15 America Avenue, Suite 3, Lakewood, New Jersey, 08701. Slate Advance LLC operates under the assumed name: "Slate Advance."

27.     Safe Vault Capital LLC is a limited liability company registered in the State of New York. Safe Vault Capital LLC lists "The Company" as its name for service via the Secretary of State and is located at 12 Bayview Avenue, Suite 321, Lawrence, New York, 11559.

28.     Goldcrest Associates LLC is a limited liability company registered in the State of New York. Goldcrest Associates LLC lists "The LLC" as its name for service via the Secretary of State and is located at 1253 East 28th Street, Brooklyn, New York, 11210.

29.     Parkside Capital Group LLC is a limited liability company registered in the State of New York. Parkside Capital Group LLC's registered agent is USACORP Inc. and is located at 325 Division Avenue, Suite 201, Brooklyn, New York, 11211.

30.     Hybrid Advance LLC is a limited liability company registered in the State of New York. Hybrid Advance LLC's registered agent is Ariel Ilyabayev located at 9918 62nd Drive, Rego Park, New York, 11374.

31.     EOM Business Capital LLC is a limited liability company registered in the State of New York. EOM Business Capital LLC lists "The Limited Liability Company" as its name for service via the Secretary of State and is located at 4615 Surf Avenue, Brooklyn, New York, 11224.

32.     Genesis Equity Group Funding LLC is a limited liability company registered in the State of New York. Genesis Equity Group Funding LLC lists "Genesis Equity Group Funding LLC" as its name for service via the Secretary of State and is located at 5308 13th Avenue, Suite 422, Brooklyn, New York, 11219.

33.     Everyday Group LLC is a limited liability company registered in the State of New York. Everyday Group LLC lists "The LLC" as its name for service via the Secretary of State and is located at 63 Flushing Avenue, Unit 148, Brooklyn, New York, 11205.

34.     World Global Fund is a registered trade name in the State of Wyoming registered to Funding Gateway Inc. whose principal place of business is 1309 Coffeen Avenue, Suite 1200,

Sheridan, Wyoming, 82801.

35.     World Global LLC is a limited liability company registered in the State of Wyoming with its principal place of business located at 1309 Coffeen Avenue, Suite 1200, Sheridan, Wyoming, 82801. World Global LLC's registered agent is Cloud Peak Law, LLC, located at 1095 Sugar View Drive, Suite 500, Sheridan, Wyoming, 82801. On June 1, 2023, World Global LLC changed its name to Glass Media LLC. Andrew Pierce signed World Global LLC's Articles of Incorporation as the organizer.

36.     Funding Gateway Inc. is a corporation registered in the State of Wyoming with its principal place of business located at 1309 Coffeen Avenue, Suite 1200, Sheridan, Wyoming, 82801. Funding Gateway Inc.'s registered agent is Cloud Peak Law, LLC, located at 1095 Sugar View Drive, Suite 500, Sheridan, Wyoming, 82801. Andrew Pierce signed Funding Gateway Inc.'s Articles of Incorporation as an incorporator.

37.     Funding Gateway Inc. is a corporation registered in the State of New York. Funding Gateway Inc. lists "The Corp." as its name for service via the Secretary of State and is located at 5314 16th Avenue, Suite 139, Brooklyn, New York, 11204.

38.     Funding Gateway Inc. is a corporation registered in the State of New Jersey. Service may be effected on this entity through its registered agent: File Right RA Services, LLC, 330 Changebridge Rd., Ste 101, Pine Brook, New Jersey, 07058.

39.     Coast Processing LLC is a limited liability company registered in the State of Florida with its principal place of business located at 7901 4th Street North, Suite 5765, St. Petersburg, Florida, 33702. Coast Processing LLC was registered by Dembitzer.

40.     Vertex Capital (US) Funding LLC is a limited liability company registered in the State of Wyoming with its principal place of business located at 1309 Coffeen Avenue, Suite 1200, Sheridan, Wyoming, 82801. Vertex Capital (US) Funding LLC's registered agent is Cloud Peak Law, LLC, located at 1095 Sugar View Drive, Suite 500, Sheridan, Wyoming, 82801.

41.     Vertex Capital Partners LLC is a limited liability company registered in the State of Wyoming with its principal place of business located at 30 N. Gould Street Suite R, Sheridan, Wyoming, 82801. Vertex Capital Partners LLC's registered agent is Registered Agents Inc. located at 30 N. Gould Street, Suite R, Sheridan, Wyoming, 82801.

42.     Crystal Springs Capital LLC is a limited liability company registered in the State of Florida with its principal place of business located at 1111 Brickell Avenue, Suite 2725, Miami, Florida. Crystal Springs Capital LLC's registered agent is Mark David located at 1111 Brickell Avenue, Suite 2725, Miami, Florida and was registered by SKD Holdings LLC located at 4034

Willow Grove Road, Camden, Delaware, 19934.

43.    Weinman and Associates LLC is a Wyoming Limited Liability Company located in Sheridan, Wyoming.

### RELEVANT DEFENDANT NAMED IN THE 1046 ACTION[4]

44.    Tony Diab ("Diab") is, and at all times mentioned was, an individual residing in the State of California. Diab operated, dominated and controlled LPG, a national debt relief law firm.

### GENERAL ALLEGATIONS

A.    **LPG's BANKRUPTCY CASE**

45.    On March 20, 2023, ("Petition Date") Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, commencing the Bankruptcy Case. Diab made the decision for LPG to file for bankruptcy in order to avoid numerous pending lawsuits.

46.    The Office of the United States Trustee ("UST") filed its *Motion by United States Trustee to Dismiss or Convert Case Pursuant to 11 U.S.C. § 1112(b)* [Bankr. Docket No. 21] and creditors Debt Validation Fund II, LLC; MC DVI Fund 1, LLC; and MC DVI Fund 2, LLC filed the *Motion by DVF and MC DVI to Dismiss Chapter 11 Case Pursuant to 11 U.S.C. §§ 105, 305, 349, & 1112, or in the Alternative Convert This Case to Chapter 7 or Appoint a Trustee* [Bankr. Docket No. 44]. On May 4, 2023, the Court entered its *Order Directing United States Trustee to Appoint Chapter 11 Trustee* [Bankr. Docket No. 58], thereby granting the UST's motion and directing the UST to appoint a Chapter 11 Trustee in the Bankruptcy case.

47.    Pursuant to the *Acceptance of Appointment as Chapter 11 Trustee* [Bankr. Docket No. 63], on May 8, 2023, Trustee accepted his appointment as the Chapter 11 Trustee in the Bankruptcy Case. The Court approved the Trustee's appointment in its *Order Approving the U.S. Trustee's Application for the Appointment of a Chapter 11 Trustee* [Bankr. Docket No. 65].

48.    Pursuant to the Order Confirming Modified First Amended Joint Chapter 11 Plan of Liquidation entered September 9, 2024, and the Notice of Occurrence of Effective Date of Modified First Amended Joint Chapter 11 Plan of Liquidation filed September 24, 2024, Richard A. Marshack also became the Liquidating Trustee of the LPG Liquidation Trust, effective September 24, 2024. [Bankr. Docket Nos. 1646 & 1762].

49.    All claims have been transferred to the Liquidating Trust pursuant to the confirmed plan and Plaintiff brings this action solely in his capacity as the former Chapter 11 Trustee of the

---

[4] On May 25, 2023, the Trustee filed an adversary complaint against a number of Debtor's insiders and fraudulent transferees seeking avoidance of transfers and damages. *See*, Adv. Case No. 8:23-ap-01046 (the "1046 Action"). [Bankr. Docket No. 63.] The 1046 Action remains pending.

Debtor and as the Liquidating Trustee for the LPG Liquidation Trust.

50.     Plaintiff Trustee was not appointed until after the events of the case and, therefore, bases these allegations on information and belief. *See Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) ("The *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible."); *Miller v. City of Los Angeles*, 2014 U.S. Dist. LEXIS 198871, 2014 WL 12610195, at *5 (C.D. Cal. Aug. 7, 2014) (recognizing that the plaintiff's "information and belief" pleading was allowed and "necessary at times"); *see also Mireskandari v. Daily Mail and General Trust PLC*, 2013 U.S. Dist. LEXIS 194437, 2013 WL 12129642, at *4 (C.D. Cal. July 31, 2013) ("The Federal Rules of Civil Procedure allow parties to plead facts on 'information and belief' if the facts 'will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.' ") (citations omitted).

**B.     LPG**

51.     LPG operated a law firm for consumers across the country who sought assistance in contesting or resolving debts they would identify.

52.     The consumers would pay LPG over a period of time via monthly debits from their bank accounts.

53.     The monthly payments were meant to cover all legal services LPG provided to the consumers including validation of the debts, review of documents to determine enforceability, and court appearances to halt lawsuits to obtain judgments.

54.     In certain instances, LPG would file a lawsuit in an effort to eliminate a disputed debt or to prosecute affirmative claims held by the consumers.

55.     LPG mismanaged the consumers' monthly payments.

56.     Diab and others devised a plan to fraudulently transfer funds, client files, client funds, and assets in the form of ACH Receivables (the "ACH Receivables" or "Accounts Receivable") out of LPG to third parties prior to the filing of bankruptcy.

57.     To obtain consumer clients, LPG contracted with marketing companies, who engaged in illegal capping and would advertise or call to solicit consumers to become clients of LPG in exchange for a percentage of the ACH Receivables collected by LPG from the consumers. The marketing affiliates went so far as to assist with the execution of an engagement letter between the consumer and LPG.

58.     In exchange, LPG agreed to pay the marketing affiliates a percentage of the monthly

payments collected by LPG from the consumers.

59.    Because LPG received payments from consumers over time, it often sought financing by borrowing against its future cash flows. This borrowing was not only used to finance operations at LPG, but also to pay the fees owed to the marketing companies for providing the client referrals.

60.    Many of the documents executed in connection with such financing described the transactions as accounts receivable purchase agreements. One such method of financing was the use of Merchant Cash Advance Agreements ("MCA Agreements").

61.    Diab used entities he controlled including, without limitation, Vulcan, Coast Processing, PrimeLogix, Marich Bein, PurchaseCo80 and/or Maverick to divert LPG consumer funds and ACH Receivables. Diab would use numerous ACH processing companies in order to easily transfer millions of dollars from Debtor to these entities he controlled, without oversight or detection, and to avoid payment disputes and complications. The money that flowed from Debtor through these bank accounts to Defendants consisted of Client Funds that Debtor funneled to these entities by means of the ACH processing companies. Debtor also made deposits into these entities' bank accounts such that they received Client Funds directly from Debtor in addition to direct Accounts Receivable.

**C.    WORLD GLOBAL'S MCA AGREEMENTS**

62.    World Global's involvement with LPG began with two predecessor entities, MNS Funding and Vertex Capital, in March 2021 through initial conversations and in April 2021 with an MCA agreement with LPG and MNS Funding.

63.    On information and belief, Dembitzer and Feig's involvement through World Global formally began in or around June 2021 with World Global's first MCA Agreement.

64.    On information and belief, the June 2021 MCA Agreement with World Global was effectively a refinancing—*i.e.*, a no net renewal—of the original MNS Funding MCA Agreement.

65.    On information and belief, the original advance under this first MCA Agreement did not come directly from World Global but instead came indirectly from a third-party (Baruch "Berry" Ungries) in April 2021. On information and belief, this money was deposited into a Vertex Capital account and then transferred to LPG.

66.    On information and belief, the second and third cash advances from Dembitzer, Feig, and World Global to LPG were made in August and September of 2021 in the amounts of $1,500,000 and $500,000, respectively.

67.    In or around the end of June 2021 and into July 2021, in conjunction with the refinancing associated with the first MCA Agreement, Dembitzer, Feig, and World Global negotiated the ACH Agreement with LPG which was formally implemented the last week of July 2021.

68.     Under the ACH Agreement, World Global was to deduct its payments under the MCA Agreements and as well as its processing fees under the ACH Agreement for the ACH transfers from LPG's clients.[5]

69.     The agreements required World Global to transfer the remaining funds to LPG.

70.     On information and belief, Dembitzer, Feig, and World Global syndicated—*i.e.*, sold off—its position under the MCA Agreements to various investors. However, Dembitzer, Feig, and World Global over syndicated their position which resulted in LPG having to make a payment of $500,000 in the summer of 2022 on behalf of World Global to resolve an issue with one of World Global's investors.

71.     Traditional merchant cash advances (MCA agreements) are a variation on "factoring" where a merchant sells a discounted portion of its accounts receivable, and the purchaser receives in return the actual income from the accounts receivable it purchased. The amount paid to purchase the receivables is lower than the expected income thereby giving the seller a source of cash while losing the long-term benefit of the accounts receivable that it sold.

72.     However, the MCA Agreement transfers in this case were loans, not purchases of accounts receivable. The reason for characterizing the transactions as a "purchase" rather than a loan was to avoid the application of usury laws.

73.     Under World Global's MCA Agreements, LPG did not sell the Accounts Receivable to World Global. Instead, LPG pledged its interest in future income to World Global, but the obligation to actually collect the receivable and the risk of non-payment remained with LPG. These transactions were loans, not sales, because under its MCA Agreements, World Global bore little, if any, risk of ownership of the subject receivables.

**a.      Terms of Defendants' MCA Agreements with LPG**

74.     LPG entered into three MCA Agreements with World Global. The first one is dated June 22, 2021, with a purchase price of $3,222,650. (A true and complete copy of the 6/22/21 MCA Agreement is attached as **Exhibit 1**, and is incorporated herein). The terms of the 6/22/21 MCA Agreement are:

| | |
|---|---|
| Purchase Price: | $3,222,650.00 |
| Purchased Amount: | $4,801,748.50 |
| Specified Percentage: | 25% |

---

[5] "Transfer" includes situations where World Global direct debited LPG clients in lieu of an actual payment made or transfer of funds in the traditional sense.

| | |
|---|---|
| Daily Remittance: | $50,000 |
| Term: | 96 business days ($4,801,748.50 / $50,000) |

75.     The effect of these terms is that in exchange for $3,222,650.00, World Global would receive $4,801,748.50 in only 96 business days, or *a return of 1,579,098.00 on its $3,222,651.00 (49%) in just under fourteen weeks.* On information and belief, the Specified Percentage is just an estimate of the Daily Remittance as a percent of LPG's receivables.

76.     Section 2(D) of the agreement reflects World Global's intent to file a UCC lien against Debtor for the Purchase Price.

77.     The second agreement is dated August 17, 2021, with a purchase price of $3,000,000.00. (A true and complete copy of the 8/17/21 MCA Agreement is attached as **Exhibit 2**, and is incorporated herein). The terms of the 8/17/21 MCA Agreement are:

| | |
|---|---|
| Purchase Price: | $3,000,00.00 |
| Purchased Amount: | $4,500,000.00 |
| Specified Percentage: | 25% |
| Daily Remittance: | $50,000 |
| Term: | 90 business days ($4,500,000 / $50,000) |

78.     The effect of these terms is that in exchange for $3,000,000.00, World Global would receive $4,500,000.00 in only 90 business days, or *a return of $1,500,000 on its $3,000,000.00 (50%) in just under 13 weeks.* Again, on information and belief, the 25% Specified Percentage is just an estimate of the Daily Remittance as a percentage of LPG's receivables, but the remittance amount had dropped in only two months from $35,000/day to $20,000/day, reflecting the arbitrary nature of the estimate.

79.     Section 2(D) of the agreement reflects World Global's intent to file a UCC lien against Debtor for the Purchase Price.

80.     The third agreement is dated September 2, 2021, with a purchase price of $550,000. (A true and complete copy of the 9/2/21 MCA Agreement is attached as **Exhibit 3**, and is incorporated herein). The terms of the 9/2/21 MCA Agreement are:

| | |
|---|---|
| Purchase Price: | $550,000.00 |
| Purchased Amount: | $1,094,500.00 |
| Specified Percentage: | 25% |
| Daily Remittance: | $36,483.33 |
| Term: | 30 business days ($1,094,500 / $36,483.33) |

81.     The effect of these terms is that in exchange for $550,000, World Global would receive $1,094,500.00 in only 30 business days, or *a return of $544,500.00 on its $550,000.00 (99% in 6 weeks.* Again, on information and belief, the 25% Specified Percentage is just an estimate of the Daily Remittance as a percentage of LPG's receivables.

82.     The agreement also includes a nonrefundable Underwriting Fee of $130,000.00 to cover underwriting and the ACH debit program or 23.64% of the proposed funding, which totals $216,000 ($550,000 x 12%) and is deemed earned upon signing the agreement. The Underwriting Fee is deducted from the Purchase Price. *See* Agreement, Section 2(A). Section 2(D) of the agreement reflects World Global's intent to file a UCC lien against Debtor for the Purchase Price.

83.     The transfers made pursuant to the World Global MCA Agreements constituted loans with usurious interest rates that were not made in the ordinary course of business.

84.     Under the terms of the World Global MCA Agreements, World Global was receiving repayment for its loan through debits to LPG's bank accounts as reflected by the "Daily Remittance." World Global was not responsible for collecting the Accounts Receivable and thus had not purchased the specified receivables but, instead, had made a loan.

85.     The discrepancy between the interest rate as determined pursuant to the terms of the World Global MCA Agreements and the actual amount owed as a result of the Underwriting Fee being deducted from the Purchase Price is further indication of a loan with regard to the third MCA Agreement.

86.     World Global filed a UCC-1 Financing Statement securing repayment of its loans to LPG, which would not have been appropriate if World Global had purchased LPG's Accounts Receivable and not made loans. (A true and complete copy of the UCC-1 Financing Statement is attached as **Exhibit 4**, and is incorporated herein).

87.     Because the World Global MCA Agreements violated federal and state laws, they are void, unenforceable, and subject to avoidance as fraudulent. Moreover, even if the World Global MCA Agreements were not void for being unlawful, LPG received less than reasonable equivalent value in exchange for incurring purported obligations. As such, LPG's obligations under the World Global MCA Agreements are avoidable as fraudulent transfers.

**b.      Transfers to World Global Pursuant to MCA Agreements**

88.     During the applicable two-year reach-back period and according to records currently available, World Global would have taken $10,393,248.50 of LPG monies under the MCA Agreements. Due to World Global maintaining a separate ACH account through Optimum, discovery

is needed to determine the total amount of unreimbursed money taken by World Global pursuant to the MCA Agreements.

89.    As alleged above, the funds that LPG used to pay World Global consisted of the future ACH Receivables—*i.e.*, deposits from LPG's clients that were required to be held in LPG's client trust accounts and brought to LPG by means of the illegal Affiliate Agreements.

90.    As a result, LPG's transfers of ACH Receivable totaling at least the amount of $10,393,248.50 to World Global pursuant to the MCA Agreements ("Transfers") were fraudulent and must be set aside.

91.    Furthermore, because the MCA Agreements required the money to be paid back with interest in fixed payments, offered no ability to modify or reconcile the daily receivables with the Daily Amount due pursuant to the agreements, and specified percentages of 25%, the loans were usurious and therefore must be set aside.

92.    Additionally, all immediate transferees of World Global for monies received pursuant to the Transfers were fraudulent and must be set aside (the "Alter Ego Transfers").

**D.    WORLD GLOBAL AS ACH PAYMENT PROCESSOR**

93.    As part of the negotiations for MCA Agreements with LPG, World Global acted as one of LPG's ACH payment processors.

94.    LPG had agreements with its clients to provide legal services in exchange for its fees. To pay for the services provided by LPG, most LPG clients agreed to a flat fee paid in installments that the client can bear financially (*e.g.*, a $3,600 flat fee is paid over 12 months at $300/month). Clients permitted LPG to debit their bank accounts on a periodic basis (typically, monthly) for a set amount as set forth in their legal services agreement. An example of a Legal Services Agreement is attached hereto as **Exhibit 5**). LPG had approximately 30,000 clients who were billed in this manner.

95.    In July 2021, World Global through its representatives, Dembitzer and Feig and as part of the negotiations for the MCA Agreements, entered into an oral agreement with LPG to act as a payment processor for LPG and to process ACH debits pursuant to NACHA rules and regulations. In the same month, World Global filed an assumed name of "LPG" with the New York Department of Corporations.

96.    Pursuant to this Agreement, LPG would provide World Global with access to LPG's NACHA files (files containing client bank information). LPG agreed to pay World Global $0.30 per transaction for its ACH services as well as a $500 fee per week to World Global's accountant.

16

97.     On information and belief, the amounts LPG paid World Global under the ACH Agreement in processing fees, administrative fees, and other charges shall be proven at trial and, upon information and belief approximates $7.8MM.

98.     World Global would run the NACHA files at a bank (in this case Optimum) on a daily basis thereby initiating thousands of ACH transactions related to LPG clients.

99.     LPG and World Global, Dembitzer, and Feig selected Optimum to process the ACH transaction in part because of Dembitzer and Feig's personal relationship with Gubin—Optimum's Chairman of the Board and member of the Boards of Directors—and World Global's previous relationship with Optimum.

100.    As part of World Global's ACH processing for LPG, Dembitzer and Feig, through World Global, used the assumed name "LPG" for World Global and opened an account with Optimum using World Global's EIN into which LPG's client ACH transactions were deposited.

101.    The purpose of using World Global's EIN to open the "LPG" account into which LPG client ACH transfers were deposited was to avoid any freeze on the account or other collection mechanisms used by LPG creditors. Gubin knew about this dummy account, but, did nothing.

102.    The LPG ACH account was also one of World Global's MCA accounts out of which it was debiting the amounts owed to its investors from World Global's syndication of its MCA Agreements.

103.    LPG did not have access to this account and could not see the statements or account information.

104.    Dembitzer and Feig, through World Global, were to then transfer the funds from the ACH deposit account, less their fees owed under the ACH and MCA Agreements into a second account, under the name of "LPG Processing."

105.    It was from the LPG Processing account that Dembitzer and Feig, through World Global, released the remaining funds to LPG.

106.    As LPG would later discover, Dembitzer and Feig were wrongfully withholding funds that were supposed to be released to LPG pursuant to the ACH and MCA Agreements.

107.    On information and belief, as of June 2022, Dembitzer and Feig, through World Global, had wrongfully withheld approximately $4,800,000 of additional LPG client funds by not transferring the full amounts of the client ACH transactions less what was owed to World Global under the MCA and ACH Agreements.

108.    In March 2022, LPG elected to terminate World Global as its ACH payment processor and, instead, use a company called EquiPay. During March 2022, LPG began to shift a portion of its

debits to EquiPay, a move that upset World Global, Dembitzer, and Feig who noticed its volume of ACH transactions declining.

109.    On information and belief, on April 6, 2022, Dembitzer learned of LPG's decision to cease use of World Global's ACH services and seek the full release of all LPG money wrongfully held by World Global. In response, Dembitzer, either directly or through his agents/employees, uploaded to Optimum LPG NACHA files spanning from January 2022 through March 2022 so that debit transactions from LPG clients would be entered on April 7, 2022, and pulled on April 8, 2022.

110.    On or about April 8, 2022, World Global, using Optimum's NACHA processing platform ran the NACHA files corresponding to January, February, and March 2022 invoices.

111.    As a result of the reprocessing of the January, February, and March 2022 invoices, and on information and belief, World Global illegally withdrew over $12,000,000 in payments from LPG clients.

112.    They used old, approved ACH payment documentation to improperly withdraw sometimes three or four additional payments from individual clients without approval. The unauthorized transactions effectuated by Dembitzer, Feig, World Global, and Optimum had devastating consequences for LPG, including being contacted by Attorneys General in several states and the loss of approximately 2,000 clients.

113.    When confronted about the unauthorized ACH transactions, Dembitzer claimed it was a "mistake" by his associate "Dante" who had purportedly uploaded the wrong NACHA files and further indicated World Global would refund the money directly to LPG's clients no later than April 12, 2022. Ultimately, this did not happen.

114.    As of June 2022, World Global claims to have issued refunds totaling approximately $1,600,000 to many of LPG's clients and had reimbursed LPG $395,000 to partially reimburse it for approximately $2,000,000 in refunds LPG had issued directly to some of its clients. Many of these refunds were for the unauthorized withdrawals by World Global but also for insufficient funds charges issued by Optimum and LPG client banks.

115.    To date, World Global has refused to produce records showing which clients were debited and in what amounts, preventing LPG from ensuring all clients receive their refunds. World Global claims that it is impossible to see which clients were improperly debited due to Optimum's outdated platform.

116.    In an effort to ensure all clients received refunds, LPG agreed to allow World Global to continue debiting during the month of April 2022. World Global was, on information and belief, purposefully slowing the refund process in order to continue its ability to debit LPG client accounts.

117.    On or about April 28, 2022, LPG elected to terminate its relationship with World Global. LPG's accounting department shut off World Global's access to the LPG NACHA files.

118.    The following day, Dembitzer commenced frantically texting and calling to demand that World Global's access to LPG's NACHA files be restored and in exchange, World Global promised to initiate another refund to LPG clients of $300,000 and additionally reimburse LPG for all refunds it had paid out directly to clients affected by World Global's actions.

119.    Dembitzer insinuated that if World Global's ability to process payments was not restored, there may be adverse consequences to LPG, its clients, and its marketing affiliates. Based on this threat, LPG restored World Global's access to the NACHA files. World Global ran the LPG's NACHA files on April 29, 2022, but never issued additional refunds to LPG clients. By the end of May 2022, LPG ceased using World Global as an ACH processor.

120.    Each transfer of monies from LPG—whether pursuant to the MCA Agreements or the ACH debits—were made at a time when LPG was insolvent, which insolvency is presumed due to Debtor's Ponzi scheme.

121.    World Global's wrongful collection of monies owed to LPG by its clients was a transfer of LPG's interest in those funds and occurred when Debtor was insolvent.

**E.    DEMBITZER AND FEIG'S PERSONAL INVOLVEMENT**

122.    On information and belief, Dembitzer and Feig were fifty-fifty owners and members of World Global.

123.    On information and belief, Dembitzer and Feig did not recognize or follow any corporate formalities in creating or operating World Global.

124.    On information and belief, in addition to causing World Global to wrongfully withhold money deposited by LPG's clients through the ACH transactions and causing World Global to initiate the three months of previously run ACH transactions, Dembitzer and Feig created fake investment companies to funnel the money received under the MCA Agreements out of the LPG deposit account and into their own pockets.

125.    On information and belief, Dembitzer and Feig created shell companies to which they could transfer money from the LPG deposit account and World Global to what appeared to be outside investors but were in reality alter egos of themselves and World Global.

126.    On information and belief and to further conceal these transfers, Dembitzer and Feig had World Global register additional assumed names and then registered those assumed names or similar such names as corporations in other states.

127.    By using both assumed names and separately registered companies, Dembitzer and

Feig sought to further prevent or make more difficult any ability to recover these funds.

128.    On information and belief, each of the Parties listed below is one such alter ego of Dembitzer, Feig, and World Global which potentially received, holds, or otherwise benefitted from monies that were wrongfully taken by Dembitzer, Feig, and World Global as part of the Ponzi scheme ("Alter Egos"):

      a.  LPG Capital LLC

      b.  LPG Holdings LLC

      c.  SSD Investment Group LLC

      d.  Brickstone Group LTD.

      e.  WGF Capital Inc.

      f.  PSF 2020, Inc.

      g.  PSF, LLC

      h.  Slate Advance LLC

      i.  Safe Vault Capital LLC

      j.  Goldcrest Associates LLC

      k.  Parkside Capital Group LLC

      l.  Hybrid Advance LLC

      m.  EOM Business Capital LLC

      n.  Everyday Group LLC

      o.  Crystal Springs Capital LLC

129.    In creating these Alter Egos, Dembitzer and Feig did not recognize or follow corporate formalities.

130.    On information and belief, these Alter Egos were set up to avoid detection of asset transfers.

131.    On information and belief, these Alter Egos shared office space with multiple assumed names and LLCs.

132.    On information and belief, these Alter Egos received and/or hold funds from World Global that are the subject of this Complaint.

133.    On information and belief, these Alter Egos share many of the same names, assumed names, officers and/or directors, principal places of business, registered agents, registering agents, and/or addresses with World Global, Dembitzer, Feig, and/or each other.

134.    On information and belief, World Global, Dembitzer, and Feig created these Alter Egos to conceal monies from LPG and LPG creditors to the benefit of World Global, Dembitzer, and Feig.

135.    On information and belief, each of the Parties listed below are alter egos of Dembitzer and World Global which potentially received, holds, or otherwise benefitted from monies that were wrongfully taken by Dembitzer, Feig, and World Global as part of the Ponzi scheme (the "Dembitzer Alter Egos"):

    a.   World Global Fund

    b.   World Global LLC

    c.   Glass Media LLC

    d.   Funding Gateway Inc. (Wyoming)

    e.   Funding Gateway Inc. (New York)

    f.   Funding Gateway Inc. (New Jersey)

    g.   Genesis Equity Group Funding LLC

    h.   Supreme Advance LLC

    i.   Coast Processing LLC

    j.   Vertex Capital (US) Funding LLC

    k.   Vertex Capital Partners LLC

136.    Ultimately, both Feig and Dembitzer were personally involved in and/or responsible for negotiating World Global's MCA Agreements, World Global's ACH Agreement, soliciting additional investors for World Global's MCA Agreements, carrying out the ACH transactions, and collecting payments from LPG's clients. Accordingly, both Feig and Dembitzer are alter egos of World Global and of each of the Alter Egos and the Dembitzer Alter Egos are mere shell entities set up by Dembitzer as alter egos to escape creditors. The corporate veil of World Global, any Alter Ego of World Global or any Dembitzer Alter Ego should be pierced to allow collection of the fraudulently obtained funds from Feig and Dembitzer.

137.    Monies transferred by World Global, its numerous assumed names, and its Alter Egos to Feig, Dembitzer, other Alter Egos and the Dembitzer Alter Egos are avoidable transfers.

138.    On information and belief, BAT was an affiliate of LPG that performed marketing and payment processing functions for LPG.

139.    On information and belief, Citadel was an affiliate of LPG that performed payment processing functions for LPG.

140.     On information and belief, Validation Partners was an affiliate of LPG that performed marketing and payment processing functions for LPG.

141.     On information and belief, SSD was a company formed and owned by LPG and World Global and monies were paid by LPG's payment processor (BAT) to SSD.

**F.      GUBIN AND OPTIMUM'S PARTICIPATION**

142.     World Global, either directly or through the Alter Egos and Dembitzer Alter Egos, had more than a dozen bank accounts with Optimum. Dembitzer and/or Feig are owners, operators, and/or officers of each Alter Ego of World Global. Dembitzer is the owner of each Dembitzer Alter Ego of World Global.

143.     Gubin is the Chairman of the Board and a Director for Optimum.

144.     Optimum is a bank subject to rules and regulations. Optimum subscribes to the rules and regulations associated with NACHA for its ACH transactions.

145.     On information and belief, Gubin had a personal relationship with Dembitzer, Feig, and World Global prior to World Global, Dembitzer, and Feig's relationship with LPG.

146.     On information and belief, Gubin through his employment and work with Optimum was knowledgeable of NACHA rules.

147.     Under the NACHA rules, ACH processors must not exceed certain return rates. The return rates are in place to maintain the quality of the ACH network and are limited to 0.5% for unauthorized returns, 3.0% for administrative returns, and 15% for overall returns.

148.     On information and belief, Gubin is familiar with ways to circumvent the NACHA rules and regulations, including how to deflate return rates to ensure that ACH transactions would still be allowed to process and to avoid regulatory oversight.

149.     On information and belief, one strategy to deflate an ACH processor's return rate was to have the ACH processor create a number of shell companies, open bank accounts on behalf of those companies, and maintain small balances. The ACH processor then initiates ACH transactions between the companies that are successful thereby lowing the return rate. Gubin was familiar with this process and shared it with Dembitzer, Feig, and World Global.

150.     On information and belief, and together with Gubin and Optimum, Dembitzer, Feig, and World Global created a number of shell companies, among which were some of the Alter Egos and the Dembitzer Alter Egos, and opened bank accounts with Optimum.

151.     For example, a review of Optimum's records show that World Global Fund, Vertex Capital, and Weinman and Associates all shared the same address; other companies such as Coast Processing LLC d/b/a Citadel and d/b/a Vulcan Consulting Group also shared the same address at

839 McCullough Avenue, Apartment 130, Orlando, Florida. These overlapping entities reveal that Gubin and Optimum were aware of the fraudulent activities that World Global, Dembitzer, Feig, LPG, and the other Defendants were engaged in.

152.    On information and belief, and together with Gubin and Optimum, Dembitzer, Feig, and World Global maintained balances within the Optimum bank accounts and initiated ACH transactions that were successful and reduced the return rate of World Global.

153.    On information and belief, Dembitzer, Feig, and World Global were also aware that Gubin and Optimum would not honor UCC-1 Statements. Dembitzer, Feig, and World Global used this knowledge to prevent LPG creditors from collecting against LPG funds held in Optimum.

154.    On information and belief, Dembitzer, Feig, World Global, Gubin, and Optimum, used World Global's assumed name "LPG" to open up a bank account with Optimum under World Global's EIN that was held out as an LPG account into which the ACH transactions involving LPG's clients were deposited. The purpose of opening the World Global "LPG" account was to allow World Global to initiate the ACH transactions for LPG's clients while preventing any LPG creditor from being able to access or freeze the account—effectively hiding the assets from LPG's creditors.

155.    On information and belief, Gubin and Optimum's assistance were for the purpose of furthering the Debtor's Ponzi scheme, as well as World Global's scheme to syphon off and conceal money from LPG, LPG's clients, and LPG's creditors.

156.    On information and belief, for each of the accounts opened by World Global, Dembitzer, and Feig, including but not limited to the accounts opened using some of the Alter Egos and Dembitzer Alter Egos, Gubin and Optimum received direct financial benefit arising from account fees and other transaction fees in an amount to be proven at trial.

157.    On information and belief, Gubin and Optimum received direct financial benefit for every ACH transfer, bank transfer, and other transactions involving World Global, Dembitzer, Feig, and the other Defendants through transaction fees and other processing fees.

158.    Among the transactions discovered in Optimum's bank records are significant sums of money moving from the World Global entities to the Alter Egos including, for example, payments from World Global to Weinman and Associates, for $800,000 and payments to MNS Funding for $512,471.[6]

---

[6] These payments are presumed to be part of the $10,393,248.50 taken by World Global pursuant to the MCA Agreements.

159.    As a financial institution Optimum is required to acquire information sufficient to know the true identities, nature of the business activities, customer base, and product offerings of all entities to which it provides financial services.

160.    As a financial institution Optimum is required to report any suspected fraudulent activity. On information and belief, Optimum was aware of World Global, Dembitzer, Feig, LPG and the other Defendants' fraudulent activity and did not report any of the activity to regulatory authorities, and instead directly assisted in perpetuating and concealing the Ponzi scheme.

161.    Optimum subscribes to NACHA guidelines which require, among other things, that Optimum ensure it has record of proper authority to run ACH transactions submitted by customers like World Global.

162.    Optimum knew or had reason to know that World Global was submitting LPG's NACHA files for ACH transactions for processing but could not have seen any written authorization from LPG for these transactions because none existed. Additionally, Optimum had no written evidence that any of the LPG's clients, whose bank accounts were being drafted through the ACH platform, had authorized World Global to process those transactions.

163.    On or about April 8, 2022, and through April 12, 2022, World Global uploaded three months' worth of ACH transactions for LPG clients and sent them to Optimum for processing (the "Fraudulent ACH Transactions").

164.    Most of the accounts associated with these Fraudulent ACH Transactions had already been debited for the three months for which World Global represented it had authority to take money. Because Optimum processed the prior ACH transactions for World Global for those same LPG clients, it knew or should have known that these were duplicate drafts and were fraudulent. Yet, it allowed the duplicative and fraudulent drafts to go through.

165.    Optimum charged at least $17,955.90 to World Global for the Fraudulent ACH Transactions which charges, on information and belief, were passed on to LPG.

166.    Dembitzer initially explained that the Fraudulent ACH Transactions were the product of mistake by an associate named "Dante".

167.    Then in late May, 2022, Dembitzer provided LPG with three different letters purportedly from Optimum concerning the Fraudulent ACH Transactions. These letters are attached hereto as **Exhibits 6, 7, and 8**). Each letter claims that the Fraudulent ACH Transactions were done by mistake; the second and third letters claimed it was Optimum (and not World Global as represented by Dembitzer) that had made the error. While the May 25, 2022, letter states that Optimum had refunded all charges from the April 8, 2022 debits, this representation was false.

168.    On information and belief, Gubin and Optimum assisted Dembitzer, Feig, and World Global in covering up the Fraudulent ACH Transactions in the spring of 2022 by directing Optimum to draft and send these letters.

169.    Optimum either had no safeguards in place to ensure that the ACH transactions uploaded by World Global were authorized and not fraudulent, or ignored such safeguards due to the cozy relationship between Gubin, Feig, and Dembitzer. Accordingly, Optimum aided and abetted World Global, Dembitzer, and Feig, in orchestrating this fraud and conversion against the LPG and its clients.

170.    LPG, at all relevant times had at least three accounts at Optimum Bank (account nos. ending in 6738, 6712, and 0029).

171.    In addition to the fraudulent transfers pursuant to the MCA Agreements, World Global and its Alter Egos, in conjunction with Optimum, unlawfully retained millions of dollars from LPG and its clients through both the ACH duplicate transactions and through withholding monies from LPG pursuant to the MCA Agreements, monies that the Trustee is allowed to claw back for the benefit of creditors.

**G.    DEFENDANT'S PONZI SCHEME**

172.    The Ponzi Scheme Presumption exists in bankruptcy proceedings.

173.    The Ponzi Scheme Presumption can be utilized to establish a debtor's "intent to defraud future undertakes ([investors]) from the mere fact that a debtor was running a Ponzi scheme. Indeed, no other reasonable inference is possible. A Ponzi scheme cannot work forever. The investor pool is a limited resource and will eventually run dry. The perpetrator must know that the scheme will eventually collapse as a result of the inability to attract new investors. The perpetrator nevertheless makes payments to present investors, which, by definition, are meant to attract new investors. He must know all along, from the very nature of his activities, that investors at the end of the line will lose their money. Knowledge to a substantial certainty constitutes intent in the eyes of the law, *cf. Restatement (Second) of Torts §8A (1963 & 1964),* and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them. A trustee in bankruptcy is not required to show that an operator of a Ponzi scheme was subjectively aware his Ponzi scheme was destined to fail. *In re EPD Inv. Co., LLC,* 114 F.4th at 1153 ("[a] trustee's action to recover assets fraudulently conveyed in the course of a Ponzi scheme does not require that the trustee also prove the Ponzi-scheme operator was subjectively aware his Ponzi scheme was destined to fail.").

174.    "But if all the debtor receives in return for a transfer is the use of the defendant's money to run a Ponzi scheme, there is nothing in the bankruptcy estate for creditors to share. In fact, by helping the debtor perpetuate his scheme, the transfers exacerbate the harm to creditors by increasing the amount of claims while diminishing the debtor's estate. In such a situation, the use of the defendant's money cannot objectively be called 'reasonably equivalent value.' " *In re Independent Clearing House Co.* 77 B.R. at 859. Therefore, "[t]he trustee can avoid the transfers if they were preferential or fraudulent. Transfers to investors in a Ponzi scheme are preferential and fraudulent. Therefore, they constitute 'property of the estate,' and the trustee can recover them." *Id. At 853 n.17* (citations omitted). *See also, In re EPD Inv. Co., LLC*, 114 F.4th 1148, 1152 & 1157 (9th Cir. 2024).

175.    Debtor was operating a Ponzi scheme that utilized affiliates and several other entities as investors to continue its unlawful business practices by using funds provided by current investors to attract new investors hoping for very high returns. Therefore, the Debtor was running a Ponzi scheme and the Ponzi Scheme Presumption can be utilized to infer that the Debtor had the intent to defraud investors within the meaning of 11 U.S.C. section 548(a)(1). This is evidenced by the Court in this Bankruptcy Case declaring that Debtor was operating a Ponzi scheme when it stated the following:

> It is important to note that this Court has never received any significant and trustworthy evidence that Debtor accomplished meaningful results for its clients, but only anecdotal examples of viable success for its clients. By reviewing the Estate's claims register, there is evidence of consumer claims for the fraud and demanded but undelivered refunds of approximately $500 million. There is ample evidence that the pre-petition Debtor never placed the collected funds into an attorney-client trust account, and that the Debtor or its principals simply looted the payments received through the client automatic withdrawals, stiffing both the clients and outside attorneys who may have been working on client cases with hopes of being paid. There is also evidence before the Court that Debtor was running a Ponzi scheme and paying some outside (or "network") attorneys with funds obtained from new clients. In this case, it appears that some of the "lenders" may have been serving as "investors," hoping for very high returns before "the music

stopped." The Ninth Circuit has recently explained, "[b]y definition, a Ponzi scheme is destined to fail because the pool of available investors is not limitless. When the Ponzi scheme operator's pool of investors inevitably runs dry, the scheme collapses and the swindler and their entities often end up in bankruptcy or equitable receivership. See generally David R. Hague, Expanding the Ponzi Scheme Presumption, 64 DePaul L. Rev. 867 (2015). In bankruptcy, the court-appointed trustee is tasked with taking immediate control of the entity, ceasing ongoing fraudulent activity, locating and collection assets for the bankruptcy or receivership estate, and achieving a final, equitable distribution of the remaining assets. See 11 U.S.C § 704." *Kirkland v. Rund (In re EPD Inv. Co., LLC),* 2024 U.S. App. LEXIS 21363, at *15 (9th Cir. Aug. 23, 2024). Finally, there is evidence that Debtor was encumbering (or as some creditors assert, "double or triple selling") their accounts or receivables to multiple lenders. With respect to Greyson's requested Administrative Claim [Dk. 676], and as more fully described in the concurrently entered order denying the claim, there has been no evidence presented that any work allegedly performed by Greyson assisted any clients or added any value to the Estate.

*See, Case 8:23-bk-10571-SC*, Doc 1545 Fn. 5

176.     Moreover, since the Transfers were made with the intent to further the Ponzi scheme, the Debtor did not receive any objectively reasonable equivalent value for the Transfer, the Trustee can avoid the Transfers because they were preferential and fraudulent.

177.     The transactions between World Global and LPG were loans, not the sales of receivables, and as such World Global was serving as an "investor," hoping for very high returns before "the music stopped."

### H.    LPG'S PREPETITION CREDITORS

178.     Debtor was insolvent when each Transfer or Alter Ego Transfer was made. This insolvency is evidenced in part by the fact that 14 separate UCC-1 statements were of record securing debts of the Debtor as of September 1, 2022. These statements remained unreleased as of the Petition Date. These statements either reflected secured liens against the Debtor's assets then owned or

thereafter acquired, or provided evidence of the assignment or sale of substantial portions of the Debtor's future income.

179.    When the Transfers were made, these prior UCC-1 statements secured the repayment of the following claimed amounts that are currently known to Trustee and are allegedly owed by the Debtor: (i) $2,374,004.82 owed to Fundura Capital Group as evidenced by Proof of Claim No. 335 purportedly secured by a UCC statement filed on or about May 19, 2021; (ii) approximately $15 million dollars owed to MNS Funding, LLC as evidenced by Proof of Claim No. 1060 purportedly secured by a UCC statement filed on or about May 28, 2021; (iii) approximately $5,000,000 owed to Azzure Capital, LLC as evidenced by Proof of Claim No. 127 secured by a UCC statement filed on or about May 28, 2021; and (iv) approximately $1.5 million dollars owed to Diverse Capital, LLC purportedly secured by UCC statements filed on or about September 15, 2021, and December 1, 2021.[7]

180.    World Global filed a UCC-1 securing "All accounts receivable, receipts, instruments, contract rights and other rights to receive the payment of money, patents, chattel paper, licenses, leases and general intangibles, whether now owned acquired or arising, and all of the debtor's books and records relating to any of the foregoing. The Debtors were listed as The Litigation Practice Group, PC, B.A.T. Inc., Vulcan Consulting Group LLC, Daniel Stephen March, Tony Diab, and Brian Reale." *See* Exhibit 4.

181.    As alleged above, LPG was borrowing against its assets and future income, often on unfavorable terms, not only to finance operations at LPG, but also to pay the fees owed to the marketing affiliates for providing it with consumer clients and to pay other loans to creditors that were in default or about to be in default as part of Diab's scheme to keep LPG creditors at bay for a long as possible until he could transfer LPG's assets, client files including Client Funds, and ACH Receivables to other entities under his control. Pursuant to the agreements with the marketing companies, significant percentages of future payments were already promised to be paid to the marketing affiliates from whatever future income the Debtor would receive. And, of course, the Client Fund payments LPG received in the form of ACH Receivables were also trust funds paid to LPG by its law firm clients, subject to return of funds in the event of a request for refund or termination of the representation before LPG had earned the funds. In this regard, except to the extent earned, the ACH Receivables also represented a liability of the Debtor.

---

[7] Trustee reserves all rights, claims, and defenses with respect to these and any other purported secured or unsecured claims.

182.    In addition, on Debtor's Schedule E/F [Bankr. Docket No. 33], Debtor scheduled 11 unsecured creditors with priority unsecured claims totaling $374,060.04. These priority unsecured creditors include Indiana Dept. of Revenue, Dept. of Labor and Industries, Arizona Dept. of Economic Security, Arkansas Dept. of Finance & Admin., California Franchise Tax Board, Georgia Dept. of Labor, Internal Revenue Service, Mississippi Dept. of Revenue, Nevada Dept. of Taxation, Utah State Tax Commission, and Wisconsin Dept. of Revenue (collectively, "Priority Unsecured Creditors").

183.    Another group of creditors that Debtor listed on its Schedule E/F [Bankr. Docket No. 33] are nonpriority unsecured creditors. Those 58 creditors have scheduled claims totaling $141,439,158.05 and include Ajilon; Anthem Blue Cross; Azevedo Solutions Groups, Inc.; Carolina Technologies & Consulting Invoice; Collaboration Advisors; Credit Reporting Service Inc.; CT Corporation – Inv.; Debt Pay Pro; Document Fulfillment Services; EnergyCare, LLC; Exela Enterprise Solutions; First Legal Network, LLC; GHA Technologies Inc.; Harrington Electric, Inc.; Imagine Reporting; Juize, Inc.; Krisp Technologies, Inc.; Liberty Mutual; Marc Lemauviel – Allegra; MarkSYS Holdings, LLC; Netsuite-Oracle; Pitney Bowes; Rapid Credit, Inc.; SBS Leasing A Program of De Lage Landen; Security Solutions; Sharp Business Systems; Streamline Performance, Inc.; Thomson Reuters; Twilio, Inc.; Nationwide Appearance Attorneys; Executive Center, LLC; Outsource Accelerator, Ltd.; TaskUs Holdings, Inc.; Marich Bein, LLC; Validation Partners; MC DVI Fund 1, LLC; MC DVI Fund 2, LLC; Debt Validation Fund II, LLC; Tustin Executive Center; LexisNexus; JP Morgan Chase; Business Centers of America; Michael Schwartz; Anibal Colon Jr.; Kathleen Lacey; David Ulery; Kimberly Birdsong; Kevin Carpenter; Karen Suell; Gloria Eaton; Carolyn Beech; Debra Price; Kenneth Topp; Darcey Williamson, Trustee; James Hammett; Johnny Rizo; Beverly Graham; Kathleen Scarlett; and Geneve and Myranda Sheffield (collectively, "Nonpriority Unsecured Creditors" and, together with the Secured Creditors and Priority Unsecured Creditors, "Prepetition Creditors").

184.    The bar date for submitting claims as part of the Bankruptcy Case has passed and Plaintiff now knows that over 5,000 claims were filed totaling approximately $500 million in priority, secured and unsecured claims.

### FIRST CLAIM FOR RELIEF

**Avoidance, Recovery, and Preservation of Two-Year Actual Fraudulent Transfers
[11 U.S.C. §§ 548(a)(1)(A), 550, and 551]**

185.    Plaintiff incorporates the preceding paragraphs as if fully restated herein.

186.    The client files, including Client Funds, ACH Receivables, fees paid to Optimum for

the ACH Receivables, and funds that are the subject of the Transfers and Alter Ego Transfers alleged herein are those of LPG and the Debtor's Estate.

187.   The Affiliate Agreements, the MCA Agreements, and the ACH Transactions, and all or a portion of the Transfers alleged herein, occurred within the two years prior to the Petition Date.

188.   On or after the date that such agreements were executed and the Transfers were made, entities to which Debtor was or became indebted include the Prepetition Creditors.

189.   The Transfers happened while Debtor was insolvent or was rendered insolvent. Debtor's insolvency is presumed because it was operating a Ponzi Scheme, thus all transfers were fraudulent during the relevant look-back period.

190.   Because the referrals from the affiliates to Debtor are illegal under federal and state law, they are void; and, because the MCA Agreements transferred funds of the referrals, they too are void. Any purported consideration constitutes unlawful consideration, which cannot constitute reasonably equivalent value. The terms of the MCA Agreements also were usurious and failed to confer reasonably equivalent value to the Debtor.

191.   The Affiliate Agreements, MCA Agreements, the Transfers of funds and the Alter Ego Transfers are avoidable as fraudulent pursuant to 11 U.S.C. §§ 548(a)(1)(A), 550, and 551 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against Debtor's Estate under 11 U.S.C. § 502, or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

192.   The Affiliate Agreements, MCA Agreements, the Transfers and the Alter Ego Transfers should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(A), and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

193.   The Transfers and Alter Ego Transfers to be avoided should include any and all transfers of LPG monies, directly or indirectly, to World Global and each and every Alter Ego of World Global, each and every Dembitzer Alter Ego, every business for which World Global or its successors in interest and/or Alter Egos have registered to do business under a different taxpayer identification number, and transfers made to or for the benefit of Dembitzer or Feig, including the Dembitzer Alter Egos.

### SECOND CLAIM FOR RELIEF

**Avoidance, Recovery, and Preservation of Two Year Constructive Fraudulent Transfers**

**[11 U.S.C. §§ 548(a)(1)(B), 550, and 551]**

194.    Plaintiff incorporates the preceding paragraphs as if fully restated herein.

195.    The Affiliate Agreements, MCA Agreements, ACH Agreement, and all or a portion of the Transfers or Alter Ego Transfers alleged herein occurred within the two years prior to the Petition Date.

196.    On or after the date that such agreements were executed and such Transfers were made, entities to which Debtor was or became indebted include the Prepetition Creditors.

197.    The Transfers happened while Debtor:

    a.    was insolvent or became insolvent as a result;

    b.    was engaged or was about to engage in a transaction for which any property remaining with Debtor was of unreasonably small capital; or

    c.    intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

198.    Because the referrals from Affiliates to Debtor are illegal under federal and state law; and, because any Transfer of the Accounts Receivable, any loans repaid with the Accounts Receivable, and any settlement funded with the Accounts Receivable also are illegal under federal and state law, they are void and subject to avoidance as fraudulent.

199.    The Affiliate Agreements, MCA Agreements, ACH Agreement and the Transfers of Debtor's funds are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and Cal. Civ. Code §§ 3439.04(a) and 3439.07 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against his Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

200.    The Affiliate Agreements, MCA Agreements, ACH Agreement, and the Transfers should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(B), and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

201.    The Transfers to be avoided should include any and all transfers of LPG monies made, directly or indirectly to World Global and each and every Alter Ego of World Global, each and every Dembitzer Alter Ego, every business for which World Global or its successors in interest and/or Alter Egos have registered to do business under a different taxpayer identification number, and transfers made to or for the benefit of Dembitzer or Feig, including the Dembitzer Alter Egos.

202.    The payment of $500,000.00 made by LPG on behalf of World Global to satisfy the promissory note as alleged in paragraph 69 of the Complaint is also recoverable as a fraudulent conveyance.

## THIRD CLAIM FOR RELIEF

### Demand for Accounting

203.    Plaintiff incorporates the preceding paragraphs as if fully restated herein.

204.    Plaintiff is entitled to an accounting from World Global to discern the exact amount of LPG monies withheld by and/or taken by World Global, directly and/or indirectly through the Alter Egos, which were never refunded or reimbursed, despite representations to the contrary.

205.    Plaintiff is entitled to an accounting from Optimum to determine the amount of fees it received from World Global, World Global d/b/a LPG, the Alter Egos, and all affiliates, successors and assigns thereof, for processing ACH transactions involving LPG clients.

206.    Upon information and belief, Optimum charged overdraft fees to LPG clients when the duplicate ACH transactions were processed. Those monies should be disgorged.

207.    Optimum charged World Global fees for the ACH Transactions, including the Fraudulent ACH Transactions. Those fees were borne out of illegal transactions and therefore, are subject to recapture by the Trustee for the benefit of creditors.

208.    The bank records produced by Optimum reflect substantial sums of money transferred from the World Global bank accounts to the Alter Egos and other affiliates. An accounting is necessary to determine which entities are holding money belonging to Debtor.

209.    Many of the World Global bank statements from the spring of 2022 reflect payments to "MCA backoffice" and individuals who, through an accounting, Plaintiff can identify as persons holding assets of the Debtor.

210.    As further described in the Third Claim for Relief, the multitude of trade names and aliases requires an accounting of each and every defendant.

### FOURTH CLAIM FOR RELIEF

### Turnover of Estate Property

### [11 U.S.C. § 542]

211.    Plaintiff incorporates the preceding paragraphs as if fully restated herein.

212.    One or more of the Defendants has possession or control over property of the Estate in the form of the Transfers made pursuant to illegal, unenforceable, and avoidable agreements.

213.    For example, World Global set up each of the Alter Egos and assumed names referenced in this Complaint for the purpose of hiding the illegal transfers from LPG and its creditors.

214.    The identical assumed names set up by Funding Gateway, Inc. and World Global (*see, e.g. ¶¶ 35-37)* are no accident. These trade names were set up to ensure continuity of cash flow to the World Global, Alter Egos, the Dembitzer Alter Egos and owners to escape collection by LPG and its

creditors.

215.    The Genesis Equity Group LLC, a New York entity, shares offices with World Global. Another company was set up as The Genesis Equity Group, LLC in Wyoming, presumably at the direction of Dembitzer. These multiple trade name and company filings were used to sow confusion and allow the World Global entities and the Alter Egos and Dembitzer Alter Egos to obtain money fraudulently and transfer funds to and from their collective accounts with names similar enough to avoid detection by creditors and purposefully hold and keep funds of LPG, LPG clients and LPG creditors.

216.    Upon information and belief, these funds were transferred amongst the Alter Egos, Dembitzer and Feig, and the Dembitzer Alter Egos.

217.    The Transfers are not of inconsequential value to the Estate. Upon information and belief, these transfers exceed $20,000,000.00.

218.    The funds that are the subject of the Transfers are paramount to Debtor's ability to pay creditors.

219.    Accordingly, upon entry of judgment that the agreements are avoided or declared unenforceable, Trustee is entitled to a further judgment for turnover of the Transfers pursuant to 11 U.S.C. § 542.

## FIFTH CLAIM FOR RELIEF

**Fraud and/or Conversion/Theft Committed by World Global, Dembitzer, Feig, the Alter Egos, the Dembitzer Alter Egos – the Fraudulent ACH Transactions**

220.    Plaintiff incorporates the preceding paragraphs as if fully restated herein.

221.    World Global at the direction of Feig and Dembitzer, improperly uploaded thousands of ACH files belonging to LPG's clients which had previously been uploaded and paid out and thereby directed Optimum to debit those accounts on or about April 8, 2022 through April 12, 2022 (see ¶155).

222.    The Fraudulent ACH Transactions, which equaled approximately $10,000,000.00, were approved and processed by Optimum with a significant amount remaining unreimbursed.

223.    Dembitzer and Feig knew that the Fraudulent ACH Transactions were fraudulent and unauthorized at the time they were sent for processing.

224.    The NACHA files that were used to process the ACH Transactions were previously used in January, February, and March of 2022, and Optimum should have known the resubmission was fraudulent.

225.    Dembitzer and Feig intended to harm LPG in authorizing the Fraudulent ACH

Transactions in retaliation for LPG's intent to stop using World Global as an ACH processor.

226.    As a direct and proximate result of the Fraudulent ACH Transactions, LPG was harmed by the full amount of Fraudulent ACH Transactions less any reimbursements that may have been made.

227.    Despite promises for reimbursement by both World Global and Optimum, it did not receive full reimbursement from either entity. Upon information and belief, the unreimbursed funds are now in the hands of Dembitzer, Feig, and/or the Alter Egos set up to continue the fraud on other companies like LPG. Transfers to these entities and individuals are fraudulent transfers.

228.    At the time of the Fraudulent ACH Transactions, Debtor was insolvent.

229.    World Global, Feig, and Dembitzer intended to exercise dominion and control over the ACH files in a manner inconsistent with LPG's rights related to those files.

230.    LPG demanded return of the funds World Global received pursuant to the Fraudulent ACH Transactions, but upon information and belief, little to none of those monies were returned.

231.    Accordingly, World Global, Feig, Dembitzer, the Alter Egos and the Dembitzer Alter Egos are liable to LPG for the Fraudulent ACH Transactions and converting funds for their own use without authority.

## SIXTH CLAIM FOR RELIEF

**Fraud and/or Conversion/Theft Committed by World Global, Dembitzer, Feig, the Alter Egos and the Dembitzer Alter Egos – Unreimbursed Funds from the MCA Agreements and ACH Agreement**

232.    Plaintiff incorporates the preceding paragraphs as if fully restated herein.

233.    From July 2021 until at least May 2022, World Global, Dembitzer, and Feig withheld payments that were supposed to be remitted to LPG pursuant to the MCA Agreements and the ACH processing agreement. These funds were diverted to entities owned or controlled by World Global and/or LPG, thus bypassing LPG's creditors. World Global's involvement in processing these payments ties them directly to Diab's scheme. Moishe Gubin was, upon information and belief, participating actively in this scheme to assist World Global. As a result, both he and Optimum are also liable for the unreimbursed funds.

234.    Upon information and belief, Feig, Dembitzer, the Alter Egos, and other affiliated entities, including upon information and belief, the Dembitzer Alter Egos, received payments meant for LPG thereby laundering assets stripped from LPG. Their participation was crucial in executing the fraudulent transfers and preventing LPG from meeting creditor obligations.

## SEVENTH CLAIM FOR RELIEF

**Aiding and Abetting Fraud and/or Conversion/Theft by Optimum and Gubin**

235.    Plaintiff incorporates the preceding paragraphs as if fully restated herein.

236.    Optimum was the primary bank used by World Global to process the ACH Transactions and the Fraudulent ACH Transactions and was also a banking institution where LPG had numerous accounts.

237.    Optimum and Gubin substantially assisted in the unauthorized diversion of LPG's client payments by processing fraudulent transactions, despite clear indications that these transactions were outside the normal parameters of LPG's operations.

238.    Optimum failed to investigate suspicious transactions and, upon information and belief, knew through its director, Gubin, the nature of the relationship between World Global and LPG, yet allowed it to persist to the detriment of LPG and its creditors.

239.    Optimum failed to follow its own regulatory responsibilities when it processed the Fraudulent ACH Transactions well outside the parameters of typical transaction patterns and openly and obviously involving accounts that had already been debited for the months at issue.

240.    Optimum had already processed the accounts associated with the Fraudulent ACH Transactions for the same amounts and time periods and therefore Optimum had actual knowledge that the Fraudulent ACH Transactions were illegal.

241.    Optimum failed to reverse the ACH Fraudulent Transactions and failed to refund the monies due to the consumers whose accounts were wrongfully debited by the intentional acts of World Global, Dembitzer, and Feig.

242.    Accordingly, Optimum and Gubin substantially assisted in aiding and abetting the conversion perpetrated by World Global, Dembitzer, and Feig, by allowing the Fraudulent ACH Transactions to remain in place knowing World Global and the Alter Egos would benefit from the conversion and that it too, would benefit from keeping fees associated with the Transactions.

243.    As a direct and proximate result of the substantial assistance by Gubin and Optimum aiding and abetting the fraud and conversion of World Global, Feig, and Dembitzer, Plaintiff is entitled to claw back from Optimum all funds processed through the ACH Transactions and the Fraudulent ACH Transactions.

## EIGHTH CLAIM FOR RELIEF

### Aiding and Abetting by Defendants Optimum and Gubin

### [Cal. Civ. Code § 3439, et seq.]

244.    Plaintiff incorporates the preceding paragraphs as if fully restated herein.

245.    Defendants Optimum and Gubin, on information and belief, had direct knowledge of

the fraudulent transfers, transactions, agreements, and other fraudulent conduct that were used to perpetuate and conceal the Ponzi Scheme and other fraudulent transfers of money.

246. Defendants Optimum and Gubin with the foregoing knowledge, intended to, and did directly, help Debtor in perpetuating and concealing the Ponzi scheme and fraudulent transfers of money.

247. Upon information and belief, Defendant Optimum and Gubin assisted, and did actually engage in, the commission of fraud, unlawful Enterprise, and Ponzi scheme by coordinating, facilitating, and directing payments and transfers of monies and executing documents in furtherance of concealing the true nature of their fraudulent and criminal activity related to the Enterprise and the Ponzi scheme.

248. The injuries to Plaintiff, the Debtor's Estate and to its creditors directly, proximately and reasonably foreseeably resulting from and caused by these violations of Cal. Civ. Code § 3439, et seq., include, without limitation, hundreds of thousands of dollars in improperly transferred and acquired monies.

249. Plaintiff and the Debtor's Estate also suffered damages by incurring attorney's fees and costs associated with the prosecution of Defendant Optimum and Gubin unlawful activities.

250. In knowingly and intentionally failing to report Dembitzer, Feig, World Global, LPG, and the other Defendants' fraudulent conduct to the appropriate regulatory agencies, and instead directly assisting with the continuation of the fraudulent conduct, including but not limited to the Ponzi scheme, those defrauded by Debtor and the other Defendants would not have been defrauded. Gubin and Optimum are therefore liable for all debts incurred by Debtor following their participation in the Ponzi scheme.

## NINTH CLAIM FOR RELIEF

### Conspiracy to Commit Fraud

251. Plaintiff incorporates the preceding paragraphs as if fully restated herein.

252. Defendants, including World Global, Dembitzer, Feig, Optimum, and Gubin entered into an agreement with Diab along with third party entities owned or controlled by them to engage in a scheme to defraud LPG and its creditors. This scheme involved fraudulent transfers of LPG client receivables and other financial misconduct intended to conceal assets from creditors and render LPG insolvent.

253. In furtherance of the conspiracy, World Global and the other co-defendants knowingly and willfully committed the following overt acts:

a. Facilitating the transfer of LPG client receivables under a series of fraudulent MCA

Agreements which provided no reasonably equivalent value and diverted assets away from LPG;

    b.   Withholding payments owed to LPG and engaging in unauthorized ACH transfers to conceal the receivables from LPG's creditors; and

    c.   Aiding in the execution of triple withdrawals from client accounts which contributed to LPG's collapse.

254.    Defendants acted with specific intent to assist Diab and other co-conspirators in defrauding LPG creditors by concealing LPG receivables and diverting funds to third party entities for their benefit. World Global, Feig, Dembitzer, Optimum, and Gubin's participation in the conspiracy was knowing, willful, and undertaken with the intent to harm LPG's creditors.

255.    As a direct and proximate result of the conspiracy and the wrongful acts committed by World Global and the co-conspirators, LPG suffered significant financial harm, including insolvency, inability to pay its creditors, and depletion of its receivables. This harm was the foreseeable and intended consequence of the conspiracy.

256.    Optimum substantially assisted and encouraged the fraudulent scheme facilitating the unauthorized ACH payments, failing to monitor or investigate unusual transactions, and aiding and abetting the diversion of LPG client receivables to third-party entities which was critical to the success of the fraudulent scheme.

257.    In knowingly and intentionally failing to report Dembitzer, Feig, World Global, LPG, and the other Defendants' fraudulent conduct to the appropriate regulatory agencies, and instead directly assisting with the continuation of the fraudulent conduct, including but not limited to the Ponzi scheme, those defrauded by Debtor and the other Defendants would not have been defrauded. Gubin and Optimum are therefore liable for all debts incurred by Debtor following their participation in the Ponzi scheme.

## RESERVATION OF RIGHTS

258.    Plaintiff reserves the right to bring all other claims or causes of action that Plaintiff may have against Defendants, on any and all grounds, as allowed under the law or in equity, including but not limited to, those claims not known by the Trustee at this time but that he may discover during the pendency of this adversary proceeding.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for a judgment as follows:

**On The First, Second, and Fourth Claims for Relief:**

1.      Avoiding Debtor's obligations under the Affiliate Agreements, MCA Agreements, and avoiding, recovering, and preserving the Transfers and Alter Ego Transfers made to and by LPG and World Global in the total aggregate amount of not less than $20,000,000.00, the exact amount to be proven at trial.

**On the Third Claim for Relief:**

2.      An order for an accounting to include every financial transaction by and/or among LPG and its affiliated entities, Diab, any Defendant, any Alter Ego or Dembitzer Alter Ego between June 2021 through the present.

**On the Fifth Claim for Relief:**

3.      Damages equal to the full amount of the unreimbursed Fraudulent ACH Transactions, punitive damages, pre-judgment interest, post-judgment interest, and attorney's fees associated with collection of the monies converted by World Global, the Alter Egos, and the Dembitzer Alter Egos including, but not limited to, Feig and Dembitzer.

**On the Sixth Claim for Relief:**

4.      Damages equal to the amount of money wrongfully withheld and diverted by World Global, Feig, Dembitzer, Optimum and Gubin believed to be $4,800,000.00, the exact amount to be proven at trial.

**On the Seventh, Eighth, and Ninth Claims for Relief:**

5.      Damages equal to the full amount of the unreimbursed Fraudulent ACH Transactions, punitive damages, pre-judgment interest, post-judgment interest, and attorney's fees associated with collection of the monies converted by World Global, the Alter Egos, the Dembitzer Alter Egos, including, but not limited to, Feig and Dembitzer in an amount not less than $20,000,000.00, the exact amount to be proven at trial.

6.      Damages equal to the full amount of all consumer and investor debts against Debtor following Gubin and Optimum's assistance and furtherance of the Ponzi scheme and fraudulent activity engaged in by Defendants of not less than $145,000,000, the exact amount to be proven at trial.

**On All Claims for Relief:**

7.      Awarding pre-judgement interest at the maximum legal rate from the date of the Complaint to the date of judgment;

8.      Awarding post-judgment interest at the maximum legal rate from the date of judgment until the date the judgment is paid in full;

9.      Awarding costs of suit incurred here; and

10.     Granting such other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated: March 10, 2025                    DINSMORE & SHOHL LLP


By: /s/ Karen S. Hockstad
    Karen S. Hockstad (OH061308)
    Karen.hockstad@dinsmore.com
    Matthew H. Sommer (OH101721)
    Matthew.sommer@dinsmore.com
    DINSMORE & SHOHL, LLP
    191 W. Nationwide Blvd., Suite 200
    Columbus, OH 43215
    Tele:  614.628-6880
    Fax:    614.628-6890


    CHRISTOPHER CELENTINO (131688)
    christopher.celentino@dinsmore.com
    CHRISTOPHER B. GHIO (259094)
    christopher.ghio@dinsmore.com
    YOSINA M. LISSEBECK (201654)
    yosina.lissebeck@dinsmore.com
    DINSMORE & SHOHL LLP
    655 West Broadway, Suite 800
    San Diego, CA 92101
    Tele: 619.400.0500
    Fax: 619.400.0501

    *Attorneys for Richard A. Marshack, Plaintiff
    and Trustee of the LPG Liquidation Trust*