CHRISTOPHER CELENTINO (131688)
Christopher.Celentino@dinsmore.com
CHRISTOPHER B. GHIO (259094)
Christopher.Ghio@dinsmore.com
YOSINA M. LISSEBECK (201654)
Yosina.Lissebeck@dinsmore.com
**DINSMORE & SHOHL LLP**
655 West Broadway, Ste 800
San Diego, California 92101
Tele: (619) 400-0500
Fax: (619) 400-0501

JOSHUA I. MARRONE (Co. Bar 58503)
Joshua.marrone@dinsmore.com
JEANA M. MASON (Co. Bar 54302)
Jeana.mason@dinsmore.com
**DINSMORE & SHOHL LLP**
1775 Sherman St. Ste 2600
Denver, CO 80203
Tele: (303) 831-6958
Fax: (303) 296-0344
(Admitted pro hac vice)

Attorneys for Richard A. Marshack, Plaintiff and Trustee of the LPG Liquidation Trust

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION

| | |
|---|---|
| In re: | CHAPTER 11 |
| The Litigation Practice Group, P.C., | Case No. 8:23-bk-10571-SC |
| Debtor. | Adv. Proc. No. _____ |
| Richard A. Marshack, Trustee of the LPG Liquidation Trust, | **COMPLAINT FOR:** |
| Plaintiff, | **(1) AVOIDANCE, RECOVERY, AND PRESERVATION OF 2-YEAR ACTUAL FRAUDULENT TRANSFERS;** |
| v. | **(2) AVOIDANCE, RECOVERY, AND PRESERVATION OF 2-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS;** |
| Revolv3, Inc., a Delaware limited liability corporation; and Nathan Johnston, individually, | **(3) AVOIDANCE, RECOVERY, AND PRESERVATION OF 4-YEAR ACTUAL FRAUDULENT TRANSFERS;** |
| Defendants. | **(4) AVOIDANCE, RECOVERY, AND PRESERVATION OF 4-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS;** |
| | **(5) TURNOVER; AND** |

**(6) AIDING AND ABETTING**

Judge:     Hon. Scott C. Clarkson

For his *Complaint for (1) Avoidance, Recovery, and Preservation of 2-Year Actual Fraudulent Transfers; (2) Avoidance, Recovery, and Preservation of 2-Year Constructive Fraudulent Transfers; (3) Avoidance, Recovery, and Preservation of 4-Year Actual Fraudulent Transfers; (4) Avoidance, Recovery, and Preservation of 4-Year Constructive Fraudulent Transfers; (5) Turnover; and (6) Aiding and Abetting* ("Complaint"), plaintiff Richard A. Marshack, the former Chapter 11 Trustee and current trustee of the LPG Liquidation Trust ("Trustee" or "Plaintiff") for the bankruptcy estate ("Estate") of debtor The Litigation Practice Group P.C. ("Debtor" or "LPG") in the above-captioned bankruptcy case ("Bankruptcy Case"), alleges and avers as follows:

## STATEMENT OF JURISDICTION, NATURE OF PROCEEDING, AND VENUE

1.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E), (H) and (O), 1334(b), and General Order No. 13-05 of the District Court for the Central District of California because this is a core proceeding arising in and/or related to the Bankruptcy Case, which is a case under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code"), and which is pending in the United States Bankruptcy Court for the Central District of California, Santa Ana Division ("Bankruptcy Court").

2.     Regardless of whether this proceeding is core, non-core, or otherwise, Plaintiff consents to the entry of a final order and judgment by the Bankruptcy Court.

3.     Defendant is notified that Rule 7008 of the Federal Rules of Bankruptcy Procedure requires Defendant to plead whether consent is given to the entry of a final order and judgment by the Bankruptcy Court.

4.     Venue of this adversary proceeding properly lies in this judicial district pursuant to 28 U.S.C. § 1409(a) because this proceeding is related to Debtor's pending Bankruptcy Case.

## THE PARTIES

5.     Plaintiff is Richard A. Marshack, the former Chapter 11 Trustee for the bankruptcy estate ("Estate") of debtor The Litigation Practice Group P.C. ("Debtor" or "LPG") and current

liquidating trustee of the LPG Liquidation Trust (collectively, "Trustee" or "Plaintiff").

6.    Debtor LPG is, and at all material times was, a professional corporation organized, existing, and in good standing under the laws of the State of California, with its principal place of business in Tustin, California.

7.    Defendant, Revolv3, Inc. ("Revolv3"), is, and at all material times represented that it was, a limited liability corporation existing under the laws of the State of Delaware, with its principal place of business in Laguna Beach, California.

8.    Upon information and belief, Defendant Nathan Johnston ("Johnston") is, and at all material times was, an individual residing in the State of California. Defendant Johnston operated, managed, and/or controlled Defendant Revolv3's relationship with LPG.

9.    Revolv3 may be served by first class mail postage prepaid upon its registered agent for service of process, United States Corporation Agents, Inc., 131 Continental Drive, Suite 305, Newark, DE 19713.

10.    Upon information and belief, Johnston may be served by first class mail postage prepaid to his residence at 9841 E. Texas Ave, Mesa, AZ 85212.

## GENERAL ALLEGATIONS

### A.    The Bankruptcy Case

11.    On March 20, 2023 ("Petition Date"), Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, commencing the Bankruptcy Case.

12.    Tony Diab ("Diab") is, and at all relevant times was, an individual who operated, dominated and controlled LPG.

13.    Diab made the decision for LPG to file for bankruptcy in order to avoid numerous pending lawsuits.

14.    The Office of the United States Trustee ("UST") filed its *Motion by United States Trustee to Dismiss or Convert Case Pursuant to 11 U.S.C. § 1112(b)* [Bankr. Docket No. 21] and creditors Debt Validation Fund II, LLC; MC DVI Fund 1, LLC; and MC DVI Fund 2, LLC filed the *Motion by DVF and MC DVI to Dismiss Chapter 11 Case Pursuant to 11 U.S.C. §§ 105, 305, 349, & 1112, or in the Alternative Convert This Case to Chapter 7 or Appoint a Trustee* [Bankr.

Docket No. 44]. On May 4, 2023, the Court entered its *Order Directing United States Trustee to Appoint Chapter 11 Trustee* [Bankr. Docket No. 58].

15.    Pursuant to the *Acceptance of Appointment as Chapter 11 Trustee* [Bankr. Docket No. 63], on May 8, 2023, Trustee accepted his appointment as the Chapter 11 Trustee in the Bankruptcy Case. The Court approved the Trustee's appointment in its *Order Approving the U.S. Trustee's Application for the Appointment of a Chapter 11 Trustee* [Docket No. 65].

16.    Pursuant to the Order Confirming Modified First Amended Joint Chapter 11 Plan of Liquidation entered September 9, 2024, and the Notice of Occurrence of Effective Date of Modified First Amended Joint Chapter 11 Plan of Liquidation filed September 24, 2024, Richard A. Marshack became the Liquidating Trustee of the LPG Liquidation Trust, effective September 24, 2024. [Bankr. Docket Nos. 1646 & 1762].

17.    Trustee was not appointed until after events of the case and, therefore, bases these allegations on information and belief. *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) ("The *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible."); *Miller v. City of Los Angeles*, 2014 U.S. Dist. LEXIS 198871, 2014 WL 12610195, at *5 (C.D. Cal. Aug. 7, 2014) (recognizing that the plaintiff's "information and belief" pleading was allowed and "necessary at times"); *see also Mireskandari v. Daily Mail and General Trust PLC*, 2013 U.S. Dist. LEXIS 194437, 2013 WL 12129642, at *4 (C.D. Cal. July 31, 2013) ("The Federal Rules of Civil Procedure allow parties to plead facts on 'information and belief' if the facts 'will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.'" (citations omitted)).

18.    All claims have been transferred to the Liquidating Trust pursuant to the confirmed plan and Plaintiff brings this action solely in his capacity as the Chapter 11 Trustee for the benefit of Debtor's Estate and its creditors.

/ / /

/ / /

4

**B.     Protective Order**

19.     On or about May 2, 2024, Plaintiff filed that certain Notice and Motion for Entry of Protective Order (the "Protective Order Motion"). On June 3, 2024, the Court entered its Order Granting Motion for Entry of Protective Order and the Protective Order [Docket No. 1270] (the "Protective Order").

20.     By its own terms, the Protective Order applies to this adversary proceeding and governs all discovery conducted herein.

**C.     LPG**

21.     LPG operated a law firm for consumers across the country who sought assistance in contesting or resolving debts they would identify.

22.     The consumers would pay LPG over a period of time via monthly debits via ACH pulls from their bank accounts.

23.     The monthly payments were meant to cover all legal services LPG provided to the consumers including validation of the debts, review of documents to determine enforceability, and court appearances to halt lawsuits to obtain judgments.

24.     In certain instances, LPG would file a lawsuit in an effort to eliminate a disputed debt or to prosecute affirmative claims held by the consumers.

25.     LPG mismanaged the consumers' monthly payments by failing to segregate and hold client payments in trust until fees had been earned by LPG.

26.     Diab and other defendants devised a plan to fraudulently transfer funds, client files, client funds and assets in the form of ACH Receivables (the "ACH Receivables" or "Accounts Receivable") out of LPG to third parties prior to the filing of bankruptcy.

27.     To obtain consumer clients, LPG contracted with marketing companies, who engaged in illegal capping and would advertise or call to solicit consumers to become clients of LPG in exchange for a percentage of the ACH Receivables collected by LPG from the consumers. The marketing affiliate went so far as to assist with the execution of an engagement letter between the consumer and LPG.

/ / /

28.    In exchange, LPG agreed to pay the marketing affiliates a percentage the monthly payments collected by LPG from the consumers. LPG would also enter into purchase agreements, at a discount, with various marketing affiliates in an attempt to regain control over the receivables that the marketing companies had an interest in.

29.    Because LPG received payments from consumers over time, it often sought financing by borrowing against its future cash flows. This borrowing not only was used to finance operations at LPG, but also to pay fees owed to the marketing companies for providing client referrals.

30.    Many of the documents executed in connection with such financing described the transactions as accounts receivable purchase agreements.

31.    Diab used entities he controlled including, without limitation, Vulcan, Coast Processing, PrimeLogix, and/or Maverick to divert LPG consumer funds and ACH Receivables. Diab would use numerous ACH processing companies in order to easily transfer millions of dollars from Debtor to these entities he controlled, without oversight or detection, and to avoid payment disputes and complications.  The money that flowed from Debtor through these bank accounts consisted of Client Funds that Debtor funneled to these entities by means of the ACH processing companies.  Debtor also made deposits into various entities' bank account such that they received Client Funds directly from Debtor in addition to future Accounts Receivable.

**D.    Diab's Scheme**

32.    As discussed above, the Debtor borrowed against its future ACH Receivables by entering into accounts receivable purchase agreements or similar transactions with marketers and factoring companies.  In many instances, the ACH Receivables were transferred multiple times over to different alleged purchasers or factoring companies.

33.    Given that all and/or a substantial portion of Debtor's ACH Receivables were transferred and/or sold multiple times over there were more claims for payment from any one ACH Receivable that that Receivable generated. Accordingly, prior to the petition date, Debtor engaged in a scheme to defraud its creditors by transferring ownership of the ACH Receivables to various fraudulent conveyance partners as alleged herein and the various adversary proceedings brought by the Trustee, including, but not limited to, the 1046 Action.

**E.**     **Diab's Control over LPG's Payment Processing**

34.     Diab used entities he controlled including, without limitation, Validation Partners, Vulcan Consulting Group, Coast Processing, PrimeLogix, LLC, and/or Maverick Management LLC to divert LPG consumer funds and ACH Receivables.  Diab would use numerous ACH processing companies in order to easily transfer millions of dollars from Debtor to these entities he controlled, without oversight or detection, and to avoid payment disputes and complications.  The money that flowed from Debtor through these bank accounts consisted of Client Funds that Debtor funneled to these entities by means of the ACH processing companies, such as Defendant Revolv3.  Debtor regularly made deposits into these entities' bank accounts such that they received Client Funds directly from Debtor.  This is the manner in which Diab continued to exploit the ACH Receivables, by using Revolv3 to divert Debtor money to entities such as Prime Logix, as further described below.

**F.**     **LPG's Ponzi Scheme**

35.     Debtor was running a Ponzi scheme that utilized the Defendants and others as a facilitator, and the Debtor attracted new investors by making Transfers to them using the funds provided by another investor, thereby continuing the Ponzi scheme with each new investor that the Debtor could find.

36.     Moreover, since the Transfers were made with the intent to further the Ponzi scheme, the Debtor did not receive an objectively reasonable equivalent value for the Transfers, and the Trustee can avoided the Transfers because they were preferential and fraudulent.

**G. Defendant Revolv3**

37.     Defendant Revolv3 was an entity that served as an intermediary between LPG and Worldpay. Revolv3 managed, directed, processed, and advised LPG on many of its ACH transactions.

38.     LPG contracted with Revolv3 for access to Revolv3's Cloud SaaS payment processing platform.

39.     In exchange, LPG agreed to pay, and in fact paid, Revolv3 certain fees for each transaction that Revolv3's SaaS platform processed.

40.     On or about March 21, 2023, Debtor entered into a Master Subscription Agreement with Defendant Revolv3 ("Agreement"). A true and accurate copy of the Agreement is attached as **Exhibit 1**, and incorporated here.

41.     The Agreement states:

"Subject to Customer's compliance with this Agreement and the Order Form, Revolv3 hereby grants to Customer during the term of the applicable Subscription Period a non-exclusive, limited, non-transferable right to access and use the Cloud Services via Revolv3's internet-hosted web site, solely (a) for use by Authorized Users and no other users, in accordance with the User Terms of Use (if applicable), (b) in support of Customer's internal business purposes, and (c) in strict accordance with this Agreement and the Order Form. Subject to Customer's compliance with this Agreement and the Order Form, Revolv3 hereby grants to Customer a non-exclusive, limited, non- transferable right to use and copy the Documentation, solely for the purpose of using the Cloud Services pursuant to this Section 2.1." *See* **Ex. 1**.

42.     Pursuant to the Agreement, Defendant Revolv3 processed numerous transactions for LPG, drafting funds from consumer accounts through ACH transactions and directing them to an account agreed upon by LPG and Revolv3.

43.     Pursuant to the Agreement, Debtor agreed to pay Revolv3 as follows: "$0.15 for each payment approval commencing on the Order Form Effective Date." *See* **Ex. 1**.

44.     In entering the contract with Revolv3, Diab discussed LPG's impending bankruptcy with Johnston.

45.     Initially, Diab sought for Revolv3 to process transactions for a new entity, Phoenix Law ("Phoenix"), to whom Diab was transferring clients from LPG to avoid the impact of bankruptcy.

46.     Diab advised Johnston that, problematically, other payment processers would not provide sufficient credit to process transactions for new the entities Diab was creating.

/ / /

/ / /

47.     Because Phoenix did not have a lengthy payment history, Johnston knew that Phoenix would not be approved to process the number and dollar amounts of transactions that LPG clients would generate.

48.     Johnston—knowing that LPG was facing bankruptcy and thus a significant credit risk—advised Diab to use LPG as the applicant and utilize LPG's more lengthy payment history.

49.     Although Revolv3, through Johnston, knew that it would be processing transactions for Phoenix, it nonetheless utilized LPG's application to obtain necessary credit approval.

50.     Furthermore, Johnston advised Diab to continue to identify "LPG" as the entity pulling ACH transactions on the clients' bank statements, rather than Phoenix.

51.     Johnston specifically formulated this plan to reduce potential chargebacks; Johnston knew that the clients would not know what or who "Phoenix Law" was, or that it was now the entity servicing files. Johnston sought to hide the true details of Revolv3's ACH transactions to avoid problematic chargeback rates.

52.     Additionally, Johnston and Diab conspired to process transactions and send the funds to an account outside of LPG—this decision was explicitly made so that future incoming funds would avoid LPG accounts, thereby concealing and rendering those funds unavailable in LPG's bankruptcy proceedings.

53.     LPG's Agreement with Revolv3 worked to fund transactions that violate Sections 6151 and 6155 of the California Business and Professional Code, which prohibit referrals of potential clients to attorneys unless registered with the State Bar of California. Cal. Bus. & Prof. Code § 6155. "Referral activity" includes "any entity 'which, in person, electronically, or otherwise, refers the consumer to an attorney or law firm not identified' in the advertising." *Jackson v. LegalMatch.com*, 42 Cal. App. 5th 760, 775 (2019). A referral includes receiving information from potential clients and sending that information to lawyers, even when the advertiser does not advertise the name of the attorneys and the clients do not clear the name of the potential attorney after the referral occurred. *Id.*

54.     Further, if any effect of an agreement is to accomplish an unlawful purpose, the agreement may be declared illegal regardless of the intention of the parties. *Stockton Morris Plan*

*Co. v. Cal. Tractor & Equip. Corp.*, 112 Cal. App. 2d 684, 690 (1952) (citing *Fewel & Dawes, Inc. v. Pratt*, 17 Cal. 2d 85, 91 (1941)). This remains true regardless of whether the contract has been performed. *Stevens v. Boyes Hot Springs Co.*, 113 Cal. App. 479, 483 (1931) (A contract by a corporation to purchase its own stock has the effect of illegally withdrawing and paying to a stockholder a part of the capital stock of the corporation and is illegal and void, regardless of the fact that the contract is fully performed by the sellers and partially performed by the corporation.); *Mansfield v. Hyde*, 112 Cal. App. 2d 133, 139 (1952), overruled, *Fomco, Inc. v. Joe Maggio, Inc.*, 8 Cal. Rptr. 459 (1960) (Where object of statute requiring licenses is to prevent improper persons from engaging in particular activity, or is for purpose of regulating occupation or business for protection of public, imposition of penalty amounts to prohibition against engaging in occupation or business without license, and contract made by unlicensed person in violation of statute is invalid.); *Firpo v. Murphy*, 72 Cal. App. 249, 252 (1925) (A contract to pay commissions to a real estate broker is illegal and he is not entitled to recover thereon where he fails to secure the license required by law to carry on his business.).

55.    Revolv3, through its Agreement with LPG, (1) processed unlawful transactions for Phoenix/Prime Logix despite knowing that only LPG was authorized to process the ACH Receivables; (2) intentionally hid the nature of the transactions and the name/identity of the parties ultimately obtaining the funds from consumers; and (3) knowingly and intentionally processed transactions and funds in a way that bypassed LPG's account with the specific intent to avoid bankruptcy proceedings.

56.    Because the Agreement and its execution violated federal and state law, it is void, unenforceable, and subject to avoidance as fraudulent.

57.    Unlawful consideration is that which is: "(1) contrary to an express provision of law; (2) contrary to the policy of express law, though not expressly prohibited; or (3) otherwise contrary to good morals." Cal. Civ. Code § 1667. "If any part of a single consideration for one or more objects, or of several considerations for a single object, is unlawful, the entire contract is void." Cal. Civ. Code § 1608.

/ / /

**H.    Mishandling of ACH Receivables**

58.    As discussed above, Revolv3 and Johnston where aware that the ACH Receivables being processed through their platform were owned by LPG and fraudulently transferred to Phoenix.

59.    Revolv3 and Johnston knew that the funds received following processing of the ACH Receivables were being deposited into an account owned and controlled by Prime Logix, and not LPG.

60.    Each transfer of monies from LPG via the processing of ACH Receivables and depositing of funds into the Prime Logix bank account was made at a time when LPG was insolvent, which insolvency is both presumed due to Debtor's Ponzi scheme and evidenced by Debtor's Petition, filed on March 20, 2023, prior to the start of any processing of ACH Receivables by Revolv3.

61.    For the avoidance of doubt, Revolv3 and Johnston were aware at all times they processed the transactions discussed below that neither Prime Logix nor Phoenix was authorized to process the ACH Receivables.

**I.    Transactions Processed by Defendant Revolv3**

62.    During the period of the Agreement, Defendant Revolv3 processed transactions totaling at least $19,837,277.77 from March 20, 2023, through August 7, 2023 ("Transfers"). Of those transactions, $6,113,499.81 resulted in chargebacks. True and accurate amounts are subject to proof at trial. A true and accurate list of the known transfers processed by Revolv3 is attached as **Exhibit 2**, and incorporated here.

63.    Since appointment, the Trustee has recovered approximately $5,024,678.89 of the fraudulent Revolv3 Transfers.

64.    The Transfers are based on updated figures as of January of 2025.

**J.    LPG's Prepetition Creditors**

65.    Debtor was insolvent when each Transfer was made. This insolvency is evidenced in part by the fact that 14 separate UCC-1 statements were of record securing debts of the Debtor as of September 1, 2022. These statements remained unreleased as of the Petition Date. These statements either reflected secured liens against the Debtor's assets then owned or thereafter

acquired, or provided evidence of the assignment or sale of substantial portions of the Debtor's future income.

66.     When the Transfers were made, these prior UCC-1 statements secured the repayment of the following claimed amounts that are currently known to Trustee and are allegedly owed by the Debtor: (i) $2,374,004.82 owed to Fundura Capital Group as evidenced by Proof of Claim No. 335 purportedly secured by a UCC statement filed on or about May 19, 2021; (ii) approximately $15 million dollars owed to MNS Funding, LLC as evidenced by Proof of Claim No. 1060 purportedly secured by a UCC statement filed on or about May 28, 2021; (iii) approximately $5,000,000 owed to Azzure Capital, LLC as evidenced by Proof of Claim No. 127 secured by a UCC statement filed on or about May 28, 2021; and (iv) approximately $1.5 million dollars owed to Diverse Capital, LLC purportedly secured by UCC statements filed on or about September 15, 2021, and December 1, 2021.[1]

67.     As alleged above, LPG was borrowing against its assets and future income, often on unfavorable terms, not only to finance operations at LPG, but also to pay the fees owed to other defendants and marketing affiliates for providing it with consumer clients. Pursuant to the agreements with the marketing companies, significant percentages of future payments were already promised to be paid to the marketing affiliates from whatever future income the Debtor would receive.

68.     In addition, on Debtor's Schedule E/F [Bankr. Docket No. 33], Debtor scheduled 11 unsecured creditors with priority unsecured claims totaling $374,060.04. These priority unsecured creditors include Indiana Dept. of Revenue, Dept. of Labor and Industries, Arizona Dept. of Economic Security, Arkansas Dept. of Finance & Admin., California Franchise Tax Board, Georgia Dept. of Labor, Internal Revenue Service, Mississippi Dept. of Revenue, Nevada Dept. of Taxation, Utah State Tax Commission, and Wisconsin Dept. of Revenue (collectively, "Priority Unsecured Creditors").

/ / /

---

[1] Trustee reserves all rights, claims, and defenses with respect to these and any other purported secured or unsecured claims.

69.     Another group of creditors that Debtor listed on its Schedule E/F [Bankr. Docket No. 33] are nonpriority unsecured creditors. Those 58 creditors have scheduled claims totaling $141,439,158.05 and include Ajilon; Anthem Blue Cross; Azevedo Solutions Groups, Inc.; Carolina Technologies & Consulting Invoice; Collaboration Advisors; Credit Reporting Service Inc.; CT Corporation – Inv.; Debt Pay Pro; Document Fulfillment Services; EnergyCare, LLC; Exela Enterprise Solutions; First Legal Network, LLC; GHA Technologies Inc.; Harrington Electric, Inc.; Imagine Reporting; Juize, Inc.; Krisp Technologies, Inc.; Liberty Mutual; Marc Lemauviel – Allegra; MarkSYS Holdings, LLC; Netsuite-Oracle; Pitney Bowes; Rapid Credit, Inc.; SBS Leasing A Program of De Lage Landen; Security Solutions; Sharp Business Systems; Streamline Performance, Inc.; Thomson Reuters; Twilio, Inc.; Nationwide Appearance Attorneys; Executive Center, LLC; Outsource Accelerator, Ltd.; TaskUs Holdings, Inc.; Marich Bein, LLC; Validation Partners; MC DVI Fund 1, LLC; MC DVI Fund 2, LLC; Debt Validation Fund II, LLC; Tustin Executive Center; LexisNexus; JP Morgan Chase; Business Centers of America; Michael Schwartz; Anibal Colon Jr.; Kathleen Lacey; David Ulery; Kimberly Birdsong; Kevin Carpenter; Karen Suell; Gloria Eaton; Carolyn Beech; Debra Price; Kenneth Topp; Darcey Williamson, Trustee; James Hammett; Johnny Rizo; Beverly Graham; Kathleen Scarlett; and Geneve and Myranda Sheffield (collectively, "Nonpriority Unsecured Creditors" and, together with the Secured Creditors and Priority Unsecured Creditors, "Prepetition Creditors").

70.     As of the filing of this complaint, 2543 claims have been filed with the bankruptcy Court. As of July 1, 2024, Omni Agent Solutions, has received an additional 5675 claims. While Trustee has not reviewed all claims as of the date of this complaint, and reserves all rights to object to those claims, the total amount is in excess of $500,000,000.

**FIRST CLAIM FOR RELIEF**

**Count I - Avoidance, Recovery, and Preservation of Actual Fraudulent Transfers**

**[11 U.S.C. §§ 548(a)(1)(A), 550, and 551]**

71.     Plaintiff realleges and incorporates here by reference each and every allegation contained in paragraphs 1 through 61 as though set forth in full.

72.     The Agreement and all or a portion of the Transfers occurred within the two years

prior to the Petition Date.

73.    On or after the date that such agreements were executed and the Transfers were made, entities to which Debtor was or became indebted include the Prepetition Creditors.

74.    The Transfers happened while Debtor was insolvent or rendered Debtor insolvent.

75.    Despite Debtor's obligation to the Prepetition Creditors, Debtor continued to pay Revolv3 portions of sums received from consumers under the Agreement, which constitutes an illegal capping agreement between Revolv3 and Debtor. Any obligation of the Debtor arising from such agreement is also avoidable as fraudulent.

76.    Despite Debtor's obligation to the Prepetition Creditors, Revolv3 continued to process client transactions, which were illegal under federal and state laws.

77.    The Transfers were made with actual intent to hinder, delay, or defraud creditors of Debtor.

78.    Revolv3, through Johnston, directed funds to accounts outside of LPG with the specific intent to hide funds from LPG's creditors and the bankruptcy proceedings.

79.    The Debtor's conduct was done with oppression, fraud, and malice, as defined in Civil Code section 3294, entitling the Trustee to, in addition to the actual damages, exemplary or punitive damages for making an example of the Debtor and to punish the Debtor.

80.    The Agreement and the Transfers of Debtor's funds are avoidable as fraudulent pursuant to 11 U.S.C. §§ 548(a)(1)(A), 550, 551, and the common law tort of intentional fraudulent transfers by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against the Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

81.    The Agreement and Transfers should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(A) and under the common law tort of intentional fraudulent transfers, and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

/ / /

/ / /

**SECOND CLAIM FOR RELIEF**

**Count II - Avoidance, Recovery, and Preservation of Constructive Fraudulent**

**Transfers Against Defendants**

**[11 U.S.C. §§ 548(a)(1)(B), 550, and 551]**

82.    Plaintiff realleges and incorporates here by reference each and every allegation contained in paragraphs 1 through 72 as though set forth in full.

83.    The Agreement and all or a portion of the Transfers occurred within the two years prior to the Petition Date.

84.    On or after the date that such agreements were executed and such Transfers were made, entities to which Debtor was or became indebted include the Prepetition Creditors.

85.    The Transfers happened while Debtor:

a.    was insolvent or became insolvent as a result;

b.    was engaged or was about to engage in a transaction for which any property remaining with Debtor was of unreasonably small capital; or

c.    intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

86.    Because the transactions processed by Revolv3 were illegal under federal and state law, they are void and subject to avoidance as fraudulent. Any purported consideration constitutes unlawful consideration, which cannot constitute reasonably equivalent value. Thus, at the time the Agreement was executed and the Transfers made, Debtor received less than reasonably equivalent value.

87.    Furthermore, the Debtor did not receive the reasonably equivalent value of the Transfers processed by Revolv3 because by using the money coming through Revolv3 to run a Ponzi scheme there is nothing in Estate for the creditors to share. Rather, the Transfers exacerbate the harm to creditors by increasing the amount of claims while diminishing the Debtor's Estate— indeed, Revolv3 specifically diverted funds away from LPG accounts to avoid any increase in the Debtor's available Estate. In this situation, the use of the funds to further the Debtor's Ponzi scheme cannot be consideration for the Transfers and cannot objectively be called reasonably equivalent

1  value.

2      88.    Any transfers processed by Revolv3 can be avoided by the Plaintiff since the

3  Transfers are preferential and fraudulent such that they constitute property of the Estate in which

4  the Plaintiff can recover.

5      89.    The Agreement and the Transfers should be avoided as fraudulent under 11 U.S.C.

6  § 548(a)(1)(B), and such transferred property, or the value thereof, should be recovered and

7  preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

8                    **THIRD CLAIM FOR RELIEF**

9      **Count III - Avoidance, Recovery, and Preservation of Actual Fraudulent**

10                 **Transfers Against Defendants**

11    **[11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.04(a) and 3439.07]**

12     90.    Plaintiff realleges and incorporates here by reference each and every allegation

13  contained in paragraphs 1 through 80 as though set forth in full.

14     91.    The Agreement and all or a portion of the Transfers occurred within the four years

15  prior to the Petition Date.

16     92.    On or after the date that such agreements were entered and such Transfers were

17  made, entities to which Debtor was or became indebted include the Prepetition Creditors.

18     93.    Despite Debtor's obligation to the Prepetition Creditors, Debtor continued to pay

19  Revolv3 sums received from consumers under the Agreement, based on Transfers that were the

20  result of illegal capping agreements between Debtor and market affiliates.

21     94.    Because the referrals from the various market affiliates to Debtor are illegal under

22  federal and state law, they are void and subject to avoidance as fraudulent. Any purported

23  consideration constitutes unlawful consideration, which cannot constitute reasonably equivalent

24  value. Thus, at the time the agreements were executed and the Transfers made, Debtor received

25  less than reasonably equivalent value.

26     95.    Additionally, because the transactions processed by Revolv3 were illegal under

27  federal and state law, they are void and subject to avoidance as fraudulent. Any purported

28  consideration constitutes unlawful consideration, which cannot constitute reasonably equivalent

1  value. Thus, at the time the Agreement was executed and the Transfers made, Debtor received less

2  than reasonably equivalent value.

3       96.    The Transfers Revolv3 processed to facilitate these agreements were made with

4  actual intent to hinder, delay, or defraud creditors of Debtor.

5       97.    Revolv3, through Johnston, knew that the Transfers were unlawful, and

6  intentionally processed the Transfers to hide the funds from LPG's bankruptcy proceedings and

7  LPG's creditors.

8       98.    The Debtor's conduct was done with oppression, fraud, and malice, as defined in

9  Civil Code section 3294, entitling the Trustee to, in addition to the actual damages, exemplary or

10 punitive damages for making an example of the Debtor and to punish the Debtor.

11      99.    The Agreement and the Transfers of Debtor's funds are avoidable as fraudulent

12 pursuant to 11 U.S.C. § 544(b) and Cal. Civ. Code §§ 3439.04(a) and 3439.07 by one or more

13 creditors who held and hold unsecured claims against Debtor that were and are allowable against

14 the Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. §

15 502(e), including, without limitation, the Prepetition Creditors.

16      100.   Accordingly, the Agreement and the Transfers should be avoided as fraudulent under

17 11 U.S.C. §§ 544(b) and Cal. Civ. Code §§ 3439.04(a) and 3439.07, and such transferred property,

18 or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11

19 U.S.C. §§ 550 and 551 and Cal. Civ. Code § 3439.07.

20                          **FOURTH CLAIM FOR RELIEF**

21   **Count IV - Avoidance, Recovery, and Preservation of Constructive Fraudulent**

22                          **Transfers Against Defendants**

23   **[11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.05, and 3439.07]**

24      101.   Plaintiff realleges and incorporates here by reference each and every allegation

25 contained in paragraphs 1 through 90 as though set forth in full.

26      102.   The Agreement and all or a portion of the Transfers occurred within the four years

27 prior to the Petition Date.

28      103.   The Transfers happened while Debtor:

  a. was insolvent or became insolvent as a result;

  b. was engaged or was about to engage in a transaction for which any property remaining with Debtor was of unreasonably small capital; or

  c. intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

104. Because the referrals from the various market affiliates to Debtor are illegal under federal and state law, they are void and subject to avoidance as fraudulent. Any purported consideration constitutes unlawful consideration, which cannot constitute reasonably equivalent value. Thus, at the time the agreements were executed and the Transfers made, Debtor received less than reasonably equivalent value.

105. Additionally, because the transactions processed by Revolv3 were illegal under federal and state law, they are void and subject to avoidance as fraudulent. Any purported consideration constitutes unlawful consideration, which cannot constitute reasonably equivalent value. Thus, at the time the Agreement was executed and the Transfers made, Debtor received less than reasonably equivalent value.

106. The Transfers Revolv3 processed to facilitate these agreements were made with actual intent to hinder, delay, or defraud creditors of Debtor.

107. Revolv3, through Johnston, knew that the Transfers were unlawful, and intentionally processed the Transfers to hide the funds from LPG's bankruptcy proceedings and LPG's creditors.

108. The Agreement and the Transfers of Debtor's funds are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and Cal. Civ. Code §§ 3439.05 and 3439.07 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against the Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

109. Accordingly, the Agreement and the Transfers should be avoided as fraudulent under 11 U.S.C. §§ 544(b) and Cal. Civ. Code §§ 3439.05 and 3439.07, and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11

U.S.C. §§ 550 and 551 and Cal. Civ. Code § 3439.07.

## FIFTH CLAIM FOR RELIEF

### Count V - Turnover of Estate Property Against Defendants

### [11 U.S.C. § 542]

110.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 98 as though set forth in full.

111.    Revolv3 has possession or control over property of the Estate in the form of the Transfers made pursuant to illegal and unenforceable agreements.

112.    The Transfers are not of inconsequential value to the Estate.

113.    The funds that are the subject of the Transfers are paramount to Debtor's ability to pay creditors.

114.    Accordingly, Trustee is entitled to a judgment for turnover of the Transfer pursuant to 11 U.S.C. § 542.

## SIXTH CLAIM FOR RELIEF

### Aiding and Abetting

### (Against Defendant Johnston and Revolv3)

### [Cal. Civ. Code § 3439.07]

115.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 103 as though set forth in full.

116.    Johnston, upon information and belief, individually and through Revolv3 and Revolv3, had knowledge of the fraudulent transfers, transactions, and agreements that were used to perpetuate and conceal the Ponzi Scheme and fraudulent transfers.

117.    Johnston and Revolv3, with the foregoing knowledge, intended to, and did, help Debtor in perpetuating and concealing the Ponzi scheme and fraudulent transfers of money.

118.    Upon information and belief, Johnston and Revolv3 assisted, and did actually engage in, the commission of fraud, unlawful Enterprise, and Ponzi scheme by coordinating, facilitating, and directing payments and transfers of monies in furtherance of concealing the true nature of their fraudulent and criminal activity related to the Enterprise and the Ponzi scheme.

119.    The injuries to Plaintiff, the Debtor's Estate and to its creditors directly, proximately and reasonably foreseeably resulting from and caused by these violations of Cal. Civ. Code § 3439.04, and include, without limitation, hundreds of thousands of dollars in improperly transferred and acquired monies.

120.    Plaintiff and the Debtor's Estate also suffered damages by incurring attorney's fees and costs associated with the prosecution of Johnson's and Revolv3's unlawful activities.

121.    Pursuant to Cal. Civ. Code § 3439.04 and § 3439.07, Plaintiff is entitled to damages to the fullest extent of the law and costs of suit, including attorney's fees, from Johnston and Revolv3.

### RESERVATION OF RIGHTS

122.    Plaintiff reserves the right to bring all other claims or causes of action that Plaintiff may have against Defendants, on any and all grounds, as allowed under the law or in equity, including but not limited to, those claims not known by the Trustee at this time but that he may discover during the pendency of this adversary proceeding.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for a judgment as follows:

**On The First, Second, Third, and Fourth Claims for Relief:**

1.    Avoiding, recovering, and preserving the Transfers against Defendant;

**On the Fifth Claim for Relief:**

2.    Ordering Defendant to immediately turn over the Transfers and/or Preference Transfers;

**On the Sixth Claim for Relief:**

3.    Awarding Plaintiff compensatory damages in an amount to be determined at trial;

/ / /

/ / /

/ / /

/ / /

/ / /

1      **On All Claims for Relief:**

2          4.      Awarding costs of suit incurred here; and

3          5.      Granting any other and further relief as the Court deems just and proper.

4

5    Dated: March 12, 2025                          Respectfully submitted,

6                                                   DINSMORE & SHOHL LLP

7

8                                                   By:  _/s/ Jeana M. Mason_
                                                        Joshua I. Marrone
9                                                       Jeana M. Mason
                                                   *Special Counsel to Richard A. Marshack,*
10                                                 *Trustee of the LPG Liquidation Trust*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

EXHIBIT 1
PAGE 22

CONFIDENTIAL

### REVOLV3 MASTER SUBSCRIPTION AGREEMENT

This Master Subscription Agreement ("Agreement") is entered into by and between Revolv3 Inc., a corporation organized under the laws of Delaware "Revolv3") and The Litigation Practice Group PC, a California corporation with a principal place of business at 17542 E 17th Street, Ste 100 Tustin, California 92780 ("Customer") and is effective as of March 20th, 2023 (the "Effective Date"). Customer and Revolv3 may be referred to herein collectively as the "Parties" or individually as a "Party." This Agreement incorporates by reference Exhibit A (Service Level Agreement), Exhibit B (Technical Support) and Exhibit C (Order Form Template).

1.      **Definitions.**

        1.1      "Applicable Laws" means all laws, ordinances, rules, regulations, orders, licenses, permits, judgments, decisions or other requirements of any governmental authority in any territory that has jurisdiction over the Parties, whether those laws, etc., are in effect as of the Order Form Effective Date or later come into effect during the term of the Order Form.

        1.2      "Authorized User" means each employee of Customer: (i) authorized by Customer in writing to access and/or use the Cloud Services for Customer's internal use in accordance with this Agreement, the Documentation, and the Order Form; (ii) to whom a password-protected account for use of the Cloud Services has been created by or on behalf of Customer; and (iii) who, if required by Revolv3, has agreed to the applicable terms and conditions made available by Revolv3 to such employee for use of the Cloud Services (the "User Terms of Use").

        1.3      "Cloud Service(s)" means, collectively, the software-as-a-service products ordered by Customer under an Order Form, all as made available to Customer under such Order Form and this Agreement, and as may be updated by Revolv3 from time to time. "Cloud Services" exclude Content and Non-Revolv3 Applications.

        1.4      "Content" means information obtained by Revolv3 from publicly available sources or its third party content providers and made available to Customer through the Cloud Services.

        1.5      "Customer Data" means all information and data input by Authorized Users or, if applicable, by Revolv3 personnel on behalf of an Authorized User, into the Cloud Services, excluding Content and Non-Revolv3 Applications.

        1.6      "Data Protection Laws" means all applicable laws, statutory rules, statutory regulations and binding guidance by a supervisory authority that relate to the collection, confidentiality, processing, privacy, security, protection, breach, transfer or cross-border data flow of Personal Information.

        1.7      "Documentation" means any standard user guide, manual or other explanatory materials regarding the Cloud Services as provided or otherwise made electronically available by Revolv3 to Customer, including as modified or updated by Revolv3 from time to time.

        1.8      "Fees" means the Subscription Fees and any other fees and expenses payable by Customer as set forth in the applicable Order Form.

DocuSign Envelope ID: 480D1B5A-BD34-4A97-9B50-16980C3166CE

CONFIDENTIAL

1.9    "Intellectual Property Rights" means all intellectual property rights, including copyrights, patents, trademarks, trade secrets, know-how, databases, designs, software, processes, algorithms, user interfaces, techniques, other tangible or intangible technical material and any other proprietary information.

1.10    "Malicious Code" means code, files, scripts, agents or programs intended to do harm, including, for example, viruses, worms, time bombs and Trojan horses.

1.11    "Non-Revolv3 Application" means a software application that is provided by Customer, or a third party that interoperates with the Service.

1.12    "Order Form" means the agreement that is entered into between Customer and Revolv3 regarding the Cloud Services, including any schedules and supplements thereto for which this Agreement apply, a form of which is set forth as Exhibit C attached hereo.

1.13    "Order Form Effective Date" has the meaning set forth in the applicable Order Form.

1.14    "Professional Service(s)" means, collectively, the consulting, development, customization and other professional services which Customer orders from Revolv3 under an applicable Order Form, including any deliverables described in the Order Form.

1.15    "Personal Information"  means Customer Data that includes (i) any information that identifies, relates to, describes, is capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular individual or household, and (ii) any other information that constitutes "personal information", "personal data" or any similar category of information subject to Data Protection Laws.

1.16    "Restricted Information" means (i) sensitive personal information as defined in Article 9 and 10 of the EU General Data Protection Regulation (GDPR) and other applicable data protection laws, and (ii) personal health  information (meaning health or medical condition of an individual or the provision of health care to an individual).

1.17    "Revolv3" means such entity as defined in the Order Form that serves as the licensor of the Cloud Services.

1.18    "Service(s)" means, collectively, the Cloud Services and the Professional Services.

1.19    "Subscription Fees" mean the annual fees payable by Customer in consideration for its right to use and access the Cloud Services in accordance with this Agreement and as described in the Order Form.

1.20    "Subscription Period" means the term of Customer's subscription to the Cloud Services as identified in the Order Form.

1.21    "Updates" means updates of the Cloud Services for repairs, enhancements or new features applied by Revolv3, including updates to the Documentation as a result of such updates, at no additional fee during the Subscription Period. Updates shall not include additional new functionality or upgrades to modules or applications that Customer has not already subscribed to in an Order Form and

EXHIBIT 1   2
PAGE 24

DocuSign Envelope ID: 480D1B5A-BD71-4A07-9D50-16980C9166CE
                     Case 8:23-bk-10571-SC    Doc 500    Filed 09/13/23    Entered 09/13/23 20:53:09    Desc
                     Main Document      Page 7 of 30

CONFIDENTIAL

for which Revolv3 requires a separate charge from its other customers generally for such new modules or applications.

2.    **Scope.**

    2.1    <u>License to the Cloud Services</u>.  Subject to Customer's compliance with this Agreement and the Order Form, Revolv3 hereby grants to Customer during the term of the applicable Subscription Period a non-exclusive, limited, non-transferable right to access and use the Cloud Services via Revolv3's internet-hosted web site, solely (a) for use by Authorized Users and no other users, in accordance with the User Terms of Use (if applicable), (b) in support of Customer's internal business purposes, and (c) in strict accordance with this Agreement and the Order Form.  Subject to Customer's compliance with this Agreement and the Order Form, Revolv3 hereby grants to Customer a non-exclusive, limited, non-transferable right to use and copy the Documentation, solely for the purpose of using the Cloud Services pursuant to this <u>Section 2.1</u>.

    2.2    <u>Provision of Cloud Services</u>. Revolv3 shall use commercially reasonable efforts to make the Cloud Services available, subject to (i) planned downtime (of which Revolv3 shall give advance electronic notice), (ii) emergency maintenance, and (iii) the occurrence of force majeure events, as described in <u>Section 10.2</u>. Revolv3's sole obligation under this <u>Section 2.2</u>, and Customer's sole and exclusive remedy for any breach of this <u>Section 2.2</u>, shall be for Revolv3 to perform its technical support obligations as set forth in <u>Section 2.3</u>.  Revolv3 may utilize the services of any subcontractor as it deems appropriate to perform its obligations under this Agreement and the Order Form.

    2.3    <u>Support, Uptime and Updates</u>.  Revolv3 shall: (i) provide the level of support specified in the Order Form in accordance with <u>Exhibit B</u>; (ii) provide Updates at no additional charge as part of Customer's subscription during the Subscription Period in accordance with <u>Exhibit B</u>; and (iii) make the Cloud Services available in accordance with <u>Exhibit A</u>.

    2.4    <u>Restrictions</u>.  Customer shall not use, or allow others to use, the Services in any manner other than as expressly allowed in this Agreement, the Documentation and the Order Form.  Customer may not (a) reverse engineer, decompile, disassemble, re-engineer or otherwise create or attempt to create or permit, allow, or assist others to discover or create the source code of the Cloud Services or their structural framework, (b) make any Service or Content available to anyone other than its Authorized Users, or use any Service or Content for the benefit of anyone other than Customer for its own use or for its use in performing services for its customers, (c) sublicense, subcontract, translate, distribute, make available, rent, lease or sell any rights to the Services or Content, or include any Service or Content in a service bureau or outsourcing offering, (d) use any robot, spider, site search or retrieval mechanism or other manual or automatic device or process to retrieve, index, data mine, or in any way reproduce or circumvent the navigational structure or presentation of the Cloud Services, (e) harvest or collect information about or from other users of the Cloud Services, (f) probe, scan or test the vulnerability of the Cloud Services, nor breach the security or authentication measures on the Cloud Services or take any action that imposes an unreasonable or disproportionately large load on the infrastructure of the Cloud Services, (g) modify or create derivative works of the Cloud Services, (h) use a Service or Non-Revolv3 Application to store or transmit infringing, libelous, or otherwise unlawful or tortious material, or to store or transmit material in violation of third-party privacy rights, (i) attempt to gain unauthorized access to the Cloud Services or their related systems or networks, (j) use a Service or Non-Revolv3 Application to store or transmit Malicious Code, (k) use the Services in whole or in part for benchmarking purposes, or for any illegal purpose, or any other purpose except as expressly provided under this Agreement and the

DocuSign Envelope ID: 480D3B5A-BD74-4A07-9050-16980C8166CE

CONFIDENTIAL

Order Form, (l) facilitate or encourage any violations of this Section 2.4, (m) interfere with or disrupt the integrity or performance of the Cloud Services, (n) create Internet "links" to the Cloud Services or "frame" or "mirror" any content therein, or (o) use, or permit the use of, the Services in connection with the development of any product or service that is in competition with services or features provided by the Services.

2.5    Customer Responsibilities. Customer will (a) be responsible for its Authorized Users' compliance with this Agreement, the Documentation, and the Order Form, (b) be responsible for the interoperation of any Non-Revolv3 Applications that Customer uses with the Cloud Services or Content, (c) use commercially reasonable efforts to prevent unauthorized access to or use of Cloud Services and Content, and notify Revolv3 promptly of any such unauthorized access or use, (d) use Cloud Services and Content only in accordance with this Agreement, the Documentation, and the Order Form, and (e) comply with terms of service of any Non-Revolv3 Applications with which Customer uses Cloud Services or Content. Any use of the Services in breach of the foregoing by Customer or its Authorized Users that in Revolv3's judgment threatens the security, integrity or availability of Revolv3's services may result in Revolv3's immediate suspension of the Services, however Revolv3 will use commercially reasonable efforts under the circumstances to provide Customer with notice and an opportunity to remedy such violation or threat prior to any such suspension.

2.6    Violations of Law. If Customer receives notice that Content or Customer Data must be removed, modified and/or disabled to avoid violating Applicable Law or third-party rights, Customer will promptly notify Revolv3 in writing and, with respect to Customer Data, take such corrective action promptly.  If Customer receives notice that a Non-Revolv3 Application used by Customer must be removed, modified or disabled to avoid violating Applicable Law or third-party rights, Customer will promptly notify Revolv3 in writing and take such corrective action promptly.  If requested by Revolv3, Customer shall confirm such deletion and discontinuance of use in writing and Revolv3 shall be authorized to provide a copy of such confirmation to any such third party claimant or governmental authority, as applicable.  Notwithstanding the foregoing, Revolv3 may immediately suspend provision of the Services at any time, without notice to Customer and without liability, if Revolv3 suspects or receives notice that the Services or the use thereof actually or allegedly infringes or violates any third party's rights or violates any Applicable Laws.  Revolv3 may immediately suspend Customer's and its Authorized Users' access to and use of the Services in order to comply with Applicable Laws, or upon having reason to believe that any improper activity or potential damage to Revolv3 products or services or other customers is associated with Customer's or its Authorized Users' use of or access to the Services.

2.7    Security. Customer shall, and shall cause its Authorized Users to, ensure the security of all account IDs and passwords associated with Customer's and its Authorized Users' access to and use of the Cloud Services, which may not be shared with any other individual. If any account ID or password is stolen or otherwise compromised, Customer shall immediately change the password and inform Revolv3 of the compromise.  If an Authorized User leaves the employ of the Customer, Customer shall take affirmative steps to prevent further access to and use of the Cloud Services by such person and shall promptly notify Revolv3 to disable the account ID and password associated with such person.  In each such instance, Customer shall also promptly update, and provide to Revolv3 in writing, the revised list of Authorized Users.  Revolv3 may change the authorization method for access to the Cloud Services if it determines in its sole discretion that there are circumstances justifying such changes.  Revolv3 is not responsible for loss of any data in transmission or improper transmission by Customer or its Authorized Users and Customer is solely responsible for maintaining an appropriate backup of Customer Data.  Without derogating from the above, Revolv3 will not be responsible or liable in any way in any instance

DocuSign Envelope ID: 480D1B5A-BD74-4A07-9050-16980C8166CE

CONFIDENTIAL

of unauthorized access or use of the Cloud Service by Customer, Customer's Authorized Users, or any other third party using Customer's account to access to the Cloud Service (including in case of theft, embezzlement or similar cases).   Revolv3 will adhere to industry standard security processes in hosting the Cloud Services and will promptly respond to any security breaches of the Cloud Services of which it becomes aware.

2.8   Payment.  Customer shall pay Revolv3 the Fees as described in the applicable Order Form.  Unless stated otherwise in the applicable Order Form, all invoiced amounts will be due and payable to Revolv3 within thirty (30) days after Customer's receipt of an invoice, and all subsequent amounts outstanding beyond thirty (30) days from the invoice date will be subject to a late payment charge at the lesser of one and one half percent (1.5%) per month or the highest rate permissible under Applicable Law for the actual number of days elapsed.  All billing and payment will be in United States dollars only.  If Customer fails to make payments when due, Revolv3 may, upon notice to Customer, suspend Customer's access and use of the Services until such payments are made. Customer will continue to be charged Subscription Fees during any period of suspension.  Revolv3 may impose a reconnection fee if Customer is suspended pursuant to this Section and thereafter requests access to the Services.  Customer agrees and acknowledges that Revolv3 has no obligation to retain Customer Data and that such Customer Data may be irretrievably deleted if Customer's account is delinquent for thirty (30) days or longer.

2.9   Taxes.  All fees and payments hereunder are nonrefundable and exclusive of all taxes, including, but not limited to, sales, use, excise, value-added, goods and services, consumption, and other similar taxes or duties (except taxes on the income of Revolv3), and Customer agrees to pay such taxes, whether federal, state, local, or municipal.

3.   **Term and Termination.**

3.1   Term.  The Agreement commences on the Effective Date and continues until all Order Forms subject to this Agreement have expired or terminated, unless this Agreement is earlier terminated in accordance with this Section 3. The term of each Order Form shall commence on the Order Form Effective Date and continue until expiration of the Subscription Period stated therein, unless terminated earlier in accordance with Section 3 of this Agreement.  Unless otherwise provided in the Order Form, each Order Form shall automatically renew for additional periods of one year on the same terms unless either Party gives the other written notice of non-renewal at least sixty (60) days prior to the end of the relevant Subscription Period.

3.2   Termination for Cause. A Party may terminate the applicable Order Form for cause (i) upon ten (10) business days written notice to the other Party if the other Party materially breaches this Agreement or the applicable Order Form, and such breach has not been cured by the end of such ten (10) day period, or (ii) immediately upon written notice to the other Party if the other Party becomes the subject of a petition in bankruptcy or any proceeding relating to insolvency, receivership, liquidation or composition for the benefit of creditors.   For the avoidance of doubt, failure to make payment in accordance with Section 2.8 shall be considered a material breach of this Agreement.

3.3   Suspension for Non-Payment.  If Customer does not pay two monthly consecutive invoices, Revolv3, in its sole discretion, may suspend, block and/or restrict Customer's access to the system and the Services. Revolv3 will give Customer ten (10) days prior notice of such suspension.

EXHIBIT 1   5
PAGE 27

DocuSign Envelope ID: 489D1B54-BD74-4A97-9B50-16980C8166CE

CONFIDENTIAL

3.4    <u>Effect of Termination</u>.  Upon any termination of the applicable Order Form, (a) Customer's and its Authorized Users' right to access or use the Customer Data and the Cloud Services shall immediately cease and except as otherwise provided herein, Revolv3 will have no obligation to maintain, deliver or provide access to any Customer Data, and (b) Customer shall pay any balance due to Revolv3 pursuant to <u>Section 2.8</u>.

3.5    <u>Survival</u>.  Any provision of the applicable Order Form or this Agreement which contemplates performance or observance subsequent to any termination or expiration thereof shall survive any such termination or expiration and continue in full force and effect.

4.    **Intellectual Property.**

4.1    <u>Reservation of Revolv3's Rights</u>.  All rights not expressly granted to Customer herein are expressly reserved by Revolv3.  As between the Parties, the Cloud Services are and will remain the exclusive property of Revolv3, and Revolv3 will retain ownership of all Intellectual Property Rights relating to or residing in the Cloud Services and the Documentation and any updates, improvements, modifications and enhancements (including error corrections and enhancements) thereto, and all derivative works thereof, and Customer will have no right, title, or interest in or to the same except as expressly granted in <u>Section 2.1</u>.  Nothing in this Agreement or the Order Form will be deemed to grant, by implication, estoppel, or otherwise, a license under any of Revolv3's or its licensors' existing or future rights in or to the Cloud Services except as expressly granted in <u>Section 2.1</u>.  Revolv3 trade names, trademarks, service marks, titles, and logos, and any goodwill appurtenant thereto, shall be owned exclusively by Revolv3 and shall inure solely to the benefit of Revolv3; Customer shall not use any of the foregoing for any purpose without the prior written consent of Revolv3 in each instance.

4.2    <u>Customer Data</u>.  As between the Parties, Customer has and shall retain sole and exclusive title and ownership of all Customer Data.  Customer hereby grants to Revolv3 a royalty-free, fully paid, non-exclusive, non-transferable (except as set forth in <u>Section 10.1</u> (Assignment)), sub-licensable, worldwide right and license to reproduce, use, process, transfer and store Customer Data solely for the purposes of performing Revolv3's obligations under this Agreement and any other activities expressly agreed to by Customer. If Customer chooses to use a Non-Revolv3 Application with a Service, Customer grants Revolv3 permission to allow the Non-Revolv3 Application and its provider to access Customer Data and information about Customer's usage of the Non-Revolv3 Application as appropriate for the interoperation of that Non-Revolv3 Application with the Service. Customer acknowledges that it is solely responsible for the integrity, completeness, accuracy, and validity of Customer Data, and Revolv3 shall not be responsible for any loss, damage or liability arising out of the Customer Data, including any mistakes contained in the Customer Data, the use or transmission of the Customer Data, or any results obtained from the Customer Data.

4.3    <u>Aggregate Data</u>.  Customer agrees that, as part of providing the Cloud Services, Revolv3 may collect, use and disclose quantitative data derived from the use of the Cloud Services for service improvements, industry analysis, benchmarking, analytics and supporting Customer's usage of the Cloud Services. All data disclosed will be in aggregate and anonymous form only and will not identify Customer or its specific Authorized Users or its relationship to its suppliers.

4.4    <u>License by Customer to Use Feedback</u>. Customer grants to Revolv3 a worldwide, perpetual, irrevocable, royalty-free license to use and incorporate into its services any suggestion,

DocuSign Envelope ID: 480D1BE5-BD74-4A07-9D50-16980C8166CE

CONFIDENTIAL

enhancement request, recommendation, correction or other feedback provided by Customer or its Authorized Users relating to the operation of Revolv3's services.

5.    **Specifications and Requirements**.

5.1    <u>Requirements for the Services</u>.  As between the Parties, Customer is responsible for obtaining and maintaining all computer hardware, software, communications and office equipment needed to access and use the Services, and for paying all associated third-party access charges, including, but not limited to, any license fees related thereto.

5.2    <u>Changes to the Cloud Services</u>.  Revolv3 may make upgrades and improvements to the Cloud Services available to Customer from time to time.  Revolv3 may modify or delete any features of the Cloud Services.  Revolv3 may, at any time, modify the Cloud Services, or substitute old features with new features that have similar or improved functionality, as may be necessary to meet Applicable Laws or industry-standard requirements or demands or requirements of third party service providers.

5.3    <u>Future Functionality</u>. Customer agrees that its purchases are not contingent on the delivery of any future functionality or features, or dependent on any oral or written public comments made by Revolv3 regarding future functionality or features.

5.4    <u>Professional Services</u>. To the extent any Professional Services are to be performed by Revolv3, such professional services will be defined in and performed pursuant to the applicable Order Form.  Revolv3 will perform such Professional Services in a reasonable and workmanlike manner.

6.    **Confidentiality; Data Protection**.

6.1    <u>Confidential Information</u>.  Each Party acknowledges and understands that, except as set forth in <u>Section 6.2</u>, any and all technical, trade secret, or business information, including, without limitation, financial information, business or marketing strategies or plans, product development or customer information, which is disclosed by a Party (the "<u>Disclosing Party</u>") to the other Party (the "<u>Receiving Party</u>") or is otherwise obtained by the Receiving Party, its affiliates, employees, representatives or other agents that is designated as confidential or which should be reasonably understood as confidential under the circumstances, during the term of the Order Form(or during any negotiation or evaluation of Revolv3's services in connection with the Order Form) (the "<u>Confidential Information</u>") is confidential.  As between the Parties, each Party retains all ownership rights in and to its Confidential Information.  Without limiting the foregoing, the Cloud Services and all related technology, and the Documentation, is Revolv3's Confidential Information.

6.2    <u>Exceptions</u>.  Confidential Information does not include any information that is (a) already known to the Receiving Party at the time of the disclosure; (b) publicly known at the time of the disclosure or becomes publicly known through no wrongful act or failure of the Receiving Party; or (c) subsequently disclosed to the Receiving Party on a non-confidential basis by a third party not having a confidential relationship with the Disclosing Party and which third party rightfully acquired such information.

6.3    <u>Obligations</u>. The Receiving Party shall maintain as confidential and shall not disclose (except to those employees, subcontractors, attorneys, accountants and other advisors, or agents of the Receiving Party who need to know such information for purposes of the Order Form and this Agreement

DocuSign Envelope ID: 480D1EF6-BD74-4A97-9B50-16980C8166CE

CONFIDENTIAL

and who have in turn been advised of the confidentiality obligation hereunder), copy, or use for purposes other than in connection with use or provision of the Services as authorized hereunder, the Disclosing Party's Confidential Information. Each Party agrees to protect the other Party's Confidential Information with the same degree of care that it uses to protect the confidentiality of its own confidential information of like kind (but not less than reasonable care).  Neither Party shall disclose the terms of any Order Form to any third party other than its affiliates, legal counsel and accountants without the other Party's prior written consent. The Receiving Party shall be liable under the Order Form and this Agreement to the Disclosing Party for any use or disclosure of the Disclosing Party's Confidential Information in violation of this Agreement by the Receiving Party's  employees, subcontractors, attorneys, accountants or other advisors, or agents.

6.4     Compelled Disclosure**.** The Receiving Party may disclose Confidential Information of the Disclosing Party to the extent compelled by law to do so, provided the Receiving Party gives the Disclosing Party prior notice of the compelled disclosure (to the extent legally permitted) and reasonable assistance, at the Disclosing Party's cost, if the Disclosing Party wishes to contest the disclosure. If the Receiving Party is compelled by law to disclose the Disclosing Party's Confidential Information as part of a civil proceeding to which the Disclosing Party is a party, and the Disclosing Party is not contesting the disclosure, the Disclosing Party will reimburse the Receiving Party for its reasonable cost of compiling and providing secure access to that Confidential Information.  Notwithstanding any obligation herein to the contrary, Revolv3 may share Customer Confidential Information with affiliates of Revolv3 for the purpose improving the Cloud Services or providing additional services to Customer and its Authorized Users.

6.5     Data Security Program. Revolv3 agrees to implement and maintain reasonable, appropriate, and adequate technical, organizational, physical, administrative and security measures and safeguards against the unauthorized destruction, loss, use, disclosure, access or alteration of Customer Data, and which shall be consistent with then-accepted security standards in the industry and which shall comply with applicable Data Protection Laws.

6.6     Breach Notification.  Revolv3 shall report to Customer's support contacts designated in Revolv3's customer support portal ("Support Portal") the accidental or unlawful alteration, unauthorized disclosure of, or access to Customer Data ("Breach") within 24 hours, after Revolv3 determines that a Breach has occurred, unless restricted by law. Accordingly, Revolv3 shall share information about the nature and consequences of the Breach that is reasonably requested by Customer to enable it to notify affected individuals, government agencies and/or credit bureaus. Customer has sole control over the content of Customer Data that it enters into the Cloud Service and is solely responsible for determining whether to notify impacted individuals and the applicable regulatory bodies or enforcement commissions and for providing such notice. Customer shall ensure that the support contacts designated in Revolv3's customer support portal be current and ready to receive any breach notification from Revolv3.

6.7     Privacy Requirements.  In addition to its other obligations under this Agreement, Revolv3 will (i) comply with all Applicable Laws (including Data Protection Laws) with respect to Personal Information, and (ii) provide Customer with all relevant information, assistance and cooperation as Customer may reasonably require to comply with applicable Data Protection Laws, including responding to any inquiries, notices, assessments or investigations by supervisory authorities or other regulators, courts or government agencies. Revolv3 will only use or process Personal Information (i) for the sole purpose of fulfilling Revolv3's obligations under this Agreement or applicable Data Protection Laws; (ii) for the Subscription Period, and (iii) in accordance with the documented instructions of Customer and in

EXHIBIT 1    8
PAGE 30

CONFIDENTIAL

compliance with Data Protection Laws.  To the extent that Customer processes any Personal Information under this Agreement that is subject to Data Protection Laws outside the U.S., Customer shall notify Revolv3 of such processing, and the Parties shall cooperate to take all steps necessary to comply with applicable requirements.

6.8    Restricted Information. Unless otherwise agreed by the parties in writing on an Order Form with reference to this Section 6.8, Customer shall not (and shall ensure that its Authorized Users do not) upload, provide or submit any Restricted Information to the Cloud Services.

7.    **Limited Warranties.**

7.1    Mutual Warranties.  Each Party warrants to the other Party that (a) such Party has the right to enter into the Order Form and this Agreement, and perform its respective obligations thereunder and hereunder in the manner contemplated by the same; and (b) the Order Form and this Agreement do not conflict with any other agreement entered into by such Party.

7.2    Customer Warranties.  Customer represents, warrants and covenants that it (a) will comply with all Applicable Laws with respect to its and its Authorized Users' access to and use of the Services; (b) has received all third-party consents and certifications necessary for (i) the transmission of Customer Data into the Cloud Services, and (ii) Revolv3 to use the Customer Data as permitted herein; and (c) is not subject to any regulatory or other restrictions precluding the use of the Cloud Services.  Revolv3 is not responsible for ensuring that the Services or any portion thereof is in compliance with Customer's criteria for legal compliance.

7.3    Revolv3 Warranties. Revolv3 warrants to Customer that, when used in accordance with the Documentation, the Cloud Services will perform materially in compliance with the Documentation during the Subscription Period ("Services Warranty").  Revolv3's sole obligation under the Services Warranty, and Customer's sole and exclusive remedy for any breach of the Services Warranty, shall be for Revolv3 to perform its technical support obligations as set forth in Section 2.3.

7.4    Disclaimers. EXCEPT FOR THE SERVICES WARRANTY PROVIDED IN SECTION 7.3, REVOLV3 EXPRESSLY DISCLAIMS ALL OTHER WARRANTIES, WHETHER EXPRESS, IMPLIED, OR STATUTORY, REGARDING THE SERVICES, THE CLOUD SERVICES ANY OTHER APPLICABLE PLATFORM THROUGH WHICH THE SERVICES ARE PROVIDED, AND ANY INFORMATION, MATERIALS AND OTHER SERVICES PROVIDED HEREUNDER, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTIES OF TITLE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, LOSS OF OR DAMAGE TO CUSTOMER DATA, LOSS OF BUSINESS OR LOST PROFITS.  WITHOUT LIMITING THE FOREGOING, REVOLV3 DOES NOT REPRESENT OR WARRANT THAT THE SERVICES WILL BE AVAILABLE, ERROR FREE, COMPLETELY SECURE, VIRUS FREE, OR WITHOUT INTERRUPTION, OR THAT THEIR FUNCTIONS WILL MEET ANY PARTICULAR REQUIREMENTS, OR THAT PROGRAM DEFECTS OR ERRORS ARE CAPABLE OF CORRECTION OR IMPROVEMENT.  THE SERVICES MAY BE SUBJECT TO LIMITATIONS, DELAYS, AND OTHER PROBLEMS INHERENT IN THE USE OF THE INTERNET AND ELECTRONIC COMMUNICATIONS AND REVOLV3 IS NOT RESPONSIBLE FOR ANY DELAYS, DELIVERY FAILURES, OR OTHER DAMAGE RESULTING FROM SUCH. WITHOUT LIMITING THE FOREGOING, REVOLV3 HAS NO RESPONSIBILITY FOR ANY DAMAGE RESULTING FROM ANY SECURITY BREACH RESULTING FROM: (A) ANY MODIFICATIONS OR ALTERATION OF THE CLOUD SERVICE ITS FUNCTIONALITY OR CAPABILITIES THAT IS NOT MADE BY REVOLV3 OR ITS AGENTS; AND/OR (B) BY MALICIOUS CODE, MALWARE, BOTS, WORMS, TROJANS, BACKDOORS, EXPLOITS, CHEATS, FRAUD,

DocuSign Envelope ID: 480D1E5A-BD74-4A07-9B50-16980C9166CE
Case 8:23-bk-10571-SC    Doc 560    Filed 09/13/23    Entered 09/13/23 20:53:09    Desc
Main Document      Page 14 of 30

CONFIDENTIAL

HACKS, HIDDEN DIAGNOSTICS, OR OTHER MECHANISMS TO DISABLE SECURITY OR CONTENT PROTECTION THAT IS RESULTING FROM CUSTOMER'S NETWORK OR SYSTEM.

7.5    <u>Third Party Data and Non-Revolv3 Applications</u>.  The Cloud Services may allow access to Non-Revolv3 Applications, Content, data, information, materials or services disseminated by third-party sources. Customer acknowledges that Revolv3 and its suppliers and licensors do not warrant or support, and disclaim responsibility for the use, content, accuracy, timeliness, completeness or availability of, such Non-Revolv3 Applications, Content, data, information, materials or services.  Customer is responsible for obtaining the licenses required for Customer to access and use any such Non-Revolv3 Applications, Content, data, information, materials or services; and any acquisition by Customer of such products or services, and any exchange of data between Customer and any third-party provider, product or service, is solely between Customer and the applicable third-party provider. CUSTOMER USES SUCH NON-REVOLV3 APPLICATIONS, CONTENT, THIRD-PARTY DATA, INFORMATION, MATERIALS AND SERVICES AT ITS OWN RISK.

7.6    <u>Integration with Non-Revolv3 Applications</u>. The Cloud Services may contain features designed to interoperate with Non-Revolv3 Applications. Revolv3 cannot guarantee the continued availability of such Cloud Service features, and may cease providing them without entitling Customer to any refund, credit, or other compensation, if for example and without limitation, the provider of a Non-Revolv3 Application ceases to make the Non-Revolv3 Application available for interoperation with the corresponding Cloud Service features in a manner acceptable to Revolv3.

8.    **Indemnification.**

8.1    <u>By Revolv3</u>.  Revolv3 will defend Customer against any claim, demand, suit or proceeding made or brought against Customer by a third party alleging that the Cloud Services infringe or misappropriate such third party's intellectual property rights (a "<u>Claim Against Customer</u>"), and will indemnify Customer from any damages, attorney fees and costs finally awarded against Customer as a result of, or for amounts paid by Customer under a settlement approved by Revolv3 in writing of, a Claim Against Customer, provided Customer (a) promptly gives Revolv3 written notice of the Claim Against Customer, but failure to provide such notice shall not relieve Revolv3 of its indemnity obligations hereunder unless it is materially prejudiced thereby, (b) gives Revolv3 sole control of the defense and settlement of the Claim Against Customer (except that Revolv3 may not settle any Claim Against Customer without Customer's approval unless it unconditionally releases Customer of all liability), (c) shall have the right, at its cost, to employ counsel of its choice to participate in the defense of such claim, and (d) gives Revolv3 all reasonable assistance, at Revolv3's expense. If Revolv3 receives information about an infringement or misappropriation claim related to the Cloud Services, Revolv3 may in its discretion and at no cost to Customer (i) modify the Cloud Services so that they are no longer claimed to infringe or misappropriate, (ii) obtain a license for Customer's continued use of the Cloud Services in accordance with the Order Form and this Agreement, or (iii) terminate Customer's subscriptions for the applicable Cloud Service upon thirty (30) days' written notice and refund Customer any prepaid fees covering the remainder of the term of the terminated subscriptions. The above defense and indemnification obligations do not apply if (1) the allegation does not state with specificity that the Cloud Services are the basis of the Claim Against Customer; (2) a Claim Against Customer arises from the use or combination of the Cloud Services or any part thereof with software, hardware, data, or processes not provided by Revolv3, if the Cloud Services or use thereof would not infringe without such combination; (3) a Claim Against Customer arises from Cloud Services under an Order Form for which there is no charge; or (4) a Claim against Customer arises from Content, a Non-Revolv3 Application or Customer's breach of this

DocuSign Envelope ID: 488D1BE4-BD74-4A07-9D50-16980C8466CE

CONFIDENTIAL

Agreement, the Documentation or applicable Order Forms. This Section states the Revolv3's sole liability to Customer, and the Customer's exclusive remedy against Revolv3, for any third party claim described in this Section.

8.2    <u>By Customer</u>.  Customer will defend Revolv3 and its affiliates against any claim, demand, suit or proceeding made or brought against Revolv3 by a third party (a) alleging (i) that any Customer Data or Customer's use of Customer Data with the Cloud Services, (ii) a Non-Revolv3 Application provided by Customer, or (iii) the combination of a Non-Revolv3 Application provided by Customer and used with the Cloud Services, infringes or misappropriates such third party's intellectual property rights or (b) arising from Customer's use of the Cloud Services or Content (each a "<u>Claim Against Revolv3</u>"), and will indemnify Revolv3 from any damages, attorney fees and costs finally awarded against Revolv3 as a result of, or for any amounts paid by Revolv3 under a settlement approved by Customer in writing of, a Claim Against Revolv3, provided Revolv3 (1) promptly gives Customer written notice of the Claim Against Revolv3, but failure to provide such notice shall not relieve Customer of its indemnity obligations hereunder unless it is materially prejudiced thereby, (2) gives Customer sole control of the defense and settlement of the Claim Against Revolv3 (except that Customer may not settle any Claim Against Revolv3 without Revolv3's approval unless it unconditionally releases Revolv3 of all liability), (3) shall have the right, at its cost, to employ counsel of its choice to participate in the defense of such claim, and (4) gives Customer all reasonable assistance, at Customer's expense. The above defense and indemnification obligations do not apply if a Claim Against Revolv3 arises from Revolv3's breach of this Agreement, the Documentation or applicable Order Form. This Section states the Customer's sole liability to Revolv3, and the Revolv3's exclusive remedy against Customer, for any third party claim described in this Section.

9.    **Limitations of Liability**.  TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NEITHER PARTY WILL BE LIABLE TO THE OTHER PARTY OR ANY THIRD PARTY FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, SPECIAL, OR EXEMPLARY DAMAGES OF ANY KIND, INCLUDING WITHOUT LIMITATION ANY LOSS OF USE, LOSS OF DATA, LOSS OF BUSINESS OR LOSS OF PROFIT OR REVENUE, ARISING OUT OF OR IN CONNECTION WITH THE ORDER FORM, THIS AGREEMENT, THE SERVICES AND/OR ANY OTHER SERVICES RENDERED HEREUNDER (HOWEVER ARISING, INCLUDING NEGLIGENCE), EVEN IF SUCH PARTY IS OR SHOULD HAVE BEEN AWARE OF THE POSSIBILITY OF SUCH DAMAGES.  REVOLV3'S TOTAL CUMULATIVE LIABILITY TO CUSTOMER IN CONNECTION WITH EACH INDIVIDUAL ORDER FORM, WHETHER IN CONTRACT OR TORT OR OTHERWISE, WILL NOT EXCEED AMOUNTS ACTUALLY PAID BY CUSTOMER TO REVOLV3 UNDER SUCH ORDER FORM DURING THE SIX (6) MONTH PERIOD IMMEDIATELY PRECEDING ANY SUCH LIABILITY.

10.    **General.**

10.1    <u>Assignment</u>. Neither Party may assign this Agreement or any Order Form without prior written consent of the other, except in the event of a merger, consolidation or sale of all or substantially all of such Party's assets to which this Agreement or any such Order Form relates.  Any attempt to assign this Agreement or any Order Form not in accordance with this <u>Section 10.1</u> shall be null and void.

10.2    <u>Force Majeure</u>.  Except with respect to the obligation of payment, neither Party will be in default or otherwise liable for any delay in or failure of its performance under the Order Form or this Agreement if such delay or failure arises by any reason beyond its reasonable control, including, for example, an act of God, act of government, flood, fire, earthquake, civil unrest, disease or pandemic, act of terror, strike or other labor problem (other than one involving Revolv3's employees), Internet service provider failure or delay, a Non-Revolv3 Application, or a cyber or denial of service attack.  The Parties will

EXHIBIT 1   11
PAGE 33

DocuSign Envelope ID: 480D1B5E-BD34-4A97-9D60-16980C3166CE

CONFIDENTIAL

promptly inform and consult with each other as to any of the above causes, which in their judgment may or could be the cause of a substantial delay in the performance of its obligations under the Order Form or this Agreement.

10.3    <u>Limitation of Actions</u>.  No action, regardless of form, arising out of the Order Form or this Agreement may be brought by Customer more than one year after the cause of action has been or reasonably should have been discovered.

10.4    <u>Governing Law</u>.  The Order Form and this Agreement are deemed to be made under and shall be interpreted in accordance with the laws of the State of California, excluding its conflict of laws provisions.

10.5    <u>Arbitration</u>.  The Parties agree that any dispute, claim or controversy directly or indirectly relating to or arising out of the Order Form or this Agreement, the termination or validity thereof, any alleged breach thereof, or the engagement contemplated by the Parties therein (any of the foregoing, a "<u>Claim</u>") shall be submitted to Judicial Arbitration and Mediation Services ("<u>JAMS</u>"), or its successor, in San Francisco, CA, for final and binding arbitration in front of a panel of three arbitrators with JAMS in San Francisco County, California under the JAMS Comprehensive Arbitration Rules and Procedures (with each of Revolv3 and Customer choosing one arbitrator, and the chosen arbitrators choosing the third arbitrator).  The arbitrators shall, in their award, allocate all of the costs of the arbitration, including the fees of the arbitrators and the reasonable attorneys' fees of the prevailing Party, against the Party who did not prevail.  The award in the arbitration shall be final and binding.  The arbitration shall be governed by the Federal Arbitration Act, 9 U.S.C. §§1–16, and judgment upon the award rendered by the arbitrators may be entered by any court having jurisdiction thereof.  Customer and Revolv3 agree and consent to personal jurisdiction, service of process and venue in any federal or state court within the State and County of California in connection with any action brought to enforce an award in arbitration.  The Parties agree that any award rendered from an arbitration proceeding (as well as a settlements between the Parties) shall remain confidential except as otherwise required to be disclosed pursuant to Applicable Law or regulation and except as otherwise used by a Party in connection with any judicial proceeding related to the arbitration.

10.6    <u>Independent Contractors</u>. Customer and Revolv3 are independent contractors and nothing in the Order Form or this Agreement will be deemed to create any agency, employee-employer relationship, partnership, or joint venture between the Parties.  Except as otherwise specifically provided in the Order Form or this Agreement, neither Party will have or represent that such Party has the right, power or authority to bind, contract or commit the other Party or to create any obligation on behalf of the other Party.

10.7    <u>Notices</u>.  Except as provided elsewhere in this Agreement, either Party may give notice by written communication sent by next-day mail delivered by a nationally recognized delivery service: (i) if to Customer, to Customer's address on record in Revolv3's account information or (ii) if to Revolv3, to 381 Forest Ave Suite C, Laguna Beach CA 92651, addressed to the attention of: Legal Department, with an email copy to legal@revolv3.com. Such notice shall be deemed to have been given upon receipt. Each Party may change its address for receipt of notices by giving notice of the new address to the other Party.

10.8    <u>Publicity</u>.  Customer hereby grants to Revolv3 the right to use Customer's name and logo on the Revolv3 website and in Revolv3's collateral marketing materials relating to the Cloud Services. Customer agrees to allow Revolv3 to use Customer's name and logo (in such form as provided by

EXHIBIT 1    12
PAGE 34

DocuSign Envelope ID: A80D3B54-BD74-4A07-9D60-16980C8466CE

CONFIDENTIAL

Customer to Revolv3 for such purpose) solely as a reference, current customer or user of the Cloud Services in Revolv3 marketing materials.

10.9    <u>Severability</u>.  If any provision of the Order Form or this Agreement is held by a court of law to be illegal, invalid, or unenforceable, the legality, validity, and enforceability of the remaining provisions will not be affected or impaired thereby and the illegal, invalid, or unenforceable provision will be deemed modified such that it is legal, valid, and enforceable and accomplishes the intention of the Parties to the fullest extent possible.

10.10    <u>Waivers</u>.  The failure of either Party to enforce any provision of the Order Form or this Agreement, unless waived in writing by such Party, will not constitute a waiver of that Party's right to enforce that provision or any other provision of the Order Form or this Agreement.

10.11    <u>LIMITED REMEDIES</u>.  WITHOUT LIMITING ANYTHING IN THE ORDER FORM OR THIS AGREEMENT, IT IS UNDERSTOOD AND AGREED BY THE PARTIES THAT EACH AND EVERY PROVISION OF THIS AGREEMENT WHICH PROVIDES LIMITATION OF LIABILITY, DISCLAIMER OF WARRANTIES OR EXCLUSION OF DAMAGES (I) ARE A FUNDAMENTAL PART OF THE BASIS OF REVOLV3's BARGAIN HEREUNDER, AND REVOLV3 WOULD NOT ENTER INTO THE ORDER FORM AND THIS AGREEMENT ABSENT SUCH LIMITATIONS, DISCLAIMERS AND EXCLUSIONS, AND (II) ARE INTENDED BY THE PARTIES TO BE ENFORCEABLE TO THE MAXIMUM ALLOWED BY APPLICABLE LAW, SEVERABLE AND INDEPENDENT OF ANY OTHER SUCH PROVISION AND TO BE ENFORCED AS SUCH.  IT IS EXPRESSLY UNDERSTOOD AND AGREED THAT IN THE EVENT ANY REMEDY HEREUNDER IS DETERMINED TO HAVE FAILED OF ITS ESSENTIAL PURPOSE, ALL LIMITATIONS OF LIABILITY AND EXCLUSIONS OF DAMAGES SET FORTH HEREIN SHALL REMAIN IN EFFECT TO THE MAXIMUM ALLOWED BY APPLICABLE LAW.

10.12    <u>Equitable Remedies</u>.  Each Party acknowledges that a breach of its obligations under the Order Form or this Agreement relating to confidentiality or intellectual property could cause irreparable harm to the other Party and that monetary damages may be difficult to ascertain.  Therefore, without prejudice to the rights and remedies otherwise available to it, and notwithstanding anything to the contrary set forth herein, each Party shall be entitled to seek relief by way of injunction or specific performance in any court of competent jurisdiction without the need of posting a bond or other security.

10.13    <u>No Third-Party Beneficiaries</u>.  The Order Form and this Agreement are made and entered into for the sole protection and benefit of the Parties hereto, and no other person or entity shall be a direct or indirect beneficiary of, or shall have any direct or indirect cause of action or claim in connection with the Order Form or this Agreement.

10.14    <u>Remedies Cumulative</u>.  Unless explicitly stated otherwise, the enumeration herein of specific remedies shall not be exclusive of any other remedies.  Any delay or failure by any Party to exercise any right, power, remedy or privilege herein contained, or now or hereafter existing under any applicable statute or law, shall not be construed to be a waiver of such right, power, remedy or privilege, nor to limit the exercise of such right, power, remedy, or privilege, nor shall it preclude the further exercise thereof or the exercise of any other right, power, remedy or privilege.

10.15    <u>Entire Agreement</u>**.**  The Order Form and this Agreement supersede all prior discussions, understandings and agreements with respect to their subject matter.  Any terms on a purchase order, payment document, or other document submitted by Customer shall be void and have no force or effect.

EXHIBIT 1 13
PAGE 35

DocuSign Envelope ID: 480D1B54-BD74-4A07-9050-16980C8166CE

CONFIDENTIAL

10.16    <u>Export Compliance</u>**.** The Services, Content, other Revolv3 technology, and derivatives thereof may be subject to export laws and regulations of the United States and other jurisdictions. Revolv3 and Customer each represents that it is not named on any U.S. government denied-party list. Customer will not permit any Authorized User to access or use the Services or Content in a U.S.-embargoed country or region or in violation of any U.S. export law or regulation.

10.17    <u>Order of Precedence</u>.  In the event of any conflict or inconsistency among the following documents, the order of precedence shall be: (1) the applicable Order Form, (2) this Agreement, and (3) the Documentation.

10.18    <u>Interpretation</u>.  Titles and headings of sections of this Agreement and the Order Form are for convenience only and shall not affect the construction of any provision contained herein or therein.

*[signature page follows]*

MSA

EXHIBIT 1  14
PAGE 36

CONFIDENTIAL

IN WITNESS WHEREOF, the Parties have caused this Agreement to be effective as of the Effective Date.

**Revolv3 Inc.**                                         The Litigation Practice Group PC

Name:  Frank Arellano                            Name:  Tony Diab

Title: CEO                                              Title: Partner

Signature:  _Frank Arellano_                 Signature:  _Tony Diab_

Date:  3/21/2023                                   Date:  3/21/2023

DocuSign Envelope ID: 489D1BE4-BD74-4A07-9050-16080C8166CE

CONFIDENTIAL

**Exhibit A**

**Service Level Agreement**

1.    **Uptime SLA Definitions and Exclusions**.

  1.1    If service outages result in a failure of any production instance of a Cloud Service to meet an uptime availability requirement of 99.8% over a calendar month ("Uptime SLA"), Customer's sole and exclusive remedy shall be a service credit equal to ten percent (10%) of the Subscription Fees set forth in the applicable Order Form for that calendar month.

  1.2    The following events shall be excluded in calculating Uptime SLA (collectively, "Excused Downtime"):

    (a)    Planned maintenance windows, as notified by Revolv3 to Customer via the Support Portal.

    (b)    Emergency maintenance required to address an exigent situation with the Cloud Service or Revolv3 Platform that if not addressed on an emergency basis could result in material harm to the Cloud Service or Revolv3 Platform. Revolv3 shall provide advance notice of emergency maintenance via the Support Portal to the extent practicable.

    (c)    Any unavailability caused by circumstances beyond Revolv3's reasonable control, including without limitation, unavailability due to Customer or its Authorized Users' acts or omissions, a Force Majeure Event, Internet service provider failures or delays, failure or malfunction of equipment or systems not belonging to or controlled by Revolv3.

2.    **SLA Calculation**.

Uptime SLA is calculated as follows:

| | |
|---|---|
| $$\frac{(x - y - z)}{(x - z)} * 100$$ | x = total number of minutes in a calendar month<br><br>y = total number of minutes of downtime in a calendar month that is not Excused Downtime<br><br>z = Excused Downtime |

3.    **Credit Requests**.

Customer must request all service credits in writing to Revolv3 within thirty (30) days of the end of the month in which the Uptime SLA was not met, including identifying the period Customer's production instance of the Cloud Services was not available. Revolv3 shall apply the service credit during Customer's next billing cycle unless the service credit is reasonably disputed by Revolv3, in which case Customer and Revolv3 shall work together in good faith to resolve such dispute in a timely manner. The total amount of service credits for any month may not exceed the applicable monthly subscription fee for the affected Cloud Services and has no cash value (unless a service credit is owed at the termination or expiration of this Agreement without a renewal order, in which case, such service credit shall be paid to Customer

EXHIBIT 1   16
PAGE 38

DocuSign Envelope ID: 480D1BE4-BD74-4A07-9050-16980C8166CE

CONFIDENTIAL

within ninety (90) days of the end of the Subscription Period). Uptime and other system performance
metrics can be found on trust.coupa.com.

Exhibit A

EXHIBIT 1  17
PAGE 39

DocuSign Envelope ID: 480D1BE6-BD74-44A07-9060-16080C9166CE

CONFIDENTIAL

**Exhibit B**

**Technical Support**

The following describes the technical support services ("Technical Support") that Revolv3 shall provide for the support level purchased by Customer ("Support Level") as stated on the Order Form. The following terms may be updated from time to time, however, for each Order Form, the terms effective as of the execution of the Order Form shall apply for the duration of the applicable Subscription Period.

1.    **Scope**.

The purpose of Technical Support is to address defects in the Cloud Services that prevent them from performing in substantial conformance with the applicable Documentation. A resolution to such a defect may consist of a fix, workaround or other relief reasonably determined by Revolv3's Technical Support staff.

2.    **Online Support Portal**.

The Revolv3 support portal includes an online knowledge base, best practices for use of the Cloud Services, and a portal for the Designated Support Contacts (as defined below) to submit support tickets.

3.    **Live Phone Support**.

Support personnel are available to provide Technical Support to Customer on the phone, as described at [insert hyperlink for Contact Us page].

4.    **Severity Levels**.

Each support ticket shall be categorized by Customer into one of the following severity levels.

| Severity | Definition |
|---|---|
| **Severity Level 1** | Severe error that results in the Cloud Services experiencing complete unavailability and halting transactions with no workaround. |
| **Severity Level 2** | Serious error that results in a major function of the Cloud Services suffering a reproducible problem causing either major inconvenience to Users or consistent failure in a common functionality. |
| **Severity Level 3** | Error that results in a common functionality experiencing an intermittent problem or a consistent failure in a less common functionality. |
| **Severity Level 4** | Service requests such as sandbox refreshes, SSO setups, and other how-to type of questions. |

5.    **Support Levels**.

Support personnel will respond to and update each support ticket in accordance with the following timelines.

DocuSign Envelope ID: 489D1BE4-BD74-4A97-9B60-16980C8166CE

CONFIDENTIAL

| Online Ticket Submission, Phone Support | Severity Level 1: 24x7<br><br>Severity Levels 2-4: Mon-Fri, 8am-6pm at Customer's main domicile | |
|---|---|---|
| **Designated Support Contacts** | Maximum of 5 | |
| | **Response Times** | **Update Frequency** |
| **Severity Level 1** | 1 hour | 2 hours |
| **Severity Level 2** | 4 hours | 1 business day |
| **Severity Level 3** | 3 business days | 4 business days |
| **Severity Level 4** | 7 business days | 7 business days |

6.      **Customer Responsibilities**.

        6.1      Customer shall designate no more than the number of administrators ("Designated Support Contacts") set forth above who may contact and interact with Revolv3 in connection with Technical Support requests. Customer's Designated Support Contacts shall answer questions and resolve issues as needed when they arise from other Authorized Users of the Cloud Services. Customer's Designated Support Contacts enter support request tickets, work through Technical Support issues with Revolv3, and take action as needed to implement the resolution to the issue. Customer agrees that Revolv3 may communicate and follow instructions to make changes to Customer Data and/or Customer's instances, with its Designated Support Contacts via email, phone or through the Support Portal.

        6.2      Customer shall ensure that Customer's Designated Support Contacts are trained on the use and administration of the Cloud Services. Customer shall ensure that the name, contact and other information for these Designated Support Contacts are current in the Support Portal. Customer may replace Designated Support Contacts by updating the applicable information in the Support Portal, provided that at no time may Customer have more than the number of Designated Support Contacts permitted based on its Support Level.

7.      **Support Exclusions**.

Revolv3 is not required to provide resolutions for immaterial defects or defects due to modifications of the Cloud Services made by anyone other than: (a) Revolv3; or (b) anyone acting at Revolv3's direction. Technical Support does not include professional services for implementation, configuration, integration or customization of a Cloud Service or custom software development, training or assistance with administrative functions.

8.      **Update Process**.

        8.1      Revolv3 shall use commercially reasonable efforts to (1) monitor the Cloud Services and related infrastructure for opportunities to address performance, availability and security issues; and (2) at Revolv3's discretion, deliver functionality enhancements to address customer and market requirements to improve such Cloud Services based on Revolv3 innovation.

DocuSign Envelope ID: 480D1BE6-BD34-4A07-9950-16980C8166CE

CONFIDENTIAL

8.2      Customer understands that Technical Support may not be available if Customer does not comply with Revolv3's update process, and that only the latest release of the Cloud Services contains the most current features, availability, performance, and security, including software fixes. Revolv3 is not responsible for product defects or security issues affecting the Cloud Services or failure to meet the Uptime SLA (defined in <u>Exhibit A</u>) for Cloud Services when Customer is not in compliance with Revolv3's update process.

Exhibit B

EXHIBIT 1  20
PAGE 42

DocuSign Envelope ID: 480D3B5A-BD34-4A07-9050-16980C8166CE

CONFIDENTIAL

**Exhibit C**

**Order Form Template**

---------------

**ORDER FORM #**0317A

This Order Form, #0317A, (this "Order Form") is entered into by and between Revolv3 Inc., a corporation organized under the laws of Delaware ("Revolv3") and The Litigation Practice Group PC, a California corporation with a principal place of business at 17542 E 17th Street, Ste 100 Tustin, California 92780 ("Customer") pursuant to and subject to the Agreement and Conditions set forth (as amended from time to time) (the "Agreement"), and is effective as of March 21, 2023 (the "Order Form Effective Date"). The Agreement, except as may be expressly modified or excluded herein, is incorporated herein by reference. All capitalized terms used herein and not otherwise defined in this Order Form shall have the meanings set forth in the Agreement.  Customer and Revolv3 may be referred to herein collectively as the "Parties" or individually as a "Party."

1. **Products and Services.**

Customer wishes to acquire the Cloud Services listed below under this Order Form:

| Check Box | Menu of Products/Services |
|---|---|
| ☒ | Revolv3 SaaS Platform, including installments, one-time payments, recurring billing |
| ☐ | [...] |
| ☐ | [...] |
| ☐ | [...] |
| ☐ | [...] |

2. **Fees.**

The following Fees shall apply to the Services being acquired under this Order Form:

| Service Fees: | |
|---|---|
| **Transaction Fee:** | $0.15 for each payment approval commencing on the Order Form Effective Date |

3. **Subscription Period.**

The initial Subscription Period for each applicable Service included above is one (1) year commencing on the Order Form Effective Date.  The Subscription Period will automatically renew for each applicable Service for additional successive terms of one (1) year each unless either Party provides written notification to the other Party of its intent not to renew the Subscription Period for such applicable Service prior to expiration of the then-current Subscription Period, which notice must be sent at least sixty (60)

Exhibit C

EXHIBIT 1  21
PAGE 43

DocuSign Envelope ID: 880D1B5A-BD74-4A07-9050-16980C8166CE

CONFIDENTIAL

days prior to such expiration, in which case the Subscription Period shall expire upon expiration of the then-current term, only for such applicable Service.  In the event the Subscription Period expires for a specific Service, this Order Form shall continue in full force and effect with respect to any other Services not subject to such expiration.

4.      **Billing and Renewal.**

Customer shall receive an invoice for Subscription Fees applicable to the first Subscription Period upon or before the Order Form Effective Date.  Thereafter, Revolv3 shall invoice Customer for the Subscription Fees for each additional Subscription Period on or before the first day of the additional Subscription Period.  Any other applicable Fees during each Subscription Period shall be invoiced monthly in arrears.

Subscription renewal fees shall be equal to the subscription pricing in effect during the last month of the prior Subscription Period, unless Revolv3 has given Customer at least sixty (60) days prior written notice of a fee increase, which shall be effective upon renewal of the Subscription Period.  Fees for additional or out of scope services will be charged on an as-quoted basis.

Customer must provide Revolv3 with complete and accurate billing and contact information.  This information includes Customer's legal company name, street address, e-mail address, and name and telephone number of an authorized business contact and named Accounts Payable representative. Customer shall update this information within thirty (30) days of any change to it.

5.      **Changes to Order Form.**

Any changes to this Order Form during the Subscription Period shall require a written amendment to this Order Form (an "Amended Order Form") signed by both Revolv3 and Customer.  Both Revolv3 and Customer agree to act in good faith when considering an Amended Order Form proposed by the other Party, but acknowledge that neither Party is obligated to execute an Amended Order Form.

[*signature page follows*]

Exhibit C

EXHIBIT 1  22
PAGE 44

CONFIDENTIAL

IN WITNESS WHEREOF, the Parties have caused this Order Form to be effective as of the Order Form Effective Date.

**Revolv3 Inc.**                                    The Litigation Practice Group PC

Name:  Nathan Johnston _____        Name:  Tony Diab _____

Title: Director, Strategic Partnerships          Title: Partner _____

Signature: *Nathan Johnston* _____       Signature: *Tony Diab* _____
          A00DA902B1F04E2...                              5169E6465B47480...

Date: 3/21/2023 _____           Date: 3/21/2023 _____

Exhibit C                                              EXHIBIT 1  23
                                                      PAGE 45

# EXHIBIT 2

EXHIBIT 2
PAGE 46

Reconciliation Settlement Report - Context: The Litigation Practice Group, P.C. - From: 08/30/2022 To: 08

| Routing Number | Account Number | Account Description | Transfer Date |
|---|---|---|---|
| ███3576 | ███9960 | **The Litigation Practice Group PC Merchant Account** | |
| | | The Litigation Practice Group PC Merch | 6/9/2023 |
| | | The Litigation Practice Group PC Merch | 6/12/2023 |
| | | The Litigation Practice Group PC Merch | 6/13/2023 |
| | | The Litigation Practice Group PC Merch | 6/14/2023 |
| | | The Litigation Practice Group PC Merch | 6/15/2023 |
| | | The Litigation Practice Group PC Merch | 6/16/2023 |
| | | The Litigation Practice Group PC Merch | 6/20/2023 |
| | | The Litigation Practice Group PC Merch | 6/21/2023 |
| | | The Litigation Practice Group PC Merch | 6/26/2023 |
| | | The Litigation Practice Group PC Merch | 6/27/2023 |
| | | The Litigation Practice Group PC Merch | 6/28/2023 |
| | | The Litigation Practice Group PC Merch | 6/29/2023 |
| | | The Litigation Practice Group PC Merch | 6/30/2023 |
| | | The Litigation Practice Group PC Merch | 7/3/2023 |
| | | The Litigation Practice Group PC Merch | 7/6/2023 |
| | | The Litigation Practice Group PC Merch | 7/7/2023 |
| | | The Litigation Practice Group PC Merch | 7/10/2023 |
| | | The Litigation Practice Group PC Merch | 7/11/2023 |
| | | The Litigation Practice Group PC Merch | 7/14/2023 |
| | | The Litigation Practice Group PC Merch | 7/17/2023 |
| | | The Litigation Practice Group PC Merch | 7/31/2023 |
| ███0724 | ███9201 | **The Litigation Practice Group PC Merchant Account** | |
| | | The Litigation Practice Group PC Merch | 3/30/2023 |
| | | The Litigation Practice Group PC Merch | 3/31/2023 |
| | | The Litigation Practice Group PC Merch | 4/4/2023 |
| | | The Litigation Practice Group PC Merch | 4/5/2023 |
| | | The Litigation Practice Group PC Merch | 4/6/2023 |
| | | The Litigation Practice Group PC Merch | 4/7/2023 |
| | | The Litigation Practice Group PC Merch | 4/10/2023 |
| | | The Litigation Practice Group PC Merch | 4/11/2023 |
| | | The Litigation Practice Group PC Merch | 4/12/2023 |
| | | The Litigation Practice Group PC Merch | 4/13/2023 |
| | | The Litigation Practice Group PC Merch | 4/14/2023 |
| | | The Litigation Practice Group PC Merch | 4/18/2023 |
| | | The Litigation Practice Group PC Merch | 4/19/2023 |
| | | The Litigation Practice Group PC Merch | 4/20/2023 |
| | | The Litigation Practice Group PC Merch | 4/21/2023 |
| | | The Litigation Practice Group PC Merch | 4/24/2023 |
| | | The Litigation Practice Group PC Merch | 4/25/2023 |
| | | The Litigation Practice Group PC Merch | 4/26/2023 |
| | | The Litigation Practice Group PC Merch | 4/27/2023 |
| | | The Litigation Practice Group PC Merch | 4/28/2023 |
| | | The Litigation Practice Group PC Merch | 5/1/2023 |
| | | The Litigation Practice Group PC Merch | 5/2/2023 |
| | | The Litigation Practice Group PC Merch | 5/3/2023 |
| | | The Litigation Practice Group PC Merch | 5/4/2023 |
| | | The Litigation Practice Group PC Merch | 5/5/2023 |
| | | The Litigation Practice Group PC Merch | 5/8/2023 |
| | | The Litigation Practice Group PC Merch | 5/9/2023 |

EXHIBIT 2
PAGE 47

| | |
|---|---|
| The Litigation Practice Group PC Merch | 5/10/2023 |
| The Litigation Practice Group PC Merch | 5/11/2023 |
| The Litigation Practice Group PC Merch | 5/12/2023 |
| The Litigation Practice Group PC Merch | 5/15/2023 |
| The Litigation Practice Group PC Merch | 5/16/2023 |
| The Litigation Practice Group PC Merch | 5/17/2023 |
| The Litigation Practice Group PC Merch | 5/18/2023 |
| The Litigation Practice Group PC Merch | 5/19/2023 |
| The Litigation Practice Group PC Merch | 5/22/2023 |
| The Litigation Practice Group PC Merch | 5/23/2023 |
| The Litigation Practice Group PC Merch | 5/24/2023 |
| The Litigation Practice Group PC Merch | 5/25/2023 |
| The Litigation Practice Group PC Merch | 5/26/2023 |
| The Litigation Practice Group PC Merch | 5/30/2023 |
| The Litigation Practice Group PC Merch | 5/31/2023 |
| The Litigation Practice Group PC Merch | 6/1/2023 |
| The Litigation Practice Group PC Merch | 6/2/2023 |
| The Litigation Practice Group PC Merch | 6/5/2023 |
| The Litigation Practice Group PC Merch | 6/6/2023 |
| The Litigation Practice Group PC Merch | 6/7/2023 |
| The Litigation Practice Group PC Merch | 6/8/2023 |

**Total:**

EXHIBIT 2

PAGE 48

/07/2023 for USD

| Worldpay Transfer Id | Selected Reporting Group | Full Transfer Amount |
|---|---:|---:|
| | 4,639,060.24 | 4,639,060.24 |
| 26501807066417 | 83,694.31 | 83,694.31 |
| 26501808535717 | 93,895.54 | 93,895.54 |
| 26501809873810 | 348,680.63 | 348,680.63 |
| 26501811108015 | -2,309.90 | -2,309.90 |
| 26501812356217 | -24,622.11 | -24,622.11 |
| 26501813661110 | 700,615.88 | 700,615.88 |
| 26501815289811 | 217,686.51 | 217,686.51 |
| 26501816666918 | 174,748.62 | 174,748.62 |
| 26501817910919 | 624,037.71 | 624,037.71 |
| 26501821875918 | 371,476.54 | 371,476.54 |
| 26501823013210 | 41,158.94 | 41,158.94 |
| 26501824314212 | 78,502.39 | 78,502.39 |
| 26501825526418 | 61,500.72 | 61,500.72 |
| 26501827087112 | 217,541.00 | 217,541.00 |
| 26501828999018 | 846,663.37 | 846,663.37 |
| 26501831132110 | 474,404.29 | 474,404.29 |
| 26501832604018 | 18,704.06 | 18,704.06 |
| 26501834172212 | 275,969.14 | 275,969.14 |
| 26501835429215 | 46,679.75 | 46,679.75 |
| 26501839365118 | 109,522.48 | 109,522.48 |
| 26501841119917 | -119,489.63 | -119,489.63 |
| | 8,727,499.04 | 8,727,499.04 |
| 26501738200713 | 2,500.21 | 2,500.21 |
| 26501739458013 | 369.45 | 369.45 |
| 26501742538710 | 12,146.09 | 12,146.09 |
| 26501743893312 | 686,338.56 | 686,338.56 |
| 26501745241817 | 210,948.22 | 210,948.22 |
| 26501746564415 | 105,077.92 | 105,077.92 |
| 26501748019418 | -21,854.63 | -21,854.63 |
| 26501749579212 | 280,379.20 | 280,379.20 |
| 26501750876713 | 15,121.18 | 15,121.18 |
| 26501752157112 | -34,369.31 | -34,369.31 |
| 26501753440814 | 56,820.98 | 56,820.98 |
| 26501754980214 | 660,216.90 | 660,216.90 |
| 26501757705014 | 90,290.12 | 90,290.12 |
| 26501758989518 | -128,500.43 | -128,500.43 |
| 26501760286416 | 124,163.87 | 124,163.87 |
| 26501761772018 | 74,515.63 | 74,515.63 |
| 26501763138515 | 229,761.78 | 229,761.78 |
| 26501764425911 | 42,905.69 | 42,905.69 |
| 26501765702318 | 236,891.16 | 236,891.16 |
| 26501766981010 | 58,809.66 | 58,809.66 |
| 26501768526219 | 457,888.48 | 457,888.48 |
| 26501769881811 | 736,949.98 | 736,949.98 |
| 26501771306914 | 91,280.12 | 91,280.12 |
| 26501772729411 | 120,744.36 | 120,744.36 |
| 26501774091414 | 162,170.98 | 162,170.98 |
| 26501775642413 | 275,262.46 | 275,262.46 |
| 26501777229219 | 281,578.69 | 281,578.69 |

EXHIBIT 2
PAGE 49

| | | |
|---|---:|---:|
| 26501778536018 | -29,171.05 | -29,171.05 |
| 26501779838017 | 69,270.23 | 69,270.23 |
| 26501781137317 | 47,917.59 | 47,917.59 |
| 26501782605411 | 127,062.40 | 127,062.40 |
| 26501784022219 | 818,299.51 | 818,299.51 |
| 26501785342616 | 382,040.03 | 382,040.03 |
| 26501786612512 | -55,398.97 | -55,398.97 |
| 26501787885315 | 120,275.66 | 120,275.66 |
| 26501789359210 | -30,254.34 | -30,254.34 |
| 26501790672114 | 642,549.44 | 642,549.44 |
| 26501791932913 | 26,942.95 | 26,942.95 |
| 26501793177913 | -52,381.63 | -52,381.63 |
| 26501794404118 | 191,899.42 | 191,899.42 |
| 26501795911715 | 79,179.45 | 79,179.45 |
| 26501797253819 | 16,629.42 | 16,629.42 |
| 26501798552912 | 372,322.27 | 372,322.27 |
| 26501799969412 | 376,614.47 | 376,614.47 |
| 26501801565216 | 145,019.26 | 145,019.26 |
| 26501802988318 | 686,488.26 | 686,488.26 |
| 26501804299318 | -13,067.71 | -13,067.71 |
| 26501805591317 | -23,144.94 | -23,144.94 |
| | **13,366,559.28** | **13,366,559.28** |

EXHIBIT 2

PAGE 50

Reconciliation Settlement Report - Context: The Litigation Practice Group, P.C. - From: 08/30/2022

| Settlement Date | Activity Date | Net Settled Sales | Count | Settled Deposits |
|---|---|---|---|---|
| August 30-31, 2022 | | 0.00 | 0 | 0.00 |
| September 1-30, 2022 | | 0.00 | 0 | 0.00 |
| October 1-31, 2022 | | 0.00 | 0 | 0.00 |
| November 1-30, 2022 | | 0.00 | 0 | 0.00 |
| December 1-31, 2022 | | 0.00 | 0 | 0.00 |
| January 1-31, 2023 | | 0.00 | 0 | 0.00 |
| February 1-28, 2023 | | 0.00 | 0 | 0.00 |
| March 1-31, 2023 | | 2,906.13 | 10 | 2,906.13 |
| April 1-30, 2023 | | 4,006,972.21 | 12788 | 4,006,972.21 |
| May 1-31, 2023 | | 6,919,750.56 | 22212 | 6,919,750.56 |
| June 1-30, 2023 | | 6,342,827.10 | 20100 | 6,342,827.10 |
| July 1-31, 2023 | | 2,564,821.77 | 8294 | 2,564,821.77 |
| August 1-7, 2023 | | 0.00 | 0 | 0.00 |
| **Total:** | | **19,837,277.77** | **63404** | **19,837,277.77** |

EXHIBIT 2

PAGE 51

To: 08/07/2023 for USD

| Settled Refunds | Deposit Reversal | Refund Reversal | Push to Card |
|---|---|---|---|
| 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 |
| **0.00** | **0.00** | **0.00** | **0.00** |

EXHIBIT 2

PAGE 52

| Returned Payments | Chargebacks/Returns | Rejected Payments | Total Fees | Worldpay Fees |
|---|---|---|---|---|
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | -36.47 | -35.48 |
| -1,230,597.92 | -1,230,597.92 | 0.00 | -76,711.70 | -71,941.16 |
| -2,342,090.16 | -2,342,090.16 | 0.00 | -96,925.22 | -88,977.07 |
| -1,881,808.86 | -1,881,808.86 | 0.00 | -147,720.85 | -142,108.28 |
| -659,002.87 | -659,002.87 | 0.00 | -35,824.44 | -32,879.86 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **-6,113,499.81** | **-6,113,499.81** | **0.00** | **-357,218.68** | **-335,941.85** |

EXHIBIT 2

PAGE 53

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| **PLAINTIFFS**<br>Richard A. Marshack, Trustee of the LPG Liquidation Trust | **DEFENDANTS**<br>Revolv3, Inc. and Nathan Johnston |
|---|---|

| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br>Christopher Celentino<br>Yosina M. Lissebeck<br>Joshua Marrone (pro hac vice)<br>Jeana Mason (pro hac vice)<br><br>Dinsmore & Shohl LLP<br>655 West Broadway, Suite 800<br>San Diego, California 92101<br>619.400.0500 | **ATTORNEYS** (If Known) |
|---|---|

| **PARTY** (Check One Box Only)<br>☐ Debtor   ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor   ☐ Other<br>☒ Trustee | **PARTY** (Check One Box Only)<br>☐ Debtor   ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor   ☐ Other<br>☐ Trustee |
|---|---|

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

(1) Avoidance, Recovery, and Preservation of 2-Year Actual Fraudulent Transfers; (2) Avoidance, Recovery, and Preservation of 2-Year Constructive Fraudulent Transfers; (3) Avoidance, Recovery, and Preservation of 4-Year Actual Fraudulent Transfers; (4) Avoidance, Recovery, and Preservation of 4-Year Constructive Fraudulent Transfers; (5) Turnover; and (6) Aiding and Abetting

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
- ☒ 11-Recovery of money/property - §542 turnover of property
- ☐ 12-Recovery of money/property - §547 preference
- ☒ 13-Recovery of money/property - §548 fraudulent transfer
- ☒ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
- ☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
- ☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
- ☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
- ☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
- ☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
- ☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
- ☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
- ☐ 61-Dischargeability - §523(a)(5), domestic support
- ☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
- ☐ 63-Dischargeability - §523(a)(8), student loan
- ☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
- ☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
- ☐ 71-Injunctive relief – imposition of stay
- ☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
- ☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
- ☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
- ☐ 01-Determination of removed claim or cause

**Other**
- ☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
- ☒ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ 8,699,099 |

Other Relief Sought

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>The Litigation Practice Group P.C. | BANKRUPTCY CASE NO.<br>8:23-bk-10571-SC | |
| DISTRICT IN WHICH CASE IS PENDING<br>Central District of California | DIVISION OFFICE<br>Santa Ana | NAME OF JUDGE<br>Hon. Scott C. Clarkson |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br>3/12/25 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Joshua I. Marrone | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.