1  CHRISTOPHER CELENTINO (131688)
   Christopher.Celentino@dinsmore.com
2  YOSINA M. LISSEBECK (201654)
   Yosina.Lissebeck@dinsmore.com
3  CHRISTOPHER B. GHIO (259094)
   Christopher.Ghio@dinsmore.com
4  VANESSA E. RODRIGUEZ (349425)
   Vanessa.Rodriguez@dinsmore.com
5  **DINSMORE & SHOHL LLP**
   655 West Broadway, Ste 800
6  San Diego, California 92101
   Tele: (619) 400-0500
7  Fax:  (619) 400-0501

8  SARA A. JOHNSTON (Ky. Bar 96769)
   Sara.Johnston@dinsmore.com
9  **DINSMORE & SHOHL LLP**
   101 West Main Street, Ste 900
10 Lexington, Kentucky 40507
   Tele: (859) 425-1000
11 Fax:  (859) 425-1099
   (Admitted pro hac vice)
12
   *Attorneys for Richard A. Marshack,*
13 *Trustee of the LPG Liquidation Trust*

14                **UNITED STATES BANKRUPTCY COURT**

15       **CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION**

16

| | |
|---|---|
| In re: | CHAPTER 11 |
| The Litigation Practice Group P.C., | Case No.: 8:23-bk-10571-SC |
| Debtor(s). | Adv No.:  8:25-ap-\_\_\_\_\_-SC |
| | **COMPLAINT FOR:** |
| Richard A. Marshack, Trustee of the LPG Liquidation Trust, | **(1) AVOIDANCE, RECOVERY, AND PRESERVATION OF 2-YEAR ACTUAL FRAUDULENT TRANSFERS;** |
| Plaintiff(s), | **(2) AVOIDANCE, RECOVERY, AND PRESERVATION OF 2-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS;** |
| v. | **(3) AVOIDANCE, RECOVERY, AND PRESERVATION OF 4-YEAR ACTUAL FRAUDULENT TRANSFERS;** |
| Summit Marketing Solutions, Inc., a Wyoming corporation dba Solutions by Summit; Arthur Henderson, individually, | |
| Defendant(s). | **(4) AVOIDANCE, RECOVERY, AND PRESERVATION OF 4-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS;** |

**(5) AVOIDANCE, RECOVERY AND PRESERVATION OF PREFERENTIAL TRANSFERS MADE WITHIN NINETY DAYS OF THE PETITION DATE;**

**(6) TURNOVER; AND**

**(7) AIDING AND ABETTING**

Date: [To Be Set]
Time: [To Be Set]
Place: Courtroom 5C
        411 West Fourth Street
        Santa Ana, California 92701
Judge: Hon. Scott C. Clarkson

For his *Complaint for (1) Avoidance, Recovery, and Preservation of 2-Year Actual Fraudulent Transfers; (2) Avoidance, Recovery, and Preservation of 2-Year Constructive Fraudulent Transfers; (3) Avoidance, Recovery, and Preservation of 4-Year Actual Fraudulent Transfers; (4) Avoidance, Recovery, and Preservation of 4-Year Constructive Fraudulent Transfers; (5) Avoidance, Recovery, and Preservation of Preferential Transfers; (6) Turnover; and (7) Aiding and Abetting as to Defendant Arthur Henderson* ("Complaint"), plaintiff Richard A. Marshack, the Trustee of the LPG Liquidation Trust ("Trustee" or "Plaintiff") for the bankruptcy estate ("Estate") of debtor The Litigation Practice Group P.C. ("Debtor" or "LPG") in the above-captioned bankruptcy case ("Bankruptcy Case"), alleges and avers as follows:

**STATEMENT OF JURISDICTION, NATURE OF PROCEEDING, AND VENUE**

1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E), (H) and (O), 1334(b), and General Order No. 13-05 of the District Court for the Central District of California because this is a core proceeding arising in and/or related to the Bankruptcy Case, which is a case under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code"), and which is pending in the United States Bankruptcy Court for the Central District of California, Santa Ana Division ("Bankruptcy Court").

2.      Regardless of whether this proceeding is core, non-core, or otherwise, Plaintiff consents to the entry of a final order and judgment by the Bankruptcy Court.

3.      Defendants are notified that Rule 7008 of the Federal Rules of Bankruptcy Procedure requires Defendants to plead whether consent is given to the entry of a final order and judgment by the Bankruptcy Court.

4.      Venue of this adversary proceeding properly lies in this judicial district pursuant to 28 U.S.C. § 1409(a) because this proceeding is related to Debtor's pending Bankruptcy Case.

**THE PARTIES**

5.      Plaintiff, Richard A. Marshack was the duly-appointed, qualified, and acting Chapter 11 Trustee of Debtor's Estate and is now the current duly-appointed, qualified, and acting Trustee of the LPG Liquidation Trust.

6.      Debtor is, and at all material times was, a professional corporation organized, existing, and in good standing under the laws of the State of California, with its principal place of business in Tustin, California.

7.      Defendant Summit Marketing Solutions Inc. dba Solutions by Summit ("Defendant Summit"), is, and at all material times was, a Wyoming limited liability company organized, existing, and in good standing under the laws of the State of Wyoming. Defendant Summit is a foreign corporation authorized to conduct business in California pursuant to the Statement and Designation by Foreign Corporation filed with the California Secretary of State on July 22, 2019. Defendant Summit may be served by first class mail postage prepaid upon its registered agent for service of process, who also serves as Defendant Summit's sole principal, Arthur Henderson, at 5200 Warner Avenue, Ste 201, Huntington Beach, California 92649.

8.      Defendant Arthur Henderson ("Defendant Henderson") is, and at all material times was, an individual residing in Huntington Beach, California and may be served at 5200 Warner Avenue, Ste 201, Huntington Beach, California 92649. Upon information and belief, Defendant Henderson, is and at all material times was, the controlling principal of Defendant Summit (collectively with Defendant Summit, the "Defendants").

9.      Upon information and belief, each of the Defendants were the agent, servant, employee, partner, alter ego, or joint venture of the other Defendants, and in doing the things hereinafter alleged, each was acting within the scope of said agency, employment, partnership or

3

venture, and with the knowledge, permission, consent and ratification of other Defendants in doing, or failing to do, the things alleged herein.

### GENERAL ALLEGATIONS

A.    **The Bankruptcy Case**

10.    On March 20, 2023 ("Petition Date"), Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, commencing the Bankruptcy Case.

11.    The Office of the United States Trustee ("UST") filed its *Motion by United States Trustee to Dismiss or Convert Case Pursuant to 11 U.S.C. § 1112(b)* [Bankr. Docket No. 21] and creditors Debt Validation Fund II, LLC; MC DVI Fund 1, LLC; and MC DVI Fund 2, LLC filed the *Motion by DVF and MC DVI to Dismiss Chapter 11 Case Pursuant to 11 U.S.C. §§ 105, 305, 349, & 1112, or in the Alternative Convert This Case to Chapter 7 or Appoint a Trustee* [Bankr. Docket No. 44]. On May 4, 2023, the Court entered its *Order Directing United States Trustee to Appoint Chapter 11 Trustee* [Bankr. Docket No. 58].

12.    Pursuant to the *Acceptance of Appointment as Chapter 11 Trustee* [Bankr. Docket No. 63], on May 8, 2023, Trustee accepted his appointment as the Chapter 11 Trustee in the Bankruptcy Case. The Court approved the Trustee's appointment in its *Order Approving the U.S. Trustee's Application for the Appointment of a Chapter 11 Trustee* [Docket No. 65].

13.    Pursuant to the Order Confirming Modified First Amended Joint Chapter 11 Plan of Liquidation entered September 9, 2024, and the Notice of Occurrence of Effective Date of Modified First Amended Joint Chapter 11 Plan of Liquidation filed September 24, 2024, Richard A. Marshack became the Liquidating Trustee of the LPG Liquidation Trust, effective September 24, 2024. [Bankr. Docket Nos. 1646 & 1762].

14.    Trustee was not appointed until after events of the case and, therefore, bases these allegations on information and belief. *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) ("The *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible."); *Miller v. City of Los Angeles*, 2014 U.S. Dist. LEXIS 198871, 2014 WL

12610195, at *5 (C.D. Cal. Aug. 7, 2014) (recognizing that the plaintiff's "information and belief" pleading was allowed and "necessary at times"); *see also Mireskandari v. Daily Mail and General Trust PLC*, 2013 U.S. Dist. LEXIS 194437, 2013 WL 12129642, at *4 (C.D. Cal. July 31, 2013) ("The Federal Rules of Civil Procedure allow parties to plead facts on 'information and belief' if the facts 'will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.'" (citations omitted)).

15.    All claims have been transferred to the Liquidating Trust pursuant to the confirmed plan and Plaintiff brings this action solely in his capacity as the Trustee of the LPG Liquidation Trust for the benefit of Debtor's Estate and its creditors.

**B.    Protective Order**

16.    On or about May 2, 2024, Plaintiff filed that certain Notice and Motion for Entry of Protective Order (the "Protective Order Motion").

17.    On June 3, 2024, the Court entered its Order Granting Motion for Entry of Protective Order and the Protective Order [Docket No. 1270] (the "Protective Order"). A true and accurate copy of the Protective Order is attached as **Exhibit 1** and incorporated herein.

18.    By its own terms, the Protective Order applies to this adversary proceeding and governs all discovery conducted herein.

**C.    LPG and Tony Diab**

19.    LPG operated a law firm for consumers across the country who sought assistance in contesting or resolving debts they would identify.

20.    The consumers would pay LPG over a period of time via monthly debits and/or ACH debits from their bank accounts.

21.    The monthly payments were meant to cover all legal services LPG provided to the consumers including validation of the debts, review of documents to determine enforceability, and court appearances to halt lawsuits to obtain judgments.

22.    In certain instances, LPG would file a lawsuit in an effort to eliminate a disputed debt or to prosecute affirmative claims held by the consumers.

23.    LPG mismanaged the consumers' monthly payments.

24.     Tony Diab is, and at all relevant times was, an individual who operated, dominated and controlled LPG ("Diab"). Diab and others devised a plan to fraudulently transfer funds, client files, client funds and assets in the form of ACH Receivables (the "ACH Receivables" or "Accounts Receivable") out of LPG to third parties prior to the filing of bankruptcy.

25.     To obtain consumer clients, LPG contracted with marketing companies, who engaged in illegal capping and would advertise or call to solicit consumers to become clients of LPG in exchange for a percentage of the ACH Receivables collected by LPG from the consumers.

26.     The marketing affiliate went so far as to assist with the execution of an engagement letter between the consumer and LPG.

27.     In exchange, LPG agreed to pay the marketing affiliates a percentage of the monthly payments collected by LPG from the consumers.

28.     Because LPG received payments from consumers over time, it often sought financing by borrowing against its future cash flows. This borrowing was not only used to finance operations at LPG, but also to pay the fees owed to the marketing companies for providing the client referrals.

29.     Many of the documents executed in connection with such financing described the transactions as accounts receivable purchase agreements.

30.     Diab used entities he controlled, and were his alter egos, including, without limitation, Vulcan, Coast Processing, PrimeLogix, Maverick, Validation Partners LLC, PurchaseCo80, LLC ("PurchaseCo80"), Marich Bein, LLC ("Marich Bein") and/or Validation, LLC ("Validation")[1] to divert LPG consumer funds and ACH Receivables. Diab would use numerous ACH processing companies in order to easily transfer millions of dollars from Debtor to these entities he controlled, without oversight or detection, and to avoid payment disputes and complications. The money that flowed from Debtor through these bank accounts to defendants consisted of Client Funds that Debtor funneled to these entities by means of the ACH processing

---

[1]     The entities referenced in this paragraph are also incorporated by reference into "LPG" or "Debtor.

companies.[2] Debtor also made deposits into these entities bank account such that they received Client Funds directly from Debtor in addition to future Accounts Receivable.

**31.**    The money that flowed from Debtor through Validation's bank account to Defendant Summit consisted of Client Funds that Debtor funneled to Validation by means of the ACH processing companies.

**32.**    LPG's monthly revenue from client files was primarily received via ACH payments. In order to process ACH payments, LPG was required to enlist the services of ACH payment processing companies who handle high risk transactions. In this regard, Diab enlisted numerous ACH processing companies[3] in order to easily switch between different vendors and quickly transfer millions of dollars of LPG funds to entities he controlled, generally in less than three days from receipt of funds by the processing company. One reason for the plethora of processing company vendors was to avoid payment disputes and complications with the vendor itself. Switching between ACH processing companies further facilitated unauthorized double pulls, and made it more difficult for LPG clients to dispute, prevent or stop unauthorized ACH transactions, even where the Client disputed the transactions, had cancelled their services, and/or requested a refund.

**D.**    **Defendants Summit Marketing Solutions, Inc. and Arthur Henderson**

**33.**    Upon information and belief, Defendant Henderson, is and at all material times was, the controlling principal of Defendant Summit.

**34.**    Defendant Summit was one of the marketing companies that procured clients for LPG.

**35.**    LPG agreed to pay, and in fact paid, Defendant Summit a portion of the monthly payments received from consumers referred by Defendant Summit.

---

[2]    The ACH processing companies LPG used and which Diab controlled includes, but is not limited to, EPPS; EquiPay; Merit Fund; Authorize.net; World Global; Optimum Bank; BankUnited; Marich Bein; Revolv3; Maverick Bankcard; FIS; and/or Guardian.

[3]    The ACH processing companies LPG also used and which Diab controlled includes, but is not limited to, EPPS; EquiPay; Merit Fund; Authorize.net; World Global; Optimum Bank; BankUnited; Marich Bein; Revolv3; Maverick Bankcard; FIS; and/or Guardian.

**36.**    Defendant Summit also entered into agreements pursuant to which it purported to sell accounts receivable back to LPG.

**37.**    Defendant Henderson was, at all times mentioned herein, in an executive position, such as President and CEO, with Defendant Summit.

**38.**    As an executive of Defendant Summit, Defendant Henderson had control of and authorized Defendant Summit's financial operations.

**39.**    Defendant Henderson executed agreements, such as the Affiliate Agreement and/or the ARPA Agreements, with Validation, acting as the alter ego of Diab, the Debtor, or one of its ACH processing companies, on behalf of Defendant Summit. *See* **Ex. 2** and **Exs. 3-9**.

**40.**    As an executive of Defendant Summit, Defendant Henderson had knowledge of the business dealings with Debtor, including but not limited to the payment structure between consumers of Debtor and Debtor's ACH processing companies, and Defendant Summit.

**41.**    Defendant Henderson, through authorizing actions of Defendant Summit, facilitated Debtor's criminal enterprise by advertising and marketing Debtor's services to potential consumers and thereafter enrolling consumers to pay for Debtor's services.

**42.**    Defendant Henderson used the business operations between Defendant Summit and Debtor for his personal gain.

> **i.    Affiliate Agreement**

**43.**    On or about January 4, 2022, Defendant Summit and Validation entered into an affiliate agreement ("Affiliate Agreement"). A true and accurate copy of the Affiliate Agreement is attached as **Exhibit 2** and incorporated herein.

**44.**    The Affiliate Agreement states that Defendant Summit "owns and operates a system of generating leads consisting of consumers interested in the legal services offered by [Validation]." *See* **Ex. 2**.

**45.**    Pursuant to the Affiliate Agreement, Defendant Summit generated leads consisting of consumers interested in the legal services offered by Debtor through Validation and referred those consumers to Debtor. *See* **Ex. 2**.

**46.**    Defendant Summit went so far as to assist with the execution of an engagement letter with the consumer. *See* **Ex. 2**.

**47.**    Pursuant to the Affiliate Agreement, Validation agreed to pay Defendant Summit as follows:

> Affiliate shall be entitled to receive the following as full and complete compensation for its services to [Validation]: -45% of all revenue generated from files originated by Affiliate if Affiliate originates 1 to 500 files in a given month; [Validation] shall bear all expenses related to the services it offers to consumers, and Affiliate shall bear all expenses related to its marketing of the same except as is set forth in this Paragraph. Neither [Validation] nor Affiliate shall be required to pay the expenses of the other.

*See* **Ex. 2**.

**48.**    The Affiliate Agreement violates Sections 6151 and 6155 of the California Business and Professional Code, which prohibit referrals of potential clients to attorneys unless registered with the State Bar of California. Cal. Bus. & Prof. Code § 6155. "Referral activity" includes "any entity 'which, in person, electronically, or otherwise, refers the consumer to an attorney or law firm not identified' in the advertising." *Jackson v. LegalMatch.com*, 42 Cal. App. 5th 760, 775 (2019). A referral includes receiving information from potential clients and sending that information to lawyers, even when the advertiser does not advertise the name of the attorneys and the clients do not clear the name of the potential attorney after the referral occurred. *Id.*

**49.**    Further, if any effect of an agreement is to accomplish an unlawful purpose, the agreement may be declared illegal regardless of the intention of the parties. *Stockton Morris Plan Co. v. Cal. Tractor & Equip. Corp.*, 112 Cal. App. 2d 684, 690 (1952) (citing *Fewel & Dawes, Inc. v. Pratt*, 17 Cal. 2d 85, 91 (1941)). This remains true regardless of whether the contract has been performed. *Stevens v. Boyes Hot Springs Co.*, 113 Cal. App. 479, 483 (1931) (A contract by a corporation to purchase its own stock has the effect of illegally withdrawing and paying to a stockholder a part of the capital stock of the corporation and is illegal and void, regardless of the fact that the contract is fully performed by the sellers and partially performed by the corporation.); *Mansfield v. Hyde*, 112 Cal. App. 2d 133, 139 (1952), overruled, *Fomco, Inc. v. Joe Maggio, Inc.*, 8 Cal. Rptr. 459 (1960) (Where object of statute requiring licenses is to prevent improper persons

from engaging in particular activity, or is for purpose of regulating occupation or business for protection of public, imposition of penalty amounts to prohibition against engaging in occupation or business without license, and contract made by unlicensed person in violation of statute is invalid.); *Firpo v. Murphy*, 72 Cal. App. 249, 252 (1925) (A contract to pay commissions to a real estate broker is illegal and he is not entitled to recover thereon where he fails to secure the license required by law to carry on his business.).

50.     Because the Affiliate Agreement violates federal and state law, it is void, unenforceable, and subject to avoidance as fraudulent. Any alleged consideration provided under the Affiliate Agreement and/or the ARPA Agreements (as defined below) was unlawful.

51.     Unlawful consideration is that which is: "(1) contrary to an express provision of law; (2) contrary to the policy of express law, though not expressly prohibited; or (3) otherwise contrary to good morals." Cal. Civ. Code § 1667. "If any part of a single consideration for one or more objects, or of several considerations for a single object, is unlawful, the entire contract is void." Cal. Civ. Code § 1608.

## ii.    Accounts Receivable Purchase Agreements

52.     On or about September 7, 2022, Defendant Summit entered into an Account Receivable Purchase Agreement with PurchaseCo80, LLC ("ARPA 1"). Debtor consented to and approved the assignment contemplated in the ARPA 1 and Guaranteed the account receivables. A true and accurate copy of ARPA 1 is attached as **Exhibit 3** and incorporated herein.

53.     On or about September 14, 2022, Defendant Summit entered into an Account Receivable Purchase Agreement with PurchaseCo80, LLC ("ARPA 2"). Debtor consented to and approved the assignment contemplated in the ARPA 2 and Guaranteed the account receivables. A true and accurate copy of ARPA 2 is attached as **Exhibit 4** and incorporated herein.

54.     On or about October 6, 2022, Defendant Summit entered into an Account Receivable Purchase Agreement with Marich Bein, LLC ("ARPA 3"). Debtor consented to and approved the assignment contemplated in the ARPA 3 and Guaranteed the account receivables. ARPA 3 is also consistent with LPG's practices with other affiliate marketers with whom LPG had

express capping agreements. A true and accurate copy of ARPA 3 is attached as **Exhibit 5** and incorporated herein.

**55.**    On or about November 7, 2022, Defendant Summit entered into an Account Receivable Purchase Agreement with Debtor ("ARPA 4"). A true and accurate copy of ARPA 4 is attached as **Exhibit 6** and incorporated herein.

**56.**    On or about December 2, 2022, Defendant Summit entered into an Account Receivable Purchase Agreement with ProofPositive, LLC ("ARPA 5"). Debtor consented to and approved the assignment contemplated in the ARPA 5 and Guaranteed the account receivables. A true and accurate copy of ARPA 5 is attached as **Exhibit 7** and incorporated herein.

**57.**    On or about January 6, 2023, Defendant Summit entered into an Account Receivable Purchase Agreement with Debtor ("ARPA 6"). A true and accurate copy of ARPA 6 is attached as **Exhibit 8** and incorporated herein.

**58.**    On or about February 28, 2023, Defendant Summit entered into an Account Receivable Purchase Agreement with Debtor ("ARPA 7"). A true and accurate copy of ARPA 7 is attached as **Exhibit 9** and incorporated herein.

**59.**    Plaintiff believes there are other ARPA agreements and/or other agreements supporting and evidencing the procurement of client files for Debtor and/or sale of account receivables from Debtor's client files.

**60.**    ARPA 1 through ARPA 7 and other above mentioned agreements are referred to collectively hereinafter as the "ARPA Agreements."

**61.**    Pursuant to the ARPA Agreements, Defendant Summit purported to sell to the Debtor, PurchaseCo80, Marich Bein, and ProofPositive streams of monthly payments from consumers that were supposed to be held in trust until earned. *See* **Exs. 3 - 9**. The Debtor, PurchaseCo80, and Marich Bein are Diab's alter egos and under his control and direction.

**62.**    By entering into the ARPA Agreements, Debtor, Defendant Summit, and PurchaseCo80 and Marich Bein as alter egos of Diab, violated federal and state laws by selling unearned legal fees or funds there were supposed to be held in trust or used for the benefit of consumers.

63.     The effect of the ARPA Agreements was to accomplish an unlawful purpose. Thus, the agreements may be declared illegal regardless of the intention of the parties. *Stockton Morris Plan Co. v. Cal. Tractor & Equip. Corp.*, 112 Cal. App. 2d 684, 690 (1952) (citing *Fewel & Dawes, Inc. v. Pratt*, 17 Cal. 2d 85, 91 (1941)). This remains true regardless of whether the contract has been performed. *Stevens v. Boyes Hot Springs Co.*, 113 Cal. App. 479, 483 (1931) (A contract by a corporation to purchase its own stock has the effect of illegally withdrawing and paying to a stockholder a part of the capital stock of the corporation and is illegal and void, regardless of the fact that the contract is fully performed by the sellers and partially performed by the corporation.); *Mansfield v. Hyde*, 112 Cal. App. 2d 133, 139 (1952), overruled, *Fomco, Inc. v. Joe Maggio, Inc.*, 8 Cal. Rptr. 459 (1960) (Where object of statute requiring licenses is to prevent improper persons from engaging in particular activity, or is for purpose of regulating occupation or business for protection of public, imposition of penalty amounts to prohibition against engaging in occupation or business without license, and contract made by unlicensed person in violation of statute is invalid.);  *Firpo v. Murphy*, 72 Cal. App. 249, 252 (1925) (A contract to pay commissions to a real estate broker is illegal and he is not entitled to recover thereon where he fails to secure the license required by law to carry on his business.).

64.     Because the ARPA Agreements violate federal and state laws, they are void, unenforceable, and subject to avoidance as fraudulent. Any alleged consideration provided to Debtor, PurchaseCo80 or Marich Bein, as alter egos of Diab, under the ARPA Agreements was unlawful.

65.     Unlawful consideration is that which is: "(1) contrary to an express provision of law; (2) contrary to the policy of express law, though not expressly prohibited; or (3) otherwise contrary to good morals." Cal. Civ. Code § 1667. "If any part of a single consideration for one or more objects, or of several considerations for a single object, is unlawful, the entire contract is void." Cal. Civ. Code § 1608.

///

///

///

### iii. <u>Preference Letter and Demand Letter</u>

**66.** On or about September 15, 2023, Trustee sent a preference letter to Defendant Summit (the "Preference Letter"). A true and accurate copy of the Preference Letter is attached as **<u>Exhibit 10</u>** and incorporated herein.

**67.** The Preference Letter discussed certain known transfers from Debtor that were made to Defendant Summit within the 90-day period prior to the Petition Date. The transfers were listed on the attached "Preference Transfer Schedule" showing the date and amount, according to Debtor's books and records, of each transfer or other payment ("Preference Transfer Schedule"). Trustee requested payment of the total amount due under the Preference Transfer Schedule that amounted to $33,346, in exchange for a waiver and release from all claims that could be asserted by Trustee against Defendant Summit pursuant to 11 U.S.C. §§ 547 and 550.

**68.** Based on the information available to Trustee and considering the nature of the relationship between Debtor and Defendant Summit, no potential defenses were identified that could reduce Defendant Summit's liability for the preference payments. Consequently, Defendant Summit was requested to provide any facts and valid defenses that could substantiate its position and potentially mitigate or prevent some or all of the Transfers (as defined below) made by Debtor.

**69.** On or about October 19, 2023, Defendant Summit responded to the Preference Letter ("Response Letter"). A true and accurate copy of the Response Letter is attached as **<u>Exhibit 11</u>** and incorporated herein.

**70.** Defendant Summit alleges certain defenses that were meritless and otherwise do not account for the fraudulent Transfers. Trustee has yet to receive any payment from Defendant Summit pursuant to the Preference Letter.

**71.** On or about February 29, 2024, the Trustee sent a demand letter to Defendant Summit ("Demand Letter"). A true and accurate copy of the Demand Letter is attached as **<u>Exhibit 12</u>** and incorporated herein.

**72.** The Demand Letter requested that Defendant Summit voluntarily produce responses to the Trustee's request for production of documents to determine whether Defendant Summit

received certain fraudulent transfers from the Debtor. Although Defendant Summit produced certain documents, the documents they provided were insufficient.

### iv.    2004 Motion

73.    On or about June 6, 2024, the Trustee filed the Notice of Motion and Motion Pursuant to Fed. R. Bankr. P. 2004 and L.B.R. 2004-1 for an Order Authorizing the Production of Documents by Summit Marketing Solutions, LLC; Memorandum of Points and Authorities; Declaration of Jacob R. Bothamley in Support Thereof; and Exhibit 1 with Proof of Service [Doc. Nos. 1313 and 1317 ( as amended, the "2004 Motion").

74.    Although Defendant Summit produced documents pursuant to the 2004 Motion and related subpoena, the document production was not fully responsive. Although the Trustee requested additional documents from Defendant Summit, they did not respond to the Trustee's request.

### E.    Payments to Defendant Summit

75.    During the applicable reach-back period, Debtor paid Defendant Summit the sum of at least $717,199 between February 2022 and February 2023, subject to proof at trial ("Transfers"). A true and accurate list of the known payments made by Debtor to Defendant Summit is attached as **Exhibit 13** and incorporated herein.

76.    At least $65,688 of the Transfers from Debtor to Defendant Summit occurred during the 90-day preference period ("Preference Transfers"). A true and accurate list of the payments made during the Preference Transfers is attached as **Exhibit 14** and incorporated herein.

77.    The Preference Period Transfers are based on updated figures as of February of 2025.

### F.    LPG'S Ponzi Scheme

78.    The Ponzi Scheme Presumption exists in bankruptcy proceedings.

79.    The Ponzi Scheme Presumption can be utilized to establish a debtor's "intent to defraud future undertakers [investors] from the mere fact that a debtor was running a Ponzi scheme. Indeed, no other reasonable inference is possible. A Ponzi scheme cannot work forever. The investor pool is a limited resource and will eventually run dry. The perpetrator must know that the

scheme will eventually collapse as a result of the inability to attract new investors. The perpetrator nevertheless makes payments to present investors, which, by definition, are meant to attract new investors. He must know all along, from the very nature of his activities, that investors at the end of the line will lose their money. Knowledge to a substantial certainty constitutes intent in the eyes of the law, *cf. Restatement (Second) of Torts § 8A (1963 & 1964)*, and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them. *Kirkland v. Rund* (*In re EPD Inv. Co., LLC*), 114 F.4th 1148, 1153 (9th Cir. 2024) (by definition a Ponzi scheme is destined to fail and the swindler and their entities often end in bankruptcy or equitable receivership); *Cf. Coleman Am. Moving Servs., Inc. v. First Nat'l Bank & Trust Co. (In re American Properties, Inc.)* (Bankr.D.Kan. 1981)14 B.R. 637, 643 (intentionally carrying out a transaction with full knowledge that its effect will be detrimental to creditors is sufficient for actual intent to hinder, delay or defraud within the meaning of § 548(a)(1))." *Merrill v. Abbott (In re Independent Clearing House Co.)*, 77 B.R. 843, 860 (D. Utah 1987).

80.     "But if all the debtor receives in return for a transfer is the use of the defendant's money to run a Ponzi scheme, there is nothing in the bankruptcy estate for creditors to share. In fact, by helping the debtor perpetuate his scheme, the transfers exacerbate the harm to creditors by increasing the amount of claims while diminishing the debtor's estate. In such a situation, the use of the defendant's money cannot objectively be called "reasonably equivalent value." *In re Independent Clearing House Co.,* 77 B.R. at 859. Therefore, "[t]he trustee can avoid the transfers if they were preferential or fraudulent. Transfers to investors in a Ponzi scheme are preferential and fraudulent. Therefore, they constitute 'property of the estate,' and the trustee can recover them." *Id*. at 853 n.17 (citations omitted).

81.     Debtor was operating a Ponzi scheme that utilized Defendant Summit and several other entities as investors to continue its unlawful business practices by using funds provided by current investors to attract new investors hoping for very high returns. Therefore, the Debtor was running a Ponzi scheme, and the Ponzi Scheme Presumption can be utilized to infer that the Debtor had the intent to defraud investors within the meaning of 11 U.S.C. section 548(a)(1).

**82.**    Moreover, since the Transfers were made with the intent to further the Ponzi scheme, the Debtor did not receive an objectively reasonable equivalent value for the Transfers, and the Trustee can avoid the Transfers because they were preferential and fraudulent.

**G.    The Criminal Enterprise**

**83.**    Debtor's operations, activities and transfers done in furtherance of the Ponzi scheme, including those in conjunction with its affiliates and its dealings with Defendants, also constituted a criminal enterprise.

**84.**    This, too, is evidenced by the Court's order in the 1046 Action wherein it denied the Motion of Greyson Law Center to Vacate the Preliminary Injunction previously entered in Debtor's main case, and the Court offered the opinion:

> Through the various proceedings and evidence produced in both the main case and the various adversary proceedings, including but not limited to various Motions for Temporary Restraining Orders, Preliminary Injunctions, Motions to Dismiss, a Motion for Appointment of a Chapter 11 Trustee, a Motion to Sell Assets, a multitude of pleadings filed by both secured and unsecured creditors (supported by evidence presented under oath) in support of their claims, and especially the pleadings and evidence presented by the "Watchdog of the Bankruptcy System" aka the Office of the United States Trustee (an arm of the United States Department of Justice), *it is clear to this Court that Debtor, since its pre-petition inception (and through the time of the appointment of the Chapter 11 Trustee) was in the Court's opinion, operating a criminal enterprise.*

Case No. 8:23-bk-10571-SC; Adv. No. 8:23-ap-01046-SC [Bankr. Docket No. 1545, p.3 (emphasis in original)].

**85.**    As part of this criminal enterprise, Debtor and Defendants engaged in fraudulent transfers of its accounts receivables pursuant to various agreements, including the ARPAs.

**H.    LPG'S Prepetition Creditors**

**86.**    Debtor was insolvent when each Transfer was made. This insolvency is evidenced in part by the fact that 14 separate UCC-1 statements were of record securing debts of the Debtor as of September 1, 2022. These statements remained unreleased as of the Petition Date. These statements either reflected secured liens against the Debtor's assets then owned or thereafter acquired or provided evidence of the assignment or sale of substantial portions of the Debtor's future income.

87.    When the Transfers were made, these prior UCC-1 statements secured the repayment of the following claimed amounts that are currently known to Trustee and are allegedly owed by the Debtor: (i) $2,374,005 owed to Fundura Capital Group as evidenced by Proof of Claim No. 335 purportedly secured by a UCC statement filed on or about May 19, 2021; (ii) approximately $15 million dollars owed to MNS Funding, LLC as evidenced by Proof of Claim No. 1060 purportedly secured by a UCC statement filed on or about May 28, 2021; (iii) approximately $5,000,000 owed to Azzure Capital, LLC as evidenced by Proof of Claim No. 127 secured by a UCC statement filed on or about May 28, 2021; and (iv) approximately $1.5 million dollars owed to Diverse Capital, LLC purportedly secured by UCC statements filed on or about September 15, 2021, and December 1, 2021.[4]

88.    As alleged above, LPG was borrowing against its assets and future income, often on unfavorable terms, not only to finance operations at LPG, but also to pay the fees owed to the marketing affiliates for providing it with consumer clients. Pursuant to the agreements with the marketing companies, significant percentages of future payments were already promised to be paid to the marketing affiliates from whatever future income the Debtor would receive.

89.    In addition, on Debtor's Schedule E/F [Bankr. Docket No. 33], Debtor scheduled 11 unsecured creditors with priority unsecured claims totaling $374,061. These priority unsecured creditors include Indiana Dept. of Revenue, Dept. of Labor and Industries, Arizona Dept. of Economic Security, Arkansas Dept. of Finance & Admin., California Franchise Tax Board, Georgia Dept. of Labor, Internal Revenue Service, Mississippi Dept. of Revenue, Nevada Dept. of Taxation, Utah State Tax Commission, and Wisconsin Dept. of Revenue (collectively, "Priority Unsecured Creditors").

90.    Another group of creditors that Debtor listed on its Schedule E/F [Bankr. Docket No. 33] are nonpriority unsecured creditors. Those 58 creditors have scheduled claims totaling $141,439,159 and include Ajilon; Anthem Blue Cross; Azevedo Solutions Groups, Inc.; Carolina Technologies & Consulting Invoice; Collaboration Advisors; Credit Reporting Service Inc.; CT

---

[4] Trustee reserves all rights, claims, and defenses with respect to these and any other purported secured or unsecured claims.

Corporation – Inv.; Debt Pay Pro; Document Fulfillment Services; EnergyCare, LLC; Exela Enterprise Solutions; First Legal Network, LLC; GHA Technologies Inc.; Harrington Electric, Inc.; Imagine Reporting; Juize, Inc.; Krisp Technologies, Inc.; Liberty Mutual; Marc Lemauviel – Allegra; MarkSYS Holdings, LLC; Netsuite-Oracle; Pitney Bowes; Rapid Credit, Inc.; SBS Leasing A Program of De Lage Landen; Security Solutions; Sharp Business Systems; Streamline Performance, Inc.; Thomson Reuters; Twilio, Inc.; Nationwide Appearance Attorneys; Executive Center, LLC; Outsource Accelerator, Ltd.; TaskUs Holdings, Inc.; Marich Bein, LLC; Validation Partners; MC DVI Fund 1, LLC; MC DVI Fund 2, LLC; Debt Validation Fund II, LLC; Tustin Executive Center; LexisNexus; JP Morgan Chase; Business Centers of America; Michael Schwartz; Anibal Colon Jr.; Kathleen Lacey; David Ulery; Kimberly Birdsong; Kevin Carpenter; Karen Suell; Gloria Eaton; Carolyn Beech; Debra Price; Kenneth Topp; Darcey Williamson, Trustee; James Hammett; Johnny Rizo; Beverly Graham; Kathleen Scarlett; and Geneve and Myranda Sheffield (collectively, "Nonpriority Unsecured Creditors" and, together with the Secured Creditors and Priority Unsecured Creditors, "Prepetition Creditors").

**91.**    As of the filing of this complaint, approximately 5,771 claims have been filed with the bankruptcy Court. While Trustee has not reviewed all claims as of the date of this complaint, and reserves all rights to object to those claims, the total amount is in excess of approximately $717,507,463.

## FIRST CLAIM FOR RELIEF

### Count I - Avoidance, Recovery, and Preservation of Actual Fraudulent Transfers

### Against Defendant Summit

### [11 U.S.C. §§ 544, 548(a)(1)(A), 550, and 551]

**92.**    Plaintiff realleges and incorporates here by reference each and every allegation contained in paragraphs 1 through 91 as though set forth in full.

**93.**    The Affiliate Agreement, ARPA Agreements, and all or a portion of the Transfers occurred within the two years prior to the Petition Date.

**94.**    On or after the date that such agreements were executed and the Transfers were made, entities to which Debtor was or became indebted include the Prepetition Creditors.

**95.** The Transfers happened while Debtor was insolvent or rendered Debtor insolvent.

**96.** Despite Debtor's obligation to the Prepetition Creditors, Debtor continued to pay Defendant Summit sums received from consumers under the Affiliate Agreement, which constitutes an illegal capping agreement between Defendant Summit and Debtor. Any obligation of the Debtor arising from such agreement is also avoidable as fraudulent.

**97.** Despite Debtor's obligation to the Prepetition Creditors, Defendant Summit continued to sell or transfer portions of its accounts receivable to Debtor, PurchaseCo80, and Marich Bein, as alter egos of Diab, which is illegal under federal and state laws.

**98.** The Transfers were made with actual intent to hinder, delay, or defraud creditors of Debtor.

**99.** The Debtor was operating a Ponzi scheme, and the Ponzi Scheme Presumption can be utilized to infer the Debtor's actual intent to defraud within the meaning of 11 U.S.C. section 548(a)(1).

**100.** The Affiliate Agreement, ARPA Agreements, and the Transfers of Debtor's funds are avoidable as fraudulent pursuant to 11 U.S.C. §§ 548(a)(1)(A), 550, and 551, and the common law tort of intentional fraudulent transfers by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against the Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

**101.** The Affiliate Agreement, ARPA Agreements, and Transfers should be voided as fraudulent under 11 U.S.C. § 548(a)(1)(A) and under the common law tort of intentional fraudulent transfers, and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

///

///

///

///

///

19

**SECOND CLAIM FOR RELIEF**

**Count II - Avoidance, Recovery, and Preservation of Constructive Fraudulent Transfers**

**Against Defendant Summit**

**[11 U.S.C. §§ 548(a)(1)(B), 550, and 551]**

102.    Plaintiff realleges and incorporates here by reference each and every allegation contained in paragraphs 1 through 101 as though set forth in full.

103.    The Affiliate Agreement, ARPA Agreements, and all or a portion of the Transfers occurred within the two years prior to the Petition Date.

104.    On or after the date that such agreements were executed and such Transfers were made, entities to which Debtor was or became indebted include the Prepetition Creditors.

105.    The Transfers happened while Debtor:

a.    was insolvent or became insolvent, as a result;

b.    was engaged or was about to engage in a transaction for which any property remaining with Debtor was of unreasonably small capital; or

c.    intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

106.    Because the referrals from Defendant Summit to Debtor are illegal under federal and state law, they are void and subject to avoidance as fraudulent. Any purported consideration constitutes unlawful consideration, which cannot constitute reasonably equivalent value. Thus, at the time the agreements were executed and the Transfers made, Debtor received less than reasonably equivalent value.

107.    Furthermore, the Debtor did not receive the reasonably equivalent value of the Transfers to Defendant Summit because by using Defendant Summit's money to run a Ponzi scheme there is nothing in Estate for the creditors to share. Rather, the Transfers exacerbated the harm to creditors by increasing the amount of claims while diminishing the Debtor's Estate. In this situation, the use of Defendant Summit's money to further the Debtor's Ponzi scheme cannot be consideration for the Transfers and cannot objectively be called reasonably equivalent value.

108.     Therefore, Defendant Summit was acting as an investor in the Debtor's Ponzi scheme. Any transfers made to Defendant Summit can be avoided by the Plaintiff since the Transfers are preferential and fraudulent such that they constitute property of the Estate in which the Plaintiff can recover.

109.     The Affiliate Agreement, ARPA Agreements, and the Transfers should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(B), and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

### THIRD CLAIM FOR RELIEF

**Count III - Avoidance, Recovery, and Preservation of Actual Fraudulent Transfers**

**Against Defendant Summit**

**[11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.04(a), 3439.04(b), and 3439.07]**

110.     Plaintiff realleges and incorporates here by reference each and every allegation contained in paragraphs 1 through 109 as though set forth in full.

111.     The Affiliate Agreement, ARPA Agreements, and all or a portion of the Transfers occurred within the four years prior to the Petition Date.

112.     On or after the date that such agreements were entered and such Transfers were made, entities to which Debtor was or became indebted include the Prepetition Creditors.

113.     Despite Debtor's obligation to the Prepetition Creditors, Debtor continued to pay Defendant Summit sums received from consumers under the Affiliate Agreement, which constitutes an illegal capping agreement between Defendant Summit and Debtor.

114.     The Transfers happened while Debtor was insolvent, or Debtor became insolvent shortly after the Transfers were made as is evidenced by the filing of the voluntary petition.

115.     The value of the consideration received by Debtor for such Transfers was not reasonably equivalent to the value of the Transfers because the Transfers were used to further assist Debtor in its Ponzi scheme.

116.     Because the referrals from Defendant Summit to Debtor are illegal under federal and state law, they are void and subject to avoidance as fraudulent. Any purported consideration

constitutes unlawful consideration, which cannot constitute reasonably equivalent value. Thus, at the time the agreements were executed and the Transfers made, Debtor received less than reasonably equivalent value.

117.    The Transfers were made with actual intent to hinder, delay, or defraud creditors of Debtor.

118.    The Debtor was operating a Ponzi scheme, and the Ponzi Scheme Presumption can be utilized to infer the Debtor's actual intent to defraud within the meaning of 11 U.S.C. section 548(a)(1).

119.    The Affiliate Agreement, the ARPA Agreements, and the Transfers of Debtor's funds are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and Cal. Civ. Code §§ 3439.04(a), 3439.04(b), and 3439.07, and the common law tort of intentional fraudulent transfers by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against the Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

120.    Accordingly, the Affiliate Agreement, the ARPA Agreements, and the Transfers should be avoided as fraudulent under 11 U.S.C. §§ 544(b) and Cal. Civ. Code §§ 3439.04(a), 3439.04(b), and 3439.07, and under the common law tort of intentional fraudulent transfers, and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551 and Cal. Civ. Code § 3439.07.

## FOURTH CLAIM FOR RELIEF

**Count IV - Avoidance, Recovery, and Preservation of Constructive Fraudulent Transfers Against Defendant Summit**

**[11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.05, and 3439.07]**

121.    Plaintiff realleges and incorporates here by reference each and every allegation contained in paragraphs 1 through 120 as though set forth in full.

122.    The Affiliate Agreement, the ARPA Agreements, and all or a portion of the Transfers occurred within the four years prior to the Petition Date.

123.    The Transfers happened while Debtor:

1          a.      was insolvent or became insolvent as a result;

2          b.      was engaged or was about to engage in a transaction for which any property

3     remaining with Debtor was of unreasonably small capital; or

4          c.      intended to incur, or believed that it would incur, debts beyond its ability to

5     pay as such debts matured.

6          **124.**    Because the referrals from Defendant Summit to Debtor are illegal under federal

7     and state law, the agreements are void and subject to avoidance as fraudulent. Any purported

8     consideration constitutes unlawful consideration, which cannot constitute reasonably equivalent

9     value. Thus, at the time the agreements were executed and the Transfers made, Debtor received

10    less than reasonably equivalent value.

11         **125.**    Furthermore, the Debtor did not receive the reasonably equivalent value of the

12    Transfers to Defendant Summit because by using Defendant Summit's money to run a Ponzi

13    scheme there is nothing in Estate for the creditors to share. Rather, the Transfers exacerbated the

14    harm to creditors by increasing the amount of claims while diminishing the Debtor's Estate. In

15    this situation, the use of Defendant Summit's money to further the Debtor's Ponzi scheme cannot

16    be consideration for the Transfers and cannot objectively be called reasonably equivalent value.

17         **126.**    Defendant Summit was therefore acting as an investor in the Debtor's Ponzi scheme

18    and any Transfers made to Defendant Summit can be avoided by the Plaintiff since the Transfers

19    to Defendant Summit are preferential and fraudulent such that they constitute property of the Estate

20    in which the Plaintiff can recover.

21         **127.**    The Affiliate Agreement, the ARPA Agreements, and the Transfers of Debtor's

22    funds are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and Cal. Civ. Code §§ 3439.05

23    and 3439.07 by one or more creditors who held and hold unsecured claims against Debtor that were

24    and are allowable against the Estate under 11 U.S.C. § 502 or that were not and are not allowable

25    only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

26         **128.**    Accordingly, the Affiliate Agreement, the ARPA Agreements, and the Transfers

27    should be avoided as fraudulent under 11 U.S.C. §§ 544(b) and Cal. Civ. Code §§ 3439.05 and

28

3439.07, and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551 and Cal. Civ. Code § 3439.07.

**FIFTH CLAIM FOR RELIEF**

**Count V - Avoidance, Recovery, and Preservation of Preferential Transfer to**

**Defendant Summit in Preference Period**

**[11 U.S.C. §§ 547, 550, and 551]**

129.    Plaintiff realleges and incorporates here by reference each and every allegation contained in paragraphs 1 through 128 as though set forth in full.

130.    The Preference Transfers were made for, or on account of, an antecedent debt or debts owed by LPG to Defendant Summit, each of which constituted a "debt" or "claim" (as those terms are defined in the Bankruptcy Code) of Defendant Summit.

131.    The Preference Transfers happened while LPG was insolvent.

132.    Debtor is also entitled to the presumption of insolvency when the Preference Transfers happened pursuant to 11 U.S.C. § 547(f).

133.    As a result of the Preference Transfers, Defendant Summit recovered more than it would have received if: (i) the Debtor's case was under chapter 7 of the Bankruptcy Code; (ii) the Preference Transfers had not been made; and (iii) Defendant Summit received payments of its debts under the provisions of the Bankruptcy Code. As evidenced by the Debtor's schedules filed in the underlying Bankruptcy Case, as well as the proofs of claim that have been received to date, the Debtor's liabilities exceed its assets to the point that unsecured creditors will not receive a full payout of their claims from the Debtor's Estate.

134.    In accordance with the foregoing, the Preference Transfers are voidable pursuant to 11 U.S.C. § 547(b), and may be recovered and preserved for the benefit of the estate pursuant to 11 U.S.C. §§ 550 and 551.

///

///

///

///

## SIXTH CLAIM FOR RELIEF

### Count VI - Turnover of Estate Property Against Defendant Summit

### [11 U.S.C. § 542]

135.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 134 as though set forth in full.

136.    Defendant Summit has possession or control over property of the Estate in the form of the Transfers made pursuant to illegal and unenforceable agreements.

137.    The Transfers are not of inconsequential value to the Estate.

138.    The funds that are the subject of the Transfers are paramount to Debtor's ability to pay creditors.

139.    Accordingly, Trustee is entitled to a judgment for turnover of the Transfer pursuant to 11 U.S.C. § 542.

## SEVENTH CLAIM FOR RELIEF

### Count VII – Aiding and Abetting Against Defendants

### [11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.04(a), 3439.04(b), and 3439.07]

140.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 139 as though set forth in full.

141.    Defendants have possession or control over property of the Estate including, but not limited to the Transfers, Preference Transfers, and Post-Petition Transfers made pursuant to illegal and unenforceable agreements.

142.    Defendants had knowledge of the fraudulent transactions, transfers, and agreements that were used to perpetuate and conceal the Ponzi scheme and fraudulent transfers.

143.    Defendants, with the foregoing knowledge, intended to, and did, help the Debtor and other scheme participants in perpetuating and concealing the Ponzi scheme and fraudulent transfers of money.

144.    At all material times, Defendants had the intent to facilitate and conceal the Ponzi scheme and fraudulent transfers of money by aiding and abetting the illegal capping scheme and signing up consumer clients to keep the business going.

145.    Defendants assisted, and did actually engage in, LPG's commission of fraud and Ponzi scheme by coordinating, facilitating, and directing payments and transfers of monies and executing documents in furtherance of concealing the true nature of their fraudulent and criminal activity related to the Ponzi scheme.

146.    Without in any way limiting the foregoing, as President and CEO, Defendant Henderson used his control over Defendant Summit to support, participate in, and benefit from LPG's Ponzi scheme and fraudulent transfers.

147.    The injuries to Plaintiff, the Debtor's Estate and to its creditors directly, proximately and reasonably foreseeably resulting from and caused by these fraudulent transfers and Ponzi scheme include, without limitation, hundreds of thousands of dollars in improperly transferred and acquired monies.

148.    The property, including but not limited to the Transfers are not of inconsequential value to the Estate and recovering these funds is paramount to Debtor's ability to pay creditors.

149.    Plaintiff and the Debtor's Estate also suffered damages by incurring attorney's fees and costs associated with the prosecution of Defendants' unlawful activities.

## **RESERVATION OF RIGHTS**

Plaintiff reserves the right to bring all other claims or causes of action that Plaintiff may have against Defendants, on any and all grounds, as allowed under the law or in equity, including but not limited to, those claims not known by the Trustee at this time but that he may discover during the pendency of this adversary proceeding.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for a judgment as follows:

**On The First, Second, Third, and Fourth Claims for Relief:**

1.    Avoiding, recovering, and preserving the Transfers against Defendant Summit; and

**On the Fifth Claim for Relief:**

2.    Avoiding, recovering, and preserving the Preference Transfers against Defendant Summit;

///

**On the Sixth Claim for Relief:**

3.    Ordering Defendant Summit to immediately turn over the Transfers and/or Preference Transfers;

**On the Seventh Claim for Relief:**

4.    Awarding Plaintiff compensatory damages in an amount to be determined at trial;

**On All Claims for Relief:**

5.    Awarding pre-judgment interest at the maximum legal rate;

6.    Awarding post-judgment interest at the maximum rate from the date of the last Transfer until the judgment is paid in pull;

7.    Awarding punitive damages against Defendant Summit and Defendant Henderson;

8.    Awarding costs of suit incurred here; and

9.    Granting any other and further relief as the Court deems just and proper.


Respectfully submitted,

Dated: March 13, 2025                    DINSMORE & SHOHL LLP


By: */s/ Vanessa E. Rodriguez*
       Yosina M. Lissebeck
       Vanessa E. Rodriguez

Attorneys for Richard A. Marshack,
Trustee of the LPG Liquidation Trust

# EXHIBIT 1

EXHIBIT 1
Page 28

1  CHRISTOPHER B. GHIO (259094)
   christopher.ghio@dinsmore.com
2  CHRISTOPHER CELENTINO (131688)
   christopher.celentino@dinsmore.com
3  YOSINA M. LISSEBECK (201654)
   yosina.lissebeck@dinsmore.com
4  DINSMORE & SHOHL LLP
5  655 West Broadway, Suite 800
   San Diego, California 92101
6  Tele:  619.400.0500
   Fax:  619.400.0501
7
8  Sarah S. Mattingly (Ky. Bar 94257)
   sarah.mattingly@dinsmore.com
9  DINSMORE & SHOHL, LLP
   101 S. Fifth Street, Suite 2500
10 Louisville, Kentucky 40202
   Tele: 859-425-1096
11 Fax: 502-585-2207
12 (Admitted pro hac vice)

13 Special Counsel to Richard A. Marshack

**FILED & ENTERED**

**JUN 03 2024**

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY mccall    DEPUTY CLERK

14            **UNITED STATES BANKRUPTCY COURT**

15   **CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION**

16  In Re                              Case No: 23-bk-10571-SC

17                                     Chapter 11

18
    The Litigation Practice Group P.C.,   **ORDER GRANTING MOTION FOR**
19                                         **ENTRY OF PROTECTIVE ORDER AND**
                    Debtor(s),            **THE PROTECTIVE ORDER**
20

21                                     Date:    May 23, 2024
22                                     Time:    1:30 p.m.
                                       Judge:   Hon. Scott C. Clarkson
23                                     Place:   Courtroom 5C (via Zoom)[1]
                                                411 West Fourth Street
24                                              Santa Ana, CA 92701
25

26

27 ─────────────────────

28 [1] Video and audio connection information for each hearing will be provided on Judge Clarkson's
   publicly posted hearing calendar, which may be viewed online at:
   http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

                                                    EXHIBIT 1
                                                    Page 29

1   The Court has read and considered the Notice of Motion and Motion for Entry of Protective

2   Order (the "Motion") filed by Richard A. Marshack, in his capacity as the Chapter 11 Trustee (the

3   "Trustee") of the Bankruptcy Estate ("Estate") of The Litigation Practice Group P.C., on May 2, 2024,

4   pursuant to Federal Rule of Bankruptcy Procedure 7026 and Federal Rule of Civil Procedure 26(c)(1),

5   as Dk. No. 1164 ("Motion"), and has found good cause to grant the Motion.

6       IT IS HEREBY ORDERED that:

7       1.      The Motion is granted;

8       2.      The below Protective Order shall apply to any contested matter arising

9       in the main bankruptcy case and in all adversary proceedings filed by or against Trustee,

10      present and future; and

11      3.      Govern the discovery conducted therein.

12

13                          **PROTECTIVE ORDER**

14  **1.    DEFINITIONS**

15      1.1     "Confidential Information" as used in this Protective Order shall mean documents and

16  other information (regardless of how generated, stored or maintained) that a Party or non-party

17  reasonably believes to contain or reflect non-public financial or business information, bank records,

18  financial records, such as social security numbers, non-public financial or personal information of a

19  Party or non-party, account numbers, sensitive digital information and identifiers, information subject

20  to confidentiality agreements or provisions other than this Protective Order, and other non-public

21  research, development, or commercial information that derives value or avoids injury by virtue of not

22  being known to the public.

23      1.2     This "Action" is defined and hereby means any contested matter arising in the main

24  bankruptcy case and in all adversary proceedings filed by or against Trustee, present and future.

25      1.3     "Designating Party" means a Party or non-party that designates Confidential

26  Information during the Action.

27      1.4     "Receiving Party" means a Party that receives Confidential Information during the

28  Action.

2

EXHIBIT 1
Page 30

1       1.5    "Party" or "Parties" means person or entity subject to this Protective Order.

2      **2.    SCOPE OF THIS PROTECTIVE ORDER**

3       2.1    Unless otherwise ordered, this Protective Order shall govern certain documents and other products of discovery obtained in the Action from the Parties there to, and from third parties. As well as certain information copied or derived therefrom, excerpts, summaries or compilations thereof, including, but not limited to, documents voluntarily exchanged as part of early settlement discussions, documents produced pursuant to initial disclosures, requests authorized by the Federal Rules of Civil Procedure made applicable herein by the Federal Rules of Bankruptcy Procedure, answers to interrogatories, deposition transcripts, responses to requests for production, responses to requests for admission, subpoenas, affidavits, declarations, expert reports, and other such material and information as may be produced during the course of the Action and designated as Confidential Information.

13     **3.    DESIGNATION OF CONFIDENTIAL INFORMATION**

14     3.1    This Protective Order shall govern the production and handling of any Confidential Information in this Action. Any Party or non-party who produces Confidential Information in this Action may designate it as "Confidential" or "Attorneys' Eyes Only" consistent with the terms of this Protective Order. Whenever possible, the Designating Party must designate only those portions of a document, written discovery responses, deposition, transcript, or other material that contain the Confidential Information and refrain from designating entire documents. Regardless of any designations made hereunder, the Designating Party is not otherwise restricted from use or disclosure of its Confidential Information outside of this Action or for any business purposes. In addition, any Party may move to modify or seek other relief from any of the terms of this Protective Order if it has first tried in writing and in good faith to resolve its needs or disputes with the other Parties or Party as the case may be under the terms of this Protective Order. Further, nothing in this Protective Order shall prevent a Party from redacting documents consistent with the Federal Rules of Civil Procedure and utilizing the documents as needed through-out the Action.

27     3.2    <u>Application to Non-Parties:</u> Before a non-party is given copies of documents or materials designated as Confidential Information or Attorneys' Eyes Only as permitted hereunder, it

3

EXHIBIT 1
Page 31

1    must first sign an acknowledgment to be bound to these terms that is attached hereto as <u>Exhibit </u>A; if

2    it fails to do so, the Parties to this Action must resolve any such dispute before making disclosure of

3    designated information as permitted hereunder to the non-party. If a non-party wishes to make

4    designations hereunder, it must first sign attached <u>Exhibit A.</u>

5        3.3    <u>Timing and Provisional Protection:</u> Designations of Confidential Information may be

6    made at any time. To avoid potential waiver of protection hereunder, the Designating Party should

7    designate documents or materials containing Confidential Information at the time of production or

8    disclosure, including on the record during the taking of any deposition. Deposition testimony will be

9    deemed provisionally protected for a period of thirty (30) days after the transcript is released to the

10   Parties by the court reporter, although the Parties may agree at any time to different timelines of

11   provisional protection of information as Confidential or Attorneys' Eyes Only as part of one or more

12   specific depositions. To retain any designations beyond the provisional period, a Designating Party

13   must designate specific pages and lines of deposition testimony before the provisional period has

14   expired. Such designations must be made in writing so that all counsel and court reporters may append

15   the designation to all copies of the transcripts.

16       3.4    <u>Manner of Designation:</u> Confidential Information may be designated hereunder in any

17   reasonable manner or method that notifies the Receiving Party of the designation level and identifies

18   with specificity the information to which the designation applies. If made verbally, the Designating

19   Party must promptly confirm the designation in writing. Whenever possible, the Designating Party

20   should stamp, affix, or embed a legend of "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY" on

21   each designated page of the document or electronic image that contains Confidential Information.

22       **4.    CHALLENGES TO DESIGNATED INFORMATION**

23       4.1    In the event that a Receiving Party disagrees at any time with any designation(s) made

24   by the Designating Party, the Receiving Party must first try to resolve such challenge in good faith

25   on an informal basis with the Designating Party. The Receiving Party must provide written notice of

26   the challenge and the grounds therefor to the Designating Party, who must respond in writing to the

27   challenge within fifteen (15) days. At all times, the Designating Party carries the burden of

28   establishing the propriety of the designation and protection level. Unless and until the challenge is

4

EXHIBIT 1
Page 32

resolved by the Parties or ruled upon by the Court, the designated information shall remain protected under this Protective Order. The failure of any Receiving Party to challenge a designation does not constitute a concession that the designation is proper or an admission that the designated information is otherwise competent, relevant, or material.

## 5.    LIMITED ACCESS/USE OF PROTECTED INFORMATION

5.1    Restricted Use: Information that is produced or exchanged in the course of the Action and designated under this Protective Order may be used for preparation for trial and preparation for any appeal of any and all matters in the Action, as well as related settlement negotiations, and for no other purpose, without the written consent of the Designating Party. No Confidential Information may be disclosed to any person except in accordance with the terms of this Protective Order, unless the parties are co-counsel or have entered into joint defense agreements. All persons in possession of Confidential Information agree to exercise reasonable care with regard to the custody, use, or storage of such information to ensure that its confidentiality is maintained. This obligation includes, but is not limited to, the Receiving Party providing to the Designating Party prompt notice of the receipt of any subpoena that seeks production or disclosure of any designated information and consulting with the Designating Party before responding to the subpoena. Any use or disclosure of Confidential or Attorneys' Eyes Only information in violation of the terms of this Protective Order may subject the disclosing person or party to sanctions.

5.2    Access to "Confidential" Information: The Party(ies) and all persons subject to this Protective Order agree that information designated as "CONFIDENTIAL" may only be accessed or reviewed by the following:

a)    The Court, its personnel, and court reporters;

b)    Counsel of record, or co-counsel for any Party, or other party that has entered into a joint defense agreement in the Action and their employees who assist counsel of record, or co-counsel in the Action and are informed of the duties and obligations imposed hereunder;

c)    The Parties, including their clients, agents and employees who are assisting or have reason to know of the Action;

/ / /

EXHIBIT 1
Page 33

d)  Experts or consultants employed by the Parties or their counsel, or co-counsel, for purposes of an Action, so long as each such expert or consultant has signed attached <u>Exhibit A;</u> and

e)  Other witnesses or persons with the Designating Party's consent or by court order.

5.3  <u>Access to "Attorneys' Eyes Only" Designations:</u> The Parties and all persons subject to this Protective Order agree that information designated as "ATTORNEYS' EYES ONLY" may only be accessed or reviewed by the following:

a)  The Court, its personnel, and court reporters;

b)  Counsel of record, or co-counsel for any Party, or other party that has entered into a joint defense agreement in the Action and their employees who assist counsel of record in the Action and are informed of the duties hereunder;

c)  In-house counsel for any Party in the Action and Richard A. Marshack, as Chapter 11 Trustee of The Litigation Practice Group P.C. who is informed of the duties and obligations imposed hereunder;

d)  Experts or consultants employed by the Parties or their counsel, or co-counsel for purposes of the Action,  and so long as each such expert or consultant has signed attached <u>Exhibit A;</u> and

e)  Other witnesses or persons to whom the Designating Party agrees in advance of disclosure or by court order.

5.4  <u>Non-Waiver Effect of Designations:</u> Neither the taking of, nor the failure to take, any action to enforce the provisions of this Protective Order, nor the failure to object to any designation, will constitute a waiver of any Party(ies)'s claim or defense in the Action or any other action or proceeding, including, but not limited to, a claim or defense that any designated information is or is not Confidential, is or is not entitled to particular protection, or embodies or does not embody information protectable by law.

5.5  <u>In-Court Use of Designated Information:</u> If information designated under this Protective Order will or may be offered in evidence at a hearing or trial related to any matter in the Action, then the offering party must give advance notice to the party or non-party that designated prior to offering the information so that any use or disclosure may be addressed in accordance with

6

EXHIBIT 1
Page 34

the Court's case-management or other pre-trial order, or by a motion *in limine.* Nothing in this Protective Order shall be construed as a waiver by a Party of any objections that may be raised as to the admissibility at trial of any evidentiary materials.

## 6.    CLAW-BACK REQUESTS

6.1    <u>Failure to Make Designation:</u>  If, at any time, a Party or non-party discovers that it produced or disclosed Confidential Information without designation, it may promptly notify the Receiving Party and identify with particularity the Confidential Information to be designated and the level of designation (the claw-back notification). The Receiving Party may then request substitute production of the newly-designated information. Within thirty (30) days of receiving the claw-back notification, the Receiving Party must: (1) certify to the Designating Party it has appropriately marked or, if substitute production has been requested, destroyed all unmarked copies that it received, made, and/or distributed; and (2) if it was practicably unable to mark or destroy any information because disclosures occurred while the Receiving Party was under no duty of confidentiality under the terms of this Protective Order regarding that information, the Receiving Party must reasonably provide as much information as practicable to aid the Designating Party in protecting the information, consistently with the Receiving Party's attorney-client, work-product, and/or trial-preparation privileges.

6.2    <u>Inadvertent Production of Privileged Information:</u>  If, at any time, a Party discovers that it produced information that it reasonably believes is subject to protection under the attorney/client, work-product, or trial-preparation privileges, then it must promptly notify each Receiving Party of the claim for protection, the basis for it, amend its privilege log accordingly, and comply with Fed. R. Civ. P. 26(b)(5). Whenever possible, the producing party must produce substitute information that redacts the information subject to the claimed protection. The Receiving Party must thereupon comply with Fed. R. Civ. P. 26(b)(5)(B) as to the information subject to the claimed protection.

/ / /

/ / /

/ / /

EXHIBIT 1
Page 35

**7.    DURATION/CONTINUED RESTRICTIONS**

7.1    <u>Handling of Designated Information Upon Conclusion of the Main Bankruptcy Case:</u> Upon conclusion of the Main Bankruptcy Case, by way of dismissal or closing of the case, the Designating Party(ies) is/are responsible for ensuring that any Party or person to whom the Designating Party shared or disclosed designated information in any of the matters under the Action returns or destroys all of its copies, regardless of the medium in which it was stored. No witness or Party may retain designated information that it received from any other Party or non-party under this Protective Order; only counsel of record, or co-counsel, are the authorized agents who may retain one copy for their respective legal files, and who must also describe to the Designating Party the extra steps taken to protect its legal file containing paper and/or electronic copies of the designated information so that it is not accessed, used, or disclosed inconsistently with the obligations under this Protective Order. This provision does not apply to the Court or Court staff. Moreover, this provision does not apply to Trustee, who may retain and use – consistent with this Order – Confidential Information received in any Action during the entirety of the Bankruptcy.

7.2    <u>Continued Restrictions Under this Protective Order:</u> The restrictions on disclosure and use of Confidential Information shall survive the conclusion of the Bankruptcy case and any matter in the Action.

**8.    PRIVILEGED OR PROTECTED INFORMATION**

8.1    Nothing in this Protective Order shall require disclosure of information that is protected by the attorney-client privilege, the work-product protection, or any other legally cognizable privilege (a "Privilege or Protection").  If information subject to a claim of Privilege or Protection is inadvertently produced, pursuant to Federal Rule of Evidence 502(d) such production shall not constitute a waiver of, or estoppel as to, any claim of Privilege or Protection for such information or any other information that may be protected from disclosure by a Privilege or Protection in any proceeding.

8.2    If a Party receives a document that appears to be subject to a Privilege or Protection, then it shall refrain from examining the document any more than is essential to ascertain if it is privileged or protected and shall promptly notify the producing Party in writing that the receiving

8

EXHIBIT 1
Page 36

1  Party possesses material that appears to be subject to a Privilege or Protection. The producing Party

2  shall have seven (7) days after receiving such notice to assert a Privilege or Protection over the

3  identified material. If the producing Party does not assert a claim of Privilege or Protection within the

4  seven (7)-day period, the material in question shall be deemed not privileged or protected.

5      8.3    If a producing Party has produced a document subject to a claim of Privilege or

6  Protection, upon written request by the producing Party, the document for which a claim of Privilege

7  or Protection is made shall be sequestered or destroyed to the extent reasonably practicable, and the

8  receiving Party shall not use the document for any purpose other than in connection with analyzing

9  or disputing a claim of Privilege or Protection or in connection with a motion to compel the production

10  of the document.

11     8.4    The receiving Party sequestering or destroying such material may then move the Court

12  for an order compelling production of the material. The applicable producing Party bears the burden

13  of establishing the applicable Privilege or Protection of any clawed-back document or information as

14  and to the same extent that it would have borne such burden had it not produced the document or

15  information.  Nothing in this Protective Order shall limit the Court's right or any receiving Party's

16  right to request an in camera review of any information subject to a claim of Privilege or Protection.

17

18                                    ###

19

20

21

22

23

24  Date: June 3, 2024                    Scott C. Clarkson
                                         United States Bankruptcy Judge

25

26

27

28

9

EXHIBIT 1
Page 37

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT "A"

1

EXHIBIT 1
Page 38

1   Christopher B. Ghio (State Bar No. 259094)
    Christopher Celentino (State Bar No. 131688)
2   Yosina M. Lissebeck (State Bar No. 201654)
    **DINSMORE & SHOHL LLP**
3   655 West Broadway, Suite 800
    San Diego, CA 92101
4   Telephone:  619.400.0500
    Facsimile:  619.400.0501
5   christopher.ghio@dinsmore.com
    christopher.celentino@dinsmore.com
6   yosina.lissebeck@dinsmore.com

7   Sarah S. Mattingly (Ky. Bar 94257)
    DINSMORE & SHOHL, LLP
8   101 S. Fifth Street, Suite 2500
    Louisville, KY 40202
9   Telephone: 859-425-1096
    Facsimile: 502-585-2207
10  Sarah.mattingly@dinsmore.com
    (Admitted pro hac vice)
11
    Special Counsel to Richard A. Marshack,
12  Chapter 11 Trustee

13

14

15                    **UNITED STATES BANKRUPTCY COURT**

16                     **CENTRAL DISTRICT OF CALIFORNIA**

17
    In Re                              Case No. 8:23-BK-10571-SC
18
                                       Chapter 11
19
    The Litigation Practice Group P.C.,   **EXHIBIT A TO STIPULATED**
20                                        **ORDER**
            Debtor(s),
21                                     Date:   May 23, 2024
22                                     Time:   1:30 p.m.
                                       Judge:  Hon. Scott C. Clarkson
23                                     Place:  Courtroom 5C[1] - Via Zoom
24                                             411 W. Fourth Street
                                               Santa Ana, CA  92701
25

26

27  ─────────────────────
    [1] Video and audio connection information for each hearing will be provided on Judge Clarkson's
28   publicly posted hearing calendar, which may be viewed online at:
     http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

                                  1

EXHIBIT 1
Page 39

This is to certify that:

      (a)      I am being given access to Confidential Information pursuant to the Stipulated Protective Order that was entered into the main bankruptcy case for Litigation Practice Group, but which is binding and controlling as set forth by the Court's Order on any and all contested matters and any and all litigation commenced by Trustee;

      (b)      I have read the Stipulated Protective Order; and

      (c)      I agree to be bound by the terms and conditions thereof, including, without limitation, to the obligations regarding the use, non-disclosure and return of such Confidential Information. I further agree that in addition to being contractually bound by the Stipulated Protective Order, I am subject to the jurisdiction of the above reference Court for any violation thereof.

Date: _____

_____
          Signature

_____
          Printed Name

2

EXHIBIT 1
Page 40

# EXHIBIT 2

EXHIBIT 2
Page 41

## Affiliate Agreements

THIS AGREEMENT (the "Agreement") is made and effective as of the __4_ day of January 2022 by and between Validation LLC ("VLLC") and _____ Summit Marketing Solutions Inc (hereinafter "Affiliate").

RECITALS:

VLLC is in the business of providing a package debtor's rights services in the form of debt validation, consultation, and litigation defense through law firms for which VLLC provides administrative support services (those law firms include but are not limited to The Litigation Practice Group PC and Sonoma County Law). Among the services offered by VLLC through the law firms handling each client file are the following:

- Removal of invalid debts through correspondence directly with the three credit bureaus;

- Validation of consumer debts through correspondence including disputes with original creditors, validation demands to third party debt collectors and assignees, and disputes with all three credit bureaus;

- Defense of collection actions initiated by original creditors or third party assignees;

- Negotiation of advantageous settlements of consumer debts both pre and post litigation;

- Education of clients regarding federal laws applicable to consumer debt and credit reporting, and consultation regarding risk mitigation and litigation defense through its network of attorneys across the country.

Each of these services is offered without regard to the identity of the creditor or third-party debt collector or assignee. VLLC reviews all client files prior to the execution of the client's legal services agreement with the appropriate law firm, and maintains oversight through its administrative services over all file placements.

Affiliate owns and operates a system of generating leads consisting of consumers interested in the legal services offered by VLLC. Affiliate, acting in accordance with direction from VLLC, shall obtain the names of Consumers and will market in a lawful manner, complying with the restrictions of the jurisdiction in which the consumer resides. For consumers interested in utilizing VLLC's services, Affiliate will assist VLLC in having consumers execute an approved legal services agreement with a law firm to which VLLC provides administrative support services, at which point consumers will become clients of that law firm, and that law firm will be exclusively responsible for and liable for the representation of consumers in the context of the provision of legal services. Nothing in this Agreement nor in the eventual legal services agreement shall restrict Affiliate from offering any other service of any kind to consumer, including credit repair or debt relief programs. Nor is Affiliate restricted from marketing on behalf of credit repair or debt relief entities, including but not limited to other law firms. VLLC and Affiliate hereby agree that any and all prior agreements entered into by VLLC and Affiliate or any law firm to which VLLC provides administrative support services and Affiliate are null and void and unenforceable, and this Agreement shall become the

EXHIBIT 2
Page 42

operative agreement for all files previously placed through the use of VLLC's administrative support services.

VLLC and Affiliate hereby agree to the following:

1.     Each Party shall be solely responsible for bearing its own costs and expenses incurred in performing its responsibilities under this Agreement, including all tariffs, filings, licensing and/or other fees.

2.     Affiliate shall comply with state and federal laws in communicating with consumers regarding VLLC, any law firm utilized by VLLC, or any of the programs of VLLC or the assigned law firm.

3.     Both VLLC and the law firm it utilizes shall comply with all state and federal laws in performing its obligations under the legal services agreement entered into between VLLC and the consumers referred by Affiliate.

4.     If requested by VLLC, Affiliate shall provide a copy of all marketing materials to VLLC upon receiving a request from VLLC.  Affiliate shall endeavor to provide such materials within 10 business days of such request, but may provide such materials in any time frame that is commercially reasonable.

5.     Affiliate agrees to keep any and all documents or communications between itself and VLLC confidential pursuant to the provisions set forth below.

6.     A monthly per file maintenance fee will be paid to the law firm to cover all services provided under the legal services agreement and will be deducted from the gross revenue generated from files originated by Affiliate after which Affiliate shall be entitled to receive the following as full and complete compensation for its services to VLLC:

    -45% of all revenue generated from files originated by Affiliate if Affiliate originates 1 to 500  files in a given month;

7.     VLLC shall bear all expenses related to the services it offers to consumers, and Affiliate shall bear all expenses related to its marketing of the same except as is set forth in this Paragraph.  Neither VLLC nor Affiliate shall be required to pay the expenses of the other.

8.     VLLC reserves all rights with regard to rejection or cancellation of a consumer, but will do so only in accordance with the recommendation of the law firm utilized in providing such service, and only subject to the applicable state bar rules for such representation.

9.     This agreement shall continue to operate and bind VLLC and Affiliate for a period of 18 months from the date of execution of this Agreement.  At that time, this Agreement will automatically renew for an additional 18 month term unless, 30 days prior to the automatic renewal date, VLLC or Affiliate shall postmark a cancellation letter clearly stating the intent of that party to terminate this Agreement on the automatic renewal date.

EXHIBIT 2
Page 43

10.    If either party shall default under this Agreement, defined as a failure to comply with any of the obligations set forth above, the Agreement shall terminate following notice of default and a cure period of 30 days from the date postmarked on the notice of default.  The notice of default must state with specificity the act of default alleged.

11.    Upon termination of this Agreement for any reason whatsoever, VLLC and Affiliate will refrain from making any disparaging or negative comment, remark, statement, or implication, whether written or oral.

12.    The confidential information of VLLC or Affiliate shall include information regarding contracts, customer or client lists or information, hardware, software, screens, specifications, designs, plans, drawings, data, prototypes, discoveries, research, developments, methods, processes, procedures, improvements, 'Know-how', compilations, market research, marketing techniques and plans, marketing materials, business plans and strategies, documents, scripts, guidelines, price lists, pricing policies and financial information or other business and/or technical information and materials, in oral, demonstrative, written, graphic or machine-readable form, which is unpublished, not available to the general public or trade, and which is maintained as confidential and proprietary information by the disclosing party for regulatory, customer relations, and/or competitive reasons.  Neither VLLC nor Affiliate may disclose the confidential information of the other with the express written consent of the other.  A failure to abide by this confidentiality term shall entitle the party whose confidential information was compromised to a reasonable sum not less than $50,000.00, nor more than $200,000.00.  The disclosure of information in connection with a judicial proceeding shall not constitute a violation of this term.  The parties agree to notify the other if any inadvertent disclosure of information occurs within 48 hours of becoming aware of such disclosure.  The parties agree to work together in good faith to remediate any disclosure of confidential information.  A party whose confidential information is disclosed shall be entitled to injunctive relief in any court of competent jurisdiction.

13.    Affiliate agrees not to use the name VLLC or any law firm in any advertising, publicity release, or sales presentation designed to promote Affiliate's service, unless VLLC provides prior written consent to such specific use.  Affiliate may use the name The Litigation Practice Group PC (or LPG for short), and may hold itself out as an agent for LPG for the purpose of onboarding new clients.

14.    Any fees incurred by VLLC in connection with a customer's Non-Sufficient Funds ("NSF") fee shall be borne mutually by both VLLC and Affiliate if and only if the customer cancels the program after such NSF.  The Affiliate shall bear that portion of the NSF fee commensurate with its share of the per file fee set forth in Paragraph 6, above.  This amount shall be deducted from the fees remitted to Affiliate in the month in which the client having an outstanding NSF charge cancels the program without remitting such NSF fee.

15.    This Agreement may not be assigned or transferred without the prior written consent of the other. This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and assigns.

EXHIBIT 2
Page 44

16.    In the event of a breach, the prevailing party shall be entitled to reasonable attorneys' fees and collection costs, including all fees and costs on appeal.

17.    This Agreement contains the entire Agreement between the Parties, and shall not be modified, amended or supplemented, or any rights therein waived, unless specifically agreed upon in writing by VLLC and Affiliate.

**Validation LLC**

1/5/2022

**By: Matthew Church, Member**

Arthur Henderson
By: _____

Title: President & CEO

EXHIBIT 2
Page 45

## Electronic Funds Transfer Authorization

This Electronic Funds Transfer (EFT) authorization is for use in connection with the foregoing Agreement, and permits VLLC to transfer any and all amounts due to **[Affiliate Name]** (Affiliate) under the Marketpro Insurance Inc. foregoing Agreement by EFT.  By signing below, Affiliate hereby authorizes VLLC to initiate EFT transfers at its discretion, with all fees and costs incurred by Affiliate in connection with such transfer to be borne by Affiliate, while all fees and costs incurred by VLLC in connection with such transfer to be borne by VLLC.

Account Holder Signature: _____ Date: _____1/5/2022_____

By: Arthur Henderson

Title: President & CEO

Account Owner Name: Arthur Henderson

Social Security Number / FEIN Number associated with account listed below: ▮▮▮▮▮▮▮▮

Address: 17682 Beach Blvd. Ste. 202, Huntington Beach, CA 92647

Tel: ▮▮▮▮▮▮▮▮

Bank Name: Bank of America

Routing Number: ▮▮▮▮▮▮▮▮

Account Number: ▮▮▮▮▮▮▮▮

Account type: Checking

EXHIBIT 2
Page 46

# EXHIBIT 3

EXHIBIT 3
Page 47

## ACCOUNTS RECEIVABLE PURCHASE AGREEMENT

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is made as of September 7, 2022 (the "**Agreement Date**"), by and between PurchaseCo80, LLC (the "**Buyer**"), and Summit Marketing Solutions

(the"**Seller"**, and together with the Buyer, the **"Parties"**).

### RECITALS

WHEREAS, in the regular course of business, the Seller originates account receivables from Litigation Practice Group LLC ("**LPG**") in connection with client on-boarding services provided by the Seller to LPG and its affiliates;

WHEREAS, the account receivables represent an obligation of various clients to pay Seller for services that Seller previously provided, but which LPG shall provide from the date of execution of this Agreement;

Whereas, Purchaser desires to purchase, and Seller desires to sell to Purchaser, all right, title and interest to the payments owing to Seller from the client files of the Consumers listed on Addendum A (the "**Client Files**").

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables (the "**Purchased Accounts**").

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

### ARTICLE 1.
### DEFINITIONS

Section 1.1    Certain Definitions.  Certain defined terms used in this Agreement are set forth on **Exhibit A**.

### ARTICLE 2.
### ASSIGNMENT AND TRANSFER AND CONSIDERATION

Section 2.1    Assignment of the Purchased Accounts to the Buyer.  Upon execution of this Agreement and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all of the Seller's right, title, and interest in and to the Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens. Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the "**Excluded Assets**").

Section 2.2    No Assumption of Liabilities.  The Buyer shall not assume any Liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the "**Excluded Liabilities**").

Section 2.3    Payment of Purchase Price.    Buyer shall pay $110,366.93 (the "**Purchase Price**") by wire transfer in accordance with the wire transfer instructions set forth in **Schedule 2.3** (the "**Wire Instructions**") in exchange for the receivable on the 116 files identified on the attached spreadsheet.

EXHIBIT 3
Page 48

**ARTICLE 3.**
**REPRESENTATIONS AND WARRANTIES OF THE SELLER**

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1    Organization; Good Standing.  The Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the Laws of the State of Delaware and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2    Affiliate shall compy with state and federal laws in performing (a) its operations associated with the transaction contemplated herein, and (b) its obligations under this Agreement and any other agreement associated herewith, including communicating with consumers and/or potential consumers regarding LPG or any of its or LPG's programs.

Section 3.3    LPG shall comply with state and federal laws in performing (a) its operations associated with the transaction contemplated herein, (b) its obligations under the Agreement, and (c) the legal services agreement entered into between LPG and consumers and Affiliates.

Section 3.4    Each of LPG and Affiliate are in compliance in all material respects with any federal, state, local or foreign law (including common law), statute, code ordinance, rule, regulation or other requirement ("**Law**") applicable to its business or operations.  Neither LPG nor Affiliate have received any written or other notice or been charged with the violation of any Laws. To the knowledge of LPG and Affiliate, neither is under investigation with respect to the violation of any Laws and, to the knowledge of LPG and Affiliate, there are no facts or circumstances which could form the basis for any such violation. LPG and Affiliate currently have all material approvals, authorizations, consents, licenses, permits or certificates which are required for the operation of the business as presently conducted ("**Permits**"). Neither LPG nor Affiliate (i) are in default or violation (and no event has occurred which, with notice or lapse of time or both, would constitute a default or violation) of any term, condition or provision of the certificate of organization of the relevant party, and (ii) are in default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation) in any material respect of any term, condition or provision of any Permit, to which the business is subject or by which its properties or assets are bound, and to the knowledge of the LPG and Affiliate, there are no facts or circumstances which could form the basis for any such default or violation.

Section 3.5    Power and Authority.  The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement

EXHIBIT 3
Page 49

of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.6    Title to, and Sufficiency of, the Purchased Accounts.  The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all of the Purchased Accounts, free and clear of all Liens.

Section 3.7    Consents.  The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.8    No Conflicts. The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

Section 3.9    Compliance with Laws.  The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.

Section 3.10    Legal Proceedings.  There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements.  No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.11    Condition of Purchased Accounts.  Each Purchased Account shall have received no less than one processed payment.

Section 3.12    Confidentiality.  Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the "**Confidential Information**").  Seller will at all times keep the  Confidential Information in confidence and trust.  Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer.  Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions.  Seller agrees that violation of this Section 3.9.  The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

### ARTICLE 4.
### REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1    Organization; Good Standing.  The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Florida.

Section 4.2    Power and Authority.  The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 4.3    No Conflicts.  The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4    Sufficient Funds.  The Buyer has, and will have, sufficient funds available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

### ARTICLE 5.
### COVENANTS

Section 5.1    Appropriate Actions.

(a)    General.  Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

### ARTICLE 6.
### CLOSING

Section 6.1    Closing.  The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing.  The date on which the Closing occurs is hereinafter referred to as the "**Closing Date**."

EXHIBIT 3
Page 51

The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2    Closing Deliverables of the Seller.  At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer:  (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **Exhibit B** (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3    Closing Deliverables of the Buyer.  At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to Section 6.2, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4    Indemnification by the Seller.  Subject to the limitations set forth in this Article 6, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Seller pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability, or (d) Affiliate's actions or omissions in their business operations.  This indemnity provision is not limited to third party claims against Purchaser.  This indemnity provision shall surve the termination of the Agreement.

Section 6.5    Indemnification by LPG.  Subject to the limitations set forth in this Article 6, LPG agrees to indemnify and hold harmless the **Buyer Indemnified Parties** against all **Losses** paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of LPG in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the LPG pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability, or (d) LPG's actions or omissions in their business operations.  This indemnity provision is not limited to third party claims against Purchaser.  This indemnity provision shall surve the termination of the Agreement.

Section 6.6    Indemnification by the Buyer.  Subject to the limitations set forth in this Article 6, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurance related to the Purchased Accounts or Buyer occurring after the Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.7    Indemnification Procedures.

EXHIBIT 3
Page 52

(a)    No Restraints.  Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, provided, however, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim.  The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; provided, however, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred.  In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense.  The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b)    No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim.  An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c)    If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**").  Such Notice of Claim shall specify the basis for such Direct Claim.  The failure by any Indemnified Party to so notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this Section 6.6(c).  If the Indemnifying Party does not notify the Indemnified Party within thirty days following its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this Article 6 or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this Article 6, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined.  In the event that the Indemnifying Party has timely disputed its Liability with respect

EXHIBIT 3
Page 53

to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

## ARTICLE 7.
## MISCELLANEOUS

Section 7.1    Entire Agreement; Amendment.    This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof.  This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2    Waivers.    The rights and remedies of the Parties to this Agreement are cumulative and not alternative.  To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for which it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3    Notices.    All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission. A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

Section 7.4    Successors and Assigns.    This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns.  This Agreement and any rights or obligations of a Party hereunder may be assigned by a Party or an Affiliate of such Party without consent of the other Parties.  This Agreement will be binding upon any assignee of any Party.  No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5    Public Disclosure.    Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6    Expenses and Fees.    Whether or not the Closing occurs, all fees and expenses incurred in connection with this transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.  In the event of a breach,

the party who prevails in any court proceeding shall be entitled to reasonable attorneys' fees and collection costs, including all fees and costs on appeal.

Section 7.7    Specific Performance.  The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.8    Governing Law.  This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws principlesSeverability.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdictionConstruction.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

Section 7.9    Non Disparagement - Upon termination of this Agreement for any reason whatsoever, LPG and Affiliate will refrain, and will instruct their affiliates, officers, directors, employees, contractors and agents to refrain, from making any disparaging or negative comment, remark, statement, or implication, whether written or oral, about any Party to this Agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

By: PurchaseCo80, LLC

By: The Litigation Practice Group, P.C., its Manager

By: _____
   *Daniel S March*
   9C494DB1993341E...
   Name: Dan March
   Title: Managing Shareholder

By: OHP - LPG, LP, its controlling shareholder

By: _____
   *[signature]*
   AEFD0C515ACC44E...
   Name: Adam Blum
   Title: Manager of the General Partner

**SELLER:** Summit Marketing Solutions

By: _____
   *[signature]*
   AC9E3F96B5874C2...
   Name: Arthur Henderson
   Title: President & CEO

<h3 style="text-align:center">APPROVAL OF ASSIGNMENT</h3>

The assignment of the Purchased Accounts set forth in this Agreement is hereby approved, and with respect to the Purchased Accounts, the Buyer shall have all rights of Buyer as set forth in this agreement.

**The Litigation Practice Group P.C.**

By: _____
   DocuSigned by:
   *Daniel S March*
   9C404DB1003341E...
   Name: Daniel S. March
   Title: Managing Shareholder

## EXHIBIT A

### DEFINITIONS

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a)     "**Action**" shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b)     "**Agreement**" shall have the meaning set forth in the preamble to this Agreement.

(c)     "**Agreement Date**" shall have the meaning set forth in the preamble to this Agreement.

(d)     "**Affiliate**" shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii), with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals.  For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e)     "**Bill of Sale and Assignment and Assumption Agreement**" shall have the meaning set forth in Section 6.2.

(f)     "**Business**" shall mean the business of the Seller as conducted on the Agreement Date.

(g)     "**Buyer**" shall have the meaning set forth in the preamble to this Agreement.

(h)     "**Buyer Indemnified Parties**" shall have the meaning set forth in Section 6.4.

(i)     "**Client Files**" shall have the meaning set forth in the Recitals.

(i)     "**Closing**" shall have the meaning set forth in Section 6.1.

(j)     "**Closing Date**" shall have the meaning set forth in Section 6.1.

(k)     "**Direct Claim**" shall have the meaning set forth in Section 6.6(c).

(l)     "**Excluded Assets**" shall have the meaning set forth in Section 2.1.

(m)     "**Excluded Liabilities**" shall have the meaning set forth in Section 2.2.

(n)     "**Governmental Body**" shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

EXHIBIT 3
Page 57

(o)     "**Indebtedness**" means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p)     "**Indemnified Party**" shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q)     "**Indemnifying Party**" shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r)     "**Knowledge**" shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s)     "**Law**" shall have the meaning set forth in Article 3.

(t)     "**Liabilities**" shall mean any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on- or off-balance sheet, or other.

(u)     "**Lien**" shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v)     "**Losses**" shall have the meaning set forth in Section 6.4.

(w)     "**Notice of Claim**" shall have the meaning set forth in Section 6.6(c).

(x)     "**Organizational Documents**" shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y)     "**Party**" or "**Parties**" shall have the meaning set forth in the preamble to this Agreement.

(z)     "**Permits**" shall have the meaning set forth in Article 3.

(aa)     "**Permitted Liens**" shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(bb)     "**Person**" shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

EXHIBIT 3
Page 58

(cc)　　"**Purchase Price**" shall have the meaning set forth in <u>Section 2.3</u>.

(dd)　　"**Purchased Accounts**" shall have the meaning set forth in the Recitals.

(ee)　　"**Seller**" shall have the meaning set forth in the preamble to this Agreement.

(ff)　　"**Seller Indemnified Parties**" shall have the meaning set forth in <u>Section 6.5</u>.

(gg)　　"**Tax**" or "**Taxes**" shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(hh)　　"**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(ii)　　"**Third Party**" or "**Third Parties**" shall mean any Person other than the Parties or their respective Affiliates.

(jj)　　"**Third-party Claim**" shall have the meaning set forth in <u>Section 6.6(a)</u>.

(kk)　　"**Transaction Agreements**" shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(ll)　　"**Upfront Cash Payment**" shall have the meaning set forth in <u>Section 2.3</u>.

(mm)　　"**Wire Instructions**" shall have the meaning set forth in <u>Section 2.3</u>.

EXHIBIT 3
Page 59

## EXHIBIT B

### FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this **"Agreement"**), is made by and between PurchaseCo80, LLC (the "**Buyer**"), and Summit Marketing Solutions (the "**Seller**"). Each of the Seller and the Buyer are sometimes referred to herein, individually, as a "**Party**" and, collectively, as the "**Parties**."

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the "**Purchase Agreement**"), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.      Defined Terms. Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2.      Sale of Purchased Accounts; Assignment. The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3.      Further Assurances. Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

4.      Terms of the Purchase Agreement. This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement. The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference. The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5.      Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[*Remainder of page intentionally left blank.*]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**BUYER:**

By: PurchaseCo80, LLC

By: The Litigation Practice Group, P.C., its Manager

By: _____
          *Daniel S March*
          Name: Dan March
          Title: Managing Shareholder

By: OHP - LPG, LP, its controlling shareholder

By: _____
          Name: Adam Blum
          Title: Manager of the General
          Partner

**SELLER:** Summit Marketing Solutions

By: _____
          Name: Arthur Henderson
          Title: President & CEO

**Schedule 2.3**
**Wire Instructions**

**Account Holder Name: Summit Marketing Solutions, Inc**

**Address: 17682 Beach Blvd, Suite 202 Huntington Beach, CA 92647**

**Routing Number:**

**Account Number:**

# EXHIBIT 4

EXHIBIT 4
Page 63

**ACCOUNTS RECEIVABLE PURCHASE AGREEMENT**

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is made as of
S e p t e m b e r  1 4 , 2022 (the "**Agreement Date**"), by and between PurchaseCo80, LLC (the "**Buyer**"), and
Summit Marketing Solutions Inc (the  "**Seller**", and together with the Buyer, the **"Parties"**).

### RECITALS

WHEREAS, in the regular course of business, the Seller originates account receivables from Litigation
Practice Group LLC ("**LPG**") in connection with client on-boarding services provided by the Seller to  LPG and its
affiliates;

WHEREAS, the account receivables represent an obligation of various clients to pay Seller for services
that Seller previously provided, but which LPG shall provide from the date of execution of this Agreement;

Whereas, Purchaser desires to purchase, and Seller desires to sell to Purchaser, all right, title and
interest to the payments owing to Seller from the client files of the Consumers listed on Addendum A (the
"**Client Files**").

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to
purchase, acquire, and accept from the Seller, certain of these account receivables (the "**Purchased Accounts**").

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the
Parties, intending to be legally bound, agree as follows:

### ARTICLE 1.
### DEFINITIONS

Section 1.1    Certain Definitions.  Certain defined terms used in this Agreement are set forth on **Exhibit
A**.

### ARTICLE 2.
### ASSIGNMENT AND TRANSFER AND CONSIDERATION

Section 2.1    Assignment of the Purchased Accounts to the Buyer.  Upon execution of this Agreement
and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the
Buyer shall purchase, acquire, and accept from the Seller, all the Seller's right, title, and interest in and to the
Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens. Other
than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively,
the "**Excluded Assets**").

Section 2.2    No Assumption of Liabilities.  The Buyer shall not assume any Liabilities of the Seller of any
kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter
created (collectively, the "**Excluded Liabilities**").

Section 2.3    Payment of Purchase Price.    Buyer shall pay **$49,306.65** (the "**Purchase
Price**") by wire transfer in accordance with the wire transfer instructions set forth in **Schedule  2.3**
(the  "**Wire Instructions**") in exchange for the receivable on the 40 files identified on the attached spreadsheet.

EXHIBIT 4
Page 64

### ARTICLE 3.
### REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1    Organization; Good Standing.  The Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the Laws of the State of Delaware and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2    Affiliate shall company with state and federal laws in performing (a) its operations associated with the transaction contemplated herein, and (b) its obligations under this Agreement and any other agreement associated herewith, including communicating with consumers and/or potential consumers regarding LPG or any of its or LPG's programs.

Section 3.3     LPG shall comply with state and federal laws in performing (a) its operations associated with the transaction contemplated herein, (b) its obligations under the Agreement, and (c) the legal services agreement entered into between LPG and consumers and Affiliates.

Section 3.4     Each of LPG and Affiliate are in compliance in all material respects with any federal, state, local or foreign law (including common law), statute, code ordinance, rule, regulation or other requirement ("**Law**") applicable to its business or operations.  Neither LPG nor Affiliate have received any written or other notice or been charged with the violation of any Laws. To the knowledge of LPG and Affiliate, neither is under investigation with respect to the violation of any Laws and, to the knowledge of LPG and Affiliate, there are no facts or circumstances which could form the basis for any such violation. LPG and Affiliate currently have all material approvals, authorizations, consents, licenses, permits, or certificates which are required for the operation of the business as presently conducted ("**Permits**"). Neither LPG nor Affiliate (i) are in default or violation (and no event has occurred which, with notice or lapse of time or both, would constitute a default or violation) of any term, condition or provision of the certificate of organization of the relevant party, and (ii) are in default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation) in any material respect of any term, condition or provision of any Permit, to which the business is subject or by which its properties or assets are bound, and to the knowledge of the LPG and Affiliate, there are no facts or circumstances which could form the basis for any such default or violation.

Section 3.5    Power and Authority. The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement

EXHIBIT 4
Page 65

DocuSign Envelope ID: 2A99CCE0-1B42-4B32-9F0D-B41AA735A05C

of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.6    Title to, and Sufficiency of, the Purchased Accounts.  The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all the Purchased Accounts, free and clear of all Liens.

Section 3.7    Consents.  The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.8    No Conflicts. The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

Section 3.9    Compliance with Laws.  The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.

Section 3.10    Legal Proceedings.  There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements.  No event has occurred, or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.11    Condition of Purchased Accounts.  Each Purchased Account shall have received no less than one processed payment.

Section 3.12    Confidentiality. Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the "**Confidential Information**").  Seller will at all times keep the  Confidential Information in confidence and trust.  Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer.  Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions.  Seller agrees that violation of this Section 3.9.  The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

EXHIBIT 4
Page 66

## ARTICLE 4.
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1    Organization; Good Standing.  The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Florida.

Section 4.2    Power and Authority. The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 4.3    No Conflicts. The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4    Sufficient Funds.  The Buyer has, and will have, sufficient funds available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

## ARTICLE 5.
## COVENANTS

Section 5.1    Appropriate Actions.

(a)    General. Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

## ARTICLE 6.
## CLOSING

Section 6.1    Closing.  The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing.  The date on which the Closing occurs is hereinafter referred to as the "**Closing Date**."

The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2    Closing Deliverables of the Seller.  At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer: (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **Exhibit B** (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3    Closing Deliverables of the Buyer.  At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to Section 6.2, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4    Indemnification by the Seller.  Subject to the limitations set forth in this Article 6, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Seller pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability, or (d) Affiliate's actions or omissions in their business operations.  This indemnity provision is not limited to third party claims against Purchaser.  This indemnity provision shall survive the termination of the Agreement.

Section 6.5    Indemnification by LPG. Subject to the limitations set forth in this Article 6, LPG agrees to indemnify and hold harmless the **Buyer Indemnified Parties** against all **Losses** paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of LPG in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the LPG pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability, or (d) LPG's actions or omissions in their business operations.  This indemnity provision is not limited to third party claims against Purchaser.  This indemnity provision shall survive the termination of the Agreement.

Section 6.6    Indemnification by the Buyer.  Subject to the limitations set forth in this Article 6, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurrence related to the Purchased Accounts or Buyer occurring after the Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.7    Indemnification Procedures.

(a)     No Restraints.  Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, provided, however, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim.  The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; provided, however, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred.  In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense.  The Indemnifying Party or the Indemnified Party (as the case may be) shall, at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b)     No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim.  An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c)     If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**").  Such Notice of Claim shall specify the basis for such Direct Claim.  The failure by any Indemnified Party to so notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this Section 6.6(c).  If the Indemnifying Party does not notify the Indemnified Party within thirty days following its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this Article 6 or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this Article 6, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined.  In the event that the Indemnifying Party has timely disputed its Liability with respect

to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

## ARTICLE 7.
## MISCELLANEOUS

Section 7.1   Entire Agreement; Amendment.   This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof.   This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2   Waivers.   The rights and remedies of the Parties to this Agreement are cumulative and not alternative.   To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for which it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3   Notices.   All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission. A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

Section 7.4   Successors and Assigns.   This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns.   This Agreement and any rights or obligations of a Party hereunder may be assigned by a Party or an Affiliate of such Party without consent of the other Parties.   This Agreement will be binding upon any assignee of any Party.   No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5   Public Disclosure.   Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6   Expenses and Fees.   Whether or not the Closing occurs, all fees and expenses incurred in connection with these transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.   In the event of a breach,

DocuSign Envelope ID: 2A99CCE0-4A43-4B32-9E0D-B41AA735A05C

the party who prevails in any court proceeding shall be entitled to reasonable attorneys' fees and collection costs, including all fees and costs on appeal.

Section 7.7    Specific Performance. The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.8      Governing Law.  This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

Section 7.9      Non Disparagement - Upon termination of this Agreement for any reason whatsoever, LPG and Affiliate will refrain, and will instruct their affiliates, officers, directors, employees, contractors and agents to refrain, from making any disparaging or negative comment, remark, statement, or implication, whether written or oral, about any Party to this Agreement.

EXHIBIT 4
Page 71

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

By: PurchaseCo80, LLC

By: The Litigation Practice Group, P.C., its manager

By: _____

Name: Dan March

Title: Managing Shareholder

By: OHP - LPG, LP, its controlling shareholder

By: _____

Name: Adam Blum

Title: Manager of the General Partner

**SELLER:** Summit Marketing Solutions Inc

By: _____

Name: Arthur Henderson

Title: President & CEO

**APPROVAL OF ASSIGNMENT**

The assignment of the Purchased Accounts set forth in this Agreement is hereby approved, and with respect to the Purchased Accounts, the Buyer shall have all rights of Buyer as set forth in this agreement.

**The Litigation Practice Group P.C.**

By: _____

Name: Daniel S. March

Title: Managing Shareholder

[*Signature Page to Accounts Receivable Purchase Agreement*]

EXHIBIT 4
Page 72

## EXHIBIT A

## DEFINITIONS

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a)    "**Action**" shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b)    "**Agreement**" shall have the meaning set forth in the preamble to this Agreement.

(c)    "**Agreement Date**" shall have the meaning set forth in the preamble to this Agreement.

(d)    "**Affiliate**" shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii) with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals.  For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e)    "**Bill of Sale and Assignment and Assumption Agreement**" shall have the meaning set forth in Section 6.2.

(f)    "**Business**" shall mean the business of the Seller as conducted on the Agreement Date.

(g)    "**Buyer**" shall have the meaning set forth in the preamble to this Agreement.

(h)    "**Buyer Indemnified Parties**" shall have the meaning set forth in Section 6.4.

(i)    "**Client Files**" shall have the meaning set forth in the Recitals.

(i)    "**Closing**" shall have the meaning set forth in Section 6.1.

(j)    "**Closing Date**" shall have the meaning set forth in Section 6.1.

(k)    "**Direct Claim**" shall have the meaning set forth in Section 6.6(c).

(l)    "**Excluded Assets**" shall have the meaning set forth in Section 2.1.

(m)    "**Excluded Liabilities**" shall have the meaning set forth in Section 2.2.

(n)    "**Governmental Body**" shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

EXHIBIT 4
Page 73

(o)    "**Indebtedness**" means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p)    "**Indemnified Party**" shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q)    "**Indemnifying Party**" shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r)    "**Knowledge**" shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s)    "**Law**" shall have the meaning set forth in Article 3.

(t)    "**Liabilities**" shall mean any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on- or off-balance sheet, or other.

(u)    "**Lien**" shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v)    "**Losses**" shall have the meaning set forth in Section 6.4.

(w)    "**Notice of Claim**" shall have the meaning set forth in Section 6.6(c).

(x)    "**Organizational Documents**" shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y)    "**Party**" or "**Parties**" shall have the meaning set forth in the preamble to this Agreement.

(z)    "**Permits**" shall have the meaning set forth in Article 3.

(aa)    "**Permitted Liens**" shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(bb)    "**Person**" shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

EXHIBIT 4
Page 74

(cc)    "**Purchase Price**" shall have the meaning set forth in <u>Section 2.3</u>.

(dd)    "**Purchased Accounts**" shall have the meaning set forth in the Recitals.

(ee)    "**Seller**" shall have the meaning set forth in the preamble to this Agreement.

(ff)    "**Seller Indemnified Parties**" shall have the meaning set forth in <u>Section 6.5</u>.

(gg)    "**Tax**" or "**Taxes**" shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(hh)    "**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(ii)    "**Third Party**" or "**Third Parties**" shall mean any Person other than the Parties or their respective Affiliates.

(jj)    "**Third-party Claim**" shall have the meaning set forth in <u>Section 6.6(a)</u>.

(kk)    "**Transaction Agreements**" shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(ll)    "**Upfront Cash Payment**" shall have the meaning set forth in <u>Section 2.3</u>.

(mm)    "**Wire Instructions**" shall have the meaning set forth in <u>Section 2.3</u>.

EXHIBIT 4
Page 75

## EXHIBIT B

### FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this **"Agreement"**), is made by and between PurchaseCo80, LLC (the "**Buyer**"), and Summit Marketing Solutions Inc (the "**Seller**"). Each of the Seller and the Buyer are sometimes referred to herein, individually, as a "**Party**" and, collectively, as the "**Parties**."

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the "**Purchase Agreement**"), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.    Defined Terms.  Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2.    Sale of Purchased Accounts; Assignment.  The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3.    Further Assurances.  Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request, in order to more effectively consummate the transactions contemplated by this Agreement.

4.    Terms of the Purchase Agreement.  This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement. The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference.  The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5.    Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[*Remainder of page intentionally left blank.*]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**BUYER:**

By: PurchaseCo80, LLC

By: The Litigation Practice Group, P.C., its Manager

By: _____
Name: Dan March
Title: Managing Shareholder

By: OHP - LPG, LP, its controlling shareholder

By: _____
Name: Adam Blum
Title: Manager of the General
Partner

**SELLER:** Summit Marketing Solutions Inc

By: _____
Name: Arthur Henderson
Title:    President & CEO

## Schedule 2.3
## Wire Instructions

**Account Holder Name: Summit Marketing Solutions Inc**

**Address: 17682 Beach Blvd, Suite 202 Huntington Beach, CA 92647**

**Routing Number:** ▮▮▮▮▮▮▮▮

**Account Number:** ▮▮▮▮▮▮▮▮

# EXHIBIT 5

EXHIBIT 5
Page 79

**ACCOUNTS RECEIVABLE PURCHASE AGREEMENT**

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is made as of October 6, 2022 (the "**Agreement Date**"), by and between Marich Bein LLC (collectively the "**Buyer**"), and Summit Marketing Solutions Inc (the "**Seller" or "LPG**", and together with the Buyer, the **"Parties"**), and The Litigation Practice Group PC ("LPG").

**RECITALS**

WHEREAS, in the regular course of business, the Seller originates account receivables from **LPG** in connection with client on-boarding services provided by the Seller to LPG and its affiliates;

WHEREAS, the account receivables represent an obligation of various clients to pay Seller for services that Seller previously provided, but which LPG shall provide from the date of execution of this Agreement;

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables (the "**Purchased Accounts**").

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

## ARTICLE 1.
### DEFINITIONS

Section 1.1    Certain Definitions.  Certain defined terms used in this Agreement are set forth on **Exhibit A**.

## ARTICLE 2.
### ASSIGNMENT AND TRANSFER AND CONSIDERATION

Section 2.1    Assignment of the Purchased Accounts to the Buyer.  Upon execution of this Agreement and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all of the Seller's right, title, and interest in and to the Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens. Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the "**Excluded Assets**").

Section 2.2    No Assumption of Liabilities.  The Buyer shall not assume any Liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the "**Excluded Liabilities**").

Section 2.3    Payment of Purchase Price.  Buyer shall pay $166,843.16 (total purchase price) for the Purchased Accounts (the "**Purchase Price**") by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in **Schedule 2.3** (the "**Wire Instructions**"). The Purchased Accounts are set forth on the attached spreadsheet.

Section 2.4    Guarantee of LPG.  If any file acquired by buyer shall fail to make a first payment, LPG will replace the file and bear any cost associated with such replacement.  The replacement file shall yield no less than the receivable of the failed file.  In addition, if any any calendar month a total of less than 80% of files make a cleared payment, LPG shall replace any non-performing files in such month so that the performance of the file

EXHIBIT 5
Page 80

package as a whole equals 80%. This guarantee shall continue until the completion of the 24th month following execution of this agreement.

## ARTICLE 3.
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1    Organization; Good Standing.  The Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the Laws of the State of Delaware and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2    Power and Authority.  The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.3    Title to, and Sufficiency of, the Purchased Accounts.  The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all of the Purchased Accounts, free and clear of all Liens.

Section 3.4    Consents.  The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.5    No Conflicts. The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

EXHIBIT 5
Page 81

Section 3.6    Compliance with Laws.    The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.

Section 3.7    Legal Proceedings.    There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements.    No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.8    Condition of Purchased Accounts.    Each Purchased Account shall have received no less than one processed payment.

Section 3.9    Confidentiality.    Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the "**Confidential Information**").    Seller will at all times keep the  Confidential Information in confidence and trust.    Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer.    Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions.    Seller agrees that violation of this Section 3.9.    The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

## ARTICLE 4.
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1    Organization; Good Standing.    The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Florida.

Section 4.2    Power and Authority.    The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.    The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.    This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 4.3     <u>No Conflicts</u>. The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4     <u>Sufficient Funds</u>. The Buyer has, and will have, sufficient funds available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

## ARTICLE 5.
## COVENANTS

Section 5.1     <u>Appropriate Actions</u>.

(a)     <u>General</u>. Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

## ARTICLE 6.
## CLOSING

Section 6.1     <u>Closing</u>. The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing. The date on which the Closing occurs is hereinafter referred to as the "**Closing Date**." The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2     <u>Closing Deliverables of the Seller</u>. At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer: (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **Exhibit B** (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3     <u>Closing Deliverables of the Buyer</u>. At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to <u>Section 6.2</u>, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4     <u>Indemnification by the Seller</u>. Subject to the limitations set forth in this <u>Article 6</u>, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of,

Accounts Receivable Purchase Agreement
Page 4 of 7

EXHIBIT 5
Page 83

arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Seller pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability.

Section 6.5    Indemnification by the Buyer.  Subject to the limitations set forth in this Article 6, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurance related to the Purchased Accounts or Buyer occurring after the Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.6    Indemnification Procedures.

(a)    No Restraints.  Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, provided, however, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim.  The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; provided, however, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred.  In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense.  The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b)    No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim.  An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party

Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c)     If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**").  Such Notice of Claim shall specify the basis for such Direct Claim.  The failure by any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this Section 6.6(c).  If the Indemnifying Party does not notify the Indemnified Party within thirty days following its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this Article 6 or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this Article 6, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined.  In the event that the Indemnifying Party has timely disputed its Liability with respect to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

### ARTICLE 7.
### MISCELLANEOUS

Section 7.1     Entire Agreement; Amendment.   This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof.  This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2     Waivers.   The rights and remedies of the Parties to this Agreement are cumulative and not alternative.  To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for what it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3     Notices.   All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission. A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

Accounts Receivable Purchase Agreement
Page 6 of 7

EXHIBIT 5
Page 85

Section 7.4    Successors and Assigns.  This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns.  Neither this Agreement nor any rights or obligations of a Party hereunder shall be assigned by a Party (unless to an Affiliate of such Party) without the prior written consent of the other Parties.  This Agreement will be binding upon any permitted assignee of any Party.  No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5    Public Disclosure.  Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6    Expenses and Fees.  Whether or not the Closing occurs, all fees and expenses incurred in connection with this transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.

Section 7.7    Specific Performance.  The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

Section 7.8    Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.9    Governing Law.  This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws principles.

Section 7.10    Severability.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 7.11    Construction.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

**Marich Bein LLC**

By: _____
    Name:
    Title:

**SELLER:**

**Summit Marketing Solutions Inc**

By: _____
    Name: Arthur Henderson
    Title: President & CEO

**APPROVAL OF ASSIGNMENT AND GUARANTEE**

The assignment of the Purchased Accounts set forth in this Agreement as well as the guarantee included therein is hereby approved, and with respect to the Purchased Accounts, the Buyer shall have all rights of Buyer as set forth in this agreement.

**The Litigation Practice Group P.C.**

By: _____
    Name: Daniel S. March
    Title: Managing Shareholder

By: _____
    Name: Tony M. Diab

*[Signature Page to Accounts Receivable Purchase Agreement]*

EXHIBIT 5
Page 87

## EXHIBIT A

### DEFINITIONS

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a)    "**Action**" shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b)    "**Agreement**" shall have the meaning set forth in the preamble to this Agreement.

(c)    "**Agreement Date**" shall have the meaning set forth in the preamble to this Agreement.

(d)    "**Affiliate**" shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii), with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals.  For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e)    "**Bill of Sale and Assignment and Assumption Agreement**" shall have the meaning set forth in Section 6.2.

(f)    "**Business**" shall mean the business of the Seller as conducted on the Agreement Date.

(g)    "**Buyer**" shall have the meaning set forth in the preamble to this Agreement.

(h)    "**Buyer Indemnified Parties**" shall have the meaning set forth in Section 6.4.

(i)    "**Closing**" shall have the meaning set forth in Section 6.1.

(j)    "**Closing Date**" shall have the meaning set forth in Section 6.1.

(k)    "**Direct Claim**" shall have the meaning set forth in Section 6.6(c).

(l)    "**Excluded Assets**" shall have the meaning set forth in Section 2.1.

(m)    "**Excluded Liabilities**" shall have the meaning set forth in Section 2.2.

(n)    "**Governmental Body**" shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

EXHIBIT 5
Page 88

(o)    "**Indebtedness**" means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p)    "**Indemnified Party**" shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q)    "**Indemnifying Party**" shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r)    "**Knowledge**" shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s)    "**Law**" shall mean any law, statute, ordinance, regulation, rule, code, notice requirement, court decision, or agency guideline, of any foreign, federal, state, or local Governmental Body.

(t)    "**Liabilities**" shall mean any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on- or off-balance sheet, or other.

(u)    "**Lien**" shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v)    "**Losses**" shall have the meaning set forth in Section 6.4.

(w)    "**Notice of Claim**" shall have the meaning set forth in Section 6.6(c).

(x)    "**Organizational Documents**" shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y)    "**Party**" or "**Parties**" shall have the meaning set forth in the preamble to this Agreement.

(z)    "**Permitted Liens**" shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(aa)    "**Person**" shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

EXHIBIT 5
Page 89

(bb)    "**Purchase Price**" shall have the meaning set forth in <u>Section 2.3</u>.

(cc)    "**Purchased Accounts**" shall have the meaning set forth in the Recitals.

(dd)    "**Seller**" shall have the meaning set forth in the preamble to this Agreement.

(ee)    "**Seller Indemnified Parties**" shall have the meaning set forth in <u>Section 6.5</u>.

(ff)    "**Tax**" or "**Taxes**" shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(gg)    "**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(hh)    "**Third Party**" or "**Third Parties**" shall mean any Person other than the Parties or their respective Affiliates.

(ii)    "**Third-party Claim**" shall have the meaning set forth in <u>Section 6.6(a)</u>.

(jj)    "**Transaction Agreements**" shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(kk)    "**Upfront Cash Payment**" shall have the meaning set forth in <u>Section 2.3</u>.

(ll)    "**Wire Instructions**" shall have the meaning set forth in <u>Section 2.3</u>.

EXHIBIT 5
Page 90

## EXHIBIT B

### FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this **"Agreement"**), is made by and between **Buyer**, and **Seller**.  Each of the Seller and the Buyer are sometimes referred to herein, individually, as a "**Party**" and, collectively, as the "**Parties**."

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the "**Purchase Agreement**"), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.    Defined Terms.  Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2.    Sale of Purchased Accounts; Assignment.  The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3.    Further Assurances.  Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

4.    Terms of the Purchase Agreement.  This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement.    The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference.  The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5.    Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[*Remainder of page intentionally left blank.*]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**BUYER:**

**Marich Bein LLC**

By: _____
   Name:
   Title:

**SELLER:**

**Summit Marketing Solutions Inc**

By: _____
   Name: Arthur Henderson
   Title: President & CEO

**Schedule 2.3**
**Wire Instructions**

**$166,843.16**

**Account Holder Name: Summit Marketing Solutions Inc**

**Address: 17682 Beach Blvd, Suite 202 Huntington Beach, CA 92647**

**Routing Number** ▮▮▮▮▮▮▮

**Account Number:** ▮▮▮▮▮▮▮

# EXHIBIT 6

EXHIBIT 6
Page 94

### ACCOUNTS RECEIVABLE PURCHASE AGREEMENT

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is made as of November 7, 2022 (the "**Agreement Date**"), by and between The Litigation Practice Group PC (collectively the "**Buyer**"), and Summit Marketing Solutions Inc (the "**Seller" or "LPG"**, and together with the Buyer, the **"Parties"**), and The Litigation Practice Group PC ("LPG").

### RECITALS

WHEREAS, in the regular course of business, the Seller originates account receivables from **LPG** in connection with client on-boarding services provided by the Seller to LPG and its affiliates;

WHEREAS, the account receivables represent an obligation of various clients to pay Seller for services that Seller previously provided, but which LPG shall provide from the date of execution of this Agreement;

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables (the "**Purchased Accounts**").

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

### ARTICLE 1.
### DEFINITIONS

Section 1.1    Certain Definitions.  Certain defined terms used in this Agreement are set forth on **Exhibit A**.

### ARTICLE 2.
### ASSIGNMENT AND TRANSFER AND CONSIDERATION

Section 2.1    Assignment of the Purchased Accounts to the Buyer.  Upon execution of this Agreement and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all of the Seller's right, title, and interest in and to the Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens. Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the "**Excluded Assets**").

Section 2.2    No Assumption of Liabilities.  The Buyer shall not assume any Liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the "**Excluded Liabilities**").

Section 2.3    Payment of Purchase Price.  Buyer shall pay $146,521.38 (total purchase price) for the Purchased Accounts (the "**Purchase Price**") by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in **Schedule 2.3** (the "**Wire Instructions**").  The Purchased Accounts are set forth on the attached spreadsheet.

Section 2.4    Guarantee of LPG.  If any file acquired by buyer shall fail to make a first payment, LPG will replace the file and bear any cost associated with such replacement.  The replacement file shall yield no less than the receivable of the failed file.  In addition, if any any calendar month a total of less than 80% of files make a cleared payment, LPG shall replace any non-performing files in such month so that the performance of the file

EXHIBIT 6
Page 95

package as a whole equals 80%.  This guarantee shall continue until the completion of the 24th month following execution of this agreement.

### ARTICLE 3.
### REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1    Organization; Good Standing.  The Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the Laws of the State of Delaware and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2    Power and Authority.  The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.3    Title to, and Sufficiency of, the Purchased Accounts.  The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all of the Purchased Accounts, free and clear of all Liens.

Section 3.4    Consents.  The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.5    No Conflicts. The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

EXHIBIT 6
Page 96

Section 3.6     Compliance with Laws.     The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.

Section 3.7     Legal Proceedings.     There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements.  No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.8     Condition of Purchased Accounts.     Each Purchased Account shall have received no less than one processed payment.

Section 3.9     Confidentiality.     Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the "**Confidential Information**").  Seller will at all times keep the  Confidential Information in confidence and trust.  Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer.  Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions.  Seller agrees that violation of this Section 3.9.  The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

## ARTICLE 4.
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1     Organization; Good Standing.     The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Florida.

Section 4.2     Power and Authority.     The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

EXHIBIT 6
Page 97

Section 4.3    No Conflicts. The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4    Sufficient Funds. The Buyer has, and will have, sufficient funds available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

## ARTICLE 5.
## COVENANTS

Section 5.1    Appropriate Actions.

(a)    General. Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

## ARTICLE 6.
## CLOSING

Section 6.1    Closing. The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing. The date on which the Closing occurs is hereinafter referred to as the "**Closing Date**." The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2    Closing Deliverables of the Seller. At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer: (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **Exhibit B** (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3    Closing Deliverables of the Buyer. At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to Section 6.2, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4    Indemnification by the Seller. Subject to the limitations set forth in this Article 6, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of,

arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Seller pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability.

Section 6.5    Indemnification by the Buyer.  Subject to the limitations set forth in this Article 6, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurance related to the Purchased Accounts or Buyer occurring after the Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.6    Indemnification Procedures.

(a)    No Restraints.  Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, provided, however, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim.  The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; provided, however, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred.  In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense.  The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b)    No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim.  An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party

Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c)    If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**").  Such Notice of Claim shall specify the basis for such Direct Claim.  The failure by any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this Section 6.6(c).  If the Indemnifying Party does not notify the Indemnified Party within thirty days following its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this Article 6 or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this Article 6, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined.  In the event that the Indemnifying Party has timely disputed its Liability with respect to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

### ARTICLE 7.
### MISCELLANEOUS

Section 7.1    Entire Agreement; Amendment.    This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof.  This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2    Waivers.    The rights and remedies of the Parties to this Agreement are cumulative and not alternative.  To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for what it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3    Notices.    All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission.  A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

Accounts Receivable Purchase Agreement
Page 6 of 7

EXHIBIT 6
Page 100

Section 7.4    Successors and Assigns.  This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns.  Neither this Agreement nor any rights or obligations of a Party hereunder shall be assigned by a Party (unless to an Affiliate of such Party) without the prior written consent of the other Parties.  This Agreement will be binding upon any permitted assignee of any Party.  No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5    Public Disclosure.  Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6    Expenses and Fees.  Whether or not the Closing occurs, all fees and expenses incurred in connection with this transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.

Section 7.7    Specific Performance.  The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

Section 7.8    Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.9    Governing Law.  This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws principles.

Section 7.10    Severability.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 7.11    Construction.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

**The Litigation Practice Group P.C.**

By: _____
Name: Daniel S March
Title: Managing Shareholder

**SELLER:**

**Summit Marketing Solutions Inc**

By: _____
Name: Arthur Henderson
Title: President & CEO

**APPROVAL OF ASSIGNMENT AND GUARANTEE**

The assignment of the Purchased Accounts set forth in this Agreement as well as the guarantee included therein is hereby approved, and with respect to the Purchased Accounts, the Buyer shall have all rights of Buyer as set forth in this agreement.

**The Litigation Practice Group P.C.**

By: _____
Name: Daniel S. March
Title: Managing Shareholder

*[Signature Page to Accounts Receivable Purchase Agreement]*

EXHIBIT 6
Page 102

## EXHIBIT A

### DEFINITIONS

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a)    "**Action**" shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b)    "**Agreement**" shall have the meaning set forth in the preamble to this Agreement.

(c)    "**Agreement Date**" shall have the meaning set forth in the preamble to this Agreement.

(d)    "**Affiliate**" shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii) with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals.  For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e)    "**Bill of Sale and Assignment and Assumption Agreement**" shall have the meaning set forth in Section 6.2.

(f)    "**Business**" shall mean the business of the Seller as conducted on the Agreement Date.

(g)    "**Buyer**" shall have the meaning set forth in the preamble to this Agreement.

(h)    "**Buyer Indemnified Parties**" shall have the meaning set forth in Section 6.4.

(i)    "**Closing**" shall have the meaning set forth in Section 6.1.

(j)    "**Closing Date**" shall have the meaning set forth in Section 6.1.

(k)    "**Direct Claim**" shall have the meaning set forth in Section 6.6(c).

(l)    "**Excluded Assets**" shall have the meaning set forth in Section 2.1.

(m)    "**Excluded Liabilities**" shall have the meaning set forth in Section 2.2.

(n)    "**Governmental Body**" shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

EXHIBIT 6
Page 103

(o) "**Indebtedness**" means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p) "**Indemnified Party**" shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q) "**Indemnifying Party**" shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r) "**Knowledge**" shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s) "**Law**" shall mean any law, statute, ordinance, regulation, rule, code, notice requirement, court decision, or agency guideline, of any foreign, federal, state, or local Governmental Body.

(t) "**Liabilities**" shall mean any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on- or off-balance sheet, or other.

(u) "**Lien**" shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v) "**Losses**" shall have the meaning set forth in Section 6.4.

(w) "**Notice of Claim**" shall have the meaning set forth in Section 6.6(c).

(x) "**Organizational Documents**" shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y) "**Party**" or "**Parties**" shall have the meaning set forth in the preamble to this Agreement.

(z) "**Permitted Liens**" shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(aa) "**Person**" shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

EXHIBIT 6
Page 104

(bb)    "**Purchase Price**" shall have the meaning set forth in <u>Section 2.3</u>.

(cc)    "**Purchased Accounts**" shall have the meaning set forth in the Recitals.

(dd)    "**Seller**" shall have the meaning set forth in the preamble to this Agreement.

(ee)    "**Seller Indemnified Parties**" shall have the meaning set forth in <u>Section 6.5</u>.

(ff)    "**Tax**" or "**Taxes**" shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(gg)    "**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(hh)    "**Third Party**" or "**Third Parties**" shall mean any Person other than the Parties or their respective Affiliates.

(ii)    "**Third-party Claim**" shall have the meaning set forth in <u>Section 6.6(a)</u>.

(jj)    "**Transaction Agreements**" shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(kk)    "**Upfront Cash Payment**" shall have the meaning set forth in <u>Section 2.3</u>.

(ll)    "**Wire Instructions**" shall have the meaning set forth in <u>Section 2.3</u>.

EXHIBIT 6
Page 105

## EXHIBIT B

### FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this **"Agreement"**), is made by and between **Buyer**, and **Seller**. Each of the Seller and the Buyer are sometimes referred to herein, individually, as a "**Party**" and, collectively, as the "**Parties**."

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the "**Purchase Agreement**"), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.      Defined Terms. Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2.      Sale of Purchased Accounts; Assignment. The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3.      Further Assurances. Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

4.      Terms of the Purchase Agreement. This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement.  The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference. The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5.      Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[*Remainder of page intentionally left blank.*]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**BUYER: The Litigation Practice Group P.C.**

By: _____
    Name: Daniel S. March
    Title: Managing Shareholder

**SELLER:**

**Summit Marketing Solutions Inc**

By: _____
    Name: Arthur Henderson
    Title: President & CEO

**Schedule 2.3**
**Wire Instructions**

**$146,521.38**

**Account Holder Name: Summit Marketing Solutions Inc**

**Address: 17682 Beach Blvd, Suite 202 Huntington Beach, CA 92647**

**Routing Number:**

**Account Number:**

# EXHIBIT 7

EXHIBIT 7
Page 109

**ACCOUNTS RECEIVABLE PURCHASE AGREEMENT**

        This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is made as of December 2, 2022 (the "**Agreement Date**"), by and between ProofPositive LLC (collectively the "**Buyer**"), and Summit Marketing Solutions Inc (the "**Seller" or "LPG**", and together with the Buyer, the **"Parties"**), and The Litigation Practice Group PC ("LPG").

**RECITALS**

        WHEREAS, in the regular course of business, the Seller originates account receivables from **LPG** in connection with client on-boarding services provided by the Seller to LPG and its affiliates;

        WHEREAS, the account receivables represent an obligation of various clients to pay Seller for services that Seller previously provided, but which LPG shall provide from the date of execution of this Agreement;

        WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables (the "**Purchased Accounts**").

        NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

**ARTICLE 1.**
**DEFINITIONS**

        Section 1.1    Certain Definitions.  Certain defined terms used in this Agreement are set forth on **Exhibit A**.

**ARTICLE 2.**
**ASSIGNMENT AND TRANSFER AND CONSIDERATION**

        Section 2.1    Assignment of the Purchased Accounts to the Buyer.  Upon execution of this Agreement and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all of the Seller's right, title, and interest in and to the Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens. Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the "**Excluded Assets**").

        Section 2.2    No Assumption of Liabilities.  The Buyer shall not assume any Liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the "**Excluded Liabilities**").

        Section 2.3    Payment of Purchase Price.  Buyer shall pay $14,670.72 (total purchase price) for the Purchased Accounts (the "**Purchase Price**") by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in **Schedule 2.3** (the "**Wire Instructions**").  The Purchased Accounts are set forth on the attached spreadsheet.

        Section 2.4    Guarantee of LPG.  If any file acquired by buyer shall fail to make a first payment, LPG will replace the file and bear any cost associated with such replacement.  The replacement file shall yield no less than the receivable of the failed file.  In addition, if any any calendar month a total of less than 80% of files make a cleared payment, LPG shall replace any non-performing files in such month so that the performance of the file

EXHIBIT 7
Page 110

package as a whole equals 80%. This guarantee shall continue until the completion of the 24th month following execution of this agreement.

## ARTICLE 3.
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1    Organization; Good Standing.  The Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the Laws of the State of Delaware and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2    Power and Authority.  The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.3    Title to, and Sufficiency of, the Purchased Accounts.  The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all of the Purchased Accounts, free and clear of all Liens.

Section 3.4    Consents.  The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.5    No Conflicts. The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

EXHIBIT 7
Page 111

Section 3.6 <u>Compliance with Laws</u>. The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.

Section 3.7 <u>Legal Proceedings</u>. There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements. No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.8 <u>Condition of Purchased Accounts</u>. Each Purchased Account shall have received no less than one processed payment.

Section 3.9 <u>Confidentiality</u>. Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the "**Confidential Information**"). Seller will at all times keep the Confidential Information in confidence and trust. Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer. Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions. Seller agrees that violation of this Section 3.9. The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

### ARTICLE 4.
### REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1 <u>Organization; Good Standing</u>. The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Florida.

Section 4.2 <u>Power and Authority</u>. The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby. This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 4.3    No Conflicts.  The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4    Sufficient Funds.  The Buyer has, and will have, sufficient funds available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

## ARTICLE 5.
## COVENANTS

Section 5.1    Appropriate Actions.

(a)    General.  Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

## ARTICLE 6.
## CLOSING

Section 6.1    Closing.  The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing.  The date on which the Closing occurs is hereinafter referred to as the "**Closing Date**." The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2    Closing Deliverables of the Seller.  At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer:  (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **Exhibit B** (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3    Closing Deliverables of the Buyer.  At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to Section 6.2, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4    Indemnification by the Seller.  Subject to the limitations set forth in this Article 6, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of,

arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Seller pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability.

Section 6.5     Indemnification by the Buyer.  Subject to the limitations set forth in this Article 6, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurance related to the Purchased Accounts or Buyer occurring after the Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.6     Indemnification Procedures.

(a)     No Restraints.  Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, provided, however, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim.  The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; provided, however, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred.  In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense.  The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b)     No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim.  An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party

EXHIBIT 7
Page 114

Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c)     If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**").  Such Notice of Claim shall specify the basis for such Direct Claim.  The failure by any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this Section 6.6(c).  If the Indemnifying Party does not notify the Indemnified Party within thirty days following its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this Article 6 or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this Article 6, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined.  In the event that the Indemnifying Party has timely disputed its Liability with respect to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

### ARTICLE 7.
### MISCELLANEOUS

Section 7.1     Entire Agreement; Amendment.  This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof.  This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2     Waivers.  The rights and remedies of the Parties to this Agreement are cumulative and not alternative.  To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for what it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3     Notices.  All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission. A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

Accounts Receivable Purchase Agreement
Page 6 of 7

EXHIBIT 7
Page 115

Section 7.4    Successors and Assigns.  This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns.  Neither this Agreement nor any rights or obligations of a Party hereunder shall be assigned by a Party (unless to an Affiliate of such Party) without the prior written consent of the other Parties.  This Agreement will be binding upon any permitted assignee of any Party.  No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5    Public Disclosure.  Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6    Expenses and Fees.  Whether or not the Closing occurs, all fees and expenses incurred in connection with this transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.

Section 7.7    Specific Performance.  The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

Section 7.8    Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.9    Governing Law.  This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws principles.

Section 7.10    Severability.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 7.11    Construction.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

**ProofPositive LLC**

By: *Gail Hanson*

Name: Gail Hanson

Title: Member

**SELLER:**

**Summit Marketing Solutions Inc**

By: _____

Name: Arthur Henderson

Title: President & CEO

**APPROVAL OF ASSIGNMENT AND GUARANTEE**

The assignment of the Purchased Accounts set forth in this Agreement as well as the guarantee included therein is hereby approved, and with respect to the Purchased Accounts, the Buyer shall have all rights of Buyer as set forth in this agreement.

**The Litigation Practice Group P.C.**

By: *Daniel S March*

Name: Daniel S. March

Title: Managing Shareholder

[*Signature Page to Accounts Receivable Purchase Agreement*]

EXHIBIT 7
Page 117

## EXHIBIT A

## DEFINITIONS

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a)  "**Action**" shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b)  "**Agreement**" shall have the meaning set forth in the preamble to this Agreement.

(c)  "**Agreement Date**" shall have the meaning set forth in the preamble to this Agreement.

(d)  "**Affiliate**" shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii), with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals. For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e)  "**Bill of Sale and Assignment and Assumption Agreement**" shall have the meaning set forth in Section 6.2.

(f)  "**Business**" shall mean the business of the Seller as conducted on the Agreement Date.

(g)  "**Buyer**" shall have the meaning set forth in the preamble to this Agreement.

(h)  "**Buyer Indemnified Parties**" shall have the meaning set forth in Section 6.4.

(i)  "**Closing**" shall have the meaning set forth in Section 6.1.

(j)  "**Closing Date**" shall have the meaning set forth in Section 6.1.

(k)  "**Direct Claim**" shall have the meaning set forth in Section 6.6(c).

(l)  "**Excluded Assets**" shall have the meaning set forth in Section 2.1.

(m)  "**Excluded Liabilities**" shall have the meaning set forth in Section 2.2.

(n)  "**Governmental Body**" shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

EXHIBIT 7
Page 118

(o)    "**Indebtedness**" means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p)    "**Indemnified Party**" shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q)    "**Indemnifying Party**" shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r)    "**Knowledge**" shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s)    "**Law**" shall mean any law, statute, ordinance, regulation, rule, code, notice requirement, court decision, or agency guideline, of any foreign, federal, state, or local Governmental Body.

(t)    "**Liabilities**" shall mean any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on- or off-balance sheet, or other.

(u)    "**Lien**" shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v)    "**Losses**" shall have the meaning set forth in Section 6.4.

(w)    "**Notice of Claim**" shall have the meaning set forth in Section 6.6(c).

(x)    "**Organizational Documents**" shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y)    "**Party**" or "**Parties**" shall have the meaning set forth in the preamble to this Agreement.

(z)    "**Permitted Liens**" shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(aa)    "**Person**" shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

EXHIBIT 7
Page 119

(bb)    "**Purchase Price**" shall have the meaning set forth in <u>Section 2.3</u>.

(cc)    "**Purchased Accounts**" shall have the meaning set forth in the Recitals.

(dd)    "**Seller**" shall have the meaning set forth in the preamble to this Agreement.

(ee)    "**Seller Indemnified Parties**" shall have the meaning set forth in <u>Section 6.5</u>.

(ff)    "**Tax**" or "**Taxes**" shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(gg)    "**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(hh)    "**Third Party**" or "**Third Parties**" shall mean any Person other than the Parties or their respective Affiliates.

(ii)    "**Third-party Claim**" shall have the meaning set forth in <u>Section 6.6(a)</u>.

(jj)    "**Transaction Agreements**" shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(kk)    "**Upfront Cash Payment**" shall have the meaning set forth in <u>Section 2.3</u>.

(ll)    "**Wire Instructions**" shall have the meaning set forth in <u>Section 2.3</u>.

EXHIBIT 7
Page 120

## EXHIBIT B

### FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this **"Agreement"**), is made by and between **Buyer**, and **Seller**.  Each of the Seller and the Buyer are sometimes referred to herein, individually, as a "**Party**" and, collectively, as the "**Parties**."

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the "**Purchase Agreement**"), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.      Defined Terms.  Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2.      Sale of Purchased Accounts; Assignment.  The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3.      Further Assurances.  Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

4.      Terms of the Purchase Agreement.  This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement.   The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference.  The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5.      Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[*Remainder of page intentionally left blank.*]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**BUYER:**

**ProofPositive LLC**

By: _____

*Gail Hanson*

Name: Gail Hanson
Title: Member

**SELLER:**

**Summit Marketing Solutions Inc**

By: _____

Name: Arthur Henderson
Title: President & CEO

**Schedule 2.3**
**Wire Instructions**

**$14,670.72**

**Account Holder Name: Summit Marketing Solutions Inc**

**Address: 17682 Beach Blvd, Suite 202 Huntington Beach, CA 92647**

**Routing Number:**

**Account Number:**

# EXHIBIT 8

EXHIBIT 8
Page 124

**ACCOUNTS RECEIVABLE PURCHASE AGREEMENT**

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is made as of January 6, 2023 (the "**Agreement Date**"), by and between The Litigation Practice Group PC (collectively the "**Buyer**"), and Summit Marketing Solutions Inc (the "**Seller" or "LPG**", and together with the Buyer, the **"Parties"**), and The Litigation Practice Group PC ("LPG").

**RECITALS**

WHEREAS, in the regular course of business, the Seller originates account receivables from **LPG** in connection with client on-boarding services provided by the Seller to LPG and its affiliates;

WHEREAS, the account receivables represent an obligation of various clients to pay Seller for services that Seller previously provided, but which LPG shall provide from the date of execution of this Agreement;

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables (the "**Purchased Accounts**").

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

## ARTICLE 1.
### DEFINITIONS

Section 1.1      Certain Definitions.  Certain defined terms used in this Agreement are set forth on **Exhibit A**.

## ARTICLE 2.
### ASSIGNMENT AND TRANSFER AND CONSIDERATION

Section 2.1      Assignment of the Purchased Accounts to the Buyer.  Upon execution of this Agreement and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all of the Seller's right, title, and interest in and to the Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens. Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the "**Excluded Assets**").

Section 2.2      No Assumption of Liabilities.  The Buyer shall not assume any Liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the "**Excluded Liabilities**").

Section 2.3      Payment of Purchase Price.  Buyer shall pay $151,662.98 (total purchase price) for the Purchased Accounts (the "**Purchase Price**") by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in **Schedule 2.3** (the "**Wire Instructions**").  The Purchased Accounts are set forth on the attached spreadsheet.

Section 2.4      Guarantee of LPG.  If any file acquired by buyer shall fail to make a first payment, LPG will replace the file and bear any cost associated with such replacement.  The replacement file shall yield no less than the receivable of the failed file.  In addition, if any any calendar month a total of less than 80% of files make a cleared payment, LPG shall replace any non-performing files in such month so that the performance of the file

EXHIBIT 8
Page 125

package as a whole equals 80%. This guarantee shall continue until the completion of the 24th month following execution of this agreement.

### ARTICLE 3.
### REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1    Organization; Good Standing.  The Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the Laws of the State of Delaware and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2    Power and Authority.  The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.3    Title to, and Sufficiency of, the Purchased Accounts.  The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all of the Purchased Accounts, free and clear of all Liens.

Section 3.4    Consents.  The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.5    No Conflicts. The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

Section 3.6    Compliance with Laws.    The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.

Section 3.7    Legal Proceedings.    There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements.    No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.8    Condition of Purchased Accounts.    Each Purchased Account shall have received no less than one processed payment.

Section 3.9    Confidentiality.    Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the "**Confidential Information**").    Seller will at all times keep the  Confidential Information in confidence and trust.    Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer.    Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions.    Seller agrees that violation of this Section 3.9.    The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

### ARTICLE 4.
### REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1    Organization; Good Standing.    The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Florida.

Section 4.2    Power and Authority.    The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.    The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.    This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

EXHIBIT 8
Page 127

Section 4.3    No Conflicts. The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4    Sufficient Funds. The Buyer has, and will have, sufficient funds available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

### ARTICLE 5.
### COVENANTS

Section 5.1    Appropriate Actions.

(a)    General. Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

### ARTICLE 6.
### CLOSING

Section 6.1    Closing. The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing. The date on which the Closing occurs is hereinafter referred to as the "**Closing Date**." The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2    Closing Deliverables of the Seller. At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer: (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **Exhibit B** (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3    Closing Deliverables of the Buyer. At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to Section 6.2, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4    Indemnification by the Seller. Subject to the limitations set forth in this Article 6, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of,

arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Seller pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability.

Section 6.5    Indemnification by the Buyer.  Subject to the limitations set forth in this Article 6, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurance related to the Purchased Accounts or Buyer occurring after the Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.6    Indemnification Procedures.

(a)    No Restraints.  Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, provided, however, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim.  The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; provided, however, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred.  In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense.  The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b)    No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim.  An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party

EXHIBIT 8
Page 129

Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c)    If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**").  Such Notice of Claim shall specify the basis for such Direct Claim.  The failure by any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this Section 6.6(c).  If the Indemnifying Party does not notify the Indemnified Party within thirty days following its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this Article 6 or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this Article 6, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined.  In the event that the Indemnifying Party has timely disputed its Liability with respect to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

### ARTICLE 7.
### MISCELLANEOUS

Section 7.1    Entire Agreement; Amendment.    This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof.  This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2    Waivers.    The rights and remedies of the Parties to this Agreement are cumulative and not alternative.  To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for what it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3    Notices.    All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission. A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

Section 7.4    Successors and Assigns.  This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns.  Neither this Agreement nor any rights or obligations of a Party hereunder shall be assigned by a Party (unless to an Affiliate of such Party) without the prior written consent of the other Parties.  This Agreement will be binding upon any permitted assignee of any Party.  No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5    Public Disclosure.  Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6    Expenses and Fees.  Whether or not the Closing occurs, all fees and expenses incurred in connection with this transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.

Section 7.7    Specific Performance.  The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

Section 7.8    Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.9    Governing Law.  This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws principles.

Section 7.10    Severability.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 7.11    Construction.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

**The Litigation Practice Group P.C.**

By: _____
DocuSigned by:
*Daniel S March*
9D494DB1993341E...
Name: Daniel S March
Title: Managing Shareholder

**SELLER:**

**Summit Marketing Solutions Inc**

By: _____
DocuSigned by:
A60E9F860587402...
Name: Arthur Henderson
Title: President & CEO

## APPROVAL OF ASSIGNMENT AND GUARANTEE

The assignment of the Purchased Accounts set forth in this Agreement as well as the guarantee included therein is hereby approved, and with respect to the Purchased Accounts, the Buyer shall have all rights of Buyer as set forth in this agreement.

**The Litigation Practice Group P.C.**

By: _____
DocuSigned by:
*Daniel S March*
9D494DB1993341E...
Name: Daniel S. March
Title: Managing Shareholder

[*Signature Page to Accounts Receivable Purchase Agreement*]

EXHIBIT 8
Page 132

## EXHIBIT A

## DEFINITIONS

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a)     "**Action**" shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b)     "**Agreement**" shall have the meaning set forth in the preamble to this Agreement.

(c)     "**Agreement Date**" shall have the meaning set forth in the preamble to this Agreement.

(d)     "**Affiliate**" shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii), with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals.  For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e)     "**Bill of Sale and Assignment and Assumption Agreement**" shall have the meaning set forth in Section 6.2.

(f)     "**Business**" shall mean the business of the Seller as conducted on the Agreement Date.

(g)     "**Buyer**" shall have the meaning set forth in the preamble to this Agreement.

(h)     "**Buyer Indemnified Parties**" shall have the meaning set forth in Section 6.4.

(i)     "**Closing**" shall have the meaning set forth in Section 6.1.

(j)     "**Closing Date**" shall have the meaning set forth in Section 6.1.

(k)     "**Direct Claim**" shall have the meaning set forth in Section 6.6(c).

(l)     "**Excluded Assets**" shall have the meaning set forth in Section 2.1.

(m)     "**Excluded Liabilities**" shall have the meaning set forth in Section 2.2.

(n)     "**Governmental Body**" shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

EXHIBIT 8
Page 133

(o) "**Indebtedness**" means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p) "**Indemnified Party**" shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q) "**Indemnifying Party**" shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r) "**Knowledge**" shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s) "**Law**" shall mean any law, statute, ordinance, regulation, rule, code, notice requirement, court decision, or agency guideline, of any foreign, federal, state, or local Governmental Body.

(t) "**Liabilities**" shall mean any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on- or off-balance sheet, or other.

(u) "**Lien**" shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v) "**Losses**" shall have the meaning set forth in Section 6.4.

(w) "**Notice of Claim**" shall have the meaning set forth in Section 6.6(c).

(x) "**Organizational Documents**" shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y) "**Party**" or "**Parties**" shall have the meaning set forth in the preamble to this Agreement.

(z) "**Permitted Liens**" shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(aa) "**Person**" shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

EXHIBIT 8
Page 134

(bb)     "**Purchase Price**" shall have the meaning set forth in <u>Section 2.3</u>.

(cc)     "**Purchased Accounts**" shall have the meaning set forth in the Recitals.

(dd)     "**Seller**" shall have the meaning set forth in the preamble to this Agreement.

(ee)     "**Seller Indemnified Parties**" shall have the meaning set forth in <u>Section 6.5</u>.

(ff)     "**Tax**" or "**Taxes**" shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(gg)     "**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(hh)     "**Third Party**" or "**Third Parties**" shall mean any Person other than the Parties or their respective Affiliates.

(ii)     "**Third-party Claim**" shall have the meaning set forth in <u>Section 6.6(a)</u>.

(jj)     "**Transaction Agreements**" shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(kk)     "**Upfront Cash Payment**" shall have the meaning set forth in <u>Section 2.3</u>.

(ll)     "**Wire Instructions**" shall have the meaning set forth in <u>Section 2.3</u>.

EXHIBIT 8
Page 135

## EXHIBIT B

### FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this **"Agreement"**), is made by and between **Buyer**, and **Seller**. Each of the Seller and the Buyer are sometimes referred to herein, individually, as a "**Party**" and, collectively, as the "**Parties**."

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the "**Purchase Agreement**"), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.    Defined Terms. Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2.    Sale of Purchased Accounts; Assignment. The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3.    Further Assurances. Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

4.    Terms of the Purchase Agreement. This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement. The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference. The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5.    Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[*Remainder of page intentionally left blank.*]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**BUYER: The Litigation Practice Group P.C.**

By: _____
Name: Daniel S. March
Title: Managing Shareholder

**SELLER:**

**Summit Marketing Solutions Inc**

By: _____
Name: Arthur Henderson
Title: President & CEO

**Schedule 2.3**
**Wire Instructions**

**$151,662.98**

**Account Holder Name: Summit Marketing Solutions Inc**

**Address: 17682 Beach Blvd, Suite 202 Huntington Beach, CA 92647**

**Routing Number:**

**Account Number:**

# EXHIBIT 9

EXHIBIT 9
Page 139

## ACCOUNTS RECEIVABLE PURCHASE AGREEMENT

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is made as of February 28, 2023 (the "**Agreement Date**"), by and between The Litigation Practice Group PC (collectively the "**Buyer**"), and Summit Marketing Solutions Inc (the "**Seller" or "LPG**", and together with the Buyer, the **"Parties"**), and The Litigation Practice Group PC ("LPG").

### RECITALS

WHEREAS, in the regular course of business, the Seller originates account receivables from **LPG** in connection with client on-boarding services provided by the Seller to LPG and its affiliates;

WHEREAS, the account receivables represent an obligation of various clients to pay Seller for services that Seller previously provided, but which LPG shall provide from the date of execution of this Agreement;

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables (the "**Purchased Accounts**").

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

### ARTICLE 1.
### DEFINITIONS

Section 1.1    Certain Definitions.  Certain defined terms used in this Agreement are set forth on **Exhibit A**.

### ARTICLE 2.
### ASSIGNMENT AND TRANSFER AND CONSIDERATION

Section 2.1    Assignment of the Purchased Accounts to the Buyer.  Upon execution of this Agreement and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all of the Seller's right, title, and interest in and to the Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens. Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the "**Excluded Assets**").

Section 2.2    No Assumption of Liabilities.  The Buyer shall not assume any Liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the "**Excluded Liabilities**").

Section 2.3    Payment of Purchase Price.  Buyer shall pay $26,565.04 (total purchase price) for the Purchased Accounts (the "**Purchase Price**") by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in **Schedule 2.3** (the "**Wire Instructions**").  The Purchased Accounts are set forth on the attached spreadsheet.

Section 2.4    Guarantee of LPG.  If any file acquired by buyer shall fail to make a first payment, LPG will replace the file and bear any cost associated with such replacement. The replacement file shall yield no less than the receivable of the failed file.  In addition, if any any calendar month a total of less than 80% of files make a cleared payment, LPG shall replace any non-performing files in such month so that the performance of the file

EXHIBIT 9
Page 140

package as a whole equals 80%.  This guarantee shall continue until the completion of the 24th month following execution of this agreement.

### ARTICLE 3.
### REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1    Organization; Good Standing.  The Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the Laws of the State of Delaware and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2    Power and Authority.  The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.3    Title to, and Sufficiency of, the Purchased Accounts.  The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all of the Purchased Accounts, free and clear of all Liens.

Section 3.4    Consents.  The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.5    No Conflicts. The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

Section 3.6    Compliance with Laws.    The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.

Section 3.7    Legal Proceedings.    There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements.    No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.8    Condition of Purchased Accounts.    Each Purchased Account shall have received no less than one processed payment.

Section 3.9    Confidentiality.  Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the "**Confidential Information**").    Seller will at all times keep the  Confidential Information in confidence and trust.  Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer.  Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions.  Seller agrees that violation of this Section 3.9.  The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

### ARTICLE 4.
### REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1    Organization; Good Standing.    The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Florida.

Section 4.2    Power and Authority.    The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Accounts Receivable Purchase Agreement
Page 3 of 7

EXHIBIT 9
Page 142

Section 4.3    No Conflicts.  The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4    Sufficient Funds.  The Buyer has, and will have, sufficient funds available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

## ARTICLE 5.
## COVENANTS

Section 5.1    Appropriate Actions.

(a)    General.  Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

## ARTICLE 6.
## CLOSING

Section 6.1    Closing.  The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing.  The date on which the Closing occurs is hereinafter referred to as the "**Closing Date**." The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2    Closing Deliverables of the Seller.  At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer:  (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **Exhibit B** (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3    Closing Deliverables of the Buyer.  At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to Section 6.2, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4    Indemnification by the Seller.  Subject to the limitations set forth in this Article 6, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of,

Accounts Receivable Purchase Agreement
Page 4 of 7

EXHIBIT 9
Page 143

arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Seller pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability.

Section 6.5     Indemnification by the Buyer.  Subject to the limitations set forth in this Article 6, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurance related to the Purchased Accounts or Buyer occurring after the Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.6     Indemnification Procedures.

(a)     No Restraints.  Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, provided, however, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim.  The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; provided, however, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred.  In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense.  The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b)     No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim.  An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party

EXHIBIT 9
Page 144

Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c)    If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**"). Such Notice of Claim shall specify the basis for such Direct Claim. The failure by any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this Section 6.6(c). If the Indemnifying Party does not notify the Indemnified Party within thirty days following its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this Article 6 or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this Article 6, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined. In the event that the Indemnifying Party has timely disputed its Liability with respect to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

## ARTICLE 7.
## MISCELLANEOUS

Section 7.1    Entire Agreement; Amendment. This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof. This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2    Waivers. The rights and remedies of the Parties to this Agreement are cumulative and not alternative. To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for what it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3    Notices. All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission. A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

EXHIBIT 9
Page 145

Section 7.4    Successors and Assigns.  This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns.  Neither this Agreement nor any rights or obligations of a Party hereunder shall be assigned by a Party (unless to an Affiliate of such Party) without the prior written consent of the other Parties.  This Agreement will be binding upon any permitted assignee of any Party.  No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5    Public Disclosure.  Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6    Expenses and Fees.  Whether or not the Closing occurs, all fees and expenses incurred in connection with this transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.

Section 7.7    Specific Performance.  The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

Section 7.8    Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.9    Governing Law.  This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws principles.

Section 7.10    Severability.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 7.11    Construction.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

**The Litigation Practice Group P.C.**

By: _Daniel S March_

Name: Daniel S March

Title: Managing Shareholder

**SELLER:**

**Summit Marketing Solutions Inc**

By: _____

Name: Arthur Henderson

Title: President & CEO

**APPROVAL OF ASSIGNMENT AND GUARANTEE**

The assignment of the Purchased Accounts set forth in this Agreement as well as the guarantee included therein is hereby approved, and with respect to the Purchased Accounts, the Buyer shall have all rights of Buyer as set forth in this agreement.

**The Litigation Practice Group P.C.**

By: _Daniel S March_

Name: Daniel S. March

Title: Managing Shareholder

[*Signature Page to Accounts Receivable Purchase Agreement*]

EXHIBIT 9
Page 147

## EXHIBIT A

## DEFINITIONS

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a)    "**Action**" shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b)    "**Agreement**" shall have the meaning set forth in the preamble to this Agreement.

(c)    "**Agreement Date**" shall have the meaning set forth in the preamble to this Agreement.

(d)    "**Affiliate**" shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii), with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals.  For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e)    "**Bill of Sale and Assignment and Assumption Agreement**" shall have the meaning set forth in Section 6.2.

(f)    "**Business**" shall mean the business of the Seller as conducted on the Agreement Date.

(g)    "**Buyer**" shall have the meaning set forth in the preamble to this Agreement.

(h)    "**Buyer Indemnified Parties**" shall have the meaning set forth in Section 6.4.

(i)    "**Closing**" shall have the meaning set forth in Section 6.1.

(j)    "**Closing Date**" shall have the meaning set forth in Section 6.1.

(k)    "**Direct Claim**" shall have the meaning set forth in Section 6.6(c).

(l)    "**Excluded Assets**" shall have the meaning set forth in Section 2.1.

(m)    "**Excluded Liabilities**" shall have the meaning set forth in Section 2.2.

(n)    "**Governmental Body**" shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

EXHIBIT 9
Page 148

(o)    "**Indebtedness**" means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p)    "**Indemnified Party**" shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q)    "**Indemnifying Party**" shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r)    "**Knowledge**" shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s)    "**Law**" shall mean any law, statute, ordinance, regulation, rule, code, notice requirement, court decision, or agency guideline, of any foreign, federal, state, or local Governmental Body.

(t)    "**Liabilities**" shall mean any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on- or off-balance sheet, or other.

(u)    "**Lien**" shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v)    "**Losses**" shall have the meaning set forth in Section 6.4.

(w)    "**Notice of Claim**" shall have the meaning set forth in Section 6.6(c).

(x)    "**Organizational Documents**" shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y)    "**Party**" or "**Parties**" shall have the meaning set forth in the preamble to this Agreement.

(z)    "**Permitted Liens**" shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(aa)    "**Person**" shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

EXHIBIT 9
Page 149

(bb)    "**Purchase Price**" shall have the meaning set forth in <u>Section 2.3</u>.

(cc)    "**Purchased Accounts**" shall have the meaning set forth in the Recitals.

(dd)    "**Seller**" shall have the meaning set forth in the preamble to this Agreement.

(ee)    "**Seller Indemnified Parties**" shall have the meaning set forth in <u>Section 6.5</u>.

(ff)    "**Tax**" or "**Taxes**" shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(gg)    "**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(hh)    "**Third Party**" or "**Third Parties**" shall mean any Person other than the Parties or their respective Affiliates.

(ii)    "**Third-party Claim**" shall have the meaning set forth in <u>Section 6.6(a)</u>.

(jj)    "**Transaction Agreements**" shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(kk)    "**Upfront Cash Payment**" shall have the meaning set forth in <u>Section 2.3</u>.

(ll)    "**Wire Instructions**" shall have the meaning set forth in <u>Section 2.3</u>.

EXHIBIT 9
Page 150

## EXHIBIT B

### FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this **"Agreement"**), is made by and between **Buyer**, and **Seller**.  Each of the Seller and the Buyer are sometimes referred to herein, individually, as a "**Party**" and, collectively, as the "**Parties**."

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the "**Purchase Agreement**"), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.      Defined Terms.  Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2.      Sale of Purchased Accounts; Assignment.  The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3.      Further Assurances.  Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

4.      Terms of the Purchase Agreement.  This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement.   The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference.  The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5.      Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[*Remainder of page intentionally left blank.*]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**BUYER: The Litigation Practice Group P.C.**

DocuSigned by:

By: _Daniel S March_____

Name: Daniel S. March
Title: Managing Shareholder

**SELLER:**

**Summit Marketing Solutions Inc**

DocuSigned by:

By: _____

Name: Arthur Henderson
Title: President & CEO

EXHIBIT 9
Page 152

**Schedule 2.3**
**Wire Instructions**

**$26,565.04**

**Account Holder Name: Summit Marketing Solutions Inc**

**Address: 17682 Beach Blvd, Suite 202 Huntington Beach, CA 92647**

**Routing Number:**

**Account Number:**

# EXHIBIT 10

EXHIBIT 10
Page 154





DINSMORE & SHOHL LLP
100 West Main Street, Suite 900
Lexington, Kentucky 40507
www.dinsmore.com

Tyler Powell
(859) 425-1046 (direct) ^ (859) 425-1099 (fax)
Tyler.powell@dinsmore.com

September 15, 2023

**CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FEDERAL RULE OF EVIDENCE 408**

Summit Marketing Solutions Inc.
17682 Beach Blvd, Suite 202
Huntington Beach, CA 92647
Elizabeth@solutionsbysummit.com
arthur@solutionsbysummit.com

      Re:    In re: The Litigation Practice Group, P.C.
             U.S. Bankruptcy Court, Central District of California, Case No. 8:23-bk-10571

Dear Sir/Madam:

This firm represents Richard A. Marshack, solely in his capacity as Chapter 11 Trustee ("Trustee") for the bankruptcy estate of The Litigation Practice Group, P.C. ("Debtor") in the above-referenced bankruptcy case. Pursuant to 11 U.S.C. § 1107 and his appointment as Trustee, the Trustee has the obligation to investigate and pursue claims, including avoidance actions.

EXHIBIT 10
Page 155



If we have not received any reply to this letter by September 28, 2023, we will proceed to pursue recovery of the preferential transfers by filing suit against you in the bankruptcy court. The Trustee also reserves all rights to bring additional claims against you as the investigation into your relationship with the Debtor continues and/or after discovery begins once a suit is filed.

Of course, we would be happy to discuss this matter with you or your counsel.

Very truly yours,

DINSMORE & SHOHL LLP

Tyler Powell, Partner of Counsel

2

EXHIBIT 10
Page 156

[redacted]

_____

**BY**: _____

**TITLE**: _____

**DATE**: _____

*Enclosure*

EXHIBIT 10
Page 157

**The Litigation Practice Group, P.C. Preference Transfer Schedule**

| Vendor Name | Payment Date | Payment Amount |
|---|---|---|
| Summit Marketing Solutions Inc. | 1/24/2023 | $9,762.55 |
| Summit Marketing Solutions Inc. | 1/10/2023 | $3,960.92 |
| Summit Marketing Solutions Inc. | 1/6/2023 | $3,960.92 |
| Summit Marketing Solutions Inc. | 12/30/2022 | $3,935.11 |
| Summit Marketing Solutions Inc. | 12/28/2022 | $11,725.58 |
| | | **Total: $ 33,345.08** |

EXHIBIT 10
Page 158

# EXHIBIT 11

EXHIBIT 11
Page 159

# PHILLIPS LAW

## CORPORATION

**CALIFORNIA OFFICE**
801 PARKCENTER DRIVE, SUITE 105
SANTA ANA, CA 92705
TEL: (714) 573-4087
FAX: (714) 586-5499

**ARIZONA OFFICE**
112 NORTH CENTRAL AVENUE, 1ST FLOOR
PHOENIX, AZ 85019
TEL: (602) 258-0110
FAX: (714) 586-5499

BRENT R. PHILLIPS, ESQ.
ADMITTED CALIFORNIA, ARIZONA & MARYLAND

E-mail: bphillips@phillipslawcorporation.com

October 19, 2023

**VIA ELECTRONIC MAIL**

Tyler Powell, Esq.
DINSMORE & SHOHL, LLP
100 West Main Street, Suite 900
Lexington, KY 40507

> **Re:** **In re: The Litigation Practice Group**
> **Our File No:** **100.039**
> **Our Client:** **Summit Marketing Solutions, Inc.**

Dear Mr. Powell:

This office represents Summit Marketing Solutions, Inc. ("Summit"). We are in receipt of your correspondence dated September 15, 2023 regarding claims that Richard A. Marshack (the "Trustee") as Trustee for the bankruptcy estate of The Litigation Practice Group, P.C. ("LPG") may have against Summit pursuant to 11 U.S.C. § 547(b) for avoidance. The Trustee's claims against Summit are based on payments made to Summit in December of 2022 and January 2023 by LPG in the amount of $33,345.08.



EXHIBIT 11
Page 160

Tyler Powell, Esq.
DINSMORE & SHOHL, LLP
October 19, 2023
Page 2 of 2



Otherwise, we consider this matter closed.

Should you have any questions, please feel free to contact us.

Sincerely,

PHILLIPS LAW CORPORATION

*Brent R. Phillips*

BRENT R. PHILLIPS

Enclosures

EXHIBIT 11
Page 161

# EXHIBIT 12

EXHIBIT 12
Page 162





*Legal Counsel.*

DINSMORE & SHOHL LLP
655 West Broadway, Suite 800
San Diego, CA 92101
www.dinsmore.com

Jacob R. Bothamley
(619) 400-0493 (direct) · (619) 400-0501 (fax)
Jacob.Bothamley@Dinsmore.com

February 29, 2024

**VIA [E-MAIL – bphillips@phillipslawcorporation.com]**
Summit Marketing Solutions, Inc.
c/o Phillips Law Corporation
801 Parkcenter Drive, Suite 105
Santa Ana, CA 92705

Attn: Brent R. Phillips

Re:     In re: The Litigation Practice Group, P.C.
        U.S. Bankruptcy Court, Central District of California – Case No.
        23-bk-10571

Dear Mr. Phillips,

It has been a pleasure to make your acquaintance in our telephone conversations of February 9 and February 21. As you know, my firm represents Richard Marshack ("Trustee"), the court appointed Chapter 11 trustee for debtor, The Litigation Practice Group P.C. ("LPG"). Trustee is currently investigating certain transfers of funds made by LPG to suspected affiliate entities leading up to LPG's bankruptcy filing on March 20, 2023 (the "Petition Date"). Trustee believes these transfers may constitute avoidable fraudulent and preferential transfers under the Bankruptcy Code. Trustee is looking into certain transfers from LPG to Summit Marketing Solutions, Inc. ("Summit").

Pursuant to our aforementioned telephone conversations and Bankruptcy Rule 2004, we will proceed with Summit's voluntary responses to the below requests for production:

1) A ledger of any and all payments made by LPG to Summit, including the dates that the payments were made and the amounts of the payments, including source of funds, bank account, wire, or other related information.

2) Any communications (letters, emails, text messages, social media, photographs, etc.) between LPG (or known associates such as Tony Diab or affiliates) and Summit, or any communication involving Summit where LPG (or known associates) is directly or indirectly the subject. If you are unsure if an entity is affiliated, please let us know and we can crosscheck our records.

EXHIBIT 12
Page 163

In re Litigation Practice Group
Page 2

    a.  Any communications or documents to, from, involving or mentioning the email address: "tony@validationllc.com".

    b.  Any communications or documents to, from, involving or mentioning the email address: "admin@lpglaw.com".

3) Any agreements (formal or informal) involving LPG (or a known associated or affiliated entity) and Summit.

4) Any and all documents relating to any document produced in response to Request Nos. 1-3.

    In our phone conversation of February 9, we tentatively agreed on a production date in early March. I propose a production date of **March 11, 2024**. Please let me know if that is agreeable. To the extent Summit has any responsive documents that it contends are protected from disclosure by the attorney-client privilege and/or attorney work product doctrine, please identify them on a privilege log, identifying the basis for the privilege, the date the document was created, sent, and received, the name, title, and address for the individual(s) who prepared, produced or reproduced the document (or who were the recipients of said document), a description of the document sufficient to identify it without revealing the information for which the privilege is claimed, including the general subject matter and character of the document, the location of the document, the custodian of the document, and every basis on which such privilege is claimed or on which the document is otherwise withheld

    If you should have any questions, please do not hesitate to contact our office.

    Best,

    Jacob R. Bothamley

EXHIBIT 12
Page 164

# EXHIBIT 13

EXHIBIT 13
Page 165

In re: The Litigation Practice Group PC
Disbursement Details by Payee
4 Years Pre-Petition (03/20/2019 - 03/20/2023)

Summit Marketing Solutions, Inc.



| Bank Name | Account Type | Account Name | Account Number | Statement Date | Transaction Date | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|
| UnionBank | Checking | The Litigation Practice Group PC | | 2/28/2022 | 2/11/2022 | 138.21 | WIRE TRANS TRN 0211017043 021122 UBOC UB103095N Sent To: BANK OF AMERICA N.A. Beneficiary: 1/Summit Marketing Solutions, Inc. |
| Chase | Checking | The Litigation Practice Group PC | | 2/28/2022 | 2/18/2022 | 874.72 | Fedwire Debit Via: Bk Amer Nyc/026009593 A/C: Summit Marketing Solutions, Inc Huntington Beach, CA 92647 US Ref: Weekly Disbursement Imad: 0218B1 Qgc06COi 3166 Tm: 5i89400049Jo |
| Chase | Checking | The Litigation Practice Group PC | | 2/28/2022 | 2/25/2022 | 968.07 | Fedwire Debit Via: Bk Amer Nyc/026009593 A/C: Summit Marketing Solutions, Inc Huntington Beach, CA 92647 US Ref: Weekly Disbursement Imad: 0225B1Qgc06C016824 Tm: 6368000056Jo |
| Chase | Checking | The Litigation Practice Group PC | | 3/31/2022 | 3/4/2022 | 1,826.17 | Fedwire Debit Via: Bk Amer Nyc/026009593 A/C: Summit Marketing Solutions, Inc Huntington Beach, CA 92647 us Ref: Weekly Disbursement Imad: 0304B1 Qgc0I COI 1115 Tm: 5366600063Jo |
| Chase | Checking | The Litigation Practice Group PC | | 3/31/2022 | 3/10/2022 | 2,769.84 | Fedwire Debit Via: Bk Amer Nyc/026009593 A/C: Summit Marketing Solutions, Inc Huntington Beach, CA 92647 US Ref: Weekly Disbursement Imad: 031 0B1 Qgc0400i 1863 Tm: 741 9600069Jo |
| Chase | Checking | The Litigation Practice Group PC | | 3/31/2022 | 3/18/2022 | 3,630.99 | Fedwire Debit Via: Bk Amer Nyc/026009593 NC: Summit Marketing Solutions, Inc Huntington Beach, CA 92647 us Ref: Weekly Disbursement Imad: 0318B1Qgc01C009645 Tm: 4570700077Jo |
| Chase | Checking | The Litigation Practice Group PC | | 3/31/2022 | 3/24/2022 | 2,250.02 | Fedwire Debit Via: Bk Amer Nyc/026009593 NC: Summit Marketing Solutions, Inc Huntington Beach, CA 92647 us Ref: Weekly Disbursement Imad: 0324B1 Qgc06COi 5442 Tm: 5976200083Jo |
| Chase | Checking | The Litigation Practice Group PC | | 4/30/2022 | 4/1/2022 | 1,796.87 | Fedwire Debit Via: Bk Amer Nyc/026009593 A/C: Summit Marketing Solutions, Inc Huntington Beach, CA 92647 US Ref: Weekly Disbursement Imad: 0401 B1Qgc07C015184 Tm: 5025200009Jo |
| Chase | Checking | The Litigation Practice Group PC | | 4/30/2022 | 4/7/2022 | 2,711.63 | Fedwire Debit Via: Bk Amer Nyc/026009593 A/C: Summit Marketing Solutions, Inc Huntington Beach, CA 92647 S Ret: Weekly Disbursement Imad: 0407B1 Qgc05C009284 Tm: 5692300097Jo |
| Chase | Checking | The Litigation Practice Group PC | | 4/30/2022 | 4/21/2022 | 15,895.28 | Fedwire Debit Via: Bk Amer Nyc/026009593 A/C: Summit Marketing Solutions, Inc Huntington Beach, CA 92647 us Ret: Weekly Disbursement Imad: 0421B1Qgc07C0i0996 Tm: 4880400iiiJo |
| Chase | Checking | The Litigation Practice Group PC | | 4/30/2022 | 4/28/2022 | 3,425.43 | Fedwire Debit Via: Bk Amer Nyc/026009593 A/C: Summit Marketing Solutions, Inc Huntington Beach, CA 92647 US Ref: Weekly Disbursement Imad: 0428B1Qgc05C009807 Tm: 59295001 i8Jo |
| Chase | Checking | The Litigation Practice Group PC | | 5/31/2022 | 5/5/2022 | 3,557.15 | Fedwire Debit Via: Bk Amer Nyc/026009593 NC: Summit Marketing Solutions, Inc Huntington Beach, CA 92647 us Ref: Weekly Disbursement Imad: 0505B1 Qgc08C032088 Tm: 71249001 25Jo |
| Chase | Checking | The Litigation Practice Group PC | | 5/31/2022 | 5/13/2022 | 4,923.53 | Fedwire Debit Via: Bk Amer Nyc/026009593 NC: Summit Marketing Solutions, Inc Huntington Beach, CA 92647 us Ref: Weekly Disbursement Imad: 0513B1Qgc07C0i8624 Tm: 7444700133Jo |
| Chase | Checking | The Litigation Practice Group PC | | 5/31/2022 | 5/19/2022 | 4,710.56 | Fedwire Debit Via: Bk Amer Nyc/026009593 NC: Summit Marketing Solutions, Inc Huntington Beach, CA 92647 us Ref: Weekly Disbursement Imad: 051 9B1 QgcO7C0i 3778 Tm: 55478001 39Jo |
| Chase | Checking | The Litigation Practice Group PC | | 5/31/2022 | 5/27/2022 | 4,751.17 | Fedwire Debit Via: Bk Amer Nyc/026009593 NC: Summit Marketing Solutions, Inc Huntington Beach, CA 92647 us Ref: Weekly Disbursement Imad: 0527B1Qgc08C0309i5 Tm: 7i62800147Jo |
| Chase | Checking | The Litigation Practice Group PC | | 6/30/2022 | 6/3/2022 | 3,027.33 | Fedwire Debit Via: Bk Amer Nyc/026009593 A/C: Summit Marketing Solutions, Inc Huntington Beach, CA 92647 us Ref: Weekly Disbursement Imad: 0603B1Qgc06C0i4474 Tm: 6209200154Jo |
| Chase | Checking | The Litigation Practice Group PC | | 6/30/2022 | 6/10/2022 | 6,279.88 | Fedwire Debit Via: Bk Amer Nyc/026009593 NC: Summit Marketing Solutions, Inc Huntington Beach, CA 92647 us Ref: Weekly Disbursement Imad: 061 0B1 Qgc04C006756 Tm: 5147200161 Jo |
| Chase | Checking | The Litigation Practice Group PC | | 6/30/2022 | 6/16/2022 | 5,621.53 | Fedwire Debit Via: Bk Amer Nyc/026009593 A/C: Summit Marketing Solutions, Inc Huntington Beach, CA 92647 US Ref: Weekly Disbursement Imad: 0616B1Qgc06C010594 Tm: 3737900167Jo |
| Chase | Checking | The Litigation Practice Group PC | | 6/30/2022 | 6/23/2022 | 1,393.93 | Fedwire Debit Via: Bk Amer Nyc/026009593 A/C: Summit Marketing Solutions, Inc Huntington Beach, CA 92647 US Ref: Weekly Disbursement Imad: 0623B1Qgc01C007893 Tm: 651 1900174Jo |
| Chase | Checking | The Litigation Practice Group PC | | 6/30/2022 | 6/30/2022 | 2,538.02 | Fedwire Debit Via: Bk Amer Nyc/026009593 NC: Summit Marketing Solutions, Inc Huntington Beach, CA 92647 us Ref: Weekly Disbursement Imad: 0630B1Qgc3C022274 Tm: 5592700181Jo |
| Chase | Checking | The Litigation Practice Group PC | | 7/31/2022 | 7/8/2022 | 2,628.90 | Fedwire Debit Via: Bk Amer Nyc/026009593 A/C: Summit Marketing Solutions, Inc Huntington Beach, CA 92647 US Ref: Weekly Disbursement Imad: O7O8BIQgc07COi 1511 Tm: 4038300i89Jo |
| Chase | Checking | The Litigation Practice Group PC | | 7/31/2022 | 7/14/2022 | 7,278.50 | Fedwire Debit Via: Bk Amer Nyc1026009593 A/C: Summit Marketing Solutions, Inc Huntington Beach, CA 92647 US Ref: Weekly Disbursement Imad: 0714B1Qgc010005305 Tm: 5i08700i95Jo |
| Chase | Checking | The Litigation Practice Group PC | | 7/31/2022 | 7/21/2022 | 4,366.94 | Fedwire Debit Via: Bk Amer Nyc/026009593 A/C: Summit Marketing Solutions, Inc Huntington Beach, CA 92647 US Ref: Weekly Disbursement Imad: 0721 Bi Qgc06C0i4649 Tm: 5239900202Jo |
| Chase | Checking | The Litigation Practice Group PC | | 7/31/2022 | 7/29/2022 | 10,573.16 | Fedwire Debit Via: Bk Amer Nyc/026009593 A/C: Summit Marketing Solutions, Inc Huntington Beach, CA 92647 US Ref: Weekly Disbursement Imad: 0729B1 Qgc04C0i 1998 Tm: 370840021 OJo |
| Chase | Checking | The Litigation Practice Group PC | | 8/31/2022 | 8/5/2022 | 7,065.46 | Fedwire Debit Via: Bk Amer Nyc/026009593 A/C: Summit Marketing Solutions, Inc Huntington Beach, CA 92647 US Ref: Weekly Disbursement Imad: 0805B1Qgc05C006167 Tm: 3i023002i7Jo |
| Chase | Checking | The Litigation Practice Group PC | | 8/31/2022 | 8/11/2022 | 12,001.26 | Fedwire Debit Via: Bk Amer Nyc/026009593 A/C: Summit Marketing Solutions, Inc Huntington Beach, CA 92647 US Ref: Weekly Disbursement Imad: 0811 Bi Qgc02C005908 Tm: 3898600223Jo |
| Chase | Checking | The Litigation Practice Group PC | | 8/31/2022 | 8/19/2022 | 7,966.45 | Fedwire Debit Via: Bk Amer Nyc/026009593 A/C: Summit Marketing Solutions, Inc Huntington Beach, CA 92647 US Ref: Weekly Disbursement Imad: 081 9B1 Qgc08C0I 0900 Tm: 2836200231 Jo |
| Chase | Checking | The Litigation Practice Group PC | | 8/31/2022 | 8/26/2022 | 5,856.37 | Fedwire Debit Via: Bk Amer Nyc/026009593 A/C: Summit Marketing Solutions, Inc Huntington Beach, CA 92647 US Ref: Weekly Disbursement Imad: 0826B1 Qgc04COO98i 6 Tm: 4485700238Jo |

DRAFT FORM - SUBJECT TO CHANGE

EXHIBIT 13
Page 166

In re: The Litigation Practice Group PC
Disbursement Details by Payee
4 Years Pre-Petition (03/20/2019 - 03/20/2023)

Case 8:23-bk-10571-SC    Doc 2260    Filed 03/13/25    Entered 03/13/25 17:17:53    Desc
Main Document    Page 167 of 173
Summit Marketing Solutions, Inc



| Bank Name | Account Type | Account Name | Account Number | Statement Date | Transaction Date | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|
| Chase | Checking | The Litigation Practice Group PC | | 9/30/2022 | 9/2/2022 | 76,836.90 | Fedwire Debit Via: Bk Amer Nyc/026009593 A/C: Summit Marketing Solutions, Inc Huntington Beach, CA 92647 us Ref: Weekly Disbursement Imad: 0902B1Qgc01C015594 Tm: 7203700245Jo |
| Chase | Checking | The Litigation Practice Group PC | | 9/30/2022 | 9/2/2022 | 5,275.64 | Fedwire Debit Via: Bk Amer Nyc/026009593 NC: Summit Marketing Solutions, inc Huntington Beach, CA 92647 US Ref: Weekly Disbursement mad: 0902B1 Qgc03C006695 Tm: 3730200245Jo |
| Chase | Checking | The Litigation Practice Group PC | | 9/30/2022 | 9/9/2022 | 8,678.40 | Fedwire Debit Via: Bk Amer Nyc/026009593 A/C: Summit Marketing Solutions, inc Huntington Beach, CA 92647 US Ref: Weekly Disbursement Imad: 0909B1Qgc020006Si3 Tm: 3437300252Jo |
| Chase | Checking | The Litigation Practice Group PC | | 9/30/2022 | 9/16/2022 | 10,222.52 | Fedwire Debit Via: Bk Amer Nyc/026009593 A/C: Summit Marketing Solutions, inc Huntington Beach, CA 92647 US Ref: Weekly Disbursement Imad: 091 6B1 QgcO200i 8412 Tm: 6662800259Jo |
| Chase | Checking | The Litigation Practice Group PC | | 9/30/2022 | 9/22/2022 | 20,639.03 | Fedwire Debit Via: Bk Amer Nyc/026009593 A/C: Summit Marketing Solutions, inc Huntington Beach, CA 92647 US Ret: Lead Cost Reimbursement mad: 0922B1 Qgc08COi 7286 Tm: 5i56300265Jo |
| Chase | Checking | The Litigation Practice Group PC | | 9/30/2022 | 9/23/2022 | 6,701.66 | Fedwire Debit Via: Bk Amer Nyc/026009593 A/C: Summit Marketing Solutions, inc Huntington Beach, CA 92647 US Ref: Weekly Disbursement mad: O923B1Qgc08CO1 1072 Tm: 3i04800266Jo |
| Chase | Checking | The Litigation Practice Group PC | | 9/30/2022 | 9/30/2022 | 8,576.53 | Fedwire Debit Via: Bk Amer Nyc/026009593 A/C: Summit Marketing Solutions, inc Huntington Beach, CA 92647 us Ret: Weekly Disbursement Imad: 0930B1 Qgc08C056459 Tm: 8680500273Jo |
| Chase | Checking | The Litigation Practice Group PC | | 10/31/2022 | 10/6/2022 | 3,995.03 | Fedwire Debit Via: Bk Amer Nyc/026009593 A/C: Summit Marketing Solutions, inc Huntington Beach, CA 92647 US Ref: Weekly Disbursement Imad: 1006B1Qgc05C009458 Tm: 4305000279Jo |
| Chase | Checking | The Litigation Practice Group PC | | 10/31/2022 | 10/7/2022 | 166,843.16 | Fedwire Debit Via: Bk Amer Nyc/026009593 A/C: Summit Marketing Solutions, inc Huntington Beach, CA 92647 us Ret: File Purchase Imad: iOO7BiQgcO7COiO38i Tm: 6420500280Jo |
| Chase | Checking | The Litigation Practice Group PC | | 10/31/2022 | 10/14/2022 | 5,537.81 | Fedwire Debit Via: Bk Amer Nyc1026009593 A/C: Summit Marketing Solutions, inc Huntington Beach, CA 92647 US Ref: Weekly Disbursement Imad: 1014B1Qgc02C009393 Tm: 6308600287Jo |
| Chase | Checking | The Litigation Practice Group PC | | 10/31/2022 | 10/21/2022 | 3,627.55 | Fedwire Debit Via: Bk Amer Nyc/026009593 A/C: Summit Marketing Solutions, inc Huntington Beach, CA 92647 US Ref: Weekly Disbursement Imad: 1021 Bi Qgc08C024823 Tm: 5054000294Jo |
| Chase | Checking | The Litigation Practice Group PC | | 10/31/2022 | 10/28/2022 | 1,507.30 | Fedwire Debit Via: Bk Amer Nyc/026009593 A/C: Summit Marketing Solutions, inc Huntington Beach, CA 92647 US Ref: Weekly Disbursement Imad: 1O28B1Qgc02C01 1568 Tm: 7397200301Jo |
| Chase | Checking | The Litigation Practice Group PC | | 11/30/2022 | 11/9/2022 | 4,500.00 | Fedwire Debit Via: Bk Amer Nyc/026009593 NC: Summit Marketing Solutions, Inc Huntington Beach, CA 92647 US Ref: Weekly Disbursement Imad: 1 IO9BlQgcC8CO2I 117 Tm: 391 830031 3do |
| Chase | Checking | The Litigation Practice Group PC | | 11/30/2022 | 11/10/2022 | 4,752.88 | Fedwire Debit Vie: Bk Amer Nyc1026009593 NC: Summit Marketing Solutions, inc Huntington Beach, CA 92647 US Ref: Weekly Disbursement Imad: ii 10B1Qgc08C048463 Tm: 606050031 4Jo |
| Chase | Checking | The Litigation Practice Group PC | | 11/30/2022 | 11/10/2022 | 3,363.49 | Fadwira Debit Vie: Bk Amer Nyc/026009593 NC: Summit Marketing Solutions, inc Huntington Beach, CA 92647 US Ref: Weekly Disbursement Imad: Il IDB1Qgc08CD4B4Si Tm: 466400031 3J0 |
| Chase | Checking | The Litigation Practice Group PC | | 11/30/2022 | 11/15/2022 | 146,521.38 | Fedwire Debit Via Bk Amer Nyc/026009593 NC Summit Marketing Solutions, Inc Huntington Beach, CA 92647 US Ret: File Purchase Imad: 111561C9c01C004629 Tm: 5119600319Jo |
| Chase | Checking | The Litigation Practice Group PC | | 11/30/2022 | 11/18/2022 | 8,723.49 | Fedwire Debit Via Bk Amer Nyc/026009593 NC Summit Marketing Solutions, Inc Huntington Beach, CA 92647 US Ref: Weekly Disbursement Imad: 11 18R1Ogc08C028279 Tm: 5042300322Jo |
| Chase | Checking | The Litigation Practice Group PC | | 11/30/2022 | 11/25/2022 | 8,057.37 | Fedwire Debit Vie: Bk Amer Nyc/026009593 NC: Summit Marketing solutions, inc Huntington Beach, CA 92647 us Ret: Weekly Disbursement Imad: I 125B1Qgc05C009837 Tm: 4228200329Jo |
| Chase | Checking | The Litigation Practice Group PC | | 11/30/2022 | 11/25/2022 | 4,728.55 | Fedwire Debit Via: Bk Amer Nyc/026009593 ND: Summit Marketing Solutions, inc Huntington Beach, CA 92647 US Ret: Weekly Disbursement Imad: 1 125B1Qgc07C029362 Tm: 4241 300329Jo |
| Chase | Checking | The Litigation Practice Group PC | | 12/31/2022 | 12/5/2022 | 9,837.83 | Fedwire Debit Vie: Bk Amer Nyc/026009593 NC: Summit Marketing Solutions, inc Huntington Beach, CA 92647 US Ref: Weekly Disbursement Imad: 1 205B1 0gc08C038607 Tm: 5571 600339Jo |
| Chase | Checking | The Litigation Practice Group PC | | 12/31/2022 | 12/9/2022 | 4,163.54 | Fedwire Debit Vie: Bk Amer Nyc/026009593 NC: Summit Marketing Solutions, inc Huntington Beach, CA 92647 US Ref: Weekly Diabursement Imad: 1 209Bl 0gc08C034840 Tm: 6584800343Jo |
| Chase | Checking | The Litigation Practice Group PC | | 12/31/2022 | 12/19/2022 | 7,594.01 | Fedwire Debit Vie Bk Amer Nyc/026009593 NC Summit Marketing Solutions, Inc Huntington Beach, CA 92547 US Ref: Weekly Disbursement Imad: 121981 Qgc08C042797 Tm: 8043000353Jo |
| Chase | Checking | The Litigation Practice Group PC | | 12/31/2022 | 12/28/2022 | 11,725.58 | Fedwire Debit Via: Bk Amer Nyc/026009593 NC: Summit Marketing Solutions, I no Huntington Beach, CA 92647 US Ret: Weekly Disbursement Imad: 122881 Qgc07CD37871 Tm: 74D8200362J0 |
| Chase | Checking | The Litigation Practice Group PC | | 12/31/2022 | 12/30/2022 | 3,935.11 | Fedwire Debit Via: Bk Amer Nyc/026D09593 NC: Summit Marketing Solutions, inc Huntington Beach, CA 92647 US Ref: Weekly Disbursement Imad: I 23081 Qgc08CD67746 Tm: 5575800364Jc |
| Chase | Checking | The Litigation Practice Group PC | | 1/31/2023 | 1/6/2023 | 3,960.92 | Fedwire Debit Via: Bk Amer Nyc/026009593 NC: Summit Marketing Solutions, inc Huntington Beach, CA 92647 US Ref: Weekly Disbursement Imad: 01 08B1 0gc08C029349 Tm: 471 8500006Jo |
| Chase | Checking | The Litigation Practice Group PC | | 1/31/2023 | 1/10/2023 | 3,960.92 | Fedwire Debit Via: Bk Amer Nyc/026009593 NC: Summit Marketing Solutions, inc Huntington Beach, CA 92647 US Ref: Weekly Disbursement Imad: 01 10R1Qgc03C005353 Tm: 4991 80001 0J0 |
| Bank of America | Checking | Litigation Practice Group PC | | 1/31/2023 | 1/10/2023 | 15,269.11 | Bill.com DES:Payables ID025DZPGXWTE4DRY INDN:Litigation Practice Gr Co ID:1 204895317 CCD PMT INFO:Multiple Payments Bill.com Payables 025D ZPGXWTE4DRY |
| Bank of America | Checking | Litigation Practice Group PC | | 1/31/2023 | 1/10/2023 | 438.53 | Bill.com DES:Payables ID025DZPGXWTE4DRY INDN:Litigation Practice Gr Co ID:1 204895317 CCD PMT INFO:Multiple Payments Bill.com Payables 025D ZPGXWTE4DRY |

In re: The Litigation Practice Group PC
Disbursement Details by Payee
4 Years Pre-Petition (03/20/2019 - 03/20/2023)

Summit Marketing Solutions, Inc

**GROBSTEIN TEEPLE**

| Bank Name | Account Type | Account Name | Account Number | Statement Date | Transaction Date | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|
| Bank of America | Checking | Litigation Practice Group PC | | 1/31/2023 | 1/10/2023 | 563.83 | Bill.com DES:Payables ID025DZPGXWTE4DRY INDN:Litigation Practice Gr Co ID:1 204895317 CCD PMT INFO:Multiple Payments Bill.com Payables 025D ZPGXWTE4DRY |
| Bank of America | Checking | Litigation Practice Group PC | | 1/31/2023 | 1/10/2023 | 3,096.46 | Bill.com DES:Payables ID025DZPGXWTE4DRY INDN:Litigation Practice Gr Co ID:1 204895317 CCD PMT INFO:Multiple Payments Bill.com Payables 025D ZPGXWTE4DRY |
| Bank of America | Checking | Litigation Practice Group PC | | 1/31/2023 | 1/10/2023 | 2,255.29 | Bill.com DES:Payables ID025DZPGXWTE4DRY INDN:Litigation Practice Gr Co ID:1 204895317 CCD PMT INFO:Multiple Payments Bill.com Payables 025D ZPGXWTE4DRY |
| Bank of America | Checking | Litigation Practice Group PC | | 1/31/2023 | 1/17/2023 | 3,254.22 | WIRE TYPE:BOOK OUT DATE230117 TIME:0429 ETTRN:2023011300504663 RELATED REF:421 502916 BNF:SUMMIT MARKETING SOLUTIONS 103251 20775628 PMT DET:O1 .1323 WEEKLY DISBURSEMENT |
| Chase | Checking | The Litigation Practice Group PC | | 1/31/2023 | 1/24/2023 | 9,762.55 | Fedwire Debit Vie: Bk Amer Nyc/026009593 NC: Summit Marketing Solutions, Inc Huntington Beach, CA 92647 US Ret: Weekly Disbursement Imed: 012461 Ogc08C032062 Trn: 5653400024lo |
| Chase | Checking | The Litigation Practice Group PC | | 2/28/2023 | 2/7/2023 | 7,464.95 | Fedwire Debit Via: Bk Amer Nyc/026009593 A/C: Summit Marketing Solutions, Inc Huntington Beach, CA 92647 US Ref: Weekly Disbursement Imzd: 020781Qgc07C031923 Trn: 6650200038Jo |
| | | | | | | 717,198.91 | |

DRAFT FORM - SUBJECT TO CHANGE

EXHIBIT 13
Page 168

# EXHIBIT 14

EXHIBIT 14
Page 169

In re: The Litigation Practice Group PC
Disbursement Details by Payee
90 Days Pre-Petition (12/20/2022 - 03/20/2023)

Summit Marketing Solutions, Inc



| Bank Name | Account Type | Account Name | Account Number | Statement Date | Transaction Date | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|
| Chase | Checking | The Litigation Practice Group PC | | 12/31/2022 | 12/28/2022 | 11,725.58 | Fadwira Debit Via: Bk Amer Nyc/026009593 NC: Summit Marketing Solutions, I no Huntington Beach, CA 92647 US Ret: Weekly Disbursement Imad: 122881 QgcD7CD37871 Tm: 74D8200362J0 |
| Chase | Checking | The Litigation Practice Group PC | | 12/31/2022 | 12/30/2022 | 3,935.11 | Fedwire Debit Via: Bk Amer Nyc/026DD9593 NC: Summit Marketing Solutions, Inc Huntington Beach, CA 92647 US Ret: Weekly Disbursement Imad: I 23081 QgcD8CD67746 Tm: 5575800364Jo |
| Chase | Checking | The Litigation Practice Group PC | | 1/31/2023 | 1/6/2023 | 3,960.92 | Fedwire Debit Via: Bk Amer Nyc/026009593 NC: Summit Marketing Solutions, Inc Huntington Beach, CA 92647 US Ret: Weekly Disbursement Imad: 01 08B1 0gc08C029349 Tm: 471 8500006Jo |
| Chase | Checking | The Litigation Practice Group PC | | 1/31/2023 | 1/10/2023 | 3,960.92 | Fedwire Debit Via: Bk Amer Nyc/026009593 NC: Summit Marketing Solutions, Inc Huntington Beach, CA 92647 US Ret: Weekly Disbursement Imad: 01 10R1Qgo03C005353 Tm: 4991 80001 0J0 |
| Bank of America | Checking | Litigation Practice Group PC | | 1/31/2023 | 1/10/2023 | 438.53 | Bill.com DES:Payables ID025DZPGXWTE4DRY INDN:Litigation Practice Gr Co ID:1 204895317 CCD PMT INFO:Multiple Payments Bill.com Payables 025D ZPGXWTE4DRY |
| Bank of America | Checking | Litigation Practice Group PC | | 1/31/2023 | 1/10/2023 | 563.83 | Bill.com DES:Payables ID025DZPGXWTE4DRY INDN:Litigation Practice Gr Co ID:1 204895317 CCD PMT INFO:Multiple Payments Bill.com Payables 025D ZPGXWTE4DRY |
| Bank of America | Checking | Litigation Practice Group PC | | 1/31/2023 | 1/10/2023 | 2,255.29 | Bill.com DES:Payables ID025DZPGXWTE4DRY INDN:Litigation Practice Gr Co ID:1 204895317 CCD PMT INFO:Multiple Payments Bill.com Payables 025D ZPGXWTE4DRY |
| Bank of America | Checking | Litigation Practice Group PC | | 1/31/2023 | 1/10/2023 | 3,096.46 | Bill.com DES:Payables ID025DZPGXWTE4DRY INDN:Litigation Practice Gr Co ID:1 204895317 CCD PMT INFO:Multiple Payments Bill.com Payables 025D ZPGXWTE4DRY |
| Bank of America | Checking | Litigation Practice Group PC | | 1/31/2023 | 1/10/2023 | 15,269.11 | Bill.com DES:Payables ID025DZPGXWTE4DRY INDN:Litigation Practice Gr Co ID:1 204895317 CCD PMT INFO:Multiple Payments Bill.com Payables 025D ZPGXWTE4DRY |
| Bank of America | Checking | Litigation Practice Group PC | | 1/31/2023 | 1/17/2023 | 3,254.22 | WIRE TYPE:BOOK OUT DATE230117 TIME:0429 ETTRN:2023011300504663 RELATED REF:421 502916 BNF:SUMMIT MARKETING SOLUTIONS 103251 20775628 PMT DET:O1 .1323 WEEKLY DISBURSEMENT |
| Chase | Checking | The Litigation Practice Group PC | | 1/31/2023 | 1/24/2023 | 9,762.55 | Fedwire Debit Vie: Bk Amer Nyc/026009593 NC: Summit Marketing Solutions, Inc Huntington Beach, CA 92647 US Ret: Weekly Disbursement Imed: 012461 Ogc08C032062 Tm: 5653400024Io |
| Chase | Checking | The Litigation Practice Group PC | | 2/28/2023 | 2/7/2023 | 7,464.95 | Fedwire Debit Via: Bk Amer Nyc/026009593 A/C: Summit Marketing Solutions, Inc Huntington Beach, CA 92647 US Ref: Weekly Disbursement Imad: 0207B1Qgc07C031923 Trn: 6650200038Jo |
| | | | | | | 65,687.47 | |

DRAFT FORM - SUBJECT TO CHANGE

EXHIBIT 14
Page 170

# ADVERSARY PROCEEDING COVER SHEET

B1040 (FORM 1040) (12/24)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

**PLAINTIFFS**
Richard A. Marshack, Trustee of the LPG Liquidation Trust

**DEFENDANTS**
Summit Marketing Solutions, Inc., a Wyoming corporation
dba Solutions by Summit; Arthur Henderson, individually

**ATTORNEYS** (Firm Name, Address, and Telephone No.)
Yosina M. Lissebeck (SBN 201654)
Christopher B. Ghio (SBN 259094)
Sara A. Johnston (Ky. Bar No. 96769) (*Admitted pro hac vice*)
Vanessa E. Rodriguez (SBN 349425)
DINSMORE & SHOHL LLP
655 West Broadway, Ste 800
San Diego, CA 92101    Telephone (619) 400-0500
yosina.lissebeck@dinsmore.com
christopher.ghio@dinsmore.com
sara.johnston@dinsmore.com
vanessa.rodriguez@dinsmore.com

**ATTORNEYS** (If Known)

**PARTY** (Check One Box Only)
- [ ] Debtor
- [ ] U.S. Trustee/Bankruptcy Admin
- [ ] Creditor
- [ ] Other
- [ ] Trustee

**PARTY** (Check One Box Only)
- [ ] Debtor
- [ ] U.S. Trustee/Bankruptcy Admin
- [ ] Creditor
- [ ] Other
- [x] Trustee

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
(1) Avoidance, Recovery, and Preservation of 2-Year Actual Fraudulent Transfers; (2) Avoidance, Recovery, and Preservation of 2-Year Constructive Fraudulent Transfers; (3) Avoidance, Recovery, and Preservation of 4-Year Actual Fraudulent Transfers; (4) Avoidance, Recovery, and Preservation of 4-Year Constructive Fraudulent Transfers; (5) Avoidance, Recovery, and Preservation of Preferential Transfers; (6) Turnover; and (7) Aiding and Abetting as to Defendant Arthur Henderson

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(a) – Recovery of Money/Property**
- [x] 11-Recovery of money/property - §542 turnover of property
- [x] 12-Recovery of money/property - §547 preference
- [x] 13-Recovery of money/property - §548 fraudulent transfer
- [ ] 14-Recovery of money/property - other

**FRBP 7001(b) – Validity, Priority or Extent of Lien**
- [ ] 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(c) – Approval of Sale of Property**
- [ ] 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(d) – Objection/Revocation of Discharge**
- [ ] 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(e) – Revocation of Confirmation**
- [ ] 51-Revocation of confirmation

**FRBP 7001(f) – Dischargeability**
- [ ] 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
- [ ] 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
- [ ] 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(f) – Dischargeability (continued)**
- [ ] 61-Dischargeability - §523(a)(5), domestic support
- [ ] 68-Dischargeability - §523(a)(6), willful and malicious injury
- [ ] 63-Dischargeability - §523(a)(8), student loan
- [ ] 64-Dischargeability - §523(a)(15), divorce or separation obligation
  (other than domestic support)
- [ ] 65-Dischargeability - other

**FRBP 7001(g) – Injunctive Relief**
- [ ] 71-Injunctive relief- imposition of stay
- [ ] 72-Injunctive relief - other

**FRBP 7001(h) Subordination of Claim or Interest**
- [ ] 81-Subordination of claim or interest

**FRBP 7001(i) Declaratory Judgment**
- [ ] 91-Declaratory judgment

**FRBP 7001(j) Determination of Removed Action**
- [ ] 01-Determination of remove d claim or cause

**Other**
- [ ] SS-SIPA Case - 15 U.S.C. §§78aaa *et.seq.*
- [ ] 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

- [ ] Check if this case involves a substantive issue of state law
- [ ] Check if this is asserted to be a class action under FRCP 23

- [ ] Check if a jury trial is demanded in complaint
- [ ] Demand $ greater than $717,199

Other Relief Sought

**ATTACHMENT**
Page 172

B1040 (FORM 1040) (12/24)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>The Litigation Practice Group P.C. | BANKRUPTCY CASE NO.<br>8:23-bk-10571-SC | |
| DISTRICT IN WHICH CASE IS PENDING<br>Central District of California | DIVISION OFFICE<br>Santa Ana | NAME OF JUDGE<br>Scott C. Clarkson |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br>/s/ Vanessa E. Rodriguez | | |
| DATE<br>March 13, 2025 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Yosina M. Lissebeck<br>Vanessa E. Rodriguez | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.