Christopher Celentino (131688)
Yosina M. Lissebeck (State Bar No. 201654)
Christopher B. Ghio (State Bar No. 259094)
**DINSMORE & SHOHL LLP**
655 West Broadway, Suite 800
San Diego, CA 92101
Telephone:  619.400.0500
Facsimile:  619.400.0501
christopher.celentino@dinsmore.com
yosina.lissebeck@dinsmore.com
christopher.ghio@dinsmore.com

Tyler Powell (Ky. Bar No. 90520 – Admitted pro hac vice)
**DINSMORE & SHOHL, LLP**
100 West Main Street, Suite 900
Lexington, KY  40507
Telephone:  859-425-1056
Facsimile:  859-425-1099
tyler.powell@dinsmore.com

Special Counsel to Richard A. Marshack,
Trustee of the LPG Liquidation Trust

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>The Litigation Practice Group P.C.,<br><br>Debtor.<br>_____<br><br>Richard A. Marshack, Trustee of the LPG Liquidation Trust,<br><br>Plaintiff,<br><br>v.<br><br>EIN Capital, Inc., a New York Domestic Business Corporation<br><br>Defendant.<br>_____ | Chapter 11<br>Case No.: 8:23-bk-10571-SC<br>Adv. Proc. No. 8:25-ap-_____-SC<br><br>**COMPLAINT FOR:**<br><br>**(1) AVOIDANCE, RECOVERY, AND PRESERVATION OF FRAUDULENT TRANSFER(S) PURSUANT TO 11 U.S.C. §§ 548(a)(1), 550, AND 551**<br><br>**(2) AVOIDANCE, RECOVERY, AND PRESERVATION OF FRAUDULENT TRANSFER(S) PURSUANT TO 11 U.S.C. §§ 548(a)(2), 550, AND 551**<br><br>**(3) AVOIDANCE, PRESERVATION, AND RECOVERY OF ACTUAL FRAUDULENT TRANSFER(S) [11 U.S.C. §§ 544, 550, 551; CAL. CIV. CODE §§ 3439.04(a)(1) AND 3439.07]**<br><br>**(4) AVOIDANCE, PRESERVATION, AND RECOVERY OF CONSTRUCTIVE FRAUDULENT TRANSFER(S) [11 U.S.C. §§ 544, 550, 551; CAL. CIV. CODE §§ 3439.04(a)(2), 3439.05, AND 3439.07]**<br><br>Honorable Scott C. Clarkson - Dept. 5C |

For his *Complaint for (1) Avoidance, Preservation, and Recovery of Actual Fraudulent Transfers pursuant to 11 U.S.C. §§ 548(a)(1)(A), 550, and 551, (2) Avoidance, Preservation, and Recovery of Constructively Fraudulent Transfers pursuant to 11 U.S.C. §§ 548(a)(1)(B), 550, and 551, (3) Avoidance, Preservation, and Recovery of Actual Fraudulent Transfers pursuant to 11 U.S.C. §§ 544, 550, and 551 and Cal. Civ. Code §§ 3349.04(a)(1) and 3439.07 and (4) Avoidance, Preservation and Recovery of Constructively Fraudulent Transfers pursuant to 11 U.S.C. §§ 544, 550, and 551 and Cal. Civ. Code §§ 3349.05 and 3439.07,* Plaintiff Richard A. Marshack, the former Chapter 11 Trustee for the bankruptcy estate ("Estate") of debtor The Litigation Practice Group P.C. ("Debtor" or "LPG") and current Liquidating Trustee of the LPG Liquidation Trust (collectively, "Trustee" or "Plaintiff") in the above-captioned bankruptcy case (the "Bankruptcy Case"), alleges and avers as follows:

## STATEMENT OF JURISDICTION, NATURE OF PROCEEDING, AND VENUE

1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E), (H) and (O), 1334(b), and General Order No. 13-05 of the District Court for the Central District of California because this is a core proceeding arising in and/or related to the Bankruptcy Case, which is a case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), and which is pending in the United States Bankruptcy Court for the Central District of California, Santa Ana Division (the "Court").

2.      Regardless of whether this proceeding is core, non-core, or otherwise, the Plaintiff consents to the entry of a final order and judgment by the Bankruptcy Court.

3.      Defendant is hereby notified that Rule 7008 of the Federal Rules of Bankruptcy Procedure requires them to plead whether consent is given to the entry of a final order and judgment by the bankruptcy court.

4.      Venue of this adversary proceeding properly lies in this judicial district pursuant to 28 U.S.C. § 1409(a) because this proceeding is related to the Debtor's pending Bankruptcy Case.

## THE PARTIES

5.      Plaintiff, Richard A. Marshack, was the duly-appointed, qualified Chapter 11 Trustee of Debtor's Estate and is now the current liquidating trustee of the LPG Liquidation Trust.

6.      Debtor LPG is, and at all material times was, a professional corporation organized, existing, and in good standing under the laws of the State of California, with its principal place of business in Tustin, California.

7.      Defendant EIN Capital, Inc. is, and at all material times represented that it was, a New York – Domestic Business Corporation ("EIN").

## GENERAL ALLEGATIONS

### A.    The Bankruptcy Case

8.      On March 20, 2023 ("Petition Date"), Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, commencing the Bankruptcy Case.

9.      The Office of the United States Trustee ("UST") filed its *Motion by United States Trustee to Dismiss or Convert Case Pursuant to 11 U.S.C. § 1112(b)* [Bankr. Docket No. 21] and creditors Debt Validation Fund II, LLC; MC DVI Fund 1, LLC; and MC DVI Fund 2, LLC filed the *Motion by DVF and MC DVI to Dismiss Chapter 11 Case Pursuant to 11 U.S.C. §§ 105, 305, 349, & 1112, or in the Alternative Convert This Case to Chapter 7 or Appoint a Trustee* [Bankr. Docket No. 44]. On May 4, 2023, the Court entered its *Order Directing United States Trustee to Appoint Chapter 11 Trustee* [Bankr. Docket No. 58].

10.     Pursuant to the *Acceptance of Appointment as Chapter 11 Trustee* [Bankr. Docket No. 63], on May 8, 2023, Trustee accepted his appointment as the Chapter 11 Trustee in the Bankruptcy Case. The Court approved the Trustee's appointment in its *Order Approving the U.S. Trustee's Application for the Appointment of a Chapter 11 Trustee* [Docket No. 65].

11.     Trustee was not appointed until after events of the case and, therefore, bases these allegations on information and belief. *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) ("The *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible."); *Miller v. City of Los Angeles*, 2014 U.S. Dist. LEXIS 198871, 2014 WL 12610195, at *5 (C.D. Cal. Aug. 7, 2014) (recognizing that the plaintiff's "information and belief" pleading was allowed and "necessary at times"); *see also Mireskandari v. Daily Mail and General Trust PLC*, 2013

3

U.S. Dist. LEXIS 194437, 2013 WL 12129642, at *4 (C.D. Cal. July 31, 2013) ("The Federal Rules of Civil Procedure allow parties to plead facts on 'information and belief' if the facts 'will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.'" (citations omitted)).

12.     Pursuant to the *Order Confirming Modified First Amended Joint Chapter 11 Plan of Liquidation* entered September 9, 2024, and the *Notice of Occurrence of Effective Date of Modified First Amended Joint Chapter 11 Plan of Liquidation* filed September 24, 2024, Richard A. Marshack became the Liquidating Trustee of the LPG Liquidation Trust, effective September 24, 2024. [Bankr. Docket Nos. 1646 & 1762].

13.     All claims have been transferred to the Liquidating Trust pursuant to the confirmed plan and Plaintiff brings this action solely in his capacity as the Liquidating Trustee of the LPG Liquidation Trust, for the benefit of Debtor's Estate and its creditors.

**B.    Protective Order**

14.     On or about May 2, 2024, Plaintiff filed that certain Notice and Motion for Entry of Protective Order (the "Protective Order").

15.     On June 3, 2024, the Court entered its *Order Granting Motion for Entry of Protective Order and the Protective Order* [Bankr. Docket No. 1270] (the "Protective Order"). A true and accurate copy of the Protective Order is attached as **Exhibit 1**, and incorporated herein.

16.     By its own terms, the Protective Order applies to this adversary proceeding and governs all discovery conducted herein.

**C.    LPG's Ownership and Management**

17.     Prior to the Petition Date, LPG operated a law firm for consumers across the country who sought assistance in contesting or resolving debts they would identify. At all relevant times, LPG was controlled and operated by the individual named Tony Diab ("Diab").

18.     The consumers would pay LPG over a period of time via monthly debits from their bank accounts.

19.     The monthly payments were meant to cover all legal services LPG provided to the consumers including validation of the debts, review of documents to determine enforceability, and

1  court appearances to halt lawsuits to obtain judgments.

2      20.    In certain instances, LPG would file a lawsuit in an effort to eliminate a disputed debt

3  or to prosecute affirmative claims held by the consumers.

4      21.    LPG mismanaged the consumers' monthly payments.

5      22.    Diab and other defendants devised a plan to fraudulently transfer funds, client files,

6  client funds and assets in the form of ACH Receivables (the "ACH Receivables" or "Accounts

7  Receivable") out of LPG to third parties prior to the filing of bankruptcy.

8      23.    To obtain consumer clients, LPG contracted with marketing companies, who

9  engaged in illegal capping and would advertise or call to solicit consumers to become clients of LPG

10 in exchange for a percentage of the ACH Receivables collected by LPG from the consumers. The

11 marketing affiliate went so far as to assist with the execution of an engagement letter between the

12 consumer and LPG.

13     24.    In exchange, LPG agreed to pay the marketing affiliates a percentage the monthly

14 payments collected by LPG from the consumers.

15     25.    Because LPG received payments from consumers over time, it often sought financing

16 by borrowing against its future cash flows. This borrowing was not only used to finance operations

17 at LPG, but also to pay the fees owed to the marketing companies for providing the client referrals.

18     26.    Many of the documents executed in connection with such financing described the

19 transactions as accounts receivable purchase agreements.

20     27.    LPG also purported to "sell" the rights to these Accounts Receivable following

21 collection by LPG to outside investors in exchange for liquidity. LPG frequently "sold" the Accounts

22 Receivable from the same client files to multiple parties.

23     28.    By August of 2022, LPG's need for capital was so severe that it began borrowing

24 funds through a loan broker named Spot On Consulting, Inc. ("Spot On"). Upon information and

25 belief, Spot On would facilitate loans to LPG from individuals and corporations – sometimes for as

26 little as $5,000 – in exchange for a ten percent (10%) commission on the principal amount of the loan.

27 LPG would then typically promise to pay each lender as much as eight percent (8%) interest per

28 month on the principal balance for twelve months and would then repay the original principal amount

1   at maturity.

2      29.   Upon further information and belief, LPG borrowed hundreds of thousands of dollars

3   **each week** on these terms beginning in August 2022 and continuing until filing for bankruptcy.

4      30.   Proof of Claim No. 108 seeking more than $66 million dollars has been filed for the

5   outstanding balances owed on these brokered "loans". This Proof of Claim is incorporated by

6   reference herein.

7      31.   As evidenced by its substantial borrowing through brokered loans and alleged sales of

8   Accounts Receivable to lenders and "investors," LPG's need for cash was constant as it had (i) to pay

9   marketing affiliates for past referrals and keep new referrals being made, (ii) to pay "returns" to

10  investors who purportedly purchased sets of Accounts Receivable or funded the continued operation

11  of the Debtor and related entities, and (iii) to pay the substantial salaries to, personal expenses of, and

12  distributions to its management and other insiders.

13     32.   This constant borrowing to pay off prior investors and obligations coupled with the

14  alleged sale of the same assets to different entities is classic evidence of a Ponzi scheme.

15     33.   Diab used entities he controlled including, without limitation, Vulcan Consulting,

16  LLC ("Vulcan") and B.A.T., Inc. dba Coast Processing ("Coast") to process payments from LPG

17  consumer clients and to divert LPG consumer funds and ACH Receivables. Diab would use numerous

18  ACH processing companies in order to easily transfer millions of dollars from Debtor to these entities

19  he controlled, without oversight or detection, and to avoid payment disputes and complications. The

20  money that flowed from Debtor through these bank account to Defendant consisted of Client Funds

21  that Debtor funneled to these entities by means of the ACH processing companies. Debtor also made

22  deposits into these entities bank account such that they received Client Funds directly from Debtor in

23  addition to direct Accounts Receivables.

24  **D.   Ponzi Scheme Presumption**

25     34.   The Ponzi Scheme Presumption exists in bankruptcy proceedings.

26     35.   The Ponzi Scheme Presumption can be utilized to establish a debtor's "intent to

27  defraud  future undertakers [investors] from the mere fact that a debtor was running a Ponzi scheme.

28  Indeed, no other reasonable inference is possible. A Ponzi scheme cannot work forever. The investor

pool is a limited resource and will eventually run dry. The perpetrator must know that the scheme will eventually collapse as a result of the inability to attract new investors. The perpetrator nevertheless makes payments to present investors, which, by definition, are meant to attract new investors. He must know all along, from the very nature of his activities, that investors at the end of the line will lose their money. Knowledge to a substantial certainty constitutes intent in the eyes of the law," *cf. Restatement (Second) of Torts § 8A* (1963 & 1964), and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them. *Kirkland v. Rund (In re EPD Inv. Co., LLC)*, 114 F.4th 1148, 1153 (9th Cir. 2024) (by definition Ponzi scheme is destined to fail and the swindler and their entities often end in bankruptcy or equitable receivership); *Cf. Coleman Am. Moving Servs., Inc. v. First Nat'l Bank & Trust Co. (In re American Properties, Inc.)* 14 B.R. 637, 643 (Bankr. D. Kan. 1981) (intentionally carrying out a transaction with full knowledge that its effect will be detrimental to creditors is sufficient for actual intent to hinder, delay or defraud within the meaning of § 548(a)(1))." *Merrill v. Abbott (In re Independent Clearing House Co.)* (D. Utah 1987) 77 B.R. 843, 860. A trustee in bankruptcy is not required to show that an operator of a Ponzi scheme was subjectively aware his Ponzi scheme was destined to fail. *In re EPD Inv. Co., LLC*, 114 F.4th at 1153 ("[a] trustee's action to recover assets fraudulently conveyed in the course of a Ponzi scheme does not require that the trustee also prove the Ponzi-scheme operator was subjectively aware his Ponzi scheme was destined to fail.").

36.    "But if all the debtor receives in return for a transfer is the use of the defendant's money to run a Ponzi scheme, there is nothing in the bankruptcy estate for creditors to share. In fact, by helping the debtor perpetuate his scheme, the transfers exacerbate the harm to creditors by increasing the amount of claims while diminishing the debtor's estate. In such a situation, the use of the defendant's money cannot objectively be called 'reasonably equivalent value.'" *In re Independent Clearing House Co.* 77 B.R. at 859. Therefore, "[t]he trustee can avoid the transfers if they were preferential or fraudulent. Transfers to investors in a Ponzi scheme are preferential and fraudulent. Therefore, they constitute "property of the estate," and the trustee can recover them. *Id.* at 853 n.17 (citations omitted).

37.    Debtor was operating a Ponzi scheme that utilized affiliates and several other entities

as investors to continue its unlawful business practices by using funds provided by current investors to attract new investors hoping for very high returns. Therefore, the Debtor was running a Ponzi scheme and the Ponzi Scheme Presumption can be utilized to infer that the Debtor had the intent to defraud investors within the meaning of 11 U.S.C. section 548(a)(1). This is evidenced by the Court in this Bankruptcy Case declaring that Debtor was operating a Ponzi scheme when it stated the following:

> It is important to note that this Court has never received any significant and trustworthy evidence that Debtor accomplished meaningful results for its clients, but only anecdotal examples of viable success for its clients. By reviewing the Estate's claims register, there is evidence of consumer claims for the fraud and demanded but undelivered refunds of approximately $500 million. There is ample evidence that the pre-petition Debtor never placed the collected funds into an attorney-client trust account, and that Debtor or its principals simply looted the payments received through the client automatic withdrawals, stiffing both the clients and outside attorneys who may have been working on client cases with the hopes of being paid. There is also evidence before the Court that Debtor was running a Ponzi scheme and paying some outside (or "network") attorneys with funds obtained from new clients. In this case, it appears that some of the "lenders" may have been serving as "investors," hoping for very high returns before "the music stopped." The Ninth Circuit has recently explained, "[b]y definition, a Ponzi scheme is destined to fail because the pool of available investors is not limitless. When the Ponzi scheme operator's pool of investors inevitably runs dry, the scheme collapses and the swindler and their entities often end up in bankruptcy or equitable receivership. *See generally* David R. Hague, Expanding the Ponzi Scheme Presumption, 64 DePaul L. Rev. 867 (2015). In bankruptcy, the court-appointed trustee is tasked with taking immediate control of the entity, ceasing ongoing fraudulent activity, locating and collecting assets for the bankruptcy or receivership estate, and achieving a final, equitable distribution of the remaining assets. *See* 11 U.S.C. § 704; *Kirkland v. Rund (In re EPD Inv. Co., LLC)*, 2024 U.S. App. LEXIS 21363, at *15 (9th Cir. Aug. 23, 2024). Finally, there is evidence that Debtor was encumbering (or as some creditors assert, "double or triple selling") their accounts or receivables to multiple lenders. With respect to Greyson's requested Administrative Claim [Dk. 676], and as more fully described in the concurrently entered order denying the claim, there has been no evidence presented that any work allegedly performed by Greyson assisted any clients or added any value to the Estate.

*See, Case 8:23-bk-10571-SC*, Doc 1545 n. 5.

38.    Moreover, since the Debtor executed agreement(s) with EIN and subsequently made payments thereto with the intent to further the Ponzi scheme, the Debtor did not receive an objectively reasonable equivalent value in exchange for its execution of the EIN Agreement. This lack of

reasonably equivalent value permits the Trustee to avoid the execution of the EIN Agreement and all payments made pursuant thereto because they were actually or constructively fraudulent.

39.    The Ponzi Scheme Presumption establishes a debtor's "intent to defraud future undertakers [investors] from the mere fact that a debtor was running a Ponzi scheme." *Merrill v. Abbott* (*In re Independent Clearing House Co.*), 77 B.R. 843, 860 (D. Utah 1987). "Knowledge to a substantial certainty constitutes intent in the eyes of the law, *cf. Restatement (Second) of Torts* § 8A (1963 & 1964), and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them." *Id*. A trustee in bankruptcy is not required to show that an operator of a Ponzi scheme was subjectively aware his Ponzi scheme was destined to fail. *In re EPD Inv. Co., LLC*, 114 F.4th at 1153 (9th Cir. 2024).

40.    "[I]f all the debtor receives in return for a transfer is the use of the defendant's money to run a Ponzi scheme, there is nothing in the bankruptcy estate for creditors to share." *In re Independent Clearing House Co.* 77 B.R. at 859. In such a situation, the use of the defendant's money cannot objectively be called "reasonably equivalent value." *Id*. Therefore, "[t]he trustee can avoid the transfers if they were preferential or fraudulent. Transfers to investors in a Ponzi scheme are preferential and fraudulent. Therefore, they constitute 'property of the estate,' and the trustee can recover them." *Id*. at 853 n.17 (citations omitted).

41.    Based on the Ponzi Scheme presumption the Court can infer that the Debtor had the intent to defraud investors within the meaning of 11 U.S.C. § 548(a)(1). Since the transfers to the Defendant were made with the intent to further the Ponzi scheme, the Debtor did not receive an objectively reasonable equivalent value for such transfers, and the Trustee can avoid any such transfers because they were actually fraudulent as to the Debtor's creditors..

**E.    Prepetition Litigation and Creditors**

42.    Debtor's Schedule E/F, filed on April 4, 2023, as Dk. No. 33, lists: (a) 11 unsecured creditors with priority unsecured claims totaling $374,060.04; and (b) 58 nonpriority unsecured creditors with scheduled claims totaling $141,439,158.05.

43.    The claims register in this Bankruptcy Case includes 2,554 proofs of claim, totaling in excess of $424 million of claims asserted against the Estate.

44.     At least 14 UCC-1 statements were of record securing alleged debts of the Debtor as of the Petition Date. These statements either reflected secured liens against the Debtor's assets then owned or thereafter acquired or provided evidence of the assignment or sale of substantial portions of the Debtor's future income. They secured the repayment of the following claimed amounts that are currently known to Trustee and are allegedly owed by the Debtor: (a) $2,374,004.82 owed to Fundura Capital Group as evidenced by Proof of Claim No. 335 purportedly secured by a UCC statement filed on or about May 19, 2021; (b) approximately $15 million dollars owed to MNS Funding, LLC as evidenced by Proof of Claim No. 1060 purportedly secured by a UCC statement filed on or about May 28, 2021; (c) approximately $5,000,000 owed to Azzure Capital, LLC as evidenced by Proof of Claim No. 127 purportedly secured by a UCC statement filed on or about May 28, 2021; and (d) approximately $1.5 million dollars owed to Diverse Capital, LLC purportedly secured by UCC statements filed on or about September 15, 2021, and December 1, 2021.

45.     Debtor's balance sheets for the 36 months ending December 31, 2021, show approximately $17,900,000 in total assets at its highest point in November 2021. This amount is significantly less than the $424 million of claims filed.

46.     Debtor's Statement of Financial Affairs, filed on April 4, 2023, as Dk. No. 34, reflects 15 pending lawsuits against Debtor as of the Petition Date. The lawsuits date back to October 18, 2021 (*Fundura v. The Litigation Practice Group P.C. et al.*, Supreme Court of New York Index No. 613192-2021) and are as recent as March 10, 2023 (*Diverse Capital LLC v. The Litigation Practice Group P.C. et al.*, Supreme Court of New York Index No. 135614-2023).

**F.     Debtor's Insolvency**

47.     Debtor was insolvent when the Transfers occurred as evidenced by: (a) the 14 UCC-1 statements reflecting secured liens against the Debtor's owned and after-acquired assets and the assignment or sale of substantial portions of the Debtor's future income; (b) the priority and non-priority unsecured debt of nearly $142 million listed in Debtor's schedules; (c) the $424 million of creditor claims filed in this Bankruptcy Case; and (d) Debtor's balance sheets reflecting, at its highest point, $17.9 million of assets in November 2021.

48.     Moreover, insolvency is presumed as a matter of law where, as in this Bankruptcy

Case, the debtor operated a Ponzi scheme. *See, e.g., Glob. Money Mgmt., L.P. v. McDonnold*, No. 06CV34, 2008 U.S. Dist. LEXIS 128733, at *15 (S.D. Cal. Feb. 27, 2008) (concluding that "if a Ponzi scheme is proven, then the debtor is proven insolvent from the time of its inception").

## SPECIFIC ALLEGATIONS

**A.    Transaction With Green Fund**

49.    On or about June 3, 2021, EIN allegedly purchased $314,775.00 of future receivables from the Debtor and other related entities for a gross purchase price of $225,000.00 pursuant to a document labeled "Merchant Agreement" ("Agreement"). A true and accurate copy of the Agreement is attached hereto as **Exhibit 2** and incorporated by reference herein.

50.    On or about June 4, 2021, EIN wired $201,033.50 to the bank account of Vulcan at Bank of America ending in 9551. The difference between the amount deposited and gross purchase price was presumably applied to fees charged under the Agreement.

51.    Following execution of the Agreement, the Debtor made multiple payments to EIN. Those payments from Debtor to EIN Fund known to the Trustee are identified on **Exhibit 3** ("Payments") attached hereto and incorporated by reference herein.

52.    Through the Payments identified on Exhibit 3 the Debtor satisfied its obligations to EIN Fund under the Agreement.

53.    The Agreement and Payments are collectively referred to herein as the "Transfers."

### FIRST CLAIM FOR RELIEF

**Avoidance, Preservation, and Recovery of Actual Fraudulent Transfers**

**11 U.S.C. §§ 548(a)(1)(A), 550 & 551**

54.    Plaintiff incorporates by reference Paragraphs 1 through 53 and realleges these paragraphs as though set forth in full.

55.    The Transfers were obligations of or property of the Debtor's Estate prior to their conveyance to Defendant.

56.    The Transfers occurred within the two years prior to the Petition Date.

57.    On or after the date that the Agreement was executed and on the date(s) that the payments were made to EIN the Debtor was or became indebted include the Prepetition Creditors.

58.     The Transfers occurred when the Debtor was insolvent or was rendered insolvent as a result of the Transfers.

59.     The Transfers to Defendant were made with actual intent to hinder, delay or defraud the creditors of Debtor because the Debtor was operating a Ponzi scheme which permits the Court to infer that the Debtor's intent was fraudulent within the meaning of 11 U.S.C. section 548(a)(1).

60.     The Transfers are avoidable as fraudulent pursuant to 11 U.S.C. §§ 548(a)(1)(A), 550, and 551 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against Debtor's Estate under 11 U.S.C. § 502, or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

61.     The Transfers should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(A), and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

**SECOND CLAIM FOR RELIEF**

**Avoidance, Preservation, and Recovery of Constructively Fraudulent Transfer**

**11 U.S.C. §§ 548(a)(1)(B), 550 & 551**

62.     Plaintiff hereby incorporates by reference Paragraphs 1 through 61 and realleges these paragraphs as though set forth in full herein.

63.     The Transfers were made within two years before the Petition Date.

64.     Debtor did not receive reasonably value in exchange for the Transfers.

65.     The Transfers were made at a time when Debtor was insolvent and/or rendered insolvent by virtue of said transfers.

66.     When the Transfers occurred, Debtor's business was undercapitalized and Debtor was engaged in business for which its capital was unreasonably small.

67.     When the Transfers occurred, Debtor had incurred or was about to incur debts that were beyond its ability to pay. The allegations in the preceding paragraphs are supported by the fact that the Debtor was having to borrow money regularly from entities like the Defendant to provide liquidity and was frequently required to borrow additional sums from other merchant cash advance lenders to service prior borrowing. The Trustee has filed suit against numerous other merchant cash

advance lenders herein.

68.     At the time each Transfer was made, Debtor was indebted to one or more creditors that held a claim against Debtor on the date of each Transfer and on the Petition Date.

69.     Plaintiff alleges that Defendant did not receive the Transfers in good faith, for value, and without knowledge of their avoidability.

70.     Defendant knew that the Debtor was a law firm who was required by law to escrow client payments until earned. However, each Defendant demanded and received payment from client payments that had not been earned because they were paid by the Debtor, Vulcan, and/or Coast or were paid directly from a payment processor for the Debtor such that the funds were never conveyed to the Debtor and placed in escrow.

71.     Defendant had to know or should have known that it was being paid with client funds that had not been placed into trust and been disbursed before they were earned.

72.     Based on the foregoing, Plaintiff may recover and preserve the avoided Transfers from Defendant for the benefit of the Estate under 11 U.S.C. §§ 550 and 551 from Defendant.

**THIRD CLAIM FOR RELIEF**

**Avoidance, Recovery, and Preservation of Four-Year Actual Fraudulent Transfers**

**[11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.04(a)(1) and 3439.07]**

73.     Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 72 as though set forth in full.

74.     Under 11 U.S.C. § 544(b)(1), Plaintiff may avoid transfers of an interest of Debtor which are voidable under applicable law by an unsecured creditor of Debtor, including under California Civil Code §§ 3439.04(a)(1) and 3439.05.

75.     The Transfers occurred within four years prior to the Petition Date.

76.     On or after the date that such Transfer were made, entities to which Debtor was or became indebted include the Prepetition Creditors.

77.     Despite Debtor's obligation to the Prepetition Creditors, Debtor made the Transfers to Defendant.

78.     The Transfers to Defendant were made with actual intent to hinder, delay or defraud

1  the creditors of Debtor as the Debtor was operating a Ponzi scheme.

2      79.    Defendant's conduct relating to the Transfers was done with oppression, fraud and

3  malice, as defined in California Civil Code section 3294, entitling Plaintiff to exemplary and punitive

4  damages.

5      80.    The Transfers are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and Cal.

6  Civ. Code §§ 3439.04(a)(1) and 3439.07 by one or more creditors who held and hold unsecured

7  claims against Debtor that were and are allowable against its Estate under 11 U.S.C. § 502 or that

8  were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the

9  Prepetition Creditors.

10     81.    Accordingly, the Transfers should be avoided as fraudulent under 11 U.S.C. §§ 544(b)

11  and Cal. Civ. Code §§ 3439.04(a)(1) and 3439.07, and such transferred property, or the value thereof,

12  should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551

13  and Cal. Civ. Code § 3439.07.

14  <center>**FOURTH CLAIM FOR RELIEF**</center>

15  <center>**Avoidance, Preservation, and Recovery of Constructive Fraudulent Transfer**</center>

16  <center>**11 U.S.C. §§ 544, 550, 551; Cal. Civ. Code §§ 3439.04(a)(2), 3439.05 and 3439.07**</center>

17     82.    Plaintiff hereby incorporates by reference Paragraphs 1 through 81 and realleges these

18  paragraphs as though set forth in full herein.

19     83.    Under 11 U.S.C. § 544(b)(1), Plaintiff may avoid transfers of an interest of Debtor

20  which are voidable under applicable law by an unsecured creditor of Debtor, including under

21  California Civil Code §§ 3439.04(a)(2) and 3439.05.

22     84.    Debtor did not receive reasonably equivalent value in exchange for the Transfers.

23     85.    The Transfers were made at a time when Debtor was insolvent and/or rendered

24  insolvent by virtue of said transfers.

25     86.    At the time each Transfer was made, Debtor was engaged or was about to engage in a

26  business or a transaction for which the remaining assets of Debtor were unreasonably small in relation

27  to the business or transaction.

28     87.    At the time each Transfer was made, Debtor intended to incur, or believed or

<center>14</center>

reasonably should have believed that Debtor would incur, debts beyond Debtor's ability to pay as they became due.

88.    At the time each Transfer was made, Debtor was indebted to one or more creditors that held a claim against Debtor on the date of each Transfer and on the Petition Date.

89.    The Transfers were made at a time when Debtor was insolvent and/or rendered insolvent by virtue of said transfers.

90.    Plaintiff alleges that Defendant did not receive the Transfers in good faith, for value, and without knowledge of their avoidability.

91.    Defendant knew that the Debtor was a law firm who was required by law to escrow client payments until earned. However, Defendant demanded and received daily payment from client funds that had not been earned because they were paid by the Debtor, Vulcan, and/or Coast or were paid directly from a payment processor for the Debtor such that the funds were never placed in trust.

92.    Defendant had to know or should have known it was being paid with client funds that had not been placed into trust and been disbursed before they were earned.

93.    Based on the foregoing, Plaintiff may avoid the Transfers pursuant to 11 U.S.C. § 544 and California Civil Code §§ 3439.04(a)(2) and 3439.05.

94.    Based on the foregoing, Plaintiff may recover and preserve the Transfers from the Defendant as the initial transferee or, alternatively, as the subsequent transferee for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551, and Cal. Civ. Code § 3439.07.

WHEREFORE, Plaintiffs prays for a judgment as follows:

**On the First, Second, Third, and Fourth Claims for Relief:**

1.    Avoiding the Debtor's obligations under the Agreement and avoiding recovering, and preserving the Payments to the Defendant in such amounts as the Court may determine;

2.    Awarding pre-judgment and post-judgment as permitted;

3.    Granting any other and such further relief as the Court deems just and proper.

DATED: March 12, 2025                    DINSMORE AND SHOHL LLP

                                        By: _/s/ Tyler Powell_
                                            Yosina M. Lissebeck
                                            Tyler Powell (*admitted pro hac vice*)
                                        Special Counsel to Richard A. Marshack, Trustee
                                        of the LPG Liquidation Trust

15

# EXHIBIT 1

Exhibit 1
Page 16

1  CHRISTOPHER B. GHIO (259094)
   christopher.ghio@dinsmore.com
2  CHRISTOPHER CELENTINO (131688)
   christopher.celentino@dinsmore.com
3  YOSINA M. LISSEBECK (201654)
   yosina.lissebeck@dinsmore.com
4  DINSMORE & SHOHL LLP
5  655 West Broadway, Suite 800
   San Diego, California 92101
6  Tele:  619.400.0500
   Fax:   619.400.0501
7
8  Sarah S. Mattingly (Ky. Bar 94257)
   sarah.mattingly@dinsmore.com
9  DINSMORE & SHOHL, LLP
   101 S. Fifth Street, Suite 2500
10 Louisville, Kentucky 40202
   Tele: 859-425-1096
11 Fax: 502-585-2207
12 (Admitted pro hac vice)
13 Special Counsel to Richard A. Marshack

**FILED & ENTERED**

**JUN 03 2024**

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY mccall    DEPUTY CLERK

14          **UNITED STATES BANKRUPTCY COURT**

15    **CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION**

16 In Re                                Case No: 23-bk-10571-SC

17                                      Chapter 11

18                                      **ORDER GRANTING MOTION FOR**
   The Litigation Practice Group P.C.,  **ENTRY OF PROTECTIVE ORDER AND**
19                                      **THE PROTECTIVE ORDER**
20          Debtor(s),

21                                      Date:   May 23, 2024
22                                      Time:   1:30 p.m.
                                        Judge:  Hon. Scott C. Clarkson
23                                      Place:  Courtroom 5C (via Zoom)[1]
                                                411 West Fourth Street
24                                                Santa Ana, CA 92701
25

26

27
_____

28 [1] Video and audio connection information for each hearing will be provided on Judge Clarkson's
   publicly posted hearing calendar, which may be viewed online at:
   http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

Exhibit 1
Page 17

The Court has read and considered the Notice of Motion and Motion for Entry of Protective Order (the "Motion") filed by Richard A. Marshack, in his capacity as the Chapter 11 Trustee (the "Trustee") of the Bankruptcy Estate ("Estate") of The Litigation Practice Group P.C., on May 2, 2024, pursuant to Federal Rule of Bankruptcy Procedure 7026 and Federal Rule of Civil Procedure 26(c)(1), as Dk. No. 1164 ("Motion"), and has found good cause to grant the Motion.

IT IS HEREBY ORDERED that:

1.    The Motion is granted;

2.    The below Protective Order shall apply to any contested matter arising in the main bankruptcy case and in all adversary proceedings filed by or against Trustee, present and future; and

3.    Govern the discovery conducted therein.

## PROTECTIVE ORDER

**1.    DEFINITIONS**

1.1    "Confidential Information" as used in this Protective Order shall mean documents and other information (regardless of how generated, stored or maintained) that a Party or non-party reasonably believes to contain or reflect non-public financial or business information, bank records, financial records, such as social security numbers, non-public financial or personal information of a Party or non-party, account numbers, sensitive digital information and identifiers, information subject to confidentiality agreements or provisions other than this Protective Order, and other non-public research, development, or commercial information that derives value or avoids injury by virtue of not being known to the public.

1.2    This "Action" is defined and hereby means any contested matter arising in the main bankruptcy case and in all adversary proceedings filed by or against Trustee, present and future.

1.3    "Designating Party" means a Party or non-party that designates Confidential Information during the Action.

1.4    "Receiving Party" means a Party that receives Confidential Information during the Action.

Exhibit 1
Page 18

1.5    "Party" or "Parties" means person or entity subject to this Protective Order.

**2.    SCOPE OF THIS PROTECTIVE ORDER**

2.1    Unless otherwise ordered, this Protective Order shall govern certain documents and other products of discovery obtained in the Action from the Parties there to, and from third parties. As well as certain information copied or derived therefrom, excerpts, summaries or compilations thereof, including, but not limited to, documents voluntarily exchanged as part of early settlement discussions, documents produced pursuant to initial disclosures, requests authorized by the Federal Rules of Civil Procedure made applicable herein by the Federal Rules of Bankruptcy Procedure, answers to interrogatories, deposition transcripts, responses to requests for production, responses to requests for admission, subpoenas, affidavits, declarations, expert reports, and other such material and information as may be produced during the course of the Action and designated as Confidential Information.

**3.    DESIGNATION OF CONFIDENTIAL INFORMATION**

3.1    This Protective Order shall govern the production and handling of any Confidential Information in this Action. Any Party or non-party who produces Confidential Information in this Action may designate it as "Confidential" or "Attorneys' Eyes Only" consistent with the terms of this Protective Order. Whenever possible, the Designating Party must designate only those portions of a document, written discovery responses, deposition, transcript, or other material that contain the Confidential Information and refrain from designating entire documents. Regardless of any designations made hereunder, the Designating Party is not otherwise restricted from use or disclosure of its Confidential Information outside of this Action or for any business purposes. In addition, any Party may move to modify or seek other relief from any of the terms of this Protective Order if it has first tried in writing and in good faith to resolve its needs or disputes with the other Parties or Party as the case may be under the terms of this Protective Order. Further, nothing in this Protective Order shall prevent a Party from redacting documents consistent with the Federal Rules of Civil Procedure and utilizing the documents as needed through-out the Action.

3.2    <u>Application to Non-Parties:</u> Before a non-party is given copies of documents or materials designated as Confidential Information or Attorneys' Eyes Only as permitted hereunder, it

must first sign an acknowledgment to be bound to these terms that is attached hereto as <u>Exhibit</u> A; if it fails to do so, the Parties to this Action must resolve any such dispute before making disclosure of designated information as permitted hereunder to the non-party. If a non-party wishes to make designations hereunder, it must first sign attached <u>Exhibit A.</u>

        3.3     <u>Timing and Provisional Protection:</u> Designations of Confidential Information may be made at any time. To avoid potential waiver of protection hereunder, the Designating Party should designate documents or materials containing Confidential Information at the time of production or disclosure, including on the record during the taking of any deposition. Deposition testimony will be deemed provisionally protected for a period of thirty (30) days after the transcript is released to the Parties by the court reporter, although the Parties may agree at any time to different timelines of provisional protection of information as Confidential or Attorneys' Eyes Only as part of one or more specific depositions. To retain any designations beyond the provisional period, a Designating Party must designate specific pages and lines of deposition testimony before the provisional period has expired. Such designations must be made in writing so that all counsel and court reporters may append the designation to all copies of the transcripts.

        3.4     <u>Manner of Designation:</u> Confidential Information may be designated hereunder in any reasonable manner or method that notifies the Receiving Party of the designation level and identifies with specificity the information to which the designation applies. If made verbally, the Designating Party must promptly confirm the designation in writing. Whenever possible, the Designating Party should stamp, affix, or embed a legend of "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY" on each designated page of the document or electronic image that contains Confidential Information.

## 4.     CHALLENGES TO DESIGNATED INFORMATION

        4.1     In the event that a Receiving Party disagrees at any time with any designation(s) made by the Designating Party, the Receiving Party must first try to resolve such challenge in good faith on an informal basis with the Designating Party. The Receiving Party must provide written notice of the challenge and the grounds therefor to the Designating Party, who must respond in writing to the challenge within fifteen (15) days. At all times, the Designating Party carries the burden of establishing the propriety of the designation and protection level. Unless and until the challenge is

Exhibit 1
Page 20

1  resolved by the Parties or ruled upon by the Court, the designated information shall remain protected

2  under this Protective Order. The failure of any Receiving Party to challenge a designation does not

3  constitute a concession that the designation is proper or an admission that the designated information

4  is otherwise competent, relevant, or material.

5  **5.    LIMITED ACCESS/USE OF PROTECTED INFORMATION**

6  5.1    <u>Restricted Use:</u> Information that is produced or exchanged in the course of the Action

7  and designated under this Protective Order may be used for preparation for trial and preparation for

8  any appeal of any and all matters in the Action, as well as related settlement negotiations, and for no

9  other purpose, without the written consent of the Designating Party. No Confidential Information may

10 be disclosed to any person except in accordance with the terms of this Protective Order, unless the

11 parties are co-counsel or have entered into joint defense agreements. All persons in possession of

12 Confidential Information agree to exercise reasonable care with regard to the custody, use, or storage

13 of such information to ensure that its confidentiality is maintained. This obligation includes, but is

14 not limited to, the Receiving Party providing to the Designating Party prompt notice of the receipt of

15 any subpoena that seeks production or disclosure of any designated information and consulting with

16 the Designating Party before responding to the subpoena. Any use or disclosure of Confidential or

17 Attorneys' Eyes Only information in violation of the terms of this Protective Order may subject the

18 disclosing person or party to sanctions.

19 5.2    <u>Access to "Confidential" Information:</u> The Party(ies) and all persons subject to this

20 Protective Order agree that information designated as "CONFIDENTIAL" may only be accessed or

21 reviewed by the following:

22      a)    The Court, its personnel, and court reporters;

23      b)    Counsel of record, or co-counsel for any Party, or other party that has entered into a

24 joint defense agreement in the Action and their employees who assist counsel of record, or co-counsel

25 in the Action and are informed of the duties and obligations imposed hereunder;

26      c)    The Parties, including their clients, agents and employees who are assisting or have

27 reason to know of the Action;

28 / / /

d)      Experts or consultants employed by the Parties or their counsel, or co-counsel, for purposes of an Action, so long as each such expert or consultant has signed attached <u>Exhibit A;</u> and

e)      Other witnesses or persons with the Designating Party's consent or by court order.

5.3      <u>Access to "Attorneys' Eyes Only" Designations:</u> The Parties and all persons subject to this Protective Order agree that information designated as "ATTORNEYS' EYES ONLY" may only be accessed or reviewed by the following:

a)      The Court, its personnel, and court reporters;

b)      Counsel of record, or co-counsel for any Party, or other party that has entered into a joint defense agreement in the Action and their employees who assist counsel of record in the Action and are informed of the duties hereunder;

c)      In-house counsel for any Party in the Action and Richard A. Marshack, as Chapter 11 Trustee of The Litigation Practice Group P.C. who is informed of the duties and obligations imposed hereunder;

d)      Experts or consultants employed by the Parties or their counsel, or co-counsel for purposes of the Action,  and so long as each such expert or consultant has signed attached <u>Exhibit A;</u> and

e)      Other witnesses or persons to whom the Designating Party agrees in advance of disclosure or by court order.

5.4      <u>Non-Waiver Effect of Designations:</u> Neither the taking of, nor the failure to take, any action to enforce the provisions of this Protective Order, nor the failure to object to any designation, will constitute a waiver of any Party(ies)'s claim or defense in the Action or any other action or proceeding, including, but not limited to, a claim or defense that any designated information is or is not Confidential, is or is not entitled to particular protection, or embodies or does not embody information protectable by law.

5.5      <u>In-Court Use of Designated Information:</u> If information designated under this Protective Order will or may be offered in evidence at a hearing or trial related to any matter in the Action, then the offering party must give advance notice to the party or non-party that designated prior to offering the information so that any use or disclosure may be addressed in accordance with

6

Exhibit 1
Page 22

the Court's case-management or other pre-trial order, or by a motion *in limine.* Nothing in this Protective Order shall be construed as a waiver by a Party of any objections that may be raised as to the admissibility at trial of any evidentiary materials.

## 6.    CLAW-BACK REQUESTS

6.1    <u>Failure to Make Designation:</u>  If, at any time, a Party or non-party discovers that it produced or disclosed Confidential Information without designation, it may promptly notify the Receiving Party and identify with particularity the Confidential Information to be designated and the level of designation (the claw-back notification). The Receiving Party may then request substitute production of the newly-designated information. Within thirty (30) days of receiving the claw-back notification, the Receiving Party must: (1) certify to the Designating Party it has appropriately marked or, if substitute production has been requested, destroyed all unmarked copies that it received, made, and/or distributed; and (2) if it was practicably unable to mark or destroy any information because disclosures occurred while the Receiving Party was under no duty of confidentiality under the terms of this Protective Order regarding that information, the Receiving Party must reasonably provide as much information as practicable to aid the Designating Party in protecting the information, consistently with the Receiving Party's attorney-client, work-product, and/or trial-preparation privileges.

6.2    <u>Inadvertent Production of Privileged Information:</u> If, at any time, a Party discovers that it produced information that it reasonably believes is subject to protection under the attorney/client, work-product, or trial-preparation privileges, then it must promptly notify each Receiving Party of the claim for protection, the basis for it, amend its privilege log accordingly, and comply with Fed. R. Civ. P. 26(b)(5). Whenever possible, the producing party must produce substitute information that redacts the information subject to the claimed protection. The Receiving Party must thereupon comply with Fed. R. Civ. P. 26(b)(5)(B) as to the information subject to the claimed protection.

/ / /

/ / /

/ / /

## 7.    DURATION/CONTINUED RESTRICTIONS

7.1    <u>Handling of Designated Information Upon Conclusion of the Main Bankruptcy Case:</u>
Upon conclusion of the Main Bankruptcy Case, by way of dismissal or closing of the case, the Designating Party(ies) is/are responsible for ensuring that any Party or person to whom the Designating Party shared or disclosed designated information in any of the matters under the Action returns or destroys all of its copies, regardless of the medium in which it was stored. No witness or Party may retain designated information that it received from any other Party or non-party under this Protective Order; only counsel of record, or co-counsel, are the authorized agents who may retain one copy for their respective legal files, and who must also describe to the Designating Party the extra steps taken to protect its legal file containing paper and/or electronic copies of the designated information so that it is not accessed, used, or disclosed inconsistently with the obligations under this Protective Order. This provision does not apply to the Court or Court staff. Moreover, this provision does not apply to Trustee, who may retain and use – consistent with this Order – Confidential Information received in any Action during the entirety of the Bankruptcy.

7.2    <u>Continued Restrictions Under this Protective Order:</u> The restrictions on disclosure and use of Confidential Information shall survive the conclusion of the Bankruptcy case and any matter in the Action.

## 8.    PRIVILEGED OR PROTECTED INFORMATION

8.1    Nothing in this Protective Order shall require disclosure of information that is protected by the attorney-client privilege, the work-product protection, or any other legally cognizable privilege (a "Privilege or Protection").  If information subject to a claim of Privilege or Protection is inadvertently produced, pursuant to Federal Rule of Evidence 502(d) such production shall not constitute a waiver of, or estoppel as to, any claim of Privilege or Protection for such information or any other information that may be protected from disclosure by a Privilege or Protection in any proceeding.

8.2    If a Party receives a document that appears to be subject to a Privilege or Protection, then it shall refrain from examining the document any more than is essential to ascertain if it is privileged or protected and shall promptly notify the producing Party in writing that the receiving

8

Exhibit 1
Page 24

1  Party possesses material that appears to be subject to a Privilege or Protection. The producing Party

2  shall have seven (7) days after receiving such notice to assert a Privilege or Protection over the

3  identified material. If the producing Party does not assert a claim of Privilege or Protection within the

4  seven (7)-day period, the material in question shall be deemed not privileged or protected.

5      8.3     If a producing Party has produced a document subject to a claim of Privilege or

6  Protection, upon written request by the producing Party, the document for which a claim of Privilege

7  or Protection is made shall be sequestered or destroyed to the extent reasonably practicable, and the

8  receiving Party shall not use the document for any purpose other than in connection with analyzing

9  or disputing a claim of Privilege or Protection or in connection with a motion to compel the production

10  of the document.

11      8.4     The receiving Party sequestering or destroying such material may then move the Court

12  for an order compelling production of the material. The applicable producing Party bears the burden

13  of establishing the applicable Privilege or Protection of any clawed-back document or information as

14  and to the same extent that it would have borne such burden had it not produced the document or

15  information.  Nothing in this Protective Order shall limit the Court's right or any receiving Party's

16  right to request an in camera review of any information subject to a claim of Privilege or Protection.

17

18                                            ###

19

20

21

22

23

24  Date: June 3, 2024                          Scott C. Clarkson
                                               United States Bankruptcy Judge

25

26

27

28

Exhibit 1
Page 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT "A"

1

Exhibit 1
Page 26

1   Christopher B. Ghio (State Bar No. 259094)
    Christopher Celentino (State Bar No. 131688)
2   Yosina M. Lissebeck (State Bar No. 201654)
    **DINSMORE & SHOHL LLP**
3   655 West Broadway, Suite 800
    San Diego, CA 92101
4   Telephone:  619.400.0500
    Facsimile:  619.400.0501
5   christopher.ghio@dinsmore.com
    christopher.celentino@dinsmore.com
6   yosina.lissebeck@dinsmore.com

7   Sarah S. Mattingly (Ky. Bar 94257)
    DINSMORE & SHOHL, LLP
8   101 S. Fifth Street, Suite 2500
    Louisville, KY 40202
9   Telephone: 859-425-1096
    Facsimile: 502-585-2207
10  Sarah.mattingly@dinsmore.com
    (Admitted pro hac vice)
11
    Special Counsel to Richard A. Marshack,
12  Chapter 11 Trustee

13

14
                    **UNITED STATES BANKRUPTCY COURT**
15
                    **CENTRAL DISTRICT OF CALIFORNIA**
16

17
    In Re                              |    Case No. 8:23-BK-10571-SC
18
                                            Chapter 11
19
    The Litigation Practice Group P.C.,      **EXHIBIT A TO STIPULATED**
20                                           **ORDER**
            Debtor(s),
21                                          Date:   May 23, 2024
22                                          Time:   1:30 p.m.
                                            Judge:  Hon. Scott C. Clarkson
23                                          Place:  Courtroom 5C[1] - Via Zoom
24                                                  411 W. Fourth Street
                                                    Santa Ana, CA  92701
25

26

27  ─────────────────────────
    [1] Video and audio connection information for each hearing will be provided on Judge Clarkson's
28   publicly posted hearing calendar, which may be viewed online at:
      http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

                                            1                          Exhibit 1
                                                                       Page 27

This is to certify that:

(a)    I am being given access to Confidential Information pursuant to the Stipulated Protective Order that was entered into the main bankruptcy case for Litigation Practice Group, but which is binding and controlling as set forth by the Court's Order on any and all contested matters and  any and all litigation commenced by Trustee;

(b)    I have read the Stipulated Protective Order; and

(c)    I agree to be bound by the terms and conditions thereof, including, without limitation, to the obligations regarding the use, non-disclosure and return of such Confidential Information. I further agree that in addition to being contractually bound by the Stipulated Protective Order, I am subject to the jurisdiction of the above reference Court for any violation thereof.

Date: _____

_____
Signature

_____
Printed Name

# EXHIBIT 2

Exhibit 2
Page 29



160 Pearl Street 5TH Floor, New York, NY 10005
Phone: 646-846-9200 Fax: 800-519-7189

**Business Information**

Business Legal Name: THE LITIGATION PRACTICE GROUP PC AND ADDITIONAL ENTITIES SEEN IN EXHIBIT A

Business DBA Name: THE LITIGATION PRACTICE GROUP AND ADDITIONAL ENTITIES SEEN IN EXHIBIT A

Business Physical Address: 1351 CALLE AVANZADO STE4 SAN CLEMNTE, California 92618 United States

Business Mailing Address: United States

Federal Tax ID: ███343    Industry Type: _____    State of Incorporation: _____

Business Start Date: _____    Business Entity Type: _____ LLC _____ Corp ____ Sole Prop. ____ Other _____

Business Location: ____ Rent ____ Own ____ Home Based    Use of Proceeds: _____

Gross Annual Sales: _____    Requested Advance Amount: _____

Business Phone: _____    Business Fax: _____    Business Website: _____

What does this business do? _____

---

**Business Owner Information #1**

First Name: DANIEL S.    Last Name: MARCH

Home Address: 20160 NOB HILL DR, YORBA LINDA, California 92886

Social Security #: ███9617    Date of Birth: 05/23/1956    Email: admin@litigationpracticegroup.com

Mobile Phone #: _____    % of Ownership: 50    Job Title: _____

**Business Owner Information #2**

First Name: TONY M    Last Name: DIAB

Home Address: _____

Social Security #: ███5745    Date of Birth: 07/05/1982    Email: tony@coastprocessing.com

Mobile Phone #: _____    % of Ownership: 50    Job Title: _____

**AUTHORIZATIONS** By signing below, each of the above listed business and business owner/officer (individually and collectively, "you") authorize EIN Cap Inc. (EIN CAP) and each of its representatives, successors, assigns and designees ("Recipients") that may be involved with or acquire business funding having daily repayment features or purchases of future receivables including Merchant Cash Advance transactions, including without limitation the application therefor (collectively, "Transactions") to obtain consumer or personal, business and investigative reports and other information about you, including credit card processor statements and bank statements, from one or more consumer reporting agencies, such as TransUnion, Experian and Equifax, and from other credit bureaus, banks, creditors and other third parties. By signing this application, you agree to OPT-IN to receive SMS text messages from EIN CAP and its affiliates about your account and program updates (text message fees may apply from your carrier). You also authorize EIN CAP to transmit this application form, along with any of the foregoing information obtained in connection with this application, to any or all the Recipients for the foregoing purposes. You also consent to the release, by any creditor or financial institution, of any information relating to any of you, to EIN CAP and to each of the Recipients, on its own behalf.

Owner 1 Signature: *DANIEL S. MARCH*    Owner 2 Signature: *TONY M DIAB*

Owner 1 Print Name: DANIEL S. MARCH    Owner 2 Print Name: TONY M DIAB

Date: 06/03/2021    Date: 06/03/2021

Exhibit 2
Page 30

**EIN CAP, INC.**
160 Pearl St. 5th FL. New York, NY 10005
Phone: (877) 651-8110; Fax (800)-519-7189

EIN CAP

### MERCHANT AGREEMENT (FIXED ACH)
### SELLER INFORMATION

This Agreement dated _____06/03/2021_____ ("Agreement") **between EIN CAP, Inc. ("EINC") and the merchant listed below ("the Merchant").**

**Type of entity (check one):** ( ) Corporation    ( ) Limited Liability Company    ( ) Limited Partnership
( ) Limited Liability Partnership    ( ) Sole  Proprietor

Federal TAX ID: ███5343

**Merchant's Legal Name:** THE LITIGATION PRACTICE GROUP PC AND ADDITIONAL ENTITIES SEEN IN EXHIBIT A

**D/B/A:** THE LITIGATION PRACTICE GROUP AND ADDITIONAL ENTITIES SEEN IN EXHIBIT A

**Physical Address:** 1351 CALLE AVANZADO STE4    City: SAN CLEMNTE    State: CA    Zip: 92618
**Mailing Address:** 20160 NOB HILL DR    City: YORBA LINDA    State: CA    Zip: 92886

### PURCHASE AND SALE OF FUTURE RECEIVABLES

Effective as of the Purchase Date (as hereinafter defined), Merchant hereby sells, assigns and transfers to EINC (making EINC the absolute owner) in consideration of the funds provided ("Purchase Price") specified below, all of Merchant's future accounts, contract rights and other obligations arising from or relating to the payment of monies from Merchant's customers' and/or other third party payors (collectively the "Receipts" defined as all payments made by cash, check, credit or debit card, electronic transfer or other form of monetary payment in the ordinary course of the Merchant's business), for the payment of Merchant's sale of goods or services until the amount specified below (the "Purchased Amount") has been received by EINC. The Purchased Amount shall be paid to EINC by Merchant irrevocably authorizing only one deposit account acceptable to EINC (the "Account") to remit the percentage specified below (the "Specified Percentage") of the Merchant's settlement amounts due from each transaction, until such time as EINC receives payment in full of the Purchased Amount.

In consideration of servicing the account, Merchant hereby authorizes EINC to ACH Debit the "Specific Daily Amount" from the Account on a daily basis as the base payment credited against the Specified Percentage due. It is Merchant's responsibility to contact EINC at the beginning of each month and provide bank statements for the Account to reconcile on a monthly basis the daily payments made against the Specific Percentage permitting EINC to debit or credit the difference to Merchant so that payments that EIN receives equals the Specified Percentage.

Merchant will provide EINC with all required access codes and monthly bank statements for the Account. Merchant understands that it will be held responsible for any fees (see Appendix A) incurred by EINC resulting from a rejected ACH attempt or upon the occurrence of an Event of Default. EINC is not responsible for any overdrafts or rejected transactions that may result from EINC's debiting the Account as provided for by the terms of this Agreement.  EINC may, upon Merchant's request, adjust the amount of any payment due under this Agreement at EINC's sole discretion and as it deems appropriate. Notwithstanding anything to the contrary in this Agreement or any other agreement between EINC and Merchant, upon the occurrence of any of the provisions of Section 1.11 of this Agreement or upon the occurrence of an Event of Default under Section 3, the Specified Percentage shall equal 100%. A list of all fees applicable under this Agreement is contained in Appendix A.

Purchase Price $225,000.00    Specified Percentage 20 %    Specific Daily Amount $12,591.00    Purchased Amount: $314,775.00

**MERCHANT (#1)**
By: DANIEL S. MARCH
(Print Name and Title)

x *DANIEL S. MARCH*
(Merchant 1 Signature)

**MERCHANT (#2)**
By: TONY M DIAB
(Print Name and Title)

x *TONY M DIAB*
(Merchant 2 Signature)

**GUARANTOR (#1)**
By: DANIEL S. MARCH
(Print Name and Title)

x *DANIEL S. MARCH*
(Guarantor's 1 Signature)

**GUARANTOR (#2)**
By: TONY M DIAB
(Print Name and Title)

x *TONY M DIAB*
(Guarantor's 2 Signature)

**EIN CAP, INC.**
By: _____
(Company Officer)

**Sales Associate Name:**
By: _____
(Signature)

Exhibit 2
Page 31

*DM*    *TD*

To the extent set forth herein, each of the parties is obligated upon his, her or its execution of the Agreement to all terms of the Agreement, including the Additional Terms set forth below. Each of above-signed Merchant and Guarantors represents that he or she is authorized to sign this Agreement, legally binding Merchant to comply with the terms of this Agreement and that the information provided herein and in all of EINC's documents, forms and recorded interviews is true, accurate and complete in all respects. If any such information is false or misleading, Merchant shall be deemed in material breach of all agreements between Merchant and EINC and shall be an Event of Default under this Agreement. With respect to Guarantors, they are signing this solely to acknowledge receipt of this Agreement, to bind themselves to the specific terms applicable to Guarantors, but for no other purpose. The Guaranty of Performance attached hereto, which they will sign, sets forth their obligations under it.

<u>Due Diligence</u>: Merchant authorizes EINC to conduct background, onsite and financial examinations of Merchant, which may include without limitation, address verifications for up to ten (10) years; verification of the status of the licenses, permits, authorizations and/or governmental filings of Merchant; verification of insurance coverage; verification of good business practices through the appropriate agencies; a search of industry association databases; and a search for bankruptcies, liens or judgments in all jurisdictions where business functions have been conducted. Any onsite examination may include, without limitation, verification that business is conducted as represented by Merchant at all sites where it conducts business. This examination shall be conducted upon reasonable prior notice to the Merchant and only during reasonable business hours. The financial examination may include, without limitation, a review of Merchant's current financial statements, its most recent annual reports, tax returns for the previous three (3) years, and all documentation supporting employee bonds and insurance policies of Merchant. If Merchant is not publicly held, EINC, or its agents, may conduct background and financial examinations of all principals owning ten percent (10%) or more of Merchant. Such examinations may include, without limitation, a review of information regarding criminal history for all jurisdictions where the principal has resided and been employed, address verification for all residences, and employment verification. The examination may also include, without limitation a review of the credit standing of the principal, and a search for bankruptcies and judgments in all jurisdictions where the principal has resided or been employed. The review may also include a review of up to three (3) years of personal tax returns.

EINC may produce a monthly statement reflecting the delivery of the Specified Percentage from Merchant to EINC. An investigative report may be obtained in connection with the Agreement. Merchant and each of the above-signed Guarantors authorizes EINC, its agents and representatives and any credit- reporting agency engaged by EINC, to (i) investigate any references given or any other statements or data obtained from or about Merchant or any of its Guarantors for the purpose of this Agreement, and (ii) obtain a credit report at any time now or for so long as Merchant and/or Guarantor(s) continue to have any obligation to EINC in connection with this Agreement or any future agreement with EINC.

**MERCHANT AND GUARANTORS ACKNOWLEDGES THAT (i) IT AND THEY HAVE HAD THE OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL OF THEIR CHOICE, AND (ii) IT AND THEY HAVE CONSULTED WITH COUNSEL OF THEIR CHOICE OR HAVE DECIDED TO WAIVE THE OPPORTUNITY TO DO SO.**

**ANY MISREPRESENTATION MADE BY MERCHANT OR GUARANTOR IN CONNECTION WITH THIS AGREEMENT MAY CONSTITUTE A SEPARATE CAUSE OF ACTION FOR FRAUD OR INTENTIONAL MISREPRESENTATION.**




Exhibit 2
Page 34

## MERCHANT AGREEMENT TERMS AND CONDITIONS

## I. TERMS OF ENROLLMENT IN PROGRAM

**1.1**  <u>Merchant Deposit Agreement</u>. Merchant shall execute an agreement (the "Merchant Deposit Agreement") acceptable to EINC, and have the account (the "Account") with a depository institution ("Bank") acceptable to EINC, to obtain electronic fund transfer services and/or ACH debits and credits. Merchant shall provide EINC and/or its authorized agent with all of the information, authorizations and passwords necessary to verify Merchant's Receipts into the Account.  Merchant authorizes EINC and/or its agent to deduct the amounts owed to EINC under this Agreement from the Account and to withdraw the Specified Daily Amount (credited against the Specified Percentage) by ACH debit from the Account on a daily basis.  The authorization shall be irrevocable absent EINC's written consent. The Specified Daily Amount is intended to represent the Specified Percentage of Merchant's Receipts each calendar month. At any time, EINC may adjust the Specified Daily Amount so that the amount in the future more closely represents the Specified Percentage. EINC will reconcile the payments on a monthly basis to equal the Specified Percentage by either debiting or crediting the difference back to Merchant.

**1.1.1.**  Merchant authorizes EINC and/or its agents to initiate such ACH debits equal to the Specified Percentage, and any other fees, costs, charges or other amounts EINC is entitled to receive under this Agreement, from Merchant's Account indicated above (the "Bank Account") until EINC has received the Purchased Amount, and any other fees, costs, charges or other amounts EINC is entitled to receive under this Agreement. In furtherance thereof, Merchant authorizes its merchant processor and/or all applicable third parties to provide to EINC and its agents all information, including but not limited to Merchant's bank deposits, as is necessary to permit EINC or its agents to determine the Specified Percentage due to EINC. Prior to the Purchase Date, and as a condition to the purchase of the Receipts by EINC, Merchant shall execute and deliver a form or forms of authorization for electronic check/ACH payments provided to Merchant by EINC.

**1.1.2.**  EINC may charge certain fees as set forth on the attached <u>Appendix A</u> (the "Fee Structure"). EINC will debit or otherwise withdraw any applicable fess from the Fee Structure if/when such become due from the Bank Account or other bank accounts of the Merchant, as authorized herein.

**1.1.3.**  In connection with the ACH Debit Authorization above, EINC will debit or otherwise withdraw the Specific Daily Amount from the Bank Account or other bank accounts of the Merchant, as authorized herein, but in no event less than every business day.

**1.1.4.**  The foregoing authorizations shall continue in effect until EINC receives final payment of the entire Purchased Amount and all other amounts due and owing under this Agreement. The foregoing authorizations in this Section 1 are absolute and unconditional, and may only be revoked with the prior written consent of EINC, and the Agreement cannot be amended or terminated without the prior written consent of EINC. Bank may rely upon the instructions of EINC, without any independent verification, in furtherance of the foregoing authorizations. Merchant waives any claim for damages it may have against Bank, in connection with actions taken based upon instructions from EINC, unless such damages were due to such Bank's failure to follow EINC's instructions.

**1.1.5.**  Merchant acknowledges and agrees that (i) Bank will be acting on behalf of EINC with respect to portions of the Purchased Amount, as applicable, until the Purchased Amount are fully and finally remitted to EINC, (ii) Bank may or may not be an affiliate of EINC, (iii) Merchant does not have any power or authority to control Bank's or EINC's actions with respect to the remittance of cash to EINC, (iv) EINC is not responsible and shall not be liable for, and Merchant agrees to hold EINC harmless from, the actions of Bank, and (v) funds representing Purchased Amount in the possession of Bank and EINC constitute property owned solely by EINC and Merchant disclaims any and all interest therein.

**1.2**  **Term of Agreement**. This Agreement shall continue until EINC irrevocably receives the Purchased Amount in full.

**1.3**  **Financial Condition**. Merchant and Guarantor(s) authorize EINC and its agents to investigate their financial responsibility and history, and will provide to EINC any bank or financial statements, tax returns, etc., as EINC deems necessary prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable for release of financial information. EINC  is authorized to update such information and financial profiles from time to time as it deems appropriate.

**1.4**  **Transaction History.** Merchant authorizes the Bank to provide EINC with Merchant's banking and/or credit-card processing history from time to time to determine qualification or continuation in this program.

**1.5**  **No Liability.** In no event will EINC be liable for any claims asserted by Merchant or Guarantors under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by Merchant and Guarantor(s).

**1.6**  **Sales of Receipts** Merchant and EINC agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount and that such Purchase Price is not intended to be, nor shall it be construed as a loan from EINC to Merchant. Merchant it being understood that there is no time certain when the Purchased Amount will be received by EINC since it is based solely upon the receipt of the Specified Percentage by EINC.  Merchant agrees that the Purchase Price is in exchange for the Receipts and equals the fair market value of such Receipts. EINC has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Payments made to EINC in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services and the payment therefore by Merchant's customers.  In no event shall the aggregate of any amounts due to EINC be deemed as interest hereunder.  In the event that a court determines that EINC has charged or received interest hereunder, and that such amount is in excess of the highest rate allowed by law, then the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and EINC shall promptly refund to Merchant any interest received by EINC in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that EINC not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law.

**1.7**  **Power of Attorney.** Merchant irrevocably appoints EINC as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document in the case of a violation by Merchant of any term of this Agreement or the occurrence of an Event of Default  under this Agreement, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice,

Exhibit 2
Page 33

bill of lading, or assignment directing customers or account debtors to make payment directly to EINC; and (v) to file any claims or take any action or institute any proceeding which EINC may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount.

**1.8   Protection of Information.** Merchant and each person signing this Agreement on behalf of Merchant and/or as Guarantor, in respect of himself or herself personally, authorizes EINC to disclose information concerning Merchant's and each Guarantor(s)'s credit standing and business conduct only to agents, affiliates, subsidiaries, and credit reporting bureaus as is required in connection with the Receipts. Merchant and Guarantor(s) hereby waives to the maximum extent permitted by law any claim for damages against EINC or any of its affiliates relating to any (i) investigation undertaken by or on behalf of EINC as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**1.9   Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by EINC, including this Agreement and any other EINC documentation (collectively, "Confidential Information") are proprietary and confidential information of EINC. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information of EINC to any person other than its attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this Section 1.10.

**1.10   D/B/A's.** Merchant hereby acknowledges and agrees that EINC may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between EINC and Merchant, including the filing of UCC-l financing statements and other notices or filings.

**1.11   Confession of Judgement.** Merchant shall, upon execution of this Agreement, deliver to EINC an executed confession of judgment in the form acceptable to EINC in favor of EINC in the amount of the Purchased Amount less any payments timely made pursuant to this Agreement, plus fees and costs.

**1.12   Security Interest.**

**1.12.1.**   To secure Merchant's payment and performance obligations to EINC under the  Agreement, Merchant hereby grants to EINC a security interest in all assets now owned, or hereafter acquired, including without limitation: (a) all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined by Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant; and (b) all proceeds, as that term is defined by Article 9 of the UCC ( collectively, the "Collateral").

**1.12.2.**   Merchant and Guarantor each agrees to execute any documents or take any action in connection with this Agreement as EINC deems necessary to perfect or maintain EINC's first priority security interest in the Collateral and any additional Collateral, including the execution of any account control agreements. Merchant and Guarantor each hereby authorizes EINC to file any financing statements deemed necessary by EINC to perfect or maintain EINC's security interest, which financing  statement may contain notification that Merchant and Guarantor have granted a negative pledge to EINC with respect to the Collateral and any additional Collateral, and that any subsequent lien may be tortuously interfering with EINC's rights. Merchant and Guarantor

shall be liable for and EINC may charge and collect all costs and expenses, including but not limited to attorney's fees, which may be incurred by EINC in protecting, preserving and enforcing EINC's security interest and rights. Merchant further acknowledges that EINC may use another legal name and/or D/B/A when designating the Secured Party, when EINC files the above-referenced financing statement(s).

**1.13   Negative Pledge.** Merchant and Guarantor each agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or any additional Collateral  as applicable.

**1.14   Consent to Enter Premises and Assign Lease.** EINC shall have the right to cure Merchant's default in the payment of rent on the following terms. In the event Merchant is served with papers in an action against Merchant for nonpayment of rent or for summary eviction, EINC may execute its rights and remedies under the Assignment of Lease. Merchant also agrees that EINC may enter into an agreement with Merchant's landlord giving EINC the right  to enter Merchant's premises and to take possession of the fixtures and equipment therein for the purpose of protecting and preserving same.

**1.15   Remedies.** Upon any Event of Default, EINC may pursue any remedy available at law (including those available under the provisions of the UCC), or in equity to collect, enforce, or satisfy any obligations then owing, whether by acceleration or otherwise.

**1.16   Timing and Method of Funding.** Merchant and EINC agree that EINC shall purchase the Receipts on a date to be determined by EINC in its sole discretion (the "Purchase Date"). Merchant and EINC also agree that EINC, in its sole discretion, may refuse to purchase the Purchased Receivables for any reason or no reason. Merchant and EINC further agree that EINC shall provide payment through any commercially reasonable method, at EINC's sole discretion, including, but not limited to, check, federal funds wire, or ACH transfer.

## II.   REPRESENTATIONS, WARRANTIES AND COVENANTS

Merchant represents warrants and covenants that as of this date and during the term of this Agreement:

**2.1   Advances are not Loans.** Merchant fully understands that the amount of the Purchase Price is not a loan, but a non-recourse transaction pursuant to which Purchaser's funds are at full risk of non-payment in the event Receipts are not sufficient to satisfy the Purchased Amount and that it is not possible to determine the time period within which the Specified Percentage of Receipts will last to repay the Purchased Amount.  Merchant agrees not to raise the defense of civil or criminal usury in any proceeding in which EINC is enforcing its rights under this Agreement.

**2.2   Financial Condition and Financial Information.** Its bank and financial statements, copies of which have been furnished to EINC, and future statements which will be furnished hereafter at the discretion of EINC, fairly represent the financial condition of Merchant at such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant has a continuing, affirmative obligation to advise EINC of any material adverse change in its financial condition, operation or ownership. EINC may request statements at any time during the performance of this Agreement and the Merchant shall provide them to EINC within 5 business days after requested. Merchant's failure to provide them is a material breach of this Agreement.

**2.3   Governmental Approvals.** Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and

Exhibit 2
Page 34

licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**2.4   Authorization.** Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**2.5   Insurance.** Merchant will maintain business-interruption insurance naming EINC as loss payee and additional insured in amounts and against risks as are satisfactory to EINC and shall provide EINC proof of such insurance upon request.

**2.6   The Account.** Merchant will not change the Account or take any other action that could have any adverse effect upon Merchant's obligations under this Agreement, without EINC's prior written consent. Any such change shall be a material breach of this Agreement.

**2.7   Change of Name or Location.** Merchant will not conduct Merchant's businesses under any name other than as disclosed to EINC or change any of its places of business without EINC written consent.

**2.8   Estoppel Certificate.** Merchant will at any time, and from time to time, upon at least one (l) day's prior notice from EINC to Merchant, execute, acknowledge and deliver to EINC and/or to any other person, firm or corporation specified by EINC, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modification s) and stating the dates which the Purchased Amount or any portion thereof has been repaid.

**2.9   No Bankruptcy.** As of the date of this Agreement, Merchant does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Merchant. Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it. In the event that the Merchant files for bankruptcy protection or is placed under an involuntary filing, Protections 2 and 3 are immediately invoked.

**2.10   No Encumbrance of Receipts.** Merchant shall not further encumber the Receipts without the prior written consent of EINC.

**2.11   Unencumbered Receipts.** Merchant has good, complete and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of EINC.

**2.12   Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

**2.13   Defaults under Other Contracts/Improper transfers**. Merchant's execution and/or performance under this Agreement will not cause or create an event of default by Merchant under any contract with another person or entity, nor will it be considered a fraudulent transfer or fraudulent conveyance, or will otherwise be void or voidable under similar laws or principles, the doctrine of equitable subordination, laws regarding preferential transfers, or for any other reason.

**2.14   Civil/Criminal/Regulatory matters.** There are no civil or criminal proceedings pending before any court, government agency, arbitration panel, or administrative tribunal or, to Merchant's knowledge, threatened against Merchant, which may result in any material adverse change in the business, property, or financial condition of Merchant. Merchant is in compliance with all applicable federal, state and local law and regulations.

**2.15   Business Closure.** At no time during the six (6) months immediately preceding the date of this Agreement has Merchant considered or decided to close or cease operating its business, in whole or in part, temporarily or permanently.

## III.   EVENTS OF DEFAULT AND REMEDIES

**3.1   Events of Default. Protections against Default.**  The occurrence of any of the following events shall constitute an "Event of Default" hereunder: (a) Merchant shall violate any term or covenant in this Agreement; (b) Any representation or warranty by Merchant in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made; (c) the sending of notice of termination by Guarantor(s); (d) Merchant shall transport, move, interrupt, suspend, dissolve or terminate its business; (e) Merchant shall transfer or sell all or substantially all of its assets; (f) Merchant shall make or send notice of any intended bulk sale or transfer by Merchant; (g) Merchant shall use any depository account other than the Account for the credit or deposit of the Receipts without the prior written consent of EINC; (h) Merchant shall change the Account without the prior written consent of EINC; (i) Merchant takes any action or fails to take any action, or offers any incentive— economic or otherwise— the result of which will be to induce any customer or customers to pay for Merchant's services with any means other than by Receipts which are deposited in the Account; (j) Merchant shall perform any act that reduces the value of any Collateral granted under this Agreement; (k) Merchant shall default under any of the terms, covenants and conditions of any other agreement with EINC; and (l)  In the event that Merchant places an ACH Block on the Account preventing Purchaser from processing an ACH debit to the Account.

**3.2   Remedies.** In case any Event of Default occurs, EINC may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Merchant's obligations hereunder (including the Guaranty) or any other legal or equitable right or remedy. All rights, powers and remedies of EINC in connection with this Agreement may be exercised at any time by EINC after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.  In addition to the foregoing, EINC may:

**3.2.1.**   Declare that the full uncollected Purchase Amount plus all fees due under this Agreement is due and payable in full immediately out of the Account and the Specified Percentage become 100%.

**3.2.2.**   May enforce the provisions of the Guaranty against the Guarantor(s).

**3.2.3.**   May enter the confession of judgment as a judgment with the Clerk of the Court and execute thereon.

**3.2.4.**   May enforce its security interest in the Collateral.

**3.2.5.**   May proceed to protect and enforce its rights and remedies by lawsuit. In any such lawsuit, in which EINC shall recover judgment against Merchant, Merchant shall be liable for all

Exhibit 2
Page 35

of EINC's costs of lawsuit, including but not limited to all reasonable attorneys' fees and court costs.

**3.2.6.** May exercise its rights under the assignment of Merchant's lease.

**3.2.7.** May debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on the Account or otherwise, in an amount equal to the Specified Percentage.

**3.2.8.** Exercise the right, without waiving any of its rights and remedies and without notice to Merchant and/or Guarantor(s), to notify Merchant's credit card processor of the sale of Receipts hereunder and to direct such credit card processor to make payment to EINC of all or any portion of the amounts received by such credit card processor on behalf of Merchant. Merchant hereby grants to EINC an irrevocable power-of-attorney, which power-of-attorney shall be coupled with an interest, and hereby appoints EINC or any of EINC's representatives as Merchant's attorney-in-fact, to take any and all action necessary to direct such new or additional credit card processor to provide such Receipts to EINC.

**3.3  Costs.** Merchant shall pay to EINC all reasonable costs associated with (a) a breach by Merchant of the representations, warranties and covenants in this Agreement and the enforcement thereof, and (b) the enforcement of EINC's remedies set forth in this Agreement, including but not limited to court costs and attorneys' fees.

**3.4  Required Notifications.** Merchant is required to give EINC written notice within 24 hours of any filing under Title ll of the United States Code. Merchant is required to give EINC seven (7) days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or stock.

## IV.  MISCELLANEOUS

**4.1  Modifications; Agreement.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by both parties.

**4.2  Assignment.** EINC may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part.

**4.3  Notices.** All notices, requests, consent, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement (or at such other address as the Party shall specify in writing) and shall become effective only upon receipt.

**4.4  Waiver Remedies.** No failure on the part of EINC to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**4.5  Binding Effect; Governing Law, Venue and Jurisdiction.** This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns, except that Merchant shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of EINC which consent may be withheld in EINC's sole discretion. This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regards to any applicable principals of conflicts of law. This

Agreement is for the sale of the Merchant's future Receipts and is subject to the Uniform Commercial Code as adopted in New York. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if EINC so elects, be instituted in any court sitting in New York State, (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient, and submit to the jurisdiction of the Acceptable Forums and waive any and all objections to jurisdiction or venue. Should a proceeding be initiated in any other forum, the parties waive any right to oppose any motion or application made by either party to transfer such proceeding to an Acceptable Forum.

**4.6  Survival of Representation, etc.** All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

**4.7  Severability.** In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

**4.8  Entire Agreement.** Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof. This Agreement hereto embodies the entire agreement between Merchant and EINC and supersedes all prior agreements and understandings relating to the subject matter hereof.

**4.9  Indemnification.** Upon the occurrence of any Event of Default, Seller and Guarantor(s) jointly and severally shall assume liability for and do hereby agree to indemnify, protect, and keep harmless EINC and any third party servicers from and against any and all liabilities, claims, losses, obligations, damages, penalties, actions and suits of whatsoever kind and nature imposed on, incurred by or asserted against EINC or any third party servicers in any way relating to or arising out of such Event of Default(collectively "Indemnified Amounts") including, without limitation, the payment of all costs and expenses of every kind for the enforcement of EINC's rights and remedies hereunder, including the collection of amounts due to EINC hereunder, including attorneys fees and costs in any trial court or appellate court proceeding or administrative proceeding, any arbitration or mediation, or any negotiations or consultations, in connection with any Event of Default.  Such Indemnified Amounts shall bear interest at the highest rate of interest allowed by applicable law until paid in full.

**4.10  JURY TRIAL WAIVER.  THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR THE ENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.**

**4.11  CLASS ACTION WAIVER.  THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY, AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AGAINST PUBLIC POLICY.  TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE**

THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION

**4.12** <u>SERVICE OF PROCESS</u>. **IN ADDITION TO THE METHODS OF SERVICE ALLOWED BY THE NEW YORK STATE CIVIL PRACTICE LAW & RULES ("CPLR"), MERCHANT HEREBY CONSENTS TO SERVICE OF PROCESS UPON IT BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED.  SERVICE HEREUNDER SHALL BE COMPLETE UPON MERCHANT'S ACTUAL RECEIPT OF PROCESS OR UPON EINC'S RECEIPT OF THE RETURN THEREOF BY THE UNITED STATES POSTAL SERVICE AS REFUSED OR UNDELIVERABLE.  MERCHANT MUST PROMPTLY NOTIFY EINC, IN WRITING, OF EACH AND EVERY CHANGE OF ADDRESS TO WHICH SERVICE OF PROCESS CAN BE MADE.  SERVICE BY EINC TO THE LAST KNOWN ADDRESS SHALL BE SUFFICIENT.  MERCHANT WILL HAVE THIRTY (30) CALENDAR DAYS AFTER SERVICE HEREUNDER IS COMPLETE IN WHICH TO RESPOND.  FURTHERMORE, MERCHANT EXPRESSLY CONSENTS THAT ANY AND ALL NOTICE(S), DEMAND(S), REQUEST(S) OR OTHER COMMUNICATION(S) UNDER AND PURSUANT TO THIS MERCHANT AGREEMENT SHALL BE DELIVERED IN ACCORDANCE WITH THE PROVISIONS OF THIS MERCHANT AGREEMENT.**

**4.13    Sale of Additional Pool of Future Receivables; Schedules; Right of First Refusal.**  In the event that Merchant wishes to sell, and EINC agrees to purchase, an additional pool (or additional pools) of Future Receivables, this Agreement shall serve as a Master Agreement which sets forth all of the terms and conditions governing any such sale.  The parties shall execute an additional schedule for each such purchase, setting forth the Purchase Price, Specified Percentage, Specific Daily Payment Amount and Purchased Amount applicable to that additional pool of future receivables.  The Purchase Price listed on such schedule shall be reduced dollar-for-dollar by Purchased Amounts then outstanding from prior purchases of Receipts by EINC, in settlement of Merchant's obligations with respect to the payment of such Purchased Amounts. With the exception of the provisions contained in these additional schedules, the terms and conditions of this Agreement shall by fully applicable.  Nothing herein shall obligate either party to sell and purchase additional pools of Future Receivables; however, Merchant grants EINC the right of first refusal to purchase any such pool of additional future receivables that Merchant may wish to sell.

**4.14    ACH Authorization**. Merchant hereby authorizes EINC, or its designated agents, successors and/or assigns, to withdraw any amount now due or hereinafter due under this Agreement, by initiating debit entries to Merchant's Bank Account and/or any other bank account that Merchant may open or maintain, at any time after the occurrence of a an Event of Default, or other breach or default of Merchant's obligations under this Agreement. Merchant authorizes debit of Merchant's Bank Account and/or any other bank account that Merchant opens or maintains for the full amount due under this Agreement or any portion thereof.  Further, Merchant authorizes and directs the Bank and/or any other bank to accept and to charge any debit entries initiated by EINC to Merchant's Bank Account or other bank accounts, as the case may be. For purposes of this Section, and unless and until the Purchased Amount has been paid in full, Merchant shall at all times maintain the Minimum Deposit in the Merchant's Bank Account, or in such other bank account in which EINC has ACH withdrawal authorization. In the event that EINC withdraws erroneously from Merchant's Bank Account or any other bank account, Merchant authorizes EINC to credit such account for the amount erroneously withdrawn.  Merchant understands that the foregoing ACH authorization and Minimum Deposit requirement are fundamental conditions to induce EINC to accept this Agreement.  Such authorization is intended to be irrevocable.  In the event that Merchant closes or terminates the Bank Account, terminates ACH authorization as set forth above, or fails to maintain the Minimum Deposit, EINC, in its sole discretion, may deem such closure, termination or failure to be an Event of Default.

**4.15    Reporting**. EINC and its affiliates are or in the future may become members of one or more industry associations that exchange and share information regarding the performance by merchants under merchant cash advance and related documents. Accordingly, EINC and its affiliates reserve the right, without further notice to the Merchant, to provide information to such industry associations relating to the Merchant and its principals, as well as the Merchant's performance under this Agreement and related documents. The Merchant, for itself and its principals, hereby authorizes EINC and its affiliates to provide such information without further notice to or consent of the Merchant and/or its principals.

**4.16    Return of EINC Proceeds**. In the event that Merchant, or any of Merchant's respective directors, officers, employees, agents, subcontractors or affiliates, receives or comes into possession of any proceeds of the Purchased Amount, Merchant shall, or shall cause such other recipients to, immediately segregate and hold such proceeds in express trust for EINC's sole and exclusive benefit. Such proceeds shall be delivered to EINC in full within three (3) business days of such receipt.

**4.17**

**4.18** <u>Facsimile Acceptance</u>.  **Facsimile signatures and/or via Portable Digital Format (PDF) shall be deemed acceptable for all purposes.**

Exhibit 2
Page 37

Page 7 of 11

Initial:

## GUARANTY OF PERFORMANCE

**Guaranty of Performance.** The undersigned Guarantor(s) hereby guarantees to EINCAP, INC. ("EINC"), the performance of all of the warranties and covenants or the accuracy of any representation in the Merchant Agreement (defined below) (the "Guaranteed Obligations") made by Merchant named in the Merchant Agreement dated even date herewith between EINC and Merchant, ("Merchant Agreement") a copy of which is attached to this Guaranty of Performance ("Guaranty"), as each agreement may be renewed, amended, extended or otherwise modified. This Guaranty does not guarantee the repayment of the Receipts but is solely a guaranty of performance in the event of a breach of the Guaranteed Obligations. Guarantor's obligations are due at the time of any breach by Merchant of any of the Guaranteed Obligations made by Merchant in this Guaranty and the Merchant Agreement.

**Cross - Collateral.** To secure Guarantor's payment and performance obligations to EINC under this Guaranty, Guarantor hereby grants EINC a security interest in the following collateral:

_____
_____.

(the "Additional Collateral"). Guarantor acknowledges and agrees that any security interest granted to EINC will secure the obligations of Guarantor under the Merchant Agreement.

**Guarantor Waivers.** In the event that Merchant breaches any of the Guaranteed Obligations, EINC may enforce its rights under this Guaranty without first seeking to obtain payment from Merchant, any other guarantor, or any Collateral or Additional Collateral EINC may hold pursuant to this Guaranty.

EINC does not have to notify Guarantor of any of the following events and Guarantor will not be released from its obligations under this Guaranty if it is not notified of: (i) EINC failure to receive in a timely manner any amount due to it under the Merchant Agreement; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; (iv) EINC's acceptance of this Guaranty; and (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to EINC. In addition, EINC may take any of the following actions without releasing Guarantor from any of its obligations under this Guaranty : (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to EINC; (ii) release Merchant from its obligations to EINC; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under this Guaranty. Until the amount due to EINC under the Merchant Agreement is paid in full, Guarantor shall not seek reimbursement from Merchant or any other guarantor for any amounts paid by it under this Guaranty. Guarantor waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other guarantor, or any collateral provided by Merchant or any other guarantor, for any amounts paid by it, or acts performed by it, under this Guaranty: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution. In the event that EINC must return any amount paid by Merchant or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations under this Guaranty shall include that amount.

**Guarantor Acknowledgement**. Guarantor acknowledges (i) the seriousness of the provisions of this Guaranty; (ii) has had a full opportunity to consult with counsel of its choice or has decided not to avail himself//herself of that opportunity.

**Joint and Several Liability**. The obligations hereunder of the persons or entities constituting Guarantors under this Guaranty are joint and several.

**THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS GUARANTY. CAPITALIZED TERMS NOT DEFINED IN THIS GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.**

**GUARANTOR #1**

Signature: _DANIEL S. MARCH_

**Name and Title:** DANIEL S. MARCH

**SS#:** 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

**Driver's License #:** _____

**Date:** 06/03/2021

**GUARANTOR #2**

Signature: _TONY M DIAB_

**Name and Title:** TONY M DIAB

**SS#:** 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

**Driver's License #:** _____

**Date:** 06/03/2021

Exhibit 2
Page 38



**EIN CAP, INC.**
160 Pearl St. 5th  FL. New York, NY 10005
Phone (877) 651-8110  Fax (800)-519-7189

**APPENDIX A**: THE FEE STRUCTURE

**Origination Fee**:  One-time fee for underwriting and related expenses.

| Amount Funded | Origination Fee |
|---|---|
| $5,000 - $19,999 | $289.00 |
| $20,000 - $49,999 | $589.00 |
| $50,000 - $99,999 | $989.00 |
| $100,000 - $200,000 | $1,489.00 |

**Service Fees**

**$35.00** - For same day wire

**$0.00**- For a bank ACH

**ACH Program Fee:**

**Up to 9.99%** of the Purchased Amount: The ACH program is a labor intensive and is not an automated process requiring EINC to charge this fee to cover related  costs.

**Bank Change Fee**

$75 - For each change of account requested, account may only be changed to another commercial checking account.

**Site Visit Fee (if applicable)**

**$200 -** One-time fee to cover the cost of onsite visit.

**NSF Fee**

**$35 per insufficient funds (NSF) in Merchant's Account to pay the Specified Percentage -**

**Rejected ACH**

**$100 per incident -** If an ACH is rejected based on any action taken by the Merchant with respect to an ACH debit without prior notification and authorization by EINC.

**ACH Block on Account**

**$2,500-** If the Merchant places an ACH Block on their account preventing EINC from processing an ACH debit to the Account.

**Default Fee**

**$5,000 -** If the Merchant changes the Account or intentionally diverts Receipts to another account preventing the Buyer from receiving any amount of the Specified Percentage without Purchaser's consent.

**Business Name:** THE LITIGATION PRACTICE GROUP PC AND ADDITIONAL ENTITIES SEEN IN EXHIBIT A

**MERCHANT 1**

Signature: _DANIEL S. MARCH_

Name: DANIEL S. MARCH

Title: _____

Date: 06/03/2021

**MERCHANT 2**

Signature: _TONY M DIAB_

Name: TONY M DIAB

Title: _____

Date: 06/03/2021

Initial:

Exhibit 2
Page 39

DM    TD

EIN CAP

Dear Merchant,

Thank you for accepting this offer from EIN Cap, Inc.  We look forward to being your funding partner.

**Daily ACH Program**

EIN Cap, Inc. will require viewing access to your bank account, each business day, in order to verify the amount of your daily payment. Please be assured that we carefully safeguard your confidential information, and only essential personnel will have access to it.

EIN Cap, Inc. will also require viewing access to your bank account, prior to funding, as part of our underwriting process.

Please fill out the form below with the information necessary to access your account.

* Be sure to indicate capital or lower case letters.

Name of Bank: ___Bank of America_____

Bank Portal Website: ___www.bankofamerica.com_____

Username: ___adminlpg_____

Password: ___Zoevirtue1;_____

Security Question / Answer 1: ___code will go to 949-715-0648____

Security Question / Answer 2: ___code will go to 949-715-0648____

Security Question / Answer 3: ___code will go to 949-715-0648____

Any other information necessary to access your account:

_____

Merchant Name: _____

By: ___DANIEL S. MARCH_____    By: ___TONY M DIAB_____

Title: _____    Title: _____

**Merchant** Please note: In the event that we are unable to access your account, we will take a daily estimated payment.  An additional $29 fee will be assessed for each day we do not have access.

If you have any questions please feel free to contact us directly at 1-877-651-8110

Initial:

Exhibit 2
Page 40

DM   TD

### DISCLOSURE FOR CONFESSION OF JUDGMENT

OBLIGEE: __EIN CAP_____, Inc. d/b/a _____

      The undersigned has executed, and/or is executing, on even date herewith, one or more of the following instruments under   which the undersigned is obligated to repay monies to Obligee:

1.      Merchant Agreement (Fixed ACH) dated _06/03/2021_; and

    A.    THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT THE ABOVE DOCUMENTS CONTAIN PROVISIONS UNDER WHICH OBLIGEE MAY ENTER JUDGMENT BY CONFESSION AGAINST THE UNDERSIGNED. BEING FULLY AWARE OF THE UNDERSIGNED'S RIGHTS TO PRIOR NOTICE AND A HEARING ON THE VALIDITY OF ANY JUDGMENT OR OTHER CLAIMS THAT MAY BE ASSERTED AGAINST THE UNDERSIGNED BY OBLIGEE THEREUNDER BEFORE JUDGMENT IS ENTERED, THE UNDERSIGNED HEREBY FREELY, KNOWINGLY, AND INTELLIGENTLY WAIVES THESE RIGHTS AND EXPRESSLY AGREES AND CONSENTS TO OBLIGEE'S ENTERING JUDGMENT AGAINST THE UNDERSIGNED BY CONFESSION PURSUANT TO THE TERMS THEREOF.

    B.    THE UNDERSIGNED ALSO ACKNOWLEDGES AND AGREES THAT THE ABOVE DOCUMENTS CONTAIN PROVISIONS UNDER WHICH OBLIGEE MAY, AFTER ENTRY OF JUDGMENT AND WITHOUT EITHER NOTICE OR A HEARING, FORECLOSE UPON, ATTACH, LEVY, OR OTHERWISE SEIZE PROPERTY OR PROCEED AGAINST THE INTERESTS OF THE UNDERSIGNED IN PROPERTY (REAL OR PERSONAL) IN FULL OR PARTIAL PAYMENT OR SATISFACTION OF THE JUDGMENT OR JUDGMENTS. BEING FULLY AWARE OF THE UNDERSIGNED'S RIGHTS AFTER JUDGMENT IS ENTERED (INCLUDING THE RIGHT TO MOVE TO OPEN OR STRIKE THE JUDGMENT OR JUDGMENTS), THE UNDERSIGNED HEREBY FREELY, KNOWINGLY AND INTELLIGENTLY WAIVES THESE RIGHTS AND EXPRESSLY AGREES AND CONSENTS TO OBLIGEE'S TAKING SUCH ACTIONS AS MAY BE PERMITTED UNDER APPLICABLE STATE AND FEDERAL LAW WITHOUT PRIOR NOTICE TO THE UNDERSIGNED.

    C.    The undersigned hereby certifies that the financial accommodations being provided by the Obligee are for a business purpose, and not for personal, family or household use.

    D.    The statements made in this Disclosure for Confession of Judgment are made under penalty of perjury.

| **MERCHANT** | **OWNER/GUARANTOR** |
|---|---|
| By: __DANIEL S. MARCH_____ | By: __DANIEL S. MARCH_____ |
| Its: _____ | SS# _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_ |
| *DANIEL S. MARCH* | *DANIEL S. MARCH* |
| (Signature) | (Signature) |
| EIN# _83-3885343_____ | Driver's License Number: _____ |

Exhibit 2
Page 41

**EIN CAP**

EIN CAP, INC.
160 Pearl St. 5th  FL. New York, NY 10005
Phone (877) 651-8110 Fax (800)-519-7189

**AGREEMENT FOR DIRECT DEPOSITS (ACH CREDITS)
AND DIRECT COLLECTIONS (ACH DEBITS)**

This Agreement for Direct Deposits (ACH Credits) and Direct Collections (ACH Debits). Seller should keep this important legal document for Seller's records.

**DISBURSMENT OF PURCHASE PRICE.** By signing below, Seller authorizes Buyer after electing to purchase the Specified Amount of the Future Payment Rights to disburse the Purchase Price set forth in the Agreement by initiating an ACH credit to the bank account described below (or a substitute bank account specified by Seller and approved by Buyer) (the "Account").

**COLLECTION OF FUNDS ARISING FROM SPECIFIED AMOUNT OF FUTURE PAYMENT RIGHTS.** By signing below, Seller authorizes Buyer to collect the funds arising from the Specified Amount of the Future Payment Rights Buyer is entitled to receive under the Agreement by initiating ACH debits to the Account in amounts not to exceed the amount of the Daily Collection set forth in the Agreement. Seller authorizes Buyer to initiate an ACH debit to the Account on the Initial Collection Date set forth in the Agreement and an ACH debit to the Account each Business Day after the Initial Collection Date until Buyer (i) collects the entire Specified Amount of Future Payment Rights or (ii) initiates the Maximum Number of ACH Debits set forth in the Agreement, whichever occurs first. Upon Seller's breach of the Agreement, Seller authorizes Buyer immediately to debit any damages that Seller owes to Buyer pursuant to the Agreement from any of Seller's accounts, including the Account via one or more debit entries.

**BUSINESS PURPOSE ACCOUNT**. By signing below, Seller attests that any account into which Seller deposits funds arising from Future Payment Rights, including, but not limited to, the Account, was established for business purposes and not primarily for personal, family or household purposes.

**MISCELLANEOUS.** Seller will deposit or cause to be deposited any and all funds arising from Future Payment Rights into the Account not more than one day after Seller or any agent of Seller receives funds. Seller understands that Seller is responsible for ensuring that funds arising from the Future Payment Rights remain in the Account each day until Buyer debits the amount that the Agreement authorizes Buyer to debit from the Account for that day. Buyer is not responsible for any overdrafts or rejected transactions that may result from Buyer debiting any of Seller's accounts. The ACH authorizations provided for in this Agreement will remain in effect until Buyer has received written notification from Seller of its termination in such time and in such manner as to afford Buyer and Seller's depository bank a reasonable opportunity to act on it. Buyer is not responsible for any fees charged by Seller's bank as a result of credits or debits initiated under this Agreement. The origination of ACH transactions to Seller's accounts, including, but not limited to, the Account, must comply with the provisions of U.S. law.

**ACCOUNT INFORMATION**

Bank Name: _Bank of America_____    Bank Phone Number: _____

Branch Address: _____

City: _____    State: _____    Zip: _____
Routing Number: _026009593_____    Account Number: ████████9551_____

**SELLER SIGNATURE**

Print Seller's Name: _DANIEL S. MARCH_____    Federal Tax ID#: _83-3885343_____

Signature: _Daniel S. March_____    Title: _____

Date: _06/03/2021_____

Exhibit 2
Page 42



# <u>Permission to Release Information</u>

I, DANIEL S. MARCH _____(Merchants Name,) owner of:

THE LITIGATION PRACTICE GROUP PC AND ADDITIONAL ENTITIES SEEN IN EXHIBIT A ___ (Legal Business Name)

Doing Business As: THE LITIGATION PRACTICE GROUP AND ADDITIONAL ENTITIES SEEN IN EXHIBIT A (DBA Name)

Authorize EIN Cap, Inc. to obtain trade, landlord, and bank information from vendors, suppliers, landlord/mortgagor, banks and creditors. This information will be used for the sole purpose of obtaining funding through EIN Cap, Inc.

**AGREED AND ACKNOWLEDGED:**

**Print Name:** DANIEL S. MARCH

**Signature:** DANIEL S. MARCH

**Date:** 06/03/2021

**Company Name(Legal Name):** THE LITIGATION PRACTICE GROUP PC AND ADDITIONAL ENTITIES SEEN IN EXHIBIT A

**DBA Name:** THE LITIGATION PRACTICE GROUP AND ADDITIONAL ENTITIES SEEN IN EXHIBIT A

Address: 1351 CALLE AVANZADO STE4
SAN CLEMNTE,California,92618

Office Phone: (_____)

Cell Phone: _____

Exhibit 2
Page 43



EIN CAP, INC.
80 Pearl St 6th FL New York NY 10005
Phone. (877) 651-8110 Fax (800)-519-7189

# <u>Permission to Release Information</u>

I, <u>TONY M DIAB</u> (Merchants Name,) owner of:
<u>THE LITIGATION PRACTICE GROUP PC AND ADDITIONAL ENTITIES SEEN IN EXHIBIT A</u> (Legal Business Name)

Doing Business As: <u>THE LITIGATION PRACTICE GROUP AND ADDITIONAL ENTITIES SEEN IN EXHIBIT A</u> (DBA Name)

Authorize EIN Cap, Inc. to obtain trade, landlord, and bank information from vendors, suppliers, landlord/mortgagor, banks and creditors. This information will be used for the sole purpose of obtaining funding through EIN Cap, Inc.

**AGREED AND ACKNOWLEDGED:**

**Print Name:** <u>TONY M DIAB</u>

**Signature:** <u>TONY M DIAB</u>

**Date:** <u>06/03/2021</u>

**Company Name(Legal Name):** <u>THE LITIGATION PRACTICE GROUP PC AND ADDITIONAL ENTITIES SEEN IN EXHIBIT A</u>

**DBA Name:** <u>THE LITIGATION PRACTICE GROUP AND ADDITIONAL ENTITIES SEEN IN EXHIBIT A</u>

**Address:** <u>1351 CALLE AVANZADO STE4</u>
<u>SAN CLEMNTE,California,92618</u>

**Office Phone:** <u>(            )</u>

**Cell Phone:** <u>                        </u>

Exhibit 2
Page 44

ADDENDUM TO CONTRACT

## WAIVER OF PERSONAL SERVICE

This Addendum ("Addendum") is to be made a part of the purchase and sale of future receivables agreement (the "Contract") between EIN CAP, Inc. ("Purchaser") and
THE LITIGATION PRACTICE GROUP PC AND ADDITIONAL ENTITIES SEEN IN EXHIBIT A ("Merchant") and

DANIEL S. MARCH ("Guarantor#1") and
TONY M DIAB ("Guarantor#2")
(collectively the "Parties") dated 2021-06-03

1. Merchant hereby irrevocably and unconditionally waives personal service of any summons, complaint, or other process, which may be made by any other means permitted by New York law. Merchant understands and agrees that an action, lawsuit, or controversy may be taken up and considered by a court without any further notice. Merchant further agrees to waive any objection to the absence of formal service of process.

2. Guarantors hereby irrevocably and unconditionally waive personal service of any summons, complaint, or other process, which may be made by any other means permitted by New York law. Guarantors understand and agree that an action, lawsuit, or controversy may be taken up and considered by a court without any further notice. Guarantors further agree to waive any objection to the absence of formal service of process.

3. MERCHANT HEREBY AGREES TO ACCEPT SERVICE OF ANY SUMMONS, COMPLAINT, OR OTHER PROCESS BY ELECTRONIC MAIL ("EMAIL") AT admin@litigationpracticegroup.con OR BY UNITED STATES POSTAL SERVICE AT 20160 NOB HILL DR _____, YORBA LINDA    California    92886 ,United States OR BY ANY OTHER MEANS PERMITTED BY NEW YORK LAW.

4. GUARANTOR#1 HEREBY AGREES TO ACCEPT SERVICE OF ANY SUMMONS, COMPLAINT, OR OTHER PROCESS BY ELECTRONIC MAIL ("EMAIL") AT admin@litigationpracticegroup.con OR BY UNITED STATES POSTAL SERVICE AT 20160 NOB HILL DR _____, YORBA LINDA    California    92886 ,United States OR BY ANY OTHER MEANS PERMITTED BY NEW YORK LAW.

GUARANTOR#2 HEREBY AGREES TO ACCEPT SERVICE OF ANY SUMMONS, COMPLAINT, OR OTHER PROCESS BY ELECTRONIC MAIL ("EMAIL") AT tony@coastprocessing.com _____ OR BY UNITED STATES POSTAL SERVICE AT _____ _____,United States OR BY ANY OTHER MEANS PERMITTED BY NEW YORK LAW.

5. Merchant or Guarantors shall notify Purchaser of any changes to its physical address or email address for service. Unless Purchaser is notified of a change in address, all addresses shall be presumed to be accurate.

6. This Addendum shall supersede any notice requirements in the Contract with respect to service of process.

**For the Personal Guarantor**
*DANIEL S. MARCH*
Name : DANIEL S. MARCH

**For the Merchant**
*DANIEL S. MARCH*
Name: DANIEL S. MARCH
Title:

**For the Personal Guarantor**
*TONY M DIAB*
Name: TONY M DIAB

**For the Merchant**
*TONY M DIAB*
Name: TONY M DIAB
Title:


INITIALS: DM

Exhibit 2
Page 45

# EXHIBIT 3

Exhibit 3
Page 46

| time | Account Name | Account Number | Transaction Date | Debit/Charge | Payee |
|------|--------------|----------------|------------------|--------------|-------|
| Bank of America | Vulcan Consulting Group LLC dba DRD | ▮9551 | 6/4/2021 | 12,591.00 | Ein Cap Inc. |
| Bank of America | Vulcan Consulting Group LLC dba DRD | ▮9551 | 6/7/2021 | 12,591.00 | Ein Cap Inc. |
| Bank of America | Vulcan Consulting Group LLC dba DRD | ▮9551 | 6/8/2021 | 12,591.00 | Ein Cap Inc. |
| Bank of America | Vulcan Consulting Group LLC dba DRD | ▮9551 | 6/9/2021 | 12,591.00 | Ein Cap Inc. |
| Bank of America | Vulcan Consulting Group LLC dba DRD | ▮9551 | 6/10/2021 | 12,591.00 | Ein Cap Inc. |
| Bank of America | Vulcan Consulting Group LLC dba DRD | ▮9551 | 6/11/2021 | 12,591.00 | Ein Cap Inc. |
| Bank of America | Vulcan Consulting Group LLC dba DRD | ▮9551 | 6/14/2021 | 12,591.00 | Ein Cap Inc. |
| Bank of America | Vulcan Consulting Group LLC dba DRD | ▮9551 | 6/15/2021 | 12,591.00 | Ein Cap Inc. |
| Bank of America | Vulcan Consulting Group LLC dba DRD | ▮9551 | 6/16/2021 | 12,591.00 | Ein Cap Inc. |
| Bank of America | Vulcan Consulting Group LLC dba DRD | ▮9551 | 6/17/2021 | 12,591.00 | Ein Cap Inc. |
| Bank of America | Vulcan Consulting Group LLC dba DRD | ▮9551 | 6/18/2021 | 12,591.00 | Ein Cap Inc. |
| Chase | Vulcan Consulting Group LLC | ▮3588 | 6/30/2021 | 140,000.00 | Ein Cap Inc. |
| | | | **Total** | **278,501.00** | |

Exhibit 3
Page 47

# Adversary Cover Sheet

B1040 (FORM 1040) (12/24)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>Richard A. Marshack, Trustee of the LPG Liquidation Trust | DEFENDANTS<br>EIN Capital, Inc. |
|---|---|
| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br>Yosina M. Lissebeck (SBN 201654)<br>Tyler Powell (Ky. Bar No. 90520) (*Admitted pro hac vice*)<br>DINSMORE & SHOHL LLP<br>655 West Broadway, Suite 800<br>San Diego, CA 92101     Telephone (619) 400-0500<br>yosina.lissebeck@dinsmore.com<br>tyler.powell@dinsmore.com | **ATTORNEYS** (If Known) |
| **PARTY** (Check One Box Only)<br>☐ Debtor     ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor     ☐ Other<br>☒ Trustee | **PARTY** (Check One Box Only)<br>☐ Debtor     ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor     ☐ Other<br>☐ Trustee |

| CAUSE OF ACTION (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)<br>(1) Avoidance, Recovery, And Preservation Of Fraudulent Transfer(s); (2) Avoidance, Recovery, And Preservation Of Fraudulent Transfer(s); (3) Avoidance, Preservation, And Recovery Of Actual Fraudulent Transfer(s); (4) Avoidance, Preservation And Recovery Of Constructive Fraudulent Transfer(s) |
|---|

| NATURE OF SUIT |
|---|
| (Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.) |

| FRBP 7001(a) – Recovery of Money/Property | FRBP 7001(f) – Dischargeability (continued) |
|---|---|
| ☐ 11-Recovery of money/property - §542 turnover of property | ☐ 61-Dischargeability - §523(a)(5), domestic support |
| ☐ 12-Recovery of money/property - §547 preference | ☐ 68-Dischargeability - §523(a)(6), willful and malicious injury |
| ☒ 13-Recovery of money/property - §548 fraudulent transfer | ☐ 63-Dischargeability - §523(a)(8), student loan |
| ☒ 14-Recovery of money/property - other | ☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation |
| | (other than domestic support) |
| **FRBP 7001(b) – Validity, Priority or Extent of Lien** | ☐ 65-Dischargeability - other |
| ☐ 21-Validity, priority or extent of lien or other interest in property | |
| | **FRBP 7001(g) – Injunctive Relief** |
| **FRBP 7001(c) – Approval of Sale of Property** | ☐ 71-Injunctive relief- imposition of stay |
| ☐ 31-Approval of sale of property of estate and of a co-owner - §363(h) | ☐ 72-Injunctive relief - other |
| | |
| **FRBP 7001(d) – Objection/Revocation of Discharge** | **FRBP 7001(h) Subordination of Claim or Interest** |
| ☐ 41-Objection / revocation of discharge - §727(c),(d),(e) | ☐ 81-Subordination of claim or interest |
| | |
| **FRBP 7001(e) – Revocation of Confirmation** | **FRBP 7001(i) Declaratory Judgment** |
| ☐ 51-Revocation of confirmation | ☐ 91-Declaratory judgment |
| | |
| **FRBP 7001(f) – Dischargeability** | **FRBP 7001(j) Determination of Removed Action** |
| ☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims | ☐ 01-Determination of remove d claim or cause |
| ☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, | **Other** |
| actual fraud | ☐ SS-SIPA Case - 15 U.S.C. §§78aaa *et.seq.* |
| ☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny | ☒ 02-Other (e.g. other actions that would have been brought in state court |
| **(continued next column)** | if unrelated to bankruptcy case) |

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ 278,000 |

| Other Relief Sought |
|---|

B1040 (FORM 1040) (12/24)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>The Litigation Practice Group P.C. | BANKRUPTCY CASE NO.<br>8:23-bk-10571-SC | |
| DISTRICT IN WHICH CASE IS PENDING<br>Central District of California | DIVISION OFFICE<br>Santa Ana | NAME OF JUDGE<br>Scott C. Clarkson |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br>/s/ Tyler Powell | | |
| DATE<br>March 12, 2025 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Yosina M. Lissebeck<br>Tyler Powell (admitted pro hac vice)<br>Special Counsel to Richard A. Marshack, Trustee of the LPG<br>Liquidation Trust | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.