CHRISTOPHER CELENTINO (State Bar No. 131688)
Christopher.Celentino@dinsmore.com
YOSINA M. LISSEBECK (State Bar No. 201654)
Yosina.Lissebeck@dinsmore.com
CHRISTOPHER B. GHIO (259094)
Christopher.Ghio@dinsmore.com
**DINSMORE & SHOHL LLP**
655 West Broadway, Ste 800
San Diego, California 92101
Telephone: (619) 400-0500
Facsimile:  (619) 400-0501

MATTHEW J. STOCKL (State Bar No. 329366)
Matthew.Stockl@dinsmore.com
**DINSMORE & SHOHL LLP**
550 South Hope Street, Ste 1765
Los Angeles, CA 90071
Telephone: (213) 335-7737
Facsimile: (213) 335-7740

Special Counsel to Richard A. Marshack,
Trustee of the LPG Liquidation Trust

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION

| | |
|---|---|
| In re: | Case No. 8:23-bk-10571-SC |
| The Litigation Practice Group P.C., | Chapter 11 |
| Debtor. | Adv. Proc. No. _____ |
| Richard A. Marshack, Trustee of the LPG Liquidation Trust, | **TRUSTEE'S COMPLAINT FOR:** |
| Plaintiff, | **(1) AVOIDANCE, RECOVERY, AND PRESERVATION OF 2-YEAR ACTUAL FRAUDULENT TRANSFERS;** |
| v. | |
| Point 69, LLC, a New York limited liability company; Lorium PLLC aka Lorium Law, a Florida professional limited liability company, | **(2) AVOIDANCE, RECOVERY, AND PRESERVATION OF 2-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS;** |
| Defendants. | **(3) AVOIDANCE, RECOVERY, AND PRESERVATION OF 4-YEAR ACTUAL FRAUDULENT TRANSFERS;** |

**(4) AVOIDANCE, RECOVERY, AND PRESERVATION OF 4-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS;**

**(5) TURNOVER; AND**

**(6) AIDING AND ABETTING AGAINST LORIUM PLLC aka LORIUM LAW**

Judge:      Hon. Scott C. Clarkson

For his *Complaint for (1) Avoidance, Recovery, and Preservation of 2-Year Actual Fraudulent Transfers; (2) Avoidance, Recovery, and Preservation of 2-Year Constructive Fraudulent Transfers; (3) Avoidance, Recovery, and Preservation of 4-Year Actual Fraudulent Transfers; (4) Avoidance, Recovery, and Preservation of 4-Year Constructive Fraudulent Transfers; (5) Turnover; and (6) Aiding and Abetting Against Lorium PLLC aka Lorium Law* ("Complaint"), plaintiff Richard A. Marshack, the former Chapter 11 Trustee for the for the bankruptcy estate ("Estate") of debtor The Litigation Practice Group P.C. ("Debtor" or "LPG") and current liquidating trustee of the LPG Liquidation Trust (collectively, "Trustee" or "Plaintiff") in the above-captioned bankruptcy case ("Bankruptcy Case"), alleges and avers as follows:

**STATEMENT OF JURISDICTION, NATURE OF PROCEEDING, AND VENUE**

1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E), (H) and (O), 1334(b), and General Order No. 13-05 of the District Court for the Central District of California because this is a core proceeding arising in and/or related to the Bankruptcy Case, which is a case under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code"), and which is pending in the United States Bankruptcy Court for the Central District of California, Santa Ana Division ("Bankruptcy Court").

2.      Regardless of whether this proceeding is core, non-core, or otherwise, Plaintiff consents to the entry of a final order and judgment by the Bankruptcy Court.

3.      Defendants are notified that Rule 7008 of the Federal Rules of Bankruptcy Procedure requires Defendants to plead whether consent is given to the entry of a final order and

1    judgment by the Bankruptcy Court.

2      4.    Venue of this adversary proceeding properly lies in this judicial district pursuant to

3 28 U.S.C. § 1409(a) because this proceeding is related to Debtor's pending Bankruptcy Case.

4 **THE PARTIES**

5      5.    Plaintiff, Richard A. Marshack, was the duly-appointed, qualified, and acting

6 Chapter 11 Trustee of Debtor's Estate and is now the current liquidating trustee of the LPG

7 Liquidation Trust.

8      6.    Debtor is, and at all material times was, a professional corporation organized,

9 existing, and in good standing under the laws of the State of California, with its principal place of

10 business in Tustin, California.

11      7.    Defendant, Point 69, LLC ("Point 69" or "Defendant"), is, and at all material times

12 represented that it was, a limited liability company existing under the laws of the State of New York.

13      8.    Defendant may be served by first class mail postage prepaid upon Point 69's

14 authorized agent for service of process, Joel Gestetner, at 1755 Broadway, Suite 1057, New York,

15 New York 10019.

16      9.    Defendant Lorium PLLC aka Lorium Law ("Lorium" and, together with Point 69,

17 "Defendants") is, and at all material times represented that it was, a professional limited liability

18 company existing under the laws of the State of Florida.

19      10.    Lorium may be served by first class mail postage prepaid upon Lorium's authorized

20 agent for service of process, Craig A. Pugatch, 101 NE Third Avenue, Suite 1800, Fort Lauderdale,

21 Florida 33301.

22 **GENERAL ALLEGATIONS**

23    **A.    The Bankruptcy Case**

24      11.    On March 20, 2023 ("Petition Date"), Debtor filed a voluntary petition for relief

25 under Chapter 11 of Title 11 of the United States Code, commencing the Bankruptcy Case.

26      12.    The Office of the United States Trustee ("UST") filed its *Motion by United States*

27 *Trustee to Dismiss or Convert Case Pursuant to 11 U.S.C. § 1112(b)* [Bankr. Docket No. 21] and

28 creditors Debt Validation Fund II, LLC; MC DVI Fund 1, LLC; and MC DVI Fund 2, LLC filed

3

the *Motion by DVF and MC DVI to Dismiss Chapter 11 Case Pursuant to 11 U.S.C. §§ 105, 305, 349, & 1112, or in the Alternative Convert This Case to Chapter 7 or Appoint a Trustee* [Bankr. Docket No. 44]. On May 4, 2023, the Court entered its *Order Directing United States Trustee to Appoint Chapter 11 Trustee* [Bankr. Docket No. 58].

13.     Pursuant to the *Acceptance of Appointment as Chapter 11 Trustee* [Bankr. Docket No. 63], on May 8, 2023, Trustee accepted his appointment as the Chapter 11 Trustee in the Bankruptcy Case. The Court approved the Trustee's appointment in its *Order Approving the U.S. Trustee's Application for the Appointment of a Chapter 11 Trustee* [Docket No. 65].

14.     Trustee was not appointed until after events of the case and, therefore, bases these allegations on information and belief. *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) ("The Twombly plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible."); *Miller v. City of Los Angeles*, 2014 U.S. Dist. LEXIS 198871, 2014 WL 12610195, at *5 (C.D. Cal. Aug. 7, 2014) (recognizing that the plaintiff's "information and belief" pleading was allowed and "necessary at times"); *see also Mireskandari v. Daily Mail and General Trust PLC*, 2013 U.S. Dist. LEXIS 194437, 2013 WL 12129642, at *4 (C.D. Cal. July 31, 2013) ("The Federal Rules of Civil Procedure allow parties to plead facts on 'information and belief' if the facts 'will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.'" (citations omitted)).

15.     Pursuant to the *Order Confirming Modified First Amended Joint Chapter 11 Plan of Liquidation* entered September 9, 2024, and the *Notice of Occurrence of Effective Date of Modified First Amended Joint Chapter 11 Plan of Liquidation* filed September 24, 2024, Richard A. Marshack became the Liquidating Trustee of the LPG Liquidation Trust, effective September 24, 2024, and he continues to serve in this capacity at this time.  [Bankr. Docket Nos. 1646 & 1762].

16.     All claims have been transferred to the Liquidating Trust pursuant to the confirmed plan and Plaintiff brings this action solely in his capacity as the former Chapter 11 Trustee and current Liquidating Trustee of the LPG Liquidation Trust for the benefit of Debtor's Estate and its

creditors.

**B.    Protective Order**

17.    On or about May 2, 2024, Plaintiff filed that certain Notice and Motion for Entry of Protective Order (the "Protective Order Motion").

18.    On June 3, 2024, the Court entered its Order Granting Motion for Entry of Protective Order and the Protective Order [Docket No. 1270] (the "Protective Order"). A true and accurate copy of the Protective Order is attached hereto as **<u>Exhibit 1</u>** and incorporated herein by reference.

19.    By its own terms, the Protective Order applies to this adversary proceeding and governs all discovery conducted herein.

**C.    LPG**

20.    LPG operated a law firm for consumers across the country who sought assistance in contesting or resolving debts they would identify.

21.    The consumers would pay LPG over a period of time via monthly debits from their bank accounts.

22.    The monthly payments were meant to cover all legal services LPG provided to the consumers including validation of the debts, review of documents to determine enforceability, and court appearances to halt lawsuits to obtain judgments.

23.    In certain instances, LPG would file a lawsuit in an effort to eliminate a disputed debt or to prosecute affirmative claims held by the consumers.

24.    LPG mismanaged the consumers' monthly payments.

25.    Tony Diab is, and at all relevant times was, an individual who operated, dominated and controlled LPG ("Diab"). Diab and other defendants devised a plan to fraudulently transfer funds, client files, client funds and assets in the form of ACH Receivables (the "ACH Receivables" or "Accounts Receivable") out of LPG to third parties prior to the filing of bankruptcy.

26.    To obtain consumer clients, LPG contracted with marketing companies, who engaged in illegal capping and would advertise or call to solicit consumers to become clients of LPG in exchange for a percentage of the ACH Receivables collected by LPG from the consumers. The marketing affiliates went so far as to assist with the execution of an engagement letter between the

5

1    consumer and LPG.

2        27.    In exchange, LPG agreed to pay the marketing affiliates a percentage the monthly

3    payments collected by LPG from the consumers.

4        28.    Because LPG received payments from consumers over time, it often sought financing

5    by borrowing against its future cash flows from the Accounts Receivable by means of, among other

6    things, merchant cash advance agreements ("MCA Agreements"). This borrowing was not only used

7    to finance operations at LPG and to pay fees owed to the marketing companies for providing the

8    client referrals, but also was used to pay creditors that had provided earlier-in-time financing in a

9    growing Ponzi scheme.

10        29.    Many of the documents executed in connection with such financing described the

11    transactions as account receivable purchase agreements.  However, LPG was not selling accounts

12    receivable to MCA lenders, it was obtaining short term loans in return for the transfer of future

13    monthly payments made by clients that were required to be held in client-trust accounts.

14        30.    To facilitate the transfer of ACH Receivables to MCA lenders, Diab used entities he

15    controlled, and were his alter egos, including, without limitation, Vulcan Consulting Group

16    ("Vulcan"), Maverick Management Group LLC ("Maverick"), Prime Logix, LLC ("Prime Logix"),

17    LGS Holdco, LLC ("LGS"), and/or Coast Processing to divert LPG consumer funds and ACH

18    Receivables. Diab would use numerous ACH processing companies in order to easily transfer

19    millions of dollars from Debtor to these entities he controlled, without oversight or detection, and

20    to avoid payment disputes and complications.  The money that flowed from Debtor through these

21    bank account to Defendants consisted of Client Funds that Debtor funneled to these entities by

22    means of the ACH processing companies.  Debtor also made deposits into these entities bank

23    account such that they received Client Funds directly from Debtor in addition to direct Accounts

24    Receivable.

25        31.    LPG transferred ACH Receivables and the associated client files in this fashion to

26    defraud creditors in a pyramid scheme and for improper personal gain.

27        32.    LPG's monthly revenue from client files was primarily received via ACH payments.

28    To process ACH payments, LPG was required to enlist the services of ACH payment processing

companies who handle high risk transactions. In this regard, Diab had enlisted numerous ACH processing companies to easily switch between different vendors and have millions of dollars of LPG funds directed to entities Diab controlled, including but not limited to Vulcan, Maverick, Prime Logix, LGS, and/or Coast Processing. Diab utilized these other entities' bank accounts as LPG bank accounts.

33.    Diab instructed lenders and file purchasers to divert LPG loan proceeds or to deposit money otherwise due to LPG into bank accounts he controlled on behalf of LPG but ostensibly held by Vulcan, Maverick, Prime Logix, LPG and/or Coast Processing.  Diab used all of these proceeds as if they were LPG funds, because they were.

34.    At or around the Petition Date, Diab transferred or sold approximately 15,000 LPG client files to Oakstone Law Group PC ("Oakstone"), 12,000 LPG files to Consumer Legal Group ("CLG"), and the remaining LPG files, approximated at slightly less than 40,000, to Phoenix Law, PC ("Phoenix").

35.    Pursuant to the asset purchase agreement between LPG and CLG, Diab instructed CLG to initiate the ACH debits on the transferred files, which it did through Optimum Bank and its processing entity LGS Holdco.

36.    At or around the Petition Date, Diab transferred, for no consideration, approximately 8,000 files (previously transferred to Phoenix) to Heshy Deutsch ("Deutsch") and Israel Reiches ("Reiches").  Diab instructed Deutsch and Reiches, by and through their co-conspirators Sam Geiger and Solomon Feig, to initiate the ACH debits on the transferred files, which they did through BCB Bank and a processing entity known as CLG Processing, into accounts, not in the name of LPG, but that held funds of behalf of LPG and disbursed those funds for LPG.

37.    The funds obtained from the ACH debits described in paragraphs 37 and 38 above were deposited in Maverick and Prime Logix accounts, among others.

38.    LPG's ACH Receivables were the primary, if not exclusive source of funds, for Validation Partners, Vulcan, Oakstone, PECC, Prime Logix, Coast Processing, LGS, and Maverick. As set forth above, the other sources of funds for these entities are the proceeds of LPG assets (i.e.,

file purchase account receivable proceeds) or constitute loan proceeds for which LPG alone was liable.

39.    Diab frequently diverted the LPG money pulled from its consumer clients and other funds it received through investors and lenders, to and through these entities.

40.    Diab frequently would direct these entities to pay affiliates (aka marketing capers), MCA lenders, and others with LPG assets.

41.    Diab would instruct others at LPG and these entities on how to manage and transfer these funds to and from these entities and LPG interchangeably.

### i.    Affiliate Agreements

42.    As part of its business, Debtor LPG routinely entered into affiliate agreements with non-attorney entities, including the marketing companies, and individuals ("Affiliate Agreements") many of whom are defendants in other adversary actions brought by the Trustee.

43.    The Affiliate Agreements state that the affiliate owns and operates a system of generating leads consisting of consumers interested in the legal services offered by LPG.

44.    Pursuant to the Affiliate Agreements, the affiliates generated leads consisting of consumers interested in the legal services offered by LPG and referred those consumers to Debtor.

45.    Pursuant to the Affiliate Agreements, Debtor agreed to pay the affiliates a percentage, generally 75%, per file for each file the affiliate placed with LPG, less a monthly maintenance fee that LPG retained to cover administrative costs.  LPG calculated the value of each file applying the percentage fee, less the maintenance fee, and remitted the amount to the affiliate pursuant to an agreed-upon schedule.

46.    These types of affiliate agreements and any associated referral activity violate Sections 6151 and 6155 of the California Business and Professional Code, which prohibit referrals of potential clients to attorneys unless registered with the State Bar of California. Cal. Bus. & Prof. Code § 6155. "Referral activity" includes "any entity 'which, in person, electronically, or otherwise, refers the consumer to an attorney or law firm not identified' in the advertising." *Jackson v. LegalMatch.com*, 42 Cal. App. 5th 760, 775 (2019). A referral includes receiving information from potential clients and sending that information to lawyers, even when the advertiser does not advertise

the name of the attorneys and the clients do not clear the name of the potential attorney after the referral occurred.  *Id.*

47.    Further, if any effect of an agreement is to accomplish an unlawful purpose, the agreement may be declared illegal regardless of the intention of the parties. *Stockton Morris Plan Co. v. Cal. Tractor & Equip. Corp.*, 112 Cal. App. 2d 684, 690 (1952) (citing *Fewel & Dawes, Inc. v. Pratt*, 17 Cal. 2d 85, 91 (1941)). This remains true regardless of whether the contract has been performed. *Stevens v. Boyes Hot Springs Co.*, 113 Cal. App. 479, 483 (1931) (A contract by a corporation to purchase its own stock has the effect of illegally withdrawing and paying to a stockholder a part of the capital stock of the corporation and is illegal and void, regardless of the fact that the contract is fully performed by the sellers and partially performed by the corporation.); *Mansfield v. Hyde*, 112 Cal. App. 2d 133, 139 (1952), overruled, *Fomco, Inc. v. Joe Maggio, Inc.*, 8 Cal. Rptr. 459 (1960) (Where object of statute requiring licenses is to prevent improper persons from engaging in particular activity, or is for purpose of regulating occupation or business for protection of public, imposition of penalty amounts to prohibition against engaging in occupation or business without license, and contract made by unlicensed person in violation of statute is invalid.);  *Firpo v. Murphy*, 72 Cal. App. 249, 252 (1925) (A contract to pay commissions to a real estate broker is illegal and he is not entitled to recover thereon where he fails to secure the license required by law to carry on his business.).

48.    Because the Affiliate Agreements and associated referral activity violate federal and state law since the named defendants have not registered with the State Bar of California as required by CAL. BUS. & PROF. CODE § 6155, they are void, unenforceable, and subject to avoidance as fraudulent. Any alleged consideration provided under Affiliate Agreements and/or the ARPA Agreement (defined hereafter below) was unlawful.

49.    Unlawful consideration is that which is: "(1) contrary to an express provision of law; (2) contrary to the policy of express law, though not expressly prohibited; or (3) otherwise contrary to good morals." Cal. Civ. Code § 1667. "If any part of a single consideration for one or more objects, or of several considerations for a single object, is unlawful, the entire contract is void." Cal. Civ. Code § 1608.

**D.      Diab's Scheme**

50.      As discussed above, the Debtor borrowed against its future ACH Receivables by purporting to transfer them to factoring companies pursuant to MCA Agreements or similar transactions.  In many instances, the ACH Receivables were transferred multiple times.

51.      Given that all or a substantial portion of Debtor's ACH Receivables were transferred multiple times, there were more claims for payment from any one ACH Receivable than the receivable would generate.  Thus, prior to the Petition Date, Debtor engaged in a scheme to defraud its creditors by transferring funds from clients in the form of future Accounts Receivable to various fraudulent conveyance partners, including Point 69, as alleged herein.

**E.      Point 69's Dealings with LPG**

52.      Point 69 was among the transferees of LPG's future Accounts Receivable pursuant to an MCA Agreement.  These ACH Receivables included funds that would be generated in the future from the unlawful Affiliate Agreements.

**i.  Terms of Point 69's MCA Agreement with LPG**

53.      On or about July 19, 2021, Defendant entered into a Revenue Purchase Agreement with Debtor ("ARPA Agreement"). A true and accurate copy of the ARPA Agreement is attached hereto as **Exhibit 2** and incorporated herein by reference.

54.      The terms of the ARPA Agreement are:

Purchase Price:          $500,000

Purchased Amount:    $995,000

Net Funds Provided:  $300,000

Specified Percentage: 11%

Daily Remittance:       $10,000

Term:                          100 business days ($995,000 / $10,000)

55.      The stated effect of these terms is that in exchange for $500,000, Point 69 would receive $995,000 in 100 days *or a return of $495,000 on its $500,000 (99%)*.  On information and belief, the 11% Specified Percentage is just an estimate of the Daily Remittance as a percent of LPG's receivables.

56.     The actual effect of the ARPA Agreement is even more onerous because the agreement provides for additional fees, including an Underwriting Fee of a "minimum of $500.00 or up to 20% in fees of the purchase price" (i.e., $100,000) for underwriting and related expenses, as well as an Origination Fee of a "minimum of $500.00 or up to 20% in fees of the purchase price" (i.e., another $100,000) for origination and ACH setup. *Thus, the Net Funds Provided were only $300,000 for the $995,000 Point 69 would receive, giving Point 69 a return of $695,000 (231.6%) on its investment in 100 business days.*

57.     The transaction entered pursuant to the ARPA Agreement, constituted a loan with a usurious interest rate, that was not made in the ordinary course of business.

58.     The Debtor did not receive reasonably equivalent value in exchange for the Transfers because the underlying ARPA Agreement contained usurious interest rates, required the Debtor to repay over three times the amount of the money it actually borrowed over a short term, and/or withheld substantial sums from the amount loaned or paid to purchase receivables as "fees" such that the Debtor was obligated to repay amounts it never borrowed or obtained.  To the extent known to the Trustee, the specifics of the transactions are set out *supra* and are incorporated by reference herein.

59.     In addition, on information and belief, the loan made to the Debtor in the guise of Defendant's ARPA Agreement was usurious at an interest rate many times more than the enforceable rate permitted by usury laws and, in particular, the usury laws of California. The debt evidenced by the ARPA Agreement further constitutes an "unlawful debt" within the meaning of 18 U.S.C. § 1961(6); 18 U.S.C. § 1962(c); and 18 U.S.C. § 1962(d).  Accordingly, Plaintiff may recover treble damages, as well as attorney's fees pursuant to the ARPA Agreement.

60.     Under the terms of the ARPA Agreement, Point 69 was receiving repayment for its loan through debits to Debtor's bank accounts as reflected by the "Daily Remittance."  Point 69 was not responsible for collecting the Accounts Receivable and thus had not purchased the specified receivables but, instead, had made a loan.

61.     The discrepancy between the interest rate determined pursuant to the terms of the ARPA Agreement and the actual amount owed as a result of the Underwriting Fee being deducted

from the Purchase Price is further indication of a loan.

62.    Point 69 required personal guaranties from Debtor's principals, again indicating that Point 69 had not assumed the same risk of loss as the Debtor, and reflecting that the transaction was a loan.

63.    By entering into the ARPA Agreement, Debtor and Point 69 violated federal and state laws by selling unearned legal fees or funds there were supposed to be held in trust or used for the benefit of consumers.

64.    The effect of the ARPA Agreement and/or related transactions was to accomplish an unlawful purpose. Thus, the agreements may be declared illegal regardless of the intention of the parties. *Stockton Morris Plan Co. v. Cal. Tractor & Equip. Corp.*, 112 Cal. App. 2d 684, 690 (1952) (citing *Fewel & Dawes, Inc. v. Pratt*, 17 Cal. 2d 85, 91 (1941)). This remains true regardless of whether the contract has been performed. *Stevens v. Boyes Hot Springs Co.*, 113 Cal. App. 479, 483 (1931) (A contract by a corporation to purchase its own stock has the effect of illegally withdrawing and paying to a stockholder a part of the capital stock of the corporation and is illegal and void, regardless of the fact that the contract is fully performed by the sellers and partially performed by the corporation.); *Mansfield v. Hyde*, 112 Cal. App. 2d 133, 139 (1952), overruled, *Fomco, Inc. v. Joe Maggio, Inc.*, 8 Cal. Rptr. 459 (1960) (Where object of statute requiring licenses is to prevent improper persons from engaging in particular activity, or is for purpose of regulating occupation or business for protection of public, imposition of penalty amounts to prohibition against engaging in occupation or business without license, and contract made by unlicensed person in violation of statute is invalid.); *Firpo v. Murphy*, 72 Cal. App. 249, 252 (1925) (A contract to pay commissions to a real estate broker is illegal and he is not entitled to recover thereon where he fails to secure the license required by law to carry on his business.).

65.    Because the ARPA Agreement and/or related transactions violate federal and state laws, they are void, unenforceable, and subject to avoidance as fraudulent. Any alleged consideration provided to Debtor under the ARPA Agreement and/or related transactions was unlawful.

/ / /

12

66.    Moreover, even if the ARPA Agreement was not void for being unlawful, Debtor received less than reasonable equivalent value in exchange for incurring the purported obligations. As such, Debtor's obligations under the ARPA Agreement are avoidable as fraudulent transfers.

67.    Unlawful consideration is that which is: "(1) contrary to an express provision of law; (2) contrary to the policy of express law, though not expressly prohibited; or (3) otherwise contrary to good morals." Cal. Civ. Code § 1667. "If any part of a single consideration for one or more objects, or of several considerations for a single object, is unlawful, the entire contract is void." Cal. Civ. Code § 1608.

### ii.    Transfers to Defendants

68.    During the applicable reach-back period, the Debtor through Vulcan paid Point 69 the sum of at least $290,00.00 between July 31, 2021 and August 23, 2021, subject to proof at trial (the "Point 69 Payments").  A true and accurate list of the known payments made by Debtor to Point 69 is attached hereto as **Exhibit 3** and incorporated herein by reference.

69.    On information and belief, Debtor first transferred substantial amounts of funds, which were used to pay Point 69, from Debtor's bank accounts to the bank accounts of its affiliate Vulcan, and Point 69 then made "pulls" from Vulcan's accounts.

70.    As alleged above, the funds that Debtor used to pay Defendant through its affiliate Vulcan consisted of Client's Funds, including ACH Receivables, and were deposits from clients brought to Debtor by means of the illegal Affiliate Agreements, which funds were required to be held in Debtor's client trust accounts.

71.    As a result, Debtor's transfers of Accounts Receivable and the Point 69 Payments to Point 69 pursuant to the ARPA Agreement were fraudulent and must be set aside.

72.    Despite its receipt of these payments, Point 69 declared the Debtor to be in default and filed suit against the Debtor in the Circuit Court of the Seventeenth Judicial Circuit in and for Broward County, Florida on October 5, 2021 (the "Point 69 Suit") .

73.    Lorium was counsel for Point 69 and filed the Point 69 Suit against the Debtor.

74.    On or around July 11, 2022, the Debtor and Point 69 settled the Point 69 Suit pursuant to the terms stated in a Settlement Agreement and Mutual Release ("Settlement Agreement")

bearing that date.  A true and accurate copy of the Settlement Agreement is attached hereto as **Exhibit 4** and incorporated herein by reference.

75.    Pursuant to the Settlement Agreement, the Debtor agreed to wire $300,000 to Lorium in exchange for a full release. A true and accurate copy of an email from Jason Slatkin, Esq. of Lorium regarding the terms of the Settlement Agreement is attached hereto as **Exhibit 5** and incorporated herein by reference.

76.    During the applicable reach-back period, on or around July 22, 2022, the Debtor wired the sum of at least $300,000.00 to Lorium from Debtor's Chase bank account ending 3158 ("Wire").  A true and accurate copy of a list of the known payments made by Debtor to Lorium is attached hereto as **Exhibit 6** and incorporated herein by reference.

77.    As alleged above, the funds that Debtor used to pay Lorium consisted of Accounts Receivable, and were actually deposits from clients brought to Debtor by means of the illegal Affiliate Agreements that were required to be held in Debtor's client trust accounts.

78.    As a result, LPG's transfers of Accounts Receivable and the Wire to Lorium pursuant to the Settlement Agreement, totaling the amount of at least $300,000, were fraudulent and must be set aside.

79.    The Trustee does not know how Lorium disbursed the Wire following receipt.

80.    Hereinafter, the Affiliate Agreement, ARPA Agreement, Point 69 Payments, Settlement Agreement, and Wire are referred to collectively as the "Transfers".

**F.    LPG's Ponzi Scheme**

81.    The Ponzi Scheme Presumption exists in bankruptcy proceedings.

82.    The Ponzi Scheme Presumption can be utilized to establish a debtor's "intent to defraud future undertakers [investors] from the mere fact that a debtor was running a Ponzi scheme. Indeed, no other reasonable inference is possible.  A Ponzi scheme cannot work forever.  The investor pool is a limited resource and will eventually run dry.  The perpetrator must know that the scheme will eventually collapse as a result of the inability to attract new investors.  The perpetrator nevertheless makes payments to present investors, which, by definition, are meant to attract new investors.  He must know all along, from the very nature of his activities, that investors at the end

of the line will lose their money.  Knowledge to a substantial certainty constitutes intent in the eyes of the law," *cf. Restatement (Second) of Torts § 8A* (1963 & 1964), and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them.  *Kirkland v. Rund (In re EPD Inv. Co., LLC)*, 114 F.4th 1148, 1153 (9th Cir. 2024) (by definition Ponzi scheme is destined to fail and the swindler and their entities often end in bankruptcy or equitable receivership); *cf. Coleman Am. Moving Servs., Inc. v. First Nat'l Bank & Trust Co. (In re American Properties, Inc.)* 14 B.R. 637, 643 (Bankr. D. Kan. 1981) (intentionally carrying out a transaction with full knowledge that its effect will be detrimental to creditors is sufficient for actual intent to hinder, delay or defraud within the meaning of § 548(a)(1))."  *Merrill v. Abbott (In re Independent Clearing House Co.)* (D. Utah 1987) 77 B.R. 843, 860.  A trustee in bankruptcy is not required to show that an operator of a Ponzi scheme was subjectively aware his Ponzi scheme was destined to fail.  *In re EPD Inv. Co., LLC*, 114 F.4th at 1153 ("[a] trustee's action to recover assets fraudulently conveyed in the course of a Ponzi scheme does not require that the trustee also prove the Ponzi-scheme operator was subjectively aware his Ponzi scheme was destined to fail.").

83.    "But if all the debtor receives in return for a transfer is the use of the defendant's money to run a Ponzi scheme, there is nothing in the bankruptcy estate for creditors to share.  In fact, by helping the debtor perpetuate his scheme, the transfers exacerbate the harm to creditors by increasing the amount of claims while diminishing the debtor's estate.  In such a situation, the use of the defendant's money cannot objectively be called 'reasonably equivalent value.'"  *In re Independent Clearing House Co.* 77 B.R. at 859.  Therefore, "[t]he trustee can avoid the transfers if they were preferential or fraudulent.  Transfers to investors in a Ponzi scheme are preferential and fraudulent.  Therefore, they constitute "property of the estate," and the trustee can recover them.  *Id.* at 853 n.17 (citations omitted).

84.    Debtor was operating a Ponzi scheme that utilized affiliates and several other entities as investors to continue its unlawful business practices by using funds provided by current investors to attract new investors hoping for very high returns. Therefore, the Debtor was running a Ponzi scheme and the Ponzi Scheme Presumption can be utilized to infer that the Debtor had the intent to defraud investors within the meaning of 11 U.S.C. section 548(a)(1).  This is evidenced by the Court

in this Bankruptcy Case declaring that Debtor was operating a Ponzi scheme when it stated the following:

> It is important to note that this Court has never received any significant and trustworthy evidence that Debtor accomplished meaningful results for its clients, but only anecdotal examples of viable success for its clients.  By reviewing the Estate's claims register, there is evidence of consumer claims for the fraud and demanded but undelivered refunds of approximately $500 million. There is ample evidence that the pre-petition Debtor never placed the collected funds into an attorney-client trust account, and that Debtor or its principals simply looted the payments received through the client automatic withdrawals, stiffing both the clients and outside attorneys who may have been working on client cases with the hopes of being paid.  There is also evidence before the Court that Debtor was running a Ponzi scheme and paying some outside (or "network") attorneys with funds obtained from new clients.  In this case, it appears that some of the "lenders" may have been serving as "investors," hoping for very high returns before "the music stopped."  The Ninth Circuit has recently explained, "[b]y definition, a Ponzi scheme is destined to fail because the pool of available investors is not limitless. When the Ponzi scheme operator's pool of investors inevitably runs dry, the scheme collapses and the swindler and their entities often end up in bankruptcy or equitable receivership.  *See generally* David R. Hague, Expanding the Ponzi Scheme Presumption, 64 DePaul L. Rev. 867 (2015).  In bankruptcy, the court-appointed trustee is tasked with taking immediate control of the entity, ceasing ongoing fraudulent activity, locating and collecting assets for the bankruptcy or receivership estate, and achieving a final, equitable distribution of the remaining assets. *See* 11 U.S.C. § 704;  *Kirkland v. Rund (In re EPD Inv. Co., LLC)*, 2024 U.S. App. LEXIS 21363, at *15 (9th Cir. Aug. 23, 2024). Finally, there is evidence that Debtor was encumbering (or as some creditors assert, "double or triple selling") their accounts or receivables to multiple lenders.  With respect to Greyson's requested Administrative Claim [Dk. 676], and as more fully described in the concurrently entered order denying the claim, there has been no evidence presented that any work allegedly performed by Greyson assisted any clients or added any value to the Estate.

*See, Case 8:23-bk-10571-SC*, Doc 1545 n. 5.

85.    Moreover, since the Transfers were made with the intent to further the Ponzi scheme, the Debtor did not receive an objectively reasonable equivalent value for the Transfers, and the Trustee can avoid the Transfers because they were fraudulent.

### G.    LPG's Prepetition Creditors

86.    Debtor was insolvent when each Transfer was made. This insolvency is evidenced in part by the fact that 14 separate UCC-1 statements were of record securing debts of the Debtor as of September 1, 2022. These statements remained unreleased as of the Petition Date. These statements either reflected secured liens against the Debtor's assets then owned or thereafter acquired, or provided evidence of the assignment or sale of substantial portions of the Debtor's future income.  Debtor's insolvency is an adjudicated fact based on the Court's finding of insolvency entered in other adversary proceedings pending before the Court.  *See, e.g.*, Case No. 8:23-bk-10571-SC; Adv. No. 8:24-ap-01002-SC [Adv. Docket No. 28] (finding that "Debtor was insolvent or rendered insolvent at the time of the transfers made to Defendant").

87.    Plaintiff directs Defendant to the Order Denying Greyson's Motion to Vacate the Preliminary Injunction entered as Bankr. Docket No. 1545 ("Order") where the Court found "it is clear to this Court that Debtor, since its pre-petition inception (and through the time of the appointment of the Chapter 11 Trustee) was, in the Court's opinion operating a criminal enterprise" and that "[t]here is also evidence before the Court that the Debtor was running a Ponzi scheme and paying some outside (or 'network') attorneys with funds obtained from new clients." Order p. 3, l. 11-13; p. 4, l. 14-15.  Insolvency is presumed as a matter of law if the debtor operated a Ponzi scheme.  *See, e.g., Glob. Money Mgmt., L.P. v. McDonnold*, No. 06CV34, 2008 U.S. Dist. LEXIS 128733, at *15 (S.D. Cal. Feb. 27, 2008) (concluding that "if a Ponzi scheme is proven, then the debtor is proven insolvent from the time of its inception").

88.    When the Transfers were made, these prior UCC-1 statements secured the repayment of the following claimed amounts that are currently known to Trustee and are allegedly owed by the Debtor: (i) $2,374,004.82 owed to Fundura Capital Group as evidenced by Proof of Claim No. 335 purportedly secured by a UCC statement filed on or about May 19, 2021; (ii) approximately $15 million dollars owed to MNS Funding, LLC as evidenced by Proof of Claim No. 1060 purportedly secured by a UCC statement filed on or about May 28, 2021; (iii) approximately $5,000,000 owed to Azzure Capital, LLC as evidenced by Proof of Claim No. 127 secured by a UCC statement filed on or about May 28, 2021; and (iv) approximately $1.5 million dollars owed to Diverse Capital,

LLC purportedly secured by UCC statements filed on or about September 15, 2021, and December 1, 2021.[1]

89.    As alleged above, LPG was borrowing against its assets and future income, often on unfavorable terms, not only to finance operations at LPG, but also to pay the fees owed to the marketing affiliates for providing consumer clients and to pay other loans to creditors that were in default or about to be in default as part of Diab's scheme to keep LPG creditors at bay for a long as possible until he could transfer LPG's assets, client files, Client Funds, and ACH Receivables to other entities under his control. Pursuant to the agreements with the marketing companies, significant percentages of future payments were already promised to be paid to the marketing affiliates from whatever future income the Debtor would receive. And, of course, the payments LPG received in the form of ACH Receivables were also trust funds paid to LPG by its law firm clients, subject to return of funds in the event of a request for refund or termination of the representation before LPG had earned the funds. In this regard, except to the extent earned, the ACH Receivables also represented a liability of the Debtor.

90.    In addition, on Debtor's Schedule E/F [Bankr. Docket No. 33], Debtor scheduled 11 unsecured creditors with priority unsecured claims totaling $374,060.04. These priority unsecured creditors include Indiana Dept. of Revenue, Dept. of Labor and Industries, Arizona Dept. of Economic Security, Arkansas Dept. of Finance & Admin., California Franchise Tax Board, Georgia Dept. of Labor, Internal Revenue Service, Mississippi Dept. of Revenue, Nevada Dept. of Taxation, Utah State Tax Commission, and Wisconsin Dept. of Revenue (collectively, "Priority Unsecured Creditors").

91.    Another group of creditors that Debtor listed on its Schedule E/F [Bankr. Docket No. 33] are nonpriority unsecured creditors. Those 58 creditors have scheduled claims totaling $141,439,158.05 and include Ajilon; Anthem Blue Cross; Azevedo Solutions Groups, Inc.; Carolina Technologies & Consulting Invoice; Collaboration Advisors; Credit Reporting Service Inc.; CT Corporation – Inv.; Debt Pay Pro; Document Fulfillment Services; EnergyCare, LLC; Exela

---

[1] Trustee reserves all rights, claims, and defenses with respect to these and any other purported secured or unsecured claims.

Enterprise Solutions; First Legal Network, LLC; GHA Technologies Inc.; Harrington Electric, Inc.; Imagine Reporting; Juize, Inc.; Krisp Technologies, Inc.; Liberty Mutual; Marc Lemauviel – Allegra; MarkSYS Holdings, LLC; Netsuite-Oracle; Pitney Bowes; Rapid Credit, Inc.; SBS Leasing A Program of De Lage Landen; Security Solutions; Sharp Business Systems; Streamline Performance, Inc.; Thomson Reuters; Twilio, Inc.; Nationwide Appearance Attorneys; Executive Center, LLC; Outsource Accelerator, Ltd.; TaskUs Holdings, Inc.; Marich Bein, LLC; Validation Partners; MC DVI Fund 1, LLC; MC DVI Fund 2, LLC; Debt Validation Fund II, LLC; Tustin Executive Center; LexisNexus; JP Morgan Chase; Business Centers of America; Michael Schwartz; Anibal Colon Jr.; Kathleen Lacey; David Ulery; Kimberly Birdsong; Kevin Carpenter; Karen Suell; Gloria Eaton; Carolyn Beech; Debra Price; Kenneth Topp; Darcey Williamson, Trustee; James Hammett; Johnny Rizo; Beverly Graham; Kathleen Scarlett; and Geneve and Myranda Sheffield (collectively, "Nonpriority Unsecured Creditors" and, together with the Secured Creditors and Priority Unsecured Creditors, "Prepetition Creditors").

92.     As of the date this complaint was drafted, approximately 5,771 claims have been filed with the bankruptcy Court. While Trustee has not reviewed all claims as of the date of this complaint, and reserves all rights to object to those claims, the total amount is in excess of approximately $717,507,462.29.

## **FIRST CLAIM FOR RELIEF**

**Count I - Avoidance, Recovery, and Preservation of Actual Fraudulent Transfers**

**[11 U.S.C. §§ 548(a)(1)(A), 550, and 551]**

93.     Plaintiff realleges and incorporates here by reference each and every allegation contained in paragraphs 1 through 92 as though set forth in full.

94.     The Affiliate Agreement, ARPA Agreement, and all or a portion of the Transfers occurred within the two years prior to the Petition Date.

95.     On or after the date that any such agreements were entered or executed and the Transfers were made, entities to which Debtor was or became indebted include the Prepetition Creditors.

96.     The Transfers happened while Debtor was insolvent or rendered Debtor insolvent.

97.     Despite Debtor's obligation to the Prepetition Creditors, Debtor continued to pay Point 69 sums received from consumers under such Affiliate Agreement, which constitutes an illegal capping agreement between Defendant and Debtor. Any obligation of the Debtor arising from such agreement is also avoidable as fraudulent.

98.     Despite Debtor's obligation to the Prepetition Creditors, Debtor continued to sell or transfer portions of its accounts receivable to Defendant, which is illegal under federal and state laws.

99.     The Transfers were made with actual intent to hinder, delay, or defraud creditors of Debtor.

100.    The Debtor was operating a Ponzi scheme and the Ponzi Scheme Presumption can be utilized to infer the Debtor's actual intent to defraud within the meaning of 11 U.S.C. section 548(a)(1).

101.    The Debtor's conduct was done with oppression, fraud, and malice, as defined in Civil Code section 3294, entitling the Trustee to, in addition to the actual damages, exemplary or punitive damages for making an example of the Debtor and to punish the Debtor.

102.    The Affiliate Agreement, ARPA Agreement, and the Transfers of Debtor's funds are avoidable as fraudulent pursuant to 11 U.S.C. §§ 548(a)(1)(A), 550, and 551, and the common law tort of intentional fraudulent transfers by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against the Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

103.    The Affiliate Agreement, ARPA Agreements, and Transfers should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(A) and under the common law tort of intentional fraudulent transfers, and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

/ / /

/ / /

/ / /

20

## SECOND CLAIM FOR RELIEF

### Count II - Avoidance, Recovery, and Preservation of

### Constructive Fraudulent Transfers Against Defendant

### [11 U.S.C. §§ 548(a)(1)(B), 550, and 551]

104.    Plaintiff realleges and incorporates here by reference each and every allegation contained in paragraphs 1 through 103 as though set forth in full.

105.    The Affiliate Agreement, ARPA Agreement, and all or a portion of the Transfers occurred within the two years prior to the Petition Date.

106.    On or after the date that such agreements were executed and such Transfers were made, entities to which Debtor was or became indebted include the Prepetition Creditors.

107.    The Transfers happened while Debtor:

    a.  was insolvent or became insolvent as a result;

    b.  was engaged or was about to engage in a transaction for which any property remaining with Debtor was of unreasonably small capital; or

    c.  intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

108.    Because the referrals from Defendant to Debtor are illegal under federal and state law, they are void and subject to avoidance as fraudulent. Any purported consideration constitutes unlawful consideration, which cannot constitute reasonably equivalent value. Thus, at the time the agreements were executed and the Transfers made, Debtor received less than reasonably equivalent value.

109.    Furthermore, the Debtor did not receive the reasonably equivalent value of the Transfers to Point 69 because by using Point 69's money to run a Ponzi scheme there is nothing in Estate for the creditors to share. Rather, the Transfers exacerbated the harm to creditors by increasing the amount of claims while diminishing the Debtor's Estate. In this situation, the use of Point 69's money to further the Debtor's Ponzi scheme cannot be consideration for the Transfers and cannot objectively be called reasonably equivalent value.

110.    Therefore, the Defendant was acting as an investor in the Debtor's Ponzi scheme.

Any transfers made to the Defendant can be avoided by the Plaintiff since the Transfers are preferential and fraudulent such that they constitute property of the Estate in which the Plaintiff can recover.

111.    The Affiliate Agreement, ARPA Agreement, and the Transfers should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(B), and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

### THIRD CLAIM FOR RELIEF

**Count III - Avoidance, Recovery, and Preservation**

**of Actual Fraudulent Transfers Against Defendant**

**[11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.04(a), 3439.04(b), and 3439.07]**

112.    Plaintiff realleges and incorporates here by reference each and every allegation contained in paragraphs 1 through 111 as though set forth in full.

113.    The Affiliate Agreement, ARPA Agreement, and all or a portion of the Transfers occurred within the four years prior to the Petition Date.

114.    On or after the date that such agreements were entered and such Transfers were made, entities to which Debtor was or became indebted include the Prepetition Creditors.

115.    Despite Debtor's obligation to the Prepetition Creditors, Debtor continued to pay Point 69 sums received from consumers under the Affiliate Agreement, which constitutes an illegal capping agreement between Defendant and Debtor.

116.    The Transfers happened while Debtor was insolvent or Debtor became insolvent shortly after the Transfers were made as is evidenced by the filing of the voluntary petition.

117.    The value of the consideration received by Debtor for such Transfers was not reasonably equivalent to the value of the Transfers because the Transfers were used to further assist Debtor in its Ponzi scheme.

118.    Because the referrals from Defendant to Debtor are illegal under federal and state law, they are void and subject to avoidance as fraudulent. Any purported consideration constitutes unlawful consideration, which cannot constitute reasonably equivalent value. Thus, at the time the

agreements were executed and the Transfers made, Debtor received less than reasonably equivalent value.

119.    The Transfers were made with actual intent to hinder, delay, or defraud creditors of Debtor.

120.    The Debtor was operating a Ponzi scheme and the Ponzi Scheme Presumption can be utilized to infer the Debtor's actual intent to defraud within the meaning of 11 U.S.C. section 548(a)(1).

121.    The Debtor's conduct was done with oppression, fraud, and malice, as defined in Civil Code section 3294, entitling the Trustee to, in addition to the actual damages, exemplary or punitive damages for making an example of the Debtor and to punish the Debtor. The Affiliate Agreement, the ARPA Agreement, and the Transfers of Debtor's funds are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and Cal. Civ. Code §§ 3439.04(a), 3439.04(b), and 3439.07, and the common law tort of intentional fraudulent transfers by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against the Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

122.    Accordingly, the Affiliate Agreement, the ARPA Agreement, and the Transfers should be avoided as fraudulent under 11 U.S.C. §§ 544(b) and Cal. Civ. Code §§ 3439.04(a), 3439.04(b), and 3439.07, and under the common law tort of intentional fraudulent transfers, and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551 and Cal. Civ. Code § 3439.07.

**<u>FOURTH CLAIM FOR RELIEF</u>**

**Count IV - Avoidance, Recovery, and Preservation of**

**Constructive Fraudulent Transfers Against Defendant**

**[11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.05, and 3439.07]**

123.    Plaintiff realleges and incorporates here by reference each and every allegation contained in paragraphs 1 through 122 as though set forth in full.

124.    The Affiliate Agreement, the ARPA Agreement, and all or a portion of the Transfers

occurred within the four years prior to the Petition Date.

125.    The Transfers happened while Debtor:

    a.    was insolvent or became insolvent as a result;

    b.    was engaged or was about to engage in a transaction for which any property remaining with Debtor was of unreasonably small capital; or

    c.    intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

126.    Because the referrals from Point 69 to Debtor are illegal under federal and state law, the agreements are void and subject to avoidance as fraudulent. Any purported consideration constitutes unlawful consideration, which cannot constitute reasonably equivalent value. Thus, at the time the agreements were executed and the Transfers made, Debtor received less than reasonably equivalent value.

127.    Furthermore, the Debtor did not receive the reasonably equivalent value of the Transfers to the Point 69 because by using Point 69's money to run a Ponzi scheme there is nothing in Estate for the creditors to share. Rather, the Transfers exacerbated the harm to creditors by increasing the amount of claims while diminishing the Debtor's Estate. In this situation, the use of Point 69's money to further the Debtor's Ponzi scheme cannot be consideration for the Transfers and cannot objectively be called reasonably equivalent value.

128.    The Defendant was therefore acting as an investor in the Debtor's Ponzi scheme and any Transfers made to the Defendant can be avoided by the Plaintiff since the Transfers to the Defendant are preferential and fraudulent such that they constitute property of the Estate in which the Plaintiff can recover.

129.    The Affiliate Agreement, the ARPA Agreement, and the Transfers of Debtor's funds are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and Cal. Civ. Code §§ 3439.05 and 3439.07 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against the Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

130.    Accordingly, the Affiliate Agreement, the ARPA Agreement, and the Transfers

should be avoided as fraudulent under 11 U.S.C. §§ 544(b) and Cal. Civ. Code §§ 3439.05 and 3439.07, and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551 and Cal. Civ. Code § 3439.07.

**FIFTH CLAIM FOR RELIEF**

**Count V - Turnover of Estate Property Against Defendant**

**[11 U.S.C. § 542]**

131.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 130 as though set forth in full.

132.    Defendant has possession or control over property of the Estate in the form of the Transfers made pursuant to illegal and unenforceable agreements.

133.    The Transfers are not of inconsequential value to the Estate.

134.    The funds that are the subject of the Transfers are paramount to Debtor's ability to pay creditors.

135.    Accordingly, Trustee is entitled to a judgment for turnover of the Transfers pursuant to 11 U.S.C. § 542.

**SIXTH CLAIM FOR RELIEF**

**Count VI - Aiding and Abetting Against Lorium**

**[11 U.S.C. §§ 544, 550, 551; Cal. Civ. Code §§ 3439.04(a), 3439.04(b), and 3439.07]**

136.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 135 as though set forth in full.

137.    While the Wire was paid to Defendant Lorium, Lorium may not meet the legal definition of a transferee pursuant to applicable law.  This might prohibit the recovery of the Wire from Lorium.  In the alternative, Plaintiff alleges that Lorium is liable to the Debtor as it aided and abetted in the making of the fraudulent and/or voidable transfers that composed the Wire.

138.    Having filed suit against the Debtor for its client Point 69,  Lorium knew that different parties were obligated to Point 69.

139.    Lorium, based upon information and belief and based on the Ponzi Scheme Presumption, had knowledge of the fraudulent transactions, transfers and illegal agreements that

were used to perpetuate and conceal the Ponzi scheme and fraudulent transfers.

140.    Lorium, with the foregoing knowledge, intended to, and did, help the Debtor in perpetuating and concealing the Ponzi scheme and fraudulent transfers of money.

141.    Lorium, upon information and belief, assisted, and did actually engage in, the commission of fraud and the Ponzi scheme by coordinating, facilitating, and directing payments and transfers of monies and executing documents in furtherance of concealing the true nature of the fraudulent and criminal activity related to the Ponzi scheme.

142.    Lorium knew that the Debtor was a law firm who was obligated to escrow client funds until earned pursuant to applicable law.

143.    Lorium's receipt of the Wire aided and abetted the Debtor's Transfers to or for the benefit of Point 69 and to the detriment of the Debtor's creditors and clients.

144.    The injuries to Plaintiff, the Debtor's Estate and to its creditors directly, proximately and reasonably foreseeably resulting from and caused by violations of Sections 6151 and 6155 of the California Business and Professional Code include, without limitation, hundreds of thousands of dollars in improperly transferred and acquired monies.

145.    Plaintiff and the Debtor's Estate also suffered damages by incurring attorney's fees and costs associated with the prosecution of Lorium's unlawful activities.

## **RESERVATION OF RIGHTS**

Plaintiff reserves the right to bring all other claims or causes of action that Plaintiff may have against Defendants, on any and all grounds, as allowed under the law or in equity, including but not limited to, those claims not known by the Trustee at this time but that he may discover during the pendency of this adversary proceeding.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for a judgment as follows:

**On The First, Second, Third, and Fourth Claims for Relief:**

1.    Avoiding, recovering, and preserving the Transfers against Defendants;

**On The First and Third Claims for Relief:**

2.    Awarding punitive and exemplary damages according to proof;

**On the Fifth Claim for Relief:**

3.      Ordering Defendants to immediately turn over the Transfers;

**On the Sixth Claim for Relief:**

4.      Awarding Plaintiff compensatory damages in an amount to be determined at trial;

**On All Claims for Relief:**

5.      Awarding costs of suit;

6.      Awarding punitive damages;

7.      Awarding attorneys' fees;

8.      Awarding pre-judgment interest at the maximum legal rate running from the date of the Complaint to the date of judgment herein;

9.      Awarding post-judgment interest at the maximum legal rate running from the date of judgment herein until the date the judgment is paid in full, plus costs;

10.     Requiring Point 69 and Lorium to pay forthwith any judgment awarded herein; and

11.     Granting Plaintiff such other and further relief as the Court deems just and proper.

Dated: March 14, 2025

Respectfully submitted,

DINSMORE & SHOHL LLP

By: _/s/ Matthew J. Stockl_____
        Christopher Celentino
        Yosina M. Lissebeck
        Matthew J. Stockl

*Special Counsel to Richard A. Marshack, Trustee of the LPG Liquidation Trust*

# EXHIBIT 1

1   CHRISTOPHER B. GHIO (259094)
    christopher.ghio@dinsmore.com
2   CHRISTOPHER CELENTINO (131688)
    christopher.celentino@dinsmore.com
3   YOSINA M. LISSEBECK (201654)
    yosina.lissebeck@dinsmore.com
4   DINSMORE & SHOHL LLP
5   655 West Broadway, Suite 800
    San Diego, California 92101
6   Tele:  619.400.0500
    Fax:   619.400.0501
7

8   Sarah S. Mattingly (Ky. Bar 94257)
    sarah.mattingly@dinsmore.com
9   DINSMORE & SHOHL, LLP
    101 S. Fifth Street, Suite 2500
10  Louisville, Kentucky 40202
    Tele: 859-425-1096
11  Fax: 502-585-2207
12  (Admitted pro hac vice)

13  Special Counsel to Richard A. Marshack

14          UNITED STATES BANKRUPTCY COURT

15     CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

16  In Re                          Case No: 23-bk-10571-SC

17                                 Chapter 11

18                                 **ORDER GRANTING MOTION FOR**
    The Litigation Practice Group P.C.,   **ENTRY OF PROTECTIVE ORDER AND**
19                                 **THE PROTECTIVE ORDER**
            Debtor(s),
20

21                                 Date:    May 23, 2024
                                   Time:    1:30 p.m.
22                                 Judge:   Hon. Scott C. Clarkson
23                                 Place:   Courtroom 5C (via Zoom)[1]
                                            411 West Fourth Street
24                                          Santa Ana, CA 92701
25

26

27  _____

28  [1] Video and audio connection information for each hearing will be provided on Judge Clarkson's
    publicly posted hearing calendar, which may be viewed online at:
    http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

                                          Exhibit 1, page 29

FILED & ENTERED

JUN 03 2024

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY mccall     DEPUTY CLERK

The Court has read and considered the Notice of Motion and Motion for Entry of Protective Order (the "Motion") filed by Richard A. Marshack, in his capacity as the Chapter 11 Trustee (the "Trustee") of the Bankruptcy Estate ("Estate") of The Litigation Practice Group P.C., on May 2, 2024, pursuant to Federal Rule of Bankruptcy Procedure 7026 and Federal Rule of Civil Procedure 26(c)(1), as Dk. No. 1164 ("Motion"), and has found good cause to grant the Motion.

IT IS HEREBY ORDERED that:

1.      The Motion is granted;

2.      The below Protective Order shall apply to any contested matter arising

in the main bankruptcy case and in all adversary proceedings filed by or against Trustee, present and future; and

3.      Govern the discovery conducted therein.

## PROTECTIVE ORDER

**1.      DEFINITIONS**

1.1      "Confidential Information" as used in this Protective Order shall mean documents and other information (regardless of how generated, stored or maintained) that a Party or non-party reasonably believes to contain or reflect non-public financial or business information, bank records, financial records, such as social security numbers, non-public financial or personal information of a Party or non-party, account numbers, sensitive digital information and identifiers, information subject to confidentiality agreements or provisions other than this Protective Order, and other non-public research, development, or commercial information that derives value or avoids injury by virtue of not being known to the public.

1.2      This "Action" is defined and hereby means any contested matter arising in the main bankruptcy case and in all adversary proceedings filed by or against Trustee, present and future.

1.3      "Designating Party" means a Party or non-party that designates Confidential Information during the Action.

1.4      "Receiving Party" means a Party that receives Confidential Information during the Action.

1      1.5   "Party" or "Parties" means person or entity subject to this Protective Order.

2      **2.**      **SCOPE OF THIS PROTECTIVE ORDER**

3      2.1   Unless otherwise ordered, this Protective Order shall govern certain documents and other products of discovery obtained in the Action from the Parties there to, and from third parties. As well as certain information copied or derived therefrom, excerpts, summaries or compilations thereof, including, but not limited to, documents voluntarily exchanged as part of early settlement discussions, documents produced pursuant to initial disclosures, requests authorized by the Federal Rules of Civil Procedure made applicable herein by the Federal Rules of Bankruptcy Procedure, answers to interrogatories, deposition transcripts, responses to requests for production, responses to requests for admission, subpoenas, affidavits, declarations, expert reports, and other such material and information as may be produced during the course of the Action and designated as Confidential Information.

**3.**      **DESIGNATION OF CONFIDENTIAL INFORMATION**

3.1   This Protective Order shall govern the production and handling of any Confidential Information in this Action. Any Party or non-party who produces Confidential Information in this Action may designate it as "Confidential" or "Attorneys' Eyes Only" consistent with the terms of this Protective Order. Whenever possible, the Designating Party must designate only those portions of a document, written discovery responses, deposition, transcript, or other material that contain the Confidential Information and refrain from designating entire documents. Regardless of any designations made hereunder, the Designating Party is not otherwise restricted from use or disclosure of its Confidential Information outside of this Action or for any business purposes. In addition, any Party may move to modify or seek other relief from any of the terms of this Protective Order if it has first tried in writing and in good faith to resolve its needs or disputes with the other Parties or Party as the case may be under the terms of this Protective Order. Further, nothing in this Protective Order shall prevent a Party from redacting documents consistent with the Federal Rules of Civil Procedure and utilizing the documents as needed through-out the Action.

3.2   <u>Application to Non-Parties:</u> Before a non-party is given copies of documents or materials designated as Confidential Information or Attorneys' Eyes Only as permitted hereunder, it

3

must first sign an acknowledgment to be bound to these terms that is attached hereto as <u>Exhibit</u> A; if it fails to do so, the Parties to this Action must resolve any such dispute before making disclosure of designated information as permitted hereunder to the non-party. If a non-party wishes to make designations hereunder, it must first sign attached <u>Exhibit A.</u>

   **3.3** <u>Timing and Provisional Protection:</u> Designations of Confidential Information may be made at any time. To avoid potential waiver of protection hereunder, the Designating Party should designate documents or materials containing Confidential Information at the time of production or disclosure, including on the record during the taking of any deposition. Deposition testimony will be deemed provisionally protected for a period of thirty (30) days after the transcript is released to the Parties by the court reporter, although the Parties may agree at any time to different timelines of provisional protection of information as Confidential or Attorneys' Eyes Only as part of one or more specific depositions. To retain any designations beyond the provisional period, a Designating Party must designate specific pages and lines of deposition testimony before the provisional period has expired. Such designations must be made in writing so that all counsel and court reporters may append the designation to all copies of the transcripts.

   **3.4** <u>Manner of Designation:</u> Confidential Information may be designated hereunder in any reasonable manner or method that notifies the Receiving Party of the designation level and identifies with specificity the information to which the designation applies. If made verbally, the Designating Party must promptly confirm the designation in writing. Whenever possible, the Designating Party should stamp, affix, or embed a legend of "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY" on each designated page of the document or electronic image that contains Confidential Information.

   **4.**  **CHALLENGES TO DESIGNATED INFORMATION**

   **4.1** In the event that a Receiving Party disagrees at any time with any designation(s) made by the Designating Party, the Receiving Party must first try to resolve such challenge in good faith on an informal basis with the Designating Party. The Receiving Party must provide written notice of the challenge and the grounds therefor to the Designating Party, who must respond in writing to the challenge within fifteen (15) days. At all times, the Designating Party carries the burden of establishing the propriety of the designation and protection level. Unless and until the challenge is

4

resolved by the Parties or ruled upon by the Court, the designated information shall remain protected under this Protective Order. The failure of any Receiving Party to challenge a designation does not constitute a concession that the designation is proper or an admission that the designated information is otherwise competent, relevant, or material.

## 5.    LIMITED ACCESS/USE OF PROTECTED INFORMATION

5.1    <u>Restricted Use:</u> Information that is produced or exchanged in the course of the Action and designated under this Protective Order may be used for preparation for trial and preparation for any appeal of any and all matters in the Action, as well as related settlement negotiations, and for no other purpose, without the written consent of the Designating Party. No Confidential Information may be disclosed to any person except in accordance with the terms of this Protective Order, unless the parties are co-counsel or have entered into joint defense agreements. All persons in possession of Confidential Information agree to exercise reasonable care with regard to the custody, use, or storage of such information to ensure that its confidentiality is maintained. This obligation includes, but is not limited to, the Receiving Party providing to the Designating Party prompt notice of the receipt of any subpoena that seeks production or disclosure of any designated information and consulting with the Designating Party before responding to the subpoena. Any use or disclosure of Confidential or Attorneys' Eyes Only information in violation of the terms of this Protective Order may subject the disclosing person or party to sanctions.

5.2    <u>Access to "Confidential" Information:</u> The Party(ies) and all persons subject to this Protective Order agree that information designated as "CONFIDENTIAL" may only be accessed or reviewed by the following:

a)    The Court, its personnel, and court reporters;

b)    Counsel of record, or co-counsel for any Party, or other party that has entered into a joint defense agreement in the Action and their employees who assist counsel of record, or co-counsel in the Action and are informed of the duties and obligations imposed hereunder;

c)    The Parties, including their clients, agents and employees who are assisting or have reason to know of the Action;

/ / /

d)      Experts or consultants employed by the Parties or their counsel, or co-counsel, for purposes of an Action, so long as each such expert or consultant has signed attached Exhibit A; and

e)      Other witnesses or persons with the Designating Party's consent or by court order.

5.3      Access to "Attorneys' Eyes Only" Designations: The Parties and all persons subject to this Protective Order agree that information designated as "ATTORNEYS' EYES ONLY" may only be accessed or reviewed by the following:

a)      The Court, its personnel, and court reporters;

b)      Counsel of record, or co-counsel for any Party, or other party that has entered into a joint defense agreement in the Action and their employees who assist counsel of record in the Action and are informed of the duties hereunder;

c)      In-house counsel for any Party in the Action and Richard A. Marshack, as Chapter 11 Trustee of The Litigation Practice Group P.C. who is informed of the duties and obligations imposed hereunder;

d)      Experts or consultants employed by the Parties or their counsel, or co-counsel for purposes of the Action,  and so long as each such expert or consultant has signed attached Exhibit A; and

e)      Other witnesses or persons to whom the Designating Party agrees in advance of disclosure or by court order.

5.4      Non-Waiver Effect of Designations: Neither the taking of, nor the failure to take, any action to enforce the provisions of this Protective Order, nor the failure to object to any designation, will constitute a waiver of any Party(ies)'s claim or defense in the Action or any other action or proceeding, including, but not limited to, a claim or defense that any designated information is or is not Confidential, is or is not entitled to particular protection, or embodies or does not embody information protectable by law.

5.5      In-Court Use of Designated Information: If information designated under this Protective Order will or may be offered in evidence at a hearing or trial related to any matter in the Action, then the offering party must give advance notice to the party or non-party that designated prior to offering the information so that any use or disclosure may be addressed in accordance with

6

the Court's case-management or other pre-trial order, or by a motion *in limine.* Nothing in this Protective Order shall be construed as a waiver by a Party of any objections that may be raised as to the admissibility at trial of any evidentiary materials.

**6.    CLAW-BACK REQUESTS**

6.1    <u>Failure to Make Designation:</u>  If, at any time, a Party or non-party discovers that it produced or disclosed Confidential Information without designation, it may promptly notify the Receiving Party and identify with particularity the Confidential Information to be designated and the level of designation (the claw-back notification). The Receiving Party may then request substitute production of the newly-designated information. Within thirty (30) days of receiving the claw-back notification, the Receiving Party must: (1) certify to the Designating Party it has appropriately marked or, if substitute production has been requested, destroyed all unmarked copies that it received, made, and/or distributed; and (2) if it was practicably unable to mark or destroy any information because disclosures occurred while the Receiving Party was under no duty of confidentiality under the terms of this Protective Order regarding that information, the Receiving Party must reasonably provide as much information as practicable to aid the Designating Party in protecting the information, consistently with the Receiving Party's attorney-client, work-product, and/or trial-preparation privileges.

6.2    <u>Inadvertent Production of Privileged Information:</u> If, at any time, a Party discovers that it produced information that it reasonably believes is subject to protection under the attorney/client, work-product, or trial-preparation privileges, then it must promptly notify each Receiving Party of the claim for protection, the basis for it, amend its privilege log accordingly, and comply with Fed. R. Civ. P. 26(b)(5). Whenever possible, the producing party must produce substitute information that redacts the information subject to the claimed protection. The Receiving Party must thereupon comply with Fed. R. Civ. P. 26(b)(5)(B) as to the information subject to the claimed protection.

/ / /

/ / /

/ / /

7

**7.     DURATION/CONTINUED RESTRICTIONS**

7.1     <u>Handling of Designated Information Upon Conclusion of the Main Bankruptcy Case:</u> Upon conclusion of the Main Bankruptcy Case, by way of dismissal or closing of the case, the Designating Party(ies) is/are responsible for ensuring that any Party or person to whom the Designating Party shared or disclosed designated information in any of the matters under the Action returns or destroys all of its copies, regardless of the medium in which it was stored. No witness or Party may retain designated information that it received from any other Party or non-party under this Protective Order; only counsel of record, or co-counsel, are the authorized agents who may retain one copy for their respective legal files, and who must also describe to the Designating Party the extra steps taken to protect its legal file containing paper and/or electronic copies of the designated information so that it is not accessed, used, or disclosed inconsistently with the obligations under this Protective Order. This provision does not apply to the Court or Court staff. Moreover, this provision does not apply to Trustee, who may retain and use – consistent with this Order – Confidential Information received in any Action during the entirety of the Bankruptcy.

7.2     <u>Continued Restrictions Under this Protective Order:</u> The restrictions on disclosure and use of Confidential Information shall survive the conclusion of the Bankruptcy case and any matter in the Action.

**8.     PRIVILEGED OR PROTECTED INFORMATION**

8.1     Nothing in this Protective Order shall require disclosure of information that is protected by the attorney-client privilege, the work-product protection, or any other legally cognizable privilege (a "Privilege or Protection").  If information subject to a claim of Privilege or Protection is inadvertently produced, pursuant to Federal Rule of Evidence 502(d) such production shall not constitute a waiver of, or estoppel as to, any claim of Privilege or Protection for such information or any other information that may be protected from disclosure by a Privilege or Protection in any proceeding.

8.2     If a Party receives a document that appears to be subject to a Privilege or Protection, then it shall refrain from examining the document any more than is essential to ascertain if it is privileged or protected and shall promptly notify the producing Party in writing that the receiving

8

Party possesses material that appears to be subject to a Privilege or Protection. The producing Party shall have seven (7) days after receiving such notice to assert a Privilege or Protection over the identified material. If the producing Party does not assert a claim of Privilege or Protection within the seven (7)-day period, the material in question shall be deemed not privileged or protected.

8.3    If a producing Party has produced a document subject to a claim of Privilege or Protection, upon written request by the producing Party, the document for which a claim of Privilege or Protection is made shall be sequestered or destroyed to the extent reasonably practicable, and the receiving Party shall not use the document for any purpose other than in connection with analyzing or disputing a claim of Privilege or Protection or in connection with a motion to compel the production of the document.

8.4    The receiving Party sequestering or destroying such material may then move the Court for an order compelling production of the material. The applicable producing Party bears the burden of establishing the applicable Privilege or Protection of any clawed-back document or information as and to the same extent that it would have borne such burden had it not produced the document or information.  Nothing in this Protective Order shall limit the Court's right or any receiving Party's right to request an in camera review of any information subject to a claim of Privilege or Protection.

###

Date: June 3, 2024

Scott C. Clarkson
United States Bankruptcy Judge

Exhibit 1, page 37

1
2
3
4
5
6
7                                    EXHIBIT "A"
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1  Christopher B. Ghio (State Bar No. 259094)
   Christopher Celentino (State Bar No. 131688)
2  Yosina M. Lissebeck (State Bar No. 201654)
   **DINSMORE & SHOHL LLP**
3  655 West Broadway, Suite 800
   San Diego, CA 92101
4  Telephone:  619.400.0500
   Facsimile:  619.400.0501
5  christopher.ghio@dinsmore.com
   christopher.celentino@dinsmore.com
6  yosina.lissebeck@dinsmore.com

7  Sarah S. Mattingly (Ky. Bar 94257)
   DINSMORE & SHOHL, LLP
8  101 S. Fifth Street, Suite 2500
   Louisville, KY 40202
9  Telephone: 859-425-1096
   Facsimile: 502-585-2207
10 Sarah.mattingly@dinsmore.com
   (Admitted pro hac vice)

11
   Special Counsel to Richard A. Marshack,
12 Chapter 11 Trustee

13

14

15             **UNITED STATES BANKRUPTCY COURT**

               **CENTRAL DISTRICT OF CALIFORNIA**
16

17
   In Re                               Case No. 8:23-BK-10571-SC
18
                                       Chapter 11
19
   The Litigation Practice Group P.C.,  **EXHIBIT A TO STIPULATED**
20                                       **ORDER**
                Debtor(s),
21                                       Date:   May 23, 2024
22                                       Time:   1:30 p.m.
                                         Judge:  Hon. Scott C. Clarkson
23                                       Place:  Courtroom 5C[1] - Via Zoom
24                                               411 W. Fourth Street
                                                 Santa Ana, CA  92701
25

26

27 _____
   [1] Video and audio connection information for each hearing will be provided on Judge Clarkson's
28   publicly posted hearing calendar, which may be viewed online at:
     http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

                                         Exhibit 1, page 39

                          1                       EXHIBIT A
                                                  Page 2

This is to certify that:

(a)    I am being given access to Confidential Information pursuant to the Stipulated Protective Order that was entered into the main bankruptcy case for Litigation Practice Group, but which is binding and controlling as set forth by the Court's Order on any and all contested matters and any and all litigation commenced by Trustee;

(b)    I have read the Stipulated Protective Order; and

(c)    I agree to be bound by the terms and conditions thereof, including, without limitation, to the obligations regarding the use, non-disclosure and return of such Confidential Information. I further agree that in addition to being contractually bound by the Stipulated Protective Order, I am subject to the jurisdiction of the above reference Court for any violation thereof.

Date: _____


_____
Signature


_____
Printed Name


Exhibit 1, page 40

2

EXHIBIT A

Page 3

# EXHIBIT 2

Point 69 LLC

### REVENUE PURCHASE AGREEMENT

Agreement dated ___07/19/2021___ between ___Point 69 LLC___ ("**PURCHASER**") and the Merchant listed below ("**MERCHANT**")

THE LITIGATION PRACTICE GROUP PC/VULCAN CONSULTING GROUP LLC/ BAT INC(____7686)

### MERCHANT INFORMATION

Merchant's Legal Name: ___LITIGATION PRACTICE GROUP PC___

AND ___VULCAN CONSULTING GROUP LLC/ BAT INC DBA COAST PROCESSING___ State of Incorporation / Organization: ___CA___

Physical Address ___17542 17TH STREET STE 100, TUSTIN, CA 92780/17542 17TH STREET STE 100, TUSTIN, CA 92780___

City ___TUSTIN___ State ___CA___ Zip ___92780___ Business Phone _____

Contact Name ___TONY M DIAB,DANIEL STEPHEN MARCH___ Cellphone Number _____

Mailing Address ___17542 17TH STREET STE 100, TUSTIN, CA 92780/17542 17TH STREET STE 100, TUSTIN, CA 92780___

City ___TUSTIN___ State ___CA___ Zip ___92780___

**Purchase Price** $ ___500,000.00___ Purchased Percentage ___11___ % Purchased Amount $ ___995,000.00___

Payment Frequency ___DAY___ Remittance $ ___10,000.00___

Merchant hereby sells, assigns and transfers to Purchaser (making Purchaser the absolute owner) in consideration of the Purchase Price specified above, the Purchased Percentage of all of Merchant's future accounts, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers' and/or other third party payors (the "Receipts" defined as all payments made by cash, check, electronic transfer or other form of monetary payment in the ordinary course of the Merchant's business), for the payments due to Merchant as a result of Merchant's sale of goods and/or services (the "Transactions") until the Purchased Amount has been delivered by or on behalf of Merchant to Purchaser.

Merchant is selling a portion of a future revenue stream to Purchaser at a discount, not borrowing money from Purchaser; therefore there is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected. The Remittance amount set forth above is a current, good faith estimate of (a) Purchased Percentage multiplied by (b) the daily average revenues of Seller during the previous calendar month divided by (c) the number of business days in the calendar month. Merchant going bankrupt or going out of business, or experiencing a slowdown in business, or a delay in collecting its receivables, in and of itself, will not constitute a breach of this Agreement. Purchaser is entering this Agreement knowing the risks that Merchant's business may slow down or fail, and Purchaser assumes these risks based on Merchant's representations, warranties and covenants in this Agreement, which are designed to give Purchaser a reasonable and fair opportunity to Purchaser to receive the benefit of its bargain. Merchant and Guarantor are only guaranteeing their performance of the terms of this Revenue Purchase Agreement, and are not guaranteeing the payment of the Purchased Amount. The initial Remittance shall be as described above. The Remittance is subject to adjustment as set forth in Paragraph 1.4 (initially, and as so adjusted, the "Remittance").

Subject to any addendums indicating an alternative payment structure or method, Purchaser will debit the Remittance each business day from only one depositing bank account, which account must be acceptable to, and pre-approved by Purchaser, (the "Account") into which Merchant and Merchant's customers shall remit the Receipts from each Transaction, until such time as Purchaser receives payment in full of the Purchased Amount. Merchant hereby authorizes Purchaser to ACH debit the Agreed Remittance from the Account on the agreed upon Payment Frequency; a daily basis means any day that is not a United States banking holiday. Purchaser's payment of the Purchase Price shall be deemed the acceptance and performance by Purchaser of this Agreement. Merchant understands that it is responsible for ensuring that the Agreed Remittance to be debited by Purchaser remains in the Account and will be held responsible for any fees incurred by Purchaser resulting from a rejected ACH attempt or an Event of Default. Purchaser is not responsible for any overdrafts or rejected transactions that may result from Purchaser's ACH debiting the Agreed Remittance under the terms of this Agreement. Notwithstanding anything to the contrary in this Agreement or any other agreement between Purchaser and Merchant, upon the occurrence of an Event of Default under Section 3 of the MERCHANT AGREEMENT TERMS AND CONDITIONS, the Purchased Percentage shall equal 100%. A list of all fees applicable under this Agreement is contained in Appendix A.

**THE MERCHANT AGREEMENT TERMS AND CONDITIONS, THE SECURITY AGREEMENT AND GUARANTY AND THE AUTHORIZATION AGREEMENT, ENTERED INTO TOGETHER WITH THIS AGREEMENT, ARE ALL HEREBY INCORPORATED IN AND MADE A PART OF THIS MERCHANT AGREEMENT.**

Sign here: *Tony Diab*
**Print Name:** TONY M DIAB
**In his/her individual capacity as an individual Guarantor and in his/her capacity as an authorized officer of each Merchant and in his/her capacity as an authorized officer of each entity Guarantor**

Sign here: *Daniel March*
**Print Name:** DANIEL STEPHEN MARCH
**In his/her individual capacity as an individual Guarantor**

1

## MERCHANT AGREEMENT TERMS AND CONDITIONS
### 1    TERMS OF ENROLLMENT IN PROGRAM

**1.1 Merchant Deposit Agreement and Processor.** Merchant shall (A) execute an agreement acceptable to Purchaser with a Bank acceptable to Purchaser to obtain electronic fund transfer services for the Account, and (B) if applicable, execute an agreement acceptable to Purchaser with a credit and debit card processor (the "Processor") instructing the Processor to deposit all Receipts into the Account. Merchant shall provide Purchaser and/or its authorized agent(s) with all of the information, authorizations and passwords necessary for verifying Merchant's receivables, receipts, deposits and withdrawals into and from the Account. Merchant hereby authorizes Purchaser and/or its agent(s) to withdraw from the Account via ACH debit the amounts owed to Purchaser for the receipts as specified herein and to pay such amounts to Purchaser. These authorizations apply not only to the approved Account but also to any subsequent or alternate account used by the Merchant for these deposits, whether pre- approved by Purchaser or not. This additional authorization is not a waiver of Purchaser's entitlement to declare this Agreement breached by Merchant as a result of its usage of an account which Purchaser did not first pre-approve in writing prior to Merchant's usage thereof. The aforementioned authorizations shall be irrevocable without the written consent of Purchaser.

**1.2 Term of Agreement.** This Agreement shall remain in full force and effect until the entire Purchased Amount and any other amounts due are received by Purchaser as per the terms of this Agreement.

**1.3 Future Purchase of Increments.** Subject to the terms of this Agreement, Purchaser offers to purchase additional Receipts in the "Increments" stated in on Page 1 of this Agreement, if any. Purchaser reserves the right to delay or rescind the offer to purchase any Increment or any additional Receipts, in its sole and absolute discretion.

**1.4 Adjustments to the Remittance.** If an Event of Default has not occurred, every two (2) calendar weeks after the funding of the Purchase Price to Merchant, Merchant may give notice to Purchaser to request a decrease in the Remittance. The amount shall be decreased if the amount received by Purchaser was more than the Purchased Percentage of all revenue of Merchant since the date of this Revenue Purchase Agreement. The Remittance shall be modified to more closely reflect the Merchant's actual receipts by multiplying the Merchant's actual receipts by the Purchased Percentage divided by the number of business days in the previous (2) calendar weeks. Seller shall provide Purchaser with viewing access to their bank account as well as all information reasonably requested by Purchaser to properly calculate the Merchant's Remittance. At the end of the two (2) calendar weeks the Merchant may request another adjustment pursuant to this paragraph or it is agreed that the Merchant's Remittance shall return to the Remittance as agreed upon on Page 1 of this Agreement.

**1.5 Financial Condition.** Merchant and Guarantor(s) (as hereinafter defined and limited) authorize Purchaser and its agents to investigate their financial responsibility and history, and will provide to Purchaser any authorizations, bank or financial statements, tax returns, etc., as Purchaser deems necessary in its sole and absolute discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable as an authorization for release of financial and credit information. Purchaser is authorized to update such information and financial and credit profiles from time to time as it deems appropriate.

**1.6 Transactional History.** Merchant authorizes all of its banks, brokers and processor to provide Purchaser with Merchant's banking, brokerage and/or processing history to determine qualification or continuation in this program and for collections purposes. Merchant shall provide Purchaser with copies of any documents related to Merchant's card processing activity or financial and banking affairs within five days after a request from Purchaser.

**1.7 Indemnification.** Merchant and Guarantor(s) jointly and severally indemnify and hold harmless Processor, its officers, directors and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by Processor resulting from (a) claims asserted by Purchaser for monies owed to Purchaser from Merchant and (b) actions taken by Processor in reliance upon any fraudulent, misleading or deceptive information or instructions provided by Purchaser.

**1.8 No Liability.** In no event will Purchaser be liable for any claims asserted by Merchant or Guarantors under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by both Merchant and Guarantor(s). In the event these claims are nonetheless raised, Merchant and Guarantors will be jointly liable for all of Purchaser's attorney's fees and expenses resulting therefrom.

**1.9 Reliance on Terms.** Section 1.1, 1.6, 1.7, 1.8 and 2.5 of this Agreement are agreed to for the benefit of Merchant, Purchaser, Processor, and Merchant's bank and notwithstanding the fact that Processor and the bank is not a party of this Agreement, Processor and the bank may rely upon their terms and raise them as a defense in any action.

**1.10 Sale of Receipts**. Merchant and Purchaser agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount, and that such Purchase Price is not intended to be, nor shall it be construed as a loan from Purchaser to Merchant. Merchant agrees that the Purchase Price is in exchange for the Receipts pursuant to this Agreement, and that it equals the fair market value of such Receipts. Purchaser has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Payments made to Purchaser in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services, and the payment therefore by Merchant's customers. In no event shall the aggregate of all amounts or any portion thereof be deemed as interest hereunder, and in the event it is found to be interest despite the parties hereto specifically representing that it is NOT interest, it shall be found that no sum charged or collected hereunder shall exceed the highest rate permissible at law. In the event that a court nonetheless determines that Purchaser has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and Purchaser shall promptly refund to Merchant any interest received by Purchaser in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that Purchaser not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law. As a result thereof, Merchant knowingly and willingly waives the defense of Usury in any action or proceeding.

**1.11 Power of Attorney.** Merchant irrevocably appoints as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to from Processor, or in the case of a violation by Merchant of Section 1or the occurrence of an Event of Default under Section 3 hereof, including without limitation (i) to collect monies due or to become due under or in respect of any of the Collateral; (ii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper (iii) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to ; and (iv) to contact Merchant's banks and financial institutions using Merchant and Guarantor(s) personal information to verify the existence of an account and obtain account balances (v) to file any claims or take any action or institute any proceeding which may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral.

**1.12 Protections against Default.** The following Protections 1 through 8 may be invoked by Purchaser immediately and without notice to Merchant in the event: (a) Merchant ceases the use of electronic check processing that is settled through Processor, or takes any action that has a material adverse effect on the use, acceptance, or authorization of checks or other payments or deposits for the purchase of Merchant's services and products including but not limited to direct deposit of any checks into a bank account without scanning into the Purchaser electronic check processor; (b) Merchant changes its arrangements with Processor or the Bank in any way that is materially adverse to Purchaser's ability to debit on each business day the Remittance from the Account; (c) Merchant changes the electronic check processor through which the Receipts are settled from Processor to another electronic check processor, or permits any event to occur that could cause diversion of any of Merchant's check or deposit transactions to another processor; (d) Merchant intentionally interrupts the operation of this business transfers, moves, sells, disposes, or otherwise conveys its business and/or assets without (i) the express prior written consent of Purchaser, and (ii) the written agreement of Purchaser or transferee to the assumption of all Merchant's obligations under this Agreement pursuant to documentation satisfactory to Purchaser; (e) Merchant takes any action which induces any customer or customers to pay for Merchant's services with any means other than payments, checks or deposits that are settled through Processor; or (f) Merchant commits or suffers any Event of Default (defined below in Section 3.1). These protections are in addition to any other remedies available to Purchaser at law, in equity or otherwise pursuant to this Agreement.

**Protection 1**. The full uncollected Purchased Amount plus all fees (including reasonable attorney's fees) due under this Agreement and the attached Security Agreement become due and payable in full immediately.

**Protection 2.** Purchaser may enforce the provisions of the Limited Personal Guaranty of Performance against the Guarantor(s).

**Protection 3.** Merchant hereby authorizes Purchaser to execute in the name of the Merchant a Confession of Judgment in favor of Purchaser in the amount of Purchased Amount stated in the Agreement. Upon an Event of Default, Purchaser may enter that Confession of Judgment as a Judgment with the Clerk of any Court and execute thereon.

**Protection 4.** Purchaser may enforce its security interest in the Collateral.

**Protection 5**. The entire Purchased Amount and all fee (including reasonable attorney's fees) shall become immediately payable to Purchaser from Merchant.

Initials:

**Protection 6.** In the event Purchaser retains counsel to enforce its rights hereunder or collect on any sums due hereunder, or to defend against Merchant, Merchant shall be liable for all of Purchaser's costs of enforcement and collection, including, but not limited to, attorneys' fees and court costs.

**Protection 7.** This Agreement shall be deemed Merchant's Assignment of Merchant's Lease of Merchant's business premises to Purchaser. Upon breach of any provision in this Agreement, Purchaser may exercise its rights under this Assignment of Lease without prior Notice to Merchant. Protection 8. Purchaser may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to Purchaser.

**1.13 Protection of Information**. Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner or Guarantor, in respect of himself or herself personally, authorizes Purchaser to disclose information concerning Merchant's and each Owner's and each Guarantor's credit standing (including credit bureau reports that Purchaser obtains) and business conduct only to agents, affiliates, subsidiaries, and credit reporting bureaus. Merchant and each Owner and each Guarantor hereby and each waives to the maximum extent permitted by law any claim for damages against Purchaser or any of its affiliates relating to any (i)investigation undertaken by or on behalf of Purchaser as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**1.14 Confidentiality**. Merchant understands and agrees that the terms and conditions of the products and services offered by Purchaser, including this Agreement and any other Purchaser documents (collectively, "Confidential Information") are proprietary and confidential information of Purchaser. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information of Purchaser to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this section. A breach hereof entitles Purchaser to not only damages and reasonable attorney's fees but also to both a Temporary Restraining Order and a Preliminary Injunction without Bond or Security.

**1.15 Publicity**. Merchant and each of Merchant's Owners and all Guarantors hereto all hereby authorizes Purchaser to use its, his or her name in listings of clients and in advertising and marketing materials.

**1.16 D/B/A's**. Merchant hereby acknowledges and agrees that Purchaser may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between Purchaser and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**2  REPRESENTATIONS, WARRANTIES AND COVENANTS**

Merchant represents warrants and covenants that:

**2.1 Financial Condition and Financial Information**. Merchant's and Guarantors' bank and financial statements, copies of which have been furnished to Purchaser, and future statements which will be furnished hereafter upon the request of Purchaser, fairly represent the financial condition of Merchant at such dates, and as of the date of this Agreement, there have been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant since such bank and financial statements were furnished. Merchant and Guarantors have a continuing, affirmative obligation to advise Purchaser of any material adverse change in their financial condition, operation or ownership. Purchaser may request statements at any time during the term of this Agreement and the Merchant and Guarantors shall provide them to Purchaser within five business days after request from Purchaser. Merchant's or Guarantors' failure to do so is a material breach of this Agreement.

**2.2 Governmental Approvals**. As of the date of this Agreement and throughout the term of this Agreement, Merchant is in compliance with, and be in compliance with, all applicable laws; and, without limiting the generality of the foregoing, has and shall have and maintain, valid permits, authorizations, and licenses to own, operate, and lease its properties and to conduct the business in which it is, and will be, engaged during the term of this Agreement.

**2.3 Authorization**. As of the date of this Agreement and during the term of this Agreement, Merchant, and the person(s) signing this Agreement on behalf of Merchant, have, and shall have, full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**2.4 Use of Funds**. During the term of this Agreement, Merchant shall use the Purchase Price for business purposes and not for personal, family, or household purposes.

**2.5 Electronic Check Processing Agreement**. During the term of this Agreement, Merchant shall not change its Processor, add terminals, change its financial institution or bank account(s) or take any other action that would reasonably be expected to have an adverse effect upon Merchant's obligations under this Agreement, without Purchaser's prior written consent. Any such changes shall be a material breach of this Agreement.

**2.6 Change of Name or Location**. During the term of this Agreement, Merchant shall not conduct Merchant's businesses under any name other than as disclosed to the Processor and Purchaser, and Merchant shall not change any of its places of business without prior written consent by Purchaser.

**2.7 Daily Batch Out**. During the term of this Agreement, Merchant shall batch out receipts with the Processor on a daily basis if applicable.

**2.8 Estoppel Certificate**. During the term of this Agreement, Merchant shall, each time, and from time to time, upon at least one (1) day's prior notice from Purchaser to Merchant, execute, acknowledge and deliver to Purchaser and/or to any other person, firm or corporation specified by Purchaser, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there has been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion thereof has been repaid.

**2.9 No Bankruptcy**. As of the date of this Agreement, Merchant is not insolvent and does not contemplate filing for bankruptcy in the next six months and has not consulted with a bankruptcy attorney or filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Merchant. Merchant does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

**2.10 Unencumbered Receipts**. As of the date of this Agreement and during the term of this Agreement, Merchant has, and shall have, good, complete, unencumbered and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated under this Agreement or adverse to the interests of Purchaser.

**2.11 Business Purpose**. As of the date of this Agreement and during the term of this Agreement, Merchant is and shall be a valid business in good standing under the laws of the jurisdictions in which it is organized and operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

**2.12 Defaults under Other Contracts**. As of the date of this Agreement and during the term of this Agreement, Merchant's execution of, and performance under, this Agreement, does not and shall not cause or create an event of default by Merchant under any contract with another person or entity.

**2.13 Good Faith**. Merchant and Guarantors hereby affirm that Merchant is receiving the Purchase Price and selling Purchaser the Purchased Amount in good faith and will use the Purchase Price funds to maintain and grow Merchant's business.

**3  EVENTS OF DEFAULT AND REMEDIES**

**3.1 Events of Default**. The occurrence of any of the following events shall constitute an "Event of Default" hereunder:

(a) Merchant or Guarantor shall violate any term or covenant in this Agreement;

(b) Any representation or warranty by Merchant in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made; (c) the sending of notice of termination by Merchant or verbally notifying Purchaser of its intent to breach this Agreement;

(c) the Merchant, either for (i) two (2) consecutive business days or (ii) four (4) business days within one month, fails to give Purchaser 24 hours advance notice that there will be insufficient funds in the account such that the ACH of the Remittance amount will not be honored by Merchant's bank, and the Merchant fails to supply allrequested documentation and allow for daily and/or real time monitoring of its bank account;

(d) the Merchant fails to make any two (2) payments by a method other than ACH (including but not limited to Wire Transfer, Certified Check etc.) if such payment method is so authorized by the terms if this Agreement or any Addendum thereto;

(f) Merchant shall transfer or sell all or substantially all of its assets;

(g) Merchant shall make or send notice of any intended bulk sale or transfer by Merchant;

(h) Merchant shall encumber its receipts or obtain any additional financing, loan, or merchant cash advance after the date Purchaser remits the purchase price

(i) Merchant shall use multiple depository accounts without the prior written consent of Purchaser

(j) Merchant shall change its depositing account without the prior written consent of Purchaser; or

(k) Merchant shall close its depositing account used for ACH debits without the prior written consent of Purchaser

(l) Merchant's bank returns a code other than NSF cutting Purchaser from its collections

3

Initials: _TD_  _DM_

(m) Merchant shall default under the other covenants, agreements and obligations of this Agreement.

**3.2 Limited Personal Guaranty** In the Event of a Default, Purchaser will enforce its rights against the Guarantors of this transaction. Said Guarantors will be jointly and severally liable to Purchaser for all of Purchaser's losses and damages, in additional to all costs and expenses and legal fees associated with such enforcement.

**3.3 Remedies**. In case any Event of Default occurs and is not waived pursuant to Section 4.4. hereof, Purchaser may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Merchant's obligations hereunder (including the Guaranty) or any other legal or equitable right or remedy, including but not limited to filing the Confession of Judgment and executing thereon, and enforcing the Security Agreement contained herein. All rights, powers and remedies of Purchaser in connection with this Agreement may be exercised at any time by Purchaser after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

**3.4 Costs**. Merchant shall pay to Purchaser all reasonable costs associated with (a) an Event or Default, (b) breach by Merchant of the Covenants in this Agreement and the enforcement thereof, and(c) the enforcement of Purchaser's remedies set forth in this Agreement, including but not limited to court costs and attorneys' fees.

**3.5 Required Notifications**. Merchant is required to give Purchaser written notice within 24 hours of any filing under Title 11 of the United States Code. Merchant is required to give Purchaser seven days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or stock.

**4    MISCELLANEOUS**

**4.1 Modifications; Agreements**. No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by Purchaser.

**4.2 Assignment**. Purchaser may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part.

**4.3 Notices**. All notices, requests, consents, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement. Notices to Purchaser shall become effective only upon receipt by Purchaser. Notices to Merchant shall become effective three days after mailing.

**4.4 Service of Process**. Each Merchant and each Guarantor consent to service of process and legal notices made by First Class or Priority Mail delivered by the United States Postal Service and addressed to the Contact Address set forth on the first page of this Agreement or any other address(es) provided in writing to Purchaser by any Merchant or any Guarantor, and unless applicable law or rules provide otherwise, any such service will be deemed complete three days after dispatch. Each Merchant and each Guarantor agrees that it will be precluded from asserting that it did not receive service of process or any other notice mailed to the Mailing Address set forth on the first page of this Agreement if it does not furnish a certified mail return receipt signed by Purchaser demonstrating that Purchaser was provided with notice of a change in the Mailing Address.

**4.5  Arbitration**. Any action or dispute relating to this Agreement or involving Purchaser on one side and any Merchant or any Guarantor on the other, including, but not limited to issues of arbitrability, will, at the option of any party to such action or dispute, be determined by arbitration before a single arbitrator. The arbitration will be administered either by Arbitration Services, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.arbitrationservicesinc.com, or by Mediation & Commercial Arbitration, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.mcarbitration.org. Once an arbitration is initiated with one of these arbitral forums, it must be maintained exclusively before that arbitral forum and the other arbitral forum specified herein may not be used. Any arbitration relating to this Agreement must be conducted in the Counties of Nassau, New York, Queens, or Kings in the State of New York. Notwithstanding any provision of any applicable arbitration rules, any witness in an arbitration who does not reside in or have a place for the regular transaction of business located in New York City or the Counties of Nassau, Suffolk, or Westchester in the State of New York will be permitted to appear and testify remotely by telephone or video conferencing. In case any Event of Default occurs and is not waived, each Merchant and each Guarantor consents to Purchaser making an application to the arbitrator, without notice to any Merchant or any Guarantor, for the issuance of an injunction, restraining order, or other equitable relief in Purchaser's favor, subject to court or arbitrator approval, restraining each Merchant's accounts and/or receivables up to the amount due to Purchaser as a result of the Event of Default.  Each Merchant acknowledges and agrees that this Agreement is the product of communications conducted by telephone and the Internet, which are instrumentalities of interstate commerce, and that the transactions contemplated under this Agreement will be made by wire transfer and ACH, which are also instrumentalities of interstate commerce, and that this Agreement therefore evidences a transaction affecting interstate commerce. Accordingly, notwithstanding any provision in this Agreement to the contrary, all matters of arbitration relating to this Agreement will be governed by and construed in accordance with the provisions of the Federal Arbitration Act, codified as Title 9 of the United States Code, however any application for injunctive relief in aid of arbitration or to confirm an arbitration award may be made under Article 75 of the New York Civil Practice Law and Rules. The arbitration agreement contained in this Section may also

**4.6 Waiver Remedies**. No failure on the part of Purchaser to exercise, and no delay in exercising any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**4.7 Binding Effect**; Governing Law, Venue and Jurisdiction. This Agreement shall be binding upon and inure to the benefit of Merchant, Purchaser and their respective successors and assigns, except that Merchant shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of Purchaser which consent may be withheld in Purchaser's sole discretion. Purchaser reserves the rights to assign this Agreement with or without prior written notice to Merchant. This Agreement shall be governed and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if Purchaser so elects, be instituted in any court  sitting in New York, (the "Acceptable Forums"). Merchant agrees that the Acceptable Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant waives any right to oppose any motion or application made by Purchaser to transfer such proceeding to an Acceptable Forum.

**4.8 Survival of Representation**, etc. All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

**4.9 Interpretation**. All Parties hereto have reviewed this Agreement with attorney of their own choosing and have relied only on their own attorneys' guidance and advice. No construction determinations shall be made against either Party hereto as drafter.

**4.10   Severability**. In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability ofany other provision contained herein shall not in any way be affected or impaired.

**4.11   Entire Agreement**. Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof.

This Agreement and the Security Agreement and Guaranty and the Authorization Agreement embody the entire agreement between Merchant and Purchaser and supersedeall prior agreements and understandings relating to the subject matter hereof.

**4.12 JURY TRIAL WAIVER**. THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING INCONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OR THEENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION      OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**4.13  CLASS  ACTION  WAIVER**. THE  PARTIES  HERETO  WAIVE  ANY  RIGHT  TO  ASSERT  ANY  CLAIMS  AGAINST  THE  OTHER  PARTY  AS  A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND ( 2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM  OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH  THE CLASS OR REPRESENTATIVE ACTION.

**4.14 Counterparts & Digital Acceptance.** This Agreement and the other Revenue Purchase Documents may be executed in multiple counterparts, each of which shall

Initials: _____

4

be deemed an original, but all of which shall constitute one and the same instrument. In the event that any signature is delivered by facsimile transmission or by e-mail delivery of a ".pdf" format data file, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile or ".pdf" signature page were an original thereof. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Any signature delivered by a party hereto by facsimile transmission, e-mail or other electronic means will be deemed to be an original signature. The parties hereto consent and agree that use of a key pad, mouse or other device to select an item, button, icon or similar act or action while using any electronic service in executing this Agreement or the other Revenue Purchase Documents constitutes a valid and enforceable signature, acceptance and agreement as if actually signed in writing. Further, the parties hereto agree that no certification authority or other third-party verification is necessary to the validity of an electronic signature and that the lack of such certification or third-party verification will not in any way affect the enforceability of the signature or any resulting contract among the parties hereto

5

Initials: _____

<u>**SECURITY AGREEMENT AND GUARANTY OF PERFORMACE (this or the "SAGP")**</u>

| | |
|---|---|
| Merchant's Legal Name: | THE LITIGATION PRACTICE GROUP PC |
| AND | VULCAN CONSULTING GROUP LLC/ BAT INC DBA COAST PROCESSING Federal ID# ███5343/ ███7431/ ███7686 |
| Physical Address | 17542 17TH STREET STE 100, TUSTIN, CA 92780/17542 17TH STREET STE 100, TUSTIN, CA 92780 |
| City TUSTIN | State CA          Zip 92780 |

**Additional Guarantor(s).**

TONY M DIAB, DANIEL STEPHEN MARCH

<u>**SECURITY AGREEMENT**</u>

**Security Interest.** Capitalized terms used but not defined in this SAGP shall have the respective meanings given to them in the preceding Revenue Purchase Agreement (the "RPA"). This SAGP will constitute a security agreement under the Uniform Commercial Code. Merchant and each Guarantor that is not a natural person ("entity guarantor") grants to Purchaser a security interest in and lien upon: (a) all of their respective accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are each defined in Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant and/or each entity Guarantor; (b) all of their respective proceeds, as that term is defined in Article 9 of the UCC; (c) all of their respective funds at any time in the Merchant's and/or each entity Guarantor's bank accounts, regardless of the source of such funds; (d) present and future Electronic Check Transactions; and (e) any amount which may be due to Purchaser under the RPA and this SAGP, including but not limited to all of their respective rights to receive any payments or credits under the RPA and this SAGP (collectively [(a), (b), (c), (d) and (e)], the "Secured Assets"). These security interests and liens will secure all of Purchaser's entitlements under the RPA and this SAGP and any other agreements now existing or later entered into between Merchant, Purchaser or an affiliate of Purchaser. Purchaser is authorized to file any and all notices or filings it deems necessary or appropriate to enforce its entitlements hereunder.

This security interest may be exercised by Purchaser without notice or demand of any kind by making an immediate withdrawal or freezing the Secured Assets. Purchaser shall have the right to notify account debtors at any time after a breach of the RPA and/or this SAGP. Pursuant to Article 9 of the Uniform Commercial Code, as amended from time to time, Purchaser has control over and may direct the disposition of the Secured Assets, without further consent of Merchant or any Guarantor. Merchant and each Guarantor hereby represent and warrant that no other person or entity has a security interest in the Secured Assets.

With respect to such security interests and liens, Purchaser will have all rights afforded under the Uniform Commercial Code, any other applicable law, by contract and in equity. Merchant and each respective entity Guarantor must obtain from Purchaser written consent prior to granting a security interest of any kind in the Secured Assets to a third party. Merchant and each Guarantor agree that this is a contract of recoupment and Purchaser is not required to file a motion for relief from a bankruptcy action automatic stay to realize on any of the Secured Assets. Nevertheless, Merchant and each Guarantor agree not to contest or object to any motion for relief from the automatic stay filed by Purchaser. Merchant and each entity Guarantor agree to execute and deliver to Purchaser such instruments and documents Purchaser may reasonably request to perfect and confirm the lien and security interest set forth in the RPA and this SAGP. Purchaser is authorized to execute all such instruments and documents in Merchant's and each entity Guarantor's name. The security interest afforded to Purchaser by virtue hereof is intended to and shall survive any judgment Purchaser may obtain against Merchant and/or each entity Guarantor.

Merchant and each entity Guarantor acknowledge and agree that any security interest granted to Purchaser under any other agreement between Merchant and/or each entity Guarantor (the "Cross-Collateral") will secure the obligations under and under the RPA and this SAGP. Merchant and each entity Guarantor agree to execute any documents or take any action in connection with this Agreement as Purchaser deems reasonably necessary to perfect or maintain Purchaser's priority security interest in the Secured Assets, including the execution of any account control agreements. Merchant and each entity Guarantor hereby authorize Purchaser to file any financing statements deemed necessary by Purchaser to perfect or maintain Purchaser's security interest. Merchant and each Guarantor shall be liable for, and Purchaser may charge and collect, all costs and expenses, including but not limited to attorney's fees, which may be incurred by Purchaser in protecting, preserving and enforcing Purchaser's security interest and rights.

**Negative Pledge**. Merchant and each entity Guarantor agree not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Secured Assets, as applicable.

**Remedies.** Upon any Event of Default, Purchaser may pursue any remedy available at law (including those available under the provisions of the UCC), by contract or in equity to collect, enforce, or satisfy any obligations then owing to Purchaser.

SEE BOTTOM OF NEXT PAGE FOR SIGNATURES<br>THE FOLLOWING PAGE IS AN INTEGRAL PART HEREOF

Initials: _TD_

_DM_

Exhibit 2, page 47

## GUARANTY OF PERFORMANCE

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE REVENUE PURCHASE AGREEMENT (the "RPA"), INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY OF PERFORMANCE. CAPITALIZED TERMS USED BUT NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY OF PERFORMANCE (this or the "SAGP") SHALL HAVE THE MEANING SET FORTH IN THE RPA, INCLUDING THE TERMS AND CONDITIONS. As an additional inducement for Purchaser to enter into the RPA, each individual guarantor and each entity guarantor signing below hereby provides Purchaser with this Guaranty of Performance. None of the undersigned Guarantors will be liable for any amount due hereunder or under the RPA **unless** Merchant defaults in the performance of Merchant's obligations as detailed in the RPA and/or this SAGP. Each Guarantor shall be jointly and severally liable for all amounts owed to Purchaser in the event Merchant defaults in the performance of Merchant's obligations as detailed in the RPA and/or this SAGP. Each Guarantor guarantees Merchant's good faith, truthfulness and performance of all of the representations, warranties, covenants made by Merchant in the RPA as each may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations"). Guarantor's obligations are due at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in the RPA.

**Guarantor Waivers.** In the event of a breach of the above, Purchaser may seek recovery from one, some or all Guarantors for all of Purchaser's losses and damages by enforcement of Purchaser's rights under the RPA and/or this SAGP without first seeking to obtain payment from Merchant, any other guarantor, or any of the Secured Assets Purchaser may hold pursuant to the RPA or any other guaranty. Purchaser does not have to notify any Guarantor of any of the following events and no Guarantor will be released from his/her/its/their obligations under the RPA or this SAGP if he/she/it/they are not notified of: (i) Merchant's failure to pay timely any amount required under the RPA; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; (iv) Purchaser's acceptance of the RPA or this SAGP; and (v) any renewal, extension or other modification of the RPA or Merchant's other obligations to Purchaser. In addition, Purchaser may take any of the following actions without releasing any Guarantor from any of its obligations under the RPA or this SAGP: (i) renew, extend or otherwise modify the RPA or Merchant's other obligations to Purchaser; (ii) release Merchant from its obligations to Purchaser; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations in a manner that impairs or precludes the right of any Guarantor to obtain reimbursement for payment hereunder or under the RPA. Until the Purchased Amount and Merchant's other obligations to Purchaser under the RPA and this SAGP are paid in full, no Guarantor shall seek or be entitled to reimbursement from Merchant or any other guarantor for any amounts paid by him/her/it/they under the RPA or this SAGP. Each Guarantor: (A) represents and warrants that he/she/it/they have read and understand the RPA and this SAGP; and (B) permanently waives and shall not seek to exercise any of the following rights that he/she/it/they may have against Merchant, any other guarantor, or any collateral provided by Merchant or any other guarantor, for any amounts paid by him/her/it/they, or acts performed by him/her/it/they, under the RPA or this SAGP: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution. In the event that Purchaser must return any amount paid by Merchant or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, every other Guarantor's obligations hereunder and under the RPA shall include that amount.

**Guarantor Acknowledgement. Each** Guarantor acknowledges that: (i) He/She/It is bound by the Class Action Waiver provision in the RPA; (ii) He/She/It understands the seriousness of the provisions of the RPA and this SAGP; (ii) He/She/It has either consulted with counsel of its choice or has decided not to avail himself/herself/itself of that opportunity.

**Sign here:** *Tony Diab*
**Print Name:**     TONY M DIAB
**In his/her individual capacity as an individual Guarantor and in his/her capacity as an authorized officer of each Merchant and in his/her capacity as an authorized officer of each entity Guarantor**

**Sign here:** *Daniel March*
**Print Name:**    DANIEL STEPHEN MARCH
**In his/her individual capacity as an individual Guarantor**

Exhibit 2, page 48

*TD*
*DM*

**APPENDIX A - THE FEE STRUCTURE:**

A.  Underwriting Fee  minimum of $500.00 or up to 20% in fees of the purchase price for underwriting and related expenses.

B.  Origination Fee  minimum of $500.00 or up to 20% in fees of the purchase price for  Origination and ACH Setup.

C.  NSF Fee (Standard)  $35.00 (each)

D.  Default Fee  $2,500.00 or 33% of the outstanding Purchased Receipts, whichever amount is greater. Fee is applied whenever an Event of Default occurs.

E.  Bank Change Fee  $50.00  When Merchant requires a change of Bank Account to be Debited, requiring us to adjust our system.

F.  Wire Fee - Each Merchant shall receive their funding electronically to their designated bank account and will be charged $50.00 for a Fed Wire or $0.00 for a bank ACH.

**Sign here** : *Tony Diab*
**Print Name:** TONY M DIAB
In his/her individual capacity as an individual Guarantor and in his/her capacity as an authorized officer of each Merchant and in his/her capacity as an authorized officer of each entity Guarantor

**Sign here:** *Daniel March*
**Print Name:** DANIEL STEPHEN MARCH
In his/her individual capacity as an individual Guarantor

**AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT) AND DIRECT PAYMENTS (ACH DEBITS)**

**PAYMENTS WILL APPEAR ON YOUR BANK STATEMENTS AS "_____".**

**DEFINITIONS**

**Purchaser:** POINT 69, LLC

**Seller:** THE LITIGATION PRACTICE GROUP PC/VULCAN CONSULTING GROUP LLC/ BAT INC
            (Merchant's Legal Name)

**Merchant Agreement**: Merchant Agreement between Purchaser and Seller, dated as of    07/19/2021

**Designated Checking Account:**

Tax ID:

Bank Name:

ABA: Routing:                                          DDA: Account:

Capitalized terms used in this Authorization Agreement without definition shall have the meanings set forth in the Merchant Agreement.
By signing below, Seller attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes. **This Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) is part of (and incorporated by reference into) the Merchant Agreement. Seller should keep a copy of this important legal document for Seller's records.**
DISBURSMENT OF ADVANCE PROCEEDS. By signing below, Seller authorizes Purchaser to disburse the Advance proceeds less the amount of any applicable fees upon Advance approval by initiating ACH credits to the Designated Checking Account, in the amounts and at the times specified in the Merchant Agreement. **By signing below, Seller also authorizes Purchaser to collect amounts due from Seller under the Merchant Agreement by initiating ACH debits to the Designated Checking Account, as follows:**

In the amount of:          $10,000
(Or) Percentage of each Banking Deposit:         11          %
On the Following Days:   MONDAY - FRIDAY
If any payment date falls on a weekend or holiday, I understand and agree that the payment may be executed on the next business day. If a payment is rejected by Seller's financial institution for any reason, including without limitation insufficient funds, Seller understands that Purchaser may, at its discretion, attempt to process the payment again as permitted under applicable ACH rules. Seller also authorizes Purchaser to initiate ACH entries to correct any erroneous payment transaction.
**MISCELLANEOUS.** Purchaser is not responsible for any fees charged by Seller's bank as the result of credits or debits initiated under this Authorization Agreement. Upon the occurrence of an Event of Default, Purchaser reserves the right to modify the payment frequency, so long as the total weekly aggregate of the remittance does not exceed the payment amount detailed above. The origination of ACH debits and credits to the Designated Checking Account must comply with applicable provisions of state and federal law, and the rules and operating guidelines of NACHA (formerly known as the National Automated Clearing House Association).
This Authorization Agreement is to remain in full force and effect until Purchaser has received written notification from Seller at the address set forth below at least 5 banking days prior of its termination to afford Purchaser a reasonable opportunity to act on it. The individual signing below on behalf of Seller certifies that he/she is an authorized signer on the Designate Checking Account. Seller will not dispute any ACH transaction initiated pursuant to this Authorization Agreement, provided the transaction corresponds to the terms of this Authorization Agreement. Seller requests the financial institution that holds the Designated Checking Account to honor all ACH entries initiated in accordance with this Authorization Agreement.

**Sign here:** _Tony Diab_
**Print Name:** TONY M DIAB
**In his/her individual capacity as an individual Guarantor and in his/her capacity as an authorized officer of each Merchant and in his/her capacity as an authorized officer of each entity Guarantor**

**Sign here:** _Daniel March_
**Print Name:** DANIEL STEPHEN MARCH
**In his/her individual capacity as an individual Guarantor**

Exhibit 2, page 50

## BANK VERIFICATION

Dear Merchant,

Thank you for accepting an offer from Purchaser. We are looking forward to building a relationship with your business that allows you to reach and exceed your goals. Please note that prior to funding your account, our Underwriting department needs to see the most recent balance and activity information in real-time as a fraud countermeasure and in order to ensure the health of your business aligns with the terms of your offer. For your convenience, we have three secure options for you to choose from to complete this step. After being completed and executed, you can fax the agreement to Purchaser.

**Option 1) Please provide information required for read-only access\* to your business account.**

| | |
|---|---|
| Bank portal website: | www.chase.com |
| Username: | ████████ |
| Password: | ████████ |
| Security Question/Answer 1: | code sent to 949-715-0648 |
| Security Question/Answer 2: | n/a |
| Security Question/Answer 3: | n/a |
| Any other information necessary to access your account: | n/a |

**Option 2) Provide an email address which will receive a secure 3rd party link, allowing you to log in on your own machine through industry standard Decision Logic. (https://www.decisionlogic.com/)**

Your valid email address (please ensure correct spelling and case sensitivity):

**Option 3) You may call into a secure line to complete this step with a live representative. Secure Verification Number: _____**

\* Read only access can be easily arranged by calling your Bank, allowing our Underwriters to view account information without being able to transfer, debit or otherwise access funds.



## Revenue Purchase Agreement Addendum

This is an addendum dated _07/19/20201_ to the Revenue Purchase Agreement (the Agreement) dated between _POINT 69, LLC_ (Purchaser) and _THE LITIGATION PRACTICE GROUP PC/VULCAN CONSULTING GROUP LLC/ BAT INC_ (Merchant). This Addendum incorporates the Agreement by reference. The terms of this Addendum will control to the extent they conflict with any of the terms in the Agreement.

Merchant will submit their daily remittance obligation to Purchaser via wire transfer on each and every business day until the complete Purchased Amount will have been fully remitted. Merchant understands and consents that it alone will be responsible for any wire transfer fees associated with said payments and that failure to make said transfers will be deemed an Event of Default under the appropriate clauses listed in Section 3.1 of the Agreement and will trigger Purchaser's ability to invoke the Protections detailed in Section 1.12 of the Agreement.

Wire Transfer will be made by Merchant to Purchaser to the following account:

> Point 69 LLC
> 1755 Broadway, New York, NY 10019 STE 1057
> Routing Number: ▮▮▮▮1360
> Account Number: ▮▮▮▮0855

**Sign here:** _Tony Diab_
**Print Name:** TONY M DIAB
**In his/her individual capacity as an individual Guarantor and in his/her capacity as an authorized officer of each Merchant and in his/her capacity as an authorized officer of each entity Guarantor**

**Sign here:** _David March_
**Print Name:** DANIEL STEPHEN MARCH
**In his/her individual capacity as an individual Guarantor**

*TD*
*DM*

# EXHIBIT 3

In re: The Litigation Practice Group PC
Disbursement Details by Payee
4 Years Pre-Petition (03/20/2019 - 03/20/2023)



| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|
| Chase | Vulcan Consulting Group LLC | 3588 | 7/31/2021 | 7/22/2021 | | 40,000.00 | 07/22 Domestic Wire Transfer Via: TD Bank, NNO31 201 360 NC: Point 69 LLC New York NY 10019 US Ref. Weekly Payment Lpg Imad. 0722B1Qgc07C008320 Tm. 3233451203Es |
| Chase | Vulcan Consulting Group LLC | 3588 | 7/31/2021 | 7/26/2021 | | 10,000.00 | 07/26 Online Domestic Wire Transfer Via: TD Bank, NNO31 201360 NC: Point 69 LLC New York NY 10019 us Ref: Lpg Pymt/BnflLpg Pymt Irnad: 0726B1Qgc06C027825 Tm 3475231 207Es |
| Chase | Vulcan Consulting Group LLC | 3588 | 7/31/2021 | 7/27/2021 | | 10,000.00 | 07/27 Online Domestic Wire Transfer Via: TD Bank, NNO31 201360 NC: Point 69 LLC New York NY 10019 us Ret: [pg Pymt/Bnf/Lpg Pymt Imad: 0727B1Qgc05C005864 Tm 3248281 2O8Es |
| Chase | Vulcan Consulting Group LLC | 3588 | 7/31/2021 | 7/28/2021 | | 10,000.00 | 07/28 Online Domestic Wire Transfer Via: TD Bank, NNO31 201360 NC: Point 69 LLC New York NY 10019 US Ret: Lpg Pymt mad: 0728B1Qgc07C01441 1 Tm. 3279161209Es |
| Chase | Vulcan Consulting Group LLC | 3588 | 7/31/2021 | 7/29/2021 | | 10,000.00 | 07/29 Online Domestic Wire Transfer Via: TD Bank, NNO31201360 NC: Point 69 LLC New York NY 10019 US Ret: Lpg Pymf Imad: 0729B1Qgc05C009910 Tm 321611 I2IOEs |
| Chase | Vulcan Consulting Group LLC | 3588 | 7/31/2021 | 7/30/2021 | | 10,000.00 | 07/30 Online Domestic Wire Transfer Via: TD Bank, NNO31201360 NC: Point 69 LLC New York NY 10019 US Rot: Lpg Pymt Imad: 0730B1Qgc07C0201 18 Tm 3532521211 Es |
| Chase | Vulcan Consulting Group LLC | 3588 | 8/31/2021 | 8/2/2021 | | 20,000.00 | 08/02 Online Domestic Wire Transfer Via: TD Bank, NA/031 201360 A/C: Point 69 LLC New York NY 10019 US Ret: Lpg Pymt Imad: 0802B1Qgc08C023505 Tm: 369B141214Es |
| Chase | Vulcan Consulting Group LLC | 3588 | 8/31/2021 | 8/3/2021 | | 30,000.00 | 08/03 Domestic Wire Transfer Via: TD Bank, NNO31 201 360 NC: Point 69 LLC Imad: 0803B1Qgc08C016355 Tm 3398571215Es |
| Chase | Vulcan Consulting Group LLC | 3588 | 8/31/2021 | 8/11/2021 | | 30,000.00 | 08/11 Online Domestic Wire Transfer Via: TD Bank, NNO31 201360 NC: Point 69 LLC New York NY 10019 US Ret: Lpg Pymt Through 8-1 1-21 Imad 0811B1Qg0070012032 Tm: 3251321223Es |
| Chase | Vulcan Consulting Group LLC | 3588 | 8/31/2021 | 8/12/2021 | | 10,000.00 | 08/12 Online Domestic Wire Transfer Via: TD Bank, NNO31 201360 NC: Point 69 LLC New York NY 10019 US Ret: Lpg Pymt Aug 12 Imad: 0812B1Qgo060002424 Tm 307411 1224Es |
| Chase | Vulcan Consulting Group LLC | 3588 | 8/31/2021 | 8/13/2021 | | 10,000.00 | 08/13 Online Domestic Wire Transfer Via: TD Bank, NNO31 201360 NC: Point 69 LLC New York NY 10019 US Ret: Lpg Pymt Aug 13 Imad: 0813B1Qgc07C012807 Tm. 334538I225Es |
| Chase | Vulcan Consulting Group LLC | 3588 | 8/31/2021 | 8/16/2021 | | 10,000.00 | 08/16 Online Domestic Wire Transfer Via: TD Bank, NNO31 201360 NC: Point 69 LLC New York NY 10019 US Ret: Lpg Pymt - Aug 16 Imad 0816B1Qgc02C008795 Tm: 3510781 228Es |
| Chase | Vulcan Consulting Group LLC | 3588 | 8/31/2021 | 8/17/2021 | | 10,000.00 | 08/17 Online Domestic Wire Transfer Via: TD Bank, NNO31201360 NC: Point 69 LLC New York NY 10019 US Ret: Lpg Pyml In,ad: 0817B1Qgc05C004372 Tm 321 4841 229Es |
| Chase | Vulcan Consulting Group LLC | 5909 | 8/31/2021 | 8/19/2021 | | 30,000.00 | 08/19 Online Domestic Wire Transfer Via: TD Bank, NA/031201360 A/C: Point 69 LLC New York NY 10019 US Ref: Lpg Pymt I mad: 0819B1Qgc05C002230 Tm: 3028541231 Es |
| Chase | Vulcan Consulting Group LLC | 3588 | 8/31/2021 | 8/23/2021 | | 50,000.00 | 08/23 Online Domestic Wire Transter Via: TD Bank, NNO31201360 NC: Point 69 LLC New York NY 10019 US Ret: Lpg Payments Week of Aug 23/Bnf/Lpg Pymt Imad: 0823B1Qgc03C005118 Tm. 3323481235Es |
| | | | | | | **290,000.00** | |

DRAFT FORM - SUBJECT TO CHANGE

Exhibit 3, page 54

# EXHIBIT 4

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

POINT 69, LLC, a New York limited
liability company,

        Plaintiff,

vs.

THE LITIGATION PRACTICE GROUP,
PC, a California corporation, VULCAN
CONSULTING GROUP, LLC, a
California limited liability company, BAT,
INC., a California corporation, TONY M.
DIAB and DANIEL STEPHEN MARCH,

        Defendants.

CASE NO.: CACE 21-018391
DIVISION: 12

---

## SETTLEMENT AGREEMENT AND MUTUAL RELEASE

This Settlement Agreement and Mutual Release (this "**Agreement**") is entered into by and between Plaintiff, Point 69, LLC ("**Plaintiff**"), and Defendants, The Litigation Practice Group, PC, Vulcan Consulting Group, LLC, Bat, Inc., Tony M. Diab, and Daniel Stephen March (collectively, the "**Defendants**") (Plaintiff and Defendants are sometimes individually referred to as a "**Party**", and collectively referred to herein as the "**Parties**"). The Parties agree and stipulate to the following:

### Recitals

**WHEREAS**, Plaintiff initiated this action against Defendants, asserting claims for foreclosure of a security interest, permanent injunction, and imposition of a constructive trust (the "**Lawsuit**");

**WHEREAS**, the Parties have reached an agreement and desire to resolve any and all controversies, claims, debts, obligations and matters of whatever nature arising from or relating to the Lawsuit and desire to memorialize the terms of such resolution.

**NOW THEREFORE**, in exchange for the terms and conditions set forth herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and after extended arms-length negotiations, the Parties hereby AGREE as follows:

1.     **Recitals.** The foregoing recitals are true and correct and incorporated herein.

2.     **Payment.** In full and final settlement of the Lawsuit, and any other matters regarding or arising out of the Lawsuit or the relationship between the Parties, Plaintiff shall be paid the full and final sum of THREE HUNDRED THOUSAND DOLLARS and 00/100 ($300,000.00) (the "**Settlement Payment**"), which amount shall be paid in full within one (1) business day from the date that the Parties execute this Agreement (the "**Effective Date**").

Upon his timely receipt of the Payment, Plaintiff shall file a Notice of Voluntary Dismissal *with Prejudice* of the Lawsuit in the form attached hereto as Exhibit A (the "**Notice of Dismissal**") and ensure that the Court enters the Order of Dismissal with Prejudice in the form attached hereto as Exhibit B (the "**Order of Dismissal**").

3.     **Failure of Performance.** If Defendants do not timely make the Settlement Payment as required under Paragraph 2, or if Defendants breach or fail to perform any obligation under this Agreement (each of the foregoing, an "**Event of Default**"), then the following provision shall apply:

(i)     **Entry of Consent Final Judgment.** Defendants hereby stipulate to the entry of, and Plaintiff is hereby authorized to submit a Consent Final Judgment to the Court, providing for a Judgment in favor of Plaintiff in the gross amount of SEVEN HUNDRED FOUR THOUSAND DOLLARS and 00/100 ($704,000.00), and interest accruing on the gross amount of $704,000.00 from and after the date of entry of Judgment at the Florida post-judgment interest rate.

4.      **Releases.**  Except for their obligations under this Agreement, the Parties hereby completely and fully release, acquit, forever discharge, and hold harmless each other, along with their respective past, present, and future officers, directors, shareholders, members, managers, partners, successors, predecessors, assigns, employers, employees, attorneys, servicers, contractors, agents, insurers and affiliates (collectively, the "**Released Parties**"), jointly and severally, of and from any and all claims, counterclaims, actions, causes of action, liabilities, demands, debts, liens, obligations, rights, damages, costs, expenses, judgments, restitution, and controversies of every kind and description, whether known or unknown, existing in law or in equity, contingent or accrued, liquidated or unliquidated, which are now existing or which may or shall hereafter exist or arise from the facts and circumstances surrounding the Lawsuit, as well as the negotiation, settlement, defense, handling, or compromise of any and all counterclaims, claims or demands made by reason of the facts and circumstances surrounding the Lawsuit.

5.      **Termination of UCC Financing Statement(s).**  Within seven (7) days of its receipt of the Settlement Payment, Plaintiff shall file UCC termination statement(s) terminating any UCC Filing Statements filed on its behalf against any of the Defendants and shall provide timely notice of a copy of the UCC termination statement(s) to the Defendants.

6.      **Non-Admission of Liability.**  The Parties agree that this Agreement is the compromise of potential, doubtful and disputed claims and does not constitute, and should not be construed as, an admission of liability, wrongdoing, fault, judgment or concession or as evidence with respect thereto by any Party.

7.      **No Inducement.**  The Parties declare and represent that they were not induced to enter this Agreement by any representations respecting the nature and extent of any damages, legal liability, or financial responsibility made by any Party or their representatives.

8.    **Entire Agreement.**  This Agreement contains the entire understanding of the Parties hereto with respect to the matters referred to herein.  No other representations, covenants, undertakings, or other prior or contemporaneous agreements, oral or written, respecting such matters, which are not specifically incorporated herein, shall be deemed in any way to exist or bind either of the Parties hereto. The Parties hereto acknowledge that each Party has not executed this Agreement in reliance on any such promise, representation or warranty.

9.    **Modification.**  This Agreement shall not be modified by either Party by oral representation made before or after the execution of this Agreement.  This Agreement may be modified only by an instrument in writing and signed by all Parties hereto.

10.    **Counterparts.**  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original Agreement, and all of which shall constitute one Agreement to be effective as of the date first written above.

11.    **Facsimile or E-mail Signatures.**  It is agreed that a facsimile or e-mail signature on this Agreement may be treated as an original signature to this Agreement.

12.    **Severability.**  If any provisions of this Agreement as applied to either Party or to any circumstance shall be adjudged by a court to be void and unenforceable, the same shall in no way affect:

(i)    Any other provision of this Agreement;

(ii)    The application of such provision in any other circumstances; or

(iii)    The validity or enforceability of the Agreement as a whole.

13.    **Construction.**  This Agreement shall not be construed against the Party preparing it, but shall be construed as if all Parties jointly prepared this Agreement and any uncertainty and ambiguity shall not be interpreted against either Party. This Agreement is to be interpreted, enforced and governed by and under the laws of the State of Florida.

14.    **Binding on Successors.**  This Agreement and the conditions and covenants contained herein, shall inure to the benefit of and be binding upon the heirs, representatives, trustees, successors and assigns of each of the Parties.

15.    **Time of the Essence.**  Time is of the essence for the performance of each and every covenant and the satisfaction of each and every condition in this Agreement.

16.    **Further Documents.**  The Parties shall execute and deliver all documents and perform all further acts that may be reasonably necessary to effectuate the provisions of this Agreement.

17.    **Advice of Counsel.**  Every Party has received or has had the opportunity to receive independent advice of counsel of his/her/its own choosing with respect to the advisability of entering into this Agreement.

18.    **Headings.**  The section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**[Signature Page to Settlement Agreement and Release]**

IN WITNESS WHEREOF, the Parties have executed and delivered this Agreement effective as of the Effective Date.

**THE POINT 69, LLC**

Dated: _____7/11/2022_____         By:_____

                                        Joes Gestetner, President

The foregoing instrument was acknowledged before me by means of ☐ physical presence or ☐ online notarization this ___ day of July, 2022, by Joes Gestetner.  He is personally known to me or has produced _____ [type of identification] as identification and did take an oath.

_____

Notary Public:

Seal:

**THE LITIGATION PRACTICE GROUP, PC**

Dated: 7/11/2022

By: _____
Daniel S. March, Chief Executive Officer

**VULCAN CONSULTING GROUP, LLC**

Dated: 7-11-2022

By: _____
Lisa Cohen, Managing Member

**BAT, INC.**

Dated: 7/11/'22

By: _____
Tony M. Diab, Chief Executive Officer

Dated: 7/11/'22

_____
**TONY M. DIAB**

Dated: 7/11/2022

_____
**DANIEL STEPHEN MARCH**

The foregoing instrument was acknowledged before me by means of ☐ physical presence or ☐ online notarization this ___ day of July, 2022, by Daniel Stephen March.  He is personally known to me or has produced _____ [type of identification] as identification and did take an oath.

_____
Notary Public:

Seal:

The foregoing instrument was acknowledged before me by means of ☐ physical presence or ☐ online notarization this ___ day of July, 2022, by Lisa Cohen.  She is personally known to me or has produced _____ [type of identification] as identification and did take an oath.

_____
Notary Public:

Seal:

The foregoing instrument was acknowledged before me by means of ☐ physical presence or ☐ online notarization this __ day of July, 2022, by Daniel Stephen March.  He is personally known to me or has produced _____ [type of identification] as identification and did take an oath.

_____

Notary Public:

Seal:

# EXHIBIT 5

| | |
|---|---|
| **From:** | Jose Ceide <Ceide@salazar.law> |
| **Sent:** | Monday, July 11, 2022 2:01 PM |
| **To:** | Tony Diab |
| **Cc:** | Luis Salazar |
| **Subject:** | POINT 69, LLC VS THE LITIGATION PRACTICE GROUP, |
| **Attachments:** | 7078.000 Settlement Agreement FULLY EXECUTED.pdf; Truist IOTA Trust Incoming Wire Form.pdf |

Tony,

Attached please find a fully executed copy of the Settlement Agreement and Release.

Consistent with the terms of the Settlement Agreement, please ensure that you wire the settlement payment of $300K is timely submitted to counsel for Point 69's IOTA Account, the instructions for which are attached again for your ease of reference.  Thanks.

Best regards,

**Jose A. Ceide | Attorney**



**T:** 305.374.4848 ext.150
**D:** 305.374.4856
**E:** Ceide@Salazar.Law
**W:** www.Salazar.law
**Mold Breakers, Difference Makers™**
This correspondence and its contents are confidential and may be privileged.

---

**From:** Jason Slatkin <jslatkin@loriumlaw.com>
**Sent:** Monday, July 11, 2022 4:49 PM
**To:** Jose Ceide <Ceide@salazar.law>
**Cc:** Luis Salazar <luis@salazar.law>; Richard Storfer <rstorfer@loriumlaw.com>
**Subject:** RE: SERVICE OF COURT DOCUMENT CASE NUMBER 062021CA018391AXXXCE POINT 69, LLC VS THE LITIGATION PRACTICE GROUP,

See attached fully executed agreement as well as my firm's wire instructions. Thank you.



**Jason E. Slatkin, Esq.**
**Phone:** (954) 462-8000
**Direct:** (954) 331-4098
**Web:** loriumlaw.com
**Email:** jslatkin@loriumlaw.com
101 N.E. 3rd Ave., Suite 1800
Fort Lauderdale, FL 33301

Exhibit 5, page 65

# **EXHIBIT** 6

In re: The Litigation Practice Group PC
Disbursement Details by Payee
4 Years Pre-Petition (03/20/2019 - 03/20/2023)

**GROBSTEIN TEEPLE**

| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|-----------|--------------|----------------|----------------|------------------|--------------|--------------|------|
| Chase | The Litigation Practice Group PC | ▮3158 | 7/31/2022 | 7/11/2022 | | 300,000.00 | Fedwire Debit Via: Truist Bank/2631 91387 A/C: Lorium Law PVc US mad: 0711 B1QgcO8CO31216 Tm: 6643800192Jo |
| | | | | | | **300,000.00** | |

DRAFT FORM - SUBJECT TO CHANGE

Exhibit 6, page 67

# Adversary Proceeding Cover Sheet

B1040 (FORM 1040) (12/24)

## ADVERSARY PROCEEDING COVER SHEET
### (Instructions on Reverse)

**ADVERSARY PROCEEDING NUMBER**
(Court Use Only)

| PLAINTIFFS | DEFENDANTS |
|---|---|
| Richard A. Marshack, Trustee of the LPG Liquidation Trust | Point 69, LLC; Lorium PLLC aka Lorium Law |

**ATTORNEYS** (Firm Name, Address, and Telephone No.)

Christopher Celentino (SBN 131688)
Yosina M. Lissebeck (SBN 201654)
Christopher B. Ghio (SBN 259094)
DINSMORE & SHOHL LLP
655 West Broadway, Ste 800
San Diego, CA 92101   Telephone (619) 400-0500
christopher.celentino@dinsmore.com
yosina.lissebeck@dinsmore.com
christopher.ghio@dinsmore.com

Matthew J. Stockl (SBN 329366)
DINSMORE & SHOHL LLP
550 South Hope Street, Ste 1765
Los Angeles, CA 90071   Telephone (213) 335-7737
matthew.stockl@dinsmore.com

**ATTORNEYS** (If Known)

**PARTY** (Check One Box Only)

☐ Debtor   ☐ U.S. Trustee/Bankruptcy Admin
☐ Creditor   ☐ Other
☐ Trustee

**PARTY** (Check One Box Only)

☐ Debtor   ☐ U.S. Trustee/Bankruptcy Admin
☐ Creditor   ☐ Other
☒ Trustee

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
(1) Avoidance, Recovery, and Preservation of 2-Year Actual Fraudulent Transfers; (2) Avoidance, Recovery, and Preservation of 2-Year Constructive Fraudulent Transfers; (3) Avoidance, Recovery, and Preservation of 4-Year Actual Fraudulent Transfers; (4) Avoidance, Recovery, and Preservation of 4-Year Constructive Fraudulent Transfers; (5) Turnover; (6) Disallowance of Claims; and (7) Aiding and Abetting Against Loum PLLC aka Lorium Law

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(a) – Recovery of Money/Property**
☒ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☒ 13-Recovery of money/property - §548 fraudulent transfer
☒ 14-Recovery of money/property - other  - §§ 544(b), 550, and 551; Cal.
  Civ. Code §§ 3439.04(a), 3439.04(b), 3439.05, and 3439.07

**FRBP 7001(b) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(c) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(d) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(e) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(f) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation,
  actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(f) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation
  (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(g) – Injunctive Relief**
☐ 71-Injunctive relief- imposition of stay
☐ 72-Injunctive relief - other

**FRBP 7001(h) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(i) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(j) Determination of Removed Action**
☐ 01-Determination of remove d claim or cause

**Other**
☐ SS-SIPA Case - 15 U.S.C. §§78aaa *et.seq.*
☐ 02-Other (e.g. other actions that would have been brought in state court
  if unrelated to bankruptcy case)

| ☒ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $590,000 |

**Other Relief Sought**
Disallowance of claims - § 502(d); awarding Plaintiff monetary damages in the amount of all fraudulent transfers on aiding and abetting claim

B1040 (FORM 1040) (12/24)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>The Litigation Practice Group P.C. | BANKRUPTCY CASE NO.<br>8:23-bk-10571-SC | |
| DISTRICT IN WHICH CASE IS PENDING<br>Central District of California | DIVISION OFFICE<br>Santa Ana | NAME OF JUDGE<br>Scott C. Clarkson |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br>/s/ Matthew J. Stockl | | |
| DATE<br>March 14, 2025 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Christopher Celentino<br>Yosina M. Lissebeck<br>Matthew J. Stockl | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.