1  CHRISTOPHER CELENTINO (State Bar No. 131688)
   Christopher.Celentino@dinsmore.com
2  YOSINA M. LISSEBECK (State Bar No. 201654)
   Yosina.Lissebeck@dinsmore.com
3  CHRISTOPHER B. GHIO (259094)
   Christopher.Ghio@dinsmore.com
4  **DINSMORE & SHOHL LLP**
5  655 West Broadway, Ste 800
   San Diego, California 92101
6  Telephone: (619) 400-0500
   Facsimile: (619) 400-0501
7
8  MATTHEW J. STOCKL (State Bar No. 329366)
   Matthew.Stockl@dinsmore.com
9  **DINSMORE & SHOHL LLP**
   550 South Hope Street, Ste 1765
10 Los Angeles, CA 90071
   Telephone: (213) 335-7737
11 Facsimile: (213) 335-7740
12
   Special Counsel to Richard A. Marshack,
13 Trustee of the LPG Liquidation Trust
14
15                **UNITED STATES BANKRUPTCY COURT**

16          **CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION**

17 | In re: | Case No. 8:23-bk-10571-SC |
18 | The Litigation Practice Group P.C., | Chapter 11 |
19 | Debtor. | Adv. Proc. No. _____ |
20 | | **COMPLAINT FOR:** |
21 | Richard A. Marshack, Trustee of the LPG Liquidation Trust, | **(1) AVOIDANCE, RECOVERY, AND PRESERVATION OF 2-YEAR ACTUAL FRAUDULENT TRANSFERS;** |
22 | Plaintiff, | |
23 | v. | **(2) AVOIDANCE, RECOVERY, AND PRESERVATION OF 2-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS;** |
24 | Tux, LLC, a Delaware limited liability company; Thomas Bryant, an individual, | |
25 | | |
26 | Defendants. | **(3) AVOIDANCE, RECOVERY, AND PRESERVATION OF 4-YEAR ACTUAL FRAUDULENT TRANSFERS;** |
27 | | |
28 | | **(4) AVOIDANCE, RECOVERY, AND PRESERVATION OF 4-YEAR** |

**CONSTRUCTIVE FRAUDULENT TRANSFERS;**

**(5) TURNOVER; AND**

**(6) AIDING AND ABETTING**

Judge: Hon. Scott C. Clarkson

For his *Complaint for (1) Avoidance, Recovery, and Preservation of 2-Year Actual Fraudulent Transfers; (2) Avoidance, Recovery, and Preservation of 2-Year Constructive Fraudulent Transfers; (3) Avoidance, Recovery, and Preservation of 4-Year Actual Fraudulent Transfers; (4) Avoidance, Recovery, and Preservation of 4-Year Constructive Fraudulent Transfers; (5) Turnover; and (6) Aiding and Abetting* ("Complaint"), plaintiff Richard A. Marshack, the former Chapter 11 Trustee for the for the bankruptcy estate ("Estate") of debtor The Litigation Practice Group P.C. ("Debtor" or "LPG") and current liquidating trustee of the LPG Liquidation Trust (collectively, "Trustee" or "Plaintiff") in the above-captioned bankruptcy case ("Bankruptcy Case"), alleges and avers as follows:

**STATEMENT OF JURISDICTION, NATURE OF PROCEEDING, AND VENUE**

1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E), (H) and (O), 1334(b), and General Order No. 13-05 of the District Court for the Central District of California because this is a core proceeding arising in and/or related to the Bankruptcy Case, which is a case under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code"), and which is pending in the United States Bankruptcy Court for the Central District of California, Santa Ana Division ("Bankruptcy Court").

2.      Regardless of whether this proceeding is core, non-core, or otherwise, Plaintiff consents to the entry of a final order and judgment by the Bankruptcy Court.

3.      Defendants are notified that Rule 7008 of the Federal Rules of Bankruptcy Procedure requires Defendants to plead whether consent is given to the entry of a final order and

judgment by the Bankruptcy Court.

4.      Venue of this adversary proceeding properly lies in this judicial district pursuant to 28 U.S.C. § 1409(a) because this proceeding is related to Debtor's pending Bankruptcy Case.

## THE PARTIES

5.      Plaintiff, Richard A. Marshack, was the duly-appointed, qualified, and acting Chapter 11 Trustee of Debtor's Estate and is now the current liquidating trustee of the LPG Liquidation Trust.

6.      Debtor is, and at all material times was, a professional corporation organized, existing, and in good standing under the laws of the State of California, with its principal place of business in Tustin, California.

7.      Defendant, Tux, LLC ("Tux" or "Defendant"), is, and at all material times represented that it was, a limited liability company existing under the laws of the State of Delaware.

8.      Defendant may be served by first class mail postage prepaid upon Thomas Bryant, the owner of Tux, at 2958 Calle Frontera, San Clemente, California 92673.

9.      Defendant may also be served by first class mail postage prepaid upon Tux's registered agent for service of process, United States Corporation Agents, Inc., at 131 Continental Drive, Suite 305, Newark, Delaware 19713.

10.     Defendant Thomas Bryant ("Mr. Bryant" and, together with Tux, "Defendants") is, and at all material times was, an individual resident of the State of California subject to service of process at 2958 Calle Frontera, San Clemente, California 92673.

## GENERAL ALLEGATIONS

**A.      The Bankruptcy Case**

11.     On March 20, 2023 ("Petition Date"), Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, commencing the Bankruptcy Case.

12.     The Office of the United States Trustee ("UST") filed its *Motion by United States Trustee to Dismiss or Convert Case Pursuant to 11 U.S.C. § 1112(b)* [Bankr. Docket No. 21] and creditors Debt Validation Fund II, LLC; MC DVI Fund 1, LLC; and MC DVI Fund 2, LLC filed the *Motion by DVF and MC DVI to Dismiss Chapter 11 Case Pursuant to 11 U.S.C. §§ 105, 305,*

3

*349, & 1112, or in the Alternative Convert This Case to Chapter 7 or Appoint a Trustee* [Bankr. Docket No. 44]. On May 4, 2023, the Court entered its *Order Directing United States Trustee to Appoint Chapter 11 Trustee* [Bankr. Docket No. 58].

13.    Pursuant to the *Acceptance of Appointment as Chapter 11 Trustee* [Bankr. Docket No. 63], on May 8, 2023, Trustee accepted his appointment as the Chapter 11 Trustee in the Bankruptcy Case. The Court approved the Trustee's appointment in its *Order Approving the U.S. Trustee's Application for the Appointment of a Chapter 11 Trustee* [Docket No. 65].

14.    Trustee was not appointed until after events of the case and, therefore, bases these allegations on information and belief. *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) ("The Twombly plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible."); *Miller v. City of Los Angeles*, 2014 U.S. Dist. LEXIS 198871, 2014 WL 12610195, at *5 (C.D. Cal. Aug. 7, 2014) (recognizing that the plaintiff's "information and belief" pleading was allowed and "necessary at times"); *see also Mireskandari v. Daily Mail and General Trust PLC*, 2013 U.S. Dist. LEXIS 194437, 2013 WL 12129642, at *4 (C.D. Cal. July 31, 2013) ("The Federal Rules of Civil Procedure allow parties to plead facts on 'information and belief' if the facts 'will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.'" (citations omitted)).

15.    Pursuant to the *Order Confirming Modified First Amended Joint Chapter 11 Plan of Liquidation* entered September 9, 2024, and the *Notice of Occurrence of Effective Date of Modified First Amended Joint Chapter 11 Plan of Liquidation* filed September 24, 2024, Richard A. Marshack became the Liquidating Trustee of the LPG Liquidation Trust, effective September 24, 2024, and he continues to serve in this capacity at this time.  [Bankr. Docket Nos. 1646 & 1762].

16.    All claims have been transferred to the Liquidating Trust pursuant to the confirmed plan and Plaintiff brings this action solely in his capacity as the former Chapter 11 Trustee and current Liquidating Trustee of the LPG Liquidation Trust for the benefit of Debtor's Estate and its creditors.

**B.      Protective Order**

17.      On or about May 2, 2024, Plaintiff filed that certain Notice and Motion for Entry of Protective Order (the "Protective Order Motion").

18.      On June 3, 2024, the Court entered its Order Granting Motion for Entry of Protective Order and the Protective Order [Docket No. 1270] (the "Protective Order"). A true and accurate copy of the Protective Order is attached hereto as **<u>Exhibit 1</u>** and incorporated herein by reference.

19.      By its own terms, the Protective Order applies to this adversary proceeding and governs all discovery conducted herein.

**C.      LPG**

20.      LPG operated a law firm for consumers across the country who sought assistance in contesting or resolving debts they would identify.

21.      The consumers would pay LPG over a period of time via monthly debits from their bank accounts.

22.      The monthly payments were meant to cover all legal services LPG provided to the consumers including validation of the debts, review of documents to determine enforceability, and court appearances to halt lawsuits to obtain judgments.

23.      In certain instances, LPG would file a lawsuit in an effort to eliminate a disputed debt or to prosecute affirmative claims held by the consumers.

24.      LPG mismanaged the consumers' monthly payments.

25.      Tony Diab is, and at all relevant times was, an individual who operated, dominated and controlled LPG ("Diab"). Diab and other defendants devised a plan to fraudulently transfer funds, client files, client funds and assets in the form of ACH Receivables (the "ACH Receivables" or "Accounts Receivable") out of LPG to third parties prior to the filing of bankruptcy.

26.      To obtain consumer clients, LPG contracted with marketing companies, who engaged in illegal capping and would advertise or call to solicit consumers to become clients of LPG in exchange for a percentage of the ACH Receivables collected by LPG from the consumers. The marketing affiliates went so far as to assist with the execution of an engagement letter between the consumer and LPG.

27.    In exchange, LPG agreed to pay the marketing affiliates a percentage the monthly payments collected by LPG from the consumers.

28.    Because LPG received payments from consumers over time, it often sought financing by borrowing against its future cash flows. This borrowing was not only used to finance operations at LPG, but also to pay the fees owed to the marketing companies for providing the client referrals.

29.    Many of the documents executed in connection with such financing described the transactions as accounts receivable purchase agreements.

30.    Diab used entities he controlled, and were his alter egos, including, without limitation, Vulcan Consulting Group, Coast Processing, PrimeLogix, LLC, Marich Bein, PurchaseCo80 and/or Maverick Management LLC to divert LPG consumer funds and ACH Receivables. Diab would use numerous ACH processing companies in order to easily transfer millions of dollars from Debtor to these entities he controlled, without oversight or detection, and to avoid payment disputes and complications.  The money that flowed from Debtor through these bank account to Defendants consisted of Client Funds that Debtor funneled to these entities by means of the ACH processing companies.  Debtor also made deposits into these entities bank account such that they received Client Funds directly from Debtor in addition to future Accounts Receivable.

**D.    Defendants**

31.    Defendant Tux was one of the marketing companies that procured clients for LPG.

32.    LPG agreed to pay, and in fact paid, Defendant a portion of the monthly payments received from consumers referred by Defendants.

33.    Defendant also likely entered into agreements pursuant to which it purported to sell accounts receivable back to LPG.

34.    On information and belief, Mr. Bryant (a) received transfers from Debtor as an initial, immediate, or mediate transferee; (b) received transfers from Defendant as a mediate transferee; (c) directed or controlled Defendant's conduct and, as such, was responsible in some manner for the occurrences alleged herein; and/or (d) was used to shield Debtor's assets from collection, levy or execution, and to otherwise, hinder, delay and defraud the Debtor and its creditors.

i.    **Affiliate Agreement**

35.    On or about November 1, 2021, Debtor entered into an affiliate agreement with Defendant ("Affiliate Agreement").  A true and accurate copy of the Affiliate Agreement is attached hereto as **Exhibit 2** and incorporated herein by reference.

36.    The Affiliate Agreement states that Defendant "owns and operates a system of generating leads consisting of consumers interested in the legal services offered by LPG." *See* **Ex. 2.**

37.    Pursuant to the Affiliate Agreement, Defendant generated leads consisting of consumers interested in the legal services offered by LPG and referred those consumers to Debtor. *See* **Ex. 2.**

38.    Pursuant to the Affiliate Agreement, Debtor agreed to pay Defendant as follows:

> Affiliate shall be entitled to receive the following as full and complete compensation for its services to LPG: LPG shall pay 75% per file for each file that Affiliate places with LPG, not counting the monthly maintenance fee of $91.38, which LPG shall retain to cover administrative costs for each file. LPG shall calculate the amount of each file, apply the above-identified percentage fee, and remit the same to Affiliate pursuant to an agreed-upon schedule not to exceed one remittance per seven (7) calendar days. If any consumer cancels LPG's services, or demands a refund for payment for such services, or both, then Affiliate shall be responsible for returning the entirety of its fees collected on such file to LPG (in such percentage as is set forth herein). LPG has exclusive discretion to grant or deny a requested refund or cancellation. LPG shall be entitled to offset any future payments to Affiliate in order to recover a refund awarded by LPG. Finally, LPG may treat a consumer's failure to remit payment in a timely manner as a cancellation of the legal services agreement executed by consumer with LPG, and has sole discretion to make such determination.

*See* **Ex. 2**.

39.    The Affiliate Agreement violates Sections 6151 and 6155 of the California Business and Professional Code, which prohibit referrals of potential clients to attorneys unless registered with the State Bar of California. Cal. Bus. & Prof. Code § 6155. "Referral activity" includes "any entity 'which, in person, electronically, or otherwise, refers the consumer to an attorney or law firm not identified' in the advertising." *Jackson v. LegalMatch.com*, 42 Cal. App. 5th 760, 775 (2019). A referral includes receiving information from potential clients and sending that information to

1    lawyers, even when the advertiser does not advertise the name of the attorneys and the clients do

2    not clear the name of the potential attorney after the referral occurred. *Id.*

3        40.    Further, if any effect of an agreement is to accomplish an unlawful purpose, the

4    agreement may be declared illegal regardless of the intention of the parties. *Stockton Morris Plan*

5    *Co. v. Cal. Tractor & Equip. Corp.*, 112 Cal. App. 2d 684, 690 (1952) (citing *Fewel & Dawes, Inc.*

6    *v. Pratt*, 17 Cal. 2d 85, 91 (1941)). This remains true regardless of whether the contract has been

7    performed. *Stevens v. Boyes Hot Springs Co.*, 113 Cal. App. 479, 483 (1931) (A contract by a

8    corporation to purchase its own stock has the effect of illegally withdrawing and paying to a

9    stockholder a part of the capital stock of the corporation and is illegal and void, regardless of the

10   fact that the contract is fully performed by the sellers and partially performed by the corporation.);

11   *Mansfield v. Hyde*, 112 Cal. App. 2d 133, 139 (1952), overruled, *Fomco, Inc. v. Joe Maggio, Inc.*,

12   8 Cal. Rptr. 459 (1960) (Where object of statute requiring licenses is to prevent improper persons

13   from engaging in particular activity, or is for purpose of regulating occupation or business for

14   protection of public, imposition of penalty amounts to prohibition against engaging in occupation

15   or business without license, and contract made by unlicensed person in violation of statute is

16   invalid.); *Firpo v. Murphy*, 72 Cal. App. 249, 252 (1925) (A contract to pay commissions to a real

17   estate broker is illegal and he is not entitled to recover thereon where he fails to secure the license

18   required by law to carry on his business.).

19       41.    Because the Affiliate Agreement violates federal and state law since the named

20   defendants have not registered with the State Bar of California as required by CAL. BUS. & PROF.

21   CODE § 6155, it is void, unenforceable, and subject to avoidance as fraudulent. Any alleged

22   consideration provided under the Affiliate Agreement and/or the ARPA Agreements (defined

23   hereafter below) was unlawful.

24       42.    Unlawful consideration is that which is: "(1) contrary to an express provision of law;

25   (2) contrary to the policy of express law, though not expressly prohibited; or (3) otherwise contrary

26   to good morals." Cal. Civ. Code § 1667. "If any part of a single consideration for one or more

27   objects, or of several considerations for a single object, is unlawful, the entire contract is void." Cal.

28   Civ. Code § 1608.

### ii.    Accounts Receivable Purchase Agreements

43.    On information and belief, Defendant entered into one or more Accounts Receivable Purchase Agreement with Debtor (collectively referred to as the "ARPA Agreements").

44.    On information and belief, pursuant to the ARPA Agreements, Defendant purported to sell Debtor streams of monthly payments from consumers that were supposed to be held in trust until earned.

45.    By entering into the ARPA Agreements, Debtor and Defendant violated federal and state laws by selling unearned legal fees or funds there were supposed to be held in trust or used for the benefit of consumers.

46.    The effect of the ARPA Agreements and/or related transactions was to accomplish an unlawful purpose. Thus, the agreements may be declared illegal regardless of the intention of the parties. *Stockton Morris Plan Co. v. Cal. Tractor & Equip. Corp.*, 112 Cal. App. 2d 684, 690 (1952) (citing *Fewel & Dawes, Inc. v. Pratt*, 17 Cal. 2d 85, 91 (1941)). This remains true regardless of whether the contract has been performed. *Stevens v. Boyes Hot Springs Co.*, 113 Cal. App. 479, 483 (1931) (A contract by a corporation to purchase its own stock has the effect of illegally withdrawing and paying to a stockholder a part of the capital stock of the corporation and is illegal and void, regardless of the fact that the contract is fully performed by the sellers and partially performed by the corporation.); *Mansfield v. Hyde*, 112 Cal. App. 2d 133, 139 (1952), overruled, *Fomco, Inc. v. Joe Maggio, Inc.*, 8 Cal. Rptr. 459 (1960) (Where object of statute requiring licenses is to prevent improper persons from engaging in particular activity, or is for purpose of regulating occupation or business for protection of public, imposition of penalty amounts to prohibition against engaging in occupation or business without license, and contract made by unlicensed person in violation of statute is invalid.); *Firpo v. Murphy*, 72 Cal. App. 249, 252 (1925) (A contract to pay commissions to a real estate broker is illegal and he is not entitled to recover thereon where he fails to secure the license required by law to carry on his business.).

47.    Because the ARPA Agreements violate federal and state laws, they are void, unenforceable, and subject to avoidance as fraudulent. Any alleged consideration provided to Debtor under the ARPA Agreements was unlawful.

48.     Unlawful consideration is that which is: "(1) contrary to an express provision of law; (2) contrary to the policy of express law, though not expressly prohibited; or (3) otherwise contrary to good morals." Cal. Civ. Code § 1667. "If any part of a single consideration for one or more objects, or of several considerations for a single object, is unlawful, the entire contract is void." Cal. Civ. Code § 1608.

### iii.     Demand Letter

49.     On or about October 28, 2024, Trustee sent a demand letter to Defendant (the "Demand Letter"). A true and accurate copy of the Demand Letter is attached hereto as **Exhibit 3** and incorporated herein by reference.

50.     The Demand Letter discussed certain transfers from Debtor that were made to Defendant within the 4-year period prior to the Petition Date, including 24 fraudulent conveyances totaling $244,868.78, which can be avoided and recovered by the Trustee pursuant to 11 U.S.C. §§ 544 and 548 and Cal. Civ. Code. §§ 3439.04 and 3439.05.

51.     Based on the information available to Trustee and considering the nature of the relationship between Debtor and Defendant, no potential defenses were identified that could reduce Defendant's liability for the fraudulent conveyances. Consequently, Defendant was requested to provide any facts and valid defenses that could substantiate its position and potentially mitigate or prevent some or all of the transfers made by Debtor.

52.     Defendant never responded to the Demand Letter.

53.     Trustee has yet to receive any response or payment from Defendant pursuant to the Demand Letter.

### E.     Payments to Defendant

54.     During the applicable reach-back period, Debtor paid Defendant the sum of at least $244,868.78 between November 12, 2021 and September 9, 2022, subject to proof at trial ("Transfers"). A true and accurate list of the known payments made by Debtor to Defendant is attached hereto as **Exhibit 4** and incorporated herein by reference.

55.     The Transfers are based on updated figures as of January 2025.

/ / /

**F.      LPG's Ponzi Scheme**

56.      The Ponzi Scheme Presumption exists in bankruptcy proceedings.

57.      The Ponzi Scheme Presumption can be utilized to establish a debtor's "intent to defraud future undertakers [investors] from the mere fact that a debtor was running a Ponzi scheme. Indeed, no other reasonable inference is possible.  A Ponzi scheme cannot work forever.  The investor pool is a limited resource and will eventually run dry.  The perpetrator must know that the scheme will eventually collapse as a result of the inability to attract new investors.  The perpetrator nevertheless makes payments to present investors, which, by definition, are meant to attract new investors.  He must know all along, from the very nature of his activities, that investors at the end of the line will lose their money.  Knowledge to a substantial certainty constitutes intent in the eyes of the law," *cf. Restatement (Second) of Torts § 8A* (1963 & 1964), and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them.  *Kirkland v. Rund (In re EPD Inv. Co., LLC)*, 114 F.4th 1148, 1153 (9th Cir. 2024) (by definition Ponzi scheme is destined to fail and the swindler and their entities often end in bankruptcy or equitable receivership); *Cf. Coleman Am. Moving Servs., Inc. v. First Nat'l Bank & Trust Co. (In re American Properties, Inc.)* 14 B.R. 637, 643 (Bankr. D. Kan. 1981) (intentionally carrying out a transaction with full knowledge that its effect will be detrimental to creditors is sufficient for actual intent to hinder, delay or defraud within the meaning of § 548(a)(1))."  *Merrill v. Abbott (In re Independent Clearing House Co.)* (D. Utah 1987) 77 B.R. 843, 860.  A trustee in bankruptcy is not required to show that an operator of a Ponzi scheme was subjectively aware his Ponzi scheme was destined to fail.  *In re EPD Inv. Co., LLC*, 114 F.4th at 1153 ("[a] trustee's action to recover assets fraudulently conveyed in the course of a Ponzi scheme does not require that the trustee also prove the Ponzi-scheme operator was subjectively aware his Ponzi scheme was destined to fail.").

58.      "But if all the debtor receives in return for a transfer is the use of the defendant's money to run a Ponzi scheme, there is nothing in the bankruptcy estate for creditors to share.  In fact, by helping the debtor perpetuate his scheme, the transfers exacerbate the harm to creditors by increasing the amount of claims while diminishing the debtor's estate.  In such a situation, the use of the defendant's money cannot objectively be called 'reasonably equivalent value.'"  *In re*

*Independent Clearing House Co.* 77 B.R. at 859.  Therefore, "[t]he trustee can avoid the transfers if they were preferential or fraudulent.  Transfers to investors in a Ponzi scheme are preferential and fraudulent.  Therefore, they constitute "property of the estate," and the trustee can recover them. *Id.* at 853 n.17 (citations omitted).

59.    Debtor was operating a Ponzi scheme that utilized affiliates and several other entities as investors to continue its unlawful business practices by using funds provided by current investors to attract new investors hoping for very high returns.  Therefore, the Debtor was running a Ponzi scheme and the Ponzi Scheme Presumption can be utilized to infer that the Debtor had the intent to defraud investors within the meaning of 11 U.S.C. section 548(a)(1).  This is evidenced by the Court in this Bankruptcy Case declaring that Debtor was operating a Ponzi scheme when it stated the following:

> It is important to note that this Court has never received any significant and trustworthy evidence that Debtor accomplished meaningful results for its clients, but only anecdotal examples of viable success for its clients.  By reviewing the Estate's claims register, there is evidence of consumer claims for the fraud and demanded but undelivered refunds of approximately $500 million.  There is ample evidence that the pre-petition Debtor never placed the collected funds into an attorney-client trust account, and that Debtor or its principals simply looted the payments received through the client automatic withdrawals, stiffing both the clients and outside attorneys who may have been working on client cases with the hopes of being paid.  There is also evidence before the Court that Debtor was running a Ponzi scheme and paying some outside (or "network") attorneys with funds obtained from new clients.  In this case, it appears that some of the "lenders" may have been serving as "investors," hoping for very high returns before "the music stopped."  The Ninth Circuit has recently explained, "[b]y definition, a Ponzi scheme is destined to fail because the pool of available investors is not limitless. When the Ponzi scheme operator's pool of investors inevitably runs dry, the scheme collapses and the swindler and their entities often end up in bankruptcy or equitable receivership. *See generally* David R. Hague, Expanding the Ponzi Scheme Presumption, 64 DePaul L. Rev. 867 (2015).  In bankruptcy, the court-appointed trustee is tasked with taking immediate control of the entity, ceasing ongoing fraudulent activity, locating and collecting assets for the bankruptcy or receivership estate, and achieving a final, equitable distribution of the remaining assets. *See* 11 U.S.C. § 704; *Kirkland v. Rund (In re EPD Inv. Co., LLC)*, 2024 U.S. App.

LEXIS 21363, at *15 (9th Cir. Aug. 23, 2024). Finally, there is evidence that Debtor was encumbering (or as some creditors assert, "double or triple selling") their accounts or receivables to multiple lenders.    With respect to Greyson's requested Administrative Claim [Dk. 676], and as more fully described in the concurrently entered order denying the claim, there has been no evidence presented that any work allegedly performed by Greyson assisted any clients or added any value to the Estate.

*See, Case 8:23-bk-10571-SC*, Doc 1545 n. 5.

60.    Moreover, since the Transfers were made with the intent to further the Ponzi scheme, the Debtor did not receive an objectively reasonable equivalent value for the Transfers, and the Trustee can avoid the Transfers because they were fraudulent.

**G.    LPG's Prepetition Creditors**

61.    Debtor was insolvent when each Transfer was made. This insolvency is evidenced in part by the fact that 14 separate UCC-1 statements were of record securing debts of the Debtor as of September 1, 2022. These statements remained unreleased as of the Petition Date. These statements either reflected secured liens against the Debtor's assets then owned or thereafter acquired, or provided evidence of the assignment or sale of substantial portions of the Debtor's future income.  Debtor's insolvency is an adjudicated fact based on the Court's finding of insolvency entered in other adversary proceedings pending before the Court.  *See, e.g.*, Case No. 8:23-bk-10571-SC; Adv. No. 8:24-ap-01002-SC [Adv. Docket No. 28] (finding that "Debtor was insolvent or rendered insolvent at the time of the transfers made to Defendant").

62.    Plaintiff directs Defendant to the Order Denying Greyson's Motion to Vacate the Preliminary Injunction entered as Bankr. Docket No. 1545 ("Order") where the Court found "it is clear to this Court that Debtor, since its pre-petition inception (and through the time of the appointment of the Chapter 11 Trustee), was, in the Court's opinion operating a criminal enterprise" and that "[t]here is also evidence before the Court that the Debtor was running a Ponzi scheme and paying some outside (or 'network') attorneys with funds obtained from new clients." Order p. 3, l. 11-13; p. 4, l. 14-15.  Insolvency is presumed as a matter of law if the debtor operated a Ponzi scheme.  *See, e.g., Glob. Money Mgmt., L.P. v. McDonnold*, No. 06CV34, 2008 U.S. Dist. LEXIS 128733, at *15 (S.D. Cal. Feb. 27, 2008) (concluding that "if a Ponzi scheme is proven, then the

debtor is proven insolvent from the time of its inception").

63.     When the Transfers were made, these prior UCC-1 statements secured the repayment of the following claimed amounts that are currently known to Trustee and are allegedly owed by the Debtor: (i) $2,374,004.82 owed to Fundura Capital Group as evidenced by Proof of Claim No. 335 purportedly secured by a UCC statement filed on or about May 19, 2021; (ii) approximately $15 million dollars owed to MNS Funding, LLC as evidenced by Proof of Claim No. 1060 purportedly secured by a UCC statement filed on or about May 28, 2021; (iii) approximately $5,000,000 owed to Azzure Capital, LLC as evidenced by Proof of Claim No. 127 secured by a UCC statement filed on or about May 28, 2021; and (iv) approximately $1.5 million dollars owed to Diverse Capital, LLC purportedly secured by UCC statements filed on or about September 15, 2021, and December 1, 2021.[1]

64.     As alleged above, LPG was borrowing against its assets and future income, often on unfavorable terms, not only to finance operations at LPG, but also to pay the fees owed to the marketing affiliates for providing consumer clients and to pay other loans to creditors that were in default or about to be in default as part of Diab's scheme to keep LPG creditors at bay for a long as possible until he could transfer LPG's assets, client files, Client Funds, and ACH Receivables to other entities under his control. Pursuant to the agreements with the marketing companies, significant percentages of future payments were already promised to be paid to the marketing affiliates from whatever future income the Debtor would receive. And, of course, the payments LPG received in the form of ACH Receivables were also trust funds paid to LPG by its law firm clients, subject to return of funds in the event of a request for refund or termination of the representation before LPG had earned the funds. In this regard, except to the extent earned, the ACH Receivables also represented a liability of the Debtor.

65.     In addition, on Debtor's Schedule E/F [Bankr. Docket No. 33], Debtor scheduled 11 unsecured creditors with priority unsecured claims totaling $374,060.04. These priority unsecured creditors include Indiana Dept. of Revenue, Dept. of Labor and Industries, Arizona Dept. of

---

[1] Trustee reserves all rights, claims, and defenses with respect to these and any other purported secured or unsecured claims.

1  Economic Security, Arkansas Dept. of Finance & Admin., California Franchise Tax Board, Georgia

2  Dept. of Labor, Internal Revenue Service, Mississippi Dept. of Revenue, Nevada Dept. of Taxation,

3  Utah State Tax Commission, and Wisconsin Dept. of Revenue (collectively, "Priority Unsecured

4  Creditors").

5        66.     Another group of creditors that Debtor listed on its Schedule E/F [Bankr. Docket No.

6  33] are nonpriority unsecured creditors. Those 58 creditors have scheduled claims totaling

7  $141,439,158.05 and include Ajilon; Anthem Blue Cross; Azevedo Solutions Groups, Inc.; Carolina

8  Technologies & Consulting Invoice; Collaboration Advisors; Credit Reporting Service Inc.; CT

9  Corporation – Inv.; Debt Pay Pro; Document Fulfillment Services; EnergyCare, LLC; Exela

10  Enterprise Solutions; First Legal Network, LLC; GHA Technologies Inc.; Harrington Electric, Inc.;

11  Imagine Reporting; Juize, Inc.; Krisp Technologies, Inc.; Liberty Mutual; Marc Lemauviel –

12  Allegra; MarkSYS Holdings, LLC; Netsuite-Oracle; Pitney Bowes; Rapid Credit, Inc.; SBS Leasing

13  A Program of De Lage Landen; Security Solutions; Sharp Business Systems; Streamline

14  Performance, Inc.; Thomson Reuters; Twilio, Inc.; Nationwide Appearance Attorneys; Executive

15  Center, LLC; Outsource Accelerator, Ltd.; TaskUs Holdings, Inc.; Marich Bein, LLC; Validation

16  Partners; MC DVI Fund 1, LLC; MC DVI Fund 2, LLC; Debt Validation Fund II, LLC; Tustin

17  Executive Center; LexisNexus; JP Morgan Chase; Business Centers of America; Michael Schwartz;

18  Anibal Colon Jr.; Kathleen Lacey; David Ulery; Kimberly Birdsong; Kevin Carpenter; Karen Suell;

19  Gloria Eaton; Carolyn Beech; Debra Price; Kenneth Topp; Darcey Williamson, Trustee; James

20  Hammett; Johnny Rizo; Beverly Graham; Kathleen Scarlett; and Geneve and Myranda Sheffield

21  (collectively, "Nonpriority Unsecured Creditors" and, together with the Secured Creditors and

22  Priority Unsecured Creditors, "Prepetition Creditors").

23        67.     As of the date this complaint was drafted, approximately 5,771 claims have been

24  filed with the bankruptcy Court. While Trustee has not reviewed all claims as of the date of this

25  complaint, and reserves all rights to object to those claims, the total amount is in excess of

26  approximately $717,507,462.29.

27  ///

28  ///

## FIRST CLAIM FOR RELIEF

### Count I - Avoidance, Recovery, and Preservation of

### Actual Fraudulent Transfers Against Tux

### [11 U.S.C. §§ 548(a)(1)(A), 550, and 551]

68.    Plaintiff realleges and incorporates here by reference each and every allegation contained in paragraphs 1 through 67 as though set forth in full.

69.    The Affiliate Agreement, ARPA Agreements, and all or a portion of the Transfers occurred within the two years prior to the Petition Date.

70.    On or after the date that such agreements were entered or executed and the Transfers were made, entities to which Debtor was or became indebted include the Prepetition Creditors.

71.    The Transfers happened while Debtor was insolvent or rendered Debtor insolvent.

72.    Despite Debtor's obligation to the Prepetition Creditors, Debtor continued to pay Tux sums received from consumers under such Affiliate Agreements, which constitutes an illegal capping agreement between Defendant and Debtor. Any obligation of the Debtor arising from such agreement is also avoidable as fraudulent.

73.    Despite Debtor's obligation to the Prepetition Creditors, Tux continued to sell or transfer portions of the accounts receivables generated under the ARPA Agreements to Debtor, which is illegal under federal and state laws.

74.    The Transfers were made with actual intent to hinder, delay, or defraud creditors of Debtor.

75.    The Debtor was operating a Ponzi scheme and the Ponzi Scheme Presumption can be utilized to infer the Debtor's actual intent to defraud within the meaning of 11 U.S.C. section 548(a)(1).

76.    The Debtor's conduct was done with oppression, fraud, and malice, as defined in Civil Code section 3294, entitling the Trustee to, in addition to the actual damages, exemplary or punitive damages for making an example of the Debtor and to punish the Debtor.

77.    The Affiliate Agreement, ARPA Agreements, and the Transfers of Debtor's funds are avoidable as fraudulent pursuant to 11 U.S.C. §§ 548(a)(1)(A), 550, and 551, and the common

law tort of intentional fraudulent transfers by one or more creditors who held and hold unsecured

claims against Debtor that were and are allowable against the Estate under 11 U.S.C. § 502 or that

were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the

Prepetition Creditors.

78.    The Affiliate Agreement, ARPA Agreements, and Transfers should be avoided as

fraudulent under 11 U.S.C. § 548(a)(1)(A) and under the common law tort of intentional fraudulent

transfers, and such transferred property, or the value thereof, should be recovered and preserved

for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

<u>**SECOND CLAIM FOR RELIEF**</u>

**Count II - Avoidance, Recovery, and Preservation of**

**Constructive Fraudulent Transfers Against Tux**

**[11 U.S.C. §§ 548(a)(1)(B), 550, and 551]**

79.    Plaintiff realleges and incorporates here by reference each and every allegation

contained in paragraphs 1 through 78 as though set forth in full.

80.    The Affiliate Agreement, ARPA Agreements, and all or a portion of the Transfers

occurred within the two years prior to the Petition Date.

81.    On or after the date that such agreements were executed and such Transfers were

made, entities to which Debtor was or became indebted include the Prepetition Creditors.

82.    The Transfers happened while Debtor:

  a.   was insolvent or became insolvent as a result;

  b.   was engaged or was about to engage in a transaction for which any property

       remaining with Debtor was of unreasonably small capital; or

  c.   intended to incur, or believed that it would incur, debts beyond its ability to pay

       as such debts matured.

83.    Because the referrals from Defendant to Debtor are illegal under federal and state

law, they are void and subject to avoidance as fraudulent. Any purported consideration constitutes

unlawful consideration, which cannot constitute reasonably equivalent value. Thus, at the time the

agreements were executed and the Transfers made, Debtor received less than reasonably equivalent

17

1  value.

2      84.      Furthermore, the Debtor did not receive the reasonably equivalent value of the

3  Transfers to Tux because by using Tux's money to run a Ponzi scheme there is nothing in Estate

4  for the creditors to share. Rather, the Transfers exacerbated the harm to creditors by increasing the

5  amount of claims while diminishing the Debtor's Estate. In this situation, the use of Tux's money

6  to further the Debtor's Ponzi scheme cannot be consideration for the Transfers and cannot

7  objectively be called reasonably equivalent value.

8      85.      Therefore, the Defendant was acting as an investor in the Debtor's Ponzi scheme.

9  Any transfers made to the Defendant can be avoided by the Plaintiff since the Transfers are

10  preferential and fraudulent such that they constitute property of the Estate in which the Plaintiff can

11  recover.

12      86.      The Affiliate Agreement, ARPA Agreements, and the Transfers should be avoided

13  as fraudulent under 11 U.S.C. § 548(a)(1)(B), and such transferred property, or the value thereof,

14  should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and

15  551.

16              **THIRD CLAIM FOR RELIEF**

17          **Count III - Avoidance, Recovery, and Preservation of**

18              **Actual Fraudulent Transfers Against Tux**

19  **[11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.04(a), 3439.04(b), and 3439.07]**

20      87.      Plaintiff realleges and incorporates here by reference each and every allegation

21  contained in paragraphs 1 through 86 as though set forth in full.

22      88.      The Affiliate Agreement, ARPA Agreements, and all or a portion of the Transfers

23  occurred within the four years prior to the Petition Date.

24      89.      On or after the date that such agreements were entered and such Transfers were

25  made, entities to which Debtor was or became indebted include the Prepetition Creditors.

26      90.      Despite Debtor's obligation to the Prepetition Creditors, Debtor continued to pay

27  Tux sums received from consumers under the Affiliate Agreements, which constitutes an illegal

28  capping agreement between Defendant and Debtor.

91.    The Transfers happened while Debtor was insolvent or Debtor became insolvent shortly after the Transfers were made as is evidenced by the filing of the voluntary petition.

92.    The value of the consideration received by Debtor for such Transfers was not reasonably equivalent to the value of the Transfers because the Transfers were used to further assist Debtor in its Ponzi scheme.

93.    Because the referrals from Defendant to Debtor are illegal under federal and state law, they are void and subject to avoidance as fraudulent. Any purported consideration constitutes unlawful consideration, which cannot constitute reasonably equivalent value. Thus, at the time the agreements were executed and the Transfers made, Debtor received less than reasonably equivalent value.

94.    The Transfers were made with actual intent to hinder, delay, or defraud creditors of Debtor.

95.    The Debtor was operating a Ponzi scheme and the Ponzi Scheme Presumption can be utilized to infer the Debtor's actual intent to defraud within the meaning of 11 U.S.C. section 548(a)(1).

96.    The Debtor's conduct was done with oppression, fraud, and malice, as defined in Civil Code section 3294, entitling the Trustee to, in addition to the actual damages, exemplary or punitive damages for making an example of the Debtor and to punish the Debtor.

97.    The Affiliate Agreements, the ARPA Agreements, and the Transfers of Debtor's funds are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and Cal. Civ. Code §§ 3439.04(a), 3439.04(b), and 3439.07, and the common law tort of intentional fraudulent transfers by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against the Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

98.    Accordingly, the Affiliate Agreements, the ARPA Agreements, and the Transfers should be avoided as fraudulent under 11 U.S.C. §§ 544(b) and Cal. Civ. Code §§ 3439.04(a), 3439.04(b), and 3439.07, and under the common law tort of intentional fraudulent transfers, and such transferred property, or the value thereof, should be recovered and preserved for the benefit

of the Estate pursuant to 11 U.S.C. §§ 550 and 551 and Cal. Civ. Code § 3439.07.

## FOURTH CLAIM FOR RELIEF

### Count IV - Avoidance, Recovery, and Preservation of

### Constructive Fraudulent Transfers Against Tux

### [11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.05, and 3439.07]

99.     Plaintiff realleges and incorporates here by reference each and every allegation contained in paragraphs 1 through 98 as though set forth in full.

100.    The Affiliate Agreement, the ARPA Agreements, and all or a portion of the Transfers occurred within the four years prior to the Petition Date.

101.    The Transfers happened while Debtor:

    a.   was insolvent or became insolvent as a result;

    b.   was engaged or was about to engage in a transaction for which any property remaining with Debtor was of unreasonably small capital; or

    c.   intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

102.    Because the referrals from Tux to Debtor are illegal under federal and state law, the agreements are void and subject to avoidance as fraudulent. Any purported consideration constitutes unlawful consideration, which cannot constitute reasonably equivalent value. Thus, at the time the agreements were executed and the Transfers made, Debtor received less than reasonably equivalent value.

103.    Furthermore, the Debtor did not receive the reasonably equivalent value of the Transfers to the Tux because by using Tux's money to run a Ponzi scheme there is nothing in Estate for the creditors to share. Rather, the Transfers exacerbated the harm to creditors by increasing the amount of claims while diminishing the Debtor's Estate. In this situation, the use of Tux's money to further the Debtor's Ponzi scheme cannot be consideration for the Transfers and cannot objectively be called reasonably equivalent value.

104.    The Defendant was therefore acting as an investor in the Debtor's Ponzi scheme and any Transfers made to the Defendant can be avoided by the Plaintiff since the Transfers to the

1  Defendant are preferential and fraudulent such that they constitute property of the Estate in which

2  the Plaintiff can recover.

3      105.    The Affiliate Agreement, the ARPA Agreements, and the Transfers of Debtor's

4  funds are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and Cal. Civ. Code §§ 3439.05 and

5  3439.07 by one or more creditors who held and hold unsecured claims against Debtor that were and

6  are allowable against the Estate under 11 U.S.C. § 502 or that were not and are not allowable only

7  under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

8      106.    Accordingly, the Affiliate Agreement, the ARPA Agreements, and the Transfers

9  should be avoided as fraudulent under 11 U.S.C. §§ 544(b) and Cal. Civ. Code §§ 3439.05 and

10  3439.07, and such transferred property, or the value thereof, should be recovered and preserved for

11  the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551 and Cal. Civ. Code § 3439.07.

12                          **FIFTH CLAIM FOR RELIEF**

13             **Count V - Turnover of Estate Property Against Defendants**

14                          **[11 U.S.C. § 542]**

15      107.    Plaintiff realleges and incorporates herein by reference each and every allegation

16  contained in paragraphs 1 through 106 as though set forth in full.

17      108.    Defendants have possession or control over property of the Estate in the form of the

18  Transfers made pursuant to illegal and unenforceable agreements.

19      109.    The Transfers are not of inconsequential value to the Estate.

20      110.    The funds that are the subject of the Transfers are paramount to Debtor's ability to

21  pay creditors.

22      111.    Accordingly, Trustee is entitled to a judgment for turnover of the Transfers pursuant

23  to 11 U.S.C. § 542.

24                          **SIXTH CLAIM FOR RELIEF**

25             **Count VI - Aiding and Abetting Against Defendants**

26    **[11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.04(a), 3439.04(b) and 3439.07]**

27      112.    Plaintiff realleges and incorporates herein by reference each and every allegation

28  contained in paragraphs 1 through 111 as though set forth in full.

113.    Defendants, based upon information and belief and based on the Ponzi Scheme Presumption, had knowledge of the fraudulent transactions, transfers and illegal agreements that were used to perpetuate and conceal the Ponzi scheme and fraudulent transfers.

114.    Defendants, with the foregoing knowledge, intended to, and did, help the Debtor in perpetuating and concealing the Ponzi scheme and fraudulent transfers of money.

115.    At all material times, Defendants had the intent to facilitate and conceal the Ponzi scheme and fraudulent transfers of money by aiding and abetting the illegal capping scheme and signing up consumer clients to keep the business going.

116.    Defendants, upon information and belief, assisted, and did actually engage in, the commission of fraud and the Ponzi scheme by coordinating, facilitating, and directing payments and transfers of monies and executing documents in furtherance of concealing the true nature of their fraudulent and criminal activity related to the Ponzi scheme.

117.    The injuries to Plaintiff, the Debtor's Estate and to its creditors directly, proximately and reasonably foreseeably resulting from and caused by violations of Sections 6151 and 6155 of the California Business and Professional Code include, without limitation, hundreds of thousands of dollars in improperly transferred and acquired monies.

118.    Plaintiff and the Debtor's Estate also suffered damages by incurring attorney's fees and costs associated with the prosecution of Defendants' unlawful activities.

## **RESERVATION OF RIGHTS**

Plaintiff reserves the right to bring all other claims or causes of action that Plaintiff may have against Defendant, on any and all grounds, as allowed under the law or in equity, including but not limited to, those claims not known by the Trustee at this time but that he may discover during the pendency of this adversary proceeding.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for a judgment as follows:

**On The First, Second, Third, and Fourth Claims for Relief:**

1.    Avoiding, recovering, and preserving the Transfers against Defendant;

**On The First and Third Claims for Relief:**

22

2.      Awarding punitive and exemplary damages according to proof;

**On the Fifth Claim for Relief:**

3.      Ordering Defendants to immediately turn over the Transfers;

**On the Sixth Claim for Relief:**

4.      Awarding Plaintiff monetary damages in the amount of all fraudulent transfers obtained by Defendants from Debtor;

**On All Claims for Relief:**

5.      Awarding costs of suit;

6.      Awarding punitive damages;

7.      Awarding attorneys' fees;

8.      Awarding pre-judgment interest at the maximum legal rate running from the date of the Complaint to the date of judgment herein;

9.      Awarding post-judgment interest at the maximum legal rate running from the date of judgment herein until the date the judgment is paid in full, plus costs;

10.    Requiring Tux and Mr. Bryant to pay forthwith any judgment awarded herein; and

11.    Granting Plaintiff such other and further relief as the Court deems just and proper.

Dated: March 14, 2025

Respectfully submitted,

DINSMORE & SHOHL LLP

By: _/s/ Matthew J. Stockl_____
    Christopher Celentino
    Yosina M. Lissebeck
    Matthew J. Stockl

*Special Counsel to Richard A. Marshack, Trustee of the LPG Liquidation Trust*

# EXHIBIT 1

CHRISTOPHER B. GHIO (259094)
christopher.ghio@dinsmore.com
CHRISTOPHER CELENTINO (131688)
christopher.celentino@dinsmore.com
YOSINA M. LISSEBECK (201654)
yosina.lissebeck@dinsmore.com
DINSMORE & SHOHL LLP
655 West Broadway, Suite 800
San Diego, California 92101
Tele:  619.400.0500
Fax:   619.400.0501

Sarah S. Mattingly (Ky. Bar 94257)
sarah.mattingly@dinsmore.com
DINSMORE & SHOHL, LLP
101 S. Fifth Street, Suite 2500
Louisville, Kentucky 40202
Tele: 859-425-1096
Fax: 502-585-2207
(Admitted pro hac vice)

Special Counsel to Richard A. Marshack

FILED & ENTERED

JUN 03 2024

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY mccall      DEPUTY CLERK

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

In Re

The Litigation Practice Group P.C.,

         Debtor(s),

Case No: 23-bk-10571-SC

Chapter 11

**ORDER GRANTING MOTION FOR
ENTRY OF PROTECTIVE ORDER AND
THE PROTECTIVE ORDER**

Date:    May 23, 2024
Time:    1:30 p.m.
Judge:   Hon. Scott C. Clarkson
Place:   Courtroom 5C (via Zoom)[1]
        411 West Fourth Street
        Santa Ana, CA 92701

---

[1] Video and audio connection information for each hearing will be provided on Judge Clarkson's
publicly posted hearing calendar, which may be viewed online at:
http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

Exhibit 1, page 25

The Court has read and considered the Notice of Motion and Motion for Entry of Protective Order (the "Motion") filed by Richard A. Marshack, in his capacity as the Chapter 11 Trustee (the "Trustee") of the Bankruptcy Estate ("Estate") of The Litigation Practice Group P.C., on May 2, 2024, pursuant to Federal Rule of Bankruptcy Procedure 7026 and Federal Rule of Civil Procedure 26(c)(1), as Dk. No. 1164 ("Motion"), and has found good cause to grant the Motion.

IT IS HEREBY ORDERED that:

1.    The Motion is granted;

2.    The below Protective Order shall apply to any contested matter arising in the main bankruptcy case and in all adversary proceedings filed by or against Trustee, present and future; and

3.    Govern the discovery conducted therein.

## PROTECTIVE ORDER

**1.    DEFINITIONS**

1.1    "Confidential Information" as used in this Protective Order shall mean documents and other information (regardless of how generated, stored or maintained) that a Party or non-party reasonably believes to contain or reflect non-public financial or business information, bank records, financial records, such as social security numbers, non-public financial or personal information of a Party or non-party, account numbers, sensitive digital information and identifiers, information subject to confidentiality agreements or provisions other than this Protective Order, and other non-public research, development, or commercial information that derives value or avoids injury by virtue of not being known to the public.

1.2    This "Action" is defined and hereby means any contested matter arising in the main bankruptcy case and in all adversary proceedings filed by or against Trustee, present and future.

1.3    "Designating Party" means a Party or non-party that designates Confidential Information during the Action.

1.4    "Receiving Party" means a Party that receives Confidential Information during the Action.

2

1.5    "Party" or "Parties" means person or entity subject to this Protective Order.

**2.    SCOPE OF THIS PROTECTIVE ORDER**

2.1    Unless otherwise ordered, this Protective Order shall govern certain documents and other products of discovery obtained in the Action from the Parties there to, and from third parties. As well as certain information copied or derived therefrom, excerpts, summaries or compilations thereof, including, but not limited to, documents voluntarily exchanged as part of early settlement discussions, documents produced pursuant to initial disclosures, requests authorized by the Federal Rules of Civil Procedure made applicable herein by the Federal Rules of Bankruptcy Procedure, answers to interrogatories, deposition transcripts, responses to requests for production, responses to requests for admission, subpoenas, affidavits, declarations, expert reports, and other such material and information as may be produced during the course of the Action and designated as Confidential Information.

**3.    DESIGNATION OF CONFIDENTIAL INFORMATION**

3.1    This Protective Order shall govern the production and handling of any Confidential Information in this Action. Any Party or non-party who produces Confidential Information in this Action may designate it as "Confidential" or "Attorneys' Eyes Only" consistent with the terms of this Protective Order. Whenever possible, the Designating Party must designate only those portions of a document, written discovery responses, deposition, transcript, or other material that contain the Confidential Information and refrain from designating entire documents. Regardless of any designations made hereunder, the Designating Party is not otherwise restricted from use or disclosure of its Confidential Information outside of this Action or for any business purposes. In addition, any Party may move to modify or seek other relief from any of the terms of this Protective Order if it has first tried in writing and in good faith to resolve its needs or disputes with the other Parties or Party as the case may be under the terms of this Protective Order. Further, nothing in this Protective Order shall prevent a Party from redacting documents consistent with the Federal Rules of Civil Procedure and utilizing the documents as needed through-out the Action.

3.2    <u>Application to Non-Parties:</u> Before a non-party is given copies of documents or materials designated as Confidential Information or Attorneys' Eyes Only as permitted hereunder, it

3

must first sign an acknowledgment to be bound to these terms that is attached hereto as <u>Exhibit</u> A; if it fails to do so, the Parties to this Action must resolve any such dispute before making disclosure of designated information as permitted hereunder to the non-party. If a non-party wishes to make designations hereunder, it must first sign attached <u>Exhibit A.</u>

3.3    <u>Timing and Provisional Protection:</u> Designations of Confidential Information may be made at any time. To avoid potential waiver of protection hereunder, the Designating Party should designate documents or materials containing Confidential Information at the time of production or disclosure, including on the record during the taking of any deposition. Deposition testimony will be deemed provisionally protected for a period of thirty (30) days after the transcript is released to the Parties by the court reporter, although the Parties may agree at any time to different timelines of provisional protection of information as Confidential or Attorneys' Eyes Only as part of one or more specific depositions. To retain any designations beyond the provisional period, a Designating Party must designate specific pages and lines of deposition testimony before the provisional period has expired. Such designations must be made in writing so that all counsel and court reporters may append the designation to all copies of the transcripts.

3.4    <u>Manner of Designation:</u> Confidential Information may be designated hereunder in any reasonable manner or method that notifies the Receiving Party of the designation level and identifies with specificity the information to which the designation applies. If made verbally, the Designating Party must promptly confirm the designation in writing. Whenever possible, the Designating Party should stamp, affix, or embed a legend of "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY" on each designated page of the document or electronic image that contains Confidential Information.

## 4.    CHALLENGES TO DESIGNATED INFORMATION

4.1    In the event that a Receiving Party disagrees at any time with any designation(s) made by the Designating Party, the Receiving Party must first try to resolve such challenge in good faith on an informal basis with the Designating Party. The Receiving Party must provide written notice of the challenge and the grounds therefor to the Designating Party, who must respond in writing to the challenge within fifteen (15) days. At all times, the Designating Party carries the burden of establishing the propriety of the designation and protection level. Unless and until the challenge is

4

resolved by the Parties or ruled upon by the Court, the designated information shall remain protected under this Protective Order. The failure of any Receiving Party to challenge a designation does not constitute a concession that the designation is proper or an admission that the designated information is otherwise competent, relevant, or material.

**5.    LIMITED ACCESS/USE OF PROTECTED INFORMATION**

5.1    <u>Restricted Use:</u> Information that is produced or exchanged in the course of the Action and designated under this Protective Order may be used for preparation for trial and preparation for any appeal of any and all matters in the Action, as well as related settlement negotiations, and for no other purpose, without the written consent of the Designating Party. No Confidential Information may be disclosed to any person except in accordance with the terms of this Protective Order, unless the parties are co-counsel or have entered into joint defense agreements. All persons in possession of Confidential Information agree to exercise reasonable care with regard to the custody, use, or storage of such information to ensure that its confidentiality is maintained. This obligation includes, but is not limited to, the Receiving Party providing to the Designating Party prompt notice of the receipt of any subpoena that seeks production or disclosure of any designated information and consulting with the Designating Party before responding to the subpoena. Any use or disclosure of Confidential or Attorneys' Eyes Only information in violation of the terms of this Protective Order may subject the disclosing person or party to sanctions.

5.2    <u>Access to "Confidential" Information:</u> The Party(ies) and all persons subject to this Protective Order agree that information designated as "CONFIDENTIAL" may only be accessed or reviewed by the following:

a)    The Court, its personnel, and court reporters;

b)    Counsel of record, or co-counsel for any Party, or other party that has entered into a joint defense agreement in the Action and their employees who assist counsel of record, or co-counsel in the Action and are informed of the duties and obligations imposed hereunder;

c)    The Parties, including their clients, agents and employees who are assisting or have reason to know of the Action;

///

Exhibit 1, page 29

d)     Experts or consultants employed by the Parties or their counsel, or co-counsel, for purposes of an Action, so long as each such expert or consultant has signed attached <u>Exhibit A;</u> and

e)     Other witnesses or persons with the Designating Party's consent or by court order.

5.3     <u>Access to "Attorneys' Eyes Only" Designations:</u> The Parties and all persons subject to this Protective Order agree that information designated as "ATTORNEYS' EYES ONLY" may only be accessed or reviewed by the following:

a)     The Court, its personnel, and court reporters;

b)     Counsel of record, or co-counsel for any Party, or other party that has entered into a joint defense agreement in the Action and their employees who assist counsel of record in the Action and are informed of the duties hereunder;

c)     In-house counsel for any Party in the Action and Richard A. Marshack, as Chapter 11 Trustee of The Litigation Practice Group P.C. who is informed of the duties and obligations imposed hereunder;

d)     Experts or consultants employed by the Parties or their counsel, or co-counsel for purposes of the Action,  and so long as each such expert or consultant has signed attached <u>Exhibit A;</u> and

e)     Other witnesses or persons to whom the Designating Party agrees in advance of disclosure or by court order.

5.4     <u>Non-Waiver Effect of Designations:</u> Neither the taking of, nor the failure to take, any action to enforce the provisions of this Protective Order, nor the failure to object to any designation, will constitute a waiver of any Party(ies)'s claim or defense in the Action or any other action or proceeding, including, but not limited to, a claim or defense that any designated information is or is not Confidential, is or is not entitled to particular protection, or embodies or does not embody information protectable by law.

5.5     <u>In-Court Use of Designated Information:</u> If information designated under this Protective Order will or may be offered in evidence at a hearing or trial related to any matter in the Action, then the offering party must give advance notice to the party or non-party that designated prior to offering the information so that any use or disclosure may be addressed in accordance with

6

the Court's case-management or other pre-trial order, or by a motion *in limine.* Nothing in this Protective Order shall be construed as a waiver by a Party of any objections that may be raised as to the admissibility at trial of any evidentiary materials.

## 6.    CLAW-BACK REQUESTS

6.1    <u>Failure to Make Designation:</u>  If, at any time, a Party or non-party discovers that it produced or disclosed Confidential Information without designation, it may promptly notify the Receiving Party and identify with particularity the Confidential Information to be designated and the level of designation (the claw-back notification). The Receiving Party may then request substitute production of the newly-designated information. Within thirty (30) days of receiving the claw-back notification, the Receiving Party must: (1) certify to the Designating Party it has appropriately marked or, if substitute production has been requested, destroyed all unmarked copies that it received, made, and/or distributed; and (2) if it was practicably unable to mark or destroy any information because disclosures occurred while the Receiving Party was under no duty of confidentiality under the terms of this Protective Order regarding that information, the Receiving Party must reasonably provide as much information as practicable to aid the Designating Party in protecting the information, consistently with the Receiving Party's attorney-client, work-product, and/or trial-preparation privileges.

6.2    <u>Inadvertent Production of Privileged Information:</u> If, at any time, a Party discovers that it produced information that it reasonably believes is subject to protection under the attorney/client, work-product, or trial-preparation privileges, then it must promptly notify each Receiving Party of the claim for protection, the basis for it, amend its privilege log accordingly, and comply with Fed. R. Civ. P. 26(b)(5). Whenever possible, the producing party must produce substitute information that redacts the information subject to the claimed protection. The Receiving Party must thereupon comply with Fed. R. Civ. P. 26(b)(5)(B) as to the information subject to the claimed protection.

/ / /

/ / /

/ / /

### 7.    DURATION/CONTINUED RESTRICTIONS

7.1    <u>Handling of Designated Information Upon Conclusion of the Main Bankruptcy Case:</u>
Upon conclusion of the Main Bankruptcy Case, by way of dismissal or closing of the case, the
Designating Party(ies) is/are responsible for ensuring that any Party or person to whom the
Designating Party shared or disclosed designated information in any of the matters under the Action
returns or destroys all of its copies, regardless of the medium in which it was stored. No witness or
Party may retain designated information that it received from any other Party or non-party under this
Protective Order; only counsel of record, or co-counsel, are the authorized agents who may retain one
copy for their respective legal files, and who must also describe to the Designating Party the extra
steps taken to protect its legal file containing paper and/or electronic copies of the designated
information so that it is not accessed, used, or disclosed inconsistently with the obligations under this
Protective Order. This provision does not apply to the Court or Court staff. Moreover, this provision
does not apply to Trustee, who may retain and use – consistent with this Order – Confidential
Information received in any Action during the entirety of the Bankruptcy.

7.2    <u>Continued Restrictions Under this Protective Order:</u> The restrictions on disclosure and
use of Confidential Information shall survive the conclusion of the Bankruptcy case and any matter
in the Action.

### 8.    PRIVILEGED OR PROTECTED INFORMATION

8.1    Nothing in this Protective Order shall require disclosure of information that is
protected by the attorney-client privilege, the work-product protection, or any other legally cognizable
privilege (a "Privilege or Protection").  If information subject to a claim of Privilege or Protection is
inadvertently produced, pursuant to Federal Rule of Evidence 502(d) such production shall not
constitute a waiver of, or estoppel as to, any claim of Privilege or Protection for such information or
any other information that may be protected from disclosure by a Privilege or Protection in any
proceeding.

8.2    If a Party receives a document that appears to be subject to a Privilege or Protection,
then it shall refrain from examining the document any more than is essential to ascertain if it is
privileged or protected and shall promptly notify the producing Party in writing that the receiving

Exhibit 1, page 32

Party possesses material that appears to be subject to a Privilege or Protection. The producing Party shall have seven (7) days after receiving such notice to assert a Privilege or Protection over the identified material. If the producing Party does not assert a claim of Privilege or Protection within the seven (7)-day period, the material in question shall be deemed not privileged or protected.

8.3    If a producing Party has produced a document subject to a claim of Privilege or Protection, upon written request by the producing Party, the document for which a claim of Privilege or Protection is made shall be sequestered or destroyed to the extent reasonably practicable, and the receiving Party shall not use the document for any purpose other than in connection with analyzing or disputing a claim of Privilege or Protection or in connection with a motion to compel the production of the document.

8.4    The receiving Party sequestering or destroying such material may then move the Court for an order compelling production of the material. The applicable producing Party bears the burden of establishing the applicable Privilege or Protection of any clawed-back document or information as and to the same extent that it would have borne such burden had it not produced the document or information.  Nothing in this Protective Order shall limit the Court's right or any receiving Party's right to request an in camera review of any information subject to a claim of Privilege or Protection.

###

Date: June 3, 2024

Scott C. Clarkson
United States Bankruptcy Judge

9

1

2

3

4

5

EXHIBIT "A"

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  Christopher B. Ghio (State Bar No. 259094)
   Christopher Celentino (State Bar No. 131688)
2  Yosina M. Lissebeck (State Bar No. 201654)
   **DINSMORE & SHOHL LLP**
3  655 West Broadway, Suite 800
   San Diego, CA 92101
4  Telephone:  619.400.0500
   Facsimile:  619.400.0501
5  christopher.ghio@dinsmore.com
   christopher.celentino@dinsmore.com
6  yosina.lissebeck@dinsmore.com

7  Sarah S. Mattingly (Ky. Bar 94257)
   DINSMORE & SHOHL, LLP
8  101 S. Fifth Street, Suite 2500
   Louisville, KY 40202
9  Telephone: 859-425-1096
   Facsimile: 502-585-2207
10 Sarah.mattingly@dinsmore.com
   (Admitted pro hac vice)
11
   Special Counsel to Richard A. Marshack,
12 Chapter 11 Trustee

13

14                **UNITED STATES BANKRUPTCY COURT**

15                **CENTRAL DISTRICT OF CALIFORNIA**

16

17 In Re                                | Case No. 8:23-BK-10571-SC

18                                       | Chapter 11

19 The Litigation Practice Group P.C.,   | **EXHIBIT A TO STIPULATED
                                         | ORDER**
20            Debtor(s),                 |
                                         | Date:   May 23, 2024
21                                       | Time:   1:30 p.m.
22                                       | Judge:  Hon. Scott C. Clarkson
                                         | Place:  Courtroom 5C[1] - Via Zoom
23                                       |         411 W. Fourth Street
24                                       |         Santa Ana, CA  92701
25

26

27 _____

28 [1] Video and audio connection information for each hearing will be provided on Judge Clarkson's
   publicly posted hearing calendar, which may be viewed online at:
   http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.          Exhibit 1, page 35

                                1                        EXHIBIT A
                                                         Page 2

This is to certify that:

    (a)    I am being given access to Confidential Information pursuant to the Stipulated Protective Order that was entered into the main bankruptcy case for Litigation Practice Group, but which is binding and controlling as set forth by the Court's Order on any and all contested matters and any and all litigation commenced by Trustee;

    (b)    I have read the Stipulated Protective Order; and

    (c)    I agree to be bound by the terms and conditions thereof, including, without limitation, to the obligations regarding the use, non-disclosure and return of such Confidential Information. I further agree that in addition to being contractually bound by the Stipulated Protective Order, I am subject to the jurisdiction of the above reference Court for any violation thereof.

Date: _____

                                    _____
                                      Signature

                                    _____
                                      Printed Name

# EXHIBIT 2

DocuSign Envelope ID: F22D5B1F-DBB8-4DDE-89A0-6F6A056FD632

## <u>The Litigation Practice Group PC - Affiliate Agreement</u>

THIS AGREEMENT (the "Agreement") is made and effective as of the 1st day of November, 2021 by and between The Litigation Practice Group PC ("LPG") and **TUX, LLC** (hereinafter "Affiliate").

RECITALS:

LPG is in the business of providing a package debtor's rights services in the form of debt validation, consultation, and litigation defense through a network of attorneys licensed to practice law in all 50 states and the District of Columbia.  The legal services offered include:

- Removal of invalid debts through correspondence directly with the three credit bureaus;
- Validation of consumer debts through correspondence including disputes with original creditors, validation demands to third party debt collectors and assignees, and disputes with all three credit bureaus;
- Defense of collection actions initiated by original creditors or third party assignees;
- Negotiation of advantageous settlements of consumer debts both pre and post litigation;
- Education of clients regarding federal laws applicable to consumer debt and credit reporting, and consultation regarding risk mitigation and litigation defense through its network of attorneys across the country.

Each of these services is offered without regard to the identity of the creditor or third-party debt collector or assignee.  LPG reviews all client files prior to the execution of the client's legal services agreement with the appropriate law firm, and maintains oversight through its administrative services over all file placements.

Affiliate owns and operates a system of generating leads consisting of consumers interested in the legal services offered by LPG.  Affiliate, acting in accordance with direction from LPG, shall obtain the names of Consumers and will market in a lawful manner, complying with the restrictions of the jurisdiction in which the consumer resides.  For consumers interested in utilizing LPG's services, Affiliate will assist LPG in having consumers execute an approved legal services agreement with a law firm to which LPG provides administrative support services, at which point consumers will become clients of that law firm, and that law firm will be exclusively responsible for and liable for the representation of consumers in the context of the provision of legal services.  Nothing in this Agreement nor in the eventual legal services agreement shall restrict Affiliate from offering any other service of any kind to consumer, including credit repair or debt relief programs.  Nor is Affiliate restricted from marketing on behalf of credit repair or debt relief entities, including but not limited to other law firms.  LPG and Affiliate hereby agree that any and all prior agreements entered into by LPG and Affiliate or any law firm to which LPG provides administrative support services and Affiliate are null and void and unenforceable, and this Agreement shall become the operative agreement for all files previously placed through the use of LPG's administrative support services.


LPG and Affiliate hereby agree to the following:



1

DocuSign Envelope ID: F22D5B1F-DBB3-4DDE-89A0-6F6A056FD632

1.      Each Party shall be solely responsible for bearing its own costs and expenses incurred in performing its responsibilities under this Agreement, including all tariffs, filings, licensing and/or other fees.

2.      Affiliate shall comply with state and federal laws in communicating with consumers regarding LPG, any law firm utilized by LPG, or any of the programs of LPG or the assigned law firm.

3.      Both LPG and the law firm it utilizes shall comply with all state and federal laws in performing its obligations under the legal services agreement entered into between LPG and the consumers referred by Affiliate.

4.      If requested by LPG, Affiliate shall provide a copy of all marketing materials to LPG upon receiving a request from LPG.  Affiliate shall endeavor to provide such materials within 10 business days of such request, but may provide such materials in any time frame that is commercially reasonable.

5.      Affiliate agrees to keep any and all documents or communications between itself and LPG confidential pursuant to the provisions set forth below.

6.      Affiliate shall be entitled to receive the following as full and complete compensation for its services to LPG: LPG shall pay 75% per file for each file that Affiliate places with LPG, not counting the monthly maintenance fee of $91.38, which LPG shall retain to cover administrative costs for each file.  LPG shall calculate the amount of each file, apply the above-identified percentage fee, and remit the same to Affiliate pursuant to an agreed-upon schedule not to exceed one remittance per seven (7) calendar days.  If any consumer cancels LPG's services, or demands a refund for payment for such services, or both, then Affiliate shall be responsible for returning the entirety of its fees collected on such file to LPG (in such percentage as is set forth herein).  LPG has exclusive discretion to grant or deny a requested refund or cancellation.  LPG shall be entitled to offset any future payments to Affiliate in order to recover a refund awarded by LPG.  Finally, LPG may treat a consumer's failure to remit payment in a timely manner as a cancellation of the legal services agreement executed by consumer with LPG, and has sole discretion to make such determination.

7.      LPG shall bear all expenses related to the services it offers to consumers, and Affiliate shall bear all expenses related to its marketing of the same except as is set forth in this Paragraph.  Neither LPG nor Affiliate shall be required to pay the expenses of the other.

8.      LPG reserves all rights with regard to rejection or cancellation of a consumer, but will do so only in accordance with the recommendation of the law firm utilized in providing such service, and only subject to the applicable state bar rules for such representation.

9.      This agreement shall continue to operate and bind LPG and Affiliate for a period of 18 months from the date of execution of this Agreement.  At that time, this Agreement will automatically renew for an additional 18 month term unless, 30 days prior to the automatic renewal date, LPG or Affiliate shall postmark a cancellation letter clearly stating the intent of that party to terminate this Agreement on the automatic renewal date.

Exhibit 2, page 39

DocuSign Envelope ID: F22D5B1F-DBB3-4DDE-89A0-6F6A056FD632

10.    If either party shall default under this Agreement, defined as a failure to comply with any of the obligations set forth above, the Agreement shall terminate following notice of default and a cure period of 30 days from the date postmarked on the notice of default.  The notice of default must state with specificity the act of default alleged.

11.    Upon termination of this Agreement for any reason whatsoever, LPG and Affiliate will refrain from making any disparaging or negative comment, remark, statement, or implication, whether written or oral.

12.    The confidential information of LPG or Affiliate shall include information regarding contracts, customer or client lists or information, hardware, software, screens, specifications, designs, plans, drawings, data, prototypes, discoveries, research, developments, methods, processes, procedures, improvements, 'Know-how', compilations, market research, marketing techniques and plans, marketing materials, business plans and strategies, documents, scripts, guidelines, price lists, pricing policies and financial information or other business and/or technical information and materials, in oral, demonstrative, written, graphic or machine-readable form, which is unpublished, not available to the general public or trade, and which is maintained as confidential and proprietary information by the disclosing party for regulatory, customer relations, and/or competitive reasons.  Neither LPG nor Affiliate may disclose the confidential information of the other with the express written consent of the other.  A failure to abide by this confidentiality term shall entitle the party whose confidential information was compromised to a reasonable sum not less than $50,000.00, nor more than $200,000.00.  The disclosure of information in connection with a judicial proceeding shall not constitute a violation of this term.  The parties agree to notify the other if any inadvertent disclosure of information occurs within 48 hours of becoming aware of such disclosure.  The parties agree to work together in good faith to remediate any disclosure of confidential information.  A party whose confidential information is disclosed shall be entitled to injunctive relief in any court of competent jurisdiction.

13.    If, after the passage of six months of the date of this Agreement, Affiliate fails, in any one calendar month, to have at least fifty (50) active consumers, LPG shall withhold 20% of the fees due to Affiliate for said month in an escrow account.  Such fees shall be held in escrow until, in a single calendar month, Affiliate has fifty (50) or more active consumers, at which point, within five (5) business days of the end of such calendar month, LPG shall transfer the balance of such escrow account to Affiliate and retain nothing in such escrow account.  If Affiliate shall cease operations for any reason, or this Agreement shall terminate for any reason, Affiliate will continue to receive fees due to it under this Agreement until all active consumers have completed or withdrawn from the program, at which point any remaining amounts being held in escrow shall be released to Affiliate in full.

14.    Affiliate agrees not to use the name LPG or any law firm  in any advertising, publicity release, or sales presentation designed to promote Affiliate's service, unless LPG provides prior written consent to such specific use.

15.    Any fees incurred by LPG in connection with a customer's Non-Sufficient Funds ("NSF") fee shall be borne mutually by both LPG and Affiliate if and only if the customer cancels the program after such NSF.  The Affiliate shall bear that portion of the NSF fee commensurate with its share of the per file fee set forth in Paragraph 6, above.  This amount shall be deducted from the fees remitted to Affiliate in the

3

DocuSign Envelope ID: F22D5B1F-DBB3-4DDE-89A0-6F6A05EFD632

month in which the client having an outstanding NSF charge cancels the program without remitting such NSF fee.

16.     This Agreement may not be assigned or transferred without the prior written consent of the other. This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and assigns.

17.     In the event of a breach, the prevailing party shall be entitled to reasonable attorneys' fees and collection costs, including all fees and costs on appeal.

18.     This Agreement contains the entire Agreement between the Parties, and shall not be modified, amended or supplemented, or any rights therein waived, unless specifically agreed upon in writing by LPG and Affiliate.

**The Litigation Practice Group PC**



DocuSigned by:
C37D9CEA699D48A...

**By: Daniel S. March, Managing Shareholder**

**TUX, LLC**

DocuSigned by:
*Thomas Bryant*
1FE4E10C13914C3...

By: Thomas Bryant

Title: Owner

## Electronic Funds Transfer Authorization

This Electronic Funds Transfer (EFT) authorization is for use in connection with the foregoing Agreement, and permits LPG to transfer any and all amounts due to TUX, LLC ("Affiliate") under the foregoing Agreement by EFT.  By signing below, Affiliate hereby authorizes LPG to initiate EFT transfers at its discretion, with all fees and costs incurred by Affiliate in connection with such transfer to be borne by Affiliate, while all fees and costs incurred by LPG in connection with such transfer to be borne by LPG.

Account Holder Signature: _____ Date: _____

*Thomas Bryant*
1FE4E1801881400...

By: Thomas Bryant

Title:  Owner

Account Owner Name:  TUX, LLC

Social Security Number / FEIN Number associated with account listed below: ████**5955**

Address: 2504 Lora Mae Ct

City: Forest Hill   State:  MD  Zip: 21050  Tel: 949-400-9371

Bank Name: Truist

Routing Number: ████3308

Account Number: ████5873

Account type :  Checking

5

Exhibit 2, page 42

# EXHIBIT 3

*Legal Counsel.*



DINSMORE & SHOHL LLP
North Point Tower, 1001 Lakeside Avenue, Suite 990
Cleveland, OH 44114
www.dinsmore.com

Benjamin D. Carnahan
(216) 413-3841 (direct) · (216) 413-3839 (fax)
Ben.Carnahan@DINSMORE.COM

*__VIA U.S. Mail Only__*

October 28, 2024

Tux LLC
c/o Thomas Bryant
2504 Lora Mae Ct.
Forest Hill, MD 21050

　　　　Re:　*In re The Litigation Practice Group P.C.*
　　　　　　U.S. Bankruptcy Court, Central District of California
　　　　　　Case No. 8:23-bk-10571-SC

Dear Sir/Madam:

This constitutes a demand to provide any and all documents and information evidencing the basis for, accounting of, and any defenses to my client's claims to avoid and recover, the transfers to Tux LLC from The Litigation Practice Group P.C. ("Debtor").

This firm represents Richard A. Marshack, Chapter 11 Trustee for the bankruptcy estate of The Litigation Practice Group P.C. and liquidating trustee of the LPG Liquidation Trust (collectively, "Trustee") in the above-referenced bankruptcy case. Pursuant to 11 U.S.C. § 1107 and his appointment as Trustee, the Trustee has the obligation to investigate and pursue claims, including fraudulent transfers, preferential transfers, and unauthorized post-petition transfers. Under the Bankruptcy Code, the Trustee has the power to file lawsuits seeking to avoid, recover, and preserve such transfers for the benefit of the Estate. *See* 11 U.S.C. §§ 544 *et seq*.

A review of the Debtor's books and records confirms that Tux LLC received 24 potential fraudulent conveyances totaling $244,868.78, which can be avoided and recovered by the Trustee pursuant to 11 U.S.C. §§ 544 and 548 and Cal. Civ. Code. §§ 3439.04 and 3439.05.

The Trustee has been unable to determine why such transfers were made to Tux LLC, what was provided to the Debtor in exchange for such transfers, and whether defenses exist to the Trustee's claims to avoid and recover the transfers. Please respond to this letter attaching any evidence you have related to these transfers including contracts, agreements, subscriptions, invoices, and any other documentation showing the date, terms, and amounts for the transfers received and any documents evidencing shipment dates as to goods and services provided by Tux LLC to the Debtor. Documents showing the course of dealing between Tux LLC and the Debtor, the date of receipt of the Debtor's payment and the amount, deposit date, and any proof of deposit for any or all of the transfers will be helpful in determining the permissibility of the transfers and what, if any, value the Debtor received in return for payments made to Tux LLC.

Exhibit 3, page 44

Tux LLC
October 28, 2024
Page 2

You are further notified that the claims against Tux LLC will be governed by the Federal Rules of Bankruptcy Procedure and the Federal Rules of Civil Procedure, which apply to lawsuits filed in federal bankruptcy courts such as the one in the Central District of California. Pursuant to these rules, every party to a lawsuit has a duty to preserve all evidence which could be relevant to the suit. These obligations also arise when, as here, litigation is reasonably foreseeable. This includes the duty to preserve all electronic evidence, such as emails discussing the incident or related to matters at issue in the suit. This duty to preserve evidence is broad and extends to all documents, regardless of whether the document is stored electronically (such as email) or in hard-copy and regardless of the type of document. For example, reports, spreadsheets, photographs and videotapes are all considered documents that must be preserved. Furthermore, the duty to preserve this documentary evidence extends to all documents in existence as of the time you reasonably anticipated this litigation.

To ensure that all relevant documents are preserved, you should communicate directly with all employees who have possession or control of potentially relevant evidence, including but not limited to personnel who deal with email retention, deletion, and archiving. You should advise each of these employees to preserve any relevant documents in their custody. Furthermore, you should advise all such persons that any regularly scheduled and/or automatic deletion of email or other electronic documents must be discontinued with respect to any relevant data. In addition, any document destruction (such as shredding of documents) must cease with respect to any relevant documents. All relevant documents, both electronic and paper, must be preserved for the duration of this litigation.

The deadline to respond to this request is November 11, 2024. Failure to respond and/or provide the requested documents will likely result in the Trustee filing an adversary complaint to avoid, recover, and preserve the subject transfers for the benefit of the Estate. If you would like to discuss this matter, please feel free to contact me by telephone at (216) 413-3841 or e-mail at ben.carnahan@dinsmore.com.

Sincerely,

BDC/jjp

# EXHIBIT 4

In re: The Litigation Practice Group PC

Disbursement Details by Payee

4 Years Pre-Petition (03/20/2019 - 03/20/2023)

Prepared by: Grobstein Teeple LLP

| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|
| Optimum Bank | Coast Processing LLC dba LPG | 6738 | 11/30/2021 | 11/12/2021 | | 5,977.97 | WIRE TO Tux,LLC |
| Chase | The Litigation Practice Group PC | 3158 | 11/30/2021 | 11/19/2021 | | 3,126.98 | 11/19 Online Domestic Wire Transfer Via: Truist Bank1055003308 NC: Tux LLC Forest Hill MD 21050 US Ref: Docs Pro Distribution Imad: lil9BiQgcO4COO8642 Tm: 3521351323Es |
| Chase | The Litigation Practice Group PC | 3158 | 11/30/2021 | 11/30/2021 | | 4,237.59 | 11/30 Online Domestic Wire Transfer Via: Truist Bank1055003308 NC: Tux LLC Forest Hill MD 21050 US Ref: Docs Pro Distribution 11.15-11.19 Imad: 11 30B1 QgcO8COl 5820 Tm: 3304631334 Es |
| Optimum Bank | Secure Payment Services LLC dba Litigation Practice Group | 0045 | 12/31/2021 | 12/3/2021 | | 2,690.95 | WIRE TO Tux,LLC |
| UnionBank | The Litigation Practice Group PC | 94858 | 12/31/2021 | 12/10/2021 | | 6,465.12 | WIRE TRANS TRN 1210023639 121021 UBOC UB418326N Sent To: BRANCH BANKING AND TRUST Beneficiary: 1/Tux, LLC |
| UnionBank | The Litigation Practice Group PC | 94858 | 12/31/2021 | 12/17/2021 | | 9,000.00 | WIRE TRANS TAN 1217018986 121721 UBOC UB381504N Sent To: BRANCH BANKING AND TRUST Beneficiary: 1/Tux LLC |
| UnionBank | The Litigation Practice Group PC | 94858 | 12/31/2021 | 12/17/2021 | | 4,263.33 | WIRE TRANS TRN 1217018983 121721 UBOC UB381513N Sent To: BRANCH BANKING AND TRUST Beneficiary: 1/Tux,LLC |
| UnionBank | The Litigation Practice Group PC | 94858 | 12/31/2021 | 12/22/2021 | | 1,412.91 | WIRE TRANS TRN 1222019651 122221 UBOC UB353748N Sent To: BRANCH BANKING AND TRUST Beneficiary: 1/Tux, LLC |
| UnionBank | The Litigation Practice Group PC | 94858 | 12/31/2021 | 12/30/2021 | | 3,476.47 | WIRE TRANS TRN 1230018743 123021 UBOC UB314889N Sent To: BRANCH BANKING AND TRUST Beneficiary: 1/Tux, LLC |
| UnionBank | The Litigation Practice Group PC | 94858 | 1/31/2022 | 1/7/2022 | | 1,649.71 | WIRE TRANS TRN 0107015737 010722 UBOC UB279303N Sent To: BRANCH BANKING AND TRUST Beneficiary: 1/Tux, LLC |
| UnionBank | The Litigation Practice Group PC | 94858 | 2/28/2022 | 2/4/2022 | | 277.03 | WIRE TRANS TRN 0204022614 020422 UBOC UB131337N Sent To: BRANCH BANKING AND TRUST Beneficiary: 1/Tux, LLC |
| Chase | The Litigation Practice Group PC | 3158 | 2/28/2022 | 2/4/2022 | | 20,000.00 | Fedwire Debit Via: Truist Bank/055003308 NC: Tux LLC Forest Hill, 21050 US Ref: 00892 Imad: 0204B1 QgcO8CO3l 064 Tm: 5964700035Jo |
| UnionBank | The Litigation Practice Group PC | 94858 | 2/28/2022 | 2/11/2022 | | 116.87 | WIRE TRANS TRN 0211017037 021122 UBOC UB1 031 07N Sent To: BRANCH BANKING AND TRUST Beneficiary: 1/Tux, LLC |
| Chase | The Litigation Practice Group PC | 3133 | 3/31/2022 | 3/4/2022 | | 30,000.00 | Fedwire Debit Via: Truist Bank/055003308 A/C: Tux, LLC Forest Hill, MD 21050 US Ref: Weekly Disbursement mad: O3O4B1QgcO2CO1 1121 Tm: 5355400063Jo |
| Chase | The Litigation Practice Group PC | 3158 | 3/31/2022 | 3/9/2022 | | 60,000.00 | Fedwire Debit Via: Truist Bank1055003308 NC: Tux LLC Forest Hill, MD 21050 US Ref: mv 6903164, 6903165 Imad: 0309B1Qgc02CO09814 Tm: 6160700068Jo |
| Chase | The Litigation Practice Group PC | 3133 | 3/31/2022 | 3/10/2022 | | 661.49 | Fedwire Debit Via: Truist Bank/055003308 A/C: Tux, LLC Forest Hill, MD 21050 US Ref: Weekly Disbursement Imad: 0310B1Qgc08CO14645 Tm: 7419900069Jo |
| Chase | The Litigation Practice Group PC | 3158 | 3/31/2022 | 3/23/2022 | | 30,000.00 | Fedwire Debit Via: Truist Bank1055003308 A/C: Tux LLC Forest Hill, MD 21050 US Ref: 6903167 mad: 0323B1Qgc06CO10409 Tm: 5278700082Jo |
| Chase | The Litigation Practice Group PC | 3133 | 4/30/2022 | 4/7/2022 | | 389.24 | Fedwire Debit Via: Truist Bank/055003308 A/C: Tux, LLC Forest Hill, MD 21050 US Ref: Weekly Disbursement Imad: 0407B1Qgc05CO09283 Tm: 5692700097Jo |
| Chase | The Litigation Practice Group PC | 3158 | 4/30/2022 | 4/8/2022 | | 30,000.00 | Fedwire Debit Via: Truist Bank1055003308 NC: Tux LLC Forest Hill, MD 21050 US Ref: 6903168 - 5 Imad: 04088B1Qgc06CO14760 Tm: 6004300098Jo |
| Chase | The Litigation Practice Group PC | 3158 | 4/30/2022 | 4/21/2022 | | 30,000.00 | Fedwire Debit Via: Truist Bank/055003308 A/C: Tux LLC Forest Hill, MD 21050 us Ref: 6903169-6 Imad: 0421 BiQgcO5COi7995 Tm: 696830011 iJo |
| Chase | The Litigation Practice Group PC | 3133 | 5/31/2022 | 5/5/2022 | | 273.28 | Fedwire Debit Via: Truist Bank1055003308 NC: Tux, LLC Forest Hill, MD 21050 US Ref: Weekly Disbursement Imad: 0505B1Qgc07C0i9407 Tm: 7i25300125Jo |
| Chase | The Litigation Practice Group PC | 3133 | 7/31/2022 | 7/8/2022 | | 295.78 | Fedwire Debit Via: Truist Bank/055003308 A/C: Tux, LLC Forest Hill, MD 21050 US Ref: Weekly Disbursement Imad: O7O8B1Qgc07CO1 1517 Tm: 4038900189Jo |
| Chase | The Litigation Practice Group PC | 3133 | 8/31/2022 | 8/5/2022 | | 277.03 | Fedwire Debit Via: Truist Bank1055003308 A/C: Tux, LLC Forest Hill, MD 21050 us Ref: Weekly Disbursement Imad: 0805B1Qgc07C007548 Tm: 31027002i7Jo |
| Chase | The Litigation Practice Group PC | 3133 | 9/30/2022 | 9/9/2022 | | 277.03 | Fedwire Debit Via: Truist Bank/055003308 NC: Tux, LLC Forest Hill, MD 21050 US Ref: Weekly Disbursement Imad: 0909BiQgc04C008988 Tm: 3437900252Jo |
| | | | | | | **244,868.78** | |

DRAFT FORM - SUBJECT TO CHANGE

Exhibit 4, page 47

# Adversary Proceeding Cover Sheet

Adversary Proceeding Cover Sheet, page 48

B1040 (FORM 1040) (12/24)

| ADVERSARY PROCEEDING COVER SHEET (Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER (Court Use Only) |
|---|---|

| PLAINTIFFS Richard A. Marshack, Trustee of the LPG Liquidation Trust | DEFENDANTS Tux, LLC; Thomas Bryant |
|---|---|

**ATTORNEYS** (Firm Name, Address, and Telephone No.)

Christopher Celentino (SBN 131688)
Yosina M. Lissebeck (SBN 201654)
Christopher B. Ghio (SBN 259094)
DINSMORE & SHOHL LLP
655 West Broadway, Ste 800
San Diego, CA 92101    Telephone (619) 400-0500
christopher.celentino@dinsmore.com
yosina.lissebeck@dinsmore.com
christopher.ghio@dinsmore.com

Matthew J. Stockl (SBN 329366)
DINSMORE & SHOHL LLP
550 South Hope Street, Ste 1765
Los Angeles, CA 90071    Telephone (213) 335-7737
matthew.stockl@dinsmore.com

**ATTORNEYS** (If Known)

**PARTY** (Check One Box Only)

☐ Debtor          ☐ U.S. Trustee/Bankruptcy Admin
☐ Creditor        ☐ Other
☐ Trustee

**PARTY** (Check One Box Only)

☐ Debtor          ☐ U.S. Trustee/Bankruptcy Admin
☐ Creditor        ☐ Other
☒ Trustee

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED) **(1) Avoidance, Recovery, and Preservation of 2-Year Actual Fraudulent Transfers; (2) Avoidance, Recovery, and Preservation of 2-Year Constructive Fraudulent Transfers; (3) Avoidance, Recovery, and Preservation of 4-Year Actual Fraudulent Transfers; (4) Avoidance, Recovery, and Preservation of 4-Year Constructive Fraudulent Transfers; (5) Turnover; and (6) Aiding and Abetting**

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(a) – Recovery of Money/Property**
☒ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☒ 13-Recovery of money/property - §548 fraudulent transfer
☒ 14-Recovery of money/property - other – §§ 544(b), 550, and 551;
Cal. Civ. Code §§ 3439.04(a), 3439.04(b), 3439.05, and 3439.07

**FRBP 7001(b) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(c) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(d) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(e) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(f) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(f) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(g) – Injunctive Relief**
☐ 71-Injunctive relief- imposition of stay
☐ 72-Injunctive relief - other

**FRBP 7001(h) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(i) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(j) Determination of Removed Action**
☐ 01-Determination of remove d claim or cause

**Other**
☐ SS-SIPA Case - 15 U.S.C. §§78aaa *et.seq.*
☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

☒ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23
☐ Check if a jury trial is demanded in complaint | Demand $245,000

Other Relief Sought
Awarding Plaintiff monetary damages in the amount of all fraudulent transfers on aiding and abetting claim.

B1040 (FORM 1040) (12/24)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>The Litigation Practice Group P.C. | BANKRUPTCY CASE NO.<br>8:23-bk-10571-SC | |
| DISTRICT IN WHICH CASE IS PENDING<br>Central District of California | DIVISION OFFICE<br>Santa Ana | NAME OF JUDGE<br>Scott C. Clarkson |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br>/s/ Matthew J. Stockl | | |
| DATE<br>March 14, 2025 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Christopher Celentino<br>Yosina M. Lissebeck<br>Matthew J. Stockl | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.