CHRISTOPHER CELENTINO (State Bar No. 131688)
Christopher.Celentino@dinsmore.com
YOSINA M. LISSEBECK (State Bar No. 201654)
Yosina.Lissebeck@dinsmore.com
CHRISTOPHER B. GHIO (State Bar No. 259094)
Christopher.Ghio@dinsmore.com
**DINSMORE & SHOHL LLP**
655 West Broadway, Ste 800
San Diego, California 92101
Telephone: (619) 400-0500
Facsimile: (619) 400-0501

MATTHEW J. STOCKL (State Bar No. 329366)
Matthew.Stockl@dinsmore.com
**DINSMORE & SHOHL LLP**
550 South Hope Street, Ste 1765
Los Angeles, CA 90071
Telephone: (213) 335-7737
Facsimile: (213) 335-7740

Special Counsel to Richard A. Marshack,
Trustee of the LPG Liquidation Trust

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION

| | |
|---|---|
| In re: | Case No. 8:23-bk-10571-SC |
| The Litigation Practice Group P.C., | Chapter 11 |
| Debtor. | Adv. Proc. No. _____ |
| | **COMPLAINT FOR:** |
| Richard A. Marshack, Trustee of the LPG Liquidation Trust, | **(1) AVOIDANCE, RECOVERY, AND PRESERVATION OF 2-YEAR ACTUAL FRAUDULENT TRANSFERS;** |
| Plaintiff, | **(2) AVOIDANCE, RECOVERY, AND PRESERVATION OF 2-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS;** |
| v. | |
| Make it Ring Marketing, LLC, a Florida limited liability company; King Consulting Group, LLC, a Florida limited liability company; Colton King, an individual, | **(3) AVOIDANCE, RECOVERY, AND PRESERVATION OF 4-YEAR ACTUAL FRAUDULENT TRANSFERS;** |
| Defendants. | **(4) AVOIDANCE, RECOVERY, AND PRESERVATION OF 4-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS;** |

1

**(5) TURNOVER; AND**

**(6) DISALLOWANCE OF CLAIMS**

Judge:      Hon. Scott C. Clarkson

For his *Complaint for (1) Avoidance, Recovery, and Preservation of 2-Year Actual Fraudulent Transfers; (2) Avoidance, Recovery, and Preservation of 2-Year Constructive Fraudulent Transfers; (3) Avoidance, Recovery, and Preservation of 4-Year Actual Fraudulent Transfers; (4) Avoidance, Recovery, and Preservation of 4-Year Constructive Fraudulent Transfers; (5) Turnover; and (6) Disallowance of Claims* ("Complaint"), plaintiff Richard A. Marshack, the former Chapter 11 Trustee for the bankruptcy estate ("Estate") of debtor The Litigation Practice Group P.C. ("Debtor" or "LPG") and current liquidating trustee of the LPG Liquidation Trust (collectively, "Trustee" or "Plaintiff") in the above-captioned bankruptcy case ("Bankruptcy Case"), alleges and avers as follows:

**STATEMENT OF JURISDICTION, NATURE OF PROCEEDING, AND VENUE**

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E), (H) and (O), 1334(b), and General Order No. 13-05 of the District Court for the Central District of California because this is a core proceeding arising in and/or related to the Bankruptcy Case, which is a case under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code"), and which is pending in the United States Bankruptcy Court for the Central District of California, Santa Ana Division ("Bankruptcy Court").

2. Regardless of whether this proceeding is core, non-core, or otherwise, Plaintiff consents to the entry of a final order and judgment by the Bankruptcy Court.

3. Defendant is notified that Rule 7008 of the Federal Rules of Bankruptcy Procedure requires Defendant to plead whether consent is given to the entry of a final order and judgment by

the Bankruptcy Court.

4.    Venue of this adversary proceeding properly lies in this judicial district pursuant to 28 U.S.C. § 1409(a) because this proceeding is related to Debtor's pending Bankruptcy Case.

**THE PARTIES**

5.    Plaintiff, Richard A. Marshack, was the duly-appointed, qualified, and acting Chapter 11 Trustee of Debtor's Estate and is now the current liquidating trustee of the LPG Liquidation Trust.

6.    Debtor is, and at all material times was, a professional corporation organized, existing, and in good standing under the laws of the State of California, with its principal place of business in Tustin, California.

7.    Defendant, Make it Ring Marketing, LLC ("Make it Ring" or "Defendant"), is, and at all material times represented that it was, a limited liability company existing under the laws of the State of Florida.

8.    Defendant may be served by first class mail postage prepaid upon Colton King, the sole managing member of King Consulting Group, LLC, a Florida limited liability company that was a managing member of Make it Ring, at 9241 Olmstead Drive, Lake Worth, Florida 33467.

9.    Defendant may also be served by first class mail postage prepaid upon Make it Ring's registered agent for service of process, Sean C. Selk, 301 Clematis Street, Suite 3000, West Palm Beach, Florida 33401.

10.    Defendant King Consulting Group, LLC ("King Consulting"), is, and at all material times represented that it was, a limited liability company existing under the laws of the State of Florida.

11.    King Consulting may be served by first class mail postage prepaid upon King Consulting's registered agent for service of process, Sean C. Selk, 301 Clematis Street, Suite 3000, West Palm Beach, Florida 33401.

12.    Defendant Colton King ("Mr. King" and, together with Make It Ring and King Consulting, "Defendants") is, and at all material times was, an individual resident of the State of Florida subject to service of process at 9241 Olmstead Drive, Lake Worth, Florida 33467.

## **GENERAL ALLEGATIONS**

### A.      The Bankruptcy Case

13.      On March 20, 2023 ("Petition Date"), Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, commencing the Bankruptcy Case.

14.      The Office of the United States Trustee ("UST") filed its *Motion by United States Trustee to Dismiss or Convert Case Pursuant to 11 U.S.C. § 1112(b)* [Bankr. Docket No. 21] and creditors Debt Validation Fund II, LLC; MC DVI Fund 1, LLC; and MC DVI Fund 2, LLC filed the *Motion by DVF and MC DVI to Dismiss Chapter 11 Case Pursuant to 11 U.S.C. §§ 105, 305, 349, & 1112, or in the Alternative Convert This Case to Chapter 7 or Appoint a Trustee* [Bankr. Docket No. 44]. On May 4, 2023, the Court entered its *Order Directing United States Trustee to Appoint Chapter 11 Trustee* [Bankr. Docket No. 58].

15.      Pursuant to the *Acceptance of Appointment as Chapter 11 Trustee* [Bankr. Docket No. 63], on May 8, 2023, Trustee accepted his appointment as the Chapter 11 Trustee in the Bankruptcy Case. The Court approved the Trustee's appointment in its *Order Approving the U.S. Trustee's Application for the Appointment of a Chapter 11 Trustee* [Docket No. 65].

16.      Trustee was not appointed until after events of the case and, therefore, bases these allegations on information and belief. *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) ("The Twombly plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible."); *Miller v. City of Los Angeles*, 2014 U.S. Dist. LEXIS 198871, 2014 WL 12610195, at *5 (C.D. Cal. Aug. 7, 2014) (recognizing that the plaintiff's "information and belief" pleading was allowed and "necessary at times"); *see also Mireskandari v. Daily Mail and General Trust PLC*, 2013 U.S. Dist. LEXIS 194437, 2013 WL 12129642, at *4 (C.D. Cal. July 31, 2013) ("The Federal Rules of Civil Procedure allow parties to plead facts on 'information and belief' if the facts 'will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.'" (citations omitted)).

17.      Pursuant to the *Order Confirming Modified First Amended Joint Chapter 11 Plan of*

*Liquidation* entered September 9, 2024, and the *Notice of Occurrence of Effective Date of Modified First Amended Joint Chapter 11 Plan of Liquidation* filed September 24, 2024, Richard A. Marshack became the Liquidating Trustee of the LPG Liquidation Trust, effective September 24, 2024, and he continues to serve in this capacity at this time. [Bankr. Docket Nos. 1646 & 1762].

18.     All claims have been transferred to the Liquidating Trust pursuant to the confirmed plan and Plaintiff brings this action solely in his capacity as the former Chapter 11 Trustee and current Liquidating Trustee of the LPG Liquidation Trust for the benefit of Debtor's Estate and its creditors.

**B.     Protective Order**

19.     On or about May 2, 2024, Plaintiff filed that certain Notice and Motion for Entry of Protective Order (the "Protective Order Motion").

20.     On June 3, 2024, the Court entered its Order Granting Motion for Entry of Protective Order and the Protective Order [Docket No. 1270] (the "Protective Order"). A true and accurate copy of the Protective Order is attached hereto as **Exhibit 1** and incorporated herein by reference.

21.     By its own terms, the Protective Order applies to this adversary proceeding and governs all discovery conducted herein.

**C.     LPG**

22.     LPG operated a law firm for consumers across the country who sought assistance in contesting or resolving debts they would identify.

23.     The consumers would pay LPG over a period of time via monthly debits from their bank accounts.

24.     The monthly payments were meant to cover all legal services LPG provided to the consumers including validation of the debts, review of documents to determine enforceability, and court appearances to halt lawsuits to obtain judgments.

25.     In certain instances, LPG would file a lawsuit in an effort to eliminate a disputed debt or to prosecute affirmative claims held by the consumers.

26.     LPG mismanaged the consumers' monthly payments.

27.     Tony Diab is, and at all relevant times was, an individual who operated, dominated

5

and controlled LPG ("Diab"). Diab and other defendants devised a plan to fraudulently transfer funds, client files, client funds and assets in the form of ACH Receivables (the "ACH Receivables" or "Accounts Receivable") out of LPG to third parties prior to the filing of bankruptcy.

28.    To obtain consumer clients, LPG contracted with marketing companies, who engaged in illegal capping and would advertise or call to solicit consumers to become clients of LPG in exchange for a percentage of the ACH Receivables collected by LPG from the consumers. The marketing affiliate went so far as to assist with the execution of an engagement letter between the consumer and LPG.

29.    In exchange, LPG agreed to pay the marketing affiliates a percentage the monthly payments collected by LPG from the consumers.

30.    Because LPG received payments from consumers over time, it often sought financing by borrowing against its future cash flows. This borrowing was not only used to finance operations at LPG, but also to pay the fees owed to the marketing companies for providing the client referrals.

31.    Many of the documents executed in connection with such financing described the transactions as accounts receivable purchase agreements.

32.    Diab used entities he controlled, and were his alter egos, including, without limitation, Vulcan Consulting Group ("Vulcan"), Maverick Management Group LLC ("Maverick"), Prime Logix, LLC ("Prime Logix"), LGS Holdco, LLC ("LGS"), and/or Coast Processing to divert LPG consumer funds and ACH Receivables. Diab would use numerous ACH processing companies in order to easily transfer millions of dollars from Debtor to these entities he controlled, without oversight or detection, and to avoid payment disputes and complications. The money that flowed from Debtor through these bank account to Defendants consisted of Client Funds that Debtor funneled to these entities by means of the ACH processing companies. Debtor also made deposits into these entities bank account such that they received Client Funds directly from Debtor in addition to direct Accounts Receivable.

33.    LPG transferred ACH Receivables and the associated client files in this fashion to defraud creditors in a pyramid scheme and for improper personal gain.

34.    LPG's monthly revenue from client files was primarily received via ACH payments.

To process ACH payments, LPG was required to enlist the services of ACH payment processing companies who handle high risk transactions. In this regard, Diab had enlisted numerous ACH processing companies to easily switch between different vendors and have millions of dollars of LPG funds directed to entities Diab controlled, including but not limited to Vulcan, Maverick, Prime Logix, LGS, and/or Coast Processing. Diab utilized these other entities' bank accounts as LPG bank accounts.

35.    Diab instructed lenders and file purchasers to divert LPG loan proceeds or to deposit money otherwise due to LPG into bank accounts he controlled on behalf of LPG but ostensibly held by Vulcan, Maverick, Prime Logix, LPG and/or Coast Processing.  Diab used all of these proceeds as if they were LPG funds, because they were.

36.    At or around the Petition Date, Diab transferred or sold approximately 15,000 LPG client files to Oakstone Law Group PC ("Oakstone"), 12,000 LPG files to Consumer Legal Group ("CLG"), and the remaining LPG files, approximated at slightly less than 40,000, to Phoenix Law, PC ("Phoenix").

37.    Pursuant to the asset purchase agreement between LPG and CLG, Diab instructed CLG to initiate the ACH debits on the transferred files, which it did through Optimum Bank and its processing entity LGS Holdco.

38.    At or around the Petition Date, Diab transferred, for no consideration, approximately 8,000 files (previously transferred to Phoenix) to Heshy Deutsch ("Deutsch") and Israel Reiches ("Reiches").  Diab instructed Deutsch and Reiches, by and through their co-conspirators Sam Geiger and Solomon Feig, to initiate the ACH debits on the transferred files, which they did through BCB Bank and a processing entity known as CLG Processing, into accounts, not in the name of LPG, but that held funds of behalf of LPG and disbursed those funds for LPG.

39.    The funds obtained from the ACH debits described in paragraphs 37 and 38 above were deposited in Maverick and Prime Logix accounts, among others.

40.    LPG's ACH Receivables were the primary, if not exclusive source of funds, for Validation Partners, Vulcan, Oakstone, PECC, Prime Logix, Coast Processing, LGS, and Maverick. As set forth above, the other sources of funds for these entities are the proceeds of LPG assets (i.e.,

1  file purchase account receivable proceeds) or constitute loan proceeds for which LPG alone was

2  liable.

3      41.    Diab frequently diverted the LPG money pulled from its consumer clients and other

4  funds it received through investors and lenders, to and through these entities.

5      42.    Diab frequently would direct these entities to pay affiliates (aka marketing capers),

6  MCA lenders, and others with LPG assets.

7      43.    Diab would instruct others at LPG and these entities on how to manage and transfer

8  these funds to and from these entities and LPG interchangeably.

9  **D.**    **Defendants**

10      44.    Defendant Make it Ring was one of the marketing companies that procured clients

11  for LPG.

12      45.    Based on information and belief, Make it Ring acted as a marketing affiliate for LPG.

13      46.    LPG agreed to pay, and in fact paid, Defendant a portion of the monthly payments

14  received from consumers referred by Defendants.

15      47.    Defendant also likely entered into agreements pursuant to which it purported to sell

16  accounts receivable back to LPG.

17      48.    On information and belief, King Consulting (a) received transfers from Debtor as an

18  initial, immediate, or mediate transferee; (b) received transfers from Defendant as a mediate

19  transferee; (c) directed or controlled Defendant's conduct and, as such, was responsible in some

20  manner for the occurrences alleged herein; and/or (d) was used to shield Debtor's assets from

21  collection, levy or execution, and to otherwise, hinder, delay and defraud the Debtor and its

22  creditors.

23      49.    On information and belief, Mr. King (a) received transfers from Debtor as an initial,

24  immediate, or mediate transferee; (b) received transfers from Defendant as a mediate transferee; (c)

25  directed or controlled Defendant's conduct and, as such, was responsible in some manner for the

26  occurrences alleged herein; and/or (d) was used to shield Debtor's assets from collection, levy or

27  execution, and to otherwise, hinder, delay and defraud the Debtor and its creditors.

28  / / /

i.    **Affiliate Agreement**

50.    On information and belief, Debtor entered into an affiliate agreement with Defendant ("Affiliate Agreement"). However, Trustee is not in possession of the applicable affiliate agreement at this time.

51.    On information and belief, and based on similar agreements, the Affiliate Agreement states that Defendant "owns and operates a system of generating leads consisting of consumers interested in the legal services offered by LPG."

52.    Based upon the Trustee's review of the business operations of the marketing affiliates and the Debtor's banking records, including transactions between Make it Ring and Debtor, upon information and belief, Make it Ring acted as a marketing affiliate for the Debtor and such arrangement was dictated by an oral or written affiliate agreement with Make it Ring (whether memorialized by written or oral agreement, the "Affiliate Agreement(s)").

53.    Pursuant to the Debtor's similar affiliate agreements, the marketing affiliate would be required to generate leads consisting of consumers interested in the legal services offered by LPG and referred those consumers to Debtor.

54.    In exchange for the referrals, Debtor paid its marketing affiliates, including the Defendant.

55.    These types of affiliate agreements violate Sections 6151 and 6155 of the California Business and Professional Code, which prohibit referrals of potential clients to attorneys unless registered with the State Bar of California. Cal. Bus. & Prof. Code § 6155. "Referral activity" includes "any entity 'which, in person, electronically, or otherwise, refers the consumer to an attorney or law firm not identified' in the advertising." *Jackson v. LegalMatch.com*, 42 Cal. App. 5th 760, 775 (2019). A referral includes receiving information from potential clients and sending that information to lawyers, even when the advertiser does not advertise the name of the attorneys and the clients do not clear the name of the potential attorney after the referral occurred. *Id.*

56.    Further, if any effect of an agreement is to accomplish an unlawful purpose, the agreement may be declared illegal regardless of the intention of the parties. *Stockton Morris Plan Co. v. Cal. Tractor & Equip. Corp.*, 112 Cal. App. 2d 684, 690 (1952) (citing *Fewel & Dawes, Inc.*

*v. Pratt*, 17 Cal. 2d 85, 91 (1941)). This remains true regardless of whether the contract has been performed. *Stevens v. Boyes Hot Springs Co.*, 113 Cal. App. 479, 483 (1931) (A contract by a corporation to purchase its own stock has the effect of illegally withdrawing and paying to a stockholder a part of the capital stock of the corporation and is illegal and void, regardless of the fact that the contract is fully performed by the sellers and partially performed by the corporation.); *Mansfield v. Hyde*, 112 Cal. App. 2d 133, 139 (1952), overruled, *Fomco, Inc. v. Joe Maggio, Inc.*, 8 Cal. Rptr. 459 (1960) (Where object of statute requiring licenses is to prevent improper persons from engaging in particular activity, or is for purpose of regulating occupation or business for protection of public, imposition of penalty amounts to prohibition against engaging in occupation or business without license, and contract made by unlicensed person in violation of statute is invalid.);  *Firpo v. Murphy*, 72 Cal. App. 249, 252 (1925) (A contract to pay commissions to a real estate broker is illegal and he is not entitled to recover thereon where he fails to secure the license required by law to carry on his business.).

57.     Because the Affiliate Agreement and associated referral activity by Defendants violate federal and state law since the named defendants have not registered with the State Bar of California as required by Cal. Bus. & Prof. Code § 6155, they are void, unenforceable, and subject to avoidance as fraudulent. Any alleged consideration provided under the Affiliate Agreements and/or the ARPA Agreements (defined hereafter below) was unlawful.

58.     Unlawful consideration is that which is: "(1) contrary to an express provision of law; (2) contrary to the policy of express law, though not expressly prohibited; or (3) otherwise contrary to good morals." Cal. Civ. Code § 1667. "If any part of a single consideration for one or more objects, or of several considerations for a single object, is unlawful, the entire contract is void." Cal. Civ. Code § 1608.

**ii.     Accounts Receivable Purchase Agreements**

59.     On information and belief, Defendant entered into one or more Accounts Receivable Purchase Agreement with Debtor (collectively referred to as the "ARPA Agreements").

60.     On information and belief, pursuant to the ARPA Agreements, the Defendant purported to sell Debtor streams of monthly payments from consumers that were supposed to be

1    held in trust until earned.

2       61.    By entering into the ARPA Agreements, Debtor and Defendant violated federal and

3    state laws by selling unearned legal fees or funds there were supposed to be held in trust or used for

4    the benefit of consumers.

5       62.    The effect of the ARPA Agreements and/or related transactions was to accomplish

6    an unlawful purpose.  Thus, the agreements may be declared illegal regardless of the intention of

7    the parties. *Stockton Morris Plan Co. v. Cal. Tractor & Equip. Corp.*, 112 Cal. App. 2d 684, 690

8    (1952) (citing *Fewel & Dawes, Inc. v. Pratt*, 17 Cal. 2d 85, 91 (1941)).  This remains true regardless

9    of whether the contract has been performed. *Stevens v. Boyes Hot Springs Co.*, 113 Cal. App. 479,

10   483 (1931) (A contract by a corporation to purchase its own stock has the effect of illegally

11   withdrawing and paying to a stockholder a part of the capital stock of the corporation and is illegal

12   and void, regardless of the fact that the contract is fully performed by the sellers and partially

13   performed by the corporation.); *Mansfield v. Hyde*, 112 Cal. App. 2d 133, 139 (1952),

14   overruled, *Fomco, Inc. v. Joe Maggio, Inc.*, 8 Cal. Rptr. 459 (1960) (Where object of statute

15   requiring licenses is to prevent improper persons from engaging in particular activity, or is for

16   purpose of regulating occupation or business for protection of public, imposition of penalty amounts

17   to prohibition against engaging in occupation or business without license, and contract made by

18   unlicensed person in violation of statute is invalid.);  *Firpo v. Murphy*, 72 Cal. App. 249, 252 (1925)

19   (A contract to pay commissions to a real estate broker is illegal and he is not entitled to recover

20   thereon where he fails to secure the license required by law to carry on his business.).

21      63.    Because the ARPA Agreements violate federal and state laws, they are void,

22   unenforceable, and subject to avoidance as fraudulent. Any alleged consideration provided to Debtor

23   under the ARPA Agreements was unlawful.

24      64.    Unlawful consideration is that which is: "(1) contrary to an express provision of law;

25   (2) contrary to the policy of express law, though not expressly prohibited; or (3) otherwise contrary

26   to good morals." Cal. Civ. Code § 1667. "If any part of a single consideration for one or more

27   objects, or of several considerations for a single object, is unlawful, the entire contract is void." Cal.

28   Civ. Code § 1608.

### iii.    Demand Letters

65.    On or about October 9, 2024 and November 27, 2024, Trustee sent  demand letters to Defendant (the "Demand Letters").  True and accurate copies of the Demand Letters are attached hereto as **Exhibit 2** and incorporated herein by reference.

66.    The Demand Letters discussed certain transfers from Debtor that were made to Defendant within the 4-year period prior to the Petition Date, including 14 fraudulent conveyances totaling $226,750.00, which can be avoided and recovered by the Trustee pursuant to 11 U.S.C. §§ 544 and 548 and Cal. Civ. Code. §§ 3439.04 and 3439.05.

67.    Based on the information available to Trustee and considering the nature of the relationship between Debtor and Defendant, no potential defenses were identified that could reduce Defendant's liability for the fraudulent conveyances.  Consequently, Defendant was requested to provide any facts and valid defenses that could substantiate its position and potentially mitigate or prevent some or all of the transfers made by Debtor.

68.    Defendant never responded to the Demand Letters.

69.    Trustee has yet to receive any response or payment from Defendant pursuant to the Demand Letters.

### E.    Payments to Defendant

70.    During the applicable reach-back period, Debtor paid Defendant the sum of at least $226,750.00 between November 12, 2021 and March 15, 2022, subject to proof at trial ("Transfers").  A true and accurate list of the known payments made by Debtor to Defendant is attached hereto as **Exhibit 3**, and incorporated herein by reference.

71.    The Transfers are based on updated figures as of January 2025.

### F.    LPG's Ponzi Scheme

72.    The Ponzi Scheme Presumption exists in bankruptcy proceedings.

73.    The Ponzi Scheme Presumption can be utilized to establish a debtor's "intent to defraud future undertakers [investors] from the mere fact that a debtor was running a Ponzi scheme. Indeed, no other reasonable inference is possible.  A Ponzi scheme cannot work forever.  The investor pool is a limited resource and will eventually run dry.  The perpetrator must know that the

scheme will eventually collapse as a result of the inability to attract new investors.  The perpetrator nevertheless makes payments to present investors, which, by definition, are meant to attract new investors.  He must know all along, from the very nature of his activities, that investors at the end of the line will lose their money. Knowledge to a substantial certainty constitutes intent in the eyes of the law." *cf. Restatement (Second) of Torts § 8A (1963 & 1964)*, and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them.  *Kirkland v. Rund (In re EPD Inv. Co., LLC)*, 114 F.4th 1148, 1153 (9th Cir. 2024) (by definition Ponzi scheme is destined to fail and the swindler and their entities often end in bankruptcy or equitable receivership); *cf. Coleman Am. Moving Servs., Inc. v. First Nat'l Bank & Trust Co. (In re American Properties, Inc.)* 14 B.R. 637,643 (Bankr. D. Kan. 1981)14 B.R. 637, 643 (intentionally carrying out a transaction with full knowledge that its effect will be detrimental to creditors is sufficient for actual intent to hinder, delay or defraud within the meaning of § 548(a)(1))." *Merrill v. Abbott (In re Independent Clearing House Co.)* (D. Utah 1987) 77 B.R. 843, 860.  A trustee in bankruptcy is not required to show that an operator of a Ponzi scheme was subjectively aware his Ponzi scheme was destined to fail.  *In re EPD Inv. Co., LLC*, 114 F.4th at 1153 ("[a] trustee's action to recover assets fraudulently conveyed in the course of a Ponzi scheme does not require that the trustee also prove the Ponzi-scheme operator was subjectively aware his Ponzi scheme was destined to fail.").

74.    "But if all the debtor receives in return for a transfer is the use of the defendant's money to run a Ponzi scheme, there is nothing in the bankruptcy estate for creditors to share.  In fact, by helping the debtor perpetuate his scheme, the transfers exacerbate the harm to creditors by increasing the amount of claims while diminishing the debtor's estate.  In such a situation, the use of the defendant's money cannot objectively be called 'reasonably equivalent value.'" *In re Independent Clearing House Co.*, 77 B.R. at 859.  Therefore, "[t]he trustee can avoid the transfers if they were preferential or fraudulent.  Transfers to investors in a Ponzi scheme are preferential and fraudulent.  Therefore, they constitute "property of the estate," and the trustee can recover them.  *Id.* at 853 n.17 (citations omitted).

75.    Debtor was operating a Ponzi scheme that utilized affiliates and several other entities as investors to continue its unlawful business practices by using funds provided by current

investors to attract new investors hoping for very high returns. Therefore, the Debtor was running a Ponzi scheme and the Ponzi Scheme Presumption can be utilized to infer that the Debtor had the intent to defraud investors within the meaning of 11 U.S.C. section 548(a)(1). This is evidenced by the Court in this Bankruptcy Case declaring that Debtor was operating a Ponzi scheme when it stated the following:

> It is important to note that this Court has never received any significant and trustworthy evidence that Debtor accomplished meaningful results for its clients, but only anecdotal examples of viable success for its clients. By reviewing the Estate's claims register, there is evidence of consumer claims for the fraud and demanded but undelivered refunds of approximately $500 million. There is ample evidence that the pre-petition Debtor never placed the collected funds into an attorney-client trust account, and that Debtor or its principals simply looted the payments received through the client automatic withdrawals, stiffing both the clients and outside attorneys who may have been working on client cases with the hopes of being paid. There is also evidence before the Court that Debtor was running a Ponzi scheme and paying some outside (or "network") attorneys with funds obtained from new clients. In this case, it appears that some of the "lenders" may have been serving as "investors," hoping for very high returns before "the music stopped." The Ninth Circuit has recently explained, "[b]y definition, a Ponzi scheme is destined to fail because the pool of available investors is not limitless. When the Ponzi scheme operator's pool of investors inevitably runs dry, the scheme collapses and the swindler and their entities often end up in bankruptcy or equitable receivership. *See generally* David R. Hague, Expanding the Ponzi Scheme Presumption, 64 DePaul L. Rev. 867 (2015). In bankruptcy, the court-appointed trustee is tasked with taking immediate control of the entity, ceasing ongoing fraudulent activity, locating and collecting assets for the bankruptcy or receivership estate, and achieving a final, equitable distribution of the remaining assets. *See* 11 U.S.C. § 704; *Kirkland v. Rund (In re EPD Inv. Co., LLC)*, 2024 U.S. App. LEXIS 21363, at *15 (9th Cir. Aug. 23, 2024). Finally, there is evidence that Debtor was encumbering (or as some creditors assert, "double or triple selling") their accounts or receivables to multiple lenders. With respect to Greyson's requested Administrative Claim [Dk. 676], and as more fully described in the concurrently entered order denying the claim, there has been no evidence presented that any work allegedly performed by Greyson assisted any clients or added any value to the Estate.

*See, Case 8:23-bk-10571-SC*, Doc 1545 n. 5.

76.    Moreover, since the Transfers were made with the intent to further the Ponzi scheme, the Debtor did not receive an objectively reasonable equivalent value for the Transfers, and the Trustee can avoid the Transfers because they were fraudulent.

**G.    LPG's Prepetition Creditors**

77.    Debtor was insolvent when each Transfer was made. This insolvency is evidenced in part by the fact that 14 separate UCC-1 statements were of record securing debts of the Debtor as of September 1, 2022. These statements remained unreleased as of the Petition Date. These statements either reflected secured liens against the Debtor's assets then owned or thereafter acquired, or provided evidence of the assignment or sale of substantial portions of the Debtor's future income.  Debtor's insolvency is an adjudicated fact based on the Court's finding of insolvency entered in other adversary proceedings pending before the Court.  *See, e.g.*, Case No. 8:23-bk-10571-SC; Adv. No. 8:24-ap-01002-SC [Adv. Docket No. 28] (finding that "Debtor was insolvent or rendered insolvent at the time of the transfers made to Defendant").

78.    Plaintiff directs Defendant to the Order Denying Greyson's Motion to Vacate the Preliminary Injunction entered as Bankr. Docket No. 1545 ("Order") where the Court found "it is clear to this Court that Debtor, since its pre-petition inception (and through the time of the appointment of the Chapter 11 Trustee) was, in the Court's opinion operating a criminal enterprise" and that "[t]here is also evidence before the Court that the Debtor was running a Ponzi scheme and paying some outside (or 'network') attorneys with funds obtained from new clients." Order p. 3, l. 11-13; p. 4, l. 14-15.  Insolvency is presumed as a matter of law if the debtor operated a Ponzi scheme.  *See, e.g., Glob. Money Mgmt., L.P. v. McDonnold*, No. 06CV34, 2008 U.S. Dist. LEXIS 128733, at *15 (S.D. Cal. Feb. 27, 2008) (concluding that "if a Ponzi scheme is proven, then the debtor is proven insolvent from the time of its inception").

79.    When the Transfers were made, these prior UCC-1 statements secured the repayment of the following claimed amounts that are currently known to Trustee and are allegedly owed by the Debtor: (i) $2,374,004.82 owed to Fundura Capital Group as evidenced by Proof of Claim No. 335 purportedly secured by a UCC statement filed on or about May 19, 2021; (ii) approximately $15 million dollars owed to MNS Funding, LLC as evidenced by Proof of Claim No. 1060 purportedly

secured by a UCC statement filed on or about May 28, 2021; (iii) approximately $5,000,000 owed to Azzure Capital, LLC as evidenced by Proof of Claim No. 127 secured by a UCC statement filed on or about May 28, 2021; and (iv) approximately $1.5 million dollars owed to Diverse Capital, LLC purportedly secured by UCC statements filed on or about September 15, 2021, and December 1, 2021.[1]

80.    As alleged above, LPG was borrowing against its assets and future income, often on unfavorable terms, not only to finance operations at LPG, but also to pay the fees owed to the marketing affiliates for providing consumer clients and to pay other loans to creditors that were in default or about to be in default as part of Diab's scheme to keep LPG creditors at bay for as long as possible until he could transfer LPG's assets, client files, Client Funds, and ACH Receivables to other entities under his control.  Pursuant to the agreements with the marketing companies, significant percentages of future payments were already promised to be paid to the marketing affiliates from whatever future income the Debtor would receive.  And, of course, the payments LPG received in the form of ACH Receivables were also trust funds paid to LPG by its law firm clients, subject to return of funds in the event of a request for refund or termination of the representation before LPG had earned the funds.  In this regard, except to the extent earned, the ACH Receivables also represented a liability of the Debtor.

81.    In addition, on Debtor's Schedule E/F [Bankr. Docket No. 33], Debtor scheduled 11 unsecured creditors with priority unsecured claims totaling $374,060.04. These priority unsecured creditors include Indiana Dept. of Revenue, Dept. of Labor and Industries, Arizona Dept. of Economic Security, Arkansas Dept. of Finance & Admin., California Franchise Tax Board, Georgia Dept. of Labor, Internal Revenue Service, Mississippi Dept. of Revenue, Nevada Dept. of Taxation, Utah State Tax Commission, and Wisconsin Dept. of Revenue (collectively, "Priority Unsecured Creditors").

82.    Another group of creditors that Debtor listed on its Schedule E/F [Bankr. Docket No. 33] are nonpriority unsecured creditors. Those 58 creditors have scheduled claims totaling

[1] Trustee reserves all rights, claims, and defenses with respect to these and any other purported secured or unsecured claims.

$141,439,158.05 and include Ajilon; Anthem Blue Cross; Azevedo Solutions Groups, Inc.; Carolina Technologies & Consulting Invoice; Collaboration Advisors; Credit Reporting Service Inc.; CT Corporation – Inv.; Debt Pay Pro; Document Fulfillment Services; EnergyCare, LLC; Exela Enterprise Solutions; First Legal Network, LLC; GHA Technologies Inc.; Harrington Electric, Inc.; Imagine Reporting; Juize, Inc.; Krisp Technologies, Inc.; Liberty Mutual; Marc Lemauviel – Allegra; MarkSYS Holdings, LLC; Netsuite-Oracle; Pitney Bowes; Rapid Credit, Inc.; SBS Leasing A Program of De Lage Landen; Security Solutions; Sharp Business Systems; Streamline Performance, Inc.; Thomson Reuters; Twilio, Inc.; Nationwide Appearance Attorneys; Executive Center, LLC; Outsource Accelerator, Ltd.; TaskUs Holdings, Inc.; Marich Bein, LLC; Validation Partners; MC DVI Fund 1, LLC; MC DVI Fund 2, LLC; Debt Validation Fund II, LLC; Tustin Executive Center; LexisNexus; JP Morgan Chase; Business Centers of America; Michael Schwartz; Anibal Colon Jr.; Kathleen Lacey; David Ulery; Kimberly Birdsong; Kevin Carpenter; Karen Suell; Gloria Eaton; Carolyn Beech; Debra Price; Kenneth Topp; Darcey Williamson, Trustee; James Hammett; Johnny Rizo; Beverly Graham; Kathleen Scarlett; and Geneve and Myranda Sheffield (collectively, "Nonpriority Unsecured Creditors" and, together with the Secured Creditors and Priority Unsecured Creditors, "Prepetition Creditors").

83.    As of the date this complaint was drafted, approximately 5,771 claims have been filed with the bankruptcy Court. While Trustee has not reviewed all claims as of the date of this complaint, and reserves all rights to object to those claims, the total amount exceeds approximately $717,507,462.29.

## **FIRST CLAIM FOR RELIEF**

### **Count I - Avoidance, Recovery, and Preservation of**
### **Actual Fraudulent Transfers Against Defendants**
### **[11 U.S.C. §§ 548(a)(1)(A), 550, and 551]**

84.    Plaintiff realleges and incorporates here by reference each and every allegation contained in paragraphs 1 through 83 as though set forth in full.

85.    All or a portion of the Transfers occurred within the two years prior to the Petition Date and thus, the agreements between the Debtor and the Defendant did as well, whether or not

memorialized in the Affiliate Agreements, ARPA Agreements, or other agreements.

86.    On or after the date that any such agreements were entered or executed and the Transfers were made, entities to which Debtor was or became indebted include the Prepetition Creditors.

87.    The Transfers happened while Debtor was insolvent or rendered Debtor insolvent.

88.    Despite Debtor's obligation to the Prepetition Creditors, Debtor continued to pay Make it Ring sums received from consumers under such Affiliate Agreements, which constitutes an illegal capping agreement between Defendant and Debtor. Any obligation of the Debtor arising from such agreement is also avoidable as fraudulent.

89.    Despite Debtor's obligation to the Prepetition Creditors, Make it Ring continued to sell or transfer portions of the accounts receivables generated under the ARPA Agreements to Debtor, which is illegal under federal and state laws.

90.    The Transfers were made with actual intent to hinder, delay, or defraud creditors of Debtor.

91.    The Debtor was operating a Ponzi scheme and the Ponzi Scheme Presumption can be utilized to infer the Debtor's actual intent to defraud within the meaning of 11 U.S.C. section 548(a)(1).

92.    The Debtor's conduct was done with oppression, fraud, and malice, as defined in Civil Code section 3294, entitling the Trustee to, in addition to the actual damages, exemplary or punitive damages for making an example of the Debtor and to punish the Debtor.

93.    The Affiliate Agreement, ARPA Agreements, and the Transfers of Debtor's funds are avoidable as fraudulent pursuant to 11 U.S.C. §§ 548(a)(1)(A), 550, and 551, and the common law tort of intentional fraudulent transfers by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against the Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

94.    The Affiliate Agreements, ARPA Agreements, and Transfers should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(A) and under the common law tort of intentional fraudulent

18

transfers, and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

**SECOND CLAIM FOR RELIEF**

**Count II - Avoidance, Recovery, and Preservation of**

**Constructive Fraudulent Transfers Against Defendants**

**[11 U.S.C. §§ 548(a)(1)(B), 550, and 551]**

95.     Plaintiff realleges and incorporates here by reference each and every allegation contained in paragraphs 1 through 94 as though set forth in full.

96.     The Affiliate Agreements, ARPA Agreements, and all or a portion of the Transfers occurred within the two years prior to the Petition Date.

97.     On or after the date that such agreements were executed and such Transfers were made, entities to which Debtor was or became indebted include the Prepetition Creditors.

98.     The Transfers happened while Debtor:

    a.  was insolvent or became insolvent as a result;

    b.  was engaged or was about to engage in a transaction for which any property remaining with Debtor was of unreasonably small capital; or

    c.  intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

99.     Because the referrals from Defendant to Debtor are illegal under federal and state law, they are void and subject to avoidance as fraudulent. Any purported consideration constitutes unlawful consideration, which cannot constitute reasonably equivalent value. Thus, at the time the agreements were executed and the Transfers made, Debtor received less than reasonably equivalent value.

100.    Furthermore, the Debtor did not receive the reasonably equivalent value of the Transfers to Make it Ring because by using Make it Ring's money to run a Ponzi scheme there is nothing in Estate for the creditors to share. Rather, the Transfers exacerbated the harm to creditors by increasing the amount of claims while diminishing the Debtor's Estate. In this situation, the use of Make it Ring's money to further the Debtor's Ponzi scheme cannot be consideration for the

Transfers and cannot objectively be called reasonably equivalent value.

101.    Therefore, the Defendant was acting as an investor in the Debtor's Ponzi scheme. Any transfers made to the Defendant can be avoided by the Plaintiff since the Transfers are preferential and fraudulent such that they constitute property of the Estate in which the Plaintiff can recover.

102.    The Affiliate Agreements, ARPA Agreements, and the Transfers should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(B), and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

## THIRD CLAIM FOR RELIEF

### Count III - Avoidance, Recovery, and Preservation of

### Actual Fraudulent Transfers Against Defendants

### [11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.04(a), 3439.04(b), and 3439.07]

103.    Plaintiff realleges and incorporates here by reference each and every allegation contained in paragraphs 1 through 102 as though set forth in full.

104.    The Affiliate Agreements, ARPA Agreements, and all or a portion of the Transfers occurred within the four years prior to the Petition Date.

105.    On or after the date that such agreements were entered and such Transfers were made, entities to which Debtor was or became indebted include the Prepetition Creditors.

106.    Despite Debtor's obligation to the Prepetition Creditors, Debtor continued to pay Make it Ring sums received from consumers under the Affiliate Agreements, which constitutes an illegal capping agreement between Defendant and Debtor.

107.    The Transfers happened while Debtor was insolvent or Debtor became insolvent shortly after the Transfers were made as is evidenced by the filing of the voluntary petition.

108.    The value of the consideration received by Debtor for such Transfers was not reasonably equivalent to the value of the Transfers because the Transfers were used to further assist Debtor in its Ponzi scheme.

109.    Because the referrals from Defendant to Debtor are illegal under federal and state

law, they are void and subject to avoidance as fraudulent. Any purported consideration constitutes unlawful consideration, which cannot constitute reasonably equivalent value. Thus, at the time the agreements were executed and the Transfers made, Debtor received less than reasonably equivalent value.

110.    The Transfers were made with actual intent to hinder, delay, or defraud creditors of Debtor.

111.    The Debtor was operating a Ponzi scheme and the Ponzi Scheme Presumption can be utilized to infer the Debtor's actual intent to defraud within the meaning of 11 U.S.C. section 548(a)(1).

112.    The Debtor's conduct was done with oppression, fraud, and malice, as defined in Civil Code section 3294, entitling the Trustee to, in addition to the actual damages, exemplary or punitive damages for making an example of the Debtor and to punish the Debtor.

113.    The Affiliate Agreements, the ARPA Agreements, and the Transfers of Debtor's funds are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and Cal. Civ. Code §§ 3439.04(a), 3439.04(b), and 3439.07, and the common law tort of intentional fraudulent transfers by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against the Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

114.    Accordingly, the Affiliate Agreements, the ARPA Agreements, and the Transfers should be avoided as fraudulent under 11 U.S.C. §§ 544(b) and Cal. Civ. Code §§ 3439.04(a), 3439.04(b), and 3439.07, and under the common law tort of intentional fraudulent transfers, and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551 and Cal. Civ. Code § 3439.07.

**FOURTH CLAIM FOR RELIEF**

**Count IV - Avoidance, Recovery, and Preservation of**

**Constructive Fraudulent Transfers Against Defendants**

**[11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.05, and 3439.07]**

115.    Plaintiff realleges and incorporates here by reference each and every allegation

contained in paragraphs 1 through 114 as though set forth in full.

116. The Affiliate Agreements, the ARPA Agreements, and all or a portion of the Transfers occurred within the four years prior to the Petition Date.

117. The Transfers happened while Debtor:

    a. was insolvent or became insolvent as a result;

    b. was engaged or was about to engage in a transaction for which any property remaining with Debtor was of unreasonably small capital; or

    c. intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

118. Because the referrals from Make it Ring to Debtor are illegal under federal and state law, the agreements are void and subject to avoidance as fraudulent. Any purported consideration constitutes unlawful consideration, which cannot constitute reasonably equivalent value. Thus, at the time the agreements were executed and the Transfers made, Debtor received less than reasonably equivalent value.

119. Furthermore, the Debtor did not receive the reasonably equivalent value of the Transfers to the Make it Ring because by using Make it Ring's money to run a Ponzi scheme there is nothing in Estate for the creditors to share. Rather, the Transfers exacerbated the harm to creditors by increasing the amount of claims while diminishing the Debtor's Estate. In this situation, the use of Make it Ring's money to further the Debtor's Ponzi scheme cannot be consideration for the Transfers and cannot objectively be called reasonably equivalent value.

120. The Defendant was therefore acting as an investor in the Debtor's Ponzi scheme and any Transfers made to the Defendant can be avoided by the Plaintiff since the Transfers to the Defendant are preferential and fraudulent such that they constitute property of the Estate in which the Plaintiff can recover.

121. The Affiliate Agreements, the ARPA Agreements, and the Transfers of Debtor's funds are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and Cal. Civ. Code §§ 3439.05 and 3439.07 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against the Estate under 11 U.S.C. § 502 or that were not and are not allowable only

1   under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

2        122.    Accordingly, the Affiliate Agreement, the ARPA Agreements, and the Transfers

3   should be avoided as fraudulent under 11 U.S.C. §§ 544(b) and Cal. Civ. Code §§ 3439.05 and

4   3439.07, and such transferred property, or the value thereof, should be recovered and preserved for

5   the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551 and Cal. Civ. Code § 3439.07.

6                         **FIFTH CLAIM FOR RELIEF**

7           **Count V - Turnover of Estate Property Against Defendants**

8                         **[11 U.S.C. § 542]**

9        123.    Plaintiff realleges and incorporates herein by reference each and every allegation

10   contained in paragraphs 1 through 122 as though set forth in full.

11        124.    Defendants have possession or control over property of the Estate in the form of the

12   Transfers made pursuant to illegal and unenforceable agreements.

13        125.    The Transfers are not of inconsequential value to the Estate.

14        126.    The funds that are the subject of the Transfers are paramount to Debtor's ability to

15   pay creditors.

16        127.    Accordingly, Trustee is entitled to a judgment for turnover of the Transfer pursuant

17   to 11 U.S.C. § 542.

18                         **SIXTH CLAIM FOR RELIEF**

19           **Count VI - Disallowance of Claims Against Defendant**

20                        **[11 U.S.C. § 502(d)]**

21        128.    Plaintiff realleges and incorporates herein by reference each and every allegation

22   contained in paragraphs 1 through 127 as though set forth in full.

23        129.    Defendant has not filed any Proof of Claim in this matter.

24        130.    Based on Defendant's conduct as set forth in paragraphs 1 through 127, any claims

25   having been filed or to be filed by Defendant in the Bankruptcy case should be disallowed pursuant

26   to 11 U.S.C. § 502(d).

27   / / /

28   / / /

## **RESERVATION OF RIGHTS**

Plaintiff reserves the right to bring all other claims or causes of action that Plaintiff may have against Defendant, on any and all grounds, as allowed under the law or in equity, including but not limited to, those claims not known by the Trustee at this time but that he may discover during the pendency of this adversary proceeding.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for a judgment as follows:

**On The First, Second, Third, and Fourth Claims for Relief:**

A.      Avoiding, recovering, and preserving the Transfers against Defendants;

**On the First and Third Claims for Relief:**

B.      Awarding punitive and exemplary damages according to proof;

**On the Fifth Claim for Relief:**

C.      Ordering Defendants to immediately turn over the Transfers;

**On the Sixth Claim for Relief:**

D.      Disallowing Defendants' claims;

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**On All Claims for Relief:**

E.  Awarding costs of suit;

F.  Awarding attorneys' fees;

G.  Awarding pre-judgment interest at the maximum legal rate running from the date of the Complaint to the date of judgment herein;

H.  Awarding post-judgment interest at the maximum legal rate running from the date of judgment herein until the date the judgment is paid in full, plus costs;

I.  Requiring Defendants to pay forthwith any judgment awarded herein; and

J.  Granting Plaintiff such other and further relief as the Court deems just and proper.

Dated: March 14, 2025

Respectfully submitted,

DINSMORE & SHOHL LLP

By: _/s/ Matthew J. Stockl_____
    Christopher Celentino
    Yosina M. Lissebeck
    Matthew J. Stockl

*Special Counsel to Richard A. Marshack, Trustee of the LPG Liquidation Trust*

# EXHIBIT 1

1   CHRISTOPHER B. GHIO (259094)
    christopher.ghio@dinsmore.com
2   CHRISTOPHER CELENTINO (131688)
    christopher.celentino@dinsmore.com
3   YOSINA M. LISSEBECK (201654)
    yosina.lissebeck@dinsmore.com
4   DINSMORE & SHOHL LLP
5   655 West Broadway, Suite 800
    San Diego, California 92101
6   Tele: 619.400.0500
    Fax: 619.400.0501
7
8   Sarah S. Mattingly (Ky. Bar 94257)
    sarah.mattingly@dinsmore.com
9   DINSMORE & SHOHL, LLP
    101 S. Fifth Street, Suite 2500
10  Louisville, Kentucky 40202
    Tele: 859-425-1096
11  Fax: 502-585-2207
12  (Admitted pro hac vice)

13  Special Counsel to Richard A. Marshack

FILED & ENTERED

JUN 03 2024

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY mccall     DEPUTY CLERK

14          **UNITED STATES BANKRUPTCY COURT**

15      **CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION**

16  In Re                              | Case No: 23-bk-10571-SC

17                                     | Chapter 11

18  The Litigation Practice Group P.C.,   | **ORDER GRANTING MOTION FOR
19                                     | ENTRY OF PROTECTIVE ORDER AND
            Debtor(s),                 | THE PROTECTIVE ORDER**
20

21                                     | Date:   May 23, 2024
22                                     | Time:   1:30 p.m.
                                       | Judge:  Hon. Scott C. Clarkson
23                                     | Place:  Courtroom 5C (via Zoom)[1]
24                                     |         411 West Fourth Street
                                       |         Santa Ana, CA 92701
25

26

27  _____

28  [1] Video and audio connection information for each hearing will be provided on Judge Clarkson's
    publicly posted hearing calendar, which may be viewed online at:
    http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

                                                        Exhibit 1, page 27

The Court has read and considered the Notice of Motion and Motion for Entry of Protective Order (the "Motion") filed by Richard A. Marshack, in his capacity as the Chapter 11 Trustee (the "Trustee") of the Bankruptcy Estate ("Estate") of The Litigation Practice Group P.C., on May 2, 2024, pursuant to Federal Rule of Bankruptcy Procedure 7026 and Federal Rule of Civil Procedure 26(c)(1), as Dk. No. 1164 ("Motion"), and has found good cause to grant the Motion.

IT IS HEREBY ORDERED that:

1.    The Motion is granted;

2.    The below Protective Order shall apply to any contested matter arising in the main bankruptcy case and in all adversary proceedings filed by or against Trustee, present and future; and

3.    Govern the discovery conducted therein.

## PROTECTIVE ORDER

### 1.    DEFINITIONS

1.1    "Confidential Information" as used in this Protective Order shall mean documents and other information (regardless of how generated, stored or maintained) that a Party or non-party reasonably believes to contain or reflect non-public financial or business information, bank records, financial records, such as social security numbers, non-public financial or personal information of a Party or non-party, account numbers, sensitive digital information and identifiers, information subject to confidentiality agreements or provisions other than this Protective Order, and other non-public research, development, or commercial information that derives value or avoids injury by virtue of not being known to the public.

1.2    This "Action" is defined and hereby means any contested matter arising in the main bankruptcy case and in all adversary proceedings filed by or against Trustee, present and future.

1.3    "Designating Party" means a Party or non-party that designates Confidential Information during the Action.

1.4    "Receiving Party" means a Party that receives Confidential Information during the Action.

2

1.5     "Party" or "Parties" means person or entity subject to this Protective Order.

**2.     SCOPE OF THIS PROTECTIVE ORDER**

2.1     Unless otherwise ordered, this Protective Order shall govern certain documents and other products of discovery obtained in the Action from the Parties there to, and from third parties. As well as certain information copied or derived therefrom, excerpts, summaries or compilations thereof, including, but not limited to, documents voluntarily exchanged as part of early settlement discussions, documents produced pursuant to initial disclosures, requests authorized by the Federal Rules of Civil Procedure made applicable herein by the Federal Rules of Bankruptcy Procedure, answers to interrogatories, deposition transcripts, responses to requests for production, responses to requests for admission, subpoenas, affidavits, declarations, expert reports, and other such material and information as may be produced during the course of the Action and designated as Confidential Information.

**3.     DESIGNATION OF CONFIDENTIAL INFORMATION**

3.1     This Protective Order shall govern the production and handling of any Confidential Information in this Action. Any Party or non-party who produces Confidential Information in this Action may designate it as "Confidential" or "Attorneys' Eyes Only" consistent with the terms of this Protective Order. Whenever possible, the Designating Party must designate only those portions of a document, written discovery responses, deposition, transcript, or other material that contain the Confidential Information and refrain from designating entire documents. Regardless of any designations made hereunder, the Designating Party is not otherwise restricted from use or disclosure of its Confidential Information outside of this Action or for any business purposes. In addition, any Party may move to modify or seek other relief from any of the terms of this Protective Order if it has first tried in writing and in good faith to resolve its needs or disputes with the other Parties or Party as the case may be under the terms of this Protective Order. Further, nothing in this Protective Order shall prevent a Party from redacting documents consistent with the Federal Rules of Civil Procedure and utilizing the documents as needed through-out the Action.

3.2     <u>Application to Non-Parties:</u> Before a non-party is given copies of documents or materials designated as Confidential Information or Attorneys' Eyes Only as permitted hereunder, it

3

must first sign an acknowledgment to be bound to these terms that is attached hereto as <u>Exhibit A</u>; if it fails to do so, the Parties to this Action must resolve any such dispute before making disclosure of designated information as permitted hereunder to the non-party. If a non-party wishes to make designations hereunder, it must first sign attached <u>Exhibit A.</u>

       3.3     <u>Timing and Provisional Protection:</u> Designations of Confidential Information may be made at any time. To avoid potential waiver of protection hereunder, the Designating Party should designate documents or materials containing Confidential Information at the time of production or disclosure, including on the record during the taking of any deposition. Deposition testimony will be deemed provisionally protected for a period of thirty (30) days after the transcript is released to the Parties by the court reporter, although the Parties may agree at any time to different timelines of provisional protection of information as Confidential or Attorneys' Eyes Only as part of one or more specific depositions. To retain any designations beyond the provisional period, a Designating Party must designate specific pages and lines of deposition testimony before the provisional period has expired. Such designations must be made in writing so that all counsel and court reporters may append the designation to all copies of the transcripts.

       3.4     <u>Manner of Designation:</u> Confidential Information may be designated hereunder in any reasonable manner or method that notifies the Receiving Party of the designation level and identifies with specificity the information to which the designation applies. If made verbally, the Designating Party must promptly confirm the designation in writing. Whenever possible, the Designating Party should stamp, affix, or embed a legend of "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY" on each designated page of the document or electronic image that contains Confidential Information.

## 4.    CHALLENGES TO DESIGNATED INFORMATION

       4.1     In the event that a Receiving Party disagrees at any time with any designation(s) made by the Designating Party, the Receiving Party must first try to resolve such challenge in good faith on an informal basis with the Designating Party. The Receiving Party must provide written notice of the challenge and the grounds therefor to the Designating Party, who must respond in writing to the challenge within fifteen (15) days. At all times, the Designating Party carries the burden of establishing the propriety of the designation and protection level. Unless and until the challenge is

4

resolved by the Parties or ruled upon by the Court, the designated information shall remain protected under this Protective Order. The failure of any Receiving Party to challenge a designation does not constitute a concession that the designation is proper or an admission that the designated information is otherwise competent, relevant, or material.

**5.    LIMITED ACCESS/USE OF PROTECTED INFORMATION**

5.1    <u>Restricted Use:</u> Information that is produced or exchanged in the course of the Action and designated under this Protective Order may be used for preparation for trial and preparation for any appeal of any and all matters in the Action, as well as related settlement negotiations, and for no other purpose, without the written consent of the Designating Party. No Confidential Information may be disclosed to any person except in accordance with the terms of this Protective Order, unless the parties are co-counsel or have entered into joint defense agreements. All persons in possession of Confidential Information agree to exercise reasonable care with regard to the custody, use, or storage of such information to ensure that its confidentiality is maintained. This obligation includes, but is not limited to, the Receiving Party providing to the Designating Party prompt notice of the receipt of any subpoena that seeks production or disclosure of any designated information and consulting with the Designating Party before responding to the subpoena. Any use or disclosure of Confidential or Attorneys' Eyes Only information in violation of the terms of this Protective Order may subject the disclosing person or party to sanctions.

5.2    <u>Access to "Confidential" Information:</u> The Party(ies) and all persons subject to this Protective Order agree that information designated as "CONFIDENTIAL" may only be accessed or reviewed by the following:

a)    The Court, its personnel, and court reporters;

b)    Counsel of record, or co-counsel for any Party, or other party that has entered into a joint defense agreement in the Action and their employees who assist counsel of record, or co-counsel in the Action and are informed of the duties and obligations imposed hereunder;

c)    The Parties, including their clients, agents and employees who are assisting or have reason to know of the Action;

/ / /

Exhibit 1, page 31

d)     Experts or consultants employed by the Parties or their counsel, or co-counsel, for purposes of an Action, so long as each such expert or consultant has signed attached Exhibit A; and

e)     Other witnesses or persons with the Designating Party's consent or by court order.

5.3     Access to "Attorneys' Eyes Only" Designations: The Parties and all persons subject to this Protective Order agree that information designated as "ATTORNEYS' EYES ONLY" may only be accessed or reviewed by the following:

a)     The Court, its personnel, and court reporters;

b)     Counsel of record, or co-counsel for any Party, or other party that has entered into a joint defense agreement in the Action and their employees who assist counsel of record in the Action and are informed of the duties hereunder;

c)     In-house counsel for any Party in the Action and Richard A. Marshack, as Chapter 11 Trustee of The Litigation Practice Group P.C. who is informed of the duties and obligations imposed hereunder;

d)     Experts or consultants employed by the Parties or their counsel, or co-counsel for purposes of the Action,  and so long as each such expert or consultant has signed attached Exhibit A; and

e)     Other witnesses or persons to whom the Designating Party agrees in advance of disclosure or by court order.

5.4     Non-Waiver Effect of Designations: Neither the taking of, nor the failure to take, any action to enforce the provisions of this Protective Order, nor the failure to object to any designation, will constitute a waiver of any Party(ies)'s claim or defense in the Action or any other action or proceeding, including, but not limited to, a claim or defense that any designated information is or is not Confidential, is or is not entitled to particular protection, or embodies or does not embody information protectable by law.

5.5     In-Court Use of Designated Information: If information designated under this Protective Order will or may be offered in evidence at a hearing or trial related to any matter in the Action, then the offering party must give advance notice to the party or non-party that designated prior to offering the information so that any use or disclosure may be addressed in accordance with

6

the Court's case-management or other pre-trial order, or by a motion *in limine.*  Nothing in this Protective Order shall be construed as a waiver by a Party of any objections that may be raised as to the admissibility at trial of any evidentiary materials.

### 6.  CLAW-BACK REQUESTS

6.1  <u>Failure to Make Designation:</u>  If, at any time, a Party or non-party discovers that it produced or disclosed Confidential Information without designation, it may promptly notify the Receiving Party and identify with particularity the Confidential Information to be designated and the level of designation (the claw-back notification). The Receiving Party may then request substitute production of the newly-designated information. Within thirty (30) days of receiving the claw-back notification, the Receiving Party must: (1) certify to the Designating Party it has appropriately marked or, if substitute production has been requested, destroyed all unmarked copies that it received, made, and/or distributed; and (2) if it was practicably unable to mark or destroy any information because disclosures occurred while the Receiving Party was under no duty of confidentiality under the terms of this Protective Order regarding that information, the Receiving Party must reasonably provide as much information as practicable to aid the Designating Party in protecting the information, consistently with the Receiving Party's attorney-client, work-product, and/or trial-preparation privileges.

6.2  <u>Inadvertent Production of Privileged Information:</u> If, at any time, a Party discovers that it produced information that it reasonably believes is subject to protection under the attorney/client, work-product, or trial-preparation privileges, then it must promptly notify each Receiving Party of the claim for protection, the basis for it, amend its privilege log accordingly, and comply with Fed. R. Civ. P. 26(b)(5). Whenever possible, the producing party must produce substitute information that redacts the information subject to the claimed protection. The Receiving Party must thereupon comply with Fed. R. Civ. P. 26(b)(5)(B) as to the information subject to the claimed protection.

/ / /

/ / /

/ / /

Exhibit 1, page 33

## 7.    DURATION/CONTINUED RESTRICTIONS

7.1    <u>Handling of Designated Information Upon Conclusion of the Main Bankruptcy Case:</u>
Upon conclusion of the Main Bankruptcy Case, by way of dismissal or closing of the case, the
Designating Party(ies) is/are responsible for ensuring that any Party or person to whom the
Designating Party shared or disclosed designated information in any of the matters under the Action
returns or destroys all of its copies, regardless of the medium in which it was stored. No witness or
Party may retain designated information that it received from any other Party or non-party under this
Protective Order; only counsel of record, or co-counsel, are the authorized agents who may retain one
copy for their respective legal files, and who must also describe to the Designating Party the extra
steps taken to protect its legal file containing paper and/or electronic copies of the designated
information so that it is not accessed, used, or disclosed inconsistently with the obligations under this
Protective Order. This provision does not apply to the Court or Court staff. Moreover, this provision
does not apply to Trustee, who may retain and use – consistent with this Order – Confidential
Information received in any Action during the entirety of the Bankruptcy.

7.2    <u>Continued Restrictions Under this Protective Order:</u> The restrictions on disclosure and
use of Confidential Information shall survive the conclusion of the Bankruptcy case and any matter
in the Action.

## 8.    PRIVILEGED OR PROTECTED INFORMATION

8.1    Nothing in this Protective Order shall require disclosure of information that is
protected by the attorney-client privilege, the work-product protection, or any other legally cognizable
privilege (a "Privilege or Protection").  If information subject to a claim of Privilege or Protection is
inadvertently produced, pursuant to Federal Rule of Evidence 502(d) such production shall not
constitute a waiver of, or estoppel as to, any claim of Privilege or Protection for such information or
any other information that may be protected from disclosure by a Privilege or Protection in any
proceeding.

8.2    If a Party receives a document that appears to be subject to a Privilege or Protection,
then it shall refrain from examining the document any more than is essential to ascertain if it is
privileged or protected and shall promptly notify the producing Party in writing that the receiving

8

Party possesses material that appears to be subject to a Privilege or Protection. The producing Party shall have seven (7) days after receiving such notice to assert a Privilege or Protection over the identified material. If the producing Party does not assert a claim of Privilege or Protection within the seven (7)-day period, the material in question shall be deemed not privileged or protected.

8.3     If a producing Party has produced a document subject to a claim of Privilege or Protection, upon written request by the producing Party, the document for which a claim of Privilege or Protection is made shall be sequestered or destroyed to the extent reasonably practicable, and the receiving Party shall not use the document for any purpose other than in connection with analyzing or disputing a claim of Privilege or Protection or in connection with a motion to compel the production of the document.

8.4     The receiving Party sequestering or destroying such material may then move the Court for an order compelling production of the material. The applicable producing Party bears the burden of establishing the applicable Privilege or Protection of any clawed-back document or information as and to the same extent that it would have borne such burden had it not produced the document or information.  Nothing in this Protective Order shall limit the Court's right or any receiving Party's right to request an in camera review of any information subject to a claim of Privilege or Protection.

### 

Date: June 3, 2024

Scott C. Clarkson
United States Bankruptcy Judge

Exhibit 1, page 35

1

2

3

4

5

6

EXHIBIT "A"

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Christopher B. Ghio (State Bar No. 259094)
Christopher Celentino (State Bar No. 131688)
Yosina M. Lissebeck (State Bar No. 201654)
**DINSMORE & SHOHL LLP**
655 West Broadway, Suite 800
San Diego, CA 92101
Telephone:  619.400.0500
Facsimile:  619.400.0501
christopher.ghio@dinsmore.com
christopher.celentino@dinsmore.com
yosina.lissebeck@dinsmore.com

Sarah S. Mattingly (Ky. Bar 94257)
DINSMORE & SHOHL, LLP
101 S. Fifth Street, Suite 2500
Louisville, KY 40202
Telephone: 859-425-1096
Facsimile: 502-585-2207
Sarah.mattingly@dinsmore.com
(Admitted pro hac vice)

Special Counsel to Richard A. Marshack,
Chapter 11 Trustee

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

| In Re | Case No. 8:23-BK-10571-SC |
|---|---|
| | Chapter 11 |
| The Litigation Practice Group P.C., | **EXHIBIT A TO STIPULATED ORDER** |
| Debtor(s), | Date:   May 23, 2024 |
| | Time:   1:30 p.m. |
| | Judge:  Hon. Scott C. Clarkson |
| | Place:  Courtroom 5C[1] - Via Zoom |
| | 411 W. Fourth Street |
| | Santa Ana, CA  92701 |

---

[1] Video and audio connection information for each hearing will be provided on Judge Clarkson's
publicly posted hearing calendar, which may be viewed online at:
http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

This is to certify that:

    (a)    I am being given access to Confidential Information pursuant to the Stipulated Protective Order that was entered into the main bankruptcy case for Litigation Practice Group, but which is binding and controlling as set forth by the Court's Order on any and all contested matters and  any and all litigation commenced by Trustee;

    (b)    I have read the Stipulated Protective Order; and

    (c)    I agree to be bound by the terms and conditions thereof, including, without limitation, to the obligations regarding the use, non-disclosure and return of such Confidential Information. I further agree that in addition to being contractually bound by the Stipulated Protective Order, I am subject to the jurisdiction of the above reference Court for any violation thereof.

Date: _____

_____
          Signature

_____
          Printed Name

Exhibit 1, page 38

2

EXHIBIT A
Page 3

# EXHIBIT 2

*Legal Counsel.*

**Dinsmôre**

DINSMORE & SHOHL LLP
655 West Broadway, Suite 800
San Diego, CA 92101
www.dinsmore.com

Yosina Lissebeck
(619) 400-0473 (direct) · (619) 400-0501 (fax)
Yosina.Lissebeck@Dinsmore.com

*VIA U.S. Mail Only*

October 9, 2024

Make it Ring Marketing LLC
Selk, Sean C, P.A., Registered Agent
3801 PGA Blvd, Suite 600
Palm Beach Gardens, FL 33410

Make it Ring Marketing LLC
840 SW 81st Avenue, Suite 204
North Lauderdale, FL 33068

Make it Ring Marketing LLC
5722 Lake George Place
Lake Worth, FL 33463

Re:    *In re The Litigation Practice Group P.C.*
U.S. Bankruptcy Court, Central District of California
Case No. 8:23-bk-10571-SC

Dear Sir/Madam:

This constitutes a demand to provide any and all documents and information evidencing the basis for, accounting of, and any defenses to my client's claims to avoid and recover, the transfers to Make it Ring Marketing LLC from The Litigation Practice Group P.C. ("Debtor").

This firm represents Richard A. Marshack, Chapter 11 Trustee for the bankruptcy estate of The Litigation Practice Group P.C. and liquidating trustee of the LPG Liquidation Trust (collectively, "Trustee") in the above-referenced bankruptcy case. Pursuant to 11 U.S.C. § 1107 and his appointment as Trustee, the Trustee has the obligation to investigate and pursue claims, including fraudulent transfers, preferential transfers, and unauthorized post-petition transfers. Under the Bankruptcy Code, the Trustee has the power to file lawsuits seeking to avoid, recover, and preserve such transfers for the benefit of the Estate. *See* 11 U.S.C. §§ 544 *et seq.*

A review of the Debtor's books and records confirms that Make it Ring Marketing LLC received 14 potential fraudulent conveyances totaling $226,750.00, which can be avoided and recovered by the Trustee pursuant to 11 U.S.C. §§ 544 and 548 and Cal. Civ. Code. §§ 3439.04 and 3439.05.

The Trustee has been unable to determine why such transfers were made to Make it Ring Marketing LLC, what was provided to the Debtor in exchange for such transfers, and whether defenses exist to the Trustee's claims to avoid and recover the transfers. Please respond to this letter attaching any evidence you have related to these transfers including contracts, agreements, subscriptions, invoices, and any other documentation showing the date, terms, and amounts for the

Make it Ring Marketing LLC
October 9, 2024
Page 2

transfers received and any documents evidencing shipment dates as to goods and services provided by Make it Ring Marketing LLC to the Debtor. Documents showing the course of dealing between Make it Ring Marketing LLC and the Debtor, the date of receipt of the Debtor's payment and the amount, deposit date, and any proof of deposit for any or all of the transfers will be helpful in determining the permissibility of the transfers and what, if any, value the Debtor received in return for payments made to Make it Ring Marketing LLC.

You are further notified that the claims against Make it Ring Marketing LLC will be governed by the Federal Rules of Bankruptcy Procedure and the Federal Rules of Civil Procedure, which apply to lawsuits filed in federal bankruptcy courts such as the one in the Central District of California. Pursuant to these rules, every party to a lawsuit has a duty to preserve all evidence which could be relevant to the suit. These obligations also arise when, as here, litigation is reasonably foreseeable. This includes the duty to preserve all electronic evidence, such as emails discussing the incident or related to matters at issue in the suit. This duty to preserve evidence is broad and extends to all documents, regardless of whether the document is stored electronically (such as email) or in hard-copy and regardless of the type of document. For example, reports, spreadsheets, photographs and videotapes are all considered documents that must be preserved. Furthermore, the duty to preserve this documentary evidence extends to all documents in existence as of the time you reasonably anticipated this litigation.

To ensure that all relevant documents are preserved, you should communicate directly with all employees who have possession or control of potentially relevant evidence, including but not limited to personnel who deal with email retention, deletion, and archiving. You should advise each of these employees to preserve any relevant documents in their custody. Furthermore, you should advise all such persons that any regularly scheduled and/or automatic deletion of email or other electronic documents must be discontinued with respect to any relevant data. In addition, any document destruction (such as shredding of documents) must cease with respect to any relevant documents. All relevant documents, both electronic and paper, must be preserved for the duration of this litigation.

The deadline to respond to this request is October 25, 2024. Failure to respond and/or provide the requested documents will likely result in the Trustee filing an adversary complaint to avoid, recover, and preserve the subject transfers for the benefit of the Estate. If you would like to discuss this matter, please feel free to contact me by telephone (619) 400-0500 or e-mail at yosina.lissebeck@dinsmore.com.

Sincerely,

Yosina Lissebeck

YML/way



*Legal Counsel.*

DINSMORE & SHOHL LLP
North Point Tower, 1001 Lakeside Avenue, Suite 990
Cleveland, OH 44114
www.dinsmore.com

Benjamin D. Carnahan
(216) 413-3841 (direct) · (216) 413-3839 (fax)
Ben.Carnahan@DINSMORE.COM

<u>*VIA E-Mail and Certified U.S. Mail*</u>

November 27, 2024

| | |
|---|---|
| Make it Ring Marketing LLC<br>Sean C. Selk, P.A., Registered Agent<br>3801 PGA Blvd, Suite 600<br>Palm Beach Gardens, FL 33410<br>sselk@selklaw.com | King Consulting Group LLC<br>5722 Lake George PL<br>Lake Worth, FL 33463 |
| Make it Ring Marketing LLC<br>5722 Lake George Place<br>Lake Worth, FL 33463 | King Consulting Group LLC<br>9241 Olmstead Drive<br>Lake Worth, FL 33467 |
| Make it Ring Marketing LLC<br>840 SW 81st Avenue, Suite 204<br>North Lauderdale, FL 33068 | King Consulting Group LLC<br>c/o Colton King<br>2399 NW 7th St.<br>Boynton Beach, FL 33463 |
| Painite Marketing, LLC<br>James P. Hayes, Registered Agent<br>400 NW 87th Lane<br>Coral Springs, FL 33071 | King Consulting Group LLC<br>c/o Colton King<br>7950 S Military Trl, Suite 103<br>Lake Worth, FL 33463 |
| United Partnerships, LLC<br>Frank Brown, Registered Agent<br>215 New River Drive East 910<br>Fort Lauderdale, FL 33301 | King Consulting Group LLC<br>Sean C. Selk, Registered Agent<br>301 Clematis Street, Suite 3000<br>West Palm Beach, FL 33401<br>sselk@selklaw.com |

Re:     *In re The Litigation Practice Group P.C.*
        U.S. Bankruptcy Court, Central District of California
        Case No. 8:23-bk-10571-SC

Dear Sir/Madam:

This constitutes a demand to provide any and all documents and information evidencing the basis for, accounting of, and any defenses to my client's claims to avoid and recover, the transfers to Make it Ring Marketing LLC from The Litigation Practice Group P.C. ("Debtor").

This firm represents Special Counsel to Richard A. Marshack, Chapter 11 Trustee For The Bankruptcy Estate Of The Litigation Practice Group P.C. and Liquidating Trustee of the LPG

Make it Ring Marketing LLC
November 27, 2024
Page 2

Liquidation Trust (collectively, "Trustee") in the above-referenced bankruptcy case. Pursuant to 11 U.S.C. § 1107 and his appointment as Trustee, the Trustee has the obligation to investigate and pursue claims, including fraudulent transfers, preferential transfers, and unauthorized post-petition transfers. Under the Bankruptcy Code, the Trustee has the power to file lawsuits seeking to avoid, recover, and preserve such transfers for the benefit of the Estate. *See* 11 U.S.C. §§ 544 *et seq*.

A review of the Debtor's books and records confirms that Make it Ring Marketing LLC received 14 potential fraudulent conveyances totaling $226,750.00, which can be avoided and recovered by the Trustee pursuant to 11 U.S.C. §§ 544 and 548 and Cal. Civ. Code. §§ 3439.04 and 3439.05.

The Trustee has been unable to determine why such transfers were made to Make it Ring Marketing LLC, what was provided to the Debtor in exchange for such transfers, and whether defenses exist to the Trustee's claims to avoid and recover the transfers. Please respond to this letter attaching any evidence you have related to these transfers including contracts, agreements, subscriptions, invoices, and any other documentation showing the date, terms, and amounts for the transfers received and any documents evidencing shipment dates as to goods and services provided by Make it Ring Marketing LLC to the Debtor. Documents showing the course of dealing between Make it Ring Marketing LLC and the Debtor, the date of receipt of the Debtor's payment and the amount, deposit date, and any proof of deposit for any or all of the transfers will be helpful in determining the permissibility of the transfers and what, if any, value the Debtor received in return for payments made to Make it Ring Marketing LLC.

You are further notified that the claims against Make it Ring Marketing LLC will be governed by the Federal Rules of Bankruptcy Procedure and the Federal Rules of Civil Procedure, which apply to lawsuits filed in federal bankruptcy courts such as the one in the Central District of California. Pursuant to these rules, every party to a lawsuit has a duty to preserve all evidence which could be relevant to the suit. These obligations also arise when, as here, litigation is reasonably foreseeable. This includes the duty to preserve all electronic evidence, such as emails discussing the incident or related to matters at issue in the suit. This duty to preserve evidence is broad and extends to all documents, regardless of whether the document is stored electronically (such as email) or in hard-copy and regardless of the type of document. For example, reports, spreadsheets, photographs and videotapes are all considered documents that must be preserved. Furthermore, the duty to preserve this documentary evidence extends to all documents in existence as of the time you reasonably anticipated this litigation.

To ensure that all relevant documents are preserved, you should communicate directly with all employees who have possession or control of potentially relevant evidence, including but not limited to personnel who deal with email retention, deletion, and archiving. You should advise each of these employees to preserve any relevant documents in their custody. Furthermore, you should advise all such persons that any regularly scheduled and/or automatic deletion of email or other electronic documents must be discontinued with respect to any relevant data. In addition, any document destruction (such as shredding of documents) must cease with respect to any relevant documents. All relevant documents, both electronic and paper, must be preserved for the duration of this litigation.

The deadline to respond to this request is December 11, 2024. Failure to respond and/or provide the requested documents will likely result in the Trustee filing an adversary complaint to avoid, recover, and preserve the subject transfers for the benefit of the Estate. If you would like to discuss

Make it Ring Marketing LLC
November 27, 2024
Page 3

this matter, please feel free to contact me by telephone at (216) 413-3841 or e-mail at
ben.carnahan@dinsmore.com.

Sincerely,

Benjamin D. Carnahan

BDC/jjp

# EXHIBIT 3

In re: The Litigation Practice Group PC
Disbursement Details by Payee
4 Years Pre-Petition (03/20/2019 - 03/20/2023)

Make It Ring Marketing LLC


GROBSTEIN
TEEPLE

| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|
| Optimum Bank | Coast Processing LLC dba LPG | 6738 | 11/30/2021 | 11/12/2021 | | 11,250.00 | WIRE TO Make It Ring Marketing LL |
| Optimum Bank | Coast Processing LLC dba LPG | 6738 | 11/30/2021 | 11/19/2021 | | 4,000.00 | WIRE TO Make It Ring Marketing LL |
| Chase | The Litigation Practice Group PC | 3158 | 12/31/2021 | 12/8/2021 | | 12,000.00 | Fedwire Debit Via: Bk Amer Nyc/026009593 NC: Make It Ring Marketing LLC Lake Worth, FL 33463 US Ref: rnv 2235 - Tcpa Complaint Leads Imad: 1 208B1 Qgc080028586 Tm: 5422400342Jo |
| Chase | The Litigation Practice Group PC | 3158 | 12/31/2021 | 12/14/2021 | | 22,500.00 | Fedwire Debit Via: Bk Amer Nyc/026009593 A/C: Make It Ring Marketing LLC Lake Worth, FL 33463 us Ref: nv. #: 2244 - Tcpa Leads Imad: 121 4B1 QgcO500i 1813 Tm: 6453000348Jo |
| Chase | The Litigation Practice Group PC | 3158 | 12/31/2021 | 12/27/2021 | | 12,500.00 | Fedwire Debit Via: Bk Amer Nyc/026009593 NC: Make It Ring Marketing LLC Lake Worth, FL 33463 US Ret: Invoice 2245 Imad: i227BiQgc08C024828 Tm: 4668700361 Jo |
| Chase | The Litigation Practice Group PC | 3158 | 12/31/2021 | 12/29/2021 | | 12,000.00 | Fedwire Debit Via: Bk Amer Nyc/026009593 A/C: Make It Ring Marketing LLC Lake Worth, FL 33463 US Ref: Inv#: 2250 Imad: 1229B1Qgc07C029618 Tm: 7574300363Jo |
| Chase | The Litigation Practice Group PC | 3158 | 1/31/2022 | 1/10/2022 | | 25,000.00 | Fedwire Debit Via: Bk Amer Nyc/026009593 NC: Make It Ring Marketing LLC Lake Worth, FL 33463 us Ref: Inv 2256 - Tcpa Compliant Leads Imad: 01 1OB1QgcO7CO2O914 Tm: 63733000i0Jo |
| UnionBank | The Litigation Practice Group PC | 94858 | 1/31/2022 | 1/14/2022 | | 22,500.00 | WIRE TRANS TRN 0114025566 011422 UBOC UB237483N Sent To: BANK OF AMERICA N.A. Beneficiary: 1/Make It Ring Marketing |
| UnionBank | The Litigation Practice Group PC | 94858 | 2/28/2022 | 2/1/2022 | | 30,000.00 | WIRE TRANS TRN 0201026575 020122 UBOC UB151419N Sent To: BANK OF AMERICA N.A. Beneficiary: 1/Make It Ring Marketing LLC |
| Chase | The Litigation Practice Group PC | 3158 | 2/28/2022 | 2/9/2022 | | 12,500.00 | Fedwire Debit Via: Bk Amer Nyc/026009593 NC: Make It Ring Marketing LLC Lake Worth, FL 33463 US Ref: 2/7 To 2/11/22 Imad: 0209B1Qgc04C020245 Tm: 5706500040Jo |
| Chase | The Litigation Practice Group PC | 3158 | 2/28/2022 | 2/14/2022 | | 12,500.00 | Fedwire Debit Via: Bk Amer Nyc/026009593 A/C: Make It Ring Marketing LLC Lake Worth, FL 33463 US Ref: 2293 Imad: 0214B1Qgc04C013197 Tm: 6692800045Jo |
| Chase | The Litigation Practice Group PC | 3158 | 2/28/2022 | 2/28/2022 | | 25,000.00 | Fedwire Debit Via: Bk Amer Nyc/026009593 A/C: Make It Ring Marketing LLC Lake Worth, FL 33463 US Ref: 1nv2307 - 2/21 To 3/4/22 Imad: 0228B1Qgc05C018133 Tm: 4584000059Jo |
| Chase | The Litigation Practice Group PC | 3158 | 3/31/2022 | 3/11/2022 | | 12,500.00 | Fedwire Debit Via: Bk Amer Nyc/026009593 A/C: Make It Ring Marketing LLC Lake Worth, FL 33463 US Ref: 2319 Imad: 0311 B1Qgc05C018859 Tm: 5828300070Jo |
| Chase | The Litigation Practice Group PC | 3158 | 3/31/2022 | 3/15/2022 | | 12,500.00 | Fedwire Debit Via: Bk Amer Nyc/026009593 A/C: Make It Ring Marketing LLC Lake Worth, FL 33463 US Ref: Inv 2319 - 3/7 To 3/11/22 Imad: 031 5B1 QgcOI COI 4941 Tm: 6683300074Jo |
| | | | | | | **226,750.00** | |

DRAFT FORM - SUBJECT TO CHANGE

Exhibit 3, page 46

# Adversary Proceeding Cover Sheet

B1040 (FORM 1040) (12/24)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| **PLAINTIFFS**<br>Richard A. Marshack, Trustee of the LPG Liquidation Trust | **DEFENDANTS**<br>Make It Ring Marketing, LLC; King Consulting Group, LLC; Colton King |
|---|---|

**ATTORNEYS** (Firm Name, Address, and Telephone No.)

Christopher Celentino (SBN 131688)
Yosina M. Lissebeck (SBN 201654)
Christopher B. Ghio (SBN 259094)
DINSMORE & SHOHL LLP
655 West Broadway, Ste 800
San Diego, CA 92101    Telephone (619) 400-0500
christopher.celentino@dinsmore.com
yosina.lissebeck@dinsmore.com
christopher.ghio@dinsmore.com

Matthew J. Stockl (SBN 329366)
DINSMORE & SHOHL LLP
550 South Hope Street, Ste 1765
Los Angeles, CA 90071    Telephone (213) 335-7737
matthew.stockl@dinsmore.com

**ATTORNEYS** (If Known)

**PARTY** (Check One Box Only)
☐ Debtor      ☐ U.S. Trustee/Bankruptcy Admin
☐ Creditor    ☐ Other
☐ Trustee

**PARTY** (Check One Box Only)
☐ Debtor      ☐ U.S. Trustee/Bankruptcy Admin
☐ Creditor    ☐ Other
☒ Trustee

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
**(1) Avoidance,  Recovery, and Preservation of 2-Year Actual Fraudulent Transfers; (2) Avoidance, Recovery, and Preservation of 2-Year Constructive Fraudulent Transfers; (3) Avoidance, Recovery, and Preservation of 4-Year Actual Fraudulent Transfers; (4) Avoidance, Recovery, and Preservation of 4-Year Constructive Fraudulent Transfers; (5) Turnover; and  (6) Disallowance of Claims.**

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(a) – Recovery of Money/Property**
☒ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☒ 13-Recovery of money/property - §548 fraudulent transfer
☒ 14-Recovery of money/property - other - §§ 544(b), 550, and 551;
    Cal. Civ. Code §§ 3439.04(a), 3439.04(b), 3439.05, and 3439.07

**FRBP 7001(b) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(c) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(d) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(e) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(f) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation,
    actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(f) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation
    (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(g) – Injunctive Relief**
☐ 71-Injunctive relief- imposition of stay
☐ 72-Injunctive relief - other

**FRBP 7001(h) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(i) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(j) Determination of Removed Action**
☐ 01-Determination of remove d claim or cause

**Other**
☐ SS-SIPA Case - 15 U.S.C. §§78aaa *et.seq.*
☐ 02-Other (e.g. other actions that would have been brought in state court
    if unrelated to bankruptcy case)

| ☒ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $226,750.00 |

Other Relief Sought
Disallowance of Claims - § 502(d)

B1040 (FORM 1040) (12/24)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>The Litigation Practice Group P.C. | BANKRUPTCY CASE NO.<br>8:23-bk-10571-SC | |
| DISTRICT IN WHICH CASE IS PENDING<br>Central District of California | DIVISION OFFICE<br>Santa Ana | NAME OF JUDGE<br>Scott C. Clarkson |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br>  /s/ Matthew J. Stockl | | |
| DATE<br>March 14, 2025 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Christopher Celentino<br>Yosina M. Lissebeck<br>Matthew J. Stockl | |

### INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.