CHRISTOPHER CELENTINO (State Bar No. 131688)
Christopher.Celentino@dinsmore.com
YOSINA M. LISSEBECK (State Bar No. 201654)
Yosina.Lissebeck@dinsmore.com
CHRISTOPHER B. GHIO (State Bar No. 259094)
Christopher.Ghio@dinsmore.com
**DINSMORE & SHOHL LLP**
655 West Broadway, Ste 800
San Diego, California 92101
Telephone: (619) 400-0500
Facsimile: (619) 400-0501

MATTHEW J. STOCKL (State Bar No. 329366)
Matthew.Stockl@dinsmore.com
**DINSMORE & SHOHL LLP**
550 South Hope Street, Ste 1765
Los Angeles, CA 90071
Telephone: (213) 335-7737
Facsimile: (213) 335-7740

Special Counsel to Richard A. Marshack,
Trustee of the LPG Liquidation Trust

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION**

| | |
|---|---|
| In re:<br><br>The Litigation Practice Group P.C.,<br><br>Debtor. | Case No. 8:23-bk-10571-SC<br><br>Chapter 11<br><br>Adv. Proc. No. _______________ |
| Richard A. Marshack, Trustee of the LPG Liquidation Trust,<br><br>Plaintiff,<br><br>v.<br><br>2030 Ventures, Inc. d/b/a Emerging Media Partners, a California corporation; Joshua Michael Bois, an individual,<br><br>Defendants. | **COMPLAINT FOR:**<br><br>**(1) AVOIDANCE, RECOVERY, AND PRESERVATION OF 2-YEAR ACTUAL FRAUDULENT TRANSFERS;**<br><br>**(2) AVOIDANCE, RECOVERY, AND PRESERVATION OF 2-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS;**<br><br>**(3) AVOIDANCE, RECOVERY, AND PRESERVATION OF 4-YEAR ACTUAL FRAUDULENT TRANSFERS;**<br><br>**(4) AVOIDANCE, RECOVERY, AND PRESERVATION OF 4-YEAR** |

**CONSTRUCTIVE FRAUDULENT TRANSFERS;**

**(5) AVOIDANCE, RECOVERY, AND PRESERVATION OF UNAUTHORIZED POST-PETITION TRANSFERS;**

**(6) TURNOVER; AND**

**(7) AIDING AND ABETTING**

Judge: Hon. Scott C. Clarkson

For his *Complaint for (1) Avoidance, Recovery, and Preservation of 2-Year Actual Fraudulent Transfers; (2) Avoidance, Recovery, and Preservation of 2-Year Constructive Fraudulent Transfers; (3) Avoidance, Recovery, and Preservation of 4-Year Actual Fraudulent Transfers; (4) Avoidance, Recovery, and Preservation of 4-Year Constructive Fraudulent Transfers; (5) Avoidance, Recovery, and Preservation of Unauthorized Post-Petition Transfers; (6) Turnover; and (7) Aiding and Abetting* ("Complaint"), plaintiff Richard A. Marshack, the former Chapter 11 Trustee for the for the bankruptcy estate ("Estate") of debtor The Litigation Practice Group P.C. ("Debtor" or "LPG") and current liquidating trustee of the LPG Liquidation Trust (collectively, "Trustee" or "Plaintiff") in the above-captioned bankruptcy case ("Bankruptcy Case"), alleges and avers as follows:

**STATEMENT OF JURISDICTION, NATURE OF PROCEEDING, AND VENUE**

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E), (H) and (O), 1334(b), and General Order No. 13-05 of the District Court for the Central District of California because this is a core proceeding arising in and/or related to the Bankruptcy Case, which is a case under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code"), and which is pending in the United States Bankruptcy Court for the Central District of California, Santa Ana Division ("Bankruptcy Court").

2. Regardless of whether this proceeding is core, non-core, or otherwise, Plaintiff consents to the entry of a final order and judgment by the Bankruptcy Court.

3. Defendant is notified that Rule 7008 of the Federal Rules of Bankruptcy Procedure

requires Defendant to plead whether consent is given to the entry of a final order and judgment by the Bankruptcy Court.

4. Venue of this adversary proceeding properly lies in this judicial district pursuant to 28 U.S.C. § 1409(a) because this proceeding is related to Debtor's pending Bankruptcy Case.

**THE PARTIES**

5. Plaintiff, Richard A. Marshack, was the duly-appointed, qualified, and acting Chapter 11 Trustee of Debtor's Estate and is now the current liquidating trustee of the LPG Liquidation Trust.

6. Debtor is, and at all material times was, a professional corporation organized, existing, and in good standing under the laws of the State of California, with its principal place of business in Tustin, California.

7. Defendant, 2030 Ventures, Inc. d/b/a Emerging Media Partners ("Emerging Media Partners" or "Defendant"), is, and at all material times represented that it was, a corporation existing under the laws of the State of California.

8. Defendant may be served by first class mail postage prepaid upon its registered agent for service of process, Thomas Bois, at 2030 Main Street, Suite 660, Irvine, California 92614.

9. Defendant Joshua Michael Bois ("Mr. Bois" and, together with Emerging Media Partners, "Defendants") is, and at all material times was, an individual resident of the State of California subject to service of process at 4590 MacArthur Boulevard, Floor 5, Newport Beach, California 92660.

**GENERAL ALLEGATIONS**

**A. The Bankruptcy Case**

10. On March 20, 2023 ("Petition Date"), Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, commencing the Bankruptcy Case.

10. The Office of the United States Trustee ("UST") filed its *Motion by United States Trustee to Dismiss or Convert Case Pursuant to 11 U.S.C. § 1112(b)* [Bankr. Docket No. 21] and creditors Debt Validation Fund II, LLC; MC DVI Fund 1, LLC; and MC DVI Fund 2, LLC filed the *Motion by DVF and MC DVI to Dismiss Chapter 11 Case Pursuant to 11 U.S.C. §§ 105, 305,*

*349, & 1112, or in the Alternative Convert This Case to Chapter 7 or Appoint a Trustee* [Bankr. Docket No. 44]. On May 4, 2023, the Court entered its *Order Directing United States Trustee to Appoint Chapter 11 Trustee* [Bankr. Docket No. 58].

11.    Pursuant to the *Acceptance of Appointment as Chapter 11 Trustee* [Bankr. Docket No. 63], on May 8, 2023, Trustee accepted his appointment as the Chapter 11 Trustee in the Bankruptcy Case. The Court approved the Trustee's appointment in its *Order Approving the U.S. Trustee's Application for the Appointment of a Chapter 11 Trustee* [Docket No. 65].

12.    Trustee was not appointed until after events of the case and, therefore, bases these allegations on information and belief. *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) ("The Twombly plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible."); *Miller v. City of Los Angeles*, 2014 U.S. Dist. LEXIS 198871, 2014 WL 12610195, at *5 (C.D. Cal. Aug. 7, 2014) (recognizing that the plaintiff's "information and belief" pleading was allowed and "necessary at times"); *see also Mireskandari v. Daily Mail and General Trust PLC*, 2013 U.S. Dist. LEXIS 194437, 2013 WL 12129642, at *4 (C.D. Cal. July 31, 2013) ("The Federal Rules of Civil Procedure allow parties to plead facts on 'information and belief' if the facts 'will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.'" (citations omitted)).

13.    Pursuant to the *Order Confirming Modified First Amended Joint Chapter 11 Plan of Liquidation* entered September 9, 2024, and the *Notice of Occurrence of Effective Date of Modified First Amended Joint Chapter 11 Plan of Liquidation* filed September 24, 2024, Richard A. Marshack became the Liquidating Trustee of the LPG Liquidation Trust, effective September 24, 2024, and he continues to serve in this capacity at this time.  [Bankr. Docket Nos. 1646 & 1762].

14.    All claims have been transferred to the Liquidating Trust pursuant to the confirmed plan and Plaintiff brings this action solely in his capacity as the former Chapter 11 Trustee and current Liquidating Trustee of the LPG Liquidation Trust for the benefit of Debtor's Estate and its creditors.

**B.    Protective Order**

15.    On or about May 2, 2024, Plaintiff filed that certain Notice and Motion for Entry of Protective Order (the "Protective Order Motion").

16.    On June 3, 2024, the Court entered its Order Granting Motion for Entry of Protective Order and the Protective Order [Docket No. 1270] (the "Protective Order"). A true and accurate copy of the Protective Order is attached hereto as **Exhibit 1** and incorporated herein by reference.

17.    By its own terms, the Protective Order applies to this adversary proceeding and governs all discovery conducted herein.

**C.    LPG's Ownership and Management**

18.    Prior to the Petition Date, LPG operated a law firm for consumers across the country who sought assistance in contesting or resolving debts they would identify.  At all relevant times, LPG was controlled and operated by the individual named Tony Diab ("Diab").

19.    The consumers would pay LPG over a period of time via monthly debits from their bank accounts.

20.    The monthly payments were meant to cover all legal services LPG provided to the consumers including validation of the debts, review of documents to determine enforceability, and court appearances to halt lawsuits to obtain judgments.

21.    In certain instances, LPG would file a lawsuit in an effort to eliminate a disputed debt or to prosecute affirmative claims held by the consumers.

22.    LPG mismanaged the consumers' monthly payments.

23.    Diab and other defendants devised a plan to fraudulently transfer funds, client files, client funds and assets in the form of ACH Receivables (the "ACH Receivables" or "Accounts Receivable") out of LPG to third parties prior to the filing of bankruptcy.

24.    To obtain consumer clients, LPG contracted with marketing companies, who engaged in illegal capping and would advertise or call to solicit consumers to become clients of LPG in exchange for a percentage of the ACH Receivables collected by LPG from the consumers. The marketing affiliate went so far as to assist with the execution of an engagement letter between the consumer and LPG.

25.     In exchange, LPG agreed to pay the marketing affiliates a percentage the monthly payments collected by LPG from the consumers.

26.     Because LPG received payments from consumers over time, it often sought financing by borrowing against its future cash flows. This borrowing was not only used to finance operations at LPG, but also to pay the fees owed to the marketing companies for providing the client referrals.

27.     Many of the documents executed in connection with such financing described the transactions as accounts receivable purchase agreements ("ARPA Agreements").

28.     Pursuant to the ARPA Agreements generally, the marketing affiliates purported to buy from the Debtor accounts receivable from consumers that were supposed to be held in trust until earned.

29.     By entering into the ARPA Agreements and/or agreeing to enter into such a transaction, Debtor violated federal and state laws by selling unearned legal fees or funds that were supposed to be held in trust or used for the benefit of consumers.

30.     Diab used entities he controlled, and were his alter egos, including, without limitation, Vulcan Consulting Group ("Vulcan"), Maverick Management Group LLC ("Maverick"), Prime Logix, LLC ("Prime Logix"), LGS Holdco, LLC ("LGS"), and/or Coast Processing to divert LPG consumer funds and ACH Receivables. Diab would use numerous ACH processing companies in order to easily transfer millions of dollars from Debtor to these entities he controlled, without oversight or detection, and to avoid payment disputes and complications.  The money that flowed from Debtor through these bank account to Defendants consisted of Client Funds that Debtor funneled to these entities by means of the ACH processing companies.  Debtor also made deposits into these entities bank account such that they received Client Funds directly from Debtor in addition to direct Accounts Receivable.

31.     LPG transferred ACH Receivables and the associated client files in this fashion to defraud creditors in a pyramid scheme and for improper personal gain.

32.     LPG's monthly revenue from client files was primarily received via ACH payments. To process ACH payments, LPG was required to enlist the services of ACH payment processing companies who handle high risk transactions. In this regard, Diab had enlisted numerous ACH

processing companies to easily switch between different vendors and have millions of dollars of LPG funds directed to entities Diab controlled, including but not limited to Vulcan, Maverick, Prime Logix, LGS, and/or Coast Processing. Diab utilized these other entities' bank accounts as LPG bank accounts.

33. Diab instructed lenders and file purchasers to divert LPG loan proceeds or to deposit money otherwise due to LPG into bank accounts he controlled on behalf of LPG but ostensibly held by Vulcan, Maverick, Prime Logix, LPG and/or Coast Processing. Diab used all of these proceeds as if they were LPG funds, because they were.

34. At or around the Petition Date, Diab transferred or sold approximately 15,000 LPG client files to Oakstone Law Group PC ("Oakstone"), 12,000 LPG files to Consumer Legal Group ("CLG"), and the remaining LPG files, approximated at slightly less than 40,000, to Phoenix Law, PC ("Phoenix").

35. Pursuant to the asset purchase agreement between LPG and CLG, Diab instructed CLG to initiate the ACH debits on the transferred files, which it did through Optimum Bank and its processing entity LGS Holdco.

36. At or around the Petition Date, Diab transferred, for no consideration, approximately 8,000 files (previously transferred to Phoenix) to Heshy Deutsch ("Deutsch") and Israel Reiches ("Reiches"). Diab instructed Deutsch and Reiches, by and through their co-conspirators Sam Geiger and Solomon Feig, to initiate the ACH debits on the transferred files, which they did through BCB Bank and a processing entity known as CLG Processing, into accounts, not in the name of LPG, but that held funds of behalf of LPG and disbursed those funds for LPG.

37. The funds obtained from the ACH debits described in paragraphs 30 and 31 above were deposited in Maverick and Prime Logix accounts, among others.

38. LPG's ACH Receivables were the primary, if not exclusive source of funds, for Validation Partners, Vulcan, Oakstone, PECC, Prime Logix, Coast Processing, LGS, and Maverick. As set forth above, the other sources of funds for these entities are the proceeds of LPG assets (i.e., file purchase account receivable proceeds) or constitute loan proceeds for which LPG alone was liable.

39. Diab frequently diverted the LPG money pulled from its consumer clients and other funds it received through investors and lenders, to and through these entities.

40. Diab frequently would direct these entities to pay affiliates (aka marketing capers), MCA lenders, and others with LPG assets.

41. Diab would instruct others at LPG and these entities on how to manage and transfer these funds to and from these entities and LPG interchangeably.

**E. Defendants' Dealings with LPG**

42. Defendant was a marketing company that provided support and branding services for LPG, supporting LPG in its illegal enterprise.

43. Upon information and belief, at all relevant times, Defendant was not registered with the State Bar of California as a certified lawyer referral service and does not appear on the list of certified lawyer referral services maintained by the State Bar of California. A true and correct copy of the list of certified lawyer referral services obtained from the State Bar of California website is attached hereto as **Exhibit 2** and incorporated herein by reference.

44. On or around December 4, 2020, Defendant entered into a Proposal & Agreement with the Debtor ("Marketing Agreement"). A true and correct copy of the Marketing Agreement is attached hereto as **Exhibit 3** and incorporated herein by reference.

45. Upon information and belief, Defendant provided various Marketing Services (defined below) to the Debtor pursuant to the Marketing Agreement and subsequent requests from LPG, whether or not memorialized in written or oral agreements.

46. Upon information and belief, Defendant created and maintained LPG's website and assisted LPG with search engine optimization ("SEO").

47. Upon information and belief, Defendant created brand logos for LPG and procured business cards, handouts, and office murals for LPG with the branding and logos.

48. Upon information and belief, Defendant coordinated advertising campaigns for LPG.

49. Upon information and belief, Defendant created advertisements, press releases, promotional videos, brochures, and/or other documents to promote LPG to consumers and prospective investors and/or lenders.

50.    Upon information and belief, Defendant provided technical support to LPG, and assisted LPG in creating "Loan/Lender Agreements" to obtain the above-described ARPA Agreements and loans.

51.    Defendant provided the foregoing services (collectively, the "Marketing Services") to LPG to, among other things, give LPG the appearance of legitimacy and assist LPG in gaining new consumers and prospective investors and/or lenders.

52.    Defendant's Marketing Services aided LPG in operating and growing a Ponzi scheme.

53.    The Marketing Agreement violates Sections 6151 and 6155 of the California Business and Professional Code, which prohibit referrals of potential clients to attorneys unless registered with the State Bar of California. Cal. Bus. & Prof. Code § 6155. "Referral activity" includes "any entity 'which, in person, electronically, or otherwise, refers the consumer to an attorney or law firm not identified' in the advertising." *Jackson v. LegalMatch.com*, 42 Cal. App. 5th 760, 775 (2019). A referral includes receiving information from potential clients and sending that information to lawyers, even when the advertiser does not advertise the name of the attorneys and the clients do not clear the name of the potential attorney after the referral occurred. *Id.*

54.    Further, if any effect of an agreement is to accomplish an unlawful purpose, the agreement may be declared illegal regardless of the intention of the parties. *Stockton Morris Plan Co. v. Cal. Tractor & Equip. Corp.*, 112 Cal. App. 2d 684, 690 (1952) (citing *Fewel & Dawes, Inc. v. Pratt*, 17 Cal. 2d 85, 91 (1941)). This remains true regardless of whether the contract has been performed. *Stevens v. Boyes Hot Springs Co.*, 113 Cal. App. 479, 483 (1931) (A contract by a corporation to purchase its own stock has the effect of illegally withdrawing and paying to a stockholder a part of the capital stock of the corporation and is illegal and void, regardless of the fact that the contract is fully performed by the sellers and partially performed by the corporation.); *Mansfield v. Hyde*, 112 Cal. App. 2d 133, 139 (1952), overruled, *Fomco, Inc. v. Joe Maggio, Inc.*, 8 Cal. Rptr. 459 (1960) (Where object of statute requiring licenses is to prevent improper persons from engaging in particular activity, or is for purpose of regulating occupation or business for protection of public, imposition of penalty amounts to prohibition against engaging in occupation

or business without license, and contract made by unlicensed person in violation of statute is invalid.); *Firpo v. Murphy*, 72 Cal. App. 249, 252 (1925) (A contract to pay commissions to a real estate broker is illegal and he is not entitled to recover thereon where he fails to secure the license required by law to carry on his business.).

55.    The Marketing Agreement violates federal and state law because (a) Defendant was not registered with the State Bar of California as required by CAL. BUS. & PROF. CODE § 6155, and (b) the effect of the Marketing Agreement is to accomplish an unlawful purpose, i.e., the furtherance of LPG's Ponzi scheme through Defendant's Marketing Services.    As such,   the Marketing Agreement is void, unenforceable, and subject to avoidance as fraudulent.    Any alleged consideration provided under the Marketing Agreement was unlawful.

56.    Unlawful consideration is that which is: "(1) contrary to an express provision of law; (2) contrary to the policy of express law, though not expressly prohibited; or (3) otherwise contrary to good morals." Cal. Civ. Code § 1667. "If any part of a single consideration for one or more objects, or of several considerations for a single object, is unlawful, the entire contract is void." Cal. Civ. Code § 1608.

57.    On information and belief, Mr. Bois (a) received transfers from Debtor as an initial, immediate, or mediate transferee; (b) received transfers from Defendant as a mediate transferee; (c) directed or controlled Defendant's conduct and, as such, was responsible in some manner for the occurrences alleged herein; and/or (d) was used to shield Debtor's assets from collection, levy or execution, and to otherwise, hinder, delay and defraud the Debtor and its creditors.

58.    On information and belief, Mr. Bois played a central role in implementing and providing the Marketing Services to LPG.

59.    On information and belief, Mr. Bois also provided related services, including but not limited to, helping "dress up" and create loan agreements, forming LinkedIn strategies for marketing affiliates, and coordinating affiliate email campaigns to enroll new affiliates.

**F.    Payments to Defendant**

60.    During the applicable reach-back period and according to records currently available, the Debtor and Vulcan, who had no other funds except diverted LPG funds, paid Defendant the sum

of at least $485,961.21 between January 26, 2021 and October 14, 2022, subject to proof at trial (the "Transfers").  A true and accurate list of the known Transfers made by Debtor and Vulcan to Defendant is attached hereto as **Exhibit 4** and incorporated herein by reference.

61.    During the applicable post-petition period and according to records currently available, Prime Logix, who had no other funds except diverted LPG funds, paid at least $31,273.00 to Defendant on May 3, 2023 (the "Post-Petition Transfer").  A true and accurate list reflecting the Post-Petition Transfer is attached hereto as **Exhibit 5** and incorporated herein by reference.

62.    As a result, Defendant received the Transfers and Post-Petition Transfer totaling at least $517,234.21.

63.    The Transfers and Post-Petition Transfer are based on updated figures as of January of 2025.

**G.    LPG's Ponzi Scheme**

64.    The Ponzi Scheme Presumption exists in this bankruptcy proceedings.

65.    The Ponzi Scheme Presumption can be utilized to establish a debtor's "intent to defraud future undertakers [investors] from the mere fact that a debtor was running a Ponzi scheme. Indeed, no other reasonable inference is possible.  A Ponzi scheme cannot work forever.  The investor pool is a limited resource and will eventually run dry.  The perpetrator must know that the scheme will eventually collapse as a result of the inability to attract new investors.  The perpetrator nevertheless makes payments to present investors, which, by definition, are meant to attract new investors.  He must know all along, from the very nature of his activities, that investors at the end of the line will lose their money.  Knowledge to a substantial certainty constitutes intent in the eyes of the law," *cf. Restatement (Second) of Torts § 8A* (1963 & 1964), and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them.  *Kirkland v. Rund (In re EPD Inv. Co., LLC)*, 114 F.4th 1148, 1153 (9th Cir. 2024) (by definition Ponzi scheme is destined to fail and the swindler and their entities often end in bankruptcy or equitable receivership); *Cf. Coleman Am. Moving Servs., Inc. v. First Nat'l Bank & Trust Co. (In re American Properties, Inc.)* 14 B.R. 637, 643 (Bankr. D. Kan. 1981) (intentionally carrying out a transaction with full knowledge that its effect will be detrimental to creditors is sufficient for actual intent to

hinder, delay or defraud within the meaning of § 548(a)(1)).” *Merrill v. Abbott (In re Independent Clearing House Co.)* (D. Utah 1987) 77 B.R. 843, 860. A trustee in bankruptcy is not required to show that an operator of a Ponzi scheme was subjectively aware his Ponzi scheme was destined to fail. *In re EPD Inv. Co., LLC*, 114 F.4th at 1153 (“[a] trustee's action to recover assets fraudulently conveyed in the course of a Ponzi scheme does not require that the trustee also prove the Ponzi-scheme operator was subjectively aware his Ponzi scheme was destined to fail.”).

66. “But if all the debtor receives in return for a transfer is the use of the defendant's money to run a Ponzi scheme, there is nothing in the bankruptcy estate for creditors to share. In fact, by helping the debtor perpetuate his scheme, the transfers exacerbate the harm to creditors by increasing the amount of claims while diminishing the debtor's estate. In such a situation, the use of the defendant's money cannot objectively be called ‘reasonably equivalent value.’” *In re Independent Clearing House Co.* 77 B.R. at 859. Therefore, “[t]he trustee can avoid the transfers if they were preferential or fraudulent. Transfers to investors in a Ponzi scheme are preferential and fraudulent. Therefore, they constitute “property of the estate,” and the trustee can recover them. *Id.* at 853 n.17 (citations omitted).

67. Debtor was operating a Ponzi scheme that utilized affiliates and several other entities as investors to continue its unlawful business practices by using funds provided by current investors to attract new investors hoping for very high returns. Therefore, the Debtor was running a Ponzi scheme and the Ponzi Scheme Presumption can be utilized to infer that the Debtor had the intent to defraud investors within the meaning of 11 U.S.C. section 548(a)(1). This is evidenced by the Court in this Bankruptcy Case declaring that Debtor was operating a Ponzi scheme when it stated the following:

> It is important to note that this Court has never received any significant and trustworthy evidence that Debtor accomplished meaningful results for its clients, but only anecdotal examples of viable success for its clients. By reviewing the Estate's claims register, there is evidence of consumer claims for the fraud and demanded but undelivered refunds of approximately $500 million. There is ample evidence that the pre-petition Debtor never placed the collected funds into an attorney-client trust account, and that Debtor or its principals simply looted the payments received through the client automatic withdrawals, stiffing both the clients and

> outside attorneys who may have been working on client cases with the hopes of being paid. There is also evidence before the Court that Debtor was running a Ponzi scheme and paying some outside (or "network") attorneys with funds obtained from new clients. In this case, it appears that some of the "lenders" may have been serving as "investors," hoping for very high returns before "the music stopped." The Ninth Circuit has recently explained, "[b]y definition, a Ponzi scheme is destined to fail because the pool of available investors is not limitless. When the Ponzi scheme operator's pool of investors inevitably runs dry, the scheme collapses and the swindler and their entities often end up in bankruptcy or equitable receivership. *See generally* David R. Hague, Expanding the Ponzi Scheme Presumption, 64 DePaul L. Rev. 867 (2015). In bankruptcy, the court-appointed trustee is tasked with taking immediate control of the entity, ceasing ongoing fraudulent activity, locating and collecting assets for the bankruptcy or receivership estate, and achieving a final, equitable distribution of the remaining assets. *See* 11 U.S.C. § 704; *Kirkland v. Rund (In re EPD Inv. Co., LLC)*, 2024 U.S. App. LEXIS 21363, at *15 (9th Cir. Aug. 23, 2024). Finally, there is evidence that Debtor was encumbering (or as some creditors assert, "double or triple selling") their accounts or receivables to multiple lenders. With respect to Greyson's requested Administrative Claim [Dk. 676], and as more fully described in the concurrently entered order denying the claim, there has been no evidence presented that any work allegedly performed by Greyson assisted any clients or added any value to the Estate.

*See,* Case No. 8:23-bk-10571-SC, [Bankr. Docket No. 1545 n. 5].

68. Moreover, since the Transfers were made with the intent to further the Ponzi scheme, the Debtor did not receive an objectively reasonable equivalent value for the Transfers, and the Trustee can avoid the Transfers because they were fraudulent and unauthorized.

**H. The Criminal Enterprise**

69. Debtor's operations, activities and transfers done in furtherance of the Ponzi scheme, including those in conjunction with its affiliates and its dealings with Defendant, also constituted a criminal enterprise.

70. This, too, is evidenced by the Court's order in the 1046 Action wherein it denied the Motion of Greyson Law Center to Vacate the Preliminary Injunction previously entered in Debtor's main case, and the Court offered the opinion:

> Through the various proceedings and evidence produced in both the main case and the various adversary proceedings, including but not limited to various Motions for Temporary Restraining Orders, Preliminary Injunctions, Motions to Dismiss, a Motion for Appointment of a Chapter 11 Trustee, a Motion to Sell Assets, a multitude of pleadings filed by both secured and unsecured creditors (supported by evidence presented under oath) in support of their claims, and especially the pleadings and evidence presented by the "Watchdog of the Bankruptcy System" aka the Office of the United States Trustee (an arm of the United States Department of Justice), *it is clear to this Court that Debtor, since its pre-petition inception (and through the time of the appointment of the Chapter 11 Trustee) was in the Court's opinion, operating a criminal enterprise.*

Case No. 8:23-bk-10571-SC; Adv. No. 8:23-ap-01046-SC [Bankr. Docket No. 1545, p.3 (emphasis in text)].

71.    In support of this criminal enterprise, Defendant provided the Marketing Services to Debtor to assist Debtor in creating an appearance of legitimacy and in attracting more consumers and affiliates to enter illegal Affiliate Agreements and ARPA Agreements.

**I.    LPG's Prepetition Creditors**

72.    Debtor was insolvent when each Transfer was made. This insolvency is evidenced in part by the fact that 14 separate UCC-1 statements were of record securing debts of the Debtor as of September 1, 2022. These statements remained unreleased as of the Petition Date. These statements either reflected secured liens against the Debtor's assets then owned or thereafter acquired, or provided evidence of the assignment or sale of substantial portions of the Debtor's future income.  Debtor's insolvency is an adjudicated fact based on the Court's finding of insolvency entered in other adversary proceedings pending before the Court.  *See, e.g.*, Case No. 8:23-bk-10571-SC; Adv. No. 8:24-ap-01002-SC [Adv. Docket No. 28] (finding that "Debtor was insolvent or rendered insolvent at the time of the transfers made to Defendant").

73.    Plaintiff directs Defendant to the Order Denying Greyson's Motion to Vacate the Preliminary Injunction entered as Bankr. Docket No. 1545 ("Order") where the Court found "it is clear to this Court that Debtor, since its pre-petition inception (and through the time of the appointment of the Chapter 11 Trustee) was, in the Court's opinion operating a criminal enterprise" and that "[t]here is also evidence before the Court that the Debtor was running a Ponzi scheme and

paying some outside (or 'network') attorneys with funds obtained from new clients." Order p. 3, l. 11-13; p. 4, l. 14-15. Insolvency is presumed as a matter of law if the debtor operated a Ponzi scheme. *See, e.g., Glob. Money Mgmt., L.P. v. McDonnold*, No. 06CV34, 2008 U.S. Dist. LEXIS 128733, at *15 (S.D. Cal. Feb. 27, 2008) (concluding that "if a Ponzi scheme is proven, then the debtor is proven insolvent from the time of its inception").

74.    When the Transfers were made, these prior UCC-1 statements secured the repayment of the following claimed amounts that are currently known to Trustee and are allegedly owed by the Debtor: (i) $2,374,004.82 owed to Fundura Capital Group as evidenced by Proof of Claim No. 335 purportedly secured by a UCC statement filed on or about May 19, 2021; (ii) approximately $15 million dollars owed to MNS Funding, LLC as evidenced by Proof of Claim No. 1060 purportedly secured by a UCC statement filed on or about May 28, 2021; (iii) approximately $5,000,000 owed to Azzure Capital, LLC as evidenced by Proof of Claim No. 127 secured by a UCC statement filed on or about May 28, 2021; and (iv) approximately $1.5 million dollars owed to Diverse Capital, LLC purportedly secured by UCC statements filed on or about September 15, 2021, and December 1, 2021.[1]

75.    As alleged above, LPG was borrowing against its assets and future income, often on unfavorable terms, not only to finance operations at LPG, but also to pay the fees owed to the marketing affiliates for providing consumer clients and to pay other loans to creditors that were in default or about to be in default as part of Diab's scheme to keep LPG creditors at bay for a long as possible until he could transfer LPG's assets, client files, Client Funds, and ACH Receivables to other entities under his control. Pursuant to the agreements with the marketing companies, significant percentages of future payments were already promised to be paid to the marketing affiliates from whatever future income the Debtor would receive. And, of course, the payments LPG received in the form of ACH Receivables were also trust funds paid to LPG by its law firm clients, subject to return of funds in the event of a request for refund or termination of the representation before LPG had earned the funds. In this regard, except to the extent earned, the ACH Receivables

---

[1] Trustee reserves all rights, claims, and defenses with respect to these and any other purported secured or unsecured claims.

also represented a liability of the Debtor.

76. In addition, on Debtor's Schedule E/F [Bankr. Docket No. 33], Debtor scheduled 11 unsecured creditors with priority unsecured claims totaling $374,060.04. These priority unsecured creditors include Indiana Dept. of Revenue, Dept. of Labor and Industries, Arizona Dept. of Economic Security, Arkansas Dept. of Finance & Admin., California Franchise Tax Board, Georgia Dept. of Labor, Internal Revenue Service, Mississippi Dept. of Revenue, Nevada Dept. of Taxation, Utah State Tax Commission, and Wisconsin Dept. of Revenue (collectively, "Priority Unsecured Creditors").

77. Another group of creditors that Debtor listed on its Schedule E/F [Bankr. Docket No. 33] are nonpriority unsecured creditors. Those 58 creditors have scheduled claims totaling $141,439,158.05 and include Ajilon; Anthem Blue Cross; Azevedo Solutions Groups, Inc.; Carolina Technologies & Consulting Invoice; Collaboration Advisors; Credit Reporting Service Inc.; CT Corporation – Inv.; Debt Pay Pro; Document Fulfillment Services; EnergyCare, LLC; Exela Enterprise Solutions; First Legal Network, LLC; GHA Technologies Inc.; Harrington Electric, Inc.; Imagine Reporting; Juize, Inc.; Krisp Technologies, Inc.; Liberty Mutual; Marc Lemauviel – Allegra; MarkSYS Holdings, LLC; Netsuite-Oracle; Pitney Bowes; Rapid Credit, Inc.; SBS Leasing A Program of De Lage Landen; Security Solutions; Sharp Business Systems; Streamline Performance, Inc.; Thomson Reuters; Twilio, Inc.; Nationwide Appearance Attorneys; Executive Center, LLC; Outsource Accelerator, Ltd.; TaskUs Holdings, Inc.; Marich Bein, LLC; Validation Partners; MC DVI Fund 1, LLC; MC DVI Fund 2, LLC; Debt Validation Fund II, LLC; Tustin Executive Center; LexisNexus; JP Morgan Chase; Business Centers of America; Michael Schwartz; Anibal Colon Jr.; Kathleen Lacey; David Ulery; Kimberly Birdsong; Kevin Carpenter; Karen Suell; Gloria Eaton; Carolyn Beech; Debra Price; Kenneth Topp; Darcey Williamson, Trustee; James Hammett; Johnny Rizo; Beverly Graham; Kathleen Scarlett; and Geneve and Myranda Sheffield (collectively, "Nonpriority Unsecured Creditors" and, together with the Secured Creditors and Priority Unsecured Creditors, "Prepetition Creditors").

78. As of the date this complaint was drafted, approximately 5,771 claims have been filed with the bankruptcy Court. While Trustee has not reviewed all claims as of the date of this

complaint, and reserves all rights to object to those claims, the total amount is in excess of approximately $717,507,462.29.

**FIRST CLAIM FOR RELIEF**

**Count I - Avoidance, Recovery, and Preservation of Actual Fraudulent Transfers**

**[11 U.S.C. §§ 548(a)(1)(A), 550, and 551]**

79. Plaintiff realleges and incorporates here by reference each and every allegation contained in paragraphs 1 through 78 as though set forth in full.

80. All or a portion of the Transfers occurred within the two years prior to the Petition Date and thus, the agreements and services between the Debtor and the Defendant did as well, whether or not memorialized in written or oral agreements.

81. On or after the date that any such agreements were entered or executed, services were provided and the Transfers were made, entities to which Debtor was or became indebted include the Prepetition Creditors.

82. The Transfers happened while Debtor was insolvent or rendered Debtor insolvent.

83. Despite Debtor's obligation to the Prepetition Creditors, Debtor continued to make Transfers to Defendant that consisted of sums received from consumers under other illegal capping agreements.

84. The Transfers happened while Debtor was insolvent or Debtor became insolvent shortly after the Transfers were made as is evidenced by the filing of the voluntary petition.

85. The value of the consideration received by Debtor for such Transfers was not reasonably equivalent to the value of the Transfers because the Transfers were used to further assist Debtor in its Ponzi scheme.

86. Because the Defendant was not registered with the State Bar of California, and because the effect of the Marketing Agreement was to accomplish an unlawful purpose, any and all referrals from its Marketing Services are illegal under federal and state law. Any purported consideration constitutes unlawful consideration, which cannot constitute reasonably equivalent value. Thus, at the time the Marketing Agreement was executed and the Transfers made, Debtor received less than reasonably equivalent value.

87.    Furthermore, the Debtor did not receive the reasonably equivalent value of the Transfers to Emerging Media Partners because by using Emerging Media Partners' services and support to run a Ponzi scheme there is no benefit to the creditors of the  Estate.  Rather, the Transfers exacerbated the harm to creditors by increasing the amount of claims while diminishing the Debtor's Estate.  In this situation, the use of Emerging Media Partners' services to further the Debtor's Ponzi scheme cannot be consideration for the Transfers and cannot objectively be called reasonably equivalent value.

88.    The Transfers were made with actual intent to hinder, delay, or defraud creditors of Debtor.

89.    The Debtor was operating a Ponzi scheme and the Ponzi Scheme Presumption can be utilized to infer the Debtor's actual intent to defraud within the meaning of 11 U.S.C. § 548(a)(1).

90.     The Debtor's conduct was done with oppression, fraud, and malice, as defined in Civil Code section 3294, entitling the Trustee to, in addition to the actual damages, exemplary or punitive damages for making an example of the Debtor and to punish the Debtor.

91.    The Transfers of Debtor's funds are avoidable as fraudulent pursuant to 11 U.S.C. §§ 548(a)(1)(A), 550, and 551, and the common law tort of intentional fraudulent transfers by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against the Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

92.    The Transfers should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(A) and under the common law tort of intentional fraudulent transfers, and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

/ / /

/ / /

/ / /

/ / /

**SECOND CLAIM FOR RELIEF**

**Count II - Avoidance, Recovery, and Preservation of Constructive Fraudulent Transfers Against Defendant**

**[11 U.S.C. §§ 548(a)(1)(B), 550, and 551]**

93. Plaintiff realleges and incorporates here by reference each and every allegation contained in paragraphs 1 through 92 as though set forth in full.

94. All or a portion of the Transfers occurred within the two years prior to the Petition Date and thus, the agreements between the Debtor and the Defendant did as well, whether or not memorialized in written or oral agreements.

95. On or after the date that such agreements were executed, services were provided, and such Transfers were made, entities to which Debtor was or became indebted include the Prepetition Creditors.

96. The Transfers happened while Debtor:

a. was insolvent or became insolvent as a result;

b. was engaged or was about to engage in a transaction for which any property remaining with Debtor was of unreasonably small capital; or

c. intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

97. Because the Defendant was not registered with the State Bar of California, and because the effect of the Marketing Agreement was to accomplish an unlawful purpose, any and all referrals from its Marketing Services are illegal under federal and state law. Any purported consideration constitutes unlawful consideration, which cannot constitute reasonably equivalent value. Thus, at the time the Marketing Agreement was executed and the Transfers made, Debtor received less than reasonably equivalent value.

98. Furthermore, the Debtor did not receive the reasonably equivalent value of the Transfers to Emerging Media Partners because by using Emerging Media Partners' services and support to run a Ponzi scheme there is no benefit to the creditors of the Estate. Rather, the Transfers exacerbated the harm to creditors by increasing the amount of claims while diminishing

the Debtor's Estate. In this situation, the use of Emerging Media Partners' services to further the Debtor's Ponzi scheme cannot be consideration for the Transfers and cannot objectively be called reasonably equivalent value.

99. Any transfers made to the Defendant can be avoided by the Plaintiff since the Transfers are fraudulent such that they constitute property of the Estate in which the Plaintiff can recover.

100. The Transfers should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(B), and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

**THIRD CLAIM FOR RELIEF**

**Count III - Avoidance, Recovery, and Preservation of**

**Actual Fraudulent Transfers Against Defendant**

**[11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.04(a), 3439.04(b), and 3439.07]**

101. Plaintiff realleges and incorporates here by reference each and every allegation contained in paragraphs 1 through 100 as though set forth in full.

102. All or a portion of the Transfers occurred within the four years prior to the Petition Date and thus, the agreements between the Debtor and the Defendant did as well, whether or not memorialized in written or oral agreements.

103. On or after the date that such agreements were entered, services were rendered, and such Transfers were made, entities to which Debtor was or became indebted include the Prepetition Creditors.

104. Despite Debtor's obligation to the Prepetition Creditors, Debtor continued to make Transfers to Defendant that consisted of sums received from consumers under other illegal capping agreements.

105. The Transfers happened while Debtor was insolvent or Debtor became insolvent shortly after the Transfers were made as is evidenced by the filing of the voluntary petition.

106.    The value of the consideration received by Debtor for such Transfers was not reasonably equivalent to the value of the Transfers because the Transfers were used to further assist Debtor in its Ponzi scheme.

107.    Because the Defendant was not registered with the State Bar of California, and because the effect of the Marketing Agreement was to accomplish an unlawful purpose, any and all  referrals from its Marketing Services are illegal under federal and state law. Any purported consideration constitutes unlawful consideration, which cannot constitute reasonably equivalent value. Thus, at the time the Marketing Agreement was executed and the Transfers made, Debtor received less than reasonably equivalent value.

108.    Furthermore, the Debtor did not receive the reasonably equivalent value of the Transfers to Emerging Media Partners because by using Emerging Media Partners' services and support to run a Ponzi scheme there is no benefit to the creditors of the  Estate.  Rather, the Transfers exacerbated the harm to creditors by increasing the amount of claims while diminishing the Debtor's Estate.  In this situation, the use of Emerging Media Partners' services to further the Debtor's Ponzi scheme cannot be consideration for the Transfers and cannot objectively be called reasonably equivalent value.

109.    The Transfers were made with actual intent to hinder, delay, or defraud creditors of Debtor.

110.    The Debtor was operating a Ponzi scheme and the Ponzi Scheme Presumption can be utilized to infer the Debtor's actual intent to defraud within the meaning of 11 U.S.C. section 548(a)(1).

111.    The Debtor's conduct was done with oppression, fraud, and malice, as defined in Civil Code section 3294, entitling the Trustee to, in addition to the actual damages, exemplary or punitive damages for making an example of the Debtor and to punish the Debtor. The Transfers of Debtor's funds are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and Cal. Civ. Code §§ 3439.04(a), 3439.04(b), and 3439.07, and the common law tort of intentional fraudulent transfers by one or more creditors who held and hold unsecured claims against Debtor that were and are

allowable against the Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

112. Accordingly, the Transfers should be avoided as fraudulent under 11 U.S.C. §§ 544(b) and Cal. Civ. Code §§ 3439.04(a), 3439.04(b), and 3439.07, and under the common law tort of intentional fraudulent transfers, and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551 and Cal. Civ. Code § 3439.07.

## FOURTH CLAIM FOR RELIEF

### Count IV - Avoidance, Recovery, and Preservation of Constructive Fraudulent Transfers Against Defendant

**[11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.05, and 3439.07]**

113. Plaintiff realleges and incorporates here by reference each and every allegation contained in paragraphs 1 through 112 as though set forth in full.

114. All or a portion of the Transfers occurred within the four years prior to the Petition Date and thus, the agreements and services rendered between the Debtor and the Defendant did as well, whether or not memorialized in written or oral agreements.

115. The Transfers happened while Debtor:

a. was insolvent or became insolvent as a result;

b. was engaged or was about to engage in a transaction for which any property remaining with Debtor was of unreasonably small capital; or

c. intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

116. Because the Defendant was not registered with the State Bar of California, and because the effect of the Marketing Agreement was to accomplish an unlawful purpose, any and all referrals from its Marketing Services are illegal under federal and state law. Any purported consideration constitutes unlawful consideration, which cannot constitute reasonably equivalent value. Thus, at the time the Marketing Agreement was executed and the Transfers made, Debtor received less than reasonably equivalent value.

117. Furthermore, the Debtor did not receive the reasonably equivalent value of the Transfers to Emerging Media Partners because by using Emerging Media Partners' services and support to run a Ponzi scheme there is no benefit to the creditors of the Estate. Rather, the Transfers exacerbated the harm to creditors by increasing the amount of claims while diminishing the Debtor's Estate. In this situation, the use of Emerging Media Partners' services to further the Debtor's Ponzi scheme cannot be consideration for the Transfers and cannot objectively be called reasonably equivalent value.

118. The Transfers of Debtor's funds are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and Cal. Civ. Code §§ 3439.05 and 3439.07 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against the Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

119. Accordingly, the Transfers should be avoided as fraudulent under 11 U.S.C. §§ 544(b) and Cal. Civ. Code §§ 3439.05 and 3439.07, and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551 and Cal. Civ. Code § 3439.07.

## FIFTH CLAIM FOR RELIEF

**Count V - Avoidance, Recovery, and Preservation of Unauthorized Post-Petition Transfers**

**[11 U.S.C. §§ 549, 550, and 551]**

120. Plaintiff realleges and incorporates here by reference each and every allegation contained in paragraphs 1 through 119 as though set forth in full.

121. Under 11 U.S.C. § 549(a), the trustee may avoid a transfer of property of the estate that occurs after the commencement of the case and that is not authorized by the court with jurisdiction over the Bankruptcy Estate.

122. The Post-Petition Transfer was a transfer of an interest in property of the Debtor.

123. Defendant received the Post-Petition Transfer in the amount of at least $31,273.00 after the Petition Date.

/ / /

124.    The Post-Petition Transfer was not authorized under the Bankruptcy Code or by the Court.

125.    The Post-Petition Transfer is an avoidable transfer pursuant to 11 U.S.C. § 549(a).

126.    Section 550 of the Bankruptcy Code provides that if a transfer is avoided under section 549 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

127.    Defendant is the initial transferee.

128.    In accordance with the foregoing, the Post-Petition Transfer is an avoidable transfer pursuant to 11 U.S.C. § 549(a), and may be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

## SIXTH CLAIM FOR RELIEF

### Count VI - Turnover of Estate Property Against Defendants

### [11 U.S.C. § 542]

129.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 128 as though set forth in full.

130.    Defendants have possession or control over property of the Estate in the form of the Transfers and Post-Petition Transfer made pursuant to illegal, unenforceable, and avoidable agreements.

131.    The Transfers and Post-Petition Transfer are not of inconsequential value to the Estate.

132.    The funds that are the subject of the Transfers and Post-Petition Transfer are paramount to Debtor's ability to pay creditors.

133.    Accordingly, Trustee is entitled to a judgment for turnover of the Transfers and Post-Petition Transfer pursuant to 11 U.S.C. § 542.

/ / /

/ / /

/ / /

**SEVENTH CLAIM FOR RELIEF**

**Count VII - Aiding and Abetting Against Defendants**

**[11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.04(a), 3439.04(b), and 3439.07]**

134. Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 133 as though set forth in full.

135. Defendants, based upon information and belief and based on the Ponzi Scheme Presumption, had knowledge of the fraudulent transactions, transfers and illegal agreements that were used to perpetuate and conceal the Ponzi scheme and fraudulent transfers.

136. Defendants, with the foregoing knowledge, intended to, and did, help the Debtor in perpetuating and concealing the Ponzi scheme and fraudulent transfers of money.

137. At all material times, Defendants had the intent to facilitate and conceal the Ponzi scheme and fraudulent transfers of money by aiding and abetting the illegal capping scheme and generating referrals from its Marketing Services to keep the business going.

138. Defendants, upon information and belief, assisted, and did actually engage in, the commission of fraud and the Ponzi scheme, by providing the Marketing Services to Debtor to assist Debtor in creating an appearance of legitimacy and in attracting more consumers and affiliates to enter illegal Affiliate Agreements and ARPA Agreements, in furtherance of concealing the true nature of LPG's fraudulent and criminal activity related to the Ponzi scheme.

139. The injuries to Plaintiff, the Debtor's Estate and to its creditors directly, proximately and reasonably foreseeably resulting from and caused by violations of Sections 6151 and 6155 of the California Business and Professional Code include, without limitation, millions of dollars in improperly transferred and acquired monies.

140. Plaintiff and the Debtor's Estate also suffered damages by incurring attorney's fees and costs associated with the prosecution of Defendants' unlawful activities.

/ / /

/ / /

/ / /

/ / /

## RESERVATION OF RIGHTS

Plaintiff reserves the right to bring all other claims or causes of action that Plaintiff may have against Defendant, on any and all grounds, as allowed under the law or in equity, including but not limited to, those claims not known by the Trustee at this time but that he may discover during the pendency of this adversary proceeding.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for a judgment as follows:

**On the First, Second, Third, and Fourth Claims for Relief:**

1. Avoiding, recovering, and preserving the Transfers against Defendant;

**On the First and Third Claims for Relief:**

2. Awarding punitive and exemplary damages according to proof;

**On the Fifth Claim for Relief:**

3. Avoiding, recovering, and preserving the Post-Petition Transfer against Defendant;

**On the Sixth Claim for Relief:**

4. Ordering Defendants to immediately turn over the property of the Estate, including, but not limited to, the Transfers and Post-Petition Transfer;

**On the Seventh Claim for Relief:**

5. Awarding Plaintiff monetary damages in the amount of all Transfers and Post-Petition Transfer obtained by Defendants from Debtor;

**On All Claims for Relief:**

6. Awarding costs of suit;

7. Awarding punitive damages;

8. Awarding attorneys' fees;

9. Awarding pre-judgment interest at the maximum legal rate running from the date of the Complaint to the date of judgment herein;

10. Awarding post-judgment interest at the maximum legal rate running from the date of judgment herein until the date the judgment is paid in full, plus costs;

11. Requiring Defendant to pay forthwith any judgment awarded herein; and

12. Granting Plaintiff such other and further relief as the Court deems just and proper.

Dated: March 14, 2025

Respectfully submitted,

DINSMORE & SHOHL LLP

By: _/s/ Matthew J. Stockl_
Christopher Celentino
Yosina M. Lissebeck
Matthew J. Stockl

*Special Counsel to Richard A. Marshack, Trustee of the LPG Liquidation Trust*

# EXHIBIT 1

CHRISTOPHER B. GHIO (259094)
christopher.ghio@dinsmore.com
CHRISTOPHER CELENTINO (131688)
christopher.celentino@dinsmore.com
YOSINA M. LISSEBECK (201654)
yosina.lissebeck@dinsmore.com
DINSMORE & SHOHL LLP
655 West Broadway, Suite 800
San Diego, California 92101
Tele: 619.400.0500
Fax: 619.400.0501

Sarah S. Mattingly (Ky. Bar 94257)
sarah.mattingly@dinsmore.com
DINSMORE & SHOHL, LLP
101 S. Fifth Street, Suite 2500
Louisville, Kentucky 40202
Tele: 859-425-1096
Fax: 502-585-2207
(Admitted pro hac vice)

Special Counsel to Richard A. Marshack

FILED & ENTERED

JUN 03 2024

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY mccall DEPUTY CLERK

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION**

In Re

The Litigation Practice Group P.C.,

Debtor(s),

Case No: 23-bk-10571-SC

Chapter 11

**ORDER GRANTING MOTION FOR ENTRY OF PROTECTIVE ORDER AND THE PROTECTIVE ORDER**

Date: May 23, 2024
Time: 1:30 p.m.
Judge: Hon. Scott C. Clarkson
Place: Courtroom 5C (via Zoom)[1]
411 West Fourth Street
Santa Ana, CA 92701

[1] Video and audio connection information for each hearing will be provided on Judge Clarkson's publicly posted hearing calendar, which may be viewed online at: http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

The Court has read and considered the Notice of Motion and Motion for Entry of Protective Order (the "Motion") filed by Richard A. Marshack, in his capacity as the Chapter 11 Trustee (the "Trustee") of the Bankruptcy Estate ("Estate") of The Litigation Practice Group P.C., on May 2, 2024, pursuant to Federal Rule of Bankruptcy Procedure 7026 and Federal Rule of Civil Procedure 26(c)(1), as Dk. No. 1164 ("Motion"), and has found good cause to grant the Motion.

IT IS HEREBY ORDERED that:

1. The Motion is granted;

2. The below Protective Order shall apply to any contested matter arising in the main bankruptcy case and in all adversary proceedings filed by or against Trustee, present and future; and

3. Govern the discovery conducted therein.

## PROTECTIVE ORDER

### 1. DEFINITIONS

1.1 "Confidential Information" as used in this Protective Order shall mean documents and other information (regardless of how generated, stored or maintained) that a Party or non-party reasonably believes to contain or reflect non-public financial or business information, bank records, financial records, such as social security numbers, non-public financial or personal information of a Party or non-party, account numbers, sensitive digital information and identifiers, information subject to confidentiality agreements or provisions other than this Protective Order, and other non-public research, development, or commercial information that derives value or avoids injury by virtue of not being known to the public.

1.2 This "Action" is defined and hereby means any contested matter arising in the main bankruptcy case and in all adversary proceedings filed by or against Trustee, present and future.

1.3 "Designating Party" means a Party or non-party that designates Confidential Information during the Action.

1.4 "Receiving Party" means a Party that receives Confidential Information during the Action.

1.5 "Party" or "Parties" means person or entity subject to this Protective Order.

**2. SCOPE OF THIS PROTECTIVE ORDER**

2.1 Unless otherwise ordered, this Protective Order shall govern certain documents and other products of discovery obtained in the Action from the Parties there to, and from third parties. As well as certain information copied or derived therefrom, excerpts, summaries or compilations thereof, including, but not limited to, documents voluntarily exchanged as part of early settlement discussions, documents produced pursuant to initial disclosures, requests authorized by the Federal Rules of Civil Procedure made applicable herein by the Federal Rules of Bankruptcy Procedure, answers to interrogatories, deposition transcripts, responses to requests for production, responses to requests for admission, subpoenas, affidavits, declarations, expert reports, and other such material and information as may be produced during the course of the Action and designated as Confidential Information.

**3. DESIGNATION OF CONFIDENTIAL INFORMATION**

3.1 This Protective Order shall govern the production and handling of any Confidential Information in this Action. Any Party or non-party who produces Confidential Information in this Action may designate it as "Confidential" or "Attorneys' Eyes Only" consistent with the terms of this Protective Order. Whenever possible, the Designating Party must designate only those portions of a document, written discovery responses, deposition, transcript, or other material that contain the Confidential Information and refrain from designating entire documents. Regardless of any designations made hereunder, the Designating Party is not otherwise restricted from use or disclosure of its Confidential Information outside of this Action or for any business purposes. In addition, any Party may move to modify or seek other relief from any of the terms of this Protective Order if it has first tried in writing and in good faith to resolve its needs or disputes with the other Parties or Party as the case may be under the terms of this Protective Order. Further, nothing in this Protective Order shall prevent a Party from redacting documents consistent with the Federal Rules of Civil Procedure and utilizing the documents as needed through-out the Action.

3.2 Application to Non-Parties: Before a non-party is given copies of documents or materials designated as Confidential Information or Attorneys' Eyes Only as permitted hereunder, it

must first sign an acknowledgment to be bound to these terms that is attached hereto as Exhibit A; if it fails to do so, the Parties to this Action must resolve any such dispute before making disclosure of designated information as permitted hereunder to the non-party. If a non-party wishes to make designations hereunder, it must first sign attached Exhibit A.

3.3 Timing and Provisional Protection: Designations of Confidential Information may be made at any time. To avoid potential waiver of protection hereunder, the Designating Party should designate documents or materials containing Confidential Information at the time of production or disclosure, including on the record during the taking of any deposition. Deposition testimony will be deemed provisionally protected for a period of thirty (30) days after the transcript is released to the Parties by the court reporter, although the Parties may agree at any time to different timelines of provisional protection of information as Confidential or Attorneys' Eyes Only as part of one or more specific depositions. To retain any designations beyond the provisional period, a Designating Party must designate specific pages and lines of deposition testimony before the provisional period has expired. Such designations must be made in writing so that all counsel and court reporters may append the designation to all copies of the transcripts.

3.4 Manner of Designation: Confidential Information may be designated hereunder in any reasonable manner or method that notifies the Receiving Party of the designation level and identifies with specificity the information to which the designation applies. If made verbally, the Designating Party must promptly confirm the designation in writing. Whenever possible, the Designating Party should stamp, affix, or embed a legend of "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY" on each designated page of the document or electronic image that contains Confidential Information.

**4. CHALLENGES TO DESIGNATED INFORMATION**

4.1 In the event that a Receiving Party disagrees at any time with any designation(s) made by the Designating Party, the Receiving Party must first try to resolve such challenge in good faith on an informal basis with the Designating Party. The Receiving Party must provide written notice of the challenge and the grounds therefor to the Designating Party, who must respond in writing to the challenge within fifteen (15) days. At all times, the Designating Party carries the burden of establishing the propriety of the designation and protection level. Unless and until the challenge is

resolved by the Parties or ruled upon by the Court, the designated information shall remain protected under this Protective Order. The failure of any Receiving Party to challenge a designation does not constitute a concession that the designation is proper or an admission that the designated information is otherwise competent, relevant, or material.

**5. LIMITED ACCESS/USE OF PROTECTED INFORMATION**

5.1 Restricted Use: Information that is produced or exchanged in the course of the Action and designated under this Protective Order may be used for preparation for trial and preparation for any appeal of any and all matters in the Action, as well as related settlement negotiations, and for no other purpose, without the written consent of the Designating Party. No Confidential Information may be disclosed to any person except in accordance with the terms of this Protective Order, unless the parties are co-counsel or have entered into joint defense agreements. All persons in possession of Confidential Information agree to exercise reasonable care with regard to the custody, use, or storage of such information to ensure that its confidentiality is maintained. This obligation includes, but is not limited to, the Receiving Party providing to the Designating Party prompt notice of the receipt of any subpoena that seeks production or disclosure of any designated information and consulting with the Designating Party before responding to the subpoena. Any use or disclosure of Confidential or Attorneys' Eyes Only information in violation of the terms of this Protective Order may subject the disclosing person or party to sanctions.

5.2 Access to "Confidential" Information: The Party(ies) and all persons subject to this Protective Order agree that information designated as "CONFIDENTIAL" may only be accessed or reviewed by the following:

a) The Court, its personnel, and court reporters;

b) Counsel of record, or co-counsel for any Party, or other party that has entered into a joint defense agreement in the Action and their employees who assist counsel of record, or co-counsel in the Action and are informed of the duties and obligations imposed hereunder;

c) The Parties, including their clients, agents and employees who are assisting or have reason to know of the Action;

/ / /

d) Experts or consultants employed by the Parties or their counsel, or co-counsel, for purposes of an Action, so long as each such expert or consultant has signed attached Exhibit A; and

e) Other witnesses or persons with the Designating Party's consent or by court order.

5.3 Access to "Attorneys' Eyes Only" Designations: The Parties and all persons subject to this Protective Order agree that information designated as "ATTORNEYS' EYES ONLY" may only be accessed or reviewed by the following:

a) The Court, its personnel, and court reporters;

b) Counsel of record, or co-counsel for any Party, or other party that has entered into a joint defense agreement in the Action and their employees who assist counsel of record in the Action and are informed of the duties hereunder;

c) In-house counsel for any Party in the Action and Richard A. Marshack, as Chapter 11 Trustee of The Litigation Practice Group P.C. who is informed of the duties and obligations imposed hereunder;

d) Experts or consultants employed by the Parties or their counsel, or co-counsel for purposes of the Action, and so long as each such expert or consultant has signed attached Exhibit A; and

e) Other witnesses or persons to whom the Designating Party agrees in advance of disclosure or by court order.

5.4 Non-Waiver Effect of Designations: Neither the taking of, nor the failure to take, any action to enforce the provisions of this Protective Order, nor the failure to object to any designation, will constitute a waiver of any Party(ies)'s claim or defense in the Action or any other action or proceeding, including, but not limited to, a claim or defense that any designated information is or is not Confidential, is or is not entitled to particular protection, or embodies or does not embody information protectable by law.

5.5 In-Court Use of Designated Information: If information designated under this Protective Order will or may be offered in evidence at a hearing or trial related to any matter in the Action, then the offering party must give advance notice to the party or non-party that designated prior to offering the information so that any use or disclosure may be addressed in accordance with

the Court's case-management or other pre-trial order, or by a motion *in limine.* Nothing in this Protective Order shall be construed as a waiver by a Party of any objections that may be raised as to the admissibility at trial of any evidentiary materials.

**6. CLAW-BACK REQUESTS**

6.1 Failure to Make Designation: If, at any time, a Party or non-party discovers that it produced or disclosed Confidential Information without designation, it may promptly notify the Receiving Party and identify with particularity the Confidential Information to be designated and the level of designation (the claw-back notification). The Receiving Party may then request substitute production of the newly-designated information. Within thirty (30) days of receiving the claw-back notification, the Receiving Party must: (1) certify to the Designating Party it has appropriately marked or, if substitute production has been requested, destroyed all unmarked copies that it received, made, and/or distributed; and (2) if it was practicably unable to mark or destroy any information because disclosures occurred while the Receiving Party was under no duty of confidentiality under the terms of this Protective Order regarding that information, the Receiving Party must reasonably provide as much information as practicable to aid the Designating Party in protecting the information, consistently with the Receiving Party's attorney-client, work-product, and/or trial-preparation privileges.

6.2 Inadvertent Production of Privileged Information: If, at any time, a Party discovers that it produced information that it reasonably believes is subject to protection under the attorney/client, work-product, or trial-preparation privileges, then it must promptly notify each Receiving Party of the claim for protection, the basis for it, amend its privilege log accordingly, and comply with Fed. R. Civ. P. 26(b)(5). Whenever possible, the producing party must produce substitute information that redacts the information subject to the claimed protection. The Receiving Party must thereupon comply with Fed. R. Civ. P. 26(b)(5)(B) as to the information subject to the claimed protection.

/ / /

/ / /

/ / /

**7. DURATION/CONTINUED RESTRICTIONS**

7.1 <u>Handling of Designated Information Upon Conclusion of the Main Bankruptcy Case:</u> Upon conclusion of the Main Bankruptcy Case, by way of dismissal or closing of the case, the Designating Party(ies) is/are responsible for ensuring that any Party or person to whom the Designating Party shared or disclosed designated information in any of the matters under the Action returns or destroys all of its copies, regardless of the medium in which it was stored. No witness or Party may retain designated information that it received from any other Party or non-party under this Protective Order; only counsel of record, or co-counsel, are the authorized agents who may retain one copy for their respective legal files, and who must also describe to the Designating Party the extra steps taken to protect its legal file containing paper and/or electronic copies of the designated information so that it is not accessed, used, or disclosed inconsistently with the obligations under this Protective Order. This provision does not apply to the Court or Court staff. Moreover, this provision does not apply to Trustee, who may retain and use – consistent with this Order – Confidential Information received in any Action during the entirety of the Bankruptcy.

7.2 <u>Continued Restrictions Under this Protective Order:</u> The restrictions on disclosure and use of Confidential Information shall survive the conclusion of the Bankruptcy case and any matter in the Action.

8. **PRIVILEGED OR PROTECTED INFORMATION**

8.1 Nothing in this Protective Order shall require disclosure of information that is protected by the attorney-client privilege, the work-product protection, or any other legally cognizable privilege (a "Privilege or Protection"). If information subject to a claim of Privilege or Protection is inadvertently produced, pursuant to Federal Rule of Evidence 502(d) such production shall not constitute a waiver of, or estoppel as to, any claim of Privilege or Protection for such information or any other information that may be protected from disclosure by a Privilege or Protection in any proceeding.

8.2 If a Party receives a document that appears to be subject to a Privilege or Protection, then it shall refrain from examining the document any more than is essential to ascertain if it is privileged or protected and shall promptly notify the producing Party in writing that the receiving

Party possesses material that appears to be subject to a Privilege or Protection. The producing Party shall have seven (7) days after receiving such notice to assert a Privilege or Protection over the identified material. If the producing Party does not assert a claim of Privilege or Protection within the seven (7)-day period, the material in question shall be deemed not privileged or protected.

8.3 If a producing Party has produced a document subject to a claim of Privilege or Protection, upon written request by the producing Party, the document for which a claim of Privilege or Protection is made shall be sequestered or destroyed to the extent reasonably practicable, and the receiving Party shall not use the document for any purpose other than in connection with analyzing or disputing a claim of Privilege or Protection or in connection with a motion to compel the production of the document.

8.4 The receiving Party sequestering or destroying such material may then move the Court for an order compelling production of the material. The applicable producing Party bears the burden of establishing the applicable Privilege or Protection of any clawed-back document or information as and to the same extent that it would have borne such burden had it not produced the document or information. Nothing in this Protective Order shall limit the Court's right or any receiving Party's right to request an in camera review of any information subject to a claim of Privilege or Protection.

###

Date: June 3, 2024

Scott C. Clarkson
United States Bankruptcy Judge

Case 8:23-bk-10571-SC Doc 1270 Filed 06/04/24 Entered 06/04/24 10:17:18 Desc
Main Document Page 10 of 12

EXHIBIT "A"

Christopher B. Ghio (State Bar No. 259094)
Christopher Celentino (State Bar No. 131688)
Yosina M. Lissebeck (State Bar No. 201654)
**DINSMORE & SHOHL LLP**
655 West Broadway, Suite 800
San Diego, CA 92101
Telephone: 619.400.0500
Facsimile: 619.400.0501
christopher.ghio@dinsmore.com
christopher.celentino@dinsmore.com
yosina.lissebeck@dinsmore.com

Sarah S. Mattingly (Ky. Bar 94257)
DINSMORE & SHOHL, LLP
101 S. Fifth Street, Suite 2500
Louisville, KY 40202
Telephone: 859-425-1096
Facsimile: 502-585-2207
Sarah.mattingly@dinsmore.com
(Admitted pro hac vice)

Special Counsel to Richard A. Marshack,
Chapter 11 Trustee

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In Re<br><br>The Litigation Practice Group P.C.,<br><br>Debtor(s), | Case No. 8:23-BK-10571-SC<br><br>Chapter 11<br><br>**EXHIBIT A TO STIPULATED ORDER**<br><br>Date: May 23, 2024<br>Time: 1:30 p.m.<br>Judge: Hon. Scott C. Clarkson<br>Place: Courtroom 5C[1] - Via Zoom<br>411 W. Fourth Street<br>Santa Ana, CA 92701 |

[1] Video and audio connection information for each hearing will be provided on Judge Clarkson's publicly posted hearing calendar, which may be viewed online at: http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

This is to certify that:

(a) I am being given access to Confidential Information pursuant to the Stipulated Protective Order that was entered into the main bankruptcy case for Litigation Practice Group, but which is binding and controlling as set forth by the Court's Order on any and all contested matters and any and all litigation commenced by Trustee;

(b) I have read the Stipulated Protective Order; and

(c) I agree to be bound by the terms and conditions thereof, including, without limitation, to the obligations regarding the use, non-disclosure and return of such Confidential Information. I further agree that in addition to being contractually bound by the Stipulated Protective Order, I am subject to the jurisdiction of the above reference Court for any violation thereof.

Date: ______________________

______________________________
Signature

______________________________
Printed Name

# EXHIBIT 2

The State Bar of California

## LIST OF CERTIFIED LAWYER REFERRAL SERVICES

Additional information on the services offered by each lawyer referral service can be found of their website. Links to each lawyer referral service's website is provided below.

- 1000Attorneys.com (#0128)
- AIDS Legal Referral Panel of the San Francisco Bay Area (#0070)
- Alameda County Bar Association LRS (#0001)
- Attorney Referral & Information Service of the Fresno County Bar Association (#0016)
- Attorney Search Network (#0113)
- California Advocates of Nursing Home Reform LRS (#0020)
- California Lawyers for the Arts (#0021)
- Contra Costa County Bar Association Lawyer Referral and Information Service (#0018)
- Higher Legal (#0130)
- Lawlinq, Inc. (#0134)
- Legal Leaf LRS, Inc. (#0135)
- LegalMatch California (#0140)
- Los Angeles LGBT Center (#0041)
- LRIS San Diego County Bar Association (#0043)
- LRS Coalition of Monterey County (#0046)
- LRS of Santa Barbara County Bar Association (#0032)
- LRS of Santa Cruz County (#0055)
- LRS of the Bar Association of Northern San Diego County (#0027)
- LRS of the Riverside County Bar Association (#0038)
- LRS of the San Joaquin County Bar Association (#0012)
- LRS of the San Mateo County Bar Association (#0039)
- LRS of the Solano County Bar Association (#0102)
- LRS of the South Bay Bar Association (#0013)
- LRS of the Western San Bernardino County Bar Association (#0040)
- Mexican American Bar Association of Los Angeles County LRIS (LACBA) (#0108)
- National Crime Victims Bar Association LRS (#0136)
- Orange County Bar Association LRIS (#0033)
- RepresentYou.com (#0126)
- San Bernardino County Bar Association LRS (#0010)
- San Fernando Valley Bar Association (#0006)
- San Gabriel Valley Bar Association LRS (#0011)
- San Luis Obispo County Bar Association LRIS (#0121)
- Santa Clara County Bar Association LRS (#0054)
- SF-Marin Lawyer Referral and Information Service of the Bar Association of San Francisco (#0002)
- SmartLaw (LRIS of LACBA) (#0042)
- Sonoma County Bar Association LRS (#0056)
- Sonoma County Legal Services Foundation Modest Means Program (#0109)
- Ventura County Bar Association Lawyer Referral & Information Service (#0059)

Last Updated: 3/7/2024

# EXHIBIT 3



**MARKETING & BRANDING PROPOSAL**
Litigation Practice Group
November 2020

November 30, 2020

EMERGING MEDIA PARTNERS
NEWPORT BEACH, CA

Dear Tony & Litigation Practice Group team,

Thanks for taking the time to meet with me and share your vision for Litigation Practice Group. I enjoy the company of passionate entrepreneurs and would be enthused to partner with you.

In my proposals, I try to ensure that I address each of your needs with a solution. From our discussions, these are the six that seem to have emerged and are the most important to solve for you:

**KEY OBJECTIVES:**

1. Develop a conversion focused web strategy to promote your business.
2. Design your website so it is professional, engaging, and matches your brand vision.
3. Engage new leads with videos for info, testimonials, and process explainers.
4. Drive traffic to your site using search and social media.
5. Establish consumer confidence through content and mobile apps
6. Timely turnaround and dedication to excellence in quality.

Tony, please let me know if these issues are in alignment with your concerns. After you go through the proposal, let me know where you would like to go from here.

Warmest Regards,

Josh
BOIS

Josh Bois
CEO Emerging Media Partners
(949) 795-0416 (cell - direct)
1(800) 836-7415 (toll free international)

EMERGING MEDIA PARTNERS

**MARKETING & BRANDING PROPOSAL**
Litigation Practice Group
November 2020

# PROJECT SCOPE OF WORK & DELIVERABLES

| | **WEBSITE** |
|---|---|
| **PLANNING** | Your website begins with a thorough, up-front process of discovery. Through interviews and surveys, we develop a series of deliverables that allows us to work efficiently through the duration of production.<br><br>Your project's success depends on a solid foundation, this work is crucial.<br><br>DELIVERABLES:<br>● Project setup<br>● Timeline & milestone setup<br>● Business objectives survey<br>● Design objectives survey<br>● Ideal customer profile brief<br>● Conversion workflow<br>● Sitemap |
| **CONVERSION CONTENT** | Your website needs to convert traffic into qualified leads. We will help develop and refine your sales letter/phrasing and site layout into several deliverables that will be used to convert traffic into leads.<br><br>DELIVERABLES:<br>● Sales letter development<br>○ Homepage, Services, Products, About, & Contact Us<br>● Content download opt-in's<br>○ Customer opt-in<br>○ Vendor opt-in<br>● Auto-responder series<br>○ Customer focused 6 part email series<br>○ Vendor focused 6 part email series |
| **ADDITIONAL CONTENT** | We know that you will have additional content that is supporting to the primary conversion pages that we are helping you with. We will help you organize and load this content into the content management system when ready. You will have the ability to change content in our system as often as you like, but we will provide the initial proofing and loading of up to 10 pages.<br><br>Further we will write out new pages & blogs to educate your customer on your services and provide content to be drip fed to search engines.<br><br>DELIVERABLES:<br>● Content inventory<br>● Writing of 10 new pages for customer product education |



| | |
|---|---|
| | • Writing of 15 blog items for search ranking<br>• 2 Rounds of professional proofing<br>• Load content into CMS and format<br>• 2 Rounds of on-site revisions to content layout |
| **SEARCH ENGINE OPTIMIZATION** | In addition to your website needing to convert visitors into qualified leads, your site needs to attract more qualified traffic. We accomplish this by optimizing your website's content for a basket of relevant, traffic-rich keywords.<br><br>DELIVERABLES:<br>• Competitive benchmark three (3) top competitors<br>• Keyword research, target top ten (10) opportunities<br>• Optimize page titles<br>• Meta descriptions<br>• SEO copywriting / text optimization<br>• Image optimization<br>• Google XML<br>• Robots.txt<br>• Optimize client's primary location on Google Local, Bing, Citysearch, and Yelp profiles; one (1) round of review and revisions per profile |
| **DESIGN** | We will create a custom website design based on your branding, colors, functionality requirements, and best usability practices. Your design will be unique to your company and setup for maximum conversion.<br><br>Your website will consist of a combination of convention and creativity to make sure that your visitors can find the content they need and inquire about your services. We design and code to the highest of standards and always keep up with industry trends.<br><br>DELIVERABLES:<br>• 3 Custom website page design concepts<br>• 2 Rounds of revisions<br>• Templates & interface code for:<br>    ○ Homepage<br>    ○ 5 Inside pages<br>    ○ Standard page elements (headers, paragraphs, images, videos, links, etc)<br>    ○ Form elements<br>• Cross-browser tested in Internet Explorer 6+, Firefox 2+, Safari, & Google Chrome |
| **MOBILE DESIGN OPTIMIZATION** | Visitors browsing your site from other device types account for up to 20% of your website traffic. We will create a separate mobile and tablet design of your site that will make browsing from these platforms an enjoyable experience. We will accomplish this by making your site |

<table>
<tr><td></td><td>"responsive" to various browser sizes.<br><br>DELIVERABLES:<br>• Mobile optimization<br>• Tablet device optimization<br>• Optimize main menu, bottom menu, graphics, sliders, and any other elements<br>• 2 rounds of revisions<br>• Optimize up to 7 pages (typically top level main menu items)<br>• Device testing - iPhone, iPad, Android</td></tr>
<tr><td>WEBSITE</td><td>We will create your website with up to 12 custom pages. Content will be created and provided by you. Content can be from existing website/brochures/collateral or range from text, pictures, galleries, PDF/PPT/DOC downloadable files, embedded video, forms, and any element supported by our Platform. All of our websites include dynamic menus as well as sitemaps to control site navigation.<br><br>CUSTOM MODULES: We will create the following custom modules as part of your website...<br><br>• Forms: contact us, customer feedback, and franchise opportunity; all form data will automatically be collected in our database<br><br>• SSL Security: Improve search rank and provide customers with increased confidence sharing contact information through a secured site<br><br>• Blog/News: you will be able to post new content and articles; your blog will include an rss feed, categories, and an archive; comments are optional; your blog will be integrated directly into your website; your blog supports categories, tags, and rss; we can also implement Facebook comments for additional shareability of blog content<br><br>• Homepage Hero: we will use mobile compatible technology (jQUERY) to create an innovative homepage hero slideshow so that you can feature new products or information; each slide will have the following assets: title, subtitle, short description, link, image or video;<br><br>DELIVERABLES:<br>• Fully functional website<br>• Google Analytics install<br>• Google Webmaster tools setup</td></tr>
<tr><td>SOCIAL MEDIA SETUP</td><td>We will integrate social media widgets into the site in the appropriate places. Additionally, we will customize your various social media</td></tr>
</table>



| | |
|---|---|
| | properties to have a consistent look & feel and desired functionality.<br><br>DELIVERABLES:<br>• Facebook commenting on-site<br>• Social media links<br>• Follow us buttons & embeds<br>• Social sharing ("like" and share buttons)<br>• Twitter feed + hashtags for product/service page feeds<br>• Facebook tabs for opt-in & products/services<br>• Facebook & twitter RSS tie-ins<br>• Customize Facebook page icon & cover image<br>• Customize Twitter page design<br>• Customize Foursquare page icon |
| **SOCIAL MEDIA MARKETING** | Our social media experts create new content based on your core business areas and publish to the major social networks on a consistent basis with researched and planned keywords and hashtags.<br><br>DELIVERABLES:<br>• Daily social media posts created and posted<br>• New graphics created for each post to match brand's aesthetic<br>• On-going keyword & hashtag research to expand influence<br>• Up to 30 hashtags per post, rotated for max exposure<br>• Integration of key client information such as logo, phone number, service areas, website or other information into the creatives<br>• Publishing to client's: Facebook, Instagram, Linked In Company page, and Twitter profile |
| **LOGO DESIGN** | Expert designers will re-craft your companies logo to use professional fonts, custom lettering, precise placement and coloring. A modern and print-friendly vector logo will be created that will be high-resolution at any size and usable across all campaigns necessary<br><br>DELIVERABLES:<br>• 5 versions provided, 4 rounds of revision<br>• Vector files, transparent PNG, web ready JPG<br>• White version to use on darker backgrounds<br>• Dark version to use on lighter backgrounds |
| **APP DESIGN** | We will provide you with mobile apps for your customers to use to easily access your primary business information utilized on the website. Improve consumer confidence in your brand by offering a brochure apps that showcase your services, process and content.<br><br>DELIVERABLES:<br>• iOS App designed, tested & published to Apple App Store<br>• Android App designed, tested & published to Google Play Store<br>• Colors & style consistent and matched to brand |



| | |
|---|---|
| **COMPLETION** | Before your website goes live we will do a quality assurance review of each web page to make it meets scope specification. Also, we will help you transfer your DNS to point to your new website. Finally, we will provide a thirty (30) day warranty period from the day the website goes live to make sure the website meets your specifications. |
| | **ONGOING TRAFFIC GENERATION** (OPTIONAL) |
| **SEARCH ENGINE MARKETING** | We will use a combination of tactics based on a core strategy of content generation to increase the traffic to your site. This ongoing campaign will be driven from a quarterly strategy outline followed with 3 months of tactical implementation. Each quarter we will review strategy and implement changes as necessary.<br><br>DELIVERABLES:<br>• Define goals<br>• Brainstorm & keyword discovery<br>• In-depth keyword research<br>• Competitive analysis<br>• Local listing submission & optimization<br>  ○ Google, Yahoo, Bing, and others<br>• Industry specific directory placement<br>• On-site keyword optimization<br>• Fixing of SEO issues identified on-website<br>• Competitive link building<br>• Blogging & PR submission<br>• Local business directories<br>• Social media optimization<br>• Monthly 30+ backlinks created<br>• Monthly SEO ranking report for top 10 keywords<br>• Guaranteed improvement of ranks on 5 keywords over 180 days 2 quarters) - services provided free for following 90 days/quarter if no rank improvement on at least 3 keywords.<br><br>40 hours per month x $81.25/hr |
| **SOCIAL MONITORING** | We know that you and your team are the best resource to interact with your customers and fans in an authentic way. Our ongoing Social Monitoring service allows for us to handle the "low hanging" engagement and to listen and notify you for when and where it is time to engage.<br><br>DELIVERABLES:<br>• Find and manage Twitter followers<br>• Provide minimal "generic" content to supplement internal content<br>• Manage "generic" conversations<br>• Facilitate conversations that require your input<br>• Monthly report, measures and recommendations (conf call) |



| | **CONVERSION OPTIMIZATION** (optional) |
|---|---|
| **POST-LAUNCH ANALYSIS & ITERATIONS** | Once your new Online Business is live and we are collecting data on how visitors use the site, then it is time to improve the experience. Following the launch, we will do monthly assessments with recommendations and implementation to increase the opt-in and conversion rates for booking and engagement.<br><br>DELIVERABLES:<br>• 3 monthly assessments<br>• 6 monthly recommendations<br>• 6 monthly fixes<br><br>Note: Up to 3 hours of labor per assessment for improvements |
| | **ALTERNATIVE MARKETING** (optional) |
| **VALUE ADDED SERVICES** | We will help the brand through additional marketing services such as review building, competitive/anti-competitive tactics, and provide general consulting as to best methods to utilize.<br><br>DELIVERABLES:<br>• 10 monthly reviews (yelp, google, avvo, other)<br>• Provide recommendations & take action on other work<br>• 6 monthly fixes<br><br>Note: Up to 3 hours of labor per assessment for improvements |
| | **ORIGINAL MEDIA** (optional) |
| **PHOTOGRAPHY** | It is important to develop original photography that provokes a strong emotional response about your services. Our approach to photography is to conduct half day or full day photo shoots that yield a "package" of images that can be used for not only your website but all aspects of your Online Business: social, email, and review sites.<br><br>DELIVERABLES:<br>• Half-day, single location (or)<br>• Full day, up to 3 locations in the client's service area(s)<br>• All raw photos provided<br>• 10 pro-edited photos |
| **VIDEO** | We know that video is a powerful storytelling tool for your Online Business. We have a variety of different approaches to take for building out video assets based on objectives and budget.<br><br>**Compilation Video (photo montage):**<br>• Up to 30 seconds in length<br>• Up to 8 client provided or stock/still images |

| | |
|---|---|
| | • Professional voice over narrative<br>• On screen typography<br>• Royalty-free music<br>• End slate (business info)<br>• 10 day turnaround<br>• 2 rounds of revisions (15 day window to receive revisions)<br><br>**Animated Explainer Video:**<br>• Up to 180 seconds in length<br>• Professional voice over narrative<br>• On screen typography<br>• Royalty-free music<br>• End slate (business info)<br>• 30 day turnaround<br>• 2 rounds of revisions (15 day window to receive revisions)<br><br>**Enhanced Compilation Video (photo montage):**<br>• Up to 30 seconds in length<br>• Enhanced visual effects and editing techniques (shimmers & professional transitions, etc)<br>• Up to 8 client provided or stock/still images<br>• Professional voice over narrative<br>• On screen typography<br>• Royalty-free music<br>• End slate (business info)<br>• 10 day turnaround<br>• 2 rounds of revisions (15 day window to receive revisions)<br><br>**Original Content Video - Business Profile (On-location shoot):**<br>• Up to 3 minutes in length<br>• Full motion original footage (HD)<br>• On-camera interview of one individual<br>• Up to 4 hours on location filming<br>• Selected footage of client's place of business interior and exterior environment<br>• Professional voice over narrative (if applicable)<br>• On screen typography<br>• Royalty-free music<br>• End slate (business info)<br>• On-site filming & interview scheduled within 5 days of order<br>• 30 day turnaround<br>• 3 round of revisions (15 day window to receive revisions)<br><br>**Experts on Call Interview Video (On-location shoot):**<br>• Up to 60 seconds in length<br>• Full motion original footage of interviewee showcasing expertise |

| | |
|---|---|
| | on topics relating to the business (HD)<br>• Supplemental product with OCV Business Profile<br>• Up to 2 hours on location filming for stand alone, or included with footage captured at same location during filming of OCV Business Profile<br>• 3 maximum when included with OCV Business Profile shoot<br>• On screen typography<br>• Royalty-free music<br>• End slate (business info)<br>• On-site filming & interview scheduled within 5 days of order<br>• 10 day turnaround<br>• 2 rounds of revisions (15 day window to receive revisions)<br><br>**Original Content Video - Testimonial (On-location shoot):**<br>• Up to 90 seconds in length<br>• Full motion original footage video (HD)<br>• On-camera interview of one individual<br>• Up to 2 hours on location filming<br>• Selected footage of client's place of business interior and exterior environment<br>• Professional voice over narrative (if applicable)<br>• On screen typography<br>• Royalty-free music<br>• End slate (business info)<br>• On-site filming & interview scheduled within 5 days of order<br>• 10 day turnaround<br>• 2 round of revisions (15 day window to receive revisions) |
| | **DIGITAL BROCHURE** |
| **CUSTOM DESIGNED COLLATERAL** | Enhance consumer confidence and education by providing an easily consumable digital brochure. Users can flip through it on your website or download a PDF they can scroll through, self-print, and share with their team. Our designers spend time matching the look and feel of your brand with professionally edited content to fit the layout.<br><br>DELIVERABLES:<br>• 6 page brochure with custom written content and pro-design<br>• PDF brochure shareable with leads & customers<br>• Digital "magazine" page for customers to flip through pages |
| | **OUT OF SCOPE** |
| **ADDITIONAL CONTENT** | We know that you will want additional content about your business on your website than what we are developing. This might include |



Main Document Page 53 of 67

EMERGING
MEDIA PARTNERS

**MARKETING & BRANDING PROPOSAL**
Litigation Practice Group
November 2020

| | |
|---|---|
| | additional pages, blog entries, imagery, frequently asked questions, and documents. We support and encourage this content to be created and added to your website.<br><br>Our disclaimer is that this content development or entry does not hold up the project process or our project milestones. Payment must not be withheld due to this content. |

Exhibit 3, page 53



**MARKETING & BRANDING PROPOSAL**
Litigation Practice Group
November 2020

# PROJECT INVESTMENT

| Deliverable | Timeframe | Cost |
|---|---|---|
| **WEBSITE** | | |
| **Planning** | 1 week | included |
| **Conversion Content (optional)** | 4 weeks | $1,250 |
| **Additional Content (optional)** | 2 weeks* | $1,480 |
| **Search Optimized Content (optional)** | 5 weeks | $2,600 |
| **Mobile Site Design** | 2 weeks | $2,300 |
| **App Dev (iOS & Android)** | 10 weeks | $12,500 |
| **Website Design & Build**<br>• Pages, code, setup<br>• Forms<br>• Blog/News<br>• Homepage<br>• Analytics<br>• Landing Pages<br>• Custom Layouts | 8 weeks | $14,100 |
| **Logo Design & Letterhead (optional)** | 3 weeks | $1,250 |
| **Social Media Integration (optional)** | 1 week* | $750 |
| **Completion, Quality Assurance, & Warranty** | 3 weeks* | $1,350 |
| **Training** | 3 days* | $450 |
| **Total** | **12 weeks** | **TBD** |

## Optional Itemizations

**ONGOING TRAFFIC GENERATION**

| | |
|---|---|
| **SEO & Search Marketing** | $3,250 |



- Monthly Retainer
  *Phase begins after site launch
  *Billed quarterly

| | |
|---|---|
| **Social Monitoring** | **$200** |
| • Monthly Retainer *Phase begins after site launch | |
| **Social Media Management & Posting Services** | **$4,250** |
| • Monthly Retainer *Phase begins immediately *billed quarterly | |
| **Alternative Marketing** | **$2,150** |
| • Monthly Retainer *Phase begins immediately | |
| **Social Media Training** | **$365** |

## CONVERSION OPTIMIZATION

| | |
|---|---|
| **Post-launch analysis & improvements** | **$780** |

## COLLATERAL DESIGN

| | |
|---|---|
| **Digital Brochure** | **$1,500** |

## ORIGINAL MEDIA

| | |
|---|---|
| **Photography** | |
| • Half Day Shoot | **$1,250** |
| **Video** (per deliverable) | |
| • Business Profile | **$2,450** |
| • Animated Explainer | **$3,150** |
| • Experts on Call Interview (requires Business Profile) | **1 x $710** |
| • Testimonial Videos | **10 x $475** |

* These phases happen concurrently with others



**MARKETING & BRANDING PROPOSAL**
Litigation Practice Group
November 2020

# ADDITIONAL BILLABLE

Unplanned components, ideas, revisions, and project scope happen - when there is an unexpected event that will incur a cost, we will notify you ahead of time and will not produce unless we receive clear approval for increased budget and timeline.

Hourly rate: $125/hour, billed to the quarter of an hour through our online billing and desktop hour tracking software. However, most additional projects and/or project modifications will be scoped and bid on fixed-price basis.

# OUR TEAM & ABOUT US

We have built over 300 online business projects since 2005. Our business is owned fully by 2030 Ventures a global brand accelerator dedicated to helping brands, entrepreneurs and investors scale faster. Your project will be managed by a dedicated account executive and several of our team members will play a part in the build over the duration of your project.

Please reference our website, "www.emergingmediapartners.com/about", for more information about our organization, founding team, global clientele, and mission.

Each of our projects are taken through an innovative process that we have designed over the last 10 years, yet continue to refine to create the best possible experience. We use a combination of online tools, customer interactions, and milestones to ensure that your project goes from execution to completion within the allotted time & budget with the best end product.

# METHODOLOGY
**How it Works**
Lets start off by looking at the steps we'll be taking to get your project from start to finish.

1. *Discovery* - through a process of surveys and meetings we'll gather all the information we need to have the best understanding of your business and goals.

2. *Architecture* - just like a building, a website needs a solid blueprint. Together we'll determine the best way to organize your content for all marketing resources created.

3. *Content* - with a solid blueprint in place it will be your job to collect, organize, edit, and deliver to us content for each page of the website.

4. *Design* - at the same time you are working on content our team will be creating non-functioning comprehensive layouts showing possible design directions.

5. *Development* - with all the necessary architecture, content, and design elements in hand we'll create the first working version of your website.

6. *Launch* - getting your website "go live" ready will inevitably require several rounds of revisions and polish.  Once the website is ready, we'll go through the final launch checklist.

7. *Warranty* - your site is now live!  Over the next several weeks our team will be training you on how to manage the website and helping you solve any issues.

8. Marketing - on-going optimization of client's online presence including website and social media



9. Analysis & Feedback Loop - monthly review of analytics & recommendations implemented

**Communicating Effectively**
During your project communication will be non-stop with emails, phone calls, and online meetings. Here is how we make it happen.

- *Email* - support@emergingmediapartners.com is the only email you need to remember. Everyone here regularly checks this account and the person best suited to reply will always do so quickly.

- *Phone* - 1 (800) 836-7415 is our direct line of your project manager. Your calls are always welcome between 8am and 5pm PST, Monday through Friday.

- *Meetings* - we use Zoom for online meetings to review milestones and deliverables. Make sure you have the software installed before our first meeting.



# TECHNOLOGY & HOSTING PLATFORM

When you are paying monthly fees for web hosting, email marketing, CRM and a web developer to build it all, you're spending a lot of money. With EMP Hosting Pro you can spend much less, while getting much more. We offer an integrated system that runs all of your Online Business in one place while growing your database automatically.

**PACKAGE** Enterprise

**MANAGEMENT TOOLS** Client portal for full access to all hosting services & reporting

**STORAGE** 240 GB of high-speed SSD storage space for all your data improving website speed

**SECURITY** Real-time & on-demand anti-virus, malware & website security scanning, cleaning

**BANDWIDTH** 550 GB of gigabit redundant monthly hosting bandwidth

**BACKUPS** Daily offsite automated backups, secure 256K bit file encryption

**MONITORING** 24/7/365 Network Operations Center (NOC) monitoring

## INVESTMENT

**TERMS** EMP's Enterprise Hosting is offered on a month-to-month basis with no long term contract.

**RETAINER** Two hundred fifteen dollars ($215) is the ongoing monthly fee for the platform per site.

## HELPDESK & EDUCATION

We want you to get the most out of your website. For this to happen, you must be asking questions and continually learning. We offer an assortment of different training, education, support, & helpdesk products and agreements.

## [OPTIONAL] PHONE HELPDESK

**TERMS** We will provide one (1) user with unlimited helpdesk support. Helpdesk allows for direct email and phone support for our hosting platform. Helpdesk does not include design or development labor.

Helpdesk services are offered Monday through Friday from 8AM to 5PM Pacific Standard Time.

**RETAINER** One hundred dollars ($100) is the ongoing monthly fee for unlimited helpdesk support.



**MARKETING & BRANDING PROPOSAL**
Litigation Practice Group
November 2020

# PROJECT AGREEMENT

## VENDOR *(us, we, our)*

Emerging Media Partners
Newport Beach, Ca
Phone: 1(800) 836-7415
Fax: 1(800) 836-7415
Email: support@emergingmediapartners.com

## CUSTOMER *(you, your)*

Litigation Practice Group
ATTN: Tony Diab

## INVOICES

Payment is due upon receipt of invoice. Invoices will be sent digitally as a PDF and also provided to our clients through the EMP client portal. Access provided upon intake after first payment received. You may not withhold any amounts due and we reserve the right to cease work without prejudice if amounts are not paid when due.

## PAYMENT

Payment may be made via bank transfer/ACH or check. All payments are due upon completion of deliverables. If you delayed the execution or performance of a deliverable we reserve the right to make payments due upon the estimated due date. Marketing services are to be paid for quarterly while single time services will be billed at 50% deposits, 25% progress payments and 25% final balance to launch. Some of the larger services broken down here, with the rest broken down through the invoice.

| Deliverable | Amount ($) | Estimated Due Date |
|---|---|---|
| Agreement Signing (quarterly marketing social media, seo/search, alternative + 50% deposits on all one-time services) | $53,755 | DECEMBER 2, 2020 |
| Web, Logo Design - Draft | $4,150 | JANUARY 15, 2020 |
| App Design - Draft 25% | $3,125 | FEBRUARY 18, 2020 |
| App Design - Final 25% | $3,125 | MARCH 25, 2020 |
| Web Launch - Final 25% | $3,525 | FEBRUARY 15, 2020 |

## TERMS & CONDITIONS

This website proposal incorporates the website proposal terms and conditions provided online at https://emergingmediapartners.com/terms and form a binding part of this agreement. You acknowledge you read, understood and agree to the terms and conditions.

## ENTIRE AGREEMENT

This document together with any attachments, as well as any new, different or additional terms, conditions or policies which we may establish from time to time, and any agreement that we are currently bound by or will be bound by in the future, constitutes the complete and exclusive agreement between you and us concerning your engagement of us on this project, and supersede and govern all prior written and verbal communications.

## SIGNATURE

By signing this document you represent to us that you are a duly authorized representative of your

Main Document Page 60 of 67

EMERGING MEDIA PARTNERS

**MARKETING & BRANDING PROPOSAL**
Litigation Practice Group
November 2020

organization and upon its behalf agree to be legally bound by its terms and conditions. You hereby accept and authorize the commencement and payment for the project described above.

BY: Daniel S. March TITLE: Managing Shareholder

NAME: [signature] DATE: 12/4/2020

Exhibit 3, page 60

# EXHIBIT 4

In re: The Litigation Practice Group PC
Disbursement Details by Payee
4 Years Pre-Petition (03/20/2019 - 03/20/2023)

Emerging Media Partners

| Bank Name | Account Name | Account Number | Cardholder Name | Cardholder Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|---|---|
| Bank of America | Vulcan Consulting Group LLC dba DRD | [redacted]9551 | | | 1/31/2021 | 1/26/2021 | | 100.00 | TRANSFER VULCAN CONSULTING GR:Emerging Media Partn Conflm,ation# 2666267798 |
| Bank of America | Vulcan Consulting Group LLC dba DRD | [redacted]9551 | | | 1/31/2021 | 1/27/2021 | | 25,000.00 | TRANSFER VULCAN CONSULTING GR:Emerging Media Partn Confirmationlt 0577461578 |
| Bank of America | Vulcan Consulting Group LLC dba DRD | [redacted]9551 | | | 1/31/2021 | 1/29/2021 | | 28,755.00 | WIRETYPE:WIRE OUT DATEQ1O129 T1ME1547 ETTRN:2021012900624080 SERVICE REFO31 583 BNF:EMERGING MEDIA PARTNERS ID:1 659064081 BNF BKW ELLS FARGO BANK, NA ID:1 21000248 PMT DET32631 2520 COMPLETION OF PAYMENT FOR CONTRACT |
| Bank of America | Vulcan Consulting Group LLC dba DRD | [redacted]9551 | | | 2/28/2021 | 2/1/2021 | | 4,305.00 | TRANSFER VULCAN CONSULTING GR:Emerging Media Partn Conflrmation# 2622759879 |
| Bank of America | Vulcan Consulting Group LLC dba DRD | [redacted]9551 | | | 3/31/2021 | 3/25/2021 | | 18,630.00 | WIRE TYPE:WIRE OUT DATEQ1 0325 TIMEO513 ETTRN:2021032500152141 SERVICE REF003472 BNF:EMERGING MEDIA PARTNERSID:1 659064081 BNF BK:W ELLS FARGO BANK, NA ID:1 21 000248 PMT DET:332779444 INVOICE EMP 000763 |
| Bank of America | Vulcan Consulting Group LLC dba DRD | [redacted]9551 | | | 4/30/2021 | 4/23/2021 | | 4,266.90 | WIRE TYPE:WIRE OUT DATEQ1 0423 T1ME1330 ETTRN:2021042300359443 SERVICE REFO1 1189 BNF:EMERGING MEDIA PARTNERS ID:1 659064081 BNF BKW ELLS FARGO BANK, NA ID:1 21 000248 PMT DET336689586 BUSINESS CARD INVOICE |
| UnionBank | The Litigation Practice Group PC | [redacted]4858 | | | 8/31/2021 | 8/3/2021 | | 29,595.00 | WIRE TRANS TRN 0803029991 080321 UBOC UB099309N Sent To: WELLS FARGO BANK NA Beneficiary: 1/Emerging Media Partners |
| Chase | The Litigation Practice Group PC | [redacted]3158 | | | 9/30/2021 | 9/14/2021 | | 32,650.00 | 09/14 Online Domestic Wire Transfer Via: Wells Fargo NN121000248 NC: Emerging Media Partners Irvine CA 92614 US Ref: Invoice No. Emp-000781/Bnf/lnvoice No. Emp-000781 /Time/05:46 I mad: 091 4B1 Qgc04C000882 Tm: 3038671 257Es |
| Chase | The Litigation Practice Group PC | [redacted]3158 | | | 2/28/2022 | 2/9/2022 | | 31,613.51 | Fedwire Debit Via: Wells Fargo NN121000248 A/C: Emerging Media Partners Irvine, CA 92614 US Ref: Emp-000785 10/27/21/Time/i 6:23 Imad: 0209B1 QgcO4COi 9790 Tm: 5569800040Jo |
| Chase | The Litigation Practice Group PC | [redacted]3158 | | | 3/31/2022 | 3/11/2022 | 1162 | 10,500.00 | |
| American Express | LPG PC; Syed Gilani | 376742818851001 | Syed Gilani | [redacted]1001 | 3/18/2022 | 3/18/2022 | | 30,453.56 | EMERGINGMEDIAPARTNERS IRVINE CA +18008367415 |
| Chase | The Litigation Practice Group PC | [redacted]3158 | | | 4/30/2022 | 4/15/2022 | 1212 | 3,271.41 | |
| Chase | LPG; Alex Tarkoff | [redacted]0935 | WESLEY J THOMAS | [redacted]-7135 | 4/22/2022 | 4/22/2022 | | 30,453.56 | EMERGINGMEDIAPARTNERS HTTPSEMERGING CA P.O.S.: opsnt6ol SALES TAX: 0.00 |
| Chase | LPG; Alex Tarkoff | [redacted]0935 | WESLEY J THOMAS | [redacted]-7135 | 5/6/2022 | 5/6/2022 | | 31,152.00 | EMERGINGMEDIAPARTNERS HTTPSEMERGING CA P.O.S.: opsntdas9ki3p SALES TAX: 0.00 |
| Chase | LPG; Alex Tarkoff | [redacted]0935 | WESLEY J THOMAS | [redacted]-7135 | 5/20/2022 | 5/9/2022 | | 65,625.00 | EMERGINGMEDIAPARTNERS HTTPSEMERGING CA P.O.S.: opsnte6w4wsso SALES TAX: 0.00 |
| Chase | LPG; Alex Tarkoff | [redacted]0935 | WESLEY J THOMAS | [redacted]-7135 | 5/20/2022 | 5/10/2022 | | 2,027.82 | EMERGINGMEDIAPARTNERS 180-08367415 CA P.O.S.: opsntex6lsxeee SALES TAX: 0.00 |
| Chase | LPG VC; Alex Tarkoff | [redacted]6652 | LPG VC PAN | [redacted]0-4814 | 5/20/2022 | 5/13/2022 | | 51,029.55 | EMERGINGMEDIAPARTNERS 180-08367415 CA P.O.S.: opsnttsgt7wx8 SALES TAX: 0.00 |
| Chase | LPG; Alex Tarkoff | [redacted]0935 | MATTHEW BUCHNER | [redacted]0-7719 | 6/3/2022 | 5/25/2022 | | 44,509.41 | EMERGINGMEDIAPARTNERS HTTPSEMERGING CA P.O.S.: opsntkgnygbnr SALES TAX: 0.00 |
| Chase | LPG; Alex Tarkoff | [redacted]0935 | ALEX TARKOFF | [redacted]-7923 | 7/1/2022 | 6/22/2022 | | 12,135.75 | EMERGINGMEDIAPARTNERS HTTPSEMERGING CA P.O.S.: opsntv2osucrt SALES TAX: 0.00 |
| Chase | LPG VC; Alex Tarkoff | [redacted]6652 | LPG VC PAN | [redacted]-4814 | 7/29/2022 | 7/19/2022 | | 27,465.24 | EMERGINGMEDIAPARTNERS HTTPSEMERGING CA P.O.S.: opsnts9qoix SALES TAX: 0.00 |
| Chase | LPG; Alex Tarkoff | [redacted]0935 | FIRAS ABUNADA | [redacted]-1163 | 10/21/2022 | 10/14/2022 | | 2,422.50 | EMERGINGMEDIAPARTNERS HTTPSEMERGING CA P.O.S.: opsntblx7ysjs9 SALES TAX: 0.00 |
| | | | | | | | | **485,961.21** | |

# EXHIBIT 5

In re: The Litigation Practice Group PC
Summary of Disbursements
Post-Petition Activity (3/20/2023 - Present)

Emerging Media Partners

GROBSTEIN TEEPLE

| Bank Name | Account Type | Account Name | Account Number | Statement Date | Transaction Date | Transaction Type | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|---|---|
| Bank of America | Checking | Prime Logix LLC | [redacted]89201 | 5/31/2023 | 5/3/2023 | Check | 1462 | 31,273.00 | |
| | | | | | | | | **31,273.00** | |

# Adversary Proceeding Cover Sheet

B1040 (FORM 1040) (12/24)

## ADVERSARY PROCEEDING COVER SHEET
(Instructions on Reverse)

**ADVERSARY PROCEEDING NUMBER** (Court Use Only)

**PLAINTIFFS**
**Richard A. Marshack, Trustee of the LPG Liquidation Trust**

**DEFENDANTS**
**2030 Ventures Inc. d/b/a Emerging Media Partners; Joshua Michael Bois**

**ATTORNEYS** (Firm Name, Address, and Telephone No.)

Yosina M. Lissebeck (SBN 201654)
Christopher Celentino (SBN 131688)
Christopher Ghio (SBN 259094)
DINSMORE & SHOHL LLP
655 West Broadway, Ste 800
San Diego, CA 92101 Telephone (619) 400-0500
yosina.lissebeck@dinsmore.com
christopher.celentino@dinsmore.com
christopher.ghio@dinsmore.com

Matthew J. Stockl (SBN 329266)
DINSMORE & SHOHL LLP
550 South Hope Street, Ste 1765
Los Angeles, CA 90071 Telephone (213) 335-7737
matthew.stockl@dinsmore.com

**ATTORNEYS** (If Known)

**PARTY** (Check One Box Only) [plaintiff]
☐ Debtor ☐ U.S. Trustee/Bankruptcy Admin
☐ Creditor ☐ Other
☒ Trustee

**PARTY** (Check One Box Only) [defendant]
☐ Debtor ☐ U.S. Trustee/Bankruptcy Admin
☐ Creditor ☐ Other
☐ Trustee

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
**(1) Avoidance, Recovery, and Preservation of 2-Year Actual Fraudulent Transfers; (2) Avoidance, Recovery, and Preservation of 2-Year Constructive Fraudulent Transfers; (3) Avoidance, Recovery, and Preservation of 4-Year Actual Fraudulent Transfers; (4) Avoidance, Recovery, and Preservation of 4-Year Constructive Fraudulent Transfers; (5) Avoidance, Recovery and Preservation of Unauthorized Post-Petition Transfers; (6) Turnover; and (7) Aiding and Abetting**

### NATURE OF SUIT
(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(a) – Recovery of Money/Property**
☒ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☒ 13-Recovery of money/property - §548 fraudulent transfer
☒ 14-Recovery of money/property - other - §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.04(a), 3439.04(b), 3439.05, and 3439.07

**FRBP 7001(b) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(c) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(d) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(e) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(f) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(f) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(g) – Injunctive Relief**
☐ 71-Injunctive relief- imposition of stay
☐ 72-Injunctive relief - other

**FRBP 7001(h) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(i) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(j) Determination of Removed Action**
☐ 01-Determination of remove d claim or cause

**Other**
☐ SS-SIPA Case - 15 U.S.C. §§78aaa *et.seq.*
☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

☒ Check if this case involves a substantive issue of state law
☐ Check if this is asserted to be a class action under FRCP 23
☐ Check if a jury trial is demanded in complaint
Demand $520,000

Other Relief Sought
Avoidance, recovery, and preservation of unauthorized post-petition transfers; aiding and abetting

B1040 (FORM 1040) (12/24)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>The Litigation Practice Group P.C. | BANKRUPTCY CASE NO.<br>8:23-bk-10571-SC | |
| DISTRICT IN WHICH CASE IS PENDING<br>Central District of California | DIVISION OFFICE<br>Santa Ana | NAME OF JUDGE<br>Scott C. Clarkson |
| **RELATED ADVERSARY PROCEEDING (IF ANY)** | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br>/s/ Matthew J. Stockl | | |
| DATE<br>March 14, 2025 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Christopher Celentino<br>Yosina M. Lissebeck<br>Matthew J. Stockl | |

**INSTRUCTIONS**

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.