1  Christopher Celentino (131688)
2  Yosina M. Lissebeck (State Bar No. 201654)
   Christopher B. Ghio (State Bar No. 259094)
3  **DINSMORE & SHOHL LLP**
   655 West Broadway, Suite 800
   San Diego, CA 92101
4  Telephone: 619.400.0500
   Facsimile: 619.400.0501
5  christopher.celentino@dinsmore.com
   yosina.lissebeck@dinsmore.com
6  christopher.ghio@dinsmore.com

7  Tyler Powell (Ky. Bar No. 90520 – Admitted pro hac vice)
8  **DINSMORE & SHOHL, LLP**
   100 West Main Street, Suite 900
9  Lexington, KY 40507
   Telephone: 859-425-1056
10 Facsimile: 859-425-1099
   tyler.powell@dinsmore.com

11 Special Counsel to Richard A. Marshack,
12 Trustee of the LPG Liquidation Trust

13          **UNITED STATES BANKRUPTCY COURT**

14          **CENTRAL DISTRICT OF CALIFORNIA**

15               **SANTA ANA DIVISION**

16 In re:                                          | Chapter 11

17 The Litigation Practice Group P.C.,             | Case No. 8:23-bk-10571-SC
                                                    | Adv No. 8:25-ap-_____-SC
18          Debtor.

19 _____               | **COMPLAINT FOR:**

20 Richard A. Marshack, Trustee of the LPG         | **(1) AVOIDANCE, RECOVERY, AND
   Liquidation Trust,                              | PRESERVATION OF FRAUDULENT
21                                                  | TRANSFER(S) PURSUANT TO 11 U.S.C. §§
          Plaintiff,                               | 548(a)(1), 550, AND 551**
22
   v.                                              | **(2) AVOIDANCE, RECOVERY, AND
23                                                  | PRESERVATION OF FRAUDULENT
   GSS Equity, LLC dba Green Fund NY, a New        | TRANSFER(S) PURSUANT TO 11 U.S.C. §§
24 York domestic limited liability company;        | 548(a)(2), 550, AND 551**
   Berkovitch & Bouskila, PLLC, a New York
25 domestic professional service limited liability | **(3) AVOIDANCE, PRESERVATION, AND
   company; Ace Funding Source, LLC d/b/a Thor     | RECOVERY OF ACTUAL FRAUDULENT
26 Capital, a New York domestic limited liability  | TRANSFER(S) PURSUANT TO 11 U.S.C. §§
   company; and Bridge Funding Cap, LLC d/b/a      | 544, 550, 551; CAL. CIV. CODE §§
27 Fundura Capital, a New York domestic limited    | 3439.04(a)(1) AND 3439.07**
   liability company,
28                                                  | **(4) AVOIDANCE, PRESERVATION,
          Defendants.                              | AND RECOVERY OF CONSTRUCTIVE
                                                    | FRAUDULENT TRANSFER(S) PURSUANT**

1

**TO 11 U.S.C. §§ 544, 550, 551; CAL. CIV. CODE §§ 3439.04(a)(2), 3439.05, AND 3439.07**

Dept 5C
Honorable Scott C. Clarkson

For his *Complaint for (1) Avoidance, Preservation, and Recovery of Actual Fraudulent Transfers pursuant to 11 U.S.C. §§ 548(a)(1)(A), 550, and 551, (2) Avoidance, Preservation, and Recovery of Constructively Fraudulent Transfers pursuant to 11 U.S.C. §§ 548(a)(1)(B), 550, and 551, (3) Avoidance, Preservation, and Recovery of Actual Fraudulent Transfers pursuant to 11 U.S.C. §§ 544, 550, and 551 and Cal. Civ. Code §§ 3349.04(a)(1) and 3439.07 and (4) Avoidance, Preservation and Recovery of Constructively Fraudulent Transfers pursuant to 11 U.S.C. §§ 544, 550, and 551 and Cal. Civ. Code §§ 3349.05 and 3439.07,* Plaintiff Richard A. Marshack, the former Chapter 11 Trustee for the bankruptcy estate ("Estate") of debtor The Litigation Practice Group P.C. ("Debtor" or "LPG") and current Liquidating Trustee of the LPG Liquidation Trust (collectively, "Trustee" or "Plaintiff") in the above-captioned bankruptcy case (the "Bankruptcy Case"), alleges and avers as follows:

## STATEMENT OF JURISDICTION, NATURE OF PROCEEDING, AND VENUE

1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E), (H) and (O), 1334(b), and General Order No. 13-05 of the District Court for the Central District of California because this is a core proceeding arising in and/or related to the Bankruptcy Case, which is a case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), and which is pending in the United States Bankruptcy Court for the Central District of California, Santa Ana Division (the "Court").

2.      Regardless of whether this proceeding is core, non-core, or otherwise, the Plaintiff consents to the entry of a final order and judgment by the Bankruptcy Court.

3.      Defendants are hereby notified that Rule 7008 of the Federal Rules of Bankruptcy Procedure requires them to plead whether consent is given to the entry of a final order and judgment by the bankruptcy court.

4.      Venue of this adversary proceeding properly lies in this judicial district pursuant to 28

1   U.S.C. § 1409(a) because this proceeding is related to the Debtor's pending Bankruptcy Case.

2   **THE PARTIES**

3   5.      Plaintiff, Richard A. Marshack, was the duly-appointed, qualified Chapter 11 Trustee

4   of Debtor's Estate and is now the current liquidating trustee of the LPG Liquidation Trust.

5   6.      Debtor LPG is, and at all material times was, a professional corporation organized,

6   existing, and in good standing under the laws of the State of California, with its principal place of

7   business in Tustin, California.

8   7.      Defendant GSS Equity LLC dba Green Fund NY is, and at all material times

9   represented that it was, a New York – Domestic Limited Liability Company, ("Green Fund").

10   8.      Defendant Green Fund may be served by first class mail postage prepaid upon an

11   officer or managing partner of GSS Equity LLC, PO Box 110836, Brooklyn, NY 11211.

12   9.      Defendant Berkovitch & Bouskila, PLLC is, and at all material times represented that

13   it was, a New York – Domestic Professional Service Limited Liability Company, ("B&B").

14   10.      Defendant B&B may be served by first class mail postage prepaid upon its registered

15   agent:  VCorp Agent Services, Inc., 25 Robert Pitt Drive, Suite 204, Mosney NY 10952.

16   11.      Defendant Ace Funding Source, LLC dba Thor Capital is, and at all material times

17   represented that it was, a New York – Domestic Limited Liability Company, ("Ace").

18   12.      Defendant Ace may be served by first class mail postage prepaid upon its registered

19   agent Northwest Registered Agent, 418 Broadway Suite N, Albany, NY 12207.

20   13.      Defendant Bridge Funding Cap, LLC D/B/A/ Fundura Capital is, and at all material

21   times represented that it was, a New York – Domestic Limited Liability Company, ("Bridge").

22   14.      Defendant Bridge may be served by first class mail postage prepaid upon an officer or

23   managing partner of Bridge Funding Cap LLC, 538 13th Avenue, Suite 324; Brooklyn, New York

24   11219.

25   **GENERAL ALLEGATIONS**

26   **A.      The Bankruptcy Case**

27   15.      On March 20, 2023 ("Petition Date"), Debtor filed a voluntary petition for relief under

28   Chapter 11 of the Bankruptcy Code, commencing the Bankruptcy Case.

16.     The Office of the United States Trustee ("UST") filed its *Motion by United States Trustee to Dismiss or Convert Case Pursuant to 11 U.S.C. § 1112(b)* [Bankr. Docket No. 21] and creditors Debt Validation Fund II, LLC; MC DVI Fund 1, LLC; and MC DVI Fund 2, LLC filed the *Motion by DVF and MC DVI to Dismiss Chapter 11 Case Pursuant to 11 U.S.C. §§ 105, 305, 349, & 1112, or in the Alternative Convert This Case to Chapter 7 or Appoint a Trustee* [Bankr. Docket No. 44]. On May 4, 2023, the Court entered its *Order Directing United States Trustee to Appoint Chapter 11 Trustee* [Bankr. Docket No. 58].

17.     Pursuant to the *Acceptance of Appointment as Chapter 11 Trustee* [Bankr. Docket No. 63], on May 8, 2023, Trustee accepted his appointment as the Chapter 11 Trustee in the Bankruptcy Case. The Court approved the Trustee's appointment in its *Order Approving the U.S. Trustee's Application for the Appointment of a Chapter 11 Trustee* [Docket No. 65].

18.     Trustee was not appointed until after events of the case and, therefore, bases these allegations on information and belief. *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) ("The *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible."); *Miller v. City of Los Angeles*, 2014 U.S. Dist. LEXIS 198871, 2014 WL 12610195, at *5 (C.D. Cal. Aug. 7, 2014) (recognizing that the plaintiff's "information and belief" pleading was allowed and "necessary at times"); *see also Mireskandari v. Daily Mail and General Trust PLC*, 2013 U.S. Dist. LEXIS 194437, 2013 WL 12129642, at *4 (C.D. Cal. July 31, 2013) ("The Federal Rules of Civil Procedure allow parties to plead facts on 'information and belief' if the facts 'will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.'" (citations omitted)).

19.     Pursuant to the *Order Confirming Modified First Amended Joint Chapter 11 Plan of Liquidation* entered September 9, 2024, and the *Notice of Occurrence of Effective Date of Modified First Amended Joint Chapter 11 Plan of Liquidation* filed September 24, 2024, Richard A. Marshack became the Liquidating Trustee of the LPG Liquidation Trust, effective September 24, 2024. [Bankr. Docket Nos. 1646 & 1762].

20.     All claims have been transferred to the Liquidating Trust pursuant to the confirmed plan and Plaintiff brings this action solely in his capacity as the Liquidating Trustee of the LPG Liquidation Trust, for the benefit of Debtor's Estate and its creditors.

**B.      Protective Order**

21.     On or about May 2, 2024, Plaintiff filed that certain Notice and Motion for Entry of Protective Order (the "Protective Order").

22.     On June 3, 2024, the Court entered its *Order Granting Motion for Entry of Protective Order and the Protective Order* [Bankr. Docket No. 1270] (the "Protective Order"). A true and accurate copy of the Protective Order is attached as **Exhibit 1**, and incorporated herein.

23.     By its own terms, the Protective Order applies to this adversary proceeding and governs all discovery conducted herein.

**C.      LPG's Ownership and Management**

24.     Prior to the Petition Date, LPG operated a law firm for consumers across the country who sought assistance in contesting or resolving debts they would identify. At all relevant times, LPG was controlled and operated by the individual named Tony Diab ("Diab").

25.     The consumers would pay LPG over a period of time via monthly debits from their bank accounts.

26.     The monthly payments were meant to cover all legal services LPG provided to the consumers including validation of the debts, review of documents to determine enforceability, and court appearances to halt lawsuits to obtain judgments.

27.     In certain instances, LPG would file a lawsuit in an effort to eliminate a disputed debt or to prosecute affirmative claims held by the consumers.

28.     LPG mismanaged the consumers' monthly payments.

29.     Diab and other defendants devised a plan to fraudulently transfer funds, client files, client funds and assets in the form of ACH Receivables (the "ACH Receivables" or "Accounts Receivable") out of LPG to third parties prior to the filing of bankruptcy.

30.     To obtain consumer clients, LPG contracted with marketing companies, who engaged in illegal capping and would advertise or call to solicit consumers to become clients of LPG in

exchange for a percentage of the ACH Receivables collected by LPG from the consumers. The marketing affiliate went so far as to assist with the execution of an engagement letter between the consumer and LPG.

31.    In exchange, LPG agreed to pay the marketing affiliates a percentage the monthly payments collected by LPG from the consumers.

32.    Because LPG received payments from consumers over time, it often sought financing by borrowing against its future cash flows. This borrowing was not only used to finance operations at LPG, but also to pay the fees owed to the marketing companies for providing the client referrals.

33.    Many of the documents executed in connection with such financing described the transactions as accounts receivable purchase agreements.

34.    Diab used entities he controlled including, without limitation, Vulcan Consulting, LLC ("Vulcan") and B.A.T., Inc. dba Coast Processing ("Coast") to process payments from LPG consumer clients and to divert LPG consumer funds and ACH Receivables. Diab would use numerous ACH processing companies in order to easily transfer millions of dollars from Debtor to these entities he controlled, without oversight or detection, and to avoid payment disputes and complications. The money that flowed from Debtor through these bank account to Defendants consisted of Client Funds that Debtor funneled to these entities by means of the ACH processing companies. Debtor also made deposits into these entities bank account such that they received Client Funds directly from Debtor in addition to direct Accounts Receivables.

**D.    Ponzi Scheme Presumption**

35.    The Ponzi Scheme Presumption exists in bankruptcy proceedings.

36.    The Ponzi Scheme Presumption can be utilized to establish a debtor's "intent to defraud future undertakers [investors] from the mere fact that a debtor was running a Ponzi scheme. Indeed, no other reasonable inference is possible. A Ponzi scheme cannot work forever. The investor pool is a limited resource and will eventually run dry. The perpetrator must know that the scheme will eventually collapse as a result of the inability to attract new investors. The perpetrator nevertheless makes payments to present investors, which, by definition, are meant to attract new investors. He must know all along, from the very nature of his activities, that investors at the end of the line will lose their

money. Knowledge to a substantial certainty constitutes intent in the eyes of the law," *cf. Restatement (Second) of Torts § 8A* (1963 & 1964), and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them. *Kirkland v. Rund (In re EPD Inv. Co., LLC)*, 114 F.4th 1148, 1153 (9th Cir. 2024) (by definition Ponzi scheme is destined to fail and the swindler and their entities often end in bankruptcy or equitable receivership); *Cf. Coleman Am. Moving Servs., Inc. v. First Nat'l Bank & Trust Co. (In re American Properties, Inc.)* 14 B.R. 637, 643 (Bankr. D. Kan. 1981) (intentionally carrying out a transaction with full knowledge that its effect will be detrimental to creditors is sufficient for actual intent to hinder, delay or defraud within the meaning of § 548(a)(1))." *Merrill v. Abbott (In re Independent Clearing House Co.)* (D. Utah 1987) 77 B.R. 843, 860. A trustee in bankruptcy is not required to show that an operator of a Ponzi scheme was subjectively aware his Ponzi scheme was destined to fail. *In re EPD Inv. Co., LLC*, 114 F.4th at 1153 ("[a] trustee's action to recover assets fraudulently conveyed in the course of a Ponzi scheme does not require that the trustee also prove the Ponzi-scheme operator was subjectively aware his Ponzi scheme was destined to fail.").

37.    "But if all the debtor receives in return for a transfer is the use of the defendant's money to run a Ponzi scheme, there is nothing in the bankruptcy estate for creditors to share. In fact, by helping the debtor perpetuate his scheme, the transfers exacerbate the harm to creditors by increasing the amount of claims while diminishing the debtor's estate. In such a situation, the use of the defendant's money cannot objectively be called 'reasonably equivalent value.'" *In re Independent Clearing House Co.* 77 B.R. at 859. Therefore, "[t]he trustee can avoid the transfers if they were preferential or fraudulent. Transfers to investors in a Ponzi scheme are preferential and fraudulent. Therefore, they constitute "property of the estate," and the trustee can recover them. *Id.* at 853 n.17 (citations omitted).

38.    Debtor was operating a Ponzi scheme that utilized affiliates and several other entities as investors to continue its unlawful business practices by using funds provided by current investors to attract new investors hoping for very high returns. Therefore, the Debtor was running a Ponzi scheme and the Ponzi Scheme Presumption can be utilized to infer that the Debtor had the intent to defraud investors within the meaning of 11 U.S.C. section 548(a)(1). This is evidenced by the Court

1  in this Bankruptcy Case declaring that Debtor was operating a Ponzi scheme when it stated the

2  following:

> It is important to note that this Court has never received any significant and trustworthy evidence that Debtor accomplished meaningful results for its clients, but only anecdotal examples of viable success for its clients. By reviewing the Estate's claims register, there is evidence of consumer claims for the fraud and demanded but undelivered refunds of approximately $500 million. There is ample evidence that the pre-petition Debtor never placed the collected funds into an attorney-client trust account, and that Debtor or its principals simply looted the payments received through the client automatic withdrawals, stiffing both the clients and outside attorneys who may have been working on client cases with the hopes of being paid. There is also evidence before the Court that Debtor was running a Ponzi scheme and paying some outside (or "network") attorneys with funds obtained from new clients. In this case, it appears that some of the "lenders" may have been serving as "investors," hoping for very high returns before "the music stopped." The Ninth Circuit has recently explained, "[b]y definition, a Ponzi scheme is destined to fail because the pool of available investors is not limitless. When the Ponzi scheme operator's pool of investors inevitably runs dry, the scheme collapses and the swindler and their entities often end up in bankruptcy or equitable receivership. *See generally* David R. Hague, Expanding the Ponzi Scheme Presumption, 64 DePaul L. Rev. 867 (2015). In bankruptcy, the court-appointed trustee is tasked with taking immediate control of the entity, ceasing ongoing fraudulent activity, locating and collecting assets for the bankruptcy or receivership estate, and achieving a final, equitable distribution of the remaining assets. *See* 11 U.S.C. § 704; *Kirkland v. Rund (In re EPD Inv. Co., LLC)*, 2024 U.S. App. LEXIS 21363, at *15 (9th Cir. Aug. 23, 2024). Finally, there is evidence that Debtor was encumbering (or as some creditors assert, "double or triple selling") their accounts or receivables to multiple lenders. With respect to Greyson's requested Administrative Claim [Dk. 676], and as more fully described in the concurrently entered order denying the claim, there has been no evidence presented that any work allegedly performed by Greyson assisted any clients or added any value to the Estate.

*See, Case 8:23-bk-10571-SC*, Doc 1545 n. 5.

39.     Moreover, since the Debtor executed agreements with Green Fund, Ace, and Bridge and subsequently made the payments to Green Fund, Ace, Bridge, and B&B pursuant to those agreements, the Green Fund Agreement, Ace Agreement, and the July 14th Agreement were made with the intent to further the Ponzi scheme, the Debtor did not receive an objectively reasonable equivalent

1  value in exchange for its execution of the Green Fund Agreement, Ace Agreement, and the July 14th

2  Agreement as defined herein. This lack of reasonably equivalent value permits the Trustee to avoid

3  the Green Fund Agreement, Ace Funding, and the July 14th Agreement and all payments made

4  pursuant thereto because they were actually or constructively fraudulent.

5     40.    The Ponzi Scheme Presumption establishes a debtor's "intent to defraud future

6  undertakers [investors] from the mere fact that a debtor was running a Ponzi scheme." *Merrill v. Abbott*

7  (*In re Independent Clearing House Co*.), 77 B.R. 843, 860 (D. Utah 1987). "Knowledge to a

8  substantial certainty constitutes intent in the eyes of the law, *cf. Restatement (Second) of Torts* § 8A

9  (1963 & 1964), and a debtor's knowledge that future investors will not be paid is sufficient to establish

10 his actual intent to defraud them." *Id*. A trustee in bankruptcy is not required to show that an operator

11 of a Ponzi scheme was subjectively aware his Ponzi scheme was destined to fail. *In re EPD Inv. Co.,*

12 *LLC*, 114 F.4th at 1153 (9th Cir. 2024).

13    41.    "[I]f all the debtor receives in return for a transfer is the use of the defendant's money

14 to run a Ponzi scheme, there is nothing in the bankruptcy estate for creditors to share." *In re*

15 *Independent Clearing House Co.* 77 B.R. at 859. In such a situation, the use of the defendant's money

16 cannot objectively be called "reasonably equivalent value." *Id*. Therefore, "[t]he trustee can avoid the

17 transfers if they were preferential or fraudulent. Transfers to investors in a Ponzi scheme are

18 preferential and fraudulent. Therefore, they constitute 'property of the estate,' and the trustee can

19 recover them." *Id*. at 853 n.17 (citations omitted).

20    42.    Based on the Ponzi Scheme presumption the Court can infer that the Debtor had the

21 intent to defraud investors within the meaning of 11 U.S.C. § 548(a)(1). Since the transfers to the

22 Defendants were made with the intent to further the Ponzi scheme, the Debtor did not receive an

23 objectively reasonable equivalent value for such transfers, and the Trustee can avoid any such transfers

24 because they were actually fraudulent as to the Debtor's creditors..

25 **E.    Prepetition Litigation and Creditors**

26    43.    Debtor's Schedule E/F, filed on April 4, 2023, as Dk. No. 33, lists: (a) 11 unsecured

27 creditors with priority unsecured claims totaling $374,060.04; and (b) 58 nonpriority unsecured

28 creditors with scheduled claims totaling $141,439,158.05.

44.     The claims register in this Bankruptcy Case includes 2,554 proofs of claim, totaling in excess of $424 million of claims asserted against the Estate.

45.     At least 14 UCC-1 statements were of record securing alleged debts of the Debtor as of the Petition Date. These statements either reflected secured liens against the Debtor's assets then owned or thereafter acquired or provided evidence of the assignment or sale of substantial portions of the Debtor's future income. They secured the repayment of the following claimed amounts that are currently known to Trustee and are allegedly owed by the Debtor: (a) $2,374,004.82 owed to Fundura Capital Group as evidenced by Proof of Claim No. 335 purportedly secured by a UCC statement filed on or about May 19, 2021; (b) approximately $15 million dollars owed to MNS Funding, LLC as evidenced by Proof of Claim No. 1060 purportedly secured by a UCC statement filed on or about May 28, 2021; (c) approximately $5,000,000 owed to Azzure Capital, LLC as evidenced by Proof of Claim No. 127 purportedly secured by a UCC statement filed on or about May 28, 2021; and (d) approximately $1.5 million dollars owed to Diverse Capital, LLC purportedly secured by UCC statements filed on or about September 15, 2021, and December 1, 2021.

46.     Debtor's balance sheets for the 36 months ending December 31, 2021, show approximately $17,900,000 in total assets at its highest point in November 2021. This amount is significantly less than the $424 million of claims filed.

47.     Debtor's Statement of Financial Affairs, filed on April 4, 2023, as Dk. No. 34, reflects 15 pending lawsuits against Debtor as of the Petition Date. The lawsuits date back to October 18, 2021 (*Fundura v. The Litigation Practice Group P.C. et al.*, Supreme Court of New York Index No. 613192-2021) and are as recent as March 10, 2023 (*Diverse Capital LLC v. The Litigation Practice Group P.C. et al.*, Supreme Court of New York Index No. 135614-2023).

F.    **Debtor's Insolvency**

48.     Debtor was insolvent when the Transfers occurred as evidenced by: (a) the 14 UCC-1 statements reflecting secured liens against the Debtor's owned and after-acquired assets and the assignment or sale of substantial portions of the Debtor's future income; (b) the priority and non-priority unsecured debt of nearly $142 million listed in Debtor's schedules; (c) the $424 million of creditor claims filed in this Bankruptcy Case; and (d) Debtor's balance sheets reflecting, at its highest

1  point, $17.9 million of assets in November 2021.

2       49.    Moreover, insolvency is presumed as a matter of law where, as in this Bankruptcy

3  Case, the debtor operated a Ponzi scheme. *See, e.g., Glob. Money Mgmt., L.P. v. McDonnold*, No.

4  06CV34, 2008 U.S. Dist. LEXIS 128733, at *15 (S.D. Cal. Feb. 27, 2008) (concluding that "if a Ponzi

5  scheme is proven, then the debtor is proven insolvent from the time of its inception").

6                         **SPECIFIC ALLEGATIONS**

7  **A.    Transaction With Green Fund**

8       50.    On or about June 17, 2021, the Green Fund allegedly purchased $399,999.98 in future

9  receivables from the Debtor, Vulcan, and Coast for a gross purchase price of $200,000.00 pursuant to

10 a document labeled "Revenue Purchase Agreement" ("Green Fund Agreement"). A true and accurate

11 copy of the Green Fund Agreement is attached hereto as **Exhibit 2** and incorporated by reference

12 herein.

13      51.    On or about June 17, 2021, Green Fund wired $160,000 to the Debtor's bank account at

14 Bank of America ending in 9551. The difference between the $200,000 purchase price and the amount

15 actually deposited is not explained in the Green Fund Agreement.

16      52.    Following execution of the Green Fund Agreement, the Debtor made multiple

17 payments to Green Fund. Those payments from Debtor to Green Fund known to the Trustee are

18 identified on **Exhibit 3** ("Green Fund Payments") attached hereto and incorporated by reference

19 herein.

20      53.    Despite its receipt of these payments, Green Fund declared the Debtor, Coast, and

21 Vulcan to be in default under the Green Fund Agreement in late June 2021.

22      54.    B&B, as counsel for Green Fund, contacted one or more entities that processed

23 payments for the Debtor and told them to freeze the Debtor's accounts pursuant to its clients asserted

24 rights in the Green Fund Agreement.

25      55.    Green Fund and the Debtor, Vulcan, and Coast agreed to settle all matters related to

26 the Green Fund Agreement in a Stipulation and Settlement Agreement dated July 2, 2021 ("Settlement

27 Agreement"). A true and accurate copy of the Settlement Agreement is attached hereto as **Exhibit 4**

28 and incorporated herein by reference.

56.     Pursuant to the Settlement Agreement the Debtor agreed to pay $468,259.67 to B&B.

57.     Because the demand from Green Fund had frozen the Debtor's funds at its payment processor, the parties agreed that EPPS, one of the Debtor's payment processors, would pay the amount owed pursuant to the Settlement Agreement.

58.     Another payment of $5,000.00 in process when the Settlement Agreement was signed was applied to the balance owed thereunder.

59.     On or about July 6, 2021, EPPS wired the sum of $232,000 to B&B.

60.     On or about July 13, EPPS wired another $232,000 to B&B (together with the July 6th wire the "Green Fund Wires").

**B.     Transaction With Ace**

61.     On or about March 17, 2021, Ace allegedly purchased $749,500.00 in future receivables from the Debtor for a gross purchase price of $500,000.00 pursuant to a document labeled "Revenue Purchase Agreement" ("Ace Agreement"). A true and accurate copy of the Ace Agreement is attached hereto as **Exhibit 5** and incorporated by reference herein.

62.     On or about March 24, 2021, Ace wired $450,000 to the Debtor's bank account at Bank of the West ending in 3441. A 10% fee was withheld from the $500,000 purchase price as an origination fee according to the Ace Agreement.

63.     Following execution of the Ace Agreement, the Debtor made multiple payments to Ace. Those payments from Debtor to Ace known to the Trustee are identified on **Exhibit 6** ("Ace Payments") attached hereto and incorporated by reference herein.

64.     Despite its receipt of these payments, Ace declared the Debtor to be in default under the Ace Agreement in late June 2021.

65.     B&B, as counsel for Ace, contacted one or more entities that processed payments for the Debtor and told them to freeze the Debtor's accounts pursuant to its clients asserted rights in the Ace Agreement.

66.     Ace and the Debtor agreed to settle all matters related to the Ace Agreement upon a payment of $369,035.00 to B&B. Pursuant to the agreement of the parties, EPPS, the Debtor's payment processor, was to wire this amount to B&B on or about June 28, 2021.

67.    On or about June 28, 2021, B&B received a wire of $369,035.00 to resolve litigation between Ace and the Debtor ("Ace Wire").

## C.    **Transaction With Bridge**

68.    The Debtor's execution of a July 22, 2021 Merchant Cash Advance Agreement with Bridge is the subject of several causes of action in Adversary Proceeding No. 8:24-ap-01011. This Agreement is identified in that adversary as the July 22nd Agreement and this will be continued herein.

69.    As noted above, this adversary does not implicate the July 22nd Agreement. Instead this adversary asserts claims related to the Debtor's and related parties execution of and payments towards that Merchant Cash Advance Agreement between the Debtor and Bridge dba Fundura executed on or about July 14, 2021 ("July 14th Agreement").

70.    A true and accurate copy of the July 14th Agreement is attached hereto as **Exhibit 7** and incorporated by reference herein.

71.    Pursuant to the July 14th Agreement, Bridge dba Fundura allegedly purchased $999,990.00 in future receivables from the Debtor for a gross purchase price of $500,000.00.

72.    On or about July 15, 2021, Bridge dba Fundura wired $390,000.00 to the Debtor and/or its co-borrowers. The difference between the $500,000 purchase price and the $390,000 actually deposited was due to Bridge withholding a $60,000 underwriting fee and a $50,000 origination fee.

73.    Following execution of the July 14th Agreement, the Debtor made multiple payments to Bridge pursuant to that agreement. Those payments from Debtor to Bridge known to the Trustee are identified on **Exhibit 8** ("Bridge Payments") attached hereto and incorporated by reference herein.

74.    Despite its receipt of these payments, Bridge dba Fundura declared the Debtor to be in default under the July 14th Agreement on or about July 20, 2021.

75.    Following the default, Bridge contacted one or more entities that processed payments for the Debtor and told them to freeze the Debtor's accounts.

76.    To eliminate the default and unfreeze the Debtor's accounts at its payment processor, Bridge dba Fundura proposed that the Debtor refinance the balance owed to it under the July 14th agreement via a new agreement. This new Merchant Cash Advance Agreement was executed on or about July 22, 2021 and stated that Bridge dba Fundura was purchasing $1,986,000.00 in future

1  receivables for a gross purchase price of $1,200,000.00 ("July 22nd Agreement"). A true and accurate

2  copy of the July 22nd Agreement is attached as **Exhibit 9.**

3        77.     The Debtor received no additional funds from its execution of the July 22nd Agreement.

4  but according to the Disbursement Authorization to the July 22nd Agreement, $1,124,987 of the funds

5  disbursed thereunder was paid to B&B to satisfy all amounts owed under the July 14th Agreement.

6        78.     Despite the Bridge Payments and despite the original repayment amount of the July

7  14th Agreement only being $999,000, the Debtor had to agree to pay Bridge more than one million

8  and one hundred thousand dollars to satisfy the amount it claimed to be owed under the July 14th

9  Agreement.

10        79.     Despite the apparent satisfaction of all amounts owed pursuant to the July 14th

11  Agreement through the execution of the July 22nd Agreement, Bridge and its counsel would not release

12  the freeze it had placed on the Debtor's accounts until the Debtor paid another $155,987.00.

13        80.     On July 23, 2021, the Debtor sent a wire of $155,987.00 to B&B ("B&B Payment")

14  from the bank account of Vulcan Consulting Group, LLC at Chase ending in Account Number 3588.

15        81.     The Trustee does not know how B&B disbursed the Green Fund Wires, Ace Wire, and

16  B&B Payment following receipt.

17        82.     B&B was the initial transferee of the Green Fund Wires, Ace Wire, and B&B Payment.

18        83.     Hereinafter, the Green Fund Agreement; Ace Agreement; July 14th Agreement; Green

19  Fund Payments; Ace Payments; Wires; Ace Wire; Bridge Payments, and B&B Payment are referred

20  to collectively as the "Transfers".

21  **FIRST CLAIM FOR RELIEF**

22  **Avoidance, Preservation, and Recovery of Actual Fraudulent Transfers**

23  **11 U.S.C. §§ 548(a)(1)(A), 550 & 551**

24        84.     Plaintiff incorporates by reference Paragraphs 1 through 83 and realleges these

25  paragraphs as though set forth in full.

26        85.     The Transfers were obligations of or property of the Debtor's Estate prior to their

27  conveyance to one of the Defendants.

28        86.     The Transfers occurred within the two years prior to the Petition Date.

87.     On or after the date that the Green Fund Agreement and July 14th Agreement were executed and on the date(s) that the payments were made to Green Fund, Bridge, and B&B the Debtor was or became indebted include the Prepetition Creditors.

88.     The Transfers occurred when the Debtor was insolvent or was rendered insolvent as a result of the Transfers.

89.     The Transfers to Defendants were made with actual intent to hinder, delay or defraud the creditors of Debtor because the Debtor was operating a Ponzi scheme which permits the Court to infer that the Debtor's intent was fraudulent within the meaning of 11 U.S.C. section 548(a)(1).

90.     The Transfers are avoidable as fraudulent pursuant to 11 U.S.C. §§ 548(a)(1)(A), 550, and 551 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against Debtor's Estate under 11 U.S.C. § 502, or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

91.     The Transfers should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(A), and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

## SECOND CLAIM FOR RELIEF

### Avoidance, Preservation, and Recovery of Constructively Fraudulent Transfers

### 11 U.S.C. §§ 548(a)(1)(B), 550 & 551

92.     Plaintiff hereby incorporates by reference Paragraphs 1 through 91 and realleges these paragraphs as though set forth in full herein.

93.     The Transfers were made within two years before the Petition Date.

94.     Debtor did not receive reasonably value in exchange for the Transfers.

95.     The Transfers were made at a time when Debtor was insolvent and/or rendered insolvent by virtue of said transfers.

96.     When the Transfers occurred, Debtor's business was undercapitalized and Debtor was engaged in business for which its capital was unreasonably small.

97.     When the Transfers occurred, Debtor had incurred or was about to incur debts that were beyond its ability to pay. The allegations in the preceding paragraphs are supported by the fact that the

1    Debtor was having to borrow money regularly from entities like the Defendants to provide liquidity

2    and was frequently required to borrow additional sums from other merchant cash advance lenders to

3    service prior borrowing. The Trustee has filed suit against numerous other merchant cash advance

4    lenders herein.

5         98.    At the time each Transfer was made, Debtor was indebted to one or more creditors that

6    held a claim against Debtor on the date of each Transfer and on the Petition Date.

7         99.    Plaintiff alleges that Defendants did not receive the Transfers in good faith, for value,

8    and without knowledge of their avoidability.

9         100.   Each Defendant knew that the Debtor was a law firm who was required by law to

10   escrow client payments until earned. However, each Defendant demanded and received payment from

11   client payments that had not been earned because they were paid by the Debtor, Vulcan, and/or Coast

12   or were paid directly from a payment processor for the Debtor such that the funds were never conveyed

13   to the Debtor and placed in escrow.

14        101.   Each Defendant had to know or should have known that they were being paid with

15   client funds that had not been placed into trust and been disbursed before they were earned.

16        102.   Based on the foregoing, Plaintiff may recover and preserve the avoided Transfers from

17   Defendants as the initial transferee or, alternatively, as the subsequent transferee for the benefit of the

18   Estate under 11 U.S.C. §§ 550 and 551 from Defendants.

19                        **THIRD CLAIM FOR RELIEF**

20   **Avoidance, Recovery, and Preservation of Four-Year Actual Fraudulent Transfers**

21    **[11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.04(a)(1) and 3439.07]**

22        103.   Plaintiff realleges and incorporates herein by reference each and every allegation

23   contained in paragraphs 1 through 102 as though set forth in full.

24        104.   Under 11 U.S.C. § 544(b)(1), Plaintiff may avoid transfers of an interest of Debtor

25   which are voidable under applicable law by an unsecured creditor of Debtor, including under

26   California Civil Code §§ 3439.04(a)(1) and 3439.05.

27        105.   The Transfers occurred within four years prior to the Petition Date.

28        106.   On or after the date that such Transfer were made, entities to which Debtor was or

                                    16

became indebted include the Prepetition Creditors.

107.    Despite Debtor's obligation to the Prepetition Creditors, Debtor made the Transfers to Defendants.

108.    The Transfers to Defendants were made with actual intent to hinder, delay or defraud the creditors of Debtor as the Debtor was operating a Ponzi scheme.

109.    Defendants' conduct relating to the Transfers was done with oppression, fraud and malice, as defined in California Civil Code section 3294, entitling Plaintiff to exemplary and punitive damages.

110.    The Transfers are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and Cal. Civ. Code §§ 3439.04(a)(1) and 3439.07 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against its Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

111.    Accordingly, the Transfers should be avoided as fraudulent under 11 U.S.C. §§ 544(b) and Cal. Civ. Code §§ 3439.04(a)(1) and 3439.07, and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551 and Cal. Civ. Code § 3439.07.

## FOURTH CLAIM FOR RELIEF

### Avoidance, Preservation, and Recovery of Constructive Fraudulent Transfers

### 11 U.S.C. §§ 544, 550, 551; Cal. Civ. Code §§ 3439.04(a)(2), 3439.05 and 3439.07

112.    Plaintiff hereby incorporates by reference Paragraphs 1 through 111 and realleges these paragraphs as though set forth in full herein.

113.    Under 11 U.S.C. § 544(b)(1), Plaintiff may avoid transfers of an interest of Debtor which are voidable under applicable law by an unsecured creditor of Debtor, including under California Civil Code §§ 3439.04(a)(2) and 3439.05.

114.    Debtor did not receive reasonably equivalent value in exchange for the Transfers.

115.    The Transfers were made at a time when Debtor was insolvent and/or rendered insolvent by virtue of said transfers.

116.    At the time each Transfer was made, Debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of Debtor were unreasonably small in relation to the business or transaction.

117.    At the time each Transfer was made, Debtor intended to incur, or believed or reasonably should have believed that Debtor would incur, debts beyond Debtor's ability to pay as they became due.

118.    At the time each Transfer was made, Debtor was indebted to one or more creditors that held a claim against Debtor on the date of each Transfer and on the Petition Date.

119.    The Transfers were made at a time when Debtor was insolvent and/or rendered insolvent by virtue of said transfers.

120.    Plaintiff alleges that Defendants did not receive the Transfers in good faith, for value, and without knowledge of their avoidability.

121.    Each Defendant knew that the Debtor was a law firm who was required by law to escrow client payments until earned. However, each Defendant demanded and received payment from client payments that had not been earned because they were paid by the Debtor, Vulcan, and/or Coast or were paid directly from a payment processor for the Debtor such that the funds were never placed in trust.

122.    Each Defendant had to know or should have known that they were being paid with client funds that had not been placed into trust and been disbursed before they were earned.

123.    Based on the foregoing, Plaintiff may avoid the Transfers pursuant to 11 U.S.C. § 544 and California Civil Code §§ 3439.04(a)(2) and 3439.05.

124.    Based on the foregoing, Plaintiff may recover and preserve the Transfers from the Defendants as the initial transferee or, alternatively, as the subsequent transferee for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551, and Cal. Civ. Code § 3439.07.

WHEREFORE, Plaintiffs prays for a judgment as follows:

**On the First, Second, Third, and Fourth Claims for Relief:**

1.    Avoiding the Debtor's obligations under the Green Fund Agreement, Ace Agreement, and July 14th Agreement and avoiding recovering, and preserving the Transfers made to the

1    Defendants in such amounts as the Court may determine their respective liabilities to the Trustee;

2          2.        Awarding pre-judgment and post-judgment as permitted;

3          3.        Granting any other and such further relief as the Court deems just and proper.

4    DATED: March 12, 2025                    DINSMORE AND SHOHL LLP

5
                                             By: */s/ Tyler Powell*
6                                               Yosina M. Lissebeck
                                                Tyler Powell (*admitted pro hac vice*)
7                                            Special Counsel to Richard A. Marshack, Trustee
                                             of the LPG Liquidation Trust
8

# EXHIBIT 1

Exhibit 1
Page 20

1  CHRISTOPHER B. GHIO (259094)
christopher.ghio@dinsmore.com
2  CHRISTOPHER CELENTINO (131688)
christopher.celentino@dinsmore.com
3  YOSINA M. LISSEBECK (201654)
yosina.lissebeck@dinsmore.com
4  DINSMORE & SHOHL LLP
655 West Broadway, Suite 800
5  San Diego, California 92101
Tele:  619.400.0500
6  Fax:  619.400.0501
7
8  Sarah S. Mattingly (Ky. Bar 94257)
sarah.mattingly@dinsmore.com
9  DINSMORE & SHOHL, LLP
101 S. Fifth Street, Suite 2500
10  Louisville, Kentucky 40202
Tele: 859-425-1096
11  Fax: 502-585-2207
12  (Admitted pro hac vice)
13  Special Counsel to Richard A. Marshack

**FILED & ENTERED**

**JUN 03 2024**

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY mccall    DEPUTY CLERK

14                **UNITED STATES BANKRUPTCY COURT**

15        **CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION**

16  In Re                                  Case No: 23-bk-10571-SC

17                                         Chapter 11

18                                         **ORDER GRANTING MOTION FOR**
    The Litigation Practice Group P.C.,   **ENTRY OF PROTECTIVE ORDER AND**
19                                         **THE PROTECTIVE ORDER**
              Debtor(s),
20

21                                         Date:   May 23, 2024
22                                         Time:   1:30 p.m.
                                           Judge:  Hon. Scott C. Clarkson
23                                         Place:  Courtroom 5C (via Zoom)[1]
                                                   411 West Fourth Street
24                                                 Santa Ana, CA 92701
25

26

27  ───────────────

28  [1] Video and audio connection information for each hearing will be provided on Judge Clarkson's
    publicly posted hearing calendar, which may be viewed online at:
    http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

Exhibit 1
Page 21

The Court has read and considered the Notice of Motion and Motion for Entry of Protective Order (the "Motion") filed by Richard A. Marshack, in his capacity as the Chapter 11 Trustee (the "Trustee") of the Bankruptcy Estate ("Estate") of The Litigation Practice Group P.C., on May 2, 2024, pursuant to Federal Rule of Bankruptcy Procedure 7026 and Federal Rule of Civil Procedure 26(c)(1), as Dk. No. 1164 ("Motion"), and has found good cause to grant the Motion.

IT IS HEREBY ORDERED that:

1.      The Motion is granted;

2.      The below Protective Order shall apply to any contested matter arising in the main bankruptcy case and in all adversary proceedings filed by or against Trustee, present and future; and

3.      Govern the discovery conducted therein.

## PROTECTIVE ORDER

**1.      DEFINITIONS**

1.1     "Confidential Information" as used in this Protective Order shall mean documents and other information (regardless of how generated, stored or maintained) that a Party or non-party reasonably believes to contain or reflect non-public financial or business information, bank records, financial records, such as social security numbers, non-public financial or personal information of a Party or non-party, account numbers, sensitive digital information and identifiers, information subject to confidentiality agreements or provisions other than this Protective Order, and other non-public research, development, or commercial information that derives value or avoids injury by virtue of not being known to the public.

1.2     This "Action" is defined and hereby means any contested matter arising in the main bankruptcy case and in all adversary proceedings filed by or against Trustee, present and future.

1.3     "Designating Party" means a Party or non-party that designates Confidential Information during the Action.

1.4     "Receiving Party" means a Party that receives Confidential Information during the Action.

Exhibit 1
Page 22

1.5    "Party" or "Parties" means person or entity subject to this Protective Order.

**2.    SCOPE OF THIS PROTECTIVE ORDER**

2.1    Unless otherwise ordered, this Protective Order shall govern certain documents and other products of discovery obtained in the Action from the Parties there to, and from third parties. As well as certain information copied or derived therefrom, excerpts, summaries or compilations thereof, including, but not limited to, documents voluntarily exchanged as part of early settlement discussions, documents produced pursuant to initial disclosures, requests authorized by the Federal Rules of Civil Procedure made applicable herein by the Federal Rules of Bankruptcy Procedure, answers to interrogatories, deposition transcripts, responses to requests for production, responses to requests for admission, subpoenas, affidavits, declarations, expert reports, and other such material and information as may be produced during the course of the Action and designated as Confidential Information.

**3.    DESIGNATION OF CONFIDENTIAL INFORMATION**

3.1    This Protective Order shall govern the production and handling of any Confidential Information in this Action. Any Party or non-party who produces Confidential Information in this Action may designate it as "Confidential" or "Attorneys' Eyes Only" consistent with the terms of this Protective Order. Whenever possible, the Designating Party must designate only those portions of a document, written discovery responses, deposition, transcript, or other material that contain the Confidential Information and refrain from designating entire documents. Regardless of any designations made hereunder, the Designating Party is not otherwise restricted from use or disclosure of its Confidential Information outside of this Action or for any business purposes. In addition, any Party may move to modify or seek other relief from any of the terms of this Protective Order if it has first tried in writing and in good faith to resolve its needs or disputes with the other Parties or Party as the case may be under the terms of this Protective Order. Further, nothing in this Protective Order shall prevent a Party from redacting documents consistent with the Federal Rules of Civil Procedure and utilizing the documents as needed through-out the Action.

3.2    <u>Application to Non-Parties:</u> Before a non-party is given copies of documents or materials designated as Confidential Information or Attorneys' Eyes Only as permitted hereunder, it

3

Exhibit 1
Page 23

must first sign an acknowledgment to be bound to these terms that is attached hereto as <u>Exhibit</u> A; if it fails to do so, the Parties to this Action must resolve any such dispute before making disclosure of designated information as permitted hereunder to the non-party. If a non-party wishes to make designations hereunder, it must first sign attached <u>Exhibit A.</u>

       3.3    <u>Timing and Provisional Protection:</u> Designations of Confidential Information may be made at any time. To avoid potential waiver of protection hereunder, the Designating Party should designate documents or materials containing Confidential Information at the time of production or disclosure, including on the record during the taking of any deposition. Deposition testimony will be deemed provisionally protected for a period of thirty (30) days after the transcript is released to the Parties by the court reporter, although the Parties may agree at any time to different timelines of provisional protection of information as Confidential or Attorneys' Eyes Only as part of one or more specific depositions. To retain any designations beyond the provisional period, a Designating Party must designate specific pages and lines of deposition testimony before the provisional period has expired. Such designations must be made in writing so that all counsel and court reporters may append the designation to all copies of the transcripts.

       3.4    <u>Manner of Designation:</u> Confidential Information may be designated hereunder in any reasonable manner or method that notifies the Receiving Party of the designation level and identifies with specificity the information to which the designation applies. If made verbally, the Designating Party must promptly confirm the designation in writing. Whenever possible, the Designating Party should stamp, affix, or embed a legend of "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY" on each designated page of the document or electronic image that contains Confidential Information.

**4.    CHALLENGES TO DESIGNATED INFORMATION**

       4.1    In the event that a Receiving Party disagrees at any time with any designation(s) made by the Designating Party, the Receiving Party must first try to resolve such challenge in good faith on an informal basis with the Designating Party. The Receiving Party must provide written notice of the challenge and the grounds therefor to the Designating Party, who must respond in writing to the challenge within fifteen (15) days. At all times, the Designating Party carries the burden of establishing the propriety of the designation and protection level. Unless and until the challenge is

Exhibit 1
Page 24

1  resolved by the Parties or ruled upon by the Court, the designated information shall remain protected

2  under this Protective Order. The failure of any Receiving Party to challenge a designation does not

3  constitute a concession that the designation is proper or an admission that the designated information

4  is otherwise competent, relevant, or material.

5      **5.      LIMITED ACCESS/USE OF PROTECTED INFORMATION**

6      5.1    Restricted Use: Information that is produced or exchanged in the course of the Action

7  and designated under this Protective Order may be used for preparation for trial and preparation for

8  any appeal of any and all matters in the Action, as well as related settlement negotiations, and for no

9  other purpose, without the written consent of the Designating Party. No Confidential Information may

10  be disclosed to any person except in accordance with the terms of this Protective Order, unless the

11  parties are co-counsel or have entered into joint defense agreements. All persons in possession of

12  Confidential Information agree to exercise reasonable care with regard to the custody, use, or storage

13  of such information to ensure that its confidentiality is maintained. This obligation includes, but is

14  not limited to, the Receiving Party providing to the Designating Party prompt notice of the receipt of

15  any subpoena that seeks production or disclosure of any designated information and consulting with

16  the Designating Party before responding to the subpoena. Any use or disclosure of Confidential or

17  Attorneys' Eyes Only information in violation of the terms of this Protective Order may subject the

18  disclosing person or party to sanctions.

19      5.2    Access to "Confidential" Information: The Party(ies) and all persons subject to this

20  Protective Order agree that information designated as "CONFIDENTIAL" may only be accessed or

21  reviewed by the following:

22      a)      The Court, its personnel, and court reporters;

23      b)      Counsel of record, or co-counsel for any Party, or other party that has entered into a

24  joint defense agreement in the Action and their employees who assist counsel of record, or co-counsel

25  in the Action and are informed of the duties and obligations imposed hereunder;

26      c)      The Parties, including their clients, agents and employees who are assisting or have

27  reason to know of the Action;

28  / / /

d)    Experts or consultants employed by the Parties or their counsel, or co-counsel, for purposes of an Action, so long as each such expert or consultant has signed attached <u>Exhibit A;</u> and

e)    Other witnesses or persons with the Designating Party's consent or by court order.

5.3    <u>Access to "Attorneys' Eyes Only" Designations:</u> The Parties and all persons subject to this Protective Order agree that information designated as "ATTORNEYS' EYES ONLY" may only be accessed or reviewed by the following:

a)    The Court, its personnel, and court reporters;

b)    Counsel of record, or co-counsel for any Party, or other party that has entered into a joint defense agreement in the Action and their employees who assist counsel of record in the Action and are informed of the duties hereunder;

c)    In-house counsel for any Party in the Action and Richard A. Marshack, as Chapter 11 Trustee of The Litigation Practice Group P.C. who is informed of the duties and obligations imposed hereunder;

d)    Experts or consultants employed by the Parties or their counsel, or co-counsel for purposes of the Action,  and so long as each such expert or consultant has signed attached <u>Exhibit A;</u> and

e)    Other witnesses or persons to whom the Designating Party agrees in advance of disclosure or by court order.

5.4    <u>Non-Waiver Effect of Designations:</u> Neither the taking of, nor the failure to take, any action to enforce the provisions of this Protective Order, nor the failure to object to any designation, will constitute a waiver of any Party(ies)'s claim or defense in the Action or any other action or proceeding, including, but not limited to, a claim or defense that any designated information is or is not Confidential, is or is not entitled to particular protection, or embodies or does not embody information protectable by law.

5.5    <u>In-Court Use of Designated Information:</u> If information designated under this Protective Order will or may be offered in evidence at a hearing or trial related to any matter in the Action, then the offering party must give advance notice to the party or non-party that designated prior to offering the information so that any use or disclosure may be addressed in accordance with

6

Exhibit 1
Page 26

the Court's case-management or other pre-trial order, or by a motion *in limine.* Nothing in this Protective Order shall be construed as a waiver by a Party of any objections that may be raised as to the admissibility at trial of any evidentiary materials.

**6.    CLAW-BACK REQUESTS**

6.1    <u>Failure to Make Designation:</u>  If, at any time, a Party or non-party discovers that it produced or disclosed Confidential Information without designation, it may promptly notify the Receiving Party and identify with particularity the Confidential Information to be designated and the level of designation (the claw-back notification). The Receiving Party may then request substitute production of the newly-designated information. Within thirty (30) days of receiving the claw-back notification, the Receiving Party must: (1) certify to the Designating Party it has appropriately marked or, if substitute production has been requested, destroyed all unmarked copies that it received, made, and/or distributed; and (2) if it was practicably unable to mark or destroy any information because disclosures occurred while the Receiving Party was under no duty of confidentiality under the terms of this Protective Order regarding that information, the Receiving Party must reasonably provide as much information as practicable to aid the Designating Party in protecting the information, consistently with the Receiving Party's attorney-client, work-product, and/or trial-preparation privileges.

6.2    <u>Inadvertent Production of Privileged Information:</u> If, at any time, a Party discovers that it produced information that it reasonably believes is subject to protection under the attorney/client, work-product, or trial-preparation privileges, then it must promptly notify each Receiving Party of the claim for protection, the basis for it, amend its privilege log accordingly, and comply with Fed. R. Civ. P. 26(b)(5). Whenever possible, the producing party must produce substitute information that redacts the information subject to the claimed protection. The Receiving Party must thereupon comply with Fed. R. Civ. P. 26(b)(5)(B) as to the information subject to the claimed protection.

/ / /

/ / /

/ / /

1      **7.      DURATION/CONTINUED RESTRICTIONS**

2         7.1    <u>Handling of Designated Information Upon Conclusion of the Main Bankruptcy Case:</u>

3   Upon conclusion of the Main Bankruptcy Case, by way of dismissal or closing of the case, the

4   Designating Party(ies) is/are responsible for ensuring that any Party or person to whom the

5   Designating Party shared or disclosed designated information in any of the matters under the Action

6   returns or destroys all of its copies, regardless of the medium in which it was stored. No witness or

7   Party may retain designated information that it received from any other Party or non-party under this

8   Protective Order; only counsel of record, or co-counsel, are the authorized agents who may retain one

9   copy for their respective legal files, and who must also describe to the Designating Party the extra

10  steps taken to protect its legal file containing paper and/or electronic copies of the designated

11  information so that it is not accessed, used, or disclosed inconsistently with the obligations under this

12  Protective Order. This provision does not apply to the Court or Court staff. Moreover, this provision

13  does not apply to Trustee, who may retain and use – consistent with this Order – Confidential

14  Information received in any Action during the entirety of the Bankruptcy.

15        7.2    <u>Continued Restrictions Under this Protective Order:</u> The restrictions on disclosure and

16  use of Confidential Information shall survive the conclusion of the Bankruptcy case and any matter

17  in the Action.

18     **8.      PRIVILEGED OR PROTECTED INFORMATION**

19        8.1    Nothing in this Protective Order shall require disclosure of information that is

20  protected by the attorney-client privilege, the work-product protection, or any other legally cognizable

21  privilege (a "Privilege or Protection").  If information subject to a claim of Privilege or Protection is

22  inadvertently produced, pursuant to Federal Rule of Evidence 502(d) such production shall not

23  constitute a waiver of, or estoppel as to, any claim of Privilege or Protection for such information or

24  any other information that may be protected from disclosure by a Privilege or Protection in any

25  proceeding.

26        8.2    If a Party receives a document that appears to be subject to a Privilege or Protection,

27  then it shall refrain from examining the document any more than is essential to ascertain if it is

28  privileged or protected and shall promptly notify the producing Party in writing that the receiving

8

Exhibit 1
Page 28

Party possesses material that appears to be subject to a Privilege or Protection. The producing Party shall have seven (7) days after receiving such notice to assert a Privilege or Protection over the identified material. If the producing Party does not assert a claim of Privilege or Protection within the seven (7)-day period, the material in question shall be deemed not privileged or protected.

8.3     If a producing Party has produced a document subject to a claim of Privilege or Protection, upon written request by the producing Party, the document for which a claim of Privilege or Protection is made shall be sequestered or destroyed to the extent reasonably practicable, and the receiving Party shall not use the document for any purpose other than in connection with analyzing or disputing a claim of Privilege or Protection or in connection with a motion to compel the production of the document.

8.4     The receiving Party sequestering or destroying such material may then move the Court for an order compelling production of the material. The applicable producing Party bears the burden of establishing the applicable Privilege or Protection of any clawed-back document or information as and to the same extent that it would have borne such burden had it not produced the document or information.  Nothing in this Protective Order shall limit the Court's right or any receiving Party's right to request an in camera review of any information subject to a claim of Privilege or Protection.

###

Date: June 3, 2024

EXHIBIT "A"

1

Exhibit 1
Page 30

1  Christopher B. Ghio (State Bar No. 259094)
   Christopher Celentino (State Bar No. 131688)
2  Yosina M. Lissebeck (State Bar No. 201654)
   **DINSMORE & SHOHL LLP**
3  655 West Broadway, Suite 800
   San Diego, CA 92101
4  Telephone:  619.400.0500
   Facsimile:  619.400.0501
5  christopher.ghio@dinsmore.com
   christopher.celentino@dinsmore.com
6  yosina.lissebeck@dinsmore.com

7  Sarah S. Mattingly (Ky. Bar 94257)
   DINSMORE & SHOHL, LLP
8  101 S. Fifth Street, Suite 2500
   Louisville, KY 40202
9  Telephone: 859-425-1096
   Facsimile: 502-585-2207
10 Sarah.mattingly@dinsmore.com
   (Admitted pro hac vice)

11

12 Special Counsel to Richard A. Marshack,
   Chapter 11 Trustee

13

14

15 **UNITED STATES BANKRUPTCY COURT**

16 **CENTRAL DISTRICT OF CALIFORNIA**

17

18 In Re                              | Case No. 8:23-BK-10571-SC

19                                    | Chapter 11

20 The Litigation Practice Group P.C., | **EXHIBIT A TO STIPULATED ORDER**

21          Debtor(s),                | Date:   May 23, 2024

22                                    | Time:   1:30 p.m.

23                                    | Judge:  Hon. Scott C. Clarkson

24                                    | Place:  Courtroom 5C[1] - Via Zoom
                                      |         411 W. Fourth Street
25                                    |         Santa Ana, CA  92701

26

27 _____

28 [1] Video and audio connection information for each hearing will be provided on Judge Clarkson's
    publicly posted hearing calendar, which may be viewed online at:
    http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

This is to certify that:

(a)    I am being given access to Confidential Information pursuant to the Stipulated Protective Order that was entered into the main bankruptcy case for Litigation Practice Group, but which is binding and controlling as set forth by the Court's Order on any and all contested matters and  any and all litigation commenced by Trustee;

(b)    I have read the Stipulated Protective Order; and

(c)    I agree to be bound by the terms and conditions thereof, including, without limitation, to the obligations regarding the use, non-disclosure and return of such Confidential Information. I further agree that in addition to being contractually bound by the Stipulated Protective Order, I am subject to the jurisdiction of the above reference Court for any violation thereof.

Date: _____

_____
Signature

_____
Printed Name

# EXHIBIT 2

Exhibit 2
Page 33

## REVENUE PURCHASE AGREEMENT

This Revenue Purchase Agreement and Security Agreement and Guaranty of Performance **("Agreement")** dated 06/17/2021_____ between **GREEN FUND NY** **("GNF")** the Merchant(s) listed below **("Merchant")** and the Individual(s) listed below **("Guarantor")**

### MERCHANT INFORMATION

Merchant's Legal Name: BAT INC AND ALL ENTITIES LISTED ON "EXHIBIT A"

D/B/A: COAST PROCESSING ALL ENTITIES LISTED ON "EXHIBIT A"

State of Incorporation / Organization: CA

Type of Entity: INC

Physical Address: 1351 CALLE AVANZADO, SUITE 2

City: SAN CLEMENTE    State: CA    Zip: 92673    Business Phone: 620-474-0301

Guarantor(s) Name: TONY MAURICE DIAB    Cellphone Number: 620-474-0301    Email Address: tony@diablaw.com

Mailing Address: 8 ALMANZORA    City: NEWPORT COAST    State: CA    Zip: 92657

**Purchase Price:** $ 200,000.00    Purchased Percent 20    %    Purchased Amount: $ 399,999.98

Payment Frequency: DAILY    Remittance $ 19,900.00

In consideration of payment by GNF to Merchant of the Purchase Price set forth above, Merchant hereby sells, assigns and transfers to GNF (making GNF the absolute owner) the Purchased Percentage of all of Merchant's payments, receipts, settlements and funds paid to or received by or for the account of Merchant from time to time on and after the date hereof in payment or settlement of Merchant's existing and future accounts, payment intangibles, credit, debit and/or stored value card transactions, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers' and/or other payors or obligors (the "Future Receipts" defined as all payments made by cash, check, clearinghouse settlement, electronic transfer or other form of monetary payment), for the payments to Merchant as a result of Merchant's sale of goods and/ or services (the "Transactions") until the Purchased Amount has been delivered by or on behalf of Merchant to GNF.

Merchant is selling a portion of a future revenue stream to GNF at a discount, and is not borrowing money from GNF, therefore there is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by GNF. The Remittance is a good faith estimate of GNF's share of the future revenue stream. Merchant going bankrupt or going out of business, or experiencing a slowdown in business, or a delay in collecting its receivables, in and of itself, does not constitute a breach of this Agreement. GNF is entering this Agreement knowing the risks that Merchant's business may not perform as expected or fail, and GNF assumes these risks based on Merchant's representations, warranties and covenants in this Agreement, which are designed to give GNF a reasonable and fair opportunity to receive the benefit of its bargain. GNF acknowledges that it may never receive the Purchased Amount if the Merchant does not generate sufficient revenue. Merchant and Guarantor(s)(s) are only guaranteeing their performance of the terms of this Revenue Purchase Agreement and are not guaranteeing the payment of the Purchased Amount. The initial Remittance shall be as described above. The Remittance is subject to adjustment as set forth in Paragraph 1.4 and Paragraph 1.5.

GNF will debit the Remittance each business day from only one depositing bank account, which account must be acceptable to, and pre-approved by, GNF (the "Account") into which Merchant and Merchant's customers shall remit the Receipts from each Transaction, until such time as GNF receives payment in full of the Purchased Amount. Merchant hereby authorizes GNF to ACH debit the agreed Remittance from the Account on the agreed upon Payment Frequency; a daily basis means any day that is not a United States banking holiday. Merchant agrees not to make or cause debits to the Account (other than in favor of GNF) at any time that would cause the balance therein on any business day to be insufficient to fund payment in full of the agreed Remittance. The Account may not be used for any personal, family or household purposes. Merchant will provide GNF with all required access codes and monthly bank statements regarding the Account so that GNF may monitor the Account. GNF payment of the Purchase Price shall be deemed the acceptance and performance by GNF of this Agreement. Merchant understands that it is responsible for ensuring that the agreed Remittance to be debited by GNF remains in the Account and will be held responsible for any fees incurred by GNF resulting from a rejected ACH attempt or an Event of Default. GNF is not responsible for any overdrafts or rejected transactions that may result from GNF's ACH debiting the agreed Remittance under the terms of this Agreement. Notwithstanding anything to the contrary in this Agreement or any other agreement between GNF and Merchant, upon the occurrence of an Event of Default of the MERCHANT AGREEMENT TERMS AND CONDITIONS the Purchased Percentage shall equal 100%. A list of all fees applicable under this Agreement is contained in Appendix A.

**THE MERCHANT AGREEMENT "TERMS AND CONDITIONS", THE "SECURITY AGREEMENT AND GUARANTY" AND THE "ADMINISTRATIVE FORM HEREOF, ARE ALL HEREBY INCORPORATED IN AND MADE A PART OF THIS MERCHANT AGREEMENT.**

**FOR THE MERCHANT (#1)** By: TONY MAURICE DIAB

DocuSigned by:
*Tony Maurice Diab*
A2C23FAF6C894BD...

(Print Name and Title)    (Signature)

**FOR THE MERCHANT (#2)** By: _____

(Print Name and Title)    (Signature)

**BY GUARANTOR(S) (#1)** By: TONY MAURICE DIAB

DocuSigned by:
*Tony Maurice Diab*
A2C23FAF6C894BD...

(Print Name and Title)    (Signature)

**BY GUARANTOR(S) (#2)** By: _____

(Print Name and Title)    (Signature)

1

MERCHANT AGREEMENT TERMS AND CONDITIONS

**1            TERMS OF ENROLLMENT IN PROGRAM**

1.1            **Merchant Deposit Agreement and Processor.** Merchant shall (A) execute an agreement acceptable to GNF with a Bank acceptable to GNF to obtain electronic fund transfer services for the Account, and (B) if applicable, execute an agreement acceptable to GNF with a credit and debit card processor (the "Processor") instructing the Processor to deposit all Receipts into the Account. Merchant shall provide GNF and/or its authorized agent(s) with all of the information, authorizations and passwords necessary for verifying Merchant's receivables, receipts, deposits and withdrawals into and from the Account. Merchant hereby authorizes GNF and/or its agent(s) to withdraw from the Account via ACH debit the amounts owed to GNF for the receipts as specified herein and to pay such amounts to GNF. These authorizations apply not only to the approved Account but also to any subsequent or alternate account used by the Merchant for these deposits, whether pre- approved by GNF or not. This additional authorization is not a waiver of GNF's entitlement to declare this Agreement breached by Merchant as a result of its usage of an account which GNF did not first pre-approve in writing prior to Merchant's usage thereof. The aforementioned authorizations shall be irrevocable without the written consent of GNF.

1.2            **Term of Agreement.** This Agreement shall remain in full force and effect until the entire Purchased Amount and any other amounts due are received by GNF as per the terms of this Agreement.

1.3            **Reconciliation.** As long as an Event of Default, or breach of this agreement, has not occurred, Merchant may request a retroactive reconciliation of the total Remittance Amount. All requests hereunder must be in writing to Reconciliations@greenfundny.com Said request must include copies of all of Merchant's bank account statements, credit card processing statements, and accounts receivable report outstanding if applicable, from the date of this Agreement through and including the date the request is made. GNF retains the right the request additional reasonable documentation including without limitation bank login or access to view Merchant's accounts using third party software, and Merchant's refusal to provide access shall be a breach of this Agreement and GNF shall have no obligation to reconcile. Such reconciliation, if applicable, shall be performed by GNF within two (2) Business Days following its receipt of Merchant's request for reconciliation by either crediting or debiting the difference back to, or from, Merchants Bank Account so that the total amount debited by GNF shall equal the Specific Percentage of the Future Receipts that Merchant collected during the requested month. Nothing set forth in this section shall be deemed to provide Merchant with the right to interfere with GNF's right and ability to debit Merchant's Account while the request is pending or to unilaterally modify the Remittance Amount, in any method other than the ones listed in this Agreement.

1.4            **Adjustments to the Remittance.** As long as an Event of Default, or breach of this agreement, has not occurred, Merchant may give notice to GNF to request a decrease in the Remittance, should they experience a decrease in its Future Receipts. All requests hereunder must be in writing to Reconciliations@greenfundny.com and must include copies of all of Merchant's bank account statements, credit card processing statements, and accounts receivable report outstanding from the date of this Agreement through and including the date the request is made. GNF retains the right the request additional reasonable documentation including without limitation bank login or 3rd party software access to view Merchant's accounts, refusal to provide access shall be a breach of this Agreement and GNF shall have no obligation to reconcile. The Remittance shall be modified to more closely reflect the Merchant's actual receipts by multiplying the Merchant's actual receipts by the Purchased Percentage divided by the number of business days in the previous (2) calendar weeks. Merchant shall provide GNF with viewing access to their bank account as well as all information reasonably requested by GNF to properly calculate the Merchant's Remittance. At the end of the two (2) calendar weeks the Merchant may request another adjustment pursuant to this paragraph or it is agreed that the Merchant's Remittance shall return to the Remittance as agreed upon on Page 1 of this Agreement.

1.5            **Financial Condition.** Merchant and Guarantor(s)(s) (as hereinafter defined and limited) authorize GNF and its agents to investigate their financial responsibility and history, and will provide to GNF any authorizations, bank or financial statements, tax returns, etc., as GNF requests in its sole and absolute discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable as an authorization for release of financial and credit information. GNF is authorized to update such information and financial and credit profiles from time to time as it deems appropriate.

1.6            **Transactional History.** Merchant authorizes all of its banks, brokers and processor to provide GNF with Merchant's banking, brokerage and/or processing history to determine qualification or continuation in this program and for collections purposes. Merchant shall provide GNF with copies of any documents related to Merchant's card processing activity or financial and banking affairs within five days after a request from GNF.

1.7            **Indemnification.** Merchant and Guarantor(s)(s) hereby jointly and severally indemnify and hold harmless GNF and each Processor, their respective officers, directors, agents and representatives, and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by any such indemnitee as a direct or indirect result of (a) claims asserted by GNF for monies owed to GNF from Merchant and (b) actions taken by indemnitee in reliance upon any fraudulent, misleading or deceptive information or instructions provided by GNF.

1.8            **No Liability.** In no event will GNF be liable for any claims asserted by Merchant or Guarantor(s)s under any legal or equitable theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by both Merchant and Guarantor(s)(s). In the event these claims are nonetheless raised, Merchant and Guarantor(s)s will be jointly liable for all of GNF's attorney's fees and expenses resulting therefrom.

1.9            **Reliance on Terms.** Section 1.1, 1.6, 1.7, 1.8 and 2.5 of this Agreement are agreed to for the benefit of Merchant, GNF, Processor, and Merchant's bank and notwithstanding the fact that Processor and the bank is not a party of this Agreement, Processor and the bank may rely upon their terms and raise them as a defense in any action. 1.10            **Sale of Receipts.** Merchant and GNF agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount, and that such Purchase Price is not intended to be, nor shall it be construed as a loan from GNF to Merchant. Merchant agrees that the Purchase Price is in exchange for the Receipts pursuant to this Agreement, and that it equals the fair market value of such Receipts. GNF has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Merchant acknowledges that GNF's share of Receipts collected are being held by Merchant in trust and are the sole property of GNF until they are remitted to GNF. Payments made to GNF in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services, and the payment therefore by Merchant's customers. By this Agreement, Merchant transfers to GNF full and complete ownership of the Purchased Amount and Merchant retains no legal or equitable interest therein. GNF hereby appoints Merchant, and Merchant accepts appointment, as servicer for and on behalf of GNF for the purpose of collecting and delivering Receipts to GNF as required by this Agreement until GNF has received the Receipts Purchased Amount, and Merchant agrees that all such Receipts shall be received and held in trust for the benefit of SPFL for purposes of carrying out the terms of this Agreement. Merchant agrees that it will treat the amounts received and the Purchased Receipts delivered to GNF under this Agreement in a manner consistent with a sale in its accounting records and tax returns. Merchant agrees that GNF is entitled to audit Merchant's accounting records upon reasonable notice in order to verify compliance. Merchant waives any rights of privacy, confidentiality or taxpayer privilege in any such litigation or arbitration in which Merchant asserts that this transaction is anything other than a sale of future receipts. In no event shall the aggregate of all amounts or any portion thereof be deemed as interest hereunder, and in the event it is found to be interest despite the parties hereto specifically representing that it is NOT interest, it shall be found that no sum charged or collected hereunder shall exceed the highest rate permissible at law. In the event that a court nonetheless determines that GNF has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and GNF shall promptly refund to Merchant any interest received by GNF in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that GNF not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law. As a result thereof, Merchant knowingly and willingly waives the defense of Usury in any action or proceeding.

1.11            **Power of Attorney.** Merchant irrevocably appoints GNF and its agents and representatives, as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to GNF from Processor, or in the case of a violation by Merchant of Section 1or the occurrence of an Event of Default under Section 3 hereof, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to GNF; and (v) to contact Merchant's banks and financial institutions using Merchant and Guarantor(s)(s) personal information to verify the existence of an account and obtain account balances (vi) to file any claims or take any action or institute any proceeding which GNF may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount. In connection therewith, all costs, expenses and fees, including legal fees, shall be payable by merchant.

1.12            **Protections against Default.** The following Protections 1 through 8 may be invoked by GNF immediately and without notice to Merchant in the event: (a) Merchant takes any action to discourage the use of electronic check processing that are settled through Processor, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks or other payments or deposits for the purchase of Merchant's services and products including but not limited to direct deposit of any checks into a bank account without scanning into the GNF electronic check processor; (b) Merchant changes its arrangements with Processor or the Bank in any way that is adverse or unacceptable to GNF; (c) Merchant changes the electronic check processor through which the Receipts are settled from Processor to another electronic check processor, or permits any event to occur that could cause diversion of any of Merchant's check or deposit transactions to another processor; (d) Merchant intentionally interrupts or ceases the operation of this business transfers, moves, sells, disposes, or otherwise conveys its business and/or assets without (i) the express prior written consent of GNF, and (ii) the written agreement of any GNF or transferee to the assumption of all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to GNF; (e) Merchant takes any action, fails

PROPERTY OF GREEN FUND NY

Initial(1)_____    Exhibit 2
Page 35

to take any action, or offers any incentive—economic or otherwise—the result of which will be to induce any customer or customers to pay for Merchant's services with any means other than payments, checks or deposits that are settled through Processor; (f) Merchant fails to provide GNF with copies of any documents related to Merchant's card processing activity of financial and banking affairs within five days after a request from GNF, or (g) Merchant breaches any terms of this Agreement, including but not limited any of the Events of Default contained in Section 3.1 herein. These protections are in addition to any other remedies available to GNF at law, in equity or otherwise pursuant to this Agreement.

**Protection 1.** The full uncollected Purchased Amount plus all fees (including attorney's fees and costs of collection in the amount of 30% of the Purchased Amount then outstanding due under this Agreement and the attached Security Agreement become due and payable in full immediately.
**Protection 2.** GNF may enforce the provisions of the Limited Personal Guaranty of Performance against the Guarantor(s).
**Protection 3.** Merchant hereby authorizes GNF to execute in the name of the Merchant a Confession of Judgment in favor of GNF pursuant to the terms of the Confession of Judgment. Upon an Event of Default, GNF may enter that Confession of Judgment as a Judgment with the Clerk of any Court and execute thereon.
**Protection 4.** GNF may enforce its security interest in the Collateral including sending demand letters to account debtors and credit card processors.
**Protection 5.** GNF may exercise any and all rights and remedies of a secured party under Uniform Commercial Code Article 9
**Protection 6.** GNF may proceed to protect and enforce its right and remedies by lawsuit. In any such lawsuit, if GNF recovers a Judgment against Merchant, Merchant shall be liable for all of GNF's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs.
**Protection 7.** This Agreement shall be deemed Merchant's Assignment of Merchant's Lease of Merchant's business premises to GNF. Upon breach of any provision in this Agreement, GNF may exercise its rights under this Assignment of Lease without prior Notice to Merchant. Protection 8. GNF may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to GNF.
**Protection 8.** GNF may debit Merchant's depository accounts wherever situated in such amounts as determined by GNF in its sole discretion for purposes of collecting funds for application to the unrealized Purchased Amount and other amounts owed by Merchant to GNF by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to GNF.
**1.13 Protection of Information.** Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner or Guarantor(s), in respect of himself or herself personally, authorizes GNF to disclose information concerning Merchant's and each Owner's and each Guarantor(s)'s credit standing (including credit bureau reports that GNF obtains) and business conduct only to agents, affiliates, subsidiaries, and credit reporting bureaus. Merchant and each Owner and each Guarantor(s) hereby and each waives to the maximum extent permitted by law any claim for damages against GNF or any of its affiliates relating to any (i)investigation undertaken by or on behalf of GNF as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.
**1.14 Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by GNF, including this Agreement and any other GNF documents (collectively, "Confidential Information") are proprietary and confidential information of GNF. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information of GNF to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this section. A breach hereof entitles GNF to not only damages and reasonable attorney's fees but also to both a Temporary Restraining Order and a Preliminary Injunction without Bond or Security.
**1.15 Publicity.** Merchant and each of Merchant's Owners and all Guarantor(s)s hereto all hereby authorizes GNF to use its, his or her name in listings of clients and in advertising and marketing materials.
**1.16 D/B/A's.** Merchant hereby acknowledges and agrees that GNF may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between GNF and Merchant, including the filing of UCC-1 financing statements and other notices or filings.
**2        REPRESENTATIONS, WARRANTIES AND COVENANTS**
Merchant represents warrants and covenants that, as of this date and during the term of this Agreement:
2.1        **Financial Condition and Financial Information.** Merchant's and Guarantor(s)s' bank and financial statements, copies of which have been furnished to GNF, and future statements which will be furnished hereafter at the discretion of GNF, fairly represent the financial condition of Merchant at such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant and Guarantor(s)s have a continuing, affirmative obligation to advise GNF of any material adverse change in their financial condition, operation or ownership. GNF may request statements at any time during the performance of this Agreement and the Merchant and Guarantor(s)s shall provide them to GNF within five business days after request from GNF. Merchant's or Guarantor(s)s' failure to do so is a material breach of this Agreement.
2.2        **Governmental Approvals.** Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.
2.3        **Authorization.** Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.
2.4        **Use of Funds.** Merchant agrees that it shall use the Purchase Price for business purposes and not for personal, family, or household purposes.
2.5        **Electronic Check Processing Agreement.** Merchant will not change its Processor, add terminals, change its financial institution or bank account(s)or take any other action that could have any adverse effect upon Merchant's obligations under this Agreement, without GNF's prior written consent. Any such changes shall be a material breach of this Agreement.
2.6        **Change of Name or Location.** Merchant will not conduct Merchant's businesses under any name other than as disclosed to the Processor and GNF, nor shall Merchant change any of its places of business without prior written consent by GNF.
2.7        **Daily Batch Out.** Merchant will batch out receipts with the Processor on a daily basis if applicable.
2.8        **Estoppel Certificate.** Merchant will at every and all times, and from time to time, upon at least one (1) day's prior notice from GNF to Merchant, execute, acknowledge and deliver to GNF and/or to any other person, firm or corporation specified by GNF, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion thereof has been repaid.
2.9        **No Bankruptcy.** As of the date of this Agreement, Merchant is not insolvent and does not contemplate filing for bankruptcy in the next six months and has not consulted with a bankruptcy attorney or filed any petition for bankruptcy protection pursuant to the United States Bankruptcy Code and there has been no involuntary petition brought or pending against Merchant. Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.
2.10        **Unencumbered Receipts.** Merchant has good, complete, unencumbered and marketable title to all Receipts and all collateral in which GNF has been granted a security interest under the Security Agreement, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever other than in favor of GNF or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of GNF.
2.11        **Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.
2.12        **Defaults under Other Contracts.** Merchant's execution of, and/or performance under this Agreement, will not cause or create an event of default by Merchant under any contract with another person or entity.
2.13        **Good Faith.** Merchant and Guarantor(s)s hereby affirm that Merchant is receiving the Purchase Price and selling GNF the Purchased Amount in good faith and will use the Purchase Price funds to maintain and grow Merchant's business
**3        EVENTS OF DEFAULT AND REMEDIES**
3.1        **Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" hereunder:
(a)        Merchant or Guarantor(s) shall violate any term or covenant in this Agreement;
(b)        Any representation or warranty by Merchant or Guarantor(s) in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made;

(c)        the sending of notice of termination by Merchant or verbally notifying GNF of its intent to breach this Agreement;
(d)        the Merchant fails to give GNF 24 hours advance notice that there will be insufficient funds in the account such that the ACH of the Remittance amount will not be honored

PROPERTY OF GREEN FUND NY                                        3                        Initial(1): _____



by Merchant's bank, the Merchant fails to supply all requested documentation and allow for daily and/or real time monitoring of its bank account;

(e)      Merchant fails to provide its bank statements, and/or month to date bank activity, and/or accounts receivable reports, and/or bank login information within two (2) business days of a request by GNF;

(f)      Merchant shall voluntarily transfer or sell all or substantially all its assets.

(g)      Merchant shall make or send notice of any intended bulk sale or transfer by Merchant.

(h)      Merchant shall use multiple depository accounts without the prior written consent of GNF or takes any other action that intentionally interferes with or prevents GNF from receiving the Purchased Amount in accordance with the terms of this Agreement.

(i)      Merchant shall enter into any financing agreements with any other party including but not limited to: Loans, Merchant Cash Advances, Receivables financing, or any other agreement that will increase the total debt owed by Merchant to any other party.

(j)      Merchant shall change its depositing account without the prior written consent of GNF; or

(k)      Merchant shall close its depositing account used for ACH debits without the prior written consent of GNF

(l)      Merchant's bank returns a code other than NSF cutting GNF from its collections

(m)      Merchant or any Owner/Guarantor(s), directly or indirectly, causes to be formed a new entity or otherwise becomes associated with any new or existing entity, which operates a business similar to or competitive with that of Merchant.

(n)      Merchant shall default under any of the terms, covenants and conditions of any other agreement with GNF.

3.2      **Limited Personal Guaranty** Upon the occurrence of an Event of Default, GNF will enforce its rights against the Guarantor(s) of this transaction. Said Guarantor(s) will be jointly and severally liable to GNF for all of GNF's losses and damages, in additional to all costs and expenses and legal fees associated with such enforcement.

3.3      **Remedies.** Upon the occurrence of an Event of Default occurs and is not waived pursuant to Section 4.4 hereof, GNF may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Merchant's obligations hereunder (including the Guaranty) or any other legal or equitable right or remedy, including but not limited to filing the Confession of Judgment and executing thereon, and enforcing the Security Agreement contained herein. All rights, powers and remedies of GNF in connection with this Agreement may be exercised at any time by GNF after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

3.4      **Attorney's Fees.** Upon the occurrence of an Event of Default, and GNF retains an attorney or law firm to enforce this Agreement, Merchant and Guarantor(s) agree that a fee equal to 30% of the Remaining Balance (purchased amount less amount remitted by Merchant) ("Attorney's Fees") shall be immediately assessed Merchant and Guarantor(s) agree that the calculation for Attorney's Fees is reasonable.

3.5      **Costs.** Merchant shall pay to GNF all reasonable costs associated with (a) an Event or Default, (b) breach by Merchant of the Covenants in this Agreement and the enforcement thereof, and(c) the enforcement of GNF's remedies set forth in this Agreement, including but not limited to court costs and attorneys' fees.

3.6      **Required Notifications.** Merchant is required to give GNF written notice within 24 hours of any filing under Title 11 of the United States Code. Merchant is required to give GNF seven days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or stock.

**4      MISCELLANEOUS**

4.1      **Modifications; Agreements.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by GNF.

4.2      **Assignment.** GNF may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part.

4.3      **Notices.** All notices, requests, consents, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement. Notices to GNF shall become effective only upon receipt by GNF. Notices to Merchant shall become effective three days after mailing.

4.4      **Waiver Remedies.** No failure on the part of GNF to exercise, and no delay in exercising any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

4.5      **Binding Effect; Governing Law, Venue and Jurisdiction.** This Agreement, Security Agreement and Guaranty, Guaranty of Performance, and any and all addendums attachments, exhibits, and other documents relating to this Agreement in any way, shall be binding upon and inure to the benefit of Merchant and Guarantor(s) on the one hand, and GNF and their respective successors and assigns, except that Merchant and Guarantor(s) shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of GNF which consent may be withheld in GNF's sole discretion. GNF reserves the rights to assign this Agreement with or without prior written notice to Merchant. This Agreement, Security Agreement and Guaranty, Guaranty of Performance, and any and all addendums, attachments, exhibits, and other documents relating to this Agreement in any way, shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if GNF so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). All Parties to this Agreement, including but not limited to, Merchant, Guarantor(s), Corporate Guarantor(s) Merchant and Guarantor(s) that the Acceptable Forums are convenient to it, and submit to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant and Guarantor(s) waives any right to oppose any motion or application made by GNF to transfer such proceeding to an Acceptable Forum. **Merchant and Guarantor(s) hereby agree that the mailing of any Summons and Complaint in any proceeding commenced by GNF by certified or registered mail, return receipt requested to the Mailing Address listed on this Agreement, or via email to the Email Address listed on this Agreement, or any other process required by any such court will constitute valid and lawful service of process against them without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions.**

4.6      **Survival of Representation**, etc. All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

4.7      **Interpretation.** All Parties hereto have reviewed this Agreement with attorney of their own choosing and have relied only on their own attorneys' guidance and advice. No construction determinations shall be made against either Party hereto as draftor.

4.8      **Severability.** In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

4.9      **Entire Agreement.** Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof. This Agreement and the Security Agreement and Guaranty hereto embody the entire agreement between Merchant Guarantor(s) and Corporate Guarantor(s) and GNF and supersede all prior agreements and understandings relating to the subject matter hereof.

4.10     **JURY TRIAL WAIVER.** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING INCONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OR THEENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND   ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

4.11     **CLASS ACTION WAIVER.** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND ( 2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

4.12     **Facsimile & Digital Acceptance.** Facsimile signatures and digital signatures hereon shall be deemed acceptable for all purposes.

4.13     **Heter Iska.** All of our business are done in accordance to the "HI-BP" which can be reviewed at the following link "shorturl.at/djBIR"



DocuSign Envelope ID: B1DBE14B-C879-4026-BC25-B46A38A8A368

## SECURITY AGREEMENT AND GUARANTY OF PERFORMANCE

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY OF PEFORMANCE. CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.

Merchant's Legal Name: **BAT INC AND ALL ENTITIES LISTED ON "EXHIBIT A"**

D/B/A: **COAST PROCESSING ALL ENTITIES LISTED ON "EXHIBIT A"**     Federal ID#: ████7686

Physical Address: **1351 CALLE AVANZADO, SUITE 2**     City: **SAN CLEMENTE**   State: **CA**     Zip: **92673**

## SECURITY AGREEMENT

**Security Interest.** This Agreement will constitute a security agreement under the Uniform Commercial Code. To secure Merchant's obligations under the Revenue Purchase Agreement to make available or deliver Purchased Amount to GNF and GNF's right to realize the Purchased Amount, as and to the extent required by the terms of the Revenue Purchase Agreement, and performance of and compliance by Merchant with its other undertakings and agreements herein, Merchant and Guarantor(s)(s) grants to GNF a security interest and lien upon: (a) all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are each defined in Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant and/or Guarantor(s)(s), (b) all proceeds, as that term is defined in Article 9 of the UCC (c) all funds at any time in the Merchant's and/or Guarantor(s)(s) Account, regardless of the source of such funds, (d) present and future Electronic Check Transactions, and (e) any amount which may be due to GNF under this Agreement, including but not limited to all rights to receive any payments or credits under this Agreement (collectively, the "Secured Assets"). Merchant agrees to provide other security to GNF upon request to secure Merchant's obligations under this Agreement. Merchant agrees that, if at any time there are insufficient funds in Merchant's Account to cover GNF's entitlements under this Agreement, GNF is granted a further security interest in all of Merchant's assets of any kind whatsoever, and such assets shall then become Secured Assets. These security interests and liens will secure all of GNF's entitlements under this Agreement and any other agreements now existing or later entered into between Merchant, GNF or an affiliate of GNF is authorized to file any and all notices or filings it deems necessary or appropriate to enforce its entitlements hereunder.

In the event Merchant, any of its officers or directors or any Owner/Guarantor(s), during the term of the Revenue Purchase Agreement or while Merchant remains liable to GNF for any obligations under the Revenue Purchase Agreement, directly or indirectly, including acting by, through or in conjunction with any other person, causes to be formed a new entity or otherwise becomes associated with any new or existing entity, whether corporate, partnership, limited liability company or otherwise, which operates a business similar to or competitive with that of Merchant, such entity shall be deemed to have expressly assumed the obligations due GNF under the Revenue Purchase Agreement. With respect to any such entity, GNF shall be deemed to have been granted an irrevocable power of attorney with authority to file, naming such newly formed or existing entity as debtor, an initial UCC financing Statement and to have it filed with any and all appropriate UCC filing offices. GNF shall be held harmless by Merchant and each Owner/Guarantor(s) and be relieved of any liability as a result of any such authentication and filing of any such Financing Statement or the resulting perfection of its ownership rights or security interests in such entity's assets. GNF shall have the right to notify such entity's payors or account debtor (as defined by the UCC) of GNF's rights, including without limitation, GNF's right to collect all accounts, and to notify any payment card processor or creditor of such entity that GNF has such rights in such entity's assets. Merchant also agrees that, at the GNF's discretion, GNF may choose to amend any existing financing statement to include any such newly formed entity as debtor.

This security interest may be exercised by GNF without notice or demand of any kind by making an immediate withdrawal or freezing the Secured Assets. GNF shall have the right to notify account debtors at any time. Pursuant to Article 9 of the Uniform Commercial Code, as amended from time to time, GNF has control over and may direct the disposition of the Secured Assets, without further consent of Merchant. Merchant hereby represents and warrants that no other person or entity has a security interest in the Secured Assets. With respect to such security interests and liens, GNF will have all rights afforded under the Uniform Commercial Code, any other applicable law and in equity. Merchant will obtain from GNF written consent prior to granting a security interest of any kind in the Secured Assets to a third party. Merchant and Guarantor(s) (s) agree(s) that this is a contract of recoupment and GNF is not required to file a motion for relief from a bankruptcy action automatic stay to realize on any of the Secured Assets. Nevertheless, Merchant and Guarantor(s)(s) agree(s) not to contest or object to any motion for relief from the automatic stay filed by GNF. Merchant and Guarantor(s)(s) agree(s) to execute and deliver to GNF such instruments and documents GNF may reasonably request to perfect and confirm the lien, security interest and right of setoff set forth in this Agreement. GNF is authorized to execute all such instruments and documents in Merchant's and Guarantor(s)(s) name.

Merchant and Guarantor(s)(s) each acknowledge and agree that any security interest granted to GNF under any other agreement between Merchant or Guarantor(s)(s) and GNF (the "Cross-Collateral") will secure the obligations hereunder and under the Merchant Agreement. Merchant and Guarantor(s)(s) each agrees to execute any documents or take any action in connection with this Agreement as GNF deems necessary to perfect or maintain GNF's first priority security interest in the Collateral and the Additional Collateral, including the execution of any account control agreements. Merchant and Guarantor(s)(s) each hereby authorizes GNF to file any financing statements deemed necessary by GNF to perfect or maintain GNF's security interest. Merchant and Guarantor(s)(s) shall be liable for, and GNF may charge and collect, all costs and expenses, including but not limited to attorney's fees, which may be incurred by GNF in protecting, preserving and enforcing GNF's security interest and rights.

**Negative Pledge.** Merchant and Guarantor(s)(s) each agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Additional Collateral, as applicable.

**Consent to Enter Premises and Assign Lease.** GNF shall have the right to cure Merchant's default in the payment of rent on the following terms. In the event Merchant is served with papers in an action against Merchant for nonpayment of rent or for summary eviction, GNF may execute its rights and remedies under the Assignment of Lease. Merchant also agrees that GNF may enter into an agreement with Merchant's landlord giving GNF the right: (a) to enter Merchant's premises and to take possession of the fixtures and equipment therein for the purpose of protecting and preserving same; and/or (b) to assign Merchant's lease to another qualified business capable of operating a business comparable to Merchant's at such premises.

**Remedies.** Upon any Event of Default, GNF may pursue any remedy available at law (including those available under the provisions of the UCC), or in equity to collect, enforce, or satisfy any obligations then owing to GNF, whether by acceleration or otherwise.

PROPERTY OF GREEN FUND NY     Initial(1): 

Exhibit 2
Page 38

**GUARANTY OF PERFORMANCE**

As an additional inducement for GNF to enter into the Revenue Purchase Agreement, the undersigned Guarantor(s)(s) hereby provides GNF with this Guaranty. Guarantor(s)(s) will not be personally liable for any amount due under the Revenue Purchase Agreement unless Merchant commits an Event of Default pursuant to Paragraph 3.1 of the Revenue Purchase Agreement. Each Guarantor(s) shall be jointly and severally liable for all amounts owed to GNF in the Event of Default. Guarantor(s)(s) guarantee Merchant's good faith, truthfulness and performance of all of the representations, warranties, covenants made by Merchant in this Agreement including the Merchant's full and timely delivery of the Purchased Amount pursuant to (and limited by) the Revenue Purchase Agreement, in each case as each may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations"). Guarantor(s)'s obligations are due at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in the Agreement.

**Guarantor(s) Waivers**. In the event of a breach of the above, GNF may seek recovery from Guarantor(s)s for all of GNF's losses and damages by enforcement of GNF's rights under this Agreement without first seeking to obtain payment from Merchant, any other Guarantor(s), or any Collateral or Additional Collateral GNF may hold pursuant to this Agreement or any other guaranty. In addition, Section 4.5, 4.10 and 4.11 are expressly reiterated in the Security Agreement and Guaranty herein. GNF is not required to notify Guarantor(s) of any of the following events and Guarantor(s) will not be released from its obligations under this Agreement if it is not notified of: (i) Merchant's failure to pay timely any amount required under the Merchant Agreement; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; (iv) GNF's acceptance of this Agreement; and (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to GNF. In addition, GNF may take any of the following actions without releasing Guarantor(s) from any of its obligations under this Agreement: (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to GNF; (ii) release Merchant from its obligations to GNF; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor(s) to obtain reimbursement for payment under this Agreement. Until the Purchased Amount and Merchant's other obligations to GNF under the Merchant Agreement and this Agreement are paid in full, Guarantor(s) shall not seek reimbursement from Merchant or any other Guarantor(s) for any amounts paid by it under this Agreement. Guarantor(s) permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other Guarantor(s), or any collateral provided by Merchant or any other Guarantor(s), for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution. In the event that GNF must return any amount paid by Merchant or any other Guarantor(s) of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor(s)'s obligations under this Agreement shall include that amount.

Guarantor(s) Acknowledgment. Guarantor(s) acknowledges that: (i) He/She is bound by the Class Action Waiver provision in the Merchant Agreement Terms and Conditions; (ii) He/She understands the seriousness of the provisions of this Agreement; (iii) He/She has had a full opportunity to consult with counsel of his/her choice; and (iv) He/She has consulted with counsel of its choice or has decided not to avail himself/herself of that opportunity.

This Security Agreement and Guaranty and Guaranty of Performance shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if GNF so elects, be instituted in any court  sitting in New York, (the "Acceptable Forums"). Merchant, Guarantor and Corporate Guarantors agree that the Acceptable Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Merchant, Guarantor and Corporate Guarantors agree that the Acceptable Forums are convenient to it, and submit to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue.  Should such proceeding be initiated in any other forum, Merchant, Guarantor and Corporate Guarantors waives any right to oppose any motion or application made by GNF to transfer such proceeding to an Acceptable Forum.

The Merchant Guarantor(s) and Corporate Guarantor(s)  acknowledge that they have read Paragraph 4.5 of this Agreement in its entirety and understand that they are waiving their right to Service of Process by traditional manners and will accept process of any Summons and Complaint or other legal process by certified mail return receipt requested to the Mailing Address on Page 1 of this Agreement.

**FOR ALL MERCHANT(S) (#1)** By: TONY MAURICE DIAB _____

DocuSigned by:

_Tony Maurice Diab_

A2C23FAF6C894BD...

(Print Name and Title)    (Signature)

SSN# _____

**FOR ALL MERCHANT(S) (#2)** By: _____

(Print Name and Title)    (Signature)

SSN# _____

**GUARANTOR(S) (#1)** By: TONY MAURICE DIAB _____

DocuSigned by:

_Tony Maurice Diab_

A2C23FAF6C894BD...

(Print Name and Title)    (Signature)

SSN# _____

**GUARANTOR(S) (#2)** By: _____

(Print Name and Title)    (Signature)

SSN# _____

PROPERTY OF GREEN FUND NY

Exhibit 2
Page 39

DocuSign Envelope ID: B1DBE14B-C879-4026-BC25-D46A38A9A168

**AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT), DIRECT PAYMENTS (ACH DEBITS), AND CHECK DEBIT**

Merchant: BAT INC AND ALL ENTITIES LISTED ON "EXHIBIT A"

(Merchant's Legal Name)

Merchant Agreement: Merchant Agreement between GNF and Merchant, dated as of: 06/17/2021

Designated Checking Account:

Capitalized terms used in this Authorization Agreement without definition shall have the meanings set forth in the Merchant Agreement.

By signing below, Merchant attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes. **This Authorization Agreement for Direct Deposit (ACH Credit), Direct Payments (ACH Debits), and Check Debit is part of (and incorporated by reference into) the Merchant Agreement. Merchant should keep a copy of this important legal document for Merchant's records.**

**DISBURSEMENT OF ADVANCE PROCEEDS.** By signing below, Merchant authorizes GNF to disburse the Advance proceeds less the amount of any applicable fees upon Advance approval by initiating ACH credits to the Designated Checking Account, in the amounts and at the times specified in the Merchant Agreement. **By signing below, Merchant also authorizes GNF to collect amounts due from Merchant under the Merchant Agreement by initiating ACH debits or to initiate a Check Debit to the**

If any payment date falls on a weekend or holiday, I understand and agree that the payment may be executed on the next business day. If a payment is rejected by Merchant's financial institution for any reason, including without limitation insufficient funds, Merchant understands that GNF may, at its discretion, attempt to process the payment again as permitted under applicable ACH rules. Merchant also authorizes GNF to initiate ACH entries to correct any erroneous payment transaction.

**MISCELLANEOUS.** GNF is not responsible for any fees charged by Merchant's bank as the result of credits or debits initiated under this Authorization Agreement. The origination  of ACH debits and credits to the Designated  Checking Account must comply with applicable  provisions of state and federal law, and the rules and operating guidelines of NACHA (formerly known as the National Automated Clearing House Association).  This Authorization Agreement is to remain in full force and effect until GNF has received written notification from Merchant at the address set forth below at least 5 banking days prior of its termination to afford GNF a reasonable opportunity to act on it. The individual signing below on behalf of Merchant certifies that he/she is an authorized signer on the Designated Checking Account. Merchant will not dispute any ACH transaction initiated pursuant to this Authorization Agreement, provided the transaction corresponds to the terms of this Authorization Agreement. Merchant requests the financial institution that holds the Designated Checking Account to honor all  ACH entries initiated in accordance with this Authorization Agreement.

**Merchant agrees** to be bound by the ACH Rules as defined by the National ACH Association (NACHA). Merchant understands that this authorization is to remain in full force and effect until GNF has received written notification from me of its termination at least five (5) business days prior to the payment due date. Merchant further understands that canceling their  ACH  authorization  does  not  relieve them  of  the  responsibility  of  paying account  in  full, and that if Merchant cancels or revokes this authorization before any remaining debt is paid in full, the GNF may take additional actions including legal actions to secure the debt.

Merchant: BAT INC AND ALL ENTITIES LISTED ON "EXHIBIT A"

(Merchant's Legal Name)

Print Name: TONY MAURICE DIAB                                        Print Name: _____

X _Tony Maurice Diab_                                                X _____
(Signature) F8C894BD...                                              (Signature)

Principal                                                           _____
(Title)                                                             (Title)

Date: 06/17/2021                                                    Date: _____
(Month) (Day) (Year)                                               (Month) (Day) (Year)

PROPERTY OF GREEN FUND NY

Exhibit 2
Page 40

# APPENDIX A - THE FEE STRUCTURE:

**A.**   **Underwriting Fee:** $ 49,999.00 to cover Underwriting and relates expenses.

**B.**   **UCC Filing Fee:** $499.00 and are not an automated process, requiring us to charge this fee to cover costs.

**C.**   **NSF Fee Standard:** $50.00 (each) up to TWO TIMES ONLY before a default is declared.

**D.**   **Bank Change Fee:** $50.00 When Merchant requires a change of Bank Account to be debited, requiring us to adjust our system.

**E.**   **Blocked ACH Payment:** $2,500.00 This fee is applied when Merchant directs the bank to BLOCK our ACH Debits. Blocking ACH Debits will place Merchant's account in default.

**F.**   **Default Fee:** $5,000.00 Shall be applied to Merchant's account in the event that Merchant defaults under the terms of the Merchant Agreement.

**G.**   **ACH Processing Fee:** $249.00 (or 10% of the contract amount, depending on size of advance) ACH's are labor intensive

**H.**   **Account Management Fee:** At the end of each month, Merchant will pay to GNF an Account Management Fee. This fee will not be applied towards the reduction of the Purchased Amount. This monthly fee will equal the average of all the payments received as a Specified percentage of the Merchants settlement amount for that Month.

**I.**   **Miscellaneous Service Fee:** Merchant shall pay certain fees for services related to the origination and maintenance of Accounts. Each Merchant shall receive their funding electronically to their designated bank account and will be charged $30.00 for a Fed Wire or 0.00 for a bank ACH. The current charge for the underwriting and origination of each Merchant

**J.**   **Working Capital Funding:** A fee of $5,000.00 or 10% shall be applied every time Merchant enters into any arrangement, agreement, or commitment that relates to or involves the Receipts, whether in the form of a purchase of, a loan against, collateral against or the sale or purchase of credits against, Receipts or future check sales with any party other than GNF

**K.**   **Contract Service Fee:** Commencing at date funded (the "Start Date"), merchant shall pay a fee of $499.00 per month (the "Monthly Fee") the monthly fee is payable each month during the term of this agreement, at a minimum of three months.

**L.**   **Attorney's Fee:** Up to 30% of remaining balance (purchased amount less amount remitted by Merchant) shall be immediately assessed Merchant and Guarantor(s) agree that the calculation for Attorney's Fees is reasonable.  When a merchant breaches any term of this Agreement and GNF is required to retain counsel to enforce, defend or collect any term of this Agreement.

[ALL FEES ARE SUBJECT TO CHANGE]

__FOR THE MERCHANT (#1)__ By: TONY MAURICE DIAB _____

*Tony Maurice Diab*
A2C23FAF6C894BD...

(Print Name and Title)                              (Signature)


__FOR THE MERCHANT (#2)__ By: _____

(Print Name and Title)                              (Signature)

PROPERTY OF GREEN FUND NY

Exhibit 2
Page 41

DocuSign Envelope ID: B1DBE14B-C879-402E-BC25-B46A38A9A368

**Bank Login Information**

Dear Merchant,

Thank you for accepting this offer from GNF. We look forward to being your funding partner for as long as you need.

**Daily ACH Program:**

GNF will require viewing access s to your bank account, each business day, in order to verify the amount of your daily payment. Please be assured that we carefully safeguard your confidential information, and only essential personnel will have access to it.

GNF will also require viewing access to your bank account, prior to funding, as part of our underwriting process.

Please fill out the form below with the information necessary to access your account.

* Be sure to indicate capital or lower-case letters.

Any other information necessary to access your account:

TONY MAURICE DIAB

<table>
<tr><td>DocuSigned by:</td><td></td></tr>
<tr><td>Tony Maurice Diab</td><td>06/17/2021</td></tr>
<tr><td>A2C23FAF8C894BD...</td><td></td></tr>
</table>

FOR THE MERCHANT (#1) By:                                    Date

FOR THE MERCHANT (#2) By:                                    Date

9

EXHIBIT A

ADDENDUM TO
**THE FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT AND GUARANTY**
This **ADDENDUM TO THE FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT and GUARANTY (this "Addendum")**, dated 06/17/2021 is entered into by and among **PROPERTY OF GREEN FUND NY** ("BUYER") and **Business Legal Name: BAT INC AND ALL ENTITIES LISTED ON EXHIBIT A D/B/A: COAST PROCESSING AND ALL ENTITIES LISTED ON EXHIBIT A**

**Business Legal Name: B.A.T INC D/B/A; COAST PROCESSING**   EIN #:████7686
**Form of Business Entity:**   ("Seller #1") and

**Business Legal Name: VULCAN CONSULTING GROUP LLC**   EIN #:████7431
**Form of Business Entity: LLC**   ("Seller #2") and

**Business Legal Name: THE LITIGATION PRACTICE GROUP PC**   EIN #:████3543
**Form of Business Entity: PC**   ("Seller #3") and

**Name:** TONY MAURICE DIAB
**SSN:**████5745
**Email:** tony@coastprocessing.com
**Phone:** 620-474-0301
**Title:** Principal

Hereinafter: (i) Seller # 1 is referred to as the "Original Seller"; and (ii) Seller # 2, Seller # 3 and Seller # 4 are referred to, individually and collectively, jointly and severally, as the "Additional Seller"; and (iii) the Original Seller and the Additional Seller are referred to, individually and collectively, jointly and severally, as the "Seller."
Hereinafter, Guarantor # 1 is referred to as the "Original Guarantor."

W-I-T-N-E-S-S-E-T-H

Hereinafter, Guarantor # 1 is referred to as the "Original Guarantor."

**WHEREAS,** BUYER, the Original Seller and the Original Guarantor entered into that certain FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT, dated 06/17/2021 (the "Agreement"); and **WHEREAS,** the obligations of the Original Seller under the Agreement are further guaranteed by the Original Guarantor pursuant to the Personal Guaranty of Performance set forth as Exhibit A to the Agreement (the "Guaranty"); and **WHEREAS,** the parties hereto desire to amend and restate the Agreement by adding the name(s) of the Additional Seller as the parties to the Agreement, as if the Additional Seller were the signatories to the Agreement. **NOW, THEREFORE,** for good and valuable consideration, the mutual receipts and sufficiency of which is hereby acknowledged, the parties to this Addendum hereby agree to the foregoing and as follows:

# EXHIBIT 3

Exhibit 3
Page 44

In re: The Litigation Practice Group PC
Disbursement Details by Payee
4 Years Pre-Petition (03/20/2019 - 03/20/2023)

**GROBSTEIN TEEPLE**

| Bank Name | Account Name | Account Number | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|
| Bank of America | Vulcan Consulting Group LLC dba DRD | 9551 | 6/17/2021 | | 19,900.00 | GREEN DES:bXXXXXXXXX ID:BAT INDN:BAT CO ID:4843148569 CCD |
| Bank of America | Vulcan Consulting Group LLC dba DRD | 9551 | 6/18/2021 | | 19,900.00 | GREEN DES:bXXX)(XXXXX ID:BAT INDN:BAT CO ID:4843148569 CCD |
| Bank of America | Vulcan Consulting Group LLC dba DRD | 9551 | 6/21/2021 | | 19,900.00 | GREEN DES:33883 ID:BAT INDN:BAT CO ID:XXXXXXXXX CCD |
| Bank of America | Vulcan Consulting Group LLC dba DRD | 9551 | 6/22/2021 | | 19,900.00 | GREEN DES:34046 ID:BAT INDN:BAT CO ID:XXXXXXXXX CCD |
| Chase | Vulcan Consulting Group LLC | 3588 | 7/1/2021 | | 5,000.00 | Orig CO Name:Green Orig 0:003067492 Desc Date:21 0701 CO Entry Descr:35407 Sec CCD Trace#:067015098775245 Fed 210701 md ID Bat nd Name.Bat |
| | | | | | **84,600.00** | |

DRAFT FORM - SUBJECT TO CHANGE

Payor Accounts: BAT Inc., Coast Processing LLC,
EZ Debt Relief, Maverick Management, Prime Logix, The
Litigation Practice Group, Vulcan Consulting Group LLC

Exhibit 3
Page 45

# EXHIBIT 4

Exhibit 4
Page 46

<u>**STIPULATION AND SETTLEMENT AGREEMENT**</u>

**THIS SETTLEMENT AGREEMENT AND GENERAL RELEASE** ("Settlement Agreement") is entered into as of July 5, 2021 (the "Execution Date"), by and between Green Fund NY ("PLAINTIFF") and BAT INC DBA COAST PROCESSING and VULCAN CONSULTING GROUP LLC and THE LITIGATION PRACTICE GROUP PC and Tony Maurice Diab ("Defendants") (collectively, the "Parties").

<u>**WITNESSETH**</u>

WHEREAS, the Parties agree that there is a balance owed by Defendants to Plaintiff in the amount of $473,259.97 ("Balance"), and

WHEREAS, the parties have agreed to the terms of settlement as set forth below,

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.  <u>Payment of Outstanding Debt</u>. The Parties agree that if the Defendants do not breach this Agreement the Plaintiffs will accept $464,000.00 as payment in full (the "Settlement Amount"). Defendants agree to pay the Outstanding Obligation in full as follows:

    a.  Wire payment in the amount of $232,000 on or before July 6, 2021.

    b.  Wire payment in the amount of $232,000 on or before July 13, 2021.

2.  Defendants shall issue an irrevocable direction letter to EPPS on or before July 6, 2021 to issue the payments detailed in Paragraph 1 to Berkovitch & Bouskila PLLC as attorney for Plaintiffs.

3.  There shall be no cure period. If any payment is not received on the aforementioned dates, Plaintiff may exercise any and all remedies in law or equity including but not limited those expressly reserved in this Agreement.

4.  Plaintiffs obligations are conditioned on the fact that there are no other funds on hold by way of restraint, lien or any other method of the Plaintiff, other than funds that are described explicitly in this agreement. If it becomes known that there are funds on hold that the Defendants did not disclose to Plaintiff, said failure to disclose will be deemed a breach of this Agreement and Plaintiff will have all remedies afforded it by this agreement.

5.  <u>Remedies</u>. In the event of a breach of this Agreement Plaintiff reserves the right to exercise any and all remedies in law or equity and those contained in the underlying Merchant Agreement, including but not limited to exercise its right as a secured creditor and all rights afforded them by the Uniform Commercial Code, including but not limited to, UCC9-406, 9-408, and 9-607.

6.  <u>Venue.</u> The Defendants recognize that because payment is to be made in the state of New York, This Agreement shall be governed by and construed according to the laws of the State of New York, without giving

1

Exhibit 4
Page 47

effect to its choice of law principles. The parties agree that all actions and proceedings arising out of or relating directly or indirectly to this Agreement or any ancillary agreement or any other related obligations shall be litigated solely and exclusively in the state or federal courts located in the State of New York, and that such courts are convenient forums. Each party hereto submits to the personal jurisdiction of such courts for purposes of any such actions or proceedings.

4.        <u>Waiver of Plaintiff's Liability</u>. Upon the Effective Date, the Defendants for itself and on behalf of all parents, divisions, subsidiaries, affiliates, related entities, representatives, successors, directors, officers, owners, agents, employees, insurance carriers, attorneys and assigns, hereby releases and forever discharges Plaintiff and its respective parents, divisions, subsidiaries, affiliates, related entities, representatives, successors, directors, officers, owners, agents, employees, insurance carriers, attorneys and assigns of and from any and all claims, counterclaims, demands, damages, debts, liabilities, accounts, actions, causes of action and suits, known or unknown, liquidated or contingent, arising from, which may arise in the future from, or which are related in any manner to the underlying Agreement, including any claims that were or could have been asserted, other than Plaintiff's obligations under this Settlement Agreement. Defendants acknowledges that any and all legal claims it maintains must be brought by a breach of this settlement agreement.

5.        <u>Attorney Review</u>. Defendants acknowledge they had ample time to consult with an attorney of its choosing with respect to the terms of this Agreement, and has been advised to do so.

IN WITNESS WHEREOF, this Stipulation and Settlement Agreement has been agreed to and executed by the undersigned as of the Effective Date written above.


_____
Tony Maurice Diab individually and on behalf
Of BAT INC DBA COAST PROCESSING
and VULCAN CONSULTING GROUP
LLC and THE LITIGATION PRACTICE
GROUP PC


_____
Ariel Bouskila, Esq.
Attorneys for Plaintiffs
80 Broad Street Suite 3303
New York, New York 10004
(212) 729-1477

2

Exhibit 4
Page 48

# EXHIBIT 5

Exhibit 5
Page 49



## REVENUE PURCHASE AGREEMENT

This Revenue Purchase Agreement and Security Agreement and Guaranty of Performance ("Agreement") dated 03/17/2021 between Thor Capital ("FUNDER") the Merchant(s) listed below (**Merchant**") and the Individual(s) listed below ("Guarantor").

### MERCHANT INFORMATION

| | |
|---|---|
| **Merchant's Legal Name:** | THE LITIGATION PRACTICE GROUP PC |
| **D/B/A:** | THE LITIGATION PRACTICE GROUP |
| **State of Incorporation / Organization:** | |
| **Type of Entity:** | |
| **Physical Address:** | 17542 17TH ST STE 100 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **City:** | TUSTIN | **State:** | CA | **Zip:** | 92780 | **Business Phone:** | 555-555-5555 |

| | | | | | |
|---|---|---|---|---|---|
| **Guarantor(s) Name:** | DANIEL STEPHEN MARCH | **Cellphone Number:** | 555-555-5555 | **Email Address:** | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Mailing Address:** | 1351 CALLE AVANZADO STE4 | **City:** | SAN CLEMNTE | **State:** | CA | **Zip:** | 92673 |

| | | | | | |
|---|---|---|---|---|---|
| **Purchase Price:** | $500,000.00 | **Purchased Percent:** | 12% | **Purchased Amount:** | $749,500.00 |
| **Payment Frequency:** | Weekly | **Remittance:** | $37,475.00 | | |

In consideration of payment by FUNDER to Merchant of the Purchase Price set forth above, Merchant hereby sells, assigns and transfers to FUNDER (making FUNDER the absolute owner) the Purchased Percentage of all of Merchant's payments, receipts, settlements and funds paid to or received by or for the account of Merchant from time to time on and after the date hereof in payment or settlement of Merchant's existing and future accounts, payment intangibles, credit, debit and/or stored value card transactions, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers' and/or other payors or obligors (the "Future Receipts" defined as all payments made by cash, check, clearinghouse settlement, electronic transfer or other form of monetary payment), for the payments to Merchant as a result of Merchant's sale of goods and/or services (the "Transactions") until the Purchased Amount has been delivered by or on behalf of Merchant to FUNDER.

Merchant is selling a portion of a future revenue stream to FUNDER at a discount, and is not borrowing money from FUNDER, therefore there is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by FUNDER. The Remittance is a good faith estimate of FUNDER's share of the future revenue stream. Merchant going bankrupt or going out of business, or experiencing a slowdown in business, or a delay in collecting its receivables, in and of itself, does not constitute a breach of this Agreement. FUNDER is entering this Agreement knowing the risks that Merchant's business may not perform as expected or fail, and FUNDER assumes these risks based on Merchant's representations, warranties and covenants in this Agreement, which are designed to give FUNDER a reasonable and fair opportunity to receive the benefit of its bargain. FUNDER acknowledges that it may never receive the Purchased Amount in the event that the Merchant does not generate sufficient revenue. Merchant and Guarantor(s)(s) are only guaranteeing their performance of the terms of this Revenue Purchase Agreement, and are not guaranteeing the payment of the Purchased Amount. The initial Remittance shall be as described above. The Remittance is subject to adjustment as set forth in Paragraph 1.4 and Paragraph 1.5.

FUNDER will debit the Remittance each business day from only one depositing bank account, which account must be acceptable to, and pre-approved by, FUNDER (the "Account") into which Merchant and Merchant's customers shall remit the Receipts from each Transaction, until such time as FUNDER receives payment in full of the Purchased Amount. Merchant hereby authorizes FUNDER to ACH debit the agreed Remittance from the Account on the agreed upon Payment Frequency; a daily basis means any day that is not a United States banking holiday. Merchant agrees not to make or cause debits to the Account (other than in favor of FUNDER) at any time that would cause the balance therein on any business day to be insufficient to fund payment in full of the agreed Remittance. The Account may not be used for any personal, family or household purposes. Merchant will provide FUNDER with all required access codes and monthly bank statements regarding the Account so that FUNDER may monitor the Account. FUNDER payment of the Purchase Price shall be deemed the acceptance and performance by FUNDER of this Agreement. Merchant understands that it is responsible for ensuring that the agreed Remittance to be debited by FUNDER remains in the Account and will be held responsible for any fees incurred by FUNDER resulting from a rejected ACH attempt or an Event of Default. FUNDER is not responsible for any overdrafts or rejected transactions that may result from FUNDER's ACH debiting the agreed Remittance under the terms of this Agreement. Notwithstanding anything to the contrary in this Agreement or any other agreement between FUNDER and Merchant, upon the occurrence of an Event of Default of the MERCHANT AGREEMENT TERMS AND CONDITIONS the Purchased Percentage shall equal 100%. A list of all fees applicable under this Agreement is contained in Appendix A.

**THE MERCHANT AGREEMENT "TERMS AND CONDITIONS", THE "SECURITY AGREEMENT AND GUARANTY" AND THE "ADMINISTRATIVE FORM HEREOF, ARE ALL HEREBY INCORPORATED IN AND MADE A PART OF THIS MERCHANT AGREEMENT.**

| | | |
|---|---|---|
| **FOR THE MERCHANT(#1)** By: | DANIEL STEPHEN MARCH | *Daniel Stephen March* |
| | | 75394E0C910442E... |
| | (Print Name and Title) | (Signature) |
| **FOR THE MERCHANT(#2)** By: | | |
| | (Print Name and Title) | (Signature) |
| **BY THE GUARANTOR (#1)** By: | DANIEL STEPHEN MARCH | *Daniel Stephen March* |
| | | 75394E0C910442E... |
| | (Print Name and Title) | (Signature) |
| **BY THE GUARANTOR (#2)** By: | | |
| | (Print Name and Title) | (Signature) |

Initial: DSM

1

Exhibit 5
Page 50

## MERCHANT AGREEMENT TERMS AND CONDITIONS

**1    TERMS OF ENROLLMENT IN PROGRAM**

**1.1    Merchant Deposit Agreement and Processor.** Merchant shall (A) execute an agreement acceptable to FUNDER with a Bank acceptable to FUNDER to obtain electronic fund transfer services for the Account, and (B) if applicable, execute an agreement acceptable to FUNDER with a credit and debit card processor (the "Processor") instructing the Processor to deposit all Receipts into the Account. Merchant shall provide FUNDER and/or its authorized agent(s) with all of the information, authorizations and passwords necessary for verifying Merchant's receivables, receipts, deposits and withdrawals into and from the Account. Merchant hereby authorizes FUNDER and/or its agent(s) to withdraw from the Account via ACH debit the amounts owed to FUNDER for the receipts as specified herein and to pay such amounts to FUNDER. These authorizations apply not only to the approved Account but also to any subsequent or alternate account used by the Merchant for these deposits, whether pre- approved by FUNDER or not. This additional authorization is not a waiver of FUNDER's entitlement to declare this Agreement breached by Merchant as a result of its usage of an account which FUNDER did not first pre- approve in writing prior to Merchant's usage thereof. The aforementioned authorizations shall be irrevocable without the written consent of FUNDER.

**1.2    Term of Agreement.** This Agreement shall remain in full force and effect until the entire Purchased Amount and any other amounts due are received by FUNDER as per the terms of this Agreement.

**1.3    Reconciliation.** As long as an Event of Default, or breach of this agreement, has not occurred, Merchant may request a retroactive reconciliation of the total Remittance Amount. All requests hereunder must be in writing to Reconciliations@funder.com. Said request must include copies of all of Merchant's bank account statements, credit card processing statements, and accounts receivable report outstanding if applicable, from the date of this Agreement through and including the date the request is made. FUNDER retains the right request additional reasonable documentation including without limitation bank login or access to view Merchant's accounts using third party software, and Merchant's refusal to provide access shall be a breach of this Agreement and FUNDER shall have no obligation to reconcile. Such reconciliation, if applicable, shall be performed by FUNDER within two (2) Business Days following its receipt of Merchant's request for reconciliation by either crediting or debiting the difference back to, or from, Merchants Bank Account so that the total amount debited by FUNDER shall equal the Specific Percentage of the Future Receipts that Merchant collected during the requested month. Nothing set forth in this section shall be deemed to provide Merchant with the right to interfere with FUNDER's right and ability to debit Merchant's Account while the request is pending or to unilaterally modify the Remittance Amount, in any method other than the ones listed in this Agreement.

**1.4    Adjustments to the Remittance.** As long an Event of Default, or breach of this agreement, has not occurred, Merchant may give notice to FUNDER to request a decrease in the Remittance, should they experience a decrease in its Future Receipts. All requests hereunder must be in writing to Reconciliations@funder.com and must include copies of all of Merchant's bank account statements, credit card processing statements, and accounts receivable report outstanding from the date of this Agreement through and

including the date the request is made. FUNDER retains the right the request additional reasonable documentation including without limitation bank login or 3rd party software access to view Merchant's accounts, refusal to provide access shall be a breach of this Agreement and FUNDER shall have no obligation to reconcile. The Remittance shall be modified to more closely reflect the Merchant's actual receipts by multiplying the Merchant's actual receipts by the Purchased Percentage divided by the number of business days in the previous

(2) calendar weeks. Merchant shall provide FUNDER with viewing access to their bank account as well as all information reasonably requested by FUNDER to properly calculate the Merchant's Remittance. At the end of the two (2) calendar weeks the Merchant may request another adjustment pursuant to this paragraph or it is agreed that the Merchant's Remittance shall return to the Remittance as agreed upon on Page 1 of this Agreement.

**1.5    Financial Condition.** Merchant and Guarantor(s)(s) (as hereinafter defined and limited) authorize FUNDER and its agents to investigate their financial responsibility and history, and will provide to FUNDER any authorizations, bank or financial statements, tax returns, etc., as FUNDER requests in its sole and absolute discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable as an authorization for release of financial and credit information. FUNDER is authorized to update such information and financial and credit profiles from time to time as it deems appropriate.

**1.6    Transactional History.** Merchant authorizes all of its banks, brokers and processor to provide FUNDER with Merchant's banking, brokerage and/or processing history to determine qualification or continuation in this program and for collections purposes. Merchant shall provide FUNDER with copies of any documents related to Merchant's card processing activity or financial and banking affairs within five days after a request from FUNDER.

**1.7    Indemnification.** Merchant and Guarantor(s)(s) hereby jointly and severally indemnify and hold harmless FUNDER and each Processor, their respective officers, directors, agents and representatives, and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by any such indemnitee as a direct or indirect result of (a) claims asserted by FUNDER for monies owed to FUNDER from Merchant and (b) actions taken by indemnitee in reliance upon any fraudulent, misleading or deceptive information or instructions provided by FUNDER.

**1.8    No Liability.** In no event will FUNDER be liable for any claims asserted by Merchant or Guarantor(s)s under any legal or equitable theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by both Merchant and Guarantor(s)(s). In the event these claims are nonetheless raised, Merchant and Guarantor(s)(s) will be jointly liable for all of FUNDER's attorney's fees and expenses resulting therefrom.

**1.9    Reliance on Terms.** Section 1.1, 1.6, 1.7, 1.8 and 2.5 of this Agreement are agreed to for the benefit of Merchant, FUNDER, Processor, and Merchant's bank and notwithstanding the fact that Processor and the bank is not a party of this Agreement, Processor and the bank may rely upon their terms and raise them as a defense in any action.

**1.10    Sale of Receipts.** Merchant and FUNDER agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount, and that such Purchase Price is not intended to be, nor shall it be construed as a loan from FUNDER to Merchant. Merchant agrees that the Purchase Price is in exchange for the Receipts pursuant to this Agreement, and that it equals the fair market value of such Receipts. FUNDER has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Merchant acknowledges that FUNDER's share of Receipts collected are being held by Merchant in trust and are the sole property of FUNDER until they are remitted to FUNDER. Payments made to FUNDER in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services, and the payment therefore by Merchant's customers. By this Agreement, Merchant transfers to FUNDER full and complete ownership of the Purchased Amount and Merchant retains no legal or equitable interest therein. FUNDER hereby appoints Merchant, and Merchant accepts appointment, as servicer for and on behalf of FUNDER for the purpose of collecting and delivering Receipts to FUNDER as required by this Agreement until FUNDER has received the Receipts Purchased Amount, and Merchant agrees that all such Receipts shall be received and held in trust for the benefit of SPFL for purposes of carrying out the terms of this Agreement. Merchant agrees that it will treat the amounts received and the Purchased Receipts delivered to FUNDER under this Agreement in a manner consistent with a sale in its accounting records and tax returns. Merchant agrees that FUNDER is entitled to audit Merchant's accounting records upon reasonable notice in order to verify compliance. Merchant waives any rights of privacy, confidentiality or taxpayer privilege in any such litigation or arbitration in which Merchant asserts that this transaction is anything other than a sale of future receipts. In no event shall the aggregate of all amounts or any portion thereof be deemed as interest hereunder, and in the event it is found to be interest despite the parties hereto specifically representing that it is NOT interest, it shall be found that no sum charged or collected hereunder shall exceed the highest rate permissible at law. In the event that a court nonetheless determines that FUNDER has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and FUNDER shall promptly refund to Merchant any interest received by FUNDER in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that FUNDER not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law. As a result thereof, Merchant knowingly and willingly waives the defense of Usury in any action or proceeding.

**1.11    Power of Attorney.** Merchant irrevocably appoints FUNDER and its agents and representatives, as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to FUNDER from Processor, or in the case of a violation by Merchant of Section 1or the occurrence of an Event of Default under Section 3 hereof, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to FUNDER; and (v) to contact Merchant's banks and financial institutions using Merchant and Guarantor(s)(s) personal information to verify the existence of an account and obtain account balances (vi) to file any claims or take any action or institute any proceeding which FUNDER may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount. In connection therewith, all costs, expenses and fees, including legal fees, shall be payable by merchant.

**1.12    Protections against Default.** The following Protections 1 through 8 may be invoked by FUNDER immediately and without notice to Merchant in the event: (a) Merchant takes any action to discourage the use of electronic check processing that are settled through Processor, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks or other payments or deposits for the purchase of Merchant's services and products including but not limited to direct deposit of any checks into a bank account without scanning into the FUNDER electronic check processor; (b) Merchant changes its arrangements with Proc_____ank in any way that

Initial: _DSM_

Exhibit 5
Page 51

is adverse or unacceptable to FUNDER; (c) Merchant changes the electronic check processor through which the Receipts are settled from Processor to another electronic check processor, or permits any event to occur that could cause diversion of any of Merchant's check or deposit transactions to another processor; (d) Merchant intentionally interrupts or ceases the operation of this business transfers, moves, sells, disposes, or otherwise conveys its business and/or assets without (i) the express prior written consent of FUNDER, and (ii) the written agreement of any FUNDER or transferee to the assumption of all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to FUNDER;(e) Merchant takes any action, fails to take any action, or offers any incentive—economic or otherwise—the result of which will be to induce any customer or customers to pay for Merchant's services with any means other than payments, checks or deposits that are settled through Processor; (f) Merchant fails to provide FUNDER with copies of any documents related to Merchant's card processing activity of financial and banking affairs within five days after a request from FUNDER, or (g) Merchant breaches any terms of this Agreement, including but not limited any of the Events of Default contained in Section 3.1 herein. These protections arein addition to any other remedies available to FUNDER at law, in equity or otherwise pursuant to this Agreement.

**Protection 1.** The full uncollected Purchased Amount plus all fees (including attorney's fees and costs of collection in the amount of 30% of the Purchased Amount then outstanding due under this Agreement and the attached Security Agreement become due and payable in full immediately.

**Protection 2.** FUNDER may enforce the provisions of the Limited Personal Guaranty of Performance against the Guarantor(s).

**Protection 3.** Merchant hereby authorizes FUNDER to execute in the name of the Merchant a Confession of Judgment in favor of FUNDER pursuant to the terms of the Confession of Judgment. Upon an Event of Default, FUNDER may enter that Confession of Judgment as a Judgment with the Clerk of any Court and execute thereon.

**Protection 4.** FUNDER may enforce its security interest in the Collateral including sending demand letters to account debtors and credit card processors.

**Protection 5.** FUNDER may exercise any and all rights and remedies of a secured party under Uniform Commercial Code Article 9

**Protection 6.** FUNDER may proceed to protect and enforce its right and remedies by lawsuit. In any such lawsuit, if FUNDER recovers a Judgment against Merchant, Merchant shall be liable for all of FUNDER's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs.

**Protection 7.** This Agreement shall be deemed Merchant's Assignment of Merchant's Lease of Merchant's business premises to FUNDER. Upon breach of any provision in this Agreement, FUNDER may exercise its rights under this Assignment of Lease without prior Notice to Merchant. Protection 8. FUNDER may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to FUNDER.

**Protection 8.** FUNDER may debit Merchant's depository accounts wherever situated in such amounts as determined by FUNDER in its sole discretion for purposes of collecting funds for application to the unrealized Purchased Amount and other amounts owed by Merchant to FUNDER by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to FUNDER.

1.13 **Protection of Information.** Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner or Guarantor(s), in respect of himself or herself personally, authorizes FUNDER to disclose information concerning Merchant's and each Owner's and each Guarantor(s)'s credit standing (including credit bureau reports that FUNDER obtains) and business conduct only to agents, affiliates, subsidiaries, and credit reporting bureaus. Merchant and each Owner and each Guarantor(s) hereby and each waives to the maximum extent permitted by law any claim for damages against FUNDER or any of its affiliates relating to any (i)investigation undertaken by or on behalf of FUNDER as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

1.14 **Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by FUNDER, including this Agreement and any other FUNDER documents (collectively, "Confidential Information") are proprietary and confidential information of FUNDER. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information of FUNDER to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this section. A breach hereof entitles FUNDER to not only damages and reasonable attorney's fees but also to both a Temporary Restraining Order and a Preliminary Injunction without Bond or Security.

1.15 **Publicity**. Merchant and each of Merchant's Owners and all Guarantor(s)s heretoall hereby authorizes FUNDER to use its, his or her name in listings of clients and in advertising and marketing materials.

1.16 **D/B/A's.** Merchant hereby acknowledges and agrees that FUNDER may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between FUNDER and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**2          REPRESENTATIONS, WARRANTIES AND COVENANTS**
Merchant represents warrants and covenants that, as of this date and during the term of this Agreement:

2.1          **Financial Condition and Financial Information.** Merchant's and Guarantor(s)s' bank and financial statements, copies of which have been furnished to FUNDER, and future statements which will be furnished hereafter at the discretion of FUNDER, fairly represent the financial condition of Merchant at such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant and Guarantor(s)s have a continuing, affirmative obligation to advise FUNDER of any material adverse change in their financial condition, operation or ownership. FUNDER may request statements at any time during the performance of this Agreement and the Merchant and Guarantor(s)s shall provide them to FUNDER within five business days after request from FUNDER. Merchant's or Guarantor(s)s' failure to do so is a material breach of this Agreement.

2.2          **Governmental Approvals.** Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.

2.3          **Authorization.** Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been dulyauthorized.

2.4          **Use of Funds.** Merchant agrees that it shall use the Purchase Price for business purposes and not for personal, family, or household purposes.

2.5          **Electronic Check Processing Agreement.** Merchant will not change its Processor, add terminals, change its financial institution or bank account(s)or take any other action that could have any adverse effect upon Merchant's obligations under this Agreement, without FUNDER's prior written consent. Any such changes shall be a material breach of this Agreement.

2.6          **Change of Name or Location.** Merchant will not conduct Merchant's businesses under any name other than as disclosed to the Processor and FUNDER, nor shall Merchant change any of its places of business without prior written consent by FUNDER.

2.7          **Daily Batch Out.** Merchant will batch out receipts with the Processor on a daily basis ifapplicable.

2.8          **Estoppel Certificate.** Merchant will at every and all times, and from time to time, upon at least one (1) day's prior notice from FUNDER to Merchant, execute, acknowledge and deliver to FUNDER and/or to any other person, firm or corporation specified by FUNDER, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion thereof has been repaid.

2.9          **No Bankruptcy.** As of the date of this Agreement, Merchant is not insolvent and does not contemplate filing for bankruptcy in the next six months and has not consulted with a bankruptcy attorney or filed any petition for bankruptcy protection pursuant to the United States Bankruptcy Code and there has been no involuntary petition brought or pending against Merchant. Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

2.10          **Unencumbered Receipts.** Merchant has good, complete, unencumbered and marketable title to all Receipts and all collateral in which FUNDER has been granted a security interest under the Security Agreement, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever other than in favor of FUNDER or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of FUNDER.

2.11          **Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

2.12          **Defaults under Other Contracts.** Merchant's execution of, and/or performance under this Agreement, will not cause or create an event of default by Merchant under any contract with another person or entity.

2.13          **Good Faith.** Merchant and Guarantor(s)s hereby affirm that Merchant is receiving the Purchase Price and selling FUNDER the Purchased Amount in good faith and will use the Purchase Price funds to maintain and grow Merchant's business

**3          EVENTS OF DEFAULT AND REMEDIES**
3.1          **Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" hereunder:

(a)          Merchant or Guarantor(s) shall violate any term or covenant in this Agreement;



Initial:

Exhibit 5
Page 52

(b)     Any representation or warranty by Merchant or Guarantor(s) in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made;

(c)     the sending of notice of termination by Merchant or verbally notifying FUNDER of its intent to breach this Agreement;

(d)     the Merchant fails to give FUNDER 24 hours advance notice that there will be insufficient funds in the account such that the ACH of the Remittance amount will not be honored by Merchant's bank, the Merchant fails to supply all requested documentation and allow for daily and/or real time monitoring of its bank account;

(e)     Merchant fails to provide its bank statements, and/or month to date bank activity, and/or accounts receivable reports, and/or bank login information within two (2) business days of a request by FUNDER,

(f)     Merchant shall voluntarily transfer or sell all or substantially all of its assets;

(g)     Merchant shall make or send notice of any intended bulk sale or transfer by Merchant;

(h)     Merchant shall use multiple depository accounts without the prior written consent of FUNDER or takes any other action that intentionally interferes with or prevents FUNDER from receiving the Purchased Amount in accordance with the terms of this Agreement;

(i)     Merchant shall enter into any financing agreements with any other party including but not limited to: Loans, Merchant Cash Advances, Receivables financing, or any other agreement that will increase the total debt owed by Merchant to any other party.

(j)     Merchant shall change its depositing account without the prior written consent of FUNDER; or

(k)     Merchant shall close its depositing account used for ACH debits without the prior written consent of FUNDER

(l)     Merchant's bank returns a code other than NSF cutting FUNDER from its collections

(m)     Merchant or any Owner/Guarantor(s), directly or indirectly, causes to be formed a new entity or otherwise becomes associated with any new or existing entity, which operates a business similar to or competitive with that of Merchant;

(n)     Merchant shall default under any of the terms, covenants and conditions of any other agreement with FUNDER.

3.2     **Limited Personal Guaranty** Upon the occurrence of an Event of Default, FUNDER will enforce its rights against the Guarantor(s)s of this transaction. Said Guarantor(s)s will be jointly and severally liable to FUNDER for all of FUNDER's losses and damages, in additional to all costs and expenses and legal fees associated with such enforcement.

3.3     **Remedies.** Upon the occurrence of an Event of Default occurs and is not waived pursuant to Section 4.4. hereof, FUNDER may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Merchant's obligations hereunder (including the Guaranty) or any other legal or equitable right or remedy, including but not limited to filing the Confession of Judgment and executing thereon, and enforcing the Security Agreement contained herein. All rights, powers and remedies of FUNDER in connection with this Agreement may be exercised at any time by FUNDER after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

3.4     **Attorney's Fees.** Upon the occurrence of an Event of Default, and Funder retains an attorney or law firm to enforce this Agreement, Merchant and Guarantor(s) agree that a fee equal to 30% of the Remaining Balance (purchased amount less amount remitted by Merchant) ("Attorney's Fees") shall be immediately assessed Merchant and Guarantor(s) agree that the calculation for Attorney's Fees is reasonable.

3.5     **Costs.** Merchant shall pay to FUNDER all reasonable costs associated with (a) an Event or Default, (b) breach by Merchant of the Covenants in this Agreement and the enforcement thereof, and(c) the enforcement of FUNDER's remedies set forth in this Agreement, including but not limited to court costs and attorneys' fees.

3.6     **Required Notifications.** Merchant is required to give FUNDER written notice within 24 hours of any filing under Title 11 of the United States Code. Merchant is required to give FUNDER seven days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or stock.

**4     MISCELLANEOUS**

4.1     **Modifications; Agreements.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by FUNDER.

4.2     **Assignment.** FUNDER may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part.

4.3     **Notices.** All notices, requests, consents, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement. Notices to FUNDER shall become effective only upon receipt by FUNDER. Notices to Merchant shall become effective three days after mailing.

4.4     **Waiver Remedies.** No failure on the part of FUNDER to exercise, and no delay in exercising any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

4.5     **Binding Effect; Governing Law, Venue and Jurisdiction.** This Agreement, Security Agreement and Guaranty, Guaranty of Performance, and any and all addendums attachments, exhibits, and other documents relating to this Agreement in any way, shall be binding upon and inure to the benefit of Merchant and Guarantor(s) on the one hand, and FUNDER and their respective successors and assigns, except that Merchant and Guarantor(s) shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of FUNDER which consent may be withheld in FUNDER's sole discretion. FUNDER reserves the rights to assign this Agreement with or without prior written notice to Merchant. This Agreement, Security Agreement and Guaranty, Guaranty of Performance, and any and all addendums, attachments, exhibits, and other documents relating to this Agreement in any way, shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if FUNDER so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). All Parties to this Agreement, including but not limited to, Merchant, Guarantor(s), Corporate Guarantor(s) Merchant and Guarantor(s) that the Acceptable Forums are convenient to it, and submit to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant and Guarantor(s) waives any right to oppose any motion or application made by FUNDER to transfer such proceeding to an Acceptable Forum. **Merchant and Guarantor(s) hereby agree that the mailing of any Summons and Complaint in any proceeding commenced by FUNDER by certified or registered mail, return receipt requested to the Mailing Address listed on this Agreement, or via email to the Email Address listed on this Agreement, or any other process required by any such court will constitute valid and lawful service of process against them without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions.**

4.6     **Survival of Representation**, etc. All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

4.7     **Interpretation.** All Parties hereto have reviewed this Agreement with attorney of their own choosing and have relied only on their own attorneys' guidance and advice. No construction determinations shall be made against either Party hereto as drafter.

4.8     **Severability.** In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected orimpaired.

4.9     **Entire Agreement.** Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof. This Agreement and the Security Agreement and Guaranty hereto embody the entire agreement between Merchant Guarantor(s) and Corporate Guarantor(s) and FUNDER and supersede all prior agreements and understandings relating to the subject matter hereof.

4.10     **JURY TRIAL WAIVER.** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING INCONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OR THEENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

4.11     **CLASS ACTION WAIVER.** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS  AGREEMENT); AND  ( 2)  THE  PARTY WHO INITIATES OR PARTICIPATES IN A MEMBER OF THE CLASS WILL NOT SUBMIT  A  CLAIM OR OTHERWISE PARTICIPATE IN ANY  RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

4.12     **Facsimile & Digital Acceptance.** Facsimile signatures and digital signatures hereon shall be deemed acceptable for all purposes.

Initial: DSM

Exhibit 5
Page 53

## SECURITY AGREEMENT AND GUARANTY OF PERFORMANCE

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY OF PERFORMANCE. CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.

| | |
|---|---|
| Merchant's Legal Name: | THE LITIGATION PRACTICE GROUP PC |
| D/B/A: | THE LITIGATION PRACTICE GROUP |
| Physical Address: | 17542 17TH ST STE 100   City: TUSTIN   State: CA   Zip: 92780 |

### SECURITY AGREEMENT

**Security Interest.** This Agreement will constitute a security agreement under the Uniform Commercial Code. To secure Merchant's obligations under the Revenue Purchase Agreement to make available or deliver Purchased Amount to FUNDER and FUNDER's right to realize the Purchased Amount, as and to the extent required by the terms of the Revenue Purchase Agreement, and performance of and compliance by Merchant with its other undertakings and agreements herein, Merchant and Guarantor(s)(s) grants to FUNDER a security interest in and lien upon: (a) all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are each defined in Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant and/or Guarantor(s)(s), (b) all proceeds, as that term is defined in Article 9 of the UCC (c) all funds at any time in the Merchant's and/or Guarantor(s)(s) Account, regardless of the source of such funds, (d) present and future Electronic Check Transactions, and (e) any amount which may be due to FUNDER under this Agreement, including but not limited to all rights to receive any payments or credits under this Agreement (collectively, the "Secured Assets"). Merchant agrees to provide other security to FUNDER upon request to secure Merchant's obligations under this Agreement. Merchant agrees that, if at any time there are insufficient funds in Merchant's Account to cover FUNDER's entitlements under this Agreement, FUNDER is granted a further security interest in all of Merchant's assets of any kind whatsoever, and such assets shall then become Secured Assets. These security interests and liens will secure all of FUNDER's entitlements under this Agreement and any other agreements now existing or later entered into between Merchant, FUNDER or an affiliate of FUNDER is authorized to file any and all notices or filings it deems necessary or appropriate to enforce its entitlements hereunder.

In the event Merchant, any of its officers or directors or any Owner/Guarantor(s), during the term of the Revenue Purchase Agreement or while Merchant remains liable to FUNDER for any obligations under the Revenue Purchase Agreement, directly or indirectly, including acting by, through or in conjunction with any other person, causes to be formed a new entity or otherwise becomes associated with any new or existing entity, whether corporate, partnership, limited liability company or otherwise, which operates a business similar to or competitive with that of Merchant, such entity shall be deemed to have expressly assumed the obligations due FUNDER under the Revenue Purchase Agreement. With respect to any such entity, FUNDER shall be deemed to have been granted an irrevocable power of attorney with authority to file, naming such newly formed or existing entity as debtor, an initial UCC financing Statement and to have it filed with any and all appropriate UCC filing offices. FUNDER shall be held harmless by Merchant and each Owner/Guarantor(s) and be relieved of any liability as a result of any such authentication and filing of any such Financing Statement or the resulting perfection of its ownership rights or security interests in such entity's assets. FUNDER shall have the right to notify such entity's payors or account debtor (as defined by the UCC) of FUNDER's rights, including without limitation, FUNDER's right to collect all accounts, and to notify any payment card processor or creditor of such entity that FUNDER has such rights in such entity's assets. Merchant also agrees that, at the FUNDER's discretion, FUNDER may choose to amend any existing financing statement to include any such newly formed entity as debtor.

This security interest may be exercised by FUNDER without notice or demand of any kind by making an immediate withdrawal or freezing the Secured Assets. FUNDER shall have the right to notify account debtors at any time. Pursuant to Article 9 of the Uniform Commercial Code, as amended from time to time, FUNDER has control over and may direct the disposition of the Secured Assets, without further consent of Merchant. Merchant hereby represents and warrants that no other person or entity has a security interest in the Secured Assets.

With respect to such security interests and liens, FUNDER will have all rights afforded under the Uniform Commercial Code, any other applicable law and in equity. Merchant will obtain from FUNDER written consent prior to granting a security interest of any kind in the Secured Assets to a third party. Merchant and Guarantor(s) (s) agree(s) that this is a contract of recoupment and FUNDER is not required to file a motion for relief from a bankruptcy action automatic stay to realize on any of the Secured Assets. Nevertheless, Merchant and Guarantor(s)(s) agree(s) not to contest or object to any motion for relief from the automatic stay filed by FUNDER. Merchant and Guarantor(s)(s) agree(s) to execute and deliver to FUNDER such instruments and documents FUNDER may reasonably request to perfect and confirm the lien, security interest and right of setoff set forth in this Agreement. FUNDER is authorized to execute all such instruments and documents in Merchant's and Guarantor(s)(s) name.

Merchant and Guarantor(s)(s) each acknowledge and agree that any security interest granted to FUNDER under any other agreement between Merchant or Guarantor(s)(s) and FUNDER (the "Cross-Collateral") will secure the obligations hereunder and under the Merchant Agreement. Merchant and Guarantor(s)(s) each agrees to execute any documents or take any action in connection with this Agreement as FUNDER deems necessary to perfect or maintain FUNDER's first priority security interest in the Collateral and the Additional Collateral, including the execution of any account control agreements. Merchant and Guarantor(s)(s) each hereby authorizes FUNDER to file any financing statements deemed necessary by FUNDER to perfect or maintain FUNDER's security interest. Merchant and Guarantor(s)(s) shall be liable for, and FUNDER may charge and collect, all costs and expenses, including but not limited to attorney's fees, which may be incurred by FUNDER in protecting, preserving and enforcing FUNDER's security interest and rights.

**Negative Pledge**. Merchant and Guarantor(s)(s) each agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Additional Collateral, as applicable.

**Consent to Enter Premises and Assign Lease**. FUNDER shall have the right to cure Merchant's default in the payment of rent on the following terms. In the event Merchant is served with papers in an action against Merchant for nonpayment of rent or for summary eviction, FUNDER may execute its rights and remedies under the Assignment of Lease. Merchant also agrees that FUNDER may enter into an agreement with Merchant's landlord giving FUNDER the right: (a) to enter Merchant's premises and to take possession of the fixtures and equipment therein for the purpose of protecting and preserving same; and/or (b) to assign Merchant's lease to another qualified business capable of operating a business comparable to Merchant's at such premises.

**Remedies**. Upon any Event of Default, FUNDER may pursue any remedy available at law (including those available under the provisions of the UCC), or in equity to collect, enforce, or satisfy any obligations then owing to FUNDER, whether by acceleration or otherwise.

Initial: 

Exhibit 5
Page 54

## GUARANTY OF PERFORMANCE

As an additional inducement for FUNDER to enter into the Revenue Purchase Agreement, the undersigned Guarantor(s)(s) hereby provides FUNDER with this Guaranty. Guarantor(s)(s) will not be personally liable for any amount due under the Revenue Purchase Agreement unless Merchant commits an Event of Default pursuant to Paragraph 3.1 of the Revenue Purchase Agreement. Each Guarantor(s)(s) shall be jointly and severally liable for all amounts owed to FUNDER in the Event of Default. Guarantor(s)(s) guarantee Merchant's good faith, truthfulness and performance of all of the representations, warranties, covenants made by Merchant in this Agreement including the Merchant's full and timely delivery of the Purchased Amount pursuant to (and limited by) the Revenue Purchase Agreement, in each case as each may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations"). Guarantor(s)'s obligations are due at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in the Agreement.

**Guarantor(s) Waivers.** In the event of a breach of the above, FUNDER may seek recovery from Guarantor(s)s for all of FUNDER's losses and damages by enforcement of FUNDER's rights under this Agreement without first seeking to obtain payment from Merchant, any other Guarantor(s), or any Collateral or Additional Collateral FUNDER may hold pursuant to this Agreement or any other guaranty. In addition, Section 4.5, 4.10 and 4.11 are expressly reiterated in the Security Agreement and Guaranty herein. FUNDER is not required to notify Guarantor(s) of any of the following events and Guarantor(s) will not be released from its obligations under this Agreement if it is not notified of: (i) Merchant's failure to pay timely any amount required under the Merchant Agreement; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; (iv) FUNDER's acceptance of this Agreement; and (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to FUNDER. In addition, FUNDER may take any of the following actions without releasing Guarantor(s) from any of its obligations under this Agreement: (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to FUNDER; (ii) release Merchant from its obligations to FUNDER; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor(s) to obtain reimbursement for payment under this Agreement. Until the Purchased Amount and Merchant's other obligations to FUNDER under the Merchant Agreement and this Agreement are paid in full, Guarantor(s) shall not seek reimbursement from Merchant or any other Guarantor(s) for any amounts paid by it under this Agreement. Guarantor(s) permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other Guarantor(s), or any collateral provided by Merchant or any other Guarantor(s), for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution. In the event that FUNDER must return any amount paid by Merchant or any other Guarantor(s) of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor(s)'s obligations under this Agreement shall include that amount.

Guarantor(s) Acknowledgement. Guarantor(s) acknowledges that: (i) He/She is bound by the Class Action Waiver provision in the Merchant Agreement Terms and Conditions; (ii) He/She understands the seriousness of the provisions of this Agreement; (iii) He/She has had a full opportunity to consult with counsel of his/her choice; and (iv) He/She has consulted with counsel of its choice or has decided not to avail himself/herself of that opportunity.

This Security Agreement and Guaranty and Guaranty of Performance shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if Funder so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). Merchant, Guarantor and Corporate Guarantors agree that the Acceptable Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Merchant, Guarantor and Corporate Guarantors agree that the Acceptable Forums are convenient to it, and submit to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant, Guarantor and Corporate Guarantors waives any right to oppose any motion or application made by Funder to transfer such proceeding to an Acceptable Forum.

<mark>The Merchant Guarantor(s) and Corporate Guarantor(s) acknowledge that they have read Paragraph 4.5 of this Agreement in its entirety and understand that they are waiving their right to Service of Process by traditional manners and will accept process of any Summons and Complaint or other legal process by certified mail return receipt requested to the Mailing Address on Page 1 of this Agreement.</mark>

**FOR ALL THE MERCHANTS (#1)** By: _____    DocuSigned by:
*Daniel Stephen March*

DANIEL STEPHEN MARCH                                       75394E0C910442E...

(Print Name and Title)                                     (Signature)

SSN #: ██████████

**FOR ALL THE MERCHANTS (#2)** By: _____    _____

(Print Name and Title)                                     (Signature)

SSN #: _____

**GUARANTORS (#1)** By: _____                DocuSigned by:
*Daniel Stephen March*

DANIEL STEPHEN MARCH                                       75394E0C910442E...

(Print Name and Title)                                     (Signature)

SSN #: ██████████

**GUARANTORS (#2)** By: _____                _____

(Print Name and Title)                                     (Signature)

SSN #: _____

DS
Initial: DSM

Exhibit 5
Page 55

**APPENDIX A - THE FEE STRUCTURE:**

A.   Underwriting Fee:  to cover underwriting and related expenses.

B.   Origination Fee 10% to cover cost of Origination and ACH Setup

C.    NSF Fee (Standard) 50 (each)

D.   Rejected ACH / Blocked ACH / Default Fee $5,000.00 When Merchant BLOCKS Account from our Debit ACH, or when Merchant directs the bank to reject our Debit ACH, which places them in default (per contract). When Merchant changes bank Account cutting us off from our collections.

E.    Bank Change Fee $50.00. When Merchant requires a change of Bank Account to be Debited, requiring us to adjust our system.

F.    Wire Fee - Each Merchant shall receive their funding electronically to their designated bank account and will be charged $50.00 for a Fed Wire or $0.00 for a bank ACH.

G. Attorney's Fee: $10,000. When merchant breaches any term of this Agreement and FUNDER is required to retain counsel to enforce, defend or collect any term of this Agreement.

H. Monthly Maintenance Fee: $299.00

**FOR THE MERCHANT(#1)** By: _____DANIEL STEPHEN MARCH_____        _____

                                    (Print Name and Title)                              (Signature)

**FOR THE MERCHANT(#2)** By: _____        _____

                                    (Print Name and Title)                              (Signature)



Initial:

Exhibit 5
Page 56

# EXHIBIT 6

Exhibit 6
Page 57

In re: The Litigation Practice Group PC
Disbursement Details by Payee
4 Years Pre-Petition (03/20/2019 - 03/20/2023)

ACE FUNDING DBA THOR CAPITAL



| Bank Name | Account Name | Account Number | Transaction Date | Debit/Charge | Memo |
|---|---|---|---|---|---|
| Bank of the West | The Litigation Practice Group PC | 3441 | 3/26/2021 | 37,475.00 | ELECTRONIC DBT Thor Capital Payment 032621 CCD |
| Bank of the West | The Litigation Practice Group PC | 3441 | 4/2/2021 | 299.00 | ELECTRONIC DBT Thor Capital Payment 040221 CCD |
| Bank of the West | The Litigation Practice Group PC | 3441 | 4/9/2021 | 37,475.00 | ELECTRONIC DBT Thor Capital Payment 040921 CCD |
| Bank of the West | The Litigation Practice Group PC | 3441 | 4/16/2021 | 37,475.00 | ELECTRONIC DBT Thor Capital Payment 041621 CCD |
| Bank of the West | The Litigation Practice Group PC | 3441 | 4/23/2021 | 37,475.00 | ELECTRONIC DBT Thor Capital Payment 042321 CCD |
| Bank of the West | The Litigation Practice Group PC | 3441 | 4/30/2021 | 37,475.00 | ELECTRONIC DBT Thor Capital Payment 043021 CCD |
| Bank of the West | The Litigation Practice Group PC | 3441 | 5/4/2021 | 299.00 | ELECTRONIC DBT Thor Capital Payment 050421 CCD |
| Bank of the West | The Litigation Practice Group PC | 3441 | 5/7/2021 | 37,475.00 | ELECTRONIC DBT Thor Capital Payment 050721 CCD |
| Bank of the West | The Litigation Practice Group PC | 3441 | 5/14/2021 | 37,475.00 | ELECTRONIC DBT Thor Capital Payment 051421 CCD |
| Bank of the West | The Litigation Practice Group PC | 3441 | 5/21/2021 | 37,475.00 | ELECTRONIC DBT Thor Capital Payment 052121 CCD |
| Bank of the West | The Litigation Practice Group PC | 3441 | 5/28/2021 | 37,475.00 | ELECTRONIC DBT Thor Capital Payment 052821 CCD |
| Bank of the West | The Litigation Practice Group PC | 3441 | 6/2/2021 | 299.00 | ELECTRONIC DBT Thor Capital Payment 060221 CCD |
| Bank of the West | The Litigation Practice Group PC | 3441 | 6/3/2021 | 11,658.00 | ELECTRONIC DBT Thor Capital Payment 060321 CCD |
| Bank of the West | The Litigation Practice Group PC | 3441 | 6/4/2021 | 11,658.00 | ELECTRONIC DBT Thor Capital Payment 060421 CCD |
| Bank of the West | The Litigation Practice Group PC | 3441 | 6/7/2021 | 11,658.00 | ELECTRONIC DBT Thor Capital Payment 060721 CCD |
| Bank of the West | The Litigation Practice Group PC | 3441 | 6/8/2021 | 11,658.00 | ELECTRONIC DBT Thor Capital Payment 060821 CCD |
| Bank of the West | The Litigation Practice Group PC | 3441 | 6/9/2021 | 11,658.00 | ELECTRONIC DBT Thor Capital Payment 060921 CCD |
| | | | | 396,462.00 | |

DRAFT FORM - SUBJECT TO CHANGE

Payor Accounts: BAT Inc., Coast Processing LLC,
EZ Debt Relief, Maverick Management, Stripe Logix, The
Litigation Practice Group, Vulcan Consulting Group LLC

Exhibit 6
Page 58

# EXHIBIT 7

Exhibit 7
Page 59

# PURCHASE & SALE OF FUTURE RECEIVABLES

**FUNDURA CAPITAL**

This Revenue Purchase Agreement and Security Agreement and Guaranty of Performance ("Agreement") dated __07/14/2021__ between Fundura Capital Group, ("**FCG**") the Merchant(s) listed below (**Merchant**") and the Individual(s) listed below ("**Guarantor**")

## Merchant Information

Merchant's Legal Name: **BAT, INC. and the entities listed on annexed "Exhibit A"**

D/B/A: **COAST PROCESSING**                    State of Incorporation / Organization: **CA**

Type of Entity:

Physical Address: **17542 17TH ST. STE 100**

City: **TUSTIN**          State: **CA**          Zip: **92780** Business Phone:

Guarantor(s) Name: **DANIEL S. MARCH** Cellphone Number:          Email Address:

Mailing Address: **20160 NOB HILL DR.**  City: **YORBA LINDA** State: **CA**          Zip: **92886**

Purchase Price: $ **500,000.00**    Purchased Percent: **50**    %  Purchased Amount: $ **999,990.00**

Payment Frequency: **DAILY**          Remittance: $ **22,500.00**

## PURCHASE AND SALE OF FUTURE RECEIVABLES

Merchant hereby sells, assigns and transfers to FCG (making FCG the absolute owner) in consideration of the "Purchase Price" specified above, the Purchased Percentage of all of Merchant's Future Receipts, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers' and/or other third party payors (the " Future Receipts" defined as all payments made by cash, check, electronic transfer or other form of monetary payment deposited into Merchants Bank Account), for the payments to Merchant as a result of Merchant's sale of goods and/or services (the "Transactions") until the "Purchased Amount has been delivered by or on behalf of Merchant to FCG

Merchant is selling a portion of a future revenue stream to FCG at a discount, not borrowing money from FCG, therefore there is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by FCG. The Remittance is a good faith estimate of Purchased Percentage multiplied by revenues of Merchant. Merchant going bankrupt or going out of business, or experiencing a slowdown in business, or a delay in collecting its receivables, in and of itself, does not constitute a breach of this Agreement. FCG is entering this Agreement knowing the risks that Merchant's business may slow down or fail, and FCG assumes these risks based on Merchant's representations, warranties and covenants in this Agreement, which are designed to give FCG a reasonable and fair opportunity to receive the benefit of its bargain. Merchant and Guarantor are only guaranteeing their performance of the terms of this Revenue Purchase Agreement, and are not guaranteeing the payment of the Purchased Amount. The initial Remittance shall be as described above. The Remittance is subject to adjustment as set forth in Paragraph 1.4 and Paragraph 1.5.

FCG will debit the Remittance each business day from only one depositing bank account, which account must be acceptable to, and pre-approved by, FCG (the "Account") which Merchant and Merchant's customers shall remit the Receipts from each Transaction, until such time as FCG receives payment in full of the Purchased Amount. Merchant hereby authorizes FCG to ACH debit the initial Remittance from the Account on the agreed upon Payment Frequency; a daily basis means any day that is not a United States banking holiday. FCG's payment of the Purchase Price shall be deemed the acceptance and performance by FCG of this Agreement. Merchant understands that it is responsible for ensuring that the initial Remittance to be debited by FCG remains in the Account and will be held responsible for any fees incurred by FCG resulting from a rejected ACH attempt or an Event of Default. FCG is not responsible for any overdrafts or rejected transactions that may result from FCG's ACH debiting the Agreed Remittance under the terms of this Agreement. Notwithstanding anything to the contrary in this Agreement or any other agreement between FCG and Merchant, upon the occurrence of an Event of Default of the MERCHANT AGREEMENT TERMS AND CONDITIONS the Purchased Percentage shall equal 100%. A list of all fees applicable under this Agreement is contained in Appendix A.

**THE MERCHANT AGREEMENT "TERMS AND CONDITIONS", THE "SECURITY AGREEMENT AND GUARANTY" AND THE "ADMINISTRATIVE FORM HEREOF, ARE ALL HEREBY INCORPORATED IN AND MADE A PART OF THIS MERCHANT AGREEMENT.**

**FOR THE MERCHANT (#1)** By: __DANIEL S. MARCH__          *Daniel S March*
                                    (Print Name and Title)                    (Signature)

**FOR THE MERCHANT (#2)** By: __TONY M. DIAB__          *Tony M Diab*
                                    (Print Name and Title)                    (Signature)

**BY OWNER (#1)** By: __DANIEL S. MARCH__          *Daniel S March*
                                    (Print Name and Title)                    (Signature)

**BY OWNER (#2)** By: __TONY M. DIAB__          *Tony M Diab*
                                    (Print Name and Title)                    (Signature)

Initials: _____

Exhibit 7
Page 60

Doc ID: 94f52ad7a99281c1cf36149b2249791a0c88fd39

**PURCHASE & SALE OF FUTURE RECEIVABLES**

FUNDURA CAPITAL

This Revenue Purchase Agreement and Security Agreement and Guaranty of Performance ("Agreement") dated __07/14/2021__ between Fundura Capital Group, ("**FCG**") the Merchant(s) listed below (**Merchant**") and the Individual(s) listed below ("**Guarantor**")

# MERCHANT AGREEMENT TERMS AND CONDITIONS

## 1.    TERMS OF ENROLLMENT IN PROGRAM

### 1.1 Merchant Deposit Agreement and Processor

Merchant shall (A) execute an agreement acceptable to FCG with a Bank acceptable to FCG to obtain electronic fund transfer services for the Account, and (B) if applicable, execute an agreement acceptable to FCG with a credit and debit card processor (the "Processor") instructing the Processor to deposit all Receipts into the Account. Merchant shall provide FCG and/or its authorized agent(s) with all of the information, authorizations and passwords necessary for verifying Merchant's receivables, receipts, deposits and withdrawals into and from the Account. Merchant hereby authorizes FCG and/or its agent(s) to withdraw from the Account via ACH debit the amounts owed to FCG for the receipts as specified herein and to pay such amounts to FCG. These authorizations apply not only to the approved Account but also to any subsequent or alternate account used by the Merchant for these deposits, whether pre-approved by FCG or not. This additional authorization is not a waiver of FCG's entitlement to declare this Agreement breached by Merchant as a result of its usage of an account which FCG did not first pre-approve in writing prior to Merchant's usage thereof. The aforementioned authorizations shall be irrevocable without the written consent of FCG

### 1.2 Term of Agreement.

This Agreement shall remain in full force and effect until the entire Purchased Amount and any other amounts due are received by FCG as per the terms of this Agreement.

### 1.3 Future Purchase of Increments.

Subject to the terms of this Agreement, FCG offers to purchase additional Receipts in the "Increments" stated in on Page 1 of this Agreement, if any. FCG reserves the right to delay or rescind the offer to purchase any Increment or any additional Receipts, in its sole and absolute discretion..

### 1.4 Reconciliation

As long as an Event of Default, or breach of this Agreement, has not occurred, once per calendar month Merchant may request a retroactive reconciliation of the total Remittance Amount(for the purposes of this Agreement "total Remittance Amount" shall be defined as all payments made by Merchant to FCG after FCG remitted the Purchase Price to Merchant). All requests hereunder must be in writing to  office@funduracap.com within five (5) business days of the close of the calendar month. Said request must include copies of all of Merchant's bank account statements, credit card processing statements, and accounts receivable report if applicable, for the requested month. FCG retains the right the request additional documentation such as bank login or DecisionLogic access to view Merchant's accounts, refusal to provide access shall be a breach of this Agreement and FCG shall have no obligation to reconcile. Such reconciliation, if applicable, shall be performed by FCG within five (5) Business Days following its receipt of Merchant's request for reconciliation by either crediting or debiting the difference back to, or from, Merchants Bank Account so that the total amount debited by FCG shall equal the Specific Percentage of the Future Receipts that Merchant Collected from the date of this Agreement up to and including the date of the Reconciliation request. Nothing set forth in this section shall be deemed to provide Merchant with the right to interfere with FCG's right and ability to debit Merchant's Account while the Request is pending or to unilaterally modify the initial Remittance amount, in any method other than the ones listed in this Agreement.

### 1.5 Adjustments to the Remittance.

As long an Event of Default, or breach of this Agreement, has not occurred and should the Merchant experience a decrease in its' Future Receipts, Merchant may give notice to FCG to request a decrease in the Remittance. All requests hereunder must be in writing to office@funduracap.com and must include copies of all of Merchant's bank account statements, credit card processing statements, and accounts receivable reports for the requested period. FCG retains the right the request additional documentation such as bank login or DecisionLogic access to view Merchant's accounts, refusal to provide access shall be a breach of this Agreement and FCG shall have no obligation to reconcile. The Remittance shall be modified to more closely reflect the Merchant's actual receipts by multiplying the Merchant's actual receipts by the Purchased Percentage divided by the number of business days in the previous (2) calendar weeks or by other means that can more accurately estimate the Merchant's Future Receipts. Merchant shall provide FCG with viewing access to their bank account as well as all information reasonably requested by FCG to properly calculate the Merchant's Remittance. At the end of the two (2) calendar weeks the Merchant may request another adjustment pursuant to this paragraph or it is agreed that the Merchant's Remittance shall return to the Remittance as agreed upon on Page 1 of this Agreement.

### 1.6 Financial Condition

Merchant and Guarantor(s) (as hereinafter defined and limited) authorize FCG and its agents to investigate their financial responsibility and history, and will provide to FCG any authorizations, bank or financial statements, tax returns, etc., as FCG deems necessary in its sole and absolute discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable as an authorization for release of financial and credit information. FCG is authorized to update such information and financial and credit profiles from time to time as it deems appropriate.

### 1.7 Transactional History.

Merchant authorizes all of its banks, brokers and processor to provide FCG with Merchant's banking, brokerage and/or processing history to determine qualification or continuation in this program and for collections purposes. Merchant shall provide FCG with copies of any documents related to Merchant's card processing activity or financial and banking affairs within five days after a request from FCG.

### 1.8 Indemnification.

Merchant and Guarantor(s) jointly and severally indemnify and hold harmless Processor, its officers, directors and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by Processor resulting from (a) claims asserted by FCG for monies owed to FCG from Merchant and (b) actions taken by Processor in reliance upon any fraudulent, misleading or deceptive information or instructions provided by FCG.

### 1.9 No Liability.

In no event will FCG be liable for any claims asserted by Merchant or Guarantors under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by both Merchant and Guarantor(s). In

Initials:

Exhibit 7
Page 61
Doc ID: 94f52ad7a99281c1cf36149b2249791a0c88fd39

the event these claims are nonetheless raised, Merchant and Guarantors will be jointly liable for all of FCG's attorney's fees and expenses resulting therefrom.

### 1.10 Reliance on Terms

Section 1.1, 1.6, 1.7, 1.8 and 2.5 of this Agreement are agreed to for the benefit of Merchant, FCG, Processor, and Merchant's bank and notwithstanding the fact that Processor and the bank is not a party of this Agreement, Processor and the bank may rely upon their terms and raise them as a defense in any action.

### 1.11 Sale of Receipts.

Merchant and FCG agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount, and that such Purchase Price is not intended to be, nor shall it be construed as a loan from FCG to Merchant. Merchant agrees that the Purchase Price is in exchange for the Receipts pursuant to this Agreement, and that it equals the fair market value of such Receipts. FCG has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Payments made to FCG in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services, and the payment therefore by Merchant's customers. In no event shall the aggregate of all amounts or any portion thereof be deemed as interest hereunder, and in the event it is found to be interest despite the parties hereto specifically representing that it is NOT interest, it shall be found that no sum charged or collected hereunder shall exceed the highest rate permissible at law. In the event that a court nonetheless determines that FCG has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and FCG shall promptly refund to Merchant any interest received by FCG in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that FCG not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law. As a result thereof, Merchant knowingly and willingly waives the defense of Usury in any action or proceeding.

### 1.12 Power of Attorney

Merchant irrevocably appoints FCG as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to FCG from Processor, or in the case of a violation by Merchant of Section 1or the occurrence of an Event of Default under Section 3 hereof, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to FCG; and (v) to contact Merchant's banks and financial institutions using Merchant and Guarantor(s) personal information to verify the existence of an account and obtain account balances (vi) to file any claims or take any action or institute any proceeding which FCG may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount. In connection therewith, all costs, expenses and fees, including legal fees, shall be payable by merchant.

### 1.13 Protections Against Default

The following Protections 1 through 8 may be invoked by FCG immediately and without notice to Merchant in the event: (a) Merchant takes any action to discourage the use of electronic check processing that are settled through Processor, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks or other payments or deposits for the purchase of Merchant's services and products including but not limited to direct deposit of any checks into a bank account without scanning into the FCG electronic check processor; (b) Merchant changes its arrangements with Processor or the Bank in any way that is adverse or unacceptable to FCG; (c) Merchant changes the electronic check processor through which the Receipts are settled from Processor to another electronic check processor, or permits any event to occur that could cause diversion of any of Merchant's check or deposit transactions to another processor; (d) Merchant intentionally interrupts the operation of this business transfers, moves, sells, disposes, or otherwise conveys its business and/or assets without (i) the express prior written consent of FCG, and (ii) the written agreement of any FCG or transferee to the assumption of all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to FCG; (e) Merchant takes any action, fails to take any action, or offers any incentive—economic or otherwise—the result of which will be to induce any customer or customers to pay for Merchant's services with any means other than payments, checks or deposits that are settled through Processor; (f) Merchant fails to provide FCG with copies of any documents related to Merchant's card processing activity of financial and banking affairs within five days after a request from FCG, or (g) Merchant breaches any terms of this Agreement, including but not limited any of the Events of Default contained in Section 3.1 herein. These protections are in addition to any other remedies available to FCG at law, in equity or otherwise pursuant to this Agreement.

**Protection 1.** The full uncollected Purchased Amount plus all fees in addition to attorney's fees in the amount of 30% of the outstanding balance due under this Agreement and the attached Security Agreement become due and payable in full immediately.

**Protection 2.** FCG may enforce the provisions of the Limited Personal Guaranty of Performance against the Guarantor(s).

**Protection 3.** Merchant hereby authorizes FCG to execute in the name of the Merchant a Confession of Judgment in favor of FCG in the amount of Purchased Amount stated in the Agreement. Upon an Event of Default, FCG may enter that Confession of Judgment as a Judgment with the Clerk of any Court and execute thereon.

**Protection 4.** FCG may enforce its security interest in the Collateral.

**Protection 5.** The entire Purchased Amount and all fees in addition to attorney's fees in the amount of 30% of the outstanding balance shall become immediately payable to FCG from Merchant. **Protection 6.** FCG may proceed to protect and enforce its right and remedies by lawsuit. In any such lawsuit, if FCG recovers a Judgment against Merchant, Merchant shall be liable for all of FCG's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs. **Protection 7.** This Agreement shall be deemed Merchant's Assignment of Merchant's Lease of Merchant's business premises to FCG. Upon breach of any provision in this Agreement, FCG may exercise its rights under this Assignment of Lease without prior Notice to Merchant. Protection 8. FCG may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to FCG.

### 1.14 Protection of Information.

Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner or Guarantor, in respect of himself or herself personally, authorizes FCG to disclose information concerning Merchant's and each Owner's and each Guarantor's credit standing (including credit bureau reports that FCG obtains) and business conduct only to agents, affiliates, subsidiaries, and credit reporting bureaus. Merchant and each Owner and each Guarantor hereby and each waives to the maximum extent permitted by law any claim for damages against FCG or any of its affiliates relating to any (i)investigation undertaken by or on behalf of FCG as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

### 1.15 Confidentiality.



Exhibit 7
Page 62

Doc ID: 94f52ad7a99281c1cf36149b2249791a0c88fd39

Merchant understands and agrees that the terms and conditions of the products and services offered by FCG, including this Agreement and any other FCG documents (collectively, "Confidential Information") are proprietary and confidential information of FCG. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information of FCG to any person other than an attorney, accountant, financial adviser or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this section. A breach hereof entitles FCG to not only damages in addition to attorney's fees in the amount of 30% of the outstanding balance but also to both a Temporary Restraining Order and a Preliminary Injunction without Bond or Security.

### 1.16 Publicity

Merchant and each of Merchant's Owners and all Guarantors hereto all hereby authorizes FCG to use its, his or her name in listings of clients and in advertising and marketing materials.

Merchant hereby acknowledges and agrees that FCG may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between FCG and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

## 2.    REPRESENTATIONS, WARRANTIES AND COVENANTS

Merchant represents warrants and covenants that, as of this date and during the term of this Agreement:

### 2.1 Financial Condition and Financial Information.

Merchant's and Guarantors' bank and financial statements, copies of which have been furnished to FCG, and future statements which will be furnished hereafter at the discretion of FCG, fairly represent the financial condition of Merchant at such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant and Guarantors have a continuing, affirmative obligation to advise FCG of any material adverse change in their financial condition, operation or ownership. FCG may request statements at any time during the performance of this Agreement and the Merchant and Guarantors shall provide them to FCG within five business days after request from FCG. Merchant's or Guarantors' failure to do so is a material breach of this Agreement.

### 2.2 Governmental Approvals.

Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.

### 2.3 Authorization.

Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

### 2.4 Use of Funds.

Merchant agrees that it shall use the Purchase Price for business purposes and not for personal, family, or household purposes.

### 2.5 Electronic Check Processing Agreement.

Merchant will not change its Processor, add terminals, change its financial institution or bank account(s)or take any other action that could have any adverse effect upon Merchant's obligations under this Agreement, without FCG's prior written consent. Any such changes shall be a material breach of this Agreement.

### 2.6 Change of Name or Location.

Merchant will not conduct Merchant's businesses under any name other than as disclosed to the Processor and FCG, nor shall Merchant change any of its places of business without prior written consent by FCG.

### 2.7 Daily Batch Out.

Merchant will batch out receipts with the Processor on a daily basis if applicable.

### 2.8 Estoppel Certificate.

Merchant will at every and all times, and from time to time, upon at least one (1) day's prior notice from FCG to Merchant, execute, acknowledge and deliver to FCG and/or to any other person, firm or corporation specified by FCG, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion thereof has been repaid.

### 2.9 No Bankruptcy.

As of the date of this Agreement, Merchant is not insolvent and does not contemplate filing for bankruptcy in the next six months and has not consulted with a bankruptcy attorney or filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Merchant. Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

### 2.10 Unencumbered Receipts.

Merchant has good, complete, unencumbered and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of FCG.

### 2.11 Business Purpose.

4 | P a g e


I n i t i a l s :

Exhibit 7
Page 63
Doc ID: 94f52ad7a99281c1cf36149b2249791a0c88fd39

Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

**2.12** Defaults under Other Contracts.

Merchant's execution of, and/or performance under this Agreement, will not cause or create an event of default by Merchant under any contract with another person or entity.

**2.13** Good Faith.

Merchant and Guarantor(s)s hereby affirm that Merchant is receiving the Purchase Price and selling FCG the Purchased Amount in good faith and will use the Purchase Price funds to maintain and grow Merchant's business

# 3.    EVENTS OF DEFAULT AND REMEDIES

**3.1** Events of Default.

The occurrence of any of the following events shall constitute an "Event of Default" hereunder:
(a)    Merchant or Guarantor shall violate any term or covenant in this Agreement;
(b)    Any representation or warranty by Merchant in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made;
(c)    the sending of notice of termination by Merchant or verbally notifying FCG of its intent to breach this Agreement;
(d)    the Merchant fails to give FCG 24 hours advance notice that there will be insufficient funds in the account such that the ACH of the Remittance amount will not be honored by Merchant's bank, and the Merchant fails to supply all requested documentation and allow for daily and/or real time monitoring of its bank account;
(f)    Merchant shall transfer or sell all or substantially all of its assets;
(g)    Merchant shall make or send notice of any intended bulk sale or transfer by Merchant;
(h)    Merchant shall use multiple depository accounts without the prior written consent of FCG
(i)    Merchant shall enter into any financing agreements with any other party including but not limited to: Loans, Merchant Cash Advances, Receivables financing, or any other agreement that will increase the total debt owed by Merchant to any other party.
(j)    Merchant shall change its depositing account without the prior written consent of FCG; or
(k)    Merchant shall close its depositing account used for ACH debits without the prior written consent of FCG
(l)    Merchant's bank returns a code other than NSF cutting FCG from its collections
(m)    Merchant shall default under any of the terms, covenants and conditions of any other agreement with FCG.

**3.2** Limited Personal Guaranty

In the Event of a Default, FCG will enforce its rights against the Guarantors of this transaction. Said Guarantors will be jointly and severally liable to FCG for all of FCG's losses and damages, in additional to all costs and expenses and legal fees associated with such enforcement.

**3.3** Remedies.

In case any Event of Default occurs and is not waived pursuant to Section 4.4. hereof, FCG may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Merchant's obligations hereunder (including the Guaranty) or any other legal or equitable right or remedy, including but not limited to filing the Confession of Judgment and executing thereon, and enforcing the Security Agreement contained herein. All rights, powers and remedies of FCG in connection with this Agreement may be exercised at any time by FCG after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

**3.4** Costs

Merchant shall pay to FCG all reasonable costs associated with (a) an Event or Default, (b) breach by  Merchant of  the Covenants in this Agreement and the enforcement thereof, and(c) the enforcement of FCG's remedies set forth in this Agreement, including but not limited to court costs and attorneys' fees.

**3.5** Required Notifications

Merchant is required to give FCG written notice within 24 hours of any filing under Title 11 of the United States Code. Merchant is required to give FCG seven days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or stock.

# 4.    MISCELLANEOUS

**4.1** Modifications; Agreements.

No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by FCG.

**4.2** Assignment.

FCG may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part.

**4.3** Notices.

All notices, requests, consents, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement. Notices to FCG shall become effective only upon receipt by FCG. Notices to Merchant shall become effective three days after mailing.

**4.4** Waiver Remedies.

No failure on the part of FCG to exercise, and no delay in exercising any right under this Agreement shall operate as a waiver thereof, nor shall any single or

5 | P a g e

Initials:

Exhibit 7
Page 64

Doc ID: 94f52ad7a99281c1cf36149b2249791a0c88fd39

partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

### 4.5 Binding Effect.

Governing Law, Venue and Jurisdiction. This Agreement shall be governed by and construed exclusively in accordance with the laws of the State of New York, without regards to any applicable principles of conflicts of law. Any lawsuit, action or proceeding arising out of or in connection with this Agreement shall be instituted in any court sitting in New York, Texas or Connecticut, and shall be the sole and exclusive venues for any lawsuit, action or proceeding (the "Acceptable Forums"). The parties agree that the said sole and exclusive Acceptable Forums are convenient and submit to the jurisdiction of the Acceptable Forums and waive any and all objections to inconvenience of the jurisdiction or venue. Should a proceeding be initiated in any other forum, each of the parties to this Agreement irrevocably waives any right to oppose any motion or application made by any other party to transfer such proceeding to an Acceptable Forum. **Merchant and Guarantor hereby agree that the mailing of any Summons and Complaint in any proceeding commenced by FCG by certified or registered mail, return receipt requested to the Mailing Address listed on this Agreement, or via email to the Email Address listed on this Agreement, or any other process required by any such court will constitute valid and lawful service of process against them without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions.**

### 4.6 Survival of Representation

etc. All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

### 4.7 Interpretation.

All Parties hereto have reviewed this Agreement with attorney of their own choosing and have relied only on their own attorneys' guidance and advice. No construction determinations shall be made against either Party hereto as drafter.

### 4.8 Severability.

In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

### 4.9 Entire Agreement.

Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof. This Agreement and the Security Agreement and Guaranty hereto embody the entire agreement between Merchant and FCG and supersede all prior agreements and understandings relating to the subject matter hereof.

### 4.10 JURY TRIAL WAIVER.

THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING INCONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OR THE ENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

### 4.11 CLASS ACTION WAIER.

THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND ( 2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

### 4.12 Facsimile & Digital Acceptance.

Facsimile signatures and digital signatures hereon shall be deemed acceptable for all purposes

### 4.13 Prejudgment Remedy Waiver

EACH AND EVERY MERCHANT, ENDORSER, GUARANTOR AND SURETY OF THIS AGREEMENT, AND EACH OTHER PERSON OR ENTITY WHO MAY BECOME LIABLE FOR ALL OR ANY PART OF THIS OBLIGATION, HEREBY ACKNOWLEDGE THAT THE TRANSACTION OF WHICH THIS AGREEMENT IS A PART IS A COMMERCIAL TRANSACTION, AND TO THE EXTENT ALLOWED UNDER CONNECTICUT GENERAL STATUTES SECTIONS 52-278a TO 52-278m, INCLUSIVE, OR BY OTHER APPLICABLE LAW EACH AND EVERY MERCHANT, ENDORSER AND GUARANTOR OF THIS AGREEMENT HEREBY WAIVE (A) ALL RIGHTS TO NOTICE AND PRIOR COURT HEARING OR COURT ORDER IN CONNECTION WITH ANY AND ALL PREJUDGMENT REMEDIES TO WHICH FCG HEREOF MAY BECOME ENTITLED BY VIRTUE OF ANY DEFAULT OR PROVISION OF THIS AGREEMENT OR SECURITY AGREEMENT SECURING THIS AGREEMENTAND (B) ALL RIGHTS TO REQUEST THAT FCG HEREOF POST A BOND, WITH OR WITHOUT SURETY, TO PROTECT SAID MERCHANTS, ENDORSER OR GUARANTOR AGAINST DAMAGES THAT MAY BE CAUSED BY ANY PREJUDGMENT REMEDY SOUGHT OR OBTAINED BY THE HOLDER HEREOF BY VIRTUE OF ANY DEFAULT OR PROVISION OF THIS AGREEMENT OR SECURITY AGREEMENT SECURING THIS AGREEMENT.

Initials:

Exhibit 7
Page 65
Doc ID: 94f52ad7a99281c1cf36149b2249791a0c88fd39

# SECURITY AGREEMENT AND GUARANTY

Merchant's Legal Name: **BAT, INC. and the entities listed on annexed "Exhibit A"**

D/B/A: **COAST PROCESSING**                                      Federal Id #:_____

Physical Address: **17542 17TH ST. STE 100** City: **TUSTIN**       State: **CA**       Zip: **92780**

Additional Guarantors:_____

## SECURITY AGREEMENT

Security Interest. This Agreement will constitute a security agreement under the Uniform Commercial Code. Merchant and Guarantor(s) grants to FCG a security interest in and lien upon all of their present and future: (a) accounts (the "Accounts Collateral"), chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are each defined in Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant and/or Guarantor(s), (b) all proceeds, as that term is defined in Article 9 of the UCC (c) funds at any time in the Merchant's and/or Guarantor(s) Account, regardless of the source of such funds, (d) present and future Electronic Check Transactions, and (e) any amount which may be due to FCG under this Agreement, including but not limited to all rights to receive any payments or credits under this Agreement (collectively, the "Collateral "). Merchant agrees to provide other security to FCG upon request to secure Merchant's obligations under this Agreement. Merchant agrees that, if at any time there are insufficient funds in Merchant's Account to cover FCG's entitlements under this Agreement, FCG is granted a further security interest in all of Merchant's assets of any kind whatsoever, and such assets shall then become Collateral. These security interests and liens will secure all of FCG's entitlements under this Agreement and any other agreements now existing or later entered into between Merchant, FCG or an affiliate of FCG. FCG is authorized to file any and all notices or filings it deems necessary or appropriate to enforce its entitlements hereunder.

This security interest may be exercised by FCG without notice or demand of any kind by making an immediate withdrawal or freezing the Collateral. FCG shall have the right to notify account debtors at any time. Pursuant to Article 9 of the Uniform Commercial Code, as amended from time to time, FCG has control over and may direct the disposition of the Collateral, without further consent of Merchant. Merchant hereby represents and warrants that no other person or entity has a security interest in the Collateral.

With respect to such security interests and liens, FCG will have all rights afforded under the Uniform Commercial Code, any other applicable law and in equity. Merchant will obtain from FCG written consent prior to granting a security interest of any kind in the Collateral to a third party. Merchant and Guarantor (s) agree(s) that this is a contract of recoupment and FCG is not required to file a motion for relief from a bankruptcy action automatic stay to realize on any of the Collateral. Nevertheless, Merchant and Guarantor(s) agree(s) not to contest or object to any motion for relief from the automatic stay filed by FCG. Merchant and Guarantor(s) agree(s) to execute and deliver to FCG such instruments and documents FCG may reasonably request to perfect and confirm the lien, security interest and right of setoff set forth in this Agreement. FCG is authorized to execute all such instruments and documents in Merchant's and Guarantor(s) name.

Merchant and Guarantor(s) each acknowledge and agree that any security interest granted to FCG under any other agreement between Merchant or Guarantor(s) and FCG (the "Cross-Collateral") will secure the obligations hereunder and under the Merchant Agreement. Merchant and Guarantor(s) each agrees to execute any documents or take any action in connection with this Agreement as FCG deems necessary to perfect or maintain FCG's first priority security interest in the Collateral and the Additional Collateral, including the execution of any account control agreements. Merchant and Guarantor(s) each hereby authorizes FCG to file any financing statements deemed necessary by FCG to perfect or maintain FCG's security interest. Merchant and Guarantor(s) shall be liable for, and FCG may charge and collect, all costs and expenses, including but not limited to attorney's fees in the amount of 30% of the outstanding balance, which may be incurred by FCG in protecting, preserving and enforcing FCG's security interest and rights.

Negative Pledge. Merchant and Guarantor(s) each agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Additional Collateral, as applicable.

Consent to Enter Premises and Assign Lease. FCG shall have the right to cure Merchant's default in the payment of rent on the following terms. In the event Merchant is served with papers in an action against Merchant for nonpayment of rent or for summary eviction, FCG may execute its rights and remedies under the Assignment of Lease. Merchant also agrees that FCG may enter into an agreement with Merchant's landlord giving FCG the right: (a) to enter Merchant's premises and to take possession of the fixtures and equipment therein for the purpose of protecting and preserving same; and/or (b) to assign Merchant's lease to another qualified business capable of operating a business comparable to Merchant's at such premises.

Remedies. Upon any Event of Default, FCG may pursue any remedy available at law (including those available under the provisions of the UCC), or in equity to collect, enforce, or satisfy any obligations then owing to FCG, whether by acceleration or otherwise.

Initials: _____

Exhibit 7
Page 66

Doc ID: 94f52ad7a99281c1cf36149b2249791a0c88fd39

# GUARANTY OF PERFORMANCE

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY. CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.

FCG As an additional inducement for FCG to enter into this Agreement, the undersigned Guarantor(s) hereby provides FCG with this Guaranty. Guarantor(s) will not be personally liable for any amount due under this Agreement unless Merchant commits an Event of Default pursuant to Paragraph 3.1 of this Agreement. Each Guarantor shall be jointly and severally liable for all amounts owed to FCG in the Event of Default. Guarantor(s) guarantee Merchant's good faith, truthfulness and performance of all of the representations, warranties, covenants made by Merchant in this Agreement as each may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations").Guarantor's obligations are due at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in the Agreement.

Guarantor Waivers. In the event of a breach of the above, FCG may seek recovery from Guarantors for all of FCG's losses and damages by enforcement of FCG's rights under this Agreement without first seeking to obtain payment from Merchant, any other guarantor, or any Collateral or Additional Collateral FCG may hold pursuant to this Agreement or any other guaranty.

FCG does not have to notify Guarantor of any of the following events and Guarantor will not be released from its obligations under this Agreement if it is not notified of:

Merchant's failure to pay timely any amount required under the Merchant Agreement; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; (iv) FCG's acceptance of this Agreement; and (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to FCG. In addition, FCG may take any of the following actions without releasing Guarantor from any of its obligations under this Agreement: (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to FCG; (ii) release Merchant from its obligations to FCG; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under this Agreement. Until the Purchased Amount and Merchant's other obligations to FCG under the Merchant Agreement and this Agreement are paid in full, Guarantor shall not seek reimbursement from Merchant or any other guarantor for any amounts paid by it under this Agreement. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other guarantor, or any collateral provided by Merchant or any other guarantor, for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution. In the event that FCG must return any amount paid by Merchant or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations under this Agreement shall include that amount.

Guarantor Acknowledgement. Guarantor acknowledges that: (i) He/She is bound by the Prejudgment Remedy Waiver and Class Action Waiver provisions in the Merchant Agreement Terms and Conditions, as well as all other terms and conditions therein, which are incorporated herein by reference; (ii) He/She understands the seriousness of the provisions of this Agreement; (ii) He/She has had a full opportunity to consult with counsel of his/her choice; and (iv) He/She has consulted with counsel of its choice or has decided not to avail himself/herself of that opportunity.

FOR THE MERCHANT(#1) By: **DANIEL S. MARCH**
_9617_
(Social security number)
(Print Name and Title)
(Signature) *Daniel S March*

FOR THE MERCHANT(#2) By: **TONY M. DIAB**
_5745_
(Social security number)
(Print Name and Title)
(Driver's License Number) *Tony M Diab*
(Signature)

BY OWNER(#1) By: **DANIEL S. MARCH**
_9617_
(Social security number)
(Print Name and Title)
(Driver's License Number) *Daniel S March*
(Signature)

BY OWNER(#2) By: **TONY M. DIAB**
_5745_
(Social security number)
(Print Name and Title)
(Driver's License Number) *Tony M Diab*
(Signature)

FOR THE GUARANTOR(S) By: _____
(Social security number)
(Print Name and Title)
(Driver's License Number)
(Signature)

FOR THE GUARANTOR(S) By: _____
(Social security number)
(Print Name and Title)
(Driver's License Number)
(Signature)



Exhibit 7
Page 67

Doc ID: 94f52ad7a99281c1cf36149b2249791a0c88fd39

# APPENDIX A- THE FEE STRUCTURE:

**A.**   **Underwriting Fee** Minimum of $500.00 or up to 12% of the purchase price for underwriting and related expenses.

**B.**   **Origination Fee** Minimum of $500.00 or up to 10% of the purchase price to cover cost of Origination and ACHSetup

**C.**   **NSF Fee (Standard)** $35.00 (each)

**D.**   **Rejected ACH / Blocked ACH / Default Fee** $5,000.00 When Merchant BLOCKS Account from our Debit ACH, or when Merchant directs the bank to reject our Debit ACH, which places them in default (per contract). When Merchant changes bank Account cutting us off from our collections.

**E.**   **Bank Change Fee** $50.00 When Merchant requires a change of Bank Account to be Debited, requiring us to adjust our system.

**F.**   **Wire Fee** - Each Merchant shall receive their funding electronically to their designated bank account and will be charged $50.00 for a Fed Wire or $0.00 for a bank ACH.

**G.**   **Unauthorized Account Fee:** $5,000.00 (if a merchant blocks FCG'S ACH debit of the Account, bounces more than 2 debits of the Account, or simultaneously uses multiple bank accounts or credit- card processors to process its receipts).

**H.**   **Default Fee:** $5,000.00 or up to 10% of the funded amount (if a merchant changes bank accounts or switches to another creditcard processor without FCG' s consent, or commits another default pursuant to the Agreement) or bounces more than 2 debits of the Account.

**I.**   **Stacking Fee:** If the Merchant takes any further financing from any other finance /factoring company a fee of 10% of the purchased amount will be added to the Merchants current balance.

**J.**   **Risk Assessment Fee:** $249.00

**K.**   **UCC Fee:** $195.00

**L.**   **Membership Fee:** $299 monthly funding fee for duration of agreement terms or until balance paid.

FOR THE MERCHANT (#1) **By:** DANIEL S. MARCH

*Daniel S March*

(Print Name and Title)                                    (Signature)

FOR THE MERCHANT (#2) **By:** TONY M. DIAB

*Tony M Diab*

(Print Name and Title)                                    (Signature)

Exhibit 7
Page 68

Doc ID: 94f52ad7a99281c1cf36149b2249791a0c88fd39

# AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT) AND DIRECT PAYMENTS (ACH DEBITS

Merchant: BAT, INC. and the entities listed on annexed "Exhibit A"
(Merchant's Legal Name)

Tax ID: _____

**Merchant Agreement:** Merchant Agreement between Fundura Capital Group LLC, and Merchant, dated as of 07/14/2021

Designated Checking Account:

| | | |
|---|---|---|
| Bank Name: UNION BANK | Routing: 122000496 | Account: ▆▆▆4858 |
| Bank Name: | Routing: | Account: |
| Bank Name: UNION BANK | Routing: 122000496 | Account: ▆▆▆4833 |
| Bank Name: | Routing: | Account: |
| Bank Name: CHASE | Routing: 322271627 | Account: ▆▆▆3588 |
| Bank Name: BANK OF AMERICA | Routing: | Account: ▆▆▆9551 |
| Bank Name: CHASE | Routing: 322271627 | Account: ▆▆▆4492 |

Capitalized terms used in this Authorization Agreement without definition shall have the meanings set forth in the Merchant Agreement.

By signing below, Merchant attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes. **This Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) is part of (and incorporated by reference into) the Merchant Agreement. Merchant should keep a copy of this important legal document for Merchant's records.**

**DISBURSEMENT OF ADVANCE PROCEEDS.** By signing below, Merchant authorizes FCG, to disburse the Advance proceeds less the amount of any applicable fees upon Advance approval by initiating ACH credits to the Designated Checking Account, in the amounts and at the times specified in the Merchant Agreement. **By signing below, Merchant also authorizes FCG to collect amounts due from Merchant under the Merchant Agreement by initiating ACH debits to the Designated Checking Account, as follows:**

In the amount of: $ 22,500.00                     (Or) Percentage of each Banking Deposit: 50 %

On the Following Days: MONDAY - FRIDAY

If any payment date falls on a weekend or holiday, I understand and agree that the payment may be executed on the next business day. If a payment is rejected by Merchant's financial institution for any reason, including without limitation insufficient funds, Merchant understands that FCG may, at its discretion, attempt to process the payment again as permitted under applicable ACH rules. Merchant also authorizes FCG to initiate ACH entries to correct any erroneous payment transaction.

**MISCELLANEOUS.** FCG is not responsible for any fees charged by Merchant's bank as the result of credits or debits initiated under this Authorization Agreement. The origination of ACH debits and credits to the Designated Checking Account must comply with applicable provisions of state and federal law, and the rules and operating guidelines of NACHA (formerly known as the National Automated Clearing House Association). Merchant agrees to be bound by the ACH Rules as set forth by NACHA. This Authorization Agreement is to remain in full force and effect until FCG has received written notification from Merchant at the address set forth below at least 5 banking days prior of its termination to afford FCG a reasonable opportunity to act on it. The individual signing below on behalf of Merchant certifies that he/she is an authorized signer on the Designated Checking Account. Merchant will not dispute any ACH transaction initiated pursuant to this Authorization Agreement, provided the transaction corresponds to the terms of this Authorization Agreement. Merchant requests the financial institution that holds the Designated Checking Account to honor all ACH entries initiated in accordance with this Authorization Agreement.

Merchant: BAT, INC. and the entities listed on annexed "Exhibit A" Date: 07/14/2021
(Merchant's Legal Name)                                         (Month) (Day) (Year)

Title: Principal

*Tony M Diab*
(Signature)

*Daniel S March*    Daniel S March

DANIEL S. MARCH
(Print Name)

Initials: _____

Exhibit 7
Page 69
Doc ID: 94f52ad7a99281c1cf36149b2249791a0c88fd39

# BANK LOGIN INFORMATION

Dear Merchant,

Thank you for accepting this offer from Fundura Capital Group LLC. We look forward to being your funding partner for as long as you need.

**Daily ACH Program:**

Fundura Capital Group LLC will require unrestricted access to your bank account, each business day, in order to verify the amount of your daily payment.
Please be assured that we carefully safeguard your confidential information on our secured server, and only essential personnel will have access to it.

Fundura Capital Group LLC will also require viewing access to your bank account, prior to funding, as part of our underwriting process.

Please fill out the form below with the information necessary to access your account.

* Be sure to indicate capital or lower case letters.


Name of Bank:_____

Bank portal website:_____

Username: _____        Password: _____

Security Question / Answer 1:_____

Security Question / Answer 2:_____

Security Question / Answer 3:_____

Any other information necessary to access your account:_____


Merchant / Owner Signature___*Daniel S March Tony M Diab*_____    Dated _____

For  any questions or concerns  about this  contract feel free to
contact us at: **516.516.4800** and we will be happy to assist you

FUNDURA CAPITAL

Initials:  

Exhibit 7
Page 70
Doc ID: 94f52ad7a99281c1cf36149b2249791a0c88fd39

**EXHIBIT A**

LIST OF ADDITIONAL PARTIES IN WHOSE ASSETS SELLER HAS GRANTED
BUYER A BLANKET SECURITY INTEREST:


THE LITIGATION PRACTICE GROUP PC
VULCAN CONSULTING GROUP LLC
EIN: ███7431
B.A.T. INC. DBA COAST PROCESSING
COAST PROCESSING
1351 CALLE AVANZADO STE 2 SAN CLEMENTE CA 92673
EIN ████7686


Buyer may file a UCC-1 financing statement with the Secretary of State,
reflecting a blanket security interest in the assets of the above-listed entities.


DATED: 07/14/2021


By: _Daniel S March_ _Tony M Diab_ _____

DANIEL S. MARCH

Exhibit 7
Page 71

Doc ID: 94f52ad7a99281c1cf36149b2249791a0c88fd39



FUNDURA CAPITAL

## DISBURSMENT AUTHORIZATION

SELLER:

PURCHASE AMOUNT: $

DATE:

The undersigned hereby authorizes Purchaser to make the following deductions from proceeds and/or draw the following checks from the Purchase Amount in accordance with the terms of the Purchase Agreement.

Deductions

-$                    Origination Fee
-$                    Origination Fee
-$                    ACH Setup Fee
-$ 249.00             Risk Assessment Fee
-$ 195.00             UCC Fee
-$ 50.00              Wire Fee
-$ 299.00             Management Fee
-$                    Legal Fee
-$                    Payoff to

**Total Deductions:  $ 160,000.00**

**Net Amount Deposited: $ 340,000.00**

**IN WITNESS WHEREOF,** this Disbursement Authorization has been duly executed by the undersigned as of the day and year first above written.

(SELLER)

By: *Daniel S March*  *Tony M Diab* _____

Name: ____Daniel S March____  **Tony Diab**

Title: ____Daniel S March____  **Principal**

*DM* Exhibit 7
Page 72

 **HELLOSIGN**

Audit Trail

| | |
|---|---|
| **TITLE** | FUNDING CONTRACTS - BAT |
| **FILE NAME** | BAT PSF.pdf and 1 other |
| **DOCUMENT ID** | 94f52ad7a99281c1cf36149b2249791a0c88fd39 |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Completed |

## Document History

| | | |
|---|---|---|
| **SENT** | **07 / 14 / 2021**<br>22:55:35 UTC | Sent for signature to DANIEL S. MARCH<br>(admin@litigationpracticegroup.com) and TONY M. DIAB<br>(tony@coastprocessing.com) from jk@funduracap.com<br>IP: 24.190.223.121 |
| **VIEWED** | **07 / 14 / 2021**<br>23:22:39 UTC | Viewed by DANIEL S. MARCH<br>(admin@litigationpracticegroup.com)<br>IP: 64.147.18.130 |
| **SIGNED** | **07 / 14 / 2021**<br>23:23:44 UTC | Signed by DANIEL S. MARCH<br>(admin@litigationpracticegroup.com)<br>IP: 64.147.18.130 |
| **VIEWED** | **07 / 14 / 2021**<br>23:23:54 UTC | Viewed by TONY M. DIAB (tony@coastprocessing.com)<br>IP: 64.147.18.130 |
| **SIGNED** | **07 / 14 / 2021**<br>23:24:51 UTC | Signed by TONY M. DIAB (tony@coastprocessing.com)<br>IP: 64.147.18.130 |
| **COMPLETED** | **07 / 14 / 2021**<br>23:24:51 UTC | The document has been completed. |

Powered by ▼ **HELLOSIGN**

Exhibit 7
Page 73

# EXHIBIT 8

Exhibit 8
Page 74

**Payments to Bridge Funding Capital due to the July 14 Contract**

| Account Holder | Account Number | Date | Amount |
|---|---|---|---|
| Vulcan Consulting Group | Chase XX3588 | 07/15/21 | ($22,500.00) |
| Vulcan Consulting Group | Chase XX3588 | 07/16/21 | ($22,500.00) |
| Vulcan Consulting Group | Chase XX3588 | 07/20/21 | ($22,500.00) |
| Vulcan Consulting Group | Chase XX3588 | 07/20/21 | ($22,500.00) |
| Vulcan Consulting Group | Chase XX3588 | 07/22/21 | ($45,000.00) |
| | | | |
| | | Total | ($135,000.00) |
| | | | |

Exhibit 8
Page 75

# EXHIBIT 9

Exhibit 9
Page 76

# PURCHASE & SALE OF FUTURE RECEIVABLES

**FUNDURA CAPITAL**

This Revenue Purchase Agreement and Security Agreement and Guaranty of Performance ("Agreement") dated ___07/22/2021___ between Fundura Capital Group, ("**FCG**") the Merchant(s) listed below (**Merchant**) and the Individual(s) listed below ("**Guarantor**")

## Merchant Information

Merchant's Legal Name: **BAT, INC. and the entities listed on annexed "Exhibit A"**

D/B/A: **COAST PROCESSING**    State of Incorporation / Organization: **CA**

Type of Entity: _____

Physical Address: **17542 17TH ST. STE 100**

City: **TUSTIN**    State: **CA**    Zip: **92780**    Business Phone: _____

Guarantor(s) Name: **DANIEL S. MARCH**    Cellphone Number: _____    Email Address: _____

Mailing Address: **20160 NOB HILL DR.**    City: **YORBA LINDA**    State: **CA**    Zip: **92886**

Purchase Price: $ **1,200,000.00**    Purchased Percent: **50** %    Purchased Amount: $ **1,986,000.00**

Payment Frequency: **DAILY**    Remittance: $ **35,000.00**

## PURCHASE AND SALE OF FUTURE RECEIVABLES

Merchant hereby sells, assigns and transfers to FCG (making FCG the absolute owner) in consideration of the "Purchase Price" specified above, the Purchased Percentage of all of Merchant's Future Receipts, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers' and/or other third party payors (the " Future Receipts" defined as all payments made by cash, check, electronic transfer or other form of monetary payment deposited into Merchants Bank Account), for the payments to Merchant as a result of Merchant's sale of goods and/or services (the "Transactions") until the "Purchased Amount has been delivered by or on behalf of Merchant to FCG

Merchant is selling a portion of a future revenue stream to FCG at a discount, not borrowing money from FCG, therefore there is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by FCG. The Remittance is a good faith estimate of Purchased Percentage multiplied by revenues of Merchant. Merchant going bankrupt or going out of business, or experiencing a slowdown in business, or a delay in collecting its receivables, in and of itself, does not constitute a breach of this Agreement. FCG is entering this Agreement knowing the risks that Merchant's business may slow down or fail, and FCG assumes these risks based on Merchant's representations, warranties and covenants in this Agreement, which are designed to give FCG a reasonable and fair opportunity to receive the benefit of its bargain. Merchant and Guarantor are only guaranteeing their performance of the terms of this Revenue Purchase Agreement, and are not guaranteeing the payment of the Purchased Amount. The initial Remittance shall be as described above. The Remittance is subject to adjustment as set forth in Paragraph 1.4 and Paragraph 1.5.

FCG will debit the Remittance each business day from only one depositing bank account, which account must be acceptable to, and pre-approved by, FCG (the "Account") into which Merchant and Merchant's customers shall remit the Receipts from each Transaction, until such time as FCG receives payment in full of the Purchased Amount. Merchant hereby authorizes FCG to ACH debit the initial Remittance from the Account on the agreed upon Payment Frequency; a daily basis means any day that is not a United States banking holiday. FCG's payment of the Purchase Price shall be deemed the acceptance and performance by FCG of this Agreement. Merchant understands that it is responsible for ensuring that the initial Remittance to be debited by FCG remains in the Account and will be held responsible for any fees incurred by FCG resulting from a rejected ACH attempt or an Event of Default. FCG is not responsible for any overdrafts or rejected transactions that may result from FCG's ACH debiting the Agreed Remittance under the terms of this Agreement. Notwithstanding anything to the contrary in this Agreement or any other agreement between FCG and Merchant, upon the occurrence of an Event of Default of the MERCHANT AGREEMENT TERMS AND CONDITIONS the Purchased Percentage shall equal 100%. A list of all fees applicable under this Agreement is contained in Appendix A.

**THE MERCHANT AGREEMENT "TERMS AND CONDITIONS", THE "SECURITY AGREEMENT AND GUARANTY" AND THE "ADMINISTRATIVE FORM HEREOF, ARE ALL HEREBY INCORPORATED IN AND MADE A PART OF THIS MERCHANT AGREEMENT.**

**FOR THE MERCHANT (#1)** By: **DANIEL S. MARCH**
    (Print Name and Title)    *Daniel S March* (Signature)

**FOR THE MERCHANT (#2)** By: **TONY M. DIAB**
    (Print Name and Title)    *Tony M Diab* (Signature)

**BY OWNER (#1)** By: **DANIEL S. MARCH**
    (Print Name and Title)    *Daniel S March* (Signature)

**BY OWNER (#2)** By: **TONY M. DIAB**
    (Print Name and Title)    *Tony M Diab* (Signature)

Exhibit 9
Page 77

Doc ID: 76ff3b1ea14fd7a4ba9e4be357ad87533018e6f1

PURCHASE & SALE OF FUTURE RECEIVABLES

This Revenue Purchase Agreement and Security Agreement and Guaranty of Performance ("Agreement") dated _____ 07/22/2021 _____ between Fundura Capital Group, ("**FCG**") the Merchant(s) listed below (**Merchant**) and the Individual(s) listed below ("**Guarantor**")

# MERCHANT AGREEMENT TERMS AND CONDITIONS

## 1.    TERMS OF ENROLLMENT IN PROGRAM

### 1.1 Merchant Deposit Agreement and Processor

Merchant shall (A) execute an agreement acceptable to FCG with a Bank acceptable to FCG to obtain electronic fund transfer services for the Account, and (B) if applicable, execute an agreement acceptable to FCG with a credit and debit card processor (the "Processor") instructing the Processor to deposit all Receipts into the Account. Merchant shall provide FCG and/or its authorized agent(s) with all of the information, authorizations and passwords necessary for verifying Merchant's receivables, receipts, deposits and withdrawals into and from the Account. Merchant hereby authorizes FCG and/or its agent(s) to withdraw from the Account via ACH debit the amounts owed to FCG for the receipts as specified herein and to pay such amounts to FCG. These authorizations apply not only to the approved Account but also to any subsequent or alternate account used by the Merchant for these deposits, whether pre-approved by FCG or not. This additional authorization is not a waiver of FCG's entitlement to declare this Agreement breached by Merchant as a result of its usage of an account which FCG did not first pre-approve in writing prior to Merchant's usage thereof. The aforementioned authorizations shall be irrevocable without the written consent of FCG

### 1.2 Term of Agreement.

This Agreement shall remain in full force and effect until the entire Purchased Amount and any other amounts due are received by FCG as per the terms of this Agreement.

### 1.3 Future Purchase of Increments.

Subject to the terms of this Agreement, FCG offers to purchase additional Receipts in the "Increments" stated in on Page 1 of this Agreement, if any. FCG reserves the right to delay or rescind the offer to purchase any Increment or any additional Receipts, in its sole and absolute discretion. .

### 1.4 Reconciliation

As long as an Event of Default, or breach of this Agreement, has not occurred, once per calendar month Merchant may request a retroactive reconciliation of the total Remittance Amount(for the purposes of this Agreement "total Remittance Amount" shall be defined as all payments made by Merchant to FCG after FCG remitted the Purchase Price to Merchant). All requests hereunder must be in writing to  office@funduracap.com within five (5) business days of the close of the calendar month. Said request must include copies of all of Merchant's bank account statements, credit card processing statements, and accounts receivable report if applicable, for the requested month. FCG retains the right the request additional documentation such as bank login or DecisionLogic access to view Merchant's accounts, refusal to provide access shall be a breach of this Agreement and FCG shall have no obligation to reconcile. Such reconciliation, if applicable, shall be performed by FCG within five (5) Business Days following its receipt of Merchant's request for reconciliation by either crediting or debiting the difference back to, or from, Merchants Bank Account so that the total amount debited by FCG shall equal the Specific Percentage of the Future Receipts that Merchant Collected from the date of this Agreement up to and including the date of the Reconciliation request. Nothing set forth in this section shall be deemed to provide Merchant with the right to interfere with FCG's right and ability to debit Merchant's Account while the Request is pending or to unilaterally modify the initial Remittance amount, in any method other than the ones listed in this Agreement.

### 1.5 Adjustments to the Remittance.

As long an Event of Default, or breach of this Agreement, has not occurred and should the Merchant experience a decrease in its' Future Receipts, Merchant may give notice to FCG to request a decrease in the Remittance. All requests hereunder must be in writing to office@funduracap.com and must include copies of all of Merchant's bank account statements, credit card processing statements, and accounts receivable reports for the requested period. FCG retains the right the request additional documentation such as bank login or DecisionLogic access to view Merchant's accounts, refusal to provide access shall be a breach of this Agreement and FCG shall have no obligation to reconcile. The Remittance shall be modified to more closely reflect the Merchant's actual receipts by multiplying the Merchant's actual receipts by the Purchased Percentage divided by the number of business days in the previous (2) calendar weeks or by other means that can more accurately estimate the Merchant's Future Receipts. Merchant shall provide FCG with viewing access to their bank account as well as all information reasonably requested by FCG to properly calculate the Merchant's Remittance. At the end of the two (2) calendar weeks the Merchant may request another adjustment pursuant to this paragraph or it is agreed that the Merchant's Remittance shall return to the Remittance as agreed upon on Page 1 of this Agreement.

### 1.6 Financial Condition

Merchant and Guarantor(s) (as hereinafter defined and limited) authorize FCG and its agents to investigate their financial responsibility and history, and will provide to FCG any authorizations, bank or financial statements, tax returns, etc., as FCG deems necessary in its sole and absolute discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable as an authorization for release of financial and credit information. FCG is authorized to update such information and financial and credit profiles from time to time as it deems appropriate.

### 1.7 Transactional History.

Merchant authorizes all of its banks, brokers and processor to provide FCG with Merchant's banking, brokerage and/or processing history to determine qualification or continuation in this program and for collections purposes. Merchant shall provide FCG with copies of any documents related to Merchant's card processing activity or financial and banking affairs within five days after a request from FCG.

### 1.8 Indemnification.

Merchant and Guarantor(s) jointly and severally indemnify and hold harmless Processor, its officers, directors and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by Processor resulting from (a) claims asserted by FCG for monies owed to FCG from Merchant and (b) actions taken by Processor in reliance upon any fraudulent, misleading or deceptive information or instructions provided by FCG

### 1.9 No Liability.

In no event will FCG be liable for any claims asserted by Merchant or Guarantors under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by both Merchant and Guarantor(s). In

Initials: DM

Exhibit 9
Page 78

Doc ID: 76ff3b1ea14fd7a4ba9e4be357ad87533018e6f1

the event these claims are nonetheless raised, Merchant and Guarantors will be jointly liable for all of FCG's attorney's fees and expenses resulting therefrom.

## 1.10 Reliance on Terms

Section 1.1, 1.6, 1.7, 1.8 and 2.5 of this Agreement are agreed to for the benefit of Merchant, FCG, Processor, and Merchant's bank and notwithstanding the fact that Processor and the bank is not a party of this Agreement, Processor and the bank may rely upon their terms and raise them as a defense in any action.

## 1.11 Sale of Receipts.

Merchant and FCG agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount, and that such Purchase Price is not intended to be, nor shall it be construed as a loan from FCG to Merchant. Merchant agrees that the Purchase Price is in exchange for the Receipts pursuant to this Agreement, and that it equals the fair market value of such Receipts. FCG has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Payments made to FCG in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services, and the payment therefore by Merchant's customers. In no event shall the aggregate of all amounts or any portion thereof be deemed as interest hereunder, and in the event it is found to be interest despite the parties hereto specifically representing that it is NOT interest, it shall be found that no sum charged or collected hereunder shall exceed the highest rate permissible at law. In the event that a court nonetheless determines that FCG has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and FCG shall promptly refund to Merchant any interest received by FCG in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that FCG not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law. As a result thereof, Merchant knowingly and willingly waives the defense of Usury in any action or proceeding.

## 1.12 Power of Attorney

Merchant irrevocably appoints FCG as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to FCG from Processor, or in the case of a violation by Merchant of Section 1or the occurrence of an Event of Default under Section 3 hereof, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to FCG; and (v) to contact Merchant's banks and financial institutions using Merchant and Guarantor(s) personal information to verify the existence of an account and obtain account balances (vi) to file any claims or take any action or institute any proceeding which FCG may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount. In connection therewith, all costs, expenses and fees, including legal fees, shall be payable by merchant.

## 1.13 Protections Against Default

The following Protections 1 through 8 may be invoked by FCG immediately and without notice to Merchant in the event: (a) Merchant takes any action to discourage the use of electronic check processing that are settled through Processor, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks or other payments or deposits for the purchase of Merchant's services and products including but not limited to direct deposit of any checks into a bank account without scanning into the FCG electronic check processor; (b) Merchant changes its arrangements with Processor or the Bank in any way that is adverse or unacceptable to FCG; (c) Merchant changes the electronic check processor through which the Receipts are settled from Processor to another electronic check processor, or permits any event to occur that could cause diversion of any of Merchant's check or deposit transactions to another processor; (d) Merchant intentionally interrupts the operation of this business transfers, moves, sells, disposes, or otherwise conveys its business and/or assets without (i) the express prior written consent of FCG, and (ii) the written agreement of any FCG or transferee to the assumption of all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to FCG; (e) Merchant takes any action, fails to take any action, or offers any incentive—economic or otherwise—the result of which will be to induce any customer or customers to pay for Merchant's services with any means other than payments, checks or deposits that are settled through Processor; (f) Merchant fails to provide FCG with copies of any documents related to Merchant's card processing activity of financial and banking affairs within five days after a request from FCG, or (g) Merchant breaches any terms of this Agreement, including but not limited any of the Events of Default contained in Section 3.1 herein. These protections are in addition to any other remedies available to FCG at law, in equity or otherwise pursuant to this Agreement.
**Protection 1.** The full uncollected Purchased Amount plus all fees in addition to attorney's fees in the amount of 30% of the outstanding balance due under this Agreement and the attached Security Agreement become due and payable in full immediately.
**Protection 2.** FCG may enforce the provisions of the Limited Personal Guaranty of Performance against the Guarantor(s).
**Protection 3.** Merchant hereby authorizes FCG to execute in the name of the Merchant a Confession of Judgment in favor of FCG in the amount of Purchased Amount stated in the Agreement. Upon an Event of Default, FCG may enter that Confession of Judgment as a Judgment with the Clerk of any Court and execute thereon.
**Protection 4.** FCG may enforce its security interest in the Collateral.
**Protection 5.** The entire Purchased Amount and all fees in addition to attorney's fees in the amount of 30% of the outstanding balance shall become immediately payable to FCG from Merchant. **Protection 6.** FCG may proceed to protect and enforce its right and remedies by lawsuit. In any such lawsuit, if FCG recovers a Judgment against Merchant, Merchant shall be liable for all of FCG's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs. **Protection 7.** This Agreement shall be deemed Merchant's Assignment of Merchant's Lease of Merchant's business premises to FCG. Upon breach of any provision in this Agreement, FCG may exercise its rights under this Assignment of Lease without prior Notice to Merchant. Protection 8. FCG may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to FCG.

## 1.14 Protection of Information.

Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner or Guarantor, in respect of himself or herself personally, authorizes FCG to disclose information concerning Merchant's and each Owner's and each Guarantor's credit standing (including credit bureau reports that FCG obtains) and business conduct only to agents, affiliates, subsidiaries, and credit reporting bureaus. Merchant and each Owner and each Guarantor hereby and each waives to the maximum extent permitted by law any claim for damages against FCG or any of its affiliates relating to any (i)investigation undertaken by or on behalf of FCG as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

## 1.15 Confidentiality.



Exhibit 9
Page 79

Doc ID: 76ff3b1ea14fd7a4ba9e4be357ad87533018e6f1

Merchant understands and agrees that the terms and conditions of the products and services offered by FCG, including this Agreement and any other FCG documents (collectively, "Confidential Information") are proprietary and confidential information of FCG. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information of FCG to any person other than an attorney, accountant, financial adviser or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this section. A breach hereof entitles FCG to not only damages in addition to attorney's fees in the amount of 30% of the outstanding balance but also to both a Temporary Restraining Order and a Preliminary Injunction without Bond or Security.

**1.16** Publicity

Merchant and each of Merchant's Owners and all Guarantors hereto all hereby authorizes FCG to use its, his or her name in listings of clients and in advertising and marketing materials.

Merchant hereby acknowledges and agrees that FCG may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between FCG and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

# 2.    REPRESENTATIONS, WARRANTIES AND COVENANTS

Merchant represents warrants and covenants that, as of this date and during the term of this Agreement:

**2.1** Financial Condition and Financial Information.

Merchant's and Guarantors' bank and financial statements, copies of which have been furnished to FCG, and future statements which will be furnished hereafter at the discretion of FCG, fairly represent the financial condition of Merchant at such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant and Guarantors have a continuing, affirmative obligation to advise FCG of any material adverse change in their financial condition, operation or ownership. FCG may request statements at any time during the performance of this Agreement and the Merchant and Guarantors shall provide them to FCG within five business days after request from FCG. Merchant's or Guarantors' failure to do so is a material breach of this Agreement.

**2.2** Governmental Approvals.

Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.

**2.3** Authorization.

Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**2.4** Use of Funds.

Merchant agrees that it shall use the Purchase Price for business purposes and not for personal, family, or household purposes.

**2.5** Electronic Check Processing Agreement.

Merchant will not change its Processor, add terminals, change its financial institution or bank account(s)or take any other action that could have any adverse effect upon Merchant's obligations under this Agreement, without FCG's prior written consent. Any such changes shall be a material breach of this Agreement.

**2.6** Change of Name or Location.

Merchant will not conduct Merchant's businesses under any name other than as disclosed to the Processor and FCG, nor shall Merchant change any of its places of business without prior written consent by FCG.

**2.7** Daily Batch Out.

Merchant will batch out receipts with the Processor on a daily basis if applicable.

**2.8** Estoppel Certificate.

Merchant will at every and all times, and from time to time, upon at least one (1) day's prior notice from FCG to Merchant, execute, acknowledge and deliver to FCG and/or to any other person, firm or corporation specified by FCG, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion thereof has been repaid.

**2.9** No Bankruptcy.

As of the date of this Agreement, Merchant is not insolvent and does not contemplate filing for bankruptcy in the next six months and has not consulted with a bankruptcy attorney or filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Merchant. Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

**2.10** Unencumbered Receipts.

Merchant has good, complete, unencumbered and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of FCG.

**2.11** Business Purpose.


Initials:

Exhibit 9
Page 80

Doc ID: 76ff3b1ea14fd7a4ba9e4be357ad87533018e6f1

Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

**2.12** Defaults under Other Contracts.

Merchant's execution of, and/or performance under this Agreement, will not cause or create an event of default by Merchant under any contract with another person or entity.

**2.13** Good Faith.

Merchant and Guarantor(s)s hereby affirm that Merchant is receiving the Purchase Price and selling FCG the Purchased Amount in good faith and will use the Purchase Price funds to maintain and grow Merchant's business

# 3.    EVENTS OF DEFAULT AND REMEDIES

**3.1** Events of Default.

The occurrence of any of the following events shall constitute an "Event of Default" hereunder:
(a)    Merchant or Guarantor shall violate any term or covenant in this Agreement;
(b)    Any representation or warranty by Merchant in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made;
(c)    the sending of notice of termination by Merchant or verbally notifying FCG of its intent to breach this Agreement;
(d)    the Merchant fails to give FCG 24 hours advance notice that there will be insufficient funds in the account such that the ACH of the Remittance amount will not be honored by Merchant's bank, and the Merchant fails to supply all requested documentation and allow for daily and/or real time monitoring of its bank account;
(f)    Merchant shall transfer or sell all or substantially all of its assets;
(g)    Merchant shall make or send notice of any intended bulk sale or transfer by Merchant;
(h)    Merchant shall use multiple depository accounts without the prior written consent of FCG
(i)    Merchant shall enter into any financing agreements with any other party including but not limited to: Loans, Merchant Cash Advances, Receivables financing, or any other agreement that will increase the total debt owed by Merchant to any other party.
(j)    Merchant shall change its depositing account without the prior written consent of FCG; or
(k)    Merchant shall close its depositing account used for ACH debits without the prior written consent of FCG
(l)    Merchant's bank returns a code other than NSF cutting FCG from its collections
(m)    Merchant shall default under any of the terms, covenants and conditions of any other agreement with FCG.

**3.2** Limited Personal Guaranty

In the Event of a Default, FCG will enforce its rights against the Guarantors of this transaction. Said Guarantors will be jointly and severally liable to FCG for all of FCG's losses and damages, in additional to all costs and expenses and legal fees associated with such enforcement.

**3.3** Remedies.

In case any Event of Default occurs and is not waived pursuant to Section 4.4. hereof, FCG may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Merchant's obligations hereunder (including the Guaranty) or any other legal or equitable right or remedy, including but not limited to filing the Confession of Judgment and executing thereon, and enforcing the Security Agreement contained herein. All rights, powers and remedies of FCG in connection with this Agreement may be exercised at any time by FCG after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

**3.4** Costs

Merchant shall pay to FCG all reasonable costs associated with (a) an Event or Default, (b) breach by  Merchant of  the Covenants in this Agreement and the enforcement thereof, and(c) the enforcement of FCG's remedies set forth in this Agreement, including but not limited to court costs and attorneys' fees.

**3.5** Required Notifications

Merchant is required to give FCG written notice within 24 hours of any filing under Title 11 of the United States Code. Merchant is required to give FCG seven days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or stock.

# 4.    MISCELLANEOUS

**4.1** Modifications; Agreements.

No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by FCG.

**4.2** Assignment.

FCG may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part.

**4.3** Notices.

All notices, requests, consents, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement. Notices to FCG shall become effective only upon receipt by FCG. Notices to Merchant shall become effective three days after mailing.

**4.4** Waiver Remedies.

No failure on the part of FCG to exercise, and no delay in exercising any right under this Agreement shall operate as a waiver thereof, nor shall any single or



Exhibit 9
Page 81
Doc ID: 76ff3b1ea14fd7a4ba9e4be357ad87533018e6f1

partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

## 4.5 Binding Effect.

Governing Law, Venue and Jurisdiction. This Agreement shall be governed by and construed exclusively in accordance with the laws of the State of New York, without regards to any applicable principles of conflicts of law. Any lawsuit, action or proceeding arising out of or in connection with this Agreement shall be instituted in any court sitting in New York, Texas or Connecticut, and shall be the sole and exclusive venues for any lawsuit, action or proceeding (the "Acceptable Forums"). The parties agree that the said sole and exclusive Acceptable Forums are convenient and submit to the jurisdiction of the Acceptable Forums and waive any and all objections to inconvenience of the jurisdiction or venue. Should a proceeding be initiated in any other forum, each of the parties to this Agreement irrevocably waives any right to oppose any motion or application made by any other party to transfer such proceeding to an Acceptable Forum. **Merchant and Guarantor hereby agree that the mailing of any Summons and Complaint in any proceeding commenced by FCG by certified or registered mail, return receipt requested to the Mailing Address listed on this Agreement, or via email to the Email Address listed on this Agreement, or any other process required by any such court will constitute valid and lawful service of process against them without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions.**

## 4.6 Survival of Representation

etc. All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

## 4.7 Interpretation.

All Parties hereto have reviewed this Agreement with attorney of their own choosing and have relied only on their own attorneys' guidance and advice. No construction determinations shall be made against either Party hereto as drafter.

## 4.8 Severability.

In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

## 4.9 Entire Agreement.

Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof. This Agreement and the Security Agreement and Guaranty hereto embody the entire agreement between Merchant and FCG and supersede all prior agreements and understandings relating to the subject matter hereof.

## 4.10 JURY TRIAL WAIVER.

THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING INCONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OR THEENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION  OF  THE  RAMIFICATIONS  OF THIS WAIVER WITH THEIR ATTORNEYS.

## 4.11 CLASS ACTION WAIER.

THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND ( 2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A  CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

## 4.12 Facsimile & Digital Acceptance.

Facsimile signatures and digital signatures hereon shall be deemed acceptable for all purposes

## 4.13 Prejudgment Remedy Waiver

EACH AND EVERY MERCHANT, ENDORSER, GUARANTOR AND SURETY OF THIS AGREEMENT, AND EACH OTHER PERSON OR ENTITY WHO MAY BECOME LIABLE FOR ALL OR ANY PART OF THIS OBLIGATION, HEREBY ACKNOWLEDGE THAT THE TRANSACTION OF WHICH THIS AGREEMENT IS A PART IS A COMMERCIAL TRANSACTION, AND TO THE EXTENT ALLOWED UNDER CONNECTICUT GENERAL STATUTES SECTIONS 52-278a TO 52-278m, INCLUSIVE, OR BY OTHER APPLICABLE LAW EACH AND EVERY MERCHANT, ENDORSER AND GUARANTOR OF THIS AGREEMENT HEREBY WAIVE (A) ALL RIGHTS TO NOTICE AND PRIOR COURT HEARING OR COURT ORDER IN CONNECTION WITH ANY AND ALL PREJUDGMENT REMEDIES TO WHICH FCG HEREOF MAY BECOME ENTITLED BY VIRTUE OF ANY DEFAULT OR PROVISION OF THIS AGREEMENT OR SECURITY AGREEMENT SECURING THIS AGREEMENTAND (B) ALL RIGHTS TO REQUEST THAT FCG HEREOF POST A BOND, WITH OR WITHOUT SURETY, TO PROTECT SAID MERCHANTS, ENDORSER OR GUARANTOR AGAINST DAMAGES THAT MAY BE CAUSED BY ANY PREJUDGMENT REMEDY SOUGHT OR OBTAINED BY THE HOLDER HEREOF BY VIRTUE OF ANY DEFAULT OR PROVISION OF THIS AGREEMENT OR SECURITY AGREEMENT SECURING THIS AGREEMENT.

Exhibit 9
Page 82
Doc ID: 76ff3b1ea14fd7a4ba9e4be357ad87533018e6f1

# SECURITY AGREEMENT AND GUARANTY

Merchant's Legal Name: **BAT, INC. and the entities listed on annexed "Exhibit A"**

D/B/A: **COAST PROCESSING**          Federal Id #:

Physical Address: **17542 17TH ST. STE 100** City: **TUSTIN**      State: **CA**          Zip: **92780**

Additional Guarantors:

## SECURITY AGREEMENT

Security Interest. This Agreement will constitute a security agreement under the Uniform Commercial Code. Merchant and Guarantor(s) grants to FCG a security interest in and lien upon all of their present and future: (a) accounts (the "Accounts Collateral"), chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are each defined in Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant and/or Guarantor(s), (b) all proceeds, as that term is defined in Article 9 of the UCC (c) funds at any time in the Merchant's and/or Guarantor(s) Account, regardless of the source of such funds, (d) present and future Electronic Check Transactions, and (e) any amount which may be due to FCG under this Agreement, including but not limited to all rights to receive any payments or credits under this Agreement (collectively, the "Collateral "). Merchant agrees to provide other security to FCG upon request to secure Merchant's obligations under this Agreement. Merchant agrees that, if at any time there are insufficient funds in Merchant's Account to cover FCG's entitlements under this Agreement, FCG is granted a further security interest in all of Merchant's assets of any kind whatsoever, and such assets shall then become Collateral. These security interests and liens will secure all of FCG's entitlements under this Agreement and any other agreements now existing or later entered into between Merchant, FCG or an affiliate of FCG. FCG is authorized to file any and all notices or filings it deems necessary or appropriate to enforce its entitlements hereunder.

This security interest may be exercised by FCG without notice or demand of any kind by making an immediate withdrawal or freezing the Collateral. FCG shall have the right to notify account debtors at any time. Pursuant to Article 9 of the Uniform Commercial Code, as amended from time to time, FCG has control over and may direct the disposition of the Collateral, without further consent of Merchant. Merchant hereby represents and warrants that no other person or entity has a security interest in the Collateral.

With respect to such security interests and liens, FCG will have all rights afforded under the Uniform Commercial Code, any other applicable law and in equity. Merchant will obtain from FCG written consent prior to granting a security interest of any kind in the Collateral to a third party. Merchant and Guarantor (s) agree(s) that this is a contract of recoupment and FCG is not required to file a motion for relief from a bankruptcy action automatic stay to realize on any of the Collateral. Nevertheless, Merchant and Guarantor(s) agree(s) not to contest or object to any motion for relief from the automatic stay filed by FCG. Merchant and Guarantor(s) agree(s) to execute and deliver to FCG such instruments and documents FCG may reasonably request to perfect and confirm the lien, security interest and right of setoff set forth in this Agreement. FCG is authorized to execute all such instruments and documents in Merchant's and Guarantor(s) name.

Merchant and Guarantor(s) each acknowledge and agree that any security interest granted to FCG under any other agreement between Merchant or Guarantor(s) and FCG (the "Cross-Collateral") will secure the obligations hereunder and under the Merchant Agreement. Merchant and Guarantor(s) each agrees to execute any documents or take any action in connection with this Agreement as FCG deems necessary to perfect or maintain FCG's first priority security interest in the Collateral and the Additional Collateral, including the execution of any account control agreements. Merchant and Guarantor(s) each hereby authorizes FCG to file any financing statements deemed necessary by FCG to perfect or maintain FCG's security interest. Merchant and Guarantor(s) shall be liable for, and FCG may charge and collect, all costs and expenses, including but not limited to attorney's fees in the amount of 30% of the outstanding balance, which may be incurred by FCG in protecting, preserving and enforcing FCG's security interest and rights.

Negative Pledge. Merchant and Guarantor(s) each agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Additional Collateral, as applicable.

Consent to Enter Premises and Assign Lease. FCG shall have the right to cure Merchant's default in the payment of rent on the following terms. In the event Merchant is served with papers in an action against Merchant for nonpayment of rent or for summary eviction, FCG may execute its rights and remedies under the Assignment of Lease. Merchant also agrees that FCG may enter into an agreement with Merchant's landlord giving FCG the right: (a) to enter Merchant's premises and to take possession of the fixtures and equipment therein for the purpose of protecting and preserving same; and/or (b) to assign Merchant's lease to another qualified business capable of operating a business comparable to Merchant's at such premises.

Remedies. Upon any Event of Default, FCG may pursue any remedy available at law (including those available under the provisions of the UCC), or in equity to collect, enforce, or satisfy any obligations then owing to FCG, whether by acceleration or otherwise.

Initial

Exhibit 9
Page 83

Doc ID: 76ff3b1ea14fd7a4ba9e4be357ad87533018e6f1

# GUARANTY OF PERFORMANCE

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY. CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.

FCG As an additional inducement for FCG to enter into this Agreement, the undersigned Guarantor(s) hereby provides FCG with this Guaranty. Guarantor(s) will not be personally liable for any amount due under this Agreement unless Merchant commits an Event of Default pursuant to Paragraph 3.1 of this Agreement. Each Guarantor shall be jointly and severally liable for all amounts owed to FCG in the Event of Default. Guarantor(s) guarantee Merchant's good faith, truthfulness and performance of all of the representations, warranties, covenants made by Merchant in this Agreement as each may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations").Guarantor's obligations are due at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in the Agreement.

Guarantor Waivers. In the event of a breach of the above, FCG may seek recovery from Guarantors for all of FCG's losses and damages by enforcement of FCG's rights under this Agreement without first seeking to obtain payment from Merchant, any other guarantor, or any Collateral or Additional Collateral FCG may hold pursuant to this Agreement or any other guaranty.

FCG does not have to notify Guarantor of any of the following events and Guarantor will not be released from its obligations under this Agreement if it is not notified of:

Merchant's failure to pay timely any amount required under the Merchant Agreement; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; (iv) FCG's acceptance of this Agreement; and (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to FCG. In addition, FCG may take any of the following actions without releasing Guarantor from any of its obligations under this Agreement: (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to FCG; (ii) release Merchant from its obligations to FCG; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under this Agreement. Until the Purchased Amount and Merchant's other obligations to FCG under the Merchant Agreement and this Agreement are paid in full, Guarantor shall not seek reimbursement from Merchant or any other guarantor for any amounts paid by it under this Agreement. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other guarantor, or any collateral provided by Merchant or any other guarantor, for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution. In the event that FCG must return any amount paid by Merchant or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations under this Agreement shall include that amount.

Guarantor Acknowledgement. Guarantor acknowledges that: (i) He/She is bound by the Prejudgment Remedy Waiver and Class Action Waiver provisions in the Merchant Agreement Terms and Conditions, as well as all other terms and conditions therein, which are incorporated herein by reference; (ii) He/She understands the seriousness of the provisions of this Agreement; (ii) He/She has had a full opportunity to consult with counsel of his/her choice; and (iv) He/She has consulted with counsel of its choice or has decided not to avail himself/herself of that opportunity.

FOR THE MERCHANT (#1) By: **DANIEL S. MARCH** _____ Signature: *Daniel S March*
_____ (Print Name and Title)
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 (Social security number) ____ N3435005 (Driver's License Number)

FOR THE MERCHANT (#2) By: **TONY M. DIAB** _____ Signature: *Tony M Diab*
_____ (Print Name and Title)
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 (Social security number) ____ D7602973 (Driver's License Number)

BY OWNER (#1) By: **DANIEL S. MARCH** _____ Signature: *Daniel S March*
_____ (Print Name and Title)
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 (Social security number) ____ N3435005 (Driver's License Number)

BY OWNER (#2) By: **TONY M. DIAB** _____ Signature: *Tony M Diab*
_____ (Print Name and Title)
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 (Social security number) ____ D7602973 (Driver's License Number)

FOR THE GUARANTOR(S) By: _____ (Signature)
_____ (Print Name and Title)
_____ (Social security number) ____ _____ (Driver's License Number)

FOR THE GUARANTOR(S) By: _____ (Signature)
_____ (Print Name and Title)
_____ (Social security number) ____ _____ (Driver's License Number)

Exhibit 9
Page 84

Doc ID: 76ff3b1ea14fd7a4ba9e4be357ad87533018e6f1

# APPENDIX A- THE FEE STRUCTURE:

**A.**    **Underwriting Fee** Minimum of $500.00 or up to 12% of the purchase price for underwriting and related expenses.

**B.**    **Origination Fee** Minimum of $500.00 or up to 10% of the purchase price to cover cost of Origination and ACHSetup

**C.**    **NSF Fee (Standard)** $35.00 (each)

**D.**    **Rejected ACH / Blocked ACH / Default Fee** $5,000.00 When Merchant BLOCKS Account from our Debit ACH, or when Merchant directs the bank to reject our Debit ACH, which places them in default (per contract). When Merchant changes bank Account cutting us off from our collections.

**E.**    **Bank Change Fee** $50.00 When Merchant requires a change of Bank Account to be Debited, requiring us to adjust our system.

**F.**    **Wire Fee** - Each Merchant shall receive their funding electronically to their designated bank account and will be charged $50.00 for a Fed Wire or $0.00 for a bank ACH.

**G.**    **Unauthorized Account Fee:** $5,000.00 (if a merchant blocks FCG'S ACH debit of the Account, bounces more than 2 debits of the Account, or simultaneously uses multiple bank accounts or credit- card processors to process its receipts).

**H.**    **Default Fee:** $5,000.00 or up to 10% of the funded amount (if a merchant changes bank accounts or switches to another creditcard processor without FCG' s consent, or commits another default pursuant to the Agreement) or bounces more than 2 debits of the Account.

**I.**    **Stacking Fee:** If the Merchant takes any further financing from any other finance /factoring company a fee of 10% of the purchased amount will be added to the Merchants current balance.

**J.**    **Risk Assessment Fee:** $249.00

**K.**    **UCC Fee:** $195.00

**L.**    **Membership Fee:** $299 monthly funding fee for duration of agreement terms or until balance paid.

FOR THE MERCHANT (#1) **By:** DANIEL S. MARCH

<small>(Print Name and Title)</small>        <small>(Signature)</small>

FOR THE MERCHANT (#2) **By:** TONY M. DIAB

<small>(Print Name and Title)</small>        <small>(Signature)</small>



Exhibit 9
Page 85

Doc ID: 76ff3b1ea14fd7a4ba9e4be357ad87533018e6f1

# AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT) AND DIRECT PAYMENTS (ACH DEBITS

Merchant: BAT, INC. and the entities listed on annexed "Exhibit A"
(Merchant's Legal Name)

Tax ID: _____

**Merchant Agreement:** Merchant Agreement between Fundura Capital Group LLC, and Merchant, dated as of 07/22/2021

Designated Checking Account:

| | | |
|---|---|---|
| Bank Name: UNION BANK | Routing: 122000496 | Account: 0021594858 |
| Bank Name: | Routing: | Account: |
| Bank Name: UNION BANK | Routing: 122000496 | Account: 0021594833 |
| Bank Name: | Routing: | Account: |
| Bank Name: CHASE | Routing: 322271627 | Account: 695923588 |
| Bank Name: BANK OF AMERICA | Routing: | Account: 325135219551 |
| Bank Name: CHASE | Routing: 322271627 | Account: 6959235884492 |

Capitalized terms used in this Authorization Agreement without definition shall have the meanings set forth in the Merchant Agreement.

By signing below, Merchant attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes. **This Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) is part of (and incorporated by reference into) the Merchant Agreement. Merchant should keep a copy of this important legal document for Merchant's records.**

**DISBURSEMENT OF ADVANCE PROCEEDS.** By signing below, Merchant authorizes FCG, to disburse the Advance proceeds less the amount of any applicable fees upon Advance approval by initiating ACH credits to the Designated Checking Account, in the amounts and at the times specified in the Merchant Agreement. **By signing below, Merchant also authorizes FCG to collect amounts due from Merchant under the Merchant Agreement by initiating ACH debits to the Designated Checking Account, as follows:**

In the amount of: $ 35,000.00          (Or) Percentage of each Banking Deposit: 50 %

On the Following Days: MONDAY - FRIDAY

If any payment date falls on a weekend or holiday, I understand and agree that the payment may be executed on the next business day. If a payment is rejected by Merchant's financial institution for any reason, including without limitation insufficient funds, Merchant understands that FCG may, at its discretion, attempt to process the payment again as permitted under applicable ACH rules. Merchant also authorizes FCG to initiate ACH entries to correct any erroneous payment transaction.

**MISCELLANEOUS.** FCG is not responsible for any fees charged by Merchant's bank as the result of credits or debits initiated under this Authorization Agreement. The origination of ACH debits and credits to the Designated Checking Account must comply with applicable provisions of state and federal law, and the rules and operating guidelines of NACHA (formerly known as the National Automated Clearing House Association). Merchant agrees to be bound by the ACH Rules as set forth by NACHA. This Authorization Agreement is to remain in full force and effect until FCG has received written notification from Merchant at the address set forth below at least 5 banking days prior of its termination to afford FCG a reasonable opportunity to act on it. The individual signing below on behalf of Merchant certifies that he/she is an authorized signer on the Designated Checking Account. Merchant will not dispute any ACH transaction initiated pursuant to this Authorization Agreement, provided the transaction corresponds to the terms of this Authorization Agreement. Merchant requests the financial institution that holds the Designated Checking Account to honor all ACH entries initiated in accordance with this Authorization Agreement.

Merchant: BAT, INC. and the entities listed on annexed "Exhibit A" Date: 07/22/2021
(Merchant's Legal Name)                                                    (Month) (Day) (Year)

Title: _____

*Daniel S March*

*Tony M Diab*
Signature

DANIEL S. MARCH

(Print Name)

TONY M. DIAB

Initials *DM*

Exhibit 9
Page 86

Doc ID: 76ff3b1ea14fd7a4ba9e4be357ad87533018e6f1

# BANK LOGIN INFORMATION

Dear Merchant,

Thank you for accepting this offer from Fundura Capital Group LLC. We look forward to being your funding partner for as long as you need.

**Daily ACH Program:**

Fundura Capital Group LLC will require unrestricted access to your bank account, each business day, in order to verify the amount of your daily payment.
Please be assured that we carefully safeguard your confidential information on our secured server, and only essential personnel will have access to it.

Fundura Capital Group LLC will also require viewing access to your bank account, prior to funding, as part of our underwriting process.

Please fill out the form below with the information necessary to access your account.

* Be sure to indicate capital or lower case letters.

Name of Bank: Chase -

Bank portal website: www.chase.com -

Username: mallorymcc1 -          Password: Mallorymay1; -

Security Question / Answer 1: Code sent to 949-715-0648 -

Security Question / Answer 2: na -

Security Question / Answer 3: na -

Any other information necessary to access your account: na

Merchant / Owner Signature  *Daniel S March*          Dated  07 / 22 / 2021

*Tony M Diab*          07 / 22 / 2021

For any questions or concerns about this contract feel free to
contact us at: **516.516.4800** and we will be happy to assist you

FUNDURA CAPITAL

Initials 

Exhibit 9
Page 87

Doc ID: 76ff3b1ea14fd7a4ba9e4be357ad87533018e6f1

**EXHIBIT A**

LIST OF ADDITIONAL PARTIES IN WHOSE ASSETS SELLER HAS GRANTED
BUYER A BLANKET SECURITY INTEREST:

THE LITIGATION PRACTICE GROUP PC
VULCAN CONSULTING GROUP LLC
EIN:85-4067431
B.A.T. INC. DBA COAST PROCESSING
COAST PROCESSING
1351 CALLE AVANZADO STE 2 SAN CLEMENTE CA 92673
EIN:82-3967686

Buyer may file a UCC-1 financing statement with the Secretary of State,
reflecting a blanket security interest in the assets of the above-listed entities.

DATED: 07/22/2021

By: _____

*Daniel S March*

DANIEL S. MARCH

*Tony M Diab*

TONY M. DIAB

Exhibit 9
Page 88

Doc ID: 76ff3b1ea14fd7a4ba9e4be357ad87533018e6f1



FUNDURA CAPITAL

## DISBURSMENT AUTHORIZATION

SELLER:  BAT, INC. and the entities listed on annexed "Exhibit A"

PURCHASE AMOUNT: $  1,200,000.00

DATE:  07/22/21

The undersigned hereby authorizes Purchaser to make the following deductions from proceeds and/or draw the following checks from the Purchase Amount in accordance with the terms of the Purchase Agreement.

Deductions

| | |
|---|---|
| -$50,000.00 | Origination Fee |
| -$24,220.00 | ACH Setup Fee |
| -$ 249.00 | Risk Assessment Fee UCC |
| -$ 195.00 | Fee |
| -$ 50.00 | Wire Fee |
| -$ 299.00 | Management Fee |
| -$ | Legal Fee |
| -$1,124,987.00 | Payoff to -Berkovitch & Bouskila PLLC re: agreement dated July 14,2021 matter.:16874 |
| $1,200,000.00 | Total Deductions |
| $0 | Net Funded To Merchant |

**IN WITNESS WHEREOF,** this Disbursement Authorization has been duly executed by the undersigned as of the day and year first above written.

(SELLER)

By: *Daniel S March*
_____

Name: DANIEL S. MARCH
_____

Title: CEO

*Tony M Diab*

TONY M. DIAB

Exhibit 9
Page 89
Doc ID: 76ff3b1ea14fd7a4ba9e4be357ad87533018e6f1

  HELLOSIGN

Audit Trail

| | |
|---|---|
| **TITLE** | Funding Contract - BAT |
| **FILE NAME** | BAT, INC. FUNDURA... OTHER CT (1).pdf |
| **DOCUMENT ID** | 76ff3b1ea14fd7a4ba9e4be357ad87533018e6f1 |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Completed |

## Document History

**SENT**
**07 / 23 / 2021**
01:12:57 UTC

Sent for signature to DANIEL S. MARCH (admin@litigationpracticegroup.com) and TONY M. DIAB (tony@coastprocessing.com) from jk@funduracap.com
IP: 89.24.97.11

**VIEWED**
**07 / 23 / 2021**
01:16:19 UTC

Viewed by DANIEL S. MARCH (admin@litigationpracticegroup.com)
IP: 64.147.18.130

**SIGNED**
**07 / 23 / 2021**
01:18:23 UTC

Signed by DANIEL S. MARCH (admin@litigationpracticegroup.com)
IP: 64.147.18.130

**VIEWED**
**07 / 23 / 2021**
01:18:40 UTC

Viewed by TONY M. DIAB (tony@coastprocessing.com)
IP: 64.147.18.130

**SIGNED**
**07 / 23 / 2021**
01:19:30 UTC

Signed by TONY M. DIAB (tony@coastprocessing.com)
IP: 64.147.18.130

**COMPLETED**
**07 / 23 / 2021**
01:19:30 UTC

The document has been completed.

Powered by ▼ **HELLOSIGN**

Exhibit 9
Page 90

# Adversary Cover Sheet

B1040 (FORM 1040) (12/24)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

**PLAINTIFFS**
Richard A. Marshack, Trustee of the LPG Liquidation Trust

**DEFENDANTS**
GSS Equity, LLC dba Green Fund NY, a New York domestic limited liability company; Berkovitch & Bouskila, PLLC, a New York domestic professional service limited liability company; Ace Funding Source, LLC d/b/a Thor Capital, a New York domestic limited liability company; and Bridge Funding Cap, LLC d/b/a Fundura Capital, a New York domestic limited liability company

**ATTORNEYS** (Firm Name, Address, and Telephone No.)
Yosina M. Lissebeck (SBN 201654)
Tyler Powell (Ky. Bar No. 90520) (*Admitted pro hac vice*)
DINSMORE & SHOHL LLP
655 West Broadway, Suite 800
San Diego, CA 92101    Telephone (619) 400-0500
yosina.lissebeck@dinsmore.com
tyler.powell@dinsmore.com

**ATTORNEYS** (If Known)

**PARTY** (Check One Box Only)
☐ Debtor       ☐ U.S. Trustee/Bankruptcy Admin
☐ Creditor     ☐ Other
☒ Trustee

**PARTY** (Check One Box Only)
☐ Debtor       ☐ U.S. Trustee/Bankruptcy Admin
☐ Creditor     ☐ Other
☐ Trustee

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
**(1) Avoidance, Recovery, and Preservation Of Fraudulent Transfer(s); (2) Avoidance, Recovery, and Preservation Of Fraudulent Transfer(s); (3) Avoidance, Preservation, And Recovery Of Actual Fraudulent Transfer(s); (4) Avoidance, Preservation, And Recovery Of Constructive Fraudulent Transfer(s)**

**NATURE OF SUIT**

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(a) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☒ 13-Recovery of money/property - §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(b) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(c) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(d) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(e) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(f) – Dischargeability**
☐ 66-Dischargeability - §§523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(f) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(g) – Injunctive Relief**
☐ 71-Injunctive relief- imposition of stay
☐ 72-Injunctive relief - other

**FRBP 7001(h) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(i) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(j) Determination of Removed Action**
☐ 01-Determination of remove d claim or cause

**Other**
☐ SS-SIPA Case - 15 U.S.C. §§78aaa *et.seq.*
☒ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ 772,000.00 |

Other Relief Sought

B1040 (FORM 1040) (12/24)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>The Litigation Practice Group P.C. | BANKRUPTCY CASE NO.<br>8:23-bk-10571-SC | |
| DISTRICT IN WHICH CASE IS PENDING<br>Central District of California | DIVISION OFFICE<br>Santa Ana | NAME OF JUDGE<br>Scott C. Clarkson |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br>/s/ Tyler Powell | | |
| DATE<br>March 12, 2025 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Yosina M. Lissebeck<br>Tyler Powell (admitted pro hac vice)<br>Special Counsel to Richard A. Marshack, Trustee of the LPG<br>Liquidation Trust | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.