Christopher Celentino (State Bar No. 131688)
Christopher B. Ghio (State Bar No. 259094)
Yosina M. Lissebeck (State Bar No. 201654)
**DINSMORE & SHOHL LLP**
655 West Broadway, Ste 800
San Diego, CA 92101
Tele:   619.400.0500
Fax:     619.400.0501
Christopher.Celentino@dinsmore.com
Christopher.Ghio@dinsmore.com
Yosina.Lissebeck@dinsmore.com

Julian Pecora (WV Bar No. 13912 – Admitted pro hac vice)
**DINSMORE & SHOHL LLP**
611 Third Ave
Huntington, WV 25701
Tele:   304-691-8322
Fax:     304-522-4312
Julian.Pecora@dinsmore.com

Attorneys for Richard A. Marshack,
Trustee of the LPG Liquidation Trust

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>The Litigation Practice Group P.C.,<br><br>Debtor.<br>_____<br><br>Richard A. Marshack, Trustee of the LPG Liquidation Trust<br><br>Plaintiff,<br><br>v.<br><br>Guardian Processing, LLC, a Wyoming limited liability company; Touzi Capital, LLC; PECC Corp.; Teracel Block Chain Fund II, LLC; Oakstone Law Group, PC; Eng Taing, an individual; Heng Taing, an individual; Jimmy Chhor, an individual; Dongliang Jiang, an individual; and DOES 1 through 100, inclusive.<br><br>Defendants. | Case No.: 8:23-bk-10571-SC<br><br>Adv. Proc. No.:<br><br>Chapter 11<br><br>**COMPLAINT FOR:**<br><br>**(1) INJUNCTIVE RELIEF;**<br><br>**(2) AVOIDANCE, RECOVERY, AND PRESERVATION OF TWO-YEAR ACTUAL FRAUDULENT TRANSFERS;**<br><br>**(3) AVOIDANCE, RECOVERY, AND PRESERVATION OF TWO-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS;**<br><br>**(4) AVOIDANCE, RECOVERY, AND PRESERVATION OF FOUR-YEAR ACTUAL FRAUDULENT TRANSFERS;**<br><br>**(5) AVOIDANCE, RECOVERY, AND PRESERVATION OF FOUR-YEAR** |

**CONSTRUCTIVE FRAUDULENT TRANSFERS;**

**(6) TURNOVER;**

**(7) BREACH OF FIDUCIARY DUTY;**

**(8) UNJUST ENRICHMENT;**

**(9) IMPOSITION OF A CONSTRUCTIVE TRUST;**

**(10) FRAUDULENT TRANSFER;**

**(11) CIVIL CONSPIRACY;**

**(12) PREFERENTIAL TRANSFER;**

**(13) FRAUDULENT INDUCEMENT;**

**(14) VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO)**

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

For his Complaint for (1) Injunctive Relief; (2) Avoidance, Recovery, and Preservation of Two-Year Actual Fraudulent Transfers; (3) Avoidance, Recovery, and Preservation of Two-Year Constructive Fraudulent Transfers; (4) Avoidance, Recovery, and Preservation of Four-Year Actual Fraudulent Transfers; (5) Avoidance, Recovery, and Preservation of Four-Year Constructive Fraudulent Transfers; (6) Turnover; (7) Breach of Fiduciary Duty; (8) Unjust Enrichment; (9) Constructive Trust; (10) Civil Conspiracy; (11) Fraudulent Inducement; (12) Preferential Transfers; and (13) Violation of RICO (the "Complaint"), Plaintiff Richard A. Marshack, former Chapter 11 Trustee for the Bankruptcy Estate of The Litigation Practice Group PC (the "Debtor" or "LPG") and current liquidating trustee of the LPG Liquidation Trust (the "Trustee" or "Plaintiff") for the bankruptcy estate of Debtor (the "Estate") in the above-captioned bankruptcy case (the "Bankruptcy Case"), alleges and avers as follows:

## STATEMENT OF JURISDICTION, NATURE OF PROCEEDING, AND VENUE

1.     This Court has jurisdiction over this action under 28 U.S.C. §§ 157(b)(2)(A), (E), (H) and (O), 1334(b), and General Order No. 13-05 of the District Court for the Central District of California because this is a core proceeding arising in and/or related to the Bankruptcy Case, which is a case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), and which is pending in the United States Bankruptcy Court for the Central District of California, Santa Ana Division (the "Court"). Regardless of whether this proceeding is core, non-core, or otherwise, the Plaintiff consents to the entry of a final order and judgment by the Bankruptcy Court. The Defendants are hereby notified that Rule 7008 of the Federal Rules of Bankruptcy Procedure requires defendants to plead whether consent is given to the entry of a final order and judgment by the Bankruptcy Court. Venue of this adversary proceeding properly lies in this judicial district under 28 U.S.C. § 1409(a) because this proceeding is related to the Debtor's pending Bankruptcy Case.

## THE PARTIES

2.     Debtor LPG is, and at all material times was, a professional corporation organized, existing, and in good standing under the laws of the State of California, with its principal place of business in Tustin, California.

/ / /

3.      Defendant Guardian Processing, LLC ("Guardian") is, and at all material times was, a limited liability corporation organized, existing, and in good standing under the laws of the State of Wyoming, with its principal place of business in Sheridan, Wyoming.

4.      Defendant Touzi Capital, LLC ("Touzi") is, and at all material times was, a limited liability company organized and existing under the laws of the State of California, with its principal place of business in Walnut, California. Touzi is owned, controlled, and managed by Eng and his brother Heng. Touzi and PECC, Corp. share the same office in Walnut, California, located at 340 South Lemon Avenue, Unit 8284 Walnut, California 91789.

5.      PECC Corp. ("PECC") is, and all material times was, a Delaware Corporation registered and licensed to do business in the State of California, with its principal place of business listed in Walnut, California. PECC Corp. is owned, controlled, and managed by Eng and Heng. Eng is also listed as PECC Corp.'s agent for service of process. PECC and Touzi share the same office located at 340 South Lemon Avenue, Unit 8284, Walnut, California 91789.

6.      Defendant Teracel Blockchain Fund II, LLC ("Teracel") is, and at all material times was, a limited liability corporation organized, existing, and in good standing under the laws of the State of Delaware. On information and belief, Teracel is owned, managed, and controlled by Eng, Heng, Touzi, and/or PECC.

7.      Defendant Eng Taing ("Eng") is, and at all material times was, an individual residing in the State of California. (Answered 3rd amended complaint)

8.      Defendant Heng Taing ("Heng") is, and at all material times was, an individual residing in the State of California.

9.      Defendant Oakstone Law Group, PC ("Oakstone") is, and at all material times was, a professional corporation organized, existing, and in good standing under the laws of the State of California, with its principal place of business in La Jolla, California.

10.     Defendant Jimmy Chhor ("Chhor") is, and at all material times was, an individual residing in the State of California.

11.     Defendant Dongliang Jiang ("Jiang") is, and at all material times was, an individual residing in State of California.

## **GENERAL ALLEGATIONS**

**A.    LPG'S BANKRUPTCY CASE**

12.    On March 20, 2023 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, commencing the Bankruptcy Case.

13.    After the Office of the United States Trustee (the "UST") filed its *Motion to Dismiss or Convert Case Pursuant to 11 U.S.C. § 1112(b)* [Bankr. Docket No. 21] and creditors Debt Validation Fund II, LLC; MC DVI Fund 1, LLC; and MC DVI Fund 2, LLC filed the *Motion by DVF and MC DVI to Dismiss Chapter 11 Case Pursuant to 11 U.S.C. §§ 105, 305, 349, & 1112, or in the Alternative Convert This Case to Chapter 7 or Appoint a Trustee* [Bankr. Docket No. 44], the Court entered the *Order Directing Unites States Trustee to Appoint Chapter 11 Trustee* [Bankr. Docket No. 58] on May 4, 2021, thereby granting the UST's motion and directing the UST to appoint a Chapter 11 Trustee in the Bankruptcy Case.

14.    Pursuant to the *Acceptance of Appointment as Chapter 11 Trustee* [Bankr. Docket No. 63; the *Order Approving Appointment* is Docket No. 65], on May 8, 2023, Plaintiff accepted his appointment as the Chapter 11 Trustee in the Bankruptcy Case, and he continues to serve in this capacity at this time. The Plaintiff was not appointed until after the alleged events giving rise to his causes of action alleged herein and, therefore, base these allegations on information and belief.

15.    All claims have been transferred to the Liquidating Trust pursuant to the confirmed Plan and Plaintiff brings this action solely in his capacity as the former Chapter 11 Trustee and current Liquidating Trustee of the Liquidation Trust for the benefit of Debtor's Estate and its creditors. The Plaintiff brings this action solely in his capacity as the former Chapter 11 Trustee and currently as the liquidating Trustee of the LPG Liquidation Trust for the benefit of the Debtor's Estate and its creditors.

**B.    LPG'S OWNERSHIP AND MANAGEMENT**

16.    After being disbarred in both California and Nevada for forging a judge's signature and misappropriating substantial client funds, Tony Diab ("Diab") transferred his existing debt resolution practice to The Litigation Practice Group, PC ("LPG"). LPG was established as a law firm purportedly offering consumer debt resolution services, eventually servicing more than 65,000 customers across the United States. Consumers who retained LPG were required to make monthly payments via ACH

1  debits from their bank accounts. These payments were ostensibly intended to cover all legal and non-

2  legal services LPG purported to provide to its clients.

3       17.     However, LPG systematically mismanaged and diverted these consumer payments. On

4  information and belief, in 2022 alone, LPG collected approximately $150,000,000 in ACH debits.

5  Rather than depositing these funds into an Interest on Lawyer Trust Account (IOLTA), as the law

6  requires until earned, LPG improperly transferred substantial portions of these funds to non-debtor

7  entities, insiders, affiliates, marketing companies, and co-conspirators. These improper transfers

8  included, but were not limited to:

9       18.     Approximately $77 million was transferred to BAT by mid-2022.

10       19.     Significant payments to marketing companies and affiliates controlled by Diab or other

11  insiders, with no documentation or justification.

12       20.     Business expenses were paid in cash, including more than $100,000 to furnish Jane

13  Dearwester's North Carolina office.

14       21.     Payments for personal luxury expenses unrelated to LPG's operations, including sports

15  cars, private jets to Las Vegas, resort stays, luxury hotels, a BMW i8, a Mercedes Benz G-Wagon, Han

16  Trinh's $300,000 wedding, a luxury box suite at the Anaheim Ducks stadium, and luxury watches

17  worth over $150,000.

18       22.     Additional fraudulent transfers were made to Diab, his co-conspirators, insiders, and

19  their affiliated entities to further their roles in the fraudulent scheme.

20       23.     These wrongful transfers rendered LPG insolvent, compelling Diab and LPG to further

21  transfer and/or sell the same ACH debits multiple times, accruing additional debt in what became a

22  Ponzi scheme designed to finance LPG's continued operations and extravagant expenditures. When

23  the fraudulent scheme began unraveling under the weight of mounting litigation and creditor claims in

24  late 2022, Diab and his co-conspirators, including but not limited to, Eng, Heng, Han Trinh ("Han"),

25  and Phoung "Jayde" Trinh ("Jayde") devised a broader scheme to protect LPG's most valuable assets—

26  its ACH debits and attorney network—through fraudulent transfers, concealment, and diversion.

27       24.     Despite being disbarred, Diab maintained complete control over LPG since its

28  inception. Diab deliberately concealed his control, requiring LPG employees to address him as

"Admin" and displaying a desk nameplate stating, "I don't work here." These calculated actions were part of a strategy to obscure his role from both employees and external stakeholders.

25.    To formalize LPG's operations and mask his disbarment, Diab "rented" the law license of Daniel March, who was nominally presented as LPG's managing partner. In reality, March had no meaningful authority or control over LPG's operations. Diab impersonated March regularly, signing contracts in March's name and issuing directives as if he were March. Notably, LPG's primary DocuSign account was tied to Diab's email address, admin@lpglaw.com, which he used to execute numerous contracts under March's name. In exchange for his participation, March received an annual salary exceeding $600,000, along with bonuses and other benefits. March has since been disbarred for his involvement in the criminal enterprise at LPG and fraudulent scheme to transfer all of LPG's assets, evade LPG's creditors and avoid investigation and adverse action by federal and state government agencies.

26.    Before March's involvement, John Thompson served as LPG's sole shareholder from February 2019 to November 2019. Thompson was appointed solely to conceal Diab's control over LPG during its early operations. Recognizing the potential liability arising from Diab's fraudulent actions, Thompson conveyed his interest in LPG to March in November 2019. Like March, Thompson's role was largely nominal, and Diab impersonated Thompson on several occasions, providing legal advice and signing legal documents, including Service Applications and Agreements submitted to Credit Reporting Services, LLC.

27.    Diab's extensive impersonations of March and Thompson, coupled with his misuse of LPG's accounts and resources, reveal a deliberate scheme to enrich himself and his co-conspirators at the expense of LPG's creditors and clients.

28.    Jiang, as the accountant for Teracel, PECC, and entities controlled by Eng and Heng Taing, played a crucial role in managing the financial transactions that furthered the fraudulent scheme. He was responsible for processing and reconciling financial records in a way that concealed fraudulent transfers, obscured the financial trail, and prevented creditors from identifying the true location of assets. Jiang knowingly participated in structuring transactions that allowed assets to be siphoned out of LPG and into entities under Eng and Heng Taing's control.

29.     Upon information and belief, Jiang actively assisted in transferring funds between LPG and Touzi Capital, PECC, and Teracel Blockchain Fund in a manner intended to frustrate recovery efforts. Jiang also advised Eng and Heng Taing on financial structuring strategies to disguise fraudulent conveyances.

## C.     LPG'S BUSINESS STRUCTURE

30.     Historically, LPG had a business partner called BAT, Inc. dba Coast Processing ("Coast Processing"), owned by Brian Real, Arash Asante Bayrooti, and Diab. Coast Processing managed LPG's in-house marketing and client development operations, as well as backend processing and other operational functions. In addition to Coast Processing's contributions, LPG relied on a network of over 100 marketing affiliates to source new clients. In 2021, Diab acquired the interests of the other investors in Coast Processing and merged its operations with LPG, including its contracts with other marketing affiliates. Despite this merger, Coast Processing remains a California corporation in good standing. Prior to the buyout, Coast Processing exercised dominion and control over LPG in collaboration with Diab, operating under the dba "LPG."

31.     At all relevant times herein, Diab controlled and ran the operations at Coast Processing. Notwithstanding from March 2, 2023 until March 13, 2024, Diab appointed Han as the Chief Executive Officer, Chief Financial Officer, Secretary, and Director of Coast Processing in order to facilitate the fraudulent transfer of funds from LPG to non-debtor entities and individuals without detection to Diab, Han, Jayde, Eng, Heng, Scott Eadie ("Eadie"), Oakstone Legal Group, PC, Guardian Processing, LLC, Phoenix, Prime Logix, LLC, Maverick Management, LLC, and Vulcan Consulting among others. Han's role at Coast Processing gave her signatory access to its bank accounts, which she used to transfer hundreds of thousands of dollars after LPG filed its Bankruptcy petition, if not more, in ACH debits on LPG client files fraudulently transferred to other non-debtor entities to herself, Jayde, Eadie, Greyson Law Center, PC ("Greyson") among others.

32.     Marketing affiliates referred clients to LPG, targeting individuals burdened by predatory lending practices or invalid claims for significant debts under applicable law. Upon onboarding these clients, LPG compensated the marketing affiliates by sharing a percentage of the fees earned through the debt resolution process. This arrangement allowed LPG to avoid large upfront

costs and spread the risk of non-payment by the client across the marketing affiliates who had secured the clients.

33.    LPG clients typically paid fees over 18 to 30 months via monthly ACH debits from their bank accounts. These payments were controlled by Diab, LPG, and at times, as alleged herein, other entities acting under Diab's direction or through conspiratorial arrangements. These entities fraudulently initiated ACH transactions on LPG clients' accounts or collaborated with Diab to facilitate the transfer of client files and funds, as detailed throughout this complaint. The payments received or due from each client are referred to herein as "ACH debits" or "ACH receivables," as applicable.

34.    Upon onboarding a client, LPG assumed responsibility for servicing the client file. To manage this, LPG utilized software platforms such as DebtPayPro ("DPP") and, more recently, a less efficient proprietary system called LUNA. These systems automated dispute processes, facilitated client communications and tracked payment data from clients and to affiliates including PECC, Touzi and Teracel. Correspondence sent on behalf of clients to creditors, collection agencies, and credit bureaus primarily consisted of generic, automated templates delivered via U.S. Mail, fax, or email. Outcomes varied: some cases resulted in successful debt resolution or credit report corrections, while others culminated in debt settlements or lawsuits. The creation of proprietary systems like LUNA also facilitated Diab's schemes and LPG's fraudulent transfers of client files, ACH information, and ACH debit processing to Phoenix, Prime Logix, Greyson, CLG, Oakstone, Touzi, Eng, Heng, Teracel, PECC, Guardian, and others.

35.    Due to the incremental nature of client payments, LPG frequently transferred its future cash flows—referred to as ACH receivables—to third-party investors or alleged factoring companies at a discounted rate. These entities received returns based on the difference between the clients' total debts and the discounted price or a percentage thereof. However, LPG exploited this process to perpetrate a pyramid scheme and misappropriate funds for personal gain. Diab and LPG repeatedly transferred the same ACH receivables to multiple entities, including Touzi, PECC, Teracel, among others, defrauding creditors, paying prior creditors in a Ponzi scheme, and/or misappropriating the proceeds of these fraudulent transactions.

36.    The largest alleged factoring company to obtain receivables from LPG was Validation Partners, LLC ("Validation Partners"). Between August 30, 2021, and August 17, 2022, Validation Partners invested $66,000,000 to acquire receivables from LPG and 58 of its marketing affiliates. In total, Validation Partners obtained over 40,000 accounts with a combined value exceeding $400,000,000.

**D.    DIAB'S SCHEME**

37.    Diab, along with his co-conspirators Eng Taing, Touzi Capital, LLC, Teracel Blockchain Fund II, LLC, and PECC Corp., among others, orchestrated a scheme to fraudulently transfer, pledge and/or sell thousands of LPG client files and their associated ACH receivables. In many instances, these client files and receivables were transferred and/or transferred multiple times to alleged factoring companies, Diab's non-debtor alter ego entities and other affiliated parties. This scheme was executed to obscure and hide the existence and true ownership of LPG's assets, hinder their discovery by creditors, and siphon as much value and funds as possible from LPG client files and ACH receivables before earning those funds in contravention of consumer protection laws. The fraudulent transfers, pledges and/or sales were deliberately structured to shield these funds from the mounting number of lawsuits being filed against LPG while enriching Diab and his co-conspirators.

38.    The fraudulent scheme involved transferring and/or reselling all, or a substantial portion, of LPG client files and ACH receivables without proper documentation, consideration, or consent from LPG's creditors or clients. These transfers, pledges and/or sales were specifically designed to defraud creditors, evade lawful claims, and conceal assets. Thousands of client files were repeatedly pledged and/or transferred, effectively implementing a Ponzi scheme orchestrated by Diab, Eng, Heng, Han and Jayde, among others, in which new funds were used to pay prior creditors, all while defrauding LPG's estate and its legitimate creditors. This calculated scheme facilitated the diversion of funds to entities such as Touzi, Teracel, PECC, Oakstone, Guardian, and Greyson, among others further illustrating their integral roles in the criminal enterprise and defrauding the estate.

39.    To perpetuate this fraudulent operation, proprietary software systems such as DebtPayPro (DPP) and LUNA were used to access and manipulate LPG's client and financial data. These systems enabled the unauthorized processing and transfer of client information and ACH

1   receivables to entities controlled by Diab, Eng, Heng, and their associated companies. As part of Eng

2   and Heng's involvement in the criminal enterprise at LPG and subsequently other non-debtor entities,

3   including but not limited to, Oakstone, Guardian, and Greyson, they were given access to DPP and

4   LUNA with permissions to control and modify LPG client files and ACH processing. These actions,

5   which lacked any legitimate business justification, contributed to Eng and Heng initiating double

6   pulls on LPG client files and the depletion of LPG's estate, further damaging LPG's creditors and

7   stakeholders.

8   **E.    DIAB'S CONTROL OVER LPG'S PAYMENT PROCESSING**

9         40.    LPG's primary source of revenue was derived from the monthly ACH debits made by

10   its client base. To facilitate these payments, LPG relied on various ACH payment processing

11   companies, many of which were deliberately selected and controlled by Diab to enable the rapid

12   transfer of millions of dollars to himself, his co-conspirators and his non-debtor alter ego entities.

13   These entities included but were not limited to, Touzi, Teracel, PECC, Guardian, and Oakstone.

14   Diab's practice of rotating between different ACH vendors was calculated to obscure the flow of

15   funds, evade detection, and avoid potential payment disputes with vendors. These transfers often

16   occurred within three days of an ACH pull, allowing Diab to quickly funnel LPG funds into accounts

17   associated with himself and his co-conspirators.

18         41.    Notably, LPG operated without formal service agreements with key ACH processors,

19   including Guardian, and other entities identified as critical participants in the scheme. The lack of

20   formal agreements underscores the fraudulent nature of these arrangements. For instance, side deals

21   between Diab and third-party processors, including Marich Bein, were created to bypass standard

22   corporate oversight and to conceal Diab's control over these transactions. This unchecked influence

23   allowed Diab to direct ACH funds to entities he controlled, to the detriment of LPG's estate and

24   creditors.

25         42.    From May 2022 to September 2022, LPG's monthly ACH debits ranged between $8.4

26   million and $11.2 million. By the Petition Date, monthly ACH debits from client accounts exceeded

27   $15 million. Despite the substantial revenue generated, LPG accumulated no meaningful cash

28   reserves, reporting only $4,500 in its bank accounts as of the Petition Date. This discrepancy

1   illustrates the extensive siphoning of funds orchestrated by Diab, Eng, Heng, Han, Jayde among

2   others, leaving LPG insolvent and unable to meet its obligations.

3       43.    The payment processing scheme was further bolstered by the involvement of

4   additional ACH vendors, including but not limited to Revolv3, BankUnited, Authorize.net, Marich

5   Bein, EPPS, Seamless, and others listed in the Court's Preliminary Injunction entered in Adversary

6   Proceeding No. 8:23-ap-01046-SC ("1046 Action"). These vendors served as conduits for Diab's

7   fraudulent transfers, facilitating the improper diversion of funds from LPG's clients and creditors to

8   entities controlled by Diab, Eng, Heng, and other co-conspirators. To further hide the fraudulent

9   scheme, Diab and his co-conspirators continued to use old LPG ACH processing accounts, including

10  but not limited to, LPG's Revolv3 account, so that LPG clients would not be alerted to the diversion

11  of their client files. Along these same lines, Diab and his co-conspirators used LPG ACH identifiers

12  that would show up on client bank records similar to "LPG 949-226-6262 #5 2363 RT 9 TOMS

13  RIVER NJ 0875," in order to give the false appearance that post-transfer ACH processing were tied

14  to LPG, further evidencing the systematic exploitation of LPG's clients and ACH debit processing.

15      44.    The deliberate misuse of ACH processing channels to funnel estate assets into alter

16  ego entities, including Touzi, PECC, Teracel, and Guardian, constitutes a fundamental breach of

17  fiduciary duty. Diab's control over these transactions, facilitated by opaque vendor relationships and

18  fraudulent processing practices, ensured the continued depletion of LPG's estate while enriching Diab

19  and his associates. This scheme directly contributed to LPG's insolvency and defrauded the estate

20  and its creditors.

21  **F.    DIAB'S CONTROL OVER LPG'S PAYMENT PROCESSING**

22      45.    LPG's primary source of revenue was derived from the monthly ACH payments made

23  by its client base. To facilitate these payments, LPG relied on various ACH payment processing

24  companies, many of which were deliberately selected and controlled by Diab and his co-conspirators,

25  including Eng and Heng, to enable the rapid and concealed transfer of millions of dollars to

26  themselves, other co-conspirators and entities under their control. Eng and Heng, through their

27  companies Touzi, PECC, Teracel, Oakstone and Guardian played a critical role in receiving and

28  concealing fraudulent transfers. These entities were frequently utilized as conduits for funneling funds

1  from LPG to entities controlled by Diab, Eng, Heng and others, thereby depriving LPG and its

2  creditors of significant assets.

3       46.    Eng and Heng's involvement in the fraudulent scheme was not passive but intentional

4  and essential to its operation. For example, through Touzi, Eng and Heng received over $234,244.57

5  in payments over four years, as evidenced by Chase disbursement records, without justification or

6  corresponding services rendered. Further, records show significant sums were funneled through

7  Teracel and PECC, which Eng and Heng owned and controlled. These entities were used to obscure

8  the origin and destination of funds, facilitating the diversion of LPG's ACH debits for personal

9  enrichment and shielding assets from LPG's creditors.

10       47.    The evidence further reveals Eng and Heng's direct participation in the execution of

11  the fraudulent scheme. For example:

12      a.   On September 27, 2022, an email from LPG's admin to Kyle Herret and Brice Long

13         explicitly stated that Eng sought to conceal his association with Teracel. This

14         concealment was part of a deliberate effort to frustrate creditor recovery and avoid

15         detection of the fraudulent transfers.

16      b.   Records show Eng coordinated with Diab to move funds rapidly through various

17         processing accounts and alter ego entities, including Touzi and PECC, ensuring that

18         funds were diverted from LPG's estate without proper oversight or consent.

19      c.   From May 2022 to September 2022, LPG's monthly ACH debits ranged between $8.4

20         million and $11.2 million. By the Petition Date, monthly debits from client accounts

21         exceeded $15 million. Despite this substantial revenue, LPG's bank accounts held only

22         $4,500 at the time of filing. The diversion of these funds, including those transferred

23         to Eng Taing's entities, left LPG insolvent and unable to meet its obligations.

24       48.    Eng and Heng and their companies played a central role in laundering the diverted

25  funds, ensuring they were disbursed to entities beyond the reach of LPG's creditors. These fraudulent

26  transfers included, but are not limited to:

27      a.   $40,046.23 paid to Touzi Capital without supporting documentation for services

28         rendered.

b. $774,180.17 transferred to Teracel, which lacked any legitimate business purpose.

c. Additional payments were made to Eng, in his individual capacity, including a $1,753.80 wire transfer on January 27, 2023, without explanation or documentation.

49.     The fraudulent ACH processing scheme, designed and executed with Eng's assistance, was further bolstered Eng and Heng's manipulation of ACH processing companies including Oakstone and Guardian. These entities facilitated improper double ACH debits on LPG client files and the improper diversion of LPG's client funds to entities owned, operated and controlled by Diab Eng and Heng, allowing them to misappropriate estate assets while maintaining the facade of legitimate transactions.

50.     Eng and Heng also benefited from their insider knowledge of LPG's financial operations and the proprietary software used to manage client files and payments, including DPP. These entities, including Touzi, Teracel and PECC, were directly integrated into the scheme, utilizing the ACH data from DPP to further exploit LPG's client accounts. This integration allowed Eng, Heng and their co-conspirators to perpetuate the fraudulent transfer of client funds under the guise of legitimate ACH processing. Diab's testimony at the Debtor's 341a hearing confirmed Eng was highly involved in the development and advocacy to follow through with the fraudulent scheme alleged herein to secure his financial interest in those debits and avoid government agency scrutiny for violations of consumer protection laws.

51.     The deliberate misuse of ACH processing channels by Eng Taing, in concert with Diab, ensured the continued depletion of LPG's estate and enriched Eng Taing and his entities, which include but are not limited to Touzi Capital, PECC, Teracel, Oakstone, And Guardian Processing. The concealment of Eng Taing's involvement and the rapid transfer of funds to his entities directly contributed to the Ponzi scheme, LPG's insolvency, and defrauded the estate and its creditors out of millions of dollars.

## G.    LPG'S PREPETITION CREDITORS

52.     In addition to financing provided by alleged factoring companies, LPG obtained significant financing from various sources to sustain its operations. These sources, which collectively lent hundreds of millions of dollars to LPG, now stand as some of the largest creditors of the estate.

53.     According to the Debtor's Schedule D [Bankr. Docket No. 33], LPG listed three secured creditors: (a) Diverse Capital, LLC, with a claim of $1,224,810; (b) City Capital NY, with a claim of $2,950,000; and (c) Fundura Capital Group, with a claim of $2,100,000 (collectively referred to as the "Secured Creditors"). These secured claims totaled $6,274,810. As of September 1, 2022, there were fourteen (14) active UCC-1 financing statements on record securing debts owed by LPG. These statements either reflected secured liens against LPG's current and future assets or evidenced the transfer, assignment or sales of substantial portions of LPG's future income. At the time of the fraudulent transfers alleged herein, these UCC-1 filings secured repayment of the following amounts, which are known to the Trustee and allegedly owed by LPG:

a.  $2,374,004.82 owed to Fundura Capital Group, as evidenced by Proof of Claim No. 335, secured by a UCC-1 filing dated May 19, 2021;

b.  Approximately $15 million owed to MNS Funding, LLC, as evidenced by Proof of Claim No. 1060, secured by a UCC-1 filing dated May 28, 2021;

c.  Approximately $5 million owed to Azzure Capital, LLC, as evidenced by Proof of Claim No. 127, secured by a UCC-1 filing dated May 28, 2021;

d.  Approximately $1.5 million owed to Diverse Capital, LLC, as evidenced by UCC-1 filings dated September 15, 2021, and December 1, 2021.

e.  The Trustee reserves all rights to challenge, dispute, or otherwise address these purported secured claims.

54.     Furthermore, LPG's Schedule E/F [Bankr. Docket No. 33] identifies eleven unsecured creditors holding priority unsecured claims totaling $374,060.04. These creditors include various state and federal agencies, such as the Indiana Department of Revenue, Washington Department of Labor and Industries, Arizona Department of Economic Security, Arkansas Department of Finance and Administration, California Franchise Tax Board, Georgia Department of Labor, Internal Revenue Service, Mississippi Department of Revenue, Nevada Department of Taxation, Utah State Tax Commission, and Wisconsin Department of Revenue (collectively, the "Priority Unsecured Creditors"). Following the claims bar date, more than $500 million in claims were filed against LPG.

/ / /

15

55.     Additionally, LPG identified 58 nonpriority unsecured creditors in its Schedule E/F [Bankr. Docket No. 33], with claims totaling $141,439,158.05. These creditors include various service providers, contractors, and individual claimants, such as Ajilon, Anthem Blue Cross, Azevedo Solutions Group, Inc., Carolina Technologies & Consulting, Credit Reporting Service Inc., DPP, Exela Enterprise Solutions, Liberty Mutual, Marich Bein, LLC, Validation Partners, JP Morgan Chase, and numerous others. These creditors, collectively referred to as the "Nonpriority Unsecured Creditors," provided a range of services to LPG before its insolvency. Together, the Secured Creditors, Priority Unsecured Creditors, and Nonpriority Unsecured Creditors are referred to as the "Prepetition Creditors."

56.     Many of the claims filed by the Prepetition Creditors stem from LPG's fraudulent and improper financial practices, including its mismanagement of ACH debits, unlawful transfers, and sale of receivables. The Trustee continues to investigate the full scope of these claims and their connection to the fraudulent scheme orchestrated by Diab, Eng and Heng, among others.

## H.     ENG AND HENG AND THEIR ROLE IN FACILITATING DIAB'S SCHEME

57.     Eng and Heng, through their control and ownership of entities including Oakstone, Guardian, Touzi, PECC, and Teracel, worked closely with Diab to execute and perpetuate the fraudulent scheme. These entities served as conduits for the transfer and concealment of LPG client funds and assets, as well as ACH receivables. Eng's involvement extended to leveraging his business operations and financial accounts to facilitate these transactions and obstruct efforts to recover the fraudulently transferred assets. Heng, on the other hand, was Eng's soldier at such entities including Touzi, PECC, and Teracel, who was highly involved in the design and implementation of Eng and Diab's scheme much in the same way Han Trinh and Jayde Trinh, among others were involved with the development and implementation of the fraudulent scheme at LPG, Coast Processing, and Greyson, among others.

58.     In or around June 2022, facing mounting litigation threats and cease-and-desist demands from creditors such as Validation Partners, LLC, Diab, with Eng and Heng's assistance, began transferring LPG's assets, including client files and ACH receivables, to entities controlled by Eng, Heng, and others. Eng's alter ego entities, including Touzi, PECC, and Teracel, Oasktone among

others were central to these efforts, receiving millions in fraudulent transfers under the guise of business transactions to shield LPG's assets from creditors.

59.    In or around September 2022, Eng was directly involved in discussions and strategies to ensure that LPG client files and ACH receivables were transferred without detection based on Diab's testimony at the Debtor's 341a hearing. Evidence shows that Eng knowingly concealed his involvement in these transactions, instructing employees and associates to avoid referencing his name in correspondence. Emails reveal that directives were issued to replace his name with generic titles such as "Finance Officer" or "General Counsel" to obscure his role in the fraudulent scheme.

60.    Between January and March 2023, as creditor actions intensified, Eng and Heng worked with Diab and others, including Guardian and Oakstone Law Group, to fraudulently transfer LPG's assets to newly formed entities. Eng's entities, such as Touzi and PECC, received millions of dollars in transfers during this period without providing equivalent value. Along these lines, Eng and Heng facilitated PECC's purchase of ACH receivables on LPG clients, many of which had already been transferred to other creditors with knowledge that LPG would file for Bankruptcy protection and breach their obligations to existing creditors leaving PECC the sole beneficiary of the ECH debits. These transfers were orchestrated to misappropriate funds for personal gain while leaving LPG and its creditors with uncollectable liabilities.

61.    Eng and Heng's role in managing LPG's ACH processing further solidified his central involvement in the scheme. Through Touzi and Teracel, Eng facilitated the receipt and redirection of funds from LPG clients. These transactions, often processed through Prime Logix, Guardian Processing, and other ACH processors, were directed by Eng in concert with Diab to ensure that LPG retained minimal funds for creditor recovery. Evidence includes detailed transaction logs and communications showing Eng's active participation in designing the workflow for these transfers.

62.    Eng and Heng's entities not only received fraudulent transfers but also acted as intermediaries to funnel funds to other co-conspirators. For example, Teracel and PECC funneled ACH receivables to other non-debtor entities, including but not limited to Oakstone and Guardian, which were created to further the scheme and frustrate recovery efforts. This multi-layered structure demonstrates Eng and Heng's intent to assist Diab in evading creditor claims and perpetuating the

1  criminal enterprise and Ponzi-like scheme. According to witnesses, Eng and Heng yielded so much

2  control, when Eng's relationship with Wes Thomas began to fall apart due to operational issues at

3  Oakstone and Guardian, Eng and Heng swiftly initiated double ACH debits on LPG client files

4  totaling more than $500,000 using Eng's Payliance account in order to pay himself and PECC back.

5  Transactions that were never authorized by the clients and never returned to LPG's clients. Eng's

6  actions directly contributed to the dissipation of LPG assets and the harm suffered by creditors,

7  including consumer creditors.

8       63.    Eng also played a role in recruiting and coordinating with other individuals and

9  entities, including Guardian and Oakstone, to facilitate the fraudulent scheme. Evidence shows that

10 Eng worked with Diab to ensure that key LPG employees, attorneys, and other personnel were

11 transitioned to these newly formed entities, enabling the continuation of LPG's operations under

12 different names while avoiding creditor scrutiny. Preparing for LPG's demise and filing of its

13 Bankruptcy petition, Diab, Eng and Heng assured LPG employees servicing LPG client files they

14 would be re-hired by Guardian in order to continue the criminal enterprise under a new name.

15      64.    As a result of his involvement, Eng, Heng and their entities received substantial

16 financial benefits, including payments exceeding $1.5 million, luxury expenses, and other

17 compensation derived from the fraudulent transfers of LPG assets. These actions were undertaken

18 with full knowledge of LPG's insolvency and the harm being inflicted on its creditors.

19      65.    Eng and Heng, directly and through their entities, including but not limited to

20 Oakstone, Guardian, PECC, Touzi and Teracel, are jointly and severally liable for the substantial

21 damages suffered by LPG's estate and creditors. Eng and Heng's actions, as detailed herein, constitute

22 knowing and intentional participation in Diab's fraudulent scheme and criminal enterprise. As a direct

23 and proximate cause of Eng and Heng's actions and involvement in the fraudulent scheme, the Trustee

24 seeks to recover all damages from Eng and Heng and their entities, including Oakstone, Guardian,

25 Touzi, PECC, and Teracel, as accomplices and co-conspirators.

26 / / /

27 / / /

28 / / /

18

**I.    FRAUDULENT TRANSFERS AND DOUBLE PULLS BY DEFENDANTS TOUZI, ENG, AND TERACEL**

66.    Eng, Touzi, Teracel, and PECC, all of which are controlled by Eng, were in business with and acting in concert with Diab as early as 2021, if not earlier, according to bank records produced by Optimum Bank showing hundreds of thousands of dollars being transferred from LPG to Touzi and PECC.

67.    After transferring and/or selling ACH receivables to Validation Partners and other alleged factoring companies, as discussed above, Diab caused LPG to sell, pledge and/or transfer receivables to a number of different entities at the direction of Eng, including Touzi, Teracel, and PECC, entities Eng owned, controlled, and dominated. At the first meeting of creditors, Tony Diab testified under oath that Eng, who owned PECC, had been "pushing for these files to be moved to a different entity." Mr. Diab said that Eng was pushing for this action given the pending lawsuits against the Debtor. As a result of these discussions, Mr. Diab testified "we essentially agreed in January that we would move them [the files] to the destination that we chose[.]" The result of this agreement and scheme between Eng and Diab was twofold, as alleged below.

68.    First it led to the execution of certain Finance Agreements and Statements, which was intended to receive the benefit of ACH debits on LPG client files identified in the Finance Agreement and cut out certain LPG creditors including but not limited to Validation Partners.

a.    As part of this scheme, approximately 719 files were transferred for $2,070,000 to Teracel, an entity owned, controlled, and operated by Touzi, which is headed by Eng and his brother Heng, and for purposes of this Complaint, alter egos of one another including PECC, Touzi, and Teracel. Out of the 719 files purchased by Teracel, 643 of those files had already been purchased by Validation Partners. All of these files were transferred without Validation Partners nor the client's knowledge or consent. Despite LPG never receiving a payment from Teracel for the purchase of these client files, the ACH receivables associated with those files are being paid out directly to Teracel, which is controlled, dominated, and managed by Eng, Touzi, and/or PECC and each of them.

/ / /

69.     Second, the scheme Diab and Eng devised led to the creation of Oakstone and Guardian, among other non-debtor entities. Oakstone and Guardian, at the direction of Eng and Diab, received thousands of LPG client files for either no and/or little or inadequate consideration. The purpose behind the transfer was to ensure Eng and Diab maintained control over LPG's ACH debits.

70.     By and through Eng, Touzi, and Guardian, Defendants Guardian, PECC, Eng, Touzi, and/or Teracel have initiated and retained funds resulting from LPG client ACH transactions processed by Payliance pre and post-petition, including but not limited to approximately $551,893.42 in ACH transactions as listed in Invoice No. 230602030241-389051, Invoice Date June 15, 2023, for the Invoice Period, post-petition from May 1, 2023 to May 31, 2023 for which Payliance charged approximately $13,140.40 to process. Notably, the Payliance account used to process these fraudulent ACH transactions is in both Guardian and Eng's name and is identified in the client's bank statements as Touzi.

71.     According to the Declaration of Christine Le [Dkt. No. 159-1] and exhibits attached thereto, between late April and May 2023 and at all relevant times alleged above, Phoenix began receiving complaints from LPG clients indicating that their monthly ACH debits were being taken out twice (double pulls) causing the client's bank account to go negative and incur overdraft fees among other charges. These LPG clients indicated that Touzi and Guardian had both taken monthly payments from their bank accounts in identical amounts. One LPG client reported his account had been debited four times in one month. Phoenix tracked these double-pull complaints by Touzi, Eng, Teracel, and Guardian in the chart attached as Exhibit A-1 to the Declaration of Christine Le [Dkt No. 159-1]. Phoenix tracked over 50 different complaints from LPG clients being double pulled totaling approximately $35,805.76 in fraudulent double pulls that Phoenix was made aware of. This does not include double pulls that were not reported. Phoenix, and therefore the Debtor's Estate, reimbursed many of these clients using Estate assets, however, approximately $16,660.16 in double pulls and overdraft fees Phoenix was made aware of have not been credited or reimbursed to the clients harmed by such conduct. On information and belief, the conduct alleged above by Eng, Heng, Touzi, Teracel, and Guardian resulted in double pulls that have not been reported to Phoenix or otherwise. Further, on information and belief, the Guardian account initiating the double pulls complained of by LPG clients

1  to Phoenix is, and at all relevant times was, the same account invoiced by Payliance above and therefore

2  under Eng's control who, as an alter ego of his many corporate forms, is responsible for the harm caused.

3       72.    The Trustee has demanded the return of the client files, ACH debits, and funds held by

4  PECC, Touzi, Eng, Heng, Guardian, and Teracel. To date, these defendants refuse to turn over property

5  of the Estate and as ordered in the Court's June 23, 2023, Preliminary Injunction [1046 Dkt No. 70].

6  The Trustee has, however, recovered the $551,893.42 in ACH debits initiated post-petition held by

7  Payliance as a result of the Trustee's compromise with Payliance [Bankr. Dkt. No. 1770].

8       73.    Despite not paying or providing inadequate consideration for LPG client files and ACH

9  receivables, Oakstone, Guardian, Touzi, PECC, and/or Teracel continued to process duplicate ACH

10  electronic funds transfers in their own name and/or in the name of Eng, Guardian, and/or Oakstone via

11  ACH payment processors, most recently to include but not limited to Payliance. The Trustee is informed

12  and believes and based thereon alleges that Touzi, Eng, Teracel, PECC, and/or Oakstone, Guradian or

13  other entities controlled by Eng and Heng continued post-petition and/or continue to use additional

14  payment processors to initiate ACH debits on LPG client files and/or receive ACH debits on LPG client

15  files that have yet to be recovered from other non-debtor entities.

16  **J.**    **FURTHER FRAUDULENT TRANSFERS AND CONVEYANCES TO ALTER EGOS**

17      **AND OTHER ENTITIES**

18       74.    In addition to diverting millions of dollars to third parties as alleged herein, Eng and

19  his entities—including Touzi Capital, PECC Corp., Teracel Blockchain Fund II, Oakstone and

20  Guardian Processing—conspired with Diab to transfer LPG's entire business and ACH receivables to

21  non-debtor entities under their control. These entities, including Oakstone, Phoenix, Greyson, CLG,

22  Vulcan, Prime Logix, and Maverick Management, are alter egos of Diab, nominally owned by licensed

23  attorneys or other intermediaries to mask their influence. Similar to Diab's arrangement, Eng and Heng

24  utilized these entities to facilitate fraudulent transfers to themselves and their alter ego entities,

25  including but not limited to, Touzi, Teracel, PECC, Oakstone and Guardian while shielding assets from

26  LPG creditors.

27       75.    The Trustee is informed and believes, and based thereon alleges, that in addition to

28  fraudulent transfers of client files and ACH receivables alleged above, Eng and Diab with the

1    assistance of Heng and Chhor caused the sale or transfer of additional LPG client files with little or no

2    consideration to other non-debtor entities, including but limited to, Greyson, CLG and Phoenix, among

3    others. These transfers were effectuated without client knowledge or consent, with Eng and Heng's

4    entities receiving a percentage of the ACH revenue streams generated by these fraudulently transferred

5    files.

6        76.    In early 2023, Eng, in coordination with Diab, facilitated the purchase of shell

7    corporations and established operational infrastructures for entities like Phoenix and Oakstone.

8    Specifically, Diab testified during the 341(a) meeting of creditors that LPG could not afford to continue

9    servicing its clients through its existing operations. Nevertheless, Eng and Diab jointly orchestrated

10   the fraudulent transfer of approximately 15,000 client files to Oakstone, 12,000 files to CLG, and close

11   to 40,000 files to Phoenix. These transfers were carried out without any executed assignment contracts

12   or proper authorization, constituting fraudulent conveyances designed to conceal assets and defraud

13   creditors.

14       77.    The fraudulent transfers extended to Defendants Touzi, PECC, Teracel, and Guardian,

15   who acted in concert with Diab, Eng and Heng to resell and transfer client files multiple times,

16   generating significant revenues in perpetuating a Ponzi scheme while withholding proceeds from LPG

17   creditors. These entities processed ACH debits and receivables using LPG's infrastructure, furthering

18   the fraudulent scheme to defraud LPG's creditors and conceal the true value of LPG's assets.

19       78.    Eng, in collaboration with Diab, Loli, Han, Jayde, and others, continued to funnel funds

20   post-petition through the newly created alter egos of Diab and Eng. For example, ACH processing

21   accounts such as LPG's FIS account, which listed "Tony Diab" as a user and LPG as the merchant,

22   were used to net between $6 million and $9.3 million in just two months—from March 28, 2023,

23   through May 19, 2023. These funds were transferred to Eng and Heng's entities, including Touzi,

24   Teracel, and PECC, further enriching Eng, Heng and their entities while circumventing protections for

25   creditors and the Estate.

26       79.    The fraudulent transfers of client files, ACH debits, receivables, and funds, as well as

27   the revenues generated therefrom, collectively constitute the "Transfers." These Transfers were

28   designed to hinder, delay, or defraud creditors, depriving the Estate of assets while enriching

1  Defendants named herein and other fraudulent transferees.

2  **K.  THE SALE OF LPG'S ASSETS**

3  80.    On July 7, 2023, Richard Marshack in his capacity as the Chapter 11 Trustee moved the

4  Court for an order (A) Approving Sale, Subject to Overbid, of Assets Free and Clear of All Liens,

5  Claims, Encumbrances and Interests Pursuant to 11 U.S.C. § 363(b) and (B) Approving Assumption

6  and Assignment of Certain Executory Contracts and Unexpired Leases and Other Agreements ("Sale

7  Motion") [Bankr. Dkt. No. 191]. After supplemental briefing, addressing multiple oppositions, holding

8  a lengthy hearing, and auction wherein Morning Law Group was the highest bidder, the Court granted

9  the Sale Motion entered August 2, 2023 ("Sale Order") [Bankr. Dkt. No. 352].

10  <u>**First Claim for Relief Injunctive Relief**</u>

11  **(Against All Defendants)**

12  81.    Plaintiff realleges and incorporates herein by reference each and every allegation

13  contained in Paragraphs 1 through 77 as though fully set forth herein.

14  82.    Plaintiff requests that this Court maintain and enforce its preliminary injunction issued

15  in the 1046 Action, Docket No. 70 prohibiting Defendants Touzi, PECC, Eng, Heng, Chhor,

16  Oakstone, Guardian, and any other related parties acting in concert with them, from interfering with

17  any ACH transfers authorized to be executed in favor of LPG and its Estate.

18  83.    Plaintiff further requests that this Court continue its preliminary injunction in the 1046

19  Action Docket No. 70 prohibiting the above Defendants from executing or interfering with any ACH

20  transfers without prior approval by the Chapter 11 Trustee, particularly those transfers involving LPG

21  client files and receivables that are part of the fraudulent transfers alleged herein.

22  84.    The Trustee also requests that this Court extend its preliminary injunction in the 1046

23  Action Docket No. 70 to prevent Touzi, Teracel, Eng, Heng, Chhor, PECC, Oakstone, Guardian and

24  their affiliates from accessing or attempting to access:

25      a.    LPG client files and/or information, whether stored electronically or in

26      hardcopy, except as ordered by the Court or agreed upon by the Trustee;

27      b.    Any CRM software, including LUNA, containing LPG client data and

28      information;

c.      LPG's email accounts, including but not limited to those hosted by Microsoft 365;

d.      LPG's Netsuite account with Oracle;

e.      LPG's Airtable account with Formgrid; and

f.      LPG's QuickBooks account or any other financial software or systems.

85.     Plaintiff further requests that this Court maintain and enforce its preliminary injunction in the 1046 Action Docket No. 70 prohibiting Guardian, Touzi, PECC, Teracel, and all other Defendants, including Eng, Heng and Chhor from interfering with Plaintiff's administration of the Estate or property of the Estate. This includes prohibiting any actions or activities that would disrupt the orderly processing of client files, ACH payments, or other business operations critical to the recovery of Estate assets.

86.     The Trustee requests that this Court further enjoin Touzi, PECC, Teracel, Eng, Heng, Chhor, Payliance, Seamless, Dwolla, Stripe, Oakstone, Guardian, Maverick, and any other associated individuals or entities from accessing or initiating any ACH electronic funds transfers derived from LPG client files or receivables that are subject to the fraudulent Transfers described herein.

87.     Plaintiff seeks these injunctive measures to prevent continued harm to the Estate and its creditors, safeguard the integrity of LPG's assets, and ensure that no further dissipation or misuse of client funds or Estate property occurs.

## Second Claim for Relief

**Avoidance, Recovery, and Preservation of Two-Year Actual Fraudulent Transfers**

**(Against All Defendants)**

**[11 U.S.C. §§ 548(a)(1)(A), 550, and 551]**

88.     Plaintiff realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 84 as though fully set forth herein.

89.     On or after the date that the Transfers were made, entities to which the Debtor was indebted included the Prepetition Creditors.

90.     The client files, ACH debits, ACH receivables, and funds that are the subject of the Transfers originated from the Debtor and constitute property of the Estate.

91.    Diab, Eng, Heng, and Chhor, among others retained possession and control of the client files, ACH debits, ACH receivables, and funds that were fraudulently transferred to the Alter Egos, Fraudulent Transferees, and other Defendants.

92.    By creating and utilizing multiple entities, , Diab, Eng, Heng, and Chhor, among others concealed the Transfers of client files, ACH receivables, and funds to the Fraudulent Transferees, including but not limited to Touzi, Teracel, and PECC, all of which were controlled by Eng and Heng.

93.    The Transfers were orchestrated by Diab, Eng, Heng, and Chhor, among others after LPG faced numerous lawsuits, including those filed by alleged factoring companies such as Validation Partners on September 20, 2022 (Case No. 30-2022-01281911-CU-BC-CXC) and DVF II on January 23, 2023 (Case No. 30-2023-01303355-CU-CO-CXC) in the Superior Court of California, County of Orange. These lawsuits sought the appointment of a receiver to preserve LPG's assets and protect creditor interests.

94.    The client files, ACH receivables, and funds transferred constituted substantially all of the Debtor's assets, leaving LPG with insufficient property to satisfy its obligations to creditors.

95.    The Transfers were made to insiders, alter ego non-debtor entities under the control of Diab, Eng, and Heng, and the Fraudulent Transferees, with the intent to hinder, delay, or defraud creditors.

96.    A significant portion of LPG's client files, ACH debits, and ACH receivables were transferred multiple times to Defendants Touzi, Teracel, PECC, Eng, and Heng in a scheme to defraud creditors. This included double pulls on client accounts, which caused direct harm to LPG clients and further diminished the Debtor's Estate by driving clients away.

97.    The Debtor received little to no consideration for the Transfers, including the double Transfers, resulting in substantial losses to the Estate.

98.    At the time of the Transfers, the Debtor was insolvent. The Debtor's schedules reflect $141,813,219.09 in total debt owed to Prepetition Creditors and $12,004,500 in assets. However, this asset valuation is inaccurate as LPG could not utilize ACH debits until earned. Furthermore, $12,000,000 in client funds was and continues to be wrongfully withheld by Defendant Marich Bein.

99.    With substantially all assets transferred out of LPG and no source of ACH debits, LPG

1    was unable to satisfy its obligations and was forced to file for bankruptcy protection.

2        100.    The Transfers were made within the two years prior to the Petition Date, with actual

3    intent to hinder, delay, or defraud the creditors of the Debtor.

4        101.    Accordingly, the Transfers orchestrated by Diab, Eng, Heng, Chhor and others named

5    herein should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(A). The property subject to the

6    Transfers, or the value thereof, should be recovered and preserved for the benefit of the Estate under

7    11 U.S.C. §§ 550 and 551.

8                                **Third Claim for Relief**

9    **Avoidance, Recovery, and Preservation of Two-Year Constructive Fraudulent Transfers**

10                                **(Against All Defendants)**

11                    **[11 U.S.C. §§ 548(a)(1)(B), 550, and 551]**

12        102.    Plaintiff realleges and incorporates herein by reference each and every allegation

13    contained in Paragraphs 1 through 98 as though fully set forth herein.

14        103.    At the time of the Transfers, the Debtor received less than reasonably equivalent value

15    in exchange for the Transfers, as alleged herein.

16        104.    In many cases, the Debtor received no consideration for the Transfers, including those

17    made to Defendants Touzi, Teracel, PECC, Guardian, Oakstone, Eng, and Heng, among others.

18        105.    Additionally, a substantial portion of LPG's client files, ACH receivables, and funds

19    were transferred to multiple Defendants, including those controlled and dominated by Eng and Heng

20    such as Touzi, PECC, and Teracel, with the intent to defraud creditors and to hide, hinder, and

21    abscond with LPG's assets. These fraudulent actions resulted in double pulls on client files, causing

22    harm to the Debtor's Estate and individual clients. The resulting loss of clients further diminished the

23    value of the Debtor's Estate.

24        106.    At the time of these Transfers, the Debtor was insolvent. The Debtor scheduled

25    $141,813,219.09 in total debt to Prepetition Creditors, including but not limited to Validation Partners

26    and DVF II. Although the Debtor's schedules state it had $12,004,500 in assets, this valuation is

27    inaccurate, as LPG could not utilize ACH debits until earned. Moreover, approximately $12,000,000

28    in client funds is wrongfully withheld by Defendant Marich Bein, as disclosed in LPG's bankruptcy

1  petition. These fraudulent transfers, combined with the lack of earned ACH debits, forced LPG into

2  bankruptcy.

3      107.    At the time the Transfers were made, or as a result thereof, the Debtor was not paying

4  debts owed to Prepetition Creditors, including Validation Partners and DVF II, as they came due.

5      108.    Thus, at the time of the Transfers, or as a result thereof, the Debtor either:

6          a.    Was insolvent on the date the Transfers were made or became insolvent as a

7          result of the Transfers;

8          b.    Was engaged in, or was about to engage in, a transaction for which any

9          property remaining with the Debtor was of unreasonably small capital; or

10         c.    Intended to incur, or believed that it would incur, debts beyond its ability to

11         pay as such debts matured.

12     109.    The Transfers of the Debtor's client files, ACH debits, ACH receivables, and funds

13  occurred within the two years prior to the Petition Date.

14     110.    Accordingly, the Transfers orchestrated by Diab, Eng, Heng, Chhor and others named

15  herein should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(B). Such property, or the value

16  thereof, should be recovered and preserved for the benefit of the Estate under 11 U.S.C. §§ 550 and

17  551.

18                              **Fourth Claim for Relief**

19     **Avoidance, Recovery, and Preservation of Four-Year Actual Fraudulent Transfers**

20                              **(Against All Defendants)**

21      **[11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.04(a) and 3439.07]**

22     111.    Plaintiff realleges and incorporates herein by reference each and every allegation

23  contained in Paragraphs 1 through 107 as though fully set forth herein.

24     112.    On or after the date such Transfers were made, entities to which the Debtor was

25  indebted included the Prepetition Creditors.

26     113.    The source of the client files, ACH debits, ACH receivables, and funds that are the

27  subject of the Transfers are property of the Debtor.

28     114.    Diab, Eng, Heng, Chhor, Touzi, Teracel, PECC, Guardian, Oakstone, among others

1  retained possession and control of the files, receivables, and funds transferred to Eng and Heng's alter

2  egos or elsewhere after the Transfers.

3      115.    By creating multiple entities, including the Alter Egos, and transferring client files,

4  ACH debits, ACH receivables, and funds to such entities, Diab sought to conceal the Transfers and

5  shield the client files, receivables, and funds from creditors.

6      116.    Diab, Eng, Heng, Chhor, Touzi, Teracel, PECC, Guardian, Oakstone and others made

7  the Transfers after LPG faced multiple lawsuits initiated by alleged factoring companies and other

8  creditors. Validation Partners initiated litigation on September 20, 2022 (Case No. 30-2022-

9  01281911-CU-BC-CXC) in the Superior Court of California, County of Orange. DVF II followed

10  with a lawsuit on January 23, 2023 (Case No. 30-2023-01303355-CU-CO-CXC) in the same court.

11  These lawsuits sought relief, including the appointment of a receiver to maintain the status quo, obtain

12  an accounting of LPG funds and assets, and prevent further dissipation of property.

13      117.    The client files, ACH debits, receivables, and funds transferred constituted

14  substantially all of the Debtor's non-exempt property. In essence, the Transfers consisted of nearly

15  all the Debtor's assets.

16      118.    The Transfers were made by Diab, Eng, Heng, Chhor, Touzi, Teracel, PECC,

17  Guardian, Oakstone, and other named Defendants to insiders, Eng and Heng's alter egos under their

18  control, and Fraudulent Transferees.

19      119.    The Debtor received little to no consideration for the Transfers.

20      120.    Furthermore, a significant portion of LPG's client files and ACH receivables were

21  transferred to Defendants, and others including Diab, Eng, Heng, Chhor, Touzi, Teracel, PECC,

22  Guardian, and Oakstone among others with the intent to defraud creditors and to hide, hinder, and

23  abscond with LPG assets. These actions resulted in double pulls on client files, causing harm to the

24  Estate and individual clients, further diminishing the Estate's value.

25      121.    At the time of the Transfers, the Debtor was insolvent, having scheduled

26  $141,813,219.09 in total debt owed to Prepetition Creditors. Despite reporting $12,004,500 in assets,

27  this amount is inaccurate, as LPG could not utilize ACH debits until earned. Additionally,

28  $12,000,000 in funds remains wrongfully withheld by Defendant Marich Bein. With substantially all

1   assets transferred and no source of ACH debits, LPG was forced to seek bankruptcy protection.

2       122.    As a result of the Transfers, the Debtor was left with remaining assets that were

3   unreasonably small in relation to its obligations.

4       123.    The Debtor was insolvent at the time of the Transfers or became insolvent as a result

5   of the Transfers, a deliberate outcome of Diab and Eng's scheme to bankrupt LPG should a receiver

6   be appointed. At the time of the Transfers, the Debtor was not paying its debts to Prepetition Creditors

7   as they became due.

8       124.    The Transfers were made with the actual intent to hinder, delay, or defraud creditors

9   of the Debtor, as well as any duly appointed Receiver.

10      125.    At the time of the Transfers, and without receiving reasonably equivalent value in

11  exchange, the Debtor:

12          a.      Was engaged in or was about to engage in a transaction for which its

13                  remaining assets were unreasonably small in relation to the business or transaction;

14                  or

15          b.      Intended to incur or reasonably should have believed it would incur debts

16                  beyond its ability to pay as such debts matured.

17      126.    The Transfers of the Debtor's client files, ACH receivables, and funds occurred within

18  the four years preceding the Petition Date.

19      127.    At all relevant times, the Transfers are avoidable as fraudulent pursuant to 11 U.S.C.

20  § 544(b) and California Civil Code §§ 3439.04(a) and 3439.07 by one or more creditors holding

21  unsecured claims allowable against the Estate under 11 U.S.C. § 502.

22      128.    Accordingly, the Transfers caused by Diab, Eng, Heng, Chhor, Touzi, Teracel, PECC,

23  Guardian, Oakstone, and others should be avoided as fraudulent under 11 U.S.C. §§ 544(b) and

24  California Civil Code §§ 3439.04(a) and 3439.07, with such property, or its value, recovered and

25  preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551 and California Civil

26  Code § 3439.07.

27  / / /

28  / / /

**Fifth Claim for Relief**

**Avoidance, Recovery, and Preservation of Four-Year Constructive Fraudulent Transfers**

**(Against All Defendants)**

**[11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.05 and 3439.07]**

129.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 125 as though fully set forth herein.

130.    At the time of the Transfers, the Debtor did not receive reasonably equivalent value in exchange for the Transfers.

131.    In numerous instances, the Debtor received no consideration for the Transfers.

132.    Furthermore, a substantial portion of LPG's client files and ACH receivables were transferred to multiple Defendants, and others including Diab, Eng, Heng, Chhor, Touzi, Teracel, PECC, Guardian, Oakstone among others with the intent to defraud creditors and to hide, hinder, and abscond with LPG assets. These actions resulted in double pulls on client files, causing harm not only to the Debtor's Estate but also to individual clients, further diminishing the Estate through the loss of clients and client trust.

133.    At the time of these Transfers, the Debtor was insolvent. The Debtor scheduled $141,813,219.09 in total debt to Prepetition Creditors. Although the Debtor's schedules stated it had $12,004,500 in assets, this figure is inaccurate as LPG could not utilize ACH debits until earned. Additionally, $12,000,000 in funds remains wrongfully withheld by Defendant Marich Bein according to LPG's bankruptcy petition. With substantially all assets transferred out of LPG and no source of ACH debits, LPG was forced to file for bankruptcy protection.

134.    These Transfers left the Debtor with remaining assets that were unreasonably small in relation to its financial obligations and ongoing business operations.

135.    On or after the date the Transfers were made, the Debtor was not paying debts owed to Prepetition Creditors as they came due, further evidencing insolvency at the time of the Transfers.

136.    At the time of the Transfers, and as a result thereof, the Debtor:

a.    Was insolvent on the date the Transfers were made or became insolvent as a result thereof;

        b.     Was engaged in or was about to engage in a transaction for which its remaining assets were unreasonably small in relation to the business or transaction; or

        c.     Intended to incur, or reasonably should have believed it would incur, debts beyond its ability to pay as such debts matured.

137.    The Transfers of the Debtor's client files, ACH receivables, and funds occurred within the four years preceding the Petition Date.

138.    At all relevant times, the Transfers of the Debtor's client files, ACH receivables, and funds are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and California Civil Code §§ 3439.05 and 3439.07 by one or more creditors holding unsecured claims allowable against the Estate under 11 U.S.C. § 502.

139.    Accordingly, the Transfers caused by Diab, Eng, Heng, Chhor, Touzi, Teracel, PECC, Guardian, Oakstone, among others should be avoided as fraudulent under 11 U.S.C. § 544(b) and California Civil Code §§ 3439.05 and 3439.07, and such property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551 and California Civil Code § 3439.07.

### Sixth Claim for Relief

**Turnover of Estate Property**

**(Against All Defendants)**

**[11 U.S.C. § 542]**

140.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 137 as though fully set forth herein.

141.    One or more of the non-debtor entities, individuals and/or Fraudulent Transferees, including but not limited to Diab, Eng, Heng, Chhor, Touzi, Teracel, PECC, Guardian, Oakstone, and others, currently possess or control property of the Estate. This property includes, but is not limited to, client files, accounts receivable, ACH debits, funds, and payments transferred from LPG's Merchant Account at FIS. As alleged, Diab and Eng orchestrated post-petition transfers exceeding $6,000,000 in Estate property to entities owned and controlled by him, his associates, and co-conspirators. Despite repeated demands, none of these funds have been turned over to the Trustee.

142.    The client files, ACH debits, ACH receivables, funds, and any amounts refunded on account of double pulls by Diab, Eng, Heng, Chhor, Touzi, Teracel, PECC, Guardian, Oakstone, among others are property of the Estate. These assets are not of inconsequential value to the Estate, as they represent a significant portion of the Debtor's potential recovery for the benefit of its creditors.

143.    The client files, ACH debits, ACH receivables, and funds subject to the Transfers were vital to the Debtor's operations and its ability to satisfy creditor claims. Without these assets, the Estate is deprived of its primary means of recovery for creditors.

144.    Pursuant to 11 U.S.C. § 542, the Trustee is entitled to a judgment for the immediate turnover of the client files, ACH debits, ACH receivables, and funds that are property of the Estate.

145.    The Trustee further seeks an accounting of all Estate property currently in the possession or control of the Defendants, including but not limited to proceeds derived from the aforementioned Transfers and any payments wrongfully withheld post-petition.

146.    Accordingly, the Trustee respectfully requests that the Court order the Defendants to immediately turn over all Estate property, including all client files, ACH receivables, ACH debits, and funds, and to provide a full accounting of such assets pursuant to 11 U.S.C. § 542.

### Seventh Claim for Relief

**Breach of Fiduciary Duty**

**(Against Eng Taing, Touzi Capital, Teracel Blockchain Fund, and Related Defendants)**

147.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 143 as though set forth in full.

148.    At all relevant times, Eng, Heng and Chhor, acting individually and through entities including but not limited to Touzi, Teracel, PECC, Guardian and Oakstone, held fiduciary responsibilities to LPG and its creditors by virtue of their control over LPG's financial systems, accounts, and proprietary data.

149.    The fiduciary duty required Eng, Heng and Chhor to act in good faith, in the best interest of LPG and its creditors, and to avoid self-dealing, conflicts of interest, and other breaches of loyalty.

150.    Eng, Heng and Chhor breached their fiduciary duty in the following ways, among

others alleged herein:

    a.    Locking out stakeholders from financial systems and email accounts to gain exclusive control, as evidenced by Donna Gomes's email dated May 1, 2023.

    b.    Facilitating and benefiting from unjustified payments totaling $234,244.57 to Touzi over a period of four years.

    c.    Diverting LPG funds for personal and insider enrichment without providing legitimate services or consideration.

151.    As a direct and proximate result of Eng, Heng and Chhor's breaches, LPG's creditors have been deprived of substantial funds necessary to satisfy claims, thereby suffering significant damages as alleged herein and according to proof at trial.

**Eighth Claim for Relief**

**Unjust Enrichment**

**(Against Eng, Heng, Chhor, Touzi, PECC and Teracel)**

152.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 160 as though set forth in full.

153.    Defendants Eng, Heng, Chhor, Touzi, Teracel and/or PECC were unjustly enriched at the expense of LPG's creditors through the receipt of funds without providing corresponding value.

154.    Evidence supporting this claim include, but are not limited to all of the foregoing allegations, and:

    a.    Invoice #1339 from All Service Financial for $655,000, addressed to Eng and Touzi, lacking any evidence of services rendered.

    b.    Monthly payments of $354.70 from July 2022 to April 2023 labeled "LPG Direct Pay," with no clarity regarding services provided.

    c.    A wire transfer from Bank of America to Taing for $1,753.80 on January 27, 2023, with no accompanying description.

155.    Defendants Eng, Heng, Chhor, Touzi, Teracel, and/or PECC unjustly retained these funds, totaling more than $665,500.00, which rightfully belong to LPG's Estate and it's creditors.

156.    The Trustee seeks restitution and disgorgement of all unjustly retained funds as alleged

herein and according to proof at trial.

## Ninth Claim for Relief

### Constructive Trust

### (Against Eng, Heng, Touzi, Teracel, and PECC)

157.    The Trustee realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 153 as though set forth in full.

158.    The funds transferred from LPG accounts to Eng, Heng, Chhor, Touzi, Teracel, and/or PECC constitute identifiable property that rightfully belongs to LPG and its creditors.

159.    Evidence supporting this claim includes, but is not limited to all of the foregoing allegations, and:

        a.    A September 27, 2022 email from LPG's admin to Kyle Herret and Brice Long, indicating Eng's concealment of his association with Teracel.

        b.    Disbursement records showing payments of $40,046.23 to Touzi and $774,180.17 to Teracel.

160.    The Trustee seeks the imposition of a constructive trust over these funds to ensure their return to the Estate as alleged herein and according to proof at trial.

## Tenth Claim for Relief

### Fraudulent Transfer

### (Against All Defendants)

161.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 157 as though set forth in full.

162.    Defendant Jiang, in his capacity as an accountant for Teracel, PECC, and other related entities, knowingly facilitated the movement of funds between entities controlled by Eng and Heng Taing. His financial structuring enabled the wrongful transfer of assets from LPG to insider-controlled entities, depriving LPG and its creditors of millions in recoverable funds.

163.    The Transfers, including payments to Eng, Heng, Chhor, Touzi, Teracel, PECC, Guardian, Oakstone, and others, were made with actual intent to hinder, delay, or defraud LPG's creditors.

164.    Evidence supporting this claim includes, but is not limited to all of the foregoing allegations, and:

    a.    A July 28, 2022 email discussing PECC's financial obligations exceeding $19 million and simultaneous transfers to Touzi and others, demonstrating insolvency at the time.

    b.    Payments of $40,046.23 and $774,180.17 to Touzi and Teracel, respectively, without equivalent value.

165.    These Transfers harmed LPG's Estate and creditors by reducing the Estate's available funds. Plaintiff seeks avoidance and recovery of the Transfers as alleged herein and according to prof at trial.

**Eleventh Claim for Relief**

**Civil Conspiracy**

**(Against All Defendants)**

166.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 161 as though set forth in full.

167.    Defendant Jiang conspired with Eng and Heng Taing and Touzi Capital, PECC, and Teracel Blockchain Fund to facilitate the improper diversion of LPG's assets. Jiang's role as an insider accountant was essential to structuring fraudulent transfers, concealing financial transactions, and misleading creditors.

168.    Defendants Diab, Eng, Heng, Chhor, Touzi, Teracel, PECC, Guardian and Oakstone, among others engaged in a civil conspiracy to defraud LPG and its creditors by transferring funds, concealing relationships, and diverting assets.

169.    Evidence supporting this claim includes, but is not limited to, all of the foregoing allegations, and:

    a.    A September 27, 2022, email coordinating efforts between Eng, Teracel, and LPG's admin to conceal relationships and facilitate improper transfers.

    b.    Systematic payments to related entities, including $234,244.57 to Touzi and $774,180.17 to Teracel.

170. As a result of Diab, Eng, Heng, Chhor, Touzi, Teracel, PECC, Guardian, Oakstone, conspiracy, LPG's Estate has suffered substantial damages. The Trustee seeks joint and several liability for all resulting damages according to proof at trial.

**Twelfth Claim for Relief**

**Preferential Transfer**

**(Against All Defendants)**

171. Plaintiff realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 165 as though set forth in full.

172. Certain payments made within the 90 days preceding LPG's bankruptcy filing, including a $73,646.08 legal fees payment on April 11, 2023, constitute preferential transfers.

173. These transfers enabled certain creditors to recover more than they would have under bankruptcy distribution principles.

174. Plaintiff seeks avoidance and recovery of these preferential transfers for the benefit of the Estate according to proof at trial.

**Thirteenth Claim for Relief**

**Fraudulent Inducement**

**(Against All Defendants)**

175. Plaintiff realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 169 as though set forth in full.

176. Defendants knowingly concealed and misrepresented material facts, including the true nature of Diab, Eng, Heng, Chhor, Touzi, Teracel, PECC, Guardian and Oakstone relationship with Teracel, LPG and Diab to induce reliance and facilitate the improper transfers.

177. Evidence supporting this claim includes but is not limited to all of the foregoing allegations, and:

    a. A September 27, 2022, email misrepresenting Taing's association with Teracel to conceal fraudulent transfers.

    b. The use of LPG's ACH processing accounts to defraud consumer creditors.

    c. Transferred LPG assets including but not limited to LPG client files and

1    without written consent.

2    178.    As a result, LPG and its creditors suffered significant harm. The Trustee seeks

3    damages and rescission of all fraudulent transactions according to proof at trial.

4    **Fourteenth Claim for Relief**

5    **RICO Violation**

6    **(Against Defendants Eng, Heng, Touzi Capital, Teracel and PECC)**

7    179.    Plaintiff realleges and incorporates herein by reference each and every allegation

8    contained in Paragraphs 1 through 173 as though set forth in full.

9    180.    The conduct of Defendants Eng, Heng Touzi, Teracel, PECC, and their affiliated

10    entities constitutes a pattern of racketeering activity in violation of 18 U.S.C. § 1962, encompassing

11    multiple predicate acts, including wire fraud (18 U.S.C. § 1343), bank fraud (18 U.S.C. § 1344), mail

12    fraud (18 U.S.C. § 1341), fraudulent misrepresentation, and fraudulent conveyance of assets designed

13    to hinder, delay, and defraud creditors in violation of federal and state laws.

14    181.    Defendants Eng and Heng exercised total dominion and control over the criminal

15    enterprise, directing all fraudulent financial maneuvers and coordinating the unlawful activities

16    through his network of entities. As the undisputed leaders, Eng and Heng dictated investment

17    misrepresentations, orchestrated fund diversions, and personally ensured that misappropriated assets

18    remained hidden from regulators and creditors. Eng and Heng controlled every facet of the scheme,

19    from soliciting investors under false pretenses to ensuring the diversion of funds through shell entities

20    he personally established and managed.

21    182.    Defendants orchestrated and executed a fraudulent scheme involving the

22    misappropriation and diversion of LPG's client files, ACH receivables, and financial assets to newly

23    created shell companies controlled by Defendants Eng, Heng, Touzi, Teracel, PECC, and other co-

24    conspirators. These fraudulent transfers were made to shield assets from LPG's creditors, enrich the

25    Defendants, and perpetuate ongoing financial crimes.

26    183.    Defendant Jiang participated in the pattern of racketeering activity by facilitating and

27    managing fraudulent transactions, engaging in wire fraud, mail fraud, and money laundering in

28    furtherance of the conspiracy. Jiang knowingly structured financial transactions to avoid detection

1   and to maintain the façade of legitimacy for fraudulent transfers.

2      184.    A complaint filed by the SEC based on its investigation alleges that Eng and Touzi

3   Capital orchestrated a $115 million securities fraud scheme from 2020 to 2023, raising money through

4   misleading investment opportunities in LPG's debt rehabilitation scheme, as well as, other crypto-

5   asset mining businesses. Investors were falsely led to believe their funds were being directed into

6   separate, liquid and well-managed entities. However, the SEC investigation revealed these

7   representations to be false and that there was rampant commingling of investor funds, unauthorized

8   withdrawals, and asset diversion, leading to widespread financial losses.

9      185.    The Defendants engaged in issuing usurious loans disguised as investment

10  opportunities, charging exorbitant interest rates that far exceeded permissible limits under state and

11  federal law. These financial arrangements were structured to appear as asset-backed transactions, but

12  in reality, they operated as high-interest predatory lending schemes that systematically extracted

13  wealth from borrowers while evading legal scrutiny.

14          A. The Enterprise (Association-in-Fact Under 18 U.S.C. § 1961(4))

15     186.    Defendants Eng, Heng, Touzi, Teracel and PECC together formed an association-in-

16  fact enterprise (the "Enterprise") designed to carry out a systematic pattern of fraudulent transactions,

17  financial misrepresentations, and money laundering activities. The Enterprise is composed of multiple

18  interrelated individuals and entities, including Eng, Heng, Touzi, Teracel, PECC, Guardian

19  Processing, Oakstone, Phoenix, Greyson, and Vulcan.

20     187.    As the undisputed heads of the Enterprise, Eng and Heng exercised exclusive authority

21  over all financial transactions, ensuring that no money moved without his explicit approval. Eng and

22  Heng controlled the flow of stolen assets, dictated fraudulent ACH transactions, and deliberately

23  structured the organization to insulate himself from liability while exploiting investor funds. Eng and

24  Heng personally oversaw the movement of millions in misappropriated assets, blocking access to

25  financial records and ensuring only he had final authority over wire transfers, ACH withdrawals, and

26  shell entity operations.

27     188.    The Enterprise operated as a coordinated criminal syndicate, engaging in:

28      • Unauthorized ACH transactions to misappropriate client funds.

- Creation of shell companies to conceal the movement of stolen assets.

- Fraudulent financial misrepresentations to investors, creditors, and regulatory authorities.

- Laundering of illicit funds through complex financial structures.

- Systematic obstruction of regulatory investigations and enforcement actions.

- Issuance of usurious loans disguised as asset-backed transactions, mirroring similar fraudulent lending schemes.

189.    The SEC complaint establishes that Defendants misrepresented Touzi Capital's ability to mine Bitcoin profitably, falsely claimed secured low-cost energy contracts, and manipulated investor expectations. The SEC's investigation found as its complaint alleges that Eng controlled all financial systems, obstructed transparency, and diverted millions to fraudulent crypto ventures and personal enrichment, furthering the criminal objectives of the Enterprise. On information and belief, Heng had and/or was given equal control over all financial systems, obstructed transparency, and diverted millions to fraudulent crypto ventures and personal enrichment, furthering the criminal objectives of the Enterprise.

B. Pattern of Racketeering Activity

190.    Defendants engaged in a continuous pattern of racketeering activity, consisting of repeated and related fraudulent acts, including:

- Wire fraud (18 U.S.C. § 1343) — unauthorized ACH transactions, resulting in over $8 million in misappropriated funds through multiple banks and processing institutions.

- Bank fraud (18 U.S.C. § 1344) — deliberate misrepresentation of financial transactions using false pretenses.

- Mail fraud (18 U.S.C. § 1341) — submission of falsified financial documents to investors and financial institutions.

- Fraudulent conveyance of assets to evade creditor claims, as corroborated by the SEC's investigation.

- Obstruction of justice — deliberate concealment of financial records to hinder regulatory investigations.

- Money laundering — using shell corporations to transfer and legitimize illegally obtained funds.

- Usurious lending practices — charging unlawful interest rates on disguised loan agreements

### C. Injury to LPG's Estate and Creditors

191.    As a direct and proximate result of the Defendants' racketeering activity, LPG's estate and its creditors have suffered substantial damages, including:

- Theft of over $8 million in client payments with no services provided.

- Deprivation of $115 million in investor funds through fraudulent securities schemes.

- Diversion of $14.2 million in cryptocurrency assets to wallets controlled by Taing, as evidenced in the SEC complaint.

- Obstruction of financial recovery efforts by systematically blocking creditor access to financial records and misrepresenting corporate solvency.

- Loss of business opportunities and reputational damage due to fraudulent conduct and financial mismanagement.

- Harm from predatory lending practices, similar to other predatory lending practices, where deceptive financial arrangements led to financial distress for victims.

192.    The SEC complaint further details that investors have been left without recourse due to Defendants' fraudulent representations, mismanagement, and active concealment of financial distress, solidifying the breadth and scope of the criminal enterprise's misconduct.

### **RESERVATION OF RIGHTS**

Plaintiff reserves the right to bring all other claims or causes of action that the Plaintiff may have against any of the Defendants, on any and all grounds, as allowed under the law or in equity, including but not limited to, those claims not known by the Plaintiff at this time but that he may discover during the pendency of this adversary proceeding.

/ / /

/ / /

/ / /

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Plaintiff prays for a judgment as follows:

### **ON THE FIRST CLAIM FOR RELIEF**

1.     <u>Control over ACH Transfers</u>: Entry of a preliminary injunction prohibiting interference with any ACH Transfer being executed pursuant to documents authorizing such transfers to be executed in favor of LPG as follows:

a.     <u>Covered Entities and Individuals</u>: The following entities and individuals, and anyone acting on their behalf: LPG, Oakstone; Greyson; Phoenix; Maverick; LGS Holdco, LLC; CLG; Vulcan; Coast Processing; Prime Logix; Tony Diab; Rosa Loli aka Rosa Bianca Loli aka Bianca Loli; Lisa Cohen, Dan March, Ty Carss, Eng, Heng and all other aliases, agents, or corporate entities affiliated with same shall, absent further order from this Court:

b.     <u>Enjoined Conduct re ACH Instructions</u>: No covered entity or individual shall initiate, cause to be initiated, or instruct any company or person that processes ACH transfers and/or their affiliated financial institution, including but not limited to EPPS; EquiPay; Authorize.net; World Global; Optimum Bank; Marich Bein; BankUnited, N.A.; Revolv3; FIS; Guardian; Payliance; Touzi Capital; Seamless; Dwolla; Stripe; Teracel; PECC Corp.; and/or any entity associated with the ACH identification transaction "LPG 949-226-6262 #5 2363 RT 9 TOMS RIVER NJ 0875" or any such substantially similar ACH identification transaction, to execute any ACH EFT on any file, financial institution, or current or former client of LPG, to or for the benefit of LPG, including but not limited to Oakstone; Greyson; Phoenix; Maverick; Guardian Processing; Teracel; Touzi Capital; and Prime Logix, without the express written authorization of the Trustee.

c.     <u>Enjoined Conduct re Bank Accounts</u>: No covered entity or individual shall open, or cause to be opened, any account, whether business or personal, that can receive or send money or anything of value, at any company including banking, financial, or similar institution and/or receive, directly or indirectly, any funds drawn from ACH Transfers;

2.     <u>Execution of ACH Transfers</u>: Entry of a preliminary injunction prohibiting interference with any ACH Transfer being executed pursuant to documents authorizing such transfers to be executed in favor of LPG as follows:

a.      <u>Covered Entities and Individuals</u>: All companies capable of processing ACH transfers, including EPPS; EquiPay; Authorize.net; World Global; Optimum Bank; Marich Bein; BankUnited, N.A.; Revolv3; FIS; Guardian; Payliance; Touzi; Seamless; Dwolla; Stripe; and/or any entity associated with the ACH identification transaction "LPG 949-226-6262 #5 2363 RT 9 TOMS RIVER NJ 0875," or any such substantially similar ACH identification transaction, are enjoined absent further order of this Court from**:**

i.      <u>Enjoined Conduct re ACH Transfers</u>: No covered entity or individual shall initiate or receive funds from any ACH EFT on any file, financial institution, or current or former client of LPG, to or for the benefit of LPG or any one or more of its alleged assignees or transferees including, but not limited to, Oakstone; Greyson; Phoenix; Maverick; Prime Logix and/or Touzi;

b.      <u>Injunction Mandating Turnover to Trustee</u>: All covered entities or individuals shall hold in trust any and all funds, receipts, and transfers related to any account, file, or current or former client of LPG, or any one or more of Diab's Alter Egos or Fraudulent Transferees, including but not limited to Oakstone; Greyson; Phoenix; Maverick; LGS Holdco, LLC; CLG (as to 40% of all Transfers for which reasonably fair value was not paid at the time each of the Transfers); Vulcan; Coast Processing; Prime Logix; Touzi, Tony Diab; Rosa Loli aka Rosa Bianca Loli aka Bianca Loli; Lisa Cohen, Eng, Heng and/or other aliases, agents or corporate entities affiliated with same until expressly directed to release, wire or transfer such funds by the Trustee and to a bank account whose information shall be provided with any such request; and, shall upon request by the Trustee provide an accounting of any and all such funds held in trust to the Trustee upon written request within ten days of said request;

c.      <u>Enjoining Conduct re Refund Instructions</u>: Enjoining LPG, or any one or more of Diab's Alter Egos or Fraudulent Transferees, including but not limited to Oakstone; Greyson; Phoenix; Maverick; Guardian Processing; Teracel; Touzi Capital; PECC Corp.; Prime Logix; Tony Diab; Rosa Loli aka Rosa Bianca Loli aka Bianca Loli; Lisa Cohen; Eng; Heng; and/or other aliases, agents, or corporate entities affiliated with the same, from instructing any person and/or client to cancel and/or demand a refund from LPG; Oakstone; Phoenix; Maverick; Guardian Processing; Touzi Capital; and/or Teracel.

d.      Enjoining Bank of America from allowing any and all funds on behalf of Prime

Logix or Vulcan, including but not limited to Account Nos. ending in xxx951 and xxx9021 and/or any other accounts to be withdrawn, wired, drawn against, moved, or otherwise transferred without the express consent of the Trustee in writing and to a financial account identified by the Trustee at the time the authorization is provided, and ordering Bank of America to hold in trust such funds;

        e.    <u>Enjoining Access to Locations and Systems</u>: Enjoining all persons identified below from accessing or attempting to gain access, whether physically, remotely, electronically, or virtually, to the following locations associated with LPG, or any one or more of Diab's Alter Egos or Fraudulent Transferees, including but not limited to Oakstone; Phoenix; Maverick; Guardian Processing; Teracel; Touzi Capital; PECC Corp.; Prime Logix; Tony Diab; Rosa Loli aka Rosa Bianca Loli aka Bianca Loli; Lisa Cohen; Eng Taing; Heng Taing; and/or other aliases, agents, or corporate entities affiliated with the same:

**Physical Locations**:

-    3347 Michelson Drive, Suites 400, 410 & 420, Irvine, California 92612
-    17542 17th Street, Suite 100, Tustin, California 92780

**Data and Cloud-Based Systems**:

-    LUNA's domain located on AWS
-    DPP Data or accounts
-    Accounting data and/or accounts on NetSuite, QuickBooks, Microsoft SharePoint, G-Suite, or other permanent or cloud-based systems

**ACH Processing Accounts**:

-    Whether individual, merchant, or business, held at any ACH processing or affiliated financial institution, including but not limited to:
  - EPPS; EquiPay; Authorize.net; World Global; Optimum Bank; Marich Bein; BankUnited, N.A.; Revolv3; FIS; Guardian; Payliance; Touzi; Seamless; Dwolla; Stripe; and/or any entity associated with the ACH identification transaction "LPG 949-226-6262 #5 2363 RT 9 TOMS RIVER NJ 0875" or any substantially similar ACH identification transaction

/ / /

**Financial Accounts**:

    o   Vulcan and/or Prime Logix's financial accounts at Bank of America, including but not limited to Account Nos. ending in xxx951 and xxx9021

**Email Data**:

    o   Emails, communications, and systems associated with the above-mentioned entities.

**Individuals Enjoined**:

       i. Tony Diab

       ii. Rosa Loli aka Rosa Bianca Loli aka Bianca Loli

       iii. Lisa Cohen

       iv. Daniel March

       v. Eng Taing

       vi. Maria Eeya Tan

       vii. Jake Akers

       viii. Han Trinh

       ix. Jayde Trinh

       x. Wes Thomas

       xi. William Taylor "Ty" Carss

       xii. Scott James Eadie

       xiii. Jimmy Chhor

       xiv. Brad Lee

       xv. Dongliang Jiang

       xvi. Heng Taing

       xvii. Max Chou

    f.      Requiring the United States Postal Service to re direct all mail directed to (1) LPG, 17542 17th Street, Suite 100, Tustin, California 92780; (2) Oakstone, 888 Prospect Street, Suite 200 La Jolla, California 92037; (3) Phoenix, 3347 Michelson Drive, Suites 400, 410 & 420, Irvine,California 92612 and/or P.O. Box 749, Millville, New Jersey 08332; (4) Prime Logix, 3347 Michelson Drive, Suites 400, 410 & 420, Irvine, California 92612; (5) CLG, P.O. Box 412 Elmsford,

New York 10523; (6) Greyson, 3347 Michelson Drive, Suites 400, 410 & 420, Irvine, California 92612; (7) and/or any other address associated with such entities, and ordering the United States Postal Service to forward and re-direct such mail to an address provided by the Trustee until such time as ordered by the Court.

**ON THE SECOND AND THIRD CLAIMS FOR RELIEF:**

3.    Avoiding, recovering, and preserving the two-year transfers against all Defendants:

**ON THE FOURTH AND FIFTH CLAIMS FOR RELIEF:**

4.    Avoiding, recovering, and preserving the four-year transfers against all Defendants:

**ON THE SIXTH CLAIM FOR RELIEF:**

5.    Ordering turnover to the Trustee of the following:

a.    Information regarding any and all persons who signed a Legal Services Contract with LPG or whose file was purchased or otherwise transferred to LPG, or any one or more of Diab's Alter Egos or Fraudulent Transferees, including but not limited to Oakstone; Greyson; Phoenix; Maverick; LGS Holdco, LLC; CLG; Vulcan; Coast Processing; Prime Logix; Tony Diab; Rosa Loli aka Rosa Bianca Loli aka Bianca Loli; Lisa Cohen; Eng; Heng; Max Chou and/or other aliases, agents or corporate entities affiliated with same, for which the client's file remains open and/or continues to make payments under an agreed upon installment contract.

b.    All client files, including but not limited to names, contact information, client file management, communications, account information, letters, pleadings, communications, payment history, financial account information, credit reports, executed legal services contracts, ACH contracts, executed installment contracts, account balances, debts in dispute, payment history, file status, settlements, debt invalidations and/or any other information created, managed and stored electronically utilizing DPP software program's software license, key or account, that was opened and is maintained and controlled by LPG, or any one or more of Diab's Alter Egos, including but not limited to Oakstone; Phoenix; Maverick; LGS Holdco, LLC; CLG; Vulcan; Coast Processing; Prime

Logix; Tony Diab; Rosa Loli aka Rosa Bianca Loli aka Bianca Loli; Lisa Cohen; Eng; Heng; Max Chou and/or other aliases, agents or corporate entities affiliated with same;

c.    All administrative usernames and passwords that give the Trustee access to any

1    DPP account held, maintained or controlled by LPG, or any one or more of Diab's alter egos, including

2    but not limited to Oakstone; Phoenix; Maverick; LGS Holdco, LLC; CLG; Vulcan; Coast Processing;

3    Prime Logix; Tony Diab; Rosa Loli aka Rosa Bianca Loli aka Bianca Loli; Lisa Cohen and/or other

4    aliases, agents or corporate entities affiliated with same;

5            d.      All client files, including but not limited to names, contact information, client file

6    management, communications, account information, letters, pleadings, communications, payment

7    history, financial account information, credit reports, executed legal services contracts, ACH contracts,

8    executed installment contracts, account balances, debts in dispute, payment history, file status,

9    settlements, debt invalidations and/or any other information created, managed and stored electronically

10   utilizing proprietary software program "LUNA" hosted on AWS and located at the current domain

11   "lunapp.com" that is maintained and controlled by LPG, or any one or more of Diab's Alter Egos,

12   including but not limited to Oakstone; Phoenix; Maverick; LGS Holdco, LLC; CLG; Vulcan; Coast

13   Processing; Prime Logix; Tony Diab; Rosa Loli aka Rosa Bianca Loli aka Bianca Loli; Lisa Cohen

14   and/or other aliases, agents or corporate entities affiliated with same;

15           e.      All administrative usernames and passwords that give the Trustee access to any

16   AWS account where LUNA, its software program, databases and client information is held, stored and

17   hosted that is maintained or controlled by LPG, or any one or more of Diab's Alter Egos, including but

18   not limited to Oakstone; Phoenix; Maverick; LGS Holdco, LLC; CLG; Vulcan; Coast Processing;

19   Prime Logix; Tony Diab; Rosa Loli aka Rosa Bianca Loli aka Bianca Loli; Lisa Cohen and/or other

20   aliases, agents or corporate entities affiliated with same;

21           f.      All ACH files related to client information, details, accounts, history of EFTs,

22   payments, amounts held, interest on held amounts, penalty fees, nonsufficient fund fees or other ACH

23   related charges to the clients stored electronically or in hard copy associated with ACH processing

24   service providers and/or affiliated financial institutions, including but not limited to EPPS; EquiPay;

25   Authorize.net; World Global; Optimum Bank; Marich Bein; BankUnited, N.A.; Revolv3;

26   FIS;Guardian; Payliance; Seamless; Dwolla; Stripe; and/or any entity associated with the ACH

27   identification transaction "LPG 949-226-6262 #5 2363 RT 9 TOMS RIVER NJ 0875", or any such

28   substantially similar ACH identification transaction;

g.     All files, information, reports, spreadsheets, account numbers, routing numbers, and databases related to transfer of funds out of any account opened, maintained and controlled by LPG, or any one or more of Diab's Alter Egos, including but not limited to Oakstone; Phoenix; Maverick; LGS Holdco, LLC; CLG; Vulcan; Coast Processing; Prime Logix; Tony Diab; Rosa Loli aka Rosa Bianca Loli aka Bianca Loli; Lisa Cohen and/or other aliases, agents or corporate entities affiliated with same that were processed and executed by ACH processing service providers and/or their affiliated financial institutions, including but not limited to EPPS; EquiPay; Authorize.net; World Global; Optimum Bank; Marich Bein; BankUnited, N.A.; Revolv3; FIS; Guardian; Payliance; Seamless; Dwolla; Stripe; and/or any entity associated with the ACH identification transaction "LPG 949-226-6262 #5 2363 RT 9 TOMS RIVER NJ 0875", or any such substantially similar ACH identification transaction;

h.     All administrative usernames and passwords that give the Trustee access to any ACH processing accounts, software, database or other program at ACH processing service providers and/or affiliated financial institutions, including but not limited to EPPS; EquiPay; Authorize.net; World Global; Optimum Bank; Marich Bein; BankUnited, N.A.; Revolv3; FIS; Guardian; Payliance; Seamless; Dwolla; Stripe; or any entity associated with the ACH identification transaction "LPG 949−226-6262 #5 2363 RT 9 TOMS RIVER NJ 0875", or any such substantially similar ACH identification transaction, used to upload or input client information, initiate client ACH EFTs, transfer client ACH funds to outside financial institutions or otherwise manage any account opened, maintained and controlled by LPG, or any one or more of Diab's Alter Egos, including but not limited to Oakstone, Phoenix; Maverick; LGS Holdco, LLC; CLG; Vulcan; Coast Processing; Prime Logix; Tony Diab; Rosa Loli aka Rosa Bianca Loli aka Bianca Loli; Lisa Cohen and/or other aliases, agents or corporate entities affiliated with same;

i.     All accounting records, files, data and information for LPG, or any one or more of Diab's Alter Egos, including but not limited to Oakstone; Phoenix; Maverick; LGS Holdco, LLC; CLG; Vulcan; Coast Processing and Prime Logix stored on NetSuite; QuickBooks and Microsoft SharePoint; G-Suite or other permanent or cloud based systems;

j.     All contracts, records, reports, information, data and details regarding the transfer

or sale of any client files or future client ACH payments to any other law firm, organization, corporate entity, person(s), or investment group (otherwise known as the alleged factoring companies) including but not limited to, Oakstone; Greyson; Phoenix; Maverick; LGS Holdco, LLC and/or CLG;

k.    All contracts, records, reports, information, data, cost basis, payment information and details regarding the transfer or receipt of any client files or future client ACH payments from any other law firm, organization, corporate entity, person(s), investment or marketing group (otherwise known as capping companies) to LPG or any one or more of Diab's Alter Egos including, but not limited to, Oakstone; Phoenix; Maverick; LGS Holdco, LLC and/or CLG;

l.    All information, data, tables, spreadsheets and reports regarding client information stored on Airtable cloud based data management system used by LPG, or any one or more of Diab's Alter Egos, including but not limited to, Oakstone; Phoenix; Maverick; LGS Holdco, LLC and/or CLG to manage the aforementioned information;

m.    All administrative usernames and passwords that give the Trustee access to any Airtable account opened, maintained or controlled by LPG, or any one or more of Diab's Alter Egos, including but not limited to Oakstone; Phoenix; Maverick; LGS Holdco, LLC and/or CLG;

n.    All email accounts related to LPG, or any one or more of Diab's Alter Egos, including but not limited to, Oakstone; Phoenix; Maverick; LGS Holdco, LLC and/or CLG stored maintained and/or hosted on Office 365, G-suite or any other email server, whether physical or cloud based servers;

o.    All post-petition client ACH payments processed and received by LPG, or any one or more of Diab's Alter Egos or Fraudulent Transferees, including but not limited to Oakstone; Greyson; Phoenix; Maverick; Prime Logix; CLG; LGS Holdco, LLC; Vulcan; Tony Diab; Rosa Loli aka Rosa Bianca Loli aka Bianca Loli; Lisa Cohen and/or any other aliases, agents or entities associated with same related to clients who entered into a legal services contract pre-petition and who have received the services provided in the contract;

p.    All rental payments made by Tony Diab; Lisa Cohen; Vulcan or Prime Logix or from Bank of America Account No. ending in xxx9021 to any landlord(s), property management company(s) or owner(s), including but not limited to Jason Oppenheim of real property located at 20101

48

1   S.W. Cypress Street, Newport Beach, California 92660 and at 8 Almanzora, Newport Coast, California

2   92657 utilizing funds originating from LPG, or any one or more of Diab's Alter Ego entities or Fraudulent

3   Transferees, including but not limited to, Oakstone; Phoenix; Maverick; CLG; Vulcan and/or Prime

4   Logix; and

5             q.       All rental payments made by Tony Diab; Lisa Cohen; Vulcan or Prime Logix or

6   from Bank of America Account No. ending in xxx9021 to any landlord(s), property management

7   company(s) or owner(s), including but not limited to 8 Almanzora, LLC, 310 West Profit Pro, Inc., Lisa

8   Delaney and/or Tong Gan of real property located at 8 Almanzora, Newport Coast, California 92657

9   utilizing funds originating from LPG, or any one or more of Diab's Alter Ego entities or Fraudulent

10  Transferees, including but not limited to, Oakstone; Phoenix; Maverick; CLG; Vulcan and/or Prime

11  Logix.

12                          **ON THE SEVENTH CLAIM FOR RELIEF**

13  1.   Damages in an amount to be proven at trial, including but not limited to the loss of funds

14       diverted from LPG's creditors.

15  2.   Disgorgement of all funds improperly obtained by defendants.

16  3.   Pre- and post-judgment interest as permitted by law.

17  4.   Costs of this action, including attorneys' fees where applicable.

18  5.   Any other relief the court deems just and proper.

19                          **ON THE EIGHTH CLAIM FOR RELIEF**

20  1.   Restitution in the amount of all funds unjustly retained by defendants, including but not

21       limited to $665,569.33.

22  2.   Disgorgement of profits obtained through unjust enrichment.

23  3.   Pre- and post-judgment interest as permitted by law.

24  4.   Costs of this action, including attorneys' fees where applicable.

25  5.   Any other relief the court deems just and proper.

26                          **ON THE NINTH CLAIM FOR RELIEF**

27  1.   Imposition of a constructive trust over the funds transferred from LPG to defendants,

28       including but not limited to $40,046.23 to Touzi Capital and $774,180.17 to Teracel

Blockchain Fund.

2. An order directing defendants to return all property subject to the constructive trust to the plaintiff for the benefit of the estate.

3. That all fraudulent transfers structured, facilitated, or concealed by Defendant Jiang be unwound, and that all assets improperly transferred be returned to the estate for creditor benefit.

4. Pre- and post-judgment interest as permitted by law.

5. Costs of this action, including attorneys' fees where applicable.

6. Any other relief the court deems just and proper.

## ON THE TENTH CLAIM FOR RELIEF

1. Avoidance and recovery of all fraudulent transfers made by defendants, including but not limited to payments to Touzi Capital and Teracel Blockchain Fund.

2. That Defendant Jiang be held jointly and severally liable for all damages arising from fraudulent transfers, financial misrepresentations, and RICO violations, as he knowingly facilitated and concealed the fraudulent transactions of Eng and Heng Taing.

3. Preservation of avoided transfers for the benefit of the estate.

4. Pre- and post-judgment interest as permitted by law.

5. Costs of this action, including attorneys' fees where applicable.

6. Any other relief the court deems just and proper.

## ON THE ELEVENTH CLAIM FOR RELIEF

1. Damages resulting from the conspiracy, including but not limited to the loss of funds diverted from LPG's creditors.

2. Joint and several liability against all defendants for their participation in the conspiracy.

3. Pre- and post-judgment interest as permitted by law.

4. Costs of this action, including attorneys' fees where applicable.

5. Any other relief the court deems just and proper.

/ / /

**ON THE TWELFTH CLAIM FOR RELIEF**

1. Avoidance and recovery of all preferential transfers made within the 90 days preceding LPG's bankruptcy filing, including but not limited to $73,646.08 paid for legal fees.

2. Preservation of avoided transfers for the benefit of the estate.

3. Pre- and post-judgment interest as permitted by law.

4. Costs of this action, including attorneys' fees where applicable.

5. Any other relief the court deems just and proper.

**ON THE THIRTEENTH CLAIM FOR RELIEF**

1. Rescission of all fraudulent transactions induced by defendants.

2. Damages caused by defendants' fraudulent inducement, including but not limited to funds improperly diverted.

3. Pre- and post-judgment interest as permitted by law.

4. Costs of this action, including attorneys' fees where applicable.

5. Any other relief the court deems just and proper.

**ON THE FOURTEENTH CLAIM FOR RELIEF**

Plaintiff seeks all available relief under RICO (18 U.S.C. § 1964), including but not limited to:

1. Treble damages for all fraudulent transfers, unauthorized withdrawals, and financial misappropriations.

2. Restitution and disgorgement of all fraudulently transferred funds.

3. Imposition of a constructive trust over all assets currently held by Defendants.

4. Permanent injunctive relief prohibiting Defendants from engaging in further fraudulent transactions.

5. An award of attorneys' fees, costs, and expenses incurred in investigating and litigating this case.

6. Full accounting and forensic audit of all financial transactions conducted by the Enterprise.

7. Appointment of a receiver to oversee the dissolution and asset recovery process of the fraudulent entities.

8. That Defendant D. Jiang be ordered to disgorge all financial gains, accounting fees, and other monetary benefits received in connection with fraudulent transactions, insider dealings, and financial structuring that obscured the movement of assets from LPG's

creditors.

9.  That Defendant Jiang be held jointly and severally liable for damages resulting from

fraudulent transfers, aiding and abetting fraud, and RICO violations.

**ON ALL CLAIMS FOR RELIEF:**

1.  Granting any other and further relief as the Court deems just and proper.

Dated:  March 17, 2025                    Respectfully submitted,

                                          DINSMORE & SHOHL LLP

                                          By: */s/ Julian Pecora*
                                                Christopher B. Ghio
                                                Julian Pecora
                                                Attorneys for Richard A. Marshack,
                                                Trustee of the LPG Liquidation Trust

# ADVERSARY PROCEEDING COVER SHEET

B1040 (FORM 1040) (12/24)

| ADVERSARY PROCEEDING COVER SHEET (Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER (Court Use Only) |
|---|---|

**PLAINTIFFS**
Richard A. Marshack, Trustee of the LPG Liquidation Trust

**ATTORNEYS** (Firm Name, Address, and Telephone No.)
Christopher B. Ghio (131688)
Yosina M. Lissebeck (201654)
Dinsmore & Shohl LLP
655 West Broadway, Ste 800, San Diego, CA 92101
Tele: (619) 400-0500

Julian Pecora (WV Bar No. 13912)
Dinsmore & Shohl LLP
611 Third Avenue, Huntington, WV 25701
Tele: (304) 691-8322
(Admitted pro hac vice)

**DEFENDANTS**
Guardian Processing, LLC, a Wyoming limited liability company; Touzi Capital, LLC; PECC Corp; Teracel Block Chain Fund II, LLC; Oakstone Law Group, PC; Eng Taing, an individual; Heng Taing, an individual; Jimmy Chhor, an individual; Dongliang Jiang, an individual; and DOES 1 through 100, inclusive.

**ATTORNEYS** (If Known)

**PARTY** (Check One Box Only)
☐ Debtor ☐ U.S. Trustee/Bankruptcy Admin
☐ Creditor ☐ Other
☐ Trustee

**PARTY** (Check One Box Only)
☐ Debtor ☐ U.S. Trustee/Bankruptcy Admin
☐ Creditor ☐ Other
☒ Trustee

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
(1) Injunctive Relief; (2) Avoidance, Recovery, and Preservation of Two-Year Actual Fraudulent Transfers; (3) Avoidance, Recovery, and Preservation of Two-Year Constructive Fraudulent Transfers; (4) Avoidance, Recovery, and Preservation of Four-Year Actual Fraudulent Transfers; (5) Avoidance, Recovery, and Preservation of Four-Year Constructive Fraudulent Transfers; (6) Turnover; (7) Breach of Fiduciary Duty; (8) Unjust Enrichment; (9) Imposition of a Constructive Trust; (10) Fraudulent Transfer; (11) Civil Conspiracy; (12) Preferential Transfer; (13) Fraudulent Inducement; and (14) Violation of the Racketeer Influenced and Corrupt Organizations Act (RICO)

**NATURE OF SUIT**

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(a) – Recovery of Money/Property**
☒ 11-Recovery of money/property - §542 turnover of property
☒ 12-Recovery of money/property - §547 preference
☒ 13-Recovery of money/property - §548 fraudulent transfer
☒ 14-Recovery of money/property - other

**FRBP 7001(b) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(c) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(d) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(e) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(f) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(f) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(g) – Injunctive Relief**
☐ 71-Injunctive relief- imposition of stay
☒ 72-Injunctive relief - other

**FRBP 7001(h) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(i) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(j) Determination of Removed Action**
☐ 01-Determination of remove d claim or cause

**Other**
☐ SS-SIPA Case - 15 U.S.C. §§78aaa et.seq.
☒ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☒ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ 1,553,441.81 |

Other Relief Sought

B1040 (FORM 1040) (12/24)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>The Litigation Practice Group P.C. | BANKRUPTCY CASE NO.<br>8:23-bk-10571-SC | |
| DISTRICT IN WHICH CASE IS PENDING<br>Central District of California | DIVISION OFFICE<br>Santa Ana | NAME OF JUDGE<br>Scott C. Clarkson |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br>/s/ Julian Pecora | | |
| DATE<br>March 17, 2025 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Christopher B. Ghio<br>Yosina M. Lissebeck<br>Julian Pecora | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.