1 | Christopher Celentino (131688)
Christopher.Celentino@dinsmore.com
2 | Yosina M. Lissebeck (201654)
Yosina.Lissebeck@dinsmore.com
3 | Christopher B. Ghio (259094)
Christopher.Ghio@dinsmore.com
4 | DINSMORE & SHOHL LLP
655 West Broadway, Suite 800
5 | San Diego, California 92101
Tele: (619) 400-0500
6 | Fax: (619) 400-0501

7 | BRIAN W. BOYD (Mi. Bar. P81004)
Brian.Boyd@dinsmore.com
8 | **DINSMORE & SHOHL LLP**
755 West Big Beaver Road, Suite 1900
9 | Troy, Michigan 48084
Tele: (248) 203-1622
10 | Fax: (248) 647-5210
(Admitted pro hac vice)

11

12 | Counsel to Richard A. Marshack, Plaintiff and
Trustee of the LPG Liquidation Trust

13

14 | **UNITED STATES BANKRUPTCY COURT**

15 | **CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION**

| | |
|---|---|
| 16 | In re: | Case No. 8:23-bk-10571-SC |
| 17 | THE LITIGATION PRACTICE GROUP P.C., | Chapter 11 |
| 18 | Debtor. | Adv. Proc. No. _____ |
| 19 | | **COMPLAINT FOR:** |
| 20 | Richard A. Marshack, Trustee of the LPG Liquidation Trust, | **(1) AVOIDANCE, RECOVERY, AND PRESERVATION OF 2-YEAR ACTUAL FRAUDULENT TRANSFERS;** |
| 21 | | |
| 22 | Plaintiff, | **(2) AVOIDANCE, RECOVERY, AND PRESERVATION OF 2-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS;** |
| 23 | v. | |
| 24 | Integrity Docs, LLC, a Florida company, and Richard Nodelman, an individual, | **(3) AVOIDANCE, RECOVERY, AND PRESERVATION OF 4-YEAR ACTUAL FRAUDULENT TRANSFERS;** |
| 25 | Defendants. | |
| 26 | | |
| 27 | | **(4) AVOIDANCE, RECOVERY, AND PRESERVATION OF 4-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS;** |
| 28 | | |

**(5)  AVOIDANCE, RECOVERY AND PRESERVATION OF PREFERENTIAL TRANSFER MADE WITHIN NINETY DAYS OF THE PETITION DATE;**

**(6) AVOIDANCE, RECOVERY, AND PRESERVATION OF UNAUTHORIZED POST-PETITION TRANSFER;**

**(7) TURNOVER; AND**

**(8) AIDING AND ABETTING**

Judge:        Hon. Scott C. Clarkson

For his *Complaint for (1) Avoidance, Recovery, and Preservation of 2-Year Actual Fraudulent Transfers; (2) Avoidance, Recovery, and Preservation of 2-Year Constructive Fraudulent Transfers; (3) Avoidance, Recovery, and Preservation of 4-Year Actual Fraudulent Transfers; (4) Avoidance, Recovery, and Preservation of 4-Year Constructive Fraudulent Transfers; (5) Avoidance, Recovery, and Preservation of Preferential Transfer; (6) Avoidance, Recovery, and Preservation of Unauthorized Post-Petition Transfer; (7) Turnover; and, (8) Aiding and Abetting* ("Complaint"), plaintiff Richard A. Marshack, the Trustee of the LPG Liquidation Trust (collectively, "Trustee" or "Plaintiff") in the above-captioned bankruptcy case ("Bankruptcy Case"), alleges and avers as follows:

### STATEMENT OF JURISDICTION, NATURE OF PROCEEDING, AND VENUE

1.        This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E), (H) and (O), 1334(b), and General Order No. 13-05 of the District Court for the Central District of California because this is a core proceeding arising in and/or related to the Bankruptcy Case, which is a case under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code"), and which is pending in the United States Bankruptcy Court for the Central District of California, Santa Ana Division ("Bankruptcy Court").

**2.** Regardless of whether this proceeding is core, non-core, or otherwise, Plaintiff consents to the entry of a final order and judgment by the Bankruptcy Court.

**3.** Defendants are notified that Rule 7008 of the Federal Rules of Bankruptcy Procedure requires Defendants to plead whether consent is given to the entry of a final order and judgment by the Bankruptcy Court.

**4.** Venue of this adversary proceeding properly lies in this judicial district pursuant to 28 U.S.C. § 1409(a) because this proceeding is related to Debtor's pending Bankruptcy Case.

<u>**THE PARTIES**</u>

**5.** Plaintiff, Richard A. Marshack, was the duly-appointed, qualified Chapter 11 Trustee of Debtor's Estate and is now the current liquidating trustee of the LPG Liquidation Trust.

**6.** Debtor is, and at all material times was, a professional corporation organized, existing, and in good standing under the laws of the State of California, with its principal place of business in Tustin, California.

**7.** Defendant, Integrity Docs, LLC ("Integrity"), is, and at all material times represented that it was, a limited liability company existing under the laws of the State of Florida.

**8.** Integrity may be served by first class mail postage prepaid upon its registered agent for service of process, at 964 Cypress Dr., Delray Beach, Florida 33483.

**9.** Defendant Richard Nodelman, is, and at all material times represented that he was, a Member of Integrity.

<u>**GENERAL ALLEGATIONS**</u>

**A.** **The Bankruptcy Case**

**10.** On March 20, 2023 ("Petition Date"), Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, commencing the Bankruptcy Case.

**11.** The Office of the United States Trustee ("UST") filed its *Motion by United States Trustee to Dismiss or Convert Case Pursuant to 11 U.S.C. § 1112(b)* [Bankr. Docket No. 21] and creditors Debt Validation Fund II, LLC; MC DVI Fund 1, LLC; and MC DVI Fund 2, LLC filed the *Motion by DVF and MC DVI to Dismiss Chapter 11 Case Pursuant to 11 U.S.C. §§ 105, 305, 349, & 1112, or in the Alternative Convert This Case to Chapter 7 or Appoint a Trustee* [Bankr.

Docket No. 44]. On May 4, 2023, the Court entered its *Order Directing United States Trustee to Appoint Chapter 11 Trustee* [Bankr. Docket No. 58].

**12.**   Pursuant to the *Acceptance of Appointment as Chapter 11 Trustee* [Bankr. Docket No. 63], on May 8, 2023, Trustee accepted his appointment as the Chapter 11 Trustee in the Bankruptcy Case, and he continues to serve in this capacity at this time. The Court approved the Trustee's appointment in its *Order Approving the U.S. Trustee's Application for the Appointment of a Chapter 11 Trustee* [Docket No. 65].

**13.**   Pursuant to the Order Confirming Modified First Amended Joint Chapter 11 Plan of Liquidation entered September 9, 2024, and the Notice of Occurrence of Effective Date of Modified First Amended Joint Chapter 11 Plan of Liquidation filed September 24, 2024, Richard A. Marshack became the Liquidating Trustee of the LPG Liquidation Trust, effective September 24, 2024. [Bankr. Docket Nos. 1646 & 1762].

**14.**   Trustee was not appointed until after events of the case and, therefore, bases these allegations on information and belief. *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) ("The *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible."); *Miller v. City of Los Angeles*, 2014 U.S. Dist. LEXIS 198871, 2014 WL 12610195, at *5 (C.D. Cal. Aug. 7, 2014) (recognizing that the plaintiff's "information and belief" pleading was allowed and "necessary at times"); *see also Mireskandari v. Daily Mail and General Trust PLC*, 2013 U.S. Dist. LEXIS 194437, 2013 WL 12129642, at *4 (C.D. Cal. July 31, 2013) ("The Federal Rules of Civil Procedure allow parties to plead facts on 'information and belief' if the facts 'will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.'" (citations omitted)).

**15.**   All claims have been transferred to the Liquidating Trust pursuant to the confirmed plan and Plaintiff brings this action solely in his capacity as the Chapter 11 Trustee for the benefit of Debtor's Estate and its creditors.

///

**B.     Protective Order**

16.     On or about May 2, 2024, Plaintiff filed that certain Notice and Motion for Entry of Protective Order (the "Protective Order Motion"). On June 3, 2024, the Court entered its Order Granting Motion for Entry of Protective Order and the Protective Order [Docket No. 1270] (the "Protective Order"). A true and accurate copy of the Protective Order is attached as **Exhibit 12**, and incorporated here.

17.     By its own terms, the Protective Order applies to this adversary proceeding and governs all discovery conducted herein.

**C.     LPG**

18.     LPG operated a law firm for consumers across the country who sought assistance in contesting or resolving debts they would identify.

19.     The consumers would pay LPG over a period of time via monthly debits from their bank accounts.

20.     The monthly payments were meant to cover all legal services LPG provided to the consumers including validation of the debts, review of documents to determine enforceability, and court appearances to halt lawsuits to obtain judgments.

21.     In certain instances, LPG would file a lawsuit in an effort to eliminate a disputed debt or to prosecute affirmative claims held by the consumers.

22.     LPG mismanaged the consumers' monthly payments.

23.     Tony Diab, who at all times relevant herein controlled LPG ("Diab") and others devised a plan to fraudulently transfer funds, client files, client funds and assets in the form of ACH Receivables (the "ACH Receivables" or "Accounts Receivable") out of LPG to third parties prior to filing of bankruptcy.

24.     To obtain consumer clients, LPG contracted with marketing companies, who engaged in illegal capping and would advertise or call to solicit consumers to become clients of LPG in exchange for a percentage of the ACH Receivables collected by LPG from the consumers. The marketing affiliate went so far as to assist with the execution of an engagement letter between the consumer and LPG.

25.     In exchange, LPG agreed to pay the marketing affiliates a percentage the monthly payments collected by LPG from the consumers.

26.     Because LPG received payments from consumers over time, it often sought financing by borrowing against its future cash flows. This borrowing was not only used to finance operations at LPG, but also to pay the fees owed to the marketing companies for providing the client referrals.

27.     Many of the documents executed in connection with such financing described the transactions as accounts receivable purchase agreements.

28.     Diab used entities he controlled including, without limitation, Vulcan Consulting Group, Coast Processing, PrimeLogix, LLC, Marich Bein, PurchaseCo80, LGS Holdco, LLC and/or Maverick Management, LLC to divert LPG consumer funds and ACH Receivables. Diab would use numerous ACH processing companies in order to easily transfer millions of dollars from Debtor to these entities he controlled, without oversight or detection, and to avoid payment disputes and complications. The money that flowed from Debtor through these bank account to Defendants consisted of Client Funds that Debtor held in its bank accounts and funneled to these entities by means of the ACH processing companies. Debtor regularly made deposits into these entities bank account such that they received Client Funds directly from Debtor in addition to future Accounts Receivable.

**D.    Defendants**

29.     Defendants were one of the marketing companies that procured clients for LPG.

30.     LPG agreed to pay, and in fact paid, Defendants a portion of the monthly payments received from consumers referred by Defendants.

31.     Defendants also entered into agreements pursuant to which it purported to sell accounts receivable back to LPG.

**i.    Affiliate Agreement**

32.     On information and belief, Debtor entered into an affiliate agreement with Defendants ("Affiliate Agreement"). However, Trustee is currently not in possession of the applicable Affiliate Agreement.

///

6

**33.** On information and belief, and based on similar agreements, the Affiliate Agreement states that Defendants "owns and operates a system of generating leads consisting of consumers interested in the legal services offered by LPG."

**34.** On information and belief, and based on similar agreements, pursuant to the Affiliate Agreement, Defendants generated leads consisting of consumers interested in the legal services offered by LPG and referred those consumers to Debtor.

**35.** On information and belief, and based on similar agreements, Defendants went so far as to assist with the execution of an engagement letter with the consumer.

**36.** On information and belief, and pursuant to the similar agreements LPG would agree to pay entities, similar Defendants as follows:

> Affiliate shall be entitled to receive the following as full and complete compensation for its services to LPG: LPG shall pay 65% per file for each file that Affiliate places with LPG, not counting the monthly maintenance fee of $96.38, which LPG shall retain to cover administrative costs for each file. LPG shall calculate the amount of each file, apply the above-identified percentage fee, and remit the same to Affiliate pursuant to an agreed-upon schedule not to exceed one remittance per seven (7) calendar days. If any consumer cancels LPG's services, or demands a refund for payment for such services, or both, then LPG shall be solely responsive [sic] for such cost and Affiliate shall not have to share such expense.

**37.** These types of Affiliate Agreement violates Sections 6151 and 6155 of the California Business and Professional Code, which prohibit referrals of potential clients to attorneys unless registered with the State Bar of California. Cal. Bus. & Prof. Code § 6155. "Referral activity" includes "any entity 'which, in person, electronically, or otherwise, refers the consumer to an attorney or law firm not identified' in the advertising." *Jackson v. LegalMatch.com*, 42 Cal. App. 5th 760, 775 (2019). A referral includes receiving information from potential clients and sending that information to lawyers, even when the advertiser does not advertise the name of the attorneys and the clients do not clear the name of the potential attorney after the referral occurred. *Id.*

**38.** Further, if any effect of an agreement is to accomplish an unlawful purpose, the agreement may be declared illegal regardless of the intention of the parties. *Stockton Morris Plan Co. v. Cal. Tractor & Equip. Corp.*, 112 Cal. App. 2d 684, 690 (1952) (citing *Fewel & Dawes, Inc.*

*v. Pratt*, 17 Cal. 2d 85, 91 (1941)). This remains true regardless of whether the contract has been performed. *Stevens v. Boyes Hot Springs Co.*, 113 Cal. App. 479, 483 (1931) (A contract by a corporation to purchase its own stock has the effect of illegally withdrawing and paying to a stockholder a part of the capital stock of the corporation and is illegal and void, regardless of the fact that the contract is fully performed by the sellers and partially performed by the corporation.); *Mansfield v. Hyde*, 112 Cal. App. 2d 133, 139 (1952), overruled, *Fomco, Inc. v. Joe Maggio, Inc.*, 8 Cal. Rptr. 459 (1960) (Where object of statute requiring licenses is to prevent improper persons from engaging in particular activity, or is for purpose of regulating occupation or business for protection of public, imposition of penalty amounts to prohibition against engaging in occupation or business without license, and contract made by unlicensed person in violation of statute is invalid.); *Firpo v. Murphy*, 72 Cal. App. 249, 252 (1925) (A contract to pay commissions to a real estate broker is illegal and he is not entitled to recover thereon where he fails to secure the license required by law to carry on his business.).

**39.**    Because the Affiliate Agreement violates federal and state law, it is void, unenforceable, and subject to avoidance as fraudulent. Any alleged consideration provided under the Affiliate Agreements and/or the ARPA Agreements (as defined below) was unlawful.

**40.**    Unlawful consideration is that which is: "(1) contrary to an express provision of law; (2) contrary to the policy of express law, though not expressly prohibited; or (3) otherwise contrary to good morals." Cal. Civ. Code § 1667. "If any part of a single consideration for one or more objects, or of several considerations for a single object, is unlawful, the entire contract is void." Cal. Civ. Code § 1608.

### ii.    Accounts Receivable Purchase Agreements

**41.**    On or about September 7, 2022, Defendants entered into an Accounts Receivable Purchase Agreement with Debtor ("ARPA 1"). The ARPA 1 is also consistent with LPG's practices with other defendants with whom LPG had express capping agreements. A true and accurate copy of ARPA 1 is attached as **Exhibit 1**, and incorporated here.

*///*

*///*

8

42.      On or about September 14, 2022, Defendants entered into an Accounts Receivable Purchase Agreement with Debtor ("ARPA 2"). A true and accurate copy of ARPA 2 is attached as **Exhibit 2**, and incorporated here.

43.      On or about September 22, 2022, Defendants entered into an Accounts Receivable Purchase Agreement with Debtor ("ARPA 3"). A true and accurate copy of ARPA 2 is attached as **Exhibit 3**, and incorporated here.

44.      On or about October 6, 2022, Defendants entered into an Accounts Receivable Purchase Agreement with Debtor ("ARPA 4"). A true and accurate copy of ARPA 4 is attached as **Exhibit 4**, and incorporated here.

45.      On or about November 7, 2022, Defendants entered into an Accounts Receivable Purchase Agreement with Debtor ("ARPA 5"). A true and accurate copy of ARPA 5 is attached as **Exhibit 5**, and incorporated here.

46.      On or about November 17, 2022, Defendants entered into an Accounts Receivable Purchase Agreement with Debtor ("ARPA 6"). A true and accurate copy of ARPA 6 is attached as **Exhibit 6**, and incorporated here.

47.      On or about January 6, 2023, Defendants entered into an Accounts Receivable Purchase Agreement with Debtor ("ARPA 7"). A true and accurate copy of ARPA 7 is attached as **Exhibit 7**, and incorporated here.

48.      On or about March 31, 2023, Defendants entered into an Accounts Receivable Purchase Agreement with Debtor ("ARPA 8"). A true and accurate copy of ARPA 8 is attached as **Exhibit 8**, and incorporated here.

49.      ARPA 1, ARPA 2, ARPA 3, ARPA 4, ARPA 5, ARPA 6, ARPA 7, and ARPA 8 are referred to collectively hereinafter as the "ARPA Agreements."

50.      Pursuant to the ARPA Agreements, Defendants purported to sell Debtor streams of monthly payments from consumers that were supposed to be held in trust until earned. *See* Ex. 1, Ex. 2, Ex. 3, Ex. 4, Ex. 5, Ex. 6, Ex. 7, Ex. 8.

///

///

51.    By entering into the ARPA Agreements, Debtor and Defendants violated federal and state laws by selling unearned legal fees or funds there were supposed to be held in trust or used for the benefit of consumers.

52.    The effect of the ARPA Agreements was to accomplish an unlawful purpose. Thus, the agreements may be declared illegal regardless of the intention of the parties. *Stockton Morris Plan Co. v. Cal. Tractor & Equip. Corp.*, 112 Cal. App. 2d 684, 690 (1952) (citing *Fewel & Dawes, Inc. v. Pratt*, 17 Cal. 2d 85, 91 (1941)). This remains true regardless of whether the contract has been performed. *Stevens v. Boyes Hot Springs Co.*, 113 Cal. App. 479, 483 (1931) (A contract by a corporation to purchase its own stock has the effect of illegally withdrawing and paying to a stockholder a part of the capital stock of the corporation and is illegal and void, regardless of the fact that the contract is fully performed by the sellers and partially performed by the corporation.); *Mansfield v. Hyde*, 112 Cal. App. 2d 133, 139 (1952), overruled, *Fomco, Inc. v. Joe Maggio, Inc.*, 8 Cal. Rptr. 459 (1960) (Where object of statute requiring licenses is to prevent improper persons from engaging in particular activity, or is for purpose of regulating occupation or business for protection of public, imposition of penalty amounts to prohibition against engaging in occupation or business without license, and contract made by unlicensed person in violation of statute is invalid.); *Firpo v. Murphy*, 72 Cal. App. 249, 252 (1925) (A contract to pay commissions to a real estate broker is illegal and he is not entitled to recover thereon where he fails to secure the license required by law to carry on his business.).

53.    Because the ARPA Agreements violate federal and state laws, they are void, unenforceable, and subject to avoidance as fraudulent. Any alleged consideration provided to Debtor under the ARPA Agreements was unlawful.

54.    Unlawful consideration is that which is: "(1) contrary to an express provision of law; (2) contrary to the policy of express law, though not expressly prohibited; or (3) otherwise contrary to good morals." Cal. Civ. Code § 1667. "If any part of a single consideration for one or more objects, or of several considerations for a single object, is unlawful, the entire contract is void." Cal. Civ. Code § 1608.

///

**D.    Payments to Defendants**

**55.**    On or about October 16, 2024, the Trustee sent a demand letter to Defendants (the "Demand Letter"). A true and accurate copy of the Demand Letter is attached as **Exhibit 9**, and incorporated here.

**56.**    The Demand Letter discussed certain transfers from Debtor that were made to Defendants within the 90-day period prior to the Petition Date ("Preference Period"). The transfers were listed on the attached "Preference Transfer Schedule" showing the date and amount, according to Debtor's books and records, of each transfer or other payment ("Preference Transfer Schedule").

**57.**    Trustee has yet to receive any response or payment from Defendants pursuant to the Demand Letter.

**58.**    During the applicable reach-back period, Debtor paid Defendants the sum of at least $481,625.26 between November 2021 and March 2023, subject to proof at trial ("Transfers"). A true and accurate list of the known payments made by Debtor to Defendants is attached as **Exhibit 10**, and incorporated here.

**59.**    At least $21,264.94 of the Transfers from Debtor to Defendants occurred during the 90-day preference period ("Preference Transfers"). A true and accurate list of the payments made during the Preference Transfers is attached as **Exhibit 11**, and incorporated here.

**60.**    The Preference Transfers are based on updated figures as of January of 2025.

**61.**    At least $30,000.00 of LPG funds were transferred by Prime Logix, LLC post-petition, and on information and belief, Defendants may have received between $60,000.00 and $80,000.00 of LPG funds transferred by Prime Logix, LLC post-petition. A true and accurate list of Post-Petition Transfers is attached as Exhibit 12, and incorporated here.

**E.    LPG's Ponzi Scheme**

**62.**    The Ponzi Scheme Presumption can be utilized to establish a debtor's "intent to defraud future undertakers [investors] from the mere fact that a debtor was running a Ponzi scheme. Indeed, no other reasonable inference is possible. A Ponzi scheme cannot work forever. The investor pool is a limited resource and will eventually run dry. The perpetrator must know that the scheme will eventually collapse as a result of the inability to attract new investors. The perpetrator

nevertheless makes payments to present investors, which, by definition, are meant to attract new investors. He must know all along, from the very nature of his activities, that investors at the end of the line will lose their money. Knowledge to a substantial certainty constitutes intent in the eyes of the law, *cf. Restatement (Second) of Torts § 8A (1963 & 1964)*, and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them. *Cf. Coleman Am. Moving Servs., Inc. v. First Nat'l Bank & Trust Co. (In re American Properties, Inc.)* (Bankr.D.Kan. 1981)14 B.R. 637, 643 (intentionally carrying out a transaction with full knowledge that its effect will be detrimental to creditors is sufficient for actual intent to hinder, delay or defraud within the meaning of § 548(a)(1))." *Merrill v. Abbott (In re Independent Clearing House Co.)* (D. Utah 1987) 77 B.R. 843, 860.

63.     "But if all the debtor receives in return for a transfer is the use of the defendant's money to run a Ponzi scheme, there is nothing in the bankruptcy estate for creditors to share. In fact, by helping the debtor perpetuate his scheme, the transfers exacerbate the harm to creditors by increasing the amount of claims while diminishing the debtor's estate. In such a situation, the use of the defendant's money cannot objectively be called "reasonably equivalent value." *Id*. at 859. Therefore, "[t]he trustee can avoid the transfers if they were preferential or fraudulent. Transfers to investors in a Ponzi scheme are preferential and fraudulent. Therefore, they constitute "property of the estate," and the trustee can recover them. *Id*. at 853 n.17 (citations omitted).

64.     Debtor was operating a Ponzi scheme that utilized the Defendants and several other entities as investors to continue its unlawful business practices by using funds provided by current investors to attract new investors hoping for very high returns. Therefore, the Debtor was running a Ponzi scheme and the Ponzi Scheme Presumption can be utilized to infer that the Debtor had the intent to defraud investors within the meaning of 11 U.S.C. section 548(a)(1).

65.     Moreover, since the Transfers were made with the intent to further the Ponzi scheme, the Debtor did not receive an objectively reasonable equivalent value for the Transfers, and the Trustee can avoided the Transfers because they were preferential and fraudulent.

///

///

### F.    LPG's Prepetition Creditors

**66.**    Debtor was insolvent when each Transfer was made. This insolvency is evidenced in part by the fact that 14 separate UCC-1 statements were of record securing debts of the Debtor as of September 1, 2022. These statements remained unreleased as of the Petition Date. These statements either reflected secured liens against the Debtor's assets then owned or thereafter acquired, or provided evidence of the assignment or sale of substantial portions of the Debtor's future income.

**67.**    When the Transfers were made, these prior UCC-1 statements secured the repayment of the following claimed amounts that are currently known to Trustee and are allegedly owed by the Debtor: (i) $2,374,004.82 owed to Fundura Capital Group as evidenced by Proof of Claim No. 335 purportedly secured by a UCC statement filed on or about May 19, 2021; (ii) approximately $15 million dollars owed to MNS Funding, LLC as evidenced by Proof of Claim No. 1060 purportedly secured by a UCC statement filed on or about May 28, 2021; (iii) approximately $5,000,000 owed to Azzure Capital, LLC as evidenced by Proof of Claim No. 127 secured by a UCC statement filed on or about May 28, 2021; and (iv) approximately $1.5 million dollars owed to Diverse Capital, LLC purportedly secured by UCC statements filed on or about September 15, 2021, and December 1, 2021.[1]

**68.**    As alleged above, LPG was borrowing against its assets and future income, often on unfavorable terms, not only to finance operations at LPG, but also to pay the fees owed to the marketing affiliates for providing it with consumer clients. Pursuant to the agreements with the marketing companies, significant percentages of future payments were already promised to be paid to the marketing affiliates from whatever future income the Debtor would receive.

**69.**    In addition, on Debtor's Schedule E/F [Bankr. Docket No. 33], Debtor scheduled 11 unsecured creditors with priority unsecured claims totaling $374,060.04. These priority unsecured creditors include Indiana Dept. of Revenue, Dept. of Labor and Industries, Arizona Dept. of Economic Security, Arkansas Dept. of Finance & Admin., California Franchise Tax Board, Georgia

---

[1] Trustee reserves all rights, claims, and defenses with respect to these and any other purported secured or unsecured claims.

Dept. of Labor, Internal Revenue Service, Mississippi Dept. of Revenue, Nevada Dept. of Taxation, Utah State Tax Commission, and Wisconsin Dept. of Revenue (collectively, "Priority Unsecured Creditors").

70.    Another group of creditors that Debtor listed on its Schedule E/F [Bankr. Docket No. 33] are nonpriority unsecured creditors. Those 58 creditors have scheduled claims totaling $141,439,158.05 and include Ajilon; Anthem Blue Cross; Azevedo Solutions Groups, Inc.; Carolina Technologies & Consulting Invoice; Collaboration Advisors; Credit Reporting Service Inc.; CT Corporation – Inv.; Debt Pay Pro; Document Fulfillment Services; EnergyCare, LLC; Exela Enterprise Solutions; First Legal Network, LLC; GHA Technologies Inc.; Harrington Electric, Inc.; Imagine Reporting; Juize, Inc.; Krisp Technologies, Inc.; Liberty Mutual; Marc Lemauviel – Allegra; MarkSYS Holdings, LLC; Netsuite-Oracle; Pitney Bowes; Rapid Credit, Inc.; SBS Leasing A Program of De Lage Landen; Security Solutions; Sharp Business Systems; Streamline Performance, Inc.; Thomson Reuters; Twilio, Inc.; Nationwide Appearance Attorneys; Executive Center, LLC; Outsource Accelerator, Ltd.; TaskUs Holdings, Inc.; Marich Bein, LLC; Validation Partners; MC DVI Fund 1, LLC; MC DVI Fund 2, LLC; Debt Validation Fund II, LLC; Tustin Executive Center; LexisNexus; JP Morgan Chase; Business Centers of America; Michael Schwartz; Anibal Colon Jr.; Kathleen Lacey; David Ulery; Kimberly Birdsong; Kevin Carpenter; Karen Suell; Gloria Eaton; Carolyn Beech; Debra Price; Kenneth Topp; Darcey Williamson, Trustee; James Hammett; Johnny Rizo; Beverly Graham; Kathleen Scarlett; and Geneve and Myranda Sheffield (collectively, "Nonpriority Unsecured Creditors" and, together with the Secured Creditors and Priority Unsecured Creditors, "Prepetition Creditors").

71.    As of the filing of this complaint, approximately 5,771 claims have been filed with the bankruptcy Court. While Trustee has not reviewed all claims as of the date of this complaint, and reserves all rights to object to those claims, the total amount is in excess of approximately $717,507,462.29.

///

///

///

14

# FIRST CLAIM FOR RELIEF

## Count I - Avoidance, Recovery, and Preservation of Actual Fraudulent Transfers

### [11 U.S.C. §§ 548(a)(1)(A), 550, and 551]

**72.**     Plaintiff realleges and incorporates here by reference each and every allegation contained in paragraphs 1 through 71 as though set forth in full.

**73.**     The Affiliate Agreement, ARPA Agreements, and all or a portion of the Transfers occurred within the two years prior to the Petition Date.

**74.**     On or after the date that such agreements were executed and the Transfers were made, entities to which Debtor was or became indebted include the Prepetition Creditors.

**75.**     The Transfers happened while Debtor was insolvent or rendered Debtor insolvent.

**76.**     Despite Debtor's obligation to the Prepetition Creditors, Debtor continued to pay Defendants sums received from consumers under the Affiliate Agreement, which constitutes an illegal capping agreement between Defendants and Debtor. Any obligation of the Debtor arising from such agreement is also avoidable as fraudulent.

**77.**     Despite Debtor's obligation to the Prepetition Creditors, Defendants continued to sell or transfer portions of its accounts receivable to Debtor, which is illegal under federal and state laws.

**78.**     The Transfers were made with actual intent to hinder, delay, or defraud creditors of Debtor.

**79.**     The Debtor was operating a Ponzi scheme and the Ponzi Scheme Presumption can be utilized to infer the Debtor's actual intent to defraud within the meaning of 11 U.S.C. section 548(a)(1).

**80.**      The Debtor's conduct was done with oppression, fraud, and malice, as defined in Civil Code section 3294, entitling the Trustee to, in addition to the actual damages, exemplary or punitive damages for making an example of the Debtor and to punish the Debtor.

**81.**     The Affiliate Agreement, ARPA Agreements, and the Transfers of Debtor's funds are avoidable as fraudulent pursuant to 11 U.S.C. §§ 548(a)(1)(A), 550, and 551, and the common law tort of intentional fraudulent transfers by one or more creditors who held and hold unsecured

claims against Debtor that were and are allowable against the Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

82.    The Affiliate Agreement, ARPA Agreements, and Transfers should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(A) and under the common law tort of intentional fraudulent transfers, and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

## SECOND CLAIM FOR RELIEF

### Count II - Avoidance, Recovery, and Preservation of Constructive Fraudulent Transfers Against Defendants

### [11 U.S.C. §§ 548(a)(1)(B), 550, and 551]

83.    Plaintiff realleges and incorporates here by reference each and every allegation contained in paragraphs 1 through 82 as though set forth in full.

84.    The Affiliate Agreement, ARPA Agreements, and all or a portion of the Transfers occurred within the two years prior to the Petition Date.

85.    On or after the date that such agreements were executed and such Transfers were made, entities to which Debtor was or became indebted include the Prepetition Creditors.

86.    The Transfers happened while Debtor:

    a.  was insolvent or became insolvent as a result;

    b.  was engaged or was about to engage in a transaction for which any property remaining with Debtor was of unreasonably small capital; or

    c.  intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

87.    Because the referrals from Defendants to Debtor are illegal under federal and state law, they are void and subject to avoidance as fraudulent. Any purported consideration constitutes unlawful consideration, which cannot constitute reasonably equivalent value. Thus, at the time the agreements were executed and the Transfers made, Debtor received less than reasonably equivalent value.

**88.**    Furthermore, the Debtor did not receive the reasonably equivalent value of the Transfers to the Defendants because by using the Defendants' money to run a Ponzi scheme there is nothing in Estate for the creditors to share. Rather, the Transfers exacerbated the harm to creditors by increasing the amount of claims while diminishing the Debtor's Estate. In this situation, the use of the Defendants' money to further the Debtor's Ponzi scheme cannot be consideration for the Transfers and cannot objectively be called reasonably equivalent value.

**89.**    Therefore, the Defendants was acting as an investor in the Debtor's Ponzi scheme. Any transfers made to the Defendants can be avoided by the Plaintiff since the Transfers are preferential and fraudulent such that they constitute property of the Estate in which the Plaintiff can recover.

**90.**    The Affiliate Agreement, ARPA Agreements, and the Transfers should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(B), and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

### **THIRD CLAIM FOR RELIEF**

**Count III - Avoidance, Recovery, and Preservation of Actual Fraudulent Transfers Against Defendants**

**[11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.04(a), 3439.04(b), and 3439.07]**

**91.**    Plaintiff realleges and incorporates here by reference each and every allegation contained in paragraphs 1 through 90 as though set forth in full.

**92.**    The Affiliate Agreement, ARPA Agreements, and all or a portion of the Transfers occurred within the four years prior to the Petition Date.

**93.**    On or after the date that such agreements were entered and such Transfers were made, entities to which Debtor was or became indebted include the Prepetition Creditors.

**94.**    Despite Debtor's obligation to the Prepetition Creditors, Debtor continued to pay Defendants sums received from consumers under the Affiliate Agreement, which constitutes an illegal capping agreement between Defendants and Debtor.

///

**95.** The Transfers happened while Debtor was insolvent or Debtor became insolvent shortly after the Transfers were made as is evidenced by the filing of the voluntary petition.

**96.** The value of the consideration received by Debtor for such Transfers was not reasonably equivalent to the value of the Transfers because the Transfers were used to further assist Debtor in its Ponzi scheme.

**97.** Because the referrals from Defendants to Debtor are illegal under federal and state law, they are void and subject to avoidance as fraudulent. Any purported consideration constitutes unlawful consideration, which cannot constitute reasonably equivalent value. Thus, at the time the agreements were executed and the Transfers made, Debtor received less than reasonably equivalent value.

**98.** The Transfers were made with actual intent to hinder, delay, or defraud creditors of Debtor.

**99.** The Debtor was operating a Ponzi scheme and the Ponzi Scheme Presumption can be utilized to infer the Debtor's actual intent to defraud within the meaning of 11 U.S.C. section 548(a)(1).

**100.** The Debtor's conduct was done with oppression, fraud, and malice, as defined in Civil Code section 3294, entitling the Trustee to, in addition to the actual damages, exemplary or punitive damages for making an example of the Debtor and to punish the Debtor. The Affiliate Agreement, the ARPA Agreements, and the Transfers of Debtor's funds are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and Cal. Civ. Code §§ 3439.04(a), 3439.04(b), and 3439.07, and the common law tort of intentional fraudulent transfers by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against the Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

**101.** Accordingly, the Affiliate Agreement, the ARPA Agreements, and the Transfers should be avoided as fraudulent under 11 U.S.C. §§ 544(b) and Cal. Civ. Code §§ 3439.04(a), 3439.04(b), and 3439.07, and under the common law tort of intentional fraudulent transfers, and

such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551 and Cal. Civ. Code § 3439.07.

### **FOURTH CLAIM FOR RELIEF**

**Count IV - Avoidance, Recovery, and Preservation of Constructive Fraudulent Transfers Against Defendants**

**[11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.05, and 3439.07]**

102.    Plaintiff realleges and incorporates here by reference each and every allegation contained in paragraphs 1 through 101 as though set forth in full.

103.    The Affiliate Agreement, the ARPA Agreements, and all or a portion of the Transfers occurred within the four years prior to the Petition Date.

104.    The Transfers happened while Debtor:

    a.   was insolvent or became insolvent as a result;

    b.   was engaged or was about to engage in a transaction for which any property remaining with Debtor was of unreasonably small capital; or

    c.   intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

105.    Because the referrals from Defendants to Debtor are illegal under federal and state law, the agreements are void and subject to avoidance as fraudulent. Any purported consideration constitutes unlawful consideration, which cannot constitute reasonably equivalent value. Thus, at the time the agreements were executed and the Transfers made, Debtor received less than reasonably equivalent value.

106.    Furthermore, the Debtor did not receive the reasonably equivalent value of the Transfers to the Defendants because by using the Defendants' money to run a Ponzi scheme there is nothing in Estate for the creditors to share. Rather, the Transfers exacerbated the harm to creditors by increasing the amount of claims while diminishing the Debtor's Estate. In this situation, the use of the Defendants' money to further the Debtor's Ponzi scheme cannot be consideration for the Transfers and cannot objectively be called reasonably equivalent value.

///

107.    The Defendants was therefore acting as an investor in the Debtor's Ponzi scheme and any Transfers made to the Defendants can be avoided by the Plaintiff since the Transfers to the Defendants are preferential and fraudulent such that they constitute property of the Estate in which the Plaintiff can recover.

108.    The Affiliate Agreement, the ARPA Agreements, and the Transfers of Debtor's funds are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and Cal. Civ. Code §§ 3439.05 and 3439.07 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against the Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

109.    Accordingly, the Affiliate Agreement, the ARPA Agreements, and the Transfers should be avoided as fraudulent under 11 U.S.C. §§ 544(b) and Cal. Civ. Code §§ 3439.05 and 3439.07, and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551 and Cal. Civ. Code § 3439.07.

## FIFTH CLAIM FOR RELIEF

**Count V - Avoidance, Recovery, and Preservation of Preferential Transfer to Defendants in Preference Period**

**[11 U.S.C. §§ 547, 550, and 551]**

110.    Plaintiff realleges and incorporates here by reference each and every allegation contained in paragraphs 1 through 109 as though set forth in full.

111.    The Preference Transfers were made for, or on account of, an antecedent debt or debts owed by LPG to Defendants, each of which constituted a "debt" or "claim" (as those terms are defined in the Bankruptcy Code) of Defendants.

112.    The Preference Transfers happened while LPG was insolvent.

113.    Debtor is also entitled to the presumption of insolvency when the Preference Transfers happened pursuant to 11 U.S.C. § 547(f).

114.    As a result of the Preference Transfers, Defendants recovered more than it would have received if: (i) the Debtor's case was under chapter 7 of the Bankruptcy Code; (ii) the Preference Transfers had not been made; and (iii) Defendants received payments of its debts under

the provisions of the Bankruptcy Code. As evidenced by the Debtor's schedules filed in the underlying Bankruptcy Case, as well as the proofs of claim that have been received to date, the Debtor's liabilities exceed its assets to the point that unsecured creditors will not receive a full payout of their claims from the Debtor's Estate.

115.    In accordance with the foregoing, the Preference Transfers are voidable pursuant to 11 U.S.C. § 547(b), and may be recovered and preserved for the benefit of the estate pursuant to 11 U.S.C. §§ 550 and 551.

## SIXTH CLAIM FOR RELIEF

### Count VI – Avoidance, Recovery, and Preservation of Unauthorized

### Post-Petition Transfer

### [11 U.S.C. §§ 549, 550, and 551]

116.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 115 as though fully set forth in full.

117.    The Unauthorized Post-Petition Transfers were made on or after March 20, 2023.

118.    The Unauthorized Post-Petition Transfers were not authorized pursuant to Title 11 of the United States Code or by order of the United States Bankruptcy Court overseeing Debtor's bankruptcy case.

119.    The Unauthorized Post-Petition Transfers were property of Debtor.

120.    The Unauthorized Post-Petition Transfers are avoidable pursuant to 11 U.S.C. § 549. Defendants has liability for all avoided Transfers under 11 U.S.C. § 550.

121.    The Trustee may preserve all avoided Unauthorized Post-Petition Transfers from Defendants and/or Doe Defendants for the benefit of the Estate pursuant to 11 U.S.C. § 551.

## SEVENTH CLAIM FOR RELIEF

### Count VII - Turnover of Estate Property Against Defendants

### [11 U.S.C. § 542]

122.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 121 as though set forth in full.

///

123.    Defendants has possession or control over property of the Estate in the form of the Transfers, Preference Transfers and Unauthorized Post-Petition Transfers made pursuant to illegal and unenforceable agreements.

124.    The Transfers are not of inconsequential value to the Estate.

125.    The funds that are the subject of the Transfers, Preference Transfers and Unauthorized Post-Petition Transfers are paramount to Debtor's ability to pay creditors.

126.    Accordingly, Trustee is entitled to a judgment for turnover of the Transfers, Preference Transfers and Unauthorized Post-Petition Transfers pursuant to 11 U.S.C. § 542.

### EIGHTH CLAIM FOR RELIEF

### Count VIII – Aiding and Abetting Against Defendant Nodelman

**[11 U.S.C. §§ 554(b), 550, and 551; Cal. Civ. Code §§ 3439.04(a), 3439.04(b), and 3439.07]**

127.    Plaintiff realleges and reincorporates herein by reference each and every allegation contained in Paragraphs 1 through 126 as if fully set forth in full.

128.    Defendants, based upon information and belief and based on the Ponzi Scheme Presumption, had knowledge of the fraudulent transactions, transfers and illegal agreements that were used to perpetuate and conceal the Ponzi scheme and fraudulent transfers of money.

129.    Defendants, with the foregoing knowledge, intended to, and did, help the Debtor in perpetuating and concealing the Ponzi scheme and fraudulent transfers of money.

130.    At all material times, Defendants had the intent to facilitate and conceal the Ponzi scheme and fraudulent transfers of money by aiding and abetting the illegal capping scheme and signing up consumer clients to keep the business going.

131.    Defendants, upon information and belief, assisted, and did actually engage in, the commission of fraud and the Ponzi scheme by coordinating, facilitating, and directing payments and transfers of moneys and executing documents in furtherance of concealing the true nature of their fraudulent and criminal activity related to the Ponzi scheme.

///

///

///

## RESERVATION OF RIGHTS

Plaintiff reserves the right to bring all other claims or causes of action that Plaintiff may have against Defendants, on any and all grounds, as allowed under the law or in equity, including but not limited to, those claims not known by the Trustee at this time but that he may discover during the pendency of this adversary proceeding.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for a judgment as follows:

**On The First, Second, Third, and Fourth Claims for Relief:**

**1.** Avoiding, recovering, and preserving the Transfers against Defendants; and

**2.** Exemplary and punitive damages to set example of Defendants commensurate to its wealth.

**On the Fifth Claim for Relief:**

**3.** Avoiding, recovering, and preserving the Preference Transfers against Defendants;

**On the Sixth Claim for Relief:**

**4.** Ordering Defendants to immediately turn over the Transfers and/or Preference Transfers;

**On the Eighth Claim for Relief:**

**5.** Ordering Defendants to immediately turn over the Transfers and/or Preference Transfers;

///
///
///
///
///
///
///
///
///

**On All Claims for Relief:**

**6.**    Awarding costs of suit incurred here;

**7.**    Awarding pre- and post-judgment interest; and

**8.**    Granting any other and further relief as the Court deems just and proper.

Dated: March 18, 2025

Respectfully submitted,

DINSMORE & SHOHL LLP


By:  _/s/ Brian W. Boyd_
Yosina M. Lissebeck
Brian W. Boyd (pro hac vice)
*Counsel to Richard A. Marshack, Plaintiff
and Trustee of the LPG Liquidation Trust*

# EXHIBIT 1

Exhibit 1
Page 24

DocuSign Envelope ID: 489877DE-D6E4-41D8-A0F5-B61E5DCB88BB

## ACCOUNTS RECEIVABLE PURCHASE AGREEMENT

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is made as of September 7, 2022 (the "**Agreement Date**"), by and between PurchaseCo80, LLC (the "**Buyer**"), and Integrity Docs (the "**Seller**", and together with the Buyer, the **"Parties"**).

### RECITALS

WHEREAS, in the regular course of business, the Seller originates account receivables from Litigation Practice Group LLC ("**LPG**") in connection with client on-boarding services provided by the Seller to LPG and its affiliates;

WHEREAS, the account receivables represent an obligation of various clients to pay Seller for services that Seller previously provided, but which LPG shall provide from the date of execution of this Agreement;

Whereas, Purchaser desires to purchase, and Seller desires to sell to Purchaser, all right, title and interest to the payments owing to Seller from the client files of the Consumers listed on Addendum A (the "**Client Files**").

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables (the "**Purchased Accounts**").

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

### ARTICLE 1.
### DEFINITIONS

Section 1.1    <u>Certain Definitions</u>.  Certain defined terms used in this Agreement are set forth on **Exhibit A**.

### ARTICLE 2.
### ASSIGNMENT AND TRANSFER AND CONSIDERATION

Section 2.1    <u>Assignment of the Purchased Accounts to the Buyer</u>.  Upon execution of this Agreement and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all of the Seller's right, title, and interest in and to the Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens.  Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the "**Excluded Assets**").

Section 2.2    <u>No Assumption of Liabilities</u>.  The Buyer shall not assume any Liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the "**Excluded Liabilities**").

Section 2.3    <u>Payment of Purchase Price</u>.  Buyer shall pay $11,966.85 (the "**Purchase Price**") by wire transfer in accordance with the wire transfer instructions set forth in **Schedule 2.3** (the "**Wire Instructions**") in exchange for the receivable on the 7 files identified on the attached spreadsheet.

Exhibit 1
Page 25

DocuSign Envelope ID: 489877DE-D2E1-41D8-A0F5-B61E5DCB88BB

## ARTICLE 3.
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1      Organization; Good Standing.  The Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the Laws of the State of Delaware and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2      Affiliate shall compy with state and federal laws in performing (a) its operations associated with the transaction contemplated herein, and (b) its obligations under this Agreement and any other agreement associated herewith, including communicating with consumers and/or potential consumers regarding LPG or any of its or LPG's programs.

Section 3.3      LPG shall comply with state and federal laws in performing (a) its operations associated with the transaction contemplated herein, (b) its obligations under the Agreement, and (c) the legal services agreement entered into between LPG and consumers and Affiliates.

Section 3.4      Each of LPG and Affiliate are in compliance in all material respects with any federal, state, local or foreign law (including common law), statute, code ordinance, rule, regulation or other requirement ("**Law**") applicable to its business or operations.  Neither LPG nor Affiliate have received any written or other notice or been charged with the violation of any Laws. To the knowledge of LPG and Affiliate, neither is under investigation with respect to the violation of any Laws and, to the knowledge of LPG and Affiliate, there are no facts or circumstances which could form the basis for any such violation. LPG and Affiliate currently have all material approvals, authorizations, consents, licenses, permits or certificates which are required for the operation of the business as presently conducted ("**Permits**"). Neither LPG nor Affiliate (i) are in default or violation (and no event has occurred which, with notice or lapse of time or both, would constitute a default or violation) of any term, condition or provision of the certificate of organization of the relevant party, and (ii) are in default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation) in any material respect of any term, condition or provision of any Permit, to which the business is subject or by which its properties or assets are bound, and to the knowledge of the LPG and Affiliate, there are no facts or circumstances which could form the basis for any such default or violation.

Section 3.5      Power and Authority.  The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement

Exhibit 1
Page 26

DocuSign Envelope ID: 43987FDE-D6E1-41D8-A0F5-B61E5DC8B6BB

of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.6    Title to, and Sufficiency of, the Purchased Accounts.  The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all of the Purchased Accounts, free and clear of all Liens.

Section 3.7    Consents.  The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.8    No Conflicts. The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

Section 3.9    Compliance with Laws.  The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.

Section 3.10    Legal Proceedings.  There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements.  No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.11    Condition of Purchased Accounts.  Each Purchased Account shall have received no less than one processed payment.

Section 3.12    Confidentiality. Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the "**Confidential Information**").  Seller will at all times keep the  Confidential Information in confidence and trust.  Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer.  Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions.  Seller agrees that violation of this Section 3.9.  The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

Exhibit 1

Page 27

DocuSign Envelope ID: 439877DE-D6E1-41D8-A0F5-B61E5DCBB8BB

## ARTICLE 4.
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1    Organization; Good Standing.  The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Florida.

Section 4.2    Power and Authority.  The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 4.3    No Conflicts.  The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4    Sufficient Funds.  The Buyer has, and will have, sufficient funds available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

## ARTICLE 5.
## COVENANTS

Section 5.1    Appropriate Actions.

(a)    General.  Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

## ARTICLE 6.
## CLOSING

Section 6.1    Closing.  The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing.  The date on which the Closing occurs is hereinafter referred to as the "**Closing Date**."

Exhibit 1
Page 28

DocuSign Envelope ID: 439877DE-D6E1-41D8-A0F5-B61E5DCB68BB

The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2    <u>Closing Deliverables of the Seller</u>.  At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer:  (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **Exhibit B** (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3    <u>Closing Deliverables of the Buyer</u>.  At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to <u>Section 6.2</u>, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4    <u>Indemnification by the Seller</u>.  Subject to the limitations set forth in this <u>Article 6</u>, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Seller pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability, or (d) Affiliate's actions or omissions in their business operations.  This indemnity provision is not limited to third party claims against Purchaser.  This indemnity provision shall surve the termination of the Agreement.

Section 6.5    <u>Indemnification by LPG</u>.  Subject to the limitations set forth in this <u>Article 6</u>, LPG agrees to indemnify and hold harmless the **Buyer Indemnified Parties** against all **Losses** paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of LPG in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the LPG pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability, or (d) LPG's actions or omissions in their business operations.  This indemnity provision is not limited to third party claims against Purchaser.  This indemnity provision shall surve the termination of the Agreement.

Section 6.6    <u>Indemnification by the Buyer</u>.  Subject to the limitations set forth in this <u>Article 6</u>, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurance related to the Purchased Accounts or Buyer occurring after the Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.7    <u>Indemnification Procedures</u>.

Exhibit 1
Page 29

(a)    No Restraints. Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, provided, however, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim.  The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; provided, however, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred.  In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense.  The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b)    No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim.  An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c)    If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**").  Such Notice of Claim shall specify the basis for such Direct Claim.  The failure by any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this Section 6.6(c).  If the Indemnifying Party does not notify the Indemnified Party within thirty days its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this Article 6 or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this Article 6, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined.  In the event that the Indemnifying Party has timely disputed its Liability with respect

Exhibit 1
Page 30

to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

## ARTICLE 7.
## MISCELLANEOUS

Section 7.1    Entire Agreement; Amendment.    This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof.  This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2    Waivers.    The rights and remedies of the Parties to this Agreement are cumulative and not alternative.  To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for which it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3    Notices.    All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission. A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

Section 7.4    Successors and Assigns.    This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns.  This Agreement and any rights or obligations of a Party hereunder may be assigned by a Party or an Affiliate of such Party without consent of the other Parties.  This Agreement will be binding upon any assignee of any Party.  No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5    Public Disclosure.    Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6    Expenses and Fees.    Whether or not the Closing occurs, all fees and expenses incurred in connection with this transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.  In the event of a breach,

Exhibit 1
Page 31

the party who prevails in any court proceeding shall be entitled to reasonable attorneys' fees and collection costs, including all fees and costs on appeal.

Section 7.7    <u>Specific Performance</u>.  The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

<u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.8    <u>Governing Law</u>.  This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws principles<u>Severability</u>.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction<u>Construction</u>.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

Section 7.9    Non Disparagement - Upon termination of this Agreement for any reason whatsoever, LPG and Affiliate will refrain, and will instruct their affiliates, officers, directors, employees, contractors and agents to refrain, from making any disparaging or negative comment, remark, statement, or implication, whether written or oral, about any Party to this Agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

By: PurchaseCo80, LLC

By: The Litigation Practice Group, P.C., its Manager

By: _____
       Name: Dan March
       Title: Managing Shareholder

By: OHP - LPG, LP, its controlling shareholder

By: _____
       Name: Adam Blum
       Title: Manager of the General Partner

**SELLER:** Integrity Docs

By: _____
       Name: Richard Nodelman
       Title: Member

**APPROVAL OF ASSIGNMENT**

The assignment of the Purchased Accounts set forth in this Agreement is hereby approved, and with respect to the Purchased Accounts, the Buyer shall have all rights of Buyer as set forth in this agreement.

**The Litigation Practice Group P.C.**

By: _____
       Name: Daniel S. March
       Title: Managing Shareholder

*[Signature Page to Accounts Receivable Purchase Agreement]*

Exhibit 1
Page 33

DocuSign Envelope ID: 439877DE-D6E4-41D8-A0F5-B61E5DC888BB

**EXHIBIT A**

**DEFINITIONS**

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a) "**Action**" shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b) "**Agreement**" shall have the meaning set forth in the preamble to this Agreement.

(c) "**Agreement Date**" shall have the meaning set forth in the preamble to this Agreement.

(d) "**Affiliate**" shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii), with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals. For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e) "**Bill of Sale and Assignment and Assumption Agreement**" shall have the meaning set forth in Section 6.2.

(f) "**Business**" shall mean the business of the Seller as conducted on the Agreement Date.

(g) "**Buyer**" shall have the meaning set forth in the preamble to this Agreement.

(h) "**Buyer Indemnified Parties**" shall have the meaning set forth in Section 6.4.

(i) "**Client Files**" shall have the meaning set forth in the Recitals.

(i) "**Closing**" shall have the meaning set forth in Section 6.1.

(j) "**Closing Date**" shall have the meaning set forth in Section 6.1.

(k) "**Direct Claim**" shall have the meaning set forth in Section 6.6(c).

(l) "**Excluded Assets**" shall have the meaning set forth in Section 2.1.

(m) "**Excluded Liabilities**" shall have the meaning set forth in Section 2.2.

(n) "**Governmental Body**" shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

Exhibit 1
Page 34

DocuSign Envelope ID: 439877DE-D6E1-44D8-A0F5-B61E5DCB86BB

(o)    "**Indebtedness**" means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p)    "**Indemnified Party**" shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q)    "**Indemnifying Party**" shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r)    "**Knowledge**" shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s)    "**Law**" shall have the meaning set forth in Article 3.

(t)    "**Liabilities**" shall mean any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on- or off-balance sheet, or other.

(u)    "**Lien**" shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v)    "**Losses**" shall have the meaning set forth in Section 6.4.

(w)    "**Notice of Claim**" shall have the meaning set forth in Section 6.6(c).

(x)    "**Organizational Documents**" shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y)    "**Party**" or "**Parties**" shall have the meaning set forth in the preamble to this Agreement.

(z)    "**Permits**" shall have the meaning set forth in Article 3.

(aa)    "**Permitted Liens**" shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(bb)    "**Person**" shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

Exhibit 1

Page 35

DocuSign Envelope ID: 439877DE-DCF1-41D8-A0F5-B61E5DCBB8BB

(cc)    "**Purchase Price**" shall have the meaning set forth in <u>Section 2.3</u>.

(dd)    "**Purchased Accounts**" shall have the meaning set forth in the Recitals.

(ee)    "**Seller**" shall have the meaning set forth in the preamble to this Agreement.

(ff)    "**Seller Indemnified Parties**" shall have the meaning set forth in <u>Section 6.5</u>.

(gg)    "**Tax**" or "**Taxes**" shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(hh)    "**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(ii)    "**Third Party**" or "**Third Parties**" shall mean any Person other than the Parties or their respective Affiliates.

(jj)    "**Third-party Claim**" shall have the meaning set forth in <u>Section 6.6(a)</u>.

(kk)    "**Transaction Agreements**" shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(ll)    "**Upfront Cash Payment**" shall have the meaning set forth in <u>Section 2.3</u>.

(mm)    "**Wire Instructions**" shall have the meaning set forth in <u>Section 2.3</u>.

Exhibit 1
Page 36

DocuSign Envelope ID: 43987FDE-D6E1-41D8-A0F5-B61E5DCB68BB

## EXHIBIT B

### FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this **"Agreement"**), is made by and between PurchaseCo80, LLC (the "**Buyer**"), and Integrity Docs (the "**Seller**").    Each of the Seller and the Buyer are sometimes referred to herein, individually, as a "**Party**" and, collectively, as the "**Parties**."

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the "**Purchase Agreement**"), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.    <u>Defined Terms</u>.  Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2.    <u>Sale of Purchased Accounts; Assignment</u>.  The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3.    <u>Further Assurances</u>.  Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

4.    <u>Terms of the Purchase Agreement</u>.  This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement.    The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference.  The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5.    <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[*Remainder of page intentionally left blank.*]

Accounts Receivable Purchase Agreement
Exhibit B – Bill of Sale

Exhibit 1
Page 37

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**BUYER:**

By: PurchaseCo80, LLC

By: The Litigation Practice Group, P.C., its Manager

By: _____

Name: Dan March

Title: Managing Shareholder

By: OHP - LPG, LP, its controlling shareholder

By: _____

Name: Adam Blum

Title: Manager of the General Partner

**SELLER:** Integrity Docs

By: _____

Name: Richard Nodelman

Title: Member

**Schedule 2.3**
**Wire Instructions**

**Account Holder Name: Integrity Docs**

**Address:** ████████████████████████

**Routing Number:** ████████

**Account Number:** ████████

# EXHIBIT 2

Exhibit 2
Page 40

## ACCOUNTS RECEIVABLE PURCHASE AGREEMENT

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is made as of September 14, 2022 (the "**Agreement Date**"), by and between PurchaseCo80, LLC (the "**Buyer**"), and Integrity Docs (the "**Seller**", and together with the Buyer, the "**Parties**").

### RECITALS

WHEREAS, in the regular course of business, the Seller originates account receivables from Litigation Practice Group LLC ("**LPG**") in connection with client on-boarding services provided by the Seller to LPG and its affiliates;

WHEREAS, the account receivables represent an obligation of various clients to pay Seller for services that Seller previously provided, but which LPG shall provide from the date of execution of this Agreement;

Whereas, Purchaser desires to purchase, and Seller desires to sell to Purchaser, all right, title and interest to the payments owing to Seller from the client files of the Consumers listed on Addendum A (the "**Client Files**").

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables (the "**Purchased Accounts**").

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

### ARTICLE 1.
### DEFINITIONS

Section 1.1    <u>Certain Definitions</u>.  Certain defined terms used in this Agreement are set forth on **<u>Exhibit A</u>**.

### ARTICLE 2.
### ASSIGNMENT AND TRANSFER AND CONSIDERATION

Section 2.1    <u>Assignment of the Purchased Accounts to the Buyer</u>.  Upon execution of this Agreement and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all the Seller's right, title, and interest in and to the Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens.  Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the "**Excluded Assets**").

Section 2.2    <u>No Assumption of Liabilities</u>.  The Buyer shall not assume any Liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the "**Excluded Liabilities**").

Section 2.3    <u>Payment of Purchase Price</u>.  Buyer shall pay $3,311.35 (the "**Purchase Price**") by wire transfer in accordance with the wire transfer instructions set forth in **<u>Schedule 2.3</u>** (the "**Wire Instructions**") in exchange for the receivable on the 5files identified on the attached spreadsheet.

Exhibit 2
Page 41

DocuSign Envelope ID: B9190E60-1CD3-4E65-93E9-88F454B4D34B

## ARTICLE 3.
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1    Organization; Good Standing.  The Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the Laws of the State of Delaware and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2    Affiliate shall company with state and federal laws in performing (a) its operations associated with the transaction contemplated herein, and (b) its obligations under this Agreement and any other agreement associated herewith, including communicating with consumers and/or potential consumers regarding LPG or any of its or LPG's programs.

Section 3.3    LPG shall comply with state and federal laws in performing (a) its operations associated with the transaction contemplated herein, (b) its obligations under the Agreement, and (c) the legal services agreement entered into between LPG and consumers and Affiliates.

Section 3.4    Each of LPG and Affiliate are in compliance in all material respects with any federal, state, local or foreign law (including common law), statute, code ordinance, rule, regulation or other requirement ("**Law**") applicable to its business or operations.  Neither LPG nor Affiliate have received any written or other notice or been charged with the violation of any Laws. To the knowledge of LPG and Affiliate, neither is under investigation with respect to the violation of any Laws and, to the knowledge of LPG and Affiliate, there are no facts or circumstances which could form the basis for any such violation. LPG and Affiliate currently have all material approvals, authorizations, consents, licenses, permits, or certificates which are required for the operation of the business as presently conducted ("**Permits**"). Neither LPG nor Affiliate (i) are in default or violation (and no event has occurred which, with notice or lapse of time or both, would constitute a default or violation) of any term, condition or provision of the certificate of organization of the relevant party, and (ii) are in default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation) in any material respect of any term, condition or provision of any Permit, to which the business is subject or by which its properties or assets are bound, and to the knowledge of the LPG and Affiliate, there are no facts or circumstances which could form the basis for any such default or violation.

Section 3.5    Power and Authority. The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement

DocuSign Envelope ID: B9190E60-1CD3-4E65-93E9-88F454B4D94B

of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.6    Title to, and Sufficiency of, the Purchased Accounts.  The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all the Purchased Accounts, free and clear of all Liens.

Section 3.7    Consents.  The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.8    No Conflicts.  The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

Section 3.9    Compliance with Laws.  The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.

Section 3.10    Legal Proceedings.  There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements.  No event has occurred, or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.11    Condition of Purchased Accounts.  Each Purchased Account shall have received no less than one processed payment.

Section 3.12    Confidentiality.  Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the "**Confidential Information**").  Seller will at all times keep the  Confidential Information in confidence and trust.  Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer.  Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions.  Seller agrees that violation of this Section 3.9.  The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

Exhibit 2
Page 43

DocuSign Envelope ID: B9190E60-1CD3-4E6E-93E9-88F454B4D94B

## ARTICLE 4.
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1 <u>Organization; Good Standing</u>. The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Florida.

Section 4.2 <u>Power and Authority</u>. The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby. This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 4.3 <u>No Conflicts</u>. The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4 <u>Sufficient Funds</u>. The Buyer has, and will have, sufficient funds available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

## ARTICLE 5.
## COVENANTS

Section 5.1 <u>Appropriate Actions</u>.

(a) <u>General</u>. Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

## ARTICLE 6.
## CLOSING

Section 6.1 <u>Closing</u>. The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing. The date on which the Closing occurs is hereinafter referred to as the "**Closing Date**."

Exhibit 2
Page 44

DocuSign Envelope ID: B9190560-1CD3-4E65-93E9-88F454B4D94B

The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2    Closing Deliverables of the Seller.  At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer: (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **Exhibit B** (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3    Closing Deliverables of the Buyer.  At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to Section 6.2, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4    Indemnification by the Seller.  Subject to the limitations set forth in this Article 6, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Seller pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability, or (d) Affiliate's actions or omissions in their business operations.  This indemnity provision is not limited to third party claims against Purchaser.  This indemnity provision shall survive the termination of the Agreement.

Section 6.5    Indemnification by LPG. Subject to the limitations set forth in this Article 6, LPG agrees to indemnify and hold harmless the **Buyer Indemnified Parties** against all **Losses** paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of LPG in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the LPG pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability, or (d) LPG's actions or omissions in their business operations.  This indemnity provision is not limited to third party claims against Purchaser.  This indemnity provision shall survive the termination of the Agreement.

Section 6.6    Indemnification by the Buyer.  Subject to the limitations set forth in this Article 6, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurrence related to the Purchased Accounts or Buyer occurring after the Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.7    Indemnification Procedures.

DocuSign Envelope ID: B9190560-1CD8-4E65-93E9-88F454B4D94B

(a)    No Restraints.  Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, provided, however, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim.  The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; provided, however, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred.  In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense.  The Indemnifying Party or the Indemnified Party (as the case may be) shall, at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b)    No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim.  An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c)    If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**").  Such Notice of Claim shall specify the basis for such Direct Claim.  The failure by any Indemnified Party to so notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this Section 6.6(c).  If the Indemnifying Party does not notify the Indemnified Party within thirty days receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this Article 6 or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this Article 6, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined.  In the event that the Indemnifying Party has timely disputed its Liability with respect

DocuSign Envelope ID: B9190E60-1CD3-4E65-93E9-88F454B4D84B

to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

## ARTICLE 7.
## MISCELLANEOUS

Section 7.1    Entire Agreement; Amendment.  This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof.  This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2    Waivers.  The rights and remedies of the Parties to this Agreement are cumulative and not alternative.  To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for which it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3    Notices.  All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission. A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

Section 7.4    Successors and Assigns.  This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns.  This Agreement and any rights or obligations of a Party hereunder may be assigned by a Party or an Affiliate of such Party without consent of the other Parties.  This Agreement will be binding upon any assignee of any Party.  No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5    Public Disclosure.  Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6    Expenses and Fees.  Whether or not the Closing occurs, all fees and expenses incurred in connection with these transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.  In the event of a breach,

Exhibit 2
Page 47

DocuSign Envelope ID: B9190560-1CD3-4E65-93E9-88F454B4D94B

the party who prevails in any court proceeding shall be entitled to reasonable attorneys' fees and collection costs, including all fees and costs on appeal.

Section 7.7    Specific Performance. The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.8    Governing Law.  This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

Section 7.9    Non Disparagement - Upon termination of this Agreement for any reason whatsoever,  LPG and Affiliate will refrain, and will instruct their affiliates, officers, directors, employees, contractors and agents to refrain, from making any disparaging or negative comment, remark, statement, or implication, whether written or oral, about any Party to this Agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

By: PurchaseCo80, LLC

By: The Litigation Practice Group, P.C., its manager

By: _Daniel S March_
    9D494DB1993341E
    Name: Dan March
    Title: Managing Shareholder


By: OHP - LPG, LP, its controlling shareholder

By: _Adam Blum_
    AEFD0C315ACC44E...
    Name: Adam Blum
    Title: Manager of the General Partner

**SELLER:** Integrity Docs

By: _Richard Nodelman_
    11F05BCD88F742A...

    Name: Richard Nodelman
    Title: Member


**APPROVAL OF ASSIGNMENT**

The assignment of the Purchased Accounts set forth in this Agreement is hereby approved, and with respect to the Purchased Accounts, the Buyer shall have all rights of Buyer as set forth in this agreement.


**The Litigation Practice Group P.C.**

By: _Daniel S March_
    9D494DB1993341E...
    Name: Daniel S. March
    Title: Managing Shareholder


*[Signature Page to Accounts Receivable Purchase Agreement]*

Exhibit 2
Page 49

DocuSign Envelope ID: B9190E60-1CD8-4E65-93E9-88F454B4D94B

## EXHIBIT A

## DEFINITIONS

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a)　　"**Action**" shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b)　　"**Agreement**" shall have the meaning set forth in the preamble to this Agreement.

(c)　　"**Agreement Date**" shall have the meaning set forth in the preamble to this Agreement.

(d)　　"**Affiliate**" shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii), with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals.  For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e)　　"**Bill of Sale and Assignment and Assumption Agreement**" shall have the meaning set forth in Section 6.2.

(f)　　"**Business**" shall mean the business of the Seller as conducted on the Agreement Date.

(g)　　"**Buyer**" shall have the meaning set forth in the preamble to this Agreement.

(h)　　"**Buyer Indemnified Parties**" shall have the meaning set forth in Section 6.4.

(i)　　"**Client Files**" shall have the meaning set forth in the Recitals.

(i)　　"**Closing**" shall have the meaning set forth in Section 6.1.

(j)　　"**Closing Date**" shall have the meaning set forth in Section 6.1.

(k)　　"**Direct Claim**" shall have the meaning set forth in Section 6.6(c).

(l)　　"**Excluded Assets**" shall have the meaning set forth in Section 2.1.

(m)　　"**Excluded Liabilities**" shall have the meaning set forth in Section 2.2.

(n)　　"**Governmental Body**" shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

Exhibit 2
Page 50

DocuSign Envelope ID: B9190E60-1CD8-4E65-93E9-88F454B4D94B

(o)    "**Indebtedness**" means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p)    "**Indemnified Party**" shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q)    "**Indemnifying Party**" shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r)    "**Knowledge**" shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s)    "**Law**" shall have the meaning set forth in Article 3.

(t)    "**Liabilities**" shall mean any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on- or off-balance sheet, or other.

(u)    "**Lien**" shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v)    "**Losses**" shall have the meaning set forth in Section 6.4.

(w)    "**Notice of Claim**" shall have the meaning set forth in Section 6.6(c).

(x)    "**Organizational Documents**" shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y)    "**Party**" or "**Parties**" shall have the meaning set forth in the preamble to this Agreement.

(z)    "**Permits**" shall have the meaning set forth in Article 3.

(aa)    "**Permitted Liens**" shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(bb)    "**Person**" shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

Exhibit 2
Page 51

DocuSign Envelope ID: B9190F60-1CD3-4E65-93E9-88F454B4D94B

(cc)    "**Purchase Price**" shall have the meaning set forth in <u>Section 2.3</u>.

(dd)    "**Purchased Accounts**" shall have the meaning set forth in the Recitals.

(ee)    "**Seller**" shall have the meaning set forth in the preamble to this Agreement.

(ff)    "**Seller Indemnified Parties**" shall have the meaning set forth in <u>Section 6.5</u>.

(gg)    "**Tax**" or "**Taxes**" shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(hh)    "**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(ii)    "**Third Party**" or "**Third Parties**" shall mean any Person other than the Parties or their respective Affiliates.

(jj)    "**Third-party Claim**" shall have the meaning set forth in <u>Section 6.6(a)</u>.

(kk)    "**Transaction Agreements**" shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(ll)    "**Upfront Cash Payment**" shall have the meaning set forth in <u>Section 2.3</u>.

(mm)    "**Wire Instructions**" shall have the meaning set forth in <u>Section 2.3</u>.

Exhibit 2
Page 52

DocuSign Envelope ID: B9190E60-1CD8-4E65-93E9-88F454B4D84B

**EXHIBIT B**

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this **"Agreement"**), is made by and between PurchaseCo80, LLC (the "**Buyer**"), and Integrity Docs (the "**Seller**"). Each of the Seller and the Buyer are sometimes referred to herein, individually, as a "**Party**" and, collectively, as the "**Parties**."

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the "**Purchase Agreement**"), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.      Defined Terms.  Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2.      Sale of Purchased Accounts; Assignment.  The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3.      Further Assurances.  Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request, in order to more effectively consummate the transactions contemplated by this Agreement.

4.      Terms of the Purchase Agreement.  This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement. The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference. The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5.      Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[*Remainder of page intentionally left blank.*]

Accounts Receivable Purchase Agreement
Exhibit B – Bill of Sale

Exhibit 2
Page 53

DocuSign Envelope ID: B9190E60-1CD3-4E6E-93E9-88F454B4D94B

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**BUYER:**

By: PurchaseCo80, LLC

By: The Litigation Practice Group, P.C., its Manager

By: _____ *Daniel S March*
         DocuSigned by:
         9D494DB1993341E...
         Name: Dan March
         Title: Managing Shareholder

By: OHP - LPG, LP, its controlling shareholder

By: _____ *Adam Blum*
         DocuSigned by:
         AEFD0C515ACC44E...
         Name: Adam Blum
         Title: Manager of the General
         Partner

**SELLER:** Integrity Docs

By: _____ *Richard Nodelman*
         DocuSigned by:
         11F05BCD88F742A...
         Name: Richard Nodelman
         Title:   Member

**Schedule 2.3**
**Wire Instructions**

**Account Holder Name: Integrity Docs**

**Address:** ███████████ ████████████████

**Routing Number:** ████████

**Account Number:** ████████

# EXHIBIT 3

Exhibit 3
Page 56

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the "***Agreement***") is entered into effective as of September 22, 2022 (the "***Effective Date***") by and among Integrity Docs LLC, a Florida limited liability company ("***Seller***"), and PurchaseCo80, LLC, a Delaware limited liability company ("***Buyer***"). Each of Seller, LPG (defined below), and Buyer may also be referred to herein individually as a "***Party***" and collectively as the "***Parties***."

### RECITALS:

A.       Seller is engaged in the origination of accounts receivables from Litigation Practice Group, PC, a California professional corporation ("***LPG***"), representing an obligation of clients to pay Seller for services previously provided by Seller, in which LPG shall provide beginning on the Effective Date.

B.       Seller desires to sell to Buyer all right, title, and interest to the payments owing to Seller from the accounts listed on <u>Schedule 1.1</u>, and Buyer desires to purchase such right, title, and interest, all on the terms and subject to the conditions contained herein (the "***Transaction***").

### AGREEMENT:

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants of the Parties set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties do hereby mutually agree as follows:

## ARTICLE I
## PURCHASE AND SALE

1.1       <u>Sale of Assets</u>.  Subject to the terms and conditions of this Agreement, Seller will sell, convey, transfer and assign to Buyer, free and clear of any and all liabilities, pledges, mortgages, security interests, liens, charges, obligations, claims and other encumbrances whatsoever, whether absolute, accrued, contingent or otherwise, (collectively, "***Liens***"), and Buyer will purchase and acquire from Seller, all right, title and interest of Seller in and to the accounts receivable of Seller listed on <u>Schedule 1.1</u> (the "***Acquired Assets***").

1.2       <u>No Assumption of Liabilities</u>.  Seller hereby acknowledges and agrees that Buyer is not, in connection with this transaction or otherwise, assuming any expense, obligation, responsibility or liability of any nature whatsoever (including, without limitation, accrued, absolute, contingent or otherwise) of Seller, including, but not limited to, liabilities incurred in the ordinary course of business and existing as of the Effective Date or otherwise relating to Seller or LPG's operation of its business prior to the Closing, and all of such expenses, obligations, responsibilities and liabilities have been and are retained in all respects by Seller and LPG (collectively, the "***Unassumed Liabilities***").

## ARTICLE II
## PURCHASE PRICE AND PAYMENT

2.1       <u>Payment of Purchase Price</u>.

(a)       The aggregate purchase price for the Acquired Assets will be $5,256.86  (the "***Purchase Price***").

Exhibit 3
Page 57

DocuSign Envelope ID: 71D3C63C-D814-4EAB-86D2-E86ED82262D7

(b)    At Closing, Buyer will pay Seller by wire transfer, in the instructions listed on <u>Schedule 2.1</u>, an amount (the "***Cash Payment***") equal to the Purchase Price.

2.2    <u>Acknowledgement of Adequacy of Purchase Price</u>.  The Parties acknowledge that the Purchase Price (i) equals or exceeds the fair market value of the Acquired Assets, and (ii) constitutes reasonably equivalent value in exchange for the Acquired Assets.

2.3    <u>Allocation of Purchase Price</u>.  The Purchase Price will be allocated among the Acquired Assets in accordance with the requirements of Section 1060 of the Internal Revenue Code of 1986, as amended, based upon the residual method, valuing all identified assets, determining the amount to be allocated based upon the contract price, assigning to respective classes of assets—Class III – Market to Market Assets & Accounts Receivable—and adjusting for specific transaction costs, in a manner to be agreed upon by the Parties thirty (30) days following the Closing.  After the Closing, the Parties will make consistent use of the allocation, fair market value, and useful lives so agreed upon for all tax purposes and in all tax returns with the IRS in respect thereof.  The Parties hereby covenant and agree not to take a position on any tax return, including Form 8594, before any governmental agency charged with the collection of an income tax, or in any judicial proceeding that is in any way inconsistent with the allocation so agreed upon. In the event that the Parties are unable to agree on the allocation described above, then the Parties hereby agree to attend mediation and participate therein in good faith prior to taking any other action provided herein or by applicable law to enforce this Agreement.

**ARTICLE III**
**REPRESENTATIONS AND WARRANTIES OF SELLER**

Seller and LPG represent and warrant to Buyer, as of the Effective Date and as of the Closing Date, as follows:

3.1    <u>Seller Organization; Affiliation of LPG</u>.  Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of FL, and has the requisite power to carry on the operations of the business of Seller as now conducted. With respect to Seller, LPG directly or indirectly (including through one or more intermediaries), controls, is controlled by, or is under common control with, Seller. For purposes of this <u>Section 3.1</u>, "<u>control</u>," when used with respect to Seller, shall mean the power, direct or indirect, to direct or cause the direction of the management and policies of Seller, whether through ownership of voting securities or partnership or other ownership interests, by contract or otherwise; and the terms "<u>controlling</u>" and "<u>controlled</u>" shall have correlative meanings.

3.2    <u>LPG Organization</u>.  LPG is a professional corporation duly organized, validly existing and in good standing under the laws of the State of California, and has the requisite power to carry on the operations of the business of LPG as now conducted.

3.3    <u>Authority</u>.  Seller and LPG have the power and authority to execute, deliver and perform all of their obligations, covenants and agreements contained in this Agreement and all documents, instruments and other writings to be executed and/or delivered by them pursuant to this Agreement.

3.4    <u>Enforceability</u>.  This Agreement constitutes, and the other documents to be executed and delivered by Seller hereunder will constitute when executed and delivered by them, (assuming the due authorization, execution and delivery by the other parties hereto and thereto) legal, valid and binding obligations of Seller and LPG enforceable against them in accordance with their respective terms.

3.5    <u>Title to Assets; Encumbrances</u>.  Seller has good, valid and indefeasible title to all of the Acquired Assets.  All of the Acquired Assets are free and clear of any Lien.

Exhibit 3

Page 58

3.6    Litigation.  There is no litigation or proceeding, in law or in equity, and there are no proceedings before any commission or other administrative authority, pending or threatened, against Seller or LPG with respect to the consummation of the Transaction or the Acquired Assets.

3.7    Books and Records.  The books of account and other records of Seller with respect to its operations and the Acquired Assets are current, complete and correct and have been maintained in accordance with sound business practices.

3.8    Third Party Consents; Licenses.  No third party (including, without limitation, governmental authorities) consents, licenses or permits are required in connection with the operation of the business of Seller, or the sale of the Acquired Assets pursuant to this Agreement.

3.9    No Violation.  The execution, delivery and performance of this Agreement by Seller and the consummation of the Transaction: (i) do not conflict with and will not conflict with, or result in or will result in a breach of, or constitute or will constitute a default (or an event which, with or without notice or lapse of time, or both, would constitute a default) under, any of the terms, conditions or provisions of any material agreement, instrument or obligation to which Seller or LPG is a party or by which any of them is bound; and (ii) do not violate and will not violate, in any material respect, any order, writ, injunction, decree, statute, rule of regulation applicable to Seller or LPG.

3.10    Legal Violations.  Seller and LPG are in full compliance with all applicable laws, ordinances and governmental regulations and the uses and operations that the business of Seller is conducting are in full compliance with all applicable laws, ordinances and governmental regulations, including the creation and collection of the Acquired Assets.  Seller has not received any notice from any governmental or quasi-governmental authority having jurisdiction over them asserting that they are in violation of any applicable financial laws, ordinances or regulations, or any legal or other requirements.

3.11    Accounts Receivable.  The Acquired Assets: (a) have arisen from bona fide transactions entered into by Seller involving the sale of goods or the rendering of services in the ordinary course of business consistent with past practice; (b) constitute only valid, undisputed claims of Seller not subject to claims of set-off or other defenses or counterclaims other than normal cash discounts accrued in the ordinary course of business consistent with past practice; (c) were created in accordance with all applicable laws and professional ethics pursuant to a validly existing and enforceable engagement letter for services between Seller and the accounts listed on Schedule 1.1; and (d) Seller has received at least one (1) payment in full from all accounts listed on Schedule 1.1.

3.12    Taxes.  Seller and LPG have filed all returns of income taxes required to be filed by it and all returns of other taxes required to be filed by it and has paid or provided for all taxes shown to be due on such returns (whether or not shown on or reportable on such returns) and with respect to any period prior to the Effective Date.  All such returns and reports filed are true, correct and complete in all material respects.

3.13    No Material Adverse Change.  There has not been any material adverse change in the business, operations, properties, prospects, assets, or condition of Seller or LPG, and no event has occurred or circumstance exists that may result in such a material adverse change.

3.14    Right of First Offer.    Seller and LPG grant to the Buyer a right of first offer to purchase any cash flow stream representing an interest in customer payments for debt validation services owned now, or later acquired by, Seller. Seller shall present Buyer with a written list of cash flows for consideration to be sold by Seller, which shall be presented to Buyer without price markups and on the same terms as originally presented by LPG. Buyer shall have five (5) days after receipt of such list to accept or decline purchase of such cash flows. Should Buyer decline any presented cash flow stream, it may be sold to third-parties for a

Exhibit 3
Page 59

DocuSign Envelope ID: 71D3C62C-D814-4EAB-86D2-E86ED82262D7

period of thirty (30) days on identical economic terms as were presented to Buyer. After the thirty (30)-day period or upon any change in economic terms of the offering, the Buyer's rights under this Section 3.14 shall be renewed as to such cash flow.

3.15   <u>Disclosure</u>.  Seller has provided Buyer with all the information Buyer has requested for deciding whether to acquire the Acquired Assets.  No representation or warranty of Seller contained in this Agreement contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein or therein not misleading in light of the circumstances under which they were made.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller, as of the Effective Date and as of the Closing Date, as follows:

4.1   <u>Organization</u>.  Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware.

4.2   <u>Authority</u>.  Buyer has the requisite power and authority to execute, deliver and perform all of its obligations, covenants and agreements contained in this Agreement and all documents, instruments and other writings to be executed and/or delivered by Buyer pursuant to this Agreement.

4.3   <u>Enforceability.</u>  This Agreement constitutes, and the other documents to be executed and delivered by Buyer hereunder will constitute when executed and delivered by Buyer, (assuming the due authorization, execution and delivery by the other parties hereto and thereto) legal, valid and binding obligations of Buyer enforceable against it in accordance with their respective terms.

## ARTICLE V
## PRE-CLOSING COVENANTS

5.1   <u>General</u>.  Between the Effective Date and the Closing Date each of the Parties will use its reasonable best efforts to take all action and to do all things necessary in order to consummate and make effective the Transaction (including satisfaction, but not waiver, of the closing conditions set forth in this Agreement), including, without limitation, compliance with and observance of the terms and conditions set forth in this Article V.

5.2   <u>Notices and Consents</u>.  Seller and LPG will make or give, as the case may be, any filings or notices to third parties, and they will use their reasonable best efforts to obtain any third-party consents required or otherwise necessary to be obtained by them in connection with the consummation of the Transaction.

5.3   <u>Preservation of Business</u>.  Seller will keep the Acquired Assets and its business substantially intact, including its present operations, working conditions, and relationships with lessors, licensors, suppliers, customers, and employees.

5.4   <u>Notice of Developments</u>.  Each Party will give prompt written notice to the other Party of any material adverse development causing a breach of any of its own representations and warranties in Articles III and Article IV hereof; *provided, however*, that no such disclosure will be deemed to amend or supplement the Schedules attached hereto or to prevent or cure any misrepresentation, breach of warranty, or breach of covenant by such Party.

- 4 -

Exhibit 3
Page 60

DocuSign Envelope ID: 71D3C62C-D814-4EAB-86D2-E86ED82262D7

5.5   <u>Exclusivity</u>. Seller or LPG will not: (i) solicit, initiate, or encourage the submission of any proposal or offer from any third party relating to the acquisition of the Acquired Assets, or (ii) participate in any discussions or negotiations regarding, furnish any information with respect to, assist or participate in, or facilitate in any manner any effort or attempt by any third party to do or seek any of the foregoing.

**ARTICLE VI**
**CONDITIONS TO CLOSING; CLOSING**

6.1   <u>Conditions Precedent to Obligations of Buyer</u>. Unless otherwise waived by Buyer, the obligations of Buyer to consummate the Transaction pursuant to this Agreement are subject to satisfaction of the following conditions precedent on or before the Closing Date:

(a)      the representations and warranties of Seller set forth in this Agreement shall be true and correct at and as of the Closing Date;

(b)      Seller and LPG shall have performed and complied with all of their respective covenants hereunder through the Closing;

(c)      Buyer shall be satisfied, in its sole discretion, with the results of its due diligence investigation into the Acquired Assets and the operations of Seller;

(d)      Seller shall have executed, acknowledged (where appropriate) and delivered all documents and instruments required hereunder to be delivered by them at or prior to Closing, including, but not limited to, the documents set forth in Section 6.4; and

(e)      there shall not have been, since the Effective Date, any material adverse change in the businesses, operations, properties, prospects, assets, or condition of Seller or LPG.

6.2   <u>Conditions Precedent to Obligations of Seller</u>. Unless otherwise waived by Seller, the obligations of Seller to consummate the Transaction pursuant to this Agreement are subject to satisfaction of the following conditions precedent on or before the Closing Date:

(a)      the representations and warranties of Buyer set forth in this Agreement shall be true and correct at and as of the Closing Date;

(b)      Buyer shall have performed and complied with all of its covenants under this Agreement through the Closing; and

(c)      Buyer shall have executed, acknowledged (where appropriate) and delivered all documents and instruments required hereunder to be delivered by it at or prior to Closing, including, but not limited to, the documents set forth in Section 6.5.

6.3   <u>Closing</u>. Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, the closing of the Transaction (the "***Closing***") will take place upon the execution and delivery of this Agreement and the documents listed in Section 6.4; or at such other date and place as the Parties may determine (the "***Closing Date***").

6.4   <u>Closing Deliveries of Seller</u>. At the Closing, Seller will deliver to Buyer: (i) a bill of sale, assignment and assumption agreement, conveying all of the Acquired Assets, duly executed by Seller substantially in the form listed in <u>Schedule 6.4</u>; and (ii) such other documents as Buyer may reasonably request for the purpose of facilitating the consummation or performance of the Transaction.

Exhibit 3
Page 61

6.5     <u>Closing Deliveries of Buyer</u>.  At the Closing, Buyer will deliver to Seller: (i) the Cash Payment; (ii) the bill of sale, assignment and assumption agreement described in Section 6.4, duly executed by Buyer substantially in the form listed in <u>Schedule 6.4</u>; and (iii) such other documents as Seller may reasonably request for the purpose of facilitating the consummation or performance of the Transaction.

**ARTICLE VII**
**POST-CLOSING COVENANTS**

7.1     <u>Confidentiality</u>.

(a)     Seller agrees not to disclose or permit the disclosure of any of the terms of this Agreement or of any other confidential, non-public or proprietary information relating to the Buyer or the business of the Buyer or any subsidiary thereof (collectively, "***Confidential Information***"); provided that such disclosure may be made (a) to any person who is a member, partner, officer, investor, director or employee, directly or indirectly, of Seller or counsel to, or accountants of, Seller solely for their use and on a need-to-know basis, (b) with the prior consent of the Buyer, (c) subject to the next paragraph, pursuant to a subpoena or order issued by a court, arbitrator or governmental body, agency or official, or (d) to any governmental or regulatory authority, body or agency pursuant to applicable laws, rules or regulations as reasonably determined by the Seller.

(b)     In the event that Seller shall receive a request to disclose any Confidential Information under a subpoena or order or examination, Seller shall to the extent legally practicable (a) promptly notify Buyer, (b) consult with Buyer on the advisability of taking steps to resist or narrow such request, and (c) if disclosure is required or deemed advisable, cooperate with Buyer in any attempt it may make to obtain an order or other assurance that confidential treatment will be accorded the Confidential Information that is disclosed.

(c)     Notwithstanding the preceding two paragraphs of this Section 7.1, neither the Seller nor LPG shall issue or publish any information about the formation or existence of the Buyer without the approval of Buyer.

7.2     <u>Payment of All Taxes Resulting From Sale of Acquired Assets</u>.  Seller will pay in a timely manner all taxes assessed by any taxing authority resulting from or payable in connection with the sale of the Acquired Assets pursuant to this Agreement.

7.3     <u>Joint Post-Closing Covenant of the Parties</u>.  The Parties jointly covenant and agree that, from and after the Closing, they will each use commercially reasonable efforts to cooperate with each other in connection with any action, suit, proceeding, investigation or audit of the other relating to (i) the preparation of an audit of any tax return of Seller for all periods prior to or including the Closing, and (ii) any audit of Buyer and/or any audit of Seller with respect to the sales, transfer and similar taxes imposed by the laws of any state or political subdivision thereof, relating to the Transaction.  In furtherance hereof, the Parties further covenant and agree to promptly respond to all reasonable inquiries related to such matters and to provide, to the extent reasonably possible, substantiation of transactions and to make available and furnish appropriate documents and personnel in connection therewith.  All costs and expenses incurred in connection with this Section 7.3 will be borne by Seller and LPG.

7.4     <u>Customer and Other Business Relationships</u>.  After the Closing, Seller will cooperate with Buyer, in its efforts to continue and maintain for the benefit of Buyer those business relationships of Seller existing prior to the Closing and relating to the Acquired Assets as operated by Buyer after the Closing, including relationships with lessors, employees, regulatory authorities, licensors, customers, suppliers and others. Seller will not take any action that would tend to diminish the value of the Acquired Assets after the Closing

- 6 -

Exhibit 3
Page 62

DocuSign Envelope ID: 71D3C62C-D814-4EAB-86D2-E86ED82262D7

or that would interfere with the business as operated by Buyer after the Closing, including disparaging the name or business of Buyer.

7.5    <u>Fees and Expenses</u>.  Except as otherwise expressly provided herein, each Party hereto will pay its own legal, accounting and other fees, costs and expenses incurred by such Party in connection with the negotiation of this Agreement and the consummation of the Transaction.

7.6    <u>Substitution of LPG</u>. Buyer, in its sole discretion, may appoint an alternate servicer for the Acquired Assets to substitute for LPG.

7.7    <u>Further Assurances</u>.  After the Closing Date, the Parties will cooperate reasonably with each other and with their respective representatives in connection with any steps required to be taken as part of their respective obligations under this Agreement, and will (i) furnish upon request to each other such further information, (ii) execute and deliver to each other such other documents, and (iii) do such other acts and things, all as the other party may reasonably request for the purpose of carrying out the intent of this Agreement and the Transaction.

**ARTICLE VIII**
**SURVIVAL; INDEMNIFICATION**

8.1    <u>Representations and Warranties to Survive</u>.  The representations and warranties made by the Parties in this Agreement will survive the execution and delivery of this Agreement until this Agreement is terminated by a mutual written instrument executed by the Parties.

8.2    <u>Indemnification by Seller and LPG</u>.  Seller and LPG will indemnify and hold harmless Buyer and its members, managers, officers, employees and agents from, against, and in respect of, any loss, liability, claim, demand, or expenses, including, without limitation, reasonable attorneys' fees and expenses (all of the foregoing, collectively, "***Losses***") arising out of or resulting from any of the following:

(a)    Any inaccuracy in or breach of any representation or warranty of Seller or LPG in this Agreement or any other agreement or document executed and delivered by Seller pursuant to this Agreement;

(b)    Any breach of or failure to fulfill any agreement or covenant of Seller or LPG under this Agreement or under any other agreement or document executed and delivered by Seller or LPG pursuant to this Agreement;

(c)    any Tax claim asserted against Buyer with respect to any taxes relating to the Acquired Assets or the operations of Seller or LPG's business attributable to periods prior to the Closing; and

(d)    Any and all actions, suits, proceedings, demands, assessments, judgments, reasonable and necessary costs and legal and other expenses incident to any of the foregoing.

8.3    <u>Indemnification by Buyer</u>.  Buyer will indemnify and hold harmless Seller from, against, and in respect of, any Losses arising out of or resulting from any of the following:

(a)    Any inaccuracy in or breach of any representation or warranty of Buyer in this Agreement or any other agreement or document executed and delivered by Buyer pursuant to this Agreement;

(b)    Any breach of or failure to fulfill any agreement or covenant of Buyer under this Agreement or under any other agreement or document executed and delivered by Buyer pursuant to this Agreement; and

Exhibit 3
Page 63

(c)    Any and all actions, suits, proceedings, demands, assessments, judgments, reasonable and necessary costs and legal and other expenses incident to any of the foregoing.

All costs and expenses incurred in connection with this Section 8.3 will be reimbursed to Buyer by Seller and LPG.

8.4    <u>Indemnity Procedures</u>.  In case any claim, demand or action will be brought by any third party against a Party entitled to indemnity under this Article VIII, such Party will promptly notify the other Party from whom indemnity is sought in writing and the indemnifying Party will assume the defense thereof, including the employment of counsel.  In addition, in case a Party will become aware of any facts which might result in any such claim, demand or action, such Party will promptly notify the other Party who would be obligated to provide indemnity hereunder with respect to such claim, demand or action, and such other Party will have the right to take such action as it or they may deem appropriate to resolve such matter. Seller, on the one hand, and Buyer, on the other hand, will each make available to the indemnifying Party any non-privileged documents, materials and information in its possession that may be necessary to the defense of any such claim, demand or action.  The indemnified Party will have the right to employ separate counsel in any such action and to participate in the defense thereof, but the fees and expenses of such counsel will be at the expense of such indemnified Party, unless the employment of such counsel has been specifically authorized in writing by the indemnifying Party or unless the indemnifying Party fails to assume and diligently pursue the defense as required above.  The indemnifying Party will not be liable for any settlement of any action effected without its written consent, but if settled with the written consent of the indemnifying Party or if there will be a final judgment for the plaintiff in any such action, the indemnifying Party will indemnify and hold harmless the indemnified Party from and against any loss or liability by reason of such settlement or judgment.  Notwithstanding anything herein to the contrary, the indemnifying Party will not, without the written consent of the indemnified Party, settle or compromise any such action or claim or consent to the entry of any judgment in respect of any such action or claim which does not include as an unconditional term thereof the giving by the claimant to the indemnified Party of an unconditional release from all liability with respect to such action or claim.

## ARTICLE IX
## MISCELLANEOUS

9.1    <u>Notices</u>.  All notices and other communications under this Agreement must be in writing and will be deemed to have been duly given if delivered personally, sent by facsimile or mailed, by certified mail, return receipt requested, first-class postage prepaid, to the Parties at the addresses listed on the signature page(s) of this Agreement or such other addresses as will be furnished by like notice by such Party.  All notices and other communications required or permitted under this Agreement that are addressed as provided in this Section 9.1 will (i) if delivered personally, be deemed given upon delivery, (ii) if delivered by facsimile, be deemed delivered when confirmed, and (iii) if delivered by mail in the manner described above, be deemed given upon receipt.

9.2    <u>Expenses</u>.  Except as otherwise provided in this Agreement, all legal and other costs and expenses incurred in connection with this Agreement and the Transaction will be paid by the Seller and LPG. Any costs and expenses incurred by Buyer in connection with this Agreement and the transaction will be reimbursed by Seller and LPG.

9.3    <u>Successors and Assigns</u>.  This Agreement will not be assignable by Seller or LPG without the prior written consent of the Buyer.  This Agreement may be assigned by Buyer in its sole discretion. This Agreement will inure to the benefit of and be binding upon the Parties, and their successors and permitted assigns.

Exhibit 3
Page 64

9.4     Entire Agreement; Amendment; Waiver.   This Agreement and the other instruments and agreements referred to herein embody the entire agreement of the Parties with respect to the subject matter hereof and supersede all prior agreements.  This Agreement may be amended, and any provision hereof waived, but only in writing signed by the Party against whom such amendment or waiver is sought to be enforced.  A waiver on one occasion will not be deemed to be a waiver of the same or any other breach on a future occasion.

9.5     Severability.  Any term or provision of this Agreement which is held to be invalid or unenforceable will be ineffective only to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement.  If any restriction or limitation in this Agreement is found by a court of competent jurisdiction to be unreasonable, onerous or unduly restrictive, such restriction or limitation will remain effective to the maximum extent permissible within reasonable bounds.

9.6     Captions.  The captions herein are inserted for convenience or reference only will be ignored in the construction or interpretation hereof.

9.7     Submission to Jurisdiction.  To the extent a dispute is not resolved in arbitration as set forth in Section 9.9 (the "***Arbitration Agreement***"), the Parties hereby agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort or otherwise, shall be brought in the United States District Court for the Western District of Texas, Austin Division. Each of the Parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding that is brought in any such court has been brought in an inconvenient form. Service of process, summons, notice or other document by registered mail to the address set forth in Section 9.9 shall be effective service of process for any suit, action or other proceeding brought in any such court.

9.8     WAIVER OF JURY TRIAL; ARBITRATION.

(a)     EACH PARTY HERETO HEREBY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

(b)     Binding Arbitration.

(i)                     This Section 9.9(b) shall be referred to as the "***Arbitration Agreement***." Upon demand of any Party, whether made before or after institution of any judicial proceeding, any dispute, claim or controversy arising out of, connected with or relating to this Agreement ("***Disputes***")[1], between or among the Parties hereto, related third parties, and the Parties' respective employees, agents, representatives, affiliates, beneficiaries, related entities and assigns, shall be resolved by binding arbitration as provided herein.  Institution of a judicial proceeding by a party does not waive the right of that party to

---

[1]     The following is not covered under this Arbitration Agreement: disputes or any portion thereof that an applicable federal statute expressly states cannot be arbitrated or cannot be the subject of a pre-dispute arbitration agreement.

Exhibit 3
Page 65

demand arbitration hereunder.  This Arbitration Agreement is intended to be as broad as legally permissible. Disputes may include, but are not limited to, tort claims, counterclaims, claims arising from ancillary Agreements or related-party agreements executed in the future, disputes as to whether a matter is subject to arbitration, or claims concerning any aspect of the past, present or future relationships arising out of or connected with this Agreement.  The Arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the validity, scope, applicability, enforceability, or waiver of this Arbitration Agreement including, but not limited to, any claim that all or any part of this Arbitration Agreement is void or voidable.  The obligation to arbitrate any Dispute will survive the satisfaction in full of all obligations under this Agreement and the termination of this Agreement, any Ancillary Agreements, and/or any Related-Party Agreement for any reason.  The parties hereto do not waive any applicable federal or state substantive law except as provided herein.  A judgment upon the award may be entered in any court having jurisdiction.

(ii)                              This Arbitration Agreement is governed by the FAA (9 U.S.C. § 1 et seq.). Unless otherwise agreed in writing by the parties, and notwithstanding any conflicting choice of law provision in any of the agreements between the Parties, Delaware law shall control the interpretation, application, and enforcement of this Agreement; provided, however, the Federal Arbitration Act will be applied to the Arbitration Agreement.  In reaching any determination or award, the Arbitrator shall apply the substantive laws of the State of Delaware and the applicable laws of the United States of America, without giving effect to any principles of conflict of laws under the laws of the State of Delaware, to all Disputes covered by this Arbitration Agreement.  Any arbitration proceeding will be conducted by the American Arbitration Association (the "AAA"), or such other administrator as the parties shall mutually agree upon.  Any arbitration proceeding shall be conducted in accordance with the AAA Commercial Arbitration Rules, including the AAA Emergency Procedures for Protection,  unless the claim or counterclaim is at least one million dollars ($1,000,000) exclusive of claimed interest, arbitration fees and costs, in which case the AAA's optional procedures for large, complex commercial disputes shall also apply (the commercial dispute resolution procedures and the optional procedures for large, complex commercial disputes to be referred to, as applicable, as the "*Arbitration Rules*").  Any arbitration shall proceed in a location in Austin, Texas selected by the AAA.  The expedited procedures set forth in Sections E-1 through E-10, et seq. of the Arbitration Rules shall be applicable to claims of less than one million dollars ($1,000,000).  All applicable statutes of limitations shall apply to any Dispute.  Either party may file dispositive motions, including without limitation a motion for summary judgment, and the Arbitrator(s) will apply the standards governing such motions under the Federal Rules of Civil Procedure. Each Party may take the deposition of four individual fact witnesses and any expert witness designated by another Party. Each Party also may propound requests for production of documents and ten (10) interrogatory requests to the other Party. And, each Party shall have the right to subpoena witnesses and documents for discovery or the arbitration hearing, including testimony and documents relevant to the case from third parties, in accordance with any applicable state or federal law (including, without limitation, pursuant to California Code of Civil Procedure § 1283.05). Additional discovery may be conducted by mutual stipulation, and the Arbitrator(s) will have exclusive authority to entertain requests for additional discovery, and to grant or deny such requests, based on the Arbitrator(s)'s determination whether additional discovery is warranted by the circumstances of a particular case.  If there is any inconsistency between the terms hereof and the Arbitration Rules, the terms and procedures set forth herein shall control.  Subject to applicable law as determined by the Arbitrator(s), any party who fails or refuses to submit to arbitration following a demand by any other Party shall bear all costs and expenses incurred by such other Party in compelling arbitration of any Dispute.  Notwithstanding anything in the foregoing to the contrary, any arbitration proceeding demanded hereunder shall begin within ninety (90) days of the appointment of the Arbitrator(s) and shall be concluded within one hundred and twenty (120) days after such appointment, unless otherwise mutually agreed in writing by the Parties.  These time limitations may not be extended unless a Party hereto shows cause for extension and then such extension shall not exceed a total of sixty (60) days, unless otherwise mutually agreed in writing by the Parties.

Exhibit 3
Page 66

(iii)                    Any arbitration proceeding in which the amount in controversy is five million dollars ($5,000,000) or less will be decided by a single arbitrator who shall not render an award of greater than five million dollars ($5,000,000) (the "Arbitrator").  Any dispute in which the amount in controversy exceeds five million dollars ($5,000,000) shall be decided by majority vote of a panel of three arbitrators (the "Arbitrators").

(iv)                    The Arbitrator(s) must have at least ten (10) years of relevant legal experience as an attorney or a judge and be knowledgeable in the subject matter of the dispute.  The Parties shall select the Arbitrator(s) by mutual agreement.  If the Parties are unable to mutually select an arbitrator, the Arbitrator(s) shall be selected as follows:

(a)      To the extent the arbitration is conducted by a single arbitrator (as set forth above), AAA will give each party a list of nine (9) arbitrators (who are subject to the qualifications listed above) drawn from its panel of arbitrators. Each Party will have ten (10) calendar days to strike all names on the list it deems unacceptable. If only one common name remains on the lists of all Parties, that individual will be designated as the Arbitrator. If more than one common name remains on the lists of all Parties, the Parties will strike names alternately from the list of common names by telephone conference administered by AAA, with the claimant to strike first until only one remains. If no common name remains on the lists of all parties, AAA will furnish an additional list of nine (9) arbitrators from which the Parties will strike alternately by telephone conference administered by AAA, with the claimant to strike first, until only one name remains. That person will be designated as the Arbitrator. If the individual selected cannot serve, AAA will issue another list of nine (9) arbitrators and repeat the alternate striking selection process.

(b)      To the extent the arbitration is conducted by a panel of three arbitrators (as set forth above), AAA will give each Party a list of twenty-seven (27) arbitrators (who are subject to the qualifications listed above) drawn from its panel of arbitrators. Each Party will have ten (10) calendar days to strike all names on the list it deems unacceptable. Any common names remaining will be designated as the Arbitrators.  To the extent more than three common names remains on the lists of all parties, the Parties will strike names alternately from the list of common names by telephone conference administered by AAA, with the claimant to strike first until only three remain. If less than three common names remain on the lists of all Parties, AAA will furnish an additional list of arbitrators (9 for each arbitrator that remains to be selected) from which the Parties will strike alternately by telephone conference administered by AAA, with the claimant to strike first, until the number of arbitrators needed to comprise the three-arbitrator panel remain. Those persons will be designated as the Arbitrators. If any individual selected cannot serve, AAA will issue another list of nine (9) arbitrators and repeat the alternate striking selection process.

(v)                    Notwithstanding the preceding binding arbitration provisions, the Parties hereto preserve, without diminution, certain remedies that such persons may employ or exercise freely, either alone, in conjunction with or during a Dispute.  Each such person shall have and hereby reserves the right to proceed in any court of proper jurisdiction or by self-help to exercise or prosecute the following remedies, as applicable:  (A) all rights to foreclose against any real or personal property or other security by exercising a power of sale granted in any agreement or under applicable law or by judicial foreclosure and sale, including a proceeding to confirm the sale, (B) all rights of self-help including peaceful occupation of property and collection of rents, set off, and peaceful possession of property, (C) obtaining provisional

- 11 -

Exhibit 3
Page 67

DocuSign Envelope ID: 71D3C62C-D614-4EAB-86D2-E86ED82262D7

or ancillary remedies including injunctive relief, sequestration, garnishment, attachment, appointment of receiver and in filing an involuntary bankruptcy proceeding, and (D) when applicable, a judgment by confession of judgment.  Preservation of these remedies does not limit the power of an arbitrator to grant similar remedies that may be requested by a party in a Dispute.

(vi)                          The Parties agree there will be no right or authority for any dispute to be brought, heard or arbitrated as a class, collective and/or consolidated action (the "Class Action Waiver"). Nor shall any Arbitrator have the authority to hear or arbitrate any such dispute, regardless of any other language in this Arbitration Agreement, or any provision of any of the rules or procedures of the AAA that might otherwise apply including, without limitation, the AAA Supplemental Rules for Class Action Arbitration.  Notwithstanding the broad delegation to the Arbitrator(s) to resolve arbitrability disputes, no Arbitrator shall have the right to interpret the extent, applicability and/or enforceability of this Class Action Waiver; rather, any issue or dispute as to whether this Agreement permits such class, collective and/or consolidated action arbitration shall be resolved and/or interpreted solely by a court of competent jurisdiction.  This Class Action Waiver shall be severable from this Arbitration Agreement if there is a final judicial determination that the Class Action Waiver is invalid, unenforceable, unconscionable, void or voidable.  In such instances, the class or collective action must be litigated in court—not in arbitration.

(vii)                         Other than as set forth in the Class Action Waiver, if any provision of this Arbitration Agreement is adjudged to be invalid, unenforceable, unconscionable, void or voidable, in whole or in part, such adjudication will not affect the validity of the rest of the Arbitration Agreement; all remaining provisions will remain in effect.

9.9      Drafting.  Each of the Parties acknowledges that it was actively involved in the negotiation and drafting of this Agreement and that no law or rule of construction will be raised or used in which the provisions of this Agreement will be construed in favor or against any Party because one Party is deemed to be the author thereof.

9.10     Counterparts.  This Agreement, and any amendments hereto, may be executed by facsimile signature and in multiple counterparts, each of which will be deemed an original but all of which together will constitute one and the same instrument.

[Remainder of Page Intentionally Left Blank]

Exhibit 3
Page 68

DocuSign Envelope ID: 71D3C63C-D814-4EAB-86D2-E86ED82262D7

IN WITNESS WHEREOF, this Agreement has been executed on behalf of each of the Parties as of the Effective Date set forth above.

**SELLER:**

Integrity Doc Solution, a Florida limited liability company

By: _Richard Nodelman_
      ⎯⎯11F05BCD088F742A⎯⎯
Name:  Richard Nodelman
Title:   Member

Address of Seller:

964 Cypress Dr
Delray Beach, FL 33483

**BUYER:**

PURCHASECO80, LLC, a Delaware limited liability company

By:     Litigation Practice Group, PC, its manager

         By: _Daniel S March_
                9D494DB1993341E⎯
           Daniel S. March, *Managing Shareholder*

     By:     OHP – LPG, LP, member

         By:     Old Hickory Fund I GP, LLC, its general partner

            By: _Adam Blum_
                AEFD0C515ACC44E⎯
              Adam C. Blum, *Manager*

**ACKNOWLEDGED AND AGREED TO:**

**LPG:**

Litigation Practice Group, PC, a California professional corporation

By: _Daniel S March_
    9D494DB1993341E⎯
   Daniel S. March, *Managing Shareholder*

SIGNATURE PAGE
TO
ASSET PURCHASE AGREEMENT

Exhibit 3
Page 69

<u>Schedule 1.1</u>

**Accounts Receivable**

See attached

<u>Schedule 2.1</u>

**Wiring Instructions**

**Account Holder Name: Integrity Docs**

**Address:** ███████ ████████████████

**Routing Number:** ████████

**Account Number:** ████████

<u>Schedule 6.4</u>

**Form of Bill of Sale, Assignment and Assumption Agreement**

This Bill of Sale and Assignment and Assumption Agreement (the "**Bill of Sale**"), effective as of September 22, 2022 (the "**Effective Date**"), is by and between Integrity Docs LLC, a Florida limited liability company ("**Seller**"), and PurchaseCo80, LLC, a Delaware limited liability company ("**Buyer**").

**WHEREAS**, Seller and Buyer have entered into a certain Asset Purchase Agreement, dated as of September 22, 2022 (the "**Purchase Agreement**"), pursuant to which, among other things, Seller has agreed to assign all of its rights, title and interests in, and Buyer has agreed to assume all of Seller's rights, interest, and title under, the Acquired Assets (as defined in the Purchase Agreement).

**NOW, THEREFORE**, in consideration of the mutual covenants, terms, and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    <u>Definitions</u>. All capitalized terms used in this Bill of Sale but not otherwise defined herein are given the meanings set forth in the Purchase Agreement.

2.    <u>Assignment and Assumption</u>. Seller hereby sells, assigns, grants, conveys and transfers to Buyer all of Seller's right, title and interest in and to the Acquired Assets. Buyer hereby accepts such assignment and assumes all of Seller's rights, title, and interest, free of any liens under the Acquired Assets accruing on and after the Effective Date.

3.    <u>Terms of the Purchase Agreement</u>. The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements and indemnities relating to the Acquired Assets are incorporated herein by this reference. The parties hereto acknowledge and agree that the representations, warranties, covenants, agreements and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

4.    <u>Governing Law</u>. This Bill of Sale shall be governed by and construed in accordance with the internal laws of the State of Texas without giving effect to any choice or conflict of law provision or rule.

5.    <u>Counterparts</u>. This Bill of Sale may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Bill of Sale delivered by facsimile, email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Bill of Sale.

[*Signature page follows.*]

SCHEDULE 6.4
FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

Exhibit 3
Page 72

DocuSign Envelope ID: 71D3C68C-D814-4EAB-86D2-E85ED82262D7

IN WITNESS WHEREOF, this Bill of Sale has been executed on behalf of each of the Parties as of the Effective Date set forth above.

**SELLER:**

Integrity Docs LLC, a Florida limited liability company

By: _____

Name:  Richard Nodelman
Title:  Member

**BUYER:**

PURCHASECO80, LLC, a Delaware limited liability company

By:        Litigation Practice Group, P.C., its manager

      By: _____

      Daniel S. March, *Managing Shareholder*

By:        OHP – LPG, LP, member

      By:        Old Hickory Fund I GP, LLC, its general
      partner

      By: _____

      Adam C. Blum, *Manager*

SCHEDULE 6.4
FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

Exhibit 3
Page 73

# EXHIBIT 4

Exhibit 4
Page 74

DocuSign Envelope ID: 4B9E9B0B-A846-4E73-906A-9A96F9993C85

**ACCOUNTS RECEIVABLE PURCHASE AGREEMENT**

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is made as of October 6, 2022 (the "**Agreement Date**"), by and between Marich Bein LLC (collectively the "**Buyer**"), and Integrity Docs LLC (the "**Seller**" or "**LPG**", and together with the Buyer, the "**Parties**"), and The Litigation Practice Group PC ("LPG").

**RECITALS**

WHEREAS, in the regular course of business, the Seller originates account receivables from **LPG** in connection with client on-boarding services provided by the Seller to LPG and its affiliates;

WHEREAS, the account receivables represent an obligation of various clients to pay Seller for services that Seller previously provided, but which LPG shall provide from the date of execution of this Agreement;

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables (the "**Purchased Accounts**").

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

**ARTICLE 1.**
**DEFINITIONS**

Section 1.1    Certain Definitions.  Certain defined terms used in this Agreement are set forth on **Exhibit A**.

**ARTICLE 2.**
**ASSIGNMENT AND TRANSFER AND CONSIDERATION**

Section 2.1    Assignment of the Purchased Accounts to the Buyer.  Upon execution of this Agreement and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all of the Seller's right, title, and interest in and to the Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens.  Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the "**Excluded Assets**").

Section 2.2    No Assumption of Liabilities.  The Buyer shall not assume any Liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the "**Excluded Liabilities**").

Section 2.3    Payment of Purchase Price.  Buyer shall pay $18,340.93 (total purchase price) for the Purchased Accounts (the "**Purchase Price**") by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in **Schedule 2.3** (the "**Wire Instructions**").  The Purchased Accounts are set forth on the attached spreadsheet.

Section 2.4    Guarantee of LPG.  If any file acquired by buyer shall fail to make a first payment, LPG will replace the file and bear any cost associated with such replacement.  The replacement file shall yield no less than the receivable of the failed file.  In addition, if any any calendar month a total of less than 80% of files make a cleared payment, LPG shall replace any non-performing files in such month so that the performance of the file package as a whole equals 80%.  This guarantee shall continue until the completion of the 24th month following execution of this agreement.

Exhibit 4
Page 75

DocuSign Envelope ID: 43BE9B0B-A846-4E73-906A-9A96F9993C85

## ARTICLE 3.
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1    Organization; Good Standing.  The Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the Laws of the State of Delaware and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2    Power and Authority.  The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.3    Title to, and Sufficiency of, the Purchased Accounts.  The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all of the Purchased Accounts, free and clear of all Liens.

Section 3.4    Consents.  The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.5    No Conflicts. The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

Section 3.6    Compliance with Laws.  The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.

Exhibit 4
Page 76

DocuSign Envelope ID: 43BE9B0B-A846-4E73-906A-9A96F9993C85

Section 3.7    Legal Proceedings.  There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements.  No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.8    Condition of Purchased Accounts.  Each Purchased Account shall have received no less than one processed payment.

Section 3.9    Confidentiality.  Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the "**Confidential Information**").  Seller will at all times keep the  Confidential Information in confidence and trust.  Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer.  Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions.  Seller agrees that violation of this Section 3.9.  The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

## ARTICLE 4.
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1    Organization; Good Standing.  The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Florida.

Section 4.2    Power and Authority.  The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 4.3    No Conflicts.  The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give

Exhibit 4
Page 77

DocuSign Envelope ID: 43DE9B0B-A846-4E78-906A-9A96F9983C85

rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4    <u>Sufficient Funds</u>.  The Buyer has, and will have, sufficient funds available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

**ARTICLE 5.**
**COVENANTS**

Section 5.1    <u>Appropriate Actions</u>.

(a)    <u>General</u>.  Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

**ARTICLE 6.**
**CLOSING**

Section 6.1    <u>Closing</u>.  The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing.  The date on which the Closing occurs is hereinafter referred to as the "**Closing Date.**" The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2    <u>Closing Deliverables of the Seller</u>.  At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer:  (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **<u>Exhibit B</u>** (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3    <u>Closing Deliverables of the Buyer</u>.  At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to <u>Section 6.2</u>, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4    <u>Indemnification by the Seller</u>.  Subject to the limitations set forth in this <u>Article 6</u>, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or

Exhibit 4
Page 78

DocuSign Envelope ID: 4BE9B0B-A846-4E73-906A-9A96F9993C85

obligation to be performed by the Seller pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability.

Section 6.5    <u>Indemnification by the Buyer</u>.  Subject to the limitations set forth in this <u>Article 6</u>, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurance related to the Purchased Accounts or Buyer occurring after the Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.6    <u>Indemnification Procedures</u>.

(a)    <u>No Restraints</u>.  Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, <u>provided</u>, <u>however</u>, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim.  The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; <u>provided</u>, <u>however</u>, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred.  In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense.  The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b)    No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim.  An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the

DocuSign Envelope ID: 4DBE9B0B-A846-4E72-906A-9A96F9983C85

Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c)    If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**").  Such Notice of Claim shall specify the basis for such Direct Claim.  The failure by any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this Section 6.6(c).  If the Indemnifying Party does not notify the Indemnified Party within thirty days following its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this Article 6 or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this Article 6, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined.  In the event that the Indemnifying Party has timely disputed its Liability with respect to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

## ARTICLE 7.
## MISCELLANEOUS

Section 7.1    Entire Agreement; Amendment.  This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof.  This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2    Waivers.  The rights and remedies of the Parties to this Agreement are cumulative and not alternative.  To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for which it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3    Notices.  All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission. A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

DocuSign Envelope ID: 43BE9B0B-A846-4E78-906A-9A96F9983C85

Section 7.4    <u>Successors and Assigns</u>.  This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns.  Neither this Agreement nor any rights or obligations of a Party hereunder shall be assigned by a Party (unless to an Affiliate of such Party) without the prior written consent of the other Parties.  This Agreement will be binding upon any permitted assignee of any Party.  No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5    <u>Public Disclosure</u>.  Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6    <u>Expenses and Fees</u>.  Whether or not the Closing occurs, all fees and expenses incurred in connection with this transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.

Section 7.7    <u>Specific Performance</u>.  The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

Section 7.8    <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.9    <u>Governing Law</u>.  This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws principles.

Section 7.10    <u>Severability</u>.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 7.11    <u>Construction</u>.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

Exhibit 4
Page 81

DocuSign Envelope ID: 4BDE9B0B-A846-4E73-906A-9A96F9993C85

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

**Marich Bein LLC**

By: _____
    Name:
    Title:

**SELLER:**

**Integrity Docs LLC**

By: _Richard Nodelman_____
    Name: Richard Nodelman
    Title: Member

**APPROVAL OF ASSIGNMENT AND GUARANTEE**

The assignment of the Purchased Accounts set forth in this Agreement as well as the guarantee included therein is hereby approved, and with respect to the Purchased Accounts, the Buyer shall have all rights of Buyer as set forth in this agreement.

**The Litigation Practice Group P.C.**

By: _Daniel S March_____
    Name: Daniel S. March
    Title: Managing Shareholder

By: _Tony M Diab_____
    Name: Tony M. Diab

*[Signature Page to Accounts Receivable Purchase Agreement]*

Exhibit 4
Page 82

DocuSign Envelope ID: 4BBF9B0B-A846-4E73-906A-9A96F9983C85

**EXHIBIT A**

**DEFINITIONS**

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a)     "**Action**" shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b)     "**Agreement**" shall have the meaning set forth in the preamble to this Agreement.

(c)     "**Agreement Date**" shall have the meaning set forth in the preamble to this Agreement.

(d)     "**Affiliate**" shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii), with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals.  For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e)     "**Bill of Sale and Assignment and Assumption Agreement**" shall have the meaning set forth in Section 6.2.

(f)     "**Business**" shall mean the business of the Seller as conducted on the Agreement Date.

(g)     "**Buyer**" shall have the meaning set forth in the preamble to this Agreement.

(h)     "**Buyer Indemnified Parties**" shall have the meaning set forth in Section 6.4.

(i)     "**Closing**" shall have the meaning set forth in Section 6.1.

(j)     "**Closing Date**" shall have the meaning set forth in Section 6.1.

(k)     "**Direct Claim**" shall have the meaning set forth in Section 6.6(c).

(l)     "**Excluded Assets**" shall have the meaning set forth in Section 2.1.

(m)     "**Excluded Liabilities**" shall have the meaning set forth in Section 2.2.

(n)     "**Governmental Body**" shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

Exhibit 4
Page 83

DocuSign Envelope ID: 4B9F99DB-A846-4E73-996A-9A96F9983C85

(o)     "**Indebtedness**" means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p)     "**Indemnified Party**" shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q)     "**Indemnifying Party**" shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r)     "**Knowledge**" shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s)     "**Law**" shall mean any law, statute, ordinance, regulation, rule, code, notice requirement, court decision, or agency guideline, of any foreign, federal, state, or local Governmental Body.

(t)     "**Liabilities**" shall mean any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on- or off-balance sheet, or other.

(u)     "**Lien**" shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v)     "**Losses**" shall have the meaning set forth in Section 6.4.

(w)     "**Notice of Claim**" shall have the meaning set forth in Section 6.6(c).

(x)     "**Organizational Documents**" shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y)     "**Party**" or "**Parties**" shall have the meaning set forth in the preamble to this Agreement.

(z)     "**Permitted Liens**" shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(aa)     "**Person**" shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

Exhibit 4
Page 84

DocuSign Envelope ID: 4BBE9B0B-A846-4E73-906A-9A96F9993C85

(bb)    "**Purchase Price**" shall have the meaning set forth in <u>Section 2.3</u>.

(cc)    "**Purchased Accounts**" shall have the meaning set forth in the Recitals.

(dd)    "**Seller**" shall have the meaning set forth in the preamble to this Agreement.

(ee)    "**Seller Indemnified Parties**" shall have the meaning set forth in <u>Section 6.5</u>.

(ff)    "**Tax**" or "**Taxes**" shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(gg)    "**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(hh)    "**Third Party**" or "**Third Parties**" shall mean any Person other than the Parties or their respective Affiliates.

(ii)    "**Third-party Claim**" shall have the meaning set forth in <u>Section 6.6(a)</u>.

(jj)    "**Transaction Agreements**" shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(kk)    "**Upfront Cash Payment**" shall have the meaning set forth in <u>Section 2.3</u>.

(ll)    "**Wire Instructions**" shall have the meaning set forth in <u>Section 2.3</u>.

Exhibit 4
Page 85

DocuSign Envelope ID: 4BDF9B0B-A848-4E72-906A-9A96F9983C85

### EXHIBIT B

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this **"Agreement"**), is made by and between **Buyer**, and **Seller**.  Each of the Seller and the Buyer are sometimes referred to herein, individually, as a **"Party"** and, collectively, as the **"Parties."**

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the **"Purchase Agreement"**), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.    <u>Defined Terms</u>.  Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2.    <u>Sale of Purchased Accounts; Assignment</u>.  The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3.    <u>Further Assurances</u>.  Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

4.    <u>Terms of the Purchase Agreement</u>.  This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement.   The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference.  The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5.    <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Remainder of page intentionally left blank.]*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.


**BUYER:**

**Marich Bein LLC**


By: _____
    Name:
    Title:



**SELLER:**

**Integrity Docs LLC**

By: _____
    *Richard Nodelman*
    Name: Richard Nodelman
    Title: Member

DocuSign Envelope ID: 4B9E99DB-A846-4E78-806A-9A96F9993C85

**Schedule 2.3**
**Wire Instructions**

<u>**$18,340.93**</u>

**Account Holder Name: Integrity Docs**

**Address:** ███████████ █████████████████

**Routing Number:** ████████

**Account Number:** █████████

# EXHIBIT 5

Exhibit 5
Page 89

DocuSign Envelope ID: FBEEB5C0-F588-44C4-AE0E-522E8575C735

### ACCOUNTS RECEIVABLE PURCHASE AGREEMENT

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is made as of November 7, 2022 (the "**Agreement Date**"), by and between The Litigation Practice Group PC (collectively the "**Buyer**"), and Integrity Docs LLC (the "**Seller" or "LPG**", and together with the Buyer, the "**Parties**"), and The Litigation Practice Group PC ("LPG").

### RECITALS

WHEREAS, in the regular course of business, the Seller originates account receivables from **LPG** in connection with client on-boarding services provided by the Seller to LPG and its affiliates;

WHEREAS, the account receivables represent an obligation of various clients to pay Seller for services that Seller previously provided, but which LPG shall provide from the date of execution of this Agreement;

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables (the "**Purchased Accounts**").

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

### ARTICLE 1.
### DEFINITIONS

Section 1.1    Certain Definitions.  Certain defined terms used in this Agreement are set forth on **Exhibit A**.

### ARTICLE 2.
### ASSIGNMENT AND TRANSFER AND CONSIDERATION

Section 2.1    Assignment of the Purchased Accounts to the Buyer.  Upon execution of this Agreement and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all of the Seller's right, title, and interest in and to the Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens.  Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the "**Excluded Assets**").

Section 2.2    No Assumption of Liabilities.  The Buyer shall not assume any Liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the "**Excluded Liabilities**").

Section 2.3    Payment of Purchase Price.  Buyer shall pay $156,810.34 (total purchase price) for the Purchased Accounts (the "**Purchase Price**") by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in **Schedule 2.3** (the "**Wire Instructions**").  The Purchased Accounts are set forth on the attached spreadsheet.

Section 2.4    Guarantee of LPG.  If any file acquired by buyer shall fail to make a first payment, LPG will replace the file and bear any cost associated with such replacement.  The replacement file shall yield no less than the receivable of the failed file.  In addition, if any any calendar month a total of less than 80% of files make a cleared payment, LPG shall replace any non-performing files in such month so that the performance of the file

Exhibit 5
Page 90

DocuSign Envelope ID: FBEEB5C0-F588-44C4-AE0E-522E8578C735

package as a whole equals 80%.  This guarantee shall continue until the completion of the 24th month following execution of this agreement.

## ARTICLE 3.
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1    Organization; Good Standing.  The Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the Laws of the State of Delaware and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2    Power and Authority.  The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.3    Title to, and Sufficiency of, the Purchased Accounts.  The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all of the Purchased Accounts, free and clear of all Liens.

Section 3.4    Consents.  The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.5    No Conflicts. The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

Exhibit 5
Page 91

DocuSign Envelope ID: FBEEB5C0-F598-44C4-AE0E-522E8D72C735

Section 3.6     Compliance with Laws.  The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.

Section 3.7     Legal Proceedings. There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements.  No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.8     Condition of Purchased Accounts.  Each Purchased Account shall have received no less than one processed payment.

Section 3.9     Confidentiality. Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the "**Confidential Information**").  Seller will at all times keep the  Confidential Information in confidence and trust.  Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer.  Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions.  Seller agrees that violation of this Section 3.9.  The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

### ARTICLE 4.
### REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1     Organization; Good Standing.  The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Florida.

Section 4.2     Power and Authority. The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Exhibit 5
Page 92

DocuSign Envelope ID: FBFEB5C0 F588 44C4 AE0E F22E8572C735

Section 4.3    <u>No Conflicts</u>.  The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4    <u>Sufficient Funds</u>.  The Buyer has, and will have, sufficient funds available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

## ARTICLE 5.
## COVENANTS

Section 5.1    <u>Appropriate Actions</u>.

(a)    <u>General</u>.  Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

## ARTICLE 6.
## CLOSING

Section 6.1    <u>Closing</u>.  The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing.  The date on which the Closing occurs is hereinafter referred to as the "**Closing Date**." The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2    <u>Closing Deliverables of the Seller</u>.  At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer:  (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **<u>Exhibit B</u>** (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3    <u>Closing Deliverables of the Buyer</u>.  At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to <u>Section 6.2</u>, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4    <u>Indemnification by the Seller</u>.  Subject to the limitations set forth in this <u>Article 6</u>, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of,

Exhibit 5
Page 93

DocuSign Envelope ID: FBEEB5C0-F588-44C4-AE0E-522E8572C735

arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Seller pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability.

Section 6.5    Indemnification by the Buyer.  Subject to the limitations set forth in this Article 6, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurance related to the Purchased Accounts or Buyer occurring after the Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.6    Indemnification Procedures.

(a)    No Restraints.  Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, provided, however, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim.  The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; provided, however, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred.  In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense.  The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b)    No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim.  An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party

Exhibit 5
Page 94

Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c) If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**"). Such Notice of Claim shall specify the basis for such Direct Claim. The failure by any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this Section 6.6(c). If the Indemnifying Party does not notify the Indemnified Party within thirty days following its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this Article 6 or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this Article 6, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined. In the event that the Indemnifying Party has timely disputed its Liability with respect to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

## ARTICLE 7.
## MISCELLANEOUS

Section 7.1    Entire Agreement; Amendment. This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof. This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2    Waivers. The rights and remedies of the Parties to this Agreement are cumulative and not alternative. To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for what it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3    Notices. All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission. A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

DocuSign Envelope ID: FBEEB5C0-F588-44C4-AE0E-F522E8D72C735

Section 7.4     Successors and Assigns.  This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns.  Neither this Agreement nor any rights or obligations of a Party hereunder shall be assigned by a Party (unless to an Affiliate of such Party) without the prior written consent of the other Parties.  This Agreement will be binding upon any permitted assignee of any Party.  No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5     Public Disclosure.  Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6     Expenses and Fees.  Whether or not the Closing occurs, all fees and expenses incurred in connection with this transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.

Section 7.7     Specific Performance.  The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

Section 7.8     Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.9     Governing Law.  This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws principles.

Section 7.10     Severability.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 7.11     Construction.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

Exhibit 5
Page 96

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

**The Litigation Practice Group P.C.**

By: _Daniel S March_____
Name: Daniel S March
Title: Managing Shareholder

**SELLER:**

**Integrity Docs LLC**

By: _Richard Nodelman_____
Name: Richard Nodelman
Title: Member

## APPROVAL OF ASSIGNMENT AND GUARANTEE

The assignment of the Purchased Accounts set forth in this Agreement as well as the guarantee included therein is hereby approved, and with respect to the Purchased Accounts, the Buyer shall have all rights of Buyer as set forth in this agreement.

**The Litigation Practice Group P.C.**

By: _Daniel S March_____
Name: Daniel S. March
Title: Managing Shareholder

*[Signature Page to Accounts Receivable Purchase Agreement]*

Exhibit 5
Page 97

DocuSign Envelope ID: FBFEB5C0-F588-44C4-AE0E-522E8572C735

## EXHIBIT A

## DEFINITIONS

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a)        "**Action**" shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b)        "**Agreement**" shall have the meaning set forth in the preamble to this Agreement.

(c)        "**Agreement Date**" shall have the meaning set forth in the preamble to this Agreement.

(d)        "**Affiliate**" shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii), with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals.  For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e)        "**Bill of Sale and Assignment and Assumption Agreement**" shall have the meaning set forth in <u>Section 6.2</u>.

(f)        "**Business**" shall mean the business of the Seller as conducted on the Agreement Date.

(g)        "**Buyer**" shall have the meaning set forth in the preamble to this Agreement.

(h)        "**Buyer Indemnified Parties**" shall have the meaning set forth in <u>Section 6.4</u>.

(i)        "**Closing**" shall have the meaning set forth in <u>Section 6.1</u>.

(j)        "**Closing Date**" shall have the meaning set forth in <u>Section 6.1</u>.

(k)        "**Direct Claim**" shall have the meaning set forth in <u>Section 6.6(c)</u>.

(l)        "**Excluded Assets**" shall have the meaning set forth in <u>Section 2.1</u>.

(m)        "**Excluded Liabilities**" shall have the meaning set forth in <u>Section 2.2</u>.

(n)        "**Governmental Body**" shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

Exhibit 5
Page 98

(o)    "**Indebtedness**" means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p)    "**Indemnified Party**" shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q)    "**Indemnifying Party**" shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r)    "**Knowledge**" shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s)    "**Law**" shall mean any law, statute, ordinance, regulation, rule, code, notice requirement, court decision, or agency guideline, of any foreign, federal, state, or local Governmental Body.

(t)    "**Liabilities**" shall mean any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on-or off-balance sheet, or other.

(u)    "**Lien**" shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v)    "**Losses**" shall have the meaning set forth in Section 6.4.

(w)    "**Notice of Claim**" shall have the meaning set forth in Section 6.6(c).

(x)    "**Organizational Documents**" shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y)    "**Party**" or "**Parties**" shall have the meaning set forth in the preamble to this Agreement.

(z)    "**Permitted Liens**" shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(aa)    "**Person**" shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

Exhibit 5
Page 99

DocuSign Envelope ID: FBFEB5C0-F588-44C4-AE0E-522E8D52C735

(bb)    "**Purchase Price**" shall have the meaning set forth in <u>Section 2.3</u>.

(cc)    "**Purchased Accounts**" shall have the meaning set forth in the Recitals.

(dd)    "**Seller**" shall have the meaning set forth in the preamble to this Agreement.

(ee)    "**Seller Indemnified Parties**" shall have the meaning set forth in <u>Section 6.5</u>.

(ff)    "**Tax**" or "**Taxes**" shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(gg)    "**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(hh)    "**Third Party**" or "**Third Parties**" shall mean any Person other than the Parties or their respective Affiliates.

(ii)    "**Third-party Claim**" shall have the meaning set forth in <u>Section 6.6(a)</u>.

(jj)    "**Transaction Agreements**" shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(kk)    "**Upfront Cash Payment**" shall have the meaning set forth in <u>Section 2.3</u>.

(ll)    "**Wire Instructions**" shall have the meaning set forth in <u>Section 2.3</u>.

Exhibit 5
Page 100

DocuSign Envelope ID: FBEEB5C0-F598-44C4-AE0E-522E8572C735

## EXHIBIT B

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this **"Agreement"**), is made by and between **Buyer**, and **Seller**. Each of the Seller and the Buyer are sometimes referred to herein, individually, as a **"Party"** and, collectively, as the **"Parties."**

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the **"Purchase Agreement"**), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1. <u>Defined Terms</u>. Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2. <u>Sale of Purchased Accounts; Assignment</u>. The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3. <u>Further Assurances</u>. Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

4. <u>Terms of the Purchase Agreement</u>. This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement. The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference. The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5. <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Remainder of page intentionally left blank.]*

DocuSign Envelope ID: FBFEB5C0-F588-44C4-AE0E-522E8B72C735

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**BUYER: The Litigation Practice Group P.C.**

By: _Daniel S March_
      9D494DB1993341E...
      Name: Daniel S. March
      Title: Managing Shareholder

**SELLER:**

**Integrity Docs LLC**

By: _Richard Nodelman_
      11F05BCD88F742A...
      Name: Richard Nodelman
      Title: Member

Accounts Receivable Purchase Agreement

Exhibit 5
Page 102

**Schedule 2.3**
**Wire Instructions**

<u>**$156,810.34**</u>

**Account Holder Name: Integrity Docs**

**Address:** ██████████ █████████████

**Routing Number:** ████████

**Account Number:** ████████

# EXHIBIT 6

Exhibit 6
Page 104

DocuSign Envelope ID: 5068756-6184-4281-9FB4-7CDD235D386A

### ACCOUNTS RECEIVABLE PURCHASE AGREEMENT

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is made as of November 17, 2022 (the "**Agreement Date**"), by and between The Litigation Practice Group PC (collectively the "**Buyer**"), and Integrity Docs LLC (the "**Seller**" or "**LPG**", and together with the Buyer, the **"Parties"**), and The Litigation Practice Group PC ("LPG").

### RECITALS

WHEREAS, in the regular course of business, the Seller originates account receivables from **LPG** in connection with client on-boarding services provided by the Seller to LPG and its affiliates;

WHEREAS, the account receivables represent an obligation of various clients to pay Seller for services that Seller previously provided, but which LPG shall provide from the date of execution of this Agreement;

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables (the "**Purchased Accounts**").

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

### ARTICLE 1.
### DEFINITIONS

Section 1.1    Certain Definitions.  Certain defined terms used in this Agreement are set forth on **Exhibit A**.

### ARTICLE 2.
### ASSIGNMENT AND TRANSFER AND CONSIDERATION

Section 2.1    Assignment of the Purchased Accounts to the Buyer.  Upon execution of this Agreement and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all of the Seller's right, title, and interest in and to the Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens.  Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the "**Excluded Assets**").

Section 2.2    No Assumption of Liabilities.  The Buyer shall not assume any Liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the "**Excluded Liabilities**").

Section 2.3    Payment of Purchase Price.  Buyer shall pay $13,746.67 (total purchase price) for the Purchased Accounts (the "**Purchase Price**") by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in **Schedule 2.3** (the "**Wire Instructions**").  The Purchased Accounts are set forth on the attached spreadsheet.

Section 2.4    Guarantee of LPG.  If any file acquired by buyer shall fail to make a first payment, LPG will replace the file and bear any cost associated with such replacement.  The replacement file shall yield no less than the receivable of the failed file.  In addition, if any any calendar month a total of less than 80% of files make a cleared payment, LPG shall replace any non-performing files in such month so that the performance of the file

Exhibit 6
Page 105

DocuSign Envelope ID: 15068756-6183-4281-9FB4-76DD235D386A

package as a whole equals 80%.  This guarantee shall continue until the completion of the 24th month following execution of this agreement.

## ARTICLE 3.
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1    <u>Organization; Good Standing</u>.  The Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the Laws of the State of Delaware and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2    <u>Power and Authority</u>.  The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.3    <u>Title to, and Sufficiency of, the Purchased Accounts</u>.  The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all of the Purchased Accounts, free and clear of all Liens.

Section 3.4    <u>Consents</u>.  The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.5    <u>No Conflicts</u>. The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

Exhibit 6
Page 106

DocuSign Envelope ID: 15068756-6183-4281-9FB4-7CDD235B386A

Section 3.6    <u>Compliance with Laws</u>.  The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.

Section 3.7    <u>Legal Proceedings</u>.  There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements.  No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.8    <u>Condition of Purchased Accounts</u>.  Each Purchased Account shall have received no less than one processed payment.

Section 3.9    <u>Confidentiality</u>. Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the "**Confidential Information**").  Seller will at all times keep the  Confidential Information in confidence and trust.  Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer.  Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions.  Seller agrees that violation of this Section 3.9.  The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

## ARTICLE 4.
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1    <u>Organization; Good Standing</u>.  The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Florida.

Section 4.2    <u>Power and Authority</u>.  The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Exhibit 6
Page 107

DocuSign Envelope ID: 5068756-6183-4281-9FB4-7CDD235D386A

Section 4.3    <u>No Conflicts</u>.  The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4    <u>Sufficient Funds</u>.  The Buyer has, and will have, sufficient funds available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

## ARTICLE 5.
## COVENANTS

Section 5.1    <u>Appropriate Actions</u>.

(a)    <u>General</u>.  Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

## ARTICLE 6.
## CLOSING

Section 6.1    <u>Closing</u>.  The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing.  The date on which the Closing occurs is hereinafter referred to as the "**Closing Date**." The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2    <u>Closing Deliverables of the Seller</u>.  At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer:  (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **Exhibit B** (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3    <u>Closing Deliverables of the Buyer</u>.  At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to <u>Section 6.2</u>, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4    <u>Indemnification by the Seller</u>.  Subject to the limitations set forth in this <u>Article 6</u>, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of,

Exhibit 6
Page 108

DocuSign Envelope ID: 15068756-6184-4381-9FB4-76DD235D386A

arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Seller pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability.

Section 6.5    Indemnification by the Buyer.  Subject to the limitations set forth in this Article 6, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurance related to the Purchased Accounts or Buyer occurring after the Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.6    Indemnification Procedures.

(a)    No Restraints.  Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, provided, however, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim.  The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; provided, however, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred.  In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense.  The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b)    No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim.  An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party

Exhibit 6
Page 109

Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c)    If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**").  Such Notice of Claim shall specify the basis for such Direct Claim.  The failure by any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this Section 6.6(c).  If the Indemnifying Party does not notify the Indemnified Party within thirty days following its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this Article 6 or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this Article 6, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined.  In the event that the Indemnifying Party has timely disputed its Liability with respect to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

## ARTICLE 7.
## MISCELLANEOUS

Section 7.1    Entire Agreement; Amendment.  This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof.  This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2    Waivers.  The rights and remedies of the Parties to this Agreement are cumulative and not alternative.  To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for what it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3    Notices.  All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission.  A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

Exhibit 6
Page 110

DocuSign Envelope ID: 15068756-6182-4281-9FB4-7CDD235D386A

Section 7.4     Successors and Assigns.  This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns.  Neither this Agreement nor any rights or obligations of a Party hereunder shall be assigned by a Party (unless to an Affiliate of such Party) without the prior written consent of the other Parties.  This Agreement will be binding upon any permitted assignee of any Party.  No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5     Public Disclosure.  Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6     Expenses and Fees.  Whether or not the Closing occurs, all fees and expenses incurred in connection with this transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.

Section 7.7     Specific Performance.  The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

Section 7.8     Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.9     Governing Law.  This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws principles.

Section 7.10     Severability.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 7.11     Construction.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

DocuSign Envelope ID: 1E068756-6182-4281-9FB4-7CDD235B386A

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

**The Litigation Practice Group P.C.**

By: _Daniel S March_____
9D494DB1993341E
Name: Daniel S March
Title: Managing Shareholder


**SELLER:**

**Integrity Docs LLC**

By: _Richard Nodelman_____
11F05BCD88F742A
Name: Richard Nodelman
Title: Member


**APPROVAL OF ASSIGNMENT AND GUARANTEE**

The assignment of the Purchased Accounts set forth in this Agreement as well as the guarantee included therein is hereby approved, and with respect to the Purchased Accounts, the Buyer shall have all rights of Buyer as set forth in this agreement.


**The Litigation Practice Group P.C.**

By: _Daniel S March_____
9D494DB1993341E
Name: Daniel S. March
Title: Managing Shareholder


*[Signature Page to Accounts Receivable Purchase Agreement]*

Exhibit 6
Page 112

DocuSign Envelope ID: 15068756-6184-4381-9FB4-7CDD235B396A

## EXHIBIT A

## DEFINITIONS

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a)     "**Action**" shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b)     "**Agreement**" shall have the meaning set forth in the preamble to this Agreement.

(c)     "**Agreement Date**" shall have the meaning set forth in the preamble to this Agreement.

(d)     "**Affiliate**" shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii), with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals.  For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e)     "**Bill of Sale and Assignment and Assumption Agreement**" shall have the meaning set forth in Section 6.2.

(f)     "**Business**" shall mean the business of the Seller as conducted on the Agreement Date.

(g)     "**Buyer**" shall have the meaning set forth in the preamble to this Agreement.

(h)     "**Buyer Indemnified Parties**" shall have the meaning set forth in Section 6.4.

(i)     "**Closing**" shall have the meaning set forth in Section 6.1.

(j)     "**Closing Date**" shall have the meaning set forth in Section 6.1.

(k)     "**Direct Claim**" shall have the meaning set forth in Section 6.6(c).

(l)     "**Excluded Assets**" shall have the meaning set forth in Section 2.1.

(m)     "**Excluded Liabilities**" shall have the meaning set forth in Section 2.2.

(n)     "**Governmental Body**" shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

Exhibit 6
Page 113

(o) "**Indebtedness**" means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p) "**Indemnified Party**" shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q) "**Indemnifying Party**" shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r) "**Knowledge**" shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s) "**Law**" shall mean any law, statute, ordinance, regulation, rule, code, notice requirement, court decision, or agency guideline, of any foreign, federal, state, or local Governmental Body.

(t) "**Liabilities**" shall mean any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on- or off-balance sheet, or other.

(u) "**Lien**" shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v) "**Losses**" shall have the meaning set forth in Section 6.4.

(w) "**Notice of Claim**" shall have the meaning set forth in Section 6.6(c).

(x) "**Organizational Documents**" shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y) "**Party**" or "**Parties**" shall have the meaning set forth in the preamble to this Agreement.

(z) "**Permitted Liens**" shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(aa) "**Person**" shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

Exhibit 6
Page 114

DocuSign Envelope ID: 15068756-6182-4281-9FB4-7CDD235D386A

(bb)    "**Purchase Price**" shall have the meaning set forth in <u>Section 2.3</u>.

(cc)    "**Purchased Accounts**" shall have the meaning set forth in the Recitals.

(dd)    "**Seller**" shall have the meaning set forth in the preamble to this Agreement.

(ee)    "**Seller Indemnified Parties**" shall have the meaning set forth in <u>Section 6.5</u>.

(ff)    "**Tax**" or "**Taxes**" shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(gg)    "**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(hh)    "**Third Party**" or "**Third Parties**" shall mean any Person other than the Parties or their respective Affiliates.

(ii)    "**Third-party Claim**" shall have the meaning set forth in <u>Section 6.6(a)</u>.

(jj)    "**Transaction Agreements**" shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(kk)    "**Upfront Cash Payment**" shall have the meaning set forth in <u>Section 2.3</u>.

(ll)    "**Wire Instructions**" shall have the meaning set forth in <u>Section 2.3</u>.

Exhibit 6
Page 115

DocuSign Envelope ID: 15068756-6183-4281-9FB4-7CDD235D386A

**EXHIBIT B**

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this **"Agreement"**), is made by and between **Buyer**, and **Seller**.  Each of the Seller and the Buyer are sometimes referred to herein, individually, as a **"Party"** and, collectively, as the **"Parties."**

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the **"Purchase Agreement"**), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.    <u>Defined Terms</u>.  Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2.    <u>Sale of Purchased Accounts; Assignment</u>.  The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3.    <u>Further Assurances</u>.  Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

4.    <u>Terms of the Purchase Agreement</u>.  This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement.   The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference.  The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5.    <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Remainder of page intentionally left blank.]*

DocuSign Envelope ID: 1F068756-6182-4381-9FB4-7CDD235D386A

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**BUYER: The Litigation Practice Group P.C.**

By: _Daniel S March_

Name: Daniel S. March

Title: Managing Shareholder

**SELLER:**

**Integrity Docs LLC**

By: _Richard Nodelman_

Name: Richard Nodelman

Title: Member

**Schedule 2.3**
**Wire Instructions**

<u>**$13,746.67**</u>

**Account Holder Name: Integrity Docs**

**Address: 4**███████ ██████████████

**Routing Number:** ████████

**Account Number:** █████████

# EXHIBIT 7

Exhibit 7
Page 119

DocuSign Envelope ID: 82FDEED5-5D22-4304-8290-71F325791A46

### ACCOUNTS RECEIVABLE PURCHASE AGREEMENT

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is made as of January 6, 2023 (the "**Agreement Date**"), by and between The Litigation Practice Group PC (collectively the "**Buyer**"), and Integrity Docs LLC (the "**Seller" or "LPG**", and together with the Buyer, the **"Parties"**), and The Litigation Practice Group PC ("LPG").

### RECITALS

WHEREAS, in the regular course of business, the Seller originates account receivables from **LPG** in connection with client on-boarding services provided by the Seller to LPG and its affiliates;

WHEREAS, the account receivables represent an obligation of various clients to pay Seller for services that Seller previously provided, but which LPG shall provide from the date of execution of this Agreement;

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables (the "**Purchased Accounts**").

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

### ARTICLE 1.
### DEFINITIONS

Section 1.1     Certain Definitions.  Certain defined terms used in this Agreement are set forth on **Exhibit A**.

### ARTICLE 2.
### ASSIGNMENT AND TRANSFER AND CONSIDERATION

Section 2.1     Assignment of the Purchased Accounts to the Buyer.  Upon execution of this Agreement and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all of the Seller's right, title, and interest in and to the Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens.  Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the "**Excluded Assets**").

Section 2.2     No Assumption of Liabilities.  The Buyer shall not assume any Liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the "**Excluded Liabilities**").

Section 2.3     Payment of Purchase Price.  Buyer shall pay $15,700.20 (total purchase price) for the Purchased Accounts (the "**Purchase Price**") by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in **Schedule 2.3** (the "**Wire Instructions**").  The Purchased Accounts are set forth on the attached spreadsheet.

Section 2.4     Guarantee of LPG.  If any file acquired by buyer shall fail to make a first payment, LPG will replace the file and bear any cost associated with such replacement.  The replacement file shall yield no less than the receivable of the failed file.  In addition, if any any calendar month a total of less than 80% of files make a cleared payment, LPG shall replace any non-performing files in such month so that the performance of the file

Exhibit 7
Page 120

package as a whole equals 80%.  This guarantee shall continue until the completion of the 24th month following execution of this agreement.

## ARTICLE 3.
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1    Organization; Good Standing.  The Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the Laws of the State of Delaware and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2    Power and Authority.  The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.3    Title to, and Sufficiency of, the Purchased Accounts.  The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all of the Purchased Accounts, free and clear of all Liens.

Section 3.4    Consents.  The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.5    No Conflicts. The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

DocuSign Envelope ID: 82FD5EED5-5D22-4304-8290-71F325790A46

Section 3.6    <u>Compliance with Laws</u>.  The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.

Section 3.7    <u>Legal Proceedings</u>.  There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements.  No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.8    <u>Condition of Purchased Accounts</u>.  Each Purchased Account shall have received no less than one processed payment.

Section 3.9    <u>Confidentiality</u>. Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the "**Confidential Information**").  Seller will at all times keep the  Confidential Information in confidence and trust.  Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer.  Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions.  Seller agrees that violation of this Section 3.9.  The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

## ARTICLE 4.
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1    <u>Organization; Good Standing</u>.  The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Florida.

Section 4.2    <u>Power and Authority</u>.  The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Exhibit 7
Page 122

DocuSign Envelope ID: 92F9EED5-5D22-4304-8290-71F32530AA46

Section 4.3      No Conflicts.  The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4      Sufficient Funds.  The Buyer has, and will have, sufficient funds available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

## ARTICLE 5.
## COVENANTS

Section 5.1      Appropriate Actions.

(a)      General.  Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

## ARTICLE 6.
## CLOSING

Section 6.1      Closing.  The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing.  The date on which the Closing occurs is hereinafter referred to as the "**Closing Date.**" The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2      Closing Deliverables of the Seller.  At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer:  (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **Exhibit B** (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3      Closing Deliverables of the Buyer.  At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to Section 6.2, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4      Indemnification by the Seller.  Subject to the limitations set forth in this Article 6, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of,

Exhibit 7
Page 123

DocuSign Envelope ID: 02F9E5D5-6D22-4304-8290-71F32579A4A6

arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Seller pursuant to this Agreement", (c) any Excluded Asset or any Excluded Liability.

Section 6.5    Indemnification by the Buyer.  Subject to the limitations set forth in this Article 6, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurance related to the Purchased Accounts or Buyer occurring after the Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.6    Indemnification Procedures.

(a)    No Restraints.  Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, provided, however, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim.  The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; provided, however, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred.  In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense.  The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b)    No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim.  An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party

Exhibit 7
Page 124

Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c)    If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**").  Such Notice of Claim shall specify the basis for such Direct Claim.  The failure by any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this Section 6.6(c).  If the Indemnifying Party does not notify the Indemnified Party within thirty days following its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this Article 6 or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this Article 6, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined.  In the event that the Indemnifying Party has timely disputed its Liability with respect to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

## ARTICLE 7.
## MISCELLANEOUS

Section 7.1    Entire Agreement; Amendment.    This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof.  This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2    Waivers.    The rights and remedies of the Parties to this Agreement are cumulative and not alternative.  To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for what it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3    Notices.    All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission. A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

DocuSign Envelope ID: 92F9E5D5-6D22-4304-8290-71F32530A4A6

Section 7.4     Successors and Assigns.  This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns.  Neither this Agreement nor any rights or obligations of a Party hereunder shall be assigned by a Party (unless to an Affiliate of such Party) without the prior written consent of the other Parties.  This Agreement will be binding upon any permitted assignee of any Party.  No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5     Public Disclosure.  Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6     Expenses and Fees.  Whether or not the Closing occurs, all fees and expenses incurred in connection with this transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.

Section 7.7     Specific Performance.  The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

Section 7.8     Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.9     Governing Law.  This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws principles.

Section 7.10     Severability.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 7.11     Construction.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

Exhibit 7
Page 126

DocuSign Envelope ID: A2FD5EED5-6D22-4304-8290-71F325791A46

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

**The Litigation Practice Group P.C.**

By: _____ *Daniel S March* _____
        9D494DB1993341E...
        Name: Daniel S March
        Title: Managing Shareholder

**SELLER:**

**Integrity Docs LLC**

By: _____ *Richard Nodelman* _____
        11F05DGD88F742A...
        Name: Richard Nodelman
        Title: Member

**APPROVAL OF ASSIGNMENT AND GUARANTEE**

The assignment of the Purchased Accounts set forth in this Agreement as well as the guarantee included therein is hereby approved, and with respect to the Purchased Accounts, the Buyer shall have all rights of Buyer as set forth in this agreement.

**The Litigation Practice Group P.C.**

By: _____ *Daniel S March* _____
        9D494DB1993341E...
        Name: Daniel S. March
        Title: Managing Shareholder

*[Signature Page to Accounts Receivable Purchase Agreement]*

Exhibit 7
Page 127

DocuSign Envelope ID: 92ED5ED5-6D22-4304-8290-71F32539A1A6

## EXHIBIT A

## DEFINITIONS

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a)      "**Action**" shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b)      "**Agreement**" shall have the meaning set forth in the preamble to this Agreement.

(c)      "**Agreement Date**" shall have the meaning set forth in the preamble to this Agreement.

(d)      "**Affiliate**" shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii), with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals.  For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e)      "**Bill of Sale and Assignment and Assumption Agreement**" shall have the meaning set forth in Section 6.2.

(f)      "**Business**" shall mean the business of the Seller as conducted on the Agreement Date.

(g)      "**Buyer**" shall have the meaning set forth in the preamble to this Agreement.

(h)      "**Buyer Indemnified Parties**" shall have the meaning set forth in Section 6.4.

(i)      "**Closing**" shall have the meaning set forth in Section 6.1.

(j)      "**Closing Date**" shall have the meaning set forth in Section 6.1.

(k)      "**Direct Claim**" shall have the meaning set forth in Section 6.6(c).

(l)      "**Excluded Assets**" shall have the meaning set forth in Section 2.1.

(m)      "**Excluded Liabilities**" shall have the meaning set forth in Section 2.2.

(n)      "**Governmental Body**" shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

Exhibit 7
Page 128

DocuSign Envelope ID: 92FD5EED-5D22-4304-8290-71F32570A436

(o)    "**Indebtedness**" means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p)    "**Indemnified Party**" shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q)    "**Indemnifying Party**" shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r)    "**Knowledge**" shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s)    "**Law**" shall mean any law, statute, ordinance, regulation, rule, code, notice requirement, court decision, or agency guideline, of any foreign, federal, state, or local Governmental Body.

(t)    "**Liabilities**" shall mean any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on- or off-balance sheet, or other.

(u)    "**Lien**" shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v)    "**Losses**" shall have the meaning set forth in Section 6.4.

(w)    "**Notice of Claim**" shall have the meaning set forth in Section 6.6(c).

(x)    "**Organizational Documents**" shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y)    "**Party**" or "**Parties**" shall have the meaning set forth in the preamble to this Agreement.

(z)    "**Permitted Liens**" shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(aa)    "**Person**" shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

Exhibit 7
Page 129

DocuSign Envelope ID: 82FD5ED5-5D22-4304-8290-71F32570A446

(bb)    "**Purchase Price**" shall have the meaning set forth in <u>Section 2.3</u>.

(cc)    "**Purchased Accounts**" shall have the meaning set forth in the Recitals.

(dd)    "**Seller**" shall have the meaning set forth in the preamble to this Agreement.

(ee)    "        **Seller Indemnified Parties**" shall have the meaning set forth in <u>Section 6.5</u>.

(ff)    "**Tax**" or "**Taxes**" shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(gg)    "**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(hh)    "**Third Party**" or "**Third Parties**" shall mean any Person other than the Parties or their respective Affiliates.

(ii)    "**Third-party Claim**" shall have the meaning set forth in <u>Section 6.6(a)</u>.

(jj)    "**Transaction Agreements**" shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(kk)    "**Upfront Cash Payment**" shall have the meaning set forth in <u>Section 2.3</u>.

(ll)    "**Wire Instructions**" shall have the meaning set forth in <u>Section 2.3</u>.

Exhibit 7
Page 130

## EXHIBIT B

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this **"Agreement"**), is made by and between **Buyer**, and **Seller**. Each of the Seller and the Buyer are sometimes referred to herein, individually, as a **"Party"** and, collectively, as the **"Parties."**

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the **"Purchase Agreement"**), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1. <u>Defined Terms</u>. Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2. <u>Sale of Purchased Accounts; Assignment</u>. The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3. <u>Further Assurances</u>. Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

4. <u>Terms of the Purchase Agreement</u>. This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement. The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference. The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5. <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[*Remainder of page intentionally left blank.*]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**BUYER: The Litigation Practice Group P.C.**

By: _____
Name: Daniel S. March
Title: Managing Shareholder

**SELLER:**

**Integrity Docs LLC**

By: _____
Name: Richard Nodelman
Title: Member

**Schedule 2.3**
**Wire Instructions**

<u>$</u>**15.700.20**

**Account Holder Name: Integrity Docs**

**Address:** ███████████ █████████████████

**Routing Number:** █████████

**Account Number:** ██████████

# EXHIBIT 8

Exhibit 8
Page 134

## ACCOUNTS RECEIVABLE PURCHASE AGREEMENT

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is made as of March 31st, 2023 (the "**Agreement Date**"), by and between The Litigation Practice Group PC (collectively the "**Buyer**"), and Integrity Docs LLC (the "**Seller" or "LPG**", and together with the Buyer, the "**Parties**"), and The Litigation Practice Group PC ("LPG").

## RECITALS

WHEREAS, in the regular course of business, the Seller originates account receivables from **LPG** in connection with client on-boarding services provided by the Seller to LPG and its affiliates;

WHEREAS, the account receivables represent an obligation of various clients to pay Seller for services that Seller previously provided, but which LPG shall provide from the date of execution of this Agreement;

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables (the "**Purchased Accounts**").

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

## ARTICLE 1.
## DEFINITIONS

Section 1.1    Certain Definitions.  Certain defined terms used in this Agreement are set forth on **Exhibit A**.

## ARTICLE 2.
## ASSIGNMENT AND TRANSFER AND CONSIDERATION

Section 2.1    Assignment of the Purchased Accounts to the Buyer.  Upon execution of this Agreement and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all of the Seller's right, title, and interest in and to the Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens.  Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the "**Excluded Assets**").

Section 2.2    No Assumption of Liabilities.  The Buyer shall not assume any Liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the "**Excluded Liabilities**").

Section 2.3    Payment of Purchase Price.  Buyer shall pay $11,810.34 (total purchase price) for the Purchased Accounts (the "**Purchase Price**") by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in **Schedule 2.3** (the "**Wire Instructions**").  The Purchased Accounts are set forth on the attached spreadsheet.

Section 2.4    Guarantee of LPG.  If any file acquired by buyer shall fail to make a first payment, LPG will replace the file and bear any cost associated with such replacement.  The replacement file shall yield no less than the receivable of the failed file.  In addition, if any any calendar month a total of less than 80% of files make a cleared payment, LPG shall replace any non-performing files in such month so that the performance of the file

Exhibit 8
Page 135

package as a whole equals 80%.  This guarantee shall continue until the completion of the 24th month following execution of this agreement.

## ARTICLE 3.
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1    <u>Organization; Good Standing</u>.  The Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the Laws of the State of Delaware and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2    <u>Power and Authority</u>.  The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.3    <u>Title to, and Sufficiency of, the Purchased Accounts</u>.  The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all of the Purchased Accounts, free and clear of all Liens.

Section 3.4    <u>Consents</u>.  The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.5    <u>No Conflicts</u>. The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

DocuSign Envelope ID: A955E431-1C0B-456E-B931-C14D91F99868

Section 3.6    <u>Compliance with Laws</u>.  The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.

Section 3.7    <u>Legal Proceedings</u>.  There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements.  No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.8    <u>Condition of Purchased Accounts</u>.  Each Purchased Account shall have received no less than one processed payment.

Section 3.9    <u>Confidentiality</u>.  Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the "**Confidential Information**").  Seller will at all times keep the  Confidential Information in confidence and trust.  Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer.  Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions.  Seller agrees that violation of this Section 3.9.  The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

**ARTICLE 4.**
**REPRESENTATIONS AND WARRANTIES OF THE BUYER**

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1    <u>Organization; Good Standing</u>.  The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Florida.

Section 4.2    <u>Power and Authority</u>.  The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Exhibit 8

Section 4.3    <u>No Conflicts</u>.  The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4    <u>Sufficient Funds</u>.  The Buyer has, and will have, sufficient funds available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

### ARTICLE 5.
### COVENANTS

Section 5.1    <u>Appropriate Actions</u>.

(a)    <u>General</u>.  Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

### ARTICLE 6.
### CLOSING

Section 6.1    <u>Closing</u>.  The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing.  The date on which the Closing occurs is hereinafter referred to as the "**Closing Date**." The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2    <u>Closing Deliverables of the Seller</u>.  At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer:  (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **Exhibit B** (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3    <u>Closing Deliverables of the Buyer</u>.  At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to <u>Section 6.2</u>, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4    <u>Indemnification by the Seller</u>.  Subject to the limitations set forth in this <u>Article 6</u>, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of,

DocuSign Envelope ID: A955F431-1C0B-456E-B931-C14D91590868

arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Seller pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability.

Section 6.5    Indemnification by the Buyer.  Subject to the limitations set forth in this Article 6, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurance related to the Purchased Accounts or Buyer occurring after the Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.6    Indemnification Procedures.

(a)    No Restraints.  Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, provided, however, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim.  The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and expenses of such counsel; provided, however, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred.  In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense.  The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b)    No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim.  An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party

Exhibit 8
Page 139

Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c)     If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**"). Such Notice of Claim shall specify the basis for such Direct Claim. The failure by any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this Section 6.6(c). If the Indemnifying Party does not notify the Indemnified Party within thirty days following its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this Article 6 or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this Article 6, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined. In the event that the Indemnifying Party has timely disputed its Liability with respect to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

**ARTICLE 7.**
**MISCELLANEOUS**

Section 7.1     Entire Agreement; Amendment. This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof. This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2     Waivers. The rights and remedies of the Parties to this Agreement are cumulative and not alternative. To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for what it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3     Notices. All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission. A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

DocuSign Envelope ID: A955F431-1C0B-456F-B931-C14D91599868

Section 7.4    <u>Successors and Assigns</u>.  This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns.  Neither this Agreement nor any rights or obligations of a Party hereunder shall be assigned by a Party (unless to an Affiliate of such Party) without the prior written consent of the other Parties.  This Agreement will be binding upon any permitted assignee of any Party.  No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5    <u>Public Disclosure</u>.  Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6    <u>Expenses and Fees</u>.  Whether or not the Closing occurs, all fees and expenses incurred in connection with this transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.

Section 7.7    <u>Specific Performance</u>.  The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

Section 7.8    <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.9    <u>Governing Law</u>.  This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws principles.

Section 7.10    <u>Severability</u>.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 7.11    <u>Construction</u>.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

DocuSign Envelope ID: A955F431-1C0B-456E-B931-C14D91F99868

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

**The Litigation Practice Group P.C.**

By: _Daniel S March_
Name: Daniel S March
Title: Managing Shareholder

**SELLER:**

**Integrity Docs LLC**

By: _____
Name: Richard Nodelman
Title: Member

### APPROVAL OF ASSIGNMENT AND GUARANTEE

The assignment of the Purchased Accounts set forth in this Agreement as well as the guarantee included therein is hereby approved, and with respect to the Purchased Accounts, the Buyer shall have all rights of Buyer as set forth in this agreement.

**The Litigation Practice Group P.C.**

By: _Daniel S March_
Name: Daniel S. March
Title: Managing Shareholder

*[Signature Page to Accounts Receivable Purchase Agreement]*

Exhibit 8
Page 142

DocuSign Envelope ID: A955F431-1C0B-456E-B931-C14D91F99868

**EXHIBIT A**

**DEFINITIONS**

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a)        "**Action**" shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b)        "**Agreement**" shall have the meaning set forth in the preamble to this Agreement.

(c)        "**Agreement Date**" shall have the meaning set forth in the preamble to this Agreement.

(d)        "**Affiliate**" shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii), with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals.  For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e)        "**Bill of Sale and Assignment and Assumption Agreement**" shall have the meaning set forth in Section 6.2.

(f)        "**Business**" shall mean the business of the Seller as conducted on the Agreement Date.

(g)        "**Buyer**" shall have the meaning set forth in the preamble to this Agreement.

(h)        "**Buyer Indemnified Parties**" shall have the meaning set forth in Section 6.4.

(i)        "**Closing**" shall have the meaning set forth in Section 6.1.

(j)        "**Closing Date**" shall have the meaning set forth in Section 6.1.

(k)        "**Direct Claim**" shall have the meaning set forth in Section 6.6(c).

(l)        "**Excluded Assets**" shall have the meaning set forth in Section 2.1.

(m)        "**Excluded Liabilities**" shall have the meaning set forth in Section 2.2.

(n)        "**Governmental Body**" shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

Exhibit 8
Page 143

(o)    "**Indebtedness**" means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p)    "**Indemnified Party**" shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q)    "**Indemnifying Party**" shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r)    "**Knowledge**" shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s)    "**Law**" shall mean any law, statute, ordinance, regulation, rule, code, notice requirement, court decision, or agency guideline, of any foreign, federal, state, or local Governmental Body.

(t)    "**Liabilities**" shall mean any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on- or off-balance sheet, or other.

(u)    "**Lien**" shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v)    "**Losses**" shall have the meaning set forth in Section 6.4.

(w)    "**Notice of Claim**" shall have the meaning set forth in Section 6.6(c).

(x)    "**Organizational Documents**" shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y)    "**Party**" or "**Parties**" shall have the meaning set forth in the preamble to this Agreement.

(z)    "**Permitted Liens**" shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(aa)    "**Person**" shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

Exhibit 8
Page 144

DocuSign Envelope ID: A955E431-1C0B-456E-B931-C14D91599868

(bb)    "**Purchase Price**" shall have the meaning set forth in <u>Section 2.3</u>.

(cc)    "**Purchased Accounts**" shall have the meaning set forth in the Recitals.

(dd)    "**Seller**" shall have the meaning set forth in the preamble to this Agreement.

(ee)    "**Seller Indemnified Parties**" shall have the meaning set forth in <u>Section 6.5</u>.

(ff)    "**Tax**" or "**Taxes**" shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(gg)    "**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(hh)    "**Third Party**" or "**Third Parties**" shall mean any Person other than the Parties or their respective Affiliates.

(ii)    "**Third-party Claim**" shall have the meaning set forth in <u>Section 6.6(a)</u>.

(jj)    "**Transaction Agreements**" shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(kk)    "**Upfront Cash Payment**" shall have the meaning set forth in <u>Section 2.3</u>.

(ll)    "**Wire Instructions**" shall have the meaning set forth in <u>Section 2.3</u>.

Exhibit 8
Page 145

DocuSign Envelope ID: A955F431-1C0B-456E-B931-C14D91F99868

**EXHIBIT B**

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this **"Agreement"**), is made by and between **Buyer**, and **Seller**. Each of the Seller and the Buyer are sometimes referred to herein, individually, as a **"Party"** and, collectively, as the **"Parties."**

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the **"Purchase Agreement"**), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1. _Defined Terms_. Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2. _Sale of Purchased Accounts; Assignment_. The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3. _Further Assurances_. Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

4. _Terms of the Purchase Agreement_. This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement. The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference. The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5. _Counterparts_. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[_Remainder of page intentionally left blank._]

DocuSign Envelope ID: A955F431-1C0B-456E-9931-C14D91F99868

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**BUYER: The Litigation Practice Group P.C.**

By: _Daniel S March_
     Name: Daniel S. March
     Title: Managing Shareholder

**SELLER:**

**Integrity Docs LLC**

By: _____
     Name: Richard Nodelman
     Title: Member

VOID

**Schedule 2.3**
**Wire Instructions**

<u>**$11,810.34**</u>

**Account Holder Name: Integrity Docs**

**Address:** ███████████ ██████████████

**Routing Number:** ██████████

**Account Number:** ██████████



# EXHIBIT 9

Exhibit 9
Page 149



*Legal Counsel.*

**DINSMORE & SHOHL** LLP
755 West Big Beaver Road, Suite 1900
Troy, MI 48237
www.dinsmore.com

Brian W. Boyd
(248) 203-1622 (direct) ^ (248) 647-5210 (fax)
Brian.Boyd@dinsmore.com

October 16, 2024

<u>*Via Certified Mail/Return Receipt Requested*</u>

Integrity Docs, LLC
Attn: Richard Nodelman, Member
964 Cypress Drive
Delray Beach, FL 33483

Integrity Docs, LLC
Attn: Richard Nodelman, Member
4561 SW 34th Street
Orlando, FL 32811

> Re:    *In re The Litigation Practice Group P.C.*
>           U.S. Bankruptcy Court, Central District of California
>           Case No. 8:23-bk-10571-SC

Dear Sir:

This correspondence constitutes a demand to provide any and all documents and information evidencing the basis for, accounting of, and any defenses to my client's claims to avoid and recover, the transfers to Integrity Docs, LLC, from The Litigation Practice Group P.C. ("Debtor").

This firm represents Richard A. Marshack, Chapter 11 Trustee for the bankruptcy estate of The Litigation Practice Group P.C. and liquidating trustee of the LPG Liquidation Trust (collectively, "Trustee"), in the above-referenced bankruptcy case. Pursuant to 11 U.S.C. § 1107 and his appointment as Trustee, the Trustee has the obligation to investigate and pursue claims, including fraudulent transfers, preferential transfers, and unauthorized post-petition transfers. Under the Bankruptcy Code, the Trustee has the power to file lawsuits seeking to avoid, recover, and preserve such transfers for the benefit of the Estate. *See* 11 U.S.C. §§ 544 *et seq.*

As explained in the Trustee's initial correspondence, a review of the Debtor's books and records confirms that Integrity Docs, LLC received: (a) eight (8) potential preferential transfers totaling $21,264.97, which can be avoided and recovered by the Trustee pursuant to 11 U.S.C. § 547(b); (b) seventy-one (71) potential fraudulent transfers totaling $481,625.26, which can be avoided

Exhibit 9
Page 150

and recovered by the Trustee pursuant to 11 U.S.C. §§ 544 and 548 and Cal. Civ. Code. §§ 3439.04 and 3439.05; and (c) two (2) unauthorized post-petition transfers totaling $30,000.00, which can be avoided and recovered by the Trustee pursuant to 11 U.S.C. § 549(a).

The Trustee has been unable to determine why such transfers were made to Integrity Docs, LLC, what was provided to the Debtor in exchange for such transfers, and whether defenses exist to the Trustee's claims to avoid and recover the transfers. Please respond to this letter, attaching any evidence you have related to these transfers, including contracts, agreements, subscriptions, invoices, and any other documentation showing the date, terms, and amounts for the transfers received and any documents evidencing shipment dates as to goods and services provided by Integrity Docs, LLC to the Debtor. Documents showing the course of dealing between Integrity Docs, LLC and the Debtor, the date of receipt of the Debtor's payment and the amount, deposit date, and any proof of deposit for any or all of the transfers will be helpful in determining the permissibility of the transfers and what, if any, value the Debtor received in return for payments made to Integrity Docs, LLC

You are further notified that the claims against Integrity Docs, LLC will be governed by the Federal Rules of Bankruptcy Procedure and the Federal Rules of Civil Procedure, which apply to lawsuits filed in Federal Bankruptcy Courts such as the one in the Central District of California. Pursuant to these rules, every party to a lawsuit has a duty to preserve all evidence which could be relevant to the suit. These obligations also arise when, as here, litigation is reasonably foreseeable. This includes the duty to preserve all electronic evidence, such as emails discussing the incident or related to matters at issue in the suit. This duty to preserve evidence is broad and extends to all documents, regardless of whether the document is stored electronically (such as email) or in hard-copy and regardless of the type of document. For example, reports, spreadsheets, photographs and videotapes are all considered documents that must be preserved. Furthermore, the duty to preserve this documentary evidence extends to all documents in existence as of the time you reasonably anticipated this litigation.

To ensure that all relevant documents are preserved, you should communicate directly with all employees who have possession or control of potentially relevant evidence, including but not limited to personnel who deal with email retention, deletion, and archiving. You should advise each of these employees to preserve any relevant documents in their custody. Furthermore, you should advise all such persons that any regularly scheduled and/or automatic deletion of email or other electronic documents must be discontinued with respect to any relevant data. In addition, any document destruction (such as shredding of documents) must cease with respect to any relevant documents. All relevant documents, both electronic and paper, must be preserved for the duration of this litigation.

The deadline to respond to this request is Friday, November 1, 2024. Failure to respond and/or provide the requested documents will likely result in the Trustee filing an adversary complaint to avoid, recover, and preserve the subject transfers for the benefit of the Estate. If you would like to discuss this matter, please feel free to contact me by telephone (248) 203-1622 and/or e-mail at brian.boyd@dinsmore.com.

Exhibit 9
Page 151

**October 17, 2024**
**Page 3**

Sincerely,

*/s/ Brian W. Boyd*
Brian W. Boyd

Exhibit 9
Page 152

# EXHIBIT 10

Exhibit 10
Page 153

In re: The Litigation Practice Group PC
Disbursement Details by Payee
4 Years Pre-Petition (03/20/2019 - 03/20/2023)

IntegrityDocs, LLC

Prepared by: Grobstein Teeple LLP

| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|
| Optimum Bank | Coast Processing LLC dba LPG | ■ | 11/30/2021 | 11/8/2021 | | 49,000.00 | WIRE TO Integrity Docs, LLC |
| Optimum Bank | Coast Processing LLC dba LPG | ■ | 12/31/2021 | 12/2/2021 | | 199.07 | WIRE TO Integrity Docs, LLC |
| UnionBank | The Litigation Practice Group PC | ■ | 12/31/2021 | 12/17/2021 | | 88.61 | WIRE TRANS TAN ■ Sent To: FIFTH THIRD BANK, NATIONAL ASSOC. Beneficiary: 1/Integrity Docs |
| UnionBank | The Litigation Practice Group PC | ■ | 12/31/2021 | 12/23/2021 | | 777.17 | WIRE TRANS TAN ■ Sent To: FIFTH THIRD BANK, NATIONAL ASSOC. Beneficiary: 1/Integrity Docs |
| UnionBank | The Litigation Practice Group PC | ■ | 12/31/2021 | 12/31/2021 | | 225.17 | WIRE TRANS TRN ■ Sent To: FIFTH THIRD BANK, NATIONAL ASSOC. Beneficiary: 1/Integrity Docs |
| UnionBank | The Litigation Practice Group PC | ■ | 1/31/2022 | 1/13/2022 | | 521.19 | WIRE TRANS TAN ■ Sent To: FIFTH THIRD BANK, NATIONAL ASSOC. Beneficiary: 1/Integrity Docs |
| UnionBank | The Litigation Practice Group PC | ■ | 1/31/2022 | 1/28/2022 | | 432.69 | WIRE TRANS TRN ■ Sent To: FIFTH THIRD BANK, NATIONAL ASSOC. Beneficiary: 1/Integrity Docs |
| UnionBank | The Litigation Practice Group PC | ■ | 2/28/2022 | 2/4/2022 | | 359.44 | WIRE TRANS TRN ■ Sent To: FIFTH THIRD BANK, NATIONAL ASSOC. Beneficiary: 1/Integrity Docs |
| Chase | The Litigation Practice Group PC | ■ | 2/28/2022 | 2/18/2022 | | 1,216.02 | Fedwire Debit Via: Fifth Third Bk ■ Integrity Docs Orlando, FL 32811 US Ref: Weekly Disbursement/Time/ |
| Chase | The Litigation Practice Group PC | ■ | 2/28/2022 | 2/25/2022 | | 1,051.15 | Fedwire Debit Via: Fifth Third Bk ■ Integrity Docs Orlando, FL 32811 US Ref: Weekly Disbursement/Time/ |
| Chase | The Litigation Practice Group PC | ■ | 3/31/2022 | 3/4/2022 | | 810.36 | Fedwire Debit Via: Fifth Third Bk ■ Integrity Docs Orlando, FL 32811 US Ref: Weekly Disbursement/Time/ |
| Chase | The Litigation Practice Group PC | ■ | 3/31/2022 | 3/18/2022 | | 1,535.66 | Fedwire Debit Via: Fifth Third Bk ■ Integrity Docs Orlando, FL 32811 us Ref: Weekly Disbursement/Time/ |
| Chase | The Litigation Practice Group PC | ■ | 3/31/2022 | 3/24/2022 | | 365.12 | Fedwire Debit Via: Fifth Third Bk ■ Integrity Docs Orlando, FL 32811 US Ref: Weekly Disbursement/Time/ |
| Chase | The Litigation Practice Group PC | ■ | 4/30/2022 | 4/1/2022 | | 1,273.87 | Fedwire Debit Via: Fifth Third Bk NA ■ Integrity Docs Orlando, FL 32811 US Ref: Weekly Disbursement/Time/ |
| Chase | The Litigation Practice Group PC | ■ | 4/30/2022 | 4/7/2022 | | 887.02 | Fedwire Debit Via: Fifth Third Bk ■ : Integrity Docs Orlando, FL 32811 US Ret: Weekly Disbursement/Time/ |
| Chase | The Litigation Practice Group PC | ■ | 4/30/2022 | 4/19/2022 | | 1,942.46 | Fedwire Debit Via: Fifth Third Bk ■ C: Integrity Docs Orlando, FL 32811 US Ref: Weekly Disbursement/Timell |
| Chase | The Litigation Practice Group PC | ■ | 4/30/2022 | 4/21/2022 | | 2,074.10 | Fedwire Debit Via: Fifth Third Bk ■ : Integrity Docs Orlando, FL 32811 US Ref: Weekly Disbursement/Time/ |
| Chase | The Litigation Practice Group PC | ■ | 4/30/2022 | 4/28/2022 | | 439.88 | Fedwire Debit Via: Fifth Third Bk ■ : Integrity Docs Orlando, FL 32811 US Ref: Weekly Disbursement/Time/ |
| Chase | The Litigation Practice Group PC | ■ | 5/31/2022 | 5/5/2022 | | 109.86 | Fedwire Debit Via: Fifth Third Bk ■ Integrity Docs Orlando, FL 32811 US Ref: Weekly Disbursement/Time/ |
| Chase | The Litigation Practice Group PC | ■ | 5/31/2022 | 5/13/2022 | | 877.18 | Fedwire Debit Via: Fifth Third Bk NN042000314 A/C: Integrity Docs Orlando, FL 32811 US Ref: Weekly Disbursement/Time/ |
| Chase | The Litigation Practice Group PC | ■ | 5/31/2022 | 5/19/2022 | | 1,253.89 | Fedwire Debit Via: Fifth Third Bk ■ Integrity Docs Orlando, FL 32811 us Ref: Weekly Disbursement/Time/ |
| Chase | The Litigation Practice Group PC | ■ | 5/31/2022 | 5/27/2022 | | 16,646.14 | Fedwire Debit Via: Fifth Third Bk ■ Integrity Docs Orlando, FL 32811 US Ref: File Purchase - 9 Files/Time/ |
| Chase | The Litigation Practice Group PC | ■ | 6/30/2022 | 6/9/2022 | | 4,008.71 | Fedwire Debit Via: Fifth Third Bk ■ Integrity Docs Orlando, FL 32811 US Ref: Missing First Payments/Time/ |
| Chase | The Litigation Practice Group PC | ■ | 6/30/2022 | 6/10/2022 | | 108.16 | Fedwire Debit Via: Fifth Third Bk ■ Integrity Docs Orlando, FL 32811 US Ref: Weekly Disbursement/Time/ |
| Chase | The Litigation Practice Group PC | ■ | 6/30/2022 | 6/16/2022 | | 1,739.16 | Fedwire Debit Via: Fifth Third Bk ■ Integrity Docs Orlando, FL 32811 us Ref: Weekly Disbursement/Time/ |
| Chase | The Litigation Practice Group PC | ■ | 6/30/2022 | 6/23/2022 | | 378.63 | Fedwire Debit Via: Fifth Third Bk ■ Integrity Docs Orlando, FL 32811 US Ref: Weekly DisbursementTime/ |
| Chase | The Litigation Practice Group PC | ■ | 6/30/2022 | 6/30/2022 | | 311.59 | Fedwire Debit Via: Fifth Third Bk ■ NC: Integrity Docs Orlando, FL 32811 US Ref: Weekly Disbursement/Time/ |
| Chase | The Litigation Practice Group PC | ■ | 7/31/2022 | 7/8/2022 | | 552.54 | Fedwire Debit Via: Fifth Third Bk ■ NC: Integrity Docs Orlando, FL 32811 US Ref: Weekly Disbursement/Time/ |
| Chase | The Litigation Practice Group PC | ■ | 7/31/2022 | 7/14/2022 | | 2,183.11 | Fedwire Debit Via: Fifth Third Bk NA ■ : Integrity Docs Orlando, FL 32811 US Ref: Weekly Disbursement/Time/ |

DRAFT FORM - SUBJECT TO CHANGE

Exhibit 10
Page 154

In re: The Litigation Practice Group PC
Disbursement Details by Payee
4 Years Pre-Petition (03/20/2019 - 03/20/2023)

Prepared by: Grobstein Teeple LLP

| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo | |
|---|---|---|---|---|---|---|---|---|
| Chase | The Litigation Practice Group PC | | 7/31/2022 | 7/21/2022 | | 838.21 | Fedwire Debit Via: Fifth Third Bk Disbursement/Time/i 3:55 | A/C: Integrity Docs Orlando, FL 32811 US Ret: Weekly |
| Chase | The Litigation Practice Group PC | | 7/31/2022 | 7/26/2022 | | 55,208.02 | Fedwire Debit Via: Fifth Third Bk Purchase/Time/i 2:02 | NC: Integrity Docs Orlando, FL 32811 US Ref: File |
| Chase | The Litigation Practice Group PC | | 7/31/2022 | 7/29/2022 | | 1,059.89 | Fedwire Debit Via: Fifth Third Bk Disbursement/Time/i 1:24 | A/C: Integrity Docs Orlando, FL 32811 US Ref: Weekly |
| Chase | The Litigation Practice Group PC | | 8/31/2022 | 8/5/2022 | | 2,700.00 | Fedwire Debit Via: Fifth Third Bk 2/Time/i 2:25 | A/C: Integrity Docs Orlando, FL 32811 US Ret: Invoice |
| Chase | The Litigation Practice Group PC | | 8/31/2022 | 8/5/2022 | | 927.77 | Fedwire Debit Via: Fifth Third Bk Disbursement/Time/i 1:27 | NC: Integrity Docs Orlando, FL 32811 us Ref: Weekly |
| Chase | The Litigation Practice Group PC | | 8/31/2022 | 8/11/2022 | | 1,474.53 | Fedwire Debit Via: Fifth Third Bk Disbursement/Time/i 1:28 | NC: Integrity Docs Orlando, FL 32811 US Ref: Weekly |
| Chase | The Litigation Practice Group PC | | 8/31/2022 | 8/19/2022 | | 33,901.00 | Fedwire Debit Via: Fifth Third Bk PurchaseITime/12:31 | NC: Integrity Docs Orlando, FL 32811 US Ref: File |
| Chase | The Litigation Practice Group PC | | 8/31/2022 | 8/19/2022 | | 1,448.88 | Fedwire Debit Via: Fifth Third Bk NA/ Disbursement/Time/lo:44 | A/C: Integrity Docs Orlando, FL 32811 us Ref: Weekly |
| Chase | The Litigation Practice Group PC | | 8/31/2022 | 8/26/2022 | | 902.83 | Fedwire Debit Via: Fifth Third Bk Disbursement/Time/i 3:43 | NC: Integrity Docs Orlando, FL 32811 US Ref: Weekly |
| Chase | The Litigation Practice Group PC | | 9/30/2022 | 9/2/2022 | | 23,296.65 | Fedwire Debit Via: Fifth Third Bk NA/ Disbursement/Time/i 8:04 | A/C: Integrity Docs Orlando, FL 32811 US Ref: Weekly |
| Chase | The Litigation Practice Group PC | | 9/30/2022 | 9/2/2022 | | 1,035.71 | Fedwire Debit Via: Fifth Third Bk Disbursement/Time/i 1:50 | NC: Integrity Docs Orlando, FL 32811 us Ref: Weekly |
| Chase | The Litigation Practice Group PC | | 9/30/2022 | 9/8/2022 | | 8,500.00 | Fedwire Debit Via: Fifth Third Bk 1:49 Imad: 0908B1Qgc02C009032 | NC: Integrity Docs Orlando, FL 32811 US Ref: Inv 003/Time/i |
| Chase | The Litigation Practice Group PC | | 9/30/2022 | 9/9/2022 | | 478.26 | Fedwire Debit Via: Fifth Third Bk Disbursement/Time/i 1:57 | NC: Integrity Docs Orlando, FL 32811 US Ref: Weekly |
| Chase | The Litigation Practice Group PC | | 9/30/2022 | 9/16/2022 | | 1,147.31 | Fedwire Debit Via: Fifth Third Bk NA/ Disbursement/Time/i 6:44 | A/C: Integrity Docs Orlando, FL 32811 US Ref: Weekly |
| Chase | The Litigation Practice Group PC | | 9/30/2022 | 9/16/2022 | | 519.26 | Fedwire Debit Via: Fifth Third Bk Purchase/Time/i 4:09 | 4 NC: Integrity Docs Orlando, FL 32811 US Ref: File |
| Chase | The Litigation Practice Group PC | | 9/30/2022 | 9/21/2022 | | 10,100.00 | Fedwire Debit Via: Fifth Third Bk InvO4ITime/ii:59 | A/C: Integrity Docs Orlando, FL 32811 us Ref: |
| Chase | The Litigation Practice Group PC | | 9/30/2022 | 9/21/2022 | | 3,590.00 | Fedwire Debit Via: Fifth Third Bk NA/ 1:59 Imad: 0921 | A/C: Integrity Docs Orlando, FL 32811 us Ref: Inv 05/Time/i |
| Chase | The Litigation Practice Group PC | | 9/30/2022 | 9/22/2022 | | 1,942.28 | Fedwire Debit Via: Fifth Third Bk NA/ Missing Amount/Time/i 5:24 | A/C: Integrity Docs Orlando, FL 32811 us Ref: File Purchase - |
| Chase | The Litigation Practice Group PC | | 9/30/2022 | 9/23/2022 | | 1,504.10 | Fedwire Debit Via: Fifth Third Bk Disbursement/Time/i 1:02 | A/C: Integrity Docs Orlando, FL 32811 US Ref: Weekly |
| Chase | The Litigation Practice Group PC | | 9/30/2022 | 9/30/2022 | | 1,483.70 | Fedwire Debit Via: Fifth Third Bk NA/ Disbursement/Time/i 7:55 | A/C: Integrity Docs Orlando, FL 32811 US Ret: Weekly |
| Chase | The Litigation Practice Group PC | | 10/31/2022 | 10/4/2022 | | 19,000.00 | Fedwire Debit Via: Fifth Third Bk Purchase/Time/i 7:22 | 4 A/C: Integrity Docs Orlando, FL 32811 US Ref: File |
| Chase | The Litigation Practice Group PC | | 10/31/2022 | 10/6/2022 | | 1,143.72 | Fedwire Debit Via: Fifth Third Bk Disbursement/Time/i 2:30 | A/C: Integrity Docs Orlando, FL 32811 us Ref: Weekly |
| Chase | The Litigation Practice Group PC | | 10/31/2022 | 10/7/2022 | | 18,340.93 | Fedwire Debit Via: Fifth Third Bk Disbursement/Time/i6:i3 | A/C: Integrity Docs Orlando, FL 32811 US Ref: Weekly |
| Chase | The Litigation Practice Group PC | | 10/31/2022 | 10/12/2022 | | 8,700.00 | Fedwire Debit Via: Fifth Third Bk 6/Time/i 6:02 | A/C: Integrity Docs Orlando, FL 32811 US Ref: Invoice |
| Chase | The Litigation Practice Group PC | | 10/31/2022 | 10/14/2022 | | 1,359.77 | Fedwire Debit Via: Fifth Third Bk Disbursement/Time/i 3:06 | NC: Integrity Docs Orlando, FL 32811 US Ref: Weekly |
| Chase | The Litigation Practice Group PC | | 10/31/2022 | 10/21/2022 | | 648.97 | Fedwire Debit Via: Fifth Third Bk Disbursement/Time/i4:23 | NC: Integrity Docs Orlando, FL 32811 US Ret: Weekly |
| Chase | The Litigation Practice Group PC | | 11/30/2022 | 11/10/2022 | | 2,905.58 | Fedwire Debit Vie: Regions Disbursement/Time/17 28 | NC: Integrity Does Orlando, FL 32811 US Ret: Weekly |
| Chase | The Litigation Practice Group PC | | 11/30/2022 | 11/10/2022 | | 1,921.51 | Fedwire Debit Via: Regions Bk Attiliete Payment/Time/i 7:26 | NC: Integrity Does Orlando, FL 32811 US _____ Week |

2 of 3

DRAFT FORM - SUBJECT TO CHANGE

Exhibit 10
Page 155

In re: The Litigation Practice Group PC

Disbursement Details by Payee

4 Years Pre-Petition (03/20/2019 - 03/20/2023)

Prepared by: Grobstein Teeple LLP

| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|
| Chase | The Litigation Practice Group PC | | 11/30/2022 | 11/15/2022 | | 156,810.34 | Fsdwirs Debit Vie: Regions Bk' NC: Integrity Decs Crlsndo, FL 32811 US Ret: Fib Purchase/Time/i 6:27 |
| Chase | The Litigation Practice Group PC | | 11/30/2022 | 11/18/2022 | | 2,654.94 | Fedwire Debit Vie: Regions Bk' NC: Integrity Docs Orlando, FL 32811 US Ret: Weekly Disbursement/Time/13 14 |
| Chase | The Litigation Practice Group PC | | 11/30/2022 | 11/25/2022 | | 1,243.13 | Fodwiro Debit Via: Regions NC: Integrity Docs Orlando, FL 32811 US Ret: Weekly Disbursement/Time/i 753 |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/5/2022 | | 587.07 | Fedwire Debit Via Regions Bk' NC Integrity Docs Orlando, FL 32811 US Ret: Weekly Disbursement/Time/i 5:00 |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/9/2022 | | 998.88 | Fedwire Debit Via: Regions Bk NC: Integrity Docs Crlando, FL 32811 US Ret: Weekly Disbursement/Time/i |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/19/2022 | | 619.01 | Fedwire Debit Via: Regions Bk NC: Integrity Doos Orlando, FL 32811 US Ret: Weekly Disbursement/Time/ |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/27/2022 | | 1,255.33 | Fedwire Debit Via Regions Bk NC Integrity Docs Orlando, FL 32811 US Rat: Weakly Disbursement/Time/13:58 |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/30/2022 | | 173.05 | Fedwire Debit Via: Regions NC: Integrity Docs Orlando, FL 32811 US Ret: Weekly Disbursement/time/i 4.39 |
| Chase | The Litigation Practice Group PC | | 1/31/2023 | 1/6/2023 | | 345.34 | Fedwire Debit Via: Regions NC: Integrity Docs Orlando, FL 32811 US Ret: Weekly Disbursement/Time/14 47 |
| Bank of America | Litigation Practice Group PC | | 1/31/2023 | 1/13/2023 | | 547.88 | WIRE TYPE:WIRE OUT DATE230113 TIME1 652 BNF:INTEGRITY DOCS BNF BKREGIONS BA NK I WEEKLY DISBURSEMENT |
| Chase | The Litigation Practice Group PC | | 1/31/2023 | 1/24/2023 | | 1,179.20 | Fedwire Debit Vie: Regione Bk' NC: Integrity Does Orlando, FL 32811 US Ret: Weekly Disbursement/Time/i 5:47 |
| Chase | The Litigation Practice Group PC | | 2/28/2023 | 2/7/2023 | | 1,339.46 | Fedwire Debit Via: Regions Bk/ NC: Integrity Docs Orlando, FL 32811 US Ref: Weekly Disbursement/Time/17:52 |
| Bank of America | Litigation Practice Group PC | | 2/28/2023 | 2/9/2023 | | 724.51 | WIRE TYPEWIRE OUT DATE.230209 TIME:1 651 ET BNF:INTEGRITY DOCS-2 BNF BKAMSOUTH BANK I |
| UnionBank | The Litigation Practice Group PC | | 3/31/2023 | 3/6/2023 | | 15,700.20 | WIRE TRANS TRN Sent To: REGIONS BANK Beneficiary: 1/Integrity Docs |
| | | | | | | 481,625.26 | |

DRAFT FORM - SUBJECT TO CHANGE

**Exhibit 10**

**Page 156**

# EXHIBIT 11

Exhibit 11
Page 157

In re: The Litigation Practice Group PC
Disbursement Details by Payee
90 Days Pre-Petition (12/20/2022 - 03/20/2023)

**GROBSTEIN TEEPLE**

| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/27/2022 | | 1,255.33 | Fedwire Debit Via Regions Bk          NC Integrity Docs Orlando, FL 32811 US Rat: Weakly Diabursement/Time/13:58 Imad:          Tm: |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/30/2022 | | 173.05 | Fedwire Debit Via: Regions          NC: Integrity Docs Orlando, FL 32811 US Ret: Weekly Disbursement/time/i 4.39 |
| Chase | The Litigation Practice Group PC | | 1/31/2023 | 1/6/2023 | | 345.34 | Fedwire Debit Via: Regions          NC: Integrity Docs Orlando, FL 32811 US Ret: Weekly Disbursement/Time/14 47 |
| Bank of America | Litigation Practice Group PC | | 1/31/2023 | 1/13/2023 | | 547.88 | WIRE TYPE:WIRE OUT DATE230113 TIME1 652 ETTRN: BNF:INTEGRITY DOCS ID:0330093406 BNF BKREGIONS BA NK ID:          WEEKLY DISBURSEMENT |
| Bank of America | Litigation Practice Group PC | | 1/31/2023 | 1/19/2023 | | 13,746.67 | Bill.com DES:Payables ID:          INDN:Litigation Practice Gr CO ID:1          CCD PMT INFO:Multiple Payments Bill.com Payables |
| Chase | The Litigation Practice Group PC | | 1/31/2023 | 1/24/2023 | | 1,179.20 | Fedwire Debit Vie: Regione Bk          NC: Integrity Does Orlando, FL 32811 US Ret: Weekly Disbursement/Time/i 5:47 |
| Chase | The Litigation Practice Group PC | | 2/28/2023 | 2/7/2023 | | 1,339.46 | Fedwire Debit Via: Regions Bk/062005690 NC: Integrity Docs Orlando, FL 32811 US Ref: Weekly Disbursement/Time/17:52 |
| Bank of America | Litigation Practice Group PC | | 2/28/2023 | 2/9/2023 | | 724.51 | WIRE TYPEWIRE OUT DATE.230209 TIME:1 651 ET BNF:INTEGRITY DOCS-2          BNF BKAMSOUTH BANK ID:          Other |
| UnionBank | The Litigation Practice Group PC | | 3/31/2023 | 3/6/2023 | | 15,700.20 | WIRE TRANS TRN          Sent To: REGIONS BANK Beneficiary: 1/Integrity Docs |
| | | | | | | **35,011.64** | |

DRAFT FORM - SUBJECT TO CHANGE

Payor Accounts: BAT Inc., Coast Processing LLC,
EZ Debt Relief, Maverick Management Group, Prime Logix, The
Litigation Practice Group, Vulcan Consulting Group LLC

Exhibit 11
Page 158

# EXHIBIT 12

Exhibit 12
Page 159

In re: The Litigation Practice Group PC
Summary of Disbursements
Post-Petition Activity (3/20/2023 - Present)



| Bank Name | Account Type | Account Name | Account Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Normalized Payee/Payor Name | Memo |
|---|---|---|---|---|---|---|---|---|---|
| Bank of America | Checking | Prime Logix LLC | ▮ | 4/30/2023 | 4/20/2023 | | 15,000.00 | Integrity Docs, LLC | WIRE TYPE:WIRE OUT DATE230420 TIME:1513 ET ▮ SERVICE ▮ BNF:INTEGRITY DOCS LLC |
| Bank of America | Checking | Prime Logix LLC | ▮ | 4/30/2023 | 4/27/2023 | | 15,000.00 | Integrity Docs, LLC | TRANSFER PRIME LOGIX LLC:Integrity Docs lic Confirmation# ▮ |
| | | | | | | | 30,000.00 | | |

DRAFT FORM - SUBJECT TO CHANGE

Exhibit 12

# EXHIBIT 13

Exhibit 13
Page 161

1   CHRISTOPHER B. GHIO (259094)
    christopher.ghio@dinsmore.com
2   CHRISTOPHER CELENTINO (131688)
    christopher.celentino@dinsmore.com
3   YOSINA M. LISSEBECK (201654)
    yosina.lissebeck@dinsmore.com
4   DINSMORE & SHOHL LLP
5   655 West Broadway, Suite 800
    San Diego, California 92101
6   Tele: 619.400.0500
    Fax:  619.400.0501
7

8   Sarah S. Mattingly (Ky. Bar 94257)
    sarah.mattingly@dinsmore.com
9   DINSMORE & SHOHL, LLP
    101 S. Fifth Street, Suite 2500
10  Louisville, Kentucky 40202
    Tele: 859-425-1096
11  Fax: 502-585-2207
12  (Admitted pro hac vice)

13  Special Counsel to Richard A. Marshack

**FILED & ENTERED**

**JUN 03 2024**

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY mccall      DEPUTY CLERK

14          **UNITED STATES BANKRUPTCY COURT**

15      **CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION**

16  In Re                          Case No: 23-bk-10571-SC

17                                 Chapter 11

18                                 **ORDER GRANTING MOTION FOR**
    The Litigation Practice Group P.C.,   **ENTRY OF PROTECTIVE ORDER AND**
19                                 **THE PROTECTIVE ORDER**

20              Debtor(s),

21                                 Date:   May 23, 2024
                                   Time:   1:30 p.m.
22                                 Judge:  Hon. Scott C. Clarkson
23                                 Place:  Courtroom 5C (via Zoom)[1]
                                           411 West Fourth Street
24                                         Santa Ana, CA 92701

25

26

27  _____

28  [1] Video and audio connection information for each hearing will be provided on Judge Clarkson's
    publicly posted hearing calendar, which may be viewed online at:
    http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

Exhibit 13
Page 162

The Court has read and considered the Notice of Motion and Motion for Entry of Protective Order (the "Motion") filed by Richard A. Marshack, in his capacity as the Chapter 11 Trustee (the "Trustee") of the Bankruptcy Estate ("Estate") of The Litigation Practice Group P.C., on May 2, 2024, pursuant to Federal Rule of Bankruptcy Procedure 7026 and Federal Rule of Civil Procedure 26(c)(1), as Dk. No. 1164 ("Motion"), and has found good cause to grant the Motion.

IT IS HEREBY ORDERED that:

1.    The Motion is granted;

2.    The below Protective Order shall apply to any contested matter arising

in the main bankruptcy case and in all adversary proceedings filed by or against Trustee, present and future; and

3.    Govern the discovery conducted therein.

## PROTECTIVE ORDER

**1.    DEFINITIONS**

1.1    "Confidential Information" as used in this Protective Order shall mean documents and other information (regardless of how generated, stored or maintained) that a Party or non-party reasonably believes to contain or reflect non-public financial or business information, bank records, financial records, such as social security numbers, non-public financial or personal information of a Party or non-party, account numbers, sensitive digital information and identifiers, information subject to confidentiality agreements or provisions other than this Protective Order, and other non-public research, development, or commercial information that derives value or avoids injury by virtue of not being known to the public.

1.2    This "Action" is defined and hereby means any contested matter arising in the main bankruptcy case and in all adversary proceedings filed by or against Trustee, present and future.

1.3    "Designating Party" means a Party or non-party that designates Confidential Information during the Action.

1.4    "Receiving Party" means a Party that receives Confidential Information during the Action.

2

Exhibit 13
Page 163

1       1.5    "Party" or "Parties" means person or entity subject to this Protective Order.

2       **2.    SCOPE OF THIS PROTECTIVE ORDER**

3       2.1    Unless otherwise ordered, this Protective Order shall govern certain documents and

4   other products of discovery obtained in the Action from the Parties there to, and from third parties.

5   As well as certain information copied or derived therefrom, excerpts, summaries or compilations

6   thereof, including, but not limited to, documents voluntarily exchanged as part of early settlement

7   discussions, documents produced pursuant to initial disclosures, requests authorized by the Federal

8   Rules of Civil Procedure made applicable herein by the Federal Rules of Bankruptcy Procedure,

9   answers to interrogatories, deposition transcripts, responses to requests for production, responses to

10  requests for admission, subpoenas, affidavits, declarations, expert reports, and other such material

11  and information as may be produced during the course of the Action and designated as Confidential

12  Information.

13      **3.    DESIGNATION OF CONFIDENTIAL INFORMATION**

14      3.1    This Protective Order shall govern the production and handling of any Confidential

15  Information in this Action. Any Party or non-party who produces Confidential Information in this

16  Action may designate it as "Confidential" or "Attorneys' Eyes Only" consistent with the terms of this

17  Protective Order. Whenever possible, the Designating Party must designate only those portions of a

18  document, written discovery responses, deposition, transcript, or other material that contain the

19  Confidential Information and refrain from designating entire documents. Regardless of any

20  designations made hereunder, the Designating Party is not otherwise restricted from use or disclosure

21  of its Confidential Information outside of this Action or for any business purposes. In addition, any

22  Party may move to modify or seek other relief from any of the terms of this Protective Order if it has

23  first tried in writing and in good faith to resolve its needs or disputes with the other Parties or Party

24  as the case may be under the terms of this Protective Order. Further, nothing in this Protective Order

25  shall prevent a Party from redacting documents consistent with the Federal Rules of Civil Procedure

26  and utilizing the documents as needed through-out the Action.

27      3.2    <u>Application to Non-Parties:</u> Before a non-party is given copies of documents or

28  materials designated as Confidential Information or Attorneys' Eyes Only as permitted hereunder, it

3

Exhibit 13
Page 164

must first sign an acknowledgment to be bound to these terms that is attached hereto as <u>Exhibit A</u>; if it fails to do so, the Parties to this Action must resolve any such dispute before making disclosure of designated information as permitted hereunder to the non-party. If a non-party wishes to make designations hereunder, it must first sign attached <u>Exhibit A.</u>

        **3.3**    <u>Timing and Provisional Protection:</u> Designations of Confidential Information may be made at any time. To avoid potential waiver of protection hereunder, the Designating Party should designate documents or materials containing Confidential Information at the time of production or disclosure, including on the record during the taking of any deposition. Deposition testimony will be deemed provisionally protected for a period of thirty (30) days after the transcript is released to the Parties by the court reporter, although the Parties may agree at any time to different timelines of provisional protection of information as Confidential or Attorneys' Eyes Only as part of one or more specific depositions. To retain any designations beyond the provisional period, a Designating Party must designate specific pages and lines of deposition testimony before the provisional period has expired. Such designations must be made in writing so that all counsel and court reporters may append the designation to all copies of the transcripts.

        **3.4**    <u>Manner of Designation:</u> Confidential Information may be designated hereunder in any reasonable manner or method that notifies the Receiving Party of the designation level and identifies with specificity the information to which the designation applies. If made verbally, the Designating Party must promptly confirm the designation in writing. Whenever possible, the Designating Party should stamp, affix, or embed a legend of "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY" on each designated page of the document or electronic image that contains Confidential Information.

        **4.**      **CHALLENGES TO DESIGNATED INFORMATION**

        **4.1**    In the event that a Receiving Party disagrees at any time with any designation(s) made by the Designating Party, the Receiving Party must first try to resolve such challenge in good faith on an informal basis with the Designating Party. The Receiving Party must provide written notice of the challenge and the grounds therefor to the Designating Party, who must respond in writing to the challenge within fifteen (15) days. At all times, the Designating Party carries the burden of establishing the propriety of the designation and protection level. Unless and until the challenge is

resolved by the Parties or ruled upon by the Court, the designated information shall remain protected under this Protective Order. The failure of any Receiving Party to challenge a designation does not constitute a concession that the designation is proper or an admission that the designated information is otherwise competent, relevant, or material.

**5.**     **LIMITED ACCESS/USE OF PROTECTED INFORMATION**

5.1   <u>Restricted Use:</u> Information that is produced or exchanged in the course of the Action and designated under this Protective Order may be used for preparation for trial and preparation for any appeal of any and all matters in the Action, as well as related settlement negotiations, and for no other purpose, without the written consent of the Designating Party. No Confidential Information may be disclosed to any person except in accordance with the terms of this Protective Order, unless the parties are co-counsel or have entered into joint defense agreements. All persons in possession of Confidential Information agree to exercise reasonable care with regard to the custody, use, or storage of such information to ensure that its confidentiality is maintained. This obligation includes, but is not limited to, the Receiving Party providing to the Designating Party prompt notice of the receipt of any subpoena that seeks production or disclosure of any designated information and consulting with the Designating Party before responding to the subpoena. Any use or disclosure of Confidential or Attorneys' Eyes Only information in violation of the terms of this Protective Order may subject the disclosing person or party to sanctions.

5.2   <u>Access to "Confidential" Information:</u> The Party(ies) and all persons subject to this Protective Order agree that information designated as "CONFIDENTIAL" may only be accessed or reviewed by the following:

    a)     The Court, its personnel, and court reporters;

    b)     Counsel of record, or co-counsel for any Party, or other party that has entered into a joint defense agreement in the Action and their employees who assist counsel of record, or co-counsel in the Action and are informed of the duties and obligations imposed hereunder;

    c)     The Parties, including their clients, agents and employees who are assisting or have reason to know of the Action;

/ / /

5

Exhibit 13
Page 166

d)       Experts or consultants employed by the Parties or their counsel, or co-counsel, for purposes of an Action, so long as each such expert or consultant has signed attached <u>Exhibit A;</u> and

e)       Other witnesses or persons with the Designating Party's consent or by court order.

5.3       <u>Access to "Attorneys' Eyes Only" Designations:</u> The Parties and all persons subject to this Protective Order agree that information designated as "ATTORNEYS' EYES ONLY" may only be accessed or reviewed by the following:

a)       The Court, its personnel, and court reporters;

b)       Counsel of record, or co-counsel for any Party, or other party that has entered into a joint defense agreement in the Action and their employees who assist counsel of record in the Action and are informed of the duties hereunder;

c)       In-house counsel for any Party in the Action and Richard A. Marshack, as Chapter 11 Trustee of The Litigation Practice Group P.C. who is informed of the duties and obligations imposed hereunder;

d)       Experts or consultants employed by the Parties or their counsel, or co-counsel for purposes of the Action,  and so long as each such expert or consultant has signed attached <u>Exhibit A;</u> and

e)       Other witnesses or persons to whom the Designating Party agrees in advance of disclosure or by court order.

5.4       <u>Non-Waiver Effect of Designations:</u> Neither the taking of, nor the failure to take, any action to enforce the provisions of this Protective Order, nor the failure to object to any designation, will constitute a waiver of any Party(ies)'s claim or defense in the Action or any other action or proceeding, including, but not limited to, a claim or defense that any designated information is or is not Confidential, is or is not entitled to particular protection, or embodies or does not embody information protectable by law.

5.5       <u>In-Court Use of Designated Information:</u> If information designated under this Protective Order will or may be offered in evidence at a hearing or trial related to any matter in the Action, then the offering party must give advance notice to the party or non-party that designated prior to offering the information so that any use or disclosure may be addressed in accordance with

6

Exhibit 13
Page 167

the Court's case-management or other pre-trial order, or by a motion *in limine.*  Nothing in this Protective Order shall be construed as a waiver by a Party of any objections that may be raised as to the admissibility at trial of any evidentiary materials.

**6.    CLAW-BACK REQUESTS**

6.1    <u>Failure to Make Designation:</u>  If, at any time, a Party or non-party discovers that it produced or disclosed Confidential Information without designation, it may promptly notify the Receiving Party and identify with particularity the Confidential Information to be designated and the level of designation (the claw-back notification). The Receiving Party may then request substitute production of the newly-designated information. Within thirty (30) days of receiving the claw-back notification, the Receiving Party must: (1) certify to the Designating Party it has appropriately marked or, if substitute production has been requested, destroyed all unmarked copies that it received, made, and/or distributed; and (2) if it was practicably unable to mark or destroy any information because disclosures occurred while the Receiving Party was under no duty of confidentiality under the terms of this Protective Order regarding that information, the Receiving Party must reasonably provide as much information as practicable to aid the Designating Party in protecting the information, consistently with the Receiving Party's attorney-client, work-product, and/or trial-preparation privileges.

6.2    <u>Inadvertent Production of Privileged Information:</u> If, at any time, a Party discovers that it produced information that it reasonably believes is subject to protection under the attorney/client, work-product, or trial-preparation privileges, then it must promptly notify each Receiving Party of the claim for protection, the basis for it, amend its privilege log accordingly, and comply with Fed. R. Civ. P. 26(b)(5). Whenever possible, the producing party must produce substitute information that redacts the information subject to the claimed protection. The Receiving Party must thereupon comply with Fed. R. Civ. P. 26(b)(5)(B) as to the information subject to the claimed protection.

/ / /

/ / /

/ / /

7

Exhibit 13
Page 168

**7.     DURATION/CONTINUED RESTRICTIONS**

7.1     <u>Handling of Designated Information Upon Conclusion of the Main Bankruptcy Case:</u>
Upon conclusion of the Main Bankruptcy Case, by way of dismissal or closing of the case, the Designating Party(ies) is/are responsible for ensuring that any Party or person to whom the Designating Party shared or disclosed designated information in any of the matters under the Action returns or destroys all of its copies, regardless of the medium in which it was stored. No witness or Party may retain designated information that it received from any other Party or non-party under this Protective Order; only counsel of record, or co-counsel, are the authorized agents who may retain one copy for their respective legal files, and who must also describe to the Designating Party the extra steps taken to protect its legal file containing paper and/or electronic copies of the designated information so that it is not accessed, used, or disclosed inconsistently with the obligations under this Protective Order. This provision does not apply to the Court or Court staff. Moreover, this provision does not apply to Trustee, who may retain and use – consistent with this Order – Confidential Information received in any Action during the entirety of the Bankruptcy.

7.2     <u>Continued Restrictions Under this Protective Order:</u> The restrictions on disclosure and use of Confidential Information shall survive the conclusion of the Bankruptcy case and any matter in the Action.

**8.     PRIVILEGED OR PROTECTED INFORMATION**

8.1     Nothing in this Protective Order shall require disclosure of information that is protected by the attorney-client privilege, the work-product protection, or any other legally cognizable privilege (a "Privilege or Protection").  If information subject to a claim of Privilege or Protection is inadvertently produced, pursuant to Federal Rule of Evidence 502(d) such production shall not constitute a waiver of, or estoppel as to, any claim of Privilege or Protection for such information or any other information that may be protected from disclosure by a Privilege or Protection in any proceeding.

8.2     If a Party receives a document that appears to be subject to a Privilege or Protection, then it shall refrain from examining the document any more than is essential to ascertain if it is privileged or protected and shall promptly notify the producing Party in writing that the receiving

8

Exhibit 13
Page 169

Party possesses material that appears to be subject to a Privilege or Protection. The producing Party shall have seven (7) days after receiving such notice to assert a Privilege or Protection over the identified material. If the producing Party does not assert a claim of Privilege or Protection within the seven (7)-day period, the material in question shall be deemed not privileged or protected.

8.3     If a producing Party has produced a document subject to a claim of Privilege or Protection, upon written request by the producing Party, the document for which a claim of Privilege or Protection is made shall be sequestered or destroyed to the extent reasonably practicable, and the receiving Party shall not use the document for any purpose other than in connection with analyzing or disputing a claim of Privilege or Protection or in connection with a motion to compel the production of the document.

8.4     The receiving Party sequestering or destroying such material may then move the Court for an order compelling production of the material. The applicable producing Party bears the burden of establishing the applicable Privilege or Protection of any clawed-back document or information as and to the same extent that it would have borne such burden had it not produced the document or information.  Nothing in this Protective Order shall limit the Court's right or any receiving Party's right to request an in camera review of any information subject to a claim of Privilege or Protection.

###

Date: June 3, 2024

Scott C. Clarkson
United States Bankruptcy Judge

Exhibit 13
Page 170

1
2
3
4
5
6                              EXHIBIT "A"
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1 | Christopher B. Ghio (State Bar No. 259094)
Christopher Celentino (State Bar No. 131688)
2 | Yosina M. Lissebeck (State Bar No. 201654)
**DINSMORE & SHOHL LLP**
3 | 655 West Broadway, Suite 800
San Diego, CA 92101
4 | Telephone:  619.400.0500
Facsimile:  619.400.0501
5 | christopher.ghio@dinsmore.com
christopher.celentino@dinsmore.com
6 | yosina.lissebeck@dinsmore.com

7 | Sarah S. Mattingly (Ky. Bar 94257)
DINSMORE & SHOHL, LLP
8 | 101 S. Fifth Street, Suite 2500
Louisville, KY 40202
9 | Telephone: 859-425-1096
Facsimile: 502-585-2207
10 | Sarah.mattingly@dinsmore.com
(Admitted pro hac vice)

11 |

12 | Special Counsel to Richard A. Marshack,
Chapter 11 Trustee

13 |

14 |

15 | **UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**
16 |

17 |

18 | In Re                                                    Case No. 8:23-BK-10571-SC

19 |                                                         Chapter 11

20 | The Litigation Practice Group P.C.,        **EXHIBIT A TO STIPULATED ORDER**

         Debtor(s),
21 |                                                         Date:   May 23, 2024

22 |                                                         Time:   1:30 p.m.

23 |                                                         Judge:  Hon. Scott C. Clarkson
                                                          Place:  Courtroom 5C[1] - Via Zoom
24 |                                                                 411 W. Fourth Street
                                                                  Santa Ana, CA  92701
25 |

26 |

27 |

28 | [1] Video and audio connection information for each hearing will be provided on Judge Clarkson's
publicly posted hearing calendar, which may be viewed online at:
http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

1   This is to certify that:

2       (a)     I am being given access to Confidential Information pursuant to the

3   Stipulated Protective Order that was entered into the main bankruptcy case for

4   Litigation Practice Group, but which is binding and controlling as set forth by the

5   Court's Order on any and all contested matters and  any and all litigation commenced

6   by Trustee;

7       (b)     I have read the Stipulated Protective Order; and

8       (c)     I agree to be bound by the terms and conditions thereof, including,

9   without limitation, to the obligations regarding the use, non-disclosure and return of

10  such Confidential Information. I further agree that in addition to being contractually

11  bound by the Stipulated Protective Order, I am subject to the jurisdiction of the above

12  reference Court for any violation thereof.

13

14  Date: _____

15

16                                            _____

17                                                      Signature

18

19                                            _____

20                                                      Printed Name

21

22

23

24

25

26

27

28

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br><br>Richard A. Marshack,<br>Trustee of the LPG Liquidation Trust | DEFENDANTS<br><br>Integrity Docs, LLC and Richard Nodelman |
|---|---|

| ATTORNEYS (Firm Name, Address, and Telephone No.)<br><br>Christopher Celentino     Dinsmore & Shohl LLP<br>Yosina M. Lissebeck      655 West Broadway, Suite 800<br>Brian W. Boyd (pro hac vice)  San Diego, California 92101<br>                     619.400.0500 | ATTORNEYS (If Known) |
|---|---|

| PARTY (Check One Box Only)<br>☐ Debtor     ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor   ☐ Other<br>☒ Trustee | PARTY (Check One Box Only)<br>☐ Debtor     ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor   ☐ Other<br>☐ Trustee |
|---|---|

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

(1) Avoidance, Recovery, and Preservation of 2-Year Actual Fraudulent Transfers; (2) Avoidance, Recovery, and Preservation of 2-Year Constructive Fraudulent Transfers; (3) Avoidance, Recovery, and Preservation of 4-Year Actual Fraudulent Transfers; (4) Avoidance, Recovery, and Preservation of 4-Year Constructive Fraudulent Transfers; (5) Avoidance, Recovery and Preservation of Preferential Transfers Made Within Ninety Days of the Petition Date; (6) Avoidance, Recovery, and Preservation of Unauthorized Post-Petition Transfer; (7) Aiding and Abetting; and (8) Turnover

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☒ 11-Recovery of money/property - §542 turnover of property
☒ 12-Recovery of money/property - §547 preference
☒ 13-Recovery of money/property - §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ 532,890.20 |

Other Relief Sought

**B1040 (FORM 1040) (12/15)**

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>The Litigation Practice Group P.C. | BANKRUPTCY CASE NO.<br>8:23-bk-10571-SC | |
| DISTRICT IN WHICH CASE IS PENDING<br>Central District of California | DIVISION OFFICE<br>Santa Ana | NAME OF JUDGE<br>Hon. Scott C. Clarkson |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br>/s/ Brian W. Boyd | | |
| DATE<br><br>March 17, 2025 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br><br>Brian W. Boyd | |

## INSTRUCTIONS

 The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

 A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

 The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.