1  Christopher B. Ghio (State Bar No. 259094)
   Christopher Celentino (State Bar No. 131688)
2  Yosina M. Lissebeck (State Bar No. 201654)
   **DINSMORE & SHOHL LLP**
3  655 West Broadway, Suite 800
   San Diego, CA 92101
4  Telephone: 619.400.0500
   Facsimile:  619.400.0501
5  christopher.ghio@dinsmore.com
   christopher.celentino@dinsmore.com
6  yosina.lissebeck@dinsmore.com

7  Sarah S. Mattingly (Ky. Bar 94257)
   **DINSMORE & SHOHL LLP**
8  101 S. Fifth Street, Suite 2500
   Louisville, KY 40202
9  Telephone: 859-425-1096
   Facsimile: 502-585-2207
10 Sarah.mattingly@dinsmore.com
   (Admitted pro hac vice)

11
   Kelli A. Lee (PA. Bar 309770)
12 **DINSMORE & SHOHL LLP**
   Six PPG Place, Suite 1300
13 Pittsburgh, PA, 15222
   Telephone: 412-288-5852
14 Facsimile: 412-281-5055
   Kelli.lee@dinsmore.com
15 (Admitted pro hac vice)

16 *Special Counsel to Richard A. Marshack,*
   *Trustee of the LPG Liquidation Trust*

17
                **UNITED STATES BANKRUPTCY COURT**

18
          **CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION**

19
   | In re: | Case No. 8:23-bk-10571-SC |
20 | | |
   | The Litigation Practice Group P.C., | Chapter 11 |
21 | | |
   |    Debtor. | Adv. Proc. No. _____ |
22 | | |
   | | **COMPLAINT FOR:** |
23

24

25

26

27

28

1

| | |
|---|---|
| Richard A. Marshack,<br>Trustee of the LPG Liquidation Trust,<br><br>     Plaintiff,<br><br>     v.<br><br>The Debt Relief Group LLC, A Florida<br>Limited Liability Company,<br><br>     Defendant | **(1) AVOIDANCE, RECOVERY, AND PRESERVATION OF 2-YEAR ACTUAL FRAUDULENT TRANSFERS;**<br><br>**(2) AVOIDANCE, RECOVERY, AND PRESERVATION OF 2-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS;**<br><br>**(3) AVOIDANCE, RECOVERY, AND PRESERVATION OF 4-YEAR ACTUAL FRAUDULENT TRANSFERS;**<br><br>**(4) AVOIDANCE, RECOVERY, AND PRESERVATION OF 4-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS;**<br><br>**(5) AVOIDANCE, RECOVERY AND PRESERVATION OF PREFERENTIAL TRANSFER MADE WITHIN NINETY DAYS OF THE PETITION DATE;**<br><br>**(6) TURNOVER; and,**<br><br>**(7) DISALLOWANCE OF CLAIMS.**<br><br>Judge: Hon. Scott C. Clarkson |

For his *Complaint for (1) Avoidance, Recovery, and Preservation of 2-Year Actual Fraudulent Transfers; (2) Avoidance, Recovery, and Preservation of 2-Year Constructive Fraudulent Transfers; (3) Avoidance, Recovery, and Preservation of 4-Year Actual Fraudulent Transfers; (4) Avoidance, Recovery, and Preservation of 4-Year Constructive Fraudulent Transfers; (5) Avoidance, Recovery, and Preservation of Preferential Transfer; (6) Turnover and, (7) Disallowance of Claims* ("Complaint"), plaintiff Richard A. Marshack, the former Chapter 11 Trustee for the bankruptcy estate ("Estate") of debtor The Litigation Practice Group P.C. ("Debtor" or "LPG") and current Liquidating Trustee of the LPG Liquidation Trust (collectively, "Trustee" or "Plaintiff") in the above-captioned bankruptcy case ("Bankruptcy Case"), alleges and avers as follows:

**STATEMENT OF JURISDICTION, NATURE OF PROCEEDING, AND VENUE**

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E), (H) and (O), 1334(b), and General Order No. 13-05 of the District Court for the Central District of California because this is a core proceeding arising in and/or related to the Bankruptcy Case, which is a case under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code"), and which is pending in the United States Bankruptcy Court for the Central District of California, Santa Ana Division ("Bankruptcy Court").

2. Regardless of whether this proceeding is core, non-core, or otherwise, Plaintiff consents to the entry of a final order and judgment by the Bankruptcy Court.

3. Defendant is notified that Rule 7008 of the Federal Rules of Bankruptcy Procedure requires Defendant to plead whether consent is given to the entry of a final order and judgment by the Bankruptcy Court.

4. Venue of this adversary proceeding properly lies in this judicial district pursuant to 28 U.S.C. § 1409(a) because this proceeding is related to Debtor's pending Bankruptcy Case.

**THE PARTIES**

5. Plaintiff, Richard A. Marshack, is the duly-appointed, qualified, and former Chapter 11 Trustee of Debtor's Estate, and is now the current duly-appointed, qualified, and acting Liquidating Trustee of the LPG Liquidation Trust.

6. Debtor is, and at all material times was, a professional corporation organized, existing, and in good standing under the laws of the State of California, with its principal place of business in Tustin, California.

7. Defendant, Debt Relief Group LLC ("Defendant" or "Debt Relief"), is, and at all material times represented that it was, a limited liability company, existing under the laws of the State of Florida.

8. Defendant may be served via first class mail, postage prepaid, upon an officer, managing or general agent, at Robert Kramer at 4000 Hollywood Boulevard, Suite 485-South, West Palm Beach, FL 33409 or any other agent authorized by appointment at 1800 Old Okeechobee Road, Suite 200, West Palm Beach, FL 33409.

# GENERAL ALLEGATIONS

## A.    The Bankruptcy Case

9.      On March 20, 2023 (the "Petition Date"), LPG filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, commencing the Bankruptcy Case. Diab made the decision for LPG to file for bankruptcy in order to avoid a plethora of pending lawsuits, two of which sought an order appointing a receiver, including but not limited to: *Validation Partners, LLC v. The Litigation Practice Group, PC, et al*., Case No. 30-2022-01281911-CU-BC-CXC (Orange County Super Ct. September 20, 2022) and *Debt Validation Fund II, LLC, et al. v. The Litigation Practice Group PC, et al*., Case No. 30-2023-01303355-CU-CO-CXC (Orange County Super. Ct. January 23, 2023), among many others. In order to abscond with and delay discovery of substantial assets and continue to profit from LPG client files and client payment obligations pursuant to LPG's client Legal Services Agreements ("ACH Receivables") prior to filing bankruptcy, Diab and other defendants devised a plan to fraudulently transfer funds, assets, client files, and ACH Receivables out of LPG to third parties.

10.     After the Office of the United States Trustee (the "UST") filed the *Motion by United States Trustee to Dismiss or Convert Case Pursuant to 11 U.S.C. § 1112(b)* [Bankr. Docket No. 21] and creditors Debt Validation Fund II, LLC; MC DVI Fund 1, LLC; and MC DVI Fund 2, LLC filed the *Motion by DVF and MC DVI to Dismiss Chapter 11 Case Pursuant to 11 U.S.C. §§ 105, 305, 349, & 1112, or in the Alternative Convert This Case to Chapter 7 or Appoint a Trustee* [Bankr. Docket No. 44], the Court entered the *Order Directing United States Trustee to Appoint Chapter 11 Trustee* [Bankr. Docket No. 58] on May 4, 2021, thereby granting the UST's motion and directing the UST to appoint a Chapter 11 Trustee in the Bankruptcy Case.

11.     Pursuant to the *Acceptance of Appointment as Chapter 11 Trustee* [Bankr. Docket No. 63; the *Order Approving Appointment* is 1046 Action Docket No. 65], on May 8, 2023, Plaintiff accepted his appointment as the Chapter 11 Trustee in the Bankruptcy Case. The Court approved the Trustee's appointment in its *Order Approving the U.S. Trustee's Application for the Appointment of a Chapter 11 Trustee*, though he no longer serves in that capacity.  [Bankr. Docket No. 65]. Plaintiff Trustee was not appointed until after the events giving rise to this action and, therefore,

bases these allegations on information and belief. *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) ("The *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible."); *Miller v. City of Los Angeles*, 2014 U.S. Dist. LEXIS 198871, 2014 WL 12610195, at *5 (C.D. Cal. Aug. 7, 2014) (recognizing that the plaintiff's "information and belief" pleading was allowed and "necessary at times"); *see also Mireskandari v. Daily Mail and General Trust PLC*, 2013 U.S. Dist. LEXIS 194437, 2013 WL 12129642, at *4 (C.D. Cal. July 31, 2013) ("The Federal Rules of Civil Procedure allow parties to plead facts on 'information and belief' if the facts 'will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.'") (citations omitted.)

12.    Pursuant to the *Order Confirming Modified First Amended Joint Chapter 11 Plan of Liquidation* entered September 9, 2024, and the *Notice of Occurrence of Effective Date of Modified First Amended Joint Chapter 11 Plan of Liquidation* filed September 24, 2024, Richard A. Marshack also became the Liquidating Trustee of the LPG Liquidation Trust, effective September 24, 2024, and he continues to serve in this capacity at this time.  [Bankr. Docket Nos. 1646 & 1762.]

13.    All claims have been transferred to the LPG Liquidation Trust pursuant to the confirmed plan and Plaintiff brings this action solely in his capacity as the former Chapter 11 Trustee and current Liquidating Trustee of the LPG Liquidation Trust for the benefit of Debtor's Estate and its creditors.

**B.    LPG'S OWNERSHIP AND MANAGEMENT**

14.    Prior to the Petition Date, LPG operated a law firm for consumers across the country who sought assistance in contesting or resolving debts. LPG services over 50,000 customers across the United States. At all relevant times, LPG was controlled and operated by an individual named Tony Diab ("Diab").

15.    Despite having been disbarred in California and Nevada, Diab controlled and operated LPG since its inception. However, Diab endeavored to conceal his control over LPG, its finances, marketing, affiliates and operations. For example, Diab purportedly required his LPG

employees to call him "Admin," his email address was "admin@lpglaw.com" and the name plate on his desk apparently read, "I don't work here."

**C.     LPG**

16.     LPG operated a law firm for consumers across the country who sought assistance in contesting or resolving debts they would identify.

17.     The consumers would pay LPG over a period of time via monthly debits from their bank accounts.

18.     The monthly payments were meant to cover all legal services LPG provided to the consumers including validation of the debts, review of documents to determine enforceability, and court appearances to halt lawsuits to obtain judgments.

19.     In certain instances, LPG would file a lawsuit in an effort to eliminate a disputed debt or to prosecute affirmative claims held by the consumers.

20.     LPG mismanaged the consumers' monthly payments by failing to segregate and hold client payments in trust until fees had been earned by LPG.

21.     Diab and other defendants devised a plan to fraudulently transfer funds, client files, client funds and assets in the form of ACH Receivables (the "ACH Receivables" or "Accounts Receivable") out of LPG to third parties prior to the filing of bankruptcy.

22.     To obtain consumer clients, LPG contracted with marketing companies, who engaged in illegal capping and would advertise or call to solicit consumers to become clients of LPG in exchange for a percentage of the ACH Receivables collected by LPG from the consumers. The marketing affiliates went so far as to assist with the execution of an engagement letter between the consumer and LPG.

23.     In exchange, LPG agreed to pay the marketing affiliates a percentage of the ACH Receivables collected by LPG from the consumers. LPG would also enter into purchase agreements, at a discount, with various marketing affiliates in an attempt to regain control over the receiveables that marketing companies had an interest in.

24.     Because LPG received payments from consumers over time, it often sought financing against its future ACH Receivables. This borrowing was used to finance operations at LPG, to pay

the fees owed to the marketing companies for providing the client referrals, and to pay creditors which had provided earlier-in-time financing in a growing Ponzi scheme, among other improper purposes.

25.    Many of the documents executed in connection with such financing described the transactions as account receivable purchase agreements.

**D.    Defendant**

26.    Defendant was one of the marketing companies that procured clients for LPG.

27.    LPG agreed to pay, and in fact paid, Defendant a portion of the monthly payments received from consumers referred by Defendant.

28.    Defendant also entered into agreements pursuant to which it purported to purchase accounts receivable from LPG. Pursuant to these agreements, Debtor purported to sell to Defendant a portion of its income stream.

**i.    Affiliate Agreement**

29.    On or about September 30, 2022, Debtor entered into an affiliate agreement with Defendant ("Affiliate Agreement"). A true and accurate copy of the Affiliate Agreement is attached as **Exhibit 1** and incorporated here.

30.    The Affiliate Agreement states that Defendant "owns and operates a system of generating leads consisting of consumers interested in the legal services offered by LPG." *See* **Ex. 1**.

31.    Pursuant to the Affiliate Agreement, Defendant generated leads consisting of consumers interested in the legal services offered by LPG and referred those consumers to Debtor. *See* **Ex. 1**.

32.    Defendant went so far as to assist with the execution of an engagement letter with the consumer. *See* **Ex. 1**.

33.    Pursuant to the Affiliate Agreement, Debtor agreed to pay Defendant as follows:

> LPG shall pay 65% per file for each file that Affiliate places with LPG, not counting the monthly maintenance fee of $96.38, which LPG shall retain to cover administrative costs for each file. LPG shall calculate the amount of

each file, apply the above-identified percentage fee, and remit the same to Affiliate pursuant to an agreed-upon schedule not to exceed one remittance per seven (7) calendar days. If any consumer cancels LPG's services, or demands a refund for payment for such services, or both, then LPG shall be solely responsible [sic] for such cost and Affiliate shall not have to share such expenses.

*See* **Ex. 1**.

34.     The Affiliate Agreement violates Sections 6151 and 6155 of the California Business and Professional Code, which prohibit referrals of potential clients to attorneys unless registered with the State Bar of California. CAL. BUS. & PROF. CODE § 6155. "Referral activity" includes "any entity 'which, in person, electronically, or otherwise, refers the consumer to an attorney or law firm not identified' in the advertising." *Jackson v. LegalMatch.com*, 42 Cal. App. 5th 760, 775 (2019). A referral includes receiving information from potential clients and sending that information to lawyers, even when the advertiser does not advertise the name of the attorneys and the clients do not clear the name of the potential attorney after the referral occurred. *Id.*

35.     Further, if any effect of an agreement is to accomplish an unlawful purpose, the agreement may be declared illegal regardless of the intention of the parties. *Stockton Morris Plan Co. v. Cal. Tractor & Equip. Corp.*, 112 Cal. App. 2d 684, 690 (1952) (citing *Fewel & Dawes, Inc. v. Pratt*, 17 Cal. 2d 85, 91 (1941)). This remains true regardless of whether the contract has been performed. *Stevens v. Boyes Hot Springs Co.*, 113 Cal. App. 479, 483 (1931) (A contract by a corporation to purchase its own stock has the effect of illegally withdrawing and paying to a stockholder a part of the capital stock of the corporation and is illegal and void, regardless of the fact that the contract is fully performed by the sellers and partially performed by the corporation.); *Mansfield v. Hyde*, 112 Cal. App. 2d 133, 139 (1952), overruled, *Fomco, Inc. v. Joe Maggio, Inc.*, 8 Cal. Rptr. 459 (1960) (Where object of statute requiring licenses is to prevent improper persons from engaging in particular activity, or is for purpose of regulating occupation or business for protection of public, imposition of penalty amounts to prohibition against engaging in occupation or business without license, and contract made by unlicensed person in violation of statute is invalid.); *Firpo v. Murphy*, 72 Cal. App. 249, 252 (1925) (A contract to pay commissions to a real

estate broker is illegal and he is not entitled to recover thereon where he fails to secure the license required by law to carry on his business.).

36.    Because the Affiliate Agreement violates federal and state law, it is void, unenforceable, and subject to avoidance as fraudulent. Any alleged consideration provided to Debtor under the Affiliate Agreement was unlawful.

37.    Unlawful consideration is that which is: "(1) contrary to an express provision of law; (2) contrary to the policy of express law, though not expressly prohibited; or (3) otherwise contrary to good morals." Cal. Civ. Code § 1667. "If any part of a single consideration for one or more objects, or of several considerations for a single object, is unlawful, the entire contract is void." Cal. Civ. Code § 1608.

ii.    **Account Receivable Purchase Agreements**

38.    Upon information and belief and based in part on the historical dealings of the Debtor with marketing affiliates and upon the Transfer Records (as defined below), Defendant likely also entered into one or more account receivable purchase agreements with Debtor and/or its related entities (whether memorialized by oral or written agreement, "ARPA Agreement(s)"). The following are the known agreements.

39.    On or about November 7, 2022, Defendant entered into an Account Receivable Purchase Agreement with Debtor ("ARPA 1"). A true and accurate copy of the ARPA 1 is attached as **Exhibit 2**, and incorporated here.

40.    On or about November 17, 2022, Defendant entered into an Account Receivable Purchase Agreement with Debtor ("ARPA 2"). A true and accurate copy of the ARPA 2 is attached as **Exhibit 3**, and incorporated here.

41.    On or about December 2, 2022, Defendant entered into an Account Receivable Purchase Agreement with Debtor ("ARPA 3"). A true and accurate copy of the ARPA 3 is attached as **Exhibit 4**, and incorporated here.

42.    On or about December 21, 2022, Defendant entered into an Account Receivable Purchase Agreement with Debtor ("ARPA 4"). A true and accurate copy of the ARPA 4 is attached as **Exhibit 5**, and incorporated here.

43.     On or about January 4, 2023, Defendant entered into an Account Receivable Purchase Agreement with Debtor ("ARPA 5"). A true and accurate copy of the ARPA 5 is attached as **Exhibit 6**, and incorporated here.

44.     On or about January 20, 2023, Defendant entered into an Account Receivable Purchase Agreement with Debtor ("ARPA 6"). A true and accurate copy of the ARPA 6 is attached as **Exhibit 7**, and incorporated here.

45.     On or about February 20, 2023, Defendant entered into an Account Receivable Purchase Agreement with Debtor ("ARPA 7"). A true and accurate copy of the ARPA 7 is attached as **Exhibit 8**, and incorporated here.

46.     On or about March 7, 2023, Defendant entered into an Account Receivable Purchase Agreement with Debtor ("ARPA 8"). A true and accurate copy of the ARPA 8 is attached as **Exhibit 9**, and incorporated here.

47.     On or about March 14, 2023, Defendant entered into an Account Receivable Purchase Agreement with Debtor ("ARPA 9"). A true and accurate copy of the ARPA 9 is attached as **Exhibit 10**, and incorporated here.

48.     ARPA 1, ARPA 2, ARPA 3, ARPA 4, ARPA 5, ARPA 6, ARPA 7, APA 1, ARPA 8, and ARPA 9, are referred to collectively hereinafter as the "ARPA Agreements."

49.     Pursuant to the Debtor's known ARPA Agreements, the Debtor purports to buy from its marketing affiliates' accounts receivable from consumers that were supposed to be held in trust until earned.

50.     By entering into an ARPA Agreements, Debtor and Defendant  further violated federal and state laws by selling unearned legal fees or funds that were supposed to be held in trust or used for the benefit of consumers.

51.     The effect of an ARPA Agreements were to accomplish an unlawful purpose. Thus, the agreements may be declared illegal regardless of the intention of the parties. *Stockton Morris Plan Co. v. Cal. Tractor & Equip. Corp.*, 112 Cal. App. 2d 684, 690 (1952) (*citing Fewel & Dawes, Inc. v. Pratt*, 17 Cal. 2d 85, 91 (1941)). This remains true regardless of whether the contract has been performed. *Stevens v. Boyes Hot Springs Co.,* 113 Cal. App. 479, 483 (1931) (A contract by a

corporation to purchase its own stock has the effect of illegally withdrawing and paying to a stockholder a part of the capital stock of the corporation and is illegal and void, regardless of the fact that the contract is fully performed by the sellers and partially performed by the corporation.); *Mansfield v. Hyde*, 112 Cal. App. 2d 133, 139 (1952), overruled, *Fomco, Inc. v. Joe Maggio, Inc.,* 8 Cal. Rptr. 459 (1960) (Where object of statute requiring licenses is to prevent improper persons from engaging in particular activity, or is for purpose of regulating occupation or business for protection of public, imposition of penalty amounts to prohibition against engaging in occupation or business without license, and contract made by unlicensed person in violation of statute is invalid.); *Firpo v. Murphy*, 72 Cal. App. 249, 252 (1925) (A contract to pay commissions to a real estate broker is illegal and he is not entitled to recover thereon where he fails to secure the license required by law to carry on his business.).

52.    Because any ARPA Agreements and/or related transactions violates federal and state laws, to the extent the Debtor and the Defendant entered into such agreement, it is void, unenforceable, and subject to avoidance as fraudulent. Any alleged consideration provided to Debtor under the ARPA Agreements and/or related transactions is also unlawful.

53.    Unlawful consideration is that which is: "(1) contrary to an express provision of law; (2) contrary to the policy of express law, though not expressly prohibited; or (3) otherwise contrary to good morals." Cal. Civ. Code §1667. "If any part of a single consideration for one or more objects, or of several considerations for a single object, is unlawful, the entire contract is void." Cal. Civ. Code § 1608.

### iii.    Preference Letter

54.    On or about September 15, 2023, Trustee sent a preference letter to Defendant (the "Preference Letter"). A true and accurate copy of the Preference Letter is attached as **Exhibit 11**, and incorporated here.

55.    The Preference Letter discussed certain transfers from Debtor that were made to Defendant within the 90-day period prior to the Petition Date. The transfers were listed on the attached "Preference Transfer Schedule" showing the date and amount, according to Debtor's books and records, of each transfer or other payment ("Preference Transfer Schedule"). Trustee requested

payment of the total amount due under the Preference Transfer Schedule that amounted to $383,148.73, in exchange for a waiver and release from all claims that could be asserted by Trustee against Defendant pursuant to 11 U.S.C. §§ 547 and 550.

56.    Based on the information available to Trustee and considering the nature of the relationship between Debtor and Defendant, no potential defenses were identified that could reduce Defendant's liability for the preference payments. Consequently, Defendant was requested to provide any facts and valid defenses that could substantiate its position and potentially mitigate or prevent some or all of the transfers made by Debtor.

57.    On or about September 28, 2023, Defendant's counsel, Johnny White, emailed Plaintiff's counsel regarding, asserting Defendant had not filed a proof of claim, performed their business at an arms-length relationship, and may have a new value defense.

58.    Trustee has yet to receive any payment from Defendant pursuant to the Preference Letter.

**D.    Payments to Defendant**

59.    During the applicable reach-back period, Debtor paid Defendant the sum of at least $997,037.98 between March 2022 and March 2023 ("Transfers"). A true and accurate list of the known payments made by Debtor to Defendant is attached as **Exhibit 12**, and incorporated here.

60.    $383,148.73 of the Transfers from Debtor to Defendant occurred during the 90-day preference period ("Preference Transfers"). A true and accurate list of the payments made during the Preference Transfers is attached as **Exhibit 13**, and incorporated here.

**D.    LPG's Ponzi Scheme**

61.    The Ponzi Scheme Presumption exists in bankruptcy proceedings.  The Ponzi Scheme Presumption can be utilized to establish a debtor's "intent to defraud future undertakers [investors] from the mere fact that a debtor was running a Ponzi scheme.  Indeed, no other reasonable inference is possible. A Ponzi scheme cannot work forever.  The investor pool is a limited resource and will eventually run dry.  The perpetrator must know that the scheme will eventually collapse as a result of the inability to attract new investors.  The perpetrator nevertheless makes payments to present investors, which, by definition, are meant to attract new investors. He must know all along,

from the very nature of his activities, that investors at the end of the line will lose their money. Knowledge to a substantial certainty constitutes intent in the eyes of the law, *cf. Restatement (Second) of Torts § 8A (1963 & 1964)*, and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them. *Cf. Coleman Am. Moving Servs., Inc. v. First Nat'l Bank & Trust Co. (In re American Properties, Inc.)* (Bankr.D.Kan. 1981)14 B.R. 637, 643 (intentionally carrying out a transaction with full knowledge that its effect will be detrimental to creditors is sufficient for actual intent to hinder, delay or defraud within the meaning of § 548(a)(1))." *Merrill v. Abbott (In re Independent Clearing House Co.)* (D. Utah 1987) 77 B.R. 843, 860. A trustee in bankruptcy is not required to show that an operator of a Ponzi scheme was subjectively aware his Ponzi scheme was destined to fail. *In re EPD Inv. Co., LLC*, 114 F.4th at 1153 ("[a] trustee's action to recover assets fraudulently conveyed in the course of a Ponzi scheme does not require that the trustee also prove the Ponzi-scheme operator was subjectively aware his Ponzi scheme was destined to fail.")

62.    "But if all the debtor receives in return for a transfer is the use of the defendant's money to run a Ponzi scheme, there is nothing in the bankruptcy estate for creditors to share. In fact, by helping the debtor perpetuate his scheme, the transfers exacerbate the harm to creditors by increasing the amount of claims while diminishing the debtor's estate. In such a situation, the use of the defendant's money cannot objectively be called 'reasonably equivalent value.'" *In re Independent Clearing House Co.* 77 B.R. at 859. Therefore, "[t]he trustee can avoid the transfers if they were preferential or fraudulent. Transfers to investors in a Ponzi scheme are preferential and fraudulent. Therefore, they constitute 'property of the estate,' and the trustee can recover them." *Id.* at 853 n.17 (citations omitted).

63.    Debtor was operating a Ponzi scheme that utilized affiliates and several other entities, including Marich Bein, the GoFi Entities, Prime Logix, and Pacific Staffing, and their owners, operators, directors, principals and/or controllers Deustch, Weisz, Reches, Cohen, and Kohlscreiber, as payment processors and intermediaries to conceal the scheme, and as investors to continue its unlawful business practices by using funds provided by current investors to attract new investors hoping for very high returns. Therefore, the Debtor was running a Ponzi scheme and the

Ponzi Scheme Presumption can be utilized to infer that the Debtor had the intent to defraud investors within the meaning of 11 U.S.C. section 548(a)(1). This is evidenced by the Court in this Bankruptcy Case declaring that Debtor was operating a Ponzi scheme when it stated the following:

> It is important to note that this Court has never received any significant and trustworthy evidence that Debtor accomplished meaningful results for its clients, but only anecdotal examples of viable success for its clients. By reviewing the Estate's claims register, there is evidence of consumer claims for the fraud and demanded but undelivered refunds of approximately $500 million. There is ample evidence that the pre-petition Debtor never placed the collected funds into an attorney-client trust account, and that Debtor or its principals simply looted the payments received through the client automatic withdrawals, stiffing both the clients and outside attorneys who may have been working on client cases with the hopes of being paid. There is also evidence before the Court that Debtor was running a Ponzi scheme and paying some outside (or "network") attorneys with funds obtained from new clients. In this case, it appears that some of the "lenders" may have been serving as "investors," hoping for very high returns before "the music stopped." The Ninth Circuit has recently explained, "[b]y definition, a Ponzi scheme is destined to fail because the pool of available investors is not limitless. When the Ponzi scheme operator's pool of investors inevitably runs dry, the scheme collapses and the swindler and their entities often end up in bankruptcy or equitable receivership. See generally David R. Hague, Expanding the Ponzi Scheme Presumption, 64 DePaul L. Rev. 867 (2015). In bankruptcy, the court-appointed trustee is tasked with taking immediate control of the entity, ceasing ongoing fraudulent activity, locating and collecting assets for the bankruptcy or receivership estate, and achieving a final, equitable distribution of the remaining assets. See 11 U.S.C. § 704." *Kirkland v. Rund (In re EPD Inv. Co., LLC)*, 2024 U.S. App. LEXIS 21363, at *15 (9th Cir. Aug. 23, 2024). Finally, there is evidence that Debtor was encumbering (or as some creditors assert, "double or triple selling") their accounts or receivables to multiple lenders. With respect to Greyson's requested Administrative Claim [Dk. 676], and as more fully described in the concurrently entered order denying the claim, there has been no evidence presented that any work allegedly performed by Greyson assisted any clients or added any value to the Estate.

*See,* Case No. 8:23-bk-10571-SC, [Bankr. Docket No. 1545 Fn. 5].

64.    Moreover, since the transfers were made with the intent to further the Ponzi scheme, the Debtor did not receive an objectively reasonable equivalent value for the Transfers, and the Trustee can avoid the Transfers because they were fraudulent.

**E.    LPG's Prepetition Creditors**

65.    Debtor was insolvent when each Transfer was made. This insolvency is evidenced in part by the fact that 14 separate UCC-1 statements were of record securing debts of the Debtor as of September 1, 2022. These statements remained unreleased as of the Petition Date. These statements either reflected secured liens against the Debtor's assets then owned or thereafter acquired, or provided evidence of the assignment or sale of substantial portions of the Debtor's future income.

66.    When the Transfers were made, these prior UCC-1 statements secured the repayment of the following claimed amounts that are currently known to Trustee and are allegedly owed by the Debtor: (i) $2,374,004.82 owed to Fundura Capital Group as evidenced by Proof of Claim No. 335 purportedly secured by a UCC statement filed on or about May 19, 2021; (ii) approximately $15 million dollars owed to MNS Funding, LLC as evidenced by Proof of Claim No. 1060 purportedly secured by a UCC statement filed on or about May 28, 2021; (iii) approximately $5,000,000 owed to Azzure Capital, LLC as evidenced by Proof of Claim No. 127 secured by a UCC statement filed on or about May 28, 2021; and (iv) approximately $1.5 million dollars owed to Diverse Capital, LLC purportedly secured by UCC statements filed on or about September 15, 2021, and December 1, 2021.[1]

67.    As alleged above, LPG was borrowing against its assets and future income, often on unfavorable terms, not only to finance operations at LPG, but also to pay the fees owed to the marketing affiliates for providing it with consumer clients. Pursuant to the agreements with the marketing companies, significant percentages of future payments were already promised to be paid to the marketing affiliates from whatever future income the Debtor would receive.

68.    In addition, on Debtor's Schedule E/F [Bankr. Docket No. 33], Debtor scheduled 11 unsecured creditors with priority unsecured claims totaling $374,060.04. These priority unsecured creditors include Indiana Dept. of Revenue, Dept. of Labor and Industries, Arizona Dept. of Economic Security, Arkansas Dept. of Finance & Admin., California Franchise Tax Board, Georgia

---

[1] Trustee reserves all rights, claims, and defenses with respect to these and any other purported secured or unsecured claims.

Dept. of Labor, Internal Revenue Service, Mississippi Dept. of Revenue, Nevada Dept. of Taxation, Utah State Tax Commission, and Wisconsin Dept. of Revenue (collectively, "Priority Unsecured Creditors").

69.    Another group of creditors that Debtor listed on its Schedule E/F [Bankr. Docket No. 33] are nonpriority unsecured creditors. Those 58 creditors have scheduled claims totaling $141,439,158.05 and include Ajilon; Anthem Blue Cross; Azevedo Solutions Groups, Inc.; Carolina Technologies & Consulting Invoice; Collaboration Advisors; Credit Reporting Service Inc.; CT Corporation – Inv.; Debt Pay Pro; Document Fulfillment Services; EnergyCare, LLC; Exela Enterprise Solutions; First Legal Network, LLC; GHA Technologies Inc.; Harrington Electric, Inc.; Imagine Reporting; Juize, Inc.; Krisp Technologies, Inc.; Liberty Mutual; Marc Lemauviel – Allegra; MarkSYS Holdings, LLC; Netsuite-Oracle; Pitney Bowes; Rapid Credit, Inc.; SBS Leasing A Program of De Lage Landen; Security Solutions; Sharp Business Systems; Streamline Performance, Inc.; Thomson Reuters; Twilio, Inc.; Nationwide Appearance Attorneys; Executive Center, LLC; Outsource Accelerator, Ltd.; TaskUs Holdings, Inc.; Marich Bein, LLC; Validation Partners; MC DVI Fund 1, LLC; MC DVI Fund 2, LLC; Debt Validation Fund II, LLC; Tustin Executive Center; LexisNexus; JP Morgan Chase; Business Centers of America; Michael Schwartz; Anibal Colon Jr.; Kathleen Lacey; David Ulery; Kimberly Birdsong; Kevin Carpenter; Karen Suell; Gloria Eaton; Carolyn Beech; Debra Price; Kenneth Topp; Darcey Williamson, Trustee; James Hammett; Johnny Rizo; Beverly Graham; Kathleen Scarlett; and Geneve and Myranda Sheffield (collectively, "Nonpriority Unsecured Creditors" and, together with the Secured Creditors and Priority Unsecured Creditors, "Prepetition Creditors").

70.    Debtor's balance sheets for the 36 months ending in December 31, 2021 show only approximately $17,900,000 in total assets (primarily comprised of accounts receivable and merchant loans receivable) at its highest point in November 2021. Obviously, this amount is significantly less than the $700,000,000 of claims filed, further evidencing Debtor's state of insolvency.

/ / /

/ / /

/ / /

## FIRST CLAIM FOR RELIEF

### Count I - Avoidance, Recovery, and Preservation of Actual Fraudulent Transfers

### [11 U.S.C. §§ 548(a)(1)(A), 550, and 551]

71.     Plaintiff realleges and incorporates here by reference each and every allegation contained in paragraphs 1 through 70 as though set forth in full.

72.     The Affiliate Agreement, ARPA Agreements, and all or a portion of the Transfers occurred within the two years prior to the Petition Date.

73.     On or after the date that such agreements were executed and the Transfers were made, entities to which Debtor was or became indebted include the Prepetition Creditors.

74.     The Transfers happened while Debtor was insolvent or rendered Debtor insolvent.

75.     Despite Debtor's obligation to the Prepetition Creditors, Debtor continued to pay Defendant sums received from consumers under the Affiliate Agreement, which constitutes an illegal capping agreement between Defendant and Debtor. Any obligation of the Debtor arising from such agreement is also avoidable as fraudulent.

76.     Despite Debtor's obligation to the Prepetition Creditors, Debtor continued to sell or transfer portions of its accounts receivable to Defendant, which is illegal under federal and state laws.

77.     The Transfers were made with actual intent to hinder, delay, or defraud creditors of Debtor.

78.     The Affiliate Agreement, ARPA Agreements, and the Transfers of Debtor's funds are avoidable as fraudulent pursuant to 11 U.S.C. §§ 548(a)(1)(A), 550, and 551 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against his Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

79.     The Affiliate Agreement, ARPA Agreements, and Transfers should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(A), and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

## SECOND CLAIM FOR RELIEF

**Avoidance, Recovery, and Preservation of Constructive Fraudulent Transfers**

**Against Defendant**

**[11 U.S.C. §§ 548(a)(1)(B), 550, and 551]**

80.    Plaintiff realleges and incorporates here by reference each and every allegation contained in paragraphs 1 through 79 as though set forth in full.

81.    The Affiliate Agreement, ARPA Agreements, and all or a portion of the Transfers occurred within the two years prior to the Petition Date.

82.    On or after the date that such agreements were executed and such Transfers were made, entities to which Debtor was or became indebted include the Prepetition Creditors.

83.    The Transfers happened while Debtor:

    a.  was insolvent or became insolvent was a result;

    b.  was engaged or was about to engage in a transaction for which any property remaining with Debtor was of unreasonably small capital; or

    c.  intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

84.    Because the referrals from Defendant to Debtor are illegal under federal and state law, they are void and subject to avoidance as fraudulent. Any purported consideration constitutes unlawful consideration, which cannot constitute reasonably equivalent value. Thus, at the time the agreements were executed and the Transfers made, Debtor received less than reasonably equivalent value.

85.    The Debtor was operating a Ponzi scheme and the Ponzi Scheme Presumption can be utilized to infer the Debtor's actual intent to defraud within the meaning of 11 U.S.C. §548(a)(1). The Debtor's conduct was done with oppression, fraud, and malice, as defined in Civil Code §3294, based on the Ponzi Scheme Presumption, entitled the Trustee to, in addition to actual damages, exemplary or punitive damages.

86.    Because the sale of the accounts receivable from Debtor to Defendant are illegal under federal and state law, they are void and subject to avoidance as fraudulent. Any purported

consideration constitutes unlawful consideration, which cannot constitute reasonably equivalent value. Thus, at the time the agreements were executed and the Transfers made, Debtor received less than reasonably equivalent value.

87.    The Affiliate Agreement, ARPA Agreements, and the Transfers should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(B), and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

## **THIRD CLAIM FOR RELIEF**

**Avoidance, Recovery, and Preservation of Actual Fraudulent Transfers**

**Against Defendant**

**[11 U.S.C. §§ 544(b), 550, and 551; CAL. CIV. CODE §§ 3439.04(a) and 3439.07]**

88.    Plaintiff realleges and incorporates here by reference each and every allegation contained in paragraphs 1 through 87 as though set forth in full.

89.    The Affiliate Agreement, ARPA Agreements, and all or a portion of the Transfers occurred within the four years prior to the Petition Date.

90.    On or after the date that such agreements were entered and such Transfers were made, entities to which Debtor was or became indebted include the Prepetition Creditors.

91.    Despite Debtor's obligation to the Prepetition Creditors, Debtor continued to pay Defendant sums received from consumers under the Affiliate Agreement, which constitutes an illegal capping agreement between Defendant and Debtor.

92.    Because the referrals from Defendant to Debtor are illegal under federal and state law, they are void and subject to avoidance as fraudulent. Any purported consideration constitutes unlawful consideration, which cannot constitute reasonably equivalent value. Thus, at the time the agreements were executed and the Transfers made, Debtor received less than reasonably equivalent value.

93.    Despite Debtor's obligation to the Prepetition Creditors, Debtor continued to sell its accounts receivable to Defendant, which is illegal under federal and state law. Because they are illegal under federal and state law, they are void and subject to avoidance as fraudulent.

94.     Because the referrals from Defendant to Debtor are illegal under federal and state law, they are void and subject to avoidance as fraudulent. Any purported consideration constitutes unlawful consideration, which cannot constitute reasonably equivalent value. Thus, at the time the agreements were executed and the Transfers made, Debtor received less than reasonably equivalent value.

95.     Despite Debtor's obligation to the Prepetition Creditors, Defendant continued to sell accounts receivable to Debtor, which is illegal under federal and state law. Because they are illegal under federal and state law, they are void and subject to avoidance as fraudulent.

96.     The Transfers were made with actual intent to hinder, delay, or defraud creditors of Debtor.

97.     The Debtor was operating a Ponzi scheme and the Ponzi Scheme Presumption can be utilized to infer the Debtor's actual intent to defraud within the meaning of 11 U.S.C. § 548(a)(1). The Debtor's conduct was done with oppression, fraud, and malice, as defined in Civil Code § 3294, based on the Ponzi Scheme Presumption, entitling the Trustee to, in addition to actual damages, exemplary or punitive damages.

98.     The Affiliate Agreement, the ARPA Agreements, and the Transfers of Debtor's funds are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and CAL. CIV. CODE §§ 3439.04(a) and 3439.07 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against his Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

99.     Accordingly, the Affiliate Agreement, the ARPA Agreements, and the Transfers should be avoided as fraudulent under 11 U.S.C. §§ 544(b) and CAL. CIV. CODE §§ 3439.04(a) and 3439.07, and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551 and CAL. CIV. CODE § 3439.07.

/ / /

/ / /

/ / /

/ / /

# FOURTH CLAIM FOR RELIEF

## Avoidance, Recovery, and Preservation of Constructive Fraudulent Transfers

## Against Defendant

**[11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.05, and 3439.07]**

100.    Plaintiff realleges and incorporates here by reference each and every allegation contained in paragraphs 1 through 99 as though set forth in full.

101.    The Affiliate Agreement, the ARPA Agreements, and all or a portion of the Transfers occurred within the four years prior to the Petition Date.

102.    The Transfers happened while Debtor:

  a.    was insolvent or became insolvent as a result;

  b.    was engaged or was about to engage in a transaction for which any property remaining with Debtor was of unreasonably small capital; or

  c.    intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

103.    Because the referrals from Defendant to Debtor are illegal under federal and state law, the agreements are void and subject to avoidance as fraudulent. Any purported consideration constitutes unlawful consideration, which cannot constitute reasonably equivalent value. Thus, at the time the agreements were executed and the Transfers made, Debtor received less than reasonably equivalent value.

104.    The Debtor was operating a Ponzi scheme and the Ponzi Scheme Presumption can be utilized to infer the Debtor's actual intent to defraud within the meaning of 11 U.S.C. § 548(a)(1). The Debtor's conduct was done with oppression, fraud, and malice, as defined in Civil Code § 3294, based on the Ponzi Scheme Presumption, entitling the Trustee to, in addition to actual damages, exemplary or punitive damages.

105.    Because the sale of the accounts receivable from Debtor to Defendant are illegal under federal and state law, they are void and subject to avoidance as fraudulent. Any purported consideration constitutes unlawful consideration, which cannot constitute reasonably equivalent value. Thus, at the time the agreements were executed and the Transfers made, Debtor received

1    less than reasonably equivalent value.

2        106.    The Affiliate Agreement, the ARPA Agreements, and the Transfers of Debtor's

3    funds are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and CAL. CIV. CODE §§ 3439.05

4    and 3439.07 by one or more creditors who held and hold unsecured claims against Debtor that

5    were and are allowable against his Estate under 11 U.S.C. § 502 or that were not and are not

6    allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

7        107.    Accordingly, the Affiliate Agreement, the ARPA Agreements, and the Transfers

8    should be avoided as fraudulent under 11 U.S.C. §§ 544(b) and CAL. CIV. CODE §§ 3439.05 and

9    3439.07, and such transferred property, or the value thereof, should be recovered and preserved for

10   the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551 and CAL. CIV. CODE § 3439.07.

11                              **FIFTH CLAIM FOR RELIEF**

12   **Avoidance, Recovery, and Preservation of Preferential Transfer to Defendant in Preference**

13                                  **Period**

14                          **[11 U.S.C. §§ 547, 550, and 551]**

15       108.    Plaintiff realleges and incorporates here by reference each and every allegation

16   contained in paragraphs 1 through 107 as though set forth in full.

17       109.    The Preference Transfers were made for, or on account of, an antecedent debt or

18   debts owed by the LPG to Defendant, each of which constituted a "debt" or "claim" (as those terms

19   are defined in the Bankruptcy Code) of Defendant.

20       110.    The Preference Transfers happened while LPG was insolvent.

21       111.    Debtor is also entitled to the presumption of insolvency when the Preference

22   Transfers happened pursuant to 11 U.S.C. § 547(f).

23       112.    As a result of the Preference Transfers, Defendant recovered more than it would

24   have received if: (i) the Debtor's case was under chapter 7 of the Bankruptcy Code; (ii) the

25   Preference Transfers had not been made; and (iii) Defendant received payments of its debts under

26   the provisions of the Bankruptcy Code. As evidenced by the Debtor's schedules filed in the

27   underlying Bankruptcy Case, as well as the proofs of claim that have been received to date, the

28   Debtor's liabilities exceed its assets to the point that unsecured creditors will not receive a full

22

payout of their claims from the Debtor's Estate.

113.    In accordance with the foregoing, the Preference Transfers are voidable pursuant to 11 U.S.C. § 547(b), and may be recovered and preserved for the benefit of the estate pursuant to 11 U.S.C. §§ 550 and 551.

## SIXTH CLAIM FOR RELIEF

### Turnover of Estate Property Against Defendant

### [11 U.S.C. § 542]

114.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 123 as though set forth in full.

115.    Defendant has possession or control over property of the Estate in the form of the Transfers made pursuant to illegal and unenforceable agreements.

116.    The Transfers are not of inconsequential value to the Estate.

117.    The funds that are the subject of the Transfers are paramount to Debtor's ability to pay creditors.

118.    Accordingly, Trustee is entitled to a judgment for turnover of the Transfer pursuant to 11 U.S.C. § 542.

## SEVENTH CLAIM FOR RELIEF

### Disallowance of Claims Against Defendant

### [11 U.S.C. § 502(d)]

119.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 128 as though set forth in full.

120.    On July 20, 2023, Defendant filed a proof of claim as Claim No. 252 (the "Proof of Claim") in the amount of $ 230,039.80.

121.    Based on Defendant's conduct as set forth in paragraphs 1 through 128 the Proof of Claim and any other claims having been filed or to be filed by Defendant in the Bankruptcy case should be disallowed pursuant to 11 U.S.C. § 502(d).

## RESERVATION OF RIGHTS

122.    Plaintiff reserves the right to bring all other claims or causes of action that Plaintiff

may have against Defendant, on any and all grounds, as allowed under the law or in equity, including but not limited to, those claims not known by the Trustee at this time but that he may discover during the pendency of this adversary proceeding.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for a judgment as follows:

**On The First, Second, Third, and Fourth Claims for Relief:**

1.    Avoiding, recovering, and preserving the Transfers against Defendant;

2.    Punitive and/or exemplary damages;

**On the Fifth Claim for Relief:**

3.    Avoiding, recovering, and preserving the Preference Transfers against Defendant;

**On the Sixth Claim for Relief:**

4.    Ordering Defendant to immediately turn over the Transfers and/or Preference Transfers;

**On the Seventh Claim for Relief:**

5.    Order disallowing Defendant's Claim and all claims filed by Defendant as the funds requested are based on fraudulent activities;

**On All Claims for Relief:**

6.    Awarding costs of suit incurred here;

7.    Awarding pre- and post-judgment interest; and

8.    Granting any other and further relief as the Court deems just and proper.

Dated: March 18, 2025

Respectfully submitted,

DINSMORE & SHOHL LLP

By: /s/ Sarah S. Mattingly
    Yosina M. Lissebeck
    Sarah S. Mattingly (pro hac vice)
    Kelli A. Lee (pro hac vice)
    *Special Counsel to Richard A. Marshack,*
    *Trustee of the LPG Liquidation Trust*

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET (Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER (Court Use Only) |
|---|---|

| PLAINTIFFS | DEFENDANTS |
|---|---|
| Richard A. Marshack, Trustee of the LPG Liquidation Trust | Debt Relief Group, LLC a Florida limited liability company, and William Burns |

| ATTORNEYS (Firm Name, Address, and Telephone No.) | ATTORNEYS (If Known) |
|---|---|
| Christoper B. Ghio<br>Yosina M. Lisseback<br>Sarah S. Mattingly (Pro Hac Vice)<br>Kelli A. Lee (Pro Hac Vice)  Dinsmore & Shohl LLP<br>655 West Broadway, Suite<br>San Diego, California 92101<br>619.400.0500 | |

**PARTY** (Check One Box Only)
☐ Debtor          ☐ U.S. Trustee/Bankruptcy Admin
☐ Creditor        ☐ Other
☒ Trustee

**PARTY** (Check One Box Only)
☐ Debtor          ☐ U.S. Trustee/Bankruptcy Admin
☐ Creditor        ☒ Other
☐ Trustee

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
(1) Avoidance, Recovery, and Preservation of 2-Year Actual Fraudulent Transfers; (2) Avoidance, Recovery, and Preservation of 2-Year Constructive Fraudulent Transfers; (3) Avoidance, Recovery, and Preservation of 4-Year Actual Fraudulent Transfers; (4) Avoidance, Recovery, and Preservation of 4-Year Constructive Fraudulent Transfers; (5)Avoidance, Recovery, and Preservation of Preferential Transfer Made Within Ninety Days of the Petition Date; (6) Turnover; and (7) Aiding and Abetting

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☒ 11-Recovery of money/property - §542 turnover of property
☒ 12-Recovery of money/property - §547 preference
☒ 13-Recovery of money/property - §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §§523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

(continued next column)

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $  1,380,186.71 |

Other Relief Sought

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>The Litigation Practice Group P.C. | BANKRUPTCY CASE NO.<br>8:23-bk-10571-SC | |
| DISTRICT IN WHICH CASE IS PENDING<br>Central District of California | DIVISION OFFICE<br>Santa Ana | NAME OF JUDGE<br>Hon. Scott C. Clarkson |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br>/s/ Sarah S. Mattingly | | |
| DATE<br><br>March 18, 2025 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Yosina M. Lissebeck<br>Sarah S. Mattingly (admitted pro hac vice)<br>Special Counsel to Richard A. Marshack, Trustee of the LPG<br>Liquidation Trust | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.