1  Christopher Celentino (131688)
   Christopher.Celentino@dinsmore.com
2  Christopher B. Ghio (259094)
   Christopher.Ghio@dinsmore.com
3  Yosina M. Lissebeck (201654)
   Yosina.Lissebeck@dinsmore.com
4  **DINSMORE & SHOHL LLP**
   655 West Broadway, Suite 800
5  San Diego, California 92101
   Tele: (619) 400-0500
6  Fax:  (619) 400-0501

7  Brian W. Boyd (Mi. Bar. P81004)
   Brian.Boyd@dinsmore.com
8  **DINSMORE & SHOHL LLP**
   755 West Big Beaver Road, Suite 1900
9  Troy, Michigan 48084
   Tele: (248) 203-1622
10 Fax: (248) 647-5210
   (Admitted pro hac vice)
11
   Counsel to Richard A. Marshack, Plaintiff and
12 Trustee of the LPG Liquidation Trust

13              **UNITED STATES BANKRUPTCY COURT**
14
          **CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION**
15

16 | In re:                                    | Case No. 8:23-bk-10571-SC

17 | The Litigation Practice Group P.C.,       | Chapter 11

18 |              Debtor.                       | Adv. Proc. No. _____

19 |_____| **COMPLAINT FOR:**

20 | Richard A. Marshack, Trustee of the LPG    | **(1) AVOIDANCE, RECOVERY, AND
   | Liquidation Trust,                         | PRESERVATION OF 2-YEAR ACTUAL
21 |                                            | FRAUDULENT TRANSFERS;**
   |              Plaintiff,                     |
22 |                                            | **(2) AVOIDANCE, RECOVERY, AND
   |       v.                                   | PRESERVATION OF 2-YEAR
23 |                                            | CONSTRUCTIVE FRAUDULENT
   | Oha Management, LLC, a California company, | TRANSFERS;**
24 | and Gabe McCarthy, an Individual,          |
   |                                            | **(3) AVOIDANCE, RECOVERY, AND
25 |              Defendants.                    | PRESERVATION OF 4-YEAR ACTUAL
   |                                            | FRAUDULENT TRANSFERS;**
26 |                                            |
   |                                            | **(4) AVOIDANCE, RECOVERY, AND
27 |                                            | PRESERVATION OF 4-YEAR
   |                                            | CONSTRUCTIVE FRAUDULENT
28 |                                            | TRANSFERS;**

1

**(5)  AVOIDANCE, RECOVERY AND PRESERVATION OF PREFERENTIAL TRANSFER MADE WITHIN NINETY DAYS OF THE PETITION DATE;**

**(6) TURNOVER; AND**

**(7) AIDING AND ABETTING**

Judge:      Hon. Scott C. Clarkson

For his *Complaint for (1) Avoidance, Recovery, and Preservation of 2-Year Actual Fraudulent Transfers; (2) Avoidance, Recovery, and Preservation of 2-Year Constructive Fraudulent Transfers; (3) Avoidance, Recovery, and Preservation of 4-Year Actual Fraudulent Transfers; (4) Avoidance, Recovery, and Preservation of 4-Year Constructive Fraudulent Transfers; (5) Avoidance, Recovery, and Preservation of Preferential Transfer; (6) Turnover; and (7) Aiding and Abetting* ("Complaint"), Plaintiff, Richard A. Marshack, the former Trustee of the LPG Liquidation Trust (collectively, "Trustee" or "Plaintiff"), in the above-captioned bankruptcy case ("Bankruptcy Case"), alleges and avers as follows:

## STATEMENT OF JURISDICTION, NATURE OF PROCEEDING, AND VENUE

**1.** This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E), (H) and (O), 1334(b), and General Order No. 13-05 of the District Court for the Central District of California because this is a core proceeding arising in and/or related to the Bankruptcy Case, which is a case under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code"), and which is pending in the United States Bankruptcy Court for the Central District of California, Santa Ana Division ("Bankruptcy Court"). Additionally, Sabia Financial, Inc. has consented to jurisdiction over this Court pursuant to its filing of the Proof of Claim (as defined herein).

**2.** Regardless of whether this proceeding is core, non-core, or otherwise, Plaintiff consents to the entry of a final order and judgment by the Bankruptcy Court.

///

///

**3.**     Defendants are notified that Rule 7008 of the Federal Rules of Bankruptcy Procedure requires Defendants to plead whether consent is given to the entry of a final order and judgment by the Bankruptcy Court.

**4.**     Venue of this adversary proceeding properly lies in this judicial district pursuant to 28 U.S.C. § 1409(a) because this proceeding is related to Debtor's pending Bankruptcy Case.

## THE PARTIES

**5.**     Plaintiff, Richard A. Marshack, was the duly-appointed, qualified Chapter 11 Trustee of Debtor's Estate and is now the current liquidating trustee of the LPG Liquidation Trust.

**6.**     Debtor is, and at all material times was, a professional corporation organized, existing, and in good standing under the laws of the State of California, with its principal place of business in Tustin, California.

**7.**     Defendant, Oha Management, LLC ("Oha"), is, and at all material times represented that it was, a limited liability company existing under the laws of the State of California.

**8.**     Defendant may be served by first class mail postage prepaid upon its registered agent for service of process, at 1881 Bennett Meadows Ln., Santa Rosa, California 95405.

**9.**     Defendant, Gabe McCarthy ("McCarthy"), is, and at all material times represented that he was, the President of Oha.

## GENERAL ALLEGATIONS

**A.     The Bankruptcy Case**

**10.**     On March 20, 2023 ("Petition Date"), Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, commencing the Bankruptcy Case.

**11.**     The Office of the United States Trustee ("UST") filed its *Motion by United States Trustee to Dismiss or Convert Case Pursuant to 11 U.S.C. § 1112(b)* [Bankr. Docket No. 21] and creditors Debt Validation Fund II, LLC; MC DVI Fund 1, LLC; and MC DVI Fund 2, LLC filed the *Motion by DVF and MC DVI to Dismiss Chapter 11 Case Pursuant to 11 U.S.C. §§ 105, 305, 349, & 1112, or in the Alternative Convert This Case to Chapter 7 or Appoint a Trustee* [Bankr. Docket No. 44]. On May 4, 2023, the Court entered its *Order Directing United States Trustee to Appoint Chapter 11 Trustee* [Bankr. Docket No. 58].

3

12.    Pursuant to the *Acceptance of Appointment as Chapter 11 Trustee* [Bankr. Docket No. 63], on May 8, 2023, Trustee accepted his appointment as the Chapter 11 Trustee in the Bankruptcy Case, and he continues to serve in this capacity at this time. The Court approved the Trustee's appointment in its *Order Approving the U.S. Trustee's Application for the Appointment of a Chapter 11 Trustee* [Docket No. 65].

13.    Pursuant to the Order Confirming Modified First Amended Joint Chapter 11 Plan of Liquidation entered on September 9, 2024, and the Notice of Occurrence of Effective Date of Modified First Amended Joint Chapter 11 Plan of Liquidation filed September 24, 2024, Richard A. Marshack became the Liquidating Trustee of the LPG Liquidation Trust, effective September 24, 2024. [Bankr. Docket Nos. 1646 & 1762].

14.    Trustee was not appointed until after events of the case and, therefore, bases these allegations on information and belief. *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) ("The *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible."); *Miller v. City of Los Angeles*, 2014 U.S. Dist. LEXIS 198871, 2014 WL 12610195, at *5 (C.D. Cal. Aug. 7, 2014) (recognizing that the plaintiff's "information and belief" pleading was allowed and "necessary at times"); *see also Mireskandari v. Daily Mail and General Trust PLC*, 2013 U.S. Dist. LEXIS 194437, 2013 WL 12129642, at *4 (C.D. Cal. July 31, 2013) ("The Federal Rules of Civil Procedure allow parties to plead facts on 'information and belief' if the facts 'will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.'" (citations omitted)).

15.    All claims have been transferred to the Liquidating Trust pursuant to the confirmed plan and Plaintiff brings this action solely in his capacity as the Chapter 11 Trustee for the benefit of Debtor's Estate and its creditors.

**B.    Protective Order**

16.    On or about May 2, 2024, Plaintiff filed that certain Notice and Motion for Entry of Protective Order (the "Protective Order Motion"). On June 3, 2024, the Court entered its Order

Granting Motion for Entry of Protective Order and the Protective Order [Docket No. 1270] (the "Protective Order"). A true and accurate copy of the Protective Order is attached as **Exhibit 5**, and incorporated here.

**17.**     By its own terms, the Protective Order applies to this adversary proceeding and governs all discovery conducted herein.

**C.     LPG**

**18.**     LPG operated a law firm for consumers across the country who sought assistance in contesting or resolving debts they would identify.

**19.**     The consumers would pay LPG over a period of time via monthly debits from their bank accounts.

**20.**     The monthly payments were meant to cover all legal services LPG provided to the consumers including validation of the debts, review of documents to determine enforceability, and court appearances to halt lawsuits to obtain judgments.

**21.**     In certain instances, LPG would file a lawsuit in an effort to eliminate a disputed debt or to prosecute affirmative claims held by the consumers.

**22.**     LPG mismanaged the consumers' monthly payments.

**23.**     Tony Diab, who at all times relevant herein controlled LPG ("Diab") and others devised a plan to fraudulently transfer funds, client files, client funds and assets in the form of ACH Receivables (the "ACH Receivables" or "Accounts Receivables") out of LPG to third parties prior to the filing of bankruptcy.

**24.**     To obtain consumer clients, LPG contracted with marketing companies, who engaged in illegal capping and would advertise or call to solicit consumers to become clients of LPG in exchange for a percentage of the ACH receivables collected by LPG from the consumers.

**25.**     The marketing affiliate went so far as to assist with the execution of an engagement letter between the consumer and LPG.

**26.**     In exchange, LPG agreed to pay the marketing affiliates a percentage the monthly payments collected by LPG from the consumers.

///

**27.**     Because LPG received payments from consumers over time, it often sought financing by borrowing against its future cash flows. This borrowing was not only used to finance operations at LPG, but also to pay the fees owed to the marketing companies for providing the client referrals.

**28.**     Many of the documents executed in connection with such financing described the transactions as accounts receivable purchase agreements.

**29.**     Diab used entities he controlled including, without limitation, Vulcan Consulting Group, Coast Processing, PrimeLogix, LLC, March Bein, PurchaseCo80 and/or Maverick Management, LLC to divert LPG consumer funds and ACH Receivables. Diab would use numerous ACH processing companies in order to easily transfer millions of dollars from Debtor to these entities he controlled, without oversight or detection, and to avoid payment disputes and complications. The money that flowed from Debtor through these bank accounts to Defendants consisted of Client Funds that Debtor held in its bank accounts and funneled to these entities by means of the ACH processing companies. Debtor regularly made deposits into these entities bank accounts such that they received Client Funds directly from Debtor in addition to future Accounts Receivable.

**D.     Defendants**

**30.**     Defendants were one of the marketing companies that procured clients for LPG.

**31.**     LPG agreed to pay, and in fact paid, Defendants a portion of the monthly payments received from consumers referred by Defendants.

**32.**     Defendants also entered into agreements pursuant to which it purported to sell accounts receivable back to LPG.

**i.     Affiliate Agreement**

**33.**     On information and belief, Debtor entered into an affiliate agreement(s) with Defendants ("Affiliate Agreement"). However, Trustee is not in current possession of the Applicable Affiliate Agreement at this time.

///

///

6

**34.** On information and belief, and based on similar agreements, the Affiliate Agreement states that Defendants "owns and operates a system of generating leads consisting of consumers interested in the legal services offered by LPG."

**35.** On information and belief, and based on similar agreements, pursuant to the Affiliate Agreement, Defendants generated leads consisting of consumers interested in the legal services offered by LPG and referred those consumers to Debtor.

**36.** On information and belief, and based on similar agreements, Defendants went so far as to assist with the execution of an engagement letter with the consumer.

**37.** On information and belief, and pursuant to similar agreements, LPG would agree to pay entities, similar to Defendants as follows:

> Affiliate shall be entitled to receive the following as full and complete compensation for its services to LPG: LPG shall pay 65% per file for each file that Affiliate places with LPG, not counting the monthly maintenance fee of $96.38, which LPG shall retain to cover administrative costs for each file. LPG shall calculate the amount of each file, apply the above-identified percentage fee, and remit the same to Affiliate pursuant to an agreed-upon schedule not to exceed one remittance per seven (7) calendar days. If any consumer cancels LPG's services, or demands a refund for payment for such services, or both, then LPG shall be solely responsive [sic] for such cost and Affiliate shall not have to share such expense.

**38.** These types of Affiliate Agreement violates Sections 6151 and 6155 of the California Business and Professional Code, which prohibit referrals of potential clients to attorneys unless registered with the State Bar of California. Cal. Bus. & Prof. Code § 6155. "Referral activity" includes "any entity 'which, in person, electronically, or otherwise, refers the consumer to an attorney or law firm not identified' in the advertising." *Jackson v. LegalMatch.com*, 42 Cal. App. 5th 760, 775 (2019). A referral includes receiving information from potential clients and sending that information to lawyers, even when the advertiser does not advertise the name of the attorneys and the clients do not clear the name of the potential attorney after the referral occurred. *Id.*

**39.** Further, if any effect of an agreement is to accomplish an unlawful purpose, the agreement may be declared illegal regardless of the intention of the parties. *Stockton Morris Plan Co. v. Cal. Tractor & Equip. Corp.*, 112 Cal. App. 2d 684, 690 (1952) (citing *Fewel & Dawes, Inc.*

*v. Pratt*, 17 Cal. 2d 85, 91 (1941)). This remains true regardless of whether the contract has been performed. *Stevens v. Boyes Hot Springs Co.*, 113 Cal. App. 479, 483 (1931) (A contract by a corporation to purchase its own stock has the effect of illegally withdrawing and paying to a stockholder a part of the capital stock of the corporation and is illegal and void, regardless of the fact that the contract is fully performed by the sellers and partially performed by the corporation.); *Mansfield v. Hyde*, 112 Cal. App. 2d 133, 139 (1952), overruled, *Fomco, Inc. v. Joe Maggio, Inc.*, 8 Cal. Rptr. 459 (1960) (Where object of statute requiring licenses is to prevent improper persons from engaging in particular activity, or is for purpose of regulating occupation or business for protection of public, imposition of penalty amounts to prohibition against engaging in occupation or business without license, and contract made by unlicensed person in violation of statute is invalid.); *Firpo v. Murphy*, 72 Cal. App. 249, 252 (1925) (A contract to pay commissions to a real estate broker is illegal and he is not entitled to recover thereon where he fails to secure the license required by law to carry on his business.).

**40.**    Because the Affiliate Agreement violates federal and state law, it is void, unenforceable, and subject to avoidance as fraudulent. Any alleged consideration provided under the Affiliate Agreements and/or the ARPA Agreements (as defined below) was unlawful.

**41.**    Unlawful consideration is that which is: "(1) contrary to an express provision of law; (2) contrary to the policy of express law, though not expressly prohibited; or (3) otherwise contrary to good morals." Cal. Civ. Code § 1667. "If any part of a single consideration for one or more objects, or of several considerations for a single object, is unlawful, the entire contract is void." Cal. Civ. Code § 1608.

   **ii.**  **Accounts Receivable Purchase Agreements**

**42.**    On or about March 16, 2020, Defendants entered into an Accounts Receivable Purchase Agreement with Debtor ("ARPA 1"). The ARPA 1 is also consistent with LPG's practices with other defendants with whom LPG had express capping agreements. A true and accurate copy of ARPA 1 is attached as **Exhibit 1**, and incorporated here.

**43.**    ARPA 1, and any and all additional ARPA agreements are referred to collectively hereinafter as the "ARPA Agreements."

44.     Pursuant to the ARPA Agreements, Defendants purported to sell Debtor streams of monthly payments from consumers that were supposed to be held in trust until earned. *See* Ex. 2.

45.     By entering into the ARPA Agreements, Debtor and Defendants violated federal and state laws by selling unearned legal fees or funds there were supposed to be held in trust or used for the benefit of consumers.

46.     The effect of the ARPA Agreements was to accomplish an unlawful purpose. Thus, the agreements may be declared illegal regardless of the intention of the parties. *Stockton Morris Plan Co. v. Cal. Tractor & Equip. Corp.*, 112 Cal. App. 2d 684, 690 (1952) (citing *Fewel & Dawes, Inc. v. Pratt*, 17 Cal. 2d 85, 91 (1941)). This remains true regardless of whether the contract has been performed. *Stevens v. Boyes Hot Springs Co.*, 113 Cal. App. 479, 483 (1931) (A contract by a corporation to purchase its own stock has the effect of illegally withdrawing and paying to a stockholder a part of the capital stock of the corporation and is illegal and void, regardless of the fact that the contract is fully performed by the sellers and partially performed by the corporation.); *Mansfield v. Hyde*, 112 Cal. App. 2d 133, 139 (1952), overruled, *Fomco, Inc. v. Joe Maggio, Inc.*, 8 Cal. Rptr. 459 (1960) (Where object of statute requiring licenses is to prevent improper persons from engaging in particular activity, or is for purpose of regulating occupation or business for protection of public, imposition of penalty amounts to prohibition against engaging in occupation or business without license, and contract made by unlicensed person in violation of statute is invalid.); *Firpo v. Murphy*, 72 Cal. App. 249, 252 (1925) (A contract to pay commissions to a real estate broker is illegal and he is not entitled to recover thereon where he fails to secure the license required by law to carry on his business.).

47.     Because the ARPA Agreements violate federal and state laws, they are void, unenforceable, and subject to avoidance as fraudulent. Any alleged consideration provided to Debtor under the ARPA Agreements was unlawful.

48.     Unlawful consideration is that which is: "(1) contrary to an express provision of law; (2) contrary to the policy of express law, though not expressly prohibited; or (3) otherwise contrary to good morals." Cal. Civ. Code § 1667. "If any part of a single consideration for one or

///

more objects, or of several considerations for a single object, is unlawful, the entire contract is void." Cal. Civ. Code § 1608.

**D.      Payments to Defendants**

**49.**      On or about October 17, 2024, the Trustee sent a demand letter to Defendants (the "Demand Letter"). A true and accurate copy of the Demand Letter is attached as **Exhibit 2**, and incorporated here.

**50.**      The Demand Letter discussed certain transfers from Debtor that were made to Defendants within the 90-day period prior to the Petition Date ("Preference Period". The transfers were listed on the attached "Preference Transfer Schedule" showing the date and amount, according to Debtor's books and records, of each transfer or other payment ("Preference Transfer Schedule").

**51.**      Trustee has yet to receive any response or payment form Defendants pursuant to the Demand Letter.

**52.**      During the applicable reach-back period, Debtor paid Defendants the sum of at least $400,745.86 between July 2021 and February 2023, subject to proof at trial ("Transfers"). A true and accurate list of the known payments made by Debtor to Defendants is attached as **Exhibit 3**, and incorporated here.

**53.**      At least $39,968.22 of the Transfers from Debtor to Defendants occurred during the 90-day preference period ("Preference Transfers"). A true and accurate list of the payments made during the Preference Transfers is attached as **Exhibit 4**, and incorporated here.

**54.**       The Preference Transfers are based on updated figures as of January of 2025.

**E.      LPG's Ponzi Scheme**

**55.**      The Ponzi Scheme Presumption can be utilized to establish a debtor's "intent to defraud future undertakers [investors] from the mere fact that a debtor was running a Ponzi scheme. Indeed, no other reasonable inference is possible. A Ponzi scheme cannot work forever. The investor pool is a limited resource and will eventually run dry. The perpetrator must know that the scheme will eventually collapse as a result of the inability to attract new investors. The perpetrator nevertheless makes payments to present investors, which, by definition, are meant to attract new investors. He must know all along, from the very nature of his activities, that investors at the end

of the line will lose their money. Knowledge to a substantial certainty constitutes intent in the eyes of the law, *cf. Restatement (Second) of Torts § 8A (1963 & 1964)*, and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them. *Cf. Coleman Am. Moving Servs., Inc. v. First Nat'l Bank & Trust Co. (In re American Properties, Inc.)* (Bankr.D.Kan. 1981)14 B.R. 637, 643 (intentionally carrying out a transaction with full knowledge that its effect will be detrimental to creditors is sufficient for actual intent to hinder, delay or defraud within the meaning of § 548(a)(1))." *Merrill v. Abbott (In re Independent Clearing House Co.)* (D. Utah 1987) 77 B.R. 843, 860.

56.     "But if all the debtor receives in return for a transfer is the use of the defendant's money to run a Ponzi scheme, there is nothing in the bankruptcy estate for creditors to share. In fact, by helping the debtor perpetuate his scheme, the transfers exacerbate the harm to creditors by increasing the amount of claims while diminishing the debtor's estate. In such a situation, the use of the defendant's money cannot objectively be called "reasonably equivalent value." *Id*. at 859. Therefore, "[t]he trustee can avoid the transfers if they were preferential or fraudulent. Transfers to investors in a Ponzi scheme are preferential and fraudulent. Therefore, they constitute "property of the estate," and the trustee can recover them. *Id*. at 853 n.17 (citations omitted).

57.     Debtor was operating a Ponzi scheme that utilized the Defendants and several other entities as investors to continue its unlawful business practices by using funds provided by current investors to attract new investors hoping for very high returns. Therefore, the Debtor was running a Ponzi scheme and the Ponzi Scheme Presumption can be utilized to infer that the Debtor had the intent to defraud investors within the meaning of 11 U.S.C. section 548(a)(1).

58.     Moreover, since the Transfers were made with the intent to further the Ponzi scheme, the Debtor did not receive an objectively reasonable equivalent value for the Transfers, and the Trustee can avoided the Transfers because they were preferential and fraudulent.

**F.     LPG's Prepetition Creditors**

59.     Debtor was insolvent when each Transfer was made. This insolvency is evidenced in part by the fact that 14 separate UCC-1 statements were of record securing debts of the Debtor as of September 1, 2022. These statements remained unreleased as of the Petition Date. These

statements either reflected secured liens against the Debtor's assets then owned or thereafter acquired, or provided evidence of the assignment or sale of substantial portions of the Debtor's future income.

60.     When the Transfers were made, these prior UCC-1 statements secured the repayment of the following claimed amounts that are currently known to Trustee and are allegedly owed by the Debtor: (i) $2,374,004.82 owed to Fundura Capital Group as evidenced by Proof of Claim No. 335 purportedly secured by a UCC statement filed on or about May 19, 2021; (ii) approximately $15 million dollars owed to MNS Funding, LLC as evidenced by Proof of Claim No. 1060 purportedly secured by a UCC statement filed on or about May 28, 2021; (iii) approximately $5,000,000 owed to Azzure Capital, LLC as evidenced by Proof of Claim No. 127 secured by a UCC statement filed on or about May 28, 2021; and (iv) approximately $1.5 million dollars owed to Diverse Capital, LLC purportedly secured by UCC statements filed on or about September 15, 2021, and December 1, 2021.[1]

61.     As alleged above, LPG was borrowing against its assets and future income, often on unfavorable terms, not only to finance operations at LPG, but also to pay the fees owed to the marketing affiliates for providing it with consumer clients. Pursuant to the agreements with the marketing companies, significant percentages of future payments were already promised to be paid to the marketing affiliates from whatever future income the Debtor would receive.

62.     In addition, on Debtor's Schedule E/F [Bankr. Docket No. 33], Debtor scheduled 11 unsecured creditors with priority unsecured claims totaling $374,060.04. These priority unsecured creditors include Indiana Dept. of Revenue, Dept. of Labor and Industries, Arizona Dept. of Economic Security, Arkansas Dept. of Finance & Admin., California Franchise Tax Board, Georgia Dept. of Labor, Internal Revenue Service, Mississippi Dept. of Revenue, Nevada Dept. of Taxation, Utah State Tax Commission, and Wisconsin Dept. of Revenue (collectively, "Priority Unsecured Creditors").

///

---

[1] Trustee reserves all rights, claims, and defenses with respect to these and any other purported secured or unsecured claims.

63.    Another group of creditors that Debtor listed on its Schedule E/F [Bankr. Docket No. 33] are nonpriority unsecured creditors. Those 58 creditors have scheduled claims totaling $141,439,158.05, and include, Ajilon; Anthem Blue Cross; Azevedo Solutions Groups, Inc.; Carolina Technologies & Consulting Invoice; Collaboration Advisors; Credit Reporting Service Inc.; CT Corporation – Inv.; Debt Pay Pro; Document Fulfillment Services; EnergyCare, LLC; Exela Enterprise Solutions; First Legal Network, LLC; GHA Technologies Inc.; Harrington Electric, Inc.; Imagine Reporting; Juize, Inc.; Krisp Technologies, Inc.; Liberty Mutual; Marc Lemauviel – Allegra; MarkSYS Holdings, LLC; Netsuite-Oracle; Pitney Bowes; Rapid Credit, Inc.; SBS Leasing A Program of De Lage Landen; Security Solutions; Sharp Business Systems; Streamline Performance, Inc.; Thomson Reuters; Twilio, Inc.; Nationwide Appearance Attorneys; Executive Center, LLC; Outsource Accelerator, Ltd.; TaskUs Holdings, Inc.; Marich Bein, LLC; Validation Partners; MC DVI Fund 1, LLC; MC DVI Fund 2, LLC; Debt Validation Fund II, LLC; Tustin Executive Center; LexisNexus; JP Morgan Chase; Business Centers of America; Michael Schwartz; Anibal Colon Jr.; Kathleen Lacey; David Ulery; Kimberly Birdsong; Kevin Carpenter; Karen Suell; Gloria Eaton; Carolyn Beech; Debra Price; Kenneth Topp; Darcey Williamson, Trustee; James Hammett; Johnny Rizo; Beverly Graham; Kathleen Scarlett; and Geneve and Myranda Sheffield (collectively, "Nonpriority Unsecured Creditors" and, together with the Secured Creditors and Priority Unsecured Creditors, "Prepetition Creditors").

64.    As of the filing of this complaint, approximately 5,771 claims have been filed with the bankruptcy Court. While Trustee has not reviewed all claims as of the date of this Complaint, and reserves all rights to object to those claims, the total amount is in excess of approximately $717,507,462.29.

### FIRST CLAIM FOR RELIEF

**Count I - Avoidance, Recovery, and Preservation of Actual Fraudulent Transfers**

**[11 U.S.C. §§ 548(a)(1)(A), 550, and 551]**

65.    Plaintiff realleges and incorporates here by reference each and every allegation contained in paragraphs 1 through 64 as though set forth in full.

///

**66.**     The Affiliate Agreement, ARPA Agreements, and all or a portion of the Transfers occurred within the two years prior to the Petition Date.

**67.**     On or after the date that such agreements were executed and the Transfers were made, entities to which Debtor was or became indebted include the Prepetition Creditors.

**10.**     The Transfers happened while Debtor was insolvent or rendered Debtor insolvent.

**68.**     Despite Debtor's obligation to the Prepetition Creditors, Debtor continued to pay Defendants sums received from consumers under the Affiliate Agreement, which constitutes an illegal capping agreement between Defendants and Debtor. Any obligation of the Debtor arising from such agreement is also avoidable as fraudulent.

**69.**     Despite Debtor's obligation to the Prepetition Creditors, Defendants continued to sell or transfer portions of its accounts receivable to Debtor, which is illegal under federal and state laws.

**70.**     The Transfers were made with actual intent to hinder, delay, or defraud creditors of Debtor.

**71.**     The Debtor was operating a Ponzi scheme and the Ponzi Scheme Presumption can be utilized to infer the Debtor's actual intent to defraud within the meaning of 11 U.S.C. section 548(a)(1).

**72.**     The Debtor's conduct was done with oppression, fraud, and malice, as defined in Civil Code section 3294, entitling the Trustee to, in addition to the actual damages, exemplary or punitive damages for making an example of the Debtor and to punish the Debtor.

**73.**     The Affiliate Agreement, ARPA Agreements, and the Transfers of Debtor's funds are avoidable as fraudulent pursuant to 11 U.S.C. §§ 548(a)(1)(A), 550, and 551, and the common law tort of intentional fraudulent transfers by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against the Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

**74.**     The Affiliate Agreement, ARPA Agreements, and Transfers should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(A) and under the common law tort of intentional fraudulent

transfers, and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

## SECOND CLAIM FOR RELIEF

### Count II - Avoidance, Recovery, and Preservation of Constructive Fraudulent Transfers Against Defendants

### [11 U.S.C. §§ 548(a)(1)(B), 550, and 551]

**75.**    Plaintiff realleges and incorporates here by reference each and every allegation contained in paragraphs 1 through 75 as though set forth in full.

**76.**    The Affiliate Agreement, ARPA Agreements, and all or a portion of the Transfers occurred within the two years prior to the Petition Date.

**77.**    On or after the date that such agreements were executed and such Transfers were made, entities to which Debtor was or became indebted include the Prepetition Creditors.

**78.**    The Transfers happened while Debtor:

    a.   was insolvent or became insolvent as a result;

    b.   was engaged or was about to engage in a transaction for which any property remaining with Debtor was of unreasonably small capital; or

    c.   intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

**79.**    Because the referrals from Defendants to Debtor are illegal under federal and state law, they are void and subject to avoidance as fraudulent. Any purported consideration constitutes unlawful consideration, which cannot constitute reasonably equivalent value. Thus, at the time the agreements were executed and the Transfers made, Debtor received less than reasonably equivalent value.

**80.**    Furthermore, the Debtor did not receive the reasonably equivalent value of the Transfers to the Defendants because by using the Defendants' money to run a Ponzi scheme there is nothing in Estate for the creditors to share. Rather, the Transfers exacerbated the harm to creditors by increasing the amount of claims while diminishing the Debtor's Estate. In this situation, the use

///

15

of the Defendants' money to further the Debtor's Ponzi scheme cannot be consideration for the Transfers and cannot objectively be called reasonably equivalent value.

81.     Therefore, the Defendants was acting as an investor in the Debtor's Ponzi scheme. Any transfers made to the Defendants can be avoided by the Plaintiff since the Transfers are preferential and fraudulent such that they constitute property of the Estate in which the Plaintiff can recover.

82.     The Affiliate Agreement, ARPA Agreements, and the Transfers should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(B), and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

## THIRD CLAIM FOR RELIEF

**Count III - Avoidance, Recovery, and Preservation of Actual Fraudulent Transfers**

**Against Defendants**

**[11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.04(a), 3439.04(b), and 3439.07]**

83.     Plaintiff realleges and incorporates here by reference each and every allegation contained in paragraphs 1 through 83 as though set forth in full.

84.     The Affiliate Agreement, ARPA Agreements, and all or a portion of the Transfers occurred within the four years prior to the Petition Date.

85.     On or after the date that such agreements were entered and such Transfers were made, entities to which Debtor was or became indebted include the Prepetition Creditors.

86.     Despite Debtor's obligation to the Prepetition Creditors, Debtor continued to pay Defendants sums received from consumers under the Affiliate Agreement, which constitutes an illegal capping agreement between Defendants and Debtor.

87.     The Transfers happened while Debtor was insolvent or Debtor became insolvent shortly after the Transfers were made as is evidenced by the filing of the voluntary petition.

88.     The value of the consideration received by Debtor for such Transfers was not reasonably equivalent to the value of the Transfers because the Transfers were used to further assist Debtor in its Ponzi scheme.

**89.**    Because the referrals from Defendants to Debtor are illegal under federal and state law, they are void and subject to avoidance as fraudulent. Any purported consideration constitutes unlawful consideration, which cannot constitute reasonably equivalent value. Thus, at the time the agreements were executed and the Transfers made, Debtor received less than reasonably equivalent value.

**90.**    The Transfers were made with actual intent to hinder, delay, or defraud creditors of Debtor.

**91.**    The Debtor was operating a Ponzi scheme and the Ponzi Scheme Presumption can be utilized to infer the Debtor's actual intent to defraud within the meaning of 11 U.S.C. section 548(a)(1).

**92.**    The Debtor's conduct was done with oppression, fraud, and malice, as defined in Civil Code section 3294, entitling the Trustee to, in addition to the actual damages, exemplary or punitive damages for making an example of the Debtor and to punish the Debtor. The Affiliate Agreement, the ARPA Agreements, and the Transfers of Debtor's funds are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and Cal. Civ. Code §§ 3439.04(a), 3439.04(b), and 3439.07, and the common law tort of intentional fraudulent transfers by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against the Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

**93.**    Accordingly, the Affiliate Agreement, the ARPA Agreements, and the Transfers should be avoided as fraudulent under 11 U.S.C. §§ 544(b) and Cal. Civ. Code §§ 3439.04(a), 3439.04(b), and 3439.07, and under the common law tort of intentional fraudulent transfers, and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551 and Cal. Civ. Code § 3439.07.

///

///

///

///

**FOURTH CLAIM FOR RELIEF**

**Count IV - Avoidance, Recovery, and Preservation of Constructive Fraudulent Transfers**

**Against Defendants**

**[11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.05, and 3439.07]**

**94.**     Plaintiff realleges and incorporates here by reference each and every allegation contained in paragraphs 1 through 94 as though set forth in full.

**95.**     The Affiliate Agreement, the ARPA Agreements, and all or a portion of the Transfers occurred within the four years prior to the Petition Date.

**96.**     The Transfers happened while Debtor:

    d.  was insolvent or became insolvent as a result;

    e.  was engaged or was about to engage in a transaction for which any property remaining with Debtor was of unreasonably small capital; or

    f.  intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

**97.**     Because the referrals from Defendants to Debtor are illegal under federal and state law, the agreements are void and subject to avoidance as fraudulent. Any purported consideration constitutes unlawful consideration, which cannot constitute reasonably equivalent value. Thus, at the time the agreements were executed and the Transfers made, Debtor received less than reasonably equivalent value.

**98.**     Furthermore, the Debtor did not receive the reasonably equivalent value of the Transfers to the Defendants because by using the Defendants' money to run a Ponzi scheme there is nothing in Estate for the creditors to share. Rather, the Transfers exacerbated the harm to creditors by increasing the amount of claims while diminishing the Debtor's Estate. In this situation, the use of the Defendants' money to further the Debtor's Ponzi scheme cannot be consideration for the Transfers and cannot objectively be called reasonably equivalent value.

**99.**     The Defendants were therefore acting as an investor in the Debtor's Ponzi scheme and any Transfers made to the Defendants can be avoided by the Plaintiff since the Transfers to the

///

18

1  Defendants are preferential and fraudulent such that they constitute property of the Estate in which

2  the Plaintiff can recover.

3       **100.**  The Affiliate Agreement, the ARPA Agreements, and the Transfers of Debtor's

4  funds are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and Cal. Civ. Code §§ 3439.05

5  and 3439.07 by one or more creditors who held and hold unsecured claims against Debtor that were

6  and are allowable against the Estate under 11 U.S.C. § 502 or that were not and are not allowable

7  only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

8  ///

9       **101.**  Accordingly, the Affiliate Agreement, the ARPA Agreements, and the Transfers

10  should be avoided as fraudulent under 11 U.S.C. §§ 544(b) and Cal. Civ. Code §§ 3439.05 and

11  3439.07, and such transferred property, or the value thereof, should be recovered and preserved for

12  the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551 and Cal. Civ. Code § 3439.07.

13  **FIFTH CLAIM FOR RELIEF**

14  **Count V - Avoidance, Recovery, and Preservation of Preferential Transfer to Defendants in**

15  **Preference Period**

16  **[11 U.S.C. §§ 547, 550, and 551]**

17       **102.**  Plaintiff realleges and incorporates here by reference each and every allegation

18  contained in paragraphs 1 through 101 as though set forth in full.

19       **103.**  The Preference Transfers were made for, or on account of, an antecedent debt or

20  debts owed by LPG to Defendants, each of which constituted a "debt" or "claim" (as those terms

21  are defined in the Bankruptcy Code) of Defendants.

22       **104.**  The Preference Transfers happened while LPG was insolvent.

23       **105.**  Debtor is also entitled to the presumption of insolvency when the Preference

24  Transfers happened pursuant to 11 U.S.C. § 547(f).

25       **106.**  As a result of the Preference Transfers, Defendants recovered more than it would

26  have received if: (i) the Debtor's case was under chapter 7 of the Bankruptcy Code; (ii) the

27  Preference Transfers had not been made; and (iii) Defendants received payments of its debts under

28  the provisions of the Bankruptcy Code. As evidenced by the Debtor's schedules filed in the

19

underlying Bankruptcy Case, as well as the proofs of claim that have been received to date, the Debtor's liabilities exceed its assets to the point that unsecured creditors will not receive a full payout of their claims from the Debtor's Estate.

107.    In accordance with the foregoing, the Preference Transfers are voidable pursuant to 11 U.S.C. § 547(b), and may be recovered and preserved for the benefit of the estate pursuant to 11 U.S.C. §§ 550 and 551.

## SIXTH CLAIM FOR RELIEF

### Count VI - Turnover of Estate Property Against Defendants

### [11 U.S.C. § 542]

108.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 108 as though set forth in full.

109.    Defendants has possession or control over property of the Estate in the form of the Transfers and Preference Transfers made pursuant to illegal and unenforceable agreements.

110.    The Transfers are not of inconsequential value to the Estate.

111.    The funds that are the subject of the Transfers and Preference Transfers are paramount to Debtor's ability to pay creditors.

112.    Accordingly, Trustee is entitled to a judgment for turnover of the Transfer and Preference Transfers pursuant to 11 U.S.C. § 542.

## SEVENTH CLAIM FOR RELIEF

### Count VII – Aiding and Abetting Against Defendant McCarthy

### [11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.04(a), 3439.04(b), and 3439.07]

113.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 113 as though set forth in full.

114.    Defendants, based upon information and belief and based on the Ponzi Scheme Presumption, had knowledge of the fraudulent transactions, transfers and illegal agreements that were used to perpetuate and conceal the Ponzi scheme and fraudulent transfers.

115.    Defendants, with the foregoing knowledge, intended to, and did, help the Debtor in perpetuating and concealing the Ponzi scheme and fraudulent transfers of money.

**116.**    At all material times, Defendants had the intent to facilitate and conceal the Ponzi scheme and fraudulent transfers of money by aiding and abetting the illegal capping scheme and signing up consumer clients to keep the business going.

**117.**    Defendants, upon information and belief, assisted, and did actually engage in, the commission of fraud and the Ponzi scheme by coordinating, facilitating, and directing payments and transfers of moneys and executing documents in furtherance of concealing the true nature of their fraudulent and criminal activity related to the Ponzi scheme.

<u>**RESERVATION OF RIGHTS**</u>

**118.**    Plaintiff reserves the right to bring all other claims or causes of action that Plaintiff may have against Defendants, on any and all grounds, as allowed under the law or in equity, including but not limited to, those claims not known by the Trustee at this time but that he may discover during the pendency of this adversary proceeding.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiff prays for a judgment as follows:

**On The First, Second, Third, and Fourth Claims for Relief:**

**1.**    Avoiding, recovering, and preserving the Transfers against Defendants; and

**2.**    Exemplary and punitive damages to set example of Defendants commensurate to its wealth.

**On the Fifth Claim for Relief:**

**3.**    Avoiding, recovering, and preserving the Preference Transfers against Defendants;

**On the Sixth Claim for Relief:**

**4.**    Ordering Defendants to immediately turn over the Transfers and/or Preference Transfers;

**On the Eighth Claim for Relief:**

**5.**    Ordering Defendants to immediately turn over the Transfers and/or Preference Transfers;

///

///

1

**On All Claims for Relief:**

2

6.    Awarding costs of suit incurred here;

3

7.    Awarding pre- and post-judgment interest; and

4

8.    Granting any other and further relief as the Court deems just and proper.

5

Dated: March 18, 2025

Respectfully submitted,

6

DINSMORE & SHOHL LLP

7

By:  _/s/ Brian W. Boyd_____

8

Yosina M. Lissebeck
Brian W. Boyd

9

*Counsel to Richard A. Marshack, Plaintiff*
*and Trustee of the LPG Liquidation Trust*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

Exhibit 1
Page 23

## ACCOUNTS RECEIVABLE PURCHASE AGREEMENT

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is effective as of March 16, 2020 (the "**Agreement Date**"), by and between the buyer identified on the signature page to this Agreement (the "**Buyer**") and All Service Financial LLC, a Florida limited liability company (the "**Seller**", and together with the Buyer, the **"Parties"**).

### RECITALS

WHEREAS, in the regular course of business, the Seller originates account receivables from BAT Inc., a California corporation ("**Coast**"), in connection with client on-boarding services provided by the Seller to Coast and its affiliates;

WHEREAS, the account receivables represent an obligation of Coast to pay Seller for services that Seller previously provided to Coast;

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables on a recurring weekly basis (the "**Purchased Accounts**").

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

### ARTICLE 1.
### DEFINITIONS

Section 1.1     Certain Definitions.  Certain defined terms used in this Agreement are set forth on **Exhibit A**.

### ARTICLE 2.
### ASSIGNMENT AND TRANSFER AND CONSIDERATION

Section 2.1     Assignment of the Purchased Accounts to the Buyer.  Upon execution of this Agreement and subject to the terms and conditions set forth herein, beginning on the Effective Date, and continuing every Monday thereafter on a weekly basis through and including December 28, 2020, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all of the Seller's right, title, and interest in and to the Purchased Accounts set forth on **Exhibit B** (as updated on a weekly basis), free and clear of any Liens.  Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the "**Excluded Assets**").  The Purchased Accounts shall be assigned to Buyer on an "as-is" basis and Seller is making no guarantee or warranty as to the collectability of any Purchased Account.

Section 2.2     No Assumption of Liabilities.  The Buyer shall not assume any liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the "**Excluded Liabilities**").

Section 2.3     Payment of Purchase Price.  Buyer shall pay Seller $1,500.00 for each Purchased Account, for a total price of $15,000.00 per week due to Seller (the "**Purchase Price**").  The Buyer shall pay the Purchase Price (the "**Upfront Cash Payment**") to the Seller at or prior to each Weekly Closing, in cash, by wire transfer of

Exhibit 1
Page 24

immediately available funds in accordance with the wire transfer instructions set forth in **Schedule 2.3** (the "**Wire Instructions**").

## ARTICLE 3.
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of each Weekly Closing, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1     Organization; Good Standing.  The Seller is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Florida and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2     Power and Authority.  The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.3     Title to, and Sufficiency of, the Purchased Accounts.  The Seller has and shall convey to the Buyer at each Weekly Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all of the Purchased Accounts, free and clear of all Liens, other than Permitted Liens.

Section 3.4     Consents.  The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.5     No Conflicts.  The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

Exhibit 1
Page 25

DocuSign Envelope ID: A4B1A62E-E61B-4201-9786-28F82E1A756A

Section 3.6 <u>Compliance with Laws</u>. The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.

Section 3.7 <u>Legal Proceedings</u>. There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements. No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.8 <u>Condition of Purchased Accounts</u>. To the knowledge of Seller, the Purchased Accounts will not be the subject of any litigation or other legal proceedings.

## ARTICLE 4.
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of each Weekly Closing, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1 <u>Power and Authority</u>. The Buyer has full power and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly authorized by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby. This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 4.2 <u>No Conflicts</u>. The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any contract to which the Buyer is party; or (b) any Law applicable to the Buyer.

Section 4.3 <u>Sufficient Funds</u>. The Buyer has, and will have, sufficient funds available to make the weekly payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

## ARTICLE 5.
## COVENANTS

Section 5.1 <u>Appropriate Actions</u>.

(a) <u>General</u>. Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable

DocuSign Envelope ID: A4B4A62E-E61B-4201-9786-28F82F1A756A

after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to each Weekly Closing.

## ARTICLE 6.
## CLOSING

Section 6.1    <u>Closing</u>.  The initial closing of the transactions contemplated by this Agreement (the "**Initial Closing**") will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing.  The Initial Closing, and the date on which each subsequent weekly closing occurs is hereinafter referred to as a "**Weekly Closing**."  The Parties agree that the Weekly Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2    <u>Closing Deliverables of the Seller</u>.  At or prior to each Weekly Closing, Seller shall deliver to Buyer any of the following if requested by Buyer:  (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **<u>Exhibit C</u>** (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3    <u>Closing Deliverables of the Buyer</u>.  At or prior to each Weekly Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to <u>Section 6.2</u>, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4    <u>Indemnification by the Seller</u>.  Subject to the limitations set forth in this <u>Article 6</u>, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Seller pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability.

Section 6.5    <u>Indemnification by the Buyer</u>.  Subject to the limitations set forth in this <u>Article 6</u>, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurrence related to the Purchased Accounts or Buyer occurring after each Weekly Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.6    <u>Indemnification Procedures</u>.

Exhibit 1
Page 27

DocuSign Envelope ID: A484A62E-E64B-4201-9786-28F82E4A766A

(a)      No Restraints.  Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, provided, however, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim.  The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; provided, however, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred.  In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense.  The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b)      No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim.  An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c)      If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**").  Such Notice of Claim shall specify the basis for such Direct Claim.  The failure by any Indemnified Party to so notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this Section 6.6(c).  If the Indemnifying Party does not notify the Indemnified Party within thirty days following its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this Article 6 or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this Article 6, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined.  In the event that the Indemnifying Party has timely disputed its Liability with respect

Exhibit 1
Page 28

DocuSign Envelope ID: A4B1A62E-E64B-4201-B786-28F82E2A756A

to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

Section 6.7. <u>Limitation of Liability; Disclaimer</u>.  NEITHER SELLER NOR ITS AFFILIATES WILL BE LIABLE (INCLUDING ANY LIABLIITY FOR THE ACTS AND OMISSIONS OF ITS EMPLOYEES, AGENTS AND SUB-CONTRACTORS) TO BUYER, ITS AFFILIATES OR ANY THIRD PARTY FOR ANY INCIDENTAL, INDIRECT, SPECIAL, CONSEQUENTIAL, PUNITIVE OR EXEMPLARY DAMAGES OR LOSSES OF ANY KIND (INCLUDING LOST OR ANTICIPATED REVENUES OR PROFITS RELATING TO THE SAME) ARISING FROM ANY CLAIM RELATING TO THIS AGREEMENT OR ANY OF THE PURCHASED ACCOUNTS HEREUNDER, WHETHER SUCH CLAIM IS BASED ON WARRANTY, CONTRACT, TORT (INCLUDING NEGLIGENCE OR STRICT LIABILITY) OR OTHERWISE, EVEN IF THE PARTIES ARE ADVISED OF THE POSSIBILITY OR LIKELIHOOD OF THE SAME.  Seller gives no warranty as to the performance or profitability of the Purchased Accounts or any part hereof, nor any guarantee that the investment objectives, expectations or targets described in this Agreement or elsewhere will be achieved, including without limitation, any risk control, risk management or return objectives, expectations or targets. In any event, the liability of Seller to Buyer for any reason and upon any cause of action, regardless of the form in which the legal or equitable action may be brought, including, without limitation, any action in tort or contract, shall not exceed the Purchase Price, *less* the total of all payments received by Buyer with respect to the Purchased Accounts.


**ARTICLE 7.**
**MISCELLANEOUS**

Section 7.1      <u>Entire Agreement; Amendment</u>.  This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof.  This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2      <u>Waivers</u>.  The rights and remedies of the Parties to this Agreement are cumulative and not alternative.  To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for which it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3      <u>Notices</u>.  All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission. A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

DocuSign Envelope ID: A4B1A62E-E61B-4201-9786-28F82E4A766A

Section 7.4    Successors and Assigns.  This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns.  Neither this Agreement nor any rights or obligations of a Party hereunder shall be assigned by a Party (unless to an Affiliate of such Party) without the prior written consent of the other Parties.  This Agreement will be binding upon any permitted assignee of any Party.  No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5    Public Disclosure.  Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6    Expenses and Fees.  Whether or not the Weekly Closing occurs, all fees and expenses incurred in connection with this transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.

Section 7.7    Specific Performance.  The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

Section 7.8    Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.9    Governing Law.  This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws principles.

Section 7.10    Severability.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 7.11    Construction.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

Exhibit 1
Page 30

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

OHA MANAGEMENT LLC

By: _____
    Name: Gabe McCarthy
    Title:  Manager
    Address: 2300 Bethards Dr. Suite G
    Santa Rosa, CA 95405

**SELLER:**

ALL SERVICE FINANCIAL LLC
a Florida limited liability company

By: _____
    Name: Vivian Stomel
    Title:  CFO
    Address: 3390 Kori Road. 2nd Floor. Jacksonville, FL

*[Signature Page to Accounts Receivable Purchase Agreement]*

Exhibit 1
Page 31

DocuSign Envelope ID: A4B4A62E-E61B-4201-B786-28F82E4A756A

## EXHIBIT A

## DEFINITIONS

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a)      "**Action**" shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b)      "**Agreement**" shall have the meaning set forth in the preamble to this Agreement.

(c)      "**Agreement Date**" shall have the meaning set forth in the preamble to this Agreement.

(d)      "**Affiliate**" shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii), with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals.  For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e)      "**Bill of Sale and Assignment and Assumption Agreement**" shall have the meaning set forth in Section 6.2.

(f)      "**Business**" shall mean the business of the Seller as conducted on the Agreement Date.

(g)      "**Buyer**" shall have the meaning set forth in the preamble to this Agreement.

(h)      "**Buyer Indemnified Parties**" shall have the meaning set forth in Section 6.4.

(i)      "**Direct Claim**" shall have the meaning set forth in Section 6.6(c).

(j)      "**Excluded Assets**" shall have the meaning set forth in Section 2.1.

(k)      "**Excluded Liabilities**" shall have the meaning set forth in Section 2.2.

(l)      "**Governmental Body**" shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

(m)      "**Indebtedness**" means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii)

Exhibit 1
Page 32

guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(n)    "**Indemnified Party**" shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(o)    "**Indemnifying Party**" shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(p)    "**Initial Closing**" shall have the meaning set forth in Section 6.1.

(q)    "**Knowledge**" shall mean, with respect to the Seller, the actual or constructive knowledge of [Josh Stomel / Bonnie Silver], after due inquiry.

(r)    "**Law**" shall mean any law, statute, ordinance, regulation, rule, code, notice requirement, court decision, or agency guideline, of any foreign, federal, state, or local Governmental Body.

(s)    "**Liabilities**" shall mean any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on- or off-balance sheet, or other.

(t)    "**Lien**" shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(u)    "**Losses**" shall have the meaning set forth in Section 6.4.

(v)    "**Notice of Claim**" shall have the meaning set forth in Section 6.6(c).

(w)    "**Organizational Documents**" shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(x)    "**Party**" or "**Parties**" shall have the meaning set forth in the preamble to this Agreement.

(y)    "**Permitted Liens**" shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(z)    "**Person**" shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

(aa)    "**Purchase Price**" shall have the meaning set forth in Section 2.3.

(bb)    "**Purchased Accounts**" shall have the meaning set forth in the Recitals.

Exhibit 1
Page 33

(cc)    "**Seller**" shall have the meaning set forth in the preamble to this Agreement.

(dd)    "**Seller Indemnified Parties**" shall have the meaning set forth in <u>Section 6.5</u>.

(ee)    "**Tax**" or "**Taxes**" shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(ff)    "**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(gg)    "**Third Party**" or "**Third Parties**" shall mean any Person other than the Parties or their respective Affiliates.

(hh)    "**Third-party Claim**" shall have the meaning set forth in <u>Section 6.6(a)</u>.

(ii)    "**Transaction Agreements**" shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(jj)    "**Upfront Cash Payment**" shall have the meaning set forth in <u>Section 2.3</u>.

(kk)    "**Weekly Closing**" shall have the meaning set forth in <u>Section 6.1</u>.

(ll)    "**Wire Instructions**" shall have the meaning set forth in <u>Section 2.3</u>.

Exhibit 1
Page 34

DocuSign Envelope ID: A4B4A62E-E61B-4201-9786-28F82E4A756A

**EXHIBIT B**

**PURCHASED ACCOUNTS**

| Date of Purchase | Purchased Account Number | Account Debtor | Purchase Price |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

Accounts Receivable Purchase Agreement
Exhibit B – Purchased Accounts

Exhibit 1
Page 35

DocuSign Envelope ID: A4B4A62E-E61B-4201-B786-28F82E1A756A

**EXHIBIT C**

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this **"Agreement"**), is made by and between the buyer identified on the signature page to this Agreement (the "**Buyer**") and All Services Financial LLC, a Florida limited liability company (the "**Seller**"). Each of the Seller and the Buyer are sometimes referred to herein, individually, as a "**Party**" and, collectively, as the "**Parties**."

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, dated as of March 16, 2020 (the "**Purchase Agreement**"), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.      Defined Terms.  Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2.      Sale of Purchased Accounts; Assignment.  The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3.      Further Assurances.  Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

4.      Terms of the Purchase Agreement.  This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement.  The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference.  The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5.      Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[*Remainder of page intentionally left blank.*]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**BUYER**

OHA MANAGEMENT LLC

By: _____
Name: Gabe McCarthy
Title:  Manager
2300 Bethards Dr. Suite G
Santa Rosa, CA 95405

**SELLER**

ALL SERVICES FINANCIAL LLC
a Florida limited liability company

By: _____
Name: Vivian Stomel
Title:  CFO

**Schedule 2.3**
**Wire Instructions**

Buyer Account Information

Full Business Name          OHA Management LLC
Banking information         ████████
Account Title          OHA
EIN number associated with account    ████████
Address:          ████████████████████
Phone number:          ████████
Bank Name:          ████████
Routing number:          ████████
Account number:          ████████
Account Type:          ████████

# EXHIBIT 2

Exhibit 2
Page 39



*Legal Counsel.*

**DINSMORE & SHOHL** LLP
755 West Big Beaver Road, Suite 1900
Troy, MI 48237
www.dinsmore.com

Brian W. Boyd
(248) 203-1622 (direct) ^ (248) 647-5210 (fax)
Brian.Boyd@dinsmore.com

October 17, 2024

<u>*Via Certified Mail/Return Receipt Requested*</u>

Oha Management, LLC
Attn: Gabe McCarthy, Manager
1881 Bennett Meadows Lane
Santa Rosa, CA 95405

   Re: *In re The Litigation Practice Group P.C.*
     U.S. Bankruptcy Court, Central District of California
     Case No. 8:23-bk-10571-SC

Dear Sir:

This correspondence constitutes a demand to provide any and all documents and information evidencing the basis for, accounting of, and any defenses to my client's claims to avoid and recover, the transfers to Oha Management, LLC from The Litigation Practice Group P.C. ("Debtor").

This firm represents Richard A. Marshack, Chapter 11 Trustee for the bankruptcy estate of The Litigation Practice Group P.C. and liquidating trustee of the LPG Liquidation Trust (collectively, "Trustee") in the above-referenced bankruptcy case. Pursuant to 11 U.S.C. § 1107 and his appointment as Trustee, the Trustee has the obligation to investigate and pursue claims, including fraudulent transfers, preferential transfers, and unauthorized post-petition transfers. Under the Bankruptcy Code, the Trustee has the power to file lawsuits seeking to avoid, recover, and preserve such transfers for the benefit of the Estate. *See* 11 U.S.C. §§ 544 *et seq.*

As explained in the Trustee's initial correspondence, a review of the Debtor's books and records confirms that Oha Management, LLC received: (a) thirteen (13) potential preferential transfers totaling $39,968.22, which can be avoided and recovered by the Trustee pursuant to 11 U.S.C. § 547(b); (b) ninety-six (96) potential fraudulent transfers totaling $1,400,745.86, which can be avoided and recovered by the Trustee pursuant to 11 U.S.C. §§ 544 and 548 and Cal. Civ. Code. §§ 3439.04 and 3439.05.

Exhibit 2
Page 40

October 17, 2024
Page 2

The Trustee has been unable to determine why such transfers were made to Oha Management, LLC, what was provided to the Debtor in exchange for such transfers, and whether defenses exist to the Trustee's claims to avoid and recover the transfers. Please respond to this letter, attaching any evidence you have related to these transfers, including contracts, agreements, subscriptions, invoices, and any other documentation showing the date, terms, and amounts for the transfers received and any documents evidencing shipment dates as to goods and services provided by Oha Management, LLC to the Debtor. Documents showing the course of dealing between Oha Management, LLC and the Debtor, the date of receipt of the Debtor's payment and the amount, deposit date, and any proof of deposit for any or all of the transfers will be helpful in determining the permissibility of the transfers and what, if any, value the Debtor received in return for payments made to Oha Management, LLC.

You are further notified that the claims against Oha Management, LLC will be governed by the Federal Rules of Bankruptcy Procedure and the Federal Rules of Civil Procedure, which apply to lawsuits filed in Federal Bankruptcy Courts such as the one in the Central District of California. Pursuant to these rules, every party to a lawsuit has a duty to preserve all evidence which could be relevant to the suit. These obligations also arise when, as here, litigation is reasonably foreseeable. This includes the duty to preserve all electronic evidence, such as emails discussing the incident or related to matters at issue in the suit. This duty to preserve evidence is broad and extends to all documents, regardless of whether the document is stored electronically (such as email) or in hard-copy and regardless of the type of document. For example, reports, spreadsheets, photographs and videotapes are all considered documents that must be preserved. Furthermore, the duty to preserve this documentary evidence extends to all documents in existence as of the time you reasonably anticipated this litigation.

To ensure that all relevant documents are preserved, you should communicate directly with all employees who have possession or control of potentially relevant evidence, including but not limited to personnel who deal with email retention, deletion, and archiving. You should advise each of these employees to preserve any relevant documents in their custody. Furthermore, you should advise all such persons that any regularly scheduled and/or automatic deletion of email or other electronic documents must be discontinued with respect to any relevant data. In addition, any document destruction (such as shredding of documents) must cease with respect to any relevant documents. All relevant documents, both electronic and paper, must be preserved for the duration of this litigation.

The deadline to respond to this request is **Friday, November 1, 2024**. Failure to respond and/or provide the requested documents will likely result in the Trustee filing an adversary complaint to avoid, recover, and preserve the subject transfers for the benefit of the Estate. If you would like to discuss this matter, please feel free to contact me by telephone at (248) 203-1622 or e-mail at brian.boyd@dinsmore.com.

Sincerely,

*/s/ Brian W. Boyd*
Brian W. Boyd

Exhibit 2
Page 41

# EXHIBIT 3

Exhibit 3
Page 42

In re: The Litigation Practice Group PC
Disbursement Details by Payee
4 Years Pre-Petition (03/20/2019 - 03/20/2023)

Oha Management LLC

Prepared by: Grobstein Teeple LLP

| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Ohack Number | Debit/Oharge | Memo |
|---|---|---|---|---|---|---|---|
| UnionBank | The Litigation Practice Group PC | | 7/31/2021 | 7/28/2021 | | 53,564.79 | WIRE TRANS TRN ... Sent To: JPMORGAN ChaSE BANK, NA Beneficiary: 1/Oha Management LLC |
| UnionBank | The Litigation Practice Group PC | | 8/31/2021 | 8/4/2021 | | 29,589.20 | WIRE TRANS TRN ... Sent To: JPMORGAN ChaSE BANK, NA Beneficiary: 1/Oha Management LLC |
| UnionBank | The Litigation Practice Group PC | | 8/31/2021 | 8/11/2021 | | 27,896.28 | WIRE TRANS TRN ... Sent To: JPMORGAN ChaSE BANK, NA Beneficiary: 1/Oha Management LLC |
| UnionBank | The Litigation Practice Group PC | | 8/31/2021 | 8/20/2021 | | 19,064.15 | WIRE TRANS TRN ... Sent To: JPMORGAN ChaSE BANK, NA Beneficiary: 1/Oha Management LLC |
| UnionBank | The Litigation Practice Group PC | | 8/31/2021 | 8/20/2021 | | 4,878.56 | WIRE TRANS TRN ... Sent To: JPMORGAN ChaSE BANK, NA Beneficiary: 1/Oha Management LLC |
| UnionBank | The Litigation Practice Group PC | | 8/31/2021 | 8/25/2021 | | 38,865.56 | WIRE TRANS TRN ... Sent To: JPMORGAN ChaSE BANK, NA Beneficiary: 1/Oha Management LLC |
| UnionBank | The Litigation Practice Group PC | | 9/30/2021 | 9/1/2021 | | 32,928.69 | WIRE TRANS TRN ... Sent To: JPMORGAN ChaSE BANK, NA Beneficiary: 1/Oha Management LLC |
| UnionBank | The Litigation Practice Group PC | | 9/30/2021 | 9/9/2021 | | 24,959.40 | WIRE TRANS TRN ... Sent To: JPMORGAN ChaSE BANK, NA Beneficiary: 1/Oha Management LLC |
| UnionBank | The Litigation Practice Group PC | | 9/30/2021 | 9/16/2021 | | 30,149.94 | WIRE TRANS TRN ... Sent To: JPMORGAN ChaSE BANK, NA Beneficiary: 1/Oha Management LLC |
| UnionBank | The Litigation Practice Group PC | | 9/30/2021 | 9/22/2021 | | 17,690.08 | 1/Oha Management LLC |
| Optimum Bank | Coast Processing LLC dba LPG | | 10/29/2021 | 10/5/2021 | | 46,114.68 | WIRE TO Oha Management LLC |
| Optimum Bank | Coast Processing LLC dba LPG | | 10/29/2021 | 10/7/2021 | | 26,895.78 | WIRE TO Oha Management LLC |
| Optimum Bank | Coast Processing LLC dba LPG | | 10/29/2021 | 10/14/2021 | | 23,787.59 | WIRE TO Oha Management LLC |
| Optimum Bank | Coast Processing LLC dba LPG | | 10/29/2021 | 10/26/2021 | | 16,471.78 | WIRE TO Oha Management LLC |
| Optimum Bank | Coast Processing LLC dba LPG | | 10/29/2021 | 10/27/2021 | | 35,468.69 | WIRE TO Oha Management LLC |
| Optimum Bank | Coast Processing LLC dba LPG | | 11/30/2021 | 11/5/2021 | | 27,511.68 | WIRE TO Oha Management LLC |
| Optimum Bank | Coast Processing LLC dba LPG | | 11/30/2021 | 11/12/2021 | | 26,890.22 | WIRE TO Oha Management LLC |
| Optimum Bank | Coast Processing LLC dba LPG | | 11/30/2021 | 11/18/2021 | | 23,293.24 | WIRE TO Oha Management LLC |
| Optimum Bank | Coast Processing LLC dba LPG | | 11/30/2021 | 11/26/2021 | | 30,788.43 | WIRE TO Oha Management LLC |
| Optimum Bank | Coast Processing LLC dba LPG | | 12/31/2021 | 12/2/2021 | | 24,753.06 | WIRE TO Oha Management LLC |
| UnionBank | The Litigation Practice Group PC | | 12/31/2021 | 12/9/2021 | | 21,598.83 | WIRE TRANS TRN ... Sent To: JPMORGAN ChaSE BANK, NA 1/Oha Management LLC |
| UnionBank | The Litigation Practice Group PC | | 12/31/2021 | 12/17/2021 | | 34,576.07 | WIRE TRANS TRN ... Sent To: JPMORGAN ChaSE BANK, NA eneficiary: 1/Oha Management LLC |
| UnionBank | The Litigation Practice Group PC | | 12/31/2021 | 12/23/2021 | | 7,304.64 | WIRE TRANS TAN ... Sent To: JPMORGAN ChaSE BANK, NA Beneficiary: 1/Oha Management LLC |
| UnionBank | The Litigation Practice Group PC | | 12/31/2021 | 12/31/2021 | | 27,284.12 | WIRE TRANS TRN ... Sent To: JPMORGAN ChaSE BANK, NA Beneficiary: 1/Oha Management LLC |
| UnionBank | The Litigation Practice Group PC | | 1/31/2022 | 1/10/2022 | | 23,977.15 | WIRE TRANS TRN ... Sent To: JPMORGAN ChaSE BANK, NA Beneficiary: 1/Oha Management LLC |
| UnionBank | The Litigation Practice Group PC | | 1/31/2022 | 1/13/2022 | | 21,787.97 | WIRE TRANS TRN ... Sent To: JPMORGAN ChaSE BANK, NA Beneficiary: 1/Oha Management LLC |
| UnionBank | The Litigation Practice Group PC | | 1/31/2022 | 1/21/2022 | | 16,232.86 | WIRE TRANS TAN ... Sent To: JPMORGAN ChaSE BANK, NA Beneficiary: 1/Oha Management LLC |
| UnionBank | The Litigation Practice Group PC | | 1/31/2022 | 1/28/2022 | | 33,055.14 | WIRE TRANS TAN ... Sent To: JPMORGAN ChaSE BANK, NA 1/Oha Management LLC |
| UnionBank | The Litigation Practice Group PC | | 2/28/2022 | 2/4/2022 | | 20,022.76 | WIRE TRANS TRN ... N Sent To: JPMORGAN ChaSE BANK, NA Beneficiary: 1/Oha Management LLC |
| UnionBank | The Litigation Practice Group PC | | 2/28/2022 | 2/11/2022 | | 23,642.89 | WIRE TRANS TRN ... Sent To: JPMORGAN ChaSE BANK, NA Beneficiary: 1/Oha Management LLC |
| Chase | The Litigation Practice Group PC | | 2/28/2022 | 2/18/2022 | | 2,138.69 | Book Transfer Debit NC: Oha Management LLC Santa Rosa CA 95405-8376 US Ref: Weekly Disbursement |
| Chase | The Litigation Practice Group PC | | 2/28/2022 | 2/22/2022 | | 14,980.73 | Book Transfer Debit A/C: Oha Management LLC Santa Rosa CA 95405-8376 us Ref: Weekly Disbursement |
| Chase | The Litigation Practice Group PC | | 2/28/2022 | 2/25/2022 | | 22,456.13 | Book Transfer Debit A/C: Oha Management LLC Santa Rosa CA 95405-8376 US Ref: Weekly Disbursement |

DRAFT FORM - SUBJECT TO CHANGE

Exhibit 3

In re: The Litigation Practice Group PC
Disbursement Details by Payee
4 Years Pre-Petition (03/20/2019 - 03/20/2023)

Oha Management LLC

Prepared by: Grobstein Teeple LLP

| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Ohack Number | Debit/Oharge | Memo |
|---|---|---|---|---|---|---|---|
| Chase | The Litigation Practice Group PC | ▮ | 3/31/2022 | 3/4/2022 | | 20,099.76 | Book Transfer Debit NC: Oha Management LLC Santa Rosa CA 95405-8376 US Ref: Weekly Disbursement ▮ |
| Chase | The Litigation Practice Group PC | ▮ | 3/31/2022 | 3/11/2022 | | 22,998.41 | Book Transfer Debit A/C: Oha Management LLC Santa Rosa CA 95405-8376 US Ref: Weekly Disbursement ▮ |
| Chase | The Litigation Practice Group PC | ▮ | 3/31/2022 | 3/18/2022 | | 19,285.56 | Book Transfer Debit A/C: Oha Management LLC Santa Rosa CA 95405-8376 US Ref: Weekly Disbursement ▮ |
| Chase | The Litigation Practice Group PC | ▮ | 3/31/2022 | 3/24/2022 | | 24,790.55 | Book Transfer Debit NC: Oha Management LLC Santa Rosa CA 95405-8376 us Ref: Weekly Disbursement ▮ |
| Chase | The Litigation Practice Group PC | ▮ | 4/30/2022 | 4/1/2022 | | 17,915.93 | Book Transfer Debit NC: Oha Management LLC Santa Rosa CA 95405-8376 US Ref: Weekly Disbursement ▮ |
| Chase | The Litigation Practice Group PC | ▮ | 4/30/2022 | 4/7/2022 | | 12,116.19 | Book Transfer Debit A/C: Oha Management LLC Santa Rosa CA 95405-8376 us Ref: Weekly Disbursement ▮ |
| Chase | The Litigation Practice Group PC | ▮ | 4/30/2022 | 4/18/2022 | | 22,612.23 | Book Transfer Debit NC: Oha Management LLC Santa Rosa CA 95405-8376 US Ref: Weekly Disbursement ▮ |
| Chase | The Litigation Practice Group PC | ▮ | 4/30/2022 | 4/21/2022 | | 7,642.82 | Book Transfer Debit A/C: Oha Management LLC Santa Rosa CA 95405-8376 us Ref: Weekly Disbursement ▮ |
| Chase | The Litigation Practice Group PC | ▮ | 4/30/2022 | 4/28/2022 | | 18,508.83 | Book Transfer Debit A/C: Oha Management LLC Santa Rosa CA 95405-8376 US Ref: Weekly Disbursement ▮ |
| Chase | The Litigation Practice Group PC | ▮ | 5/31/2022 | 5/5/2022 | | 11,682.68 | Book Transfer Debit NC: Oha Management LLC Santa Rosa CA 95405-8376 US Ref: Weekly Disbursement ▮ |
| Chase | The Litigation Practice Group PC | ▮ | 5/31/2022 | 5/13/2022 | | 17,694.44 | Book Transfer Debit A/C: Oha Management LLC Santa Rosa CA 95405-8376 US Ref: Weekly Disbursement ▮ |
| Chase | The Litigation Practice Group PC | ▮ | 5/31/2022 | 5/19/2022 | | 9,291.97 | Book Transfer Debit A/C: Oha Management LLC Santa Rosa CA 95405-8376 US Ref: Weekly Disbursement ▮ |
| Chase | The Litigation Practice Group PC | ▮ | 5/31/2022 | 5/27/2022 | | 19,214.70 | Book Transfer Debit NC: Oha Management LLC Santa Rosa CA 95405-8376 us Ref: Weekly Disbursement ▮ |
| Chase | The Litigation Practice Group PC | ▮ | 6/30/2022 | 6/3/2022 | | 13,127.67 | Book Transfer Debit A/C: Oha Management LLC Santa Rosa CA 95405-8376 us Ref: Weekly Disbursement ▮ |
| Chase | The Litigation Practice Group PC | ▮ | 6/30/2022 | 6/10/2022 | | 14,562.44 | Book Transfer Debit A/C: Oha Management LLC Santa Rosa CA 95405-8376 us Ref: Weekly Disbursement ▮ |
| Chase | The Litigation Practice Group PC | ▮ | 6/30/2022 | 6/17/2022 | | 14,917.10 | Book Transfer Debit A/C: Oha Management LLC Santa Rosa CA 95405-8376 US Ref: Weekly Disbursement ▮ |
| Chase | The Litigation Practice Group PC | ▮ | 6/30/2022 | 6/23/2022 | | 12,085.50 | Book Transfer Debit A/C: Oha Management LLC Santa Rosa CA 95405-8376 US Ref: Weekly Disbursement ▮ |
| Chase | The Litigation Practice Group PC | ▮ | 6/30/2022 | 6/30/2022 | | 15,938.28 | Book Transfer Debit NC: Oha Management LLC Santa Rosa CA 95405-8376 us Ref: Weekly Disbursement ▮ |
| Chase | The Litigation Practice Group PC | ▮ | 7/31/2022 | 7/8/2022 | | 10,141.59 | Book Transfer Debit A/C: Oha Management LLC Santa Rosa CA 95405-8376 us Ref: Weekly Disbursement ▮ |
| Chase | The Litigation Practice Group PC | ▮ | 7/31/2022 | 7/14/2022 | | 17,489.13 | Book Transfer Debit A/C: Oha Management LLC Santa Rosa CA 95405-8376 US Ref: Weekly Disbursement ▮ |
| Chase | The Litigation Practice Group PC | ▮ | 7/31/2022 | 7/21/2022 | | 6,350.38 | Book Transfer Debit NC: Oha Management LLC Santa Rosa CA 95405-8376 us Ref: Weekly Disbursement ▮ |
| Chase | The Litigation Practice Group PC | ▮ | 7/31/2022 | 7/29/2022 | | 14,652.94 | Book Transfer Debit A/C: Oha Management LLC Santa Rosa CA 95405-8376 U5 Ref: Weekly Disbursement ▮ |
| Chase | The Litigation Practice Group PC | ▮ | 8/31/2022 | 8/5/2022 | | 9,985.45 | Book Transfer Debit A/C: Oha Management LLC Santa Rosa CA 95405-8376 US Ref: Weekly Disbursement ▮ |
| Chase | The Litigation Practice Group PC | ▮ | 8/31/2022 | 8/11/2022 | | 14,282.00 | Book Transfer Debit A/C: Oha Management LLC Santa Rosa CA 95405-8376 US Ref: Weekly Disbursement ▮ |
| Chase | The Litigation Practice Group PC | ▮ | 8/31/2022 | 8/19/2022 | | 8,804.55 | Book Transfer Debit A/C: Oha Management LLC Santa Rosa CA 95405-8376 US Ref: Weekly Disbursement ▮ |
| Chase | The Litigation Practice Group PC | ▮ | 8/31/2022 | 8/26/2022 | | 12,161.09 | Book Transfer Debit A/C: Oha Management LLC Santa Rosa CA 95405-8376 us Ref: Weekly Disbursement ▮ |
| Chase | The Litigation Practice Group PC | ▮ | 9/30/2022 | 9/2/2022 | | 10,920.90 | Book Transfer Debit A/C: Oha Management LLC Santa Rosa CA 95405-8376 US Ref: Weekly Disbursement ▮ |
| Chase | The Litigation Practice Group PC | ▮ | 9/30/2022 | 9/9/2022 | | 8,768.84 | |

DRAFT FORM - SUBJECT TO CHANGE

Exhibit 3
Page 44

In re: The Litigation Practice Group PC
Disbursement Details by Payee
4 Years Pre-Petition (03/20/2019 - 03/20/2023)

Oha Management LLC

Prepared by: Grobstein Teeple LLP

| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Ohack Number | Debit/Oharge | Memo |
|-----------|-------------|----------------|----------------|------------------|--------------|--------------|------|
| Chase | The Litigation Practice Group PC | ■ | 9/30/2022 | 9/16/2022 | | 13,228.85 | Book Transfer Debit NC: Oha Management LLC Santa Rosa CA 95405-8376 us Ref: Weekly Disbursement ■ |
| Chase | The Litigation Practice Group PC | ■ | 9/30/2022 | 9/23/2022 | | 6,160.79 | Book Transfer Debit A/C: Oha Management LLC Santa Rosa CA 95405-8376 US Ref: Weekly Disbursement ■ |
| Chase | The Litigation Practice Group PC | ■ | 10/31/2022 | 10/3/2022 | | 14,702.54 | Book Transfer Debit A/C: Oha Management LLC Santa Rosa CA 95405-8376 US Ref: Weekly Disbursement ■ |
| Chase | The Litigation Practice Group PC | ■ | 10/31/2022 | 10/6/2022 | | 7,228.84 | Book Transfer Debit A/C: Oha Management LLC Santa Rosa CA 95405-8376 US Ref: Weekly Disbursement ■ |
| Chase | The Litigation Practice Group PC | ■ | 10/31/2022 | 10/14/2022 | | 13,830.66 | Book Transfer Debit A/C: Oha Management LLC Santa Rosa CA 95405-8376 US Ref: Weekly Disbursement ■ |
| Chase | The Litigation Practice Group PC | ■ | 10/31/2022 | 10/21/2022 | | 5,976.58 | Book Transfer Debit A/C: Oha Management LLC Santa Rosa CA 95405-8376 us Ref: Weekly Disbursement ■ |
| Chase | The Litigation Practice Group PC | ■ | 10/31/2022 | 10/28/2022 | | 884.34 | Book Transfer Debit NC: Oha Management LLC Santa Rosa CA 95405-8376 US Ref: Weekly Disbursement ■ |
| Chase | The Litigation Practice Group PC | ■ | 10/31/2022 | 10/28/2022 | | 42.30 | Book Transfer Debit A/C: Oha Management LLC Santa Rosa CA 95405-8376 us Ref: Weekly Disbursement ■ |
| Chase | The Litigation Practice Group PC | ■ | 11/30/2022 | 11/9/2022 | | 2,752.67 | Book Transfer Debit NC: Oha Management LLC Santa Rosa CA 95405-8376 US Ref: Weekly Disbursement ■ ■ |
| Chase | The Litigation Practice Group PC | ■ | 11/30/2022 | 11/9/2022 | | 6,460.31 | Book Transfer Debit NC: Oha Management LLC Santa Rosa CA 95405-8376 US Ref: Weekly Disbursement ■ |
| Chase | The Litigation Practice Group PC | ■ | 11/30/2022 | 11/10/2022 | | 6,333.46 | Book Transfer Debit NC: Oha Management LLC Santa Rosa CA 95405-8376 US Ref: Weekly Disbursement ■ |
| Chase | The Litigation Practice Group PC | ■ | 11/30/2022 | 11/10/2022 | | 2,157.51 | Book Transfer Debit NC: Cha Msnagement LLC Sants Ross CA 95405-8376 us Ret: Weekly Disbursement ■ |
| Chase | The Litigation Practice Group PC | ■ | 11/30/2022 | 11/18/2022 | | 2,655.67 | Book Transfer Debit NC: Oha Management LLC Santa Rosa CA 95405-8376 US Ret: Weekly Disbursement ■ |
| Chase | The Litigation Practice Group PC | ■ | 11/30/2022 | 11/18/2022 | | 7,797.19 | Book Transfer Debit NC: Oha Management LLC Santa Rosa CA 95405-8378 US Ret: Weekly Disbursement ■ |
| Chase | The Litigation Practice Group PC | ■ | 11/30/2022 | 11/25/2022 | | 4,340.91 | Book Transfer Debit NC: Oha Management LLC Sente Rose CA 95405-8376 US Ret: Weekly Disbursement ■ |
| Chase | The Litigation Practice Group PC | ■ | 11/30/2022 | 11/25/2022 | | 2,106.79 | Book Tranafer Debit NC: Oha Management LLC Sante Rosa CA 95405-8378 US Ret: Weekly Disbursement ■ |
| Chase | The Litigation Practice Group PC | ■ | 12/31/2022 | 12/5/2022 | | 7,134.10 | Book Transfer Debit NC: Oha Management LLC Ssnts Ross CA 95405-8378 US Ret: Weekly Disbursement ■ |
| Chase | The Litigation Practice Group PC | ■ | 12/31/2022 | 12/5/2022 | | 2,983.70 | Book Transfer Debit NC: Oha Management LLC Santa Rosa CA 95405-8376 US Ret Weekly Disbursement ■ |
| Chase | The Litigation Practice Group PC | ■ | 12/31/2022 | 12/9/2022 | | 1,743.75 | Book Transfer Debit NC: Oha Management LLC Santa Rosa CA 95405-8376 US Ret Weekly Disbursement ■ |
| Chase | The Litigation Practice Group PC | ■ | 12/31/2022 | 12/9/2022 | | 5,526.60 | Book Tranefar Debit NC: Oha Management LLC Santa Roea CA 95405-8376 US Rat: Weekly Disbursement ■ |
| Chase | The Litigation Practice Group PC | ■ | 12/31/2022 | 12/19/2022 | | 6,030.61 | Book Traneter Debit NC: Oha Management LLC Santa Roea CA 95405-8378 US Ret: Weekly Diabureament ■ |
| Chase | The Litigation Practice Group PC | ■ | 12/31/2022 | 12/19/2022 | | 2,037.77 | Book Transfer Debit NC: Oha Management LLC Santa Rosa CA 95405-8376 US Ret: Weekly Disbursement ■ |
| Chase | The Litigation Practice Group PC | ■ | 12/31/2022 | 12/27/2022 | | 1,925.05 | Book Transfer Debit NC: Oha Management LLC Santa Roes CA 95405-8376 US Ret: Weekly Disbursement ■ |
| Chase | The Litigation Practice Group PC | ■ | 12/31/2022 | 12/30/2022 | | 311.12 | Book Transfer Debit NC: Oha Management LLC Santa Rosa CA 95405-8376 US Ret: Weekly Disbursement ■ |
| Chase | The Litigation Practice Group PC | ■ | 12/31/2022 | 12/30/2022 | | 7,975.79 | Book Transfer Debit NC: Oha Management LLC Senta Rosa CA 95405-8376 US Ret: Weekly Disbursement ■ |
| Chase | The Litigation Practice Group PC | ■ | 1/31/2023 | 1/3/2023 | | 1,260.22 | Book Transfer Debit NC: Oha Management LLC Sante Rosa CA 95405-8376 us Ref: Weekly Disbursement ■ |
| Chase | The Litigation Practice Group PC | ■ | 1/31/2023 | 1/10/2023 | | 1,884.71 | Book Transtor Debit NC: Oha Management LLC Santa Ross CA 95405-8376 US Ref: Weekly Disbursement ■ |
| Chase | The Litigation Practice Group PC | ■ | 1/31/2023 | 1/11/2023 | | 4,475.32 | Book Transfer Debit NC: Oha Management LLC Santa Ross CA 95405-8376 US Ret: Weekly Disbursement ■ ■ |

DRAFT FORM - SUBJECT TO CHANGE

Exhibit 3
Page 45

In re: The Litigation Practice Group PC
Disbursement Details by Payee
4 Years Pre-Petition (03/20/2019 - 03/20/2023)

Prepared by: Grobstein Teeple LLP



| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Ohack Number | Debit/Oharge | Memo |
|---|---|---|---|---|---|---|---|
| Bank of America | Litigation Practice Group PC | ▮ | 1/31/2023 | 1/13/2023 | | 1,543.63 | WIRE TYPEWIRE OUT DATEQ3O1 13 TIME:1 657 ET ▮ BNF:Oha Management LLC ▮ BNF BK:JPMORGA N ChaSE BANK, NA ▮ WEEKLY DISBURSEMENT |
| Bank of America | Litigation Practice Group PC | ▮ | 1/31/2023 | 1/18/2023 | | 5,286.86 | WIRE TYPE:WIRE OUT DATE23O1 18 TIME1 301 ET ▮ BNF:Oha Management LLC ▮ BNF BK:JPMORG A N ChaSE BANK, NA 1D322271 627 PMT WE EKLY DISBURSEMENT |
| Chase | The Litigation Practice Group PC | ▮ | 1/31/2023 | 1/24/2023 | | 2,260.70 | Book Transfer Debit NC: Oha Management LLC Santa Rosa CA 95405-8376 US Ret: Weekly Disbursement ▮ |
| Chase | The Litigation Practice Group PC | ▮ | 2/28/2023 | 2/7/2023 | | 8,260.14 | Book Transfer Debit A/C: Oha Management LLC Santa Rosa CA 95405-8376 US Ref: Weekly Disbursement ▮ |
| Chase | The Litigation Practice Group PC | ▮ | 2/28/2023 | 2/7/2023 | | 1,799.15 | Book Transfer Debit NC: Oha Management LLC Santa Rosa CA 95405-8376 US Ref: Weekly Disbursement ▮ |
| Bank of America | Litigation Practice Group PC | ▮ | 2/28/2023 | 2/9/2023 | | 653.10 | WIRE TYPE:WIRE OUT DATE230209 TIME1 704 ET ▮ BNF:Oha Management. LLC ▮ BNF BK:JPMORG AN ChaSE BANK. NA ▮ |
| Bank of America | Litigation Practice Group PC | ▮ | 2/28/2023 | 2/10/2023 | | 2,332.43 | WIRE TYPE:WIRE OUT DATE:23O21 0 TIME:0759 ET ▮ BNF:Oha Management. LLC ▮ BNF BK:JPMORG AN ChaSE BANK. NA ▮ PMT |
| | | | | | | 1,400,745.86 | |

DRAFT FORM - SUBJECT TO CHANGE

Exhibit 3
Page 46

# EXHIBIT 4

Exhibit 4
Page 47

In re: The Litigation Practice Group PC
Disbursement Details by Payee
90 Days Pre-Petition (12/20/2022 - 03/20/2023)



| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|
| Chase | The Litigation Practice Group PC | ███ | 1/31/2023 | 1/24/2023 | | 2,260.70 | Book Transfer Debit NC: Cha Management LLC Santa Rosa CA ███ US Ret: Weekly Disbursement Tm: |
| Chase | The Litigation Practice Group PC | ███ | 1/31/2023 | 1/11/2023 | | 4,475.32 | Book Transtor Debit NC: Cha Management [[C Santa Ross CA ███ US Ret: Weekly Disbursement Tm: ███ |
| Chase | The Litigation Practice Group PC | ███ | 1/31/2023 | 1/10/2023 | | 1,884.71 | Book Transfer Debit NC: Cha Management LLC Sante Ross CA ███ us Ret: Weekly Disbursement Tm: ███ |
| Chase | The Litigation Practice Group PC | ███ | 12/31/2022 | 12/30/2022 | | 7,975.79 | Book Transfer Debit NC: Cha Management LLC Santa Rosa CA ███ US Ret: Weekly Disbursement Tm: |
| Chase | The Litigation Practice Group PC | ███ | 12/31/2022 | 12/27/2022 | | 1,925.05 | Book Transfer Debit NC: Cha Management LLC Sante Ross CA 8376 US Ret: Weekly Disbursement Tm: ███ |
| Chase | The Litigation Practice Group PC | ███ | 1/31/2023 | 1/3/2023 | | 1,260.22 | Book ███ Debit NC: Che Management LLC Senta Rosa CA US Ret: Weekly Disbursement Tm: ███ |
| | | | | | | **19,781.79** | |

DRAFT FORM - SUBJECT TO CHANGE

Exhibit 4
Page 48

# EXHIBIT 5

Exhibit 5
Page 49

CHRISTOPHER B. GHIO (259094)
christopher.ghio@dinsmore.com
CHRISTOPHER CELENTINO (131688)
christopher.celentino@dinsmore.com
YOSINA M. LISSEBECK (201654)
yosina.lissebeck@dinsmore.com
DINSMORE & SHOHL LLP
655 West Broadway, Suite 800
San Diego, California 92101
Tele: 619.400.0500
Fax:  619.400.0501

Sarah S. Mattingly (Ky. Bar 94257)
sarah.mattingly@dinsmore.com
DINSMORE & SHOHL, LLP
101 S. Fifth Street, Suite 2500
Louisville, Kentucky 40202
Tele: 859-425-1096
Fax: 502-585-2207
(Admitted pro hac vice)

Special Counsel to Richard A. Marshack

**FILED & ENTERED**

**JUN 03 2024**

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY mccall     DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

| | |
|---|---|
| In Re | Case No: 23-bk-10571-SC |
| | Chapter 11 |
| The Litigation Practice Group P.C., | **ORDER GRANTING MOTION FOR ENTRY OF PROTECTIVE ORDER AND THE PROTECTIVE ORDER** |
| Debtor(s), | Date:    May 23, 2024 |
| | Time:    1:30 p.m. |
| | Judge:   Hon. Scott C. Clarkson |
| | Place:   Courtroom 5C (via Zoom)[1] |
| | 411 West Fourth Street |
| | Santa Ana, CA 92701 |

---

[1] Video and audio connection information for each hearing will be provided on Judge Clarkson's publicly posted hearing calendar, which may be viewed online at: http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

Exhibit 5
Page 50

The Court has read and considered the Notice of Motion and Motion for Entry of Protective Order (the "Motion") filed by Richard A. Marshack, in his capacity as the Chapter 11 Trustee (the "Trustee") of the Bankruptcy Estate ("Estate") of The Litigation Practice Group P.C., on May 2, 2024, pursuant to Federal Rule of Bankruptcy Procedure 7026 and Federal Rule of Civil Procedure 26(c)(1), as Dk. No. 1164 ("Motion"), and has found good cause to grant the Motion.

IT IS HEREBY ORDERED that:

1.     The Motion is granted;

2.     The below Protective Order shall apply to any contested matter arising in the main bankruptcy case and in all adversary proceedings filed by or against Trustee, present and future; and

3.     Govern the discovery conducted therein.

**PROTECTIVE ORDER**

**1.    DEFINITIONS**

1.1  "Confidential Information" as used in this Protective Order shall mean documents and other information (regardless of how generated, stored or maintained) that a Party or non-party reasonably believes to contain or reflect non-public financial or business information, bank records, financial records, such as social security numbers, non-public financial or personal information of a Party or non-party, account numbers, sensitive digital information and identifiers, information subject to confidentiality agreements or provisions other than this Protective Order, and other non-public research, development, or commercial information that derives value or avoids injury by virtue of not being known to the public.

1.2  This "Action" is defined and hereby means any contested matter arising in the main bankruptcy case and in all adversary proceedings filed by or against Trustee, present and future.

1.3  "Designating Party" means a Party or non-party that designates Confidential Information during the Action.

1.4  "Receiving Party" means a Party that receives Confidential Information during the Action.

Exhibit 5
Page 51

1     1.5    "Party" or "Parties" means person or entity subject to this Protective Order.

2    **2.    SCOPE OF THIS PROTECTIVE ORDER**

3    2.1    Unless otherwise ordered, this Protective Order shall govern certain documents and other products of discovery obtained in the Action from the Parties there to, and from third parties. As well as certain information copied or derived therefrom, excerpts, summaries or compilations thereof, including, but not limited to, documents voluntarily exchanged as part of early settlement discussions, documents produced pursuant to initial disclosures, requests authorized by the Federal Rules of Civil Procedure made applicable herein by the Federal Rules of Bankruptcy Procedure, answers to interrogatories, deposition transcripts, responses to requests for production, responses to requests for admission, subpoenas, affidavits, declarations, expert reports, and other such material and information as may be produced during the course of the Action and designated as Confidential Information.

13    **3.    DESIGNATION OF CONFIDENTIAL INFORMATION**

14    3.1    This Protective Order shall govern the production and handling of any Confidential Information in this Action. Any Party or non-party who produces Confidential Information in this Action may designate it as "Confidential" or "Attorneys' Eyes Only" consistent with the terms of this Protective Order. Whenever possible, the Designating Party must designate only those portions of a document, written discovery responses, deposition, transcript, or other material that contain the Confidential Information and refrain from designating entire documents. Regardless of any designations made hereunder, the Designating Party is not otherwise restricted from use or disclosure of its Confidential Information outside of this Action or for any business purposes. In addition, any Party may move to modify or seek other relief from any of the terms of this Protective Order if it has first tried in writing and in good faith to resolve its needs or disputes with the other Parties or Party as the case may be under the terms of this Protective Order. Further, nothing in this Protective Order shall prevent a Party from redacting documents consistent with the Federal Rules of Civil Procedure and utilizing the documents as needed through-out the Action.

27    3.2    <u>Application to Non-Parties:</u> Before a non-party is given copies of documents or materials designated as Confidential Information or Attorneys' Eyes Only as permitted hereunder, it

Exhibit 5
Page 52

must first sign an acknowledgment to be bound to these terms that is attached hereto as <u>Exhibit A</u>; if it fails to do so, the Parties to this Action must resolve any such dispute before making disclosure of designated information as permitted hereunder to the non-party. If a non-party wishes to make designations hereunder, it must first sign attached <u>Exhibit A.</u>

        3.3     <u>Timing and Provisional Protection:</u> Designations of Confidential Information may be made at any time. To avoid potential waiver of protection hereunder, the Designating Party should designate documents or materials containing Confidential Information at the time of production or disclosure, including on the record during the taking of any deposition. Deposition testimony will be deemed provisionally protected for a period of thirty (30) days after the transcript is released to the Parties by the court reporter, although the Parties may agree at any time to different timelines of provisional protection of information as Confidential or Attorneys' Eyes Only as part of one or more specific depositions. To retain any designations beyond the provisional period, a Designating Party must designate specific pages and lines of deposition testimony before the provisional period has expired. Such designations must be made in writing so that all counsel and court reporters may append the designation to all copies of the transcripts.

        3.4     <u>Manner of Designation:</u> Confidential Information may be designated hereunder in any reasonable manner or method that notifies the Receiving Party of the designation level and identifies with specificity the information to which the designation applies. If made verbally, the Designating Party must promptly confirm the designation in writing. Whenever possible, the Designating Party should stamp, affix, or embed a legend of "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY" on each designated page of the document or electronic image that contains Confidential Information.

**4.     CHALLENGES TO DESIGNATED INFORMATION**

        4.1     In the event that a Receiving Party disagrees at any time with any designation(s) made by the Designating Party, the Receiving Party must first try to resolve such challenge in good faith on an informal basis with the Designating Party. The Receiving Party must provide written notice of the challenge and the grounds therefor to the Designating Party, who must respond in writing to the challenge within fifteen (15) days. At all times, the Designating Party carries the burden of establishing the propriety of the designation and protection level. Unless and until the challenge is

resolved by the Parties or ruled upon by the Court, the designated information shall remain protected under this Protective Order. The failure of any Receiving Party to challenge a designation does not constitute a concession that the designation is proper or an admission that the designated information is otherwise competent, relevant, or material.

**5.**    **LIMITED ACCESS/USE OF PROTECTED INFORMATION**

5.1    <u>Restricted Use:</u> Information that is produced or exchanged in the course of the Action and designated under this Protective Order may be used for preparation for trial and preparation for any appeal of any and all matters in the Action, as well as related settlement negotiations, and for no other purpose, without the written consent of the Designating Party. No Confidential Information may be disclosed to any person except in accordance with the terms of this Protective Order, unless the parties are co-counsel or have entered into joint defense agreements. All persons in possession of Confidential Information agree to exercise reasonable care with regard to the custody, use, or storage of such information to ensure that its confidentiality is maintained. This obligation includes, but is not limited to, the Receiving Party providing to the Designating Party prompt notice of the receipt of any subpoena that seeks production or disclosure of any designated information and consulting with the Designating Party before responding to the subpoena. Any use or disclosure of Confidential or Attorneys' Eyes Only information in violation of the terms of this Protective Order may subject the disclosing person or party to sanctions.

5.2    <u>Access to "Confidential" Information:</u> The Party(ies) and all persons subject to this Protective Order agree that information designated as "CONFIDENTIAL" may only be accessed or reviewed by the following:

a)    The Court, its personnel, and court reporters;

b)    Counsel of record, or co-counsel for any Party, or other party that has entered into a joint defense agreement in the Action and their employees who assist counsel of record, or co-counsel in the Action and are informed of the duties and obligations imposed hereunder;

c)    The Parties, including their clients, agents and employees who are assisting or have reason to know of the Action;

/ / /

Exhibit 5
Page 54

d)      Experts or consultants employed by the Parties or their counsel, or co-counsel, for purposes of an Action, so long as each such expert or consultant has signed attached <u>Exhibit A;</u> and

e)      Other witnesses or persons with the Designating Party's consent or by court order.

5.3    <u>Access to "Attorneys' Eyes Only" Designations:</u> The Parties and all persons subject to this Protective Order agree that information designated as "ATTORNEYS' EYES ONLY" may only be accessed or reviewed by the following:

a)      The Court, its personnel, and court reporters;

b)      Counsel of record, or co-counsel for any Party, or other party that has entered into a joint defense agreement in the Action and their employees who assist counsel of record in the Action and are informed of the duties hereunder;

c)      In-house counsel for any Party in the Action and Richard A. Marshack, as Chapter 11 Trustee of The Litigation Practice Group P.C. who is informed of the duties and obligations imposed hereunder;

d)      Experts or consultants employed by the Parties or their counsel, or co-counsel for purposes of the Action,  and so long as each such expert or consultant has signed attached <u>Exhibit A;</u> and

e)      Other witnesses or persons to whom the Designating Party agrees in advance of disclosure or by court order.

5.4    <u>Non-Waiver Effect of Designations:</u> Neither the taking of, nor the failure to take, any action to enforce the provisions of this Protective Order, nor the failure to object to any designation, will constitute a waiver of any Party(ies)'s claim or defense in the Action or any other action or proceeding, including, but not limited to, a claim or defense that any designated information is or is not Confidential, is or is not entitled to particular protection, or embodies or does not embody information protectable by law.

5.5    <u>In-Court Use of Designated Information:</u> If information designated under this Protective Order will or may be offered in evidence at a hearing or trial related to any matter in the Action, then the offering party must give advance notice to the party or non-party that designated prior to offering the information so that any use or disclosure may be addressed in accordance with

Exhibit 5
Page 55

the Court's case-management or other pre-trial order, or by a motion *in limine*. Nothing in this Protective Order shall be construed as a waiver by a Party of any objections that may be raised as to the admissibility at trial of any evidentiary materials.

**6.    CLAW-BACK REQUESTS**

6.1    <u>Failure to Make Designation:</u>  If, at any time, a Party or non-party discovers that it produced or disclosed Confidential Information without designation, it may promptly notify the Receiving Party and identify with particularity the Confidential Information to be designated and the level of designation (the claw-back notification). The Receiving Party may then request substitute production of the newly-designated information. Within thirty (30) days of receiving the claw-back notification, the Receiving Party must: (1) certify to the Designating Party it has appropriately marked or, if substitute production has been requested, destroyed all unmarked copies that it received, made, and/or distributed; and (2) if it was practicably unable to mark or destroy any information because disclosures occurred while the Receiving Party was under no duty of confidentiality under the terms of this Protective Order regarding that information, the Receiving Party must reasonably provide as much information as practicable to aid the Designating Party in protecting the information, consistently with the Receiving Party's attorney-client, work-product, and/or trial-preparation privileges.

6.2    <u>Inadvertent Production of Privileged Information:</u> If, at any time, a Party discovers that it produced information that it reasonably believes is subject to protection under the attorney/client, work-product, or trial-preparation privileges, then it must promptly notify each Receiving Party of the claim for protection, the basis for it, amend its privilege log accordingly, and comply with Fed. R. Civ. P. 26(b)(5). Whenever possible, the producing party must produce substitute information that redacts the information subject to the claimed protection. The Receiving Party must thereupon comply with Fed. R. Civ. P. 26(b)(5)(B) as to the information subject to the claimed protection.

/ / /

/ / /

/ / /

7

Exhibit 5
Page 56

**7.    DURATION/CONTINUED RESTRICTIONS**

7.1    <u>Handling of Designated Information Upon Conclusion of the Main Bankruptcy Case:</u>
Upon conclusion of the Main Bankruptcy Case, by way of dismissal or closing of the case, the
Designating Party(ies) is/are responsible for ensuring that any Party or person to whom the
Designating Party shared or disclosed designated information in any of the matters under the Action
returns or destroys all of its copies, regardless of the medium in which it was stored. No witness or
Party may retain designated information that it received from any other Party or non-party under this
Protective Order; only counsel of record, or co-counsel, are the authorized agents who may retain one
copy for their respective legal files, and who must also describe to the Designating Party the extra
steps taken to protect its legal file containing paper and/or electronic copies of the designated
information so that it is not accessed, used, or disclosed inconsistently with the obligations under this
Protective Order. This provision does not apply to the Court or Court staff. Moreover, this provision
does not apply to Trustee, who may retain and use – consistent with this Order – Confidential
Information received in any Action during the entirety of the Bankruptcy.

7.2    <u>Continued Restrictions Under this Protective Order:</u> The restrictions on disclosure and
use of Confidential Information shall survive the conclusion of the Bankruptcy case and any matter
in the Action.

**8.    PRIVILEGED OR PROTECTED INFORMATION**

8.1    Nothing in this Protective Order shall require disclosure of information that is
protected by the attorney-client privilege, the work-product protection, or any other legally cognizable
privilege (a "Privilege or Protection").  If information subject to a claim of Privilege or Protection is
inadvertently produced, pursuant to Federal Rule of Evidence 502(d) such production shall not
constitute a waiver of, or estoppel as to, any claim of Privilege or Protection for such information or
any other information that may be protected from disclosure by a Privilege or Protection in any
proceeding.

8.2    If a Party receives a document that appears to be subject to a Privilege or Protection,
then it shall refrain from examining the document any more than is essential to ascertain if it is
privileged or protected and shall promptly notify the producing Party in writing that the receiving

8

Exhibit 5
Page 57

1  Party possesses material that appears to be subject to a Privilege or Protection. The producing Party

2  shall have seven (7) days after receiving such notice to assert a Privilege or Protection over the

3  identified material. If the producing Party does not assert a claim of Privilege or Protection within the

4  seven (7)-day period, the material in question shall be deemed not privileged or protected.

5        8.3    If a producing Party has produced a document subject to a claim of Privilege or

6  Protection, upon written request by the producing Party, the document for which a claim of Privilege

7  or Protection is made shall be sequestered or destroyed to the extent reasonably practicable, and the

8  receiving Party shall not use the document for any purpose other than in connection with analyzing

9  or disputing a claim of Privilege or Protection or in connection with a motion to compel the production

10  of the document.

11        8.4    The receiving Party sequestering or destroying such material may then move the Court

12  for an order compelling production of the material. The applicable producing Party bears the burden

13  of establishing the applicable Privilege or Protection of any clawed-back document or information as

14  and to the same extent that it would have borne such burden had it not produced the document or

15  information.  Nothing in this Protective Order shall limit the Court's right or any receiving Party's

16  right to request an in camera review of any information subject to a claim of Privilege or Protection.

17

18                                       ###

19

20

21

22

23

24  Date: June 3, 2024

                             Scott C. Clarkson
                             United States Bankruptcy Judge

25

26

27

28

9

Exhibit 5
Page 58

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT "A"

1

1   Christopher B. Ghio (State Bar No. 259094)
    Christopher Celentino (State Bar No. 131688)
2   Yosina M. Lissebeck (State Bar No. 201654)
    **DINSMORE & SHOHL LLP**
3   655 West Broadway, Suite 800
    San Diego, CA 92101
4   Telephone:  619.400.0500
    Facsimile:  619.400.0501
5   christopher.ghio@dinsmore.com
    christopher.celentino@dinsmore.com
6   yosina.lissebeck@dinsmore.com

7   Sarah S. Mattingly (Ky. Bar 94257)
    DINSMORE & SHOHL, LLP
8   101 S. Fifth Street, Suite 2500
    Louisville, KY 40202
9   Telephone: 859-425-1096
    Facsimile: 502-585-2207
10  Sarah.mattingly@dinsmore.com
    (Admitted pro hac vice)
11
    Special Counsel to Richard A. Marshack,
12  Chapter 11 Trustee

13

14                **UNITED STATES BANKRUPTCY COURT**

15                **CENTRAL DISTRICT OF CALIFORNIA**

16

17
    In Re                          |  Case No. 8:23-BK-10571-SC
18
                                      Chapter 11
19
    The Litigation Practice Group P.C.,  **EXHIBIT A TO STIPULATED
20                                        ORDER**
              Debtor(s),
21                                    Date:   May 23, 2024
22                                    Time:   1:30 p.m.
                                      Judge:  Hon. Scott C. Clarkson
23                                    Place:  Courtroom 5C[1] - Via Zoom
24                                            411 W. Fourth Street
                                              Santa Ana, CA  92701
25

26

27  ─────────────────────
    [1] Video and audio connection information for each hearing will be provided on Judge Clarkson's
28   publicly posted hearing calendar, which may be viewed online at:
     http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

                                    1

1   This is to certify that:

2       (a)     I am being given access to Confidential Information pursuant to the

3   Stipulated Protective Order that was entered into the main bankruptcy case for

4   Litigation Practice Group, but which is binding and controlling as set forth by the

5   Court's Order on any and all contested matters and  any and all litigation commenced

6   by Trustee;

7       (b)     I have read the Stipulated Protective Order; and

8       (c)     I agree to be bound by the terms and conditions thereof, including,

9   without limitation, to the obligations regarding the use, non-disclosure and return of

10  such Confidential Information. I further agree that in addition to being contractually

11  bound by the Stipulated Protective Order, I am subject to the jurisdiction of the above

12  reference Court for any violation thereof.

13

14  Date: _____

15

16                                              _____

17                                                        Signature

18

19                                              _____

20                                                       Printed Name

21

22

23

24

25

26

27

28

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET (Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER (Court Use Only) |
|---|---|

| PLAINTIFFS | DEFENDANTS |
|---|---|
| Richard A. Marshack, Trustee of the LPG Liquidation Trust | Oha Management, LLC and Gabe McCarthy |

| ATTORNEYS (Firm Name, Address, and Telephone No.) | ATTORNEYS (If Known) |
|---|---|
| Christopher Celentino    Dinsmore & Shohl LLP<br>Yosina M. Lissebeck    655 West Broadway, Suite 800<br>Brian W. Boyd (pro hac vice)    San Diego, California 92101<br>619.400.0500 | |

**PARTY** (Check One Box Only)
- ☐ Debtor          ☐ U.S. Trustee/Bankruptcy Admin
- ☐ Creditor       ☐ Other
- ☒ Trustee

**PARTY** (Check One Box Only)
- ☐ Debtor          ☐ U.S. Trustee/Bankruptcy Admin
- ☐ Creditor       ☐ Other
- ☐ Trustee

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

(1) Avoidance, Recovery, and Preservation of 2-Year Actual Fraudulent Transfers; (2) Avoidance, Recovery, and Preservation of 2-Year Constructive Fraudulent Transfers; (3) Avoidance, Recovery, and Preservation of 4-Year Actual Fraudulent Transfers; (4) Avoidance, Recovery, and Preservation of 4-Year Constructive Fraudulent Transfers; (5) Avoidance, Recovery and Preservation of Preferential Transfers Made Within Ninety Days of the Petition Date; (6) Turnover; and (7) Aiding and Abetting

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
- ☒ 11-Recovery of money/property - §542 turnover of property
- ☒ 12-Recovery of money/property - §547 preference
- ☒ 13-Recovery of money/property - §548 fraudulent transfer
- ☒ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
- ☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
- ☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
- ☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
- ☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
- ☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
- ☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
- ☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
- ☐ 61-Dischargeability - §523(a)(5), domestic support
- ☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
- ☐ 63-Dischargeability - §523(a)(8), student loan
- ☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
- ☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
- ☐ 71-Injunctive relief – imposition of stay
- ☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
- ☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
- ☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
- ☐ 01-Determination of removed claim or cause

**Other**
- ☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
- ☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $440,714.08 |

Other Relief Sought

**B1040 (FORM 1040) (12/15)**

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>The Litigation Practice Group P.C. | BANKRUPTCY CASE NO.<br>8:23-bk-10571-SC | |
| DISTRICT IN WHICH CASE IS PENDING<br>Central District of California | DIVISION OFFICE<br>Santa Ana | NAME OF JUDGE<br>Hon. Scott C. Clarkson |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br>/s/ Brian W. Boyd | | |
| DATE<br>March 17, 2023 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Brian W. Boyd | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.