Christopher Celentino (State Bar No. 131688)
Christopher B. Ghio (State Bar No. 259094)
Yosina M. Lissebeck (State Bar No. 201654)
Lexi J. Epley (State Bar No. 342428)
**DINSMORE & SHOHL LLP**
655 West Broadway, Ste 800
San Diego, California 92101
Tele: (619) 400-0500
Fax:  (619) 400-0501
Christopher.Celentino@dinsmore.com
Christopher.Ghio@dinsmore.com
Yosina.Lissebeck@dinsmore.com
Lexi.Epley@dinsmore.com

Attorneys for Richard A. Marshack,
Trustee of the LPG Liquidation Trust

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

| | |
|---|---|
| In re: | Case No.: 8:23-bk-10571-SC |
| The Litigation Practice Group P.C. | Adv. Proc. No.: |
| Debtor. | Chapter 11 |
| Richard A. Marshack, Trustee of the LPG Liquidation Trust, | **COMPLAINT FOR:** |
| Plaintiff, | **(1) AVOIDANCE, RECOVERY, AND PRESERVATION OF 2-YEAR ACTUAL FRAUDULENT TRANSFERS;** |
| v. | **(2) AVOIDANCE, RECOVERY, AND PRESERVATION OF 2-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS;** |
| Rosa Bianca Loli, an individual; Prime Logix, LLC, a limited liability company; Maverick Management Group, LLC, a limited liability company; Master Consultants of America Inc., a Wyoming corporation; and ROES 1 through 50; | **(3) AVOIDANCE, RECOVERY, AND PRESERVATION OF 4-YEAR ACTUAL FRAUDULENT TRANSFERS;** |
| Defendants. | **(4) AVOIDANCE, RECOVERY, AND PRESERVATION OF 4-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS;** |
| | **(5) AIDING AND ABETTING;** |
| | **(6) TURNOVER** |

1

Judge: Hon. Scott A. Clarkson

2

3

4

5

6

7

8      For his *Complaint for; (1) Avoidance, Recovery, and Preservation of 2-Year Actual*

9  *Fraudulent Transfers; (2) Avoidance, Recovery, and Preservation of 2-Year Constructive Fraudulent*

10  *Transfers; (3) Avoidance, Recovery, and Preservation of 4-Year Actual Fraudulent Transfers; (4)*

11  *Avoidance, Recovery, and Preservation of 4-Year Constructive Fraudulent Transfers;(5) Aiding and*

12  *Abetting and (6) Turnover* ("Complaint"), plaintiff Richard A. Marshack, the former Chapter 11

13  Trustee for the bankruptcy estate ("Estate") of debtor The Litigation Practice Group P.C. ("Debtor"

14  or "LPG") and current liquidating trustee of the LPG Liquidation Trust (collectively "Trustee" or

15  "Plaintiff")  in the above-captioned bankruptcy case ("Bankruptcy Case"), alleges and avers as

16  follows:

17     **STATEMENT OF JURISDICTION, NATURE OF PROCEEDING, AND VENUE**

18      1.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E),

19  (H) and (O), 1334(b), and General Order No. 13-05 of the District Court for the Central District of

20  California because this is a core proceeding arising in and/or related to the Bankruptcy Case, which

21  is a case under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code"), and which is

22  pending in the United States Bankruptcy Court for the Central District of California, Santa Ana

23  Division ("Bankruptcy Court").

24      2.    Regardless of whether this proceeding is core, non-core, or otherwise, Plaintiff

25  consents to the entry of a final order and judgment by the Bankruptcy Court.

26      3.    Defendants, Rosa Loli a.k.a. Rosa Bianca Loli a.k.a. Bianca Loli, individually

27  ("Loli"), Prime Logix, LLC, a limited liability company ("Prime Logix"), Maverick Management

28  Group, LLC, a limited liability company ("Maverick"), and Master Consultants of America Inc., a

1  Wyoming corporation ("Master Consultants" and collectively with Loli, Prime Logix and Maverick,

2  "Defendants") are notified that Rule 7008 of the Federal Rules of Bankruptcy Procedure requires

3  Defendants to plead whether consent is given to the entry of a final order and judgment by the

4  Bankruptcy Court.

5      4.    Venue of this adversary proceeding properly lies in this judicial district pursuant to 28

6  U.S.C. § 1409(a) because this proceeding is related to Debtor's pending Bankruptcy Case.

7                              **THE PARTIES**

8      5.    Plaintiff, Richard A. Marshack, was the duly-appointed, qualified Chapter 11 Trustee

9  of Debtor's Estate and is now the current liquidating trustee of the LPG Liquidation Trust.

10     6.    Debtor is, and at all material times was, a professional corporation organized, existing,

11 and in good standing under the laws of the State of California, with its principal place of business in

12 Tustin, California.

13     7.    Defendant Loli is, and at all material times was, an individual residing in the State of

14 California.

15     8.    Defendant Prime Logix is, and at all material times was, is, and at all material times

16 was, a limited liability corporation in the State of Wyoming.  On information and belief, Prime Logix

17 is owned operated and/or run by Loli under the direction of Tony Diab ("Diab") who is, and at all

18 relevant times was, an individual who operated, dominated and controlled LPG.

19     9.    Defendant Maverick Management Group, LLC ("Maverick") is, and at all material

20 times was, a limited liability corporation in the State of Wyoming. On information and belief,

21 Maverick is owned, operated and run by Loli under the direction of Diab.

22     10.   Defendant Master Consultants is, and at all times was, a corporation authorized to do

23 business in the State of California and formed and existing under the laws of the State of Wyoming.

24 On information and belief, Master Consultants is owned, operated, and run by Loli under the direction

25 of Diab.

26     11.   Upon information and belief, each of the Defendants were the agent, servant,

27 employee, partner, alter ego, or joint venture of the other Defendants, and in doing the things

28 hereinafter alleged, each was acting within the scope of said agency, employment, partnership or

1   venture, and with the knowledge, permission, consent and ratification of other Defendants in doing,

2   or failing to do, the things alleged herein.

3           12.     Plaintiff is ignorant of the true names and capacities of the ROE Defendants and,

4   therefore, sues said defendants under such fictitious names. Plaintiff will amend this Complaint to

5   reflect the true names and capacities of such defendant(s) when they have been ascertained. Plaintiff

6   is informed and believes, and based thereon alleges, that each of the fictitiously named individuals

7   and/or entities are responsible in some manner for the occurrences alleged herein and proximately

8   caused Plaintiff's damages by their conduct. Plaintiff is informed and believes, and based thereon

9   alleges, that the fictitiously named defendants may constitute individuals, unknown trusts,

10  partnerships, related entities, owners, principals, shareholders, insiders, alter egos, co-conspirators,

11  and aiders and abettors that: (a) received transfers from Debtor and/or Sham Entities as an initial,

12  immediate, or mediate transferee; (b) received transfers from Defendant as a mediate transferee; (c)

13  directed or controlled Defendant's conduct and, as such, were responsible in some manner for the

14  occurrences alleged herein; and/or (d) were used to shield Debtor's assets from collection, levy or

15  execution, and to otherwise, hinder, delay and defraud the Debtor and its creditors.

16                             **GENERAL ALLEGATIONS**

17  **A.    LPG'S BANKRUPTCY CASE**

18          13.     On March 20, 2023 ("Petition Date"), Debtor filed a voluntary petition for relief under

19  Chapter 11 of Title 11 of the United States Code, commencing the Bankruptcy Case.

20          14.     The Office of the United States Trustee ("UST") filed its *Motion by United States*

21  *Trustee to Dismiss or Convert Case Pursuant to 11 U.S.C. § 1112(b)* [Bankr. Docket No. 21] and

22  creditors Debt Validation Fund II, LLC; MC DVI Fund 1, LLC; and MC DVI Fund 2, LLC filed the

23  *Motion by DVF and MC DVI to Dismiss Chapter 11 Case Pursuant to 11 U.S.C. §§ 105, 305, 349, &*

24  *1112, or in the Alternative Convert This Case to Chapter 7 or Appoint a Trustee* [Bankr. Docket No.

25  44]. On May 4, 2023, the Court entered its *Order Directing United States Trustee to Appoint Chapter*

26  *11 Trustee* [Bankr. Docket No. 58], thereby granting the UST's motion and directing the UST to

27  appoint a Chapter 11 Trustee in the Bankruptcy case.

28  / / /

15.      Pursuant to the *Acceptance of Appointment as Chapter 11 Trustee* [Bankr. Docket No. 63], on May 8, 2023, Trustee accepted his appointment as the Chapter 11 Trustee in the Bankruptcy Case. The Court approved the Trustee's appointment in its *Order Approving the U.S. Trustee's Application for the Appointment of a Chapter 11 Trustee* [Docket No. 65].

16.      Pursuant to the Order Confirming Modified First Amended Joint Chapter 11 Plan of Liquidation entered September 9, 2024, and the Notice of Occurrence of Effective Date of Modified First Amended Joint Chapter 11 Plan of Liquidation filed September 24, 2024, Richard A. Marshack became the Liquidating Trustee of the LPG Liquidation Trust, effective September 24, 2024.  [Bankr. Docket Nos. 1646 & 1762].

17.      Trustee was not appointed until after events of the case and, therefore, bases these allegations on information and belief. *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) ("The *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible."); *Miller v. City of Los Angeles*, 2014 U.S. Dist. LEXIS 198871, 2014 WL 12610195, at *5 (C.D. Cal. Aug. 7, 2014) (recognizing that the plaintiff's "information and belief" pleading was allowed and "necessary at times"); *see also Mireskandari v. Daily Mail and General Trust PLC*, 2013 U.S. Dist. LEXIS 194437, 2013 WL 12129642, at *4 (C.D. Cal. July 31, 2013) ("The Federal Rules of Civil Procedure allow parties to plead facts on 'information and belief' if the facts 'will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.'" (citations omitted)).

18.      All claims have been transferred to the Liquidating Trust pursuant to the confirmed Plan and Plaintiff brings this action solely in his capacity as the former Chapter 11 Trustee and current Liquidating Trustee for the Liquidation Trust for the benefit of Debtor's Estate and its creditors.

**B.    PROTECTIVE ORDER**

19.      On or about May 2, 2024, Plaintiff filed that certain Notice and Motion for Entry of Protective Order (the "Protective Order Motion").

/ / /

20. On June 3, 2024, the Court entered its Order Granting Motion for Entry of Protective Order and the Protective Order [Docket No. 1270] (the "Protective Order"). A true and accurate copy of the Protective Order is attached as **Exhibit 1**, and incorporated here.

21. By its own terms, the Protective Order applies to this adversary proceeding and governs all discovery conducted herein.

C. **LPG'S OWNERSHIP AND MANAGEMENT**

22. After being disbarred in both California and Nevada for forging a judge's signature and stealing large amounts of client funds, Diab transferred his existing debt resolution practice to LPG.

23. LPG operated a law firm for consumers across the country who sought assistance in contesting or resolving debts they would identify.

24. The consumers that retained LPG to represent them would pay over a period of time via monthly ACH debits from their bank accounts.

25. The monthly payments were meant to cover all legal services LPG provided to the consumers including validation of the debts, review of documents to determine enforceability, and court appearances to halt lawsuits to obtain judgments.

26. In certain instances, LPG would file a lawsuit in an effort to eliminate a disputed debt or to prosecute affirmative claims held by the consumers.

27. However, LPG mismanaged the consumers' monthly payments.

28. Diab and others devised a plan to fraudulently transfer funds, client files, client funds and assets in the form of ACH Receivables (the "ACH Receivables" or "Accounts Receivable") out of LPG to third parties prior to the filing of bankruptcy

29. To obtain consumer clients, LPG contracted with marketing companies, who engaged in illegal capping and would advertise or call to solicit consumers to become clients of LPG in exchange for a percentage of the ACH Receivables collected by LPG from the consumers.

30. The marketing affiliate went so far as to assist with the execution of an engagement letter between the consumer and LPG.

/ / /

31.     In exchange, LPG agreed to pay the marketing affiliates a percentage the monthly payments collected by LPG from the consumers. LPG would also enter into purchase agreements, at a discount, with various marketing affiliates in an attempt to regain control over the receivables that marketing companies had an interest in.

32.     Because LPG received payments from consumers over time, it often sought financing by borrowing against its future cash flows. This borrowing was not only used to finance operations at LPG, but also to pay the fees owed to the marketing companies for providing the client referrals.

33.     Many of the documents executed in connection with such financing described the transactions as accounts receivable purchase agreements.

34.     On information and belief, in 2022 LPG collected ACH debits in the range of $150,000,000. The ACH debits, should have been deposited into an IOLTA account, until earned. Notwithstanding this requirement, substantially all of LPG's ACH debits were transferred out of LPG accounts, to non-debtor entities, insiders, affiliates, marketing companies and co-conspirators. All of which rendered LPG insolvent requiring Diab and LPG to continue to improperly sell ACH debits, multiple times over and incur new debt in a Ponzi scheme to finance LPG's continued and extravagant existence. When Diab's scheme began to crumble and creditors filed suit against LPG in late 2022, Diab designed the fraudulent scheme alleged herein to protect LPG's most valuable assets and Diab's golden goose – LPG's ACH debits and attorney network.

35.     Despite having been disbarred, Diab controlled and operated LPG since its inception. Diab, however, endeavored to and did conceal his control of LPG. For example, Diab required LPG's employees to sometimes call him "Admin," and the name plate on his desk reads, "I don't work here."

36.     To pull this off, Diab rented the law license of Daniel S. March ("March") who, at times, masqueraded as the managing partner of LPG but exercised no actual management or control. In fact, Diab sometimes impersonated March and regularly signed March's signature on contracts. LPG's primary DocuSign account was tied to Diab's email address, admin@lpglaw.com, where Diab signed numerous contracts as March. For use of March's law license, March received an annual salary of $600,000 or more, in addition to bonuses and other forms of benefits and compensation.

/ / /

37. March's predecessor at LPG was John Thompson ("Thompson"). Thompson was the original sole shareholder of LPG from February 2019 to November 2019 and was put in place to hide Diab's control over LPG. Appreciating the wrongful conduct alleged herein, Thompson conveyed his interest in LPG to March in November 2019 over concerns about his and LPG's potential liability. Similar to impersonating March, Diab also impersonated Thompson on many matters, giving legal advice to clients in an attorney capacity, including but not limited to signing certain Service Applications and Service Agreements submitted by LPG to Credit Reporting Services, LLC, among many others.

**D.   LPG'S BUSINESS STRUCTURE**

38. Historically, LPG had a business partner called BAT Inc. d/b/a Coast Processing ("Coast Processing"), which was owned by Brian Real, Arash Asante Bayrooti, and Diab. Coast Processing was one entity through which LPG ran its in-house marketing and client development operations, among other operational functions at LPG such as backend processing. LPG, however, also had a network of over 100 marketing affiliates from which LPG purchased new clients. In 2021, Diab bought out the other investors in Coast Processing and merged its operations with LPG, including Coast Processing's contracts with other marketing affiliates. Despite Coast Processing's operations being merged into LPG, Coast Processing exists as a California corporation in good standing. At all relevant times prior to the buyout, Coast Processing exercised authority, dominion and control over LPG in concert with Diab, and used the dba "LPG."

39. Marketing affiliates referred clients to LPG. The marketing affiliates located clients who were victims of predatory lending or who were subject to claims for large debt that are not legally valid under applicable law. After taking on these clients, LPG paid the marketing affiliates a percentage of the fees earned through the debt resolution process in order to avoid a large upfront cost and spread the risk of non-payment by the client in the future to the marketing affiliate who signed up the client.

40. LPG clients pay fees to LPG over a period of time, ranging from 18 to 30 months, through monthly debits from their bank accounts. The monthly debits were controlled by Diab, LPG, and at times, as alleged herein, other entities who fraudulently initiated ACH transactions on LPG

clients and/or with whom Diab had control, influence and/or had conspired to use to effectuate the fraudulent transfers of client files and funds as alleged herein. Each set of payments received or due by a client is referred to as an "ACH debit" or "ACH receivable," where applicable.

41.    Once a new client had signed up, executed the retainer and payment plan contract, and provided bank ACH information, LPG was responsible for servicing the client file. To this end, LPG utilized software such as DebtPayPro ("DPP") and, more recently, cobbled together a less efficient proprietary software known as LUNA to automate the dispute process, facilitate client communications, and track payment information. For instance, the correspondence sent on behalf of clients to creditors, collection agencies, and/or credit bureaus are automated and generic templates sent via U.S. Mail, facsimile, and/or email. Some cases result in the disputed debt being corrected on the client's credit report, some result in successful challenges based on consumer protection laws, and others result in debt settlement, which the client is responsible to pay in addition to the payment plan. In limited instances, LPG will file a lawsuit in an effort to eliminate a disputed debt. Creating proprietary systems such as LUNA also facilitated Diab's scheme and LPG's fraudulent transfers of client files, ACH information, and ACH debit processing to entities such as Phoenix Law PC ("Phoenix"); Prime Logix; Greyson Law Center, PC ("Greyson"); Consumer Law Group ("CLG"); Oakstone Law Group, PC ("Oakstone"); Touzi Capital, LLC ("Touzi"); Eng Taing ("Eng"); Teracel Blockchain Fund II, LLC ("Teracel"); PECC Corp. ("PECC"); and Guardian Processing, LLC ("Guardian") among others as alleged in Plaintiff's Fifth Amended Complaint in the related 1046 Action. [Related Adv. Proceeding: 8:23-ap-01046-SC, Docket No. 653 ("Dkt. 653")]

42.    Because LPG and its marketing affiliates received only incremental payments over a period of time, LPG would often sell the future cash flow to investors, often times referred to as factoring companies, at a discounted rate. The factoring companies that bought the ACH receivables on account of these files often times received a return equal to the difference between the amount the clients owe on the file and the amount the buyer paid for the file or a percentage thereof. LPG sold ACH receivables and client files in this fashion in order to defraud creditors in a pyramid scheme and for improper personal gain. As alleged in Plaintiff's related 1046 Action [Dkt. 653], Diab and LPG sold ACH receivables in such a manner, often times selling the same ACH receivables to multiple

entities including Touzi, PECC, Teracel and Eng, among others, in order to defraud creditors, pay

prior creditors in a pyramid scheme and/or abscond with the proceeds of such fraudulent transfers.

43.    The largest factoring company to have purchased accounts receivable on account of LPG's files is Validation Partners, LLC ("Validation Partners"). Between August 30, 2021 and August 17, 2022, Validation Partners spent $66,000,000 to purchase accounts receivable from LPG and 58 of LPG's marketing affiliates. In total, Validation Partners purchased over 40,000 accounts from LPG and its affiliates with a total value greater than $400,000,000.

**E.    DIAB'S SCHEME**

44.    Diab and his co-conspirators, including Loli, Eng Taing, Touzi, Teracel, and PECC, among others, caused thousands of LPG client files and/or their associated ACH receivables to be fraudulently transferred, sold or both, and in many instances transferred and/or sold several times over, to factoring companies, Diab's non-debtor Alter Egos, and others. Diab and others implemented and facilitated such a scheme in order to hide and hinder the discovery of LPG assets and abscond with as much value and money they could squeeze out of LPG client files and associated ACH receivables in order to shield said funds against the mounting number of creditor lawsuits being filed against LPG.

45.    All and/or a substantial portion of LPG client files and ACH receivables were transferred and/or sold and resold to avoid and defraud its creditors, hide, hinder and abscond with client files and ACH funds without any knowledge or consent by LPG creditors or clients. Yet, thousands of files have been doubly sold in this manner, effectuating Diab's Ponzi scheme to defraud creditors.

**F.    DIAB'S CONTROL OVER LPG'S PAYMENT PROCESSING**

46.    LPG's monthly revenue from client files is primarily received via ACH payments. In order to process ACH payments, LPG is required to enlist the services of ACH payment processing companies[1] who handle high risk transactions. In this regard, Diab enlisted numerous ACH

---

[1] The ACH processing companies LPG uses and which Diab controls include, but are not limited to, EPPS; EquiPay; Merit Fund; Authorize.net; World Global; Optimum Bank; BankUnited; Marich Bein; Revolv3; FIS; Guardian; and/or any entity associated with the ACH identification transaction "LPG 949-226-6262 #5 2363 RT 9 TOMS RIVER NJ 0875" or any such substantially similar ACH identification transaction.

processing companies in order to easily switch between different vendors and quickly transfer millions of dollars of LPG funds to entities he controls, including but not limited to Vulcan Consulting Group, LLC ("Vulcan"), Prime Logix, and/or Coast Processing, generally in less than three days from an ACH pull, without oversight and detection and to avoid payment disputes and complications with the vendor itself. Notably, LPG does not have service contracts with EPPS or Marich Bein, LLC ("Marich Bein"), among potential others who have processed the majority of LPG's ACH payments. The side deals between Diab and Marich Bein, created to avoid a lawsuit against LPG, evidences Diab's continued influence and control over the companies processing LPG and Diab's Alter Egos' ACH EFTs – property of the Estate.

47.    LPG's monthly receipt of client payments ranged between $8.4 million to $11.2 million per month from May 2022 through September 2022. Despite this receipt of client payments, which could not be considered revenue until earned, LPG was not accumulating any cash on hand and claimed to have only $4,500 in its bank account on the Petition Date.

## G.    LPG'S PREPETITION CREDITORS

48.    In addition to the financing provided by factoring companies, LPG obtained financing directly from other sources. Both of these sources of financing, having lent hundreds of millions of dollars to LPG, are among the creditors scheduled by the Debtor.

49.    On the Debtor's Schedule D [Bankr. Docket No. 33], the Debtor listed three secured creditors – (a) Diverse Capital, LLC with a claim in the amount of $1,224,810, (b) City Capital NY with a claim in the amount of $2,950,000, and (c) Fundura Capital Group with a claim in the amount of $2,100,000 (together, the "Secured Creditors") – with secured claims totaling $6,274,810. As of September 1, 2022, fourteen (14) separate UCC-1 statements were of record securing debts of the Debtor. These statements remained unreleased as of the Petition Date. Further, these statements either reflected secured liens against the Debtor's assets then owned or thereafter acquired, or provided evidence of the assignment or sale of substantial portions of the Debtor's future income. When the fraudulent transfers were made, these prior UCC-1 statements secured the repayment of the following claimed amounts that are currently known to Trustee and are allegedly owed by the Debtor: (i) $2,374,004.82 owed to Fundura Capital Group as evidenced by Proof of Claim No. 335 purportedly

secured by a UCC-1 statement filed on or about May 19, 2021; (ii) approximately $15 million dollars owed to MNS Funding, LLC as evidenced by Proof of Claim No. 1060 purportedly secured by a UCC-1 statement filed on or about May 28, 2021; (iii) approximately $5,000,000 owed to Azzure Capital, LLC as evidenced by Proof of Claim No. 127 secured by a UCC-1 statement filed on or about May 28, 2021; and (iv) approximately $1.5 million dollars owed to Diverse Capital, LLC purportedly secured by UCC statements filed on or about September 15, 2021, and December 1, 2021.[2]

50.     In addition, on the Debtor's Schedule E/F [Bankr. Docket No. 33], the Debtor scheduled 11 unsecured creditors with priority unsecured claims totaling $374,060.04. These priority unsecured creditors include Indiana Department of Revenue, Washington Department of Labor and Industries, Arizona Department of Economic Security, Arkansas Department of Finance and Administration, California Franchise Tax Board, Georgia Department of Labor, Internal Revenue Service, Mississippi Department of Revenue, Nevada Department of Taxation, Utah State Tax Commission, and Wisconsin Department of Revenue (collectively, the "Priority Unsecured Creditors"). The claims bar date has now passed and approximately $500,000,000 in claims were filed against the Debtor.[3]

51.     Another group of creditors that the Debtor listed on its Schedule E/F [Bankr. Docket No. 33] are nonpriority unsecured creditors. Those 58 creditors have scheduled claims totaling $141,439,158.05 and include Ajilon; Anthem Blue Cross; Azevedo Solutions Groups, Inc.; Carolina Technologies & Consulting Invoice; Collaboration Advisors; Credit Reporting Service Inc.; CT Corporation – Inv.; Debt Pay Pro; Document Fulfillment Services; EnergyCare, LLC; Exela Enterprise Solutions; First Legal Network, LLC; GHA Technologies Inc.; Harrington Electric, Inc.; Imagine Reporting; Juize, Inc.; Krisp Technologies, Inc.; Liberty Mutual; Marc Lemauviel – Allegra; MarkSYS Holdings, LLC; Netsuite-Oracle; Pitney Bowes; Rapid Credit, Inc.; SBS Leasing A Program of De Lage Landen; Security Solutions; Sharp Business Systems; Streamline Performance, Inc.; Thomson Reuters; Twilio, Inc.; Nationwide Appearance Attorneys; Executive Center, LLC; Outsource Accelerator, Ltd.; TaskUs Holdings, Inc.; Marich Bein, LLC; Validation Partners; MC

---

[2] Trustee reserves all rights, claims and defenses with respect to these and any other purported secured claims.
[3] Trustee reserves all rights, claims and defenses with respect to these and any other purported unsecured claims.

1    DVI Fund 1, LLC; MC DVI Fund 2, LLC; Debt Validation Fund II, LLC; Tustin Executive Center;

2    LexisNexus; JP Morgan Chase; Business Centers of America; Michael Schwartz; Anibal Colon Jr.;

3    Kathleen Lacey; David Ulery; Kimberly Birdsong; Kevin Carpenter; Karen Suell; Gloria Eaton;

4    Carolyn Beech; Debra Price; Kenneth Topp; Darcey Williamson, Trustee; James Hammett; Johnny

5    Rizo; Beverly Graham; Kathleen Scarlett; and Geneve and Myranda Sheffield (collectively, the

6    "Nonpriority Unsecured Creditors" and, together with the Secured Creditors and Priority Unsecured

7    Creditors, the "Prepetition Creditors").

8        52.    As of the filing of this complaint, approximately 5,771 claims have been filed with the

9    bankruptcy Court. While Trustee has not reviewed all claims as of the date of this complaint, and

10    reserves all rights to object to those claims, the total amount is in excess of approximately

11    $717,507,462.29.

12    **H.    LOLI AIDED DIAB IN PERPETUATING HIS FRAUDULENT SCHEME**

13        53.    Prior to the fraudulent transfers, Loli worked closely with Diab at LPG.

14        54.    On information and belief, Prime Logix, Maverick, and Master Consultants are owned,

15    controlled, and operated by Loli.

16        55.    In or around June 2022, LPG started to receive threats of litigation and cease and desist

17    letters from LPG creditors, including but not limited to Validation Partners, LLC. In order to separate

18    LPG client files from ACH debits and protect Diab's stream of money, Loli and Diab formed Prime

19    Logix in or around May and June 2022. On information and belief, Prime Logix's primary function

20    was intended to initiate, process and receive funds from LPG's client ACH transactions. Prime Logix

21    would then transfer funds as needed to LPG, ensuring that LPG had minimal assets creditors could

22    attach, enforce a judgment or otherwise use to satisfy LPG's debt obligation.

23        56.    In or around October 2022, Loli was involved in making sure Diab remained hidden

24    behind the scenes and that his name was removed and kept off all files being transferred or intended

25    to be transferred to other entities, including but not limited to emails instructing attorneys not use the

26    name "Tony D" on any files, file notes in DPP or otherwise. Instead, employees were instructed to

27    use "Atty" or "General Counsel."

28        57.    In or around January 2023, after creditors had filed suit and were seeking the

13

appointment of a receiver over LPG, Diab began to implement his scheme to fraudulently transfer LPG's client files and ACH debits with the assistance of Loli, Han Trinh[4] ("Han"), Jayde Trinh ("Jayde") and Reid Wood ("Wood") among others as alleged herein. To that end, Diab, Loli, Han, Jayde and Eng, among others alleged herein, created entities including Phoenix, Oakstone, Greyson, Guardian, and Maverick, among other entities as alleged in Plaintiff's related 1046 Action [Dkt. 653]. During the fraudulent transfer period, Loli had knowledge of, aided, conspired, and was complicit with Diab in using and transferring LPG assets including client files, ACH debits, funds and other LPG assets and proprietary information to Phoenix, Oakstone, Guardian, Greyson, Consumer Legal Group ("CLG") and Gallant Law Group, among other fraudulent transferee entities alleged herein.

58.    In or around January 2023, Diab and Loli further formed Maverick to manage the funds, payments and transfer of funds between the fraudulent transferee entities and eventually be the successor to Prime Logix in controlling all ACH processing and funds for all or some of the newly created fraudulent transferee entities.

59.    In addition to running Prime Logix, which controlled the receipt of funds, Loli was also charged with running Maverick who controlled the distribution of LPG funds. In essence, Loli was Diab's gatekeeper for his golden goose, ACH debits. Per Diab's instructions in written communications, without Loli's approval, none of LPG's funds were to be sent out. In this regard, even when the accounting department at Maverick was required to make payments and send wires out to cover liabilities that needed to be paid to avoid disruption at Greyson, Phoenix or other entities without Loli's authorization, Diab reprimanded the employee insisting that no payment be made under any circumstances until Loli approves. On information and belief and based on the foregoing, the purpose of Diab and Loli's work flow was to ensure: 1) LPG funds were separated from operations leaving the entities minimally capitalized; and 2) that sufficient LPG funds in these separated bank accounts to cover debt obligations, including payments to affiliates for all the entities Diab, Han, Jayde and others had created.

/ / /

---

[4] Due to multiple individuals having the same last name, first names are being used to avoid any confusion. No disrespect is intended to any individual or party.

60. In her role at Prime Logix, Loli was in charge of and complicit with Diab in all fraudulent transfers of LPG client files, ACH debits and funds including post-petition ACH draws against LPG client accounts through Revolv3, among other ACH processing platforms and NACHA approved banks. Loli intentionally transferred LPG client files, ACH debits and funds to Prime Logix, among other entities. Loli negligently failed to ensure that all clients whose files and ACH receivables were transferred to and/or processed by Prime Logix provided written authorization for not only the transfer of their file but also written authorization for Prime Logix to initiate the ACH transactions on their account or credit cards.

61. In her role at Maverick, Loli was the gatekeeper charged by Diab with approving all fraudulent transfers of LPG funds from Prime Logix, among other bank accounts, to the proper fraudulent transferees, affiliates and creditors.

62. Loli's efforts to aid Diab, however, went beyond fraudulently transferring LPG and Estate funds. Loli was also involved in and assisting Diab, Han and Jayde, among others, in ensuring LPG's most valuable assets according to Diab, employees and attorneys, signed on with Diab's new entities including Greyson, Phoenix, Oakstone, and Guardian Processing among others. To this end, Loli recruited prior LPG employees in critical roles including attorneys and "settlement officers." On information and belief and based on statements made by former LPG employees, Loli, Diab, Han and Jayde, among others, have access to and are using copies of the ACH data, client file data and other LPG proprietary data that the Preliminary Injunction prohibited them from accessing and using in order to accomplish Diab's scheme to defraud creditors and harm LPG's Estate and rebuild LPG under the rouse of competition.

63. On information and belief, Loli was and is now aiding, assisting and/or heading a new entity or entities, including but not limited to Legacy Law Partners, LLC as part of Diab's scheme designed to and causing harm to LPG's Estate in an effort to recapture LPG's ACH debits through fraud, misappropriation of LPG assets, proprietary information and client data.

64. On information and belief, Loli also aided and abetted the fraudulent and unauthorized pre- and post- petition transfers of LPG assets and/or funds to Master Consultants.

/ / /

65.     Loli has received substantial assets, compensation and other benefits belonging to LPG as a result of her involvement in Diab's fraudulent scheme to transfer LPG client files, funds, assets and proprietary information. As a proximate cause of the wrongful conduct alleged herein, LPG's Estate and creditors have suffered substantial damages to which Trustee is entitled to and seeks to recover, jointly and severally, all damages, jointly and severally against Loli as an accomplice and co-conspirator with Diab.

## I.   FURTHER FRAUDULENT TRANSFERS AND CONVEYANCES TO ALTER EGOS AND OTHER ENTITIES

66.     In addition to diverting millions of dollars to third parties, Diab has transferred LPG's entire business and ACH debits to non-debtor entities free of LPG's obligations to its creditors. These non-debtor entities are alter egos of Diab and include Oakstone, Phoenix, Greyson, CLG, Vulcan, Prime Logix, Maverick, Guardian Processing among other non-debtor entities (collectively, the "Alter Egos"), as alleged in Plaintiff's related 1046 Action [Dkt. 653]. As he did with LPG, Diab controls and operates the Alter Egos, despite them being nominally owned by licensed attorneys from which Diab "rented" their license to practice law in return for unsustainable salaries.

67.     In addition to fraudulent client file and ACH receivable transfers to the Alter Egos, described above, Trustee is informed and believes and based thereon alleges that Diab sold with little or no consideration or fraudulently transferred additional LPG client files to Greyson and CLG without client consent in exchange for a right to receive a percentage of the ACH debit stream generated by those files (the "Fraudulent Transferees").

68.     In February 2023, Diab purchased a shell corporation and the website domain phoenixlaw.co and registered the business with the Better Business Bureau. Similarly, around the same time, Diab set up Oakstone with his business partner Wes Thomas, to run LPG's business through these new entities. Diab's actions are contrary to his testimony at the 341(a) meeting of creditors where Diab testified that LPG was not able to afford to service the same clients through LPG.

69.     At or around the Petition Date, Diab admitted that LPG had transferred or sold approximately 15,000 client files to Oakstone, 12,000 files to CLG, and the remaining files,

16

1    approximated at slightly less than 40,000, to Phoenix. Neither LPG nor Diab obtained consent prior

2    to fraudulently transferring the client files to these Alter Egos and/or Fraudulent Transferees. LPG

3    does not have an executed assignment contract for any of the transferred client files to Alter Egos and

4    other entities. As alleged herein, however, client files and ACH receivables were transferred and/or

5    sold and resold to other Defendants, including but not limited to Teracel and PECC, among others in

6    furtherance of Diab's scheme to defraud creditors, hide and abscond with LPG assets, namely the

7    value of monthly ACH debits.

8        70.    Diab, Loli, Han, Jayde and the same group of partners that ran LPG, post-petition,

9    syphoned off money through these new Alter Egos, using LPG's ACH processing accounts at FIS

10   that identify "Tony Diab" as the user of the account and LPG as the merchant account holder. LPG's

11   FIS account indicates that, from March 28, 2023 through May 19, 2023, Diab netted between $6

12   million and $9.3 million dollars and transferred such funds to LPG's Alter Egos or Fraudulent

13   Transferees from this one ACH processing company alone.

14       71.    Further, Diab, Loli, Han, Jayde, Eng, Heng, and/or Touzi have used other ACH

15   processing companies including Payliance (using a Guardian merchant account), among others, to

16   process and transfer property of the Estate through Diab's network of Alter Egos and Fraudulent

17   Transferees, discussed above. With this money, Diab has made payroll from an account held by

18   Vulcan. Clients who requested a refund after their file was transferred to Phoenix were refunded by

19   and through an account held by Prime Logix. Diab and Loli among others have used Diab's Alter

20   Egos and the Fraudulent Transferees to re-direct LPG funds for his own personal gain and avoid the

21   protections afforded creditors and the Estate under the Bankruptcy Code. Collectively, the client files,

22   ACH debits, ACH receivables and income received therefrom, and funds transferred to Defendants,

23   the Alter Egos and Fraudulent Transferees, are collectively referred to herein as the "Transfers."

24       72.    Upon information and belief, Maverick and Prime Logix have received property of the

25   estate, including funds in an amount exceeding ten million dollars.  This money was then: (a) spent

26   on Maverick and Prime Logix's operating expenses and overhead; and/or (b) sent to other entities

27   and individuals – at Tony Diab's specific instance and request – as part of his fraudulent scheme to

28   conceal assets from LPG's creditors and/or in furtherance of the below described Ponzi scheme.

**J.    LPG'S PONZI SCHEME**

73.    The Ponzi Scheme Presumption can be utilized to establish a debtor's "intent to defraud future undertakers [investors] from the mere fact that a debtor was running a Ponzi scheme. Indeed, no other reasonable inference is possible. A Ponzi scheme cannot work forever. The investor pool is a limited resource and will eventually run dry. The perpetrator must know that the scheme will eventually collapse as a result of the inability to attract new investors. The perpetrator nevertheless makes payments to present investors, which, by definition, are meant to attract new investors. He must know all along, from the very nature of his activities, that investors at the end of the line will lose their money. Knowledge to a substantial certainty constitutes intent in the eyes of the law, *cf. Restatement (Second) of Torts § 8A (1963 & 1964)*, and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them. *Cf. Coleman Am. Moving Servs., Inc. v. First Nat'l Bank & Trust Co. (In re American Properties, Inc.)* (Bankr.D.Kan. 1981)14 B.R. 637, 643 (intentionally carrying out a transaction with full knowledge that its effect will be detrimental to creditors is sufficient for actual intent to hinder, delay or defraud within the meaning of § 548(a)(1))." *Merrill v. Abbott (In re Independent Clearing House Co.)* (D. Utah 1987) 77 B.R. 843, 860.

74.    "But if all the debtor receives in return for a transfer is the use of the defendant's money to run a Ponzi scheme, there is nothing in the bankruptcy estate for creditors to share. In fact, by helping the debtor perpetuate his scheme, the transfers exacerbate the harm to creditors by increasing the amount of claims while diminishing the debtor's estate. In such a situation, the use of the defendant's money cannot objectively be called "reasonably equivalent value." *In re Independent Clearing House Co.* 77 B.R. at 859. Therefore, "[t]he trustee can avoid the transfers if they were preferential or fraudulent. Transfers to investors in a Ponzi scheme are preferential and fraudulent. Therefore, they constitute 'property of the estate,' and the trustee can recover them." *Id*. at 853 n.17 (citations omitted).

75.    Debtor was operating a Ponzi scheme that utilized affiliates and several other entities, including Prime Logix, Maverick, and Master Consultants, and other entities as alleged in Plaintiff's related 1046 action [Dkt. 653], and their owners, operators, directors, principals and/or controllers,

1  including Loli and others, as payment processors and intermediaries to conceal the scheme, and as

2  investors to continue its unlawful business practices by using funds provided by current investors to

3  attract new investors hoping for very high returns. Therefore, the Debtor was running a Ponzi scheme

4  and the Ponzi Scheme Presumption can be utilized to infer that the Debtor had the intent to defraud

5  investors within the meaning of 11 U.S.C. section 548(a)(1). This is evidenced by the Court in this

6  Bankruptcy Case declaring that Debtor was operating a Ponzi scheme when it stated the following:

> It is important to note that this Court has never received any significant and
> trustworthy evidence that Debtor accomplished meaningful results for its
> clients, but only anecdotal examples of viable success for its clients. By
> reviewing the Estate's claims register, there is evidence of consumer claims
> for the fraud and demanded but undelivered refunds of approximately $500
> million. There is ample evidence that the pre-petition Debtor never placed
> the collected funds into an attorney-client trust account, and that Debtor or
> its principals simply looted the payments received through the client
> automatic withdrawals, stiffing both the clients and outside attorneys who
> may have been working on client cases with the hopes of being paid. There
> is also evidence before the Court that Debtor was running a Ponzi scheme
> and paying some outside (or "network") attorneys with funds obtained
> from new clients. In this case, it appears that some of the "lenders" may
> have been serving as "investors," hoping for very high returns before "the
> music stopped." The Ninth Circuit has recently explained, "[b]y definition,
> a Ponzi scheme is destined to fail because the pool of available investors is
> not limitless. When the Ponzi scheme operator's pool of investors
> inevitably runs dry, the scheme collapses and the swindler and their entities
> often end up in bankruptcy or equitable receivership. See generally David
> R. Hague, Expanding the Ponzi Scheme Presumption, 64 DePaul L. Rev.
> 867 (2015). In bankruptcy, the court-appointed trustee is tasked with taking
> immediate control of the entity, ceasing ongoing fraudulent activity,
> locating and collecting assets for the bankruptcy or receivership estate, and
> achieving a final, equitable distribution of the remaining assets. See 11
> U.S.C. § 704." *Kirkland v. Rund (In re EPD Inv. Co., LLC)*, 2024 U.S.
> App. LEXIS 21363, at *15 (9th Cir. Aug. 23, 2024). Finally, there is
> evidence that Debtor was encumbering (or as some creditors assert,
> "double or triple selling") their accounts or receivables to multiple lenders.
> With respect to Greyson's requested Administrative Claim [Dk. 676], and
> as more fully described in the concurrently entered order denying the claim,
> there has been no evidence presented that any work allegedly performed
> by Greyson assisted any clients or added any value to the Estate.

*See,* Case No. 8:23-bk-10571-SC, [Bankr. Docket No. 1545 Fn. 5].

76.    Moreover, since the transfers were made with the intent to further the Ponzi scheme,

the Debtor did not receive an objectively reasonable equivalent value for the Transfers, and the

1  Trustee can avoid the Transfers because they were fraudulent.

2  **K.    THE SALE OF LPG'S ASSETS**

3        77.    On July 7, 2023, Richard Marshack in his capacity as the Chapter 11 Trustee moved

4  the Court for an order (A) Approving Sale, Subject to Overbid, of Assets Free and Clear of All Liens,

5  Claims, Encumbrances and Interests Pursuant to 11 U.S.C. § 363(b) and (B) Approving Assumption

6  and Assignment of Certain Executory Contracts and Unexpired Leases and Other Agreements ("Sale

7  Motion") [Bankr. Docket No. 191]. After supplemental briefing, addressing multiple oppositions,

8  holding a lengthy hearing and auction wherein Morning Law Group was the highest bidder, the Court

9  granted the Sale Motion entered August 2, 2023 ("Sale Order") [Bankr. Docket No. 352].

10 **L.    STIPULATION**

11        78.    In addition to foregoing allegations, Plaintiff incorporates by reference all factual

12 admissions set forth in ¶¶ 1 - 189 of the Stipulation for Entry of Judgment that was entered into

13 between Trustee and Tony Diab filed with the Court on March 3, 2025. [Bankr. Docket No. 719].

14                                    **FIRST CLAIM FOR RELIEF**

15 **Count II - Avoidance, Recovery, and Preservation of Actual Fraudulent Transfers Against**

16                                **Defendants Maverick and Prime Logix**

17                            **[11 U.S.C. §§ 548(a)(1)(A), 550, and 551]**

18        79.    Plaintiff incorporates all preceding paragraphs as if fully re-alleged herein.

19        80.    All or a portion of the Transfers occurred within the two years prior to the Petition

20 Date.

21        81.    On or after the date the Transfers were made, entities to which Debtor was or became

22 indebted include the Prepetition Creditors.

23        82.    The Transfers happened while Debtor was insolvent or rendered Debtor insolvent.

24        83.    The Transfers were made with actual intent to hinder, delay, or defraud creditors of

25 Debtor.

26        84.    The Debtor was operating a Ponzi scheme, and the Ponzi Scheme Presumption can be

27 utilized to infer the Debtor's actual intent to defraud within the meaning of 11 U.S.C. section

28 548(a)(1).

85.     The Debtor's conduct was done with oppression, fraud, and malice, as defined in Civil Code section 3294, entitling the Trustee to, in addition to the actual damages, exemplary or punitive damages for making an example of the Debtor and to punish the Debtor.

86.     The Transfers of Debtor's funds are avoidable as fraudulent pursuant to 11 U.S.C. §§ 548(a)(1)(A), 550, and 551, and the common law tort of intentional fraudulent transfers by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against the Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditor.

87.     The Transfers should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(A) and under the common law tort of intentional fraudulent transfers, and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

## SECOND CLAIM FOR RELIEF

### Count III - Avoidance, Recovery, and Preservation of Constructive Fraudulent Transfers Against Defendants Maverick and Prime Logix

### [11 U.S.C. §§ 548(a)(1)(B), 550, and 551]

88.     Plaintiff incorporates all preceding paragraphs as if fully re-alleged herein.

89.     All or a portion of the Transfers occurred within the two years prior to the Petition Date.

90.     On or after the date that such Transfers were made, entities to which Debtor was or became indebted include the Prepetition Creditors.

91.     The Transfers happened while Debtor:

    a.  was insolvent or became insolvent as a result;

    b.  was engaged or was about to engage in a transaction for which any property remaining with Debtor was of unreasonably small capital; or

    c.  intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

92.     The Debtor did not receive the reasonably equivalent value of the Transfers to

Defendants Maverick and Prime Logix because by using Defendants Maverick and Prime Logix's money to run a Ponzi scheme there is nothing in Estate for the creditors to share. Rather, the Transfers exacerbated the harm to creditors by increasing the amount of claims while diminishing the Debtor's Estate. In this situation, the use of Defendants Maverick and Prime Logix's money to further the Debtor's Ponzi scheme cannot be consideration for the Transfers and cannot objectively be called reasonably equivalent value.

93.    Therefore, Defendant Defendants Maverick and Prime Logix were acting as an investor in the Debtor's Ponzi scheme. Any transfers made to Defendant Defendants Maverick and Prime Logix can be avoided by the Plaintiff since the Transfers are fraudulent such that they constitute property of the Estate in which the Plaintiff can recover.

94.    The Transfers should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(B), and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

**THIRD CLAIM FOR RELIEF**

**Count IV - Avoidance, Recovery, and Preservation of Actual Fraudulent Transfers Against Defendants Maverick and Prime Logix**

**[11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.04(a), 3439.04(b), and 3439.07]**

95.    Plaintiff incorporates all preceding paragraphs as if fully re-alleged herein.

96.    All or a portion of the Transfers occurred within the two years prior to the Petition Date.

97.    On or after the date that such Transfers were made, entities to which Debtor was or became indebted include the Prepetition Creditors.

98.    The Transfers were made with actual intent to hinder, delay, or defraud creditors of Debtor.

99.    The Debtor was operating a Ponzi scheme and the Ponzi Scheme Presumption can be utilized to infer the Debtor's actual intent to defraud within the meaning of 11 U.S.C. § 548(a)(1). The Debtor's conduct was done with oppression, fraud, and malice, as defined in Civil Code § 3294, based on the Ponzi Scheme Presumption, entitling the Trustee to, in addition to actual damages,

1  exemplary or punitive damages.

2    100.    The Transfers of Debtor's funds are avoidable as fraudulent pursuant to 11 U.S.C. §

3  544(b) and Cal. Civ. Code §§ 3439.04(a) and 3439.07 by one or more creditors who held and hold

4  unsecured claims against Debtor that were and are allowable against the Estate under 11 U.S.C. § 502

5  or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation,

6  the Prepetition Creditors.

7    101.    Accordingly, the Transfers should be avoided as fraudulent under 11 U.S.C. §§ 544(b)

8  and Cal. Civ. Code §§ 3439.04(a) and 3439.07, and such transferred property, or the value thereof,

9  should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551

10  and Cal. Civ. Code § 3439.07.

11  **FOURTH CLAIM FOR RELIEF**

12  **Count V - Avoidance, Recovery, and Preservation of Constructive Fraudulent Transfers**

13  **Against Defendants Maverick and Prime Logix**

14  **[11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.05, and 3439.07]**

15    102.    Plaintiff incorporates all preceding paragraphs as if fully re-alleged herein.

16    103.    All or a portion of the Transfers occurred within the two years prior to the Petition

17  Date.

18    104.    The transfers happened while Debtor:

19    a.    Was insolvent or became insolvent as a result;

20    b.    Was engaged or was about to engage in a transaction for which any property remaining

21      with Debtor was of unreasonably small capital; or

22    c.    Intended to incur, or believed that it would incur, debts beyond its ability to pay as

23      such debts matured.

24    105.    The Debtor was operating a Ponzi scheme and the Ponzi Scheme Presumption can be

25  utilized to infer the Debtor's actual intent to defraud within the meaning of 11 U.S.C. § 548(a)(1).

26  The Debtor's conduct was done with oppression, fraud, and malice, as defined in Civil Code § 3294,

27  based on the Ponzi Scheme Presumption, entitling the Trustee to, in addition to actual damages,

28  exemplary or punitive damages.

106.    The Transfers of Debtor's funds are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and Cal. Civ. Code §§ 3439.05 and 3439.07 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against the Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

107.    Accordingly, the Affiliate Agreement, Settlement Agreement and the Transfers should be avoided as fraudulent under 11 U.S.C. §§ 544(b) and Cal. Civ. Code §§ 3439.05 and 3439.07, and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551 and Cal. Civ. Code § 3439.07.

**FIFTH CLAIM FOR RELIEF**

**Count I – Aiding and Abetting Fraudulent Transfers**

**(Against Defendants)**

**[11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.04(a), 3439.04(b), and 3439.07]**

108.    Plaintiff incorporates all preceding paragraphs as if fully re-alleged herein.

109.    Defendants, based upon information and belief and based on the Ponzi Scheme Presumption, had knowledge of the fraudulent transactions, transfers and illegal agreements that were used to perpetuate and conceal the Ponzi scheme and fraudulent transfers.

110.    Defendants, with the foregoing knowledge, intended to, and did, help the Debtor in perpetuating and concealing the Ponzi scheme and fraudulent transfers of money as described herein.

111.    At all material times, Defendants had the intent to facilitate and conceal the Ponzi scheme and fraudulent transfers of money by aiding and abetting the illegal and fraudulent transfers as described herein.

112.    Defendants assisted, and did actually engage in, LPG's commission of fraud and the Ponzi scheme by coordinating, facilitating, and directing payments and transfers of monies and executing documents in furtherance of concealing the true nature of their fraudulent and criminal activity related to the Ponzi scheme.

113.    Without in any way limiting the foregoing, Defendant Loli used her control over Prime Logix, Maverick, and Master Consultants to support, participate in, and benefit from LPG's Ponzi

1  scheme and fraudulent transfers.

2  114.    The injuries to Plaintiff, the Debtor's Estate and to its creditors directly, proximately

3  and reasonably foreseeably resulting from and caused by these fraudulent transfers and Ponzi scheme

4  include, without limitation, no less than $1,000,000.00 in improperly transferred and acquired monies.

5  115.    Plaintiff and the Debtor's Estate also suffered damages by incurring attorney's fees

6  and costs associated with the prosecution of Defendants' unlawful activities.

7  **SIXTH CLAIM FOR RELIEF**

8  **Count VI - Turnover of Estate Property Against Defendants Maverick and Prime Logix**

9  **[11 U.S.C. § 542]**

10  116.    Plaintiff incorporates all preceding paragraphs as if fully re-alleged herein.

11  117.    Defendants Maverick and Prime Logix have possession or control over property of the

12  Estate but not limited to the Transfers, any preference transfers, and any post-petition transfers made

13  pursuant to illegal and unenforceable agreements.

14  118.    The property, including but not limited to the Transfers, any preference transfers, and

15  any post-petition transfers are not of inconsequential value to the Estate.

16  119.    The funds that are the subject of the Transfers, any preference transfers, and any post-

17  petition transfers are paramount to Debtor's ability to pay creditors.

18  120.    Accordingly, Trustee is entitled to a judgment for turnover of the Transfer pursuant to

19  11 U.S.C. § 542.

20  **RESERVATION OF RIGHTS**

21  Plaintiff reserves the right to bring all other claims or causes of action that Plaintiff may have

22  against Defendants, on any and all grounds, as allowed under the law or in equity, including but not

23  limited to, those claims not known by the Trustee at this time but that he may discover during the

24  pendency of this adversary proceeding.

25  / / /

26  / / /

27  / / /

28  / / /

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for a judgment as follows:

**On The First Claim for Relief:**

1.      Awarding Plaintiff compensatory damages in an amount to be determined at trial;

**On The Second, Third, Fourth, and Fifth Claims for Relief:**

2.      Avoiding, recovering, and preserving the Transfers against Defendants Maverick and Prime Logix;

**On the Fifth Claim for Relief:**

3.      Ordering Defendants Maverick and Prime Logix to immediately turn over the Transfers;

**On All Claims for Relief:**

4.      Awarding Plaintiff compensatory damages in an amount at least exceeding $1,000,000.00, according to proof at trial;

5.      Awarding pre-judgment interest at the maximum legal rate;

6.      Awarding post-judgment interest at the maximum rate from the date of the last Transfer until the judgment is paid in pull;

7.      Awarding costs of suit incurred here; and

8.      Granting any other and further relief as the Court deems just and proper.


                                          Respectfully submitted,

Dated:  March 18, 2025                    DINSMORE & SHOHL LLP


                             By:  */s/ Christopher B. Ghio*
                                  Christopher B. Ghio
                                  Lexi J. Epley
                                  Attorneys for Richard A. Marshack,
                                  Trustee of the LPG Liquidation Trust

Exhibit 1

EXHIBIT 1
Page 27

1  CHRISTOPHER B. GHIO (259094)
   christopher.ghio@dinsmore.com
2  CHRISTOPHER CELENTINO (131688)
   christopher.celentino@dinsmore.com
3  YOSINA M. LISSEBECK (201654)
   yosina.lissebeck@dinsmore.com
4  DINSMORE & SHOHL LLP
5  655 West Broadway, Suite 800
   San Diego, California 92101
6  Tele:  619.400.0500
7  Fax:   619.400.0501

8  Sarah S. Mattingly (Ky. Bar 94257)
   sarah.mattingly@dinsmore.com
9  DINSMORE & SHOHL, LLP
10 101 S. Fifth Street, Suite 2500
   Louisville, Kentucky 40202
11 Tele: 859-425-1096
   Fax: 502-585-2207
12 (Admitted pro hac vice)

13 Special Counsel to Richard A. Marshack

**FILED & ENTERED**

**JUN 03 2024**

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY mccall     DEPUTY CLERK

14          **UNITED STATES BANKRUPTCY COURT**

15     **CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION**

16 In Re                           Case No: 23-bk-10571-SC

17                                 Chapter 11

18
                                   **ORDER GRANTING MOTION FOR**
19 The Litigation Practice Group P.C.,   **ENTRY OF PROTECTIVE ORDER AND**
                                         **THE PROTECTIVE ORDER**
20          Debtor(s),

21                                 Date:   May 23, 2024
22                                 Time:   1:30 p.m.
                                   Judge:  Hon. Scott C. Clarkson
23                                 Place:  Courtroom 5C (via Zoom)[1]
                                           411 West Fourth Street
24                                         Santa Ana, CA 92701
25

26

27 _____

28 [1] Video and audio connection information for each hearing will be provided on Judge Clarkson's
   publicly posted hearing calendar, which may be viewed online at:
   http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

EXHIBIT 1
Page 28

The Court has read and considered the Notice of Motion and Motion for Entry of Protective Order (the "Motion") filed by Richard A. Marshack, in his capacity as the Chapter 11 Trustee (the "Trustee") of the Bankruptcy Estate ("Estate") of The Litigation Practice Group P.C., on May 2, 2024, pursuant to Federal Rule of Bankruptcy Procedure 7026 and Federal Rule of Civil Procedure 26(c)(1), as Dk. No. 1164 ("Motion"), and has found good cause to grant the Motion.

IT IS HEREBY ORDERED that:

1.    The Motion is granted;

2.    The below Protective Order shall apply to any contested matter arising in the main bankruptcy case and in all adversary proceedings filed by or against Trustee, present and future; and

3.    Govern the discovery conducted therein.

## PROTECTIVE ORDER

**1.    DEFINITIONS**

1.1    "Confidential Information" as used in this Protective Order shall mean documents and other information (regardless of how generated, stored or maintained) that a Party or non-party reasonably believes to contain or reflect non-public financial or business information, bank records, financial records, such as social security numbers, non-public financial or personal information of a Party or non-party, account numbers, sensitive digital information and identifiers, information subject to confidentiality agreements or provisions other than this Protective Order, and other non-public research, development, or commercial information that derives value or avoids injury by virtue of not being known to the public.

1.2    This "Action" is defined and hereby means any contested matter arising in the main bankruptcy case and in all adversary proceedings filed by or against Trustee, present and future.

1.3    "Designating Party" means a Party or non-party that designates Confidential Information during the Action.

1.4    "Receiving Party" means a Party that receives Confidential Information during the Action.

EXHIBIT 1
Page 29

1.5    "Party" or "Parties" means person or entity subject to this Protective Order.

**2.    SCOPE OF THIS PROTECTIVE ORDER**

2.1    Unless otherwise ordered, this Protective Order shall govern certain documents and other products of discovery obtained in the Action from the Parties there to, and from third parties. As well as certain information copied or derived therefrom, excerpts, summaries or compilations thereof, including, but not limited to, documents voluntarily exchanged as part of early settlement discussions, documents produced pursuant to initial disclosures, requests authorized by the Federal Rules of Civil Procedure made applicable herein by the Federal Rules of Bankruptcy Procedure, answers to interrogatories, deposition transcripts, responses to requests for production, responses to requests for admission, subpoenas, affidavits, declarations, expert reports, and other such material and information as may be produced during the course of the Action and designated as Confidential Information.

**3.    DESIGNATION OF CONFIDENTIAL INFORMATION**

3.1    This Protective Order shall govern the production and handling of any Confidential Information in this Action. Any Party or non-party who produces Confidential Information in this Action may designate it as "Confidential" or "Attorneys' Eyes Only" consistent with the terms of this Protective Order. Whenever possible, the Designating Party must designate only those portions of a document, written discovery responses, deposition, transcript, or other material that contain the Confidential Information and refrain from designating entire documents. Regardless of any designations made hereunder, the Designating Party is not otherwise restricted from use or disclosure of its Confidential Information outside of this Action or for any business purposes. In addition, any Party may move to modify or seek other relief from any of the terms of this Protective Order if it has first tried in writing and in good faith to resolve its needs or disputes with the other Parties or Party as the case may be under the terms of this Protective Order. Further, nothing in this Protective Order shall prevent a Party from redacting documents consistent with the Federal Rules of Civil Procedure and utilizing the documents as needed through-out the Action.

3.2    <u>Application to Non-Parties:</u> Before a non-party is given copies of documents or materials designated as Confidential Information or Attorneys' Eyes Only as permitted hereunder, it

must first sign an acknowledgment to be bound to these terms that is attached hereto as <u>Exhibit</u> A; if it fails to do so, the Parties to this Action must resolve any such dispute before making disclosure of designated information as permitted hereunder to the non-party. If a non-party wishes to make designations hereunder, it must first sign attached <u>Exhibit A.</u>

       3.3    <u>Timing and Provisional Protection:</u> Designations of Confidential Information may be made at any time. To avoid potential waiver of protection hereunder, the Designating Party should designate documents or materials containing Confidential Information at the time of production or disclosure, including on the record during the taking of any deposition. Deposition testimony will be deemed provisionally protected for a period of thirty (30) days after the transcript is released to the Parties by the court reporter, although the Parties may agree at any time to different timelines of provisional protection of information as Confidential or Attorneys' Eyes Only as part of one or more specific depositions. To retain any designations beyond the provisional period, a Designating Party must designate specific pages and lines of deposition testimony before the provisional period has expired. Such designations must be made in writing so that all counsel and court reporters may append the designation to all copies of the transcripts.

       3.4    <u>Manner of Designation:</u> Confidential Information may be designated hereunder in any reasonable manner or method that notifies the Receiving Party of the designation level and identifies with specificity the information to which the designation applies. If made verbally, the Designating Party must promptly confirm the designation in writing. Whenever possible, the Designating Party should stamp, affix, or embed a legend of "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY" on each designated page of the document or electronic image that contains Confidential Information.

    **4.**    **CHALLENGES TO DESIGNATED INFORMATION**

       4.1    In the event that a Receiving Party disagrees at any time with any designation(s) made by the Designating Party, the Receiving Party must first try to resolve such challenge in good faith on an informal basis with the Designating Party. The Receiving Party must provide written notice of the challenge and the grounds therefor to the Designating Party, who must respond in writing to the challenge within fifteen (15) days. At all times, the Designating Party carries the burden of establishing the propriety of the designation and protection level. Unless and until the challenge is

resolved by the Parties or ruled upon by the Court, the designated information shall remain protected under this Protective Order. The failure of any Receiving Party to challenge a designation does not constitute a concession that the designation is proper or an admission that the designated information is otherwise competent, relevant, or material.

**5.    LIMITED ACCESS/USE OF PROTECTED INFORMATION**

5.1    <u>Restricted Use:</u> Information that is produced or exchanged in the course of the Action and designated under this Protective Order may be used for preparation for trial and preparation for any appeal of any and all matters in the Action, as well as related settlement negotiations, and for no other purpose, without the written consent of the Designating Party. No Confidential Information may be disclosed to any person except in accordance with the terms of this Protective Order, unless the parties are co-counsel or have entered into joint defense agreements. All persons in possession of Confidential Information agree to exercise reasonable care with regard to the custody, use, or storage of such information to ensure that its confidentiality is maintained. This obligation includes, but is not limited to, the Receiving Party providing to the Designating Party prompt notice of the receipt of any subpoena that seeks production or disclosure of any designated information and consulting with the Designating Party before responding to the subpoena. Any use or disclosure of Confidential or Attorneys' Eyes Only information in violation of the terms of this Protective Order may subject the disclosing person or party to sanctions.

5.2    <u>Access to "Confidential" Information:</u> The Party(ies) and all persons subject to this Protective Order agree that information designated as "CONFIDENTIAL" may only be accessed or reviewed by the following:

a)    The Court, its personnel, and court reporters;

b)    Counsel of record, or co-counsel for any Party, or other party that has entered into a joint defense agreement in the Action and their employees who assist counsel of record, or co-counsel in the Action and are informed of the duties and obligations imposed hereunder;

c)    The Parties, including their clients, agents and employees who are assisting or have reason to know of the Action;

/ / /

5

EXHIBIT 1
Page 32

d)      Experts or consultants employed by the Parties or their counsel, or co-counsel, for purposes of an Action, so long as each such expert or consultant has signed attached <u>Exhibit A;</u> and

e)      Other witnesses or persons with the Designating Party's consent or by court order.

5.3      <u>Access to "Attorneys' Eyes Only" Designations:</u> The Parties and all persons subject to this Protective Order agree that information designated as "ATTORNEYS' EYES ONLY" may only be accessed or reviewed by the following:

a)      The Court, its personnel, and court reporters;

b)      Counsel of record, or co-counsel for any Party, or other party that has entered into a joint defense agreement in the Action and their employees who assist counsel of record in the Action and are informed of the duties hereunder;

c)      In-house counsel for any Party in the Action and Richard A. Marshack, as Chapter 11 Trustee of The Litigation Practice Group P.C. who is informed of the duties and obligations imposed hereunder;

d)      Experts or consultants employed by the Parties or their counsel, or co-counsel for purposes of the Action,  and so long as each such expert or consultant has signed attached <u>Exhibit A;</u> and

e)      Other witnesses or persons to whom the Designating Party agrees in advance of disclosure or by court order.

5.4      <u>Non-Waiver Effect of Designations:</u> Neither the taking of, nor the failure to take, any action to enforce the provisions of this Protective Order, nor the failure to object to any designation, will constitute a waiver of any Party(ies)'s claim or defense in the Action or any other action or proceeding, including, but not limited to, a claim or defense that any designated information is or is not Confidential, is or is not entitled to particular protection, or embodies or does not embody information protectable by law.

5.5      <u>In-Court Use of Designated Information:</u> If information designated under this Protective Order will or may be offered in evidence at a hearing or trial related to any matter in the Action, then the offering party must give advance notice to the party or non-party that designated prior to offering the information so that any use or disclosure may be addressed in accordance with

6

EXHIBIT 1
Page 33

1    the Court's case-management or other pre-trial order, or by a motion *in limine.* Nothing in this

2    Protective Order shall be construed as a waiver by a Party of any objections that may be raised as to

3    the admissibility at trial of any evidentiary materials.

4    **6.**      **CLAW-BACK REQUESTS**

5    6.1    <u>Failure to Make Designation:</u> If, at any time, a Party or non-party discovers that it

6    produced or disclosed Confidential Information without designation, it may promptly notify the

7    Receiving Party and identify with particularity the Confidential Information to be designated and the

8    level of designation (the claw-back notification). The Receiving Party may then request substitute

9    production of the newly-designated information. Within thirty (30) days of receiving the claw-back

10    notification, the Receiving Party must: (1) certify to the Designating Party it has appropriately marked

11    or, if substitute production has been requested, destroyed all unmarked copies that it received, made,

12    and/or distributed; and (2) if it was practicably unable to mark or destroy any information because

13    disclosures occurred while the Receiving Party was under no duty of confidentiality under the terms

14    of this Protective Order regarding that information, the Receiving Party must reasonably provide as

15    much information as practicable to aid the Designating Party in protecting the information,

16    consistently with the Receiving Party's attorney-client, work-product, and/or trial-preparation

17    privileges.

18    6.2    <u>Inadvertent Production of Privileged Information:</u> If, at any time, a Party discovers

19    that it produced information that it reasonably believes is subject to protection under the

20    attorney/client, work-product, or trial-preparation privileges, then it must promptly notify each

21    Receiving Party of the claim for protection, the basis for it, amend its privilege log accordingly, and

22    comply with Fed. R. Civ. P. 26(b)(5). Whenever possible, the producing party must produce substitute

23    information that redacts the information subject to the claimed protection. The Receiving Party must

24    thereupon comply with Fed. R. Civ. P. 26(b)(5)(B) as to the information subject to the claimed

25    protection.

26    / / /

27    / / /

28    / / /

EXHIBIT 1
Page 34

## 7.    DURATION/CONTINUED RESTRICTIONS

7.1    <u>Handling of Designated Information Upon Conclusion of the Main Bankruptcy Case:</u>
Upon conclusion of the Main Bankruptcy Case, by way of dismissal or closing of the case, the
Designating Party(ies) is/are responsible for ensuring that any Party or person to whom the
Designating Party shared or disclosed designated information in any of the matters under the Action
returns or destroys all of its copies, regardless of the medium in which it was stored. No witness or
Party may retain designated information that it received from any other Party or non-party under this
Protective Order; only counsel of record, or co-counsel, are the authorized agents who may retain one
copy for their respective legal files, and who must also describe to the Designating Party the extra
steps taken to protect its legal file containing paper and/or electronic copies of the designated
information so that it is not accessed, used, or disclosed inconsistently with the obligations under this
Protective Order. This provision does not apply to the Court or Court staff. Moreover, this provision
does not apply to Trustee, who may retain and use – consistent with this Order – Confidential
Information received in any Action during the entirety of the Bankruptcy.

7.2    <u>Continued Restrictions Under this Protective Order:</u> The restrictions on disclosure and
use of Confidential Information shall survive the conclusion of the Bankruptcy case and any matter
in the Action.

## 8.    PRIVILEGED OR PROTECTED INFORMATION

8.1    Nothing in this Protective Order shall require disclosure of information that is
protected by the attorney-client privilege, the work-product protection, or any other legally cognizable
privilege (a "Privilege or Protection").  If information subject to a claim of Privilege or Protection is
inadvertently produced, pursuant to Federal Rule of Evidence 502(d) such production shall not
constitute a waiver of, or estoppel as to, any claim of Privilege or Protection for such information or
any other information that may be protected from disclosure by a Privilege or Protection in any
proceeding.

8.2    If a Party receives a document that appears to be subject to a Privilege or Protection,
then it shall refrain from examining the document any more than is essential to ascertain if it is
privileged or protected and shall promptly notify the producing Party in writing that the receiving

EXHIBIT 1
Page 35

Party possesses material that appears to be subject to a Privilege or Protection. The producing Party shall have seven (7) days after receiving such notice to assert a Privilege or Protection over the identified material. If the producing Party does not assert a claim of Privilege or Protection within the seven (7)-day period, the material in question shall be deemed not privileged or protected.

8.3    If a producing Party has produced a document subject to a claim of Privilege or Protection, upon written request by the producing Party, the document for which a claim of Privilege or Protection is made shall be sequestered or destroyed to the extent reasonably practicable, and the receiving Party shall not use the document for any purpose other than in connection with analyzing or disputing a claim of Privilege or Protection or in connection with a motion to compel the production of the document.

8.4    The receiving Party sequestering or destroying such material may then move the Court for an order compelling production of the material. The applicable producing Party bears the burden of establishing the applicable Privilege or Protection of any clawed-back document or information as and to the same extent that it would have borne such burden had it not produced the document or information.  Nothing in this Protective Order shall limit the Court's right or any receiving Party's right to request an in camera review of any information subject to a claim of Privilege or Protection.


###


Date: June 3, 2024

Scott C. Clarkson
United States Bankruptcy Judge

EXHIBIT 1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT "A"

1  Christopher B. Ghio (State Bar No. 259094)
   Christopher Celentino (State Bar No. 131688)
2  Yosina M. Lissebeck (State Bar No. 201654)
   **DINSMORE & SHOHL LLP**
3  655 West Broadway, Suite 800
   San Diego, CA 92101
4  Telephone:  619.400.0500
   Facsimile:  619.400.0501
5  christopher.ghio@dinsmore.com
   christopher.celentino@dinsmore.com
6  yosina.lissebeck@dinsmore.com

7  Sarah S. Mattingly (Ky. Bar 94257)
   DINSMORE & SHOHL, LLP
8  101 S. Fifth Street, Suite 2500
   Louisville, KY 40202
9  Telephone: 859-425-1096
   Facsimile: 502-585-2207
10 Sarah.mattingly@dinsmore.com
   (Admitted pro hac vice)
11
   Special Counsel to Richard A. Marshack,
12 Chapter 11 Trustee

13

14
                **UNITED STATES BANKRUPTCY COURT**
15
                **CENTRAL DISTRICT OF CALIFORNIA**
16

17
   In Re                          | Case No. 8:23-BK-10571-SC
18
                                  | Chapter 11
19
   The Litigation Practice Group P.C., | **EXHIBIT A TO STIPULATED**
20                                  | **ORDER**
          Debtor(s),
21                                  | Date:   May 23, 2024
22                                  | Time:   1:30 p.m.
                                    | Judge:  Hon. Scott C. Clarkson
23                                  | Place:  Courtroom 5C[1] - Via Zoom
24                                  |         411 W. Fourth Street
                                    |         Santa Ana, CA  92701
25

26

27 _____

28 [1] Video and audio connection information for each hearing will be provided on Judge Clarkson's
   publicly posted hearing calendar, which may be viewed online at:
   http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

                              1

1  This is to certify that:

2      (a)    I am being given access to Confidential Information pursuant to the

3  Stipulated Protective Order that was entered into the main bankruptcy case for

4  Litigation Practice Group, but which is binding and controlling as set forth by the

5  Court's Order on any and all contested matters and  any and all litigation commenced

6  by Trustee;

7      (b)    I have read the Stipulated Protective Order; and

8      (c)    I agree to be bound by the terms and conditions thereof, including,

9  without limitation, to the obligations regarding the use, non-disclosure and return of

10  such Confidential Information. I further agree that in addition to being contractually

11  bound by the Stipulated Protective Order, I am subject to the jurisdiction of the above

12  reference Court for any violation thereof.

13

14  Date: _____

15

16                                     _____
                                        Signature

17

18                                     _____
19                                        Printed Name

20

21

22

23

24

25

26

27

28

EXHIBIT A
Page 39

# ADVERSARY PROCEEDING COVER SHEET

B1040 (FORM 1040) (12/24)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>Richard A. Marshack, Trustee of the LPG Liquidation Trust<br><br>**ATTORNEYS** (Firm Name, Address, and Telephone No.)<br>Christopher B. Ghio (259094)<br>Yosina M. Lissebeck (201654)<br>Lexi J. Epley (342428)<br>Dinsmore & Shohl LLP<br>655 West Broadway, Ste 800, San Diego, CA 92101<br>Tele: (619) 400-0500 | DEFENDANTS<br>Rosa Bianca Loli, an individual; Prime Logix, LLC, a limited liability company; Maverick Management Group, LLC, a limited liability company; Master Consultants of America Inc., a Wyoming corporation; and ROES 1 through 50<br><br>**ATTORNEYS** (If Known) |
|---|---|

| PARTY (Check One Box Only)<br>☐ Debtor  ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor  ☐ Other<br>☒ Trustee | PARTY (Check One Box Only)<br>☐ Debtor  ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor  ☐ Other<br>☐ Trustee |
|---|---|

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
(1) Avoidance, Recovery, and Preservation of 2-Year Actual Fraudulent Transfers; (2) Avoidance, Recovery, and Preservation of 2-Year Constructive Fraudulent Transfers; (3) Avoidance, Recovery, and Preservation of 4-Year Actual Fraudulent Transfers; (4) Avoidance, Recovery, and Preservation of 4-Year Constructive Fraudulent Transfers; (5) Aiding and Abetting; and (6) Turnover

### NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(a) – Recovery of Money/Property**
☒ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☒ 13-Recovery of money/property - §548 fraudulent transfer
☒ 14-Recovery of money/property - other

**FRBP 7001(b) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(c) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(d) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(e) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(f) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(f) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(g) – Injunctive Relief**
☐ 71-Injunctive relief- imposition of stay
☐ 72-Injunctive relief - other

**FRBP 7001(h) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(i) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(j) Determination of Removed Action**
☐ 01-Determination of remove d claim or cause

**Other**
☐ SS-SIPA Case - 15 U.S.C. §§78aaa *et.seq.*
☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☒ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ 1,000,000.00 |

Other Relief Sought

ATTACHMENT
Page 41

B1040 (FORM 1040) (12/24)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>The Litigation Practice Group P.C. | BANKRUPTCY CASE NO.<br>8:23-bk-10571-SC | |
| DISTRICT IN WHICH CASE IS PENDING<br>Central District of California | DIVISION OFFICE<br>Santa Ana | NAME OF JUDGE<br>Scott C. Clarkson |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF<br>Richard A. Marshack, Trustee | DEFENDANT<br>Tony Diab, etc., et al. | ADVERSARY<br>PROCEEDING NO.<br>8:23-ap-01046-SC |
| DISTRICT IN WHICH ADVERSARY IS PENDING<br>Central District of California | DIVISION OFFICE<br>Santa Ana | NAME OF JUDGE<br>Scott C. Clarkson |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br>/s/ Christopher B. Ghio | | |
| DATE<br>March 18, 2025 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Christopher B. Ghio<br>Yosina M. Lissebeck<br>Lexi J. Epley | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.