Christopher Celentino (131688)
Christopher.Celentino@dinsmore.com
Christopher B. Ghio (259094)
Christopher.Ghio@dinsmore.com
Yosina M. Lissebeck (201654)
Yosina.Lissebeck@dinsmore.com
DINSMORE & SHOHL LLP
655 West Broadway, Suite 800
San Diego, CA 92101
Tele: 619.400.0500
Fax:  619.400.0501

Brian W. Boyd (Mi. Bar P81004)
Brian.Boyd@dinsmore.com
**DINSMORE & SHOHL LLP**
755 West Big Beaver Road, Suite 1900
Troy, Michigan 48084
Tele: (248) 203-1622
Fax: (248) 647-5210
(Admitted pro hac vice)


Counsel to Richard A. Marshack, Plaintiff
and Trustee of the LPG Liquidation Trust

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION**

| | |
|---|---|
| In re: | Bankr. Case No. 8:23-bk-10571-SC |
| THE LITIGATION PRACTICE GROUP P.C., | Adv. Proc. No. |
| Debtor. | Chapter 11 |
| | **TRUSTEE'S AMENDED COMPLAINT FOR:** |
| Richard A. Marshack, Former Trustee of the LPG Liquidation Trust, | **(1) AVOIDANCE, RECOVERY, AND PRESERVATION OF 2-YEAR ACTUAL FRAUDULENT TRANSFERS;** |
| Plaintiff, | **(2) AVOIDANCE, RECOVERY, AND PRESERVATION OF 2-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS;** |
| v. | **(3) AVOIDANCE, RECOVERY, AND PRESERVATION OF 4-YEAR ACTUAL FRAUDULENT TRANSFERS;** |
| July 5th LLC, a California company. | |
| Defendant. | **(4) AVOIDANCE, RECOVERY, AND PRESERVATION OF 4-YEAR** |

1

**CONSTRUCTIVE FRAUDULENT TRANSFERS;**

**(5) TURNOVER**

Judge: Hon. Scott C. Clarkson

For his *Complaint for (1) Avoidance, Recovery, and Preservation of 2-Year Actual Fraudulent Transfers; (2) Avoidance, Recovery, and Preservation of 2-Year Constructive Fraudulent Transfers; (3) Avoidance, Recovery, and Preservation of 4-Year Actual Fraudulent Transfers; (4) Avoidance, Recovery, and Preservation of 4-Year Constructive Fraudulent Transfers; and (5) Turnover* ("Complaint"), plaintiff Richard A. Marshack, Trustee of the LPG Liquidation Trust (together "Trustee" or "Plaintiff") in the above-captioned bankruptcy case ("Bankruptcy Case"), alleges as follows:

**STATEMENT OF JURISDICTION, NATURE OF PROCEEDING, AND VENUE**

1.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E), (H) and (O), 1334(b), and General Order No. 13-05 of the District Court for the Central District of California because this is a core proceeding arising in and/or related to the Bankruptcy Case, which is a case under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code"), and is pending in the United States Bankruptcy Court for the Central District of California, Santa Ana Division ("Bankruptcy Court").

2.     Regardless of whether this proceeding is core, non-core, or otherwise, Plaintiff consents to the entry of a final order and judgment by the Bankruptcy Court.

3.     Defendant is hereby notified that Rule 7008 of the Federal Rules of Bankruptcy Procedure requires it to plead whether consent is given to the entry of a final order and judgment by the Bankruptcy Court.

4.     Venue of this adversary proceeding properly lies in this judicial district pursuant to 28 U.S.C. § 1409(a) because this proceeding is related to Debtor's pending Bankruptcy Case.

**THE PARTIES**

5.     Plaintiff, Richard A. Marshack, is the former duly-appointed and qualified Chapter 11 Trustee of Debtor's Estate and current Liquidating Trustee of the LPG Liquidation Trust.

**6.** Debtor LPG is, and at all material times was, a professional corporation organized, existing, and in good standing under the laws of the State of California, with its principal place of business in Tustin, California.

**7.** Defendant, July 5th, LLC ("Defendant" or "July 5th"), is, and at all material times represented that it was, a limited liability company, existing under the laws of the State of California. Defendant may be served by first class mail postage prepaid upon its registered agent for service, Joyce Yi, 500 N. Brand Blvd., Glendale, California.

## RELEVANT DEFENDANT NAMED IN THE 1046 ACTION[1]

**8.** Tony Diab is, and at all times mentioned was, an individual residing in the State of California. Diab operated, dominated and controlled LPG, a national debt relief law firm.

## GENERAL ALLEGATIONS

### A. LPG'S BANKRUPTCY CASE

**9.** On March 20, 2023 ("Petition Date"), Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, commencing the Bankruptcy Case. Diab made the decision for LPG to file for bankruptcy in order to avoid numerous pending lawsuits, two of which sought an order appointing a receiver, including but not limited to: *Validation Partners, LLC v. The Litigation Practice Group, PC, et al.*, Case No. 30-2022-01281911-CU-BC-CXC (Orange County Super. Ct. September 20, 2022) and *Debt Validation Fund II, LLC, et al. v. The Litigation Practice Group PC, et al.,* Case No. 30-2023-01303355-CU-CO-CXC (Orange County Super. Ct. January 23, 2023), among many others. In order to abscond with and delay discovery of substantial assets and continue to profit from LPG client files and from client payments made pursuant to LPG'S client Legal Services Agreements ("Client Funds"), Diab and other defendants devised a plan to fraudulently transfer funds, client files, Client Funds and assets in the form of ACH Receivables (the "ACH Receivables" or "Accounts Receivable") out of LPG to third parties prior to the filing of bankruptcy. The 1046 Action primarily seeks avoidance, recovery and damages arising out of the wholesale fraudulent transfer of client files and the related ACH Receivables. This action deals primarily with

---

[1] On May 25, 2023, the Trustee filed an adversary complaint against a number of Debtor's insiders and fraudulent transferees seeking avoidance of transfers and damages. See, Adv. Case No. 8:23-ap-01046 (the "1046 Action"). [Bankr. Docket No. 63.] The 1046 Action remains pending.

the alleged transfer of client ACH Receivables to Defendant by means of a Merchant Cash Advance ("MCA") Agreement.

10.    The Office of the United States Trustee ("UST") filed its *Motion by United States Trustee to Dismiss or Convert Case Pursuant to 11 U.S.C. § 1112(b)* [Bankr. Docket No. 21] and creditors Debt Validation Fund II, LLC; MC DVI Fund 1, LLC; and MC DVI Fund 2, LLC filed the *Motion by DVF and MC DVI to Dismiss Chapter 11 Case Pursuant to 11 U.S.C. §§ 105, 305, 349, & 1112, or in the Alternative Convert This Case to Chapter 7 or Appoint a Trustee* [Bankr. Docket No. 44]. On May 4, 2023, the Court entered its *Order Directing United States Trustee to Appoint Chapter 11 Trustee* [Bankr. Docket No. 58], thereby granting the UST's motion and directing the UST to appoint a Chapter 11 Trustee in the Bankrupcy Case.

11.    Pursuant to the *Acceptance of Appointment as Chapter 11 Trustee* [Bankr. Docket No. 63], on May 8, 2023, Trustee accepted his appointment as the Chapter 11 Trustee in the Bankruptcy Case. The Court approved the Trustee's appointment in its *Order Approving the U.S. Trustee's Application for the Appointment of a Chapter 11 Trustee* although he no longer serves in that capacity. [Bankr. Docket No. 65].

12.    Plaintiff Trustee was not appointed until after events of the case and, therefore, bases these allegations on information and belief. *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) ("The *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible."); *Miller v. City of Los Angeles*, 2014 U.S. Dist. LEXIS 198871, 2014 WL 12610195, at *5 (C.D. Cal. Aug. 7, 2014) (recognizing that the plaintiff's "information and belief" pleading was allowed and "necessary at times"); *see also Mireskandari v. Daily Mail and General Trust PLC*, 2013 U.S. Dist. LEXIS 194437, 2013 WL 12129642, at *4 (C.D. Cal. July 31, 2013) ("The Federal Rules of Civil Procedure allow parties to plead facts on 'information and belief' if the facts 'will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.") (Citations omitted.)

///

13.     Pursuant to the *Order Confirming Modified First Amended Joint Chapter 11 Plan of Liquidation* entered September 9, 2024, and the *Notice of Occurrence of Effective Date of Modified First Amended Joint Chapter 11 Plan of Liquidation* filed September 24, 2024, Richard A. Marshack also became the Liquidating Trustee of the LPG Liquidation Trust, effective September 24, 2024, and continues to serve in that capacity at this time.  [Bankr. Docket Nos. 1646 & 1762.]

14.     All claims have been transferred to the Liquidating Trustee pursuant to the confirmed plan and Plaintiff brings this action solely in his capacity as the former Chapter 11 Trustee, and in his current capacity as the Liquidating Trustee of the LPG Liquidation Trust, for the benefit of Debtor's Estate and its creditors.

## B.     PROTECTIVE ORDER

15.     On or about May 2, 2024, Plaintiff filed that certain Notice and Motion for Entry of Protective Order (the "Protective Order Motion"). On June 3, 2024, the Court entered its Order Granting Motion for Entry of Protective Order and the Protective Order [Docket No. 1270] (the "Protective Order"). A true and accurate copy of the Protective Order is attached as **Exhibit 2**, and incorporated here.

16.     By its Own Terms, the Protective Order applies to this adversary proceeding and governs all discovery conducted herein.

## C.     LPG's OWNERSHIP AND MANAGEMENT

17.     Prior to the Petition Date, LPG operated a law firm for consumers across the country who sought assistance in contesting or resolving debts.  LPG serviced over 50,000 customers across the United States.  At all relevant times, LPG was controlled and operated by the individual named Tony Diab ("Diab"), the relevant defendant in the 1046 Action as alleged above.

18.     Despite having been disbarred in California and Nevada, Diab controlled and operated LPG since its inception.  Diab, however, endeavored to conceal his control over LPG, its finances, marketing, affiliates and operations.  For example, Diab purportedly required his LPG employees to call him "Admin," his email address was admin@lpglaw.com, and the name plate on his desk apparently read, "I don't work here."

///

**D.    LPG**

19.    The consumers that retained LPG to represent them would pay over a period of time via monthly ACH debits from their bank accounts.

20.    The monthly payments were meant to cover all legal services LPG provided to the consumers including validation of the debts, review of documents to determine enforceability, and court appearances to halt lawsuits to obtain judgments.

21.    In certain instances, LPG would file a lawsuit in an effort to eliminate a disputed debt or to prosecute affirmative claims held by the consumers.

22.    LPG mismanaged the consumers' monthly payments.

23.    To obtain consumer clients, LPG contracted with marketing companies, who engaged in illegal capping, and would advertise or call to solicit consumers to become clients of LPG in exchange for a percentage of the ACH Receivables collected by LPG from the consumers.

24.    The marketing affiliates went so far as to assist with the execution of an engagement letter between the consumer and LPG.

25.    Because LPG received payments from consumers over time, it often sought financing by borrowing against its future cash flows from the Accounts Receivable by means of, among other things, the MCA Agreements. This borrowing was not only used to finance operations at LPG and to pay fees owed to the marketing companies for providing the client referrals, but also was used to pay creditors that had provided earlier-in-time financing in a growing Ponzi scheme.

26.    Many of the documents executed in connection with such financing described the transactions as account receivable purchase agreements.  However, LPG was not selling accounts receivable to MCA lenders, it was obtaining short term loans in return for the transfer of future monthly payments made by clients that were required to be held in client-trust accounts.

27.    To facilitate the transfer of ACH Receivables to MCA lenders, Diab used entities he controlled including, without limitation, Vulcan Consulting Group LLC, Coast Processing, PrimeLogix, LLC, March Bein, PurchaseCo80, and/or Maverick Management, LLC to divert LPG consumer funds and ACH Receivables. Diab would use numerous ACH processing companies in order to easily transfer millions of dollars from Debtor to these entities he controlled, without oversight

or detection, and to avoid payment disputes and complications. The money that flowed through these bank accounts to Defendants consisted of Client Funds that Debtor funneled to these entities by means of ACH processing companies. All money came from LPG. Debtor regularly made deposits into these entities bank account such that they received Client Funds directly from Debtor in addition to diverted Accounts Receivable.

### a. Affiliate Agreements

28. As part of its business, Debtor LPG routinely entered into affiliate agreements with non-attorney entities, including the marketing companies, and individuals ("Affiliate Agreements") many of whom are defendants in other adversary actions brought by the Trustee.

29. The Affiliate Agreements state that the affiliate owns and operates a system of generating leads consisting of consumers interested in the legal services offered by LPG.

30. Pursuant to the Affiliate Agreements, the affiliate generated leads consisting of consumers interested in the legal services offered by LPG and referred those consumers to Debtor.

31. Pursuant to the Affiliate Agreements, Debtor agreed to pay the affiliates a percentage, generally 75%, per file for each file the affiliate placed with LPG, less a monthly maintenance fee that LPG retained to cover administrative costs. LPG calculated the value of each file applying the percentage fee, less the maintenance fee, and remitted the amount to the affiliate pursuant to an agreed-upon schedule.

32. The Affiliate Agreements violate Sections 6151 and 6155 of the California Business and Professional Code, which prohibit referrals of potential clients to attorneys unless the referring entity is registered with the State Bar of California. A referral includes receiving information from potential clients and sending that information to lawyers, even when the advertiser does not advertise the name of the attorneys and the clients do not clear the name of the potential attorney after the referral occurred.

33. Further, if any effect of an agreement is to accomplish an unlawful purpose, the agreement may be declared illegal regardless of the intention of the parties.

///

///

34.    Because the Affiliate Agreements violate federal and state law, they are void, unenforceable, and subject to avoidance as fraudulent. The alleged consideration provided under the Affiliate Agreements was unlawful.

35.    Unlawful consideration is that which is: "(1) contrary to an express provision of law; (2) contrary to the policy of express law, though not expressly prohibited; or (3) otherwise contrary to good morals." Cal. Civ. Code § 1667. "If any part of a single consideration for one or more objects, or of several considerations for a single object, is unlawful, the entire contract is void." Cal. Civ. Code § 1608.

**E.    DIAB'S SCHEME**

36.    As discussed above, the Debtor borrowed against its future ACH Receivables by purporting to transfer them to factoring companies pursuant to MCA Agreements or similar transactions.  In many instances, the ACH Receivables were transferred multiple times.

37.    Given that all or a substantial portion of Debtor's ACH Receivables were transferred multiple times, there were more claims for payment from any one ACH Receivable than the receivable would generate.  Thus, prior to the Petition Date, Debtor engaged in a scheme to defraud its creditors by transferring funds from clients in the form of future Accounts Receivable to various fraudulent conveyance partners, including the lenders under the MCA Agreements as alleged herein, and in the various adversary proceedings brought by the Trustee including, but not limited to, the 1046 Action.

**F.    DEFENDANT'S DEALINGS WITH LPG**

38.    Defendant, on information and belief, was among the transferees of LPG's future Accounts Receivable pursuant to an MCA Agreement.  These ACH Receivables included funds that would be generated in the future from the unlawful Affiliate Agreements.

39.    Traditional merchant cash advances are a variation on "factoring" where a merchant sells a discounted portion of its accounts receivable, and the purchaser receives in return the actual income from the accounts receivable it purchased.  The amount paid to purchase the receivables is lower than the expected income thereby giving the seller a source of cash while losing the long-term benefit of the accounts receivable that it sold.

///

40.    The MCA Agreement transfers in this instance, however, were loans, not purchases of accounts receivable.  The reason for characterizing the transactions as a "purchase" rather than a loan was to avoid the application of usury laws.

41.    Under the MCA Agreement, LPG did not transfer Accounts Receivable to July 5th. Instead, LPG sold its interest in future income to July 5th, but the obligation to actually collect and the risk of non-payment of the receivables remained with LPG. These transactions were loans, not sales, because under its MCA Agreement, July 5th bore little, if any, risk of ownership of the subject receivables.

   **a.**  **Terms of Defendant's MCA Agreement with LPG**

42.    LPG entered into an MCA Agreement with Defendant which, upon information and belief, was consistent with those entered into with other various MCA Lenders. However, Trustee is not in possession of the applicable MCA Agreement

43.    Based upon information and belief, a typical MCA Agreement, such as the one entered into with Defendant, would include terms for the purchase price, purchased amount, net funds provided, specified percentage of investment, a daily remittance rate, and a contractual term.

44.    The stated effect of the terms set forth in the MCA Agreement is that in exchange for a sum of capital investment, Defendant would receive a certain sum of money or return within a stated number of weeks. The Specified Percentage of return is *not an actual number* of the Daily Remittance as a percentage of LPG's receivables. Rather, the term is only included to help disguise this high interest loan as a purchase of receivables.

45.    The actual effect of the MCA Agreement is even more onerous because the agreement provides for "Additional Fees" that include, among others, a fee to cover underwriting and the ACH debit program.  *Thus, the Net Funds Provided by Defendant were only a fraction of the amount stated in the MCA Agreement, giving Defendant a higher return on its investment in six weeks.*

46.    The transaction entered pursuant to the MCA Agreement, constituted a loan with a usurious interest rate, that was not made in the ordinary course of business.

47.    Under the terms of the MCA Agreement, Defendant was receiving repayment for its loan through debits to Debtor's bank accounts as reflected by the "Daily Remittance."  Defendant

9

was not responsible for collecting the Accounts Receivable and thus had not purchased the specified receivables but, instead, had made a loan.

**48.** The discrepancy between the interest rate determined pursuant to the terms of the MCA Agreement and the actual amount owed as a result of the Underwriting Fee being deducted from the Purchase Price is further indication of a loan.

**49.** Because the MCA Agreement violated federal and state laws, it is void, unenforceable, and subject to avoidance as fraudulent. Moreover, even if the MCA Agreement was not void for being unlawful, Debtor received less than reasonable equivalent value in exchange for incurring the purported obligations. As such, Debtor's obligations under the MCA Agreement are avoidable as fraudulent transfers.

       **b.**       **Transfers to Defendant Pursuant to MCA Agreement**

**50.** During the applicable reach-back periods and according to records currently available, Debtor paid Defendant the sum of at least $1,398,809.15 pursuant to the MCA Agreement although, on information and belief, the amount is believed to be significantly higher. (A true and complete summary of payments made pursuant to the MCA Agreement, based on account statements currently available, is attached as **Exhibit 1**, and is incorporated herein.)

**51.** On information and belief, Debtor utilized accounts from Coast Processing to allow Defendant to make "pulls" of its funds held in those accounts.

**52.** As alleged above, the funds that Debtor used to pay Defendant through its affiliate Coast Processing consisted of Client's Funds, including ACH Receivables, and were deposits from clients brought to Debtor by means of the illegal Affiliate Agreements, which funds were required to be held in Debtor's client trust accounts.

**53.** As a result, Debtor's transfers of Accounts Receivable to Defendant pursuant to the MCA Agreement ("Transfers"), totaling at least the amount of $1,398,809.15 were fraudulent and must be set aside.

**G.**      **LPG'S PONZI SCHEME**

**54.** The Ponzi Scheme Presumption exists in bankruptcy proceedings.

///

55.    The Ponzi Scheme Presumption can be utilized to establish a debtor's "intent to defraud future undertakers [investors] from the mere fact that a debtor was running a Ponzi scheme. Indeed, no other reasonable inference is possible. A Ponzi scheme cannot work forever.  The investor pool is a limited resource and will eventually run dry.  The perpetrator must know that the scheme will eventually collapse as a result of the inability to attract new investors.  The perpetrator nevertheless makes payments to present investors, which, by definition, are meant to attract new investors. He must know all along, from the very nature of his activities, that investors at the end of the line will lose their money.  Knowledge to a substantial certainty constitutes intent in the eyes of the law, *cf. Restatement (Second) of Torts § 8A (1963 & 1964)*, and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them. *Cf. Coleman Am. Moving Servs., Inc. v. First Nat'l Bank & Trust Co. (In re American Properties, Inc.)* (Bankr.D.Kan. 1981)14 B.R. 637, 643 (intentionally carrying out a transaction with full knowledge that its effect will be detrimental to creditors is sufficient for actual intent to hinder, delay or defraud within the meaning of § 548(a)(1))." *Merrill v. Abbott (In re Independent Clearing House Co.)* (D. Utah 1987) 77 B.R. 843, 860. A trustee in bankruptcy is not required to show that an operator of a Ponzi scheme was subjectively aware his Ponzi scheme was destined to fail.  *In re EPD Inv. Co., LLC*, 114 F.4[th] at 1153 ("[a] trustee's action to recover assets fraudulently conveyed in the course of a Ponzi scheme does not require that the trustee also prove the Ponzi-scheme operator was subjectively aware his Ponzi scheme was destined to fail").

56.    "But if all the debtor receives in return for a transfer is the use of the defendant's money to run a Ponzi scheme, there is nothing in the bankruptcy estate for creditors to share. In fact, by helping the debtor perpetuate his scheme, the transfers exacerbate the harm to creditors by increasing the amount of claims while diminishing the debtor's estate. In such a situation, the use of the defendant's money cannot objectively be called "reasonably equivalent value. *"In re Independent Clearing House Co.* 77 B.R. at 859. Therefore, "[t]he trustee can avoid the transfers if they were preferential or fraudulent. Transfers to investors in a Ponzi scheme are preferential and fraudulent. Therefore, they constitute "property of the estate," and the trustee can recover them.  *Id.* at 853 n.17 (citations omitted).

57.    Debtor was operating a Ponzi scheme that utilized affiliates and several other entities as investors to continue its unlawful business practices by using funds provided by current investors to attract new investors hoping for very high returns. Therefore, the Debtor was running a Ponzi scheme and the Ponzi Scheme Presumption can be utilized to infer that the Debtor had the intent to defraud investors within the meaning of 11 U.S.C. section 548(a)(1).  This is evidenced by the Court in this Bankruptcy Case declaring that Debtor was operating a Ponzi scheme, when it stated the following:

> It is important to note that this Court has never received any significant and trustworthy evidence that Debtor accomplished meaningful results for its clients, but only anecdotal examples of viable success for its clients. By reviewing the Estate's claims register, there is evidence of consumer claims for the fraud and demanded but undelivered refunds of approximately $500 million. There is ample evidence that the pre-petition Debtor never placed the collected funds into an attorney-client trust account, and that Debtor or its principals simply looted the payments received through the client automatic withdrawals, stiffing both the clients and outside attorneys who may have been working on client cases with the hopes of being paid. There is also evidence before the Court that Debtor was running a Ponzi scheme and paying some outside (or "network") attorneys with funds obtained from new clients. In this case, it appears that some of the "lenders" may have been serving as "investors," hoping for very high returns before "the music stopped."  The Ninth Circuit has recently explained, "[b]y definition, a Ponzi scheme is destined to fail because the pool of available investors is not limitless. When the Ponzi scheme operator's pool of investors inevitably runs dry, the scheme collapses and the swindler and their entities often end up in bankruptcy or equitable receivership. See generally David R. Hague, Expanding the Ponzi Scheme Presumption, 64 DePaul L. Rev. 867 (2015). In bankruptcy, the court-appointed trustee is tasked with taking immediate control of the entity, ceasing ongoing fraudulent activity, locating and collecting assets for the bankruptcy or receivership estate, and achieving a final, equitable distribution of the remaining assets. See 11 U.S.C. § 704." *Kirkland v. Rund (In re EPD Inv. Co., LLC)*, 2024 U.S. App. LEXIS 21363, at *15 (9th Cir. Aug. 23, 2024). Finally, there is evidence that Debtor was encumbering (or as some creditors assert, "double or triple selling") their accounts or receivables to multiple lenders. With respect to Greyson's requested Administrative Claim [Dk. 676], and as more fully described in the concurrently entered order denying the claim, there has been no evidence presented that any work allegedly performed by Greyson assisted any clients or added any value to the Estate.

*See, Case 8:23-bk-10571-SC* [Bankr. Docket No. 1545 Fn. 5].

///

58.     Moreover, since the Transfers were made with the intent to further the Ponzi scheme, the Debtor did not receive an objectively reasonable equivalent value for the Transfers, and the Trustee can avoid the Transfers because they were preferential and fraudulent.

59.     The transactions between Defendant and the Debtor were loans, not the sales of receivables, and as such Defendant was serving as an "investor," hoping for very high returns before "the music stopped."

**H.     THE CRIMINAL ENTERPRISE**

60.     Debtor's operations, activities and transfers done in furtherance of the Ponzi scheme, including those in conjunction with its affiliates and its dealings with Defendant, also constituted a criminal enterprise.

61.     This, too, is evidenced by the Court's order in the 1046 Action wherein it denied the Motion of Greyson Law Center to Vacate the Preliminary Injunction previously entered in Debtor's main case, and the Court offered the opinion:

> Through the various proceedings and evidence produced in both the main case and the various adversary proceedings, including but not limited to various Motions for Temporary Restraining Orders, Preliminary Injunctions, Motions to Dismiss, a Motion for Appointment of a Chapter 11 Trustee, a Motion to Sell Assets, a multitude of pleadings filed by both secured and unsecured creditors (supported by evidence presented under oath) in support of their claims, and especially the pleadings and evidence presented by the "Watchdog of the Bankruptcy System" aka the Office of the United States Trustee (an arm of the United States Department of Justice), *it is clear to this Court that Debtor, since its pre-petition inception (and through the time of the appointment of the Chapter 11 Trustee) was in the Court's opinion, operating a criminal enterprise.*

Case No. 8:23-bk-10571-SC; Adv. No. 8:23-ap-01046-SC [Bankr. Docket No. 1545, p.3 (emphasis in text)].

62.     As part of this criminal enterprise, Debtor and Defendant engaged in fraudulent transfers of Debtor's Accounts Receivable pursuant to the MCA Agreement.  The MCA Agreement was a loan made by Defendant at an unlawful usurious interest rate and was not the purchase of the Accounts Receivable as represented; and, the transfers made pursuant to the MCA Agreement constituted wire fraud.

13

## I.   LPG'S PREPETITION CREDITORS

**63.**   Debtor was insolvent when each Transfer was made. This insolvency is evidenced in part by the fact that 14 separate UCC-1 statements were of record securing debts of the Debtor as of September 1, 2022. These statements remained unreleased as of the Petition Date. These statements either reflected secured liens against the Debtor's assets then owned or thereafter acquired, or provided evidence of the assignment or sale of substantial portions of the Debtor's future income.

**64.**   When the Transfers were made, these prior UCC-1 statements secured the repayment of the following claimed amounts that are currently known to Trustee and are allegedly owed by the Debtor: (i) $2,374,004.82 owed to Fundura Capital Group as evidenced by Proof of Claim No. 335 purportedly secured by a UCC statement filed on or about May 19, 2021; (ii) approximately $15 million dollars owed to MNS Funding, LLC as evidenced by Proof of Claim No. 1060 purportedly secured by a UCC statement filed on or about May 28, 2021; (iii) approximately $5,000,000 owed to Azzure Capital, LLC as evidenced by Proof of Claim No. 127 secured by a UCC statement filed on or about May 28, 2021; and (iv) approximately $1.5 million dollars owed to Diverse Capital, LLC purportedly secured by UCC statements filed on or about September 15, 2021, and December 1, 2021.[2]

**65.**   As alleged above, LPG was borrowing against its assets and future income, often on unfavorable terms, not only to finance operations at LPG, but also to pay the fees owed to the marketing affiliates for providing consumer clients and to pay other loans to creditors that were in default or about to be in default as part of Diab's scheme to keep LPG creditors at bay for a long as possible until he could transfer LPG's assets, client files, Client Funds, and ACH Receivables to other entities under his control.  Pursuant to the agreements with the marketing companies, significant percentages of future payments were already promised to be paid to the marketing affiliates from whatever future income the Debtor would receive.  And, of course, the payments LPG received in the form of ACH Receivables were also trust funds paid to LPG by its law firm clients, subject to return of funds in the event of a request for refund or termination of the representation before LPG had

///

---

[2] Trustee reserves all rights, claims, and defenses with respect to these and any other purported secured or unsecured claims.

earned the funds.  In this regard, except to the extent earned, the ACH Receivables also represented a liability of the Debtor.

66.    In addition, on Debtor's Schedule E/F [Bankr. Docket No. 33], Debtor scheduled 11 unsecured creditors with priority unsecured claims totaling $374,060.04. These priority unsecured creditors include Indiana Dept. of Revenue, Dept. of Labor and Industries, Arizona Dept. of Economic Security, Arkansas Dept. of Finance & Admin., California Franchise Tax Board, Georgia Dept. of Labor, Internal Revenue Service, Mississippi Dept. of Revenue, Nevada Dept. of Taxation, Utah State Tax Commission, and Wisconsin Dept. of Revenue (collectively, "Priority Unsecured Creditors").

67.    Another group of creditors that Debtor listed on its Schedule E/F [Bankr. Docket No. 33] are nonpriority unsecured creditors. Those 58 creditors have scheduled claims totaling $141,439,158.05 and include Ajilon; Anthem Blue Cross; Azevedo Solutions Groups, Inc.; Carolina Technologies & Consulting Invoice; Collaboration Advisors; Credit Reporting Service Inc.; CT Corporation – Inv.; Debt Pay Pro; Document Fulfillment Services; EnergyCare, LLC; Exela Enterprise Solutions; First Legal Network, LLC; GHA Technologies Inc.; Harrington Electric, Inc.; Imagine Reporting; Juize, Inc.; Krisp Technologies, Inc.; Liberty Mutual; Marc Lemauviel – Allegra; MarkSYS Holdings, LLC; Netsuite-Oracle; Pitney Bowes; Rapid Credit, Inc.; SBS Leasing A Program of De Lage Landen; Security Solutions; Sharp Business Systems; Streamline Performance, Inc.; Thomson Reuters; Twilio, Inc.; Nationwide Appearance Attorneys; Executive Center, LLC; Outsource Accelerator, Ltd.; TaskUs Holdings, Inc.; Marich Bein, LLC; Validation Partners; MC DVI Fund 1, LLC; MC DVI Fund 2, LLC; Debt Validation Fund II, LLC; Tustin Executive Center; LexisNexus; JP Morgan Chase; Business Centers of America; Michael Schwartz; Anibal Colon Jr.; Kathleen Lacey; David Ulery; Kimberly Birdsong; Kevin Carpenter; Karen Suell; Gloria Eaton; Carolyn Beech; Debra Price; Kenneth Topp; Darcey Williamson, Trustee; James Hammett; Johnny Rizo; Beverly Graham; Kathleen Scarlett; and Geneve and Myranda Sheffield (collectively, "Nonpriority Unsecured Creditors" and, together with the Secured Creditors and Priority Unsecured Creditors, "Prepetition Creditors").

///

68.    The bar date for submitting claims as part of the Bankruptcy Case has passed and Plaintiff now knows that over 5,000 claims were filed totaling approximately $500 million in priority, secured and unsecured claims.

## FIRST CLAIM FOR RELIEF

**Avoidance, Recovery, and Preservation of Two-Year Actual Fraudulent Transfers**

**[11 U.S.C. §§ 548(a)(1)(A), 550, and 551]**

69.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 68 as though set forth in full.

70.    The client files, including Client Funds, ACH Receivables, and funds that are the subject of the Transfers alleged herein are those of LPG and the Debtor's Estate.

71.    The Affiliate Agreements, MCA Agreement, and all or a portion of the Transfers alleged herein, occurred within the two years prior to the Petition Date.

72.    On or after the date that such agreements were executed and the Transfers were made, entities to which Debtor was or became indebted include the Prepetition Creditors.

73.    The Transfers happened while Debtor was insolvent or was rendered insolvent.

74.    Despite Debtor's obligation to the Prepetition Creditors, Debtor continued Transfers to Defendant, pursuant to the MCA Agreement, of Accounts Receivable that consisted of sums paid or to be paid by consumers under the Affiliate Agreements, which constitutes an illegal capping agreement between Debtor and the affiliates.

75.    The Transfers to Defendant were made with actual intent to hinder, delay and defraud the creditors of Debtor.

76.    The Debtor was operating a Ponzi scheme and the Ponzi Scheme Presumption creates an inference of the Debtor's actual intent to defraud within the meaning of 11 U.S.C. section 548(a)(1).

77.    In addition, on information and belief, the loan made to Debtor in the guise of Defendant's MCA Agreement was usurious at an interest rate many times more than the enforceable rate permitted by usury laws and, in particular, the usury laws of California. The debt evidenced by the MCA Agreement further constitutes an "unlawful debt" within the meaning of 18 U.S.C. §

1961(6); 18 U.S.C. § 1962(c); and 18 U.S.C. § 1962(d). Accordingly, Plaintiff may recover treble damages, as well as attorney's fees pursuant to the MCA Agreement.

**78.** On information and belief, Defendant's conduct relating to the Transfers was done with oppression, fraud and malice, as defined by California Civil Code section 3294, entitling Plaintiff to exemplary and punitive damages.

**79.** Because the referrals from the affiliates to Debtor are illegal under federal and state law, they are void; and, because the MCA Agreement transferred funds of the referrals, they too are void. Any purported consideration constitutes unlawful consideration, which cannot constitute reasonably equivalent value. The terms of the MCA Agreement also were usurious and failed to confer reasonably equivalent value to the Debtor.

**80.** The Affiliate Agreements, MCA Agreement, and the Transfers of funds are avoidable as fraudulent pursuant to 11 U.S.C. §§ 548(a)(1)(A), 550, and 551 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against Debtor's Estate under 11 U.S.C. § 502, or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

**81.** The Affiliate Agreements, MCA Agreement, and the Transfers should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(A), and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

## SECOND CLAIM FOR RELIEF

**Avoidance, Recovery, and Preservation of Two-Year Constructive Fraudulent Transfers**

**[11 U.S.C. §§ 548(a)(1)(B), 550, and 551]**

**82.** Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 80 as though set forth in full.

**83.** The Affiliate Agreements, MCA Agreement, and all or a portion of the Transfers alleged herein occurred within the two years prior to the Petition Date.

**84.** On or after the date that such agreements were executed and such Transfers were made, entities to which Debtor was or became indebted include the Prepetition Creditors.

**85.** The Transfers happened while Debtor:

a.    was insolvent or became insolvent as a result;

b.    was engaged or was about to engage in a transaction for which any property remaining with Debtor was of unreasonably small capital; or

c.    intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

86.    Because the referrals from Affiliates to Debtor are illegal under federal and state law; and, because any Transfer of the Accounts Receivable, any loans repaid with the Accounts Receivable, funded with the Accounts Receivable also are illegal under federal and state law, they are void and subject to avoidance as fraudulent.

87.    Furthermore and objectively, the Debtor did not receive reasonable equivalent value for the Transfers because, by Debtor's use of money received from Defendant to run the Ponzi scheme, there is nothing left in the Estate for the creditors to share and no benefit to the Estate.  Instead, the Transfers exacerbated the harm to creditors by increasing the amount of claims thereby diminishing the Debtor's Estate.

88.    The Affiliate Agreements, MCA Agreement, and the Transfers of Debtor's funds are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and Cal. Civ. Code §§ 3439.04(a) and 3439.07 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against his Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

89.    In addition, on information and belief, the loan made to Debtor in the guise of Defendant's MCA Agreement was usurious at an interest rate many times more than the enforceable rate permitted by usury laws and, in particular, the usury laws of California. The debt evidenced by the MCA Agreement further constitutes an "unlawful debt" within the meaning of 18 U.S.C. § 1961(6); 18 U.S.C. § 1962(c); and 18 U.S.C. § 1962(d). Accordingly, Plaintiff may recover treble damages, as well as attorney's fees pursuant to the MCA Agreement.

90.    The Affiliate Agreements, MCA Agreement, and the Transfers should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(B), and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

### THIRD CLAIM FOR RELIEF

**Avoidance, Recovery, and Preservation of Four-Year Actual Fraudulent Transfers**

**[11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.04(a) and 3439.07]**

**91.**    Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 88 as though set forth in full.

**92.**    The Affiliate Agreements, MCA Agreement, and all or a portion of the Transfers occurred within four years prior to the Petition Date.

**93.**    On or after the date that such agreements were entered and such Transfers were made, entities to which Debtor was or became indebted include the Prepetition Creditors.

**94.**    Despite Debtor's obligation to the Prepetition Creditors, Debtor continued to make Transfers to Defendant, pursuant to the MCA Agreement that consisted of sums paid or to be paid by consumers under the Affiliate Agreements, which constitute illegal capping agreements between Defendant and Debtor.

**95.**    The Transfers to Defendant were made with actual intent to hinder, delay and defraud the creditors of Debtor.

**96.**    The Debtor was operating a Ponzi scheme and the Ponzi Scheme Presumption creates an inference of the Debtor's actual intent to defraud within the meaning of 11 U.S.C. section 548(a)(1).

**97.**    In addition, on information and belief, the loan made to Debtor in the guise of Defendant's MCA Agreement was usurious at an interest rate many time more than the enforceable rate permitted by usury laws and, in particular, the usury laws of California. On information and belief, the debt evidenced by the MCA Agreement further constitutes an "unlawful debt" within the meaning of 18 U.S.C. § 1961(6); 18 U.S.C. § 1962(c); and 18 U.S.C. § 1962(d).  Accordingly, Plaintiff may recover treble damages, as well as attorney's fees pursuant to the MCA Agreement.

**98.**    Defendant's conduct relating to the Transfers was done with oppression, fraud and malice, as defined by California Civil Code section 3294, entitling Plaintiff to exemplary and punitive damages.

**99.**    Because the referrals from Affiliates to Debtor are illegal under federal and state law, they are void; and, because the MCA Agreement transferred funds of the referrals, they too are void.

Accordingly, any obligation of the Debtor arising from the MCA Agreement are avoidable as fraudulent. Any purported consideration constitutes unlawful consideration, which cannot constitute reasonable value. Thus, at the time the agreements were executed and the Transfers made, Debtor received less than reasonably equivalent value.

**100.**    The Affiliate Agreements, MCA Agreement, and the Transfers of Debtor's funds are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and Cal. Civ. Code §§ 3439.04(a) and 3439.07 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against his Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

**101.**    Accordingly, the Affiliate Agreements, the MCA Agreement, and the Transfers should be avoided as fraudulent under 11 U.S.C. §§ 544(b) and Cal. Civ. Code §§ 3439.04(a) and 3439.07, and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551 and Cal. Civ. Code § 3439.07

## FOURTH CLAIM FOR RELIEF

### Avoidance, Recovery, and Preservation of Four-Year Constructive Fraudulent Transfers

### [11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.05, and 3439.07]

**102.**    Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 100 as though set forth in full.

**103.**    The Affiliate Agreements, MCA Agreement, and all or a portion of the Transfers occurred within the four years prior to the Petition Date.

**104.**    The Transfers happened while Debtor:

a.    was insolvent or became insolvent as a result;

b.    was engaged or was about to engage in a transaction for which any property remaining with Debtor was of unreasonably small capital; or

c.    intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

**105.**    Because the referrals from Affiliates to Debtor are illegal under federal and state law; and, because any Transfer of Accounts Receivable, loans repaid with Accounts Receivable funded

with Accounts Receivable also are illegal under federal and state law, they are void and subject to avoidance as fraudulent. Any purported consideration constitutes unlawful consideration, which cannot constitute reasonably equivalent value. Thus, at the time the agreements were executed and the Transfers made, Debtor received less than reasonably equivalent value.

106.    Furthermore and objectively, the Debtor did not receive reasonable equivalent value for the Transfers because, by Debtor's use of money received from Defendant to run the Ponzi scheme, there is nothing left in the Estate for the creditors to share and no benefit to the Estate.  Instead, the Tranfers exacerbated the harm to creditors by increasing the amount of claims thereby diminishing the Debtor's Estate.

107.    The Affiliate Agreements, MCA Agreement, and the Transfers of Debtor's funds are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and Cal. Civ. Code §§ 3439.04(a) and 3439.07 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against his Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

108.    In addition, on information and belief, the loan made to Debtor in the guise of Defendant's MCA Agreement was usurious at an interest rate many times more than the enforceable rate permitted by usury laws and, in particular, the usury laws of California. The debt evidenced by the MCA Agreement further constitutes an "unlawful debt" within the meaning of 18 U.S.C. § 1961(6); 18 U.S.C. § 1962(c); and 18 U.S.C. § 1962(d). Accordingly, Plaintiff may recover treble damages, as well as attorney's fees pursuant to the MCA Agreement.

109.    Accordingly, the Affiliate Agreements, MCA Agreement, and the Transfers should be avoided as fraudulent under 11 U.S.C. §§ 544(b) and Cal. Civ. Code §§ 3439.05 and 3439.07, and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551 and Cal. Civ. Code § 3439.07.

///

///

///

///

## **FIFTH CLAIM FOR RELIEF**

### **Turnover of Estate Property**

### **[11 U.S.C. § 542]**

**110.**   Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 106 as though set forth in full.

**111.**   Defendant has possession or control over property of the Estate in the form of the Transfers made pursuant to illegal, unenforceable, and avoidable agreements.

**112.**   The Transfers are not of inconsequential value to the Estate.

**113.**   The funds that are the subject of the Transfers are paramount to Debtor's ability to pay creditors.

**114.**   Accordingly, upon entry of judgment that the agreements are avoided or declared unenforceable, Trustee is entitled to a further judgment for turnover of the Transfers pursuant to 11 U.S.C. § 542.

## **RESERVATION OF RIGHTS**

**115.**   Plaintiff reserves the right to bring all other claims for relief or causes of action that Plaintiff may have against Defendant, on any and all grounds, as allowed under the law or in equity, including but not limited to, those claims not known by the Trustee at this time but that he may discover during the pendency of this adversary proceeding.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for a judgment as follows:

**On The First, Second, Third, and Fourth Claims for Relief:**

**1.**   Avoiding Debtor's obligations under the Affiliate Agreements, MCA Agreement, and avoiding, recovering, and preserving the Transfers made to Defendant in the total aggregate amount of not less than $1,398,809.15;

**2.**   Entering a money judgement of not less than $1,398,809.15;

**On The First and Third Claims for Relief:**

**3.**   Awarding punitive damages and exemplary damages according to proof;

**4.**   Awarding treble damages;

22

1    **On the Fifth Claim for Relief:**

2    **5.**     Ordering Defendant to immediately turn over the Transfers;

3    **On All Claims for Relief:**

4    **6.**     Awarding pre-judgment interest at the maximum legal rate from the date of the last

5    Transfer or the date the amount is fixed, to the date of judgment;

6    **7.**     Awarding post-judgment interest at the maximum legal rate from the date of the

7    judgment until the judgment is paid in full;

8    **8.**     Awarding Plaintiff his attorney's fees and costs of suit incurred herein, to the extent

9    allow by law; and

10    **9.**     Granting such other and further relief as the Court deems just and proper.

11

12    Dated:  March 17, 2025

     Respectfully submitted,

13         DINSMORE & SHOHL LLP

14

15         By: */s/ Brian W. Boyd*
         Yosina M. Lissebeck

16             Brian W. Boyd

17         *Counsel to Richard A.*

18         *Marshack, Plaintiff and Trustee*
     *of the LPG  Liquidation Trust*

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

Exhibit 1
Page 24

In re: The Litigation Practice Group PC
Disbursement Details by Payee
4 Years Pre-Petition (03/20/2019 - 03/20/2023)

Prepared by: Grobstein Teeple LLP

| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|
| UnionBank | The Litigation Practice Group PC | ███ | 7/31/2021 | 7/28/2021 | | 90,048.97 | WIRE TRANS TRN ███ ███ ███ Sent To: JPMORGAN CHASE BANK, NA Beneficiary: 1/July 5th LLC |
| UnionBank | The Litigation Practice Group PC | ███ | 7/31/2021 | 7/30/2021 | | 165,000.00 | WIRE TRANS TRN ███ ███ Sent To: JPMORGAN CHASE BANK, NA Beneficiary: 1/July 5th LLC |
| UnionBank | The Litigation Practice Group PC | ███ | 8/31/2021 | 8/4/2021 | | 54,291.56 | WIRE TRANS TRN ███ ███ Sent To: JPMORGAN CHASE BANK, NA Beneficiary: 1/July 5th LLC |
| UnionBank | The Litigation Practice Group PC | ███ | 8/31/2021 | 8/11/2021 | | 63,999.54 | WIRE TRANS TRN ███ ███ Sent To: JPMORGAN CHASE BANK, NA Beneficiary: 1/July 5th LLC |
| UnionBank | The Litigation Practice Group PC | ███ | 8/31/2021 | 8/20/2021 | | 68,724.88 | WIRE TRANS TRN ███ ███ Sent To: JPMORGAN CHASE BANK, NA Beneficiary: 1/July 5th LLC |
| UnionBank | The Litigation Practice Group PC | ███ | 8/31/2021 | 8/25/2021 | | 77,455.15 | WIRE TRANS TRN ███ ███ Sent To: JPMORGAN CHASE BANK, NA Beneficiary: 1/July 5th LLC |
| UnionBank | The Litigation Practice Group PC | ███ | 9/30/2021 | 9/1/2021 | | 52,823.34 | WIRE TRANS TRN ███ ███ Sent To: JPMORGAN CHASE BANK, NA Beneficiary: 1/July 5th LLC |
| UnionBank | The Litigation Practice Group PC | ███ | 9/30/2021 | 9/9/2021 | | 69,362.59 | WIRE TRANS TRN ███ ███ Sent To: JPMORGAN CHASE BANK, NA Beneficiary: 1/July 5th LLC |
| UnionBank | The Litigation Practice Group PC | ███ | 9/30/2021 | 9/16/2021 | | 58,324.72 | WIRE TRANS TRN ███ ███ Sent To: JPMORGAN CHASE BANK, NA Beneficiary: 1/July 5th LLC |
| UnionBank | The Litigation Practice Group PC | ███ | 9/30/2021 | 9/22/2021 | | 9,261.95 | 1/July 5th LLC |
| Optimum Bank | Coast Processing LLC dba LPG | ███ | 9/30/2021 | 9/30/2021 | | 13,086.98 | WIRE TO July 5th LLC |
| Optimum Bank | Coast Processing LLC dba LPG | ███ | 10/29/2021 | 10/7/2021 | | 4,677.47 | WIRE TO July 5th LLC |
| Optimum Bank | Coast Processing LLC dba LPG | ███ | 10/29/2021 | 10/14/2021 | | 15,498.27 | WIRE TO July 5th LLC |
| Optimum Bank | Coast Processing LLC dba LPG | ███ | 10/29/2021 | 10/26/2021 | | 13,794.22 | WIRE TO July 5th LLC |
| Optimum Bank | Coast Processing LLC dba LPG | ███ | 11/30/2021 | 11/5/2021 | | 12,815.28 | WIRE TO July 5th LLC |
| Optimum Bank | Coast Processing LLC dba LPG | ███ | 11/30/2021 | 11/12/2021 | | 17,055.24 | WIRE TO July 5th LLC |
| Optimum Bank | Coast Processing LLC dba LPG | ███ | 11/30/2021 | 11/18/2021 | | 27,855.36 | WIRE TO July 5th LLC |
| UnionBank | The Litigation Practice Group PC | ███ | 11/30/2021 | 11/24/2021 | | 28,490.67 | WIRE TRANS TAN ███ Sent To: JPMOAGAN CHASE BANK, NA Beneficiary: 1/July 5th LLC |
| Chase | The Litigation Practice Group PC | ███ | 11/30/2021 | 11/24/2021 | | 73,150.00 | 11/24 Online Domestio Wire Transfer NC: July 5th LLC Costa Mesa CA 92626-2651 us Ref: Lpg Portion For Purohased Reoeivables Tm: ███ ███ |
| Optimum Bank | Coast Processing LLC dba LPG | ███ | 12/31/2021 | 12/2/2021 | | 19,054.42 | WIRE TO July 5th LLC |
| UnionBank | The Litigation Practice Group PC | ███ | 12/31/2021 | 12/10/2021 | | 9,538.81 | WIRE TRANS TAN ███ Sent To: JPMORGAN CHASE BANK, NA Beneficiary: 1/July 5th LLC |
| UnionBank | The Litigation Practice Group PC | ███ | 12/31/2021 | 12/17/2021 | | 34,936.27 | WIRE TRANS TAN ███ Sent To: JPMORGAN CHASE BANK, NA Beneficiary: 1/July 5th LLC |
| UnionBank | The Litigation Practice Group PC | ███ | 12/31/2021 | 12/23/2021 | | 9,596.27 | WIRE TRANS TRN ███ Sent To: JPMORGAN CHASE BANK, NA Beneficiary: 1/July 5th LLC |
| Optimum Bank | Secure Payment Services LLC dba Litigation Practice Group | ███ | 1/31/2022 | 1/3/2022 | | 29,250.28 | WIRE TO July 5th LLC |
| UnionBank | The Litigation Practice Group PC | ███ | 1/31/2022 | 1/10/2022 | | 10,305.58 | WIRE TRANS TAN ███ Sent To: JPMORGAN CHASE BANK, NA Beneficiary: 1/July 5th LLC |
| UnionBank | The Litigation Practice Group PC | ███ | 1/31/2022 | 1/13/2022 | | 29,859.24 | WIRE TRANS TAN ███ Sent To: JPMORGAN CHASE BANK, NA Beneficiary: 1/July 5th LLC |
| UnionBank | The Litigation Practice Group PC | ███ | 1/31/2022 | 1/21/2022 | | 26,936.06 | WIRE TRANS TRN ███ Sent To: JPMORGAN CHASE BANK, NA Beneficiary: 1/July 5th LLC |
| UnionBank | The Litigation Practice Group PC | ███ | 1/31/2022 | 1/28/2022 | | 27,327.22 | WIRE TRANS TRN ███ Sent To: JPMORGAN CHASE BANK, NA Beneficiary: 1/July 5th LLC |
| UnionBank | The Litigation Practice Group PC | ███ | 2/28/2022 | 2/4/2022 | | 26,924.24 | WIRE TRANS TRN ███ Sent To: JPMORGAN CHASE BANK, NA Beneficiary: 1/July 5th LLC |
| UnionBank | The Litigation Practice Group PC | ███ | 2/28/2022 | 2/11/2022 | | 22,242.86 | WIRE TRANS TRN ███ ███ Sent To: JPMORGAN CHASE BANK, NA Beneficiary: 1/July 5th LLC |
| Chase | The Litigation Practice Group PC | ███ | 2/28/2022 | 2/22/2022 | | 45,602.88 | Book Transfer Debit A/C: July 5th LLC Costa Mesa CA 92626-2651 US Ref: Weekly Disbursement Tm: ███ |
| Chase | The Litigation Practice Group PC | ███ | 2/28/2022 | 2/25/2022 | | 25,335.22 | Book Transfer Debit A/C: July 5th LLC Costa Mesa CA 92626-2651 US Ref: Weekly Disbursement Tm: ███ |

1 of 2

DRAFT FORM - SUBJECT TO CHANGE

Exhibit 1
Page 25

In re: The Litigation Practice Group PC
Disbursement Details by Payee
4 Years Pre-Petition (03/20/2019 - 03/20/2023)

Prepared by: Grobstein Teeple LLP

| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|
| Chase | The Litigation Practice Group PC | ███ | 3/31/2022 | 3/4/2022 | | 22,244.76 | Book Transfer Debit NC: July 5th LLC Costa Mesa CA 92626-2651 US Ref: Weekly Disbursement Tm: |
| Chase | The Litigation Practice Group PC | ███ | 3/31/2022 | 3/10/2022 | | 24,709.82 | Book Transfer Debit NC: July 5th LLC Costa Mesa CA 92626-2651 us Ref: Weekly Disbursement Tm: 741 |
| Chase | The Litigation Practice Group PC | ███ | 3/31/2022 | 3/18/2022 | | 38,608.02 | Book Transfer Debit NC: July 5th LLC Costa Mesa CA 92626-2651 us Ref: Weekly Disbursement Tm: |
| Chase | The Litigation Practice Group PC | ███ | 3/31/2022 | 3/24/2022 | | 29,756.78 | Book Transfer Debit A/C: July 5th LLC Costa Mesa CA 92626-2651 US Ref: Weekly Disbursement Tm: |
| Chase | The Litigation Practice Group PC | ███ | 4/30/2022 | 4/1/2022 | | 22,702.70 | Book Transfer Debit A/C: July 5th LLC Costa Mesa CA 92626-2651 US Ref: Weekly Disbursement Tm: |
| Chase | The Litigation Practice Group PC | ███ | 4/30/2022 | 4/7/2022 | | 21,056.28 | Book Transfer Debit A/C: July 5th LLC Costa Mesa CA 92626-2651 us Ret: Weekly Disbursement Tm: |
| Chase | The Litigation Practice Group PC | ███ | 4/30/2022 | 4/18/2022 | | 7,105.25 | Book Transfer Debit NC: July 5th LLC Costa Mesa CA 92626-2651 US Ref: Weekly Disbursement Tm: |
| | | | | | | 1,398,809.15 | |

DRAFT FORM - SUBJECT TO CHANGE

Exhibit 1
Page 26

# EXHIBIT 2

Exhibit 2
Page 27

CHRISTOPHER B. GHIO (259094)
christopher.ghio@dinsmore.com
CHRISTOPHER CELENTINO (131688)
christopher.celentino@dinsmore.com
YOSINA M. LISSEBECK (201654)
yosina.lissebeck@dinsmore.com
DINSMORE & SHOHL LLP
655 West Broadway, Suite 800
San Diego, California 92101
Tele:  619.400.0500
Fax:  619.400.0501

Sarah S. Mattingly (Ky. Bar 94257)
sarah.mattingly@dinsmore.com
DINSMORE & SHOHL, LLP
101 S. Fifth Street, Suite 2500
Louisville, Kentucky 40202
Tele: 859-425-1096
Fax: 502-585-2207
(Admitted pro hac vice)

Special Counsel to Richard A. Marshack

FILED & ENTERED

JUN 03 2024

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY mccall     DEPUTY CLERK

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

| | |
|---|---|
| In Re<br><br><br>The Litigation Practice Group P.C.,<br><br>              Debtor(s), | Case No: 23-bk-10571-SC<br><br>Chapter 11<br><br>**ORDER GRANTING MOTION FOR ENTRY OF PROTECTIVE ORDER AND THE PROTECTIVE ORDER**<br><br>Date:    May 23, 2024<br>Time:    1:30 p.m.<br>Judge:  Hon. Scott C. Clarkson<br>Place:  Courtroom 5C (via Zoom)[1]<br>          411 West Fourth Street<br>          Santa Ana, CA 92701 |

---

[1] Video and audio connection information for each hearing will be provided on Judge Clarkson's publicly posted hearing calendar, which may be viewed online at:
http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

Exhibit 2
Page 28

The Court has read and considered the Notice of Motion and Motion for Entry of Protective Order (the "Motion") filed by Richard A. Marshack, in his capacity as the Chapter 11 Trustee (the "Trustee") of the Bankruptcy Estate ("Estate") of The Litigation Practice Group P.C., on May 2, 2024, pursuant to Federal Rule of Bankruptcy Procedure 7026 and Federal Rule of Civil Procedure 26(c)(1), as Dk. No. 1164 ("Motion"), and has found good cause to grant the Motion.

IT IS HEREBY ORDERED that:

1.    The Motion is granted;

2.    The below Protective Order shall apply to any contested matter arising

in the main bankruptcy case and in all adversary proceedings filed by or against Trustee, present and future; and

3.    Govern the discovery conducted therein.

## PROTECTIVE ORDER

**1.    DEFINITIONS**

1.1    "Confidential Information" as used in this Protective Order shall mean documents and other information (regardless of how generated, stored or maintained) that a Party or non-party reasonably believes to contain or reflect non-public financial or business information, bank records, financial records, such as social security numbers, non-public financial or personal information of a Party or non-party, account numbers, sensitive digital information and identifiers, information subject to confidentiality agreements or provisions other than this Protective Order, and other non-public research, development, or commercial information that derives value or avoids injury by virtue of not being known to the public.

1.2    This "Action" is defined and hereby means any contested matter arising in the main bankruptcy case and in all adversary proceedings filed by or against Trustee, present and future.

1.3    "Designating Party" means a Party or non-party that designates Confidential Information during the Action.

1.4    "Receiving Party" means a Party that receives Confidential Information during the Action.

Exhibit 2
Page 29

1.5    "Party" or "Parties" means person or entity subject to this Protective Order.

**2.    SCOPE OF THIS PROTECTIVE ORDER**

2.1    Unless otherwise ordered, this Protective Order shall govern certain documents and other products of discovery obtained in the Action from the Parties there to, and from third parties. As well as certain information copied or derived therefrom, excerpts, summaries or compilations thereof, including, but not limited to, documents voluntarily exchanged as part of early settlement discussions, documents produced pursuant to initial disclosures, requests authorized by the Federal Rules of Civil Procedure made applicable herein by the Federal Rules of Bankruptcy Procedure, answers to interrogatories, deposition transcripts, responses to requests for production, responses to requests for admission, subpoenas, affidavits, declarations, expert reports, and other such material and information as may be produced during the course of the Action and designated as Confidential Information.

**3.    DESIGNATION OF CONFIDENTIAL INFORMATION**

3.1    This Protective Order shall govern the production and handling of any Confidential Information in this Action. Any Party or non-party who produces Confidential Information in this Action may designate it as "Confidential" or "Attorneys' Eyes Only" consistent with the terms of this Protective Order. Whenever possible, the Designating Party must designate only those portions of a document, written discovery responses, deposition, transcript, or other material that contain the Confidential Information and refrain from designating entire documents. Regardless of any designations made hereunder, the Designating Party is not otherwise restricted from use or disclosure of its Confidential Information outside of this Action or for any business purposes. In addition, any Party may move to modify or seek other relief from any of the terms of this Protective Order if it has first tried in writing and in good faith to resolve its needs or disputes with the other Parties or Party as the case may be under the terms of this Protective Order. Further, nothing in this Protective Order shall prevent a Party from redacting documents consistent with the Federal Rules of Civil Procedure and utilizing the documents as needed through-out the Action.

3.2    <u>Application to Non-Parties:</u> Before a non-party is given copies of documents or materials designated as Confidential Information or Attorneys' Eyes Only as permitted hereunder, it

3

Exhibit 2
Page 30

must first sign an acknowledgment to be bound to these terms that is attached hereto as <u>Exhibit</u> A; if it fails to do so, the Parties to this Action must resolve any such dispute before making disclosure of designated information as permitted hereunder to the non-party. If a non-party wishes to make designations hereunder, it must first sign attached <u>Exhibit A.</u>

       3.3    <u>Timing and Provisional Protection:</u> Designations of Confidential Information may be made at any time. To avoid potential waiver of protection hereunder, the Designating Party should designate documents or materials containing Confidential Information at the time of production or disclosure, including on the record during the taking of any deposition. Deposition testimony will be deemed provisionally protected for a period of thirty (30) days after the transcript is released to the Parties by the court reporter, although the Parties may agree at any time to different timelines of provisional protection of information as Confidential or Attorneys' Eyes Only as part of one or more specific depositions. To retain any designations beyond the provisional period, a Designating Party must designate specific pages and lines of deposition testimony before the provisional period has expired. Such designations must be made in writing so that all counsel and court reporters may append the designation to all copies of the transcripts.

       3.4    <u>Manner of Designation:</u> Confidential Information may be designated hereunder in any reasonable manner or method that notifies the Receiving Party of the designation level and identifies with specificity the information to which the designation applies. If made verbally, the Designating Party must promptly confirm the designation in writing. Whenever possible, the Designating Party should stamp, affix, or embed a legend of "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY" on each designated page of the document or electronic image that contains Confidential Information.

**4.    CHALLENGES TO DESIGNATED INFORMATION**

       4.1    In the event that a Receiving Party disagrees at any time with any designation(s) made by the Designating Party, the Receiving Party must first try to resolve such challenge in good faith on an informal basis with the Designating Party. The Receiving Party must provide written notice of the challenge and the grounds therefor to the Designating Party, who must respond in writing to the challenge within fifteen (15) days. At all times, the Designating Party carries the burden of establishing the propriety of the designation and protection level. Unless and until the challenge is

resolved by the Parties or ruled upon by the Court, the designated information shall remain protected under this Protective Order. The failure of any Receiving Party to challenge a designation does not constitute a concession that the designation is proper or an admission that the designated information is otherwise competent, relevant, or material.

**5.        LIMITED ACCESS/USE OF PROTECTED INFORMATION**

5.1        Restricted Use: Information that is produced or exchanged in the course of the Action and designated under this Protective Order may be used for preparation for trial and preparation for any appeal of any and all matters in the Action, as well as related settlement negotiations, and for no other purpose, without the written consent of the Designating Party. No Confidential Information may be disclosed to any person except in accordance with the terms of this Protective Order, unless the parties are co-counsel or have entered into joint defense agreements. All persons in possession of Confidential Information agree to exercise reasonable care with regard to the custody, use, or storage of such information to ensure that its confidentiality is maintained. This obligation includes, but is not limited to, the Receiving Party providing to the Designating Party prompt notice of the receipt of any subpoena that seeks production or disclosure of any designated information and consulting with the Designating Party before responding to the subpoena. Any use or disclosure of Confidential or Attorneys' Eyes Only information in violation of the terms of this Protective Order may subject the disclosing person or party to sanctions.

5.2        Access to "Confidential" Information: The Party(ies) and all persons subject to this Protective Order agree that information designated as "CONFIDENTIAL" may only be accessed or reviewed by the following:

a)        The Court, its personnel, and court reporters;

b)        Counsel of record, or co-counsel for any Party, or other party that has entered into a joint defense agreement in the Action and their employees who assist counsel of record, or co-counsel in the Action and are informed of the duties and obligations imposed hereunder;

c)        The Parties, including their clients, agents and employees who are assisting or have reason to know of the Action;

/ / /

Exhibit 2
Page 32

d)      Experts or consultants employed by the Parties or their counsel, or co-counsel, for purposes of an Action, so long as each such expert or consultant has signed attached <u>Exhibit A;</u> and

e)      Other witnesses or persons with the Designating Party's consent or by court order.

5.3      <u>Access to "Attorneys' Eyes Only" Designations:</u> The Parties and all persons subject to this Protective Order agree that information designated as "ATTORNEYS' EYES ONLY" may only be accessed or reviewed by the following:

a)      The Court, its personnel, and court reporters;

b)      Counsel of record, or co-counsel for any Party, or other party that has entered into a joint defense agreement in the Action and their employees who assist counsel of record in the Action and are informed of the duties hereunder;

c)      In-house counsel for any Party in the Action and Richard A. Marshack, as Chapter 11 Trustee of The Litigation Practice Group P.C. who is informed of the duties and obligations imposed hereunder;

d)      Experts or consultants employed by the Parties or their counsel, or co-counsel for purposes of the Action,  and so long as each such expert or consultant has signed attached <u>Exhibit A;</u> and

e)      Other witnesses or persons to whom the Designating Party agrees in advance of disclosure or by court order.

5.4      <u>Non-Waiver Effect of Designations:</u> Neither the taking of, nor the failure to take, any action to enforce the provisions of this Protective Order, nor the failure to object to any designation, will constitute a waiver of any Party(ies)'s claim or defense in the Action or any other action or proceeding, including, but not limited to, a claim or defense that any designated information is or is not Confidential, is or is not entitled to particular protection, or embodies or does not embody information protectable by law.

5.5      <u>In-Court Use of Designated Information:</u> If information designated under this Protective Order will or may be offered in evidence at a hearing or trial related to any matter in the Action, then the offering party must give advance notice to the party or non-party that designated prior to offering the information so that any use or disclosure may be addressed in accordance with

6

Exhibit 2
Page 33

the Court's case-management or other pre-trial order, or by a motion *in limine.* Nothing in this

Protective Order shall be construed as a waiver by a Party of any objections that may be raised as to

the admissibility at trial of any evidentiary materials.

**6.    CLAW-BACK REQUESTS**

6.1    <u>Failure to Make Designation:</u>  If, at any time, a Party or non-party discovers that it

produced or disclosed Confidential Information without designation, it may promptly notify the

Receiving Party and identify with particularity the Confidential Information to be designated and the

level of designation (the claw-back notification). The Receiving Party may then request substitute

production of the newly-designated information. Within thirty (30) days of receiving the claw-back

notification, the Receiving Party must: (1) certify to the Designating Party it has appropriately marked

or, if substitute production has been requested, destroyed all unmarked copies that it received, made,

and/or distributed; and (2) if it was practicably unable to mark or destroy any information because

disclosures occurred while the Receiving Party was under no duty of confidentiality under the terms

of this Protective Order regarding that information, the Receiving Party must reasonably provide as

much information as practicable to aid the Designating Party in protecting the information,

consistently with the Receiving Party's attorney-client, work-product, and/or trial-preparation

privileges.

6.2    <u>Inadvertent Production of Privileged Information:</u> If, at any time, a Party discovers

that it produced information that it reasonably believes is subject to protection under the

attorney/client, work-product, or trial-preparation privileges, then it must promptly notify each

Receiving Party of the claim for protection, the basis for it, amend its privilege log accordingly, and

comply with Fed. R. Civ. P. 26(b)(5). Whenever possible, the producing party must produce substitute

information that redacts the information subject to the claimed protection. The Receiving Party must

thereupon comply with Fed. R. Civ. P. 26(b)(5)(B) as to the information subject to the claimed

protection.

/ / /

/ / /

/ / /

Exhibit 2
Page 34

**7.    DURATION/CONTINUED RESTRICTIONS**

7.1    <u>Handling of Designated Information Upon Conclusion of the Main Bankruptcy Case:</u> Upon conclusion of the Main Bankruptcy Case, by way of dismissal or closing of the case, the Designating Party(ies) is/are responsible for ensuring that any Party or person to whom the Designating Party shared or disclosed designated information in any of the matters under the Action returns or destroys all of its copies, regardless of the medium in which it was stored. No witness or Party may retain designated information that it received from any other Party or non-party under this Protective Order; only counsel of record, or co-counsel, are the authorized agents who may retain one copy for their respective legal files, and who must also describe to the Designating Party the extra steps taken to protect its legal file containing paper and/or electronic copies of the designated information so that it is not accessed, used, or disclosed inconsistently with the obligations under this Protective Order. This provision does not apply to the Court or Court staff. Moreover, this provision does not apply to Trustee, who may retain and use – consistent with this Order – Confidential Information received in any Action during the entirety of the Bankruptcy.

7.2    <u>Continued Restrictions Under this Protective Order:</u> The restrictions on disclosure and use of Confidential Information shall survive the conclusion of the Bankruptcy case and any matter in the Action.

**8.    PRIVILEGED OR PROTECTED INFORMATION**

8.1    Nothing in this Protective Order shall require disclosure of information that is protected by the attorney-client privilege, the work-product protection, or any other legally cognizable privilege (a "Privilege or Protection").  If information subject to a claim of Privilege or Protection is inadvertently produced, pursuant to Federal Rule of Evidence 502(d) such production shall not constitute a waiver of, or estoppel as to, any claim of Privilege or Protection for such information or any other information that may be protected from disclosure by a Privilege or Protection in any proceeding.

8.2    If a Party receives a document that appears to be subject to a Privilege or Protection, then it shall refrain from examining the document any more than is essential to ascertain if it is privileged or protected and shall promptly notify the producing Party in writing that the receiving

8

Exhibit 2
Page 35

Party possesses material that appears to be subject to a Privilege or Protection. The producing Party shall have seven (7) days after receiving such notice to assert a Privilege or Protection over the identified material. If the producing Party does not assert a claim of Privilege or Protection within the seven (7)-day period, the material in question shall be deemed not privileged or protected.

8.3    If a producing Party has produced a document subject to a claim of Privilege or Protection, upon written request by the producing Party, the document for which a claim of Privilege or Protection is made shall be sequestered or destroyed to the extent reasonably practicable, and the receiving Party shall not use the document for any purpose other than in connection with analyzing or disputing a claim of Privilege or Protection or in connection with a motion to compel the production of the document.

8.4    The receiving Party sequestering or destroying such material may then move the Court for an order compelling production of the material. The applicable producing Party bears the burden of establishing the applicable Privilege or Protection of any clawed-back document or information as and to the same extent that it would have borne such burden had it not produced the document or information.  Nothing in this Protective Order shall limit the Court's right or any receiving Party's right to request an in camera review of any information subject to a claim of Privilege or Protection.

### 

Date: June 3, 2024

Scott C. Clarkson
United States Bankruptcy Judge

Exhibit 2
Page 36

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT "A"

1

1 | Christopher B. Ghio (State Bar No. 259094)
Christopher Celentino (State Bar No. 131688)
2 | Yosina M. Lissebeck (State Bar No. 201654)
**DINSMORE & SHOHL LLP**
3 | 655 West Broadway, Suite 800
San Diego, CA 92101
4 | Telephone:  619.400.0500
Facsimile:  619.400.0501
5 | christopher.ghio@dinsmore.com
christopher.celentino@dinsmore.com
6 | yosina.lissebeck@dinsmore.com

7 | Sarah S. Mattingly (Ky. Bar 94257)
DINSMORE & SHOHL, LLP
8 | 101 S. Fifth Street, Suite 2500
Louisville, KY 40202
9 | Telephone: 859-425-1096
Facsimile: 502-585-2207
10 | Sarah.mattingly@dinsmore.com
(Admitted pro hac vice)

11 |

12 | Special Counsel to Richard A. Marshack,
Chapter 11 Trustee

13 |

14 |

15 | **UNITED STATES BANKRUPTCY COURT**

16 | **CENTRAL DISTRICT OF CALIFORNIA**

17 |

| | |
|---|---|
| In Re | Case No. 8:23-BK-10571-SC |
| | Chapter 11 |
| The Litigation Practice Group P.C., | **EXHIBIT A TO STIPULATED ORDER** |
| Debtor(s), | Date:   May 23, 2024 |
| | Time:   1:30 p.m. |
| | Judge:  Hon. Scott C. Clarkson |
| | Place:  Courtroom 5C[1] - Via Zoom |
| | 411 W. Fourth Street |
| | Santa Ana, CA  92701 |

[1] Video and audio connection information for each hearing will be provided on Judge Clarkson's
publicly posted hearing calendar, which may be viewed online at:
http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

This is to certify that:

(a)    I am being given access to Confidential Information pursuant to the Stipulated Protective Order that was entered into the main bankruptcy case for Litigation Practice Group, but which is binding and controlling as set forth by the Court's Order on any and all contested matters and  any and all litigation commenced by Trustee;

(b)    I have read the Stipulated Protective Order; and

(c)    I agree to be bound by the terms and conditions thereof, including, without limitation, to the obligations regarding the use, non-disclosure and return of such Confidential Information. I further agree that in addition to being contractually bound by the Stipulated Protective Order, I am subject to the jurisdiction of the above reference Court for any violation thereof.

Date: _____

_____
Signature

_____
Printed Name

2

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br><br>Richard A. Marshack,<br>Trustee of the LPG Liquidation Trust | DEFENDANTS<br><br>July 5th, LLC |
|---|---|

| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>Christopher Celentino          Dinsmore & Shohl LLP<br>Yosina M. Lissebeck          655 West Broadway, Suite 800<br>Brian W. Boyd (pro hac vice)    San Diego, California 92101<br>                                      619.400.0500 | ATTORNEYS (If Known) |
|---|---|

| PARTY (Check One Box Only)<br>□ Debtor          □ U.S. Trustee/Bankruptcy Admin<br>□ Creditor        □ Other<br>☒ Trustee | PARTY (Check One Box Only)<br>□ Debtor          □ U.S. Trustee/Bankruptcy Admin<br>□ Creditor        □ Other<br>□ Trustee |
|---|---|

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

(1) Avoidance, Recovery, and Preservation of 2-Year Actual Fraudulent Transfers; (2) Avoidance, Recovery, and Preservation of 2-Year Constructive Fraudulent Transfers; (3) Avoidance, Recovery, and Preservation of 4-Year Actual Fraudulent Transfers; (4) Avoidance, Recovery, and Preservation of 4-Year Constructive Fraudulent Transfers; and (6) Turnover

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☒ 11-Recovery of money/property – §542 turnover of property
☒ 12-Recovery of money/property – §547 preference
☒ 13-Recovery of money/property – §548 fraudulent transfer
☐ 14-Recovery of money/property – other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation
    (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
☐ 02-Other (e.g. other actions that would have been brought in state court
    if unrelated to bankruptcy case)

| □ Check if this case involves a substantive issue of state law | □ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| □ Check if a jury trial is demanded in complaint | Demand  $ 1,398,809.15 |

Other Relief Sought

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>The Litigation Practice Group P.C. | BANKRUPTCY CASE NO.<br>8:23-bk-10571-SC | |
| DISTRICT IN WHICH CASE IS PENDING<br>Central District of California | DIVISION OFFICE<br>Santa Ana | NAME OF JUDGE<br>Hon. Scott C. Clarkson |

| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
|---|---|---|
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |

| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br>/s/ Brian W. Boyd | |
|---|---|
| DATE<br><br>March 18, 2025 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br><br>Brian W. Boyd |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.