Christopher Celentino (131688)
Yosina M. Lissebeck (State Bar No. 201654)
Christopher B. Ghio (State Bar No. 259094)
**DINSMORE & SHOHL LLP**
655 West Broadway, Suite 800
San Diego, CA 92101
Telephone:  619.400.0500
Facsimile:  619.400.0501
christopher.celentino@dinsmore.com
yosina.lissebeck@dinsmore.com
christopher.ghio@dinsmore.com

Tyler Powell (Ky. Bar No. 90520 – Admitted pro hac vice)
**DINSMORE & SHOHL, LLP**
100 West Main Street, Suite 900
Lexington, KY  40507
Telephone:  859-425-1056
Facsimile:  859-425-1099
tyler.powell@dinsmore.com

Special Counsel to Richard A. Marshack,
Trustee of the LPG Liquidation Trust

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SANTA ANA DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| The Litigation Practice Group P.C., | Case No. 8:23-bk-10571-SC<br>Adv No. 8:25-ap-_____-SC |
| Debtor. | |
| Richard A. Marshack, Trustee of the LPG Liquidation Trust, | **COMPLAINT FOR:** |
| Plaintiff, | **(1) AVOIDANCE, RECOVERY, AND PRESERVATION OF TRANSFERS MADE WITHIN THE NINETY DAY PERIOD BEFORE THE PETITION DATE PURSUANT TO 11 U.S.C. §§ 547, 550, AND 551;** |
| v. | |
| Lavin Fence, Inc. dba Lavin Consulting, LLC, an inactive California corporation, and Nate Lavin dba Lavin Consulting, LLC, a California resident. | **(2) AVOIDANCE, RECOVERY, AND PRESERVATION OF POST-PETITION TRANSFERS PURSUANT TO 11 U.S.C. §§ 549, 550, AND 551;** |
| Defendants. | **(3) AVOIDANCE, RECOVERY, AND PRESERVATION OF TRANSFERS MADE WITH INTENT TO DEFRAUD PURSUANT TO 11 U.S.C. §§ 548(A)(1)(B), 550, AND 551;** |

**(4) AVOIDANCE, PRESERVATION, AND RECOVERY OF CONSTRUCTIVELY FRAUDULENT TWO-YEAR TRANSFERS PURSUANT TO 11 U.S.C. §§ 548(A)(1)(B), 550 & 551;**

**(5) AVOIDANCE, PRESERVATION, AND RECOVERY OF TRANSFERS WITHIN FOUR YEARS  PURSUANT TO 11 U.S.C. §§ 544, 550, 551; CAL. CIV. CODE §§ 3439.04(A)(2), 3439.05 AND 3439.07;**

**(6) AVOIDANCE, RECOVERY, AND PRESERVATION OF TRANSFERS MADE WITHIN FOUR YEARS PURSUANT TO 11 U.S.C. §§ 544(B), 550, AND 551; CAL. CIV. CODE §§ 3439.05, AND 3439.07**

Dept 5C
Honorable Scott C. Clarkson

For his *Complaint for (1) Avoidance, Recovery, and Preservation of Transfers Made Within the Ninety Day Period Before the Petition Date Pursuant to 11 U.S.C. §§ 547, 550, and 551; (2) Avoidance, Recovery, and Preservation of Post-Petition Transfers Pursuant to 11 U.S.C. §§ 549, 550, and 551; (3) Avoidance, Recovery, and Preservation of Transfers Made With Intent to Defraud Pursuant to 11 U.S.C. §§ 548(a)(1)(B), 550, and 551; (4) Avoidance, Preservation, and Recovery of Constructively Fraudulent Two-Year Transfers Pursuant to 11 U.S.C. §§ 548(a)(1)(B), 550 & 551; (5) Avoidance, Preservation, and Recovery of Transfers Within Four Years  Pursuant to 11 U.S.C. §§ 544, 550, 551; Cal. Civ. Code §§ 3439.04(a)(2), 3439.05 and 3439.07; and (6) Avoidance, Recovery, and Preservation of Transfers Made Within Four Years Pursuant to 11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.05, and 3439.07,* Plaintiff Richard A. Marshack, the Trustee of the LPG Liquidation Trust (the "Trustee" or "Plaintiff") in the above-captioned bankruptcy case (the "Bankruptcy Case"), alleges and avers as follows:

**STATEMENT OF JURISDICTION, NATURE OF PROCEEDING, AND VENUE**

1.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E), (H) and (O), 1334(b), and General Order No. 13-05 of the District Court for the Central District of California because this is a core proceeding arising in and/or related to the Bankruptcy Case, which is a case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), and

1  which is pending in the United States Bankruptcy Court for the Central District of California, Santa

2  Ana Division (the "Court").

3      2.    Regardless of whether this proceeding is core, non-core, or otherwise, the Plaintiff

4  consents to the entry of a final order and judgment by the Bankruptcy Court.

5      3.    Defendant is hereby notified that Rule 7008 of the Federal Rules of Bankruptcy

6  Procedure requires him to plead whether consent is given to the entry of a final order and judgment

7  by the bankruptcy court.

8      4.    Venue of this adversary proceeding properly lies in this judicial district pursuant to 28

9  U.S.C. § 1409(a) because this proceeding is related to the Debtor's pending Bankruptcy Case.

10  **THE PARTIES**

11      5.    Plaintiff, Richard A. Marshack, was the duly-appointed, qualified Chapter 11 Trustee

12  of Debtor's Estate and is now the current liquidating trustee of the LPG Liquidation Trust.

13      6.    Debtor LPG is, and at all material times was, a professional corporation organized,

14  existing, and in good standing under the laws of the State of California, with its principal place of

15  business in Tustin, California.

16      7.    Defendant Lavin Fence, Inc., dba Lavin Consulting, LLC, is, and at all material times

17  represented that it was a California corporation ("Corporation").

18      8.    Defendant Corporation may be served by first class mail postage prepaid mailed to

19  Nate Lavin at the below address.

20      9.    Defendant Nate Lavin dba Lavin Consulting, LLC, is, and at all material times

21  represented that it was, a resident of the State of California ("Mr. Lavin").

22      10.    Mr. Lavin may be served by first class mail postage prepaid mailed to him 41 Via De

23  La Valle, Lake Elsinore, CA 92532.

24      11.    Lavin Consulting, LLC executed the notes discussed herein; however, the Secretary

25  of State of California has no information for a Lavin Consulting, LLC. Upon information and belief,

26  this is a dba of either Corporation or Mr. Lavin.

27  / / /

28

# GENERAL ALLEGATIONS

## A.    The Bankruptcy Case

12.    On March 20, 2023 ("Petition Date"), Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, commencing the Bankruptcy Case.

13.    The Office of the United States Trustee ("UST") filed its *Motion by United States Trustee to Dismiss or Convert Case Pursuant to 11 U.S.C. § 1112(b)* [Bankr. Docket No. 21] and creditors Debt Validation Fund II, LLC; MC DVI Fund 1, LLC; and MC DVI Fund 2, LLC filed the *Motion by DVF and MC DVI to Dismiss Chapter 11 Case Pursuant to 11 U.S.C. §§ 105, 305, 349, & 1112, or in the Alternative Convert This Case to Chapter 7 or Appoint a Trustee* [Bankr. Docket No. 44]. On May 4, 2023, the Court entered its *Order Directing United States Trustee to Appoint Chapter 11 Trustee* [Bankr. Docket No. 58].

14.    Pursuant to the *Acceptance of Appointment as Chapter 11 Trustee* [Bankr. Docket No. 63], on May 8, 2023, Trustee accepted his appointment as the Chapter 11 Trustee in the Bankruptcy Case. The Court approved the Trustee's appointment in its *Order Approving the U.S. Trustee's Application for the Appointment of a Chapter 11 Trustee* [Docket No. 65].

15.    Trustee was not appointed until after events of the case and, therefore, bases these allegations on information and belief. *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) ("The *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible."); *Miller v. City of Los Angeles*, 2014 U.S. Dist. LEXIS 198871, 2014 WL 12610195, at *5 (C.D. Cal. Aug. 7, 2014) (recognizing that the plaintiff's "information and belief" pleading was allowed and "necessary at times"); *see also Mireskandari v. Daily Mail and General Trust PLC*, 2013 U.S. Dist. LEXIS 194437, 2013 WL 12129642, at *4 (C.D. Cal. July 31, 2013) ("The Federal Rules of Civil Procedure allow parties to plead facts on 'information and belief' if the facts 'will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.'" (citations omitted)).

16.    Pursuant to the *Order Confirming Modified First Amended Joint Chapter 11 Plan of*

*Liquidation* entered September 9, 2024, and the *Notice of Occurrence of Effective Date of Modified First Amended Joint Chapter 11 Plan of Liquidation* filed September 24, 2024, Richard A. Marshack became the Liquidating Trustee of the LPG Liquidation Trust, effective September 24, 2024. [Bankr. Docket Nos. 1646 & 1762].

17.    All claims have been transferred to the Liquidating Trust pursuant to the confirmed plan and Plaintiff brings this action solely in his capacity as the Liquidating Trustee of the LPG Liquidation Trust, for the benefit of Debtor's Estate and its creditors.

**B.    Protective Order**

18.    On or about May 2, 2024, Plaintiff filed that certain Notice and Motion for Entry of Protective Order (the "Protective Order").

19.    On June 3, 2024, the Court entered its *Order Granting Motion for Entry of Protective Order and the Protective Order* [Bankr. Docket No. 1270] (the "Protective Order"). A true and accurate copy of the Protective Order is attached as **Exhibit 1**, and incorporated herein.

20.    By its own terms, the Protective Order applies to this adversary proceeding and governs all discovery conducted herein.

**C.    LPG's Ownership and Management**

21.    Prior to the Petition Date, LPG operated a law firm for consumers across the country who sought assistance in contesting or resolving debts they would identify. At all relevant times, LPG was controlled and operated by the individual named Tony Diab ("Diab").

22.    The consumers would pay LPG over a period of time via monthly debits from their bank accounts.

23.    The monthly payments were meant to cover all legal services LPG provided to the consumers including validation of the debts, review of documents to determine enforceability, and court appearances to halt lawsuits to obtain judgments.

24.    In certain instances, LPG would file a lawsuit in an effort to eliminate a disputed debt or to prosecute affirmative claims held by the consumers.

25.    LPG mismanaged the consumers' monthly payments.

26.    Diab and other defendants devised a plan to fraudulently transfer funds, client files,

client funds and assets in the form of ACH Receivables (the "ACH Receivables" or "Accounts Receivable") out of LPG to third parties prior to the filing of bankruptcy.

27.    To obtain consumer clients, LPG contracted with marketing companies, who engaged in illegal capping and would advertise or call to solicit consumers to become clients of LPG in exchange for a percentage of the ACH Receivables collected by LPG from the consumers. The marketing affiliate went so far as to assist with the execution of an engagement letter between the consumer and LPG.

28.    In exchange, LPG agreed to pay the marketing affiliates a percentage the monthly payments collected by LPG from the consumers.

29.    Because LPG received payments from consumers over time, it often sought financing by borrowing against its future cash flows. This borrowing was not only used to finance operations at LPG, but also to pay the fees owed to the marketing companies for providing the client referrals.

30.    Many of the documents executed in connection with such financing described the transactions as accounts receivable purchase agreements.

31.    Diab used entities he controlled including, without limitation, Vulcan Consulting, LLC ("Vulcan") and B.A.T., Inc. dba Coast Processing ("Coast") to process payments from LPG consumer clients and to divert LPG consumer funds and ACH Receivables. Diab would use numerous ACH processing companies in order to easily transfer millions of dollars from Debtor to these entities he controlled, without oversight or detection, and to avoid payment disputes and complications. The money that flowed from Debtor through these bank account to Defendants consisted of Client Funds that Debtor funneled to these entities by means of the ACH processing companies. Debtor also made deposits into these entities bank account such that they received Client Funds directly from Debtor in addition to direct Accounts Receivable.

**D.    Ponzi Scheme Presumption**

32.    The Ponzi Scheme Presumption exists in bankruptcy proceedings.

33.    The Ponzi Scheme Presumption can be utilized to establish a debtor's "intent to defraud future undertakers [investors] from the mere fact that a debtor was running a Ponzi scheme. Indeed, no other reasonable inference is possible. A Ponzi scheme cannot work forever. The investor

pool is a limited resource and will eventually run dry. The perpetrator must know that the scheme will eventually collapse as a result of the inability to attract new investors. The perpetrator nevertheless makes payments to present investors, which, by definition, are meant to attract new investors. He must know all along, from the very nature of his activities, that investors at the end of the line will lose their money. Knowledge to a substantial certainty constitutes intent in the eyes of the law," *cf. Restatement (Second) of Torts § 8A* (1963 & 1964), and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them. *Kirkland v. Rund (In re EPD Inv. Co., LLC)*, 114 F.4th 1148, 1153 (9th Cir. 2024) (by definition Ponzi scheme is destined to fail and the swindler and their entities often end in bankruptcy or equitable receivership); *Cf. Coleman Am. Moving Servs., Inc. v. First Nat'l Bank & Trust Co. (In re American Properties, Inc.)* 14 B.R. 637, 643 (Bankr. D. Kan. 1981) (intentionally carrying out a transaction with full knowledge that its effect will be detrimental to creditors is sufficient for actual intent to hinder, delay or defraud within the meaning of § 548(a)(1))." *Merrill v. Abbott (In re Independent Clearing House Co.)* (D. Utah 1987) 77 B.R. 843, 860. A trustee in bankruptcy is not required to show that an operator of a Ponzi scheme was subjectively aware his Ponzi scheme was destined to fail. *In re EPD Inv. Co., LLC*, 114 F.4th at 1153 ("[a] trustee's action to recover assets fraudulently conveyed in the course of a Ponzi scheme does not require that the trustee also prove the Ponzi-scheme operator was subjectively aware his Ponzi scheme was destined to fail.").

34.    "But if all the debtor receives in return for a transfer is the use of the defendant's money to run a Ponzi scheme, there is nothing in the bankruptcy estate for creditors to share. In fact, by helping the debtor perpetuate his scheme, the transfers exacerbate the harm to creditors by increasing the amount of claims while diminishing the debtor's estate. In such a situation, the use of the defendant's money cannot objectively be called 'reasonably equivalent value.'" *In re Independent Clearing House Co.* 77 B.R. at 859. Therefore, "[t]he trustee can avoid the transfers if they were preferential or fraudulent. Transfers to investors in a Ponzi scheme are preferential and fraudulent. Therefore, they constitute "property of the estate," and the trustee can recover them. *Id.* at 853 n.17 (citations omitted).

35.    Debtor was operating a Ponzi scheme that utilized affiliates and several other entities

as investors/lenders to continue its unlawful business practices by using funds provided by current investors to attract new investors hoping for very high returns. Therefore, the Debtor was running a Ponzi scheme and the Ponzi Scheme Presumption can be utilized to infer that the Debtor had the intent to defraud investors within the meaning of 11 U.S.C. section 548(a)(1). This is evidenced by the Court in this Bankruptcy Case declaring that Debtor was operating a Ponzi scheme when it stated the following:

> It is important to note that this Court has never received any significant and trustworthy evidence that Debtor accomplished meaningful results for its clients, but only anecdotal examples of viable success for its clients. By reviewing the Estate's claims register, there is evidence of consumer claims for the fraud and demanded but undelivered refunds of approximately $500 million. There is ample evidence that the pre-petition Debtor never placed the collected funds into an attorney-client trust account, and that Debtor or its principals simply looted the payments received through the client automatic withdrawals, stiffing both the clients and outside attorneys who may have been working on client cases with the hopes of being paid. There is also evidence before the Court that Debtor was running a Ponzi scheme and paying some outside (or "network") attorneys with funds obtained from new clients. In this case, it appears that some of the "lenders" may have been serving as "investors," hoping for very high returns before "the music stopped." The Ninth Circuit has recently explained, "[b]y definition, a Ponzi scheme is destined to fail because the pool of available investors is not limitless. When the Ponzi scheme operator's pool of investors inevitably runs dry, the scheme collapses and the swindler and their entities often end up in bankruptcy or equitable receivership. *See generally* David R. Hague, Expanding the Ponzi Scheme Presumption, 64 DePaul L. Rev. 867 (2015). In bankruptcy, the court-appointed trustee is tasked with taking immediate control of the entity, ceasing ongoing fraudulent activity, locating and collecting assets for the bankruptcy or receivership estate, and achieving a final, equitable distribution of the remaining assets. *See* 11 U.S.C. § 704; *Kirkland v. Rund (In re EPD Inv. Co., LLC)*, 2024 U.S. App. LEXIS 21363, at *15 (9th Cir. Aug. 23, 2024). Finally, there is evidence that Debtor was encumbering (or as some creditors assert, "double or triple selling") their accounts or receivables to multiple lenders. With respect to Greyson's requested Administrative Claim [Dk. 676], and as more fully described in the concurrently entered order denying the claim, there has been no evidence presented that any work allegedly performed by Greyson assisted any clients or added any value to the Estate.

*See, Case 8:23-bk-10571-SC*, Doc 1545 n. 5.

36.     The Ponzi Scheme Presumption establishes a debtor's "intent to defraud future undertakers [investors] from the mere fact that a debtor was running a Ponzi scheme." *Merrill v. Abbott* (*In re Independent Clearing House Co*.), 77 B.R. 843, 860 (D. Utah 1987). "Knowledge to a substantial certainty constitutes intent in the eyes of the law, *cf. Restatement (Second) of Torts* § 8A (1963 & 1964), and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them." *Id*. A trustee in bankruptcy is not required to show that an operator of a Ponzi scheme was subjectively aware his Ponzi scheme was destined to fail. *In re EPD Inv. Co., LLC*, 114 F.4th at 1153 (9th Cir. 2024).

37.     "[I]f all the debtor receives in return for a transfer is the use of the defendant's money to run a Ponzi scheme, there is nothing in the bankruptcy estate for creditors to share." *In re Independent Clearing House Co.* 77 B.R. at 859. In such a situation, the use of the defendant's money cannot objectively be called "reasonably equivalent value." *Id*. Therefore, "[t]he trustee can avoid the transfers if they were preferential or fraudulent. Transfers to investors in a Ponzi scheme are preferential and fraudulent. Therefore, they constitute 'property of the estate,' and the trustee can recover them." *Id*. at 853 n.17 (citations omitted).

38.     Based on the Ponzi Scheme presumption the Court can infer that the Debtor had the intent to defraud investors within the meaning of 11 U.S.C. § 548(a)(1). Since the transfers to the Defendant were made with the intent to further the Ponzi scheme, the Debtor did not receive an objectively reasonable equivalent value for such transfers, and the Trustee can avoid any such transfers because they were actually fraudulent as to the Debtor's creditors..

**E.    Prepetition Litigation and Creditors**

39.     Debtor's Schedule E/F, filed on April 4, 2023, as Dk. No. 33, lists: (a) 11 unsecured creditors with priority unsecured claims totaling $374,060.04; and (b) 58 nonpriority unsecured creditors with scheduled claims totaling $141,439,158.05.

40.     The claims register in this Bankruptcy Case includes 2,554 proofs of claim, totaling in excess of $424 million of claims asserted against the Estate.

41.     At least 14 UCC-1 statements were of record securing alleged debts of the Debtor as of the Petition Date. These statements either reflected secured liens against the Debtor's assets then

1  owned or thereafter acquired or provided evidence of the assignment or sale of substantial portions

2  of the Debtor's future income. They secured the repayment of the following claimed amounts that

3  are currently known to Trustee and are allegedly owed by the Debtor: (a) $2,374,004.82 owed to

4  Fundura Capital Group as evidenced by Proof of Claim No. 335 purportedly secured by a UCC

5  statement filed on or about May 19, 2021; (b) approximately $15 million dollars owed to MNS

6  Funding, LLC as evidenced by Proof of Claim No. 1060 purportedly secured by a UCC statement

7  filed on or about May 28, 2021; (c) approximately $5,000,000 owed to Azzure Capital, LLC as

8  evidenced by Proof of Claim No. 127 purportedly secured by a UCC statement filed on or about May

9  28, 2021; and (d) approximately $1.5 million dollars owed to Diverse Capital, LLC purportedly

10  secured by UCC statements filed on or about September 15, 2021, and December 1, 2021.

11      42.    Debtor's balance sheets for the 36 months ending December 31, 2021, show

12  approximately $17,900,000 in total assets at its highest point in November 2021. This amount is

13  significantly less than the $424 million of claims filed.

14      43.    Debtor's Statement of Financial Affairs, filed on April 4, 2023, as Dk. No. 34, reflects

15  15 pending lawsuits against Debtor as of the Petition Date. The lawsuits date back to October 18,

16  2021 (*Fundura v. The Litigation Practice Group P.C. et al.*, Supreme Court of New York Index No.

17  613192-2021) and are as recent as March 10, 2023 (*Diverse Capital LLC v. The Litigation Practice

18  Group P.C. et al.*, Supreme Court of New York Index No. 135614-2023).

19  **F.    Debtor's Insolvency**

20      44.    Debtor was insolvent when the Transfers occurred as evidenced by: (a) the 14 UCC-

21  1 statements reflecting secured liens against the Debtor's owned and after-acquired assets and the

22  assignment or sale of substantial portions of the Debtor's future income; (b) the priority and non-

23  priority unsecured debt of nearly $142 million listed in Debtor's schedules; (c) the $424 million of

24  creditor claims filed in this Bankruptcy Case; and (d) Debtor's balance sheets reflecting, at its highest

25  point, $17.9 million of assets in November 2021.

26      45.    Moreover, insolvency is presumed as a matter of law where, as in this Bankruptcy

27  Case, the debtor operated a Ponzi scheme. *See, e.g., Glob. Money Mgmt., L.P. v. McDonnold*, No.

28  06CV34, 2008 U.S. Dist. LEXIS 128733, at *15 (S.D. Cal. Feb. 27, 2008) (concluding that "if a

1    Ponzi scheme is proven, then the debtor is proven insolvent from the time of its inception").

2                                    **SPECIFIC ALLEGATIONS**

3         46.    Beginning in 2022, the Debtor began borrowing money from multiple third parties

4    pursuant to loan agreements administered by Spot On Consulting, Inc. ("Spot On"). Upon information

5    and belief, Spot On or any other party that referred a lender to the Debtor and Spot On received a

6    commission of a percentage of the principal amount of the loan.

7         47.    The Debtor and the third-party lender executed a loan agreement (generally "Spot On

8    Notes") that Spot On joined as an "administrative liaison/servicing company."  The terms of the Spot

9    On Notes could vary, but typically they provided that the lender would lend a fixed amount to the

10   Debtor. The Debtor, in turn, would pay eight to ten percent interest **per month** on the principal

11   amount of the loan for twelve or twenty-four months. At maturity, the Debtor promised to repay the

12   lender the entire principal amount of the Spot On Note.

13        48.    By borrowing under these terms, the Debtor was obligating itself to repay each lender

14   two to four times the amount that was borrowed. The Debtor "borrowed" hundreds of thousands of

15   dollars through the Spot On Notes **each week** beginning in the fall of 2022.

16        49.    Upon information and belief, some Spot On Notes may not document a true loan

17   transaction where the principal amount of the note was lent to the Debtor. In some instances, the

18   Trustee believes that the principal balance of some Spot On Notes may represent an amount that was

19   owed to the holder from another transaction or investment with the Debtor or related entity that was

20   converted into a Spot On Note to extend the time to repay the amount owed.

21        50.    In some instances, lenders would have multiple outstanding Spot On Notes between

22   them and the Debtor at the same time. Upon information and belief, the existence of multiple Spot

23   On Notes by one lender may not be evidence of actual funds advanced to the Debtor.

24        51.    Upon information and belief, when the Debtor first began making payments to lenders

25   on the Spot On Notes, it made a lump sum payment to Spot On equal to the total amount needed to

26   pay the installments due to the lenders for that week. Spot On would then pay the individual lenders

27   from its bank account. Upon information and belief, Spot On disbursed payments from two bank

28   accounts it held at JPMorgan Chase Bank with account numbers ending in XX7662 and XX2777

("Accounts").

52.    Ultimately, the Debtor was not able to pay Spot On a sufficient amount from its operations to make the weekly payments to the holders of the Spot On Notes. After this, upon information and belief, Spot On began using funds it obtained the execution of new Spot On Notes to make payments owed on existing Spot On Notes.

53.    The funds deposited in the Spot On account pursuant to new Spot On Notes was the Debtor's property as the Debtor had borrowed the money and was entitled to the use of it.

54.    The Debtor may have also made payments directly to the holders of Spot On Notes from its own bank accounts or the bank accounts of a related entity.

55.    Upon information and belief, payments to lenders on account of the Spot On Notes may have continued after the Petition Date.

56.    The Defendant executed one or more Spot On Notes with the Debtor in 2022 and/or 2023 (collectively "Defendant Note(s)"). A true and accurate copy of one of the Defendant Note(s) is attached hereto as **Exhibit 2.**

57.    The payments made to the Defendant known to the Trustee are set forth on **Exhibit 3**. Exhibit 3 includes payments made to the Defendant from Spot On and from the Debtor, if any. These payments are collectively referred to as the "Transfers."

58.    All Transfers on Exhibit 3 may not relate to the Defendant Note, and the Trustee may have filed a separate adversary against the Defendant based on other transactions or relationships it had with the Debtor. All Transfers to Defendant known to the Trustee are listed on Exhibit 3 out of an abundance of caution, but the relief sought in this Complaint is limited to those Transfers involved or connected with Spot On.

59.    After the Debtor filed for bankruptcy, the Defendant, and many other holders of Spot On Notes, assigned and transferred their Spot On Notes to Affirma, LLC ("Affirma"). On June 28, 2023, Affirma filed Proof of Claim No. 91 in the original amount of $66,855,310.45 (as amended the "Affirma Claim").

60.    The Trustee has filed a separate adversary against Affirma that seeks to avoid the Debtor's execution of the Spot On Notes as a fraudulent or voidable conveyance under applicable

1  law. This action only seeks to recover the payments made to the Defendant prior to the assignment

2  of the Defendant Note to Affirma. Accordingly, the Court's ruling on the claims asserted against

3  Affirma in its adversary will impact what claims and defense may be asserted in this action.

4  <u>**COUNT ONE**</u>

5  **Avoidance, Recovery, and Preservation of Transfers Made Within the Ninety Day Period**

6  **Before the Petition Date**

7  **[11 U.S.C. §§ 547, 550, and 551]**

8  61.    Plaintiff realleges and incorporates by reference each and every allegation contained

9  in the preceding paragraphs as though set forth in full herein.

10  62.    In the ninety-day period preceding the Petition Date, the Debtor made or caused to be

11  made one or more Transfers to the Defendant (collectively "90 Day Transfers"). These 90 Day

12  Transfers are identified on Exhibit 3.

13  63.    The 90 Day Transfers were paid to the Defendant on account of a preexisting debt

14  owed to that Defendant.

15  64.    The 90 Day Transfers were made to or for the benefit of a creditor within the meaning

16  of 11 U.S.C. § 547(b)(1) because the 90 Day Transfers were payments made on account of debts

17  nominally owed by the Debtor.

18  65.    A transfer of the Debtor's assets occurred when the 90 Day Transfers were paid to the

19  Defendant.

20  66.    The 90 Day Transfers were made on account of antecedent debt nominally owed by

21  the Debtor to the Defendant due to an "investment" or other document evidencing indebtedness. The

22  Debtor's payment obligations to the transferees constituted a "debt" (as defined in the Bankruptcy

23  Code).

24  67.    The 90 Day Transfers occurred when the Debtor actually was insolvent. However,

25  Plaintiff is also entitled to the presumption of insolvency when the 90 Day Transfers were made

26  pursuant to 11 U.S.C. § 547(f).

27  68.    The 90 Day Transfers were made in the ninety-day period before the Petition Date.

28  69.    To the extent any transfers were made by the Debtor to the Defendant within the

1 ninety-day period preceding the Petition Date and are not identified herein, Plaintiff reserves the right
2 to avoid and recover such transfers pursuant to 11 U.S.C. §§ 547 and 550.

3      70.     As the holder of an unsecured claim(s) or as party who has not filed a claim, the
4 payment of the 90 Day Transfers to the Defendant enabled it to recover more than it would have
5 received if: (i) the Debtor's case was under chapter 7 of the Bankruptcy Code; (ii) the 90 Day
6 Transfers had not been made; and (iii) the debts owed to the Defendant upon which payments were
7 made were paid pursuant to the provisions of the Bankruptcy Code. As evidenced by the Debtor's
8 schedules filed in the underlying Bankruptcy Case, as well as the proofs of claim that have been
9 received to date, the Debtor's liabilities exceed its assets to the point that unsecured creditors will not
10 receive a full payout of their claims from the Debtor's bankruptcy estate.

11      71.     In accordance with the foregoing, the 90 Day Transfers are avoidable pursuant to 11
12 U.S.C. § 547(b), and may be recovered and preserved for the benefit of the estate pursuant to 11
13 U.S.C. §§ 550 and 551.

14                              **COUNT TWO**

15      **Avoidance, Recovery, and Preservation of Post-Petition Transfers**

16                     **[11 U.S.C. §§ 549, 550, and 551]**

17      72.     Plaintiff realleges and incorporates by reference each and every allegation contained
18 in the preceding paragraphs as though set forth in full herein.

19      73.     This is an action to pursuant to 11 U.S.C. §§ 549 and 550 to avoid and recover
20 unauthorized post-petition transfers made by Debtor to the Defendant ("Post-Petition Transfers").

21      74.     To the extent any Post-Petition Transfers were made by the Debtor to the Defendant
22 and are not identified herein, Plaintiff reserves the right to amend the Complaint to identify the Post-
23 Petition Transfers and seek the avoidance and recovery of them pursuant to 11 U.S.C. §§ 549 and
24 550.

25      75.     Those Post-Petition transfers to Defendant that are known to the Trustee at this time
26 are identified on **Exhibit 3** hereto.

27 / / /

28

**COUNT THREE**

**Avoidance, Recovery, and Preservation of Transfers Made With Intent to Defraud**

**[11 U.S.C. §§ 548(a)(1)(B), 550, and 551]**

76. Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though set forth in full herein.

77. The Transfers were property of the Debtor's Estate prior to their conveyance to the Defendant. The Transfers to the Defendant made within two years of the Petition Date are identified on Exhibit 3 ("Two-Year Transfers").

78. When the Two-Year Transfers were made, the Debtor was indebted to the Prepetition Creditors and Defendant.

79. The Two-Year Transfers occurred when the Debtor was insolvent or was rendered insolvent as a result of the Transfers.

80. The Two-Year Transfers to the Defendant were made with actual intent to hinder, delay or defraud the creditors of Debtor because the Debtor's borrowing through the Spot On Notes was a Ponzi scheme. This fact permits the Court to infer that the Debtor's intent was fraudulent within the meaning of 11 U.S.C. section 548(a)(1).

81. The Two-Year Transfers are avoidable as fraudulent pursuant to 11 U.S.C. §§ 548(a)(1)(A), 550, and 551 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against Debtor's Estate under 11 U.S.C. § 502, or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

82. The Two-Year Transfers should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(A), and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

**COUNT FOUR**

**Avoidance, Preservation, and Recovery of Constructively Fraudulent Two-Year Transfers**

**11 U.S.C. §§ 548(a)(1)(B), 550 & 551**

83. Plaintiff realleges and incorporates by reference each and every allegation contained

1  in the preceding paragraphs as though set forth in full herein.

2       84.    The Two-Year Transfers were made within two years of the Petition Date.

3       85.    Debtor did not receive reasonably value in exchange for the Two-Year Transfers

4  because (i) the Debtor was not liable on the debts originally owed to the Defendant, (ii) the debts

5  allegedly owed to Defendant arose from investments in the Debtor or entities related to the Debtor

6  that were subsequently treated as the Debtor's debt, or (iii) the obligations to the Defendant were

7  usurious and unenforceable as a matter of law.

8       86.    The Two-Year Transfers were made at a time when Debtor was insolvent and/or

9  rendered insolvent by virtue of said transfers.

10      87.    When the Two-Year Transfers occurred, Debtor's business was undercapitalized, and

11  Debtor was engaged in business for which its capital was unreasonably small.

12      88.    When the Two-Year Transfers occurred, Debtor had incurred or was about to incur

13  debts that were beyond its ability to pay. The allegations in the preceding paragraphs are supported

14  by the fact that the Debtor was consistently borrowing money from merchant cash advance lenders,

15  purporting to sell the same groups of receivables to multiple parties, and as of August 2022 had begun

16  a separate Ponzi scheme of borrowing through the Spot On Notes as discussed herein.

17      89.    At the time each Two-Year Transfer was made, Debtor was indebted to one or more

18  creditors that held a claim against Debtor on the date of each Two-Year Transfer and on the Petition

19  Date.

20      90.    Plaintiff alleges that Defendant did not receive the Two-Year Transfers in good faith,

21  for value, and without knowledge of their avoidability.

22      91.    Each Defendant knew that the Debtor was a law firm who was required by law to

23  escrow client payments until earned. Each Defendant knew the terms of their Defendant Note, and

24  Defendant knew or should have known that the terms were usurious.

25      92.    However, the Transfers paid to Defendant were either made from (i) money borrowed

26  from new lenders in the Spot On Ponzi scheme, or (ii) client payments that had not been placed in

27  trust and earned.

28      93.    Each Defendant had to know or should have known that they were being paid with

1  funds borrowed from other lenders, or with client funds that had not been placed into trust and been

2  disbursed before they were earned.

3       94.    Each Defendant knew or should have known that were receiving payment on a debt

4  that was not valid or enforceable at law to the extent it arose from the Defendant Note.

5       95.    Based on the foregoing, Plaintiff may recover and preserve the avoided Two-Year

6  Transfers from Defendant as the initial transferee or, alternatively, as the subsequent transferee for

7  the benefit of the Estate under 11 U.S.C. §§ 550 and 551 from Defendant.

8  **<u>COUNT FIVE</u>**

9  **Avoidance, Preservation, and Recovery of Transfers Within Four Years**

10  **11 U.S.C. §§ 544, 550, 551; Cal. Civ. Code §§ 3439.04(a)(2), 3439.05 and 3439.07**

11       96.    Plaintiff realleges and incorporates by reference each and every allegation contained

12  in the preceding paragraphs as though set forth in full herein.

13       97.    Under 11 U.S.C. § 544(b)(1), Plaintiff may avoid transfers of an interest of Debtor

14  which are voidable under applicable law by an unsecured creditor of Debtor, including under

15  California Civil Code §§ 3439.04(a)(1) and 3439.05.

16       98.    The Transfers occurred within four years prior to the Petition Date.

17       99.    On or after the date that such Transfer were made, entities to which Debtor was or

18  became indebted include the Prepetition Creditors.

19       100.    Despite Debtor's obligation to the Prepetition Creditors, Debtor made the Transfers to

20  Defendant.

21       101.    The Transfers to Defendant were made with actual intent to hinder, delay or defraud

22  the creditors of Debtor as the Debtor was operating a Ponzi scheme through its borrowing from Spot

23  On.

24       102.    Defendant's conduct relating to the Transfers was done with oppression, fraud and

25  malice, as defined in California Civil Code section 3294, entitling Plaintiff to exemplary and punitive

26  damages.

27       103.    The Transfers are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and Cal.

28  Civ. Code §§ 3439.04(a)(1) and 3439.07 by one or more creditors who held and hold unsecured

claims against Debtor that were and are allowable against its Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

104.    Accordingly, the Transfers should be avoided as fraudulent under 11 U.S.C. §§ 544(b) and Cal. Civ. Code §§ 3439.04(a)(1) and 3439.07, and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551 and Cal. Civ. Code § 3439.07.

105.    Under 11 U.S.C. § 544(b)(1), Plaintiff may avoid transfers of an interest of Debtor which are voidable under applicable law by an unsecured creditor of Debtor, including under California Civil Code §§ 3439.04(a)(2) and 3439.05.

106.    Debtor did not receive reasonably equivalent value in exchange for the Transfers. The Transfers were made to (i) entities that were not creditors of the Debtor, (ii) entities that had made equity or other investments with the Debtor or in assets, (iii) the Defendant pursuant to an illegal agreement, and/or (iv) entities who claimed to be owed far more than any value that was ever given to the Debtor.

107.    The Transfers were made at a time when Debtor was insolvent and/or rendered insolvent by virtue of said transfers.

108.    At the time each Transfer was made, Debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of Debtor were unreasonably small in relation to the business or transaction.

109.    At the time each Transfer was made, Debtor intended to incur, or believed or reasonably should have believed that Debtor would incur, debts beyond Debtor's ability to pay as they became due.

110.    At the time each Transfer was made, Debtor was indebted to one or more creditors that held a claim against Debtor on the date of each Transfer and on the Petition Date.

111.    Plaintiff alleges that Defendant did not receive the Transfers in good faith, for value, and without knowledge of their avoidability.

112.    Defendant knew that the Debtor was a law firm who was required by law to escrow

1  client payments until earned. However, Defendant received payment either from (i) funds borrowed
2  from another lender, or (ii) from client payments that had not been placed in trust and earned.

3      113.    Each Defendant knew or should have known that were receiving payment on a debt
4  that was not valid or enforceable at law to the extent it arose from the Defendant Note.

5      114.    Based on the foregoing, Plaintiff may avoid the Transfers pursuant to 11 U.S.C. § 544
6  and California Civil Code §§ 3439.04(a)(2) and 3439.05.

7      115.    Based on the foregoing, Plaintiff may recover and preserve the Transfers from the
8  Defendant as the initial transferee or, alternatively, as the subsequent transferee for the benefit of the
9  Estate pursuant to 11 U.S.C. §§ 550 and 551, and Cal. Civ. Code § 3439.07.

10                                        **COUNT SIX**

11      **Avoidance, Recovery, and Preservation of Transfers Made Within Four Years**

12      **[11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.05, and 3439.07]**

13      116.    Plaintiff realleges and incorporates by reference each and every allegation contained
14  in the preceding paragraphs as though set forth in full herein.

15      117.    Under 11 U.S.C. § 544(b)(1), Plaintiff may avoid transfers of an interest of Debtor
16  which are voidable under applicable law by an unsecured creditor of Debtor, including under
17  California Civil Code §§ 3439.04(a)(2) and 3439.05.

18      118.    Debtor did not receive reasonably equivalent value in exchange for the Transfers as
19  (i) the Debtor was not liable on the debts owed to Defendant, (ii) the debts allegedly owed to
20  Defendant arose from equity investments in entities related to the Debtor that were subsequently
21  treated as the Debtor's debt, (iii) the Defendant pursuant to an illegal agreement, and/or (iv) entities
22  who claimed to be owed far more than any value that was ever given to the Debtor.

23      119.    The Transfers were made at a time when Debtor was insolvent and/or rendered
24  insolvent by virtue of said transfers.

25      120.    At the time each Transfer was made, Debtor was engaged or was about to engage in a
26  business or a transaction for which the remaining assets of Debtor were unreasonably small in relation
27  to the business or transaction.

28      121.    At the time each Transfer was made, Debtor intended to incur, or believed or

1 | reasonably should have believed that Debtor would incur, debts beyond Debtor's ability to pay as

2 | they became due.

3 |     122.    At the time each Transfer was made, Debtor was indebted to one or more creditors

4 | that held a claim against Debtor on the date of each Transfer and on the Petition Date.

5 |     123.    Plaintiff alleges that Defendant did not receive the Transfers in good faith, for value,

6 | and without knowledge of their avoidability.

7 |     124.    Defendant knew that the Debtor was a law firm who was required by law to escrow

8 | client payments until earned. However, Defendant received payment either from (i) funds borrowed

9 | from another lender, or (ii) from client payments that had not been placed in trust and earned.

10 |     125.    Defendant knew or should have known that were receiving payment on a debt that

11 | was not valid or enforceable at law to the extent it arose from the Defendant Note.

12 |     126.    Based on the foregoing, Plaintiff may avoid the Transfers pursuant to 11 U.S.C. § 544

13 | and California Civil Code §§ 3439.04(a)(2) and 3439.05.

14 |     127.    Based on the foregoing, Plaintiff may recover and preserve the Transfers from the

15 | Defendant as the initial transferee or, alternatively, as the subsequent transferee for the benefit of the

16 | Estate pursuant to 11 U.S.C. §§ 550 and 551, and Cal. Civ. Code § 3439.07.

17 |     WHEREFORE, Plaintiffs prays for a judgment as follows:

18 | **On the First, Second, Third, Fourth, Fifth, and Sixth Counts:**

19 |     1.    Avoiding recovering, and preserving the Transfers to the Defendant in such amounts

20 | as the Court may determine based on applicable law;

21 |     2.    Awarding pre-judgment and post-judgment as permitted;

22 |     3.    Granting any other and such further relief as the Court deems just and proper.

23 | DATED: March 17, 2025             DINSMORE AND SHOHL LLP

24 |

25 |     By: */s/ Tyler Powell*
         Yosina M. Lissebeck

26 |          Tyler Powell (*admitted pro hac vice*)
    Special Counsel to Richard A. Marshack, Trustee

27 |     of the LPG Liquidation Trust

28 |

# EXHIBIT 1

Exhibit 1
Page 21

CHRISTOPHER B. GHIO (259094)
christopher.ghio@dinsmore.com
CHRISTOPHER CELENTINO (131688)
christopher.celentino@dinsmore.com
YOSINA M. LISSEBECK (201654)
yosina.lissebeck@dinsmore.com
DINSMORE & SHOHL LLP
655 West Broadway, Suite 800
San Diego, California 92101
Tele:  619.400.0500
Fax:  619.400.0501

Sarah S. Mattingly (Ky. Bar 94257)
sarah.mattingly@dinsmore.com
DINSMORE & SHOHL, LLP
101 S. Fifth Street, Suite 2500
Louisville, Kentucky 40202
Tele: 859-425-1096
Fax: 502-585-2207
(Admitted pro hac vice)

Special Counsel to Richard A. Marshack

**FILED & ENTERED**

**JUN 03 2024**

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY mccall      DEPUTY CLERK

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

In Re

The Litigation Practice Group P.C.,

            Debtor(s),

Case No: 23-bk-10571-SC

Chapter 11

**ORDER GRANTING MOTION FOR
ENTRY OF PROTECTIVE ORDER AND
THE PROTECTIVE ORDER**

Date:    May 23, 2024
Time:    1:30 p.m.
Judge:   Hon. Scott C. Clarkson
Place:   Courtroom 5C (via Zoom)[1]
         411 West Fourth Street
         Santa Ana, CA 92701

---

[1] Video and audio connection information for each hearing will be provided on Judge Clarkson's
publicly posted hearing calendar, which may be viewed online at:
http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

Exhibit 1
Page 22

The Court has read and considered the Notice of Motion and Motion for Entry of Protective Order (the "Motion") filed by Richard A. Marshack, in his capacity as the Chapter 11 Trustee (the "Trustee") of the Bankruptcy Estate ("Estate") of The Litigation Practice Group P.C., on May 2, 2024, pursuant to Federal Rule of Bankruptcy Procedure 7026 and Federal Rule of Civil Procedure 26(c)(1), as Dk. No. 1164 ("Motion"), and has found good cause to grant the Motion.

IT IS HEREBY ORDERED that:

1.      The Motion is granted;

2.      The below Protective Order shall apply to any contested matter arising in the main bankruptcy case and in all adversary proceedings filed by or against Trustee, present and future; and

3.      Govern the discovery conducted therein.

## PROTECTIVE ORDER

**1.      DEFINITIONS**

1.1    "Confidential Information" as used in this Protective Order shall mean documents and other information (regardless of how generated, stored or maintained) that a Party or non-party reasonably believes to contain or reflect non-public financial or business information, bank records, financial records, such as social security numbers, non-public financial or personal information of a Party or non-party, account numbers, sensitive digital information and identifiers, information subject to confidentiality agreements or provisions other than this Protective Order, and other non-public research, development, or commercial information that derives value or avoids injury by virtue of not being known to the public.

1.2    This "Action" is defined and hereby means any contested matter arising in the main bankruptcy case and in all adversary proceedings filed by or against Trustee, present and future.

1.3    "Designating Party" means a Party or non-party that designates Confidential Information during the Action.

1.4    "Receiving Party" means a Party that receives Confidential Information during the Action.

Exhibit 1
Page 23

1    1.5    "Party" or "Parties" means person or entity subject to this Protective Order.

2    **2.    SCOPE OF THIS PROTECTIVE ORDER**

3    2.1    Unless otherwise ordered, this Protective Order shall govern certain documents and
4    other products of discovery obtained in the Action from the Parties there to, and from third parties.
5    As well as certain information copied or derived therefrom, excerpts, summaries or compilations
6    thereof, including, but not limited to, documents voluntarily exchanged as part of early settlement
7    discussions, documents produced pursuant to initial disclosures, requests authorized by the Federal
8    Rules of Civil Procedure made applicable herein by the Federal Rules of Bankruptcy Procedure,
9    answers to interrogatories, deposition transcripts, responses to requests for production, responses to
10    requests for admission, subpoenas, affidavits, declarations, expert reports, and other such material
11    and information as may be produced during the course of the Action and designated as Confidential
12    Information.

13    **3.    DESIGNATION OF CONFIDENTIAL INFORMATION**

14    3.1    This Protective Order shall govern the production and handling of any Confidential
15    Information in this Action. Any Party or non-party who produces Confidential Information in this
16    Action may designate it as "Confidential" or "Attorneys' Eyes Only" consistent with the terms of this
17    Protective Order. Whenever possible, the Designating Party must designate only those portions of a
18    document, written discovery responses, deposition, transcript, or other material that contain the
19    Confidential Information and refrain from designating entire documents. Regardless of any
20    designations made hereunder, the Designating Party is not otherwise restricted from use or disclosure
21    of its Confidential Information outside of this Action or for any business purposes. In addition, any
22    Party may move to modify or seek other relief from any of the terms of this Protective Order if it has
23    first tried in writing and in good faith to resolve its needs or disputes with the other Parties or Party
24    as the case may be under the terms of this Protective Order. Further, nothing in this Protective Order
25    shall prevent a Party from redacting documents consistent with the Federal Rules of Civil Procedure
26    and utilizing the documents as needed through-out the Action.

27    3.2    <u>Application to Non-Parties:</u> Before a non-party is given copies of documents or
28    materials designated as Confidential Information or Attorneys' Eyes Only as permitted hereunder, it

must first sign an acknowledgment to be bound to these terms that is attached hereto as <u>Exhibit</u> A; if it fails to do so, the Parties to this Action must resolve any such dispute before making disclosure of designated information as permitted hereunder to the non-party. If a non-party wishes to make designations hereunder, it must first sign attached <u>Exhibit A.</u>

3.3    <u>Timing and Provisional Protection:</u> Designations of Confidential Information may be made at any time. To avoid potential waiver of protection hereunder, the Designating Party should designate documents or materials containing Confidential Information at the time of production or disclosure, including on the record during the taking of any deposition. Deposition testimony will be deemed provisionally protected for a period of thirty (30) days after the transcript is released to the Parties by the court reporter, although the Parties may agree at any time to different timelines of provisional protection of information as Confidential or Attorneys' Eyes Only as part of one or more specific depositions. To retain any designations beyond the provisional period, a Designating Party must designate specific pages and lines of deposition testimony before the provisional period has expired. Such designations must be made in writing so that all counsel and court reporters may append the designation to all copies of the transcripts.

3.4    <u>Manner of Designation:</u> Confidential Information may be designated hereunder in any reasonable manner or method that notifies the Receiving Party of the designation level and identifies with specificity the information to which the designation applies. If made verbally, the Designating Party must promptly confirm the designation in writing. Whenever possible, the Designating Party should stamp, affix, or embed a legend of "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY" on each designated page of the document or electronic image that contains Confidential Information.

**4.    CHALLENGES TO DESIGNATED INFORMATION**

4.1    In the event that a Receiving Party disagrees at any time with any designation(s) made by the Designating Party, the Receiving Party must first try to resolve such challenge in good faith on an informal basis with the Designating Party. The Receiving Party must provide written notice of the challenge and the grounds therefor to the Designating Party, who must respond in writing to the challenge within fifteen (15) days. At all times, the Designating Party carries the burden of establishing the propriety of the designation and protection level. Unless and until the challenge is

1  resolved by the Parties or ruled upon by the Court, the designated information shall remain protected

2  under this Protective Order. The failure of any Receiving Party to challenge a designation does not

3  constitute a concession that the designation is proper or an admission that the designated information

4  is otherwise competent, relevant, or material.

5      **5.      LIMITED ACCESS/USE OF PROTECTED INFORMATION**

6      5.1    <u>Restricted Use:</u> Information that is produced or exchanged in the course of the Action

7  and designated under this Protective Order may be used for preparation for trial and preparation for

8  any appeal of any and all matters in the Action, as well as related settlement negotiations, and for no

9  other purpose, without the written consent of the Designating Party. No Confidential Information may

10  be disclosed to any person except in accordance with the terms of this Protective Order, unless the

11  parties are co-counsel or have entered into joint defense agreements. All persons in possession of

12  Confidential Information agree to exercise reasonable care with regard to the custody, use, or storage

13  of such information to ensure that its confidentiality is maintained. This obligation includes, but is

14  not limited to, the Receiving Party providing to the Designating Party prompt notice of the receipt of

15  any subpoena that seeks production or disclosure of any designated information and consulting with

16  the Designating Party before responding to the subpoena. Any use or disclosure of Confidential or

17  Attorneys' Eyes Only information in violation of the terms of this Protective Order may subject the

18  disclosing person or party to sanctions.

19      5.2    <u>Access to "Confidential" Information:</u> The Party(ies) and all persons subject to this

20  Protective Order agree that information designated as "CONFIDENTIAL" may only be accessed or

21  reviewed by the following:

22      a)      The Court, its personnel, and court reporters;

23      b)      Counsel of record, or co-counsel for any Party, or other party that has entered into a

24  joint defense agreement in the Action and their employees who assist counsel of record, or co-counsel

25  in the Action and are informed of the duties and obligations imposed hereunder;

26      c)      The Parties, including their clients, agents and employees who are assisting or have

27  reason to know of the Action;

28  / / /

d) Experts or consultants employed by the Parties or their counsel, or co-counsel, for purposes of an Action, so long as each such expert or consultant has signed attached Exhibit A; and

e) Other witnesses or persons with the Designating Party's consent or by court order.

5.3 Access to "Attorneys' Eyes Only" Designations: The Parties and all persons subject to this Protective Order agree that information designated as "ATTORNEYS' EYES ONLY" may only be accessed or reviewed by the following:

a) The Court, its personnel, and court reporters;

b) Counsel of record, or co-counsel for any Party, or other party that has entered into a joint defense agreement in the Action and their employees who assist counsel of record in the Action and are informed of the duties hereunder;

c) In-house counsel for any Party in the Action and Richard A. Marshack, as Chapter 11 Trustee of The Litigation Practice Group P.C. who is informed of the duties and obligations imposed hereunder;

d) Experts or consultants employed by the Parties or their counsel, or co-counsel for purposes of the Action, and so long as each such expert or consultant has signed attached Exhibit A; and

e) Other witnesses or persons to whom the Designating Party agrees in advance of disclosure or by court order.

5.4 Non-Waiver Effect of Designations: Neither the taking of, nor the failure to take, any action to enforce the provisions of this Protective Order, nor the failure to object to any designation, will constitute a waiver of any Party(ies)'s claim or defense in the Action or any other action or proceeding, including, but not limited to, a claim or defense that any designated information is or is not Confidential, is or is not entitled to particular protection, or embodies or does not embody information protectable by law.

5.5 In-Court Use of Designated Information: If information designated under this Protective Order will or may be offered in evidence at a hearing or trial related to any matter in the Action, then the offering party must give advance notice to the party or non-party that designated prior to offering the information so that any use or disclosure may be addressed in accordance with

6

Exhibit 1
Page 27

the Court's case-management or other pre-trial order, or by a motion *in limine.* Nothing in this Protective Order shall be construed as a waiver by a Party of any objections that may be raised as to the admissibility at trial of any evidentiary materials.

**6.    CLAW-BACK REQUESTS**

6.1    <u>Failure to Make Designation:</u>  If, at any time, a Party or non-party discovers that it produced or disclosed Confidential Information without designation, it may promptly notify the Receiving Party and identify with particularity the Confidential Information to be designated and the level of designation (the claw-back notification). The Receiving Party may then request substitute production of the newly-designated information. Within thirty (30) days of receiving the claw-back notification, the Receiving Party must: (1) certify to the Designating Party it has appropriately marked or, if substitute production has been requested, destroyed all unmarked copies that it received, made, and/or distributed; and (2) if it was practicably unable to mark or destroy any information because disclosures occurred while the Receiving Party was under no duty of confidentiality under the terms of this Protective Order regarding that information, the Receiving Party must reasonably provide as much information as practicable to aid the Designating Party in protecting the information, consistently with the Receiving Party's attorney-client, work-product, and/or trial-preparation privileges.

6.2    <u>Inadvertent Production of Privileged Information:</u> If, at any time, a Party discovers that it produced information that it reasonably believes is subject to protection under the attorney/client, work-product, or trial-preparation privileges, then it must promptly notify each Receiving Party of the claim for protection, the basis for it, amend its privilege log accordingly, and comply with Fed. R. Civ. P. 26(b)(5). Whenever possible, the producing party must produce substitute information that redacts the information subject to the claimed protection. The Receiving Party must thereupon comply with Fed. R. Civ. P. 26(b)(5)(B) as to the information subject to the claimed protection.

/ / /

/ / /

/ / /

**7.    DURATION/CONTINUED RESTRICTIONS**

7.1    <u>Handling of Designated Information Upon Conclusion of the Main Bankruptcy Case:</u>
Upon conclusion of the Main Bankruptcy Case, by way of dismissal or closing of the case, the Designating Party(ies) is/are responsible for ensuring that any Party or person to whom the Designating Party shared or disclosed designated information in any of the matters under the Action returns or destroys all of its copies, regardless of the medium in which it was stored. No witness or Party may retain designated information that it received from any other Party or non-party under this Protective Order; only counsel of record, or co-counsel, are the authorized agents who may retain one copy for their respective legal files, and who must also describe to the Designating Party the extra steps taken to protect its legal file containing paper and/or electronic copies of the designated information so that it is not accessed, used, or disclosed inconsistently with the obligations under this Protective Order. This provision does not apply to the Court or Court staff. Moreover, this provision does not apply to Trustee, who may retain and use – consistent with this Order – Confidential Information received in any Action during the entirety of the Bankruptcy.

7.2    <u>Continued Restrictions Under this Protective Order:</u> The restrictions on disclosure and use of Confidential Information shall survive the conclusion of the Bankruptcy case and any matter in the Action.

**8.    PRIVILEGED OR PROTECTED INFORMATION**

8.1    Nothing in this Protective Order shall require disclosure of information that is protected by the attorney-client privilege, the work-product protection, or any other legally cognizable privilege (a "Privilege or Protection").  If information subject to a claim of Privilege or Protection is inadvertently produced, pursuant to Federal Rule of Evidence 502(d) such production shall not constitute a waiver of, or estoppel as to, any claim of Privilege or Protection for such information or any other information that may be protected from disclosure by a Privilege or Protection in any proceeding.

8.2    If a Party receives a document that appears to be subject to a Privilege or Protection, then it shall refrain from examining the document any more than is essential to ascertain if it is privileged or protected and shall promptly notify the producing Party in writing that the receiving

8

Exhibit 1
Page 29

Party possesses material that appears to be subject to a Privilege or Protection. The producing Party shall have seven (7) days after receiving such notice to assert a Privilege or Protection over the identified material. If the producing Party does not assert a claim of Privilege or Protection within the seven (7)-day period, the material in question shall be deemed not privileged or protected.

8.3    If a producing Party has produced a document subject to a claim of Privilege or Protection, upon written request by the producing Party, the document for which a claim of Privilege or Protection is made shall be sequestered or destroyed to the extent reasonably practicable, and the receiving Party shall not use the document for any purpose other than in connection with analyzing or disputing a claim of Privilege or Protection or in connection with a motion to compel the production of the document.

8.4    The receiving Party sequestering or destroying such material may then move the Court for an order compelling production of the material. The applicable producing Party bears the burden of establishing the applicable Privilege or Protection of any clawed-back document or information as and to the same extent that it would have borne such burden had it not produced the document or information.  Nothing in this Protective Order shall limit the Court's right or any receiving Party's right to request an in camera review of any information subject to a claim of Privilege or Protection.

###

Date: June 3, 2024

Scott C. Clarkson
United States Bankruptcy Judge

Exhibit 1
Page 30

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT "A"

1  Christopher B. Ghio (State Bar No. 259094)
   Christopher Celentino (State Bar No. 131688)
2  Yosina M. Lissebeck (State Bar No. 201654)
   **DINSMORE & SHOHL LLP**
3  655 West Broadway, Suite 800
   San Diego, CA 92101
4  Telephone:  619.400.0500
   Facsimile:  619.400.0501
5  christopher.ghio@dinsmore.com
   christopher.celentino@dinsmore.com
6  yosina.lissebeck@dinsmore.com

7  Sarah S. Mattingly (Ky. Bar 94257)
   DINSMORE & SHOHL, LLP
8  101 S. Fifth Street, Suite 2500
   Louisville, KY 40202
9  Telephone: 859-425-1096
   Facsimile: 502-585-2207
10 Sarah.mattingly@dinsmore.com
   (Admitted pro hac vice)

11

12 Special Counsel to Richard A. Marshack,
   Chapter 11 Trustee

13

14

15                 **UNITED STATES BANKRUPTCY COURT**

16                 **CENTRAL DISTRICT OF CALIFORNIA**

17

18 In Re                                    Case No. 8:23-BK-10571-SC

19                                          Chapter 11

20 The Litigation Practice Group P.C.,      **EXHIBIT A TO STIPULATED
                                            ORDER**
           Debtor(s),
21                                          Date:   May 23, 2024
22                                          Time:   1:30 p.m.
                                            Judge:  Hon. Scott C. Clarkson
23                                          Place:  Courtroom 5C[1] - Via Zoom
24                                                  411 W. Fourth Street
                                                    Santa Ana, CA  92701
25

26

27 _____

28 [1] Video and audio connection information for each hearing will be provided on Judge Clarkson's
   publicly posted hearing calendar, which may be viewed online at:
   http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

                                      1
Exhibit 1
Page 32

1    This is to certify that:

2        (a)    I am being given access to Confidential Information pursuant to the

3    Stipulated Protective Order that was entered into the main bankruptcy case for

4    Litigation Practice Group, but which is binding and controlling as set forth by the

5    Court's Order on any and all contested matters and  any and all litigation commenced

6    by Trustee;

7        (b)    I have read the Stipulated Protective Order; and

8        (c)    I agree to be bound by the terms and conditions thereof, including,

9    without limitation, to the obligations regarding the use, non-disclosure and return of

10   such Confidential Information. I further agree that in addition to being contractually

11   bound by the Stipulated Protective Order, I am subject to the jurisdiction of the above

12   reference Court for any violation thereof.

13

14   Date: _____

15

16                         _____
                                                              Signature

17

18                         _____

19                         Printed Name

20

21

22

23

24

25

26

27

28

# EXHIBIT 2

Exhibit 2
Page 34



# 12 MONTH PLAN

**Lender:** _Lavin Consulting Inc._

**Contact Person:** _NATE LAVIN_

**Corp:** X **LLC:** ___ **Sole Prop:** ___ **Partnership:** ___ **Other:** ___

**Address:** _1560 Amber Sweet St_ **Phone:** _714-801-0313_

_Corona 97881_                 **Email:** _N8Natelavin@gmail.com_

NO BUSINESS RELATIONSHIP CAN COMMENCE BEFORE
LITIGATION PRACTICE GROUP IS IN RECEIPT OF THE FOLLOWING

## LENDER CHECKLIST

**1.** Lender Agreement – *signed & returned*)
**2.** W-9- *with EIN/ SSN*
**3.** Direct deposit form / Copy of voided Check

## LOAN / LENDER AGREEMENT

This agreement is made and entered into between _Lavin Consulting_ ("Lender") and Litigation Practice Group. ("LPG") as of the date last signed below. Lender and LPG may be jointly referred to herein as the "Parties." LPG may also be referred to herein as the "Borrower".

### ARTICLE 1 (TERM OF CONTRACT)

This agreement is for a total of 12 to 13 Months.

### ARTICLE II (BREAKDOWN OF LOAN)

On this day _9-1-22_ Lender is agreeing to loan LPG the following sum:
$ _300,000.00_

This amount will be held for a Total of 12 Months. Initial loan will be paid back to Lender in Full on Month 12 and LPG has option to pay on Month 13 with an additional 8% interest.

Borrower promises to pay back initial funds within 12 to 13 Months from today.

Borrower promises to pay back FULL amount of loan PLUS an additional 8% in interest per month.

Borrower promises to pay back to Lender the Total Sum of
$ _588,000.00_

### ARTICLE III (REPAYMENT)

Borrower will pay back in the following manner. Borrower will repay the amount of this note in 12 equal continuous monthly installments of $ _24,000_ each on the day of each month preliminary on the _1st_ day of _October_ 20 _22_ and ending on _Sept. 1st_ 20 _23_.

Final balance (initial loan) $ _300,000.00_ will be paid back in Full on Month 12 to 13 in thus completing the Contract.

## ARTICLE IV (LATE CHARGE & PENALTY FOR EARLY WITHDRAWAL)

Late Charge. Any payment not remunerated within Ten (10) days of its due date shall be subject to a belatedly charge of 5% of the monthly payment.

There will be a 25% fee required from initial capital for early withdrawal. All requests must be submitted in writing to LPG:

17542 E. 17th Street

Tustin, CA 92870

Early withdrawals will be paid within 15 days of submitted request.

## ARTICLE V (ARBITRATION)

Section 6.01. Binding Arbitration. Any dispute, controversy or claim arising out of or relating to this Agreement or the business relationship of the Parties, its enforcement, arbitrability or interpretation, or because of an alleged breach, default, or misrepresentation in connection with any of the foregoing, including any alleged violation of statute, common law or public policy shall be submitted to final and binding arbitration before JAMS to be held in Orange County California before a single arbitrator, in accordance with the then-current JAMS rules and the Federal Arbitration Act, as modified by the terms and conditions contained in this paragraph. A copy of the James rules are available online (www.jamsadr.com). By initialing below, Lender agrees to waive all rights to a jury trial and waives the right to pursue any class or representative claims to the maximum extent allowed by law. To the extent a class or representative claim may not be waived, the Lender agrees to stay any such claims until after all claims subject to arbitration are fully resolved. The arbitrator shall be selected by mutual agreement of the parties or, if the parties cannot agree, then by striking from a list of arbitrators supplied by JAMS. The arbitrator shall issue a written opinion stating the essential findings and conclusions on which the arbitrator's award is based. LPG will pay the arbitrator's fees and arbitration expenses and any other costs unique to the arbitration hearing (recognizing that each side bears its own deposition, witness, expert and attorney's fees and other expenses to the same extent as if the matter were being heard in court). If, however, any party prevails on a statutory claim that affords the prevailing party attorneys' fees and costs, then the arbitrator may award reasonable attorneys' fees and costs to the prevailing party. Any dispute as to who is a prevailing party and/or the reasonableness of any fee or costs shall be resolved by the arbitrator. JAMS can be reached at 949.224.1810 or www.jamsadr.com.

This Agreement to arbitrate is freely negotiated between Lender and LPG and is mutually entered into between the parties. Each party fully understands and agrees that they are giving up certain rights otherwise afforded to them by civil court actions, including but not limited to the right to a jury trial.

**By initialing below, each person signing below acknowledges he or she has read this paragraph, understands it, wants the other side to be bound by it, and agrees to be bound by it.**

_____ (initials)        _____ (initials)

(FoR LPG)

### ARTICLE VI (MISCELLANEOUS)

Entire Agreement.  The parties hereto agree that this contract contains the entirety of the agreements of the parties with respect to the subject matter hereof and that there are no other agreements oral or otherwise nor shall any amendments be permitted except by writing signed by all parties.

Place of Law and Venue. The parties agree that any action brought of maintained to enforce or interpret this agreement shall be in accordance with the laws of the State of California and venue for any such shall be in the County of Orange, State of California.

Requirement of Mediation before Arbitration. The parties agree that in the event a dispute arises between the Parties with respect to the relationship contemplated by this Agreement, the Parties shall engage in a full day of mediation prior to filing any petition or complaint for relief with any administrative office, court or arbitrator.  Failure to do so shall deprive an offending party of any right it may have had to recover costs or attorney's fees in any proceeding.

Authority. Each person who signs below on behalf of an entity or any other person represents that he/she has been expressly given authority to do so.

**Litigation Practice Group:**                              **LENDER:**


_TONY DIAB_                                    _Nathan Lavin_  8-25-22
Referred By – Print Name                       Signature            Date


_____  9-1-22                   _Lavin Consulting Inc._
Authorized Manager      Date                    Printed Name


Contract is being executed via Spot On Consulting. Spot On is the administrative liaison / servicing company that works on behalf of both Lender and Borrower.

# EXHIBIT 3

Exhibit 3
Page 39

| Date | Account | Payee | Amount | 90 Day Transfer | Post-Petition Transfer |
|---|---|---|---|---|---|
| 09/28/22 | Spot On Acct No. #7662 | Lavinconsultinginc (_#### | $24,000.00 | N | |
| 10/20/22 | Spot On Acct No. #7662 | Lavinconsultinginc (_#####2538) | $1,750.00 | N | N |
| 11/1/2022 | Spot On Acct No. #7662 | Lavinconsullinginc (_#444₹4O2538) | $24,000.00 | N | |
| 11/3/2022 | Spot On Acct No. #7662 | Lavinconsullinginc (_4444#2538) | $1,000.00 | N | |
| 11/30/2022 | Spot On Acct No. #7662 | Lavinconsullinginc (_#####2538) | $24,000.00 | N | N |
| 11/30/22 | Spot On Acct No. #7662 | Lavinconsultinginc (Jkitki | $200.00 | N | N |
| 12/29/2022 | Spot On Acct No. #7662 | Lavin Consulting 12/29 Online ACH Payment 11006929168 To Lavinconsultinginc (_#####2538) | $24,000.00 | Y | N |
| 12/29/22 | Spot On Acct No. #7662 | Lavinconsuitinginc (_#####2538) | $200.00 | Y | N |
| 1/6/2023 | Spot On Acct No. #7662 | Lavinconsultinginc (_#####2538) | $17,500.00 | Y | N |
| 1/12/2023 | Spot On Acct No. #7662 | Lavinconsultinginc (_#####2538) | $1,750.00 | Y | N |
| 1/19/2023 | Spot On Acct No. #7662 | Lavinconsultinginc (_#####2538) | $1,500.00 | Y | N |
| 1/26/2023 | Spot On Acct No. #7662 | Lavinconsultinginc (_#####2538) | $175.00 | Y | N |
| 2/1/2023 | Spot On Acct No. #7662 | Lavinconsultinginc (_#####2538) | $200.00 | Y | N |
| 2/1/2023 | Spot On Acct No. #7662 | Lavinconsultinginc f_flitit##2538) | $24,000.00 | Y | |
| 2/16/2023 | Spot On Acct No. #7662 | Lavinconsultinginc (_#####2538) | $5,000.00 | Y | N |
| 2/16/2023 | Spot On Acct No. #7662 | Lavinconsultinginc (_#####2538) | $1,500.00 | Y | N |
| 2/23/2023 | Spot On Acct No. #7662 | Lavinconsultinginc (_#OO2538) | $175.00 | Y | |
| 3/1/2023 | Spot On Acct No. #7662 | Lavinconsultinginc (_#####2538) | $200.00 | Y | N |
| 3/17/2023 | Spot On Acct No. #7662 | Lavinconsultinginc (_#####2538) | $5,000.00 | Y | N |
| 3/20/2023 | Spot On Acct No. #7662 | Lavinconsultinginc (_#####2538) | $1,500.00 | Y | N |
| 3/27/2023 | Spot On Acct No. #7662 | Lavinconsultinginc (_#####2538) | $175.00 | N | Y |
| | | **Total** | **$157,825.00** | | |

| Bank Name | Account Name | Account Number | Date | Check Number | Amount |
|---|---|---|---|---|---|
| Optimum Bank | Coast Processing LLC dba LPG | XX6738 | 11/23/2021 | 350 - Nate Lavin | **15,299.00** |

Exhibit 3
Page 40

# Adversary Cover Sheet

B1040 (FORM 1040) (12/24)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>Richard A. Marshack, Trustee of the LPG Liquidation Trust | DEFENDANTS<br>Lavin Fence, Inc. dba Lavin Consulting, LLC, an inactive California corporation, and Nate Lavin dba Lavin Consulting, LLC, a California resident |
|---|---|

| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>Yosina M. Lissebeck (SBN 201654)<br>Tyler Powell (Ky. Bar No. 90520) (*Admitted pro hac vice*)<br>DINSMORE & SHOHL LLP<br>655 West Broadway, Suite 800<br>San Diego, CA 92101    Telephone (619) 400-0500<br>yosina.lissebeck@dinsmore.com<br>tyler.powell@dinsmore.com | ATTORNEYS (If Known) |
|---|---|

**PARTY** (Check One Box Only)
- ☐ Debtor
- ☐ Creditor
- ☒ Trustee
- ☐ U.S. Trustee/Bankruptcy Admin
- ☐ Other

**PARTY** (Check One Box Only)
- ☐ Debtor
- ☐ Creditor
- ☐ Trustee
- ☐ U.S. Trustee/Bankruptcy Admin
- ☐ Other

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

((1) Avoidance, Recovery, and Preservation of Transfers Made Within the Ninety Day Period Before the Petition Date; (2) Avoidance, Recovery, and Preservation of Post-Petition Transfers; (3) Avoidance, Recovery, and Preservation of Transfers Made With Intent to Defraud; (4) Avoidance, Preservation, and Recovery of Constructively Fraudulent Two-Year Transfers; (5) Avoidance, Preservation, and Recovery of Transfers Within Four Years ; and (6) Avoidance, Recovery, and Preservation of Transfers Made Within Four Years

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(a) – Recovery of Money/Property**
- ☐ 11-Recovery of money/property - §542 turnover of property
- ☒ 12-Recovery of money/property - §547 preference
- ☒ 13-Recovery of money/property §548 fraudulent transfer
- ☒ 14-Recovery of money/property - other

**FRBP 7001(b) – Validity, Priority or Extent of Lien**
- ☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(c) – Approval of Sale of Property**
- ☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(d) – Objection/Revocation of Discharge**
- ☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(e) – Revocation of Confirmation**
- ☐ 51-Revocation of confirmation

**FRBP 7001(f) – Dischargeability**
- ☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
- ☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
- ☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(f) – Dischargeability (continued)**
- ☐ 61-Dischargeability - §523(a)(5), domestic support
- ☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
- ☐ 63-Dischargeability - §523(a)(8), student loan
- ☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
- ☐ 65-Dischargeability - other

**FRBP 7001(g) – Injunctive Relief**
- ☐ 71-Injunctive relief- imposition of stay
- ☐ 72-Injunctive relief - other

**FRBP 7001(h) Subordination of Claim or Interest**
- ☐ 81-Subordination of claim or interest

**FRBP 7001(i) Declaratory Judgment**
- ☐ 91-Declaratory judgment

**FRBP 7001(j) Determination of Removed Action**
- ☐ 01-Determination of remove d claim or cause

**Other**
- ☐ SS-SIPA Case - 15 U.S.C. §§78aaa *et.seq.*
- ☒ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ 173,124.00 |

| Other Relief Sought |
|---|

B1040 (FORM 1040) (12/24)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>The Litigation Practice Group P.C. | BANKRUPTCY CASE NO.<br>8:23-bk-10571-SC | |
| DISTRICT IN WHICH CASE IS PENDING<br>Central District of California | DIVISION OFFICE<br>Santa Ana | NAME OF JUDGE<br>Scott C. Clarkson |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br>/s/ Tyler Powell | | |
| DATE<br>March 17, 2025 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Yosina M. Lissebeck<br>Tyler Powell (admitted pro hac vice)<br>Special Counsel to Richard A. Marshack, Trustee of the LPG<br>Liquidation Trust | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.