1   Christopher Celentino (SBN 131688)
    Yosina M. Lissebeck (SBN 201654)
2   Christopher B. Ghio (SBN 259094)
    DINSMORE & SHOHL LLP
3   655 West Broadway, Ste. 800
    San Diego, CA 92101
4   Telephone: 619.400.0500
    Facsimile:  619.400.0501
5   Christopher.celentino@dinsmore.com
    yosina.lissebeck@dinsmore.com
6   Christopher.ghio@dinsmore.com

7   Tyler Powell (Ky. Bar No. 90520 – Admitted pro hac vice)
    DINSMORE & SHOHL, LLP
8   100 West Main Street, Suite 900
    Lexington, KY  40507
9   Telephone:  859-425-1056
    Facsimile:  859-425-1099
10  tyler.powell@dinsmore.com

11  Special Counsel to Richard A. Marshack,
    Trustee of the LPG Liquidation Trust
12

13              **UNITED STATES BANKRUPTCY COURT**

14        **CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION**

15  | In re: | Chapter 11 |
16  | The Litigation Practice Group P.C., | Case No. 8:23-bk-10571-SC |
17  | Debtor. | Adv. Proc. No. _____ |
18  | | **COMPLAINT FOR:** |
19  | | **(1)  AVOIDANCE, RECOVERY, AND PRESERVATION OF PREFERENTIAL TRANSFERS MADE TO OR FOR THE BENEFIT OF DEFENDANTS WITHIN NINETY DAYS OF THE PETITION DATE;** |
20  | Richard A. Marshack, Trustee of the LPG Liquidation Trust, | |
21  | Plaintiff, | |
22  | v. | **(2)  AVOIDANCE, RECOVERY, AND PRESERVATION OF POST-PETITION TRANSFERS MADE TO OR FOR THE BENEFIT OF DEFENDANTS AFTER THE PETITION DATE;** |
23  | Spot On Consulting, Inc., a California corporation; Eric Martinson, a California resident; Jesse Martinson, a California resident, and Rachel Elgas, a Missouri resident, | |
24  | | |
25  | | **(3) AVOIDANCE, RECOVERY, AND PRESERVATION OF TRANSFERS 2-YEAR ACTUAL FRAUDULENT TRANSFERS;** |
26  | Defendants. | |
27  | | **(4) AVOIDANCE, RECOVERY, AND PRESERVATION OF 2-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS;** |
28  | | |

**(5) AVOIDANCE, PRESERVATION, AND RECOVERY OF VOIDABLE TRANSFERS MADE WITH INTENT TO DEFRAUD [11 U.S.C. §§ 544, 550, 551; CAL. CIV. CODE §§ 3439.04(a)(1) AND 3439.07];**

**(6) AVOIDANCE, PRESERVATION, AND RECOVERY OF VOIDABLE TRANSFERS MADE WITH NO INTENT TO DEFRAUD [11 U.S.C. §§ 544, 550, 551; CAL. CIV. CODE §§ 3439.04(a)(2), 3439.05, AND 3439.07];**

**(7) AIDING AND ABETTING FRAUDULENT CONVEYANCES**

Honorable Scott C. Clarkson
Dept. 5C

For his *Complaint for (1) Avoidance, Recovery, and Preservation of Preferential Transfers Made to or for the Benefit of Defendants within Ninety Days of the Petition Date; (2) Avoidance, Recovery, and Preservation of Post-Petition Transfers Made to or for the Benefit of Defendants after the Petition Date; (3) Avoidance, Recovery, and Preservation of Transfers 2-Year Actual Fraudulent Transfers; (4) Avoidance, Recovery, and Preservation of 2-Year Constructive Fraudulent Transfers; (5) Avoidance, Preservation and Recovery of Voidable Transfers Made with Intent to Defraud [U.S.C. §§ 544, 550, 551; CAL. CIV. Code §§ 3439.04(a)(1) and 3439.07]; (6) Avoidance, Preservation, and Recovery of Voidable Transfers Made with no Intent to Defraud [11 U.S.C. §§ 544, 550, 551; CAL. CIV. Code §§ 3439.04(a)(2), 3439.05, and 3439.07]; and (7) Aiding and Abetting* ("Complaint"), plaintiff Richard A. Marshack, Trustee of the LPG Liquidation Trust ("Trustee" or "Plaintiff") for the bankruptcy estate ("Estate") of debtor The Litigation Practice Group P.C. ("Debtor" or "LPG"), in the above-captioned bankruptcy case ("Bankruptcy Case"), alleges as follows:

<u>**STATEMENT OF JURISDICTION, NATURE OF PROCEEDING, AND VENUE**</u>

1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E), (H) and (O), 1334(b), and General Order No. 13-05 of the District Court for the Central District of California because this is a core proceeding arising in and/or related to the Bankruptcy Case, which is a case under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code"), and which is

1  pending in the United States Bankruptcy Court for the Central District of California, Santa Ana

2  Division ("Bankruptcy Court").

3     2.     Regardless of whether this proceeding is core, non-core, or otherwise, Plaintiff

4  consents to the entry of a final order and judgment by the Bankruptcy Court.

5     3.     Defendant is notified that Rule 7008 of the Federal Rules of Bankruptcy Procedure

6  requires Defendant to plead whether consent is given to the entry of a final order and judgment by the

7  Bankruptcy Court.

8     4.     Venue of this adversary proceeding properly lies in this judicial district pursuant to 28

9  U.S.C. § 1409(a) because this proceeding is related to Debtor's pending Bankruptcy Case.

10  ## THE PARTIES

11     5.     Plaintiff, Richard A. Marshack, is the Trustee of the LPG Liquidation Trust.

12     6.     Debtor is, and at all material times was, a professional corporation organized, existing,

13  and in good standing under the laws of the State of California, with its principal place of business in

14  Tustin, California.

15     7.     Defendant, Spot On Consulting, Inc. ("Spot On"), is, and at all material times was, a

16  corporation existing under the laws of the State of California.

17     8.     Defendant Eric Martinson ("Eric") is, and at all material times was, an individual

18  residing in the State of California.

19     9.     Defendant Jesse Martinson ("Jesse") is, and at all material times was, an individual

20  residing in the State of California.

21     10.    Defendant Rachel Elgas ("Elgas") is, and at all material times was, an individual

22  residing in the state of Missouri.

23     11.    On information and belief, Eric and Elgas at all material times were principals and

24  officers of Spot On.

25     12.    Spot On may be served by first class mail postage prepaid upon an officer, managing

26  or general agent at 1560 Ambersweet Drive, Corona, CA 92881.

27     13.    Eric may be served by first class mail potage prepaid at 1560 Ambersweet St., Corona,

28  CA 92881.

3

14.     Jesse may be served by first class mail postage prepaid at 594 Grand Haven Cir. Costa Mesa, CA 92626.

15.     Elgas may be served by first class mail postage prepaid at 8181 County Road 1017, Auxvasse, MO 65231.

**RELEVANT DEFENDANT NAMED IN THE 1046 ACTION[1]**

16.     Tony Diab is, and at all times mentioned was, an individual residing in the State of California. Diab operated, dominated, and controlled LPG, a national debt relief law firm.

**GENERAL ALLEGATIONS**

**A.      The Bankruptcy Case**

17.     On March 20, 2023 ("Petition Date"), Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, commencing the Bankruptcy Case.

18.     The Office of the United States Trustee ("UST") filed its *Motion by United States Trustee to Dismiss or Convert Case Pursuant to 11 U.S.C. § 1112(b)* [Bankr. Docket No. 21] and creditors Debt Validation Fund II, LLC; MC DVI Fund 1, LLC; and MC DVI Fund 2, LLC filed the *Motion by DVF and MC DVI to Dismiss Chapter 11 Case Pursuant to 11 U.S.C. §§ 105, 305, 349, & 1112, or in the Alternative Convert This Case to Chapter 7 or Appoint a Trustee* [Bankr. Docket No. 44]. On May 4, 2023, the Court entered its *Order Directing United States Trustee to Appoint Chapter 11 Trustee* [Bankr. Docket No. 58].

19.     Pursuant to the *Acceptance of Appointment as Chapter 11 Trustee* [Bankr. Docket No. 63], on May 8, 2023, Trustee accepted his appointment as the Chapter 11 Trustee in the Bankruptcy Case. The Court approved the Trustee's appointment in its *Order Approving the U.S. Trustee's Application for the Appointment of a Chapter 11 Trustee* [Docket No. 65].

20.     Trustee was not appointed until after events of the case and, therefore, bases these allegations on information and belief. *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) ("The *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the

---

[1] On May 25, 2023, the Trustee filed an adversary complaint against a number of Debtor's insiders and fraudulent transferees seeking avoidance of transfers and damages. *See* Adv. Case No. 8:23-ap-01046 (the "1046 Action"). [Bankr. Docket No. 63.]  The 1046 Action remains pending.

defendant or where the belief is based on factual information that makes the inference of culpability plausible."); *Miller v. City of Los Angeles*, 2014 U.S. Dist. LEXIS 198871, 2014 WL 12610195, at *5 (C.D. Cal. Aug. 7, 2014) (recognizing that the plaintiff's "information and belief" pleading was allowed and "necessary at times"); *see also Mireskandari v. Daily Mail and General Trust PLC*, 2013 U.S. Dist. LEXIS 194437, 2013 WL 12129642, at *4 (C.D. Cal. July 31, 2013) ("The Federal Rules of Civil Procedure allow parties to plead facts on 'information and belief' if the facts 'will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.'" (citations omitted)).

21.    Pursuant to the *Order Confirming Modified First Amended Joint Chapter 11 Plan of Liquidation* entered September 9, 2024, and the *Notice of Occurrence of Effective Date of Modified First Amended Joint Chapter 11 Plan of Liquidation* filed September 24, 2024, Richard A. Marshack became the Liquidating Trustee of the LPG Liquidation Trust, effective September 24, 2024. [Bankr. Docket Nos. 1646 & 1762].

22.    All claims have been transferred to the Liquidating Trust pursuant to the confirmed plan and Plaintiff brings this action solely in his capacity as the Liquidating Trustee of the LPG Liquidation Trust, for the benefit of Debtor's Estate and its creditors.

**B.    Protective Order**

23.    On or about May 2, 2024, Plaintiff filed that certain Notice and Motion for Entry of Protective Order (the "Protective Order").

24.    On June 3, 2024, the Court entered its *Order Granting Motion for Entry of Protective Order and the Protective Order* [Bankr. Docket No. 1270] (the "Protective Order"). A true and accurate copy of the Protective Order is attached as **Exhibit 1**, and incorporated herein.

25.    By its own terms, the Protective Order applies to this adversary proceeding and governs all discovery conducted herein.

**C.    LPG's Ownership and Management**

26.    Prior to the Petition Date, LPG operated a law firm for consumers across the country who sought assistance in contesting or resolving debts. LPG serviced over 65,000 customers across the United States. At all relevant times, LPG was controlled and operated by the individual named

1   Tony Diab ("Diab").

2        27.    The consumers that retained LPG to represent them would pay LPG over a period of

3   time via monthly ACH debits from their bank accounts.

4        28.    The monthly payments were meant to cover all legal services LPG provided to the

5   consumers including validation of the debts, review of documents to determine enforceability, and

6   court appearances to halt lawsuits to obtain judgments.

7        29.    In certain instances, LPG would file a lawsuit in an effort to eliminate a disputed debt

8   or to prosecute affirmative claims held by the consumers.

9        30.    LPG mismanaged the consumers' monthly payments.

10       31.    Diab and other defendants devised a plan to fraudulently transfer funds, client files,

11  client funds and assets in the form of ACH Receivables (the "ACH Receivables" or "Accounts

12  Receivable") out of LPG to third parties prior to the filing of bankruptcy.

13       32.    To obtain consumer clients, LPG contracted with marketing companies, who engaged

14  in illegal capping and would advertise or call to solicit consumers to become clients of LPG in

15  exchange for a percentage of the ACH Receivables collected by LPG from the consumers. The

16  marketing affiliate went so far as to assist with the execution of an engagement letter between the

17  consumer and LPG.

18       33.    In exchange, LPG agreed to pay the marketing affiliates a percentage the monthly

19  payments collected by LPG from the consumers.

20       34.    Because LPG received payments from consumers over time, it often sought financing

21  by borrowing against its future cash flows. This borrowing was not only used to finance operations at

22  LPG, but also to pay the fees owed to the marketing companies for providing the client referrals.

23       35.    Many of the documents executed in connection with such financing described the

24  transactions as accounts receivable purchase agreements.

25       36.    LPG also purported to "sell" the rights to these Accounts Receivable following

26  collection by LPG to outside investors in exchange for liquidity. LPG frequently "sold" the Accounts

27  Receivable from the same client files to multiple parties.

28       37.    By August of 2022, LPG's need for capital was so severe that it began borrowing funds

through Defendant Spot On. Upon information and belief, Spot On would facilitate loans to LPG from individuals and corporations – sometimes for as little as $5,000 – in exchange for a ten percent (10%) commission on the principal amount of the loan. LPG would then typically promise to pay each lender as much as eight percent (8%) interest per month on the principal balance for twelve months and would then repay the original principal amount at maturity.

38.    Upon further information and belief, LPG borrowed hundreds of thousands of dollars **each week** on these terms beginning in August 2022 and continuing until filing for bankruptcy.

39.    Proof of Claim No. 108, seeking more than $66 million dollars, has been filed based on the outstanding balances owed on these brokered "loans". This Proof of Claim is incorporated by reference herein.

40.    As evidenced by its substantial borrowing through brokered loans and alleged sales of Accounts Receivable to lenders and "investors," LPG's need for cash was constant as it had (i) to pay marketing affiliates for past referrals and keep new referrals being made, (ii) to pay "returns" to investors who purportedly purchased sets of Accounts Receivable or funded the continued operation of the Debtor and related entities, and (iii) to pay the substantial salaries to, personal expenses of, and distributions to its management and other insiders.

41.    This constant borrowing to pay off prior investors and obligations coupled with the alleged sale of the same assets to different entities is classic evidence of a Ponzi scheme.

42.    Diab used entities he controlled including, without limitation, Vulcan Consulting, LLC ("Vulcan") and B.A.T., Inc. dba Coast Processing ("Coast") to process payments from LPG consumer clients and to divert LPG consumer funds and ACH Receivables. Diab would use numerous ACH processing companies in order to easily transfer millions of dollars from Debtor to these entities he controlled, without oversight or detection, and to avoid payment disputes and complications. The money that flowed from Debtor through these bank account to Defendant consisted of Client Funds that Debtor funneled to these entities by means of the ACH processing companies. Debtor also made deposits into these entities bank account such that they received Client Funds directly from Debtor in addition to direct Accounts Receivables.

### D.    Ponzi Scheme Presumption

43.    The Ponzi Scheme Presumption exists in bankruptcy proceedings.

44.    The Ponzi Scheme Presumption can be utilized to establish a debtor's "intent to defraud future undertakers [investors] from the mere fact that a debtor was running a Ponzi scheme. Indeed, no other reasonable inference is possible. A Ponzi scheme cannot work forever. The investor pool is a limited resource and will eventually run dry. The perpetrator must know that the scheme will eventually collapse as a result of the inability to attract new investors. The perpetrator nevertheless makes payments to present investors, which, by definition, are meant to attract new investors. He must know all along, from the very nature of his activities, that investors at the end of the line will lose their money. Knowledge to a substantial certainty constitutes intent in the eyes of the law," *cf. Restatement (Second) of Torts § 8A* (1963 & 1964), and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them. *Kirkland v. Rund (In re EPD Inv. Co., LLC)*, 114 F.4th 1148, 1153 (9th Cir. 2024) (by definition Ponzi scheme is destined to fail and the swindler and their entities often end in bankruptcy or equitable receivership); *Cf. Coleman Am. Moving Servs., Inc. v. First Nat'l Bank & Trust Co. (In re American Properties, Inc.)* 14 B.R. 637, 643 (Bankr. D. Kan. 1981) (intentionally carrying out a transaction with full knowledge that its effect will be detrimental to creditors is sufficient for actual intent to hinder, delay or defraud within the meaning of § 548(a)(1))." *Merrill v. Abbott (In re Independent Clearing House Co.)* (D. Utah 1987) 77 B.R. 843, 860. A trustee in bankruptcy is not required to show that an operator of a Ponzi scheme was subjectively aware his Ponzi scheme was destined to fail. *In re EPD Inv. Co., LLC*, 114 F.4th at 1153 ("[a] trustee's action to recover assets fraudulently conveyed in the course of a Ponzi scheme does not require that the trustee also prove the Ponzi-scheme operator was subjectively aware his Ponzi scheme was destined to fail.").

45.    "But if all the debtor receives in return for a transfer is the use of the defendant's money to run a Ponzi scheme, there is nothing in the bankruptcy estate for creditors to share. In fact, by helping the debtor perpetuate his scheme, the transfers exacerbate the harm to creditors by increasing the amount of claims while diminishing the debtor's estate. In such a situation, the use of the defendant's money cannot objectively be called 'reasonably equivalent value.'" *In re Independent*

*Clearing House Co.* 77 B.R. at 859. Therefore, "[t]he trustee can avoid the transfers if they were preferential or fraudulent. Transfers to investors in a Ponzi scheme are preferential and fraudulent. Therefore, they constitute "property of the estate," and the trustee can recover them. *Id.* at 853 n.17 (citations omitted).

46.    Debtor was operating a Ponzi scheme that utilized affiliates and several other entities as investors to continue its unlawful business practices by using funds provided by current investors to attract new investors hoping for very high returns. Therefore, the Debtor was running a Ponzi scheme and the Ponzi Scheme Presumption can be utilized to infer that the Debtor had the intent to defraud investors within the meaning of 11 U.S.C. section 548(a)(1). This is evidenced by the Court in this Bankruptcy Case declaring that Debtor was operating a Ponzi scheme when it stated the following:

> It is important to note that this Court has never received any significant and trustworthy evidence that Debtor accomplished meaningful results for its clients, but only anecdotal examples of viable success for its clients. By reviewing the Estate's claims register, there is evidence of consumer claims for the fraud and demanded but undelivered refunds of approximately $500 million. There is ample evidence that the pre-petition Debtor never placed the collected funds into an attorney-client trust account, and that Debtor or its principals simply looted the payments received through the client automatic withdrawals, stiffing both the clients and outside attorneys who may have been working on client cases with the hopes of being paid. There is also evidence before the Court that Debtor was running a Ponzi scheme and paying some outside (or "network") attorneys with funds obtained from new clients. In this case, it appears that some of the "lenders" may have been serving as "investors," hoping for very high returns before "the music stopped." The Ninth Circuit has recently explained, "[b]y definition, a Ponzi scheme is destined to fail because the pool of available investors is not limitless. When the Ponzi scheme operator's pool of investors inevitably runs dry, the scheme collapses and the swindler and their entities often end up in bankruptcy or equitable receivership. *See generally* David R. Hague, Expanding the Ponzi Scheme Presumption, 64 DePaul L. Rev. 867 (2015). In bankruptcy, the court-appointed trustee is tasked with taking immediate control of the entity, ceasing ongoing fraudulent activity, locating and collecting assets for the bankruptcy or receivership estate, and achieving a final, equitable distribution of the remaining assets. *See* 11 U.S.C. § 704; *Kirkland v. Rund (In re EPD Inv. Co., LLC)*, 2024 U.S. App. LEXIS 21363, at *15 (9th Cir. Aug. 23, 2024). Finally, there is evidence that Debtor was encumbering (or as some creditors assert, "double or triple selling") their accounts or receivables to multiple lenders. With respect to Greyson's requested Administrative Claim [Dk. 676], and as more fully described in the concurrently entered order denying the claim, there has been no evidence presented that any work allegedly performed by Greyson assisted any clients or added any value to the Estate.

*See, Case 8:23-bk-10571-SC*, Doc 1545 n. 5.

9

47.     The Ponzi Scheme Presumption establishes a debtor's "intent to defraud future undertakers [investors] from the mere fact that a debtor was running a Ponzi scheme." *Merrill v. Abbott* (*In re Independent Clearing House Co.*), 77 B.R. 843, 860 (D. Utah 1987). "Knowledge to a substantial certainty constitutes intent in the eyes of the law, *cf. Restatement (Second) of Torts* § 8A (1963 & 1964), and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them." *Id.* A trustee in bankruptcy is not required to show that an operator of a Ponzi scheme was subjectively aware his Ponzi scheme was destined to fail. *In re EPD Inv. Co., LLC*, 114 F.4th at 1153 (9th Cir. 2024). "[I]f all the debtor receives in return for a transfer is the use of the defendant's money to run a Ponzi scheme, there is nothing in the bankruptcy estate for creditors to share." *In re Independent Clearing House Co.* 77 B.R. at 859. In such a situation, the use of the defendant's money cannot objectively be called "reasonably equivalent value." *Id.* Therefore, "[t]he trustee can avoid the transfers if they were preferential or fraudulent. Transfers to investors in a Ponzi scheme are preferential and fraudulent. Therefore, they constitute 'property of the estate,' and the trustee can recover them." *Id.* at 853 n.17 (citations omitted).

48.     Based on the Ponzi Scheme presumption the Court can infer that the Debtor had the intent to defraud investors within the meaning of 11 U.S.C. § 548(a)(1). As a result, the transfers identified herein were made in furtherance of that scheme and the Debtor did not receive an objectively reasonable equivalent value for such transfers. Thus, the Trustee can avoid any such transfers because they were actually fraudulent as to the Debtor's creditors.

**E.     Prepetition Litigation and Creditors**

49.     Debtor's Schedule E/F, filed on April 4, 2023, as Dk. No. 33, lists: (a) 11 unsecured creditors with priority unsecured claims totaling $374,060.04; and (b) 58 nonpriority unsecured creditors with scheduled claims totaling $141,439,158.05.

50.     The claims register in this Bankruptcy Case includes 2,554 proofs of claim, totaling in excess of $424 million of claims asserted against the Estate.

51.     At least 14 UCC-1 statements were of record securing alleged debts of the Debtor as of the Petition Date. These statements either reflected secured liens against the Debtor's assets then owned or thereafter acquired or provided evidence of the assignment or sale of substantial portions of

the Debtor's future income. They secured the repayment of the following claimed amounts that are currently known to Trustee and are allegedly owed by the Debtor: (a) $2,374,004.82 owed to Fundura Capital Group as evidenced by Proof of Claim No. 335 purportedly secured by a UCC statement filed on or about May 19, 2021; (b) approximately $15 million dollars owed to MNS Funding, LLC as evidenced by Proof of Claim No. 1060 purportedly secured by a UCC statement filed on or about May 28, 2021; (c) approximately $5,000,000 owed to Azzure Capital, LLC as evidenced by Proof of Claim No. 127 purportedly secured by a UCC statement filed on or about May 28, 2021; and (d) approximately $1.5 million dollars owed to Diverse Capital, LLC purportedly secured by UCC statements filed on or about September 15, 2021, and December 1, 2021.

52.    Debtor's balance sheets for the 36 months ending December 31, 2021, show approximately $17,900,000 in total assets at its highest point in November 2021. This amount is significantly less than the $424 million of claims filed.

53.    Debtor's Statement of Financial Affairs, filed on April 4, 2023, as Dk. No. 34, reflects 15 pending lawsuits against Debtor as of the Petition Date. The lawsuits date back to October 18, 2021 (*Fundura v. The Litigation Practice Group P.C. et al.*, Supreme Court of New York Index No. 613192-2021) and are as recent as March 10, 2023 (*Diverse Capital LLC v. The Litigation Practice Group P.C. et al.*, Supreme Court of New York Index No. 135614-2023).

**F.    Debtor's Insolvency**

54.    Debtor was insolvent when the Transfers occurred as evidenced by: (a) the 14 UCC-1 statements reflecting secured liens against the Debtor's owned and after-acquired assets and the assignment or sale of substantial portions of the Debtor's future income; (b) the priority and non-priority unsecured debt of nearly $142 million listed in Debtor's schedules; (c) the $424 million of creditor claims filed in this Bankruptcy Case; and (d) Debtor's balance sheets reflecting, at its highest point, $17.9 million of assets in November 2021.

55.    Moreover, insolvency is presumed as a matter of law where, as in this Bankruptcy Case, the debtor operated a Ponzi scheme. *See, e.g., Glob. Money Mgmt., L.P. v. McDonnold*, No. 06CV34, 2008 U.S. Dist. LEXIS 128733, at *15 (S.D. Cal. Feb. 27, 2008) (concluding that "if a Ponzi scheme is proven, then the debtor is proven insolvent from the time of its inception").

56.     Diab and others devised a plan to fraudulently transfer funds, client files, client funds and assets out of LPG to third parties prior to the filing of bankruptcy.

**E.     Spot On Notes**

57.     Because LPG received payments from consumers over time, it often sought financing by borrowing against its future cash flows from merchant cash advance lenders or soliciting investments from third parties to "purchase" future receivables from a group of files.

58.     By late summer of 2022, LPG's need for operating capital was so severe that it began borrowing money from multiple lenders in loan transactions administered by Spot On (generally "Spot On Borrowing").

59.     Spot On held itself out as an "administrative liaison" or "servicing company" working on behalf of both Debtor and individual investors to facilitate the Spot On Borrowing that resulted in the execution of promissory note(s) between the Debtor and lender ("Spot On Notes").

60.     Upon information and belief, Spot On retained or was paid a percentage of the principal amount of each loan it originated as a commission.

61.     Upon further information and belief, Eric, Elgas, and others supervised and organized the Spot On Borrowing and subsequent payments pursuant to the Spot On Notes.

62.     The terms of the Spot On Notes could vary, but typically they provided for a loan to the Debtor that would be repaid in monthly installments of eight to ten percent interest **per month** on the principal amount of the loan for twelve or twenty-four months. At maturity, the Debtor would then repay the entire principal amount of the Spot On Note to lender.

63.     By borrowing under these terms, the Debtor was obligating itself to repay each lender two to four times the amount that was borrowed.

64.     Upon information and belief, some Spot On Notes may not represent a true loan transaction where the principal amount of the note was lent to the Debtor. In some instances, the Trustee believes that the principal balance of some Spot On Notes may represent an amount that was owed to the holder from another transaction or investment with the Debtor or related entity that was converted or "rolled over" into a Spot On Note to extend the time to repay the amount owed.

65.     In some instances, lenders would have multiple outstanding Spot On Notes between

them and the Debtor at the same time.

66.    Upon information and belief, when the Debtor first started making payments to lenders pursuant to the Spot On Notes, it made a lump sum payment to Spot On equal to the total amount needed to pay the installments due to the lenders for that week. Spot On would then pay the individual lenders from its bank account. Upon information and belief, Spot On disbursed payments from two bank accounts it held at JPMorgan Chase Bank with account numbers ending in XX7662 and XX2777 ("Accounts").

67.    Ultimately, the Debtor was not able to pay Spot On a sufficient amount from its operations to make the weekly payments to the holders of the Spot On Notes. After this, upon information and belief, Spot On began using funds it obtained from the execution of new Spot On Notes to make payments to prior lenders on existing Spot On Notes from the Accounts.

68.    The funds deposited in the Accounts from the execution of new Spot On Notes was the Debtor's property as the Debtor had borrowed the money and was entitled to the use of it.

69.    When funds were deposited in the Accounts Spot On would often transfer funds to one or more money market accounts at Chase ending in account numbers 7365 or 9789 ("Money Market Accounts"). While Spot On would return funds from the Money Market Accounts to the Accounts, the Trustee does not know if all amounts transferred to the Money Market Accounts was returned for disbursement. Those transfers from the Accounts to the Money Market Accounts ("MMA Transfers") known to the Trustee are identified on **Exhibit 2** attached hereto.

70.    The Spot On Borrowing constituted a Ponzi scheme as existing noteholders were being paid from funds advanced by new Spot On Notes or lenders. Without the Debtor obtaining additional funds through borrowing, it could not have made many of the payments that were made to the holders of the Spot On Notes.

71.    The Spot On Notes are invalid and unlawful because, among other reasons, they provide for a usurious interest rate.

72.    Defendant Jesse entered into one or more Spot On Notes with the Debtor. Upon information and belief, Jesse executed three Spot On Notes in the original principal amounts of $50,000, $100,000, and $100,000.

73.     Defendant Eric/Defendant Spot On also executed numerous Spot On Notes with the Debtor. A true and accurate copy of one of these Spot On Notes where Eric and/or Spot On is the lender is attached hereto as **Exhibit 3**. The attached note states that Eric is loaning the Debtor $50,000 and will be paid the sum of $170,000 from the Debtor over the next twenty-four to twenty-five months.

74.     Upon information and belief, both Jesse and Eric received payments from the Debtor or from the Accounts. Those payments to Jesse and Eric currently known to the Trustee ("Martinson Payments") are set forth on **Exhibit 4** attached hereto.

75.     The Defendants no longer hold any Spot On Notes having assigned them to Affirma, LLC as further detailed in Proof of Claim No. 108 and in the Trustee's adversary against Affirma, LLC.

76.     However, the Martinson Payments were not the only consideration that Eric received from the Accounts. On August 31, 2022, Spot On wired $297,300.81 to Emerald Escrow, Inc. from one of the Accounts ("Wire"). The stated purpose of the wire was "1560 Ambersweet Street Corona CA."

77.     Eric and Betty Jo Martinson purchased the real property located at 1560 Ambersweet Street in Corona California pursuant to a Grant Deed dated September 1, 2022 ("Deed"). Emerald Escrow, Inc. recorded the Deed. A true and accurate copy of the Deed to the Property is attached hereto as **Exhibit 5**.

78.     As noted above, the Debtor would transfer funds to Spot On who, upon receipt, would disburse the funds to the lenders owed a payment pursuant to their note with the Debtor that week. The principal amount of many loans that Spot On originated was deposited into the Accounts. From the Payments and/or the proceeds of the loans, Spot On recovered the commissions it charged the Debtor and/or additional consideration. The Debtor's payments to Spot On known to the Trustee at present total $2,423,533.58 ("Spot On Payments") and are set forth on **Exhibit 6** hereto.

79.     Spot On received and had control over the Spot On Payments and the Spot On Payments may be recovered from it as an initial transferee.

80.     The MMA Transfers, Martinson Payments, Wire, and Spot On Payments are collectively referred to herein as the "Transfers."

## COUNT ONE

**Avoidance, Recovery, and Preservation of Transfers Made Within the Ninety Day Period**

**Before the Petition Date**

**[11 U.S.C. §§ 547, 550, and 551]**

81.     Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though set forth in full herein.

82.     In the ninety-day period preceding the Petition Date, the Debtor made Transfers to or for the benefit of one or more of the Defendants as identified on the Exhibits identified above ("90 Day Transfers"). These 90 Day Transfers currently known to the Trustee are identified on **Exhibits 2, 4, and 6**.

83.     The Debtor made the 90 Day Transfers to the Defendants on account of a debt owed to that particular Defendant.

84.     The 90 Day Transfers were made to or for the benefit of a creditor within the meaning of 11 U.S.C. § 547(b)(1) because the 90 Day Transfers were payments made on account of debts nominally owed by the Debtor.

85.     A transfer of the Debtor's assets occurred when the 90 Day Transfers were received by the particular Defendant.

86.     The 90 Day Transfers were made on account of antecedent debt nominally owed by the Debtor to the recipient of the Transfer due to an "investment" with the Debtor or pursuant to an executed Spot On Note. The Debtor's payment obligations to the Defendants constituted a "debt" (as defined in the Bankruptcy Code).

87.     The 90 Day Transfers occurred when the Debtor actually was insolvent. However, Plaintiff is also entitled to the presumption of insolvency when the 90 Day Transfers were made pursuant to 11 U.S.C. § 547(f).

88.     The 90 Day Transfers were made in the ninety-day period before the Petition Date.

89.     If any transfers were made by the Debtor to any Defendant herein within the ninety-day period preceding the Petition Date and are not identified herein, Plaintiff reserves the right to avoid and recover such transfers pursuant to 11 U.S.C. §§ 547 and 550.

90.     As the holder of an unsecured claim(s) or as party who has not filed a claim, the payment of the 90 Day Transfers to one or more of the Defendants enabled them to recover more than they would have received if: (i) the Debtor's case was under chapter 7 of the Bankruptcy Code; (ii) the 90 Day Transfers had not been made; and (iii) the debts owed to the Defendants that received the 90 Day Transfers were paid pursuant to the provisions of the Bankruptcy Code. As evidenced by the Debtor's schedules filed in the underlying Bankruptcy Case, as well as the proofs of claim that have been received to date, the Debtor's liabilities exceed its assets to the point that unsecured creditors will not receive a full payout of their claims from the Debtor's bankruptcy estate.

91.     In accordance with the foregoing, the 90 Day Transfers are avoidable pursuant to 11 U.S.C. § 547(b), and may be recovered and preserved for the benefit of the estate pursuant to 11 U.S.C. §§ 550 and 551.

## COUNT TWO

### Avoidance, Recovery, and Preservation of Post-Petition Transfers

### [11 U.S.C. §§ 549, 550, and 551]

92.     Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though set forth in full herein.

93.     This is an action to pursuant to 11 U.S.C. §§ 549 and 550 to avoid and recover unauthorized post-petition transfers made by Debtor to any of the Defendants ("Post-Petition Transfers").

94.     To the extent any Post-Petition Transfers were made by the Debtor to any Defendant following the Petition Date and are not identified herein, Plaintiff reserves the right to amend the Complaint to identify the Post-Petition Transfers and seek the avoidance and recovery of them pursuant to 11 U.S.C. §§ 549 and 550.

95.     Those Post-Petition transfers to the Defendants that are currently known to the Trustee at this time are identified on **Exhibits 2, 4, and 6** hereto.

/ / /

/ / /

16

### COUNT THREE

**Avoidance, Recovery, and Preservation of Two-Year**

**Actual Fraudulent Transfers**

**[11 U.S.C. §§ 548(a)(1)(A), 550, and 551]**

96.     Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though set forth in full herein.

97.     The funds used to make the Transfers were the Debtor's property.

98.     The Transfers occurred within the two years prior to the Petition Date.

99.     On or after the date that such Transfers were made, entities to which Debtor was or became indebted include the Prepetition Creditors.

100.     The Transfers happened while Debtor was insolvent or was rendered insolvent.

101.     Despite Debtor's obligation to the Prepetition Creditors, Debtor made the Transfers to the Defendants pursuant to the Spot On Notes and/or the Spot On Borrowing, which constitute illegal usurious loan agreements between Debtor, its investors, and Spot On.

102.     The Spot On Borrowing coordinated between Debtor and the Defendants was a Ponzi scheme and the Ponzi Scheme Presumption creates an inference of the Debtor's and Spot On's actual intent to defraud within the meaning of 11 U.S.C. section 548(a)(1).

103.     Because the Spot On Borrowing and Spot On Notes were a Ponzi scheme, the Transfers to Defendants were made with actual intent to hinder, delay or defraud the creditors of Debtor.

104.     The Transfers of funds are avoidable as fraudulent pursuant to 11 U.S.C. §§ 548(a)(1)(A), 550, and 551 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against Debtor's Estate under 11 U.S.C. § 502, or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

105.     As avoidable transfers pursuant to 11 U.S.C. § 548(a)(1)(A), the Transfers, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

**COUNT FOUR**

**Avoidance, Recovery, and Preservation of Two-Year**

**Constructive Fraudulent Transfers**

**[11 U.S.C. §§ 548(a)(1)(B), 550, and 551]**

106.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though set forth in full herein.

107.    The Transfers were made within two years before the Petition Date.

108.    Debtor did not receive reasonably value in exchange for the Transfers.

109.    The Transfers were made at a time when Debtor was insolvent and/or rendered insolvent by virtue of said transfers.

110.    When the Transfers occurred, Debtor's business was undercapitalized and Debtor was engaged in business for which its capital was unreasonably small.

111.    When the Transfers occurred, Debtor had incurred or was about to incur debts that were beyond its ability to pay. The allegations in the preceding paragraphs are supported by the fact that the Debtor was borrowing money through a Ponzi scheme overseen by the Defendants to fund operations.

112.    At the time each Transfer was made, Debtor was indebted to one or more creditors that held a claim against Debtor on the date of each Transfer and on the Petition Date.

113.    Plaintiff alleges that Defendants did not receive the Transfers in good faith, for value, and without knowledge of their avoidability. Defendants knew or should have known that the Spot On Notes and Spot On Borrowing were illegal and unenforceable as a matter of law.

114.    Defendants knew or should have known that the terms of the Spot On Notes were illegal and unenforceable as a matter of law.

115.    Defendants knew that the Debtor was a law firm who was required by law to escrow client payments until earned. However, each Defendant demanded and received payment from client payments that had not been earned because they were paid by the Debtor, Vulcan, and/or Coast or were paid directly from loan proceeds from another lender to the Debtor.

116.    The Transfers of funds are avoidable as fraudulent pursuant to 11 U.S.C. §§ 548(a)(1)(B), 550, and 551 by one or more creditors who held and hold unsecured claims against

18

Debtor that were and are allowable against Debtor's Estate under 11 U.S.C. § 502, or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

117.    As avoidable transfers pursuant to 11 U.S.C. § 548(a)(1)(B), the Transfers, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

**COUNT FIVE**

**Avoidance, Recovery, and Preservation of Four-Year Actual Fraudulent Transfers**

**[11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.04(a)(1) and 3439.07]**

118.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though set forth in full herein.

119.    Under 11 U.S.C. § 544(b)(1), Plaintiff may avoid transfers of an interest of Debtor which are voidable under applicable law by an unsecured creditor of Debtor, including under California Civil Code §§ 3439.04(a)(1) and 3439.05.

120.    The Transfers occurred within four years prior to the Petition Date.

121.    On or after the date that such Transfer were made, entities to which Debtor was or became indebted include the Prepetition Creditors.

122.    Despite Debtor's obligation to the Prepetition Creditors, Debtor made the Transfers to Defendant.

123.    The Transfers to Defendant were made with actual intent to hinder, delay or defraud the creditors of Debtor as the Debtor was operating a Ponzi scheme with the help of the Defendants.

124.    Defendants' conduct relating to the Transfers was done with oppression, fraud and malice, as defined in California Civil Code section 3294, entitling Plaintiff to exemplary and punitive damages.

125.    The Transfers are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and Cal. Civ. Code §§ 3439.04(a)(1) and 3439.07 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against its Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition

Creditors.

126.    As avoidable transfers pursuant to 11 U.S.C. § 544 and Cal. Civ. Code §§ 3439.04(a)(1) and 3439.07, the Transfers, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

**COUNT SIX**

**Avoidance, Preservation, and Recovery of Constructive Fraudulent Transfer**

**11 U.S.C. §§ 544, 550, 551; Cal. Civ. Code §§ 3439.04(a)(2), 3439.05 and 3439.07**

127.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though set forth in full herein.

128.    Under 11 U.S.C. § 544(b)(1), Plaintiff may avoid transfers of an interest of Debtor which are voidable under applicable law by an unsecured creditor of Debtor, including under California Civil Code §§ 3439.04(a)(2) and 3439.05.

129.    Debtor did not receive reasonably equivalent value in exchange for the Transfers.

130.    The Transfers were made at a time when Debtor was insolvent and/or rendered insolvent by virtue of said transfers.

131.    At the time each Transfer was made, Debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of Debtor were unreasonably small in relation to the business or transaction.

132.    At the time each Transfer was made, Debtor intended to incur, or believed or reasonably should have believed that Debtor would incur, debts beyond Debtor's ability to pay as they became due.

133.    At the time each Transfer was made, Debtor was indebted to one or more creditors that held a claim against Debtor on the date of each Transfer and on the Petition Date.

134.    The Transfers were made at a time when Debtor was insolvent and/or rendered insolvent by virtue of said transfers.

135.    Plaintiff alleges that Defendants did not receive the Transfers in good faith, for value, and without knowledge of their avoidability as they were helping the Debtor borrow funds through a Ponzi scheme using usurious rates of interest.

136.   Defendants knew that the Debtor was a law firm who was required by law to escrow client payments until earned. However, Defendants demanded and received payments from client funds that had not been earned and/or from the loan proceeds advanced by new lenders to the Debtor.

137.   Defendants knew or should have known that the terms of the Spot On Notes were illegal and unenforceable as a matter of law.

138.   The Transfers are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and Cal. Civ. Code §§ 3439.04(a)(1) and 3439.07 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against its Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

139.   As avoidable transfers pursuant to 11 U.S.C. § 544 and Cal. Civ. Code §§ 3439.04(a)(1) and 3439.07, the Transfers, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

**COUNT SEVEN**

**Aiding and Abetting (All Defendants)**

**[11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.04(a), 3934.04(b), and 3439.07]**

140.   Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though set forth in full herein.

141.   Defendants and others not named herein, based upon information and belief and based on the Ponzi Scheme Presumption, had knowledge of the fraudulent transactions, transfers and illegal agreements that were used to perpetuate and conceal the Ponzi scheme and fraudulent transfers.

142.   Defendants, with the foregoing knowledge, intended to, and did, help the Debtor in perpetuating and concealing the Ponzi scheme and fraudulent transfers of money through the issuance of the Spot On Notes.

143.   At all material times, Defendants had the intent to facilitate and conceal the Ponzi scheme and fraudulent transfers of money through the Spot On Borrowing and the solicitation of new loans and new lenders. The solicitation of new lenders also provided the funds to make payments on the Defendants prior Spot On Notes.

144. Defendants, upon information and belief, assisted, and did actually engage in, the commission of fraud and the Ponzi scheme by coordinating, facilitating, and directing payments and transfers of monies and executing documents in furtherance of continuing the Debtor's participation in the Spot On Borrowing and issuance of new Spot On Notes.

145. The injuries to the Debtor's Estate and to its creditors directly, proximately and reasonably foreseeably resulting from and caused by violations of Sections 6151 and 6155 of the California Business and Professional Code include, without limitation, hundreds of thousands of dollars in improperly transferred and acquired moneys.

146. Plaintiff and the Debtor's estate also suffered damages by incurring attorney's fees and costs associated with the prosecution of Defendants' unlawful activities.

## RESERVATION OF RIGHTS

147. Plaintiff reserves the right to bring all other claims or causes of action that Plaintiff may have against any Defendant, on any and all grounds, as allowed under the law or in equity, including but not limited to, those claims not known by the Trustee at this time but that he may discover during the pendency of this adversary proceeding.

## PRAYER FOR RELIEF

**On the First Through Sixth Claims for Relief:**

1. Avoiding, recovering, and preserving the Transfers to the Defendants in such amounts as the Court may determine pursuant to applicable law;

**On the Seventh Claim for Relief:**

2. Finding the Defendants liable for aiding and abetting the Ponzi scheme of borrowing and payments through the Spot On Notes and awarding the Plaintiff damages as the Court determines;

**On All Claims for Relief:**

3. Awarding punitive and exemplary damages according to proof;

4. Awarding pre-judgment interest at the maximum legal rate;

5. Awarding post-judgment interest at the maximum legal rate from the date of the last Transfer until the judgment is paid in full;

1    6.    Awarding costs of suit incurred herein; and

2    7.    Granting any other and further relief as the Court deems just and proper.

3  Dated: March 18, 2025                    Respectfully submitted,

4                                           DINSMORE & SHOHL LLP

5                                           By: /s/ Tyler Powell

6                                               Tyler Powell
                                                Yosina M. Lissebeck
7                                          *Special Counsel to Richard A. Marshack,
                                           Trustee of the LPG Liquidation Trust*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

23

# EXHIBIT 1

Exhibit 1
Page 24

1  CHRISTOPHER B. GHIO (259094)
   christopher.ghio@dinsmore.com
2  CHRISTOPHER CELENTINO (131688)
   christopher.celentino@dinsmore.com
3  YOSINA M. LISSEBECK (201654)
   yosina.lissebeck@dinsmore.com
4  DINSMORE & SHOHL LLP
5  655 West Broadway, Suite 800
   San Diego, California 92101
6  Tele:  619.400.0500
7  Fax:   619.400.0501

8  Sarah S. Mattingly (Ky. Bar 94257)
   sarah.mattingly@dinsmore.com
9  DINSMORE & SHOHL, LLP
10 101 S. Fifth Street, Suite 2500
   Louisville, Kentucky 40202
11 Tele: 859-425-1096
   Fax: 502-585-2207
12 (Admitted pro hac vice)

13 Special Counsel to Richard A. Marshack

**FILED & ENTERED**

**JUN 03 2024**

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY mccall    DEPUTY CLERK

14          **UNITED STATES BANKRUPTCY COURT**

15     **CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION**

16 In Re                                    Case No: 23-bk-10571-SC

17                                          Chapter 11

18                                          **ORDER GRANTING MOTION FOR**
   The Litigation Practice Group P.C.,      **ENTRY OF PROTECTIVE ORDER AND**
19                                          **THE PROTECTIVE ORDER**
20              Debtor(s),

21                                          Date:   May 23, 2024
                                            Time:   1:30 p.m.
22                                          Judge:  Hon. Scott C. Clarkson
23                                          Place:  Courtroom 5C (via Zoom)[1]
                                                    411 West Fourth Street
24                                                  Santa Ana, CA 92701
25

26

27 ─────────────────────────

28 [1] Video and audio connection information for each hearing will be provided on Judge Clarkson's
   publicly posted hearing calendar, which may be viewed online at:
   http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

Exhibit 1
Page 25

The Court has read and considered the Notice of Motion and Motion for Entry of Protective Order (the "Motion") filed by Richard A. Marshack, in his capacity as the Chapter 11 Trustee (the "Trustee") of the Bankruptcy Estate ("Estate") of The Litigation Practice Group P.C., on May 2, 2024, pursuant to Federal Rule of Bankruptcy Procedure 7026 and Federal Rule of Civil Procedure 26(c)(1), as Dk. No. 1164 ("Motion"), and has found good cause to grant the Motion.

IT IS HEREBY ORDERED that:

1.    The Motion is granted;

2.    The below Protective Order shall apply to any contested matter arising in the main bankruptcy case and in all adversary proceedings filed by or against Trustee, present and future; and

3.    Govern the discovery conducted therein.

**PROTECTIVE ORDER**

**1.    DEFINITIONS**

1.1    "Confidential Information" as used in this Protective Order shall mean documents and other information (regardless of how generated, stored or maintained) that a Party or non-party reasonably believes to contain or reflect non-public financial or business information, bank records, financial records, such as social security numbers, non-public financial or personal information of a Party or non-party, account numbers, sensitive digital information and identifiers, information subject to confidentiality agreements or provisions other than this Protective Order, and other non-public research, development, or commercial information that derives value or avoids injury by virtue of not being known to the public.

1.2    This "Action" is defined and hereby means any contested matter arising in the main bankruptcy case and in all adversary proceedings filed by or against Trustee, present and future.

1.3    "Designating Party" means a Party or non-party that designates Confidential Information during the Action.

1.4    "Receiving Party" means a Party that receives Confidential Information during the Action.

Exhibit 1
Page 26

1.5    "Party" or "Parties" means person or entity subject to this Protective Order.

**2.    SCOPE OF THIS PROTECTIVE ORDER**

2.1    Unless otherwise ordered, this Protective Order shall govern certain documents and other products of discovery obtained in the Action from the Parties there to, and from third parties. As well as certain information copied or derived therefrom, excerpts, summaries or compilations thereof, including, but not limited to, documents voluntarily exchanged as part of early settlement discussions, documents produced pursuant to initial disclosures, requests authorized by the Federal Rules of Civil Procedure made applicable herein by the Federal Rules of Bankruptcy Procedure, answers to interrogatories, deposition transcripts, responses to requests for production, responses to requests for admission, subpoenas, affidavits, declarations, expert reports, and other such material and information as may be produced during the course of the Action and designated as Confidential Information.

**3.    DESIGNATION OF CONFIDENTIAL INFORMATION**

3.1    This Protective Order shall govern the production and handling of any Confidential Information in this Action. Any Party or non-party who produces Confidential Information in this Action may designate it as "Confidential" or "Attorneys' Eyes Only" consistent with the terms of this Protective Order. Whenever possible, the Designating Party must designate only those portions of a document, written discovery responses, deposition, transcript, or other material that contain the Confidential Information and refrain from designating entire documents. Regardless of any designations made hereunder, the Designating Party is not otherwise restricted from use or disclosure of its Confidential Information outside of this Action or for any business purposes. In addition, any Party may move to modify or seek other relief from any of the terms of this Protective Order if it has first tried in writing and in good faith to resolve its needs or disputes with the other Parties or Party as the case may be under the terms of this Protective Order. Further, nothing in this Protective Order shall prevent a Party from redacting documents consistent with the Federal Rules of Civil Procedure and utilizing the documents as needed through-out the Action.

3.2    <u>Application to Non-Parties:</u> Before a non-party is given copies of documents or materials designated as Confidential Information or Attorneys' Eyes Only as permitted hereunder, it

must first sign an acknowledgment to be bound to these terms that is attached hereto as <u>Exhibit</u> A; if it fails to do so, the Parties to this Action must resolve any such dispute before making disclosure of designated information as permitted hereunder to the non-party. If a non-party wishes to make designations hereunder, it must first sign attached <u>Exhibit A.</u>

3.3    <u>Timing and Provisional Protection:</u> Designations of Confidential Information may be made at any time. To avoid potential waiver of protection hereunder, the Designating Party should designate documents or materials containing Confidential Information at the time of production or disclosure, including on the record during the taking of any deposition. Deposition testimony will be deemed provisionally protected for a period of thirty (30) days after the transcript is released to the Parties by the court reporter, although the Parties may agree at any time to different timelines of provisional protection of information as Confidential or Attorneys' Eyes Only as part of one or more specific depositions. To retain any designations beyond the provisional period, a Designating Party must designate specific pages and lines of deposition testimony before the provisional period has expired. Such designations must be made in writing so that all counsel and court reporters may append the designation to all copies of the transcripts.

3.4    <u>Manner of Designation:</u> Confidential Information may be designated hereunder in any reasonable manner or method that notifies the Receiving Party of the designation level and identifies with specificity the information to which the designation applies. If made verbally, the Designating Party must promptly confirm the designation in writing. Whenever possible, the Designating Party should stamp, affix, or embed a legend of "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY" on each designated page of the document or electronic image that contains Confidential Information.

**4.    CHALLENGES TO DESIGNATED INFORMATION**

4.1    In the event that a Receiving Party disagrees at any time with any designation(s) made by the Designating Party, the Receiving Party must first try to resolve such challenge in good faith on an informal basis with the Designating Party. The Receiving Party must provide written notice of the challenge and the grounds therefor to the Designating Party, who must respond in writing to the challenge within fifteen (15) days. At all times, the Designating Party carries the burden of establishing the propriety of the designation and protection level. Unless and until the challenge is

1   resolved by the Parties or ruled upon by the Court, the designated information shall remain protected

2   under this Protective Order. The failure of any Receiving Party to challenge a designation does not

3   constitute a concession that the designation is proper or an admission that the designated information

4   is otherwise competent, relevant, or material.

5         **5.      LIMITED ACCESS/USE OF PROTECTED INFORMATION**

6         5.1    <u>Restricted Use:</u> Information that is produced or exchanged in the course of the Action

7   and designated under this Protective Order may be used for preparation for trial and preparation for

8   any appeal of any and all matters in the Action, as well as related settlement negotiations, and for no

9   other purpose, without the written consent of the Designating Party. No Confidential Information may

10  be disclosed to any person except in accordance with the terms of this Protective Order, unless the

11  parties are co-counsel or have entered into joint defense agreements. All persons in possession of

12  Confidential Information agree to exercise reasonable care with regard to the custody, use, or storage

13  of such information to ensure that its confidentiality is maintained. This obligation includes, but is

14  not limited to, the Receiving Party providing to the Designating Party prompt notice of the receipt of

15  any subpoena that seeks production or disclosure of any designated information and consulting with

16  the Designating Party before responding to the subpoena. Any use or disclosure of Confidential or

17  Attorneys' Eyes Only information in violation of the terms of this Protective Order may subject the

18  disclosing person or party to sanctions.

19        5.2    <u>Access to "Confidential" Information:</u> The Party(ies) and all persons subject to this

20  Protective Order agree that information designated as "CONFIDENTIAL" may only be accessed or

21  reviewed by the following:

22        a)     The Court, its personnel, and court reporters;

23        b)     Counsel of record, or co-counsel for any Party, or other party that has entered into a

24  joint defense agreement in the Action and their employees who assist counsel of record, or co-counsel

25  in the Action and are informed of the duties and obligations imposed hereunder;

26        c)     The Parties, including their clients, agents and employees who are assisting or have

27  reason to know of the Action;

28  / / /

d)      Experts or consultants employed by the Parties or their counsel, or co-counsel, for purposes of an Action, so long as each such expert or consultant has signed attached Exhibit A; and

e)      Other witnesses or persons with the Designating Party's consent or by court order.

5.3      Access to "Attorneys' Eyes Only" Designations: The Parties and all persons subject to this Protective Order agree that information designated as "ATTORNEYS' EYES ONLY" may only be accessed or reviewed by the following:

a)      The Court, its personnel, and court reporters;

b)      Counsel of record, or co-counsel for any Party, or other party that has entered into a joint defense agreement in the Action and their employees who assist counsel of record in the Action and are informed of the duties hereunder;

c)      In-house counsel for any Party in the Action and Richard A. Marshack, as Chapter 11 Trustee of The Litigation Practice Group P.C. who is informed of the duties and obligations imposed hereunder;

d)      Experts or consultants employed by the Parties or their counsel, or co-counsel for purposes of the Action,  and so long as each such expert or consultant has signed attached Exhibit A; and

e)      Other witnesses or persons to whom the Designating Party agrees in advance of disclosure or by court order.

5.4      Non-Waiver Effect of Designations: Neither the taking of, nor the failure to take, any action to enforce the provisions of this Protective Order, nor the failure to object to any designation, will constitute a waiver of any Party(ies)'s claim or defense in the Action or any other action or proceeding, including, but not limited to, a claim or defense that any designated information is or is not Confidential, is or is not entitled to particular protection, or embodies or does not embody information protectable by law.

5.5      In-Court Use of Designated Information: If information designated under this Protective Order will or may be offered in evidence at a hearing or trial related to any matter in the Action, then the offering party must give advance notice to the party or non-party that designated prior to offering the information so that any use or disclosure may be addressed in accordance with

6

Exhibit 1
Page 30

1    the Court's case-management or other pre-trial order, or by a motion *in limine.*  Nothing in this

2    Protective Order shall be construed as a waiver by a Party of any objections that may be raised as to

3    the admissibility at trial of any evidentiary materials.

4    **6.    CLAW-BACK REQUESTS**

5    6.1    <u>Failure to Make Designation:</u>  If, at any time, a Party or non-party discovers that it

6    produced or disclosed Confidential Information without designation, it may promptly notify the

7    Receiving Party and identify with particularity the Confidential Information to be designated and the

8    level of designation (the claw-back notification). The Receiving Party may then request substitute

9    production of the newly-designated information. Within thirty (30) days of receiving the claw-back

10   notification, the Receiving Party must: (1) certify to the Designating Party it has appropriately marked

11   or, if substitute production has been requested, destroyed all unmarked copies that it received, made,

12   and/or distributed; and (2) if it was practicably unable to mark or destroy any information because

13   disclosures occurred while the Receiving Party was under no duty of confidentiality under the terms

14   of this Protective Order regarding that information, the Receiving Party must reasonably provide as

15   much information as practicable to aid the Designating Party in protecting the information,

16   consistently with the Receiving Party's attorney-client, work-product, and/or trial-preparation

17   privileges.

18   6.2    <u>Inadvertent Production of Privileged Information:</u> If, at any time, a Party discovers

19   that it produced information that it reasonably believes is subject to protection under the

20   attorney/client, work-product, or trial-preparation privileges, then it must promptly notify each

21   Receiving Party of the claim for protection, the basis for it, amend its privilege log accordingly, and

22   comply with Fed. R. Civ. P. 26(b)(5). Whenever possible, the producing party must produce substitute

23   information that redacts the information subject to the claimed protection. The Receiving Party must

24   thereupon comply with Fed. R. Civ. P. 26(b)(5)(B) as to the information subject to the claimed

25   protection.

26   / / /

27   / / /

28   / / /

1      **7.**     **DURATION/CONTINUED RESTRICTIONS**

2      7.1     <u>Handling of Designated Information Upon Conclusion of the Main Bankruptcy Case:</u>

3 Upon conclusion of the Main Bankruptcy Case, by way of dismissal or closing of the case, the

4 Designating Party(ies) is/are responsible for ensuring that any Party or person to whom the

5 Designating Party shared or disclosed designated information in any of the matters under the Action

6 returns or destroys all of its copies, regardless of the medium in which it was stored. No witness or

7 Party may retain designated information that it received from any other Party or non-party under this

8 Protective Order; only counsel of record, or co-counsel, are the authorized agents who may retain one

9 copy for their respective legal files, and who must also describe to the Designating Party the extra

10 steps taken to protect its legal file containing paper and/or electronic copies of the designated

11 information so that it is not accessed, used, or disclosed inconsistently with the obligations under this

12 Protective Order. This provision does not apply to the Court or Court staff. Moreover, this provision

13 does not apply to Trustee, who may retain and use – consistent with this Order – Confidential

14 Information received in any Action during the entirety of the Bankruptcy.

15      7.2     <u>Continued Restrictions Under this Protective Order:</u> The restrictions on disclosure and

16 use of Confidential Information shall survive the conclusion of the Bankruptcy case and any matter

17 in the Action.

18      **8.**     **PRIVILEGED OR PROTECTED INFORMATION**

19      8.1     Nothing in this Protective Order shall require disclosure of information that is

20 protected by the attorney-client privilege, the work-product protection, or any other legally cognizable

21 privilege (a "Privilege or Protection"). If information subject to a claim of Privilege or Protection is

22 inadvertently produced, pursuant to Federal Rule of Evidence 502(d) such production shall not

23 constitute a waiver of, or estoppel as to, any claim of Privilege or Protection for such information or

24 any other information that may be protected from disclosure by a Privilege or Protection in any

25 proceeding.

26      8.2     If a Party receives a document that appears to be subject to a Privilege or Protection,

27 then it shall refrain from examining the document any more than is essential to ascertain if it is

28 privileged or protected and shall promptly notify the producing Party in writing that the receiving

Party possesses material that appears to be subject to a Privilege or Protection. The producing Party shall have seven (7) days after receiving such notice to assert a Privilege or Protection over the identified material. If the producing Party does not assert a claim of Privilege or Protection within the seven (7)-day period, the material in question shall be deemed not privileged or protected.

8.3    If a producing Party has produced a document subject to a claim of Privilege or Protection, upon written request by the producing Party, the document for which a claim of Privilege or Protection is made shall be sequestered or destroyed to the extent reasonably practicable, and the receiving Party shall not use the document for any purpose other than in connection with analyzing or disputing a claim of Privilege or Protection or in connection with a motion to compel the production of the document.

8.4    The receiving Party sequestering or destroying such material may then move the Court for an order compelling production of the material. The applicable producing Party bears the burden of establishing the applicable Privilege or Protection of any clawed-back document or information as and to the same extent that it would have borne such burden had it not produced the document or information.  Nothing in this Protective Order shall limit the Court's right or any receiving Party's right to request an in camera review of any information subject to a claim of Privilege or Protection.

###

Date: June 3, 2024

Scott C. Clarkson
United States Bankruptcy Judge

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT "A"

1  Christopher B. Ghio (State Bar No. 259094)
   Christopher Celentino (State Bar No. 131688)
2  Yosina M. Lissebeck (State Bar No. 201654)
   **DINSMORE & SHOHL LLP**
3  655 West Broadway, Suite 800
   San Diego, CA 92101
4  Telephone:  619.400.0500
   Facsimile:  619.400.0501
5  christopher.ghio@dinsmore.com
   christopher.celentino@dinsmore.com
6  yosina.lissebeck@dinsmore.com

7  Sarah S. Mattingly (Ky. Bar 94257)
   DINSMORE & SHOHL, LLP
8  101 S. Fifth Street, Suite 2500
   Louisville, KY 40202
9  Telephone: 859-425-1096
   Facsimile: 502-585-2207
10 Sarah.mattingly@dinsmore.com
   (Admitted pro hac vice)
11
   Special Counsel to Richard A. Marshack,
12 Chapter 11 Trustee

13

14
                    **UNITED STATES BANKRUPTCY COURT**
15
                    **CENTRAL DISTRICT OF CALIFORNIA**
16

17

18 In Re                                    Case No. 8:23-BK-10571-SC

19                                           Chapter 11

20 The Litigation Practice Group P.C.,       **EXHIBIT A TO STIPULATED
                                             ORDER**
         Debtor(s),
21                                           Date:   May 23, 2024
22                                           Time:   1:30 p.m.
                                             Judge:  Hon. Scott C. Clarkson
23                                           Place:  Courtroom 5C[1] - Via Zoom
24                                                   411 W. Fourth Street
                                                     Santa Ana, CA  92701
25

26

27  _____
   [1] Video and audio connection information for each hearing will be provided on Judge Clarkson's
28  publicly posted hearing calendar, which may be viewed online at:
   http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

                                        1
                                                              Exhibit 1
                                                              Page 35

This is to certify that:

      (a)     I am being given access to Confidential Information pursuant to the Stipulated Protective Order that was entered into the main bankruptcy case for Litigation Practice Group, but which is binding and controlling as set forth by the Court's Order on any and all contested matters and any and all litigation commenced by Trustee;

      (b)     I have read the Stipulated Protective Order; and

      (c)     I agree to be bound by the terms and conditions thereof, including, without limitation, to the obligations regarding the use, non-disclosure and return of such Confidential Information. I further agree that in addition to being contractually bound by the Stipulated Protective Order, I am subject to the jurisdiction of the above reference Court for any violation thereof.

Date: _____

_____
Signature

_____
Printed Name

Exhibit 1
Page 36

# EXHIBIT 2

Exhibit 2
Page 37

| Date | Account | Payee | Amount | 90 Day Transfer | Post-Petition Transfer |
|---|---|---|---|---|---|
| 01/10/23 | Spot On Acct. #2777 | Mma ...7365 Transaction#: 16257898800 | $172,500.00 | Y | N |
| 01/18/23 | Spot On Acct. #2777 | Mma . 7365 Transaction* 16322177441 | $194,500.00 | Y | N |
| 01/26/23 | Spot On Acct. #2777 | Mma ...9789 Transaction* 16381304343 | $350,000.00 | Y | N |
| 02/02/23 | Spot On Acct. #2777 | Mma ...7365 Transaction* 16446551217 | $50,000.00 | Y | N |
| 02/02/23 | Spot On Acct. #2777 | Mma ...7365 Transaction* 16448110584 | $45,000.00 | Y | N |
| 02/02/23 | Spot On Acct. #2777 | Mma ...9789 Transactionk 16446523528 | $150,000.00 | Y | N |
| 02/02/23 | Spot On Acct. #2777 | Mma _7365 Transaction*. 16446594384 | $50,000.00 | Y | N |
| 02/16/23 | Spot On Acct. #2777 | Mma . 7365 Transaction* 16595301360 | $15,000.00 | Y | N |
| 03/06/23 | Spot On Acct. #2777 | Mma ...7365 Transaction* 16759957524 | $29,000.00 | Y | N |
| 03/06/23 | Spot On Acct. #2777 | Mma ...7365 Transaction*. 16759958667 | $20,000.00 | Y | N |
| 03/06/23 | Spot On Acct. #2777 | Mma .7365 Transaction*: 16739005837 | $20,000.00 | Y | N |
|  |  |  |  |  |  |
|  |  | Total | $1,096,000.00 |  |  |
|  |  |  |  |  |  |

Exhibit 2
Page 38

| Date | Account | Payee | Amount | 90 Day Transfer | Post-Petition Transfer |
|---|---|---|---|---|---|
| 01/05/23 | Spot On Acct. #7662 | Mma  7365 Transaction4 16214786541 | $30,000.00 | Y | N |
| 1/20/2023 | Spot On Acct. #7662 | Mma ...7365 Transaction#. 16341391058 | $9,454.00 | Y | N |
| 01/27/23 | Spot On Acct. #7662 | Mma ...7365 Transaction# 16395789180 | $12,320.00 | Y | N |
| 2/3/2023 | Spot On Acct. #7662 | Mma ...7365 Transaction#: 16465327635 | $8,250.00 | Y | N |
| 2/10/2023 | Spot On Acct. #7662 | Mma . 7365 Transaction# 16537518033 | $10,000.00 | Y | N |
| 2/16/2023 | Spot On Acct. #7662 | Mma ...7365 Transaction#. 16598056268 | $3,050.00 | Y | N |
| 2/24/2023 | Spot On Acct. #7662 | Mma  7365 Transaction* 16667664800 | $20,000.00 | Y | N |
| 3/13/2023 | Spot On Acct. #7662 | Mma ...7365 Transaction# 16815523043 | $7,275.00 | Y | N |
| | | | | | |
| | | **Total** | **$100,349.00** | | |
| | | | | | |

Exhibit 2
Page 39

# EXHIBIT 3

Exhibit 3
Page 40

DocuSign Envelope ID: 73DBD124-F383-4A28-B567-19A726B1F659



## 24 MONTH PLAN WITH PAYMENTS

Lender: SPOT ON INVESTMENTS/ERIC MARTINSON

Contact Person: Spot On Investments

Corp: _____    LLC: _____    Sole Prop: _____    Partnership: _____

Other: _____    Address: 1560 AMBERSWEET ST., CORONA, CA 92881

Phone: 714-624-4446    Email: e04j04m04@gmail.com

Amount: 50,000.00

**NO BUSINESS RELATIONSHIP CAN COMMENCE BEFORE
LITIGATION PRACTICE GROUP IS IN RECEIPT OF THE FOLLOWING**

## LENDER CHECKLIST

☑ Lender Agreement – signed & returned

☑ W-9- with EIN/ SSN

☑ Direct deposit form / Copy of voided Check



Referred By: ERT

DocuSign Envelope ID: 73DF80F24-7306-4A28-B567-A2663659



## LOAN / LENDER AGREEMENT

This agreement is made and entered into between <u>SPOT ON INVESTMENTS</u>
("Lender") and Litigation Practice Group. ("LPG") as of the date last signed below.
Lender and LPG may be jointly referred to herein as the "Parties." LPG may also be
referred to herein as the "Borrower".

## ARTICLE 1 (TERM OF CONTRACT)

This agreement is for a total of 24 to 25 Months.

## ARTICLE II (BREAKDOWN OF LOAN)

On this day <u>SPOT ON INVESTMENTS</u> Lender is agreeing to loan LPG the following sum:
$ <u>50,000.00</u>
This amount will be held for a Total of 24 Months. Initial loan will be paid back to Lender
in Full on Month 24 and LPG has option to pay on Month 25 with an additional 10%
interest.

Borrower promises to pay back initial funds within 24 to 25 Months from today. Borrow-
er promises to pay back FULL amount of loan PLUS an additional 10% in interest per
month. Borrower promises to pay back to Lender the Total Sum of
$ <u>170,000.00</u>

## ARTICLE III (REPAYMENT)

Borrower will pay back in the following manner. Borrower will repay the amount of this
note in 24 equal continuous monthly installments of $ <u>5,000.00</u> each on the
day of each month preliminary on the <u>3RD</u> day of <u>FEBRUARY</u> 20 <u>23</u> and ending
on <u>JANUARY</u> 20 <u>25</u> .
Final balance (initial loan) $ <u>50,000.00</u> will be paid back in Full on Month
24 to 25 in thus completing the Contract.



Exhibit 3
Page 42

DocuSign Envelope ID: 23D78CF2-0366-4A28-B567-20C12081359



## ARTICLE IV (LATE CHARGE & PENALTY FOR EARLY WITHDRAWAL)

Late Charge. Any payment not remunerated within Ten (10) days of its due date shall be subject to a belatedly charge of 5% of the monthly payment.

There will be a 25% fee required from initial capital for early withdrawal. All requests must be submitted in writing to LPG:

17542 E. 17th Street

Tustin, CA 92870

Early withdrawals will be paid within 15 days of submitted request.

## ARTICLE V (ARBITRATION)

Section 6.01. Binding Arbitration. Any dispute, controversy or claim arising out of or relating to this Agreement or the business relationship of the Parties, its enforcement, arbitrability or interpretation, or because of an alleged breach, default, or misrepresentation in connection with any of the foregoing, including any alleged violation of statute, common law or public policy shall be submitted to final and binding arbitration before JAMS to be held in Orange County California before a single arbitrator, in accordance with the then-current JAMS rules and the Federal Arbitration Act, as modified by the terms and conditions contained in this paragraph. A copy of the James rules are available online (www.jamsadr.com). By initialing below, Lender agrees to waive all rights to a jury trial and waives the right to pursue any class or representative claims to the maximum extent allowed by law. To the extent a class or representative claim may not be waived, the Lender agrees to stay any such claims until after all claims subject to arbitration are fully resolved. The arbitrator shall be selected by mutual agreement of the parties or, if the parties cannot agree, then by striking from a list of arbitrators supplied by JAMS. The arbitrator shall issue a written opinion stating the essential findings and conclusions on which the arbitrator's award is based. LPG will pay the arbitrator's fees and arbitration expenses and any other costs unique to the arbitration hearing (recognizing that each side bears its own deposition, witness, expert and attorney's fees and other expenses to the same extent as if the matter were being heard in court). If, however, any party prevails on a statutory claim that affords the prevailing party attorneys' fees and costs, then the arbitrator may award reasonable attorneys' fees and costs to the prevailing party. Any dispute as to who is a prevailing party and/or the reasonableness of any fee or costs shall be resolved by the arbitrator. JAMS can be reached at 949.224.1810 or www.jamsadr.com.

This Agreement to arbitrate is freely negotiated between Lender and LPG and is mutually entered into between the parties. Each party fully understands and agrees that they are giving up certain rights otherwise afforded to them by civil court actions, including but not limited to the right to a jury trial.

🌐 www.LPGlaw.com    📞 (949) 229-6262    📍 17542 E. 17th Street
🖨 (949) 315-4332    Suite 100
Tustin, CA 92780

Exhibit 3
Page 43



By initialing below, each person signing below acknowledges he or she has read this paragraph, understands it, wants the other side to be bound by it, and agrees to be bound by it.

_Dan_ (initials)          _SM_ (initials)

**Borrower**                    **Lender**

## ARTICLE VI (MISCELLANEOUS)

Entire Agreement. The parties hereto agree that this contract contains the entirety of the agreements of the parties with respect to the subject matter hereof and that there are no other agreements oral or otherwise nor shall any amendments be permitted except by writing signed by all parties.

Place of Law and Venue. The parties agree that any action brought of maintained to enforce or interpret this agreement shall be in accordance with the laws of the State of California and venue for any such shall be in the County of Orange, State of California.

Requirement of Mediation before Arbitration. The parties agree that in the event a dispute arises between the Parties with respect to the relationship contemplated by this Agreement, the Parties shall engage in a full day of mediation prior to filing any petition or complaint for relief with any administrative office, court or arbitrator. Failure to do so shall deprive an offending party of any right it may have had to recover costs or attorney's fees in any proceeding.

Authority. Each person who signs below on behalf of an entity or any other person represents that he/she has been expressly given authority to do so.

**SEND WIRE TRANSFER TO**
The Litigation Practice Group

Bank Name:          Routing:          Account Number:
Chase Bank          322271627         ████2777

Address:                              Name:
17542 E 17th Street Suite 100         Litigation Practice Group
Tustin, CA 92780

LPG | LITIGATION
P R A C T I C E G R O U P

**Litigation Practice Group:**

*Dan March* 01/20/2023

Signature                        Date

Dan March, Managing Shareholder
Printed Name

**LENDER:**

DocuSigned by:

*Spot On Investments* 01/20/2023

Signature                        Date

Spot On Investments
Printed Name

701202023
Batch #:



Contract is being executed via Spot On Consulting. Spot On is the administrative liaison / servicing company that works on behalf of both Lender and Borrower.

DocuSign Envelope ID: 73DE0K21F559 4A286 567 DOAA203659

# Spot On Consulting

## Direct Deposit Authorization

**Instructions** _____

This document must be signed by the person requesting automatic deposit of dividends and retained on file by the institute. A voided check must be attached for the account to help verify their account numbers and bank routing numbers.

**Account 1** _____

Account 1 type: ◯ Checking ◯ Savings

Bank routing number (ABA number): _009897_____

Account number: ███ 7999 _____

*attach a voided check for each account here*

**Authorization** (enter your company name in the blank space below) _____

This authorizes __The Litigation Practice Group_____ (the "Company") to send credit entries (and appropriate debit and adjustment entries), electronically or by any other commercially accepted method, to my (our) account(s) indicated below and to other accounts I (we) identify in the future (the "Account"). This authorizes the financial institution holding the Account to post all such entries. I agree that the ACH transactions authorized herein shall comply with all applicable U.S. Law. This authorization will be in effect until the Company receives a written termination notice from myself and has a reasonable opportunity to act on it.

Authorized signature: _DocuSigned by: *Spot On Investments* 0081CB8A03954B8...___ Date: _01/20/2023_____

Print name: _Spot On Investments_____

Exhibit 3

Page 46

# EXHIBIT 4

Exhibit 4
Page 47

| Date | Account | Description | Amount | 90 Day Transfer | Post-Petition Transfer |
|---|---|---|---|---|---|
| 8/26/22 | Spot On Acct No. #7662 | Eric Martinson/Spot OnEmspoton (_#####8637) | $6,496.00 | N | N |
| 9/2/22 | Spot On Acct No. #7662 | Emspoton (_#####8637) | $5,860.00 | N | N |
| 9/12/22 | Spot On Acct No. #7662 | Emspoton (_#####8637) | $6,330.00 | N | N |
| 09/16/22 | Spot On Acct No. #7662 | Emspoton (_#####8637) | $6,513.33 | N | N |
| 09/28/22 | Spot On Acct No. #7662 | Emspoton (J044/8637) | $5,000.00 | N | N |
| 09/29/22 | Spot On Acct No. #7662 | Emspoton (_#####8637) | $19,717.00 | N | N |
| 10/6/22 | Spot On Acct No. #7662 | Emspoton (_#####8637) | $8,460.00 | N | N |
| 10/26/22 | Spot On Acct No. #7662 | Emspoton (_#####8637) | $5,000.00 | N | N |
| 11/1/22 | Spot On Acct No. #7662 | Emspoton (_#44148637) | $5,000.00 | N | N |
| 11/1/22 | Spot On Acct No. #7662 | Emspoton (_#####8637) | $5,000.00 | N | N |
| 11/3/22 | Spot On Acct No. #7662 | Emspoton (_#14448637) | $19,200.00 | N | N |

Exhibit 4
Page 48

| Date | Account | Description | Amount | 90 Day Transfer | Post-Petition Transfer |
|---|---|---|---|---|---|
| 11/09/22 | Spot On Acct No. #7662 | Emspoton (_#####8637) | $23,000.00 | N | N |
| 11/15/22 | Spot On Acct No. #7662 | Emspoton (_###f#48637) | $10,000.00 | N | N |
| 11/25/22 | Spot On Acct No. #7662 | Emspoton (_#####8637) | $17,141.00 | N | N |
| 11/30/22 | Spot On Acct No. #7662 | Emspoton (_#####8637) | $1,000.00 | N | N |
| 12/2/22 | Spot On Acct No. #7662 | Emspoton (_###448637) | $3,500.00 | N | N |
| 12/2/22 | Spot On Acct No. #7662 | Emspoton (_##4448637) | $6,200.00 | N | N |
| 12/29/22 | Spot On Acct No. #7662 | Emspoton (_#####8637) | $7,500.00 | Y | N |
| 12/29/22 | Spot On Acct No. #7662 | Emspoton (_#####8637) | $5,000.00 | Y | N |
| 1/11/23 | Spot On Acct No. #7662 | Emspoton (_#####8637) | $7,000.00 | Y | N |
| 1/12/23 | Spot On Acct No. #7662 | Emspoton (_#####8637) | $13,000.00 | Y | N |
| 1/17/23 | Spot On Acct No. #7662 | Emspoton (_#####8637) | $10,000.00 | Y | N |

Exhibit 4
Page 49

| Date | Account | Description | Amount | 90 Day Transfer | Post-Petition Transfer |
|---|---|---|---|---|---|
| 1/24/23 | Spot On Acct No. #7662 | Emspoton (_#####8637) | $18,641.00 | Y | N |
| 1/26/23 | Spot On Acct No. #7662 | Emspoton (_#####8637) | $5,000.00 | Y | N |
| 2/1/23 | Spot On Acct No. #7662 | Emspoton (_#####8637) | $7,500.00 | Y | N |
| 2/1/23 | Spot On Acct No. #7662 | Emspoton (_#ff###8637) | $5,000.00 | Y | N |
| 2/2/23 | Spot On Acct No. #7662 | Emspoton (_#####8637) | $5,000.00 | Y | N |
| 2/3/23 | Spot On Acct No. #7662 | Emspoton (_#####8637) | $19,200.00 | Y | N |
| 2/9/23 | Spot On Acct No. #7662 | Emspoton (_ffli###8637) | $5,000.00 | Y | N |
| 2/10/23 | Spot On Acct No. #7662 | Emspoton (_#####8637) | $23,000.00 | Y | N |
| 2/10/23 | Spot On Acct No. #7662 | Emspoton (J044148637) | $7,000.00 | Y | N |
| 2/15/23 | Spot On Acct No. #7662 | Emspoton (_#####8637) | $20,000.00 | Y | N |
| 2/16/23 | Spot On Acct No. #7662 | Emspoton (_#####8637) | $10,000.00 | Y | N |

Exhibit 4
Page 50

| Date | Account | Description | Amount | 90 Day Transfer | Post-Petition Transfer |
|---|---|---|---|---|---|
| 2/23/23 | Spot On Acct No. #7662 | Emspoton (_#4048637) | $18,641.00 | Y | N |
| 2/27/23 | Spot On Acct No. #7662 | Emspoton (_1104O8637) | $5,000.00 | Y | N |
| 03/01/23 | Spot On Acct No. #7662 | Emspoton (_#####8637) | $57,500.00 | Y | N |
| 3/1/23 | Spot On Acct No. #7662 | Emspoton *(_#####8637)* | $5,000.00 | Y | N |
| 3/2/23 | Spot On Acct No. #7662 | Emspoton (_#####8637) | $5,000.00 | Y | N |
| 3/6/23 | Spot On Acct No. #7662 | Emspoton (_#####8637) | $19,200.00 | Y | N |
| 03/09/23 | Spot On Acct No. #7662 | Emspoton (_#####8637) | $5,000.00 | Y | N |
| 3/13/23 | Spot On Acct No. #7662 | Emspoton (_#####8637) | $23,000.00 | Y | N |
| 3/13/23 | Spot On Acct No. #7662 | Emspoton (_#####8637) | $7,000.00 | Y | N |
| | | **Total** | **$466,599.33** | | |
| | | | | | |
| | | | | | |

Exhibit 4
Page 51

| | | Jesse Martinson Payments | | | |
|---|---|---|---|---|---|
| | | | | | |
| **Date** | **Account** | **Description** | **Amount** | **90 Day Transfer** | **Post-Petition Transfer** |
| 03/09 | Spot On Acct No. #2777 | Jessemartinson (_if***5415) | $5,000.00 | Y | N |
| 03/16 | Spot On Acct No. #2777 | Jessemartinson (_44445415) | $5,000.00 | Y | N |
| 03/23 | Spot On Acct No. #2777 | Jessemartinson (_****5415) | $5,000.00 | N | Y |
| 03/30 | Spot On Acct No. #2777 | Jessemartinson (_#*##5415) | $5,000.00 | N | Y |
| **Date** | **Account** | **Description** | **Amount** | **90 Day Transfer** | **Post-Petition Transfer** |
| 2/16/2023 | Spot On Acct No. #7662 | Jessemarlinson (_####5415) | $15,000.00 | Y | N |
| 3/17/2023 | Spot On Acct No. #7662 | Jessemartinson (_####5415) | $15,000.00 | Y | N |
| 3/30/23 | Spot On Acct No. #7662 | Jessemartinson (_#44145415) | $100,000.00 | N | Y |
| | | | | | |
| | | **Total** | **$150,000.00** | | |
| | | | | | |
| | | | | | |

Exhibit 4
Page 52

# EXHIBIT 5

Exhibit 5
Page 53

RECORDED AT THE REQUEST OF
CHICAGO TITLE - INLAND EMPIRE

RECORDING REQUESTED BY:
Emerald Escrow, Inc.
Order No. 7102210425
Escrow No. 82529
Parcel No. 108-553-005

AND WHEN RECORDED MAIL TO:

ERIC MARTINSON
1560 AMBERSWEET STREET
CORONA, CA 92881

DOC # 2022-0381490
09/01/2022 04:26 PM Fees: $17.00
Page 1 of 2
Recorded in Official Records
County of Riverside
Peter Aldana
Assessor-County Clerk-Recorder

**This document was electronically submitted
to the County of Riverside for recording**
Receipted by: TERESA #134

TRA· 004-080

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## GRANT DEED

THE UNDERSIGNED GRANTOR(S) DECLARE(S) THAT DOCUMENTARY TRANSFER TAX IS **$1,375.00** and CITY $ 0
☑ computed on full value of property conveyed, or
☐ computed on full value less liens or encumbrances remaining at the time of sale.
☐ unincorporated area:          ☐ **Corona**, and

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, **Suad Al Shekhli, a Married Woman as her sole and separate property**

hereby GRANT(S) to   **Eric Martinson**, a widower and Betty Jo Martinson, a widow, as Joint Tenants
the following described real property in the County of **Riverside**, State of California:
See Exhibit "A" Attached Hereto and Made A Part Of.
More commonly known as: **1560 Ambersweet Street, Corona, CA 92881**

Date    August 5, 2022

Suad Al Shekhli

---

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA
COUNTY OF Riverside          } S.S.

On August Ø 5, 2022, before me, Emily Bahos, Notary Public
personally appeared **Suad Al Shekhli** who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

EMILY BAHOS
Notary Public - California
Riverside County
Commission # 2310302
My Comm. Expires Oct 24, 2023

Mail Tax Statement to: SAME AS ABOVE or Address Noted Below

Exhibit 5
Page 54

## EXHIBIT "A"

### Legal Description

For APN/Parcel ID(s): 108-553-005

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF CORONA, COUNTY OF RIVERSIDE, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS: LOT 47, OF TRACT 25469 AS SHOWN BY MAP ON FILE IN BOOK 304, PAGES 11 TO 18 INCLUSIVE OF MAPS IN THE OFFICE OF THE COUNTY RECORDER OF RIVERSIDE COUNTY, CALIFORNIA.

EXCEPTING ALL MINERALS, OIL, GAS AND OTHER HYDROCARBON SUBSTANCES BELOW A DEPTH OF 500 FEET WITHOUT THE RIGHT OF SURFACE ENTRY AS RESERVED BY CORPORATION OF THE PRESIDENT OF THE SAN BERNARDINO STAKE OF THE CHURCH OF JESUS CHRIST OF LATTER DAY SAINTS, A CORPORATION SOLE, IN DOCUMENT RECORDED SEPTEMBER 22, 1983 AS INSTRUMENT NO. 83-194547 OF OFFICIAL RECORDS.

Exhibit 5
Page 55

# EXHIBIT 6

Exhibit 6
Page 56

In re: The Litigation Practice Group PC
Disbursement Details by Payee
4 Years Pre-Petition (03/20/2019 - 03/20/2023)

Spot On Consulting, Inc

**GROBSTEIN TEEPLE**

| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|
| Chase | LPG; Alex Tarkoff | 0935 | 6/17/2022 | 6/13/2022 | | 30,000.00 | IN *SPOT ON CONSULTING, I 714-62`I446 CA P.O.S.: 4 SALES TAX: 0.00 |
| Chase | The Litigation Practice Group PC | 3158 | 7/31/2022 | 7/13/2022 | 1248 | 6,448.85 | |
| Chase | LPG VC; Alex Tarkoff | 6652 | 7/29/2022 | 7/19/2022 | | 30,000.00 | IN *SPOT ON CONSULTING, I 714-6244446 CA P.O.S.: 7 SALES TAX: 0.00 |
| Chase | LPG VC; Alex Tarkoff | 6652 | 8/12/2022 | 8/1/2022 | | 10,897.28 | IN *SPOT ON CONSULTING, 714-62146 CA P.O.S.: 63 SALES TAX: 0.00 |
| Chase | The Litigation Practice Group PC | 3158 | 8/31/2022 | 8/15/2022 | | 23,900.00 | Orig CO Name:Spot On Consulti Orig ID:9215986202 Desc Date:220813 CO Entry Descr:Sale Sec:CCD Trace#:021000028069548 Eed:220815 md ID: md Name:The Litigation Practic Tm: 2278069548Tc |
| Chase | LPG; Alex Tarkoff | 6652 | 8/26/2022 | 8/16/2022 | | 93,000.00 | IN *SPOT ON CONSULTING, I 714-62`I146 CA P.O.S.: 81 SALES TAX: 0.00 |
| Chase | LPG VC; Alex Tarkoff | 6652 | 8/26/2022 | 8/16/2022 | | 99,000.00 | IN *SPOT ON CONSULTING, I 714-62`I446 CA P.O.S.: 79 SALES TA}(: 0.00 |
| Chase | LPG; Alex Tarkoff | 0935 | 8/26/2022 | 8/16/2022 | | 80,000.00 | IN *SPOT ON CONSULTING, I 714-62146 CA P.O.S.: 80 SALES TAX: 0.00 |
| Chase | LPG VC; Alex Tarkoff | 6652 | 9/9/2022 | 8/30/2022 | | 93,000.00 | IN *SPOT ON CONSULTING, I 714-62`1`146 CA P.O.S.: 82 SALES TAX: 0.00 |
| Chase | LPG VC; Alex Tarkoff | 6652 | 9/23/2022 | 9/14/2022 | | 42,300.00 | SQ *SPOT ON CONSULTING IN GOSQ.COM CA P.O.S.: 00011529215118981 SALES TAX: 0.00 |
| Chase | LPG VC; Alex Tarkoff | 6652 | 9/23/2022 | 9/19/2022 | | 39,440.00 | SQ *SPOT ON CONSULTING IN GOSQ.COM CA P.O.S.: 00011529215119104 SALES TAX: 0.00 |
| Chase | The Litigation Practice Group PC | 3158 | 9/30/2022 | 9/21/2022 | | 21,200.00 | Book Transfer Debit A/C: Spot On Consulting, Inc Corona 92881-0722 US Ref: mv 1050 Tm: 4978500264Jo |
| Chase | LPG; Alex Tarkoff | 0935 | 10/7/2022 | 9/26/2022 | | 5,370.00 | SQ *SPOT ON CONSULTING IN GOSQ.COM CA P.O.S.: 00011529215119470 SALES TAX: 0.00 |
| Chase | The Litigation Practice Group PC | 3158 | 9/30/2022 | 9/28/2022 | | 52,280.00 | Book Transfer Debit NC: Spot On Consulting, Inc Corona CA 92881-0722 US Ref: Inv 1051 Tm: 3364100271Jo |
| Chase | LPG VC; Alex Tarkoff | 6652 | 10/7/2022 | 10/3/2022 | | 48,508.00 | SQ *S POT ON CONSULTING IN GOSQ.COM CA P.O.S.: 00011529215119724 SALES TAX: 0.00 |
| Chase | The Litigation Practice Group PC | 3158 | 10/31/2022 | 10/4/2022 | | 33,040.00 | Book Transfer Debit A/C: Spot On Consulting, Inc CA 92881 -0722 US Ref: Invoice 1052 Tm: 5i82000277Jo |
| Chase | The Litigation Practice Group PC | 3158 | 10/31/2022 | 10/11/2022 | | 25,240.00 | Book Transfer Debit A/C: Spot On Consulting, Inc Corona 92881-0722 US Ref: InvlO53Trn: 1625600283Jo |
| Chase | The Litigation Practice Group PC | 3158 | 10/31/2022 | 10/25/2022 | | 21,200.00 | Book Transfer Debit A/C: Spot On Consulting, Inc Corona 92881-0722 US Ref: nv 1058 Tm: 4243400298Jo |
| Chase | The Litigation Practice Group PC | 3158 | 10/31/2022 | 10/26/2022 | | 58,120.00 | Book Transfer Debit A/C: Spot On Consulting, Inc Corona CA 92881 -0722 US Tm: 3463200299Jo |
| Chase | The Litigation Practice Group PC | 3158 | 11/30/2022 | 11/2/2022 | | 25,240.00 | Book Transfer Debit NC: Spot On Consulting, Inc Corona CA 92881 -0722 US Ref mv 1062 Tm: 3865500306Jo |
| Chase | The Litigation Practice Group PC | 3158 | 11/30/2022 | 11/2/2022 | | 52,280.00 | Book Transfer Debit A'C: Spot On Consulting, Inc Dorona GA 92881 -0722 US Ret mv 1063 Tm: 3665400306,Jo |
| Chase | The Litigation Practice Group PC | 3158 | 11/30/2022 | 11/2/2022 | | 70,960.00 | Book Transfer Debit NC: Spot On Consulting, Inc Corona CA 92881 -0722 US Ret. mv 1056 Tm: 4541 800306Jo |
| Chase | The Litigation Practice Group PC | 3158 | 11/30/2022 | 11/8/2022 | | 33,040.00 | Book Transfer Debh NC: Spot On Consulting, Inc Corona CA 92881 -0722 US Ret Inc 1061 Tm: 5431 00031 2,Jo |
| Chase | The Litigation Practice Group PC | 3158 | 11/30/2022 | 11/8/2022 | | 76,868.78 | Book Transfer Debit NC: Spot On Consulting, Inc Corona CA 92881 -0722 US Ret: Inv IOGO Tm: 541 060031 9Jo |
| Chase | The Litigation Practice Group PC | 3158 | 11/30/2022 | 11/15/2022 | | 99,170.00 | Book Trnsfer Debit NC: Spot On Consulting, mo Corona CA 92851-0722 US Ret. mv 1056 Tm: 4541 |
| Chase | The Litigation Practice Group PC | 63158 | 11/30/2022 | 11/30/2022 | | 52,280.00 | Book Trancter Debit NC: Spot On Consulting, Ino Corona CA 92861 -0722 US Ref Inc 1069 Tm: 5815700334Jo |
| Chase | The Litigation Practice Group PC | 3158 | 11/30/2022 | 11/30/2022 | | 124,818.11 | Book Trancter Debit NC: Spot On Consulting, mo Corona CA 92861 -0722 US Ref Inc 1068 Tm: 5806700334J0 |
| Chase | The Litigation Practice Group PC | 3158 | 12/31/2022 | 12/2/2022 | | 70,960.00 | Book Trancter Debit NC: Spot On Coneulting, Inc Corona CA 92881-0722 US Ref. mv 1070 Tm: 7246600336Jo |
| Chase | The Litigation Practice Group PC | 3158 | 12/31/2022 | 12/7/2022 | | 53,550.00 | Book Transfer Debit NC: Spot On Consulting, Inc Corona CA 92881 -0722 US Ref mv 1076 Tm: 3541 700341 Jo |
| Chase | The Litigation Practice Group PC | 3158 | 12/31/2022 | 12/9/2022 | | 33,040.00 | Book Transfer Debit NO: Spot On Consulting, Inc Corona CA 92881 -0722 US Ret nv 1072 Tm: 3655400343,Jo |
| Chase | The Litigation Practice Group PC | 3158 | 12/31/2022 | 12/9/2022 | | 58,870.00 | Book Transfer Debit NO: Spot On Consulting, Inc Corona CA 92881 -0722 US Ret. nv 1071 Tm: 3655500343Jo |
| Chase | The Litigation Practice Group PC | 3158 | 12/31/2022 | 12/9/2022 | | 76,868.78 | Book Transfer Debit NO: Spot On Consulting, Inc Corona CA 92881 -0722 US Ret nv 1073 Tm: 3655600343Jo |
| Chase | The Litigation Practice Group PC | 3158 | 12/31/2022 | 12/14/2022 | | 25,240.00 | Book Transfer Debit A/C: Spot On Consulting, Inc Corona CA 92861 -0722 US Ref Inv 1075 Tm: 498D500348Jo |
| Chase | The Litigation Practice Group PC | 3158 | 12/31/2022 | 12/14/2022 | | 64,000.00 | Book Transfer Debit 4/C: Spot On Consulting, Inc Corona CA 92881 -0722 US Ret. Inv 1074 Tm: 4980700348Jo |

DRAFT FORM - SUBJECT TO CHANGE

Exhibit 6
Page 57

In re: The Litigation Practice Group PC
Disbursement Details by Payee
4 Years Pre-Petition (03/20/2019 - 03/20/2023)

Spot On Consulting, Inc



| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|
| Chase | The Litigation Practice Group PC | 3158 | 12/31/2022 | 12/15/2022 | | 99,170.00 | Book Transfer Debit NC: Spot On Consulting, Inc Corona CA 92881-0722 US Ret. Inv 1076-2 Tm: 501 3000349Jo |
| Chase | The Litigation Practice Group PC | 3158 | 12/31/2022 | 12/22/2022 | | 11,479.84 | Rook Trancer Cebit NC: Spot On Consulting, Inc Corona CA 92881-0722 US Ret mv 1078 - Partial Payment Tm: 8037600356Jc |
| Chase | The Litigation Practice Group PC | 3158 | 12/31/2022 | 12/22/2022 | | 102,920.00 | Rook Trancer Debit A'S: Spot On Consulting, Inc Corona CA 92001 -0722 US Ret mv 1077, 1079, 1080 Irn: 698D600356Jo |
| Chase | The Litigation Practice Group PC | 3133 | 12/31/2022 | 12/23/2022 | | 48,981.16 | Book Trenster Debit NC: Spot On Consulting, Inc Corona CA 92681-0722 US Ret. Inv 1078 Tm: 3505400357Jo |
| Bank of America | Litigation Practice Group PC | 6457 | 12/31/2022 | 12/23/2022 | | 10,000.00 | WIRE TYPE:WIRE OUT DATE221223 TIME:0456 ETTRN:2022122200569036 SERVICE REF004861 BNF:SPOT ON CONSULTING ID:860007662 BNF BK:JPMORGA N CHASE BANK, NA ID322271 627 PMT DET:PSGXNY4B3 P0 P Other |
| Bank of America | Litigation Practice Group PC | 6457 | 1/31/2023 | 1/5/2023 | | 76,868.78 | WIRE TYPE:WIRE OUT DATE:230105 TIME:1 219 ETTRN:20230i0500359904 SERVICE REFO1 0062 BNF:SPOT ON CONSULTING, INC ID:860007662 BNF BKJP MORGAN CHASE BANK, NA 1D322271 627 PMT DET:4203040 58 INV 1088 |
| Bank of America | Litigation Practice Group PC | 6457 | 1/31/2023 | 1/5/2023 | | 155,574.00 | WIRE TYPE:WIRE OUT DATE230105 TIMEO500 ETTRN:2023010400514486 SERVICE REF003645 BNF:SPOT ON CONSULTING ID:860007662 BNF BK:JPMORGA N CHASE BANK, NA ID:322271 627 PMT DET:GWHQDVA)L P0 P Other memo: mv. 1085 / 1086////i 087 |
| Bank of America | Litigation Practice Group PC | 6457 | 1/31/2023 | 1/11/2023 | | 99,170.00 | WIRE TYPEWIRE OUT DATE23O1 11 TIME1 459 ET TRN202301 1100413261 SERVICE REF:012485 BNF:SPOTON CONSULTING, INC ID:860007662 BNF BKJP MORGAN CHASE BANK, NA ID:322271 627 PMT DET:421 102582 INV 1091 |
| Bank of America | Litigation Practice Group PC | 6457 | 1/31/2023 | 1/12/2023 | | 25,240.00 | TRANSFER LITIGATION PRACTICE :Spot On Consulting, Confirmationll 2852664893 |
| Bank of America | Litigation Practice Group PC | 6457 | 1/31/2023 | 1/12/2023 | | 64,000.00 | TRANSFER LITIGATION PRACTICE :Spot On Consulting, Confirmation# 2855278989 |
| | | | | | | 2,423,533.58 | |

DRAFT FORM - SUBJECT TO CHANGE

Exhibit 6
Page 58

# Adversary Cover Sheet

B1040 (FORM 1040) (12/24)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS | DEFENDANTS |
|---|---|
| Richard A. Marshack, Trustee of the LPG Liquidation Trust | Spot On Consulting, Inc., a California corporation; Eric Martinson, a California resident; Jesse Martinson, a California resident, and Rachel Elgas, a Missouri resident |

| ATTORNEYS (Firm Name, Address, and Telephone No.) | ATTORNEYS (If Known) |
|---|---|
| Yosina M. Lissebeck (SBN 201654)<br>Tyler Powell (Ky. Bar No. 90520) (*Admitted pro hac vice*)<br>DINSMORE & SHOHL LLP<br>655 West Broadway, Suite 800<br>San Diego, CA 92101    Telephone (619) 400-0500<br>yosina.lissebeck@dinsmore.com<br>tyler.powell@dinsmore.com | |

| PARTY (Check One Box Only)<br>☐ Debtor          ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor        ☐ Other<br>☒ Trustee | PARTY (Check One Box Only)<br>☐ Debtor          ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor        ☐ Other<br>☐ Trustee |
|---|---|

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
(1) Avoidance, Recovery, and Preservation of Preferential Transfers Made to or for the Benefit of Defendants within Ninety Days of the Petition Date; (2) Avoidance, Recovery, and Preservation of Post-Petition Transfers Made to or for the Benefit of Defendants after the Petition Date; (3) Avoidance, Recovery, and Preservation of Transfers 2-Year Actual Fraudulent Transfers; (4) Avoidance, Recovery, and Preservation of 2-Year Constructive Fraudulent Transfers; (5) Avoidance, Preservation and Recovery of Voidable Transfers Made with Intent to Defraud; (6) Avoidance, Preservation, and Recovery of Voidable Transfers Made with no Intent to Defraud; and (7) Aiding and Abetting

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(a) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☒ 14-Recovery of money/property - other

**FRBP 7001(b) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(c) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(d) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(e) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(f) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(f) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(g) – Injunctive Relief**
☐ 71-Injunctive relief- imposition of stay
☐ 72-Injunctive relief - other

**FRBP 7001(h) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(i) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(j) Determination of Removed Action**
☐ 01-Determination of remove d claim or cause

**Other**
☐ SS-SIPA Case - 15 U.S.C. §§78aaa *et.seq.*
☒ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ 3M+ |

Other Relief Sought
Aiding & Abetting

B1040 (FORM 1040) (12/24)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>The Litigation Practice Group P.C. | BANKRUPTCY CASE NO.<br>8:23-bk-10571-SC | |
| DISTRICT IN WHICH CASE IS PENDING<br>Central District of California | DIVISION OFFICE<br>Santa Ana | NAME OF JUDGE<br>Scott C. Clarkson |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br>/s/ Tyler Powell | | |
| DATE<br>March 18, 2025 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Yosina M. Lissebeck<br>Tyler Powell (admitted pro hac vice)<br>Special Counsel to Richard A. Marshack, Trustee of the LPG<br>Liquidation Trust | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.