CHRISTOPHER CELENTINO (131688)
Christopher.Celentino@dinsmore.com
CHRISTOPHER B. GHIO (259094)
Christopher.Ghio@dinsmore.com
YOSINA M. LISSEBECK (201654)
Yosina.Lissebeck@dinsmore.com
JACOB R. BOTHAMLEY (319457)
Jacob.Bothamley@dinsmore.com
**DINSMORE & SHOHL LLP**
655 West Broadway, Suite 800
San Diego, California 92101
Tele: 619.400.0500
Fax:  619.400.0501

Attorneys for Plaintiff Richard A. Marshack,
Trustee of the LPG Liquidation Trust

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>THE LITIGATION PRACTICE GROUP P.C.,<br><br>Debtor.<br><br>_____<br><br>Richard A. Marshack, Trustee of the LPG Liquidation Trust,<br><br>Plaintiff,<br><br>v.<br><br>Apate Safeguard LLC, a Florida Limited Liability Company, dba Debt Reso; Arthur Ramirez, individually and as Managing Member of Apate Safeguard LLC,<br><br>Defendants. | Bankr. Case No. 8:23-bk-10571-SC<br><br>Chapter 11<br><br>Adv. Proc. No.<br><br>COMPLAINT FOR:<br><br>(1) AVOIDANCE, RECOVERY, AND PRESERVATION OF 4-YEAR ACTUAL FRAUDULENT TRANSFERS;<br><br>(2) AVOIDANCE, RECOVERY, AND PRESERVATION OF 4-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS;<br><br>(3) AVOIDANCE, RECOVERY, AND PRESERVATION OF 2-YEAR ACTUAL FRAUDULENT TRANSFERS;<br><br>(4) AVOIDANCE, RECOVERY, AND PRESERVATION OF 2-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS;<br><br>(5) AVOIDANCE, RECOVERY, AND PRESERVATION OF TRANSFERS WITHIN 90-DAYS OF THE PETITION DATE; |

1

(6) AVOIDANCE, RECOVERY, AND PRESERVATION OF POST-PETITION TRANSFERS;

(7) TURNOVER; AND

(8) AIDING AND ABETTING FRAUD

For his *Complaint for (1) Avoidance, Recovery, and Preservation of 4-Year Actual Fraudulent Transfers; (2) Avoidance, Recovery, and Preservation of 4-Year Constructive Fraudulent Transfers; (3) Avoidance, Recovery, and Preservation of 2-Year Actual Fraudulent Transfers; (4) Avoidance, Recovery, and Preservation of 2-Year Constructive Fraudulent Transfers; (5) Avoidance, Recovery, and Preservation of Transfers Within 90-Days of the Petition Date; (6) Avoidance, Recovery, and Preservation of Post-Petition Transfers; (7) Turnover; and (8) Aiding and Abetting Fraud* ("Complaint"), plaintiff Richard A. Marshack, the former Chapter 11 Trustee for the bankruptcy estate ("Estate") of debtor The Litigation Practice Group P.C. ("Debtor" or "LPG") and current liquidating trustee of the LPG Liquidation Trust (collectively "Trustee" or "Plaintiff") in the above-captioned bankruptcy case ("Bankruptcy Case"), alleges and avers as follows:

## STATEMENT OF THE CASE

1.    A bankruptcy trustee may avoid and recover actual and constructively fraudulent transfers made by a debtor. In this case, while insolvent, Debtor transferred at least $97,634.31 to Defendant Apate Safeguard LLC[1] ("Defendant Apate") within four years prior to the bankruptcy (the "Pre-petition Transfers"), which includes at least $57,239.62 in payments from Debtor within 90 days of Debtor's petition date (the "Preference Transfers"), March 20, 2023 ("Petition Date"). Defendant Apate also received at least $ 2,852.76 after the Petition Date ("Post-Petition Transfers"). The total of all transfers from Debtor to Defendant Apate is at least $100,487.07 (collectively, the "Transfers"). Reasonably equivalent value was not provided to the Debtor in exchange for the Transfers, and, as evidenced below, the Transfers were made with actual intent to hinder, delay, or defraud Debtor's creditors.

---

[1] Although in no way intended to be presented as evidence of Defendant's intent in this case, it is nevertheless interesting that the name "Apate" has its origins in Greek Mythology as being the name of the goddess of deceit. (*See* https://en.wikipedia.org/wiki/Apate.)

2.      Under these facts, the Trustee can avoid the Transfers and recover from Defendant Apate as the "initial" transferee of such transfers who did not take in good faith, for value, and without knowledge of the avoidability of such transfers. Trustee seeks to avoid, recover, and preserve the Transfers for the benefit of the Estate.

## STATEMENT OF JURISDICTION AND VENUE

3.      The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 in that this action arises in and relates to the bankruptcy case pending in the United States Bankruptcy Court for the Central District of California, Santa Ana Division, entitled *In re The Litigation Practice Group P.C.*, Bankruptcy Case Number 8:23-bk-10571-SC.

4.      Plaintiff has standing to bring this adversary proceeding pursuant to Provision V.E. of the Modified First Amended Joint Chapter 11 Plan of Liquidation, confirmed by the Court on September 9, 2024, as Dk. No. 1646. The Plan provides that the estate's litigation claims, including avoidance claims, were transferred to the LPG Liquidating Trust. Plaintiff brings these claims on behalf of the Trust.

5.      This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (E), (H), and (O), and this Court has Constitutional authority to enter a final judgment on these claims. To the extent any claim for relief contained herein is determined not to be a non-core proceeding or a *Stern*-claim, Plaintiff consents to the entry of final judgment and orders by the Bankruptcy Court.

6.      Defendant is notified that Rule 7008 of the Federal Rules of Bankruptcy Procedure requires Defendant to plead whether consent is given to the entry of a final order and judgment by the Bankruptcy Court.

7.      Venue properly lies in the Central District of California in that this adversary proceeding arises in or is related to a case under Title 11 of the United State Code as provided in 28 U.S.C. §§ 1408 and 1409.

## PARTIES

8.      The Litigation Practice Group P.C. (previously defined as "Debtor") is a corporation organized under the laws of the State of California that had its principal place of business in Tustin,

3

California. During all relevant times prior to bankruptcy, Daniel S. March ("Mr. March") was the Chief Executive Officer of Debtor.

9.      Tony Diab ("Diab") operated, dominated, and controlled Debtor.

10.     Richard A. Marshack (previously defined as "Trustee" or "Plaintiff") was the duly-appointed, qualified, and acting Chapter 11 Trustee for the Estate.  Pursuant to the confirmed Plan, the Trustee now serves as Trustee of the LPG Liquidation Trust. All claims have been transferred to the Liquidating Trust pursuant to the confirmed plan and Plaintiff brings this action solely in his capacity as the former Chapter 11 Trustee and current Liquidating Trustee of the LPG Liquidation Trust for the benefit of Debtor's Estate and its creditors.

11.     Plaintiff alleges that, at all relevant times, Defendant Apate Safeguard LLC was a limited liability company formed and existing under the laws of the State of Florida that did business as Debt Reso. According to the Florida Secretary of State website, Defendant's Principal Address was 611 Anton, #970, Costa Mesa, CA 92626. Defendant's agent and managing member, Defendant Arthur Ramirez, according to the Florida Secretary of State and California Secretary of State's websites, may be served at this address, or alternatively at 4767 New Broad Street, Orlando, Florida 32814. True and correct copies of Defendant's information on the Florida and California Secretary of State websites are attached hereto as **Exhibit 1**.

12.     According to the Florida Secretary of State website, Defendant filed Articles of Dissolution on November 25, 2024. A true and correct copy of Defendant's Articles of Dissolution is attached as **Exhibit 2**.

13.     Defendant, Arthur Ramirez ("Defendant Ramirez"), was the managing member of Defendant at all relevant times.

### GENERAL ALLEGATIONS

**A.      The Bankruptcy Case**

14.     On March 20, 2023 (previously defined as the "Petition Date"), the Debtor filed a voluntary petition under Chapter 11 of Title 11 of the United States Code, initiating bankruptcy Case No. 8:23-bk-10571-SC ("Bankruptcy Case") in the United States Bankruptcy Court for the Central District of California, Santa Ana Division.

15.     On May 8, 2023, Trustee accepted his appointment as the Chapter 11 Trustee in the Bankruptcy Case. To the extent that Trustee was not appointed until after any of the events alleged in this Complaint, the allegations are based on information and belief. *See Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017); *Miller v. City of Los Angeles*, 2014 U.S. Dist. LEXIS 198871, at *5 (C.D. Cal. Aug. 7, 2014); *Mireskandari v. Daily Mail and General Trust PLC*, 2013 U.S. Dist. LEXIS 194437, at *4 (C.D. Cal. July 31, 2013).

16.     Pursuant to the Order Confirming Modified First Amended Joint Chapter 11 Plan of Liquidation entered September 9, 2024, and the Notice of Occurrence of Effective Date of Modified First Amended Joint Chapter 11 Plan of Liquidation filed September 24, 2024, Richard A. Marshack became the Liquidating Trustee of the LPG Liquidation Trust effective September 24, 2024. [Bankr. Docket Nos. 1646 & 1762.]

**B.      PROTECTIVE ORDER**

17.     On or about May 2, 2024, Plaintiff filed that certain Notice and Motion for Entry of Protective Order (the "Protective Order Motion"). On June 3, 2024, the Court entered its Order Granting Motion for Entry of Protective Order and the Protective Order [Bankr. Docket No. 1270] (the "Protective Order"). A true and accurate copy of the Protective Order is attached as **Exhibit 3** and incorporated here.

18.     By its own terms, the Protective Order applies to this adversary proceeding and governs all discovery conducted herein.

**C.      DEBTOR'S INSOLVENCY**

19.     Debtor was insolvent when the Transfers occurred as evidenced by: (a) the 14 UCC 1 statements reflecting secured liens against the Debtor's owned and after-acquired assets and the assignment or sale of substantial portions of the Debtor's future income; (b) the priority and nonpriority unsecured debt of nearly $142 million listed in Debtor's schedules; and, (c) the $424 million of creditor claims filed in this Bankruptcy Case.

20.     Moreover, insolvency is presumed as a matter of law where, as in this Bankruptcy Case, the debtor operated a Ponzi scheme. *See, e.g., Global Money Mgmt., L.P. v. McDonnold*, No. 06CV34, 2008 U.S. Dist. LEXIS 128733, at *15 (S.D. Cal. Feb. 27, 2008) (concluding that "if a

5

Ponzi scheme is proven, then the debtor is proven insolvent from the time of its inception"). (internal citations omitted).

**D.    LPG**

21.    Pre-petition, Debtor was a law firm that provided consumer debt resolution services to more than 65,000 clients nationwide.

22.    The consumers would pay LPG over a period of time via monthly debits and/or ACH debits from their bank accounts.

23.    The monthly payments were meant to cover all legal services LPG provided to the consumers including validation of the debts, review of documents to determine enforceability, and court appearances to halt lawsuits to obtain judgments.

24.    In certain instances, LPG would file a lawsuit in an effort to eliminate a disputed debt or to prosecute affirmative claims held by the consumers.

25.    LPG mismanaged the consumers' monthly payments.

26.    Diab and others devised a plan to fraudulently transfer funds, client files, client funds and assets in the form of ACH Receivables (the "ACH Receivables" or "Accounts Receivable") out of LPG to third parties prior to the filing of bankruptcy.

27.    To obtain consumer clients, LPG contracted with marketing companies, who engaged in illegal capping and would advertise or call to solicit consumers to become clients of LPG in exchange for a percentage of the ACH Receivables collected by LPG from the consumers.

28.    The marketing companies would advertise to or call to solicit them to become clients of LPG.

29.    Because LPG received payments from consumers over time, it often sought financing by borrowing against its future cash flows. This borrowing was not only used to finance operations at LPG, but also to pay the fees owed to the marketing companies for providing the client referrals.

30.    Many of the documents executed in connection with such financing described the transactions as accounts receivable purchase agreements.

///

////

31.    To facilitate the transfer of ACH Receivables to marketing affiliates, Diab used entities he controlled including, without limitation, Vulcan Consulting, LLC, Coast Processing, LLP, Prime Logix, LLC ("Prime Logix"), Maverick Management, LLC, and/or Validation Partners LLC.

32.    Under applicable state and federal laws, ACH pulls from a consumer's bank account cannot occur until the party initiating the payments obtains the consumer's express written consent.

33.    With respect to the ACH pulls, the consumer clients only consented to the Debtor initiating the payments from their accounts.

34.    With respect to the ACH pulls, the funds were derived from consumer clients that never consented to any law firm other than the Debtor representing them.

35.    At all times, the Transfers constituted transfers of interests of the Debtor in property as that term is defined in 11 U.S.C. § 101(54).[2]

**E.    LPG'S PREPETITION CREDITORS**

36.    Debtor was insolvent when each Transfer was made. This insolvency is evidenced in part by the fact that 14 separate UCC-1 statements were of record securing debts of the Debtor as of September 1, 2022. These statements remained unreleased as of the Petition Date. These statements either reflected secured liens against the Debtor's assets then owned or thereafter acquired or provided evidence of the assignment or sale of substantial portions of the Debtor's future income.

37.    When the Transfers were made, these prior UCC-1 statements secured the repayment of the following claimed amounts that are currently known to Trustee and are allegedly owed by the Debtor: (i) $2,374,004.82 owed to Fundura Capital Group as evidenced by Proof of Claim No. 335

---

[2] To the extent the LPG Insiders are adjudicated to be initial transferees of the Transfers, the omission of the LPG Insiders in this Complaint is not fatal to the fraudulent transfer claims set forth herein. See *Erickson v. Leonard (In re AVI, Inc.)*, 389 B.R. 721, 735 (9th Cir. BAP 2008) ("[W]e hold that a trustee is not required to avoid the initial transfer from the initial transferee before seeking recovery from subsequent transferees under § 550(a)(2)."); *IBT Intern., Inc. v. Northern (In re Int'l Admin. Servs., Inc,)*, 408 F.3d 689, 708 (11th Cir. 2005) ("Section 550(a) does not mandate a plaintiff to first pursue recovery against the initial transferee and successfully avoid all prior transfers against a mediate transferee."); *Leslie v. Ace Gallery N.Y. Corp. (In re Art & Architecture Books of the 21st Century)*, 2021 Bankr. LEXIS 3637, *98 (Bankr. C.D. Cal. 2022) ("The language of 11 U.S.C. § 550 does not require a trustee to successfully avoid a transfer with respect to the initial transferee in order to recover from a subsequent transferee under 11 U.S.C. § 550."); *In re M. Fabrikant & Sons, Inc.*, 394 B.R. 721, 743 (Bankr. S.D.N.Y. 2008) ("[T]he Bankruptcy Code, and specifically §§ 544(b) and 548, does not identify the proper, necessary or indispensable parties to a fraudulent transfer action, and does not state that the initial transferee is necessary.").

purportedly secured by a UCC statement filed on or about May 19, 2021; (ii) approximately $15 million owed to MNS Funding, LLC as evidenced by Proof of Claim No. 1060 purportedly secured by a UCC statement filed on or about May 28, 2021; (iii) approximately $5,000,000 owed to Azzure Capital, LLC as evidenced by Proof of Claim No. 127 secured by a UCC statement filed on or about May 28, 2021; and (iv) approximately $1.5 million owed to Diverse Capital, LLC purportedly secured by UCC statements filed on or about September 15, 2021, and December 1, 2021.[3]

38.     As alleged above, LPG was borrowing against its assets and future income, often on unfavorable terms, not only to finance operations at LPG, but also to pay the fees owed to the marketing affiliates for providing it with consumer clients. Pursuant to the agreements with the marketing companies, significant percentages of future payments were already promised to be paid to the marketing affiliates from whatever future income the Debtor would receive.

39.     In addition, on Debtor's Schedule E/F [Bankr. Docket No. 33], Debtor scheduled 11 unsecured creditors with priority unsecured claims totaling $374,060.04. These priority unsecured creditors include Indiana Dept. of Revenue, Dept. of Labor and Industries, Arizona Dept. of Economic Security, Arkansas Dept. of Finance & Admin., California Franchise Tax Board, Georgia Dept. of Labor, Internal Revenue Service, Mississippi Dept. of Revenue, Nevada Dept. of Taxation, Utah State Tax Commission, and Wisconsin Dept. of Revenue (collectively, "Priority Unsecured Creditors").

40.     Another group of creditors that Debtor listed on its Schedule E/F [Bankr. Docket No. 33] are nonpriority unsecured creditors. Those 58 creditors have scheduled claims totaling $141,439,158.05 and include Ajilon; Anthem Blue Cross; Azevedo Solutions Groups, Inc.; Carolina Technologies & Consulting Invoice; Collaboration Advisors; Credit Reporting Service Inc.; CT Corporation – Inv.; Debt Pay Pro; Document Fulfillment Services; EnergyCare, LLC; Exela Enterprise Solutions; First Legal Network, LLC; GHA Technologies Inc.; Harrington Electric, Inc.; Imagine Reporting; Juize, Inc.; Krisp Technologies, Inc.; Liberty Mutual; Marc Lemauviel – Allegra; MarkSYS Holdings, LLC; Netsuite-Oracle; Pitney Bowes; Rapid Credit, Inc.; SBS Leasing A Program of De Lage Landen; Security Solutions; Sharp Business Systems; Streamline Performance,

---

[3] Trustee reserves all rights, claims, and defenses with respect to these and any other purported secured or unsecured claims.

1    Inc.; Thomson Reuters; Twilio, Inc.; Nationwide Appearance Attorneys; Executive Center, LLC;

2    Outsource Accelerator, Ltd.; TaskUs Holdings, Inc.; Marich Bein, LLC; Validation Partners; MC DVI

3    Fund 1, LLC; MC DVI Fund 2, LLC; Debt Validation Fund II, LLC; Tustin Executive Center;

4    LexisNexus; JP Morgan Chase; Business Centers of America; Michael Schwartz; Anibal Colon Jr.;

5    Kathleen Lacey; David Ulery; Kimberly Birdsong; Kevin Carpenter; Karen Suell; Gloria Eaton;

6    Carolyn Beech; Debra Price; Kenneth Topp; Darcey Williamson, Trustee; James Hammett; Johnny

7    Rizo; Beverly Graham; Kathleen Scarlett; and Geneve and Myranda Sheffield (collectively,

8    "Nonpriority Unsecured Creditors" and, together with the Secured Creditors and Priority Unsecured

9    Creditors, "Prepetition Creditors").

10        41.    As of the filing of this complaint, approximately 5,771 claims have been filed with the

11    Bankruptcy Court. While Trustee has not reviewed all claims as of the date of this complaint, and

12    reserves all rights to object to those claims, the total amount is in excess of approximately

13    $717,507,462.29.

14    **F.    Ponzi Scheme**

15        42.    This Court has recognized that Debtor operated a Ponzi scheme by using funds

16    provided by former investors to attract new investors hoping for very high returns. [*See* Bankr. Docket

17    No. 1545, fn. 5.]

18        43.    The Ponzi Scheme Presumption establishes a debtor's "intent to defraud future

19    undertakers [investors] from the mere fact that a debtor was running a Ponzi scheme." *Merrill v. Abbott*

20    (*In re Independent Clearing House Co.*), 77 B.R. 843, 860 (D. Utah 1987). "Knowledge to a

21    substantial certainty constitutes intent in the eyes of the law, cf. Restatement (Second) of Torts § 8A

22    (1963 & 1964), and a debtor's knowledge that future investors will not be paid is sufficient to establish

23    his actual intent to defraud them." *Id*. A trustee in bankruptcy is not required to show that an operator

24    of a Ponzi scheme was subjectively aware his Ponzi scheme was destined to fail. *In re EPD Inv. Co.,*

25    *LLC*, 114 F.4th at 1153 (9th Cir. 2024).

26        44.    "[I]f all the debtor receives in return for a transfer is the use of the defendant's money

27    to run a Ponzi scheme, there is nothing in the bankruptcy estate for creditors to share." *In re*

28    *Independent Clearing House Co.* 77 B.R. at 859. In such a situation, the use of the defendant's money

cannot objectively be called "reasonably equivalent value." *Id*. Therefore, "[t]he trustee can avoid the transfers if they were preferential or fraudulent. Transfers to investors in a Ponzi scheme are preferential and fraudulent. Therefore, they constitute 'property of the estate,' and the trustee can recover them." *Id*. at 853 n.17 (citations omitted).

45.    Based on the Ponzi Scheme presumption, the Court can infer that the Debtor had the intent to defraud investors within the meaning of 11 U.S.C. § 548(a)(1). Since the transfers by Debtor to third parties, including Defendants, were made with the intent to further the Ponzi scheme, the Debtor did not receive an objectively reasonable equivalent value for such transfers, and the Trustee can avoid any such transfers because they were preferential and/or fraudulent.

**G.    The Criminal Enterprise**

46.    Debtor's operations, activities and transfers done in furtherance of the Ponzi scheme, including those in conjunction with its affiliates and its dealings with Defendants, also constituted a criminal enterprise.

47.    This, too, is evidenced by the Court's order in the 1046 Action wherein it denied the Motion of Greyson Law Center to Vacate the Preliminary Injunction previously entered in Debtor's main case, and the Court offered the opinion:

> Through the various proceedings and evidence produced in both the main case and the various adversary proceedings, including but not limited to various Motions for Temporary Restraining Orders, Preliminary Injunctions, Motions to Dismiss, a Motion for Appointment of a Chapter 11 Trustee, a Motion to Sell Assets, a multitude of pleadings filed by both secured and unsecured creditors (supported by evidence presented under oath) in support of their claims, and especially the pleadings and evidence presented by the "Watchdog of the Bankruptcy System" aka the Office of the United States Trustee (an arm of the United States Department of Justice), *it is clear to this Court that Debtor, since its pre-petition inception (and through the time of the appointment of the Chapter 11 Trustee) was in the Court's opinion, operating a criminal enterprise.*

(Case No. 8:23-bk-10571-SC; Adv. No. 8:23-ap-01046-SC [Bankr. Docket No. 1545, p. 3 (emphasis in original)].)

48.    As part of this criminal enterprise, Debtor and Defendants engaged in fraudulent transfers of its accounts receivables pursuant to various agreements.

///

**H.      DEFENDANT APATE**

49.      Defendant Apate dba Debt Reso was one of the marketing companies that procured clients for LPG, though it did so as an affiliate of the Diab-controlled entity, Prime Logix.

50.      Indeed, Defendant Apate, under its dba, Debt Reso, and through its managing member, Ramirez, signed a Marketing Affiliate Agreement ("Affiliate Agreement") with Prime Logix on September 26, 2022. A true and correct copy of the signed Marketing Affiliate Agreement is attached hereto as **Exhibit 4**.

51.      Under the Affiliate Agreement, Prime Logix agreed to pay Defendant Apate "referral fees" as follows:

> Prime [Logix] will pay [Debtreso] a commission in the following amount: 50% of the service fee charged to the Referral Customer (the "Referral Fee") for each Referral Customer who meets all of the requirements of such offer. The Referral Fee is payable within ten (10) days after the service fee paid by the Referral Customer clears and is sent to Prime. Marketing Affiliate shall not be entitled to any portion of the maintenance fee charged by Prime, which fee is currently set at $80.00 per file (as of the date of this Agreement) but which is subject to change at the sole discretion of Prime. No fee will be charged to the Referral Customer other than the service fee and maintenance fee. Marketing Affiliate will provide Prime with all appropriate tax
>
> identification information that Prime requires to ensure Prime's compliance with applicable tax regulations.

(*See* **Exhibit 4**, §3.)

52.      The Affiliate Agreement violates Sections 6151 and 6155 of the California Business and Professional Code, which prohibit referrals of potential clients to attorneys unless registered with the State Bar of California. Cal. Bus. & Prof. Code § 6155. "Referral activity" includes "any entity 'which, in person, electronically, or otherwise, refers the consumer to an attorney or law firm not identified' in the advertising." *Jackson v. LegalMatch.com*, 42 Cal. App. 5th 760, 775 (2019). A referral includes receiving information from potential clients and sending that information to lawyers, even when the advertiser does not advertise the name of the attorneys and the clients do not clear the name of the potential attorney after the referral occurred. *Id.*

53.      Further, if any effect of an agreement is to accomplish an unlawful purpose, the agreement may be declared illegal regardless of the intention of the parties. *Stockton Morris Plan Co. v. Cal. Tractor & Equip. Corp.*, 112 Cal. App. 2d 684, 690 (1952) (citing *Fewel & Dawes, Inc. v. Pratt*, 17 Cal. 2d 85, 91 (1941)). This remains true regardless of whether the contract has been

11

1    performed. *Stevens v. Boyes Hot Springs Co.*, 113 Cal. App. 479, 483 (1931) (A contract by a

2    corporation to purchase its own stock has the effect of illegally withdrawing and paying to a

3    stockholder a part of the capital stock of the corporation and is illegal and void, regardless of the fact

4    that the contract is fully performed by the sellers and partially performed by the corporation.);

5    *Mansfield v. Hyde*, 112 Cal. App. 2d 133, 139 (1952), overruled, *Fomco, Inc. v. Joe Maggio, Inc.*, 8

6    Cal. Rptr. 459 (1960) (Where object of statute requiring licenses is to prevent improper persons from

7    engaging in particular activity, or is for purpose of regulating occupation or business for protection of

8    public, imposition of penalty amounts to prohibition against engaging in occupation or business

9    without license, and contract made by unlicensed person in violation of statute is invalid.); *Firpo v.*

10   *Murphy*, 72 Cal. App. 249, 252 (1925) (A contract to pay commissions to a real estate broker is illegal

11   and he is not entitled to recover thereon where he fails to secure the license required by law to carry

12   on his business.).

13        54.    Because the Affiliate Agreement violates federal and state law, it is void,

14   unenforceable, and subject to avoidance as fraudulent. Any alleged consideration provided under the

15   Affiliate Agreement was unlawful.

16        55.    Unlawful consideration is that which is: "(1) contrary to an express provision of law;

17   (2) contrary to the policy of express law, though not expressly prohibited; or (3) otherwise contrary to

18   good morals." Cal. Civ. Code § 1667. "If any part of a single consideration for one or more objects,

19   or of several considerations for a single object, is unlawful, the entire contract is void." Cal. Civ. Code

20   § 1608.

21        56.    Furthermore, on information and belief, Defendants were informed of the unlawful

22   nature of the business arrangements and willingly chose to participate. (*See Stipulation With*

23   *Defendant Tony Diab For Entry of Judgment*, Adv. Proc. 23-ap-01046-SC, dkt. 719, pp. 12-13, ¶ 44.)

24        **I.    Defendant Ramirez**

25        57.    Defendant Ramirez was, at all times mentioned herein, in an executive position with

26   Defendant Apate.

27        58.    As an executive of Defendant Apate, Defendant Ramirez had control of and authorized

28   Defendant Apate's financial operations.

59.    Defendant Ramirez executed agreements, such as the Affiliate Agreement with Prime Logix on behalf of Defendant Apate. (*See* **Exhibit 4**.)

60.    Defendant Ramirez, through authorizing actions of Defendant Apate, facilitated Debtor's criminal enterprise by advertising and marketing Debtor's services to potential consumers and thereafter enrolling consumers to pay for Debtor's services.

61.    Defendant Ramirez used the business operations between Defendant Apate and Debtor for his personal gain.

**J.    The Demand Letter**

62.    On or about October 18, 2024, Trustee sent a demand letter to Defendants (the "Demand Letter"). A true and correct copy of the Demand Letter is attached hereto as **Exhibit 5**.

63.    The Demand Letter discussed the known transfers from Debtor that were made to Defendant Apate, which included the Preference Transfers and Post-Petition transfers. Trustee requested payment of the total amount of the Preference Transfers in exchange for a waiver and release from all claims that could be asserted by Trustee against Defendant pursuant to 11 U.S.C. §§ 544, 548, 547, 549, and 550, as well as California Civil Code sections 3439.04 and 3439.05.

64.    Based on the information available to Trustee and considering the nature of the relationship between Debtor and Defendant Apate, no obvious potential defenses were identified that could reduce Defendant Apate's liability for the transfers. Consequently, Defendant Apate was requested to provide any facts and valid defenses that could substantiate its position and potentially mitigate or prevent some or all of the transfers made by Debtor.

65.    Defendants responded to the Demand Letter on November 8, 2024. Defendants claimed to be owed significant sums by Prime Logix, with whom they had the Affiliate Agreement and claimed to have no knowledge of Debtor or the bankruptcy filing.  A true and correct copy of an email exchange between Plaintiff's counsel and Defendants dated November 8, 2024 is attached hereto as **Exhibit 6**.

**K.    The Subject Transfers**

66.    As noted above, during the applicable reach-back period, Debtor, primarily through Prime Logix, transferred cash (collectively, "Pre-petition Transfers") to Defendant Apate not less than $97,634.31, which includes no less than $57,239.62 in the 90-day period prior to the Petition Date

(previously defined as the "Preference Transfers"), and an additional $2,852.76 post-petition (previously defined as the "Post-Petition Transfers"), for a total of at least $100,487.07 (previously defined collectively as the "Transfers"). A true and correct list of the known transfers made by Debtor, through Prime Logix, to Defendant is attached hereto as **Exhibit 7**.

67.    The Transfers span from October 21, 2022 through March 24, 2023. (*Id.*)

**L.    Due Diligence**

68.    Prior to filing this Complaint, Plaintiff's counsel conducted an electronic search of Debtor's paper files and accounting records, including Debtor's Quickbooks files, which records and files are now stored electronically. Plaintiff's search of the subject records and files revealed no apparent defenses to the alleged claims.

## FIRST CLAIM FOR RELIEF

### Avoidance, Preservation, and Recovery of Actual Fraudulent Transfer

### 11 U.S.C. §§ 544, 550, and 551; Cal. Civ. Code §§ 3439.04(a)(1) and 3439.07

### (Against Defendant Apate)

69.    Plaintiff incorporates by reference Paragraphs 1 through 68 and realleges these paragraphs as though set forth in full.

70.    Under 11 U.S.C. § 544(b)(1), Plaintiff may avoid transfers of an interest of Debtor which are voidable under applicable law by an unsecured creditor of Debtor, including under California Civil Code section 3439.04(a)(1).

71.    The Pre-petition Transfers were of property of Debtor as defined in 11 U.S.C. § 101(54).

72.    The Pre-petition Transfers were made within four years prior to the Petition Date.

73.    The Pre-petition Transfers were made with the actual intent to hinder, delay, or defraud Debtor's creditors.

74.    At the time each pre-petition transfer was made, Debtor was indebted to one or more creditors that held a claim against Debtor on the date of each Transfer and on the Petition Date.

75.    Debtor had been sued or threatened with suit before some or all of the Pre-petition Transfers occurred.

76.     Despite Debtor's obligation to the Prepetition Creditors, Debtor continued to pay Defendant Outsource sums received from consumers pursuant to its affiliate agreement, which constitutes an illegal capping agreement between Defendant Outsource and Debtor.

77.     Debtor incurred substantial debt shortly before or shortly after some or all of the Pre-petition Transfers occurred.

78.     Debtor actively concealed its beneficial interest in the Pre-petition Transfers and made the payments to Defendants with actual intent to hinder, delay, or defraud other creditors of the Debtor.

79.     The Debtor was operating a Ponzi scheme and the Ponzi Scheme Presumption can be utilized to infer the Debtor's actual intent to defraud within the meaning of 11 U.S.C. § 548(a)(1). The Debtor's conduct was done with oppression, fraud, and malice, as defined in California Civil Code section 3294, based on the Ponzi Scheme Presumption, entitling the Trustee to, in addition to actual damages, exemplary or punitive damages.

80.     Debtor received less than reasonably equivalent value in exchange for the Pre-petition Transfers because the referrals from Defendant Apate to Prime Logix were illegal under federal and state law, nullifying their value as consideration.

81.     Defendant Apate received at least $97,634.31 of property belonging to Debtor.

82.     The Pre-petition Transfers were made at a time when Debtor was insolvent and/or rendered insolvent by virtue of said transfers.

83.     As noted above, Debtor's insolvency is presumed as a matter of law where, as here, Debtor operated a Ponzi scheme.

84.     Plaintiff alleges that Defendant did not receive the Pre-petition Transfers in good faith, for value, and without knowledge of their avoidability.

85.     The Affiliate Agreement with Defendant Apate, as well as the transfers of Debtor's funds pursuant to the agreement are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and Cal. Civ. Code §§ 3439.04(a) and 3439.07 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against the Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

86.     Based on the foregoing, Plaintiff may avoid the Pre-Petition Transfers pursuant to 11 U.S.C. § 544 and California Civil Code section 3439.04(a)(1).

87.     Based on the foregoing, Plaintiff may recover and preserve the Pre-petition Transfers from Defendant as the initial transferee for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551, and California Civil Code section 3439.07.

### SECOND CLAIM FOR RELIEF

**Avoidance, Preservation, and Recovery of Constructive Fraudulent Transfer**

**11 U.S.C. §§ 544, 550, and 551; Cal. Civ. Code §§ 3439.04(a)(2), 3439.05, and 3439.07**

**(Against Defendant Apate)**

88.     Plaintiff hereby incorporates by reference Paragraphs 1 through 87p and realleges these paragraphs as though set forth in full herein.

89.     Under 11 U.S.C. § 544(b)(1), Plaintiff may avoid transfers of an interest of Debtor which are voidable under applicable law by an unsecured creditor of Debtor, including under California Civil Code sections 3439.04(a)(2) and 3439.05.

90.     The Pre-petition Transfers were made within four years prior to the Petition Date.

91.     As noted above, Debtor did not receive reasonably equivalent value in exchange for the Pre-petition Transfers because the referrals from Defendant Apate to Prime Logix were illegal under federal and state law, nullifying their value as consideration.

92.     The Pre-petition Transfers were made at a time when Debtor was insolvent and/or rendered insolvent by virtue of said transfers.

93.     As noted above, Debtor's insolvency is presumed as a matter of law where, as here, Debtor operated a Ponzi scheme.

94.     At the time each Pre-petition transfer was made, Debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of Debtor were unreasonably small in relation to the business or transaction.

95.     At the time each pre-petition transfer was made, Debtor intended to incur, or believed or reasonably should have believed that Debtor would incur, debts beyond Debtor's ability to pay as they became due.

96.    At the time each pre-petition transfer was made, Debtor was indebted to one or more creditors that held a claim against Debtor on the date of each pre-petition transfer and on the Petition Date.

97.    Plaintiff alleges that Defendant Apate did not receive the Pre-petition Transfers in good faith, for value, and without knowledge of their avoidability.

98.    The Debtor was operating a Ponzi scheme and the Ponzi Scheme Presumption can be utilized to infer the Debtor's actual intent to defraud within the meaning of 11 U.S.C. § 548(a)(1). The Debtor's conduct was done with oppression, fraud, and malice, as defined in California Civil Code section 3294, based on the Ponzi Scheme Presumption, entitling the Trustee to, in addition to actual damages, exemplary or punitive damages.

99.    The Affiliate Agreement with Defendant Apate, as well as the transfers of Debtor's funds pursuant to the agreement are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and Cal. Civ. Code §§ 3439.04(a) and 3439.07 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against the Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

100.    Based on the foregoing, Plaintiff may avoid the Pre-Petition Transfers pursuant to 11 U.S.C. § 544 and California Civil Code sections 3439.04(a)(2) and 3439.05.

101.    Based on the foregoing, Plaintiff may recover and preserve the Pre-Petition Transfers from Defendant as the initial transferee for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551, and California Civil Code sections 3439.07.

### THIRD CLAIM FOR RELIEF

**Avoidance, Preservation, and Recovery of Actual Fraudulent Transfer**

**11 U.S.C. §§ 548(a)(1)(A), 550 and 551**

**(Against Defendant Apate)**

102.    Plaintiff hereby incorporates by reference Paragraphs 1 through 101 and realleges these paragraphs as though set forth in full herein.

///

103.    One or more of the Pre-petition Transfers were made within two years prior to the Petition Date.

104.    The Pre-petition Transfers were made to Defendant Apate with the actual intent to hinder, delay, or defraud Debtor's creditors.

105.    The Debtor was operating a Ponzi scheme and the Ponzi Scheme Presumption can be utilized to infer the Debtor's actual intent to defraud within the meaning of 11 U.S.C. § 548(a)(1).

106.    At the time each pre-petition transfer was made, Debtor was indebted to one or more creditors that held a claim against Debtor on the date of each pre-petition transfer and on the Petition Date.

107.    Debtor had been sued or threatened with suit before some or all of the Pre-petition Transfers occurred.

108.    Despite Debtor's obligation to the Prepetition Creditors, Debtor continued to pay Defendant Outsource sums received from consumers pursuant to its affiliate agreement, which constitutes an illegal capping agreement between Defendant Outsource and Debtor.

109.    Despite Debtor's obligation to the Prepetition Creditors, Defendant Paragon continued to sell or transfer portions of its accounts receivable to Debtor, which is illegal under federal and state laws.

110.    Debtor incurred substantial debt shortly before or shortly after some or all of the Pre-petition Transfers occurred.

111.    The Pre-petition Transfers were made at a time when Debtor was insolvent and/or rendered insolvent by virtue of said transfers.

112.    As noted above, Debtor's insolvency is presumed as a matter of law where, as here, Debtor operated a Ponzi scheme.

113.    Plaintiff alleges that Defendant Apate did not receive the Pre-Petition Transfers in good faith, for value, and without knowledge of their avoidability because the referrals from Defendant Apate to Prime Logix were illegal under federal and state law, nullifying their value as consideration.

114.    Based on the foregoing, Plaintiff may avoid the Pre-petition Transfers under 11 U.S.C. § 548(a)(1)(A).

115.    Based on the foregoing, Plaintiff may recover and preserve the avoided transfers up to the amount of the Pre-petition Transfers from Defendant as the initial transferee for the benefit of the Estate under 11 U.S.C. §§ 550 and 551.

**FOURTH CLAIM FOR RELIEF**

**Avoidance, Preservation, and Recovery of Constructive Fraudulent Transfer**

**11 U.S.C. §§ 548(a)(1)(B), 550, and 551**

**(Against Defendant Apate)**

116.    Plaintiff hereby incorporates by reference Paragraphs 1 through 115 and realleges these paragraphs as though set forth in full herein.

117.    One or more of the Pre-petition Transfers were made within two years prior to the Petition Date.

118.    Debtor did not receive reasonably value in exchange for the Pre-petition Transfers because the referrals from Defendant Apate to Prime Logix were illegal under federal and state law, nullifying their value as consideration.

119.    The Pre-petition Transfers were made at a time when Debtor was insolvent and/or rendered insolvent by virtue of said transfers.

120.    As noted above, Debtor's insolvency is presumed as a matter of law where, as here, Debtor operated a Ponzi scheme.

121.    When the Pre-petition Transfers occurred, Debtor's business was undercapitalized and Debtor was engaged in business for which its capital was unreasonably small.

122.    When the Pre-petition Transfers occurred, Debtor was about to incur debts that were beyond its ability to pay.

123.    At the time each Pre-petition Transfer was made, Debtor was indebted to one or more creditors that held a claim against Debtor on the date of each Transfer and on the Petition Date.

124.    Based on the foregoing, Plaintiff may avoid the Pre-Petition Transfers under 11 U.S.C. § 548(a)(1)(B).

125.    Based on the foregoing, Plaintiff may recover and preserve the avoided transfers from Defendant as the initial transferee for the benefit of the Estate under 11 U.S.C. §§ 550 and 551.

## FIFTH CLAIM FOR RELIEF

### Avoidance, Recovery, and Preservation of Preferential Transfers

### to Defendants in Preference Period

### 11 U.S.C. §§ 547, 550, and 551

### [Against Defendant Apate]

126.    Plaintiff hereby incorporates by reference Paragraphs 1 through 125 and realleges these paragraphs as though set forth in full herein.

127.    As noted above, at least $57,239.62 of the Pre-petition Transfers (previously defined as the "Preference Transfers") from Debtor to Defendant Apate occurred during the 90-day preference period.

128.    These Preference Transfers were made for, or on account of, an antecedent debt or debts owed by the Debtor to Defendant Apate, each of which constituted a "debt" or "claim" (as those terms are defined in the Bankruptcy Code) of Defendant Apate's.

129.    The Preference Transfers happened while LPG was insolvent.

130.    As noted above, Debtor's insolvency is presumed as a matter of law where, as here, Debtor operated a Ponzi scheme.

131.    Debtor is also entitled to the presumption of insolvency when the Preference Transfers happened pursuant to 11 U.S.C. § 547(f).

132.    As a result of the Preference Transfers, Defendant Apate recovered more than it would have received if: (i) the Debtor's case was under chapter 7 of the Bankruptcy Code; (ii) the Preference Transfers had not been made; and (iii) Defendant Apate received payments of its debts under the provisions of the Bankruptcy Code. As evidenced by the Debtor's schedules filed in the underlying Bankruptcy Case, as well as the proofs of claim that have been received to date, the Debtor's liabilities exceed its assets to the point that unsecured creditors will not receive a full payout of their claims from the Debtor's Estate.

133.    Based on the foregoing, Plaintiff may recover and preserve the avoided Preference Transfers from Defendant Apate as the initial transferee for the benefit of the Estate under 11 U.S.C. §§ 550 and 551.

**SIXTH CLAIM FOR RELIEF**

**Avoidance, Recovery, and Preservation of Unauthorized Post-Petition Transfers**

**11 U.S.C. §§ 549, 550, and 551**

**[Against Defendant Apate]**

134.    Plaintiff hereby incorporates by reference Paragraphs 1 through 133 and realleges these paragraphs as though set forth in full herein.

135.    As noted above, Defendant Apate received at least $2,852.76 after the Petition Date (previously defined as the "Post-Petition Transfers") from Debtor. The Post-Petition Transfers were neither authorized by any section of the Bankruptcy Code nor by any order of this Court.

136.    Based on the foregoing, Plaintiff may recover and preserve the avoided Post-Petition Transfers from Defendant Apate as the initial transferee for the benefit of the Estate under 11 U.S.C. §§ 550 and 551.

**SEVENTH CLAIM FOR RELIEF**

**Turnover of Estate Property**

**11 U.S.C. § 542**

**[Against Defendant Apate]**

137.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 136 as though set forth in full.

138.    Defendant Apate has possession or control over property of the Estate in the form of the Transfers made pursuant to illegal and unenforceable agreements.

139.    The Transfers are not of inconsequential value to the Estate.

140.    The funds that are the subject of the Transfers are paramount to Debtor's ability to pay creditors.

141.    Accordingly, Trustee is entitled to a judgment for turnover of the Transfer pursuant to 11 U.S.C. § 542.

///

///

///

**<u>EIGHTH CLAIM FOR RELIEF</u>**

**Aiding and Abetting Fraudulent Transfer**

**Cal. Civ. Code § 3439 et seq.**

**[Against All Defendants]**

142.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 141 as though set forth in full.

143.    Defendants have possession or control over property of the Estate including, but not limited to, the Transfers made pursuant to illegal and unenforceable agreements.

144.    Defendants had knowledge of the fraudulent transactions, transfers, and agreements that were used to perpetuate and conceal the Ponzi scheme and fraudulent transfers.

145.    Defendants, with the foregoing knowledge, intended to, and did, help the Debtor and other scheme participants in perpetuating and concealing the Ponzi scheme and fraudulent transfers of money.

146.    At all material times, Defendants had the intent to facilitate and conceal the Ponzi scheme and fraudulent transfers of money by aiding and abetting the illegal capping scheme and signing up consumer clients to keep the business going.

147.    Defendants assisted, and did actually engage in, LPG's commission of fraud and Ponzi scheme by coordinating, facilitating, and directing payments and transfers of monies and executing documents in furtherance of concealing the true nature of their fraudulent and criminal activity related to the Ponzi scheme.

148.    Without in any way limiting the foregoing, as managing member of Defendant Apate, Defendant Ramirez used his control over Defendant Apate to support, participate in, and benefit from LPG's Ponzi scheme and fraudulent transfers.

149.    The injuries to Plaintiff, the Debtor's Estate and to its creditors directly, proximately and reasonably foreseeably resulting from and caused by these fraudulent transfers and Ponzi scheme include, without limitation, hundreds of thousands of dollars in improperly transferred and acquired monies.

///

150. The property, including, but not limited to, the Transfers are not of inconsequential value to the Estate and recovering these funds is paramount to Debtor's ability to pay creditors.

151. Plaintiff and the Debtor's Estate also suffered damages by incurring attorney's fees and costs associated with the prosecution of Defendants' unlawful activities.

### Reservation Of Rights

152. Plaintiff reserves the right to bring all other claims or causes of action that Plaintiff may have against Defendants, on any and all grounds, as allowed under the law or in equity, including but not limited to, those claims not known by the Trustee at this time but that he may discover during the pendency of this adversary proceeding.

### Prayer

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

**On the First Claim for Relief**

1. That the Pre-petition Transfers be avoided under 11 U.S.C. § 544 and California Civil Code sections 3439.04(a)(1) and 3439.07;

2. That Plaintiff recover the avoided Pre-petition Transfers or a money judgment in an amount equal to the value of the avoided Transfers pursuant to 11 U.S.C. § 550;

**On the Second Claim for Relief**

3. That the Pre-petition Transfers be avoided under 11 U.S.C. § 544 and California Civil Code sections 3439.04(a)(2), 3439.05 and 3439.07;

4. That Plaintiff recover the avoided Pre-petition Transfers or a money judgment in an amount equal to the value of the avoided Transfers pursuant to 11 U.S.C. § 550;

**On the Third Claim for Relief**

5. That the Pre-petition Transfers be avoided under 11 U.S.C. § 548(a)(1)(A);

6. That Plaintiff recover the avoided Pre-petition Transfers or a money judgment in an amount equal to the value of the avoided Transfers pursuant to 11 U.S.C. § 550;

///

///

///

**On the Fourth Claim for Relief**

7.      That the Pre-petition Transfers be avoided under 11 U.S.C. § 548(a)(1)(B);

8.      That Plaintiff recover the avoided Pre-petition Transfers or a money judgment in an amount equal to the value of the avoided Transfers pursuant to 11 U.S.C. § 550;

**On the Fifth Claim for Relief**

9.      That the Preference Transfers be avoided under 11 U.S.C. § 547;

10.     That Plaintiff recover the avoided Preference Transfers or a money judgment in an amount equal to the value of the avoided Preference Transfers pursuant to 11 U.S.C. § 550;

**On The Sixth Claim For Relief**

11.     That the Post-Petition Transfers be avoided under 11 U.S.C. § 549;

12.     That Plaintiff recover the avoided Post-Petition Transfers or a money judgment in an amount equal to the value of the avoided Post-Petition Transfers pursuant to 11 U.S.C. § 550;

**On The Seventh Claim For Relief**

13.     Ordering Defendant Apate to immediately turn over the value of the Transfers;

**On The Eighth Claim For Relief**

14.     Awarding Plaintiff compensatory damages in an amount to be determined at trial;

**On All Claims for Relief**

15.     That Plaintiff only recover a single satisfaction of all avoided Transfers under 11 U.S.C. § 550(d);

16.     That all avoided Transfers be preserved pursuant to 11 U.S.C. § 551;

17.     For prejudgment interest under state law on all fraudulent transfer claims from the date each transfer was made, as set forth in *In re Slatkin*, 525 F.3d 805, 820 (9th Cir.2008), *In re Agricultural Research and Technology Group, Inc.*, 916 F.2d 528, 541-42 (9th Cir.1990), and *Field v. Kepoikai* (*In re Maui Indus. Loan & Fin. Co.*), 483 B.R. 346, 353 (Bankr. D. Haw. 2012);

///

///

///

///

18.    For pre-judgment interest on all other claims at the maximum rate allowed by law;

19.    For costs incurred by Plaintiff in prosecuting this action; and

20.    For such other and further relief as the Court may deem just and proper.

DATED: March 19, 2025

Respectfully submitted,

DINSMORE & SHOHL LLP

By: /s/ Jacob R. Bothamley
     Yosina M. Lissebeck
     Jacob R. Bothamley
     Attorneys for Plaintiff Richard A. Marshack,
     Trustee of The LPG Liquidation Trust

# EXHIBIT 1



Department of State  /  Division of Corporations  /  Search Records  /  Search by Entity Name  /

# Detail by Entity Name

Florida Limited Liability Company
APATE SAFEGUARD LLC

**Filing Information**

| | |
|---|---|
| **Document Number** | L18000138540 |
| **FEI/EIN Number** | 83-0957615 |
| **Date Filed** | 06/04/2018 |
| **Effective Date** | 06/04/2018 |
| **State** | FL |
| **Status** | INACTIVE |
| **Last Event** | VOLUNTARY DISSOLUTION |
| **Event Date Filed** | 11/25/2024 |
| **Event Effective Date** | 11/26/2024 |

**Principal Address**

611 Anton
#970
Costa Mesa, CA 92626

Changed: 01/24/2024
**Mailing Address**

4767 New Broad St.
Orlando, FL 32814

Changed: 08/15/2023
**Registered Agent Name & Address**

Apate Safeguard LLC
4767 New Broad Street
Orlando, FL 32814

Name Changed: 04/25/2023

Address Changed: 01/24/2024
**Authorized Person(s) Detail**

**Name & Address**

Title MGR

Ramirez, Arthur
4767 New Broad Street
Orlando, FL 32814

**Annual Reports**

| Report Year | Filed Date |
|---|---|
| 2022 | 08/10/2022 |
| 2023 | 04/25/2023 |
| 2024 | 01/24/2024 |

**Document Images**

| | |
|---|---|
| 11/25/2024 -- VOLUNTARY DISSOLUTION | View image in PDF format |
| 01/24/2024 -- ANNUAL REPORT | View image in PDF format |
| 04/25/2023 -- ANNUAL REPORT | View image in PDF format |
| 08/10/2022 -- ANNUAL REPORT | View image in PDF format |
| 07/27/2021 -- ANNUAL REPORT | View image in PDF format |
| 07/20/2020 -- ANNUAL REPORT | View image in PDF format |
| 04/17/2019 -- LC Amendment | View image in PDF format |
| 03/25/2019 -- ANNUAL REPORT | View image in PDF format |
| 06/04/2018 -- Florida Limited Liability | View image in PDF format |

California
*Secretary of State*

Business          UCC

Login

Home

Search

Forms

Help

# Business Search

*The California Business Search provides access to available information for **corporations**, **limited liability companies** and **limited partnerships** of record with the California Secretary of State, with **free PDF copies** of over 17 million imaged business entity documents, including the most recent imaged Statements of Information filed for Corporations and Limited Liability Companies.*

*Currently, information for Limited Liability Partnerships (e.g. law firms, architecture firms, engineering firms, public accountancy firms, and land survey firms), General Partnerships, and other entity types are **not contained** in the California Business Search. If you wish to obtain information about LLPs and GPs, submit a Business Entities Order paper form to request copies of filings for these entity types. Note: This search is not intended to serve as a name reservation search. To reserve an entity name, select Forms on the left panel and select Entity Name Reservation ? Corporation, LLC, LP.*

### Basic Search

*A Basic search can be performed using an entity name or entity number. When conducting a search by*

Apate Safeguard LLC
(202358714699)



Request
Certificate

| | |
|---|---|
| *Initial Filing Date* | 08/23/2023 |
| *Status* | Active |
| *Standing - SOS* | Good |
| *Standing - FTB* | Good |
| *Standing - Agent* | Good |
| *Standing - VCFCF* | Good |
| *Formed In* | FLORIDA |
| *Entity Type* | Limited Liability Company - Out of State |
| *Principal Address* | 4767 NEW BROAD ST ORLANDO, FL 32814 |
| *Mailing Address* | 4767 NEW BROAD ST ORLANDO,FL32814 |
| *Statement of Info Due Date* | 08/31/2025 |
| *Agent* | Individual A Ramirez 611 ANTON BLVD 970 COSTA MESA, CA  92626 |



View History



Request Access

Exhibit 1, Page 29

Business         UCC

Home

Search

Forms

Help

*search **only ACTIVE entities** (Corporations, Limited Liability Companies, Limited Partnerships, Cooperatives, Name Reservations, Foreign Name Reservations, Unincorporated Common Interest Developments, and Out of State Associations). The basic search performs a contains ? keyword? search. The Advanced search allows for a ?starts with? filter. To search entities that have a status other than active or to refine search criteria, use the **Advanced** search feature.*

**Advanced Search**

*An Advanced search is required when searching for publicly traded disclosure information or a status other than active.*

*An Advanced search allows for searching by specific entity types (e.g., Nonprofit Mutual Benefit Corporation) or by entity groups (e.g., All Corporations) as well as searching by ?begins with? specific search criteria.*

**Disclaimer:** *Search results are limited to the 500 entities closest matching the entered search criteria. If your desired search result is not found within the 500 entities provided, please refine the search criteria using the Advanced search function for additional results/entities. The California Business*

## Apate Safeguard LLC (202358714699)



Request Certificate

| | |
|---|---|
| Initial Filing Date | 08/23/2023 |
| Status | Active |
| Standing - SOS | Good |
| Standing - FTB | Good |
| Standing - Agent | Good |
| Standing - VCFCF | Good |
| Formed In | FLORIDA |
| Entity Type | Limited Liability Company - Out of State |
| Principal Address | 4767 NEW BROAD ST ORLANDO, FL 32814 |
| Mailing Address | 4767 NEW BROAD ST ORLANDO,FL32814 |
| Statement of Info Due Date | 08/31/2025 |
| Agent | Individual A Ramirez 611 ANTON BLVD 970 COSTA MESA, CA  92626 |



View History



Request Access

Business    UCC

complete or certified record.

*Although every attempt has been made to ensure that the information contained in the database is accurate, the Secretary of State's office is not responsible for any loss, consequence, or damage resulting directly or indirectly from reliance on the accuracy, reliability, or timeliness of the information that is provided. All such information is provided "as is." To order certified copies or certificates of status, (1) locate an entity using the search; (2)select Request Certificate in the right-hand detail drawer; and (3) complete your request online.*

Home

Search

Forms

Help



Advanced ⌄

## Apate Safeguard LLC (202358714699)



Request
Certificate

| | |
|---|---|
| *Initial Filing Date* | 08/23/2023 |
| *Status* | Active |
| *Standing - SOS* | Good |
| *Standing - FTB* | Good |
| *Standing - Agent* | Good |
| *Standing - VCFCF* | Good |
| *Formed In* | FLORIDA |
| *Entity Type* | Limited Liability Company - Out of State |
| *Principal Address* | 4767 NEW BROAD ST ORLANDO, FL 32814 |
| *Mailing Address* | 4767 NEW BROAD ST ORLANDO,FL32814 |
| *Statement of Info Due Date* | 08/31/2025 |
| *Agent* | Individual A Ramirez 611 ANTON BLVD 970 COSTA MESA, CA 92626 |

Results: 1

| Entity Information | Initial Filing Date |
|---|---|
| Apate Safeguard LLC (202358714699) > | 08/23/20 |

View History                Request Access

# EXHIBIT 2

**FILED**
**Nov 25, 2024**
**Secretary of State**

# ARTICLES OF DISSOLUTION

Pursuant to section 605.0707, Florida Statutes, this Florida limited liability company submits the following Articles of Dissolution:

The name of the limited liability company as currently filed with the Florida Department of State:

APATE SAFEGUARD LLC

The document number of the limited liability company: L18000138540

The file date of the articles of organization: June 4, 2018

The effective date of the dissolution if not effective on the date of filing: November 26, 2024

A description of occurance that resulted in the limited liability company's dissolution:

THE LLC IS NO LONGER GENERATING INCOME FOR THE PURPOSE INTENDED. LLC WAS NOT COMPENSATED FOR SERVICES RENDERED AND THEREFORE MUST CLOSE DOWN.

The name and address of the person appointed to wind up the company's activities and affairs:

ARTHUR RAMIREZ
4767 NEW BROAD STREET
ORLANDO, FL  32814      UN

I/we submit this document and affirm that the facts stated herein are true.  I/we am/are aware that any false information submitted in a document to the Department of State constitutes a third degree felony as provided for in section 817.155, Florida Statutes.

Signature:   ARTHUR RAMIREZ
_____
            Electronic Signature of authorized person

# EXHIBIT 3

1   CHRISTOPHER B. GHIO (259094)
    christopher.ghio@dinsmore.com
2   CHRISTOPHER CELENTINO (131688)
    christopher.celentino@dinsmore.com
3   YOSINA M. LISSEBECK (201654)
    yosina.lissebeck@dinsmore.com
4   DINSMORE & SHOHL LLP
    655 West Broadway, Suite 800
5   San Diego, California 92101
    Tele: 619.400.0500
6   Fax: 619.400.0501
7
8   Sarah S. Mattingly (Ky. Bar 94257)
    sarah.mattingly@dinsmore.com
9   DINSMORE & SHOHL, LLP
    101 S. Fifth Street, Suite 2500
10  Louisville, Kentucky 40202
    Tele: 859-425-1096
11  Fax: 502-585-2207
12  (Admitted pro hac vice)
13  Special Counsel to Richard A. Marshack

14              UNITED STATES BANKRUPTCY COURT

15     CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

16  In Re                              Case No: 23-bk-10571-SC

17                                     Chapter 11

18                                     **ORDER GRANTING MOTION FOR
    The Litigation Practice Group P.C.,    ENTRY OF PROTECTIVE ORDER AND
19                                     THE PROTECTIVE ORDER**
            Debtor(s),
20
21                                     Date:   May 23, 2024
22                                     Time:   1:30 p.m.
                                       Judge:  Hon. Scott C. Clarkson
23                                     Place:  Courtroom 5C (via Zoom)[1]
                                               411 West Fourth Street
24                                             Santa Ana, CA 92701
25
26
27  ─────────────────────────
28  [1] Video and audio connection information for each hearing will be provided on Judge Clarkson's
    publicly posted hearing calendar, which may be viewed online at:
    http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.          Exhibit 3, Page 35

FILED & ENTERED

JUN 03 2024

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY mccall    DEPUTY CLERK

The Court has read and considered the Notice of Motion and Motion for Entry of Protective Order (the "Motion") filed by Richard A. Marshack, in his capacity as the Chapter 11 Trustee (the "Trustee") of the Bankruptcy Estate ("Estate") of The Litigation Practice Group P.C., on May 2, 2024, pursuant to Federal Rule of Bankruptcy Procedure 7026 and Federal Rule of Civil Procedure 26(c)(1), as Dk. No. 1164 ("Motion"), and has found good cause to grant the Motion.

IT IS HEREBY ORDERED that:

1.    The Motion is granted;

2.    The below Protective Order shall apply to any contested matter arising in the main bankruptcy case and in all adversary proceedings filed by or against Trustee, present and future; and

3.    Govern the discovery conducted therein.

**PROTECTIVE ORDER**

**1.    DEFINITIONS**

1.1    "Confidential Information" as used in this Protective Order shall mean documents and other information (regardless of how generated, stored or maintained) that a Party or non-party reasonably believes to contain or reflect non-public financial or business information, bank records, financial records, such as social security numbers, non-public financial or personal information of a Party or non-party, account numbers, sensitive digital information and identifiers, information subject to confidentiality agreements or provisions other than this Protective Order, and other non-public research, development, or commercial information that derives value or avoids injury by virtue of not being known to the public.

1.2    This "Action" is defined and hereby means any contested matter arising in the main bankruptcy case and in all adversary proceedings filed by or against Trustee, present and future.

1.3    "Designating Party" means a Party or non-party that designates Confidential Information during the Action.

1.4    "Receiving Party" means a Party that receives Confidential Information during the Action.

Exhibit 3, Page 36

2

1.5    "Party" or "Parties" means person or entity subject to this Protective Order.

**2.    SCOPE OF THIS PROTECTIVE ORDER**

2.1    Unless otherwise ordered, this Protective Order shall govern certain documents and other products of discovery obtained in the Action from the Parties there to, and from third parties. As well as certain information copied or derived therefrom, excerpts, summaries or compilations thereof, including, but not limited to, documents voluntarily exchanged as part of early settlement discussions, documents produced pursuant to initial disclosures, requests authorized by the Federal Rules of Civil Procedure made applicable herein by the Federal Rules of Bankruptcy Procedure, answers to interrogatories, deposition transcripts, responses to requests for production, responses to requests for admission, subpoenas, affidavits, declarations, expert reports, and other such material and information as may be produced during the course of the Action and designated as Confidential Information.

**3.    DESIGNATION OF CONFIDENTIAL INFORMATION**

3.1    This Protective Order shall govern the production and handling of any Confidential Information in this Action. Any Party or non-party who produces Confidential Information in this Action may designate it as "Confidential" or "Attorneys' Eyes Only" consistent with the terms of this Protective Order. Whenever possible, the Designating Party must designate only those portions of a document, written discovery responses, deposition, transcript, or other material that contain the Confidential Information and refrain from designating entire documents. Regardless of any designations made hereunder, the Designating Party is not otherwise restricted from use or disclosure of its Confidential Information outside of this Action or for any business purposes. In addition, any Party may move to modify or seek other relief from any of the terms of this Protective Order if it has first tried in writing and in good faith to resolve its needs or disputes with the other Parties or Party as the case may be under the terms of this Protective Order. Further, nothing in this Protective Order shall prevent a Party from redacting documents consistent with the Federal Rules of Civil Procedure and utilizing the documents as needed through-out the Action.

3.2    <u>Application to Non-Parties:</u> Before a non-party is given copies of documents or materials designated as Confidential Information or Attorneys' Eyes Only as permitted hereunder, it

3

Exhibit 3, Page 37

must first sign an acknowledgment to be bound to these terms that is attached hereto as <u>Exhibit</u> A; if it fails to do so, the Parties to this Action must resolve any such dispute before making disclosure of designated information as permitted hereunder to the non-party. If a non-party wishes to make designations hereunder, it must first sign attached <u>Exhibit A.</u>

       3.3    <u>Timing and Provisional Protection:</u> Designations of Confidential Information may be made at any time. To avoid potential waiver of protection hereunder, the Designating Party should designate documents or materials containing Confidential Information at the time of production or disclosure, including on the record during the taking of any deposition. Deposition testimony will be deemed provisionally protected for a period of thirty (30) days after the transcript is released to the Parties by the court reporter, although the Parties may agree at any time to different timelines of provisional protection of information as Confidential or Attorneys' Eyes Only as part of one or more specific depositions. To retain any designations beyond the provisional period, a Designating Party must designate specific pages and lines of deposition testimony before the provisional period has expired. Such designations must be made in writing so that all counsel and court reporters may append the designation to all copies of the transcripts.

       3.4    <u>Manner of Designation:</u> Confidential Information may be designated hereunder in any reasonable manner or method that notifies the Receiving Party of the designation level and identifies with specificity the information to which the designation applies. If made verbally, the Designating Party must promptly confirm the designation in writing. Whenever possible, the Designating Party should stamp, affix, or embed a legend of "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY" on each designated page of the document or electronic image that contains Confidential Information.

### 4.    CHALLENGES TO DESIGNATED INFORMATION

       4.1    In the event that a Receiving Party disagrees at any time with any designation(s) made by the Designating Party, the Receiving Party must first try to resolve such challenge in good faith on an informal basis with the Designating Party. The Receiving Party must provide written notice of the challenge and the grounds therefor to the Designating Party, who must respond in writing to the challenge within fifteen (15) days. At all times, the Designating Party carries the burden of establishing the propriety of the designation and protection level. Unless and until the challenge is

4

resolved by the Parties or ruled upon by the Court, the designated information shall remain protected under this Protective Order. The failure of any Receiving Party to challenge a designation does not constitute a concession that the designation is proper or an admission that the designated information is otherwise competent, relevant, or material.

**5.    LIMITED ACCESS/USE OF PROTECTED INFORMATION**

5.1    <u>Restricted Use:</u> Information that is produced or exchanged in the course of the Action and designated under this Protective Order may be used for preparation for trial and preparation for any appeal of any and all matters in the Action, as well as related settlement negotiations, and for no other purpose, without the written consent of the Designating Party. No Confidential Information may be disclosed to any person except in accordance with the terms of this Protective Order, unless the parties are co-counsel or have entered into joint defense agreements. All persons in possession of Confidential Information agree to exercise reasonable care with regard to the custody, use, or storage of such information to ensure that its confidentiality is maintained. This obligation includes, but is not limited to, the Receiving Party providing to the Designating Party prompt notice of the receipt of any subpoena that seeks production or disclosure of any designated information and consulting with the Designating Party before responding to the subpoena. Any use or disclosure of Confidential or Attorneys' Eyes Only information in violation of the terms of this Protective Order may subject the disclosing person or party to sanctions.

5.2    <u>Access to "Confidential" Information:</u> The Party(ies) and all persons subject to this Protective Order agree that information designated as "CONFIDENTIAL" may only be accessed or reviewed by the following:

a)    The Court, its personnel, and court reporters;

b)    Counsel of record, or co-counsel for any Party, or other party that has entered into a joint defense agreement in the Action and their employees who assist counsel of record, or co-counsel in the Action and are informed of the duties and obligations imposed hereunder;

c)    The Parties, including their clients, agents and employees who are assisting or have reason to know of the Action;

/ / /

Exhibit 3, Page 39

5

d)      Experts or consultants employed by the Parties or their counsel, or co-counsel, for purposes of an Action, so long as each such expert or consultant has signed attached Exhibit A; and

e)      Other witnesses or persons with the Designating Party's consent or by court order.

5.3     Access to "Attorneys' Eyes Only" Designations: The Parties and all persons subject to this Protective Order agree that information designated as "ATTORNEYS' EYES ONLY" may only be accessed or reviewed by the following:

a)      The Court, its personnel, and court reporters;

b)      Counsel of record, or co-counsel for any Party, or other party that has entered into a joint defense agreement in the Action and their employees who assist counsel of record in the Action and are informed of the duties hereunder;

c)      In-house counsel for any Party in the Action and Richard A. Marshack, as Chapter 11 Trustee of The Litigation Practice Group P.C. who is informed of the duties and obligations imposed hereunder;

d)      Experts or consultants employed by the Parties or their counsel, or co-counsel for purposes of the Action,  and so long as each such expert or consultant has signed attached Exhibit A; and

e)      Other witnesses or persons to whom the Designating Party agrees in advance of disclosure or by court order.

5.4     Non-Waiver Effect of Designations: Neither the taking of, nor the failure to take, any action to enforce the provisions of this Protective Order, nor the failure to object to any designation, will constitute a waiver of any Party(ies)'s claim or defense in the Action or any other action or proceeding, including, but not limited to, a claim or defense that any designated information is or is not Confidential, is or is not entitled to particular protection, or embodies or does not embody information protectable by law.

5.5     In-Court Use of Designated Information: If information designated under this Protective Order will or may be offered in evidence at a hearing or trial related to any matter in the Action, then the offering party must give advance notice to the party or non-party that designated prior to offering the information so that any use or disclosure may be addressed in accordance with

6

the Court's case-management or other pre-trial order, or by a motion *in limine.* Nothing in this Protective Order shall be construed as a waiver by a Party of any objections that may be raised as to the admissibility at trial of any evidentiary materials.

**6.    CLAW-BACK REQUESTS**

6.1    <u>Failure to Make Designation:</u>  If, at any time, a Party or non-party discovers that it produced or disclosed Confidential Information without designation, it may promptly notify the Receiving Party and identify with particularity the Confidential Information to be designated and the level of designation (the claw-back notification). The Receiving Party may then request substitute production of the newly-designated information. Within thirty (30) days of receiving the claw-back notification, the Receiving Party must: (1) certify to the Designating Party it has appropriately marked or, if substitute production has been requested, destroyed all unmarked copies that it received, made, and/or distributed; and (2) if it was practicably unable to mark or destroy any information because disclosures occurred while the Receiving Party was under no duty of confidentiality under the terms of this Protective Order regarding that information, the Receiving Party must reasonably provide as much information as practicable to aid the Designating Party in protecting the information, consistently with the Receiving Party's attorney-client, work-product, and/or trial-preparation privileges.

6.2    <u>Inadvertent Production of Privileged Information:</u> If, at any time, a Party discovers that it produced information that it reasonably believes is subject to protection under the attorney/client, work-product, or trial-preparation privileges, then it must promptly notify each Receiving Party of the claim for protection, the basis for it, amend its privilege log accordingly, and comply with Fed. R. Civ. P. 26(b)(5). Whenever possible, the producing party must produce substitute information that redacts the information subject to the claimed protection. The Receiving Party must thereupon comply with Fed. R. Civ. P. 26(b)(5)(B) as to the information subject to the claimed protection.

/ / /

/ / /

/ / /

**7.     DURATION/CONTINUED RESTRICTIONS**

7.1     <u>Handling of Designated Information Upon Conclusion of the Main Bankruptcy Case:</u> Upon conclusion of the Main Bankruptcy Case, by way of dismissal or closing of the case, the Designating Party(ies) is/are responsible for ensuring that any Party or person to whom the Designating Party shared or disclosed designated information in any of the matters under the Action returns or destroys all of its copies, regardless of the medium in which it was stored. No witness or Party may retain designated information that it received from any other Party or non-party under this Protective Order; only counsel of record, or co-counsel, are the authorized agents who may retain one copy for their respective legal files, and who must also describe to the Designating Party the extra steps taken to protect its legal file containing paper and/or electronic copies of the designated information so that it is not accessed, used, or disclosed inconsistently with the obligations under this Protective Order. This provision does not apply to the Court or Court staff. Moreover, this provision does not apply to Trustee, who may retain and use – consistent with this Order – Confidential Information received in any Action during the entirety of the Bankruptcy.

7.2     <u>Continued Restrictions Under this Protective Order:</u> The restrictions on disclosure and use of Confidential Information shall survive the conclusion of the Bankruptcy case and any matter in the Action.

**8.     PRIVILEGED OR PROTECTED INFORMATION**

8.1     Nothing in this Protective Order shall require disclosure of information that is protected by the attorney-client privilege, the work-product protection, or any other legally cognizable privilege (a "Privilege or Protection").  If information subject to a claim of Privilege or Protection is inadvertently produced, pursuant to Federal Rule of Evidence 502(d) such production shall not constitute a waiver of, or estoppel as to, any claim of Privilege or Protection for such information or any other information that may be protected from disclosure by a Privilege or Protection in any proceeding.

8.2     If a Party receives a document that appears to be subject to a Privilege or Protection, then it shall refrain from examining the document any more than is essential to ascertain if it is privileged or protected and shall promptly notify the producing Party in writing that the receiving

Exhibit 3, Page 42

Party possesses material that appears to be subject to a Privilege or Protection. The producing Party shall have seven (7) days after receiving such notice to assert a Privilege or Protection over the identified material. If the producing Party does not assert a claim of Privilege or Protection within the seven (7)-day period, the material in question shall be deemed not privileged or protected.

8.3    If a producing Party has produced a document subject to a claim of Privilege or Protection, upon written request by the producing Party, the document for which a claim of Privilege or Protection is made shall be sequestered or destroyed to the extent reasonably practicable, and the receiving Party shall not use the document for any purpose other than in connection with analyzing or disputing a claim of Privilege or Protection or in connection with a motion to compel the production of the document.

8.4    The receiving Party sequestering or destroying such material may then move the Court for an order compelling production of the material. The applicable producing Party bears the burden of establishing the applicable Privilege or Protection of any clawed-back document or information as and to the same extent that it would have borne such burden had it not produced the document or information.  Nothing in this Protective Order shall limit the Court's right or any receiving Party's right to request an in camera review of any information subject to a claim of Privilege or Protection.

###

Date: June 3, 2024

Scott C. Clarkson
United States Bankruptcy Judge

Exhibit 3, Page 43

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT "A"

1

1  Christopher B. Ghio (State Bar No. 259094)
   Christopher Celentino (State Bar No. 131688)
2  Yosina M. Lissebeck (State Bar No. 201654)
   **DINSMORE & SHOHL LLP**
3  655 West Broadway, Suite 800
   San Diego, CA 92101
4  Telephone:  619.400.0500
   Facsimile:  619.400.0501
5  christopher.ghio@dinsmore.com
   christopher.celentino@dinsmore.com
6  yosina.lissebeck@dinsmore.com

7  Sarah S. Mattingly (Ky. Bar 94257)
   DINSMORE & SHOHL, LLP
8  101 S. Fifth Street, Suite 2500
   Louisville, KY 40202
9  Telephone: 859-425-1096
   Facsimile: 502-585-2207
10 Sarah.mattingly@dinsmore.com
   (Admitted pro hac vice)
11
   Special Counsel to Richard A. Marshack,
12 Chapter 11 Trustee

13

14                 **UNITED STATES BANKRUPTCY COURT**

15                 **CENTRAL DISTRICT OF CALIFORNIA**

16

17 In Re                              Case No. 8:23-BK-10571-SC
18
                                      Chapter 11
19
   The Litigation Practice Group P.C.,  **EXHIBIT A TO STIPULATED
20                                        ORDER**
          Debtor(s),
21                                    Date:   May 23, 2024
22                                    Time:   1:30 p.m.
                                      Judge:  Hon. Scott C. Clarkson
23                                    Place:  Courtroom 5C[1] - Via Zoom
24                                            411 W. Fourth Street
                                              Santa Ana, CA  92701
25

26

27 ─────────────
   [1] Video and audio connection information for each hearing will be provided on Judge Clarkson's
28 publicly posted hearing calendar, which may be viewed online at:
   http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

                                      Exhibit 3, Page 45
                          1                EXHIBIT A
                                            Page 2

1   This is to certify that:

2   (a)    I am being given access to Confidential Information pursuant to the

3   Stipulated Protective Order that was entered into the main bankruptcy case for

4   Litigation Practice Group, but which is binding and controlling as set forth by the

5   Court's Order on any and all contested matters and  any and all litigation commenced

6   by Trustee;

7   (b)    I have read the Stipulated Protective Order; and

8   (c)    I agree to be bound by the terms and conditions thereof, including,

9   without limitation, to the obligations regarding the use, non-disclosure and return of

10  such Confidential Information. I further agree that in addition to being contractually

11  bound by the Stipulated Protective Order, I am subject to the jurisdiction of the above

12  reference Court for any violation thereof.

13

14  Date: _____

15

16                                          _____
                                            Signature

17

18                                          _____
19                                          Printed Name

20

21

22

23

24

25

26

27

28

# EXHIBIT 4

## MARKETING AFFILIATE AGREEMENT

This Marketing Affiliate Agreement ("*Agreement*") is effective as of the Effective Date by and between Prime Logix LLC, ("Prime") and Debtreso, as the entity executing or otherwise accepting this Agreement as a marketing affiliate of Prime ("***Marketing Affiliate***"). Capitalized terms used but not otherwise defined herein shall have the meaning provided in the definitions set forth in Section 13 below.

1.  Authorization; Marketing and Promotion.

    1.1.  Authorization. Subject to Marketing Affiliate's compliance with this Agreement, Prime hereby grants to Marketing Affiliate a non-exclusive, non-transferable, and non-assignable right to promote and market the Services to prospective customers.

    1.2.  Marketing and Promotion. Marketing Affiliate will use commercially reasonable efforts to market and promote the Services to prospective customers during the Term. Any advertising materials to be used by Marketing Affiliate (other than the materials provided by Prime) shall be at its own cost and expense. Marketing Affiliate agrees to assist in Prime's marketing efforts to a prospective customer referred by Marketing Affiliate and will provide commercially reasonable cooperation if so requested. Marketing Affiliate shall clearly and conspicuously disclose that it is being compensated by Prime for its promotion of the Services. In connection with its performance under this Agreement, Marketing Affiliate shall not represent itself as an agent of Prime for any purpose.

    1.3.  Prime Marks. All use by Marketing Affiliate of the trademarks, service marks, and trade names associated with Prime and/or the Services, whether registered or unregistered (the "*Prime Marks*"), including any goodwill associated therewith, shall inure to the benefit of, conform to the standards set by, and be under the control of, Prime. Marketing Affiliate's use of any of the Prime Marks must comply with this Agreement and any trademark usage guidelines provided by Prime from time to time. Marketing Affiliate shall not use any of the Prime Marks in connection with any product or service or in any manner that is likely to cause confusion, and shall not copy, imitate, or use any such marks, in whole or in part, without the prior written permission of Prime. As between the parties, Prime will have the sole right and discretion to determine whether any use of the Prime Marks in connection with the promotional activities hereunder complies with the requirements of this Agreement.

    1.4.  Customer Terms. Marketing Affiliate will notify each prospective customer that its access to the Services will be subject to the TOS and such customer must accept the TOS prior to using the Services. Marketing Affiliate will not accept the TOS on behalf of its Referral Customers.

2.  Referral Process. A prospective customer may become a Referral Customer through Marketing Affiliate's submission and Prime's acceptance of a Referral Notice per Section 2.1 below, or through Prime's Affiliate Webpage per Section 2.2 below.

    2.1.  Referral Notice. Marketing Affiliate may submit a Referral Notice to Prime for each prospective customer referred by Marketing Affiliate to Prime. If Prime accepts the Referral Notice, the prospective customer referred thereby will be considered a Referral Customer. Prime may reject any Referral Notice if the prospective customer set forth in such Referral Notice is (a) a current customer of Prime, or (b) a prospective customer of Prime who, at the time the Referral Notice is submitted to Prime concerning such customer: (i) is being actively recruited by Prime or another partner of Prime, or (ii) has been actively recruited by Prime or another partner of Prime in the one hundred eighty (180) day period immediately preceding submission of such Referral Notice. If Prime fails to provide Marketing Affiliate with a written acceptance or rejection within thirty (30) days after submission of the Referral Notice, the Referral Notice will be considered

rejected by Prime and Marketing Affiliate must resubmit a Referral Notice for such prospective customer to be reconsidered as a Referral Customer hereunder.

2.2.  Affiliate Code. Marketing Affiliate may be assigned a referral code or URL that is specifically linked to Marketing Affiliate in conjunction with this Agreement (both referred to herein as an "*Affiliate Code*"). Marketing Affiliate may share its Affiliate Code with prospective customers and if a prospective customer uses the Affiliate Code during the Term when purchasing a subscription to the Services, and Prime accepts the Affiliate Code associated with the purchase, such prospective customer will be deemed a Referral Customer of Marketing Affiliate with respect to such purchase. Prime may reject any Affiliate Code related to a purchase if the prospective customer is (a) a current customer of Prime, or (b) has been actively recruited by Prime or another partner of Prime in the one hundred eighty (180) day period immediately preceding the purchase.

3. Pricing and Payment. Prime is responsible for all account-related activities with the Referral Customers, including billing and collecting fees from all Referral Customers, and may communicate directly with the Referral Customers at any time. Prime is also free to assign the servicing of Referral Customers to any other service provider at its sole discretion.  Prime is free to determine the prices that it will charge Referral Customers for the Services and will have the right to alter the Services, alter any prices for the Services, or reject or discontinue sales of the Services or any part thereof, with respect to any Referral Customer at any time or from time to time in its sole discretion.

4. Referral Fee. As consideration for any and all efforts by Marketing Affiliate to promote the Services hereunder, Prime will pay Marketing Affiliate a commission in the following amount: 50% of the service fee charged to the Referral Customer (the "*Referral Fee*") for each Referral Customer who meets all of the requirements of such offer. The Referral Fee is payable within ten (10) days after the service fee paid by the Referral Customer clears and is sent to Prime.  Marketing Affiliate shall not be entitled to any portion of the maintenance fee charged by Prime, which fee is currently set at $80.00 per file (as of the date of this Agreement) but which is subject to change at the sole discretion of Prime.  No fee will be charged to the Referral Customer other than the service fee and maintenance fee. Marketing Affiliate will provide Prime with all appropriate tax identification information that Prime requires to ensure Prime's compliance with applicable tax regulations.

5. Intellectual Property Rights. Except for the rights to use the Prime Marks and promote the Services as expressly granted herein, neither party will acquire any rights, title or interest in any of the Intellectual Property Rights belonging to the other party or the other party's licensors. Nothing in this Agreement is intended to constitute a sale of any software or documentation associated with the Services or any derivations thereof. The Services constitute valuable proprietary and trade secret information and property of Prime. Title, ownership, and intellectual property rights, including without limitation all copyright rights, in and to the Services, and all derivatives thereof, shall remain with Prime and its licensors. Marketing Affiliate acknowledges the ownership and intellectual property rights of Prime in the Services, and will not take any action to jeopardize, limit or interfere in any manner with such ownership or other rights. Marketing Affiliate hereby grants Prime a non-exclusive, royalty-free, fully paid up, perpetual, irrevocable, transferable, unlimited, worldwide right to use and otherwise commercially exploit any feedback, ideas or other suggestions communicated by Marketing Affiliate to Prime.

6. Confidentiality. Each party will: (a) protect the other party's Confidential Information with the same standard of care it uses to protect its own Confidential Information, but in no event less than reasonable care; and (b) not disclose the Confidential Information, except to affiliates, employees, agents and professional advisors who need to know it and who have agreed in writing (or in the case of professional advisors are otherwise bound) to keep it confidential. Each party (and any affiliates, employees and agents to whom it has disclosed Confidential Information) may use Confidential Information only to exercise rights and fulfill obligations under this Agreement, while using reasonable care to protect it. Each party is responsible for any actions of its affiliates, employees and agents in violation of this Section. Notwithstanding the foregoing, each party may disclose the other party's Confidential Information when required by law, but only after it, if legally permissible: (a) uses commercially reasonable efforts to notify the other party; and (b) gives the other party the chance to challenge the disclosure.

7. Publicity. Marketing Affiliate will not issue any press release, public announcement, or public statement regarding the existence or content of this Agreement or issue any materials containing Prime's name, trade

2

DocuSign Envelope ID: 64066EDD-2B32-4BDE-A792-E20E8226196D

names, trademarks, service marks, logos, domain names, or other distinctive brand features of Prime without Prime's prior written approval.

8.    Agreement Term; Termination.

   8.1.  Initial Term; Auto-Renewal. This Agreement will commence on the Effective Date and will continue for an initial term of twelve (12) months (the "*Initial Term*"). Upon expiration of the Initial Term, and on each anniversary of such date, this Agreement will auto-renew for a renewal term of twelve (12) months (each a "*Renewal Term*") unless either party notifies the other in writing of its intent to not renew the Agreement at least thirty (30) days prior to the end of the then-current Term.

   8.2.  Termination for Breach. Notwithstanding anything to the contrary elsewhere in the Agreement, either party may suspend performance or terminate this Agreement if: (i) the other party is in material breach of the Agreement and fails to cure that breach within fifteen (15) days after receipt of written notice; (ii) the other party ceases its business operations or becomes subject to insolvency proceedings and the proceedings are not dismissed within ninety (90) days; (iii) the other party is in material breach of this Agreement more than two (2) times notwithstanding any cure of such breaches.

   8.3.  Termination for Convenience. Notwithstanding anything to the contrary elsewhere in the Agreement, either party may terminate this Agreement for convenience upon sixty (60) days prior written notice to the other party.

   8.4.  Effect of Termination. Upon any termination or expiration of this Agreement: (i) all rights and licenses granted by one party to the other will immediately cease; (ii) each party will promptly return to the other party, or destroy and certify the destruction of, all of the other party's Confidential Information; (iii) Marketing Affiliate shall no longer market or promote the Services and will remove all references to Prime and/or the Services from is website; and (iv) Marketing Affiliate will, if Prime so requests, inform Referral Customers that its relationship with Prime has terminated. Termination or expiration of this Agreement, in part or in whole, will not limit either party from pursuing other remedies available to it. In the event of non-renewal or termination of this Agreement, the Referral Fee for Referral Customers who have met the applicable offer requirement(s) prior to the effective date of termination or expiration will be paid as set forth herein.

   8.5.  Acknowledgement. Marketing Affiliate hereby waives any right, either express or implied by applicable law or otherwise, to renewal of this Agreement or to any damages or compensation for any expiration or termination of this Agreement as provided herein.

9. Representations. Marketing Affiliate represents and warrants that:

   9.1.  Marketing Affiliate will comply with the terms and conditions of this Agreement, all applicable laws and regulations (including, without limitation, Export Laws), and any policies related to the Services, as such policies may be modified by Prime from time to time, in its marketing and promotion of the Services;

   9.2.  Marketing Affiliate will not make any unauthorized, false, misleading, or illegal statements in connection with this Agreement or regarding the Services and will not make any representation or warranty that is inconsistent with this Agreement or Prime's written materials regarding the Services as provided by Prime to Marketing Affiliate or otherwise made publicly available by Prime. Marketing Affiliate will indemnify, defend, and hold harmless Prime from and against all liabilities, damages, and costs (including settlement costs and reasonable attorneys' fees) arising out of or related to any representations or warranties

3

made by Marketing Affiliate regarding the Services that are inconsistent with this Agreement or the written materials regarding the Services provided by Prime;

9.3. Marketing Affiliate has obtained and will maintain all licenses, permits and approvals and will be responsible for satisfying all formalities as may be required to: (a) enter into this Agreement; (b) perform its obligations in accordance with this Agreement; and (c) comply with applicable laws, rules and regulations;

9.4. The execution and delivery of this Agreement, and the performance by Marketing Affiliate of its obligations hereunder, will not constitute a breach or default of or otherwise violate any agreement to which Marketing Affiliate or any of its affiliates are a party, or violate any rights of any third parties arising from those agreements, including without limitation any rights related to exclusivity; and

9.5. Marketing Affiliate and its directors, officers, employees and agents have not, and will not offer, pay, promise or authorize the payment, directly or indirectly through any other person or entity, of any monies or anything of value for the purpose of inducing or rewarding any favorable action or influencing any act or decision in connection with Prime's business to a candidate for public office, or to any of the following for the purpose of inducing or rewarding any favorable action or influencing any act or decision of such person or entity in connection with Prime's business: (a) any governmental official or employee of a government; (b) any official or employee of any government-controlled entity, public international organization or any political party; or (c) any candidate for political office.

10. Disclaimer. TO THE FULLEST EXTENT PERMITTED BY LAW, PRIME, ITS LICENSORS AND SUPPLIERS MAKE NO WARRANTY, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION WITH RESPECT TO THE SERVICES, AND EXPRESSLY DISCLAIM THE WARRANTIES OR CONDITIONS OF NONINFRINGEMENT, SATISFACTORY QUALITY, MERCHANTABILITY AND FITNESS FOR ANY PARTICULAR PURPOSE. MARKETING AFFILIATE HEREBY WAIVES ANY RIGHTS THAT IT MIGHT OTHERWISE HAVE IN CONNECTION WITH THIS SECTION. PRIME WILL NOT BE OBLIGATED UNDER THIS AGREEMENT TO TAKE ANY ACTION OR REFRAIN FROM TAKING ANY ACTION THAT IT BELIEVES, IN GOOD FAITH, WOULD CAUSE IT TO BE IN VIOLATION OF ANY LAWS OF THE TERRITORY OR ANY OTHER APPLICABLE JURISDICTION, INCLUDING, WITHOUT LIMITATION, THE UNITED STATES.

11. Limitation of Liability. IN NO EVENT WILL EITHER PARTY HAVE ANY LIABILITY TO THE OTHER WITH RESPECT TO ANY SUBJECT MATTER OF THIS AGREEMENT OR TERMS AND CONDITIONS RELATED HERETO FOR ANY INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES, HOWEVER CAUSED AND WHETHER IN CONTRACT, TORT OR UNDER ANY OTHER THEORY OF LIABILITY, WHETHER OR NOT SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LIABILITY AND EVEN IF DIRECT DAMAGES DO NOT SATISFY A REMEDY. IN NO EVENT WILL EITHER PARTY'S AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THE SUBJECT MATTER OF THIS AGREEMENT, WHETHER IN CONTRACT, TORT OR UNDER ANY OTHER THEORY OF LIABILITY, EXCEED THE AMOUNTS PAID BY PRIME TO MARKETING AFFILIATE HEREUNDER IN THE 12 MONTHS PRIOR TO THE ACT THAT GAVE RISE TO THE LIABILITY. THESE LIMITATIONS OF LIABILITY APPLY TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW BUT DO NOT APPLY TO A PARTY'S INDEMNIFICATION OBLIGATIONS, VIOLATIONS OF THE OTHER PARTY'S INTELLECTUAL PROPERTY RIGHTS, OR BREACHES OF CONFIDENTIALITY OBLIGATIONS.

12. Miscellaneous.

12.1. Non-Exclusivity. Prime expressly reserves the right (on a worldwide basis) to promote, advertise, market, sell, license and distribute the Services either directly or indirectly through other partners, managed service providers, dealers, distributors, or other third parties, and reserves the right (on a worldwide basis) to promote, advertise, market, sell, license, and distribute the Services to any customer of Marketing

4

DocuSign Envelope ID: 64066EDD-2832-4BDE-A792-E20E8226196D

Affiliate, subject to the confidentiality provisions of this Agreement. Nothing in this Agreement shall be deemed to preclude Prime from contacting Referral Customers directly.

12.2.   Non-Disparagement. Each party agrees and covenants that it will not at any time make, publish, or communicate to any person or entity or in any public forum, including, without limitation, on any digital or online review sites or forums, any defamatory, discrediting or disparaging remarks, comments or statements concerning the other party or its businesses, or any of its employees or officers, now or in the future. For purposes of this paragraph, a disparaging or discrediting statement or representation is any communication which, if publicized to another, would cause or tend to cause the recipient of the communication to question the business condition, integrity, competence, good character, or product quality of the person or entity to whom the communication relates, but will not include any disclosure required to be made to any governmental or quasi-governmental agency, or any disclosure made in the course of any pending or threatened litigation, mediation, arbitration or agency action.

12.3.   Notices. All notices must be in writing and addressed to the attention of the other party at the address first set forth above or on the signature page hereto, or at such other address as provided by a party from time to time by like notice. Notice will be deemed given: (a) when delivered by personal courier, (b) one (1) business day after sending via a nationally-recognized overnight courier, (c) three (3) business days after sending via certified mail, or (d) when verified by automated receipt or electronic logs if sent by facsimile or email.

12.4.   Beneficiaries; No Agency; Assignment. There are no third-party beneficiaries to this Agreement. The parties are independent contractors, and this Agreement does not create an agency, partnership or joint venture. Marketing Affiliate may not assign or transfer any part of this Agreement, including without limitation, by change of control or an assignment by operation of law, without Prime's prior written consent. Any attempt by Marketing Affiliate to transfer or assign this Agreement in violation of this Section is void.

12.5.   Force Majeure. Neither party will be liable for inadequate performance to the extent caused by a condition (for example, natural disaster, epidemic or pandemic, act of war or terrorism, riot, labor condition, governmental action, and Internet disturbance) that was beyond the party's reasonable control.

12.6.   No Waiver; Severability. Failure to enforce any provision of this Agreement will not constitute a waiver. If any provision of this Agreement is found unenforceable, it and any related provisions will be interpreted to best accomplish the unenforceable provision's essential purpose.

12.7.   Governing Law; Jurisdiction. This Agreement is governed by the laws of the State of Georgia, excluding its choice of law rules. FOR ANY DISPUTE RELATING TO THIS AGREEMENT, THE PARTIES CONSENT TO PERSONAL JURISDICTION IN FULTON COUNTY, GEORGIA AND THE EXCLUSIVE VENUE OF, THE COURTS IN FULTON COUNTY, GEORGIA.

12.8.   Waiver of Jury Trial. EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE SUBJECT MATTER HEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

DocuSign Envelope ID: 64966EDD-2B32-4BDE-A792-F30E8226196D

12.9.  Equitable Relief; Survival. Nothing in this Agreement will limit either party's ability to seek equitable relief. Upon expiration or termination of this Agreement, the rights and obligations of the parties will cease, except for the rights and obligations in all provisions of this Agreement which by their nature contemplate performance or applicability after the expiration or termination hereof, which will survive termination or expiration of this Agreement.

12.10.  Entire Agreement; Amendments; Counterparts. This Agreement constitutes the parties' entire agreement relating to its subject and supersedes any prior or contemporaneous agreements on that subject. Any amendments to this Agreement must be agreed upon in writing and signed by both parties hereto. The parties may execute this Agreement electronically (including, without limitation, via Marketing Affiliate's acceptance of this Agreement through the Affiliate Webpage, or via electronic signature) and the parties may exchange executed signature pages in counterparts, including by facsimile, PDF or other electronic method, which taken together will constitute one instrument.

13. Definitions.

For purposes of this Agreement, the following terms will have the meanings set forth below:

"Affiliate Webpage" means the URL designed by Prime for prospective affiliates to register as a marketing affiliate of Prime and obtain an Affiliate Code, currently located at: https://www.Prime/affiliates/, as may be updated by Prime from time to time.

"Confidential Information" means information disclosed by a party to the other party under this agreement that is marked as confidential or would normally be considered confidential under the circumstances. Without limiting the foregoing, the Referral Fee and any information obtained through the Services are Confidential Information of Prime. Notwithstanding the foregoing, Confidential Information does not include information that: (a) the recipient of the Confidential Information already knew; (b) becomes public through no fault of the recipient; (c) was independently developed by the recipient; or (d) was rightfully given to the recipient by another party.

"Effective Date" means the date on which both Prime and Marketing Affiliate execute this Agreement below. If this Agreement is executed by Marketing Affiliate and Prime on different dates, the Effective Date will be the date the last party signs this Agreement.

"Export Laws" means all applicable export and re-export control laws and regulations, and specifically includes the Export Administration Regulations maintained by the U.S. Department of Commerce, the trade and economic sanctions maintained by the Treasury Department's Office of Foreign Assets Control, and the International Traffic in Arms Regulations maintained by the Department of State.

"Intellectual Property Rights" means current and future worldwide rights under patent law, copyright law, trade secret law, trademark law, moral rights law, and other similar rights.

"Referral Customers" means those prospective customers referred by Marketing Affiliate to Prime and accepted by Prime in accordance with Section 2 above.

"Referral Notice" means Marketing Affiliate's submission of written notice to Prime regarding a prospective customer's interest in purchasing the Services, in the form designated by Prime from time to time, which shall include all information about the prospective customer and opportunity as reasonably requested by Prime.

"Services" means the products and services offered by Prime to Referral Customers as more particularly described at www.Prime.com, as may be updated or modified by Prime from time to time.

"Taxes" means any and all taxes, charges, fees, levies, imposts, duties, tariffs or other assessments imposed by or payable to any federal, state, local or foreign tax or governmental authority, including, without limitation, sales, use,

6

goods, services, value-added, transfer, customs, personal property, stamp duty, excise, withholding and other obligations of the same or similar nature.

"Term" means the Initial Term together with all Renewal Terms, as such terms are defined in Section 8.1 above.

"TOS" means the Terms of Service presented by Prime to Referral Customers upon login to the Services, as Prime may modify from time to time, which must be accepted by each Referral Customer prior to its use of the Services. A copy of the then-current TOS for the applicable Services will be made available by Prime for review upon request.

The parties have caused this Agreement to be executed as of the Effective Date.

Prime Logix LLC

By: _____
Cesar De La Cruz Villarruel
Date: 9/26/2022

Marketing Affiliate: Debtreso

By: _____
Arthur Ramirez
Date: 9/26/2022

7

## MARKETING AFFILIATE AGREEMENT

This Marketing Affiliate Agreement ("*Agreement*") is effective as of the Effective Date by and between Prime Logix LLC, ("Prime") and Debtreso, as the entity executing or otherwise accepting this Agreement as a marketing affiliate of Prime ("***Marketing Affiliate***"). Capitalized terms used but not otherwise defined herein shall have the meaning provided in the definitions set forth in Section 13 below.

1.  Authorization; Marketing and Promotion.

    1.1.  Authorization. Subject to Marketing Affiliate's compliance with this Agreement, Prime hereby grants to Marketing Affiliate a non-exclusive, non-transferable, and non-assignable right to promote and market the Services to prospective customers.

    1.2.  Marketing and Promotion. Marketing Affiliate will use commercially reasonable efforts to market and promote the Services to prospective customers during the Term. Any advertising materials to be used by Marketing Affiliate (other than the materials provided by Prime) shall be at its own cost and expense. Marketing Affiliate agrees to assist in Prime's marketing efforts to a prospective customer referred by Marketing Affiliate and will provide commercially reasonable cooperation if so requested. Marketing Affiliate shall clearly and conspicuously disclose that it is being compensated by Prime for its promotion of the Services. In connection with its performance under this Agreement, Marketing Affiliate shall not represent itself as an agent of Prime for any purpose.

    1.3.  Prime Marks. All use by Marketing Affiliate of the trademarks, service marks, and trade names associated with Prime and/or the Services, whether registered or unregistered (the "*Prime Marks*"), including any goodwill associated therewith, shall inure to the benefit of, conform to the standards set by, and be under the control of, Prime. Marketing Affiliate's use of any of the Prime Marks must comply with this Agreement and any trademark usage guidelines provided by Prime from time to time. Marketing Affiliate shall not use any of the Prime Marks in connection with any product or service or in any manner that is likely to cause confusion, and shall not copy, imitate, or use any such marks, in whole or in part, without the prior written permission of Prime. As between the parties, Prime will have the sole right and discretion to determine whether any use of the Prime Marks in connection with the promotional activities hereunder complies with the requirements of this Agreement.

    1.4.  Customer Terms. Marketing Affiliate will notify each prospective customer that its access to the Services will be subject to the TOS and such customer must accept the TOS prior to using the Services. Marketing Affiliate will not accept the TOS on behalf of its Referral Customers.

2.  Referral Process. A prospective customer may become a Referral Customer through Marketing Affiliate's submission and Prime's acceptance of a Referral Notice per Section 2.1 below, or through Prime's Affiliate Webpage per Section 2.2 below.

    2.1.  Referral Notice. Marketing Affiliate may submit a Referral Notice to Prime for each prospective customer referred by Marketing Affiliate to Prime. If Prime accepts the Referral Notice, the prospective customer referred thereby will be considered a Referral Customer. Prime may reject any Referral Notice if the prospective customer set forth in such Referral Notice is (a) a current customer of Prime, or (b) a prospective customer of Prime who, at the time the Referral Notice is submitted to Prime concerning such customer: (i) is being actively recruited by Prime or another partner of Prime, or (ii) has been actively recruited by Prime or another partner of Prime in the one hundred eighty (180) day period immediately preceding submission of such Referral Notice. If Prime fails to provide Marketing Affiliate with a written acceptance or rejection within thirty (30) days after submission of the Referral Notice, the Referral Notice will be considered

rejected by Prime and Marketing Affiliate must resubmit a Referral Notice for such prospective customer to be reconsidered as a Referral Customer hereunder.

2.2.  Affiliate Code. Marketing Affiliate may be assigned a referral code or URL that is specifically linked to Marketing Affiliate in conjunction with this Agreement (both referred to herein as an "*Affiliate Code*"). Marketing Affiliate may share its Affiliate Code with prospective customers and if a prospective customer uses the Affiliate Code during the Term when purchasing a subscription to the Services, and Prime accepts the Affiliate Code associated with the purchase, such prospective customer will be deemed a Referral Customer of Marketing Affiliate with respect to such purchase. Prime may reject any Affiliate Code related to a purchase if the prospective customer is (a) a current customer of Prime, or (b) has been actively recruited by Prime or another partner of Prime in the one hundred eighty (180) day period immediately preceding the purchase.

3.  Pricing and Payment. Prime is responsible for all account-related activities with the Referral Customers, including billing and collecting fees from all Referral Customers, and may communicate directly with the Referral Customers at any time. Prime is also free to assign the servicing of Referral Customers to any other service provider at its sole discretion.  Prime is free to determine the prices that it will charge Referral Customers for the Services and will have the right to alter the Services, alter any prices for the Services, or reject or discontinue sales of the Services or any part thereof, with respect to any Referral Customer at any time or from time to time in its sole discretion.

4.  Referral Fee. As consideration for any and all efforts by Marketing Affiliate to promote the Services hereunder, Prime will pay Marketing Affiliate a commission in the following amount: $1,500.00 for each Referral Customer (the "*Referral Fee*") who meets all of the following requirements: a minimum monthly payment of $300.00, minimum of twelve (12) monthly payments, one cleared payment, and minimum enrolled debt of $10,000.00. The Referral Fee is payable within ten (10) days after the first service fee paid by the Referral Customer clears and is sent to Prime.  For any Referral Customer that does not meet this criteria, Marketing Affiliate will be paid 50% of the service fee charged to such client within 10 days of such client clearing payment of the applicable service fee.  Marketing Affiliate shall not be entitled to any portion of the maintenance fee charged by Prime, which fee is currently set at $80.00 per file (as of the date of this Agreement) but which is subject to change at the sole discretion of Prime.  No fee will be charged to the Referral Customer other than the service fee and maintenance fee. Marketing Affiliate will provide Prime with all appropriate tax identification information that Prime requires to ensure Prime's compliance with applicable tax regulations.

5.  Intellectual Property Rights. Except for the rights to use the Prime Marks and promote the Services as expressly granted herein, neither party will acquire any rights, title or interest in any of the Intellectual Property Rights belonging to the other party or the other party's licensors. Nothing in this Agreement is intended to constitute a sale of any software or documentation associated with the Services or any derivations thereof. The Services constitute valuable proprietary and trade secret information and property of Prime. Title, ownership, and intellectual property rights, including without limitation all copyright rights, in and to the Services, and all derivatives thereof, shall remain with Prime and its licensors. Marketing Affiliate acknowledges the ownership and intellectual property rights of Prime in the Services, and will not take any action to jeopardize, limit or interfere in any manner with such ownership or other rights. Marketing Affiliate hereby grants Prime a non-exclusive, royalty-free, fully paid up, perpetual, irrevocable, transferable, unlimited, worldwide right to use and otherwise commercially exploit any feedback, ideas or other suggestions communicated by Marketing Affiliate to Prime.

6.  Confidentiality. Each party will: (a) protect the other party's Confidential Information with the same standard of care it uses to protect its own Confidential Information, but in no event less than reasonable care; and (b) not disclose the Confidential Information, except to affiliates, employees, agents and professional advisors who need to know it and who have agreed in writing (or in the case of professional advisors are otherwise bound) to keep it confidential. Each party (and any affiliates, employees and agents to whom it has disclosed Confidential Information) may use Confidential Information only to exercise rights and fulfill obligations under this Agreement, while using reasonable care to protect it. Each party is responsible for any actions of its affiliates, employees and agents in violation of this Section. Notwithstanding the foregoing, each party may disclose the other party's Confidential Information when

2

required by law, but only after it, if legally permissible: (a) uses commercially reasonable efforts to notify the other party; and (b) gives the other party the chance to challenge the disclosure.

7.  Publicity. Marketing Affiliate will not issue any press release, public announcement, or public statement regarding the existence or content of this Agreement or issue any materials containing Prime's name, trade names, trademarks, service marks, logos, domain names, or other distinctive brand features of Prime without Prime's prior written approval.

8.  Agreement Term; Termination.

    8.1.  Initial Term; Auto-Renewal. This Agreement will commence on the Effective Date and will continue for an initial term of twelve (12) months (the "*Initial Term*"). Upon expiration of the Initial Term, and on each anniversary of such date, this Agreement will auto-renew for a renewal term of twelve (12) months (each a "*Renewal Term*") unless either party notifies the other in writing of its intent to not renew the Agreement at least thirty (30) days prior to the end of the then-current Term.

    8.2.  Termination for Breach. Notwithstanding anything to the contrary elsewhere in the Agreement, either party may suspend performance or terminate this Agreement if: (i) the other party is in material breach of the Agreement and fails to cure that breach within fifteen (15) days after receipt of written notice; (ii) the other party ceases its business operations or becomes subject to insolvency proceedings and the proceedings are not dismissed within ninety (90) days; (iii) the other party is in material breach of this Agreement more than two (2) times notwithstanding any cure of such breaches.

    8.3.  Termination for Convenience. Notwithstanding anything to the contrary elsewhere in the Agreement, either party may terminate this Agreement for convenience upon sixty (60) days prior written notice to the other party.

    8.4.  Effect of Termination. Upon any termination or expiration of this Agreement: (i) all rights and licenses granted by one party to the other will immediately cease; (ii) each party will promptly return to the other party, or destroy and certify the destruction of, all of the other party's Confidential Information; (iii) Marketing Affiliate shall no longer market or promote the Services and will remove all references to Prime and/or the Services from is website; and (iv) Marketing Affiliate will, if Prime so requests, inform Referral Customers that its relationship with Prime has terminated. Termination or expiration of this Agreement, in part or in whole, will not limit either party from pursuing other remedies available to it. In the event of non-renewal or termination of this Agreement, the Referral Fee for Referral Customers who have met the applicable offer requirement(s) prior to the effective date of termination or expiration will be paid as set forth herein.

    8.5.  Acknowledgement. Marketing Affiliate hereby waives any right, either express or implied by applicable law or otherwise, to renewal of this Agreement or to any damages or compensation for any expiration or termination of this Agreement as provided herein.

9. Representations. Marketing Affiliate represents and warrants that:

    9.1.  Marketing Affiliate will comply with the terms and conditions of this Agreement, all applicable laws and regulations (including, without limitation, Export Laws), and any policies related to the Services, as such policies may be modified by Prime from time to time, in its marketing and promotion of the Services;

    9.2.  Marketing Affiliate will not make any unauthorized, false, misleading, or illegal statements in connection with this Agreement or regarding the Services and will not make any representation or warranty

3

Exhibit 4, Page 57

DocuSign Envelope ID: 6314BE9B-D7AE-491E-9446-73075B943B59

that is inconsistent with this Agreement or Prime's written materials regarding the Services as provided by Prime to Marketing Affiliate or otherwise made publicly available by Prime. Marketing Affiliate will indemnify, defend, and hold harmless Prime from and against all liabilities, damages, and costs (including settlement costs and reasonable attorneys' fees) arising out of or related to any representations or warranties made by Marketing Affiliate regarding the Services that are inconsistent with this Agreement or the written materials regarding the Services provided by Prime;

9.3.   Marketing Affiliate has obtained and will maintain all licenses, permits and approvals and will be responsible for satisfying all formalities as may be required to: (a) enter into this Agreement; (b) perform its obligations in accordance with this Agreement; and (c) comply with applicable laws, rules and regulations;

9.4.   The execution and delivery of this Agreement, and the performance by Marketing Affiliate of its obligations hereunder, will not constitute a breach or default of or otherwise violate any agreement to which Marketing Affiliate or any of its affiliates are a party, or violate any rights of any third parties arising from those agreements, including without limitation any rights related to exclusivity; and

9.5.   Marketing Affiliate and its directors, officers, employees and agents have not, and will not offer, pay, promise or authorize the payment, directly or indirectly through any other person or entity, of any monies or anything of value for the purpose of inducing or rewarding any favorable action or influencing any act or decision in connection with Prime's business to a candidate for public office, or to any of the following for the purpose of inducing or rewarding any favorable action or influencing any act or decision of such person or entity in connection with Prime's business: (a) any governmental official or employee of a government; (b) any official or employee of any government-controlled entity, public international organization or any political party; or (c) any candidate for political office.

10. Disclaimer. TO THE FULLEST EXTENT PERMITTED BY LAW, PRIME, ITS LICENSORS AND SUPPLIERS MAKE NO WARRANTY, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION WITH RESPECT TO THE SERVICES, AND EXPRESSLY DISCLAIM THE WARRANTIES OR CONDITIONS OF NONINFRINGEMENT, SATISFACTORY QUALITY, MERCHANTABILITY AND FITNESS FOR ANY PARTICULAR PURPOSE. MARKETING AFFILIATE HEREBY WAIVES ANY RIGHTS THAT IT MIGHT OTHERWISE HAVE IN CONNECTION WITH THIS SECTION. PRIME WILL NOT BE OBLIGATED UNDER THIS AGREEMENT TO TAKE ANY ACTION OR REFRAIN FROM TAKING ANY ACTION THAT IT BELIEVES, IN GOOD FAITH, WOULD CAUSE IT TO BE IN VIOLATION OF ANY LAWS OF THE TERRITORY OR ANY OTHER APPLICABLE JURISDICTION, INCLUDING, WITHOUT LIMITATION, THE UNITED STATES.

11. Limitation of Liability. IN NO EVENT WILL EITHER PARTY HAVE ANY LIABILITY TO THE OTHER WITH RESPECT TO ANY SUBJECT MATTER OF THIS AGREEMENT OR TERMS AND CONDITIONS RELATED HERETO FOR ANY INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES, HOWEVER CAUSED AND WHETHER IN CONTRACT, TORT OR UNDER ANY OTHER THEORY OF LIABILITY, WHETHER OR NOT SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LIABILITY AND EVEN IF DIRECT DAMAGES DO NOT SATISFY A REMEDY. IN NO EVENT WILL EITHER PARTY'S AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THE SUBJECT MATTER OF THIS AGREEMENT, WHETHER IN CONTRACT, TORT OR UNDER ANY OTHER THEORY OF LIABILITY, EXCEED THE AMOUNTS PAID BY PRIME TO MARKETING AFFILIATE HEREUNDER IN THE 12 MONTHS PRIOR TO THE ACT THAT GAVE RISE TO THE LIABILITY. THESE LIMITATIONS OF LIABILITY APPLY TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW BUT DO NOT APPLY TO A PARTY'S INDEMNIFICATION OBLIGATIONS, VIOLATIONS OF THE OTHER PARTY'S INTELLECTUAL PROPERTY RIGHTS, OR BREACHES OF CONFIDENTIALITY OBLIGATIONS.

12. Miscellaneous.

4

DocuSign Envelope ID: 6314BE9B-D7AF-491E-9446-73075B943B59

12.1.  Non-Exclusivity. Prime expressly reserves the right (on a worldwide basis) to promote, advertise, market, sell, license and distribute the Services either directly or indirectly through other partners, managed service providers, dealers, distributors, or other third parties, and reserves the right (on a worldwide basis) to promote, advertise, market, sell, license, and distribute the Services to any customer of Marketing Affiliate, subject to the confidentiality provisions of this Agreement. Nothing in this Agreement shall be deemed to preclude Prime from contacting Referral Customers directly.

12.2.  Non-Disparagement. Each party agrees and covenants that it will not at any time make, publish, or communicate to any person or entity or in any public forum, including, without limitation, on any digital or online review sites or forums, any defamatory, discrediting or disparaging remarks, comments or statements concerning the other party or its businesses, or any of its employees or officers, now or in the future. For purposes of this paragraph, a disparaging or discrediting statement or representation is any communication which, if publicized to another, would cause or tend to cause the recipient of the communication to question the business condition, integrity, competence, good character, or product quality of the person or entity to whom the communication relates, but will not include any disclosure required to be made to any governmental or quasi-governmental agency, or any disclosure made in the course of any pending or threatened litigation, mediation, arbitration or agency action.

12.3.  Notices. All notices must be in writing and addressed to the attention of the other party at the address first set forth above or on the signature page hereto, or at such other address as provided by a party from time to time by like notice. Notice will be deemed given: (a) when delivered by personal courier, (b) one (1) business day after sending via a nationally-recognized overnight courier, (c) three (3) business days after sending via certified mail, or (d) when verified by automated receipt or electronic logs if sent by facsimile or email.

12.4.  Beneficiaries; No Agency; Assignment. There are no third-party beneficiaries to this Agreement. The parties are independent contractors, and this Agreement does not create an agency, partnership or joint venture. Marketing Affiliate may not assign or transfer any part of this Agreement, including without limitation, by change of control or an assignment by operation of law, without Prime's prior written consent. Any attempt by Marketing Affiliate to transfer or assign this Agreement in violation of this Section is void.

12.5.  Force Majeure. Neither party will be liable for inadequate performance to the extent caused by a condition (for example, natural disaster, epidemic or pandemic, act of war or terrorism, riot, labor condition, governmental action, and Internet disturbance) that was beyond the party's reasonable control.

12.6.  No Waiver; Severability. Failure to enforce any provision of this Agreement will not constitute a waiver. If any provision of this Agreement is found unenforceable, it and any related provisions will be interpreted to best accomplish the unenforceable provision's essential purpose.

12.7.  Governing Law; Jurisdiction. This Agreement is governed by the laws of the State of Georgia, excluding its choice of law rules. FOR ANY DISPUTE RELATING TO THIS AGREEMENT, THE PARTIES CONSENT TO PERSONAL JURISDICTION IN FULTON COUNTY, GEORGIA AND THE EXCLUSIVE VENUE OF, THE COURTS IN FULTON COUNTY, GEORGIA.

12.8.  Waiver of Jury Trial. EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE SUBJECT MATTER HEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HERETO HEREBY FURTHER

5

WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS
LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS
JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

12.9.  Equitable Relief; Survival. Nothing in this Agreement will limit either party's ability to seek
equitable relief. Upon expiration or termination of this Agreement, the rights and obligations of the parties
will cease, except for the rights and obligations in all provisions of this Agreement which by their nature
contemplate performance or applicability after the expiration or termination hereof, which will survive
termination or expiration of this Agreement.

12.10.  Entire Agreement; Amendments; Counterparts. This Agreement constitutes the parties' entire
agreement relating to its subject and supersedes any prior or contemporaneous agreements on that subject.
Any amendments to this Agreement must be agreed upon in writing and signed by both parties hereto. The
parties may execute this Agreement electronically (including, without limitation, via Marketing Affiliate's
acceptance of this Agreement through the Affiliate Webpage, or via electronic signature) and the parties
may exchange executed signature pages in counterparts, including by facsimile, PDF or other electronic
method, which taken together will constitute one instrument.

13. Definitions.

For purposes of this Agreement, the following terms will have the meanings set forth below:

"Affiliate Webpage" means the URL designed by Prime for prospective affiliates to register as a marketing affiliate
of Prime and obtain an Affiliate Code, as may be updated by Prime from time to time.

"Confidential Information" means information disclosed by a party to the other party under this agreement that is
marked as confidential or would normally be considered confidential under the circumstances. Without limiting the
foregoing, the Referral Fee and any information obtained through the Services are Confidential Information of
Prime. Notwithstanding the foregoing, Confidential Information does not include information that: (a) the recipient
of the Confidential Information already knew; (b) becomes public through no fault of the recipient; (c) was
independently developed by the recipient; or (d) was rightfully given to the recipient by another party.

"Effective Date" means the date on which both Prime and Marketing Affiliate execute this Agreement below. If this
Agreement is executed by Marketing Affiliate and Prime on different dates, the Effective Date will be the date the
last party signs this Agreement.

"Export Laws" means all applicable export and re-export control laws and regulations, and specifically includes the
Export Administration Regulations maintained by the U.S. Department of Commerce, the trade and economic
sanctions maintained by the Treasury Department's Office of Foreign Assets Control, and the International Traffic in
Arms Regulations maintained by the Department of State.

"Intellectual Property Rights" means current and future worldwide rights under patent law, copyright law, trade
secret law, trademark law, moral rights law, and other similar rights.

"Referral Customers" means those prospective customers referred by Marketing Affiliate to Prime and accepted by
Prime in accordance with Section 2 above.

"Referral Notice" means Marketing Affiliate's submission of written notice to Prime regarding a prospective
customer's interest in purchasing the Services, in the form designated by Prime from time to time, which shall
include all information about the prospective customer and opportunity as reasonably requested by Prime.

"Services" means the products and services offered by Prime to Referral Customers as more particularly described
at www.Prime.com, as may be updated or modified by Prime from time to time.

6

"Taxes" means any and all taxes, charges, fees, levies, imposts, duties, tariffs or other assessments imposed by or payable to any federal, state, local or foreign tax or governmental authority, including, without limitation, sales, use, goods, services, value-added, transfer, customs, personal property, stamp duty, excise, withholding and other obligations of the same or similar nature.

"Term" means the Initial Term together with all Renewal Terms, as such terms are defined in Section 8.1 above.

"TOS" means the Terms of Service presented by Prime to Referral Customers upon login to the Services, as Prime may modify from time to time, which must be accepted by each Referral Customer prior to its use of the Services. A copy of the then-current TOS for the applicable Services will be made available by Prime for review upon request.

The parties have caused this Agreement to be executed as of the Effective Date.

Prime Logix LLC

By: _____
Paul Eid
Date: _____
11/3/2022

Debtreso

By: _____
Arthur Ramirez
Date: _____
11/4/2022

7

# EXHIBIT 5

Richard A. Marshack
D. Edward Hays
David A. Wood
Laila Masud
Aaron E. de Leest
Tinho Mang
Bradford N. Barnhardt
Sarah R. Hasselberger
Devan N. de los Reyes

*Of Counsel*
Kristine A. Thagard
Matthew W. Grimshaw
Chad V. Haes
Alina Mamlyuk



Sender: Chad V. Haes
chaes@marshackhays.com
Reference No. 1015-157

18 October 2024

*VIA U.S. MAIL ONLY*

Apate Safeguard LLC
4767 New Broad Street
Orlando, FL 32814
Attn: Arthur Ramirez, General Counsel,
CEO, or Officer, Managing or General
Agent, or any Other Agent Authorized to
Receive Service of Process

Apate Safeguard LLC
611 Anton #970
Costa Mesa, CA 92626
Attn: Arthur Ramirez, General Counsel,
CEO, or Officer, Managing or General
Agent, or any Other Agent Authorized to
Receive Service of Process

Re:     *In re The Litigation Practice Group P.C.*
        U.S. Bankruptcy Court, Central District of California,
        Case No. 8:23-bk-10571-SC

Dear Sir/Madam:

   This firm represents Richard A. Marshack, Chapter 11 Trustee for the bankruptcy estate of The Litigation Practice Group P.C. and liquidating trustee of the LPG Liquidation Trust (collectively, "Trustee") in the above-referenced bankruptcy case. Pursuant to 11 U.S.C. § 1107 and his appointment as Trustee, the Trustee has the obligation to investigate and pursue claims, including fraudulent transfers, preferential transfers, and unauthorized post-petition transfers.

   After a review of the books and records of The Litigation Practice Group P.C. ("Debtor"), the Trustee believes that he may have claims against Apate Safeguard LLC to avoid and recover post-petition transfers, preferential transfers, and fraudulent transfers. This letter is written in an attempt to investigate such claims.

   Section 547 of the Bankruptcy Code permits a trustee or debtor-in-possession to avoid certain payments made to creditors within the 90-day period preceding the filing

Exhibit 5, Exhibit 63

18 October 2024
Page 2

of a bankruptcy case. Sections 544 and 548 of the Bankruptcy Code permit a trustee or
debtor-in-possession to avoid certain payments made to creditors within the two-year
period preceding the filing of a bankruptcy case. Sections 3439.04 and 3439.05 of the
California Civil Code also permit a trustee to avoid certain payments made to creditors
within the applicable reach back period, generally, four years. Section 549 of the
Bankruptcy Code permits a trustee or debtor-in-possession to avoid certain transfers
made after the filing of a bankruptcy case known as post-petition transfers. Our
preliminary investigation has identified transfers from the Debtor to Apate Safeguard
LLC within the reach back period for both preferential transfers and fraudulent
transfers, as well as post-petition.

It appears that: (a) 8 of these transfers, totaling $57,239.62, may constitute
preferential transfers made within the 90-day period prior to the petition date, which can
be avoided and recovered by the Trustee pursuant to 11 U.S.C. § 547(b); (b) 16 of these
transfers, totaling $97,634.31, may constitute fraudulent transfers made within the four-
year period prior to the petition date, which can be avoided and recovered by the
Trustee pursuant to 11 U.S.C. §§ 544 and 548 and Cal. Civ. Code. §§ 3439.04 and
3439.05; and (c) 1 transfer, totaling $2,852.76, may constitute improper post-petition
transfer, which can be avoided and recovered by the Trustee pursuant to 11 U.S.C. §
549(a). In sum, and depending on your response to this letter, the Trustee may file suit
in the bankruptcy court to avoid and recover these transfers.

As to the preferential transfers, the Trustee has been unable to determine if any
viable defenses exist that would reduce or eliminate Apate Safeguard LLC's liability for
such claims. If Apate Safeguard LLC engaged with the Debtor in the "ordinary course of
business," or if you believe that Apate Safeguard LLC provided "new value" to the
Debtor subsequent to each transfer, as those terms are defined in 11 U.S.C. § 547(a)(2)
and (c)(2), then please provide information for the relevant period to substantiate the
applicable defenses.

As to the fraudulent transfers and post-petition transfer, the Trustee has been
unable to determine why such transfers were made to Apate Safeguard LLC and what
was provided to the Debtor in exchange for such transfers. Please respond to this letter,
attaching any evidence you have related to these transfers, including, but not limited to,
contracts, agreements, subscriptions, invoices, and any other documentation showing the
date, terms, and amounts for the transfers received and any documents evidencing
shipment dates as to goods and services provided by Apate Safeguard LLC to the Debtor.
Documents showing the course of dealing between Apate Safeguard LLC and the
Debtor, the date of receipt of the Debtor's payment and the amount, deposit date, and any

18 October 2024
Page 3


proof of deposit for any or all of the transfers will be helpful in determining the permissibility of the transfers and what, if any, value the Debtor received in return for payments made to Apate Safeguard LLC.

      Please provide the requested documents and information to us on or before November 8, 2024, so that we can assess whether any claims or defenses exist. If you have any questions, we are happy to discuss this matter with you or your counsel.

      Sincerely,

CHAD V. HAES

# EXHIBIT 6

**From:** Chad Haes
**Sent:** Wednesday, November 13, 2024 9:19 AM
**To:** Art Ramirez <art.14.ramirez@gmail.com>
**Cc:** anc@covelaw.com; Aaron E. de Leest <adeleest@marshackhays.com>; Lissebeck, Yosina
<Yosina.Lissebeck@Dinsmore.com>; Kathleen Frederick <KFrederick@marshackhays.com>; Sandee Pineda
<SPineda@MarshackHays.com>
**Subject:** FW: Case No. 8:23-bk-10571-SC

Art:

I have reviewed the attached documents and your e-mail, and I have one question so far. The affiliate marketing
agreements were between Prime Logix and Debtreso. But the subject payments were made to Apate Safeguard LLC.
Why were the payments made to Apate Safeguard LLC?

Chad

**From:** Art Ramirez <art.14.ramirez@gmail.com>
**Sent:** Friday, November 8, 2024 4:20 PM
**To:** Chad Haes <chaes@marshackhays.com>
**Cc:** Andrew Cove <anc@covelaw.com>
**Subject:** Case No. 8:23-bk-10571-SC

Exhibit 6, Page 67

Chad Haes,

I have cc'd our attorney, but requested he not reply. This is just for his records and we will discuss after your reply.

**Overview:**

Our relationship with affiliates that ultimately trace back to The Litigation Practice Group, P.C. was a brief 5 months period that resulted in hundreds of thousands of losses to Apate Safeguard, LLC, personal financial investment lost, as well as the efforts of our employment staff. We are the victims of this scam group out of California. I will give you transparency directly, as I would like to refrain from adding additional legal costs on my side with my attorney.

Firstly, I am in receipt of your letter as of today. Due to the recent hurricane season here in central Florida, I have not been able to return home/office until recently and just getting to this stack of mail which included your letter. So by happenstance, I am in receipt of your letter today 11/8/24. The letter is intriguing by its contents and the deadline of 11/8/24 is a coincidence.

I was greatly wronged by all parties under The Litigation Practice Group, P.C. or whomever they claim to be. I understand your role and contents of your request, however you will soon find out Apate Safeguard, LLC was a victim of these terrible people.

**Points of Interest and Timeline:**

- Apate Safeguard, LLC signed an Flat Fee Payout Affiliate Agreement to sell on behalf of Prime Logix LLC on 9/26/22 (see attached). This relationship lasted 5 months. We began sales in October 2022. By February of 2023 the company stopped paying per our agreement. They claimed CRM issues, ownership fighting, and billing issues. They continued to allow us to sell on their behalf, claiming that money owed was coming, all this happened into February 2023 and then in March 2023 they stated they went out of business and ceased to communicate.

- Apate Safeguard, LLC has limited records as Prime Logix LLC locked us out of the CRM that we operated out of (their system).

- Our Attorney sent a Demand Letter for outstanding commissions earned on 4/24/23 No reply. We had +$150,000.00 in future commissions owed that were never addressed. Communication ceased in March 2023. We discussed it with our attorney and ceded to being scammed. Apate Safeguard, LLC paid its internal staff, let everyone go, and began to try to investigate what transpired.

- I found on the internet a public notice of bankruptcy protection with hundreds of companies named and a small "two line" listing of our company. No calls or emails or correspondence to who we thought were the responsible parties were ever replied to. It was our position to accept the loss and scam we were taken for. At this time, we realized we were but a small part of a bigger scam.

- Apate Safeguard, LLC was not made aware of The Litigation Practice Group, P.C. until I was first notified via email on 9/6/23 by Caron Burke that this company was in Bankruptcy. That is my first official notification. Below is her contact information and email.

# In re Litigation Practice Group P.C.; United States Bankruptcy Court Case No. 8:23-bk-10571-SC

External

Inbox

Search for all messages with label Inbox

Remove label Inbox from this conversation



**Burke, Caron <Caron.Burke@dinsmore.com>**

to

Attached please find the following documents for service on you:


    **1.   NOTICE OF MOTION AND MOTION FOR SECOND ORDER REJECTING UNEXPIRED EXECUTORY CONTRACTS AND UNEXPIRED LEASES PURSUANT TO 11 U.S.C. § 365; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF; DECLARATION OF RICHARD A. MARSHACK**


    **2.   NOTICE OF HEARING ON MOTION FOR SECOND ORDER REJECTING UNEXPIRED EXECUTORY CONTRACTS AND UNEXPIRED LEASES PURSUANT TO 11 U.S.C. § 365; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**


Thank you.


**Caron C. Burke**
Legal Administrative Assistant
Dinsmore & Shohl LLP  •  Legal Counsel
655 West Broadway
Suite 800
San Diego, CA 92101
**T** (619) 400-0522  •  **F** (619) 400-0501
**E** caron.burke@dinsmore.com  •  dinsmore.com


- Apate Safeguard, LLC was not aware at any point of being in contract with The Litigation Practice Group, P.C. We were contracted by Prime Logic LLC as a flat fee affiliate sales office based out of Florida. Apate Safeguard, LLC filed necessary documentation per our state law, obtained a telemarketing license(s) as we operated out of Florida and it is a requirement.

**Response to your letter:**

- The transfers totaling $57,239.62 (this number has not been confirmed as I am just in receipt of your letter) were earned commissions resulting from work completed per our agreement with Pro Logix LLC. I am not familiar with the exact date of a bankruptcy filing by The Litigation Practice Group, P.C. because we have never done business with this entity directly. I am not eager to pull the records and without CRM access (Pro Logix, LLC) controlled this, I will need some time to pull what commision reports we do have, but all payments were earned.

3

Exhibit 6, Page 69

- The transfers totaling $97,6234.31 (this number has not been confirmed as I am just in receipt of your letter) were earned commissions resulting from work completed per our agreement with Pro Logix LLC. I am not familiar with the exact date of the filing of a bankruptcy filing by The Litigation Practice Group, P.C. because we have never done business with this entity directly. I am not eager to pull the records and without CRM access (Pro Logix, LLC) controlled this, I will need some time to pull what commision reports we do have, but all payments were earned.

- 1 transfer, totalling $2,852.76 (this number has not been confirmed as I am just in receipt of your letter) were earned commissions resulting from work completed per our agreement with Pro Logix LLC. I believe this was a late payment as the others were as well. I am not familiar with the exact date of the filing of a bankruptcy filing by The Litigation Practice Group, P.C. because we have never done business with this entity directly.

PLEASE NOTE: Again, we were unaware of The Litigation Practice Group, P.C. protection and if they did in fact pay us after, we were unaware (again, see our Agreements. Nowhere was The Litigation Practice Group, P.C. ever mentioned)

**Summary:**

If you would like our internal records, I would have to do this personally as all staff has been let go years ago. I can and will, but request 90 days. Our entity Apate Safeguard, LLC has tried some other ventures and ceased operations in 2024 and are in process of closing the corporation, filing final return. etc. I am personally working another job to attempt to recoup what was lost personally.

Sincerely,

Art Ramirez - Managing Member
Apate Safeguard LLC DBA DebtReso
407-404-4053

4

# EXHIBIT 7

In re: The Litigation Practice Group PC
Disbursement Details by Payee
4 Years Pre-Petition (03/20/2019 - 03/20/2023)

Apate Safeguard LLC

**GROBSTEIN TEEPLE**

| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|
| Bank of America | Prime Logix LLC | 9201 | 10/31/2022 | 10/21/2022 | | 137.18 | Online Banking Transfer Conf# anw0f598w; Apate Safeguard LLC |
| Bank of America | Prime Logix LLC | 9201 | 11/30/2022 | 11/4/2022 | | 443.15 | Online Banking Transfer Conf# p1 gl4btl 6; Apate SafeguardLLC |
| Bank of America | Prime Logix LLC | 9201 | 11/30/2022 | 11/10/2022 | | 313.60 | Online Banking Transfer Conf# bt2xtl uh8; Apate Safeguard LLC |
| Bank of America | Prime Logix LLC | 9201 | 11/30/2022 | 11/21/2022 | | 855.26 | Online Banking Transfer Conf# gpnpvc4so; Apate Safeguard LLC |
| Bank of America | Prime Logix LLC | 9201 | 11/30/2022 | 11/22/2022 | | 905.40 | Online Banking Transfer Conf# jto33wdgm; Apate Safeguard LLC |
| Bank of America | Prime Logix LLC | 9201 | 12/31/2022 | 12/2/2022 | | 1,692.39 | Online Banking Transfer Conf# eJpmng6p5; Apate Safeguard LLC |
| Bank of America | Prime Logix LLC | 9201 | 12/31/2022 | 12/9/2022 | | 34,500.00 | WIRETYPE:BOOK OUT DATE221209 TIME:1209 ETTRN:2022120900339448 RELATED REF:41 6667210 BNF:APATE SAFEGUARD LLC ID:        3042 PMT DET:FI LE PURCHASE |
| Bank of America | Prime Logix LLC | 9201 | 12/31/2022 | 12/9/2022 | | 1,547.71 | Online Banking Transfer Conf# badlujmt; Apate Safeguard LLC |
| Bank of America | Prime Logix LLC | 9201 | 12/31/2022 | 12/23/2022 | | 1,208.01 | WIRE TYPE:BOOK OUT DATE221 223 TIME:1 050 ET TRN:20221 22300385158 RELATED REF:41 8568078 BNF.APATE SAFEGUARD LLC ID:        3042 |
| Bank of America | Prime Logix LLC | 9201 | 12/31/2022 | 12/29/2022 | | 2,064.96 | WIRE TYPE:BOOK OUT DATE:221 229 TIME:1 227 ET TRN:20221 22900397085 RELATED REF:41 9226262 BNP.APATE SAFEGUARD LLC ID:        3042 |
| Bank of America | Prime Logix LLC | 9201 | 1/31/2023 | 1/13/2023 | | 7,500.00 | WIRETYPE:BOOK OUT DATEQ3O113 TIME:1620 ETTRN:2023011300485106 RELATED REF:421 495014 BNFAPATE SAFEGUARD LLC ID:8        3042 PMT DET:FI LE PURCHASE OF 5 FILES |
| Bank of America | Prime Logix LLC | 9201 | 1/31/2023 | 1/13/2023 | | 1,571.34 | WIRE TYPE:BOOK OUT DATE:2301 13 TIME:1 542 ET TRNQO23O1 1300465811 RELATED REF:421 487806 BNFAPATE SAFEGUARD LLC ID:        3042 |
| Bank of America | Prime Logix LLC | 9201 | 1/31/2023 | 1/20/2023 | | 3,677.89 | Online Banking Transfer Conf# f9esg3c76; Apate Safeguard LLC |
| Bank of America | Prime Logix LLC | 9201 | 1/31/2023 | 1/27/2023 | | 345.04 | Online Banking Transfer Conf# l2d6dn6la; Apate Safeguard LLC |
| Bank of America | Prime Logix LLC | 9201 | 2/28/2023 | 2/3/2023 | | 1,290.38 | Online Banking Transfer Conf# acp6xod7w; Apate Safeguard LLC |
| Bank of America | Prime Logix LLC | 9201 | 2/28/2023 | 2/10/2023 | | 39,582.00 | WIRE TYPE:BOOK OUT DATEQ3O21 0 T1ME1450 Er TRNQO23O21 000409942 RELATED REF:425325242 BNF.APATE SAFEGUARD LLC ID:        3042 PMT DET:JA N 30 TO FEB 5 INCLUDES FILE PURCH |
| | | | | | | **97,634.31** | |

DRAFT FORM - SUBJECT TO CHANGE

In re: The Litigation Practice Group PC
Disbursement Details by Payee
90 Days Pre-Petition (12/20/2022 - 03/20/2023)



Apate Safeguard LLC

| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|
| Bank of America | Prime Logix LLC | 9201 | 12/31/2022 | 12/23/2022 | | 1,208.01 | WIRE TYPE:BOOK OUT DATE221 223 TIME:1 050 ET TRN:20221 22300385158 RELATED REF:41 8568078 BNF.APATE SAFEGUARD LLC ID:      3042 |
| Bank of America | Prime Logix LLC | 9201 | 12/31/2022 | 12/29/2022 | | 2,064.96 | WIRE TYPE:BOOK OUT DATE:221 229 TIME:1 227 ET TRN:20221 22900397085 RELATED REF:41 9226262 BNP.APATE SAFEGUARD LLC ID:      3042 |
| Bank of America | Prime Logix LLC | 9201 | 1/31/2023 | 1/13/2023 | | 1,571.34 | WIRE TYPE:BOOK OUT DATE:2301 13 TIME:1 542 ET TRNQQ23O1 1300465811 RELATED REF:421 487806 BNFAPATE SAFEGUARD LLC ID:      3042 |
| Bank of America | Prime Logix LLC | 9201 | 1/31/2023 | 1/13/2023 | | 7,500.00 | WIRETYPE:BOOK OUT DATEQ3O113 TIME:1620 ETTRN:2023011300485106 RELATED REF:421 495014 BNFAPATE SAFEGUARD LLC ID:      3042 PMT DET:FI LE PURCHASE OF 5 FILES |
| Bank of America | Prime Logix LLC | 9201 | 1/31/2023 | 1/20/2023 | | 3,677.89 | Online Banking Transfer Conf# f9esg3c76; Apate Safeguard LLC |
| Bank of America | Prime Logix LLC | 9201 | 1/31/2023 | 1/27/2023 | | 345.04 | Online Banking Transfer Conf# l2d6dn6la; Apate Safeguard LLC |
| Bank of America | Prime Logix LLC | 9201 | 2/28/2023 | 2/3/2023 | | 1,290.38 | Online Banking Transfer Conf# acp6xod7w; Apate Safeguard LLC |
| Bank of America | Prime Logix LLC | 9201 | 2/28/2023 | 2/10/2023 | | 39,582.00 | WIRE TYPE:BOOK OUT DATEQ3O21 0 T1ME1450 Er TRNQQ23O21 000409942 RELATED REF:425325242 BNF.APATE SAFEGUARD LLC ID:      23042 PMT DET:JA N 30 TO FEB 5 INCLUDES FILE PURCH |
| | | | | | | 57,239.62 | |

DRAFT FORM - SUBJECT TO CHANGE

Payor Accounts: BAT Inc., Coast Processing LLC,
EZ Debt Relief, Maverick Management Group, Prime Logix, The
Litigation Practice Group, Vulcan Consulting Group LLC

Exhibit 7, Page 73

In re: The Litigation Practice Group PC
Summary of Disbursements
Post-Petition Activity (3/20/2023 - Present)

| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|
| Bank of America | Prime Logix LLC | 9201 | 3/31/2023 | 3/24/2023 | | 2,852.76 | Online Banking Transfer Conf# iz2vwo2ip; Apate Safeguard LLC |
| | | | | | | **2,852.76** | |

DRAFT FORM - SUBJECT TO CHANGE

Payor Accounts: BAT Inc., Coast Processing LLC,
EZ Debt Relief, Maverick Management Group, Prime Logix, The
Litigation Practice Group, Vulcan Consulting Group LLC

Exhibit 7, Page 74

# ADVERARY PROCEEDING COVER SHEET

B1040 (FORM 1040) (12/24)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>Richard A. Marshack, Trustee of the LPG Liquidation Trust | DEFENDANTS<br>Apate Safeguard LLC, a Florida Limited Liability Company, dba Debt Reso; Arthur Ramirez, individually and as Managing Member of Apate Safeguard LLC |
|---|---|

| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>Yosina M. Lissebeck (SBN 201654)<br>Jacob R. Bothamley (319457<br>DINSMORE & SHOHL LLP<br>655 West Broadway, Suite 800<br>San Diego, CA 92101    Telephone (619) 400-0500<br>yosina.lissebeck@dinsmore.com<br>Jacob.bothamely@dinsmore.com | ATTORNEYS (If Known)<br>Andrew Cove<br>Cove Law<br>1300 SE 4th   Avenuue, #1<br>Ft. Lauderdale, FL 33316 |
|---|---|

**PARTY** (Check One Box Only)
- ☐ Debtor
- ☐ U.S. Trustee/Bankruptcy Admin
- ☐ Creditor
- ☐ Other
- ☒ Trustee

**PARTY** (Check One Box Only)
- ☐ Debtor
- ☐ U.S. Trustee/Bankruptcy Admin
- ☐ Creditor
- ☒ Other
- ☐ Trustee

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
Complaint For: (1) Avoidance, Recovery, And Preservation Of 4-Year Actual Fraudulent Transfers; (2) Avoidance, Recovery, And Preservation Of 4-Year Constructive Fraudulent Transfers; (3) Avoidance, Recovery, And Preservation Of 2-Year Actual Fraudulent Transfers; (4) Avoidance, Recovery, And Preservation Of 2-Year Constructive Fraudulent Transfers; (5) Avoidance, Recovery, And Preservation Of Transfers Within Preservation Of Post-Petition Transfers; (7) Turnover; and (8) Aiding And Abetting Fraud

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(a) – Recovery of Money/Property**
- ☒ 11-Recovery of money/property - §542 turnover of property
- ☐ 12-Recovery of money/property - §547 preference
- ☒ 13-Recovery of money/property - §548 fraudulent transfer
- ☐ 14-Recovery of money/property - other

**FRBP 7001(b) – Validity, Priority or Extent of Lien**
- ☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(c) – Approval of Sale of Property**
- ☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(d) – Objection/Revocation of Discharge**
- ☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(e) – Revocation of Confirmation**
- ☐ 51-Revocation of confirmation

**FRBP 7001(f) – Dischargeability**
- ☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
- ☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
- ☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(f) – Dischargeability (continued)**
- ☐ 61-Dischargeability - §523(a)(5), domestic support
- ☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
- ☐ 63-Dischargeability - §523(a)(8), student loan
- ☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
- ☐ 65-Dischargeability - other

**FRBP 7001(g) – Injunctive Relief**
- ☐ 71-Injunctive relief- imposition of stay
- ☐ 72-Injunctive relief - other

**FRBP 7001(h) Subordination of Claim or Interest**
- ☐ 81-Subordination of claim or interest

**FRBP 7001(i) Declaratory Judgment**
- ☐ 91-Declaratory judgment

**FRBP 7001(j) Determination of Removed Action**
- ☐ 01-Determination of remove d claim or cause

**Other**
- ☐ SS-SIPA Case - 15 U.S.C. §§78aaa *et.seq.*
- ☒ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ 100,487.07 |

Other Relief Sought

B1040 (FORM 1040) (12/24)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>The Litigation Practice Group P.C. | BANKRUPTCY CASE NO.<br>8:23-bk-10571-SC | |
| DISTRICT IN WHICH CASE IS PENDING<br>Central District of California | DIVISION OFFICE<br>Santa Ana | NAME OF JUDGE<br>Scott C. Clarkson |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br>/s/ Jacob R. Bothamley | | |
| DATE<br>March 19, 2025 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Yosina M. Lissebeck<br>Jacob R. Bothamley<br>Attorneys for Plaintiff, Richard A. Marshack, Trustee of the<br>LPG Liquidation Trust | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.