Christopher Celentino (State Bar No. 131688)
Yosina M. Lissebeck (State Bar No. 201654)
Christopher B. Ghio (State Bar No. 259094)
**DINSMORE & SHOHL LLP**
655 West Broadway, Suite 800
San Diego, CA 92101
Telephone:  619.400.0500
Facsimile:  619.400.0501
Christopher.Celentino@dinsmore.com
Yosina.Lissebeck@dinsmore.com
Christopher.Ghio@dinsmore.com

Tyler Powell (Ky. Bar No. 90520 – Admitted pro hac vice)
**DINSMORE & SHOHL LLP**
100 West Main Street, Suite 900
Lexington, KY 40507
Telephone: 859-425-1056
Facsimile: 859-425-1099
Tyler.Powell@dinsmore.com

Special Counsel to Richard A. Marshack,
Trustee of the LPG Liquidation Trust

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| The Litigation Practice Group, P.C., | Case No.: 8:23-bk-10571-SC |
| Debtor. | Adv. Proc. No.: |
| | **COMPLAINT FOR:** |
| Richard A. Marshack, Trustee of the LPG Liquidation Trust, | **(1) AVOIDANCE, RECOVERY, AND PRESERVATION OF FRAUDULENT TRANSFER(S) PURSUANT TO 11 U.S.C. §§ 548(a)(1), 550, AND 551** |
| Plaintiff, | |
| v. | **(2) AVOIDANCE, RECOVERY, AND PRESERVATION OF FRAUDULENT TRANSFER(S) PURSUANT TO 11 U.S.C. §§ 548(a)(2), 550, AND 551 AND** |
| Elizabeth Reale, a California resident; Reale Family Irrevocable Trust; James E. Reale, a California resident, EMR Greenhouse, Inc., a California corporation, FreshFico, Inc. fka Freedom Enrollment Advisors, Inc., a California corporation, Reale Marketing, Inc., a California corporation, The Elizabeth Marie Reale Living Trust U/A dated March 28, 2024; and Kelly Hess, a California resident; | **(3) AVOIDANCE, PRESERVATION, AND RECOVERY OF ACTUAL FRAUDULENT TRANSFER(S) 11 U.S.C. §§ 544, 550, 551; CAL. CIV. CODE §§ 3439.04(a)(1) AND 3439.07 AND** |
| Defendants. | **(4) AVOIDANCE, PRESERVATION, AND RECOVERY OF CONSTRUCTIVE FRAUDULENT TRANSFER(S)** |

| | **PURSUANT TO 11 U.S.C. §§ 544, 550, 551; CAL. CIV. CODE §§ 3439.04(a)(2), 3439.05, AND 3439.07** |
|---|---|
| | Honorable Scott C. Clarkson |
| | Dept. 5C |

For his *Complaint for (1) Avoidance, Recovery, and Preservation of Transfers Made With Intent to Defraud Pursuant to 11 U.S.C. §§ 548(a)(1)(B), 550, and 551; (2) Avoidance, Preservation, and Recovery of Constructively Fraudulent Two-Year Transfers Pursuant to 11 U.S.C. §§ 548(a)(1)(B), 550 & 551; (3) Avoidance, Preservation, and Recovery of Transfers Within Four Years Pursuant to 11 U.S.C. §§ 544, 550, 551; Cal. Civ. Code §§ 3439.04(a)(2), 3439.05 and 3439.07; and (4) Avoidance, Recovery, and Preservation of Transfers Made Within Four Years Pursuant to 11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.05, and 3439.07* (the "Complaint"), plaintiff Richard A. Marshack, the Chapter 11 Trustee (the "Trustee" or "Plaintiff") for the bankruptcy estate (the "Estate") of debtor The Litigation Practice Group P.C. (the "Debtor" or "LPG") in the above-captioned bankruptcy case (the "Bankruptcy Case"), alleges and avers as follows:

## STATEMENT OF JURISDICTION, NATURE OF PROCEEDING, AND VENUE

1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E), (H) and (O), 1334(b), and General Order No. 13-05 of the District Court for the Central District of California because this is a core proceeding arising in and/or related to the Bankruptcy Case, which is a case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), and which is pending in the United States Bankruptcy Court for the Central District of California, Santa Ana Division (the "Court").

2.      Regardless of whether this proceeding is core, non-core, or otherwise, the Plaintiff consents to the entry of a final order and judgment by the Bankruptcy Court.

3.      Defendants are hereby notified that Rule 7008 of the Federal Rules of Bankruptcy Procedure requires him to plead whether consent is given to the entry of a final order and judgment by the bankruptcy court.

4.      Venue of this adversary proceeding properly lies in this judicial district pursuant to 28 U.S.C. § 1409(a) because this proceeding is related to the Debtor's pending Bankruptcy Case.

**THE PARTIES**

5.      Debtor LPG is, and at all material times was, a professional corporation organized, existing, and in good standing under the laws of the State of California, with its principal place of business in Tustin, California.

6.      Defendant Elizabeth M. Reale ("Ms. Reale") is, and at all material times was, an individual resident of the state of California subject to service of process via first class mail postage prepaid at, 7 Anacapri, Laguna Niguel, CA 92677.

7.      Defendant James E. Reale, ("James Reale") is, and at all material times was, an individual resident of the state of California subject to service of process via first class mail postage prepaid at, 24552 Paseo De Valencia, Unit B608, Laguna Hills, CA 92653.

8.      Defendant Reale Family Irrevocable Trust ("Family Trust") is, and at all material times was, a trust subject to service of process in the state of California through service on its Trustee, James Reale.  James Reale, as Trustee, may be served at 24552 Paseo De Valencia, Unit B608, Laguna Hills, CA 92653.

9.      Defendant EMR Green House, Inc. ("EMR Green House") is an active pending termination California corporation that is subject to service of process via first class mail postage prepaid care of its registered agent, Liz Reale at 7 Anacapri, Laguna Niguel, CA 92677.

10.      Defendant FreshFico, Inc. fka Freedom Enrollment Advisors, Inc. ("Freedom") is a suspended California corporation that is subject to service of process via first class mail postage prepaid care of its former shareholder/officer Brandon Vargas, 27126 Paseo Espada Suite 724, San Juan Capistrano, CA 92675.

11.      Defendant Reale Marketing, Inc. ("Marketing") is a suspended California corporation that is subject to service process via first class mail postage prepaid care of Ms. Reale at the above address, either in her individual capacity or as the Trustee of the Family Trust, who would have acquired Brian Reale's interest in Reale Marketing upon his passing.

12.      Defendant The Elizabeth Marie Reale Living Trust U/A dated March 28, 2024 ("Elizabeth Trust") is, and at all material times was, subject to service of process in California through service on its Trustee, Ms. Reale.  Ms. Reale, as Trustee, may be served at 7 Anacapri, Laguna Niguel,

3

CA 92677.

13.    Defendant Kelly Hess, ("Mr. Hess") is, and at all material times was, an individual resident of the state of California subject to service of process via first class mail postage prepaid at 660 Terraine Ave, Long Beach, CA 90814.

14.    Upon information and belief, Brian Reale has passed away.  The Family Trust, Ms. Reale, and the Elizabeth Trust are named as Defendants both in their individual capacities but also as the subsequent transferees and/or presumed successors in interest to Brian Reale's interests in the other Defendants named herein.

## GENERAL ALLEGATIONS

### A.    The Bankruptcy Case

15.    On March 20, 2023 ("Petition Date"), Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, commencing the Bankruptcy Case.

16.    The Office of the United States Trustee ("UST") filed its *Motion by United States Trustee to Dismiss or Convert Case Pursuant to 11 U.S.C. § 1112(b)* [Bankr. Docket No. 21] and creditors Debt Validation Fund II, LLC; MC DVI Fund 1, LLC; and MC DVI Fund 2, LLC filed the *Motion by DVF and MC DVI to Dismiss Chapter 11 Case Pursuant to 11 U.S.C. §§ 105, 305, 349, & 1112, or in the Alternative Convert This Case to Chapter 7 or Appoint a Trustee* [Bankr. Docket No. 44]. On May 4, 2023, the Court entered its *Order Directing United States Trustee to Appoint Chapter 11 Trustee* [Bankr. Docket No. 58].

17.    Pursuant to the *Acceptance of Appointment as Chapter 11 Trustee* [Bankr. Docket No. 63], on May 8, 2023, Trustee accepted his appointment as the Chapter 11 Trustee in the Bankruptcy Case. The Court approved the Trustee's appointment in its *Order Approving the U.S. Trustee's Application for the Appointment of a Chapter 11 Trustee* [Docket No. 65].

18.    Trustee was not appointed until after events of the case and, therefore, bases these allegations on information and belief. *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) ("The *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability

plausible."); *Miller v. City of Los Angeles*, 2014 U.S. Dist. LEXIS 198871, 2014 WL 12610195, at *5 (C.D. Cal. Aug. 7, 2014) (recognizing that the plaintiff's "information and belief" pleading was allowed and "necessary at times"); *see also Mireskandari v. Daily Mail and General Trust PLC*, 2013 U.S. Dist. LEXIS 194437, 2013 WL 12129642, at *4 (C.D. Cal. July 31, 2013) ("The Federal Rules of Civil Procedure allow parties to plead facts on 'information and belief' if the facts 'will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.'" (citations omitted)).

19.     Pursuant to the *Order Confirming Modified First Amended Joint Chapter 11 Plan of Liquidation* entered September 9, 2024, and the *Notice of Occurrence of Effective Date of Modified First Amended Joint Chapter 11 Plan of Liquidation* filed September 24, 2024, Richard A. Marshack became the Liquidating Trustee of the LPG Liquidation Trust, effective September 24, 2024. [Bankr. Docket Nos. 1646 & 1762].

20.     All claims have been transferred to the Liquidating Trust pursuant to the confirmed plan and Plaintiff brings this action solely in his capacity as the Trustee of the LPG Liquidation Trust, for the benefit of Debtor's Estate and its creditors.

**B.     Protective Order**

21.     On or about May 2, 2024, Plaintiff filed that certain Notice and Motion for Entry of Protective Order (the "Protective Order").

22.     On June 3, 2024, the Court entered its *Order Granting Motion for Entry of Protective Order and the Protective Order* [Bankr. Docket No. 1270] (the "Protective Order"). A true and accurate copy of the Protective Order is attached as **Exhibit 1**, and incorporated herein.

23.     By its own terms, the Protective Order applies to this adversary proceeding and governs all discovery conducted herein.

**C.     LPG's Ownership and Management**

24.     Prior to the Petition Date, LPG operated a law firm for consumers across the country who sought assistance in contesting or resolving debts they would identify. At all relevant times, LPG was controlled and operated by the individual named Tony Diab ("Diab").

/ / /

25.    The consumers would pay LPG over a period of time via monthly debits from their bank accounts.

26.    The monthly payments were meant to cover all legal services LPG provided to the consumers including validation of the debts, review of documents to determine enforceability, and court appearances to halt lawsuits to obtain judgments.

27.    In certain instances, LPG would file a lawsuit in an effort to eliminate a disputed debt or to prosecute affirmative claims held by the consumers.

28.    LPG mismanaged the consumers' monthly payments.

29.    Diab and others devised a plan to fraudulently transfer funds, client files, client funds and assets in the form of ACH Receivables (the "ACH Receivables" or "Accounts Receivable") out of LPG to third parties prior to the filing of bankruptcy.

30.    To obtain consumer clients, LPG contracted with marketing companies, who engaged in illegal capping or client recruitment and would advertise or call to solicit consumers to become clients of LPG in exchange for a percentage of the ACH Receivables collected by LPG from the consumers. The marketing affiliate went so far as to assist with the execution of an engagement letter between the consumer and LPG.

31.    In exchange, LPG agreed to pay the marketing affiliates a percentage the monthly payments collected by LPG from the consumers.

32.    Because LPG received payments from consumers over time, it often sought financing by borrowing against its future cash flows. This borrowing was not only used to finance operations at LPG, but also to pay the fees owed to the marketing companies for providing the client referrals.

33.    Many of the documents executed in connection with such financing described the transactions as accounts receivable purchase agreements.

34.    Diab used entities he controlled including, without limitation, Vulcan Consulting, LLC ("Vulcan") and B.A.T., Inc. dba Coast Processing ("Coast") to process payments from LPG consumer clients and to divert LPG consumer funds and ACH Receivables. Diab would use numerous ACH processing companies in order to easily transfer millions of dollars from Debtor to these entities he controlled, without oversight or detection, and to avoid payment disputes and complications. The

6

1   money that flowed from Debtor through these bank account to Defendants consisted of Client Funds

2   that Debtor funneled to these entities by means of the ACH processing companies. Debtor also made

3   deposits into these entities bank account such that they received Client Funds directly from Debtor in

4   addition to direct Accounts Receivables.

5   **D.    Ponzi Scheme Presumption**

6           35.    The Ponzi Scheme Presumption exists in bankruptcy proceedings.

7           36.    The Ponzi Scheme Presumption can be utilized to establish a debtor's "intent to

8   defraud future undertakers [investors] from the mere fact that a debtor was running a Ponzi scheme.

9   Indeed, no other reasonable inference is possible. A Ponzi scheme cannot work forever. The investor

10  pool is a limited resource and will eventually run dry. The perpetrator must know that the scheme will

11  eventually collapse as a result of the inability to attract new investors. The perpetrator nevertheless

12  makes payments to present investors, which, by definition, are meant to attract new investors. He

13  must know all along, from the very nature of his activities, that investors at the end of the line will

14  lose their money. Knowledge to a substantial certainty constitutes intent in the eyes of the law," *cf.*

15  *Restatement (Second) of Torts § 8A* (1963 & 1964), and a debtor's knowledge that future investors

16  will not be paid is sufficient to establish his actual intent to defraud them. *Kirkland v. Rund (In re*

17  *EPD Inv. Co., LLC)*, 114 F.4th 1148, 1153 (9th Cir. 2024) (by definition Ponzi scheme is destined to

18  fail and the swindler and their entities often end in bankruptcy or equitable receivership); *Cf. Coleman*

19  *Am. Moving Servs., Inc. v. First Nat'l Bank & Trust Co. (In re American Properties, Inc.)* 14 B.R.

20  637, 643 (Bankr. D. Kan. 1981) (intentionally carrying out a transaction with full knowledge that its

21  effect will be detrimental to creditors is sufficient for actual intent to hinder, delay or defraud within

22  the meaning of § 548(a)(1))." *Merrill v. Abbott (In re Independent Clearing House Co.)* (D. Utah

23  1987) 77 B.R. 843, 860. A trustee in bankruptcy is not required to show that an operator of a Ponzi

24  scheme was subjectively aware his Ponzi scheme was destined to fail. *In re EPD Inv. Co., LLC*, 114

25  F.4th at 1153 ("[a] trustee's action to recover assets fraudulently conveyed in the course of a Ponzi

26  scheme does not require that the trustee also prove the Ponzi-scheme operator was subjectively aware

27  his Ponzi scheme was destined to fail.").

28  / / /

37.    "But if all the debtor receives in return for a transfer is the use of the defendant's money to run a Ponzi scheme, there is nothing in the bankruptcy estate for creditors to share. In fact, by helping the debtor perpetuate his scheme, the transfers exacerbate the harm to creditors by increasing the amounts of claims while diminishing the debtor's estate. In such a situation, the use of the defendant's money cannot objectively be called 'reasonably equivalent value.'" *In re Independent Clearing House Co.* 77 B.R. at 859. Therefore, "[t]he trustee can avoid the transfers if they were preferential or fraudulent. Transfers to investors in a Ponzi scheme are preferential and fraudulent. Therefore, they constitute "property of the estate," and the trustee can recover them. *Id.* at 853 n.17 (citations omitted).

38.    Debtor was operating a Ponzi scheme that utilized affiliates and several other entities as investors to continue its unlawful business practices by using funds provided by current investors to attract new investors hoping for very high returns. Therefore, the Debtor was running a Ponzi Scheme and the Ponzi Scheme Presumption can be utilized to infer that the Debtor had the intent to defraud investors within the meaning of 11 U.S.C. section 548(a)(1). This is evidenced by the Court in this Bankruptcy Case declaring that Debtor was operating a Ponzi scheme when it stated the following:

> It is important to note that this Court has never received any significant and trustworthy evidence that Debtor accomplished meaningful results for its clients, but only anecdotal examples of viable success for its clients. By reviewing the Estate's claims register, there is evidence of consumer claims for the fraud and demanded but undelivered refunds of approximately $500 million. There is ample evidence that the pre-petition Debtor never placed the collected funds into an attorney-client trust account, and that Debtor or its principals simply looted the payments received through the client automatic withdrawals, stiffing both the clients and outside attorneys who may have been working on client cases with the hopes of being paid. There is also evidence before the Court that Debtor was running a Ponzi scheme and paying some outside (or "network") attorneys with funds obtained from new clients. In this case, it appears that some of the "lenders" may have been serving as "investors," hoping for very high returns before "the music stopped."    The Ninth Circuit has recently explained, "[b]y definition, a Ponzi scheme is destined to fail because the pool of available investors is not limitless. When the Ponzi scheme operator's pool of investors inevitably runs dry, the scheme collapses and the swindler and their entities often end up in bankruptcy or equitable receivership. *See generally* David R. Hague, Expanding the Ponzi Scheme Presumption, 64 DePaul L. Rev. 867 (2015). In bankruptcy, the court-appointed trustee is tasked

8

> with taking immediate control of the entity, ceasing ongoing fraudulent activity, locating and collecting assets for the bankruptcy or receivership estate, and achieving a final, equitable distribution of the remaining assets. *See* 11 U.S.C. § 704; *Kirkland v. Rund (In re EPD Inv. Co., LLC)*, 2024 U.S. App. LEXIS 21363, at *15 (9th Cir. Aug. 23, 2024). Finally, there is evidence that Debtor was encumbering (or as some creditors assert, "double or triple selling") their accounts or receivables to multiple lenders. With respect to Greyson's requested Administrative Claim [Dk. 676], and as more fully described in the concurrently entered order denying the claim, there has been no evidence presented that any work allegedly performed by Greyson assisted any clients or added any value to the Estate.

*See, Case 8:23-bk-10571-SC*, Doc 1545 n. 5.

39.    The Ponzi Scheme Presumption establishes a debtor's "intent to defraud future undertakers [investors] from the mere fact that a debtor was running a Ponzi scheme." *Merrill v. Abbott* (*In re Independent Clearing House Co*.), 77 B.R. 843, 860 (D. Utah 1987). "Knowledge to a substantial certainty constitutes intent in the eyes of the law, *cf. Restatement (Second) of Torts* § 8A (1963 & 1964), and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them." *Id*. A trustee in bankruptcy is not required to show that an operator of a Ponzi scheme was subjectively aware his Ponzi scheme was destined to fail. *In re EPD Inv. Co., LLC*, 114 F.4th at 1153 (9th Cir. 2024).

40.    "[I]f all the debtor receives in return for a transfer is the use of the defendant's money to run a Ponzi scheme, there is nothing in the bankruptcy estate for creditors to share." *In re Independent Clearing House Co*. 77 B.R. at 859. In such a situation, the use of the defendant's money cannot objectively be called "reasonably equivalent value." *Id*. Therefore, "[t]he trustee can avoid the transfers if they were preferential or fraudulent. Transfers to investors in a Ponzi scheme are preferential and fraudulent. Therefore, they constitute 'property of the estate,' and the trustee can recover them." *Id*. at 853 n.17 (citations omitted).

/ / /

/ / /

/ / /

/ / /

/ / /

41.    Based on the Ponzi Scheme presumption the Court can infer that the Debtor had the intent to defraud investors within the meaning of 11 U.S.C. § 548(a)(1). Since the Debtor's transactions with the Defendants were made with the intent to further the Ponzi scheme, the Debtor did not receive an objectively reasonable equivalent value for engaging in such transactions, and the Trustee can avoid these transactions or transfers because they were actually fraudulent as to the Debtor's creditors.

**E.    Prepetition Litigation and Creditors**

42.    Debtor's Schedule E/F, filed on April 4, 2023, as Dk. No. 33, lists: (a) 11 unsecured creditors with priority unsecured claims totaling $374,060.04; and (b) 58 nonpriority unsecured creditors with scheduled claims totaling $141,439,158.05.

43.    The claims register in this Bankruptcy Case includes 2,554 proofs of claim, totaling in excess of $424 million of claims asserted against the Estate.

44.    At least 14 UCC-1 statements were of record securing alleged debts of the Debtor as of the Petition Date. These statements either reflected secured liens against the Debtor's assets then owned or thereafter acquired or provided evidence of the assignment or sale of substantial portions of the Debtor's future income. They secured the repayment of the following claimed amounts that are currently known to Trustee and are allegedly owed by the Debtor: (a) $2,374,004.82 owed to Fundura Capital Group as evidenced by Proof of Claim No. 335 purportedly secured by a UCC statement filed on or about May 19, 2021; (b) approximately $15 million dollars owed to MNS Funding, LLC as evidenced by Proof of Claim No. 1060 purportedly secured by a UCC statement filed on or about May 28, 2021; (c) approximately $5,000,000 owed to Azzure Capital, LLC as evidenced by Proof of Claim No. 127 purportedly secured by a UCC statement filed on or about May 28, 2021; and (d) approximately $1.5 million dollars owed to Diverse Capital, LLC purportedly secured by UCC statements filed on or about September 15, 2021, and December 1, 2021.

45.    Debtor's balance sheets for the 36 months ending December 31, 2021, show approximately $17,900,000 in total assets at its highest point in November 2021. This amount is significantly less than the $424 million of claims filed.

/ / /

46.     Debtor's Statement of Financial Affairs, filed on April 4, 2023, as Dk. No. 34, reflects 15 pending lawsuits against Debtor as of the Petition Date. The lawsuits date back to October 18, 2021 (*Fundura v. The Litigation Practice Group P.C. et al.*, Supreme Court of New York Index No. 613192-2021) and are as recent as March 10, 2023 (*Diverse Capital LLC v. The Litigation Practice Group P.C. et al.*, Supreme Court of New York Index No. 135614-2023).

**F.    Debtor's Insolvency**

47.     Debtor was insolvent when the Transfers occurred as evidenced by: (a) the 14 UCC-1 statements reflecting secured liens against the Debtor's owned and after-acquired assets and the assignment or sale of substantial portions of the Debtor's future income; (b) the priority and non-priority unsecured debt of nearly $142 million listed in Debtor's schedules; (c) the $424 million of creditor claims filed in this Bankruptcy Case; and (d) Debtor's balance sheets reflecting, at its highest point, $17.9 million of assets in November 2021.

48.     Moreover, insolvency is presumed as a matter of law where, as in this Bankruptcy Case, the debtor operated a Ponzi scheme. *See, e.g., Glob. Money Mgmt., L.P. v. McDonnold*, No. 06CV34, 2008 U.S. Dist. LEXIS 128733, at *15 (S.D. Cal. Feb. 27, 2008) (concluding that "if a Ponzi scheme is proven, then the debtor is proven insolvent from the time of its inception").

## SPECIFIC ALLEGATIONS

49.     Prior to the Petition Date and prior to his death, Brian Reale was one of three shareholders in Coast.  Upon information and belief, Mr. Reale owned forty-six and one-half percent (46.5%) of the outstanding stock in Coast.

50.     Coast processed and collected monthly payments from LPG's consumer clients.  Upon information and belief, all funds deposited in Coast's bank accounts were collected from LPG's consumer clients.

51.     Upon further information and belief, there was no formal contract between Coast and LPG regarding the fees payable for Coast's processing services. Coast processed the payments for LPG's consumer clients, forwarded sufficient funds to LPG to fund its operations, and retained the rest of the collected funds. Upon further information and belief, the shareholders of Coast treated whatever funds it retained as their funds and diverted those funds to personal use at will.

52.    As an officer and shareholder, Mr. Reale regularly used the client funds that Coast processed on behalf of LPG to pay his personal expenses, to pay relatives, and pay related entities through fraudulent invoices to withdraw money from Coast without tax consequences, or to take "distributions" from Coast that were either paid to Mr. Reale or one of the Reale Defendants.

53.    While investigation continues the Trustee has identified more than $180,000.00 in transfers from Coast to third parties that were, upon information and belief, paid to or for the benefit of Mr. Reale and/or one of the other Defendants ("Transfers"). These transfers from Coast to or for the benefit of one or more of the Defendants are set forth on **Exhibit 2** hereto.

54.    The Trustee has no information on why Coast would make payments to any Defendant herein.

55.    Upon information and belief, Mr. Reale either individually or with his fellow owners may have taken distributions from Coast that would have been paid with client funds collected for LPG.  These distributions may have been paid to Brian Reale, personally, or to a third party who subsequently disbursed the funds.  The Trustee makes these allegations to place all parties on notice that he intends to pursue any such "distributions" when they are identified ("Coast Distributions").

56.    As a shareholder in Coast and as discussed in the Trustee's previously filed adversary proceeding against Arash Bayrooti (8:24-ap-1068), Mr. Diab negotiated stock purchase agreements with Coast's shareholders to acquire the outstanding stock in 2021.

57.    As evidence of Mr. Diab's intent to purchase Mr. Reale's shares in Coast, an unexecuted, draft stock purchase agreement from the Debtor's files is attached hereto as **Exhibit 3**.

58.    Whatever Mr. Reale and Mr. Diab agreed would be the purchase price ("Purchase Price") of Mr. Reale's shares in Coast, they agreed the Purchase Price would be paid over time. Furthermore, they agreed that the Purchase Price would be paid to different entities and individuals connected to or related to Mr. Reale to avoid tax issues.

59.    Payments from the Debtor to the Defendants known to the Trustee are set forth on **Exhibit 4** hereto and incorporated as if set forth herein ("Debtor Transfers").  The Trustee cannot identify what Debtor Transfers were for the Purchase Price and what Debtor Transfers were made for another purpose.

60.     To the extent any Debtor Transfer was made as part of an "investment" in LPG or paid pursuant to a purchase of receivables from client files, the Trustee seeks the avoidance, preservation, and recovery of those Transfers herein.

61.     Upon further information and belief, the Debtor made additional payments to one or more of the Defendants through its payroll processing companies.  Upon further information and belief, the Debtor was able to add one or more of the Defendants to its payroll as employees or independent contractors.

62.     The Trustee does not know what amounts the Debtor paid to the Defendants toward the Purchase Price through a third party payroll service at the present time.  The Trustee will obtain this information and seek leave to amend the complaint to include such payments herein.  These allegations shall place the Defendants on notice of the Trustee's intent to pursue such payments.

63.     The Coast Transfers, Coast Distributions, and Debtor Transfers are collectively referred to herein as the "Transfers".

**COUNT ONE**

**Avoidance, Recovery, and Preservation of Transfers Made Within the Ninety Day**

**Period Before the Petition Date**

**[11 U.S.C. §§ 547, 550, and 551]**

64.     Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though set forth in full herein.

65.     This is an action to pursuant to 11 U.S.C. §§ 547 and 550 to avoid and recover any Transfers to one or more Defendants made within the ninety day period preceding the Petition Date ("90 Day Transfers").

66.     To the extent any 90 Day Transfers were made by the Debtor to any Defendant and are known to the Trustee, they are identified on the **Exhibits** hereto.  Plaintiff reserves the right to amend the Complaint to identify the 90 Day Transfers and seek their avoidance and recovery.

/ / /

/ / /

/ / /

## COUNT TWO

### Avoidance, Recovery, and Preservation of Post-Petition Transfers

### [11 U.S.C. §§ 549, 550, and 551]

67.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though set forth in full herein.

68.    This is an action to pursuant to 11 U.S.C. §§ 549 and 550 to avoid and recover unauthorized post-petition transfers made by Debtor to any of the Defendants ("Post-Petition Transfers").

69.    To the extent any Post-Petition Transfers were made by the Debtor to any Defendant following the Petition Date and are not identified herein, Plaintiff reserves the right to amend the Complaint to identify the Post-Petition Transfers and seek the avoidance and recovery of them pursuant to 11 U.S.C. §§ 549 and 550.

70.    Any Post-Petition transfers to the Defendants currently known to the Trustee are identified on the **Exhibits** hereto.

## COUNT THREE

### Avoidance, Recovery, and Preservation of Two-Year

### Actual Fraudulent Transfers

### [11 U.S.C. §§ 548(a)(1)(A), 550, and 551]

71.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though set forth in full herein.

72.    The Transfers were property of the Debtor's Estate prior to their conveyance to the one or more of the Defendants. The Transfers to the Defendants made within Two Years of the Petition Date ("Two-Year Transfers") known to the Trustee are identified on the **Exhibits** hereto and incorporated by reference herein.

73.    When the Two-Year Transfers were made, the Debtor was or became indebted include the Prepetition Creditors.

74.    The Two-Year Transfers occurred when the Debtor was insolvent or was rendered insolvent as a result of the Transfers.

75.    The Two-Year Transfers to the Defendants were made with actual intent to hinder,

delay or defraud the creditors of Debtor because the Debtor was operating a Ponzi scheme which permits the Court to infer that the Debtor's intent was fraudulent within the meaning of 11 U.S.C. section 548(a)(1).

76.     The Two-Year Transfers are avoidable as fraudulent pursuant to 11 U.S.C. §§ 548(a)(1)(A), 550, and 551 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against Debtor's Estate under 11 U.S.C. § 502, or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

77.     The Two-Year Transfers should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(A), and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

## COUNT FOUR

### Avoidance, Recovery, and Preservation of Two-Year

### Constructive Fraudulent Transfers

### [11 U.S.C. §§ 548(a)(1)(B), 550, and 551]

78.     Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though set forth in full herein.

79.     The Two Year Transfers were made within two years before the Petition Date.

80.     Debtor did not receive reasonably value in exchange for the Two Year Transfers.

81.     The Two Year Transfers were made at a time when Debtor was insolvent and/or rendered insolvent by virtue of said transfers.

82.     When the Two Year Transfers occurred, Debtor's business was undercapitalized and Debtor was engaged in business for which its capital was unreasonably small.

83.     When the Two Year Transfers occurred, Debtor had incurred or was about to incur debts that were beyond its ability to pay. The allegations in the preceding paragraphs are supported by the fact that the Debtor was generally operating a Ponzi scheme to fund operations and that the Defendants were involved in a smaller scale Ponzi scheme using the Spot On Notes.

84.     At the time each Two Year Transfer was made, Debtor was indebted to one or more

1    creditors that held a claim against Debtor on the date of each Transfer and on the Petition Date.

2        85.    Plaintiff alleges that Defendants did not receive the Two Year Transfers in good faith,

3    for value, and without knowledge of their avoidability. Defendants knew or should have known that

4    their transactions with the Debtor were illegal and unenforceable as a matter of law.

5        86.    Defendants knew or should have known that the terms of their agreements with the

6    Debtor were illegal and unenforceable as a matter of law.  Defendants knew or should have known

7    that the Debtor received no consideration for Mr. Diab's purchase of Mr. Reale's shares in Coast.

8        87.    Defendants knew that the Debtor was a law firm who was required by law to escrow

9    client payments until earned. However, each Defendant demanded and received payment from client

10    payments that had not been earned because they were paid by the Debtor, Vulcan, and/or Coast.

11        88.    The Two Year Transfers are avoidable as fraudulent pursuant to 11 U.S.C. §§

12    548(a)(1)(B), 550, and 551 by one or more creditors who held and hold unsecured claims against

13    Debtor that were and are allowable against Debtor's Estate under 11 U.S.C. § 502, or that were not

14    and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition

15    Creditors.

16        89.    As avoidable transfers pursuant to 11 U.S.C. § 548(a)(1)(B), the Two Year Transfers,

17    or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11

18    U.S.C. §§ 550 and 551.

19                                    **COUNT FIVE**

20    **Avoidance, Recovery, and Preservation of Four-Year Actual Fraudulent Transfers**

21    **[11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.04(a)(1) and 3439.07]**

22        90.    Plaintiff realleges and incorporates by reference each and every allegation contained

23    in the preceding paragraphs as though set forth in full herein.

24        91.    Under 11 U.S.C. § 544(b)(1), Plaintiff may avoid transfers of an interest of Debtor

25    which are voidable under applicable law by an unsecured creditor of Debtor, including under

26    California Civil Code §§ 3439.04(a)(1) and 3439.05.

27        92.    The Transfers occurred within four years prior to the Petition Date.

28        93.    On or after the date that such Transfer were made, entities to which Debtor was or

became indebted include the Prepetition Creditors.

94.    Despite Debtor's obligation to the Prepetition Creditors, Debtor made the Transfers to Defendant.

95.    The Transfers to Defendant were made with actual intent to hinder, delay or defraud the creditors of Debtor as the Debtor was operating a Ponzi scheme.

96.    Defendants' conduct relating to the Transfers was done with oppression, fraud and malice, as defined in California Civil Code section 3294, entitling Plaintiff to exemplary and punitive damages.

97.    The Transfers are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and Cal. Civ. Code §§ 3439.04(a)(1) and 3439.07 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against its Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

98.    As avoidable transfers pursuant to 11 U.S.C. § 544 and Cal. Civ. Code §§ 3439.04(a)(1) and 3439.07, the Transfers, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

## COUNT SIX

**Avoidance, Preservation, and Recovery of Constructive Fraudulent Transfer**

**11 U.S.C. §§ 544, 550, 551; Cal. Civ. Code §§ 3439.04(a)(2), 3439.05 and 3439.07**

99.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though set forth in full herein.

100.    Under 11 U.S.C. § 544(b)(1), Plaintiff may avoid transfers of an interest of Debtor which are voidable under applicable law by an unsecured creditor of Debtor, including under California Civil Code §§ 3439.04(a)(2) and 3439.05.

101.    Debtor did not receive reasonably equivalent value in exchange for the Transfers.

102.    The Transfers were made at a time when Debtor was insolvent and/or rendered insolvent by virtue of said transfers.

103.    At the time each Transfer was made, Debtor was engaged or was about to engage in a

business or a transaction for which the remaining assets of Debtor were unreasonably small in relation to the business or transaction.

104.    At the time each Transfer was made, Debtor intended to incur, or believed or reasonably should have believed that Debtor would incur, debts beyond Debtor's ability to pay as they became due.

105.    At the time each Transfer was made, Debtor was indebted to one or more creditors that held a claim against Debtor on the date of each Transfer and on the Petition Date.

106.    The Transfers were made at a time when Debtor was insolvent and/or rendered insolvent by virtue of said transfers.

107.    Plaintiff alleges that Defendants did not receive the Transfers in good faith, for value, and without knowledge of their avoidability as they were helping the Debtor borrow funds through a Ponzi scheme using usurious rates of interest.

108.    Defendants knew that the Debtor was a law firm who was required by law to escrow client payments until earned. However, Defendants demanded and received payments from client funds that had not been earned.

109.    Defendants knew or should have known that the Debtor received no consideration for Mr. Diab's purchase of Mr. Reale's shares in Coast.

110.    The Transfers are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and Cal. Civ. Code §§ 3439.04(a)(1) and 3439.07 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against its Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

111.    As avoidable transfers pursuant to 11 U.S.C. § 544 and Cal. Civ. Code §§ 3439.04(a)(1) and 3439.07, the Transfers, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

/ / /

/ / /

/ / /

## **PRAYER FOR RELIEF**

**On the First Through Eighth Claims for Relief:**

1.      Avoiding, recovering, and preserving the Transfers to the Defendants in such amounts as the Court may determine pursuant to applicable law;

**On All Claims for Relief:**

2.      Awarding punitive and exemplary damages according to proof;

3.      Awarding pre-judgment interest at the maximum legal rate;

4.      Awarding post-judgment interest at the maximum legal rate from the date of the last of the Transfers until the judgment is paid in full;

5.      Awarding costs of suit incurred herein; and

6**.**      Granting any other and further relief as the Court deems just and proper.

March 19, 2025                                Respectfully submitted,

                                                     DINSMORE & SHOHL LLP

                                  By:  /s/ Tyler Powell
                                                     Tyler Powell
                                                     Christopher B. Ghio
                                                     Christopher Celentino
                                                     Special Counsel to Richard A. Marshack,
                                                     Trustee of the LPG Liquidation Trust

# Exhibit 1

EXHIBIT 1
Page 20

1 | CHRISTOPHER B. GHIO (259094)
christopher.ghio@dinsmore.com
2 | CHRISTOPHER CELENTINO (131688)
christopher.celentino@dinsmore.com
3 | YOSINA M. LISSEBECK (201654)
yosina.lissebeck@dinsmore.com
4 | DINSMORE & SHOHL LLP
5 | 655 West Broadway, Suite 800
San Diego, California 92101
6 | Tele:  619.400.0500
Fax:  619.400.0501
7 |

**FILED & ENTERED**

**JUN 03 2024**

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY mccall      DEPUTY CLERK

8 | Sarah S. Mattingly (Ky. Bar 94257)
sarah.mattingly@dinsmore.com
9 | DINSMORE & SHOHL, LLP
101 S. Fifth Street, Suite 2500
10 | Louisville, Kentucky 40202
Tele: 859-425-1096
11 | Fax: 502-585-2207
12 | (Admitted pro hac vice)

13 | Special Counsel to Richard A. Marshack

14 | **UNITED STATES BANKRUPTCY COURT**

15 | **CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION**

16 | In Re

17 |

18 |

19 | The Litigation Practice Group P.C.,

20 | Debtor(s),

21 |

22 |

23 |

24 |

Case No: 23-bk-10571-SC

Chapter 11

**ORDER GRANTING MOTION FOR
ENTRY OF PROTECTIVE ORDER AND
THE PROTECTIVE ORDER**

Date:    May 23, 2024
Time:    1:30 p.m.
Judge:   Hon. Scott C. Clarkson
Place:   Courtroom 5C (via Zoom)[1]
         411 West Fourth Street
         Santa Ana, CA 92701

25 |

26 |

27 |

28 | [1] Video and audio connection information for each hearing will be provided on Judge Clarkson's publicly posted hearing calendar, which may be viewed online at:
http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

EXHIBIT 1
Page 21

The Court has read and considered the Notice of Motion and Motion for Entry of Protective Order (the "Motion") filed by Richard A. Marshack, in his capacity as the Chapter 11 Trustee (the "Trustee") of the Bankruptcy Estate ("Estate") of The Litigation Practice Group P.C., on May 2, 2024, pursuant to Federal Rule of Bankruptcy Procedure 7026 and Federal Rule of Civil Procedure 26(c)(1), as Dk. No. 1164 ("Motion"), and has found good cause to grant the Motion.

IT IS HEREBY ORDERED that:

1.      The Motion is granted;

2.      The below Protective Order shall apply to any contested matter arising in the main bankruptcy case and in all adversary proceedings filed by or against Trustee, present and future; and

3.      Govern the discovery conducted therein.

## PROTECTIVE ORDER

**1.      DEFINITIONS**

1.1      "Confidential Information" as used in this Protective Order shall mean documents and other information (regardless of how generated, stored or maintained) that a Party or non-party reasonably believes to contain or reflect non-public financial or business information, bank records, financial records, such as social security numbers, non-public financial or personal information of a Party or non-party, account numbers, sensitive digital information and identifiers, information subject to confidentiality agreements or provisions other than this Protective Order, and other non-public research, development, or commercial information that derives value or avoids injury by virtue of not being known to the public.

1.2      This "Action" is defined and hereby means any contested matter arising in the main bankruptcy case and in all adversary proceedings filed by or against Trustee, present and future.

1.3      "Designating Party" means a Party or non-party that designates Confidential Information during the Action.

1.4      "Receiving Party" means a Party that receives Confidential Information during the Action.

2

EXHIBIT 1
Page 22

1        1.5    "Party" or "Parties" means person or entity subject to this Protective Order.

2       **2.**      **SCOPE OF THIS PROTECTIVE ORDER**

3       2.1    Unless otherwise ordered, this Protective Order shall govern certain documents and other products of discovery obtained in the Action from the Parties there to, and from third parties. As well as certain information copied or derived therefrom, excerpts, summaries or compilations thereof, including, but not limited to, documents voluntarily exchanged as part of early settlement discussions, documents produced pursuant to initial disclosures, requests authorized by the Federal Rules of Civil Procedure made applicable herein by the Federal Rules of Bankruptcy Procedure, answers to interrogatories, deposition transcripts, responses to requests for production, responses to requests for admission, subpoenas, affidavits, declarations, expert reports, and other such material and information as may be produced during the course of the Action and designated as Confidential Information.

**3.**      **DESIGNATION OF CONFIDENTIAL INFORMATION**

3.1    This Protective Order shall govern the production and handling of any Confidential Information in this Action. Any Party or non-party who produces Confidential Information in this Action may designate it as "Confidential" or "Attorneys' Eyes Only" consistent with the terms of this Protective Order. Whenever possible, the Designating Party must designate only those portions of a document, written discovery responses, deposition, transcript, or other material that contain the Confidential Information and refrain from designating entire documents. Regardless of any designations made hereunder, the Designating Party is not otherwise restricted from use or disclosure of its Confidential Information outside of this Action or for any business purposes. In addition, any Party may move to modify or seek other relief from any of the terms of this Protective Order if it has first tried in writing and in good faith to resolve its needs or disputes with the other Parties or Party as the case may be under the terms of this Protective Order. Further, nothing in this Protective Order shall prevent a Party from redacting documents consistent with the Federal Rules of Civil Procedure and utilizing the documents as needed through-out the Action.

3.2    <u>Application to Non-Parties:</u> Before a non-party is given copies of documents or materials designated as Confidential Information or Attorneys' Eyes Only as permitted hereunder, it

EXHIBIT 1
Page 23

must first sign an acknowledgment to be bound to these terms that is attached hereto as <u>Exhibit</u> A; if it fails to do so, the Parties to this Action must resolve any such dispute before making disclosure of designated information as permitted hereunder to the non-party. If a non-party wishes to make designations hereunder, it must first sign attached <u>Exhibit A.</u>

   3.3  <u>Timing and Provisional Protection:</u> Designations of Confidential Information may be made at any time. To avoid potential waiver of protection hereunder, the Designating Party should designate documents or materials containing Confidential Information at the time of production or disclosure, including on the record during the taking of any deposition. Deposition testimony will be deemed provisionally protected for a period of thirty (30) days after the transcript is released to the Parties by the court reporter, although the Parties may agree at any time to different timelines of provisional protection of information as Confidential or Attorneys' Eyes Only as part of one or more specific depositions. To retain any designations beyond the provisional period, a Designating Party must designate specific pages and lines of deposition testimony before the provisional period has expired. Such designations must be made in writing so that all counsel and court reporters may append the designation to all copies of the transcripts.

   3.4  <u>Manner of Designation:</u> Confidential Information may be designated hereunder in any reasonable manner or method that notifies the Receiving Party of the designation level and identifies with specificity the information to which the designation applies. If made verbally, the Designating Party must promptly confirm the designation in writing. Whenever possible, the Designating Party should stamp, affix, or embed a legend of "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY" on each designated page of the document or electronic image that contains Confidential Information.

   **4.**  **CHALLENGES TO DESIGNATED INFORMATION**

   4.1  In the event that a Receiving Party disagrees at any time with any designation(s) made by the Designating Party, the Receiving Party must first try to resolve such challenge in good faith on an informal basis with the Designating Party. The Receiving Party must provide written notice of the challenge and the grounds therefor to the Designating Party, who must respond in writing to the challenge within fifteen (15) days. At all times, the Designating Party carries the burden of establishing the propriety of the designation and protection level. Unless and until the challenge is

EXHIBIT 1
Page 24

resolved by the Parties or ruled upon by the Court, the designated information shall remain protected under this Protective Order. The failure of any Receiving Party to challenge a designation does not constitute a concession that the designation is proper or an admission that the designated information is otherwise competent, relevant, or material.

**5.    LIMITED ACCESS/USE OF PROTECTED INFORMATION**

5.1    <u>Restricted Use:</u> Information that is produced or exchanged in the course of the Action and designated under this Protective Order may be used for preparation for trial and preparation for any appeal of any and all matters in the Action, as well as related settlement negotiations, and for no other purpose, without the written consent of the Designating Party. No Confidential Information may be disclosed to any person except in accordance with the terms of this Protective Order, unless the parties are co-counsel or have entered into joint defense agreements. All persons in possession of Confidential Information agree to exercise reasonable care with regard to the custody, use, or storage of such information to ensure that its confidentiality is maintained. This obligation includes, but is not limited to, the Receiving Party providing to the Designating Party prompt notice of the receipt of any subpoena that seeks production or disclosure of any designated information and consulting with the Designating Party before responding to the subpoena. Any use or disclosure of Confidential or Attorneys' Eyes Only information in violation of the terms of this Protective Order may subject the disclosing person or party to sanctions.

5.2    <u>Access to "Confidential" Information:</u> The Party(ies) and all persons subject to this Protective Order agree that information designated as "CONFIDENTIAL" may only be accessed or reviewed by the following:

a)    The Court, its personnel, and court reporters;

b)    Counsel of record, or co-counsel for any Party, or other party that has entered into a joint defense agreement in the Action and their employees who assist counsel of record, or co-counsel in the Action and are informed of the duties and obligations imposed hereunder;

c)    The Parties, including their clients, agents and employees who are assisting or have reason to know of the Action;

/ / /

5

EXHIBIT 1
Page 25

d)       Experts or consultants employed by the Parties or their counsel, or co-counsel, for purposes of an Action, so long as each such expert or consultant has signed attached Exhibit A; and

e)       Other witnesses or persons with the Designating Party's consent or by court order.

5.3     Access to "Attorneys' Eyes Only" Designations: The Parties and all persons subject to this Protective Order agree that information designated as "ATTORNEYS' EYES ONLY" may only be accessed or reviewed by the following:

a)       The Court, its personnel, and court reporters;

b)       Counsel of record, or co-counsel for any Party, or other party that has entered into a joint defense agreement in the Action and their employees who assist counsel of record in the Action and are informed of the duties hereunder;

c)       In-house counsel for any Party in the Action and Richard A. Marshack, as Chapter 11 Trustee of The Litigation Practice Group P.C. who is informed of the duties and obligations imposed hereunder;

d)       Experts or consultants employed by the Parties or their counsel, or co-counsel for purposes of the Action,  and so long as each such expert or consultant has signed attached Exhibit A; and

e)       Other witnesses or persons to whom the Designating Party agrees in advance of disclosure or by court order.

5.4     Non-Waiver Effect of Designations: Neither the taking of, nor the failure to take, any action to enforce the provisions of this Protective Order, nor the failure to object to any designation, will constitute a waiver of any Party(ies)'s claim or defense in the Action or any other action or proceeding, including, but not limited to, a claim or defense that any designated information is or is not Confidential, is or is not entitled to particular protection, or embodies or does not embody information protectable by law.

5.5     In-Court Use of Designated Information: If information designated under this Protective Order will or may be offered in evidence at a hearing or trial related to any matter in the Action, then the offering party must give advance notice to the party or non-party that designated prior to offering the information so that any use or disclosure may be addressed in accordance with

6

EXHIBIT 1
Page 26

the Court's case-management or other pre-trial order, or by a motion *in limine*.  Nothing in this Protective Order shall be construed as a waiver by a Party of any objections that may be raised as to the admissibility at trial of any evidentiary materials.

**6.    CLAW-BACK REQUESTS**

6.1    <u>Failure to Make Designation:</u>  If, at any time, a Party or non-party discovers that it produced or disclosed Confidential Information without designation, it may promptly notify the Receiving Party and identify with particularity the Confidential Information to be designated and the level of designation (the claw-back notification). The Receiving Party may then request substitute production of the newly-designated information. Within thirty (30) days of receiving the claw-back notification, the Receiving Party must: (1) certify to the Designating Party it has appropriately marked or, if substitute production has been requested, destroyed all unmarked copies that it received, made, and/or distributed; and (2) if it was practicably unable to mark or destroy any information because disclosures occurred while the Receiving Party was under no duty of confidentiality under the terms of this Protective Order regarding that information, the Receiving Party must reasonably provide as much information as practicable to aid the Designating Party in protecting the information, consistently with the Receiving Party's attorney-client, work-product, and/or trial-preparation privileges.

6.2    <u>Inadvertent Production of Privileged Information:</u>  If, at any time, a Party discovers that it produced information that it reasonably believes is subject to protection under the attorney/client, work-product, or trial-preparation privileges, then it must promptly notify each Receiving Party of the claim for protection, the basis for it, amend its privilege log accordingly, and comply with Fed. R. Civ. P. 26(b)(5). Whenever possible, the producing party must produce substitute information that redacts the information subject to the claimed protection. The Receiving Party must thereupon comply with Fed. R. Civ. P. 26(b)(5)(B) as to the information subject to the claimed protection.

/ / /

/ / /

/ / /

EXHIBIT 1
Page 27

**7.    DURATION/CONTINUED RESTRICTIONS**

7.1    <u>Handling of Designated Information Upon Conclusion of the Main Bankruptcy Case:</u>
Upon conclusion of the Main Bankruptcy Case, by way of dismissal or closing of the case, the Designating Party(ies) is/are responsible for ensuring that any Party or person to whom the Designating Party shared or disclosed designated information in any of the matters under the Action returns or destroys all of its copies, regardless of the medium in which it was stored. No witness or Party may retain designated information that it received from any other Party or non-party under this Protective Order; only counsel of record, or co-counsel, are the authorized agents who may retain one copy for their respective legal files, and who must also describe to the Designating Party the extra steps taken to protect its legal file containing paper and/or electronic copies of the designated information so that it is not accessed, used, or disclosed inconsistently with the obligations under this Protective Order. This provision does not apply to the Court or Court staff. Moreover, this provision does not apply to Trustee, who may retain and use – consistent with this Order – Confidential Information received in any Action during the entirety of the Bankruptcy.

7.2    <u>Continued Restrictions Under this Protective Order:</u> The restrictions on disclosure and use of Confidential Information shall survive the conclusion of the Bankruptcy case and any matter in the Action.

**8.    PRIVILEGED OR PROTECTED INFORMATION**

8.1    Nothing in this Protective Order shall require disclosure of information that is protected by the attorney-client privilege, the work-product protection, or any other legally cognizable privilege (a "Privilege or Protection").  If information subject to a claim of Privilege or Protection is inadvertently produced, pursuant to Federal Rule of Evidence 502(d) such production shall not constitute a waiver of, or estoppel as to, any claim of Privilege or Protection for such information or any other information that may be protected from disclosure by a Privilege or Protection in any proceeding.

8.2    If a Party receives a document that appears to be subject to a Privilege or Protection, then it shall refrain from examining the document any more than is essential to ascertain if it is privileged or protected and shall promptly notify the producing Party in writing that the receiving

EXHIBIT 1
Page 28

Party possesses material that appears to be subject to a Privilege or Protection. The producing Party shall have seven (7) days after receiving such notice to assert a Privilege or Protection over the identified material. If the producing Party does not assert a claim of Privilege or Protection within the seven (7)-day period, the material in question shall be deemed not privileged or protected.

8.3     If a producing Party has produced a document subject to a claim of Privilege or Protection, upon written request by the producing Party, the document for which a claim of Privilege or Protection is made shall be sequestered or destroyed to the extent reasonably practicable, and the receiving Party shall not use the document for any purpose other than in connection with analyzing or disputing a claim of Privilege or Protection or in connection with a motion to compel the production of the document.

8.4     The receiving Party sequestering or destroying such material may then move the Court for an order compelling production of the material. The applicable producing Party bears the burden of establishing the applicable Privilege or Protection of any clawed-back document or information as and to the same extent that it would have borne such burden had it not produced the document or information.  Nothing in this Protective Order shall limit the Court's right or any receiving Party's right to request an in camera review of any information subject to a claim of Privilege or Protection.

###

Date: June 3, 2024

Scott C. Clarkson
United States Bankruptcy Judge

EXHIBIT 1
Page 29

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT "A"

EXHIBIT 1
Page 30

1  Christopher B. Ghio (State Bar No. 259094)
   Christopher Celentino (State Bar No. 131688)
2  Yosina M. Lissebeck (State Bar No. 201654)
   **DINSMORE & SHOHL LLP**
3  655 West Broadway, Suite 800
   San Diego, CA 92101
4  Telephone:  619.400.0500
   Facsimile:  619.400.0501
5  christopher.ghio@dinsmore.com
   christopher.celentino@dinsmore.com
6  yosina.lissebeck@dinsmore.com

7  Sarah S. Mattingly (Ky. Bar 94257)
   DINSMORE & SHOHL, LLP
8  101 S. Fifth Street, Suite 2500
   Louisville, KY 40202
9  Telephone: 859-425-1096
   Facsimile: 502-585-2207
10 Sarah.mattingly@dinsmore.com
   (Admitted pro hac vice)

11
   Special Counsel to Richard A. Marshack,
12 Chapter 11 Trustee

13

14

15                    **UNITED STATES BANKRUPTCY COURT**

16                    **CENTRAL DISTRICT OF CALIFORNIA**

17

18 In Re                                    Case No. 8:23-BK-10571-SC

19                                          Chapter 11

20 The Litigation Practice Group P.C.,      **EXHIBIT A TO STIPULATED
                                            ORDER**
21              Debtor(s),
                                            Date:   May 23, 2024
22                                          Time:   1:30 p.m.
                                            Judge:  Hon. Scott C. Clarkson
23                                          Place:  Courtroom 5C[1] - Via Zoom
24                                                  411 W. Fourth Street
                                                    Santa Ana, CA  92701
25

26

27  ────────────────────

28  [1] Video and audio connection information for each hearing will be provided on Judge Clarkson's
    publicly posted hearing calendar, which may be viewed online at:
    http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

                                      1
EXHIBIT 1
Page 31

This is to certify that:

    (a)    I am being given access to Confidential Information pursuant to the Stipulated Protective Order that was entered into the main bankruptcy case for Litigation Practice Group, but which is binding and controlling as set forth by the Court's Order on any and all contested matters and any and all litigation commenced by Trustee;

    (b)    I have read the Stipulated Protective Order; and

    (c)    I agree to be bound by the terms and conditions thereof, including, without limitation, to the obligations regarding the use, non-disclosure and return of such Confidential Information. I further agree that in addition to being contractually bound by the Stipulated Protective Order, I am subject to the jurisdiction of the above reference Court for any violation thereof.

Date: _____

_____
Signature

_____
Printed Name

Exhibit 2

EXHIBIT 2
Page 33

| Payee and Purpose | Date | Amount |
|---|---|---|
| **Ford Credit - Reale Car Payment** | 5/24/2019 | $693.54 |
| **Ford Credit - Reale Car Payment** | 6/21/2019 | $684.92 |
| **Ford Credit - Reale Car Payment** | 7/16/2019 | $693.54 |
| **Ford Credit - Reale Car Payment** | 9/9/2019 | $684.92 |
| **Ford Credit - Reale Car Payment** | 9/13/2019 | $693.54 |
| **Ford Credit - Reale Car Payment** | 10/18/2019 | $711.65 |
| **Ford Credit - Reale Car Payment** | 11/25/2019 | $677.92 |
| **Ford Credit - Reale Car Payment** | 12/30/2019 | $866.92 |
| **Ford Credit - Reale Car Payment** | 1/15/2020 | $10.00 |
| **Ford Credit - Reale Car Payment** | 1/31/2020 | $667.20 |
| **Ford Credit - Reale Car Payment** | 2/11/2020 | $677.20 |
| **Ford Credit - Reale Car Payment** | 2/20/2020 | $685.44 |
| **Ford Credit - Reale Car Payment** | 3/27/2020 | $685.44 |
| **Ford Credit - Reale Car Payment** | 4/17/2020 | $1,777.19 |
| **Ford Credit - Reale Car Payment** | 5/14/2020 | $685.44 |
| **Ford Credit - Reale Car Payment** | 6/11/2020 | $684.64 |
| **Ford Credit - Reale Car Payment** | 8/13/2020 | $684.64 |
| **Ford Credit - Reale Car Payment** | 9/10/2020 | $684.64 |
| **Ford Credit - Reale Car Payment** | 10/14/2020 | $684.64 |
| **Ford Credit - Reale Car Payment** | 11/12/2020 | $684.64 |
| **Ford Credit - Reale Car Payment** | 12/10/2020 | $684.64 |
| **Ford Credit - Reale Car Payment** | 1/13/2021 | $684.64 |
| **Ford Credit - Reale Car Payment** | 2/11/2021 | $684.64 |
| **Ford Credit - Reale Car Payment** | 3/10/2021 | $684.64 |
| **Ford Credit - Reale Car Payment** | 4/15/2021 | $684.64 |
| **Ford Credit - Reale Car Payment** | 5/13/2021 | $684.64 |
| **Ford Credit - Reale Car Payment** | 6/24/2021 | $866.92 |
| | **Total** | **$19,292.82** |
| | | |

EXHIBIT 2
Page 34

| Type of Payment | Date | Amount |
|---|---:|---:|
| **Jim Reale - (Father of Brian Reale)** | 9/24/2019 | $10,000.00 |
| **Jim Reale - (Father of Brian Reale)** | 9/30/2019 | $6,000.00 |
| **Jim Reale - (Father of Brian Reale)** | 11/7/2019 | $6,000.00 |
| **Jim Reale - (Father of Brian Reale)** | 12/6/2019 | $6,000.00 |
| **Jim Reale - (Father of Brian Reale)** | 12/31/2019 | $6,000.00 |
| **Jim Reale - (Father of Brian Reale)** | 2/7/2020 | $6,000.00 |
| **Jim Reale - (Father of Brian Reale)** | 3/1/2020 | $6,000.00 |
| **Jim Reale - (Father of Brian Reale)** | 4/10/2020 | $6,000.00 |
| **Jim Reale - (Father of Brian Reale)** | 5/14/2020 | $6,000.00 |
| **Jim Reale - (Father of Brian Reale)** | 6/22/2020 | $6,000.00 |
| **Jim Reale - (Father of Brian Reale)** | 7/16/2020 | $6,000.00 |
| **Jim Reale - (Father of Brian Reale)** | 8/13/2020 | $6,000.00 |
| **Jim Reale - (Father of Brian Reale)** | 9/16/2020 | $6,000.00 |
| **Jim Reale - (Father of Brian Reale)** | 10/7/2020 | $6,000.00 |
| **Jim Reale - (Father of Brian Reale)** | 11/5/2020 | $6,000.00 |
| **Jim Reale - (Father of Brian Reale)** | 12/3/2020 | $6,000.00 |
| **Jim Reale - (Father of Brian Reale)** | 1/13/2021 | $6,000.00 |
| **Jim Reale - (Father of Brian Reale)** | 2/16/2021 | $6,000.00 |
| **Jim Reale - (Father of Brian Reale)** | 3/10/2021 | $6,000.00 |
| **Jim Reale - (Father of Brian Reale)** | 4/8/2021 | $6,000.00 |
| **Jim Reale - (Father of Brian Reale)** | 5/6/2021 | $6,000.00 |
| **Jim Reale - (Father of Brian Reale)** | 6/18/2021 | $6,000.00 |
| | | |
| **Total** | | **$136,000.00** |
| | | |
| **Type of Payment** | **Date** | **Amount** |
| **Kelly Hess - Money to Brians Nephew** | 5/27/2021 | $    8,000.00 |
| **Kelly Hess - Money to Brians Nephew** | 4/28/2021 | $    8,000.00 |
| **Kelly Hess - Money to Brians Nephew** | 3/29/2021 | $    8,000.00 |
| **Total** | | **$    24,000.00** |
| | | |
| | | |

EXHIBIT 2
Page 35

| Bank Name | Account Name | Account Number | Date | Payment | Payee |
|---|---|---|---|---|---|
| Optimum Bank | Coast Processing LLC dba LPG | X6738 | 10/26/2021 | $4,789.58 | **Reale Family Irrevocable Trust** |
| Optimum Bank | Coast Processing LLC dba LPG | X6738 | 11/5/2021 | $2,690.54 | **Reale Family Irrevocable Trust** |
| Optimum Bank | Coast Processing LLC dba LPG | X6738 | 11/12/2021 | $2,628.38 | **Reale Family Irrevocable Trust** |
| Optimum Bank | Coast Processing LLC dba LPG | X6738 | 11/18/2021 | $1,576.47 | **Reale Family Irrevocable Trust** |
| Optimum Bank | Coast Processing LLC dba LPG | X6738 | 11/26/2021 | $2,429.25 | **Reale Family Irrevocable Trust** |
| Optimum Bank | Coast Processing LLC dba LPG | X6738 | 12/2/2021 | $1,866.35 | **Reale Family Irrevocable Trust** |
|  |  |  |  |  |  |
|  |  |  | **Total** | **$15,980.57** |  |

| Bank Name | Account Name | Account Number | Date | Payment | Payee |
|---|---|---|---|---|---|
| Optimum Bank | Coast Processing LLC dba LPG | X6738 | 9/30/2021 | $2,748.21 | **Reale Marketing Inc** |
| Optimum Bank | Coast Processing LLC dba LPG | X6738 | 10/26/2021 | $2,728.39 | **Reale Marketing Inc** |
| Optimum Bank | Coast Processing LLC dba LPG | X6738 | 11/5/2021 | $652.81 | **Reale Marketing Inc** |
| Optimum Bank | Coast Processing LLC dba LPG | X6738 | 11/12/2021 | $1,067.17 | **Reale Marketing Inc** |
| Optimum Bank | Coast Processing LLC dba LPG | X6738 | 11/18/2021 | $1,457.24 | **Reale Marketing Inc** |
| Optimum Bank | Coast Processing LLC dba LPG | X6738 | 11/26/2021 | $2,327.00 | **Reale Marketing Inc** |
| Optimum Bank | Coast Processing LLC dba LPG | X6738 | 12/2/2021 | $1,093.67 | **Reale Marketing Inc** |
|  |  |  |  |  |  |
|  |  |  | **Total** | **$12,074.49** |  |

EXHIBIT 2
Page 36

# Exhibit 3

EXHIBIT 3
Page 37

# Stock Purchase Agreement

THIS AGREEMENT is made and entered on _____, 2021 by and between, Brian Reale, ("Seller") and Tony Diab ("Purchaser") of B.A.T. Inc. dba Coast Processing.

WITNESSETH:

WHEREAS, the Seller is a Stockholder in BAT Inc. dba Coast Processing, who is the record owner of outstanding shares of the capital stock of BAT Inc. dba Coast Processing (hereinafter referred to as the "Corporation"), a California corporation, which has authority to sell 46 shares of capital stock at $155,000.00 par value common stock, and

WHEREAS, the Purchaser desires to purchase said stock and the Seller desires to sell said stock, upon the terms and subject to the conditions hereinafter set forth;

WHEREAS, the Purchaser will be the sole shareholder of the Corporation at the conclusion of this transaction;

NOW, THEREFORE, in consideration of the mutual covenants and Agreements contained in this Agreement, and in order to consummate the purchase and the sale of the Corporation's Stock aforementioned, it is hereby agreed as follows:

**Purchase and Sale**
Subject to the terms and conditions hereinafter set forth, at the closing of the transaction contemplated hereby, the Seller shall sell, convey, transfer, and deliver to the Purchaser certificates representing such stock, and the Purchaser shall purchase from the Seller the Corporation's Stock in consideration of the purchase price set forth in this Agreement. The certificates representing the Corporation's Stock shall be duly endorsed for transfer or accompanied by appropriate stock transfer powers duly executed in blank, in either case with signatures guaranteed in the customary fashion, and shall have all the necessary documentary transfer tax stamps affixed thereto at the expense of the Seller.

The closing of the transactions contemplated by this Agreement (the "Closing"), shall take place using an escrow agent mutually agreed upon by the parties.

**Amount and Payment of Purchase Price**
    **(a) Consideration**
As total consideration for the purchase and sale of the Corporation's Stock, pursuant to this Agreement, the Purchaser shall pay to the Seller the sum of $7,130,000, such total consideration to be referred to in this Agreement as the "Purchase Price." Other than the Lump Sum Payment, as defined herein below, the rest of the Purchase Price, as outlined, herein below, shall be paid pursuant to the terms of the Promissory Note, attached hereto as Exhibit "A" and incorporated herein by this reference.

    **(b) Payment**
The Purchase Price shall be paid as follows:

746717.1

EXHIBIT 3
Page 38

i. The sum of $3,680,000.00 to be delivered to Seller upon Closing ("Lump Sum Payment").

ii. The sum of $460,000.00 to be delivered to Seller on or before July 1, 2021.

iii. The sum of $920,000.00 to be delivered to Seller on or before August 1, 2021.

iv. The sum of $920,000.00 to be delivered to Seller on or before September 1, 2021.

v. The sum of $1,150,000.00 to be delivered to Seller on or before October 1, 2021.

### (c) Other Consideration

Upon execution of this Agreement, Seller shall:

1. Furnish to Buyer a duly executed Guarantee and Release from The Litigation Practice Group, attached hereto as Exhibit "B" and incorporated herein by reference.

### Non-Dissolution of the Corporation

Purchaser hereby represents and warranties that Purchaser will not dissolve or cause for the Corporation to be dissolved until the final Purchase Price is made, pursuant to the schedule herein above.

### Non-Payment of Scheduled Purchase Amounts

Should Buyer fail to make any scheduled payment as detailed above, Buyer shall be in breach and, Seller shall be entitled to take any action to recover any and all assets of Corporation, including contacting customers, attorneys and 3rd parties to mitigate their damages. Payments made up to the point of such breach shall be forfeited to Seller and not recoverable by Buyer. Further all other provisions regarding Representations and Warranties of Seller shall be void and unenforceable. Seller may take any action it deems appropriate and in its interest without regard to Buyer.

### Representations and Warranties of Seller

Seller hereby warrants and represents:

### (a) Organization and Standing

The Seller is a stockholder and record owner of the issued and outstanding shares of the capital stock of the Corporation, which is a corporation duly organized, validly existing and in good standing under the laws of the State of California and has the Corporation has the corporate power and authority to carry on its business as it is now being conducted.

### (b) Restrictions on Stock

i. The Seller is not a party to any Agreement, written or oral, creating rights in respect to the Corporation's Stock in any third person or relating to the voting of the Corporation's Stock.

ii. Seller is the lawful owner of the Stock, free and clear of all security interests, liens, encumbrances, equities and other charges.

746717.1

EXHIBIT 3
Page 39

iii. There are no existing warrants, options, stock purchase agreements, redemption agreements, restrictions of any nature, calls or rights to subscribe of any character relating to the stock, nor are there any securities convertible into such stock.

**Representations and Warranties of Seller and Purchaser**

Seller and Purchaser hereby represent and warrant that there has been no act or omission by Seller and Purchaser which would give rise to any valid claim against any of the parties hereto for a brokerage commission, finder's fee, or other like payment in connection with the transactions contemplated hereby.

**Representations and Warranties of Purchaser**

Purchaser hereby agrees to accept liability for any and all claims by all 3rd Parties, both public and private for any and all acts or omissions both known and unknown against Corporation including customers, and governmental entities and respond diligently and appropriately as Owner of Corporation so that Purchaser accepts all liability for purposes of settlement and any regulatory responsibility. Purchaser hereby represents that as a sophisticated businessperson, they have diligently reviewed and accepted such liability for acts going back to the origination of Corporation including any pending legal or ethical issues, and any accusations of wrongdoing of any kind that may come up in the future. All Corporation liabilities shall stay affixed to Corporation and shall not be assigned, blamed or otherwise associated in any way to Sellers.

**No Other Representations and Warranties.**

Except for the representations and warranties contained herein above, none of Seller, the Corporation or any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller or the Corporation, including any representation or warranty as to the accuracy or completeness of any information regarding the Corporation furnished or made available to Purchaser and its Representatives, management presentations or in any other form in expectation of the transactions contemplated hereby or as to the future revenue, profitability or success of the Corporation, or any representation or warranty arising from statute or otherwise in law. The Purchaser is buying the Corporation in an "as is" state and hereby agrees and acknowledges that Purchaser may be liable for past acts of the Corporation and will not seek any indemnity or file any cross-actions against the Seller, his representatives and/or affiliates for same.

**Independent Investigation.**

Purchaser has conducted its own independent investigation, review and analysis of the business, results of operations, prospects, condition (financial or otherwise) or assets of the Corporation and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records, and other documents and data of Seller and the Company for such purpose. Buyer acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Purchaser has relied solely upon its own investigation and the express representations and warranties of Seller set forth herein; and (b) none of Seller, the Corporation or any other Person has made any representation or warranty as to Seller, the Corporation or this Agreement, except as expressly set forth herein.

746717.1

EXHIBIT 3
Page 40

**Designation of New Ownership and Confidentiality of Former Owners**
Should the subject matter of ownership of Corporation be raised by any entity, either public or private, Buyer hereby obligate themselves to clearly state they are exclusively the "Owner" of Corporation and any attempt to associate Sellers with Ownership after Closing shall be a material breach of this agreement. If asked about former owners, Buyers shall make only the representation that they are now owners without utilizing the names, either corporate or individual, of former owners. Once Agreement is signed, identity of former owners shall become confidential and not subject to voluntary disclosure to any party.

**Sufficiency of Funds.**
Purchaser has sufficient cash on hand or other sources of immediately available funds to enable it to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement.

**General Provisions**

**(a) Entire Agreement**
This Agreement (including any written amendments hereof executed by the parties) constitutes the entire Agreement and supersedes all prior agreements and understandings, oral and written, between the parties hereto with respect to the subject matter hereof.

**(b) Sections and Other Headings**
The section and other headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

**(c) Confidentiality and Non-Disparagement**
The Parties agree that the terms and conditions of this Agreement are confidential and shall not be disclosed to any third party at any time, and that they shall use their best efforts to maintain the confidential nature of this Agreement. Disclosure of the terms and conditions shall only occur if enforcement of the Agreement is necessary or upon a court order compelling disclosure. In the event that any Party is subpoenaed or otherwise compelled by court order to provide information that would violate this provision, that Party shall send a written notice to the other Party at the address set forth in Section 21 before responding to such request to afford the other Party the opportunity to assert any objection they may have.

The Parties agree that no Party nor any employee, agent, or someone acting at their direction will, at any time after the Effective Date, through any medium, either orally or in writing, including, but not limited to, electronic mail, television or radio, Internet bulletin boards, social media, or any other form of communication, disparage the other or cause or tend to cause the recipient of a communication to question the good character or professionalism of the Parties or their current or former employees, officers, directors, shareholders, members, affiliates, agents, managers, consultants, divisions, subsidiaries, predecessors, successors, assigns, partners, administrators, executors, principals, attorneys, insurers, and/or representatives.

The Parties agree that confidentiality and non-disparagement are material terms of this Agreement that form the basis of the agreed sale price.  A breach of this term of the Agreement is a material

746717.1

EXHIBIT 3
Page 41

breach of the Agreement and shall constitute a release of any further obligation Purchaser to remit payment.

**(d) Release of All Interest**

Seller agrees that in relinquishing its interest in the Corporation, it is relinquishing its interest in the entire accounts receivable of the Corporation, all entities associated with or affiliated with the Corporation, all bank accounts of the Corporation, all rights to payment from the Corporation or related or affiliated entities, all decision-making authority for the Corporation, and all investments of the Corporation.

**(e) Indemnification**

Purchaser agrees to indemnify and hold Seller harmless from any claim, known or unknown, that has arisen or might arise against Seller in connection with the Corporation or its past, current, or future operation. This indemnification extends to all legal fees incurred in connection with the defense of such claim, and all liability that may arise from such claim, without limitation. Purchaser agrees to bear this indemnification in his individual capacity, and on behalf of the Corporation as the majority shareholder in the Corporation with authority to bind the Corporation.

FROM AND AFTER THE EXECUTION OF THIS AGREEMENT, AND TO THE FULLEST EXTENT PERMITTED BY LAW, PURCHASER AGREES TO INDEMNIFY, DEFEND, AND HOLD HARMLESS SELLER AND SELLER'S DIRECTORS, SHAREHOLDERS, MEMBERS, OFFICERS, EMPLOYEES, AFFILIATES, SUCCESSORS AND ASSIGNS , FROM AND AGAINST ANY AND ALL LIABILITIES, CLAIMS, STRICT LIABILITY CLAIMS, DEMANDS, LAWSUITS, JUDGMENTS, ORDERS, FINES, PENALTIES, DAMAGES, EXPENSES (INCLUDING BUT NOT LIMITED TO REASONABLE ATTORNEYS' FEES), COSTS AND CAUSES OF ACTION ASSERTED BY ANY PERSON OR ENTITY FOR PERSONAL INJURY, FINANCIAL INJURY, OR DEATH, FOR COMPLIANCE WITH REGULATIONS, ORDERS, OR GUIDELINES, OR FOR LOSS OR DAMAGE TO THE PARTIES, THIRD PARTIES OR THE ENVIRONMENT (collectively, "Liabilities/Claims"), ARISING FROM OR RELATING TO THE OWNERSHIP, USE, OR OPERATION OF THE CORPROATION BY BEFORE AND/OR AFTER CLOSING, REGARDLESS OF WHETHER SUCH LIABILITIES/CLAIMS ARE CAUSED BY OR ARISE FROM SELLER'S PRE-CLOSING ORDINARY NEGLIGENCE (BUT NOT GROSS NEGLIGENCE OR WILLFUL MISCONDUCT), ACTIONS, OR OMISSIONS RELATING TO THE OPERATION, DESIGN, PHYSICAL CONDITION, OR MAINTENANCE STATUS OF THE CORPORATION.

**(f) Governing Law**

All matters arising out of or relating to this Agreement shall be governed by and construed in accordance with the internal laws of the State of California without giving effect to any choice or conflict of law provision or rule (whether of the State of California or any other jurisdiction). Any legal suit, action, proceeding, or dispute arising out of or related to this Agreement, the other Transaction Documents, or the transactions contemplated hereby or thereby may be instituted in the federal courts of the United States of America or the courts of the State of California in each case located in the city of Los Angeles and county of California, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, proceeding, or dispute.

746717.1

EXHIBIT 3
Page 42

**(g) Dispute Resolution**

The parties agree that any and all disputes, claims or controversies arising out of or relating to this Agreement shall be submitted for mediation, and if the matter is not resolved through mediation, then it shall be submitted, and binding arbitration as set forth below.

Either party may commence mediation by providing to the other party a written request for mediation, setting forth the subject of the dispute and the relief requested. The parties will cooperate with one another in selecting a mediator and in scheduling the mediation proceedings. Should the parties be unable to select a mediator, each party will select a mediator and the two mediators, in turn, will select a mediator for the parties. The parties agree that they will participate in the mediation in good faith and that they will share equally in its costs. All offers, promises, conduct and statements, whether oral or written, made in the course of the mediation by any of the parties, their agents, employees, experts and attorneys, and by the mediator are confidential, privileged and inadmissible for any purpose, including impeachment, in any arbitration or other proceeding involving the parties, provided that evidence that is otherwise admissible or discoverable shall not be rendered inadmissible or non-discoverable as a result of its use in the mediation.

Either party may initiate arbitration with respect to the matters submitted to mediation by filing a written demand for arbitration at any time following the initial mediation session or at any time following 45 days from the date of filing the written request for mediation, whichever occurs first ("Earliest Initiation Date"). Should the parties be unable to find a mutually agreeable arbitrator, the mediator shall select one for them. All arbitration proceedings shall be in accordance with the rules of the American Arbitration Association. Any arbitration hereunder shall take place in Los Angeles, California.  The mediation may continue after the commencement of arbitration if the parties so desire.

At no time prior to the Earliest Initiation Date shall either side initiate any arbitration related to this Agreement except to pursue a provisional remedy that is authorized by law or by agreement of the parties. Notwithstanding anything to the contrary set forth herein, it is agreed and understood that monetary damages would not adequately compensate an injured party hereto for the breach of this Agreement by any other party hereto, that this Agreement shall be specifically enforceable, and that any breach or threatened breach of this Agreement shall be the proper subject of a temporary or permanent injunction or restraining order.  Further, each party hereto waives any claim or defense that there is an adequate remedy at law for such breach or threatened breach.  Any such request for specific enforcement may be brought in any court of competent jurisdiction in Los Angeles, California.

The dispute resolution provisions of this Agreement shall be the exclusive manner of dispute resolutions between the parties.

**(h) Legal Fees**

In the event that litigation or arbitration results from or arises out of this Agreement or the performance thereof, the parties agree to reimburse the prevailing party's reasonable attorney's fees, court costs, and all other expenses, whether or not taxable by the court as costs, in addition to any other relief to which the prevailing party may be entitled.

746717.1

EXHIBIT 3
Page 43

**(i) Bankruptcy Petition**

Purchaser agrees not to file any bankruptcy petition on behalf of the Corporation within two (2) years of the execution of this Agreement.

**(j) Successors and Assigns**

This Agreement shall be binding and inure to the benefit of the parties, their successors and assigns.

**(k) Counterparts**

This Agreement may be signed in counterparts, with each executed counterpart, upon proof of execution of one or more counterparts by all parties, to be accepted as original.

**(l) Assignment**

Except as otherwise expressly provided in this Agreement, no party may assign any rights or delegate any duties under this Agreement without the prior written consent of the other party. Any attempted assignment or delegation without the required consent shall be void.

**(m) Authority**

Any entity signing this Agreement on behalf of any other entity hereby represents and warrants in an individual capacity that it has full authority to do so on behalf of the other entity. Any individual signing this Agreement on behalf of an entity hereby represents and warrants in his/her individual capacity that he/she has full authority
to do so on behalf of that entity.

**(n) Accumulation of Remedies**

The various rights, options, elections, powers and remedies under this Agreement or granted by law, (collectively, "Rights"), shall be construed as cumulative. No single Right is exclusive of any other Rights.

**(o) Incorporation of Exhibits and Recitals**

All exhibits and recitals referred to in this Agreement are an integral part of this Agreement. They are incorporated in this Agreement by this reference as though at this point set forth in full.

**(p) No Third-Party Rights**

The parties do not intend the benefits of this Agreement to inure to any person or entity not a party to this Agreement. Notwithstanding anything contained in this Agreement, or any conduct or course of conduct by either party before or after signing this Agreement, this Agreement shall not be construed as creating any right, claim or cause of action against either party by any person or entity not a party to this Agreement.

**(q) Review and Explanation by Legal Counsel**

The parties acknowledge, covenant and agree that they have carefully and completely read this

746717.1

EXHIBIT 3
Page 44

entire Agreement; that each has had the opportunity to have all of the provisions of this Agreement explained to him/her by legal counsel; that each party fully and completely understands, accepts and is satisfied with the terms and conditions of this Agreement; and, that each acknowledges that they have reached this Agreement only after careful, extended and deliberate thought and consideration. The parties also acknowledge and agree that this Agreement is made and entered into freely and voluntarily, free from any duress, coercion, menace, fraud or undue influence of any kind, character or nature upon the part of the other party and that it will be legally binding when signed by both parties.


IN WITNESS WHEREOF, this Agreement has been executed by each of the individual parties hereto on the date first above written.

SELLER:

By: _____     Date: _____
    Brian Reale

PURCHASER:

By: _____     Date: _____
    Tony M. Diab

746717.1

EXHIBIT 3
Page 45

EXHIBIT "A"

SECURED PROMISSORY NOTE

## SECURED PROMISSORY NOTE

U.S. $  3,450,000

This Promissory Note, hereinafter "Promissory Note," is made on 06/___/2021 by and between Brian Reale, an individual, hereinafter called "Lender," and Tony M. Diab, an individual, hereinafter called "Borrower," collectively referred to as "Parties."

As a condition to this Note and loan described herein, Borrower shall execute and deliver the Security Agreement, attached hereto as Exhibit "A".

1.    Pursuant to a Stock Purchase Agreement, executed between the Parties on_____, 2021, Borrower has become indebted to the Lender in the amount of $3,450,000. Accordingly, at the times and in the manner hereinafter stated, Borrower, promises to pay to the order of Lender, at such place, either within or without the State of California as Lender may from time to time designate in writing, in legal tender of the United States of America, the principal sum of <u>three million four hundred and fifty thousand (U.S. $3,450,000)</u> without interest upon the terms and conditions set forth below.

2.    <u>Payment of Principal and Term</u>.  The principal under this Promissory Note shall be due and payable by Borrower to Lender as follows:

2.1    <u>Term, Payments of Principal.</u>

ii. The sum of $460,000.00 to be delivered to Seller on or before July 1, 2021.

iii. The sum of $920,000.00 to be delivered to Seller on or before August 1, 2021.

iv. The sum of $920,000.00 to be delivered to Seller on or before September 1, 2021.

v. The sum of $1,150,000.00 to be delivered to Seller on or before October 1, 2021.

Should any of the above listed payments be paid after the due date set forth above for each applicable payment or should the payment due on the applicable date not be paid in full, the remaining balance owed shall begin to accrue interest at the rate of 10% per annum and be paid together with, and in addition to, the principal.

2.2    <u>Grace Period</u>.  Lender shall provide Borrower a three (3) day grace period to make any and all payments due under this Promissory Note.

746717.1

EXHIBIT 3
Page 47

2.3    <u>Setoff from Subsequent Collections</u>    Should Lender collect any offsetting proceeds for this debt from other sources, Borrower shall be credited with net amounts of such collections.

3.    If any of the following events of default occur, this Promissory Note and any other obligations of the Borrower to the Lender, shall become due immediately, without demand or notice:

3.1.    The failure of the Borrower to pay the principal in full on or before the due date;

3.2.    The filing of bankruptcy proceedings involving the Borrower as a debtor;

3.3.    The application for the appointment of a receiver for the Borrower;

3.4.    The making of a general assignment for the benefit of the Borrower's creditors;

3.5.    The insolvency of the Borrower;

3.6.    The Borrower becomes insolvent or offers settlement to any creditors.

4.    In the event that Borrower defaults upon any obligation, agreement or promise contained herein, then the Lender shall have the right to reduce its claim to judgment, foreclose this Promissory Note, or otherwise enforce this agreement by any available lawful procedure.

5.    No waiver by Lender of any breach or default shall be deemed a waiver of any breach or default thereafter occurring and the taking of any action by the Lender shall not be deemed to be an election of that action, but rather the rights and privileges and options granted to the Lender under the terms of this Promissory Note shall be deemed cumulative, the one with the other and not alternatively.

6.    If this Promissory Note is placed in an attorney's hands for collection, or collected by a lawsuit or through a bankruptcy, or probate, or any other court, either before or after maturity, there shall be paid to the holder of this Promissory Note reasonable attorneys' fees, costs, and other expenses incurred by the holder in enforcing the terms of this Promissory Note.

EXHIBIT 3
Page 48

7.   Failure to pay any part of the principal of this Promissory Note when due shall authorize the holder of this Promissory Note to declare as immediately due and payable the then-unpaid principal.

8.   If any one or more of the provisions of this Promissory Note are determined to be unenforceable, in whole or in part, for any reason, the remaining provisions shall remain fully operative.

9.   All payments of principal on this Promissory Note shall be paid in the legal currency of the United States.

10. No renewal or extension of this Promissory Note, delay in enforcing any right of the Lender under this Promissory Note, or assignment by Lender of this Promissory Note shall affect the liability or the obligations of the Borrower.

11. For purposes of executing this Promissory Note, a counterpart of this Agreement signed and then transmitted to the other party by facsimile machine or telecopier shall be treated as validly executed by the party transmitting it.  The signature of such party shall be considered as an original signature, the document transmitted shall have the same binding, legal effect as an originally signed document, and no party may raise the use of a facsimile machine or the fact that any signature was transmitted through use of a facsimile machine as a defense to the enforcement of this Promissory Note.  At the request of either party, any counterpart of this Promissory Note that is executed and transmitted by facsimile shall be re-executed by both parties in the original form.

12. This Promissory Note shall be governed by and construed in accordance with the laws of the State of California.  Borrower and Lender hereby acknowledge, stipulate, consents and agrees to the jurisdiction of the Courts of the State of California, for the County of Los Angeles.

13. The terms of this Promissory Note apply to, inure to the benefit of, and bind all parties hereto, their heirs, legatees, devisees, administrators, executors, successors and assigns.  This Promissory Note may NOT be assigned by Borrower without first obtaining the written consent from the Lender.

14. If any provision or any word, term, clause or part of any provision of this Promissory Note shall be invalid for any reason, the remainder of this Promissory Note and the provisions thereof shall remain in full force and effect.

746717.1

EXHIBIT 3
Page 49

Executed in the City of _____, State of _____.


Dated:

                       _____
                       Tony M. Diab

EXHIBIT 3
Page 50

EXHIBIT "A"
SECURITY AGREEMENT

# SECURITY AGREEMENT

SECURITY AGREEMENT, dated as of July _____, 2021, between Tony M. Diab, an individual (the "Borrower"), and Brian Reale. an Individual (hereinafter, the "Lender") and B.A.T., Inc. (hereinafter "Company") collectively referred to as "Parties."

WHEREAS, the Borrower purchased the Company stock from Lender pursuant to a certain Stock Purchase Agreement, dated _____.

WHEREAS, the Borrower has entered into a Secured Promissory Note dated as of _____ (as amended and in effect from time to time, the "Promissory Note"), with the Lender, pursuant to which the Lender, subject to the terms and conditions contained therein, has extended a loan to the Borrower in the amount of $3,450,000; and

WHEREAS, it is a condition precedent to the Lender's extending the loan to the Borrower under the Secured Promissory Note that the Borrower cause the Company execute and deliver to the Lender a security agreement in substantially the form hereof; and

WHEREAS, the Borrower, wishes to grant a security interest in favor of the Lender as herein provided;

NOW, THEREFORE, in consideration of the promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. **Definitions.** All capitalized terms used herein without definitions shall have the respective meanings provided therefor in the Promissory Note. The term "State", as used herein, means the State of California. All terms defined in the Uniform Commercial Code of the State and used herein shall have the same definitions herein as specified therein. However, if a term is defined in Article 9 of the Uniform Commercial Code of the State differently than in another Article of the Uniform Commercial Code of the State, the term has the meaning specified in Article 9. The term "electronic document" applies in the event that the 2003 revisions to Article 7, with amendments to Article 9, of the Uniform Commercial Code, in substantially the form approved by the American Law Institute and the National Conference of Commissioners on Uniform State Laws, are now or hereafter adopted and become effective in the State or in any other relevant jurisdiction. The term "Obligations", as used herein, means all of the indebtedness, obligations and liabilities of the Company to the Lender, individually or collectively, whether direct or indirect, joint or several, absolute or contingent, due or to become due, now existing or hereafter arising under or in respect of the Secured Promissory Note or this Agreement, and the term "Event of Default", as used herein, means the failure of the Company to pay or perform any of the Obligations as and when due to be paid or performed under the terms of the Secured Promissory Note.

## 2.  **Grant of Security Interest.**

**2.1  Grant;  Collateral Description.**  The Borrower hereby grants to the Lender, to secure the payment and performance in full of all of the Obligations, a security interest in and pledges and assigns to the Lender, the following properties, assets and rights of the B.A.T., Inc. (hereinafter "Company"), owned in whole by the Borrower pursuant to the Stock Purchase Agreement signed between the Lender and Borrower on _____, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof (all of the same being hereinafter called the "Collateral"): all personal, intellectual and fixture property of every kind and nature including all goods (including inventory, equipment and any accessions thereto), instruments (including promissory notes), documents (including, if applicable, electronic documents), accounts (including any receivables), chattel paper (whether tangible or electronic), deposit accounts, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), commercial tort claims, securities and all other investment property, supporting obligations, any other contract rights or rights to the payment of money, insurance claims and proceeds, and all general intangibles (including but not limited to copyrightable works, patented inventions, trademarks, and trade secret)

**3.  Authorization  to  File  Financing  Statements.**  The  Company  hereby  irrevocably authorizes the Lender at any time and from time to time to file in any filing office in any Uniform Commercial Code jurisdiction any initial financing statements and amendments thereto that (a) indicate the Collateral (i) as all assets of the Company or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the Uniform Commercial Code of the State or such jurisdiction, or (ii) as being of an equal or lesser scope or with greater detail, and (b) provide any other information required by part 5 of Article 9 of the Uniform Commercial Code of the State or such other jurisdiction for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether the Company is an organization, the type of organization and any organizational identification number issued to the Company and, (ii) in the case of a financing statement filed as a fixture filing or indicating Collateral as as-extracted collateral or timber to be cut, a sufficient description of real property to which the Collateral relates.  The Company agrees to furnish any such information to the Lender promptly upon the Lender's request.  The Company also ratifies its authorization for the Lender to have filed in any Uniform Commercial Code jurisdiction any like initial financing statements or amendments thereto if filed prior to the date hereof.

**4.  Other Actions.**  Further to insure the attachment, perfection and first priority of, and the ability of the Lender to enforce, the Lender's security interest in the Collateral, the Company agrees, in each case at the Company's expense, to take the following actions with respect to the following Collateral and without limitation on the Company's other obligations contained in this Agreement:

**4.1.  Promissory Notes and Tangible Chattel Paper**.  If the Company shall at any time hold or acquire any promissory notes or tangible chattel paper, the Company shall forthwith endorse, assign and deliver the same to the Lender, accompanied by such

instruments of transfer or assignment duly executed in blank as the Lender may from time to time specify.

4.2. **Deposit Accounts**.  For each deposit account that the Company at any time opens or maintains, the Company shall, at the Lender's request and option, pursuant to an agreement in form and substance satisfactory to the Lender, either (a) cause the depositary bank to agree to comply, without further consent of the Company, at any time with instructions from the Lender to such depositary bank directing the disposition of funds from time to time credited to such deposit account, or (b) arrange for the Lender to become the customer of the depositary bank with respect to the deposit account, with the Company being permitted, only with the consent of the Lender, to exercise rights to withdraw funds from such deposit account.  The provisions of this paragraph shall not apply to (i) any deposit account for which the Company, the depositary bank and the Lender have entered into a cash collateral agreement specially negotiated among the Company, the depositary bank and the Lender for the specific purpose set forth therein, (ii) a deposit account for which the Lender is the depositary bank and is in automatic control, and (iii) any deposit accounts specially and exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of the Company's salaried employees

4.3. **Investment Property**.  If the Company shall at any time hold or acquire any certificated securities, the Company shall forthwith endorse, assign and deliver the same to the Lender, accompanied by such instruments of transfer or assignment duly executed in blank as the Lender may from time to time specify.  If any securities now or hereafter acquired by the Company are uncertificated and are issued to the Company or its nominee directly by the issuer thereof, the Company shall immediately notify the Lender thereof and, at the Lender's request and option, pursuant to an agreement in form and substance satisfactory to the Lender, either (a) cause the issuer to agree to comply, without further consent of the Company or such nominee, at any time with instructions from the Lender as to such securities, or (b) arrange for the Lender to become the registered owner of the securities.  If any securities, whether certificated or uncertificated, or other investment property now or hereafter acquired by the Company are held by the Company or its nominee through a securities intermediary or commodity intermediary, the Company shall immediately notify the Lender thereof and, at the Lender's request and option, pursuant to an agreement in form and substance satisfactory to the Lender, either (i) cause such securities intermediary or (as the case may be) commodity intermediary to agree to comply, in each case without further consent of the Company or such nominee, at any time with entitlement orders or other instructions from the Lender to such securities intermediary as to such securities or other investment property, or (as the case may be) to apply any value distributed on account of any commodity contract as directed by the Lender to such commodity intermediary, or (ii) in the case of financial assets or other investment property held through a securities intermediary, arrange for the Lender to become the entitlement holder with respect to such investment property, with the Company being permitted, only with the consent of the Lender, to exercise rights to withdraw or otherwise deal with such investment property.  The Lender agrees with the Company that the Lender shall not give any such entitlement orders or instructions or directions to any such issuer, securities intermediary or commodity intermediary, and shall not withhold its consent to the exercise of any withdrawal or dealing rights by the Company, unless an Event of Default has

occurred and is continuing, or, after giving effect to any such investment and withdrawal rights not otherwise permitted by the Loan Documents, would occur.  The provisions of this paragraph shall not apply to any financial assets credited to a securities account for which the Lender is the securities intermediary.

**4.4.  Collateral in the Possession of a Bailee**  If any Collateral is at any time in the possession of a bailee, the Company shall promptly notify the Lender thereof and, at the Lender's request and option, shall promptly obtain an acknowledgement from the bailee, in form and substance satisfactory to the Lender, that the bailee holds such Collateral for the benefit of the Lender and such bailee's agreement to comply, without further consent of the Company, at any time with instructions of the Lender as to such Collateral.  The Lender agrees with the Company that the Lender shall not give any such instructions unless an Event of Default has occurred and is continuing or would occur after taking into account any action by the Company with respect to the bailee.

**4.6.  Letter-of-credit Rights**.  If the Company is at any time a beneficiary under a letter of credit now or hereafter, the Company shall promptly notify the Lender thereof and, at the request and option of the Lender, the Company shall, pursuant to an agreement in form and substance satisfactory to the Lender, either (i) arrange for the issuer and any confirmer or other nominated person of such letter of credit to consent to an assignment to the Lender of the proceeds of the letter of credit or (ii) arrange for the Lender to become the transferee beneficiary of the letter of credit, with the Lender agreeing, in each case, that the proceeds of the letter to credit are to be applied *as* provided in the Promissory Note.

**4.7  Commercial Tort Claims**.  If the Company shall at any time hold or acquire a commercial tort claim, the Company shall immediately notify the Lender in a writing signed by the Company of the particulars thereof and grant to the Lender in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance satisfactory to the Lender.

**4.8.  Other Actions as to any and all Collateral**.  The Company further agrees, upon request of the Lender and at the Lender's option, to take any and all other actions as the Lender may determine to be necessary or useful for the attachment, perfection and first priority of, and the ability of the Lender to enforce, the Lender's security interest in any and all of the Collateral, including (a) executing, delivering and, where appropriate, filing financing statements and amendments relating thereto under the Uniform Commercial Code of any relevant jurisdiction, to the extent, if any, that the Company's signature thereon is required therefor, (b) causing the Lender's name to be noted as secured party on any certificate of title for a titled good if such notation is a condition to attachment, perfection or priority of, or ability of the Lender to enforce, the Lender's security interest in such Collateral, (c) complying with any provision of any statute, regulation or treaty of the United States as to any Collateral if compliance with such provision is a condition to attachment, perfection or priority of, or ability of the Lender to enforce, the Lender's security interest in such Collateral, (d) obtaining governmental and other third party waivers, consents and approvals in form and substance satisfactory to the Lender, including any consent of any licensor, lessor or other person obligated on Collateral and any party or parties whose consent is required for the security interest of the Lender to attach, (e)

obtaining waivers from mortgagees and landlords in form and substance satisfactory to the Lender and (f) taking all actions under any earlier versions of the Uniform Commercial Code or under any other law, as reasonably determined by the Lender to be applicable in any relevant Uniform Commercial Code or other jurisdiction, including any foreign jurisdiction.

5. **Relation to Other Security Documents.** The provisions of this Agreement supplement the provisions of any real estate mortgage or deed of trust granted by the Company to the Lender and which secures the payment or performance of any of the Obligations. Nothing contained in any such real estate mortgage or deed of trust shall derogate from any of the rights or remedies of the Lender hereunder.

6. **Representations and Warranties Concerning Company's Legal Status.** The Company has previously delivered to the Lender a certificate signed by the Company and entitled "Perfection Certificate" (the "Perfection Certificate"). The Company represents and warrants to the Lender as follows: (a) the Company's exact legal name is that indicated on the Perfection Certificate and on the signature page hereof, (b) the Company is an organization of the type, and is organized in the jurisdiction, set forth in the Perfection Certificate, (c) the Perfection Certificate accurately sets forth the Company's organizational identification number or accurately states that the Company has none, (d) the Perfection Certificate accurately sets forth the Company's place of business or, if more than one, its chief executive office,  as well as the Company's mailing address, if different, (e) all other information set forth on the Perfection Certificate pertaining to the Company is accurate and complete and (f) there has been no change in any of such information since the date on which the Perfection Certificate was signed by the Company.

7. **Covenants Concerning Company's Legal Status.** The Company covenants with the Lender as follows: (a) without providing at least 30 days prior written notice to the Lender, the Company will not change its name, its place of business or, if more than one, chief executive office, or its mailing address or organizational identification number if it has one, (b) if the Company does not have an organizational identification number and later obtains one, the Company will forthwith notify the Lender of such organizational identification number, and (c) the Company will not change its type of organization, jurisdiction of organization or other legal structure.

8. **Representations and Warranties Concerning Collateral, Etc.** The Company further represents and warrants to the Lender as follows: (a) the Company is the owner of *or* has other rights in or power to transfer the Collateral, free from any right or claim of any person or any adverse lien, security interest or other encumbrance, except for the security interest created by this Agreement (b) none of the Collateral constitutes, or is the proceeds of, "farm products" as defined in §9-102(a)(34) of the Uniform Commercial Code of the State, (c) none of the account debtors or other persons obligated on any of the Collateral is a governmental authority covered by the Federal Assignment of Claims Act or like federal, state or local statute or rule in respect of such Collateral, (d) the Company holds no commercial tort claim except as indicated on the Perfection Certificate, and (e) the Company has at all times operated its business in compliance with all applicable provisions of the federal Fair Labor Standards Act, as amended, and with all applicable provisions of federal, state and local statutes and ordinances dealing with the control, shipment, storage or disposal of hazardous materials or substances, (f) all other information set forth on the Perfection

Certificate pertaining to the Collateral is accurate and complete, and (g) there has been no change in any of such information since the date on which the Perfection Certificate was signed by the Company.

**9.  Covenants Concerning Collateral, Etc.**  The Company further covenants with the Lender as follows: (a) the Collateral, to the extent not delivered to the Lender pursuant to §4, will be kept at those locations listed on the Perfection Certificate and the Company will not remove the Collateral from such locations, without providing at least 30 days prior written notice to the Lender, (b) except for the security interest herein granted**,** the Company shall be the owner of the Collateral free from any right or claim of any other person or any lien, security interest or other encumbrance, and the Company shall defend the same against all claims and demands of all persons at any time claiming the same or any interests therein adverse to the Lender, (c) the Company shall not pledge, mortgage or create, or suffer to exist any right of any person in or claim by any person to the Collateral, or any security interest, lien or other encumbrance in the Collateral in favor of any person, or become bound (as provided in Section 9-203(d) of the Uniform Commercial Code of the State or any other relevant jurisdiction or otherwise) by a security agreement in favor of any person as secured party, other than the Lender, (d) the Company will keep the Collateral in good order and repair and will not use the same in violation of law or any policy of insurance thereon, (e) the Company will permit the Lender, or its designee, to inspect the Collateral at any reasonable time, wherever located, (f) the Company will pay promptly when due all taxes, assessments, governmental charges and levies upon the Collateral or incurred in connection with the use or operation of such Collateral or incurred in connection with this Agreement, (g) the Company will continue to operate its business in compliance with all applicable provisions of the federal Fair Labor Standards Act, as amended, and with all applicable provisions of federal, state and local statutes and ordinances dealing with the control, shipment, storage or disposal of hazardous materials or substances, and (h) the Company will not sell or otherwise dispose, or offer to sell or otherwise dispose, of the Collateral or any interest therein except for *(i)* sales of inventory in the ordinary course of business**.**

**10.  Collateral Protection Expenses; Preservation of Collateral.**

**10.1.  Expenses Incurred by Lender.**  In the Lender's discretion the Lender may discharge taxes and other encumbrances at any time levied or placed on any of the Collateral, make repairs thereto and pay any necessary filing fees or insurance premiums, in each case to the extent that the Company fails to do so.  The Company agrees to reimburse the Lender on demand for all expenditures so made.  The Lender shall have no obligation to the Company to make any such expenditures, nor shall the making thereof be construed as a waiver or cure any Default or Event of Default.

**10.2.  Lender's Obligations and Duties.**  Anything herein to the contrary notwithstanding, the Company shall remain obligated and liable under each contract or agreement comprised in the Collateral to be observed or performed by the Company thereunder.  The Lender shall not have any obligation or liability under any such contract or agreement by reason of or arising out of this Agreement or the receipt by the Lender of any payment relating to any of the Collateral, nor shall the Lender be obligated in any manner to perform any of the obligations of the Company under or pursuant to any such contract or agreement, to make inquiry as to the nature or sufficiency of any payment

received by the Lender in respect of the Collateral or as to the sufficiency of any performance by any party under any such contract or agreement, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to the Lender or to which the Lender may be entitled at any time or times.  The Lender's sole duty with respect to the custody, safe keeping and physical preservation of the Collateral in its possession, under §9-207 of the Uniform Commercial Code of the State or otherwise, shall be to deal with such Collateral in the same manner as the Lender deals with similar property for its own account.

**11.  Securities and Deposits.**  The Lender may at any, at its option, transfer to itself or any nominee any securities constituting Collateral, receive any income thereon and hold such income as additional Collateral or apply it to the Obligations.  Whether or not any Obligations are due, the Lender may  demand, sue for, collect, or make any settlement or compromise which it deems desirable with respect to the Collateral.  Regardless of the adequacy of Collateral or any other security for the Obligations, any deposits or other sums at any time credited by or due from the Lender to the Company may at any time be applied to or set off against any of the Obligations.

**12.  Notification to Account Debtors and Other Persons Obligated on Collateral.**  If an Event of Default shall have occurred and be continuing, the Company shall, at the request and option of the Lender, notify account debtors and other persons obligated on any of the Collateral of the security interest of the Lender in any account, chattel paper, general intangible, instrument or other Collateral and that payment thereof is to be made directly to the Lender or to any financial institution designated by the Lender as the Lender's agent therefor, and the Lender may itself, if a Default or an Event of Default shall have occurred and be continuing, without notice to or demand upon the Company, so notify account debtors and other persons obligated on Collateral.  After the making of such a request or the giving of any such notification, the Company shall hold any proceeds of collection of accounts, chattel paper, general intangibles, instruments and other Collateral received by the Company as trustee for the Lender without commingling the same with other funds of the Company and shall turn the same over to the Lender in the identical form received, together with any necessary endorsements or assignments.  The Lender shall apply the proceeds of collection of accounts, chattel paper, general intangibles, instruments and other Collateral received by the Lender to the Obligations, such proceeds to be immediately credited after final payment in cash or other immediately available funds of the items giving rise to them.

**13.  Power of Attorney.**

**13.1.  Appointment and Powers of Lender.**  The Company hereby irrevocably constitutes and appoints the Lender and any officer or agent thereof, with full power of substitution, as its true and lawful attorneys-in-fact with full irrevocable power and authority in the place and stead of the Company or in the Lender's own name, for the purpose of carrying out the terms of this Agreement, to take any and all appropriate action and to execute any and all documents and instruments that may be necessary or useful to accomplish the purposes of this Agreement and, without limiting the generality of the foregoing, hereby gives said attorneys the power and right, on behalf of the Company, without notice to or assent by the Company, to do the following:

746717.1

EXHIBIT 3
Page 58

(a)    upon the occurrence and during the continuance of an Event of Default, generally to sell, transfer, pledge, make any agreement with respect to or otherwise dispose of or deal with any of the Collateral in such manner as is consistent with the Uniform Commercial Code of the State or any other relevant jurisdiction and as fully and completely as though the Lender were the absolute owner thereof for all purposes, and to do, at the Company's expense, at any time, or from time to time, all acts and things which the Lender deems necessary or useful to protect, preserve or realize upon the Collateral and the Lender's security interest therein, in order to effect the intent of this Agreement, all no less fully and effectively as the Company might do, including, without limitation, (i) the filing and prosecuting of registration and transfer applications with the appropriate federal, state or local agencies or authorities with respect to trademarks, copyrights and patentable inventions and processes, (ii) upon written notice to the Company, the exercise of voting rights with respect to voting securities, which rights may be exercised, if the Lender so elects, with a view to causing the liquidation of assets of the issuer of any such securities and (iii) the execution, delivery and recording, in connection with any sale or other disposition of any Collateral, of the endorsements, assignments or other instruments of conveyance or transfer with respect to such Collateral; and

(b)    to the extent that the Company's authorization given in §3 is not sufficient, to file such financing statements with respect hereto, with or without the Company's signature, or a photocopy of this Agreement in substitution for a financing statement, as the Lender may deem appropriate and to execute in the Company's name such financing statements and amendments thereto and continuation statements which may require the Company's signature.

**13.2.    Ratification by Company.**  To the extent permitted by law, the Company hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof. This power of attorney is a power coupled with an interest and is irrevocable.

**13.3.    No Duty on Lender.**  The powers conferred on the Lender hereunder are solely to protect its interests in the Collateral and shall not impose any duty upon it to exercise any such powers. The Lender shall be accountable only for the amounts that it actually receives as a result of the exercise of such powers, and neither it nor any of its officers, directors, employees or agents shall be responsible to the Company for any act or failure to act, except for the Lender's own gross negligence or willful misconduct.

**14.    Rights and Remedies.**  If an Event of Default shall have occurred and be continuing, the Lender, without any other notice to or demand upon the Company, shall have in any jurisdiction in which enforcement hereof is sought, in addition to all other rights and remedies, the rights and remedies of a secured party under the Uniform Commercial Code of the State or any other relevant jurisdiction and any additional rights and remedies as may be provided to a secured party in any jurisdiction in which Collateral is located, including, without limitation, the right to take possession of the Collateral, and for that purpose the Lender may, so far as the Company can give authority therefor, enter upon any premises on which the Collateral may be situated and remove the same therefrom.  The Lender may in its discretion require the Company to assemble all or any

part of the Collateral at such location or locations within the jurisdiction(s) of the Company's principal office(s) or at such other locations as the Lender may reasonably designate.  Unless the Collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, the Lender shall give to the Company at least five Business Days prior written notice of the time and place of any public sale of Collateral or of the time after which any private sale or any other intended disposition is to be made.  The Company hereby acknowledges that five Business Days prior written notice of such sale or sales shall be reasonable notice.  In addition, the Company waives any and all rights that it may have to a judicial hearing in advance of the enforcement of any of the Lender's rights and remedies hereunder, including, without limitation, its right following an Event of Default to take immediate possession of the Collateral and to exercise its rights and remedies with respect thereto.

    **15.  <u>Standards for Exercising Rights and Remedies.</u>**  To the extent that applicable law imposes duties on the Lender to exercise remedies in a commercially reasonable manner, the Company acknowledges and agrees that it is not commercially unreasonable for the Lender (a) to fail to incur expenses reasonably deemed significant by the Lender to prepare Collateral for disposition or otherwise to fail to complete raw material or work in process into finished goods or other finished products for disposition, (b) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (c) to fail to exercise collection remedies against account debtors or other persons obligated on Collateral or to fail to remove liens or encumbrances on or any adverse claims against Collateral, (d) to exercise collection remedies against account debtors and other persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (e) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (f) to contact other persons, whether or not in the same business as the Company, for expressions of interest in acquiring all or any portion of the Collateral, (g) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the collateral is of a specialized nature, (h) to dispose of Collateral by utilizing Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets, (i) to dispose of assets in wholesale rather than retail markets, (j) to disclaim disposition warranties, (k) to purchase insurance or credit enhancements to insure the Lender against risks of loss, collection or disposition of Collateral or to provide to the Lender a guaranteed return from the collection or disposition of Collateral, or (l) to the extent deemed appropriate by the Lender, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Lender in the collection or disposition of any of the Collateral.  The Company acknowledges that the purpose of this §15 is to provide non-exhaustive indications of what actions or omissions by the Lender would fulfill the Lender's duties under the Uniform Commercial Code of the State or any other relevant jurisdiction in the Lender's exercise of remedies against the Collateral and that other actions or omissions by the Lender shall not be deemed to fail to fulfill such duties solely on account of not being indicated in this §15.  Without limitation upon the foregoing, nothing contained in this §15 shall be construed to grant any rights to the Company or to impose any duties on the Lender that would not have been granted or imposed by this Agreement or by applicable law in the absence of this §15.

16. **No Waiver by Lender, etc.**  The Lender shall not be deemed to have waived any of its rights and remedies in respect of the Obligations or the Collateral unless such waiver shall be in writing and signed by the Lender.  No delay or omission on the part of the Lender in exercising any right or remedy shall operate as a waiver of such right or remedy or any other right or remedy. A waiver on any one occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion.  All rights and remedies of the Lender with respect to the Obligations or the Collateral, whether evidenced hereby or by any other instrument or papers, shall be cumulative and may be exercised singularly, alternatively, successively or concurrently at such time or at such times as the Lender deems expedient.

17. **Suretyship Waivers by Company.**  The Company waives demand, notice, protest, notice of acceptance of this Agreement, notice of loans made, credit extended, Collateral received or delivered or other action taken in reliance hereon and all other demands and notices of any description.  With respect to both the Obligations and the Collateral, the Company assents to any extension or postponement of the time of payment or any other indulgence, to any substitution, exchange or release of or failure to perfect any security interest in any Collateral, to the addition or release of any party or person primarily or secondarily liable, to the acceptance of partial payment thereon and the settlement, compromising or adjusting of any thereof, all in such manner and at such time or times as the Lender may deem advisable.  The Lender shall have no duty as to the collection or protection of the Collateral or any income therefrom, the preservation of rights against prior parties, or the preservation of any rights pertaining thereto beyond the safe custody thereof as set forth in §10.2.  The  Company further waives any and all other suretyship defenses.

18. **Marshaling.**  The Lender shall not be required to marshal any present or future collateral security (including but not limited to the Collateral) for, or other assurances of payment of, the Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order, and all of its rights and remedies hereunder and in respect of such collateral security and other assurances of payment shall be cumulative and in addition to all other rights and remedies, however existing or arising.  To the extent that it lawfully may, the Company hereby agrees that it will not invoke any law relating to the marshaling of collateral which might cause delay in or impede the enforcement of the Lender's rights and remedies under this Agreement or under any other instrument creating or evidencing any of the Obligations or under which any of the Obligations is outstanding or by which any of the Obligations is secured or payment thereof is otherwise assured, and, to the extent that it lawfully may, the Company hereby irrevocably waives the benefits of all such laws.

19. **Proceeds of Dispositions; Expenses.**  The Company shall pay to the Lender on demand any and all expenses, including reasonable attorneys' fees and disbursements, incurred or paid by the Lender in protecting, preserving or enforcing the Lender's rights and remedies under or in respect of any of the Obligations or any of the Collateral.  After deducting all of said expenses, the residue of any proceeds of collection or sale or other disposition of Collateral shall, to the extent actually received in cash, be applied to the payment of the Obligations in such order or preference as the Lender may determine, proper allowance and provision being made for any Obligations not then due.  Upon the final payment and satisfaction in full of all of the Obligations and after making any payments required by Sections 9-608(a)(1)(C) or 9-615(a)(3) of the Uniform Commercial Code of the State, any excess shall be returned to the Company.  In the absence of

final payment and satisfaction in full of all of the Obligations, the Company shall remain liable for any deficiency.

**20. <u>Overdue Amounts</u>.** Until paid, all amounts due and payable by the Company hereunder shall be a debt secured by the Collateral and shall bear, whether before or after judgment, interest at the rate of interest for overdue principal set forth in the Promissory Note.

**21. <u>Governing Law; Consent to Jurisdiction</u>.** THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE. The Company agrees that any action or claim arising out of any dispute in connection with this Agreement, any rights or obligations hereunder or the performance or enforcement of such rights or obligations may be brought in the courts of the State or any federal court sitting therein and consents to the non-exclusive jurisdiction of such court and to service of process in any such suit being made upon the Company by mail at the address, specified of the Promissory Note. The Company hereby waives any objection that it may now or hereafter have to the venue of any such suit or any such court or that such suit is brought in an inconvenient court.

**22. <u>Miscellaneous</u>.** The headings of each section of this Agreement are for convenience only and shall not define or limit the provisions thereof. This Agreement and all rights and obligations hereunder shall be binding upon the Company and its successors and assigns, and shall inure to the benefit of the Lender and its successors and assigns. If any term of this Agreement shall be held to be invalid, illegal or unenforceable, the validity of all other terms hereof shall in no way be affected thereby, and this Agreement shall be construed and be enforceable as if such invalid, illegal or unenforceable term had not been included herein. The Company acknowledges receipt of a copy of this Agreement.


IN WITNESS WHEREOF, intending to be legally bound, the Borrower and Company has caused this Agreement to be duly executed as of the date first above written.


By:_____
Name:
Title:


By: _____
Name:
Title:

746717.1

EXHIBIT 3
Page 62

EXHIBIT "B"

GUARANTEE

EXHIBIT 3
Page 63

# GUARANTY

This Guaranty of Promissory Note (this "**Guaranty**"), dated as of _____, 20___, is made by The Litigation Practice Group, a California Professional Corporation, with its principal place of business located at 17542 17th Street, Suite 100, Tustin, CA 92780 ("**Guarantor**"), in favor and for the benefit of Brian Reale, an individual ("**Beneficiary**").

Reference herein is made to the (i) Stock Purchase Agreement and (ii) Promissory Note securing payment under such Stock Purchase Agreement attached hereto as **Exhibit "A"** and incorporated by reference (collectively, the "**Underlying Agreement**"), by and between Tony Diab, an individual ("**Obligor**"), and Beneficiary. In consideration of and to induce the Beneficiary to enter into the Underlying Agreement, Guarantor hereby agrees as follows:

Guaranty. Guarantor absolutely, unconditionally and irrevocably guarantees, as primary obligor and not merely as surety, the full and punctual payment and performance of all present and future obligations, liabilities, covenants and agreements required to be observed and performed or paid or reimbursed by Obligor under or relating to the Underlying Agreement, plus all costs, expenses and fees (including the reasonable fees and expenses of Beneficiary's counsel) in any way relating to the enforcement or protection of Beneficiary's rights hereunder (collectively, the "**Obligations**").

Guaranty Absolute and Unconditional. Guarantor agrees that its Obligations under this Guaranty are irrevocable, continuing, absolute and unconditional and shall not be discharged or impaired or otherwise affected by, and Guarantor hereby irrevocably waives any defenses to enforcement it may have (now or in the future) by reason of:

Any illegality, invalidity or unenforceability of any Obligation or the Underlying Agreement or any related agreement or instrument, or any law, regulation, decree or order of any jurisdiction or any other event affecting any term of the Obligations.

Any change in the time, place or manner of payment or performance of, or in any other term of the Obligations, or any rescission, waiver, release, assignment, amendment or other modification of the Underlying Agreement.

Any taking, exchange, substitution, release, impairment, amendment, waiver, modification or non-perfection of any collateral or any other guaranty for the Obligations, or any manner of sale, disposition or application of proceeds of any collateral or other assets to all or part of the Obligations.

Any default, failure or delay, willful or otherwise, in the performance of the Obligations.

Any change, restructuring or termination of the corporate structure, ownership or existence of Guarantor or Obligor or any insolvency, bankruptcy, reorganization or other

similar proceeding affecting Obligor or its assets or any resulting restructuring, release or discharge of any Obligations.

Any failure of Beneficiary to disclose to Guarantor any information relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of Obligor now or hereafter known to Beneficiary, Guarantor waiving any duty of Beneficiary to disclose such information.

The failure of any other guarantor or third party to execute or deliver this Guaranty or any other guaranty or agreement, or the release or reduction of liability of Guarantor or any other guarantor or surety with respect to the Obligations.

The failure of Beneficiary to assert any claim or demand or to exercise or enforce any right or remedy under the provisions of any Underlying Agreement or otherwise.

The existence of any claim, set-off, counterclaim, recoupment or other rights that Guarantor or Obligor may have against Beneficiary (other than a defense of payment or performance).

Any other circumstance (including, without limitation, any statute of limitations), act, omission or manner of administering the Underlying Agreement or any existence of or reliance on any representation by Beneficiary that might vary the risk of Guarantor or otherwise operate as a defense available to, or a legal or equitable discharge of, Guarantor.

Release.

Guarantor, on behalf of itself and its respective present and former parents, subsidiaries, affiliates, officers, directors, shareholders, managers, members, successors, and assigns (collectively, "**Releasors**") hereby releases, waives, and forever discharges Beneficiary and his respective present and former affiliates, employees, agents, representatives, permitted successors, and permitted assigns (collectively, "**Releasees**") of and from any and all actions, causes of action, suits, losses, liabilities, rights, debts, dues, sums of money, accounts, reckonings, obligations, costs, expenses, liens, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, and demands, of every kind and nature whatsoever, whether now known or unknown, foreseen or unforeseen, matured or unmatured, suspected or unsuspected, in law, admiralty, or equity (collectively, "**Claims**"), which any of such Releasors ever had, now have, or hereafter can, shall, or may have against any of such Releasees for, upon, or by reason of any matter, cause, or thing whatsoever from the beginning of time through the date of this Guaranty arising out of or relating to the Guaranty, the Stock Purchase Agreement, and/or the Promissory Note.

Each Releasor understands that it may later discover Claims or facts that may be different from, or in addition to, those that it or any other Releasor now knows or believes to exist regarding the subject matter of the release contained in this Section, and which, if known at the time of signing this Guaranty, may have materially affected this Release Guaranty and such party's decision to enter into it and grant the release contained in this Section. Nevertheless, the Releasors intend to fully, finally, and forever settle and release all Claims that now exist, may exist, or previously existed, as set out in the release contained in this Section, whether known or unknown, foreseen or unforeseen, or suspected or unsuspected, and the release given herein is and will remain in effect as a complete release, notwithstanding the discovery or existence of such additional or different facts. The Releasors hereby waive any right or Claim that might arise as a result of such different or additional Claims or facts. The Releasors have been made aware of, and understand, the provisions of California Civil Code Section 1542 ("Section 1542"), which provides: **"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."** The Releasors expressly, knowingly, and intentionally waive any and all rights, benefits, and protections of Section 1542 and of any other state or federal statute or common law principle limiting the scope of a general release.

Certain Waivers; Acknowledgments. Guarantor further acknowledges and agrees as follows:

Guarantor hereby unconditionally and irrevocably waives any right to revoke this Guaranty and acknowledges that this Guaranty is continuing in nature and applies to all presently existing and future Obligations, until the complete, irrevocable and indefeasible payment and satisfaction in full of the Obligations.

This Guaranty is a guaranty of payment and performance and not of collection. Beneficiary shall not be obligated to enforce or exhaust its remedies against Obligor or under the Underlying Agreement before proceeding to enforce this Guaranty.

This Guaranty is a direct guaranty and independent of the obligations of Obligor under the Underlying Agreement. Beneficiary may resort to Guarantor for payment and performance of the Obligations whether or not Beneficiary shall have resorted to any collateral therefor or shall have proceeded against Obligor or any other guarantors with respect to the Obligations. Beneficiary may, at Beneficiary's option, proceed against Guarantor and Obligor, jointly and severally, or against Guarantor only without having obtained a judgment against Obligor.

Guarantor hereby unconditionally and irrevocably waives promptness, diligence, notice of acceptance, presentment, demand for performance, notice of non-performance, default, acceleration, protest or dishonor and any other notice with respect to any of the

746717.1

EXHIBIT 3
Page 66

Obligations and this Guaranty and any requirement that Beneficiary protect, secure, perfect or insure any lien or any property subject thereto.

Notwithstanding anything contained herein to the contrary, the Obligations of Guarantor shall be limited to the maximum amount so as to not constitute a fraudulent transfer or conveyance for purposes of the United States Bankruptcy Code or any applicable state law or otherwise to the extent applicable to this Guaranty and the Obligations of Guarantor hereunder.

Guarantor agrees that its guaranty hereunder shall continue to be effective or be reinstated, as the case may be, if at any time all or part of any payment of any Obligation is voided, rescinded or recovered or must otherwise be returned by Beneficiary upon the insolvency, bankruptcy or reorganization of Obligor.

Subrogation. Guarantor waives and shall not exercise any rights that it may acquire by way of subrogation, contribution, reimbursement or indemnification for payments made under this Guaranty until all Obligations shall have been indefeasibly paid and discharged in full.

Representations and Warranties. To induce Beneficiary to enter into the Underlying Agreement, Guarantor represents and warrants that: (a) Guarantor is a duly organized and validly existing Professional Corporation in good standing under the laws of California; (b) this Guaranty constitutes Guarantor's valid and legally binding agreement in accordance with its terms; (c) the execution, delivery and performance of this Guaranty have been duly authorized by all necessary action and will not violate any order, judgment or decree to which Guarantor or any of its assets may be subject; (d) Guarantor is currently solvent and will not be rendered insolvent by providing this Guaranty; and (e) the signatory of this Guaranty is duly authorized with the corporate power and authority to bind Guarantor to the terms of this Guaranty.

Notices. All notices, requests, consents, demands and other communications hereunder (each, a "**Notice**") shall be in writing and delivered to the parties at the addresses set forth herein or to such other address as may be designated by the receiving party in a Notice given in accordance with this section. All Notices shall be delivered by personal delivery, nationally recognized overnight courier, facsimile or email or certified or registered mail (return receipt requested, postage prepaid). Except as otherwise provided in this Guaranty, a Notice is effective only (a) with written confirmation of delivery or transmission; (b) upon receipt of the receiving party; and (c) if the party giving the Notice has complied with the requirements of this section.

Assignment. This Guaranty shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided, however, that Guarantor may not, without the prior written consent of Beneficiary, assign any of its rights, powers or obligations hereunder. Any attempted assignment in violation of this section shall be null and void.

746717.1

EXHIBIT 3
Page 67

Governing Law; Service of Process. THIS GUARANTY SHALL BE GOVERNED BY AND CONSTRUED UNDER THE LAWS OF THE STATE OF CALIFORNIA, WITHOUT REFERENCE TO ANY CHOICE OF LAW DOCTRINE. EACH PARTY IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 7 HEREOF AND AGREES THAT NOTHING HEREIN SHALL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY MANNER PERMITTED BY APPLICABLE LAW.

Dispute Resolution.  The parties agree that any and all disputes, claims or controversies arising out of or relating to this Guaranty shall be submitted for mediation, and if the matter is not resolved through mediation, then it shall be submitted, and binding arbitration as set forth below.

Either party may commence mediation by providing to the other party a written request for mediation, setting forth the subject of the dispute and the relief requested. The parties will cooperate with one another in selecting a mediator and in scheduling the mediation proceedings. Should the parties be unable to select a mediator, each party will select a mediator and the two mediators, in turn, will select a mediator for the parties. The parties agree that they will participate in the mediation in good faith and that they will share equally in its costs. All offers, promises, conduct and statements, whether oral or written, made in the course of the mediation by any of the parties, their agents, employees, experts and attorneys, and by the mediator are confidential, privileged and inadmissible for any purpose, including impeachment, in any arbitration or other proceeding involving the parties, provided that evidence that is otherwise admissible or discoverable shall not be rendered inadmissible or non-discoverable as a result of its use in the mediation.

Either party may initiate arbitration with respect to the matters submitted to mediation by filing a written demand for arbitration at any time following the initial mediation session or at any time following 45 days from the date of filing the written request for mediation, whichever occurs first ("**Earliest Initiation Date**"). Should the parties be unable to find a mutually agreeable arbitrator, the mediator shall select one for them. All arbitration proceedings shall be in accordance with the rules of the American Arbitration Association. Any arbitration hereunder shall take place in Los Angeles, California.  The mediation may continue after the commencement of arbitration if the parties so desire.

At no time prior to the Earliest Initiation Date shall either side initiate any arbitration related to this Guaranty except to pursue a provisional remedy that is authorized by law or by agreement of the parties. Notwithstanding anything to the contrary set forth herein, it is agreed and understood that monetary damages would not adequately compensate an injured party hereto for the breach of this Guaranty by any other party hereto, that this Guaranty shall be specifically enforceable, and that any breach or threatened breach of this Guaranty shall be the proper subject of a temporary or permanent injunction or restraining order.  Further, each party hereto waives any claim or defense that there is an adequate remedy at law for such breach or threatened breach.  Any such request for specific enforcement may be brought in any court of competent

746717.1

EXHIBIT 3
Page 68

jurisdiction in Los Angeles, California.  The dispute resolution provisions of this Guaranty shall be the exclusive manner of dispute resolutions between the parties.

Waiver of Jury Trial. EACH PARTY HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHTS TO TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS GUARANTY OR ANY OF THE OBLIGATIONS HEREUNDER.

Cumulative Rights. Each right, remedy and power hereby granted to Beneficiary or allowed it by applicable law or other agreement shall be cumulative and not exclusive of any other, and may be exercised by Beneficiary at any time or from time to time.

Severability. If any provision of this Guaranty is to any extent determined by final decision of a court of competent jurisdiction to be unenforceable, the remainder of this Guaranty shall not be affected thereby, and each provision of this Guaranty shall be valid and enforceable to the fullest extent permitted by law.

Entire Agreement; Amendments; Headings; Effectiveness. This Guaranty constitutes the sole and entire agreement of Guarantor and Beneficiary with respect to the subject matter hereof and supersedes all previous agreements or understandings, oral or written, with respect to such subject matter. No amendment or waiver of any provision of this Guaranty shall be valid and binding unless it is in writing and signed, in the case of an amendment, by both parties, or in the case of a waiver, by the party against which the waiver is to be effective. Section headings are for convenience of reference only and shall not define, modify, expand or limit any of the terms of this Guaranty. Delivery of this Guaranty by facsimile or in electronic (i.e., pdf or tif) format shall be effective as delivery of a manually executed original of this Guaranty.

**[SIGNATURE PAGE FOLLOWS]**

746717.1

EXHIBIT 3
Page 69

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the day and year first above written.

GUARANTOR:

**The Litigation Practice Group PC**

By: _____

Name: _____

Title: _____

746717.1

EXHIBIT 3
Page 70

## **EXHIBIT A**

**(Executed Copies of Stock Purchase Agreement and Promissory Note)**

EXHIBIT 3
Page 71

# Exhibit 4

EXHIBIT 4
Page 72

| Bank Name | Account Name | Account Number | Transaction Date | Payee | Payment |
|---|---|---|---|---|---|
| UnionBank | The Litigation Practice Group PC | X4858 | 7/28/2021 | **Reale Family Irrevocable Trust** | $4,363.93 |
| UnionBank | The Litigation Practice Group PC | X4858 | 8/4/2021 | **Reale Family Irrevocable Trust** | $2,309.38 |
| UnionBank | The Litigation Practice Group PC | X4858 | 8/11/2021 | **Reale Family Irrevocable Trust** | $2,249.07 |
| UnionBank | The Litigation Practice Group PC | X4858 | 8/20/2021 | **Reale Family Irrevocable Trust** | $2,369.10 |
| UnionBank | The Litigation Practice Group PC | X4858 | 8/25/2021 | **Reale Family Irrevocable Trust** | $3,135.64 |
| UnionBank | The Litigation Practice Group PC | X4858 | 9/1/2021 | **Reale Family Irrevocable Trust** | $2,331.14 |
| UnionBank | The Litigation Practice Group PC | X4858 | 9/9/2021 | **Reale Family Irrevocable Trust** | $2,131.23 |
| UnionBank | The Litigation Practice Group PC | X4858 | 9/16/2021 | **Reale Family Irrevocable Trust** | $3,678.40 |
| UnionBank | The Litigation Practice Group PC | X4858 | 9/22/2021 | **Reale Family Irrevocable Trust** | $1,156.86 |
| UnionBank | The Litigation Practice Group PC | X4858 | 10/1/2021 | **Reale Family Irrevocable Trust** | $3,695.48 |
| UnionBank | The Litigation Practice Group PC | X4858 | 10/8/2021 | **Reale Family Irrevocable Trust** | $1,987.38 |
| Optimum Bank | Coast Processing LLC dba LPG | X6738 | 10/26/2021 | **Reale Family Irrevocable Trust** | $4,789.58 |
| Optimum Bank | Coast Processing LLC dba LPG | X6738 | 11/5/2021 | **Reale Family Irrevocable Trust** | $2,690.54 |
| Optimum Bank | Coast Processing LLC dba LPG | X6738 | 11/12/2021 | **Reale Family Irrevocable Trust** | $2,628.38 |
| Optimum Bank | Coast Processing LLC dba LPG | X6738 | 11/18/2021 | **Reale Family Irrevocable Trust** | $1,576.47 |
| Optimum Bank | Coast Processing LLC dba LPG | X6738 | 11/26/2021 | **Reale Family Irrevocable Trust** | $2,429.25 |
| Optimum Bank | Coast Processing LLC dba LPG | X6738 | 12/2/2021 | **Reale Family Irrevocable Trust** | $1,866.35 |
| UnionBank | The Litigation Practice Group PC | X4858 | 12/10/2021 | **Reale Family Irrevocable Trust** | $1,605.77 |
| UnionBank | The Litigation Practice Group PC | X4858 | 12/17/2021 | **Reale Family Irrevocable Trust** | $2,961.82 |
| UnionBank | The Litigation Practice Group PC | X4858 | 12/23/2021 | **Reale Family Irrevocable Trust** | $895.01 |
| Chase | The Litigation Practice Group PC | x3158 | 8/12/2022 | **Reale Family Irrevocable Trust** | $10,000.00 |
| Chase | The Litigation Practice Group PC | x3158 | 10/7/2022 | **Reale Family Irrevocable Trust** | $10,000.00 |
| Chase | The Litigation Practice Group PC | x3158 | 11/16/2022 | **Reale Family Irrevocable Trust** | $20,000.00 |
| | | | | **Total** | **$90,850.78** |

| Bank Name | Account Name | Account Number | Transaction Date | Payee | Payment |
|---|---|---|---|---|---|
| UnionBank | The Litigation Practice Group PC | X4858 | 7/28/2021 | **Reale Marketing Inc.** | $2,808.52 |
| UnionBank | The Litigation Practice Group PC | X4858 | 8/4/2021 | **Reale Marketing Inc.** | $1,237.39 |
| UnionBank | The Litigation Practice Group PC | X4858 | 8/11/2021 | **Reale Marketing Inc.** | $1,645.32 |
| UnionBank | The Litigation Practice Group PC | X4858 | 8/20/2021 | **Reale Marketing Inc.** | $1,695.44 |
| UnionBank | The Litigation Practice Group PC | X4858 | 8/25/2021 | **Reale Marketing Inc.** | $2,552.53 |
| UnionBank | The Litigation Practice Group PC | X4858 | 9/1/2021 | **Reale Marketing Inc.** | $888.99 |
| UnionBank | The Litigation Practice Group PC | X4858 | 9/9/2021 | **Reale Marketing Inc.** | $1,812.36 |
| UnionBank | The Litigation Practice Group PC | X4858 | 9/16/2021 | **Reale Marketing Inc.** | $1,698.98 |
| UnionBank | The Litigation Practice Group PC | X4858 | 9/22/2021 | **Reale Marketing Inc.** | $1,083.38 |
| Optimum Bank | Coast Processing LLC dba LPG | X6738 | 9/30/2021 | **Reale Marketing Inc.** | $2,748.21 |
| UnionBank | The Litigation Practice Group PC | X4858 | 10/8/2021 | **Reale Marketing Inc.** | $988.06 |
| Optimum Bank | Coast Processing LLC dba LPG | X6738 | 10/26/2021 | **Reale Marketing Inc.** | $2,728.39 |
| Optimum Bank | Coast Processing LLC dba LPG | X6738 | 11/5/2021 | **Reale Marketing Inc.** | $652.81 |
| Optimum Bank | Coast Processing LLC dba LPG | X6738 | 11/12/2021 | **Reale Marketing Inc.** | $1,067.17 |
| Optimum Bank | Coast Processing LLC dba LPG | X6738 | 11/18/2021 | **Reale Marketing Inc.** | $1,457.24 |
| Optimum Bank | Coast Processing LLC dba LPG | X6738 | 11/26/2021 | **Reale Marketing Inc.** | $2,327.00 |
| Optimum Bank | Coast Processing LLC dba LPG | X6738 | 12/2/2021 | **Reale Marketing Inc.** | $1,093.67 |
| UnionBank | The Litigation Practice Group PC | X4858 | 12/9/2021 | **Reale Marketing Inc.** | $588.77 |
| UnionBank | The Litigation Practice Group PC | X4858 | 12/17/2021 | **Reale Marketing Inc.** | $1,359.61 |
| UnionBank | The Litigation Practice Group PC | X4858 | 12/23/2021 | **Reale Marketing Inc.** | $815.51 |
| | | | | **Total** | **$31,249.35** |

| Bank Name | Account Name | Account Number | Transaction Date | Payee | Payment |
|---|---|---|---|---|---|
| UnionBank | The Litigation Practice Group PC | X4858 | 2/26/2021 | **Kelly Hess** | $8,000.00 |
| UnionBank | The Litigation Practice Group PC | X4858 | 3/23/2021 | **Kelly Hess** | $1,071.74 |
| UnionBank | The Litigation Practice Group PC | X4858 | 7/16/2021 | **Kelly Hess** | $6,548.93 |
| UnionBank | The Litigation Practice Group PC | X4858 | 7/30/2021 | **Kelly Hess** | $8,000.00 |
| Chase | The Litigation Practice Group PC | x3158 | 9/13/2021 | **Kelly Hess** | $8,000.00 |
| Chase | The Litigation Practice Group PC | x3158 | 11/29/2022 | **Kelly Hess** | $908.00 |
| | | | | **Total** | **$32,528.67** |

EXHIBIT 4
Page 73



# ADVERSARY PROCEEDING COVER SHEET

B1040 (FORM 1040) (12/24)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

**PLAINTIFFS**
Richard A. Marshack, Trustee of the LPG Liquidation Trust

**ATTORNEYS** (Firm Name, Address, and Telephone No.)
Christopher Celentino (131688)
Christopher B. Ghio (259094)
Yosina M. Lissebeck (201654)
Dinsmore & Shohl LLP
655 West Broadway, Ste 800, San Diego, CA 92101
Tele: (619) 400-0500

Tyler Powell (KY Bar No. 90520)
Dinsmore & Shohl LLP
100 West Main Street, Suite 900
Lexington, KY 40507
Tele: (502) 585-2207
(Admitted pro hac vice)

**DEFENDANTS**
Elizabeth Reale, a California resident; Reale Family Irrevocable Trust; Jim Reale, a California resident, EMR Greenhouse, Inc., a California corporation, FreshFico, Inc. fka Freedom Enrollment Advisors, Inc., a California corporation, Reale Marketing, Inc., a California corporation, The Elizabeth Marie Reale Living Trust U/A dated March 28, 2024; and Kelly Hess, a California resident

**ATTORNEYS** (If Known)

**PARTY** (Check One Box Only)
☐ Debtor  ☐ U.S. Trustee/Bankruptcy Admin
☐ Creditor  ☐ Other
☒ Trustee

**PARTY** (Check One Box Only)
☐ Debtor  ☐ U.S. Trustee/Bankruptcy Admin
☐ Creditor  ☐ Other
☐ Trustee

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
(1) Avoidance, Recovery, and Preservation of Fraudulent Transfer(s) Pursuant to 11 U.S.C. §§ 548(a)(1), 550, and 551 (2) Avoidance, Recovery, and Preservation of Fraudulent Transfer(s) Pursuant to 11 U.S.C. §§ 548(a)(2), 550, and 551 and (3) Avoidance, Preservation, and Recovery of Actual Fraudulent Transfer(s) 11 U.S.C. §§ 544, 550, 551; Cal. Civ. Code §§ 3439.04(a)(1) and 3439.07 and (4) Avoidance, Preservation, and Recovery of Constructive Fraudulent Transfer(s) Pursuant to 11 U.S.C. §§ 544, 550, 551; Cal. Civ. Code §§ 3439.04(a)(2), 3439.05, and 3439.07

**NATURE OF SUIT**

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(a) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☒ 13-Recovery of money/property - §548 fraudulent transfer
☒ 14-Recovery of money/property - other
**FRBP 7001(b) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property
**FRBP 7001(c) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)
**FRBP 7001(d) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)
**FRBP 7001(e) – Revocation of Confirmation**
☐ 51-Revocation of confirmation
**FRBP 7001(f) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(f) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other
**FRBP 7001(g) – Injunctive Relief**
☐ 71-Injunctive relief- imposition of stay
☐ 72-Injunctive relief - other
**FRBP 7001(h) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest
**FRBP 7001(i) Declaratory Judgment**
☐ 91-Declaratory judgment
**FRBP 7001(j) Determination of Removed Action**
☐ 01-Determination of remove d claim or cause
**Other**
☐ SS-SIPA Case - 15 U.S.C. §§78aaa *et.seq.*
☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☒ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ 2,000,000 |
| Other Relief Sought | |

ATTACHMENT
Page 75

B1040 (FORM 1040) (12/24)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>The Litigation Practice Group P.C. | BANKRUPTCY CASE NO.<br>8:23-bk-10571-SC | |
| DISTRICT IN WHICH CASE IS PENDING<br>Central District of California | DIVISION OFFICE<br>Santa Ana | NAME OF JUDGE<br>Scott C. Clarkson |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br>/s/ Tyler Powell | | |
| DATE<br>March 19, 2025 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Christopher Celentino<br>Christopher B. Ghio<br>Yosina M. Lissebeck<br>Tyler Powell | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.