Christopher Celentino (State Bar No. 131688)
Yosina M. Lissebeck (State Bar No. 201654)
Christopher B. Ghio (State Bar No. 259094)
**DINSMORE & SHOHL LLP**
655 West Broadway, Suite 800
San Diego, CA 92101
Telephone:  619.400.0500
Facsimile:  619.400.0501
christopher.celentino@dinsmore.com
yosina.lissebeck@dinsmore.com
christopher.ghio@dinsmore.com

Tyler Powell (Ky. Bar No. 90520 – Admitted pro hac vice)
**DINSMORE & SHOHL, LLP**
100 West Main Street, Suite 900
Lexington, KY  40507
Telephone:  859-425-1056
Facsimile:  859-425-1099
tyler.powell@dinsmore.com

Special Counsel to Richard A. Marshack,
Trustee of the LPG Liquidation Trust

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION**

| | |
|---|---|
| In re:<br><br>The Litigation Practice Group P.C.,<br><br>                    Debtor. | Chapter 11<br><br>Case No.: 8:23-bk-10571-SC<br>Adv. No. 8:25-ap-_____-SC<br><br>**COMPLAINT FOR:** |
| Richard A. Marshack, Trustee of the LPG Liquidation Trust,<br><br>                    Plaintiff,<br><br>v.<br><br>Pace Construction, Inc., a California corporation; Lifestar Products, Inc., a California Corporation; Caesar Mercado, a California resident; Rose Romo dba Blue Jae Inc., a California resident; JNR Services, Inc., a  California corporation; A Solution Debt Relief, Inc., a Wyoming corporation; Jason Dovalina, a California resident; and JR Bray Group LLC, a California limited liability company.<br><br>                    Defendants. | **(1) AVOIDANCE, RECOVERY, AND PRESERVATION OF PREFERENTIAL TRANSFERS MADE TO OR FOR THE BENEFIT OF DEFENDANTS WITHIN NINETY DAYS OF THE PETITION DATE;**<br><br>**(2)  AVOIDANCE, RECOVERY, AND PRESERVATION OF POST-PETITION TRANSFERS MADE TO OR FOR THE BENEFIT OF DEFENDANTS AFTER THE PETITION DATE;**<br><br>**(3) AVOIDANCE, RECOVERY, AND PRESERVATION OF 2-YEAR ACTUAL FRAUDULENT TRANSFERS;**<br><br>**(4) AVOIDANCE, RECOVERY, AND PRESERVATION OF 2-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS;** |

1

**(5) AVOIDANCE, PRESERVATION, AND RECOVERY OF VOIDABLE TRANSFERS MADE WITH INTENT TO DEFRAUD [11 U.S.C. §§ 544, 550, 551; CAL. CIV. CODE §§ 3439.04(a)(1) AND 3439.07];**

**(6) AVOIDANCE, PRESERVATION, AND RECOVERY OF VOIDABLE TRANSFERS MADE WITH NO INTENT TO DEFRAUD [11 U.S.C. §§ 544, 550, 551; CAL. CIV. CODE §§ 3439.04(a)(2), 3439.05, AND 3439.07];**

**(7) AIDING AND ABETTING FRAUDULENT CONVEYANCES UNDER CAL. CIV. CODE §§ 3439.04(a)(1) AND 3439.07]; and**

**(8) AVOIDANCE, RECOVERY, AND PRESERVATION OF TRANSFERS 2-YEAR ACTUAL FRAUDULENT TRANSFERS AS TO JR BRAY GROUP LLC ONLY; AND**

**(9) AVOIDANCE, RECOVERY, AND PRESERVATION OF 2-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS AS TO JR BRAY GROUP LLC ONLY;**

Honorable Scott C. Clarkson
Courtroom 5C

For his *Complaint for (1) Avoidance, Recovery, and Preservation of Preferential Transfers Made to or for the Benefit of Defendants within Ninety Days of the Petition Date; (2) Avoidance, Recovery, and Preservation of Post-Petition Transfers Made to or for the Benefit of Defendants after the Petition Date; (3) Avoidance, Recovery, and Preservation of Transfers 2-Year Actual Fraudulent Transfers; (4) Avoidance, Recovery, and Preservation of 2-Year Constructive Fraudulent Transfers; (5) Avoidance, Preservation and Recovery of Voidable Transfers Made with Intent to Defraud [U.S.C. §§ 544, 550, 551; CAL. CIV. Code §§ 3439.04(a)(1) and 3439.07]; (6) Avoidance, Preservation, and Recovery of Voidable Transfers Made with no Intent to Defraud [11 U.S.C. §§ 544, 550, 551; CAL. CIV. Code §§ 3439.04(a)(2), 3439.05, and 3439.07]; and (7) Aiding and Abetting Fraudulent Conveyances under CAL. CIV. Code §§ 3439.04), 3439.05, and 3439.07* Plaintiff Richard A. Marshack, the former Chapter 11 Trustee for the bankruptcy estate ("Estate")

of debtor The Litigation Practice Group P.C. ("Debtor" or "LPG") and current Trustee of the LPG Liquidation Trust (collectively, "Trustee" or "Plaintiff") in the above-captioned bankruptcy case (the "Bankruptcy Case"), alleges and avers as follows:

### STATEMENT OF JURISDICTION, NATURE OF PROCEEDING, AND VENUE

1.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E), (H) and (O), 1334(b), and General Order No. 13-05 of the District Court for the Central District of California because this is a core proceeding arising in and/or related to the Bankruptcy Case, which is a case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), and which is pending in the United States Bankruptcy Court for the Central District of California, Santa Ana Division (the "Court").

2.    Regardless of whether this proceeding is core, non-core, or otherwise, the Plaintiff consents to the entry of a final order and judgment by the Bankruptcy Court.

3.    Defendants are hereby notified that Rule 7008 of the Federal Rules of Bankruptcy Procedure requires them to plead whether consent is given to the entry of a final order and judgment by the bankruptcy court.

4.    Venue of this adversary proceeding properly lies in this judicial district pursuant to 28 U.S.C. § 1409(a) because this proceeding is related to the Debtor's pending Bankruptcy Case.

### THE PARTIES

5.    Plaintiff, Richard A. Marshack, was the duly-appointed, qualified Chapter 11 Trustee of Debtor's Estate and is now the current liquidating trustee of the LPG Liquidation Trust.

6.    Debtor LPG is, and at all material times was, a professional corporation organized, existing, and in good standing under the laws of the State of California, with its principal place of business in Tustin, California.

7.    Defendant Lifestar Products, Inc. is, and at all material times represented that it was, a California corporation, ("Lifestar").

8.    Defendant Pace Construction, Inc. is, and at all material times represented that it was, a California corporation ("Pace").

9.    Defendant Pace may be served by first class mail postage prepaid upon its officer

and agent for service of process, Rose Romo at 335 Appleby Street, Corona, CA 92881.

10. Defendant Lifestar may be served by first class mail postage prepaid upon its registered agent, Caesar Mercado at 3950 Redondo Street, Riverside, CA 92505.

11. Defendant Rose Romo dba Blue Jae Investments is, upon information and belief, a resident of California ("Ms. Romo") and may be served by first class mail postage prepaid at 335 Appleby Street, Corona, CA 92881.

12. Defendant Caeser Mercado is, upon information and belief, a resident of California ("Mr. Mercado") and may be served by first class mail postage prepaid at 3950 Redondo Street, Riverside, CA 92505.

13. Defendant JNR Services, Inc. is, and at all material times represented that it was a California – domestic corporation ("JNR") and it may be served with process via first class mail postage prepaid upon its registered agent Rick R. Emmett; 10 Pointe Drive, Suite 150, Brea, California 92821.

14. Defendant A Solution Debt Relief, Inc., is, upon information and belief, a Wyoming corporation ("A Solution") and may be served with process by first class mail postage prepaid to its registered agent Cloud Peak Law, LLC, 1309 Coffeen Avenue, Suite 1200 Sheridan, Wyoming 82801.

15. Defendant Jason Dovalina, is upon information and belief, a California resident ("Mr. Dovalina") and may be served with process by first class mail postage prepaid sent to 128 W. Santa Fe Avenue, Suite C, Placentia, California 92870-5632.

16. All of the foregoing parties are referred to herein as the "Defendants" and Counts One through Seven of the Complaint are asserted against them as set forth herein.

17. While Defendant JR Bray Group, LLC is a California limited liability company ("Defendant Bray") and a defendant herein, it is not included in the defined term "Defendants." Instead, Defendant Bray will be referred to separately and only Counts Eight and Nine are asserted against it.

18. Defendant Bray is a California limited liability company and may be served with process via first class mail directed to its registered agent, Justin Bray, 1001 Avenida Pico #C305,

4

San Clemente, CA 92673.

## GENERAL ALLEGATIONS

**A.** **The Bankruptcy Case**

19.     On March 20, 2023 ("Petition Date"), Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, commencing the Bankruptcy Case.

20.     The Office of the United States Trustee ("UST") filed its *Motion by United States Trustee to Dismiss or Convert Case Pursuant to 11 U.S.C. § 1112(b)* [Bankr. Docket No. 21] and creditors Debt Validation Fund II, LLC; MC DVI Fund 1, LLC; and MC DVI Fund 2, LLC filed the *Motion by DVF and MC DVI to Dismiss Chapter 11 Case Pursuant to 11 U.S.C. §§ 105, 305, 349, & 1112, or in the Alternative Convert This Case to Chapter 7 or Appoint a Trustee* [Bankr. Docket No. 44]. On May 4, 2023, the Court entered its *Order Directing United States Trustee to Appoint Chapter 11 Trustee* [Bankr. Docket No. 58].

21.     Pursuant to the *Acceptance of Appointment as Chapter 11 Trustee* [Bankr. Docket No. 63], on May 8, 2023, Trustee accepted his appointment as the Chapter 11 Trustee in the Bankruptcy Case. The Court approved the Trustee's appointment in its *Order Approving the U.S. Trustee's Application for the Appointment of a Chapter 11 Trustee* [Docket No. 65].

22.     Trustee was not appointed until after events of the case and, therefore, bases these allegations on information and belief. *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) ("The *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible."); *Miller v. City of Los Angeles*, 2014 U.S. Dist. LEXIS 198871, 2014 WL 12610195, at *5 (C.D. Cal. Aug. 7, 2014) (recognizing that the plaintiff's "information and belief" pleading was allowed and "necessary at times"); *see also Mireskandari v. Daily Mail and General Trust PLC*, 2013 U.S. Dist. LEXIS 194437, 2013 WL 12129642, at *4 (C.D. Cal. July 31, 2013) ("The Federal Rules of Civil Procedure allow parties to plead facts on 'information and belief' if the facts 'will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.'" (citations omitted)).

23.     Pursuant to the *Order Confirming Modified First Amended Joint Chapter 11 Plan of Liquidation* entered September 9, 2024, and the *Notice of Occurrence of Effective Date of Modified First Amended Joint Chapter 11 Plan of Liquidation* filed September 24, 2024, Richard A. Marshack became the Liquidating Trustee of the LPG Liquidation Trust, effective September 24, 2024. [Bankr. Docket Nos. 1646 & 1762].

24.     All claims have been transferred to the Liquidating Trust pursuant to the confirmed plan and Plaintiff brings this action solely in his capacity as the Liquidating Trustee of the LPG Liquidation Trust, for the benefit of Debtor's Estate and its creditors.

**B.    Protective Order**

25.     On or about May 2, 2024, Plaintiff filed that certain Notice and Motion for Entry of Protective Order (the "Protective Order").

26.     On June 3, 2024, the Court entered its *Order Granting Motion for Entry of Protective Order and the Protective Order* [Bankr. Docket No. 1270] (the "Protective Order"). A true and accurate copy of the Protective Order is attached as **Exhibit 1**, and incorporated herein.

27.     By its own terms, the Protective Order applies to this adversary proceeding and governs all discovery conducted herein.

**C.    LPG's Ownership and Management**

28.     Prior to the Petition Date, LPG operated a law firm for consumers across the country who sought assistance in contesting or resolving debts. LPG serviced over 65,000 customers across the United States. At all relevant times, LPG was controlled and operated by the individual named Tony Diab ("Diab").

29.     The consumers that retained LPG to represent them would pay LPG over a period of time via monthly ACH debits from their bank accounts.

30.     The monthly payments were meant to cover all legal services LPG provided to the consumers including validation of the debts, review of documents to determine enforceability, and court appearances to halt lawsuits to obtain judgments.

31.     In certain instances, LPG would file a lawsuit in an effort to eliminate a disputed debt or to prosecute affirmative claims held by the consumers.

6

32.    LPG mismanaged the consumers' monthly payments.

33.    Diab and other defendants devised a plan to fraudulently transfer funds, client files, client funds and assets in the form of ACH Receivables (the "ACH Receivables" or "Accounts Receivable") out of LPG to third parties prior to the filing of bankruptcy.

34.    To obtain consumer clients, LPG contracted with marketing companies, who engaged in illegal capping and would advertise or call to solicit consumers to become clients of LPG in exchange for a percentage of the ACH Receivables collected by LPG from the consumers. The marketing affiliate went so far as to assist with the execution of an engagement letter between the consumer and LPG.

35.    In exchange, LPG agreed to pay the marketing affiliates a percentage the monthly payments collected by LPG from the consumers.

36.    Because LPG received payments from consumers over time, it often sought financing by borrowing against its future cash flows. This borrowing was not only used to finance operations at LPG, but also to pay the fees owed to the marketing companies for providing the client referrals.

37.    Many of the documents executed in connection with such financing described the transactions as accounts receivable purchase agreements.

38.    LPG also purported to "sell" the rights to these Accounts Receivable following collection by LPG to outside investors in exchange for liquidity. LPG frequently "sold" the Accounts Receivable from the same client files to multiple parties.

39.    As evidenced by its substantial borrowing through brokered loans and alleged sales of Accounts Receivable to lenders and "investors," LPG's need for cash was constant as it had (i) to pay marketing affiliates for past referrals and keep new referrals being made, (ii) to pay "returns" to investors who purportedly purchased sets of Accounts Receivable or funded the continued operation of the Debtor and related entities, and (iii) to pay the substantial salaries to, personal expenses of, and distributions to its management and other insiders.

40.    This constant borrowing to pay off prior investors and obligations coupled with the alleged sale of the same assets to different entities is classic evidence of a Ponzi scheme.

41.     Diab used entities he controlled including, without limitation, Vulcan Consulting, LLC ("Vulcan") and B.A.T., Inc. dba Coast Processing ("Coast") to process payments from LPG consumer clients and to divert LPG consumer funds and ACH Receivables. Diab would use numerous ACH processing companies in order to easily transfer millions of dollars from Debtor to these entities he controlled, without oversight or detection, and to avoid payment disputes and complications. The money that flowed from Debtor through these bank account to Defendant consisted of Client Funds that Debtor funneled to these entities by means of the ACH processing companies. Debtor also made deposits into these entities bank account such that they received Client Funds directly from Debtor in addition to direct Accounts Receivables.

**D.      Ponzi Scheme Presumption**

42.     The Ponzi Scheme Presumption exists in bankruptcy proceedings.

43.     The Ponzi Scheme Presumption can be utilized to establish a debtor's "intent to defraud  future undertakers [investors] from the mere fact that a debtor was running a Ponzi scheme. Indeed, no other reasonable inference is possible. A Ponzi scheme cannot work forever. The investor pool is a limited resource and will eventually run dry. The perpetrator must know that the scheme will eventually collapse as a result of the inability to attract new investors. The perpetrator nevertheless makes payments to present investors, which, by definition, are meant to attract new investors. He must know all along, from the very nature of his activities, that investors at the end of the line will lose their money. Knowledge to a substantial certainty constitutes intent in the eyes of the law," *cf. Restatement (Second) of Torts § 8A* (1963 & 1964), and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them. *Kirkland v. Rund (In re EPD Inv. Co., LLC)*, 114 F.4th 1148, 1153 (9th Cir. 2024) (by definition Ponzi scheme is destined to fail and the swindler and their entities often end in bankruptcy or equitable receivership); *Cf. Coleman Am. Moving Servs., Inc. v. First Nat'l Bank & Trust Co. (In re American Properties, Inc.)* 14 B.R. 637, 643 (Bankr. D. Kan. 1981) (intentionally carrying out a transaction with full knowledge that its effect will be detrimental to creditors is sufficient for actual intent to hinder, delay or defraud within the meaning of § 548(a)(1))." *Merrill v. Abbott (In re Independent Clearing House Co.)* (D. Utah 1987) 77 B.R. 843, 860. A trustee in bankruptcy is not required to

8

1    show that an operator of a Ponzi scheme was subjectively aware his Ponzi scheme was destined to

2    fail. *In re EPD Inv. Co., LLC*, 114 F.4th at 1153 ("[a] trustee's action to recover assets fraudulently

3    conveyed in the course of a Ponzi scheme does not require that the trustee also prove the Ponzi-

4    scheme operator was subjectively aware his Ponzi scheme was destined to fail.").

5        44.    "But if all the debtor receives in return for a transfer is the use of the defendant's

6    money to run a Ponzi scheme, there is nothing in the bankruptcy estate for creditors to share. In

7    fact, by helping the debtor perpetuate his scheme, the transfers exacerbate the harm to creditors by

8    increasing the amount of claims while diminishing the debtor's estate. In such a situation, the use

9    of the defendant's money cannot objectively be called 'reasonably equivalent value.'"    *In re*

10   *Independent Clearing House Co.* 77 B.R. at 859. Therefore, "[t]he trustee can avoid the transfers if

11   they were preferential or fraudulent. Transfers to investors in a Ponzi scheme are preferential and

12   fraudulent. Therefore, they constitute "property of the estate," and the trustee can recover them. *Id.*

13   at 853 n.17 (citations omitted).

14       45.    Debtor was operating a Ponzi scheme that utilized affiliates and several other entities

15   as investors to continue its unlawful business practices by using funds provided by current investors

16   to attract new investors hoping for very high returns. Therefore, the Debtor was running a Ponzi

17   scheme and the Ponzi Scheme Presumption can be utilized to infer that the Debtor had the intent to

18   defraud investors within the meaning of 11 U.S.C. section 548(a)(1). This is evidenced by the Court

19   in this Bankruptcy Case declaring that Debtor was operating a Ponzi scheme when it stated the

20   following:

21           It is important to note that this Court has never received any significant and
             trustworthy evidence that Debtor accomplished meaningful results for its clients,
22           but only anecdotal examples of viable success for its clients. By reviewing the
             Estate's claims register, there is evidence of consumer claims for the fraud and
23           demanded but undelivered refunds of approximately $500 million. There is ample
             evidence that the pre-petition Debtor never placed the collected funds into an
24           attorney-client trust account, and that Debtor or its principals simply looted the
             payments received through the client automatic withdrawals, stiffing both the
25           clients and outside attorneys who may have been working on client cases with
             the hopes of being paid. There is also evidence before the Court that Debtor was
26           running a Ponzi scheme and paying some outside (or "network") attorneys with
             funds obtained from new clients. In this case, it appears that some of the "lenders"
27           may have been serving as "investors," hoping for very high returns before "the
             music stopped."  The Ninth Circuit has recently explained, "[b]y definition, a
28           Ponzi scheme is destined to fail because the pool of available investors is not

9

limitless. When the Ponzi scheme operator's pool of investors inevitably runs dry, the scheme collapses and the swindler and their entities often end up in bankruptcy or equitable receivership. *See generally* David R. Hague, Expanding the Ponzi Scheme Presumption, 64 DePaul L. Rev. 867 (2015). In bankruptcy, the court-appointed trustee is tasked with taking immediate control of the entity, ceasing ongoing fraudulent activity, locating and collecting assets for the bankruptcy or receivership estate, and achieving a final, equitable distribution of the remaining assets. *See* 11 U.S.C. § 704; *Kirkland v. Rund (In re EPD Inv. Co., LLC)*, 2024 U.S. App. LEXIS 21363, at *15 (9th Cir. Aug. 23, 2024). Finally, there is evidence that Debtor was encumbering (or as some creditors assert, "double or triple selling") their accounts or receivables to multiple lenders. With respect to Greyson's requested Administrative Claim [Dk. 676], and as more fully described in the concurrently entered order denying the claim, there has been no evidence presented that any work allegedly performed by Greyson assisted any clients or added any value to the Estate.

*See, Case 8:23-bk-10571-SC*, Doc 1545 n. 5.

48.    The Ponzi Scheme Presumption establishes a debtor's "intent to defraud future undertakers [investors] from the mere fact that a debtor was running a Ponzi scheme." *Merrill v. Abbott* (*In re Independent Clearing House Co*.), 77 B.R. 843, 860 (D. Utah 1987). "Knowledge to a substantial certainty constitutes intent in the eyes of the law, *cf. Restatement (Second) of Torts* § 8A (1963 & 1964), and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them." *Id*. A trustee in bankruptcy is not required to show that an operator of a Ponzi scheme was subjectively aware his Ponzi scheme was destined to fail. *In re EPD Inv. Co., LLC*, 114 F.4th at 1153 (9th Cir. 2024). "[I]f all the debtor receives in return for a transfer is the use of the defendant's money to run a Ponzi scheme, there is nothing in the bankruptcy estate for creditors to share." *In re Independent Clearing House Co.* 77 B.R. at 859. In such a situation, the use of the defendant's money cannot objectively be called "reasonably equivalent value." *Id*. Therefore, "[t]he trustee can avoid the transfers if they were preferential or fraudulent. Transfers to investors in a Ponzi scheme are preferential and fraudulent. Therefore, they constitute 'property of the estate,' and the trustee can recover them." *Id*. at 853 n.17 (citations omitted).

49.    Based on the Ponzi Scheme presumption the Court can infer that the Debtor had the intent to defraud investors within the meaning of 11 U.S.C. § 548(a)(1). As a result, the transfers identified herein were made in furtherance of that scheme and the Debtor did not receive an objectively reasonable equivalent value for such transfers. Thus, the Trustee can avoid any such

transfers because they were actually fraudulent as to the Debtor's creditors.

**E.**     **Prepetition Litigation and Creditors**

50.     Debtor's Schedule E/F, filed on April 4, 2023, as Dk. No. 33, lists: (a) 11 unsecured creditors with priority unsecured claims totaling $374,060.04; and (b) 58 nonpriority unsecured creditors with scheduled claims totaling $141,439,158.05.

51.     The claims register in this Bankruptcy Case includes 2,554 proofs of claim, totaling in excess of $424 million of claims asserted against the Estate.

52.     At least 14 UCC-1 statements were of record securing alleged debts of the Debtor as of the Petition Date. These statements either reflected secured liens against the Debtor's assets then owned or thereafter acquired or provided evidence of the assignment or sale of substantial portions of the Debtor's future income. They secured the repayment of the following claimed amounts that are currently known to Trustee and are allegedly owed by the Debtor: (a) $2,374,004.82 owed to Fundura Capital Group as evidenced by Proof of Claim No. 335 purportedly secured by a UCC statement filed on or about May 19, 2021; (b) approximately $15 million dollars owed to MNS Funding, LLC as evidenced by Proof of Claim No. 1060 purportedly secured by a UCC statement filed on or about May 28, 2021; (c) approximately $5,000,000 owed to Azzure Capital, LLC as evidenced by Proof of Claim No. 127 purportedly secured by a UCC statement filed on or about May 28, 2021; and (d) approximately $1.5 million dollars owed to Diverse Capital, LLC purportedly secured by UCC statements filed on or about September 15, 2021, and December 1, 2021.

53.     Debtor's balance sheets for the 36 months ending December 31, 2021, show approximately $17,900,000 in total assets at its highest point in November 2021. This amount is significantly less than the $424 million of claims filed.

54.     Debtor's Statement of Financial Affairs, filed on April 4, 2023, as Dk. No. 34, reflects 15 pending lawsuits against Debtor as of the Petition Date. The lawsuits date back to October 18, 2021 (*Fundura v. The Litigation Practice Group P.C. et al.*, Supreme Court of New York Index No. 613192-2021) and are as recent as March 10, 2023 (*Diverse Capital LLC v. The Litigation Practice Group P.C. et al.*, Supreme Court of New York Index No. 135614-2023).

**F.      Debtor's Insolvency**

55.      Debtor was insolvent when the Transfers occurred as evidenced by: (a) the 14 UCC-1 statements reflecting secured liens against the Debtor's owned and after-acquired assets and the assignment or sale of substantial portions of the Debtor's future income; (b) the priority and non-priority unsecured debt of nearly $142 million listed in Debtor's schedules; (c) the $424 million of creditor claims filed in this Bankruptcy Case; and (d) Debtor's balance sheets reflecting, at its highest point, $17.9 million of assets in November 2021.

56.      Moreover, insolvency is presumed as a matter of law where, as in this Bankruptcy Case, the debtor operated a Ponzi scheme. *See, e.g., Glob. Money Mgmt., L.P. v. McDonnold*, No. 06CV34, 2008 U.S. Dist. LEXIS 128733, at *15 (S.D. Cal. Feb. 27, 2008) (concluding that "if a Ponzi scheme is proven, then the debtor is proven insolvent from the time of its inception").

57.      Diab and others devised a plan to fraudulently transfer funds, client files, client funds and assets out of LPG to third parties prior to the filing of bankruptcy.

**G.      Transactions with Debtor and Related Entities**

58.      Despite the Defendants' apparent involvement in fields other than legal services, many of the Defendants received payments from the Debtor or related entities beginning in 2021. It appears that one or more of the Defendants were loaning money to the Debtor or "investing" in the Debtor's operations by "purchasing" receivables related to client files in 2021.

59.      For example, a June 3, 2022 invoice to the Debtor from Defendant Pace for $30,000 for "consulting" is attached hereto as **Exhibit 2** and incorporated as if set forth herein. Upon information and belief, the Debtor never consulted with Pace for construction services.

60.      In fact the purpose of some payments made by the Debtor to Defendants Pace, Romo dba Blue Jae, and Lifestar state the purpose of the payment as "referral fees" "lead generation" and "settlement funding."  All payments from the Debtor to the Defendants known to the Trustee are set forth on **Exhibit 3** attached hereto, which is incorporated as if set forth herein ("Debtor Payments").

**H.      Spot On Notes**

61.      However, the Debtor Payments were not the only payments that the Debtor made or

caused to be made to or for the benefit of the Defendants. The Debtor and the Defendants participated in a lending program coordinated by Spot On Consulting, Inc. ("Spot On").

62.    Because LPG received payments from consumers over time, it often sought financing by borrowing against its future cash flows from merchant cash advance lenders or soliciting investments from third parties to "purchase" future receivables from a group of files.

63.    In 2022, LPG's need for operating capital was so severe that it began borrowing money from multiple lenders in loan transactions administered by Spot On.

64.    Spot On held itself out as an "administrative liaison" or "servicing company" working on behalf of both Debtor and individual investors to facilitate the execution of promissory note(s) between the Debtor and lender ("Spot On Notes").

65.    Upon information and belief, Spot On retained or was paid a percentage of the principal amount of each loan it originated as a commission. Referral fees were also paid to entities that referred new lenders to Spot On.

66.    Upon information and belief, one or more of the Defendants were paid referral fees for recruiting new lenders.

67.    The terms of the Spot On Notes could vary, but typically they provided for a loan to the Debtor that would be repaid in monthly installments of eight to ten percent interest **per month** on the principal amount of the loan for twelve or twenty-four months. At maturity, the Debtor would then repay the entire principal amount of the Spot On Note to lender.

68.    By borrowing under these terms, the Debtor was obligating itself to repay each lender two to four times the amount that was borrowed.

69.    Upon information and belief, some Spot On Notes may not represent a true loan transaction where the principal amount of the note was lent to the Debtor. In some instances, the Trustee believes that the principal balance of some Spot On Notes may represent an amount that was owed to the holder from another transaction or investment that was converted or "rolled over" into a Spot On Note to extend the time to repay the amount owed.

70.    In some instances, lenders, such as the Defendants, would have multiple outstanding Spot On Notes between them and the Debtor at the same time.

71.     Upon information and belief, when the Debtor first started making payments to lenders pursuant to the Spot On Notes, it made a lump sum payment to Spot On equal to the total amount needed to pay the installments due to the lenders for that week. Spot On would then pay the individual lenders from its bank accounts.

72.     Upon information and belief, Spot On disbursed payments from two bank accounts it held at JPMorgan Chase Bank with account numbers ending in XX7662 and XX2777 ("Accounts"). The Debtor also made payments directly to some holders of Spot On Notes.

73.     Ultimately, the Debtor was not able to pay Spot On a sufficient amount from its operations to make the weekly payments to the holders of the Spot On Notes. After this, upon information and belief, Spot On began using funds it obtained from the execution of new Spot On Notes to make payments to prior lenders on existing Spot On Notes from the Accounts.

74.     The funds deposited in the Accounts from the execution of new Spot On Notes was the Debtor's property as the Debtor had borrowed the money and was entitled to the use of it.

75.     The issuance, execution and borrowing under the Spot On Notes was a Ponzi scheme as existing noteholders were being paid from funds advanced by new Spot On Notes or lenders. Without the Debtor obtaining additional funds through borrowing, it could not have made many of the payments that were made to the holders of the Spot On Notes.

76.     The Spot On Notes are invalid and unlawful because, among other reasons, they provide for a usurious interest rate.

77.     Upon information and belief, the Defendants were, directly or indirectly, active participants in the lending of funds to the Debtor through the Spot On Notes and in the recruitment of new lenders to Spot On to provide additional funds to the Debtor and to make payments to existing holders of Spot One Notes.

78.     Additional proof of the involvement of some or all of the Defendants in the issuance of the Spot On Notes is contained in the proof of claim that has been filed on behalf of many of the lenders under the Spot On Notes. On June 28, 2023, Affirma, LLC ("Affirma") filed Proof of Claim No. 108 seeking a claim of more than $66 million dollars ("Claim") based on its status as the assignee of hundreds of separate Spot On Notes. Defendant Mercado executed the Claim on behalf

1  of Affirma as its "owner."

2      79.    The numerous Spot On Notes that the Defendants held as of the Petition Date are

3  identified in the Claim. The list of Spot On Notes that make up the Claim identify the names of

4  many Defendants herein both as a borrower and as a point of contact for notes issued in the name

5  of third parties.

6      80.    Spot On made substantial payments to the Defendants from the Accounts. The

7  source of these payments was either the proceeds of new loans to the Debtor deposited into Spot

8  On's accoutns, or from funds transferred to Spot On by the Debtor. Mr. Diab also used the funds in

9  the Accounts to make payments to third parties unrelated to the Spot On Notes. All payments to or

10  for the benefit of the Defendants from the Accounts ("Spot On Payments") are identified on **Exhibit**

11  **4** which is attached hereto and incorporated by reference herein.

12      81.    The Debtor Payments and Spot On Payments are collectively referred to herein as

13  the "Transfers."

14      82.    All Transfers identified herein may not relate to the transactions and entities

15  discussed herein, and the Trustee may have filed or may file separate litigation against one or more

16  Defendants based on other transactions or relationships it had with the Debtor. All Transfers to

17  Defendants known to the Trustee are identified herein out of an abundance of caution.

18  **COUNT ONE**

19  **Avoidance, Recovery, and Preservation of Transfers Made Within the Ninety Day Period**

20  **Before the Petition Date**

21  **[11 U.S.C. §§ 547, 550, and 551]**

22      83.    Plaintiff realleges and incorporates by reference each and every allegation contained

23  in the preceding paragraphs as though set forth in full herein.

24      84.    In the ninety-day period preceding the Petition Date, the Debtor made Transfers to

25  or for the benefit of one or more of the Defendants as identified on the Exhibits identified above

26  ("90 Day Transfers"). These 90 Day Transfers currently known to the Trustee are identified on

27  **Exhibits 3 and 4**.

28      85.    The Debtor made the 90 Day Transfers to the Defendants on account of a debt owed

to that particular Defendant.

86.    The 90 Day Transfers were made to or for the benefit of a creditor within the meaning of 11 U.S.C. § 547(b)(1) because the 90 Day Transfers were payments made on account of debts nominally owed by the Debtor.

87.    A transfer of the Debtor's assets occurred when the 90 Day Transfers were received by the particular Defendant.

88.    The 90 Day Transfers were made on account of antecedent debt nominally owed by the Debtor to the recipient of the Transfer due to an "investment" with the Debtor or pursuant to an executed Spot On Note. The Debtor's payment obligations to the Defendants constituted a "debt" (as defined in the Bankruptcy Code).

89.    The 90 Day Transfers occurred when the Debtor actually was insolvent. However, Plaintiff is also entitled to the presumption of insolvency when the 90 Day Transfers were made pursuant to 11 U.S.C. § 547(f).

90.    The 90 Day Transfers were made in the ninety-day period before the Petition Date.

91.    If any transfers were made by the Debtor to any Defendant herein within the ninety-day period preceding the Petition Date and are not identified herein, Plaintiff reserves the right to avoid and recover such transfers pursuant to 11 U.S.C. §§ 547 and 550.

92.    As the holder of an unsecured claim(s) or as party who has not filed a claim, the payment of the 90 Day Transfers to one or more of the Defendants enabled them to recover more than they would have received if: (i) the Debtor's case was under chapter 7 of the Bankruptcy Code; (ii) the 90 Day Transfers had not been made; and (iii) the debts owed to the Defendants that received the 90 Day Transfers were paid pursuant to the provisions of the Bankruptcy Code. As evidenced by the Debtor's schedules filed in the underlying Bankruptcy Case, as well as the proofs of claim that have been received to date, the Debtor's liabilities exceed its assets to the point that unsecured creditors will not receive a full payout of their claims from the Debtor's bankruptcy estate.

93.    In accordance with the foregoing, the 90 Day Transfers are avoidable pursuant to 11 U.S.C. § 547(b), and may be recovered and preserved for the benefit of the estate pursuant to 11 U.S.C. §§ 550 and 551.

## COUNT TWO

**Avoidance, Recovery, and Preservation of Post-Petition Transfers**

**[11 U.S.C. §§ 549, 550, and 551]**

94.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though set forth in full herein.

95.    This is an action to pursuant to 11 U.S.C. §§ 549 and 550 to avoid and recover unauthorized post-petition transfers made by Debtor to any of the Defendants ("Post-Petition Transfers").

96.    To the extent any Post-Petition Transfers were made by the Debtor to any Defendant following the Petition Date and are not identified herein, Plaintiff reserves the right to amend the Complaint to identify the Post-Petition Transfers and seek the avoidance and recovery of them pursuant to 11 U.S.C. §§ 549 and 550.

97.    Those Post-Petition transfers to the Defendants that are currently known to the Trustee at this time are identified on **Exhibits 3 and 4** hereto.

## COUNT THREE

**Avoidance, Recovery, and Preservation of Two-Year**

**Actual Fraudulent Transfers**

**[11 U.S.C. §§ 548(a)(1)(A), 550, and 551]**

98.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though set forth in full herein.

99.    The Transfers were property of the Debtor's Estate prior to their conveyance to the one or more of the Defendants. The Transfers to the Defendants made within Two-Years of the Petition Date ("Two-Year Transfers") that are known to the Trustee are identified on **Exhibits** hereto and incorporated by reference herein.

100.    When the Two-Year Transfers were made, the Debtor was or became indebted include the Prepetition Creditors.

101.    The Two-Year Transfers occurred when the Debtor was insolvent or was rendered insolvent as a result of the Transfers.

102.    The Two-Year Transfers to the Defendants were made with actual intent to hinder, delay or defraud the creditors of Debtor because the Debtor was operating a Ponzi scheme which permits the Court to infer that the Debtor's intent was fraudulent within the meaning of 11 U.S.C. section 548(a)(1).

103.    The Two-Year Transfers are avoidable as fraudulent pursuant to 11 U.S.C. §§ 548(a)(1)(A), 550, and 551 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against Debtor's Estate under 11 U.S.C. § 502, or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

104.    The Two-Year Transfers should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(A), and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

## COUNT FOUR

### Avoidance, Recovery, and Preservation of Two-Year

### Constructive Fraudulent Transfers

### [11 U.S.C. §§ 548(a)(1)(B), 550, and 551]

105.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though set forth in full herein.

106.    The Two Year Transfers were made within two years before the Petition Date.

107.    Debtor did not receive reasonably value in exchange for the Two Year Transfers.

108.    The Two Year Transfers were made at a time when Debtor was insolvent and/or rendered insolvent by virtue of said transfers.

109.    When the Two Year Transfers occurred, Debtor's business was undercapitalized and Debtor was engaged in business for which its capital was unreasonably small.

110.    When the Two Year Transfers occurred, Debtor had incurred or was about to incur debts that were beyond its ability to pay. The allegations in the preceding paragraphs are supported by the fact that the Debtor was generally operating a Ponzi scheme to fund operations and that the Defendants were involved in a smaller scale Ponzi scheme using the Spot On Notes.

111.    At the time each Two Year Transfer was made, Debtor was indebted to one or more creditors that held a claim against Debtor on the date of each Transfer and on the Petition Date.

112.    Plaintiff alleges that Defendants did not receive the Two Year Transfers in good faith, for value, and without knowledge of their avoidability. Defendants knew or should have known that their transactions with the Debtor were illegal and unenforceable as a matter of law.

113.    Defendants knew or should have known that the terms of their agreements with the Debtor were illegal and unenforceable as a matter of law.

114.    Defendants knew that the Debtor was a law firm who was required by law to escrow client payments until earned. However, each Defendant demanded and received payment from client payments that had not been earned because they were paid by the Debtor, Vulcan, and/or Coast or were paid directly from loan proceeds from another lender to the Debtor.

115.    The Two Year Transfers are avoidable as fraudulent pursuant to 11 U.S.C. §§ 548(a)(1)(B), 550, and 551 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against Debtor's Estate under 11 U.S.C. § 502, or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

116.    As avoidable transfers pursuant to 11 U.S.C. § 548(a)(1)(B), the Two Year Transfers, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

## COUNT FIVE

**Avoidance, Recovery, and Preservation of Four-Year Actual Fraudulent Transfers**

**[11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.04(a)(1) and 3439.07]**

117.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though set forth in full herein.

118.    Under 11 U.S.C. § 544(b)(1), Plaintiff may avoid transfers of an interest of Debtor which are voidable under applicable law by an unsecured creditor of Debtor, including under California Civil Code §§ 3439.04(a)(1) and 3439.05.

119.    The Transfers occurred within four years prior to the Petition Date.

120.    On or after the date that such Transfer were made, entities to which Debtor was or became indebted include the Prepetition Creditors.

121.    Despite Debtor's obligation to the Prepetition Creditors, Debtor made the Transfers to Defendant.

122.    The Transfers to Defendant were made with actual intent to hinder, delay or defraud the creditors of Debtor as the Debtor was operating a Ponzi scheme with the help of the Defendants.

123.    Defendants' conduct relating to the Transfers was done with oppression, fraud and malice, as defined in California Civil Code section 3294, entitling Plaintiff to exemplary and punitive damages.

124.    The Transfers are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and Cal. Civ. Code §§ 3439.04(a)(1) and 3439.07 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against its Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

125.    As avoidable transfers pursuant to 11 U.S.C. § 544 and Cal. Civ. Code §§ 3439.04(a)(1) and 3439.07, the Transfers, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

## COUNT SIX

### Avoidance, Preservation, and Recovery of Constructive Fraudulent Transfer

### 11 U.S.C. §§ 544, 550, 551; Cal. Civ. Code §§ 3439.04(a)(2), 3439.05 and 3439.07

126.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though set forth in full herein.

127.    Under 11 U.S.C. § 544(b)(1), Plaintiff may avoid transfers of an interest of Debtor which are voidable under applicable law by an unsecured creditor of Debtor, including under California Civil Code §§ 3439.04(a)(2) and 3439.05.

128.    Debtor did not receive reasonably equivalent value in exchange for the Transfers.

129.    The Transfers were made at a time when Debtor was insolvent and/or rendered insolvent by virtue of said transfers.

130.    At the time each Transfer was made, Debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of Debtor were unreasonably small in relation to the business or transaction.

131.    At the time each Transfer was made, Debtor intended to incur, or believed or reasonably should have believed that Debtor would incur, debts beyond Debtor's ability to pay as they became due.

132.    At the time each Transfer was made, Debtor was indebted to one or more creditors that held a claim against Debtor on the date of each Transfer and on the Petition Date.

133.    The Transfers were made at a time when Debtor was insolvent and/or rendered insolvent by virtue of said transfers.

134.    Plaintiff alleges that Defendants did not receive the Transfers in good faith, for value, and without knowledge of their avoidability as they were helping the Debtor borrow funds through a Ponzi scheme using usurious rates of interest.

135.    Defendants knew that the Debtor was a law firm who was required by law to escrow client payments until earned. However, Defendants demanded and received payments from client funds that had not been earned and/or from the loan proceeds advanced by new lenders to the Debtor.

136.    Defendants knew or should have known that the terms of the Spot On Notes were illegal and unenforceable as a matter of law.

137.    The Transfers are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and Cal. Civ. Code §§ 3439.04(a)(1) and 3439.07 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against its Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

138.    As avoidable transfers pursuant to 11 U.S.C. § 544 and Cal. Civ. Code §§ 3439.04(a)(1) and 3439.07, the Transfers, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

## COUNT SEVEN

### Aiding and Abetting (All Defendants)

**[11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.04(a), 3934.04(b), and 3439.07]**

139.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though set forth in full herein

141.    Defendants and others not named herein, based upon information and belief and based on the Ponzi Scheme Presumption, had knowledge of the fraudulent transactions, transfers and illegal agreements that were used to perpetuate and conceal the Ponzi scheme and fraudulent transfers.

142.    Defendants, with the foregoing knowledge, intended to, and did, help the Debtor in perpetuating and concealing the Ponzi scheme and fraudulent transfers of money through the issuance of the Spot On Notes.

143.    At all material times, Defendants had the intent to facilitate and conceal the Ponzi scheme and fraudulent transfers of money through lending overseen by Spot On and the solicitation of new loans and new lenders. The solicitation of new lenders also provided the funds to make payments to the Defendants pursuant to prior Spot On Notes.

144.    Defendants, upon information and belief, assisted, and did actually engage in, the commission of fraud and the Ponzi scheme by coordinating, facilitating, and directing payments and transfers of monies and executing documents in furtherance of continuing the Debtor's participation in borrowing through Spot On and issuance of new Spot On Notes.

145.    The injuries to the Debtor's Estate and to its creditors directly, proximately and reasonably foreseeably resulting from and caused by violations of Sections 6151 and 6155 of the California Business and Professional Code include, without limitation, hundreds of thousands of dollars in improperly transferred and acquired moneys.

146.    Plaintiff and the Debtor's estate also suffered damages by incurring attorney's fees and costs associated with the prosecution of Defendants' unlawful activities.

/ / /

/ / /

**COUNT EIGHT**

**Avoidance, Recovery, and Preservation of**

**Actual Fraudulent Transfers to Defendant Bray**

**[11 U.S.C. §§ 548(a)(1)(A), 550, and 551]**

147.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though set forth in full herein.

148.    On December 12, 2022 Spot On paid Defendant Bray the sum of $75,000 from one of the Accounts (as defined above) that ended in #2777.

149.    On December 21, 2022, Spot On paid Defendant Bray the sum of $80,900 from its bank account that ended in #2777 (with the December 12th payment "Bray Transfers").

150.    The Bray Transfers total $155,900.00 and were paid from the Debtor's funds on deposit in the Account of Spot On.

151.    The Debtor and/or Mr. Diab directed Spot On to pay the Bray Transfers to Defendant Bray to pay debts of Defendants Mr. Dovalina, JNR Services, and/or A Solution owed to "Adzedia" – an entity owned or controlled by Justin Bray.

152.    True and accurate copies of two invoices from "Adzedia" addressed to the Debtor but noting the debt belonged to A Solution are attached hereto as **Exhibit 5** and incorporated as if set forth herein.

153.    The funds used to pay the Bray Transfers were property of the Debtor's Estate prior to their conveyance to the Defendant Bray. The Bray Transfers were made within two years of the Debtor's Petition Date and are identified above.

154.    When the Bray Transfers were made, the Debtor was or became indebted include the Prepetition Creditors.

155.    The Bray Transfers occurred when the Debtor was insolvent or was rendered insolvent as a result of the Bray Transfers.

156.    The Bray Transfers to the Defendant Bray were made with actual intent to hinder, delay or defraud the creditors of Debtor because the Debtor did not owe a debt to Defendant Bray and because the Debtor was operating a Ponzi scheme which permits the Court to infer that the

1   Debtor's intent was fraudulent within the meaning of 11 U.S.C. section 548(a)(1).

2   157.   The Bray Transfers are avoidable as fraudulent pursuant to 11 U.S.C. §§

3   548(a)(1)(A), 550, and 551 by one or more creditors who held and hold unsecured claims against

4   Debtor that were and are allowable against Debtor's Estate under 11 U.S.C. § 502, or that were not

5   and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition

6   Creditors.

7   158.   The Bray Transfers should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(A),

8   and such transferred property, or the value thereof, should be recovered and preserved for the benefit

9   of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

10   <u>**COUNT NINE**</u>

11   **Avoidance, Recovery, and Preservation of Bray Transfers as Constructively Fraudulent**

12   **[11 U.S.C. §§ 548(a)(1)(B), 550, and 551]**

13   159.   Plaintiff realleges and incorporates by reference each and every allegation contained

14   in the preceding paragraphs as though set forth in full herein.

15   160.   The Bray Transfers were made within two years before the Petition Date.

16   161.   Debtor did not receive reasonably value in exchange for the Bray Transfers as it did

17   not owe money to Defendant Bray when the Bray Transfers were made.

18   162.   The Bray Transfers were made at a time when Debtor was insolvent and/or rendered

19   insolvent by virtue of said transfers.

20   163.   When the Bray Transfers occurred, Debtor's business was undercapitalized and

21   Debtor was engaged in business for which its capital was unreasonably small.

22   164.   When the Bray Transfers occurred, Debtor had incurred or was about to incur debts

23   that were beyond its ability to pay. The allegations in the preceding paragraphs are supported by

24   the fact that the Debtor was generally operating a Ponzi scheme to fund operations and that the

25   Defendants were involved in a smaller scale Ponzi scheme using the Spot On Notes.

26   165.   At the time each Bray Transfer was made, Debtor was indebted to one or more

27   creditors that held a claim against Debtor on the date of each Transfer and on the Petition Date.

28   166.   Plaintiff alleges that Defendant Bray did not receive the Bray Transfers in good faith,

for value, and without knowledge of their avoidability. Defendant Bray knew or should have known that the invoices were prepared for payment by the Debtor for the debt of another, that the Debtor was a law firm, and that the Bray Transfers were paid by an unrelated party.

167.    The Bray Transfers are avoidable as fraudulent pursuant to 11 U.S.C. §§ 548(a)(1)(B), 550, and 551 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against Debtor's Estate under 11 U.S.C. § 502, or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

117.    As avoidable transfers pursuant to 11 U.S.C. § 548(a)(1)(B), the Bray Transfers, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

## **RESERVATION OF RIGHTS**

147.    Plaintiff reserves the right to bring all other claims or causes of action that Plaintiff may have against any Defendant, on any and all grounds, as allowed under the law or in equity, including but not limited to, those claims not known by the Trustee at this time but that he may discover during the pendency of this adversary proceeding.

## **PRAYER FOR RELIEF**

**On the First Through Sixth Claims for Relief:**

1.    Avoiding, recovering, and preserving the Transfers to the Defendants in such amounts as the Court may determine pursuant to applicable law;

**On the Seventh Claim for Relief:**

2.    Finding the Defendants liable for aiding and abetting the Ponzi scheme of borrowing and payments through the Spot On Notes and awarding the Plaintiff damages as the Court determines;

**On the Eighth and Ninth Claims for Relief:**

3.    Avoiding, recovering, and preserving the Bray Transfers from the Bray Defendant pursuant to 11 U.S.C. § 548, 550, and 551;

**On All Claims for Relief:**

4.      Awarding punitive and exemplary damages according to proof;

5.      Awarding pre-judgment interest at the maximum legal rate;

6.      Awarding post-judgment interest at the maximum legal rate from the date of the last Transfer and/or Bray Transfers until the judgment is paid in full;

7.      Awarding costs of suit incurred herein; and

8.      Granting any other and further relief as the Court deems just and proper.

DATED: March 19, 2025                    DINSMORE AND SHOHL LLP

By: */s/ Tyler Powell*
    Yosina M. Lissebeck
    Tyler Powell (*admitted pro hac vice*)
Special Counsel to Richard A. Marshack, Trustee
of the LPG Liquidation Trust

# EXHIBIT 1

Exhibit 1
Page 27

CHRISTOPHER B. GHIO (259094)
christopher.ghio@dinsmore.com
CHRISTOPHER CELENTINO (131688)
christopher.celentino@dinsmore.com
YOSINA M. LISSEBECK (201654)
yosina.lissebeck@dinsmore.com
DINSMORE & SHOHL LLP
655 West Broadway, Suite 800
San Diego, California 92101
Tele: 619.400.0500
Fax:  619.400.0501

Sarah S. Mattingly (Ky. Bar 94257)
sarah.mattingly@dinsmore.com
DINSMORE & SHOHL, LLP
101 S. Fifth Street, Suite 2500
Louisville, Kentucky 40202
Tele: 859-425-1096
Fax: 502-585-2207
(Admitted pro hac vice)

Special Counsel to Richard A. Marshack

**FILED & ENTERED**

**JUN 03 2024**

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY mccall     DEPUTY CLERK

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

In Re

The Litigation Practice Group P.C.,

          Debtor(s),

Case No: 23-bk-10571-SC

Chapter 11

**ORDER GRANTING MOTION FOR ENTRY OF PROTECTIVE ORDER AND THE PROTECTIVE ORDER**

Date:    May 23, 2024
Time:    1:30 p.m.
Judge:   Hon. Scott C. Clarkson
Place:   Courtroom 5C (via Zoom)[1]
             411 West Fourth Street
             Santa Ana, CA 92701

---

[1] Video and audio connection information for each hearing will be provided on Judge Clarkson's publicly posted hearing calendar, which may be viewed online at:
http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

Exhibit 1
Page 28

The Court has read and considered the Notice of Motion and Motion for Entry of Protective Order (the "Motion") filed by Richard A. Marshack, in his capacity as the Chapter 11 Trustee (the "Trustee") of the Bankruptcy Estate ("Estate") of The Litigation Practice Group P.C., on May 2, 2024, pursuant to Federal Rule of Bankruptcy Procedure 7026 and Federal Rule of Civil Procedure 26(c)(1), as Dk. No. 1164 ("Motion"), and has found good cause to grant the Motion.

IT IS HEREBY ORDERED that:

1.    The Motion is granted;

2.    The below Protective Order shall apply to any contested matter arising in the main bankruptcy case and in all adversary proceedings filed by or against Trustee, present and future; and

3.    Govern the discovery conducted therein.

## PROTECTIVE ORDER

**1.    DEFINITIONS**

1.1    "Confidential Information" as used in this Protective Order shall mean documents and other information (regardless of how generated, stored or maintained) that a Party or non-party reasonably believes to contain or reflect non-public financial or business information, bank records, financial records, such as social security numbers, non-public financial or personal information of a Party or non-party, account numbers, sensitive digital information and identifiers, information subject to confidentiality agreements or provisions other than this Protective Order, and other non-public research, development, or commercial information that derives value or avoids injury by virtue of not being known to the public.

1.2    This "Action" is defined and hereby means any contested matter arising in the main bankruptcy case and in all adversary proceedings filed by or against Trustee, present and future.

1.3    "Designating Party" means a Party or non-party that designates Confidential Information during the Action.

1.4    "Receiving Party" means a Party that receives Confidential Information during the Action.

Exhibit 1
Page 29

1   1.5   "Party" or "Parties" means person or entity subject to this Protective Order.

2   **2.   SCOPE OF THIS PROTECTIVE ORDER**

3   2.1   Unless otherwise ordered, this Protective Order shall govern certain documents and
4   other products of discovery obtained in the Action from the Parties there to, and from third parties.
5   As well as certain information copied or derived therefrom, excerpts, summaries or compilations
6   thereof, including, but not limited to, documents voluntarily exchanged as part of early settlement
7   discussions, documents produced pursuant to initial disclosures, requests authorized by the Federal
8   Rules of Civil Procedure made applicable herein by the Federal Rules of Bankruptcy Procedure,
9   answers to interrogatories, deposition transcripts, responses to requests for production, responses to
10  requests for admission, subpoenas, affidavits, declarations, expert reports, and other such material
11  and information as may be produced during the course of the Action and designated as Confidential
12  Information.

13  **3.   DESIGNATION OF CONFIDENTIAL INFORMATION**

14  3.1   This Protective Order shall govern the production and handling of any Confidential
15  Information in this Action. Any Party or non-party who produces Confidential Information in this
16  Action may designate it as "Confidential" or "Attorneys' Eyes Only" consistent with the terms of this
17  Protective Order. Whenever possible, the Designating Party must designate only those portions of a
18  document, written discovery responses, deposition, transcript, or other material that contain the
19  Confidential Information and refrain from designating entire documents. Regardless of any
20  designations made hereunder, the Designating Party is not otherwise restricted from use or disclosure
21  of its Confidential Information outside of this Action or for any business purposes. In addition, any
22  Party may move to modify or seek other relief from any of the terms of this Protective Order if it has
23  first tried in writing and in good faith to resolve its needs or disputes with the other Parties or Party
24  as the case may be under the terms of this Protective Order. Further, nothing in this Protective Order
25  shall prevent a Party from redacting documents consistent with the Federal Rules of Civil Procedure
26  and utilizing the documents as needed through-out the Action.

27  3.2   <u>Application to Non-Parties:</u> Before a non-party is given copies of documents or
28  materials designated as Confidential Information or Attorneys' Eyes Only as permitted hereunder, it

Exhibit 1
Page 30

must first sign an acknowledgment to be bound to these terms that is attached hereto as <u>Exhibit</u> A; if it fails to do so, the Parties to this Action must resolve any such dispute before making disclosure of designated information as permitted hereunder to the non-party. If a non-party wishes to make designations hereunder, it must first sign attached <u>Exhibit A.</u>

   **3.3**  <u>Timing and Provisional Protection:</u> Designations of Confidential Information may be made at any time. To avoid potential waiver of protection hereunder, the Designating Party should designate documents or materials containing Confidential Information at the time of production or disclosure, including on the record during the taking of any deposition. Deposition testimony will be deemed provisionally protected for a period of thirty (30) days after the transcript is released to the Parties by the court reporter, although the Parties may agree at any time to different timelines of provisional protection of information as Confidential or Attorneys' Eyes Only as part of one or more specific depositions. To retain any designations beyond the provisional period, a Designating Party must designate specific pages and lines of deposition testimony before the provisional period has expired. Such designations must be made in writing so that all counsel and court reporters may append the designation to all copies of the transcripts.

   **3.4**  <u>Manner of Designation:</u> Confidential Information may be designated hereunder in any reasonable manner or method that notifies the Receiving Party of the designation level and identifies with specificity the information to which the designation applies. If made verbally, the Designating Party must promptly confirm the designation in writing. Whenever possible, the Designating Party should stamp, affix, or embed a legend of "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY" on each designated page of the document or electronic image that contains Confidential Information.

   **4.**  **CHALLENGES TO DESIGNATED INFORMATION**

   4.1  In the event that a Receiving Party disagrees at any time with any designation(s) made by the Designating Party, the Receiving Party must first try to resolve such challenge in good faith on an informal basis with the Designating Party. The Receiving Party must provide written notice of the challenge and the grounds therefor to the Designating Party, who must respond in writing to the challenge within fifteen (15) days. At all times, the Designating Party carries the burden of establishing the propriety of the designation and protection level. Unless and until the challenge is

4

Exhibit 1
Page 31

1  resolved by the Parties or ruled upon by the Court, the designated information shall remain protected

2  under this Protective Order. The failure of any Receiving Party to challenge a designation does not

3  constitute a concession that the designation is proper or an admission that the designated information

4  is otherwise competent, relevant, or material.

5      **5.      LIMITED ACCESS/USE OF PROTECTED INFORMATION**

6      5.1    <u>Restricted Use:</u> Information that is produced or exchanged in the course of the Action

7  and designated under this Protective Order may be used for preparation for trial and preparation for

8  any appeal of any and all matters in the Action, as well as related settlement negotiations, and for no

9  other purpose, without the written consent of the Designating Party. No Confidential Information may

10 be disclosed to any person except in accordance with the terms of this Protective Order, unless the

11 parties are co-counsel or have entered into joint defense agreements. All persons in possession of

12 Confidential Information agree to exercise reasonable care with regard to the custody, use, or storage

13 of such information to ensure that its confidentiality is maintained. This obligation includes, but is

14 not limited to, the Receiving Party providing to the Designating Party prompt notice of the receipt of

15 any subpoena that seeks production or disclosure of any designated information and consulting with

16 the Designating Party before responding to the subpoena. Any use or disclosure of Confidential or

17 Attorneys' Eyes Only information in violation of the terms of this Protective Order may subject the

18 disclosing person or party to sanctions.

19     5.2    <u>Access to "Confidential" Information:</u> The Party(ies) and all persons subject to this

20 Protective Order agree that information designated as "CONFIDENTIAL" may only be accessed or

21 reviewed by the following:

22     a)     The Court, its personnel, and court reporters;

23     b)     Counsel of record, or co-counsel for any Party, or other party that has entered into a

24 joint defense agreement in the Action and their employees who assist counsel of record, or co-counsel

25 in the Action and are informed of the duties and obligations imposed hereunder;

26     c)     The Parties, including their clients, agents and employees who are assisting or have

27 reason to know of the Action;

28 / / /

d)      Experts or consultants employed by the Parties or their counsel, or co-counsel, for purposes of an Action, so long as each such expert or consultant has signed attached Exhibit A; and

e)      Other witnesses or persons with the Designating Party's consent or by court order.

5.3      Access to "Attorneys' Eyes Only" Designations: The Parties and all persons subject to this Protective Order agree that information designated as "ATTORNEYS' EYES ONLY" may only be accessed or reviewed by the following:

a)      The Court, its personnel, and court reporters;

b)      Counsel of record, or co-counsel for any Party, or other party that has entered into a joint defense agreement in the Action and their employees who assist counsel of record in the Action and are informed of the duties hereunder;

c)      In-house counsel for any Party in the Action and Richard A. Marshack, as Chapter 11 Trustee of The Litigation Practice Group P.C. who is informed of the duties and obligations imposed hereunder;

d)      Experts or consultants employed by the Parties or their counsel, or co-counsel for purposes of the Action,  and so long as each such expert or consultant has signed attached Exhibit A; and

e)      Other witnesses or persons to whom the Designating Party agrees in advance of disclosure or by court order.

5.4      Non-Waiver Effect of Designations: Neither the taking of, nor the failure to take, any action to enforce the provisions of this Protective Order, nor the failure to object to any designation, will constitute a waiver of any Party(ies)'s claim or defense in the Action or any other action or proceeding, including, but not limited to, a claim or defense that any designated information is or is not Confidential, is or is not entitled to particular protection, or embodies or does not embody information protectable by law.

5.5      In-Court Use of Designated Information: If information designated under this Protective Order will or may be offered in evidence at a hearing or trial related to any matter in the Action, then the offering party must give advance notice to the party or non-party that designated prior to offering the information so that any use or disclosure may be addressed in accordance with

the Court's case-management or other pre-trial order, or by a motion *in limine.*  Nothing in this Protective Order shall be construed as a waiver by a Party of any objections that may be raised as to the admissibility at trial of any evidentiary materials.

**6.    CLAW-BACK REQUESTS**

6.1    <u>Failure to Make Designation:</u>  If, at any time, a Party or non-party discovers that it produced or disclosed Confidential Information without designation, it may promptly notify the Receiving Party and identify with particularity the Confidential Information to be designated and the level of designation (the claw-back notification). The Receiving Party may then request substitute production of the newly-designated information. Within thirty (30) days of receiving the claw-back notification, the Receiving Party must: (1) certify to the Designating Party it has appropriately marked or, if substitute production has been requested, destroyed all unmarked copies that it received, made, and/or distributed; and (2) if it was practicably unable to mark or destroy any information because disclosures occurred while the Receiving Party was under no duty of confidentiality under the terms of this Protective Order regarding that information, the Receiving Party must reasonably provide as much information as practicable to aid the Designating Party in protecting the information, consistently with the Receiving Party's attorney-client, work-product, and/or trial-preparation privileges.

6.2    <u>Inadvertent Production of Privileged Information:</u> If, at any time, a Party discovers that it produced information that it reasonably believes is subject to protection under the attorney/client, work-product, or trial-preparation privileges, then it must promptly notify each Receiving Party of the claim for protection, the basis for it, amend its privilege log accordingly, and comply with Fed. R. Civ. P. 26(b)(5). Whenever possible, the producing party must produce substitute information that redacts the information subject to the claimed protection. The Receiving Party must thereupon comply with Fed. R. Civ. P. 26(b)(5)(B) as to the information subject to the claimed protection.

/ / /

/ / /

/ / /

## 7. DURATION/CONTINUED RESTRICTIONS

7.1    <u>Handling of Designated Information Upon Conclusion of the Main Bankruptcy Case:</u> Upon conclusion of the Main Bankruptcy Case, by way of dismissal or closing of the case, the Designating Party(ies) is/are responsible for ensuring that any Party or person to whom the Designating Party shared or disclosed designated information in any of the matters under the Action returns or destroys all of its copies, regardless of the medium in which it was stored. No witness or Party may retain designated information that it received from any other Party or non-party under this Protective Order; only counsel of record, or co-counsel, are the authorized agents who may retain one copy for their respective legal files, and who must also describe to the Designating Party the extra steps taken to protect its legal file containing paper and/or electronic copies of the designated information so that it is not accessed, used, or disclosed inconsistently with the obligations under this Protective Order. This provision does not apply to the Court or Court staff. Moreover, this provision does not apply to Trustee, who may retain and use – consistent with this Order – Confidential Information received in any Action during the entirety of the Bankruptcy.

7.2    <u>Continued Restrictions Under this Protective Order:</u> The restrictions on disclosure and use of Confidential Information shall survive the conclusion of the Bankruptcy case and any matter in the Action.

## 8. PRIVILEGED OR PROTECTED INFORMATION

8.1    Nothing in this Protective Order shall require disclosure of information that is protected by the attorney-client privilege, the work-product protection, or any other legally cognizable privilege (a "Privilege or Protection").  If information subject to a claim of Privilege or Protection is inadvertently produced, pursuant to Federal Rule of Evidence 502(d) such production shall not constitute a waiver of, or estoppel as to, any claim of Privilege or Protection for such information or any other information that may be protected from disclosure by a Privilege or Protection in any proceeding.

8.2    If a Party receives a document that appears to be subject to a Privilege or Protection, then it shall refrain from examining the document any more than is essential to ascertain if it is privileged or protected and shall promptly notify the producing Party in writing that the receiving

Exhibit 1
Page 35

Party possesses material that appears to be subject to a Privilege or Protection. The producing Party shall have seven (7) days after receiving such notice to assert a Privilege or Protection over the identified material. If the producing Party does not assert a claim of Privilege or Protection within the seven (7)-day period, the material in question shall be deemed not privileged or protected.

8.3    If a producing Party has produced a document subject to a claim of Privilege or Protection, upon written request by the producing Party, the document for which a claim of Privilege or Protection is made shall be sequestered or destroyed to the extent reasonably practicable, and the receiving Party shall not use the document for any purpose other than in connection with analyzing or disputing a claim of Privilege or Protection or in connection with a motion to compel the production of the document.

8.4    The receiving Party sequestering or destroying such material may then move the Court for an order compelling production of the material. The applicable producing Party bears the burden of establishing the applicable Privilege or Protection of any clawed-back document or information as and to the same extent that it would have borne such burden had it not produced the document or information.  Nothing in this Protective Order shall limit the Court's right or any receiving Party's right to request an in camera review of any information subject to a claim of Privilege or Protection.

###

Date: June 3, 2024

Scott C. Clarkson
United States Bankruptcy Judge

Exhibit 1
Page 36

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT "A"

1

Exhibit 1
Page 37

1  Christopher B. Ghio (State Bar No. 259094)
   Christopher Celentino (State Bar No. 131688)
2  Yosina M. Lissebeck (State Bar No. 201654)
   **DINSMORE & SHOHL LLP**
3  655 West Broadway, Suite 800
   San Diego, CA 92101
4  Telephone:  619.400.0500
   Facsimile:  619.400.0501
5  christopher.ghio@dinsmore.com
   christopher.celentino@dinsmore.com
6  yosina.lissebeck@dinsmore.com

7  Sarah S. Mattingly (Ky. Bar 94257)
   DINSMORE & SHOHL, LLP
8  101 S. Fifth Street, Suite 2500
   Louisville, KY 40202
9  Telephone: 859-425-1096
   Facsimile: 502-585-2207
10 Sarah.mattingly@dinsmore.com
   (Admitted pro hac vice)

11
   Special Counsel to Richard A. Marshack,
12 Chapter 11 Trustee

13

14                    **UNITED STATES BANKRUPTCY COURT**

15                    **CENTRAL DISTRICT OF CALIFORNIA**

16

17 In Re                              | Case No. 8:23-BK-10571-SC
18                                    |
                                      | Chapter 11
19
   The Litigation Practice Group P.C., | **EXHIBIT A TO STIPULATED**
20                                     | **ORDER**
                Debtor(s),            |
21                                    | Date:   May 23, 2024
22                                    | Time:   1:30 p.m.
                                      | Judge:  Hon. Scott C. Clarkson
23                                    | Place:  Courtroom 5C[1] - Via Zoom
24                                    |         411 W. Fourth Street
                                      |         Santa Ana, CA  92701
25

26

27  _____

28  [1] Video and audio connection information for each hearing will be provided on Judge Clarkson's
    publicly posted hearing calendar, which may be viewed online at:
    http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

                                    1

Exhibit 1
Page 38

This is to certify that:

    (a)    I am being given access to Confidential Information pursuant to the Stipulated Protective Order that was entered into the main bankruptcy case for Litigation Practice Group, but which is binding and controlling as set forth by the Court's Order on any and all contested matters and any and all litigation commenced by Trustee;

    (b)    I have read the Stipulated Protective Order; and

    (c)    I agree to be bound by the terms and conditions thereof, including, without limitation, to the obligations regarding the use, non-disclosure and return of such Confidential Information. I further agree that in addition to being contractually bound by the Stipulated Protective Order, I am subject to the jurisdiction of the above reference Court for any violation thereof.

Date: _____

_____
Signature

_____
Printed Name

# EXHIBIT 2

Exhibit 2
Page 40

# Pace Construction Inc

*CSLB: 262961*



# INVOICE

335 Appleby St
Corona, CA 92881
Phone 714-408-7612   Fax 714-276-0669

**Bill To:**
LPG

| | |
|---|---|
| **DATE:** | June 3, 2022 |
| **INVOICE #** | 07-19-35 |
| **FOR:** | *Project or service* |

| DESCRIPTION | AMOUNT |
|---|---|
| Consulting | $        30,000.00 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| **TOTAL** | $        30,000.00 |

Make all checks payable to Pace Construction Inc

**THANK YOU FOR YOUR BUSINESS!**

Exhibit 2
Page 41

In re: The Litigation Practice Group PC
Disbursement Details by Payee
4 Years Pre-Petition (03/20/2019 - 03/20/2023)

**GROBSTEIN TEEPLE**

| Bank Name | Account Name | Account Number | Cardholder Name | Cardholder Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|---|---|
| Bank of the West | The Litigation Practice Group PC | 3441 | | | 5/31/2021 | 5/17/2021 | 1003581147 | 30,000.00 | |
| Bank of the West | The Litigation Practice Group PC | 3441 | | | 6/30/2021 | 6/4/2021 | 1129 | 3,900.00 | |
| Optimum Bank | Coast Processing LLC dba LPG | 6738 | | | 11/30/2021 | 11/5/2021 | | 30,192.76 | WIRE TO Pace Construction |
| UnionBank | The Litigation Practice Group PC; IOLTA | 4874 | | | 1/31/2022 | 1/10/2022 | 127 | 28,978.69 | Settlement Funding |
| Chase | The Litigation Practice Group PC | 3158 | | | 2/28/2022 | 2/18/2022 | 1145 | 30,000.00 | |
| Chase | The Litigation Practice Group PC | 3158 | | | 3/31/2022 | 3/4/2022 | 11055 | 30,000.00 | Referral Fees |
| Chase | The Litigation Practice Group PC | 3158 | | | 3/31/2022 | 3/24/2022 | 1178 | 30,000.00 | |
| Chase | The Litigation Practice Group PC | 3158 | | | 6/30/2022 | 6/7/2022 | 11416 | 30,000.00 | Consulting Services |
| Chase | The Litigation Practice Group PC | 3158 | | | 8/31/2022 | 8/1/2022 | | 73,900.00 | Book Transfer Debit A/C: Pace Construction, Inc. Corona CA 92881-0944 US Ref: Invoice 07.29 Tm: 5997500213Jo |
| Chase | The Litigation Practice Group PC | 3158 | | | 8/31/2022 | 8/4/2022 | | 200,000.00 | Book Transfer Debit A/C: Pace Construction, Inc. Corona CA 92881-0944 US Ref: 08.04.22 Consulting Services Tm: 6047500216Jo |
| Chase | The Litigation Practice Group PC | 3158 | | | 8/31/2022 | 8/5/2022 | | 100,000.00 | Book Transfer Debit A/C: Pace Construction, Inc. Corona CA 92881-0944 US Ref: Lead Purchase Tm: 2838900217Jo |
| Chase | LPG VC; Alex Tarkoff | 6652 | LPG VC PAN | 4814 | 9/23/2022 | 9/16/2022 | | 28,000.00 | PACE CONSTRUCTION INC 714-408-7612 CA P.O.S.: 07589010416 SALES TAX: 0.00 |
| Chase | LPG; Alex Tarkoff | 0935 | FIRAS ABUNADA | 1163 | 9/23/2022 | 9/22/2022 | | 47,000.00 | PACE CONSTRUCTION INC 714-408-7612 CA P.O.S.: 07606932424 SALES TAX: 0.00 |
| Chase | LPG VC; Alex Tarkoff | 6652 | LPG VC PAN | 4814 | 10/7/2022 | 9/27/2022 | | 49,000.00 | PACE CONSTRUCTION INC 714-408-7612 CA P.O.S.: 07620603313 SALES TAX: 0.00 |
| Chase | LPG VC; Alex Tarkoff | 6652 | LPG VC PAN | 4814 | 11/18/2022 | 11/9/2022 | | 24,671.33 | PACE CONSTRUCTION INC 714-408-7612 CA P.O.S.: 07774136205 SALES TAX: 0.00 |
| | | | | | | | | **735,642.78** | |

DRAFT FORM - SUBJECT TO CHANGE

Payor Accounts: BAT Inc., Coast Processing LLC,
EZ Debt Relief, Maverick Management, Phoenixgix, The
Litigation Practice Group, Vulcan Consulting Group LLC

Exhibit 2
Page 42

# EXHIBIT 3

Exhibit 3
Page 43

| Bank Name | Account Name | Acc. Number | Transaction Date | Check No. | Amount | Payee | 90 Day Transfer | Post-Petition Transfer |
|---|---|---|---|---|---|---|---|---|
| Optimum Bank | Coast Processing LLC dba LPG | X6738 | 11/5/2021 | | $55,740.48 | **Lifestar Products** | N | N |
| UnionBank | The Litigation Practice Group PC; IOLTA | X4874 | 1/10/2022 | 126 | $53,499.17 | **Lifestar Products** | N | N |
| | | | | Total | **$109,239.65** | | | |
| | | | | | | | | |
| Chase | Vulcan Consulting Group LLC | X3588 | 5/13/2021 | | $56,250.00 | **Rose Romo** | N | N |
| Bank of the West | The Litigation Practice Group PC | X3441 | 6/4/2021 | 1128 | $7,500.00 | **Rose Romo** | N | N |
| Chase | Vulcan Consulting Group LLC | X3588 | 7/13/2021 | | $123,800.00 | **Rose Romo** | N | N |
| | | | | Total | **$187,550.00** | | | |
| | | | | | | | | |
| Chase | The Litigation Practice Group PC | X3158 | 7/14/2022 | 11632 | $13,996.26 | **Blue Jae** | N | N |
| Chase | The Litigation Practice Group PC | X3158 | 7/29/2022 | 11728 | $12,909.12 | **Blue Jae** | N | N |
| | | | | Total | **$26,905.38** | | | |
| | | | | | | | | |
| Chase | Vulcan Consulting Group LLC | X3588 | 4/22/2021 | | $37,000.00 | **JNR Services, Inc.** | N | N |
| Bank of the West | The Litigation Practice Group PC | X3441 | 5/17/2021 | 1003581150 | $31,500.00 | **JNR Services, Inc.** | N | N |
| Optimum Bank | Coast Processing LLC dba LPG | X6738 | 11/5/2021 | | $74,991.76 | **JNR Services, Inc.** | N | N |
| UnionBank | The Litigation Practice Group PC | X4858 | 11/23/2021 | | $250,000.00 | **JNR Services, Inc.** | N | N |
| UnionBank | The Litigation Practice Group PC; IOLTA | X4874 | 1/7/2022 | 124 | $40,919.74 | **JNR Services, Inc.** | N | N |
| Bank of America | Vulcan Consulting Group LLC dba DRD | X9551 | 1/25/2022 | | $21,886.00 | **JNR Services, Inc.** | N | N |
| Chase | The Litigation Practice Group PC | X3158 | 2/10/2022 | | $20,000.00 | **JNR Services, Inc.** | N | N |
| Chase | The Litigation Practice Group PC | X3158 | 3/9/2022 | 1158 | $16,678.57 | **JNR Services, Inc.** | N | N |
| Chase | The Litigation Practice Group PC | X3158 | 3/22/2022 | | $25,000.00 | **JNR Services, Inc.** | N | N |
| Chase | The Litigation Practice Group PC | X3158 | 7/8/2022 | | $35,000.00 | **JNR Services, Inc.** | N | N |
| Chase Card | LPG VC; Alex Tarkoff | X6652 | 10/25/2022 | | $42,500.00 | **JNR Services, Inc.** | N | N |
| Chase Card | LPG VC; Alex Tarkoff | X6652 | 10/25/2022 | | $32,500.00 | **JNR Services, Inc.** | N | N |
| Chase | The Litigation Practice Group PC | X3158 | 11/15/2022 | | $23,000.00 | **JNR Services, Inc.** | N | N |
| | | | | Total | **$650,976.07** | | | |
| | | | | | | | | |
| Chase | Vulcan Consulting Group LLC | X3588 | 4/1/2021 | | $11,250.00 | **Jason Dovalina** | N | N |
| Bank of the West | The Litigation Practice Group PC | X3441 | 5/4/2021 | 1032 | $55,000.00 | **Jason Dovalina** | N | N |
| Chase | Vulcan Consulting Group LLC | X3588 | 5/13/2021 | | $20,000.00 | **Jason Dovalina** | N | N |
| Chase | Vulcan Consulting Group LLC | X5909 | 8/18/2021 | 1092574424 | $25,000.00 | **Jason Dovalina** | N | N |
| American Express | LPG PC; Syed Gilani | X1001 | 12/19/2021 | | $300.00 | **Jason Dovalina** | N | N |
| American Express | LPG PC; Syed Gilani | X1001 | 12/19/2021 | | $350.00 | **Jason Dovalina** | Y | N |
| | | | | Total | **$111,900.00** | | | |

Exhibit 3
Page 44

| Bank Name | Account Name | Acc. Number | Transaction Date | Check No. | Amount | Payee | 90 Day Transfer | Post-Petition Transfer |
|---|---|---|---|---|---|---|---|---|
| Chase | The Litigation Practice Group PC | X3133 | 4/1/2022 | | $2,101.55 | A Solution Debt Relief Inc. | N | N |
| Chase | The Litigation Practice Group PC | X3133 | 4/7/2022 | | $940.01 | A Solution Debt Relief Inc. | N | N |
| Chase | The Litigation Practice Group PC | X3133 | 4/18/2022 | | $8,177.10 | A Solution Debt Relief Inc. | N | N |
| Chase | The Litigation Practice Group PC | X3133 | 4/21/2022 | | $1,840.98 | A Solution Debt Relief Inc. | N | N |
| Chase | The Litigation Practice Group PC | X3133 | 4/28/2022 | | $2,709.94 | A Solution Debt Relief Inc. | N | N |
| Chase | The Litigation Practice Group PC | X3133 | 5/4/2022 | | $60,000.00 | A Solution Debt Relief Inc. | N | N |
| Chase | The Litigation Practice Group PC | X3133 | 5/5/2022 | | $2,343.95 | A Solution Debt Relief Inc. | N | N |
| Chase | The Litigation Practice Group PC | X3133 | 5/13/2022 | | $4,640.96 | A Solution Debt Relief Inc. | N | N |
| Chase | The Litigation Practice Group PC | X3133 | 5/19/2022 | | $5,792.76 | A Solution Debt Relief Inc. | N | N |
| Chase | The Litigation Practice Group PC | X3133 | 5/26/2022 | | $15,000.00 | A Solution Debt Relief Inc. | N | N |
| Chase | The Litigation Practice Group PC | X3133 | 5/27/2022 | | $5,534.32 | A Solution Debt Relief Inc. | N | N |
| Chase | The Litigation Practice Group PC | X3133 | 6/3/2022 | | $6,022.83 | A Solution Debt Relief Inc. | N | N |
| Chase | The Litigation Practice Group PC | X3133 | 6/10/2022 | | $6,055.52 | A Solution Debt Relief Inc. | N | N |
| Chase | The Litigation Practice Group PC | X3133 | 6/16/2022 | | $8,864.64 | A Solution Debt Relief Inc. | N | N |
| Chase | The Litigation Practice Group PC | X3133 | 6/23/2022 | | $8,322.70 | A Solution Debt Relief Inc. | N | N |
| Chase | The Litigation Practice Group PC | X3133 | 6/30/2022 | | $9,232.65 | A Solution Debt Relief Inc. | N | N |
| Chase | The Litigation Practice Group PC | X3133 | 7/8/2022 | | $7,296.52 | A Solution Debt Relief Inc. | N | N |
| Chase | The Litigation Practice Group PC | X3133 | 7/14/2022 | | $16,507.81 | A Solution Debt Relief Inc. | N | N |
| Chase | The Litigation Practice Group PC | X3133 | 7/21/2022 | | $9,242.69 | A Solution Debt Relief Inc. | N | N |
| Chase | The Litigation Practice Group PC | X3133 | 7/22/2022 | | $8,000.00 | A Solution Debt Relief Inc. | N | N |
| Chase | The Litigation Practice Group PC | X3133 | 7/29/2022 | | $6,564.30 | A Solution Debt Relief Inc. | N | N |
| Chase | The Litigation Practice Group PC | X3133 | 8/5/2022 | | $11,015.82 | A Solution Debt Relief Inc. | N | N |
| Chase | The Litigation Practice Group PC | X3133 | 8/5/2022 | | $10,000.00 | A Solution Debt Relief Inc. | N | N |
| Chase | The Litigation Practice Group PC | X3133 | 8/11/2022 | | $5,937.53 | A Solution Debt Relief Inc. | N | N |
| Chase | The Litigation Practice Group PC | X3133 | 8/19/2022 | | $15,000.00 | A Solution Debt Relief Inc. | N | N |
| Chase | The Litigation Practice Group PC | X3133 | 8/19/2022 | | $9,910.73 | A Solution Debt Relief Inc. | N | N |
| Chase | The Litigation Practice Group PC | X3133 | 8/26/2022 | | $208.21 | A Solution Debt Relief Inc. | N | N |
| Chase | The Litigation Practice Group PC | X3133 | 11/9/2022 | | $10,730.52 | A Solution Debt Relief Inc. | N | N |
| Bank of America | Vulcan Consulting Group LLC dba DRD | X9551 | 11/17/2022 | | $6,000.00 | A Solution Debt Relief Inc. | N | N |
| Chase | The Litigation Practice Group PC | X3133 | 12/2/2022 | | $14,843.50 | A Solution Debt Relief Inc. | N | N |
| Chase | The Litigation Practice Group PC | X3133 | 12/30/2022 | | $5,758.94 | A Solution Debt Relief Inc. | Y | N |
| Bank of America Card | Litigation Practice Group PC | X6538 | 1/13/2023 | | $5,971.19 | A Solution Debt Relief Inc. | Y | N |
| | | | | Total | $290,567.67 | | | |

Exhibit 3
Page 45

# EXHIBIT 4

Exhibit 4
Page 46

| Date | Account | Payee | Amount | 90 Day Transfer | Post-Petition Transfer |
|---|---|---|---|---|---|
| ######## | Spot On Acct No. #2777 | A Solution Debt Relief Inc. | $25,000.00 | N | N |
| ######## | Spot On Acct No. #2777 | A Solution Debt Relief Inc. | $35,000.00 | Y | N |
| 1/3/2023 | Spot On Acct No. #2777 | A Solution Debt Relief Inc. | $25,000.00 | Y | N |
| 1/3/2023 | Spot On Acct No. #2777 | A Solution Debt Relief Inc. | $5,000.00 | Y | N |
| 1/3/2023 | Spot On Acct No. #2777 | A Solution Debt Relief Inc. | $5,000.00 | Y | N |
| 1/3/2023 | Spot On Acct No. #2777 | A Solution Debt Relief Inc. | $5,000.00 | Y | N |
| 1/3/2023 | Spot On Acct No. #2777 | A Solution Debt Relief Inc. | $5,000.00 | Y | N |
| 1/4/2023 | Spot On Acct No. #2777 | A Solution Debt Relief Inc. | $3,000.00 | Y | N |
| 1/5/2023 | Spot On Acct No. #2777 | A Solution Debt Relief Inc. | $22,000.00 | Y | N |
| 1/6/2023 | Spot On Acct No. #7662 | A Solution Debt Relief Inc. | $25,000.00 | Y | N |
| 1/9/2023 | Spot On Acct No. #2777 | A Solution Debt Relief Inc. | $5,000.00 | Y | N |
| 1/11/2023 | Spot On Acct No. #7662 | A Solution Debt Relief Inc. | $20,000.00 | Y | N |
| 1/13/2023 | Spot On Acct No. #2777 | A Solution Debt Relief Inc. | $25,000.00 | Y | N |
| 1/19/2023 | Spot On Acct No. #2777 | A Solution Debt Relief Inc. | $40,000.00 | Y | N |
| 1/27/2023 | Spot On Acct No. #2777 | A Solution Debt Relief Inc. | $40,000.00 | Y | N |
| 2/3/2023 | Spot On Acct No. #2777 | A Solution Debt Relief Inc. | $40,000.00 | Y | N |
| 2/13/2023 | Spot On Acct No. #7662 | A Solution Debt Relief Inc. | $29,000.00 | Y | N |
| | | Total | **$354,000.00** | | |

| Date | Account | Payee | Amount | 90 Day Transfer | Post-Petition Transfer |
|---|---|---|---|---|---|
| 8/12/2022 | Spot On Acct No. #7662 | Ben: Jnr Services Fullerton CA 92832 US | $7,950.00 | N | N |
| 10/3/2022 | Spot On Acct No. #7662 | Ben: Jnr Services Fullerton CA 92832 US | $50,000.00 | N | N |
| 2/3/2023 | Spot On Acct No. #7662 | Ben: Jnr Services Fullerton CA 92832 US | $20,000.00 | Y | N |
| | | Total | **$77,950.00** | | |

| Date | Account | Payee | Amount | 90 Day Transfer | Post-Petition Transfer |
|---|---|---|---|---|---|
| 8/18/2022 | Spot On Acct No. #7662 | Jason (_########9208) | $40,000.00 | N | N |
| 10/4/2022 | Spot On Acct No. #7662 | Jason (_########9208) | $2,000.00 | N | N |
| 10/6/2022 | Spot On Acct No. #7662 | Jason (_########9208) | $3,500.00 | N | N |
| 12/2/2022 | Spot On Acct No. #7662 | Jason (_########9208) | $960.00 | N | N |
| 12/9/2022 | Spot On Acct No. #7662 | Jason (_########9208) | $1,050.00 | N | N |
| ######## | Spot On Acct No. #7662 | Jason (_########9208) | $42,500.00 | Y | N |
| 1/3/2023 | Spot On Acct No. #7662 | Jason (_########9208) | $960.00 | Y | N |
| 1/3/2023 | Spot On Acct No. #7662 | Jason (_########9208) | $750.00 | Y | N |
| 2/3/2023 | Spot On Acct No. #7662 | Jason (_########9208) | $960.00 | Y | N |
| | | Total | **$92,680.00** | | |

| Date | Account | Payee | Amount | 90 Day Transfer | Post-Petition Transfer |
|---|---|---|---|---|---|
| 12/12/2022 | Spot On Acct No. #2777 | Jr Bray Group LLC Paid on Behalf of A Solution Debt Relief, Inc. | $75,000.00 | N | N |
| 12/21/2022 | Spot On Acct No. #2777 | Jr Bray Group LLC Paid on Behalf of A Solution Debt Relief, Inc. | $80,900.00 | Y | N |
| | | Total | **$155,900.00** | | |

Exhibit 4
Page 47

| Date | Account | Payee | Amount | 90 Day Transfer | Post-Petition Transfer |
|------|---------|-------|--------|-----------------|------------------------|
| 11/29/2021 | Spot On Acct No. #7662 | Pace Construction | $13,260.00 | N | N |
| 12/30/2022 | Spot On Acct No. #7662 | Pace Construction | $1,000.00 | Y | N |
| 1/6/2023 | Spot On Acct No. #7662 | Pace Construction | $1,000.00 | Y | N |
| 1/30/2023 | Spot On Acct No. #7662 | Pace Construction | $2,000.00 | Y | N |
| 2/3/2023 | Spot On Acct No. #7662 | Pace Construction | $2,000.00 | Y | N |
| 2/13/2023 | Spot On Acct No. #7662 | Pace Construction | $2,000.00 | Y | N |
| | | Total | $21,260.00 | | |

Exhibit 4
Page 48

| Date | Account | Payee | Amount | 90 Day Transfer | Post-Petition Transfer |
|------|---------|-------|--------|-----------------|------------------------|
| 9/7/2022 | Spot On Acct No. #7662 | Caesarmercado (_######7662) | $2,500.00 | N | N |
| 9/8/2022 | Spot On Acct No. #7662 | Caesarmercado (_######8717) | $2,500.00 | N | N |
| 9/14/2022 | Spot On Acct No. #7662 | Caesarmercado (_######8717) | $2,500.00 | N | N |
| 9/20/2022 | Spot On Acct No. #7662 | Caesarmercado (_######8717) | $400.00 | N | N |
| 9/29/2022 | Spot On Acct No. #7662 | Caesarmercado (_######8717) | $1,310.00 | N | N |
| 10/20/2022 | Spot On Acct No. #7662 | Caesarmercado (_######8717) | $4,200.00 | N | N |
| 10/25/2022 | Spot On Acct No. #7662 | Caesarmercado (_######8717) | $400.00 | N | N |
| 10/26/2022 | Spot On Acct No. #7662 | Caesarmercado (_41:40#48717) | $6,400.00 | N | N |
| 11/25/2022 | Spot On Acct No. #7662 | Caesarmercado (_######8717) | $6,400.00 | N | N |
| 11/25/2022 | Spot On Acct No. #7662 | Caesarmercado (_######8717) | $400.00 | N | N |
| 12/19/2022 | Spot On Acct No. #7662 | Caesarmercado (_######8717) | $1,100.00 | Y | N |
| 12/22/2022 | Spot On Acct No. #7662 | Caesarmercado (_######8717) | $400.00 | Y | N |
| 12/27/2022 | Spot On Acct No. #7662 | Caesarmercado (_######8717) | $5,200.00 | Y | N |
| 12/27/2022 | Spot On Acct No. #7662 | Caesarmercado (_######8717) | $1,200.00 | Y | N |
| 1/6/2023 | Spot On Acct No. #7662 | Caesarmercado (_######8717) | $700.00 | Y | N |
| 1/24/2023 | Spot On Acct No. #7662 | Caesarmercado (_######8717) | $400.00 | Y | N |
| 1/26/2023 | Spot On Acct No. #7662 | Caesarmercado (_######8717) | $6,400.00 | Y | N |
| 1/27/2023 | Spot On Acct No. #7662 | Caesarmercado (_######8717) | $1,350.00 | Y | N |
| 2/9/2023 | Spot On Acct No. #7662 | Caesarmercado (_######8717) | $800.00 | Y | N |
| 2/23/2023 | Spot On Acct No. #7662 | Caesarmercado (_######8717) | $400.00 | Y | N |
| 2/27/2023 | Spot On Acct No. #7662 | Caesarmercado (_######8717) | $6,400.00 | Y | N |
| 3/9/2023 | Spot On Acct No. #7662 | Caesarmercado (_######8717) | $800.00 | Y | N |
| 3/27/2023 | Spot On Acct No. #7662 | Caesarmercado (_######8717) | $400.00 | N | Y |
| 3/28/2023 | Spot On Acct No. #7662 | Caesarmercado (_######8717) | $6,400.00 | N | Y |
|  |  | **Total** | **$58,960.00** |  |  |

Exhibit 4
Page 49

| Date | Account | Payee | Amount | 90 Day Transfer | Post-Petition Transfer |
|---|---|---|---|---|---|
| 8/30/2022 | Spot On Acct. #7662 | Bluejae ( #####0475) | $6,496.00 | N | N |
| 9/2/2022 | Spot On No. 7662 | Bluejae (_#####0475) | $5,860.00 | N | N |
| 9/7/2022 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $3,126.00 | N | N |
| 9/12/2022 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $6,330.00 | N | N |
| 9/16/2022 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $6,513.33 | N | N |
| 9/29/2022 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $350.00 | N | N |
| 10/4/2022 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $10,000.00 | N | N |
| 10/6/2022 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $2,460.00 | N | N |
| 10/14/2022 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $13,963.60 | N | N |
| 10/20/2022 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $25,660.00 | N | N |
| 10/26/2022 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $10,000.00 | N | N |
| 10/27/2022 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $19,488.63 | N | N |
| 11/3/2022 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $16,962.50 | N | N |
| 11/3/2022 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $20,000.00 | N | N |
| 11/7/2022 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $1,600.00 | N | N |
| 11/8/2022 | Spot On Acct No. 7662 | Bluejae (_#4####0475) | $10,000.00 | N | N |
| 11/9/2022 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $10,000.00 | N | N |
| 11/14/2022 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $14,335.83 | N | N |
| 11/15/2022 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $20,000.00 | N | N |
| 11/18/2022 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $1,750.00 | N | N |
| 11/18/2022 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $15,083.33 | N | N |
| 11/25/2022 | Spot On Acct No. 7662 | Bluejae (_#4####0475) | $20,000.00 | N | N |
| 11/25/2022 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $10,000.00 | N | N |
| 11/29/2022 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $5,380.00 | N | N |
| 11/30/2022 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $5,000.00 | N | N |
| 12/2/2022 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $20,000.00 | N | N |
| 12/7/2022 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $4,020.00 | N | N |
| 12/7/2022 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $6,700.00 | N | N |
| 12/9/2022 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $10,000.00 | N | N |
| 12/9/2022 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $7,574.66 | N | N |
| 12/9/2022 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $5,000.00 | N | N |
| 12/9/2022 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $2,500.00 | N | N |
| 12/9/2022 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $10,000.00 | N | N |
| 12/9/2022 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $15,000.00 | N | N |
| 12/12/2022 | Spot On Acct No. #2777 | Bluejae (_#####0476) | $30,000.00 | N | N |
| 12/15/2022 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $20,000.00 | N | N |
| 12/15/2022 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $10,000.00 | N | N |
| 12/15/2022 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $400.00 | N | N |
| 12/19/2022 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $1,600.00 | N | N |
| 12/19/2022 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $11,613.33 | Y | N |
| 12/22/2022 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $13,003.33 | Y | N |
| 12/22/2022 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $20,000.00 | Y | N |
| 12/27/2022 | Spot On Acct No. 7662 | Bluejae (_#4####0475) | $10,000.00 | Y | N |
| 12/29/2022 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $5,000.00 | Y | N |
| 12/30/2022 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $6,416.00 | Y | N |
| 1/3/2023 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $20,000.00 | Y | N |
| 1/6/2023 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $20,000.00 | Y | N |
| 1/6/2023 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $10,000.00 | Y | N |
| 1/6/2023 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $2,500.00 | Y | N |
| 1/6/2023 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $5,000.00 | Y | N |
| 1/6/2023 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $13,616.00 | Y | N |
| 1/12/2023 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $9,203.00 | Y | N |
| 1/12/2023 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $1,000.00 | Y | N |
| 1/12/2023 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $10,000.00 | Y | N |
| 1/17/2023 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $20,000.00 | Y | N |
| 1/19/2023 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $10,000.00 | Y | N |
| 1/20/2023 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $9,454.41 | Y | N |
| 1/24/2023 | Spot On Acct No. 7662 | Bluejae (_#####0475) | $20,000.00 | Y | N |

Exhibit 4
Page 50

| Date | Account | Payee | Amount | 90 Day Transfer | Post-Petition Transfer |
|------|---------|-------|--------|-----------------|------------------------|
| 1/26/2023 | Spot On Acct No. #7662 | Bluejae (_#####0475) | $10,000.00 | Y | N |
| 1/30/2023 | Spot On No. #7662 | Bluejae (_#####0475) | $13,070.00 | Y | N |
| 2/1/2023 | Spot On Acct No. #7662 | Bluejae (_#####0475) | $5,000.00 | Y | N |
| 2/2/2023 | Spot On Acct No. #7662 | Bluejae (_#####0475) | $5,000.00 | Y | N |
| 2/3/2023 | Spot On Acct No. #7662 | Bluejae (_#####0475) | $20,000.00 | Y | N |
| 2/3/2023 | Spot On Acct No. #7662 | Bluejae (_#####0475) | $8,000.00 | Y | N |
| 2/8/2023 | Spot On Acct No. #7662 | Bluejae (_#####0475) | $5,000.00 | Y | N |
| 2/8/2023 | Spot On Acct No. #7662 | Bluejae (_#####0475) | $22,500.00 | Y | N |
| 2/9/2023 | Spot On Acct No. #7662 | Bluejae (_#####0475) | $15,000.00 | Y | N |
| 2/10/2023 | Spot On Acct No. #7662 | Bluejae (_#####0475) | $10,000.00 | Y | N |
| 2/13/2023 | Spot On Acct No. #7662 | Bluejae (_#####0475) | $2,100.00 | Y | N |
| 2/15/2023 | Spot On Acct No. #7662 | Bluejae (_#####0475) | $10,000.00 | Y | N |
| 2/16/2023 | Spot On Acct No. #7662 | Bluejae (_#####0475) | $20,000.00 | Y | N |
| 2/16/2023 | Spot On Acct No. #7662 | Bluejae (_#####0475) | $10,000.00 | Y | N |
| 2/16/2023 | Spot On Acct No. #7662 | Bluejae (_#####0475) | $650.00 | Y | N |
| 2/16/2023 | Spot On Acct No. #7662 | Bluejae (_#####0475) | $3,050.00 | Y | N |
| 2/23/2023 | Spot On Acct No. #7662 | Bluejae (_#####0475) | $20,000.00 | Y | N |
| 2/24/2023 | Spot On Acct No. #7662 | Bluejae (_#####0475) | $2,000.00 | Y | N |
| 2/24/2023 | Spot On Acct No. #7662 | Bluejae (_#####0475) | $12,625.00 | Y | N |
| 2/27/2023 | Spot On Acct No. #7662 | Bluejae (_#####0475) | $10,000.00 | Y | N |
| 3/2/2023 | Spot On Acct No. #7662 | Bluejae (_#####0475) | $5,000.00 | Y | N |
| 3/3/2023 | Spot On Acct No. #7662 | Bluejae (_#####0475) | $7,000.00 | Y | N |
| 3/3/2023 | Spot On Acct No. #7662 | Bluejae (_#####0475) | $5,625.00 | Y | N |
| 3/6/2023 | Spot On Acct No. #7662 | Bluejae (_#####0475) | $15,000.00 | Y | N |
| 3/8/2023 | Spot On Acct No. #7662 | Bluejae (_#####0475) | $20,000.00 | Y | N |
| 3/8/2023 | Spot On Acct No. #7662 | Bluejae (_#####0475) | $2,500.00 | Y | N |
| 3/8/2023 | Spot On Acct No. #7662 | Bluejae (_#####0475) | $10,000.00 | Y | N |
| 3/9/2023 | Spot On Acct No. #7662 | Bluejae (_#####0475) | $15,000.00 | Y | N |
| 3/13/2023 | Spot On Acct No. #7662 | Bluejae (_#####40475) | $10,000.00 | Y | N |
| 3/13/2023 | Spot On Acct No. #7662 | Bluejae (_#####0475) | $7,275.00 | Y | N |
| 3/16/2023 | Spot On Acct No. #7662 | Bluejae (_#####0475) | $10,000.00 | Y | N |
| 3/17/2023 | Spot On Acct No. #7662 | Bluejae (_#####0475) | $4,000.00 | N | Y |
| 3/20/2023 | Spot On Acct No. #7662 | Bluejae (_#####0475) | $2,925.00 | N | Y |
| 3/20/2023 | Spot On Acct No. #7662 | Bluejae (_#####0475) | $10,000.00 | N | Y |
| 3/27/2023 | Spot On Acct No. #7662 | Bluejae (_#####0475) | $2,000.00 | N | Y |
| 3/27/2023 | Spot On Acct No. #7662 | Bluejae (_#####0475) | $2,425.00 | N | Y |
| | | **Total** | **$952,704.95** | | |

Exhibit 4
Page 51

# EXHIBIT 5

Exhibit 5
Page 52



# INVOICE # 121922

DATE: 12/19/2022

**Client Name**: Litigation Practice Group
**Company Name**: Litigation Practice Group
**Address**: PC, 17542 17th St Suite 100, Tustin, CA
**Phone**: 949-715-0644
**Email to**: tony@coastprocessing.com

| START DATE | END DATE | DID/ CALL DELIVERY # | TIME ZONE |
|---|---|---|---|
| 12/07/2022 | NA | On File | On File |
| **DELIVERY DAYS** | **HOURS OF OPERATION** | **PAYABLE TERMS** | **DAILY MAX LEADS** |
| 12/07/2022 | On File | WIRE/ACH/CC | |

| | |
|---|---|
| **DESCRIPTION:** | PAST DUE- IN BOUNDS CALLS FOR A SOLUTION DEBT |
| **Rate:** | $50 |
| **Total Sold calls:** | 618 |
| **COST:** | $30,900.00 |

**REMINDERS:**

Payment of this invoice represents that Buyer (Client) and/or authorized signer has the full right and authority to enter into this agreement.

Buyer (client) agrees to indemnify, defend and hold harmless ADZEDIA, its employees. Directors, officers, agents, business partners, affiliates, contractors and representatives from and against any and all third party claims, demands, liabilities, costs or expenses, including attorney's fees and costs, arising from, or related to: (I) Buyer's products, services or businesses; (ii) any claim from it customer or potential customer of Buyer's products or services. or (iii) any breach of this Agreement by Buyer. Buyer will not acquiesce to any judgment or enter into any settlement that adversely affects ADZEDIA's rights or interests without the prior written consent of ADZEDIA. Buyer is aware of the risks associated with consumer telemarketing and takes full responsibility including any 3rd party claims or demands for every lead they receive and/or offer services to. Buyer is aware, knows and understands, and agrees not violate the rules and regulations with specific regard to the Federal Trade Commission and the Federal Communications Commission National Do Not Call Registry rules and regulations and individual State Do Not Call Lists rules and regulations along with any other similar laws that may be applicable to Buyers use of leads and services provided. Buyer agrees not to violate these or any other applicable Federal or State laws. Buyer agrees that it is the sole responsibility of the Buyer to abide by any laws defined by the State or Federal Government in which Services will be applicable. Buyer understands and agrees that ADZEDIA will not be held responsible for damages to the Buyer or any third-party losses incurred. This agreement covers any and all future orders with buyer starting on the date this insertion order agreement is signed.

(Client) Guarantee of Compliance: Client promises to operate their business legally and compliantly which is not limited to but shall include compliance in regard to the following laws for: 1.) Consumer Fee Collection Will Be Collected Legally & Compliantly by Client 2.) Sales methods used by client shall be legal and not be misleading and it is the responsibility of client to ensure all sales, advertising, & marketing methods used by client are vetted and approved by the client's legal counsel. 3.) Client agrees to assume all responsibility for any and all complaints or inquiries whether at the consumer level and/or state or federal level arising from any negligence by Client when contacting any leads or data client purchases.

CANCELLATION POLICY: Client agrees to provide to Client at least 7 business notice if they chose to terminate their services with provider. Provider may cancel at any time with Client if it is determined their negligent or violation of this agreement.

**BANK TRANSFER INFORMATION:**

**JPMORGAN CHASE BANK, NA**
**5 Monarch Bay Plaza**
**Dana Point, CA 92629**

**ADZEDIA**
**1001 Avenida Pico #C305**
**San Clemente, CA 92673**

**WIRE TRANSFER/ROUTING # 322 271 627**
**BUSINESS BANK ACCOUNT # ▇▇▇ 761**

Exhibit 5
Page 53



# INVOICE # 121922

DATE: 12/19/2022

**Client Name**: Litigation Practice Group
**Company Name**: Litigation Practice Group
**Address**: PC, 17542 17th St Suite 100, Tustin, CA
**Phone**: 949-715-0644
**Email to**: tony@coastprocessing.com

| START DATE | END DATE | DID/ CALL DELIVERY # | TIME ZONE |
|---|---|---|---|
| 12/07/2022 | NA | On File | On File |
| **DELIVERY DAYS** | **HOURS OF OPERATION** | **PAYABLE TERMS** | **DAILY MAX LEADS** |
| 12/07/2022 | On File | WIRE/ACH/CC | |

| DESCRIPTION: | PREPAY- INBOUNDS CALLS FOR A SOLUTION DEBT |
|---|---|
| **Rate:** | $50 |
| **Total Sold calls:** | 1000 |
| **COST:** | $50,000.00 |

**REMINDERS:**

Payment of this invoice represents that Buyer (Client) and/or authorized signer has the full right and authority to enter into this agreement.

Buyer (client) agrees to indemnify, defend and hold harmless ADZEDIA, its employees. Directors, officers, agents, business partners, affiliates, contractors and representatives from and against any and all third party claims, demands, liabilities, costs or expenses, including attorney's fees and costs, arising from, or related to: (I) Buyer's products, services or businesses; (ii) any claim from it customer or potential customer of Buyer's products or services. or (iii) any breach of this Agreement by Buyer. Buyer will not acquiesce to any judgment or enter into any settlement that adversely affects ADZEDIA's rights or interests without the prior written consent of ADZEDIA. Buyer is aware of the risks associated with consumer telemarketing and takes full responsibility including any 3rd party claims or demands for every lead they receive and/or offer services to. Buyer is aware, knows and understands, and agrees not violate the rules and regulations with specific regard to the Federal Trade Commission and the Federal Communications Commission National Do Not Call Registry rules and regulations and individual State Do Not Call Lists rules and regulations along with any other similar laws that may be applicable to Buyers use of leads and services provided. Buyer agrees not to violate these or any other applicable Federal or State laws. Buyer agrees that it is the sole responsibility of the Buyer to abide by any laws defined by the State or Federal Government in which Services will be applicable. Buyer understands and agrees that ADZEDIA will not be held responsible for damages to the Buyer or any third-party losses incurred. This agreement covers any and all future orders with buyer starting on the date this insertion order agreement is signed.

(Client) Guarantee of Compliance: Client promises to operate their business legally and compliantly which is not limited to but shall include compliance in regard to the following laws for: 1.) Consumer Fee Collection Will Be Collected Legally & Compliantly by Client 2.) Sales methods used by client shall be legal and not be misleading and it is the responsibility of client to ensure all sales, advertising, & marketing methods used by client are vetted and approved by the client's legal counsel. 3.) Client agrees to assume all responsibility for any and all complaints or inquiries whether at the consumer level and/or state or federal level arising from any negligence by Client when contacting any leads or data client purchases.

CANCELLATION POLICY: Client agrees to provide to Client at least 7 business notice if they chose to terminate their services with provider. Provider may cancel at any time with Client if it is determined their negligent or violation of this agreement.

**BANK TRANSFER INFORMATION:**

**JPMORGAN CHASE BANK, NA**
**5 Monarch Bay Plaza**
**Dana Point, CA 92629**

**ADZEDIA**
**1001 Avenida Pico #C305**
**San Clemente, CA 92673**

**WIRE TRANSFER/ROUTING # 322 271 627**
**BUSINESS BANK ACCOUNT #** ███ **761**

Exhibit 5
Page 54

# Adversary Cover Sheet

B1040 (FORM 1040) (12/24)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

**PLAINTIFFS**
Richard A. Marshack, Trustee of the LPG Liquidation Trust

**DEFENDANTS**
Pace Construction, Inc., a California corporation;   Lifestar Products, Inc., a California Corporation; Caesar Mercado, a California resident; Rose Romo dba Blue Jae Inc., a California resident; JNR Services, Inc., a   California corporation; A Solution Debt Relief, Inc., a Wyoming corporation; Jason Dovalina, a California resident; and JR Bray Group LLC, a California limited liability company

**ATTORNEYS** (Firm Name, Address, and Telephone No.)
Yosina M. Lissebeck (SBN 201654)
Tyler Powell (Ky. Bar No. 90520) (*Admitted pro hac vice*)
DINSMORE & SHOHL LLP
655 West Broadway, Suite 800
San Diego, CA 92101    Telephone (619) 400-0500
yosina.lissebeck@dinsmore.com
tyler.powell@dinsmore.com

**ATTORNEYS** (If Known)

**PARTY** (Check One Box Only)
☐ Debtor    ☐ U.S. Trustee/Bankruptcy Admin
☐ Creditor    ☐ Other
☒ Trustee

**PARTY** (Check One Box Only)
☐ Debtor    ☐ U.S. Trustee/Bankruptcy Admin
☐ Creditor    ☐ Other
☐ Trustee

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
for (1) Avoidance, Recovery, and Preservation of Preferential Transfers Made to or for the Benefit of Defendants within Ninety Days of the Petition Date; (2) Avoidance, Recovery, and Preservation of Post-Petition Transfers Made to or for the Benefit of Defendants after the Petition Date; (3) Avoidance, Recovery, and Preservation of Transfers 2-Year Actual Fraudulent Transfers; (4) Avoidance, Recovery, and Preservation of 2-Year Constructive Fraudulent Transfers; (5) Avoidance, Preservation and Recovery of Voidable Transfers Made with Intent to Defraud; (6) Avoidance, Preservation, and Recovery of Voidable Transfers Made with no Intent to Defraud; and (7) Aiding and Abetting Fraudulent Conveyances

**NATURE OF SUIT**

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(a) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☒ 13-Recovery of money/property - §548 fraudulent transfer
☒ 14-Recovery of money/property - other

**FRBP 7001(b) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(c) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(d) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(e) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(f) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(f) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(g) – Injunctive Relief**
☐ 71-Injunctive relief- imposition of stay
☐ 72-Injunctive relief - other

**FRBP 7001(h) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(i) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(j) Determination of Removed Action**
☐ 01-Determination of remove d claim or cause

**Other**
☐ SS-SIPA Case - 15 U.S.C. §§78aaa *et.seq.*
☒ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ 3M+ |

Other Relief Sought

B1040 (FORM 1040) (12/24)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>The Litigation Practice Group P.C. | BANKRUPTCY CASE NO.<br>8:23-bk-10571-SC | |
| DISTRICT IN WHICH CASE IS PENDING<br>Central District of California | DIVISION OFFICE<br>Santa Ana | NAME OF JUDGE<br>Scott C. Clarkson |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br>/s/ Tyler Powell | | |
| DATE<br>March 19, 2025 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Yosina M. Lissebeck<br>Tyler Powell (admitted pro hac vice)<br>Special Counsel to Richard A. Marshack, Trustee of the LPG<br>Liquidation Trust | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.