Christopher Celentino (State Bar No. 131688)
Christopher B. Ghio (State Bar No. 259094)
Yosina M. Lissebeck (State Bar No. 201654)
**DINSMORE & SHOHL LLP**
655 West Broadway, Ste 800
San Diego, California 92101
Tele: (619) 400-0500
Fax:  (619) 400-0501
Christopher.Celentino@dinsmore.com
Christopher.Ghio@dinsmore.com
Yosina.Lissebeck@dinsmore.com

M. Trent Spurlock (KY Bar No. 88569)
Suzanne M. Marino (KY Bar No. 99070)
**DINSMORE & SHOHL LLP**
101 S. Fifth St., Ste 2500
Louisville, KY 40206
Tele: (502) 540-2300
Fax:  (502) 585-2207
(Admitted pro hac vice)

Special Counsel to Richard A. Marshack,
Trustee of the LPG Liquidation Trust

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

| | |
|---|---|
| In re: | Case No.: 8:23-bk-10571-SC |
| The Litigation Practice Group P.C. | Adv. Proc. No.: |
| Debtor. | Chapter 11 |
| Richard A. Marshack, Trustee of the LPG Liquidation Trust, | **COMPLAINT FOR:** |
| Plaintiff, | **(1) AVOIDANCE, RECOVERY, AND PRESERVATION OF 2-YEAR ACTUAL FRAUDULENT TRANSFERS;** |
| v. | |
| Vasco Assets, Inc., and Benny Mor | **(2) AVOIDANCE, RECOVERY, AND PRESERVATION OF 2-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS;** |
| Defendants. | |
| | **(3) AVOIDANCE, RECOVERY, AND PRESERVATION OF 4-YEAR ACTUAL FRAUDULENT TRANSFERS;** |
| | **(4) AVOIDANCE, RECOVERY, AND PRESERVATION OF 4-YEAR** |

**CONSTRUCTIVE FRAUDULENT TRANSFERS;**

**(5) AIDING AND ABETTING BY VASCO AND MOR; and**

**(6) TURNOVER OF ESTATE PROPERTY**

Judge: Hon. Scott C. Clarkson

For his *Complaint for (1) Avoidance, Recovery, and Preservation of 2-Year Actual Fraudulent Transfers; (2) Avoidance, Recovery, and Preservation of 2-Year Constructive Fraudulent Transfers; (3) Avoidance, Recovery, and Preservation of 4-Year Actual Fraudulent Transfers; (4) Avoidance, Recovery, and Preservation of 4-Year Constructive Fraudulent Transfers; (5) Avoidance, Recovery, and Preservation of Preferential Transfer; (6) Aiding and Abetting by Vasco and Mor; (7) Aiding and Abetting by Vasco; and (8) Turnover of Estate Property* ("Complaint"), plaintiff Richard A. Marshack, the former Chapter 11 Trustee for the bankruptcy estate ("Estate") of debtor The Litigation Practice Group P.C. ("Debtor" or "LPG") and current liquidating trustee (collectively "Trustee" or "Plaintiff") of the LPG Liquidating Trust  in the above-captioned bankruptcy case ("Bankruptcy Case"), alleges and avers as follows:

## STATEMENT OF JURISDICTION, NATURE OF PROCEEDING, AND VENUE

1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E), (H) and (O), 1334(b), and General Order No. 13-05 of the District Court for the Central District of California because this is a core proceeding arising in and/or related to the Bankruptcy Case, which is a case under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code"), and which is pending in the United States Bankruptcy Court for the Central District of California, Santa Ana Division ("Bankruptcy Court").

2.      Regardless of whether this proceeding is core, non-core, or otherwise, Plaintiff consents to the entry of a final order and judgment by the Bankruptcy Court.

/ / /

3.  Defendants are notified that Rule 7008 of the Federal Rules of Bankruptcy Procedure requires Defendants to plead whether consent is given to the entry of a final order and judgment by the Bankruptcy Court.

4.  Venue of this adversary proceeding properly lies in this judicial district pursuant to 28 U.S.C. § 1409(a) because this proceeding is related to Debtor's pending Bankruptcy Case.

**THE PARTIES**

5.  Plaintiff, Richard A. Marshack, is the duly-appointed, qualified, and acting Trustee of the LPG Liquidation Trust.

6.  Debtor is, and at all material times was, a professional corporation organized, existing, and in good standing under the laws of the State of California, with its principal place of business in Tustin, California.

7.  Defendant, Vasco Assets, Inc. ("Vasco"), is, and at all material times represented that it was, a domestic corporation, existing under the laws of the State of California.

8.  Vasco's principal and mailing address is 2024 Quail Street, Newport Beach, California 92660.

9.  Vasco may be served via its agent for service, Benny Mor ("Mor"), at 2024 Quail Street, Newport Beach, California 92660.

10. On information and belief, Defendant Mor is an individual residing in the state of California, and at all material times was a principal, director and officer of Vasco.

11. Defendant Mor may be served by first class mail postage prepaid at 2024 Quail Street, Newport Beach, California 92660.

**GENERAL ALLEGATIONS**

**A.  THE BANKRUPTCY CASE**

12. On March 20, 2023 ("Petition Date"), Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, commencing the Bankruptcy Case.  Diab made the decision for LPG to file for bankruptcy in order to avoid numerous pending lawsuits, two of which sought an order appointing a receiver, including but not limited to: *Validation Partners, LLC v. The Litigation Practice Group, PC, et al.*, Case No. 30-2022-01281911-CU-BC-CXC (Orange County

Super. Ct. September 20, 2022) and *Debt Validation Fund II, LLC, et al. v. The Litigation Practice Group PC, et al.*, Case No. 30-2023-01303355-CU-CO-CXC (Orange County Super. Ct. January 23, 2023), among many others. In order to abscond with and delay discovery of substantial assets and continue to profit from LPG client files and from client payments made pursuant to LPG's client Legal Services Agreements ("Client Funds"), Diab and other defendants devised a plan to fraudulently transfer funds, client files, Client Funds and assets in the form of ACH Receivables (the "ACH Receivables" or "Accounts Receivable") out of LPG to third parties prior to the filing of bankruptcy. The 1046 Action primarily seeks avoidance, recovery and damages arising out of the wholesale fraudulent transfer of client files and the related ACH Receivables. This action deals primarily with the fraudulent transfers of LPG funds, including its Client Funds, to Vasco.

13.    The Office of the United States Trustee ("UST") filed its *Motion by United States Trustee to Dismiss or Convert Case Pursuant to 11 U.S.C. § 1112(b)* [Bankr. Docket No. 21] and creditors Debt Validation Fund II, LLC; MC DVI Fund 1, LLC; and MC DVI Fund 2, LLC filed the *Motion by DVF and MC DVI to Dismiss Chapter 11 Case Pursuant to 11 U.S.C. §§ 105, 305, 349, & 1112, or in the Alternative Convert This Case to Chapter 7 or Appoint a Trustee* [Bankr. Docket No. 44]. On May 4, 2023, the Court entered its *Order Directing United States Trustee to Appoint Chapter 11 Trustee* [Bankr. Docket No. 58]. On May 4, 2023, the Court entered its *Order Directing United States Trustee to Appoint Chapter 11 Trustee* [Bankr. Docket No. 58], thereby granting the UST's motion and directing the UST to appoint a Chapter 11 Trustee in the Bankruptcy Case.

14.    Pursuant to the *Acceptance of Appointment as Chapter 11 Trustee* [Bankr. Docket No. 63], on May 8, 2023, Trustee accepted his appointment as the Chapter 11 Trustee in the Bankruptcy Case. The Court approved the Trustee's appointment in its *Order Approving the U.S. Trustee's Application for the Appointment of a Chapter 11 Trustee* [Docket No. 65].

15.    Trustee was not appointed until after events of the case and, therefore, bases these allegations on information and belief. *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) ("The *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability

1  plausible."); *Miller v. City of Los Angeles*, 2014 U.S. Dist. LEXIS 198871, 2014 WL 12610195, at

2  *5 (C.D. Cal. Aug. 7, 2014) (recognizing that the plaintiff's "information and belief" pleading was

3  allowed and "necessary at times"); *see also Mireskandari v. Daily Mail and General Trust PLC*, 2013

4  U.S. Dist. LEXIS 194437, 2013 WL 12129642, at *4 (C.D. Cal. July 31, 2013) ("The Federal Rules

5  of Civil Procedure allow parties to plead facts on 'information and belief' if the facts 'will likely have

6  evidentiary support after a reasonable opportunity for further investigation or discovery.'" (citations

7  omitted)).

8          16.     Pursuant to the *Order Confirming Modified First Amended Joint Chapter 11 Plan of*

9  *Liquidation* entered September 9, 2024, and the *Notice of Occurrence of Effective Date of Modified*

10 *First Amended Joint Chapter 11 Plan of Liquidation* filed September 24, 2024, Richard A. Marshack

11 became the Liquidating Trustee of the LPG Liquidation Trust, effective September 24, 2024. [Bankr.

12 Docket Nos. 1646 & 1762.]

13         17.     All claims have been transferred to the Liquidating Trust pursuant to the confirmed

14 plan and Plaintiff brings this action solely in his capacity as the former Chapter 11 Trustee and current

15 Liquidating Trustee of the LPG Liquidation Trust for the benefit of Debtor's Estate and its creditors.

16 **B.    PROTECTIVE ORDER**

17         18.     On or about May 2, 2024, Plaintiff filed that certain Notice and Motion for Entry of

18 Protective Order (the "Protective Order Motion").

19         19.     On June 3, 2024, the Court entered its Order Granting Motion for Entry of Protective

20 Order and the Protective Order [Docket No. 1270] (the "Protective Order"). A true and accurate copy

21 of the Protective Order is attached hereto as **Exhibit 1** and incorporated herein by reference.

22         20.     By its own terms, the Protective Order applies to this adversary proceeding and

23 governs all discovery conducted herein.

24 **C.    LPG'S OWNERSHIP AND MANAGEMENT**

25         21.     Prior to the Petition Date, LPG operated a law firm for consumers across the country

26 who sought assistance in contesting or resolving debts.

27         23.     The consumers that retained LPG to represent them would pay for LPG's services over

28 a period of time via monthly ACH debits from the consumers' bank accounts.

24. The monthly payments were meant to cover all legal services LPG provided to the consumers including validation of the debts, review of documents to determine enforceability, court appearances to halt lawsuits to obtain judgments, and, in certain instances, filing lawsuits to eliminate disputed debts or pursue consumers' affirmative claims.

25. LPG mismanaged the consumers' monthly payments.

26. Tony Diab is, and at all relevant times was, an individual who operated, dominated and controlled LPG ("Diab"). Diab and other defendants devised a plan to fraudulently transfer funds, client files, Client Funds and assets in the form of ACH Receivables (the "ACH Receivables" or "Accounts Receivable") out of LPG to third parties prior to the filing of bankruptcy.

27. To obtain consumer clients, LPG contracted with marketing companies, who engaged in illegal capping, and would advertise to or call to solicit consumers to become clients of LPG in exchange for a percentage of the ACH Receivables to be collected from the consumers. The marketing affiliates went so far as to assist with the execution of an engagement letter between the consumer and LPG.

28. In exchange, LPG agreed to pay the marketing affiliates a percentage the monthly payments collected by LPG from the consumers.

29. Because LPG received payments from consumers over time, it often sought financing by borrowing against its future cash flows from the Accounts Receivable by means of, among other things, merchant cash advance agreements ("MCA Agreements"). This borrowing was not only used to finance operations at LPG and to pay fees owed to the marketing companies for providing the client referrals but also was used to pay creditors that had provided earlier-in-time financing in a growing Ponzi scheme.

30. Many of the documents executed in connection with such financing described the transactions as account receivable purchase agreements. However, LPG was not selling accounts receivable to MCA lenders, it was obtaining short term loans in return for the transfer of future monthly payments made by clients that were required to be held in client-trust accounts.

31. To facilitate the transfer of ACH Receivables to MCA lenders, Diab used entities he controlled including, without limitation, Vulcan Consulting Group ("Vulcan"), BAT Inc. (d/b/a

"Coast Processing"), Maverick Management Group LLC ("Maverick") and Prime Logix to divert LPG consumer funds and ACH Receivables. Diab would use numerous ACH processing companies including, without limitation, Coast Processing, in order to easily transfer millions of dollars from Debtor to the entities he controlled, without oversight or detection, and to avoid payment disputes and complications. The money that flowed from Debtor to Defendants through the bank accounts of the various entities Diab controlled consisted of Client Funds that Debtor funneled to these entities by means of the ACH processing companies. Debtor also made deposits into these entities bank accounts such that they received Client Funds directly from Debtor, in addition to direct Accounts Receivable.

32. LPG transferred ACH Receivables and the associated Client Funds in this fashion to defraud creditors in a pyramid scheme and for improper personal gain.

33. LPG's monthly revenue from client files was primarily received via ACH payments. To process ACH payments, LPG was required to enlist the services of ACH payment processing companies who handle high risk transactions. In this regard, Diab had enlisted numerous ACH processing companies to easily switch between different vendors and have millions of dollars of LPG funds directed to entities Diab controlled, including but not limited to Vulcan, Coast Processing, Maverick, Prime Logix and others. Diab utilized these other entities' bank accounts as LPG bank accounts.

34. ACH debits from LPG's consumer clients should have been deposited into an LPG trust account, until earned. Notwithstanding this requirement, some ACH debits were collected by entities other than LPG and never deposited in an LPG trust account, or were transferred out of LPG accounts to non-debtor entities, insiders, affiliates, marketing companies and co-conspirators. All of which rendered LPG insolvent requiring Diab and LPG to continue to improperly sell ACH Receivables multiple times over and incur new debt in a Ponzi scheme to finance LPG's continued and extravagant existence.

/ / /

/ / /

/ / /

35.    Diab instructed lenders and file purchasers to divert LPG loan proceeds or to deposit money otherwise due to LPG into bank accounts he controlled on behalf of LPG but ostensibly held by Vulcan and other entities. Diab used all of these proceeds as if they were LPG funds, because they were.

36.    Diab frequently diverted the LPG money pulled from its consumer clients and other funds it received through investors and lenders.

37.    Diab frequently would direct these entities to pay LPG affiliates (aka marketing cappers), MCA lenders, and others with LPG assets.

38.    Diab would instruct others at LPG and these entities on how to manage and transfer these funds to and from these entities and LPG interchangeably.

**D.    BAT INC. (D/B/A "COAST PROCESSING")**

39.    LPG had a business partner called BAT Inc. d/b/a Coast Processing ("Coast Processing"), which was owned and controlled at various times by Diab, Brian Reale ("Reale"), Arash Asante Bayrooti ("Bayrooti"), and Mario Azevedo ("Azevedo").

40.    Coast Processing, among other functions, performed ACH debit processing to collect Client Funds from LPG's consumer clients.  In many cases, these funds would be retained by Coast Processing and would not be transferred into an LPG account.

41.    LPG or other entities, including without limitation Vulcan, Maverick and others, would also regularly transfer LPG funds, including Client Funds, to Coast Processing to facilitate the transfer of payments to lenders, marketing cappers and others without detection.

**E.    ABR ENTERPRISES LLC**

42.    Upon information and belief, ABR Enterprises LLC ("ABR") was, at all times relevant, an entity owned and controlled by Reale and Bayrooti.

43.    Upon information and belief, Reale and/or Bayrooti would transfer funds to ABR, comprised in whole or in part of LPG Client Funds collected by Coast Processing or LPG funds transferred to Coast Processing.

44.    On information and belief, LPG would also transfer LPG funds, including Client Funds, directly to ABR, according to proof at trial.

**F.    DEFENDANTS VASCO AND MOR**

45.    Defendant Vasco holds itself out publicly as a purchaser and seller of luxury items, and provider of collateral loans against luxury assets.

46.    Upon information and belief, Defendant Mor is, and at all times relevant, was an owner and officer of Vasco.

**G.    VASCO, COAST PROCESSING AND ABR**

47.    Upon information and belief, Coast Processing and ABR owners Reale and Bayrooti, and Defendant Mor devised and regularly carried out a plan to fraudulently exchange LPG Client Funds and other LPG funds for various precious assets including but not limited to gold bars, luxury watches and gold, silver and platinum coins ("Precious Assets"), all to the benefit of Reale, Bayrooti, Vasco and Mor.

48.    Upon information and belief, at various times between 2018 and 2023, Vasco and Mor would create bogus invoices from Vasco to Coast Processing and ABR, among other entities, for services such as marketing and consulting which Vasco and Mor did not actually provide.

49.    Upon information and belief, Reale and Bayrooti would have Vasco's invoices paid by Coast Processing as business expenses using funds derived in whole or in part from LPG Client Funds collected directly by Coast Processing or LPG funds, including Client Funds, transferred to Coast Processing from LPG or entities including, without limitation, Vulcan and Maverick.  A total of at least $471,460.61 in payments from Coast Processing to Vasco were made between May 15, 2020 and June 7, 2021, according to proof at trial.

50.    Upon information and belief, Reale and Bayrooti would have the invoices to ABR paid by ABR as business expenses using funds derived in whole or in part from LPG Client Funds collected directly by Coast Processing and transferred to ABR, from LPG Client Funds and other LPG funds that had previously been transferred to Coast Processing from LPG or other entities such as Vulcan or Maverick, or from LPG Client Funds or other LPG funds transferred directly to ABR  from LPG or other entities such as Vulcan and Maverick.

51.    Upon information and belief, in exchange for payment of the invoices, Vasco and Mor would give Reale and Bayrooti Precious Assets.

52. Upon information and belief, these exchanges allowed Reale and Bayrooti to extract tax-free compensation from Coast Processing and ABR in the form of Precious Assets, funded in whole or in part by LPG Client Funds.

53. Vasco and Mor, in turn, would receive a profit on the Precious Assets which were sold at values significantly higher than Vasco's cost to obtain the Precious Assets.

**H.    VASCO, ARSHA AND LPG**

54. Upon information and belief, Bayrooti was an owner of Arsha Corp.

55. Upon information and belief, Coast Processing transferred funds to Arsha Corp. comprised in whole or in part of LPG Client Funds and other LPG funds. A total of $452,187.61 in payments from Coast Processing to Vasco was made between June 28, 2019 and May 6, 2021, according to proof at trial.

56. Upon information and belief Bayrooti would arrange with Mor for Vasco to send bogus invoices to Arsha for marketing or other alleged services Vasco did not actually provide. The invoices would be paid by Arsha Corp. as a business expense, using in whole or in part LPG Client Funds or other LPG funds, and Vasco and Mor would provide Bayrooti with Precious Assets.

57. Upon information and belief, in the approximate time frame of September - November 2022, Bayrooti arranged with Mor for Vasco to send bogus invoices for "marketing development" or similar alleged services to Arsha Corp. A copy of one such invoice is attached as **Exhibit 2**. Consistent with the practices described above, Bayrooti planned to have the invoices paid by Arsha Corp. as a business expense and, in exchange, he would personally receive certain Precious Assets from Vasco and Mor.

58. Upon information and belief, around this same period of time, Bayrooti was seeking repayment from Diab of a loan from Bayrooti to Diab with an agreed upon balance owed of $400,000.

59. Upon information and belief, rather than having Diab repay him, Bayrooti requested that Diab pay Vasco for the Precious Assets Bayrooti was seeking to acquire from Vasco at the time.

60. Upon information and belief, Diab and Bayrooti coordinated with Mor and Vasco to replace the invoices to Arsha Corp. with multiple invoices from Vasco to LPG totaling $395,581.73. These invoices were paid by LPG in four payments between October 17, 2022 and January 6, 2023

using Client Funds and other LPG funds. A summary of the LPG bank transactions reflecting these payments and three checks used to make the payments are collectively attached as **Exhibit 3**. The checks used to pay Vasco contained memos indicating that the payments were for "marketing development," "lead generation," and "business consultation." Upon information and belief, Vasco and Mor subsequently gave the Precious Assets to Bayrooti and the Precious Assets were never received by LPG.

I.      **ATTEMPTED COVER-UP BY MOR**

61.    Based on the history of payments from LPG to Vasco within two years of the Petition Date, counsel for the Trustee filed a motion pursuant to Fed. R. Bankr. P. 2004 and L.B.R. 2004-1 for an order authorizing the production of documents by Vasco Assets. [Bankr. Dk. No. 957.] The Motion was based upon a need to discover the basis for the payments from LPG to Vasco.  The Court granted the Motion via Order dated February 23, 2024 [Bankr. Dk. No. 964] and a corresponding subpoena was issued to Vasco.

62.    In response to the subpoena and communication with counsel for the Trustee, Mor on behalf of Vasco sent a letter to counsel for the Trustee explaining the four payments from LPG to Vasco described above were made pursuant to 15 invoices for Precious Assets sold to LPG.  A copy of the letter and accompanying invoices are collectively attached as **Exhibit 4**.

63.    In order to discover the location of the Precious Assets allegedly purchased by LPG, counsel for the Trustee files another motion pursuant to Fed. R. Bankr. P. 2004 and L.B.R. 2004-1 for an order authorizing the production of documents by Vasco Assets [Bankr. Dk. No. 1448.] which was granted via Order on July 24, 2024. [Bankr. Dk. No. 1452.] A corresponding subpoena was issued to Vasco.

64.    In response to the subpoena and communication with counsel for the Trustee, Mor provided a signed declaration stating that he is the CEO of Vasco and custodian of records; that the invoices to LPG he produced were true and complete copies from Vasco's records; that he on behalf of Vasco had sold the items listed on the invoices to Diab on behalf of LPG; and that Diab paid for the items listed on the invoices. Also included with Mor's production of documents in response to the second subpoena was a picture of Diab at a Starbucks wearing the Cartier watch referenced in one of

11

the Vasco invoices to LPG. A copy of Mor's declaration and documents produced therewith are attached as **Exhibit 5.**[1]

65.    Upon information and belief, Mor's declaration, Vasco's invoices to LPG and the picture of Diab were false and/or misleading.

66.    Upon information and belief, after Mor was first contacted and subpoenaed by counsel for the Trustee in early 2024, Mor, Bayrooti and Diab conspired to create the impression that LPG has legitimately purchased the Precious Assets to hide the true fraudulent nature of the transactions. In furtherance of their plan, Mor and Vasco created the invoices attached as Exhibit 4 in early 2024 and back-dated them to dates in 2022.  They also met at a Starbucks and staged a photo of Diab wearing a Cartier watch included on one of the invoices. The picture of Mr. Diab wearing this watch (taken in 2024) is attached to the Benny Mor declaration, Exhibit 5 hereto.  Mor also drafted the above-described letter and subsequently executed the above-described declaration in an attempt to legitimize the fake invoices and suggest that Diab and LPG had actually purchased the Precious Assets itemized on the invoices.

67.    Upon information and belief, Mor agreed to the above-described scheme in exchange for the return from Bayrooti of approximately $400,000 worth of Precious Assets.

**J.    TRANSFERS OF LPG FUNDS TO VASCO**

68.    During the four years preceding the bankruptcy Petition Date, Defendant Vasco directly or indirectly received a sum of at least $867,042.34 of LPG's Client Funds or other LPG funds, with at least $493,517.50 of the total received during the two years before the Petition Date.

69.    Upon information and belief, Vasco directly or indirectly received additional LPG Client Funds or other LPG funds, in an amount to be proven at trial, during the 90-day, two-year and/or four-year period prior to the Petition Date. (All LPG funds received directly or indirectly by Vasco at any time during the four-years preceding the Petition Date collectively described as the "Transfers.")

/ / /

---

[1] The invoices and checks referenced as exhibits to the declaration are Exhibits 3 and 4 to this Complaint.

**K.      LPG'S PONZI SCHEME**

70.      The Ponzi Scheme Presumption exists in bankruptcy proceedings.

71.      The Ponzi Scheme Presumption can be utilized to establish a debtor's "intent to defraud future undertakers [investors] from the mere fact that a debtor was running a Ponzi scheme. Indeed, no other reasonable inference is possible. A Ponzi scheme cannot work forever. The investor pool is a limited resource and will eventually run dry. The perpetrator must know that the scheme will eventually collapse as a result of the inability to attract new investors. The perpetrator nevertheless makes payments to present investors, which, by definition, are meant to attract new investors. He must know all along, from the very nature of his activities, that investors at the end of the line will lose their money. Knowledge to a substantial certainty constitutes intent in the eyes of the law, *cf. Restatement (Second) of Torts § 8A (1963 & 1964)*, and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them. *Kirkland v. Rund (In re EPD Inv. Co., LLC)*, 114 F.4th 1148, 1153 (9th Cir. 2024) (by definition Ponzi scheme is destined to fail and the swindler and their entities often end in bankruptcy or equitable receivership); *cf. Coleman Am. Moving Servs., Inc. v. First Nat'l Bank & Trust Co. (In re American Properties, Inc.)* 14 Bankr. 637, 643 (Bankr. D. Kan. 1981) (intentionally carrying out a transaction with full knowledge that its effect will be detrimental to creditors is sufficient for actual intent to hinder, delay or defraud within the meaning of § 548(a)(1))." *Merrill v. Abbott (In re Independent Clearing House Co.)* 77 B.R. 843, 860 (D. Utah 1987). A trustee in bankruptcy is not required to show that an operator of a Ponzi scheme was subjectively aware his Ponzi scheme was destined to fail. *In re EPD Inv. Co., LLC*, 114 F.4th at 1153 ("[a] trustee's action to recover assets fraudulently conveyed in the course of a Ponzi scheme does not require that the trustee also prove the Ponzi-scheme operator was subjectively aware his Ponzi scheme was destined to fail.").

72.      "But if all the debtor receives in return for a transfer is the use of the defendant's money to run a Ponzi scheme, there is nothing in the bankruptcy estate for creditors to share. In fact, by helping the debtor perpetuate his scheme, the transfers exacerbate the harm to creditors by increasing the amount of claims while diminishing the debtor's estate. In such a situation, the use of the defendant's money cannot objectively be called "reasonably equivalent value." *In re Independent*

*Clearing House Co.*, 77 B.R. at 859.  Therefore, "[t]he trustee can avoid the transfers if they were preferential or fraudulent.  Transfers to investors in a Ponzi scheme are preferential and fraudulent.  Therefore, they constitute 'property of the estate,' and the trustee can recover them."  *Id.* at 853 n.17 (citations omitted).

73.    Debtor was operating a Ponzi scheme that utilized affiliates and several other entities as investors to continue its unlawful business practices by using funds provided by current investors to attract new investors hoping for very high returns.  Therefore, the Debtor was running a Ponzi scheme and the Ponzi Scheme Presumption can be utilized to infer that the Debtor had the intent to defraud investors within the meaning of 11 U.S.C. § 548(a)(1).  This is evidenced by the Court in this Bankruptcy Case declaring that Debtor was operating a Ponzi scheme:

> It is important to note that this Court has never received any significant and trustworthy evidence that Debtor accomplished meaningful results for its clients, but only anecdotal examples of viable success for its clients.  By reviewing the Estate's claims register, there is evidence of consumer claims for the fraud and demanded but undelivered refunds of approximately $500 million.  There is ample evidence that the pre-petition Debtor never placed the collected funds into an attorney-client trust account, and that Debtor or its principals simply looted the payments received through the client automatic withdrawals, stiffing both the clients and outside attorneys who may have been working on client cases with the hopes of being paid.  There is also evidence before the Court that Debtor was running a Ponzi scheme and paying some outside (or "network") attorneys with funds obtained from new clients.  In this case, it appears that some of the "lenders" may have been serving as "investors," hoping for very high returns before "the music stopped."    The Ninth Circuit has recently explained, "[b]y definition, a Ponzi scheme is destined to fail because the pool of available investors is not limitless.  When the Ponzi scheme operator's pool of investors inevitably runs dry, the scheme collapses and the swindler and their entities often end up in bankruptcy or equitable receivership.  *See generally* David R. Hague, Expanding the Ponzi Scheme Presumption, 64 DePaul L. Rev. 867 (2015).    In bankruptcy, the court-appointed trustee is tasked with taking immediate control of the entity, ceasing ongoing fraudulent activity, locating and collecting assets for the bankruptcy or receivership estate, and achieving a final, equitable distribution of remaining assets.  *See* 11 U.S.C. § 704."  *Kirkland v. Rund (In re EPD Inv. Co., LLC)*, 2024 U.S. App. LEXIS 21363, at *15 (9th Cir. Aug. 23, 2024).  Finally, there is evidence that Debtor was encumbering (or as some creditors assert, "double or triple selling") their accounts or receivables to multiple lenders.  With respect to Greyson's requested Administrative Claim [Dk. 676], and as more fully described in the concurrently entered order denying the claim, there has been no evidence presented that any work allegedly performed by Greyson assisted any clients or added any value to the Estate.

*See*, Case No. 8:23-bk-10571-SC, [Bankr. Docket No. 1545, Fn. 5.]

74.     The fraudulent transactions between Vasco and Mor, and LPG and associated entities including Coast Processing, ABR and Arsha Corp. served to further the Ponzi scheme, enriching the perpetrators of the scheme at the expense of later "investors" and creditors of LPG.

75.     Moreover, since the Transfers of LPG funds to Vasco were made with intent to further the Ponzi scheme, and since the Debtor did not actually receive the goods purchased using LPG's funds, the Debtor did not receive an objectively reasonable equivalent value for the Transfers, and the trustee can avoid the Transfers because they were preferential and fraudulent.

76.     Debtor's and Vasco's operations, activities, and transfers done in furtherance of the Ponzi scheme, also constituted a criminal enterprise.

77.     This, too, is evidenced by the Court's order in the 1046 Action wherein it denied the Motion of Greyson Law Center to Vacate the Preliminary Injunction previously entered in Debtor's main case, and the Court offered the opinion:

> Through the various proceedings and evidence produced in both the main case and the various adversary proceedings, including but not limited to various Motions for Temporary Restraining Orders, Preliminary Injunctions, Motions to Dismiss, a Motion for Appointment of a Chapter 11 Trustee, a Motion to Sell Assets, a multitude of pleadings filed by both secured and unsecured creditors (supported by evidence presented under oath) in support of their claims, and especially the pleadings and evidence presented by the "Watchdog of the Bankruptcy System" aka the Office of the United States Trustee (an arm of the United States Department of Justice), *it is clear to this Court that Debtor, since its pre-petition inception (and through the time of the appointment of the Chapter 11 Trustee) was in the Court's opinion, operating a criminal enterprise.*

Case No. 8:23-bk-10571-SC, ADv. No. 8:23-ap-01046-SC [Bankr. Docket No. 1545, p. 3 (emphasis in original)].

78.     As part of this criminal enterprise, Debtor and Vasco engaged in fraudulent Transfers of LPG's Client Funds to Vasco for the purpose of facilitating LPG's enterprise.  LPG did not receive reasonably equivalent value for its transfers to Vasco.  The Transfers constituted wire fraud.

**L.     LPG's Prepetition Creditors**

79.     Debtor was insolvent when each Transfer was made. This insolvency is evidenced in part by the fact that 14 separate UCC-1 statements were of record securing debts of the Debtor as of September 1, 2022. These statements remained unreleased as of the Petition Date.  These statements

either reflected secured liens against the Debtor's assets then owned or thereafter acquired, or provided evidence of the assignment or sale of substantial portions of the Debtor's future income.

80.     Debtor was insolvent when each Transfer was made. This insolvency is evidenced in part by the fact that 14 separate UCC-1 statements were of record securing debts of the Debtor as of September 1, 2022. These statements remained unreleased as of the Petition Date. These statements either reflected secured liens against the Debtor's assets then owned or thereafter acquired, or provided evidence of the assignment or sale of substantial portions of the Debtor's future income.

81.     When the Transfers were made, these prior UCC-1 statements secured the repayment of the following claimed amounts that are currently known to Trustee and are allegedly owed by the Debtor: (i) $2,374,004.82 owed to Fundura Capital Group as evidenced by Proof of Claim No. 335 purportedly secured by a UCC statement filed on or about May 19, 2021; (ii) approximately $15 million dollars owed to MNS Funding, LLC as evidenced by Proof of Claim No. 1060 purportedly secured by a UCC statement filed on or about May 28, 2021; (iii) approximately $5,000,000 owed to Azzure Capital, LLC as evidenced by Proof of Claim No. 127 secured by a UCC statement filed on or about May 28, 2021; and (iv) approximately $1.5 million dollars owed to Diverse Capital, LLC purportedly secured by UCC statements filed on or about September 15, 2021, and December 1, 2021.[2]

82.     As alleged above, LPG was borrowing against its assets and future income, often on unfavorable terms, not only to finance operations at LPG, but also to pay the fees owed to the marketing affiliates for providing consumer clients and to pay other loans to creditors that were in default or about to be in default as part of Diab's scheme to keep LPG creditors at bay for a long as possible until he could transfer LPG's assets, client files, Client Funds, and ACH Receivables to other entities under his control.  Pursuant to the agreements with the marketing companies, significant percentages of future payments were already promised to be paid to the marketing affiliates from whatever future income the Debtor would receive.  And, of course, the payments LPG received in the form of ACH Receivables were also trust funds paid to LPG by its law firm clients, subject to return

---

[2] Trustee reserves all rights, claims, and defenses with respect to these and any other purported secured or unsecured claims.

1    of funds in the event of a request for refund or termination of the representation before LPG had

2    earned the funds.  In this regard, except to the extent earned, the ACH Receivables also represented

3    a liability of the Debtor.

4         83.    In addition, on Debtor's Schedule E/F [Bankr. Docket No. 33], Debtor scheduled 11

5    unsecured creditors with priority unsecured claims totaling $374,060.04. These priority unsecured

6    creditors include Indiana Dept. of Revenue, Dept. of Labor and Industries, Arizona Dept. of Economic

7    Security, Arkansas Dept. of Finance & Admin., California Franchise Tax Board, Georgia Dept. of

8    Labor, Internal Revenue Service, Mississippi Dept. of Revenue, Nevada Dept. of Taxation, Utah State

9    Tax Commission, and Wisconsin Dept. of Revenue (collectively, "Priority Unsecured Creditors").

10        84.    Another group of creditors that Debtor listed on its Schedule E/F [Bankr. Docket No.

11   33] are nonpriority unsecured creditors. Those 58 creditors have scheduled claims totaling

12   $141,439,158.05 and include Ajilon; Anthem Blue Cross; Azevedo Solutions Groups, Inc.; Carolina

13   Technologies & Consulting Invoice; Collaboration Advisors; Credit Reporting Service Inc.; CT

14   Corporation – Inv.; Debt Pay Pro; Document Fulfillment Services; EnergyCare, LLC; Exela

15   Enterprise Solutions; First Legal Network, LLC; GHA Technologies Inc.; Harrington Electric, Inc.;

16   Imagine Reporting; Juize, Inc.; Krisp Technologies, Inc.; Liberty Mutual; Marc Lemauviel – Allegra;

17   MarkSYS Holdings, LLC; Netsuite-Oracle; Pitney Bowes; Rapid Credit, Inc.; SBS Leasing A

18   Program of De Lage Landen; Security Solutions; Sharp Business Systems; Streamline Performance,

19   Inc.; Thomson Reuters; Twilio, Inc.; Nationwide Appearance Attorneys; Executive Center, LLC;

20   Outsource Accelerator, Ltd.; TaskUs Holdings, Inc.; Marich Bein, LLC; Validation Partners; MC

21   DVI Fund 1, LLC; MC DVI Fund 2, LLC; Debt Validation Fund II, LLC; Tustin Executive Center;

22   LexisNexus; JP Morgan Chase; Business Centers of America; Michael Schwartz; Anibal Colon Jr.;

23   Kathleen Lacey; David Ulery; Kimberly Birdsong; Kevin Carpenter; Karen Suell; Gloria Eaton;

24   Carolyn Beech; Debra Price; Kenneth Topp; Darcey Williamson, Trustee; James Hammett; Johnny

25   Rizo; Beverly Graham; Kathleen Scarlett; and Geneve and Myranda Sheffield (collectively,

26   "Nonpriority Unsecured Creditors" and, together with the Secured Creditors and Priority Unsecured

27   Creditors, "Prepetition Creditors").

28   / / /

85.     The bar date for submitting claims as part of the Bankruptcy Case has passed and Plaintiff now knows that over 5,000 claims were filed totaling approximately $500 million in priority, secured and unsecured claims.

## FIRST CLAIM FOR RELIEF

**Count I - Avoidance, Recovery, and Preservation of 2-Year**

**Actual Fraudulent Transfers Against Defendant Vasco**

**[11 U.S.C. §§ 548(a)(1)(A), 550, and 551]**

86.     Plaintiff realleges and incorporates here by reference all of the preceding allegations as though set forth in full.

87.     Some Transfers occurred within the two years prior to the Petition Date.

88.     On or after the date that such Transfers were made, entities to which Debtor was or became indebted include the Prepetition Creditors.

89.     The Transfers happened while Debtor was insolvent or rendered Debtor insolvent.

90.     Despite Debtor's obligation to the Prepetition Creditors, Defendants continued to be paid amounts derived from Debtor's Client Funds or other funds directly from Debtor or indirectly from others in possession of such funds.

91.     As alleged above, Debtor received nothing of value from Defendants and, as a result, at the time the Transfers were made, Debtor received less than reasonably equivalent value.

92.     The Transfers of Debtor's funds are avoidable as fraudulent pursuant to 11 U.S.C. §§ 548(a)(1)(A), 550, and 551 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against his Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

93.     The Transfers should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(A), and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

/ / /

/ / /

/ / /

### SECOND CLAIM FOR RELIEF

**Avoidance, Recovery, and Preservation of 2-Year Constructive**

**Fraudulent Transfers Against Defendant Vasco**

**[11 U.S.C. §§ 548(a)(1)(B), 550, and 551]**

94.     Plaintiff realleges and incorporates here by reference each and every preceding allegation as though set forth in full.

95.     A portion of the Transfers occurred within the two years prior to the Petition Date.

96.     On or after the date that such Transfers were made, entities to which Debtor was or became indebted include the Prepetition Creditors.

97.     The Transfers happened while Debtor:

a.   was insolvent or became insolvent as a result;

b.   was engaged or was about to engage in a transaction for which any property remaining with Debtor was of unreasonably small capital; or

c.   intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

98.     As alleged above, Debtor received nothing of value from Defendants and, as a result, at the time the Transfers were made, Debtor received less than reasonably equivalent value.

99.     The Transfers should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(B), and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

### THIRD CLAIM FOR RELIEF

**Avoidance, Recovery, and Preservation of 4-Year**

**Actual Fraudulent Transfers Against Defendant Vasco**

**[11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.04(a) and 3439.07]**

100.   Plaintiff realleges and incorporates here by reference all preceding allegations as though set forth in full.

101.   The Transfers occurred within the four years prior to the Petition Date.

/ / /

102.   On or after the date that such Transfers were made, entities to which Debtor was or became indebted include the Prepetition Creditors.

103.   Despite Debtor's obligation to the Prepetition Creditors, Defendants continued to be paid amounts derived from Debtor's Client Funds or other funds directly from Debtor or indirectly from others in possession of such funds.

104.   As alleged above, Debtor received nothing of value from Defendants and, as a result, at the time the Transfers were made, Debtor received less than reasonably equivalent value.

105.   The Transfers of Debtor's funds are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and CAL. CIV. CODE §§ 3439.04(a) and 3439.07 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against his Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

106.   Accordingly, the Transfers should be avoided as fraudulent under 11 U.S.C. §§ 544(b) and CAL. CIV. CODE §§ 3439.04(a) and 3439.07, and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551 and CAL. CIV. CODE § 3439.07.

**FOURTH CLAIM FOR RELIEF**

**Avoidance, Recovery, and Preservation of 4-Year Constructive**

**Fraudulent Transfers Against Defendant Vasco**

**[11 U.S.C. §§ 544(b), 550, and 551; CAL. CIV. CODE §§ 3439.05, and 3439.07]**

107.   Plaintiff realleges and incorporates here by reference all preceding allegations as though set forth in full.

108.   The Transfers occurred within the four years prior to the Petition Date.

/ / /

/ / /

/ / /

/ / /

/ / /

109.    The Transfers happened while Debtor:

a.    was insolvent or became insolvent as a result;

b.    was engaged or was about to engage in a transaction for which any property remaining with Debtor was of unreasonably small capital; or

c.    intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

110.    As alleged above, Debtor received nothing of value from Defendants and, as a result, at the time the Transfers were made, Debtor received less than reasonably equivalent value.

111.    The Transfers of Debtor's funds are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and CAL. CIV. CODE §§ 3439.05 and 3439.07 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against his Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

112.    Accordingly, the Transfers should be avoided as fraudulent under 11 U.S.C. §§ 544(b) and CAL. CIV. CODE §§ 3439.05 and 3439.07, and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551 and CAL. CIV. CODE § 3439.07.

**FIFTH CLAIM FOR RELIEF**

**Aiding and Abetting (Vasco and Mor)**

**[11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.04(a),**

**3934.04(b), and 3439.07]**

113.    Plaintiff realleges and incorporates herein by reference all of the preceding allegations as though set forth in full.

114.    Defendants, based upon information and belief and based on the Ponzi Scheme Presumption, had knowledge of the fraudulent transactions, transfers and illegal agreements that were used to perpetuate and conceal the Ponzi scheme and fraudulent transfers.

115.    Defendants, with the foregoing knowledge, intended to, and did, help the Debtor in perpetuating and concealing the Ponzi scheme and fraudulent transfers of money.

116.   At all material times, Defendants had the intent to facilitate and conceal the Ponzi scheme and fraudulent transfers of money by assisting in moving money out of the Debtor via fake and fraudulent invoices to insiders of the Debtor and its affiliates and in a manner to avoid income taxes.

117.   Defendants, upon information and belief, assisted, and did actually engage in, the commission of fraud and the Ponzi scheme by coordinating, facilitating, and directing payments and transfers of monies and executing documents in furtherance of concealing the true nature of their fraudulent and criminal activity related to the Ponzi scheme.

118.   The injuries to Plaintiff, the Debtor's Estate and to its creditors directly, proximately and reasonably foreseeably resulting from and caused by violations of Sections 6151 and 6155 of the California Business and Professional Code include, without limitation, hundreds of thousands of dollars in improperly transferred and acquired moneys.

119.   Plaintiff and the Debtor's estate also suffered damages by incurring attorney's fees and costs associated with the prosecution of Defendants' unlawful activities.

## SIXTH CLAIM FOR RELIEF

### Turnover of Estate Property (Vasco and Mor)

### [11 U.S.C. § 542]

120.   Plaintiff realleges and incorporates herein by reference all preceding allegations as though set forth in full.

121.   Vasco and/or Mor has possession or control over property of the Estate in the form of the Transfers and Precious Assets purchased through Transfers.

122.   The Transfers and Precious Assets are not of inconsequential value to the Estate.

123.   The funds and Precious Assets that are the subject of the Transfers are paramount to Debtor's ability to pay creditors.

124.   Accordingly, upon entry of judgment that the agreements are avoided or declared unenforceable, Trustee is entitled to a further judgment for turnover of the Transfers and Precious Assets pursuant to 11 U.S.C. § 542.

/ / /

**RESERVATION OF RIGHTS**

125.    Plaintiff reserves the right to bring all other claims or causes of action that Plaintiff may have against Defendants, on any and all grounds, as allowed under the law or in equity, including but not limited to, those claims not known by the Trustee at this time but that he may discover during the pendency of this adversary proceeding.

**PRAYER FOR RELIEF**

**On the First, Second, Third, Fourth, and Fifth Claims for Relief:**

1.    Avoiding, recovering, and preserving the Transfers made to Vasco in the total aggregate amount of not less than $867,042.34;

**On the First, Third and Fifth Claims for Relief:**

2.    Awarding punitive and exemplary damages according to proof;

**On the Sixth Claim for Relief:**

3.    Ordering Vasco to immediately turn over the Transfers, Precious Assets or the goods purchased using LPG funds;

**On All Claims for Relief:**

4.    Awarding pre-judgment interest at the maximum legal rate;

5.    Awarding post-judgment interest at the maximum legal rate from the date of the last Transfer until the judgment is paid in full;

6.    Awarding costs of suit incurred herein; and

Granting any other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated:  March 19, 2025                                   DINSMORE & SHOHL LLP


By:  _/s/ Christopher B. Ghio_
     Christopher B. Ghio
     M. Trent Spurlock
     Suzanne M. Marino
     Special Counsel to Richard A. Marshack,
     Trustee of the LPG Liquidation Trust

Exhibit 1

EXHIBIT 1
Page 24

1  CHRISTOPHER B. GHIO (259094)
   christopher.ghio@dinsmore.com
2  CHRISTOPHER CELENTINO (131688)
   christopher.celentino@dinsmore.com
3  YOSINA M. LISSEBECK (201654)
   yosina.lissebeck@dinsmore.com
4  DINSMORE & SHOHL LLP
5  655 West Broadway, Suite 800
   San Diego, California 92101
6  Tele:  619.400.0500
7  Fax:  619.400.0501

8  Sarah S. Mattingly (Ky. Bar 94257)
   sarah.mattingly@dinsmore.com
9  DINSMORE & SHOHL, LLP
   101 S. Fifth Street, Suite 2500
10 Louisville, Kentucky 40202
   Tele: 859-425-1096
11 Fax: 502-585-2207
12 (Admitted pro hac vice)

13 Special Counsel to Richard A. Marshack

**FILED & ENTERED**

**JUN 03 2024**

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY mccall      DEPUTY CLERK

14 | **UNITED STATES BANKRUPTCY COURT**

15 | **CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION**

16 | In Re | Case No: 23-bk-10571-SC

17 | | Chapter 11

18 | | **ORDER GRANTING MOTION FOR**
19 | The Litigation Practice Group P.C., | **ENTRY OF PROTECTIVE ORDER AND**
   | | **THE PROTECTIVE ORDER**
20 | Debtor(s),

21 | | Date:    May 23, 2024
22 | | Time:    1:30 p.m.
   | | Judge:   Hon. Scott C. Clarkson
23 | | Place:   Courtroom 5C (via Zoom)[1]
24 | |          411 West Fourth Street
   | |          Santa Ana, CA 92701
25
26
27

28  [1] Video and audio connection information for each hearing will be provided on Judge Clarkson's
    publicly posted hearing calendar, which may be viewed online at:
    http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

EXHIBIT 1
Page 25

The Court has read and considered the Notice of Motion and Motion for Entry of Protective Order (the "Motion") filed by Richard A. Marshack, in his capacity as the Chapter 11 Trustee (the "Trustee") of the Bankruptcy Estate ("Estate") of The Litigation Practice Group P.C., on May 2, 2024, pursuant to Federal Rule of Bankruptcy Procedure 7026 and Federal Rule of Civil Procedure 26(c)(1), as Dk. No. 1164 ("Motion"), and has found good cause to grant the Motion.

IT IS HEREBY ORDERED that:

1.      The Motion is granted;

2.      The below Protective Order shall apply to any contested matter arising

in the main bankruptcy case and in all adversary proceedings filed by or against Trustee, present and future; and

3.      Govern the discovery conducted therein.

## PROTECTIVE ORDER

### 1.      DEFINITIONS

1.1      "Confidential Information" as used in this Protective Order shall mean documents and other information (regardless of how generated, stored or maintained) that a Party or non-party reasonably believes to contain or reflect non-public financial or business information, bank records, financial records, such as social security numbers, non-public financial or personal information of a Party or non-party, account numbers, sensitive digital information and identifiers, information subject to confidentiality agreements or provisions other than this Protective Order, and other non-public research, development, or commercial information that derives value or avoids injury by virtue of not being known to the public.

1.2      This "Action" is defined and hereby means any contested matter arising in the main bankruptcy case and in all adversary proceedings filed by or against Trustee, present and future.

1.3      "Designating Party" means a Party or non-party that designates Confidential Information during the Action.

1.4      "Receiving Party" means a Party that receives Confidential Information during the Action.

EXHIBIT 1
Page 26

1.5    "Party" or "Parties" means person or entity subject to this Protective Order.

**2.    SCOPE OF THIS PROTECTIVE ORDER**

2.1    Unless otherwise ordered, this Protective Order shall govern certain documents and other products of discovery obtained in the Action from the Parties there to, and from third parties. As well as certain information copied or derived therefrom, excerpts, summaries or compilations thereof, including, but not limited to, documents voluntarily exchanged as part of early settlement discussions, documents produced pursuant to initial disclosures, requests authorized by the Federal Rules of Civil Procedure made applicable herein by the Federal Rules of Bankruptcy Procedure, answers to interrogatories, deposition transcripts, responses to requests for production, responses to requests for admission, subpoenas, affidavits, declarations, expert reports, and other such material and information as may be produced during the course of the Action and designated as Confidential Information.

**3.    DESIGNATION OF CONFIDENTIAL INFORMATION**

3.1    This Protective Order shall govern the production and handling of any Confidential Information in this Action. Any Party or non-party who produces Confidential Information in this Action may designate it as "Confidential" or "Attorneys' Eyes Only" consistent with the terms of this Protective Order. Whenever possible, the Designating Party must designate only those portions of a document, written discovery responses, deposition, transcript, or other material that contain the Confidential Information and refrain from designating entire documents. Regardless of any designations made hereunder, the Designating Party is not otherwise restricted from use or disclosure of its Confidential Information outside of this Action or for any business purposes. In addition, any Party may move to modify or seek other relief from any of the terms of this Protective Order if it has first tried in writing and in good faith to resolve its needs or disputes with the other Parties or Party as the case may be under the terms of this Protective Order. Further, nothing in this Protective Order shall prevent a Party from redacting documents consistent with the Federal Rules of Civil Procedure and utilizing the documents as needed through-out the Action.

3.2    <u>Application to Non-Parties:</u> Before a non-party is given copies of documents or materials designated as Confidential Information or Attorneys' Eyes Only as permitted hereunder, it

3

EXHIBIT 1
Page 27

must first sign an acknowledgment to be bound to these terms that is attached hereto as <u>Exhibit</u> A; if it fails to do so, the Parties to this Action must resolve any such dispute before making disclosure of designated information as permitted hereunder to the non-party. If a non-party wishes to make designations hereunder, it must first sign attached <u>Exhibit A.</u>

       3.3    <u>Timing and Provisional Protection:</u> Designations of Confidential Information may be made at any time. To avoid potential waiver of protection hereunder, the Designating Party should designate documents or materials containing Confidential Information at the time of production or disclosure, including on the record during the taking of any deposition. Deposition testimony will be deemed provisionally protected for a period of thirty (30) days after the transcript is released to the Parties by the court reporter, although the Parties may agree at any time to different timelines of provisional protection of information as Confidential or Attorneys' Eyes Only as part of one or more specific depositions. To retain any designations beyond the provisional period, a Designating Party must designate specific pages and lines of deposition testimony before the provisional period has expired. Such designations must be made in writing so that all counsel and court reporters may append the designation to all copies of the transcripts.

       3.4    <u>Manner of Designation:</u> Confidential Information may be designated hereunder in any reasonable manner or method that notifies the Receiving Party of the designation level and identifies with specificity the information to which the designation applies. If made verbally, the Designating Party must promptly confirm the designation in writing. Whenever possible, the Designating Party should stamp, affix, or embed a legend of "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY" on each designated page of the document or electronic image that contains Confidential Information.

       **4.**    **CHALLENGES TO DESIGNATED INFORMATION**

       4.1    In the event that a Receiving Party disagrees at any time with any designation(s) made by the Designating Party, the Receiving Party must first try to resolve such challenge in good faith on an informal basis with the Designating Party. The Receiving Party must provide written notice of the challenge and the grounds therefor to the Designating Party, who must respond in writing to the challenge within fifteen (15) days. At all times, the Designating Party carries the burden of establishing the propriety of the designation and protection level. Unless and until the challenge is

EXHIBIT 1
Page 28

1   resolved by the Parties or ruled upon by the Court, the designated information shall remain protected

2   under this Protective Order. The failure of any Receiving Party to challenge a designation does not

3   constitute a concession that the designation is proper or an admission that the designated information

4   is otherwise competent, relevant, or material.

5       **5.       LIMITED ACCESS/USE OF PROTECTED INFORMATION**

6       5.1    <u>Restricted Use:</u> Information that is produced or exchanged in the course of the Action

7   and designated under this Protective Order may be used for preparation for trial and preparation for

8   any appeal of any and all matters in the Action, as well as related settlement negotiations, and for no

9   other purpose, without the written consent of the Designating Party. No Confidential Information may

10  be disclosed to any person except in accordance with the terms of this Protective Order, unless the

11  parties are co-counsel or have entered into joint defense agreements. All persons in possession of

12  Confidential Information agree to exercise reasonable care with regard to the custody, use, or storage

13  of such information to ensure that its confidentiality is maintained. This obligation includes, but is

14  not limited to, the Receiving Party providing to the Designating Party prompt notice of the receipt of

15  any subpoena that seeks production or disclosure of any designated information and consulting with

16  the Designating Party before responding to the subpoena. Any use or disclosure of Confidential or

17  Attorneys' Eyes Only information in violation of the terms of this Protective Order may subject the

18  disclosing person or party to sanctions.

19      5.2    <u>Access to "Confidential" Information:</u> The Party(ies) and all persons subject to this

20  Protective Order agree that information designated as "CONFIDENTIAL" may only be accessed or

21  reviewed by the following:

22      a)     The Court, its personnel, and court reporters;

23      b)     Counsel of record, or co-counsel for any Party, or other party that has entered into a

24  joint defense agreement in the Action and their employees who assist counsel of record, or co-counsel

25  in the Action and are informed of the duties and obligations imposed hereunder;

26      c)     The Parties, including their clients, agents and employees who are assisting or have

27  reason to know of the Action;

28  / / /

d)    Experts or consultants employed by the Parties or their counsel, or co-counsel, for purposes of an Action, so long as each such expert or consultant has signed attached <u>Exhibit A;</u> and

e)    Other witnesses or persons with the Designating Party's consent or by court order.

5.3    <u>Access to "Attorneys' Eyes Only" Designations:</u> The Parties and all persons subject to this Protective Order agree that information designated as "ATTORNEYS' EYES ONLY" may only be accessed or reviewed by the following:

a)    The Court, its personnel, and court reporters;

b)    Counsel of record, or co-counsel for any Party, or other party that has entered into a joint defense agreement in the Action and their employees who assist counsel of record in the Action and are informed of the duties hereunder;

c)    In-house counsel for any Party in the Action and Richard A. Marshack, as Chapter 11 Trustee of The Litigation Practice Group P.C. who is informed of the duties and obligations imposed hereunder;

d)    Experts or consultants employed by the Parties or their counsel, or co-counsel for purposes of the Action,  and so long as each such expert or consultant has signed attached <u>Exhibit A;</u> and

e)    Other witnesses or persons to whom the Designating Party agrees in advance of disclosure or by court order.

5.4    <u>Non-Waiver Effect of Designations:</u> Neither the taking of, nor the failure to take, any action to enforce the provisions of this Protective Order, nor the failure to object to any designation, will constitute a waiver of any Party(ies)'s claim or defense in the Action or any other action or proceeding, including, but not limited to, a claim or defense that any designated information is or is not Confidential, is or is not entitled to particular protection, or embodies or does not embody information protectable by law.

5.5    <u>In-Court Use of Designated Information:</u> If information designated under this Protective Order will or may be offered in evidence at a hearing or trial related to any matter in the Action, then the offering party must give advance notice to the party or non-party that designated prior to offering the information so that any use or disclosure may be addressed in accordance with

6

EXHIBIT 1
Page 30

the Court's case-management or other pre-trial order, or by a motion *in limine.* Nothing in this Protective Order shall be construed as a waiver by a Party of any objections that may be raised as to the admissibility at trial of any evidentiary materials.

**6.    CLAW-BACK REQUESTS**

6.1    <u>Failure to Make Designation:</u> If, at any time, a Party or non-party discovers that it produced or disclosed Confidential Information without designation, it may promptly notify the Receiving Party and identify with particularity the Confidential Information to be designated and the level of designation (the claw-back notification). The Receiving Party may then request substitute production of the newly-designated information. Within thirty (30) days of receiving the claw-back notification, the Receiving Party must: (1) certify to the Designating Party it has appropriately marked or, if substitute production has been requested, destroyed all unmarked copies that it received, made, and/or distributed; and (2) if it was practicably unable to mark or destroy any information because disclosures occurred while the Receiving Party was under no duty of confidentiality under the terms of this Protective Order regarding that information, the Receiving Party must reasonably provide as much information as practicable to aid the Designating Party in protecting the information, consistently with the Receiving Party's attorney-client, work-product, and/or trial-preparation privileges.

6.2    <u>Inadvertent Production of Privileged Information:</u> If, at any time, a Party discovers that it produced information that it reasonably believes is subject to protection under the attorney/client, work-product, or trial-preparation privileges, then it must promptly notify each Receiving Party of the claim for protection, the basis for it, amend its privilege log accordingly, and comply with Fed. R. Civ. P. 26(b)(5). Whenever possible, the producing party must produce substitute information that redacts the information subject to the claimed protection. The Receiving Party must thereupon comply with Fed. R. Civ. P. 26(b)(5)(B) as to the information subject to the claimed protection.

/ / /

/ / /

/ / /

EXHIBIT 1
Page 31

**7.    DURATION/CONTINUED RESTRICTIONS**

7.1    <u>Handling of Designated Information Upon Conclusion of the Main Bankruptcy Case:</u> Upon conclusion of the Main Bankruptcy Case, by way of dismissal or closing of the case, the Designating Party(ies) is/are responsible for ensuring that any Party or person to whom the Designating Party shared or disclosed designated information in any of the matters under the Action returns or destroys all of its copies, regardless of the medium in which it was stored. No witness or Party may retain designated information that it received from any other Party or non-party under this Protective Order; only counsel of record, or co-counsel, are the authorized agents who may retain one copy for their respective legal files, and who must also describe to the Designating Party the extra steps taken to protect its legal file containing paper and/or electronic copies of the designated information so that it is not accessed, used, or disclosed inconsistently with the obligations under this Protective Order. This provision does not apply to the Court or Court staff. Moreover, this provision does not apply to Trustee, who may retain and use – consistent with this Order – Confidential Information received in any Action during the entirety of the Bankruptcy.

7.2    <u>Continued Restrictions Under this Protective Order:</u> The restrictions on disclosure and use of Confidential Information shall survive the conclusion of the Bankruptcy case and any matter in the Action.

**8.    PRIVILEGED OR PROTECTED INFORMATION**

8.1    Nothing in this Protective Order shall require disclosure of information that is protected by the attorney-client privilege, the work-product protection, or any other legally cognizable privilege (a "Privilege or Protection").  If information subject to a claim of Privilege or Protection is inadvertently produced, pursuant to Federal Rule of Evidence 502(d) such production shall not constitute a waiver of, or estoppel as to, any claim of Privilege or Protection for such information or any other information that may be protected from disclosure by a Privilege or Protection in any proceeding.

8.2    If a Party receives a document that appears to be subject to a Privilege or Protection, then it shall refrain from examining the document any more than is essential to ascertain if it is privileged or protected and shall promptly notify the producing Party in writing that the receiving

EXHIBIT 1
Page 32

Party possesses material that appears to be subject to a Privilege or Protection. The producing Party shall have seven (7) days after receiving such notice to assert a Privilege or Protection over the identified material. If the producing Party does not assert a claim of Privilege or Protection within the seven (7)-day period, the material in question shall be deemed not privileged or protected.

8.3    If a producing Party has produced a document subject to a claim of Privilege or Protection, upon written request by the producing Party, the document for which a claim of Privilege or Protection is made shall be sequestered or destroyed to the extent reasonably practicable, and the receiving Party shall not use the document for any purpose other than in connection with analyzing or disputing a claim of Privilege or Protection or in connection with a motion to compel the production of the document.

8.4    The receiving Party sequestering or destroying such material may then move the Court for an order compelling production of the material. The applicable producing Party bears the burden of establishing the applicable Privilege or Protection of any clawed-back document or information as and to the same extent that it would have borne such burden had it not produced the document or information.  Nothing in this Protective Order shall limit the Court's right or any receiving Party's right to request an in camera review of any information subject to a claim of Privilege or Protection.

###

Date: June 3, 2024

Scott C. Clarkson
United States Bankruptcy Judge

9

EXHIBIT 1
Page 33

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT "A"

1

EXHIBIT 1
Page 34

1  Christopher B. Ghio (State Bar No. 259094)
   Christopher Celentino (State Bar No. 131688)
2  Yosina M. Lissebeck (State Bar No. 201654)
   **DINSMORE & SHOHL LLP**
3  655 West Broadway, Suite 800
   San Diego, CA 92101
4  Telephone:  619.400.0500
   Facsimile:  619.400.0501
5  christopher.ghio@dinsmore.com
   christopher.celentino@dinsmore.com
6  yosina.lissebeck@dinsmore.com

7  Sarah S. Mattingly (Ky. Bar 94257)
   DINSMORE & SHOHL, LLP
8  101 S. Fifth Street, Suite 2500
   Louisville, KY 40202
9  Telephone: 859-425-1096
   Facsimile: 502-585-2207
10 Sarah.mattingly@dinsmore.com
   (Admitted pro hac vice)

11
   Special Counsel to Richard A. Marshack,
12 Chapter 11 Trustee

13

14
                    **UNITED STATES BANKRUPTCY COURT**
15
                    **CENTRAL DISTRICT OF CALIFORNIA**
16

17
   In Re                            | Case No. 8:23-BK-10571-SC
18
                                    | Chapter 11
19
   The Litigation Practice Group P.C., | **EXHIBIT A TO STIPULATED**
20                                   | **ORDER**
                    Debtor(s),
21                                  | Date:   May 23, 2024
22                                  | Time:   1:30 p.m.
                                    | Judge:  Hon. Scott C. Clarkson
23                                  | Place:  Courtroom 5C[1] - Via Zoom
24                                  |         411 W. Fourth Street
                                    |         Santa Ana, CA  92701
25

26

27
   _____
28 [1] Video and audio connection information for each hearing will be provided on Judge Clarkson's
    publicly posted hearing calendar, which may be viewed online at:
    http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

                                    1                            EXHIBIT 1
                                                                 Page 35

This is to certify that:

(a)     I am being given access to Confidential Information pursuant to the Stipulated Protective Order that was entered into the main bankruptcy case for Litigation Practice Group, but which is binding and controlling as set forth by the Court's Order on any and all contested matters and  any and all litigation commenced by Trustee;

(b)     I have read the Stipulated Protective Order; and

(c)     I agree to be bound by the terms and conditions thereof, including, without limitation, to the obligations regarding the use, non-disclosure and return of such Confidential Information. I further agree that in addition to being contractually bound by the Stipulated Protective Order, I am subject to the jurisdiction of the above reference Court for any violation thereof.

Date: _____

_____
Signature

_____
Printed Name

Exhibit 2

EXHIBIT 2
Page 37

# VASCO ⋈ ASSETS

2024 Quail St.
Newport Beach, CA 92660
Phone #   949-679-2300

# Invoice

| Date | Invoice # |
|------|-----------|
| 11/2/2022 | 4217 |

**Bill To**

Ansha Corp.

| P.O. No. | Terms | Project |
|----------|-------|---------|
| | Net 10 | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| 1 | MARKETING DEVELOPMENT | 100,375.00 | 100,375.00 |

| | **Total** | $100,375.00 |
|--|-----------|-------------|

www.vascoassets.com

EXHIBIT 2
Page 38

# Exhibit 3

EXHIBIT 3
Page 39

In re: The Litigation Practice Group PC
Disbursement Details by Payee
4 Years Pre-Petition (03/20/2019 - 03/20/2023)

Vasco Assets LLC



| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|
| Chase | The Litigation Practice Group PC | 3158 | 1/31/2023 | 1/6/2023 | | 100,000.00 | Fedwire Debit Via: Fst Bk Sf1 MC/081009428 NC: Vasco Assets LLC Newport Beech, CA 92660 US Ret: 1ev 4303 Imed: 0105B1Cgc05C032245 Tm: 51 49400006Jo |
| Chase | The Litigation Practice Group PC | 3158 | 12/31/2022 | 12/12/2022 | 12290 | 100,206.73 | Business Consultation Charge |
| Chase | The Litigation Practice Group PC | 3158 | 11/30/2022 | 11/23/2022 | 12190 | 100,375.00 | |
| Chase | The Litigation Practice Group PC | 3158 | 10/31/2022 | 10/17/2022 | 12109 | 95,000.00 | |
| | | | | | | 395,581.73 | |

DRAFT FORM - SUBJECT TO CHANGE

EXHIBIT 3
Page 40



The Litigation Practice Group
P.O Box 513018
Los Angeles, CA 90051-1018

Chase

12109

10/13/2022

PAY
TO THE
ORDER OF    Vasco Assets, LLC

$ **95,000.00

Ninety five thousand and 00/100************************************************

DOLLARS

Vasco Assets, LLC
2024 Quail Street
Newport Beach CA 92660
United States

MEMO
Lead Generation

SECURITY FEATURES INCLUDED DETAILS ON BACK

AUTHORIZED SIGNATURE

⑆012109⑆ ⑈322271627⑈ 735863158⑈

10172022 406040605163434



The Litigation Practice Group
P O Box 513018
Los Angeles, CA 90051-1018

Chase

12190

11/08/2022

PAY
TO THE
ORDER OF    Vasco Assets, LLC

$ **100,375.00

One hundred thousand three hundred seventy five and 00/100************************************************** DOLLARS

Vasco Assets, LLC
2024 Quail Street
Newport Beach CA 92660
United States

MEMO
Marketing Development                    SECURITY FEATURES INCLUDED. DETAILS ON BACK    AUTHORIZED SIGNATURE

⑈012190⑈ ⑆322271627⑆ 735863158⑈



Exhibit 4

EXHIBIT 4
Page 44

# VASCO ◍ ASSETS

March 19th, 2024

Mr. Jonathan Serrano, Dinsmore & Shohl LLP,

Vasco Assets is a luxury assets and commodities company. Between September 13th, 2022, and December 28th, 2022, Vasco Assets sold LPG luxury goods to include watches, gold coins, gold bars, silver coins, and platinum coins, as well as performed a watch service. I have listed the invoices below in their respective batches for your convenience:

Batch One invoices: 4136, 4141, 4151, 4179, 4181, and 4192 totaling $95,000.00. These invoices were paid with check #12109 on October 17th, 2022.

Batch Two invoice 4216 totaled $100,375.00. This invoice was paid with check #12190 on November 23rd, 2022.

Batch Three invoices: 4218, 4222, 4243, and 4248 totaling $100,206.73. These invoices were paid on December 12th, 2022.

Batch Four invoices: 4275, 4304, 4317, and 4323 totaling $100,000.00. These invoices were paid by wire on January 6th, 2023.

All batches with detailed invoices are attached to this document. If you have any questions don't hesitate to ask.

Regards,
Benny Mor



# Invoice

2024 Quail St.
Newport Beach, CA 92660
Phone #   949-679-2300

**PAID**
**10/14/2022**

| Date | Invoice # |
|------|-----------|
| 9/12/2022 | 4136 |

**Bill To**

LPG
17542 E 17th Street STE 100
Tustin, CA 92780

| P.O. No. | Terms | Project |
|----------|-------|---------|
| | Net 10 | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| 1 | ONE 22K SAINT CHRISTOPHER COIN 0.56OZ 173 GRAMS | 945.00 | 945.00 |

| | **Total** | **$945.00** |
|--|-----------|-------------|

www.vascoassets.com

EXHIBIT 4
Page 46



# Invoice

2024 Quail St.
Newport Beach, CA 92660
Phone #   949-679-2300

**PAID**
**10/14/2022**

| Date | Invoice # |
|------|-----------|
| 9/13/2022 | 4141 |

**Bill To**

LPG
17542 E 17th Street STE 100
Tustin, CA 92780

| P.O. No. | Terms | Project |
|----------|-------|---------|
|  | Net 10 |  |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| 1 | (1)  VALCAMBI 24K GOLD 10 OZ. | 17,590.00 | 17,590.00 |
| 1 | (1) VALCAMBI 24K GOLD 10 OZ. | 17,590.00 | 17,590.00 |

| | **Total** | **$35,180.00** |
|---|---|---|

# VASCO  ASSETS

# Invoice

2024 Quail St.
Newport Beach, CA 92660
Phone #   949-679-2300

PAID
10/14/2022

| Date | Invoice # |
|------|-----------|
| 9/19/2022 | 4151 |

**Bill To**

LPG
17542 E 17th Street STE 100
Tustin, CA 92780

| P.O. No. | Terms | Project |
|----------|-------|---------|
| | Net 10 | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| 1 | (7) 7X24KT GOLD BARS VALCAMBI | 12,155.00 | 12,155.00 |
| 1 | (1) BUFFALO 1 OZ MS 69 | 2,150.00 | 2,150.00 |
| 1 | (1) 20 DOLLAR 0.9675 OZ | 1,925.00 | 1,925.00 |
| 1 | (1) 0.25 OZ EAGLE 24KT | 495.00 | 495.00 |
| 1 | (1) 0.10 OZ 24KT OLD DIME | 260.00 | 260.00 |

| | **Total** | $16,985.00 |
|--|-----------|-----------|

www.vascoassets.com

EXHIBIT 4
Page 48



# VASCO ⊘ ASSETS

# Invoice

2024 Quail St.
Newport Beach, CA 92660
Phone #   949-679-2300

**PAID**
**10/14/2022**

| Date | Invoice # |
|------|-----------|
| 10/4/2022 | 4179 |

**Bill To**

LPG
17542 E 17th Street STE 100
Tustin, CA 92780

| P.O. No. | Terms | Project |
|----------|-------|---------|
|  | Net 10 |  |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| 1 | (70) COINS OF PLAT 0.5OZ WAR OF 1812 | 36,400.00 | 36,400.00 |

| | **Total** | **$36,400.00** |
|--|-----------|----------------|

www.vascoassets.com

EXHIBIT 4
Page 49



# Invoice

2024 Quail St.
Newport Beach, CA 92660
Phone #   949-679-2300

| Date | Invoice # |
|------|-----------|
| 10/4/2022 | 4181 |

**PAID**
**10/14/2022**

**Bill To**

LPG
17542 E 17th Street STE 100
Tustin, CA 92780

| P.O. No. | Terms | Project |
|----------|-------|---------|
|  | Net 10 |  |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| 1 | (1) 0.76 TRUMP COIN | 25.00 | 25.00 |

| | **Total** | $25.00 |
|--|-----------|--------|

www.vascoassets.com

EXHIBIT 4
Page 50



# Invoice

2024 Quail St.
Newport Beach, CA 92660
Phone #   949-679-2300

**PAID**
**10/14/2022**

| Date | Invoice # |
|------|-----------|
| 10/13/2022 | 4192 |

**Bill To**

LPG
17542 E 17th Street STE 100
Tustin, CA 92780

| P.O. No. | Terms | Project |
|----------|-------|---------|
|  | Net 10 |  |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| 1 | Gold Corum Watch | 5,465.00 | 5,465.00 |
|  |  | **Total** | **$5,465.00** |

www.vascoassets.com

EXHIBIT 4
Page 51

# VASCO ASSETS

# Invoice

2024 Quail St.
Newport Beach, CA 92660
Phone #   949-679-2300

**PAID**
**11/22/2022**

| Date | Invoice # |
|---|---|
| 11/2/2022 | 4216 |

**Bill To**

LPG
17542 E 17th Street STE 100
Tustin, CA 92780

| P.O. No. | Terms | Project |
|---|---|---|
| | Net 10 | |

| Quantity | Description | Rate | Amount |
|---|---|---|---|
| 1 | (2) KRUGGERANDS 24KT 2X 10OZ COINS | 3,490.00 | 3,490.00 |
| 1 | (1) 10OZ MAPLE CANADIAN 24KT | 1,745.00 | 1,745.00 |
| 1 | (1) 250 GRAM 24KT GOLD BAR | 13,545.00 | 13,545.00 |
| 1 | (3) 10OZ GOLD UBS BARS | 5,295.00 | 5,295.00 |
| 1 | (1) 0.64OZ GOLD PAMP BAR | 1,100.00 | 1,100.00 |
| 1 | (1) 0.1176OZ BRITISH SOVEREIGN | 200.00 | 200.00 |
| 1 | (150) PLATINUM COINS WAR OF 1812 | 75,000.00 | 75,000.00 |

| | **Total** | $100,375.00 |
|---|---|---|

www.vascoassets.com

EXHIBIT 4
Page 52



# Invoice

2024 Quail St.
Newport Beach, CA 92660
Phone #   949-679-2300

| Date | Invoice # |
|------|-----------|
| 11/3/2022 | 4218 |

**Bill To**

LPG
17542 E 17th Street STE 100
Tustin, CA 92780

| P.O. No. | Terms | Project |
|----------|-------|---------|
|  | Net 10 |  |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| 1 | (1) 19.80OZ OF SILVER COIN - CONTINENTAL Y2 DOLLAR | 501.73 | 501.73 |

| | Total | $501.73 |
|--|-------|---------|

www.vascoassets.com

EXHIBIT 4
Page 53



# Invoice

2024 Quail St.
Newport Beach, CA 92660
Phone #   949-679-2300

| Date | Invoice # |
|---|---|
| 11/7/2022 | 4222 |

**Bill To**

LPG
17542 E 17th Street STE 100
Tustin, CA 92780

| P.O. No. | Terms | Project |
|---|---|---|
| | Net 10 | |

| Quantity | Description | Rate | Amount |
|---|---|---|---|
| 1 | (5) 10OZ 24K GOLD COINS - AMERICAN EAGLE | 9,000.00 | 9,000.00 |
| 1 | (100) COINS OF 0.5OZ PLATINUM - WAR OF 1812 | 50,000.00 | 50,000.00 |

| | **Total** | **$59,000.00** |
|---|---|---|

www.vascoassets.com

EXHIBIT 4
Page 54



# Invoice

2024 Quail St.
Newport Beach, CA 92660
Phone #   949-679-2300

| Date | Invoice # |
| --- | --- |
| 11/25/2022 | 4243 |

**Bill To**

LPG
17542 E 17th Street STE 100
Tustin, CA 92780

| P.O. No. | Terms | Project |
| --- | --- | --- |
|  | Net 10 |  |

| Quantity | Description | Rate | Amount |
| --- | --- | --- | --- |
| 1 | (1) CARTIER WATCH | 24,500.00 | 24,500.00 |
| 1 | (3) GOLD BAR 3.4OZ : 2.4OZ BANK OF TAIWAN; 1.0OZ UBST | 6,205.00 | 6,205.00 |

| | **Total** | $30,705.00 |
| --- | --- | --- |

www.vascoassets.com

EXHIBIT 4
Page 55

# VASCO ⓥ ASSETS

# Invoice

2024 Quail St.
Newport Beach, CA 92660
Phone #   949-679-2300

| Date | Invoice # |
|------|-----------|
| 11/28/2022 | 4248 |

**Bill To**

LPG
17542 E 17th Street STE 100
Tustin, CA 92780

| P.O. No. | Terms | Project |
|----------|-------|---------|
| | Net 10 | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| 1 | (20) 0.5OZ PLATINUM COINS - WAR OF 1812 | 10,000.00 | 10,000.00 |

| | **Total** | $10,000.00 |
|--|-----------|------------|

www.vascoassets.com

EXHIBIT 4
Page 56



# Invoice

**2024 Quail St.**
Newport Beach, CA 92660
Phone #   949-679-2300

PAID
01/06/2023

| Date | Invoice # |
|------|-----------|
| 12/8/2022 | 4275 |

**Bill To**

LPG
17542 E 17th Street STE 100
Tustin, CA 92780

| P.O. No. | Terms | Project |
|----------|-------|---------|
| | Net 10 | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| 1 | (100) 0.5oz Coins of War 1812 | 50,500.00 | 50,500.00 |
| | | | |
| | **Total** | | $50,500.00 |

# VASCO ⬗ ASSETS

## Invoice

2024 Quail St.
Newport Beach, CA 92660
Phone #   949-679-2300

| Date | Invoice # |
|------|-----------|
| 12/16/2022 | 4304 |

**PAID**
**01/06/2023**

| Bill To |
|---------|
| LPG
17542 E 17th Street STE 100
Tustin, CA 92780 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
|  | Net 10 |  |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| 1 | (90) PLATINUM COIN 0.5OZ – WAR OF 1812 | 46,350.00 | 46,350.00 |

| | Total | $46,350.00 |
|---|-------|-----------|

www.vascoassets.com

EXHIBIT 4
Page 58



# Invoice

2024 Quail St.
Newport Beach, CA 92660
Phone #  949-679-2300

PAID
01/06/2023

| Date | Invoice # |
|------|-----------|
| 12/22/2022 | 4317 |

**Bill To**

LPG
17542 E 17th Street STE 100
Tustin, CA 92780

| P.O. No. | Terms | Project |
|----------|-------|---------|
|  | Net 10 |  |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| 1 | (76) MORGAN SILVER COINS - ONE DOLLAR | 2,430.00 | 2,430.00 |

| | Total | $2,430.00 |
|---|-------|-----------|


VASCO ASSETS

# Invoice

2024 Quail St.
Newport Beach, CA 92660
Phone #   949-679-2300

| Date | Invoice # |
|------|-----------|
| 12/28/2022 | 4323 |

**PAID 01/06/2023**

| Bill To |
|---------|
| LPG<br>17542 E 17th Street STE 100<br>Tustin, CA 92780 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
| | Net 10 | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| 1 | WATCH REPAIR | 720.00 | 720.00 |

| | Total | $720.00 |
|---|-------|---------|

Exhibit 5

EXHIBIT 5
Page 61

**DECLARATION OF BENNY MOR**

I, Benny Mor, declare as follows:

      1.     I am the Chief Executive Officer of Vasco Assets, Inc., a California corporation ("Vasco"). I am also the duly authorized custodian of records for Vasco and have the authority to certify records. As such, I have personal knowledge of the matters set forth herein. If called as a witness in this matter, I could and would testify competently thereto.

      2.     Attached as **Exhibit A** are true and correct copies of invoice nos. 4136, 4141, 4151, 4179, 4181, 4192, 4216, 4218, 4222, 4243, 4248, 4275, 4304, 4317, and 4323 (collectively, the "Invoices"). I certify that the Invoices are true and complete copies of records maintained in the regular course and scope of Vasco's business and were prepared by me at or near the time of the acts, conditions, or events recorded.

      3.     On behalf of Vasco, I sold the items listed in the Invoices to Tony Diab on behalf of The Litigation Practice Group P.C. ("LPG").

      4.     On behalf of LPG, Tony Diab paid Vasco $95,000.00 for the items listed in invoice nos. 4136, 4141, 4151, 4179, 4181, and 4192 with check no. 12109 on October 17, 2022. A true and correct copy of check no. 12109 is attached as **Exhibit B**.

      5.     On behalf of LPG, Tony Diab paid Vasco $100,375.00 for the items listed in invoice no. 4216 with check no. 12190 on or about November 23, 2022. A true and correct copy of check no. 4216 is attached as **Exhibit B**.

      6.     On behalf of LPG, Tony Diab paid Vasco $100,206.76 for the items listed in invoice nos. 4218, 4222, 4243, and 4248 with check no. 12290 on or about December 12, 2022. A true and correct copy of the bank statement showing that wire transfer is attached as **Exhibit C**.

      7.     On behalf of LPG, Tony Diab paid Vasco $100,000.00 for the items listed in invoice nos. 4275, 4304, 4317, and 4323 via wire transfer on January 6, 2023. A true and correct copy of the bank statement showing that wire transfer is attached as **Exhibit D**.

      I declare under penalty of perjury that the foregoing is true and correct.

DATED: September 3, 2024

                                    _____
                                      Benny Mor

1

EXHIBIT 5
Page 62

**FIRST BANK**

Member FDIC

PO Box 548 • Hazelwood, MO 63042-0548

Return Service Requested

VASCO ASSETS INC
October 31, 2022

Page:    2 of 4

XXXXXX6655

| Date | Description | Additions |
|------|-------------|-----------|
| 10-07 | Deposit | 47,500.00 |
| 10-11 | Deposit | 9,170.00 |
| 10-11 | ' ACH Deposit Square Inc 221011P2 221011 L206757616566 | 502.45 |
| 10-11 | ' ACH Deposit Square Inc 221010P2 221011 L206757393918 | 192.90 |
| 10-12 | Deposit | 1,700.00 |
| 10-12 | ' ACH Deposit VENMO CASHOUT 221012 | 245.00 |
| 10-13 | ' ACH Deposit Square Inc 221013P2 221013 L206758204407 | 100.37 |
| 10-14 | Deposit | 214,985.00 |
| 10-14 | Deposit | 642.00 |
| 10-17 | Deposit | 96,600.00 |
| 10-18 | ' ACH Deposit VENMO CASHOUT 221018 | 386.33 |
| 10-18 | Deposit | 175.00 |
| 10-18 | ' ACH Deposit VENMO CASHOUT 221018 | 139.50 |
| 10-21 | Deposit | 1,000.00 |
| 10-21 | ' ACH Deposit Square Inc 221021P2 221021 L206760361981 | 91.32 |
| 10-24 | ' ACH Deposit Square Inc 221024P2 221024 L206760990647 | 324.89 |
| 10-26 | Deposit | 175.00 |
| 10-27 | Deposit | 42,490.00 |

*(handwritten: DCP of 9200 8/09)*

## DAILY BALANCES

| Date | Amount | Date | Amount | Date | Amount |
|------|--------|------|--------|------|--------|
| 09-30 | 110,935.02 | 10-12 | 125,479.78 | 10-24 | 147,644.69 |
| 10-03 | 116,897.45 | 10-13 | 125,513.65 | 10-25 | 146,893.62 |
| 10-04 | 119,497.45 | 10-14 | 277,140.65 | 10-26 | 147,068.62 |
| 10-05 | 119,346.43 | 10-17 | 145,527.65 | 10-27 | 152,546.62 |
| 10-07 | 166,846.43 | 10-18 | 146,228.48 | 10-31 | 128,123.56 |
| 10-11 | 123,534.78 | 10-21 | 147,319.80 | | |



EXHIBIT 5
Page 63

00008775-0036623-0002-0003-TIMR800815100R24284(00008775)-00036625

**FIRST BANK**

Member FDIC

VASCO ASSETS INC
January 31, 2023

Page:    2 of 4

XXXXXX6655

## CREDITS

| Date | Description | Additions |
|------|-------------|----------:|
| 01-03 | Deposit | 1,300.00 |
| 01-03 | Deposit | 888.00 |
| 01-03 | Deposit | 250.00 |
| 01-04 | Deposit | 1,001.13 |
| 01-05 | ' ACH Deposit | 1,354.00 |
| | VENMO CASHOUT 230105 | |
| 01-06 | ' Incoming Wire | 100,000.00 |
| | 202301060001777 THE LITIGATION PRAINV 4303 | |
| 01-06 | Deposit | 500.00 |
| 01-06 | ' ACH Deposit | 245.00 |
| | VENMO CASHOUT 230106 | |
| 01-09 | Deposit | 450.00 |
| 01-09 | ' ACH Deposit | 198.64 |
| | Square Inc 230109P2 230109 | |
| | L206778126088 | |
| 01-10 | ' ACH Deposit | 110.00 |
| | VENMO CASHOUT 230110 | |
| 01-10 | Deposit | 100.00 |
| 01-10 | ' ACH Deposit | 60.16 |
| | Square Inc 230110P2 230110 | |
| | L206778340073 | |
| 01-10 | ' ACH Deposit | 21.17 |
| | VENMO CASHOUT 230110 | |
| 01-13 | ' ACH Deposit | 829.00 |
| | Square Inc 230113P2 230113 | |
| | L206778999081 | |
| 01-17 | ' ACH Deposit | 374.67 |
| | VENMO CASHOUT 230117 | |
| 01-17 | ' ACH Deposit | 115.00 |
| | VENMO CASHOUT 230117 | |
| 01-17 | ' ACH Deposit | 79.94 |
| | Square Inc 230116P2 230117 | |
| | L206779461889 | |
| 01-19 | ' ACH Deposit | 319.86 |
| | Square Inc 230119P2 230119 | |
| | L206780034201 | |
| 01-19 | Deposit | 250.00 |
| 01-23 | Deposit | 350.00 |
| 01-23 | ' ACH Deposit | 120.47 |
| | Square Inc 230123P2 230123 | |
| | L206780862694 | |
| 01-25 | Deposit | 1,900.00 |
| 01-25 | ' ACH Deposit | 98.00 |
| | VENMO CASHOUT 230125 | |
| 01-26 | Deposit | 2,800.00 |

*(handwritten note near 01-06 Incoming Wire: "PAYMENT TJ SAN")*

EXHIBIT 5
Page 64

**FIRST BANK**

Member FDIC

VASCO ASSETS INC
December 30, 2022

Page:    2 of 7

XXXXXX6655

| Number | Date | Amount | Number | Date | Amount |
|--------|------|--------|--------|------|--------|
| 11493 | 12-22 | 7,500.00 | 11499 | 12-28 | 93,220.00 |
| 11494 | 12-22 | 12,200.00 | 11500 | 12-29 | 1,150.00 |
| 11495 | 12-23 | 8,812.00 | 11501 | 12-30 | 11,000.00 |
| 11497 * | 12-23 | 6,060.00 | * Skip in check sequence | | |
| 11498 | 12-28 | 3,205.00 | | | |

## DEBITS

| Date | Description | Subtractions |
|------|-------------|--------------|
| 12-12 | ' Analysis Serv Charge | 50.00 |
| | ANALYSIS ACTIVITY FOR 11/22 | |
| 12-30 | Deposit Return Item | 100,000.00 |

## CREDITS

| Date | Description | Additions |
|------|-------------|-----------|
| 12-01 | Deposit | 250.00 |
| 12-02 | Deposit | 4,700.00 |
| 12-02 | ' ACH Deposit | 400.00 |
| | VENMO CASHOUT 221202 | |
| 12-05 | Deposit | 3,734.25 |
| 12-05 | Deposit | 1,021.00 |
| 12-05 | ' ACH Deposit | 627.94 |
| | Square Inc 221205P2 221205 | |
| | L206770735690 | |
| 12-06 | Deposit | 81,500.00 |
| 12-06 | Deposit | 1,150.00 |
| 12-06 | ' ACH Deposit | 250.00 |
| | VENMO CASHOUT 221206 | |
| 12-06 | ' ACH Deposit | 245.00 |
| | VENMO CASHOUT 221206 | |
| 12-06 | ' ACH Deposit | 193.85 |
| | Square Inc 221206P2 221206 | |
| | L206770976742 | |
| 12-07 | Deposit | 1,575.00 |
| 12-08 | Deposit | 2,700.00 |
| 12-09 | Deposit | 100,506.73 |
| 12-09 | ' ACH Deposit | 25,150.00 |
| | TALFEL INC SENDER 221209 | |
| | 622387572 | |
| 12-12 | ' ACH Deposit | 60.16 |
| | Square Inc 221212P2 221212 | |
| | L206772549264 | |
| 12-13 | Deposit | 2,045.46 |
| 12-13 | ' ACH Deposit | 80.00 |
| | VENMO CASHOUT 221213 | |
| 12-14 | Deposit | 11,600.00 |

*handwritten: DEP OF 100306.76*

EXHIBIT 5
Page 65



**FIRST BANK**

Member FDIC

PO Box 548 • Hazelwood, MO 63042-0548

Return Service Requested

VASCO ASSETS INC
November 30, 2022

Page:    2 of 4

XXXXXX6655

| Date | Description | Additions |
|------|-------------|-----------|
| 11-08 | ' ACH Deposit | 1,655.13 ✓ |
| | Square Inc 221108P2 221108 | |
| | L206764572402 | |
| 11-10 | Deposit | 29,930.00 |
| 11-14 | Deposit | 220.00 |
| 11-14 | ' ACH Deposit | 60.16 |
| | Square Inc 221111P2 221114 | |
| | L206765366954 | |
| 11-15 | Deposit | 750.00 |
| 11-15 | ' ACH Deposit | 276.27 |
| | Square Inc 221115P2 221115 | |
| | L206766226633 | |
| 11-16 | ' ACH Deposit | 509.17 |
| | Square Inc 221116P2 221116 | |
| | L206766451004 | |
| 11-17 | Deposit | 31,075.00 |
| 11-17 | ' ACH Deposit | 552.71 |
| | Square Inc 221117P2 221117 | |
| | L206766835531 | |
| 11-21 | Deposit | 25,000.00 |
| 11-22 | Deposit | 100,375.00 |
| 11-22 | ' ACH Deposit | 245.11 |
| | Square Inc 221122P2 221122 | |
| | L206768048440 | |
| 11-23 | Deposit | 2,193.52 |
| 11-23 | ' ACH Deposit | 98.36 |
| | Square Inc 221123P2 221123 | |
| | L206768316668 | |
| 11-25 | Deposit | 350.00 |
| 11-28 | Deposit | 130.00 |
| 11-29 | ' ACH Deposit | 1,035.00 |
| | VENMO CASHOUT 221129 | |

*DKp* (handwritten note near 11-22)

## DAILY BALANCES

| Date | Amount | Date | Amount | Date | Amount |
|------|--------|------|--------|------|--------|
| 10-31 | 128,123.56 | 11-09 | 113,220.34 | 11-21 | 149,034.55 |
| 11-01 | 128,373.56 | 11-10 | 143,091.24 | 11-22 | 155,484.66 |
| 11-02 | 129,873.56 | 11-14 | 143,371.40 | 11-23 | 157,059.95 |
| 11-04 | 129,720.21 | 11-15 | 144,397.67 | 11-25 | 157,409.95 |
| 11-07 | 130,065.21 | 11-16 | 144,906.84 | 11-28 | 132,145.61 |
| 11-08 | 131,720.34 | 11-17 | 147,534.55 | 11-29 | 133,180.61 |



EXHIBIT 5
Page 66



EXHIBIT 5
Page 67

# ADVERSARY PROCEEDING COVER SHEET

B1040 (FORM 1040) (12/24)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

**PLAINTIFFS**
Richard A. Marshack, Trustee of the LPG Liquidation Trust

**ATTORNEYS** (Firm Name, Address, and Telephone No.)
Christopher Celentino (131688)
Christopher B. Ghio (259094)
Yosina M. Lissebeck (201654)
Dinsmore & Shohl LLP
655 West Broadway, Ste 800, San Diego, CA 92101
Tele: (619) 400-0500

M. Trent Spurlock (KY Bar No. 88569)
Suzanne M. Marino (99070)
Dinsmore & Shohl LLP
101 S. Fifth St., Ste 2500, Louisville, KY 40206
Tele: (502) 585-2207
(Admitted pro hac vice)

**DEFENDANTS**
Vasco Assets, Inc., and Benny Mor

**ATTORNEYS** (If Known)

**PARTY** (Check One Box Only)
- ☐ Debtor
- ☐ U.S. Trustee/Bankruptcy Admin
- ☐ Creditor
- ☐ Other
- ☒ Trustee

**PARTY** (Check One Box Only)
- ☐ Debtor
- ☐ U.S. Trustee/Bankruptcy Admin
- ☐ Creditor
- ☐ Other
- ☐ Trustee

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
(1) Avoidance, Recovery, and Preservation of 2-Year Actual Fraudulent Transfers; (2) Avoidance, Recovery, and Preservation of 2-Year Constructive Fraudulent Transfers; (3) Avoidance, Recovery, and Preservation of 4-Year Actual Fraudulent Transfers; (4) Avoidance, Recovery, and Preservation of 4-Year Constructive Fraudulent Transfers; (5) Aiding and Abetting by Vasco and Mor; and (6) Turnover of Estate Property

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(a) – Recovery of Money/Property**
- ☒ 11-Recovery of money/property - §542 turnover of property
- ☐ 12-Recovery of money/property - §547 preference
- ☒ 13-Recovery of money/property - §548 fraudulent transfer
- ☒ 14-Recovery of money/property - other
**FRBP 7001(b) – Validity, Priority or Extent of Lien**
- ☐ 21-Validity, priority or extent of lien or other interest in property
**FRBP 7001(c) – Approval of Sale of Property**
- ☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)
**FRBP 7001(d) – Objection/Revocation of Discharge**
- ☐ 41-Objection / revocation of discharge - §727(c),(d),(e)
**FRBP 7001(e) – Revocation of Confirmation**
- ☐ 51-Revocation of confirmation
**FRBP 7001(f) – Dischargeability**
- ☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
- ☐ 62-Dischargeability - §523(a)(2), false pretenses, false
  representation, actual fraud
- ☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(f) – Dischargeability (continued)**
- ☐ 61-Dischargeability - §523(a)(5), domestic support
- ☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
- ☐ 63-Dischargeability - §523(a)(8), student loan
- ☐ 64-Dischargeability - §523(a)(15), divorce or separation
  obligation (other than domestic support)
- ☐ 65-Dischargeability - other
**FRBP 7001(g) – Injunctive Relief**
- ☐ 71-Injunctive relief- imposition of stay
- ☐ 72-Injunctive relief - other
**FRBP 7001(h) Subordination of Claim or Interest**
- ☐ 81-Subordination of claim or interest
**FRBP 7001(i) Declaratory Judgment**
- ☐ 91-Declaratory judgment
**FRBP 7001(j) Determination of Removed Action**
- ☐ 01-Determination of remove d claim or cause
**Other**
- ☐ SS-SIPA Case - 15 U.S.C. §§78aaa *et.seq.*
- ☐ 02-Other (e.g. other actions that would have been brought in
  state court if unrelated to bankruptcy case)

| ☒ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ 867,042.34 |
| Other Relief Sought | |

ATTACHMENT
Page 69

B1040 (FORM 1040) (12/24)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>The Litigation Practice Group P.C. | BANKRUPTCY CASE NO.<br>8:23-bk-10571-SC | |
| DISTRICT IN WHICH CASE IS PENDING<br>Central District of California | DIVISION OFFICE<br>Santa Ana | NAME OF JUDGE<br>Scott C. Clarkson |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br>/s/ Christopher B. Ghio | | |
| DATE<br>March 19, 2025 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Christopher B. Ghio<br>Trent Spurlock<br>Suzanne M. Marino | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.