1 | Christopher Celentino (State Bar No. 131688)
Yosina M. Lissebeck (State Bar No. 201654)
2 | Christopher B. Ghio (State Bar No. 259094)
3 | **DINSMORE & SHOHL LLP**
655 West Broadway, Ste 800
4 | San Diego, CA 92101
Telephone:  619.400.0500
5 | Facsimile:  619.400.0501
christopher.celentino@dinsmore.com
6 | yosina.lissebeck@dinsmore.com
christopher.ghio@dinsmore.com
7 |

8 | Tyler Powell (Ky. Bar No. 90520 – Admitted pro hac vice)
**DINSMORE & SHOHL LLP**
9 | 100 West Main Street, Ste 900
Lexington, KY 40507
10 | Telephone: 859-425-1056
Facsimile:  859-425-1099
11 | tyler.powell@dinsmore.com

12 |
Special Counsel to Richard A. Marshack,
13 | Trustee of the LPG Liquidating Trust

14 |                **UNITED STATES BANKRUPTCY COURT**

15 |      **CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION**

16 | In re:                                  | Case No.: 8:23-bk-10571-SC

17 | The Litigation Practice Group, P.C.,    | Adv. Proc. No.:

18 |                    Debtor.              | Chapter 11

19 | ——————————————————————

20 | Richard A. Marshack, Trustee of the LPG | **COMPLAINT FOR:**
Liquidating Trust,

20 |                                         | **(1) AVOIDANCE, RECOVERY, AND PRESERVATION OF FRAUDULENT TRANSFER(S) PURSUANT TO 11 U.S.C. §§ 548(a)(1), 550, AND 551**
21 |                    Plaintiff,

22 |                      v.

23 | Arash Asante Bayrooti, a California resident; Arsha Corp., a California corporation; and ABR | **(2) AVOIDANCE, RECOVERY, AND PRESERVATION OF FRAUDULENT TRANSFER(S) PURSUANT TO 11 U.S.C. §§ 548(a)(2), 550, AND 551 AND**
24 | Enterprises, LLC fka Leap Forward, LLC, a Nevada limited liability company,

25 |                    Defendants.          | **(3) AVOIDANCE, PRESERVATION, AND RECOVERY OF ACTUAL FRAUDULENT TRANSFER(S) 11 U.S.C. §§ 544, 550, 551; CAL. CIV. CODE §§ 3439.04(a)(1) AND 3439.07 AND**
26 |

27 |

28 |                                         | **(4) AVOIDANCE, PRESERVATION,**

1          **AND RECOVERY OF CONSTRUCTIVE FRAUDULENT TRANSFER(S) PURSUANT TO 11 U.S.C. §§ 544, 550, 551; CAL. CIV. CODE §§ 3439.04(a)(2), 3439.05, AND 3439.07**

2

3

4          Honorable Scott C. Clarkson
Dept. 5C

5

6         For his *Complaint for (1) Avoidance, Recovery, and Preservation of Transfers Made With*

7  *Intent to Defraud Pursuant to 11 U.S.C. §§ 548(a)(1)(B), 550, and 551; (2) Avoidance, Preservation,*

8  *and Recovery of Constructively Fraudulent Two-Year Transfers Pursuant to 11 U.S.C. §§*

9  *548(a)(1)(B), 550 & 551; (3) Avoidance, Preservation, and Recovery of Transfers Within Four Years*

10  *Pursuant to 11 U.S.C. §§ 544, 550, 551; Cal. Civ. Code §§ 3439.04(a)(2), 3439.05 and 3439.07; and*

11  *(4) Avoidance, Recovery, and Preservation of Transfers Made Within Four Years Pursuant to 11*

12  *U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.05, and 3439.07* (the "Complaint"), plaintiff

13  Richard A. Marshack, the Chapter 11 Trustee (the "Trustee" or "Plaintiff") for the bankruptcy estate

14  (the "Estate") of debtor The Litigation Practice Group P.C. (the "Debtor" or "LPG") in the above-

15  captioned bankruptcy case (the "Bankruptcy Case"), alleges and avers as follows:

16         **STATEMENT OF JURISDICTION, NATURE OF PROCEEDING, AND VENUE**

17         1.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157(b)(2)(A),

18  (E), (H) and (O), 1334(b), and General Order No. 13-05 of the District Court for the Central District

19  of California because this is a core proceeding arising in and/or related to the Bankruptcy Case,

20  which is a case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), and

21  which is pending in the United States Bankruptcy Court for the Central District of California, Santa

22  Ana Division (the "Court").

23         2.    Regardless of whether this proceeding is core, non-core, or otherwise, the Plaintiff

24  consents to the entry of a final order and judgment by the Bankruptcy Court.

25         3.    Defendants are hereby notified that Rule 7008 of the Federal Rules of Bankruptcy

26  Procedure requires them to plead whether consent is given to the entry of a final order and judgment

27  by the bankruptcy court.

28  / / /

4.      Venue of this adversary proceeding properly lies in this judicial district pursuant to 28 U.S.C. § 1409(a) because this proceeding is related to the Debtor's pending Bankruptcy Case.

**THE PARTIES**

5.      Debtor LPG is, and at all material times was, a professional corporation organized, existing, and in good standing under the laws of the State of California, with its principal place of business in Tustin, California.

6.      Defendant Arash Asante Bayrooti ("Mr. Bayrooti") is, and at all material times was, an individual resident of the state of California subject to service of process via first class mail postage prepaid at 23 Costa Del Sol, Dana Point, CA 92629-4039.

7.      Defendant Arsha, Corp. ("Arsha") is, and at all material times was, a California corporation subject to service of process via first class mail postage prepaid care of its registered agent, Mr. Bayrooti at 1630 Sunkist Street, G Anaheim CA 92806.

8.      Defendant ABR Enterprises, LLC fka Leap Forward, LLC ("ABR") is currently a dissolved Nevada limited liability company that is subject to service of process via first class mail postage prepaid care of its registered agent, Mr. Bayrooti at 23 Costa Del Sol, Dana Point, CA 92629 and at 20 Meadowhawk Lane, Las Vegas, NV 89135 which is the address registered with the Nevada Secretary of State.

**GENERAL ALLEGATIONS**

**A.      The Bankruptcy Case**

9.      On March 20, 2023 ("Petition Date"), Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, commencing the Bankruptcy Case.

10.     The Office of the United States Trustee ("UST") filed its *Motion by United States Trustee to Dismiss or Convert Case Pursuant to 11 U.S.C. § 1112(b)* [Bankr. Docket No. 21] and creditors Debt Validation Fund II, LLC; MC DVI Fund 1, LLC; and MC DVI Fund 2, LLC filed the *Motion by DVF and MC DVI to Dismiss Chapter 11 Case Pursuant to 11 U.S.C. §§ 105, 305, 349, & 1112, or in the Alternative Convert This Case to Chapter 7 or Appoint a Trustee* [Bankr. Docket No. 44]. On May 4, 2023, the Court entered its *Order Directing United States Trustee to Appoint Chapter 11 Trustee* [Bankr. Docket No. 58].

3

11.     Pursuant to the *Acceptance of Appointment as Chapter 11 Trustee* [Bankr. Docket No. 63], on May 8, 2023, Trustee accepted his appointment as the Chapter 11 Trustee in the Bankruptcy Case. The Court approved the Trustee's appointment in its *Order Approving the U.S. Trustee's Application for the Appointment of a Chapter 11 Trustee* [Docket No. 65].

12.     Trustee was not appointed until after events of the case and, therefore, bases these allegations on information and belief. *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) ("The *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible."); *Miller v. City of Los Angeles*, 2014 U.S. Dist. LEXIS 198871, 2014 WL 12610195, at *5 (C.D. Cal. Aug. 7, 2014) (recognizing that the plaintiff's "information and belief" pleading was allowed and "necessary at times"); *see also Mireskandari v. Daily Mail and General Trust PLC*, 2013 U.S. Dist. LEXIS 194437, 2013 WL 12129642, at *4 (C.D. Cal. July 31, 2013) ("The Federal Rules of Civil Procedure allow parties to plead facts on 'information and belief' if the facts 'will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.'" (citations omitted)).

13.     Pursuant to the *Order Confirming Modified First Amended Joint Chapter 11 Plan of Liquidation* entered September 9, 2024, and the *Notice of Occurrence of Effective Date of Modified First Amended Joint Chapter 11 Plan of Liquidation* filed September 24, 2024, Richard A. Marshack became the Liquidating Trustee of the LPG Liquidation Trust, effective September 24, 2024. [Bankr. Docket Nos. 1646 & 1762].

14.     All claims have been transferred to the Liquidating Trust pursuant to the confirmed plan and Plaintiff brings this action solely in his capacity as the Trustee of the LPG Liquidation Trust, for the benefit of Debtor's Estate and its creditors.

**B.**     **Protective Order**

15.     On or about May 2, 2024, Plaintiff filed that certain Notice and Motion for Entry of Protective Order (the "Protective Order").

/ / /

16.    On June 3, 2024, the Court entered its *Order Granting Motion for Entry of Protective Order and the Protective Order* [Bankr. Docket No. 1270] (the "Protective Order"). A true and accurate copy of the Protective Order is attached as **Exhibit 1**, and incorporated herein.

17.    By its own terms, the Protective Order applies to this adversary proceeding and governs all discovery conducted herein.

C.    **LPG's Ownership and Management**

18.    Prior to the Petition Date, LPG operated a law firm for consumers across the country who sought assistance in contesting or resolving debts they would identify. At all relevant times, LPG was controlled and operated by the individual named Tony Diab ("Diab").

19.    The consumers would pay LPG over a period of time via monthly debits from their bank accounts.

20.    The monthly payments were meant to cover all legal services LPG provided to the consumers including validation of the debts, review of documents to determine enforceability, and court appearances to halt lawsuits to obtain judgments.

21.    In certain instances, LPG would file a lawsuit in an effort to eliminate a disputed debt or to prosecute affirmative claims held by the consumers.

22.    LPG mismanaged the consumers' monthly payments.

23.    Diab and others devised a plan to fraudulently transfer funds, client files, client funds and assets in the form of ACH Receivables (the "ACH Receivables" or "Accounts Receivable") out of LPG to third parties prior to the filing of bankruptcy.

24.    To obtain consumer clients, LPG contracted with marketing companies, who engaged in illegal capping or client recruitment and would advertise or call to solicit consumers to become clients of LPG in exchange for a percentage of the ACH Receivables collected by LPG from the consumers. The marketing affiliate went so far as to assist with the execution of an engagement letter between the consumer and LPG.

25.    In exchange, LPG agreed to pay the marketing affiliates a percentage the monthly payments collected by LPG from the consumers.

/ / /

26.     Because LPG received payments from consumers over time, it often sought financing by borrowing against its future cash flows. This borrowing was not only used to finance operations at LPG, but also to pay the fees owed to the marketing companies for providing the client referrals.

27.     Many of the documents executed in connection with such financing described the transactions as accounts receivable purchase agreements.

28.     Diab used entities he controlled including, without limitation, Vulcan Consulting, LLC ("Vulcan") and B.A.T., Inc. dba Coast Processing ("Coast") to process payments from LPG consumer clients and to divert LPG consumer funds and ACH Receivables. Diab would use numerous ACH processing companies in order to easily transfer millions of dollars from Debtor to these entities he controlled, without oversight or detection, and to avoid payment disputes and complications. The money that flowed from Debtor through these bank account to Defendants consisted of Client Funds that Debtor funneled to these entities by means of the ACH processing companies. Debtor also made deposits into these entities bank account such that they received Client Funds directly from Debtor in addition to direct Accounts Receivables.

**D.    Ponzi Scheme Presumption**

29.     The Ponzi Scheme Presumption exists in bankruptcy proceedings.

30.     The Ponzi Scheme Presumption can be utilized to establish a debtor's "intent to defraud future undertakers [investors] from the mere fact that a debtor was running a Ponzi scheme. Indeed, no other reasonable inference is possible. A Ponzi scheme cannot work forever. The investor pool is a limited resource and will eventually run dry. The perpetrator must know that the scheme will eventually collapse as a result of the inability to attract new investors. The perpetrator nevertheless makes payments to present investors, which, by definition, are meant to attract new investors. He must know all along, from the very nature of his activities, that investors at the end of the line will lose their money. Knowledge to a substantial certainty constitutes intent in the eyes of the law," *cf. Restatement (Second) of Torts § 8A* (1963 & 1964), and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them. *Kirkland v. Rund (In re EPD Inv. Co., LLC)*, 114 F.4th 1148, 1153 (9th Cir. 2024) (by definition Ponzi scheme is destined to fail and the swindler and their entities often end in bankruptcy or equitable receivership); *Cf. Coleman*

*Am. Moving Servs., Inc. v. First Nat'l Bank & Trust Co. (In re American Properties, Inc.)* 14 B.R. 637, 643 (Bankr. D. Kan. 1981) (intentionally carrying out a transaction with full knowledge that its effect will be detrimental to creditors is sufficient for actual intent to hinder, delay or defraud within the meaning of § 548(a)(1))." *Merrill v. Abbott (In re Independent Clearing House Co.)* (D. Utah 1987) 77 B.R. 843, 860. A trustee in bankruptcy is not required to show that an operator of a Ponzi scheme was subjectively aware his Ponzi scheme was destined to fail. *In re EPD Inv. Co., LLC*, 114 F.4th at 1153 ("[a] trustee's action to recover assets fraudulently conveyed in the course of a Ponzi scheme does not require that the trustee also prove the Ponzi-scheme operator was subjectively aware his Ponzi scheme was destined to fail.").

31.    "But if all the debtor receives in return for a transfer is the use of the defendant's money to run a Ponzi scheme, there is nothing in the bankruptcy estate for creditors to share. In fact, by helping the debtor perpetuate his scheme, the transfers exacerbate the harm to creditors by increasing the amounts of claims while diminishing the debtor's estate. In such a situation, the use of the defendant's money cannot objectively be called 'reasonably equivalent value.'" *In re Independent Clearing House Co.* 77 B.R. at 859. Therefore, "[t]he trustee can avoid the transfers if they were preferential or fraudulent. Transfers to investors in a Ponzi scheme are preferential and fraudulent. Therefore, they constitute "property of the estate," and the trustee can recover them. *Id.* at 853 n.17 (citations omitted).

32.    Debtor was operating a Ponzi scheme that utilized affiliates and several other entities as investors to continue its unlawful business practices by using funds provided by current investors to attract new investors hoping for very high returns. Therefore, the Debtor was running a Ponzi Scheme and the Ponzi Scheme Presumption can be utilized to infer that the Debtor had the intent to defraud investors within the meaning of 11 U.S.C. section 548(a)(1). This is evidenced by the Court in this Bankruptcy Case declaring that Debtor was operating a Ponzi scheme when it stated the following:

> It is important to note that this Court has never received any significant and trustworthy evidence that Debtor accomplished meaningful results for its clients, but only anecdotal examples of viable success for its clients. By reviewing the Estate's claims register, there is evidence of consumer claims for the fraud and demanded but undelivered refunds of approximately $500 million. There is ample evidence that the pre-petition Debtor never placed

the collected funds into an attorney-client trust account, and that Debtor or its principals simply looted the payments received through the client automatic withdrawals, stiffing both the clients and outside attorneys who may have been working on client cases with the hopes of being paid. There is also evidence before the Court that Debtor was running a Ponzi scheme and paying some outside (or "network") attorneys with funds obtained from new clients. In this case, it appears that some of the "lenders" may have been serving as "investors," hoping for very high returns before "the music stopped."    The Ninth Circuit has recently explained, "[b]y definition, a Ponzi scheme is destined to fail because the pool of available investors is not limitless. When the Ponzi scheme operator's pool of investors inevitably runs dry, the scheme collapses and the swindler and their entities often end up in bankruptcy or equitable receivership. *See generally* David R. Hague, Expanding the Ponzi Scheme Presumption, 64 DePaul L. Rev. 867 (2015). In bankruptcy, the court-appointed trustee is tasked with taking immediate control of the entity, ceasing ongoing fraudulent activity, locating and collecting assets for the bankruptcy or receivership estate, and achieving a final, equitable distribution of the remaining assets. *See* 11 U.S.C. § 704; *Kirkland v. Rund (In re EPD Inv. Co., LLC)*, 2024 U.S. App. LEXIS 21363, at *15 (9th Cir. Aug. 23, 2024). Finally, there is evidence that Debtor was encumbering (or as some creditors assert, "double or triple selling") their accounts or receivables to multiple lenders. With respect to Greyson's requested Administrative Claim [Dk. 676], and as more fully described in the concurrently entered order denying the claim, there has been no evidence presented that any work allegedly performed by Greyson assisted any clients or added any value to the Estate.

*See, Case 8:23-bk-10571-SC*, Doc 1545 n. 5.

33.    Moreover, since the Debtor's transactions with Everyday and Rosen were made with the intent to further the Ponzi scheme, the Debtor did not receive an objectively reasonable equivalent value in its transactions with Everyday and Rosen as set forth herein. This lack of reasonably equivalent value permits the Trustee to avoid the Debtor's obligations with Everyday and recover all payments made to satisfy that obligation because these transactions were actually or constructively fraudulent.

34.    The Ponzi Scheme Presumption establishes a debtor's "intent to defraud future undertakers [investors] from the mere fact that a debtor was running a Ponzi scheme." *Merrill v. Abbott* (*In re Independent Clearing House Co.*), 77 B.R. 843, 860 (D. Utah 1987). "Knowledge to a substantial certainty constitutes intent in the eyes of the law, *cf. Restatement (Second) of Torts* § 8A (1963 & 1964), and a debtor's knowledge that future investors will not be paid is sufficient to establish

his actual intent to defraud them." *Id*. A trustee in bankruptcy is not required to show that an operator of a Ponzi scheme was subjectively aware his Ponzi scheme was destined to fail. *In re EPD Inv. Co., LLC*, 114 F.4th at 1153 (9th Cir. 2024).

35.     "[I]f all the debtor receives in return for a transfer is the use of the defendant's money to run a Ponzi scheme, there is nothing in the bankruptcy estate for creditors to share." *In re Independent Clearing House Co.* 77 B.R. at 859. In such a situation, the use of the defendant's money cannot objectively be called "reasonably equivalent value." *Id*. Therefore, "[t]he trustee can avoid the transfers if they were preferential or fraudulent. Transfers to investors in a Ponzi scheme are preferential and fraudulent. Therefore, they constitute 'property of the estate,' and the trustee can recover them." *Id*. at 853 n.17 (citations omitted).

36.     Based on the Ponzi Scheme presumption the Court can infer that the Debtor had the intent to defraud investors within the meaning of 11 U.S.C. § 548(a)(1). Since the Debtor's transactions with the Defendants were made with the intent to further the Ponzi scheme, the Debtor did not receive an objectively reasonable equivalent value for engaging in such transactions, and the Trustee can avoid these transactions or transfers because they were actually fraudulent as to the Debtor's creditors.

**E.    Prepetition Litigation and Creditors**

37.     Debtor's Schedule E/F, filed on April 4, 2023, as Dk. No. 33, lists: (a) 11 unsecured creditors with priority unsecured claims totaling $374,060.04; and (b) 58 nonpriority unsecured creditors with scheduled claims totaling $141,439,158.05.

38.     The claims register in this Bankruptcy Case includes 2,554 proofs of claim, totaling in excess of $424 million of claims asserted against the Estate.

39.     At least 14 UCC-1 statements were of record securing alleged debts of the Debtor as of the Petition Date. These statements either reflected secured liens against the Debtor's assets then owned or thereafter acquired or provided evidence of the assignment or sale of substantial portions of the Debtor's future income. They secured the repayment of the following claimed amounts that are currently known to Trustee and are allegedly owed by the Debtor: (a) $2,374,004.82 owed to Fundura Capital Group as evidenced by Proof of Claim No. 335 purportedly secured by a UCC statement filed

on or about May 19, 2021; (b) approximately $15 million dollars owed to MNS Funding, LLC as evidenced by Proof of Claim No. 1060 purportedly secured by a UCC statement filed on or about May 28, 2021; (c) approximately $5,000,000 owed to Azzure Capital, LLC as evidenced by Proof of Claim No. 127 purportedly secured by a UCC statement filed on or about May 28, 2021; and (d) approximately $1.5 million dollars owed to Diverse Capital, LLC purportedly secured by UCC statements filed on or about September 15, 2021, and December 1, 2021.

40.     Debtor's balance sheets for the 36 months ending December 31, 2021, show approximately $17,900,000 in total assets at its highest point in November 2021. This amount is significantly less than the $424 million of claims filed.

41.     Debtor's Statement of Financial Affairs, filed on April 4, 2023, as Dk. No. 34, reflects 15 pending lawsuits against Debtor as of the Petition Date. The lawsuits date back to October 18, 2021 (*Fundura v. The Litigation Practice Group P.C. et al.*, Supreme Court of New York Index No. 613192-2021) and are as recent as March 10, 2023 (*Diverse Capital LLC v. The Litigation Practice Group P.C. et al.*, Supreme Court of New York Index No. 135614-2023).

**F.    Debtor's Insolvency**

42.     Debtor was insolvent when the Transfers occurred as evidenced by: (a) the 14 UCC-1 statements reflecting secured liens against the Debtor's owned and after-acquired assets and the assignment or sale of substantial portions of the Debtor's future income; (b) the priority and non-priority unsecured debt of nearly $142 million listed in Debtor's schedules; (c) the $424 million of creditor claims filed in this Bankruptcy Case; and (d) Debtor's balance sheets reflecting, at its highest point, $17.9 million of assets in November 2021.

43.     Moreover, insolvency is presumed as a matter of law where, as in this Bankruptcy Case, the debtor operated a Ponzi scheme. *See, e.g., Glob. Money Mgmt., L.P. v. McDonnold*, No. 06CV34, 2008 U.S. Dist. LEXIS 128733, at *15 (S.D. Cal. Feb. 27, 2008) (concluding that "if a Ponzi scheme is proven, then the debtor is proven insolvent from the time of its inception").

**SPECIFIC ALLEGATIONS**

44.     This is the Trustee's second adversary proceeding against Mr. Bayrooti and the Living Trust. In the first adversary proceeding (Case No. 8:24-ap-01068) ("Bayrooti 1"), the Trustee sought

to avoid and recover a single transfer from LPG of $5,814,146.45 to Mr. Bayrooti. As detailed in the Complaint in Bayrooti 1, this payment was to complete Tony Diab's purchase of Mr. Bayrooti's shares of stock in Coast. As set forth in the Amended Complaint in Bayrooti 1 and in the Stipulation of Judgment of Tony Diab filed as Dkt. No. 719 in Adversary Proceeding No. 8:23-ap-1046, Coast processed and collected monthly payments from LPG's consumer clients. Upon information and belief, the only funds that Coast ever received were collected from LPG's consumer clients.

45.    Upon further information and belief, there was no formal contract between Coast and LPG regarding the fees payable for Coast's processing services. Coast processed the payments for LPG's consumer clients, forwarded sufficient funds to LPG to fund its operations, and retained the rest of the collected funds. Upon further information and belief, the shareholders of Coast treated whatever funds it retained as their funds and diverted those funds to personal use at will.

46.    The majority of the claims in this action seek to recover the payments and other transfers made by Coast to or for the benefit of Mr. Bayrooti and/or one of the Bayrooti Defendants. These transfers were made by Mr. Bayrooti while he was an officer and shareholder in Coast and. These transfers were paid with funds collected from LPG's clients that Coast had no right to disburse or pay for the benefit of Mr. Bayrooti.

47.    Mr. Bayrooti and the Bayrooti Defendants also received substantial payments from the Debtor that the Trustee seeks to avoid and recover herein.   These transfers are separate from and have no connection to the claims asserted and settled in Bayrooti 1.

**Transfers Made From Coast**

48.    As an officer and shareholder, Mr. Bayrooti regularly used the client funds that Coast processed on behalf of LPG to pay his personal expenses, to generate and pay fraudulent invoices to withdraw money from Coast without tax consequences, or to take "distributions" from Coast that were either paid to Mr. Bayrooti or to one or more of the Bayrooti Defendants.

49.    Mr. Bayrooti and potentially other parties also directed Coast to assign a stream of payments recoverable from future client fees generated from a large group of files to Defendant ABR for no consideration. Upon information and belief, no consideration was paid or value given for the assignment of a portion of these client payments to ABR.

50.    While investigation is continuing the Trustee has identified more than $450,000 in transfers from Coast to third parties that were, upon information and belief, paid to or for the benefit of Mr. Bayrooti and/or one of the other Bayrooti Defendant ("Third Party Transfers"). The Third Party Coast Transfers known to the Trustee at present are set forth on **Exhibit 2** hereto.

51.    The Third Party Coast Transfers on Exhibit 2 include payments to Mr. Bayrooti's ex-wife, payments for life insurance premiums, and designated as "home construction/improvement."

52.    There is no business purpose for a payment processing company like Coast to pay the Third Party Coast Transfers in the ordinary course of business.

53.    As noted above, Mr. Bayrooti also wanted to pull money from Coast without tax consequences. Upon information and belief, Mr. Bayrooti achieved this goal by purchasing precious metals and/or jewelry from Vasco Assets, Inc. ("Vasco"). He then had Coast pay for these purchases based on fake invoices stating that the payments were for "consulting" or "marketing expenses."

54.    The website for Vasco states that it "specializes in the global trade of luxury tangible assets …[focusing] on precious metals and stones, luxury watches, state and designer jewelry, diamonds, coins, luxury and exotic vehicles and select collectible art.."

55.    There was no legitimate business purpose for Coast to pay Vasco for "consulting" or "marketing expenses."

56.    While investigation is continuing the Trustee has identified more than $470,000 in transfers from Coast to Vasco to purchase precious metals, gems, and the like to or for the benefit of Mr. Bayrooti and/or the Bayrooti Defendants ("Vasco Coast Transfers"). The Vasco Coast Transfers known to the Trustee at present are set forth on **Exhibit 3** hereto

57.    Upon information and belief, Mr. Bayrooti also generated false invoices or transactions between Coast and his company, Arsha. Upon information and belief, the trade name of Arsha is Lifetime Flooring, and its actual business is the selling and installation of floors. Despite Coast occupying a rented office space that was ready for use, Mr. Bayrooti had Coast pay Arsha more than $450,000 that Coast treated as "outside services" and/or "personal loans" ("Arsha Transfers"). The Arsha Transfers known to the Trustee at present are set forth on **Exhibit 4** hereto.

/ / /

58.     Upon information and belief, Arsha never performed any services for Coast that were provided in the ordinary course of business.

59.     To the extent any of the Arsha Transfers were actually loans, Arsha has not repaid any such loans to Coast.

60.     As discussed in Bayrooti 1, Mr. Diab and Mr. Bayrooti were discussing Mr. Diab purchasing Mr. Bayrooti shares of stock in Coast in the spring of 2021.

61.     While these discussions were underway, on May 21, 2021 Mr. Bayrooti withdrew $3,300,000.00 ("Withdrawal") from the Coast bank account at Union Bank with an account number ending in XX4833 ("Account").

62.     Coast used this Account to collect payments from the Debtor's clients. EPPS, another payment processor for the Debtor, also deposited funds into the Account.

63.     The Withdrawal was taken from client funds collected from the Debtor's clients.

64.     An extract from the Account showing the most recent deposits into the Account before May 21, 2021 is shown below.

| 5/18 | WIRE TRANS TRN 0518020617 051821 UBOC UB516900N<br>Received From:<br>  EPPS, INC<br>Originator: | 93054234 | 742,737.15 |
|------|------|------|------|
| 5/18 | Coast Processing Settlement CCD 000011297872594 | 52551327 | 20,242.55 |
| 5/18 | COAST PROCESSING PC CLEAR PPD -SETT-PC CLEAR2 | 53007605 | 185,259.85 |
| 5/19 | COAST PROCESSING PC CLEAR PPD -SETT-PC CLEAR2 | 54390887 | 39,562.97 |
| 5/19 | Coast Processing Settlement CCD 000011307710778 | 53963643 | 41,845.37 |
| 5/20 | COAST PROCESSING PC CLEAR PPD -SETT-PC CLEAR2 | 55663597 | 5,395.13 |
| 5/20 | Coast Processing Settlement CCD 000011316234409 | 55210175 | 153,787.80 |
| 5/21 | COAST PROCESSING PC CLEAR PPD -SETT-PC CLEAR2 | 56683246 | 37,107.49 |

65.     Mr. Bayrooti's use of the Withdrawal is not known to the Trustee at present.

66.     Finally, upon information and belief, Mr. Bayrooti and one or more unknown parties assigned a portion of client funds collected on a large group of the Debtor's client files to ABR ("Assignment").

67.     ABR paid no consideration to Coast or the Debtor for the Assignment.

68.     The date of the Assignment is not known to the Trustee; however, the Debtor was not incorporated until February 22, 2019. Thus, the Assignment must have occurred after that date.

/ / /

69.     Under the Debtor's business model (albeit illegal), the funds assigned from ABR from these files should have been paid to the marketing company that referred the client(s) to the Debtor.

70.     But, once the Assignment was made in Coast's computer system, regular payments were sent to ABR when funds were collected from the files in the designated group.

71.     From the date of the Assignment through August 19, 2021, Coast paid ABR the sum of $2,811,004.94 in multiple transfers pursuant to the Assignment ("Assignment Payment").

**Transfers From The Debtor**

72.     Even after Mr. Bayrooti's interest in Coast was purchased, the Assignment was paid to ABR. The Debtor made payments directly to ABR, which are identified on **Exhibit 5** hereto ("File Payments").

73.     Upon information and belief, the File Payments were made pursuant to the Assignment, and they were paid with client funds.

74.     As a result of the Assignment, ABR was paid another $2,500,000.00 in two transfers on or about November 23, 2021 by Validation Partners, LLC ("Validation") as part of its transaction with the Debtor (collectively "Validation Payment"). The Validation Payment was made to purchase or "buy out" the Assignment. A true and accurate copy of a page from Validation's bank account showing the Validation Payment is attached hereto as **Exhibit 6**.

75.     The Validation Payment to ABR was a transfer of the Debtor's property as it was paid from the proceeds of the Debtor's investment from/transaction with Validation.

76.     Upon information and belief, Mr. Bayrooti had loaned money to Mr. Diab in a matter unrelated to the Debtor.  Mr. Bayrooti and Mr. Diab agreed that this loan would be repaid from the Debtor in a manner similar to the Vasco Coast Transfers to avoid tax implications for Mr. Bayrooti. Mr. Bayrooti purchased precious metals, jewelry, and similar items from Vasco, and the Debtor paid for these purchases using false invoices stating the payment was for "consulting" or "marketing." The payments the Debtor made to Vasco ("Vasco LPG Payments") on behalf of Mr. Bayrooti are identified on **Exhibit 7** hereto.

/ / /

/ / /

77.     Upon information and belief, Vasco, Bayrooti, and the Debtor all cooperated to have the purchased items delivered to Mr. Bayrooti and to arrange for the payment of the invoices from Vasco by LPG appear as a business expenses.

78.     The Third-Party Transfers, Vasco Coast Transfers, Arsha Transfers, Withdrawal, Assignment, File Payments, Assignment Payment, Validation Payment, and Vasco LPG Payments are collectively referred to herein as the "Transfers".

**FIRST CLAIM FOR RELIEF**

**Avoidance, Preservation, and Recovery of Actual Fraudulent Transfer(s)**

**11 U.S.C. §§ 548(a)(1)(A), 550 & 551**

79.     Plaintiff incorporates by reference the preceding Paragraphs as if set forth in full.

80.     The Transfers were property of the Debtor and/or its Estate.

81.     Many of the Transfers occurred within the two years prior to the Petition Date ("Two-Year Transfers").

82.     On or after the date that each Two-Year Transfer occurred, the Debtor was or became indebted include the Prepetition Creditors.

83.     The Two-Year Transfers happened when the Debtor was insolvent or was rendered insolvent as a result of the Two-Year Transfers.

84.     The Two-Year Transfers were done with actual intent to hinder, delay or defraud the creditors of Debtor because the Debtor was operating a Ponzi scheme which permits the Court to infer that intent in making the Two-Year Transfers was fraudulent within the meaning of 11 U.S.C. section 548(a)(1).

85.     The Two-Year Transfers are avoidable as fraudulent pursuant to 11 U.S.C. §§ 548(a)(1)(A), 550, and 551 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against Debtor's Estate under 11 U.S.C. § 502, or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

/ / /

/ / /

86.     The Two-Year Transfers should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(A), and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

**SECOND CLAIM FOR RELIEF**

**Avoidance, Preservation, and Recovery of Constructively Fraudulent Transfer(s)**

**11 U.S.C. §§ 548(a)(1)(B), 550 & 551**

87.     Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though set forth in full herein.

88.     The Two-Year Transfers were made within two years before the Petition Date.

89.     Debtor did not receive reasonably value in exchange for the Two-Year Transfers.

90.     The Two-Year Transfers were made when Debtor was insolvent and/or rendered insolvent as a result of the Two-Year Transfers.

91.     When the Two-Year Transfers were made, the Debtor's business was undercapitalized, the Two-Year Transfers used funds that should have been delivered to the Debtor, and the Debtor was engaged in business for which its capital was unreasonably small.

92.     When the Two-Year Transfers were executed, Debtor had incurred or was about to incur debts that were beyond its ability to pay. The allegations in the preceding paragraphs are supported by the fact that the Debtor was borrowing money regularly from merchant cash lenders and "selling" files to investors to provide liquidity.

93.     At the time each Two-Year Transfer was made, Debtor was indebted to one or more creditors that held a claim against Debtor on that date and on the Petition Date.

94.     Plaintiff alleges that the Two-Year Transfers were not made in good faith, for value, and without knowledge of their avoidability.

95.     Each Defendant that received or benefitted from the Two-Year Transfers knew or should have known that the funds used to make the Two-Year Transfers were client funds or was the result of "selling" payments from client files to non-lawyers.

96.     Each Defendant knew or should have known that Coast collected payments from the Debtor's clients, and as client funds, these should have been placed in escrow by the Debtor.

97.     The Two-Year Transfers are avoidable as fraudulent pursuant to 11 U.S.C. §§ 548(a)(1)(B), 550, and 551 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against Debtor's Estate under 11 U.S.C. § 502, or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

98.     As avoidable transfers pursuant to 11 U.S.C. § 548(a)(1)(B), the Transfers, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

**THIRD CLAIM FOR RELIEF**

**Avoidance, Recovery, and Preservation of Four-Year Actual Fraudulent Transfer(s)**

**[11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.04(a)(1) and 3439.07]**

99.     Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though set forth in full herein.

100.     Under 11 U.S.C. § 544(b)(1), Plaintiff may avoid obligations of the Debtor which are voidable under applicable law by an unsecured creditor of Debtor, including under California Civil Code §§ 3439.04(a)(1) and 3439.05.

101.     All of the Transfers occurred within four years prior to the Petition Date.

102.     On or after the date that the Transfers were made, entities to which Debtor was or became indebted include the Prepetition Creditors.

103.     Despite Debtor's obligation to the Prepetition Creditors, the Transfers were made with funds that should have been delivered to the Debtor.

104.     The Transfers were made with the actual intent to hinder, delay or defraud the creditors of Debtor as the Debtor was operating a Ponzi scheme and because the Transfers were made from client funds that were diverted from the Debtor.

105.     The Transfers were made with oppression, fraud and malice, as defined in California Civil Code section 3294, entitling Plaintiff to exemplary and punitive damages.

/ / /

/ / /

106.    The Transfers are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and Cal. Civ. Code §§ 3439.04(a)(1) and 3439.07 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against its Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

107.    The Transfers are avoidable as fraudulent pursuant to 11 U.S.C. §§ 544 and Cal. Civ. Code §§ 3439.04(a)(1) and 3439.07 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against Debtor's Estate under 11 U.S.C. § 502, or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

108.    As avoidable transfers pursuant to 11 U.S.C. § 544, the Transfers, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

### FOURTH CLAIM FOR RELIEF

**Avoidance, Preservation, and Recovery of Constructive Fraudulent Transfer(s)**

**11 U.S.C. §§ 544, 550, 551; Cal. Civ. Code §§ 3439.04(a)(2), 3439.05 and 3439.07**

109.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though set forth in full herein.

110.    Under 11 U.S.C. § 544(b)(1), Plaintiff may avoid transfers of an interest of Debtor which are voidable under applicable law by an unsecured creditor of Debtor, including under California Civil Code §§ 3439.04(a)(2) and 3439.05.

111.    Debtor did not receive reasonably equivalent value in exchange for the Transfers.

112.    The Transfers were made at a time when Debtor was insolvent and/or rendered insolvent by virtue of said transfers.

113.    At the time each Transfer was made, Debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of Debtor were unreasonably small in relation to the business or transaction.

/ / /

/ / /

114.   At the time each Transfer was made, Debtor intended to incur or, believed or reasonably should have believed that Debtor would incur, debts beyond Debtor's ability to pay as they became due.

115.   At the time each Transfer was made, Debtor was indebted to one or more creditors that held a claim against Debtor on the date of each Transfer and on the Petition Date.

116.   The Transfers were made at a time when Debtor was insolvent and/or rendered insolvent by virtue of said transfers.

117.   Plaintiff alleges that Defendants did not receive the Transfers in good faith, for value, and without knowledge of their avoidability.

118.   Each Defendant knew that the Debtor was a law firm who was required by law to escrow client payments until earned.

119.   Each Defendant knew or should have known that the funds used to make the Transfers was client funds that were diverted from the Debtor, or were the proceeds of "selling" payments from client files to non-lawyers.

120.   Based on the foregoing, Plaintiff may avoid the Transfers pursuant to 11 U.S.C. § 544 and California Civil Code §§ 3439.04(a)(2) and 3439.05.

121.   Based on the foregoing, Plaintiff may recover and preserve the Transfers from the Defendants as the initial transferee or, alternatively, as the subsequent transferee for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551, and Cal. Civ. Code § 3439.07.

**On the First, Second, Third, and Fourth Claims for Relief:**

1.   Avoiding the Two-Year Transfers and/or the Transfers to or for the benefit of the Defendants as fraudulent conveyances made with an intent to defraud pursuant to 11 U.S.C. § 548(a)(1)(A) and/or 11 U.S.C. § 544 and California Civil Code §§ 3439.04(a)(1) and 3439.05 and ordering their recovery and preservation pursuant to 11 U.S.C. §§ 550 and 551, and Cal. Civ. Code § 3439.07; and/or

/ / /

/ / /

/ / /

1       2.     Avoiding the Two-Year Transfers and/or the Transfers to or for the benefit of the

2   Defendants as fraudulent conveyances pursuant to 11 U.S.C. § 548(a)(1)(B) and/or 11 U.S.C. § 544

3   and California Civil Code §§ 3439.04(a)(2) and 3439.05 and ordering their recovery and preservation

4   pursuant to 11 U.S.C. §§ 550 and 551, and Cal. Civ. Code § 3439.07; and/or

5       3.   Granting any other and such further relief as the Court deems just and proper.

Dated:  April 2, 2025              Respectfully submitted,

DINSMORE & SHOHL LLP

By: */s/ Tyler Powell*_____
      Tyler Powell
      Christopher B. Ghio
      Christopher Celentino
      Special Counsel to Richard A. Marshack,
      Trustee of the LPG Liquidation Trust

# Exhibit 1

Exhibit 1
Page 21

CHRISTOPHER B. GHIO (259094)
christopher.ghio@dinsmore.com
CHRISTOPHER CELENTINO (131688)
christopher.celentino@dinsmore.com
YOSINA M. LISSEBECK (201654)
yosina.lissebeck@dinsmore.com
DINSMORE & SHOHL LLP
655 West Broadway, Suite 800
San Diego, California 92101
Tele:  619.400.0500
Fax:  619.400.0501

Sarah S. Mattingly (Ky. Bar 94257)
sarah.mattingly@dinsmore.com
DINSMORE & SHOHL, LLP
101 S. Fifth Street, Suite 2500
Louisville, Kentucky 40202
Tele: 859-425-1096
Fax: 502-585-2207
(Admitted pro hac vice)

Special Counsel to Richard A. Marshack

**FILED & ENTERED**

**JUN 03 2024**

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY mccall      DEPUTY CLERK

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION**

| | |
|---|---|
| In Re | Case No: 23-bk-10571-SC |
| | Chapter 11 |
| The Litigation Practice Group P.C., | **ORDER GRANTING MOTION FOR ENTRY OF PROTECTIVE ORDER AND THE PROTECTIVE ORDER** |
| Debtor(s), | Date:    May 23, 2024<br>Time:    1:30 p.m.<br>Judge:   Hon. Scott C. Clarkson<br>Place:   Courtroom 5C (via Zoom)[1]<br>        411 West Fourth Street<br>        Santa Ana, CA 92701 |

[1] Video and audio connection information for each hearing will be provided on Judge Clarkson's publicly posted hearing calendar, which may be viewed online at:
http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

Exhibit 1
Page 22

The Court has read and considered the Notice of Motion and Motion for Entry of Protective Order (the "Motion") filed by Richard A. Marshack, in his capacity as the Chapter 11 Trustee (the "Trustee") of the Bankruptcy Estate ("Estate") of The Litigation Practice Group P.C., on May 2, 2024, pursuant to Federal Rule of Bankruptcy Procedure 7026 and Federal Rule of Civil Procedure 26(c)(1), as Dk. No. 1164 ("Motion"), and has found good cause to grant the Motion.

IT IS HEREBY ORDERED that:

1.      The Motion is granted;

2.      The below Protective Order shall apply to any contested matter arising in the main bankruptcy case and in all adversary proceedings filed by or against Trustee, present and future; and

3.      Govern the discovery conducted therein.

## PROTECTIVE ORDER

**1.      DEFINITIONS**

1.1      "Confidential Information" as used in this Protective Order shall mean documents and other information (regardless of how generated, stored or maintained) that a Party or non-party reasonably believes to contain or reflect non-public financial or business information, bank records, financial records, such as social security numbers, non-public financial or personal information of a Party or non-party, account numbers, sensitive digital information and identifiers, information subject to confidentiality agreements or provisions other than this Protective Order, and other non-public research, development, or commercial information that derives value or avoids injury by virtue of not being known to the public.

1.2      This "Action" is defined and hereby means any contested matter arising in the main bankruptcy case and in all adversary proceedings filed by or against Trustee, present and future.

1.3      "Designating Party" means a Party or non-party that designates Confidential Information during the Action.

1.4      "Receiving Party" means a Party that receives Confidential Information during the Action.

Exhibit 1
Page 23

1          1.5      "Party" or "Parties" means person or entity subject to this Protective Order.

2          **2.        SCOPE OF THIS PROTECTIVE ORDER**

3          2.1      Unless otherwise ordered, this Protective Order shall govern certain documents and

4    other products of discovery obtained in the Action from the Parties there to, and from third parties.

5    As well as certain information copied or derived therefrom, excerpts, summaries or compilations

6    thereof, including, but not limited to, documents voluntarily exchanged as part of early settlement

7    discussions, documents produced pursuant to initial disclosures, requests authorized by the Federal

8    Rules of Civil Procedure made applicable herein by the Federal Rules of Bankruptcy Procedure,

9    answers to interrogatories, deposition transcripts, responses to requests for production, responses to

10   requests for admission, subpoenas, affidavits, declarations, expert reports, and other such material

11   and information as may be produced during the course of the Action and designated as Confidential

12   Information.

13         **3.        DESIGNATION OF CONFIDENTIAL INFORMATION**

14         3.1      This Protective Order shall govern the production and handling of any Confidential

15   Information in this Action. Any Party or non-party who produces Confidential Information in this

16   Action may designate it as "Confidential" or "Attorneys' Eyes Only" consistent with the terms of this

17   Protective Order. Whenever possible, the Designating Party must designate only those portions of a

18   document, written discovery responses, deposition, transcript, or other material that contain the

19   Confidential Information and refrain from designating entire documents. Regardless of any

20   designations made hereunder, the Designating Party is not otherwise restricted from use or disclosure

21   of its Confidential Information outside of this Action or for any business purposes. In addition, any

22   Party may move to modify or seek other relief from any of the terms of this Protective Order if it has

23   first tried in writing and in good faith to resolve its needs or disputes with the other Parties or Party

24   as the case may be under the terms of this Protective Order. Further, nothing in this Protective Order

25   shall prevent a Party from redacting documents consistent with the Federal Rules of Civil Procedure

26   and utilizing the documents as needed through-out the Action.

27         3.2      <u>Application to Non-Parties:</u> Before a non-party is given copies of documents or

28   materials designated as Confidential Information or Attorneys' Eyes Only as permitted hereunder, it

must first sign an acknowledgment to be bound to these terms that is attached hereto as <u>Exhibit</u> A; if it fails to do so, the Parties to this Action must resolve any such dispute before making disclosure of designated information as permitted hereunder to the non-party. If a non-party wishes to make designations hereunder, it must first sign attached <u>Exhibit A.</u>

        3.3    <u>Timing and Provisional Protection:</u> Designations of Confidential Information may be made at any time. To avoid potential waiver of protection hereunder, the Designating Party should designate documents or materials containing Confidential Information at the time of production or disclosure, including on the record during the taking of any deposition. Deposition testimony will be deemed provisionally protected for a period of thirty (30) days after the transcript is released to the Parties by the court reporter, although the Parties may agree at any time to different timelines of provisional protection of information as Confidential or Attorneys' Eyes Only as part of one or more specific depositions. To retain any designations beyond the provisional period, a Designating Party must designate specific pages and lines of deposition testimony before the provisional period has expired. Such designations must be made in writing so that all counsel and court reporters may append the designation to all copies of the transcripts.

        3.4    <u>Manner of Designation:</u> Confidential Information may be designated hereunder in any reasonable manner or method that notifies the Receiving Party of the designation level and identifies with specificity the information to which the designation applies. If made verbally, the Designating Party must promptly confirm the designation in writing. Whenever possible, the Designating Party should stamp, affix, or embed a legend of "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY" on each designated page of the document or electronic image that contains Confidential Information.

        **4.**      **CHALLENGES TO DESIGNATED INFORMATION**

        4.1    In the event that a Receiving Party disagrees at any time with any designation(s) made by the Designating Party, the Receiving Party must first try to resolve such challenge in good faith on an informal basis with the Designating Party. The Receiving Party must provide written notice of the challenge and the grounds therefor to the Designating Party, who must respond in writing to the challenge within fifteen (15) days. At all times, the Designating Party carries the burden of establishing the propriety of the designation and protection level. Unless and until the challenge is

1  resolved by the Parties or ruled upon by the Court, the designated information shall remain protected

2  under this Protective Order. The failure of any Receiving Party to challenge a designation does not

3  constitute a concession that the designation is proper or an admission that the designated information

4  is otherwise competent, relevant, or material.

5      **5.      LIMITED ACCESS/USE OF PROTECTED INFORMATION**

6      5.1    <u>Restricted Use:</u> Information that is produced or exchanged in the course of the Action

7  and designated under this Protective Order may be used for preparation for trial and preparation for

8  any appeal of any and all matters in the Action, as well as related settlement negotiations, and for no

9  other purpose, without the written consent of the Designating Party. No Confidential Information may

10 be disclosed to any person except in accordance with the terms of this Protective Order, unless the

11 parties are co-counsel or have entered into joint defense agreements. All persons in possession of

12 Confidential Information agree to exercise reasonable care with regard to the custody, use, or storage

13 of such information to ensure that its confidentiality is maintained. This obligation includes, but is

14 not limited to, the Receiving Party providing to the Designating Party prompt notice of the receipt of

15 any subpoena that seeks production or disclosure of any designated information and consulting with

16 the Designating Party before responding to the subpoena. Any use or disclosure of Confidential or

17 Attorneys' Eyes Only information in violation of the terms of this Protective Order may subject the

18 disclosing person or party to sanctions.

19     5.2    <u>Access to "Confidential" Information:</u> The Party(ies) and all persons subject to this

20 Protective Order agree that information designated as "CONFIDENTIAL" may only be accessed or

21 reviewed by the following:

22     a)    The Court, its personnel, and court reporters;

23     b)    Counsel of record, or co-counsel for any Party, or other party that has entered into a

24 joint defense agreement in the Action and their employees who assist counsel of record, or co-counsel

25 in the Action and are informed of the duties and obligations imposed hereunder;

26     c)    The Parties, including their clients, agents and employees who are assisting or have

27 reason to know of the Action;

28 / / /

d)      Experts or consultants employed by the Parties or their counsel, or co-counsel, for purposes of an Action, so long as each such expert or consultant has signed attached Exhibit A; and

e)      Other witnesses or persons with the Designating Party's consent or by court order.

5.3      Access to "Attorneys' Eyes Only" Designations: The Parties and all persons subject to this Protective Order agree that information designated as "ATTORNEYS' EYES ONLY" may only be accessed or reviewed by the following:

a)      The Court, its personnel, and court reporters;

b)      Counsel of record, or co-counsel for any Party, or other party that has entered into a joint defense agreement in the Action and their employees who assist counsel of record in the Action and are informed of the duties hereunder;

c)      In-house counsel for any Party in the Action and Richard A. Marshack, as Chapter 11 Trustee of The Litigation Practice Group P.C. who is informed of the duties and obligations imposed hereunder;

d)      Experts or consultants employed by the Parties or their counsel, or co-counsel for purposes of the Action,  and so long as each such expert or consultant has signed attached Exhibit A; and

e)      Other witnesses or persons to whom the Designating Party agrees in advance of disclosure or by court order.

5.4      Non-Waiver Effect of Designations: Neither the taking of, nor the failure to take, any action to enforce the provisions of this Protective Order, nor the failure to object to any designation, will constitute a waiver of any Party(ies)'s claim or defense in the Action or any other action or proceeding, including, but not limited to, a claim or defense that any designated information is or is not Confidential, is or is not entitled to particular protection, or embodies or does not embody information protectable by law.

5.5      In-Court Use of Designated Information: If information designated under this Protective Order will or may be offered in evidence at a hearing or trial related to any matter in the Action, then the offering party must give advance notice to the party or non-party that designated prior to offering the information so that any use or disclosure may be addressed in accordance with

6

Exhibit 1
Page 27

the Court's case-management or other pre-trial order, or by a motion *in limine.*  Nothing in this Protective Order shall be construed as a waiver by a Party of any objections that may be raised as to the admissibility at trial of any evidentiary materials.

**6.    CLAW-BACK REQUESTS**

6.1    <u>Failure to Make Designation:</u>  If, at any time, a Party or non-party discovers that it produced or disclosed Confidential Information without designation, it may promptly notify the Receiving Party and identify with particularity the Confidential Information to be designated and the level of designation (the claw-back notification). The Receiving Party may then request substitute production of the newly-designated information. Within thirty (30) days of receiving the claw-back notification, the Receiving Party must: (1) certify to the Designating Party it has appropriately marked or, if substitute production has been requested, destroyed all unmarked copies that it received, made, and/or distributed; and (2) if it was practicably unable to mark or destroy any information because disclosures occurred while the Receiving Party was under no duty of confidentiality under the terms of this Protective Order regarding that information, the Receiving Party must reasonably provide as much information as practicable to aid the Designating Party in protecting the information, consistently with the Receiving Party's attorney-client, work-product, and/or trial-preparation privileges.

6.2    <u>Inadvertent Production of Privileged Information:</u> If, at any time, a Party discovers that it produced information that it reasonably believes is subject to protection under the attorney/client, work-product, or trial-preparation privileges, then it must promptly notify each Receiving Party of the claim for protection, the basis for it, amend its privilege log accordingly, and comply with Fed. R. Civ. P. 26(b)(5). Whenever possible, the producing party must produce substitute information that redacts the information subject to the claimed protection. The Receiving Party must thereupon comply with Fed. R. Civ. P. 26(b)(5)(B) as to the information subject to the claimed protection.

/ / /

/ / /

/ / /

Exhibit 1
Page 28

**7.**      **DURATION/CONTINUED RESTRICTIONS**

7.1     <u>Handling of Designated Information Upon Conclusion of the Main Bankruptcy Case:</u> Upon conclusion of the Main Bankruptcy Case, by way of dismissal or closing of the case, the Designating Party(ies) is/are responsible for ensuring that any Party or person to whom the Designating Party shared or disclosed designated information in any of the matters under the Action returns or destroys all of its copies, regardless of the medium in which it was stored. No witness or Party may retain designated information that it received from any other Party or non-party under this Protective Order; only counsel of record, or co-counsel, are the authorized agents who may retain one copy for their respective legal files, and who must also describe to the Designating Party the extra steps taken to protect its legal file containing paper and/or electronic copies of the designated information so that it is not accessed, used, or disclosed inconsistently with the obligations under this Protective Order. This provision does not apply to the Court or Court staff. Moreover, this provision does not apply to Trustee, who may retain and use – consistent with this Order – Confidential Information received in any Action during the entirety of the Bankruptcy.

7.2     <u>Continued Restrictions Under this Protective Order:</u> The restrictions on disclosure and use of Confidential Information shall survive the conclusion of the Bankruptcy case and any matter in the Action.

**8.**      **PRIVILEGED OR PROTECTED INFORMATION**

8.1     Nothing in this Protective Order shall require disclosure of information that is protected by the attorney-client privilege, the work-product protection, or any other legally cognizable privilege (a "Privilege or Protection"). If information subject to a claim of Privilege or Protection is inadvertently produced, pursuant to Federal Rule of Evidence 502(d) such production shall not constitute a waiver of, or estoppel as to, any claim of Privilege or Protection for such information or any other information that may be protected from disclosure by a Privilege or Protection in any proceeding.

8.2     If a Party receives a document that appears to be subject to a Privilege or Protection, then it shall refrain from examining the document any more than is essential to ascertain if it is privileged or protected and shall promptly notify the producing Party in writing that the receiving

Exhibit 1
Page 29

1  Party possesses material that appears to be subject to a Privilege or Protection. The producing

2  Party shall have seven (7) days after receiving such notice to assert a Privilege or Protection over the

3  identified material. If the producing Party does not assert a claim of Privilege or Protection within the

4  seven (7)-day period, the material in question shall be deemed not privileged or protected.

5      8.3     If a producing Party has produced a document subject to a claim of Privilege or

6  Protection, upon written request by the producing Party, the document for which a claim of Privilege

7  or Protection is made shall be sequestered or destroyed to the extent reasonably practicable, and the

8  receiving Party shall not use the document for any purpose other than in connection with analyzing

9  or disputing a claim of Privilege or Protection or in connection with a motion to compel the production

10  of the document.

11      8.4     The receiving Party sequestering or destroying such material may then move the Court

12  for an order compelling production of the material. The applicable producing Party bears the burden

13  of establishing the applicable Privilege or Protection of any clawed-back document or information as

14  and to the same extent that it would have borne such burden had it not produced the document or

15  information.  Nothing in this Protective Order shall limit the Court's right or any receiving Party's

16  right to request an in camera review of any information subject to a claim of Privilege or Protection.

17

18                                    ###

19

20

21

22

23

24  Date: June 3, 2024                    Scott C. Clarkson
                                          United States Bankruptcy Judge

25

26

27

28

9

Exhibit 1
Page 30

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT "A"

1

Exhibit 1
Page 31

1  Christopher B. Ghio (State Bar No. 259094)
   Christopher Celentino (State Bar No. 131688)
2  Yosina M. Lissebeck (State Bar No. 201654)
   **DINSMORE & SHOHL LLP**
3  655 West Broadway, Suite 800
   San Diego, CA 92101
4  Telephone:  619.400.0500
   Facsimile:  619.400.0501
5  christopher.ghio@dinsmore.com
   christopher.celentino@dinsmore.com
6  yosina.lissebeck@dinsmore.com

7  Sarah S. Mattingly (Ky. Bar 94257)
   DINSMORE & SHOHL, LLP
8  101 S. Fifth Street, Suite 2500
   Louisville, KY 40202
9  Telephone: 859-425-1096
   Facsimile: 502-585-2207
10 Sarah.mattingly@dinsmore.com
   (Admitted pro hac vice)
11
   Special Counsel to Richard A. Marshack,
12 Chapter 11 Trustee

13

14
                **UNITED STATES BANKRUPTCY COURT**
15
                **CENTRAL DISTRICT OF CALIFORNIA**
16

17
   In Re                              Case No. 8:23-BK-10571-SC
18
                                      Chapter 11
19
   The Litigation Practice Group P.C.,  **EXHIBIT A TO STIPULATED**
20                                       **ORDER**
                Debtor(s),
21                                    Date:   May 23, 2024
22                                    Time:   1:30 p.m.
                                      Judge:  Hon. Scott C. Clarkson
23                                    Place:  Courtroom 5C[1] - Via Zoom
24                                            411 W. Fourth Street
                                              Santa Ana, CA  92701
25

26

27  _____

28  [1] Video and audio connection information for each hearing will be provided on Judge Clarkson's
    publicly posted hearing calendar, which may be viewed online at:
    http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

                                        1

                                                        Exhibit 1
                                                        Page 32

This is to certify that:

    (a)    I am being given access to Confidential Information pursuant to the Stipulated Protective Order that was entered into the main bankruptcy case for Litigation Practice Group, but which is binding and controlling as set forth by the Court's Order on any and all contested matters and  any and all litigation commenced by Trustee;

    (b)    I have read the Stipulated Protective Order; and

    (c)    I agree to be bound by the terms and conditions thereof, including, without limitation, to the obligations regarding the use, non-disclosure and return of such Confidential Information. I further agree that in addition to being contractually bound by the Stipulated Protective Order, I am subject to the jurisdiction of the above reference Court for any violation thereof.

Date: _____

_____
Signature

_____
Printed Name

2

Exhibit 1
Page 33

# Exhibit 2

Exhibit 2
Page 34

| Date | Type | Amount |
|---|---|---|
| 5/17/2019 | Primerica Life Insruance - Personal Life Insurance | $190.48 |
| 5/17/2019 | Primerica Life Insruance - Personal Life Insurance | $163.40 |
| 7/17/2019 | Primerica Life Insruance - Personal Life Insurance | $5,975.00 |
| 7/17/2019 | Primerica Life Insruance - Personal Life Insurance | $4,800.00 |
| 9/9/2019 | Primerica Life Insruance - Personal Life Insurance | $4,563.00 |
| 4/20/2020 | The Print House - Purchasing Art | $2,680.28 |
| 4/27/2020 | Creative Atmospheres -Construction on Homes | $1,250.00 |
| 5/1/2020 | The Print House - Purchasing Art | $2,680.28 |
| 5/29/2020 | Mitra Barzegar - Asante ex wife | $13,000.00 |
| 8/7/2020 | The Print House - Purchasing Art | $2,680.28 |
| 8/11/2020 | The Print House - Purchasing Art | $2,680.28 |
| 8/19/2020 | Creative Atmospheres -Construction on Homes | $4,300.00 |
| 8/31/2020 | Unknown "Donation" on American Express | $20,000.00 |
| 8/31/2020 | Unknown "Donation" on American Express | $250.00 |
| 9/9/2020 | The Print House - Purchasing Art | $2,680.28 |
| 9/22/2020 | The Print House - Purchasing Art | $2,995.45 |
| 9/25/2020 | Creative Atmospheres -Construction on Homes | $15,000.00 |
| 10/5/2020 | Primerica Life Insurance - Personal Life Insurance | $6,072.00 |
| 10/5/2020 | Primerica Life Insurance - Personal Life Insurance | $8,923.00 |
| 10/30/2020 | Creative Atmospheres -Construction on Homes | $62,100.00 |
| 11/5/2020 | The Print House - Purchasing Art | $2,995.45 |
| 12/11/2020 | Sheepdog Fitness LLC - Mental Health Clinic | $10,000.00 |
| 12/11/2020 | Laili Corp Inc - Unknown Consulting Expense | $7,500.00 |
| 2/22/2021 | Creative Atmospheres -Construction on Homes | $20,000.00 |
| 2/22/2021 | Creative Atmospheres -Construction on Homes | $20,000.00 |
| 2/22/2021 | Creative Atmospheres -Construction on Homes | $12,600.00 |
| 3/1/2021 | Creative Atmospheres -Construction on Homes | $38,572.13 |
| 3/8/2021 | Creative Atmospheres -Construction on Homes | $38,975.49 |
| 3/23/2021 | Creative Atmospheres -Construction on Homes | $40,000.00 |
| 4/15/2021 | Creative Atmospheres -Construction on Homes | $50,000.00 |
| 5/13/2021 | Webber Films LLC - Unknown Marketing Expense | $50,000.00 |
| | **Total** | **$453,626.80** |

Exhibit 2
Page 35

Exhibit 3

Exhibit 3
Page 36

| Date | Type | Amount | |
|---|---|---|---|
| 5/15/2020 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 5,000.00 |
| 5/20/2020 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 5,000.00 |
| 5/20/2020 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 10,000.00 |
| 5/28/2020 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 10,000.00 |
| 5/28/2020 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 5,000.00 |
| 6/1/2020 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 2,000.00 |
| 6/1/2020 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 5,000.00 |
| 6/4/2020 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 5,000.00 |
| 6/10/2020 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 5,000.00 |
| 6/17/2020 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 6,500.00 |
| 6/24/2020 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 8,116.00 |
| 7/9/2020 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 31,060.00 |
| 8/3/2020 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 16,872.00 |
| 8/3/2020 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 1,000.00 |
| 8/5/2020 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 1,000.00 |
| 8/5/2020 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 1,000.00 |
| 8/13/2020 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 5,500.00 |
| 8/13/2020 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 10,800.00 |
| 8/19/2020 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 8,528.00 |
| 8/19/2020 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 646.00 |
| 8/26/2020 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 7,455.00 |
| 9/3/2020 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 4,250.00 |
| 9/3/2020 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 1,725.00 |
| 9/3/2020 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 1,365.00 |
| 9/9/2020 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 1,600.00 |
| 9/17/2020 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 400.00 |
| 9/23/2020 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 8,340.00 |
| 9/29/2020 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 1,325.00 |
| 9/29/2020 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 2,599.00 |
| 9/29/2020 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 30,000.00 |
| 10/22/2020 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 2,578.00 |
| 11/4/2020 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 5,748.00 |
| 11/11/2020 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 5,080.00 |
| 11/17/2020 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 7,100.00 |
| 11/19/2020 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 4,174.00 |
| 11/24/2020 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 12,552.00 |
| 12/3/2020 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 12,500.00 |
| 12/3/2020 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 1,859.00 |

| Date | Type | Amount | |
|---|---|---|---|
| 12/9/2020 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 15,799.00 |
| 12/11/2020 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 3,200.00 |
| 12/14/2020 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 4,987.98 |
| 12/14/2020 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 3,230.00 |
| 12/17/2020 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 9,850.00 |
| 12/23/2020 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 1,940.00 |
| 1/7/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 903.05 |
| 1/11/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 903.05 |
| 1/13/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 8,938.98 |
| 1/14/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 2,605.68 |
| 1/20/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 875.27 |
| 1/20/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 3,425.00 |
| 1/27/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 12,879.51 |
| 1/27/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 2,251.28 |
| 1/27/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 2,610.19 |
| 1/28/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 1,255.00 |
| 1/28/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 5,789.35 |
| 2/4/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 2,684.92 |
| 2/5/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 2,670.25 |
| 2/5/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 1,230.55 |
| 2/10/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 2,172.25 |
| 2/11/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 2,563.51 |
| 2/11/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 1,994.25 |
| 2/11/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 5,067.20 |
| 2/18/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 789.39 |
| 2/25/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 3,388.46 |
| 3/3/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 1,697.95 |
| 3/10/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 2,120.00 |
| 3/15/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 3,090.48 |
| 3/15/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 1,139.89 |
| 3/15/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 2,120.00 |
| 3/15/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 3,468.39 |
| 3/19/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 2,211.99 |
| 3/24/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 2,212.09 |
| 3/24/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 4,338.74 |
| 3/25/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 2,233.66 |
| 3/26/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 2,069.12 |
| 4/1/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 1,327.40 |

| Date | Type | Amount | |
|---|---|---|---|
| 4/2/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 4,597.18 |
| 4/5/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 3,583.08 |
| 4/7/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 1,202.38 |
| 4/7/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 1,944.85 |
| 4/9/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 2,125.68 |
| 4/15/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 2,147.61 |
| 4/15/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 3,567.54 |
| 4/15/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 4,210.78 |
| 4/22/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 2,704.07 |
| 4/22/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 1,403.10 |
| 4/27/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 4,862.14 |
| 4/27/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 1,592.41 |
| 4/29/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 6,750.00 |
| 4/30/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 945.09 |
| 5/6/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 2,057.98 |
| 5/6/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 4,980.79 |
| 5/6/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 2,225.00 |
| 5/12/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 6,411.72 |
| 5/12/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 2,316.00 |
| 5/12/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 2,233.66 |
| 5/13/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 1,992.00 |
| 5/27/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 1,899.27 |
| 5/27/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 4,327.16 |
| 6/3/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 1,205.92 |
| 6/3/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 13,131.18 |
| 6/7/2021 | Vasco Assets Inc - Unknown Consulting/Marketing Expense | $ | 1,338.17 |
| | **Total** | $ | **471,460.61** |

Exhibit 3
Page 37

Exhibit 4

Exhibit 4
Page 38

| Date | Type | Amount |
|---|---|---|
| 6/28/2019 | Arsha Corp - Personal Loan/Outside Service | $15,000.00 |
| 6/4/2020 | Arsha Corp - Personal Loan/Outside Service | $160,000.00 |
| 9/17/2020 | Arsha Corp - Personal Loan/Outside Service | $15,000.00 |
| 9/17/2020 | Arsha Corp - Personal Loan/Outside Service | $25,000.00 |
| 9/24/2020 | Arsha Corp - Personal Loan/Outside Service | $16,000.00 |
| 10/1/2020 | Arsha Corp - Personal Loan/Outside Service | $22,500.00 |
| 12/31/2020 | Arsha Corp - Personal Loan/Outside Service | $160,000.00 |
| 4/7/2021 | Arsha Corp - Personal Loan/Outside Service | $2,076.77 |
| 5/6/2021 | Arsha Corp - Personal Loan/Outside Service | $36,610.84 |
|  |  |  |
|  | **Total** | **$452,187.61** |
|  |  |  |
|  |  |  |

Exhibit 4
Page 39

# Exhibit 5

Exhibit 5
Page 40

| Bank Name | Account Name | Account Number | Transaction Date | Debit/Charge | Memo |
|---|---|---|---|---|---|
| UnionBank | The Litigation Practice Group PC | X4858 | 7/28/2021 | 82,850.64 | WIRE TRANS TRN 0728027720 072821 UBOC930 UB1 32486N Sent To: ABR ENTERPRISES LLC Beneficiary: |
| UnionBank | The Litigation Practice Group PC | X4858 | 8/11/2021 | 4,186.57 | WIRE TRANS TRN 0811021526 081121 UBOC UB059955N Sent To: ABR ENTERPRISES LLC Beneficiary: |
| UnionBank | The Litigation Practice Group PC | X4858 | 8/20/2021 | 61,354.47 | WIRE TRANS TRN 0820019221 082021 UBOC UB012045N Sent To: ABR ENTERPRISES LLC Beneficiary: |
| UnionBank | The Litigation Practice Group PC | X4858 | 8/20/2021 | 62.88 | WIRE TRANS TRN 0820021974 082021 UBOC UB009993N Sent To: ABR ENTERPRISES LLC Beneficiary: |
| Chase | The Litigation Practice Group PC | X3158 | 8/27/2021 | 72,149.51 | Wire Transfer Via: Union LA Aka Uboc/i 22000496 NC: Abr Enterprise LLC Las Vegas NV |
| | | | | | |
| | | | Total | 220,604.07 | |

Exhibit 5
Page 41

Exhibit 6

Exhibit 6
Page 42

# CHASE ◖

JPMorgan Chase Bank, N.A.
P O Box 182051
Columbus, OH 43218 - 2051

October 30, 2021 through November 30, 2021

Account Number: **33097**

## CUSTOMER SERVICE INFORMATION

| | |
|---|---|
| Web site: | **www.Chase.com** |
| Service Center: | **1-877-425-8100** |
| Deaf and Hard of Hearing: | 1-800-242-7383 |
| Para Espanol: | 1-888-622-4273 |
| International Calls: | 1-713-262-1679 |

00329845 DRE 703 219 33521 NNNNNNNNNNN  1 000000000 64 0000
VALIDATION PARTNERS LLC
1300 SAWGRASS CORPORATE PKWY STE 110
SUNRISE FL 33323



**Good news — we've made two changes to help simplify how overdraft fees work.**

We'll no longer charge:

1.  Returned Item Fees when items are declined or returned unpaid because you don't have a sufficient balance in your account.

2.  Insufficient Funds Fees when your account balance is overdrawn by $50 or less at the end of the business day. If you overdraw your account by more than that, we'll charge a $34 Insufficient Funds Fee per item, beginning with the first item that overdraws your account balance by more than $50 (maximum of 6 fees per business day, up to $204).

We pay overdrafts at our discretion so we don't guarantee that we will always pay any type of transaction. As a reminder, overdraft services are only available for qualifying checking accounts. For additional information, please visit **chase.com/overdraft**.

## CHECKING SUMMARY | Chase Platinum Business Checking

| | INSTANCES | AMOUNT |
|---|---|---|
| **Beginning Balance** | | **$28,400.00** |
| Deposits and Additions | 7 | 15,950,000.00 |
| Electronic Withdrawals | 30 | -9,257,891.00 |
| Fees | 1 | -345.00 |
| **Ending Balance** | **38** | **$6,720,164.00** |

Your Chase Platinum Business Checking account provides:
*   No transaction fees for unlimited electronic deposits (including ACH, ATM, wire, Chase Quick Deposit)
*   500 debits and non-electronic deposits (those made via check or cash in branches) per statement cycle
*   $25,000 in cash deposits per statement cycle
*   Unlimited return deposited items with no fee

There are additional fee waivers and benefits associated with your account – please refer to your Deposit Account Agreement for more information.



October 30, 2021 through November 30, 2021

Account Number:    **33097**



## ELECTRONIC WITHDRAWALS  *(continued)*

| | | |
|---|---|---|
| | Ref: Account Purchase/Time/17:00 Imad: 1123B1Qgc07C026433 Trn: 3484441327Es | |
| 11/23 | 11/23 Domestic Wire Transfer Via: Union LA Aka Uboc/122000496 A/C: Abr Enterprises LLC<br>Ref: Account Purchase/Time/17:34 Imad: 1123B1Qgc08C028881 Trn: 3476071327Es | 1,500,000.00 |
| 11/23 | 11/23 Domestic Wire Transfer Via: Union LA Aka Uboc/122000496 A/C: Abr Enterprises LLC<br>Ref: Account Purchase/Time/18:43 Imad: 1123B1Qgc08C030121 Trn: 3479441327Es | 1,000,000.00 |

## DAILY ENDING BALANCE

| DATE | AMOUNT | DATE | AMOUNT | DATE | AMOUNT |
|---|---|---|---|---|---|
| 11/01 | $28,055.00 | 11/16 | 1,552,694.00 | 11/23 | 860,504.00 |
| 11/04 | 2,028,055.00 | 11/17 | 558,294.00 | 11/24 | 762,164.00 |
| 11/05 | 83,105.00 | 11/18 | 545,694.00 | 11/29 | 720,164.00 |
| 11/10 | 883,105.00 | 11/19 | 5,734,348.00 | 11/30 | 6,720,164.00 |
| 11/12 | 1,106,194.00 | 11/22 | 5,684,348.00 | | |

Exhibit 7

Exhibit 7
Page 45

| Bank Name | Account Name | Account Number | Transaction Date | Check Number | Debit/Charge |
|---|---|---|---|---|---|
| | | | | | |
| Chase | The Litigation Practice Group PC | XX3158 | 10/17/2022 | 12109 | 95,000.00 |
| Chase | The Litigation Practice Group PC | XX3158 | 11/23/2022 | 12190 | 100,375.00 |
| Chase | The Litigation Practice Group PC | XX3158 | 12/12/2022 | 12290 | 100,206.73 |
| Bank of America | Litigation Practice Group PC | X6457 | 12/28/2022 | 1005 | 100,000.00 |
| | | | | | |
| | | | | | |
| | | | | **Total** | **395,581.73** |

Exhibit 7
Page 46

# ADVERSARY PROCEEDING COVER SHEET

B1040 (FORM 1040) (12/24)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

**PLAINTIFFS**
Richard A. Marshack, Trustee of the LPG Liquidation Trust

**DEFENDANTS**
Arash Asante Bayrooti, a California resident; Arsha Corp., a California corporation; and ABR Enterprises, LLC fka Leap Forward, LLC, a Nevada limited liability company

**ATTORNEYS** (Firm Name, Address, and Telephone No.)
Christopher Celentino (131688)
Christopher B. Ghio (259094)
Yosina M. Lissebeck (201654)
Dinsmore & Shohl LLP
655 West Broadway, Ste 800, San Diego, CA 92101
Tele: (619) 400-0500

Tyler Powell (KY Bar No. 90520)
Dinsmore & Shohl LLP
100 West Main Street, Ste 900, Lexington, KY 40507
Tele: (502) 585-2207
(Admitted pro hac vice)

**ATTORNEYS** (If Known)

**PARTY** (Check One Box Only)
☐ Debtor          ☐ U.S. Trustee/Bankruptcy Admin
☐ Creditor        ☐ Other
☐ Trustee

**PARTY** (Check One Box Only)
☐ Debtor          ☐ U.S. Trustee/Bankruptcy Admin
☐ Creditor        ☐ Other
☒ Trustee

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
(1) Avoidance, Recovery, and Preservation of Fraudulent Transfer(s) Pursuant to 11 U.S.C. §§ 548(a)(1), 550, and 551; (2) Avoidance, Recovery, and Preservation of Fraudulent Transfer(s) Pursuant to 11 U.S.C. §§ 548(a)(2), 550, and 551; (3) Avoidance, Preservation, and Recovery of Actual Fraudulent Transfer(s) 11 U.S.C. §§ 544, 550, 551; Cal. Civ. Code §§ 3439.04(a)(1) and 3439.07; and (4) Avoidance, Preservation, and Recovery of Constructive Fraudulent Transfer(s) Pursuant to 11 U.S.C. §§ 544, 550, 551; Cal. Civ. Code §§ 3439.04(a)(2), 3439.05, and 3439.7

**NATURE OF SUIT**

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(a) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☒ 13-Recovery of money/property - §548 fraudulent transfer
☒ 14-Recovery of money/property - other
**FRBP 7001(b) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property
**FRBP 7001(c) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner – §363(h)
**FRBP 7001(d) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)
**FRBP 7001(e) – Revocation of Confirmation**
☐ 51-Revocation of confirmation
**FRBP 7001(f) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny
**(continued next column)**

**FRBP 7001(f) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other
**FRBP 7001(g) – Injunctive Relief**
☐ 71-Injunctive relief- imposition of stay
☐ 72-Injunctive relief - other
**FRBP 7001(h) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest
**FRBP 7001(i) Declaratory Judgment**
☐ 91-Declaratory judgment
**FRBP 7001(j) Determination of Removed Action**
☐ 01-Determination of remove d claim or cause
**Other**
☐ SS-SIPA Case - 15 U.S.C. §§78aaa *et.seq.*
☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☒ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $  10,000,000+ |

Other Relief Sought

B1040 (FORM 1040) (12/24)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>The Litigation Practice Group P.C. | BANKRUPTCY CASE NO.<br>8:23-bk-10571-SC | |
| DISTRICT IN WHICH CASE IS PENDING<br>Central District of California | DIVISION OFFICE<br>Santa Ana | NAME OF JUDGE<br>Scott C. Clarkson |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF<br>Richard A. Marshack, Chapter 11 Trustee | DEFENDANT<br>Arash Asante Bayrooti, a California resident | ADVERSARY<br>PROCEEDING NO.<br>8:24-ap-01068-SC |
| DISTRICT IN WHICH ADVERSARY IS PENDING<br>Central District of California | DIVISION OFFICE<br>Santa Ana | NAME OF JUDGE<br>Scott C. Clarkson |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br>/s/ Tyler Powell | | |
| DATE<br>April 2, 2025 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Christopher Celentino<br>Christopher B. Ghio<br>Yosina M. Lissebeck<br>Tyler Powell | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.