1  Christopher Celentino (SBN 131688)
2  Yosina M. Lissebeck (SBN 201654)
   Christopher B. Ghio (SBN 259094)
3  **DINSMORE & SHOHL LLP**
   655 West Broadway, Suite 800
   San Diego, CA 92101
4  Tel: (619) 400-0500
   Fax: (619) 400-0501
5  christopher.celentino@dinsmore.com
   yosina.lissebeck@dinsmore.com
6  christopher.ghio@dinsmore.com

7  Tyler Powell (Ky. Bar No. 90520 – Admitted pro hac vice)
8  **DINSMORE & SHOHL, LLP**
   100 West Main Street, Suite 900
   Lexington, KY  40507
9  Tel: (859) 425-1056
   Fax: (859) 425-1099
10 tyler.powell@dinsmore.com

11 Attorneys for Richard A. Marshack,
   Trustee of the LPG Liquidation Trust
12

13              **UNITED STATES BANKRUPTCY COURT**

14              **CENTRAL DISTRICT OF CALIFORNIA**

15                   **SANTA ANA DIVISION**

16 In re:                                  | Chapter 11

17 The Litigation Practice Group P.C.,      | Case No. 8:23-bk-10571-SC
                                            | Adv No. 8:25-ap-_____-SC
18              Debtor.

19 ─────────────────────────────────────   | **COMPLAINT FOR:**

20 Richard A. Marshack, Trustee of the LPG  | **(1) AVOIDANCE, RECOVERY, AND**
   Liquidation Trust,                       | **PRESERVATION OF TRANSFERS MADE**
21                                          | **WITHIN THE NINETY DAY PERIOD**
              Plaintiff,                    | **BEFORE THE PETITION DATE**
22                                          | **PURSUANT TO 11 U.S.C. §§ 547, 550, AND**
   v.                                       | **551;**
23
   Hi Bar Capital, LLC, a New York limited  | **(2) AVOIDANCE, RECOVERY, AND**
24 liability company,                       | **PRESERVATION OF TRANSFERS MADE**
                                            | **WITH INTENT TO DEFRAUD PURSUANT**
25              Defendant.                  | **TO 11 U.S.C. §§ 548(A)(1)(B), 550, AND 551;**

26                                          | **(3) AVOIDANCE, PRESERVATION, AND**
                                            | **RECOVERY OF CONSTRUCTIVELY**
27                                          | **FRAUDULENT TWO-YEAR TRANSFERS**
                                            | **PURSUANT TO 11 U.S.C. §§ 548(A)(1)(B),**
28                                          | **550 & 551;**

                              1

**(4) AVOIDANCE, PRESERVATION, AND RECOVERY OF TRANSFERS WITHIN FOUR YEARS  PURSUANT TO 11 U.S.C. §§ 544, 550, 551; CAL. CIV. CODE §§ 3439.04(a)(1), 3439.05 AND 3439.07; AND**

**(5) AVOIDANCE, RECOVERY, AND PRESERVATION OF TRANSFERS MADE WITHIN FOUR YEARS PURSUANT TO 11 U.S.C. §§ 544(B), 550, AND 551; CAL. CIV. CODE §§ 3439.04(a)(2), 3439.05, AND 3439.07**

Dept 5C
Honorable Scott C. Clarkson

For his *Complaint for (1) Avoidance, Recovery, and Preservation of Transfers Made Within the Ninety Day Period Before the Petition Date Pursuant to 11 U.S.C. §§ 547, 550, and 551; (2) Avoidance, Recovery, and Preservation of Transfers Made With Intent to Defraud Pursuant to 11 U.S.C. §§ 548(a)(1)(B), 550, and 551; (3) Avoidance, Preservation, and Recovery of Constructively Fraudulent Two-Year Transfers Pursuant to 11 U.S.C. §§ 548(a)(1)(B), 550 & 551; (4) Avoidance, Preservation, and Recovery of Transfers Within Four Years  Pursuant to 11 U.S.C. §§ 544, 550, 551; Cal. Civ. Code §§ 3439.04(a)(2), 3439.05 and 3439.07; and (5) Avoidance, Recovery, and Preservation of Transfers Made Within Four Years Pursuant to 11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.05, and 3439.07,* Plaintiff Richard A. Marshack, the Trustee of the LPG Liquidation Trust (the "Trustee" or "Plaintiff") in the above-captioned bankruptcy case (the "Bankruptcy Case"), alleges and avers as follows:

## STATEMENT OF JURISDICTION, NATURE OF PROCEEDING, AND VENUE

1.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E), (H) and (O), 1334(b), and General Order No. 13-05 of the District Court for the Central District of California because this is a core proceeding arising in and/or related to the Bankruptcy Case, which is a case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), and which is pending in the United States Bankruptcy Court for the Central District of California, Santa Ana Division (the "Court").

2.     Regardless of whether this proceeding is core, non-core, or otherwise, the Plaintiff consents to the entry of a final order and judgment by the Bankruptcy Court.

3.      Defendant is hereby notified that Rule 7008 of the Federal Rules of Bankruptcy Procedure requires him to plead whether consent is given to the entry of a final order and judgment by the bankruptcy court.

4.      Venue of this adversary proceeding properly lies in this judicial district pursuant to 28 U.S.C. § 1409(a) because this proceeding is related to the Debtor's pending Bankruptcy Case.

## THE PARTIES

5.      Plaintiff, Richard A. Marshack, was the duly-appointed, qualified Chapter 11 Trustee of Debtor's Estate and is now the current trustee of the LPG Liquidation Trust.

6.      Debtor LPG is, and at all material times was, a professional corporation organized, existing, and in good standing under the laws of the State of California, with its principal place of business in Tustin, California.

7.      Defendant Hi Bar Capital, LLC is a New York limited liability company ("Hi Bar") that does business under the assumed names of Diverse Capital and Kingdom Kapital among others.

8.      Defendant Hi Bar may be served by first class mail postage, prepaid mailed to itself as agent for service of process at 1820 Avenue M, Suite #697, Brooklyn, NY 11230.

## GENERAL ALLEGATIONS

A.      **The Bankruptcy Case**

9.      On March 20, 2023 ("Petition Date"), Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, commencing the Bankruptcy Case.

10.      The Office of the United States Trustee ("UST") filed its *Motion by United States Trustee to Dismiss or Convert Case Pursuant to 11 U.S.C. § 1112(b)* [Bankr. Docket No. 21] and creditors Debt Validation Fund II, LLC; MC DVI Fund 1, LLC; and MC DVI Fund 2, LLC filed the *Motion by DVF and MC DVI to Dismiss Chapter 11 Case Pursuant to 11 U.S.C. §§ 105, 305, 349, & 1112, or in the Alternative Convert This Case to Chapter 7 or Appoint a Trustee* [Bankr. Docket No. 44]. On May 4, 2023, the Court entered its *Order Directing United States Trustee to Appoint Chapter 11 Trustee* [Bankr. Docket No. 58].

11.      Pursuant to the *Acceptance of Appointment as Chapter 11 Trustee* [Bankr. Docket No. 63], on May 8, 2023, Trustee accepted his appointment as the Chapter 11 Trustee in the Bankruptcy

1  Case. The Court approved the Trustee's appointment in its *Order Approving the U.S. Trustee's*
2  *Application for the Appointment of a Chapter 11 Trustee* [Docket No. 65].

3      12.    Trustee was not appointed until after events of the case and, therefore, bases these
4  allegations on information and belief. *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir.
5  2017) ("The *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts alleged
6  upon information and belief where the facts are peculiarly within the possession and control of the
7  defendant or where the belief is based on factual information that makes the inference of culpability
8  plausible."); *Miller v. City of Los Angeles*, 2014 U.S. Dist. LEXIS 198871, 2014 WL 12610195, at
9  *5 (C.D. Cal. Aug. 7, 2014) (recognizing that the plaintiff's "information and belief" pleading was
10 allowed and "necessary at times"); *see also Mireskandari v. Daily Mail and General Trust PLC*, 2013
11 U.S. Dist. LEXIS 194437, 2013 WL 12129642, at *4 (C.D. Cal. July 31, 2013) ("The Federal Rules
12 of Civil Procedure allow parties to plead facts on 'information and belief' if the facts 'will likely have
13 evidentiary support after a reasonable opportunity for further investigation or discovery.'" (citations
14 omitted)).

15     13.    Pursuant to the *Order Confirming Modified First Amended Joint Chapter 11 Plan of*
16 *Liquidation* entered September 9, 2024, and the *Notice of Occurrence of Effective Date of Modified*
17 *First Amended Joint Chapter 11 Plan of Liquidation* filed September 24, 2024, Richard A. Marshack
18 became the Liquidating Trustee of the LPG Liquidation Trust, effective September 24, 2024. [Bankr.
19 Docket Nos. 1646 & 1762].

20     14.    All claims have been transferred to the Liquidating Trust pursuant to the confirmed
21 plan and Plaintiff brings this action solely in his capacity as the Liquidating Trustee of the LPG
22 Liquidation Trust, for the benefit of Debtor's Estate and its creditors.

23 **B.**    **Protective Order**

24     15.    On or about May 2, 2024, Plaintiff filed that certain Notice and Motion for Entry of
25 Protective Order (the "Protective Order").

26     16.    On June 3, 2024, the Court entered its *Order Granting Motion for Entry of Protective*
27 *Order and the Protective Order* [Bankr. Docket No. 1270] (the "Protective Order"). A true and
28 accurate copy of the Protective Order is attached as **Exhibit 1**, and incorporated herein.

17.     By its own terms, the Protective Order applies to this adversary proceeding and governs all discovery conducted herein.

**C.    LPG's Ownership and Management**

18.     Prior to the Petition Date, LPG operated a law firm for consumers across the country who sought assistance in contesting or resolving debts they would identify. At all relevant times, LPG was controlled and operated by the individual named Tony Diab ("Diab").

19.     The consumers would pay LPG over a period of time via monthly debits from their bank accounts.

20.     The monthly payments were meant to cover all legal services LPG provided to the consumers including validation of the debts, review of documents to determine enforceability, and court appearances to halt lawsuits to obtain judgments.

21.     In certain instances, LPG would file a lawsuit in an effort to eliminate a disputed debt or to prosecute affirmative claims held by the consumers.

22.     LPG mismanaged the consumers' monthly payments.

23.     Diab and others devised a plan to fraudulently transfer funds, client files, client funds and assets in the form of ACH Receivables (the "ACH Receivables" or "Accounts Receivable") out of LPG to third parties prior to the filing of bankruptcy.

24.     To obtain consumer clients, LPG contracted with marketing companies, who engaged in illegal capping and would advertise or call to solicit consumers to become clients of LPG in exchange for a percentage of the ACH Receivables collected by LPG from the consumers. The marketing affiliate went so far as to assist with the execution of an engagement letter between the consumer and LPG.

25.     In exchange, LPG agreed to pay the marketing affiliates a percentage the monthly payments collected by LPG from the consumers.

26.     Because LPG received payments from consumers over time, it often sought financing by borrowing against its future cash flows. This borrowing was not only used to finance operations at LPG, but also to pay the fees owed to the marketing companies for providing the client referrals.

27.     Many of the documents executed in connection with such financing described the transactions as accounts receivable purchase agreements.

28.     Diab used entities he controlled including, without limitation, Vulcan Consulting, LLC ("Vulcan"), Maverick Management, LLC, and B.A.T., Inc. dba Coast Processing ("Coast") to process payments from LPG consumer clients and to divert LPG consumer funds and ACH Receivables. Diab would use numerous ACH processing companies in order to easily transfer millions of dollars from Debtor to these entities he controlled, without oversight or detection, and to avoid payment disputes and complications. The money that flowed from Debtor through these bank account to Defendants consisted of Client Funds that Debtor funneled to these entities by means of the ACH processing companies. Debtor also made deposits into these entities bank account such that they received Client Funds directly from Debtor in addition to direct Accounts Receivables.

**D.    Ponzi Scheme Presumption**

29.     The Ponzi Scheme Presumption exists in bankruptcy proceedings.

30.     The Ponzi Scheme Presumption can be utilized to establish a debtor's "intent to defraud future undertakers [investors] from the mere fact that a debtor was running a Ponzi scheme. Indeed, no other reasonable inference is possible. A Ponzi scheme cannot work forever. The investor pool is a limited resource and will eventually run dry. The perpetrator must know that the scheme will eventually collapse as a result of the inability to attract new investors. The perpetrator nevertheless makes payments to present investors, which, by definition, are meant to attract new investors. He must know all along, from the very nature of his activities, that investors at the end of the line will lose their money. Knowledge to a substantial certainty constitutes intent in the eyes of the law," *cf. Restatement (Second) of Torts § 8A* (1963 & 1964), and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them. *Kirkland v. Rund (In re EPD Inv. Co., LLC)*, 114 F.4th 1148, 1153 (9th Cir. 2024) (by definition Ponzi scheme is destined to fail and the swindler and their entities often end in bankruptcy or equitable receivership); *Cf. Coleman Am. Moving Servs., Inc. v. First Nat'l Bank & Trust Co. (In re American Properties, Inc.)* 14 B.R. 637, 643 (Bankr. D. Kan. 1981) (intentionally carrying out a transaction with full knowledge that its effect will be detrimental to creditors is sufficient for actual intent to hinder, delay

1  or defraud within the meaning of § 548(a)(1)).” *Merrill v. Abbott (In re Independent Clearing House*

2  *Co.)* (D. Utah 1987) 77 B.R. 843, 860. A trustee in bankruptcy is not required to show that an operator

3  of a Ponzi scheme was subjectively aware his Ponzi scheme was destined to fail. *In re EPD Inv. Co.,*

4  *LLC*, 114 F.4th at 1153 (“[a] trustee’s action to recover assets fraudulently conveyed in the course of

5  a Ponzi scheme does not require that the trustee also prove the Ponzi-scheme operator was

6  subjectively aware his Ponzi scheme was destined to fail.”).

7       31.    “But if all the debtor receives in return for a transfer is the use of the defendant’s

8  money to run a Ponzi scheme, there is nothing in the bankruptcy estate for creditors to share. In fact,

9  by helping the debtor perpetuate his scheme, the transfers exacerbate the harm to creditors by

10  increasing the amount of claims while diminishing the debtor’s estate. In such a situation, the use of

11  the defendant’s money cannot objectively be called ‘reasonably equivalent value.’” *In re Independent*

12  *Clearing House Co.* 77 B.R. at 859. Therefore, “[t]he trustee can avoid the transfers if they were

13  preferential or fraudulent. Transfers to investors in a Ponzi scheme are preferential and fraudulent.

14  Therefore, they constitute “property of the estate,” and the trustee can recover them. *Id.* at 853 n.17

15  (citations omitted).

16       32.    Debtor was operating a Ponzi scheme that utilized affiliates and several other entities

17  as investors/lenders to continue its unlawful business practices by using funds provided by current

18  investors to attract new investors hoping for very high returns. Therefore, the Debtor was running a

19  Ponzi scheme and the Ponzi Scheme Presumption can be utilized to infer that the Debtor had the

20  intent to defraud investors within the meaning of 11 U.S.C. section 548(a)(1). This is evidenced by

21  the Court in this Bankruptcy Case declaring that Debtor was operating a Ponzi scheme when it stated

22  the following:

23          It is important to note that this Court has never received any
           significant and trustworthy evidence that Debtor accomplished
24          meaningful results for its clients, but only anecdotal examples of
           viable success for its clients. By reviewing the Estate’s claims
25          register, there is evidence of consumer claims for the fraud and
           demanded but undelivered refunds of approximately $500 million.
26          There is ample evidence that the pre-petition Debtor never placed the
           collected funds into an attorney-client trust account, and that Debtor
27          or its principals simply looted the payments received through the
           client automatic withdrawals, stiffing both the clients and outside
28          attorneys who may have been working on client cases with the hopes
           of being paid. There is also evidence before the Court that Debtor
           was running a Ponzi scheme and paying some outside (or “network”)

attorneys with funds obtained from new clients. In this case, it appears that some of the "lenders" may have been serving as "investors," hoping for very high returns before "the music stopped." The Ninth Circuit has recently explained, "[b]y definition, a Ponzi scheme is destined to fail because the pool of available investors is not limitless. When the Ponzi scheme operator's pool of investors inevitably runs dry, the scheme collapses and the swindler and their entities often end up in bankruptcy or equitable receivership. *See generally* David R. Hague, Expanding the Ponzi Scheme Presumption, 64 DePaul L. Rev. 867 (2015). In bankruptcy, the court-appointed trustee is tasked with taking immediate control of the entity, ceasing ongoing fraudulent activity, locating and collecting assets for the bankruptcy or receivership estate, and achieving a final, equitable distribution of the remaining assets. *See* 11 U.S.C. § 704; *Kirkland v. Rund (In re EPD Inv. Co., LLC)*, 2024 U.S. App. LEXIS 21363, at *15 (9th Cir. Aug. 23, 2024). Finally, there is evidence that Debtor was encumbering (or as some creditors assert, "double or triple selling") their accounts or receivables to multiple lenders. With respect to Greyson's requested Administrative Claim [Dk. 676], and as more fully described in the concurrently entered order denying the claim, there has been no evidence presented that any work allegedly performed by Greyson assisted any clients or added any value to the Estate.

*See, Case 8:23-bk-10571-SC*, Doc 1545 n. 5.

33.    The Ponzi Scheme Presumption establishes a debtor's "intent to defraud future undertakers [investors] from the mere fact that a debtor was running a Ponzi scheme." *Merrill v. Abbott* (*In re Independent Clearing House Co.*), 77 B.R. 843, 860 (D. Utah 1987). "Knowledge to a substantial certainty constitutes intent in the eyes of the law, *cf. Restatement (Second) of Torts* § 8A (1963 & 1964), and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them." *Id*. A trustee in bankruptcy is not required to show that an operator of a Ponzi scheme was subjectively aware his Ponzi scheme was destined to fail. *In re EPD Inv. Co., LLC*, 114 F.4th at 1153 (9th Cir. 2024).

34.    "[I]f all the debtor receives in return for a transfer is the use of the defendant's money to run a Ponzi scheme, there is nothing in the bankruptcy estate for creditors to share." *In re Independent Clearing House Co.* 77 B.R. at 859. In such a situation, the use of the defendant's money cannot objectively be called "reasonably equivalent value." *Id*. Therefore, "[t]he trustee can avoid the transfers if they were preferential or fraudulent. Transfers to investors in a Ponzi scheme are preferential and fraudulent. Therefore, they constitute 'property of the estate,' and the trustee can recover them." *Id*. at 853 n.17 (citations omitted).

35.     Based on the Ponzi Scheme presumption the Court can infer that the Debtor had the intent to defraud investors within the meaning of 11 U.S.C. § 548(a)(1). Since the transfers to the Defendant were made with the intent to further the Ponzi scheme, the Debtor did not receive an objectively reasonable equivalent value for such transfers, and the Trustee can avoid any such transfers because they were actually fraudulent as to the Debtor's creditors..

**E.     Prepetition Litigation and Creditors**

36.     Debtor's Schedule E/F, filed on April 4, 2023, as Dk. No. 33, lists: (a) 11 unsecured creditors with priority unsecured claims totaling $374,060.04; and (b) 58 nonpriority unsecured creditors with scheduled claims totaling $141,439,158.05.

37.     The claims register in this Bankruptcy Case includes 2,554 proofs of claim, totaling in excess of $424 million of claims asserted against the Estate.

38.     At least 14 UCC-1 statements were of record securing alleged debts of the Debtor as of the Petition Date. These statements either reflected secured liens against the Debtor's assets then owned or thereafter acquired or provided evidence of the assignment or sale of substantial portions of the Debtor's future income. They secured the repayment of the following claimed amounts that are currently known to Trustee and are allegedly owed by the Debtor: (a) $2,374,004.82 owed to Fundura Capital Group as evidenced by Proof of Claim No. 335 purportedly secured by a UCC statement filed on or about May 19, 2021; (b) approximately $15 million dollars owed to MNS Funding, LLC as evidenced by Proof of Claim No. 1060 purportedly secured by a UCC statement filed on or about May 28, 2021; (c) approximately $5,000,000 owed to Azure Capital, LLC as evidenced by Proof of Claim No. 127 purportedly secured by a UCC statement filed on or about May 28, 2021.

39.     Debtor's balance sheets for the 36 months ending December 31, 2021, show approximately $17,900,000 in total assets at its highest point in November 2021. This amount is significantly less than the $424 million in claims filed.

40.     Debtor's Statement of Financial Affairs, filed on April 4, 2023, as Dk. No. 34, reflects 15 pending lawsuits against Debtor as of the Petition Date. The lawsuits date back to October 18, 2021 (*Fundura v. The Litigation Practice Group P.C. et al.*, Supreme Court of New York Index No.

613192-2021) and are as recent as March 10, 2023 (*Diverse Capital LLC v. The Litigation Practice Group P.C. et al.*, Supreme Court of New York Index No. 135614-2023).

**F.    Debtor's Insolvency**

41.    Debtor was insolvent when the Transfers identified herein occurred as evidenced by: (a) the 14 UCC-1 statements reflecting secured liens against the Debtor's owned and after-acquired assets and the assignment or sale of substantial portions of the Debtor's future income; (b) the priority and non-priority unsecured debt of nearly $142 million listed in Debtor's schedules; (c) the $424 million of creditor claims filed in this Bankruptcy Case; and (d) Debtor's balance sheets reflecting, at its highest point, $17.9 million of assets in November 2021.

42.    Moreover, insolvency is presumed as a matter of law where, as in this Bankruptcy Case, the debtor operated a Ponzi scheme. *See, e.g., Glob. Money Mgmt., L.P. v. McDonnold*, No. 06CV34, 2008 U.S. Dist. LEXIS 128733, at *15 (S.D. Cal. Feb. 27, 2008) (concluding that "if a Ponzi scheme is proven, then the debtor is proven insolvent from the time of its inception").

## SPECIFIC ALLEGATIONS

43.    On July 21, 2021, the Debtor and Hi Bar using the name Diverse Capital executed a Merchant Agreement whereby the Debtor purportedly sold $374,750.00 of its future receivables in exchange for $250,000.00 ("First Agreement"). Repayment was to be made pursuant to a daily debit of $10,000.00 until the debt was paid in full. Pursuant to the First Agreement, Hi Bar deposited $225,000 in the Vulcan account at Chase Bank ending in 3588. A true and accurate copy of the First Agreement is attached as **Exhibit 2** attached hereto and incorporated herein.

44.    Vulcan is not a party to the First Agreement.

45.    Before the Debtor stopped making regular payments to Hi Bar pursuant to the First Agreement, it had paid at least $260,000.00 to Hi Bar from late July to September 2021.

46.    On August 18, 2021, the Debtor and Hi Bar, using the name Diverse Capital, executed another Merchant Agreement whereby the Debtor purportedly sold $749,500.00 of its future receivables in exchange for $500,000.00 ("Second Agreement"). Repayment was to be a daily debit of $13,325.00 until the debt was paid in full. Pursuant to the Second Agreement, Hi Bar deposited $450,000 in the Vulcan account at Chase Bank ending in 3588. A true and accurate copy of the Second

Diverse Agreement is attached as **Exhibit 3.**

47.    Vulcan is not a party to the Second Agreement

48.    Before the Debtor stopped making regular payments to Hi Bar pursuant to the Second Agreement, it had paid at least $174,880 to Hi Bar from late July to November 2021.

49.    On or about February 16, 2022, Hi Bar received a wire of $275,000 from SSD Investment Group, LLC ("SSD"). Upon information and belief, Hi Bar applied this wire to the balance it claimed to be owed on the Second Agreement.

50.    At this time, SSD was processing payments from the Debtor's clients for it. The wire transfer identified above was made with funds collected from the Debtor's clients and not delivered to the Debtor for escrowing.

51.    On August 17, 2021, the Debtor and Hi Bar, using the name of Kingdom Kapital, executed a Revenue Purchase Agreement whereby the Debtor purportedly sold $749,500.00 of its future receivables in exchange for $500,000.00 ("Third Agreement"). Repayment was to be a daily debit of $14,990.00 until paid in full. Pursuant to the Third Agreement, Hi Bar deposited $450,000.00 into the Debtor's account at Union Bank ending in 4858. A true and accurate copy of the Third Agreement is attached hereto as **Exhibit 4.**

52.    Before Hi Bar stopped receiving regular payments pursuant to the Third Agreement, it received at least $44,970.03 in payments from late July to September 2021.

53.    On December 1, 2021, Hi Bar recorded UCC Statement No. 210106788229 against the Debtor with the California Secretary of State ("Hi Bar Statement") as permitted by its Agreements with the Debtor. When recorded and at all times herein, the Hi Bar Statement was inferior to a number of other previously recorded UCC-1 Statements against the Debtor.

54.    On December 31, 2021, Hi Bar received a wire of $100,000 from the bank account of Coast Processing, LLC dba Vulcan Consulting Group. Again, the funds for this payment were collected from the Debtor's clients and paid to Hi Bar before they were delivered to the Debtor. Upon information and belief, Hi Bar applied this payment to the balance owed on the Third Agreement.

55.    On January 26, 2022, Hi Bar received a wire of $80,000 from SSD. Again, the funds for this payment were collected from the Debtor's clients and paid to Hi Bar before they were delivered

to the Debtor. Upon information and belief, Hi Bar applied this payment to the balance owed on the Third Agreement.

56. On February 28, 2022, Hi Bar received a wire of $25,000 from SSD. Again, the funds for this payment were collected from the Debtor's clients and paid to Hi Bar before they were delivered to the Debtor. Upon information and belief, Hi Bar applied this payment to the balance owed on the Third Agreement.

57. On February 28, 2022, Hi Bar received a wire of $75,000 from SSD. Again, the funds for this payment were collected from the Debtor's clients and paid to Hi Bar before they were delivered to the Debtor. Upon information and belief, Hi Bar applied this payment to the balance owed on the Third Agreement.

58. All payments to Hi Bar made on account of the First, Second, and Third Agreements, including the wire transfers above, are identified on the table attached hereto as **Exhibit 5** and will be collectively referred to herein as the "Hi Bar Transfers".

59. On or about November 25, 2022, Hi Bar and the Debtor and other related entities executed a Stipulation and Settlement Agreement ("Settlement Agreement"). A true and accurate copy of the Settlement Agreement is attached hereto as **Exhibit 6**.

60. The Settlement Agreement provided that Hi Bar agreed to accept the sum of $850,000.00 in full satisfaction of all its claims under the First, Second, and Third Agreements.

61. Hi Bar received a total of $850,000 in five separate transactions before the end of 2022 (collectively "Settlement Payments"). Hi Bar received the following payments on the following dates:

- $100,000.00 paid on or about November 18, 2022.
- $200,000.00 paid on or about November 29, 2022.
- $300,000.00 paid on or about December 12, 2022.
- $126,551.00 paid on or about December 23, 2022.
- $123,449.00 paid on or about December 27, 2022.

62. However, the Debtor paid another $423,449.00 to Hi Bar from its bank account at Chase Bank ending in 3158 on or about December 13, 2022 ("Additional Payment").

63. Upon information and belief, the Additional Payment was unrelated to the Settlement

1    Agreement or the Agreements. Instead, the Additional Payment was paid to Hi Bar to fund the

2    purchase of a 2022 Rolls-Royce Cullinan ("Vehicle") for the personal benefit of Mordi Herbst, the

3    owner of Hi Bar, and Mr. Diab.

4         64.     Mr. Diab and Mr. Herbst formed a Montana LLC named Black Badge LLC to purchase

5    the Vehicle for $433,449.00. A copy of the Buyer's Order for the Vehicle between Foreign Affairs

6    Motorsport LLC in Florida and Black Badge LLC is attached hereto as **Exhibit 7**.

7         65.     The Settlement Payments and Additional Payment are identified on **Exhibit 8**.

8         66.     The execution of both the First, Second, and Third Agreements (collectively "Hi Bar

9    Agreements") and the Settlement Agreement, the filing of the Hi Bar Statement, and Hi Bar's receipt

10   of the Hi Bar Payments, Settlement Payments, and Additional Payment are collectively referred to

11   herein as the "Transfers".

12   <u>**COUNT ONE**</u>

13   **Avoidance, Recovery, and Preservation of Transfers Made Within the Ninety Day Period**

14   **Before the Petition Date**

15   **[11 U.S.C. §§ 547, 550, and 551]**

16        67.     Plaintiff realleges and incorporates by reference each and every allegation contained

17   in the preceding paragraphs as though set forth in full herein.

18        68.     In the ninety-day period preceding the Petition Date, the Debtor made the following

19   payments to Hi Bar: (i) $126,551.00 paid on or about December 23, 2022 and (ii) $123,449.00 paid

20   on or about December 27, 2022 (collectively "90 Day Transfers"). These 90 Day Transfers are

21   identified on Exhibit 7 above and were two of the Settlement Payments as defined above.

22        69.     The 90 Day Transfers were paid to the Defendant on account of a preexisting debt

23   owed to that Defendant.

24        70.     The 90 Day Transfers were made to or for the benefit of a creditor within the meaning

25   of 11 U.S.C. § 547(b)(1) because the 90 Day Transfers were payments made on account of debts

26   nominally owed by the Debtor.

27        71.     A transfer of the Debtor's assets occurred when the 90 Day Transfers were paid to the

28   Defendant.

72.     The 90 Day Transfers were made on account of antecedent debt nominally owed by the Debtor to the Defendant due to an "investment" or other document evidencing indebtedness. The Debtor's payment obligations to the transferees constituted a "debt" (as defined in the Bankruptcy Code).

73.     The 90 Day Transfers occurred when the Debtor actually was insolvent. However, Plaintiff is also entitled to the presumption of insolvency when the 90 Day Transfers were made pursuant to 11 U.S.C. § 547(f).

74.     The 90 Day Transfers were made in the ninety-day period before the Petition Date.

75.     To the extent any transfers were made by the Debtor to the Defendant within the ninety-day period preceding the Petition Date and are not identified herein, Plaintiff reserves the right to avoid and recover such transfers pursuant to 11 U.S.C. §§ 547 and 550.

76.     As the holder of an unsecured claim(s) or as party who has not filed a claim, the payment of the 90 Day Transfers to the Defendant enabled it to recover more than it would have received if: (i) the Debtor's case was under chapter 7 of the Bankruptcy Code; (ii) the 90 Day Transfers had not been made; and (iii) the debts owed to the Defendant upon which payments were made were paid pursuant to the provisions of the Bankruptcy Code. As evidenced by the Debtor's schedules filed in the underlying Bankruptcy Case, as well as the proofs of claim that have been received to date, the Debtor's liabilities exceed its assets to the point that unsecured creditors will not receive a full payout of their claims from the Debtor's bankruptcy estate.

77.     In accordance with the foregoing, the 90 Day Transfers are avoidable pursuant to 11 U.S.C. § 547(b), and may be recovered and preserved for the benefit of the estate pursuant to 11 U.S.C. §§ 550 and 551.

## COUNT TWO

### Avoidance, Recovery, and Preservation of Transfers Made With Intent to Defraud

### [11 U.S.C. §§ 548(a)(1)(B), 550, and 551]

78.     Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though set forth in full herein.

79.     The Transfers were property of the Debtor's Estate prior to their conveyance to the

Defendant and are identified herein.

80.    When the Transfers were made, the Debtor was indebted to the Prepetition Creditors and Defendant.

81.    The Transfers occurred when the Debtor was insolvent or was rendered insolvent as a result of the Transfers.

82.    The Transfers to the Defendant were made with actual intent to hinder, delay or defraud the creditors of Debtor because the Debtor was engaged in a Ponzi scheme. This fact permits the Court to infer that the Debtor's intent in making the Transfers was fraudulent within the meaning of 11 U.S.C. section 548(a)(1).

83.    The Additional Payment was made with the intent to defraud the creditors of the Debtor as the Debtor received nothing in exchange for making the Additional Payment and the Vehicle purchased with the Additional Payment was for the personal benefit of Mr. Diab and Mr. Herbst.

84.    The Transfers are avoidable as fraudulent pursuant to 11 U.S.C. §§ 548(a)(1)(A), 550, and 551 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against Debtor's Estate under 11 U.S.C. § 502, or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

85.    The Transfers should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(A), and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

## **COUNT THREE**

**Avoidance, Preservation, and Recovery of Constructively Fraudulent Transfers**

**11 U.S.C. §§ 548(a)(1)(B), 550 & 551**

86.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though set forth in full herein.

87.    The Transfers were made within two years of the Petition Date.

88.    Debtor did not receive reasonably value in exchange for the Transfers because any obligation owed to the Defendant were usurious and unenforceable as a matter of law and/or because

1    one or more of the Transfers were not made for business purposes.

2         89.    The Transfers were made at a time when Debtor was insolvent and/or rendered

3    insolvent by virtue of said transfers.

4         90.    When the Transfers occurred, Debtor's business was undercapitalized, and Debtor was

5    engaged in business for which its capital was unreasonably small.

6         91.    When the Transfers occurred, Debtor had incurred or was about to incur debts that

7    were beyond its ability to pay. The allegations in the preceding paragraphs are supported by the fact

8    that the Debtor was consistently borrowing money from merchant cash advance lenders, purporting

9    to sell the same groups of receivables to multiple parties.

10        92.    At the time each Transfer was made, Debtor was indebted to one or more creditors

11   that held a claim against Debtor on the date of each Transfer and on the Petition Date.

12        93.    Plaintiff alleges that Defendant did not receive the Transfers in good faith, for value,

13   and without knowledge of their avoidability.

14        94.    Defendant knew that the Debtor was a law firm who was required by law to escrow

15   client payments until earned. Defendant knew the terms of the Agreements were usurious.

16        95.    Defendant knew that the Debtor received no consideration for making the Additional

17   Payment and that the Vehicle purchased with the Additional Payment would not belong to the Debtor.

18        96.    However, the Transfers paid to Defendant were either paid using client payments that

19   had been collected, but not earned and placed into the trust.

20        97.    Defendant had to know or should have known that they were being paid with funds

21   borrowed from other lenders, or with client funds that had not been placed into trust and been

22   disbursed before they were earned.

23        98.    Defendant knew or should have known that it was receiving payments on obligations

24   that were not valid or enforceable at law to the extent it arose from the Hi Bar Agreements and that

25   no legitimate business purpose existed for the Additional Payment.

26        99.    Based on the foregoing, Plaintiff may recover and preserve the avoided Transfers from

27   Defendant as the initial transferee or, alternatively, as the subsequent transferee for the benefit of the

28   Estate under 11 U.S.C. §§ 550 and 551 from Defendant.

## COUNT FOUR

**Avoidance, Preservation, and Recovery of Transfers Within Four Years**

**11 U.S.C. §§ 544, 550, 551; Cal. Civ. Code §§ 3439.04(a)(2), 3439.05 and 3439.07**

100.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though set forth in full herein.

101.    Under 11 U.S.C. § 544(b)(1), Plaintiff may avoid transfers of an interest of Debtor which are voidable under applicable law by an unsecured creditor of Debtor, including under California Civil Code §§ 3439.04(a)(1) and 3439.05.

102.    The Transfers occurred within four years prior to the Petition Date.

103.    On or after the date that such Transfer were made, entities to which Debtor was or became indebted include the Prepetition Creditors.

104.    Despite Debtor's obligation to the Prepetition Creditors, Debtor made the Transfers to Defendant.

105.    The Transfers to Defendant were made with actual intent to hinder, delay or defraud the creditors of Debtor as the Debtor was operating a Ponzi scheme through its borrowing from Spot On.

106.    The Additional Payment to Defendant was made with actual intent to hinder, delay, or defraud the creditors of the Debtor as the Additional Payment was used to purchase the Vehicle for a third party to be used by Mr. Diab and Mr. Herbst.

107.    Defendant's conduct relating to the Transfers was done with oppression, fraud and malice, as defined in California Civil Code section 3294, entitling Plaintiff to exemplary and punitive damages.

108.    The Transfers are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and Cal. Civ. Code §§ 3439.04(a)(1) and 3439.07 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against its Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

109.    Accordingly, the Transfers should be avoided as fraudulent under 11 U.S.C. §§ 544(b) and Cal. Civ. Code §§ 3439.04(a)(1) and 3439.07, and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551 and Cal. Civ. Code § 3439.07.

110.    Based on the foregoing, Plaintiff may recover and preserve the Transfers from the Defendant as the initial transferee or, alternatively, as the subsequent transferee for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551, and Cal. Civ. Code § 3439.07.

<u>COUNT FIVE</u>

**Avoidance, Recovery, and Preservation of Transfers Made Within Four Years**

**[11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.04(a)(2), 3439.05, and 3439.07]**

111.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though set forth in full herein.

112.    Under 11 U.S.C. § 544(b)(1), Plaintiff may avoid transfers of an interest of Debtor which are voidable under applicable law by an unsecured creditor of Debtor, including under California Civil Code §§ 3439.04(a)(2) and 3439.05.

113.    Debtor did not receive reasonably equivalent value in exchange for the Transfers as (i) the Debtor was not liable on the debts owed to Defendant, (ii) the debts allegedly owed to Defendant arose from equity investments in entities related to the Debtor that were subsequently treated as the Debtor's debt, (iii) the Defendant pursuant to an illegal agreement, and/or (iv) entities who claimed to be owed far more than any value that was ever given to the Debtor.

114.    The Transfers were made at a time when Debtor was insolvent and/or rendered insolvent by virtue of said transfers.

115.    At the time each Transfer was made, Debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of Debtor were unreasonably small in relation to the business or transaction.

116.    At the time each Transfer was made, Debtor intended to incur, or believed or reasonably should have believed that Debtor would incur, debts beyond Debtor's ability to pay as they became due.

117.   At the time each Transfer was made, Debtor was indebted to one or more creditors that held a claim against Debtor on the date of each Transfer and on the Petition Date.

118.   Plaintiff alleges that Defendant did not receive the Transfers in good faith, for value, and without knowledge of their avoidability.

119.   Defendant knew that the Debtor was a law firm who was required by law to escrow client payments until earned. However, Defendant received payment either from (i) funds borrowed from another lender, or (ii) from client payments that had not been placed in trust and earned.

120.   Defendant knew or should have known that were receiving payment on a debt that was not valid or enforceable at law to the extent it arose from the Hi Bar Agreements and with respect to the Additional Payment, Defendant knew it had no legitimate purpose.

121.   Based on the foregoing, Plaintiff may avoid the Transfers pursuant to 11 U.S.C. § 544 and California Civil Code §§ 3439.04(a)(2) and 3439.05.

122.   Based on the foregoing, Plaintiff may recover and preserve the Transfers from the Defendant as the initial transferee or, alternatively, as the subsequent transferee for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551, and Cal. Civ. Code § 3439.07.

WHEREFORE, Plaintiffs prays for a judgment as follows:

**<u>On the First, Second, Third, Fourth, and Fifth Counts</u>:**

1.   Avoiding recovering, and preserving the Transfers to the Defendants in such amounts as the Court may determine based on applicable law;

2.   Awarding pre-judgment and post-judgment as permitted;

3.   Granting any other and such further relief as the Court deems just and proper.

DATED: May 9, 2025                                   DINSMORE AND SHOHL LLP


By: */s/ Tyler Powell*
    Yosina M. Lissebeck
    Tyler Powell (*admitted pro hac vice*)
Attorneys for Richard A. Marshack, Trustee of the
LPG Liquidation Trust

# EXHIBIT 1

Exhibit 1
Page 20

CHRISTOPHER B. GHIO (259094)
christopher.ghio@dinsmore.com
CHRISTOPHER CELENTINO (131688)
christopher.celentino@dinsmore.com
YOSINA M. LISSEBECK (201654)
yosina.lissebeck@dinsmore.com
DINSMORE & SHOHL LLP
655 West Broadway, Suite 800
San Diego, California 92101
Tele:  619.400.0500
Fax:  619.400.0501

Sarah S. Mattingly (Ky. Bar 94257)
sarah.mattingly@dinsmore.com
DINSMORE & SHOHL, LLP
101 S. Fifth Street, Suite 2500
Louisville, Kentucky 40202
Tele: 859-425-1096
Fax: 502-585-2207
(Admitted pro hac vice)

Special Counsel to Richard A. Marshack

FILED & ENTERED

JUN 03 2024

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY mccall    DEPUTY CLERK

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION**

In Re

The Litigation Practice Group P.C.,

           Debtor(s),

Case No: 23-bk-10571-SC

Chapter 11

**ORDER GRANTING MOTION FOR ENTRY OF PROTECTIVE ORDER AND THE PROTECTIVE ORDER**

Date:    May 23, 2024
Time:    1:30 p.m.
Judge:   Hon. Scott C. Clarkson
Place:   Courtroom 5C (via Zoom)[1]
        411 West Fourth Street
        Santa Ana, CA 92701

---

[1] Video and audio connection information for each hearing will be provided on Judge Clarkson's publicly posted hearing calendar, which may be viewed online at: http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

Exhibit 1
Page 21

The Court has read and considered the Notice of Motion and Motion for Entry of Protective Order (the "Motion") filed by Richard A. Marshack, in his capacity as the Chapter 11 Trustee (the "Trustee") of the Bankruptcy Estate ("Estate") of The Litigation Practice Group P.C., on May 2, 2024, pursuant to Federal Rule of Bankruptcy Procedure 7026 and Federal Rule of Civil Procedure 26(c)(1), as Dk. No. 1164 ("Motion"), and has found good cause to grant the Motion.

IT IS HEREBY ORDERED that:

1.    The Motion is granted;

2.    The below Protective Order shall apply to any contested matter arising in the main bankruptcy case and in all adversary proceedings filed by or against Trustee, present and future; and

3.    Govern the discovery conducted therein.

## PROTECTIVE ORDER

**1.    DEFINITIONS**

1.1    "Confidential Information" as used in this Protective Order shall mean documents and other information (regardless of how generated, stored or maintained) that a Party or non-party reasonably believes to contain or reflect non-public financial or business information, bank records, financial records, such as social security numbers, non-public financial or personal information of a Party or non-party, account numbers, sensitive digital information and identifiers, information subject to confidentiality agreements or provisions other than this Protective Order, and other non-public research, development, or commercial information that derives value or avoids injury by virtue of not being known to the public.

1.2    This "Action" is defined and hereby means any contested matter arising in the main bankruptcy case and in all adversary proceedings filed by or against Trustee, present and future.

1.3    "Designating Party" means a Party or non-party that designates Confidential Information during the Action.

1.4    "Receiving Party" means a Party that receives Confidential Information during the Action.

Exhibit 1
Page 22

1.5    "Party" or "Parties" means person or entity subject to this Protective Order.

**2.      SCOPE OF THIS PROTECTIVE ORDER**

2.1    Unless otherwise ordered, this Protective Order shall govern certain documents and other products of discovery obtained in the Action from the Parties there to, and from third parties. As well as certain information copied or derived therefrom, excerpts, summaries or compilations thereof, including, but not limited to, documents voluntarily exchanged as part of early settlement discussions, documents produced pursuant to initial disclosures, requests authorized by the Federal Rules of Civil Procedure made applicable herein by the Federal Rules of Bankruptcy Procedure, answers to interrogatories, deposition transcripts, responses to requests for production, responses to requests for admission, subpoenas, affidavits, declarations, expert reports, and other such material and information as may be produced during the course of the Action and designated as Confidential Information.

**3.      DESIGNATION OF CONFIDENTIAL INFORMATION**

3.1    This Protective Order shall govern the production and handling of any Confidential Information in this Action. Any Party or non-party who produces Confidential Information in this Action may designate it as "Confidential" or "Attorneys' Eyes Only" consistent with the terms of this Protective Order. Whenever possible, the Designating Party must designate only those portions of a document, written discovery responses, deposition, transcript, or other material that contain the Confidential Information and refrain from designating entire documents. Regardless of any designations made hereunder, the Designating Party is not otherwise restricted from use or disclosure of its Confidential Information outside of this Action or for any business purposes. In addition, any Party may move to modify or seek other relief from any of the terms of this Protective Order if it has first tried in writing and in good faith to resolve its needs or disputes with the other Parties or Party as the case may be under the terms of this Protective Order. Further, nothing in this Protective Order shall prevent a Party from redacting documents consistent with the Federal Rules of Civil Procedure and utilizing the documents as needed through-out the Action.

3.2    <u>Application to Non-Parties:</u> Before a non-party is given copies of documents or materials designated as Confidential Information or Attorneys' Eyes Only as permitted hereunder, it

must first sign an acknowledgment to be bound to these terms that is attached hereto as <u>Exhibit</u> A; if it fails to do so, the Parties to this Action must resolve any such dispute before making disclosure of designated information as permitted hereunder to the non-party. If a non-party wishes to make designations hereunder, it must first sign attached <u>Exhibit A.</u>

      3.3    <u>Timing and Provisional Protection:</u> Designations of Confidential Information may be made at any time. To avoid potential waiver of protection hereunder, the Designating Party should designate documents or materials containing Confidential Information at the time of production or disclosure, including on the record during the taking of any deposition. Deposition testimony will be deemed provisionally protected for a period of thirty (30) days after the transcript is released to the Parties by the court reporter, although the Parties may agree at any time to different timelines of provisional protection of information as Confidential or Attorneys' Eyes Only as part of one or more specific depositions. To retain any designations beyond the provisional period, a Designating Party must designate specific pages and lines of deposition testimony before the provisional period has expired. Such designations must be made in writing so that all counsel and court reporters may append the designation to all copies of the transcripts.

      3.4    <u>Manner of Designation:</u> Confidential Information may be designated hereunder in any reasonable manner or method that notifies the Receiving Party of the designation level and identifies with specificity the information to which the designation applies. If made verbally, the Designating Party must promptly confirm the designation in writing. Whenever possible, the Designating Party should stamp, affix, or embed a legend of "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY" on each designated page of the document or electronic image that contains Confidential Information.

**4.    CHALLENGES TO DESIGNATED INFORMATION**

      4.1    In the event that a Receiving Party disagrees at any time with any designation(s) made by the Designating Party, the Receiving Party must first try to resolve such challenge in good faith on an informal basis with the Designating Party. The Receiving Party must provide written notice of the challenge and the grounds therefor to the Designating Party, who must respond in writing to the challenge within fifteen (15) days. At all times, the Designating Party carries the burden of establishing the propriety of the designation and protection level. Unless and until the challenge is

Exhibit 1
Page 24

1   resolved by the Parties or ruled upon by the Court, the designated information shall remain protected

2   under this Protective Order. The failure of any Receiving Party to challenge a designation does not

3   constitute a concession that the designation is proper or an admission that the designated information

4   is otherwise competent, relevant, or material.

5       **5.      LIMITED ACCESS/USE OF PROTECTED INFORMATION**

6       5.1    <u>Restricted Use:</u> Information that is produced or exchanged in the course of the Action

7   and designated under this Protective Order may be used for preparation for trial and preparation for

8   any appeal of any and all matters in the Action, as well as related settlement negotiations, and for no

9   other purpose, without the written consent of the Designating Party. No Confidential Information may

10  be disclosed to any person except in accordance with the terms of this Protective Order, unless the

11  parties are co-counsel or have entered into joint defense agreements. All persons in possession of

12  Confidential Information agree to exercise reasonable care with regard to the custody, use, or storage

13  of such information to ensure that its confidentiality is maintained. This obligation includes, but is

14  not limited to, the Receiving Party providing to the Designating Party prompt notice of the receipt of

15  any subpoena that seeks production or disclosure of any designated information and consulting with

16  the Designating Party before responding to the subpoena. Any use or disclosure of Confidential or

17  Attorneys' Eyes Only information in violation of the terms of this Protective Order may subject the

18  disclosing person or party to sanctions.

19      5.2    <u>Access to "Confidential" Information:</u> The Party(ies) and all persons subject to this

20  Protective Order agree that information designated as "CONFIDENTIAL" may only be accessed or

21  reviewed by the following:

22          a)      The Court, its personnel, and court reporters;

23          b)      Counsel of record, or co-counsel for any Party, or other party that has entered into a

24  joint defense agreement in the Action and their employees who assist counsel of record, or co-counsel

25  in the Action and are informed of the duties and obligations imposed hereunder;

26          c)      The Parties, including their clients, agents and employees who are assisting or have

27  reason to know of the Action;

28  / / /

d)      Experts or consultants employed by the Parties or their counsel, or co-counsel, for purposes of an Action, so long as each such expert or consultant has signed attached Exhibit A; and

e)      Other witnesses or persons with the Designating Party's consent or by court order.

5.3      Access to "Attorneys' Eyes Only" Designations: The Parties and all persons subject to this Protective Order agree that information designated as "ATTORNEYS' EYES ONLY" may only be accessed or reviewed by the following:

a)      The Court, its personnel, and court reporters;

b)      Counsel of record, or co-counsel for any Party, or other party that has entered into a joint defense agreement in the Action and their employees who assist counsel of record in the Action and are informed of the duties hereunder;

c)      In-house counsel for any Party in the Action and Richard A. Marshack, as Chapter 11 Trustee of The Litigation Practice Group P.C. who is informed of the duties and obligations imposed hereunder;

d)      Experts or consultants employed by the Parties or their counsel, or co-counsel for purposes of the Action,  and so long as each such expert or consultant has signed attached Exhibit A; and

e)      Other witnesses or persons to whom the Designating Party agrees in advance of disclosure or by court order.

5.4      Non-Waiver Effect of Designations: Neither the taking of, nor the failure to take, any action to enforce the provisions of this Protective Order, nor the failure to object to any designation, will constitute a waiver of any Party(ies)'s claim or defense in the Action or any other action or proceeding, including, but not limited to, a claim or defense that any designated information is or is not Confidential, is or is not entitled to particular protection, or embodies or does not embody information protectable by law.

5.5      In-Court Use of Designated Information: If information designated under this Protective Order will or may be offered in evidence at a hearing or trial related to any matter in the Action, then the offering party must give advance notice to the party or non-party that designated prior to offering the information so that any use or disclosure may be addressed in accordance with

the Court's case-management or other pre-trial order, or by a motion *in limine.*  Nothing in this

Protective Order shall be construed as a waiver by a Party of any objections that may be raised as to

the admissibility at trial of any evidentiary materials.

**6.    CLAW-BACK REQUESTS**

6.1    <u>Failure to Make Designation:</u>  If, at any time, a Party or non-party discovers that it

produced or disclosed Confidential Information without designation, it may promptly notify the

Receiving Party and identify with particularity the Confidential Information to be designated and the

level of designation (the claw-back notification). The Receiving Party may then request substitute

production of the newly-designated information. Within thirty (30) days of receiving the claw-back

notification, the Receiving Party must: (1) certify to the Designating Party it has appropriately marked

or, if substitute production has been requested, destroyed all unmarked copies that it received, made,

and/or distributed; and (2) if it was practicably unable to mark or destroy any information because

disclosures occurred while the Receiving Party was under no duty of confidentiality under the terms

of this Protective Order regarding that information, the Receiving Party must reasonably provide as

much information as practicable to aid the Designating Party in protecting the information,

consistently with the Receiving Party's attorney-client, work-product, and/or trial-preparation

privileges.

6.2    <u>Inadvertent Production of Privileged Information:</u> If, at any time, a Party discovers

that it produced information that it reasonably believes is subject to protection under the

attorney/client, work-product, or trial-preparation privileges, then it must promptly notify each

Receiving Party of the claim for protection, the basis for it, amend its privilege log accordingly, and

comply with Fed. R. Civ. P. 26(b)(5). Whenever possible, the producing party must produce substitute

information that redacts the information subject to the claimed protection. The Receiving Party must

thereupon comply with Fed. R. Civ. P. 26(b)(5)(B) as to the information subject to the claimed

protection.

/ / /

/ / /

/ / /

Exhibit 1
Page 27

## 7.    DURATION/CONTINUED RESTRICTIONS

7.1    <u>Handling of Designated Information Upon Conclusion of the Main Bankruptcy Case:</u>
Upon conclusion of the Main Bankruptcy Case, by way of dismissal or closing of the case, the
Designating Party(ies) is/are responsible for ensuring that any Party or person to whom the
Designating Party shared or disclosed designated information in any of the matters under the Action
returns or destroys all of its copies, regardless of the medium in which it was stored. No witness or
Party may retain designated information that it received from any other Party or non-party under this
Protective Order; only counsel of record, or co-counsel, are the authorized agents who may retain one
copy for their respective legal files, and who must also describe to the Designating Party the extra
steps taken to protect its legal file containing paper and/or electronic copies of the designated
information so that it is not accessed, used, or disclosed inconsistently with the obligations under this
Protective Order. This provision does not apply to the Court or Court staff. Moreover, this provision
does not apply to Trustee, who may retain and use – consistent with this Order – Confidential
Information received in any Action during the entirety of the Bankruptcy.

7.2    <u>Continued Restrictions Under this Protective Order:</u> The restrictions on disclosure and
use of Confidential Information shall survive the conclusion of the Bankruptcy case and any matter
in the Action.

## 8.    PRIVILEGED OR PROTECTED INFORMATION

8.1    Nothing in this Protective Order shall require disclosure of information that is
protected by the attorney-client privilege, the work-product protection, or any other legally cognizable
privilege (a "Privilege or Protection").  If information subject to a claim of Privilege or Protection is
inadvertently produced, pursuant to Federal Rule of Evidence 502(d) such production shall not
constitute a waiver of, or estoppel as to, any claim of Privilege or Protection for such information or
any other information that may be protected from disclosure by a Privilege or Protection in any
proceeding.

8.2    If a Party receives a document that appears to be subject to a Privilege or Protection,
then it shall refrain from examining the document any more than is essential to ascertain if it is
privileged or protected and shall promptly notify the producing Party in writing that the receiving

Party possesses material that appears to be subject to a Privilege or Protection. The producing Party shall have seven (7) days after receiving such notice to assert a Privilege or Protection over the identified material. If the producing Party does not assert a claim of Privilege or Protection within the seven (7)-day period, the material in question shall be deemed not privileged or protected.

8.3    If a producing Party has produced a document subject to a claim of Privilege or Protection, upon written request by the producing Party, the document for which a claim of Privilege or Protection is made shall be sequestered or destroyed to the extent reasonably practicable, and the receiving Party shall not use the document for any purpose other than in connection with analyzing or disputing a claim of Privilege or Protection or in connection with a motion to compel the production of the document.

8.4    The receiving Party sequestering or destroying such material may then move the Court for an order compelling production of the material. The applicable producing Party bears the burden of establishing the applicable Privilege or Protection of any clawed-back document or information as and to the same extent that it would have borne such burden had it not produced the document or information.  Nothing in this Protective Order shall limit the Court's right or any receiving Party's right to request an in camera review of any information subject to a claim of Privilege or Protection.

###

Date: June 3, 2024

Scott C. Clarkson
United States Bankruptcy Judge

Exhibit 1
Page 29

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT "A"

1

Exhibit 1
Page 30

1   Christopher B. Ghio (State Bar No. 259094)
    Christopher Celentino (State Bar No. 131688)
2   Yosina M. Lissebeck (State Bar No. 201654)
    **DINSMORE & SHOHL LLP**
3   655 West Broadway, Suite 800
    San Diego, CA 92101
4   Telephone:  619.400.0500
    Facsimile:  619.400.0501
5   christopher.ghio@dinsmore.com
    christopher.celentino@dinsmore.com
6   yosina.lissebeck@dinsmore.com

7   Sarah S. Mattingly (Ky. Bar 94257)
    DINSMORE & SHOHL, LLP
8   101 S. Fifth Street, Suite 2500
    Louisville, KY 40202
9   Telephone: 859-425-1096
    Facsimile: 502-585-2207
10  Sarah.mattingly@dinsmore.com
    (Admitted pro hac vice)

11
    Special Counsel to Richard A. Marshack,
12  Chapter 11 Trustee

13

14                    **UNITED STATES BANKRUPTCY COURT**

15                    **CENTRAL DISTRICT OF CALIFORNIA**

16

17  In Re                                    Case No. 8:23-BK-10571-SC

18                                           Chapter 11

19  The Litigation Practice Group P.C.,      **EXHIBIT A TO STIPULATED
20                                           ORDER**
        Debtor(s),
21                                           Date:   May 23, 2024
22                                           Time:   1:30 p.m.
                                             Judge:  Hon. Scott C. Clarkson
23                                           Place:  Courtroom 5C[1] - Via Zoom
24                                                   411 W. Fourth Street
                                                     Santa Ana, CA  92701
25

26

27  ─────────────────────
    [1] Video and audio connection information for each hearing will be provided on Judge Clarkson's
28   publicly posted hearing calendar, which may be viewed online at:
     http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

                                      1                              Exhibit 1
                                                                     Page 31

1    This is to certify that:

2        (a)      I am being given access to Confidential Information pursuant to the

3    Stipulated Protective Order that was entered into the main bankruptcy case for

4    Litigation Practice Group, but which is binding and controlling as set forth by the

5    Court's Order on any and all contested matters and  any and all litigation commenced

6    by Trustee;

7        (b)      I have read the Stipulated Protective Order; and

8        (c)      I agree to be bound by the terms and conditions thereof, including,

9    without limitation, to the obligations regarding the use, non-disclosure and return of

10    such Confidential Information. I further agree that in addition to being contractually

11    bound by the Stipulated Protective Order, I am subject to the jurisdiction of the above

12    reference Court for any violation thereof.

13

14    Date: _____

15

16                                    _____

17                                        Signature

18

19                                    _____

20                                        Printed Name

21

22

23

24

25

26

27

28

# EXHIBIT 2

Exhibit 2
Page 33

# DIVERSE CAPITAL

**MERCHANT AGREEMENT**

Merchant Agreement, dated 07/21/2021 _____ (together with the Terms and Conditions attached hereto (the "Terms and Conditions") and the appendices attached hereto, and as amended, restated or otherwise modified from time to time, this "Agreement"), by and among Diverse Capital, LLC, a Connecticut limited liability company ("Company"), the merchant listed below (the "Merchant") and the individual guarantor(s) signatory hereto (each, a "Guarantor").

Merchant's Legal Name: THE LITIGATION PRACTICE GROUP PC

All other names (including any prior names, d/b/as and trade names) used by Merchant at any time: THE LITIGATION PRACTICE GROUP

Merchant's Chief Executive Office Address: 17542 17TH. STE 100

City: TUSTIN                                    State: CA                    Zip: 92780

Merchant's mailing address is same as address of chief executive office (if not checked, provide mailing address below)

Merchant's Mailing Address: 1351 CALLE AVANZADO, STE 4

City: SAN CLEMENTE                             State: CA                    Zip: 92673

Type of Entity of Merchant (circle one): ⦿Corporation ◯Limited Liability Company ◯Limited Liability Partnership ◯Limited Partnership ◯Sole Proprietor

Merchant's Federal EIN: ▇▇5343

## PURCHASE AND SALE OF FUTURE RECEIVABLES

In consideration of the Purchase Price specified below (the "Purchase Price"), Merchant hereby sells, assigns and transfers to Company (making Company the absolute owner thereof), a percentage specified as the Purchased Percentage below (the "Purchased Percentage") of all of Merchant's future accounts, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers' and/or other third party payors, including all payments made by cash, check, electronic transfer or other form of monetary payment in the ordinary course of the Merchant's business (the "Receipts"), for the payments due to Merchant as a result of Merchant's sale of goods and/or services (the "Transactions") until the Purchased Amount specified below (the "Purchased Amount") has been delivered by or on behalf of Merchant to Company.

Merchant is selling a portion of a future revenue stream to Company at a discount, not borrowing money from Company, therefore there is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by Company. The Remittance is a good faith estimate of (a) Purchased Percentage multiplied by (b) the daily average revenues of Merchant during the previous calendar month divided by (c) the number of Business Days (as defined in the Terms and Conditions) in such calendar month. Merchant going bankrupt or going out of business, or experiencing a slowdown in business, or a delay in collecting its receivables, in and of itself, does not constitute a breach of this Agreement. Company is entering this Agreement knowing the risks that Merchant's business may slow down or fail, and Company assumes these risks based on Merchant's representations, warranties and covenants in this Agreement, which are designed to give Company a reasonable and fair opportunity to receive the benefit of its bargain. Merchant and each Guarantor are only guaranteeing their performance of the terms of this Agreement, and are not guaranteeing the payment of the Purchased Amount. The initial Remittance shall be as described above. The Remittance is subject to adjustment as set forth in Section 1.3 of the Terms and Conditions.

Company will debit an amount equal to the Remittance specified below (the "Remittance") on each Business Day from only one depositing bank account, which account must be acceptable to, and pre-approved by, Company (the "Account") into which Merchant and Merchant's customers shall remit the Receipts from each Transaction, until such time as Company receives payment in full of the Purchased Amount. Merchant hereby authorizes Company to ACH debit the Remittance from the Account on a daily basis (other than on a day that is a legal holiday under the laws of the State of New York or the State of Connecticut or is a day on which banking institutions in such states are authorized or required by law to close). Company's payment of the Purchase Price shall be deemed the acceptance and performance by Company of this Agreement, Merchant understands that it is responsible for ensuring that the Remittance to be debited by Company remains in the Account and will be held responsible for any fees incurred by Company resulting from a rejected ACH attempt or an Event of Default (as defined in the Terms and Conditions). Company is not responsible for any overdrafts or rejected transactions that may result from Company's ACH debiting the Remittance under the terms of this Agreement. Notwithstanding anything to the contrary in this Agreement or any other agreement between Company and Merchant, upon the occurrence of an Event of Default, the Purchased Percentage shall equal 100%. All fees owed to Company by Merchant pursuant to this Agreement are contained in Appendix A attached hereto.

The obligation of Company to fund the Purchase Price hereunder is subject to Company receiving executed counterparts of each of the MCA Documents (as defined in the Terms and Conditions).

**PURCHASE PRICE¹:** $ 250,000.00    **PURCHASED PERCENTAGE:** 10%    **PURCHASED AMOUNT:** $ 374,750.00    **REMITTANCE:** $ 10,000.00

THE MERCHANT AGREEMENT TERMS AND CONDITIONS ATTACHED HERETO AND EACH OF THE APPENDICES ATTACHED HERETO ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS AGREEMENT.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

| MERCHANT | DIVERSE CAPITAL, LLC |
|---|---|
| (Print Legal Name of Merchant): DANIEL STEPHEN MARCH | |
| By: *Daniel Stephen March* 242CC5601A23474... | By: _____ |
| Name (Print Legal Name of Signatory): DANIEL STEPHEN MARCH | Name: _____ |
| Title (Print Title of Signatory): OWNER | Title: _____ |
| **GUARANTOR #1:** | **GUARANTOR #2** |
| (Print Legal Name of Guarantor #1): DANIEL STEPHEN MARCH | (Print Legal Name of Guarantor #2): _____ |
| *Daniel Stephen March* 242CC5601A23474... | _____ |

ANY MISREPRESENTATION BY MERCHANT OR ANY GUARANTOR IN CONNECTION WITH THIS AGREEMENT MAY CONSTITUTE A SEPARATE CAUSE OF ACTION FOR FRAUD OR INTENTIONAL MISREPRESENTATION.

¹ Less any applicable fees as set forth in Appendix A.

Exhibit 2
Page 34

**MERCHANT AGREEMENT TERMS AND CONDITIONS**

**1.    TERMS OF ENROLLMENT IN PROGRAM**

**1.1    Merchant Deposit Agreement and Processor**. Merchant shall (A) execute an agreement acceptable to Company with a bank acceptable to Company ("Bank") to obtain electronic fund transfer services for the Account, and (B) if applicable, execute an agreement acceptable to Company with a credit and debit card processor (the "Processor") instructing the Processor to deposit all Receipts into the Account. Merchant shall provide Company and/or its authorized agent(s) with all of the information, authorizations and passwords necessary for verifying Merchant's receivables, receipts, deposits and withdrawals into and from the Account. Merchant hereby authorizes Company and/or its agent(s) to withdraw from the Account via ACH debit the amounts owed to Company for the receipts as specified herein and to pay such amounts to Company. These authorizations apply not only to the approved Account but also to any subsequent or alternate account used by the Merchant for these deposits, whether pre-approved by Company or not. This additional authorization is not a waiver of Company's entitlement to declare this Agreement breached by Merchant as a result of its usage of an account which Company did not first pre-approve in writing prior to Merchant's usage thereof. The aforementioned authorizations shall be irrevocable without the written consent of Company.

**1.2    Term of Agreement**. This Agreement shall remain in full force and effect until the entire Purchased Amount and any other amounts due are received by Company as per the terms of this Agreement.

**1.3    Adjustments to the Remittance**. If an Event of Default has not occurred, once every two (2) calendar weeks after the funding of the Purchase Price to Merchant, Merchant may give notice to Company to request a change in the Remittance to more accurately reflect the Purchased Percentage of Receipts being collected by Merchant at that time. The amount shall be modified to more closely reflect the Merchant's actual receipts by multiplying the Merchant's actual receipts by the Purchased Percentage divided by the number of Business Days in the previous two (2) calendar weeks. Merchant shall provide Company with viewing access to its bank accounts, including the Account, as well as all information reasonably requested by Company to properly calculate the Merchant's Remittance. The adjusted Remittance will become the new daily Remittance until any subsequent adjustment.

**1.4    Financial Condition**. Merchant and Guarantor(s) authorize Company and its agents to investigate their financial responsibility and history, and will provide to Company any authorizations, bank or financial statements, tax returns, etc., as Company deems necessary in its sole and absolute discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable as an authorization for release of financial and credit information. Company is authorized to update such information and financial and credit profiles from time to time as it deems appropriate.

**1.5    Transactional History**. Merchant authorizes all of its banks, brokers and processors to provide Company with Merchant's banking, brokerage and/or processing history to determine qualification or continuation in this program and for collections purposes. Merchant shall provide Company with copies of any documents related to Merchant's card processing activity or financial and banking affairs within five (5) days after a request from Company.

**1.6    Indemnification**. Merchant and Guarantor(s) jointly and severally indemnify and hold harmless Processor, its officers, directors and shareholders against all fosses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by Processor resulting from (a) claims asserted by Company for monies owed to Company from Merchant and (b) actions taken by Processor in reliance upon any fraudulent, misleading or deceptive information or instructions provided by Company.

**1.7    No Liability**. In no event will Company be liable for any claims asserted by Merchant or Guarantors under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by each of Merchant and each Guarantor. In the event these claims are nonetheless raised, Merchant and Guarantor(s) will be jointly liable for all of Company's attorney's fees and expenses resulting therefrom.

**1.8    Reliance on Terms**. Section 1.1, 1.5, 1.6, 1.7 and 2.5 of this Agreement are agreed to for the benefit of Merchant, Company, Processor, and Bank and notwithstanding the fact that neither Processor nor Bank is a party to this Agreement, Processor and Bank may rely upon their terms and raise them as a defense in any action.

**1.9    Sale of Receipts (THIS IS NOT A LOAN)**. Merchant and Company agree that the Purchase Price (less the applicable fees agreed to herein) under this Agreement is in exchange for the Purchased Amount, and that such Purchase Price is not intended to be, nor shall it be construed as a loan from Company to Merchant, Merchant agrees that the Purchase Price is in exchange for the Receipts pursuant to this Agreement, and that it equals the fair market value of such Receipts. Company has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Payments made to Company in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services, and the payment thereby by Merchant's customers. In no event shall the aggregate of all amounts or any portion thereof be deemed as interest hereunder, and in the event it is found to be interest despite the parties hereto specifically representing that it is NOT interest, it shall be found that no sum charged or collected hereunder shall exceed the highest rate permissible at law. In the event that a court nonetheless determines that Company has charged or received interest hereunder in excess of the higher applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and Company shall promptly refund to Merchant any interest received by Company in excess of the maximum lawful rate, it being intended that Merchant not pay or contract

to pay, and that Company not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law. As a result thereof, Merchant knowingly and willingly waives the defense of usury in any action or proceeding. If, notwithstanding such intent, such transfer is not deemed to constitute a sale, Merchant hereby grants to Company a security interest in all right, title and interest of Merchant in and to the Receipts, which security interest shall secure the payment of the Purchased Amount and all other obligations of Merchant under this Agreement. Merchant hereby authorizes Company to file any financing statements deemed necessary or advisable by Company to perfect or maintain Company's interest in the Receipts.

**1.10    Power of Attorney**. Merchant irrevocably appoints Company as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to Company from Processor, or in the case of a violation by Merchant of Section 1 or the occurrence of an Event of Default under Section 3, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral (as defined in Section 5); (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to Company; and (v) to contact Merchant's banks and financial institutions using Merchant's and Guarantor(s)' personal information to verify the existence of an account and obtain account balances; (vi) to file any claims or take any action or institute any proceeding which Company may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount. In connection therewith, all costs, expenses and fees, including legal fees, shall be payable by and from Merchant, and Company is authorized to use Merchant's funds to pay for same; and (vii) Company shall have the right, without waiving any of its rights and remedies and without notice to Merchant or any Guarantor, to notify any credit card processor of the sale of future payment rights and re-direct the remittance of daily settlements to an account of Company's choosing in order to settle all obligations due to Company under this Agreement.

**1.11    Protections against Default**. The following Protections 1 through 7 may be invoked by Company immediately and without notice to Merchant in the event: (a) Merchant takes any action to discourage the use of electronic check processing that are settled through Processor, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks or other payments or deposits for the purchase of Merchant's services and products including but not limited to direct deposit of any checks into a bank account without scanning such checks into the Company electronic check processor; (b) Merchant changes its arrangements with Processor or the Bank in any way that is adverse or unacceptable to Company; (c) Merchant changes the electronic check processor through which the Receipts are settled from Processor to another electronic check processor, or permits any event to occur that could cause diversion of any of Merchant's check or deposit transactions to another processor; (d) Merchant intentionally interrupts the operation of its business transfers, moves, sells, disposes, or otherwise conveys its business and/or assets without the express prior written consent of Company; (e) Merchant takes any action, fails to take any action, or offers any incentive, economic or otherwise, the result of which will be to induce any customer or customers to pay for Merchant's services with any means other than payments, checks or deposits that are settled through Processor; or (f) Merchant fails to provide Company with copies of any documents related to Merchant's card processing activity or financial and banking affairs within five (5) days after a request from Company. These protections are in addition to any other remedies available to Company at law, in equity or otherwise pursuant to this Agreement.

**Protection 1**. The full uncollected Purchased Amount plus all fees (including reasonable attorney's fees and expenses) due under this Agreement and the other MCA Documents (as defined in Section 5) become due and payable in full immediately.

**Protection 2**. Company may enforce the provisions of the Guaranty (as defined in Section 5) against any Guarantor.



INITIALS

Exhibit 2
Page 35

**Protection 3.** Company may enforce its security interest in the Collateral in accordance with the Security Agreement (as defined in Section 5).

**Protection 4.** Company may proceed to protect and enforce its right and remedies by lawsuit. In any such lawsuit, if Company recovers a judgment against Merchant, Merchant shall be liable for all of Company's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs.

**Protection 5.** Merchant shall, upon execution of this Agreement, deliver to Company an executed assignment of lease of Merchant's business premises in favor of Company. Upon breach of any provision in this paragraph 1.10, Company may exercise its rights under such assignment without notice to Merchant.

**Protection 6.** Company may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on the Account or otherwise for all sums due to Company.

**1.12   Protection of Information.** Merchant and each Guarantor, in respect of himself or herself personally, authorizes Company to disclose information concerning Merchant's and such Guarantor's credit standing (including credit bureau reports that Company obtains) and business conduct only to agents, affiliates and credit reporting bureaus. Merchant and such Guarantor each hereby waives to the maximum extent permitted by law any claim for damages against Company or any of its agents or affiliates relating to any (i) investigation undertaken by or on behalf of Company as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**1.13   Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by Company, including this Agreement and any other Company documents (collectively, "Confidential Information") are proprietary and confidential information of Company. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information of Company to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such Confidential Information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this section. A breach hereof entitles Company to not only damages and reasonable attorney's fees but also to both a Temporary Restraining Order and a Preliminary Injunction without Bond or Security.

**1.14   Publicity.** Each of Merchant and each Guarantor hereby authorizes Company to use its, his or her name in listings of clients and in advertising and marketing materials.

**1.15   'D/B/A's.** Merchant hereby acknowledges and agrees that Company may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between Company and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**2.      REPRESENTATIONS, WARRANTIES AND COVENANTS**
Merchant represents warrants and covenants that, as of this date and during the term of this Agreement:

**2.1      Financial Condition and Financial information.** Merchant's and each Guarantor's bank and financial statements, copies of which have been furnished to Company, and future statements which will be furnished hereafter at the discretion of Company, fairly represent the financial condition of Merchant or such Guarantor, as applicable, as of such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant and Guarantor(s) have a continuing, affirmative obligation to advise Company of any material adverse change in their financial condition, operation or ownership. Company may request statements at any time during the performance of this Agreement and the Merchant and Guarantor(s) shall provide them to Company within five (5) Business Days after request from Company. Merchant's or Guarantor(s)' failure to do so is a material breach of this Agreement.

**2.2      Governmental Approvals.** Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.

**2.3      Authorization.** Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**2.4      Use of Funds.** Merchant agrees that it shall use the Purchase Price for business purposes and not for personal, family, or household purposes. Merchant will not, directly or through any of its subsidiaries, engage in the business of extending credit for the purpose of purchasing or carrying margin stock, and no proceeds of the Purchase Price will be used to purchase or carry margin stock.

**2.5      Electronic Check Processing Agreement.** Merchant will not change its Processor, add terminals, change its financial institution or bank account(s) (including the Account) or take any other action that could have any adverse effect upon Merchant's obligations under this Agreement, without Company's prior written consent. Any such changes shall be a material breach of this Agreement.

**2.6      Change of Name or Location.** Merchant will not conduct Merchant's businesses under any name other than as disclosed to the Processor and Company, nor shall Merchant change any of its places of business without prior written consent by Company.

**2.7      Daily Batch Out.** Merchant will batch out receipts with the Processor on a daily basis if applicable.

**2.8      Estoppel Certificate.** Merchant will at every and all times, and from time to time, upon at least one (1) day's prior notice from Company to Merchant, execute, acknowledge and deliver to Company and/or to any other person, firm or corporation specified by Company, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion thereof has been repaid.

**2.9      No Bankruptcy.** As of the date of this Agreement, Merchant is not insolvent and does not contemplate filing for bankruptcy in the next six (6) months and has not consulted with a bankruptcy attorney or filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Merchant. Merchant further represents and warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

**2.10  Unencumbered Receipts.** Merchant has good, complete, unencumbered and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of Company.

**2.11  Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates.

**2.12  Defaults under Other Contracts.** Merchant's execution of, and/or performance under, this Agreement will not cause or create an event of default by Merchant under any contract with another person or entity.

**2.13  Good Faith.** Each of Merchant and each Guarantor hereby affirms that Merchant is receiving the Purchase Price and selling Company the Purchased Amount in good faith and will use the Purchase Price funds in accordance with Section 2.4.

**3.      EVENTS OF DEFAULT AND REMEDIES**
**3.1      Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" hereunder:

(a)      Merchant or any Guarantor shall violate any term or covenant in this Agreement or any other MCA Document;

(b)      Merchant fails to pay (or cause to be paid) any fees described on Appendix A attached hereto when and as required to be paid as described therein;

(c)      any representation or warranty by Merchant in this Agreement or any other MCA Document shall prove to have been incorrect, false or misleading in any material respect when made;

(d)      the sending of notice of termination by Merchant or notifying Company verbally or in writing of its intent to breach this Agreement;

(e)      the Merchant fails to give Company 24 hours' advance notice that there will be insufficient funds in the Account such that the ACH of the Remittance amount will not be honored by Bank, and the Merchant fails to supply all requested documentation and allow for daily and/or real time monitoring of its bank accounts (including the Account);

(f)      Merchant shall enter into any financing agreements with any other party including but not limited to: loans, merchant cash advances, receivables financing, factoring, or any other agreement that will increase the total debt or merchant cash advances owed by Merchant to any party other than Company.

(g)      Merchant shall transfer or sell all or substantially all of its assets;

(h)      Merchant shall make or send notice of any intended bulk sale or transfer by Merchant;

(i)      Merchant shall use multiple depository accounts without the prior written consent of Company;

(j)      Merchant shall change the Bank Account without the prior written consent of Company;

(k)      Merchant shall close the Bank Account without the prior written consent of Company;

(l)      Merchant fails to provide timely notice to Company such that in any given calendar month, there are two or more ACH transactions attempted by Company that are rejected by Merchant's bank;

(m)      Merchant shall default under any of the terms, covenants and conditions of any other agreement with Company.



INITIALS

DocuSign Envelope ID: 67A61E43-BD1E-4D78-AC4E-50EE29E20E7D

**3.2** **Remedies**. In case any Event of Default occurs and is not waived pursuant to Section 4.5. hereof, Company may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Merchant's obligations hereunder (including the Guaranty) or any other legal or equitable right or remedy. All rights, powers and remedies of Company in connection with this Agreement may be exercised at any time by Company after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

**3.3** **Costs**. Merchant shall pay to Company all reasonable costs associated with (a) an Event or Default, (b) breach by Merchant of the covenants in this Agreement and the enforcement thereof, and (c) the enforcement of Company's remedies set forth in this Agreement, including but not limited to court costs and attorneys' fees.

**3.4** **Required Notifications**. Merchant is required to give Company written notice within 24 hours of any filing under Title 11 of the United States Code. Merchant is required to give Company seven (7) days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or stock.

**4.** **MISCELLANEOUS**

**4.1** **Modifications; Agreements**. No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by Company.

**4.2** **Assignment**. Company may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part, including by assigning, transferring or selling a participation in the Purchased Amount. Merchant acknowledges that, if any such assignment is made, persons other than Company may have the right to exercise rights or remedies against Merchant pursuant to this Agreement. Merchant shall not have, and no Guarantor shall have, the right to assign its rights and/or obligations under this Agreement and/or the other MCA Documents or any interest herein or therein without the prior written consent of Company, which consent may be withheld in Company's sole discretion.

**4.3** **Negative Pledge**. Each of Merchant and each Guarantor agrees not to create, incur, assume, or permit to exist, directly or indirectly, any additional cash advances, loans, lien or other encumbrance on or with respect to any of the Collateral, as applicable, without written permission of Company.

**4.4** **Notices**. All notices, requests, consents, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement. Notices to Company shall become effective only upon receipt by Company. Notices to Merchant shall become effective three (3) days after mailing.

**4.5** **Waiver Remedies**. No failure on the part of Company to exercise, and no delay in exercising any right under this Agreement shall operate as a waiver hereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the' exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**4.6** **Binding Effect; Governing Law, Venue and Jurisdiction**. This Agreement shall be binding upon and inure to the benefit of Merchant, Company and their respective successors and assigns, except that Merchant shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of Company, which consent may be withheld in Company's sole discretion. Company reserves the rights to assign this Agreement pursuant to Section 4.2 with or without prior written notice to Merchant. This Agreement shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Except required to enforce a security interest or otherwise required by applicable law, any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall be instituted in any court sitting in New York, or Connecticut to the exclusion of all other forums (the "Acceptable Forums"). Merchant agrees that the Acceptable Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant waives any right to oppose any motion or application made by Company to transfer such proceeding to an Acceptable Forum.

**4.7** **Survival of Representation, etc.** All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

**4.8** **Interpretation**. All parties hereto have reviewed this Agreement with attorneys of their own choosing and have relied only on their own attorneys' guidance and advice. No construction determinations shall be made against either party hereto as drafter.

**4.9** **Severability**. In case any of the provisions in this Agreement are found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired. Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof.

**4.10** **Entire Agreement**. This Agreement and the other MCA Documents embody the entire agreement among Merchant, each Guarantor and Company and supersede all prior agreements and understandings relating to the subject matter hereof.

**4.11** **JURY TRIAL WAIVER**. THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OR THE ENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVE KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR RESPECTIVE ATTORNEYS.

**4.12** **CLASS ACTION WAIVER**. THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**4.13** **Counterparts & Digital Acceptance**. This Agreement and the other MCA Documents may be executed in multiple counterparts, each of which shall be deemed an original provided all parties have executed a counterpart of this Agreement, and all such counterparts shall together constitute one and the same instrument. Any signature delivered by a party hereto by facsimile transmission, e-mail or other electronic means will be deemed to be an original signature. [The parties hereto consent and agree that use of a key pad, mouse or other device to select an item, button, icon or similar act or action while using any electronic service in executing this Agreement or the other MCA Documents  constitutes a valid and enforceable signature, acceptance and agreement as if actually signed in writing. Further, the parties hereto agree that no certification authority or other third-party verification is necessary to the validity of an electronic signature and that the lack of such certification or third-party verification will not in any way affect the enforceability of the signature or any resulting contract among the parties hereto.]

**4.14** **Headings**.  The headings used in this Agreement will be used only for the purpose of reference and shall not be deemed to govern, limit, modify or in any other manner affect the scope, meaning or intent of the provisions of this Agreement or be given any legal effect whatsoever.

**4.15** **Service of Process**. In addition to the methods of service allowed by the New York State Civil Practice Law & Rules ("CPLR"), Merchant and all Guarantors hereby expressly consent to service of process upon it by registered or certified mail, return receipt requested. Service hereunder shall be complete upon Merchant (or, where applicable, Guarantors') actual receipt of process or upon Company's receipt of the return thereof by the United States Postal Services as *Refused* or *Undeliverable*. Merchant and Guarantors must promptly notify Company, in writing, of each and every change of address to which service of process can be made. Service upon the last known address shall be sufficient. Merchant and Guarantors shall have thirty (30) calendar days after service hereunder is complete in which to respond. Furthermore, Merchant and Guarantors expressly consent that any and all notices, demands, requests or other communications under and pursuant to this Agreement for the Purchase and Sale of Future Receivables shall be delivered in accordance with the provisions of this Agreement for the Purchase and Sale of Future Receivables.

**4.16** **Commercial Waiver.**  The parties acknowledge that the transaction of which this agreement is a part is a commercial transaction as defined by Connecticut Law. By signing this agreement you agree to be personally liable for all charges incurred on this account and you further waive your right to and/or your company's right to notice and hearing in any civil collection action seeking a prejudgment remedy or attachment as outlined in Connecticut General Statutes Sections 52-278a to 52-278f. Further, you agree that upon default of this agreement, you waive all rights to request that the purchaser hereof post a bond, with or without surety, to protect said merchant or guarantor against damages that may be caused by any prejudgment remedy sought or obtained by the purchaser hereof. You agree to be liable for costs of collection and reasonable attorneys fees in any such action.

**5.** **DEFINED TERMS**

**5.1**  As used herein the following terms have the following meanings:

"ACH Form" means any one or more ACH authorization forms delivered by or on behalf of Merchant or any Guarantor regarding the Account for the benefit of Company.]

"Affidavit" means any one or more affidavits of confession of judgement signed by or on behalf of Merchant or any Guarantor with respect for the benefit of Company.

["Balance Transfer Form" means any one or more balance transfer forms delivered by or on behalf of Merchant or any Guarantor regarding the Account for the benefit of Company.]

"Business Day" means any day that is not a Saturday, Sunday or other day that is a legal holiday under the laws of the State of New York or the State of Connecticut or is a day on which banking institutions in such states are authorized or required by law to close.

"Collateral" has the meaning ascribed to such term in the Security Agreement.

"Guaranty" means that certain Guaranty of Performance, dated as of the date hereof, by and among Company, Merchant and each Guarantor, as may be amended, restated or otherwise modified from time to time

"MCA Documents" means this Merchant Agreement, the Security Agreement, the Guaranty, [the ACH Form,] the Balance Transfer Form and the Affidavit.

"Security Agreement" means that certain Security Agreement, dated as of the date hereof, by and among Company, Merchant and each Guarantor, as may be amended, restated or otherwise modified from time to time.



INITIALS

4

Exhibit 2
Page 37

DocuSign Envelope ID: 67A61E43-BD1E-4D78-AC4E-50EE29E28CE7D

# DIVERSE CAPITAL

## MERCHANT AGREEMENT APPENDIX A:

## FEE STRUCTURE

Reference is made to that certain Merchant Agreement, dated as of __07/21/2021__ (together with the Merchant Agreement Terms and Conditions attached thereto and the appendices attached thereto, and as may be amended, restated or otherwise modified from time to time, the "Merchant Agreement"), by and among Diverse Capital, LLC, a Connecticut limited liability company ("Company"), THE LITIGATION PRACTICE GROUP PC ("Merchant") and the Guarantor(s) party thereto, to which this Appendix A is attached. Capitalized terms used but not defined in this Appendix A shall have the respective meanings set forth in the Merchant Agreement.

A.  Origination Fee:  $295.00 to cover cost of origination.

B.  Brokerage and Underwriting Fee:  An amount equal to the greater of (i) $499.00 and (ii) 12% of the Purchased Amount to cover underwriting and related expenses. This fee is deemed earned upon Merchant signing the Merchant Agreement. If for whatever reason, Company determines, in its sole discretion, to cancel the deal, Merchant agrees that Company may withdraw this non-refundable brokerage and underwriting fee.

C.  NSF Fee:  $50.00 each instance in which Bank returns a code of "NSF."

D.  Default Fee:  $5,000.00 when Merchant breaches any material terms of the Merchant Agreement.

E.  Blocked Account Fee:  $5,000.00 when Merchant breaches the Merchant Agreement by placing a stop-payment on Company's ACH or closes the Account.

F.  Bank Change Fee:  $50.00 when Merchant requires a change of the Account, requiring Company to adjust its system and records.

G.  Wire Fee:  Merchant shall receive the Purchase Price electronically in its designated bank account and will be charged $50.00 for a Fed Wire or $0.00 for a bank ACH, as applicable.

H.  ACH Program Fee:  $299.00 per month for the duration of the Merchant Agreement. See Appendix E.

I.  Stacking Fee:  An amount equal to [the greater of (i) 10% of outstanding Purchased Amount or (ii) $25,000]. Additionally, in accordance with Appendix D to this Merchant Agreement, taking on additional financing will be deemed a breach of this Merchant Agreement, upon which Company may invoke all of its rights per the terms of the MCA Documents.

J.  UCC Fee:  $195.00.

K.  Miscellaneous Service Fees:  Merchant agrees that it shall pay for certain services related to the transactions under and in connection with the Merchant Agreement.

Acknowledged and Agreed:

**MERCHANT**
(Print Legal Name of Merchant):  DANIEL STEPHEN MARCH

By:  *DANIEL STEPHEN MARCH*
242CC5601A23474...   DANIEL STEPHEN MARCH
Name (Print Legal Name of Signatory):  DANIEL STEPHEN MARCH

Title (Print Title of Signatory): OWNER

Exhibit 2
Page 38

# DIVERSE
## CAPITAL

Appendix B:

**AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT) AND DIRECT PAYMENTS (ACH DEBITS)**

**DEFINITIONS**:

**Company**:    Diverse Capital, LLC, a Connecticut limited liability company

**Merchant**: THE LITIGATION PRACTICE GROUP PC
_____
(Merchant's Legal Name)

**Merchant Agreement**:  Merchant Agreement, dated as of 07/21/2021, by and among Company, Merchant and the Guarantor(s) party thereto, to which this Appendix B is attached (together with the Merchant Agreement Terms and Conditions attached thereto and the other appendices attached thereto, and as may be amended, restated or otherwise modified from time to time,).

**Designated Checking Account**:

**Bank Name:**    Chase _____        **Branch:**_____

**Tax ID:**_____

**ABA:  Routing:**    322271627 _____        **DDA:  Accounting:**_____3588_____

Capitalized terms used but not defined in this Appendix B shall have the respective meanings set forth in the Merchant Agreement.

By signing below, Merchant attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes. **This Appendix B is part of (and incorporated by reference into) the Merchant Agreement. Merchant should keep a copy of this important legal document for Merchant's records.**

DISBURSEMENT OF ADVANCE PROCEEDS. By signing below, Merchant authorizes Company to disburse an amount equal to (i) the Purchase Price less (ii) the amount of any applicable fees upon Company's approval of the purchase of the Receipts by initiating ACH credits to the Account, in the amounts and at the times specified in the Merchant Agreement. **By signing below, Merchant also authorizes Company to collect amounts due from Merchant under the Merchant Agreement by initiating ACH debits to the Account, as follows:**

**In the Amount of**: $ $ 10,000.00 _____Daily

(or) Percentage of each Banking Deposit:_____%

On the Following Days (each, a "Payment Date"):M-F_____

If any Payment Date falls on a Business Day in which the Merchant's Bank is closed, Merchant understands and agrees that the payment may be executed on the next Business Day for which the Merchant's Bank is open. If a payment is rejected by Bank for any reason, including without limitation insufficient funds, Merchant understands that Company may, at its discretion, attempt to process the payment again as permitted under applicable ACH rules. Merchant also authorizes Company to initiate ACH entries to correct any erroneous payment transaction.

**MISCELLANEOUS**. Company is not responsible for any fees charged by Bank as the result of credits or debits initiated under this Appendix B. The origination of ACH debits and credits to the Designated Checking Account must comply with applicable provisions of state and federal law, and the rules and operating guidelines of NACHA (formerly known as the National Automated Clearing House Association).

This Appendix B is to remain in full force and effect until Company has received written notification from Merchant at the address set forth below at least five (5) Business Days prior to its termination to afford Company a reasonable opportunity to act on it. The individual signing below on behalf of Merchant certifies that he/she is an authorized signer on the Account. Merchant will not dispute any ACH transaction initiated pursuant to this Appendix B, provided the transaction corresponds to the terms of this Appendix B. Merchant requests that Bank honor all ACH entries initiated in accordance with this Appendix B.

**MERCHANT**
(Print Legal Name of Merchant):    DANIEL STEPHEN MARCH

By: DANIEL STEPHEN MARCH
    242CC5601A23474...
Name (Print Legal Name of Signatory): DANIEL STEPHEN MARCH
Title (Print Title of Signatory): OWNER

Exhibit 2
Page 39

# DIVERSE CAPITAL

### Appendix C:

### Bank Portal Information

Thank you for accepting an offer from Diverse Capital, LLC, a Connecticut limited liability company. We are looking forward to building a relationship with your business that allows you to reach and exceed your goals. Please note that prior to funding your account, our Underwriting Department needs to see the most recent balance and activity information in real-time as a fraud countermeasure and in order to ensure the health of your business aligns with the terms of your offer. For your convenience, we have three secure options for you to choose from to complete this step. After being completed and executed, please e-mail this Appendix C to your funding specialist.

**Please provide information required for read-only access\* to your business account**.

*\*Be sure to indicate capital or lower case letters*.

**Bank Portal Website:** _____ www.chase.com _____

**Username:** _____ mallorymcc1 _____

**Password:** _____ Mallorymay1; _____

**Security Question/Answer 1:** _____

**Security Question/Answer 2:** _____

**Security Question/Answer 3:** _____

**Any other information necessary to access your account:** _____

_____



INITIALS

Exhibit 2
Page 40

DocuSign Envelope ID: 67A61E43-BD1E-4D78-AC4E-50EE20E2CE7D



# DIVERSE CAPITAL

**Appendix D:**

## NO STACKING ADDENDUM

Reference is made to that certain Merchant Agreement, dated as of ___07/21/2021___ (together with the Merchant Agreement Terms and Conditions attached thereto and the appendices attached thereto, and as may be amended, restated or otherwise modified from time to time, the "Merchant Agreement"), by and among Diverse Capital, LLC, a Connecticut limited liability company ("Company"), __THE LITIGATION PRACTICE GROUP PC__ ("Merchant") and the Guarantor(s) party thereto, to which this Appendix D is attached. Capitalized terms used but not defined in this Appendix D shall have the respective meanings set forth in the Merchant Agreement.

This Appendix D is to certify that Merchant is prohibited from initiating a cash advance or any loan products with any party other than Company. Doing so will place Merchant in a breach of contract, and Merchant will be liable for the entire amount owed to Company immediately, plus attorneys' fees, costs, liquidated damages and a default fee in an amount equal to [the greater of (i) $2,500 and (ii) 20% of the Purchased Amount].

Amounts received from any merchant cash advances received from a party other than Company subsequent to the date of the Merchant Agreement will be subject to collections Company to satisfy the outstanding account balance under the Merchant Agreement.

By its signature below, Merchant agrees to be bound by this Appendix D.

---

This authorization is to remain in full force and effect until Company receives written notification from the Merchant of its termination in such time and in such manner to afford Company reasonable opportunity to act on it. Revocation of this authorization prior to remittance of the balance owed pursuant to the MCA Documents shall constitute breach thereunder.

**MERCHANT**
(Print Legal Name of Merchant): DANIEL STEPHEN MARCH

By: _DANIEL STEPHEN MARCH_
242CC5601A23474...

Name (Print Legal Name of Signatory): DANIEL STEPHEN MARCH
Title (Print Title of Signatory): OWNER

Exhibit 2
Page 41

DocuSign Envelope ID: 67A61E43-BD1E-4D78-AC4E-50EE29E2CE7D



**DIVERSE
CAPITAL**

**Appendix E:**

### FUNDERSLINK ADDENDUM

This Appendix E is entered on __07/21/2021__, by and among Diverse Capital, LLC, a Connecticut limited liability company ("Company"), DANIEL STEPHEN MARCH ("Merchant") and Funderslink, LLC, a [_____] limited liability company ("Funderslink").

Should any terms of this Appendix E conflict with the Merchant Agreement dated as of the date hereof (together with the Merchant Agreement Terms and Conditions attached thereto and the appendices attached thereto, and as may be amended, restated or otherwise modified from time to time, the "Merchant Agreement"), by and among Company, Merchant and the Guarantor(s) party thereto, to which this Appendix E is attached, the terms of this Appendix E shall govern and be controlling. Capitalized terms used herein, but not otherwise defined, shall have the same definition as in the Merchant Agreement.

Merchant represents and warrants that it understands that Company must engage a third-party, namely Funderslink, to manage the ACH withdrawals, reporting and deal tracking. For this service, Merchant agrees to pay Funderslink a nominal fee of $299.00 per month. This amount is due on the first day of the Merchant Agreement and every subsequent thirty days until the Purchased Amount is paid in full to Company.

IN WITNESS WHEREOF, the parties hereto have caused this Appendix E to be duly executed as of the date first above written.

**MERCHANT**
(Print Legal Name of Merchant): __DANIEL STEPHEN MARCH__

By: __DANIEL STEPHEN MARCH__
242CC5601A23474...

Name (Print Legal Name of Signatory): __DANIEL STEPHEN MARCH__

Title (Print Title of Signatory): __OWNER__

**DIVERSE CAPITAL, LLC**

By: _____

Name: _____

Title: _____

**FUNDERSLINK, LLC**

By: _____

Name: _____

Title: _____

Exhibit 2
Page 42

# DIVERSE CAPITAL

**SECURITY AGREEMENT**

Security Agreement, dated <u>07/21/2021</u> (as may be amended, restated or otherwise modified from time to time, this "**Agreement**"), by and among Diverse Capital, LLC, a Connecticut limited liability company ("**Company**"), the merchant listed below (the "**Merchant**") and the individual guarantor(s) signatory hereto (each, a "**Guarantor**").

Merchant's Legal Name: <u>THE LITIGATION PRACTICE GROUP PC</u>

Merchant's Chief Executive Office Address: <u>17542 17TH. STE 100</u>

City: <u>TUSTIN</u>                State: <u>CA</u>        Zip: <u>92780</u>

Merchant's Federal EIN: ███5343

**1.**   Company, Merchant and each Guarantor are parties to that certain Merchant Agreement, dated as of the date hereof (together with the Merchant Agreement Terms and Conditions attached thereto and the appendices attached thereto, and as may be amended, restated or otherwise modified from time to time, the "Merchant Agreement"), pursuant to which COMPANY agreed to purchase the Merchant's Receipts (as defined therein) in exchange for the Purchase Price (as defined therein). Capitalized terms used but not defined in this Agreement shall have the respective meanings set forth in the Merchant Agreement.

**2.**   The obligation of Company to fund the Purchase Price under the Merchant Agreement is conditioned upon, among other things, the execution and delivery of this Agreement by Merchant and each Guarantor. Each Guarantor is an affiliate of Merchant, will derive substantial benefits from the sale of the Receipts pursuant to the Merchant Agreement and is willing to execute and deliver this Agreement in order to induce COMPANY to purchase such Receipts.

**3.**   This Agreement will constitute a security agreement under the UCC (as defined below). Each of Merchant and each Guarantor grants to Company a security interest in and lien upon: (a) all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are each defined in Article 9 of the Uniform Commercial Code in effect in any applicable jurisdiction and as may be amended from time to time (the "UCC"), now or hereafter owned or acquired by Merchant or such Guarantor, (b) all funds at any time in the Account, regardless of the source of such funds, (c) present and future electronic check transactions and (d) all proceeds of the foregoing, as that term is defined in Article 9 of the UCC (collectively, and together with any Cross-Collateral (as defined below), the "Collateral"). Merchant agrees to provide other security to Company upon request to secure Merchant's obligations under this Agreement. These security interests and liens will secure all of Merchant's payment and performance obligations under the MCA Documents and each Guarantor's payment and performance obligations under the MCA Documents. Company is authorized to file any and all notices or filings it deems necessary or appropriate to enforce its entitlements hereunder.

**4.**   This security interest may be exercised by Company without notice or demand of any kind by making an immediate withdrawal or freezing the Collateral. Company shall have the right to notify account debtors at any time. [Pursuant to Article 9 of the UCC, Company has control over and may direct the disposition of the Collateral, without further consent of Merchant.] Merchant hereby represents and warrants that no other person or entity has a security interest in the Collateral.

**5.**   With respect to such security interests and liens, Company will have all rights afforded under the UCC, any other applicable law and in equity. Merchant will obtain from Company written consent prior to granting a security interest of any kind in the Collateral to a third party. Each of Merchant and each Guarantor agrees to execute and deliver to Company such instruments and documents Company may reasonably request to perfect and confirm the lien, security interest and right of setoff set forth in this Agreement. Company is authorized to execute all such instruments and documents in Merchant's and Guarantor(s) name.

**6.**   Each of Merchant and each Guarantor acknowledges and agrees that any security interest granted to Company under any other agreement between Merchant or such Guarantor and Company (the "Cross-Collateral") will secure the obligations hereunder and under the Merchant Agreement. Each of Merchant and each Guarantor agrees to execute any documents or take any action in connection with this Agreement as Company deems necessary to perfect or maintain Company's first priority security interest in the Collateral, including the execution of any account control agreements. Each of Merchant and each Guarantor hereby authorizes Company to file any financing statements deemed necessary by Company to perfect or maintain Company's security interest. Merchant and Guarantor(s) shall be liable for, and Company may charge and collect, all costs and expenses, including but not limited to attorney's fees, which may be incurred by Company in protecting, preserving and enforcing Company's security interest and rights.

**7.**   Each of Merchant and each Guarantor agrees not to create, incur, assume, or permit to exist, directly or indirectly, any additional cash advances, loans, lien or other encumbrance on or with respect to any of the Collateral, as applicable, without written permission of Company.

**8.**   The provisions in Section 4 of the Merchant Agreement are hereby incorporated by reference as if fully stated herein and shall apply to this Agreement, *mutatis mutandis*.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**MERCHANT**
(Print Legal Name of Merchant): DANIEL STEPHEN MARCH



By: DANIEL STEPHEN MARCH
242CC5601A23474...

Name (Print Legal Name of Signatory): DANIEL STEPHEN MARCH

Title (Print Title of Signatory): OWNER

**GUARANTOR #1:**
(Print Legal Name of Guarantor #1):
DANIEL STEPHEN MARCH



DANIEL STEPHEN MARCH
242CC5601A23474...

**GUARANTOR #2**
(Print Legal Name of Guarantor #2): _____

_____

**DIVERSE CAPITAL, LLC**

By: _____

Name: _____

Title: _____

THE TERMS, DEFINITIONS, CONDITIONS, AND INFORMATION SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE "TERMS AND CONDITIONS" THERETO, ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS AGREEMENT.

Exhibit 2
Page 43

# DIVERSE CAPITAL

**Guaranty of Performance**

**Guaranty of Performance**, dated 07/21/2021 **(as may be amended, restated or otherwise modified from time to time, this "Guaranty"), by and among Diverse Capital, LLC, a Connecticut limited liability company ("Company"), the merchant listed below (the "Merchant") and the individual guarantor(s) signatory hereto (each, a "Guarantor").**

**Merchant's Legal Name:** THE LITIGATION PRACTICE GROUP PC

**Merchant's Chief Executive Office Address:** 17542 17TH. STE 100

**City:** TUSTIN          **State:** CA          **Zip:** 92780

**Merchant's Federal EIN:** ■5343

**1.** Company, Merchant and each Guarantor are parties to that certain Merchant Agreement, dated as of the date hereof (together with the Merchant Agreement Terms and Conditions attached hereto and the appendices attached thereto, and as may be amended, restated or otherwise modified from time to time, the "Merchant Agreement"), pursuant to which COMPANY agreed to purchase the Merchant's Receipts (as defined therein) in exchange for the Purchase Price (as defined therein). Capitalized terms used but not defined in this Guaranty shall have the respective meanings set forth in the Merchant Agreement.

**2.** The obligation of Company to fund the Purchase Price under the Merchant Agreement is conditioned upon, among other things, the execution and delivery of this Guaranty by Merchant and each Guarantor. Each Guarantor is an affiliate of Merchant, will derive substantial benefits from the sale of the Receipts pursuant to the Merchant Agreement and is willing to execute and deliver this Guaranty in order to induce COMPANY to purchase such Receipts.

**3.** Each Guarantor jointly and severally guarantees Merchant's good faith, truthfulness and performance of all of the representations, warranties and covenants made by Merchant in each MCA Document as each may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations"). Each of Guarantor's obligations are due at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in the Merchant Agreement or in any other MCA Document or upon the occurrence of an Event of Default.

**4.** Company does not have to notify any Guarantor of any of the following events and no Guarantor will be released from its obligations under this Guaranty if it is not notified of:  (i) Merchant's failure to pay timely any amount required under the Merchant Agreement or any other MCA Document; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any Collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; (iv) Company's acceptance of the MCA Documents; and (v) any renewal, extension or other modification of the Merchant Agreement, any other MCA Document or Merchant's other obligations to Company. In addition, Company may take any of the following actions without releasing Guarantor from any of its obligations under this Guaranty:  (i) renew, extend or otherwise modify the Merchant Agreement, any other MCA Document or Merchant's other obligations to Company; (ii) release Merchant from its obligations to Company; (iii) sell, release, impair, waive or otherwise fail to realize upon any Collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; and (iv) foreclose on any Collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under any of the MCA Documents. Until the Purchased Amount and Merchant's other obligations to Company under the Merchant Agreement and the other MCA Documents are paid in full, Guarantor shall not seek reimbursement from Merchant or any other guarantor for any amounts paid by it under this Guaranty or any other MCA Document. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other guarantor, or any Collateral provided by Merchant or any other guarantor, for any amounts paid by it, or acts performed by it, under this Guaranty or any other MCA Document:  (I) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution.  In the event that Company must return any amount paid by Merchant or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations under this Guaranty and the other MCA Documents shall include that amount.

**5.** Each Guarantor acknowledges that:  (i) he/she is bound by the Class Action Waiver contained in Section 4.12 of the Merchant Agreement; (ii) he/she understands the seriousness of the provisions of this Guaranty and the other MCA Documents; (iii) he/she has had a full opportunity to consult with counsel of his/her choice; and (iv) he/she has consulted with counsel of his/her choice or has decided not to avail himself/herself of that opportunity.

**6.** Section 4 of the Merchant Agreement are hereby incorporated by reference as if fully stated herein and shall apply to this Guaranty, *mutatis mutandis*.

IN WITNESS WHEREOF, the parties hereto have caused this Guaranty to be duly executed as of the date first above written.

**MERCHANT**
(Print Legal Name of Merchant):  DANIEL STEPHEN MARCH

By:  _DANIEL STEPHEN MARCH_
242CC5601A23474...

Name (Print Legal Name of Signatory):  DANIEL STEPHEN MARCH

Title (Print Title of Signatory): OWNER

**GUARANTOR #1:**
(Print Legal Name of Guarantor #1):
DANIEL STEPHEN MARCH

_DANIEL STEPHEN MARCH_
242CC5601A23474...

Driver's License Number: _____

Social Security Number: 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

**GUARANTOR #2**
(Print Legal Name of Guarantor #2): _____

Driver's License Number: _____

Social Security Number: _____

**DIVERSE CAPITAL, LLC**

By: _____

Name: _____

Title: _____

THE TERMS, DEFINITIONS, CONDITIONS, AND INFORMATION SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE "TERMS AND CONDITIONS" ATTACHED THERETO, ARE HEREBAY INCORPORATED IN AND MADE A PART OF THIS GUARANTY.

Exhibit 2
Page 44

## ACH AUTHORIZATION FORM
*All information on this form is required unless otherwise noted.*

**BUSINESS AYTHORIZED TO DEBIT/CREDIT ACCOUNT**

| | |
|---|---|
| Authorized Business Name | Authorized Business Phone Number |

Authorized Business Address          City          State          Zip

**ACCOUNT HOLDER INFORMATION**

THE LITIGATION PRACTICE GROUP PC

Account Holder First Name          Account Holder Last Name          Account Holder DBA Name (If Business Account)          Phone Number

Account Holder Address

**ACCOUNT HOLDER BANK INFORMATION**

# DANIEL STEPHEN MARCH

Account Holder Fist Name          Branch City          State          Zip

How to find your Routing and Account Numbers on a check

Bank Routing Code          Bank Account Number          Business Checking          Personal Checking          Savings

Bank Routing Number (9 digits)          Bank Account Number

**TRANSACTION INFORMATION**

Goods Purchased/Services Rendered

| On time          Recurring |
| Rate_____ |
| No. of Transactions_____    Or Open Ended |

Amount of Transaction          Effective Date

**AUTHORIZATION**

In exchange for products and/or services listed above the undersigned hereby authorizes:

To electronically draft via Automated Clearing House system the amounts indicated above from the account identified above. This authority will continue until withdrawn in writhing by the above-listed account holder. The undersigned individual hereby certifies that he/she is duly authorized to execute this form on behalf of the above-listed account holder. The above-listed account holder acknowledges that it is subject a $25 reject fee if items are returned for insufficient funds.

Account Holder:

By: *DANIEL STEPHEN MARCH*
Signature of Account Holder

DANIEL STEPHEN          MARCH          OWNER          07/21/2021
First Name of Account Holder          Last Name of Account Holder          Title of Account Holder          Date

Exhibit 2
Page 45

# DIVERSE CAPITAL

### BALANCE TRANSFER FORM

| | |
|---|---|
| **Merchant Legal Name ("Merchant"):** | THE LITIGATION PRACTICE GROUP PC |
| **Name of Authorized Officer of Merchant ("Authorized Officer"):** | DANIEL STEPHEN MARCH |
| **Title of Authorized Officer:** | |
| **DBA:** | THE LITIGATION PRACTICE GROUP |
| **Physical Address:** | 17542 17TH. STE 100 |
| **City:** | TUSTIN |
| **State:** | CA |
| **Zip Code:** | 92780 |
| **Date:** | 07/21/2021 |
| **Transferee:** | Diverse Capital, LLC, a Connecticut limited liability company ("Company") |
| **Address of Transferee:** | 750 Main Street Suite 906, Hartford CT 06103 |
| **[Date of previous secured agreement:]** | 4/15/2021 |
| **Remaining [RTR Concern]:** | $122,230.00 |

To Whom It May Concern:

[I, Authorized Officer, on behalf of Merchant, hereby authorize Company to debit the remaining RTR balance which is currently due and owing to Company pursuant to the previous Merchant Agreement, entered into by and among Company, Merchant and the Guarantor(s) party thereto.

I acknowledge that as a result of the above-referenced debit, the amount paid to Merchant by Company pursuant to the new secured agreement will be reduced by the amount of the remaining RTR.]

Thank you,

Merchant Legal Name: THE LITIGATION PRACTICE GROUP PC

**By:** DANIEL STEPHEN MARCH
242CC5601A23474

**Name:** DANIEL STEPHEN MARCH

**Title:** OWNER

13

Exhibit 2
Page 46

DocuSign Envelope ID: 67A61E43-BD4E-4D78-AC4E-50EE20E2CE7D

DocuSign Envelope ID: 67A61E43-BD1E-4D78-AC4E-50EE20E2CE7D

# DIVERSE
# CAPITAL

## CREDIT REPORT AUTHORIZATION FORM

Merchant hereby authorizes Diverse Capital, LLC and its designated agents and representatives to conduct a comprehensive review of Merchant's (and that of any guarantor's or co-obligor's) background through a credit report and/or an investigative credit report to be generated for the underwriting/application process in connection with this Agreement, as well as a subsequent renewal of this Agreement and/or any collection action related to same. Merchant understands that the scope of the credit report/investigative credit report may include, but is not limited to, the following areas: verification of Social Security number; current and previous residences; employment history, including all personnel files; education; references; credit history and reports; criminal history, including records from any criminal justice agency in any or all federal, state or county jurisdictions; birth records; motor vehicle records, including traffic citations and registration; and any other public records.

Merchant hereby authorizes the complete release of these records or data pertaining to Merchant that an individual, company, firm, corporation or public agency may have. Merchant hereby authorizes and requests any present or former employer, school, police department, financial institution or other persons having personal knowledge of Merchant to furnish Diverse Capital, LLC or its designated agents with any and all information in their possession regarding Merchant. Merchant hereby authorizes that a photocopy of this authorization be accepted with the same authority as the original.

Merchant understands that, if any adverse action is to be taken based upon the credit report, a copy of the report and a summary of Merchant's rights will be provided to Merchant.

Thank you,

Merchant Legal Name: DANIEL STEPHEN MARCH

By: _DANIEL STEPHEN MARCH_

Name: DANIEL STEPHEN MARCH

Title: OWNER

14

Exhibit 2
Page 47

DocuSign Envelope ID: 67A61E43-BD1E-4D78-AC4E-50EE29E2CE7D

# DIVERSE
# CAPITAL

### *** PLEASE READ CAREFULLY ***
### *The information below must be filled out completely*

Dear Merchant,

We are glad to welcome you to our unique financing program. The program will go into effect immediately after you return a signed agreement and will continue to be in effect until we receive the full Purchased Amount according to the agreement. After we receive the full agreement amount we will close off your account and deliver you a $0 balance letter for your future reference.

In order to assure the maintenance and servicing of your account please keep these service lines in your contacts for any service or maintenance request. Please note: due to a large amount of accounts and the difficulties of keeping track we sometime have accounting problems with the daily ACH debits. If you do have any debit that you think was incorrect you agree to contact us immediately to notify us about the incorrect debits:

### 631-520-0020 or email us at **submit@diversecapitalllc.com**

*We also **require** an active point of contact during the Term of the agreement. By providing your contact info below you agree to be contacted in regards to your account during the Term of the agreement. In case of an Emergency please list a secondary point of contact **(*required)**:

Please note all necessary information in regards to **reaching you or your staff**, in case of a problem:

If we experienced any issues with your account and we cannot reach you or your point of contact, we will enforce all legal remedies available to us, under the Agreement. We are always available to assist you with any service request that you may need.

### Please make sure to call us if any problems come up.

Contact Name;                                          Email;

DANIEL STEPHEN MARCH                     admin@litigationpracticegroup.com

Phone;                                                     Cell Phone;

948-715-0648                                          949-715-0648

15

Exhibit 2
Page 48

# EXHIBIT 3

Exhibit 3
Page 49

# DIVERSE CAPITAL

## MERCHANT AGREEMENT

Merchant Agreement, dated __08/06/2021__ (together with the Terms and Conditions attached hereto (the "**Terms and Conditions**") and the appendices attached hereto, and as amended, restated or otherwise modified from time to time, this "**Agreement**"), by and among Diverse Capital, LLC, a Connecticut limited liability company ("**Company**"), the merchant listed below (the "**Merchant**") and the individual guarantor(s) signatory hereto (each, a "**Guarantor**").

Merchant's Legal Name: __THE LITIGATION PRACTICE GROUP PC__

All other names (including any prior names, d/b/as and trade names) used by Merchant at any time: __THE LITIGATION PRACTICE GROUP__

Merchant's Chief Executive Office Address: __17542 17TH STE 100__

City: __TUSTIN__    State: __CA__    Zip: __92780__

Merchant's mailing address is same as address of chief executive office (if not checked, provide mailing address below)

Merchant's Mailing Address: __1351 CALLE AVANZADO, STE 4__

City: __SAN CLEMENTE__    State: __CA__    Zip: __92673__

Type of Entity of Merchant (circle one): ● Corporation ○ Limited Liability Company ○ Limited Liability Partnership ○ Limited Partnership ○ Sole Proprietor

Merchant's Federal EIN: __████5343__

## PURCHASE AND SALE OF FUTURE RECEIVABLES

In consideration of the Purchase Price specified below (the "**Purchase Price**"), Merchant hereby sells, assigns and transfers to Company (making Company the absolute owner thereof), a percentage specified as the Purchased Percentage below (the "**Purchased Percentage**") of all of Merchant's future accounts, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers' and/or other third party payors, including all payments made by cash, check, electronic transfer or other form of monetary payment in the ordinary course of the Merchant's business (the "**Receipts**"), for the payments due to Merchant as a result of Merchant's sale of goods or services (the "**Transactions**") until the Purchased Amount specified below (the "**Purchased Amount**") has been delivered by or on behalf of Merchant to Company.

Merchant is selling a portion of a future revenue stream to Company at a discount, not borrowing money from Company, therefore there is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by Company. The Remittance is a good faith estimate of (a) Purchased Percentage multiplied by (b) the daily average revenues of Merchant during the previous calendar month divided by (c) the number of Business Days (as defined in the Terms and Conditions) in such calendar month. Merchant going bankrupt or going out of business, or experiencing a slowdown in business, or a delay in collecting its receivables, in and of itself, does not constitute a breach of this Agreement. Company is entering this Agreement knowing the risks that Merchant's business may slow down or fail, and Company assumes these risks based on Merchant's representations, warranties and covenants in this Agreement, which are designed to give Company a reasonable and fair opportunity to receive the benefit of its bargain. Merchant and each Guarantor are only guaranteeing their performance of the terms of this Agreement, and are not guaranteeing the payment of the Purchased Amount. The initial Remittance shall be as described above. The Remittance is subject to adjustment as set forth in Section 1.3 of the Terms and Conditions.

Company will debit an amount equal to the Remittance specified below (the "**Remittance**") on each Business Day from only one depositing bank account, which account must be acceptable to, and pre-approved by, Company (the "**Account**") into which Merchant and Merchant's customers shall remit the Receipts from each Transaction, until such time as Company receives payment in full of the Purchased Amount. Merchant hereby authorizes Company to ACH debit the Remittance from the Account on a daily basis (other than on a day that is a legal holiday under the laws of the State of New York or the State of Connecticut or is a day on which banking institutions in such states are authorized or required by law to close). Company's payment of the Purchase Price shall be deemed the acceptance and performance by Company of this Agreement, Merchant understands that it is responsible for ensuring that the Remittance to be debited by Company remains in the Account and will be held responsible for any fees incurred by Company resulting from a rejected ACH attempt or an Event of Default (as defined in the Terms and Conditions). Company is not responsible for any overdrafts or rejected transactions that may result from Company's ACH debiting the Remittance under the terms of this Agreement. Notwithstanding anything to the contrary in this Agreement or any other agreement between Company and Merchant, upon the occurrence of an Event of Default, the Purchased Percentage shall equal 100%. All fees owed to Company by Merchant pursuant to this Agreement are contained in Appendix A Attached hereto.

The obligation of Company to fund the Purchase Price hereunder is subject to Company receiving executed counterparts of each of the MCA Documents (as defined in the Terms and Conditions).

PURCHASE PRICE[1]: $ 500,000.00    PURCHASED PERCENTAGE: 10%    PURCHASED AMOUNT: $ 749,500.00    REMITTANCE: $ 18,735.00

THE MERCHANT AGREEMENT TERMS AND CONDITIONS ATTACHED HERETO AND EACH OF THE APPENDICES ATTACHED HERETO ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS AGREEMENT.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**MERCHANT**
(Print Legal Name of Merchant): __DANIEL STEPHEN MARCH__

*DocuSigned by:*
*Daniel Stephen March*
242CC5601A23474...

Name (Print Legal Name of Signatory): __DANIEL STEPHEN MARCH__
Title (Print Title of Signatory): __OWNER__

**GUARANTOR #1:**
(Print Legal Name of Guarantor #1): __DANIEL STEPHEN MARCH__

*DocuSigned by:*
*Daniel Stephen March*
242CC5601A23474...

**DIVERSE CAPITAL, LLC**

By: _____

Name: _____
Title: _____

**GUARANTOR #2**
(Print Legal Name of Guarantor #2): _____

_____

ANY MISREPRESENTATION BY MERCHANT OR ANY GUARANTOR IN CONNECTION WITH THIS AGREEMENT MAY CONSTITUTE A SEPARATE CAUSE OF ACTION FOR FRAUD OR INTENTIONAL MISREPRESENTATION.

Exhibit 3
Page 50

[1] Less any applicable fees as set forth in Appendix A.

1

**MERCHANT AGREEMENT TERMS AND CONDITIONS**

**1.   TERMS OF ENROLLMENT IN PROGRAM**

**1.1   Merchant Deposit Agreement and Processor**. Merchant shall (A) execute an agreement acceptable to Company with a bank acceptable to Company ("Bank") to obtain electronic fund transfer services for the Account, and (B) if applicable, execute an agreement acceptable to Company with a credit and debit card processor (the "Processor") instructing the Processor to deposit all Receipts into the Account. Merchant shall provide Company and/or its authorized agent(s) with all of the information, authorizations and passwords necessary for verifying Merchant's receivables, receipts, deposits and withdrawals into and from the Account. Merchant hereby authorizes Company and/or its agent(s) to withdraw from the Account via ACH debit the amounts owed to Company for the receipts as specified herein and to pay such amounts to Company. These authorizations apply not only to the approved Account but also to any subsequent or alternate account used by the Merchant for these deposits, whether pre-approved by Company or not. This additional authorization is not a waiver of Company's entitlement to declare this Agreement breached by Merchant as a result of its usage of an account which Company did not first pre-approve in writing prior to Merchant's usage thereof. The aforementioned authorizations shall be irrevocable without the written consent of Company.

**1.2   Term of Agreement**. This Agreement shall remain in full force and effect until the entire Purchased Amount and any other amounts due are received by Company as per the terms of this Agreement.

**1.3   Adjustments to the Remittance**. If an Event of Default has not occurred, once every two (2) calendar weeks after the funding of the Purchase Price to Merchant, Merchant may give notice to Company to request a change in the Remittance to more accurately reflect the Purchased Percentage of Receipts being collected by Merchant at that time. The amount shall be modified to more closely reflect the Merchant's actual receipts by multiplying the Merchant's actual receipts by the Purchased Percentage divided by the number of Business Days in the previous two (2) calendar weeks. Merchant shall provide Company with viewing access to its bank accounts, including the Account, as well as all information reasonably requested by Company to properly calculate the Merchant's Remittance. The adjusted Remittance will become the new daily Remittance until any subsequent adjustment.

**1.4   Financial Condition**. Merchant and Guarantor(s) authorize Company and its agents to investigate their financial responsibility and history, and will provide to Company any authorizations, bank or financial statements, tax returns, etc., as Company deems necessary in its sole and absolute discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable as an authorization for release of financial and credit information. Company is authorized to update such information and financial and credit profiles from time to time as it deems appropriate.

**1.5   Transactional History**. Merchant authorizes all of its banks, brokers and processors to provide Company with Merchant's banking, brokerage and/or processing history to determine qualification or continuation in this program and for collections purposes. Merchant shall provide Company with copies of any documents related to Merchant's card processing activity or financial and banking affairs within five (5) days after a request from Company.

**1.6   Indemnification**. Merchant and Guarantor(s) jointly and severally indemnify and hold harmless Processor, its officers, directors and shareholders against all fosses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by Processor resulting from (a) claims asserted by Company for monies owed to Company from Merchant and (b) actions taken by Processor in reliance upon any fraudulent, misleading or deceptive information or instructions provided by Company.

**1.7   No Liability**. In no event will Company be liable for any claims asserted by Merchant or Guarantors under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by each of Merchant and each Guarantor. In the event these claims are nonetheless raised, Merchant and Guarantor(s) will be jointly liable for all of Company's attorney's fees and expenses resulting therefrom.

**1.8   Reliance on Terms**. Section 1.1, 1.5, 1.6, 1.7 and 2.5 of this Agreement are agreed to for the benefit of Merchant, Company, Processor, and Bank and notwithstanding the fact that neither Processor nor Bank is a party to this Agreement, Processor and Bank may rely upon their terms and raise them as a defense in any action.

**1.9   Sale of Receipts (THIS IS NOT A LOAN)**. Merchant and Company agree that the Purchase Price (less the applicable fees agreed to herein) under this Agreement is in exchange for the Purchased Amount, and that such Purchase Price is not intended to be, nor shall it be construed as a loan from Company to Merchant, Merchant agrees that the Purchase Price is in exchange for the Receipts pursuant to this Agreement, and that it equals the fair market value of such Receipts. Company has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Payments made to Company in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services, and the payment therefore by Merchant's customers. In no event shall the aggregate of all amounts or any portion thereof be deemed as interest hereunder, and in the event it is found to be interest despite the parties hereto specifically representing that it is NOT interest, it shall be found that no sum charged or collected hereunder shall exceed the highest rate permissible at law. In the event that a court nonetheless determines that Company has charged or received interest hereunder in excess of the higher applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and Company shall promptly refund to Merchant any interest received by Company in excess of the maximum lawful rate, it being intended that Merchant not pay or contract

to pay, and that Company not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law. As a result thereof, Merchant knowingly and willingly waives the defense of usury in any action or proceeding. If, notwithstanding such intent, such transfer is not deemed to constitute a sale, Merchant hereby grants to Company a security interest in all right, title and interest of Merchant in and to the Receipts, which security interest shall secure the payment of the Purchased Amount and all other obligations of Merchant under this Agreement. Merchant hereby authorizes Company to file any financing statements deemed necessary or advisable by Company to perfect or maintain Company's interest in the Receipts.

**1.10   Power of Attorney**. Merchant irrevocably appoints Company as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to Company from Processor, or in the case of a violation by Merchant of Section 1 or the occurrence of an Event of Default under Section 3, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral (as defined in Section 5); (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to Company; and (v) to contact Merchant's banks and financial institutions using Merchant's and Guarantor(s)' personal information to verify the existence of an account and obtain account balances; (vi) to file any claims or take any action or institute any proceeding which Company may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount. In connection therewith, all costs, expenses and fees, including legal fees, shall be payable by and from Merchant, and Company is authorized to use Merchant's funds to pay for same; and (vii) Company shall have the right, without waiving any of its rights and remedies and without notice to Merchant or any Guarantor, to notify any credit card processor of the sale of future payment rights and re-direct the remittance of daily settlements to an account of Company's choosing in order to settle all obligations due to Company under this Agreement.

**1.11   Protections against Default**. The following Protections 1 through 7 may be invoked by Company immediately and without notice to Merchant in the event: (a) Merchant takes any action to discourage the use of electronic check processing that are settled through Processor, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks or other payments or deposits for the purchase of Merchant's services and products including but not limited to direct deposit of any checks into a bank account without scanning such checks into the Company electronic check processor; (b) Merchant changes its arrangements with Processor or the Bank in any way that is adverse or unacceptable to Company; (c) Merchant changes the electronic check processor through which the Receipts are settled from Processor to another electronic check processor, or permits any event to occur that could cause diversion of any of Merchant's check or deposit transactions to another processor; (d) Merchant intentionally interrupts the operation of its business transfers, moves, sells, disposes, or otherwise conveys its business and/or assets without the express prior written consent of Company; (e) Merchant takes any action, fails to take any action, or offers any incentive, economic or otherwise, the result of which will be to induce any customer or customers to pay for Merchant's services with any means other than payments, checks or deposits that are settled through Processor; or (f) Merchant fails to provide Company with copies of any documents related to Merchant's card processing activity or financial and banking affairs within five (5) days after a request from Company. These protections are in addition to any other remedies available to Company at law, in equity or otherwise pursuant to this Agreement.

**Protection 1**. The full uncollected Purchased Amount plus all fees (including reasonable attorney's fees and expenses) due under this Agreement and the other MCA Documents (as defined in Section 5) become due and payable in full immediately.

**Protection 2**. Company may enforce the provisions of the Guaranty (as defined in Section 5) against any Guarantor.



INITIALS

Exhibit 3
Page 51

**Protection 3**. Company may enforce its security interest in the Collateral in accordance with the Security Agreement (as defined in Section 5).

**Protection 4**. Company may proceed to protect and enforce its right and remedies by lawsuit. In any such lawsuit, if Company recovers a judgment against Merchant, Merchant shall be liable for all of Company's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs.

**Protection 5**. Merchant shall, upon execution of this Agreement, deliver to Company an executed assignment of lease of Merchant's business premises in favor of Company. Upon breach of any provision in this paragraph 1.10, Company may exercise its rights under such assignment without notice to Merchant.

**Protection 6**. Company may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on the Account or otherwise for all sums due to Company.

**1.12   Protection of Information**. Merchant and each Guarantor, in respect of himself or herself personally, authorizes Company to disclose information concerning Merchant's and such Guarantor's credit standing (including credit bureau reports that Company obtains) and business conduct only to agents, affiliates and credit reporting bureaus. Merchant and such Guarantor each hereby waives to the maximum extent permitted by law any claim for damages against Company or any of its agents or affiliates relating to any (i) investigation undertaken by or on behalf of Company as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**1.13   Confidentiality**. Merchant understands and agrees that the terms and conditions of the products and services offered by Company, including this Agreement and any other Company documents (collectively, "Confidential Information") are proprietary and confidential information of Company. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information of Company to any person other than an adviser, accountant, financial advisor or employee of Merchant who needs to know such Confidential Information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this section. A breach hereof entitles Company to not only damages and reasonable attorney's fees but also to both a Temporary Restraining Order and a Preliminary Injunction without Bond or Security.

**1.14   Publicity**. Each of Merchant and each Guarantor hereby authorizes Company to use its, his or her name in listings of clients and in advertising and marketing materials.

**1.15   D/B/A's**. Merchant hereby acknowledges and agrees that Company may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between Company and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**2.   REPRESENTATIONS, WARRANTIES AND COVENANTS**
Merchant represents warrants and covenants that, as of this date and during the term of this Agreement:

**2.1   Financial Condition and Financial information**. Merchant's and each Guarantor's bank and financial statements, copies of which have been furnished to Company, and future statements which will be furnished hereafter at the discretion of Company, fairly represent the financial condition of Merchant or such Guarantor, as applicable, as of such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant and Guarantor(s) have a continuing, affirmative obligation to advise Company of any material adverse change in their financial condition, operation or ownership. Company may request statements at any time during the performance of this Agreement and the Merchant and Guarantor(s) shall provide them to Company within five (5) Business Days after request from Company. Merchant's or Guarantor(s)' failure to do so is a material breach of this Agreement.

**2.2   Governmental Approvals**. Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.

**2.3   Authorization**. Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**2.4   Use of Funds**. Merchant agrees that it shall use the Purchase Price for business purposes and not for personal, family, or household purposes. Merchant will not, directly or through any of its subsidiaries, engage in the business of extending credit for the purpose of purchasing or carrying margin stock, and no proceeds of the Purchase Price will be used to purchase or carry margin stock.

**2.5   Electronic Check Processing Agreement**. Merchant will not change its Processor, add terminals, change its financial institution or bank account(s) (including the Account) or take any other action that could have any adverse effect upon Merchant's obligations under this Agreement, without Company's prior written consent. Any such changes shall be a material breach of this Agreement.

**2.6   Change of Name or Location**. Merchant will not conduct Merchant's businesses under any name other than as disclosed to the Processor and Company, nor shall Merchant change any of its places of business without prior written consent by Company.

**2.7   Daily Batch Out**. Merchant will batch out receipts with the Processor on a daily basis if applicable.

**2.8   Estoppel Certificate**. Merchant will at every and all times, and from time to time, upon at least one (1) day's prior notice from Company to Merchant, execute, acknowledge and deliver to Company and/or to any other person, firm or corporation specified by Company, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion thereof has been repaid.

**2.9   No Bankruptcy**. As of the date of this Agreement, Merchant is not insolvent and does not contemplate filing for bankruptcy in the next six (6) months and has not consulted with a bankruptcy attorney or filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Merchant. Merchant further represents and warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

**2.10   Unencumbered Receipts**. Merchant has good, complete, unencumbered and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of Company.

**2.11   Business Purpose**. Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates.

**2.12   Defaults under Other Contracts**. Merchant's execution of, and/or performance under, this Agreement will not cause or create an event of default by Merchant under any contract with another person or entity.

**2.13   Good Faith**. Each of Merchant and each Guarantor hereby affirms that Merchant is receiving the Purchase Price and selling Company the Purchased Amount in good faith and will use the Purchase Price funds in accordance with Section 2.4.

**3.   EVENTS OF DEFAULT AND REMEDIES**
**3.1   Events of Default**. The occurrence of any of the following events shall constitute an "Event of Default" hereunder:

(a)   Merchant or any Guarantor shall violate any term or covenant in this Agreement or any other MCA Document;

(b)   Merchant fails to pay (or cause to be paid) any fees described on Appendix A attached hereto when and as required to be paid as described therein;

(c)   any representation or warranty by Merchant in this Agreement or any other MCA Document shall prove to have been incorrect, false or misleading in any material respect when made;

(d)   the sending of notice of termination by Merchant or notifying Company verbally or in writing of its intent to breach this Agreement;

(e)   the Merchant fails to give Company 24 hours' advance notice that there will be insufficient funds in the Account such that the ACH of the Remittance amount will not be honored by Bank, and the Merchant fails to supply ail requested documentation and allow for daily and/or real time monitoring of its bank accounts (including the Account);

(f)   Merchant shall enter into any financing agreements with any other party including but not limited to: loans, merchant cash advances, receivables financing, factoring, or any other agreement that will increase the total debt or merchant cash advances owed by Merchant to any party other than Company.

(g)   Merchant shall transfer or sell all or substantially all of its assets;

(h)   Merchant shall make or send notice of any intended bulk sale or transfer by Merchant;

(i)   Merchant shall use multiple depository accounts without the prior written consent of Company;

(j)   Merchant shall change the Bank Account without the prior written consent of Company;

(k)   Merchant shall close the Bank Account without the prior written consent of Company;

(l)   Merchant fails to provide timely notice to Company such that in any given calendar month, there are two or more ACH transactions attempted by Company that are rejected by Merchant's bank;

(m)   Merchant shall default under any of the terms, covenants and conditions of any other agreement with Company.



INITIALS

**3.2     Remedies.** In case any Event of Default occurs and is not waived pursuant to Section 4.5. hereof, Company may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Merchant's obligations hereunder (including the Guaranty) or any other legal or equitable right or remedy. All rights, powers and remedies of Company in connection with this Agreement may be exercised at any time by Company after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

**3.3     Costs.** Merchant shall pay to Company all reasonable costs associated with (a) an Event or Default, (b) breach by Merchant of the covenants in this Agreement and the enforcement thereof, and (c) the enforcement of Company's remedies set forth in this Agreement, including but not limited to court costs and attorneys' fees.

**3.4     Required Notifications.** Merchant is required to give Company written notice within 24 hours of any filing under Title 11 of the United States Code. Merchant is required to give Company seven (7) days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or stock.

**4.       MISCELLANEOUS**

**4.1     Modifications; Agreements.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by Company.

**4.2     Assignment.** Company may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part, including by assigning, transferring or selling a participation in the Purchased Amount. Merchant acknowledges that, if any such assignment is made, persons other than Company may have the right to exercise rights or remedies against Merchant pursuant to this Agreement. Merchant shall not have, and no Guarantor shall have, the right to assign its rights and/or obligations under this Agreement and/or the other MCA Documents or any interest herein or therein without the prior written consent of Company, which consent may be withheld in Company's sole discretion.

**4.3     Negative Pledge.** Each of Merchant and each Guarantor agrees not to create, incur, assume, or permit to exist, directly or indirectly, any additional cash advances, loans, lien or other encumbrance on or with respect to any of the Collateral, as applicable, without written permission of Company.

**4.4     Notices.** All notices, requests, consents, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement. Notices to Company shall become effective only upon receipt by Company. Notices to Merchant shall become effective three (3) days after mailing.

**4.5     Waiver Remedies.** No failure on the part of Company to exercise, and no delay in exercising any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the' exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**4.6     Binding Effect; Governing Law, Venue and Jurisdiction.** This Agreement shall be binding upon and inure to the benefit of Merchant, Company and their respective successors and assigns, except that Merchant shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of Company, which consent may be withheld in Company's sole discretion. Company reserves the rights to assign this Agreement pursuant to Section 4.2 with or without prior written notice to Merchant. This Agreement shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Except required to enforce a security interest or otherwise required by applicable law, any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall be instituted in any court sitting in New York, or Connecticut to the exclusion of all other forums (the "Acceptable Forums"). Merchant agrees that the Acceptable Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant waives any right to oppose any motion or application made by Company to transfer such proceeding to an Acceptable Forum.

**4.7     Survival of Representation, etc.** All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

**4.8     Interpretation.** All parties hereto have reviewed this Agreement with attorneys of their own choosing and have relied only on their own attorneys' guidance and advice. No construction determinations shall be made against either party hereto as drafter.

**4.9     Severability.** In case any of the provisions in this Agreement are found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired. Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof.

**4.10   Entire Agreement.** This Agreement and the other MCA Documents embody the entire agreement among Merchant, each Guarantor and Company and supersede all prior agreements and understandings relating to the subject matter hereof.

**4.11   JURY TRIAL WAIVER.** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OR THE ENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVE KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR RESPECTIVE ATTORNEYS.

**4.12   CLASS ACTION WAIVER.** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**4.13   Counterparts & Digital Acceptance.** This Agreement and the other MCA Documents may be executed in multiple counterparts, each of which shall be deemed an original provided all parties have executed a counterpart of this Agreement, and all such counterparts shall together constitute one and the same instrument. Any signature delivered by a party hereto by facsimile transmission, e-mail or other electronic means will be deemed to be an original signature. [The parties hereto consent and agree that use of a key pad, mouse or other device to select an item, button, icon or similar act or action while using any electronic service in executing this Agreement or the other MCA Documents  constitutes a valid and enforceable signature, acceptance and agreement as if actually signed in writing. Further, the parties hereto agree that no certification authority or other third-party verification is necessary to the validity of an electronic signature and that the lack of such certification or third-party verification will not in any way affect the enforceability of the signature or any resulting contract among the parties hereto.]

**4.14   Headings.** The headings used in this Agreement will be used only for the purpose of reference and shall not be deemed to govern, limit, modify or in any other manner affect the scope, meaning or intent of the provisions of this Agreement or be given any legal effect whatsoever.

**4.15   Service of Process.** In addition to the methods of service allowed by the New York State Civil Practice Law & Rules ("CPLR"), Merchant and all Guarantors hereby expressly consent to service of process upon it by registered or certified mail, return receipt requested. Service hereunder shall be complete upon Merchant (or, where applicable, Guarantors') actual receipt of process or upon Company's receipt of the return thereof by the United States Postal Services as *Refused* or *Undeliverable*. Merchant and Guarantors must promptly notify Company, in writing, of each and every change of address to which service of process can be made. Service upon the last known address shall be sufficient. Merchant and Guarantors shall have thirty (30) calendar days after service hereunder is complete in which to respond. Furthermore, Merchant and Guarantors expressly consent that any and all notices, demands, requests or other communications under and pursuant to this Agreement for the Purchase and Sale of Future Receivables shall be delivered in accordance with the provisions of this Agreement for the Purchase and Sale of Future Receivables.

**4.16   Commercial Waiver.** The parties acknowledge that the transaction of which this agreement is a part is a commercial transaction as defined by Connecticut Law. By signing this agreement you agree to be personally liable for all charges incurred on this account and you further waive your right to and/or your company's right to notice and hearing in any civil collection action seeking a prejudgment remedy or attachment as outlined in Connecticut General Statutes Sections 52-278a to 52-278f. Further, you agree that upon default of this agreement, you waive all rights to request that the purchaser hereof post a bond, with or without surety, to protect said merchant or guarantor against damages that may be caused by any prejudgment remedy sought or obtained by the purchaser hereof. You agree to be liable for costs of collection and reasonable attorneys fees in any such action.

**5.       DEFINED TERMS**

**5.1**     As used herein the following terms have the following meanings:

["ACH Form" means any one or more ACH authorization forms delivered by or on behalf of Merchant or any Guarantor regarding the Account for the benefit of Company.]

"Affidavit" means any one or more affidavits of confession of judgement signed by or on behalf of Merchant or any Guarantor with respect for the benefit of Company.

["Balance Transfer Form" means any one or more balance transfer forms delivered by or on behalf of Merchant or any Guarantor regarding the Account for the benefit of Company.]

"Business Day" means any day that is not a Saturday, Sunday or other day that is a legal holiday under the laws of the State of New York or the State of Connecticut or is a day on which banking institutions in such states are authorized or required by law to close.

"Collateral" has the meaning ascribed to such term in the Security Agreement.

"Guaranty" means that certain Guaranty of Performance, dated as of the date hereof, by and among Company, Merchant and each Guarantor, as may be amended, restated or otherwise modified from time to time

"MCA Documents" means this Merchant Agreement, the Security Agreement, the Guaranty, [the ACH Form,] the Balance Transfer Form and the Affidavit.

"Security Agreement" means that certain Security Agreement, dated as of the date hereof, by and among Company, Merchant and each Guarantor, as may be amended, restated or otherwise modified from time to time.



Exhibit 3
Page 53

# DIVERSE
# CAPITAL

## MERCHANT AGREEMENT APPENDIX A:

## FEE STRUCTURE

Reference is made to that certain Merchant Agreement, dated as of ___08/06/2021___ (together with the Merchant Agreement Terms and Conditions attached thereto and the appendices attached thereto, and as may be amended, restated or otherwise modified from time to time, the "Merchant Agreement"), by and among Diverse Capital, LLC, a Connecticut limited liability company ("Company"), ___THE LITIGATION PRACTICE GROUP PC___ ("Merchant") and the Guarantor(s) party thereto, to which this Appendix A is attached. Capitalized terms used but not defined in this Appendix A shall have the respective meanings set forth in the Merchant Agreement.

A.  Origination Fee:  $295.00 to cover cost of origination.

B.  Brokerage and Underwriting Fee:  An amount equal to the greater of (i) $499.00 and (ii) 12% of the Purchased Amount to cover underwriting and related expenses. This fee is deemed earned upon Merchant signing the Merchant Agreement. If for whatever reason, Company determines, in its sole discretion, to cancel the deal, Merchant agrees that Company may withdraw this non-refundable brokerage and underwriting fee.

C.  NSF Fee:  $50.00 each instance in which Bank returns a code of "NSF."

D.  Default Fee:  $5,000.00 when Merchant breaches any material terms of the Merchant Agreement.

E.  Blocked Account Fee:  $5,000.00 when Merchant breaches the Merchant Agreement by placing a stop-payment on Company's ACH or closes the Account.

F.  Bank Change Fee:  $50.00 when Merchant requires a change of the Account, requiring Company to adjust its system and records.

G.  Wire Fee:  Merchant shall receive the Purchase Price electronically in its designated bank account and will be charged $50.00 for a Fed Wire or $0.00 for a bank ACH, as applicable.

H.  ACH Program Fee:  $299.00 per month for the duration of the Merchant Agreement. See Appendix E.

I.  Stacking Fee:  An amount equal to [the greater of (i) 10% of outstanding Purchased Amount or (ii) $25,000]. Additionally, in accordance with Appendix D to this Merchant Agreement, taking on additional financing will be deemed a breach of this Merchant Agreement, upon which Company may invoke all of its rights per the terms of the MCA Documents.

J.  UCC Fee:  $195.00.

K.  Miscellaneous Service Fees:  Merchant agrees that it shall pay for certain services related to the transactions under and in connection with the Merchant Agreement.

Acknowledged and Agreed:

**MERCHANT**
(Print Legal Name of Merchant): ___DANIEL STEPHEN MARCH___

By: _DANIEL STEPHEN MARCH_
242CC5601A23474...
Name (Print Legal Name of Signatory): ___DANIEL STEPHEN MARCH___

Title (Print Title of Signatory): ___OWNER___

Exhibit 3
Page 54

DocuSign Envelope ID: D2171AB0-384E-4101-B4F9-06227DB7E1BC

# DIVERSE CAPITAL

### Appendix B:

## AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT) AND DIRECT PAYMENTS (ACH DEBITS)

**DEFINITIONS**:

**Company**: Diverse Capital, LLC, a Connecticut limited liability company

**Merchant**: THE LITIGATION PRACTICE GROUP PC
(Merchant's Legal Name)

**Merchant Agreement**: Merchant Agreement, dated as of 08/06/2021, by and among Company, Merchant and the Guarantor(s) party thereto, to which this Appendix B is attached (together with the Merchant Agreement Terms and Conditions attached thereto and the other appendices attached thereto, and as may be amended, restated or otherwise modified from time to time,).

**Designated Checking Account**:

**Bank Name**: _____        **Branch**:_____

**Tax ID**:_____

**ABA: Routing**:_____        **DDA: Accounting**:_____

Capitalized terms used but not defined in this Appendix B shall have the respective meanings set forth in the Merchant Agreement.

By signing below, Merchant attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes. **This Appendix B is part of (and incorporated by reference into) the Merchant Agreement. Merchant should keep a copy of this important legal document for Merchant's records.**

DISBURSEMENT OF ADVANCE PROCEEDS. By signing below, Merchant authorizes Company to disburse an amount equal to (i) the Purchase Price less (ii) the amount of any applicable fees upon Company's approval of the purchase of the Receipts by initiating ACH credits to the Account, in the amounts and at the times specified in the Merchant Agreement. **By signing below, Merchant also authorizes Company to collect amounts due from Merchant under the Merchant Agreement by initiating ACH debits to the Account, as follows:**

**In the Amount of**: $ $ 18,735.00 _____ Daily

(or) Percentage of each Banking Deposit:_____%

On the Following Days (each, a "Payment Date"): MONDAY-FRIDAY

If any Payment Date falls on a Business Day in which the Merchant's Bank is closed, Merchant understands and agrees that the payment may be executed on the next Business Day for which the Merchant's Bank is open. If a payment is rejected by Bank for any reason, including without limitation insufficient funds, Merchant understands that Company may, at its discretion, attempt to process the payment again as permitted under applicable ACH rules. Merchant also authorizes Company to initiate ACH entries to correct any erroneous payment transaction.

**MISCELLANEOUS**. Company is not responsible for any fees charged by Bank as the result of credits or debits initiated under this Appendix B. The origination of ACH debits and credits to the Designated Checking Account must comply with applicable provisions of state and federal law, and the rules and operating guidelines of NACHA (formerly known as the National Automated Clearing House Association).

This Appendix B is to remain in full force and effect until Company has received written notification from Merchant at the address set forth below at least five (5) Business Days prior to its termination to afford Company a reasonable opportunity to act on it. The individual signing below on behalf of Merchant certifies that he/she is an authorized signer on the Account. Merchant will not dispute any ACH transaction initiated pursuant to this Appendix B, provided the transaction corresponds to the terms of this Appendix B. Merchant requests that Bank honor all ACH entries initiated in accordance with this Appendix B.

**MERCHANT**
(Print Legal Name of Merchant): DANIEL STEPHEN MARCH

By DANIEL STEPHEN MARCH
—242CC5601A23474...
Name (Print Legal Name of Signatory): DANIEL STEPHEN MARCH
Title (Print Title of Signatory): OWNER

6

Exhibit 3
Page 55

DocuSign Envelope ID: D21714B0-384E-4101-B4F9-06227DB7E1BC

# DIVERSE
# CAPITAL

**Appendix C:**

**Bank Portal Information**

Thank you for accepting an offer from Diverse Capital, LLC, a Connecticut limited liability company. We are looking forward to building a relationship with your business that allows you to reach and exceed your goals. Please note that prior to funding your account, our Underwriting Department needs to see the most recent balance and activity information in real-time as a fraud countermeasure and in order to ensure the health of your business aligns with the terms of your offer. For your convenience, we have three secure options for you to choose from to complete this step. After being completed and executed, please e-mail this Appendix C to your funding specialist.

**Please provide information required for read-only access\* to your business account**.

*\*Be sure to indicate capital or lower case letters.*

**Bank Portal Website:**_____

**Username:**_____

**Password:**_____

**Security Question/Answer 1:**_____

**Security Question/Answer 2:**_____

**Security Question/Answer 3:**_____

**Any other information necessary to access your account:**_____

_____



7

Exhibit 3
Page 56

DocuSign Envelope ID: D2171AB0-384E-4101-B4F9-06227DB7E1BC



## DIVERSE CAPITAL

**Appendix D:**

### NO STACKING ADDENDUM

Reference is made to that certain Merchant Agreement, dated as of ___08/06/2021___ (together with the Merchant Agreement Terms and Conditions attached thereto and the appendices attached thereto, and as may be amended, restated or otherwise modified from time to time, the "Merchant Agreement"), by and among Diverse Capital, LLC, a Connecticut limited liability company ("Company"), __THE LITIGATION PRACTICE GROUP PC__ ("Merchant") and the Guarantor(s) party thereto, to which this Appendix D is attached. Capitalized terms used but not defined in this Appendix D shall have the respective meanings set forth in the Merchant Agreement.

This Appendix D is to certify that Merchant is prohibited from initiating a cash advance or any loan products with any party other than Company. Doing so will place Merchant in a breach of contract, and Merchant will be liable for the entire amount owed to Company immediately, plus attorneys' fees, costs, liquidated damages and a default fee in an amount equal to [the greater of (i) $2,500 and (ii) 20% of the Purchased Amount].

Amounts received from any merchant cash advances received from a party other than Company subsequent to the date of the Merchant Agreement will be subject to collections Company to satisfy the outstanding account balance under the Merchant Agreement.

By its signature below, Merchant agrees to be bound by this Appendix D.

---

This authorization is to remain in full force and effect until Company receives written notification from the Merchant of its termination in such time and in such manner to afford Company reasonable opportunity to act on it. Revocation of this authorization prior to remittance of the balance owed pursuant to the MCA Documents shall constitute breach thereunder.

**MERCHANT**
(Print Legal Name of Merchant): __DANIEL STEPHEN MARCH__

By: _DANIEL STEPHEN MARCH_
    — DocuSigned by:
    —242CC5601A23474...
Name (Print Legal Name of Signatory): __DANIEL STEPHEN MARCH__
Title (Print Title of Signatory): __OWNER__

Exhibit 3
Page 57

# DIVERSE CAPITAL

**Appendix E:**

## FUNDERSLINK ADDENDUM

This Appendix E is entered on __08/06/2021__, by and among Diverse Capital, LLC, a Connecticut limited liability company ("Company"), DANIEL STEPHEN MARCH ("Merchant") and Funderslink, LLC, a [_____] limited liability company ("Funderslink").

Should any terms of this Appendix E conflict with the Merchant Agreement dated as of the date hereof (together with the Merchant Agreement Terms and Conditions attached thereto and the appendices attached thereto, and as may be amended, restated or otherwise modified from time to time, the "Merchant Agreement"), by and among Company, Merchant and the Guarantor(s) party thereto, to which this Appendix E is attached, the terms of this Appendix E shall govern and be controlling. Capitalized terms used herein, but not otherwise defined, shall have the same definition as in the Merchant Agreement.

Merchant represents and warrants that it understands that Company must engage a third-party, namely Funderslink, to manage the ACH withdrawals, reporting and deal tracking. For this service, Merchant agrees to pay Funderslink a nominal fee of $299.00 per month. This amount is due on the first day of the Merchant Agreement and every subsequent thirty days until the Purchased Amount is paid in full to Company.

IN WITNESS WHEREOF, the parties hereto have caused this Appendix E to be duly executed as of the date first above written.

**MERCHANT**
(Print Legal Name of Merchant):   DANIEL STEPHEN MARCH

By: _DANIEL STEPHEN MARCH_
242CC5601A23474...

Name (Print Legal Name of Signatory): DANIEL STEPHEN MARCH

Title (Print Title of Signatory): OWNER

**DIVERSE CAPITAL, LLC**

By: _____

Name: _____

Title: _____

**FUNDERSLINK, LLC**

By: _____

Name: _____

Title: _____

Exhibit 3
Page 58

# DIVERSE CAPITAL

## SECURITY AGREEMENT

**Security Agreement, dated** _08/06/2021_ **(as may be amended, restated or otherwise modified from time to time, this "Agreement"), by and among Diverse Capital, LLC, a Connecticut limited liability company ("Company"), the merchant listed below (the "Merchant") and the individual guarantor(s) signatory hereto (each, a "Guarantor").**

**Merchant's Legal Name:** THE LITIGATION PRACTICE GROUP PC

**Merchant's Chief Executive Office Address:** 17542 17TH STE 100

**City:** TUSTIN                                        **State:** CA                **Zip:** 92780

**Merchant's Federal EIN:** ████5343

**1.** Company, Merchant and each Guarantor are parties to that certain Merchant Agreement, dated as of the date hereof (together with the Merchant Agreement Terms and Conditions attached thereto and the appendices attached thereto, and as may be amended, restated or otherwise modified from time to time, the "Merchant Agreement"), pursuant to which COMPANY agreed to purchase the Merchant's Receipts (as defined therein) in exchange for the Purchase Price (as defined therein). Capitalized terms used but not defined in this Agreement shall have the respective meanings set forth in the Merchant Agreement.
**2.** The obligation of Company to fund the Purchase Price under the Merchant Agreement is conditioned upon, among other things, the execution and delivery of this Agreement by Merchant and each Guarantor. Each Guarantor is an affiliate of Merchant, will derive substantial benefits from the sale of the Receipts pursuant to the Merchant Agreement and is willing to execute and deliver this Agreement in order to induce COMPANY to purchase such Receipts.
**3.** This Agreement will constitute a security agreement under the UCC (as defined below). Each of Merchant and each Guarantor grants to Company a security interest in and lien upon: (a) all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are each defined in Article 9 of the Uniform Commercial Code in effect in any applicable jurisdiction and as may be amended from time to time (the "UCC"), now or hereafter owned or acquired by Merchant or such Guarantor, (b) all funds at any time in the Account, regardless of the source of such funds, (c) present and future electronic check transactions and (d) all proceeds of the foregoing, as that term is defined in Article 9 of the UCC (collectively, and together with any Cross-Collateral (as defined below), the "Collateral"). Merchant agrees to provide other security to Company upon request to secure Merchant's obligations under this Agreement. These security interests and liens will secure all of Merchant's payment and performance obligations under the MCA Documents and each Guarantor's payment and performance obligations under the MCA Documents. Company is authorized to file any and all notices or filings it deems necessary or appropriate to enforce its entitlements hereunder.
**4.** This security interest may be exercised by Company without notice or demand of any kind by making an immediate withdrawal or freezing the Collateral. Company shall have the right to notify account debtors at any time. [Pursuant to Article 9 of the UCC, Company has control over and may direct the disposition of the Collateral, without further consent of Merchant.] Merchant hereby represents and warrants that no other person or entity has a security interest in the Collateral.
**5.** With respect to such security interests and liens, Company will have all rights afforded under the UCC, any other applicable law and in equity. Merchant will obtain from Company written consent prior to granting a security interest of any kind in the Collateral to a third party. Each of Merchant and each Guarantor agrees to execute and deliver to Company such instruments and documents Company may reasonably request to perfect and confirm the lien, security interest and right of setoff set forth in this Agreement. Company is authorized to execute all such instruments and documents in Merchant's and Guarantor(s) name.

**6.** Each of Merchant and each Guarantor acknowledges and agrees that any security interest granted to Company under any other agreement between Merchant or such Guarantor and Company (the "Cross-Collateral") will secure the obligations hereunder and under the Merchant Agreement. Each of Merchant and each Guarantor agrees to execute any documents or take any action in connection with this Agreement as Company deems necessary to perfect or maintain Company's first priority security interest in the Collateral, including the execution of any account control agreements. Each of Merchant and each Guarantor hereby authorizes Company to file any financing statements deemed necessary by Company to perfect or maintain Company's security interest. Merchant and Guarantor(s) shall be liable for, and Company may charge and collect, all costs and expenses, including but not limited to attorney's fees, which may be incurred by Company in protecting, preserving and enforcing Company's security interest and rights.
**7.** Each of Merchant and each Guarantor agrees not to create, incur, assume, or permit to exist, directly or indirectly, any additional cash advances, loans, lien or other encumbrance on or with respect to any of the Collateral, as applicable, without written permission of Company.
**8.** The provisions in Section 4 of the Merchant Agreement are hereby incorporated by reference as if fully stated herein and shall apply to this Agreement, *mutatis mutandis.*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**MERCHANT**
(Print Legal Name of Merchant):    DANIEL STEPHEN MARCH

By: 

Name (Print Legal Name of Signatory):    DANIEL STEPHEN MARCH

Title (Print Title of Signatory): OWNER

**GUARANTOR #1:**
(Print Legal Name of Guarantor #1):
DANIEL STEPHEN MARCH



**GUARANTOR #2**
(Print Legal Name of Guarantor #2): _____

    _____

**DIVERSE CAPITAL, LLC**

By: _____

Name: _____

Title: _____

THE TERMS, DEFINITIONS, CONDITIONS, AND INFORMATION SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE "TERMS AND CONDITIONS" THERETO, ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS AGREEMENT.

Exhibit 3
Page 59

# DIVERSE CAPITAL

**Guaranty of Performance**

**Guaranty of Performance, dated** 08/06/2021 **(as may be amended, restated or otherwise modified from time to time, this "Guaranty"), by and among Diverse Capital, LLC, a Connecticut limited liability company ("Company"), the merchant listed below (the "Merchant") and the individual guarantor(s) signatory hereto (each, a "Guarantor").**

**Merchant's Legal Name:** THE LITIGATION PRACTICE GROUP PC

**Merchant's Chief Executive Office Address:** 17542 17TH STE 100

**City:** TUSTIN    **State:** CA    **Zip:** 92780

**Merchant's Federal EIN:** ████5343

---

**1.** Company, Merchant and each Guarantor are parties to that certain Merchant Agreement, dated as of the date hereof (together with the Merchant Agreement Terms and Conditions attached thereto and the appendices attached thereto, and as may be amended, restated or otherwise modified from time to time, the "Merchant Agreement"), pursuant to which COMPANY agreed to purchase the Merchant's Receipts (as defined therein) in exchange for the Purchase Price (as defined therein). Capitalized terms used but not defined in this Guaranty shall have the respective meanings set forth in the Merchant Agreement.

**2.** The obligation of Company to fund the Purchase Price under the Merchant Agreement is conditioned upon, among other things, the execution and delivery of this Guaranty by Merchant and each Guarantor. Each Guarantor is an affiliate of Merchant, will derive substantial benefits from the sale of the Receipts pursuant to the Merchant Agreement and is willing to execute and deliver this Guaranty in order to induce COMPANY to purchase such Receipts.

**3.** Each Guarantor jointly and severally guarantees Merchant's good faith, truthfulness and performance of all of the representations, warranties and covenants made by Merchant in each MCA Document as each may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations"). Each of Guarantor's obligations are due at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in the Merchant Agreement or in any other MCA Document or upon the occurrence of an Event of Default.

**4.** Company does not have to notify any Guarantor of any of the following events and no Guarantor will be released from its obligations under this Guaranty if it is not notified of: (i) Merchant's failure to pay timely any amount required under the Merchant Agreement or any other MCA Document; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any Collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; (iv) Company's acceptance of the MCA Documents; and (v) any renewal, extension or other modification of the Merchant Agreement, any other MCA Document or Merchant's other obligations to Company. In addition, Company may take any of the following actions without releasing Guarantor from any of its obligations under this Guaranty: (i) renew, extend or otherwise modify the Merchant Agreement, any other MCA Document or Merchant's other obligations to Company; (ii) release Merchant from its obligations to Company; (iii) sell, release, impair, waive or otherwise fail to realize upon any Collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; and (iv) foreclose on any Collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under any of the MCA Documents. Until the Purchased Amount and Merchant's other obligations to Company under the Merchant Agreement and the other MCA Documents are paid in full, Guarantor shall not seek reimbursement from Merchant or any other guarantor for any amounts paid by it under this Guaranty or any other MCA Document. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other guarantor, or any Collateral provided by Merchant or any other guarantor, for any amounts paid by it, or acts performed by it, under this Guaranty or any other MCA Document: (I) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution. In the event that Company must return any amount paid by Merchant or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations under this Guaranty and the other MCA Documents shall include that amount.

**5.** Each Guarantor acknowledges that: (i) he/she is bound by the Class Action Waiver contained in Section 4.12 of the Merchant Agreement; (ii) he/she understands the seriousness of the provisions of this Guaranty and the other MCA Documents; (iii) he/she has had a full opportunity to consult with counsel of his/her choice; and (iv) he/she has consulted with counsel of his/her choice or has decided not to avail himself/herself of that opportunity.

**6.** Section 4 of the Merchant Agreement are hereby incorporated by reference as if fully stated herein and shall apply to this Guaranty, *mutatis mutandis*.

IN WITNESS WHEREOF, the parties hereto have caused this Guaranty to be duly executed as of the date first above written.

**MERCHANT**
(Print Legal Name of Merchant): DANIEL STEPHEN MARCH

By: *DANIEL STEPHEN MARCH*
242CC5601A23474...

Name (Print Legal Name of Signatory): DANIEL STEPHEN MARCH

Title (Print Title of Signatory): OWNER

**GUARANTOR #1:**
(Print Legal Name of Guarantor #1):
DANIEL STEPHEN MARCH

*DANIEL STEPHEN MARCH*
242CC5601A23474...

Driver's License Number:_____
Social Security Number: 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

**GUARANTOR #2**
(Print Legal Name of Guarantor #2):_____

_____

Driver's License Number:_____
Social Security Number:_____

**DIVERSE CAPITAL, LLC**

By: _____

Name: _____

Title:_____

---

THE TERMS, DEFINITIONS, CONDITIONS, AND INFORMATION SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE "TERMS AND CONDITIONS" ATTACHED THERETO, ARE HEREBAY INCORPORATED IN AND MADE A PART OF THIS GUARANTY.

Exhibit 3
Page 60

DocuSign Envelope ID: D21711B0-384E-4101-B4F9-0627DB7E1BC

## ACH AUTHORIZATION FORM

*All information on this form is required unless otherwise noted.*

**BUSINESS AYTHORIZED TO DEBIT/CREDIT ACCOUNT**

Authorized Business Name                          Authorized Business Phone Number

Authorized Business Address                       City                          State          Zip

**ACCOUNT HOLDER INFORMATION**

                                                  THE LITIGATION PRACTICE GROUP PC
Account Holder First Name     Account Holder Last Name     Account Holder DBA Name (If          Phone Number
                                                           Business Account)

Account Holder Address

**ACCOUNT HOLDER BANK INFORMATION**

DANIEL STEPHEN MARCH
Account Holder Fist Name              Branch City                State          Zip

How to find your Routing and Account Numbers on a check

| Bank Routing Code | Bank Account Number | Business Checking | Personal Checking | Savings |

Bank Routing Number (9 digits)                    Bank Account Number

**TRANSACTION INFORMATION**

Goods Purchased/Services Rendered

On time          Recurring
Rate_____
Amount of Transaction          Effective Date     No. of Transactions_____  Or Open Ended

**AUTHORIZATION**

In exchange for products and/or services listed above the undersigned hereby authorizes:

To electronically draft via Automated Clearing House system the amounts indicated above from the account identified above. This authority will continue until withdrawn in writhing by the above-listed account holder. The undersigned individual hereby certifies that he/she is duly authorized to execute this form on behalf of the above-listed account holder. The above-listed account holder acknowledges that it is subject a $25 reject fee if items are returned for insufficient funds.

Account Holder:_____

By _____
DANIEL STEPHEN MARCH
Signature of Account Holder
242CC5607A2344...

DANIEL STEPHEN          MARCH               OWNER               08/06/2021
First Name of Account Holder   Last Name of Account Holder   Title of Account Holder   Date

12

Exhibit 3
Page 61

DocuSign Envelope ID: D21714B0-384E-4101-B4F9-06227DB7E1BC

# DIVERSE CAPITAL

## BALANCE TRANSFER FORM

| | |
|---|---|
| **Merchant Legal Name ("Merchant"):** | THE LITIGATION PRACTICE GROUP PC |
| **Name of Authorized Officer of Merchant ("Authorized Officer"):** | DANIEL STEPHEN MARCH |
| **Title of Authorized Officer:** | |
| **DBA:** | THE LITIGATION PRACTICE GROUP |
| **Physical Address:** | 17542 17TH STE 100 |
| **City:** | TUSTIN |
| **State:** | CA |
| **Zip Code:** | 92780 |
| **Date:** | 08/06/2021 |
| **Transferee:** | Diverse Capital, LLC, a Connecticut limited liability company ("Company") |
| **Address of Transferee:** | 750 Main Street Suite 906, Hartford CT 06103 |
| **[Date of previous secured agreement:]** | |
| **Remaining [RTR Concern]:** | |

To Whom It May Concern:

[I, Authorized Officer, on behalf of Merchant, hereby authorize Company to debit the remaining RTR balance which is currently due and owing to Company pursuant to the previous Merchant Agreement, entered into by and among Company, Merchant and the Guarantor(s) party thereto.

I acknowledge that as a result of the above-referenced debit, the amount paid to Merchant by Company pursuant to the new secured agreement will be reduced by the amount of the remaining RTR.]

Thank you,

Merchant Legal Name: THE LITIGATION PRACTICE GROUP PC

By: *DANIEL STEPHEN MARCH*

DocuSigned by:
242CC5691A3347A...

Name: DANIEL STEPHEN MARCH

Title: OWNER

13

Exhibit 3
Page 62

DocuSign Envelope ID: D2171AB0-394E-4101-B4F9-06227DB7E1BC

# DIVERSE CAPITAL

## CREDIT REPORT AUTHORIZATION FORM

Merchant hereby authorizes Diverse Capital, LLC and its designated agents and representatives to conduct a comprehensive review of Merchant's (and that of any guarantor's or co-obligor's) background through a credit report and/or an investigative credit report to be generated for the underwriting/application process in connection with this Agreement, as well as a subsequent renewal of this Agreement and/or any collection action related to same. Merchant understands that the scope of the credit report/investigative credit report may include, but is not limited to, the following areas: verification of Social Security number; current and previous residences; employment history, including all personnel files; education; references; credit history and reports; criminal history, including records from any criminal justice agency in any or all federal, state or county jurisdictions; birth records; motor vehicle records, including traffic citations and registration; and any other public records.

Merchant hereby authorizes the complete release of these records or data pertaining to Merchant that an individual, company, firm, corporation or public agency may have. Merchant hereby authorizes and requests any present or former employer, school, police department, financial institution or other persons having personal knowledge of Merchant to furnish Diverse Capital, LLC or its designated agents with any and all information in their possession regarding Merchant. Merchant hereby authorizes that a photocopy of this authorization be accepted with the same authority as the original.

Merchant understands that, if any adverse action is to be taken based upon the credit report, a copy of the report and a summary of Merchant's rights will be provided to Merchant.

Thank you,

Merchant Legal Name: DANIEL STEPHEN MARCH



By: DANIEL STEPHEN MARCH

Name: DANIEL STEPHEN MARCH

Title: OWNER

14

Exhibit 3
Page 63

# DIVERSE CAPITAL

### *** PLEASE READ CAREFULLY ***
### *The information below must be filled out completely*

Dear Merchant,

We are glad to welcome you to our unique financing program. The program will go into effect immediately after you return a signed agreement and will continue to be in effect until we receive the full Purchased Amount according to the agreement. After we receive the full agreement amount we will close off your account and deliver you a $0 balance letter for your future reference.

In order to assure the maintenance and servicing of your account please keep these service lines in your contacts for any service or maintenance request. Please note: due to a large amount of accounts and the difficulties of keeping track we sometime have accounting problems with the daily ACH debits. If you do have any debit that you think was incorrect you agree to contact us immediately to notify us about the incorrect debits:

### 631-520-0020 or email us at **submit@diversecapitalllc.com**

*We also **require** an active point of contact during the Term of the agreement. By providing your contact info below you agree to be contacted in regards to your account during the Term of the agreement. In case of an Emergency please list a secondary point of contact **(*required)**:

_____

Please note all necessary information in regards to **reaching you or your staff**, in case of a problem:

_____
_____
_____

If we experienced any issues with your account and we cannot reach you or your point of contact, we will enforce all legal remedies available to us, under the Agreement. We are always available to assist you with any service request that you may need.

### Please make sure to call us if any problems come up.

Contact Name;                              Email;

Dan March                                  admin@litigationpracticegroup.com
_____                      _____

Phone;                                     Cell Phone;

9▓▓▓-0648                                  ▓▓▓▓0648
_____                      _____

Exhibit 3
Page 64

# EXHIBIT 4

Exhibit 4
Page 65

**KINGDOM KAPITAL**

**REVENUE PURCHASE AGREEMENT**    08/17/2021

This Revenue Purchase Agreement and Security Agreement and Guaranty of Performance (**"Agreement"**) dated_____ between **KINGDOM KAPITAL** (**"KDK"**) the Merchant(s) listed below (**"Merchant"**) and the Individual(s) listed below (**"Guarantor"**)

## MERCHANT INFORMATION

Merchant's Legal Name: THE LITIGATION PRACTICE GROUP PC

D/B/A: THE LITIGATION PRACTICE GROUP PC

State of Incorporation / Organization:_____

Type of Entity: INC

Physical Address: 1351 CALLE AVANZADO ST4

City: SAN CLEMENTE    State: CA    Zip: 92673    Business Phone:_____

Guarantor(s) Name: TONY M DIAB    Cellphone Number:_____    Email Address:_____

Mailing Address: 1351 CALLE AVANZADO ST4    City: SAN CLEMENTE    State: CA    Zip: 92673

**Purchase Price:** $ 500,000.00    Purchased Percent 15    %    Purchased Amount: $ 749,500.00

Payment Frequency: DAILY    Remittance $ 14,990.00

In consideration of payment by KDK to Merchant of the Purchase Price set forth above, Merchant hereby sells, assigns and transfers to KDK (making KDK the absolute owner) the Purchased Percentage of all of Merchant's payments, receipts, settlements and funds paid to or received by or for the account of Merchant from time to time on and after the date hereof in payment or settlement of Merchant's existing and future accounts, payment intangibles, credit, debit and/or stored value card transactions, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers' and/or other payors or obligors (the "Future Receipts" defined as all payments made by cash, check, clearinghouse settlement, electronic transfer or other form of monetary payment), for the payments to Merchant as a result of Merchant's sale of goods and/ or services (the "Transactions") until the Purchased Amount has been delivered by or on behalf of Merchant to KDK. Merchant is selling a portion of a future revenue stream to KDK at a discount, and is not borrowing money from KDK, therefore there is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by KDK. The Remittance is a good faith estimate of KDK's share of the future revenue stream. Merchant going bankrupt or going out of business, or experiencing a slowdown in business, or a delay in collecting its receivables, in and of itself, does not constitute a breach of this Agreement. KDK is entering this Agreement knowing the risks that Merchant's business may not perform as expected or fail, and KDK assumes these risks based on Merchant's representations, warranties and covenants in this Agreement, which are designed to give KDK a reasonable and fair opportunity to receive the benefit of its bargain. KDK acknowledges that it may never receive the Purchased Amount if the Merchant does not generate sufficient revenue. Merchant and Guarantor(s)(s) are only guaranteeing their performance of the terms of this Revenue Purchase Agreement and are not guaranteeing the payment of the Purchased Amount. The initial Remittance shall be as described above. The Remittance is subject to adjustment as set forth in Paragraph 1.4 and Paragraph 1.5. KDK will debit the Remittance each business day from only one depositing bank account, which account must be acceptable to, and pre-approved by, KDK (the "Account") into which Merchant and Merchant's customers shall remit the Receipts from each Transaction, until such time as KDK receives payment in full of the Purchased Amount. Merchant hereby authorizes KDK to ACH debit the agreed Remittance from the Account on the agreed upon Payment Frequency; a daily basis means any day that is not a United States banking holiday. Merchant agrees not to make or cause debits to the Account (other than in favor of KDK) at any time that would cause the balance therein on any business day to be insufficient to fund payment in full of the agreed Remittance. The Account may not be used for any personal, family or household purposes.  Merchant will provide KDK with all required access codes and monthly bank statements regarding the Account so that KDK may monitor the Account. KDK payment of the Purchase Price shall be deemed the acceptance and performance by KDK of this Agreement. Merchant understands that it is responsible for ensuring that the agreed Remittance to be debited by KDK remains in the Account and will be held responsible for any fees incurred by KDK resulting from a rejected ACH attempt or an Event of Default. KDK is not responsible for any overdrafts or rejected transactions that may result from KDK's ACH debiting the agreed Remittance under the terms of this Agreement. Notwithstanding anything to the contrary in this Agreement or any other agreement between KDK and Merchant, upon the occurrence of an Event of Default of the MERCHANT AGREEMENT TERMS AND CONDITIONS the Purchased Percentage shall equal 100%. A list of all fees applicable under this Agreement is contained in Appendix A.

**THE MERCHANT AGREEMENT "TERMS AND CONDITIONS", THE "SECURITY AGREEMENT AND GUARANTY" AND THE "ADMINISTRATIVE FORM HEREOF, ARE ALL HEREBY INCORPORATED IN AND MADE A PART OF THIS MERCHANT AGREEMENT.**

**FOR THE MERCHANT (#1)** By: TONY M DIAB _____    _TONY M DIAB_
                                        (Print Name and Title)    (Signature)

**FOR THE MERCHANT (#2)** By: _____    _____
                                        (Print Name and Title)    (Signature)

**BY GUARANTOR(S) (#1)** By: TONY M DIAB _____    _TONY M DIAB_
                                        (Print Name and Title)    (Signature)

**BY GUARANTOR(S) (#2)** By: _____    _____
                                        (Print Name and Title)    (Signature)

1

**MERCHANT AGREEMENT TERMS AND CONDITIONS**

**1        TERMS OF ENROLLMENT IN PROGRAM**

1.1              **Merchant Deposit Agreement and Processor.** Merchant shall (A) execute an agreement acceptable to KDK with a Bank acceptable to KDK to obtain electronic fund transfer services for the Account, and (B) if applicable, execute an agreement acceptable to KDK with a credit and debit card processor (the "Processor") instructing the Processor to deposit all Receipts into the Account. Merchant shall provide KDK and/or its authorized agent(s) with all of the information, authorizations and passwords necessary for verifying Merchant's receivables, receipts, deposits and withdrawals into and from the Account. Merchant hereby authorizes KDK and/or its agent(s) to withdraw from the Account via ACH debit the amounts owed to KDK for the receipts as specified herein and to pay such amounts to KDK. These authorizations apply not only to the approved Account but also to any subsequent or alternate account used by the Merchant for these deposits, whether pre- approved by KDK or not. This additional authorization is not a waiver of KDK's entitlement to declare this Agreement breached by Merchant as a result of its usage of an account which KDK did not first pre-approve in writing prior to Merchant's usage thereof. The aforementioned authorizations shall be irrevocable without the written consent of KDK.

1.2              **Term of Agreement.** This Agreement shall remain in full force and effect until the entire Purchased Amount and any other amounts due are received by KDK as per the terms of this Agreement.

1.3              **Reconciliation.** As long as an Event of Default, or breach of this agreement, has not occurred, Merchant may request a retroactive reconciliation of the total Remittance Amount. All requests hereunder must be in writing to Reconciliations@businessfundcorp.com Said request must include copies of all of Merchant's bank account statements, credit card processing statements, and accounts receivable report outstanding if applicable, from the date of this Agreement through and including the date the request is made. KDK retains the right the request additional reasonable documentation including without limitation bank login or access to view Merchant's accounts using third party software, and Merchant's refusal to provide access shall be a breach of this Agreement and KDK shall have no obligation to reconcile. Such reconciliation, if applicable, shall be performed by KDK within two (2) Business Days following its receipt of Merchant's request for reconciliation by either crediting or debiting the difference back to, or from, Merchants Bank Account so that the total amount debited by KDK shall equal the Specific Percentage of the Future Receipts that Merchant collected during the requested month. Nothing set forth in this section shall be deemed to provide Merchant with the right to interfere with KDK's right and ability to debit Merchant's Account while the request is pending or to unilaterally modify the Remittance Amount, in any method other than the ones listed in this Agreement.

1.4              **Adjustments to the Remittance.** As long an Event of Default, or breach of this agreement, has not occurred, Merchant may elect to request a decrease in the Remittance, should they experience a decrease in its Future Receipts. All requests hereunder must be in writing to Reconciliations@businessfundcorp.com and must include copies of all of Merchant's bank account statements, credit card processing statements, and accounts receivable report outstanding from the date of this Agreement through and including the date the request is made. KDK retains the right the request additional reasonable documentation including without limitation bank login or 3rd party software access to view Merchant's accounts, refusal to provide access shall be a breach of this Agreement and KDK shall have no obligation to reconcile. The Remittance shall be modified to more closely reflect the Merchant's actual receipts by multiplying the Merchant's actual receipts by the Purchased Percentage divided by the number of business days in the previous (2) calendar weeks. Merchant shall provide KDK with viewing access to their bank account as well as all information reasonably requested by KDK to properly calculate the Merchant's Remittance. At the end of the two (2) calendar weeks the Merchant may request another adjustment pursuant to this paragraph or it is agreed that the Merchant's Remittance shall return to the Remittance as agreed upon on Page 1 of this Agreement.

1.5              **Financial Condition.** Merchant and Guarantor(s)(s) (as hereinafter defined and limited) authorize KDK and its agents to investigate their financial responsibility and history, and will provide to KDK any authorizations, bank or financial statements, tax returns, etc., as KDK requests in its sole and absolute discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable as an authorization for release of financial and credit information. KDK is authorized to update such information and financial and credit profiles from time to times as appropriate.

1.6              **Transactional History.** Merchant authorizes all of its banks, brokers and processor to provide KDK with Merchant's banking, brokerage and/or processing history to determine qualification or continuation in this program and for collections purposes. Merchant shall provide KDK with copies of any documents related to Merchant's card processing activity or financial and banking affairs within five days after a request from KDK.

1.7              **Indemnification.** Merchant and Guarantor(s)(s) hereby jointly and severally indemnify and hold harmless KDK and each Processor, their respective officers, directors, agents and representatives, and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by any such indemnitee as a direct or indirect result of (a) claims asserted by KDK for monies owed to KDK from Merchant and (b) actions taken by indemnitee in reliance upon any fraudulent, misleading or deceptive information or instructions provided by KDK.

1.8              **No Liability.** In no event will KDK be liable for any claims asserted by Merchant or Guarantor(s)(s) under any legal or equitable theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by both Merchant and Guarantor(s)(s). In the event these claims are nonetheless raised, Merchant and Guarantor(s)(s) will be jointly liable for all of KDK's attorney's fees and expenses resulting therefrom.

1.9              **Reliance on Terms.** Section 1.1, 1.6, 1.7, 1.8 and 2.5 of this Agreement are agreed to for the benefit of Merchant, KDK, Processor, and Merchant's bank and notwithstanding the fact that Processor and the bank is not a party of this Agreement, Processor and the bank may rely upon their terms and raise them as a defense in any action.

1.10              **Sale of Receipts.** Merchant and KDK agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount, and that such Purchase Price is not intended to be, nor shall it be construed as a loan from KDK to Merchant. Merchant agrees that the Purchase Price is in exchange for the Receipts pursuant to this Agreement, and that it equals the fair market value of such Receipts. KDK has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Merchant acknowledges that KDK's share of Receipts collected are being held by Merchant in trust and are the sole property of KDK until they are remitted to KDK. Payments made to KDK in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services, and the payment therefore by Merchant's customers. By this Agreement, Merchant transfers to KDK full and complete ownership of the Purchased Amount and Merchant retains no legal or equitable interest therein. KDK hereby appoints Merchant, and Merchant accepts appointment, as servicer for and on behalf of KDK for the purpose of collecting and delivering Receipts to KDK as required by this Agreement until KDK has received the Receipts Purchased Amount, and Merchant agrees that all such Receipts shall be received and held in trust for the benefit of SPFL for purposes of carrying out the terms of this Agreement. Merchant agrees that it will treat the amounts received and the Purchased Receipts delivered to KDK under this Agreement in a manner consistent with a sale in its accounting records and tax returns. Merchant agrees that KDK is entitled to audit Merchant's accounting records upon reasonable notice in order to verify compliance. Merchant waives any rights of privacy, confidentiality or taxpayer privilege in any such litigation or arbitration in which Merchant asserts that this transaction is anything other than a sale of future receipts. In no event shall the aggregate of all amounts or any portion thereof be deemed as interest hereunder, and in the event it is found to be interest despite the parties hereto specifically representing that it is NOT interest, it shall be found that no sum charged or collected hereunder shall exceed the highest rate permissible at law. In the event that a court nonetheless determines that KDK has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and KDK shall promptly refund to Merchant any interest received by KDK in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that KDK not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law. As a result thereof, Merchant knowingly and willingly waives the defense of Usury in any action or proceeding.

1.11              **Power of Attorney.** Merchant irrevocably appoints KDK and its agents and representatives, as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to KDK from Processor, or in the case of a violation by Merchant of Section 1or the occurrence of an Event of Default under Section 3 hereof, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to KDK; and (v) to contact Merchant's banks and financial institutions using Merchant and Guarantor(s)(s) personal information to verify the existence of an account and obtain account balances (vi) to file any claims or take any action or institute any proceeding which KDK may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount. In connection therewith, all costs, expenses and fees, including legal fees, shall be payable by merchant.

1.12              **Protections against Default.** The following Protections 1 through 8 may be invoked by KDK immediately and without notice to Merchant in the event: (a)Merchant takes any action to discourage the use of electronic check processing that are settled through Processor, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks or other payments or deposits for the purchase of Merchant's services and products including but not limited to direct deposit of any checks into a bank account without scanning into the KDK electronic check processor; (b) Merchant changes its arrangements with Processor or the Bank in any way that is adverse or unacceptable to KDK; (c) Merchant changes the electronic check processor through which the Receipts are settled from Processor to another electronic check processor, or permits any event to occur that could cause diversion of any of Merchant's check or deposit transactions to another processor; (d) Merchant intentionally interrupts or ceases the operation of this business transfers, moves, sells, disposes, or otherwise conveys its business and/or assets without (i) the express prior written consent of KDK, and (ii) the written agreement of any KDK or transferee to the assumption of all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to KDK; (e) Merchant takes any action, fails

to take any action, or offers any incentive—economic or otherwise—the result of which will be to induce any customer or customers to pay for Merchant's services with any means other than payments, checks or deposits that are settled through Processor; (f) Merchant fails to provide KDK with copies of any documents related to Merchant's card processing activity of financial and banking affairs within five days after a request from KDK, or (g) Merchant breaches any terms of this Agreement, including but not limited any of the Events of Default contained in Section 3.1 herein. These protections are in addition to any other remedies available to KDK at law, in equity or otherwise pursuant to this Agreement.

**Protection 1.** The full uncollected Purchased Amount plus all fees (including attorney's fees and costs of collection in the amount of 30% of the Purchased Amount then outstanding due under this Agreement and the attached Security Agreement become due and payable in full immediately.

**Protection 2.** KDK may enforce the provisions of the Limited Personal Guaranty of Performance against the Guarantor(s).

**Protection 3.** Merchant hereby authorizes KDK to execute in the name of the Merchant a Confession of Judgment in favor of KDK pursuant to the terms of the Confession of Judgment. Upon an Event of Default, KDK may enter that Confession of Judgment as a Judgment with the Clerk of any Court and execute thereon.

**Protection 4.** KDK may enforce its security interest in the Collateral including sending demand letters to account debtors and credit card processors.

**Protection 5.** KDK may exercise any and all rights and remedies of a secured party under Uniform Commercial Code Article 9

**Protection 6.** KDK may proceed to protect and enforce its right and remedies by lawsuit. In any such lawsuit, if KDK recovers a Judgment against Merchant, Merchant shall be liable for all of KDK's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs.

**Protection 7.** This Agreement shall be deemed Merchant's Assignment of Merchant's Lease of Merchant's business premises to KDK. Upon breach of any provision in this Agreement, KDK may exercise its rights under this Assignment of Lease without prior Notice to Merchant. Protection 8. KDK may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to KDK.

**Protection 8.** KDK may debit Merchant's depository accounts wherever situated in such amounts as determined by KDK in its sole discretion for purposes of collecting funds for application to the unrealized Purchased Amount and other amounts owed by Merchant to KDK by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to KDK.

**1.13 Protection of Information.** Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner or Guarantor(s), in respect of himself or herself personally, authorizes KDK to disclose information concerning Merchant's and each Owner's and each Guarantor(s)'s credit standing (including credit bureau reports that KDK obtains) and business conduct only to agents, affiliates, subsidiaries, and credit reporting bureaus. Merchant and each Owner and each Guarantor(s) hereby and each waives to the maximum extent permitted by law any claim for damages against KDK or any of its affiliates relating to any (i)investigation undertaken by or on behalf of KDK as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**1.14 Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by KDK, including this Agreement and any other KDK documents (collectively, "Confidential Information") are proprietary and confidential information of KDK. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information of KDK to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this section. A breach hereof entitles KDK to not only damages and reasonable attorney's fees but also to both a Temporary Restraining Order and a Preliminary Injunction without Bond or Security.

**1.15 Publicity.** Merchant and each of Merchant's Owners and all Guarantor(s) hereto all hereby authorizes KDK to use its, his or her name in listings of clients and in advertising and marketing materials.

**1.16 D/B/A's.** Merchant hereby acknowledges and agrees that KDK may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between KDK and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**2          REPRESENTATIONS, WARRANTIES AND COVENANTS**
Merchant represents warrants and covenants that, as of this date and during the term of this Agreement:

2.1          **Financial Condition and Financial Information.** Merchant's and Guarantor(s)s' bank and financial statements, copies of which have been furnished to KDK, and future statements which will be furnished hereafter at the discretion of KDK, fairly represent the financial condition of Merchant at such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant and Guarantor(s)s have a continuing, affirmative obligation to advise KDK of any material adverse change in their financial condition, operation or ownership. KDK may request statements at any time during the performance of this Agreement and the Merchant and Guarantor(s)s shall provide them to KDK within five business days after request from KDK. Merchant's or Guarantor(s)s' failure to do so is a material breach of this Agreement.

2.2          **Governmental Approvals.** Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.

2.3          **Authorization.** Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

2.4          **Use of Funds.** Merchant agrees that it shall use the Purchase Price for business purposes and not for personal, family, or household purposes.

2.5          **Electronic Check Processing Agreement.** Merchant will not change its Processor, add terminals, change its financial institution or bank account(s)or take any other action that could have any adverse effect upon Merchant's obligations under this Agreement, without KDK's prior written consent. Any such changes shall be a material breach of this Agreement.

2.6          **Change of Name or Location.** Merchant will not conduct Merchant's businesses under any name other than as disclosed to the Processor and KDK, nor shall Merchant change any of its places of business without prior written consent by KDK.

2.7          **Daily Batch Out.** Merchant will batch out receipts with the Processor on a daily basis ifapplicable.

2.8          **Estoppel Certificate.** Merchant will at every and all times, and from time to time, upon at least one (1) day's prior notice from KDK to Merchant, execute, acknowledge and deliver to KDK and/or to any other person, firm or corporation specified by KDK, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion thereof has been repaid.

2.9          **No Bankruptcy.** As of the date of this Agreement, Merchant is not insolvent and does not contemplate filing for bankruptcy in the next six months and has not consulted with a bankruptcy attorney or filed any petition for bankruptcy protection pursuant to the United States Bankruptcy Code and there has been no involuntary petition brought or pending against Merchant. Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

2.10          **Unencumbered Receipts.** Merchant has good, complete, unencumbered and marketable title to all Receipts and all collateral in which KDK has been granted a security interest under the Security Agreement, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever other than in favor of KDK or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of KDK.

2.11          **Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

2.12          **Defaults under Other Contracts.** Merchant's execution of, and/or performance under this Agreement, will not cause or create an event of default by Merchant under any contract with another person or entity.

2.13          **Good Faith.** Merchant and Guarantor(s)s hereby affirm that Merchant is receiving the Purchase Price and selling KDK the Purchased Amount in good faith and will use the Purchase Price funds to maintain and grow Merchant's business

**3          EVENTS OF DEFAULT AND REMEDIES**
3.1          **Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" hereunder:
(a)          Merchant or Guarantor(s) shall violate any term or covenant in this Agreement;
(b)          Any representation or warranty by Merchant or Guarantor(s) in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made;

(c)          the sending of notice of termination by Merchant or verbally notifying KDK of its intent to breach this Agreement;
(d)          the Merchant fails to give KDK 24 hours advance notice that there will be insufficient funds in the account such that the ACH of the Remittance amount will not be honored by Merchant's bank, the Merchant fails to supply all requested documentation and allow for daily and/or real time monitoring of its bank account;



(e)    Merchant fails to provide its bank statements, and/or month to date bank activity, and/or accounts receivable reports, and/or bank login information within two (2) business days of a request by KDK,

(f)    Merchant shall voluntarily transfer or sell all or substantially all its assets.

(g)    Merchant shall make or send notice of any intended bulk sale or transfer by Merchant.

(h)    Merchant shall use multiple depository accounts without the prior written consent of KDK or takes any other action that intentionally interferes with or prevents KDK from receiving the Purchased Amount in accordance with the terms of this Agreement.

(i)    Merchant shall enter into any financing agreements with any other party including but not limited to: Loans, Merchant Cash Advances, Receivables financing, or any other agreement that will increase the total debt owed by Merchant to any other party.

(j)    Merchant shall change its depositing account without the prior written consent of KDK; or

(k)    Merchant shall close its depositing account used for ACH debits without the prior written consent of KDK

(l)    Merchant's bank returns a code other than NSF cutting KDK from its collections

(m)    Merchant or any Owner/Guarantor(s), directly or indirectly, causes to be formed a new entity or otherwise becomes associated with any new or existing entity, which operates a business similar to or competitive with that of Merchant.

(n)    Merchant shall default under any of the terms, covenants and conditions of any other agreement with KDK.

**3.2    Limited Personal Guaranty** Upon the occurrence of an Event of Default, KDK will enforce its rights against the Guarantor(s) of this transaction. Said Guarantor(s) will be jointly and severally liable to KDK for all of KDK's losses and damages, in addition to all costs and expenses and legal fees associated with such enforcement.

**3.3    Remedies.** Upon the occurrence of an Event of Default occurs and is not waived pursuant to Section 4.4. hereof, KDK may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Merchant's obligations hereunder (including the Guaranty) or any other legal or equitable right or remedy, including but not limited to filing the Confession of Judgment and executing thereon, and enforcing the Security Agreement contained herein. All rights, powers and remedies of KDK in connection with this Agreement may be exercised at any time by KDK after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

**3.4    Attorney's Fees.** Upon the occurrence of an Event of Default, and KDK retains an attorney or law firm to enforce this Agreement, Merchant and Guarantor(s) agree that a fee equal to 30% of the Remaining Balance (purchased amount less amount remitted by Merchant) ("Attorney's Fees") shall be immediately assessed Merchant and Guarantor(s) agree that the calculation for Attorney's Fees is reasonable.

**3.5    Costs.** Merchant shall pay to KDK all reasonable costs associated with (a) an Event or Default, (b) breach by Merchant of the Covenants in this Agreement and the enforcement thereof, and(c) the enforcement of KDK's remedies set forth in this Agreement, including but not limited to court costs and attorneys' fees.

**3.6    Required Notifications.** Merchant is required to give KDK written notice within 24 hours of any filing under Title 11 of the United States Code. Merchant is required to give KDK seven days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or stock.

**4    MISCELLANEOUS**

**4.1    Modifications; Agreements.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by KDK.

**4.2    Assignment.** KDK may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part.

**4.3    Notices.** All notices, requests, consents, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement. Notices to KDK shall become effective only upon receipt by KDK. Notices to Merchant shall become effective three days after mailing.

**4.4    Waiver Remedies.** No failure on the part of KDK to exercise, and no delay in exercising any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**4.5    Binding Effect; Governing Law, Venue and Jurisdiction.** This Agreement, Security Agreement and Guaranty, Guaranty of Performance, and any and all addendums attachments, exhibits, and other documents relating to this Agreement in any way, shall be binding upon and inure to the benefit of Merchant and Guarantor(s) on the one hand, and KDK and their respective successors and assigns, except that Merchant and Guarantor(s) shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of KDK which consent may be withheld in KDK's sole discretion. KDK reserves the rights to assign this Agreement with or without prior written notice to Merchant. This Agreement, Security Agreement and Guaranty, Guaranty of Performance, and any and all addendums, attachments, exhibits, and other documents relating to this Agreement in any way, shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if KDK so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). All Parties to this Agreement, including but not limited to, Merchant, Guarantor(s), Corporate Guarantor(s) Merchant and Guarantor(s) that the Acceptable Forums are convenient to it, and submit to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant and Guarantor(s) waives any right to oppose any motion or application made by KDK to transfer such proceeding to an Acceptable Forum. **Merchant and Guarantor(s) hereby agree that the mailing of any Summons and Complaint in any proceeding commenced by KDK by certified or registered mail, return receipt requested to the Mailing Address listed on this Agreement, or via email to the Email Address listed on this Agreement, or any other process required by any such court will constitute valid and lawful service of process against them without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions.**

**4.6    Survival of Representation,** etc. All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

**4.7    Interpretation.** All Parties hereto have reviewed this Agreement with attorney of their own choosing and have relied only on their own attorneys' guidance and advice. No construction determinations shall be made against either Party hereto as drafter.

**4.8    Severability.** In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

**4.9    Entire Agreement.** Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof. This Agreement and the Security Agreement and Guaranty hereto embody the entire agreement between Merchant Guarantor(s) and Corporate Guarantor(s) and KDK and supersede all prior agreements and understandings relating to the subject matter hereof.

**4.10    JURY TRIAL WAIVER.** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING INCONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OR THEENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND   ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**4.11    CLASS ACTION WAIVER.** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND ( 2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**4.12    Facsimile & Digital Acceptance.** Facsimile signatures and digital signatures hereon shall be deemed acceptable for all purposes.

**4.13    Heter Iska.** All of our business are done in accordance to the "HI-BP" which can be reviewed at the following link "shorturl.at/djBIR"

PROPERTY OF KINGDOM KAPITAL

Initial(1): _____    Initial(2): _____



Exhibit 4
Page 69

## SECURITY AGREEMENT AND GUARANTY OF PERFORMANCE

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY OF PEFORMANCE. CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.

Merchant's Legal Name: THE LITIGATION PRACTICE GROUP PC

D/B/A: THE LITIGATION PRACTICE GROUP PC          Federal ID#: ████5343

Physical Address: 1351 CALLE AVANZADO ST4          City: SAN CLEMENTE   State: CA          Zip: 92673

## SECURITY AGREEMENT

**Security Interest.** This Agreement will constitute a security agreement under the Uniform Commercial Code. To secure Merchant's obligations under the Revenue Purchase Agreement to make available or deliver Purchased Amount to KDK and KDK's right to realize the Purchased Amount, as and to the extent required by the terms of the Revenue Purchase Agreement, and performance of and compliance by Merchant with its other undertakings and agreements herein, Merchant and Guarantor(s)(s) grants to KDK a security interest and in lien upon: (a) all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are each defined in Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant and/or Guarantor(s)(s), (b) all proceeds, as that term is defined in Article 9 of the UCC (c) all funds at any time in the Merchant's and/or Guarantor(s)(s) Account, regardless of the source of such funds, (d) present and future Electronic Check Transactions, and (e) any amount which may be due to KDK under this Agreement, including but not limited to all rights to receive any payments or credits under this Agreement (collectively, the "Secured Assets"). Merchant agrees to provide other security to KDK upon request to secure Merchant's obligations under this Agreement. Merchant agrees that, if at any time there are insufficient funds in Merchant's Account to cover KDK's entitlements under this Agreement, KDK is granted a further security interest in all of Merchant's assets of any kind whatsoever, and such assets shall then become Secured Assets. These security interests and liens will secure all of KDK's entitlements under this Agreement and any other agreements now existing or later entered into between Merchant, KDK or an affiliate of KDK is authorized to file any and all notices or filings it deems necessary or appropriate to enforce its entitlements hereunder.

In the event Merchant, any of its officers or directors or any Owner/Guarantor(s), during the term of the Revenue Purchase Agreement or while Merchant remains liable to KDK for any obligations under the Revenue Purchase Agreement, directly or indirectly, including acting by, through or in conjunction with any other person, causes to be formed a new entity or otherwise becomes associated with any new or existing entity, whether corporate, partnership, limited liability company or otherwise, which operates a business similar to or competitive with that of Merchant, such entity shall be deemed to have expressly assumed the obligations due KDK under the Revenue Purchase Agreement. With respect to any such entity, KDK shall be deemed to have been granted an irrevocable power of attorney with authority to file, naming such newly formed or existing entity as debtor, an initial UCC financing Statement and to have it filed with any and all appropriate UCC filing offices. KDK shall be held harmless by Merchant and each Owner/Guarantor(s) and be relieved of any liability as a result of any such authentication and filing of any such Financing Statement or the resulting perfection of its ownership rights or security interests in such entity's assets. KDK shall have the right to notify such entity's payors or account debtor (as defined by the UCC) of KDK's rights, including without limitation, KDK's right to collect all accounts, and to notify any payment card processor or creditor of such entity that KDK has such rights in such entity's assets. Merchant also agrees that, at the KDK's discretion, KDK may choose to amend any existing financing statement to include any such newly formed entity as debtor.

This security interest may be exercised by KDK without notice or demand of any kind by making an immediate withdrawal or freezing the Secured Assets. KDK shall have the right to notify account debtors at any time.  Pursuant to Article 9 of the Uniform Commercial Code, as amended from time to time, KDK has control over and may direct the disposition of the Secured Assets, without further consent of Merchant. Merchant hereby represents and warrants that no other person or entity has a security interest in the Secured Assets. With respect to such security interests and liens, KDK will have all rights afforded under the Uniform Commercial Code, any other applicable law and in equity. Merchant will obtain from KDK written consent prior to granting a security interest of any kind in the Secured Assets to a third party. Merchant and Guarantor(s) (s) agree(s) that this is a contract of recoupment and KDK is not required to file a motion for relief from a bankruptcy action automatic stay to realize on any of the Secured Assets. Nevertheless, Merchant and Guarantor(s)(s) agree(s) not to contest or object to any motion for relief from the automatic stay filed by KDK. Merchant and Guarantor(s)(s) agree(s) to execute and deliver to KDK such instruments and documents KDK may reasonably request to perfect and confirm the lien, security interest and right of setoff set forth in this Agreement. KDK is authorized to execute all such instruments and documents in Merchant's and Guarantor(s)(s) name.

Merchant and Guarantor(s)(s) each acknowledge and agree that any security interest granted to KDK under any other agreement between Merchant or Guarantor(s)(s) and KDK (the "Cross-Collateral") will secure the obligations hereunder and under the Merchant Agreement. Merchant and Guarantor(s)(s) each agrees to execute any documents or take any action in connection with this Agreement as KDK deems necessary to perfect or maintain KDK's first priority security interest in the Collateral and the Additional Collateral, including the execution of any account control agreements. Merchant and Guarantor(s)(s) each hereby authorizes KDK to file any financing statements deemed necessary by KDK to perfect or maintain KDK's security interest. Merchant and Guarantor(s)(s) shall be liable for, and KDK may charge and collect, all costs and expenses, including but not limited to attorney's fees, which may be incurred by KDK in protecting, preserving and enforcing KDK's security interest and rights.

**Negative Pledge**. Merchant and Guarantor(s)(s) each agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Additional Collateral, as applicable.

**Consent to Enter Premises and Assign Lease**. KDK shall have the right to cure Merchant's default in the payment of rent on the following terms. In the event Merchant is served with papers in an action against Merchant for nonpayment of rent or for summary eviction, KDK may execute its rights and remedies under the Assignment of Lease. Merchant also agrees that KDK may enter into an agreement with Merchant's landlord giving KDK the right: (a) to enter Merchant's premises and to take possession of the fixtures and equipment therein for the purpose of protecting and preserving same; and/or (b) to assign Merchant's lease to another qualified business capable of operating a business comparable to Merchant's at such premises.

**Remedies**. Upon any Event of Default, KDK may pursue any remedy available at law (including those available under the provisions of the UCC), or in equity to collect, enforce, or satisfy any obligations then owing to KDK, whether by acceleration or otherwise.

PROPERTY OF KINGDOM KAPITAL          Initial(1): ___  Initial(2): ___



Exhibit 4
Page 70

## GUARANTY OF PERFORMANCE

As an additional inducement for KDK to enter into the Revenue Purchase Agreement, the undersigned Guarantor(s)(s) hereby provides KDK with this Guaranty. Guarantor(s)(s) will not be personally liable for any amount due under the Revenue Purchase Agreement unless Merchant commits an Event of Default pursuant to Paragraph 3.1 of the Revenue Purchase Agreement. Each Guarantor(s) shall be jointly and severally liable for all amounts owed to KDK in the Event of Default. Guarantor(s)(s) guarantee Merchant's good faith, truthfulness and performance of all of the representations, warranties, covenants made by Merchant in this Agreement including the Merchant's full and timely delivery of the Purchased Amount pursuant to (and limited by) the Revenue Purchase Agreement, in each case as each may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations"). Guarantor(s)'s obligations are due at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in the Agreement.

**Guarantor(s) Waivers**. In the event of a breach of the above, KDK may seek recovery from Guarantor(s)s for all of KDK's losses and damages by enforcement of KDK's rights under this Agreement without first seeking to obtain payment from Merchant, any other Guarantor(s), or any Collateral or Additional Collateral KDK may hold pursuant to this Agreement or any other guaranty. In addition, Section 4.5, 4.10 and 4.11 are expressly reiterated in the Security Agreement and Guaranty herein. KDK is not required to notify Guarantor(s) of any of the following events and Guarantor(s) will not be released from its obligations under this Agreement if it is not notified of: (i) Merchant's failure to pay timely any amount required under the Merchant Agreement; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; (iv) KDK's acceptance of this Agreement; and (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to KDK. In addition, KDK may take any of the following actions without releasing Guarantor(s) from any of its obligations under this Agreement: (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to KDK; (ii) release Merchant from its obligations to KDK; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor(s) to obtain reimbursement for payment under this Agreement. Until the Purchased Amount and Merchant's other obligations to KDK under the Merchant Agreement and this Agreement are paid in full, Guarantor(s) shall not seek reimbursement from Merchant or any other Guarantor(s) for any amounts paid by it under this Agreement. Guarantor(s) permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other Guarantor(s), or any collateral provided by Merchant or any other Guarantor(s), for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution. In the event that KDK must return any amount paid by Merchant or any other Guarantor(s) of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor(s)'s obligations under this Agreement shall include that amount.

Guarantor(s) Acknowledgement. Guarantor(s) acknowledges that: (i) He/She is bound by the Class Action Waiver provision in the Merchant Agreement Terms and Conditions; (ii) He/She understands the seriousness of the provisions of this Agreement; (ii) He/She has had a full opportunity to consult with counsel of his/her choice; and (iv) He/She has consulted with counsel of its choice or has decided not to avail himself/herself of that opportunity.

This Security Agreement and Guaranty and Guaranty of Performance shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if KDK so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). Merchant, Guarantor and Corporate Guarantors agree that the Acceptable Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Merchant, Guarantor and Corporate Guarantors agree that the Acceptable Forums are convenient to it, and submit to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant, Guarantor and Corporate Guarantors waives any right to oppose any motion or application made by KDK to transfer such proceeding to an Acceptable Forum.

The Merchant Guarantor(s) and Corporate Guarantor(s) acknowledge that they have read Paragraph 4.5 of this Agreement in its entirety and understand that they are waiving their right to Service of Process by traditional manners and will accept process of any Summons and Complaint or other legal process by certified mail return receipt requested to the Mailing Address on Page 1 of this Agreement.

**FOR ALL MERCHANT(S) (#1)** By: TONY M DIAB _____

_____ (Signature)
(Print Name and Title)

SSN# ████ 5745 _____

**FOR ALL MERCHANT(S) (#2)** By: _____

_____ (Signature)
(Print Name and Title)

SSN# _____

**GUARANTOR(S) (#1)** By: TONY M DIAB _____

_____ (Signature)
(Print Name and Title)

SSN# ████ 5745 _____

**GUARANTOR(S) (#2)** By: _____

_____ (Signature)
(Print Name and Title)

SSN# _____

6

KINGDOM KAPITAL

Exhibit 4
Page 71

**AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT), DIRECT PAYMENTS (ACH DEBITS), AND CHECK DEBIT**

Merchant: THE LITIGATION PRACTICE GROUP PC

(Merchant's Legal Name)

**Merchant Agreement:** Merchant Agreement between KDK and Merchant, dated as of: 08/17/2021

Designated Checking Account:

Capitalized terms used in this Authorization Agreement without definition shall have the meanings set forth in the Merchant Agreement.

By signing below, Merchant attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes. **This Authorization Agreement for Direct Deposit (ACH Credit), Direct Payments (ACH Debits), and Check Debit is part of (and incorporated by reference into) the Merchant Agreement. Merchant should keep a copy of this important legal document for Merchant's records.**

**DISBURSEMENT OF ADVANCE PROCEEDS.** By signing below, Merchant authorizes KDK to disburse the Advance proceeds less the amount of any applicable fees upon Advance approval by initiating ACH credits to the Designated Checking Account, in the amounts and at the times specified in the Merchant Agreement. **By signing below, Merchant also authorizes KDK to collect amounts due from Merchant under the Merchant Agreement by initiating ACH debits or to initiate a Check Debit to the Designated Checking Account, as follows:**

Bank Name:_____    Branch:_____

Federal ID#: ▆▆▆6343

ABA: Routing: 122000496    DDA: Account: ▆▆▆4858

Bank Name:_____    Branch:_____

Federal ID#:_____

ABA: Routing:_____    DDA: Account:_____

In the Amount of: $ 14,990.00

(Or) Percentage of each Banking Deposit: 15 %

On the Following Days: MONDAY-FRIDAY

If any payment date falls on a weekend or holiday, I understand and agree that the payment may be executed on the next business day. If a payment is rejected by Merchant's financial institution for any reason, including without limitation insufficient funds, Merchant understands that KDK may, at its discretion, attempt to process the payment again as permitted under applicable ACH rules. Merchant also authorizes KDK to initiate ACH entries to correct any erroneous payment transaction.

**MISCELLANEOUS.** KDK is not responsible for any fees charged by Merchant's bank as the result of credits or debits initiated under this Authorization Agreement. The origination   of ACH debits and credits to the Designated  Checking Account must comply with applicable  provisions of state and federal law, and the rules and operating guidelines of NACHA (formerly known as the National Automated Clearing House Association).  This Authorization Agreement is to remain in full force and effect until KDK has received written notification from Merchant at the address set forth below at least 5 banking days prior of its termination to afford KDK a reasonable opportunity to act on it. The individual signing below on behalf of Merchant certifies that he/she is an authorized signer on the Designated Checking Account. Merchant will not dispute any ACH transaction initiated pursuant to this Authorization Agreement, provided the transaction corresponds to the terms of this Authorization Agreement. Merchant requests the financial institution that holds the Designated Checking Account to honor all   ACH entries initiated in accordance with this Authorization Agreement.

**Merchant agrees** to be bound by the ACH Rules as defined by the National ACH Association (NACHA). Merchant understands that this authorization is to remain in full force and effect until KDK has received written notification from me of its termination at least five (5) business days prior to the payment due date. Merchant further understands that canceling their  ACH authorization  does  not  relieve  them  of  the  responsibility  of  paying  account  in  full, and that if Merchant cancels or revokes this authorization before any remaining debt is paid in full, the KDK may take additional actions including legal actions to secure the debt.

Merchant: THE LITIGATION PRACTICE GROUP PC

(Merchant's Legal Name)

Print Name: TONY M DIAB                                    Print Name: _____

X TONY M DIAB                                               X _____

(Signature)                                                (Signature)

_____                                    _____

(Title)                                                    (Title)

Date: 08/17/2021                                           Date: 08/17/2021

(Month) (Day) (Year)                                       (Month) (Day) (Year)

7

Exhibit 4
Page 72

# APPENDIX A - THE FEE STRUCTURE:

**A.** **Underwriting Fee**: $50,000   to cover Underwriting and relates expenses.

**B.** **UCC Filing Fee**: $499.00 and are not an automated process, requiring us to charge this fee to cover costs.

**C.** **NSF Fee Standard:** $50.00 (each) up to TWO TIMES ONLY before a default is declared.

**D.** **Bank Change Fee:** $50.00 When Merchant requires a change of Bank Account to be debited, requiring us to adjust our system.

**E.** **Blocked ACH Payment**: $2,500.00 This fee is applied when Merchant directs the bank to BLOCK our ACH Debits. Blocking ACH Debits will place Merchant's account in default.

**F.** **Default Fee:** $5,000.00 Shall be applied to Merchant's account in the event that Merchant defaults under the terms of the Merchant Agreement.

**G.** **ACH Processing Fee**: $249.00 (or 10% of the contract amount, depending on size of advance) ACH's are labor intensive

**H.** **Account Management Fee:** At the end of each month, Merchant will pay to KDK an Account Management Fee. This fee will not be applied towards the reduction of the Purchased Amount. This monthly fee will equal the average of all the payments received as a Specified percentage of the Merchants settlement amount for that Month.

**I.** **Miscellaneous Service Fee:** Merchant shall pay certain fees for services related to the origination and maintenance of Accounts. Each Merchant shall receive their funding electronically to their designated bank account and will be charged $30.00 for a Fed Wire or 0.00 for a bank ACH. The current charge for the underwriting and origination of each Merchant

**J.** **Working Capital Funding**: A fee of $5,000.00 or 10% shall be applied every time Merchant enters into any arrangement, agreement, or commitment that relates to or involves the Receipts, whether in the form of a purchase of, a loan against, collateral against or the sale or purchase of credits against, Receipts or future check sales with any party other than KDK

**K.** **Contract Service Fee:**  Commencing at date funded (the "Start Date"), merchant shall pay a fee of $499.00 per month (the "Monthly Fee") the monthly fee is payable each month during the term of this agreement, at a minimum of three months.

**L.** **Attorney's Fee:** Up to 30% of remaining balance (purchased amount less amount remitted by Merchant) shall be immediately assessed Merchant and Guarantor(s) agree that the calculation for Attorney's Fees is reasonable.  When a merchant breaches any term of this Agreement and KDK is required to retain counsel to enforce, defend or collect any term of this Agreement.

[ALL FEES ARE SUBJECT TO CHANGE]

**FOR THE MERCHANT (#1)** By: TONY M DIAB _____    _____

DocuSigned by:

_tony m diab_
A2C23FAF6C894BD...

(Print Name and Title)                                   (Signature)

**FOR THE MERCHANT (#2)** By: _____    _____

(Print Name and Title)                                   (Signature)

PROPERTY OF KINGDOM KAPITAL



Exhibit 4
Page 73

**Bank Login Information**

Dear Merchant,

Thank you for accepting this offer from KDK. We look forward to being your funding partner for as long as you need.

**Daily ACH Program:**

KDK will require viewing access s to your bank account, each business day, in order to verify the amount of your daily payment. Please be assured that we carefully safeguard your confidential information, and only essential personnel will have access to it.

KDK will also require viewing access to your bank account, prior to funding, as part of our underwriting process.

Please fill out the form below with the information necessary to access your account.

* Be sure to indicate capital or lower-case letters.

Name of Bank: _____

Bank portal website:

Username: _____

Password: _____

Security Question / Answer 1: _____

Security Question /Answer 2: _____

Security Question / Answer 3: _____

Any other information necessary to access your account:

_____

TONY M DIAB                                                          08/17/2021
_____            _____

FOR THE MERCHANT (#1) By:   TONY M DIAB                  Date
                            A2C23FAF6C8948D...
                                                                     08/17/2021
_____            _____

FOR THE MERCHANT (#2) By:                                Date

9

PROPERTY OF KINGDOM KAPITAL



Exhibit 4
Page 74

# EXHIBIT 5

Exhibit 5
Page 75

| Account | Date | Debit | Credit |
|---|---|---|---|
| 1st Agreement | 7/23/2021 | $0.00 | $10,000.00 |
| 1st Agreement | 7/26/2021 | $0.00 | $10,000.00 |
| 1st Agreement | 7/27/2021 | $0.00 | $10,000.00 |
| 1st Agreement | 7/28/2021 | $0.00 | $10,000.00 |
| 1st Agreement | 7/29/2021 | $0.00 | $10,000.00 |
| 1st Agreement | 7/30/2021 | $0.00 | $10,000.00 |
| 1st Agreement | 8/2/2021 | $0.00 | $10,000.00 |
| 1st Agreement | 8/2/2021 | $0.00 | $10,000.00 |
| 1st Agreement | 8/2/2021 | $0.00 | $10,000.00 |
| 1st Agreement | 8/3/2021 | $0.00 | $10,000.00 |
| 1st Agreement | 8/6/2021 | $0.00 | $10,000.00 |
| 1st Agreement | 8/9/2021 | $0.00 | $10,000.00 |
| 1st Agreement | 8/10/2021 | $0.00 | $10,000.00 |
| 1st Agreement | 8/11/2021 | $0.00 | $10,000.00 |
| 1st Agreement | 8/12/2021 | $0.00 | $10,000.00 |
| 1st Agreement | 8/13/2021 | $0.00 | $10,000.00 |
| 1st Agreement | 8/16/2021 | $0.00 | $10,000.00 |
| 1st Agreement | 8/17/2021 | $0.00 | $10,000.00 |
| 1st Agreement | 8/18/2021 | $0.00 | $10,000.00 |
| 1st Agreement | 8/19/2021 | $0.00 | $10,000.00 |
| 1st Agreement | 8/20/2021 | $10,000.00 | $0.00 |

Exhibit 5
Page 76

| 1st Agreement | 8/20/2021 | $0.00 | $10,000.00 |
|---|---|---|---|
| 1st Agreement | 8/23/2021 | $0.00 | $10,000.00 |
| 1st Agreement | 8/24/2021 | $0.00 | $10,000.00 |
| 1st Agreement | 8/25/2021 | $0.00 | $10,000.00 |
| 1st Agreement | 8/26/2021 | $0.00 | $10,000.00 |
| 1st Agreement | 8/27/2021 | $0.00 | $10,000.00 |
| 1st Agreement | 8/30/2021 | $10,000.00 | $0.00 |
| 1st Agreement | 8/30/2021 | $0.00 | $10,000.00 |
| 1st Agreement | 8/31/2021 | $10,000.00 | $0.00 |
| 1st Agreement | 8/31/2021 | $0.00 | $10,000.00 |
| 1st Agreement | 9/1/2021 | $10,000.00 | $0.00 |
| 1st Agreement | 9/1/2021 | $0.00 | $10,000.00 |
| 1st Agreement | 9/2/2021 | $10,000.00 | $0.00 |
| 1st Agreement | 9/2/2021 | $0.00 | $10,000.00 |
| 1st Agreement | 9/3/2021 | $10,000.00 | $0.00 |
| 1st Agreement | 9/3/2021 | $0.00 | $10,000.00 |
| 1st Agreement | 9/3/2021 | $0.00 | $30,000.00 |
| 1st Agreement | 9/7/2021 | $10,000.00 | $0.00 |
| 1st Agreement | 9/7/2021 | $0.00 | $10,000.00 |
| 1st Agreement | 9/8/2021 | $10,000.00 | $0.00 |
| 1st Agreement | 9/8/2021 | $0.00 | $10,000.00 |
| 1st Agreement | 9/9/2021 | $10,000.00 | $0.00 |

Exhibit 5
Page 77

| | | | |
|---|---|---|---|
| 1st Agreement | 9/9/2021 | $0.00 | $10,000.00 |
| 1st Agreement | 9/10/2021 | $10,000.00 | $0.00 |
| 1st Agreement | 9/10/2021 | $10,000.00 | $0.00 |
| 1st Agreement | 9/10/2021 | $0.00 | $10,000.00 |
| 1st Agreement | 9/13/2021 | $10,000.00 | $0.00 |
| 1st Agreement | 9/13/2021 | $0.00 | $10,000.00 |
| 1st Agreement | 9/14/2021 | $10,000.00 | $0.00 |
| | | | |
| | Total | $130,000.00 | $390,000.00 |
| | | | |
| | | **Payments** | **$ 260,000.00** |
| | | | |

Exhibit 5
Page 78

| Account | Date | Debit | Credit |
|---|---|---|---|
| 2nd Agreement | 8/16/2021 | $                - | $  18,735.00 |
| 2nd Agreement | 8/17/2021 | $                - | $  18,735.00 |
| 2nd Agreement | 8/18/2021 | $                - | $  18,735.00 |
| 2nd Agreement | 8/19/2021 | $                - | $  18,735.00 |
| 2nd Agreement | 8/20/2021 | $                - | $  18,735.00 |
| 2nd Agreement | 8/23/2021 | $                - | $  18,735.00 |
| 2nd Agreement | 8/24/2021 | $                - | $  18,735.00 |
| 2nd Agreement | 8/25/2021 | $                - | $  18,735.00 |
| 2nd Agreement | 8/26/2021 | $                - | $  18,735.00 |
| 2nd Agreement | 8/27/2021 | $                - | $  18,735.00 |
| 2nd Agreement | 8/30/2021 | $        18,735.00 | $                - |
| 2nd Agreement | 8/30/2021 | $                - | $  18,735.00 |
| 2nd Agreement | 8/31/2021 | $        18,735.00 | $                - |
| 2nd Agreement | 8/31/2021 | $                - | $  18,735.00 |
| 2nd Agreement | 9/1/2021 | $        18,735.00 | $                - |
| 2nd Agreement | 9/1/2021 | $                - | $  18,735.00 |
| 2nd Agreement | 9/2/2021 | $        18,735.00 | $                - |
| 2nd Agreement | 9/2/2021 | $                - | $  18,735.00 |
| 2nd Agreement | 9/3/2021 | $        18,735.00 | $                - |
| 2nd Agreement | 9/3/2021 | $                - | $  18,735.00 |
| 2nd Agreement | 9/7/2021 | $        18,735.00 | $                - |

Exhibit 5
Page 79

| | | | |
|---|---|---|---|
| 2nd Agreement | 9/7/2021 | $ - | $ 18,735.00 |
| 2nd Agreement | 9/8/2021 | $ 18,735.00 | $ - |
| 2nd Agreement | 9/8/2021 | $ - | $ 18,735.00 |
| 2nd Agreement | 9/9/2021 | $ 18,735.00 | $ - |
| 2nd Agreement | 9/9/2021 | $ - | $ 20,000.00 |
| 2nd Agreement | 9/9/2021 | $ - | $ 18,735.00 |
| 2nd Agreement | 9/10/2021 | $ 18,735.00 | $ - |
| 2nd Agreement | 9/10/2021 | $ 18,735.00 | $ - |
| 2nd Agreement | 9/10/2021 | $ - | $ 18,735.00 |
| 2nd Agreement | 9/13/2021 | $ 18,735.00 | $ - |
| 2nd Agreement | 9/13/2021 | $ - | $ 18,735.00 |
| 2nd Agreement | 9/14/2021 | $ 18,735.00 | $ - |
| 2nd Agreement | 9/21/2021 | $ - | $ 10,000.00 |
| 2nd Agreement | 9/22/2021 | $ 10,000.00 | $ - |
| 2nd Agreement | 9/22/2021 | $ - | $ 10,000.00 |
| 2nd Agreement | 9/23/2021 | $ 10,000.00 | $ - |
| 2nd Agreement | 9/23/2021 | $ - | $ 10,000.00 |
| 2nd Agreement | 9/24/2021 | $ 10,000.00 | $ - |
| 2nd Agreement | 9/24/2021 | $ - | $ 10,000.00 |
| 2nd Agreement | 9/27/2021 | $ 10,000.00 | $ - |
| 2nd Agreement | 9/27/2021 | $ - | $ 10,000.00 |
| 2nd Agreement | 9/28/2021 | $ 10,000.00 | $ - |

Exhibit 5
Page 80

| | | | |
|---|---|---|---|
| 2nd Agreement | 9/28/2021 | $ - | $ 10,000.00 |
| 2nd Agreement | 9/29/2021 | $ 10,000.00 | $ - |
| 2nd Agreement | 9/29/2021 | $ - | $ 10,000.00 |
| 2nd Agreement | 9/30/2021 | $ 10,000.00 | $ - |
| 2nd Agreement | 9/30/2021 | $ 10,000.00 | $ - |
| 2nd Agreement | 9/30/2021 | $ - | $ 10,000.00 |
| 2nd Agreement | 10/1/2021 | $ - | $ 10,000.00 |
| 2nd Agreement | 10/4/2021 | $ 10,000.00 | $ - |
| 2nd Agreement | 10/4/2021 | $ - | $ 10,000.00 |
| 2nd Agreement | 10/5/2021 | $ 10,000.00 | $ - |
| 2nd Agreement | 10/5/2021 | $ - | $ 10,000.00 |
| 2nd Agreement | 10/5/2021 | $ - | $ 5,000.00 |
| 2nd Agreement | 10/6/2021 | $ 10,000.00 | $ - |
| 2nd Agreement | 10/6/2021 | $ 5,000.00 | $ - |
| 2nd Agreement | 10/6/2021 | $ - | $ 5,000.00 |
| 2nd Agreement | 10/7/2021 | $ 5,000.00 | $ - |
| 2nd Agreement | 10/7/2021 | $ - | $ 5,000.00 |
| 2nd Agreement | 10/8/2021 | $ 5,000.00 | $ - |
| 2nd Agreement | 10/8/2021 | $ - | $ 5,000.00 |
| 2nd Agreement | 10/12/2021 | $ - | $ 5,000.00 |
| 2nd Agreement | 10/13/2021 | $ 5,000.00 | $ - |
| 2nd Agreement | 10/13/2021 | $ - | $ 5,000.00 |

Exhibit 5
Page 81

| | | | |
|---|---|---|---|
| 2nd Agreement | 10/14/2021 | $ 5,000.00 | $ - |
| 2nd Agreement | 10/14/2021 | $ - | $ 5,000.00 |
| 2nd Agreement | 10/15/2021 | $ 5,000.00 | $ - |
| 2nd Agreement | 10/15/2021 | $ - | $ 5,000.00 |
| 2nd Agreement | 10/18/2021 | $ 5,000.00 | $ - |
| 2nd Agreement | 10/18/2021 | $ - | $ 5,000.00 |
| 2nd Agreement | 10/19/2021 | $ 5,000.00 | $ - |
| 2nd Agreement | 10/19/2021 | $ - | $ 5,000.00 |
| 2nd Agreement | 10/20/2021 | $ 5,000.00 | $ - |
| 2nd Agreement | 10/20/2021 | $ - | $ 5,000.00 |
| 2nd Agreement | 10/21/2021 | $ 5,000.00 | $ - |
| 2nd Agreement | 10/21/2021 | $ - | $ 5,000.00 |
| 2nd Agreement | 10/22/2021 | $ 5,000.00 | $ - |
| 2nd Agreement | 10/22/2021 | $ - | $ 5,000.00 |
| 2nd Agreement | 10/25/2021 | $ 5,000.00 | $ - |
| 2nd Agreement | 10/25/2021 | $ - | $ 5,000.00 |
| 2nd Agreement | 10/26/2021 | $ 5,000.00 | $ - |
| 2nd Agreement | 10/26/2021 | $ - | $ 5,000.00 |
| 2nd Agreement | 10/27/2021 | $ 5,000.00 | $ - |
| 2nd Agreement | 10/27/2021 | $ - | $ 5,000.00 |
| 2nd Agreement | 10/28/2021 | $ 5,000.00 | $ - |
| 2nd Agreement | 10/28/2021 | $ - | $ 5,000.00 |

Exhibit 5
Page 82

| | | | |
|---|---|---|---|
| 2nd Agreement | 10/29/2021 | $ 5,000.00 | $ - |
| 2nd Agreement | 10/29/2021 | $ - | $ 5,000.00 |
| 2nd Agreement | 11/1/2021 | $ 5,000.00 | $ - |
| 2nd Agreement | 11/1/2021 | $ - | $ 5,000.00 |
| 2nd Agreement | 11/2/2021 | $ 5,000.00 | $ - |
| 2nd Agreement | 11/2/2021 | $ - | $ 5,000.00 |
| 2nd Agreement | 11/3/2021 | $ 5,000.00 | $ - |
| 2nd Agreement | 11/3/2021 | $ - | $ 5,000.00 |
| 2nd Agreement | 11/4/2021 | $ 5,000.00 | $ - |
| 2nd Agreement | 11/4/2021 | $ - | $ 5,000.00 |
| 2nd Agreement | 11/5/2021 | $ 5,000.00 | $ - |
| 2nd Agreement | 11/5/2021 | $ - | $ 5,000.00 |
| 2nd Agreement | 11/8/2021 | $ 5,000.00 | $ - |
| 2nd Agreement | 11/8/2021 | $ - | $ 5,000.00 |
| 2nd Agreement | 11/9/2021 | $ 5,000.00 | $ - |
| 2nd Agreement | 11/9/2021 | $ - | $ 5,000.00 |
| 2nd Agreement | 11/10/2021 | $ 5,000.00 | $ - |
| 2nd Agreement | 11/10/2021 | $ - | $ 5,000.00 |
| 2nd Agreement | 11/12/2021 | $ 5,000.00 | $ - |
| 2nd Agreement | 11/12/2021 | $ - | $ 5,000.00 |
| 2nd Agreement | 11/15/2021 | $ 5,000.00 | $ - |
| 2nd Agreement | 11/15/2021 | $ - | $ 5,000.00 |

Exhibit 5
Page 83

| | | | |
|---|---|---|---|
| 2nd Agreement | 11/16/2021 | $ 5,000.00 | $ - |
| 2nd Agreement | 11/16/2021 | $ - | $ 5,000.00 |
| 2nd Agreement | 11/17/2021 | $ 5,000.00 | $ - |
| 2nd Agreement | 11/17/2021 | $ - | $ 5,000.00 |
| 2nd Agreement | 11/18/2021 | $ 5,000.00 | $ - |
| 2nd Agreement | 11/18/2021 | $ - | $ 5,000.00 |
| 2nd Agreement | 11/19/2021 | $ 5,000.00 | $ - |
| 2nd Agreement | 11/19/2021 | $ - | $ 5,000.00 |
| 2nd Agreement | 11/22/2021 | $ 5,000.00 | $ - |
| 2nd Agreement | 2/16/2022 | Wire from SSD | $ 275,000.00 |
| | Total | $ 489,820.00 | $ 939,700.00 |
| | | | |
| | | **Total Payments** | **$ 449,880.00** |
| | | | |
| | | | |

Exhibit 5
Page 84

| Account | Date | Debit | Credit |
|---|---|---|---|
| 3rd Agreement | 8/23/2021 | $ - | $ 14,990.00 |
| 3rd Agreement | 8/24/2021 | $ 14,990.00 | $ - |
| 3rd Agreement | 8/24/2021 | $ - | $ 14,990.00 |
| 3rd Agreement | 8/25/2021 | $ 14,990.00 | $ - |
| 3rd Agreement | 8/25/2021 | $ - | $ 14,990.00 |
| 3rd Agreement | 8/25/2021 | $ - | $ 14,990.01 |
| 3rd Agreement | 8/25/2021 | $ - | $ 14,990.02 |
| 3rd Agreement | 8/25/2021 | $ - | $ 14,990.00 |
| 3rd Agreement | 8/26/2021 | $ 14,990.00 | $ - |
| 3rd Agreement | 8/26/2021 | $ - | $ 14,990.00 |
| 3rd Agreement | 8/27/2021 | $ - | $ 14,990.00 |
| 3rd Agreement | 8/30/2021 | $ 14,990.00 | $ - |
| 3rd Agreement | 8/30/2021 | $ - | $ 14,990.00 |
| 3rd Agreement | 8/31/2021 | $ 14,990.00 | $ - |
| 3rd Agreement | 8/31/2021 | $ - | $ 14,990.00 |
| 3rd Agreement | 9/1/2021 | $ 14,990.00 | $ - |
| 3rd Agreement | 9/1/2021 | $ - | $ 14,990.00 |
| 3rd Agreement | 9/2/2021 | $ 14,990.00 | $ - |
| 3rd Agreement | 9/2/2021 | $ - | $ 14,990.00 |
| 3rd Agreement | 9/3/2021 | $ 14,990.00 | $ - |
| 3rd Agreement | 9/3/2021 | $ - | $ 14,990.00 |

Exhibit 5
Page 85

| | | | |
|---|---|---|---|
| 3rd Agreement | 9/7/2021 | $ 14,990.00 | $ - |
| 3rd Agreement | 9/7/2021 | $ - | $ 14,990.00 |
| 3rd Agreement | 9/8/2021 | $ 14,990.00 | $ - |
| 3rd Agreement | 9/8/2021 | $ - | $ 14,990.00 |
| 3rd Agreement | 9/9/2021 | $ 14,990.00 | $ - |
| 3rd Agreement | 9/9/2021 | $ - | $ 14,990.00 |
| 3rd Agreement | 9/10/2021 | $ 14,990.00 | $ - |
| 3rd Agreement | 9/10/2021 | $ 14,990.00 | $ - |
| 3rd Agreement | 9/10/2021 | $ - | $ 14,990.00 |
| 3rd Agreement | 9/13/2021 | $ 14,990.00 | $ - |
| 3rd Agreement | 9/13/2021 | $ - | $ 14,990.00 |
| 3rd Agreement | 9/14/2021 | $ 14,990.00 | $ - |
| 3rd Agreement | 12/31/2021 | Coast Processing Wire | $ 100,000.00 |
| 3rd Agreement | 1/26/2022 | SSD Wire | $ 80,000.00 |
| 3rd Agreement | 2/28/2022 | SSD Wire | $ 25,000.00 |
| 3rd Agreement | 2/28/2022 | SSD Wire | $ 75,000.00 |
| | **Total** | **$ 224,850.00** | **$ 549,820.03** |
| | | | |
| | | **Payments** | **$ 324,970.03** |
| | | | |
| | | | |

Exhibit 5
Page 86

# EXHIBIT 6

Exhibit 6
Page 87

## STIPULATION OF SETTLEMENT

**THIS SETTLEMENT AGREEMENT AND GENERAL RELEASE** ("Settlement Agreement") is entered into as of November 18, 2022 (the "Execution Date"), by and between **Error! Reference source not found.**("Hi Bar") and THE LITIGATION PRACTICE GROUP PC and VULCAN CONSULTING GROUP LLC and BAT INC and COAST PROCESSING.COM D/B/A/ COAST PROCESSING ("Merchants") and DANIEL S MARCH and TONY M DIAB ("Guarantors" altogether as "Merchants and Guarantors") (collectively, the "Parties").

WHEREAS, the Parties entered into the following agreements (collectively, the "Agreements"):

1. A Merchant Agreement dated August 6, 2021 pursuant to which Hi Bar d/b/a Diverse Capital purchased 10% of the Merchants' total future accounts receivable up to the sum of $749,500.00 in exchange for an upfront purchase price of $500,000.00. The Guarantors guaranteed the Merchants' obligations to Hi Bar pursuant to a guaranty that was executed contemporaneously with the Merchant Agreement;
2. A Merchant Agreement dated July 21, 2021 pursuant to which Hi Bar d/b/a Diverse Capital purchased 10% of the Merchants' total future accounts receivable up to the sum of $374,750.00 in exchange for an upfront purchase price of $250,000.00. The Guarantors guaranteed the Merchants' obligations to Hi Bar pursuant to a guaranty that was executed contemporaneously with the Merchant Agreement;
3. A Revenue Purchase Agreement dated August 17, 2021 pursuant to which Hi Bar d/b/a Kingdom Kapital purchased 15% of the Merchants' total future accounts receivable up to the sum of $749,500.00 in exchange for an upfront purchase price of $500,000.00. The Guarantors guaranteed the Merchants' obligations to Hi Bar pursuant to a guaranty that was executed contemporaneously with the Merchant Agreement.

**WHEREAS**, Merchants and Guarantors defaulted on their obligations to Hi Bar pursuant to the Agreements; **WHEREAS**, the Parties agree that Hi Bar has claims against Merchants in the amount $1,090,596.96;

**WHEREAS**, the Parties wish to settle all disputes between them pursuant to the terms and conditions

set forth in this Agreement;

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. Settlement Amount.  Hi Bar hereby agrees to accept the sum of **$850,000** (the "Settlement Amount") in full satisfaction of any and all claims Hi Bar may have against Merchants and Guarantors relating to the Agreements. The Settlement Amount shall be paid as follows:'

1

Exhibit 6
Page 88

(a) $100,000 to be wired to Hi Bar's on or before Friday, November 18, 2022;

(b) $200,000 to be wired to Hi Bar on or before Friday November 25, 2022;

(c) $300,000 to be wired to hi Bar on or before Friday December 9, 2022;

(d) $250,000 to be wired to Hi Bar on or before Friday December 23, 2022;

**HI BAR CAPITAL**
1825 65TH St. Brooklyn, New York, 11204

**OPTIMIM BANK**
**ADDRESS:** 2929 E Commercial Blvd. Fort Lauderdale, FL 33308
**ACCOUNT #:** ▮▮▮▮968
**ROUTING #:** 067015096

If the due date of any payment falls on a bank holiday or weekend, said payment shall be due on the very next workday that is not a bank holiday.

2. <u>Forbearance of Litigation</u>: Providing full compliance with the terms of this Agreement, all litigation/legal actions between the parties are hereby stayed and Hi Bar agrees to forbear from enforcing any UCC liens and/or security interests upon Merchant's assets and/or account debtors.

3. <u>Termination of UCC</u>. Upon receipt of the full Settlement Amount, Merchants and Guarantors shall have the right to file a UCC-3 termination, with the consent and authority of Hi Bar, terminating UCC filed under number U210106788229.

4. <u>Effective Date</u>. The Agreement shall become binding and be closed by the execution hereof by all parties.

5. <u>Waiver of Hi Bar's Liability</u>. Upon the Effective Date, the Merchants and Guarantors for themselves and on behalf of all parents, divisions, subsidiaries, affiliates, related entities, representatives, successors, directors, officers, owners, agents, employees, insurance carriers, attorneys and assigns, hereby releases and forever discharges Hi Bar and its respective parents, divisions, subsidiaries, affiliates, related entities, representatives, successors, directors, officers, owners, agents, employees, insurance carriers, attorneys and assigns of and from any and all claims, counterclaims, demands, damages, debts, liabilities, accounts, actions, causes of action and suits, known or unknown, liquidated or contingent, arising from,

2

Exhibit 6
Page 89

which may arise in the future from, or which are related in any manner to the underlying Agreement, including any claims that were or could have been asserted, other than Hi Bar's obligations under this Settlement Agreement. Merchants and Guarantors acknowledges that any and all legal claims it maintains must be brought by a breach of this settlement agreement.

6. Waiver of Merchants and Guarantors' Liability. Upon receipt of the full Settlement Amount,  Hi Bar for itself and on behalf of all parents, divisions, subsidiaries, affiliates, related entities, representatives, successors, directors, officers, owners, agents, employees, insurance carriers, attorneys and assigns, hereby releases and forever discharges Merchants and Guarantors and their respective parents, divisions, subsidiaries, affiliates, related entities, representatives, successors, directors, officers, owners, agents, employees, insurance carriers, attorneys and assigns of and from any and all claims, counterclaims, demands, damages, debts, liabilities, accounts, actions, causes of action and suits, known or unknown, liquidated or contingent, arising from, which may arise in the future from, or which are related in any manner to the underlying Agreements, including any claims that were or could have been asserted, other than Merchants and Guarantors' obligations under this Settlement Agreement. Hi Bar acknowledges that any and all legal claims it maintains must be brought by a breach of this settlement agreement.

7. Default and Right to Cure. A default under this Stipulation will occur if payment is not received on the date it is due. Merchants and Guarantors shall have a five (5) business day cure period within which to cure any default hereunder upon notice via email to Merchants and Guarantors counsel at **ashlee@colonnacohenlaw.com** and Guarantor at **tony@coastprocessing.com**.

8. Withdraw Claims and Consent to Judgment. Merchants and Guarantors hereby withdraw any defenses arising from the Agreements or any pending actions filed by the Purchaser. Merchants and Guarantors further agree to waive all defenses, claims, or counterclaims that may arise from this Agreement or the Agreements. In the event of default of this Agreement, Hi Bar may, without further notice, file a claim for the total outstanding balance set forth above plus accrued interest at the rate of 16% per annum from the date of default, less payments received.

3

Exhibit 6
Page 90

9. Attorneys' Fees. In the event that Merchants and Guarantors' breach the provisions of this Agreement and Hi Bar has to commence legal action to enforce its rights under this Agreement, Merchants and Guarantors shall be liable to Hi Bar for attorneys' fees in the amount of 25% of the amount of the Settlement Amount that remains outstanding at the time of default, which amount is based upon the standard contingency fee rate charged by collection lawyers in the MCA industry.

10. Venue. The Merchants and Guarantors recognize that because payment is to be made in the state of New York, this Agreement shall be governed by and construed according to the laws of the State of New York, without giving effect to its choice of law principles. The parties agree that all actions and proceedings arising out of or relating directly or indirectly to this Agreement or any ancillary agreement or any other related obligations shall be litigated solely and exclusively in in the Supreme Court of the State of New York County of Nassau, and that such courts are convenient forums. Each party hereby submits to the personal jurisdiction of such courts for purposes of any such actions or proceedings. The Merchants and Guarantors waive their right to service of process of any complaint or other process commenced arising from their obligations hereunder, and agree to accept service of any commencement documents including but not limited to a Summons and Complaint via email to their counsel **ashlee@colonnacohenlaw.com** and the Guarantor at tony@coastprocessing.com.

11. Confidentiality: The Parties agree that they will not disclose to any entity or other person the terms or conditions of this Settlement Agreement (subject to the exceptions expressly stated in this paragraph) without the prior written consent of the other Party. Notwithstanding the foregoing, the Parties may otherwise disclose the terms of this Settlement Agreement only in the following situations: (i) to his or her legal, insurance, or tax professionals; (ii) in any action or proceeding to enforce the terms and conditions of this Settlement Agreement; (iii) as required by a lawfully issued subpoena after notification to the other Party so as to give the other Party time to move to quash said subpoena; and (iv) to the extent necessary to the holder of a mortgage or security interest in any property. Any disclosure in violation of this section shall be deemed a material breach of this Stipulation of Settlement.

4

Exhibit 6
Page 91

12. <u>Execution and Delivery of Documents</u>.  The Parties agree that they respectively shall, upon request by another party to this Agreement, execute and deliver promptly any and all such documentation, or documents of any and every kind and character as may be reasonably required, necessary or proper for the purpose of giving full force and effect to this agreement and to the covenants, conditions, and agreements contained herein.  Furthermore, the parties agree to cooperate and to do all things necessary to accomplish the intention of this agreement.

13. <u>Incorporation by Reference, Recitals</u>.  All documents referred to in this Agreement are made a part hereof and incorporated herein by reference.

14. <u>Copies</u>.  Any true executed copy of the Agreement shall be deemed to constitute an original of the same.

15. <u>Construction and Interpretation</u>.  No provision in this Agreement shall be interpreted for or against another party because that party's attorney drafted such provision.

16. <u>Entire Agreement</u>.    This Agreement represents the full, complete and entire agreement between the parties and supersedes any previous agreement between the parties. This Agreement may only be modified in writing, accepted, and approved in writing by all Parties.

17. <u>Attorney Review</u>. Merchants and Guarantors acknowledge they had ample time to consult with an attorney of its choosing with respect to the terms of this Agreement, and has been advised to do so.

<b><u><i>Signature Page to Follow</i></u></b>

5

Exhibit 6
Page 92

IN WITNESS WHEREOF, this Stipulation and Settlement Agreement has been agreed to and executed by the undersigned this 25th day of November, 2022.

_Error! Reference source not found._, individually, and on behalf of
*VULCAN CONSULTING GROUP LLC and BAT INC and COAST
PROCESSING.COM D/B/A/ COAST PROCESSING*

*Daniel S. March*, individually, and on behalf of
*THE LITIGATION PRACTICE GROUP PC*

Mordi Herbst
Authorized Representative
*Hi Bar Capital, LLC*

6

Exhibit 6
Page 93

# EXHIBIT 7

Exhibit 7
Page 94

# Buyer's Order

| Dealer/Seller Name and Address | Buyer/Co-Buyer Name(s) and Address(es) |
|---|---|
| FOREIGN AFFAIRS MOTORSPORT LLC<br>1939 NW 40th Ct<br>Deerfield Beach, FL 33064<br><br>(561) 923-5233 | Black Badge Llc<br>415 N Benton Ave<br>Helena, MT 59601<br>(929) 491-9130 |

Date 12/7/2022
App No. 641

Mo. of birth _____
Stock No. 50707
Contract No. 641

Mo. of birth _____   Mo. of birth _____
Salesperson Amy  Farnham

## Vehicle Information

☐ New   ☒ Used   ☐ Demo   ☐ _____
Year  2022
Make Rolls-Royce
Model Cullinan
Body Style SUV
VIN  SLATV8C00NU212963
Other

Lic. No.
Odometer Reading 2586
Color

## Insurance Information

Buyer has arranged insurance on the motor vehicle.
Insurance Company
Policy No.

## Trade-In Information

**Trade-in 1**
Year
Make
Model
Body Style
VIN
Lienholder Name
Address

Lic. No.
Odometer Reading
Color

Phone
Payoff good through
Approved

Payoff  N/A

**Trade-in 2**
Year
Make
Model
Body Style
VIN
Lienholder Name
Address

Lic. No.
Odometer Reading
Color

Phone
Payoff good through
Approved

Payoff  N/A

## Itemization of Sale

| | | |
|---|---|---|
| 1. Vehicle Sales Price | $ | 432950.00 |
| 2. Sales Tax   N/A | $ | 0.00 |
| 3. County Tax   N/A | $ | 0.00 |
| 4. Other Tax (es)  N/A | $ | N/A |
| 5. Subtotal (Add lines 1 through 4) | $ | 432950.00 |
| Title, License, Taxes & Other Fees | | |
| 6. Predelivery Service Fee* | $ | 499.00 |
| 7. Electronic Transfer Fee* | $ | N/A |
| 8. License Plate/Registration | $ | C.O.D |
| 9. Certificate of Title | $ | C.O.D |
| 10. Temp Tag | $ | N/A |
| 11. Doc Stamp | $ | N/A |
| 12. _____ | $ | N/A |
| 13. _____ | $ | N/A |
| 14. _____ | $ | N/A |
| 15. Total Other Fees<br>(Add lines 6 through 14) | $ | 499.00 |
| Additional Products | | |
| 16. _____ | $ | N/A |
| 17. _____ | $ | N/A |
| 18. _____ | $ | N/A |
| 19. _____ | $ | N/A |
| 20. _____ | $ | N/A |
| 21. _____ | $ | |
| 22. _____ | $ | |
| 23. _____ | $ | |
| 24. Total Products<br>(Add lines 16 through 23) | $ | N/A |
| 25. Cash Sale Price (Add lines 5 + 15 + 24) | $ | 433449.00 |
| 26. Trade-in Allowance | $ | N/A |
| 27. Less Payoff | $ | N/A |
| 28. Net Trade Allowance (Line 26-27) | $ | N/A |
| 29. Cash Down Payment | $ | 433449.00 |
| 30. Deferred Down Payment | $ | N/A |
| 31. Total Down Payment<br>(Line 28 + 29 + 30) | $ | 433449.00 |
| 32. Total Balance Due (Line 25-31) | $ | N/A |

We may retain or receive a portion of any amounts paid to others.

* This charge represents costs and profit to the dealer for items such as inspecting, cleaning, and adjusting vehicles, and preparing documents related to the sale. These fees are not state or government fees.

Initials: _____  _____

Buyers Order-FL
©2020 The Reynolds and Reynolds Company
THERE ARE NO WARRANTIES, EXPRESS OR IMPLIED, AS TO CONTENT OR FITNESS FOR PURPOSE OF THIS FORM. CONSULT YOUR OWN LEGAL COUNSEL.

BUY-ORDER-FL 10/15/2020
Bankers Systems®
Page 1 of 3

Exhibit 7
Page 95

## Additional Terms

**Definitions.** *Contract* refers to this *Buyer's Order.* The pronouns *you* and *your* refer to each Buyer signing this Contract. *Dealer* and the pronouns *we, us* and *our* refer to the Dealer/Seller. *Vehicle* means the motor vehicle described in the *Vehicle Information* section. *Trade-in Vehicle(s)* refers to the vehicle(s) described in the *Trade-in Information* section being traded to the Dealer/Seller as part of this transaction. *Manufacturer* refers to the entity that manufactured the Vehicle.

**Agreement to Purchase.** You agree to buy the Vehicle from us for the price stated in this Contract. You agree to sign any documents necessary to complete this transaction. Unless you have canceled this Contract under the condition described in the *Manufacturer* section, if you refuse to take delivery of the Vehicle, we can keep any deposits you have made to us, and you will be liable to us for all of our damages and expenses in connection herewith, including but not limited to reasonable attorneys' fees.

You represent that you are of legal age and have legal capacity to enter into this Contract.

**Manufacturer.** We are not an agent of the Manufacturer. Manufacturer can change the price, design or standard features of the Vehicle at any time without notice. If we cannot obtain the Vehicle from the Manufacturer at the price in effect as of the date of this Contract, or if we cannot obtain the agreed upon product from the Manufacturer, you or we can cancel this Contract.

If you cancel this Contract under the terms of this section, we will refund to you any amounts you have paid to us. If you have delivered a Trade-in Vehicle to us, we will return it to you. If we have already sold the Trade-in Vehicle, we will pay you the trade-in allowance after adjusting for any payoff we made to a lienholder and costs for repair and reconditioning, if any.

**Insurance.** You represent that the insurance information you have given us is accurate.

**Trade-in Vehicle.** You will transfer title to the Trade-in Vehicle to us free of all liens except those noted on this Contract. You give permission to us to contact the lienholder(s) for payoff information. If the payoff information that we obtain from the lienholder(s) differs from the amount disclosed in this Contract, you agree to pay the difference to us if the actual amount of the balance owed is greater than the amount listed in this Contract. If the actual amount of the balance owed is less than the amount listed in this Contract, then we will pay you the difference.

If you do not deliver the Trade-in Vehicle to us at the time of the initial appraisal, we may reappraise the Trade-in Vehicle when it is delivered to us. If the reappraised value is lower than the original appraisal, you can cancel this transaction as long as you have not taken delivery of the Vehicle.

You represent that (a) you are the sole true and lawful owner of the Trade-in Vehicle, (b) the Trade-in Vehicle has never been titled under any state or federal "brand" such as "defective," "rebuilt," "salvage," "flood," etc., (c) the mileage of the Trade-in Vehicle shown in this Contract is the actual mileage of the Trade-in Vehicle, and (d) all emission control equipment is on the Trade-in Vehicle and is in satisfactory working order. If any of these representations are not true, we may elect to cancel the transaction. We may also choose to reappraise the Trade-in Vehicle and adjust the Total Balance Due instead of canceling the transaction. You agree to immediately pay us the difference.

**Retail Installment Contract.** In the event that you and we enter into a retail installment contract for the financing of the purchase of the Vehicle, the terms of the retail installment contract will control any inconsistencies between this Contract and the retail installment contract.

**Vehicle Inspection.** You are purchasing the Vehicle based upon your personal inspection, and are not relying upon any opinion, statement, promise or representation of the salesperson, or any other of our employees that is not contained in the written agreements you are signing today.

**Vehicle Condition.** You understand that the Vehicle may have sustained prior body damage and may have undergone prior mechanical repairs during or after its manufacture, during or after transit to us or while in the possession of prior owners or operators.

Initials:

Buyers Order-FL
©2020 The Reynolds and Reynolds Company
THERE ARE NO WARRANTIES, EXPRESS OR IMPLIED, AS TO CONTENT OR FITNESS FOR PURPOSE OF THIS FORM. CONSULT YOUR OWN LEGAL COUNSEL.

BUY-ORDER-FL 10/15/2020
Bankers Systems®
Page 2 of 3

Exhibit 7
Page 96

## Warranty Information

**Warranty.** We make no express or implied warranties. Except as required by law, we make no implied warranty of merchantability and no warranty that the Vehicle is fit for a particular purpose. We sell the Vehicle AS IS - NOT EXPRESSLY WARRANTED OR GUARANTEED, WITH ALL FAULTS.

If this is a new Vehicle, the Vehicle is subject to a standard written manufacturer's warranty. This warranty is made by the manufacturer and not by us.

**Used Car Buyer Notice.** If you are buying a used vehicle, the information you see on the window form for this Vehicle is part of this Contract. Information on the window form overrides any contrary provisions in the contract of sale.

**Guía para compradores de vehículos usados.** La información que ve en el formulario de la ventanilla para este vehículo forma parte del presente contrato. La información del formulario de la ventanilla deja sin efecto toda disposición en contrario contenida en el contrato de venta.

## Notices

☐ You understand that the balance owed on the Trade-in exceeds the Trade-in Allowance and that as a result the Total Balance Due has been increased by this $ _N/A_ of negative equity.

**Section 501.98, Florida Statutes,** requires that, at least 30 days before bringing any claim against a motor vehicle dealer for an unfair or deceptive trade practice, a consumer must provide the dealer with a written demand letter stating the name, address, and telephone number of the consumer; the name and address of the dealer; a description of the facts that serve as the basis for the claim; the amount of damages; and copies of any documents in the possession of the consumer which relate to the claim. Such notice must be delivered by the United States Postal Service or by a nationally recognized carrier, return receipt requested, to the address where the subject vehicle was purchased or leased or where the subject transaction occurred, or an address at which the dealer regularly conducts business.

DocuSigned by:

_Tony Diab_

Buyer  Black Badge Llc                                    12/7/2022
                                                          Date

_____
Buyer                                                     Date

_____
Buyer                                                     Date

_____

Check the box below when Fla. Stat. Ann. § 319.001(9) applies:
☐ THIS VEHICLE WAS DELIVERED TO A PREVIOUS PURCHASER.

_____
Buyer                                                     Date

_____
Buyer                                                     Date

_____
Buyer                                                     Date

## Signatures

**This agreement is not binding upon the Dealer/Seller until it is signed by an authorized representative of the Dealer/Seller.**

By signing below, you agree to the terms of this Contract. You received a copy of this Contract and had a chance to read and review it before you signed it. This is the complete agreement; there are no other written or oral agreements.

☐ A separate Arbitration Agreement is a part of this Contract.

DocuSigned by:

_Tony Diab_

Buyer  Black Badge Llc                                    12/7/2022
                                                          Date

_____
Buyer                                                     Date

_____
Buyer                                                     Date

_Amy Farnham_

Dealer/Seller  FOREIGN AFFAIRS MOTORSPORT LLC  12/7/2022  Date

Buyers Order-FL
©2020 The Reynolds and Reynolds Company
THERE ARE NO WARRANTIES, EXPRESS OR IMPLIED, AS TO CONTENT OR FITNESS FOR PURPOSE OF THIS FORM. CONSULT YOUR OWN LEGAL COUNSEL.

BUY-ORDER-FL 10/15/2020
Bankers Systems®
Page 3 of 3

Exhibit 7
Page 97

# EXHIBIT 8

Exhibit 8
Page 98

| Bank Name | Account Type | Account Name | Account Number | Date | Payment | Memo |
|---|---|---|---|---|---|---|
| Bank of America | Checking | Vulcan Consulting Group LLC dba DRD | X9551 | 11/18/2022 | $100,000.00 | WIRE TYPEWIRE OUT DATEQ21 118 TIME1 748 ET TRN:20221 11800467568 SERVICE REF:01 7594 BNF:HI BAR CAPITAL IDQ1 0022968 BNF BK:OPTIMUMBANK ID067015096 PMT DET:VGY5MN8RX POP Services |
| Bank of America | Checking | Vulcan Consulting Group LLC dba DRD | X9551 | 11/29/2022 | $200,000.00 | WIRE TYPE:WIRE OUT DATEQ21 129 TIME:0906 ET TRN:20221 12900279029 SERVICE REF0O5686 BNF:HI BAR CAPITAL IDQ1 0022968 BNF BK:OPTIMUMBANK IDO67O15O96 PMT DET:41 4917686 |
| Chase | Checking | The Litigation Practice Group PC | X3158 | 12/12/2022 | $300,000.00 | Fedwire Debit Via Cptimumbank FL/067015096 NC HI Bar Capital Brooklyn, NY 11204 US Ret: Settlement 1 mmed: 121281 Cgc08C050909 Tm: 88941 00343Jo |
| Chase | Checking | The Litigation Practice Group PC | X3158 | 12/13/2022 | $423,449.00 | Fedwire Debit Via Optimembank FL/067015096 NO HI Bar Capital Brooklyn, NY 11204 US Ret. Settlement 3 Imad. 121381 OgoOI 0008585 Tm. 7894900348Jo |
| Chase | Checking | The Litigation Practice Group PC | X3158 | 12/23/2022 | $126,551.00 | Fedwire Debit Via. Optimumbank FL1067015096 NC. HI Bar Capital US Ret. Settlement Imad 122391 OgoO20006i 97 Tm: 3239700357Jo |
| Chase | Checking | The Litigation Practice Group PC | X3158 | 12/27/2022 | $123,449.00 | Fadwira Debit Via, OptimumbankFLJO67OISO96 NC: HI Bar Capital Brooklyn, NY 11204 US Ret: Settlement lmac[ 122731 QgcOI 00071 02 Tm: 3065600361J0 |
| | | | | Total | $1,273,449.00 | |
| | | | | | | |

Exhibit 8
Page 99

# Adversary Cover Sheet

B1040 (FORM 1040) (12/24)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| **PLAINTIFFS**<br>Richard A. Marshack, Trustee of the LPG Liquidation Trust | **DEFENDANTS**<br>Hi Bar Capital, LLC, a New York limited liability company |
|---|---|

| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br>Christopher Celentino (SBN 131688)<br>Yosina M. Lissebeck (SBN 201654)<br>Tyler Powell (Ky. Bar No. 90520) (*Admitted pro hac vice*)<br>DINSMORE & SHOHL LLP<br>655 West Broadway, Suite 800<br>San Diego, CA 92101    Tel: (619) 400-0500<br>christopher.celentino@dinsmore.com<br>yosina.lissebeck@dinsmore.com<br>tyler.powell@dinsmore.com | **ATTORNEYS** (If Known) |
|---|---|

**PARTY** (Check One Box Only) [Plaintiffs side]
- ☐ Debtor
- ☐ Creditor
- ☒ Trustee
- ☐ U.S. Trustee/Bankruptcy Admin
- ☐ Other

**PARTY** (Check One Box Only) [Defendants side]
- ☐ Debtor
- ☐ Creditor
- ☐ Trustee
- ☐ U.S. Trustee/Bankruptcy Admin
- ☐ Other

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
1) Avoidance, Recovery, And Preservation Of Transfers Made Within The Ninety Day Period Before The Petition Date; (2) Avoidance, Recovery, And Preservation Of Transfers Made With Intent To Defraud; (3) Avoidance, Preservation, And Recovery Of Constructively Fraudulent Two-Year Transfers; (4) Avoidance, Preservation, And Recovery Of Transfers Within Four Years; And (5) Avoidance, Recovery, And Preservation Of Transfers Made Within Four Years

**NATURE OF SUIT**

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(a) – Recovery of Money/Property**
- ☐ 11-Recovery of money/property - §542 turnover of property
- ☒ 12-Recovery of money/property - §547 preference
- ☒ 13-Recovery of money/property - §548 fraudulent transfer
- ☒ 14-Recovery of money/property - other

**FRBP 7001(b) – Validity, Priority or Extent of Lien**
- ☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(c) – Approval of Sale of Property**
- ☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(d) – Objection/Revocation of Discharge**
- ☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(e) – Revocation of Confirmation**
- ☐ 51-Revocation of confirmation

**FRBP 7001(f) – Dischargeability**
- ☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
- ☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
- ☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(f) – Dischargeability (continued)**
- ☐ 61-Dischargeability - §523(a)(5), domestic support
- ☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
- ☐ 63-Dischargeability - §523(a)(8), student loan
- ☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
- ☐ 65-Dischargeability - other

**FRBP 7001(g) – Injunctive Relief**
- ☐ 71-Injunctive relief- imposition of stay
- ☐ 72-Injunctive relief - other

**FRBP 7001(h) Subordination of Claim or Interest**
- ☐ 81-Subordination of claim or interest

**FRBP 7001(i) Declaratory Judgment**
- ☐ 91-Declaratory judgment

**FRBP 7001(j) Determination of Removed Action**
- ☐ 01-Determination of remove d claim or cause

**Other**
- ☐ SS-SIPA Case - 15 U.S.C. §§78aaa *et.seq.*
- ☒ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand: approximately $2,500,000 |

Other Relief Sought

**B1040 (FORM 1040) (12/24)**

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>The Litigation Practice Group P.C. | BANKRUPTCY CASE NO.<br>8:23-bk-10571-SC | |
| DISTRICT IN WHICH CASE IS PENDING<br>Central District of California | DIVISION OFFICE<br>Santa Ana | NAME OF JUDGE<br>Scott C. Clarkson |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br>/s/ Tyler Powell | | |
| DATE<br>May 9, 2025 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Yosina M. Lissebeck<br>Tyler Powell (admitted pro hac vice) | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.