Christopher Celentino (State Bar No. 131688)
Christopher B. Ghio (State Bar No. 259094)
Yosina M. Lissebeck (State Bar No. 201654)
**DINSMORE & SHOHL LLP**
655 West Broadway, Ste 800
San Diego, CA 92101
Tele:   619.400.0500
Fax:    619.400.0501
Christopher.Celentino@dinsmore.com
Christopher.Ghio@dinsmore.com
Yosina.Lissebeck@dinsmore.com

Julian Pecora (WV Bar No. 13912 – Admitted pro hac vice)
**DINSMORE & SHOHL LLP**
611 Third Ave
Huntington, WV 25701
Tele:   304-691-8322
Fax:    304-522-4312
Julian.Pecora@dinsmore.com

Attorneys for Richard A. Marshack,
Trustee of the LPG Liquidation Trust

### UNITED STATES BANKRUPTCY COURT

### CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION

| | |
|---|---|
| In re: | Case No.: 8:23-bk-10571-SC |
| The Litigation Practice Group P.C., | Adv. Proc. No.: |
| Debtor. | Chapter 11 |
| Richard A. Marshack, Trustee of the LPG Liquidation Trust, | **COMPLAINT FOR:** |
| Plaintiff, | **(1) AVOIDANCE, RECOVERY, AND PRESERVATION OF UNAUTHORIZED POST-PETITION TRANSFERS** |
| v. | **(2) TURNOVER** |
| Jimmy Chhor; and DOES 1 through 100, inclusive, | |
| Defendants. | |

1

For his Complaint for (1) Avoidance, Recovery, and Preservation of Unauthorized Post-Petition Transfers; and (2) Turnover.  Plaintiff Richard A. Marshack, former Chapter 11 Trustee for the Bankruptcy Estate of The Litigation Practice Group PC (the "Debtor" or "LPG") and current liquidating trustee of the LPG Liquidation Trust (the Trustee" or "Plaintiff") for the bankruptcy Estate of Debtor (the "Estate") in the above-captioned bankruptcy case (the "Bankruptcy Case"), alleges and avers as follows:

<u>**STATEMENT OF JURISDICTION, NATURE OF PROCEEDING, AND VENUE**</u>

1.      This Court has jurisdiction over this action under 28 U.S.C. §§ 157(b)(2)(A), (E), (H) and (O), 1334(b), and General Order No. 13-05 of the District Court for the Central District of California because this is a core proceeding arising in and/or related to the Bankruptcy Case, which is a case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), and which is pending in the United States Bankruptcy Court for the Central District of California, Santa Ana Division (the "Court"). Regardless of whether this proceeding is core, non-core, or otherwise, the Plaintiff consents to the entry of a final order and judgment by the Bankruptcy Court. The Defendants are hereby notified that Rule 7008 of the Federal Rules of Bankruptcy Procedure requires defendants to plead whether consent is given to the entry of a final order and judgment by the Bankruptcy Court. Venue of this adversary proceeding properly lies in this judicial district under 28 U.S.C. § 1409(a) because this proceeding is related to the Debtor's pending Bankruptcy Case.

<u>**THE PARTIES**</u>

2.      Plaintiff, Richard A. Marshack, was duly-appointed, qualified, and acting Chapter 11 Trustee of Debtor's Estate and is now the current liquidating trustee of the LPG Liquidation Trust.

3.      Debtor LPG is, and at all material times was, a professional corporation organized, existing, and in good standing under the laws of the State of California, with its principal place of business in Tustin, California.

4.      Defendant Jimmy Chhor ("Chhor") is, and was at all material times, an individual residing in the State of California.

<u>**GENERAL ALLEGATIONS**</u>

**A.      LPG'S BANKRUPTCY CASE**

5.      Plaintiff incorporates relevant allegations from prior pleadings in Adv. Proc. No. 8:25-ap-01156-SC for context regarding the broader fraudulent scheme involving Tony Diab, Eng Taing, Heng Teng, Dongliang Jiang, and related entities. These facts are included to provide background and support the Trustee's claims against Defendant Chhor and to preserve the right to assert additional claims, including under 11 U.S.C. §§ 548 and 544, should further evidence be discovered.

6.      On March 20, 2023 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, commencing the Bankruptcy Case.

7.      After the Office of the United States Trustee (the "UST") filed its *Motion to Dismiss or Convert Case Pursuant to 11 U.S.C. § 1112(b)* [Bankr. Docket No. 21] and creditors Debt Validation Fund II, LLC; MC DVI Fund 1, LLC; and MC DVI Fund 2, LLC filed the *Motion by DVF and MC DVI to Dismiss Chapter 11 Case Pursuant to 11 U.S.C. §§ 105, 305, 349, & 1112, or in the Alternative Convert This Case to Chapter 7 or Appoint a Trustee* [Bankr. Docket No. 44], the Court entered the *Order Directing Unites States Trustee to Appoint Chapter 11 Trustee* [Bankr. Docket No. 58] on May 4, 2021, thereby granting the UST's motion and directing the UST to appoint a Chapter 11 Trustee in the Bankruptcy Case.

8.      Pursuant to the *Acceptance of Appointment as Chapter 11 Trustee* [Bankr. Docket No. 63; the *Order Approving Appointment* is Docket No. 65], on May 8, 2023, Plaintiff accepted his appointment as the Chapter 11 Trustee in the Bankruptcy Case, and he continues to serve in this capacity at this time. The Plaintiff was not appointed until after the alleged events giving rise to his causes of action alleged herein and, therefore, base these allegations on information and belief.

9.      All claims have been transferred to the Liquidating Trust pursuant to the confirmed Plan and Plaintiff brings this action solely in his capacity as the former Chapter 11 Trustee and current Liquidating Trustee of the Liquidation Trust for the benefit of Debtor's Estate and its creditors. The Plaintiff brings this action solely in his capacity as the former Chapter 11 Trustee and currently as the liquidating Trustee of the LPG Liquidation Trust for the benefit of the Debtor's Estate and its creditors.

**B.      LPG'S OWNERSHIP AND MANAGEMENT**

10.      After being disbarred in both California and Nevada for forging a judge's signature and misappropriating substantial client funds, Tony Diab ("Diab") transferred his existing debt resolution

3

practice to LPG. LPG was established as a law firm purportedly offering consumer debt resolution services, eventually servicing more than 65,000 customers across the United States. Consumers who retained LPG were required to make monthly payments via ACH debits from their bank accounts. These payments were ostensibly intended to cover all legal and non-legal services LPG purported to provide to its clients.

11.     However, LPG systematically mismanaged and diverted these consumer payments. On information and belief, in 2022 alone, LPG collected approximately $150,000,000 in ACH debits. Rather than depositing these funds into an Interest on Lawyer Trust Account ("IOLTA"), as the law requires until earned, LPG improperly transferred substantial portions of these funds to non-debtor entities, insiders, affiliates, marketing companies, and co-conspirators. These improper transfers included, but were not limited to:

12.     Approximately $77 million was transferred to BAT, Inc. d/b/a Coast Processing ("Coast Processing"), a LPG affiliate, by mid-2022.

13.     Significant payments to marketing companies and affiliates controlled by Diab or other insiders, with no documentation or justification.

14.     Business expenses were paid in cash, including more than $100,000 to furnish Jane Dearwester's North Carolina office.

15.     Payments for personal luxury expenses unrelated to LPG's operations, including sports cars, private jets to Las Vegas, resort stays, luxury hotels, a BMW i8, a Mercedes Benz G-Wagon, Han Trinh's $300,000 wedding, a luxury box suite at the Anaheim Ducks stadium, and luxury watches worth over $150,000.

16.     Additional fraudulent transfers were made to Diab, his co-conspirators, insiders, and their affiliated entities to further their roles in the fraudulent scheme.

17.     These wrongful transfers rendered LPG insolvent, compelling Diab and LPG to further transfer and/or sell the same ACH debits multiple times, accruing additional debt in what became a Ponzi scheme designed to finance LPG's continued operations and extravagant expenditures. When the fraudulent scheme began unraveling under the weight of mounting litigation and creditor claims in late 2022, Diab and his co-conspirators, including but not limited to, Eng Taing,("Eng") Heng Teng,

4

(Heng"),  Han Trinh ("Han"), and Phuong "Jayde" Trinh ("Jayde") devised a broader scheme to protect LPG's most valuable assets—its ACH debits and attorney network, through fraudulent transfers, concealment, and diversion.

18. Despite being disbarred, Diab maintained complete control over LPG since its inception. Diab deliberately concealed his control, requiring LPG employees to address him as "Admin" and displaying a desk nameplate stating, "I don't work here." These calculated actions were part of a strategy to obscure his role from both employees and external stakeholders.

19. To formalize LPG's operations and mask his disbarment, Diab "rented" the law license of Daniel March, who was nominally presented as LPG's managing partner. In reality, March had no meaningful authority or control over LPG's operations. Diab impersonated March regularly, signing contracts in March's name and issuing directives as if he were March. Notably, LPG's primary DocuSign account was tied to Diab's email address, admin@lpglaw.com, which he used to execute numerous contracts under March's name. In exchange for his participation, March received an annual salary exceeding $600,000, along with bonuses and other benefits. March has since been disbarred for his involvement in the criminal enterprise at LPG and fraudulent scheme to transfer all of LPG's assets, evade LPG's creditors and avoid investigation and adverse action by federal and state government agencies.

20. Before March's involvement, John Thompson served as LPG's sole shareholder from February 2019 to November 2019. Thompson was appointed solely to conceal Diab's control over LPG during its early operations. Recognizing the potential liability arising from Diab's fraudulent actions, Thompson conveyed his interest in LPG to March in November 2019. Like March, Thompson's role was largely nominal, and Diab impersonated Thompson on several occasions, providing legal advice and signing legal documents, including Service Applications and Agreements submitted to Credit Reporting Services, LLC.

21. Diab's extensive impersonations of March and Thompson, coupled with his misuse of LPG's accounts and resources, reveal a deliberate scheme to enrich himself and his co-conspirators at the expense of LPG's creditors and clients.

22.    Dongliang Jiang ("Jiang"), as the accountant for Teracel Blockchain Fund II, LLC ("Teracel"), PECC Corp, ("PECC") and entities controlled by Eng and Heng Taing, played a crucial role in managing the financial transactions that furthered the fraudulent scheme. He was responsible for processing and reconciling financial records in a way that concealed fraudulent transfers, obscured the financial trail, and prevented creditors from identifying the true location of assets. Jiang knowingly participated in structuring transactions that allowed assets to be siphoned out of LPG and into entities under Eng and Heng Taing's control.

23.    Upon information and belief, Jiang actively assisted in transferring funds between LPG and Touzi Capita, LLC, ("Touzi Capital") PECC, and Teracel Blockchain Fund in a manner intended to frustrate recovery efforts. Jiang also advised Eng and Heng Taing on financial structuring strategies to disguise fraudulent conveyances.

**C.    LPG'S BUSINESS STRUCTURE**

24.    Historically, LPG had a business partner called BAT, Inc. d/b/a Coast Processing ("Coast Processing"), owned by Brian Real, Arash Asante Bayrooti, and Diab. Coast Processing managed LPG's in-house marketing and client development operations, as well as back-end processing and other operational functions. In addition to Coast Processing's contributions, LPG relied on a network of over 100 marketing affiliates to source new clients. In 2021, Diab acquired the interests of the other investors in Coast Processing and merged its operations with LPG, including its contracts with other marketing affiliates. Despite this merger, Coast Processing remains a California corporation in good standing. Prior to the buyout, Coast Processing exercised dominion and control over LPG in collaboration with Diab, operating under the d/b/a "LPG."

25.    At all relevant times herein, Diab controlled and ran the operations at Coast Processing. Notwithstanding from March 2, 2023 until March 13, 2024, Diab appointed Han as the Chief Executive Officer, Chief Financial Officer, Secretary, and Director of Coast Processing in order to facilitate the fraudulent transfer of funds from LPG to non-debtor entities and individuals without detection to Diab, Han, Jayde, Eng, Heng, Scott Eadie ("Eadie"), Oakstone Legal Group, PC, ("Oakstone") Guardian Processing, LLC, ("Guardian") Phoenix, Prime Logix, LLC, Maverick Management, LLC, and Vulcan Consulting among others. Han's role at Coast Processing gave her

signatory access to its bank accounts, which she used to transfer hundreds of thousands of dollars, if not more, after LPG filed its Bankruptcy petition in ACH debits on LPG client files fraudulently transferred to other non-debtor entities to herself, Jayde, Eadie, Greyson Law Center, PC ("Greyson") among others.

26.    Marketing affiliates referred clients to LPG, targeting individuals burdened by predatory lending practices or invalid claims for significant debts under applicable law. Upon onboarding these clients, LPG compensated the marketing affiliates by sharing a percentage of the fees earned through the debt resolution process. This arrangement allowed LPG to avoid large upfront costs and spread the risk of non-payment by the client across the marketing affiliates who had secured the clients.

27.    LPG clients typically paid fees over 18 to 30 months via monthly ACH debits from their bank accounts. These payments were controlled by Diab, LPG, and at times, as alleged herein, other entities acting under Diab's direction or through conspiratorial arrangements. These entities fraudulently initiated ACH transactions on LPG clients' accounts or collaborated with Diab to facilitate the transfer of client files and funds, as detailed throughout this complaint. The payments received or due from each client are referred to herein as "ACH debits" or "ACH receivables," as applicable.

28.    Upon onboarding a client, LPG assumed responsibility for servicing the client file. To manage this, LPG utilized software platforms such as DebtPayPro ("DPP") and, more recently, a less efficient proprietary system called LUNA. These systems automated dispute processes facilitated client communications and tracked payment data from clients and to affiliates including PECC, Touzi, and Teracel. Correspondence sent on behalf of clients to creditors, collection agencies, and credit bureaus primarily consisted of generic, automated templates delivered via U.S. Mail, fax, or email. Outcomes varied, some cases resulted in successful debt resolution or credit report corrections, while others culminated in debt settlements or lawsuits. The creation of proprietary systems like LUNA also facilitated Diab's schemes and LPG's fraudulent transfers of client files, ACH information, and ACH debit processing to Phoenix, Prime Logix, Greyson, CLG, Oakstone, Touzi, Eng, Heng, Teracel, PECC, Guardian, and others.

7

29.     Due to the incremental nature of client payments, LPG frequently transferred its future cash flows, referred to as ACH receivables, to third-party investors or alleged factoring companies at a discounted rate. These entities received returns based on the difference between the clients' total debts and the discounted price or a percentage thereof. However, LPG exploited this process to perpetrate a pyramid scheme and misappropriate funds for personal gain. Diab and LPG repeatedly transferred the same ACH receivables to multiple entities, including Touzi, PECC, Teracel, among others, defrauding creditors, paying prior creditors in a Ponzi scheme, and/or misappropriating the proceeds of these fraudulent transactions.

30.     The largest alleged factoring company to obtain receivables from LPG was Validation Partners, LLC ("Validation Partners"). Between August 30, 2021, and August 17, 2022, Validation Partners invested $66,000,000 to acquire receivables from LPG and 58 of its marketing affiliates. In total, Validation Partners obtained over 40,000 accounts with a combined value exceeding $400,000,000.

**D.     DIAB'S SCHEME**

31.     Diab, along with his co-conspirators Eng, Touzi, Teracel, and PECC, among others, orchestrated a scheme to fraudulently transfer, pledge and/or sell thousands of LPG client files and their associated ACH receivables. In many instances, these client files and receivables were transferred and/or transferred multiple times to alleged factoring companies, Diab's non-debtor alter ego entities and other affiliated parties. This scheme was executed to obscure and hide the existence and true ownership of LPG's assets, hinder their discovery by creditors, and siphon as much value and funds as possible from LPG client files and ACH receivables before earning those funds in contravention of consumer protection laws. The fraudulent transfers, pledges, and/or sales were deliberately structured to shield these funds from the mounting number of lawsuits being filed against LPG while enriching Diab and his co-conspirators.

32.     The fraudulent scheme involved transferring and/or reselling all, or a substantial portion, of LPG client files and ACH receivables without proper documentation, consideration, or consent from LPG's creditors or clients. These transfers, pledges and/or sales were specifically designed to defraud creditors, evade lawful claims, and conceal assets. Thousands of client files were

8

repeatedly pledged and/or transferred, effectively implementing a Ponzi scheme orchestrated by Diab, Eng, Heng, Han and Jayde, among others, in which new funds were used to pay prior creditors, all while defrauding LPG's Estate and its legitimate creditors. This calculated scheme facilitated the diversion of funds to entities such as Touzi, Teracel, PECC, Oakstone, Guardian, and Greyson, among others further illustrating their integral roles in the criminal enterprise and defrauding the Estate. To perpetuate this fraudulent operation, proprietary software systems such as DPP and LUNA were used to access and manipulate LPG's client and financial data. These systems enabled the unauthorized processing and transfer of client information and ACH receivables to entities controlled by Diab, Eng, Heng, and Chhor and their associated companies. As part of Eng, Chhor, and Heng's involvement in the criminal enterprise at LPG and subsequently other non-debtor entities, including but not limited to, Oakstone, Guardian, and Greyson, they were given access to DPP and LUNA with permissions to control and modify LPG client files and ACH processing. These actions, which lacked any legitimate business justification, contributed to Eng and Heng initiating double pulls, where monthly ACH debits were being taken out twice causing the client's bank account to go negative and incur overdraft fees among other charges, on LPG client files and the depletion of LPG's Estate, further damaging LPG's creditors and stakeholders.

**E.      DIAB'S CONTROL OVER LPG'S PAYMENT PROCESSING**

33.      LPG's primary source of revenue was derived from the monthly ACH debits made by its client base. To facilitate these payments, LPG relied on various ACH payment processing companies, many of which were deliberately selected and controlled by Diab to enable the rapid transfer of millions of dollars to himself, his co-conspirators and his non-debtor alter ego entities. These entities included, but were not limited to, Touzi, Teracel, PECC, Guardian, and Oakstone. Diab's practice of rotating between different ACH vendors was calculated to obscure the flow of funds, evade detection, and avoid potential payment disputes with vendors. These transfers often occurred within three days of an ACH pull, allowing Diab to quickly funnel LPG funds into accounts associated with himself and his co-conspirators.

34.      Notably, LPG operated without formal service agreements with key ACH processors, including Guardian, and other entities identified as critical participants in the scheme. The lack of

formal agreements underscores the fraudulent nature of these arrangements. For instance, side deals between Diab and third-party processors, including Marich Bein, were created to bypass standard corporate oversight and to conceal Diab's control over these transactions. This unchecked influence allowed Diab to direct ACH funds to entities he controlled, to the detriment of LPG's Estate and creditors.

35.    From May 2022 to September 2022, LPG's monthly ACH debits ranged between $8.4 million and $11.2 million. By the Petition Date, monthly ACH debits from client accounts exceeded $15 million. Despite the substantial revenue generated, LPG accumulated no meaningful cash reserves, reporting only $4,500 in its bank accounts as of the Petition Date. This discrepancy illustrates the extensive siphoning of funds orchestrated by Diab, Eng, Heng, Han, Jayde among others, leaving LPG insolvent and unable to meet its obligations.

36.    The payment processing scheme was further bolstered by the involvement of additional ACH vendors, including but not limited to Revolv3, BankUnited, Authorize.net, Marich Bein, EPPS, Seamless, and others listed in the Court's Preliminary Injunction entered in Adversary Proceeding No. 8:23-ap-01046-SC ("1046 Action"). These vendors served as conduits for Diab's fraudulent transfers, facilitating the improper diversion of funds from LPG's clients and creditors to entities controlled by Diab, Eng, Heng, and other co-conspirators. To further hide the fraudulent scheme, Diab and his co-conspirators continued to use old LPG ACH processing accounts, including but not limited to, LPG's Revolv3 account, so that LPG clients would not be alerted to the diversion of their client files. Along these same lines, Diab and his co-conspirators used LPG ACH identifiers, such as "LPG 949-226-6262 #5 2363 RT 9 TOMS RIVER NJ 0875," in order to give clients the false impression that post-transfer ACH processing were tied to LPG. Such intentional confusion is further evidence of Diab and Defendants' systematic exploitation of LPG's clients and ACH debit processing.

37.    The deliberate misuse of ACH processing channels to funnel Estate assets into alter ego entities, including Touzi, PECC, Teracel, and Guardian, constitutes a fundamental breach of fiduciary duty. Diab, Eng, Jiang, Chhor, and Heng control over these transactions, facilitated by opaque vendor relationships and fraudulent processing practices, ensured the continued depletion of

LPG's Estate while enriching Diab and his associates. This scheme directly contributed to LPG's insolvency and defrauded the Estate and its creditors.

**F.     DIAB'S CONTROL OVER LPG'S PAYMENT PROCESSING**

38.     LPG's primary source of revenue was derived from the monthly ACH payments made by its client base. To facilitate these payments, LPG relied on various ACH payment processing companies, many of which were deliberately selected and controlled by Diab and his co-conspirators, including Eng and Heng, to enable the rapid and concealed transfer of millions of dollars to themselves, other co-conspirators and entities under their control. Eng, Heng, and Chhor through their companies Touzi, PECC, Teracel, Oakstone and Guardian played a critical role in receiving and concealing fraudulent transfers. These entities were frequently utilized as conduits for funneling funds from LPG to entities controlled by Diab, Eng, Heng, Chhor, and others, thereby depriving LPG and its creditors of significant assets.

39.     Eng and Heng's involvement in the fraudulent scheme was not passive but intentional and essential to its operation. For example, through Touzi, Eng and Heng received over $234,244.57 in payments over four years, as evidenced by Chase disbursement records, without justification or corresponding services rendered. Further, records show significant sums were funneled through Teracel and PECC, which Eng and Heng owned and controlled. These entities were used to obscure the origin and destination of funds, facilitating the diversion of LPG's ACH debits for personal enrichment and shielding assets from LPG's creditors. *See* **Exhibit 1. Financial records.**

40.     The evidence further reveals Eng, Chhor, and Heng's direct participation in the execution of the fraudulent scheme. For example:

a.  On September 27, 2022, an email from LPG's admin to Kyle Herret and Brice Long explicitly stated that Eng sought to conceal his association with Teracel. This concealment was part of a deliberate effort to frustrate creditor recovery and avoid detection of the fraudulent transfers. *See* Exhibit 2

b.  Records show Eng coordinated with Diab to move funds rapidly through various processing accounts and alter ego entities, including Touzi and PECC, ensuring that funds were diverted from LPG's Estate without proper oversight or consent.

11

c. From May 2022 to September 2022, LPG's monthly ACH debits ranged between $8.4 million and $11.2 million. By the Petition Date, monthly debits from client accounts exceeded $15 million. Despite this substantial revenue, LPG's bank accounts held only $4,500 at the time of filing. The diversion of these funds, including those transferred to Eng's entities, left LPG insolvent and unable to meet its obligations.

41. Eng, Heng and Chhor and their companies played a central role in laundering the diverted funds, ensuring they were disbursed to entities beyond the reach of LPG's creditors. These fraudulent transfers included, but are not limited to:

a. $40,046.23 paid to Touzi Capital without supporting documentation for services rendered. *See* Exhibit 1.

b. $774,180.17 transferred to Teracel, which lacked any legitimate business purpose. *Id*.

c. Additional payments were made to Eng, in his individual capacity, including a $1,753.80 wire transfer on January 27, 2023, without explanation or documentation. *Id*.

42. The fraudulent ACH processing scheme, designed and executed with Eng's assistance, was further bolstered Eng and Heng's manipulation of ACH processing companies including Oakstone and Guardian. These entities facilitated improper double ACH debits on LPG client files and the improper diversion of LPG's client funds to entities owned, operated and controlled by Diab Eng and Heng, allowing them to misappropriate Estate assets while maintaining the facade of legitimate transactions.

43. Eng and Heng also benefited from their insider knowledge of LPG's financial operations and the proprietary software used to manage client files and payments, including DPP. These entities, including Touzi, Teracel and PECC, were directly integrated into the scheme, utilizing the ACH data from DPP to further exploit LPG's client accounts. This integration allowed Eng, Heng and their co-conspirators to perpetuate the fraudulent transfer of client funds under the guise of legitimate ACH processing. Diab's testimony at the Debtor's 341a hearing confirmed Eng was highly involved in the development and advocacy to follow through with the fraudulent scheme alleged

herein to secure his financial interest in those debits and avoid government agency scrutiny for violations of consumer protection laws.

44. The deliberate misuse of ACH processing channels by Eng, in concert with Diab, ensured the continued depletion of LPG's Estate and enriched Eng and his entities, which include but are not limited to Touzi Capital, PECC, Teracel, Oakstone, And Guardian Processing. The concealment of Eng's involvement and the rapid transfer of funds to his entities directly contributed to the Ponzi scheme, LPG's insolvency, and defrauded the Estate and its creditors out of millions of dollars.

## G. LPG'S PREPETITION CREDITORS

45. In addition to financing provided by alleged factoring companies, LPG obtained significant financing from various sources to sustain its operations. These sources, which collectively lent hundreds of millions of dollars to LPG, now stand as some of the largest creditors of the Estate.

46. According to the Debtor's Schedule D [Bankr. Docket No. 33], LPG listed three secured creditors: (a) Diverse Capital, LLC, with a claim of $1,224,810; (b) City Capital NY, with a claim of $2,950,000; and (c) Fundura Capital Group, with a claim of $2,100,000 (collectively referred to as the "Secured Creditors"). These secured claims totaled $6,274,810. As of September 1, 2022, there were fourteen (14) active UCC-1 financing statements on record securing debts owed by LPG. These statements either reflected secured liens against LPG's current and future assets or evidenced the transfer, assignment or sales of substantial portions of LPG's future income. At the time of the fraudulent transfers alleged herein, these UCC-1 filings secured repayment of the following amounts, which are known to the Trustee and allegedly owed by LPG:

    a. $2,374,004.82 owed to Fundura Capital Group, as evidenced by Proof of Claim No. 335, secured by a UCC-1 filing dated May 19, 2021;

    b. Approximately $15 million owed to MNS Funding, LLC, as evidenced by Proof of Claim No. 1060, secured by a UCC-1 filing dated May 28, 2021;

    c. Approximately $5 million owed to Azzure Capital, LLC, as evidenced by Proof of Claim No. 127, secured by a UCC-1 filing dated May 28, 2021;

13

d. Approximately $1.5 million owed to Diverse Capital, LLC, as evidenced by UCC-1 filings dated September 15, 2021, and December 1, 2021.

e. The Trustee reserves all rights to challenge, dispute, or otherwise address these purported secured claims.

47. Furthermore, LPG's Schedule E/F [Bankr. Docket No. 33] identifies eleven unsecured creditors holding priority unsecured claims totaling $374,060.04. These creditors include various state and federal agencies, such as the Indiana Department of Revenue, Washington Department of Labor and Industries, Arizona Department of Economic Security, Arkansas Department of Finance and Administration, California Franchise Tax Board, Georgia Department of Labor, Internal Revenue Service, Mississippi Department of Revenue, Nevada Department of Taxation, Utah State Tax Commission, and Wisconsin Department of Revenue (collectively, the "Priority Unsecured Creditors"). Following the claims bar date, more than $500 million in claims were filed against LPG.

48. Additionally, LPG identified 58 nonpriority unsecured creditors in its Schedule E/F [Bankr. Docket No. 33], with claims totaling $141,439,158.05. These creditors include various service providers, contractors, and individual claimants, such as Ajilon, Anthem Blue Cross, Azevedo Solutions Group, Inc., Carolina Technologies & Consulting, Credit Reporting Service Inc., DPP, Exela Enterprise Solutions, Liberty Mutual, Marich Bein, LLC, Validation Partners, JP Morgan Chase, and numerous others. These creditors, collectively referred to as the "Nonpriority Unsecured Creditors," provided a range of services to LPG before its insolvency. Together, the Secured Creditors, Priority Unsecured Creditors, and Nonpriority Unsecured Creditors are referred to as the "Prepetition Creditors."

49. Many of the claims filed by the Prepetition Creditors stem from LPG's fraudulent and improper financial practices, including its mismanagement of ACH debits, unlawful transfers, and sale of receivables. The Trustee continues to investigate the full scope of these claims and their connection to the fraudulent scheme orchestrated by Diab, Eng and Heng, among others.

14

**H. ENG, CHHOR, AND HENG AND THEIR ROLE IN FACILITATING DIAB'S SCHEME**

50. Eng, Chhor, and Heng, through their control and ownership of entities including Oakstone, Guardian, Touzi, PECC, and Teracel, worked closely with Diab to execute and perpetuate the fraudulent scheme. These entities served as conduits for the transfer and concealment of LPG client funds and assets, as well as ACH receivables. Eng's involvement extended to leveraging his business operations and financial accounts to facilitate these transactions and obstruct efforts to recover the fraudulently transferred assets. Heng, on the other hand, was Eng's soldier at such entities including Touzi, PECC, and Teracel, who was highly involved in the design and implementation of Eng and Diab's scheme much in the same way Han Trinh and Jayde Trinh, among others were involved with the development and implementation of the fraudulent scheme at LPG, Coast Processing, and Greyson, among others. Chhor was instrumental in the formation of certain corporate entities and assisted in structuring operations that allowed the fraudulent enterprise to continue under the direction and control of Eng Taing, thereby enabling the concealment and diversion of estate assets.

51. In or around June 2022, facing mounting litigation threats and cease-and-desist demands from creditors such as Validation Partners, LLC, Diab, with Eng and Heng's assistance, began transferring LPG's assets, including client files and ACH receivables, to entities controlled by Eng, Heng, *Chhor* and others. Eng's alter ego entities, including Touzi, PECC, Teracel, and Oakstone, among others, were central to these efforts, receiving millions in fraudulent transfers under the guise of business transactions to shield LPG's assets from creditors.

52. Later that summer, Eng orchestrated a series of internal "agreements" between LPG and PECC to cut out Validation Partners and coordinate recoupment directly with LPG. These agreements had the effect of artificially inflating LPG's liabilities owing to Eng's affiliates. In substance, Eng caused LPG's books to reflect tens of millions of dollars of additional debt purportedly owed to his entities without any new capital infusion, services, or other consideration being provided to LPG. For example, one set of sham transactions increased LPG's obligation to PECC from about $17 million to over $28 million on paper; more broadly, Eng's maneuvers inflated LPG's reported

15

debt from roughly $95 million to around $150 million by transferring the debt obligations of Validation Partners to LPG. These "internal agreements" were fabricated for the sole purpose of creating the appearance of additional debt owed to Eng's companies to justify future transfers of LPG assets to Eng and his affiliates.

53. The transactions engineered by Eng were not negotiated at arm's length and were never approved through any legitimate corporate governance process at LPG. They served no legitimate business purpose for LPG; rather, their primary effect was to position Eng (through PECC and Touzi, Teracel, Guardian, Oakstone) as an even larger creditor of LPG on paper. This positioning, in turn, allowed for Eng to later divert value from LPG to himself under the guise of "debt repayment."

54. In or around September 2022, Eng was directly involved in discussions and strategies to ensure that LPG client files and ACH receivables were transferred without detection based on Diab's testimony at the Debtor's 341a hearing. Evidence shows that Eng knowingly concealed his involvement in these transactions, instructing employees and associates to avoid referencing his name in correspondence. Emails reveal that directives were issued to replace his name with generic titles such as "Finance Officer" or "General Counsel" to obscure his role in the fraudulent scheme.

55. Between January and March 2023, as creditor actions intensified, Eng, Chhor, and Heng worked with Diab and others, including Guardian and Oakstone Law Group, to fraudulently transfer LPG's assets to newly formed entities. Eng's entities, including Touzi, PECC, Tercel, received millions of dollars in transfers during this period without providing equivalent value. Along these lines, Eng and Heng facilitated PECC's purchase of ACH receivables on LPG clients, many of which had already been transferred to other creditors with knowledge that LPG would file for Bankruptcy protection and breach their obligations to existing creditors leaving PECC the sole beneficiary of the ECH debits. These transfers were orchestrated to misappropriate funds for personal gain while leaving LPG and its creditors with uncollectable liabilities.

56. Eng and Heng's role in managing LPG's ACH processing further solidified his central involvement in the scheme. Through Touzi and Teracel, Eng facilitated the receipt and redirection of funds from LPG clients. These transactions, often processed through Prime Logix, Guardian Processing, and other ACH processors, were directed by Eng in concert with Diab to ensure that LPG

retained minimal funds for creditor recovery. Evidence includes detailed transaction logs and communications showing Eng's active participation in designing the workflow for these transfers.

57. Eng, Chhor, and Heng's entities not only received fraudulent transfers but also acted as intermediaries to funnel funds to other co-conspirators. For example, Teracel and PECC funneled ACH receivables to other non-debtor entities, including but not limited to Oakstone and Guardian, which were created to further the scheme and frustrate recovery efforts. This multi-layered structure demonstrates Eng and Heng's intent to assist Diab in evading creditor claims and perpetuating the criminal enterprise and Ponzi-like scheme. According to witnesses, Eng and Heng yielded so much control, when Eng's relationship with Wes Thomas, the Chief Financial Officer at Oakstone, began to fall apart due to operational issues at Oakstone and Guardian, Eng and Heng swiftly initiated double ACH debits on LPG client files totaling more than $500,000 using Eng's Payliance account in order to pay himself and PECC back. Transactions that were never authorized by the clients and never returned to LPG's clients. Eng's actions directly contributed to the dissipation of LPG assets and the harm suffered by creditors, including consumer creditors.

58. Eng also played a role in recruiting and coordinating with other individuals and entities, including Guardian and Oakstone, to facilitate the fraudulent scheme. Evidence shows that Eng worked with Diab to ensure that key LPG employees, attorneys, and other personnel were transitioned to these newly formed entities, enabling the continuation of LPG's operations under different names while avoiding creditor scrutiny. Preparing for LPG's demise and filing of its Bankruptcy petition, Diab, Eng and Heng assured LPG employees servicing LPG client files they would be re-hired by Guardian in order to continue the criminal enterprise under a new name.

59. As a result of his involvement, Eng, Heng and their entities received substantial financial benefits, including payments exceeding $1.5 million, luxury expenses, and other compensation derived from the fraudulent transfers of LPG assets. These actions were undertaken with full knowledge of LPG's insolvency and the harm being inflicted on its creditors.

60. Eng, Chhor, and Heng, directly and through their entities, including but not limited to Oakstone, Guardian, PECC, Touzi and Teracel, are jointly and severally liable for the substantial damages suffered by LPG's Estate and creditors. Eng and Heng's actions, as detailed herein,

17

constitute knowing and intentional participation in Diab's fraudulent scheme and criminal enterprise. As a direct and proximate cause of Eng and Heng's actions and involvement in the fraudulent scheme, the Trustee seeks to recover all damages from Eng and Heng and their entities, including Oakstone, Guardian, Touzi, PECC, and Teracel, as accomplices and co-conspirators.

**FRAUDULENT TRANSFERS AND DOUBLE PULLS BY DEFENDANTS TOUZI, ENG, AND TERACEL**

61. Eng, Touzi, Teracel, and PECC, all of which are controlled by Eng, were in business with and acting in concert with Diab as early as 2021, if not earlier, according to bank records produced by Optimum Bank showing hundreds of thousands of dollars being transferred from LPG to Touzi and PECC.

62. After transferring and/or selling ACH receivables to Validation Partners and other alleged factoring companies, as discussed above, Diab caused LPG to sell, pledge and/or transfer receivables to a number of different entities at the direction of Eng, including Touzi, Teracel, and PECC, entities Eng owned, controlled, and dominated. At the first meeting of creditors, Tony Diab testified under oath that Eng, who owned PECC, had been "pushing for these files to be moved to a different entity." Mr. Diab said that Eng was pushing for this action given the pending lawsuits against the Debtor. As a result of these discussions, Mr. Diab testified "we essentially agreed in January that we would move them [the files] to the destination that we chose[.]" The result of this agreement and scheme between Eng and Diab was twofold, as alleged below.

63. First it led to the execution of certain Finance Agreements and Statements, which was intended to receive the benefit of ACH debits on LPG client files identified in the Finance Agreement and cut out certain LPG creditors including but not limited to Validation Partners.

    a. As part of this scheme, approximately 719 files were transferred for $2,070,000 to Teracel, an entity owned, controlled, and operated by Touzi, which is headed by Eng and his brother Heng, and for purposes of this Complaint, alter egos of one another including PECC, Touzi, and Teracel. Out of the 719 files purchased by Teracel, 643 of those files had already been purchased by Validation Partners. All of these files were transferred without Validation Partners nor the client's knowledge or consent. Despite

LPG never receiving a payment from Teracel for the purchase of these client files, the ACH receivables associated with those files are being paid out directly to Teracel, which is controlled, dominated, and managed by Eng, Touzi, and/or PECC and each of them.

64.     Second, the scheme Diab and Eng devised led to the creation of Oakstone and Guardian, among other non-debtor entities. Oakstone and Guardian, at the direction of Eng and Diab, received thousands of LPG client files for either no and/or little or inadequate consideration. The purpose behind the transfer was to ensure Eng and Diab maintained control over LPG's ACH debits.

65.     By and through Eng, Touzi, and Guardian, Defendants Guardian, PECC, Eng, Touzi, and/or Teracel have initiated and retained funds resulting from LPG client ACH transactions processed by Payliance pre and post-petition, including but not limited to approximately $551,893.42 in ACH transactions as listed in Invoice No. 230602030241-389051, Invoice Date June 15, 2023, for the Invoice Period, post-petition from May 1, 2023 to May 31, 2023 for which Payliance charged approximately $13,140.40 to process. Notably, the Payliance account used to process these fraudulent ACH transactions is in both Guardian and Eng's name and is identified in the client's bank statements as Touzi.

66.     According to the Declaration of Christine Le [Dkt. No. 159-1] and exhibits attached thereto, between late April and May 2023 and at all relevant times alleged above, Phoenix began receiving complaints from LPG clients indicating that their monthly ACH debits were being taken out twice (double pulls) causing the client's bank account to go negative and incur overdraft fees among other charges. These LPG clients indicated that Touzi and Guardian had both taken monthly payments from their bank accounts in identical amounts. One LPG client reported his account had been debited four times in one month. Phoenix tracked these double-pull complaints by Touzi, Eng, Teracel, and Guardian in the chart attached as Exhibit A-1 to the Declaration of Christine Le [Dkt No. 159-1]. Phoenix tracked over 50 different complaints from LPG clients being double pulled totaling approximately $35,805.76 in fraudulent double pulls that Phoenix was made aware of. This does not include double pulls that were not reported. Phoenix, and therefore the Debtor's Estate, reimbursed many of these clients using Estate assets, however, approximately $16,660.16 in double pulls and overdraft fees Phoenix was made aware of have not been credited or reimbursed to the clients harmed

19

by such conduct. On information and belief, the conduct alleged above by Eng, Heng, Touzi, Teracel, and Guardian resulted in double pulls that have not been reported to Phoenix or otherwise. Further, on information and belief, the Guardian account initiating the double pulls complained of by LPG clients to Phoenix is, and at all relevant times was, the same account invoiced by Payliance above and therefore under Eng's control who, as an alter ego of his many corporate forms, is responsible for the harm caused.

67.    The Trustee has demanded the return of the client files, ACH debits, and funds held by PECC, Touzi, Eng, Heng, Guardian, and Teracel. To date, these Defendants refuse to turn over property of the Estate and as ordered in the Court's June 23, 2023, Preliminary Injunction [1046 Dkt No. 70]. The Trustee has, however, recovered the $551,893.42 in ACH debits initiated post-Petition held by Payliance as a result of the Trustee's compromise with Payliance [Bankr. Dkt. No. 1770].

68.    Despite not paying or providing inadequate consideration for LPG client files and ACH receivables, Oakstone, Guardian, Touzi, PECC, and/or Teracel continued to process duplicate ACH electronic funds transfers in their own name and/or in the name of Eng, Guardian, and/or Oakstone via ACH payment processors, most recently to include but not limited to Payliance. The Trustee is informed and believes and based thereon alleges that Touzi, Eng, Teracel, PECC, and/or Oakstone, Guradian or other entities controlled by Eng and Heng continued post-petition and/or continue to use additional payment processors to initiate ACH debits on LPG client files and/or receive ACH debits on LPG client files that have yet to be recovered from other non-debtor entities.

**J.    FURTHER FRAUDULENT TRANSFERS AND CONVEYANCES TO ALTER EGOS AND OTHER ENTITIES**

69.    In addition to diverting millions of dollars to third parties as alleged herein, Eng and his entities, including Touzi Capital, PECC, Teracel, Oakstone and Guardian, conspired with Diab to transfer LPG's entire business and ACH receivables to non-debtor entities under their control. These entities, including Oakstone, Phoenix, Greyson, CLG, Vulcan, Prime Logix, and Maverick Management, are alter egos of Diab, nominally owned by licensed attorneys or other intermediaries to mask Diab's influence. Similar to Diab's arrangement, Eng and Heng utilized these entities to facilitate fraudulent transfers to themselves and their alter ego entities, including but not limited to, Touzi, Teracel, PECC, Oakstone and Guardian while shielding assets from LPG creditors.

70. The Trustee is informed and believes, and based thereon alleges, that in addition to fraudulent transfers of client files and ACH receivables alleged above, Eng and Diab with the assistance of Heng and Chhor caused the sale or transfer of additional LPG client files with little or no consideration to other non-debtor entities, including but limited to, Greyson, CLG and Phoenix, among others. These transfers were effectuated without client knowledge or consent, with Eng and Heng's entities receiving a percentage of the ACH revenue streams generated by these fraudulently transferred files.

71. Beginning in July 2022, Eng initiated a calculated scheme to consolidate control over LPG's assets, manufacture false liabilities, and extract value through a pattern of insider transactions, preferential payments, and fraudulent transfers. This scheme was executed through a series of manipulative agreements and covert financial operations that deprived the Estate of millions in value while enriching entities owned or controlled by Eng. *See* **Exhibit 3** (PECC Agreements).

72. In or around July 2022, Eng approached Wes Thomas ("Thomas"), then a CFO in the Oakstone operation, with a proposal to create a separate investment vehicle, or "side pocket fund," that would offer preferential terms to select insiders. Although no formal documentation was executed, this proposal marked the beginning of a broader scheme by Eng to isolate LPG's receivables, restructure its obligations without oversight, and consolidate unilateral control over its most valuable assets—all while concealing these efforts from LPG's stakeholders, creditors, and regulators.[1] *See* Declaration of Wes Thomas.

73. On or about July 19, 2022, Eng orchestrated a restructuring of LPG's purported debt to PECC, a shell entity wholly owned and controlled by him. This restructuring artificially inflated LPG's liabilities from approximately $95 million to $150 million, an increase of over 50%, despite no new capital infusion, services rendered, or legitimate consideration. The inflated obligation was not supported by any contemporaneous documentation or board approval and served as a pretext for future insider transactions, including the January 2023 Accounts Receivable Purchase Agreement ("ARPA"),

---

[1] Thomas, a former partner of Eng and executive at Oakstone, is a direct witness and primary source of evidence regarding the misappropriation of funds, use of fake payment processors, and post-Petition activity by Eng. Thomas had access to internal operations and financial records and personally reviewed the illegitimate transactions.

21

which was executed under coercive conditions and without fair value to LPG. *See* Exhibit 2; Declaration of Wes Thomas; Declaration of Tony Diab.

74.    Throughout the summer and fall of 2022, Eng caused LPG to execute a series of internal agreements with PECC, a shell entity under his exclusive control, purporting to "memorialize" liabilities that had no legitimate economic basis. These agreements were not supported by actual loans, services, or capital contributions. Instead, they were fabricated to create the illusion of enforceable debt obligations, enabling PECC to later assert a priority claim over LPG's most valuable assets, particularly its receivables. These documents were created solely for Eng's benefit, lacked any arms-length negotiation, and were executed without board approval, third-party valuation, or notice to creditors.. *Id.*

75.    Despite LPG's deepening insolvency, in 2023, entities controlled by Eng and his affiliates continued to receive payments, insider transfers, and payroll disbursements, often without any supporting documentation, invoices, or legitimate services rendered. These disbursements occurred while creditors remained unpaid and operational shortfalls escalated. E-check and double-debit practices became increasingly common, and accounts were opened under third-party names, including that of Scott Eadie, to obscure ownership and evade detection. Based on internal records and testimony, more than $800,000 in client funds processed through these unauthorized channels remain unaccounted for. *See* Thomas Documents attached hereto as Exhibit 3.

76.    Within two years prior to the filing of the bankruptcy petition, Debtor LPG, acting through Eng and his alter ego entities, including PECC, Touzi, Teracel, Guardian, and Oakstone, transferred millions of dollars in client funds to insider-controlled accounts. These transfers occurred while LPG was insolvent and were made without LPG receiving any reasonably equivalent value in return. This was done with actual intent to hinder, delay, or defraud creditors. These transfers were not authorized by any court order, lacked any legitimate business justification, and were not disclosed to the Estate or the Trustee at the time they occurred. *Id.*

77.    The structure and pattern of these transfers exhibit clear indicia of fraudulent intent. Eng operated multiple CRM and payment processing systems simultaneously, including off-the-books accounts opened in the names of LPG insiders and employees. He further disguised these

22

transfers by mislabeling transactions in internal ledgers, forging banking documents, and directing Jiang to misclassify account entries. The volume and timing of these withdrawals—particularly in March and April 2023—coincided with mounting creditor demands and internal communications reflecting a deliberate effort to shield assets from recovery. *Id*.

78.     On January 11, 2023, Eng executed the ARPA, purporting to transfer LPG's entire receivables portfolio to PECC, a shell entity wholly owned and controlled by him, for a stated "purchase price" of $28,291,360. In reality, no funds were exchanged. The purported consideration was applied as a fictitious offset against a previously fabricated promissory note, which lacked any legitimate economic basis. PECC assumed no liabilities, paid no cash, and acquired 100% of the revenue streams associated with the accounts. The ARPA contained one-sided confidentiality and indemnification provisions, lacked any third-party valuation or appraisal, and included accounts that were known to be delinquent or uncollectible. Executed less than 70 days before LPG's bankruptcy filing, during a period of clear insolvency and mounting creditor demands, the ARPA was a circular, insider-driven transaction designed to strip LPG of its last remaining assets.[2]

79.     Between March 10 and April 20, 2023, within the 90-day preference period preceding the Debtor's bankruptcy filing, the Debtor made a series of payments totaling more than $1.6 million to entities directly or indirectly controlled by Eng. These payments include, but are not limited to: $400,000 on March 10, 2023; $50,000 on March 13, 2023; $90,000 on March 16, 2023; $300,000 on April 4, 2023; $298,000 on April 5, 2023; $280,000 on April 13, 2023; $90,000 on April 14, 2023; $39,900 on April 16, 2023; and $71,450 on April 20, 2023. These transfers are detailed further in the attached **Exhibit 3**.

80.     These payments were made for the benefit of insiders—including Eng and entities under his ownership and control—and occurred while the Debtor was insolvent. The timing, control, and nature of these transfers make them avoidable preferential transfers under 11 U.S.C. § 547(b).

81.     The recipients of these payments did not provide new value or contemporaneous exchange in return. Instead, these transfers were used to enrich insiders, conceal liabilities, and

---

[2] Diab further confirms that Jiang was directly involved in extracting large sums from Oakstone accounts between February and April 2023, further implicating him as an active participant in the fraudulent transfers and unjust enrichment. This activity occurred contemporaneously with the insider payments detailed above.

deplete Estate assets in anticipation of bankruptcy. Accordingly, the Trustee seeks to avoid and recover these transfers pursuant to 11 U.S.C. § 547 and 11 U.S.C. § 550.

82.    In the alternative, these same payments may also constitute actual or constructive fraudulent transfers under 11 U.S.C. § 548, as they were made with intent to hinder, delay, or defraud creditors or were made without reasonably equivalent value while the Debtor was insolvent or became insolvent as a result.

83.    Beginning in or around April 2023, clients began contacting Oakstone and Phoenix administrators demanding refunds for charges neither entity had processed. These complaints triggered an internal investigation led by Thomas, who uncovered that Eng had diverted at least $4 million— and ultimately closer to $8 million—through undisclosed ACH withdrawals. These transactions bypassed Oakstone's legitimate CRM systems and were processed through unauthorized channels under Eng's control. See *Exhibit 2* consolidates Substantial documentary evidence confirms Eng's direct involvement in orchestrating these fraudulent transactions, laundering diverted funds, and enabling breaches of fiduciary duty by others. *See* Exhibit 2, 3, Diab Declaration, Thomas Declaration.

84.    In early 2023, Thomas learned that Eng intended to shut down Oakstone, continue processing unauthorized ACH withdrawals from LPG clients, and flee to Cambodia to evade legal consequences. Thomas further reported that Eng threatened him personally, including a specific threat to cancel his daughter's health insurance coverage—a threat that, if carried out, would have placed her life in jeopardy. These actions were part of a broader effort to silence internal dissent, obstruct oversight, and finalize the diversion of LPG's remaining assets without interference.

85.    Between March 10 and April 20, 2023, within 90 days of the bankruptcy filing, more than $1.6 million was transferred to entities controlled by Eng. These payments include, but are not limited to: $400,000 on March 10, 2023; $50,000 on March 13, 2023; $90,000 on March 16, 2023; $300,000 on April 4, 2023; $298,000 on April 5, 2023; $280,000 on April 13, 2023; $90,000 on April 14, 2023; $39,900 on April 16, 2023; and $71,450 on April 20, 2023. *See* Exhibit 4.

86.    The foregoing events were not the result of negligence or poor business judgment. They reflect a deliberate and multi-stage conspiracy by Eng and his affiliates to enrich themselves at the direct expense of LPG, its clients, and its creditors. The scheme's complexity and timing, including

fabricated liabilities in July, sham agreements in fall 2022, a fraudulent ARPA in January 2023, and large-scale insider payments in March and April, confirm a concerted effort to strip the Estate of its most valuable assets while shielding insider beneficiaries from liability.

87.    In early 2023, Eng, in coordination with Diab, facilitated the purchase of shell corporations and established operational infrastructures for entities like Phoenix and Oakstone. Specifically, Diab testified during the 341(a) meeting of creditors that LPG could not afford to continue servicing its clients through its existing operations. Nevertheless, Eng and Diab jointly orchestrated the fraudulent transfer of approximately 15,000 client files to Oakstone, 12,000 files to CLG, and close to 40,000 files to Phoenix. These transfers were carried out without any executed assignment contracts or proper authorization, constituting fraudulent conveyances designed to conceal assets and defraud creditors.

88.    The fraudulent transfers extended to Defendants Touzi, PECC, Teracel, and Guardian, who acted in concert with Diab, Eng, Chhor, and Heng to resell and transfer client files multiple times, generating significant revenues in perpetuating a Ponzi scheme while withholding proceeds from LPG creditors. These entities processed ACH debits and receivables using LPG's infrastructure, furthering the fraudulent scheme to defraud LPG's creditors and conceal the true value of LPG's assets.

89.    Eng, in collaboration with Diab, Han, Jayde, and others, continued to funnel funds post-petition through the newly created alter egos of Diab and Eng. For example, ACH processing accounts such as LPG's FIS account, which listed "Tony Diab" as a user and LPG as the merchant, were used to net between $6 million and $9.3 million in just two months—from March 28, 2023, through May 19, 2023. These funds were transferred to Eng and Heng's entities, including Touzi, Teracel, and PECC, further enriching Eng, Heng and their entities while circumventing protections for creditors and the Estate.

90.    The fraudulent transfers of client files, ACH debits, receivables, and funds, as well as the revenues generated therefrom, collectively constitute the "Transfers." These Transfers were designed to hinder, delay, or defraud creditors, depriving the Estate of assets while enriching Defendants named herein and other fraudulent transferees.

91. These efforts continued post-petition. As of the Petition Date, Eng was still initiating unauthorized client fund withdrawals through shadow accounts at NMI, Payliance, and Guardian. The proceeds were diverted to entities unrelated to LPG and outside the control of the Estate. These withdrawals persisted into late April and early May 2023, evidencing a continuous scheme to evade detection, deplete Estate assets, and mislead both clients and the Trustee. These transfers were made with actual intent to hinder, delay, or defraud creditors, and are avoidable under 11 U.S.C. § 548(a)(1)(A).

92. Among the fraudulent transfers were post-Petition ACH withdrawals orchestrated by Eng and his affiliates, including over $3.5 million routed through Guardian-linked accounts and $850,000 processed via NMI and Touzi in March and April 2023. These transfers were neither authorized by any court nor disclosed to creditors or CRM, and occurred after the Petition filing date. At all relevant times, Jiang aided in structuring and concealing these transfers, resulting in unjust enrichment to Eng, PECC, Teracel, and Validation Partners, and causing substantial loss to the Estate.

93. Financial records, including documents provided by Thomas and corroborating statements from Diab, confirm that Eng orchestrated these transfers with the assistance of Jiang and others. Jiang knowingly misrepresented the nature of the transactions and manipulated accounting entries to conceal their fraudulent character. As a result, Plaintiff is entitled to avoid and recover these transfers under 11 U.S.C. §§ 548(a)(1)(B) and 550(a).

94. According to Diab, Defendants Eng and Jiang continued to withdraw funds from client accounts via side ACH channels into the summer of 2023—well after the collapse of LPG and initiation of bankruptcy proceedings. These withdrawals were unauthorized, concealed, and conducted through a network of bank accounts, including some fraudulently opened under the name of another employee, Scott Eadie. Clients began contacting Oakstone affiliates in April and May 2023 about withdrawals they did not authorize, which ultimately led to the discovery of these operations.

95. On or around April 17, 2023, Thomas discovered that Eng had initiated a mass double-debiting of client accounts totaling approximately $850,000 through an NMI-linked payment processing account associated solely with Touzi Capital. These unauthorized withdrawals occurred during a period when Oakstone and LPG had ceased operations, and no lawful basis existed for

continuing to process client payments. The transactions were not reflected in Oakstone's CRM systems and were executed through parallel processing infrastructure controlled by Eng. *See* Exhibit 4; Declaration of Wes Thomas.

96. Thomas also uncovered a broader scheme involving unauthorized "side" payment processing accounts that operated entirely outside of Oakstone's official CRM systems. Initially estimated at $4 million, the volume of unauthorized transactions processed through these parallel systems exceeded $8 million by mid-2023. These off-book accounts were used to divert client funds without oversight, further concealing the scope of the fraud and depriving the Estate of substantial assets. *Id*.

97. Thomas also reported discovering a box containing canceled checks and banking records tied to unauthorized "side" accounts used by Eng and Jiang. These materials corroborated the existence of parallel payment structures and financial accounts—many of which were opened without proper authorization or any legitimate business purpose. The Trustee continues to investigate these records as part of the broader effort to trace and recover misappropriated Estate assets. *Id*.

98. Thomas has provided direct, firsthand evidence of the misappropriation of funds and the operation of unlawful payment processing schemes orchestrated by Eng. Based on his personal involvement in Oakstone's financial and operational infrastructure, Thomas observed and documented Eng's use of unauthorized ACH channels, parallel banking systems, and insider-controlled entities to divert client funds and conceal the true scope of the fraud *Id*.

99. Thomas also uncovered documentation showing that, in March 2023 alone, $3,580,787.45 in unauthorized withdrawals were processed through a Guardian Processing account ending in x6597 despite the account having a beginning balance of just $4,362.19. These withdrawals appear to have been routed to accounts and entities affiliated with or controlled by Eng. The volume and velocity of these transactions, occurring during a period of insolvency and operational shutdown, further support the existence of a coordinated scheme to divert Estate assets. *Id*.

100. Thomas also produced a bank resolution document for Everett Bank that included a forged signature of Scott Eadie, which Eng used to open a financial account in Oakstone's name. This forgery directly implicates Taing in bank fraud and identity misuse. *Id*. Upon information and belief,

27

Defendant Chhor likewise participated in or facilitated similar misconduct by misusing Scott Eadie's signature to create new bank accounts to continue the fraudulent operations, thereby aiding and abetting the concealment and diversion of Estate assets.

101. According to Thomas, by April 2023 it had become clear that Eng was no longer attempting to operate Oakstone as a legitimate business. Instead, he was actively draining its accounts and using multiple payment processors, including Touzi and other alter ego entities, to continue diverting client funds. The scale, coordination, and concealment of these activities point to deliberate and calculated misconduct. *Id*.

102. Thomas stated that every dollar reflected in the Paya and Payliance reports he reviewed represented fraud or theft, as the transactions were processed after the businesses had ceased operations and lacked any lawful basis. *Id*.

103. On July 27, 2023, Chhor received a $75,000 payment from Oakstone Law Group PC, a non-debtor entity identified in prior pleadings as a transferee of Estate assets. Exhibit 5 – Copy of $75,000 Check from Oakstone Law Group PC to Jim Chhor (dated July 27, 2023).

104. The payment occurred after the Petition Date, was made from funds traceable to the Debtor's Estate, and was not authorized by the Bankruptcy Code or any Court order.

105. Defendant was previously dismissed without prejudice under a stipulation filed in Adv. Proc. No. 8:25-ap-01156-SC, which expressly reserved the Trustee's right to reassert claims upon discovery of such transfers (see Exhibit 6). Exhibit 6 – Stipulation for Dismissal Without Prejudice and Court Order (Dkt. 70 & 71) from Adv. Proc. No. 8:25-ap-01156-SC

106. The Trustee discovered the $75,000 payment from Oakstone Law Group PC to Chhor only after Chhor had been dismissed pursuant to the stipulation. Following this discovery, the Trustee requested an explanation and supporting documentation from Defendant regarding the payment, but Defendant failed to provide any explanation.

107. Attached hereto as Exhibit 7 is a summary of Oakstone Law Group PC's post-petition receipts and disbursements, reflecting transfers to and from entities identified in this Complaint, including Touzi Capital LLC, Guardian Processing LLC, Greyson Law Center LLC, and Defendant Chhor.

108. Despite demand for turnover and cooperation, Defendant has failed to return the funds or provide a full disclosure.

109. The Trustee's investigation remains ongoing, and subpoenas for financial records have been issued to additional banks and payment processors. Preliminary evidence suggests that substantial additional funds remain unaccounted for, and that Chhor his affiliates failed to turn over all known assets and records. The Trustee reserves the right to further amend this Complaint as more evidence is uncovered during discovery.[3]

**K.   THE SALE OF LPG'S ASSETS**

110. On July 7, 2023, Richard Marshack in his capacity as the Chapter 11 Trustee moved the Court for an order (A) Approving Sale, Subject to Overbid, of Assets Free and Clear of All Liens, Claims, Encumbrances and Interests Pursuant to 11 U.S.C. § 363(b) and (B) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and Other Agreements ("Sale Motion") [Bankr. Dkt. No. 191]. After supplemental briefing, addressing multiple oppositions, holding a lengthy hearing, and auction wherein Morning Law Group was the highest bidder, the Court granted the Sale Motion entered August 2, 2023 ("Sale Order") [Bankr. Dkt. No. 352].

<u>**First Claim for Relief**</u>

**Avoidance, Recovery, and Preservation of Unauthorized Post-Petition Transfers**

**[11 U.S.C. §§ 549, 550, and 551]**

111. Plaintiff realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 107 as though fully set forth herein.

112. The post-petition financial summary attached as Exhibit 7 further evidences that the $75,000 transfer to Chhor was part of a series of unauthorized post-petition transfers from Oakstone to insiders and affiliated entities.

113. On or about July 27, 2023, Chhor received a transfer of $75,000 from Oakstone Law Group PC, a non-debtor entity identified in prior pleadings as a transferee of Estate assets (see Exhibit 5).

---

[3] Eng used numerous fake or altered payment processors, including NMI, Paylance, and Guardian , which were often opened under false pretenses or using forged documents, including forging Scott Eadie's signature to open at least one account. Some of these accounts were in the names of unrelated or unaware individuals.

114.    The transfer occurred after the Petition Date and involved property of the Estate or proceeds thereof.

115.    The transfer was not authorized by the Bankruptcy Code, by any provision of Title 11, or by any order of this Court.

116.    Pursuant to 11 U.S.C. § 549(a), the Trustee may avoid a transfer of property of the Estate that occurs after the commencement of the case and that is not authorized under the Bankruptcy Code or by the Court.

117.    The $75,000 transfer to Chhor constitutes an unauthorized post-petition transfer and is avoidable under 11 U.S.C. § 549(a).

118.    Plaintiff seeks entry of judgment avoiding the transfer under § 549(a), preserving the avoided transfer for the benefit of the estate under § 551, and granting such other and further relief as the Court deems just and proper. Pursuant to 11 U.S.C. § 550(a), Plaintiff seeks recovery of the property transferred or the value thereof from Chhor as the initial transferee of the unauthorized post-petition transfer.

**Second Claim for Relief**

**Turnover of Estate Property**

**[11 U.S.C. § 542]**

119.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 117 as though fully set forth herein.

120.    Pursuant to 11 U.S.C. § 542(a), any entity in possession, custody, or control of property that the Trustee may use, sell, or lease under § 363, or that the Debtor may exempt under § 522, shall deliver such property to the Trustee and account for the same.

121.    The $75,000 payment received by Chhor from Oakstone Law Group PC on or about July 27, 2023 constitutes property of the Estate or proceeds thereof.

122.    Chhor is in possession, custody, or control of the $75,000 transfer, or its traceable proceeds, and has failed and refused to return such property to the Trustee despite written demand (see Exhibit 6).

123.   In addition to the funds, Chhor possesses documents and records relating to the transfer, including bank statements, copies of checks, deposit records, and communications with Oakstone or its affiliates, which are necessary for the Trustee's administration of the estate.

124.   Chhor's continued retention of the funds and related records is unlawful under 11 U.S.C. § 542(a) and impairs the Trustee's ability to recover and administer estate property for the benefit of creditors.

## RESERVATION OF RIGHTS

Plaintiff reserves the right to bring all other claims or causes of action that the Plaintiff may have against Chhor, on any and all grounds, as allowed under the law or in equity, including but not limited to, those claims not known by the Plaintiff at this time but that he may discover during the pendency of this adversary proceeding.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff prays for a judgment as follows:

### ON THE FIRST CLAIM FOR RELIEF:

1. The $75,000 transfer constitutes an unauthorized post-petition transfer of Estate property. Plaintiff seeks avoidance of the transfer under § 549(a).

### ON THE SECOND CLAIM FOR RELIEF:

2 Ordering turnover to the Trustee of the following: Ordering turnover to the Trustee of:

    a. The $75,000 payment received from Oakstone Law Group PC on or about July 27, 2023, or the value thereof;

    b. All documents and communications relating to that payment, including bank statements, copies of checks, deposit records, and any agreements or correspondence with Oakstone or its affiliates;

    c. Any additional financial records in Chhor's possession, custody, or control reflecting transfers from Oakstone, Touzi Capital, PECC Corp., Teracel Blockchain Fund II LLC, Swift Sync, Build Senior Living Center, or any other entity identified in prior pleadings as part of the fraudulent transfer scheme; and

    d. A sworn declaration identifying all payments or benefits received from the above entities within the last four years.

3. *(Reservation: Trustee reserves the right to seek additional turnover of client files, ACH data, and system credentials if evidence shows Chhor's involvement in broader post-petition diversion of estate assets.)*

## ON ALL CLAIMS FOR RELIEF:

1. Granting any other and further relief as the Court deems just and proper.

Dated: December 17, 2025

                            Respectfully submitted,

                            DINSMORE & SHOHL LLP

                            By: */s/ Julian Pecora*
                                  Christopher B. Ghio
                                  Julian Pecora
                                  Attorneys for Richard A. Marshack,
                                  Trustee of the LPG Liquidation Trust

32